# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, THE
EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY,

                      Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

---

## NOTICE OF SUBMISSION OF FOURTH AMENDED
## PLAN SUPPLEMENT AND PLAN RELATED
## DOCUMENTS BY THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PLEASE TAKE NOTICE** that on October 11, 2021, that the Financial Oversight and

Management Board for Puerto Rico (the "<u>Oversight Board</u>"), as the representative of the

Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico ("<u>ERS</u>"), and the Puerto Rico Public Buildings

Authority ("<u>PBA</u>") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and*

*Economic Stability Act* ("<u>PROMESA</u>"),[2] filed the *Plan Supplement and Plan Related Documents*

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four
(4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto
Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales
Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal
Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-
3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of
the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal
Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS)
(Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy
Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as
Bankruptcy Case numbers due to software limitations).

[2]    PROMESA is codified at 48 U.S.C. §§ 2101–2241.

of the Commonwealth of Puerto Rico, et al. (the "Original Plan Supplement") [Case No. 17-BK-3283-LTS, ECF No. 18470], containing documents listed on Schedule 1 thereto, pursuant to Section 1.395 of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627].[3]

**PLEASE TAKE FURTHER NOTICE** that on November 4, 2021, the Oversight Board filed the *Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 19062] (the "Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that on November 21, 2021, the Oversight Board filed the *Second Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 19326] (the "Second Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that on February 3, 2022, the Oversight Board filed the *Third Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 20019] (the "Third Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the Oversight Board has filed the *Fourth Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (the "Fourth Amended Plan Supplement"). The Fourth Amended Plan Supplement is attached hereto as **Exhibit A**, containing documents listed on **Schedule 1** hereto (collectively, the "Plan Related Documents").

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases

---

[3] Capitalized terms used herein that are not otherwise defined shall have the meanings given to them in the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2021 [ECF No. 19784].

are available  (a)  free of charge by visiting  https://cases.primeclerk.com/puertorico  or by calling

+1 (844) 822-9231,  and (b) on the Court's  website at http://www.prd.uscourts.gov,  subject to the

procedures and fees set forth therein.

Dated: March 15, 2022
      San Juan, Puerto Rico

Respectfully  submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

**Schedule 1**

**List of Exhibits in the Fourth Amended Plan Supplement**

| Exhibit A: | New GO Bond Trust Agreement |
| Exhibit B: | CVI Trust Agreement |
| Exhibit C: | Avoidance Actions Trust Agreement |
| Exhibit D: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit E: | Assured Custodial Trust Agreement[4] |
| Exhibit F: | FGIC Custodial Trust Agreement[5] |
| Exhibit G: | Act 53-2021 approved on October 26, 2021[6] |
| Exhibit H: | Pension Reserve Deed of Trust and Guidelines |
| Exhibit I: | FGIC – CW/HTA Bond Claim Escrow Account Agreements |
| Exhibit J: | Debt Management Policy |

---

[4]   Due to the numerous Assured custodial trust agreements for the various series of bonds, only one Assured Custodial Trust Agreement is included in the Plan Supplement.

[5]   Due to the numerous FGIC custodial trust agreements for the various series of bonds, only one FGIC Custodial Trust Agreement is included in the Plan Supplement.

[6]   The English version of Act 53-2021 begins on page 36 of Exhibit G.

**<u>Exhibit A</u>**

**Fourth Amended Plan Supplement**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, THE
EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY,

                     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## FOURTH AMENDED PLAN SUPPLEMENT AND PLAN RELATED DOCUMENTS OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## Table of Contents

| | |
|---|---|
| Exhibit  A: | New GO Bond Trust Agreement |
| Exhibit  B: | CVI Trust Agreement |
| Exhibit  C: | Avoidance Actions Trust Agreement |
| Exhibit  D: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit  E: | Assured Custodial Trust Agreement[2] |
| Exhibit  F: | FGIC Custodial Trust Agreement[3] |
| Exhibit  G: | Act 53-2021 approved on October 26, 2021[4] |
| Exhibit  H: | Pension Reserve Deed of Trust and Guidelines |
| Exhibit  I: | FGIC – CW/HTA Bond Claim Escrow Account Agreements |
| Exhibit  J: | Debt Management Policy |

---

[2]    Due to the numerous Assured custodial trust agreements for the various series of bonds, only one Assured Custodial Trust Agreement is included in the Plan Supplement.

[3]    Due to the numerous FGIC custodial trust agreements for the various series of bonds, only one FGIC Custodial Trust Agreement is included in the Plan Supplement.

[4]    The English version of Act 53-2021 begins on page 36 of Exhibit G.

## **EXHIBIT A**

New GO Bond Trust Agreement

The enclosed electronic (PDF) document has been created by scanning an original paper document. Optical Character Recognition (OCR) has been used to create searchable text. OCR technology is not perfect, and therefore some words present in the original document image may be missing or altered or may run together with adjacent words in the searchable text.

# TRUST AGREEMENT

**by and between**

## COMMONWEALTH OF PUERTO RICO

**and**

## UMB BANK, N.A., as Trustee

**Dated as of March 15, 2022**

Relating to the
Commonwealth of Puerto Rico
General Obligation Restructured Bonds

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION ................................................. 4

Section 1.01       Definitions................................................................................ 4
Section 1.02       Rules of Construction .............................................................. 14

ARTICLE II. AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2022A BONDS .. 14

Section 2.01       Authorization of Bonds ........................................................... 14
Section 2.02       Provisions for Issuance of Bonds............................................. 15
Section 2.03       Supplemental Trust Agreements............................................... 17
Section 2.04       Maturity Dates, Principal Amounts and Interest Rates for Series 2022A
                   Current Interest Bonds ............................................................ 18
Section 2.05       Maturity Dates, Principal Amounts and Interest Rates for Series 2022A
                   Capital Appreciation Bonds .................................................... 18
Section 2.06       Reserved................................................................................. 18
Section 2.07       Interest Payments and Interest Accretion ................................. 18

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ....................................... 19

Section 3.01       Place and Medium of Payment ................................................ 19
Section 3.02       Legends.................................................................................. 20
Section 3.03       CUSIP Numbers...................................................................... 20
Section 3.04       Execution and Authentication.................................................. 20
Section 3.05       Interchangeability of Bonds .................................................... 21
Section 3.06       Transfer and Registry.............................................................. 21
Section 3.07       Transfer of Bonds ................................................................... 21
Section 3.08       Regulations with Respect to Exchanges and Transfers ................. 22
Section 3.09       Bonds Mutilated, Destroyed, Lost or Stolen............................. 22
Section 3.10       Book Entry Bonds.................................................................. 23
Section 3.11       Preparation of Definitive Bonds; Temporary Bonds ...................... 24

ARTICLE IV. REDEMPTION OF BONDS ......................................................... 24

Section 4.01       Authorization of Redemption .................................................. 24
Section 4.02       Redemption at the Election of the Commonwealth ...................... 25
Section 4.03       Redemption Other Than at Commonwealth's Election .................. 25
Section 4.04       Redemption Prices and Terms of Series 2022A Bonds ................... 25
Section 4.05       Selection of Bonds to be Redeemed ......................................... 30
Section 4.06       Notice of Redemption ............................................................ 31
Section 4.07       Payment of Redeemed Bonds .................................................. 32

ARTICLE V. STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS
AND ACCOUNTS;  COMMONWEALTH REVENUES AND APPLICATION THEREOF ... 32

Section 5.01       Statutory Lien in Debt Service Fund ........................................ 32
Section 5.02       Establishment of Funds and Accounts...................................... 33
Section 5.03       Application of Bond Proceeds ................................................ 33

4842-1351-5245.34

# TABLE OF CONTENTS
## (continued)

**Page**

Section 5.04      Application of Money in the Costs of Issuance Fund ........................ 33
Section 5.05      Application of Moneys ........................................................................ 34
Section 5.06      Debt Service Fund .............................................................................. 34
Section 5.07      Arbitrage Rebate Fund ....................................................................... 35
Section 5.08      Trustee Expenses Fund. ...................................................................... 36
The Trustee Expenses Fund shall be held for the benefit of the Trustee as provided herein
                  and maintained by the Trustee. ............................................................ 36
Section 5.09      Transfer of Investments ...................................................................... 36

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS ..................... 36

Section 6.01      Security for Deposits ........................................................................... 36
Section 6.02      Investment of Funds and Accounts Held by the Trustee .................... 36
Section 6.03      Liability for Investments ..................................................................... 37

ARTICLE VII. PARTICULAR COVENANTS ....................................................................... 37

Section 7.01      Payment of Principal and Interest ...................................................... 37
Section 7.02      Pledge of Good Faith and Credit; Bonds Constitute Public Debt .......... 38
Section 7.03      Deemed Annual Allocation ................................................................. 38
Section 7.04      Powers as to Bonds ............................................................................. 38
Section 7.05      Further Assurance ............................................................................... 38
Section 7.06      Offices for Payment and Registration of Bonds ............................... 39
Section 7.07      General ................................................................................................ 39
Section 7.08      Non-Impairment Covenant ................................................................. 39
Section 7.09      Tax Exemption Covenant .................................................................... 39
Section 7.10      Comprehensive Cap on Net Tax-Supported Debt .............................. 39
Section 7.11      Fiscal Plan .......................................................................................... 40
Section 7.12      Reporting Requirements ..................................................................... 40

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT ..................... 40

Section 8.01      Appointment and Acceptance of Trustee ........................................... 40
Section 8.02      Appointment and Acceptance of Paying Agents ............................... 40
Section 8.03      Responsibilities of Trustee and Paying Agents ................................. 41
Section 8.04      Property Held in Trust ........................................................................ 41
Section 8.05      Rights of the Trustee and the Paying Agent ...................................... 41
Section 8.06      Compensation and Indemnification .................................................... 43
Section 8.07      Permitted Acts .................................................................................... 44
Section 8.08      Resignation of Trustee ........................................................................ 44
Section 8.09      Removal of Trustee ............................................................................. 45
Section 8.10      Successor Trustee and/or Paying Agent ............................................ 45
Section 8.11      Transfer of Rights and Property to Successor Trustee ....................... 46
Section 8.12      Merger or Consolidation of the Trustee .............................................. 46
Section 8.13      Ancillary Agreements ......................................................................... 46

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS ........................................................ 47

Section 9.01     Modification and Amendment without Consent .................................. 47
Section 9.02     Supplemental Trust Agreements Effective with Consent of Bondholders ........ 48
Section 9.03     General Provisions Relating to Supplemental Trust Agreements ..................... 48

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT ....................................... 49

Section 10.01    Powers of Amendment ................................................................... 49
Section 10.02    Consent of Bondholders ................................................................ 50
Section 10.03    Modifications by Unanimous Consent ............................................. 50
Section 10.04    Mailing ....................................................................................... 50
Section 10.05    Exclusion of Bonds ...................................................................... 51
Section 10.06    Notation on Bonds ....................................................................... 51

ARTICLE XI. DEFAULTS AND REMEDIES ............................................................ 51

Section 11.01    Events of Default ......................................................................... 51
Section 11.02    No Acceleration with Respect to the Bonds ................................... 52
Section 11.03    Enforcement of Remedies ............................................................ 52
Section 11.04    Priority of Payments after Default ................................................ 53
Section 11.05    Termination of Proceedings ......................................................... 54
Section 11.06    Bondholders' Direction of Proceedings ......................................... 54
Section 11.07    Control by Holders of Bonds; Limitations ..................................... 54
Section 11.08    Actions by Trustee; Possession of Bonds by Trustee Not Required ............... 55
Section 11.09    Waiver and Non–Waiver of Default ............................................... 55
Section 11.10    Notice of Event of Default ............................................................ 55
Section 11.11    Remedies Not Exclusive ............................................................... 56

ARTICLE XII. DEFEASANCE .............................................................................. 56

Section 12.01    Defeasance .................................................................................. 56

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY BONDHOLDERS  AND PROOF
OF OWNERSHIP OF BONDS .............................................................................. 58

Section 13.01    Evidence of Signatures of Bondholders and Ownership of Bonds ................... 58

ARTICLE XIV. MISCELLANEOUS ...................................................................... 59

Section 14.01    Preservation and Inspection of Documents .................................... 59
Section 14.02    Money and Funds Held for Particular Bonds ................................. 59
Section 14.03    Cancellation of Bonds .................................................................. 59
Section 14.04    No Recourse under Trust Agreement or on the Bonds ..................... 59
Section 14.05    Severability of Invalid Provision ................................................. 59
Section 14.06    Parties of Interest ........................................................................ 59
Section 14.07    Certain Provisions Relating to Capital Appreciation Bonds ............ 60

- iii -

# TABLE OF CONTENTS
## (continued)

                                                                                                          **Page**

Section 14.08   Notices ......................................................................................................... 60
Section 14.09   Headings ....................................................................................................... 61
Section 14.10   Governing Laws ............................................................................................ 61
Section 14.11   Retention of Jurisdiction of Title III Court ................................................... 61
Section 14.12   Signatures and Counterparts ......................................................................... 61
Section 14.13   Successors and Assigns.................................................................................. 61
Section 14.14   Conflicts ........................................................................................................ 61
Section 14.15   Force Majeure ............................................................................................... 62


EXHIBIT A – FORM OF SERIES 2022A CURRENT INTEREST BONDS ........................... A-1
EXHIBIT B – FORM OF SERIES 2022A CAPITAL APPRECIATION BONDS ................. B-1
EXHIBIT C – ACCRETED VALUE TABLE ......................................................................... C-1
EXHIBIT D – CONFIRMATION ORDER ............................................................................. D-1
EXHIBIT E – REPORTING AGREEMENT ...........................................................................E-1
EXHIBIT F – TRUSTEE FEE SCHEDULE............................................................................F-1

4842-1351-5245.34

# TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and **UMB BANK, N.A.**, a national banking association, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Bondholders that it has authorized this Trust Agreement.

## R E C I T A L S

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below), the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were the resolution of certain claims relating to the Commonwealth's direct and guaranteed general obligation debt and certain other liabilities of the Commonwealth and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Bonds (as defined below) pursuant to this Trust Agreement.

On October 26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the Act (as defined below) which, among other things authorized the issuance of the Series 2022A Bonds.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the Act, the Title III Court made a binding determination that the Bonds are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Commonwealth law and federal law:

a.     The Confirmation Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.

b.     Confirmation of the Plan constitutes a judicial determination, pursuant to Section 4 of PROMESA, that all laws, rules and regulations giving rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules and regulations.

c.     The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and of the Plan, and the Bonds in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

d.     Pursuant to PROMESA, including Section 4 thereof, as well as Sections 944 and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Title III Court determined that the Bonds, and the covenants by the Commonwealth, for the benefit of the Holders of the Bonds as provided in the Act, this Trust Agreement or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

e.     The Bonds are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the Commonwealth may legally pledge its good faith[1], credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of the Bonds.

f.     Pursuant to the Act, the Commonwealth has validly pledged its good faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for payment with respect to the Bonds.

g.     In light of the enactment of the Act, upon execution by all parties hereto, this Trust Agreement shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with its terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

h.     At the time of issuance and delivery of the Bonds, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Bonds a legend substantially as follows:

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

4842-1351-5245.34

DETERMINED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11
U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY
BINDING, AND ENFORCEABLE PURSUANT TO THE
JUDGMENT AND CONFIRMATION ORDER, ENTERED ON
THE 18TH DAY OF JANUARY, 2022

All things have been done which are necessary to make the Bonds, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust agreement for the security of the Bonds, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Bonds as follows:

This Trust Agreement provides for the following transactions:

(a)     issuance by the Commonwealth of its general obligations to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the Act:

(b)     the statutory lien on moneys deposited into the Debt Service Fund (as defined herein) established herein; and

(c)     the rights and remedies of the holders from time to time of the Commonwealth's Bonds.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, the moneys on deposit in the Debt Service Fund shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the moneys on deposit in the Debt Service Fund, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a)(i) the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Principal (as defined below) of Bonds with interest, according to the provisions set forth in the Bonds, respectively, and each of them or (ii) shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01

- 3 -

of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, and (b) shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Bonds remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act, the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Bonds are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions**.  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Accreted Value"** means, with respect to the Capital Appreciation Bonds, as of the date of calculation, the principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated in Section 2.05 herein or within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Commonwealth, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; ***provided, however***, that Accreted Value shall be, as of the time of the Commonwealth actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond from the prior Valuation Date.

**"Act"** means Act No. 53-2021.

- 4 -

"**Ancillary Agreements**" means the Trust Agreement, the Confirmation Order, the Plan, the Reporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

"**Arbitrage Rebate Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Authorized Denominations**" means, with respect to the Series 2022A Capital Appreciation Bonds, $1.00 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2022A Current Interest Bonds, $1.00 in Principal amount or any integral multiple thereof.

"**Authorized Officer**" means (a) in the case of the Commonwealth, the Governor of the Commonwealth, the Secretary of Treasury or such other officer of a Government Entity as may be designated by the Governor through executive order, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

"**Bond**" means any bond, including the Series 2022A Bonds, of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof and, with respect to the Refunding Bonds the applicable Supplemental Trust Agreement.

"**Bondholder**", "**Holder of Bonds**" or "**Holder**" or any similar term, when used with reference to a Bond or Bonds, means the registered owner thereof; *provided, however*, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (i) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (ii) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

"**Bond Insurance Policy**" means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

"**Bond Insurer**" means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

"**Book Entry Bond**" means a Bond issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

"**Capital Appreciation Bond**" means any Bond as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

"**Costs of Issuance**" means the items of expense to be paid by the Commonwealth which are incurred prior to, upon and during a reasonable period of time after issuance of the Bonds of a Series, in each case in connection with the authorization, sale and issuance of the Bonds, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel, other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and safekeeping of the Bonds, premiums, fees and charges for insurance on the Bonds, and other costs, charges and fees in connection with the foregoing.

"**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Corporate Trust Office**" means the designated office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at ███████████████████████████████████, Attention: ███████████, or such other address as the Trustee may designate from time to time by notice to the Holders and the Commonwealth, or the designated corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Commonwealth).

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue

assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement (as defined in the Plan); and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Defeasance Security**" means:

(a)   a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)   any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Bonds to serve as securities depository for Bonds of such Series, or any successor of any of the foregoing, as applicable.

"**Effective Date**" means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys

4842-1351-5245.34

issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

"**Eligible Investments**" means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)     Defeasance Securities;

(b)     interest-bearing general obligations of the United States of America;

(c)     United States of America treasury bills and other non-interest-bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)     short-term discount U.S. Government Obligations;

(e)     certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)     banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)     commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)     tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Commonwealth's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)     Investment Agreements that are fully collateralized by Eligible Investments; and

(k)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

- 8 -

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Plan**" means a Fiscal Plan (as defined by Section 5(10) of PROMESA) of the Commonwealth, certified by the Oversight Board.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**General Fund**" means the Commonwealth's primary operating fund.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Interest Payment Date**" means each January 1 and July 1; provided, however, that with respect to the Series 2022A Bonds that are not issued as Capital Appreciation Bonds, such term also includes the Effective Date.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.

"**Maturity Value**" means, with respect to a Series 2022A Capital Appreciation Bond, the Accreted Value due at stated maturity if no Sinking Fund Installment on such Bond is paid prior to stated maturity.

"**Monthly Disbursement Date**" means the first Business Day of each calendar month.

- 9 -

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Outstanding**", when used in reference to Bonds, means, as of a particular date, all such Bonds authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)     any Bonds canceled by the Trustee at or before such date;

(b)     any Bonds deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Bond canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof; and

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Bonds hereunder, any Bond deemed to not be Outstanding in accordance with Section 10.05 hereof.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Bonds of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code, and the terms thereof.

"**Principal**" means collectively, the principal payment required to be made on a Bond on its final maturity date and each Sinking Fund Installment of a Bond due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Principal Payment Date**" means each July 1.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

**"Qualified Financial Institution"** means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)     a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)     a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)     a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)     the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)     a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.  In the event that two or more groups of Holders satisfy the percentage requirement set forth

- 11 -

in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Bonds (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Confirmation**" means the written confirmation of a relevant Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to each of the Bonds rated by such Rating Service will remain unchanged and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

"**Redemption Date**" means each date of redemption specified in Section 4.04 hereof for the redemption of Series 2022A Capital Appreciation Bonds.

"**Redemption Price**" when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.02 hereof.

"**Reporting Agreement**" means the Reporting Agreement (Commonwealth of Puerto Rico General Obligation Restructured Bonds), dated as of March 15, 2022, as executed and delivered by the Commonwealth and as amended or supplemented from time to time.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**S&P**" means S&P Global Ratings and its successors.

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Serial Bonds**" means the Bonds so designated in a Supplemental Trust Agreement.

"**Series**" means with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.07 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

"**Series 2022A Bonds**" means the Commonwealth's General Obligation Restructured Bonds, Series 2022A authorized and issued pursuant to Article II of this Trust Agreement, which

are issued as Tax Exempt Bonds, which consist of, collectively, the Series 2022A Capital Appreciation Bonds and the Series 2022A Current Interest Bonds.

"**Series 2022A Capital Appreciation Bonds**" means the Series 2022A Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024 and July 1, 2033.

"**Series 2022A Current Interest Bonds**" means the Series 2022A Bonds issued as current interest bonds, which have stated maturity dates of July 1, 2023, July 1, 2025, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041 and July 1, 2046.

"**Sinking Fund Installment**" means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Bonds which mature after said future July 1, but does not include any amount payable by the Commonwealth by reason only of the maturity of a Bond.

"**Statutory Lien**" means the statutory first lien on the amounts deposited into the Debt Service Fund established with the Trustee for the purpose of securing the payment of the Bonds, including any income and revenues generated therefrom, which statutory first lien is created under and imposed by Article 203 of the Act.

"**Supplemental Trust Agreement**" means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**Taxable Bond**" means all Bonds issued pursuant to this Trust Agreement other than Tax Exempt Bonds.

"**Tax Exempt Bond**" means any Bond as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

"**Term Bond**" means a Bond so designated and payable from Sinking Fund Installments.

"**Title III Cases**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trustee**" means the entity or organization appointed as Trustee for the Bonds pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any entity or organization which may at any time be substituted in its place pursuant hereto.

- 13 -

"**Trustee Expenses Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**Valuation Date**" means with respect to any Capital Appreciation Bond, each January 1 and July 1; provided, however, that with respect to the Series 2022A Bonds that are issued as Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement. All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

### AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2022A BONDS

**Section 2.01   Authorization of Bonds**.  (a)  There are hereby authorized to be issued Bonds of the Commonwealth to be designated as "Commonwealth of Puerto Rico General Obligation Restructured Bonds," which, in accordance with, and as provided by, Article 203 of the Act are secured by the Statutory Lien.  The aggregate principal amount of Bonds which may be executed, authenticated and delivered is not limited except as provided hereby and in the Act, the Plan, the Confirmation Order, and the terms and conditions authorized by the Commonwealth and set forth in the Ancillary Agreements.

(b)   On the Effective Date, the Commonwealth is hereby authorized to issue, with a deemed issuance date of July 1, 2021, and deliver the Series 2022A Bonds consisting of (i) $6,683,270,000 aggregate principal amount of the Series 2022A Current Interest Bonds and (ii) $1,170,550,000 aggregate principal amount in Maturity Value of Series 2022A Capital Appreciation Bonds.  Each maturity of the Series 2022A Bonds is hereby designated as a Term

- 14 -

Bond.   The Series 2022A Bonds are Tax Exempt Bonds and are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series 2022A".

(c)     The form of the Series 2022A Current Interest Bonds is attached hereto as Exhibit A.   The form of the Series 2022A Capital Appreciation Bonds is attached hereto as Exhibit B.

**Section 2.02   Provisions for Issuance of Bonds**.   The Commonwealth shall issue Bonds under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Authorized Officer of the Commonwealth, or his or her designee; provided, however, that such direction may not conflict with the terms of this Trust Agreement, the Act, the Plan or the Confirmation Order.   The Series 2022A Bonds are permitted to be issued as provided herein.   The issuance of any Series of Refunding Bonds permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements.   The Bonds of a Series authorized to be issued shall be executed by the Commonwealth and delivered to the Trustee.   Such Bonds shall from time to time and in such amounts as directed by the Commonwealth be authenticated by the Trustee and by it delivered to or upon the order of the Commonwealth upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a)     a copy of this Trust Agreement and, with respect to any Series of Bonds other than the Series 2022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, certified by an Authorized Officer of the Commonwealth;

(b)     a written order as to the delivery of such Bonds, signed by an Authorized Officer of the Commonwealth, describing the Bonds to be delivered, designating the Person(s) to whom such Bonds are to be delivered and stating the consideration for such Bonds;

(c)     a certificate signed by the Secretary of the Treasury relating to (i) authorization and due execution of the Bond documents; (ii) signature of the Bonds; (iii) order to authenticate and deliver the Bonds; (vi) application of proceeds of the Bonds (if any) and (vii), compliance by the Commonwealth with any debt limits applicable as of the date of issuance of the Bonds, including any applicable debt limit (if any) contained in the Constitution and, with respect to any Series of Bonds other than the Series 2022A Bonds, the Comprehensive Cap, which certificate shall describe any assumptions with respect to the calculation of such debt limit; with respect to any Series of Bonds other than the Series 2022A Bonds, a certificate of AAFAF regarding the resolution approving the issuance of the Bonds and confirming its recommendations to the Governor of the Commonwealth and the Secretary of Treasury as to the details of the Bonds;

(d)     an opinion of Transaction Counsel to the effect that (i) the Trust Agreement and any applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Bonds have been duly authorized, executed and delivered by the Commonwealth in accordance with the Act and the Trust Agreement, (iv) upon the execution and delivery thereof and upon authentication by the Trustee, the Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth and entitled to the benefits of the Trust Agreement, (v) the Bonds constitute valid and binding general obligations of the Commonwealth for which the good

faith, credit and taxing power of the Commonwealth are irrevocably pledged, and (vi) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes, *provided, however,* that such opinions may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; *provided, further*, that such opinions may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy; and *provided, further,* that, with respect to the opinions in (i), (iii), (v) and (vi), Transaction Counsel may rely in the opinion of Puerto Rico counsel, or Puerto Rico counsel may independently deliver such opinions to the Trustee;

(e)      an opinion of the Secretary of Justice of the Commonwealth to the effect that (i) the Act been legally enacted in accordance with the laws of the Commonwealth, is valid and in full force and effect, (ii) no litigation is pending, or, to the best of his or her knowledge, threatened (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for or the validity of this Trust Agreement, the applicable Supplemental Trust Agreement, the Bonds, the issuance of the Bonds, or the repayment of other indebtedness of the Commonwealth as set forth in this Trust Agreement, (C) in any way contesting the power of the Authorized Officer of the Commonwealth to issue the Bonds or the power of the Commonwealth to deliver the Bonds, or (D) in any way contesting the pledge of the good faith, credit and taxing power of the Commonwealth to the prompt payment of the Principal of and interest on the Bonds, except, in the case of the Series 2022A Bonds, as provided in such opinion, (iii) the Bonds constitute "public debt" within the meaning of Sections 2 and 8 of Article VI of the Commonwealth Constitution, and (iv) the Secretary of Treasury is authorized to transfer from any available resources of the Commonwealth such amounts necessary to make the payments required under the Bonds pursuant to this Trust Agreement; *provided, however,* that such opinion of the Secretary of Justice of the Commonwealth may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determinations address and provide for such matters;

(f)      for each issuance of Refunding Bonds, a certificate of an Authorized Officer of the Commonwealth demonstrating that upon the issuance of such Series of Refunding Bonds:

(A)      the final maturity date of the Refunding Bonds is not later than thirty (30) years from the original scheduled maturity date of the Outstanding Bonds to be refunded; and

(B)      upon the issuance of any Refunding Bonds, (1) there is no increase in the amount of Principal and interest due on Outstanding Bonds in any Fiscal Year and (2) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified in the Debt Management Policy; provided, however, that, refinancings without cash flow savings in any Fiscal Year are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic,

- 16 -

terrorism or other natural disaster and similar emergencies and debt service due in any Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

**Section 2.03   Supplemental Trust Agreements**.  Each Supplemental Trust Agreement authorizing the issuance of Refunding Bonds shall specify the following:

(a)      The authorized principal amount of such Series of Bonds;

(b)      The date or dates of the Bonds, the maturity date or dates and Principal amounts of each maturity of the Bonds of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Bonds of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Bonds of such Series;

(c)      The interest rate or rates, if any, on the Bonds of such Series and the first date on which interest on the Bonds of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Bonds be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Bond or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Bond;

(d)      If all or a portion of the Bonds of such Series are Capital Appreciation Bonds, the Valuation Dates for such Bonds and the Accreted Value on each such Valuation Date;

(e)      The denomination or denominations of and the manner of numbering and lettering of the Bonds of such Series;

(f)      The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Bonds of such Series;

(g)      Provisions for the sale or exchange of the Bonds of such Series and for the delivery thereof;

(h)      The form of the Bonds of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Bonds of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)      Directions for the application of the proceeds of the Bonds of such Series;

(j)      If all or a portion of such Bonds will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; ***provided, however,*** in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon); and

(k)      Any other provisions deemed advisable by an Authorized Officer of the Commonwealth not in conflict with the provisions hereof or of any Ancillary Agreement.

- 17 -

4842-1351-5245.34

**Section 2.04    Maturity Dates, Principal Amounts and Interest Rates for Series 2022A Current Interest Bonds**.  The Series 2022A Current Interest Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|------------------|---------------|-------|
| 2023 | $725,770,000 | 5.250% | 74514L3E5 |
| 2025 | 723,735,000 | 5.375 | 74514L3F2 |
| 2027 | 717,180,000 | 5.625 | 74514L3G0 |
| 2029 | 705,545,000 | 5.625 | 74514L3H8 |
| 2031 | 685,290,000 | 5.750 | 74514L3J4 |
| 2033 | 649,835,000 | 4.000 | 74514L3K1 |
| 2035 | 584,115,000 | 4.000 | 74514L3L9 |
| 2037 | 501,325,000 | 4.000 | 74514L3M7 |
| 2041 | 681,610,000 | 4.000 | 74514L3N5 |
| 2046 | 708,865,000 | 4.000 | 74514L3P0 |

**Section 2.05    Maturity Dates, Principal Amounts and Interest Rates for Series 2022A Capital Appreciation Bonds**.  The Series 2022A Capital Appreciation Bonds shall accrue and accrete at such rates and shall mature on July 1 of each year set forth below and in the Maturity Value set forth below:

| Year | Initial Accreted Amount | Maturity Value[†] | Interest Rate | CUSIP |
|------|-------------------------|-------------------|---------------|-------|
| 2024 | $288,241,989.75 | $334,275,000.00 | 5.000% | 74514L3Q8 |
| 2033 | 442,506,553.50 | $836,275,000.00 | 5.375 | 74514L3R6 |

_____
[†]   "Maturity Value" reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

**Section 2.06    Reserved**.

**Section 2.07    Interest Payments and Interest Accretion**.   (a) The Series 2022A Current Interest Bonds shall bear interest from: (i) July 1, 2021 until January 1, 2022, payable on the Effective Date and (ii) January 1, 2022 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth), payable semiannually after the Effective Date on each Interest Payment Date, at the rates provided above.  Interest on the Series 2022A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

(b)     Interest on the Series 2022A Capital Appreciation Bonds shall accrue and accrete from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth).   Interest on the Series 2022A Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof

- 18 -

in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Commonwealth).  See "Exhibit C - Table of Accreted Value for the Series 2022A Capital Appreciation Bonds" for the Accreted Values for Series 2022A Capital Appreciation Bonds on each Valuation Date, assuming that no Sinking Fund Installment will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01   Place and Medium of Payment**.  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) as otherwise provided in Section 4.07 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds shall be payable at the Corporate Trust Office.  Interest on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Commonwealth or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series.  For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.  All payments of Principal and interest shall be rounded to the nearest $1.00.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof. Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; *provided, however,* that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds, which shall capitalize on each Interest Payment Date. For the avoidance of doubt, if any Principal of, or accrued interest on, a Bond is not paid when due, such Principal and interest shall remain due and payable until paid.

- 19 -

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed herein with respect to the Series 2022A Bonds or by the Supplemental Trust Agreement authorizing the issuance of Refunding Bonds. Interest on all Bonds (other than Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year. The first installment of interest due on the Bonds of a Series may be for such period as the Commonwealth shall fix herein with respect to the Series 2022A Bonds or in the Supplemental Trust Agreement authorizing the issuance thereof of the Refunding Bonds.

**Section 3.02   Legends**. The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Commonwealth prior to their delivery. The Series 2022A Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022."

**Section 3.03   CUSIP Numbers**. The Commonwealth shall provide for the assignment of CUSIP numbers for all Bonds ((including a separate CUSIP for each Series (and, where applicable, the subseries of such Series evidenced by such subseries' stated maturity date) of the Series 2022A Current Interest Bonds, the Series 2022A Capital Appreciation Bonds and any future Series (and, where applicable, subseries of such Series evidenced by such subseries' stated maturity date) of Bonds issued pursuant to a Supplemental Trust Agreement) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; ***provided, however***, that the Trustee shall have no liability for any defect in the CUSIP numbers as they appear on any Bond, notice or elsewhere, ***provided, further,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption. The Commonwealth shall promptly notify the Trustee, in writing, of any change in the CUSIP numbers assigned to any Bond of which the Commonwealth has knowledge. The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication**. The Bonds shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer of the Commonwealth, or in such other manner as may be permitted by law. In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Bonds had not ceased to hold such offices or be so employed. Any Bond may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Bonds such Persons may not have been so authorized or have held such office or employment.

4842-1351-5245.34

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth herein with respect to the Series 2022A Bonds or in the Supplemental Trust Agreement authorizing the issuance of the Bonds, executed manually by the Trustee.  Each time the Trustee is required to authenticate a Bond hereunder, the Commonwealth shall deliver a written order as to the delivery of such Bonds, signed by an Authorized Officer of the Commonwealth, describing the Bonds to be delivered and designating the Person(s) to whom such Bonds are to be delivered, and requesting that the Trustee authenticate the Bonds.  Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Bond executed on behalf of the Commonwealth shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds**.  Bonds, upon surrender thereof at the Corporate Trust Office with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry**.  So long as any of the Bonds remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the Corporate Trust Office, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer.  So long as any of the Bonds remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Bonds at the Corporate Trust Office.

**Section 3.07   Transfer of Bonds**.  Each Bond shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the Corporate Trust Office, by the registered owner thereof in Person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Bond, the Commonwealth shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may conclusively rely on the information provided to it and shall have no responsibility whatsoever to validate, verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Bond shall be registered upon the books of the Commonwealth as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment

4842-1351-5245.34

of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary.  The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting without gross negligence or willful misconduct hereunder, in so treating such registered owner.

Section 3.08   **Regulations with Respect to Exchanges and Transfers**.  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

Section 3.09   **Bonds Mutilated, Destroyed, Lost or Stolen**.  In case any Bond shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and Principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such fees and expenses as the Commonwealth and the Trustee may incur in connection therewith.  All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth

- 22 -

and the Trustee may prescribe and paying such fees and expenses as the Commonwealth and the Trustee may incur in connection therewith.

     **Section 3.10   Book Entry Bonds**.  Anything herein to the contrary notwithstanding, the Series 2022A Bonds shall be authorized and issued as Book Entry Bonds and any other Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

     For all purposes of the Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond.  The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever.  The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid.  No Person other than the Depository shall receive a Bond or other instrument evidencing the Commonwealth's obligation to make payments of the Principal or Redemption Price thereof and interest thereon.

     Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the Principal amount of such Bond Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Bond.

     The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other Person, may terminate the services of the Depository with respect to a Book Entry Bond if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests,

- 23 -

as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by Bondholders transferring or exchanging such Bonds, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may conclusively rely on the information provided to it and shall have no responsibility whatsoever to validate, verify or ensure the accuracy of such information.

**Section 3.11  Preparation of Definitive Bonds; Temporary Bonds**.  The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.  The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the Corporate Trust Office of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the Corporate Trust Office, definitive Bonds of the same aggregate Principal amount, Series and maturity as the temporary Bonds surrendered.  Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01  Authorization of Redemption**.  Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

- 24 -

**Section 4.02   Redemption at the Election of the Commonwealth**.  In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Commonwealth shall give written notice to the Trustee of its election to redeem, of the Series and of the Principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed.  Such notice shall be given not less than thirty (30) days prior to the redemption date.  The Series, maturities and Principal amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein (including, without limitation, Section 4.05 below) or in the Supplemental Trust Agreement authorizing such Series. The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

**Section 4.03   Redemption Other Than at Commonwealth's Election**.  Whenever by the terms hereof (with respect to the Series 2022A Bonds) or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.05 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04   Redemption Prices and Terms of Series 2022A Bonds**.  The Series 2022A Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 4.04.

(a)   *Optional Redemption*.  The Series 2022A Current Interest Bonds maturing on or before July 1, 2031 are not subject to optional redemption prior to stated maturity.  The Series 2022A Capital Appreciation Bonds maturing on July 1, 2024 are not subject to optional redemption prior to stated maturity.

The Series 2022A Current Interest Bonds maturing on July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041, and July 1, 2046 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

The Series 2022A Capital Appreciation Bonds maturing on July 1, 2033 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

- 25 -

| Redemption Period | Redemption Price |
|---|---|
| On or after July 1, 2031 | 100% of Accreted Value |

(b)  *Mandatory Redemption for the Series 2022A Current Interest Bonds*.  The Series 2022A Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2022A Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2022A Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2022A Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022A Current Interest Bonds:

$725,770,000
Series 2022A
Current Interest Bonds
maturing July 1, 2023

| Year | Amount |
|---|---|
| 2022 | $ 362,815,000 |
| 2023[†] | 362,955,000 |

[†] Stated maturity.

$723,735,000
Series 2022A
Current Interest Bonds
maturing July 1, 2025

| Year | Amount |
|---|---|
| 2024 | $ 362,355,000 |
| 2025[†] | 361,380,000 |

[†] Stated maturity.

- 26 -

$717,180,000
Series 2022A
Current Interest Bonds
maturing July 1, 2027

| Year | Amount |
| --- | --- |
| 2026 | $ 359,535,000 |
| 2027[†] | 357,645,000 |

_____
[†] Stated maturity.

$705,545,000
Series 2022A
Current Interest Bonds
maturing July 1, 2029

| Year | Amount |
| --- | --- |
| 2028 | $ 354,755,000 |
| 2029[†] | 350,790,000 |

_____
[†] Stated maturity.

$685,290,000
Series 2022A
Current Interest Bonds
maturing July 1, 2031

| Year | Amount |
| --- | --- |
| 2030 | $ 345,650,000 |
| 2031[†] | 339,640,000 |

_____
[†] Stated maturity.

$649,835,000
Series 2022A
Current Interest Bonds
maturing July 1, 2033

| Year | Amount |
| --- | --- |
| 2032 | $ 332,265,000 |
| 2033[†] | 317,570,000 |

_____
[†] Stated maturity.

- 27 -

$584,115,000
Series 2022A
Current Interest Bonds
maturing July 1, 2035

| Year | Amount |
|------|--------|
| 2034 | $ 301,170,000 |
| 2035[†] | 282,945,000 |

[†] Stated maturity.

$501,325,000
Series 2022A
Current Interest Bonds
maturing July 1, 2037

| Year | Amount |
|------|--------|
| 2036 | $ 262,150,000 |
| 2037[†] | 239,175,000 |

[†] Stated maturity.

$681,160,000
Series 2022A
Current Interest Bonds
maturing July 1, 2041

| Year | Amount |
|------|--------|
| 2038 | $ 213,890,000 |
| 2039 | 186,135,000 |
| 2040 | 155,745,000 |
| 2041[†] | 125,840,000 |

[†] Stated maturity.

$708,865,000
Series 2022A
Current Interest Bonds
maturing July 1, 2046

| Year | Amount |
|------|--------|
| 2042 | $ 130,875,000 |
| 2043 | 136,110,000 |
| 2044 | 141,555,000 |
| 2045 | 147,220,000 |
| 2046[†] | 153,105,000 |

[†] Stated maturity.

4842-1351-5245.34

(c)      *Mandatory Redemption for the Series 2022A Capital Appreciation Bonds*.
The Series 2022A Capital Appreciation Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2022A Capital Appreciation Bond or portion thereof to be redeemed.  Unless none of the Series 2022A Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2022A Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022A Capital Appreciation Bonds:

$288,241,989.75 Initial Accreted Value
Series 2022A
Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value | Accreted Value at Redemption Date[*] | Maturity Value[**] |
|------|------------------------|--------------------------------------|--------------------|
| 2022 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 2023 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 2024[††] | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |

[*]  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$442,506,553.50 Initial Accreted Value
Series 2022A
Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value | Accreted Value at Redemption Date[*] | Maturity Value[**] |
|------|------------------------|--------------------------------------|--------------------|
| 2029 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 2030 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 2031 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 2032 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 2033[††] | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |

[*]  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

(d)      *Reserved.*

- 29 -

(e)      *Credit Against Sinking Fund Installments.*  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2022A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2022A Current Interest Bond (A) purchased by the Commonwealth with moneys in the Debt Service Fund pursuant to Section 5.06(b) of this Trust Agreement, (B) redeemed at the option of the Commonwealth pursuant to paragraph (a) of this Section, (C) purchased by the Commonwealth and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of this Trust Agreement.  Series 2022A Current Interest Bonds purchased pursuant to Section 5.06(b) of this Trust Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2022A Current Interest Bonds redeemed at the option of the Commonwealth, purchased by the Commonwealth (other than pursuant to Section 5.06(b) of this Trust Agreement), or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Commonwealth shall specify in a written direction of an Authorized Officer of the Commonwealth delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

**Section 4.05   Selection of Bonds to be Redeemed**.  Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the Principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the Principal amount of such Bonds to be redeemed.  In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.05 provided) which end in the same digit or in the same two digits.  In case, upon any drawing by groups, the total Principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine.  The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption.  The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the Principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

- 30 -

For purposes of this Section 4.05, the lowest denomination in which a Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Commonwealth shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.

**Section 4.06   Notice of Redemption**.  Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Commonwealth which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or accretion rates of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the Principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the Corporate Trust Office giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Commonwealth's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein.  Such certificate shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be

- 31 -

transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds.  This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

Any notice of redemption given pursuant to this Section 4.06 which states that it is conditional upon receipt by the Trustee of money sufficient to pay the Redemption Price of such Bonds or upon the satisfaction of any other condition, may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied. Notice of such rescission shall be given by the Trustee to affected Bondholders as promptly as practicable upon the failure of such condition or the occurrence of such other event.

**Section 4.07   Payment of Redeemed Bonds**.  Notice having been given in the manner provided in Section 4.06 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed.  If there shall be called for redemption less than all of the Principal amount of a registered Bond, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the Principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS;
## COMMONWEALTH REVENUES AND APPLICATION THEREOF

**Section 5.01   Statutory Lien in Debt Service Fund**.  To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys deposited in the Debt Service Fund established herein, which Statutory

Lien shall remain in full force and effect until the Bonds have been paid or satisfied in full in accordance with their terms.  The Statutory Lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the Statutory Lien. Furthermore, pursuant to this Trust Agreement, the funds established hereunder (with the exception of the Arbitrage Rebate Fund, Trustee Expenses Fund and the Costs of Issuance Fund), are hereby pledged to secure the repayment of the Bonds.  The Commonwealth agrees that, as of the commencement date of any future insolvency proceeding commenced by or on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise), the automatic stay pursuant to 11 U.S.C. Section 362 shall be deemed waived with respect to monies on deposit in the Debt Service Fund, and the Commonwealth shall consent to any motion for relief from the automatic stay filed by the Trustee or any beneficial owner of the Bonds filed pursuant to this Section 5.01.

Section 5.02   Establishment of Funds and Accounts.  (a)  The following funds and separate accounts within funds are hereby established and shall be held, in trust for the benefit of the Holders of the Bonds and maintained by the Trustee:

> Costs of Issuance Fund; and
> Trustee Expenses Fund
> Debt Service Fund, comprised of:
> > Interest Account; and
> > Principal Account

(b)      The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Commonwealth. The Arbitrage Rebate Fund is not subject to the Statutory Lien or contractual lien.

(c)      Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Commonwealth may otherwise deem proper.  All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

Section 5.03   Application of Bond Proceeds.  Upon the receipt of proceeds from the sale of a Series of Bonds, the Commonwealth shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series.  No deposit of proceeds shall be made in connection with the issuance of the Series 2022A Bonds; provided that, on the Effective Date, the Secretary of Treasury shall transfer into the Debt Service Fund such additional amounts as may be necessary to account for the Bonds being issued as of July 1, 2021.

Accrued interest, if any, received upon the delivery of a Series of Bonds shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

Section 5.04   Application of Money in the Costs of Issuance Fund.  (a)  As soon as practicable after the delivery of each Series of Bonds, there shall be deposited into each account

- 33 -

within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)     Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Bonds payable by the Commonwealth.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Commonwealth that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee. The Trustee shall conclusively rely on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)     The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Commonwealth for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

*First*, to the Arbitrage Rebate Fund, the amount determined by the Commonwealth to be required to be deposited therein; and

*Second*, to the Debt Service Fund, any balance remaining therein.

**Section 5.05  Application of Moneys**.  On each Monthly Disbursement Date, the Secretary of Treasury shall transfer to the Trustee and the Trustee shall apply such amounts as follows and in the following order of priority; ***provided, however***, that on the Effective Date the Secretary of the Treasury shall deposit such additional amounts as may be necessary to account for the issuance of the Bonds from July 1, 2021:

*First*:  To the following accounts:

(i)     the Trustee Expenses Fund, an amount equal to the Trustee administration fee as set forth in Exhibit F;

(ii)    the Interest Account of the Debt Service Fund, one-sixth (1/6) of the amount of the interest payable on the Bonds on the next Interest Payment Date; and

(iii)   the Principal Account of the Debt Service Fund, one-twelfth (1/12) of the amount of Principal and Sinking Fund Installment due on the next Principal Payment Date;

*Second*:  Upon the written direction of an Authorized Officer of the Commonwealth, to the Arbitrage Rebate Fund moneys on deposit in the amount set forth in such direction.

**Section 5.06  Debt Service Fund**.  (a)  The Trustee shall pay out of the Debt Service Fund the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably pledged to and applied to such payments.

(b)      Notwithstanding the provisions of this Section, the Commonwealth may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price equal to the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; provided that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; provided further that in the case of Capital Appreciation Bonds, no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Commonwealth.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)      Money in the Debt Service Fund in excess of the amount required to be deposited therein in accordance with Section 5.05 herein, shall at the written direction of an Authorized Officer of the Commonwealth, upon payment or satisfaction in full of the Bonds, be withdrawn and transferred to the Commonwealth.

**Section 5.07   Arbitrage Rebate Fund**.  The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Commonwealth for deposit therein and, notwithstanding any other provisions of this Article V, shall transfer to the Arbitrage Rebate Fund, in accordance with written directions of an Authorized Officer of the Commonwealth, money on deposit in any other funds or accounts held by the Trustee hereunder at such times and in such amounts as shall be set forth in such written directions of the Commonwealth.

Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Commonwealth only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Commonwealth shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  As of any date, money on deposit in the Arbitrage Rebate Fund which an Authorized Officer of the Commonwealth determines to be in excess of the amount required to be so rebated as of such date, shall be transferred (a) to the Debt Service Fund, if the amount then on deposit in the Debt Service Fund is less than the sum of the amounts required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and (b) to the extent not required to be deposited in the Debt Service Fund, may at the direction of an Authorized Officer of the Commonwealth, either be retained therein or transferred to the Commonwealth.

If and to the extent required by the Code, the Commonwealth shall periodically, at such times as may be required to comply with the Code, determine or cause to be determined the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (a) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder and deposit to the Arbitrage Rebate Fund, such

- 35 -

amount as the Commonwealth shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (b) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

Section 5.08   **Trustee Expenses Fund**.

The Trustee Expenses Fund shall be held for the benefit of the Trustee as provided herein and maintained by the Trustee.  On the first Monthly Disbursement Date of each Fiscal Year, the Commonwealth shall provide to the Trustee a written requisition signed by an Authorized Officer of the Commonwealth, permitting the Trustee to withdraw from the Trustee Expenses Fund the Trustee administration fee as set forth in Exhibit F.

Section 5.09   **Transfer of Investments**.  Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

## ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

Section 6.01   **Security for Deposits.**  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Holders of the Bonds, and solely to the extent of any residual moneys to be returned to the Commonwealth pursuant to the terms of this Agreement, for the benefit of the Commonwealth, in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

Section 6.02   **Investment of Funds and Accounts Held by the Trustee**. (a)   Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Commonwealth given in writing, such writing to specify the particular Eligible Investment to be purchased. In the absence of the receipt of such written direction, the Trustee shall hold the funds uninvested.

(b)      The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.  Ratings of permitted investments shall be determined at the time of purchase of such permitted investments.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

- 36 -

(c)      Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)      In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the direction of the Authorized Officer of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)      Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03   Liability for Investments**.  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01   Payment of Principal and Interest**.  The Commonwealth shall pay or cause to be paid every Bond, including interest thereon, on the dates and at the places and in the manner provided in this Trust Agreement and in the Bonds.

**Section 7.02   Pledge of Good Faith and Credit; Bonds Constitute Public Debt**.   The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Principal of and the interest on the Bonds authorized by this Trust Agreement.   The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.   The Secretary of Treasury is authorized and directed to pay the Principal of and the interest of the Bonds as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.   Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Bonds in the amounts and at the times required by Section 5.05 hereof.   For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Deemed Annual Allocation**.   Pursuant to the Act, the Commonwealth shall, to the extent necessary to satisfy its obligations to pay the Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act No. 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Section 8 of Article VI of the Constitution, and (iii) any other available resources (*recursos disponibles*) of the Commonwealth to the payment of the Principal of and the interest (and accreted value) on the Bonds; provided that (A) this covenant is not intended to grant to the Holders of the Bonds any lien on such proceeds, monies and resources until deposited pursuant to the provisions hereof, and (B) for purposes of compliance with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the Holders of the Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth herein.

**Section 7.04   Powers as to Bonds**.   Pursuant to the Act, the Plan, and the Confirmation Order, the Commonwealth is duly authorized to create and issue the Bonds and to execute the Trust Agreement and each Supplemental Trust Agreement.   The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.   Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Bonds and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement.   The Commonwealth further covenants that its good faith, credit and taxing power pledge in support of the Bonds is a valid, binding and legally enforceable pledge of the Commonwealth.   The Commonwealth further covenants that it shall not fail to at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the Statutory Lien and all of the rights of the Trustee for the benefit of the Holders of Bonds under the Trust Agreement and each Supplemental Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.05   Further Assurance**.   The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all

- 38 -

and singular the Statutory Lien and the pledge of its good faith, credit and taxing power set forth herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.06   Offices for Payment and Registration of Bonds**.  Unless all of the Bonds are Book Entry Bonds, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the Corporate Trust Office.  The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Bonds of the Series authorized thereby or referred to therein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Bonds may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Bonds.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

**Section 7.07   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the date of issuance of Bonds, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds, shall exist, have happened and have been performed.

**Section 7.08   Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of Bonds, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Bonds have been paid or otherwise satisfied in full in accordance with their terms, the Commonwealth will not take any action that would:

(a)      Impair the monthly deposits of interest and Principal required by Article 203 of the Act and Section 5.05 hereof,

(b)      limit or alter the rights vested in Holders of Bonds in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the Holders of the Bonds,

(c)      impair the rights and remedies of the Holders of the Bonds.

**Section 7.09   Tax Exemption Covenant.**  The Commonwealth covenants that it shall not take any action that would, or fail to take any action, if such failure would cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

**Section 7.10   Comprehensive Cap on Net Tax-Supported Debt**.  For so long as any portion of the Series 2022A Bonds shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional Net Tax-Supported Debt set forth in Article VI of the Debt

Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series 2022A Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  In connection with the issuance of Net Tax-Supported Debt, the Secretary of Treasury shall certify that such Net Tax-Supported Debt is being issued in compliance with the Comprehensive Cap.  Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Bonds issued under this Trust Agreement, and the validity of such Net Tax-Supported Debt shall not be subject to legal challenge.  In calculating Debt Policy Revenues for purposes of this Section 7.10 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.11   Fiscal Plan**.   Any post-Effective Date Fiscal Plan proposed by the Commonwealth will include provisions for the payment in each Fiscal Year of Principal and interest (and Accreted Value) on the Bonds.

**Section 7.12   Reporting Requirements**.   The Commonwealth covenants that, in connection with the delivery of the Series 2022A Bonds hereunder, it will enter into a reporting agreement substantially the form attached hereto as Exhibit E.  An event of default under such Reporting Agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee**.  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents**.  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Bonds of any Series in the Supplemental Trust Agreement authorizing such Bonds or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Bonds so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its

acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents**.  The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Bonds shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Bonds, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to:  (i) the issuance of the Bonds for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Commonwealth or others in accordance herewith and with each Supplemental Trust Agreement except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own gross negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee. If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust**.  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

**Section 8.05   Rights of the Trustee and the Paying Agent**.  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it to be genuine, and to have been signed or presented by the proper party or parties, in the absence of gross negligence or willful misconduct.  The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in accordance therewith, in the absence of gross negligence or willful misconduct on the Trustee's part.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a

- 41 -

certificate signed by an Authorized Officer of the Commonwealth. Such certificate shall be full warrant for any action taken or suffered under the provisions hereof and of the Supplemental Trust Agreement, but in its reasonable discretion, the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence. Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any default or Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the Corporate Trust Office and such notice references the Bonds relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon in writing.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

The Trustee shall have no liability for any action or failure to act in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its gross negligence or willful misconduct in connection therewith.

In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer, unless it is proven that the Trustee was grossly negligent.

The Trustee shall be under no obligation to exercise any of the rights or powers vested in it under this Trust Agreement at the request or direction of any of the Holders pursuant to this Trust Agreement unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities (except as may result from the Trustee's own gross negligence or willful misconduct) which might be incurred by it in compliance with such request or direction).

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); provided, however, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a Person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer.  The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth.  Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee.  The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent, in writing, immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**  The Commonwealth shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all documented fees, expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement.  None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial

- 43 -

liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The Trustee shall be indemnified by the Commonwealth and held harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of enforcing the provisions of this Trust Agreement (including this Section) against the Commonwealth and defending itself against any claim (whether asserted by the Company, or any Bondholder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts**.  The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Bonds or to effect or aid in any reorganization growing out of the enforcement hereof or of the Bonds or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee**.  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Bonds by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address,  Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided,***

- 44 -

*however,* that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee**.  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) days' written notice by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent**.  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Bonds, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and

- 45 -

customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any entity or Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee**.  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein.  Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.  In all instances, the Trustee then ceasing to act as trustee shall remain liable for actions or omissions prior to such transfer subject to Section 8.03 and Section 8.05 herein.

**Section 8.12   Merger or Consolidation of the Trustee**.  Any company, corporation, association, trust company, banking association, or other entity into which the Trustee may be merged or with which it may be consolidated or any company, corporation, association, trust company, banking association, or other entity resulting from any merger or consolidation to which it shall be a party or any company, corporation, association, trust company, banking association, or other entity to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company, corporation, association, trust company, banking association, or other entity shall be qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such company, corporation, association, trust company, banking association, or other entity is not so qualified, such company, corporation, association, trust company, banking association, or other entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13   Ancillary Agreements.**  The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements**.**

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01   Modification and Amendment without Consent**.  Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)      To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)      To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(c)      To prescribe further limitations and restrictions upon the issuance of Refunding Bonds by the Commonwealth which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan;

(d)      To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(e)      To confirm, as further assurance, the Statutory Lien, and the subjection to the Statutory Lien, of the Commonwealth's right title and interest in the monies deposited hereunder, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(f)      To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Bonds of any Series of Bonds Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Bonds issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(g)      With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction

- 47 -

Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Bondholders in any material respect.

(h)      To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective unless there has been delivered to the Trustee (i) a Rating Confirmation on the Outstanding Bonds and (ii) an opinion of Transaction Counsel to the effect that the same is not inconsistent with this Trust Agreement and will not adversely affect the exclusion of interest on any Tax Exempt Bond from gross income for purposes of federal income taxation, ***provided, however,*** this clause (i) shall be inapplicable unless the Outstanding Bonds are rated at least Baa3/BBB- (or equivalent) by at least two Rating Services (with one such Rating Service being S&P or Moody's).

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement will not materially adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (h) above, the rights of the Holders of the Bonds.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Bondholders**.  The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Bondholders in accordance with Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements**. The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.05 hereof.  Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Commonwealth to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.04 hereof or the right or obligation of the Commonwealth to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(i), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms and that it will not adversely affect the exemption from federal income taxation of the Tax Exempt Bonds in

- 48 -

accordance with Section 7.09 of this Trust Agreement.  The Trustee shall be fully protected in conclusively relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, at its own expense and as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Commonwealth and shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

**Section 10.01  Powers of Amendment**.  (a) Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Commonwealth and of the Holders of the Bonds hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.

(b)      No such modification or amendment shall, without the prior written consent of the Holder of such Bond, permit a change in the provisions related to the timing or amount of any payment on the Bonds, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Bonds, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the Principal of any Outstanding Bond or of any installment of interest thereon or a reduction in the Principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment. Further, no waiver of any default or compliance with any provisions of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Bond.

(c)      For the purposes of this Section 10.01, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Bonds of such Series in any respect.  The Trustee may, based on an opinion of counsel, determine whether or not, in accordance with the foregoing provisions, the Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such

- 49 -

determination shall be binding and conclusive on the Commonwealth and all Holders of Bonds. If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth and all Holders of Bonds.

**Section 10.02 Consent of Bondholders**. The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section. Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Bonds. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Bonds for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Bonds. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Bonds specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. Any such consent shall be binding upon the Holder of the Bonds giving such consent and on any subsequent Holder of such Bonds (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Bonds shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given to the Bondholders by mailing such notice to Bondholders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Bonds at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **provided, however**, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient so long as consistent with the Supplemental Trust Agreement.

**Section 10.03 Modifications by Unanimous Consent**. The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Bonds may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing**. Any provision in this Article X for the mailing of a notice or other document to Bondholders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Bonds then Outstanding at such Person's

- 50 -

address, if any, appearing upon the registry books of the Commonwealth, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05 Exclusion of Bonds**.  Bonds owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may conclusively rely, describing all Bonds so to be excluded.

**Section 10.06 Notation on Bonds**.  Bonds delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Bond for such purpose at the Corporate Trust Office suitable notation shall be made on such Bond by the Trustee as to any such action.  If the Commonwealth or the Trustee shall so determine, new Bonds so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Bond then Outstanding shall be exchanged, without cost to such Bondholder, for Bonds of the same Series and maturity then Outstanding, upon surrender of such Bonds.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default**.  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)    Payment of the Principal or Redemption Price of any Bond shall not be made by the Commonwealth when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)    Payment of an installment of interest on any Bond shall not be made by the Commonwealth when the same shall become due and payable; or

(c)    The Statutory Lien shall at any time and for any reason cease to be in full force and effect or a final judgment shall be rendered which shall declare the Statutory Lien to be null and void or shall declare that the Statutory Lien does not establish in any material respect the lien it purports to establish; or

(d)    The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Commonwealth to be performed, other than the provisions of Section 7.12 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give

4842-1351-5245.34

such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if in the determination of the Commonwealth, such default is capable of being cured within ninety (90) days of the date the default initially occurred but is not capable of being cured within forty-five (45) days of the date the default initially occurred, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

(e)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any Person to be released from any covenants or obligations with respect to the Bonds.

**Section 11.02 No Acceleration with Respect to the Bonds.**  There shall be no right of acceleration with respect to the Bonds.

**Section 11.03 Enforcement of Remedies**.  (a)  If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)     If an Event of Default under Section 11.01(a) or (b) occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (*recursos disponibles*) of the Commonwealth to the payment of the Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(c)     If an Event of Default under Section 11.01 occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, seek specific performance of any relevant provisions of this Trust Agreement or any relevant Supplemental Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)     Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Commonwealth for Principal or interest or otherwise under any of the provisions of the Trust Agreement or of any Supplemental Trust Agreement or of the Bonds, with interest on overdue payments of the Principal of or interest on the Bonds at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Trust Agreement and under such Bonds, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or

- 52 -

decree against the Commonwealth but solely as provided herein, in any Supplemental Trust Agreement and in such Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

   **Section 11.04  Priority of Payments after Default**.  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder and under each Supplemental Trust Agreement shall not be sufficient to pay the Principal of and interest on the Bonds as the same become due and payable, the money held by the Trustee hereunder and under each Supplemental Trust Agreement together with any money then available or thereafter becoming available to pay the Principal of and interest on the Bonds, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows, *pro rata*:

   (A) To the payment of amounts due to the Trustee and its agents and counsel under Section 8.06 hereof; and

   then, pro-rata, as follows:

   (B) To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

   (C) To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

   Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Bonds or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of Principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Bonds are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

**Section 11.05  Termination of Proceedings**.  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

**Section 11.06  Bondholders' Direction of Proceedings**.  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of counsel to the Trustee would be unjustly prejudicial to Bondholders not parties to such direction and (iv) the Trustee reasonably believes it will be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such direction.

**Section 11.07  Control by Holders of Bonds; Limitations**.  No Holder of any of the Bonds shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Bonds secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Bonds.  Notwithstanding any other provision hereof, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the Principal of (and premium, if any)

- 54 -

and interest on such Bond on the stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the Act.

**Section 11.08 Actions by Trustee; Possession of Bonds by Trustee Not Required**. All rights of action hereunder or under any of the Bonds secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Bonds or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Bonds to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**.  No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

Except as provided in the next paragraph, the Trustee may, and upon written request of the Holders of not less than a Majority in Interest of the Outstanding Bonds to which an Event of Default relates, shall waive a default (except with respect to nonpayment following the occurrence of any applicable redemption date, which only may be waived upon written request to the Trustee by Holders of each Outstanding Bond which has not been so paid); ***provided, further,*** that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds to which an Event of Default relates, shall waive any default which in the opinion of the Trustee or such Holders of not less than a Quarter in Interest shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; ***provided, however,*** the Trustee may not waive any default if it has received a direction from the Holders of a greater percentage of Quarter in Interest of the Outstanding Bonds to which such default relates that such default may not be waived by the Trustee; ***provided, further,*** that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**.  The Trustee shall give notice of each Event of Default hereunder known to the Trustee to AAFAF, the Commonwealth and Holders of the Bonds, within ten (10) Business Days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; ***provided, however***, that failure to provide notice to AAFAF or the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders.  In the case of the Holders of the Bonds, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Bonds, as the names and addresses of such Holders

- 55 -

appear on the books for registration and transfer of Bonds as kept by the Trustee and to the Bond Insurer at its last known address.

**Section 11.11 Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

**Section 12.01 Defeasance**.  (a)   If the Commonwealth shall pay or cause to be paid to the Holder of a Bond the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all rights granted hereby and by the Act to such Bond (including without limitation, the Statutory Lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Bonds and which are not required for the payment or redemption of Bonds of the same Series as such Bond shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be transferred to the Commonwealth.

(b)     Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee for the benefit of the Holders of the Bonds (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     in case any of said Bonds are to be redeemed on any date prior to their maturity, the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Bonds; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized

- 56 -

verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the Redemption Date or maturity date thereof, as the case may be; and

(iii)    in the event said Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Commonwealth shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; and

(iv)    the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Bond having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B)  such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Commonwealth shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section.  The Trustee shall select the Bonds of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.05 hereof.  Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Bonds on and prior to such redemption date or maturity date hereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Bonds, as realized, shall be applied by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be retained therein or, upon confirmation of the nationally recognized verification agent that sufficient monies remain to effectuate the defeasance pursuant to this Article XII, transferred to the Commonwealth.

(c)      Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Bonds of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Bonds of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Bonds of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Bonds for which said money is held was due and payable, shall, at the written request of the Commonwealth, be repaid by the Trustee or Paying Agent to the Commonwealth as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Bonds shall look only to the Commonwealth for the payment of such Bonds.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS
## AND PROOF OF OWNERSHIP OF BONDS

**Section 13.01 Evidence of Signatures of Bondholders and Ownership of Bonds**. Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Bonds may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Bonds in Person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Bonds, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Bonds and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith.  The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

# ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents**.  All documents received by the Trustee from the Commonwealth or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession solely as a repository and shall be subject at all reasonable times to the inspection of the Commonwealth, any Bondholder, and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

**Section 14.02 Money and Funds Held for Particular Bonds**.  The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Bonds due on any date with respect to particular Bonds shall, pending such payment, be set aside and held in trust by it for the benefit of the Holders of such Bonds entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Bonds, due after such date thereof, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Bonds**.  The Trustee or any Paying Agent shall forthwith cancel all Bonds which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Bonds shall be deemed Outstanding Bonds hereunder and no Bonds shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Bonds**.  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Bonds or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Commonwealth or any Person executing the Bonds, all such liability, if any, being expressly waived and released by every Holder of Bonds by the acceptance of the Bonds.

**Section 14.05 Severability of Invalid Provision**.  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Bonds.

**Section 14.06 Parties of Interest**.   Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the

- 59 -

Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents, the Holders and the Bond Insurer. Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement. In accordance with Section 326 of the U.S.A. Patriot Act (Pub.L. 107-56), the Trustee is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The Commonwealth agrees that it will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act.

**Section 14.07 Certain Provisions Relating to Capital Appreciation Bonds**. For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its Principal amount. In computing the Principal amount of Bonds held by the registered owner of a Capital Appreciation Bond in giving to the Commonwealth or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 14.08 Notices**. Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Trustee, addressed to it at the Corporate Trust Office; in the case of the Commonwealth addressed to the Secretary of Treasury, to the attention of the Secretary of Treasury at ███████████████████████████████; and in the case of AAFAF, to the attention of the Executive Director at ████████████ ████████████████████████████████████, or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Bonds, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Bonds of the Series to the Commonwealth's dissemination agent for distribution through the EMMA system. The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

Any notice provided to the Commonwealth shall also be provided to AAFAF.

**Section 14.09 Headings**.  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.10 Governing Laws**.  This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; ***provided, however***, that the authorization of this Trust Agreement and the issuance of the Bonds by the Commonwealth shall be governed by the laws of the Commonwealth; and, ***provided, further***, that the holders of the Bonds shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Constitution.

**Section 14.11 Retention of Jurisdiction of Title III Court**.  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Bonds and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Bonds (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.12 Signatures and Counterparts**.  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.13 Successors and Assigns**.  Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.14 Conflicts.**  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

4842-1351-5245.34

**Section 14.15 Force Majeure**.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, pandemics, epidemics, recognized public emergencies, quarantine restrictions, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services and hacking, cyber-attacks, or other use or infiltration of the Trustee's technological infrastructure exceeding authorized access; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

[Remainder of page intentionally left blank; signature page follows]

4842-1351-5245.34

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**COMMONWEALTH OF PUERTO RICO**

By: _____

[Signature page to Trust Agreement relating to the General Obligation Restructured Bonds]

**UMB BANK, N.A.,** as Trustee

By:

EXHIBIT A

FORM OF SERIES 2022A CURRENT INTEREST BOND

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  AR-                                                                                          $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS
SERIES 2022A

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:     CEDE & CO.

Principal Amount:     _____ DOLLARS

A-1

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **PRINCIPAL AMOUNT** specified above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal Amount, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July (each, an "Interest Payment Date"). The Principal Amount of this bond is payable upon presentation and surrender hereof at the corporate trust office of the Trustee hereinafter mentioned. Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date. Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of **UMB BANK, N.A.**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Trust Agreement, or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 2022A Current Interest Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, Series 2022A" (herein called the "Series 2022A Bonds"). The Series 2022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and UMB Bank, N.A., as trustee (the "Trustee), dated as of March 15, 2022 (the "Trust Agreement") and Act No. 53-2021. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

A-2

This Series 2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

4842-1351-5245.34

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico

_____
Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____
Secretary of State

A-4

4842-1351-5245.34

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2022A, of the Commonwealth of Puerto Rico.

**UMB BANK, N.A.**, as Trustee

By: _____

Authorized Signatory

Date of authentication:  March 15, 2022

A-5

ASSIGNMENT

FOR VALUE RECEIVED: _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____      _____

_____      Please print or typewrite name and address,
                                        including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____      _____

                                  NOTE: The signature to this assignment must
                                  correspond with the name as written on the within
                                  Bond in every particular, without alteration or
                                  enlargement or any change whatsoever.

                                  Signature Guaranteed:

A-6

4842-1351-5245.34

EXHIBIT B

FORM OF SERIES 2022A CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  AR-                                                                                    $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS,
SERIES 2022A

| ACCRETION RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
| --- | --- | --- | --- |

Registered Owner:      CEDE & CO.

Principal Amount at Issuance:      _____ DOLLARS

B-1

4842-1351-5245.34

Maturity Value[2]:        _____ DOLLARS

     The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **MATURITY VALUE** specified above on the Maturity Date stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement) upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned.  Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement).  Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date.  Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of **UMB BANK, N.A.,** as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

     The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond.  To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

     This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, Series 2022A" (herein called the "Series 2022A Bonds").  The Series 2022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and UMB Bank, N.A., as trustee (the "Trustee), dated as of March 15, 2022 (the "Trust Agreement") and Act No. 53-2021.  The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

     Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

---

[2]    Reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

4842-1351-5245.34

This Series 2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds, all as of the Dated Date specified above.

_____

Governor of the Commonwealth of Puerto Rico

_____

Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____

Secretary of State

B-4

4842-1351-5245.34

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2022A, of the Commonwealth of Puerto Rico.

**UMB BANK, N.A.**, as Trustee

By: _____
Authorized Signatory

Date of authentication:  March 15, 2022

B-5

ASSIGNMENT

FOR VALUE RECEIVED:   _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____    _____

Please print or typewrite name and address,
_____    including zip code, of transferee

the   within-mentioned   Bond   and   hereby   irrevocably   constitutes   and   appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:  _____        _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

B-6

EXHIBIT C

ACCRETED VALUE TABLE

| Maturity | **7/1/2024** | **7/1/2033** |
|---|---|---|
| Yield | **5.000%** | **5.375%** |
| 7/1/21 | $ 4,311.45 | $ 2,645.70 |
| 1/1/22 | 4,419.25 | 2,716.80 |
| 7/1/22 | 4,529.75 | 2,789.85 |
| 1/1/23 | 4,642.95 | 2,864.80 |
| 7/1/23 | 4,759.05 | 2,941.80 |
| 1/1/24 | 4,878.00 | 3,020.85 |
| 7/1/24 | 5,000.00 | 3,102.05 |
| 1/1/25 | - | 3,185.45 |
| 7/1/25 | - | 3,271.05 |
| 1/1/26 | - | 3,358.95 |
| 7/1/26 | - | 3,449.20 |
| 1/1/27 | - | 3,541.90 |
| 7/1/27 | - | 3,637.10 |
| 1/1/28 | - | 3,734.85 |
| 7/1/28 | - | 3,835.25 |
| 1/1/29 | - | 3,938.30 |
| 7/1/29 | - | 4,044.15 |
| 1/1/30 | - | 4,152.85 |
| 7/1/30 | - | 4,264.45 |
| 1/1/31 | - | 4,379.05 |
| 7/1/31 | - | 4,496.75 |
| 1/1/32 | - | 4,617.60 |
| 7/1/32 | - | 4,741.70 |
| 1/1/33 | - | 4,869.10 |
| 7/1/33 | - | 5,000.00 |

C-1

EXHIBIT D

CONFIRMATION ORDER

4842-1351-5245.34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III
JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

| | | |
|---|---|---|
| 1. | Confirmation of the Plan | 5 |
| 2. | Objections | 5 |
| 3. | Findings/Conclusions | 5 |
| 4. | Litigation Resolution | 9 |
| 5. | Plan Settlements Approved | 10 |
| 6. | Dismissal of Med Center Litigation | 11 |
| 7. | Dismissal of ERS Litigation | 12 |
| 8. | Dismissal of GO/Clawback Litigation | 13 |
| 9. | Dismissal of PRIFA BANs Litigation | 13 |
| 10. | Dismissal of the PBA Litigation | 13 |
| 11. | Implementation of the Plan | 14 |
| 12. | Enforceability of New Debt Instruments | 15 |
| 13. | Authorization of New GO Bonds and CVIs and Injunction | 15 |
| 14. | Purchase and Sale of Certain ERS Assets | 16 |
| 15. | Monthly Deposits of Interest and Principal | 16 |
| 16. | Comprehensive Cap on All Net Tax-Supported Debt | 17 |
| 17. | Adoption and Maintenance of a Debt Management Policy | 18 |
| 18. | Creation of Avoidance Actions Trust | 18 |
| 19. | Avoidance Actions Trust Assets | 19 |
| 20. | Funding, Costs, and Expenses of the Avoidance Actions Trust | 19 |
| 21. | Indemnification of Avoidance Actions Trustee and Board | 20 |
| 22. | Creation of Pension Reserve Trust | 20 |
| 23. | Funding of the Pension Reserve Trust | 21 |
| 24. | No Action | 22 |
| 25. | Government Action | 22 |
| 26. | Oversight Board Consent Pursuant to PROMESA Section 305 | 23 |
| 27. | Binding Effect | 23 |
| 28. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 24 |
| 29. | Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases | 26 |
| 30. | Insurance Policies | 27 |

| | | |
|---|---|---|
| 31. | Rejection Damages Claims | 28 |
| 32. | Payment of Cure Amounts | 28 |
| 33. | Setoff | 28 |
| 34. | Delivery of Distributions | 29 |
| 35. | Disbursing Agent | 37 |
| 36. | Payment of Trustee Fees and Expenses | 37 |
| 37. | Securities Laws Exemption | 38 |
| 38. | Acceleration of Insured Bonds | 39 |
| 39. | Disputed Claims Reconciliation | 40 |
| 40. | Disputed Claims Holdback | 42 |
| 41. | National Action Claims | 43 |
| 42. | No Amendments to Proofs of Claim | 44 |
| 43. | Conditions to Effective Date | 45 |
| 44. | Administrative Claim Bar Date | 45 |
| 45. | Professional Compensation and Reimbursement Claims | 46 |
| 46. | GO/PBA Consummation Costs | 47 |
| 47. | AFSCME Professional Fees | 47 |
| 48. | GO/PBA PSA Restriction Fee | 48 |
| 49. | ERS Restriction Fee | 50 |
| 50. | CCDA Consummation Costs | 50 |
| 51. | CCDA Restriction Fee | 51 |
| 52. | HTA Bond Claims | 53 |
| 53. | System 2000 Obligations | 53 |
| 54. | HTA/CCDA Clawback Structuring Fees | 53 |
| 55. | Active JRS Participants and Active TRS Participants | 54 |
| 56. | Discharge and Release of Claims and Causes of Action | 56 |
| 57. | Releases by the Debtors and Reorganized Debtors | 62 |
| 58. | Release and Exculpation Provisions | 63 |
| 59. | **Injunction on Claims** | 63 |
| 60. | **Injunction Related to Releases** | 64 |
| 61. | Exculpation | 65 |
| 62. | Maintenance of Pension System | 71 |
| 63. | Appointments Related Litigation | 72 |

| | | |
|---|---|---|
| 64. | **Bar Order** ........................................................................................... | 72 |
| 65. | **Supplemental Injunction** ................................................................... | 73 |
| 66. | Term of Existing Injunctions or Stays ..................................................... | 75 |
| 67. | Prosecution of Claims ............................................................................. | 75 |
| 68. | Indemnification and Reimbursement Obligations ................................... | 75 |
| 69. | Compliance with Tax Requirements ........................................................ | 76 |
| 70. | Documents and Instruments .................................................................... | 77 |
| 71. | Fiscal Plan .............................................................................................. | 77 |
| 72. | Claims ..................................................................................................... | 77 |
| 73. | GUC Reserve ........................................................................................... | 78 |
| 74. | PROMESA 407 Claims ............................................................................ | 78 |
| 75. | Dairy Producer Claims ............................................................................ | 78 |
| 76. | Eminent Domain/Inverse Condemnation Claims. .................................... | 79 |
| 77. | Oversight Board Termination and Post-Confirmation Powers .................. | 80 |
| 78. | Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion ................................................................. | 80 |
| 79. | Government Post-Confirmation Powers and Duties .................................. | 81 |
| 80. | Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated ........ | 81 |
| 81. | Non-Impairment of CVIs, SUT ............................................................... | 81 |
| 82. | Reversal/Stay/Modification/Vacatur of Order ......................................... | 82 |
| 83. | Retention of Jurisdiction ......................................................................... | 82 |
| 84. | Conflicts Among Documents ................................................................... | 83 |
| 85. | PBA Leases ............................................................................................. | 83 |
| 86. | Modifications .......................................................................................... | 84 |
| 87. | Asserted Surety Claims ........................................................................... | 85 |
| 88. | Identification of Additional Retail Investors / Retail Support Fee .......... | 85 |
| 89. | Provisions of Plan and Order Nonseverable and Mutually Dependent ..... | 87 |
| 90. | Governing Law ........................................................................................ | 87 |
| 91. | PFC Reservation ...................................................................................... | 87 |
| 92. | Applicable Nonbankruptcy Law ............................................................. | 87 |
| 93. | Waiver of Filings ..................................................................................... | 88 |
| 94. | Notice of Order ....................................................................................... | 88 |
| 95. | No Waiver ................................................................................................ | 89 |

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the

Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and

ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board"), as Title III representative of the Debtors under section 315(b) of

the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] having

proposed and filed with the United States District Court for the District of Puerto Rico (the

"Court") the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

*of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784 in Case No. 17-3283)[2]

(as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as

set forth in this Confirmation Order through the date hereof, including the Plan Supplement, and

as may be amended, supplemented, or modified pursuant to section 313 of PROMESA, the

"Plan"[3] through the date hereof);[4] and the Court having entered, pursuant to, inter alia, section

---

[1]  PROMESA is codified at 48 U.S.C. § 2101 et seq. References to "PROMESA" section
numbers in the remainder of this Confirmation Order are to the uncodified version of the
legislation.

[2]  All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]  The use of the term "Plan" herein, unless otherwise indicated by context, refers to the
confirmable final version filed at Docket Entry No. 19784, as described herein. The
penultimate version of the plan, which required final modifications to be confirmable,
was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the
Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No.
19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

[4]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in
the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined
herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of
Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto
Rico, et al.* (the "Findings of Fact and Conclusions of Law"), entered contemporaneously
herewith, as applicable. A composite copy of the Plan is annexed hereto as **Exhibit A**.

1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an

order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i)

approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing

procedures for the solicitation, voting, and tabulation of votes on and elections with respect to

the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in

connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the

Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections*

*to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the

following documents having been filed by the Debtors or the PSA Creditors in support of or in

connection with confirmation of the Plan:

(a)   Plan Supplement (Docket Entry No. 18470);

(b)   *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9);

(c)   *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4);

(d)   *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e)   *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 18869) (the "Confirmation Brief");

(f)   *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4);

(g)   *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry Nos. 18726 and 19054-1);

(h)     *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9);

(i)     *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10);

(j)     *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8);

(k)     *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6);

(l)     *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18736 and 19054-7);

(m)     *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2);

(n)     *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5);

(o)     *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3);

(p)     *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056. See also Docket Entry No. 19144);

(q)     *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r)     *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s)    *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t)    *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u)    *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059);

(v)    *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19060);

(w)    *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115); and

(x)    *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329);

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and on the record of the Confirmation Hearing; and, except to the extent otherwise provided herein, each of the objections having been resolved, overruled, sustained, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[5] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing

---

[5]    All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

documents, and the evidence admitted and arguments of counsel presented at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.      Confirmation of the Plan.  The Plan and each of its provisions shall be, and

hereby are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained

in the Plan Supplement are authorized and approved.  The terms of the Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

Hearing, as set forth in this Confirmation Order as well as in the revised composite copy attached

hereto as **Exhibit A**, include the Plan Supplement, as amended, supplemented, or modified on or

prior to the date hereof, and are incorporated by reference into and are an integral part of this

Confirmation Order.

2.      Objections.  With the narrow exception of the objections of holders of alleged

Eminent Domain/Inverse Condemnation Claims, which are hereby SUSTAINED to the extent

that such Claims are ultimately Allowed Claims, all objections, responses to, and statements and

comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are,

OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn

with prejudice.

3.      Findings/Conclusions.  The findings of fact and conclusions of law set forth in the

Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in

full.  Notwithstanding such incorporation, the following summarizes certain of the Court's

determinations:

> (A)      Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27,
> 2019, the Commonwealth, ERS, and PBA, respectively, each commenced a
> case before the Court in accordance with the requirements of Title III of
> PROMESA.  The commencement of these cases vested the Court with

exclusive jurisdiction over the cases and all respective property of the Commonwealth, ERS, and PBA, wherever located. As a result of the consensual agreement among the Debtors and their respective creditor representatives, the Debtors formulated, duly solicited, and now seek confirmation of a plan of adjustment in accordance with federal law.

(B)    This Confirmation Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law. Confirmation of the Plan constitutes a judicial determination, pursuant to section 4 of PROMESA, that all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and this Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations. Pursuant to section 4 of PROMESA, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, have been preempted to the extent set forth in Exhibit A to the Findings of Fact and Conclusions of Law. Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, to the extent inconsistent with the Plan's discharge of the Debtors' obligations. Such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations. All laws enacted from and after the commencement of the Title III Cases to the extent they are inconsistent with the transactions contemplated by the Plan are also unenforceable. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on **Exhibit C** hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, and (b) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on **Exhibit C** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

(C)    The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)    At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVI a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.

(E)    The New GO Bonds Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F)    Pursuant to PROMESA, including section 4 thereof, as well as sections 944[6] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court determines that the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

---

[6]    Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws.") (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010)) (additional citations omitted). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

(G)     The New GO Bonds and the CVIs are bonds or notes within the meaning of
        Section 2 of Article VI of the Commonwealth Constitution to which the
        Commonwealth may legally pledge its full faith, credit and taxing power
        under the Commonwealth Constitution and applicable Puerto Rico law for the
        payment of principal and interest.

(H)     Pursuant to the New GO Bonds Legislation and the CVI Legislation, the
        Commonwealth has validly pledged its full faith, credit and taxing power
        under the Commonwealth Constitution and applicable Puerto Rico law for the
        payment of principal and interest with respect to the New GO Bonds and
        payment with respect to the CVIs.

(I)     Subject to the occurrence of the Effective Date and as of the date of issuance
        of the New GO Bonds and CVIs, the Commonwealth is in compliance with
        any applicable debt limits, including the Comprehensive Cap and any
        applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)     Pursuant to the New GO Bonds Legislation and other applicable law, upon the
        issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
        priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53))
        over the funds deposited in the Debt Service Fund, including any revenues
        generated therefrom, which statutory first lien shall occur automatically and
        shall automatically attach and be perfected, valid, and binding from and after
        the Effective Date, without any further act or agreement by any Person, and
        shall remain in full force and effect until the New GO Bonds have been paid
        or satisfied in full in accordance with their terms.

(K)     The statutory first lien on funds deposited into the Debt Service Fund, as
        provided for in the New GO Bonds Legislation, and all other provisions to pay
        the New GO Bonds are valid, binding, legal, and enforceable, including,
        without limitation, covenants not to impair such property, maintain available
        tax exemption and provide for the conditions regarding substitution of
        collateral (including, without limitation, the statutory lien thereon as adequate
        protection for the property rights in the Plan and in the Confirmation Order).

(L)     The statutory first lien on funds deposited into the Debt Service Fund, as
        provided for in the New GO Bonds Legislation, creates the valid pledge and
        the valid lien upon the right, title and interest of the Commonwealth in such
        funds in favor of the Trustee (for the benefit of the holders of the New GO
        Bonds) which it purports to create, subject only to the provisions of the New
        GO Bonds Indenture permitting the withdrawal, payment, setting apart or
        appropriation thereof for the purposes and on the terms and conditions set
        forth in the New GO Bonds Indenture and each applicable supplemental
        indenture.

(M)     The Commonwealth has waived, and shall be deemed to have waived, the
        automatic stay in any future insolvency proceeding commenced on behalf of

the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

(N)     In light of the enactment of the New GO Bonds Legislation and the CVI Legislation, upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(O)     For purposes of section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

(P)     The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint* (Docket Entry No. 83 in Adv. Proc. No. 21-00068), including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.      <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, the MBA, and PRIFA, as applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status, and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements, and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this Confirmation Order constitutes, if required, approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code. Pursuant to this Confirmation Order, and to the extent provided in the Plan, on the Effective Date, such compromises and settlements shall be binding upon the Debtors, all Creditors of the Debtors, and all other Entities and, to the fullest extent permitted by applicable law, shall not be subject to collateral attack or other challenge (other than appeals) in any other court or forum.

5. <u>Plan Settlements Approved</u>. The Court hereby approves the compromises and settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan, authorizes and directs the consummation thereof.

6. _Dismissal of Med Center Litigation_. On the Effective Date, the Med Center

Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of

the Commonwealth and the respective Med Centers shall take such action as is necessary to

notify the applicable court of such dismissal, including, without limitation, within ten (10)

Business Days of the Effective Date, filing notices with the clerk of such court setting forth the

resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action),

with prejudice; _provided_, _however_, that all appeals taken from the Med DC Action shall be

dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such

appeals shall take such action as is necessary to notify such appellate courts of appeal of such

dismissal, with prejudice; and, _provided_, _further_, that the Commonwealth and the Med Centers

shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all

actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and

after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the

Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue

relief and the Commonwealth may present any and all defenses with respect to such alleged

future defaults, with all existing defaults as of the date hereof having been waived by the Med

Centers. Without in any way limiting the foregoing, from and after the earlier to occur of (y)

July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise

ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and

provisions of that certain _Stipulation Modifying the Automatic Stay Between the Commonwealth_

_and Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr._

_Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv. Médicos_

_Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc.,_

*Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.*,
dated July 12, 2019 (the "Med Center Stipulation") (see Docket Entry Nos. 8499 and 12918-14),
including, without limitation, the making of quarterly payments to certain Med Centers in
accordance therewith. Payments made by the Commonwealth, either directly or indirectly
through contractors or subcontractors, to any Med Center prior to modification of the Med
Center Stipulation or such other agreement between the applicable Med Centers and the
Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes
of action arising during the period up to and including the Effective Date; provided, however,
that, in the event that the Commonwealth or any Med Center determines that any payments made
pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an
overpayment or an underpayment, as the case may be, based upon services provided by the Med
Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center
shall submit such issue for a determination in connection with the Med DC Action, with all
parties reserving all rights, defenses, and counterclaims with respect to such overpayments or
underpayments, as the case may be, notwithstanding the imposition of any stay.

7.     Dismissal of ERS Litigation.  On the Effective Date, (a) the ERS Litigation and
the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the
Oversight Board, by itself or through its committees, the Creditors' Committee, and the ERS
Bondholders (on their own account or on behalf of affiliates or related funds or accounts
managed by affiliates) shall take any and all action reasonably necessary, including, without
limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to
effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions,

with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.     <u>Dismissal of GO/Clawback Litigation</u>.  On the Effective Date, (a) to the extent extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the Creditors' Committee, the Monolines and the PSA Creditors (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the aforementioned litigations and motions, with prejudice.

9.     <u>Dismissal of PRIFA BANs Litigation</u>.  On the Effective Date, (a) the PRIFA BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings Litigation, with prejudice.

10.     <u>Dismissal of the PBA Litigation</u>.  On the Effective Date, (a) the PBA Litigation shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its

committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related

funds or accounts managed by affiliates) shall take any and all action necessary, including,

without limitation, filing such notices, stipulations or other pleadings in the Title III Court to

effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.     <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the

Reorganized Debtors, and each of their respective authorized agents and representatives are

authorized and directed to (a) execute, deliver, file, or record such documents, contracts,

instruments, releases, and other agreements including, without limitation, those contained in the

Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and

as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be

necessary to effectuate, implement, and further evidence the terms and conditions of the Plan,

including, among other things, all such actions delineated in article LXXXIX of the Plan,[7] and

(d) direct or instruct The Depository Trust Company, or such other person or entity necessary to

implement or effectuate the terms of (i) any custodial trust, escrow arrangement, or similar

structure established pursuant to section 75.5(b) of the Plan and facilitated by Ambac (an

"Ambac Trust"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow

arrangement, or similar structure established pursuant to section 75.1(b)(ii) of the Plan (an

"Assured Trust"), and (v) the Avoidance Actions Trust (collectively, the "Trusts"), and (vi) the

related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date,

the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case

may be, and members of the boards of directors of the same, as applicable, are authorized,

---

[7]     Article LXXXIV has been amended to reflect that Class 54 is among the Unimpaired
Classes (§ 84.2), rather than among the Impaired Classes (§ 84.1).

empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12. <u>Enforceability of New Debt Instruments</u>. Pursuant to each of Bankruptcy Code section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

13. <u>Authorization of New GO Bonds and CVIs and Injunction</u>. The debt authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh Amended Plan"), and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under the Teachers Retirement System or the Judiciary Retirement System from and after the Effective Date. The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53-2021 for its debt authorization. The Commonwealth government shall not repeal such debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in accordance with the terms thereof. For avoidance of doubt, the Plan does not modify benefits

comprised of the "Monthly Base Pension," "Christmas Bonus," "Summer Bonus," "Medicine

Bonus," and "Medical Insurance Benefit," each as defined in the Seventh Amended Plan.

14.     <u>Purchase and Sale of Certain ERS Assets</u>.  On the Effective Date, (a) the

Commonwealth shall purchase, and ERS shall sell, assign, transfer, and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without

limitation, such Assets subject to a valid and perfected lien or security interest (other than liens

or claims discharged pursuant to the Plan and this Confirmation Order) for an aggregate purchase

price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and

(b) in accordance with the terms and provisions of section 69.2 of the Plan, (i) the

Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the

interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option,

pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS

Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be

necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with

the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not

exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15.     <u>Monthly Deposits of Interest and Principal</u>.  Pursuant to the New GO Bonds

Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New

GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st)

Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the

Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-

sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the

payment of interest to accrue on the New GO Bonds through the next interest payment date, and

(ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect

to the payment of principal (or accreted value) on the New GO Bonds. On the Effective Date,

the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional

amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed

Issuance Date.

16.     <u>Comprehensive Cap on All Net Tax-Supported Debt</u>.  During the Debt Policy

Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds

Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as

applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive

Cap on all Net Tax-Supported Debt of article IV of the Debt Responsibility Act, which cap shall

be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and

when measured in accordance with the Debt Responsibility Act, including a secured and/or

securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy

Revenues above and beyond the percentage of Debt Policy Revenues required to pay the

maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt

service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO

Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other

contingent value instruments that may be issued pursuant to or in connection with a

Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA,

CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by

such instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The Secretary of Treasury's certification of compliance with the Debt limit pursuant to section 74.4 of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

17. Adoption and Maintenance of a Debt Management Policy. During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated. The Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board (to the extent exercising authority in accordance with the provisions of PROMESA), at all times include the principles and limitations provided in section 74.5 of the Plan.

18. Creation of Avoidance Actions Trust. Upon the execution of the Avoidance Actions Trust Agreement pursuant to section 78.1 of the Plan, the Avoidance Actions Trust shall be established and validly created pursuant to the terms of the Avoidance Actions Trust Agreement, with no further authorization or legislative action being required, and the Avoidance Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and

provisions of the Avoidance Actions Trust Agreement.

19.    <u>Avoidance Actions Trust Assets</u>.  The Avoidance Actions Trust shall consist of

the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section

1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right,

authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions,

including, without limitation, those set forth on Exhibits A and B to the Plan, as of the Effective

Date.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities,

including, without limitation, all counterclaims and defenses to any such Avoidance Actions

Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer

shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other

similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized

Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant

to section 88.2 of the Plan shall be discharged and released from all liability with respect to the

delivery of such distributions.

20.    <u>Funding, Costs, and Expenses of the Avoidance Actions Trust</u>.  On the Effective

Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to

Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior

to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions

Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained

professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered
costs and expenses of the Avoidance Actions Trust.

21.      Indemnification of Avoidance Actions Trustee and Board.  The Avoidance
Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust
Agreement), and their respective firms, companies, affiliates, partners, officers, directors,
members, employees, professionals, advisors, attorneys, financial advisors, investment bankers,
disbursing agents and agents, and any of such Person's successors and assigns (each, an
"Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as
defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity
as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable,
except those acts arising from their own fraud, willful misconduct or gross negligence, and each
shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees
and expenses in defending any and all actions or inactions in their capacity as, or on behalf of,
the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions
or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim
of an Indemnified Party pursuant to section 7.5 of the Avoidance Actions Trust Agreement shall
be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority
distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the
advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified
Party shall survive the termination of such Indemnified Party from the capacity for which they
are indemnified.

22.      Creation of Pension Reserve Trust.  Upon the execution of the Pension Reserve
Deed of Trust pursuant to section 83.1 of the Plan, the Pension Reserve Trust shall be established

and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further

authorization or legislative action being required, and shall not be subject to taxation by the

Commonwealth.  This Court's retention of jurisdiction includes jurisdiction over actions to

enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.     Funding of the Pension Reserve Trust.  On the Effective Date, the Commonwealth

shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars

($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve

Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve

Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be

deposited into the Pension Benefits Council's administrative and operating account, and One

Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension

Reserve Board's administrative and operating account.  From and after the FY in which the

Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY

in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be

made, annual (but in no event later than October 1st following the conclusion of each FY)

contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)

such additional amount calculated as the lower of the actual primary surplus for such FY and the

projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution

for such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for

such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in

all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to

applicable laws, including, without limitation, Titles I and II of PROMESA, such additional

amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust.  The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the

independence, professionalism, experience and qualification standards set forth in the Pension

Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics, and

conflicts of interest laws and regulations.

24.    <u>No Action</u>.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are

directed to, and no further action of the directors or officers of the Debtors shall be required to

authorize the Debtors to, enter into, execute, deliver, file, adopt, amend, restate, consummate, or

effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be

executed, delivered, adopted, or amended in connection with the implementation of the Plan,

including, without limitation, the Plan Supplement.

25.    <u>Government Action</u>.  From the Effective Date up to and including the satisfaction

of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to

Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation,

any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to

consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of

Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any

requirements of Puerto Rico law, to execute any and all agreements necessary for the

implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to

section 108(a)(2) of PROMESA, no party, individual, official, or officer (elected or appointed),

agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i)

impedes, financially or otherwise, consummation and implementation of the transactions

contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New

GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount, or event between the terms and provisions of the Plan or a Fiscal Plan certified by the

Oversight Board, each of which actions has been determined by the Oversight Board to impair or

defeat the purposes of PROMESA. To the maximum extent permitted by law, the Government

of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf

thereof, is directed to take any and all actions necessary to consummate the transactions

contemplated by the Plan. Without in any way limiting the foregoing, on the earlier to occur of

(y) the Effective Date and (z) within forty-five (45) days from and after the date hereof, the

agencies and instrumentalities set forth on **Exhibit D** hereto are directed to transfer the funds and

the proceeds of liquid securities held on account and set forth on **Exhibit D** hereto to the Puerto

Rico Treasury Single Account; provided, however, that **Exhibit D** hereto may be amended

during the period up to and including thirty (30) days from the date hereof upon the agreement of

the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an

informative motion with the Title III Court with respect thereto.

      26.    <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>. Pursuant to

section 305 of PROMESA, with the consent of the Oversight Board and consistent with the Plan,

using all their political and governmental powers, the Governor and Legislature are directed to

take all acts necessary to carry out and satisfy all obligations and distributions set forth in the

Plan.

      27.    <u>Binding Effect</u>. This is a full and complete Final Order intended to be conclusive

and binding on all parties in interest, is not intended to be subject to collateral attack in any other

forum, and may only be challenged in accordance with applicable rules in this Court and

appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence,

by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its

instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or

any other Commonwealth instrumentality, including each holder of a bond claim and each holder

of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer

or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with

respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank

that receives or holds funds related to such bonds, whether or not such claim or other rights of

such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity

accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs,

successors, assigns, trustees, executors, administrators, officers, directors, agents,

representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises

and settlements set forth in the Plan and this Confirmation Order with respect to the priority of

the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other

applicable law shall not be binding on any party in interest (including any successor to the

Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

      28.    <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>.  Pursuant

to section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other

agreement or document entered into or delivered in connection with the Plan, (b) for purposes of

evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the

Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to section

76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all

instruments and documents related thereto will be deemed automatically cancelled, terminated

and of no further force or effect against the Debtors without any further act or action under any

applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee,

paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan, and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call rights assigned to such Monoline pursuant to the provisions of article LXXV of the Plan, (vi) to allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv) above, or (vii) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.

Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

29. <u>Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases</u>. Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and subject to the provisions of sections 76.5 and 76.7 of the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); <u>provided</u>, <u>however</u>, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom

or add any Executory Contract and Unexpired Lease thereto, in which event such Executory

Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of

any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through

the operation of section 76.1 of the Plan, by including a schedule of such contracts and leases in

the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be

rejected through the operation of section 76.1 of the Plan, by serving a separate notice to the

relevant counterparties to such agreements.  To the extent there are any amendments to such

schedules, the Debtors shall provide notice of any such amendments to the parties to the

Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the

schedules to the Plan Supplement or in any separate notice shall not constitute an admission by

the Debtors that such document is an Executory Contract and Unexpired Lease or that the

Debtors have any liability thereunder.  Except as provided in articles LV and LVI of the Plan,

none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts

and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain

in effect subject, in all instances, to Puerto Rico law and articles LV and LVI of the Plan

regarding the payment and ongoing treatment of pension and related claims obligations.

     30.   <u>Insurance Policies</u>.  Subject to the terms and provisions of section 76.7 of the

Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments

relating thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such

treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect

to its respective obligations to holders of Claims under policies of insurance and applicable law

and governing documents with respect thereto.

31.  <u>Rejection Damages Claims</u>.  If the rejection of an Executory Contract and

Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to

such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof

of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its

properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors,

unless a proof of Claim is filed with the Title III Court and served upon attorneys for the

Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after

the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Title III

Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.  <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment

with respect to each prepetition executory contract and unexpired lease to be assumed pursuant

to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment

of the cure amount in Cash on the later to occur of (a) the Effective Date and (b) within ten (10)

Business Days of the occurrence of a Final Order setting forth the cure amount as to each

executory contract or unexpired ease to be assumed or assumed and assigned, or upon such other

terms and dates as the parties to such executory contracts or unexpired leases and the Debtor

otherwise agree.

33.  <u>Setoffs</u>.  Except as otherwise provided in the Plan or in this Confirmation Order,

the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off

against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the

claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may

hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release

by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the

Debtors or the Reorganized Debtors possess against such holder; and, <u>provided</u>, <u>further</u>, that

nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of

setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560

of the Bankruptcy Code or pursuant to the common law right of recoupment; and, <u>provided</u>,

<u>further</u>, that nothing in this decretal paragraph or section 77.11 of the Plan shall affect the

releases and injunctions provided in article XCII of the Plan or this Confirmation Order.

34. <u>Delivery of Distributions</u>.

(a) <u>Delivery of Distributions Generally</u>. Subject to the provisions of Rule

9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and

deliveries to holders of Allowed Claims shall be made through The Depository Trust Company

or at the address of each such holder as set forth on the Schedules filed with the Court, unless

superseded by the address set forth on proofs of Claim filed by such holders, or at the last known

address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing

of a change of address; <u>provided</u>, <u>however</u>, that, except as otherwise provided herein,

distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be

made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the

respective governing documents for such obligations; and, <u>provided</u>, <u>further</u>, that, except as

otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction

Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto

in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or

fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn,

deliver the distribution to holders in the manner provided for in the applicable governing

documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions

received from the Debtors or their agents with respect to the delivery of distributions in

accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and

escrow positions established by the Debtors or their agents with The Depository Trust Company,

and each trustee or fiscal agent shall close and terminate the original CUSIPs after making

distributions in accordance with the terms and provisions of the Plan and shall have no further

distribution obligations thereunder.  No trustee or fiscal agent shall be required to post any bond

or surety or other security for the performance of its duties, unless otherwise ordered or directed

by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent

shall only be required to make the distributions and deliveries described in this decretal

paragraph and the Plan and in accordance with the terms of this Confirmation Order, the Plan

and such other governing document, and shall have no liability for actions reasonably taken in

accordance with the terms of this Confirmation Order, the Plan and such other governing

document, or in reasonable reliance upon information provided to such trustee or fiscal agent by

the Debtors or their agents in accordance with the terms of this Confirmation Order, the Plan or

in connection with distributions to be made hereunder or thereunder, except for liabilities

resulting from the gross negligence or willful misconduct of such trustee or fiscal agent.  The

New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with

the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

(b)     Delivery of Distributions with Respect to Assured Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number

74514LD46  validly elects (or is deemed to elect) Assured Bondholder Election 2, the

Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured

Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust

agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with

CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured

Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the

custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in

the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP

number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond

with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or

745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with

CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election

2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts

into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as

the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the

existing custodial arrangement, such that the Assured Trustee will be deemed to hold the

Assured Insured Bonds underlying the applicable custody receipts and the related Assured

Insurance Policies as provided in the applicable trust agreement, without any further action on

the part of the existing custodian, provided, however, that the existing custodian is also hereby

authorized and ordered to take any further actions that may be necessary to confirm the collapse

of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer

the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the

Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts

and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent

an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8

validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured

Bondholder will be deemed to have deposited such custody receipts into the applicable Assured

Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be

deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will

be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and

the related Assured Insurance Policies as provided in the applicable trust agreement, without

any further action on the part of the existing custodian, provided, however, that the existing

custodian is also hereby authorized and ordered to take any further actions that may be

necessary to confirm the collapse of the existing custodial arrangement as provided herein, and,

without prejudice to the ability of the Assured Trustee to draw on the applicable Assured

Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured

Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and

the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to section 75.4(a)

of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be

deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive

the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody

receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify

as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant

Assured Trust in accordance with the applicable trust agreement; (iv) pursuant to section

75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price

Payment Option with respect to all Assured Insured Bonds with respect to which Assured has

exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New

Securities and Cash on account of any Assured Insured Bonds with respect to which Assured

has exercised the Assured Election or with respect to which an Assured Insured Bondholder has

validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon

between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the

Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid

with respect to any Assured Insured Bonds with respect to which Assured has exercised the

Assured Election or with respect to which an Assured Insured Bondholder has validly elected

Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured

Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal

agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance

Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such

Assured Insured Bonds insured in the primary market in accordance with sections 75.1(a) and

75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured

in the secondary market, Assured shall, or shall cause the applicable custodian of custody

receipts evidencing the beneficial ownership interest of the holders thereof in such Assured

Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured

Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the secondary market in accordance with sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the avoidance of doubt, Assured shall not in any circumstance be required to pay itself an Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise.

(c)     Delivery of Distributions with Respect to National Insured Bonds. Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration that would otherwise be allocable to holders of Allowed National Insured Bond Claims that elected to receive the National Non-Commutation Treatment by electing such treatment in accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25 (Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in Class 18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt, National shall not in any circumstance be required to pay itself the National Acceleration Price with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)     Delivery of Distributions to FGIC.  Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, the Disbursing Agent shall distribute to FGIC FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee Bond Recovery, and the Vintage PBA Bond Recovery in accordance with the terms and provisions of section 75.4(b) of the Plan in a manner mutually agreed upon between the Disbursing Agent and FGIC.

(e)      Delivery of Distributions with Respect to Ambac Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or

745235B75 validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing

Agent shall, on the Effective Date or as soon as reasonably practicable thereafter, distribute to

Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims

in Classes 4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP

numbers 745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac

Commutation Treatment or otherwise fails to validly elect to receive the Ambac Non-

Commutation Treatment (including submitting an election for less than all of its Claims in

Classes 4 or 26), on the Effective Date or as soon as reasonably practicable thereafter, the

Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of

its Allowed Claims in Class 4 and/or 26 under the Plan to the applicable indenture trustee,

which shall in turn distribute such consideration to the applicable bondholders, except that

Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to

account for any payments that Ambac has made, or for any other consideration that Ambac has

made available or will make available, to such holder (collectively, the "Prior Payments"), and

the applicable indenture trustee shall then pay the portion of the Ambac Commutation

Consideration equal to the applicable Prior Payment to Ambac; (iii) to the extent a holder of

any Ambac Insured Bonds with CUSIP number 745145AX0 validly elects to receive the

Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably

practicable thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan

Consideration payable to such holder on account of its Allowed Claims in Class 19; (iv) to the

extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly

elect to receive the Ambac Non-Commutation Treatment (including by submitting an election

for less than all of its Claims), on the Effective Date or as soon as reasonably practicable

thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration

payable on account of its Allowed Claims in Class 19 under the Plan to the applicable indenture

trustee, which shall in turn distribute such consideration to the applicable bondholders, except

that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder

to account for any Prior Payments that Ambac has made, or for any other consideration that

Ambac has made available or will make available, to such holder and the applicable indenture

trustee shall then pay the portion of the Ambac Commutation Consideration equal to the

applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP

numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0,

745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as

reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan

Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

      (f)    <u>Delivery of Distributions with Respect to Clawback Recoveries</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) on the

Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of

the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent

shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in

accordance with the terms and provisions of section 63.1 of the Plan in a manner mutually

agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention

Center Clawback Recovery in accordance with the terms and provisions of section 64.1 of the

Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and

(iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been

satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum

Tax Recovery in accordance with the terms and provision of section 65.1 of the Plan in a

manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the

later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions,

the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback

Recovery in accordance with the terms and provisions of section 63.2 of the Plan in a manner

mutually agreed upon by the Disbursing Agent and National. Upon satisfaction of the HTA

Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback

Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to

Allowed CWHTA Claims set forth in Exhibit J to the Plan.

35. <u>Disbursing Agent</u>. Pursuant to section 1.204 of the Plan, the Disbursing Agent

shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon

consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions

in accordance with the provisions of the Plan and this Confirmation Order. Upon designation

thereof, the Oversight Board shall file an informative motion with the Title III Court setting forth

the name of the Disbursing Agent designated.

36. <u>Payment of Trustee Fees and Expenses</u>. The distributions to be made pursuant to

the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses

allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts

discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights

of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made

hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b)

pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the

period from and after the Commonwealth Petition Date, including, without limitation, that

certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of

December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National

Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided,

however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the

later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification

pursuant to Title VI of PROMESA, (the "PRIFA Effective Date") in the event that, following

application of fees and expenses in accordance with the terms and provisions of the Settlement

Agreement, the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be,

pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA,

as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may

be, within fifteen (15) Business Days following the Effective Date or the PRIFA Effective Date,

as applicable, by wire transfer of immediately available funds.

       37.   Securities Laws Exemption.  Pursuant to section 1145 of the Bankruptcy Code

and/or section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New

GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this

Confirmation Order (and any subsequent offering of such securities, including, without

limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in

accordance with articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from

registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities, and, pursuant to section 2(b) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests shall be exempt from the provisions of the Investment Company Act.

38. <u>Acceleration of Insured Bonds</u>. Notwithstanding any other provision of the Plan or this Confirmation Order:

(a) <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(b) <u>National Insured Bonds</u>: To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(c) <u>Syncora Insured Bonds</u>: To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d) <u>FGIC Insured Bonds</u>: Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be

accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)     Ambac Insured Bonds:  To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date.  Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.     Disputed Claims Reconciliation.  In accordance with the terms and provisions of section 82.1(b) of the Plan and the Committee Agreement:

(a)     The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such

appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).[8]

(b)     With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve. All such compensation and reimbursements shall be paid by the Entity selected pursuant to section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment. To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)     Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to section 82.7

---

[8]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.[9]

(d)     In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence.  The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.     <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

---

[9]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery

by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii), and (iii) above.  To the

extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any

New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or

CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be,

shall exercise voting or consent rights with respect to such obligations.

     41.    National Action Claims.  Notwithstanding anything contained herein, in the

GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action

asserted in the National Action;  provided, however, that, in the event that notwithstanding the

application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the

defendants and, to the extent named, third-party  defendants in the National Action assert against

the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of

the Commonwealth (collectively, the "CW Entities") claims or counterclaims for

indemnification, contribution, reimbursement, setoff or similar theories of recovery based on,

arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the

CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including,

without limitation, invoking the Bar Date Orders and discharge provisions set forth in article

XCII of the Plan and this Confirmation Order, objecting to any proof of claim, and prosecuting

available appeals, based upon, arising from, or related to the National Action, (B) to allow

National, at its option, to participate in or undertake such defense to such action in its sole

discretion, and (C) not to settle any CW Entities' Claims without National's written consent,

which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and

hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of

monies or the delivery of property, pursuant to a Final Order or settlement as a result of the

National Action, and (B) reimburse the relevant CW Entities for all documented fees and

expenses incurred in connection with the defense against such CW Entities' Claims, including,

without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A)

and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement

exceed any recovery realized by National in connection with the National Action; provided,

however, that National shall have no obligation pursuant to this Confirmation Order, the Plan or

otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising

from or related to the Underwriter Actions that are not based upon, arising from, or related to the

National Action or in which National is not involved.  For the avoidance of doubt, CW Entities'

Claims shall not constitute CW General Unsecured Claims.

       42.    No Amendments to Proofs of Claim/Objections to Claims.  As of the

commencement of the Confirmation Hearing, a proof of Claim may not be amended without the

approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in

respect of executory contracts and unexpired leases rejected pursuant to this Confirmation Order,

any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby

barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such

proofs of Claims from the claims registry in the Title III Cases.  Notwithstanding the provisions

of section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the

terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back

to the claims registry for determination by the Title III Court, the period in which the

Reorganized Debtors shall file and serve any objections to the Claim, by and through the

Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one

hundred eighty (180) days from and after the date of such notice transferring any such Claim

back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with

section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver,

or cause applicable agencies, instrumentalities, or Commonwealth of Puerto Rico public

corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to

the extent applicable, pleadings requested by the Oversight Board in connection with the

reconciliation of Claims, including, without limitation, Disputed Claims. Without in any way

limiting the foregoing or the terms and provisions of the Plan or the ACR Order, to the extent a

Claim subject to the terms and provisions of the ACR Order, including, without limitation,

"grievance claims" subject to the provisions of collective bargaining agreements, remain subject

to the ACR Order, upon resolution thereof, such Claims shall be satisfied by the Debtors in the

ordinary course.

43.     _Conditions to Effective Date_.  The Plan shall not become effective unless and

until the conditions set forth in section 86.1 of the Plan have been satisfied or waived in

accordance with the provisions set forth in section 86.2 of the Plan.

44.     _Administrative Claim Bar Date_.  The last day to file proof of Administrative

Expense Claims shall be ninety (90) days after the Effective Date, after which date, any

Administrative Expense Claim, proof of which has not been filed, shall be deemed forever

barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto;

_provided_, _however_, that no proof of Administrative Expense Claim shall be required to be filed if

such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order

of the Court or (ii) with the written consent of the applicable Government Parties expressly

granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an

intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of

taxes incurred by any of the Debtors during the period from and after the Commonwealth

Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, (e) relates to

actions occurring in the ordinary course during the period from and after the respective Debtor's

petition date up to and including the Effective Date, (f) relates to a Claim that is subject to the

provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of

the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking

allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of

the entry of this Confirmation Order; and, provided, further, that any such proof of

Administrative Expense Claim by a governmental unit shall remain subject to the rights and

interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in

interest to interpose an objection or other defense to the allowance or payment thereof.

45.   Professional Compensation and Reimbursement Claims.  All Entities awarded

compensation, including, without limitation, to the fullest extent provided in respective letters of

engagement or similar instruments or agreements, or reimbursement of expenses by the Title III

Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,

without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the

Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur

thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms

no more favorable to the claimant as may be mutually agreed upon between such claimant and

the Government Parties; provided, however, that, except as provided herein or in the Plan, each

Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred by their respective Professionals from and after the Effective Date in the ordinary course and without the need for Title III Court approval.

46. _GO/PBA Consummation Costs._ Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora, and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (Eastern Standard Time) on February 22, 2021.

47. _AFSCME Professional Fees._ Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its reasonable professional fees and expenses incurred to compensate AFSCME for the cost of

negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the

resolution of issues pertaining to pensions.

48. <u>GO/PBA PSA Restriction Fee</u>. Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, in exchange for (a) executing and delivering the

GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or

PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support

Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions,

including support of the Plan and the "lock-up" of GO Bonds and PBA Bonds in accordance

with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors

(including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-

insured GO Bond or PBA Bond insured by Ambac, Assured, Syncora, or National, as the case

may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the

Claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with section

301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac,

Assured, FGIC, Syncora, and National, to the extent Ambac, Assured, FGIC, Syncora, or

National, as the case may be, is authorized to vote such Claims in accordance with section

301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to

receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten

(10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee, in the form

of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of

the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of

PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication

and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA

Creditor is authorized to vote any such Claim in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac,

Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the

Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims,

CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are

Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such

Claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents

and applicable law) for which it would have been entitled to receive the GO/PBA PSA

Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the

Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business

Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and,

provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated

pursuant to the terms of sections 7.1(b)(iii) (subject to the extension provided for in section

7.1(b) thereof), (c)(i), or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan

Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement

by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation

Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in

Cash, as an allowed administrative expense claim under a plan of adjustment for the

Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and,

provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and

payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan

Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the

GO/PBA Plan Support Agreement is terminated.

49. <u>ERS Restriction Fee</u>. Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) in exchange for executing and delivering the ERS

Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in

accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS

Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall

pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such

parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars

($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan

Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative

Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy

Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars

($2,250,000.00), as agreed to among such parties.

50. <u>CCDA Consummation Costs</u>. Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, in order to compensate certain parties for the cost of

negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and

the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA

Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable,

but in no event later than ten (10) Business Days following the Effective Date, an amount equal

to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA

Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51. <u>CCDA Restriction Fee</u>. Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; <u>provided</u>, <u>however</u>, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds

after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than

a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC, or National, as the case

may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with

respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC,

and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such

Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive

insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee

equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA

Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured,

solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in

accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and

applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the

HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided,

further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have

been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to

receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the

selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA

Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond

Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in

the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of section

7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable
to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52.    <u>HTA Bond Claims</u>.  In consideration for the agreements set forth in the
HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction
of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA
68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four
Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two
Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall
reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and
the corresponding HTA Bond Claims; <u>provided</u>, <u>however</u>, that, for purposes of this decretal
paragraph 52, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims
and the HTA 98 Senior Bond Claims arising from the HTA Bonds insured by any such
Monoline, if any, in accordance with section 301(c)(3) of PROMESA, applicable law and
governing insurance and other documents applicable to such HTA Bonds; and, <u>provided</u>, <u>further</u>,
that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by
FGIC, HTA shall make such interim distribution to FGIC, and (b) with respect to any HTA 98
Senior Bonds insured by FGIC, but not owned by FGIC, HTA shall make such interim
distribution to the owners of such HTA 98 Senior Bonds.

53.    <u>System 2000 Obligations</u>.  Pursuant to the terms and provisions of section 55.10
of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System
2000 Participant Claims in the timeframes set forth therein.

54.    <u>HTA/CCDA Clawback Structuring Fees</u>.  In consideration for the structuring of
payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims,

CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution
Conditions, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA
Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in
accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days
following such date, the Commonwealth shall make payments to Assured and National in the
amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and
Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

55. <u>Active JRS Participants and Active TRS Participants</u>. In connection with the
treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to
sections 55.8 and 55.9 of the Plan:

(a) <u>Act 106 Defined Contribution Accounts</u>. Notwithstanding any provision of Act
106 to the contrary (including, without limitation, sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on
or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts
(the "Defined Contribution Accounts") pursuant to chapter 3 of Act 106 for all holders of such
Active JRS Participant Claims and Active TRS Participant Claims who do not have such
accounts as the Effective Date and who, prior to the Effective Date, were making contributions
to JRS in accordance with the provisions of Act No. 12 of October 19, 1954, as amended,
known as the "Judiciary Retirement Act," or to TRS in accordance with the provisions of Act
No. 91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement
System Act," as applicable. Without in any way limiting the foregoing, in connection with the
modification of the Commonwealth's obligations under any laws establishing or enabling TRS or
JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have

otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined

Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)    <u>Eligibility for and Enrollment in Federal Social Security</u>.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active

TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall

mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of

two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit

established in section 1081.01(d)(7) of Act 1-2011; <u>provided</u>, <u>however</u>, that each teacher and

judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his

or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of

his or her monthly compensation, up to the limited established in section 1081.01(d)(7) of Act

No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," or any

successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social

Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60)

days of the Effective Date to reduce their contributions to a minimum of two and three-tenths

percent (2.3%) and be enrolled in the Federal Social Security system.  For teachers who are

Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the

Effective Date who contribute two and three-tenths percent (2.3%) of their monthly

compensation as set forth above, including those aged 45 and older who have elected to do so,

the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly

compensation and remit such amount to the appropriate authority as required by the applicable

provisions of the Federal Social Security Act and other applicable Federal law to enable the

inclusion of the Participant in the Federal Social Security system.  Teachers who are Active TRS

Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date

may voluntarily contribute to their Defined Contribution Accounts additional amounts to those

established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no

case may those increased contribution rates and additional amounts exceed the applicable limits

to be eligible, and affect the eligibility of these Participants, for coverage under the Federal

Social Security system, unless such Participants are aged 45 and older and do not participate in

the Federal Social Security system.  In accordance with the foregoing, the Government of the

Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or

on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or

mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure

eligibility for and enrollment of Participants in the Federal Social Security system and

effectuating the Federal Insurance Contributions Act remittances.

      56.      Discharge and Release of Claims and Causes of Action.

      (a)      Except as expressly provided in the Plan or herein, all distributions and rights

afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete

satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against the

Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date,

relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective

Assets, property, or interests of any nature whatsoever, including any interest accrued on such

Claims from and after the Petition Date, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;

provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors of the Debtors.  Upon the Effective Date and independent of the distributions provided for under the Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code and section 407 of PROMESA, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and section 407 of PROMESA (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or herein shall release, discharge, or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized

Debtors or any of their respective Assets and property, including any and all interest accrued on such Claims, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action, or liabilities. In accordance with the foregoing, except as expressly provided in the Plan or herein, this Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt, or liability. As of the Effective Date, and in consideration for the distributions or other value provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)     Notwithstanding any other provisions of decretal paragraph 56 of this Confirmation Order or section 92.2 of the Plan, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the

Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with

respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this

Confirmation Order and section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the

contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers,

or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes

of action, proceedings or investigations against any non-debtor person or non-debtor entity in

any forum.

(e)     United States Limitation.  Notwithstanding anything contained herein or in the

Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or

agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be,

from compliance with federal laws or territorial laws and requirements implementing a federally

authorized or federally delegated program protecting the health, safety, and environment of

persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which

the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release,

enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United

States arising from and after the Effective Date, (B) any liability to the United States that is not a

Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the

Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and

recoupment of such parties are expressly preserved, (D) the continued validity of the obligations

of the United States, the Debtors, or the Reorganized Debtors, as the case may be, under any

United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized

Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such

federal legal provisions, including, but not limited to, compliance obligations, requirements

under consent decrees or judicial orders, and obligations to pay associated administrative, civil,

or other penalties, and (F) any liability to the United States on the part of any non-debtor.

Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to

determine the tax liability of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such

tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or

tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors

and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any

claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv)

to grant any relief to any Entity that the Court is prohibited from granting by the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)      Underwriter Actions.  Notwithstanding anything contained herein or in the Plan to

the contrary, including, without limitation, sections 92.2, 92.3, and 92.11 of the Plan, except as

may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the

Confirmation Order, or any Plan-related document set forth in the Plan Supplement is intended,

nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release,

reduce, eliminate, or limit the rights of the plaintiffs and defendants, including, without

limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims,

causes of action and defenses in the Underwriter Actions, including, but not limited to, any

Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available),

or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit

against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive

Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive

Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery

of property to any plaintiff, defendant and, to the extent named, third-party defendant by any of

the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party

in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the

extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the

Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative

monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the

Plan, and/or this Confirmation Order; and/or (ii) against any of the CW Entities any Claims or

counterclaims for purposes of obtaining an affirmative monetary recovery, including, without

limitation, for indemnification, contribution, reimbursement, setoff, or similar theories to the

extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or

counterclaims shall be deemed disallowed, barred, released, and discharged in accordance with

the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for

the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be

construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in

any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or

limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the

Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,

prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for

purposes of obtaining an affirmative monetary recovery, including, without limitation,

indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for

purposes of obtaining an affirmative monetary recovery, based upon, arising from, or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

(g) <u>Quest Litigation</u>. Notwithstanding anything contained herein or in the Plan to the contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes of action and defenses in the avoidance action brought against it, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment (the "Quest Rights"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any Quest Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property by any of the Debtors to Quest in connection with the merits of its avoidance action, and (2) to file and receive payment on any Claim it has pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); <u>provided</u>, <u>however</u>, that any such Claims would constitute a CW General Unsecured Claim and be treated in accordance with the terms and provisions of article LXII of the Plan.

57. <u>Releases by the Debtors and Reorganized Debtors</u>. Except as otherwise expressly provided in the Plan or this Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit,

and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors,

Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through

them, on their behalf or for their benefit, have or may have or claim to have, now or in the future,

against any Released Party that are Released Claims.

58.     <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this

Confirmation Order, all release and exculpation provisions, including, but not limited to, those

contained in article XCII of the Plan, are approved and shall be effective and binding on all

Entities, to the extent provided therein.

59.     **<u>Injunction on Claims</u>.  Except as otherwise expressly provided in section**

**92.11 of the Plan, this Confirmation Order, or such other Final Order of the Title III Court**

**that is applicable, all Entities who have held, hold, or in the future hold Claims or any**

**other debt or liability that is discharged or released pursuant to section 92.2 of the Plan or**

**who have held, hold, or in the future hold Claims or any other debt or liability discharged**

**or released pursuant to section 92.2 of the Plan are permanently enjoined, from and after**

**the Effective Date, from (a) commencing or continuing, directly or indirectly, in any**

**manner, any action or other proceeding (including, without limitation, any judicial,**

**arbitral, administrative, or other proceeding) of any kind on any such Claim or other debt**

**or liability discharged pursuant to the Plan against any of the Released Parties or any of**

**their respective assets or property, (b) the enforcement, attachment, collection or recovery**

**by any manner or means of any judgment, award, decree, or order against any of the**

**Released Parties or any of their respective assets or property on account of any Claim or**

**other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing**

**any encumbrance of any kind against any of the Released Parties or any of their respective**

assets or property on account of any Claim or other debt or liability discharged pursuant

to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553,

555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against

any obligation due from any of the Released Parties or any of their respective assets or

property, with respect to any such Claim or other debt or liability discharged pursuant to

the Plan. Such injunction shall extend to all successors and assigns of the Released Parties

and their respective assets and property. Notwithstanding the foregoing, without prejudice

to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61

hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it

be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors.

60.     **Injunction Related to Releases**.  As of the Effective Date, all Entities that

hold, have held, or in the future hold a Released Claim released pursuant to section 92.5 of

the Plan, are, and shall be, permanently, forever and completely stayed, restrained,

prohibited, barred, and enjoined from taking any of the following actions, whether directly

or indirectly, derivatively or otherwise, on account of or based on the subject matter of

such discharged Released Claims: (i) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action, or other proceeding (including, without

limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii)

enforcing, attaching (including, without limitation any prejudgment attachment),

collecting, or in any way seeking to recover any judgment, award, decree, or other order;

(iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any

Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Confirmation Order and section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order. For the avoidance of doubt, the following stipulations will terminate upon the entry of this Confirmation Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Exhibit "B" Regarding the Tolling of Statute of Limitations* (Docket Entry No. 17394), as amended.

61.     Exculpation.

(a)     Government Parties:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the

foregoing provisions of this subparagraph (a) or section 92.7 of the Plan shall not affect the

liability of any Entity that otherwise would result from any such act or omission to the extent that

such act or omission is determined in a Final Order to have constituted intentional fraud or

willful misconduct.  Nothing in this subparagraph (a) or section 92.7(a) of the Plan shall

prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective

professionals to assert reliance upon advice of counsel as a defense with respect to their duties

and responsibilities under the Plan.

(b)   <u>PSA Creditors</u>:  Each of the PSA Creditors solely in its capacity as a party to the

GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA

Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition

Date up to and including the Effective Date and each of their respective Related Persons shall not

have or incur any liability to any Entity for any act taken or omitted to be taken in connection

with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement,

the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive

Documents, or any other contract, instrument, release or other agreement or document provided

for or contemplated in connection with the consummation of the transactions set forth in the

Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (b) and section

92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined in a Final Order to

have constituted intentional fraud or willful misconduct.

(c) <u>Retiree Committee</u>: Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, <u>provided</u>, <u>however</u>, that, the foregoing provisions of this subparagraph (c) and section 92.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d) <u>Creditors' Committee</u>: Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided, however, that, the foregoing provisions of this subparagraph (d) and section 92.7(d) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)     AFSCME:  AFSCME, solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date, and each of its respective Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing provisions of this subparagraph (e) and section 92.7(e) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act

or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f)      Monoline Insurers:  Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained in this Confirmation Order or the Plan to the contrary, the terms and provisions of the Plan and this Confirmation Order shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as

applicable); provided, however, that the foregoing provisions of this subparagraph (f) and section 92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined, pursuant to a Final Order, to have constituted intentional fraud or willful misconduct.

(g)    The DRA Parties:  Each of the GDB Debt Recovery Authority ("DRA"), AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the Effective Date and each of the DRA Parties, respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100 Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) shall not affect the liability of any Entity that would otherwise result from any

such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62. <u>Maintenance of Pension System</u>. Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.   <u>Appointments Related Litigation/Uniformity Litigation</u>.  Notwithstanding
anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in
connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to
entry of this Confirmation Order, in consideration of the distributions made, to be made, or
deemed to be made in accordance with the terms and provisions of the Plan and documents and
instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have
received, distributions pursuant to or as a result of the Plan or this Confirmation Order having
consented and agreed, such Final Order shall not in any way or manner reverse, affect or
otherwise modify the transactions contemplated in the Plan and this Confirmation Order,
including, without limitation, the releases, exculpations and injunctions provided pursuant to
article XCII of the Plan and herein; <u>provided</u>, <u>however</u>, that, to the extent that a plaintiff in the
Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA
Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support
Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such
plaintiff shall take any and all actions to dismiss, with prejudice or, in the event other plaintiffs
are party to such litigations, withdraw from, with prejudice, such Appointments Related
Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing
notices with the clerk of the court having jurisdiction thereof.

64.   **<u>Bar Order</u>.  To the limited extent provided in the Plan, each and every Entity
is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing, or
litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action
of any and every kind, character or nature whatsoever, in law or in equity, known or
unknown, direct or derivative, whether asserted or unasserted, against any of the Released**

Parties, based upon, related to, or arising out of or in connection with any of the Released

Claims, confirmation and consummation of the Plan, the negotiation and consummation of

the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan

Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan

Support Agreement, or any claim, act, fact, transaction, occurrence, statement, or omission

in connection with or alleged or that could have been alleged in the Title III Cases,

including, without limitation, any such claim, demand, right, liability, or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs, or fees

incurred arising directly or indirectly from or otherwise relating to the Title III Cases,

either directly or indirectly by any Person for the direct or indirect benefit of any Released

Party arising from or related to the claims, acts, facts, transactions, occurrences,

statements, or omissions that are, could have been or may be alleged in the related actions

or any other action brought or that might be brought by, through, on behalf of, or for the

benefit of any of the Released Parties (whether arising under federal, state, or foreign law,

and regardless of where asserted); provided, however, that, without prejudice to the

exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof,

nothing contained in the Plan or this Confirmation Order is intended, nor shall it be

construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and

of their respective Related Persons by Creditors of the Debtors.

    65.    **Supplemental Injunction**.  Notwithstanding anything contained herein or in

the Plan to the contrary, except to the limited extent provided in the Plan, all Entities,

including Entities acting on their behalf, who currently hold or assert, have held or

asserted, or may hold or assert, or may control by enacting legislation, any Released

Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity, or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained, and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering, or receiving any payment or recovery with respect to any Released Claims for themselves or other entities, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing, or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)     Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

**provided**, **however**, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

66.    Term of Existing Injunctions or Stays.  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect through the Effective Date, except that each injunction imposed by a Court order shall remain in effect permanently unless the order specifies a termination date or event, in which case, the specification set forth in such order shall govern.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

67.    Prosecution of Claims.  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

68.    Indemnification and Reimbursement Obligations.  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the

Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense Claims.

69. <u>Compliance with Tax Requirements</u>. Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state, or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions. Except as provided above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing

Agent or the trustee of the applicable trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70. <u>Documents and Instruments</u>. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

71. <u>Fiscal Plan</u>. For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72. <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA, and MBA</u>. The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.    <u>GUC Reserve</u>.  On and after the Effective Date, the Debtors' and Reorganized

Debtors' liability to holders of Allowed CW General Unsecured Claims shall be limited to

funding the GUC Reserve in accordance with section 62.3 of the Plan as follows: subject to the

reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the

Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31,

2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d)

One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e)

Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the

GUC Reserve being funded by the Commonwealth in accordance with section 62.3 of the Plan,

the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed

CW General Unsecured Claims.

74.    <u>PROMESA 407 Claims</u>.  All Claims reserved by holders of bonds issued by

HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and*

*Order Approving the Qualifying Modification for the Government Development Bank for Puerto*

*Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and*

*Economic Stability Act*, including, without limitation, any claim under section 407 of

PROMESA, shall be automatically released on the Effective Date with no further notice or

action.

75.    <u>Dairy Producer Claims</u>.  Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) nothing contained herein shall adjust, enlarge,

compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to

the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation

under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory

approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Producer Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

76.     <u>Eminent Domain/Inverse Condemnation Claims</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class 54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective Date, and upon the effective date of a Final Order of a court of competent jurisdiction determining the validity of and amount of just compensation attributable to an Allowed Eminent Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and (c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as CW General Unsecured Claims for purposes of distribution.  Nothing in the Plan or this Confirmation Order shall be construed to prevent any determination of just compensation from including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent Domain/Inverse Condemnation Claim.  Notwithstanding the foregoing, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the

Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed

Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and

provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent

Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration,

satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent

Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make,

payments, in Cash, in an amount equal to the pro rata payments to be made to holders of

Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

77.     <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the Plan

nor this Confirmation Order shall change the duration of the Oversight Board's existence set

forth in section 209 of PROMESA, and neither the Plan nor this Confirmation Order shall alter

any of the Oversight Board's powers and duties under each title of PROMESA.  Until

termination of the Oversight Board pursuant to section 209 of PROMESA, the Oversight Board

may enforce the Plan.  At all times, each party in interest may enforce Plan provisions directly

affecting the party in interest.

78.     <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's
Sole Discretion</u>.  Nothing in the Plan and nothing in this Confirmation Order (a) alters the

powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its

sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and

to develop and certify new fiscal plans and budgets at any times, (b) grants the government of

Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants

the government of Puerto Rico any rights and powers barred by section 108(a) of PROMESA.

79. <u>Government Post-Confirmation Powers and Duties</u>. Upon termination of the Oversight Board pursuant to section 209 of PROMESA, the Governor shall enforce the Plan. If the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest after being requested to do so by a party in interest, each party in interest that would reasonably be prejudiced or injured by lack of enforcement may enforce the Plan provision. At no time prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other obligations. Pursuant to section 1142(b) of the Bankruptcy Code, the Governor shall cause the executive branch of the Commonwealth government to take all acts necessary for the consummation of the Plan.

80. <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>. The Government of Puerto Rico, including without limitation, any Entity or Person acting for or on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal, change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt issued pursuant to the Plan.

81. <u>Non-Impairment of CVIs, SUT</u>. Until all obligations with respect to the CVIs have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter the rights vested in the Commonwealth in accordance with the Plan and this Confirmation Order to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track

performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in

the CVI Indenture; provided, however, that the foregoing shall not preclude the Commonwealth

from exercising its power, through a valid change in law, to eliminate the Measured SUT, or

replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI

Indenture.

82.      Reversal/Stay/Modification/Vacatur of Order.  Except as otherwise provided in

this Confirmation Order or a subsequent order issued by this Court or a higher court having

jurisdiction over an appeal of this Confirmation Order or over a certiorari proceeding in respect

of this Confirmation Order, if any or all of the provisions of this Confirmation Order are

hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other

court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of

any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors

or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay,

modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of

this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in

reliance on, this Confirmation Order prior to the effective date of such reversal, stay,

modification, or vacatur shall be governed in all respect by the provisions of this Confirmation

Order and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an

order of this Court or an appellate court, all existing orders entered in the Title III Cases remain

in full force and effect.

83.      Retention of Jurisdiction.  Notwithstanding the entry of this Confirmation Order

or the occurrence of the Effective Date, subject to the terms and provisions of article XCI of the

Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

84. <u>Conflicts Among Documents</u>. The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this Confirmation Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Confirmation Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the event of any irreconcilable inconsistency between the Plan and this Confirmation Order, the documents shall control in the following order of priority: (i) this Confirmation Order, and (ii) the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this Confirmation Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III Case, the terms and provisions of this Confirmation Order shall control; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

85. <u>PBA Leases</u>. Notwithstanding anything contained herein or in the Plan to the contrary, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") shall be deemed rejected effective upon the earliest to occur of (a) June 30, 2022, (b) the date

upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA

enters into a new or amended lease with respect to the leased property subject to such PBA

Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to

a PBA Lease, and (e) the date upon which AAFAF, on behalf of the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, that is a counterparty, as lessee,

with respect to a PBA Lease, provides written notice to PBA that such PBA Lease is rejected (in

each case, the earliest of (a) through (e), the "PBA Rejection Date"); provided, however, that,

during the period from the Effective Date up to, but not including, the applicable PBA Rejection

Date, with respect to any PBA Lease between PBA, as lessor, and the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, as lessee, monthly lease payments

shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified

Fiscal Plan and (z) the monthly costs and expenses associated with the applicable leased

property; and, provided, further, that any accruals on the books of PBA or any of the

Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as

counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA

Lease shall be deemed released, settled, and discharged as of the PBA Rejection Date.

     86.    Modifications. The modifications to the Seventh Amended Plan, as set forth in

the Plan, do not adversely change the treatment of the Claim of any Creditor that accepted the

Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan. Before

substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after

entry of this Confirmation Order, subject to any limitations set forth in the Plan (including

consent rights) and any stipulation approved by this Court in connection with the Plan; provided,

however, that the circumstances warrant such modification and the Court, after notice and a

hearing, confirms such modified plan under the applicable legal requirements. For the avoidance

of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942

and the terms of this Confirmation Order.

87. <u>Asserted Surety Claims</u>. Notwithstanding anything contained in the Plan to the

contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a

secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a)

of the Bankruptcy Code following the expiration of the period to object to any such Claim in

accordance with the provisions of section 82.1 of the Plan, such Claim shall be paid in full, in

Cash; <u>provided</u>, <u>however</u>, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in

accordance with the provisions of section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

88. <u>Identification of Additional Retail Investors / Retail Support Fee</u>. Within five (5)

Business Days of the date hereof, the Oversight Board shall cause the Balloting Agent to

distribute, by mail, electronic mail, or such other means customary, the form of Certification

Notice annexed hereto as **<u>Exhibit E</u>** (the "Certification Notice") to all known holders, by and

through their respective Nominee(s), of (a) Vintage PBA Bond Claims, (b) 2011 PBA Bond

Claims, (c) 2012 PBA Bond Claims, (d) Vintage CW Bond Claims, (e) 2011 CW Bond Claims,

(f) 2011 CW Series D/E/PIB Bond Claims, (g) 2012 CW Bond Claims, and (h) 2014 CW Bond

Claims (collectively, the "Bonds") who did <u>not</u> submit a vote that was not otherwise revoked by

such holder pursuant to the procedures set forth in the Disclosure Statement Order on or before

6:00 p.m. (Atlantic Standard Time) on October 18, 2021.

      a.   The record date to determine which beneficial owners of the Bonds (collectively,
the "Beneficial Owners") are entitled to receive the Certification Notice and make
the Certification (as defined below) shall be 6:00 p.m. (Atlantic Standard Time)
on October 18, 2021 (the "Certification Record Date").

b. Promptly upon receipt of a Certification Notice, each Nominee (or such Nominee's agent) shall distribute such Certification Notice to the Beneficial Owners eligible as of the Certification Record Date pursuant to such Nominee's (or such Nominee's agent's) customary practices for conveying such information.

c. If it is a Nominee's (or such Nominee's agent's) customary and accepted business practice to forward the Certification Notice to (and collect Certifications from) Beneficial Owners by information form, email, telephone, or other customary means of communications, as applicable, the Nominee (or such Nominee's agent) shall employ such method of communication in lieu of sending a paper copy of the Certification Notice to Beneficial Owners; provided, however, that if the Nominee's (or such Nominee's agent's) customary internal practice is to provide to Beneficial Owners an electronic link to the Certification Notice, the Nominee (or such Nominee's agent) may follow such customary practice in lieu of forwarding paper copies of the Certification Notice to Beneficial Owners.

d. The Oversight Board shall cause the Balloting Agent to provide Beneficial Owners of the Bonds as of the Certification Record Date a frozen "user CUSIP" (or similarly appropriate non-tradeable identifier) for the purpose of making the Certification.

e. Each Beneficial Owner of the Bonds who certifies that it is an individual who held the Bonds as of the Certification Record Date in the aggregate outstanding principal amount of One Million Dollars ($1,000,000.00) or less in one or more brokerage account(s), trust account(s), custodial account(s), or separately managed account(s) (the "Certification") pursuant to the procedures set forth in this decretal paragraph 88 hereof shall be deemed a Retail Investor for purposes of distributions to be made pursuant to the Plan, and shall receive a distribution of the Retail Support Fee through the "user CUSIP" in accordance with the terms and provisions of the Plan.

f. Beneficial Owners of the Bonds must deliver their certification instructions to (or otherwise coordinate with) their Nominee according to the instructions in the Certification Notice in sufficient time for the Nominee to effectuate the Beneficial Owner's Certification through The Depository Trust Company's ("DTC") Automated Tender Offer Program ("ATOP") in accordance with the procedures of DTC and be received on ATOP by 6:00 p.m. (Atlantic Standard Time) on the first Business Day thirty (30) days from and after the date hereof (the "Certification Deadline");[10] provided, however, that any holder who has executed, completed, and delivered through ATOP in accordance with the procedures of DTC its Certification may revoke such Certification and withdraw any securities that have been tendered with respect to a Certification through ATOP in accordance with the procedures of DTC on or before the Certification Deadline.

---

[10]     6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

g. All securities that are tendered with respect to a Certification shall be restricted from further trading or transfer through the Effective Date of the Plan.

89.     <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

90.     <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

91.     <u>PFC Reservation</u>.  Neither the Plan nor this Confirmation Order determine, affect, or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA, or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

92.     <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to section 301(a) of PROMESA, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Confirmation Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including,

without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO

CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions

Trust Agreement, provide adequate means for implementation of the Plan pursuant to section

1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall

constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions

to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as

applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in

accordance with their terms.

93. <u>Waiver of Filings</u>. Any requirement pursuant to Bankruptcy Rule 1007 obligating

the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S.

Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective

Date.

94. <u>Notice of Order</u>. In accordance with Bankruptcy Rules 2002 and 3020(c), as soon

as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of

this Confirmation Order and the occurrence of the Effective Date, substantially in the form

attached as **Exhibit B** hereto, to all parties who hold a Claim in the Commonwealth Title III

Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the

Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States Attorney for the District of Puerto Rico. Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Confirmation Order.

95.   <u>No Waiver</u>.  The failure to specifically include any particular provision of the

Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor

constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its

entirety and incorporated herein by this reference.


SO ORDERED.

Dated: January 18, 2022

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

**Exhibit A**

**Plan**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board*
*as Representative for the Debtors in their Title III Cases*

Dated: January 14, 2022

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................1

| | | |
|---|---|---|
| 1.1 | 2011 CW Bond Claim ................................................................................1 |
| 1.2 | 2011 CW Bond Claim (Assured)................................................................1 |
| 1.3 | 2011 CW Bond Claim (Taxable Election) .................................................1 |
| 1.4 | 2011 CW Bond Recovery ..........................................................................1 |
| 1.5 | 2011 CW Bonds.........................................................................................1 |
| 1.6 | 2011 CW Guarantee Bond Claim ..............................................................2 |
| 1.7 | 2011 CW Guarantee Bond Claim (Taxable Election) ...............................2 |
| 1.8 | 2011 CW Guarantee Bond Recovery.........................................................2 |
| 1.9 | 2011 CW Guarantee Taxable Bond Distribution .......................................2 |
| 1.10 | 2011 CW Series D/E/PIB Bond Claim .......................................................2 |
| 1.11 | 2011 CW Series D/E/PIB Bond Claim (Assured) ......................................2 |
| 1.12 | 2011 CW Series D/E/PIB Bond Claim (Taxable Election) ........................2 |
| 1.13 | 2011 CW Series D/E/PIB Bond Recovery..................................................3 |
| 1.14 | 2011 CW Series D/E/PIB Bonds ................................................................3 |
| 1.15 | 2011 CW Series D/E/PIB Taxable Bond Distribution................................3 |
| 1.16 | 2011 CW Taxable Bond Distribution .........................................................3 |
| 1.17 | 2011 PBA Bond Claim ...............................................................................3 |
| 1.18 | 2011 PBA Bond Recovery..........................................................................3 |
| 1.19 | 2011 PBA Bonds.........................................................................................4 |
| 1.20 | 2012 CW Bond Claim.................................................................................4 |
| 1.21 | 2012 CW Bond Claim (Assured)................................................................4 |
| 1.22 | 2012 CW Bond Claim (Taxable Election)..................................................4 |
| 1.23 | 2012 CW Bond Recovery ...........................................................................4 |
| 1.24 | 2012 CW Bonds..........................................................................................4 |
| 1.25 | 2012 CW Guarantee Bond Claim ...............................................................5 |
| 1.26 | 2012 CW Guarantee Bond Claim (Taxable Election) ................................5 |
| 1.27 | 2012 CW Guarantee Bond Recovery..........................................................5 |
| 1.28 | 2012 CW Guarantee Taxable Bond Distribution........................................5 |
| 1.29 | 2012 CW Taxable Bond Distribution..........................................................5 |
| 1.30 | 2012 PBA Bond Claim ...............................................................................5 |
| 1.31 | 2012 PBA Bond Recovery..........................................................................6 |
| 1.32 | 2012 PBA Bonds.........................................................................................6 |
| 1.33 | 2014 CW Bond Claim.................................................................................6 |
| 1.34 | 2014 CW Bond Claim (Taxable Election)..................................................6 |
| 1.35 | 2014 CW Bond Recovery ...........................................................................6 |
| 1.36 | 2014 CW Bonds..........................................................................................6 |
| 1.37 | 2014 CW Guarantee Bond Claim ...............................................................6 |
| 1.38 | 2014 CW Guarantee Bond Claim (Taxable Election) ................................7 |
| 1.39 | 2014 CW Guarantee Taxable Bond Distribution........................................7 |
| 1.40 | 2014 CW Taxable Bond Distribution..........................................................7 |
| 1.41 | 5.5% SUT....................................................................................................7 |

i

## Table of Contents
## (Cont'd)

| | | |
|---|---|---:|
| 1.42 | AAFAF | 7 |
| 1.43 | ACR Order | 7 |
| 1.44 | Act 106 | 7 |
| 1.45 | Act 106 Board | 7 |
| 1.46 | Active and Retired Employee Benefit Claim | 7 |
| 1.47 | Active ERS Participant Claim | 8 |
| 1.48 | Active JRS Participant Claim | 8 |
| 1.49 | Active Participant | 8 |
| 1.50 | Active TRS Participant Claim | 8 |
| 1.51 | Administrative Claim Bar Date | 8 |
| 1.52 | Administrative Expense Claim | 8 |
| 1.53 | ADR Order | 8 |
| 1.54 | ADR Procedures | 8 |
| 1.55 | Affiliate | 8 |
| 1.56 | AFICA | 9 |
| 1.57 | AFSCME | 9 |
| 1.58 | AFSCME CBAs | 9 |
| 1.59 | AFSCME Claims | 9 |
| 1.60 | AFSCME Plan Support Agreement | 9 |
| 1.61 | AFSCME Term Sheet | 9 |
| 1.62 | Allowed | 9 |
| 1.63 | Allowed Claim | 9 |
| 1.64 | Ambac | 9 |
| 1.65 | Ambac Acceleration Price | 10 |
| 1.66 | Ambac Action | 10 |
| 1.67 | Ambac Certificates | 10 |
| 1.68 | Ambac Commutation Consideration | 10 |
| 1.69 | Ambac Commutation Treatment | 10 |
| 1.70 | Ambac CW/HTA Bond Claims | 10 |
| 1.71 | Ambac Escrow Account | 10 |
| 1.72 | Ambac Insured Bond Claims | 10 |
| 1.73 | Ambac Insured Bonds | 10 |
| 1.74 | Ambac Insurance Policies | 10 |
| 1.75 | Ambac Plan Consideration | 10 |
| 1.76 | Ambac Trust | 11 |
| 1.77 | Ambac Trust Assets | 11 |
| 1.78 | Ambac CW/Convention Center Claims | 11 |
| 1.79 | Ambac CW/HTA Bond Claims | 11 |
| 1.80 | Ambac CW/PRIFA Rum Tax Claims | 11 |
| 1.81 | AMPR | 11 |
| 1.82 | Appointments Related Litigation | 11 |
| 1.83 | Assets | 11 |
| 1.84 | Assured | 11 |
| 1.85 | Assured Acceleration Price | 12 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.86 | Assured Acceleration Price Payment Option | 12 |
| 1.87 | Assured Bondholder Elections | 12 |
| 1.88 | Assured Bondholder Elections Form | 12 |
| 1.89 | Assured CVIs | 12 |
| 1.90 | Assured CW/Convention Center Claims | 12 |
| 1.91 | Assured CW/HTA Bond Claims | 12 |
| 1.92 | Assured CW/PRIFA Rum Tax Claims | 12 |
| 1.93 | Assured Election | 12 |
| 1.94 | Assured Election Notice | 13 |
| 1.95 | Assured Insurance Policies | 13 |
| 1.96 | Assured Insured Bond Claim | 13 |
| 1.97 | Assured Insured Bondholder | 13 |
| 1.98 | Assured Insured Bonds | 13 |
| 1.99 | Assured New GO Bonds | 13 |
| 1.100 | Assured New Securities | 13 |
| 1.101 | Assured Plan Consideration | 13 |
| 1.102 | Assured Treatment | 13 |
| 1.103 | Avoidance Actions | 13 |
| 1.104 | Avoidance Actions CW Interests | 14 |
| 1.105 | Avoidance Actions ERS Interests | 14 |
| 1.106 | Avoidance Actions Trust | 14 |
| 1.107 | Avoidance Actions Trust Agreement | 14 |
| 1.108 | Avoidance Actions Trust Assets | 14 |
| 1.109 | Avoidance Actions Trust Beneficiaries | 15 |
| 1.110 | Avoidance Actions Trust Board | 15 |
| 1.111 | Avoidance Actions Trust Interests | 15 |
| 1.112 | Avoidance Actions Trustee | 15 |
| 1.113 | Ballot Date | 15 |
| 1.114 | Ballot/Election Form | 15 |
| 1.115 | Bankruptcy Code | 15 |
| 1.116 | Bankruptcy Rules | 15 |
| 1.117 | Bar Date | 15 |
| 1.118 | Bar Date Orders | 15 |
| 1.119 | Base Contribution | 16 |
| 1.120 | Bond Claim | 16 |
| 1.121 | Bond Recovery Category | 16 |
| 1.122 | Bondholder Election | 16 |
| 1.123 | Business Day | 16 |
| 1.124 | Capital Improvements | 16 |
| 1.125 | Cash | 16 |
| 1.126 | Causes of Action | 16 |
| 1.127 | CCDA | 17 |
| 1.128 | CCDA Bonds | 17 |
| 1.129 | CCDA Bond Claims | 17 |

**Table of Contents**
**(Cont'd)**

1.130  CCDA Consummation Costs ............................................................17
1.131  CCDA Restriction Fee Creditors ....................................................17
1.132  CCDA Restriction Fee Percentage..................................................17
1.133  CCDA Trustee ................................................................................17
1.134  Charging Lien ................................................................................17
1.135  Claim ..............................................................................................18
1.136  Class ...............................................................................................18
1.137  Clawback Actions ..........................................................................18
1.138  Clawback CVI Indenture ...............................................................18
1.139  Clawback CVIs ..............................................................................18
1.140  Clawback Recovery ........................................................................18
1.141  COFINA ........................................................................................18
1.142  COFINA Bonds ..............................................................................19
1.143  COFINA Bonds Indenture .............................................................19
1.144  COFINA Bonds Legislation ...........................................................19
1.145  COFINA Confirmation Order .........................................................19
1.146  COFINA Plan .................................................................................19
1.147  Committee Agreement ....................................................................19
1.148  Commonwealth ...............................................................................19
1.149  Commonwealth Constitution ..........................................................19
1.150  Commonwealth Election .................................................................19
1.151  Commonwealth Instrumentality Plan .............................................19
1.152  Commonwealth Legislature ............................................................19
1.153  Commonwealth Petition Date .........................................................19
1.154  Commonwealth Title III Case .........................................................19
1.155  Comprehensive Cap ........................................................................19
1.156  Confirmation Date ..........................................................................20
1.157  Confirmation Hearing .....................................................................20
1.158  Confirmation Order .........................................................................20
1.159  Constitutional Debt Group ..............................................................20
1.160  Constitutional Debt Group Members ..............................................20
1.161  Consummation Costs .......................................................................20
1.162  Convenience Cap .............................................................................20
1.163  Convenience Claim ..........................................................................20
1.164  Creditor ...........................................................................................21
1.165  Creditors' Committee .......................................................................21
1.166  CRIM ...............................................................................................21
1.167  CUSIP ..............................................................................................21
1.168  Custodial Trust Documents ..............................................................21
1.169  CVIs .................................................................................................21
1.170  CVI Indenture ..................................................................................21
1.171  CVI Legislation ...............................................................................21
1.172  CVI Payment Reserve ......................................................................21
1.173  CVI Trustee ......................................................................................22

**Table of Contents**
**(Cont'd)**

1.174  CW Appropriations Claims ...................................................................22
1.175  CW Bond Claims ..................................................................................22
1.176  CW Bond Claims (Insured) ..................................................................22
1.177  CW Fiscal Plan ....................................................................................22
1.178  CW General Unsecured Claim .............................................................22
1.179  CW Guarantee Bond Claims ................................................................23
1.180  CW Guarantee Bond Claims (Insured) ...............................................23
1.181  CW GUC Recovery ..............................................................................23
1.182  CW/Convention Center Claim .............................................................23
1.183  CW/Convention Center Clawback Recovery .......................................24
1.184  CW/HTA Claim ....................................................................................24
1.185  CW/HTA Clawback Recovery ..............................................................24
1.186  CW/MBA Claim ...................................................................................24
1.187  CW/MBA Clawback Recovery .............................................................24
1.188  CW/PRIFA Rum Tax Claim ..................................................................24
1.189  CW/PRIFA Rum Tax Clawback Recovery .............................................24
1.190  Dairy Producer Claim ..........................................................................24
1.191  Dairy Producer Settlement ...................................................................25
1.192  Debt .....................................................................................................25
1.193  Debt Management Policy .....................................................................25
1.194  Debtors ...............................................................................................25
1.195  Debt Policy Period ...............................................................................25
1.196  Debt Policy Revenues ..........................................................................25
1.197  Debt Related Objections ......................................................................25
1.198  Debt Responsibility Act .......................................................................26
1.199  Debt Service Fund ...............................................................................26
1.200  Debtors ...............................................................................................27
1.201  Deemed Issuance Date ........................................................................27
1.202  Definitive Documents ..........................................................................27
1.203  Disallowed ...........................................................................................27
1.204  Disbursing Agent .................................................................................27
1.205  Disclosure Statement ...........................................................................27
1.206  Disclosure Statement Hearing .............................................................27
1.207  Disclosure Statement Order .................................................................27
1.208  Disputed Claim ....................................................................................28
1.209  Distribution Date .................................................................................28
1.210  Distribution Record Date .....................................................................28
1.211  Effective Date ......................................................................................28
1.212  Eminent Domain/Inverse Condemnation Claim ..................................28
1.213  Eminent Domain Proceeding ...............................................................28
1.214  Energy Incentive Act ...........................................................................28
1.215  Energy Incentive Claims ......................................................................29
1.216  Entity ..................................................................................................29
1.217  ERS .....................................................................................................29

**Table of Contents**
**(Cont'd)**

1.218   ERS Bond Claim ...........................................................................................29
1.219   ERS Bond Recovery .......................................................................................29
1.220   ERS Bonds ....................................................................................................29
1.221   ERS Fiscal Agent ...........................................................................................29
1.222   ERS General Unsecured Claim .......................................................................30
1.223   ERS GUC Pool ..............................................................................................30
1.224   ERS Litigation ...............................................................................................30
1.225   ERS Participant Claim ...................................................................................31
1.226   ERS Petition Date ..........................................................................................31
1.227   ERS Portfolio Price ........................................................................................31
1.228   ERS Private Equity Portfolio .........................................................................31
1.229   ERS Recovery Actions ...................................................................................31
1.230   ERS Resolution ..............................................................................................31
1.231   ERS Stipulation .............................................................................................31
1.232   ERS Takings Action .......................................................................................31
1.233   ERS Title III Case ..........................................................................................32
1.234   ERS Trust ......................................................................................................32
1.235   Excess Cash Surplus ......................................................................................32
1.236   Executory Contract ........................................................................................32
1.237   Federal Claims ...............................................................................................32
1.238   FGIC .............................................................................................................32
1.239   FGIC Action ..................................................................................................32
1.240   FGIC Certificates ...........................................................................................32
1.241   FGIC CW/Convention Center Claims .............................................................32
1.242   FGIC CW/HTA Bond Claims .........................................................................32
1.243   FGIC CW/PRIFA Rum Tax Claims ................................................................32
1.244   FGIC Escrow Account ....................................................................................32
1.245   FGIC Insured Bond Claims ............................................................................33
1.246   FGIC Insured Bonds ......................................................................................33
1.247   FGIC Insured PRIFA Bond Claims .................................................................33
1.248   FGIC Insurance Policies .................................................................................33
1.249   FGIC Plan Consideration ...............................................................................33
1.250   FGIC Rehabilitation Plan ...............................................................................33
1.251   FGIC Treatment .............................................................................................33
1.252   FGIC Trust ....................................................................................................33
1.253   Final Order ....................................................................................................33
1.254   Fiscal Plan .....................................................................................................34
1.255   Fiscal Plan Surplus ........................................................................................34
1.256   FY .................................................................................................................34
1.257   GDB ..............................................................................................................34
1.258   GDB HTA Loans ...........................................................................................34
1.259   GDB Loan Priority Determination ..................................................................34
1.260   General Fund .................................................................................................34
1.261   General Unsecured Claims .............................................................................34

Case:17-03283-LTS Doc#:20353 Filed:03/15/22 Entered:03/15/22 21:45:04 Desc:Main
Document Page 193 of 1477
**Table of Contents**
**(Cont'd)**

**Page**

1.262  GO Bonds ................................................................34
1.263  GO CVIs ................................................................34
1.264  GO CVI Indenture ....................................................35
1.265  GO Group ..............................................................35
1.266  GO/PBA Annex Agreement ..........................................35
1.267  GO/PBA Consummation Costs ......................................35
1.268  GO/PBA Joinder Agreement ........................................35
1.269  GO/PBA Joinder Creditors ..........................................35
1.270  GO/PBA Joinder Deadline ............................................35
1.271  GO/PBA Plan Support Agreement ..................................35
1.272  GO/PBA PSA Creditors ..............................................35
1.273  GO/PBA PSA Restriction Fee ......................................35
1.274  GO/PBA Restriction Fee Percentage ..............................36
1.275  Government Entity ....................................................36
1.276  Government Parties ..................................................36
1.277  Government Released Claims ........................................36
1.278  Government Releasees ..............................................36
1.279  Gracia Gracia Claim ................................................37
1.280  Gracia Gracia CW Action ..........................................37
1.281  Gracia Gracia Federal Action ......................................37
1.282  Gracia Gracia Settlement ..........................................37
1.283  GSA Helicopter Loan ................................................37
1.284  GUC Recovery Cap ..................................................37
1.285  GUC Reserve ..........................................................37
1.286  HTA ....................................................................37
1.287  HTA 68 Bonds ........................................................37
1.288  HTA 98 Bonds ........................................................38
1.289  HTA 98 Senior Bonds ................................................38
1.290  HTA 98 Sub Bonds ..................................................39
1.291  HTA Bonds ............................................................39
1.292  HTA/CCDA Annex Agreement ......................................39
1.293  HTA/CCDA Joinder Agreement ....................................39
1.294  HTA/CCDA Joinder Deadline ......................................39
1.295  HTA/CCDA Joinder Creditors ......................................39
1.296  HTA/CCDA Plan Support Agreement ..............................39
1.297  HTA/CCDA PSA Creditors ..........................................39
1.298  HTA/CCDA PSA Restriction Fee Period ..........................40
1.299  HTA/CCDA PSA Threshold Attainment ..........................40
1.300  HTA Clawback CVI ..................................................40
1.301  HTA Confirmation Order ............................................40
1.302  HTA Distribution Conditions ......................................40
1.303  HTA Effective Date ..................................................40
1.304  HTA Fiscal Agent ....................................................41
1.305  HTA Petition Date ....................................................41

### Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.306 | HTA Plan | 41 |
| 1.307 | HTA Title III Case | 41 |
| 1.308 | Initial PSA Creditors | 41 |
| 1.309 | Initial GO/PBA PSA Creditors | 41 |
| 1.310 | Initial GO/PBA PSA Restriction Fee Creditors | 41 |
| 1.311 | Initial HTA/CCDA PSA Creditors | 41 |
| 1.312 | Initial PSA | 41 |
| 1.313 | Initial PSA Joinder Creditors | 41 |
| 1.314 | Initial PSA Threshold Attainment | 41 |
| 1.315 | Insured Bond Claim | 42 |
| 1.316 | Invalidity Actions | 42 |
| 1.317 | IRC | 42 |
| 1.318 | IRS | 42 |
| 1.319 | JRS | 42 |
| 1.320 | JRS Participant Claim | 42 |
| 1.321 | LCDC | 42 |
| 1.322 | LCDC Holders | 42 |
| 1.323 | Lien | 42 |
| 1.324 | Lien Challenge Actions | 42 |
| 1.325 | Lift Stay Motions | 42 |
| 1.326 | List of Creditors | 43 |
| 1.327 | Local Bankruptcy Rules | 43 |
| 1.328 | Maximum Annual Debt Service | 43 |
| 1.329 | Maximum Taxable Bond Election Amount | 43 |
| 1.330 | Measured SUT | 43 |
| 1.331 | Med Centers | 43 |
| 1.332 | Med Center Claims | 44 |
| 1.333 | Med Center Litigation | 44 |
| 1.334 | Med DC Action | 45 |
| 1.335 | MFA | 45 |
| 1.336 | Monolines | 45 |
| 1.337 | Monthly Benefit Modification | 45 |
| 1.338 | National | 45 |
| 1.339 | National Action | 45 |
| 1.340 | National Acceleration Price | 45 |
| 1.341 | National Certificates | 45 |
| 1.342 | National Commutation Consideration | 45 |
| 1.343 | National Commutation Treatment | 45 |
| 1.344 | National CW/HTA Bond Claims | 46 |
| 1.345 | National Escrow Account | 46 |
| 1.346 | National Insurance Policies | 46 |
| 1.347 | National Insured Bond Claims | 46 |
| 1.348 | National Insured Bonds | 46 |
| 1.349 | National Non-Commutation Treatment | 46 |

## Table of Contents
## (Cont'd)

1.350 National Plan Consideration ................................................................46
1.351 National Treatment ............................................................................46
1.352 National Trust ....................................................................................46
1.353 Net Allowed ERS Bond Claims ........................................................46
1.354 Net CW Cash Consideration ..............................................................46
1.355 Net Tax-Supported Debt ....................................................................47
1.356 New GO 5.0% CABs ..........................................................................47
1.357 New GO 5.375% CABs ......................................................................47
1.358 New GO Bonds ..................................................................................47
1.359 New GO Bonds Indenture ..................................................................47
1.360 New GO Bonds Legislation ................................................................47
1.361 New GO Bonds Trustee ......................................................................47
1.362 New GO CIBs ....................................................................................48
1.363 New GO Refunding Bonds ................................................................48
1.364 New HTA Bonds ................................................................................48
1.365 New HTA Bonds Indenture ................................................................48
1.366 Non-Own Source Revenues ................................................................48
1.367 Notas de Ahorro ................................................................................48
1.368 OGP....................................................................................................48
1.369 Ordinary Course Employee Claim ....................................................48
1.370 Outperformance Condition ................................................................48
1.371 Outstanding ........................................................................................49
1.372 Oversight Board ................................................................................49
1.373 Participant ..........................................................................................49
1.374 PayGo ................................................................................................49
1.375 PBA....................................................................................................49
1.376 PBA Administrative Expense Claim ..................................................49
1.377 PBA Bond Claims ..............................................................................49
1.378 PBA Bond Distribution ......................................................................49
1.379 PBA Bonds ........................................................................................49
1.380 PBA Cash ..........................................................................................49
1.381 PBA/DRA Secured Claim ..................................................................49
1.382 PBA/DRA Unsecured Claim ..............................................................49
1.383 PBA General Unsecured Claim ..........................................................50
1.384 PBA Litigation ..................................................................................50
1.385 PBA Petition Date ..............................................................................50
1.386 PBA Property ....................................................................................50
1.387 PBA Title III Case ..............................................................................50
1.388 Pension Reserve Deed of Trust ..........................................................50
1.389 Pension Reserve Trust ........................................................................50
1.390 Person ................................................................................................50
1.391 PFC ....................................................................................................50
1.392 Plan ....................................................................................................50
1.393 Plan Supplement ................................................................................50

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.394 | Ports | 51 |
| 1.395 | PRASA | 51 |
| 1.396 | PREPA | 51 |
| 1.397 | PRIDCO | 51 |
| 1.398 | PRIFA | 51 |
| 1.399 | PRIFA BANs | 51 |
| 1.400 | PRIFA BANs Commonwealth Guaranty | 51 |
| 1.401 | PRIFA BANs Litigation | 51 |
| 1.402 | PRIFA BANs Trustee | 51 |
| 1.403 | PRIFA Bond Claims | 51 |
| 1.404 | PRIFA Bonds | 51 |
| 1.405 | PRIFA Clawback CVI | 52 |
| 1.406 | PRIFA Distribution Conditions | 52 |
| 1.407 | PRIFA Order | 52 |
| 1.408 | PRIFA Plan | 52 |
| 1.409 | PRIFA Plan Support Agreement | 52 |
| 1.410 | PRIFA PSA Creditors | 52 |
| 1.411 | Professional | 52 |
| 1.412 | Professional Claim | 53 |
| 1.413 | Projected Fiscal Plan Surplus | 53 |
| 1.414 | PROMESA | 53 |
| 1.415 | Pro Rata Share | 53 |
| 1.416 | PSA Creditors | 53 |
| 1.417 | PSA Restriction Fees | 53 |
| 1.418 | Puerto Rico Investor | 53 |
| 1.419 | QTCB Group | 54 |
| 1.420 | Related Persons | 54 |
| 1.421 | Released Claims | 54 |
| 1.422 | Released Parties | 55 |
| 1.423 | Releasing Parties | 55 |
| 1.424 | Reorganized Commonwealth | 55 |
| 1.425 | Reorganized Debtors | 55 |
| 1.426 | Reorganized Debtors' By-Laws | 55 |
| 1.427 | Restriction Fee Creditors | 55 |
| 1.428 | Retail 2011 CW Bond Claim | 56 |
| 1.429 | Retail 2011 CW Series D/E/PIB Bond Claim | 56 |
| 1.430 | Retail 2011 PBA Bond Claim | 56 |
| 1.431 | Retail 2012 CW Bond Claim | 56 |
| 1.432 | Retail 2012 PBA Bond Claim | 56 |
| 1.433 | Retail 2014 CW Bond Claim | 56 |
| 1.434 | Retail CW Bond Claims | 56 |
| 1.435 | Retail Investor | 56 |
| 1.436 | Retail PBA Bond Claims | 56 |
| 1.437 | Retail Support Fee | 56 |

## Table of Contents
### (Cont'd)

|  |  | Page |
|---|---|---|
| 1.438 | Retail Support Fee Return | 57 |
| 1.439 | Retail Vintage CW Bond Claim | 57 |
| 1.440 | Retail Vintage PBA Bond Claim | 57 |
| 1.441 | Retired ERS Participant Above-Threshold Claim | 57 |
| 1.442 | Retired ERS Participant Below-Threshold Claim | 57 |
| 1.443 | Retired JRS Participant Above-Threshold Claim | 57 |
| 1.444 | Retired JRS Participant Below-Threshold Claim | 57 |
| 1.445 | Retired TRS Participant Above-Threshold Claim | 57 |
| 1.446 | Retired TRS Participant Below-Threshold Claim | 57 |
| 1.447 | Retiree | 58 |
| 1.448 | Retiree Claim | 58 |
| 1.449 | Retiree Committee | 58 |
| 1.450 | Retiree Committee Plan Support Agreement | 58 |
| 1.451 | Rum Tax CVI | 58 |
| 1.452 | Rum Tax CVI Indenture | 58 |
| 1.453 | Sales Tax | 58 |
| 1.454 | SCC Action | 58 |
| 1.455 | SEC | 58 |
| 1.456 | Section 510(b) Subordinated Claim | 58 |
| 1.457 | Securities Act | 59 |
| 1.458 | Solicitation Agent | 59 |
| 1.459 | SPU | 59 |
| 1.460 | Substitute Measured Tax | 59 |
| 1.461 | Syncora | 59 |
| 1.462 | Syncora Acceleration Price | 59 |
| 1.463 | Syncora Certificates | 59 |
| 1.464 | Syncora Commutation Consideration | 59 |
| 1.465 | Syncora Commutation Treatment | 59 |
| 1.466 | Syncora Escrow Account | 59 |
| 1.467 | Syncora Insured Bond Claims | 59 |
| 1.468 | Syncora Insured Bonds | 60 |
| 1.469 | Syncora Insurance Policies | 60 |
| 1.470 | Syncora Non-Commutation Treatment | 60 |
| 1.471 | Syncora Plan Consideration | 60 |
| 1.472 | Syncora Treatment | 60 |
| 1.473 | Syncora Trust | 60 |
| 1.474 | System 2000 | 60 |
| 1.475 | System 2000 Participant Claim | 60 |
| 1.476 | Taxable Bond Distributions | 60 |
| 1.477 | Taxable Election CW Claims | 60 |
| 1.478 | Taxable New GO Bonds | 60 |
| 1.479 | Tax Credit Claims | 61 |
| 1.480 | Tax-Supported Debt | 61 |
| 1.481 | Threshold | 61 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.482 | Title III | 61 |
| 1.483 | Title III Cases | 61 |
| 1.484 | Title III Court | 61 |
| 1.485 | TRS | 61 |
| 1.486 | Trustee Fiscal Agent | 62 |
| 1.487 | TRS Participant Claim | 62 |
| 1.488 | Trust Documentation | 62 |
| 1.489 | Unclaimed Distribution | 62 |
| 1.490 | Underwriter Actions | 62 |
| 1.491 | Unexpired Lease | 62 |
| 1.492 | Uniformity Litigation | 62 |
| 1.493 | UPR | 62 |
| 1.494 | Vintage CW Bond Claim | 62 |
| 1.495 | Vintage CW Bond Claim (Ambac) | 63 |
| 1.496 | Vintage CW Bond Claim (Assured) | 63 |
| 1.497 | Vintage CW Bond Claim (FGIC) | 63 |
| 1.498 | Vintage CW Bond Claim (National) | 63 |
| 1.499 | Vintage CW Bond Claim (Syncora) | 63 |
| 1.500 | Vintage CW Bond Claim (Taxable Election) | 63 |
| 1.501 | Vintage CW Bond Recovery | 63 |
| 1.502 | Vintage CW Bonds | 63 |
| 1.503 | Vintage CW Guarantee Bond Claim | 65 |
| 1.504 | Vintage CW Guarantee Bond Claim (Ambac) | 65 |
| 1.505 | Vintage CW Guarantee Bond Claim (Assured) | 65 |
| 1.506 | Vintage CW Guarantee Bond Claim (FGIC) | 65 |
| 1.507 | Vintage CW Guarantee Bond Claim (National) | 65 |
| 1.508 | Vintage CW Guarantee Bond Claim (Syncora) | 65 |
| 1.509 | Vintage CW Guarantee Bond Claim (Taxable Election) | 65 |
| 1.510 | Vintage CW Guarantee Bond Recovery | 66 |
| 1.511 | Vintage CW Guarantee Taxable Bond Distribution | 66 |
| 1.512 | Vintage PBA Bond Claim | 66 |
| 1.513 | Vintage PBA Bond Claim (Ambac) | 66 |
| 1.514 | Vintage PBA Bond Claim (Assured) | 66 |
| 1.515 | Vintage PBA Bond Claim (FGIC) | 66 |
| 1.516 | Vintage PBA Bond Claim (National) | 66 |
| 1.517 | Vintage PBA Bond Claim (Syncora) | 67 |
| 1.518 | Vintage PBA Bond Recovery | 67 |
| 1.519 | Vintage PBA Bonds | 67 |
| 1.520 | Vintage Taxable Bond Distribution | 68 |
| 1.521 | Voting Record Date | 68 |
| 1.522 | VTP Payroll Participant | 68 |
| 1.523 | VTP Payroll Participant Claim | 68 |
| 1.524 | VTP Payroll Participant Above-Threshold Claims | 68 |
| 1.525 | VTP Payroll Participant Below-Threshold Claims | 68 |

**Table of Contents**
**(Cont'd)**

1.526   GDB/PET .................................................................................................68
1.527   GDB/PET Claim ......................................................................................68
1.528   COSSEC ..................................................................................................68
1.529   Other Definitions ....................................................................................69
1.530   Rules of Interpretation ...........................................................................69

ARTICLE II COMPROMISE AND SETTLEMENT OF
         DISPUTES/RESTRUCTURING OF ENTITIES .........................................69

2.1   Litigation Resolution ..................................................................................69
2.2   Allowance of Bond Claims .........................................................................70
2.3   Releases, Injunctions and Exculpation ......................................................71
2.4   Purchase and Sale of Certain ERS Assets ..................................................71

ARTICLE III PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
          CLAIMS ....................................................................................................71

3.1    Administrative Expense Claims ................................................................71
3.2    Professional Compensation and Reimbursement Claims .........................72
3.3    GO/PBA Consummation Costs .................................................................72
3.4    AFSCME and AMPR Professional Fees ..................................................72
3.5    GO/PBA PSA Restriction Fee ..................................................................72
3.6    Retail Support Fee .....................................................................................74
3.7    ERS Restriction Fee ..................................................................................74
3.8    CCDA Consummation Costs .....................................................................74
3.9    CCDA Restriction Fee ...............................................................................75
3.10   Non-Severability .......................................................................................76

ARTICLE IV CLASSIFICATION OF CLAIMS ..............................................................76

4.1   Claims are classified as follows .................................................................76

ARTICLE V PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
         CLAIMS (CLASS 1) ..................................................................................79

5.1   Treatment of Vintage PBA Bond Claims ...................................................79

ARTICLE VI PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
          CLAIMS (ASSURED) (CLASS 2) ...........................................................79

6.1   Treatment of Vintage PBA Bond Claims (Assured) ...................................79

ARTICLE VII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
           CLAIMS (NATIONAL) (CLASS 3) ........................................................80

7.1   Treatment of Vintage PBA Bond Claims (National) ...................................80

**Table of Contents**
**(Cont'd)**

ARTICLE VIII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (AMBAC) (CLASS 4) ............................................................80

    8.1    Treatment of Vintage PBA Bond Claims (Ambac) ................................80

ARTICLE IX PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (FGIC) (CLASS 5) .................................................................80

    9.1    Treatment of Vintage PBA Bond Claims (FGIC) ..................................80

ARTICLE X PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (SYNCORA) (CLASS 6) .........................................................80

    10.1    Treatment of Vintage PBA Bond Claims (Syncora) ..............................80

ARTICLE XI PROVISIONS FOR TREATMENT OF RETAIL VINTAGE PBA BOND CLAIMS (CLASS 7) ..................................................................81

    11.1    Treatment of Retail Vintage PBA Bond Claims ...................................81

ARTICLE XII PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8) ...............................................................................81

    12.1    Treatment of 2011 PBA Bond Claims ..................................................81

ARTICLE XIII PROVISIONS FOR TREATMENT OF RETAIL 2011 PBA BOND CLAIMS (CLASS 9) ..................................................................81

    13.1    Treatment of Retail 2011 PBA Bond Claims ........................................81

ARTICLE XIV PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10) .............................................................................82

    14.1    Treatment of 2012 PBA Bond Claims ..................................................82

ARTICLE XV PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11) ...............................................................82

    15.1    Treatment of Retail 2012 PBA Bond Claims ........................................82

ARTICLE XVI PROVISIONS FOR TREATMENT OF PBA/DRA SECURED CLAIMS (CLASS 12) ..............................................................82

    16.1    Treatment of PBA/DRA Secured Claims .............................................82

ARTICLE XVII PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED CLAIMS (CLASS 13) ...............................................82

    17.1    Treatment of PBA General Unsecured Claims ......................................82

**Table of Contents**
**(Cont'd)**

Page

ARTICLE XVIII PROVISIONS FOR TREATMENT OF PBA/DRA UNSECURED
CLAIMS (CLASS 14) ...................................................................................83

18.1    Treatment of PBA/DRA Unsecured Claims .................................................83

ARTICLE XIX PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (CLASS 15) ..................................................................................83

19.1    Treatment of Vintage CW Bond Claims.......................................................83
19.2    Right of Election to Vintage CW Bond Claims (Taxable Election)....................83

ARTICLE XX PROVISIONS FOR TREATMENT OF RETAIL VINTAGE  CW
BOND CLAIMS (CLASS 16) .......................................................................84

20.1    Treatment of Retail Vintage CW Bond Claims ............................................84
20.2    Right of Election to Retail Vintage CW Bond Claims (Taxable
Election) ....................................................................................................84

ARTICLE XXI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (ASSURED) (CLASS 17) .............................................................84

21.1    Treatment of Vintage CW Bond Claims (Assured)......................................84

ARTICLE XXII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (NATIONAL) (CLASS 18) ..........................................................85

22.1    Treatment of Vintage CW Bond Claims (National) .....................................85

ARTICLE XXIII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (AMBAC) (CLASS 19) ................................................................85

23.1    Treatment of Vintage CW Bond Claims (Ambac) .......................................85

ARTICLE XXIV PROVISIONS FOR TREATMENT OF VINTAGE  CW BOND
CLAIMS (FGIC) (CLASS 20).......................................................................85

24.1    Treatment of Vintage CW Bond Claims (FGIC)..........................................85

ARTICLE XXV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (SYNCORA) (CLASS 21)..............................................................85

25.1    Treatment of Vintage CW Bond Claims (Syncora).......................................85

ARTICLE XXVI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (TAXABLE ELECTION) (CLASS 22) ...............................................86

26.1    Treatment of Vintage CW Bond Claims (Taxable Election)................................86

ARTICLE XXVII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (CLASS 23) ..................................................86

**Table of Contents**
**(Cont'd)**

27.1   Treatment of Vintage CW Guarantee Bond Claims .................................................86
27.2   Right of Election to Vintage CW Guarantee Bond Claims (Taxable
Election) .................................................................................................................86

ARTICLE XXVIII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24) ................................86

28.1   Treatment of Vintage CW Guarantee Bond Claims (Assured) .........................86

ARTICLE XXIX PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25) ..........................87

29.1   Treatment of Vintage CW Guarantee Bond Claims (National)...........................87

ARTICLE XXX PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26) ................................87

30.1   Treatment of Vintage CW Guarantee Bond Claims (Ambac) .............................87

ARTICLE XXXI PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (FGIC) (CLASS 27).....................................87

31.1   Treatment of Vintage CW Guarantee Bond Claims (FGIC) ...............................87

ARTICLE XXXII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28).............................87

32.1   Treatment of Vintage CW Guarantee Bond Claims (Syncora) ...........................87

ARTICLE XXXIII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS
29) ..........................................................................................................................88

33.1   Treatment of Vintage CW Guarantee Bond Claims (Taxable
Election)..................................................................................................................88

ARTICLE XXXIV PROVISIONS FOR TREATMENT OF 2011  CW BOND
CLAIMS (CLASS 30) ...........................................................................................88

34.1   Treatment of 2011 CW Bond Claims ..................................................................88
34.2   Right of Election to 2011 CW Bond Claims (Taxable Election)..........................88

ARTICLE XXXV PROVISIONS FOR TREATMENT OF RETAIL 2011  CW
BOND CLAIMS (CLASS 31)................................................................................88

35.1   Treatment of Retail 2011 CW Bond Claims........................................................88
35.2   Right of Election to Retail 2011 CW Bond Claims (Taxable
Election) .................................................................................................................89

**Table of Contents**
(Cont'd)

ARTICLE XXXVI PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (ASSURED) (CLASS 32) ....................................................89

    36.1    Treatment of 2011 CW Bond Claims (Assured)...................................89

ARTICLE XXXVII PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 33) .............................................89

    37.1    Treatment of 2011 CW Bond Claims (Taxable Election) .....................89

ARTICLE XXXVIII PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (CLASS 34) ....................................................90

    38.1    Treatment of 2011 CW Guarantee Bond Claims....................................90
    38.2    Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election).......................................................................................90

ARTICLE XXXIX PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 35) ....................................90

    39.1    Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)...................90

ARTICLE XL PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)....................................................90

    40.1    Treatment of 2011 CW Series D/E/PIB Bond Claims............................90
    40.2    Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election).......................................................................................91

ARTICLE XLI PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37) .......................................91

    41.1    Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured).........................91

ARTICLE XLII PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38) ....................................................91

    42.1    Treatment of Retail 2011 CW Series D/E/PIB Bond Claims ...............................91
    42.2    Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election).......................................................................................91

ARTICLE XLIII PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39) ...................................92

    43.1    Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election).......................................................................................92

ARTICLE XLIV PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40) ....................................................92

## Table of Contents
### (Cont'd)

44.1    Treatment of 2012 CW Bond Claims ................................................................92
44.2    Right of Election to 2012 CW Bond Claims (Taxable Election)...........................92

ARTICLE XLV PROVISIONS FOR TREATMENT OF RETAIL 2012 CW BOND
      CLAIMS (CLASS 41) ....................................................................................93

45.1    Treatment of Retail 2012 CW Bond Claims.....................................................93
45.2    Right of Election to Retail 2012 CW Bond Claims (Taxable
      Election)..........................................................................................................93

ARTICLE XLVI PROVISIONS FOR TREATMENT OF 2012 CW BOND
      CLAIMS (ASSURED) (CLASS 42) ...............................................................93

46.1    Treatment of 2012 CW Bond Claims (Assured).................................................93

ARTICLE XLVII PROVISIONS FOR TREATMENT OF 2012 CW BOND
      CLAIMS (TAXABLE ELECTION) (CLASS 43) ..........................................94

47.1    Provisions for Treatment of 2012 CW Bond Claims (Taxable
      Election)..........................................................................................................94

ARTICLE XLVIII PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
      BOND CLAIMS (CLASS 44)........................................................................94

48.1    Treatment of 2012 CW Guarantee Bond Claims ...............................................94
48.2    Right of Election to 2012 CW Guarantee Bond Claims (Taxable
      Election)..........................................................................................................94

ARTICLE XLIX PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
      BOND CLAIMS (TAXABLE ELECTION) (CLASS 45) ...............................94

49.1    Treatment of 2012 CW Guarantee Bond Claims (Taxable Election)...................94

ARTICLE L PROVISIONS FOR TREATMENT OF 2014 CW BOND CLAIMS
      (CLASS 46) ...................................................................................................95

50.1    Treatment of 2014 CW Bond Claims ...............................................................95
50.2    Right of Election to 2014 CW Bond Claims (Taxable Election)...........................95

ARTICLE LI PROVISIONS FOR TREATMENT OF RETAIL 2014 CW BOND
      CLAIMS (CLASS 47) ....................................................................................95

51.1    Treatment of Retail 2014 Bond Claims ............................................................95
51.2    Right of Election to Retail 2014 CW Bond Claims (Taxable
      Election)..........................................................................................................95

ARTICLE LII PROVISIONS FOR TREATMENT OF 2014 CW BOND CLAIMS
      (TAXABLE ELECTION) (CLASS 48)...........................................................96

**Table of Contents**
**(Cont'd)**

52.1     Provisions for Treatment of 2014 CW Bond Claims (Taxable Election) ............................................................................................96

ARTICLE LIII PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE BOND CLAIMS (CLASS 49) ..................................................96

53.1     Treatment of 2014 CW Guarantee Bond Claims .....................................96
53.2     Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election) ............................................................................................96

ARTICLE LIV PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 50) ...................96

54.1     Treatment of 2014 CW Guarantee Bond Claims (Taxable Election) ...................96

ARTICLE LV PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L) ......................................................................97

55.1     Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A) ............................................................................97
55.2     Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B) ............................................................................97
55.3     Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C) ............................................................................97
55.4     Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D) ............................................................................98
55.5     Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E) ............................................................................98
55.6     Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F) ............................................................................98
55.7     Treatment of Active ERS Participant Claims (Class 51G) ...................99
55.8     Treatment of Active JRS Participant Claims (Class 51H) ..................99
55.9     Treatment of Active TRS Participant Claims (Class 51I) ................100
55.10    Treatment of System 2000 Participant Claims (Class 51J) ..............101
55.11    Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K): ...........................................................................102
55.12    Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L): ...........................................................................102

ARTICLE LVI PROVISIONS FOR TREATMENT OF AFSCME CLAIMS (CLASS 52) ..................................................................103

56.1     Treatment of AFSCME Claims ..........................................................103

ARTICLE LVII PROVISIONS FOR TREATMENT OF DAIRY PRODUCER CLAIMS (CLASS 53) ....................................................104

**Table of Contents**
**(Cont'd)**

57.1    Treatment of Dairy Producer Claims ................................................. 104

ARTICLE LVIII PROVISIONS FOR TREATMENT OF CW EMINENT
          DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54) .................. 104

58.1    Treatment of Eminent/Inverse Condemnation Domain Claims ........................ 104

ARTICLE LIX PROVISIONS FOR TREATMENT OF  ENERGY INCENTIVE
          CLAIMS (CLASS 55) ........................................................... 105

59.1    Treatment of Energy Incentive Claims ............................................... 105

ARTICLE LX PROVISIONS FOR TREATMENT OF  MED CENTER CLAIMS
          (CLASS 56) ................................................................... 105

60.1    Treatment of Med Center Claims ................................................... 105
60.2    Dismissal of Med Center Litigation ................................................ 106

ARTICLE LXI PROVISIONS FOR TREATMENT OF  TAX CREDIT CLAIMS
          (CLASS 57) ................................................................... 106

61.1    Treatment of Tax Credit Claims .................................................... 106

ARTICLE LXII PROVISIONS FOR TREATMENT OF CW GENERAL
          UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58
          AND 58A) ...................................................................... 106

62.1    Treatment of CW General Unsecured Claims ........................................ 106
62.2    Limitation on Recovery .......................................................... 107
62.3    GUC Reserve .................................................................... 107
62.4    Treatment of GDB/PET Claims .................................................... 108

ARTICLE LXIII PROVISIONS FOR TREATMENT  OF CW/HTA CLAIMS
          (CLASS 59) .................................................................... 108

63.1    Treatment of CW/HTA Claims ...................................................... 108
63.2    Distribution of the CW/HTA Clawback Recovery ................................... 108

ARTICLE LXIV PROVISIONS FOR TREATMENT OF CW/CONVENTION
          CENTER CLAIMS (CLASS 60) ..................................................... 109

64.1    Treatment of CW/Convention Center Claims ........................................ 109

ARTICLE LXV PROVISIONS FOR TREATMENT OF CW/PRIFA RUM TAX
          CLAIMS (CLASS 61) ............................................................ 109

65.1    Treatment of CW/PRIFA Rum Tax Claims ........................................... 109
65.2    Distribution of the Beneficial Interests in the PRIFA Trust ...................... 110

**Table of Contents**
**(Cont'd)**

**Page**

ARTICLE LXVI PROVISIONS FOR TREATMENT OF  CW/MBA CLAIMS
(CLASS 62) ..........................................................................................110

66.1     Treatment of CW/MBA Claims .......................................................110

ARTICLE LXVII PROVISIONS FOR TREATMENT OF CW APPROPRIATIONS
CLAIMS (CLASS 63) .........................................................................110

67.1     Treatment of CW Appropriations Claims .........................................110

ARTICLE LXVIII PROVISIONS FOR TREATMENT OF SECTION 510(b)
SUBORDINATED CLAIMS (CLASS 64) ............................................110

68.1     Treatment of Section 510(b) Subordinated Claims ...........................110

ARTICLE LXIX PROVISIONS FOR TREATMENT OF ERS BOND CLAIMS
(CLASS 65) ..........................................................................................111

69.1     Treatment of ERS Bond Claims .......................................................111
69.2     ERS Private Equity Portfolio ...........................................................111
69.3     Dismissal of Litigation .....................................................................112

ARTICLE LXX PROVISIONS FOR TREATMENT OF ERS GENERAL
UNSECURED CLAIMS (CLASS 66) ...................................................112

70.1     Treatment of ERS General Unsecured Claims ..................................112
70.2     Limitation on Recovery ....................................................................113

ARTICLE LXXI PROVISIONS FOR TREATMENT OF GRACIA GRACIA
CLAIMS (CLASS 67) .........................................................................113

71.1     Treatment of Gracia Gracia Claims ..................................................113

ARTICLE LXXII PROVISIONS FOR TREATMENT OF CONVENIENCE
CLAIMS (CLASS 68) .........................................................................113

72.1     Treatment of Convenience Claims.....................................................113

ARTICLE LXXIII PROVISIONS FOR TREATMENT  OF FEDERAL CLAIMS
(CLASS 69) ..........................................................................................114

73.1     Treatment of Federal Claims: ...........................................................114

ARTICLE LXXIV PROVISIONS REGARDING NEW GO BONDS,  CVIS AND
ADDITIONAL INDEBTEDNESS ........................................................114

74.1     Issuance and Distribution of the New GO Bonds .............................114
74.2     Issuance and Distribution of the CVIs ..............................................118
74.3     Tax-Exempt Treatment of the New GO Bonds .................................119
74.4     Comprehensive Cap on All Net Tax-Supported Debt .......................120

xxi

**Table of Contents**
**(Cont'd)**

74.5 Adoption and Maintenance of a Debt Management Policy ...................................121

ARTICLE LXXV PROVISIONS REGARDING ASSURED INSURED BONDS,
NATIONAL INSURED BONDS, SYNCORA INSURED BONDS,
AMBAC INSURED BONDS AND FGIC INSURED BONDS .......................122

75.1 Treatment of Assured Insured Bond Claims....................................................122
75.2 Treatment of National Insured Bond Claims...................................................125
75.3 Treatment of Syncora Insured Bond Claims....................................................127
75.4 Treatment of FGIC Insured Bond Claims.........................................................129
(a) FGIC Insured Bond Claims Treatment:............................................................129
75.5 Treatment of Ambac Insured Bond Claims .....................................................131

ARTICLE LXXVI TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES ...........................................................................134

76.1 Rejection or Assumption of Remaining Executory Contracts and
Unexpired Leases...............................................................................................134
76.2 Approval of Rejection or Assumption of Executory Contracts and
Unexpired Leases...............................................................................................134
76.3 Inclusiveness......................................................................................................134
76.4 Cure of Defaults.................................................................................................135
76.5 Insurance Policies..............................................................................................135
76.6 Rejection Damage Claims..................................................................................135
76.7 Indemnification and Reimbursement Obligations ...........................................135
76.8 Nonoccurrence of Effective Date......................................................................136
76.9 Reservation of Rights.........................................................................................136
76.10 Collective Bargaining Agreements ...................................................................136

ARTICLE LXXVII PROVISIONS GOVERNING DISTRIBUTIONS ...........................136

77.1 Time and Manner of Distribution .....................................................................136
77.2 Timeliness of Payments.....................................................................................137
77.3 Distributions by the Disbursing Agent .............................................................137
77.4 Manner of Payment under the Plan....................................................................138
77.5 Delivery of Distributions...................................................................................138
77.6 Cancellation of Notes, Instruments, Certificates, and Other
Documents..........................................................................................................138
77.7 Undeliverable/Reserved Distributions ..............................................................139
77.8 Withholding and Reporting Requirements ........................................................140
77.9 Time Bar to Cash Payments ..............................................................................140
77.10 Distributions After Effective Date ....................................................................140
77.11 Setoffs................................................................................................................140
77.12 Allocation of Plan Distributions Between Principal and Interest .....................141
77.13 Payment of Trustee Fees and Expenses.............................................................141
77.14 Beneficial Owner ..............................................................................................141

## Table of Contents
## (Cont'd)

77.15 Value of Distributions ........................................................................142

ARTICLE LXXVIII AVOIDANCE ACTIONS TRUST ...........................................142

78.1 Execution of Avoidance Actions Trust Agreement ............................142
78.2 Purpose of the Avoidance Actions Trust ...........................................142
78.3 Avoidance Actions Trust Assets .......................................................142
78.4 Administration of the Avoidance Actions Trust .................................143
78.5 The Avoidance Actions Trustee .........................................................143
78.6 Role of the Avoidance Actions Trustee .............................................143
78.7 Avoidance Actions Trustee's Tax Power for Debtors .........................143
78.8 Transferability of Avoidance Actions Trust Interests .........................143
78.9 Cash ....................................................................................................143
78.10 Distribution of Avoidance Actions Trust Assets ...............................144
78.11 Funding, Costs and Expenses of the Avoidance Actions Trust ..........144
78.12 Compensation of the Avoidance Actions Trustee ..............................144
78.13 Retention of Professionals/Employees by the Avoidance Actions
Trustee ................................................................................................144
78.14 Federal Income Tax Treatment of the Avoidance Actions Trust ........144
78.15 Indemnification of Avoidance Actions Trustee and Members of
Avoidance Actions Trust Bond ..........................................................147

ARTICLE LXXIX PROSECUTION AND EXTINGUISHMENT OF CLAIMS
HELD BY THE DEBTORS ........................................................148

79.1 Prosecution of Claims .......................................................................148

ARTICLE LXXX ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS ...........148

80.1 Impaired Classes to Vote ..................................................................148
80.2 Acceptance by Class of Creditors .....................................................148
80.3 Cramdown ..........................................................................................148

ARTICLE LXXXI RIGHTS AND POWERS OF DISBURSING AGENT ...............149

81.1 Exculpation .......................................................................................149
81.2 Powers of the Disbursing Agent .......................................................149
81.3 Fees and Expenses Incurred From and After the Effective Date ........149

ARTICLE LXXXII PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
AND CLAIMS SUBJECT TO ACR PROCEDURES ....................149

82.1 Objections to Claims; Prosecution of Disputed Claims ....................149
82.2 Estimation of Claims .........................................................................150
82.3 Payments and Distributions on Disputed Claims ..............................151
82.4 Authority to Amend Lists of Creditors ..............................................151

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 82.5 | Non-Accrual of Interest | 152 |
| 82.6 | Disallowance of Claims | 152 |
| 82.7 | Claims Subject to ACR Procedures | 152 |
| 82.8 | National Action Claims | 152 |

ARTICLE LXXXIII GOVERNANCE AND PROVISIONS REGARDING
PENSION RESERVE AND PENSION SYSTEM ................................. 153

| | | |
|---|---|---|
| 83.1 | Formation and Responsibilities of the Pension Reserve | 153 |
| 83.2 | Funding of the Pension Reserve Trust | 153 |
| 83.3 | Non-Impairment Covenant | 154 |
| 83.4 | Maintenance of Pension | 154 |

ARTICLE LXXXIV IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
AND NOT IMPAIRED BY THE PLAN ................................................. 155

| | | |
|---|---|---|
| 84.1 | Impaired Classes | 155 |
| 84.2 | Unimpaired Classes | 155 |

ARTICLE LXXXV CONDITIONS PRECEDENT TO CONFIRMATION OF THE
PLAN ................................................................................................... 155

| | | |
|---|---|---|
| 85.1 | Conditions Precedent to Confirmation of the Plan | 155 |
| 85.2 | Waiver of Conditions Precedent to Confirmation | 156 |

ARTICLE LXXXVI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ................. 157

| | | |
|---|---|---|
| 86.1 | Conditions Precedent to the Effective Date | 157 |
| 86.2 | Waiver of Conditions Precedent | 160 |
| 86.3 | Effect of Non-Occurrence of Conditions to Effective Date | 161 |

ARTICLE LXXXVII MODIFICATION, REVOCATION, OR WITHDRAWAL OF
THE PLAN ........................................................................................... 161

| | | |
|---|---|---|
| 87.1 | Modification of Plan | 161 |
| 87.2 | Revocation or Withdrawal | 161 |
| 87.3 | Amendment of Plan Documents | 161 |
| 87.4 | No Admission of Liability | 161 |

ARTICLE LXXXVIII CORPORATE GOVERNANCE AND  MANAGEMENT OF
REORGANIZED DEBTORS ............................................................... 162

| | | |
|---|---|---|
| 88.1 | Corporate Action | 162 |
| 88.2 | Dissolution of ERS | 163 |
| 88.3 | Officers of Reorganized Debtors | 163 |
| 88.4 | PBA and CCDA Governance Structure | 163 |

**Table of Contents**
**(Cont'd)**

ARTICLE LXXXIX PROVISIONS REGARDING OVERSIGHT BOARD AND
    COMPLIANCE WITH PROMESA ...............................................163

    89.1    Effect of Confirmation ...............................................163
    89.2    Ongoing Role of the Oversight Board ...............................................163
    89.3    Preemption of Laws ...............................................163

ARTICLE XC PROVISIONS REGARDING COMMITTEES ...............................................164

    90.1    Dissolution of Committees ...............................................164

ARTICLE XCI RETENTION OF JURISDICTION ...............................................164

    91.1    Retention of Jurisdiction ...............................................164

ARTICLE XCII MISCELLANEOUS PROVISIONS ...............................................166

    92.1    Title to Assets ...............................................166
    92.2    Discharge and Release of Claims and Causes of Action ...............167
    92.3    Injunction on Claims ...............................................170
    92.4    Integral to Plan ...............................................170
    92.5    Releases by the Debtors and Reorganized Debtors ...............170
    92.6    Injunction Related to Releases ...............................................170
    92.7    Exculpation ...............................................171
    92.8    Appointments Related Litigation/Uniformity Litigation ...............173
    92.9    Bar Order ...............................................174
    92.10    No Waiver ...............................................174
    92.11    Supplemental Injunction ...............................................174
    92.12    Post-Effective Date Fees and Expenses ...............................................175
    92.13    Securities Act Exemption ...............................................175
    92.14    Severability ...............................................176
    92.15    Governing Law ...............................................176
    92.16    Closing Case ...............................................176
    92.17    Section Headings ...............................................176
    92.18    Inconsistencies ...............................................176
    92.19    Document Retention ...............................................176
    92.20    Immediate Binding Effect ...............................................176
    92.21    Additional Documents ...............................................177
    92.22    Reservation of Rights ...............................................177
    92.23    Successors and Assigns ...............................................177
    92.24    Notices ...............................................177
    92.25    Term of Injunctions or Stays ...............................................180
    92.26    Entire Agreement ...............................................180
    92.27    Plan Supplement ...............................................180

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following joint plan of adjustment.

## ARTICLE I

## DEFINITIONS

As used in the Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1     **2011 CW Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Bonds, other than a 2011 CW Bond Claim (Assured) or a Retail 2011 CW Bond Claim.

1.2     **2011 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.3     **2011 CW Bond Claim (Taxable Election):** A 2011 CW Bond Claim or Retail 2011 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and  CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim shall be a 2011 CW Bond Claim (Taxable Election) up to such 2011 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Bond Claim.

1.4     **2011 CW Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Bond Claims, Allowed 2011 CW Bond Claims (Assured), and Allowed Retail 2011 CW Bond Claims on account of any such Claims, consisting of (a) One Hundred Forty-Eight Million Eight Hundred Thirty-Three Thousand Seven Hundred Thirty Dollars and Ninety-Five Cents ($148,833,730.95) in Cash, (b) One Hundred Seventy-Nine Million One Hundred Ninety-Three Thousand Four Hundred Twenty-Five Dollars ($179,193,425.00) in original principal amount of New GO CIBs, (c) Eleven Million Eight Hundred Sixty-Four Thousand Five Hundred Ten Dollars and Ninety-Five Cents ($11,864,510.95) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Twenty-Eight Thousand Three Hundred Sixty Dollars and Thirty-Five Cents ($7,728,360.35) in original principal amount of New GO 5.0% CABs, and (e) two and four hundred seventy-nine one thousandths percent (2.479%) of the GO CVIs.

1.5     **2011 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2011 C, issued by the Commonwealth in the original principal amount of Four Hundred Forty-Two Million Fifteen Thousand Dollars ($442,015,000.00), and (b) Notas de Ahorro issued in 2011 in the aggregate outstanding principal amount of Fifty-Three Thousand Eight Hundred Dollars ($53,800.00).

1

1.6     **2011 CW Guarantee Bond Claim:** A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds; provided, however, that, solely for purposes of distribution in accordance with, but not voting with respect to, the Plan, the amount of a holder's 2011 CW Guarantee Bond Claim with respect to the Commonwealth's guarantee of such 2011 PBA Bond Claim shall be calculated as the amount of such holder's 2011 PBA Bond Claim minus the amount of such holder's 2011 PBA Bond Recovery.

1.7     **2011 CW Guarantee Bond Claim (Taxable Election):** A 2011 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim shall be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Guarantee Bond Claim.

1.8     **2011 CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed 2011 CW Guarantee Bond Claims, consisting of (a) Three Hundred Twenty-Three Million Five Hundred Twenty-Three Thousand Nine Hundred Two Dollars and Fifty Cents ($323,523,902.50) in Cash, (b) Three Hundred Eighty-Nine Million Five Hundred Seventeen Thousand Five Hundred Ninety-Two Dollars ($389,517,592.00) in original principal amount of New GO CIBs, (c) Twenty-Five Million Seven Hundred Ninety Thousand Two Hundred Eight Dollars and Forty-Six Cents ($25,790,208.46) in original principal amount of New GO 5.375% CABs, (d) Sixteen Million Seven Hundred Ninety-Nine Thousand Three Hundred Forty-Six Dollars and Seventy-Seven Cents ($16,799,346.77) in original principal amount of New GO 5.0% CABs, and (e) seven and five hundred fifty-two one thousandths percent (7.552%) of the GO CVIs.

1.9     **2011 CW Guarantee Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 39.1 hereof.

1.10     **2011 CW Series D/E/PIB Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, other than a 2011 CW Series D/E/PIB Bond Claim (Assured) or a Retail 2011 CW Series D/E/PIB Bond Claim.

1.11     **2011 CW Series D/E/PIB Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market policy.

1.12     **2011 CW Series D/E/PIB Bond Claim (Taxable Election):** A 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim, the holder of which is a

2

Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim shall be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 Series D/E/PIB CW Bond Claim.

1.13 **2011 CW Series D/E/PIB Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Series D/E/PIB Bond Claims, Allowed 2011 CW Series D/E/PIB Bond Claims (Assured) and Allowed Retail 2011 CW Series D/E/PIB Bond Claims on account of such Claims, consisting of (a) Two Hundred Eleven Million Three Hundred Fifty-Five Thousand Thirty-Five Dollars and Seventy-Four Cents ($211,355,035.74) in Cash, (b) Two Hundred Fifty-Four Million Four Hundred Sixty-Eight Thousand Seventy-Four Dollars ($254,468,074.00) in original principal amount of New GO CIBs, (c) Sixteen Million Eight Hundred Forty-Eight Thousand Four Hundred Ninety-Three Dollars and Eighty-Four Cents ($16,848,493.84) in original principal amount of New GO 5.375% CABs, (d) Ten Million Nine Hundred Seventy-Four Thousand Eight Hundred Fifty Dollars and Thirty Cents ($10,974,850.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred fourteen one thousandths percent (3.514%) of the GO CVIs.

1.14 **2011 CW Series D/E/PIB Bonds:** Collectively, (a) the Public Improvement Bonds of 2011, issued by the Commonwealth in the original principal amount of Three Hundred Four Million Dollars ($304,000,000.00), (b) the Public Improvement Refunding Bonds, Series 2011D, issued by the Commonwealth in the original principal amount of Fifty-Two Million One Hundred Ninety Thousand Dollars ($52,190,000.00), and (c) the Public Improvement Refunding Bonds, Series 2011E, issued by the Commonwealth in the original principal amount of Two Hundred Forty-Five Million Nine Hundred Fifteen Thousand Dollars ($245,915,000.00).

1.15 **2011 CW Series D/E/PIB Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 43.1 hereof.

1.16 **2011 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 37.1 hereof.

1.17 **2011 PBA Bond Claim:** A Claim against PBA on account of the 2011 PBA Bonds, other than a Retail 2011 PBA Bond Claim.

1.18 **2011 PBA Bond Recovery:** The aggregate recovery by holders of Allowed 2011 PBA Bond Claims and Allowed Retail 2011 PBA Bond Claims totaling Three Hundred Six Million Seven Hundred Sixty-Eight Thousand Nine Hundred Eleven Dollars and Seventy-Two Cents ($306,768,911.72) in Cash.

1.19    **2011 PBA Bonds:** Collectively, (a) the Government Facilities Revenue Bonds, Series R, (Qualified School Construction Bonds), issued by PBA in the original principal amount of Seven Hundred Fifty-Six Million Four Hundred Forty-Nine Thousand Dollars ($756,449,000.00), (b) the Government Facilities Revenue Bonds, Series S, issued by PBA in the original principal amount of Three Hundred Three Million Nine Hundred Forty-Five Thousand Dollars ($303,945,000.00), and (c) the Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds), issued by PBA in the original principal amount of One Hundred Twenty-One Million Five Hundred Twenty-Eight Thousand Dollars ($121,528,000.00), the repayment of which is guaranteed by the Commonwealth.

1.20    **2012 CW Bond Claim:** A Claim against the Commonwealth on account of 2012 CW Bonds, other than a 2012 CW Bond Claim (Assured) or a Retail 2012 CW Bond Claim.

1.21    **2012 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2012 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.22    **2012 CW Bond Claim (Taxable Election):** A 2012 CW Bond Claim and Retail 2012 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim shall be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Bond Claim.

1.23    **2012 CW Bond Recovery**: The aggregate recovery by holders of Allowed 2012 CW Bond Claims, Allowed 2012 CW Bond Claims (Assured), and Allowed Retail 2012 CW Bond Claims on account of any such Claims, consisting of (a) Nine Hundred Nine Million Nine Hundred Twelve Thousand Six Hundred Seventy-Nine Dollars and Seventy-Three Cents ($909,912,679.73) in Cash, (b) One Billion Ninety-Five Million Five Hundred Twenty Thousand Two Hundred Seventy-Seven Dollars ($1,095,520,277.00) in original principal amount of New GO CIBs, (c) Seventy-Two Million Five Hundred Thirty-Five Thousand Ninety-Six Dollars and Ninety-Six Cents ($72,535,096.96) in original principal amount of New GO 5.375% CABs, (d) Forty-Seven Million Two Hundred Forty-Eight Thousand Two Hundred Fifty-One Dollars ($47,248,251.00) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred fifty-seven one thousandths percent (15.157%) of the GO CVIs.

1.24    **2012 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2012 A, issued by the Commonwealth in the original principal amount of Two Billion Three Hundred Eighteen Million One Hundred Ninety Thousand Dollars ($2,318,190,000.00), (b) the Public Improvement Refunding Bonds, Series 2012 B, issued by the Commonwealth in the original principal amount of Four Hundred Fifteen Million Two Hundred Seventy Thousand Dollars ($415,270,000.00), (c) the GSA Helicopter Loan, (d) Hacienda loans (Loan ID Nos. 200017-215-001-003-47, 200017-215-001-003-48, 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding

principal amount of One Hundred Sixty-Nine Million Four Hundred Thirty-Eight Thousand Thirty-Seven Dollars and Seventy-Six Cents ($169,438,037.76) and (e) Notas de Ahorro issued in 2012 in the outstanding principal amount of Two Million Five Hundred Thirty-Three Thousand Fifty Dollars ($2,533,050.00).

1.25 **2012 CW Guarantee Bond Claim:** A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2012 up to and including December 31, 2013, and (b) the 2012 PBA Bonds; provided, however, that, solely for purposes of distribution under, but not voting with respect to, the Plan, the amount of a holder's 2012 CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of such 2012 PBA Bonds shall be measured as the amount of such holder's 2012 PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of 2012 PBA Bonds.

1.26 **2012 CW Guarantee Bond Claim (Taxable Election):** A 2012 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim shall be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Guarantee Bond Claim.

1.27 **2012 CW Guarantee Bond Recovery:** The aggregate recovery by holders of Allowed 2012 CW Guarantee Bond Claims, consisting of (a) One Hundred Forty-Nine Million Seven Hundred Thousand Twenty-Seven Dollars and Twenty-Four Cents ($149,700,027.24) in Cash, (b) One Hundred Eighty Million Two Hundred Thirty-Six Thousand Four Hundred Thirty-Four Dollars ($180,236,434.00) in original principal amount of New GO CIBs, (c) Eleven Million Nine Hundred Thirty-Three Thousand Five Hundred Sixty-Nine Dollars and Fifty-Four Cents ($11,933,569.54) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Seventy-Three Thousand Three Hundred Forty-Four Dollars and Thirty Cents ($7,773,344.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred ninety-four one thousandths percent (3.594%) of the GO CVIs.

1.28 **2012 CW Guarantee Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 49.1 hereof.

1.29 **2012 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2012 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 47.1 hereof.

1.30 **2012 PBA Bond Claim:** A Claim against PBA on account of 2012 PBA Bonds, other than a Retail 2012 PBA Bond Claim.

5

1.31    **2012 PBA Bond Recovery:**  The aggregate recovery by holders of Allowed 2012 PBA Bond Claims, and Allowed Retail 2012 PBA Bond Claims on account of such Claims, One Hundred Fifty-Four Million Eight Hundred Ninety-Nine Thousand Nine Hundred Two Dollars and Twenty-Three Cents ($154,899,902.23) in Cash.

1.32    **2012 PBA Bonds:**  Collectively, the Government Facilities Revenue Refunding Bonds, Series U, issued by PBA in the original principal amount of Five Hundred Eighty-Two Million Three Hundred Forty-Five Thousand Dollars ($582,345,000.00).

1.33    **2014 CW Bond Claim:**  A Claim against the Commonwealth on account of the 2014 CW Bonds, other than a Retail 2014 CW Bond Claim.

1.34    **2014 CW Bond Claim (Taxable Election):**  A 2014 CW Bond Claim and Retail 2014 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim shall be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Bond Claim.

1.35    **2014 CW Bond Recovery:**  The aggregate recovery by holders of Allowed 2014 CW Bond Claims, Allowed 2014 CW Guarantee Bond Claims and Allowed Retail 2014 CW Bond Claims on account of any such Claims, consisting of (a) One Billion Two Hundred Thirteen Million Four Hundred Seventy-Eight Thousand Eight Hundred Seventy-Seven Dollars and Thirty-Five Cents ($1,213,478,877.35) in Cash, (b) One Billion Four Hundred Sixty-One Million Nine Thousand One Hundred Twelve Dollars ($1,461,009,112.00) in original principal amount of New GO CIBs, (c) Ninety-Six Million Seven Hundred Thirty-Four Thousand Three Hundred Forty-Six Dollars ($96,734,346.00) in original principal amount of New GO 5.375% CABs, (d) Sixty-Three Million Eleven Thousand Two Hundred Seventy Dollars and Ninety-One Cents ($63,011,270.91) in original principal amount of New GO 5.0% CABs, and (e) twenty and two hundred sixty-six one thousandths percent (20.266%) of the GO CVIs.

1.36    **2014 CW Bonds:**  Collectively, the General Obligation Bonds of 2014, Series A, issued by the Commonwealth in the original principal amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00).

1.37    **2014 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality, which guarantee was executed, delivered or enacted during the period from January 1, 2014 up to, but not including, the Commonwealth Petition Date, (b) the Ports bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of Two Hundred Twenty-Five Million Five Hundred Thirty-Three Thousand Seven Hundred Dollars and Forty-Five Cents ($225,533,700.45), and (c) PRIFA BANs, Series 2015, which, as of the

Commonwealth Petition Date, were in the outstanding principal amount of Seventy-Eight Million One Hundred Forty-Five Thousand Dollars ($78,145,000.00).

1.38 **2014 CW Guarantee Bond Claim (Taxable Election):** A 2014 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee Bond Claim shall be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Guarantee Bond Claim.

1.39 **2014 CW Guarantee Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 54.1 hereof.

1.40 **2014 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2014 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 52.1 hereof.

1.41 **5.5% SUT:** The present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

1.42 **AAFAF:** Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.43 **ACR Order:** That certain Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice and (C) Granting Related Relief, dated March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.44 **Act 106:** Act 106 of 2017, which created the pay-as-you-go pension system known as "PayGo" and established a defined contribution retirement system to replace the retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act 3-2013, as amended, and Act 160-2013, as amended.

1.45 **Act 106 Board:** The board created in accordance with Act 106.

1.46 **Active and Retired Employee Benefit Claim:** A Retired ERS Participant Below-Threshold Claim, a Retired JRS Participant Below-Threshold Claim, a Retired TRS Participant Below-Threshold Claim, a Retired ERS Participant Above-Threshold Claim, a Retired JRS Participant Above-Threshold Claim, a Retired TRS Participant Above-Threshold Claim, an Active ERS Participant Claim, an Active JRS Participant Claim, an Active TRS Participant Claim, a System 2000 Participant Claim, a VTP Payroll Participant Below-Threshold Claim, and a VTP Payroll Participant Above-Threshold Claim.

1.47     **Active ERS Participant Claim:**  An ERS Participant Claim held by an Active Participant, expressly excluding, however, any Participant benefitting from the provisions of either Act 70-2010 or Act 211-2015.

1.48     **Active JRS Participant Claim:**  A JRS Participant Claim held by an Active Participant.

1.49     **Active Participant:**  A Participant that is not a Retiree.

1.50     **Active TRS Participant Claim:**  A TRS Participant Claim held by an Active Participant.

1.51     **Administrative Claim Bar Date:**  Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order.

1.52     **Administrative Expense Claim:**  A Claim against the Debtors or their Assets constituting a cost or expense of administration of the Title III Cases asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and PSA Restriction Fees; provided, however, that, under no circumstances shall an Administrative Expense Claim include the PBA Administrative Expense Claim.

1.53     **ADR Order:**  That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.54     **ADR Procedures:**  The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.55     **Affiliate:**  With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.56    **AFICA:**  Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority.

1.57    **AFSCME**:  American Federation of State, County and Municipal Employees, for itself and on behalf of its two local chapters, SPU, AFSCME Council 95 and Capitulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico.

1.58    **AFSCME CBAs:**  Those certain collective bargaining agreements between AFSCME and the Commonwealth, and listed on Exhibit "G" hereto.

1.59    **AFSCME Claims:**  A Claim arising from or related to the AFSCME CBAs.

1.60    **AFSCME Plan Support Agreement:**  That certain Plan Support Agreement, dated as of June 7, 2019, by and among the Oversight Board, the Commonwealth and AFSCME, as may be amended from time to time.

1.61    **AFSCME Term Sheet:**  The term sheet annexed as Exhibit "A" to the AFSCME Plan Support Agreement.

1.62    **Allowed:**  With respect to any Claim, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtors in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the Commonwealth Petition Date and any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law.  Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.63    **Allowed Claim:**  A Claim, to the extent it is or has become Allowed.

1.64    **Ambac:**  Ambac Assurance Corporation or its successor or designee.

9

1.65 **Ambac Acceleration Price:** A price equal to the outstanding principal amount of an Ambac Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.66 **Ambac Action:** The litigation styled <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV01505.

1.67 **Ambac Certificates:** The certificate(s) or receipt(s) to be issued by Ambac to beneficial holders of GO Bonds which are deposited into the Ambac Trust.

1.68 **Ambac Commutation Consideration:** A combination of some or all of the following selected at Ambac's sole discretion no later than twenty-one (21) days prior to the Ballot Date: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage, to be determined at Ambac's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to Ambac in accordance with the terms and provisions of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.69 **Ambac Commutation Treatment:** The treatment set forth in Section 75.5(a) hereof.

1.70 **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.71 **Ambac Escrow Account:** A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, as the case may be, for the benefit of the beneficial holders of Ambac Insured Bonds whose Ambac Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.72 **Ambac Insured Bond Claims:** Collectively, the Claims against the Commonwealth or PBA, as applicable, arising from the Ambac Insured Bonds, including, any Vintage CW Bond Claims (Ambac), Vintage CW Guarantee Bond Claims (Ambac), and Vintage PBA Bond Claims (Ambac).

1.73 **Ambac Insured Bonds:** Collectively, the Vintage CW Bonds and the Vintage PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.74 **Ambac Insurance Policies:** The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.75 **Ambac Plan Consideration:** The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims, the CW/HTA Clawback Recovery allocable to holders of the Allowed Ambac CW/HTA Claims, the CW/CCDA Clawback Recovery allocable to holders of Allowed Ambac CW/CCDA Claims, and the CW/PRIFA Clawback Recovery allocable to holders of Allowed Ambac CW/PRIFA Rum Tax Claims, as the case may be.

1.76    **Ambac Trust:**  With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.77    **Ambac Trust Assets:**  Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) distributions to be made in respect of such Ambac Insured Bonds, and (c) the Ambac Insurance Policies.

1.78    **Ambac CW/Convention Center Claims:**  Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.79    **Ambac CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.80    **Ambac CW/PRIFA Rum Tax Claims:**  Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured or otherwise owned (by subrogation or otherwise by Ambac including pursuant to a secondary market insurance policy.

1.81    **AMPR:**  Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.

1.82    **Appointments Related Litigation:**  Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States Adv. Proc. No. 18-00041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montanez, et al. v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.83    **Assets:**  With respect to the Debtors, (i) all "property" of the Debtors, including, without limitation, such property as it may be reflected on the Debtors' books and records and the Confirmation Order as of the Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtors or other authorized representative for the benefit of the Debtors and its Creditors, unless modified or released pursuant to the Plan or a Final Order, including, without limitation, any Avoidance Action.

1.84    **Assured:**  Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.85 **Assured Acceleration Price:** A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.86 **Assured Acceleration Price Payment Option:** Assured's option in accordance with Section 75.1 hereof, if either (a) at or prior to the time of pricing of Assured New GO Bonds with respect to which Assured has exercised the Assured Election, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (b) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, to elect, in its sole discretion, to pay the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election and to receive, on the Effective Date, the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash or other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.

1.87 **Assured Bondholder Elections:** Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 75.1 hereof in the event Assured does not exercise the Assured Election.

1.88 **Assured Bondholder Elections Form:** The "Form of Election Notice for Certain Bondholders with Respect to Classes 2, 17, 24 and 42" attached as Schedule 5(a) to the Disclosure Statement Order.

1.89 **Assured CVIs:** Collectively, the CVIs allocable to holders of Assured Insured Bond Claims.

1.90 **Assured CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.91 **Assured CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.92 **Assured CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured by Assured including pursuant to a secondary market insurance policy.

1.93 **Assured Election:** Assured's rights, as set forth in Section 75.1 hereof, to receive the Cash and the CVIs allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of Assured

Insured Bonds, which Assured New GO Bonds shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, cause amounts equal to such deficiency to be paid by Assured in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.94    **Assured Election Notice:**  The "Assured Election Notice" attached as Schedule 5(b) to the Disclosure Statement Order.

1.95    **Assured Insurance Policies:**  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.96    **Assured Insured Bond Claim:**  A Claim against the Commonwealth or the PBA, as applicable, on account of an Assured Insured Bond, including a Vintage CW Bond Claim (Assured), 2011 CW Bond Claim (Assured), 2011 CW Series D/E/PIB Bond Claim (Assured) 2012 CW Bond Claim (Assured), Vintage CW Guarantee Bond Claim (Assured), or a Vintage PBA Bond Claim (Assured).

1.97    **Assured Insured Bondholder:**  The beneficial holder of an Assured Insured Bond.

1.98    **Assured Insured Bonds:**  Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

1.99    **Assured New GO Bonds:**  The New GO Bonds allocable to holders of Assured Insured Bond Claims.

1.100    **Assured New Securities:**  Collectively, the Assured New GO Bonds and the Assured CVIs.

1.101    **Assured Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Assured Insured Bond Claims.

1.102    **Assured Treatment:**  The treatment of Assured Insured Bond Claims set forth in Section 75.1 hereof.

1.103    **Avoidance Actions:**  Collectively, (a) those avoidance, recovery, subordination or other actions or remedies identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, against any Entity that have been brought by or on behalf of the Debtors against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and

553 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of
PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or
on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit
"B" hereto, as such Exhibit "B" may be amended or modified up to and including the Effective
Date in accordance with the terms and conditions of the Committee Agreement, and (c) all similar
Causes of Action that are currently subject to tolling agreements with the Commonwealth and/or
ERS; provided, however, that under no circumstances shall "Avoidance Actions" include (x) any
Claim or Cause of Action against any Entity relating to CW Bond Claims, PBA Bond Claims, CW
Guarantee Bond Claims, or PRIFA BANs (other than the Claims and Causes of Action in the SCC
Action and the related tolling agreements), (y) any Claim or Cause of Action related to the Fourth
Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways
and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order
[Case No. 17-3283-LTS, ECF No. 15854], as amended, which shall terminate upon entry of the
Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended
Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto
Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental
Entitles Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-
3283-LTS, ECF No. 17394], as amended, which shall terminate upon entry of the Confirmation
Order.

      1.104    **Avoidance Actions CW Interests**:  The tranche of beneficial interests in the
Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the
CW GUC Recovery and relating only to net recoveries attributable to Avoidance Actions relating
to the Commonwealth Title III Case.

      1.105    **Avoidance Actions ERS Interests**:  The tranche of beneficial interests in the
Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the
ERS GUC Pool and relating only to net recoveries attributable to Avoidance Actions relating to the
ERS Title III Case.

      1.106    **Avoidance Actions Trust**:  The trust to be created on or prior to the Effective
Date into which on the Effective Date shall be transferred the authority to litigate or compromise
and settle the Avoidance Actions.

      1.107    **Avoidance Actions Trust Agreement**:  The agreement to be executed and
delivered on or prior to the Effective Date providing for, among other things, the ongoing litigation
of the Avoidance Actions, which agreement shall be in form and substance reasonably acceptable
to the Creditors' Committee.

      1.108    **Avoidance Actions Trust Assets**:  Collectively, (a) the Avoidance Actions, (b)
funds held in escrow as of the Effective Date relating to the compromise and settlement of certain
avoidance actions prior to the Effective Date (net of expenses incurred by the escrow agent with
respect thereto), and (c) such other actions that have been brought by or on behalf of the Debtors
seeking affirmative recoveries, and which actions are set forth in the respective litigations listed on
Exhibit "B" hereto.

1.109    **Avoidance Actions Trust Beneficiaries:** Collectively, the holders of Avoidance Actions CW Interests and Avoidance Actions ERS Interests.

1.110    **Avoidance Actions Trust Board:** The three (3) member board appointed as of the Effective Date to govern the Avoidance Actions Trust, with (a) two (2) directors selected by the Creditors' Committee and (b) one (1) director selected by the Oversight Board.

1.111    **Avoidance Actions Trust Interests:** Collectively, the Avoidance Actions CW Trust Interests and the Avoidance Actions ERS Trust Interests.

1.112    **Avoidance Actions Trustee:** The trustee appointed by the Avoidance Actions Trust Board, by a simple majority vote of such board, on or prior to the Effective Date in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, including, without limitation, any successor thereto.

1.113    **Ballot Date:** The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the Plan.

1.114    **Ballot/Election Form:** The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the Plan.

1.115    **Bankruptcy Code:** The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

1.116    **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

1.117    **Bar Date:** The respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against a Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

1.118    **Bar Date Orders:** The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtors or their Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof  [Case No. 17-3283-LTS, ECF No. 3160], and (c) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 19-5523-LTS, ECF No. 55].

1.119 **Base Contribution:** One Hundred Seventy-Five Million Dollars ($175,000,000.00), the amount the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve in accordance with the terms and provisions of Section 83.2 of the Plan; provided, however, that, in the event that, for any of (a) the FY in which the Effective Date occurs and (b) the following nine (9) FYs, the Projected Fiscal Plan Surplus is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000.00), such contribution amount shall increase to an amount equal to fifty percent (50%) of the Projected Fiscal Plan Surplus.

1.120 **Bond Claim:** A Claim on account of a GO Bond, a PBA Bond, a CW Guarantee Bond Claim, or an ERS Bond with the amount of such Claim being calculated as the outstanding principal amount of such bonds plus any, accrued and unpaid interest thereon, up to, but not including, the respective Petition Date for (a) a GO Bond, the Commonwealth Petition Date, (b) a PBA Bond, the PBA Petition Date, (c) a CW Guarantee Bond Claim, the Commonwealth Petition Date, and (d) an ERS Bond, the ERS Petition Date.

1.121 **Bond Recovery Category:** Collectively, the categories set forth on Exhibit "L" hereto relating to the respective Classes of Claims and the distributions to be made thereto pursuant to the terms and provisions of the Plan.

1.122 **Bondholder Election:** The right of holders of Allowed ERS Bond Claims to purchase the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the provisions of Section 69.2(b) hereof.

1.123 **Business Day:** A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

1.124 **Capital Improvements:** Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including, without limitation, buildings, park facilities, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

1.125 **Cash:** Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.126 **Causes of Action:** All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code,

16

whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

1.127    **CCDA:**  Puerto Rico Convention Center District Authority.

1.128    **CCDA Bonds:**  Collectively, the non-recourse bonds issued by CCDA, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00), in accordance with the terms of that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, as supplemented and amended from time to time.

1.129    **CCDA Bond Claims:**  Collectively, the Claims against CCDA arising from or relating to the CCDA Bonds.

1.130    **CCDA Consummation Costs:**  Collectively, the amounts set forth in Section 3.8 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and conditions of the HTA/CCDA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.131    **CCDA Restriction Fee Creditors:**  Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors holding and/or insuring (without duplication) CCDA Bond Claims that execute, or have executed, the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement relating thereto at or prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA Threshold Attainment is reached with respect to CCDA Bond Claims shall be considered CCDA Restriction Fee Creditors.

1.132    **CCDA Restriction Fee Percentage:**  The percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs divided by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by CCDA Restriction Fee Creditors.

1.133    **CCDA Trustee:**  The Bank of New York Mellon, solely in its capacity as successor trustee with respect to the CCDA Bonds.

1.134    **Charging Lien:**  A lien or right to priority of payment to which any Trustee/Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the Effective Date.

1.135 **Claim:** Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.136 **Class:** A category of holders of Claims set forth in Article IV of the Plan.

1.137 **Clawback Actions:** Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

1.138 **Clawback CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Clawback CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.139 **Clawback CVIs:** Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, including, without limitation, Exhibit "J" hereto, the Confirmation Order, the Clawback CVI Indenture and the CVI Legislation.

1.140 **Clawback Recovery:** The aggregate recovery by holders of Allowed CW/Convention Center Claims, Allowed CW/HTA Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, consisting of Clawback CVIs distributed to holders of such Claims hereunder and subject to the Annual Payment Waterfall, as defined in Exhibit "J" hereto and as set forth in Section 74.2(a) hereof and Exhibit "J" hereto.

1.141 **COFINA:** Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth.

1.142 **COFINA Bonds:** Collectively, the securities issued by COFINA pursuant to the COFINA Plan, the COFINA Confirmation Order, the COFINA Bonds Legislation and the COFINA Bonds Indenture.

1.143 **COFINA Bonds Indenture:** The trust indenture pursuant to which COFINA issued the COFINA Bonds, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

1.144 **COFINA Bonds Legislation:** Act 241 of the Legislative Assembly of Puerto Rico, approved November 15, 2018, amending Act 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended.

1.145 **COFINA Confirmation Order:** That certain Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019 [Case No. 17-3284-LTS, ECF. No. 561].

1.146 **COFINA Plan:** That certain Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated January 9, 2019 [Case No. 17-3284-LTS, ECF. No. 436].

1.147 **Committee Agreement:** That certain letter agreement, dated July 12, 2021, between the Creditors' Committee and the Oversight Board.

1.148 **Commonwealth:** The Commonwealth of Puerto Rico.

1.149 **Commonwealth Constitution:** The Constitution of the Commonwealth of Puerto Rico.

1.150 **Commonwealth Election:** The right of the Commonwealth to purchase the Private Equity Portfolio and the interest in the ERS Trust in accordance with the provisions of Section 66.2(a) hereof.

1.151 **Commonwealth Instrumentality Plan:** A plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan of adjustment or Title VI Qualifying Modification for HTA, CCDA, or PRIFA.

1.152 **Commonwealth Legislature:** The Legislative Assembly of Puerto Rico.

1.153 **Commonwealth Petition Date:** May 3, 2017.

1.154 **Commonwealth Title III Case:** The Title III case under PROMESA pending for the Commonwealth in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al., Case No. 17-3283-LTS (D.P.R.).

1.155 **Comprehensive Cap:** The limitation on Maximum Annual Debt Service payable on Net Tax-Supported Debt, established pursuant to the Debt Responsibility Act and the Debt

Management Policy, which shall apply in addition to the limitation imposed on the incurrence of public Debt established pursuant to the Article VI, Section 2 of the Commonwealth Constitution.

1.156 **Confirmation Date:** The date on which the Clerk of the Title III Court enters the Confirmation Order on the docket.

1.157 **Confirmation Hearing:** The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.158 **Confirmation Order:** The order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.159 **Constitutional Debt Group:** The Ad Hoc Group of Constitutional Debtholders consisting of the Constitutional Debt Group Members, as such membership may change from time to time.

1.160 **Constitutional Debt Group Members:** BlackRock Financial Management Inc., Brigade Capital Management, EMSO Asset Management Limited, Mason Capital Management, LLC, Silver Point Capital, L.P., and VR Advisory Services Ltd., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.161 **Consummation Costs:** Collectively, the CCDA Consummation Costs and the GO/PBA Consummation Costs.

1.162 **Convenience Cap:** Sixty-Five Million Dollars ($65,000,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims (whether against the Commonwealth or ERS), unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing.

1.163 **Convenience Claim:** An Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim, as the case may be, to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 72.1 hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims (whether against the Commonwealth or ERS) shall be Sixty-Five Million Dollars ($65,000,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of

20

the Confirmation Hearing in its sole and absolute discretion; and, <u>provided</u>, <u>further</u>, that, in the event that such Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.164    **Creditor:**  Any Entity holding a Claim against the Debtors or any Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtors, including, without limitation, a Claim against the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.165    **Creditors' Committee:**  The statutory committee of unsecured claimholders appointed in, among other cases, the Commonwealth Title III Case, the ERS Title III Case and the HTA Title III Case.

1.166    **CRIM:**  Centro de Recaudacion de Ingresos Municipales or Municipal Revenue Collection Center.

1.167    **CUSIP:**  The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.168    **Custodial Trust Documents:**  Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of (a) the HTA Effective Date and relating to (i) the HTA Bonds insured by Assured and National, if applicable, and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Assured, and National, as the case may be, and (ii) the HTA Bonds insured by FGIC and Ambac and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance satisfactory to the Oversight Board, FGIC, and Ambac, as the case may be, and (b) the PRIFA Effective Date and relating to (i) the PRIFA Bonds insured by Ambac, Assured and FGIC, if applicable, and the distributions to be made in accordance with the PRIFA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Ambac, and FGIC.

1.169    **CVIs:**  Collectively, GO CVIs and the Clawback CVIs.

1.170    **CVI Indenture:**  Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.171    **CVI Legislation:**  Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation.

1.172    **CVI Payment Reserve:**  To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the

21

terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, Cash payable from the HTA Clawback CVI to be held in reserve by the Clawback CVI paying agent or the CVI Trustee, as the case may be, pursuant to the Trust Documentation and the Clawback CVI Indenture in an amount equal to the difference of (a) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds <u>minus</u> (b) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

1.173    **CVI Trustee:**   The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

1.174    **CW Appropriations Claims:**   Collectively, the Claims against the Commonwealth arising from or related to indebtedness only payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions, including, without limitation, (a) notes from the Commonwealth or its agencies or instrumentalities held by PFC for the repayment of PFC indebtedness and (b) loans only payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Debt Recovery Authority or the GDB Public Entity Trust; <u>provided</u>, <u>however</u>, that "CW Appropriations Claims" shall not include the PBA Administrative Expense Claim.

1.175    **CW Bond Claims:**   Collectively, the Claims against the Commonwealth arising from or relating to the GO Bonds, including the Vintage CW Bond Claims, the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the CW Bond Claims (Insured), and the Retail CW Bond Claims.

1.176    **CW Bond Claims (Insured):**   Collectively, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), the Vintage CW Bond Claims (National), the Vintage CW Bond Claims (FGIC), the Vintage CW Bond Claims (Syncora), the 2011 CW Bond Claims (Assured), the 2011 CW Series D/E/PIB Bond Claims (Assured), and the 2012 CW Bond Claims (Assured).

1.177    **CW Fiscal Plan:**   That certain Fiscal Plan of the Commonwealth, certified by the Oversight Board on May 27, 2020.

1.178    **CW General Unsecured Claim:**   A Claim against the Commonwealth; <u>provided</u>, <u>however</u>, that, under all circumstances, "CW General Unsecured Claim" shall not include (a) a PBA Bond Claim, (b) a CW Bond Claim, (c) a CW Guarantee Bond Claim, (d) an Active and Retired Employee Benefits Claim, (e) an AFSCME Claim, (f) a CW/HTA Claim, (g) a CW/Convention Center Claim, (h) a CW/PRIFA Rum Tax Claim, (i) a CW/MBA Claim, (j) an Energy Incentive Claim, (k) an Eminent Domain/Inverse Condemnation Claim, (l) a Med Center Claim, (m) a Dairy Producer Claim, (n) a Tax Credit Claim, (o) a CW Appropriations Claim, (p) a

22

Section 510(b) Subordinated Claim, (q) a Gracia Gracia Claim, (r) a Late-Filed Claim, (s) a Convenience Claim, (t) a Federal Claim, (u) any Claim that is eligible to be transferred into or administered through the ACR process, (v) the Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any related proofs of claim asserting claims related to the litigation styled <u>Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department</u>, Case No. KAC-2007-4170, (w) all claims for retiree benefits (including, without limitation, those portions of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless of whether such claims are asserted by retirees or active employees and regardless of whether of such claims are asserted through litigation or administrative proceedings, but excluding claims for any increased pension payments that would have been payable prior to adjudication of such claims (<u>i.e.</u>, pension "back pay") and only up to the amount related to unpaid pensions, (x) all Claims against the Commonwealth by any Governmental Unit (as defined in section 101 of the Bankruptcy Code), including the United States government, any State government, foreign government, any municipality (whether of the Commonwealth or otherwise), the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted directly by such Governmental Unit or indirectly or derivatively by any other entity, including, without limitation, any Claims by the GDB asserted by or though the GDB Debt Recovery Authority, (y) any unsecured deficiency claims with respect to asserted priority and/or secured claims, or (z) such other Claim determined by the Title III Court not to be a CW General Unsecured Claim.

1.179    **CW Guarantee Bond Claims**:  Collectively, the Vintage CW Guarantee Bond Claims, the 2011 CW Guarantee Bond Claims, the 2012 CW Guarantee Bond Claims, the 2014 CW Guarantee Bond Claims and the CW Guarantee Bond Claims (Insured).

1.180    **CW Guarantee Bond Claims (Insured)**:  Collectively, the Vintage CW Guarantee Bond Claims (Ambac), the Vintage CW Guarantee Bond Claims (Assured), the Vintage CW Guarantee Bond Claims (National), the Vintage CW Guarantee Bond Claims (FGIC), and the Vintage CW Guarantee Bond Claims (Syncora).

1.181    **CW GUC Recovery**:  The aggregate recovery available to holders of Allowed CW General Unsecured Claims, consisting of (a) Net CW Cash Consideration (funded in accordance with the terms and provisions of Section 62.3 hereof, including, without limitation, any adjustments in accordance with the terms of the final proviso thereof) plus (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.

1.182    **CW/Convention Center Claim**:  The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.183   **CW/Convention Center Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.184   **CW/HTA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

1.185   **CW/HTA Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.186   **CW/MBA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

1.187   **CW/MBA Clawback Recovery:** The aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.188   **CW/PRIFA Rum Tax Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

1.189   **CW/PRIFA Rum Tax Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto, as may be adjusted in accordance with the Rum Tax CVI pursuant to the terms and conditions of the CVI Indenture.

1.190   **Dairy Producer Claim:** Collectively, the Claims of Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. arising from and relating to the Dairy Producer Settlement, which, as of the Effective Date, shall be (a) allowed in the aggregate amount of Sixty-Two Million Three

Hundred Twenty-Three Thousand Six Hundred Thirty-Nine Dollars and Twenty-Two Cents ($62,323,639.22), and (b) allocated to Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. in the amounts of Forty-Five Million Three Hundred Twenty-Five Thousand One Hundred Fifty-One Dollars and Twenty-Two Cents ($45,325,151.22) and Sixteen Million Nine Hundred Ninety-Eight Thousand Four Hundred Eighty-Eight Dollars ($16,998,488.00), respectively.

1.191 **Dairy Producer Settlement:** The Final Settlement Agreement and Memorandum of Understanding Between the Parties, filed October 29, 2013, in the litigation styled Vaquería Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al., Civil Case No.: 04-1840 (DRD), then pending in the United States District Court for the District of Puerto Rico.

1.192 **Debt:** Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money.

1.193 **Debt Management Policy:** The policy developed by AAFAF, relating to the issuance of indebtedness, as more fully described in the Debt Responsibility Act and herein.

1.194 **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.195 **Debt Policy Period:** The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

1.196 **Debt Policy Revenues:** Collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, including, without limitation, any such revenue assigned to, or owned by, COFINA or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan, (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to FY2020, and as reflected in the CW Fiscal Plan, "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

1.197 **Debt Related Objections:** Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee,

and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No. 10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without limitation, litigations or actions commenced to recover principal and/or interest with respect to the GO Bonds, the PBA Bonds and/or the PRIFA BANs, and (ii) any other objections or joinders to these or other such objections or joinders to these or such other objections or notices of participation that support the relief requested in such objections filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond Claims, and the PBA Bond Claims.

1.198 **Debt Responsibility Act:** Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms of the GO/PBA Plan Support Agreement.

1.199 **Debt Service Fund:** The fund to be created pursuant to the New GO Bonds Indenture, and held by the New GO Bonds Trustee in trust for the benefit of the holders of the New GO Bonds, into which the Commonwealth shall deposit monthly such amounts equal to (a) one-sixth (1/6) of the semi-annual obligation with respect to the payment of interest to accrue on

the New GO Bonds through the next interest payment date, and (b) one-twelfth (1/12) of the annual obligation with respect to the payment of principal and accreted value on the New GO Bonds.

1.200 **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.201 **Deemed Issuance Date:** The earlier to occur of (a) July 1, 2021 and (b) the Effective Date.

1.202 **Definitive Documents:** Collectively, the definitive documents and agreements contemplated by the Plan, including, without limitation, (a) the Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and pleadings in support of entry thereof, (c) the New GO Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New GO Bonds, (e) the CVI Indenture and documents or agreements related thereto, (f) the form of the CVIs, (g) the documents or agreements related to the Pension Reserve and the governance thereof, and (h) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured, National, Ambac, FGIC, and Syncora, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors' Committee.

1.203 **Disallowed:** With respect to any Claim, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or undisputed and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the holder thereof.

1.204 **Disbursing Agent:** Such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan.

1.205 **Disclosure Statement:** The disclosure statement relating to the Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA.

1.206 **Disclosure Statement Hearing:** The hearing held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.207 **Disclosure Statement Order:** The order of the Title III Court (a) approving the form of the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to

27

Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions hereunder, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.208   **Disputed Claim:**  A Claim against the Debtors or their Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.209   **Distribution Date:**  Except as otherwise set forth herein, the date or dates determined by the Commonwealth, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

1.210   **Distribution Record Date:**  The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the Plan through The Depository Trust Company.

1.211   **Effective Date:**  The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

1.212   **Eminent Domain/Inverse Condemnation Claim:**  A Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto, or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use by one of the Debtors without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

1.213   **Eminent Domain Proceeding:**  A condemnation action or proceeding commenced by the Commonwealth or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A §2905 to obtain title to real property located on Puerto Rico.

1.214   **Energy Incentive Act:**  The Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019.

1.215    **Energy Incentive Claims:**  Collectively, any and all Claims arising from or related to the Energy Incentive Act, also known as the Puerto Rico Green Energy Incentives Act, in connection with promoting the production of the renewable energy.

1.216    **Entity:**  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.217    **ERS:**  Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

1.218    **ERS Bond Claim:**  A Claim arising from or related to the ERS Bonds, including, without limitation, interest accrued thereon during the period up to, but not including, the ERS Petition Date.

1.219    **ERS Bond Recovery:**  The aggregate recovery by holders of Allowed ERS Bond Claims, consisting of (a) Three Hundred Seventy-Three Million Dollars ($373,000,000.00), (b) the right to receive the proceeds of the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in the event the Commonwealth or one or more holders of Allowed ERS Bond Claims purchases the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in accordance with the terms and provisions of Section 69.2 hereof, and (c) in the event the Commonwealth does not elect to purchase such assets in accordance with Section 69.2(a) hereof, the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio.

1.220    **ERS Bonds:**  Collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million Six Hundred Ninety-Eight  Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

1.221    **ERS Fiscal Agent:**  The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the ERS Bonds.

1.222    **ERS General Unsecured Claim:**  A Claim against ERS other than an ERS Bond Claim.

1.223    **ERS GUC Pool:**  The sum of (a) Five Hundred Thousand Dollars ($500,000.00) in Cash plus (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests; provided, however, that, under no circumstances, shall such aggregate amount of consideration, including, without limitation, net recoveries from the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, exceed Five Million Dollars ($5,000,000.00); and, provided, further, that, in the event that the aggregate amount of the ERS GUC Pool (y) exceeds the aggregate amount of Allowed ERS General Unsecured Claims or (z) would exceed Five Million Dollars ($5,000,000.00) but for the limitation on recovery above, such excess amount or Avoidance Actions ERS Interests, as the case may be, shall be reallocated, on a pro rata basis, for the benefit of holders of Allowed CW General Unsecured Claims.

1.224    **ERS Litigation:**  Collectively, the litigation styled (a) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Co., et al., Case Nos, 19-1699, 19-1700 (appealed from Adv. Proc. No. 17-00213), currently pending in the United States Court of Appeals for the First Circuit, (b) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Andalusian Global Designated Activity Co., et al., Adv. Proc. No. 19-00366, currently pending in the Title III Court, (c) Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico, dated March 12, 2019 [Case No. 17-3283-LTS, ECF No. 5580], currently pending in the Title III Court, (d) Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth, dated April 23, 2019 [Case No. 17-3283-LTS, ECF No. 6482], currently pending in the Title III Court, (e) Special Claims Committee of the Financial Oversight & Management Board for Puerto Rico, et al., v. Jefferies, LLC, et al., Adv. Proc. No. 19-00355, currently pending in the Title III Court, (f) Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, as Fiscal Agent (Claim No. 16775), dated May 22, 2019, and as supplemental on January 6, 2020 [Case No. 17-3283-LTS, ECF Nos. 7075 and 9700], currently pending in the Title III Court, (g) Andalusian Global Designated Activity Co., et al., v. Financial Oversight & Management Board for Puerto Rico, et al., Case No. 20-1065, currently pending in the United States Court of Appeals for the First Circuit, (h) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Glendon Opportunities Fund, L.P. et al., Adv. Proc. No. 19-00367, currently pending in the Title III Court, (i) Objection of Financial Oversight and Management Board Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Proof of Claim Against ERS by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16777), dated January 6, 2020 [Case No. 17-3283-LTS, ECF No. 9701], currently pending in the Title III Court, (j) Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00219, currently pending in

the Title III Court, (k) <u>Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.</u>, Adv. Proc. No. 17-00220, currently pending in the Title III Court, and (l) ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims, dated November 21, 2019, as joined by The Bank of New York Mellon [Case No. 17-3283-LTS, ECF Nos. 9285, 9294, and 9298], currently pending the Title III Court.

1.225 **ERS Participant Claim:** A Claim on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of Act 106; <u>provided</u>, <u>however</u>, that "ERS Participant Claim" shall not include Claims held by a Participant in ERS, whose hire date was on or after January 1, 2000, based on participation in System 2000.

1.226 **ERS Petition Date:** May 21, 2017, the date on which the ERS Title III Case was commenced.

1.227 **ERS Portfolio Price:** Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), the base price to be paid for the ERS Private Equity Portfolio.

1.228 **ERS Private Equity Portfolio:** Collectively, the portfolio of private equity interests held by ERS as of the Effective Date.

1.229 **ERS Recovery Actions:** Collectively, the litigations styled: (a) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Jefferies LLC, et al.</u>, Adv. Proc. No. 19-00355; (b) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1M, et al.</u>, Adv., Proc. No. 19-00356; (c) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Stoever Glass & Co., et al.</u>, Adv. Proc. No. 19-00357; (d) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1F et al.</u>, Adv. Proc. No. 19-00358; (e) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1H et al.</u>, Adv. Proc. No. 19-00359; (f) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Wells Fargo Securities, LLC et al.</u>, Adv. Proc. No. 19-00360; and (g) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1G, et al.</u>, Adv. Proc. No. 19-00361 each pending in the Title III Court.

1.230 **ERS Resolution:** That certain Pension Funding Bond Resolution, adopted January 24, 2008, relating to the issuance of the ERS Bonds.

1.231 **ERS Stipulation:** That certain Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment, dated April 2, 2021.

1.232 **ERS Takings Action:** The litigation styled <u>Altair Global Credit Opportunities Fund (A) LLC v. United States</u>, Case No. 21-1577, currently pending in the United States Court of Appeals for the Federal Circuit.

1.233   **ERS Title III Case:**  The Title III case under PROMESA pending for ERS in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico, as representative of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico</u>, Case No. 17 3566-LTS (D.P.R.).

1.234   **ERS Trust:**  The trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS' interests in the ERS Private Equity Portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of Section 69.2 hereof.

1.235   **Excess Cash Surplus**:  The amount of actual cash surplus above and beyond the projected Fiscal Plan Surplus contained in the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.236   **Executory Contract:**  A contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.237   **Federal Claims:**  Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.

1.238   **FGIC:**  Financial Guaranty Insurance Company or its successor or designee.

1.239   **FGIC Action:**  The litigation styled <u>Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.240   **FGIC Certificates:**  With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

1.241   **FGIC CW/Convention Center Claims:**  Collectively, the CW/Convention Center Claims arising from the CCDA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.242   **FGIC CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.243   **FGIC CW/PRIFA Rum Tax Claims:**  Collectively, the CW/PRIFA Rum Tax Claims arising from the PRIFA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.244   **FGIC Escrow Account:**  The escrow account(s) that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of

FGIC Insured Bonds whose FGIC Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.245    **FGIC Insured Bond Claims**:  Collectively, the Claims arising from the FGIC Insured Bonds, including, for the avoidance of doubt, any Vintage CW Bond Claims (FGIC), Vintage CW Guarantee Claims (FGIC), and Vintage PBA Bond Claims (FGIC).

1.246    **FGIC Insured Bonds**:  Collectively, the GO Bonds and the PBA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.247    **FGIC Insured PRIFA Bond Claims**:  Collectively, the Claims, arising from the PRIFA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.248    **FGIC Insurance Policies**:  The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.249    **FGIC Plan Consideration**:  The consideration allocable or distributable in accordance with Sections 9.1, 24.1 and 31.1 of the Plan to holders of Allowed FGIC Insured Bond Claims.

1.250    **FGIC Rehabilitation Plan**:  The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.251    **FGIC Treatment**:  The treatment of FGIC Insured Bond Claims set forth in Section 75.4(a) hereof.

1.252    **FGIC Trust**:  With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.253    **Final Order**:  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in

full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.254 **Fiscal Plan:** A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.255 **Fiscal Plan Surplus:** The amount set forth on the line entitled **"Surplus/ (Deficit) Post Measures (excl. Debt Payments)"** of the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.256 **FY:** A fiscal year of the Commonwealth, commencing on July 1st and concluding on June 30th of the following calendar year.

1.257 **GDB:** The Government Development Bank for Puerto Rico.

1.258 **GDB HTA Loans:** Collectively, the loans, if any, made to HTA by GDB and now held by the Governmental Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.259 **GDB Loan Priority Determination:** The determination, in either the Commonwealth Title III Case or the HTA Tile III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery Authority does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

1.260 **General Fund:** The Commonwealth's primary operating fund.

1.261 **General Unsecured Claims:** Collectively, CW General Unsecured Claims and ERS General Unsecured Claims.

1.262 **GO Bonds:** Collectively, the currently outstanding general obligation bonds issued by the Commonwealth.

1.263 **GO CVIs:** Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture and the CVI Legislation.

1.264　**GO CVI Indenture:**　The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the GO CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.265　**GO Group:**　The Ad Hoc Group of General Obligation Bondholders consisting of Aurelius Capital Management, LP, and Autonomy Capital (Jersey) L.P., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the Plan Support Agreement.

1.266　**GO/PBA Annex Agreement:**　That certain Annex Agreement annexed as Exhibit "G" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims may become GO/PBA PSA Creditors.

1.267　**GO/PBA Consummation Costs:**　Collectively, the amounts set forth in Section 3.3 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the Initial GO/PBA PSA Creditors in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.268　**GO/PBA Joinder Agreement:**　That certain Joinder Agreement annexed as Exhibit "F" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims and PBA Bond Claims may become GO/PBA PSA Creditors.

1.269　**GO/PBA Joinder Creditors:**　Collectively, those GO/PBA PSA Creditors that executed and delivered either the GO/PBA Joinder Agreement or the GO/PBA Annex Agreement prior to the GO/PBA Joinder Deadline.

1.270　**GO/PBA Joinder Deadline:**　July 30, 2021.

1.271　**GO/PBA Plan Support Agreement:**　That certain Amended and Restated Plan Support Agreement, dated as of July 12, 2021, by and among the Oversight Board and the GO/PBA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.272　**GO/PBA PSA Creditors:**　Collectively, the parties to the GO/PBA Plan Support Agreement, other than the Government Parties.

1.273　**GO/PBA PSA Restriction Fee:**　Collectively, the fee to be paid, in Cash, on the Effective Date in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Section 3.5 hereof and the Confirmation Order, in an amount equal to the product of (a) the Restriction Fee Percentage _times_ (b) the outstanding principal amount of GO Bonds and

PBA Bonds, plus interest accrued thereon during the period up to, but not including the Commonwealth Petition Date and the PBA Petition Date, respectively, (i) tendered for exchange in accordance with the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, in the case of GO/PBA PSA Creditors required to tender and exchange their bonds pursuant to the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, (ii) constituting Assured Insured Bonds, in the case of Assured, and (iii) constituting National Insured Bonds, in the case of National.

1.274 **GO/PBA Restriction Fee Percentage**: One and three hundred twenty-one thousandths percent (1.321%).

1.275 **Government Entity**: Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.276 **Government Parties**: Collectively, (a) the Oversight Board, as the representative of the Debtors, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtors, including, without limitation, any of its agencies, and (d) AAFAF; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.277 **Government Released Claims**: Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtors, Claims (including, without limitation, Claims arising from or relating to the PBA Bonds and the GO Bonds), the Debt Related Objections, the PBA Litigation, and the ERS Litigation, and arising prior to the Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtors (or their successors, including Reorganized Commonwealth) or COFINA arising from or relating to the Debtors' obligations pursuant to the Plan or the securities to be issued pursuant to the Plan or that were issued pursuant to the COFINA Plan, or (ii) a Government Releasee unrelated to the Debtors or the Claims discharged pursuant to the terms and provisions of the Plan, (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by AFICA, CCDA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and the CW Appropriations Claims.

1.278 **Government Releasees**: Collectively, the Government Parties and the Debtors, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors,

principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Cases in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and related to the CW Appropriations Claims.

1.279    **Gracia Gracia Claim:**  A Claim of a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action.

1.280    **Gracia Gracia CW Action:**  The litigation styled García Rubiera, et al. v. Asociación de Subcripcion Conjunta del Seguro de Responsabilidad Obligatorio, et al., Civil Núm.: KDP2001-1441(801), currently pending in the Puerto Rico Court of First Instance.

1.281    **Gracia Gracia Federal Action:**  The litigation styled García Rubiera, et al. v. Fortuño, et al., Case No.: 02-1179-GAG, currently pending in the United States District Court for the District of Puerto Rico.

1.282    **Gracia Gracia Settlement:**  Collectively, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016 and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain Judgment, dated March 1, 2016.

1.283    **GSA Helicopter Loan:**  The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of approximately Twenty-Three Million Seven Hundred Sixty-Four Thousand Six Hundred Seven Dollars ($23,764,607.00).

1.284    **GUC Recovery Cap:**  Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust shall not count towards attaining the forty percent (40%) cap.

1.285    **GUC Reserve:**  The reserve to be created on or prior to the Effective Date, and held by an independent, non-Commonwealth government entity selected jointly by the Oversight Board and the Creditors' Committee, solely for the benefit of holders of Allowed CW General Unsecured Claims.

1.286    **HTA:**  Puerto Rico Highways and Transportation Authority.

1.287    **HTA 68 Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the

Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight
Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the
Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One
Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway
Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One
Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00),
(d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original
principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars
($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in
the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand
Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by
HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-
Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010
Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount
of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars
($188,395,000.00), (h)the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA
in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand
Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal
amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

  1.288 **HTA 98 Bonds:** Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub
Bonds.

  1.289 **HTA 98 Senior Bonds:** Collectively, the following bonds issued by HTA
pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue
Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred
Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars
($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the
original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars
($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by
HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five
Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G,
issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred
Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds,
Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five
Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series
I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty
Thousand Dollars ($82,340,000.00), (g) the 2004 Transportation Revenue Refunding Bonds,
Series J, issued by HTA in the original principal amount of Four Hundred Five Million Nine
Hundred Eighty-Five Thousand Dollars ($405,985,000.00), (h) the 2005Transportation Revenue
Refunding Bonds, Series K, issued by HTA in the original principal amount of Eight Hundred
Million Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series
L, issued by HTA in the original principal amount of Five Hundred Ninety-Eight Million Two
Hundred Eighty-Five Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue
Refunding Bonds, Series M, issued by HTA in the original principal amount of Two Hundred Fifty

Million Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original principal amount of One Billion Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95), and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Forty-Four Million Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.290 **HTA 98 Sub Bonds:** Collectively, the following subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million Fifty Thousand Dollars ($75,050,000.00), and (b) the Subordinated Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.291 **HTA Bonds:** Collectively, the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.292 **HTA/CCDA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.293 **HTA/CCDA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.294 **HTA/CCDA Joinder Deadline:** With respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

1.295 **HTA/CCDA Joinder Creditors:** Collectively, those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement, the forms of which are annexed to the HTA/CCDA Plan Support Agreement as Exhibits "H" and "I", respectively, prior to the HTA/CCDA Joinder Deadline.

1.296 **HTA/CCDA Plan Support Agreement:** That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.297 **HTA/CCDA PSA Creditors:** Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.298     **HTA/CCDA PSA Restriction Fee Period:**   The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.299     **HTA/CCDA PSA Threshold Attainment:**   The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.300     **HTA Clawback CVI:**   The CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, the HTA/CCDA Plan Support Agreement and the Settlement Summary annexed thereto as Exhibit "J".

1.301     **HTA Confirmation Order:**   The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.302     **HTA Distribution Conditions:**   Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.303     **HTA Effective Date:**   The date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

1.304    **HTA Fiscal Agent:**  The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.305    **HTA Petition Date:**  May 21, 2017.

1.306    **HTA Plan:**  The plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", and, with respect to HTA Bonds insured by FGIC and Ambac, containing provisions consistent with the terms and provisions set forth in Sections 74.4 and 74.5 hereof, respectively.

1.307    **HTA Title III Case:**  The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Case No. 17-3567-LTS (D.P.R.).

1.308    **Initial PSA Creditors:**  Collectively, the Initial GO/PBA PSA Creditors and the Initial HTA/CCDA PSA Creditors.

1.309    **Initial GO/PBA PSA Creditors:**  Collectively, those creditors that executed the Initial PSA on February 22, 2021.

1.310    **Initial GO/PBA PSA Restriction Fee Creditors:**  Collectively, the Initial GO/PBA PSA Creditors and the Initial GO/PBA PSA Joinder Creditors that executed and delivered the Initial PSA, a joinder or annex agreement, as applicable, at or prior to the Initial PSA Threshold Attainment.

1.311    **Initial HTA/CCDA PSA Creditors:**  The "Initial PSA Creditors" as defined in the HTA/CCDA Plan Support Agreement.

1.312    **Initial PSA:**  That certain Plan Support Agreement, dated as of February 22, 2021, by and among the Oversight Board and the Initial GO/PBA PSA Creditors.

1.313    **Initial PSA Joinder Creditors:**  Collectively, those Entities holding GO Bonds or PBA Bonds, that executed and delivered a Joinder Agreement or an Annex Agreement to the Initial PSA, the forms of which were annexed to the Initial PSA as Exhibits "F" and "G", respectively, prior to the Initial PSA Threshold Attainment.

1.314    **Initial PSA Threshold Attainment:**  The date and time which the Initial GO/PBA PSA Restriction Fee Creditors owned or had due investment management responsibility and authority for funds or accounts which owned, or, with respect to Assured, Syncora and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, seventy percent (70%) of the aggregate amount of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims (without duplication and, to the extent such claims are Insured Bond Claims, to the extent a PSA

Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law).

1.315 **Insured Bond Claim:** Collectively, the Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.316 **Invalidity Actions:** Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "C" hereto.

1.317 **IRC:** The United States Internal Revenue Code of 1986, as amended from time to time.

1.318 **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.319 **JRS:** Judiciary Retirement System.

1.320 **JRS Participant Claim:** A Claim on account of being or having been a Participant in JRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in JRS from and after the Effective Date.

1.321 **LCDC:** The LCDC Holders, as such membership may change from time to time.

1.322 **LCDC Holders:** The Lawful Constitutional Debt Coalition consisting of Aristeia Capital, LLC, Farmstead Capital Management, FCO Advisors LP, GoldenTree Asset Management LP, Monarch Alternative Capital LP, Taconic Capital Advisors L.P., and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors GO/PBA and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.323 **Lien:** Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.324 **Lien Challenge Actions:** Collectively, the adversary proceedings listed on Exhibit "D" hereto.

1.325 **Lift Stay Motions:** Collectively, the litigation styled (a) <u>Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico</u>, filed in the HTA Title III Case [Dkt. No. 673], (b) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) <u>AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, filed in the HTA Title III Case [Dkt. No. 591], (e) <u>Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) <u>Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.</u>,

Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit, (g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

1.326    **List of Creditors:**  The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the (a) *Notice of Filing of Creditor List for the Commonwealth of Puerto Rico* filed in the Commonwealth Title III Case [Case No. 17-3283-LTS, ECF No. 1215], (b) *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* filed in the ERS Title III Case [Case No. 17-3566-LTS, ECF No. 207], and (c) *Notice of Filing of Creditor List for The Puerto Rico Public Buildings Authority* filed in the PBA Title III Case [Case No. 19-5523-LTS, ECF No. 34] pursuant to sections 924 and 925 of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be amended, restated, supplemented or otherwise modified by the Debtors.

1.327    **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.328    **Maximum Annual Debt Service:**  The maximum scheduled annual debt service (including principal and interest payments due and payable on bonds bearing current interest and, in the case of capital appreciation bonds or similar instruments, the maturity value due and payable on such instruments) for any FY on Net Tax-Supported Debt; <u>provided</u>, <u>however</u>, that, in the case of variable rate Debt, the calculation shall assume that such Debt bears interest at the maximum annual rate permitted by law; and, <u>provided</u>, <u>further</u>, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may establish additional provisions or clarifications regarding the calculation of the Maximum Annual Debt Service consistent with the principles and objectives set forth therein.

1.329    **Maximum Taxable Bond Election Amount:**  The amount of New GO Bonds required, after consultation with Section 103 tax counsel and determination by Internal Revenue Service, to be issued as non-exempt for federal income tax purposes.

1.330    **Measured SUT:**  The 5.5% SUT, <u>less</u> CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00), as set forth in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement.

1.331    **Med Centers:**  Collectively, the following federally qualified health centers: (a) Atlantic Medical Center, Inc.; (b) Camuy Health Services, Inc.; (c) HPM Foundation, Inc.; (d) Centro de Salud de Lares, Inc.; (e) Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc.; (f) Ciales Pumay Health Care Services, Inc.; (g) Concilio de Salud Integral de Loiza, Inc.; (h) Corporacion de Servicios Medicos Primarios Prevencion de Hatillo, Inc.; (i) Corporacion de Servicios de Salud y Medicina de Avandaza; (j) NeoMed Center, Inc.; (k) Hospital Center

43

Castaner, Inc.; (l) Migrant Health Center, Inc.; (m) Morovis Community Health Center, Inc.; (n) Centro de Servicios Primarios de Salud de Patillas, Inc.; (o) Costa Salud, Inc.; (p) Salud Integral en la Montana, Inc. (SIM), f/k/a Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerro, Corozal, Narajito y Orocovis; (q) Corporacion SANOS; (r) San Juan Comprehensive Health Care for the Homeless Program; (s) Centro de Servicios Primarios de Salud de Florida; (t) Puerto Rico Community Network for Clinical Research (CONCRA); and (u) Rio Grande Community Health Center, Inc.

1.332 **Med Center Claims:** Collectively, any and all Claims of the Med Centers arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), including, without limitation, (a) any claims and causes of action asserted or which could have been asserted in the Med Center Litigation against the Commonwealth, (b) any amounts asserted to be due and owing by the Commonwealth, or which could have been asserted as due and owing by the Commonwealth, in the Med Center proofs of claim, and (c) any amounts asserted to be owing by the Commonwealth and relating to the period from the Commonwealth Petition Date up to and including the Effective Date; provided, however, that "Med Center Claims" expressly excludes any claims asserted by any Med Center against the Municipality of San Juan in the litigation styled Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth of First Instance.

1.333 **Med Center Litigation:** Collectively, the litigation styled (a) Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth Court of First Instance, together with the following appeals therefrom: (i) Appeal No. KLCE2017-0147; (ii) Appeal No. KLCE2017-00094; and (iii) Appeal No. KLCE2017-00105, but, expressly excluding therefrom any claims asserted in the foregoing litigation by any Med Centers against the Municipality of San Juan, (b) Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al., Case No. 03-1640(GAG), currently pending in the United States District Court for the District of Puerto Rico, together with following appeals therefrom: (i) Case No. 17-1731; (ii) Case No. 17-1812; (iii) Case No. 17-1822; (iv) Case No. 18-1083; and (v) Case No. 19-1336, (c) Atlantic Medical Center Inc. et al. v. The Commonwealth of Puerto Rico, et al., Case No. 06-1291, currently pending in the United States District Court for the District of Puerto Rico, (d) Asociacion de Salud Primaria de P.R., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00227, currently pending in the Title III Court, (e) Atlantic Med. Ctr., Inc., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00278, currently pending in the Title III Court, (f) Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00292, currently pending in the Title III Court, (g) Corporacion de Servicios Integrals de Salud del Area de Barranquitas, Comerio, Corozal, Naanjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Proc. No. 17-00298, currently pending in the Title III Court, (h) Motion of Salud Integral en la Montana, Corporacion de Servicios de Salud y Medicina Avanzada, Neomed Center, Mgmt. Health Center, HPM Foundation, Morovis Community Health Center and Concilio de Salud Integral de Loiza for Allowance and Payment of Administrative Expense Claim, or in the Alternative, Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF No. 13582], (i) Motion of Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud familiar Dr. Julio Palmieri

Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Medicos Primarios y Prevencion de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc. and Hospital General Costoner, Inc. Seeking (I) Enforcement of the Court's Prior Order and (II) Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF. No. 12918], (j) Motion for Relief from Stay, filed in the Commonwealth Title III Case [ECF No. 13748], and (k) any litigation, adversary proceeding or motion with respect to the Med Center Claims at issue in the Commonwealth Title III Case or any of the above-referenced Med Center Litigations.

1.334    **Med DC Action:**  The litigation styled <u>Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 03-1640 (GAG), currently pending in the United States District Court for the District of Puerto Rico.

1.335    **MFA:**  Puerto Rico Municipal Finance Agency.

1.336    **Monolines:**  Collectively, Ambac, Assured, FGIC, National and Syncora, as insurers of GO Bonds, PBA Bonds, HTA Bonds, CCDA Bonds, PRIFA Bonds or other Claims or securities issued by the Debtors, as applicable.

1.337    **Monthly Benefit Modification:**  Zero Dollars ($0.00).

1.338    **National:**  National Public Finance Guarantee Corporation.

1.339    **National Action:**  The litigation styled <u>National Public Finance Guarantee Corp., et al. v. UBS Financial Services, Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.340    **National Acceleration Price:**  With respect to any National Insured Bonds, an amount equal to the outstanding principal amount of such National Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.341    **National Certificates:**  With respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

1.342    **National Commutation Consideration:**  A combination of some or all of the following, to be selected at National's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to National in accordance with the terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

1.343    **National Commutation Treatment:**  The treatment set forth in Section 72.2(a) hereof.

1.344   **National CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured by National.

1.345   **National Escrow Account:**  A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of National Insured Bonds whose National Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.346   **National Insurance Policies:**  The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.347   **National Insured Bond Claims:**  Collectively, the Claims arising from the National Insured Bonds, including any Vintage CW Guarantee Bond Claims (National).

1.348   **National Insured Bonds:**  Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.349   **National Non-Commutation Treatment:**  The treatment set forth in Article 72.2(b) hereof.

1.350   **National Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (National), Allowed Vintage CW Bond Claims (National), and Allowed Vintage CW Guarantee Bond Claims (National), as the case may be.

1.351   **National Treatment:**  With respect to each Class of National Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.352   **National Trust:**  The trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.353   **Net Allowed ERS Bond Claims:**  Collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

1.354   **Net CW Cash Consideration:**  The amount of Cash equal to Five Hundred Seventy-Five Million Dollars ($575,000,000.00) in Cash, minus (a) up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing in its sole and absolute discretion, as necessary to fund the administration and operation of the Avoidance Actions Trust, (b) such amounts paid to compensate the Creditors' Committee appointees to the Avoidance Actions Trust Board and their counsel in connection with their review

and analysis of the claims reconciliation process in accordance with Article LXXXII of the Plan, which under all circumstances shall not exceed, on an annual basis, Three Million Dollars ($3,000,000.00), and (c) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims in accordance with Article LXXII of the Plan,

1.355    **Net Tax-Supported Debt:**  Any Tax-Supported Debt, excluding any (a) Debt guaranteed by the full faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed FYs, (b) Debt being refinanced through the proceeds of the proposed bond or note issuance, and (c) Debt and obligations expressly excluded from the calculation of the Comprehensive Cap in Section 74.4 hereof.

1.356    **New GO 5.0% CABs:**  Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five percent (5%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.357    **New GO 5.375% CABs:**  Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five and three hundred seventy-five one thousandths percent (5.375%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.358    **New GO Bonds:**  Collectively, (a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs, issued as general obligation bonds, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, and the New GO Bonds Legislation, including, without limitation, any refunding bonds which may be issued in accordance with the New GO Bonds Indenture and the New GO Bonds Legislation.

1.359    **New GO Bonds Indenture:**  The indenture to be executed and delivered as of the Effective Date pursuant to which the Commonwealth shall issue the New GO Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.360    **New GO Bonds Legislation:**  Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement.

1.361    **New GO Bonds Trustee:**  The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New GO Bonds Indenture.

1.362    **New GO CIBs:**  Collectively, the series of general obligation current interest bonds to be issued pursuant to the Plan as components of the New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.363    **New GO Refunding Bonds:**  The securities which may be issued by Reorganized Commonwealth from and after the Effective Date, for the purpose of refinancing, in whole or in part, New GO Bonds or securities previously issued to refinance New GO Bonds, provided that, (a) the final maturity date on any such refinancing securities shall not be later than thirty (30) years from the original scheduled final maturity date of the New GO Bonds, and (b) upon the issuance of any such securities, the annual debt service due in the then-current and each future fiscal year on all New GO Bonds and New GO Refunding Bonds outstanding after the issuance of the New GO Refunding Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year through FY 2046, respectively, on all New GO Bonds and New GO Refunding Bonds outstanding prior to such issuance.

1.364    **New HTA Bonds:**  Collectively, the bonds to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

1.365    **New HTA Bonds Indenture:**  The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to Assured and National. .

1.366    **Non-Own Source Revenues:**  Collectively, the revenues of the Commonwealth received from the United States government or any agencies or instrumentalities thereof.

1.367    **Notas de Ahorro:**  Collectively, savings notes issued by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico, the payment of which is backed by the full faith and credit of the Commonwealth.

1.368    **OGP:**  The Office of Management and Budget of the Commonwealth.

1.369    **Ordinary Course Employee Claim:**  A Claim held by an employee of the Debtors related to ordinary course employment matters, including, without limitation, a Claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar Claims; provided, however, that, an "Ordinary Course Employee Claim" shall not include Claims related to retiree benefits.

1.370    **Outperformance Condition:**  The amount that Measured SUT exceeds the "Outperformance Metric", as defined in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement, in any FY.

1.371 **Outstanding:** Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.372 **Oversight Board:** The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtors' representative in their respective Title III Cases pursuant to Section 315(b) of PROMESA.

1.373 **Participant:** A current, former, active, inactive, or disabled employee who holds an accrued claim for one or more retirement benefits on account of being or having been a participant in ERS, JRS, or TRS, together with its beneficiaries, if any.

1.374 **PayGo:** The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.375 **PBA:** Puerto Rico Public Buildings Authority.

1.376 **PBA Administrative Expense Claim:** The Claim of PBA against the Commonwealth relating to the Commonwealth's use and occupancy of PBA Property during the period from the commencement of the Commonwealth's Title III Case up to and including the Effective Date.

1.377 **PBA Bond Claims:** Collectively, the Claims against PBA arising from or relating to the PBA Bonds, including the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), the Vintage Bond Claims (Syncora), the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the Retail PBA Bond Claims.

1.378 **PBA Bond Distribution:** The distribution of Cash to holders of Allowed PBA Bond Claims in an amount equal to the Allowed PBA Administrative Expense Claim.

1.379 **PBA Bonds:** Collectively, the 2011 PBA Bonds, the 2012 PBA Bonds and the Vintage PBA Bonds.

1.380 **PBA Cash:** One Billion Seventy-Three Million Dollars ($1,073,000,000.00), the amount paid by the Commonwealth in connection with the compromise and settlement of the Allowed PBA Administrative Expense Claim.

1.381 **PBA/DRA Secured Claim:** Collectively, the loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of Sixty-Eight Million Six Hundred Fifty-Three Thousand Two Hundred Ninety-Seven Dollars and Sixty-Nine Cents ($68,653,297.69), the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.

1.382 **PBA/DRA Unsecured Claim:** Collectively, the subordinated loans allegedly made by GDB, to PBA, which, as of the PBA Petition Date, were in the outstanding principal

amount of One Hundred Thirty-Eight Million Six Hundred Seventy-Eight Thousand Nine Hundred Thirty-Five Dollars and Seventy-One Cents ($138,678,935.71).

1.383 **PBA General Unsecured Claim:** A Claim against PBA, other than a PBA Bond Claim, a PBA/DRA Secured Claim and a PBA/DRA Unsecured Claim, but including Ordinary Course Employee Claims against PBA.

1.384 **PBA Litigation:** The adversary proceeding styled The Financial Oversight & Management Board of Puerto Rico v. Puerto Rico Public Buildings Authority, Adv. Proc. No. 18-00149, currently pending in the Title III Court.

1.385 **PBA Petition Date:** September 27, 2019, the date on which the PBA Title III Case was commenced.

1.386 **PBA Property:** All property for which any right, title or interest currently resides in PBA, including, without limitation, the buildings and other facilities owned or leased by PBA.

1.387 **PBA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Public Buildings Authority, Case No. 19-5523-LTS (D.P.R.).

1.388 **Pension Reserve Deed of Trust:** The deed of trust to be executed and delivered on or prior to the Effective Date, reasonably acceptable to the Government of Puerto Rico, the Retiree Committee, and labor organizations party to plan support agreements for the Plan, substantially in the form included in the Plan Supplement, providing for, among other things, creating the Pension Reserve Trust and providing for the terms for the deposit and withdrawal of monies in the Pension Reserve Trust for the benefit of the Retirees.

1.389 **Pension Reserve Trust:** The reserve trust to be created in accordance with the terms and conditions of Article LXXXIII hereof, which reserve trust shall be utilized for payment of the Commonwealth's pension obligations under Act 106 and which shall not be subject to taxation by the Commonwealth.

1.390 **Person:** An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.391 **PFC:** Puerto Rico Public Finance Corporation.

1.392 **Plan:** This Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.393 **Plan Supplement:** A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, forms of the New GO Bonds and the CVIs and, if not

50

previously enacted, the draft of the New GO Bonds Legislation and the CVI Legislation, respectively, which, in each case, shall be in form and substance reasonably satisfactory to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Ambac, Assured, FGIC, National, and Syncora, and, solely with respect to the provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee. The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.394    **Ports:** Ports of the Americas Authority.

1.395    **PRASA:** Puerto Rico Aqueduct and Sewer Authority.

1.396    **PREPA:** The Puerto Rico Electric Power Authority.

1.397    **PRIDCO:** Puerto Rico Industrial Development Company.

1.398    **PRIFA:** Puerto Rico Infrastructure Financing Authority.

1.399    **PRIFA BANs:** Collectively, the PRIFA Bond Anticipation Notes, Series 2015, issued pursuant to that certain Trust Agreement dated March 2015, between PRIFA and the PRIFA BANs Trustee.

1.400    **PRIFA BANs Commonwealth Guaranty:** That certain Guaranty Agreement, dated as of March 1, 2015, made by the Commonwealth to and for the benefit of RBC Municipal Products, LLC, as initial purchaser, and for the benefit of the PRIFA BANs Trustee.

1.401    **PRIFA BANs Litigation:** The litigation styled The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon, et al., Adv. Pro. No. 19-AP-269-LTS, currently pending in the Title III Court.

1.402    **PRIFA BANs Trustee:** The Bank of New York Mellon, solely in its capacity as trustee, paying agent, and registrar with respect to the PRIFA BANs.

1.403    **PRIFA Bond Claims:** Collectively, the Claims against PRIFA arising from or relating to the PRIFA Bonds.

1.404    **PRIFA Bonds:** Collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d)

Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

      1.405    **PRIFA Clawback CVI:**  The series or subseries of contingent value instrument, the payment for which the Commonwealth shall have pledged its full faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law, as more fully described in (a) Annex 4 of Exhibit "J" annexed hereto as twenty-seven percent (27%) of the Clawback CVIs and (b) the Settlement Summary annexed hereto as Exhibit "M" including the Rum Tax CVI to be issued on the Effective Date by the Commonwealth to the holders of PRIFA Bond Claims in accordance with the terms and conditions hereof, the Plan, the Confirmation Order, the PRIFA Order, the CVI Legislation, and the Clawback CVI Indenture.

      1.406    **PRIFA Distribution Conditions:**  Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the PRIFA Plan, the PRIFA Order, the CVI Indenture, and the Custodial Trust Documents, as applicable, shall have been agreed upon by the Oversight Board, Ambac, and FGIC, and (c) holders of, or insurers entitled to vote with respect to the PRIFA Bonds, holding or insuring, as the case may be, at least seventy percent (70%) of the outstanding principal amount of the PRIFA Bonds shall have executed the PRIFA Plan Support Agreement or a Joinder Agreement or an Annex Agreement with respect thereto; provided, however, that, upon entry of a Final Order with respect to the PRIFA Order, the condition set forth in subsection (c) shall be deemed satisfied.

      1.407    **PRIFA Order:**  The order of the Title III Court either (a) confirming a plan of adjustment for PRIFA in the event a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, or (b) approving a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

      1.408    **PRIFA Plan:**  As determined by the Oversight Board, upon consultation with AAFAF, either (a) in the event that a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, the plan of adjustment filed by the Oversight Board and confirmed by the Title III Court pursuant to the PRIFA Order, or (b) in the event that Ambac or FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA consistent with the terms and conditions set forth in the Settlement Summary annexed as Exhibit "F" to the PRIFA Plan Support Agreement, the application to approve such qualifying modification filed by the Oversight Board.

      1.409    **PRIFA Plan Support Agreement:**  That certain PRIFA Related Plan Support Agreement, dated as of July 27, 2021, by and among the Oversight Board and the PRIFA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

      1.410    **PRIFA PSA Creditors:**  Collectively, the parties to the PRIFA Plan Support Agreement, other than the Oversight Board.

      1.411    **Professional:**  An Entity (a) to be compensated for services rendered prior to or on the Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Cases by the Government Parties (in the Government Parties' sole discretion); (ii)

employed in the Title III Cases by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.412 **Professional Claim:** A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 316 and 317 of PROMESA.

1.413 **Projected Fiscal Plan Surplus:** The projected primary unrestricted Fiscal Plan Surplus as set forth in the Fiscal Plan as in effect as of the Effective Date <u>minus</u> the sum of (a) projected CVI payments for such FY and (b) the positive difference, if any, of projected Non-Own Source Revenues <u>minus</u> actual Non-Own Source Revenues for such FY; <u>provided</u>, <u>however</u>, that, in the event of (i) a federally-declared natural disaster, or (ii) a federally – declared pandemic other than the current Covid-19 pandemic in any FY, upon the filing of a motion by the Government of the Commonwealth of Puerto Rico, and upon notice and a hearing, "Projected Fiscal Plan Surplus" shall be reduced by the amount of any actual reduction in revenues for such FY as compared to projected revenues for such FY as set forth in the Fiscal Plan in effect on the Effective Date, whether or not the council acting on behalf of the Pension Reserve Trust agrees to such reduction, in the event that the Title III Court determines, by entry of a Final Order, that the amount of such reduction is directly attributable to such natural disaster or pandemic.

1.414 **PROMESA:** The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.415 **Pro Rata Share:** With respect to Allowed Claims (a) among and within Classes within the same Bond Recovery Category set forth in Exhibit "L" hereto, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class (or within all Classes within such Bond Recovery Category, as applicable), taking into account, and reducing for, unmatured interest thereon as of the Commonwealth Petition Date or the PBA Petition Date, as the case may be, with respect to individual bonds within such Class, and (b) among more than one Class, but not within the same Bond Recovery Category, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.416 **PSA Creditors:** Collectively, the GO/PBA PSA Creditors and the HTA/CCDA PSA Creditors.

1.417 **PSA Restriction Fees:** Collectively, the GO/PBA Restriction Fee and the CCDA Restriction Fee.

1.418 **Puerto Rico Investor:** A holder of a CW Bond Claim, a PBA Bond Claim, or a CW Guarantee Bond Claim that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole

and absolute discretion); provided, however, that "Puerto Rico Investor" shall not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National, or Syncora.

1.419    **QTCB Group:**  The QTCB Noteholder Group consisting of Canyon Capital Advisors LLC, Sculptor Capital LP, and Davidson Kempner Capital Management LP, each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.420    **Related Persons:**  With respect to (a) any of the Debtors (including for the avoidance of doubt, the Commonwealth and the Government Parties), including, without limitation, its predecessors, successors and assigns (whether by operation of law or otherwise) and any and all Professionals retained by the Debtors and AAFAF), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them each in its respective capacity as such, (b) with respect to each of the Creditors' Committee and the Retiree Committee, its successors and assigns (whether by operation of law or otherwise) and their respective current and former members, financial advisors, attorneys, accountants, consultants, agents and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, including their respective counsel and advisors, in each case, solely to the extent acting in such capacity, and (c) solely in connection with (i) the releases given by the Debtors pursuant to the terms and provisions of Sections 92.2 and 92.5 of the Plan, and (ii) the exculpation provided pursuant to the terms and provisions of Sections 92.7(b) and 92.7(f) of the Plan, with respect to each of the PSA Creditors, AFSCME, Ambac, Assured, FGIC, National, and Syncora, their respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity; provided, however, that "Related Persons" is not intended, nor shall it be construed, to include AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA.

1.421    **Released Claims:**  Collectively, (a) with respect to those Entities party to the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, respectively, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtors or their Assets in the Title III Cases, (c) Claims and Causes of Action that have been or could have been asserted by the Debtors (with respect to releases given by the Debtors) or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial

Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, and (e) Claims that otherwise arise from or relate to the Title III Cases, the Plan, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement, Retiree Committee Plan Support Agreement, the AFSCME Plan Support Agreement, any plan support agreement with AMPR, the ERS Stipulation, the Committee Agreement, and the compromises set forth herein, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtors or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort; and, provided, further, that "Released Claims: is not intended to release, nor shall it have the effect of releasing, any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan, including, without limitation, performance of obligations arising from or related to New GO Bonds, the New Refunding Bonds, the CVIs or under any policy of insurance or related documents issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

1.422    **Released Parties:**  Collectively, solely to the extent provided in the Plan or the Confirmation Order, (a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee, (d) the Creditors' Committee, (e) AFSCME, and (f) with respect to the foregoing clauses (a) through (e), each of their respective Related Persons.

1.423    **Releasing Parties:**  Collectively, solely to the extent provided in the Plan, (a) all holders of Claims against the Debtors or their Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

1.424    **Reorganized Commonwealth:**  The Commonwealth, from and after the Effective Date.

1.425    **Reorganized Debtors:**  The Debtors, from and after the Effective Date.

1.426    **Reorganized Debtors' By-Laws:**  The by-laws of the Debtors, to the extent applicable, from and after the Effective Date.

1.427    **Restriction Fee Creditors:**  Collectively, the CCDA Restriction Fee Creditors and the Initial GO/PBA PSA Restriction Fee Creditors or the GO/PBA Joinder Creditors, as applicable.

1.428 **Retail 2011 CW Bond Claim:** A 2011 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.429 **Retail 2011 CW Series D/E/PIB Bond Claim:** A Claim of 2011 CW Series D/E/PIB Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.430 **Retail 2011 PBA Bond Claim:** A 2011 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.431 **Retail 2012 CW Bond Claim:** A 2012 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.432 **Retail 2012 PBA Bond Claim:** A 2012 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.433 **Retail 2014 CW Bond Claim:** A 2014 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.434 **Retail CW Bond Claims:** Collectively, the Retail Vintage CW Bond Claims, the Retail 2011 CW Bond Claims, the Retail CW Series 2011 D/E/PIB Bond Claims, the Retail 2012 CW Bond Claims and the Retail 2014 CW Bond Claims.

1.435 **Retail Investor:** An individual who purchased GO Bonds, PBA Bonds and/or CW Guarantee Bond Claims for his or her own brokerage account, trust account, custodial account or in a separately managed account, with aggregate holdings in an amount less than One Million Dollars ($1,000,000.00); provided, however, that "Retail Investor" shall not include any individual in his or her capacity as a holder of a GO Bond or a PBA Bond (a) the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National or Syncora, or (b) who tendered for exchange such GO Bond or PBA Bond, as the case may be, in accordance with the terms and provisions of Article II of the GO/PBA Plan Support Agreement, in which case, such individual shall be deemed a holder of GO Bonds or PBA Bonds in the applicable Class of GO Bonds or PBA Bonds, as the case may be, not held by Retail Investors.

1.436 **Retail PBA Bond Claims:** Collectively, the Retail Vintage PBA Bond Claims, the Retail 2011 PBA Bond Claims, and the Retail 2012 PBA Bond Claims.

1.437 **Retail Support Fee:** Collectively, that portion of the fees to be made available to Retail Investors, in accordance with the terms and provisions of the GO/PBA Plan Support Agreement, the Plan, and the Confirmation Order, which fees, in the aggregate, shall not exceed Fifty Million Dollars ($50,000,000.00); provided, however, that, notwithstanding the foregoing, in

56

accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order, such aggregate amount may be decreased on account of the Retail Support Fee Return, with the aggregate amount of the Retail Support Fee Return being redistributed in accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order.

1.438 **Retail Support Fee Return:** Collectively, that portion of the Retail Support Fee not allocated to classes of Retail Investors, which portion is then payable and reallocated to Initial GO/PBA PSA Restriction Fee Creditors and members of Retail Investor Classes that voted to accept the Plan in accordance with the provisions of Section 3.6 hereof and the Confirmation Order.

1.439 **Retail Vintage CW Bond Claim:** A Vintage CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.440 **Retail Vintage PBA Bond Claim:** A Vintage PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to be less than One Million Dollars ($1,000,000.00).

1.441 **Retired ERS Participant Above-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i) the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is greater than the Threshold, or (b) who benefits from Act 127-1958.

1.442 **Retired ERS Participant Below-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i)the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is equal to or less than the Threshold, or (b) who does not benefit from Act 127-1950.

1.443 **Retired JRS Participant Above-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.444 **Retired JRS Participant Below-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.445 **Retired TRS Participant Above-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.446 **Retired TRS Participant Below-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.447 **Retiree:** A person who, as reflected in the records of ERS, JRS, or TRS, as applicable, as of April 1, 2021, receives a pension or annuity as a Participant in ERS, JRS or TRS; provided, however, that, under no circumstances shall a "Retiree" include a former employee of the Government of Puerto Rico who left public service before vesting in any pension benefits and who was not reimbursed for such person's contributions to ERS, JRS or TRS up to and including the date of separation.

1.448 **Retiree Claim:** An ERS Participant Claim, a JRS Participant Claim or a TRS Participant Claim held by a Retiree.

1.449 **Retiree Committee:** The committee of retired former employees of the Commonwealth, its agencies and instrumentalities appointed by the Office of the United States Trustee in the Commonwealth Title III Case.

1.450 **Retiree Committee Plan Support Agreement:** That certain Plan Support Agreement, dated as of June 7, 2019, by and between the Debtor, by and through the Oversight Board, pursuant to Section 315(b) of PROMESA, and the Retiree Committee, as may be amended or supplemented by the parties thereto.

1.451 **Rum Tax CVI:** The contingent value instrument, as more fully described in the Settlement Summary annexed as Exhibit "M" annexed hereto, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the PRIFA Plan, the Confirmation Order, the PRIFA Order, and the Rum Tax CVI Indenture.

1.452 **Rum Tax CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Rum Tax CVI, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.453 **Sales Tax:** The sales and use tax, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

1.454 **SCC Action:** The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.455 **SEC:** The United States Securities and Exchange Commission,

1.456 **Section 510(b) Subordinated Claim:** Any Claim, to the extent determined pursuant to a Final Order, against the Debtors' or their Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an Affiliate of a Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.457    **Securities Act:**  The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.458    **Solicitation Agent:**  Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Title III Cases by Title III Court order.

1.459    **SPU:**  Servidores Publicos Unidos.

1.460    **Substitute Measured Tax:**  All or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

1.461    **Syncora:**  Syncora Guarantee Inc., or its successor or designee.

1.462    **Syncora Acceleration Price:**  With respect to any Syncora Insured Bonds, an amount equal to the outstanding principal amount of such Syncora Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.463    **Syncora Certificates:**  With respect to each Syncora Trust that is formed for the benefit of the beneficial holders of a Syncora Insured Bonds CUSIP, the certificate(s) or receipt(s) to be issued by such Syncora Trust to beneficial holders of such Syncora Insured Bonds CUSIP that are deposited into such Syncora Trust.

1.464    **Syncora Commutation Consideration:**  A combination of some or all of the following, to be selected at Syncora's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the Plan Consideration; (ii) a percentage, to be determined at Syncora's sole discretion, of the Consummation Costs and/or the PSA Restriction Fees allocable to Syncora; and (iii) Cash in an amount to be determined by Syncora in its sole discretion.

1.465    **Syncora Commutation Treatment:**  The treatment set forth in Section 75.3(a) hereof.

1.466    **Syncora Escrow Account:**  A single escrow account that will be formed, on or prior to the Effective Date by the Commonwealth or PBA, at the sole cost and expense of Syncora, and for the benefit of the beneficial holders of Syncora Insured Bonds whose Plan Consideration is deposited therein.

1.467    **Syncora Insured Bond Claims:**  Collectively, the Bond Claims arising from the Syncora Insured Bonds, including, for the avoidance of doubt, any Vintage CW Guarantee Bond Claims (Syncora).

1.468 **Syncora Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured by Syncora, including, without limitation, pursuant to a secondary market insurance policy.

1.469 **Syncora Insurance Policies:** The existing insurance policies issued by Syncora relating to the Syncora Insured Bonds, together with any and all agreements and other documents related thereto.

1.470 **Syncora Non-Commutation Treatment:** The treatment set forth in Section 75.3(b) hereof.

1.471 **Syncora Plan Consideration:** The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (Syncora), Allowed Vintage CW Bond Claims (Syncora), and Allowed Vintage CW Guarantee Bond Claims (Syncora), as the case may be.

1.472 **Syncora Treatment:** With respect to each Class of Syncora Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.473 **Syncora Trust:** With respect to each Syncora Insured Bonds CUSIP, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth or PBA, at the sole cost and expense of Syncora and for the benefit of the beneficial holders of such Syncora Insured Bonds CUSIP.

1.474 **System 2000:** The pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq, or Act 3-2013.

1.475 **System 2000 Participant Claim:** A Claim that accrued under System 2000 or Act 3, by a Participant whose hire date was on or after January 1, 2000.

1.476 **Taxable Bond Distributions:** Collectively, the Vintage Taxable Bond Distribution, the 2011 CW Taxable Bond Distribution, the 2011 CW Series D/E/PIB Taxable Bond Distribution, the 2012 CW Taxable Bond Distribution, the 2014 CW Taxable Bond Distribution, the Vintage CW Guarantee Taxable Bond Distributions, the 2011 CW Guarantee Taxable Bond Distribution, the 2012 CW Guarantee Taxable Bond Distribution, and the 2014 CW Guarantee Taxable Bond Distribution.

1.477 **Taxable Election CW Claims:** Collectively, the Vintage CW Bond Claims (Taxable Election), the Vintage CW Guarantee Bond Claims (Taxable Election), the 2011 CW Bond Claims (Taxable Election), the 2011 CW Guarantee Bond Claims (Taxable Election), the 2011 CW Series D/E/PIB Bond Claims (Taxable Election), the 2012 CW Bond Claims (Taxable Election), the 2012 CW Guarantee Bond Claims (Taxable Election), the 2014 CW Bond Claims (Taxable Election) and the 2014 CW Guarantee Bond Claims (Taxable Election).

1.478 **Taxable New GO Bonds:** Collectively, the portion of the New GO Bonds in the aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the IRC, which New GO Bonds shall be issued as CIBs with an interest rate of five

percent (5.0%), payable semi-annually in arrears, and having a maturity of July 1, 2041 and be made available to Puerto Rico Investors with respect to the first One Million Dollars ($1,000,000.00) of aggregate holdings of (a) PBA Bond Claims, (b) CW Bond Claims, and (c) CW Guarantee Bond Claims (without duplication).

1.479 **Tax Credit Claims:** Collectively, Claims or rights, other than Energy Incentive Claims and Claims related to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, as amended, or an economic incentive law, concession, or decree, in each case, resulting in corporate income tax credits, deductions, exemptions or carryforwards.

1.480 **Tax-Supported Debt:** Collectively, without duplication, (a) direct Debt of the Commonwealth for the payment of which the full faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds and CVIs), (b) Debt issued by any Entity and guaranteed by the full faith, credit and taxing power of the Commonwealth, (c) Debt issued by any Entity (including the COFINA Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations, and (d) any other Debt identified as Tax-Supported Debt in the Debt Management Policy; provided, however, that the following shall not be considered Tax-Supported Debt: (1) tax and revenue anticipation notes with a final maturity occurring within the same FY of their issuance; and (2) Debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, provided, further, and without limiting the foregoing, "Tax-Supported Debt" excludes (y) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including, without limitation, the self-supporting Debt of PRASA, PREPA, HTA or any related securitization entity, (z) any other Debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such Debt is not guaranteed by the full faith, credit and taxing power of the Commonwealth; and, provided, further, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may contain additional provisions and clarifications regarding which Debt is considered Tax-Supported Debt consistent with the principles and objectives set forth therein.

1.481 **Threshold:** One Thousand Five Hundred Dollars ($1,500.00) per month.

1.482 **Title III:** Title III of PROMESA.

1.483 **Title III Cases:** Collectively, the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.

1.484 **Title III Court:** The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.485 **TRS:** Teachers Retirement System.

1.486　**Trustee Fiscal Agent:**　Each of the CCDA Trustee, the ERS Fiscal Agent, the HTA Fiscal Agent, and the PRIFA BANs Trustee.

1.487　**TRS Participant Claim:**　A Claim on account of being or having been a Participant in TRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in TRS from and after the Effective Date.

1.488　**Trust Documentation:**　Collectively, the documentation required, if necessary, to establish and maintain the trust into which with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

1.489　**Unclaimed Distribution:**　Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.490　**Underwriter Actions:**　Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action, or any action brought in the future in any state, federal or Commonwealth court, agency or tribunal against any of the defendants named in such litigations concerning or relating to indebtedness or bonds issued by a Debtor, any of the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth.

1.491　**Unexpired Lease:**　A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.492　**Uniformity Litigation:**　Collectively, (a) the litigation styled <u>Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.</u>, Adv. Pro. No. 20-000068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.493　**UPR:**　Universidad de Puerto Rico.

1.494　**Vintage CW Bond Claim:**　A Claim against the Commonwealth on account of Vintage CW Bonds, other than a Vintage CW Bond Claim (Ambac), a Vintage CW Bond Claim (Assured), a Vintage CW Bond Claim (FGIC), a Vintage CW Bond Claim (National), a Vintage CW Bond Claim (Syncora), or a Retail Vintage CW Bond Claim.

1.495    **Vintage CW Bond Claim (Ambac):** A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Ambac.

1.496    **Vintage CW Bond Claim (Assured):** A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.497    **Vintage CW Bond Claim (FGIC):** A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.498    **Vintage CW Bond Claim (National):** A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by National.

1.499    **Vintage CW Bond Claim (Syncora):** A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Syncora.

1.500    **Vintage CW Bond Claim (Taxable Election):** A Vintage CW Bond Claim or a Retail Vintage CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim shall be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Bond Claim.

1.501    **Vintage CW Bond Recovery:** The aggregate recovery by holders of Allowed Vintage CW Bond Claims, Allowed Vintage CW Bond Claims (Ambac), Allowed Vintage CW Bond Claims (Assured), Allowed Vintage CW Bond Claims (National), Allowed Vintage CW Bond Claims (FGIC), Allowed Vintage CW Bond Claims (Syncora), and Allowed Retail Vintage CW Bond Claims, consisting of (a) One Billion Nine Hundred Forty Million Four Hundred Thirteen Thousand Five Hundred Seventy-Two Dollars and Sixty-Eight Cents ($1,940,413,572.68) in Cash, (b) Two Billion Three Hundred Thirty-Six Million Two Hundred Twenty-Six Thousand Eight Hundred Thirty Dollars ($2,336,226,830.00) in original principal amount of New GO CIBs, (c) One Hundred Fifty-Four Million Six Hundred Eighty-Three Thousand Seventy Dollars and Twenty-Five Cents ($154,683,070.25) in original principal amount of New GO 5.375% CABs, (d) One Hundred Million Seven Hundred Fifty-Eight Thousand One Hundred Eighty-Two Dollars and Ninety-Five Cents ($100,758,182.95) in original principal amount of New GO 5.0% CABs, and (e) thirty-two and two hundred forty-four one thousandths percent (32.244%) of the GO CVIs.

1.502    **Vintage CW Bonds:** Collectively, the following bonds issued by the Commonwealth: (a) the Public Improvement Bonds of 1998, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (b) the Public Improvement Bonds of

1999, issued in the original principal amount of Four Hundred Seventy-Five Million Dollars ($475,000,000.00); (c) the Public Improvement Bonds of 2001, Series A, issued in the original principal amount of Two Hundred Seventy-Four Million One Hundred Thirty-Five Thousand Dollars ($274,135,000.00); (d) the Public Improvement Bonds of 2002, Series A, issued in the original principal amount of Four Hundred Fifty-Five Million Dollars ($455,000,000.00); (e) the Public Improvement Bonds of 2003, Series A, issued in the original principal amount of Four Hundred Sixty Million Dollars ($460,000,000.00); (f) the Public Improvement Bonds of 2004, Series A, issued in the original principal amount of Four Hundred Fifty-Seven Million One Hundred Seventy-Five Thousand Dollars ($457,175,000.00); (g) the Public Improvement Bonds of 2005, Series A, issued in the original principal amount of Four Hundred Forty Million Four Hundred Sixty Thousand Dollars ($440,460,000.00); (h) the Public Improvement Bonds of 2006, Series A, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (i) the Public Improvement Bonds of 2006, Series B, issued in the original principal amount of Thirty-Nine Million Three Hundred Eighty Thousand Dollars ($39,380,000.00); (j) the Public Improvement Bonds of 2007, Series A, issued in the original principal amount of Four Hundred Eight Million Eight Hundred Thousand Dollars ($408,800,000.00); (k) the Public Improvement Bonds of 2008, Series A, issued in the original principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00); (l) the Public Improvement Refunding Bonds, Series 2011A, issued in the original principal amount of Three Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00); (m) the Public Improvement Refunding Bonds, Series 1998, issued in the original principal amount of Five Hundred Three Million Nine Hundred Sixty-Three Thousand Two Hundred Sixty-Four Dollars ($503,963,264.00); (n) the Public Improvement Refunding Bonds, Series 2000, issued in the original principal amount of Fifty-Five Million Nine Hundred Ten Thousand Nine Hundred Ninety-Three Dollars ($55,910,993.00); (o) the Public Improvement Refunding Bonds, Series 2001, issued in the original principal amount of Three Hundred Thirty-Seven Million Two Hundred Thirty-Five Thousand Dollars ($337,235,000.00); (p) the Public Improvement Refunding Bonds, Series 2002A, issued in the original principal amount of Eight Hundred Thirty-Seven Million Nine Hundred Sixty Thousand Dollars ($837,960,000.00); (q) the Public Improvement Refunding Bonds, Series 2003A, issued in the original principal amount of Eighty-Nine Million Six Hundred Ten Thousand Dollars ($89,610,000.00); (r) the Public Improvement Refunding Bonds, Series 2003C-7, issued in the original principal amount of One Hundred Ninety-Four Million Six Hundred Ten Thousand Dollars ($194,610,000.00); (s) the Public Improvement Refunding Bonds, Series 2006A, issued in the original principal amount of One Hundred One Million Six Hundred Ninety-Five Thousand Dollars ($101,695,000.00); (t) the Public Improvement Refunding Bonds, Series 2006B, issued in the original principal amount of Three Hundred Thirty-Five Million Six Hundred Fifty Thousand Dollars ($335,650,000.00); (u) the Public Improvement Refunding Bonds, Series 2007A, issued in the original principal amount of Nine Hundred Twenty-Six Million Five Hundred Seventy Thousand Dollars ($926,570,000.00); (v) the Public Improvement Refunding Bonds, Series 2007A-4, issued in the original principal amount of Ninety-Three Million Eight Hundred Thirty-Five Thousand Dollars ($93,835,000.00); (w) the Public Improvement Refunding Bonds, Series 2008A, issued in the original principal amount of Seven Hundred Thirty-Five Million Fifteen Thousand Dollars ($735,015,000.00); (x) the Public Improvement Refunding Bonds, Series 2008C, issued in the original principal amount of One Hundred Ninety Million One Hundred Thirty-Five Thousand Dollars ($190,135,000.00);

(y) the Public Improvement Refunding Bonds, Series 2009A, issued in the original principal amount of Three Million Four Hundred Twenty-Five Thousand Dollars ($3,425,000.00); (z) the Public Improvement Refunding Bonds, Series 2009B, issued in the original principal amount of Three Hundred Seventy-Two Million Six Hundred Eighty-Five Thousand Dollars ($372,685,000.00); (aa) the Public Improvement Ten Million Refunding Bonds, Series 2009C, issued in the original principal amount of Two Hundred Ten Million Two Hundred Fifty Thousand Dollars ($210,250,000.00), and (bb) Notas de Ahorro issued prior to 2011 in the outstanding principal amount of Two Hundred Forty-Two Thousand Six Hundred Fifty Dollars ($242,650.00).

1.503    **Vintage CW Guarantee Bond Claim:**  A Claim, other than a Vintage CW Guarantee Bond Claim (Ambac), a Vintage CW Guarantee Bond Claim (Assured), a Vintage CW Guarantee Bond Claim (National), a Vintage CW Guarantee Bond Claim (FGIC), and Vintage CW Guarantee Bond Claim (Syncora) on account of the Commonwealth's guarantee of Vintage PBA Bonds; provided, however, that, solely for purposes of distribution under the Plan, the amount of a holder's Vintage CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of Vintage PBA Bonds shall be measured as the amount of such holder's Vintage PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds; and, provided, further, that Vintage CW Guarantee Claims may include an obligation, other than a Vintage PBA Bond Claim, for which the Commonwealth has pledged its good faith, credit and taxing power as authorized by the Commonwealth Legislature on or prior to December 31, 2012.

1.504    **Vintage CW Guarantee Bond Claim (Ambac):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Ambac.

1.505    **Vintage CW Guarantee Bond Claim (Assured):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.506    **Vintage CW Guarantee Bond Claim (FGIC):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by FGIC, including pursuant to a secondary market insurance policy.

1.507    **Vintage CW Guarantee Bond Claim (National):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by National.

1.508    **Vintage CW Guarantee Bond Claim (Syncora):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, of the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.509    **Vintage CW Guarantee Bond Claim (Taxable Election):**  A Vintage CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected

to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim shall be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Guarantee Bond Claim.

1.510 **Vintage CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed Vintage CW Guarantee Bond Claims, Allowed Vintage CW Guarantee Bond Claims (Ambac), Allowed Vintage CW Guarantee Bond Claims (Assured), Allowed Vintage CW Guarantee Bond Claims (National), Allowed Vintage CW Guarantee Bond Claims (FGIC), and Allowed Vintage CW Guarantee Bond Claims (Syncora), consisting of (a) Six Hundred Fifty-Three Million Seven Hundred Eighty-Two Thousand One Hundred Seventy-Three Dollars and Eighty-One Cents ($653,782,173.81) in Cash, (b) Seven Hundred Eighty-Seven Million One Hundred Forty-Three Thousand Two Hundred Fifty-Six Dollars ($787,143,256.00) in original principal amount of New GO CIBs, (c) Fifty-Two Million One Hundred Seventeen Thousand Two Hundred Fifty-Seven Dollars and Fifty Cents ($52,117,257.50) in original principal amount of New GO 5.375% CABs, (d) Thirty-Three Million Nine Hundred Forty-Eight Thousand Three Hundred Eighty-Three Dollars and Seventeen Cents ($33,948,383.17) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred ninety-four one thousandths percent (15.194%) of the GO CVIs.

1.511 **Vintage CW Guarantee Taxable Bond Distribution**: The distribution to be made to such holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 30.1 hereof.

1.512 **Vintage PBA Bond Claim**: A Claim against PBA on account of Vintage PBA Bonds, other than a Vintage PBA Bond Claim (Ambac), a Vintage PBA Bond Claim (Assured), a Vintage PBA Bond Claim (National), a Vintage PBA Bond Claim (FGIC), a Vintage PBA Bond Claim (Syncora) or a Retail Vintage PBA Bond Claim.

1.513 **Vintage PBA Bond Claim (Ambac)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Ambac.

1.514 **Vintage PBA Bond Claim (Assured)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.515 **Vintage PBA Bond Claim (FGIC)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.516 **Vintage PBA Bond Claim (National)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by National.

1.517     **Vintage PBA Bond Claim (Syncora):**  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.518     **Vintage PBA Bond Recovery**:  The aggregate recovery by holders of Allowed Vintage PBA Bond Claims, Allowed Vintage PBA Bond Claims (Ambac), Allowed Vintage PBA Bond Claims (Assured), Allowed Vintage PBA Bond Claims (National), Allowed Vintage PBA Bond Claims (FGIC), Allowed Vintage PBA Bond Claims (Syncora), and Allowed Retail Vintage PBA Bond Claims on account of such Claims, consisting of Six Hundred Eleven Million Three Hundred Thirty-One Thousand One Hundred Eighty-Six Dollars and Five Cents ($611,331,186.05) in Cash.

1.519     **Vintage PBA Bonds:**  Collectively, (a) the Government Facilities Revenue Refunding Bonds, Series C, issued by PBA in the original principal amount of One Hundred Eighty-Five Million Two Hundred Ninety Thousand Dollars ($185,290,000.00), (b) the Government Facilities Revenue Bonds, Series D, issued by PBA in the original principal amount of Five Hundred Fifty-Three Million Seven Hundred Thirty-Three Thousand Seven Hundred Ninety-Four Dollars and Ninety Cents ($553,733,794.90), (c) the Government Facilities Revenue Refunding Bonds, Series F, issued by PBA in the original principal amount of One Hundred Thirty-One Million Four Hundred Forty-Five Thousand Dollars ($131,445,000.00), (d) the Government Facilities Revenue Bonds, Series G, issued by PBA in the original principal amount of Sixty-Two Million Dollars ($62,000,000.00), (e) the Government Facilities Revenue Refunding Bonds, Series H, issued by PBA in the original principal amount of Two Hundred Seventy-Two Million Seven Hundred Seventeen Thousand Four Hundred Eighteen Dollars and Ten Cents ($272,717,418.10), (f) the Government Facilities Revenue Bonds, Series I, issued by PBA in the original principal amount of Eight Hundred Thirty-Two Million Three Hundred Eighty-Five Thousand Dollars ($832,385,000.00), (g) the Government Facilities Revenue Refunding Bonds, Series J, issued by PBA in the original principal amount of Three Hundred Thirty-Five Million Five Hundred Eighty Thousand Dollars ($335,580,000.00), (h) the Government Facilities Revenue Refunding Bonds, Series K, issued by PBA in the original principal amount of Three Hundred Forty-Seven Million Sixty-Five Thousand Dollars ($347,065,000.00), (i) the Government Facilities Revenue Bonds, Series L, issued by PBA in the original principal amount of Six Million Seven Hundred Ninety-Five Thousand Dollars ($6,795,000.00), (j) the Government Facilities Revenue Refunding Bonds, Series M-1, issued by PBA in the original principal amount of Two Hundred Eighty-Three Million Five Hundred Fifty Thousand Dollars ($283,550,000.00), (k) the Government Facilities Revenue Refunding Bonds, Series M-2, issued by PBA in the original principal amount of One Hundred Twenty-Nine Million Three Hundred Thousand Dollars ($129,300,000.00), (l) the Government Facilities Revenue Refunding Bonds Series M-3, issued by PBA in the original principal amount of One Hundred Fifty Million Dollars ($150,000,000.00), (m) the Government Facilities Revenue Bonds, Series N, issued by PBA in the original principal amount of Three Hundred Twenty-Nine Million Four Hundred Fifteen Thousand Dollars ($329,415,000.00), (n) the Government Facilities Revenue Bonds, Series O, issued by PBA in the original principal amount of Three Million Twenty-Five Thousand Dollars ($3,025,000.00), (o) the Government Facilities Revenue Refunding Bonds, Series P, issued by PBA in the original principal amount of Three Hundred Thirty Million Nine Hundred Thirty-Five Thousand Dollars

($330,935,000.00), and (p) the Government Facilities Revenue Refunding Bonds Series Q, issued by PBA in the original principal amount of One Hundred Fifty-Two Million Five Hundred Forty Thousand Dollars ($152,540,000.00), the repayment of which is guaranteed by the Commonwealth.

1.520    **Vintage Taxable Bond Distribution**:  The distribution to be made to each holder of an Allowed Vintage CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 26.1 hereof.

1.521    **Voting Record Date**:  The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the Plan and set forth in the Disclosure Statement Order.

1.522    **VTP Payroll Participant**:  A person who, based on the current records of ERS and OGP, is receiving payment through the payroll of the Commonwealth or its agencies arising from participation in the Voluntary Transition Programs under Act 70-2010 or Act 211-2015 which allowed certain members to receive pensions or other forms of payment through their former employer's payroll, subject to transition to PayGo upon satisfying necessary age and service eligibility requirements.

1.523    **VTP Payroll Participant Claim**:  A Claim on account of being a VTP Payroll Participant for payments arising through Act 70-2010 or Act 211-2015 through the payroll of the Commonwealth or its agencies.

1.524    **VTP Payroll Participant Above-Threshold Claims**:  A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is greater than the Threshold.

1.525    **VTP Payroll Participant Below-Threshold Claims**:  A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is less than or equal to the Threshold.

1.526    **GDB/PET**:  The Public Entity Trust created pursuant to that certain GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018, in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds, and the municipalities having claims in respect of federal funds on deposit with GDB, which assets mainly consist of loans to public agencies and departments of the Commonwealth and funds sufficient to restore certain federal funds deposited at GDB for certain municipalities and non-municipal government entities.

1.527    **GDB/PET Claim**:  The Claim of the GDB/PET against the Commonwealth arising from or related to the restructuring of the GDB and the assets contributed to the GDB/PET.

1.528    **COSSEC**:  Public Corporation for Supervision and Insurance of Cooperatives.

1.529    **Findings of Fact and Conclusions of Law**:  The findings of fact and conclusions of law of the Title III Court entered in the Title III Cases in connection with confirmation of the

Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA.

1.530    **Other Definitions:**  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code.  Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America.  The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  In computing any period prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.531    **Rules of Interpretation:**  For purposes of the Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents; (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the Effective Date pursuant to the Plan <u>plus</u> the amount, if any, of Cash so distributed; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Cases are references to the docket numbers under the Title III Court's CM/ECF system; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES

2.1    **Litigation Resolution:**  The Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond

69

Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, Puerto Rico Metropolitan Bus Authority ("MBA") and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.

2.2    **Allowance of Bond Claims:**  For purposes of confirmation and consummation of the Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the Effective Date, among other Claims, (a) the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), and the Vintage PBA Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $2,661,243,754.21, (b) the 2011 PBA Bond Claims shall be deemed allowed in the aggregate amount of $1,335,422,892.78, (c) the 2012 PBA Bond Claims shall be deemed allowed in the aggregate amount of $674,308,470.06, (d) the Vintage CW Bond Claims, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (FGIC), and Vintage CW Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $5,843,252,912.91, (e) the ERS Bond Claims shall be deemed allowed in the aggregate amount of $3,168,698,776.55, (f) the 2011 CW Bond Claims and the 2011 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $476,498,325.06, (g) the 2011 CW Series D/E/PIB Bond Claims and the 2011 CW Series D/E/PIB Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $645,673,111.48, (h) the 2012 CW Bond Claims and the 2012 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $2,934,427,459.40, (i) the 2014 CW Bond Claims shall be deemed allowed in the amount of $3,836,611,111.11, and (j) the 2014 CW Guarantee Bond Claims shall be deemed allowed in the amount of $346,242,219.86.

(a)    Solely for purposes of confirmation and consummation of the Plan and the distributions to be made hereunder, unless otherwise allowed pursuant to a Final Order of the Title III Court, on the Effective Date, the CW/Convention Center Claims, the CW/HTA Claims, the

70

CW/MBA Claim and the CW/PRIFA Rum Tax Claims shall be deemed allowed in the amounts of $383,862,878.90, $6,377,335,459.34, $30,106,786.87, and $1,928,867,051.00, respectively.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and exculpation provided in Article XCII herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

2.4 **Purchase and Sale of Certain ERS Assets:** On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 hereof, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

## ARTICLE III

### PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan.

3.1 **Administrative Expense Claims:** On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective

Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

3.2 **Professional Compensation and Reimbursement Claims**: All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.3 **GO/PBA Consummation Costs**: Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

3.4 **AFSCME and AMPR Professional Fees**: Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, (a) AFSCME shall be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions, and (b) in the event that, on or prior to September 30, 2021, (i) AMPR notifies the Oversight Board, in writing, that the Active TRS Participants have ratified the terms set forth in the term sheet annexed hereto as Exhibit "F-2", and (ii) AMPR executes an agreement with the Oversight Board wherein AMPR agrees to, among other things, support confirmation and consummation of the Plan, AMPR shall be reimbursed its reasonable professional fees and expenses incurred with respect to confirmation and consummation of such plan support agreement, including any term sheets, and the resolution of issues pertaining to pensions.

3.5 **GO/PBA PSA Restriction Fee**: Notwithstanding anything contained in the Plan to the contrary, in exchange for executing and delivering the GO/PBA Plan Support Agreement (or the GO/PBA Joinder Agreement or GO/PBA Annex Agreement, as applicable, in connection therewith) on or prior to the GO/PBA Joinder Deadline, and, agreeing to all of its terms and

conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the GO/PBA Plan Support Agreement, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive the GO/PBA PSA Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than (i) a breach of the GO/PBA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan, and such modification would have a material adverse effect on the Oversight Board and the GO/PBA PSA Creditors' ability to consummate the Plan on terms consistent with the GO/PBA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "I"), (iii) the New GO Bonds Legislation, the CVI Legislation, and the Debt Responsibility Act are not enacted prior to the commencement of the Confirmation Hearing, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the GO/PBA Plan Support Agreement, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

3.6 **Retail Support Fee:** In accordance with the terms and provisions set forth herein, in the event that a Class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 47) votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee of up to Fifty Million Dollars ($50,000,000.00) in an amount equal to the GO/PBA Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, held by such accepting Class of Retail Investors, as the case may be, as of the date the Title III Court enters the Confirmation Order; provided, however, that, (a) in the event that, after allocating the Retail Support Fee to Retail Investors in the Classes that voted to accept the Plan, the entire Fifty Million Dollars ($50,000,000.00) is not fully allocated, the balance of the Retail Support Fee shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order, and (b) the Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

3.7 **ERS Restriction Fee:** Notwithstanding anything contained in the Plan to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

3.8 **CCDA Consummation Costs:** Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

3.9     **CCDA Restriction Fee:**  Notwithstanding anything contained in the Plan to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured, FGIC or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

3.10    **Non-Severability**:  The allowance and payment of the Consummation Costs and PSA Restriction Fees as set forth in this Article III compensate the Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1    **Claims are classified as follows**:

|       |              |                                      |
|-------|--------------|--------------------------------------|
| (a)   | **Class 1:** | Vintage PBA Bond Claims              |
| (b)   | **Class 2:** | Vintage PBA Bond Claims (Assured)    |
| (c)   | **Class 3:** | Vintage PBA Bond Claims (National)   |
| (d)   | **Class 4:** | Vintage PBA Bond Claims (Ambac)      |
| (e)   | **Class 5:** | Vintage PBA Bond Claims (FGIC)       |
| (f)   | **Class 6:** | Vintage PBA Bond Claims (Syncora)    |
| (g)   | **Class 7:** | Retail Vintage PBA Bond Claims       |
| (h)   | **Class 8:** | 2011 PBA Bond Claims                 |
| (i)   | **Class 9:** | Retail 2011 PBA Bond Claims          |
| (j)   | **Class 10:**| 2012 PBA Bond Claims                 |
| (k)   | **Class 11:**| Retail 2012 PBA Bond Claims          |
| (l)   | **Class 12:**| PBA/DRA Secured Claims               |
| (m)   | **Class 13:**| PBA General Unsecured Claims         |
| (n)   | **Class 14:**| PBA/DRA Unsecured Claims             |
| (o)   | **Class 15:**| Vintage CW Bond Claims               |
| (p)   | **Class 16:**| Retail Vintage CW Bond Claims        |
| (q)   | **Class 17:**| Vintage CW Bond Claims (Assured)     |
| (r)   | **Class 18:**| Vintage CW Bond Claims (National)    |
| (s)   | **Class 19:**| Vintage CW Bond Claims (Ambac)       |

| (t) | **Class 20:** | Vintage CW Bond Claims (FGIC) |
|-----|---------------|-------------------------------|
| (u) | **Class 21:** | Vintage CW Bond Claims (Syncora) |
| (v) | **Class 22:** | Vintage CW Bond Claims (Taxable Election) |
| (w) | **Class 23:** | Vintage CW Guarantee Bond Claims |
| (x) | **Class 24:** | Vintage CW Guarantee Bond Claims (Assured) |
| (y) | **Class 25:** | Vintage CW Guarantee Bond Claims (National) |
| (z) | **Class 26:** | Vintage CW Guarantee Bond Claims (Ambac) |
| (aa) | **Class 27:** | Vintage CW Guarantee Bond Claims (FGIC) |
| (bb) | **Class 28:** | Vintage CW Guarantee Bond Claims (Syncora) |
| (cc) | **Class 29:** | Vintage CW Guarantee Bond Claims (Taxable Election) |
| (dd) | **Class 30:** | 2011 CW Bond Claims |
| (ee) | **Class 31:** | Retail 2011 CW Bond Claims |
| (ff) | **Class 32:** | 2011 CW Bond Claims (Assured) |
| (gg) | **Class 33:** | 2011 CW Bond Claims (Taxable Election) |
| (hh) | **Class 34:** | 2011 CW Guarantee Bond Claims |
| (ii) | **Class 35:** | 2011 CW Guarantee Bond Claims (Taxable Election) |
| (jj) | **Class 36:** | 2011 CW Series D/E/PIB Bond Claims |
| (kk) | **Class 37:** | 2011 CW Series D/E/PIB Bond Claims (Assured) |
| (ll) | **Class 38:** | Retail 2011 CW Series P/E/PIB Bond Claims |
| (mm) | **Class 39:** | 2011 CW Series D/E/PIB Bond Claims (Taxable Election) |
| (nn) | **Class 40:** | 2012 CW Bond Claims |
| (oo) | **Class 41:** | Retail 2012 CW Bond Claims |
| (pp) | **Class 42:** | 2012 CW Bond Claims (Assured) |
| (qq) | **Class 43:** | 2012 CW Bond Claims (Taxable Election) |

(rr)         **Class 44:**     2012 CW Guarantee Bond Claims

(ss)         **Class 45:**     2012 CW Guarantee Bond Claims (Taxable Election)

(tt)         **Class 46:**     2014 CW Bond Claims

(uu)         **Class 47:**     Retail 2014 CW Bond Claims

(vv)         **Class 48:**     2014 CW Bond Claims (Taxable Election)

(ww)         **Class 49:**     2014 CW Guarantee Bond Claims

(xx)         **Class 50:**     2014 CW Guarantee Bond Claims (Taxable Election)

(yy)         **Class 51:**     Active and Retired Employee Benefits Claims

        (i)        **Class 51A:**    Retired ERS Participant Below-Threshold Claims

        (ii)        **Class 51B:**    Retired JRS Participant Below-Threshold Claims

        (iii)        **Class 51C:**    Retired TRS Participant Below-Threshold Claims

        (iv)        **Class 51D:**    Retired ERS Participant Above-Threshold Claims

        (v)        **Class 51E:**    Retired JRS Participant Above-Threshold Claims

        (vi)        **Class 51F:**    Retired TRS Participant Above-Threshold Claims

        (vii)        **Class 51G:**    Active ERS Participant Claims

        (viii)        **Class 51H:**    Active JRS Participant Claims

        (ix)        **Class 51I:**    Active TRS Participant Claims

        (x)        **Class 51J:**    System 2000 Participant Claims

        (xi)        **Class 51K:**    VTP Payroll Participant Below-Threshold Claims

        (xii)        **Class 51L:**    VTP Payroll Participant Above-Threshold Claims

(zz)         **Class 52:**     AFSCME Claims

(aaa)         **Class 53:**     Dairy Producer Claims

(bbb)         **Class 54:**     Eminent Domain/Inverse Condemnation Claims

(ccc)         **Class 55:**     Energy Incentive Claims

| (ddd) | **Class 56:** | Med Center Claims |
| (eee) | **Class 57:** | Tax Credit Claims |
| (fff) | **Class 58:** | CW General Unsecured Claims |
| (ggg) | **Class 58A:** | GDB/PET Claim |
| (hhh) | **Class 59:** | CW/HTA Claims |
| (iii) | **Class 60:** | CW/Convention Center Claims |
| (jjj) | **Class 61:** | CW/PRIFA Rum Tax Claims |
| (kkk) | **Class 62:** | CW/MBA Claims |
| (lll) | **Class 63:** | CW Appropriations Claims |
| (mmm) | **Class 64:** | Section 510(b) Subordinated Claims |
| (nnn) | **Class 65:** | ERS Bond Claims |
| (ooo) | **Class 66:** | ERS General Unsecured Claims |
| (ppp) | **Class 67:** | Gracia Gracia Claims |
| (qqq) | **Class 68:** | Convenience Claims |
| (rrr) | **Class 69:** | Federal Claims |

## ARTICLE V

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (CLASS 1)

5.1     **Treatment of Vintage PBA Bond Claims:**  On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim, such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (ASSURED) (CLASS 2)

6.1     **Treatment of Vintage PBA Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Assured) shall be entitled to receive in full consideration, satisfaction, release and

79

exchange of such holder's Allowed Vintage PBA Bond Claim (Assured), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VII

### PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (NATIONAL) (CLASS 3)

7.1 **Treatment of Vintage PBA Bond Claims (National)**: Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (National), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VIII

### PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (AMBAC) (CLASS 4)

8.1 **Treatment of Vintage PBA Bond Claims (Ambac)**: Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE IX

### PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (FGIC) (CLASS 5)

9.1 **Treatment of Vintage PBA Bond Claims (FGIC)**: Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (FGIC) shall be entiled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE X

### PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (SYNCORA) (CLASS 6)

10.1 **Treatment of Vintage PBA Bond Claims (Syncora)**: Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

80

## ARTICLE XI

## PROVISIONS FOR TREATMENT OF RETAIL
## VINTAGE PBA BOND CLAIMS (CLASS 7)

11.1    **Treatment of Retail Vintage PBA Bond Claims**:  On the Effective Date, each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage PBA Bond Claim, such holder's Pro Rata Share of (a) the Vintage PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage PBA Bond Claims; provided, however, that, in the event that Class 7 votes to reject the Plan in accordance with section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XII

## PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8)

12.1    **Treatment of 2011 PBA Bond Claims**:  On the Effective Date, each holder of an Allowed 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 PBA Bond Claim, such holder's Pro Rata Share of the 2011 PBA Bond Recovery.

## ARTICLE XIII

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## PBA BOND CLAIMS (CLASS 9)

13.1    **Treatment of Retail 2011 PBA Bond Claims**:  On the Effective Date, each holder of an Allowed Retail 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2011 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 PBA Bond Claims; provided, however, that, in the event that Class 9 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XIV

## PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10)

14.1 **Treatment of 2012 PBA Bond Claims:** On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 PBA Bond Claim, such holder's Pro Rata Share of the 2012 PBA Bond Recovery.

## ARTICLE XV

## PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11)

15.1 **Treatment of Retail 2012 PBA Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2012 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 PBA Bond Claims; provided, however, that, in the event that Class 11 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XVI

## PROVISIONS FOR TREATMENT OF
## PBA/DRA SECURED CLAIMS (CLASS 12)

16.1 **Treatment of PBA/DRA Secured Claims:** On the Effective Date, each holder of an PBA/DRA Secured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Secured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Secured Claim.

## ARTICLE XVII

## PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED
## CLAIMS (CLASS 13)

17.1 **Treatment of PBA General Unsecured Claims:** On the Effective Date, each holder of an Allowed PBA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA General Unsecured Claim, (a) payment of the Allowed amount of such holder's Claim, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA General Unsecured Claim, on,

82

or as soon as practicable after the latest to occur of (1) the Effective Date, (2) the date on which such PBA General Unsecured Claim becomes Allowed, (3) the date on which such Allowed PBA General Unsecured Claim is otherwise due and payable, and (4) such other date as may be mutually agreed to by such holder of such PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be, or (b) such other treatment as may be mutually agreed to by and among such holder of a PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF PBA/DRA
## UNSECURED CLAIMS (CLASS 14)

18.1     **Treatment of PBA/DRA Unsecured Claims:**  On the Effective Date, each holder of an PBA/DRA Unsecured Claim shall be entitled to, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Unsecured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Unsecured Claim.

## ARTICLE XIX

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (CLASS 15)

19.1     **Treatment of Vintage CW Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 19.2 hereof, each holder of an Allowed Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim, such holder's Pro Rata Share of the Vintage CW Bond Recovery.

19.2     **Right of Election to Vintage CW Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 19.1 of the Plan, each holder of an Allowed Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XX

### PROVISIONS FOR TREATMENT OF RETAIL VINTAGE
### CW BOND CLAIMS (CLASS 16)

20.1    **Treatment of Retail Vintage CW Bond Claims**:  On the Effective Date, each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage CW Bond Claim, such holder's Pro Rata Share of (a) the Vintage CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage CW Bond Claims; provided, however, that, in the event that Class 16 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

20.2    **Right of Election to Retail Vintage CW Bond Claims (Taxable Election)**:  Notwithstanding the provisions of Section 20.1 of the Plan, each holder of an Allowed Retail Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

### ARTICLE XXI

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (ASSURED) (CLASS 17)

21.1    **Treatment of Vintage CW Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Assured), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXII

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (NATIONAL) (CLASS 18)

22.1     **Treatment of Vintage CW Bond Claims (National)**:  Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (National), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXIII

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (AMBAC) (CLASS 19)

23.1     **Treatment of Vintage CW Bond Claims (Ambac)**:  Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXIV

### PROVISIONS FOR TREATMENT OF VINTAGE
### CW BOND CLAIMS (FGIC) (CLASS 20)

24.1     **Treatment of Vintage CW Bond Claims (FGIC)**:  Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXV

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (SYNCORA) (CLASS 21)

25.1     **Treatment of Vintage CW Bond Claims (Syncora)**:  Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXVI

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (TAXABLE ELECTION) (CLASS 22)

26.1 **Treatment of Vintage CW Bond Claims (Taxable Election):** On the Effective
Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) shall be entitled to
receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage
CW Bond Claim (Taxable Election), its Pro Rata Share of the Vintage CW Bond Recovery, as
modified by its Pro Rata Share of the Vintage Taxable Bond Distribution.

## ARTICLE XXVII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (CLASS 23)

27.1 **Treatment of Vintage CW Guarantee Bond Claims:** On the Effective Date,
and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee
Bond Claim, each holder of an Allowed Vintage CW Guarantee Bond Claim shall receive such
holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

27.2 **Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 27.1 of the Plan, each holder of an Allowed Vintage
CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled
to elect to receive distributions pursuant to the terms and provisions of Sections 33.1 and 77.1
hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight
Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of
the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstance may such waiver by the Oversight Board occur on
or after the Effective Date.

## ARTICLE XXVIII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24)

28.1 **Treatment of Vintage CW Guarantee Bond Claims (Assured):** Subject to the
terms and provisions of Section 75.1 hereof, on the Effective Date, and in full consideration,
satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Assured),
each holder of an Allowed Vintage CW Guarantee Bond Claim (Assured) shall be entitled to
receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

86

## ARTICLE XXIX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25)

29.1 **Treatment of Vintage CW Guarantee Bond Claims (National)**: Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its allowed Vintage CW Guarantee Bond Claim (National), each holder of an Allowed Vintage CW Guarantee Bond Claim (National) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26)

30.1 **Treatment of Vintage CW Guarantee Bond Claims (Ambac)**: Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Ambac), each holder of an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXI

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (FGIC) (CLASS 27)

31.1 **Treatment of Vintage CW Guarantee Bond Claims (FGIC)**: Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (FGIC), each holder of an Allowed Vintage CW Guarantee Bond Claim (FGIC) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28)

32.1 **Treatment of Vintage CW Guarantee Bond Claims (Syncora)**: Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Syncora), each holder of an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29)

33.1 **Treatment of Vintage CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the Vintage Taxable Bond Distribution.

## ARTICLE XXXIV

## PROVISIONS FOR TREATMENT OF 2011
## CW BOND CLAIMS (CLASS 30)

34.1 **Treatment of 2011 CW Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 34.2 hereof, each holder of an Allowed 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim, such holder's Pro Rata Share of the 2011 CW Bond Recovery.

34.2 **Right of Election to 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 34.1 of the Plan, each holder of an Allowed 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXXV

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## CW BOND CLAIMS (CLASS 31)

35.1 **Treatment of Retail 2011 CW Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Bond Claims; provided, however, that, in the event that Class 31 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to

receive such holder's Pro Rata Share of the 2011 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

35.2      **Right of Election to Retail 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 35.1 of the Plan, each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXXVI

## PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (ASSURED) (CLASS 32)

36.1      **Treatment of 2011 CW Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Bond Recovery.

## ARTICLE XXXVII

## PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 33)

37.1      **Treatment of 2011 CW Bond Claims (Taxable Election)**:  On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Taxable Bond Distribution.

# ARTICLE XXXVIII

## PROVISIONS FOR TREATMENT OF
## 2011 CW GUARANTEE BOND CLAIMS (CLASS 34)

38.1    **Treatment of 2011 CW Guarantee Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 38.2 hereof, each holder of an Allowed 2011 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery.

38.2    **Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 38.1 of the Plan, each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 39.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XXXIX

## PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 35)

39.1    **Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)**:  On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.

# ARTICLE XL

## PROVISIONS FOR TREATMENT OF 2011
## CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)

40.1    **Treatment of 2011 CW Series D/E/PIB Bond Claims**:  On the Effective Date, and subject to the right of election set forth in Section 40.2 hereof, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

40.2 **Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 40.1 of the Plan, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLI

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37)

41.1 **Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

## ARTICLE XLII

## PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38)

42.1 **Treatment of Retail 2011 CW Series D/E/PIB Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Series D/E/PIB Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims; provided, however, that, in the event that Class 38 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

42.2 **Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 42.1 of the Plan, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the

Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIII

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39)

43.1    **Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election):**    On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution.

## ARTICLE XLIV

## PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40)

44.1    **Treatment of 2012 CW Bond Claims:**    On the Effective Date, and subject to the right of election set forth in Section 44.2 hereof, each holder of an Allowed 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim, such holder's Pro Rata Share of the 2012 CW Bond Recovery.

44.2    **Right of Election to 2012 CW Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 44.1 of the Plan, each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLV

### PROVISIONS FOR TREATMENT OF RETAIL 2012
### CW BOND CLAIMS (CLASS 41)

45.1 **Treatment of Retail 2012 CW Bond Claims**:  On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 CW Bond Claim, such holder's Pro Rata Share of (a) the 2012 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 CW Bond Claims; provided, however, that, in the event that Class 41 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

45.2 **Right of Election to Retail 2012 CW Bond Claims (Taxable Election):**  Notwithstanding the provisions of Section 45.1 of the Plan, each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

### ARTICLE XLVI

### PROVISIONS FOR TREATMENT OF 2012
### CW BOND CLAIMS (ASSURED) (CLASS 42)

46.1 **Treatment of 2012 CW Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Assured) shall be entitled to received, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2012 CW Bond Recovery.

93

## ARTICLE XLVII

## PROVISIONS FOR TREATMENT OF 2012 CW BOND
## CLAIMS (TAXABLE ELECTION) (CLASS 43)

47.1     **Provisions for Treatment of 2012 CW Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Bond Recovery, as modified by its Pro Rata Share of the 2012 CW Taxable Bond Distribution.

## ARTICLE XLVIII

## PROVISIONS FOR TREATMENT OF
## 2012 CW GUARANTEE BOND CLAIMS (CLASS 44)

48.1     **Treatment of 2012 CW Guarantee Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 48.2 hereof, each holder of an Allowed 2012 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery.

48.2     **Right of Election to 2012 CW Guarantee Bond Claims (Taxable Election):**  Notwithstanding the provisions of Section 48.1 of the Plan, each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 49.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIX

## PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 45)

49.1     **Treatment of 2012 CW Guarantee Bond Claims (Taxable Election)**:  On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2012 CW Guarantee Taxable Bond Distribution.

# ARTICLE L

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (CLASS 46)

50.1 **Treatment of 2014 CW Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 50.2 hereof, each holder of an Allowed 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

50.2 **Right of Election to 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 50.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE LI

## PROVISIONS FOR TREATMENT OF  RETAIL 2014
## CW BOND CLAIMS (CLASS 47)

51.1 **Treatment of Retail 2014 Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2014 CW Bond Claim, such holder's Pro Rata Share of (a) the 2014 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2014 CW Bond Claims; provided, however, that, in the event that Class 47 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2014 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2014 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

51.2 **Right of Election to Retail 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 51.1 of the Plan, each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by

such holder.  Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstances may such waiver by the Oversight Board occur on
or after the Effective Date.

## ARTICLE LII

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 48)

52.1     **Provisions for Treatment of 2014 CW Bond Claims (Taxable Election):**  On
the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) shall be
entitled to receive, in full consideration, satisfaction, release and exchange of such holder's
Allowed 2014 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW
Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Taxable Bond
Distribution.

## ARTICLE LIII

## PROVISIONS FOR TREATMENT OF
## 2014 CW GUARANTEE BOND CLAIMS (CLASS 49)

53.1     **Treatment of 2014 CW Guarantee Bond Claims:**  On the Effective Date,
subject to the right of election set forth in Section 53.2 hereof, each holder of an Allowed 2014
CW Guarantee Bond claim shall be entitled to receive, in full consideration, satisfaction, release
and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim, such holder's Pro Rata
Share of the 2014 CW Bond Recovery.

53.2     **Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 53.1 of the Plan, each holder of an Allowed 2014 CW
Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to
receive distributions pursuant to the terms and provisions of Sections 54.1 and 77.1 hereof.  Such
election must be made on the Ballot/Election Form, be received by the Oversight Board, or its
designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by
such holder.  Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstances may such waiver by the Oversight Board occur on
or after the Effective Date.

## ARTICLE LIV

## PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 50)

54.1     **Treatment of 2014 CW Guarantee Bond Claims (Taxable Election):**  On the
Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election)

shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Guarantee Taxable Bond Distribution.

**ARTICLE LV**

**PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED
EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)**

55.1     **Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A):**

(a)     Treatment.  Each holder of an Allowed Retired ERS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.2     **Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B):**

(a)     Treatment.  Each holder of an Allowed Retired JRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.3     **Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C):**

(a)     Treatment.  Each holder of an Allowed Retired TRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     _Preemption_.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.4     Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D):

(a)     _Treatment_.  Each holder of an Allowed Retired ERS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     _Preemption_.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.5     Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E):

(a)     _Treatment_.  Each holder of an Allowed Retired JRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     _Preemption_.  All provisions of the Commonwealth Constitution, Commonwealth statues, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.6     Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F):

(a)     _Treatment_.  Each holder of an Allowed Retired TRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     _Preemption_.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive order, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part

herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.7    **Treatment of Active ERS Participant Claims (Class 51G):**

(a)    <u>Treatment</u>.  Each holder of an Allowed Active ERS Participant Claim shall be entitled to receive on account of such Allowed Active ERS Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, Active ERS Participant Claims of Active ERS Participants hired prior to January 1, 2000, but which accrued after June 30, 2013 pursuant to Act 3-2013, shall not be subject to reduction in accordance with the Plan.  Benefits which accrued after June 30, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 shall include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date and such Participants' balances shall have a four percent (4%) interest rate applied to them upon conversion of the balances to an annuity.  Each holder of an Active ERS Participant Claim (who is actively employed by an employer within the ERS as of the Effective Date) shall also receive a one-time payment in the amount of Two Thousand Six Hundred Dollars ($2,600.00), to be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each Participant will reach age 65, unless any such Participant has affirmatively elected different investment options.  Holders of Allowed Active ERS Participant Claims who have already retired as of April 1, 2021 and who have converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g. Act 211-2015 or 70-2016), are not eligible for the treatment described in this Section 55.7(a) and shall not receive a cash payment, and will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1, 55.4, 55.11, or 55.12 of the Plan, as applicable.

(b)    <u>Preemption</u>:  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(c)    <u>Payroll Deductions</u>:  As further consideration to assure active Participants' future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to their individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

55.8    **Treatment of Active JRS Participant Claims (Class 51H):**

(a)     Treatment. Each holder of an Allowed JRS Participant Claim shall be entitled to receive on account of such Allowed Active JRS Participant Claim (i) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "E" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, frozen as of the date as set forth on the term sheet attached as Exhibit "E" hereto, as applicable, to such holder of an Allowed Active JRS Participant Claim, including the social security benefits defined therein.

(b)     Rejection. To effectuate the freeze of contractual rights of Active JRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "E" hereto, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active JRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.9     Treatment of Active TRS Participant Claims (Class 51I):

(a)     Treatment.

(i)     Each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (i) his or her, as applicable, benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification, as applicable, and the terms set forth on Exhibit "F-1" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the Effective Date as set forth on the term sheet attached as Exhibit "F-1" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein; provided, however, that, notwithstanding the foregoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(ii)     Notwithstanding the terms and provisions of Section 55.9(a)(i) hereof, in the event that, on or prior to September 30, 2021, AMPR (A) notifies the Oversight Board, in writing, that the terms set forth in the term sheets annexed hereto as Exhibit "F-2" have been ratified, and (B) executes a plan support agreement with, among others, the Oversight Board, on behalf of the Commonwealth, that incorporates the terms set forth on Exhibit "F-2" hereto, each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (1) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "F-2"

hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, (2) such additional benefits for service during the period from and after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the six (6) month anniversary of the Effective Date as set forth on the term sheet attached as Exhibit "F-2" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein, and (3) the benefits of the terms of a new collective bargaining agreement and all other terms as set forth on the term sheet attached hereto as Exhibit "F-2", in which case any existing collective bargaining agreement(s) with AMPR shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code. Without limiting the foregoing, on or as soon as reasonably practicable from and after the Effective Date, the Active TRS Participants shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "F-2" hereto. Notwithstanding the forgoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(b)     Rejection.  To effectuate the freeze of the contractual rights of Active TRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "F-1"or "F-2" hereto, as applicable, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, the statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(d)     Payroll Deductions.  As further consideration to assure Active TRS Participants' future contributions and benefits, such Participants shall have his, her or their payroll deductions for contributions to the Participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

55.10     **Treatment of System 2000 Participant Claims (Class 51J):**

(a)     System 2000 Benefits:  Except as set forth in Sections 55.7(b), 55.8(c) and 55.9(c) hereof, holders of Allowed System 2000 Participant Claims shall receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued thereon pursuant to applicable law for the period up to, but not including, the Commonwealth Petition Date, which amount shall be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant unless any such participant has affirmatively elected different investment options.  If the total amount of contributions, plus accrued interest thereon as described above, is less than or equal to One Billion Five Hundred Million Dollars

($1,500,000,000.00), on the Effective Date, each holder of an Allowed System 2000 Participant Claim shall receive such holder's Pro Rata Share of such aggregate amount. If the total amount of contributions described in this Section 55.10(a), plus accrued interest thereon as described above, exceeds One Billion Five Hundred Million Dollars ($1,500,000,000.00), the Oversight Board and AFSCME shall develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions (for the avoidance of doubt, the amount in excess of One Billion Five Hundred Million Dollars ($1,500,000,000.00)) described in this Section 55.5(a). In all events, the full amount of contributions described in this Section 55.5(a) will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025. As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits. Holders of Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g., Act 211-2015 or Act 70-2010) are not eligible for the treatment described in this Section 55.5(a) and shall not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1 of the Plan.

(b)  Preemption: All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment afforded pursuant to Section 55.5(a) hereof, are preempted as inconsistent with PROMESA.

(c)  Payroll Deductions: As further consideration to assure active participant's future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to a participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deposited from such participant's payroll distribution.

## 55.11  **Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K):**

(a)  Treatment. Each holder of a VTP Payroll Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)  Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

## 55.12  **Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L):**

(a)     Treatment.  Each holder of a VTP Payroll Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

## ARTICLE LVI

## PROVISIONS FOR TREATMENT OF
## AFSCME CLAIMS (CLASS 52)

56.1     **Treatment of AFSCME Claims:**

(a)     Modified AFSCME Collective Bargaining Agreements:  The existing collective bargaining agreements between the Commonwealth, its applicable agencies and instrumentalities, on the one hand, and AFSCME and its related union affiliates, on the other hand, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code and replaced  with modified collective bargaining agreements to be entered into in accordance with the terms and conditions agreed to by AFSCME and the Oversight Board, as set forth on Exhibit "G" hereto. Without limiting the foregoing, such modifications shall include, among other matters, (a) a term of five (5) years, commencing as of the Effective Date, (b) provisions regarding layoffs and downsizing, (c) terms regarding System 2000 and (d) provisions for sharing Excess Cash Surplus. Each holder of an Allowed AFSCME Claim shall be entitled to receive the treatment set forth in Sections 56.1(a), (b), (c) and (d) hereof in full consideration, satisfaction, release, and exchange of such holder's Allowed AFSCME Claim resulting from such rejection.  The Commonwealth shall have no obligation to bargain with AFSCME over terms of a new or modified collective bargaining agreements throughout the term of such modified collective bargaining agreements and the failure to bargain during such period shall not constitute, nor shall it be construed to be, an unfair labor practice under any Puerto Rico law.  No adjudicative forum shall take into consideration prior practices or bargaining history when interpreting the terms of the modified collective bargaining agreements set forth on Exhibit "G" hereto.

(b)     Additional AFSCME Distribution.  On or as soon as reasonably practicable after the Effective Date, AFSCME and its member employees, as applicable, shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "G" hereto.

(c)     Pre-Petition Arbitration and Grievance Claims.  Any distributions on account of Claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures arising under the collective bargaining agreements between the Commonwealth and AFSCME shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) thirty (30) days after such disposition and (ii) sixty (60) days after the Effective Date.

(d)        Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified herein, to the extent inconsistent with the treatment afforded in this Section 56.1, are preempted as inconsistent with PROMESA and shall be of no further force or effect.

## ARTICLE LVII

## PROVISIONS FOR TREATMENT OF
## DAIRY PRODUCER CLAIMS (CLASS 53)

57.1    **Treatment of Dairy Producer Claims:**  On the Effective Date, each holder of a Dairy Producer Claim be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Dairy Producer Claim, an amount equal to fifty percent (50%) of such Allowed Dairy Producer Claim, with such amount being payable by the Commonwealth in three (3) equal installments commencing on the Effective Date and each subsequent payment thereof being made on July 1st of each FY.  Notwithstanding anything contained in the Plan to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise, discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth in decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Produce Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

## ARTICLE LVIII

## PROVISIONS FOR TREATMENT OF CW EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54)

58.1    **Treatment of Eminent Domain/Inverse Condemnation Claims:**  From and after the Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and (b) subject to the entry of the Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the Plan providing such Claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse

Condemnation Claim; provided, however, that, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

## ARTICLE LIX

## PROVISIONS FOR TREATMENT OF
## ENERGY INCENTIVE CLAIMS (CLASS 55)

59.1     **Treatment of Energy Incentive Claims:**  From and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive Act, and (ii) in connection therewith, assume Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

## ARTICLE LX

## PROVISIONS FOR TREATMENT OF
## MED CENTER CLAIMS (CLASS 56)

60.1     **Treatment of Med Center Claims:**  On the Effective Date, and provided that Class 56 votes to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (a) receive an Allowed Med Center Claim in the amount set forth in Column "A" set forth on Exhibit "H" hereto, and (b) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim; provided, however, that, in the event that Class 56 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (y) receive an Allowed Med Center Claim in the amount set forth in Column "B" set forth on Exhibit "H" hereto, and (z) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim set forth in Column "B" set forth on Exhibit "H" hereto, with either such amount being payable by the Commonwealth in three (3) equal annual installments,

commencing on the Effective Date and each subsequent payment thereof being made on the anniversary thereof.

      60.2    **Dismissal of Med Center Litigation**:  On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of the Effective Date, filing notices with the clerk of such court setting forth the resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action), with prejudice; provided, however, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal; and, provided, further, that the Commonwealth and the Med Centers shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DC Action shall be stayed; provided, however, that any claims and causes of action relating to the period up to and including the Effective Date shall be deemed dismissed, with prejudice, (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth may present any and all defenses with respect to such alleged defaults, and (c) any Med Center claims for injunctive relief relating to the period from and after July 1, 2022 shall be brought in the Med DC Action and shall proceed in the ordinary course upon the expiration or the lifting of the automatic stay, subject to the reservation of all rights, claims, and defenses of the Med Centers and the Commonwealth with respect to any such claims.

## ARTICLE LXI

## PROVISIONS FOR TREATMENT OF
## TAX CREDIT CLAIMS (CLASS 57)

      61.1    **Treatment of Tax Credit Claims:**  From and after the Effective Date, the Commonwealth shall assume Allowed Tax Credit Claims and the instruments and agreements in existence as of the Effective Date with respect thereto and the holders of Allowed Tax Credit Claims shall be permitted to exercise and claim the tax benefits and entitlements with respect thereto in accordance with the terms and provisions of such documents, instruments, and applicable law.

## ARTICLE LXII

## PROVISIONS FOR TREATMENT OF CW GENERAL
## UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58 AND 58A)

      62.1    **Treatment of CW General Unsecured Claims:**

        (a)    Treatment of CW General Unsecured Claims.  Subject to the election set forth in Section 62.1(b) hereof, on the Effective Date, each holder of an Allowed CW General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and

exchange of such holder's Allowed CW General Unsecured Claim, such holder's Pro Rata Share of the CW GUC Recovery up to the GUC Recovery Cap.

(b)    Election to be Treated as Convenience Claim.  Notwithstanding the provisions of Section 62.1(a) of the Plan, any holder of an Allowed CW General Unsecured Claim, other than a CW General Unsecured Claim that is a component of a larger CW General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, may elect to be treated as the holder of an Allowed Convenience Claim.  Such election must be made on Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

62.2    **Limitation on Recovery:**  Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust, any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes.

62.3    **GUC Reserve:**  The GUC Reserve shall be funded as follows: (a) Two Hundred Million Dollars ($200,000,000.00) on the Effective Date, (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022, (c) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2023, (d) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024, and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025; provided, however, that amounts necessary (a) to fund the Avoidance Actions Trust in accordance with Section 78.11 hereof shall be funded directly to the Avoidance Actions Trust and not into the GUC Reserve, and (b) to satisfy Allowed Convenience Claims shall be funded directly to the Disbursing Agent and not into the GUC Reserve; and provided, further, that, in the event that the Avoidance Actions Trust ceases pursuit of Avoidance Actions, including, without limitation, pursuant to settlement or dismissal of all Avoidance Actions, all funds in the Avoidance Actions Trust (including amounts necessary to fund the administration and operation of the Avoidance Action Trust) shall be transferred to the GUC Reserve for distribution to holders of Allowed CW General Unsecured Claims; and, provided, further, that, in accordance with Section 62.2 hereof, in the event recoveries on account of Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, (a) any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes, or (b) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, the Commonwealth shall be relieved of such future funding obligation; and, provided, further, that, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and such Claims for just compensation must be paid in full and the Oversight Board prosecutes such appeal in good faith, the GUC Reserve shall be reduced as follows: (a) in the event such appeal is successful and a Final Order is entered holding that the

Eminent Domain/Inverse Condemnation Claims are dischargeable and may be impaired, the GUC Reserve shall be reduced by the lesser of (i) Thirty Million Dollars ($30,000,000.00) and (ii) ten percent (10%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims, or (b) in the event such appeal is not successful and a Final Order is entered holding that Eminent Domain/Inverse Condemnation Claims are non-dischargeable or may not be impaired, the GUC Reserve shall be reduced by the lesser of (i) Fifteen Million Dollars ($15,000,000.00) and (ii) five percent (5%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims. For the avoidance of doubt, regardless of whether or not such appeal is successful, Eminent Domain/Inverse Condemnation Claims shall not be deemed CW General Unsecured Claims.

62.4 **Treatment of GDB/PET Claims:** On the Effective Date, the holder of the GDB/PET Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of the Allowed GDB/PET Claim, payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions of Sections 62.1, 62.2 and 62.3 hereof.

## ARTICLE LXIII

## PROVISIONS FOR TREATMENT
## OF CW/HTA CLAIMS (CLASS 59)

63.1 **Treatment of CW/HTA Claims:** On the Effective Date, and subject to the satisfaction of the HTA Distribution Conditions, each holder of an Allowed CW/HTA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/HTA Claim, such holder's Pro Rata Share of the CW/HTA Clawback Recovery; provided, however, that, upon satisfaction of the HTA Distribution Conditions, Ambac, Assured, and National shall receive their respective shares of the CW/HTA Clawback Recovery on account of the Ambac CW/HTA Bond Claims, Assured CW/HTA Bond Claims, and National CW/HTA Bond Claims, respectively; and provided, further, that, upon satisfaction of the HTA Distribution Conditions, the CW/HTA Clawback Recovery allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

63.2 **Distribution of the CW/HTA Clawback Recovery**: Notwithstanding anything contained in the Plan to the contrary, upon satisfaction of the HTA Distribution Conditions, the Commonwealth shall take such actions as are necessary to distribute the CW/HTA Clawback Recovery to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto; provided, however, that, until receipt of the GDB Loan Priority Determination, (a) Cash payable with respect to the HTA Clawback CVI and allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (b) the CW/HTA Clawback Recovery otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any

108

undistributed CW/HTA Clawback Recovery shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (y) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (z) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto. Notwithstanding the foregoing, the HTA Clawback CVI to be issued and distributed pursuant to this Article LXIII and any payments made thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the HTA Distribution Conditions are satisfied, and, in the event the HTA/CCDA Plan Support Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto.

## ARTICLE LXIV

## PROVISIONS FOR TREATMENT OF
## CW/CONVENTION CENTER CLAIMS (CLASS 60)

64.1 **Treatment of CW/Convention Center Claims:** Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed CW/Convention Center Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/Convention Center Claim, such holder's Pro Rata Share of the CW/Convention Center Clawback Recovery; provided, however, that Ambac and Assured shall receive their respective share of the CW/Convention Center Clawback Recovery on account of the Allowed Ambac CW/Convention Center Claims and the Allowed Assured CW/Convention Center Claims, respectively; and, provided, further, that the CW/Convention Center Clawback Recovery on account of the Allowed FGIC CW/Convention Center Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

## ARTICLE LXV

## PROVISIONS FOR TREATMENT OF
## CW/PRIFA RUM TAX CLAIMS (CLASS 61)

65.1 **Treatment of CW/PRIFA Rum Tax Claims:** On the Effective Date, subject to the satisfaction of the PRIFA Distribution Conditions, each holder of an Allowed CW/PRIFA Rum Tax Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/PRIFA Rum Tax Claim, such holder's Pro Rata Share of the CW/PRIFA Clawback Recovery; provided, however that, upon satisfaction of the PRIFA Distribution Conditions, Ambac and Assured shall receive their respective share of the CW/PRIFA Clawback Recovery on account of Allowed Ambac CW/PRIFA Rum Tax Claims and the Allowed Assured CW/PRIFA Rum Tax Claims, respectively; and, provided, further, that the CW/PRIFA Clawback Recovery on account of the Allowed FGIC PRIFA Rum Tax Claims shall

be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

65.2 **Distribution of the Beneficial Interests in the PRIFA Trust:** Notwithstanding anything contained in the Plan to the contrary, (a) on the Effective Date, the Commonwealth shall take such actions as are necessary to deposit (i) the PRIFA Clawback CVI and the Rum Tax CVI, and all payments to be made in connection therewith, and (ii) One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00) into the PRIFA Trust, each for the benefit of holders of PRIFA Bond Claims (including the Monolines), and (b) upon satisfaction of the PRIFA Distribution Conditions, cause the distribution of the beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims (including the Monolines); provided, however, that the beneficial interests in the PRIFA Trust on account of the FGIC Insured PRIFA Bond Claims shall be treated and distributed in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

## ARTICLE LXVI

## PROVISIONS FOR TREATMENT OF
## CW/MBA CLAIMS (CLASS 62)

66.1 **Treatment of CW/MBA Claims:** On the Effective Date, each holder of an Allowed CW/MBA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/MBA Claim, such holder's Pro Rata Share of the CW/MBA Clawback Recovery.

## ARTICLE LXVII

## PROVISIONS FOR TREATMENT OF
## CW APPROPRIATIONS CLAIMS (CLASS 63)

67.1 **Treatment of CW Appropriations Claims:** CW Appropriations Claims shall not receive a distribution pursuant to the Plan and each holder of a CW Appropriations Claim shall be deemed to have rejected the Plan with respect to such CW Appropriations Claim.

## ARTICLE LXVIII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 64)

68.1 **Treatment of Section 510(b) Subordinated Claims:** Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

## ARTICLE LXIX

## PROVISIONS FOR TREATMENT OF
## ERS BOND CLAIMS (CLASS 65)

69.1    **Treatment of ERS Bond Claims:**  On the Effective Date, each holder of an Allowed ERS Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS Bond Claim, such holder's Pro Rata Share of the ERS Bond Recovery, without setoff or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

69.2    **ERS Private Equity Portfolio:**

(a)    Commonwealth Election to Purchase.  From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price.  In the event the Commonwealth determines to the exercise the Commonwealth Election, the Commonwealth shall provide notice thereof by publication to holders of Allowed ERS Bond Claims on or prior April 10, 2023, and shall consummate the purchase thereof on or prior to April 25, 2023, with the proceeds thereof being distributed, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(b)    Bondholder Election to Purchase.  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023.  In the event that one or more holders of Allowed ERS Bond Claims determine to exercise the Bondholder Election, such electing holder(s) shall pay such purchase price, on a pro rata basis calculated with respect to the amount of such holders' Allowed ERS Bond Claims, to the Commonwealth no later than April 20, 2023.  Upon payment thereof, the Commonwealth shall distribute such proceeds, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(c)    Commonwealth Obligation to Purchase.  In the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, and (ii) the Commonwealth shall distribute the proceeds thereof, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(d)     Quarterly Reporting.  From the Effective Date up to, but not including, the sale of ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, the Commonwealth shall provide quarterly portfolio summaries to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement, with the understanding that any information provided thereto shall not be subject to public disclosure.

(e)     Tax Accounting.  From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, ERS shall be deemed the owner of the ERS Private Equity Portfolio and the ERS Trust for all applicable tax purposes, and that no items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to holders of Allowed ERS Bond Claims unless and until such holder(s) have purchased the interests in the ERS Trust pursuant to the Bondholder Election and Section 69.2(b) hereof.

69.3     **Dismissal of Litigation**:  On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action as may be reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

## ARTICLE LXX

## PROVISIONS FOR TREATMENT OF
## ERS GENERAL UNSECURED CLAIMS (CLASS 66)

70.1     **Treatment of ERS General Unsecured Claims**:

(a)     Treatment of ERS General Unsecured Claims.  On the Effective Date, and subject to the election set forth in Section 70.1(b) hereof, each holder of an Allowed ERS General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS General Unsecured Claim, such holder's Pro Rata Share of the ERS GUC Pool.

(b)     Allowed Claims of Twenty Thousand Dollars ($20,000.00) or More/Election to be Treated as a Convenience Claim.  Notwithstanding the provisions of Section 70.1(a) of the Plan, any holder of an Allowed ERS General Unsecured Claim, other than an ERS General Unsecured Claim that is a component of a larger ERS General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed ERS General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed ERS General Unsecured Claim to Twenty Thousand Dollars ($20,000.00), or, if a holder of multiple Allowed ERS General Unsecured Claims, elects to reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of

Forty Thousand Dollars ($40,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed ERS General Unsecured Claim as so reduced, distributions pursuant to Section 72.1 hereof. Such election must be made on Ballot/Election Form and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

70.2 **Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to holders of an Allowed ERS General Unsecured Claim in accordance with the provisions of Section 70.1 hereof, in the event that the sum of the distributions of Cash and Cash received on account of Avoidance Actions net recoveries are equal to or in excess of one hundred percent (100%) of such holder's Allowed ERS General Unsecured Claim, the Avoidance Actions Trust Interests allocable to the ERS GUC Pool and Cash otherwise distributable to such holder on account of net recoveries from the Avoidance Actions Trust shall be deemed redistributed, on a pro rata basis, to the benefit of holders of Allowed CW General Unsecured Claims.

# ARTICLE LXXI

## PROVISIONS FOR TREATMENT OF
## GRACIA GRACIA CLAIMS (CLASS 67)

71.1 **Treatment of Gracia Gracia Claims:** On the Effective Date, the Gracia Gracia Settlement shall be deemed assumed and (a) the members of the class certified in the Gracia Gracia CW Action and the Gracia Gracia Federal Action and the counsel to such classes shall be entitled to receive funds in accordance with the terms and provisions of the Gracia Gracia Settlement and (b) pursuant to the Confirmation Order, all pending motions, applications, litigations and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action shall be deemed withdrawn with prejudice.

# ARTICLE LXXII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 68)

72.1 **Treatment of Convenience Claims:** On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

# ARTICLE LXXIII

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 69)

73.1    **Treatment of Federal Claims:** On the later to occur of (a) the Effective Date and
(b) the date on which a Federal Claim shall become an Allowed Claim, the Reorganized Debtors
shall (i) in their sole and absolute discretion, and in full consideration, satisfaction, release and
exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in
Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed
Federal Claim in accordance with the terms and conditions of such documents evidencing such
Allowed Federal Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full
amount of such Allowed Federal Claim in forty (40) equal amount installments, with such
payments commencing on the third (3rd) anniversary of the Effective Date and continuing on each
anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as
the Reorganized Debtors and the holder of any such Allowed Federal Claim shall agree.

# ARTICLE LXXIV

## PROVISIONS REGARDING NEW GO BONDS,
## CVIS AND ADDITIONAL INDEBTEDNESS

74.1    **Issuance and Distribution of the New GO Bonds:** On the Effective Date,
Reorganized Commonwealth shall issue the New GO Bonds, consisting of New GO CIBs, New
GO 5.375% CABs and New GO 5.0% CABs, as more particularly described herein. The
maturities, interest rates and amortization schedules for the New GO Bonds are annexed hereto as
Exhibit "I". All debt service on the New GO Bonds which is not paid when due, whether at or
prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be
paid. Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate
for CABs), compounding semiannually, until the applicable New GO Bonds are paid or satisfied in
full in accordance with their terms. Interest on the New GO Bonds shall be calculated on a 30/360
basis. To the extent the Government Parties, each acting in its sole and absolute discretion,
determine to apply for ratings on the New GO Bonds, the Government Parties shall use their
commercially reasonable best efforts to obtain ratings on the New GO Bonds, including promptly
responding in good faith to documentary or other requests, as soon as reasonably practicable as
determined solely by the Government Parties, following consultation with up to two (2) Initial
GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the
LCDC, the QTCB Group, Syncora, Assured (solely to the extent that it has not terminated the
GO/PBA Plan Support Agreement as to itself), and National (solely to the extent that it has not
terminated the GO/PBA Plan Support Agreement as to itself), each of which shall have executed a
confidentiality agreement, in form and substance satisfactory to the Oversight Board and
restricting such Initial GO/PBA PSA Creditors from trading New GO Bonds, including based upon
the Government Parties' judgment with respect to expected benefits. After the Government Parties
determine which rating agencies to apply for ratings from, the Government Parties shall use their
commercially reasonable best efforts to obtain the best possible ratings. Notwithstanding anything
contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such

114

Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) first, to holders of Allowed Taxable Election CW Claims and (2) second, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

(a) **New GO CIBs:** Subject to any adjustments provided for herein, the New GO CIBs shall have the original principal amount, interest rate, maturity date and taxable status as follows: (a) Seven Hundred Forty-Five Million Fifty Thousand Dollars ($745,050,000.00), five percent (5.0%), July 1, 2023, and tax exempt, (b) Seven Hundred Forty Million Eight Hundred Twenty Thousand Dollars ($740,820,000.00), five percent (5.0%), July 1, 2025, and tax-exempt, (c) Seven Hundred Twenty-Nine Million Five Hundred Sixty-Five Thousand Dollars ($729,565,000.00), five percent (5.0%), July 1, 2027, and tax exempt, (d) Seven Hundred Ten Million Forty Thousand Dollars ($710,040,000.00), five percent (5.0%), July 1, 2029, and tax-exempt, (e) Six Hundred Eighty Million Eight Hundred Thirty-Five Thousand ($680,835,000.00), five percent (5.0%), July 1, 2031, and tax-exempt, (f) Six Hundred Thirty-Seven Million Forty Thousand Dollars ($637,040,000.00), four percent (4.0%), July 1, 2033, and tax-exempt, (g) Four Hundred Forty-Eight Million Five Hundred Eighty Thousand Dollars ($448,580,000.00), four percent (4.0%), July 1, 2035, and tax-exempt, (h) Two Hundred Fifty-Five Million Six Hundred Sixty Thousand Dollars ($255,660,000.00), four percent (4.0%), July 1, 2037, and tax-exempt, (i) Two Hundred Four Million Six Hundred Thousand Dollars ($204,600,000.00), four percent (4.0%), July 1, 2041, and tax-exempt, (j) Eight Hundred Twenty-Two Million Two Hundred Sixty Thousand Dollars ($822,260,000.00), five percent (5.0%), July 1, 2041, and taxable, and (k) Seven Hundred Eight Million Eight Hundred Sixty-Five Thousand Dollars ($708,865,000.00, four percent (4.0%), July 1, 2046, and tax-exempt. New GO CIBs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrue on all overdue debt service, at the regular coupon rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(b) **New GO CABs:** Subject to any adjustments provided for herein, the New GO CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: (a) Two Hundred Eighty-Eight Million Two Hundred Forty-One Thousand Nine Hundred Eighty-Nine Dollars and Seventy-Five Cents ($288,241,989.75), five percent (5.0%), July 1, 2024, and tax-exempt, and (b) Four Hundred Forty-Two Million Five Hundred Six Thousand Five Hundred Fifty-Three Dollars and Fifty Cents ($442,506,553.50), five and three hundred seventy-five one thousandths percent (5.375%), July 1, 2033, and tax-exempt. New GO CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(c) **Deemed Issuance Date:** Notwithstanding the timing of the Effective Date, interest on the New GO Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2021 and (ii) the Effective Date, which date shall be designated as the "dated" date of the New GO Bonds.

(d) **Call Provisions/Optional Redemption:** The New GO Bonds shall be callable, in whole or in part, in any order of maturity, at par (or at the accreted value for the 2033 CABs) plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

2023 CIBS:   Non-Callable
2024 CABS: Non-Callable
2025 CIBS:   Non-Callable
2027 CIBS:   Non-Callable
2029 CIBS:   Non-Callable
2031 CIBS:   Non-Callable
2033 CIBS:   Callable as follows:

| **Date** | **Price** |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |

2035, 2037, 2041 and 2046 CIBS (Taxable and Tax-Exempt): Callable as follows:

| **Date** | **Price** |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |
| July 1, 2033 through June 30, 2034 | 101% of Par |
| July 1, 2034 and thereafter | 100% of Par |

2033 CABS: Callable as follows:

| **Date** | **Price** |
| --- | --- |
| July 1, 2031 and thereafter | 100% of Accreted Value |

If less than all of the New GO Bonds of a particular series are called for prior redemption, Reorganized Commonwealth will select the maturity or maturities of such series of the New GO Bonds to be redeemed, and, if less than all of the New GO Bonds within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

(e)     **Deemed Annual Allocation:**  Pursuant to the New GO Bonds Legislation, the Reorganized Commonwealth shall covenant that, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each FY, the Reorganized Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest (and accreted value) with respect to the New GO Bonds issued to such holders, first, the 1.03% property tax levied pursuant to Act 83-1991 and collected by CRIM with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, second, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and third other resources of the Reorganized Commonwealth.  Without limiting the foregoing, within thirty (30) days following the conclusion of each quarter of each FY, CRIM shall pay to the Commonwealth amounts collected by CRIM in connection with the 1.03% property tax levied pursuant to Act 83-1991 and which are due and owing to the Commonwealth.

(f)     **Monthly Deposits of Interest and Principal:**  From and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their

116

terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds. Upon deposit thereof, pursuant to the New GO Bonds Legislation, the New GO Bonds Trustee, on behalf of the holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on such monies deposited with the New GO Bond Trustee, which monies shall be held in trust for the benefit of holders of the New GO Bonds. Without limiting the foregoing, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

(g) **Covenants for New GO Bonds:** On the Effective Date, the Definitive Documents, including the New GO Bonds Indenture, New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants for similarly structured and supported bonds, including, without limitation, the following covenants and other provisions with respect to New GO Bonds:

(i) **Non-Impairment Covenant:** Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of New GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Reorganized Commonwealth will take no action that would (1) impair the monthly deposits of interest and principal referred to in Section 74.1(f) hereof, (2) limit or alter the rights vested in the Debtors or Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New GO Bonds or (3) impair the rights and remedies of the holders of the New GO Bonds.

(ii) **Tax-Exemption Covenant:** Pursuant to the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of federally tax-exempt New GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, Reorganized Commonwealth will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt New GO Bonds shall be and remain excludable from gross income for federal income tax purposes.

(h) **Rights of Acceleration:** The New GO Bonds shall not have rights of acceleration.

(i) **Residual Interest of the Commonwealth:** Pursuant to the New GO Bonds Indenture, and subject to such additional rights and obligations as provided therein, any funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New GO Bonds Indenture shall be released by the New GO Bonds Trustee to, or at the direction of, the Reorganized Commonwealth, upon payment or satisfaction in full of the New GO Bonds in

117

accordance with their terms, such amounts shall revert and be distributed to, or at the direction of, the Reorganized Commonwealth.

(j) **Direct Right of Action**: Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance and other available remedies for any breach of covenants in the New GO Bonds Indenture.

(k) **Governing Law**: The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the New GO Bonds Indenture and the New GO Bonds, the holders of New GO Bonds shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.2 **Issuance and Distribution of the CVIs:**

(a) **Issuance of GO CVIs**: On the Effective Date, Reorganized Commonwealth shall issue the GO CVIs, in the aggregate original notional amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00), having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(b) **Issuance of Clawback CVIs**: On the Effective Date, Reorganized Commonwealth shall issue the Clawback CVIs, in the aggregate original notional amount equal to Five Billion Three Hundred Eighty-Four Million One Hundred Twenty-Seven Thousand Seven Hundred Sixty-Four Dollars ($5,384,127,764.00), having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(c) **Payment Waterfall and Redemption Provisions**: The GO CVIs shall be subject to mandatory redemption in accordance with priorities set forth in the "Subject to Waterfall Annual Mandatory Redemption Payments" provisions set forth on Exhibit "J" annexed hereto, subject to the provisions set forth in Annex 1 thereto and the allocation set forth in Annex 3 thereto. The Clawback CVIs shall be subject to mandatory redemption in accordance with the "Mandatory Redemption Payments to Subject to Waterfall Clawback CVI" and "Mandatory Redemption Payments to Not Subject to Waterfall Clawback CVI" provisions set forth on Exhibit "J" annexed hereto, subject to provisions set forth in Annex 2 thereto, the allocation set forth in Annex 4 thereto and the priorities set forth in Annex 6 thereto.

(d) **Direct Right of Action**: Pursuant to the CVI Indenture, and subject to such additional rights as provided therein, the CVI Trustee shall have a direct right of action to

118

enforce the terms of the CVI Indenture, including, without limitation, with respect to payments in respect of the CVIs and seeking specific performance and other available remedies for any breach of covenants in the CVI Indenture.

(e)    **Full Faith and Credit**:  For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law.

(f)    **Non-Impairment Covenant**:  The Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Reorganized Commonwealth will not: (a) take any action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Reorganized Commonwealth to fulfill the terms of any agreements made with respect to the CVIs; (c) impair the ability of the holders of the CVIs to track performance of  the Measured SUT; provided, however, that the foregoing shall not preclude the Reorganized Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with  the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Reorganized Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in Exhibit "J" annexed hereto or (d) not now or in the future, subject payments or redemptions made with respect to the CVIs to any Commonwealth tax or withholding obligation imposed by the Commonwealth regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(g)    **Governing Law**:  The CVI Indenture and the CVIs issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the CVI Indenture and the CVIs, the holders of CVIs shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.3    **Tax-Exempt Treatment of the New GO Bonds:**  Notwithstanding the terms and provisions of Sections 74.1 and 74.2 hereof, in the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Favorable Determination") that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date (the "New Ratio") to the total aggregate amount of all New GO Bonds is less than thirteen percent (13%) (the "Existing Ratio"), (i) in the event that the Favorable Determination is obtained on or prior to the Effective Date, the holders of any Claims receiving New GO Bonds pursuant to the Plan shall receive the benefit of such Favorable Determination in the form of tax-exempt New GO Bonds issued pursuant to the Plan with coupons for all maturities

119

equal to the coupons on the tax-exempt New GO Bonds set forth on Exhibit "I" hereto, and, to the extent that the Government Parties and the Initial GO/PBA PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit "I" hereto, the amount of par New GO Bonds will either increase or decrease, on a dollar-for-dollar basis, depending upon the coupon structure, subject to the amount of the maximum annual debt service provided for in Exhibit "I" hereto, and any such modification being applied to creditors pro rata on a post-application of GO/PBA PSA Restriction Fee and GO/PBA Consummation Costs recovery basis as described in footnote 8 to Annex 2-A to Exhibit "I" of the GO/PBA Plan Support Agreement, (ii) in the event that the Favorable Determination is obtained subsequent to the Effective Date and the New Ratio is less than the Existing Ratio, then the holders of the Taxable Bonds affected by such determination  (the "Invited Bonds")  shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; provided, however, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and (iii) in the event that neither of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New GO Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

74.4    **Comprehensive Cap on All Net Tax-Supported Debt:**  During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than

the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The Secretary of Treasury's certification of compliance with the Debt limit pursuant to this Section 74.4 shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

74.5 **Adoption and Maintenance of a Debt Management Policy**: During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated. While the Reorganized Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a) **Long-Term Borrowing for Capital Improvements Only**: To ensure the Reorganized Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements, as determined by the issuer of such Debt and approved by AAFAF, or to refinance Tax-Supported Debt in accordance with the terms and provisions of Section 74.5(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b) **30-Year Maturity Limitation on All Tax-Supported Borrowing**: No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to (a) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution or (b) Tax-Supported Debt issued to refinance Debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to terms and provisions of Section 74.5(d) hereof.

(c) **Required Principal Amortization**: No series of Tax-Supported Debt issued from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such Debt is no longer outstanding.

121

(d)    **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year**:  Refinancings of Tax-Supported Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Reorganized Commonwealth in its Debt Management Policies; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

(e)    **Fiscal Plan Debt Service**:  Any post-Effective Date Fiscal Plan shall include provisions for the payment, in each FY of (a) principal and interest (and accreted value) with respect to the New GO Bonds, including, without limitation, sinking fund payments due in such FY and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Reorganized Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above.  The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE LXXV

### PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, SYNCORA INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

75.1    **Treatment of Assured Insured Bond Claims**:  In the event that Classes 2, 17, 24, 32, 37, and 42 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force and effect or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, holders of Assured Insured Bond Claims shall receive the following treatments:

(a)    **Assured Election**:  With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, Assured shall receive the Cash and CVIs allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of such Assured Insured Bonds, which Assured New GO Bonds shall be (i)

122

insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12, and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Assured Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any such deficiency amount with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured.  The principal amounts, maturities and interest rates on such Assured New GO Bonds allocated on account of the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice shall be determined by Assured in consultation with applicable underwriter(s), such that the interest rates on such Assured New GO Bonds shall be the lowest interest rates necessary for such Assured New GO Bonds to be issued with increased par amounts relative to other New GO Bonds and otherwise result in the Assured New GO Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Assured New GO Bonds due in any FY shall not be greater than the annual debt service that would have been due in such FY if such Assured New GO Bonds had the same terms as the other New GO Bonds.  If either (i) at or prior to the time of pricing of Assured New GO Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (ii) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, then, in either case, Assured (A) may elect, in its sole discretion, to exercise the Assured Acceleration Price Payment Option by paying the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself the Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured, and (B) shall receive, on the Effective Date the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash and other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election or the Assured Acceleration Price Payment Option, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)     **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2; and, provided, further, that, for the avoidance of doubt, Assured Insured Bonds owned by Assured (by subrogation or otherwise) shall not be subject to the Assured Bondholder Elections set forth in this

Section 75.1(b), and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds.

(i) **Assured Bondholder Election 1:** Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Assured Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Cash and Assured New Securities allocable to such holder under the Plan, which Assured New Securities, in the case of Assured New GO Bonds, may, at Assured's selection, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it, but at no cost or premium to the Commonwealth; or

(ii) **Assured Bondholder Election 2:** Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) certain Assured New Securities in accordance with terms acceptable to Assured. The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 75.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment. Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the Effective Date upon thirty (30) days' prior written notice to the relevant holders. Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation. From and after payment of the Assured Acceleration Price on the Effective Date or other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable. Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(c) **Acceleration of Assured Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the

Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)      **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth, PBA and CCDA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth, PBA and CCDA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

(e)      **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA.

75.2      **Treatment of National Insured Bond Claims:** In the event that Classes 3, 18, and 25 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing; provided, however, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Section 75.2 and National shall receive the National Plan Consideration on account of such bonds:

(a)      **National Commutation Treatment:** Each holder of an Allowed National Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, and (ii) National shall receive the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim.  If a holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment or (2) submits an election for less than all of its National Insured Bond Claims (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in this subsection (a), to commute the National Insurance Policies, to release and discharge National's obligations under the National Insurance Policies, and to receive distributions in accordance with this subsection (a).  A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the

125

related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

(b)    **National Non-Commutation Treatment**:  In the event that a holder of an Allowed National Insured Bond Claim timely and validly elects not to receive the National Commutation Treatment in accordance with the provisions Section 75.2(a) hereof, such holder of an Allowed National Insured Bond Claim shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing:

(i)    **Custodial Trusts**:  Such holder of an Allowed National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration and the National Insured Bonds allocable to such electing holder into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Plan Consideration and National Certificates in consideration therefor and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

(ii)    **Escrow**:  Such holder of an Allowed National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration in the National Escrow Account and such deposited National Plan Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Plan Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii)    **Payment of Accelerated Amounts**:  National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price.

(iv)    **Alternative Treatment**:  The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of National Insured Bonds.

(c)    **Acceleration of National Insured Bonds**:  Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the

126

National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d) **Assignment of Redemption Rights**: Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(e) **Entitlement to Vote**: Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of National Insured Bond Claims and National CW/HTA Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment and the National Non-Commutation Treatment as set forth in Section 75.2(a) hereof shall be made by the beneficial holders of National Insured Bonds; provided, however, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Section 75.2(b) hereof.

(f) **Deemed Election**: Each holder of an Allowed Vintage PBA Bond Claim (National) and an Allowed Vintage CW Guarantee Bond Claim (National) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.2 as described above; provided, however, that holders making an election pursuant to Section 75.2 with respect to such holders' Allowed Vintage PBA Bond Claim (National) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (National) pursuant to Section 75.2 hereof.

75.3 **Treatment of Syncora Insured Bond Claims**: In the event that Classes 6, 21, and 28 vote to accept the Plan in accordance with Section 1126 of the Bankruptcy Code, on the Effective Date, notwithstanding any other provision of the Plan, Syncora Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Syncora, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing:

(a) **Syncora Commutation Treatment**: Each holder of an Allowed Syncora Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Syncora Commutation Consideration, distributable by or at the direction of Syncora, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Syncora Insurance Policy or any Syncora Trust or Syncora Escrow Account and (ii) Syncora shall receive the Syncora Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Syncora Insured Bond Claim. If a

127

holder of an Allowed Syncora Insured Bond Claim (1) fails to timely and validly elect the Syncora Non-Commutation Treatment or (2) submits an election for less than all of its Syncora Insured Bond Claims (in which case, such election shall be void and of no force of effect), such holder shall be deemed to have elected to receive the Syncora Commutation Treatment set forth in this subsection (a), to commute the Syncora Insurance Policies, to release and discharge Syncora's obligations under the Syncora Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed Syncora Insured Bond Claim that does not validly elect to receive the Syncora Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the Syncora Insured Bonds, including the obligations of Syncora under the related Syncora Insurance Policies, underlying such holder's Allowed Syncora Insured Bond Claim cancelled.

(b) **Syncora Non-Commutation Treatment**: In the event that a holder of an Allowed Syncora Insured Bond Claim timely and validly elects not to receive the Syncora Commutation Treatment in accordance with the provisions Section 75.3(a) hereof, such holder of an Allowed Syncora Insured Bond Claim shall receive one or more of the following treatments, at Syncora's election, which election shall be exercised by Syncora at or prior to the commencement of the Disclosure Statement Hearing.

(i) **Custodial Trusts**: Such holder of an Allowed Syncora Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration and the Syncora Insured Bonds allocable to such electing holder into the applicable Syncora Trust, (B) be deemed to have received its Pro Rata Share of the Syncora Plan Consideration and Syncora Certificates in consideration therefor, and (C) have no recourse to Syncora or the Syncora Insurance Policies other than as provided for under the terms of the Syncora Trust.

(ii) **Escrow**: Such holder of an Allowed Syncora Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration in the Syncora Escrow Account and such deposited Syncora Plan Consideration shall be held as security for Syncora's obligations to the holders of the Syncora Insured Bonds whose Syncora Plan Consideration was deposited in the Syncora Escrow Account under the Syncora Insurance Policies.

(iii) **Payment of Accelerated Amounts**: Syncora shall receive the Syncora Plan Consideration that would be otherwise allocable to such holder of an Allowed Syncora Insured Bond Claim and Syncora shall fully and completely discharge its obligation to such holder of an Allowed Syncora Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Syncora Acceleration Price.

(iv) **Alternative Treatment**: The Oversight Board and Syncora reserve the right to formulate an alternative election or implementation option with respect to the Syncora Insured Bonds that is mutually acceptable to the Oversight Board and Syncora, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, Syncora may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Syncora Insured Bonds.

(c) **Acceleration of Syncora Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Syncora any and all rights to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Syncora Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Syncora Insured Bond Claims shall be made by the Oversight Board to Syncora in accordance with the provisions of Section 301(c)(3) of PROMESA, and (b) the election to choose between the Syncora Commutation Treatment and the Syncora Non-Commutation Treatment as set forth in Section 75.3(a) hereof shall be made by the beneficial holders of Syncora Insured Bonds; provided, however, that the form of the Syncora Non-Commutation Treatment shall be selected by Syncora in accordance with Section 75.3(b) hereof.

(f) **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Syncora) and an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.3 as described above; provided, however, that holders making an election pursuant to Section 75.3 with respect to Allowed Vintage PBA Bond Claim (Syncora) shall be deemed to have made the same election with respect to corresponding Allowed Vintage CW Guarantee Bond Claim (Syncora) pursuant to Section 75.3 hereof.

75.4 **Treatment of FGIC Insured Bond Claims**: In the event that Classes 5, 20, and 27 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the Plan, holders of FGIC Insured Bond Claims shall receive the following treatments:

(a) **FGIC Insured Bond Claims Treatment:** Each holder of an Allowed FGIC Insured Bond Claim (except as provided in Section 75.4(b) hereof) shall (A) deposit, or be

129

deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor. All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy. For the avoidance of doubt, each distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable Insurance Policies.

(b) **FGIC Insured Bond Claims Owned By FGIC:** With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the Effective Date, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, its Pro Rata Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c) **Acceleration of FGIC Insured Bonds:** Notwithstanding any other provision of the Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive insurance documents and the applicable FGIC Insurance Policy, on the Effective Date, the Commonwealth and PBA, shall be deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by FGIC as if it were the Commonwealth or PBA, as applicable, for such purpose.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of FGIC Insured Bond Claims and FGIC CW/HTA Bond Claims shall be made by the Oversight Board to FGIC in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents.

75.5     **Treatment of Ambac Insured Bond Claims**:  In the even that Classes 4, 19, and 26 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatments, which treatments shall be selected by the Ambac, in its sole and absolute discretion, not later than twenty-one (21) days prior to the Ballot Date:

(a)     **Ambac Commutation Treatment:**  Each holder of an Allowed Ambac Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s) or Ambac Escrow Account(s), and (ii) Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Ambac Insured Bond Claim.  A holder of an Allowed Ambac Insured Bond Claim that validly elects to receive the Ambac Commutation Treatment, or makes an improper election as described in Section 75.5(f) hereof, shall be deemed to have had, on or after Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies, underlying such holder's Allowed Ambac Insured Bond Claims cancelled.

(b)     **Ambac Non-Commutation Treatment:**  In the event that a holder of an Allowed Ambac Insured Bond Claim timely and validly elects to receive the Ambac Non-Commutation Treatement, such holder of an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments, at Ambac's election, which election shall be exercised by Ambac not later than twenty-one (21) days prior to the Ballot Date;

(i)     **Custodial Trusts:**  Such holder of an Allowed Ambac Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration and the Ambac Insured Bonds allocable to such electing holder into the applicable Ambac Trust(s), (B) be deemed to have received its Pro Rata Share of the Ambac Plan Consideration and Ambac Certificates in consideration therefor, and (C) have no recourse to Ambac or the Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s).  The terms of the Ambac Trust(s) shall be set forth in a trust agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall include the following terms, without limitation: (i) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement governing the Ambac Trust(s); (ii) Ambac shall be deemed the sole holder of the Ambac Insured Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings; and (iii) the agreement governing the Ambac Trust(s) will provide that (a) all rights of a holder of Ambac Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the

Ambac Certificates shall be entitled to any right with respect to the Ambac Insured Bonds (other than as otherwise described in the Ambac Trust(s)), and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

(ii) **Escrow:** Such holder of an Allowed Ambac Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration in the applicable Ambac Escrow Account(s) and such deposited Ambac Plan Consideration shall be held as security for Ambac's obligations to the holders of the Ambac Insured Bonds whose Ambac Plan Consideration was deposited in the applicable Ambac Escrow Account(s) under the Ambac Insurance Policies.

(iii) **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to such holder of an Allowed Ambac Insured Bond Claim and Ambac shall fully and completely discharge its obligation to such holder of an Allowed Ambac Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Ambac Acceleration Price.

(iv) **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Ambac Insured Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, not later than twenty-one (21) days prior to the Ballot Date.

Notwithstanding the foregoing and for the avoidance of doubt, Ambac may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Ambac Insured Bonds.

(c) **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date. Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv)) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

132

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Ambac any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Ambac Insured Bond Claims and Ambac CW/HTA Bond Claims shall be made by the Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (b) the election to choose between the Ambac Commutation Treatment as set forth in Section 75.5(a) hereof and the Ambac Non-Commutation Treatment as set forth in Section 75.5(b) hereof shall be made by the beneficial holders of Ambac Insured Bonds; provided, however, that the form of the Ambac Non-Commutation Treatment shall be selected by Ambac in accordance with Section 75.5(b) hereof.

(f) **Improper Election:** If a holder of an Allowed Ambac Insured Bond Claim (1) fails to timely and validly elect either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to Section 75.5(a) or 75.5(b) hereof, or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the Ambac Commutation Treatment set forth in Section 75.5(a) hereof with respect to such Ambac Insured Bond Claims, to commute the applicable Ambac Insurance Policies, to release and discharge Ambac's obligations under such Ambac Insurance Policies, and to receive distributions in accordance with Section 75.5(a) hereof. In addition, a holder of an Allowed Ambac Insured Bond claim that does not validly elect to receive either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed to have had, on or after the Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies underlying such holder's Allowed Ambac Insured Bond Claim, cancelled.

(g) **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Ambac) and an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.5 as described above; provided, however, that holders making an election pursuant to Section 75.5 with respect to such holder's Allowed Vintage PBA Bond Claim (Ambac) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (Ambac) pursuant to Section 75.5 hereof.

133

# ARTICLE LXXVI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

76.1 **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**:  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Section 76.5 and 76.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico Pursuant to 2 L.P.R.A § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 76.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 76.1, by serving a separate notice to the relevant counterparties to such agreements.  To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

76.2 **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**:  Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 76.1 of the Plan.

76.3 **Inclusiveness**:  Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements

made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

76.4    **Cure of Defaults**:  Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 76.1 of the Plan, the Debtors shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within ten (10) Business Days of entry of a Final Order setting forth the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the case may be, shall pay or otherwise satisfy such cure amount.  Notwithstanding the terms and provisions of Section 76.1 of the Plan, each of the Debtors shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

76.5    **Insurance Policies**:  Subject to the terms and provisions of Section 76.7 hereof, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan; provided, however, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

76.6    **Rejection Damage Claims**:  If the rejection of an Executory Contract and Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

76.7    **Indemnification and Reimbursement Obligations**:  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be Administrative Expense Claims; provided, however, that, under no circumstances shall the Debtors or the Reorganized Debtors, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

76.8    **Nonoccurrence of Effective Date**:  In the event that the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

76.9    **Reservation of Rights**:  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

76.10    **Collective Bargaining Agreements**:  Except as provided in Articles LV and LVI hereof, none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Articles LV and LVI regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE LXXVII

## PROVISIONS GOVERNING DISTRIBUTIONS

77.1    **Time and Manner of Distribution**:  Except as otherwise provided herein, distributions under the Plan shall be made to each holder of an Allowed Claim as follows:

(a)    **Distributions to Holders of PBA Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed PBA Bond Claim, and in each case consistent with the terms hereof, such Creditor's Pro Rata Share, if any, of the PBA Bond Distribution, GO/PBA PSA Restriction Fee, Retail Support Fee, Retail Support Fee Return, and GO/PBA Consummation Costs, if applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim is subject to the delivery, on the prior to the Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(b)    **Distributions to Holders of CW Bond Claims and CW Guarantee Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed CW Bond Claim or an Allowed CW Guarantee Bond Claim, such Creditor's (i) applicable recovery provided hereunder, (ii) the GO/PBA PSA Restriction Fee, (iii) the Retail Support Fee, (iv) the Retail Support Fee Return, and (v) the GO/PBA Consummation Costs, in each case, to the extent applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed CW Bond Claim is subject to the delivery, on or prior to the

Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(c)     **Distributions to Holders of ERS Bond Claims:** Except as otherwise provided herein, (i) within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed ERS Bond Claim, such Creditor's Pro Rata Share of the ERS Bond Recovery, calculated based upon the amount of Net Allowed ERS Bond Claims, and (ii) upon making distributions in accordance with the provisions of this Section 77.1(c), including, without limitation, the distribution of any proceeds from the sale of the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the terms and provisions of Section 69.2 hereof, the ERS Fiscal Agent shall close and terminate the original CUSIPs with respect to the ERS Bonds and shall have no further distribution obligations thereafter.

(d)     **Distributions with Respect to General Unsecured Claims:** Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, (i) to each holder of an Allowed CW General Unsecured Claim and Allowed ERS General Unsecured Claim such Creditor's Pro Rata Share, if any, of the CW GUC Recovery and the ERS GUC Pool, respectively, and (ii) to each holder of an Allowed PBA General Unsecured Claim distributions in accordance with the terms and provisions of Section 17.1 hereof.

(e)     **Distributions with respect to Eminent Domain/Inverse Condemnation Claims:** Except as otherwise provided herein, within ten (10) Business Days following the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Eminent Domain/Inverse Condemnation Claim, Cash in the amount of such Allowed Claim.

(f)     **Distribution of Cash to Holders of Allowed Administrative Expense Claims:** Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

77.2     **Timeliness of Payments**: Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 77.1(a) hereof to have been made on the Effective Date.

77.3     **Distributions by the Disbursing Agent**: Except as otherwise provided herein or in the Confirmation Order, and except to the extent the Avoidance Actions Trustee selects a

different disbursing agent pursuant to the terms of the Avoidance Actions Trust Agreement, all distributions to be made pursuant to the Plan, including, without limitation, distributions to be made pursuant to the Avoidance Actions Trust Agreement, shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

77.4 **Manner of Payment under the Plan**: Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

77.5 **Delivery of Distributions**: Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Confirmation Order or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each such obligation shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents. The Debtors, its agents and servicers, and the Disbursing Agent shall have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date; provided, however, that the New GO Bonds and the CVIs will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

77.6 **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 hereof), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the PBA Bonds, ERS Bonds and GO

138

Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 75.1 and 75.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

77.7    **Undeliverable/Reserved Distributions**:

(a)    **Holding of Undeliverable Distributions by the Disbursing Agent:** If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Subject to the terms and provision of Section 77.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b)    **Failure to Claim Undeliverable Distributions:** If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against

Reorganized Debtors, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized Debtors for use to discharge operating expenses of Reorganized Debtors and (2) the New GO Bonds and the CVIs in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized Debtors for cancellation or deposit into the treasury of Reorganized Debtors, as determined by Reorganized Debtors in their sole and absolute discretion.

77.8 **Withholding and Reporting Requirements**: Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

77.9 **Time Bar to Cash Payments**: Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

77.10 **Distributions After Effective Date**: Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XCII of the Plan.

77.11 **Setoffs**: Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this Section 77.11 shall affect the releases and injunctions provided in Article XCII of the Plan.

77.12    **Allocation of Plan Distributions Between Principal and Interest**:  Unless otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; provided, however, that the Debtors or Reorganized Debtors' treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

77.13    **Payment of Trustee Fees and Expenses**:  The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses which may be allegedly due and owing by the Commonwealth, ERS and PBA with respect to amounts discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

77.14    **Beneficial Owner**:  For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article LXXVII, except with respect to Claims arising from bonds insured by Syncora, the "holder" of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; provided, however, that, for purposes of Article LXXV hereof and section 1126 of the Bankruptcy Code, (a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA

Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the "holder" of and FGIC Insured Bond Claims any FGIC CW/Convention Center Claims, and FGIC CW/HTA Bond Claims, and any CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/Convention Center Claims, the FGIC CW/HTA Bond Claims, and the FGIC CW/PRIFA Rum Tax Claims, and (e) the "holder" of any other Insured Bond Claims shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured Bond Claims.

77.15    **Value of Distributions**:  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New GO Bonds and CVIs shall be valued at the original principal amount thereof.

## ARTICLE LXXVIII

## AVOIDANCE ACTIONS TRUST

78.1    **Execution of Avoidance Actions Trust Agreement**:  On or before the Effective Date, the Debtors and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on or after the Effective Date.  The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

78.2    **Purpose of the Avoidance Actions Trust**:  The Avoidance Actions Trust shall be established for the sole purpose of Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

78.3    **Avoidance Actions Trust Assets**:  The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Section 88.2 hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

142

78.4     **Administration of the Avoidance Actions Trust**:  The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

78.5     **The Avoidance Actions Trustee**:  In the event the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; provided, however, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

78.6     **Role of the Avoidance Actions Trustee**:  In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers and duties, (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust, (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust, (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible, (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority and (vii) to not unduly prolong the duration of the Avoidance Actions Trust. In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

78.7     **Avoidance Actions Trustee's Tax Power for Debtors**:  From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns or other tax information statements required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate.

78.8     **Transferability of Avoidance Actions Trust Interests**:  The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law

78.9     **Cash**:  The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

78.10    **Distribution of Avoidance Actions Trust Assets**:  The Avoidance Actions Trustee shall distribute to the holders of Allowed Claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 78.10), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts' as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 hereof to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to this Section 78.10 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and, provided, further, that the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to those holders of Avoidance Actions Trust Interests with respect to which the Avoidance Actions Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

78.11    **Funding, Costs and Expenses of the Avoidance Actions Trust**:  On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

78.12    **Compensation of the Avoidance Actions Trustee**:  The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Title III Court.

78.13    **Retention of Professionals/Employees by the Avoidance Actions Trustee**: Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

78.14    **Federal Income Tax Treatment of the Avoidance Actions Trust:**

(a)    Avoidance Actions Trust Assets Treated as Owned by Creditors.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors,

144

the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust Claims Reserve) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to the Avoidance Actions Trust Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)  Tax Reporting.

(i)  The Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 78.14. The Avoidance Actions Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(ii)  The Avoidance Actions Trustee will then in good faith value all other Avoidance Actions Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Avoidance Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee, and Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.

(iii)  Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance Actions Trust Claims Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets for

145

purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in
accordance with tax accounting principles prescribed by the IRC, the applicable Treasury
Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     Subject to definitive guidance from the IRS or a court of
competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a
private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse
determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the
Avoidance Actions Trustee shall (A) timely elect to treat any Avoidance Actions Trust Claims
Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and
(B) to the extent permitted by applicable law, report consistently with the foregoing for state and
local income tax purposes.  All parties (including the Avoidance Actions Trustee and the
Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local
income tax purposes consistently with the foregoing.

(v)     The Avoidance Actions Trustee shall be responsible for payment,
out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets,
including the Avoidance Actions Trust Claims Reserve.  In the event, and to the extent, any Cash
retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is
insufficient to pay the portion of any such taxes attributable to the taxable income arising from the
assets allocable to, or retained on account of, Disputed Claims (including any income that may
arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), such
taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed
Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from
any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution
of such Disputed Claims.

(c)     Tax Withholdings by Avoidance Actions Trustee.  The Avoidance Actions
Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld
pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any
payment or distribution to the holders of Avoidance Actions Trust Interests.  All such amounts
withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the
need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions
Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood
that any such amount withheld shall reduce the amount actually realized by the applicable holder
upon distribution.  The Avoidance Actions Trustee shall be authorized to collect such tax
information from the holders of Avoidance Actions Trust Interests (including, without limitation,
social security numbers or other tax identification numbers) as in its sole discretion the Avoidance
Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the
Avoidance Actions Trust Agreement.  In order to receive distributions under the Plan, all holders
of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance
Actions Trustee and provide tax information and the specifics of their holdings, to the extent the
Avoidance Actions Trustee deems appropriate in the manner and in accordance with the
procedures from time to time established by the Avoidance Actions Trustee for these purposes.
This identification requirement generally applies to all holders of Avoidance Actions Trust
Interests, including those who hold their securities in street name.  The Avoidance Actions Trustee

may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that, if such information is not furnished to the Avoidance Actions Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided, further, that, upon the delivery of such information  by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, provided, further, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Avoidance Actions Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions Trustee for such liability (to the extent such amounts were actually distributed to such holder).

(d)     The Avoidance Actions Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made; provided, however, in no event shall the Avoidance Actions Trust be dissolved later than three (3) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions Trustee and the Avoidance Actions Trust Board that any further extension would not adversely affect the status of the trust as an Avoidance Actions Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets.  If at any time the Avoidance Actions Trustee determines, in reliance upon such professionals as the Avoidance Actions Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Avoidance Actions Trustee, and (iii) dissolve the Avoidance Actions Trust.

78.15   **Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond**:  The Avoidance Actions Trustee or the individual(s) comprising the Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and their respective employees, agents and professionals,

shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

## ARTICLE LXXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTORS

79.1     **Prosecution of Claims**:  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

## ARTICLE LXXX

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

80.1     **Impaired Classes to Vote**:  Each holder, as of the Voting Record Date, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan in accordance with Sections 26.1, 33.1, 37.1, 39.1, 43.1, 47.1, 49.1, 52.1, 54.1, 58.1, 59.1, 61.1, 67.1, 68.1, and 71.1 of the Plan, shall be entitled to vote separately to accept or reject the Plan.

80.2     **Acceptance by Class of Creditors**:  An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

80.3     **Cramdown**:  In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Title III Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the GO/PBA PSA

Creditors, in accordance with the provisions of the GO/PBA Plan Support Agreement, amend the Plan.

## ARTICLE LXXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

81.1     **Exculpation**:  From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent.  No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

81.2     **Powers of the Disbursing Agent**:  Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

81.3     **Fees and Expenses Incurred From and After the Effective Date**:  Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## ARTICLE LXXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
## AND CLAIMS SUBJECT TO ACR PROCEDURES

81.1     **Objections to Claims; Prosecution of Disputed Claims**:

(a)     Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final

Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtors, Reorganized Debtors shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event that an order reversing or vacating the Confirmation Order with respect to Bond Claims becomes a Final Order, such Bond Claims shall be reinstated on the claims registry.

(b)     The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. With respect to the foregoing obligations and responsibilities, such appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), which amounts shall be funded from the GUC Reserve.

82.2     **Estimation of Claims**: Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized Debtors, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without

limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized Debtors, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

82.3    **Payments and Distributions on Disputed Claims**:

(a)    **Disputed Claims Holdback:**  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. To the extent that any of the Reorganized Debtors retains any New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs are distributed, such Reorganized Debtors shall exercise voting or consent rights with respect to such obligations.

(b)    **Allowance of Disputed Claims:**  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Debtors shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.

82.4    **Authority to Amend Lists of Creditors**:  Except with respect to Bond Claims, and subject to the limitations in Section 82.1(b) hereof, the Debtors shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court. If no such

objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

82.5     **Non-Accrual of Interest**: Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as the case may be, on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

82.6     **Disallowance of Claims**: All Claims of any Entity from which property is sought by the Debtors under sections 550, or 553 of the Bankruptcy Code or that the Debtors alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

82.7     **Claims Subject to ACR Procedures**: To the extent not already transferred as of the Effective Date in accordance with the terms and conditions of the ACR Order, the Debtors or the Reorganized Debtors, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtors and the Reorganized Debtors, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims. Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 54, Class 58, Class 66, or Class 68 under the Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 82.7.

82.8     **National Action Claims**: Notwithstanding anything contained herein, in the GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary, National may continue to litigate to final judgment or settlement all claims and causes of action asserted in the National Action; provided, however, that, in the event that notwithstanding the application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the defendants and, to the extent named, third-party defendants in the National Action assert against

the Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth (collectively, the "CW Entities") claims or counterclaims for indemnification, contribution, reimbursement, setoff or similar theories of recovery based on, arising from or relating to the National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including, without limitation, invoking the Bar Date Orders and discharge provisions set forth in Article XCII of the Plan and the Confirmation Order, objecting to any proof of claim, and prosecuting available appeals based upon, arising from or related to the National Action, (B) to allow National, at its option, to participate in or undertake such defense and to settle such action in its sole discretion, and (C) not to settle any such CW Entities' Claims without National's written consent, which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and hold the CW Entities harmless to the extent of the CW Entities' liability pursuant to a Final Order or settlement as a result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees and expenses incurred in connection with the defense against any such CW Entities' Claims, including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement exceed any recovery realized by National in connection with the National Action; provided, however, that National shall have no obligation pursuant to the Plan or the Confirmation Order to indemnify and hold the CW Entities harmless for claims based upon, arising from or related to the Underwriter Actions that are not the National Action or in which National is not involved. For the avoidance of doubt, any CW Entities' Claims shall not constitute CW General Unsecured Claims.

## ARTICLE LXXXIII

## GOVERNANCE AND PROVISIONS REGARDING PENSION RESERVE AND PENSION SYSTEM

83.1 **Formation and Responsibilities of the Pension Reserve**: On or prior to the Effective Date, the Commonwealth shall take all necessary steps to establish the Pension Reserve Trust, including, without limitation, by execution and delivery of the Pension Reserve Deed of Trust.

83.2 **Funding of the Pension Reserve Trust**: On the Effective Date, the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars ($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve Trust. From and after the FY in which the Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be made, annual (but in no event later than October 1st following the conclusion of each FY) contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b) such additional amount calculated as the lower of the actual unrestricted primary surplus minus the actual CVI payments for such FY and the Projected Fiscal Plan Surplus for such FY, minus the sum of (i) the Base Contribution for such FY, plus (ii) the Commonwealth debt service obligation pursuant to the plan for such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to applicable laws,

including, without limitation, Titles I and II of PROMESA, such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The Pension Reserve Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations.

83.3 **Non-Impairment Covenant**: The Commonwealth covenants herein, and will covenant in the Pension Reserve Deed of Trust, for the benefit of all Participants that, with respect to payments and other obligations owed to Participants pursuant to the Plan, including, without limitation, PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation, enforceable by any and each of the Oversight Board, and any affected Retirees and, with respect to any such provision, the Pension Reserve Deed of Trust shall not be amended or modified by the Commonwealth except (i) with the express prior written consent of the Oversight Board (if in existence), and a majority in number of the Retirees receiving benefits pursuant to the Plan who are affected by such amendment or modification, or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.

83.4 **Maintenance of Pension**: Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

# ARTICLE LXXXIV

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
## AND NOT IMPAIRED BY THE PLAN

84.1    **Impaired Classes**:  The Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 53, 56, 58 through 62, 65, 66 and 69 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, and 68 are deemed to have accepted the Plan.  The Claims in Classes 63 and 64 are impaired and not receiving a distribution pursuant to the Plan and, therefore, Classes 63 and 64 are deemed to have rejected the Plan.

84.2    **Unimpaired Classes**:  Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired pursuant to the Plan, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

# ARTICLE LXXXV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

85.1    **Conditions Precedent to Confirmation of the Plan**:  Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

(a)    **Fiscal Plan Certification:**  The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b)    **Required Orders:**  The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order providing for the following:

(i)    Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)    Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)    Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)    Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XCII of the Plan;

155

(v)     Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

(vi)     Determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors and the Plan;

(vii)     Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the CVI Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties with respect thereto;

(viii)     Determining that the New GO Bonds Legislation and the CVI Legislation, to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and the CVIs, respectively; and

(ix)     Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

(c)     **Form of Orders:**  The Confirmation Order and the Plan are each in form and substance reasonably acceptable to the Oversight Board, the Debtors, the Initial GO/PBA PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee.

(d)     **Confirmation Order:**  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XCII of the Plan and (iii) the applicable provisions set forth in Section 85.2 (b) hereof.

85.2     **Waiver of Conditions Precedent to Confirmation**:  Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 85.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtors, the Initial PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee, which consent shall not be unreasonably withheld.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

# ARTICLE LXXXVI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

86.1    **Conditions Precedent to the Effective Date**: The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)    **Fiscal Plan Certification:** The Oversight Board shall have determined that the Plan is consistent with the Debtors' Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA. The Fiscal Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds, including, without limitation, sinking fund payments and the mechanisms and procedures for payment of the CVIs in the event that the Outperformance Condition is satisfied and payment is due in accordance with the CVI Indenture.

(b)    **Entry of the Confirmation Order:** The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Cases pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial PSA Creditors, and the Creditors' Committee and the Confirmation Order shall provide for the following:

(i)    Authorize the Debtors and the Reorganized Debtors, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)    Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)    Authorize the Debtors and Reorganized Debtors, as the case may be, to (1) make all distributions and issuances as required under the Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)    Authorize the implementation of the Plan in accordance with its terms;

(v)    Determine the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York and federal law;

157

(vi)        Determine that, the Commonwealth shall have pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds and payment on the CVIs;

(vii)       Determine that, pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory first liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

(viii)      Determine the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (5) any other Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(ix)        Provide that the Fiscal Plan, certified as of the Effective Date, and any post-Effective Date Fiscal Plan include provisions for the payment in each FY of (a) principal and interest payable on the New GO, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

(x)        Determine that the statutory first lien on funds once deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order);

(xi)       Provide that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund as of the commencement thereof;

(xii)      Determine that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

(xiii)    Provide that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding;

(xiv)    Determine that the Plan is consistent with the Debtors' Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xv)    Provide that, in consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and upon satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xvi)    Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xvii)    Provide that neither the Governor nor the Legislature shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan;

(xviii)    Provide that the Governor and the Legislature, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the Plan; and

(xix)    Provide that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(c)    **No Injunction:**  The Confirmation Order shall not be stayed in any respect.

(d)    **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New GO Bonds Legislation and the CVI Legislation, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and

159

not inconsistent with any other provision of the Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan.

(e) **Execution of Documents; Other Actions:** All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, are effected or executed and delivered, as applicable, and are in full force and effect.

(f) **Opinions:** Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the CVIs by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial GO/PBA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

(g) **Constitutional Claims:** The Title III Court shall have entered an order finding that any Claim asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall be determined to be a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and shall be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors and the Reorganized Debtors shall have no liability on account of such Claims.

(h) **Lift Stay Motions and Clawback Actions:** The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

(i) **Preemption**: The Title III Court shall have entered an order finding or determining that (1) Act 80, Act 81, and Act 82, each enacted on August 3, 2020, and (2) Joint Resolution 33-2021, signed into law on December 16, 2021 and requiring the partial implementation of Act 80, are either preempted by the provisions of PROMESA or nullified or unenforceable pursuant to PROMESA, including, without limitation, Sections 104(k), 108, 201, 202, and 204 thereof.

86.2 **Waiver of Conditions Precedent**: Subject to the provisions of the GO/PBA Plan Support Agreement, the Oversight Board may waive any of the conditions to the Effective Date set forth in Section 86.1 hereof at any time without any notice to any other parties in interest, other than the Initial GO/PBA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan; provided, however, that, subject to the terms and provisions of Committee Agreement, each of the conditions precedent in Section 86.1 hereof with respect to provisions affecting Classes 54, 58, 66 and 68 may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

86.3     **Effect of Non-Occurrence of Conditions to Effective Date**:  If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtors, the Oversight Board, the Creditor's  Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity.

## ARTICLE LXXXVII

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

87.1     **Modification of Plan**:  Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Oversight Board may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

87.2     **Revocation or Withdrawal**:

(a)     Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.

(b)     If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

87.3     **Amendment of Plan Documents**:  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

87.4     **No Admission of Liability**:

(a)  The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)  None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtors, the Debtors, or any other Entity with respect to the validity of any Claim.  None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE LXXXVIII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED DEBTORS

88.1  **Corporate Action**:  On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, the Debtors and Reorganized Debtors shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable.

88.2    **Dissolution of ERS**:  On or as soon as practicable subsequent to the Effective Date, ERS shall be dissolved and all existing directors and officers of ERS shall be relieved of any further duties and obligations.  Upon such dissolution, all remaining assets of ERS shall be transferred to the Commonwealth.

88.3    **Officers of Reorganized Debtors**:  To the extent applicable, the board of directors of Reorganized Debtors shall elect officers of Reorganized Debtors as of or after the Effective Date.

88.4    **PBA and CCDA Governance Structure**:  No changes to the PBA governance structure or PBA collective bargaining agreements will be implemented during or following the PBA Title III Case, unless any such changes are approved by the Oversight Board and AAFAF.

## ARTICLE LXXXIX

### PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

89.1    **Effect of Confirmation**:  Nothing in this Plan or the Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtors shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

89.2    **Ongoing Role of the Oversight Board**:  Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtors' duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

89.3    **Preemption of Laws**:  As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws that are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, such preempted provisions include, without limitation, (a) pursuant to section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, and (b) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the Plan's discharge of the Debtors' obligations, and all such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations or any of the transactions contemplated by the Plan.  Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by

163

PROMESA include, without limitation, those listed on Exhibit "K" hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law and (z) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

## ARTICLE XC

## PROVISIONS REGARDING COMMITTEES

90.1 **Dissolution of Committees**: On the Effective Date, each of the Creditors' Committee and the Retiree Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases; provided, however, that (x) in the event that an appeal of the Confirmation Order is taken, neither the Creditors' Committee nor the Retiree Committee shall be dissolved until the Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with the HTA and PREPA Title III cases, and (z) each of the Creditors' Committee and the Retiree Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals. To the extent that, as of the date immediately prior to the Effective Date, either the Creditors' Committee or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, without limitation, the Debt Related Objections, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtors or the Avoidance Actions Trustee shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon such assumption, the Creditors' Committee or the Retiree Committee, as the case may be, shall be relieved of any role, responsibility or obligation with respect thereto; provided, however, and, for the avoidance of doubt, in no event shall the Avoidance Actions Trustee assume any role with respect to the Debt Related Objections, the PBA Litigation, the Invalidity Actions or the Lien Challenge Actions, which litigation shall be settled as set forth in Section 2.1 hereof and the Confirmation Order.

## ARTICLE XCI

## RETENTION OF JURISDICTION

91.1 **Retention of Jurisdiction**: The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b)      to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)      to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought thereafter;

(e)      to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan or orders entered by the Title III Court;

(f)      to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Cases and (b) the Plan, the Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan,

(g)      to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)      to approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections

165

945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     to adjudicate, decide or resolve any matters relating to the Debtors' compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)     to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)     to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order, including, without limitation, the provisions of Section 92.2 and 92.3 hereof;

(l)     to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New GO Bonds and the CVIs, and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

(o)     to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee's appointees to the Avoidance Actions Trust Board in connection with the settlement of Claims in accordance with the provisions of Section 82.1(b) of the Plan;

(p)     to enforce and clarify any orders previously entered by the Title III Court in the Title III Cases; and

(q)     to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XCII

## MISCELLANEOUS PROVISIONS

92.1     **Title to Assets**:  Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in

Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

92.2    **Discharge and Release of Claims and Causes of Action:**

(a)    Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.  Upon the Effective Date, the Debtors and Reorganized Debtors shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained herein or in the Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)    Except as expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective

167

Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the Effective Date, and in consideration for the value provided under the Plan, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property and all such Claims.

(c)    Notwithstanding any other provisions of this Section 92.2, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 92.2.

(d)    <u>SEC Limitation</u>.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)    <u>United States Limitation</u>.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtors or the Reorganized Debtors, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized Debtors' obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor.  Without limiting the foregoing, nothing contained herein or in the Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the
IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any
relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28
U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

        (f)      <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the
Confirmation Order to the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of
the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the
Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is
intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin,
release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without
limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims,
causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims,
defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any
rights to allocate responsibility or liability or any other basis for the reduction of (or credit against)
any judgment in connection with the Underwriter Actions (collectively, the "<u>Defensive Rights</u>");
<u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any Defensive Rights be used
to obtain or result in the affirmative payment of money or the affirmative delivery of property to
any plaintiff, defendant and, to the extent named, third party defendant by any of the Debtors, the
Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth
in connection with an Underwriter Action; and <u>provided</u>, <u>further</u>, that, no party in the Underwriter
Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party
defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any
Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that
otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or the
Confirmation Order; and/or (ii) against the Debtors, the Reorganized Debtors, PREPA, HTA, or
any other agency or instrumentality of the Commonwealth any Claims or counterclaims for
purposes of obtaining an affirmative monetary recovery, including, without limitation, for
indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for
purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be
deemed disallowed, barred, released and discharged in accordance with the terms and provisions of
the Plan and the Confirmation Order; and <u>provided</u>, <u>further</u>, that nothing herein or in the
Confirmation Order is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or
limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights
for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any
Underwriter Action.  The parties in the Underwriter Actions shall be permanently barred, enjoined
and restrained from commencing, prosecuting, or asserting, against the Debtors, the Reorganized
Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth any Claims
or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without
limitation, indemnification, contribution, reimbursement, setoff or similar theories, to the extent
asserted for purposes of obtaining an affirmative monetary recovery based upon, arising from or
related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted
in a court, an arbitration, an administrative agency or forum or in any other manner.

92.3    **Injunction on Claims**:  Except as otherwise expressly provided in the Plan, the
Confirmation Order or such other Final Order of the Title III Court that is applicable, all Entities
who have held, hold or in the future hold Claims or any other debt or liability that is discharged or
released pursuant to Section 92.2 hereof or who have held, hold or in the future hold Claims or any
other debt or liability discharged or released pursuant to Section 92.2 of the Plan are permanently
enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or
indirectly, in any manner, any action or other proceeding (including, without limitation, any
judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt
or liability that is discharged pursuant to the Plan against any of the Released Parties or any of
their respective assets or property, (b) the enforcement, attachment, collection or recovery by any
manner or means of any judgment, award, decree or order against any of the Released Parties or
any of their respective assets or property on account of any Claim or other debt or liability that is
discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind
against any of the Released Parties or any of their respective assets or property on account of any
Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent
provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or
pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or
recoupment of any kind against any obligation due from any of the Released Parties or any of their
respective assets or property, with respect to any such Claim or other debt or liability that is
discharged pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the
Released Parties and their respective assets and property.  Notwithstanding the foregoing, without
prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order,
nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be
a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective
Related Persons by Creditors of Debtors.

92.4    **Integral to Plan**:  Each of the discharge, injunction, exculpation and release
provisions provided in this Article XCII is an integral part of the Plan and is essential to its
implementation.  Each of the Released Parties shall have the right to independently seek the
enforcement of the discharge, injunction and release provisions set forth in this Article XCII.

92.5    **Releases by the Debtors and Reorganized Debtors**:  Except as otherwise
expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and
valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and
each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and
hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and
discharge the Released Parties from any and all Claims or Causes of Action that the Debtors,
Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them,
on their behalf or for their benefit, have or may have or claim to have, now or in the future, against
any Released Party that are Released Claims.

92.6    **Injunction Related to Releases**:  As of the Effective Date, all Entities that hold,
have held, or in the future hold a Released Claim that is released pursuant to Section 92.2 of the
Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred
and enjoined from taking any of the following actions, whether directly or indirectly, derivatively
or otherwise, on account of or based on the subject matter of such discharged Released Claims:

(i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 92.5 hereof; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of the Confirmation Order: the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended.

92.7    **Exculpation:**

(a)    **Government Parties**:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in the foregoing provisions of this Section 92.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)    **PSA Creditors**:  Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document

provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)     **Retiree Committee:**  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     **Creditors' Committee:**  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)     **AFSCME:**  AFSCME, solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date, and each of its respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the

172

Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing provisions of this Section 92.7(e) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f) **Monoline Insurers:** Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable).

92.8 **Appointments Related Litigation/Uniformity Litigation**: Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and the Confirmation Order, including, without limitation, the releases, exculpations and injunctions provided pursuant to Article XCII of the Plan; provided, however, that, to the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement or the ERS Stipulation, within five (5) Business Days of the Effective Date, such plaintiff shall take any and all actions to dismiss, with prejudice, or, in the event other plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

92.9 **Bar Order**: To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted); provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.10 **No Waiver**: Notwithstanding anything to the contrary contained in Sections 92.5 and 92.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors, the PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

92.11 **Supplemental Injunction**: Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

174

(b)    Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)    Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)    Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.12    **Post-Effective Date Fees and Expenses**:  From and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized Debtors related to implementation and consummation of the Plan without further approval from the Title III Court.  Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

92.13    **Securities Act Exemption**:  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds and the CVIs pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

92.14    **Severability**:  Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the Committee Agreement, and Section 3.7 hereof, if, prior to the Confirmation Date, (a) any term or provision of the Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the Plan, including, without limitation, to remove a Debtor (other than the Commonwealth and PBA) from the treatments set forth in the Plan, the Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

92.15    **Governing Law**:  Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

92.16    **Closing Case**:  The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XCI of the Plan.

92.17    **Section Headings**:  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

92.18    **Inconsistencies**:  To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

92.19    **Document Retention**:  From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors.

92.20    **Immediate Binding Effect**:  Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the

Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

92.21     **Additional Documents**: On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

92.22     **Reservation of Rights**: Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

92.23     **Successors and Assigns**: Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

92.24     **Notices**: All notices, requests to, demands or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, the Debtors or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:     Financial Oversight and Management Board for Puerto Rico
                                   268 Muñoz Rivera Ave, Suite 1107

San Juan, PR 00918-1813
Attn: Natalie A. Jaresko, Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
     Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

If to the Debtors, to:               The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Office of the Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
       Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

– and –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
       Peter Friedman, Esq.
       Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

Case:17-03283-LTS Doc#:20533 Filed:03/15/22 Entered:03/15/22 21:45:04 Desc: Main
Exhibit A en Plan Page 391 of 475

If to AAFAF, to:               Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

– with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
Peter Friedman, Esq.
Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

92.25    **Term of Injunctions or Stays**: Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

92.26    **Entire Agreement**: Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

92.27    **Plan Supplement**: All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://cases.primeclerk.com/ puertorico/ or the Title III Court's website, available via PACER. Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New GO Bonds Indenture or the CVI Indenture, to the extent that any provisions of the Plan are inconsistent with the New GO Bonds Indenture or the CVI Indenture, the New GO Bonds Indenture or the CVI Indenture, as the case may be, shall control.

Dated: San Juan, Puerto Rico
January 14, 2021

THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
　　Name: Natalie A. Jaresko
　　Title: Executive Director

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
　　Name: Natalie A. Jaresko
　　Title: Executive Director

PUERTO RICO PUBLIC BUILDINGS AUTHORITY, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
　　Name: Natalie A. Jaresko
　　Title: Executive Director

181

# EXHIBIT A

SCHEDULE OF AVOIDANCE ACTIONS

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| ALEJANDRO ESTRADA MAISONET | Adversary | 19-00059 |
| AMBASSADOR VETERANS SERVICES OF PR LLC | Adversary | 19-00048 |
| APEX GENERAL CONTRACTORS | Adversary | 19-00062 |
| BIO NUCLEAR OF P R INC | Adversary | 19-00091 |
| BRISTOL /MYERS SQUIBB P R INC | Adversary | 19-00042 |
| CARIBBEAN EDUCATIONAL SERVICES INC | Adversary | 19-00098 |
| CARIBE GROLIER INC | Adversary | 19-00051 |
| CCHPR HOSPITALITY, INC | Adversary | 19-00116 |
| CENTRO DE DESARROLLO ACADEMICO INC. | Adversary | 19-00053 |
| CITIBANK N A | Adversary | 19-00265 |
| CLINICA DE TERAPIAS PEDIATRICA | Adversary | 19-00054 |
| COMMUNITY CORNESTONE OF P R | Adversary | 19-00043 |
| COMPUTER LEARNING CENTERS, INC. | Adversary | 19-00055 |
| COMPUTER NETWORK SYSTEMS CORP | Adversary | 19-00150 |
| Core Laboratories N.V. d/b/a Saybolt | Adversary | 19-00381 |
| CREATIVE EDUCATIONAL & PSYCHOLOGICAL SER | Adversary | 19-00152 |
| DIDACTICOS, INC. | Adversary | 19-00161 |
| DISTRIBUIDORA LEBRON | Adversary | 19-00167 |
| Ecolift Corp. | Adversary | 19-00172 |
| EDWIN CARDONA & ASOC | Adversary | 19-00056 |
| EMPRESAS ARR INC | Adversary | 19-00084 |
| ENTERPRISE SERVICES CARIBE LLC | Adversary | 19-00060 |
| EVERTEC INC | Adversary | 19-00044 |
| EXPLORA CENTRO ACADEMICO Y TERAPEUTICO | Adversary | 19-00143 |
| FACSIMILE PAPER CONNECTION CORP | Adversary | 19-00092 |
| FAST ENTERPRISES LLC | Adversary | 19-00266 |
| FIRST HOSPITAL PANAMERICANO | Adversary | 19-00093 |
| FP+1,LLC | Adversary | 19-00148 |
| GF SOLUTIONS, INC. | Adversary | 19-00063 |
| GIRARD MANUFACTURING INC DBA/BANCO DE | Adversary | 19-00103 |
| GM SECURITY TECHNOLOGIES | Adversary | 19-00273 |
| GREAT EDUCATIONAL SERVICE, CORP. | Adversary | 19-00277 |
| GUIMERFE INC | Adversary | 19-00182 |
| HEWLETT PACKARD PR BV | Adversary | 19-00183 |
| HOSPIRA | Adversary | 19-00186 |
| I.D.E.A. INC. | Adversary | 19-00268 |
| INSTITUCION EDUCATIVA NETS, LLC | Adversary | 19-00067 |
| INTERNATIONAL SURVEILLANCE SERV CORP | Adversary | 19-00202 |
| INTERVOICE COMMUNICATIONS OF PR INC | Adversary | 19-00068 |
| JOSE SANTIAGO INC | Adversary | 19-00075 |
| JUNIOR BUS LINE, INC. | Adversary | 19-00229 |

A-2

| L.L.A.C., INC. | Adversary | 19-00122 |
|---|---|---|
| LAW OFFICES WOLF POPPER, INC | Adversary | 19-00236 |
| MACAM S.E. | Adversary | 19-00255 |
| MANAGEMENT, CONSULTANT & COMPUTER SERV | Adversary | 19-00081 |
| MANPOWER | Adversary | 19-00088 |
| MERCK SHARP & DOHME | Adversary | 19-00276 |

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| MICHICA INTERNATIONAL CO INC | Adversary | 19-00238 |
| MICROSOFT CORPORATION | Adversary | 19-00290 |
| N. HARRIS COMPUTER CORPORATION | Adversary | 19-00102 |
| NATIONAL COPIER | Adversary | 19-00251 |
| NELSON D. ROSARIO GARCIA | Adversary | 19-00125 |
| NETWAVE EQUIPMENT CORP | Adversary | 19-00253 |
| NEXT LEVEL LEARNING, INC | Adversary | 19-00129 |
| ORACLE CARIBBEAN INC | Adversary | 19-00112 |
| PCPS - Professional Consulting Psychoeducational Services, LLC | Adversary | 19-00188 |
| PERFECT CLEANING SERVICES INC | Adversary | 19-00249 |
| POSTAGE BY PHONE RESERVE ACCOUNT | Adversary | 19-00181 |
| PROSPERO TIRE EXPORT INC | Adversary | 19-00196 |
| Puerto Nuevo Security Guard | Adversary | 19-00384 |
| PUERTO RICO SUPPLIES GROUP INC | Adversary | 19-00199 |
| PUERTO RICO TELEPHONE COMPANY | Adversary | 19-00127 |
| QUEST DIAGNOSTICS | Adversary | 19-00440 |
| Ready & Responsible Security, Inc | Adversary | 19-00387 |
| REYES CONTRACTOR GROUP | Adversary | 19-00220 |
| RICARDO ESTRADA MAISONET | Adversary | 19-00227 |
| ROCK SOLID TECHNOLOGIES INC | Adversary | 19-00230 |
| ROCKET LEARNING INC | Adversary | 19-00232 |
| ROCKET TEACHER TRAINING | Adversary | 19-00235 |
| RODRIGUEZ PARISSI VAZQUEZ & CO PCS | Adversary | 19-00155 |
| ROSSO GROUP INC | Adversary | 19-00239 |
| S H V P MOTOR CORP | Adversary | 19-00134 |
| SEGUROS COLON INC | Adversary | 19-00130 |
| SESCO TECHNOLOGY SOLUTIONS LLC | Adversary | 19-00162 |
| ST. JAMES SECURITY SERVICES, INC. | Adversary | 19-00145 |
| TACTICAL EQUIPMENT CONSULTANTS INC | Adversary | 19-00222 |
| TALLER DESARROLLO INFANTIL CHIQUIRIMUNDI | Adversary | 19-00049 |
| Total Petroleum Puerto Rico Corp. | Adversary | 19-00114 |
| TRANSPORTES SONNEL INC | Adversary | 19-00149 |
| TRINITY METAL ROOF AND STEEL STRUC CO | Adversary | 19-00187 |
| TRUENORTH CORP | Adversary | 19-00160 |
| WF COMPUTER SERVICES | Adversary | 19-00200 |
| XEROX CORPORATION | Adversary | 19-00218 |

## EXHIBIT B

SCHEDULE OF AFFIRMATIVE RECOVERY ACTIONS

Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court

**EXHIBIT C**

SCHEDULE OF INVALIDITY ACTIONS

## Invalidity Actions

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

# EXHIBIT D

SCHEDULE OF LIEN CHALLENGE ACTIONS

**Lien Challenge Actions**

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd.</u>, Adv. Proc. No. 19-00291

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon</u>, Adv. Proc. No. 19-00292

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta</u>, Adv. Proc. No. 19-00293

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez</u>, Adv. Proc. No. 19-00294

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso</u>, Adv. Proc. No. 19-00295

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman</u>, Adv. Proc. No. 19-00296

<u>The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt.</u>, Adv. Proc. No. 19-00297

## **EXHIBIT E**

MODIFICATIONS TO JRS PENSION BENEFITS

## MODIFICATIONS FOR JRS CLAIMS

The following is a summary of modifications with respect to outstanding benefits of the Judiciary Retirement System for the Commonwealth of Puerto Rico ("JRS") as it applies to judges serving without a fixed tenure. The modifications listed herein modify the benefits provided by JRS as established in Act 12-2954 and all subsequent amendments through the Plan Effective Date and are to be adhered to in the administration of JRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

JRS members hired (a) prior to July 1, 2014 are currently accruing benefits under a defined benefit ("DB") formula and (b) on or after July 1, 2014 are currently accruing benefits pursuant to an alternative DB formula and paired with a hybrid formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the JRS plan benefit accrual shall be modified. In doing so, JRS members will retain the benefits they have accrued up to and including the Effective Date, as defined in the Plan; provided, however, that any future cost of living adjustments are eliminated pursuant to the Plan, as any right to such future adjustments is not an accrued benefit and will not be an accrued benefit as of the Effective Date. Benefits accrued from and after the Effective Date shall be based on contributions and earnings in new segregated DC retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
| --- | --- |
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of JRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Freeze Date** | The Effective Date. |
| **Retirement Benefit** | The amount of benefit payable to a JRS member each month. |
| **Creditable Service** | For purposes of calculating Creditable Service, the years and months (where fractional months are counted as full months of service) begin on the Credit Date. Years and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| **Credit Date** | The Credit Date for JRS members hired on or after July 1, 2014, is the date of appointment as a judge, and for all other JRS members shall be the date first employed by the Government of Puerto Rico (provided that |

E-2

| Definitions | |
|---|---|
| | accumulated contributions for prior government service are transferred to the Pension System). |
| **Highest Salary** | The highest salary received as a judge. Compensation earned after the effective date of the freeze will not be considered. (Applicable for JRS members hired prior to July 1, 2014) |
| **Average Compensation** | The average of the last sixty (60) months of salary that a JRS member has received for Creditable Service. (Applicable for JRS members hired on or after July 1, 2014) |
| **Hybrid Account** | The notional individual account established for each new JRS member on or after July 1, 2014. Such accounts shall be credited with JRS member contributions and interest through the Freeze Date. |
| **Defined Contribution Account** | New accounts to be credited with JRS member contributions and interest in conjunction with the Act 106-2017 defined contribution ("DC") plan, to be established effective as of the Effective Date for JRS members, in connection with the freeze of the JRS pension. |
| **Basic Retirement Eligibility Age** | Age at which the JRS member attains age sixty (60) and ten (10) years of Creditable Service. (Applicable for JRS members hired prior to July 1, 2014) |
| **Optional Retirement Eligibility Age** | For judges with at least eight (8) years of Creditable Service as a judge, the attainment of either:<br><br>a.      Thirty (30) years of total Creditable Service, or<br><br>b.      Age fifty-five (55) with eighty-two (82) combined years of age plus Creditable Service ("Points")<br><br>(Applicable for JRS members hired prior to July 1, 2014) |

| Timing | |
|---|---|
| **Pension Freeze** | JRS pension benefit accrual freeze becomes effective as of the Effective Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

E-3

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefits frozen as of Freeze Date. New DC account balances shall be funded with employee contributions to be established in connection with the freeze. The minimum employee contribution shall be eight and one-half percent (8.5%), as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Retirement Eligibility Enhancement If Within Six (6) Months of Unreduced Retirement Eligibility** | For JRS members hired prior to July 1, 2014, if not already eligible for retirement as of the freeze, JRS members hired prior to July 1, 2014 will be permitted to grow into eligibility for retirement provided the JRS member reaches any of the following within six (6) months of the Freeze Date:<br><br>a.     Basic Retirement Eligibility Age,<br>b.     Optional Retirement Eligibility Age, or<br>c.     Attainment of 20 years of creditable service |
| **Delay in Retirement Eligibility for All Others** | For individuals hired prior to July 1, 2014 who do not meet the criteria listed above, retirement eligibility is delayed up to three (3) years. Retirement is also delayed for terminated JRS members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Cost-of-Living Adjustment (COLA)** | The statutory three percent (3%) COLA which has been granted every three (3) years since 2002 will be eliminated for all JRS members effective as of the Freeze Date. |
| **Freezing of Certain Bonuses** | Christmas, Summer and Medicine bonus will no longer be paid to JRS members who retire after the Freeze Date. Further, the Medical Insurance Plan contribution will also be eliminated for retirements taken after the Freeze Date. |
| **Elimination of Enhanced Disability Benefits** | JRS members terminating due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated JRS members. |
| **Elimination of Occupational and One Year of Salary Death Benefits for** | Terminations due to death would be eligible for a refund of accumulated contributions. |

E-4

| Provisions of the Modification | |
|---|---|
| **Future in-Service Deaths** | |
| **Elimination of Free Post-Retirement Death Benefit** | The normal form of payment for annuity benefit provided for future retirements will be a single life annuity. JRS members will be able to elect a joint and survivor benefit that will be the actuarial equivalent benefit to the normal form of payment. |

| More detailed provisions of the Modifications | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to July 1, 2014** | A. JRS members who are eligible to retire prior to the Freeze Date will continue to be eligible to retire at any time. <br><br> B. JRS members who would attain either any of the following on or prior to the date that is six (6) months following the Freeze Date had service continued to accrue past the Freeze Date will continue to be eligible to retire at any time: <br><br> a. Basic Retirement Eligibility Age <br> b. Optional Retirement Eligibility Age <br> c. Attainment of 20 years of Creditable Service <br><br> C. JRS members who are not eligible to retire as of the Freeze Date and will not meet the criterion listed in B. above as of six (6) months after the Freeze Date will be eligible to retire upon the date the JRS member would have attained ten (10) years of Creditable Service had the freeze not occurred and reaching the ages shown in the following table: |

| Attained Age as of the Freeze Date | Retirement Eligibility Age Six Months After the Freeze Date |
|---|---|
| 57 and up | 61 |
| 56 | 62 |
| 55 or under | 63 |

| **Specific Implications on Retirement Benefit if Hired Prior to July 1, 2014** | **Retirements on or before the date that is six (6) months following the Freeze Date:** <br><br> A. If a JRS member attains the Optional Retirement Eligibility Age, the benefit payable will be equal to seventy-five percent (75%) of Highest Salary (sixty percent (60%) of Highest Salary if hired after December 24, 2013). <br><br> B. If a JRS member attains the Basic Retirement Eligibility Age, but has not yet attained the Optional Retirement Eligibility Age, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five |
|---|---|

E-5

| **More detailed provisions of the Modifications** |
| --- |

percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.     If a JRS member has attained age seventy (70) with fewer than ten (10) years of Creditable Service at retirement, the benefit payable is twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10).

D.     If a JRS member has attained at least twenty (20) years of Creditable Service, but has not attained either the Basic Retirement Eligibility Age or the Optional Retirement Eligibility Age, the benefit payable is twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary sixty percent (60%) of highest salary if hired after December 24, 2013), actuarially reduced to current retirement age from the earlier of the date the JRS member would have attained either age sixty (60) or the Optional Retirement Eligibility age based on their service at retirement.

**Retirements after Six Months After the Freeze Date:**

A.     If a JRS member has attained Optional Retirement Eligibility as of the Freeze Date (or would have attained Optional Retirement Eligibility by the date that is six (6) months after the Freeze Date), the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

B.     If a JRS member has attained Basic Retirement Eligibility as of the Freeze Date (or would have attained Basic Retirement Eligibility as of the six (6) month anniversary of the Freeze Date), the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.     If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from the earlier of the date the JRS member would have attained

| More detailed provisions of the Modifications | |
|---|---|
| | either age sixty (60) and the Optional Retirement Eligibility Age based on their service as of the Freeze Date. <br><br> D.      If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has not attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from age sixty (60). <br><br> E.      If a JRS member has attained at least ten (10) years of Creditable Service as of the Freeze Date and would not have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013). <br><br> F.      If a JRS member has not attained at least ten (10) years of Creditable Service at the Freeze Date, and retires after the date the participant would have earned ten (10) years of service had the freeze not occurred the benefit payable equals twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10). |
| **Specific Implications on Retirement Eligibility Age if Hired on or After July 1, 2014** | A.      JRS members that are eligible to retire or would have been eligible to retire prior to the date six (6) months after the Freeze Date will remain eligible to retire at any time. Current eligibility is attainment of age fifty-five (55) with twelve (12) years of Creditable Service. <br><br> B.      JRS members who would not meet retirement eligibility by the date six (6) months after the Freeze Date will become retirement eligible upon attainment of age sixty-five (65) with twelve (12) years of Creditable Service. |
| **Specific Implications on Retirement Benefit Amount if Hired on or After July 1, 2014** | A.      JRS members will continue to receive a benefit of one and one-half percent (1.5%) of Average Compensation plus the annuitized value of the balance of the Hybrid Account at the time of retirement. <br><br> B.      JRS members who would have attained retirement eligibility prior to the date six (6) months after the Freeze Date and who have not yet attained age sixty (60) will receive a benefit of one and one-half |

| More detailed provisions of the Modifications | |
|---|---|
| | percent (1.5%) of Average Compensation reduced by 1/180 for each of the first sixty months (60) months and by 1/360 for each of the next sixty (60) months by which the retirement date precedes age sixty-five (65), plus the annuitized value of the Hybrid Account. |
| **Implications for Judges serving without fixed tenure and appointed prior to June 28, 2007** | Judges serving without a fixed tenure and appointed prior to June 28, 2007 will receive the benefit they had accrued as of the Freeze Date, calculated based on the Creditable Service and Salary earned prior to the Plan Effective Date and otherwise under the provisions in effect prior to the Freeze Date. As these judges have been identified as having been eligible for retirement and are fully accrued in their plan benefit as of the Freeze Date, the only limitation will be that the Salary used for calculating the benefit will be limited to those earnings prior to the Plan Effective Date. |
| **Social Security** | The Oversight Board and the Government will take appropriate actions to provide that all members hired after the Freeze Date and all judges under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current judges 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security.<br><br>Elections by current judges 45 and older to enroll must be completed within the sixty (60) days after the Effective Date. By default, current judges age 45 or older will be assumed to have opted out of Social Security coverage.<br><br>For JRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

**EXHIBIT F-1**

MODIFICATIONS TO TRS PENSION BENEFITS
(WITHOUT AMPR PSA)

## MODIFICATIONS FOR FREEZE OF TRS BENEFIT OBLIGATIONS[1]

The following is a summary of modifications with respect to a freeze of pension benefits accrued under the TRS. The modifications listed herein modify the benefits provided by TRS as established in Act 218-1951 and all subsequent amendments through the Plan Effective Date (including but not limited to Act 91-2004, Act 160-2013, and Act 106-2017) and are to be adhered to in the administration of TRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual shall be frozen as of the Effective Date of the Plan (the "Freeze Date") Such freeze shall apply to all members of TRS, regardless of title or job classification. TRS members will retain the benefits they have accrued to date, provided that any future cost of living adjustments, which are not accrued benefits and will not be accrued benefits as of the Effective Date, shall be eliminated as of the Effective Date. Future benefits shall be based on contributions and earnings in new segregated defined contribution ("DC") retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of TRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement Benefit** | The amount of benefit payable to a member each month. |
| **Creditable Service** | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, fifteen (15) calendar days of a school year month shall be equal to one (1) calendar month worked during the school year for teachers; and twenty-one (21) calendar days of a month shall be equal to one (1) calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |

---

[1] Milliman actuarial valuation report as of June 30, 2017, using July 1, 2016, Census data collection, which is the latest dataset currently available. If a new dataset from 2017 or 2018 becomes available, the values will be updated accordingly.

| Definitions | |
|---|---|
| **Average Compensation** | The average of the thirty-six (36) highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| **Defined Contribution Account** | New accounts to be established as soon as administratively feasible and effective after the Freeze Date for members hired prior to August 1, 2014, in connection with the freeze of the DB formula. |

| Timing | |
|---|---|
| **Pension Freeze** | TRS pension benefit accrual freeze shall become effective on the Freeze Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefit frozen as of Freeze Date, as noted below. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution shall be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Delay in Retirement Eligibility for Members not yet Eligible** | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, retirement eligibility is delayed three (3) years. Retirement is also delayed for terminated members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Minimum Benefit** | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| **Elimination of Service Purchase** | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| Provisions of the Modification | |
| --- | --- |
| **Elimination of Enhanced Disability Benefits** | Active members hired prior to August 1, 2014 who terminate employment due to disability have been able to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8% of Average Compensation per year of Creditable Service. Terminations due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated participants (i.e., deferred retirement benefits without enhancement). |
| **Suspension of Benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined Contribution Transfer from Prior Plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be subject to the provisions of the Act 106 DC plan regarding the to transfer these amounts to their DC Account.. |

| More Detailed Provisions of the Modification | |
| --- | --- |
| **Specific Implications on Retirement Eligibility Age if Hired Prior to August 1, 2014** | A.       Members who meet the following age and service combinations prior to the Freeze Date, will continue to be eligible to retire at any time:<br><br>a.       At least age 60 with at least ten (10) years of Creditable Service<br>b.       At least age 47 with at least twenty-five (25) years of Creditable Service<br><br>B.       Members who are not eligible to retire as of the Freeze Date, will be eligible to retire upon attaining ten (10) years of Creditable Service and reaching the age 63. |
| **Specific Implications on Retirement Benefit if Hired Prior to August 1, 2014** | **Retirements on or after the Freeze Date:**<br><br>Minimum benefits will no longer apply to future retirees.<br><br>The freeze also eliminates accelerated payment of benefits due to future disabilities and the ability to purchase additional service.<br><br>A.       If a member is at least age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals seventy-five percent (75%) of Average Compensation as of the Freeze Date. |

| **More Detailed Provisions of the Modification** |
|---|

| | B.     If a member is under age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals sixty-five percent (65%) of Average Compensation as of the Freeze Date. |
|---|---|
| | C.     If a member is at least age 50 as of the Freeze Date and does not attain at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |
| | D.     If a member is under age 50 as of the Freeze Date and does not attain at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals ninety-five percent (95%) of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

| **Miscellaneous** |
|---|

| | |
|---|---|
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all members hired after the Freeze Date and all teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security within sixty (60) days of the Effective Date all members who are eligible to accrue Social Security credits; those members age 45 and older may choose whether to enroll.

Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have opted out of Social Security coverage.

For TRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

**EXHIBIT F-2**

**SUMMARY OF SUPPLEMENTAL MODIFICATIONS TO TRS PENSION BENEFITS AND COLLECTIVE BARGANING AGREEMENT WITH AMPR PSA**

**APPENDIX I**

**MODIFICATIONS TO AFT COLLECTIVE BARGAINING AGREEMENTS**

The following is a summary of material terms included in the new collective bargaining agreement (the "AFT Operative CBA") between AFT and the Commonwealth. For the duration of the AFT Operative CBA, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express written agreement of AFT, AMPR and AMPR-LS. Nothing contained herein shall prohibit changes to the AFT Operative CBA by mutual written agreement of the unions, the FOMB, and the Department.

| Definitions | |
|---|---|
| Administration | The management for the division (agency/grouping) in which the employee is assigned. |
| Department | The division (agency/grouping) in which the employee is assigned (Department of Education). |
| Union Affiliates | ▪ American Federation of Teachers ("AFT"),<br>▪ Asociacion de Maestros de Puerto Rico ("AMPR"),<br>▪ Asociacion de Maestros de Puerto Rico -Local Sindical ("AMPR-LS") |

| Timing | |
|---|---|
| Terms | Five (5) year CBA effective as of the effective date of the Commonwealth Plan. AFT Operative CBA start date will be retroactive to the beginning (i.e. July 1) of the Commonwealth Fiscal Year in which the POA becomes effective. Final version of the AFT Operative CBA will be attached to the contemplated plan support agreement among AFT, AMPR, AMPR-LS, and the Oversight Board.. |
| Implementation | Commonwealth Plan of Adjustment |

| More Detailed Provisions of the Proposal | |
|---|---|
| Healthcare plan / Medical services | The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, including transitory employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |

F-6

| More Detailed Provisions of the Proposal | |
|---|---|
| Sick leave | **Section 1** When a member of the Appropriate Unit covered by the Operative CBA is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished. |
| | **Section 2** |
| | A. **Leave for Parents with Children with Physical and / or Mental Disabilities.** In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him as a person with disabilities. |
| | They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it. |
| | B. **Leave for Elderly Persons.** In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person evidencing that he / she is sixty (60) years or more. They must comply with Section 3's provisions. |
| | **Section 3** The Administration shall authorize the father or mother of children with disabilities to stay with them when they are hospitalized. The father or mother must submit evidence of the hospitalization and the duration of the hospitalization. The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave. So that the licenses are not affected in a dangerous manner, the member of the Appropriate Unit that requests |

| **More Detailed Provisions of the Proposal** | |
|---|---|
| | this special license must leave accrue fifteen (15) or more days due to illness. |
| **Additional Language for Holidays, Sick and Vacation Leaves** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement, except that Union members shall retain Funeral Leave and Teachers' Day as provided in the existing CBA. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | To comply with the Fiscal Plan in force and during the term of this Agreement, employees shall be entitled to those bonuses that are provided for in the certified Budget for the Commonwealth or otherwise lawfully granted by the Administration. |
| **Institutional representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of 4 individual members, appointed by the Union to represent labor.<br><br>**Section 2** The members may be appointed for terms of 12 months, and may be reappointed by the Union.<br><br>**Section 3** The members will meet with representatives of the Department management three (3) times a year to discuss and share perspectives on Department status, actions and proposed future plans, to include school closures, restructuring actions and future identification and development of new schools and transition plans.<br><br>**Section 4** For the avoidance of doubt, these three (3) meetings a year with the Department are not a substitution for collective bargaining.<br><br>**Section 5** The members will meet with representatives of the Financial Oversight and Management Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget.<br><br>**Section 6** The three (3) meetings with the Department and annual meeting with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |

| More Detailed Provisions of the Proposal | |
|---|---|
| | |
| **Medicare** | The oversight board and the government will take appropriate actions with the social security administration to facilitate access and enrollment into Medicare for those members who are eligible. |
| **Dues Deduction, Charges** | **Section 1** The Department shall inform new employees of the right conferred by Act No. 45-1998 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45-1998, as amended. The Administration shall not discourage union membership

**Section 2** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.

**Section 3** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.

**Section 4** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund as soon as it is required. If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |
| **Improvement of terms** | If the Commonwealth government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45, and such more beneficial economic terms are lawfully implemented, expressly including but not limited to more beneficial pension terms or benefits, such more beneficial economic terms shall be provided to AFT, AMPR, and AMPR-LS bargaining unit employees. |

**APPENDIX II**

## PROPOSED TERMS FOR TRS SYSTEM BENEFITS

This is a summary of proposed indicative terms for a freeze of the outstanding benefits of the Teachers Retirement System for the Commonwealth of Puerto Rico ("TRS").

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual will be frozen upon the six (6) month anniversary of the Effective Date of the Plan of Adjustment (the "Freeze Date")

| Definitions | |
|---|---|
| Pension System | The terms of this document and references to Pension System pertain to the freeze of pension obligations of the Teachers Retirement System (TRS). |
| Eligibility for Membership | This applies to all active participants of TRS ("Member" or "Members"), regardless of title or job classification. Members will retain the benefits they have accrued to date, subject to the benefit reduction formula. |
| Retirement eligibility age | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| Retirement benefit | The Retirement Benefit is the amount of benefit payable to a member each month. |
| Creditable service | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, 15 calendar days of a school year month shall be equal to 1 calendar month worked during the school year for teachers; and 21 calendar days of a month shall be equal to 1 calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| Average compensation | The average of the 36 highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| Defined contribution account | The individual account established under Act 106-2017 for each new member hired on or after August 1, 2014. These accounts have been credited with member contributions to the prior hybrid benefit plan in which they were enrolled, with interest. New accounts will be established for members hired prior to August 1, 2014, in connection with the freeze of the DB formula, and in accordance with the provisions of Appendix IV. |

F-11

| Timing | |
|---|---|
| **Pension freeze** | TRS pension benefit accrual freeze becomes effective upon the Freeze Date. |
| **Pension benefits date** | The data set used to calculate the freeze of pension benefits required is based on the July 1, 2017 dataset provided by the Pension System actuary, which is the latest dataset currently available. If a new dataset becomes available, the values will be updated accordingly. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits earned under and paid by the plan on or after the Freeze Date, also subject to the benefit reduction formula discussed in the separate benefit cut term sheet and as clarified in this document. |

| Provisions of the proposal | |
|---|---|
| **Freeze of benefit accruals and implementation of DC account** | Accrued benefit frozen as of the Freeze Date. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution will be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Maintaining retirement eligibility for individuals over age 50** | Members hired prior to August 1, 2014 who were over age 50 as of the Freeze Date, but not eligible for retirement at the Freeze Date will have the opportunity to achieve the previous milestones for retirement eligibility (i.e. age 60 with 10 years of service, age 47 with 25 years of service or 30 years of service) and then would be eligible to retire upon achieving those milestones. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service as of the Freeze Date, not inclusive of service after the freeze. |
| **Maintaining retirement eligibility for individuals under age 50 and within 3 years of retirement eligibility** | Members hired prior to August 1, 2014 who were under age 50 and within 3 years of achieving the age 47 and 25 years of service milestone for retirement eligibility will have an opportunity to achieve the milestone for retirement eligibility. Members who achieve that milestone would then be eligible to retire such that they will not be subject to any delay in retirement eligibility and corresponding early retirement benefit reduction. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date, not inclusive of service after the freeze. |

| Delay in retirement eligibility for all others | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, not within 3 years of retirement eligibility as of the Freeze Date, and were under age 50 at the Freeze Date, retirement eligibility is delayed to age 63 (or later upon completion of 10 years of service). Retirement is also delayed for terminated members that have not yet commenced.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date; however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
|---|---|
| Benefit formula upon achieving 30 years of service | Members hired prior to August 1, 2014 who had not earned 30 years of service as of the Freeze Date will be eligible to receive a modified benefit enhancement upon reaching 30 years of service regardless of the Creditable Service at the Freeze Date. The enhancement will provide members the following:<br>    a. Members age 50 and over at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0%<br>    b. Members under age 50 at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0% but will continue to be reduced by a 95% factor.<br>The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date.<br><br>Under no circumstances shall any member who is not subject to the benefit reduction formula trigger a benefit cut by virtue of achieving 30 years of service and the corresponding benefit enhancement described in this section. This provision is an explicit modification to any pension benefit reductions provisions of the Commonwealth Plan of Adjustment, as applicable. |
| Elimination of minimum benefit | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| Elimination of service purchase | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| Elimination of continued contributions under age 55 | Employee contributions that were required of pensioners under age 55 will be eliminated after the Freeze Date. |
|---|---|
| Separation from service | The Oversight Board and Government will take appropriate actions to support efforts to afford teachers with frozen defined benefits access to their defined contribution plan accounts upon early retirement or separation of service at age 55 or over under the same conditions as if distributions were taken at age 62. |
| Suspension of benefits | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| Defined contribution transfer from prior plans | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be eligible to transfer these amounts to their DC account, either as a single transfer upon enrolling in the plan or through an initial election to defer compensation through payroll, subject to tax considerations. |
| Disability benefits for DB plan participants | Active members hired prior to August 1, 2014 who terminate employment due to disability will continue to be eligible to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8 percent of Average Compensation per year of Creditable Service with both determined as of the Freeze Date. Eligibility requirements and compensation averaging periods for Occupational and Non-Occupational disabilities will also be preserved. |

**More detailed provisions of the proposal**

| Specific implications on retirement eligibility age if hired prior to August 1, 2014 | **Retirements after the Freeze Date**:<br><br>A. Members who meet the following age and service combinations as of the Freeze Date, will continue to be eligible to retire at any time and members age 50 or older as of the Freeze Date, will become eligible once they meet the following age and service combinations:<br><br>    a. At least age 60 with at least 10 years of Creditable Service<br>    b. At least age 47 with at least 25 years of Creditable Service<br>    c. At least 30 years of Creditable Service |

F-14

| | |
|---|---|
| | B. Members under age 50 as of the Freeze Date who will attain any of the age/service conditions listed below within 3 years of the Freeze Date will become eligible to retire once they meet the age/service criterion listed below:<br><br>a. At least age 47 with at least 25 years of Creditable Service<br>b. At least 30 years of Creditable Service<br><br>C. Members under age 50 as of the Freeze Date who are not eligible to retire within 3 years of the Freeze Date will be eligible to retire upon attaining 10 years of Creditable Service and reaching the age 63.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date, however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
| **Specific implications on Retirement Benefit if hired prior to August 1, 2014** | **Retirements after the Freeze Date**:<br><br>A. Minimum benefits will no longer apply to future retirees.<br><br>B. The freeze also eliminates the ability to purchase additional service.<br><br>C. If a member is at least age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 75 percent of Average Compensation as of the Freeze Date.<br><br>D. If a member is under age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 65 percent of Average Compensation as of the Freeze Date.<br><br>E. If a member is at least age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

F-15

|  | F. If a member is under age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 95 percent of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |
|  | G. If a member is at least age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
|  | H. If a member is under age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 95 percent of 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
| **Implications if hired on or after August 1, 2014** | These members have been enrolled in the new defined contribution accounts under Act 106-2017. Any balances from the prior hybrid benefit plan have been deposited in these teachers' Act 106 accounts and will not be impacted by the Pension Freeze. |
| **Miscellaneous** | |
| ***Asociacion de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de*** | Nothing in this term sheet or the Plan of Adjustment shall impact the precedential effect of this decision. |

| | |
|---|---|
| ***Puerto Rico* 190 D.P.R. 854 (2014)** | |
| **Recognition Payment** | One-time payment of $3,000 to each of the Union represented participants (expressly including Transitory Participants) to be made upon the effective date of a confirmed Plan of Adjustment for the purpose of recognizing the outstanding service of the teachers of Puerto Rico and their importance to Puerto Rico's future, and of acknowledging the challenges resulting from the freeze of the teachers' TRS defined benefit accruals.<br><br>Payable 60 days after the Effective Date of the Plan of Adjustment. |
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all teachers hired after the Freeze Date and all current teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis. Alternatively, current teachers 45 and older may choose not to be enrolled in Social Security by electing to contribute 8.5% of compensation to the defined contribution plan. Enrollment in Social Security will be effective in accordance with Appendix IV. Teachers enrolled in Social Security will contribute 2.3% of compensation to the defined contribution plan and will have elective deferrals capped so that the total contribution made to the defined contribution plan remains below 7.5%. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security all teachers who are eligible to accrue Social Security credits in accordance with Appendix IV; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have elected to contribute 8.5% to the defined contribution plan and thus opted out of Social Security coverage. |
| **Law 160** | For the avoidance of doubt, any contributions made to Law 160 accounts will not be subject to any pension benefit cut. |
| **JRS Defined Benefit Plan** | The Oversight Board will not propose a plan or enter into agreements that would impose a freeze of the TRS defined benefit plan but not of the JRS defined benefit plan. |

F-17

# APPENDIX III

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFT, AMPR and AMPR-LS Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with AMPR and AMPR member participants (expressly including participants with transitory status in the same status as other participants (the "Transitory Participants")) for each fiscal year of the AFT Operative CBA to provide participation of AMPR in sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFT, AMPR and AMPR-LS ("Union") |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | Excess Cash Surplus is defined as excess cash surplus above and beyond the projected Fiscal Plan surplus contained in the Certified Fiscal Plan in effect as of the Effective Date for the Plan of Adjustment for the Commonwealth. <br><br> If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of the AFT Operative CBA, currently targeted for implementation with the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date. |

| Provisions of the proposal | |
|---|---|
| **Upside Participation Bonus** | For the term of the AFT Operative CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants (expressly including Transitory Participants) and all rank-and-file Commonwealth employees each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus, up to a 7.5% total Defined Contribution cap in total for the year, to their Defined Contribution account; any remainder will be distributed in cash. The 7.5% cap is a requirement to ensure participants maintain continued enrollment in Social Security. |

F-20

**APPENDIX IV**
**SOCIAL SECURITY/DEFINED CONTRIBUTION PLAN IMPLEMENTATION**

Below is a summary of procedures for enrollment of teachers into Social Security and, as applicable, defined contribution accounts under Act 106-2017 (the "Defined Contribution Plan"), and enforcement thereof.

| Provisions of the proposal |
|---|

| | |
|---|---|
| **Timing of Pension Freeze** | a. The Pension Freeze will take effect six (6) months following the Effective Date of the Commonwealth Plan of Adjustment. |
| | b. The order confirming the Plan (the "Confirmation Order") will provide that the Commonwealth will fully implement enrollment in Social Security and the Defined Contribution Plan such that in the first full pay period following the Pension Freeze, the Commonwealth will withhold payroll contributions and remit said contributions to Social Security and the Defined Contribution Plan in a timely manner. |
| |   i. With respect to the Defined Contribution Plan, full implementation includes the transfer of funds in a timely manner, as described in Section (b)(iii)(1) in "Penalties for Noncompliance" below, from withholding of payroll contribution to individual accounts over which participants have investment direction rights. |
| |   ii. Failure by the Commonwealth to act in accordance with this section (b) will be deemed a violation of the provisions of the Plan and the Confirmation Order and will give rise to enforcement remedies set forth herein but will not affect the Freeze Date noted above. |
| |   iii. If timing is not met, penalties for noncompliance, as described in the next section, "Penalties for Noncompliance," will apply. |
| | c. Prior to the Freeze Date, the Commonwealth will provide notice to the Puerto Rico Social Security State Administrator and the applicable administrator of the New York Region of the Social Security Administration that teachers will no longer be covered by a qualified replacement plan as of the Pension Freeze effective date. At that time, the Commonwealth will send such parties a data file containing a list of all affected teachers who will be eligible for Social Security coverage as of the Pension Freeze effective date. |

| Penalties for Noncompliance | a. Three Groups<br>    i. Group 1 – Members who experience a delay in the withholding and remittance of their Social Security contributions<br>    ii. Group 2 – Members who experience a delay in the withholding and remittance of their Social Security contributions and suffer a loss of benefits as a result of delay upon applying for Social Security benefits. For avoidance of doubt, these are members who retire prior to full implementation of Social Security and are otherwise eligible to retire under Social Security (whether: (a) they have enough quarters of prior Social Security service without counting post-freeze service; or (b) they only have enough Social Security creditable service on account of post-freeze service .<br>    iii. Group 3 – Members who experience a delay in the withholding and remittance of defined contributions.<br>b. Remedies<br>    i. Group 1 – Members will be held harmless for the failure of the Commonwealth to contribute Social Security taxes by retroactively making contributions to Social Security on behalf of affected members to the extent necessary.<br>        1. Will include tax gross up on contributions so member earnings net of taxes is not impacted<br>    ii. Group 2 – In addition to Group 1 remedy, the Commonwealth will pay reconciliation damages to members whose actual Social Security benefits are affected in an amount to be determined as follows:<br>        1. Payment will be in the form of one-time cash damages payment<br>        2. No payment shall be less than $1,500<br>        3. Payment is based on two (2) key tiers impacting the size of lost income<br>            a. Whether or not individuals have enough quarters of prior Social Security service (i.e., with another employer) to qualify for Social Security benefits without counting post-freeze service |
|---|---|

F-22

      b. Proximity of retirement date to Freeze Date based on the assumption, for the sole purpose of calculating payments, of a 3-year assumed delay period.

      c. Schedule is as follows (single one-time payment only):

**40 or more quarters from previous employer**

|        | **Yes** | **No** |
|--------|---------|--------|
| Year 1 | $1,500  | $9,000 |
| Year 2 | $1,500  | $7,200 |
| Year 3 | $1,500  | $3,600 |

    4. Will include tax gross up on damages payment, if any, so member earnings net of taxes is not impacted

    5. One-time payments will no longer be made for any future Social Security retirements once Social Security recognizes post-freeze service for determining retirement benefits

iii. All Groups – Members will be held harmless for the failure of the Commonwealth to contribute defined contributions in a timely manner by the Commonwealth retroactively making contributions and compensatory earnings to Defined Contribution Plan on behalf of affected members.

    1. Timely manner defined as within 30 days of the payroll withholding date when funds are taken out of the employee payroll and held by employer, unless otherwise defined by Alight agreement

    2. Compensatory earnings to be calculated using the greater of 0% or the return on the T. Rowe Price Retirement Blend 2045 (Tr-B) fund.

    3. Compensatory earnings to be calculated from Freeze Date for pre-2014 hires, to the month end prior to full Defined Contribution Plan implementation.

    4. Members who are enrolled in Defined Contribution Plan prior to the Freeze Date

F-23

| | |
|---|---|
| | will not be covered under this remedy. |
| **Enforcement Incentive** | a. This Section will take effect immediately upon the Plan Effective Date.<br>b. FOMB will establish a budget appropriation under the custody of Hacienda immediately following the Plan effective date. If the Commonwealth does not fully implement either Social Security or the Defined Contribution Plan by the Freeze Date, as determined by the Funds Committee, then the appropriated funds will be segregated into a separate account at Hacienda to be administered by the Funds Committee.<br>   i. Appropriation will be held in place with initial funding until Commonwealth has withheld and remitted funds on behalf of Social Security and/or defined contribution accounts as described in (III)(d)(ii) below.<br>   ii. Social Security withholding defined as Commonwealth withholding 6.2% from teacher payroll<br>   iii. Defined contribution withholding defined as Commonwealth withholding 2.3% or 8.5% from teacher payroll, dependent on applicable plan selected by a teacher.<br>c. Hacienda will support the Funds Committee (see Section (h)(i) below) to use funds to address penalties for noncompliance and pay Group 1, Group 2, and Group 3 remedies.<br>d. Agreement will include required Appropriation level based upon meeting Social Security and defined contribution milestones. The Appropriation shall be replenished as described in section (d)(iii) below.<br>   i. The Commonwealth will make an initial appropriation of $77 million<br>   1. $77 million protects employee Social Security and defined contribution amounts for approximately 1 year ($900m payroll * 8.5% = $77m)<br>   2. Commonwealth will appropriate employer 6.2% Social Security contribution for exclusive use in PRDE budget<br>   ii. Staggered release of appropriated funds<br>   1. Upon Commonwealth withholding and transferring funds to Social Security Administration, the fund balance will be reduced to no more than $50 million ($27 million released). |

2. Upon Commonwealth withholding and transferring 95% of defined contributions to individual accounts, the fund balance will be reduced to no more than $30 million ($20 million released). When 100% of teachers are properly enrolled, the fund balance will be no more than $25 million ($5 million released).

3. A minimum amount of $25 million will be held in the segregated account for a period of two (2) years following the release of 100% of the defined contribution portion of funds or of 100% of the Social Security portion of the fund, whichever is later, for the exclusive purpose of settling outstanding noncompliance claims. Once the two (2) year period ends, the remaining balance will be released out of the segregated account.

iii. Replenishment of budget appropriation

1. For each year of delay following the Pension Freeze date in which the Commonwealth fails to fully implement Social Security and/or the Defined Contribution Plan, the Commonwealth will make an annual additional appropriation to maintain a balance of $77m (as modified by (3)(d)(ii) above) in the segregated account.

2. The appropriation shall not affect funding levels available to the Department of Education or any other program for targeted for public education or students.

e. In addition to appropriation, FOMB will use the Confirmation Order, Fiscal Plan and all legal actions available to reasonably enforce timely implementation of both Social Security and Defined Contribution accounts for members. In addition, all parties in interest, including AMPR/AFT, retain their rights to seek enforcement of the timely implementation of both Social Security and the Defined Contribution accounts whether by seeking enforcement of the provisions of the Confirmation Order and/or by exercising any other available legal remedies.

f. Commonwealth will also face federal liability to the extent the new Defined Contribution plan is not a qualified retirement replacement plan and Social Security is not implemented.

g. The Commonwealth/FOMB will provide a monthly written report to AMPR/AFT on progress made toward implementation of Social Security and DC plan enrollment that details the status of payroll withholdings, remittances to Social Security and the DC plan, and the

funding of individual defined contribution accounts until
enrollment is fully
implemented.

h. Appropriation would be administered with support of a Funds
Committee

    i. Funds Committee will be comprised of five (5)
members to include two (2) appointees by FOMB,
two (2) appointees by AMPR, one of which will
serve as Committee Chair, and one appointee by
AAFAF.

    ii. The Commonwealth will establish a recurring
annual budget appropriation for the Funds
Committee in the amount of $300,000 until such
time as the Commonwealth has satisfied the
conditions set forth in Section (d)(ii)(2) above.
Initial funding will be made available at the Plan
Effective Date. For the next two years after
satisfaction of the conditions set forth in Section
(d)(ii)(2) above, the Commonwealth will establish
a $150,000 annual budget for the Funds
Committee. At the end of any fiscal year, unspent
funds will carry over into the next fiscal year,
except in the second year following satisfaction of
the conditions set forth in Section (d)(ii)(2) above.

    iii. A portion of the Funds Committee appropriation
will be used to create a teacher-facing
Ombudsman with responsibility for educating
teachers about noncompliance issues and
shepherding teachers with individual claims
through the Funds Committee claims process.

    iv. Funds Committee structure to be further detailed,
with dispute resolution options

    v. Funds Committee would be charged with:

        1. Determining if the Commonwealth has fully
implemented Social Security and the Defined
Contribution Plan prior to the Freeze Date in
accordance with Section (b) of "Timing of Pension
Freeze" above.

        2. Determining when the Commonwealth has satisfied
the aforementioned conditions for the incremental
release or increase of the Enforcement Incentive
funds. The Funds Committee will be entitled to
such documentation as requested to validate
compliance, including without limitation payroll
records, defined contribution account records, and

| | | |
|---|---|---|
| | | forms submitted to Social Security/IRS. Documentation will not contain personal identifiable information. To the extent the Funds Committee requires any documentation containing personal identifiable information, the Funds Committee must obtain waivers from each individual and present those to the Commonwealth prior to receipt of personal identifiable information. |
| | | 3. Reviewing claims and approving/disallowing claims for damages |
| | | 4. Determining compensatory earnings as a result of any delay in the funding of individual Defined Contribution Plan accounts |
| | | 5. Identifying and pursuing resolution of issues and communicating same with Commonwealth, FOMB, AMPR and Social Security/defined contribution Implementation team, including an Ombudsman if appointed |
| | | vi. FOMB will use best efforts to bind Hacienda to the decisions of the Funds Committee through the Plan. |
| **Group Annuity Contracts** | The FOMB will use best efforts to require the Commonwealth to adhere to ERISA/U.S. Department of Labor fiduciary requirements when entering into any annuity contracts in the future through language in the Plan | |

**EXHIBIT G**

SUMMARY TERMS OF AFSCME COLLECTIVE BARGAINING AGREEMENT

## MODIFICATIONS TO AFSCME COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of agreed upon modifications to the collective bargaining agreements (collectively, the "<u>AFSCME CBAs</u>") between AFSCME and the Commonwealth. Provisions of existing AFSCME CBAs not in conflict with terms and conditions set forth below shall remain unchanged and remain in full force and effect in the new AFSCME CBAs. Only those AFSCME CBAs listed below shall be modified at this time[2].

| Definitions | |
| --- | --- |
| **Administration** | The management for the division (agency/grouping) in which the employee is assigned. |
| **Department** | The division (agency/grouping) in which the employee is assigned. |
| **Union Affiliates** | <ul><li>Parole Board and Local 3584 / United Public Servants</li><li>Department of Consumer Affairs and Local 3986 / United Public Servants</li><li>Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants</li><li>Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants</li><li>Department of Education and Local 3840 covering only employees within the AFSCME jurisdiction of PASO</li><li>Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants</li><li>Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants</li><li>Department of Transportation and Public Works and Local 3889 / United Public Servants</li><li>Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants</li><li>Department of the Family and Local 3227-Unit A / United Public Servants</li><li>Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants</li><li>Bureau of Forensic Sciences and Local 2099 / United Public Servants</li><li>Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants</li></ul> |

---

[2] If the Government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45 with the exception of members of the Teachers Retirement System (TRS) (or employees who would have been eligible for membership in TRS but for the adoption of Act 3-2013), and such more beneficial economic terms are lawfully implemented, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees.

| | ▪ Bureau of Transport and Other Public Services and Local 3897 / United Public Servants |
|---|---|

| Timing | |
|---|---|
| **Terms** | Five (5) year CBAs effective as of the effective date of the Commonwealth Plan. |
| **Implementation** | The Plan. |

| More detailed provisions of the proposal | |
|---|---|
| **Terminations / Layoffs** | **Section 1** In order to avoid the involuntary layoff of personnel and to give personnel adequate notice of reassignments or relocations, the Union and the Oversight Board agree to discuss modifying the regulations implementing Act 8-2017 with the Government.

**Section 2** In the event that the Administration needs to carry out downsizing of personnel (layoffs) to comply with the provisions of the approved Fiscal Plan, the parties agree to the following:

A. **Temporary Suspension.** The immediate commencement of the layoff plan will entail the automatic suspension of any clause, precept and/or provision applicable to employees and/or positions covered by this agreement, contained in laws, collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contract letters, certifications, regulations, rules and conditions of employment, regulatory letters, classification plans and/or retribution plans that conflict with this Article

The suspension of the clauses and provisions provided herein will be for a term of five (5) years, and the Administration may reduce this period after the Oversight Board certifies compliance with the objectives of the Administration and/or Department's Fiscal Plan.

B. **Reassignment and Relocation.** The Administration may implement any reassignment of positions and relocation of personnel when its budgetary interests so require to avoid layoffs. If reassignments and/or relocations are necessary and budgetary feasible, the Administration shall reassign/relocate the most qualified volunteer(s) who would otherwise be subject to layoff. If there are insufficient qualified volunteers, the least senior qualified employee will be involuntary reassigned/relocated. An employee who has been involuntarily relocated because her/his position has been eliminated may request the position she/he previously held, if the Administration creates it again within the term of two (2) years following the relocation. The employee must make the corresponding request to the |

| More detailed provisions of the proposal |
| --- |

Human Resources Division. Seniority shall be the determining criteria to the extent that the position is requested by more than one relocated employee. This provision shall establish the order of voluntary and involuntary employee reassignment, relocation and mobility but shall not be interpreted as a limitation to the Administration's right to implement mobility plans pursuant to Act 8-2017.

C.    **Layoffs.**

a.    In view of the state of fiscal emergency, the scarcity of fiscal resources, the gravity of the problems that the Administration faces, and the urgency required to correct the fiscal problems, it is exempted from exhausting measures such as retraining employees, the enjoyment of accrued vacations, the enjoyment of unpaid leave, a reduction in work hours, or demotions, prior to implementing the layoffs.

b.    The Administration will notify in the first place the termination to all employees of the appropriate unit who as of the date of effectiveness of this Agreement have a temporary or irregular appointment, so that it will not be necessary to observe, with respect to these employees, the criterion of seniority.  The notification will be made by hand delivery or by certified mail, return receipt requested, to the address that appears in the Administration's files.

c.    The layoffs of employees with permanent or career appointment will be carried out observing exclusively the criterion of seniority by occupational classification affected by the layoff and consonant with the need to ensure the continuity and quality of Administration services, so that those who have less seniority in each affected occupational classification will be laid off in the first place.

d.    In order to determine the seniority of affected employees, all of the services provided by the employees affected in the public service will be considered, regardless of the provisions of the collective bargaining agreements, regulations, circulars, and other normative documents.

e.    The Administration will notify the layoffs at least thirty (30) calendar days in advance of the date of effectiveness, through written communication addressed to the employee and to the Union, indicating the date of effectiveness thereof.

f.    The affected employee and Union may request a review of the final determination made by the Administration, only as to their seniority and

| More detailed provisions of the proposal |
|---|

| | the occupational classification, within a period no greater than thirty (30) calendar days from receipt of the notification from the Administration. |
|---|---|
| **Healthcare plan / Medical services** | **Section 1** The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |
| | **Section 2** Employees have opted for syndication and shall be entitled to have an exclusive representative negotiate on their behalf regarding all matters concerning health benefits and the contracting of a health plan. The exclusive representative shall designate a Health Plans Evaluating Committee to represent the different sectors and interests of the members. Such committee shall be responsible for the analysis and evaluation of all health plans in the market in order to select those that offer the lowest and most reasonable premiums, the best coverage and health services benefits and the best medication coverage. |
| | **Section 3** The exclusive representative shall call the members to an Assembly in which he/she shall present the health plans selected by the Committee, so that the Assembly, by the express vote of the majority constituting quorum to such effects, selected the health plan that better suits its needs. Once the health plan has been selected in a legally convened Assembly, it shall be compulsory for all the members represented by said exclusive representative, except as provided by Act 95-1963, as amended. |
| **Holidays** | **Section 1** Holidays shall include all twenty-four (24) hours, after midnight, of the calendar day in question. |
| | **Section 2** The Administration recognizes that the days listed below shall be paid holidays for employees covered by the AFSCME CBAs; provided, however, that the Administration shall have the right to assign work to the members of the Appropriate Unit in any of them, when the need for service so requires. The time worked shall be compensated in time and a half (1½) of the time worked. On years where general elections shall be held, Election Day shall be considered as included among the holidays listed below. |

| | Date | Holiday |
|---|---|---|
| 1 | January 1st | New Year's Day |
| 2 | January 6th | Three Kings' Day |

G-5

| More detailed provisions of the proposal | | | |
|---|---|---|---|
| | 3 | Third Monday of January | Dr. Martin Luther King Day |
| | 4 | Third Monday of February | George Washington / Presidents' Day |
| | 5 | March 2nd | American Citizenship Day |
| | 6 | March 22nd | Abolition of Slavery Day |
| | 7 | Movable | Good Friday |
| | 8 | Last Monday of May | Memorial Day |
| | 9 | July 4th | Independence Day |
| | 10 | First Monday of September | Labor Day |
| | 11 | October 12th | Race Day (Discovery of America) |
| | 12 | November 11th | Veteran's Day |
| | 13 | November 19th | Discovery of Puerto Rico |
| | 14 | Fourth Thursday of November | Thanksgiving |
| | 15 | December 25th | Christmas |

**Section 3** The Administration recognizes that holidays that fall on a Sunday shall be enjoyed during the next day and holidays that fall on a Saturday shall be enjoyed on the previous business day.

**Section 4** Days or half days that by proclamations of the Governor of Puerto Rico or the President of the United States are declared as holidays to be observed in Puerto Rico, shall also be considered paid holidays and included as part of the previous list, as long as they are not discounted from ordinary leave.

**Sick leave**

**Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs, which were hired prior to February 4, 2017 shall have the right to accrue sick leave at the rate of one and a half days (1½) for each month of service. Members hired on or after February 4, 2017 shall accrue at the rate of one (1) day for each month of service.

**Section 2** Sick leave may be accrued up to a maximum of ninety (90) business days at the end of each calendar year. Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.

| More detailed provisions of the proposal | |
|---|---|
| | **Section 3** Accrued sick leave days that have not been enjoyed shall not be liquidated in any way.<br><br>**Section 4** Sick leave shall be used:<br><br>A.      When the employee is sick, physically or mentally incapacitated, or exposed to a contagious disease which requires his/her absence from work to protect his/her or other persons' health.<br><br>B.      A maximum of five (5) days a year may also be used for the following, provided that the employee has accrued a minimum balance of twelve (12) days:<br><br>a.      The care and attention of his/her sick children.<br><br>b.      Management of sick, elderly or disabled persons within his/her familial nucleus, within the fourth degree of consanguinity, second of affinity, persons that live within the same household, persons over which employee has legal custody or guardianship.<br><br>c.      First appearance of any petitioner, victim or complainant before the Department, Agency, Corporation or Public Instrumentality of the Commonwealth of Puerto Rico, in matters regarding alimonies, domestic violence, sexual harassment in the workplace or gender-based discrimination.<br><br>C.      The employee shall present evidence issued by the competent authority which credits such appearance.<br><br>D.      For the purposes of this Section, the following definitions shall apply:<br><br>a.      "Elderly person":  any person sixty (60) years or older.<br><br>b.      "Person with disabilities":  any person with a physical, mental or sensory disability that substantially limits one (1) or more essential activities in his/her life.<br><br>**Section 5** Only in sickness absences for more than three (3) consecutive days shall the employee submit a medical certificate justifying such absences. Notwithstanding, the employee or any of his/her relatives must notify his/her immediate supervisor of his absence.  This shall be applied or interpreted in a manner consistent with the Americans with Disabilities Act, better known as ADA, the Family Medical Leave Act of 1993, or any other applicable law. |

G-7

| More detailed provisions of the proposal |
| --- |

**Section 6** In the event that the employee exhausts his/her sick leave and remains ill, he/she may use the leave he/she has accrued, in accordance with the provisions of this Collective Agreement.

**Section 7** Sick leave charges shall be made on the basis of the working day's daily work assigned to the employee, it being understood that it shall not be charged for days off in cases where the employee works rotating shifts or for holidays.

**Section 8** When a member of the Appropriate Unit covered by the AFSCME CBAs is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.

**Section 9** The Administration may advance sick leave up to a maximum of eighteen (18) working days, to any member of the Appropriate Unit covered by these CBAs which requests it by presenting proper justification. He/she must have worked for the Administration for one (1) year or more. Advanced leave may only be granted after the accrued sick and regular leave have been exhausted.

**Section 10**

A.      **Leave for Parents with Children with Physical and / or Mental Disabilities**. In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him/her as a person with disabilities.

They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.

B.      **Leave for Elderly Persons**. In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person

| More detailed provisions of the proposal |
|---|

|  | evidencing that he / she is sixty (60) years or more.  They must comply with Section 11's provisions.<br><br>**Section 11** The Administration shall authorize the father or mother of children to stay with them when they are hospitalized.  The father or mother must submit evidence of the hospitalization and the duration of the hospitalization.  The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave.  An employee that requests this leave must have an accrued sick leave balance of fifteen (15) or more days. |
|---|---|
| **Vacation Leave** | **Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs shall have the right to accrue regular vacation leave at the rate of one and a quarter (1¼) days for each month of service.  Employees with reduced or part-time regular working hours will accumulate vacation leave proportionally to the number of hours they regularly provide service in.  Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.<br><br>**Section 2** Regular vacation leave shall be accrued up to a maximum of sixty (60) business days at the end of each calendar year.<br><br>**Section 3** Every employee shall have the right to enjoy his accrued vacation leave for a period of fifteen (15) business days during each calendar year, of which no less than ten (10) days shall be consecutive.  By agreement between the Director and / or Supervisor and the employee, he may be granted periods of less than ten (10) business vacation days, but never less than five (5) days.<br><br>Employees, who, due to the need for service and at the request of the Administration, cannot enjoy their vacation leave during a specific calendar year, shall be exempt from this provision.  In this case, the Department is required to make the necessary adjustments so that the employee is able to enjoy at least leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.<br><br>**Section 4** The enjoyment of regular vacation leave shall not be interrupted nor rescheduled for any member of the Appropriate Unit covered by these CBAs.  The only exceptions are clear and unavoidable emergencies related to the need for the service.  The Administration shall replenish the time used by the employee. |

| More detailed provisions of the proposal |
| --- |
| **Section 5** The Administration shall formulate a Vacation Plan each calendar year, according to the need of service and in coordination with the employees of the Appropriate Unit covered by this Collective Agreement and their respective supervisors, which establishes the period (s) within of which each employee shall enjoy their vacations. The Plan must be established by December 31st of each year so that it becomes effective the first (1st) of January of each year. Both parties agree to comply with the Plan. By agreement between the Director and / or Supervisor and the employee, he / she may enjoy a maximum of two (2) vacation periods per calendar year.<br><br>**Section 6** The Administration shall formulate and administer the Vacation Plan harmonizing the observations, recommendations and preferences of the employees with the needs of service, so that they do not lose their vacation leave at the end of the calendar year and enjoy their regular vacation leave annually without affecting the service.<br><br>If there is a conflict between two (2) or more employees regarding the date to take vacations, the Director and / or Supervisor shall determine, according to the need of service, which employee shall leave first. In case the only conflict is that both chose the same date and cannot leave at the same time, the employee with the most seniority will leave first and from then on it will be done alternately.<br><br>**Section 7** The Administration shall inform the accrued vacation leave balance to all Appropriate Unit members covered by these CBAs, a total of three (3) times a year. In case of any calculation error, the information may be corrected at the initiative of any of the Parties. Any request for review by the employee must be made in writing within fifteen (15) working days before the Director of the Human Resources Division of the Administration. The Director shall have fifteen (15) working days to answer the request. If the employee is not satisfied, he/she may use the Complaint and Grievance Procedure established in this Collective Agreement.<br><br>**Section 8** The Administration shall evaluate, if so requested by the employee, granting regular leave in excess of fifteen (15) days in a calendar year, up to a maximum of fifty (50) days in any calendar year to those employees who have accrued leave. The employee shall maintain a minimum of five (5) days of regular vacation leave. When granting said leave, the Administration shall consider the needs of service and any other factor established in applicable law.<br><br>**Section 9** When a member of the Appropriate Unit covered by CBAs is using his / her regular leave, he / she shall be entitled to the accrual of |

| More detailed provisions of the proposal |
|---|

regular and sick leave, for the time that he / she is enjoying said leave, as long as he / she is reinstated to his work when he / she finishes such enjoyment.

**Section 10** Due to special circumstances, the Administration may advance regular leave to any member of the Appropriate Unit covered by CBAs who requests it and has worked for the Administration for more than one (1) year, up to a maximum of fifteen (15) work days, provided that the employee shall return to service. The Administration shall evaluate said request according to the needs of service.

**Section 11** Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him/her for said advanced leave.

**Section 12** At the option of the Appropriate Unit member covered by CBAs, the payment of regular scheduled vacations shall be effective before beginning to enjoy them. Said request must be submitted forty-five (45) calendar days in advance of the date on which the vacation begins.

**Section 13** In those cases in which a proclamation or administrative order of the Governor of Puerto Rico is issued, granting official time without charge to vacations, the same shall be applicable to all members of the Appropriate Unit covered by CBAs who are in use of regular leave. When the employee is enjoying his/her regular vacation leave, the period of his/her vacation will be extended for the official time granted.

**Section 14** Any member of the Appropriate Unit covered by CBAs who becomes ill while enjoying regular leave may request that the period of illness be credited to his / her accrued sick leave. The employee must certify his/her illness in conjunction with his/her request.

**Section 15** The members of the Appropriate Unit covered by CBAs shall have the right to authorize the Administration to assign five (5) days per month of their accumulated vacation license, in favor of other employees of the agency. It shall be in accordance with the provisions established by Act No. 44 of May 22, 1996, as amended, known as the "Holiday License Assignment Act".

| | |
|---|---|
| **Additional Language for Holidays, Sick** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the |

| More detailed provisions of the proposal | |
|---|---|
| **and Vacation Leaves** | provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | **Section 1** To the extent that bonuses not otherwise provided for in CBAs are lawfully provided to similarly situated Commonwealth employees, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Institutional Representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of four (4) individual members, appointed by the Union to represent labor. <br><br> **Section 2** The members may be appointed for terms of twelve (12) months, and may be reappointed by the Union. <br><br> **Section 3** The members will meet with representatives of the Oversight Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget. <br><br> **Section 4** Annual meetings with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |
| **Full Agreement** | **Section 1** The provisions of this term sheet, combined with the most recent CBAs, shall constitute the CBAs commencing on the effective date of the Commonwealth Plan; provided, however, that the provisions of this term sheet control if there is any conflict with the most recent CBAs. For the duration of the Agreement, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express agreement of the Union. In addition, no other changes inconsistent with the terms of the term sheet shall be implemented without the express agreement of the Union. Nothing in this Agreement shall be interpreted in a manner to preclude employees represented by the Union from receiving any benefit that is lawfully granted by the Governor or Administration to other employees of the Government. |
| **Dues Deduction, Charges** | **Section 1** During the term of these agreements and during any extension thereof, the Department shall deduct from the salary of each bargaining unit employee who authorizes payroll deduction of union dues or payments on a form provided by the union the regular dues that the Union certifies in accordance with its regulations and the applicable provisions |

| More detailed provisions of the proposal |
|---|
| of Act 45 as amended. The dues amount shall be reported to the Department by the Union. For such purposes, the Department shall notify the Department of the Treasury of dues charges to be deducted from employees included in the Appropriate Unit within thirty (30) working days from the date on which the Union informs the Department regarding the amount to be deducted.

**Section 2** The Department shall send a copy to the Union on a monthly basis of the list provided by the Department of the Treasury, reflecting the name of each employee included in the Appropriate Unit, with Social Security number and amount deducted for dues charges.

**Section 3** The Department shall inform new employees of the right conferred by Act No. 45 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45 of February 25, 1998, as amended. The Administration shall not discourage union membership

**Section 4** The Department shall have fifteen (15) working days to inform the Union in writing of the name, Social Security number, position, date of employment and salary of newly recruited employees and that come to occupy positions included in the Appropriate Unit.

**Section 5** The authorization to deduct membership dues is in effect and irrevocable pursuant to the terms stated on the employee authorization, but employees must be permitted to rescind their authorization prior to any renewal at least annually.

**Section 6** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.

**Section 7** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.

**Section 8** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund |

| More detailed provisions of the proposal | |
|---|---|
| | as soon as it is required.  If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |

**APPENDIX I**

## PROPOSED TERMS FOR ERS SYSTEM BENEFITS

The following is a summary of indicative terms for the Puerto Rico Government Employees Retirement System ("ERS") for:

1.      System 2000 members;

2.      participants who participated exclusively in the Act 3 benefit but not in Act 1 or Act 447 benefit tiers; and

3.      Act 3 participants who participated in Act 1 or Act 447 benefit tiers.

These terms do not address benefits earned under Act 1 and Act 447.

| Definitions | |
| --- | --- |
| **Pension System** | The Puerto Rico Government Employees Retirement System (ERS). |
| **System 2000 Members** | Generally, those members hired on or after January 1, 2000 and on or before June 30, 2013. In addition, for purposes of this Agreement, employees hired on or after July 1, 2013 and on or before June 30, 2017 shall be treated the same as System 2000 members. |
| **Type of Plan** | System 2000 and Act 3 plans are contributory, hybrid defined benefit plans. |
| **Effective date of the Plan** | The Pension System was established in 1951 by Act 447 to be effective January 1, 1952. The Plan was last amended under Act 3, approved April 4, 2013. |
| **Eligibility for Membership** | Members of the ERS and its Instrumentalities include all regular full-time and non-municipal temporary employees who are not contributing to other Retirement Systems (Articles 1-104 and 1-105). |
| **Contributions** | Contributions to System 2000 and Act 3 benefits are made exclusively from mandatory employee payroll deductions of 8.275 percent until 2013 and 10 percent of pay thereafter (starting with the passage of Act 3-2013). |

| Timing | |
| --- | --- |
| **Effective date** | Commonwealth Plan Effective Date. |
| **Implementation** | Applies to benefits earned under the Plan on or before June 30, 2017. |

| Provisions of the proposal |
| --- |

G-16

| | |
|---|---|
| **Segregate cash upfront** | Segregate full System 2000 contributions from 2000 through 2013 (no reduction ), full System 2000 participant Act 3-2013 contributions, and full Act 3 participant (who had not participated in either Act 1 or Act 447) contributions through 2017 (no reduction), with interest through the Commonwealth Petition Date.  Roll balances into Defined Contribution accounts currently being set up under Act 106-2017 and invested by default into a target date life-cycle fund.  As of the Effective Date, participants with System 2000 contributions from 2000 through 2013, and Act 3-2013 contributions through 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability provisions, etc. <br><br> Participants who had not participated in either Act 1 or Act 447 retirement plans and who have already retired and converted their System 2000 or Act 3 contributions to a system paid annuity are not eligible for the treatment described in this section and will not receive a cash payment. |
| **Exempt from Reduction Formula** | Pay up to full accumulated contributions value, with interest up to, but not including, the Commonwealth Petition Date, for all Act 1 and Act 447 contributions made in Act 3 after July 1, 2013 annuitized upon retirement in accordance with applicable law. |

## More detailed Provisions of the Proposal as of July 1, 2015

| | System 2000 | | | |
|---|---|---|---|---|
| | **Active members** | **Retired members** | **Disabled members** | **Beneficiaries in payment** |
| Count | 65,605 | 273 | 72 | 81 |
| Average age | 42.7 | 67.8 | 54.2 | 62.5 |
| Average salary | $24,891 | | | |
| Average creditable service | 9.5 | | | |
| Average monthly basic system benefit | | $758 | $853 | $997 |
| Average monthly system administered benefit | | $16 | $9 | $8 |

G-17

# APPENDIX II

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFSCME Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with Unions and Union member participants for each fiscal year of this Agreement to provide participation of Unions on sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFSCME |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. Notwithstanding the foregoing, the Upside Participation Bonus to be paid to AFSCME-represented employees for each of the five fiscal years of the Agreement shall be no less than $2,000 per employee per year regardless of the amount of the Excess Cash Surplus. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of proposed changes to CBAs, as well as the overall agreement with AFSCME, currently targeted for the Effective Date. |
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a Cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For signing bonus:** Payable to Union represented participants upon the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| | **For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date.<br><br>**For Support Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment.<br><br>**For Additional Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment. |

| Provisions of the proposal | |
|---|---|
| **Signing Bonus (see Summary of bonuses)** | Upon the Effective Date, a one-time signing bonus of Five Hundred Dollars ($500.00) to each of the Union represented participants. |
| **Upside Participation Bonus** | For the term of the CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants and all other eligible Commonwealth employees designated by the Oversight Board each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus to their Defined Contribution account and any remainder will be distributed in cash. |
| **Support Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, as compensation for its efforts serving as the lead negotiator of and as a signatory to this Agreement. |
| **Additional Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, to be disbursed as a cash bonus to its represented participants. Accordingly, the bonuses that Union represented participants are receiving pursuant to this Agreement are a one-time $1000 bonus (approximate) and any Upside Participation Bonus. In addition, to the extent that similarly situated Commonwealth employees lawfully receive a bonus, such as a Christmas bonus, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Payment of Pre-petition** | Any distributions under and pursuant to the Plan on account of claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures |

| Arbitration and Grievance Claims | arising under the CBAs between the Commonwealth and AFSCME's local affiliate(s) in Puerto Rico shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after such disposition or (ii) 60 days after the Effective Date of the Plan. |
|---|---|

**EXHIBIT H**

SCHEDULE OF MED CENTER CLAIMS

| Claim Numbers | Facility | Group | Column "A" | Column "B" |
|---|---|---|---|---|
| 27630, 30530, 166265 | Centro De Salud Familiar Dr. Julio Palmieri Ferri Claims: 166265 Facility: Arroyo | AMC Group | $12,639,331.92 | $11,871,346.29 |
| 158091 | Atlantic Medical Center, Inc. Claims: 158091 Facility: Barceloneta | AMC Group | $11,518,922.99 | $3,030,376.45 |
| 167114 | Camuy Health Services, Inc. Claims: 167114 Facility: Camuy | AMC Group | $31,349,345.60 | $13,470,273.43 |
| 146462 | Hospital General Castaner, Inc. Claims: 146462 Facility: Castaner | AMC Group | $5,489,636.26 | $1,506,047.44 |
| 137070 | Ciales Primary Health Care Services, Inc. Claims: 137070 Facility: Ciales | AMC Group | $6,155,787.47 | $3,036,743.77 |
| 167361 | Corporacion De Servicios Medicos De Hatillo Claims: 167361 Facility: Hatillo | AMC Group | $11,948,076.45 | $4,507,785.17 |
| 166254 | Centro De Salud De Lares, Inc. Claims: 166254 Facility: Lares | AMC Group | $28,276,675.12 | $10,296,151.19 |
| 158138 | Centro De Servicios Primarios De Salud De Patillas Claims: 158138 Facility: Patillas | AMC Group | $19,497,267.19 | $19,596,454.39 |
| 157161 | Costa Salud Community Health Center Claims: 157161 Facility: Rincon | AMC Group | $12,310,505.80 | $5,931,865.47 |
| 93971 | Rio Grande Community Health Center Claims: 93971 Facility: Rio Grande (1) | AMC Group | $9,949,732.57 | $1,735,779.32 |
| 114996, 176157 | Migrant Health Center, Inc. Claims: 114996,176157 Facility: Migrant | Migrant Group | $17,691,291.17 | $9,772,993.70 |
| 98437, 108527 | HPM Foundation Inc. Claims: 98437,108527 Facility: Belaval | Morovis Group | $4,918,873.90 | $(2,405,967.79) |
| 34436, 122862 | Corporacion De Servicios De Salud Y Medicina Avanzada Claims: 34436,122862 Facility: Cossma | Morovis Group | $25,655,184.64 | $5,737,364.38 |
| 20254, 20301, 20392, 52387, 111373 | NeoMed Center, Inc Claims: 20254, 20301, 20392, 52387, 111373 Facility: Gurabo | Morovis Group | $29,258,557.90 | $36,253,807.51 |
| 101569, 108464, 139655 | Salud Integral De La Montana Inc. Claims: 101569,108464,139655 Facility: La Montana | Morovis Group | $33,906,988.74 | $2,525,918.30 |
| 20756, 20794, 39401, 130107 | Concilio De Salud Integral De Loiza, Inc Claims: 20756, 20794, 39401, 130107 Facility: Loiza | Morovis Group | $27,119,329.96 | $16,658,798.02 |
| 34431, 110999 | Morovis Community Health Center Claims: 34431,110999 Facility: Morovis | Morovis Group | $5,898,265.08 | $2,456,721.37 |
| | | Total | $293,583,772.78 | $145,982,458.41 |

(1) – Rio Grande Community Health Center provided actual data for period 1997 – 2000 asserting liabilities of approximately $7.6 m. They asserted additional liabilities related to 2001 which does not provide sufficient data to determine averages. A&M is not able to validate the asserted amounts and recommends further discussions with the FQHC related to this period.

## EXHIBIT I

SCHEDULE OF CASH FLOWS OF NEW GO BONDS

Tax-Exempt and Taxable Current Interest Bonds Debt Service

| Fiscal Year (7/1) | Tax-Exempt Annual Debt Service Cash Flows | | | Taxable Annual Debt Service Cash Flows | | | Aggregate Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service |
| Total | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 | $822,260,000 | $698,096,750 | $1,520,356,750 | $6,683,315,000 | $3,163,702,400 | $9,847,017,400 |
| 2022 | $372,660,000 | $270,505,300 | $643,165,300 | | $41,113,000 | $41,113,000 | $372,660,000 | $311,618,300 | $684,278,300 |
| 2023 | 372,390,000 | 251,872,300 | 624,262,300 | | 41,113,000 | 41,113,000 | 372,390,000 | 292,985,300 | 665,375,300 |
| 2024 | 371,350,000 | 233,252,800 | 604,602,800 | | 41,113,000 | 41,113,000 | 371,350,000 | 274,365,800 | 645,715,800 |
| 2025 | 369,470,000 | 214,685,300 | 584,155,300 | | 41,113,000 | 41,113,000 | 369,470,000 | 255,798,300 | 625,268,300 |
| 2026 | 366,675,000 | 196,211,800 | 562,886,800 | | 41,113,000 | 41,113,000 | 366,675,000 | 237,324,800 | 603,999,800 |
| 2027 | 362,890,000 | 177,878,050 | 540,768,050 | | 41,113,000 | 41,113,000 | 362,890,000 | 218,991,050 | 581,881,050 |
| 2028 | 358,030,000 | 159,733,550 | 517,763,550 | | 41,113,000 | 41,113,000 | 358,030,000 | 200,846,550 | 558,876,550 |
| 2029 | 352,010,000 | 141,832,050 | 493,842,050 | | 41,113,000 | 41,113,000 | 352,010,000 | 182,945,050 | 534,955,050 |
| 2030 | 344,740,000 | 124,231,550 | 468,971,550 | | 41,113,000 | 41,113,000 | 344,740,000 | 165,344,550 | 510,084,550 |
| 2031 | 336,095,000 | 106,994,550 | 443,089,550 | | 41,113,000 | 41,113,000 | 336,095,000 | 148,107,550 | 484,202,550 |
| 2032 | 325,990,000 | 90,189,800 | 416,179,800 | | 41,113,000 | 41,113,000 | 325,990,000 | 131,302,800 | 457,292,800 |
| 2033 | 311,050,000 | 77,150,200 | 388,200,200 | | 41,113,000 | 41,113,000 | 311,050,000 | 118,263,200 | 429,313,200 |
| 2034 | 294,385,000 | 64,708,200 | 359,093,200 | | 41,113,000 | 41,113,000 | 294,385,000 | 105,821,200 | 400,206,200 |
| 2035 | 154,195,000 | 52,932,800 | 207,127,800 | $121,695,000 | 41,113,000 | 162,808,000 | 275,890,000 | 94,045,800 | 369,935,800 |
| 2036 | 137,290,000 | 46,765,000 | 184,055,000 | 118,735,000 | 35,028,250 | 153,763,250 | 256,025,000 | 81,793,250 | 337,818,250 |
| 2037 | 118,370,000 | 41,273,400 | 159,643,400 | 115,625,000 | 29,091,500 | 144,716,500 | 233,995,000 | 70,364,900 | 304,359,900 |
| 2038 | 97,300,000 | 36,538,600 | 133,838,600 | 112,360,000 | 23,310,250 | 135,670,250 | 209,660,000 | 59,848,850 | 269,508,850 |
| 2039 | 64,880,000 | 32,646,600 | 97,526,600 | 117,980,000 | 17,692,250 | 135,672,250 | 182,860,000 | 50,338,850 | 233,198,850 |
| 2040 | 29,640,000 | 30,051,400 | 59,691,400 | 123,880,000 | 11,793,250 | 135,673,250 | 153,520,000 | 41,844,650 | 195,364,650 |
| 2041 | 12,780,000 | 28,865,050 | 41,645,800 | 111,985,000 | 5,599,250 | 117,584,250 | 124,765,000 | 34,465,050 | 159,230,050 |
| 2042 | 130,875,000 | 28,354,600 | 159,229,600 | | | | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 136,110,000 | 23,119,600 | 159,229,600 | | | | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 141,555,000 | 17,675,200 | 159,230,200 | | | | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 147,220,000 | 12,013,000 | 159,233,000 | | | | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 153,105,000 | 6,124,200 | 159,229,200 | | | | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

I-2

Detail on Tax-Exempt Current Interest Bonds

| | | | Detailed Summary of Tax-Exempt Term Bonds | | | | | Tax-Exempt Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
| Total | | | $5,861,055,000 | $5,861,055,000 | | | | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 |
| 2022 | 7/1/22 | 2023 | 372,660,000 | | 5.000% | | 2022 | $372,660,000 | $270,505,300 | $643,165,300 |
| 2023 | 7/1/23 | 2023 | 372,390,000 | $745,050,000 | 5.000% | | 2023 | 372,390,000 | 251,872,300 | 624,262,300 |
| 2024 | 7/1/24 | 2025 | 371,350,000 | | 5.000% | | 2024 | 371,350,000 | 233,252,800 | 604,602,800 |
| 2025 | 7/1/25 | 2025 | 369,470,000 | $740,820,000 | 5.000% | | 2025 | 369,470,000 | 214,685,300 | 584,155,300 |
| 2026 | 7/1/26 | 2027 | 366,675,000 | | 5.000% | | 2026 | 366,675,000 | 196,211,800 | 562,886,800 |
| 2027 | 7/1/27 | 2027 | 362,890,000 | $729,565,000 | 5.000% | | 2027 | 362,890,000 | 177,878,050 | 540,768,050 |
| 2028 | 7/1/28 | 2029 | 358,030,000 | | 5.000% | | 2028 | 358,030,000 | 159,733,550 | 517,763,550 |
| 2029 | 7/1/29 | 2029 | 352,010,000 | $710,040,000 | 5.000% | | 2029 | 352,010,000 | 141,832,050 | 493,842,050 |
| 2030 | 7/1/30 | 2031 | 344,740,000 | | 5.000% | | 2030 | 344,740,000 | 124,231,550 | 468,971,550 |
| 2031 | 7/1/31 | 2031 | 336,095,000 | $680,835,000 | 5.000% | | 2031 | 336,095,000 | 106,994,550 | 443,089,550 |
| 2032 | 7/1/32 | 2033 | 325,990,000 | | 4.000% | 7/1/31 | 2032 | 325,990,000 | 90,189,800 | 416,179,800 |
| 2033 | 7/1/33 | 2033 | 311,050,000 | $637,040,000 | 4.000% | 7/1/31 | 2033 | 311,050,000 | 77,150,200 | 388,200,200 |
| 2034 | 7/1/34 | 2035 | 294,385,000 | | 4.000% | 7/1/31 | 2034 | 294,385,000 | 64,708,200 | 359,093,200 |
| 2035 | 7/1/35 | 2035 | 154,195,000 | $448,580,000 | 4.000% | 7/1/31 | 2035 | 154,195,000 | 52,932,800 | 207,127,800 |
| 2036 | 7/1/36 | 2037 | 137,290,000 | | 4.000% | 7/1/31 | 2036 | 137,290,000 | 46,765,000 | 184,055,000 |
| 2037 | 7/1/37 | 2037 | 118,370,000 | $255,660,000 | 4.000% | 7/1/31 | 2037 | 118,370,000 | 41,273,400 | 159,643,400 |
| 2038 | 7/1/38 | 2041 | 97,300,000 | | 4.000% | 7/1/31 | 2038 | 97,300,000 | 36,538,600 | 133,838,600 |
| 2039 | 7/1/39 | 2041 | 64,880,000 | | 4.000% | 7/1/31 | 2039 | 64,880,000 | 32,646,600 | 97,526,600 |
| 2040 | 7/1/40 | 2041 | 29,640,000 | | 4.000% | 7/1/31 | 2040 | 29,640,000 | 30,051,400 | 59,691,400 |
| 2041 | 7/1/41 | 2041 | 12,780,000 | $204,600,000 | 4.000% | 7/1/31 | 2041 | 12,780,000 | 28,865,800 | 41,645,800 |
| 2042 | 7/1/42 | 2046 | 130,875,000 | | 4.000% | 7/1/31 | 2042 | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 7/1/43 | 2046 | 136,110,000 | | 4.000% | 7/1/31 | 2043 | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 7/1/44 | 2046 | 141,555,000 | | 4.000% | 7/1/31 | 2044 | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 7/1/45 | 2046 | 147,220,000 | | 4.000% | 7/1/31 | 2045 | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 7/1/46 | 2046 | 153,105,000 | $708,865,000 | 4.000% | 7/1/31 | 2046 | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

I-3

Detail on Taxable Current Interest Bonds

| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | | | $822,260,000 | $822,260,000 | | | | $822,260,000 | $698,096,750 | $1,520,356,750 |
| 2022 | 7/1/22 | | | | | | 2022 | | $41,113,000 | $41,113,000 |
| 2023 | 7/1/23 | | | | | | 2023 | | 41,113,000 | 41,113,000 |
| 2024 | 7/1/24 | | | | | | 2024 | | 41,113,000 | 41,113,000 |
| 2025 | 7/1/25 | | | | | | 2025 | | 41,113,000 | 41,113,000 |
| 2026 | 7/1/26 | | | | | | 2026 | | 41,113,000 | 41,113,000 |
| 2027 | 7/1/27 | | | | | | 2027 | | 41,113,000 | 41,113,000 |
| 2028 | 7/1/28 | | | | | | 2028 | | 41,113,000 | 41,113,000 |
| 2029 | 7/1/29 | | | | | | 2029 | | 41,113,000 | 41,113,000 |
| 2030 | 7/1/30 | | | | | | 2030 | | 41,113,000 | 41,113,000 |
| 2031 | 7/1/31 | | | | | | 2031 | | 41,113,000 | 41,113,000 |
| 2032 | 7/1/32 | | | | | | 2032 | | 41,113,000 | 41,113,000 |
| 2033 | 7/1/33 | | | | | | 2033 | | 41,113,000 | 41,113,000 |
| 2034 | 7/1/34 | | | | | | 2034 | | 41,113,000 | 41,113,000 |
| 2035 | 7/1/35 | 2041 | $121,695,000 | | 5.000% | 7/1/31 | 2035 | $121,695,000 | 41,113,000 | 162,808,000 |
| 2036 | 7/1/36 | 2041 | 118,735,000 | | 5.000% | 7/1/31 | 2036 | 118,735,000 | 35,028,250 | 153,763,250 |
| 2037 | 7/1/37 | 2041 | 115,625,000 | | 5.000% | 7/1/31 | 2037 | 115,625,000 | 29,091,500 | 144,716,500 |
| 2038 | 7/1/38 | 2041 | 112,360,000 | | 5.000% | 7/1/31 | 2038 | 112,360,000 | 23,310,250 | 135,670,250 |
| 2039 | 7/1/39 | 2041 | 117,980,000 | | 5.000% | 7/1/31 | 2039 | 117,980,000 | 17,692,250 | 135,672,250 |
| 2040 | 7/1/40 | 2041 | 123,880,000 | | 5.000% | 7/1/31 | 2040 | 123,880,000 | 11,793,250 | 135,673,250 |
| 2041 | 7/1/41 | 2041 | 111,985,000 | $822,260,000 | 5.000% | 7/1/31 | 2041 | 111,985,000 | 5,599,250 | 117,584,250 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

I-4

Capital Appreciation Bonds: 5.000% July 1, 2024 Maturity

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/22 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 7/1/23 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 7/1/24 (1) | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |
| Total | $288,241,989.75 | $317,908,737.85 | $334,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.

Capital Appreciation Bonds: 5.375% July 1, 2033 Maturity*

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/29 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 7/1/30 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 7/1/31 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 7/1/32 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 7/1/33 (1) | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |
| Total | $442,506,553.50 | $749,992,315.35 | $836,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.
*Callable on 7/1/2031 and thereafter at accreted value.

## EXHIBIT J

DESCRIPTION OF CVI TERMS AND WATERFALL PROVISIONS

**Exhibit J**
**General Terms Applicable to Both GO CVI and Subject to Waterfall Clawback CVI**

| TERM | DESCRIPTION |
|------|-------------|
| **Outperformance Metric** | ▪ See Annex 5 |
| **Structure** | ▪ Attachment Point: 100% of CW Fiscal Plan projections as included in Annex 5 (the "Baseline SUT") of this exhibit<br>▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the GO CVI, Subject to Waterfall Clawback CVI, and Not Subject to Waterfall Clawback CVI<br>    o See Annex 1 for terms specific to GO CVI<br>    o See Annex 2 for terms specific to Clawback CVI<br>▪ For the avoidance of doubt, when the term "Clawback CVI" is used on its own throughout this exhibit, the term encompasses both the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, defined as follows<br>    o **Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Subject to Waterfall Outperformance Amount,<br>    o **Not Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Not Subject to Waterfall Outperformance Amount<br>▪ Security provisions as described in Section 4.10 (b) of the CW Plan Support Agreement<br>▪ Amounts paid to various CVI instruments are subject to applicable caps, including GO CVI Maximum Annual Payment, GO CVI Lifetime Cap, Clawback CVI Maximum Annual Payment, and Clawback CVI Lifetime Cap (as defined throughout this exhibit) |
| **Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Subject to Waterfall Outperformance Amount"):<br>    o (i) 50% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to GO CVI and Subject to Waterfall Clawback CVI<br>        ▪ For the avoidance of doubt, amounts paid to Clawback CVI will first be allocated to Subject to Waterfall Clawback CVI (from Subject to Waterfall Annual |

J-2

| TERM | DESCRIPTION |
|---|---|
|  | Payments, as defined below) for purposes of calculation of payments previously made <br> ○ (ii) 75% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance) <br> ▪ For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |
| **Subject to Waterfall Annual Mandatory Redemption Payments** | ▪ Years 1-22: From the Subject to Waterfall Outperformance Amount, annual payment waterfall is as follows (the "Annual Payment Waterfall"): <br> ○ (a) First $100,000,000 to GO CVI <br> ○ (b) Next $11,111,111 to Subject to Waterfall Clawback CVI <br> ○ (c) Thereafter, pro rata sharing as follows: <br>    ▪ 90% to GO CVI <br>    ▪ 10% to Subject to Waterfall Clawback CVI <br> ▪ To the extent that the GO CVI Lifetime Cap (as defined below) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Subject to Waterfall Clawback CVI beginning in the following year <br> ▪ Years 23-30: 100% of Subject to Waterfall Outperformance Amount to Subject to Waterfall Clawback CVI |
| **SUT True-Up** | ▪ No adjustment required: <br> ○ Exemptions / holidays included in the Puerto Rico Internal Revenue Code as of the date of the Plan Support Agreement (sections 4030.01 through 4030.27) <br> ▪ Baseline SUT Reduced (the "Baseline SUT Reduction"): <br> ○ Exemptions/Holiday during U.S. Presidential Declaration of Disaster for a period not to exceed 30 days and only for emergency-related categories of spend. If Exemptions/Holiday exceed 30 day period, the amount of any exemptions beyond such 30 day period will be included under the SUT True-Up mechanism defined below <br> ▪ In-Year SUT Revenue Increased ("SUT True-Up"): <br> ○ Any other exemption implemented by the Government under applicable law <br> ▪ For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation will be determined by the Treasury Secretary and validated by an independent third party and will be publicly disclosed. Validation of independent third party binding on both the Government and Creditors |

| TERM | DESCRIPTION |
|---|---|
| | <ul><li>Documentation in a separate agreement on the methodology the independent third party will use to verify the Treasury Secretary's calculation</li><li>To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, a formulaic adjustment to be agreed upon by the Board and Initial PSA Creditors to maintain the same amount of outperformance had the Measured SUT remained at 5.5%. Further protections provided in Section 4.10 (b)(xi) of the CW Plan Support Agreement</li></ul> |

## ANNEX 1: GO CVI-SPECIFIC TERMS

| TERM | DESCRIPTION |
|---|---|
| **GO CVI Lifetime Cap** | ▪ $3,500 million (the "GO CVI Lifetime Cap") |
| **GO CVI Term** | ▪ 22 years (FY2043)<br>▪ Deemed issuance date of July 1, 2021 |
| **Payments to GO CVI** | ▪ As referenced within (a) and (c) of Annual Payment Waterfall, subject to the GO CVI Maximum Annual Payment and the GO CVI Lifetime Cap |
| **GO CVI Maximum Annual Payment** | ▪ Maximum annual payment of $200 million for the GO CVI plus any unused amounts from previous years, subject to annual payment not being greater than $400 million for the GO CVI. For the avoidance of doubt, the GO CVI Maximum Annual Payment is calculated as the lesser of the (i) the sum of GO CVI Carryforward Balance (see below) and $200 million and (ii) $400 million<br>▪ The GO CVI Carryforward Balance shall be calculated as follows:<br>   ○ (a) In year 1, an amount equal to $0<br>   ○ (b) For each year thereafter, the Annual GO CVI Carryforward Amount (see below) shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance.<br>      ▪ The Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $200 million and (z) CVI payments (if any) made to the GO CVI in the prior fiscal year<br>▪ To the extent there is a positive GO CVI Carryforward Balance remaining at the end of the 22-year term, the Commonwealth will not owe any further amount to GO CVI |
| **GO CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI |
| **GO CVI Allocation** | ▪ See Annex 3 |

## ANNEX 2: CLAWBACK CVI-SPECIFIC TERMS

| TERM | DESCRIPTION |
|---|---|
| **Clawback CVI Lifetime Cap** | ▪ $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Claims, $22,580,090 for Allowed CW/MBA Claim, and $1,301,525,288 for Allowed CW/PRIFA Rum Tax Claims[3] (in total, $5,239,002,764)<br>   ○ Applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI |
| **Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **Mandatory Redemption Payments to Subject to Waterfall Clawback CVI** | ▪ <u>Years 1-22</u>: As referenced within (b) and (c) of Annual Payment Waterfall, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>▪ <u>Years 23-30</u>: From 100% of the Subject to Waterfall Outperformance Amount, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>   ○ To the extent that GO CVI Lifetime Cap (as defined above) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Clawback CVI beginning in the following year subject to applicable Clawback CVI Maximum Annual Mandatory Redemption Payment (as specified below) and Clawback CVI Lifetime Cap |
| **Not Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Not Subject to Waterfall Outperformance Amount"):<br>   ○ (i) 40% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to Not Subject to Waterfall Clawback CVI<br>   ○ (ii) 95% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance), less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year<br>▪ For the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |

---

[3] Both (i) Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and (ii) Rum Tax CVI Annual Payments (as defined in Exhibit "F" to the PRIFA Plan Support Agreement) to holders of Allowed CW/PRIFA Rum Tax Claims will be subject to an aggregate $1,301,525,288.00 lifetime cap.

| TERM | DESCRIPTION |
|------|-------------|
| **Mandatory Redemption Payments Not Subject to Waterfall Clawback CVI** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable caps, including both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap |
| **Clawback CVI Maximum Annual Payment** | ▪ <u>Years 1-22</u>: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $350 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of Clawback CVI Carryforward Balance (see below) and $175 million and (ii) $350 million<br>   ○ The Clawback CVI Carryforward Balance shall be calculated as follows:<br>        ▪ (a) In year 1, an amount equal to $0<br>        ▪ (b) For each year thereafter, the Annual Clawback CVI Carryforward Amount shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance. The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $175 million and (z) aggregate CVI payments made to the Subject to Waterfall Clawback CVI (if any) and the Not Subject to Waterfall Clawback CVI (if any) in the prior fiscal year<br>▪ <u>Years 23-30</u>: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance (see below) and $375 million and (ii) $750 million.<br>   ○ The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $375 million and (z) aggregate CVI payments made (if any) to the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI in the prior fiscal year<br>   ○ Such Annual Clawback CVI Carryforward Amount will be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance<br>▪ To the extent that GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the $375 million annual payment cap – and annual payment cap up to $750 |

| TERM | DESCRIPTION |
|------|-------------|
| | million to the extent sufficient Clawback CVI Carryforward Balance is available – for the Clawback CVI, including CVI payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, would begin in the following year<br>■ To the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI<br>■ For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted |
| **Clawback CVI Call Structure** | ■ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| **Clawback CVI Allocation** | ■ See Annex 4 |

## ANNEX 3: GO CVI ALLOCATION SUMMARY

| Claim | GO CVI Allocation % |
|---|---:|
| Vintage CW Bond Claim | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | 3.514% |
| 2011 CW Bond Claim | 2.479% |
| 2012 CW Bond Claim[4] | 15.157% |
| 2014 CW Bond Claim[5] | 20.266% |
| Vintage CW Guarantee Claim | 15.194% |
| 2011 CW Guarantee Bond Claim | 7.552% |
| 2012 CW Guarantee Bond Claim | 3.594% |

---

[4] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter Loan.
[5] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports bonds.

**ANNEX 4: CLAWBACK CVI ALLOCATION SUMMARY**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[6] | 68.6% |
| Allowed CW/Convention Claims | 4.0% |
| Allowed CW/PRIFA Rum Tax Claims | 27.0% |
| Allowed CW/MBA Claims | 0.4% |

---

[6] See Annex 6 for details of priority distribution waterfall of CVI payments from Clawback CVI allocation to Allowed CW/HTA Claims.

## ANNEX 5: 5.5% SUT BASELINE[7]

*($ USD)*

|  | 5.5% SUT Baseline | | |
|---|---|---|---|
| Fiscal Year | Amount | Fiscal Year | Amount |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | 2050[4] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | 2051[4] | 1,810,682,942.40 |

---

[7] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

J-12

### ANNEX 6: PRIORITY DISTRIBUTION WATERFALL FROM CLAWBACK CVI ALLOCATION TO ALLOWED CW/HTA CLAIMS

| TERM | DESCRIPTION |
|---|---|
| **HTA Clawback CVI Priority Distribution Waterfall[8]** | <ul><li><u>First</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, Clawback CVI payments, if any, to the HTA 68 Bond Claims up to $179,462,539</li><li><u>Second</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Senior Bond Claims up to $1,833,405,578</li><li><u>Third</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Sub Bond Claims up to $207,294,178</li><li><u>Fourth</u>, after paying the permitted amounts above in full, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to the GDB HTA Loans up to $1,477,506,700</li><li>Waterfall implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination</li></ul> |

---

[8] Capitalized terms used but not otherwise defined within Annex 6 shall have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement.

## **EXHIBIT K**

SCHEDULE OF PREEMPTED STATUTES

**List of Main Statutes Preempted by PROMESA**[9]

I. **Commonwealth good faith and credit pledge statutes**
   A. General Obligation Bonds
      1. Act 2 approved October 10, 1985.
      2. Act 1 approved June 26, 1987, as amended.
      3. Act 34 approved March 4, 2014.
      4. Act 79 approved June 1, 2011.
      5. Act 243 approved August 9, 2008.
      6. Act 43 approved August 1, 2005, as amended.
      7. Act 216 approved August 19, 2004.
      8. Act 100 approved July 12, 2002, as amended.
      9. Act 161 approved July 5, 2003.
      10. Act 149 approved August 9, 2002, as amended.
      11. Joint Resolution No. 57 approved July 12, 1993.
      12. Act 54 approved July 6, 2001.
      13. Act 118 approved July 13, 2000.
      14. Act 153 approved July 16, 1999.
      15. Act 219 approved August 9, 1998.
      16. Act 81 approved August 14, 1997.
      17. Act 119 approved August 9, 1995.
      18. Act 46 approved July 28, 1994.
      19. Act 39 approved May 13, 1976, as amended.
      20. Act 83 approved August 30, 1991.[10]

   B. General Obligation Loans
      1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2. GDB Loans to the Commonwealth
         1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         2. Joint Resolution No. 96 approved November 27, 2013.  [$30 million line of credit].

   C. Commonwealth Guaranty – Public Buildings Authority Bonds
      1. Act 17 approved April 11, 1968, as amended.

   D. Commonwealth Guaranty – APLA
      1. Act 409 approved September 22, 2004.

   E. Commonwealth Guaranty – PRIFA-BANs
      1. Act 1 approved January 1, 2015.

   F. [Commonwealth Guaranty – PRASA

---

[9] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.
[10] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

1. Act 45 approved July 28, 1994.]

## II. Statutes appropriating Commonwealth revenues

A. HTA
   1. Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]
   2. 13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
   3. 13 L.P.R.A. § 31751(a)(3). [cigarette tax]

B. PRIFA
   1. Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]

C. PRIFA BANs
   1. Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]

D. MBA
   1. 13 L.P.R.A. § 31751(a)(4). [cigarette tax]

E. PRITA
   1. 13 L.P.R.A. § 31751(a)(5). [cigarette tax]

F. CCDA
   1. 13 L.P.R.A. § 2271v(a). [hotel room tax]

G. Act 147 enacted June 18, 1980, as amended
   1. 23 L.P.R.A. § 104.[11] [judiciary appropriation]

H. UPR
   1. 18 L.P.R.A. § 621-1.[12]

I. Act 83 approved August 30, 1991, as amended[13]
   1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[14]

J. Act 221 approved May 15, 1948, as amended
   1. 15 L.P.R.A. § 74(d).[15]

K. Act 18 approved January 24, 2014, as amended
   1. 21 L.P.R.A. § 6742.[16]

L. Act 41 approved July 22, 2011, as amended
   1. 12 L.P.R.A. §8105

---

[11] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[12] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[13] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[14] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted. In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[15] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

[16] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

III. **TRS and JRS Statutes**
    A. Act 106 approved August 23, 2017
    B. Act 160 approved December 24, 2013
    C. Act 91 of March 24, 2004
    D. Act 12 approved October 19, 1954
    E. Act 162 approved December 24, 2013

IV. **Article VI of the Puerto Rico Constitution**
    A. Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are Preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan. Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future purpose.

**EXHIBIT L**

BOND RECOVERY CATEGORIES

| Bond Recovery Category | Classes Included |
|---|---|
| Vintage PBA Bond Claims | 1, 2, 3, 4, 5, 6 and 7 |
| 2011 PBA Bond Claims | 8 and 9 |
| 2012 PBA Bond Claims | 10 and 11 |
| Vintage CW Bond Claims | 15, 16, 17, 18, 19, 20, 21, and 22 |
| 2011 CW Series D/E/PIB Bond Claims | 36, 37, 38, and 39 |
| 2011 CW Bond Claims | 30, 31, 32, and 33 |
| 2012 CW Bond Claims | 40, 41, 42, and 43 |
| 2014 CW Bond Claims | 46, 47, 48, 49 and 50 |
| Vintage CW Guarantee Bond Claims | 23, 24, 25, 26, 27, 28, and 29 |
| 2011 CW Guarantee Bond Claims | 34 and 35 |
| 2012 CW Guarantee Bond Claims | 44 and 45 |

## EXHIBIT M

DESCRIPTION OF RUM TAX CVI ANNUAL PAYMENT TERMS

**Exhibit M**
**Terms Applicable to Rum Tax CVI Annual Payment**

| TERM | DESCRIPTION |
|---|---|
| 1) **Rum Tax CVI Annual Payment** | |
| **a) Outperformance Metric** | ▪ See Annex 1, which is equivalent to 100% of general fund rum tax collections (i.e., aggregation of Items B, E, and I in Annex 2) per Rum Tax Waterfall (see Annex 2) within CW 2021 Fiscal Plan projections (the "Outperformance Metric") |
| **b) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **c) Rum Tax CVI Notional / Lifetime Cap** | ▪ Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and Rum Tax CVI Annual Payments to holders of Allowed CW/PRIFA Rum Tax Claims subject to an aggregate $1,301,525,288 lifetime cap. |
| **d) Rum Tax CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **e) Supplemental Cover Over** | ▪ Amount per proof-gallon that the U.S. Treasury can cover-over to the Commonwealth of Puerto Rico on account of rum taxes, less $10.50, for the applicable fiscal year |
| **f) Supplemental Cover Over Revenues** | ▪ The amount of Supplemental Cover Over Revenues is calculated as the product of (i) the ratio of Supplemental Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) $10.50 (the "Base Cover Over") and (ii) total rum tax collections received by the Commonwealth as documented within the U.S. Department of Treasury monthly detailed activity report of net excise tax due to the Government of Puerto Rico and certified by Hacienda ("Commonwealth Rum Tax Revenues")<br>   ○ For purposes of calculating the Rum Tax CVI Annual Payment based on outperformance of Waterfall General Fund Rum Tax Collections (as defined below) relative to the Outperformance Metric, the maximum amount of Supplemental Cover Over Revenues in each applicable fiscal year is $88,000,000 ("Supplemental Cover Over Revenues Cap") |

| TERM | DESCRIPTION |
|---|---|
| g) **Waterfall Supplemental Cover Over Revenues** | ▪ The amount of Waterfall Supplemental Cover Over Revenues is calculated as the lesser of (i) Supplemental Cover Over Revenues and (ii) Supplemental Cover Over Revenues Cap |
| h) **Base Cover Over Revenues** | ▪ The amount of Base Cover Over Revenues is calculated as the product of (i) the ratio of the Base Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) the Base Cover Over and (ii) Commonwealth Rum Tax Revenues |
| i) **Waterfall Cover Over Revenues** | ▪ The amount of Waterfall Cover Over Revenues is calculated as the sum of (i) Waterfall Supplemental Cover Over Revenues and (ii) Base Cover Over Revenues |
| j) **Rum Producer Incentive** | ▪ The permitted incentive percentage ("Rum Producer Incentive Percentage", included in calculations of Items D and H in Annex 2) that is utilized in calculating amounts paid to rum producers ("Rum Producer Incentive Payments") is subject to the following constraints:<br>  ○ For the first 10 years (i.e. FY2022-2031), maximum of 46%<br>  ○ For the next 5 years (i.e. FY2032-2036), maximum of 48%<br>  ○ For the following 15 years (i.e. FY2037-2051), maximum of 50%<br>▪ For the avoidance of doubt, any increase in Rum Producer Incentive Percentage within the limits set forth above will not affect the Outperformance Metric<br>▪ Notwithstanding the limits for the purposes of the Rum Tax Waterfall calculation as set forth in this section 1(k), the Rum Producer Incentive Percentage may be increased beyond the limits set forth above at the Commonwealth's discretion, subject to those increases not impacting the Outperformance Condition calculation and payment |
| k) **Permitted Rum Tax Waterfall Deductions** | Permitted Rum Tax Waterfall Deductions are calculated as the sum of the following:<br>▪ Science and Technology Trust (i.e., Item C in Annex 2)<br>  ○ $5 million transferred to the Puerto Rico Science, Research, and Technology Trust Fund account<br>▪ Rum Producer Incentive Payments (i.e., Items D and H in Annex 2)<br>  ○ As described above in section 1(k)<br>▪ Conservation Trust (i.e., Item F in Annex 2) |

| TERM | DESCRIPTION |
|---|---|
| | <ul><li>○ Calculated as the product of (a) Supplemental Cover Over Revenues and (b) $1/6^{th}$</li><li>○ Amount transferred to Puerto Rico Conservation Trust account</li></ul> ■ PRIDCO (i.e., Item G in Annex 2) <ul><li>○ Calculated as the lesser of (i) \$5 million and (ii) (a) 2.5% multiplied by (b) Commonwealth Rum Tax Revenues</li><li>○ Amount transferred to Puerto Rico Industrial Development Company account</li></ul> |
| **l) Waterfall General Fund Rum Tax Collections** | ■ Waterfall General Fund Rum Tax Collections are calculated as (i) Waterfall Cover Over Revenues less (ii) Permitted Rum Tax Waterfall Deductions |
| **m) Rum Tax CVI Annual Payment** | ■ On an annual basis, the lesser of the following: <ul><li>○ (i) 40% of cumulative outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, starting on July 1, 2021, less the aggregate amount of previous Rum Tax CVI Annual Payments</li><li>○ (ii) 50% of annual outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, measured at the conclusion of each fiscal year</li><li>○ (iii) \$30 million</li></ul> |
| **n) Reporting** | ■ Reporting obligations and audit rights related to the Rum Tax Revenues and calculation of the Rum Tax CVI Annual Payment to be agreed upon by no later than the PRIFA Effective Date (as defined within the PRIFA Related Plan Support Agreement) |

**ANNEX 1: OUTPERFORMANCE METRIC**
*($ in USD)*

| Outperformance Metric | | | |
|---|---|---|---|
| **Fiscal Year** | **Amount** | **Fiscal Year** | **Amount** |
| 2022 | $208,569,215.76 | 2037 | $208,781,748.91 |
| 2023 | 200,354,469.05 | 2038 | 209,289,240.57 |
| 2024 | 201,031,406.80 | 2039 | 209,788,269.00 |
| 2025 | 201,692,902.40 | 2040 | 210,278,694.61 |
| 2026 | 202,348,675.07 | 2041 | 210,749,432.35 |
| 2027 | 202,998,555.87 | 2042 | 211,211,199.81 |
| 2028 | 203,632,157.16 | 2043 | 211,674,906.69 |
| 2029 | 204,259,404.03 | 2044 | 212,129,474.13 |
| 2030 | 204,869,786.20 | 2045 | 212,574,772.82 |
| 2031 | 205,473,363.12 | 2046 | 213,021,852.71 |
| 2032 | 206,059,507.07 | 2047 | 213,459,499.22 |
| 2033 | 206,627,882.49 | 2048 | 213,898,852.55 |
| 2034 | 207,188,744.83 | 2049 | 214,339,919.35 |
| 2035 | 207,731,302.94 | 2050 | 214,782,706.32 |
| 2036 | 208,265,935.46 | 2051 | 215,227,220.15 |

## ANNEX 2: RUM TAX WATERFALL[17]

($ in (USD) millions)

| Fiscal Year | Item | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $383 | $341 | $344 | $346 | $348 | $350 | $353 | $355 | $357 | $359 | $361 | $363 | $365 | $367 | $369 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $266 | $224 | $227 | $229 | $231 | $233 | $236 | $238 | $240 | $242 | $244 | $246 | $248 | $250 | $252 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $261 | $219 | $222 | $224 | $226 | $228 | $231 | $233 | $235 | $237 | $239 | $241 | $243 | $245 | $247 |
| Incentive Pay. to Rum Producers | D | (120) | (101) | (102) | (103) | (104) | (105) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (113) | (113) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $141 | $118 | $120 | $121 | $122 | $123 | $125 | $126 | $127 | $128 | $129 | $130 | $131 | $132 | $133 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $93 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| Conservation Trust | F | (8) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $65 | $67 | $68 | $69 | $70 | $72 | $73 | $74 | $75 | $76 | $77 | $78 | $79 | $80 |
| Rum Producers | H | (37) | (30) | (31) | (31) | (32) | (32) | (33) | (33) | (34) | (34) | (35) | (35) | (36) | (36) | (37) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $35 | $36 | $37 | $37 | $38 | $39 | $39 | $40 | $40 | $41 | $42 | $42 | $43 | $43 |
| General Fund | I | (44) | (35) | (36) | (37) | (37) | (38) | (39) | (39) | (40) | (40) | (41) | (42) | (42) | (43) | (43) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $200 | $201 | $202 | $202 | $203 | $204 | $204 | $205 | $205 | $206 | $207 | $207 | $208 | $208 |

| Fiscal Year | Item | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $370 | $372 | $374 | $375 | $377 | $379 | $380 | $382 | $383 | $385 | $386 | $388 | $389 | $391 | $392 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $253 | $255 | $257 | $258 | $260 | $262 | $263 | $265 | $266 | $268 | $269 | $271 | $272 | $274 | $275 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $248 | $250 | $252 | $253 | $255 | $257 | $258 | $260 | $261 | $263 | $264 | $266 | $267 | $269 | $270 |
| Incentive Pay. to Rum Producers | D | (114) | (115) | (116) | (117) | (117) | (118) | (119) | (119) | (120) | (121) | (122) | (122) | (123) | (124) | (124) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $134 | $135 | $136 | $137 | $138 | $139 | $139 | $140 | $141 | $142 | $143 | $144 | $144 | $145 | $146 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| Conservation Trust | F | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $82 | $83 | $84 | $85 | $86 | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 |
| Rum Producers | H | (37) | (38) | (38) | (39) | (39) | (39) | (40) | (40) | (41) | (41) | (41) | (42) | (42) | (42) | (43) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $44 | $45 | $45 | $46 | $46 | $47 | $47 | $48 | $48 | $49 | $49 | $49 | $50 | $50 |
| General Fund | I | (44) | (44) | (45) | (45) | (46) | (46) | (47) | (47) | (48) | (48) | (48) | (49) | (49) | (50) | (50) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $209 | $210 | $210 | $211 | $211 | $212 | $212 | $213 | $213 | $213 | $214 | $214 | $215 | $215 |

---

[17] For the avoidance of doubt, to the extent the Supplemental Cover Over is extended, payments to annual Conservation Trust will be calculated as set forth in section 1(l) above.

**Exhibit B**

**Form of Notice**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                         Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### NOTICE OF (A) ENTRY OF ORDER CONFIRMING
### MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF
### THE COMMONWEALTH OF PUERTO RICO, ET AL. PURSUANT TO
### TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that, pursuant to an order, dated _____ [ECF No. ____] (the "Confirmation Order"), the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* dated January 14, 2022 (as amended, supplemented, or modified, the "Plan"), was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan and the Confirmation Order.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on _____ and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2022; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, (e) relates to actions occurring from and after the respective Debtor's petition date, (f) relates to a Claim that is subject to the provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking allowance of any administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent to the following:

[_____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [_____], 2022 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with**

2

respect to such Administrative Expense Claim) against the Debtors and their property, and the Debtors and Reorganized Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 76.6 of the Plan and decretal paragraph 31 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is a full, final, and complete order, intended to be, conclusive and binding upon all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in the Court and appealed as provided in PROMESA and other applicable federal laws, rules and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

Dated: _____
       San Juan, Puerto Rico

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

/s/ _____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

**Exhibit C**

**Preempted Laws**

**List of Main Statutes Preempted by PROMESA**[8]

**I. Commonwealth good faith and credit pledge statutes**

   A. General Obligation Bonds

      1. Act 2 approved October 10, 1985.
      2. Act 1 approved June 26, 1987, as amended.
      3. Act 34 approved March 4, 2014.
      4. Act 79 approved June 1, 2011.
      5. Act 243 approved August 9, 2008.
      6. Act 43 approved August 1, 2005, as amended.
      7. Act 216 approved August 19, 2004.
      8. Act 100 approved July 12, 2002, as amended.
      9. Act 161 approved July 5, 2003.
      10. Act 149 approved August 9, 2002, as amended.
      11. Joint Resolution No. 57 approved July 12, 1993.
      12. Act 54 approved July 6, 2001.
      13. Act 118 approved July 13, 2000.
      14. Act 153 approved July 16, 1999.
      15. Act 219 approved August 9, 1998.
      16. Act 81 approved August 14, 1997.
      17. Act 119 approved August 9, 1995.
      18. Act 46 approved July 28, 1994.
      19. Act 39 approved May 13, 1976, as amended.
      20. Act 83 approved August 30, 1991.[9]

   B. General Obligation Loans

      1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2. GDB Loans to the Commonwealth
         1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         2. Joint Resolution No. 96 approved November 27, 2013.  [$30 million line of credit].

   C. Commonwealth Guaranty – Public Buildings Authority Bonds

      1. Act 17 approved April 11, 1968, as amended.

   D. Commonwealth Guaranty – APLA

      1. Act 409 approved September 22, 2004.

   E. Commonwealth Guaranty – PRIFA-BANs

      1. Act 1 approved January 1, 2015.

---

[8] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

[9] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

    F.  [Commonwealth Guaranty – PRASA
        1.  Act 45 approved July 28, 1994.]

**II.   Statutes appropriating Commonwealth revenues**
    A.  HTA
        1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681 [motor vehicle license fees]
        2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
        3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
    B.  PRIFA
        1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
    C.  PRIFA BANs
        1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
    D.  MBA
        1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]
    E.  PRITA
        1.  13 L.P.R.A. § 31751(a)(5). [cigarette tax]

    F.  CCDA
        1.  13 L.P.R.A. § 2271v(a). [hotel room tax]
    G.  Act 147 enacted June 18, 1980, as amended
        1. 23 L.P.R.A. § 104.[10] [judiciary appropriation]
    H.  UPR
        1. 18 L.P.R.A. § 621-1.[11]
    I.  Act 83 approved August 30, 1991, as amended[12]
        1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[13]
    J.  Act 221 approved May 15, 1948, as amended
        1. 15 L.P.R.A. § 74(d).[14]
    K.  Act 18 approved January 24, 2014, as amended

---

[10] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[11] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[12] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[13] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted.  In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[14] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

       1. 21 L.P.R.A. § 6742.[15]
   L.  Act 41 approved July 22, 2011, as amended
       1. 12 L.P.R.A. §8105

**III.   TRS and JRS Statutes**
   A.  Act 106 approved August 23, 2017
   B.  Act 160 approved December 24, 2013
   C.  Act 91 of March 24, 2004
   D.  Act 12 approved October 19, 1954
   E.  Act 162 approved December 24, 2013

**IV.   Article VI of the Puerto Rico Constitution**
   A.  Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico
      Constitution to General Obligation bonds and Commonwealth-guaranteed bonds
      or indebtedness restructured pursuant to the Plan are preempted by PROMESA is
      settled by the treatment of such bonds and indebtedness pursuant to the provisions
      of the Plan.  Nothing in the Plan affects or determines whether Article VI,
      Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future
      purpose.

---

[15] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not
    preempted.

# **Exhibit D**

**List of Agencies and Amounts to be Transferred**

| Sources | | | $ millions | | 30-Jun-21 |
|---|---|---|---|---|---|
| **TSA Bank Account Balances** | | | | | |
| **Account Description** | **Account Number** | **Bank Name** | | | |
| TSA Operational | X9458 | Banco Popular | $ | | 2,000 |
| TSA Reserve (Per Fiscal Plan) | X1012 | Banco Popular | | | 304 |
| TSA Cash Concentration | X1020 | Banco Popular | | | 5,742 |
| TSA Overnight Sweep (Repos) | X9036 | Citibank | | | 3,624 |
| TSA Accumulation Account | X2463 | Banco Santander | | | - |
| | | | | | 11,671 |
| **TSA Cash Adjustments** | | | | | |
| Federal Funds in the TSA | | | | | (76) |
| **TSA Bank Accounts** | | | | $ | 11,595 |
| **Sweep Account Balances** | | | | | |
| **Account Description** | **Account Number** | **Bank Name** | | | |
| Excise, Inheritance, Gifts, and Licenses | X3630 | Banco Popular | $ | | 158 |
| Sales & Use Tax (SUT/IVU) | X4406 | Banco Popular | | | 54 |
| | | | | | 212 |

| Sources | | | $ millions | | 30-Jun-21 |
|---|---|---|---|---|---|
| **Cash at Commonwealth Agencies** | | | | | |
| **Account Holder** | **Account Number** | **Bank Name** | | | |
| Hacienda | X7205 | Banco Popular | $ | | 46 |
| Hacienda | X7044 | Banco Popular | | | 339 |
| Hacienda | X9038 | Banco Popular | | | 556 |
| Hacienda | X9857 | Banco Popular | | | 147 |
| Controller's Office | X0251 | Banco Popular | | | 11 |
| Department of Economic Development and Commerce | X4551 | Banco Popular | | | 22 |
| Department of Economic Development and Commerce | X4527 | Banco Popular | | | 6 |
| Department of Economic Development and Commerce | X4519 | Banco Popular | | | 4 |
| Department of Economic Development and Commerce | X1301 | Banco Popular | | | 10 |
| Department of Economic Development and Commerce | X5730 | Banco Popular | | | 50 |
| Department of Housing | X5636 | Banco Popular | | | 8 |
| Department of Housing | X5571 | Banco Popular | | | 5 |
| Department of Housing | X0037 | Banco Popular | | | 0 |
| Department of Education | X3706 | Banco Popular | | | 13 |
| Department of Labor | X0308 | Banco Popular | | | 178 |

| | | | |
|---|---|---|---:|
| Department of Labor | X0286 | Banco Popular | 13 |
| Environmental Quality Board | X0316 | Banco Popular | 10 |
| Office of Court Administration | X9562 | First Bank | 102 |
| Office of Court Administration | X1022 | Citibank | 6 |
| Office of Court Administration | X0974 | First Bank | 10 |
| Puerto Rico Energy Commission | X3064 | Banco Popular | 7 |
| Puerto Rico Energy Commission | X3056 | Banco Popular | 33 |
| Puerto Rico Police Bureau | X9598 | Banco Popular | 30 |
| Senate | X2665 | First Bank | 8 |
| Senate | X2687 | First Bank | 1 |
| Statistics Institute of PR | X7055 | Banco Popular | 4 |
| Superintendent of the Capitol | X2775 | First Bank | 1 |
| Superintendent of the Capitol | X2764 | First Bank | 1 |
| Department of Justice – Office of Inspector General | X6054 | Banco Popular | 3 |
| Forensics Science Bureau | X4496 | Banco Popular | - |
| Forensics Science Bureau | X1681 | Banco Popular | 3 |
| Government Ethics Office | X0828 | First Bank | 0 |
| Government Ethics Office | X1067 | Banco Popular | 4 |
| Government Ethics Office | X1059 | Banco Popular | 0 |
| Government Ethics Office | X2001 | Banco Popular | 3 |
| House of Representatives | X2610 | First Bank | 5 |
| Office of Legislative Services | X2819 | First Bank | 3 |
| Office of Legislative Services | X2808 | First Bank | - |
| Office of Legislative Services | X2797 | First Bank | - |
| Office of Legislative Services | X2786 | First Bank | 6 |
| PR Federal Affairs Administration | X3037 | Citibank | 0 |
| PR Federal Affairs Administration | X9332 | Citibank | 1 |
| PR Federal Affairs Administration | X9316 | Citibank | 0 |
| Electric Lottery | X5328 | First Bank | 20 |
| | | | 1,668 |

| Sources | | $ millions | 30-Jun-21 |
|---|---|---|---|

**Cash from ERS and PBA**

| Account Holder | Account Number | Bank Name | | |
|---|---|---|---|---:|
| Employee Retirement System | X0514 | BNY Mellon | $ | 141 |
| Employee Retirement System | X8059 | Banco Popular | | 95 |
| Employee Retirement System | X4554 | Banco Popular | | 30 |
| Employee Retirement System | X4546 | Banco Popular | | 111 |
| Employee Retirement System | X1185 | Banco Popular | | 3 |
| Employee Retirement System | X1177 | Banco Popular | | 10 |
| Public Building Authority | X2002 | US Bank | | 3 |
| Public Building Authority | X9006 | US Bank | | 4 |
| Public Building Authority | X7589 | Oriental Bank | | 16 |
| Public Building Authority | X4707 | Oriental Bank | | 13 |

| Public Building Authority | | X1571 | Oriental Bank | 5 |
| Public Building Authority | | X5578 | Oriental Bank | 10 |
| Public Building Authority | | X4128 | Banco Popular | 62 |
| Public Building Authority | | X5019 | Banco Popular | 9 |
| | | | | 512 |

| Sources | $ millions | 30-Jun-21 |
| --- | --- | --- |

**Cash from TRS and JRS**

| Account Holder | Account Number | Bank Name | |
| --- | --- | --- | --- |
| Teacher Retirement System | X7036 | Banco Popular | 116 |
| Teacher Retirement System | X0244 | Banco Popular | 13 |
| Teacher Retirement System | X8820 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X1223 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X5199 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X4538 | Banco Popular | 35 |
| | | | 164 |

**Exhibit E**

**Certification Notice**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF RETAIL INVESTOR CERTIFICATION

On [_____], the United States District Court for the District of Puerto Rico (the "Court") entered an order confirming the *Modified Eight Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (as amended, supplemented, or modified, the "Plan").[2]  The Plan provides for certain distributions to be made to "Retail Investors."

A "Retail Investor" is an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s).

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]  Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings given to them in the Plan.

If you are a "Retail Investor" and did <u>not</u> submit a vote to accept or reject the Plan on or before 5:00 p.m. (Atlantic Standard Time) on October 18, 2021 (or submitted such vote, which you timely revoked), you must identify yourself to be eligible to receive the appropriate distributions as a "Retail Investor" pursuant to the Plan. Instructions to identify yourself and certify (the "<u>Certification</u>") that you meet the requirements to be a "Retail Investor" are provided below.

For the avoidance of doubt, if you submitted a valid vote into ATOP on or before October 18, 2021, and your bonds were subsequently released from ATOP after October 18, 2021 in accordance with the Disclosure Statement Order, you are not eligible to submit a Certification.

The deadline for your broker or nominee to submit your certification as a Retail Investor is **[      ], 2022 at 6:00 p.m. (Atlantic Standard Time)** (the "<u>Certification Deadline</u>").[3] **Note that your broker or nominee may set an earlier deadline to provide it sufficient time to submit your certification before the Certification Deadline.**

The record date to determine holders of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** eligible to receive this Certification Notice and make the Certification is 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, which coincides with the conclusion of the original voting and distribution election events for the Plan.

For the avoidance of doubt, if you traded the bonds associated with the **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** after the Certification Record Date, but submit a valid Certification into ATOP pursuant to these instructions, only you will receive the Retail Support Fee based on the Certification. Any other entitlement or distribution pursuant to the terms of the Plan will be made to the holder of such bonds at the time of distribution.

### <u>How to Submit a Valid Certification</u>

If you wish to certify that, as of 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, you were:

> an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s)

---

[3] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

you must instruct your broker or nominee (each, a "**Nominee**") to electronically deliver all of your aforementioned bonds via the Automated Tender Offer Program ("**ATOP**") at The Depository Trust Company ("**DTC**") in accordance with your desire to instruct on the above certification.

**If you and/or your Nominee do not electronically deliver your bonds via ATOP (i.e., take no action), you will be deemed <u>not</u> to be a Retail Investor.**

\*     \*     \*     \*     \*

In addition, by delivering your bonds via ATOP, you are certifying that:

1. either (a) your certification is the only certification by you on account of a **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]**, or (b) in addition to the certification, one or more additional certifications ("**Additional Certifications**") on account of other bonds have been submitted by one or more Nominees, and you have provided (or coordinated with your Nominee to provide) the Numerosity Spreadsheet (as defined below) to the Balloting Agent by the Certification Deadline;

2. you have submitted a Certification for all of your Claims on account of the bonds to which this Notice pertains and acknowledge that no split Certifications will be permitted;

3. you are the holder of the Claims on account of bonds to which this Notice pertains or is an authorized signatory of such holder, and has full power and authority to make the Certification; and

4. your Certification is subject to all the terms and conditions set forth in the Plan, Disclosure Statement, and Disclosure Statement Order.

No paperwork is required to be delivered to Prime Clerk LLC to effectuate the Certification (except in the limited circumstance noted below in the section titled "*Numerosity Information Request – Applicable Only for Beneficial Holders Submitting More Than One Instruction Through ATOP*"). The sole means of effectuating this Certification is to (i) validly tender your bonds into the proper ATOP envelope at DTC, and (ii) make the required certification set forth above, each as described on DTC's ATOP system.

| **THE CERTIFICATION  DEADLINE IS**<br>**6:00 P.M. (ATLANTIC STANDARD TIME) ON [_____], 2022.[4]**<br><br>This date and time is referred to as the "**Certification Deadline**." |
| --- |

---

[4] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR BONDS THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR BONDS THROUGH THE EFFECTIVE DATE.**

**YOU MAY REVOKE YOUR CERTIFICATION AND WITHDRAW ANY TENDERED BONDS AT ANY TIME BEFORE THE CERTIFICATION DEADLINE.**

\*   \*   \*   \*   \*

### How to Revoke a Valid Certification

You may revoke your Certification and withdraw your bonds tendered through DTC's ATOP at any time on or before the Certification Deadline.

If you wish to revoke your Certification, you must instruct your Nominee to revoke your Certification and withdraw your bonds via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the revocation.

If you revoke your Certification any time before the Certification Deadline, you may make a Certification again at any time before the Certification Deadline, in accordance with the instructions to submit a valid Certification above.

\*   \*   \*   \*   \*

### Numerosity Information Submission
### (Applicable Only for Beneficial Holders Submitting More than One Certification Through ATOP)

Any beneficial holder of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** that holds multiple CUSIPs of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** and submits more than one certification through one or more Nominees, MUST submit (or coordinate with your Nominee(s) to submit) a list of all such ATOP instruction confirmation numbers (also referred to as ATOP voluntary offer instructions or "**VOIs**"). The Balloting Agent has made available a template electronic spreadsheet (the "**Numerosity Spreadsheet**") on its website at: https://cases.primeclerk.com/puertorico (click on the link titled "Numerosity Spreadsheet").

Please return (or coordinate with your Nominee to return) the Numerosity Spreadsheet to the Balloting Agent in excel format via email to puertoricoinfo@primeclerk.com. If you anticipate any difficulty in submitting your Numerosity Spreadsheet in excel format, please contact Prime Clerk at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international

callers) or by e-mail at [puertoricoballots@primeclerk.com](mailto:puertoricoballots@primeclerk.com) .

\*   \*   \*   \*   \*

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK, LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOINFO@PRIMECLERK.COM AND REFERENCE "RETAIL INVESTOR SOLICITATION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

EXHIBIT E

REPORTING AGREEMENT

4842-1351-5245.34

**REPORTING AGREEMENT**
(*Commonwealth of Puerto Rico*
*General Obligation Restructured Bonds*)

This Reporting Agreement (the "<u>Agreement</u>") is executed and delivered by the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") as of March 15, 2022 (the "<u>Effective Date</u>") in connection with the issuance of its $7,414,018,543.25 aggregate principal amount at issuance of Commonwealth of Puerto Rico General Obligation Restructured Bonds (the "<u>Restructured Bonds</u>"), pursuant to the terms of the Trust Agreement (as defined herein).

### Section 1.  Definitions.

Capitalized terms not otherwise defined herein shall have the same meanings ascribed thereto in the Trust Agreement.

"*Agreement*" has the meaning set forth in the preamble.

"*Annual Report*" means the report provided by the Commonwealth pursuant to and as specified in Sections 3(b), 3(c) and 4 hereof.

"*Catch Up Period*" means the period between the Effective Date and the earlier of (i) the last day of the Fiscal Year in which audited financial statements for all prior Fiscal Years of the Commonwealth have been completed and made available and (ii) June 30, 2023.

"*Commonwealth*" has the meaning set forth in the preamble.

"*Dissemination Agent*" means the Puerto Rico Fiscal Agency and Financial Advisory Authority, acting in its capacity as Dissemination Agent hereunder, or any successor Dissemination Agent designated in writing by the Commonwealth and which has filed with the Commonwealth a written acceptance of such designation.

"*Effective Date*" has the meaning set forth in the preamble.

"*EMMA System*" means the MSRB's Electronic Municipal Market Access system or any successor nationally recognized municipal securities information repository.

"*Financial Obligation*" means (i) a debt obligation (including a contingent value instrument); (ii) derivative instrument entered into in connection with, or pledged as a security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii).  The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB.

"*Fiscal Year*" means the twelve-month period at the end of which the financial position of the Commonwealth and results of its operation for such period are determined. Currently, the Commonwealth's Fiscal Year begins July 1 and continues through June 30 of the next year.

"*Holder*" means any registered owner of Restructured Bonds and any beneficial owner of Restructured Bonds within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

"*Listed Events*" means any of the events listed in Section 5(a) hereof.

"*MSRB*" means the Municipal Securities Rulemaking Board established in accordance with the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

*"Restructured Bonds"* has the meaning set forth in the preamble.

*"Trust Agreement"* means the Trust Agreement related to the Restructured Bonds, as may be amended and supplemented from time to time, dated as of March 15, 2022, by and between the Commonwealth and the Trustee.

*"Trustee"* means UMB Bank, N. A., as trustee under the Trust Agreement.

**Section 2.   Purpose of the Agreement.** This Agreement is being executed and delivered by the Commonwealth for the benefit of the Holders of the Restructured Bonds and the Trustee, on behalf of the Holders.

**Section 3.   Provision of Annual Audited Financial Statements and Annual Report.**

(a)   During the Catch Up Period, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the audited financial statements of the Commonwealth, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units, promptly upon such audited financial statements being available.

(b)   Not later than 180 days following the date on which the audited financial statements for the Fiscal Year ending June 30, 2022 are provided to the MSRB through the EMMA System pursuant to (a) above, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating the Fiscal Year ending June 30, 2022 that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(c)   After the Catch Up Period, not later than 305 days following the end of each Fiscal Year, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating to the immediately preceding Fiscal Year (commencing with the Annual Report for the last Fiscal Year of the Catch Up Period) that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(d)   If in any Fiscal Year, the Commonwealth does not provide the Annual Report to the MSRB by the time specified in subsections (b) or (c) above, the Commonwealth shall, in each case, instead file, or shall cause the Dissemination Agent to file, a notice, substantially in the form of Exhibit A, to the MSRB through the EMMA System stating that the Annual Report has not been timely completed and, if known, stating the date by which the Commonwealth expects to file the Annual Report. For the avoidance of doubt, provision of the notice described in this Section 3(d) will not satisfy the Commonwealth's obligation to file the Annual Reports required by Section 3(b) and 3(c).

**Section 4.   Content of Annual Report.**

The Annual Report shall contain or incorporate by reference the following:

(a)     the audited financial statements of the Commonwealth for the prior Fiscal Year, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units;

(b)     a summary of the Commonwealth's budget for the corresponding Fiscal Year;

(c)     other material information related to the Commonwealth's economy, revenues, expenditures, indebtedness, and pending litigation, in each case, to the extent not included in the Commonwealth's audited financial statements;

(d)     illustrative calculations of the Comprehensive Cap and the limitation on the incurrence of public debt established in Article VI, Section 2 of the Constitution of the Commonwealth of Puerto Rico; and

(e)     such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

**Section 5.   Reporting of Listed Events.**

(a)     The Commonwealth shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Restructured Bonds not later than ten (10) business days after the occurrence of the event:

1.   Principal and interest payment delinquencies;

2.   Non-payment related defaults, if material;

3.   Unscheduled draws on debt service reserves reflecting financial difficulties;

4.   Unscheduled draws on credit enhancements reflecting financial difficulties;

5.   Substitution of credit or liquidity providers, or their failure to perform;

6.   Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Restructured Bonds, or other material events affecting the tax status of the Restructured Bonds;

7.   Modifications to rights of Holders of Restructured Bonds, if material;

8.   Bond calls, if material, and tender offers;

9.   Defeasances;

10.  Release, substitution, or sale of property securing repayment of the Restructured Bonds, if material;

3

11. Rating changes;

12. Bankruptcy, insolvency, receivership or similar event of the Commonwealth; or

13. The consummation of a merger, consolidation, or acquisition involving the Commonwealth or the sale of all or substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

14. The appointment of a successor or additional trustee or the change of name of a trustee, if material;

15. Incurrence of a Financial Obligation of the Commonwealth, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the Commonwealth, any of which affect security holders, if material; and

16. The default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Commonwealth, any of which reflect financial difficulties.

**Note:** For the purposes of the event identified in subparagraph (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Commonwealth in a proceeding under the U.S. Bankruptcy Code, PROMESA (or a successor thereof) or in any other proceeding under state, Commonwealth or federal law in which a court (including, but not limited to, the Title III Court) or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Commonwealth, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court (including, but not limited to, the Title III Court) or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Commonwealth, other than in connection with the filing of the Plan with the Title III Court and approval of the Plan by the Title III Court or the retention of jurisdiction by the Title III Court in connection with the Plan.

(b) The Commonwealth shall, within ten (10) business days of occurrence of a Listed Event, file a notice of such occurrence with the MSRB through the EMMA System in electronic format, accompanied by such identifying information as is prescribed by the MSRB. Notwithstanding the foregoing, the Listed Events in subsections (a)(3), (4), and (5) of this Section 5 are not applicable to the Restructured Bonds. For the avoidance of doubt, subsection (a)(3) of this Section 5 is not intended to permit withdrawals from the Debt Service Fund or any other fund or account except as contemplated by the Trust Agreement. Moreover, notice of the Listed Event described in subsection (a)(8) of this Section 5 need not be given (i) in the event of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in the Trust Agreement or the corresponding Supplemental Trust Agreement, the only open issue is which Restructured Bonds will be redeemed in the case of a partial redemption, and the notice of redemption is given to the Holders as required pursuant to Securities Exchange Act of 1934 Release No. 34-23856, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Restructured Bonds or (ii) any earlier than the notice (if any) of the underlying event is given to Holders of affected Restructured Bonds pursuant to the Trust Agreement.

**Section 6.   Remedies.** If the Commonwealth shall fail to comply with any provision of this Agreement, then the Trustee or any Holder may enforce, for the equal benefit and protection of all Holders similarly situated, by mandamus or other suit or proceeding in law or in equity, this Agreement against the Commonwealth and any of the officers, agents and employees of the Commonwealth, and may compel the Commonwealth or any such officers, agents or employees to perform and carry out their duties under this Agreement; provided that the sole and exclusive remedy for breach of this Agreement shall be an action to compel specific performance of the obligations of the Commonwealth hereunder and no person or entity shall be entitled to recover monetary damages hereunder under any circumstances, and, provided further, that any challenge to the adequacy of any information provided pursuant to Section 3, 4 or 5 hereof may be brought only by the Holders holding a Quarter in Interest of the Restructured Bonds at the time outstanding or the Trustee as directed in writing by the Holders of such amount of Restructured Bonds. Provided; however, neither the Trustee nor such Holders may institute any suit, action or proceeding at law or in equity for the enforcement of this Agreement or for any remedy for breach thereof, unless such Trustee or Holders, as the case may be, shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have failed to comply within a reasonable time (and in no event in excess of 60 days after such request). Any action shall be instituted in the Title III Court and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, a court of Commonwealth of Puerto Rico located in the Municipality of San Juan, Puerto Rico or any appellate court therefrom. A failure by the Commonwealth to comply with the provisions of this Agreement shall not constitute an event of default under the Trust Agreement or any other applicable resolution, trust agreement, indenture or other debt authorization of the Commonwealth.

**Section 7.   Dissemination Agent.** The Commonwealth may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Agreement and may discharge any such agent, with or without appointing a successor Dissemination Agent. If at any time there is not any other designated Dissemination Agent, the Commonwealth shall be the Dissemination Agent.

**Section 8.   Parties in Interest.** This Agreement is executed and delivered solely for the benefit of the Holders and the Trustee on behalf of such Holders under the Trust Agreement. No other person shall have any right to enforce the provisions hereof or any other rights hereunder.

**Section 9.   Amendment.** Without the consent of any Holders of Restructured Bonds, the Commonwealth at any time and from time to time may enter into any amendments or changes to this Agreement for any of the following purposes:

(a)   to add a dissemination agent for the information required to be provided hereby and to make any necessary or desirable provisions with respect thereto;

(b)   to add to the covenants of the Commonwealth for the benefit of the Holders, or to surrender any right or power herein conferred upon the Commonwealth; or

(c)   to modify the contents, presentation and format of the Annual Report from time to time as a result of a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of the Commonwealth.

**Section 10.   Additional Information.** Nothing in this Agreement shall be deemed to prevent the Commonwealth from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Report, in addition to that which is required by this Agreement. If the Commonwealth chooses to include any

information in any Annual Report not specifically required by this Agreement, the Commonwealth shall not have any obligation under this Agreement to update such information, and the Commonwealth shall have no obligation to include it in any future Annual Report.

**Section 11.    Termination of Obligation.** This Agreement shall remain in full force and effect until such time as all principal of and interest on the Restructured Bonds shall have been paid in full or legally defeased pursuant to the Trust Agreement. Upon any such legal defeasance, the Commonwealth shall provide notice of such defeasance to the EMMA System. Such notice shall state whether the Restructured Bonds have been defeased to maturity or to redemption and the timing of such maturity or redemption.

**Section 12.    Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO DETERMINED WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.


[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned has executed this Reporting Agreement on the date first written above.

**COMMONWEALTH OF PUERTO RICO**

By: _____
Name: ███████████████
Title: Secretary of Treasury

*[Signature Page to Reporting Agreement – General Obligation Bonds]*

**REPORTING AGREEMENT**
**EXHIBIT A**

FORM OF NOTICE TO THE MUNICIPAL SECURITIES RULEMAKING BOARD
OF FAILURE TO FILE ANNUAL REPORT

Name of Issuer:          Commonwealth of Puerto Rico
Name of Bond Issue:      Commonwealth of Puerto Rico, General Obligation Restructured Bonds
Date of Issuance:        March 15, 2022

NOTICE IS HEREBY GIVEN that the Issuer has not provided the Annual Report for fiscal year
[_____] as required by Section 3(b) or 3(c) of the Reporting Agreement of the Issuer, dated the Date of
Issuance. [The Issuer anticipates that the Annual Report for fiscal year [_____] will be filed by
_____.]

Dated:

                         COMMONWEALTH OF PUERTO RICO


                         By:  [to be signed only if filed]

EXHIBIT F

TRUSTEE FEE SCHEDULE

<u>Acceptance Fee</u>                                                    $███████

<u>Trustee Administration Fees</u>

    GO Current Interest Bonds                              $███████

    GO 5.375% Capital Appreciation Bonds        $███████

    GO 5.0% Capital Appreciation Bonds            $███████

F-1

**<u>EXHIBIT B</u>**

CVI Trust Agreement

Case:17-03283-LTS Doc#:20353 Filed:03/15/22 Entered:03/15/22 23:41:05 Desc: Main Document Page 520 of 1477

The enclosed electronic (PDF) document has been created by scanning an original paper document. Optical Character Recognition (OCR) has been used to create searchable text. OCR technology is not perfect, and therefore some words present in the original document image may be missing or altered or may run together with adjacent words in the searchable text.

# TRUST AGREEMENT

## (relating to CVIs)

### by and between

### COMMONWEALTH OF PUERTO RICO

### and

### THE BANK OF NEW YORK MELLON, as Trustee

_____

### Dated as of March 15, 2022

_____

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION ............................................................... 4

    Section 1.01    Definitions ................................................................. 4
    Section 1.02    Rules of Construction .................................................. 23

ARTICLE II. AUTHORIZATION AND ISSUANCE OF NOTES ........................................... 23

    Section 2.01    Authorization of Notes ................................................ 23
    Section 2.02    Provisions for Issuance of Notes .................................... 25

ARTICLE III. GENERAL TERMS AND PROVISIONS OF NOTES ...................................... 26

    Section 3.01    Place and Medium of Payment ...................................... 26
    Section 3.02    Legends ................................................................... 27
    Section 3.03    CUSIP Numbers ....................................................... 27
    Section 3.04    Execution and Authentication ...................................... 27
    Section 3.05    Interchangeability of Notes ......................................... 28
    Section 3.06    Transfer and Registry ................................................. 28
    Section 3.07    Transfer of Notes ...................................................... 28
    Section 3.08    Regulations with Respect to Exchanges and Transfers......... 29
    Section 3.09    Notes Mutilated, Destroyed, Lost or Stolen ...................... 29
    Section 3.10    Book Entry Notes ..................................................... 30
    Section 3.11    Preparation of Definitive Notes; Temporary Notes .............. 31

ARTICLE IV. REDEMPTION OF NOTES ........................................................................... 32

    Section 4.01    Authorization of Redemption ....................................... 32
    Section 4.02    Extraordinary Redemption of GO CVIs at Election of Commonwealth ...................................................... 32
    Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of Commonwealth ...................................................... 32
    Section 4.04    Extraordinary Redemption at the Election of the Commonwealth ........ 32
    Section 4.05    Selection of Notes to be Redeemed................................ 32
    Section 4.06    Notice of Redemption ................................................ 33
    Section 4.07    Payment of Redeemed Notes ....................................... 33

ARTICLE V. LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;  PLEDGED DEPOSITS AND APPLICATION THEREOF ................................................................ 34

    Section 5.01    Lien on Trust Estate .................................................. 34
    Section 5.02    Establishment of Funds and Accounts ............................ 34
    Section 5.03    Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition............ 35
    Section 5.04    Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.................................................. 38
    Section 5.05    Not Subject to Waterfall Outperformance Amount .............. 40
    Section 5.06    Rum Tax CVI Annual Payment Amount .......................... 42
    Section 5.07    HTA Clawback CVI Priority Distribution Waterfall ............ 43
    Section 5.08    CVIs Payment Fund ................................................. 43
    Section 5.09    Trustee and Independent Consultant Expenses Fund............ 45

# TABLE OF CONTENTS
## (continued)

**Page**

ARTICLE VI. INVESTMENT OF FUNDS ...................................................................... 46

    Section 6.01    Investment of Funds ................................................................ 46
    Section 6.02    Liability for Investments ......................................................... 47

ARTICLE VII. PARTICULAR COVENANTS .............................................................. 47

    Section 7.01    Payment of Notes ..................................................................... 47
    Section 7.02    Pledge of Good Faith, Credit and Taxing Power of
                  Commonwealth ........................................................................ 47
    Section 7.03    Powers as to Notes ................................................................... 48
    Section 7.04    Further Assurance .................................................................... 48
    Section 7.05    Offices for Payment and Registration of Notes ...................... 48
    Section 7.06    General ..................................................................................... 48
    Section 7.07    Non-Impairment Covenant ...................................................... 48
    Section 7.08    Baseline SUT Reduction and SUT True-Up ........................... 49
    Section 7.09    Substitute Measured Tax .......................................................... 50
    Section 7.10    Tax Covenant ........................................................................... 50
    Section 7.11    Comprehensive Cap on Net Tax Supported Indebtedness ...... 50
    Section 7.12    Rum Tax Reporting .................................................................. 51
    Section 7.13    Creation of Liens. The Commonwealth shall not create or cause
                  to be created any lien or charge on the Trust Estate, other than as
                  provided in Section 5.01 hereof ............................................... 51
    Section 7.14    Fiscal Plan ............................................................................... 51
    Section 7.15    Reporting Requirements ........................................................... 51
    Section 7.16    Cap on Notional Amount ......................................................... 51
    Section 7.17    Subsequent Bankruptcy Case ................................................... 51

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT ................... 52

    Section 8.01    Appointment and Acceptance of Trustee ................................ 52
    Section 8.02    Appointment and Acceptance of Paying Agents...................... 52
    Section 8.03    Responsibilities of Trustee and Paying Agents....................... 52
    Section 8.04    Property Held in Trust.............................................................. 52
    Section 8.05    Rights of the Trustee and the Paying Agent............................ 53
    Section 8.06    Compensation and Indemnification ......................................... 55
    Section 8.07    Permitted Acts ......................................................................... 56
    Section 8.08    Resignation of Trustee ............................................................. 56
    Section 8.09    Removal of Trustee .................................................................. 56
    Section 8.10    Successor Trustee and/or Paying Agent................................... 56
    Section 8.11    Transfer of Rights and Property to Successor Trustee............. 57
    Section 8.12    Merger or Consolidation of the Trustee ................................... 58
    Section 8.13    Ancillary Agreements .............................................................. 58

ARTICLE IX. AMENDMENTS TO TRUST AGREEMENT............................................ 58

    Section 9.01    Modification and Amendment without Consent ..................... 58
    Section 9.02    Supplemental Trust Agreements Effective with Consent of
                  Holders .................................................................................... 59
    Section 9.03    General Provisions Relating to Supplemental Trust Agreements.......... 59

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS ............................................................................................................ 60

    Section 10.01   Powers of Amendment ...................................................... 60
    Section 10.02   Consent of Holders .......................................................... 61
    Section 10.03   Modifications by Unanimous Consent ............................. 61
    Section 10.04   Mailing ............................................................................ 61
    Section 10.05   Exclusion of Notes .......................................................... 62
    Section 10.06   Notation on Notes ............................................................ 62

ARTICLE XI. DEFAULTS AND REMEDIES .............................................................. 62

    Section 11.01   Events of Default ............................................................. 62
    Section 11.02   No Acceleration with Respect to the Notes ..................... 63
    Section 11.03   Enforcement of Remedies ............................................... 63
    Section 11.04   Priority of Payments after Default .................................. 63
    Section 11.05   Termination of Proceedings ............................................ 64
    Section 11.06   Holders' Direction of Proceedings .................................. 65
    Section 11.07   Control by Holders of Notes; Limitations ....................... 65
    Section 11.08   Actions by Trustee; Possession of Notes by Trustee Not Required ....... 66
    Section 11.09   Waiver and Non–Waiver of Default ................................ 66
    Section 11.10   Notice of Event of Default .............................................. 66
    Section 11.11   Remedies Not Exclusive .................................................. 67

ARTICLE XII. DEFEASANCE ...................................................................................... 67

    Section 12.01   Discharge and Defeasance ............................................... 67

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY NOTE HOLDERS  AND PROOF OF OWNERSHIP OF NOTES ................................................................. 68

    Section 13.01   Evidence of Signatures of Holders and Ownership of Notes ................ 68

ARTICLE XIV. MISCELLANEOUS ............................................................................. 68

    Section 14.01   Preservation and Inspection of Documents ..................... 68
    Section 14.02   Money and Funds Held for Particular Notes .................... 69
    Section 14.03   Cancellation of Notes ...................................................... 69
    Section 14.04   No Recourse under Trust Agreement or on the Notes ...... 69
    Section 14.05   Severability of Invalid Provision ..................................... 69
    Section 14.06   Parties of Interest ............................................................ 69
    Section 14.07   Notices ............................................................................. 69
    Section 14.08   Headings .......................................................................... 70
    Section 14.09   Governing Laws .............................................................. 70
    Section 14.10   Retention of Jurisdiction of Title III Court ...................... 70
    Section 14.11   Signatures and Counterparts ............................................ 70
    Section 14.12   Successors and Assigns ................................................... 71
    Section 14.13   Conflicts .......................................................................... 71
    Section 14.14   Force Majeure ................................................................. 71

**TABLE OF CONTENTS**

**(continued)**

**Page**

Attachment 1     5.5% SUT Baseline
Attachment 2     PRIFA Rum Tax CVI Outperformance Metric
Attachment 3     GO CVI Allocation Summary
Attachment 4     Clawback CVI Allocation Summary
Attachment 5     Form of GO CVI (includes variations for different GO CVI Subseries)
Attachment 6     Form of Clawback CVI (includes variations for different Clawback CVI Subseries
                 and Sub-Subseries)
Attachment 7     Calculations relating to GO CVIs and Clawback CVIs Payments
Attachment 8     Illustrative scenarios of the calculation of the GO and Clawback CVIs Annual
                 Payment Amounts
Attachment 9     Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment
                 Amount
Attachment 10    Reporting Agreement
Attachment 11    Form of Initial Calculation Agent Agreement
Attachment 12    Trustee Fee Schedule

EXHIBIT A - CONFIRMATION ORDER

# TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and **THE BANK OF NEW YORK MELLON**, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Holders that it has authorized this Trust Agreement.

## R E C I T A L S

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Case, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below) attached hereto as Exhibit A, the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were the resolution of certain claims relating to the Commonwealth's general obligation bonds and certain other liabilities of the Commonwealth and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Notes (as defined below) pursuant to this Trust Agreement.

On October 26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the CVI Legislation (as defined below) which, among other things, authorized the issuance of the Notes and the irrevocable pledge of the good faith[1], credit and taxing power of the Commonwealth for the prompt payment of the Notes when due.

---

[1]    "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution.  "Good faith" is the literal translation of the term "buena fe".  See Article VI, Section 2 of the Commonwealth's Constitution.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the CVI Legislation, the Title III Court made a binding determination that the Notes are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Puerto Rico law and federal law:

a.  The Confirmation Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.

b.  Confirmation of the Plan constitutes a judicial determination, pursuant to Section 4 of PROMESA, that all laws, rules and regulations giving rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules and regulations.

c.  The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and of the Plan, and the Notes in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

d.  Pursuant to PROMESA, including Section 4 thereof, as well as Sections 944 and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Title III Court determined that the Notes, and the covenants by the Commonwealth, for the benefit of the Holders of the Notes as provided in the CVI Legislation, this Trust Agreement or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

e.  The Notes are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the Commonwealth may legally pledge its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of the Notes.

f.  Pursuant to the CVI Legislation, the Commonwealth has validly pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for payment with respect to the Notes.

g.  In light of the enactment of the CVI Legislation, upon execution by all parties hereto, this Trust Agreement shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with its terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

h.  At the time of issuance and delivery of the Notes, the Commonwealth is hereby directed to have stamped or written on each of the Notes a legend substantially as follows:

DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022

All things have been done which are necessary to make the Notes, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust indenture for the security of the Holders (as defined below), in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Notes are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Notes as follows:

This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the CVI Legislation, and the rights and remedies of the Holders.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, amounts available for the payment of the Notes shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Notes issued and to be issued hereunder, without preference, priority or distinction as to participation in the Trust Estate (as defined below), and the benefit and protection thereof of one Note over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Notes shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a) (i) the Commonwealth or its successors or assigns shall (A) well and truly pay or cause to be paid the Notes, according to the provisions set forth in the Notes, respectively and each of them or (B) provide for the payment of Notes by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, or (ii) the GO CVIs Final Maturity Date and the Clawback CVIs Final Maturity Date (each as defined below) shall have occurred and there shall be no obligation of the Commonwealth hereunder to make any additional payments on the GO CVIs or the Clawback CVIs (each as defined below), respectively, and (b) the Commonwealth or its successors or assigns shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth or its successors or assigns, then, provided no Notes remain

Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Notes are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Notes are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"5.5% SUT"** means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).  In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 hereof, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

**"5.5% SUT Baseline"** reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 hereto.  Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall substitute a revised Attachment 1 prepared by the Calculation Agent for the then applicable Attachment 1 as provided in Sections 7.08 and 7.09 hereof and in the Calculation Agent Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1.

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Ancillary Agreements"** means the Trust Agreement, the Confirmation Order, the Plan, the Calculation Agent Agreement, the Reporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

- 4 -

"**Annual Clawback CVI Carryforward Amount**" as described in Section 5.04(c)(ii)(B) or (C) hereof, as applicable.

"**Annual GO CVI Carryforward Amount**" as described in Section 5.04(c)(i)(B) hereof.

"**Annual Waterfall Payment**" as described in Section 5.04(e) and (f) hereof, as applicable.

"**Authorized Officer**" means (a) in the case of the Commonwealth, the Governor of the Commonwealth, the Secretary of Treasury or such other officer of a Government Entity as may be designated by the Governor through executive order, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

"**Base Cover Over**" means the lesser of (a) $10.50 per proof gallon of the Rum Tax and (b) the amount per proof gallon of the Rum Tax required to be covered over to the Commonwealth by the U.S. Department of Treasury pursuant to the U.S. Internal Revenue Code of 1986.

"**Base Cover Over Revenues**" means the product of (a) Commonwealth Rum Tax Revenues, and (b) the ratio of the Base Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.

"**Baseline SUT Reduction**" has the meaning set forth in Section 7.08(b) hereof.

"**Book Entry Note**" means a Note issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

"**Calculation Agent**" means the Person serving in such capacity under the Calculation Agent Agreement from time to time.  The Calculation Agent must be an Independent Consultant for all purposes of this Trust Agreement.

"**Calculation Agent Agreement**" means the Calculation Agent Agreement, dated as of March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time, including any successor agreements thereto serving substantially the same purposes.  The form of the initial Calculation Agent Agreement is attached hereto as Attachment 11.

"**Causes of Action**" has the meaning set forth in the Plan.

"**CCDA**" means the Puerto Rico Convention Center District Authority.

"**Challenge Payment Date**" means the date of distribution of moneys following the final settlement or resolution of a challenge or Proceeding under the Calculation Agent Agreement, which distribution shall be not later than fifteen (15) Business Days following the finalization of such challenge or Proceeding.

"**Claim**" means any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Clawback CVI Annual Not Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 hereof.

"**Clawback CVI Annual Payment Amount**" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"**Clawback CVI Annual Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**Clawback CVI Carryforward Amount**" has the meaning attributed under Section 5.04(c)(ii)(B).

"**Clawback CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(ii).

"**Clawback CVI Lifetime Cap**" means a total of $5,239,002,764 allocated under the Plan to be paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims, and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.  On or prior to the Effective Date, the Commonwealth and the entity that would be entitled as of the Effective Date to the payment of the $22,580,090 Allowed CW/MBA Claims have settled such Claims.  Consequently, Clawback CVIs relating to the Allowed CW/MBA Claims will not be issued hereunder and the full amount of the $22,580,090 in Allowed CW/MBA Claims will be treated for all purposes hereunder as Deemed Paid CVIs Payments.  The Clawback CVI Lifetime Cap as of the Effective Date following the settlement of the Allowed CW/MBA Claims relating to

Allowed CW/HTA Claims, Allowed CW/Convention Center Claims and Allowed CW/PRIFA Rum Tax Claims is $5,216,422,674.

"**Clawback CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the Clawback CVIs, calculated as provided in Section 5.04(b)(v) or (vi) hereof, as applicable.

"**Clawback CVIs**" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to this Trust Agreement, for the payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.  For the avoidance of doubt, unless otherwise provided in this Trust Agreement, the term "Clawback CVI" as used in this Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"**Clawback CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid cumulatively an amount equal to the Clawback CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2051, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2051, and (2) the CVIs Annual Payment Date in 2051, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2051.

"**Commonwealth**" has the meaning given to such term in the Recitals.

"**Commonwealth Rum Tax Revenues**" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

"**CVI Legislation**" means Act No. 53-2021.

"**CVIs Annual Payment Amount**" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"**CVIs Annual Payment Amount Calculation Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, September 15 of the next Fiscal Year.

"**CVIs Annual Payment Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, November 1 of the next Fiscal Year.

"**CVIs Maximum Payment Amounts**" means the Clawback CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the GO CVI Maximum Annual Payment, and the PRIFA Rum Tax Clawback CVIs Lifetime Cap, as applicable.

"**CVIs Outperformance Condition Determination Date**" means, for each Fiscal Year, September 15 of the next Fiscal Year.

"**CVIs Payment Fund**" means the fund established in accordance with Section 5.08.

"**CW/Convention Center Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, and being settled through implementation of the Plan by, among other things, payment of the CW/Convention Center Clawback Recovery.

"**CW/Convention Center Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/HTA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751(a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998, and being settled through implementation of the Plan by, among other things, payment of the CW/HTA Clawback Recovery.

"**CW/HTA Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths' percent (68.6%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/MBA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, and being settled through implementation of the Plan by, among other things, payment of the CW/MBA Clawback Recovery.  On or prior to the Effective Date, the Commonwealth and the entity that would be entitled as of the Effective Date to the payment of the $22,580,090 Allowed CW/MBA Claims have settled such Claims.  Consequently, Clawback CVIs relating to the Allowed CW/MBA Claims will not be issued hereunder and the full amount of the $22,580,090 in Allowed CW/MBA Claims will be treated for all purposes hereunder as Deemed Paid CVIs Payments.

"**CW/MBA Clawback Recovery**" means the aggregate recovery allocable by the Plan to the holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, which, due to the settlement of such Claims on or prior to the Effective Date, are Deemed Paid CVIs Payments hereunder.

"**CW/PRIFA Rum Tax Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the PRIFA Bonds, and being settled through implementation of the Plan by, among other things, payment of the CW/PRIFA Rum Tax Clawback Recovery.

"**CW/PRIFA Rum Tax Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act, as the same may be amended, modified or supplemented.

"**Debt Policy Revenues**" has the meaning ascribed to such term in the Plan.

"**Debt Responsibility Act**" means Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Deemed Paid CVIs Payments**" means amounts that would otherwise have been payable to the holders of either (a) the $22,580,090 Allowed CW/MBA Claims settled on or prior to the Effective Date, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 hereof.  As of the Effective Date, Attachments 2, 3 and 7 reflect the settlement of Claims on or prior to the Effective Date and, contemporaneously with the extraordinary redemption of Notes pursuant to Section 4.02 and 4.03 hereof, the Commonwealth shall provide substitute Attachments 2, 3 and 7 to the Trustee and the Calculation Agent reflecting such redemptions.  Deemed Paid CVIs Payments shall be deducted from the Subject to Waterfall

Payment Amount available to be paid to the Holders of the Clawback CVIs and the Not Subject to Waterfall Payment Amount prior to the transfer to the Trustee in accordance with Section 5.08 hereof.

**"Defeasance Security"** means:

(a)    a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)    any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; *provided* that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

**"Depository"** means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement to serve as securities depository for the Notes, or any successor of any of the foregoing, as applicable.

**"Effective Date"** means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)    Defeasance Securities;

(b)    interest-bearing general obligations of the United States of America;

(c)    United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)    short-term discount U.S. Government Obligations;

(e)    certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)     banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)     commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(i)     Investment Agreements that are fully collateralized by Eligible Investments; and

(j)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

**"EMMA"** means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

**"Event of Default"** has the meaning given to such term in Section 11.01 hereof.

**"Extraordinary Redemption Payment Account"** means the account established by Section 5.02(b) hereof.

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

**"Fiscal Plan"** means the Fiscal Plan of the Commonwealth adopted in a Fiscal Year.

**"Fiscal Year"** means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

**"Fitch"** means Fitch Ratings and its successors.

**"GDB"** means Government Development Bank for Puerto Rico.

**"GDB HTA Loans"** means, collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

**"General Fund"** means the Commonwealth's primary operating fund.

**"GO CVI Annual Payment Amount"** means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

**"GO CVI Carryforward Amount"** has the meaning attributed under Section 5.04(c)(i)(B).

**"GO CVI Carryforward Balance"** has the meaning attributed under Section 5.04(c)(i).

**"GO CVI Lifetime Cap"** means $3,500,000,000.

**"GO CVI Maximum Annual Payment"** means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) hereof.

**"GO CVI Notional Amount"** means Three Billion Five Hundred Million Dollars ($3,500,000,000.00) in aggregate initial notional amount as of the Effective Date.

**"GO CVIs"** means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to this Trust Agreement, for the payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.

**"GO CVIs Final Maturity Date"** means the earlier to occur of (a) the date when the Holders of the GO CVIs have been paid cumulatively an amount equal to the GO CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2043, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2043, and (2) the CVIs Annual Payment Date in 2043, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2043.

**"Government Entity"** means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Commonwealth.

**"Holder"** or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

**"HTA"** means the Puerto Rico Highways and Transportation Authority.

**"HTA Bonds"** has the meaning set forth in the Plan.

**"HTA/CCDA Related Plan Support Agreement"** means that certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified or supplemented in accordance with the terms thereof.

**"Independent"** when used with respect to any specified person or entity means such a person or entity who (1) is not the Commonwealth, any instrumentality thereof, or any employee of the Commonwealth or any of its instrumentalities, (2) does not have any direct financial interest or material indirect financial interest in this Trust Agreement, the Notes or the Commonwealth or any of its instrumentalities (other than in connection with the services to be provided as Independent Consultant), and (3) is not connected with the Commonwealth, any of its instrumentalities, any party to this Trust Agreement, or any officer, employee, promoter, underwriter, trustee, partner, director, member or person of the foregoing performing similar functions (other than under this Agreement and any agreement pursuant to which it provides the Independent Consultant services).

**"Independent Consultant"** means an Independent third party performing certain designated functions hereunder chosen by the Commonwealth.  An Independent Consultant may be chosen for any or all of the functions requiring an Independent Consultant hereunder.  Such Independent Consultant shall be nationally recognized and professionally qualified to provide the services of the type required to be performed by such Independent Consultant hereunder.

**"Instructions"** has the meaning given to such term in Section 8.05.

**"Investment Agreement"** means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

**"KBRA"** means Kroll Bond Rating Agency Inc. and its successors.

**"Majority in Interest"** means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

**"MBA"** means the Metropolitan Bus Authority.

**"Measured SUT"** means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and

Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Note**" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"**Not Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Not Subject to Waterfall Outperformance Amounts.

"**Not Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Not Subject to Waterfall CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the Not Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the Clawback CVIs from the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**Not Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) hereof.

"**Outstanding**", when used in reference to the Notes, means, as of a particular date, all such Notes authenticated and delivered hereunder except:

(a)     any Notes canceled by the Trustee at or before such date;

(b)     any Notes deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Note canceled or paid pursuant to Section 3.09 or Section 4.07 hereof or any Note in lieu of or in substitution for which another Note, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof;

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Notes hereunder, any Note deemed to not be Outstanding in accordance with Section 10.05 hereof;

(e)     GO CVIs on and after the GO CVIs Final Maturity Date, solely to the extent all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid; and

(f)      Clawback CVIs on and after the Clawback CVIs Final Maturity Date, solely to the extent all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid; provided, however, the Sub-Subseries of Clawback CVIs relating to the CW/HTA Claims, namely the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, the HTA 98 Sub Bond Claims and the GDB HTA Loans, which are payable in that order of priority, shall be deemed no longer Outstanding when such Holders have been paid their respective notional amounts set forth in Attachment 4 hereto in full prior to the Clawback CVIs Final Maturity Date.

**"Oversight Board"** has the meaning given to such term in the Recitals.

**"Paying Agent"** means, with respect to the Notes, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

**"Permitted Rum Tax Waterfall Deductions"** means the sum of the following:

(a)      <u>Science and Technology Trust</u> – $5,000,000 transferred to the Puerto Rico Science, Research and Technology Trust Fund;

(b)      <u>Rum Producer Incentive Payments</u> – as described in the definition of **"Rum Producer Incentive Payments"**;

(c)      <u>Conservation Trust</u> – the amount transferred to the Puerto Rico Conservation Trust – calculated as the product of (1) Supplemental Cover Over Revenues and (2) $1/6^{th}$; and

(d)      PRIDCO – the amount transferred to the Puerto Rico Industrial Development Company – calculated as the lesser of (1) $5,000,000 and (2) 2.5% multiplied by the Commonwealth Rum Tax Revenues.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

**"Plan"** means the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms thereof.

**"PRIFA"** means the Puerto Rico Infrastructure Financing Authority.

**"PRIFA Bonds"** means, collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and

(d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

"**PRIFA Related Plan Support Agreement**" means the PRIFA Related Plan Support Agreement, dated as of July 27, 2021, by and among the Oversight Board, the Commonwealth, certain holders of PRIFA Bond Claims, and certain other signatories, as amended or supplemented from time to time.

"**PRIFA Rum Tax Clawback CVIs**" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

"**PRIFA Rum Tax Clawback CVIs Lifetime Cap**" means $1,301,525,288 of the Clawback CVI Lifetime Cap, allocable to the PRIFA Rum Tax Clawback CVIs from Clawback CVI Annual Not Subject to Waterfall Payment Amounts, Clawback CVI Annual Subject to Waterfall Payment Amounts and Rum Tax CVI Annual Payment Amounts.

"**PRIFA Rum Tax Clawback CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**PRIFA Rum Tax Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account equal to the payments due to the Holders of the PRIFA Rum Tax Clawback CVIs from (a) the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, (b) the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, and (c) the Rum Tax CVI Annual Payment Amounts as calculated in accordance with Section 5.06 hereof, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**PRIFA Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.06 hereof.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a) a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating

category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)  a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)  a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)  the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)  a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.  Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to Notes of a Series, the date which is fifteen (15) days before the date of payment or action to be taken, whether or not such fifteenth day is a Business Day.

"**Redemption Price**" when used with respect to a Note, means the price established for such redemption in accordance with Article IV hereof and as set forth in the notice of redemption relating thereto.

"**Remaining Clawback CVI Lifetime Cap**" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims individually, (b) less the aggregate amounts of the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims settled after the Effective Date, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.03 hereof.

"**Remaining GO CVI Lifetime Cap**" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.02 hereof.

"**Reporting Agreement**" means the Reporting Agreement (Commonwealth of Puerto Rico Contingent Value Instruments), dated as of March 15, 2022, executed and delivered by the Commonwealth, as amended or supplemented from time to time.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**Rum Producer Incentive Payments**" means, solely for purposes of calculating the amount to include within Permitted Rum Tax Waterfall Deductions, the amount of incentive payments paid to rum tax producers, which amount shall be calculated by multiplying the Rum Producer Incentive Payments Percentage by both (A) the amount remaining after the payment of (i) $117 million to the General Fund and (ii) $5 million to the Puerto Rico Science, Research and Technology Trust Fund (the "**First Rum Producer Incentive Waterfall Payment**") and (B) the amount remaining after the payment of (i) $117 million to the General Fund, (ii) $5 million to the Puerto Rico Science, Research and Technology Trust Fund, (iii) the First Rum Producer Incentive Waterfall Payment, (iv) $48 million to the General Fund, (v) amounts payable to the Puerto Rico Conservation Trust as described in the definition of "Permitted Rum Tax Waterfall Deductions" and (vi) amounts payable to the Puerto Rico Industrial Development Company as described in the definition of "Permitted Rum Tax Waterfall Deductions." For the avoidance of doubt, the actual payments made to rum producers may be increased beyond the limits set forth in this definition at the Commonwealth's discretion, provided that any payments in excess of such limits will not affect

the Rum Tax Outperformance Condition calculation and payment of the Rum Tax CVI Annual Payment Amount.

**"Rum Producer Incentive Payments Percentage"** means (i) as of the date of this Trust Agreement, 46% and (ii) following the date hereof, the percentage established by the Commonwealth from time to time, provided that, solely for purposes of calculating the Waterfall General Fund Rum Tax Collections, such percentage is not permitted to exceed the following amounts in the following Fiscal Years: (a) for Fiscal Years ending June 30, 2022 through June 30, 2031, 46%; (b) for Fiscal Years ending June 30, 2032 through June 30, 2036, 48%; and (c) for Fiscal Years ending June 30, 2037 through June 30, 2051, 50%. Any increase in the actual percentage that is used to calculate actual incentive payments paid to rum producers in excess of the percentages set forth in the preceding sentence will not affect the Rum Tax Outperformance Metric.

**"Rum Tax"** means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

**"Rum Tax CVI Annual Payment Amount"** means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 hereof.

**"Rum Tax Outperformance Condition"** means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

**"Rum Tax Outperformance Metric"** reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 1 hereto.

**"S&P"** means S&P Global Ratings and its successors.

**"Sales Tax"** means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

**"Secretary of Treasury"** means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

**"Series"** means either Clawback CVIs or GO CVIs.

**"Series 2022A-1 Capital Appreciation Bonds"** means the Commonwealth's General Obligation Bonds, Series 2022A-1 Bonds.

**"Subject to Waterfall Clawback CVI"** means the portion of payments to the Holders of the Clawback CVIs made from the Subject to Waterfall Outperformance Amounts.

"**Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Subject to Waterfall CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the GO CVIs and due to the Holders of the Clawback CVIs from the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) hereof.

"**Subseries**" means the three categories of Claims against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

"**Subsequent Bankruptcy Case**" has the meaning set forth in Section 7.16 hereof.

"**Substitute Measured Tax**" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

"**Sub-Subseries**" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"**Supplemental Cover Over**" means the amount per proof-gallon of the Rum Tax that the U.S. Department of Treasury covers over to the Commonwealth, less the Base Cover Over, for the applicable Fiscal Year, it being understood the Supplemental Cover Over cannot be less than $0.

"**Supplemental Cover Over Revenues**" means the product of (a) the Commonwealth Rum Tax Revenues, and (b) the ratio of the Supplemental Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.  For purposes of calculating the Rum Tax CVI Annual Payment Amount in Section 5.06 hereof, the maximum amount of Supplemental Cover Over Revenues in each applicable Fiscal Year is the Supplemental Cover Over Revenues Cap.

"**Supplemental Cover Over Revenues Cap**" means $88,000,000.

"**Supplemental Trust Agreement**" means any trust agreement amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**SUT Outperformance Condition**" means that the 5.5% SUT collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year.

An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

**"SUT True-Up"** has the meaning set forth in Section 7.08(c) and (d) hereof.

**"Title III Case"** has the meaning given to such term in the Recitals.

**"Title III Court"** has the meaning given to such term in the Recitals.

**"Transaction Counsel"** means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

**"Treasury Rate"** means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI or the Clawback CVI, as the case may be, being redeemed.

**"Trust Agreement"** means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

**"Trust Estate"** means, other than the Trustee and Independent Consultant Expenses Fund, (a) for the benefit of the Holders, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the CVIs Payment Fund, (b) for the benefit of the Holders of the GO CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the GO CVIs; (c) for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs; (d) with respect to the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the PRIFA Rum Tax Clawback CVIs; and (e) in each case, the Trustee's right to receive any such money, securities and other assets relating to each of the foregoing, as applicable, wheresoever located.

**"Trustee"** means the entity or organization appointed as Trustee for the Notes pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other entity or organization which may at any time be substituted in its place pursuant hereto.

"**Trustee and Independent Consultant Expenses**" means the reasonable and verified permitted costs, fees and expenses of the Trustee and the Independent Consultants (including the Calculation Agent) arising out of or incurred in connection with carrying out and administering their respective duties hereunder and under the Ancillary Agreements, but excluding certain expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders (except those expenses, charges, counsel fees and expenses and other disbursements incurred in accordance with a direction of Holders at any time when an Event of Default pursuant to Section 11.01(a) has occurred and is continuing), and further excluding the Trustee's rights to indemnification as a result of such actions, suits, and other Proceedings brought by or at the direction or request of any Holders (with the same exception for an Event of Default pursuant to Section 11.01(a), including the fees and expenses incurred in connection with any indemnified claim, as more fully described in Section 8.06 hereof.

"**Trustee and Independent Consultant Expenses Deposits**" means (a) the amount initially deposited into the Trustee and Independent Consultant Expenses Fund in accordance with Section 2.02(b) hereof, (b) the additional deposits by the Commonwealth as may be required by Section 5.09(b) hereof, and (c) additional deposits as may be made from time to time by the Commonwealth.

"**Trustee and Independent Consultant Expenses Fund**" means the Trustee and Independent Consultant Expenses Fund so designated, created and established pursuant to Section 5.02(a) hereof.

"**Trustee and Independent Consultant Expenses Funding Amount**" means an amount determined annually by the Commonwealth to be a reasonable amount to be deposited into the Trustee and Independent Consultant Expenses Fund, including any accounts and subaccounts therein, for the purposes of paying certain fees and expenses of the Trustee and the Independent Consultants. The amount so determined by the Commonwealth is not intended to be a limitation on the amounts that may be payable to the Trustee and the Independent Consultants in accordance with their respective contracts with the Commonwealth.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**U.S. Presidential Declaration of Disaster**" means the declaration of a disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 100-707, as amended or supplemented from time to time, and any comparable successor legislation.

"**Waterfall Cover Over Revenues**" means the sum of (a) Waterfall Supplemental Cover Over Revenues plus (b) Base Cover Over Revenues.

**"Waterfall General Fund Rum Tax Collections"** means (a) Waterfall Cover Over Revenues less (b) Permitted Rum Tax Waterfall Deductions.

**"Waterfall Supplemental Cover Over Revenues"** means the lesser of (a) Supplemental Cover Over Revenues and (b) the Supplemental Cover Over Revenues Cap.

**Section 1.02   Rules of Construction.**   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF NOTES

**Section 2.01   Authorization of Notes.**

(a)      There are hereby authorized to be issued Notes of the Commonwealth in two series – the "GO CVIs" and the "Clawback CVIs."  The Notes shall be issued in authorized denominations of one dollar ($1.00) and integral multiples thereof.

(b)      On the Effective Date, the Commonwealth shall deliver the GO CVIs in the original GO CVI Notional Amount to those beneficiaries entitled to receive the same as provided in the Plan.  The GO CVIs shall be issued in one Series in the total aggregate notional amount equal to the GO CVI Notional Amount.  As more fully detailed in the written order delivered in accordance with Section 2.02(c) hereof, and except as hereinafter provided in subsection (c) below, the owners of the Vintage CW Bond Claims shall receive GO CVIs in the original Notional Amount of $1,128,505,000,  the owners of the 2011 CW Series D/E/PIB Bond Claims shall receive GO CVIs in the original Notional Amount of $122,990,000, the owners of the 2011 CW Bond Claims shall receive GO CVIs in the original Notional Amount of $86,765,000, the owners of the 2012 CW Bond Claims shall receive GO CVIs in the original Notional Amount of $530,495,000, the owners of the 2014 CW Bond Claims shall receive GO CVIs in the original Notional Amount of $709,310,000, the owners of the Vintage CW Guarantee Bond Claims shall receive GO CVIs in the original Notional Amount of $531,825,000, the owners of 2011 CW Guarantee Bond Claims shall receive GO CVIs in the original Notional Amount of $264,320,000 and the owners of 2012 CW Guarantee Bond Claims shall receive GO CVIs in the original Notional Amount of $125,790,000.  The GO CVIs shall be deemed issued on July 1, 2021.  The GO CVIs shall mature

on the earlier of (a) the date when the Holders of the GO CVIs have been paid an amount equal to the GO CVI Lifetime Cap and (b) July 1, 2043, subject to the final GO CVI Annual Payment Amount being paid no later than the GO CVIs Final Maturity Date (with the GO CVIs remaining Outstanding until such time as all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid). The sum of the payments to the Holders of the GO CVIs and Deemed Paid CVIs Payments relating to GO CVIs, if any, shall not exceed in the aggregate the GO CVI Lifetime Cap.

(c)     The Clawback CVIs shall be issued in the original aggregate notional amount of $5,216,422,674 in three Subseries designated as "Allowed CW/HTA Claims," "Allowed CW/Convention Center Claims" and "Allowed CW/PRIFA Rum Tax Claims."

(i)     Within the Subseries relating to "Allowed CW/HTA Claims," there shall be issued four Sub-Subseries: (A) HTA 68 Bond Claims; (B) HTA 98 Senior Bond Claims; (C) HTA 98 Sub Bond Claims; and (D) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

(ii)     On the Effective Date, the Commonwealth shall deliver (A) $3,697,668,995 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/HTA Claims, of which (w) $179,462,539 shall be allocated to the Sub-Subseries relating to HTA 68 Bond Claims; (x) $1,833,405,578 shall be allocated to the Sub-Subseries relating to HTA 98 Senior Bond Claims; (y) $207,294,178 shall be allocated to the Sub-Subseries relating to HTA 98 Sub Bond Claims; and (z) the remaining $1,477,506,700 shall be allocated to the Sub-Subseries relating to GDB HTA Loans; (B) $217,228,391 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/Convention Center Claims; and (C) $1,301,525,288 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/PRIFA Rum Tax Claims. On the Effective Date, the four Sub-Subseries relating to "Allowed CW/HTA Claims" shall be authenticated by the Trustee and delivered to a designee of the Commonwealth. Upon three Business Days' notice to the Trustee, the Commonwealth, by written direction of an Authorized Officer in accordance with Article III hereof, may request that the Trustee authenticate and deliver to DTC replacement Notes as Book Entry Notes relating to the four Sub-Subseries relating to "Allowed CW/HTA Claims," registered in the name of DTC or its nominee, all as more fully set forth in such written direction. On the Effective Date, the remaining Clawback CVIs other than the four Sub-Subseries relating to "Allowed CW/HTA Claims" shall be authenticated by the Trustee and delivered as Book Entry Bonds to DTC or its nominee.

(iii)     The Clawback CVIs shall be deemed issued on July 1, 2021. The Clawback CVIs shall mature on the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid an amount equal to the Clawback CVI Lifetime Cap, and (b) on July 1, 2051, subject to the final Clawback CVI Annual Payment Amount being paid no later than the Clawback CVIs Final Maturity Date (with the Clawback CVIs remaining Outstanding until such time as all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment

Date have been paid).  The sum of the payments to the Holders of the Clawback CVIs issued hereunder shall not exceed in the aggregate the Clawback CVI Lifetime Cap as of the Effective Date after taking into consideration the settlement of the Allowed CW/MBA Claims.  From the Clawback CVI Lifetime Cap, payments to the Holders of the Clawback CVIs for the Allowed CW/HTA Claims shall not exceed in the aggregate $3,697,668,995, which are further limited within each Sub-Subseries to the amounts allocated thereto; payments to the Holders of the Clawback CVIs for the Allowed CW/Convention Center Claims shall not exceed in the aggregate $217,228,391; and payments to the Holders of the Clawback CVIs for the Allowed CW/PRIFA Rum Tax Claims shall not exceed in the aggregate $1,301,525,288.

(d)     The Notes are general obligations of the Commonwealth payable in the manner more particularly provided herein, subject to the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable.  The Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law to the payment of the Notes in accordance with the terms of Section 7.02 hereof.

(e)     The form of the GO CVI is attached hereto as Attachment 5.  The form of the Clawback CVI is attached hereto as Attachment 6.

**Section 2.02   Provisions for Issuance of Notes.**  The Commonwealth shall issue Notes under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Secretary of Treasury of the Commonwealth, or his or her designee; **_provided_, _however_**, that such direction may not conflict with the terms of this Trust Agreement, the CVI Legislation, the Plan or the Confirmation Order.  The Notes authorized to be issued in accordance with the terms of this Section 2.02 shall be executed by the Commonwealth and delivered to the Trustee for authentication.  Such Notes shall, as directed by the Commonwealth, be authenticated by the Trustee upon delivery to the Trustee of:

(a)     a copy of this Trust Agreement authorizing such Notes, certified by an Authorized Officer of the Commonwealth;

(b)     delivery by the Commonwealth to the Trustee of an amount equal to the Trustee and Independent Consultant Expenses Funding Amount determined by the Commonwealth on or prior to the Effective Date for deposit into the Trustee and Independent Consultant Expenses Fund, including any accounts or subaccounts therein;

(c)     a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered, and requesting that the Trustee authenticate the Notes, each dated the Effective Date;

(d)     an opinion of Transaction Counsel to the effect that (i) the Trust Agreement has been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement is in full force and effect and is valid and binding upon the Commonwealth and enforceable in accordance with its terms; (iii) the Notes have been duly authorized, executed and

delivered by the Commonwealth in accordance with the Act and the Trust Agreement, (iv) upon the execution and delivery thereof and upon authentication by the Trustee, the Notes will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth and entitled to the benefits of the Trust Agreement, (v) the Notes constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged, (vi) it is not necessary in connection with the issuance of the Notes to register any security under the Securities Act of 1933, as amended, or to qualify the Trust Agreement or any indenture under the Trust Indenture Act of 1939, as amended, and (vii) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Notes and to carry out the transactions contemplated by this Trust Agreement are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes, provided, however, that such opinion may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; provided, further, that such opinions may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy; and provided, further, that, with respect to the opinions in (i), (iii), (v) and (vii), Transaction Counsel may rely on the opinion of Puerto Rico counsel, or Puerto Rico counsel may independently deliver such opinions to the Trustee; and

(e)     an opinion of the Secretary of Justice of the Commonwealth to the effect that (i) the Act has been legally enacted in accordance with the laws of the Commonwealth, is valid and in full force and effect, (ii) no litigation is pending, or, to the best of his or her knowledge, threatened (A) to restrain or enjoin the issuance or delivery of any of the Notes, (B) in any way contesting or affecting any authority for or the validity of this Trust Agreement, the Notes, the issuance of the Notes, or the repayment of other indebtedness of the Commonwealth as set forth in this Trust Agreement, (C) in any way contesting the power of the Authorized Officer of the Commonwealth to issue the Notes or the power of the Commonwealth to deliver the Notes, or (D) in any way contesting the pledge of the good faith, credit and taxing power of the Commonwealth to the prompt payment of amounts due under the Notes, except as provided in such opinion, (iii) the Notes constitute "public debt" within the meaning of Sections 2 and 8 of Article VI of the Commonwealth Constitution, and (iv) the Secretary of Treasury is authorized to transfer from any available resources of the Commonwealth such amounts necessary to make the payments on the Notes pursuant to this Trust Agreement; provided, however, that such opinion of the Secretary of Justice of the Commonwealth may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determinations address and provide for such matters.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF NOTES

**Section 3.01   Place and Medium of Payment.**  Amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Notes, upon presentation and surrender of Notes, such Notes shall be payable at the designated corporate trust office of the

Trustee, and amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be paid by check mailed to the registered owner thereof as of the Record Date at the address thereof as it appears on the registry books of the Commonwealth or by wire transfer to such registered owner of the Notes if such registered Owner owns at least one million dollars ($1,000,000) initial notional amount of Notes of the GO CVIs or any of the Subseries of the Clawback CVIs.

Notes shall be initially dated as of July 1, 2021. Notes of each Series, Subseries and Sub-Subseries issued on or subsequent to the first CVIs Annual Payment Date shall be dated as of the CVIs Annual Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be a CVIs Annual Payment Date, in which case they shall be dated as of such date of authentication; *provided, however,* that if, as shown by the records of the Trustee, no CVIs Annual Payment Amount has been paid as of the CVIs Annual Payment Date immediately preceding the date of authentication thereof by the Trustee, the Notes of such Series Subseries or Sub-Subseries issued in lieu of Notes surrendered for transfer or exchange shall be dated as of the date through which the last CVIs Annual Payment Amount has been paid in full on the Notes surrendered or, if no CVIs Annual Payment Amount has been paid on the Notes surrendered since their authentication, as of the date of authentication of the surrendered Notes.

**Section 3.02   Legends.**   The Notes shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022."

**Section 3.03   CUSIP Numbers.**  The Commonwealth shall provide for the assignment of CUSIP numbers for all Notes of all Series and Subseries (including a separate CUSIP number for each Subseries, or, in the case of a Subseries that has Sub-Subseries, a separate CUSIP number for each Sub-Subseries) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Holders as a convenience to Holders; *provided, however,* that the Trustee shall have no liability for any defect in the CUSIP numbers as they appear on any Note, notice or elsewhere, and, *provided further*, that any such notice may state that no representation is made as to the correctness of such number either as printed on such Notes or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Note or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption. The Commonwealth shall promptly notify the Trustee, in writing, of any change in the CUSIP numbers assigned to any Note of which the Commonwealth has knowledge. The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**  The Notes shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer thereof, or in such other manner as may be permitted by law. In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually authenticated and delivered by the Trustee, such Notes may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Notes had not ceased to hold such offices or be so employed. Any Note may be

signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Note shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Notes such Persons may not have been so authorized or have held such office or employment.

The Notes of each Series, Subseries and Sub-Subseries shall bear thereon a certificate of authentication, in the form set forth in the forms of Notes annexed hereto, executed manually by the Trustee. Each time the Trustee is required to authenticate a Note hereunder, the Commonwealth shall deliver a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered, and requesting that the Trustee authenticate the Notes. Only such Notes as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Note shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Note executed on behalf of the Commonwealth shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Notes.**   Notes, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate notional amount of Notes of the same Series, Subseries and Sub-Subseries and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry.**   So long as any of the Notes remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Notes; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Note entitled to registration or transfer. So long as any of the Notes remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Notes at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Notes.**   Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the U.S. Internal Revenue

Code of 1986.  The Trustee may conclusively rely on the information provided to it and shall have no responsibility whatsoever to validate, verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Note shall be registered upon the books of the Commonwealth as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the Notes, subject to the provisions of Section 3.01 hereof with respect to Record Dates, and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary.  The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting without gross negligence or willful misconduct hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Notes in accordance with the provisions hereof.  All Notes surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Notes, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Note upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Notes of any Series, Subseries or Sub-Subseries during the period beginning on the Record Date for such Notes immediately preceding a CVIs Annual Payment Date relating to such Notes and ending on such CVIs Annual Payment Date, or, in the case of any proposed other redemption of Notes of such Series, Subseries or Sub-Subseries, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Notes Mutilated, Destroyed, Lost or Stolen.**  In case any Note shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Note of like Series, Subseries and Sub-Subseries, tenor and notional amount as the Note so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Note, upon surrender and cancellation of such mutilated Note or in lieu of and substitution for such Note so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such fees and expenses as the Commonwealth and the Trustee may incur in connection therewith.  All Notes so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Note which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth

may, instead of issuing a Note in exchange or substitution therefor, pay or authorize the payment of such mutilated Note upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Note, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such fees and expenses as the Commonwealth and the Trustee may incur in connection therewith.

**Section 3.10  Book Entry Notes.**  Anything herein to the contrary notwithstanding, except as provided in Section 2.02 hereof, Notes shall be authorized and issued as Book Entry Notes.

For all purposes of the Trust Agreement, the Holder of a Book Entry Note shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Note or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Note with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Note, (b) the delivery to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any notice with respect to such Note, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any amount with respect to the CVIs Annual Payment Amount and Redemption Prices relating to such Note.  The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Note for the purpose of (x) payment of the CVIs Annual Payment Amount and Redemption Prices relating to such Note, (y) giving notices of redemption and of other matters with respect to such Note, (z) registering transfers with respect to such Note, and for all other purposes whatsoever.  The Trustee shall pay the CVIs Annual Payment Amount and Redemption Prices relating to such Note only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such CVIs Annual Payment Amount and Redemption Prices to the extent of the sum or sums so paid.  No Person other than the Depository shall receive a Note or other instrument evidencing the Commonwealth's obligation to make payments of the CVIs Annual Payment Amount.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Note which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Note to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the notional amount of such Note Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Note.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Note or any other Person, may terminate the services of the Depository with respect to a Book Entry Note if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Notes or (b) a continuation of the requirement that all of the Outstanding Notes of like Series,

Subseries and/or Sub-Subseries issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Notes, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Notes for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Note, or upon the resignation of a Depository with respect to a Book Entry Note, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Notes shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by the Holders transferring or exchanging such Notes, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the U.S. Internal Revenue Code of 1986. The Trustee may conclusively rely on the information provided to it and shall have no responsibility whatsoever to validate, verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Notes; Temporary Notes.** The definitive Notes of each Series, Subseries and Sub-Subseries shall be lithographed or printed on steel engraved borders, except that Book Entry Notes may be typewritten. Until the definitive Notes of any Series, Subseries or Sub-Subseries are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability for registered Notes, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Note or Notes are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Notes. The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Notes for exchange and the cancellation of such surrendered temporary Notes the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Notes of the same aggregate notional amount and Series, Subseries and Sub-Subseries as the temporary Notes surrendered. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and security as definitive Notes issued pursuant hereto.

All temporary Notes surrendered in exchange for a definitive Note or Notes shall be forthwith canceled by the Trustee.

# ARTICLE IV.

## REDEMPTION OF NOTES

**Section 4.01    Authorization of Redemption.**  Notes are subject to mandatory redemption in accordance with their respective rights to payment from CVIs Annual Payment Amounts.  Notes shall be additionally redeemable from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein.

**Section 4.02    Extraordinary Redemption of GO CVIs at Election of Commonwealth.**  The GO CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.02 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

**Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of Commonwealth.**  The Clawback CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.03 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

**Section 4.04    Extraordinary Redemption at the Election of the Commonwealth.**  In the case of any extraordinary redemption of Notes in accordance with the provisions of Section 4.02 or 4.03 hereof from moneys other than CVIs Annual Payment Amounts, the Commonwealth shall give written notice to the Trustee and the Calculation Agent of its election to redeem, whether such Notes are GO CVIs or Clawback CVIs, the notional amount to be redeemed, and the Redemption Prices of the Notes to be redeemed.  Such notice shall be given to the Trustee and the Calculation Agent not less than forty-five (45) days prior to the redemption date.  The Series, Subseries and Sub-Subseries of Notes and notional amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein, including any priority of payment with respect to such Series, Subseries and/or Sub-Subseries as provided herein.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee hereunder, is sufficient to redeem on the redemption date at the Redemption Price thereof, all of the Notes or portions thereof to be so redeemed, and any such payment shall be deposited by the Trustee in the applicable Subaccount of the Extraordinary Redemption Payment Account.

**Section 4.05    Selection of Notes to be Redeemed.**  In the event of redemption of less than all of the Outstanding Notes of like Series, Subseries or Sub-Subseries, the Trustee shall select the Notes to be redeemed (i) on a pro rata basis to the extent practicable or, (ii) in the case of Book

Entry Notes, where pro rata redemption is not possible, in accordance with the applicable procedures of the Depository.  Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed.

   **Section 4.06   Notice of Redemption.**   Whenever Notes or portions thereof are to be redeemed in accordance with Sections 4.02 and 4.03, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth which notice shall specify:  (a) the Notes to be redeemed which shall be identified by the designation of the Notes given in accordance with Article II hereof; (b) the numbers and other distinguishing marks of the Notes to be redeemed, including CUSIP numbers; (c) the redemption date; (d) the Redemption Price (including the calculation thereof); (e) with respect to each such Note, the notional amount thereof to be redeemed; (f) that, except in the case of Book Entry Notes, such Notes will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (g) that no representation is made as to the correctness of the CUSIP number either as printed on the Notes or as contained in such notice and that an error in a CUSIP number as printed on a Note or as contained in such notice shall not affect the validity of the proceedings for redemption; and (h) if the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Note to be redeemed the Redemption Price thereof.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Notes to be redeemed in the manner provided herein.  Such certification shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

   The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.  The Trustee shall make available to the Holders of Notes subject to redemption a copy of the notice of redemption under procedures established by the Trustee.

   **Section 4.07   Payment of Redeemed Notes.**   Notice having been given in the manner provided in Section 4.06 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, except as

otherwise provided in Section 3.10 hereof upon presentation and surrender of such Notes, at the office or offices specified in such notice, and, in the case of Notes presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Notes, or portions thereof, shall be paid at the Redemption Price; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer as provided in the first paragraph of Section 3.01 hereof.  If there shall be called for redemption less than all of the notional amount of a registered Note, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Note, without charge to the owner thereof, for the unredeemed balance of the notional amount of the registered Note so surrendered, Notes of like Series, Subseries and Sub-Subseries and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes or portions thereof to be redeemed shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Notes or portions thereof shall continue to be payable as herein provided as if such redemption had not been noticed.

## ARTICLE V.

## LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;
## PLEDGED DEPOSITS AND APPLICATION THEREOF

**Section 5.01   Lien on Trust Estate.**   The Commonwealth hereby grants, upon the issuance of the Notes, a lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Notes, all as reflected in the definition of "Trust Estate".  The Commonwealth hereby represents that such lien is valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the lien.

**Section 5.02   Establishment of Funds and Accounts.**

(a)      The Trustee shall establish a Trustee and Independent Consultant Expenses Fund, which fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee.  The Trustee shall establish a General Account within the Trustee and Independent Consultant Expenses Fund for the payment of Trustee and Independent Consultant Expenses not payable from other accounts or subaccounts that may be established from time to time in the Trustee and Independent Consultant Expenses Fund.   Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.09 hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses.  The Commonwealth may establish one or more additional accounts or subaccounts within the Trustee and Independent Consultant Expenses Fund by delivering to the Trustee a written certificate of an Authorized Officer.

(b)     The Trustee shall establish a CVIs Payments Fund and, within such CVIs Payments Fund, (i) a Subject to Waterfall CVIs Payment Account, and, within such Subject to Waterfall CVIs Payment Account, a (A) GO CVIs Subaccount and (B) a Clawback CVIs Subaccount, (ii) a Not Subject to Waterfall CVIs Payment Account, (iii) a PRIFA Rum Tax Clawback CVIs Payment Account, and (iv) an Extraordinary Redemption Payment Account, and, within such Extraordinary Redemption Payment Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, which fund, accounts and subaccounts shall constitute a portion of the Trust Estate and shall be held in trust for the benefit of the Holders as provided herein and maintained by the Trustee.

(c)     The GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs as provided herein, including Section 5.04 hereof.

(d)     The Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the Holders of the PRIFA Rum Tax Clawback CVIs, as provided herein, including Section 5.05 hereof.

(e)     The PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs as provided herein, including Sections 5.04, 5.05 and 5.06 hereof.

(f)     The Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes subject to redemption in accordance with Sections 4.02 and 4.03 hereof.  The GO CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs.  The Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs.  The PRIFA Rum Tax Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs.

(g)     The moneys in each such fund, account and subaccount shall be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.**

(a)     By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent, as provided in the Calculation Agent Agreement, shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year.  Upon such determination, the Calculation Agent shall provide the Trustee and the Commonwealth with its determinations, promptly confirmed in writing, together with the calculations used to make such determinations.  Within one (1) Business Day of receipt thereof,

the Trustee shall post such determinations with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt of the written confirmation of such determinations. The Trustee shall promptly notify the Holders in writing that such determinations have been so posted. In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall thereafter undertake to calculate the amounts required to be calculated in accordance with Section 5.03(b) hereof by no later than the CVIs Annual Payment Amount Calculation Date.

(b)     In the event the Calculation Agent has determined that an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 hereof by no later than the CVIs Annual Payment Amount Calculation Date. In the event the Calculation Agent has determined that a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Rum Tax CVI Annual Payment Amount as provided in Section 5.06 hereof by no later than the CVIs Annual Payment Amount Calculation Date. In each case, the Calculation Agent shall calculate the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Date on a schedule in substantially the form of Attachment 7 hereto. The Commonwealth shall also complete by no later than the CVIs Annual Payment Amount Calculation Date the calculations required to finalize Attachment 7, including the revised amounts of the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be applied on the CVIs Annual Payment Date, as well as the Clawback CVI Carryforward Amount, the Clawback CVI Carryforward Balance, the GO CVI Carryforward Amount and the GO CVI Carryforward Balance. Promptly upon completion, the Calculation Agent shall provide the Commonwealth and the Trustee with written copies of its calculations, including a final Attachment 7. Within one (1) Business Day of receipt thereof, the Trustee shall post such calculations and final Attachment 7, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes. The Trustee shall promptly notify the Holders in writing that such calculations and other written materials have been so posted.

(c)     To the extent that an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred, the Commonwealth shall transfer to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date, subject to the CVIs Maximum Payment Amounts, an amount equal to the sum of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount, if any, and the Rum Tax CVI Annual Payment Amount, if any, together with written directions on the amounts, if any, that are to be deposited into each Subaccount of the Subject to Waterfall CVIs Payment Account (in an amount equal to the Subject to Waterfall CVIs Payment Account Deposit), the Not Subject to Waterfall CVIs Payment Account (in an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit) and the PRIFA Rum Tax Clawback CVIs Payment Account (in an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit). Upon receipt by the Trustee from the Commonwealth of the amounts described in the preceding

sentence, (i) an amount equal to the Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Subject to Waterfall CVIs Payment Account and portions thereof shall be deposited into the Subaccounts therein as hereinafter provided, (ii) an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Not Subject to Waterfall CVIs Payment Account, and (iii) an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account.  The moneys deposited into the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Payment Account shall be held by the Trustee uninvested until the payment to the respective Holders.

(d)      No payments (other than from the PRIFA Rum Tax Clawback CVIs Payment Account if a Rum Tax Outperformance Condition has occurred) shall be made to the Holders of the Notes in Fiscal Years following Fiscal Years in which an SUT Outperformance Condition has not occurred.

(e)      No payments shall be made to the Holders of the GO CVIs in excess of the GO CVI Annual Payment Amount or the GO CVI Lifetime Cap, as applicable.

(f)      No payments shall be made to the Holders of the Clawback CVIs in excess of the Clawback CVI Annual Payment Amount or the Clawback CVI Lifetime Cap, as applicable.

(g)      No payments shall be made to the Holders of the PRIFA Rum Tax Clawback CVIs from the Rum Tax CVI Annual Payment Amount in excess of the amount calculated in accordance with Section 5.06(a) hereof or the PRIFA Rum Tax Clawback CVIs Lifetime Cap.

(h)      In the event that, due to any challenge or Proceeding under the Calculation Agent Agreement, (i) the Calculation Agent is not able to finally determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year by no later than the originally scheduled CVIs Outperformance Condition Determination Date, (ii) the Calculation Agent is not able to finally complete the calculations required with respect to all or a portion of the calculations required to be calculated by no later than the originally scheduled CVIs Annual Payment Amount Calculation Date, or (iii) the payment of all or a portion of the amounts due to the Holders as a result of such final calculations cannot be made on the originally scheduled CVIs Annual Payment Date, the Commonwealth, the Trustee and the Calculation Agent shall agree on a revised schedule of compliance with the terms and provisions of this Trust Agreement on a rescheduled CVIs Outperformance Condition Determination Date, CVIs Annual Payment Amount Calculation Date and/or CVIs Annual Payment Date consistent with the resolution of such challenge or Proceeding. Once a revised schedule has been determined, the Commonwealth shall provide a written order to the Calculation Agent and the Trustee detailing such schedule and providing a form of notice to be given to the Holders affected by such distribution.

**Section 5.04   Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.**

(a)    The Subject to Waterfall Outperformance Amount shall be calculated and agreed to by the Calculation Agent by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022 (with such calculation identifying any Subject to Waterfall Outperformance Amount associated with the Fiscal Year ending June 30, 2022), following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; provided, however, for the avoidance of doubt, the Subject to Waterfall Outperformance Amount is subject to the aggregate GO CVI Maximum Annual Payment and the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    fifty percent (50%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to (A) the Holders of the GO CVIs and (B) the Holders of Clawback CVIs from Subject to Waterfall Outperformance Amounts; and

(ii)    seventy-five percent (75%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred.

(b)    For purposes of calculating the Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount is the "annual Outperformance" referred to in Section 5.04(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.04(a)(i) above as described in Section 5.04(b)(ii) below, as well as the 75% of "annual Outperformance" amount for purposes of Section 5.04(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.04(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.04(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)    the Commonwealth will then calculate the lesser of 50% of the "cumulative Outperformance" amount and 75% of the "annual Outperformance" amount;

(iv)     the GO CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the GO CVI Carryforward Balance and $200,000,000 and (B) $400,000,000;

(v)     until the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $175,000,000 and (B) $350,000,000; and

(vi)     beginning in the Fiscal Year after the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance and $375,000,000 and (ii) $750,000,000.

(c)     For purposes of subsection (b) above,

(i)     the "GO CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each Fiscal Year thereafter, the Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $200,000,000 and (B) CVI payments (if any) made to the Holders of the GO CVIs in such Fiscal Year.  The Annual GO CVI Carryforward Amount from such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance from the prior Fiscal Year; and

(C)     to the extent there is a positive GO CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2043, the Commonwealth will not owe any further amount to the Holders of the GO CVIs.

(ii)     the "Clawback CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each year thereafter during the period described in Section 5.04(b)(v), the Annual Clawback CVI Carryforward Balance shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $175,000,000 and (B) aggregate CVI payments made to the Holders of Clawback CVIs (if any) in such Fiscal Year.  The Annual Clawback CVI Carryforward Amount from such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year;

(C)     for each year during the period described in Section 5.04(b)(vi), the Annual Clawback CVI Carryforward Amount shall be calculated as the difference between (which for the avoidance of doubt, may be a positive or negative number) (y) $375,000,000 and (z) aggregate CVI payments made (if any) to the Holders of Clawback CVIs in such Fiscal Year.  The Annual Clawback CVI Carryforward Amount from such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year; and

(D)     to the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2051, the Commonwealth will not owe any further amount to the Holders of the Clawback CVIs.

Illustrative scenarios of the calculation of the GO and Clawback CVIs Annual Payment Amounts are set forth in Attachment 8.

(d)     For purposes of Section 5.04(a)(i), for the avoidance of doubt, amounts paid to the Holders of the Clawback CVIs will first be allocated to Subject to Waterfall Clawback CVIs (from Subject to Waterfall Payments) for purposes of calculation of payments previously made.

(e)     Until the GO CVIs Final Maturity Date, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:

(i)     the first $100,000,000 shall be paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto;

(ii)     the next $11,111,111 shall be paid to the holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto; and

(iii)     thereafter, any remaining available moneys in the Annual Waterfall Payment shall be shared with ninety percent (90%) being paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto, and the remaining ten percent (10%) being paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

(f)     Beginning in the Fiscal Year following the GO CVIs Final Maturity Date, subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:  one hundred percent (100%) to the Holders of the Clawback CVIs until the Clawback CVIs Final Maturity Date.

**Section 5.05   Not Subject to Waterfall Outperformance Amount.**

(a)     The Not Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; ***provided***,

*however*, for the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount is subject to the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)      forty percent (40%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of Clawback CVIs from the Not Subject to Waterfall Outperformance Amounts; and

(ii)      ninety-five percent (95%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred, less payments previously made to (A) the Holders of GO CVIs and (B) the Holders of Clawback CVIs from the Subject to Waterfall Outperformance Amounts for the corresponding Fiscal Year.

(b)      For purposes of calculating the Not Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)      the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount is the "annual Outperformance" referred to in Section 5.05(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.05(a)(i) above as described in Section 5.05(b)(ii) below, as well as the 95% of "annual Outperformance" amount for purposes of Section 5.05(a)(ii) above;

(ii)      the "annual Outperformance" amount calculated in accordance with Section 5.05(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.05(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)      the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount and 95% of the "annual Outperformance" amount; and

(iv)      the Clawback CVI Maximum Annual Payment shall be calculated in the same manner as in Section 5.04(b)(v) and (vi) hereof.

(c)      For purposes of subsection (b) above, the Clawback CVI Carryforward Balance shall be calculated in the same manner as Section 5.04(c)(ii).

(d)     For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted.

(e)     Subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, one hundred percent (100%) of the Not Subject to Waterfall Outperformance Amount shall be paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

Illustrative scenarios of the calculation of the GO and Clawback CVIs Annual Payment Amounts are set forth in Attachment 8.

### Section 5.06   Rum Tax CVI Annual Payment Amount.

(a)     The Rum Tax CVI Annual Payment Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of a Rum Tax Outperformance Condition and shall be equal to the lesser of the following:

(i)     forty percent (40%) of cumulative Outperformance of the Waterfall General Fund Rum Tax Collections relative to the Rum Tax Outperformance Metric (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of the PRIFA Rum Tax Clawback CVIs on account of previous Rum Tax CVI Annual Payment Amounts;

(ii)     fifty percent (50%) of annual Outperformance of the Waterfall General Fund Rum Tax Collections above the Rum Tax Outperformance Metric, measured at the conclusion of each Fiscal Year; and

(iii)     $30 million.

(b)     For purposes of calculating the Rum Tax CVI Annual Payment Amount in accordance with subsection (a) above,

(i)     the Commonwealth shall first calculate the amount by which the actual Waterfall General Fund Rum Collections in the prior Fiscal Year exceeded the Rum Tax Outperformance Metric for such Fiscal Year as set forth in the then applicable Attachment 2, which amount is the "annual Outperformance" referred to in Section 5.06(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.06(a)(i) above as described in Section 5.06(b)(ii) below, as well as the 50% of "annual Outperformance" amount for purposes of Section 5.06(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.06(b)(i) above is added to (if a positive number during a Fiscal Year in which a Rum Tax Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which a Rum Tax Outperformance Condition has not

occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.06(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations; and

(iii)     the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount, 50% of the "annual Outperformance" amount, and $30,000,000.

Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount are set forth in Attachment 9.

**Section 5.07   HTA Clawback CVI Priority Distribution Waterfall.**

Notwithstanding any other provision of this Trust Agreement:

(a)     All moneys to be applied by the Trustee under this Trust Agreement on account of the HTA Clawback CVI shall be applied as follows:

(i)     First, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 68 Bond Claims, up to $179,462,539, until such amount has been paid in full;

(ii)     Second, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Senior Bond Claims, up to $1,833,405,578, until such amount has been paid in full;

(iii)     Third, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Sub Bond Claims, up to $207,294,178, until such amount has been paid in full;

(iv)     Fourth, following payment of the amounts above in full, to the Sub-Subseries related to the GDB HTA Loans up to $1,477,506,700.

(b)     No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries in the above waterfall have been paid in full.

**Section 5.08   CVIs Payment Fund.**

(a)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the amount to be deposited into each Subaccount in the Subject to Waterfall CVIs Payment Account that are payable to (i) the Holders of the GO CVIs, taking into account Deemed Paid CVIs Payments applicable to any GO CVIs, (ii) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, taking into account Deemed Paid CVIs Payments applicable to any Clawback CVIs, and (iii) the Holders of the PRIFA Rum Tax Clawback CVIs.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee

no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, and (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account.  Moneys deposited into the Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Notes entitled to payment therefrom on the CVIs Annual Payment Date as provided in Section 5.04(e) and (f) hereof and Attachments 2 and 3 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (iii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(b)    In connection with the preparation of Attachment 7 on any CVIs Annual Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Not Subject to Waterfall Outperformance Amount to be distributed pursuant to the provisions of Section 5.05 hereof.  The Calculation Agent, as provided in the Calculation Agent Agreement, shall then calculate the amounts from the Not Subject to Waterfall Outperformance Amount that are payable to (i) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (ii) the Holders of the PRIFA Rum Tax Clawback CVIs.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the Not Subject to Waterfall CVIs Payment Account.  Moneys deposited into the Not Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Clawback CVIs (other than the Holders of the PRIFA Rum Tax Clawback CVIs) on the CVIs Annual Payment Date as provided in Section 5.05 and Attachment 4 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(c)    Amounts paid by the Commonwealth in accordance with Section 5.08(a)(iii) and Section 5.08(b)(ii) shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account when received by the Trustee.  To the extent a Rum Tax Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall transfer, subject to the PRIFA Rum Tax Clawback CVIs Lifetime Cap, an amount equal to the Rum Tax CVI Annual Payment Amount, if any, to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.  Moneys deposited into the PRIFA Rum Tax Clawback CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of PRIFA Rum Tax Clawback CVIs on the CVIs Annual Payment Date.

(d)    No later than one (1) Business Day before any extraordinary redemption date noticed by the Commonwealth in accordance with Sections 4.02 or 4.03 hereof, the Commonwealth shall transfer to the Trustee an amount necessary to provide for the payment of the Redemption Price of the Notes being redeemed for deposit into the Extraordinary Redemption Payment Account.   Moneys transferred by the Commonwealth in connection with the

extraordinary redemption of GO CVIs shall be deposited by the Trustee into the GO CVIs Subaccount.  Moneys transferred by the Commonwealth in connection with the extraordinary redemption of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the Clawback CVIs Subaccount.  Moneys transferred by the Commonwealth in connection with the extraordinary redemption of PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the PRIFA Rum Tax Clawback CVIs Subaccount.  Moneys deposited into the Extraordinary Redemption Payment Account shall be held uninvested by the Trustee and distributed from the appropriate Subaccount to the Holders of the Notes being redeemed as directed in writing by an Authorized Officer of the Commonwealth.

(e)     No later than one (1) Business Day prior to any applicable Challenge Payment Date for the GO CVIs, the Commonwealth shall pay (i) into the GO CVIs Subaccount and the Clawback CVIs Subaccount of the Subject to Waterfall Payment Account any amounts determined to be payable with respect to the GO CVIs and the Clawback CVIs, respectively, (ii) into the Not Subject to Waterfall Payment Account any amounts determined to be payable with respect to the Clawback CVIs, and (iii) into the PRIFA Rum Tax Clawback CVIs Payment Account any amounts determined to be payable with respect to the PRIFA Rum Tax Clawback CVIs, all in accordance with Section 204(e) of the Calculation Agent Agreement, and all such moneys shall be distributed to the Holders entitled thereto as if such payments were being made on a CVIs Annual Payment Date.

### Section 5.09    Trustee and Independent Consultant Expenses Fund.

(a)     The Trustee and Independent Consultant Expenses Fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee.  Unless otherwise provided in the Calculation Agent Agreement or pursuant to a written direction of an Authorized Officer, moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund, including accounts and subaccounts therein, as provided in Sections 2.02(b) and 5.09(b) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses, in each case upon written requisition signed by an Authorized Officer of the Commonwealth.  Unless otherwise provided in the Calculation Agent Agreement or pursuant to a written direction of an Authorized Officer, the Trustee and each Independent Consultant requesting payment from the Trustee and Independent Consultant Expenses Fund shall submit an invoice for payment to the Commonwealth at least thirty (30) days prior to the date it requests payment; the request for payment shall be deemed approved thirty (30) days after receipt by the Commonwealth unless the Commonwealth submits written notice to the Trustee objecting to such payment and providing reasonable detail of its objection.  In the absence of an objection raised by the Commonwealth, the Trustee will use its best efforts to pay such invoices within five (5) Business Days of the later of the approval or deemed approval by the Commonwealth or the resolution of any objection.

(b)     By no later than each CVIs Annual Payment Amount Calculation Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall determine the Trustee and Independent Consultant Expenses Funding Amount for that Fiscal Year and provide the Trustee with written notice of such amount. On or prior to each CVIs Annual Payment Amount Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance

Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall transfer to the Trustee an amount equal to the Trustee and Independent Consultant Expenses Funding Amount for deposit into the Trustee and Independent Consultant Expenses Fund.  The money deposited into the Trustee and Independent Consultant Expenses Fund may be invested as provided in Article VI hereof.

## ARTICLE VI.

## INVESTMENT OF FUNDS

**Section 6.01   Investment of Funds**.

(a)      Moneys in the CVIs Payment Fund and the accounts therein shall be held uninvested by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys held by it in the CVIs Payment Fund and the accounts therein.

(b)      Subject to the limitations set forth in this paragraph, moneys held in the Trustee and Independent Consultant Expenses Fund shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the written direction of an Authorized Officer of the Commonwealth.   The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.  Ratings of Eligible Investments shall be determined at the time of purchase of such Eligible Investments.  In the event that the ratings of such Eligible Investments fall below the ratings set forth in the definition thereof, the Commonwealth shall substitute such Eligible Investments with other Eligible Investments meeting the ratings requirements of the definition. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in the Trustee and Independent Consultant Expenses Fund held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Trustee and Independent Consultant Expenses Fund due to the investment thereof shall be credited or charged, as the case may be, to the Trustee and Independent Consultant Expenses Fund.

(d)      In computing the amount in the Trustee and Independent Consultant Expenses Fund under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the written direction of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the Trustee

and Independent Consultant Expenses Fund.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all investments held for the credit of the Trustee and Independent Consultant Expenses Fund as of the end of the preceding month.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in the Trustee and Independent Consultant Expenses Fund in the previous month.

(f)     Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.02   Liability for Investments.**  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Notes as follows:

**Section 7.01   Payment of Notes.**   Subject to the limitations herein, including the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, and the CVIs Maximum Payment Amounts, the Commonwealth shall pay or cause to be paid every Note, on the dates and at the places and in the manner provided herein and in the Notes according to the true intent and meaning thereof.

**Section 7.02   Pledge of Good Faith, Credit and Taxing Power of Commonwealth**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notes as and when due in accordance with this Trust Agreement. The Notes constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Notes as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Notes in the amounts and at the times required by Section 5.03(b) hereof.  For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Powers as to Notes.**  Pursuant to the CVI Legislation, the Plan and the Confirmation Order, the Commonwealth is duly authorized to execute and deliver the Notes and to execute the Trust Agreement.  The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Notes and the provisions hereof are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof.  The Commonwealth further represents that its good faith, credit and taxing power pledge in support of the Notes is a valid, binding and legally enforceable pledge of the Commonwealth.  The Commonwealth further covenants that it shall not fail at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the lien created by Section 5.01 and all of the rights of the Trustee for the benefit of the Holders of Notes under the Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.04   Further Assurance.**  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the pledge and lien provided for herein, or which the Commonwealth may hereafter become bound to pledge or assign.  The Commonwealth shall take all actions, if any, necessary to perfect the lien on the Trust Estate granted under Section 5.01 hereof and maintain the perfection thereof.

**Section 7.05   Offices for Payment and Registration of Notes.**  Unless all of the Notes are Book Entry Notes, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Notes may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee.  The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Notes authorized thereby or referred to herein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Notes may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Notes.  The provisions of this Section shall be subject to the provisions of Section 3.10 hereof.

**Section 7.06   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the Effective Date, all conditions, acts and things required by the Plan, the Confirmation Order and the statutes of the Commonwealth, including the CVI Legislation, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Notes, shall exist, have happened and have been performed.

**Section 7.07   Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of the Notes, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Notes have been paid or otherwise satisfied in accordance with their respective terms, the Commonwealth will not:

(a)    take any action that would impair the rights and remedies of the Holders of the Notes;

(b)    limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with respect to the Notes; or

(c)    impair the ability of the Holders of the Notes to track performance of the Measured SUT and the Waterfall General Fund Rum Tax Collections;

*provided*, *however*, the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with this Trust Agreement, which shall protect Holders of the Notes from such elimination or replacement reducing the likelihood that an SUT Outperformance Condition will occur; and, *provided*, *further*, that the Commonwealth shall provide for the timely posting with EMMA by the Trustee of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, all in accordance with the Calculation Agent Agreement.

### Section 7.08    Baseline SUT Reduction and SUT True-Up.

(a)    The 5.5% SUT Baseline set forth in Attachment 1 hereto reflects the statutory and administrative provisions of the law governing the imposition and collection of the 5.5% SUT as of the Effective Date.  No adjustments to the 5.5% SUT Baseline shall be made for exemptions or holidays that are included in the Puerto Rico Internal Revenue Code (Sections 4030.01 through 4030.27 thereof) as of the Effective Date.

(b)    In the event that subsequent to the Effective Date, exemptions or holidays are created during a U.S. Presidential Declaration of Disaster for a period not to exceed thirty (30) days and only for emergency-related categories of spend, the 5.5% SUT Baseline shall be reduced by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from any such exemptions or holidays (the "Baseline SUT Reduction").

(c)    In the event that subsequent to the Effective Date, any exemptions or holidays of any kind (other than those covered by subsection (b) above) are implemented with respect to the 5.5% SUT (including any exemptions or holidays created during a U.S. Presidential Declaration of Disaster for a period exceeding thirty (30) days or for categories of spend other than emergency-related categories of spend), the Measured SUT shall be increased by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from such exemptions or holidays ("SUT True-Up").

(d)    To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, the Commonwealth shall adjust the Measured SUT for each Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (i) the projected Measured SUT generated at the lower rate by (ii) the fraction equal to 5.5% divided by the lower rate.  Such an adjustment shall be considered an SUT True-Up for purposes of this Section 7.08.

(e)     For the calculation of either the Baseline SUT Reduction or SUT True-Up, as provided in the Calculation Agent Agreement, the calculation shall be determined by the Secretary of Treasury and verified by an Independent Consultant.  Verification by an Independent Consultant shall be binding on both the Commonwealth and the Holders of the Notes.

(f)     As provided in the Calculation Agent Agreement, the Trustee shall post the calculations relating to each Baseline SUT Reduction, SUT True-Up and reduction in the 5.5% SUT and the revised Attachment 1, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

**Section 7.09   Substitute Measured Tax**.

(a)     The Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, subject to the satisfaction of the requirements set forth in the Calculation Agent Agreement.

(b)     The Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

(c)     As provided in the Calculation Agent Agreement, the Trustee shall post a summary of the material provisions of the Substitute Measured Tax and the revised Attachment 1, reflecting that the Substitute Measured Tax has become effective, together with projections and supporting summary narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

**Section 7.10   Tax Covenant**.  The Commonwealth represents that, as provided in the CVI Legislation, the Plan and the Confirmation Order, the Notes, including but not limited to any payments or income with respect thereto, and the transfer thereof, shall at all times, be totally exempt from all kinds of taxes imposed by the Commonwealth (including, without limitation, income taxes, assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith).

**Section 7.11   Comprehensive Cap on Net Tax Supported Indebtedness**.  For so long as any portion of the Notes shall remain Outstanding, the Commonwealth shall maintain a Comprehensive Cap on all Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional Net Tax-Supported Debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series 2022A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of

claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  In connection with the issuance of Net Tax-Supported Debt, the Secretary of Treasury shall certify that such Net Tax-Supported Debt is being issued in compliance with the Comprehensive Cap.  Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Notes issued under this Trust Agreement, and the validity of such Net Tax-Supported Debt shall not be subject to legal challenge.  In calculating Debt Policy Revenues for purposes of this Section 7.11 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.12   Rum Tax Reporting**.   The Commonwealth shall provide information relating to the collection of the Commonwealth Rum Tax Revenues as set forth in the Calculation Agent Agreement.

**Section 7.13   Creation of Liens.** The Commonwealth shall not create or cause to be created any lien or charge on the Trust Estate, other than as provided in Section 5.01 hereof**.**

**Section 7.14   Fiscal Plan**.  Any Fiscal Plan certified after the Effective Date will include provisions for the payment in each Fiscal Year of, to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the Notes in accordance with the terms hereof; provided, however, that nothing in the Fiscal Plan shall be deemed to be a determination that an SUT Outperformance Condition or a Rum Tax Outperformance Condition has occurred with respect to any such Fiscal Year or shall create an obligation of the Commonwealth to make any payments with respect thereto, it being the intention of this Trust Agreement that such determinations and related obligations shall be governed by the provisions of Article V hereof.

**Section 7.15   Reporting Requirements**.   The Commonwealth covenants that, in connection with the delivery of the Notes hereunder, it will enter into a reporting agreement in substantially the form attached hereto as Attachment 10 hereto.  An event of default under such Reporting Agreement, including the failure to timely provide the notices or information described therein, shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

**Section 7.16   Cap on Notional Amount**.   The GO CVI Notional Amount and the Clawback CVI Notional Amount set out the maximum aggregate amount of Notes that are permitted to be issued pursuant to this Trust Agreement and the Commonwealth shall not issue a greater aggregate notional amount of Notes.

**Section 7.17   Subsequent Bankruptcy Case**.  In the event that, during the period that the CVIs remain Outstanding, the Commonwealth commences a proceeding under Title III of PROMESA or under any other then applicable bankruptcy or insolvency law (the "Subsequent Bankruptcy Case"), the Commonwealth acknowledges and agrees that (a) the Trustee shall be authorized to file a proof of claim in the Subsequent Bankruptcy Case on behalf of the Holders of the CVIs seeking payment on account of a contingent, unliquidated claim with respect to the CVIs that remain Outstanding as of the date of such Subsequent Bankruptcy Case, together with all fees and expenses payable hereunder, and (b) unless the CVIs are rendered or determined to be

unimpaired in such Subsequent Bankruptcy Case, the court presiding over such Subsequent Bankruptcy Case shall determine the allowance, amount, and priority of such claim, if any, in accordance with applicable law, including, without limitation, any objections with respect thereto.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Notes of any Series, Subseries or Sub-Subseries so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in the Notes shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded hereby, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own gross negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust.**  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof.

**Section 8.05   Rights of the Trustee and the Paying Agent.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it to be genuine, and to have been signed or presented by the proper party or parties, in the absence of gross negligence or willful misconduct.  The Trustee and any Paying Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it and in accordance therewith, in the absence of gross negligence or willful misconduct on the Trustee's part.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered under the provisions hereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any default or Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Notes relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon in writing.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Notes, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Notes.

The Trustee shall have no liability for any action or failure to act in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its gross negligence or willful misconduct in connection therewith.

In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer, unless it is proven that the Trustee was grossly negligent.

The Trustee shall be under no obligation to exercise any of the rights or powers vested in it under this Trust Agreement at the request or direction of any of the Holders pursuant to this Trust Agreement unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities (except as may result from the Trustee's own gross negligence or willful misconduct) which might be incurred by it in compliance with such request or direction).

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("Instructions"); *provided*, *however*, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer.  The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth.  Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee.  The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that

the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent, in writing, immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**  There shall be paid from the Trustee and Independent Consultant Expenses Fund or other moneys available to the Commonwealth to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder, and also all documented fees, expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder.  The initial fee schedule of the Trustee is set forth as Attachment 12 hereto.  Such Attachment 12 may be revised from time to time by the Commonwealth and the Trustee without the consent of any Holders.  The Commonwealth agrees to pay the foregoing, other than expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim, all of which shall be paid by the Holders directing or requesting such actions.  For the avoidance of doubt, the foregoing limitation on the Commonwealth's obligations pursuant to this Section 8.06 shall not apply in the case of any expenses, charges, counsel fees and expenses and other disbursements incurred at any time when an Event of Default pursuant to Section 11.01(a) hereof has occurred and is continuing.  None of the provisions contained herein shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

Except as provided herein when the Holders shall be required to provide security and indemnification in the case of actions or Proceedings at the direction or request of Holders (other than in connection with an Event of Default pursuant to Section 11.01(a) hereof, the Trustee shall be indemnified by the Commonwealth and held harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of enforcing the provisions of this Trust Agreement (including this Section) against the Commonwealth and defending itself against any claim (whether asserted by the Company, or any Bondholder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**   The Trustee may become the owner of or may deal in Notes as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Notes or to effect or aid in any reorganization growing out of the enforcement hereof or of the Notes whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Notes in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee.**   The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Notes by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books. Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee.**   The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon 30 day's written notice by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Notes.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent.**   In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or

by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; ***provided, nevertheless,*** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Notes, at their last addresses appearing on the registry books. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11    Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally appointed as Trustee. However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth. In all instances, the Trustee then ceasing to act as trustee shall remain liable for actions or omissions prior to such transfer, subject to Section 8.03 and Section 8.05 herein.

**Section 8.12   Merger or Consolidation of the Trustee.**  Any company, corporation, association, trust company, banking association, or other entity into which the Trustee may be merged or with which it may be consolidated or any company, corporation, association, trust company, banking association, or other entity resulting from any merger or consolidation to which it shall be a party or any company, corporation, association, trust company, banking association, or other entity to which such Trustee may sell or transfer all or substantially all of its corporate trust business, ***provided*** such company, corporation, association, trust company, banking association, or other entity shall be qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such company, corporation, association, trust company, banking association, or other entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

**Section 8.13   Ancillary Agreements**.  To the extent it is a party thereto, the Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

## ARTICLE IX.

## AMENDMENTS TO TRUST AGREEMENT

**Section 9.01   Modification and Amendment without Consent.**  Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)     To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Notes, ***provided*** such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the CVI Legislation, and ***provided further*** that such additional covenants and agreements shall be for the equal benefit and security of all Notes, without discrimination or preference;

(b)     To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, the Plan, the Confirmation Order or in the CVI Legislation; provided that same shall be for the equal benefit and security of all Notes, without discrimination or preference;

(c)     To confirm, as further assurance, the lien, and the subjection to the lien, of the Commonwealth's right, title and interest in the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Notes (or, as contemplated hereunder, the applicable Series, Subseries or Sub-Subseries of Notes), without discrimination or preference; and

(d)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the next paragraph of this Section 9.01, materially adversely affect the rights of the Holders of the Notes.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement is authorized pursuant to this Section 9.01 and will not materially adversely affect the rights of the Holders of the Notes.

For the avoidance of doubt, no Supplemental Indenture shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 hereof with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Holders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Holders and the rights of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements.** The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX or Article X hereof.  A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, at its own expense and as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and the Trustee shall post a copy of such Supplemental Trust Agreement on EMMA under the CUSIPs for the Outstanding Notes.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

### Section 10.01  Powers of Amendment.

(a)      Except as provided in Section 9.01 hereof, any modification or amendment hereof or of the rights and obligations of the Commonwealth and of the Holders of the Notes hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Notes Outstanding at the time such consent is given, or (ii) in case less than all of the several Series, Subseries or Sub-Subseries of Notes then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Notes of each Series, Subseries or Sub-Subseries so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Notes of any specified like Series, Subseries or Sub-Subseries and tenor remain Outstanding, the consent of the Holders of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section.

(b)      No such modification or amendment shall, without the prior written consent of the Holder of such Note, permit a change in the provisions related to the timing or amount of any payment on the Notes, including, without limitation, any change in the currency to be used to pay the Notes, any change in the amount or date of any payment, the terms of redemption of any Outstanding Note or a reduction in the notional amount thereof.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Note, reduce the percentages or otherwise affect the classes of Notes the consent of the Holders of which is required to effect any such modification or amendment.  Further, no waiver of any default or compliance with any provision of this Section 10.01 shall be granted without the prior written consent of the Holder of such Note.

(c)      For the purposes of this Section 10.01, a Series, Subseries or Sub-Subseries shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Notes of such Series, Subseries or Sub-Subseries in any respect or diminishes (or is likely to diminish) the recovery of or the amount likely to be paid on account of such Series, Subseries or Sub-Subseries in any respect.  The Trustee shall obtain and may conclusively rely on an opinion of Transaction Counsel as to whether the Notes of any particular Series, Subseries or Sub-Subseries would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth, the Trustee and all Holders of Notes.

(d)      Subject to the prior provisions of this Section 10.01 relating to the consent of affected Holders, if legally authorized to do so, in the event the Commonwealth chooses to provide for the exclusion from gross income for federal income tax purposes of all or a portion of the payments on the Notes, the Commonwealth may propose amendments to this Trust Agreement and the Notes to provide for such tax treatment, as well as establishing a priority in the payments on the Notes to provide for a senior lien with respect to certain payments and a subordinate lien with respect to the remaining payments, and other amendments necessary or convenient with respect thereto, all as determined by the Commonwealth with the consent of the affected Holders.

**Section 10.02 Consent of Holders.** The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section. Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Notes. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Notes of any Series, Subseries or Sub-Subseries affected by such modification or amendment for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Notes. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Notes specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. For purposes of calculating the required percentage of Notes consenting to a modification or amendment, any such consent shall be binding upon the Holder of the Notes of such Series, Subseries or Sub-Subseries affected giving such consent and on any subsequent Holder of such Notes (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries affected shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries and will be effective as provided in this Section, shall be given to the Holders by mailing such notice to Holders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Notes of such Series, Subseries or Sub-Subseries affected at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; ***provided, however***, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03 Modifications by Unanimous Consent.** The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Notes may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Notes then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing**. Any provision in this Article X for the mailing of a notice or other document to Holders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Notes then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, and (b) to the Trustee.

**Section 10.05 Exclusion of Notes.**  Notes owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Notes to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may conclusively rely, describing all Notes so to be excluded.

**Section 10.06 Notation on Notes.**  Notes delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Note Outstanding at such effective date and upon presentation of his Note for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Note by the Trustee as to any such action.  If the Commonwealth or the Trustee shall so determine, new Notes so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Note then Outstanding shall be exchanged, without cost to such Holder, for Notes of the same Series, Subseries or Sub-Subseries then Outstanding, upon surrender of such Notes.

# ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.**  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)      Following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the Notes the amounts due and payable hereunder by (i) the CVIs Annual Payment Date, (ii) in the event of any challenge or Proceeding as provided in the Calculation Agent Agreement, the related Challenge Payment Date or (iii) extraordinary redemption date, as applicable; or

(b)      The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Notes on the part of the Commonwealth to be performed, other than the provisions of Section 7.15 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates, unless, if in the determination of the Commonwealth, such default is capable of being cured within ninety (90) days of the date the default initially occurred but is not capable of being cured within forty-five (45) days of the date the default initially occurred, the Commonwealth has commenced to cure such default within forty-five (45)  days and does cure such default within ninety (90) days of the date the default initially occurred; or

(c)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Notes or the security provided for in this Trust Agreement to be impaired, and such impairment affects the enforceability of or payments on the Notes, or any Person to be released from any covenants or obligations with respect to the Notes; or

(d)     the representations of the Commonwealth set forth in the final sentence of Section 5.01 hereof or Section 7.10(a) hereof shall not be true and correct in any material respect on and after the Effective Date and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates.

**Section 11.02 No Acceleration with Respect to the Notes.**  There shall be no right of acceleration with respect to the Notes.

**Section 11.03 Enforcement of Remedies.**

(a)     If an Event of Default occurs under Section 11.01(a) and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (recursos disponibles) of the Commonwealth resources to the payment of the Notes, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(b)     If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.  If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek specific performance of any relevant provisions of this Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)     Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

**Section 11.04 Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder shall not be sufficient to pay the amounts on the Notes as the same become due and payable, the money held by the Trustee hereunder together with any money then available or thereafter becoming available to pay

the Notes, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows:

First:  To the payment of amounts due to the Trustee and Paying Agents under Section 8.06;

Second:

(i) from amounts collected from the exercise of remedies relating to an Event of Default relating to Subject to Waterfall Outperformance Amounts, to the payment to the Holders of the GO CVIs and the Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Subject to Waterfall Outperformance Amount occurred;

(ii) from amounts collected from the exercise of remedies relating to an Event of Default relating to Not Subject to Waterfall Outperformance Amounts, to the payment to the Holders of Not Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Not Subject to Waterfall Outperformance Amount occurred; and

(iii) from amounts collected from the exercise of remedies relating to an Event of Default relating to the Rum Tax CVI Annual Payment Amount, to the payment to the Holders of the PRIFA Rum Tax Clawback CVIs to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Rum Tax CVI Annual Payment Amount occurred.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Notes or to any other Person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date upon which such application is to be made.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Notes are Outstanding and unpaid shall be paid to the Commonwealth.

**Section 11.05 Termination of Proceedings.**  In case any Proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Holders shall be restored to their former positions and rights

hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such Proceeding had been commenced in the case of discontinuance or abandonment or the provisions of this Trust Agreement shall be modified in accordance with any determination by the entity making such determination if the Proceedings were determined adversely to the Trustee.

**Section 11.06 Holders' Direction of Proceedings.**   Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder with respect to such Event of Default, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy related to such Event of Default available pursuant to Section 11.03, ***provided***, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Holders not parties to such direction, and (iv) the Trustee reasonably believes it will be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such direction.  Notwithstanding the foregoing, (a) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Not Subject to Waterfall Outperformance Amount, including the calculation or application thereof, only the Holders of the Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding, and (b) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Rum Tax CVI Annual Payment Amount, including the calculation or application thereof, only the Holders of the PRIFA Rum Tax Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding.

**Section 11.07 Control by Holders of Notes; Limitations**.  No Holder of any of the Notes shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Notes secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all Proceedings

- 65 -

shall be instituted and maintained for the benefit of all Holders of the Outstanding Notes. Notwithstanding any other provision hereof, the Holder of any Note shall have the right which is absolute and unconditional to receive payment of the amounts due on such Note expressed in such Note (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the CVI Legislation.

**Section 11.08 Actions by Trustee; Possession of Notes by Trustee Not Required.** All rights of action hereunder or under any of the Notes secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Notes or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Notes to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

Except as provided in the next paragraph, the Trustee may, and upon written request of the Holders of not less than a Majority in Interest of the Outstanding Notes to which an Event of Default relates, shall waive a default (except with respect to nonpayment following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition by the CVI Annual Payment Amount Payment Date or any applicable redemption date, which only may be waived upon written request to the Trustee by Holders of each Outstanding Note which has not been so paid); *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall waive a default which in the opinion of the Trustee or such Holders of not less than a Quarter in Interest shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from the Holders of a greater percentage of Quarter in Interest of the Outstanding Notes to which such default relates that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall promptly give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth and to the Holders of Notes, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to AAFAF and the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Holders. In the case of the Holders of the Notes, each such notice of Event of Default

shall be given by the Trustee by mailing written notice thereof to all registered Holders of Notes, as the names and addresses of such Holders appear on the books for registration and transfer of Notes as kept by the Trustee.

**Section 11.11  Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

**Section 12.01  Discharge and Defeasance.**

(a)     If the Commonwealth shall pay or cause to be paid to the Holder of a Note the Remaining Clawback CVI Lifetime Cap or the Remaining GO CVI Lifetime Cap, as applicable, then all rights granted hereby to such Note (including without limitation, the lien) shall be discharged and satisfied.   In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth.

(b)     Notes for the redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such redemption) at the redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Notes of any Series or Subseries shall prior to the redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Notes; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay the Remaining Clawback CVI Lifetime Cap or Remaining GO CVI Lifetime Cap, as applicable, on the redemption date; and

(iii)     the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Note having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, and (B) such defeasance is in accordance with the terms hereof.

Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of said Notes;

*provided, however,* that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due said Notes on such redemption date.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY NOTE HOLDERS
## AND PROOF OF OWNERSHIP OF NOTES

**Section 13.01 Evidence of Signatures of Holders and Ownership of Notes.** Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Notes may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Notes in person or by his or their attorneys duly appointed in writing. Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Notes, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Holder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Holder may be established without further proof if such instrument is signed by a Person purporting to be the president or another Authorized Officer of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Notes and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books. Any request, consent or vote of the owner of any Note shall bind all future owners of such Note in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith. The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents.** All documents received by the Trustee from the Commonwealth or from Holders under the provisions hereof shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Holder and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Holder a written request of

such Holder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

      **Section 14.02 Money and Funds Held for Particular Notes.**  The amounts held by the Trustee or any Paying Agent for the payment of particular Notes due on any particular date shall, pending such payment, be irrevocably set aside and held in trust by it for the Holders of such Notes entitled thereto, and for the payments on such Notes, with the amounts so set aside and validly and irrevocably held in trust for the Holders of such Notes, shall no longer be considered to be unpaid upon such payment.

      **Section 14.03 Cancellation of Notes.**  The Trustee or any Paying Agent shall forthwith cancel all Notes which have been redeemed or paid, or upon the Clawback CVIs Final Maturity Date in the case of the Clawback CVIs and the GO CVIs Final Maturity Date in the case of the GO CVIs, and shall dispose of such Notes in accordance with its customary procedures.  No such Notes shall be deemed Outstanding Notes hereunder and no Notes shall be issued in lieu thereof.

      **Section 14.04 No Recourse under Trust Agreement or on the Notes.**  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Notes or for any claims based thereon, hereon against any member, officer or employee of the Commonwealth or any Person executing the Notes, all such liability, if any, being expressly waived and released by every Holder of Notes by the acceptance of the Notes.

      **Section 14.05 Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Notes.

      **Section 14.06 Parties of Interest.**  Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents and the Holders.  In accordance with Section 326 of the U.S.A. Patriot Act (Pub.L. 107-56), the Trustee is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The Commonwealth agrees that it will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act.

      **Section 14.07 Notices.**  Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto shall be in writing and shall be

delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth addressed to the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901; and in the case of AAFAF, to the attention of the Executive Director at Roberto Sánchez Vilella (Minillas) Government Center, De Diego Avenue Stop 22, San Juan, PR 00907; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at The Bank of New York Mellon, 240 Greenwich Street, Floor 7 East, New York, New York 10286, Attention: Corporate Trust, or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons.  Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any Series or Subseries of Notes, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Notes of the Series or Subseries to the Commonwealth's dissemination agent for distribution through the EMMA system.  The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing.  The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph.  The sole remedy for failure of the Trustee to perform is specific performance.

**Section 14.08 Headings.**  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.09 Governing Laws.**  This Trust Agreement and the Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Notes; *provided*, *however*, that the authorization of this Trust Agreement and the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

**Section 14.10 Retention of Jurisdiction of Title III Court.**  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Notes (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.11 Signatures and Counterparts.**  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate

counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.12 Successors and Assigns.** Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.13 Conflicts.** All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

**Section 14.14 Force Majeure**. In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, pandemics, epidemics, recognized public emergencies, quarantine restrictions, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services and hacking, cyber-attacks, or other use or infiltration of the Trustee's technological infrastructure exceeding authorized access; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

[Remainder of page intentionally left blank; signature page follows]

**IN WITNESS WHEREOF**, the Commonwealth has caused these presents to be signed in its name and on its behalf and attested by its duly authorized officer, and, to evidence its acceptance of the trusts hereby created, the Trustee has caused these presents to be signed in its name and on its behalf by its duly authorized officer, all as of the day and year first above written.

**COMMONWEALTH OF PUERTO RICO**

By:

[Signature page to Trust Agreement relating to CVIs]

**THE BANK OF NEW YORK MELLON,**
as Trustee

By:

[Signature page to Trust Agreement relating to CVIs]

**EXHIBIT A**

**CONFIRMATION ORDER**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO et al.,

                    Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III
JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | Confirmation of the Plan | 5 |
| 2. | Objections | 5 |
| 3. | Findings/Conclusions | 5 |
| 4. | Litigation Resolution | 9 |
| 5. | Plan Settlements Approved | 10 |
| 6. | Dismissal of Med Center Litigation | 11 |
| 7. | Dismissal of ERS Litigation | 12 |
| 8. | Dismissal of GO/Clawback Litigation | 13 |
| 9. | Dismissal of PRIFA BANs Litigation | 13 |
| 10. | Dismissal of the PBA Litigation | 13 |
| 11. | Implementation of the Plan | 14 |
| 12. | Enforceability of New Debt Instruments | 15 |
| 13. | Authorization of New GO Bonds and CVIs and Injunction | 15 |
| 14. | Purchase and Sale of Certain ERS Assets | 16 |
| 15. | Monthly Deposits of Interest and Principal | 16 |
| 16. | Comprehensive Cap on All Net Tax-Supported Debt | 17 |
| 17. | Adoption and Maintenance of a Debt Management Policy | 18 |
| 18. | Creation of Avoidance Actions Trust | 18 |
| 19. | Avoidance Actions Trust Assets | 19 |
| 20. | Funding, Costs, and Expenses of the Avoidance Actions Trust | 19 |
| 21. | Indemnification of Avoidance Actions Trustee and Board | 20 |
| 22. | Creation of Pension Reserve Trust | 20 |
| 23. | Funding of the Pension Reserve Trust | 21 |
| 24. | No Action | 22 |
| 25. | Government Action | 22 |
| 26. | Oversight Board Consent Pursuant to PROMESA Section 305 | 23 |
| 27. | Binding Effect | 23 |
| 28. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 24 |
| 29. | Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases | 26 |
| 30. | Insurance Policies | 27 |

31.  Rejection Damages Claims ..................................................................................... 28

32.  Payment of Cure Amounts .................................................................................... 28

33.  Setoff ..................................................................................................................... 28

34.  Delivery of Distributions ....................................................................................... 29

35.  Disbursing Agent ................................................................................................... 37

36.  Payment of Trustee Fees and Expenses ................................................................ 37

37.  Securities Laws Exemption .................................................................................... 38

38.  Acceleration of Insured Bonds .............................................................................. 39

39.  Disputed Claims Reconciliation ............................................................................ 40

40.  Disputed Claims Holdback .................................................................................... 42

41.  National Action Claims .......................................................................................... 43

42.  No Amendments to Proofs of Claim ..................................................................... 44

43.  Conditions to Effective Date .................................................................................. 45

44.  Administrative Claim Bar Date .............................................................................. 45

45.  Professional Compensation and Reimbursement Claims ...................................... 46

46.  GO/PBA Consummation Costs .............................................................................. 47

47.  AFSCME Professional Fees ................................................................................... 47

48.  GO/PBA PSA Restriction Fee ............................................................................... 48

49.  ERS Restriction Fee ............................................................................................... 50

50.  CCDA Consummation Costs .................................................................................. 50

51.  CCDA Restriction Fee ........................................................................................... 51

52.  HTA Bond Claims .................................................................................................. 53

53.  System 2000 Obligations ....................................................................................... 53

54.  HTA/CCDA Clawback Structuring Fees ............................................................... 53

55.  Active JRS Participants and Active TRS Participants ........................................... 54

56.  Discharge and Release of Claims and Causes of Action ....................................... 56

57.  Releases by the Debtors and Reorganized Debtors ............................................... 62

58.  Release and Exculpation Provisions ...................................................................... 63

59.  **Injunction on Claims** .............................................................................................. 63

60.  **Injunction Related to Releases** ............................................................................. 64

61.  Exculpation ............................................................................................................ 65

62.  Maintenance of Pension System ............................................................................ 71

63.  Appointments Related Litigation ........................................................................... 72

| | | |
|---|---|---|
| 64. | **Bar Order** | 72 |
| 65. | **Supplemental Injunction** | 73 |
| 66. | Term of Existing Injunctions or Stays | 75 |
| 67. | Prosecution of Claims | 75 |
| 68. | Indemnification and Reimbursement Obligations | 75 |
| 69. | Compliance with Tax Requirements | 76 |
| 70. | Documents and Instruments | 77 |
| 71. | Fiscal Plan | 77 |
| 72. | Claims | 77 |
| 73. | GUC Reserve | 78 |
| 74. | PROMESA 407 Claims | 78 |
| 75. | Dairy Producer Claims | 78 |
| 76. | Eminent Domain/Inverse Condemnation Claims. | 79 |
| 77. | Oversight Board Termination and Post-Confirmation Powers | 80 |
| 78. | Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion | 80 |
| 79. | Government Post-Confirmation Powers and Duties | 81 |
| 80. | Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated | 81 |
| 81. | Non-Impairment of CVIs, SUT | 81 |
| 82. | Reversal/Stay/Modification/Vacatur of Order | 82 |
| 83. | Retention of Jurisdiction | 82 |
| 84. | Conflicts Among Documents | 83 |
| 85. | PBA Leases | 83 |
| 86. | Modifications | 84 |
| 87. | Asserted Surety Claims | 85 |
| 88. | Identification of Additional Retail Investors / Retail Support Fee | 85 |
| 89. | Provisions of Plan and Order Nonseverable and Mutually Dependent | 87 |
| 90. | Governing Law | 87 |
| 91. | PFC Reservation | 87 |
| 92. | Applicable Nonbankruptcy Law | 87 |
| 93. | Waiver of Filings | 88 |
| 94. | Notice of Order | 88 |
| 95. | No Waiver | 89 |

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the

Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and

ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board"), as Title III representative of the Debtors under section 315(b) of

the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] having

proposed and filed with the United States District Court for the District of Puerto Rico (the

"Court") the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth

of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784 in Case No. 17-3283)[2]

(as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as

set forth in this Confirmation Order through the date hereof, including the Plan Supplement, and

as may be amended, supplemented, or modified pursuant to section 313 of PROMESA, the

"Plan"[3] through the date hereof);[4] and the Court having entered, pursuant to, inter alia, section

---

[1]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section numbers in the remainder of this Confirmation Order are to the uncodified version of the legislation.

[2]     All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]     The use of the term "Plan" herein, unless otherwise indicated by context, refers to the confirmable final version filed at Docket Entry No. 19784, as described herein.  The penultimate version of the plan, which required final modifications to be confirmable, was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No. 19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

[4]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Findings of Fact and Conclusions of Law"), entered contemporaneously herewith, as applicable.  A composite copy of the Plan is annexed hereto as **Exhibit A**.

1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i) approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the following documents having been filed by the Debtors or the PSA Creditors in support of or in connection with confirmation of the Plan:

(a) Plan Supplement (Docket Entry No. 18470);

(b) *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9);

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4);

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 18869) (the "Confirmation Brief");

(f) *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4);

(g) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry Nos. 18726 and 19054-1);

(h)    *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9);

(i)    *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10);

(j)    *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8);

(k)    *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6);

(l)    *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18736 and 19054-7);

(m)    *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2);

(n)    *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5);

(o)    *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3);

(p)    *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056. See also Docket Entry No. 19144);

(q)    *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r)    *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s)     *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t)     *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u)     *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059);

(v)      *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19060);

(w)     *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115); and

(x)     *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329);

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and on the record of the Confirmation Hearing; and, except to the extent otherwise provided herein, each of the objections having been resolved, overruled, sustained, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[5] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing

---

[5]     All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

documents, and the evidence admitted and arguments of counsel presented at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.      Confirmation of the Plan.  The Plan and each of its provisions shall be, and

hereby are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained

in the Plan Supplement are authorized and approved.  The terms of the Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

Hearing, as set forth in this Confirmation Order as well as in the revised composite copy attached

hereto as **Exhibit A**, include the Plan Supplement, as amended, supplemented, or modified on or

prior to the date hereof, and are incorporated by reference into and are an integral part of this

Confirmation Order.

2.      Objections.  With the narrow exception of the objections of holders of alleged

Eminent Domain/Inverse Condemnation Claims, which are hereby SUSTAINED to the extent

that such Claims are ultimately Allowed Claims, all objections, responses to, and statements and

comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are,

OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn

with prejudice.

3.      Findings/Conclusions.  The findings of fact and conclusions of law set forth in the

Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in

full.  Notwithstanding such incorporation, the following summarizes certain of the Court's

determinations:

> (A)      Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27,
> 2019, the Commonwealth, ERS, and PBA, respectively, each commenced a
> case before the Court in accordance with the requirements of Title III of
> PROMESA.  The commencement of these cases vested the Court with

exclusive jurisdiction over the cases and all respective property of the
Commonwealth, ERS, and PBA, wherever located. As a result of the
consensual agreement among the Debtors and their respective creditor
representatives, the Debtors formulated, duly solicited, and now seek
confirmation of a plan of adjustment in accordance with federal law.

(B)      This Confirmation Order is a final order intended to be binding on all parties
in interest, and shall not be subject to collateral attack or other challenge in
any other court or other forum, except as permitted under applicable law.
Confirmation of the Plan constitutes a judicial determination, pursuant to
section 4 of PROMESA, that all laws, rules, and regulations giving rise to
obligations of the Debtors discharged by the Plan and this Confirmation Order
pursuant to PROMESA are preempted by PROMESA and such discharge
shall prevail over any general or specific provisions of territory laws, rules,
and regulations. Pursuant to section 4 of PROMESA, to the extent not
previously ruled preempted pursuant to an order of the Title III Court, all laws
(or such portions thereof) of the Commonwealth of Puerto Rico, other than
budgets certified by the Oversight Board, inconsistent with PROMESA, have
been preempted to the extent set forth in Exhibit A to the Findings of Fact and
Conclusions of Law. Such preempted laws include, without limitation, laws
enacted prior to June 30, 2016, that provide for transfers or other
appropriations after the enactment of PROMESA, including transfers from the
Commonwealth or one of its instrumentalities to any agency or
instrumentality, whether to enable such agency or instrumentality to pay or
satisfy indebtedness or for any other purpose, to the extent inconsistent with
the Plan's discharge of the Debtors' obligations. Such laws shall not be
enforceable to the extent they are inconsistent with the Plan's discharge of the
Debtors' obligations. All laws enacted from and after the commencement of
the Title III Cases to the extent they are inconsistent with the transactions
contemplated by the Plan are also unenforceable. Without in any way limiting
the foregoing, (a) the Commonwealth laws preempted by PROMESA include,
without limitation, those listed on **Exhibit C** hereto for the reasons, and to the
extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law,
and (b) all litigation in which any Government Party is a defendant, over
whether any Commonwealth law listed on **Exhibit C** hereto is preempted by
PROMESA shall be dismissed, with prejudice, as of the Effective Date and
the parties thereto shall provide the Oversight Board prompt notice of such
dismissal. For the avoidance of doubt, the non-inclusion of a payment
obligation arising from a valid law in a certified fiscal plan or budget is not a
basis for disallowance of such obligation to the extent the claim arising
therefrom otherwise satisfies the requirements for allowance of a claim under
the relevant provisions of the Bankruptcy Code.

(C)      The Court shall retain jurisdiction to enforce the terms hereof and of the Plan,
the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with
their terms to ensure compliance with the Plan and to adjudicate claims arising
therefrom, including rights to specific performance.

(D) At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVI a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.

(E) The New GO Bonds Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F) Pursuant to PROMESA, including section 4 thereof, as well as sections 944[6] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court determines that the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

---

[6] Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws.") (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010)) (additional citations omitted). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

(G)   The New GO Bonds and the CVIs are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the Commonwealth may legally pledge its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest.

(H)   Pursuant to the New GO Bonds Legislation and the CVI Legislation, the Commonwealth has validly pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest with respect to the New GO Bonds and payment with respect to the CVIs.

(I)   Subject to the occurrence of the Effective Date and as of the date of issuance of the New GO Bonds and CVIs, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)   Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid, and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

(K)   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal, and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

(L)   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

(M)   The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of

the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

(N)    In light of the enactment of the New GO Bonds Legislation and the CVI Legislation, upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(O)    For purposes of section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

(P)    The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint* (Docket Entry No. 83 in Adv. Proc. No. 21-00068), including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.    <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of

CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive

revenues historically conditionally appropriated to CCDA, HTA, the MBA, and PRIFA, as

applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the

Commonwealth Constitution, (e) relating to the validity, priority, secured status, and related

rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery

Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including,

without limitation, the resolution of (i) the claims and Causes of Action currently being litigated

in the PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and

(iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims

that PBA may assert against the Commonwealth under leases, agreements, and applicable law,

(h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention

Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in

the PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this

Confirmation Order constitutes, if required, approval of all such compromises and settlements

pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.

Pursuant to this Confirmation Order, and to the extent provided in the Plan, on the Effective

Date, such compromises and settlements shall be binding upon the Debtors, all Creditors of the

Debtors, and all other Entities and, to the fullest extent permitted by applicable law, shall not be

subject to collateral attack or other challenge (other than appeals) in any other court or forum.

     5.    <u>Plan Settlements Approved</u>.  The Court hereby approves the compromises and

settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan,

authorizes and directs the consummation thereof.

6.      <u>Dismissal of Med Center Litigation</u>.  On the Effective Date, the Med Center

Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of

the Commonwealth and the respective Med Centers shall take such action as is necessary to

notify the applicable court of such dismissal, including, without limitation, within ten (10)

Business Days of the Effective Date, filing notices with the clerk of such court setting forth the

resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action),

with prejudice; <u>provided</u>, <u>however</u>, that all appeals taken from the Med DC Action shall be

dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such

appeals shall take such action as is necessary to notify such appellate courts of appeal of such

dismissal, with prejudice; and, <u>provided</u>, <u>further</u>, that the Commonwealth and the Med Centers

shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all

actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and

after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the

Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue

relief and the Commonwealth may present any and all defenses with respect to such alleged

future defaults, with all existing defaults as of the date hereof having been waived by the Med

Centers.  Without in any way limiting the foregoing, from and after the earlier to occur of (y)

July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise

ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and

provisions of that certain *Stipulation Modifying the Automatic Stay Between the Commonwealth

and Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr.

Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv. Médicos

Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc.,*

*Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.*,

dated July 12, 2019 (the "Med Center Stipulation") (see Docket Entry Nos. 8499 and 12918-14),

including, without limitation, the making of quarterly payments to certain Med Centers in

accordance therewith.  Payments made by the Commonwealth, either directly or indirectly

through contractors or subcontractors, to any Med Center prior to modification of the Med

Center Stipulation or such other agreement between the applicable Med Centers and the

Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes

of action arising during the period up to and including the Effective Date; provided, however,

that, in the event that the Commonwealth or any Med Center determines that any payments made

pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an

overpayment or an underpayment, as the case may be, based upon services provided by the Med

Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center

shall submit such issue for a determination in connection with the Med DC Action, with all

parties reserving all rights, defenses, and counterclaims with respect to such overpayments or

underpayments, as the case may be, notwithstanding the imposition of any stay.

      7.    <u>Dismissal of ERS Litigation</u>.  On the Effective Date, (a) the ERS Litigation and

the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the

Oversight Board, by itself or through its committees, the Creditors' Committee, and the ERS

Bondholders (on their own account or on behalf of affiliates or related funds or accounts

managed by affiliates) shall take any and all action reasonably necessary, including, without

limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to

effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions,

with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate

the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.      <u>Dismissal of GO/Clawback Litigation</u>.  On the Effective Date, (a) to the extent

extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift

Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or

denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the

Creditors' Committee, the Monolines and the PSA Creditors (on their own account or on behalf

of affiliates or related funds or accounts managed by affiliates) shall take any and all action

reasonably necessary, including, without limitation, filing such notices, stipulations or other

pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the

courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the

aforementioned litigations and motions, with prejudice.

9.      <u>Dismissal of PRIFA BANs Litigation</u>.  On the Effective Date, (a) the PRIFA

BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with

prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs

therein (on their own account or on behalf of affiliates or related funds or accounts managed by

affiliates) shall take any and all action necessary, including, without limitation, filing such

notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal

and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court

of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings

Litigation, with prejudice.

10.     <u>Dismissal of the PBA Litigation</u>.  On the Effective Date, (a) the PBA Litigation

shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its

committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court to effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.    <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective authorized agents and representatives are authorized and directed to (a) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements including, without limitation, those contained in the Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan, including, among other things, all such actions delineated in article LXXXIX of the Plan,[7] and (d) direct or instruct The Depository Trust Company, or such other person or entity necessary to implement or effectuate the terms of (i) any custodial trust, escrow arrangement, or similar structure established pursuant to section 75.5(b) of the Plan and facilitated by Ambac (an "Ambac Trust"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow arrangement, or similar structure established pursuant to section 75.1(b)(ii) of the Plan (an "Assured Trust"), and (v) the Avoidance Actions Trust (collectively, the "Trusts"), and (vi) the related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date, the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case may be, and members of the boards of directors of the same, as applicable, are authorized,

---

[7]    Article LXXXIV has been amended to reflect that Class 54 is among the Unimpaired Classes (§ 84.2), rather than among the Impaired Classes (§ 84.1.)

empowered, and directed to issue, execute, file, and deliver or record such documents, contracts,

instruments, releases, and other agreements, including those contained in the Plan Supplement,

contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers

contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name

of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12.    Enforceability of New Debt Instruments.  Pursuant to each of Bankruptcy Code

section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments

to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations

of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision

made to pay or secure payment of such obligation is valid.

13.    Authorization of New GO Bonds and CVIs and Injunction.  The debt

authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly

Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of

Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh

Amended Plan"), and does not require satisfaction of any other conditions including cancellation

of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of

defined benefits under the Teachers Retirement System or the Judiciary Retirement System from

and after the Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification

previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in

Act 53-2021 for its debt authorization.  The Commonwealth government shall not repeal such

debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in

accordance with the terms thereof.  For avoidance of doubt, the Plan does not modify benefits

comprised of the "Monthly Base Pension," "Christmas Bonus," "Summer Bonus," "Medicine

Bonus," and "Medical Insurance Benefit," each as defined in the Seventh Amended Plan.

14.     <u>Purchase and Sale of Certain ERS Assets</u>.  On the Effective Date, (a) the

Commonwealth shall purchase, and ERS shall sell, assign, transfer, and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without

limitation, such Assets subject to a valid and perfected lien or security interest (other than liens

or claims discharged pursuant to the Plan and this Confirmation Order) for an aggregate purchase

price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and

(b) in accordance with the terms and provisions of section 69.2 of the Plan, (i) the

Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the

interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option,

pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS

Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be

necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with

the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not

exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15.     <u>Monthly Deposits of Interest and Principal</u>.  Pursuant to the New GO Bonds

Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New

GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st)

Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the

Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-

sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the

payment of interest to accrue on the New GO Bonds through the next interest payment date, and

(ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect

to the payment of principal (or accreted value) on the New GO Bonds. On the Effective Date,

the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional

amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed

Issuance Date.

16. <u>Comprehensive Cap on All Net Tax-Supported Debt</u>. During the Debt Policy

Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds

Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as

applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive

Cap on all Net Tax-Supported Debt of article IV of the Debt Responsibility Act, which cap shall

be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and

when measured in accordance with the Debt Responsibility Act, including a secured and/or

securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy

Revenues above and beyond the percentage of Debt Policy Revenues required to pay the

maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date. Debt

service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO

Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other

contingent value instruments that may be issued pursuant to or in connection with a

Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA,

CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by

such instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation

bonds or similar tax supported debt obligations issued to anyone other than the holders or

insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value

instruments or similar tax supported debt obligations issued other than pursuant to or in

connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the

Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The

Secretary of Treasury's certification of compliance with the Debt limit pursuant to section 74.4

of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in

issuing such certification, with respect to the calculation of the revenues of public corporations

included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from

officers of such public corporations.

   17. <u>Adoption and Maintenance of a Debt Management Policy</u>. During the Debt

Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt

Management Policy designed to ensure that certain past Debt issuance practices of the

Commonwealth are not repeated. The Debt Management Policy shall, unless otherwise

approved, in writing, by the Oversight Board (to the extent exercising authority in accordance

with the provisions of PROMESA), at all times include the principles and limitations provided in

section 74.5 of the Plan.

   18. <u>Creation of Avoidance Actions Trust</u>. Upon the execution of the Avoidance

Actions Trust Agreement pursuant to section 78.1 of the Plan, the Avoidance Actions Trust shall

be established and validly created pursuant to the terms of the Avoidance Actions Trust

Agreement, with no further authorization or legislative action being required, and the Avoidance

Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement. This Court shall retain jurisdiction to enforce the terms and provisions of the Avoidance Actions Trust Agreement.

19. <u>Avoidance Actions Trust Assets</u>. The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets. On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right, authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions, including, without limitation, those set forth on Exhibits A and B to the Plan, as of the Effective Date. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, including, without limitation, all counterclaims and defenses to any such Avoidance Actions Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant to section 88.2 of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

20. <u>Funding, Costs, and Expenses of the Avoidance Actions Trust</u>. On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing. The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets. Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

21.  <u>Indemnification of Avoidance Actions Trustee and Board</u>.  The Avoidance Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust Agreement), and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except those acts arising from their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim of an Indemnified Party pursuant to section 7.5 of the Avoidance Actions Trust Agreement shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

22.  <u>Creation of Pension Reserve Trust</u>.  Upon the execution of the Pension Reserve Deed of Trust pursuant to section 83.1 of the Plan, the Pension Reserve Trust shall be established

and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further
authorization or legislative action being required, and shall not be subject to taxation by the
Commonwealth. This Court's retention of jurisdiction includes jurisdiction over actions to
enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.     Funding of the Pension Reserve Trust. On the Effective Date, the Commonwealth
shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars
($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve
Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve
Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be
deposited into the Pension Benefits Council's administrative and operating account, and One
Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension
Reserve Board's administrative and operating account. From and after the FY in which the
Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY
in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be
made, annual (but in no event later than October 1st following the conclusion of each FY)
contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)
such additional amount calculated as the lower of the actual primary surplus for such FY and the
projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution
for such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for
such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in
all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to
applicable laws, including, without limitation, Titles I and II of PROMESA, such additional
amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust. The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the

independence, professionalism, experience and qualification standards set forth in the Pension

Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics, and

conflicts of interest laws and regulations.

24.     No Action.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are

directed to, and no further action of the directors or officers of the Debtors shall be required to

authorize the Debtors to, enter into, execute, deliver, file, adopt, amend, restate, consummate, or

effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be

executed, delivered, adopted, or amended in connection with the implementation of the Plan,

including, without limitation, the Plan Supplement.

25.     Government Action.  From the Effective Date up to and including the satisfaction

of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to

Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation,

any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to

consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of

Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any

requirements of Puerto Rico law, to execute any and all agreements necessary for the

implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to

section 108(a)(2) of PROMESA, no party, individual, official, or officer (elected or appointed),

agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i)

impedes, financially or otherwise, consummation and implementation of the transactions

contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New

GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount, or event between the terms and provisions of the Plan or a Fiscal Plan certified by the

Oversight Board, each of which actions has been determined by the Oversight Board to impair or

defeat the purposes of PROMESA.  To the maximum extent permitted by law, the Government

of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf

thereof, is directed to take any and all actions necessary to consummate the transactions

contemplated by the Plan.  Without in any way limiting the foregoing, on the earlier to occur of

(y) the Effective Date and (z) within forty-five (45) days from and after the date hereof, the

agencies and instrumentalities set forth on **Exhibit D** hereto are directed to transfer the funds and

the proceeds of liquid securities held on account and set forth on **Exhibit D** hereto to the Puerto

Rico Treasury Single Account; provided, however, that **Exhibit D** hereto may be amended

during the period up to and including thirty (30) days from the date hereof upon the agreement of

the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an

informative motion with the Title III Court with respect thereto.

26.     Oversight Board Consent Pursuant to PROMESA Section 305.  Pursuant to

section 305 of PROMESA, with the consent of the Oversight Board and consistent with the Plan,

using all their political and governmental powers, the Governor and Legislature are directed to

take all acts necessary to carry out and satisfy all obligations and distributions set forth in the

Plan.

27.     Binding Effect.  This is a full and complete Final Order intended to be conclusive

and binding on all parties in interest, is not intended to be subject to collateral attack in any other

forum, and may only be challenged in accordance with applicable rules in this Court and

appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence,

by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its

instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or

any other Commonwealth instrumentality, including each holder of a bond claim and each holder

of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer

or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with

respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank

that receives or holds funds related to such bonds, whether or not such claim or other rights of

such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity

accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs,

successors, assigns, trustees, executors, administrators, officers, directors, agents,

representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises

and settlements set forth in the Plan and this Confirmation Order with respect to the priority of

the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other

applicable law shall not be binding on any party in interest (including any successor to the

Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

      28.    <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>. Pursuant

to section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other

agreement or document entered into or delivered in connection with the Plan, (b) for purposes of

evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the

Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to section

76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all

instruments and documents related thereto will be deemed automatically cancelled, terminated

and of no further force or effect against the Debtors without any further act or action under any

applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee,

paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan, and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call rights assigned to such Monoline pursuant to the provisions of article LXXV of the Plan, (vi) to allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv) above, or (vii) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.

Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such

bonds or bond documents that remain outstanding shall not form the basis for the assertion of

any Claim against the Debtors or Reorganized Debtors, as the case may be.

29.     Rejection or Assumption of Remaining Executory Contracts and Unexpired

Leases.  Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and subject to the provisions of sections 76.5 and 76.7 of

the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any

Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall

be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract

and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of

the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a

contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been

registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from

registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and

regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or

authorized by the Title III Court, unless specifically designated a contract to be rejected in the

Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or

pursuant to any federal program, (g) that is an incentive agreement between the Government of

the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover

Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments,

municipalities, public corporations, or instrumentalities (other than leases to which PBA is a

party); provided, however, that the Debtors reserve the right to amend, on or prior to the

Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom

or add any Executory Contract and Unexpired Lease thereto, in which event such Executory

Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of

any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through

the operation of section 76.1 of the Plan, by including a schedule of such contracts and leases in

the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be

rejected through the operation of section 76.1 of the Plan, by serving a separate notice to the

relevant counterparties to such agreements.  To the extent there are any amendments to such

schedules, the Debtors shall provide notice of any such amendments to the parties to the

Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the

schedules to the Plan Supplement or in any separate notice shall not constitute an admission by

the Debtors that such document is an Executory Contract and Unexpired Lease or that the

Debtors have any liability thereunder.  Except as provided in articles LV and LVI of the Plan,

none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts

and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain

in effect subject, in all instances, to Puerto Rico law and articles LV and LVI of the Plan

regarding the payment and ongoing treatment of pension and related claims obligations.

     30.   <u>Insurance Policies</u>.  Subject to the terms and provisions of section 76.7 of the

Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments

relating thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such

treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect

to its respective obligations to holders of Claims under policies of insurance and applicable law

and governing documents with respect thereto.

31.     <u>Rejection Damages Claims</u>.  If the rejection of an Executory Contract and

Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to

such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof

of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its

properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors,

unless a proof of Claim is filed with the Title III Court and served upon attorneys for the

Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after

the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Title III

Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.     <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment

with respect to each prepetition executory contract and unexpired lease to be assumed pursuant

to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment

of the cure amount in Cash on the later to occur of (a) the Effective Date and (b) within ten (10)

Business Days of the occurrence of a Final Order setting forth the cure amount as to each

executory contract or unexpired ease to be assumed or assumed and assigned, or upon such other

terms and dates as the parties to such executory contracts or unexpired leases and the Debtor

otherwise agree.

33.     <u>Setoffs</u>.  Except as otherwise provided in the Plan or in this Confirmation Order,

the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off

against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the

claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may

hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release

by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the

Debtors or the Reorganized Debtors possess against such holder; and, provided, further, that

nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of

setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560

of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided,

further, that nothing in this decretal paragraph or section 77.11 of the Plan shall affect the

releases and injunctions provided in article XCII of the Plan or this Confirmation Order.

34.     Delivery of Distributions.

(a)     Delivery of Distributions Generally.  Subject to the provisions of Rule

9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and

deliveries to holders of Allowed Claims shall be made through The Depository Trust Company

or at the address of each such holder as set forth on the Schedules filed with the Court, unless

superseded by the address set forth on proofs of Claim filed by such holders, or at the last known

address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing

of a change of address; provided, however, that, except as otherwise provided herein,

distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be

made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the

respective governing documents for such obligations; and, provided, further, that, except as

otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction

Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto

in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or

fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn,

deliver the distribution to holders in the manner provided for in the applicable governing documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to the delivery of distributions in accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and escrow positions established by the Debtors or their agents with The Depository Trust Company, and each trustee or fiscal agent shall close and terminate the original CUSIPs after making distributions in accordance with the terms and provisions of the Plan and shall have no further distribution obligations thereunder.  No trustee or fiscal agent shall be required to post any bond or surety or other security for the performance of its duties, unless otherwise ordered or directed by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent shall only be required to make the distributions and deliveries described in this decretal paragraph and the Plan and in accordance with the terms of this Confirmation Order, the Plan and such other governing document, and shall have no liability for actions reasonably taken in accordance with the terms of this Confirmation Order, the Plan and such other governing document, or in reasonable reliance upon information provided to such trustee or fiscal agent by the Debtors or their agents in accordance with the terms of this Confirmation Order, the Plan or in connection with distributions to be made hereunder or thereunder, except for liabilities resulting from the gross negligence or willful misconduct of such trustee or fiscal agent.  The New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

(b)   Delivery of Distributions with Respect to Assured Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number

74514LD46  validly elects (or is deemed to elect) Assured Bondholder Election 2, the

Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured

Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust

agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with

CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured

Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the

custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in

the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP

number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond

with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or

745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with

CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election

2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts

into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as

the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the

existing custodial arrangement, such that the Assured Trustee will be deemed to hold the

Assured Insured Bonds underlying the applicable custody receipts and the related Assured

Insurance Policies as provided in the applicable trust agreement, without any further action on

the part of the existing custodian, provided, however, that the existing custodian is also hereby

authorized and ordered to take any further actions that may be necessary to confirm the collapse

of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer

the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the

Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts

and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent

an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8

validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured

Bondholder will be deemed to have deposited such custody receipts into the applicable Assured

Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be

deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will

be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and

the related Assured Insurance Policies as provided in the applicable trust agreement, without

any further action on the part of the existing custodian, provided, however, that the existing

custodian is also hereby authorized and ordered to take any further actions that may be

necessary to confirm the collapse of the existing custodial arrangement as provided herein, and,

without prejudice to the ability of the Assured Trustee to draw on the applicable Assured

Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured

Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and

the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to section 75.4(a)

of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be

deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive

the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody

receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify

as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant

Assured Trust in accordance with the applicable trust agreement; (iv) pursuant to section

75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price

Payment Option with respect to all Assured Insured Bonds with respect to which Assured has

exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New

Securities and Cash on account of any Assured Insured Bonds with respect to which Assured

has exercised the Assured Election or with respect to which an Assured Insured Bondholder has

validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon

between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the

Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid

with respect to any Assured Insured Bonds with respect to which Assured has exercised the

Assured Election or with respect to which an Assured Insured Bondholder has validly elected

Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured

Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal

agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance

Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such

Assured Insured Bonds insured in the primary market in accordance with sections 75.1(a) and

75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured

in the secondary market, Assured shall, or shall cause the applicable custodian of custody

receipts evidencing the beneficial ownership interest of the holders thereof in such Assured

Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured

Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial

holders of such Assured Insured Bonds insured in the secondary market in accordance with

sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the

avoidance of doubt, Assured shall not in any circumstance be required to pay itself an

Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by

subrogation or otherwise.

> (c)     Delivery of Distributions with Respect to National Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective

Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner

mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration

that would otherwise be allocable to holders of Allowed National Insured Bond Claims that

elected to receive the National Non-Commutation Treatment by electing such treatment in

accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25

(Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in

Class 18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt,

National shall not in any circumstance be required to pay itself the National Acceleration Price

with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

> (d)     Delivery of Distributions to FGIC.  Notwithstanding any other provision

of the Plan or of this Confirmation Order, on the Effective Date, the Disbursing Agent shall

distribute to FGIC FGIC's share of the Vintage CW Bond Recovery, the Vintage CW

Guarantee Bond Recovery, and the Vintage PBA Bond Recovery in accordance with the terms

and provisions of section 75.4(b) of the Plan in a manner mutually agreed upon between the

Disbursing Agent and FGIC.

(e)     <u>Delivery of Distributions with Respect to Ambac Insured Bonds</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or

745235B75 validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing

Agent shall, on the Effective Date or as soon as reasonably practicable thereafter, distribute to

Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims

in Classes 4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP

numbers 745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac

Commutation Treatment or otherwise fails to validly elect to receive the Ambac Non-

Commutation Treatment (including submitting an election for less than all of its Claims in

Classes 4 or 26), on the Effective Date or as soon as reasonably practicable thereafter, the

Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of

its Allowed Claims in Class 4 and/or 26 under the Plan to the applicable indenture trustee,

which shall in turn distribute such consideration to the applicable bondholders, except that

Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to

account for any payments that Ambac has made, or for any other consideration that Ambac has

made available or will make available, to such holder (collectively, the "Prior Payments"), and

the applicable indenture trustee shall then pay the portion of the Ambac Commutation

Consideration equal to the applicable Prior Payment to Ambac; (iii) to the extent a holder of

any Ambac Insured Bonds with CUSIP number 745145AX0 validly elects to receive the

Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably

practicable thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan

Consideration payable to such holder on account of its Allowed Claims in Class 19; (iv) to the

extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly

elect to receive the Ambac Non-Commutation Treatment (including by submitting an election

for less than all of its Claims), on the Effective Date or as soon as reasonably practicable

thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration

payable on account of its Allowed Claims in Class 19 under the Plan to the applicable indenture

trustee, which shall in turn distribute such consideration to the applicable bondholders, except

that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder

to account for any Prior Payments that Ambac has made, or for any other consideration that

Ambac has made available or will make available, to such holder and the applicable indenture

trustee shall then pay the portion of the Ambac Commutation Consideration equal to the

applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP

numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0,

745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as

reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan

Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

   (f) <u>Delivery of Distributions with Respect to Clawback Recoveries</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) on the

Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of

the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent

shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in

accordance with the terms and provisions of section 63.1 of the Plan in a manner mutually

agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention

Center Clawback Recovery in accordance with the terms and provisions of section 64.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and (iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum Tax Recovery in accordance with the terms and provision of section 65.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions, the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback Recovery in accordance with the terms and provisions of section 63.2 of the Plan in a manner mutually agreed upon by the Disbursing Agent and National.  Upon satisfaction of the HTA Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to Allowed CWHTA Claims set forth in Exhibit J to the Plan.

35.   _Disbursing Agent_.  Pursuant to section 1.204 of the Plan, the Disbursing Agent shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan and this Confirmation Order.  Upon designation thereof, the Oversight Board shall file an informative motion with the Title III Court setting forth the name of the Disbursing Agent designated.

36.   _Payment of Trustee Fees and Expenses_.  The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts

discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights

of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made

hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b)

pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the

period from and after the Commonwealth Petition Date, including, without limitation, that

certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of

December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National

Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided,

however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the

later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification

pursuant to Title VI of PROMESA, (the "PRIFA Effective Date") in the event that, following

application of fees and expenses in accordance with the terms and provisions of the Settlement

Agreement, the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be,

pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA,

as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may

be, within fifteen (15) Business Days following the Effective Date or the PRIFA Effective Date,

as applicable, by wire transfer of immediately available funds.

      37.    Securities Laws Exemption.  Pursuant to section 1145 of the Bankruptcy Code

and/or section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New

GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this

Confirmation Order (and any subsequent offering of such securities, including, without

limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in

accordance with articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from

registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities, and, pursuant to section 2(b) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests shall be exempt from the provisions of the Investment Company Act.

38. <u>Acceleration of Insured Bonds</u>. Notwithstanding any other provision of the Plan or this Confirmation Order:

(a) <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(b) <u>National Insured Bonds</u>: To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(c) <u>Syncora Insured Bonds</u>: To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d) <u>FGIC Insured Bonds</u>: Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be

accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)   Ambac Insured Bonds:  To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date.  Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.   Disputed Claims Reconciliation.  In accordance with the terms and provisions of section 82.1(b) of the Plan and the Committee Agreement:

(a)   The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such

appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).[8]

(b)     With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve. All such compensation and reimbursements shall be paid by the Entity selected pursuant to section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment. To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)     Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to section 82.7

---

[8]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.[9]

(d)      In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence.  The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.      <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

---

[9]      Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery

by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii), and (iii) above.  To the

extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any

New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or

CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be,

shall exercise voting or consent rights with respect to such obligations.

      41.    National Action Claims.  Notwithstanding anything contained herein, in the

GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action

asserted in the National Action;  provided, however, that, in the event that notwithstanding the

application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the

defendants and, to the extent named, third-party  defendants in the National Action assert against

the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of

the Commonwealth (collectively, the "CW Entities") claims or counterclaims for

indemnification, contribution, reimbursement, setoff or similar theories of recovery based on,

arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the

CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including,

without limitation, invoking the Bar Date Orders and discharge provisions set forth in article

XCII of the Plan and this Confirmation Order, objecting to any proof of claim, and prosecuting

available appeals, based upon, arising from, or related to the National Action, (B) to allow

National, at its option, to participate in or undertake such defense to such action in its sole

discretion, and (C) not to settle any CW Entities' Claims without National's written consent,

which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and

hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of monies or the delivery of property, pursuant to a Final Order or settlement as a result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees and expenses incurred in connection with the defense against such CW Entities' Claims, including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement exceed any recovery realized by National in connection with the National Action; provided, however, that National shall have no obligation pursuant to this Confirmation Order, the Plan or otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising from or related to the Underwriter Actions that are not based upon, arising from, or related to the National Action or in which National is not involved. For the avoidance of doubt, CW Entities' Claims shall not constitute CW General Unsecured Claims.

42.    No Amendments to Proofs of Claim/Objections to Claims.  As of the commencement of the Confirmation Hearing, a proof of Claim may not be amended without the approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in respect of executory contracts and unexpired leases rejected pursuant to this Confirmation Order, any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such proofs of Claims from the claims registry in the Title III Cases.  Notwithstanding the provisions of section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back to the claims registry for determination by the Title III Court, the period in which the Reorganized Debtors shall file and serve any objections to the Claim, by and through the

Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one

hundred eighty (180) days from and after the date of such notice transferring any such Claim

back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with

section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver,

or cause applicable agencies, instrumentalities, or Commonwealth of Puerto Rico public

corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to

the extent applicable, pleadings requested by the Oversight Board in connection with the

reconciliation of Claims, including, without limitation, Disputed Claims.  Without in any way

limiting the foregoing or the terms and provisions of the Plan or the ACR Order, to the extent a

Claim subject to the terms and provisions of the ACR Order, including, without limitation,

"grievance claims" subject to the provisions of collective bargaining agreements, remain subject

to the ACR Order, upon resolution thereof, such Claims shall be satisfied by the Debtors in the

ordinary course.

43.     Conditions to Effective Date.  The Plan shall not become effective unless and

until the conditions set forth in section 86.1 of the Plan have been satisfied or waived in

accordance with the provisions set forth in section 86.2 of the Plan.

44.     Administrative Claim Bar Date.  The last day to file proof of Administrative

Expense Claims shall be ninety (90) days after the Effective Date, after which date, any

Administrative Expense Claim, proof of which has not been filed, shall be deemed forever

barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto;

provided, however, that no proof of Administrative Expense Claim shall be required to be filed if

such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order

of the Court or (ii) with the written consent of the applicable Government Parties expressly

granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an

intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of

taxes incurred by any of the Debtors during the period from and after the Commonwealth

Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, (e) relates to

actions occurring in the ordinary course during the period from and after the respective Debtor's

petition date up to and including the Effective Date, (f) relates to a Claim that is subject to the

provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of

the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking

allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of

the entry of this Confirmation Order; and, provided, further, that any such proof of

Administrative Expense Claim by a governmental unit shall remain subject to the rights and

interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in

interest to interpose an objection or other defense to the allowance or payment thereof.

45. _Professional Compensation and Reimbursement Claims._ All Entities awarded

compensation, including, without limitation, to the fullest extent provided in respective letters of

engagement or similar instruments or agreements, or reimbursement of expenses by the Title III

Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,

without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the

Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur

thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms

no more favorable to the claimant as may be mutually agreed upon between such claimant and

the Government Parties; provided, however, that, except as provided herein or in the Plan, each

Professional must file its application for final allowance of compensation for professional

services rendered and reimbursement of expenses on or prior to the date that is one hundred

twenty (120) days following the Effective Date.  The Reorganized Debtors shall pay

compensation for professional services extended and reimbursement of expenses incurred by

their respective Professionals from and after the Effective Date in the ordinary course and

without the need for Title III Court approval.

   46. <u>GO/PBA Consummation Costs</u>.  Notwithstanding anything contained in the Plan

or this Confirmation Order to the contrary, to compensate certain parties for the cost of

negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the

Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan

Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants

contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be

entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event

later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the

form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths

percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims,

CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to

each of Assured, Syncora, and National, including positions that it holds or has insured), without

duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (Eastern

Standard Time) on February 22, 2021.

   47. <u>AFSCME Professional Fees</u>.  Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its

reasonable professional fees and expenses incurred to compensate AFSCME for the cost of

negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the
resolution of issues pertaining to pensions.

48.   <u>GO/PBA PSA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or
this Confirmation Order to the contrary, in exchange for (a) executing and delivering the
GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or
PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support
Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions,
including support of the Plan and  the "lock-up" of GO Bonds and PBA Bonds in accordance
with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors
(including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-
insured GO Bond or PBA Bond insured by Ambac, Assured, Syncora, or National, as the case
may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the
Claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with section
301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac,
Assured, FGIC, Syncora, and National, to the extent Ambac, Assured, FGIC, Syncora, or
National, as the case may be, is authorized to vote such Claims in accordance with section
301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to
receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten
(10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee, in the form
of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of
the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of
PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication
and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA

Creditor is authorized to vote any such Claim in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac,

Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the

Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims,

CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are

Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such

Claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents

and applicable law) for which it would have been entitled to receive the GO/PBA PSA

Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the

Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business

Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and,

provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated

pursuant to the terms of sections 7.1(b)(iii) (subject to the extension provided for in section

7.1(b) thereof), (c)(i), or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan

Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement

by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation

Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in

Cash, as an allowed administrative expense claim under a plan of adjustment for the

Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and,

provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and

payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan

Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

49.     <u>ERS Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

50.     <u>CCDA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA

Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51.     <u>CCDA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; <u>provided</u>, <u>however</u>, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds

after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than

a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC, or National, as the case

may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with

respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC,

and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such

Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive

insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee

equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA

Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured,

solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in

accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and

applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the

HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided,

further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have

been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to

receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the

selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA

Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond

Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in

the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of section

7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52. <u>HTA Bond Claims</u>. In consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims; <u>provided</u>, <u>however</u>, that, for purposes of this decretal paragraph 52, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims and the HTA 98 Senior Bond Claims arising from the HTA Bonds insured by any such Monoline, if any, in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to such HTA Bonds; and, <u>provided</u>, <u>further</u>, that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by FGIC, HTA shall make such interim distribution to FGIC, and (b) with respect to any HTA 98 Senior Bonds insured by FGIC, but not owned by FGIC, HTA shall make such interim distribution to the owners of such HTA 98 Senior Bonds.

53. <u>System 2000 Obligations</u>. Pursuant to the terms and provisions of section 55.10 of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System 2000 Participant Claims in the timeframes set forth therein.

54. <u>HTA/CCDA Clawback Structuring Fees</u>. In consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims,

CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution

Conditions, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA

Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in

accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days

following such date, the Commonwealth shall make payments to Assured and National in the

amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and

Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

     55.    <u>Active JRS Participants and Active TRS Participants</u>.  In connection with the

treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to

sections 55.8 and 55.9 of the Plan:

     (a)    <u>Act 106 Defined Contribution Accounts</u>.  Notwithstanding any provision of Act

106 to the contrary (including, without limitation, sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on

or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts

(the "Defined Contribution Accounts") pursuant to chapter 3 of Act 106 for all holders of such

Active JRS Participant Claims and Active TRS Participant Claims who do not have such

accounts as the Effective Date and who, prior to the Effective Date, were making contributions

to JRS  in accordance with the provisions of Act No. 12 of October 19, 1954, as amended,

known as the "Judiciary Retirement Act," or to TRS in accordance with the provisions of Act

No. 91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement

System Act," as applicable.  Without in any way limiting the foregoing, in connection with the

modification of the Commonwealth's obligations under any laws establishing or enabling TRS or

JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have

otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined

Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)     <u>Eligibility for and Enrollment in Federal Social Security</u>.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active

TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall

mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of

two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit

established in section 1081.01(d)(7) of Act 1-2011; <u>provided</u>, <u>however</u>, that each teacher and

judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his

or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of

his or her monthly compensation, up to the limited established in section 1081.01(d)(7) of Act

No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," or any

successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social

Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60)

days of the Effective Date to reduce their contributions to a minimum of two and three-tenths

percent (2.3%) and be enrolled in the Federal Social Security system.  For teachers who are

Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the

Effective Date who contribute two and three-tenths percent (2.3%) of their monthly

compensation as set forth above, including those aged 45 and older who have elected to do so,

the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly

compensation and remit such amount to the appropriate authority as required by the applicable

provisions of the Federal Social Security Act and other applicable Federal law to enable the inclusion of the Participant in the Federal Social Security system. Teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date may voluntarily contribute to their Defined Contribution Accounts additional amounts to those established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no case may those increased contribution rates and additional amounts exceed the applicable limits to be eligible, and affect the eligibility of these Participants, for coverage under the Federal Social Security system, unless such Participants are aged 45 and older and do not participate in the Federal Social Security system. In accordance with the foregoing, the Government of the Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure eligibility for and enrollment of Participants in the Federal Social Security system and effectuating the Federal Insurance Contributions Act remittances.

56.    Discharge and Release of Claims and Causes of Action.

(a)    Except as expressly provided in the Plan or herein, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;

provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of

the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation

Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release

of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors

of the Debtors.  Upon the Effective Date and independent of the distributions provided for under

the Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all

Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the

Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections

502(g), 502(h), or 502(i) of the Bankruptcy Code and section 407 of PROMESA, whether or not

(a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the

Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and

section 407 of PROMESA (or is otherwise resolved), or (c) the holder of a Claim based upon

such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or

herein shall release, discharge, or enjoin any claims or causes of action against PREPA arising

from or related to PREPA-issued bonds, including, without limitation, Monoline-issued

insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against

any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to

PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's

Title III case, including, without limitation, any plan of adjustment therein.

   (b) Except as expressly provided in the Plan or herein, all Entities shall be precluded

from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of

their respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of

Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized

Debtors or any of their respective Assets and property, including any and all interest accrued on

such Claims, and regardless of whether any property will have been distributed or retained

pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments,

damages, debts, rights, remedies, causes of action, or liabilities.  In accordance with the

foregoing, except as expressly provided in the Plan or herein, this Confirmation Order shall

constitute a judicial determination, as of the Effective Date, of the discharge and release of all

such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors

pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any

judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and

property at any time, to the extent such judgment is related to a discharged Claim, debt, or

liability.  As of the Effective Date, and in consideration for the distributions or other value

provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and

hereby is deemed to release and forever waive and discharge as against the Debtors and

Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)      Notwithstanding any other provisions of decretal paragraph 56 of this

Confirmation Order or section 92.2 of the Plan, in accordance with the provisions of the

GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective

Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have

released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek

any other type of relief against any of the Government Releasees based upon, arising from or

relating to the Government Released Claims or any of the Claims or Causes of Action asserted or

which could have been asserted, including, without limitation, in the Clawback Actions and the

Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with

respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this

Confirmation Order and section 92.2 of the Plan.

(d) <u>SEC Limitation</u>. Notwithstanding anything contained herein or in the Plan to the

contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers,

or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes

of action, proceedings or investigations against any non-debtor person or non-debtor entity in

any forum.

(e) <u>United States Limitation</u>. Notwithstanding anything contained herein or in the

Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or

agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be,

from compliance with federal laws or territorial laws and requirements implementing a federally

authorized or federally delegated program protecting the health, safety, and environment of

persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which

the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release,

enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United

States arising from and after the Effective Date, (B) any liability to the United States that is not a

Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the

Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and

recoupment of such parties are expressly preserved, (D) the continued validity of the obligations

of the United States, the Debtors, or the Reorganized Debtors, as the case may be, under any

United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized

Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)     <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, including, without limitation, sections 92.2, 92.3, and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order, or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate, or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit

against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive

Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive

Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery

of property to any plaintiff, defendant and, to the extent named, third-party defendant by any of

the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party

in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the

extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the

Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative

monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the

Plan, and/or this Confirmation Order; and/or (ii) against any of the CW Entities any Claims or

counterclaims for purposes of obtaining an affirmative monetary recovery, including, without

limitation, for indemnification, contribution, reimbursement, setoff, or similar theories to the

extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or

counterclaims shall be deemed disallowed, barred, released, and discharged in accordance with

the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for

the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be

construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in

any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or

limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the

Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,

prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for

purposes of obtaining an affirmative monetary recovery, including, without limitation,

indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for

purposes of obtaining an affirmative monetary recovery, based upon, arising from, or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

(g)    Quest Litigation.  Notwithstanding anything contained herein or in the Plan to the contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes of action and defenses in the avoidance action brought against it, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment (the "Quest Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Quest Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property by any of the Debtors to Quest in connection with the merits of its avoidance action, and (2) to file and receive payment on any Claim it has pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); provided, however, that any such Claims would constitute a CW General Unsecured Claim and be treated in accordance with the terms and provisions of article LXII of the Plan.

57.    Releases by the Debtors and Reorganized Debtors.  Except as otherwise expressly provided in the Plan or this Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit,

and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors,

Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through

them, on their behalf or for their benefit, have or may have or claim to have, now or in the future,

against any Released Party that are Released Claims.

58.     <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this

Confirmation Order, all release and exculpation provisions, including, but not limited to, those

contained in article XCII of the Plan, are approved and shall be effective and binding on all

Entities, to the extent provided therein.

59.     **<u>Injunction on Claims</u>.  Except as otherwise expressly provided in section**

**92.11 of the Plan, this Confirmation Order, or such other Final Order of the Title III Court**

**that is applicable, all Entities who have held, hold, or in the future hold Claims or any**

**other debt or liability that is discharged or released pursuant to section 92.2 of the Plan or**

**who have held, hold, or in the future hold Claims or any other debt or liability discharged**

**or released pursuant to section 92.2 of the Plan are permanently enjoined, from and after**

**the Effective Date, from (a) commencing or continuing, directly or indirectly, in any**

**manner, any action or other proceeding (including, without limitation, any judicial,**

**arbitral, administrative, or other proceeding) of any kind on any such Claim or other debt**

**or liability discharged pursuant to the Plan against any of the Released Parties or any of**

**their respective assets or property, (b) the enforcement, attachment, collection or recovery**

**by any manner or means of any judgment, award, decree, or order against any of the**

**Released Parties or any of their respective assets or property on account of any Claim or**

**other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing**

**any encumbrance of any kind against any of the Released Parties or any of their respective**

assets or property on account of any Claim or other debt or liability discharged pursuant

to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553,

555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against

any obligation due from any of the Released Parties or any of their respective assets or

property, with respect to any such Claim or other debt or liability discharged pursuant to

the Plan. Such injunction shall extend to all successors and assigns of the Released Parties

and their respective assets and property. Notwithstanding the foregoing, without prejudice

to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61

hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it

be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors.

   60.  <u>Injunction Related to Releases</u>. As of the Effective Date, all Entities that

hold, have held, or in the future hold a Released Claim released pursuant to section 92.5 of

the Plan, are, and shall be, permanently, forever and completely stayed, restrained,

prohibited, barred, and enjoined from taking any of the following actions, whether directly

or indirectly, derivatively or otherwise, on account of or based on the subject matter of

such discharged Released Claims: (i) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action, or other proceeding (including, without

limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii)

enforcing, attaching (including, without limitation any prejudgment attachment),

collecting, or in any way seeking to recover any judgment, award, decree, or other order;

(iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any

Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Confirmation Order and section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order. For the avoidance of doubt, the following stipulations will terminate upon the entry of this Confirmation Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Exhibit "B" Regarding the Tolling of Statute of Limitations* (Docket Entry No. 17394), as amended.

61. Exculpation.

(a) Government Parties: The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the

foregoing provisions of this subparagraph (a) or section 92.7 of the Plan shall not affect the

liability of any Entity that otherwise would result from any such act or omission to the extent that

such act or omission is determined in a Final Order to have constituted intentional fraud or

willful misconduct.  Nothing in this subparagraph (a) or section 92.7(a) of the Plan shall

prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective

professionals to assert reliance upon advice of counsel as a defense with respect to their duties

and responsibilities under the Plan.

(b)     <u>PSA Creditors</u>:  Each of the PSA Creditors solely in its capacity as a party to the

GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA

Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition

Date up to and including the Effective Date and each of their respective Related Persons shall not

have or incur any liability to any Entity for any act taken or omitted to be taken in connection

with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement,

the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive

Documents, or any other contract, instrument, release or other agreement or document provided

for or contemplated in connection with the consummation of the transactions set forth in the

Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (b) and section

92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined in a Final Order to

have constituted intentional fraud or willful misconduct.

(c)     <u>Retiree Committee</u>:  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, <u>provided</u>, <u>however</u>, that, the foregoing provisions of this subparagraph (c) and section 92.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     <u>Creditors' Committee</u>:  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, or any contract, instrument, release, or

other agreement or document provided for or contemplated in connection with the consummation

of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing

exculpation, in the event that litigation is commenced against a member of the Creditors

Committee with respect to the aforementioned actions, such member shall be reimbursed for

reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any

damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided,

however, that, the foregoing provisions of this subparagraph (d) and section 92.7(d) of the Plan

shall not affect the liability of any Entity that would otherwise result from any such act or

omission to the extent such act or omission is determined in a Final Order to have constituted

intentional fraud or willful misconduct.

     (e)      <u>AFSCME</u>:  AFSCME, solely in its capacity as a party to the AFSCME Plan

Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and

including the Effective Date, and each of its respective Related Persons shall not have or incur

through the Effective Date any liability to any Entity for any act taken or omitted to be taken in

connection with the Title III Cases, the formation, preparation, dissemination, implementation,

confirmation, or approval of the Plan or any compromises or settlements contained therein, the

Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument,

release or other agreement or document provided for or contemplated in connection with the

consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement;

provided, however, that, the foregoing provisions of this subparagraph (e) and section 92.7(e) of

the Plan shall not affect the liability of any Entity that otherwise would result from any such act

or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f)     Monoline Insurers:  Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained in this Confirmation Order or the Plan to the contrary, the terms and provisions of the Plan and this Confirmation Order shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as

applicable); provided, however, that the foregoing provisions of this subparagraph (f) and section

92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined, pursuant to a Final

Order, to have constituted intentional fraud or willful misconduct.

(g)    The DRA Parties:  Each of the GDB Debt Recovery Authority ("DRA"),

AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-

Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington

Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the

Effective Date and each of the DRA Parties, respective predecessors, successors and assigns

(whether by operation of law or otherwise), and their respective financial advisors, attorneys,

accountants, consultants, agents, and professionals, or other representatives, each acting in such

capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent

acting in such capacity, shall not have or incur any liability to any Entity for any act taken or

omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation,

preparation, dissemination, implementation, confirmation or approval of the Plan or any

compromises or settlements contained therein, the Disclosure Statement, the Stipulation in

Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the

Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral

Monitor (Docket Entry No. 19100 Ex. A), or any contract, instrument, release or other agreement

or document provided for or contemplated in connection with the consummation of the

transactions set forth in the Plan; provided, however, that, the foregoing provisions of this

subparagraph (g) shall not affect the liability of any Entity that would otherwise result from any

such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62.  <u>Maintenance of Pension System</u>.  Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.     Appointments Related Litigation/Uniformity Litigation.  Notwithstanding

anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in

connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to

entry of this Confirmation Order, in consideration of the distributions made, to be made, or

deemed to be made in accordance with the terms and provisions of the Plan and documents and

instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have

received, distributions pursuant to or as a result of the Plan or this Confirmation Order having

consented and agreed, such Final Order shall not in any way or manner reverse, affect or

otherwise modify the transactions contemplated in the Plan and this Confirmation Order,

including, without limitation, the releases, exculpations and injunctions provided pursuant to

article XCII of the Plan and herein; provided, however, that, to the extent that a plaintiff in the

Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA

Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support

Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such

plaintiff shall take any and all actions to dismiss, with prejudice or, in the event other plaintiffs

are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing

notices with the clerk of the court having jurisdiction thereof.

64.     **Bar Order**.  **To the limited extent provided in the Plan, each and every Entity**

**is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing, or**

**litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action**

**of any and every kind, character or nature whatsoever, in law or in equity, known or**

**unknown, direct or derivative, whether asserted or unasserted, against any of the Released**

Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs, or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements, or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state, or foreign law, and regardless of where asserted); _provided_, _however_, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

65.     **Supplemental Injunction**.  Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, or may control by enacting legislation, any Released

Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity, or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained, and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering, or receiving any payment or recovery with respect to any Released Claims for themselves or other entities, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)      Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)      Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)      Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)      Except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing, or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)      Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

**provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.**

66.    <u>Term of Existing Injunctions or Stays</u>.  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect through the Effective Date, except that each injunction imposed by a Court order shall remain in effect permanently unless the order specifies a termination date or event, in which case, the specification set forth in such order shall govern.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

67.    <u>Prosecution of Claims</u>.  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

68.    <u>Indemnification and Reimbursement Obligations</u>.  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the

Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of

officers and directors during the period from and after the Commonwealth Petition Date, the

ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense

Claims.

69. <u>Compliance with Tax Requirements</u>. Any party issuing any instrument or making

any distribution under the Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state, or local tax law or Tax Authority, and

all distributions under the Plan shall be subject to any such withholding or reporting

requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs

shall not be subject to any Commonwealth tax or withholding obligation imposed by the

Commonwealth now or in the future regardless of whether such payments or redemptions with

respect to the CVIs may be exempt from the payment of federal or state taxes, including, without

limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may

otherwise be applicable to such payments or redemptions. Except as provided above, each

holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and

exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by

any governmental unit, including income, withholding and other tax obligations, on account of

such distribution. Any party issuing any instrument or making any distribution under the Plan

has the right, but not the obligation, to not make a distribution until such holder has made

arrangements satisfactory to such issuing or disbursing party for payment of any such

withholding tax obligations and, if any party issuing any instrument or making any distribution

under the Plan fails to withhold with respect to any such holder's distribution, and is later held

liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing

Agent or the trustee of the applicable trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70. <u>Documents and Instruments</u>. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

71. <u>Fiscal Plan</u>. For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72. <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA, and MBA</u>. The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.  <u>GUC Reserve</u>.  On and after the Effective Date, the Debtors' and Reorganized

Debtors' liability to holders of Allowed CW General Unsecured Claims shall be limited to

funding the GUC Reserve in accordance with section 62.3 of the Plan as follows: subject to the

reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the

Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31,

2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d)

One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e)

Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the

GUC Reserve being funded by the Commonwealth in accordance with section 62.3 of the Plan,

the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed

CW General Unsecured Claims.

74.  <u>PROMESA 407 Claims</u>.  All Claims reserved by holders of bonds issued by

HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and*

*Order Approving the Qualifying Modification for the Government Development Bank for Puerto*

*Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and*

*Economic Stability Act*, including, without limitation, any claim under section 407 of

PROMESA, shall be automatically released on the Effective Date with no further notice or

action.

75.  <u>Dairy Producer Claims</u>.  Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) nothing contained herein shall adjust, enlarge,

compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to

the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation

under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory

approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated

and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy

Producer Claim from any other source, and (c) the Plan shall not affect the regulatory accrual

charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer

Settlement.

76.   Eminent Domain/Inverse Condemnation Claims.  Notwithstanding anything

contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the

Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class

54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective

Date, and upon the effective date of a Final Order of a court of competent jurisdiction

determining the validity of and amount of just compensation attributable to an Allowed Eminent

Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be

entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's

unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one

hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and

(c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as

CW General Unsecured Claims for purposes of distribution.  Nothing in the Plan or this

Confirmation Order shall be construed to prevent any determination of just compensation from

including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent

Domain/Inverse Condemnation Claim.  Notwithstanding the foregoing, in the event that (x) the

Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions

of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse

Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the

Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed

Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and

provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent

Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration,

satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent

Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make,

payments, in Cash, in an amount equal to the pro rata payments to be made to holders of

Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

      77.    <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the Plan

nor this Confirmation Order shall change the duration of the Oversight Board's existence set

forth in section 209 of PROMESA, and neither the Plan nor this Confirmation Order shall alter

any of the Oversight Board's powers and duties under each title of PROMESA.  Until

termination of the Oversight Board pursuant to section 209 of PROMESA, the Oversight Board

may enforce the Plan.  At all times, each party in interest may enforce Plan provisions directly

affecting the party in interest.

      78.    <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's
Sole Discretion</u>.  Nothing in the Plan and nothing in this Confirmation Order (a) alters the

powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its

sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and

to develop and certify new fiscal plans and budgets at any times, (b) grants the government of

Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants

the government of Puerto Rico any rights and powers barred by section 108(a) of PROMESA.

79.    <u>Government Post-Confirmation Powers and Duties</u>.  Upon termination of the
Oversight Board pursuant to section 209 of PROMESA, the Governor shall enforce the Plan.  If
the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest
after being requested to do so by a party in interest, each party in interest that would reasonably
be prejudiced or injured by lack of enforcement may enforce the Plan provision.  At no time
prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature
enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or
indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other
obligations.  Pursuant to section 1142(b) of the Bankruptcy Code, the Governor shall cause the
executive branch of the Commonwealth government to take all acts necessary for the
consummation of the Plan.

80.    <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>.
The Government of Puerto Rico, including without limitation, any Entity or Person acting for or
on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal,
change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or
any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt
issued pursuant to the Plan.

81.    <u>Non-Impairment of CVIs, SUT</u>.  Until all obligations with respect to the CVIs
have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any
Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter
the rights vested in the Commonwealth in accordance with the Plan and this Confirmation Order
to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and
remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track

performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in

the CVI Indenture; provided, however, that the foregoing shall not preclude the Commonwealth

from exercising its power, through a valid change in law, to eliminate the Measured SUT, or

replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI

Indenture.

82. Reversal/Stay/Modification/Vacatur of Order. Except as otherwise provided in

this Confirmation Order or a subsequent order issued by this Court or a higher court having

jurisdiction over an appeal of this Confirmation Order or over a certiorari proceeding in respect

of this Confirmation Order, if any or all of the provisions of this Confirmation Order are

hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other

court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of

any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors

or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay,

modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of

this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in

reliance on, this Confirmation Order prior to the effective date of such reversal, stay,

modification, or vacatur shall be governed in all respect by the provisions of this Confirmation

Order and the Plan. To the extent not specifically reversed, modified, vacated, or stayed by an

order of this Court or an appellate court, all existing orders entered in the Title III Cases remain

in full force and effect.

83. Retention of Jurisdiction. Notwithstanding the entry of this Confirmation Order

or the occurrence of the Effective Date, subject to the terms and provisions of article XCI of the

Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

84.  <u>Conflicts Among Documents</u>.  The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this Confirmation Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Confirmation Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the event of any irreconcilable inconsistency between the Plan and this Confirmation Order, the documents shall control in the following order of priority: (i) this Confirmation Order, and (ii) the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this Confirmation Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III Case, the terms and provisions of this Confirmation Order shall control; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

85.  <u>PBA Leases</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") shall be deemed rejected effective upon the earliest to occur of (a) June 30, 2022, (b) the date

upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF, on behalf of the Commonwealth or any Commonwealth agency, public corporation or instrumentality, that is a counterparty, as lessee, with respect to a PBA Lease, provides written notice to PBA that such PBA Lease is rejected (in each case, the earliest of (a) through (e), the "PBA Rejection Date"); provided, however, that, during the period from the Effective Date up to, but not including, the applicable PBA Rejection Date, with respect to any PBA Lease between PBA, as lessor, and the Commonwealth or any Commonwealth agency, public corporation or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified Fiscal Plan and (z) the monthly costs and expenses associated with the applicable leased property; and, provided, further, that any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the PBA Rejection Date.

86.     Modifications.  The modifications to the Seventh Amended Plan, as set forth in the Plan, do not adversely change the treatment of the Claim of any Creditor that accepted the Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.  Before substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after entry of this Confirmation Order, subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan; provided, however, that the circumstances warrant such modification and the Court, after notice and a

hearing, confirms such modified plan under the applicable legal requirements. For the avoidance

of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942

and the terms of this Confirmation Order.

87. <u>Asserted Surety Claims</u>. Notwithstanding anything contained in the Plan to the

contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a

secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a)

of the Bankruptcy Code following the expiration of the period to object to any such Claim in

accordance with the provisions of section 82.1 of the Plan, such Claim shall be paid in full, in

Cash; <u>provided</u>, <u>however</u>, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in

accordance with the provisions of section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

88. <u>Identification of Additional Retail Investors / Retail Support Fee</u>. Within five (5)

Business Days of the date hereof, the Oversight Board shall cause the Balloting Agent to

distribute, by mail, electronic mail, or such other means customary, the form of Certification

Notice annexed hereto as **<u>Exhibit E</u>** (the "Certification Notice") to all known holders, by and

through their respective Nominee(s), of (a) Vintage PBA Bond Claims, (b) 2011 PBA Bond

Claims, (c) 2012 PBA Bond Claims, (d) Vintage CW Bond Claims, (e) 2011 CW Bond Claims,

(f) 2011 CW Series D/E/PIB Bond Claims, (g) 2012 CW Bond Claims, and (h) 2014 CW Bond

Claims (collectively, the "Bonds") who did <u>not</u> submit a vote that was not otherwise revoked by

such holder pursuant to the procedures set forth in the Disclosure Statement Order on or before

6:00 p.m. (Atlantic Standard Time) on October 18, 2021.

     a. The record date to determine which beneficial owners of the Bonds (collectively, the "Beneficial Owners") are entitled to receive the Certification Notice and make the Certification (as defined below) shall be 6:00 p.m. (Atlantic Standard Time) on October 18, 2021 (the "Certification Record Date").

b. Promptly upon receipt of a Certification Notice, each Nominee (or such Nominee's agent) shall distribute such Certification Notice to the Beneficial Owners eligible as of the Certification Record Date pursuant to such Nominee's (or such Nominee's agent's) customary practices for conveying such information.

c. If it is a Nominee's (or such Nominee's agent's) customary and accepted business practice to forward the Certification Notice to (and collect Certifications from) Beneficial Owners by information form, email, telephone, or other customary means of communications, as applicable, the Nominee (or such Nominee's agent) shall employ such method of communication in lieu of sending a paper copy of the Certification Notice to Beneficial Owners; provided, however, that if the Nominee's (or such Nominee's agent's) customary internal practice is to provide to Beneficial Owners an electronic link to the Certification Notice, the Nominee (or such Nominee's agent) may follow such customary practice in lieu of forwarding paper copies of the Certification Notice to Beneficial Owners.

d. The Oversight Board shall cause the Balloting Agent to provide Beneficial Owners of the Bonds as of the Certification Record Date a frozen "user CUSIP" (or similarly appropriate non-tradeable identifier) for the purpose of making the Certification.

e. Each Beneficial Owner of the Bonds who certifies that it is an individual who held the Bonds as of the Certification Record Date in the aggregate outstanding principal amount of One Million Dollars ($1,000,000.00) or less in one or more brokerage account(s), trust account(s), custodial account(s), or separately managed account(s) (the "Certification") pursuant to the procedures set forth in this decretal paragraph 88 hereof shall be deemed a Retail Investor for purposes of distributions to be made pursuant to the Plan, and shall receive a distribution of the Retail Support Fee through the "user CUSIP" in accordance with the terms and provisions of the Plan.

f. Beneficial Owners of the Bonds must deliver their certification instructions to (or otherwise coordinate with) their Nominee according to the instructions in the Certification Notice in sufficient time for the Nominee to effectuate the Beneficial Owner's Certification through The Depository Trust Company's ("DTC") Automated Tender Offer Program ("ATOP") in accordance with the procedures of DTC and be received on ATOP by 6:00 p.m. (Atlantic Standard Time) on the first Business Day thirty (30) days from and after the date hereof (the "Certification Deadline");[10] provided, however, that any holder who has executed, completed, and delivered through ATOP in accordance with the procedures of DTC its Certification may revoke such Certification and withdraw any securities that have been tendered with respect to a Certification through ATOP in accordance with the procedures of DTC on or before the Certification Deadline.

---

[10] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

g.   All securities that are tendered with respect to a Certification shall be restricted from further trading or transfer through the Effective Date of the Plan.

89.   <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

90.   <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

91.   <u>PFC Reservation</u>.  Neither the Plan nor this Confirmation Order determine, affect, or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA, or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

92.   <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to section 301(a) of PROMESA, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Confirmation Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including,

without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO

CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions

Trust Agreement, provide adequate means for implementation of the Plan pursuant to section

1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall

constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions

to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as

applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in

accordance with their terms.

93.     <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating

the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S.

Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective

Date.

94.     <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon

as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of

this Confirmation Order and the occurrence of the Effective Date, substantially in the form

attached as **Exhibit B** hereto, to all parties who hold a Claim in the Commonwealth Title III

Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the

Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Confirmation Order.

95.    <u>No Waiver</u>.  The failure to specifically include any particular provision of the

Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor

constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its

entirety and incorporated herein by this reference.


SO ORDERED.

Dated: January 18, 2022

  /s/ Laura Taylor Swain    
LAURA TAYLOR SWAIN
United States District Judge

**<u>Exhibit A</u>**

**Plan**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
| Debtors. | |

## MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board*
*as Representative for the Debtors in their Title III Cases*

Dated: January 14, 2022

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1

 1.1  2011 CW Bond Claim .................................................................................1
 1.2  2011 CW Bond Claim (Assured).................................................................1
 1.3  2011 CW Bond Claim (Taxable Election) ..................................................1
 1.4  2011 CW Bond Recovery............................................................................1
 1.5  2011 CW Bonds..........................................................................................1
 1.6  2011 CW Guarantee Bond Claim ...............................................................2
 1.7  2011 CW Guarantee Bond Claim (Taxable Election) .................................2
 1.8  2011 CW Guarantee Bond Recovery..........................................................2
 1.9  2011 CW Guarantee Taxable Bond Distribution ........................................2
 1.10  2011 CW Series D/E/PIB Bond Claim .......................................................2
 1.11  2011 CW Series D/E/PIB Bond Claim (Assured).......................................2
 1.12  2011 CW Series D/E/PIB Bond Claim (Taxable Election) .........................2
 1.13  2011 CW Series D/E/PIB Bond Recovery .................................................3
 1.14  2011 CW Series D/E/PIB Bonds ................................................................3
 1.15  2011 CW Series D/E/PIB Taxable Bond Distribution.................................3
 1.16  2011 CW Taxable Bond Distribution ..........................................................3
 1.17  2011 PBA Bond Claim ...............................................................................3
 1.18  2011 PBA Bond Recovery..........................................................................3
 1.19  2011 PBA Bonds........................................................................................4
 1.20  2012 CW Bond Claim.................................................................................4
 1.21  2012 CW Bond Claim (Assured)................................................................4
 1.22  2012 CW Bond Claim (Taxable Election)..................................................4
 1.23  2012 CW Bond Recovery...........................................................................4
 1.24  2012 CW Bonds..........................................................................................4
 1.25  2012 CW Guarantee Bond Claim ...............................................................5
 1.26  2012 CW Guarantee Bond Claim (Taxable Election) .................................5
 1.27  2012 CW Guarantee Bond Recovery..........................................................5
 1.28  2012 CW Guarantee Taxable Bond Distribution ........................................5
 1.29  2012 CW Taxable Bond Distribution ..........................................................5
 1.30  2012 PBA Bond Claim ...............................................................................5
 1.31  2012 PBA Bond Recovery..........................................................................6
 1.32  2012 PBA Bonds........................................................................................6
 1.33  2014 CW Bond Claim.................................................................................6
 1.34  2014 CW Bond Claim (Taxable Election)..................................................6
 1.35  2014 CW Bond Recovery...........................................................................6
 1.36  2014 CW Bonds..........................................................................................6
 1.37  2014 CW Guarantee Bond Claim ...............................................................6
 1.38  2014 CW Guarantee Bond Claim (Taxable Election) .................................7
 1.39  2014 CW Guarantee Taxable Bond Distribution ........................................7
 1.40  2014 CW Taxable Bond Distribution ..........................................................7
 1.41  5.5% SUT...................................................................................................7

## Table of Contents
## (Cont'd)

Page

| | | |
|---|---|---:|
| 1.42 | AAFAF | 7 |
| 1.43 | ACR Order | 7 |
| 1.44 | Act 106 | 7 |
| 1.45 | Act 106 Board | 7 |
| 1.46 | Active and Retired Employee Benefit Claim | 7 |
| 1.47 | Active ERS Participant Claim | 8 |
| 1.48 | Active JRS Participant Claim | 8 |
| 1.49 | Active Participant | 8 |
| 1.50 | Active TRS Participant Claim | 8 |
| 1.51 | Administrative Claim Bar Date | 8 |
| 1.52 | Administrative Expense Claim | 8 |
| 1.53 | ADR Order | 8 |
| 1.54 | ADR Procedures | 8 |
| 1.55 | Affiliate | 8 |
| 1.56 | AFICA | 9 |
| 1.57 | AFSCME | 9 |
| 1.58 | AFSCME CBAs | 9 |
| 1.59 | AFSCME Claims | 9 |
| 1.60 | AFSCME Plan Support Agreement | 9 |
| 1.61 | AFSCME Term Sheet | 9 |
| 1.62 | Allowed | 9 |
| 1.63 | Allowed Claim | 9 |
| 1.64 | Ambac | 9 |
| 1.65 | Ambac Acceleration Price | 10 |
| 1.66 | Ambac Action | 10 |
| 1.67 | Ambac Certificates | 10 |
| 1.68 | Ambac Commutation Consideration | 10 |
| 1.69 | Ambac Commutation Treatment | 10 |
| 1.70 | Ambac CW/HTA Bond Claims | 10 |
| 1.71 | Ambac Escrow Account | 10 |
| 1.72 | Ambac Insured Bond Claims | 10 |
| 1.73 | Ambac Insured Bonds | 10 |
| 1.74 | Ambac Insurance Policies | 10 |
| 1.75 | Ambac Plan Consideration | 10 |
| 1.76 | Ambac Trust | 11 |
| 1.77 | Ambac Trust Assets | 11 |
| 1.78 | Ambac CW/Convention Center Claims | 11 |
| 1.79 | Ambac CW/HTA Bond Claims | 11 |
| 1.80 | Ambac CW/PRIFA Rum Tax Claims | 11 |
| 1.81 | AMPR | 11 |
| 1.82 | Appointments Related Litigation | 11 |
| 1.83 | Assets | 11 |
| 1.84 | Assured | 11 |
| 1.85 | Assured Acceleration Price | 12 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.86 | Assured Acceleration Price Payment Option | 12 |
| 1.87 | Assured Bondholder Elections | 12 |
| 1.88 | Assured Bondholder Elections Form | 12 |
| 1.89 | Assured CVIs | 12 |
| 1.90 | Assured CW/Convention Center Claims | 12 |
| 1.91 | Assured CW/HTA Bond Claims | 12 |
| 1.92 | Assured CW/PRIFA Rum Tax Claims | 12 |
| 1.93 | Assured Election | 12 |
| 1.94 | Assured Election Notice | 13 |
| 1.95 | Assured Insurance Policies | 13 |
| 1.96 | Assured Insured Bond Claim | 13 |
| 1.97 | Assured Insured Bondholder | 13 |
| 1.98 | Assured Insured Bonds | 13 |
| 1.99 | Assured New GO Bonds | 13 |
| 1.100 | Assured New Securities | 13 |
| 1.101 | Assured Plan Consideration | 13 |
| 1.102 | Assured Treatment | 13 |
| 1.103 | Avoidance Actions | 13 |
| 1.104 | Avoidance Actions CW Interests | 14 |
| 1.105 | Avoidance Actions ERS Interests | 14 |
| 1.106 | Avoidance Actions Trust | 14 |
| 1.107 | Avoidance Actions Trust Agreement | 14 |
| 1.108 | Avoidance Actions Trust Assets | 14 |
| 1.109 | Avoidance Actions Trust Beneficiaries | 15 |
| 1.110 | Avoidance Actions Trust Board | 15 |
| 1.111 | Avoidance Actions Trust Interests | 15 |
| 1.112 | Avoidance Actions Trustee | 15 |
| 1.113 | Ballot Date | 15 |
| 1.114 | Ballot/Election Form | 15 |
| 1.115 | Bankruptcy Code | 15 |
| 1.116 | Bankruptcy Rules | 15 |
| 1.117 | Bar Date | 15 |
| 1.118 | Bar Date Orders | 15 |
| 1.119 | Base Contribution | 16 |
| 1.120 | Bond Claim | 16 |
| 1.121 | Bond Recovery Category | 16 |
| 1.122 | Bondholder Election | 16 |
| 1.123 | Business Day | 16 |
| 1.124 | Capital Improvements | 16 |
| 1.125 | Cash | 16 |
| 1.126 | Causes of Action | 16 |
| 1.127 | CCDA | 17 |
| 1.128 | CCDA Bonds | 17 |
| 1.129 | CCDA Bond Claims | 17 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.130 | CCDA Consummation Costs | 17 |
| 1.131 | CCDA Restriction Fee Creditors | 17 |
| 1.132 | CCDA Restriction Fee Percentage | 17 |
| 1.133 | CCDA Trustee | 17 |
| 1.134 | Charging Lien | 17 |
| 1.135 | Claim | 18 |
| 1.136 | Class | 18 |
| 1.137 | Clawback Actions | 18 |
| 1.138 | Clawback CVI Indenture | 18 |
| 1.139 | Clawback CVIs | 18 |
| 1.140 | Clawback Recovery | 18 |
| 1.141 | COFINA | 18 |
| 1.142 | COFINA Bonds | 19 |
| 1.143 | COFINA Bonds Indenture | 19 |
| 1.144 | COFINA Bonds Legislation | 19 |
| 1.145 | COFINA Confirmation Order | 19 |
| 1.146 | COFINA Plan | 19 |
| 1.147 | Committee Agreement | 19 |
| 1.148 | Commonwealth | 19 |
| 1.149 | Commonwealth Constitution | 19 |
| 1.150 | Commonwealth Election | 19 |
| 1.151 | Commonwealth Instrumentality Plan | 19 |
| 1.152 | Commonwealth Legislature | 19 |
| 1.153 | Commonwealth Petition Date | 19 |
| 1.154 | Commonwealth Title III Case | 19 |
| 1.155 | Comprehensive Cap | 19 |
| 1.156 | Confirmation Date | 20 |
| 1.157 | Confirmation Hearing | 20 |
| 1.158 | Confirmation Order | 20 |
| 1.159 | Constitutional Debt Group | 20 |
| 1.160 | Constitutional Debt Group Members | 20 |
| 1.161 | Consummation Costs | 20 |
| 1.162 | Convenience Cap | 20 |
| 1.163 | Convenience Claim | 20 |
| 1.164 | Creditor | 21 |
| 1.165 | Creditors' Committee | 21 |
| 1.166 | CRIM | 21 |
| 1.167 | CUSIP | 21 |
| 1.168 | Custodial Trust Documents | 21 |
| 1.169 | CVIs | 21 |
| 1.170 | CVI Indenture | 21 |
| 1.171 | CVI Legislation | 21 |
| 1.172 | CVI Payment Reserve | 21 |
| 1.173 | CVI Trustee | 22 |

**Table of Contents**
**(Cont'd)**

1.174   CW Appropriations Claims ........................................................22
1.175   CW Bond Claims ........................................................................22
1.176   CW Bond Claims (Insured) ........................................................22
1.177   CW Fiscal Plan ...........................................................................22
1.178   CW General Unsecured Claim ...................................................22
1.179   CW Guarantee Bond Claims ......................................................23
1.180   CW Guarantee Bond Claims (Insured) ......................................23
1.181   CW GUC Recovery ....................................................................23
1.182   CW/Convention Center Claim ...................................................23
1.183   CW/Convention Center Clawback Recovery .............................24
1.184   CW/HTA Claim ..........................................................................24
1.185   CW/HTA Clawback Recovery ...................................................24
1.186   CW/MBA Claim ..........................................................................24
1.187   CW/MBA Clawback Recovery ...................................................24
1.188   CW/PRIFA Rum Tax Claim .......................................................24
1.189   CW/PRIFA Rum Tax Clawback Recovery .................................24
1.190   Dairy Producer Claim .................................................................24
1.191   Dairy Producer Settlement .........................................................25
1.192   Debt ............................................................................................25
1.193   Debt Management Policy ............................................................25
1.194   Debtors .......................................................................................25
1.195   Debt Policy Period .....................................................................25
1.196   Debt Policy Revenues ................................................................25
1.197   Debt Related Objections .............................................................25
1.198   Debt Responsibility Act .............................................................26
1.199   Debt Service Fund ......................................................................26
1.200   Debtors .......................................................................................27
1.201   Deemed Issuance Date ...............................................................27
1.202   Definitive Documents .................................................................27
1.203   Disallowed ..................................................................................27
1.204   Disbursing Agent ........................................................................27
1.205   Disclosure Statement ..................................................................27
1.206   Disclosure Statement Hearing ....................................................27
1.207   Disclosure Statement Order ........................................................27
1.208   Disputed Claim ...........................................................................28
1.209   Distribution Date ........................................................................28
1.210   Distribution Record Date ...........................................................28
1.211   Effective Date .............................................................................28
1.212   Eminent Domain/Inverse Condemnation Claim .........................28
1.213   Eminent Domain Proceeding ......................................................28
1.214   Energy Incentive Act ..................................................................28
1.215   Energy Incentive Claims ............................................................29
1.216   Entity ..........................................................................................29
1.217   ERS .............................................................................................29

### Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.218 | ERS Bond Claim | 29 |
| 1.219 | ERS Bond Recovery | 29 |
| 1.220 | ERS Bonds | 29 |
| 1.221 | ERS Fiscal Agent | 29 |
| 1.222 | ERS General Unsecured Claim | 30 |
| 1.223 | ERS GUC Pool | 30 |
| 1.224 | ERS Litigation | 30 |
| 1.225 | ERS Participant Claim | 31 |
| 1.226 | ERS Petition Date | 31 |
| 1.227 | ERS Portfolio Price | 31 |
| 1.228 | ERS Private Equity Portfolio | 31 |
| 1.229 | ERS Recovery Actions | 31 |
| 1.230 | ERS Resolution | 31 |
| 1.231 | ERS Stipulation | 31 |
| 1.232 | ERS Takings Action | 31 |
| 1.233 | ERS Title III Case | 32 |
| 1.234 | ERS Trust | 32 |
| 1.235 | Excess Cash Surplus | 32 |
| 1.236 | Executory Contract | 32 |
| 1.237 | Federal Claims | 32 |
| 1.238 | FGIC | 32 |
| 1.239 | FGIC Action | 32 |
| 1.240 | FGIC Certificates | 32 |
| 1.241 | FGIC CW/Convention Center Claims | 32 |
| 1.242 | FGIC CW/HTA Bond Claims | 32 |
| 1.243 | FGIC CW/PRIFA Rum Tax Claims | 32 |
| 1.244 | FGIC Escrow Account | 32 |
| 1.245 | FGIC Insured Bond Claims | 33 |
| 1.246 | FGIC Insured Bonds | 33 |
| 1.247 | FGIC Insured PRIFA Bond Claims | 33 |
| 1.248 | FGIC Insurance Policies | 33 |
| 1.249 | FGIC Plan Consideration | 33 |
| 1.250 | FGIC Rehabilitation Plan | 33 |
| 1.251 | FGIC Treatment | 33 |
| 1.252 | FGIC Trust | 33 |
| 1.253 | Final Order | 33 |
| 1.254 | Fiscal Plan | 34 |
| 1.255 | Fiscal Plan Surplus | 34 |
| 1.256 | FY | 34 |
| 1.257 | GDB | 34 |
| 1.258 | GDB HTA Loans | 34 |
| 1.259 | GDB Loan Priority Determination | 34 |
| 1.260 | General Fund | 34 |
| 1.261 | General Unsecured Claims | 34 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.262 | GO Bonds | 34 |
| 1.263 | GO CVIs | 34 |
| 1.264 | GO CVI Indenture | 35 |
| 1.265 | GO Group | 35 |
| 1.266 | GO/PBA Annex Agreement | 35 |
| 1.267 | GO/PBA Consummation Costs | 35 |
| 1.268 | GO/PBA Joinder Agreement | 35 |
| 1.269 | GO/PBA Joinder Creditors | 35 |
| 1.270 | GO/PBA Joinder Deadline | 35 |
| 1.271 | GO/PBA Plan Support Agreement | 35 |
| 1.272 | GO/PBA PSA Creditors | 35 |
| 1.273 | GO/PBA PSA Restriction Fee | 35 |
| 1.274 | GO/PBA Restriction Fee Percentage | 36 |
| 1.275 | Government Entity | 36 |
| 1.276 | Government Parties | 36 |
| 1.277 | Government Released Claims | 36 |
| 1.278 | Government Releasees | 36 |
| 1.279 | Gracia Gracia Claim | 37 |
| 1.280 | Gracia Gracia CW Action | 37 |
| 1.281 | Gracia Gracia Federal Action | 37 |
| 1.282 | Gracia Gracia Settlement | 37 |
| 1.283 | GSA Helicopter Loan | 37 |
| 1.284 | GUC Recovery Cap | 37 |
| 1.285 | GUC Reserve | 37 |
| 1.286 | HTA | 37 |
| 1.287 | HTA 68 Bonds | 37 |
| 1.288 | HTA 98 Bonds | 38 |
| 1.289 | HTA 98 Senior Bonds | 38 |
| 1.290 | HTA 98 Sub Bonds | 39 |
| 1.291 | HTA Bonds | 39 |
| 1.292 | HTA/CCDA Annex Agreement | 39 |
| 1.293 | HTA/CCDA Joinder Agreement | 39 |
| 1.294 | HTA/CCDA Joinder Deadline | 39 |
| 1.295 | HTA/CCDA Joinder Creditors | 39 |
| 1.296 | HTA/CCDA Plan Support Agreement | 39 |
| 1.297 | HTA/CCDA PSA Creditors | 39 |
| 1.298 | HTA/CCDA PSA Restriction Fee Period | 40 |
| 1.299 | HTA/CCDA PSA Threshold Attainment | 40 |
| 1.300 | HTA Clawback CVI | 40 |
| 1.301 | HTA Confirmation Order | 40 |
| 1.302 | HTA Distribution Conditions | 40 |
| 1.303 | HTA Effective Date | 40 |
| 1.304 | HTA Fiscal Agent | 41 |
| 1.305 | HTA Petition Date | 41 |

## Table of Contents
### (Cont'd)

Page

1.306 HTA Plan .................................................................................41
1.307 HTA Title III Case .......................................................................41
1.308 Initial PSA Creditors ...................................................................41
1.309 Initial GO/PBA PSA Creditors .........................................................41
1.310 Initial GO/PBA PSA Restriction Fee Creditors .......................................41
1.311 Initial HTA/CCDA PSA Creditors .......................................................41
1.312 Initial PSA .............................................................................41
1.313 Initial PSA Joinder Creditors .........................................................41
1.314 Initial PSA Threshold Attainment .....................................................41
1.315 Insured Bond Claim ....................................................................42
1.316 Invalidity Actions .....................................................................42
1.317 IRC ......................................................................................42
1.318 IRS ......................................................................................42
1.319 JRS ......................................................................................42
1.320 JRS Participant Claim ..................................................................42
1.321 LCDC .....................................................................................42
1.322 LCDC Holders ...........................................................................42
1.323 Lien .....................................................................................42
1.324 Lien Challenge Actions ................................................................42
1.325 Lift Stay Motions ......................................................................42
1.326 List of Creditors ......................................................................43
1.327 Local Bankruptcy Rules ................................................................43
1.328 Maximum Annual Debt Service ..........................................................43
1.329 Maximum Taxable Bond Election Amount ................................................43
1.330 Measured SUT ...........................................................................43
1.331 Med Centers ............................................................................43
1.332 Med Center Claims ......................................................................44
1.333 Med Center Litigation ..................................................................44
1.334 Med DC Action ..........................................................................45
1.335 MFA ......................................................................................45
1.336 Monolines ..............................................................................45
1.337 Monthly Benefit Modification .........................................................45
1.338 National ................................................................................45
1.339 National Action ........................................................................45
1.340 National Acceleration Price ...........................................................45
1.341 National Certificates ..................................................................45
1.342 National Commutation Consideration ..................................................45
1.343 National Commutation Treatment .......................................................45
1.344 National CW/HTA Bond Claims ..........................................................46
1.345 National Escrow Account ...............................................................46
1.346 National Insurance Policies ...........................................................46
1.347 National Insured Bond Claims ..........................................................46
1.348 National Insured Bonds ................................................................46
1.349 National Non-Commutation Treatment ..................................................46

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.350 | National Plan Consideration | 46 |
| 1.351 | National Treatment | 46 |
| 1.352 | National Trust | 46 |
| 1.353 | Net Allowed ERS Bond Claims | 46 |
| 1.354 | Net CW Cash Consideration | 46 |
| 1.355 | Net Tax-Supported Debt | 47 |
| 1.356 | New GO 5.0% CABs | 47 |
| 1.357 | New GO 5.375% CABs | 47 |
| 1.358 | New GO Bonds | 47 |
| 1.359 | New GO Bonds Indenture | 47 |
| 1.360 | New GO Bonds Legislation | 47 |
| 1.361 | New GO Bonds Trustee | 47 |
| 1.362 | New GO CIBs | 48 |
| 1.363 | New GO Refunding Bonds | 48 |
| 1.364 | New HTA Bonds | 48 |
| 1.365 | New HTA Bonds Indenture | 48 |
| 1.366 | Non-Own Source Revenues | 48 |
| 1.367 | Notas de Ahorro | 48 |
| 1.368 | OGP | 48 |
| 1.369 | Ordinary Course Employee Claim | 48 |
| 1.370 | Outperformance Condition | 48 |
| 1.371 | Outstanding | 49 |
| 1.372 | Oversight Board | 49 |
| 1.373 | Participant | 49 |
| 1.374 | PayGo | 49 |
| 1.375 | PBA | 49 |
| 1.376 | PBA Administrative Expense Claim | 49 |
| 1.377 | PBA Bond Claims | 49 |
| 1.378 | PBA Bond Distribution | 49 |
| 1.379 | PBA Bonds | 49 |
| 1.380 | PBA Cash | 49 |
| 1.381 | PBA/DRA Secured Claim | 49 |
| 1.382 | PBA/DRA Unsecured Claim | 49 |
| 1.383 | PBA General Unsecured Claim | 50 |
| 1.384 | PBA Litigation | 50 |
| 1.385 | PBA Petition Date | 50 |
| 1.386 | PBA Property | 50 |
| 1.387 | PBA Title III Case | 50 |
| 1.388 | Pension Reserve Deed of Trust | 50 |
| 1.389 | Pension Reserve Trust | 50 |
| 1.390 | Person | 50 |
| 1.391 | PFC | 50 |
| 1.392 | Plan | 50 |
| 1.393 | Plan Supplement | 50 |

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.394 | Ports | 51 |
| 1.395 | PRASA | 51 |
| 1.396 | PREPA | 51 |
| 1.397 | PRIDCO | 51 |
| 1.398 | PRIFA | 51 |
| 1.399 | PRIFA BANs | 51 |
| 1.400 | PRIFA BANs Commonwealth Guaranty | 51 |
| 1.401 | PRIFA BANs Litigation | 51 |
| 1.402 | PRIFA BANs Trustee | 51 |
| 1.403 | PRIFA Bond Claims | 51 |
| 1.404 | PRIFA Bonds | 51 |
| 1.405 | PRIFA Clawback CVI | 52 |
| 1.406 | PRIFA Distribution Conditions | 52 |
| 1.407 | PRIFA Order | 52 |
| 1.408 | PRIFA Plan | 52 |
| 1.409 | PRIFA Plan Support Agreement | 52 |
| 1.410 | PRIFA PSA Creditors | 52 |
| 1.411 | Professional | 52 |
| 1.412 | Professional Claim | 53 |
| 1.413 | Projected Fiscal Plan Surplus | 53 |
| 1.414 | PROMESA | 53 |
| 1.415 | Pro Rata Share | 53 |
| 1.416 | PSA Creditors | 53 |
| 1.417 | PSA Restriction Fees | 53 |
| 1.418 | Puerto Rico Investor | 53 |
| 1.419 | QTCB Group | 54 |
| 1.420 | Related Persons | 54 |
| 1.421 | Released Claims | 54 |
| 1.422 | Released Parties | 55 |
| 1.423 | Releasing Parties | 55 |
| 1.424 | Reorganized Commonwealth | 55 |
| 1.425 | Reorganized Debtors | 55 |
| 1.426 | Reorganized Debtors' By-Laws | 55 |
| 1.427 | Restriction Fee Creditors | 55 |
| 1.428 | Retail 2011 CW Bond Claim | 56 |
| 1.429 | Retail 2011 CW Series D/E/PIB Bond Claim | 56 |
| 1.430 | Retail 2011 PBA Bond Claim | 56 |
| 1.431 | Retail 2012 CW Bond Claim | 56 |
| 1.432 | Retail 2012 PBA Bond Claim | 56 |
| 1.433 | Retail 2014 CW Bond Claim | 56 |
| 1.434 | Retail CW Bond Claims | 56 |
| 1.435 | Retail Investor | 56 |
| 1.436 | Retail PBA Bond Claims | 56 |
| 1.437 | Retail Support Fee | 56 |

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.438 | Retail Support Fee Return | 57 |
| 1.439 | Retail Vintage CW Bond Claim | 57 |
| 1.440 | Retail Vintage PBA Bond Claim | 57 |
| 1.441 | Retired ERS Participant Above-Threshold Claim | 57 |
| 1.442 | Retired ERS Participant Below-Threshold Claim | 57 |
| 1.443 | Retired JRS Participant Above-Threshold Claim | 57 |
| 1.444 | Retired JRS Participant Below-Threshold Claim | 57 |
| 1.445 | Retired TRS Participant Above-Threshold Claim | 57 |
| 1.446 | Retired TRS Participant Below-Threshold Claim | 57 |
| 1.447 | Retiree | 58 |
| 1.448 | Retiree Claim | 58 |
| 1.449 | Retiree Committee | 58 |
| 1.450 | Retiree Committee Plan Support Agreement | 58 |
| 1.451 | Rum Tax CVI | 58 |
| 1.452 | Rum Tax CVI Indenture | 58 |
| 1.453 | Sales Tax | 58 |
| 1.454 | SCC Action | 58 |
| 1.455 | SEC | 58 |
| 1.456 | Section 510(b) Subordinated Claim | 58 |
| 1.457 | Securities Act | 59 |
| 1.458 | Solicitation Agent | 59 |
| 1.459 | SPU | 59 |
| 1.460 | Substitute Measured Tax | 59 |
| 1.461 | Syncora | 59 |
| 1.462 | Syncora Acceleration Price | 59 |
| 1.463 | Syncora Certificates | 59 |
| 1.464 | Syncora Commutation Consideration | 59 |
| 1.465 | Syncora Commutation Treatment | 59 |
| 1.466 | Syncora Escrow Account | 59 |
| 1.467 | Syncora Insured Bond Claims | 59 |
| 1.468 | Syncora Insured Bonds | 60 |
| 1.469 | Syncora Insurance Policies | 60 |
| 1.470 | Syncora Non-Commutation Treatment | 60 |
| 1.471 | Syncora Plan Consideration | 60 |
| 1.472 | Syncora Treatment | 60 |
| 1.473 | Syncora Trust | 60 |
| 1.474 | System 2000 | 60 |
| 1.475 | System 2000 Participant Claim | 60 |
| 1.476 | Taxable Bond Distributions | 60 |
| 1.477 | Taxable Election CW Claims | 60 |
| 1.478 | Taxable New GO Bonds | 60 |
| 1.479 | Tax Credit Claims | 61 |
| 1.480 | Tax-Supported Debt | 61 |
| 1.481 | Threshold | 61 |

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.482 | Title III | 61 |
| 1.483 | Title III Cases | 61 |
| 1.484 | Title III Court | 61 |
| 1.485 | TRS | 61 |
| 1.486 | Trustee Fiscal Agent | 62 |
| 1.487 | TRS Participant Claim | 62 |
| 1.488 | Trust Documentation | 62 |
| 1.489 | Unclaimed Distribution | 62 |
| 1.490 | Underwriter Actions | 62 |
| 1.491 | Unexpired Lease | 62 |
| 1.492 | Uniformity Litigation | 62 |
| 1.493 | UPR | 62 |
| 1.494 | Vintage CW Bond Claim | 62 |
| 1.495 | Vintage CW Bond Claim (Ambac) | 63 |
| 1.496 | Vintage CW Bond Claim (Assured) | 63 |
| 1.497 | Vintage CW Bond Claim (FGIC) | 63 |
| 1.498 | Vintage CW Bond Claim (National) | 63 |
| 1.499 | Vintage CW Bond Claim (Syncora) | 63 |
| 1.500 | Vintage CW Bond Claim (Taxable Election) | 63 |
| 1.501 | Vintage CW Bond Recovery | 63 |
| 1.502 | Vintage CW Bonds | 63 |
| 1.503 | Vintage CW Guarantee Bond Claim | 65 |
| 1.504 | Vintage CW Guarantee Bond Claim (Ambac) | 65 |
| 1.505 | Vintage CW Guarantee Bond Claim (Assured) | 65 |
| 1.506 | Vintage CW Guarantee Bond Claim (FGIC) | 65 |
| 1.507 | Vintage CW Guarantee Bond Claim (National) | 65 |
| 1.508 | Vintage CW Guarantee Bond Claim (Syncora) | 65 |
| 1.509 | Vintage CW Guarantee Bond Claim (Taxable Election) | 65 |
| 1.510 | Vintage CW Guarantee Bond Recovery | 66 |
| 1.511 | Vintage CW Guarantee Taxable Bond Distribution | 66 |
| 1.512 | Vintage PBA Bond Claim | 66 |
| 1.513 | Vintage PBA Bond Claim (Ambac) | 66 |
| 1.514 | Vintage PBA Bond Claim (Assured) | 66 |
| 1.515 | Vintage PBA Bond Claim (FGIC) | 66 |
| 1.516 | Vintage PBA Bond Claim (National) | 66 |
| 1.517 | Vintage PBA Bond Claim (Syncora) | 67 |
| 1.518 | Vintage PBA Bond Recovery | 67 |
| 1.519 | Vintage PBA Bonds | 67 |
| 1.520 | Vintage Taxable Bond Distribution | 68 |
| 1.521 | Voting Record Date | 68 |
| 1.522 | VTP Payroll Participant | 68 |
| 1.523 | VTP Payroll Participant Claim | 68 |
| 1.524 | VTP Payroll Participant Above-Threshold Claims | 68 |
| 1.525 | VTP Payroll Participant Below-Threshold Claims | 68 |

**Table of Contents**
**(Cont'd)**

1.526 GDB/PET ................................................................................68
1.527 GDB/PET Claim ........................................................................68
1.528 COSSEC ..................................................................................68
1.529 Other Definitions ...................................................................69
1.530 Rules of Interpretation ...........................................................69

ARTICLE II COMPROMISE AND SETTLEMENT OF
DISPUTES/RESTRUCTURING OF ENTITIES ..................................69

2.1 Litigation Resolution ...............................................................69
2.2 Allowance of Bond Claims ........................................................70
2.3 Releases, Injunctions and Exculpation .......................................71
2.4 Purchase and Sale of Certain ERS Assets....................................71

ARTICLE III PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
CLAIMS ...........................................................................................71

3.1 Administrative Expense Claims..................................................71
3.2 Professional Compensation and Reimbursement Claims .................72
3.3 GO/PBA Consummation Costs ...................................................72
3.4 AFSCME and AMPR Professional Fees .......................................72
3.5 GO/PBA PSA Restriction Fee ....................................................72
3.6 Retail Support Fee ...................................................................74
3.7 ERS Restriction Fee.................................................................74
3.8 CCDA Consummation Costs ......................................................74
3.9 CCDA Restriction Fee ..............................................................75
3.10 Non-Severability .....................................................................76

ARTICLE IV CLASSIFICATION OF CLAIMS ........................................................76

4.1 Claims are classified as follows.................................................76

ARTICLE V PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (CLASS 1) ...........................................................................79

5.1 Treatment of Vintage PBA Bond Claims .....................................79

ARTICLE VI PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (ASSURED) (CLASS 2) ..........................................................79

6.1 Treatment of Vintage PBA Bond Claims (Assured).......................79

ARTICLE VII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (NATIONAL) (CLASS 3) ........................................................80

7.1 Treatment of Vintage PBA Bond Claims (National).......................80

## Table of Contents
### (Cont'd)

ARTICLE VIII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (AMBAC) (CLASS 4) ............................................................80

    8.1    Treatment of Vintage PBA Bond Claims (Ambac) ................................80

ARTICLE IX PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (FGIC) (CLASS 5)................................................................80

    9.1    Treatment of Vintage PBA Bond Claims (FGIC)..................................80

ARTICLE X PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
CLAIMS (SYNCORA) (CLASS 6)........................................................80

    10.1    Treatment of Vintage PBA Bond Claims (Syncora)..............................80

ARTICLE XI PROVISIONS FOR TREATMENT OF RETAIL  VINTAGE PBA
BOND CLAIMS (CLASS 7) ................................................................81

    11.1    Treatment of Retail Vintage PBA Bond Claims ...................................81

ARTICLE XII PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS
(CLASS 8) .......................................................................................81

    12.1    Treatment of 2011 PBA Bond Claims .................................................81

ARTICLE XIII PROVISIONS FOR TREATMENT OF RETAIL 2011  PBA BOND
CLAIMS (CLASS 9) ..........................................................................81

    13.1    Treatment of Retail 2011 PBA Bond Claims .......................................81

ARTICLE XIV PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS
(CLASS 10) ......................................................................................82

    14.1    Treatment of 2012 PBA Bond Claims .................................................82

ARTICLE XV PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND
CLAIMS (CLASS 11) ........................................................................82

    15.1    Treatment of Retail 2012 PBA Bond Claims .......................................82

ARTICLE XVI PROVISIONS FOR TREATMENT OF  PBA/DRA SECURED
CLAIMS (CLASS 12) ........................................................................82

    16.1    Treatment of PBA/DRA Secured Claims .............................................82

ARTICLE XVII PROVISIONS FOR TREATMENT OF PBA GENERAL
UNSECURED CLAIMS (CLASS 13) ....................................................82

    17.1    Treatment of PBA General Unsecured Claims.....................................82

## Table of Contents
### (Cont'd)

ARTICLE XVIII PROVISIONS FOR TREATMENT OF PBA/DRA UNSECURED
CLAIMS (CLASS 14) ............................................................83

18.1    Treatment of PBA/DRA Unsecured Claims .................................83

ARTICLE XIX PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (CLASS 15) ...........................................................83

19.1    Treatment of Vintage CW Bond Claims .....................................83
19.2    Right of Election to Vintage CW Bond Claims (Taxable Election)...............83

ARTICLE XX PROVISIONS FOR TREATMENT OF RETAIL VINTAGE CW
BOND CLAIMS (CLASS 16) ...................................................84

20.1    Treatment of Retail Vintage CW Bond Claims ...............................84
20.2    Right of Election to Retail Vintage CW Bond Claims (Taxable
Election)...................................................................84

ARTICLE XXI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (ASSURED) (CLASS 17) ...............................................84

21.1    Treatment of Vintage CW Bond Claims (Assured)...........................84

ARTICLE XXII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (NATIONAL) (CLASS 18) ..............................................85

22.1    Treatment of Vintage CW Bond Claims (National) ..........................85

ARTICLE XXIII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (AMBAC) (CLASS 19) ................................................85

23.1    Treatment of Vintage CW Bond Claims (Ambac) ............................85

ARTICLE XXIV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (FGIC) (CLASS 20)...................................................85

24.1    Treatment of Vintage CW Bond Claims (FGIC)...............................85

ARTICLE XXV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (SYNCORA) (CLASS 21)...............................................85

25.1    Treatment of Vintage CW Bond Claims (Syncora)...........................85

ARTICLE XXVI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (TAXABLE ELECTION) (CLASS 22) .................................86

26.1    Treatment of Vintage CW Bond Claims (Taxable Election).................86

ARTICLE XXVII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (CLASS 23) ....................................86

**Table of Contents**
**(Cont'd)**

27.1   Treatment of Vintage CW Guarantee Bond Claims ..............................................86

27.2   Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election) ...........................................................................................................86

ARTICLE XXVIII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24) ..............................86

28.1   Treatment of Vintage CW Guarantee Bond Claims (Assured) ....................86

ARTICLE XXIX PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25) ............................87

29.1   Treatment of Vintage CW Guarantee Bond Claims (National) ...........................87

ARTICLE XXX PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26) ............................87

30.1   Treatment of Vintage CW Guarantee Bond Claims (Ambac) .............................87

ARTICLE XXXI PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (FGIC) (CLASS 27) ............................87

31.1   Treatment of Vintage CW Guarantee Bond Claims (FGIC) .................87

ARTICLE XXXII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28) ............................87

32.1   Treatment of Vintage CW Guarantee Bond Claims (Syncora) ............................87

ARTICLE XXXIII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29) ...........................................................................................................88

33.1   Treatment of Vintage CW Guarantee Bond Claims (Taxable Election) ...........................................................................................................88

ARTICLE XXXIV PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (CLASS 30) ............................................................................88

34.1   Treatment of 2011 CW Bond Claims ........................................................88

34.2   Right of Election to 2011 CW Bond Claims (Taxable Election) .........................88

ARTICLE XXXV PROVISIONS FOR TREATMENT OF RETAIL 2011 CW BOND CLAIMS (CLASS 31) ............................................................................88

35.1   Treatment of Retail 2011 CW Bond Claims .............................................88

35.2   Right of Election to Retail 2011 CW Bond Claims (Taxable Election) ...........................................................................................................89

ARTICLE XXXVI PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (ASSURED) (CLASS 32) ....................................................89

36.1     Treatment of 2011 CW Bond Claims (Assured)......................................89

ARTICLE XXXVII PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 33) ................................................89

37.1     Treatment of 2011 CW Bond Claims (Taxable Election) ....................................89

ARTICLE XXXVIII PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (CLASS 34) ....................................................90

38.1     Treatment of 2011 CW Guarantee Bond Claims....................................90
38.2     Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election)........................................................................................90

ARTICLE XXXIX PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 35) ....................................90

39.1     Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)...................90

ARTICLE XL PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)....................................................90

40.1     Treatment of 2011 CW Series D/E/PIB Bond Claims............................................90
40.2     Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)........................................................................................91

ARTICLE XLI PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37) ..........................................91

41.1     Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured).........................91

ARTICLE XLII PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38) ....................................................91

42.1     Treatment of Retail 2011 CW Series D/E/PIB Bond Claims ................................91
42.2     Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election)........................................................................................91

ARTICLE XLIII PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39) ....................................92

43.1     Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election)........................................................................................92

ARTICLE XLIV PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40) ........................................................................92

**Table of Contents**
**(Cont'd)**

44.1    Treatment of 2012 CW Bond Claims ................................................................92
44.2    Right of Election to 2012 CW Bond Claims (Taxable Election)..........................92

ARTICLE XLV PROVISIONS FOR TREATMENT OF RETAIL 2012  CW BOND
            CLAIMS (CLASS 41) ................................................................................93

45.1    Treatment of Retail 2012 CW Bond Claims......................................................93
45.2    Right of Election to Retail 2012 CW Bond Claims (Taxable
            Election)................................................................................................93

ARTICLE XLVI PROVISIONS FOR TREATMENT OF 2012  CW BOND
            CLAIMS (ASSURED) (CLASS 42) ............................................................93

46.1    Treatment of 2012 CW Bond Claims (Assured)................................................93

ARTICLE XLVII PROVISIONS FOR TREATMENT OF 2012 CW BOND
            CLAIMS (TAXABLE ELECTION) (CLASS 43) ........................................94

47.1    Provisions for Treatment of 2012 CW Bond Claims (Taxable
            Election)................................................................................................94

ARTICLE XLVIII PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
            BOND CLAIMS (CLASS 44)....................................................................94

48.1    Treatment of 2012 CW Guarantee Bond Claims................................................94
48.2    Right of Election to 2012 CW Guarantee Bond Claims (Taxable
            Election)................................................................................................94

ARTICLE XLIX PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
            BOND CLAIMS (TAXABLE ELECTION) (CLASS 45) .............................94

49.1    Treatment of 2012 CW Guarantee Bond Claims (Taxable Election)....................94

ARTICLE L PROVISIONS FOR TREATMENT OF 2014  CW BOND CLAIMS
            (CLASS 46) ............................................................................................95

50.1    Treatment of 2014 CW Bond Claims ................................................................95
50.2    Right of Election to 2014 CW Bond Claims (Taxable Election)..........................95

ARTICLE LI PROVISIONS FOR TREATMENT OF  RETAIL 2014  CW BOND
            CLAIMS (CLASS 47) ..............................................................................95

51.1    Treatment of Retail 2014 Bond Claims ............................................................95
51.2    Right of Election to Retail 2014 CW Bond Claims (Taxable
            Election)................................................................................................95

ARTICLE LII PROVISIONS FOR TREATMENT OF 2014  CW BOND CLAIMS
            (TAXABLE ELECTION) (CLASS 48)........................................................96

**Table of Contents**
**(Cont'd)**

Page

52.1  Provisions for Treatment of 2014 CW Bond Claims (Taxable Election).................................................................................................96

ARTICLE LIII PROVISIONS FOR TREATMENT OF  2014 CW GUARANTEE BOND CLAIMS (CLASS 49)...................................................96

53.1  Treatment of 2014 CW Guarantee Bond Claims.....................................96
53.2  Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election).................................................................................................96

ARTICLE LIV PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 50) ...................................96

54.1  Treatment of 2014 CW Guarantee Bond Claims (Taxable Election)...................96

ARTICLE LV PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)................................................................................97

55.1  Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A) ........................................................................................97
55.2  Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B).........................................................................................97
55.3  Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C).........................................................................................97
55.4  Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D).........................................................................................98
55.5  Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E).........................................................................................98
55.6  Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F).........................................................................................98
55.7  Treatment of Active ERS Participant Claims (Class 51G)....................................99
55.8  Treatment of Active JRS Participant Claims (Class 51H)....................................99
55.9  Treatment of Active TRS Participant Claims (Class 51I) ...................................100
55.10 Treatment of System 2000 Participant Claims (Class 51J) ...............................101
55.11 Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K): .......................................................................................102
55.12 Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L):.........................................................................................102

ARTICLE LVI PROVISIONS FOR TREATMENT OF  AFSCME CLAIMS (CLASS 52) ....................................................................................103

56.1  Treatment of AFSCME Claims .............................................................103

ARTICLE LVII PROVISIONS FOR TREATMENT OF  DAIRY PRODUCER CLAIMS (CLASS 53) ...............................................................104

**Table of Contents**
**(Cont'd)**

57.1  Treatment of Dairy Producer Claims ..................................................104

ARTICLE LVIII PROVISIONS FOR TREATMENT OF CW EMINENT
DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54) ...................104

58.1  Treatment of Eminent/Inverse Condemnation Domain Claims.........................104

ARTICLE LIX PROVISIONS FOR TREATMENT OF  ENERGY INCENTIVE
CLAIMS (CLASS 55) ...................................................................105

59.1  Treatment of Energy Incentive Claims .................................................105

ARTICLE LX PROVISIONS FOR TREATMENT OF  MED CENTER CLAIMS
(CLASS 56) .............................................................................105

60.1  Treatment of Med Center Claims ......................................................105
60.2  Dismissal of Med Center Litigation....................................................106

ARTICLE LXI PROVISIONS FOR TREATMENT OF  TAX CREDIT CLAIMS
(CLASS 57) .............................................................................106

61.1  Treatment of Tax Credit Claims .......................................................106

ARTICLE LXII PROVISIONS FOR TREATMENT OF CW GENERAL
UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58
AND 58A)..............................................................................106

62.1  Treatment of CW General Unsecured Claims ...................................106
62.2  Limitation on Recovery ...............................................................107
62.3  GUC Reserve .........................................................................107
62.4  Treatment of GDB/PET Claims......................................................108

ARTICLE LXIII PROVISIONS FOR TREATMENT  OF CW/HTA CLAIMS
(CLASS 59) .............................................................................108

63.1  Treatment of CW/HTA Claims........................................................108
63.2  Distribution of the CW/HTA Clawback Recovery..............................108

ARTICLE LXIV PROVISIONS FOR TREATMENT OF CW/CONVENTION
CENTER CLAIMS (CLASS 60)......................................................109

64.1  Treatment of CW/Convention Center Claims....................................109

ARTICLE LXV PROVISIONS FOR TREATMENT OF CW/PRIFA RUM TAX
CLAIMS (CLASS 61) .................................................................109

65.1  Treatment of CW/PRIFA Rum Tax Claims........................................109
65.2  Distribution of the Beneficial Interests in the PRIFA Trust ................110

xx

ARTICLE LXVI PROVISIONS FOR TREATMENT OF  CW/MBA CLAIMS
(CLASS 62) ..................................................................................110

66.1    Treatment of CW/MBA Claims ..................................................110

ARTICLE LXVII PROVISIONS FOR TREATMENT OF CW APPROPRIATIONS
CLAIMS (CLASS 63) ..................................................................110

67.1    Treatment of CW Appropriations Claims ...................................110

ARTICLE LXVIII PROVISIONS FOR TREATMENT OF SECTION 510(b)
SUBORDINATED CLAIMS (CLASS 64) ....................................110

68.1    Treatment of Section 510(b) Subordinated Claims .....................110

ARTICLE LXIX PROVISIONS FOR TREATMENT OF ERS BOND CLAIMS
(CLASS 65) ..................................................................................111

69.1    Treatment of ERS Bond Claims ..................................................111
69.2    ERS Private Equity Portfolio ......................................................111
69.3    Dismissal of Litigation ...............................................................112

ARTICLE LXX PROVISIONS FOR TREATMENT OF ERS GENERAL
UNSECURED CLAIMS (CLASS 66) ............................................112

70.1    Treatment of ERS General Unsecured Claims ...........................112
70.2    Limitation on Recovery ..............................................................113

ARTICLE LXXI PROVISIONS FOR TREATMENT OF GRACIA GRACIA
CLAIMS (CLASS 67) ..................................................................113

71.1    Treatment of Gracia Gracia Claims ............................................113

ARTICLE LXXII PROVISIONS FOR TREATMENT OF CONVENIENCE
CLAIMS (CLASS 68) ..................................................................113

72.1    Treatment of Convenience Claims...............................................113

ARTICLE LXXIII PROVISIONS FOR TREATMENT  OF FEDERAL CLAIMS
(CLASS 69) ..................................................................................114

73.1    Treatment of Federal Claims: .....................................................114

ARTICLE LXXIV PROVISIONS REGARDING NEW GO BONDS,  CVIS AND
ADDITIONAL INDEBTEDNESS...................................................114

74.1    Issuance and Distribution of the New GO Bonds .......................114
74.2    Issuance and Distribution of the CVIs........................................118
74.3    Tax-Exempt Treatment of the New GO Bonds ...........................119
74.4    Comprehensive Cap on All Net Tax-Supported Debt .................120

**Table of Contents**
**(Cont'd)**

Page

74.5 Adoption and Maintenance of a Debt Management Policy ...............................121

ARTICLE LXXV PROVISIONS REGARDING ASSURED INSURED BONDS,
NATIONAL INSURED BONDS, SYNCORA INSURED BONDS,
AMBAC INSURED BONDS AND FGIC INSURED BONDS ........................122

75.1 Treatment of Assured Insured Bond Claims.................................................122
75.2 Treatment of National Insured Bond Claims................................................125
75.3 Treatment of Syncora Insured Bond Claims................................................127
75.4 Treatment of FGIC Insured Bond Claims....................................................129
(a) FGIC Insured Bond Claims Treatment:.......................................................129
75.5 Treatment of Ambac Insured Bond Claims ..................................................131

ARTICLE LXXVI TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES ..........................................................................134

76.1 Rejection or Assumption of Remaining Executory Contracts and
Unexpired Leases...................................................................................134
76.2 Approval of Rejection or Assumption of Executory Contracts and
Unexpired Leases...................................................................................134
76.3 Inclusiveness........................................................................................134
76.4 Cure of Defaults ...................................................................................135
76.5 Insurance Policies .................................................................................135
76.6 Rejection Damage Claims.......................................................................135
76.7 Indemnification and Reimbursement Obligations ........................................135
76.8 Nonoccurrence of Effective Date..............................................................136
76.9 Reservation of Rights.............................................................................136
76.10 Collective Bargaining Agreements ...........................................................136

ARTICLE LXXVII PROVISIONS GOVERNING DISTRIBUTIONS ..........................136

77.1 Time and Manner of Distribution .............................................................136
77.2 Timeliness of Payments..........................................................................137
77.3 Distributions by the Disbursing Agent ......................................................137
77.4 Manner of Payment under the Plan...........................................................138
77.5 Delivery of Distributions ........................................................................138
77.6 Cancellation of Notes, Instruments, Certificates, and Other
Documents............................................................................................138
77.7 Undeliverable/Reserved Distributions .......................................................139
77.8 Withholding and Reporting Requirements ..................................................140
77.9 Time Bar to Cash Payments.....................................................................140
77.10 Distributions After Effective Date ............................................................140
77.11 Setoffs .................................................................................................140
77.12 Allocation of Plan Distributions Between Principal and Interest .....................141
77.13 Payment of Trustee Fees and Expenses......................................................141
77.14 Beneficial Owner ..................................................................................141

## Table of Contents
### (Cont'd)

77.15   Value of Distributions ..........................................................................142

ARTICLE LXXVIII AVOIDANCE ACTIONS TRUST ...............................................142

78.1    Execution of Avoidance Actions Trust Agreement ...............................142
78.2    Purpose of the Avoidance Actions Trust ..............................................142
78.3    Avoidance Actions Trust Assets ...........................................................142
78.4    Administration of the Avoidance Actions Trust ...................................143
78.5    The Avoidance Actions Trustee .............................................................143
78.6    Role of the Avoidance Actions Trustee .................................................143
78.7    Avoidance Actions Trustee's Tax Power for Debtors ...........................143
78.8    Transferability of Avoidance Actions Trust Interests ...........................143
78.9    Cash .......................................................................................................143
78.10   Distribution of Avoidance Actions Trust Assets ..................................144
78.11   Funding, Costs and Expenses of the Avoidance Actions Trust .............144
78.12   Compensation of the Avoidance Actions Trustee .................................144
78.13   Retention of Professionals/Employees by the Avoidance Actions
        Trustee ...................................................................................................144
78.14   Federal Income Tax Treatment of the Avoidance Actions Trust ...........144
78.15   Indemnification of Avoidance Actions Trustee and Members of
        Avoidance Actions Trust Bond .............................................................147

ARTICLE LXXIX PROSECUTION AND EXTINGUISHMENT OF CLAIMS
        HELD BY THE DEBTORS .............................................................148

79.1    Prosecution of Claims ...........................................................................148

ARTICLE LXXX ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
        REJECTION BY ONE OR MORE CLASSES OF CLAIMS ............................148

80.1    Impaired Classes to Vote ......................................................................148
80.2    Acceptance by Class of Creditors .........................................................148
80.3    Cramdown ..............................................................................................148

ARTICLE LXXXI RIGHTS AND POWERS OF DISBURSING AGENT ...............................149

81.1    Exculpation ...........................................................................................149
81.2    Powers of the Disbursing Agent ...........................................................149
81.3    Fees and Expenses Incurred From and After the Effective Date ..........149

ARTICLE LXXXII PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
        AND CLAIMS SUBJECT TO ACR PROCEDURES .......................................149

82.1    Objections to Claims; Prosecution of Disputed Claims ........................149
82.2    Estimation of Claims .............................................................................150
82.3    Payments and Distributions on Disputed Claims ..................................151
82.4    Authority to Amend Lists of Creditors .................................................151

**Table of Contents**
**(Cont'd)**

Page

| | | |
|---|---|---|
| 82.5 | Non-Accrual of Interest | 152 |
| 82.6 | Disallowance of Claims | 152 |
| 82.7 | Claims Subject to ACR Procedures | 152 |
| 82.8 | National Action Claims | 152 |

ARTICLE LXXXIII GOVERNANCE AND PROVISIONS REGARDING
PENSION RESERVE AND PENSION SYSTEM ............................................. 153

| | | |
|---|---|---|
| 83.1 | Formation and Responsibilities of the Pension Reserve | 153 |
| 83.2 | Funding of the Pension Reserve Trust | 153 |
| 83.3 | Non-Impairment Covenant | 154 |
| 83.4 | Maintenance of Pension | 154 |

ARTICLE LXXXIV IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
AND NOT IMPAIRED BY THE PLAN ........................................................ 155

| | | |
|---|---|---|
| 84.1 | Impaired Classes | 155 |
| 84.2 | Unimpaired Classes | 155 |

ARTICLE LXXXV CONDITIONS PRECEDENT TO CONFIRMATION OF THE
PLAN ................................................................................................... 155

| | | |
|---|---|---|
| 85.1 | Conditions Precedent to Confirmation of the Plan | 155 |
| 85.2 | Waiver of Conditions Precedent to Confirmation | 156 |

ARTICLE LXXXVI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ................. 157

| | | |
|---|---|---|
| 86.1 | Conditions Precedent to the Effective Date | 157 |
| 86.2 | Waiver of Conditions Precedent | 160 |
| 86.3 | Effect of Non-Occurrence of Conditions to Effective Date | 161 |

ARTICLE LXXXVII MODIFICATION, REVOCATION, OR WITHDRAWAL OF
THE PLAN ............................................................................................ 161

| | | |
|---|---|---|
| 87.1 | Modification of Plan | 161 |
| 87.2 | Revocation or Withdrawal | 161 |
| 87.3 | Amendment of Plan Documents | 161 |
| 87.4 | No Admission of Liability | 161 |

ARTICLE LXXXVIII CORPORATE GOVERNANCE AND  MANAGEMENT OF
REORGANIZED DEBTORS ...................................................................... 162

| | | |
|---|---|---|
| 88.1 | Corporate Action | 162 |
| 88.2 | Dissolution of ERS | 163 |
| 88.3 | Officers of Reorganized Debtors | 163 |
| 88.4 | PBA and CCDA Governance Structure | 163 |

## Table of Contents
### (Cont'd)

| | | Page |
|---|---|---|

**ARTICLE LXXXIX PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA** ...................163

| 89.1 | Effect of Confirmation | 163 |
| 89.2 | Ongoing Role of the Oversight Board | 163 |
| 89.3 | Preemption of Laws | 163 |

**ARTICLE XC PROVISIONS REGARDING COMMITTEES** ...................164

| 90.1 | Dissolution of Committees | 164 |

**ARTICLE XCI RETENTION OF JURISDICTION** ...................164

| 91.1 | Retention of Jurisdiction | 164 |

**ARTICLE XCII MISCELLANEOUS PROVISIONS** ...................166

| 92.1 | Title to Assets | 166 |
| 92.2 | Discharge and Release of Claims and Causes of Action | 167 |
| 92.3 | Injunction on Claims | 170 |
| 92.4 | Integral to Plan | 170 |
| 92.5 | Releases by the Debtors and Reorganized Debtors | 170 |
| 92.6 | Injunction Related to Releases | 170 |
| 92.7 | Exculpation | 171 |
| 92.8 | Appointments Related Litigation/Uniformity Litigation | 173 |
| 92.9 | Bar Order | 174 |
| 92.10 | No Waiver | 174 |
| 92.11 | Supplemental Injunction | 174 |
| 92.12 | Post-Effective Date Fees and Expenses | 175 |
| 92.13 | Securities Act Exemption | 175 |
| 92.14 | Severability | 176 |
| 92.15 | Governing Law | 176 |
| 92.16 | Closing Case | 176 |
| 92.17 | Section Headings | 176 |
| 92.18 | Inconsistencies | 176 |
| 92.19 | Document Retention | 176 |
| 92.20 | Immediate Binding Effect | 176 |
| 92.21 | Additional Documents | 177 |
| 92.22 | Reservation of Rights | 177 |
| 92.23 | Successors and Assigns | 177 |
| 92.24 | Notices | 177 |
| 92.25 | Term of Injunctions or Stays | 180 |
| 92.26 | Entire Agreement | 180 |
| 92.27 | Plan Supplement | 180 |

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following joint plan of adjustment.

## ARTICLE I

## DEFINITIONS

As used in the Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1     **2011 CW Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Bonds, other than a 2011 CW Bond Claim (Assured) or a Retail 2011 CW Bond Claim.

1.2     **2011 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.3     **2011 CW Bond Claim (Taxable Election):** A 2011 CW Bond Claim or Retail 2011 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim shall be a 2011 CW Bond Claim (Taxable Election) up to such 2011 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Bond Claim.

1.4     **2011 CW Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Bond Claims, Allowed 2011 CW Bond Claims (Assured), and Allowed Retail 2011 CW Bond Claims on account of any such Claims, consisting of (a) One Hundred Forty-Eight Million Eight Hundred Thirty-Three Thousand Seven Hundred Thirty Dollars and Ninety-Five Cents ($148,833,730.95) in Cash, (b) One Hundred Seventy-Nine Million One Hundred Ninety-Three Thousand Four Hundred Twenty-Five Dollars ($179,193,425.00) in original principal amount of New GO CIBs, (c) Eleven Million Eight Hundred Sixty-Four Thousand Five Hundred Ten Dollars and Ninety-Five Cents ($11,864,510.95) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Twenty-Eight Thousand Three Hundred Sixty Dollars and Thirty-Five Cents ($7,728,360.35) in original principal amount of New GO 5.0% CABs, and (e) two and four hundred seventy-nine one thousandths percent (2.479%) of the GO CVIs.

1.5     **2011 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2011 C, issued by the Commonwealth in the original principal amount of Four Hundred Forty-Two Million Fifteen Thousand Dollars ($442,015,000.00), and (b) Notas de Ahorro issued in 2011 in the aggregate outstanding principal amount of Fifty-Three Thousand Eight Hundred Dollars ($53,800.00).

1

1.6    **2011 CW Guarantee Bond Claim:** A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds; provided, however, that, solely for purposes of distribution in accordance with, but not voting with respect to, the Plan, the amount of a holder's 2011 CW Guarantee Bond Claim with respect to the Commonwealth's guarantee of such 2011 PBA Bond Claim shall be calculated as the amount of such holder's 2011 PBA Bond Claim minus the amount of such holder's 2011 PBA Bond Recovery.

1.7    **2011 CW Guarantee Bond Claim (Taxable Election):** A 2011 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim shall be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Guarantee Bond Claim.

1.8    **2011 CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed 2011 CW Guarantee Bond Claims, consisting of (a) Three Hundred Twenty-Three Million Five Hundred Twenty-Three Thousand Nine Hundred Two Dollars and Fifty Cents ($323,523,902.50) in Cash, (b) Three Hundred Eighty-Nine Million Five Hundred Seventeen Thousand Five Hundred Ninety-Two Dollars ($389,517,592.00) in original principal amount of New GO CIBs, (c) Twenty-Five Million Seven Hundred Ninety Thousand Two Hundred Eight Dollars and Forty-Six Cents ($25,790,208.46) in original principal amount of New GO 5.375% CABs, (d) Sixteen Million Seven Hundred Ninety-Nine Thousand Three Hundred Forty-Six Dollars and Seventy-Seven Cents ($16,799,346.77) in original principal amount of New GO 5.0% CABs, and (e) seven and five hundred fifty-two one thousandths percent (7.552%) of the GO CVIs.

1.9    **2011 CW Guarantee Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 39.1 hereof.

1.10    **2011 CW Series D/E/PIB Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, other than a 2011 CW Series D/E/PIB Bond Claim (Assured) or a Retail 2011 CW Series D/E/PIB Bond Claim.

1.11    **2011 CW Series D/E/PIB Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market policy.

1.12    **2011 CW Series D/E/PIB Bond Claim (Taxable Election):** A 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim, the holder of which is a

2

Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim shall be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 Series D/E/PIB CW Bond Claim.

1.13    **2011 CW Series D/E/PIB Bond Recovery**:  The aggregate recovery by holders of Allowed 2011 CW Series D/E/PIB Bond Claims, Allowed 2011 CW Series D/E/PIB Bond Claims (Assured) and Allowed Retail 2011 CW Series D/E/PIB Bond Claims on account of such Claims, consisting of (a) Two Hundred Eleven Million Three Hundred Fifty-Five Thousand Thirty-Five Dollars and Seventy-Four Cents ($211,355,035.74) in Cash, (b) Two Hundred Fifty-Four Million Four Hundred Sixty-Eight Thousand Seventy-Four Dollars ($254,468,074.00) in original principal amount of New GO CIBs, (c) Sixteen Million Eight Hundred Forty-Eight Thousand Four Hundred Ninety-Three Dollars and Eighty-Four Cents ($16,848,493.84) in original principal amount of New GO 5.375% CABs, (d) Ten Million Nine Hundred Seventy-Four Thousand Eight Hundred Fifty Dollars and Thirty Cents ($10,974,850.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred fourteen one thousandths percent (3.514%) of the GO CVIs.

1.14    **2011 CW Series D/E/PIB Bonds**:  Collectively, (a) the Public Improvement Bonds of 2011, issued by the Commonwealth in the original principal amount of Three Hundred Four Million Dollars ($304,000,000.00), (b) the Public Improvement Refunding Bonds, Series 2011D, issued by the Commonwealth in the original principal amount of Fifty-Two Million One Hundred Ninety Thousand Dollars ($52,190,000.00), and (c) the Public Improvement Refunding Bonds, Series 2011E, issued by the Commonwealth in the original principal amount of Two Hundred Forty-Five Million Nine Hundred Fifteen Thousand Dollars ($245,915,000.00).

1.15    **2011 CW Series D/E/PIB Taxable Bond Distribution**:  The distribution to be made to each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 43.1 hereof.

1.16    **2011 CW Taxable Bond Distribution**:  The distribution to be made to each holder of an Allowed 2011 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 37.1 hereof.

1.17    **2011 PBA Bond Claim**:  A Claim against PBA on account of the 2011 PBA Bonds, other than a Retail 2011 PBA Bond Claim.

1.18    **2011 PBA Bond Recovery**:  The aggregate recovery by holders of Allowed 2011 PBA Bond Claims and Allowed Retail 2011 PBA Bond Claims totaling Three Hundred Six Million Seven Hundred Sixty-Eight Thousand Nine Hundred Eleven Dollars and Seventy-Two Cents ($306,768,911.72) in Cash.

1.19　　**2011 PBA Bonds:** Collectively, (a) the Government Facilities Revenue Bonds, Series R, (Qualified School Construction Bonds), issued by PBA in the original principal amount of Seven Hundred Fifty-Six Million Four Hundred Forty-Nine Thousand Dollars ($756,449,000.00), (b) the Government Facilities Revenue Bonds, Series S, issued by PBA in the original principal amount of Three Hundred Three Million Nine Hundred Forty-Five Thousand Dollars ($303,945,000.00), and (c) the Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds), issued by PBA in the original principal amount of One Hundred Twenty-One Million Five Hundred Twenty-Eight Thousand Dollars ($121,528,000.00), the repayment of which is guaranteed by the Commonwealth.

1.20　　**2012 CW Bond Claim:** A Claim against the Commonwealth on account of 2012 CW Bonds, other than a 2012 CW Bond Claim (Assured) or a Retail 2012 CW Bond Claim.

1.21　　**2012 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2012 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.22　　**2012 CW Bond Claim (Taxable Election):** A 2012 CW Bond Claim and Retail 2012 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim shall be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Bond Claim.

1.23　　**2012 CW Bond Recovery**: The aggregate recovery by holders of Allowed 2012 CW Bond Claims, Allowed 2012 CW Bond Claims (Assured), and Allowed Retail 2012 CW Bond Claims on account of any such Claims, consisting of (a) Nine Hundred Nine Million Nine Hundred Twelve Thousand Six Hundred Seventy-Nine Dollars and Seventy-Three Cents ($909,912,679.73) in Cash, (b) One Billion Ninety-Five Million Five Hundred Twenty Thousand Two Hundred Seventy-Seven Dollars ($1,095,520,277.00) in original principal amount of New GO CIBs, (c) Seventy-Two Million Five Hundred Thirty-Five Thousand Ninety-Six Dollars and Ninety-Six Cents ($72,535,096.96) in original principal amount of New GO 5.375% CABs, (d) Forty-Seven Million Two Hundred Forty-Eight Thousand Two Hundred Fifty-One Dollars ($47,248,251.00) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred fifty-seven one thousandths percent (15.157%) of the GO CVIs.

1.24　　**2012 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2012 A, issued by the Commonwealth in the original principal amount of Two Billion Three Hundred Eighteen Million One Hundred Ninety Thousand Dollars ($2,318,190,000.00), (b) the Public Improvement Refunding Bonds, Series 2012 B, issued by the Commonwealth in the original principal amount of Four Hundred Fifteen Million Two Hundred Seventy Thousand Dollars ($415,270,000.00), (c) the GSA Helicopter Loan, (d) Hacienda loans (Loan ID Nos. 200017-215-001-003-47, 200017-215-001-003-48, 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding

principal amount of One Hundred Sixty-Nine Million Four Hundred Thirty-Eight Thousand Thirty-Seven Dollars and Seventy-Six Cents ($169,438,037.76) and (e) Notas de Ahorro issued in 2012 in the outstanding principal amount of Two Million Five Hundred Thirty-Three Thousand Fifty Dollars ($2,533,050.00).

1.25     **2012 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2012 up to and including December 31, 2013, and (b) the 2012 PBA Bonds; provided, however, that, solely for purposes of distribution under, but not voting with respect to, the Plan, the amount of a holder's 2012 CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of such 2012 PBA Bonds shall be measured as the amount of such holder's 2012 PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of 2012 PBA Bonds.

1.26     **2012 CW Guarantee Bond Claim (Taxable Election):**  A 2012 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim shall be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Guarantee Bond Claim.

1.27     **2012 CW Guarantee Bond Recovery:**  The aggregate recovery by holders of Allowed 2012 CW Guarantee Bond Claims, consisting of (a) One Hundred Forty-Nine Million Seven Hundred Thousand Twenty-Seven Dollars and Twenty-Four Cents ($149,700,027.24) in Cash, (b) One Hundred Eighty Million Two Hundred Thirty-Six Thousand Four Hundred Thirty-Four Dollars ($180,236,434.00) in original principal amount of New GO CIBs, (c) Eleven Million Nine Hundred Thirty-Three Thousand Five Hundred Sixty-Nine Dollars and Fifty-Four Cents ($11,933,569.54) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Seventy-Three Thousand Three Hundred Forty-Four Dollars and Thirty Cents ($7,773,344.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred ninety-four one thousandths percent (3.594%) of the GO CVIs.

1.28     **2012 CW Guarantee Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 49.1 hereof.

1.29     **2012 CW Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2012 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 47.1 hereof.

1.30     **2012 PBA Bond Claim:**  A Claim against PBA on account of 2012 PBA Bonds, other than a Retail 2012 PBA Bond Claim.

1.31     **2012 PBA Bond Recovery:**  The aggregate recovery by holders of Allowed 2012 PBA Bond Claims, and Allowed Retail 2012 PBA Bond Claims on account of such Claims, One Hundred Fifty-Four Million Eight Hundred Ninety-Nine Thousand Nine Hundred Two Dollars and Twenty-Three Cents ($154,899,902.23) in Cash.

1.32     **2012 PBA Bonds:**  Collectively, the Government Facilities Revenue Refunding Bonds, Series U, issued by PBA in the original principal amount of Five Hundred Eighty-Two Million Three Hundred Forty-Five Thousand Dollars ($582,345,000.00).

1.33     **2014 CW Bond Claim:**  A Claim against the Commonwealth on account of the 2014 CW Bonds, other than a Retail 2014 CW Bond Claim.

1.34     **2014 CW Bond Claim (Taxable Election):**  A 2014 CW Bond Claim and Retail 2014 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim shall be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Bond Claim.

1.35     **2014 CW Bond Recovery:**  The aggregate recovery by holders of Allowed 2014 CW Bond Claims, Allowed 2014 CW Guarantee Bond Claims and Allowed Retail 2014 CW Bond Claims on account of any such Claims, consisting of (a) One Billion Two Hundred Thirteen Million Four Hundred Seventy-Eight Thousand Eight Hundred Seventy-Seven Dollars and Thirty-Five Cents ($1,213,478,877.35) in Cash, (b) One Billion Four Hundred Sixty-One Million Nine Thousand One Hundred Twelve Dollars ($1,461,009,112.00) in original principal amount of New GO CIBs, (c) Ninety-Six Million Seven Hundred Thirty-Four Thousand Three Hundred Forty-Six Dollars ($96,734,346.00) in original principal amount of New GO 5.375% CABs, (d) Sixty-Three Million Eleven Thousand Two Hundred Seventy Dollars and Ninety-One Cents ($63,011,270.91) in original principal amount of New GO 5.0% CABs, and (e) twenty and two hundred sixty-six one thousandths percent (20.266%) of the GO CVIs.

1.36     **2014 CW Bonds:**  Collectively, the General Obligation Bonds of 2014, Series A, issued by the Commonwealth in the original principal amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00).

1.37     **2014 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality, which guarantee was executed, delivered or enacted during the period from January 1, 2014 up to, but not including, the Commonwealth Petition Date, (b) the Ports bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of Two Hundred Twenty-Five Million Five Hundred Thirty-Three Thousand Seven Hundred Dollars and Forty-Five Cents ($225,533,700.45), and (c) PRIFA BANs, Series 2015, which, as of the

Commonwealth Petition Date, were in the outstanding principal amount of Seventy-Eight Million
One Hundred Forty-Five Thousand Dollars ($78,145,000.00).

1.38     **2014 CW Guarantee Bond Claim (Taxable Election):**  A 2014 CW Guarantee
Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive
a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions
are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in
excess of the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee Bond Claim
shall be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee
Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder
thereof shall be a 2014 CW Guarantee Bond Claim.

1.39     **2014 CW Guarantee Taxable Bond Distribution:**  The distribution to be made
to each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) in accordance
with the terms and provisions of Section 54.1 hereof.

1.40     **2014 CW Taxable Bond Distribution:**  The distribution to be made to each
holder of an Allowed 2014 CW Bond Claim (Taxable Election) in accordance with the terms and
provisions of Section 52.1 hereof.

1.41     **5.5% SUT:**  The present and future revenues and collections generated by the
portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

1.42     **AAFAF:**  Autoridad de Asesoría Financiera y Agencia Fiscal, a public
corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico
Fiscal Agency and Financial Advisory Authority.

1.43     **ACR Order:**  That certain Order (A) Authorizing Administrative Reconciliation
of Claims, (B) Approving Additional Form of Notice and (C) Granting Related Relief, dated
March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.44     **Act 106:**  Act 106 of 2017, which created the pay-as-you-go pension system
known as "PayGo" and established a defined contribution retirement system to replace the
retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act 3-2013, as
amended, and Act 160-2013, as amended.

1.45     **Act 106 Board:**  The board created in accordance with Act 106.

1.46     **Active and Retired Employee Benefit Claim:**  A Retired ERS Participant
Below-Threshold Claim, a Retired JRS Participant Below-Threshold Claim, a Retired TRS
Participant Below-Threshold Claim, a Retired ERS Participant Above-Threshold Claim, a Retired
JRS Participant Above-Threshold Claim, a Retired TRS Participant Above-Threshold Claim, an
Active ERS Participant Claim, an Active JRS Participant Claim, an Active TRS Participant Claim,
a System 2000 Participant Claim, a VTP Payroll Participant Below-Threshold Claim, and a VTP
Payroll Participant Above-Threshold Claim.

1.47    **Active ERS Participant Claim:** An ERS Participant Claim held by an Active Participant, expressly excluding, however, any Participant benefitting from the provisions of either Act 70-2010 or Act 211-2015.

1.48    **Active JRS Participant Claim:** A JRS Participant Claim held by an Active Participant.

1.49    **Active Participant:** A Participant that is not a Retiree.

1.50    **Active TRS Participant Claim:** A TRS Participant Claim held by an Active Participant.

1.51    **Administrative Claim Bar Date:** Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order.

1.52    **Administrative Expense Claim:** A Claim against the Debtors or their Assets constituting a cost or expense of administration of the Title III Cases asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and PSA Restriction Fees; provided, however, that, under no circumstances shall an Administrative Expense Claim include the PBA Administrative Expense Claim.

1.53    **ADR Order:** That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.54    **ADR Procedures:** The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.55    **Affiliate:** With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.56    **AFICA:** Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority.

1.57    **AFSCME**: American Federation of State, County and Municipal Employees, for itself and on behalf of its two local chapters, SPU, AFSCME Council 95 and Capitulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico.

1.58    **AFSCME CBAs:** Those certain collective bargaining agreements between AFSCME and the Commonwealth, and listed on Exhibit "G" hereto.

1.59    **AFSCME Claims:** A Claim arising from or related to the AFSCME CBAs.

1.60    **AFSCME Plan Support Agreement:** That certain Plan Support Agreement, dated as of June 7, 2019, by and among the Oversight Board, the Commonwealth and AFSCME, as may be amended from time to time.

1.61    **AFSCME Term Sheet:** The term sheet annexed as Exhibit "A" to the AFSCME Plan Support Agreement.

1.62    **Allowed:** With respect to any Claim, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtors in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the Commonwealth Petition Date and any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law. Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.63    **Allowed Claim:** A Claim, to the extent it is or has become Allowed.

1.64    **Ambac:** Ambac Assurance Corporation or its successor or designee.

1.65 **Ambac Acceleration Price:** A price equal to the outstanding principal amount of an Ambac Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.66 **Ambac Action:** The litigation styled <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.,</u> currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV01505.

1.67 **Ambac Certificates:** The certificate(s) or receipt(s) to be issued by Ambac to beneficial holders of GO Bonds which are deposited into the Ambac Trust.

1.68 **Ambac Commutation Consideration:** A combination of some or all of the following selected at Ambac's sole discretion no later than twenty-one (21) days prior to the Ballot Date: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage, to be determined at Ambac's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to Ambac in accordance with the terms and provisions of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.69 **Ambac Commutation Treatment:** The treatment set forth in Section 75.5(a) hereof.

1.70 **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.71 **Ambac Escrow Account:** A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, as the case may be, for the benefit of the beneficial holders of Ambac Insured Bonds whose Ambac Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.72 **Ambac Insured Bond Claims:** Collectively, the Claims against the Commonwealth or PBA, as applicable, arising from the Ambac Insured Bonds, including, any Vintage CW Bond Claims (Ambac), Vintage CW Guarantee Bond Claims (Ambac), and Vintage PBA Bond Claims (Ambac).

1.73 **Ambac Insured Bonds:** Collectively, the Vintage CW Bonds and the Vintage PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.74 **Ambac Insurance Policies:** The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.75 **Ambac Plan Consideration:** The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims, the CW/HTA Clawback Recovery allocable to holders of the Allowed Ambac CW/HTA Claims, the CW/CCDA Clawback Recovery allocable to holders of Allowed Ambac CW/CCDA Claims, and the CW/PRIFA Clawback Recovery allocable to holders of Allowed Ambac CW/PRIFA Rum Tax Claims, as the case may be.

1.76    **Ambac Trust:** With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.77    **Ambac Trust Assets:** Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) distributions to be made in respect of such Ambac Insured Bonds, and (c) the Ambac Insurance Policies.

1.78    **Ambac CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.79    **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.80    **Ambac CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured or otherwise owned (by subrogation or otherwise by Ambac including pursuant to a secondary market insurance policy.

1.81    **AMPR:** Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.

1.82    **Appointments Related Litigation:** Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States Adv. Proc. No. 18-00041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montanez, et al. v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.83    **Assets:** With respect to the Debtors, (i) all "property" of the Debtors, including, without limitation, such property as it may be reflected on the Debtors' books and records and the Confirmation Order as of the Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtors or other authorized representative for the benefit of the Debtors and its Creditors, unless modified or released pursuant to the Plan or a Final Order, including, without limitation, any Avoidance Action.

1.84    **Assured:** Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.85     **Assured Acceleration Price:**  A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.86     **Assured Acceleration Price Payment Option:**  Assured's option in accordance with Section 75.1 hereof, if either (a) at or prior to the time of pricing of Assured New GO Bonds with respect to which Assured has exercised the Assured Election, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (b) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, to elect, in its sole discretion, to pay the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election and to receive, on the Effective Date, the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash or other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.

1.87     **Assured Bondholder Elections:**  Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 75.1 hereof in the event Assured does not exercise the Assured Election.

1.88     **Assured Bondholder Elections Form:**  The "Form of Election Notice for Certain Bondholders with Respect to Classes 2, 17, 24 and 42" attached as Schedule 5(a) to the Disclosure Statement Order.

1.89     **Assured CVIs:**  Collectively, the CVIs allocable to holders of Assured Insured Bond Claims.

1.90     **Assured CW/Convention Center Claims:**  Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.91     **Assured CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.92     **Assured CW/PRIFA Rum Tax Claims:**  Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured by Assured including pursuant to a secondary market insurance policy.

1.93     **Assured Election:**  Assured's rights, as set forth in Section 75.1 hereof, to receive the Cash and the CVIs allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of Assured

Insured Bonds, which Assured New GO Bonds shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, cause amounts equal to such deficiency to be paid by Assured in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.94 **Assured Election Notice:** The "Assured Election Notice" attached as Schedule 5(b) to the Disclosure Statement Order.

1.95 **Assured Insurance Policies:** The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.96 **Assured Insured Bond Claim:** A Claim against the Commonwealth or the PBA, as applicable, on account of an Assured Insured Bond, including a Vintage CW Bond Claim (Assured), 2011 CW Bond Claim (Assured), 2011 CW Series D/E/PIB Bond Claim (Assured) 2012 CW Bond Claim (Assured), Vintage CW Guarantee Bond Claim (Assured), or a Vintage PBA Bond Claim (Assured).

1.97 **Assured Insured Bondholder:** The beneficial holder of an Assured Insured Bond.

1.98 **Assured Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

1.99 **Assured New GO Bonds:** The New GO Bonds allocable to holders of Assured Insured Bond Claims.

1.100 **Assured New Securities:** Collectively, the Assured New GO Bonds and the Assured CVIs.

1.101 **Assured Plan Consideration:** The consideration allocable or distributable to holders of Allowed Assured Insured Bond Claims.

1.102 **Assured Treatment:** The treatment of Assured Insured Bond Claims set forth in Section 75.1 hereof.

1.103 **Avoidance Actions:** Collectively, (a) those avoidance, recovery, subordination or other actions or remedies identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, against any Entity that have been brought by or on behalf of the Debtors against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and

13

553 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit "B" hereto, as such Exhibit "B" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, and (c) all similar Causes of Action that are currently subject to tolling agreements with the Commonwealth and/or ERS; provided, however, that under no circumstances shall "Avoidance Actions" include (x) any Claim or Cause of Action against any Entity relating to CW Bond Claims, PBA Bond Claims, CW Guarantee Bond Claims, or PRIFA BANs (other than the Claims and Causes of Action in the SCC Action and the related tolling agreements), (y) any Claim or Cause of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, which shall terminate upon entry of the Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entitles Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, which shall terminate upon entry of the Confirmation Order.

1.104    **Avoidance Actions CW Interests**:  The tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the CW GUC Recovery and relating only to net recoveries attributable to Avoidance Actions relating to the Commonwealth Title III Case.

1.105    **Avoidance Actions ERS Interests**:  The tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the ERS GUC Pool and relating only to net recoveries attributable to Avoidance Actions relating to the ERS Title III Case.

1.106    **Avoidance Actions Trust**:  The trust to be created on or prior to the Effective Date into which on the Effective Date shall be transferred the authority to litigate or compromise and settle the Avoidance Actions.

1.107    **Avoidance Actions Trust Agreement**:  The agreement to be executed and delivered on or prior to the Effective Date providing for, among other things, the ongoing litigation of the Avoidance Actions, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

1.108    **Avoidance Actions Trust Assets**:  Collectively, (a) the Avoidance Actions, (b) funds held in escrow as of the Effective Date relating to the compromise and settlement of certain avoidance actions prior to the Effective Date (net of expenses incurred by the escrow agent with respect thereto), and (c) such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth in the respective litigations listed on Exhibit "B" hereto.

1.109     **Avoidance Actions Trust Beneficiaries:**  Collectively, the holders of Avoidance Actions CW Interests and Avoidance Actions ERS Interests.

1.110     **Avoidance Actions Trust Board:**  The three (3) member board appointed as of the Effective Date to govern the Avoidance Actions Trust, with (a) two (2) directors selected by the Creditors' Committee and (b) one (1) director selected by the Oversight Board.

1.111     **Avoidance Actions Trust Interests:**  Collectively, the Avoidance Actions CW Trust Interests and the Avoidance Actions ERS Trust Interests.

1.112     **Avoidance Actions Trustee:**  The trustee appointed by the Avoidance Actions Trust Board, by a simple majority vote of such board, on or prior to the Effective Date in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, including, without limitation, any successor thereto.

1.113     **Ballot Date:**  The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the Plan.

1.114     **Ballot/Election Form:**  The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the Plan.

1.115     **Bankruptcy Code:**  The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

1.116     **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

1.117     **Bar Date:**  The respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against a Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

1.118     **Bar Date Orders:**  The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtors or their Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof  [Case No. 17-3283-LTS, ECF No. 3160], and (c) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 19-5523-LTS, ECF No. 55].

1.119 **Base Contribution:** One Hundred Seventy-Five Million Dollars ($175,000,000.00), the amount the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve in accordance with the terms and provisions of Section 83.2 of the Plan; provided, however, that, in the event that, for any of (a) the FY in which the Effective Date occurs and (b) the following nine (9) FYs, the Projected Fiscal Plan Surplus is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000.00), such contribution amount shall increase to an amount equal to fifty percent (50%) of the Projected Fiscal Plan Surplus.

1.120 **Bond Claim:** A Claim on account of a GO Bond, a PBA Bond, a CW Guarantee Bond Claim, or an ERS Bond with the amount of such Claim being calculated as the outstanding principal amount of such bonds plus any, accrued and unpaid interest thereon, up to, but not including, the respective Petition Date for (a) a GO Bond, the Commonwealth Petition Date, (b) a PBA Bond, the PBA Petition Date, (c) a CW Guarantee Bond Claim, the Commonwealth Petition Date, and (d) an ERS Bond, the ERS Petition Date.

1.121 **Bond Recovery Category:** Collectively, the categories set forth on Exhibit "L" hereto relating to the respective Classes of Claims and the distributions to be made thereto pursuant to the terms and provisions of the Plan.

1.122 **Bondholder Election:** The right of holders of Allowed ERS Bond Claims to purchase the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the provisions of Section 69.2(b) hereof.

1.123 **Business Day:** A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

1.124 **Capital Improvements:** Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including, without limitation, buildings, park facilities, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

1.125 **Cash:** Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.126 **Causes of Action:** All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code,

16

whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

1.127    **CCDA:**  Puerto Rico Convention Center District Authority.

1.128    **CCDA Bonds:**  Collectively, the non-recourse bonds issued by CCDA, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00), in accordance with the terms of that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, as supplemented and amended from time to time.

1.129    **CCDA Bond Claims:**  Collectively, the Claims against CCDA arising from or relating to the CCDA Bonds.

1.130    **CCDA Consummation Costs:**  Collectively, the amounts set forth in Section 3.8 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and conditions of the HTA/CCDA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.131    **CCDA Restriction Fee Creditors:**  Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors holding and/or insuring (without duplication) CCDA Bond Claims that execute, or have executed, the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement relating thereto at or prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA Threshold Attainment is reached with respect to CCDA Bond Claims shall be considered CCDA Restriction Fee Creditors.

1.132    **CCDA Restriction Fee Percentage:**  The percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs divided by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by CCDA Restriction Fee Creditors.

1.133    **CCDA Trustee:**  The Bank of New York Mellon, solely in its capacity as successor trustee with respect to the CCDA Bonds.

1.134    **Charging Lien:**  A lien or right to priority of payment to which any Trustee/Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the Effective Date.

1.135    **Claim:**  Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.136    **Class:**  A category of holders of Claims set forth in Article IV of the Plan.

1.137    **Clawback Actions:**  Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

1.138    **Clawback CVI Indenture:**  The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Clawback CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.139    **Clawback CVIs:**  Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, including, without limitation, Exhibit "J" hereto, the Confirmation Order, the Clawback CVI Indenture and the CVI Legislation.

1.140    **Clawback Recovery:**  The aggregate recovery by holders of Allowed CW/Convention Center Claims, Allowed CW/HTA Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, consisting of Clawback CVIs distributed to holders of such Claims hereunder and subject to the Annual Payment Waterfall, as defined in Exhibit "J" hereto and as set forth in Section 74.2(a) hereof and Exhibit "J" hereto.

1.141    **COFINA:**  Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth.

1.142    **COFINA Bonds:**  Collectively, the securities issued by COFINA pursuant to the COFINA Plan, the COFINA Confirmation Order, the COFINA Bonds Legislation and the COFINA Bonds Indenture.

1.143    **COFINA Bonds Indenture:**  The trust indenture pursuant to which COFINA issued the COFINA Bonds, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

1.144    **COFINA Bonds Legislation:**  Act 241 of the Legislative Assembly of Puerto Rico, approved November 15, 2018, amending Act 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended.

1.145    **COFINA Confirmation Order:**  That certain Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019 [Case No. 17-3284-LTS, ECF. No. 561].

1.146    **COFINA Plan:**  That certain Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated January 9, 2019 [Case No. 17-3284-LTS, ECF. No. 436].

1.147    **Committee Agreement:**  That certain letter agreement, dated July 12, 2021, between the Creditors' Committee and the Oversight Board.

1.148    **Commonwealth:**  The Commonwealth of Puerto Rico.

1.149    **Commonwealth Constitution:**  The Constitution of the Commonwealth of Puerto Rico.

1.150    **Commonwealth Election:**  The right of the Commonwealth to purchase the Private Equity Portfolio and the interest in the ERS Trust in accordance with the provisions of Section 66.2(a) hereof.

1.151    **Commonwealth Instrumentality Plan:**  A plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan of adjustment or Title VI Qualifying Modification for HTA, CCDA, or PRIFA.

1.152    **Commonwealth Legislature:**  The Legislative Assembly of Puerto Rico.

1.153    **Commonwealth Petition Date:**  May 3, 2017.

1.154    **Commonwealth Title III Case:**  The Title III case under PROMESA pending for the Commonwealth in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al., Case No. 17-3283-LTS (D.P.R.).

1.155    **Comprehensive Cap:**  The limitation on Maximum Annual Debt Service payable on Net Tax-Supported Debt, established pursuant to the Debt Responsibility Act and the Debt

Management Policy, which shall apply in addition to the limitation imposed on the incurrence of public Debt established pursuant to the Article VI, Section 2 of the Commonwealth Constitution.

1.156    **Confirmation Date:**  The date on which the Clerk of the Title III Court enters the Confirmation Order on the docket.

1.157    **Confirmation Hearing:**  The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.158    **Confirmation Order:**  The order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.159    **Constitutional Debt Group:**  The Ad Hoc Group of Constitutional Debtholders consisting of the Constitutional Debt Group Members, as such membership may change from time to time.

1.160    **Constitutional Debt Group Members:**  BlackRock Financial Management Inc., Brigade Capital Management, EMSO Asset Management Limited, Mason Capital Management, LLC, Silver Point Capital, L.P., and VR Advisory Services Ltd., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.161    **Consummation Costs:**  Collectively, the CCDA Consummation Costs and the GO/PBA Consummation Costs.

1.162    **Convenience Cap:**  Sixty-Five Million Dollars ($65,000,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims (whether against the Commonwealth or ERS), unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing.

1.163    **Convenience Claim:**  An Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim, as the case may be, to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 72.1 hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims (whether against the Commonwealth or ERS) shall be Sixty-Five Million Dollars ($65,000,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of

the Confirmation Hearing in its sole and absolute discretion; and, <u>provided</u>, <u>further</u>, that, in the event that such Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.164 **Creditor:** Any Entity holding a Claim against the Debtors or any Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtors, including, without limitation, a Claim against the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.165 **Creditors' Committee:** The statutory committee of unsecured claimholders appointed in, among other cases, the Commonwealth Title III Case, the ERS Title III Case and the HTA Title III Case.

1.166 **CRIM:** Centro de Recaudacion de Ingresos Municipales or Municipal Revenue Collection Center.

1.167 **CUSIP:** The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.168 **Custodial Trust Documents:** Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of (a) the HTA Effective Date and relating to (i) the HTA Bonds insured by Assured and National, if applicable, and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Assured, and National, as the case may be, and (ii) the HTA Bonds insured by FGIC and Ambac and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance satisfactory to the Oversight Board, FGIC, and Ambac, as the case may be, and (b) the PRIFA Effective Date and relating to (i) the PRIFA Bonds insured by Ambac, Assured and FGIC, if applicable, and the distributions to be made in accordance with the PRIFA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Ambac, and FGIC.

1.169 **CVIs:** Collectively, GO CVIs and the Clawback CVIs.

1.170 **CVI Indenture:** Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.171 **CVI Legislation:** Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation.

1.172 **CVI Payment Reserve:** To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the

terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, Cash payable from the HTA Clawback CVI to be held in reserve by the Clawback CVI paying agent or the CVI Trustee, as the case may be, pursuant to the Trust Documentation and the Clawback CVI Indenture in an amount equal to the difference of (a) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds <u>minus</u> (b) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

1.173    **CVI Trustee:**  The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

1.174    **CW Appropriations Claims:**  Collectively, the Claims against the Commonwealth arising from or related to indebtedness only payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions, including, without limitation, (a) notes from the Commonwealth or its agencies or instrumentalities held by PFC for the repayment of PFC indebtedness and (b) loans only payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Debt Recovery Authority or the GDB Public Entity Trust; <u>provided</u>, <u>however</u>, that "CW Appropriations Claims" shall not include the PBA Administrative Expense Claim.

1.175    **CW Bond Claims:**  Collectively, the Claims against the Commonwealth arising from or relating to the GO Bonds, including the Vintage CW Bond Claims, the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the CW Bond Claims (Insured), and the Retail CW Bond Claims.

1.176    **CW Bond Claims (Insured):**  Collectively, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), the Vintage CW Bond Claims (National), the Vintage CW Bond Claims (FGIC), the Vintage CW Bond Claims (Syncora), the 2011 CW Bond Claims (Assured), the 2011 CW Series D/E/PIB Bond Claims (Assured), and the 2012 CW Bond Claims (Assured).

1.177    **CW Fiscal Plan:**  That certain Fiscal Plan of the Commonwealth, certified by the Oversight Board on May 27, 2020.

1.178    **CW General Unsecured Claim:**  A Claim against the Commonwealth; <u>provided</u>, <u>however</u>, that, under all circumstances, "CW General Unsecured Claim" shall not include (a) a PBA Bond Claim, (b) a CW Bond Claim, (c) a CW Guarantee Bond Claim, (d) an Active and Retired Employee Benefits Claim, (e) an AFSCME Claim, (f) a CW/HTA Claim, (g) a CW/Convention Center Claim, (h) a CW/PRIFA Rum Tax Claim, (i) a CW/MBA Claim, (j) an Energy Incentive Claim, (k) an Eminent Domain/Inverse Condemnation Claim, (l) a Med Center Claim, (m) a Dairy Producer Claim, (n) a Tax Credit Claim, (o) a CW Appropriations Claim, (p) a

22

Section 510(b) Subordinated Claim, (q) a Gracia Gracia Claim, (r) a Late-Filed Claim, (s) a Convenience Claim, (t) a Federal Claim, (u) any Claim that is eligible to be transferred into or administered through the ACR process, (v) the Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any related proofs of claim asserting claims related to the litigation styled Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department, Case No. KAC-2007-4170, (w) all claims for retiree benefits (including, without limitation, those portions of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless of whether such claims are asserted by retirees or active employees and regardless of whether of such claims are asserted through litigation or administrative proceedings, but excluding claims for any increased pension payments that would have been payable prior to adjudication of such claims (i.e., pension "back pay") and only up to the amount related to unpaid pensions, (x) all Claims against the Commonwealth by any Governmental Unit (as defined in section 101 of the Bankruptcy Code), including the United States government, any State government, foreign government, any municipality (whether of the Commonwealth or otherwise), the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted directly by such Governmental Unit or indirectly or derivatively by any other entity, including, without limitation, any Claims by the GDB asserted by or though the GDB Debt Recovery Authority, (y) any unsecured deficiency claims with respect to asserted priority and/or secured claims, or (z) such other Claim determined by the Title III Court not to be a CW General Unsecured Claim.

1.179 **CW Guarantee Bond Claims:** Collectively, the Vintage CW Guarantee Bond Claims, the 2011 CW Guarantee Bond Claims, the 2012 CW Guarantee Bond Claims, the 2014 CW Guarantee Bond Claims and the CW Guarantee Bond Claims (Insured).

1.180 **CW Guarantee Bond Claims (Insured):** Collectively, the Vintage CW Guarantee Bond Claims (Ambac), the Vintage CW Guarantee Bond Claims (Assured), the Vintage CW Guarantee Bond Claims (National), the Vintage CW Guarantee Bond Claims (FGIC), and the Vintage CW Guarantee Bond Claims (Syncora).

1.181 **CW GUC Recovery:** The aggregate recovery available to holders of Allowed CW General Unsecured Claims, consisting of (a) Net CW Cash Consideration (funded in accordance with the terms and provisions of Section 62.3 hereof, including, without limitation, any adjustments in accordance with the terms of the final proviso thereof) plus (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.

1.182 **CW/Convention Center Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.183    **CW/Convention Center Clawback Recovery:**  The aggregate recovery by
holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%)
of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.184    **CW/HTA Claim:**  The Claim against the Commonwealth arising from or related
to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the
provisions of the Commonwealth Constitution, any statute, regulation, or executive order,
including, without limitation, claims asserted on account of the GDB HTA Loans and claims
related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth
Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and
Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-
18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain
(i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February
26, 1998.

1.185    **CW/HTA Clawback Recovery:**  The aggregate recovery by holders or insurers
of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the
Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.186    **CW/MBA Claim:**  The Claim against the Commonwealth arising from or related
to the Commonwealth's retention of certain funds historically transferred to MBA related to the
rights or obligations arising under the provisions of the Commonwealth Constitution, any statute,
regulation, or executive order.

1.187    **CW/MBA Clawback Recovery:**  The aggregate recovery by holders of Allowed
CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, as
presented within Annex 4 of Exhibit "J" annexed hereto.

1.188    **CW/PRIFA Rum Tax Claim:**  The Claim against the Commonwealth arising
from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA
pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive
order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI
of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico
Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the
indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1,
1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

1.189    **CW/PRIFA Rum Tax Clawback Recovery:**  The aggregate recovery by holders
or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%)
of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto, as may be
adjusted in accordance with the Rum Tax CVI pursuant to the terms and conditions of the CVI
Indenture.

1.190    **Dairy Producer Claim:**  Collectively, the Claims of Suiza Dairy, Inc. and
Vaquería Tres Monjitas, Inc. arising from and relating to the Dairy Producer Settlement, which, as
of the Effective Date, shall be (a) allowed in the aggregate amount of Sixty-Two Million Three

24

Hundred Twenty-Three Thousand Six Hundred Thirty-Nine Dollars and Twenty-Two Cents ($62,323,639.22), and (b) allocated to Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. in the amounts of Forty-Five Million Three Hundred Twenty-Five Thousand One Hundred Fifty-One Dollars and Twenty-Two Cents ($45,325,151.22) and Sixteen Million Nine Hundred Ninety-Eight Thousand Four Hundred Eighty-Eight Dollars ($16,998,488.00), respectively.

1.191    **Dairy Producer Settlement:**  The Final Settlement Agreement and Memorandum of Understanding Between the Parties, filed October 29, 2013, in the litigation styled Vaquería Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al., Civil Case No.: 04-1840 (DRD), then pending in the United States District Court for the District of Puerto Rico.

1.192    **Debt:**  Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money.

1.193    **Debt Management Policy:**  The policy developed by AAFAF, relating to the issuance of indebtedness, as more fully described in the Debt Responsibility Act and herein.

1.194    **Debtors:**  Collectively, the Commonwealth, ERS and PBA.

1.195    **Debt Policy Period:**  The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

1.196    **Debt Policy Revenues:**  Collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, including, without limitation, any such revenue assigned to, or owned by, COFINA or any other  instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan, (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further,  that, for purposes of illustration, with respect to FY2020, and as reflected in the CW Fiscal Plan, "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

1.197    **Debt Related Objections:**  Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee,

and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No. 10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without limitation, litigations or actions commenced to recover principal and/or interest with respect to the GO Bonds, the PBA Bonds and/or the PRIFA BANs, and (ii) any other objections or joinders to these or other such objections or joinders to these or such other objections or notices of participation that support the relief requested in such objections filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond Claims, and the PBA Bond Claims.

1.198   **Debt Responsibility Act:**  Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms of the GO/PBA Plan Support Agreement.

1.199   **Debt Service Fund:**  The fund to be created pursuant to the New GO Bonds Indenture, and held by the New GO Bonds Trustee in trust for the benefit of the holders of the New GO Bonds, into which the Commonwealth shall deposit monthly such amounts equal to (a) one-sixth (1/6) of the semi-annual obligation with respect to the payment of interest to accrue on

the New GO Bonds through the next interest payment date, and (b) one-twelfth (1/12) of the annual obligation with respect to the payment of principal and accreted value on the New GO Bonds.

1.200 **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.201 **Deemed Issuance Date:** The earlier to occur of (a) July 1, 2021 and (b) the Effective Date.

1.202 **Definitive Documents:** Collectively, the definitive documents and agreements contemplated by the Plan, including, without limitation, (a) the Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and pleadings in support of entry thereof, (c) the New GO Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New GO Bonds, (e) the CVI Indenture and documents or agreements related thereto, (f) the form of the CVIs, (g) the documents or agreements related to the Pension Reserve and the governance thereof, and (h) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured, National, Ambac, FGIC, and Syncora, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors' Committee.

1.203 **Disallowed:** With respect to any Claim, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or undisputed and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the holder thereof.

1.204 **Disbursing Agent:** Such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan.

1.205 **Disclosure Statement:** The disclosure statement relating to the Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA.

1.206 **Disclosure Statement Hearing:** The hearing held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.207 **Disclosure Statement Order:** The order of the Title III Court (a) approving the form of the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to

Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions hereunder, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

      1.208    **Disputed Claim:**  A Claim against the Debtors or their Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

      1.209    **Distribution Date:**  Except as otherwise set forth herein, the date or dates determined by the Commonwealth, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

      1.210    **Distribution Record Date:**  The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the Plan through The Depository Trust Company.

      1.211    **Effective Date:**  The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

      1.212    **Eminent Domain/Inverse Condemnation Claim:**  A Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto, or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use by one of the Debtors without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

      1.213    **Eminent Domain Proceeding:**  A condemnation action or proceeding commenced by the Commonwealth or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A §2905 to obtain title to real property located on Puerto Rico.

      1.214    **Energy Incentive Act:**  The Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019.

1.215 **Energy Incentive Claims:** Collectively, any and all Claims arising from or related to the Energy Incentive Act, also known as the Puerto Rico Green Energy Incentives Act, in connection with promoting the production of the renewable energy.

1.216 **Entity:** A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.217 **ERS:** Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

1.218 **ERS Bond Claim:** A Claim arising from or related to the ERS Bonds, including, without limitation, interest accrued thereon during the period up to, but not including, the ERS Petition Date.

1.219 **ERS Bond Recovery:** The aggregate recovery by holders of Allowed ERS Bond Claims, consisting of (a) Three Hundred Seventy-Three Million Dollars ($373,000,000.00), (b) the right to receive the proceeds of the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in the event the Commonwealth or one or more holders of Allowed ERS Bond Claims purchases the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in accordance with the terms and provisions of Section 69.2 hereof, and (c) in the event the Commonwealth does not elect to purchase such assets in accordance with Section 69.2(a) hereof, the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio.

1.220 **ERS Bonds:** Collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million Six Hundred Ninety-Eight  Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

1.221 **ERS Fiscal Agent:** The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the ERS Bonds.

1.222    **ERS General Unsecured Claim:**  A Claim against ERS other than an ERS Bond Claim.

1.223    **ERS GUC Pool:**  The sum of (a) Five Hundred Thousand Dollars ($500,000.00) in Cash <u>plus</u> (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests; <u>provided</u>, <u>however</u>, that, under no circumstances, shall such aggregate amount of consideration, including, without limitation, net recoveries from the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, exceed Five Million Dollars ($5,000,000.00); and, <u>provided</u>, <u>further</u>, that, in the event that the aggregate amount of the ERS GUC Pool (y) exceeds the aggregate amount of Allowed ERS General Unsecured Claims or (z) would exceed Five Million Dollars ($5,000,000.00) but for the limitation on recovery above, such excess amount or Avoidance Actions ERS Interests, as the case may be, shall be reallocated, on a pro rata basis, for the benefit of holders of Allowed CW General Unsecured Claims.

1.224    **ERS Litigation:**  Collectively, the litigation styled (a) <u>Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Co., et al.</u>, Case Nos. 19-1699, 19-1700 (appealed from Adv. Proc. No. 19-00213), currently pending in the United States Court of Appeals for the First Circuit, (b) <u>Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Andalusian Global Designated Activity Co., et al.</u>, Adv. Proc. No. 19-00366, currently pending in the Title III Court, (c) Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico, dated March 12, 2019 [Case No. 17-3283-LTS, ECF No. 5580], currently pending in the Title III Court, (d) Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth, dated April 23, 2019 [Case No. 17-3283-LTS, ECF No. 6482], currently pending in the Title III Court, (e) <u>Special Claims Committee of the Financial Oversight & Management Board for Puerto Rico, et al., v. Jefferies, LLC, et al.</u>, Adv. Proc. No. 19-00355, currently pending in the Title III Court, (f) Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, as Fiscal Agent (Claim No. 16775), dated May 22, 2019, and as supplemental on January 6, 2020 [Case No. 17-3283-LTS, ECF Nos. 7075 and 9700], currently pending in the Title III Court, (g) <u>Andalusian Global Designated Activity Co., et al., v. Financial Oversight & Management Board for Puerto Rico, et al.</u>, Case No. 20-1065, currently pending in the United States Court of Appeals for the First Circuit, (h) <u>Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Glendon Opportunities Fund, L.P. et al.</u>, Adv. Proc. No. 19-00367, currently pending in the Title III Court, (i) Objection of Financial Oversight and Management Board Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Proof of Claim Against ERS by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16777), dated January 6, 2020 [Case No. 17-3283-LTS, ECF No. 9701], currently pending in the Title III Court, (j) <u>Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.</u>, Adv. Proc. No. 17-00219, currently pending in

the Title III Court, (k) <u>Andalusian Global Designated Activity Co., et al. v. Commonwealth of</u>
<u>Puerto Rico, et al.</u>, Adv. Proc. No. 17-00220, currently pending in the Title III Court, and (l) ERS
Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative
Expense Claims, dated November 21, 2019, as joined by The Bank of New York Mellon [Case
No. 17-3283-LTS, ECF Nos. 9285, 9294, and 9298], currently pending the Title III Court.

1.225    **ERS Participant Claim:**  A Claim on account of being or having been a
participant in ERS for retiree benefits that accrued through the date of implementation of Act 106;
<u>provided</u>, <u>however</u>, that "ERS Participant Claim" shall not include Claims held by a Participant in
ERS, whose hire date was on or after January 1, 2000, based on participation in System 2000.

1.226    **ERS Petition Date:**  May 21, 2017, the date on which the ERS Title III Case was
commenced.

1.227    **ERS Portfolio Price:**  Seventy Million Seven Hundred Fifty Thousand Dollars
($70,750,000.00), the base price to be paid for the ERS Private Equity Portfolio.

1.228    **ERS Private Equity Portfolio:**  Collectively, the portfolio of private equity
interests held by ERS as of the Effective Date.

1.229    **ERS Recovery Actions:**  Collectively, the litigations styled: (a) <u>Special Claims</u>
<u>Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Jefferies</u>
<u>LLC, et al.</u>, Adv. Proc. No. 19-00355; (b) <u>Special Claims Committee of The Financial Oversight &</u>
<u>Management Board for Puerto Rico, et al. v. Defendant 1M, et al.</u>, Adv., Proc. No. 19-00356; (c)
<u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et</u>
<u>al. v. Stoever Glass & Co., et al.</u>, Adv. Proc. No. 19-00357; (d) <u>Special Claims Committee of The</u>
<u>Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1F et al.</u>, Adv. Proc.
No. 19-00358; (e) <u>Special Claims Committee of The Financial Oversight & Management Board</u>
<u>for Puerto Rico, et al. v. Defendant 1H et al.</u>, Adv. Proc. No. 19-00359; (f) <u>Special Claims</u>
<u>Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Wells Fargo</u>
<u>Securities, LLC et al.</u>, Adv. Proc. No. 19-00360; and (g) <u>Special Claims Committee of The</u>
<u>Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1G, et al.</u>, Adv.
Proc. No. 19-00361 each pending in the Title III Court.

1.230    **ERS Resolution:**  That certain Pension Funding Bond Resolution, adopted
January 24, 2008, relating to the issuance of the ERS Bonds.

1.231    **ERS Stipulation:**  That certain Amended and Restated Stipulation (A) Allowing
Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of
Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of
Adjustment, dated April 2, 2021.

1.232    **ERS Takings Action:**  The litigation styled <u>Altair Global Credit Opportunities</u>
<u>Fund (A) LLC v. United States</u>, Case No. 21-1577, currently pending in the United States Court of
Appeals for the Federal Circuit.

1.233　　**ERS Title III Case:**　The Title III case under PROMESA pending for ERS in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico, as representative of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico</u>, Case No. 17 3566-LTS (D.P.R.).

1.234　　**ERS Trust:**　The trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS' interests in the ERS Private Equity Portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of Section 69.2 hereof.

1.235　　**Excess Cash Surplus**:　The amount of actual cash surplus above and beyond the projected Fiscal Plan Surplus contained in the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.236　　**Executory Contract:**　A contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.237　　**Federal Claims:**　Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.

1.238　　**FGIC:**　Financial Guaranty Insurance Company or its successor or designee.

1.239　　**FGIC Action:**　The litigation styled <u>Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.,</u> currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.240　　**FGIC Certificates:**　With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

1.241　　**FGIC CW/Convention Center Claims:**　Collectively, the CW/Convention Center Claims arising from the CCDA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.242　　**FGIC CW/HTA Bond Claims:**　Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.243　　**FGIC CW/PRIFA Rum Tax Claims:**　Collectively, the CW/PRIFA Rum Tax Claims arising from the PRIFA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.244　　**FGIC Escrow Account:**　The escrow account(s) that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of

FGIC Insured Bonds whose FGIC Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.245     **FGIC Insured Bond Claims**:  Collectively, the Claims arising from the FGIC Insured Bonds, including, for the avoidance of doubt, any Vintage CW Bond Claims (FGIC), Vintage CW Guarantee Claims (FGIC), and Vintage PBA Bond Claims (FGIC).

1.246     **FGIC Insured Bonds**:  Collectively, the GO Bonds and the PBA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.247     **FGIC Insured PRIFA Bond Claims**:  Collectively, the Claims, arising from the PRIFA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.248     **FGIC Insurance Policies**:  The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.249     **FGIC Plan Consideration**:  The consideration allocable or distributable in accordance with Sections 9.1, 24.1 and 31.1 of the Plan to holders of Allowed FGIC Insured Bond Claims.

1.250     **FGIC Rehabilitation Plan**:  The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.251     **FGIC Treatment**:  The treatment of FGIC Insured Bond Claims set forth in Section 75.4(a) hereof.

1.252     **FGIC Trust**:  With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.253     **Final Order**:  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in

full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.254    **Fiscal Plan:**  A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.255    **Fiscal Plan Surplus:**  The amount set forth on the line entitled **"Surplus/ (Deficit) Post Measures (excl. Debt Payments)"** of the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.256    **FY:**  A fiscal year of the Commonwealth, commencing on July 1st and concluding on June 30th of the following calendar year.

1.257    **GDB:**  The Government Development Bank for Puerto Rico.

1.258    **GDB HTA Loans:**  Collectively, the loans, if any, made to HTA by GDB and now held by the Governmental Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.259    **GDB Loan Priority Determination:**  The determination, in either the Commonwealth Title III Case or the HTA Tile III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery Authority does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

1.260    **General Fund:**  The Commonwealth's primary operating fund.

1.261    **General Unsecured Claims:**  Collectively, CW General Unsecured Claims and ERS General Unsecured Claims.

1.262    **GO Bonds:**  Collectively, the currently outstanding general obligation bonds issued by the Commonwealth.

1.263    **GO CVIs:**  Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture and the CVI Legislation.

1.264    **GO CVI Indenture:**  The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the GO CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.265    **GO Group:**  The Ad Hoc Group of General Obligation Bondholders consisting of Aurelius Capital Management, LP, and Autonomy Capital (Jersey) L.P., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the Plan Support Agreement.

1.266    **GO/PBA Annex Agreement:**  That certain Annex Agreement annexed as Exhibit "G" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims may become GO/PBA PSA Creditors.

1.267    **GO/PBA Consummation Costs:**  Collectively, the amounts set forth in Section 3.3 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the Initial GO/PBA PSA Creditors in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.268    **GO/PBA Joinder Agreement:**  That certain Joinder Agreement annexed as Exhibit "F" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims and PBA Bond Claims may become GO/PBA PSA Creditors.

1.269    **GO/PBA Joinder Creditors:**  Collectively, those GO/PBA PSA Creditors that executed and delivered either the GO/PBA Joinder Agreement or the GO/PBA Annex Agreement prior to the GO/PBA Joinder Deadline.

1.270    **GO/PBA Joinder Deadline:**  July 30, 2021.

1.271    **GO/PBA Plan Support Agreement:**  That certain Amended and Restated Plan Support Agreement, dated as of July 12, 2021, by and among the Oversight Board and the GO/PBA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.272    **GO/PBA PSA Creditors:**  Collectively, the parties to the GO/PBA Plan Support Agreement, other than the Government Parties.

1.273    **GO/PBA PSA Restriction Fee:**  Collectively, the fee to be paid, in Cash, on the Effective Date in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Section 3.5 hereof and the Confirmation Order, in an amount equal to the product of (a) the Restriction Fee Percentage _times_ (b) the outstanding principal amount of GO Bonds and

PBA Bonds, plus interest accrued thereon during the period up to, but not including the Commonwealth Petition Date and the PBA Petition Date, respectively, (i) tendered for exchange in accordance with the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, in the case of GO/PBA PSA Creditors required to tender and exchange their bonds pursuant to the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, (ii) constituting Assured Insured Bonds, in the case of Assured, and (iii) constituting National Insured Bonds, in the case of National.

1.274    **GO/PBA Restriction Fee Percentage:**  One and three hundred twenty-one thousandths percent (1.321%).

1.275    **Government Entity:**  Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.276    **Government Parties:**  Collectively, (a) the Oversight Board, as the representative of the Debtors, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtors, including, without limitation, any of its agencies, and (d) AAFAF; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.277    **Government Released Claims:**  Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtors, Claims (including, without limitation, Claims arising from or relating to the PBA Bonds and the GO Bonds), the Debt Related Objections, the PBA Litigation, and the ERS Litigation, and arising prior to the Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtors (or their successors, including Reorganized Commonwealth) or COFINA arising from or relating to the Debtors' obligations pursuant to the Plan or the securities to be issued pursuant to the Plan or that were issued pursuant to the COFINA Plan, or (ii) a Government Releasee unrelated to the Debtors or the Claims discharged pursuant to the terms and provisions of the Plan, (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by AFICA, CCDA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and the CW Appropriations Claims.

1.278    **Government Releasees:**  Collectively, the Government Parties and the Debtors, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors,

principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Cases in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and related to the CW Appropriations Claims.

1.279 **Gracia Gracia Claim:** A Claim of a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action.

1.280 **Gracia Gracia CW Action:** The litigation styled García Rubiera, et al. v. Asociación de Subcripcion Conjunta del Seguro de Responsabilidad Obligatorio, et al., Civil Núm.: KDP2001-1441(801), currently pending in the Puerto Rico Court of First Instance.

1.281 **Gracia Gracia Federal Action:** The litigation styled García Rubiera, et al. v. Fortuño, et al., Case No.: 02-1179-GAG, currently pending in the United States District Court for the District of Puerto Rico.

1.282 **Gracia Gracia Settlement:** Collectively, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016 and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain Judgment, dated March 1, 2016.

1.283 **GSA Helicopter Loan:** The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of approximately Twenty-Three Million Seven Hundred Sixty-Four Thousand Six Hundred Seven Dollars ($23,764,607.00).

1.284 **GUC Recovery Cap:** Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust shall not count towards attaining the forty percent (40%) cap.

1.285 **GUC Reserve:** The reserve to be created on or prior to the Effective Date, and held by an independent, non-Commonwealth government entity selected jointly by the Oversight Board and the Creditors' Committee, solely for the benefit of holders of Allowed CW General Unsecured Claims.

1.286 **HTA:** Puerto Rico Highways and Transportation Authority.

1.287 **HTA 68 Bonds:** Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the

Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (h)the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

1.288  **HTA 98 Bonds:**  Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

1.289  **HTA 98 Senior Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars ($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars ($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G, issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty Thousand Dollars ($82,340,000.00), (g) the 2004 Transportation Revenue Refunding Bonds, Series J, issued by HTA in the original principal amount of Four Hundred Five Million Nine Hundred Eighty-Five Thousand Dollars ($405,985,000.00), (h) the 2005Transportation Revenue Refunding Bonds, Series K, issued by HTA in the original principal amount of Eight Hundred Million Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series L, issued by HTA in the original principal amount of Five Hundred Ninety-Eight Million Two Hundred Eighty-Five Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue Refunding Bonds, Series M, issued by HTA in the original principal amount of Two Hundred Fifty

Million Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original principal amount of One Billion Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95), and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Forty-Four Million Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.290    **HTA 98 Sub Bonds:**  Collectively, the following subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million Fifty Thousand Dollars ($75,050,000.00), and (b) the Subordinated Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.291    **HTA Bonds:**  Collectively, the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.292    **HTA/CCDA Annex Agreement:**  That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.293    **HTA/CCDA Joinder Agreement:**  That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.294    **HTA/CCDA Joinder Deadline:**  With respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

1.295    **HTA/CCDA Joinder Creditors:**  Collectively, those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement, the forms of which are annexed to the HTA/CCDA Plan Support Agreement as Exhibits "H" and "I", respectively, prior to the HTA/CCDA Joinder Deadline.

1.296    **HTA/CCDA Plan Support Agreement:**  That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.297    **HTA/CCDA PSA Creditors:**  Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.298    **HTA/CCDA PSA Restriction Fee Period:**  The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.299    **HTA/CCDA PSA Threshold Attainment:**  The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.300    **HTA Clawback CVI:**  The CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, the HTA/CCDA Plan Support Agreement and the Settlement Summary annexed thereto as Exhibit "J".

1.301    **HTA Confirmation Order:**  The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.302    **HTA Distribution Conditions:**  Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.303    **HTA Effective Date:**  The date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

1.304    **HTA Fiscal Agent:**  The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.305    **HTA Petition Date:**  May 21, 2017.

1.306    **HTA Plan:**  The plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", and, with respect to HTA Bonds insured by FGIC and Ambac, containing provisions consistent with the terms and provisions set forth in Sections 74.4 and 74.5 hereof, respectively.

1.307    **HTA Title III Case:**  The Title III case under PROMESA pending in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority</u>, Case No. 17-3567-LTS (D.P.R.).

1.308    **Initial PSA Creditors:**  Collectively, the Initial GO/PBA PSA Creditors and the Initial HTA/CCDA PSA Creditors.

1.309    **Initial GO/PBA PSA Creditors:**  Collectively, those creditors that executed the Initial PSA on February 22, 2021.

1.310    **Initial GO/PBA PSA Restriction Fee Creditors:**  Collectively, the Initial GO/PBA PSA Creditors and the Initial GO/PBA PSA Joinder Creditors that executed and delivered the Initial PSA, a joinder or annex agreement, as applicable, at or prior to the Initial PSA Threshold Attainment.

1.311    **Initial HTA/CCDA PSA Creditors:**  The "Initial PSA Creditors" as defined in the HTA/CCDA Plan Support Agreement.

1.312    **Initial PSA:**  That certain Plan Support Agreement, dated as of February 22, 2021, by and among the Oversight Board and the Initial GO/PBA PSA Creditors.

1.313    **Initial PSA Joinder Creditors:**  Collectively, those Entities holding GO Bonds or PBA Bonds, that executed and delivered a Joinder Agreement or an Annex Agreement to the Initial PSA, the forms of which were annexed to the Initial PSA as Exhibits "F" and "G", respectively, prior to the Initial PSA Threshold Attainment.

1.314    **Initial PSA Threshold Attainment:**  The date and time which the Initial GO/PBA PSA Restriction Fee Creditors owned or had due investment management responsibility and authority for funds or accounts which owned, or, with respect to Assured, Syncora and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, seventy percent (70%) of the aggregate amount of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims (without duplication and, to the extent such claims are Insured Bond Claims, to the extent a PSA

Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law).

1.315    **Insured Bond Claim:** Collectively, the Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.316    **Invalidity Actions:** Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "C" hereto.

1.317    **IRC:** The United States Internal Revenue Code of 1986, as amended from time to time.

1.318    **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.319    **JRS:** Judiciary Retirement System.

1.320    **JRS Participant Claim:** A Claim on account of being or having been a Participant in JRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in JRS from and after the Effective Date.

1.321    **LCDC:** The LCDC Holders, as such membership may change from time to time.

1.322    **LCDC Holders:** The Lawful Constitutional Debt Coalition consisting of Aristeia Capital, LLC, Farmstead Capital Management, FCO Advisors LP, GoldenTree Asset Management LP, Monarch Alternative Capital LP, Taconic Capital Advisors L.P., and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors GO/PBA and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.323    **Lien:** Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.324    **Lien Challenge Actions:** Collectively, the adversary proceedings listed on Exhibit "D" hereto.

1.325    **Lift Stay Motions:** Collectively, the litigation styled (a) Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 673], (b) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board of Puerto Rico, filed in the HTA Title III Case [Dkt. No. 591], (e) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.,

Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit, (g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

1.326    **List of Creditors:**  The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the (a) *Notice of Filing of Creditor List for the Commonwealth of Puerto Rico* filed in the Commonwealth Title III Case [Case No. 17-3283-LTS, ECF No. 1215], (b) *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* filed in the ERS Title III Case [Case No. 17-3566-LTS, ECF No. 207], and (c) *Notice of Filing of Creditor List for The Puerto Rico Public Buildings Authority* filed in the PBA Title III Case [Case No. 19-5523-LTS, ECF No. 34] pursuant to sections 924 and 925 of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be amended, restated, supplemented or otherwise modified by the Debtors.

1.327    **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.328    **Maximum Annual Debt Service:**  The maximum scheduled annual debt service (including principal and interest payments due and payable on bonds bearing current interest and, in the case of capital appreciation bonds or similar instruments, the maturity value due and payable on such instruments) for any FY on Net Tax-Supported Debt; <u>provided</u>, <u>however</u>, that, in the case of variable rate Debt, the calculation shall assume that such Debt bears interest at the maximum annual rate permitted by law; and, <u>provided</u>, <u>further</u>, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may establish additional provisions or clarifications regarding the calculation of the Maximum Annual Debt Service consistent with the principles and objectives set forth therein.

1.329    **Maximum Taxable Bond Election Amount:**  The amount of New GO Bonds required, after consultation with Section 103 tax counsel and determination by Internal Revenue Service, to be issued as non-exempt for federal income tax purposes.

1.330    **Measured SUT:**  The 5.5% SUT, <u>less</u> CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00), as set forth in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement.

1.331    **Med Centers:**  Collectively, the following federally qualified health centers: (a) Atlantic Medical Center, Inc.; (b) Camuy Health Services, Inc.; (c) HPM Foundation, Inc.; (d) Centro de Salud de Lares, Inc.; (e) Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc.; (f) Ciales Pumay Health Care Services, Inc.; (g) Concilio de Salud Integral de Loiza, Inc.; (h) Corporacion de Servicios Medicos Primarios Prevencion de Hatillo, Inc.; (i) Corporacion de Servicios de Salud y Medicina de Avandaza; (j) NeoMed Center, Inc.; (k) Hospital Center

Castaner, Inc.; (l) Migrant Health Center, Inc.; (m) Morovis Community Health Center, Inc.; (n) Centro de Servicios Primarios de Salud de Patillas, Inc.; (o) Costa Salud, Inc.; (p) Salud Integral en la Montana, Inc. (SIM), f/k/a Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerro, Corozal, Narajoti y Orocovis; (q) Corporacion SANOS; (r) San Juan Comprehensive Health Care for the Homeless Program; (s) Centro de Servicios Primarios de Salud de Florida; (t) Puerto Rico Community Network for Clinical Research (CONCRA); and (u) Rio Grande Community Health Center, Inc.

1.332    **Med Center Claims:** Collectively, any and all Claims of the Med Centers arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), including, without limitation, (a) any claims and causes of action asserted or which could have been asserted in the Med Center Litigation against the Commonwealth, (b) any amounts asserted to be due and owing by the Commonwealth, or which could have been asserted as due and owing by the Commonwealth, in the Med Center proofs of claim, and (c) any amounts asserted to be owing by the Commonwealth and relating to the period from the Commonwealth Petition Date up to and including the Effective Date; provided, however, that "Med Center Claims" expressly excludes any claims asserted by any Med Center against the Municipality of San Juan in the litigation styled Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth of First Instance.

1.333    **Med Center Litigation:** Collectively, the litigation styled (a) Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth Court of First Instance, together with the following appeals therefrom: (i) Appeal No. KLCE2017-0147; (ii) Appeal No. KLCE2017-00094; and (iii) Appeal No. KLCE2017-00105 but, expressly excluding therefrom any claims asserted in the foregoing litigation by any Med Centers against the Municipality of San Juan, (b) Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al., Case No. 03-1640(GAG), currently pending in the United States District Court for the District of Puerto Rico, together with following appeals therefrom: (i) Case No. 17-1731; (ii) Case No. 17-1812; (iii) Case No. 17-1822; (iv) Case No. 18-1083; and (v) Case No. 19-1336, (c) Atlantic Medical Center Inc. et al. v. The Commonwealth of Puerto Rico, et al., Case No. 06-1291, currently pending in the United States District Court for the District of Puerto Rico, (d) Asociacion de Salud Primaria de P.R., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00227, currently pending in the Title III Court, (e) Atlantic Med. Ctr., Inc., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00278, currently pending in the Title III Court, (f) Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00292, currently pending in the Title III Court, (g) Corporacion de Servicios Integrals de Salud del Area de Barranquitas, Comerio, Corozal, Naanjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00298, currently pending in the Title III Court, (h) Motion of Salud Integral en la Montana, Corporacion de Servicios de Salud y Medicina Avanzada, Neomed Center, Mgmt. Health Center, HPM Foundation, Morovis Community Health Center and Concilio de Salud Integral de Loiza for Allowance and Payment of Administrative Expense Claim, or in the Alternative, Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF No. 13582], (i) Motion of Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud familiar Dr. Julio Palmieri

Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Medicos Primarios y Prevencion de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc. and Hospital General Costoner, Inc. Seeking (I) Enforcement of the Court's Prior Order and (II) Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF. No. 12918], (j) Motion for Relief from Stay, filed in the Commonwealth Title III Case [ECF No. 13748], and (k) any litigation, adversary proceeding or motion with respect to the Med Center Claims at issue in the Commonwealth Title III Case or any of the above-referenced Med Center Litigations.

1.334    **Med DC Action:**  The litigation styled <u>Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 03-1640 (GAG), currently pending in the United States District Court for the District of Puerto Rico.

1.335    **MFA:**  Puerto Rico Municipal Finance Agency.

1.336    **Monolines:**  Collectively, Ambac, Assured, FGIC, National and Syncora, as insurers of GO Bonds, PBA Bonds, HTA Bonds, CCDA Bonds, PRIFA Bonds or other Claims or securities issued by the Debtors, as applicable.

1.337    **Monthly Benefit Modification:**  Zero Dollars ($0.00).

1.338    **National:**  National Public Finance Guarantee Corporation.

1.339    **National Action:**  The litigation styled <u>National Public Finance Guarantee Corp., et al. v. UBS Financial Services, Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.340    **National Acceleration Price:**  With respect to any National Insured Bonds, an amount equal to the outstanding principal amount of such National Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.341    **National Certificates:**  With respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

1.342    **National Commutation Consideration:**  A combination of some or all of the following, to be selected at National's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to National in accordance with the terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

1.343    **National Commutation Treatment:**  The treatment set forth in Section 72.2(a) hereof.

1.344 **National CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by National.

1.345 **National Escrow Account:** A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of National Insured Bonds whose National Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.346 **National Insurance Policies:** The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.347 **National Insured Bond Claims:** Collectively, the Claims arising from the National Insured Bonds, including any Vintage CW Guarantee Bond Claims (National).

1.348 **National Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.349 **National Non-Commutation Treatment:** The treatment set forth in Article 72.2(b) hereof.

1.350 **National Plan Consideration:** The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (National), Allowed Vintage CW Bond Claims (National), and Allowed Vintage CW Guarantee Bond Claims (National), as the case may be.

1.351 **National Treatment:** With respect to each Class of National Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.352 **National Trust:** The trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.353 **Net Allowed ERS Bond Claims:** Collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

1.354 **Net CW Cash Consideration:** The amount of Cash equal to Five Hundred Seventy-Five Million Dollars ($575,000,000.00) in Cash, minus (a) up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing in its sole and absolute discretion, as necessary to fund the administration and operation of the Avoidance Actions Trust, (b) such amounts paid to compensate the Creditors' Committee appointees to the Avoidance Actions Trust Board and their counsel in connection with their review

46

and analysis of the claims reconciliation process in accordance with Article LXXXII of the Plan, which under all circumstances shall not exceed, on an annual basis, Three Million Dollars ($3,000,000.00), and (c) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims in accordance with Article LXXII of the Plan,

1.355 **Net Tax-Supported Debt:** Any Tax-Supported Debt, excluding any (a) Debt guaranteed by the full faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed FYs, (b) Debt being refinanced through the proceeds of the proposed bond or note issuance, and (c) Debt and obligations expressly excluded from the calculation of the Comprehensive Cap in Section 74.4 hereof.

1.356 **New GO 5.0% CABs:** Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five percent (5%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.357 **New GO 5.375% CABs:** Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five and three hundred seventy-five one thousandths percent (5.375%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.358 **New GO Bonds:** Collectively, (a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs, issued as general obligation bonds, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, and the New GO Bonds Legislation, including, without limitation, any refunding bonds which may be issued in accordance with the New GO Bonds Indenture and the New GO Bonds Legislation.

1.359 **New GO Bonds Indenture:** The indenture to be executed and delivered as of the Effective Date pursuant to which the Commonwealth shall issue the New GO Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.360 **New GO Bonds Legislation:** Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement.

1.361 **New GO Bonds Trustee:** The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New GO Bonds Indenture.

1.362 **New GO CIBs:** Collectively, the series of general obligation current interest bonds to be issued pursuant to the Plan as components of the New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.363 **New GO Refunding Bonds:** The securities which may be issued by Reorganized Commonwealth from and after the Effective Date, for the purpose of refinancing, in whole or in part, New GO Bonds or securities previously issued to refinance New GO Bonds, provided that, (a) the final maturity date on any such refinancing securities shall not be later than thirty (30) years from the original scheduled final maturity date of the New GO Bonds, and (b) upon the issuance of any such securities, the annual debt service due in the then-current and each future fiscal year on all New GO Bonds and New GO Refunding Bonds outstanding after the issuance of the New GO Refunding Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year through FY 2046, respectively, on all New GO Bonds and New GO Refunding Bonds outstanding prior to such issuance.

1.364 **New HTA Bonds:** Collectively, the bonds to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

1.365 **New HTA Bonds Indenture:** The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to Assured and National. .

1.366 **Non-Own Source Revenues:** Collectively, the revenues of the Commonwealth received from the United States government or any agencies or instrumentalities thereof.

1.367 **Notas de Ahorro:** Collectively, savings notes issued by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico, the payment of which is backed by the full faith and credit of the Commonwealth.

1.368 **OGP:** The Office of Management and Budget of the Commonwealth.

1.369 **Ordinary Course Employee Claim:** A Claim held by an employee of the Debtors related to ordinary course employment matters, including, without limitation, a Claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar Claims; provided, however, that, an "Ordinary Course Employee Claim" shall not include Claims related to retiree benefits.

1.370 **Outperformance Condition:** The amount that Measured SUT exceeds the "Outperformance Metric", as defined in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement, in any FY.

1.371    **Outstanding:**  Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.372    **Oversight Board:**  The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtors' representative in their respective Title III Cases pursuant to Section 315(b) of PROMESA.

1.373    **Participant:**  A current, former, active, inactive, or disabled employee who holds an accrued claim for one or more retirement benefits on account of being or having been a participant in ERS, JRS, or TRS, together with its beneficiaries, if any.

1.374    **PayGo:**  The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.375    **PBA:**  Puerto Rico Public Buildings Authority.

1.376    **PBA Administrative Expense Claim:**  The Claim of PBA against the Commonwealth relating to the Commonwealth's use and occupancy of PBA Property during the period from the commencement of the Commonwealth's Title III Case up to and including the Effective Date.

1.377    **PBA Bond Claims:**  Collectively, the Claims against PBA arising from or relating to the PBA Bonds, including the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), the Vintage Bond Claims (Syncora), the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the Retail PBA Bond Claims.

1.378    **PBA Bond Distribution:**  The distribution of Cash to holders of Allowed PBA Bond Claims in an amount equal to the Allowed PBA Administrative Expense Claim.

1.379    **PBA Bonds:**  Collectively, the 2011 PBA Bonds, the 2012 PBA Bonds and the Vintage PBA Bonds.

1.380    **PBA Cash:**  One Billion Seventy-Three Million Dollars ($1,073,000,000.00), the amount paid by the Commonwealth in connection with the compromise and settlement of the Allowed PBA Administrative Expense Claim.

1.381    **PBA/DRA Secured Claim:**  Collectively, the loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of Sixty-Eight Million Six Hundred Fifty-Three Thousand Two Hundred Ninety-Seven Dollars and Sixty-Nine Cents ($68,653,297.69), the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.

1.382    **PBA/DRA Unsecured Claim:**  Collectively, the subordinated loans allegedly made by GDB, to PBA, which, as of the PBA Petition Date, were in the outstanding principal

amount of One Hundred Thirty-Eight Million Six Hundred Seventy-Eight Thousand Nine Hundred Thirty-Five Dollars and Seventy-One Cents ($138,678,935.71).

1.383    **PBA General Unsecured Claim:**  A Claim against PBA, other than a PBA Bond Claim, a PBA/DRA Secured Claim and a PBA/DRA Unsecured Claim, but including Ordinary Course Employee Claims against PBA.

1.384    **PBA Litigation:**  The adversary proceeding styled <u>The Financial Oversight & Management Board of Puerto Rico v. Puerto Rico Public Buildings Authority</u>, Adv. Proc. No. 18-00149, currently pending in the Title III Court.

1.385    **PBA Petition Date:**  September 27, 2019, the date on which the PBA Title III Case was commenced.

1.386    **PBA Property:**  All property for which any right, title or interest currently resides in PBA, including, without limitation, the buildings and other facilities owned or leased by PBA.

1.387    **PBA Title III Case:**  The Title III case under PROMESA pending in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Public Buildings Authority</u>, Case No. 19-5523-LTS (D.P.R.).

1.388    **Pension Reserve Deed of Trust:**  The deed of trust to be executed and delivered on or prior to the Effective Date, reasonably acceptable to the Government of Puerto Rico, the Retiree Committee, and labor organizations party to plan support agreements for the Plan, substantially in the form included in the Plan Supplement, providing for, among other things, creating the Pension Reserve Trust and providing for the terms for the deposit and withdrawal of monies in the Pension Reserve Trust for the benefit of the Retirees.

1.389    **Pension Reserve Trust:**  The reserve trust to be created in accordance with the terms and conditions of Article LXXXIII hereof, which reserve trust shall be utilized for payment of the Commonwealth's pension obligations under Act 106 and which shall not be subject to taxation by the Commonwealth.

1.390    **Person:**  An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.391    **PFC:**  Puerto Rico Public Finance Corporation.

1.392    **Plan:**  This Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.393    **Plan Supplement:**  A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, forms of the New GO Bonds and the CVIs and, if not

previously enacted, the draft of the New GO Bonds Legislation and the CVI Legislation, respectively, which, in each case, shall be in form and substance reasonably satisfactory to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Ambac, Assured, FGIC, National, and Syncora, and, solely with respect to the provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee. The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.394 **Ports:** Ports of the Americas Authority.

1.395 **PRASA:** Puerto Rico Aqueduct and Sewer Authority.

1.396 **PREPA:** The Puerto Rico Electric Power Authority.

1.397 **PRIDCO:** Puerto Rico Industrial Development Company.

1.398 **PRIFA:** Puerto Rico Infrastructure Financing Authority.

1.399 **PRIFA BANs:** Collectively, the PRIFA Bond Anticipation Notes, Series 2015, issued pursuant to that certain Trust Agreement dated March 2015, between PRIFA and the PRIFA BANs Trustee.

1.400 **PRIFA BANs Commonwealth Guaranty:** That certain Guaranty Agreement, dated as of March 1, 2015, made by the Commonwealth to and for the benefit of RBC Municipal Products, LLC, as initial purchaser, and for the benefit of the PRIFA BANs Trustee.

1.401 **PRIFA BANs Litigation:** The litigation styled The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon, et al., Adv. Pro. No. 19-AP-269-LTS, currently pending in the Title III Court.

1.402 **PRIFA BANs Trustee:** The Bank of New York Mellon, solely in its capacity as trustee, paying agent, and registrar with respect to the PRIFA BANs.

1.403 **PRIFA Bond Claims:** Collectively, the Claims against PRIFA arising from or relating to the PRIFA Bonds.

1.404 **PRIFA Bonds:** Collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d)

Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

1.405    **PRIFA Clawback CVI:**  The series or subseries of contingent value instrument, the payment for which the Commonwealth shall have pledged its full faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law, as more fully described in (a) Annex 4 of Exhibit "J" annexed hereto as twenty-seven percent (27%) of the Clawback CVIs and (b) the Settlement Summary annexed hereto as Exhibit "M" including the Rum Tax CVI to be issued on the Effective Date by the Commonwealth to the holders of PRIFA Bond Claims in accordance with the terms and conditions hereof, the Plan, the Confirmation Order, the PRIFA Order, the CVI Legislation, and the Clawback CVI Indenture.

1.406    **PRIFA Distribution Conditions:**  Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the PRIFA Plan, the PRIFA Order, the CVI Indenture, and the Custodial Trust Documents, as applicable, shall have been agreed upon by the Oversight Board, Ambac, and FGIC, and (c) holders of, or insurers entitled to vote with respect to the PRIFA Bonds, holding or insuring, as the case may be, at least seventy percent (70%) of the outstanding principal amount of the PRIFA Bonds shall have executed the PRIFA Plan Support Agreement or a Joinder Agreement or an Annex Agreement with respect thereto; provided, however, that, upon entry of a Final Order with respect to the PRIFA Order, the condition set forth in subsection (c) shall be deemed satisfied.

1.407    **PRIFA Order:**  The order of the Title III Court either (a) confirming a plan of adjustment for PRIFA in the event a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, or (b) approving a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

1.408    **PRIFA Plan:**  As determined by the Oversight Board, upon consultation with AAFAF, either (a) in the event that a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, the plan of adjustment filed by the Oversight Board and confirmed by the Title III Court pursuant to the PRIFA Order, or (b) in the event that Ambac or FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA consistent with the terms and conditions set forth in the Settlement Summary annexed as Exhibit "F" to the PRIFA Plan Support Agreement, the application to approve such qualifying modification filed by the Oversight Board.

1.409    **PRIFA Plan Support Agreement:**  That certain PRIFA Related Plan Support Agreement, dated as of July 27, 2021, by and among the Oversight Board and the PRIFA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.410    **PRIFA PSA Creditors:**  Collectively, the parties to the PRIFA Plan Support Agreement, other than the Oversight Board.

1.411    **Professional:**  An Entity (a) to be compensated for services rendered prior to or on the Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Cases by the Government Parties (in the Government Parties' sole discretion); (ii)

employed in the Title III Cases by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.412    **Professional Claim:**  A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 316 and 317 of PROMESA.

1.413    **Projected Fiscal Plan Surplus:**  The projected primary unrestricted Fiscal Plan Surplus as set forth in the Fiscal Plan as in effect as of the Effective Date <u>minus</u> the sum of (a) projected CVI payments for such FY and (b) the positive difference, if any, of projected Non-Own Source Revenues <u>minus</u> actual Non-Own Source Revenues for such FY; <u>provided</u>, <u>however</u>, that, in the event of (i) a federally-declared natural disaster, or (ii) a federally – declared pandemic other than the current Covid-19 pandemic in any FY, upon the filing of a motion by the Government of the Commonwealth of Puerto Rico, and upon notice and a hearing, "Projected Fiscal Plan Surplus" shall be reduced by the amount of any actual reduction in revenues for such FY as compared to projected revenues for such FY as set forth in the Fiscal Plan in effect on the Effective Date, whether or not the council acting on behalf of the Pension Reserve Trust agrees to such reduction, in the event that the Title III Court determines, by entry of a Final Order, that the amount of such reduction is directly attributable to such natural disaster or pandemic.

1.414    **PROMESA:**  The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.415    **Pro Rata Share:**  With respect to Allowed Claims (a) among and within Classes within the same Bond Recovery Category set forth in Exhibit "L" hereto, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class (or within all Classes within such Bond Recovery Category, as applicable), taking into account, and reducing for, unmatured interest thereon as of the Commonwealth Petition Date or the PBA Petition Date, as the case may be, with respect to individual bonds within such Class, and (b) among more than one Class, but not within the same Bond Recovery Category, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.416    **PSA Creditors:**  Collectively, the GO/PBA PSA Creditors and the HTA/CCDA PSA Creditors.

1.417    **PSA Restriction Fees:**  Collectively, the GO/PBA Restriction Fee and the CCDA Restriction Fee.

1.418    **Puerto Rico Investor:**  A holder of a CW Bond Claim, a PBA Bond Claim, or a CW Guarantee Bond Claim that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole

and absolute discretion); provided, however, that "Puerto Rico Investor" shall not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National, or Syncora.

1.419    **QTCB Group:**  The QTCB Noteholder Group consisting of Canyon Capital Advisors LLC, Sculptor Capital LP, and Davidson Kempner Capital Management LP, each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.420    **Related Persons:**  With respect to (a) any of the Debtors (including for the avoidance of doubt, the Commonwealth and the Government Parties), including, without limitation, its predecessors, successors and assigns (whether by operation of law or otherwise) and any and all Professionals retained by the Debtors and AAFAF), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them each in its respective capacity as such, (b) with respect to each of the Creditors' Committee and the Retiree Committee, its successors and assigns (whether by operation of law or otherwise) and their respective current and former members, financial advisors, attorneys, accountants, consultants, agents and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, including their respective counsel and advisors, in each case, solely to the extent acting in such capacity, and (c) solely in connection with (i) the releases given by the Debtors pursuant to the terms and provisions of Sections 92.2 and 92.5 of the Plan, and (ii) the exculpation provided pursuant to the terms and provisions of Sections 92.7(b) and 92.7(f) of the Plan, with respect to each of the PSA Creditors, AFSCME, Ambac, Assured, FGIC, National, and Syncora, their respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity; provided, however, that "Related Persons" is not intended, nor shall it be construed, to include AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA.

1.421    **Released Claims:**  Collectively, (a) with respect to those Entities party to the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, respectively, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtors or their Assets in the Title III Cases, (c) Claims and Causes of Action that have been or could have been asserted by the Debtors (with respect to releases given by the Debtors) or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial

54

Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B"
Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as
amended, and (e) Claims that otherwise arise from or relate to the Title III Cases, the Plan, the
GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan
Support Agreement, Retiree Committee Plan Support Agreement, the AFSCME Plan Support
Agreement, any plan support agreement with AMPR, the ERS Stipulation, the Committee
Agreement, and the compromises set forth herein, including, without limitation, in connection with
or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities,
operations, or property; provided, however, that, "Released Claims" is not intended to include, nor
shall it have the effect of including, Claims or Causes of Action unrelated to the Debtors or Claims
or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that
could have been asserted, whether sounding in contract or tort; and, provided, further, that
"Released Claims: is not intended to release, nor shall it have the effect of releasing, any Entity in
its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with
the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that
"Released Claims" is not intended to release, nor shall it have the effect of releasing, any party
from the performance of its obligations in accordance with the Confirmation Order or the Plan,
including, without limitation, performance of obligations arising from or related to New GO
Bonds, the New Refunding Bonds, the CVIs or under any policy of insurance or related documents
issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims
against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA,
UPR, and PREPA.

      1.422    **Released Parties:**  Collectively, solely to the extent provided in the Plan or the
Confirmation Order, (a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee,
(d) the Creditors' Committee, (e) AFSCME, and (f) with respect to the foregoing clauses (a)
through (e), each of their respective Related Persons.

      1.423    **Releasing Parties:**  Collectively, solely to the extent provided in the Plan, (a) all
holders of Claims against the Debtors or their Assets; (b) such holders' current and former
Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and
former Related Persons.

      1.424    **Reorganized Commonwealth:**  The Commonwealth, from and after the
Effective Date.

      1.425    **Reorganized Debtors:**  The Debtors, from and after the Effective Date.

      1.426    **Reorganized Debtors' By-Laws:**  The by-laws of the Debtors, to the extent
applicable, from and after the Effective Date.

      1.427    **Restriction Fee Creditors:**  Collectively, the CCDA Restriction Fee Creditors
and the Initial GO/PBA PSA Restriction Fee Creditors or the GO/PBA Joinder Creditors, as
applicable.

1.428    **Retail 2011 CW Bond Claim:**  A 2011 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.429    **Retail 2011 CW Series D/E/PIB Bond Claim:**  A Claim of 2011 CW Series D/E/PIB Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.430    **Retail 2011 PBA Bond Claim:**  A 2011 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.431    **Retail 2012 CW Bond Claim:**  A 2012 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.432    **Retail 2012 PBA Bond Claim:**  A 2012 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.433    **Retail 2014 CW Bond Claim:**  A 2014 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.434    **Retail CW Bond Claims:**  Collectively, the Retail Vintage CW Bond Claims, the Retail 2011 CW Bond Claims, the Retail CW Series 2011 D/E/PIB Bond Claims, the Retail 2012 CW Bond Claims and the Retail 2014 CW Bond Claims.

1.435    **Retail Investor:**  An individual who purchased GO Bonds, PBA Bonds and/or CW Guarantee Bond Claims for his or her own brokerage account, trust account, custodial account or in a separately managed account, with aggregate holdings in an amount less than One Million Dollars ($1,000,000.00); provided, however, that "Retail Investor" shall not include any individual in his or her capacity as a holder of a GO Bond or a PBA Bond (a) the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National or Syncora, or (b) who tendered for exchange such GO Bond or PBA Bond, as the case may be, in accordance with the terms and provisions of Article II of the GO/PBA Plan Support Agreement, in which case, such individual shall be deemed a holder of GO Bonds or PBA Bonds in the applicable Class of GO Bonds or PBA Bonds, as the case may be, not held by Retail Investors.

1.436    **Retail PBA Bond Claims:**  Collectively, the Retail Vintage PBA Bond Claims, the Retail 2011 PBA Bond Claims, and the Retail 2012 PBA Bond Claims.

1.437    **Retail Support Fee:**  Collectively, that portion of the fees to be made available to Retail Investors, in accordance with the terms and provisions of the GO/PBA Plan Support Agreement, the Plan, and the Confirmation Order, which fees, in the aggregate, shall not exceed Fifty Million Dollars ($50,000,000.00); provided, however, that, notwithstanding the foregoing, in

accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order, such aggregate amount may be decreased on account of the Retail Support Fee Return, with the aggregate amount of the Retail Support Fee Return being redistributed in accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order.

1.438 **Retail Support Fee Return:** Collectively, that portion of the Retail Support Fee not allocated to classes of Retail Investors, which portion is then payable and reallocated to Initial GO/PBA PSA Restriction Fee Creditors and members of Retail Investor Classes that voted to accept the Plan in accordance with the provisions of Section 3.6 hereof and the Confirmation Order.

1.439 **Retail Vintage CW Bond Claim:** A Vintage CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.440 **Retail Vintage PBA Bond Claim:** A Vintage PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to be less than One Million Dollars ($1,000,000.00).

1.441 **Retired ERS Participant Above-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i) the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is greater than the Threshold, or (b) who benefits from Act 127-1958.

1.442 **Retired ERS Participant Below-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i)the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is equal to or less than the Threshold, or (b) who does not benefit from Act 127-1950.

1.443 **Retired JRS Participant Above-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.444 **Retired JRS Participant Below-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.445 **Retired TRS Participant Above-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.446 **Retired TRS Participant Below-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.447    **Retiree:**  A person who, as reflected in the records of ERS, JRS, or TRS, as applicable, as of April 1, 2021, receives a pension or annuity as a Participant in ERS, JRS or TRS; provided, however, that, under no circumstances shall a "Retiree" include a former employee of the Government of Puerto Rico who left public service before vesting in any pension benefits and who was not reimbursed for such person's contributions to ERS, JRS or TRS up to and including the date of separation.

1.448    **Retiree Claim:**  An ERS Participant Claim, a JRS Participant Claim or a TRS Participant Claim held by a Retiree.

1.449    **Retiree Committee:**  The committee of retired former employees of the Commonwealth, its agencies and instrumentalities appointed by the Office of the United States Trustee in the Commonwealth Title III Case.

1.450    **Retiree Committee Plan Support Agreement:**  That certain Plan Support Agreement, dated as of June 7, 2019, by and between the Debtor, by and through the Oversight Board, pursuant to Section 315(b) of PROMESA, and the Retiree Committee, as may be amended or supplemented by the parties thereto.

1.451    **Rum Tax CVI:**  The contingent value instrument, as more fully described in the Settlement Summary annexed as Exhibit "M" annexed hereto, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the PRIFA Plan, the Confirmation Order, the PRIFA Order, and the Rum Tax CVI Indenture.

1.452    **Rum Tax CVI Indenture:**  The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Rum Tax CVI, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.453    **Sales Tax:**  The sales and use tax, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

1.454    **SCC Action:**  The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.455    **SEC:**  The United States Securities and Exchange Commission,

1.456    **Section 510(b) Subordinated Claim:**  Any Claim, to the extent determined pursuant to a Final Order, against the Debtors' or their Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an Affiliate of a Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.457   **Securities Act:**  The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.458   **Solicitation Agent:**  Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Title III Cases by Title III Court order.

1.459   **SPU:**  Servidores Publicos Unidos.

1.460   **Substitute Measured Tax:**  All or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

1.461   **Syncora:**  Syncora Guarantee Inc., or its successor or designee.

1.462   **Syncora Acceleration Price:**  With respect to any Syncora Insured Bonds, an amount equal to the outstanding principal amount of such Syncora Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.463   **Syncora Certificates:**  With respect to each Syncora Trust that is formed for the benefit of the beneficial holders of a Syncora Insured Bonds CUSIP, the certificate(s) or receipt(s) to be issued by such Syncora Trust to beneficial holders of such Syncora Insured Bonds CUSIP that are deposited into such Syncora Trust.

1.464   **Syncora Commutation Consideration:**  A combination of some or all of the following, to be selected at Syncora's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the Plan Consideration; (ii) a percentage, to be determined at Syncora's sole discretion, of the Consummation Costs and/or the PSA Restriction Fees allocable to Syncora; and (iii) Cash in an amount to be determined by Syncora in its sole discretion.

1.465   **Syncora Commutation Treatment:**  The treatment set forth in Section 75.3(a) hereof.

1.466   **Syncora Escrow Account:**  A single escrow account that will be formed, on or prior to the Effective Date by the Commonwealth or PBA, at the sole cost and expense of Syncora, and for the benefit of the beneficial holders of Syncora Insured Bonds whose Plan Consideration is deposited therein.

1.467   **Syncora Insured Bond Claims:**  Collectively, the Bond Claims arising from the Syncora Insured Bonds, including, for the avoidance of doubt, any Vintage CW Guarantee Bond Claims (Syncora).

1.468 **Syncora Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured by Syncora, including, without limitation, pursuant to a secondary market insurance policy.

1.469 **Syncora Insurance Policies:** The existing insurance policies issued by Syncora relating to the Syncora Insured Bonds, together with any and all agreements and other documents related thereto.

1.470 **Syncora Non-Commutation Treatment:** The treatment set forth in Section 75.3(b) hereof.

1.471 **Syncora Plan Consideration:** The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (Syncora), Allowed Vintage CW Bond Claims (Syncora), and Allowed Vintage CW Guarantee Bond Claims (Syncora), as the case may be.

1.472 **Syncora Treatment:** With respect to each Class of Syncora Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.473 **Syncora Trust:** With respect to each Syncora Insured Bonds CUSIP, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth or PBA, at the sole cost and expense of Syncora and for the benefit of the beneficial holders of such Syncora Insured Bonds CUSIP.

1.474 **System 2000:** The pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq, or Act 3-2013.

1.475 **System 2000 Participant Claim:** A Claim that accrued under System 2000 or Act 3, by a Participant whose hire date was on or after January 1, 2000.

1.476 **Taxable Bond Distributions:** Collectively, the Vintage Taxable Bond Distribution, the 2011 CW Taxable Bond Distribution, the 2011 CW Series D/E/PIB Taxable Bond Distribution, the 2012 CW Taxable Bond Distribution, the 2014 CW Taxable Bond Distribution, the Vintage CW Guarantee Taxable Bond Distributions, the 2011 CW Guarantee Taxable Bond Distribution, the 2012 CW Guarantee Taxable Bond Distribution, and the 2014 CW Guarantee Taxable Bond Distribution.

1.477 **Taxable Election CW Claims:** Collectively, the Vintage CW Bond Claims (Taxable Election), the Vintage CW Guarantee Bond Claims (Taxable Election), the 2011 CW Bond Claims (Taxable Election), the 2011 CW Guarantee Bond Claims (Taxable Election), the 2011 CW Series D/E/PIB Bond Claims (Taxable Election), the 2012 CW Bond Claims (Taxable Election), the 2012 CW Guarantee Bond Claims (Taxable Election), the 2014 CW Bond Claims (Taxable Election) and the 2014 CW Guarantee Bond Claims (Taxable Election).

1.478 **Taxable New GO Bonds:** Collectively, the portion of the New GO Bonds in the aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the IRC, which New GO Bonds shall be issued as CIBs with an interest rate of five

percent (5.0%), payable semi-annually in arrears, and having a maturity of July 1, 2041 and be made available to Puerto Rico Investors with respect to the first One Million Dollars ($1,000,000.00) of aggregate holdings of (a) PBA Bond Claims, (b) CW Bond Claims, and (c) CW Guarantee Bond Claims (without duplication).

1.479　**Tax Credit Claims:**　Collectively, Claims or rights, other than Energy Incentive Claims and Claims related to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, as amended, or an economic incentive law, concession, or decree, in each case, resulting in corporate income tax credits, deductions, exemptions or carryforwards.

1.480　**Tax-Supported Debt:**　Collectively, without duplication, (a) direct Debt of the Commonwealth for the payment of which the full faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds and CVIs), (b) Debt issued by any Entity and guaranteed by the full faith, credit and taxing power of the Commonwealth, (c) Debt issued by any Entity (including the COFINA Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations, and (d) any other Debt identified as Tax-Supported Debt in the Debt Management Policy; provided, however, that the following shall not be considered Tax-Supported Debt: (1) tax and revenue anticipation notes with a final maturity occurring within the same FY of their issuance; and (2) Debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, provided, further, and without limiting the foregoing, "Tax-Supported Debt" excludes (y) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including, without limitation, the self-supporting Debt of PRASA, PREPA, HTA or any related securitization entity, (z) any other Debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such Debt is not guaranteed by the full faith, credit and taxing power of the Commonwealth; and, provided, further, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may contain additional provisions and clarifications regarding which Debt is considered Tax-Supported Debt consistent with the principles and objectives set forth therein.

1.481　**Threshold:**　One Thousand Five Hundred Dollars ($1,500.00) per month.

1.482　**Title III:**　Title III of PROMESA.

1.483　**Title III Cases:**　Collectively, the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.

1.484　**Title III Court:**　The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.485　**TRS:**　Teachers Retirement System.

1.486    **Trustee Fiscal Agent:**  Each of the CCDA Trustee, the ERS Fiscal Agent, the HTA Fiscal Agent, and the PRIFA BANs Trustee.

1.487    **TRS Participant Claim:**  A Claim on account of being or having been a Participant in TRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in TRS from and after the Effective Date.

1.488    **Trust Documentation:**  Collectively, the documentation required, if necessary, to establish and maintain the trust into which with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

1.489    **Unclaimed Distribution:**  Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.490    **Underwriter Actions:**  Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action, or any action brought in the future in any state, federal or Commonwealth court, agency or tribunal against any of the defendants named in such litigations concerning or relating to indebtedness or bonds issued by a Debtor, any of the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth.

1.491    **Unexpired Lease:**  A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.492    **Uniformity Litigation:**  Collectively, (a) the litigation styled <u>Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.</u>, Adv. Pro. No. 20-000068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.493    **UPR:**  Universidad de Puerto Rico.

1.494    **Vintage CW Bond Claim:**  A Claim against the Commonwealth on account of Vintage CW Bonds, other than a Vintage CW Bond Claim (Ambac), a Vintage CW Bond Claim (Assured), a Vintage CW Bond Claim (FGIC), a Vintage CW Bond Claim (National), a Vintage CW Bond Claim (Syncora), or a Retail Vintage CW Bond Claim.

1.495    **Vintage CW Bond Claim (Ambac):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Ambac.

1.496    **Vintage CW Bond Claim (Assured):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.497    **Vintage CW Bond Claim (FGIC):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.498    **Vintage CW Bond Claim (National):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by National.

1.499    **Vintage CW Bond Claim (Syncora):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Syncora.

1.500    **Vintage CW Bond Claim (Taxable Election):**  A Vintage CW Bond Claim or a Retail Vintage CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim shall be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Bond Claim.

1.501    **Vintage CW Bond Recovery:**  The aggregate recovery by holders of Allowed Vintage CW Bond Claims, Allowed Vintage CW Bond Claims (Ambac), Allowed Vintage CW Bond Claims (Assured), Allowed Vintage CW Bond Claims (National), Allowed Vintage CW Bond Claims (FGIC), Allowed Vintage CW Bond Claims (Syncora), and Allowed Retail Vintage CW Bond Claims, consisting of (a) One Billion Nine Hundred Forty Million Four Hundred Thirteen Thousand Five Hundred Seventy-Two Dollars and Sixty-Eight Cents ($1,940,413,572.68) in Cash, (b) Two Billion Three Hundred Thirty-Six Million Two Hundred Twenty-Six Thousand Eight Hundred Thirty Dollars ($2,336,226,830.00) in original principal amount of New GO CIBs, (c) One Hundred Fifty-Four Million Six Hundred Eighty-Three Thousand Seventy Dollars and Twenty-Five Cents ($154,683,070.25) in original principal amount of New GO 5.375% CABs, (d) One Hundred Million Seven Hundred Fifty-Eight Thousand One Hundred Eighty-Two Dollars and Ninety-Five Cents ($100,758,182.95) in original principal amount of New GO 5.0% CABs, and (e) thirty-two and two hundred forty-four one thousandths percent (32.244%) of the GO CVIs.

1.502    **Vintage CW Bonds:**  Collectively, the following bonds issued by the Commonwealth: (a) the Public Improvement Bonds of 1998, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (b) the Public Improvement Bonds of

1999, issued in the original principal amount of Four Hundred Seventy-Five Million Dollars ($475,000,000.00); (c) the Public Improvement Bonds of 2001, Series A, issued in the original principal amount of Two Hundred Seventy-Four Million One Hundred Thirty-Five Thousand Dollars ($274,135,000.00); (d) the Public Improvement Bonds of 2002, Series A, issued in the original principal amount of Four Hundred Fifty-Five Million Dollars ($455,000,000.00); (e) the Public Improvement Bonds of 2003, Series A, issued in the original principal amount of Four Hundred Sixty Million Dollars ($460,000,000.00); (f) the Public Improvement Bonds of 2004, Series A, issued in the original principal amount of Four Hundred Fifty-Seven Million One Hundred Seventy-Five Thousand Dollars ($457,175,000.00); (g) the Public Improvement Bonds of 2005, Series A, issued in the original principal amount of Four Hundred Forty Million Four Hundred Sixty Thousand Dollars ($440,460,000.00); (h) the Public Improvement Bonds of 2006, Series A, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (i) the Public Improvement Bonds of 2006, Series B, issued in the original principal amount of Thirty-Nine Million Three Hundred Eighty Thousand Dollars ($39,380,000.00); (j) the Public Improvement Bonds of 2007, Series A, issued in the original principal amount of Four Hundred Eight Million Eight Hundred Thousand Dollars ($408,800,000.00); (k) the Public Improvement Bonds of 2008, Series A, issued in the original principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00); (l) the Public Improvement Refunding Bonds, Series 2011A, issued in the original principal amount of Three Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00); (m) the Public Improvement Refunding Bonds, Series 1998, issued in the original principal amount of Five Hundred Three Million Nine Hundred Sixty-Three Thousand Two Hundred Sixty-Four Dollars ($503,963,264.00); (n) the Public Improvement Refunding Bonds, Series 2000, issued in the original principal amount of Fifty-Five Million Nine Hundred Ten Thousand Nine Hundred Ninety-Three Dollars ($55,910,993.00); (o) the Public Improvement Refunding Bonds, Series 2001, issued in the original principal amount of Three Hundred Thirty-Seven Million Two Hundred Thirty-Five Thousand Dollars ($337,235,000.00); (p) the Public Improvement Refunding Bonds, Series 2002A, issued in the original principal amount of Eight Hundred Thirty-Seven Million Nine Hundred Sixty Thousand Dollars ($837,960,000.00); (q) the Public Improvement Refunding Bonds, Series 2003A, issued in the original principal amount of Eighty-Nine Million Six Hundred Ten Thousand Dollars ($89,610,000.00); (r) the Public Improvement Refunding Bonds, Series 2003C-7, issued in the original principal amount of One Hundred Ninety-Four Million Six Hundred Ten Thousand Dollars ($194,610,000.00); (s) the Public Improvement Refunding Bonds, Series 2006A, issued in the original principal amount of One Hundred One Million Six Hundred Ninety-Five Thousand Dollars ($101,695,000.00); (t) the Public Improvement Refunding Bonds, Series 2006B, issued in the original principal amount of Three Hundred Thirty-Five Million Six Hundred Fifty Thousand Dollars ($335,650,000.00); (u) the Public Improvement Refunding Bonds, Series 2007A, issued in the original principal amount of Nine Hundred Twenty-Six Million Five Hundred Seventy Thousand Dollars ($926,570,000.00); (v) the Public Improvement Refunding Bonds, Series 2007A-4, issued in the original principal amount of Ninety-Three Million Eight Hundred Thirty-Five Thousand Dollars ($93,835,000.00); (w) the Public Improvement Refunding Bonds, Series 2008A, issued in the original principal amount of Seven Hundred Thirty-Five Million Fifteen Thousand Dollars ($735,015,000.00); (x) the Public Improvement Refunding Bonds, Series 2008C, issued in the original principal amount of One Hundred Ninety Million One Hundred Thirty-Five Thousand Dollars ($190,135,000.00);

(y) the Public Improvement Refunding Bonds, Series 2009A, issued in the original principal amount of Three Million Four Hundred Twenty-Five Thousand Dollars ($3,425,000.00); (z) the Public Improvement Refunding Bonds, Series 2009B, issued in the original principal amount of Three Hundred Seventy-Two Million Six Hundred Eighty-Five Thousand Dollars ($372,685,000.00); (aa) the Public Improvement Ten Million Refunding Bonds, Series 2009C, issued in the original principal amount of Two Hundred Ten Million Two Hundred Fifty Thousand Dollars ($210,250,000.00), and (bb) Notas de Ahorro issued prior to 2011 in the outstanding principal amount of Two Hundred Forty-Two Thousand Six Hundred Fifty Dollars ($242,650.00).

1.503    **Vintage CW Guarantee Bond Claim:**  A Claim, other than a Vintage CW Guarantee Bond Claim (Ambac), a Vintage CW Guarantee Bond Claim (Assured), a Vintage CW Guarantee Bond Claim (National), a Vintage CW Guarantee Bond Claim (FGIC), and Vintage CW Guarantee Bond Claim (Syncora) on account of the Commonwealth's guarantee of Vintage PBA Bonds; provided, however, that, solely for purposes of distribution under the Plan, the amount of a holder's Vintage CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of Vintage PBA Bonds shall be measured as the amount of such holder's Vintage PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds; and, provided, further, that Vintage CW Guarantee Claims may include an obligation, other than a Vintage PBA Bond Claim, for which the Commonwealth has pledged its good faith, credit and taxing power as authorized by the Commonwealth Legislature on or prior to December 31, 2012.

1.504    **Vintage CW Guarantee Bond Claim (Ambac):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Ambac.

1.505    **Vintage CW Guarantee Bond Claim (Assured):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.506    **Vintage CW Guarantee Bond Claim (FGIC):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by FGIC, including pursuant to a secondary market insurance policy.

1.507    **Vintage CW Guarantee Bond Claim (National):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by National.

1.508    **Vintage CW Guarantee Bond Claim (Syncora):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, of the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.509    **Vintage CW Guarantee Bond Claim (Taxable Election):**  A Vintage CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected

to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim shall be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Guarantee Bond Claim.

1.510    **Vintage CW Guarantee Bond Recovery**:  The aggregate recovery by holders of Allowed Vintage CW Guarantee Bond Claims,  Allowed Vintage CW Guarantee Bond Claims (Ambac), Allowed Vintage CW Guarantee Bond Claims (Assured), Allowed Vintage CW Guarantee Bond Claims (National), Allowed Vintage CW Guarantee Bond Claims (FGIC), and Allowed Vintage CW Guarantee Bond Claims (Syncora), consisting of (a) Six Hundred Fifty-Three Million Seven Hundred Eighty-Two Thousand One Hundred Seventy-Three Dollars and Eighty-One Cents ($653,782,173.81) in Cash, (b) Seven Hundred Eighty-Seven Million One Hundred Forty-Three Thousand Two Hundred Fifty-Six Dollars ($787,143,256.00) in original principal amount of New GO CIBs, (c) Fifty-Two Million One Hundred Seventeen Thousand Two Hundred Fifty-Seven Dollars and Fifty Cents ($52,117,257.50) in original principal amount of New GO 5.375% CABs, (d) Thirty-Three Million Nine Hundred Forty-Eight Thousand Three Hundred Eighty-Three Dollars and Seventeen Cents ($33,948,383.17) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred ninety-four one thousandths percent (15.194%) of the GO CVIs.

1.511    **Vintage CW Guarantee Taxable Bond Distribution**:  The distribution to be made to such holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 30.1 hereof.

1.512    **Vintage PBA Bond Claim**:  A Claim against PBA on account of Vintage PBA Bonds, other than a Vintage PBA Bond Claim (Ambac), a Vintage PBA Bond Claim (Assured), a Vintage PBA Bond Claim (National), a Vintage PBA Bond Claim (FGIC), a Vintage PBA Bond Claim (Syncora) or a Retail Vintage PBA Bond Claim.

1.513    **Vintage PBA Bond Claim (Ambac)**:  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Ambac.

1.514    **Vintage PBA Bond Claim (Assured)**:  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.515    **Vintage PBA Bond Claim (FGIC)**:  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.516    **Vintage PBA Bond Claim (National)**:  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by National.

1.517    **Vintage PBA Bond Claim (Syncora):**  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.518    **Vintage PBA Bond Recovery**:  The aggregate recovery by holders of Allowed Vintage PBA Bond Claims, Allowed Vintage PBA Bond Claims (Ambac), Allowed Vintage PBA Bond Claims (Assured), Allowed Vintage PBA Bond Claims (National), Allowed Vintage PBA Bond Claims (FGIC), Allowed Vintage PBA Bond Claims (Syncora), and Allowed Retail Vintage PBA Bond Claims on account of such Claims, consisting of Six Hundred Eleven Million Three Hundred Thirty-One Thousand One Hundred Eighty-Six Dollars and Five Cents ($611,331,186.05) in Cash.

1.519    **Vintage PBA Bonds:**  Collectively, (a) the Government Facilities Revenue Refunding Bonds, Series C, issued by PBA in the original principal amount of One Hundred Eighty-Five Million Two Hundred Ninety Thousand Dollars ($185,290,000.00), (b) the Government Facilities Revenue Bonds, Series D, issued by PBA in the original principal amount of Five Hundred Fifty-Three Million Seven Hundred Thirty-Three Thousand Seven Hundred Ninety-Four Dollars and Ninety Cents ($553,733,794.90), (c) the Government Facilities Revenue Refunding Bonds, Series F, issued by PBA in the original principal amount of One Hundred Thirty-One Million Four Hundred Forty-Five Thousand Dollars ($131,445,000.00), (d) the Government Facilities Revenue Bonds, Series G, issued by PBA in the original principal amount of Sixty-Two Million Dollars ($62,000,000.00), (e) the Government Facilities Revenue Refunding Bonds, Series H, issued by PBA in the original principal amount of Two Hundred Seventy-Two Million Seven Hundred Seventeen Thousand Four Hundred Eighteen Dollars and Ten Cents ($272,717,418.10), (f) the Government Facilities Revenue Bonds, Series I, issued by PBA in the original principal amount of Eight Hundred Thirty-Two Million Three Hundred Eighty-Five Thousand Dollars ($832,385,000.00), (g) the Government Facilities Revenue Refunding Bonds, Series J, issued by PBA in the original principal amount of Three Hundred Thirty-Five Million Five Hundred Eighty Thousand Dollars ($335,580,000.00), (h) the Government Facilities Revenue Refunding Bonds, Series K, issued by PBA in the original principal amount of Three Hundred Forty-Seven Million Sixty-Five Thousand Dollars ($347,065,000.00), (i) the Government Facilities Revenue Bonds, Series L, issued by PBA in the original principal amount of Six Million Seven Hundred Ninety-Five Thousand Dollars ($6,795,000.00), (j) the Government Facilities Revenue Refunding Bonds, Series M-1, issued by PBA in the original principal amount of Two Hundred Eighty-Three Million Five Hundred Fifty Thousand Dollars ($283,550,000.00), (k) the Government Facilities Revenue Refunding Bonds, Series M-2, issued by PBA in the original principal amount of One Hundred Twenty-Nine Million Three Hundred Thousand Dollars ($129,300,000.00), (l) the Government Facilities Revenue Refunding Bonds Series M-3, issued by PBA in the original principal amount of One Hundred Fifty Million Dollars ($150,000,000.00), (m) the Government Facilities Revenue Bonds, Series N, issued by PBA in the original principal amount of Three Hundred Twenty-Nine Million Four Hundred Fifteen Thousand Dollars ($329,415,000.00), (n) the Government Facilities Revenue Bonds, Series O, issued by PBA in the original principal amount of Three Million Twenty-Five Thousand Dollars ($3,025,000.00), (o) the Government Facilities Revenue Refunding Bonds, Series P, issued by PBA in the original principal amount of Three Hundred Thirty Million Nine Hundred Thirty-Five Thousand Dollars

($330,935,000.00), and (p) the Government Facilities Revenue Refunding Bonds Series Q, issued by PBA in the original principal amount of One Hundred Fifty-Two Million Five Hundred Forty Thousand Dollars ($152,540,000.00), the repayment of which is guaranteed by the Commonwealth.

      1.520    **Vintage Taxable Bond Distribution**: The distribution to be made to each holder of an Allowed Vintage CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 26.1 hereof.

      1.521    **Voting Record Date**: The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the Plan and set forth in the Disclosure Statement Order.

      1.522    **VTP Payroll Participant**: A person who, based on the current records of ERS and OGP, is receiving payment through the payroll of the Commonwealth or its agencies arising from participation in the Voluntary Transition Programs under Act 70-2010 or Act 211-2015 which allowed certain members to receive pensions or other forms of payment through their former employer's payroll, subject to transition to PayGo upon satisfying necessary age and service eligibility requirements.

      1.523    **VTP Payroll Participant Claim**: A Claim on account of being a VTP Payroll Participant for payments arising through Act 70-2010 or Act 211-2015 through the payroll of the Commonwealth or its agencies.

      1.524    **VTP Payroll Participant Above-Threshold Claims**: A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is greater than the Threshold.

      1.525    **VTP Payroll Participant Below-Threshold Claims**: A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is less than or equal to the Threshold.

      1.526    **GDB/PET**: The Public Entity Trust created pursuant to that certain GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018, in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds, and the municipalities having claims in respect of federal funds on deposit with GDB, which assets mainly consist of loans to public agencies and departments of the Commonwealth and funds sufficient to restore certain federal funds deposited at GDB for certain municipalities and non-municipal government entities.

      1.527    **GDB/PET Claim**: The Claim of the GDB/PET against the Commonwealth arising from or related to the restructuring of the GDB and the assets contributed to the GDB/PET.

      1.528    **COSSEC**: Public Corporation for Supervision and Insurance of Cooperatives.

      1.529    **Findings of Fact and Conclusions of Law**: The findings of fact and conclusions of law of the Title III Court entered in the Title III Cases in connection with confirmation of the

Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA.

     1.530    **Other Definitions:** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. In computing any period prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

     1.531    **Rules of Interpretation:** For purposes of the Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents; (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the Effective Date pursuant to the Plan plus the amount, if any, of Cash so distributed; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Cases are references to the docket numbers under the Title III Court's CM/ECF system; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES

     2.1    **Litigation Resolution:** The Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond

Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, Puerto Rico Metropolitan Bus Authority ("MBA") and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.

2.2    **Allowance of Bond Claims:**  For purposes of confirmation and consummation of the Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the Effective Date, among other Claims, (a) the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), and the Vintage PBA Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $2,661,243,754.21, (b) the 2011 PBA Bond Claims shall be deemed allowed in the aggregate amount of $1,335,422,892.78, (c) the 2012 PBA Bond Claims shall be deemed allowed in the aggregate amount of $674,308,470.06, (d) the Vintage CW Bond Claims, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (FGIC), and Vintage CW Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $5,843,252,912.91, (e) the ERS Bond Claims shall be deemed allowed in the aggregate amount of $3,168,698,776.55, (f) the 2011 CW Bond Claims and the 2011 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $476,498,325.06, (g) the 2011 CW Series D/E/PIB Bond Claims and the 2011 CW Series D/E/PIB Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $645,673,111.48, (h) the 2012 CW Bond Claims and the 2012 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $2,934,427,459.40, (i) the 2014 CW Bond Claims shall be deemed allowed in the amount of $3,836,611,111.11, and (j) the 2014 CW Guarantee Bond Claims shall be deemed allowed in the amount of $346,242,219.86.

(a)    Solely for purposes of confirmation and consummation of the Plan and the distributions to be made hereunder, unless otherwise allowed pursuant to a Final Order of the Title III Court, on the Effective Date, the CW/Convention Center Claims, the CW/HTA Claims, the

70

CW/MBA Claim and the CW/PRIFA Rum Tax Claims shall be deemed allowed in the amounts of $383,862,878.90, $6,377,335,459.34, $30,106,786.87, and $1,928,867,051.00, respectively.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and exculpation provided in Article XCII herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

2.4 **Purchase and Sale of Certain ERS Assets:** On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 hereof, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

## ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan.

3.1 **Administrative Expense Claims:** On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective

Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

3.2 **Professional Compensation and Reimbursement Claims**: All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.3 **GO/PBA Consummation Costs**: Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

3.4 **AFSCME and AMPR Professional Fees**: Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, (a) AFSCME shall be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions, and (b) in the event that, on or prior to September 30, 2021, (i) AMPR notifies the Oversight Board, in writing, that the Active TRS Participants have ratified the terms set forth in the term sheet annexed hereto as Exhibit "F-2", and (ii) AMPR executes an agreement with the Oversight Board wherein AMPR agrees to, among other things, support confirmation and consummation of the Plan, AMPR shall be reimbursed its reasonable professional fees and expenses incurred with respect to confirmation and consummation of such plan support agreement, including any term sheets, and the resolution of issues pertaining to pensions.

3.5 **GO/PBA PSA Restriction Fee**: Notwithstanding anything contained in the Plan to the contrary, in exchange for executing and delivering the GO/PBA Plan Support Agreement (or the GO/PBA Joinder Agreement or GO/PBA Annex Agreement, as applicable, in connection therewith) on or prior to the GO/PBA Joinder Deadline, and, agreeing to all of its terms and

conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the GO/PBA Plan Support Agreement, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive the GO/PBA PSA Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than (i) a breach of the GO/PBA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan, and such modification would have a material adverse effect on the Oversight Board and the GO/PBA PSA Creditors' ability to consummate the Plan on terms consistent with the GO/PBA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "I"), (iii) the New GO Bonds Legislation, the CVI Legislation, and the Debt Responsibility Act are not enacted prior to the commencement of the Confirmation Hearing, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the GO/PBA Plan Support Agreement, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

3.6     **Retail Support Fee:**  In accordance with the terms and provisions set forth herein, in the event that a Class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 47) votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee of up to Fifty Million Dollars ($50,000,000.00) in an amount equal to the GO/PBA Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, held by such accepting Class of Retail Investors, as the case may be, as of the date the Title III Court enters the Confirmation Order; provided, however, that, (a) in the event that, after allocating the Retail Support Fee to Retail Investors in the Classes that voted to accept the Plan, the entire Fifty Million Dollars ($50,000,000.00) is not fully allocated, the balance of the Retail Support Fee shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order, and (b) the Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

3.7     **ERS Restriction Fee:**  Notwithstanding anything contained in the Plan to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

3.8     **CCDA Consummation Costs:**  Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

3.9     **CCDA Restriction Fee:**  Notwithstanding anything contained in the Plan to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured, FGIC or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

3.10 **Non-Severability**: The allowance and payment of the Consummation Costs and PSA Restriction Fees as set forth in this Article III compensate the Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1 <u>**Claims are classified as follows**</u>:

| | | |
|---|---|---|
| (a) | **Class 1:** | Vintage PBA Bond Claims |
| (b) | **Class 2:** | Vintage PBA Bond Claims (Assured) |
| (c) | **Class 3:** | Vintage PBA Bond Claims (National) |
| (d) | **Class 4:** | Vintage PBA Bond Claims (Ambac) |
| (e) | **Class 5:** | Vintage PBA Bond Claims (FGIC) |
| (f) | **Class 6:** | Vintage PBA Bond Claims (Syncora) |
| (g) | **Class 7:** | Retail Vintage PBA Bond Claims |
| (h) | **Class 8:** | 2011 PBA Bond Claims |
| (i) | **Class 9:** | Retail 2011 PBA Bond Claims |
| (j) | **Class 10:** | 2012 PBA Bond Claims |
| (k) | **Class 11:** | Retail 2012 PBA Bond Claims |
| (l) | **Class 12:** | PBA/DRA Secured Claims |
| (m) | **Class 13:** | PBA General Unsecured Claims |
| (n) | **Class 14:** | PBA/DRA Unsecured Claims |
| (o) | **Class 15:** | Vintage CW Bond Claims |
| (p) | **Class 16:** | Retail Vintage CW Bond Claims |
| (q) | **Class 17:** | Vintage CW Bond Claims (Assured) |
| (r) | **Class 18:** | Vintage CW Bond Claims (National) |
| (s) | **Class 19:** | Vintage CW Bond Claims (Ambac) |

| (t) | **Class 20:** | Vintage CW Bond Claims (FGIC) |
| (u) | **Class 21:** | Vintage CW Bond Claims (Syncora) |
| (v) | **Class 22:** | Vintage CW Bond Claims (Taxable Election) |
| (w) | **Class 23:** | Vintage CW Guarantee Bond Claims |
| (x) | **Class 24:** | Vintage CW Guarantee Bond Claims (Assured) |
| (y) | **Class 25:** | Vintage CW Guarantee Bond Claims (National) |
| (z) | **Class 26:** | Vintage CW Guarantee Bond Claims (Ambac) |
| (aa) | **Class 27:** | Vintage CW Guarantee Bond Claims (FGIC) |
| (bb) | **Class 28:** | Vintage CW Guarantee Bond Claims (Syncora) |
| (cc) | **Class 29:** | Vintage CW Guarantee Bond Claims (Taxable Election) |
| (dd) | **Class 30:** | 2011 CW Bond Claims |
| (ee) | **Class 31:** | Retail 2011 CW Bond Claims |
| (ff) | **Class 32:** | 2011 CW Bond Claims (Assured) |
| (gg) | **Class 33:** | 2011 CW Bond Claims (Taxable Election) |
| (hh) | **Class 34:** | 2011 CW Guarantee Bond Claims |
| (ii) | **Class 35:** | 2011 CW Guarantee Bond Claims (Taxable Election) |
| (jj) | **Class 36:** | 2011 CW Series D/E/PIB Bond Claims |
| (kk) | **Class 37:** | 2011 CW Series D/E/PIB Bond Claims (Assured) |
| (ll) | **Class 38:** | Retail 2011 CW Series P/E/PIB Bond Claims |
| (mm) | **Class 39:** | 2011 CW Series D/E/PIB Bond Claims (Taxable Election) |
| (nn) | **Class 40:** | 2012 CW Bond Claims |
| (oo) | **Class 41:** | Retail 2012 CW Bond Claims |
| (pp) | **Class 42:** | 2012 CW Bond Claims (Assured) |
| (qq) | **Class 43:** | 2012 CW Bond Claims (Taxable Election) |

| (rr) | **Class 44:** | 2012 CW Guarantee Bond Claims |
|---|---|---|
| (ss) | **Class 45:** | 2012 CW Guarantee Bond Claims (Taxable Election) |
| (tt) | **Class 46:** | 2014 CW Bond Claims |
| (uu) | **Class 47:** | Retail 2014 CW Bond Claims |
| (vv) | **Class 48:** | 2014 CW Bond Claims (Taxable Election) |
| (ww) | **Class 49:** | 2014 CW Guarantee Bond Claims |
| (xx) | **Class 50:** | 2014 CW Guarantee Bond Claims (Taxable Election) |
| (yy) | **Class 51:** | Active and Retired Employee Benefits Claims |

|  | (i) | **Class 51A:** | Retired ERS Participant Below-Threshold Claims |
|---|---|---|---|
|  | (ii) | **Class 51B:** | Retired JRS Participant Below-Threshold Claims |
|  | (iii) | **Class 51C:** | Retired TRS Participant Below-Threshold Claims |
|  | (iv) | **Class 51D:** | Retired ERS Participant Above-Threshold Claims |
|  | (v) | **Class 51E:** | Retired JRS Participant Above-Threshold Claims |
|  | (vi) | **Class 51F:** | Retired TRS Participant Above-Threshold Claims |
|  | (vii) | **Class 51G:** | Active ERS Participant Claims |
|  | (viii) | **Class 51H:** | Active JRS Participant Claims |
|  | (ix) | **Class 51I:** | Active TRS Participant Claims |
|  | (x) | **Class 51J:** | System 2000 Participant Claims |
|  | (xi) | **Class 51K:** | VTP Payroll Participant Below-Threshold Claims |
|  | (xii) | **Class 51L:** | VTP Payroll Participant Above-Threshold Claims |

| (zz) | **Class 52:** | AFSCME Claims |
|---|---|---|
| (aaa) | **Class 53:** | Dairy Producer Claims |
| (bbb) | **Class 54:** | Eminent Domain/Inverse Condemnation Claims |
| (ccc) | **Class 55:** | Energy Incentive Claims |

| (ddd) | **Class 56:** | Med Center Claims |
| (eee) | **Class 57:** | Tax Credit Claims |
| (fff) | **Class 58:** | CW General Unsecured Claims |
| (ggg) | **Class 58A:** | GDB/PET Claim |
| (hhh) | **Class 59:** | CW/HTA Claims |
| (iii) | **Class 60:** | CW/Convention Center Claims |
| (jjj) | **Class 61:** | CW/PRIFA Rum Tax Claims |
| (kkk) | **Class 62:** | CW/MBA Claims |
| (lll) | **Class 63:** | CW Appropriations Claims |
| (mmm) | **Class 64:** | Section 510(b) Subordinated Claims |
| (nnn) | **Class 65:** | ERS Bond Claims |
| (ooo) | **Class 66:** | ERS General Unsecured Claims |
| (ppp) | **Class 67:** | Gracia Gracia Claims |
| (qqq) | **Class 68:** | Convenience Claims |
| (rrr) | **Class 69:** | Federal Claims |

## ARTICLE V

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (CLASS 1)

5.1 **Treatment of Vintage PBA Bond Claims:** On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim, such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (ASSURED) (CLASS 2)

6.1 **Treatment of Vintage PBA Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Assured) shall be entitled to receive in full consideration, satisfaction, release and

exchange of such holder's Allowed Vintage PBA Bond Claim (Assured), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (NATIONAL) (CLASS 3)

7.1 **Treatment of Vintage PBA Bond Claims (National)**: Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (National), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VIII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (AMBAC) (CLASS 4)

8.1 **Treatment of Vintage PBA Bond Claims (Ambac)**: Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE IX

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (FGIC) (CLASS 5)

9.1 **Treatment of Vintage PBA Bond Claims (FGIC)**: Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (FGIC) shall be entiled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE X

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (SYNCORA) (CLASS 6)

10.1 **Treatment of Vintage PBA Bond Claims (Syncora)**: Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE XI

## PROVISIONS FOR TREATMENT OF RETAIL
## VINTAGE PBA BOND CLAIMS (CLASS 7)

11.1 **Treatment of Retail Vintage PBA Bond Claims**: On the Effective Date, each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage PBA Bond Claim, such holder's Pro Rata Share of (a) the Vintage PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage PBA Bond Claims; provided, however, that, in the event that Class 7 votes to reject the Plan in accordance with section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

# ARTICLE XII

## PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8)

12.1 **Treatment of 2011 PBA Bond Claims**: On the Effective Date, each holder of an Allowed 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 PBA Bond Claim, such holder's Pro Rata Share of the 2011 PBA Bond Recovery.

# ARTICLE XIII

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## PBA BOND CLAIMS (CLASS 9)

13.1 **Treatment of Retail 2011 PBA Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2011 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 PBA Bond Claims; provided, however, that, in the event that Class 9 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

# ARTICLE XIV

## PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10)

14.1    **Treatment of 2012 PBA Bond Claims:**  On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 PBA Bond Claim, such holder's Pro Rata Share of the 2012 PBA Bond Recovery.

# ARTICLE XV

## PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11)

15.1    **Treatment of Retail 2012 PBA Bond Claims:**  On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2012 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 PBA Bond Claims; provided, however, that, in the event that Class 11 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

# ARTICLE XVI

## PROVISIONS FOR TREATMENT OF
## PBA/DRA SECURED CLAIMS (CLASS 12)

16.1    **Treatment of PBA/DRA Secured Claims:**  On the Effective Date, each holder of an PBA/DRA Secured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Secured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Secured Claim.

# ARTICLE XVII

## PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED
## CLAIMS (CLASS 13)

17.1    **Treatment of PBA General Unsecured Claims:**  On the Effective Date, each holder of an Allowed PBA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA General Unsecured Claim, (a) payment of the Allowed amount of such holder's Claim, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA General Unsecured Claim, on,

82

or as soon as practicable after the latest to occur of (1) the Effective Date, (2) the date on which such PBA General Unsecured Claim becomes Allowed, (3) the date on which such Allowed PBA General Unsecured Claim is otherwise due and payable, and (4) such other date as may be mutually agreed to by such holder of such PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be, or (b) such other treatment as may be mutually agreed to by and among such holder of a PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF PBA/DRA
## UNSECURED CLAIMS (CLASS 14)

18.1 **Treatment of PBA/DRA Unsecured Claims:** On the Effective Date, each holder of an PBA/DRA Unsecured Claim shall be entitled to, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Unsecured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Unsecured Claim.

## ARTICLE XIX

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (CLASS 15)

19.1 **Treatment of Vintage CW Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 19.2 hereof, each holder of an Allowed Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim, such holder's Pro Rata Share of the Vintage CW Bond Recovery.

19.2 **Right of Election to Vintage CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 19.1 of the Plan, each holder of an Allowed Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XX

## PROVISIONS FOR TREATMENT OF RETAIL VINTAGE
## CW BOND CLAIMS (CLASS 16)

20.1 **Treatment of Retail Vintage CW Bond Claims**: On the Effective Date, each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage CW Bond Claim, such holder's Pro Rata Share of (a) the Vintage CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage CW Bond Claims; provided, however, that, in the event that Class 16 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

20.2 **Right of Election to Retail Vintage CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 20.1 of the Plan, each holder of an Allowed Retail Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXI

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (ASSURED) (CLASS 17)

21.1 **Treatment of Vintage CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Assured), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXII

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (NATIONAL) (CLASS 18)

22.1    **Treatment of Vintage CW Bond Claims (National)**:  Subject to the terms and
provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (National), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXIII

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (AMBAC) (CLASS 19)

23.1    **Treatment of Vintage CW Bond Claims (Ambac)**:  Subject to the terms and
provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (Ambac), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXIV

### PROVISIONS FOR TREATMENT OF VINTAGE
### CW BOND CLAIMS (FGIC) (CLASS 20)

24.1    **Treatment of Vintage CW Bond Claims (FGIC)**:  Subject to the terms and
provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release and
exchange of such holder's Allowed Vintage CW Bond Claim (FGIC), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXV

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (SYNCORA) (CLASS 21)

25.1    **Treatment of Vintage CW Bond Claims (Syncora)**:  Subject to the terms and
provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (Syncora), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXVI

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (TAXABLE ELECTION) (CLASS 22)

26.1    **Treatment of Vintage CW Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Bond Claim (Taxable Election), its Pro Rata Share of the Vintage CW Bond Recovery, as modified by its Pro Rata Share of the Vintage Taxable Bond Distribution.

## ARTICLE XXVII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (CLASS 23)

27.1    **Treatment of Vintage CW Guarantee Bond Claims:**  On the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim, each holder of an Allowed Vintage CW Guarantee Bond Claim shall receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

27.2    **Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election):**  Notwithstanding the provisions of Section 27.1 of the Plan, each holder of an Allowed Vintage CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 33.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXVIII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24)

28.1    **Treatment of Vintage CW Guarantee Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Assured), each holder of an Allowed Vintage CW Guarantee Bond Claim (Assured) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXIX

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25)

29.1 **Treatment of Vintage CW Guarantee Bond Claims (National)**: Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its allowed Vintage CW Guarantee Bond Claim (National), each holder of an Allowed Vintage CW Guarantee Bond Claim (National) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXX

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26)

30.1 **Treatment of Vintage CW Guarantee Bond Claims (Ambac)**: Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Ambac), each holder of an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXI

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (FGIC) (CLASS 27)

31.1 **Treatment of Vintage CW Guarantee Bond Claims (FGIC)**: Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (FGIC), each holder of an Allowed Vintage CW Guarantee Bond Claim (FGIC) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXII

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28)

32.1 **Treatment of Vintage CW Guarantee Bond Claims (Syncora)**: Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Syncora), each holder of an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

87

## ARTICLE XXXIII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29)

33.1 **Treatment of Vintage CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the Vintage Taxable Bond Distribution.

### ARTICLE XXXIV

### PROVISIONS FOR TREATMENT OF 2011
### CW BOND CLAIMS (CLASS 30)

34.1 **Treatment of 2011 CW Bond Claims**:  On the Effective Date, and subject to the right of election set forth in Section 34.2 hereof, each holder of an Allowed 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim, such holder's Pro Rata Share of the 2011 CW Bond Recovery.

34.2 **Right of Election to 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 34.1 of the Plan, each holder of an Allowed 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

### ARTICLE XXXV

### PROVISIONS FOR TREATMENT OF RETAIL 2011
### CW BOND CLAIMS (CLASS 31)

35.1 **Treatment of Retail 2011 CW Bond Claims**:  On the Effective Date, each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Bond Claims; provided, however, that, in the event that Class 31 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to

88

receive such holder's Pro Rata Share of the 2011 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

35.2 **Right of Election to Retail 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 35.1 of the Plan, each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

**ARTICLE XXXVI**

**PROVISIONS FOR TREATMENT OF 2011 CW
BOND CLAIMS (ASSURED) (CLASS 32)**

36.1 **Treatment of 2011 CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Bond Recovery.

**ARTICLE XXXVII**

**PROVISIONS FOR TREATMENT OF 2011 CW BOND
CLAIMS (TAXABLE ELECTION) (CLASS 33)**

37.1 **Treatment of 2011 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Taxable Bond Distribution.

# ARTICLE XXXVIII

## PROVISIONS FOR TREATMENT OF
## 2011 CW GUARANTEE BOND CLAIMS (CLASS 34)

38.1     **Treatment of 2011 CW Guarantee Bond Claims:**   On the Effective Date, and subject to the right of election set forth in Section 38.2 hereof, each holder of an Allowed 2011 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery.

38.2     **Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 38.1 of the Plan, each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 39.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XXXIX

## PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 35)

39.1     **Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)**:   On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.

# ARTICLE XL

## PROVISIONS FOR TREATMENT OF 2011
## CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)

40.1     **Treatment of 2011 CW Series D/E/PIB Bond Claims**:   On the Effective Date, and subject to the right of election set forth in Section 40.2 hereof, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

90

40.2 **Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 40.1 of the Plan, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLI

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37)

41.1 **Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

## ARTICLE XLII

## PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38)

42.1 **Treatment of Retail 2011 CW Series D/E/PIB Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Series D/E/PIB Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims; provided, however, that, in the event that Class 38 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

42.2 **Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 42.1 of the Plan, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the

Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIII

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39)

43.1 **Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution.

## ARTICLE XLIV

## PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40)

44.1 **Treatment of 2012 CW Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 44.2 hereof, each holder of an Allowed 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim, such holder's Pro Rata Share of the 2012 CW Bond Recovery.

44.2 **Right of Election to 2012 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 44.1 of the Plan, each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

92

## ARTICLE XLV

### PROVISIONS FOR TREATMENT OF RETAIL 2012
### CW BOND CLAIMS (CLASS 41)

45.1     **Treatment of Retail 2012 CW Bond Claims**:   On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 CW Bond Claim, such holder's Pro Rata Share of (a) the 2012 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 CW Bond Claims; provided, however, that, in the event that Class 41 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

45.2     **Right of Election to Retail 2012 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 45.1 of the Plan, each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLVI

### PROVISIONS FOR TREATMENT OF 2012
### CW BOND CLAIMS (ASSURED) (CLASS 42)

46.1     **Treatment of 2012 CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Assured) shall be entitled to received, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2012 CW Bond Recovery.

## ARTICLE XLVII

### PROVISIONS FOR TREATMENT OF 2012 CW BOND
### CLAIMS (TAXABLE ELECTION) (CLASS 43)

47.1 **Provisions for Treatment of 2012 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Bond Recovery, as modified by its Pro Rata Share of the 2012 CW Taxable Bond Distribution.

## ARTICLE XLVIII

### PROVISIONS FOR TREATMENT OF
### 2012 CW GUARANTEE BOND CLAIMS (CLASS 44)

48.1 **Treatment of 2012 CW Guarantee Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 48.2 hereof, each holder of an Allowed 2012 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery.

48.2 **Right of Election to 2012 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 48.1 of the Plan, each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 49.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIX

### PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
### BOND CLAIMS (TAXABLE ELECTION) (CLASS 45)

49.1 **Treatment of 2012 CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2012 CW Guarantee Taxable Bond Distribution.

# ARTICLE L

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (CLASS 46)

50.1 **Treatment of 2014 CW Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 50.2 hereof, each holder of an Allowed 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

50.2 **Right of Election to 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 50.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE LI

## PROVISIONS FOR TREATMENT OF  RETAIL 2014
## CW BOND CLAIMS (CLASS 47)

51.1 **Treatment of Retail 2014 Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2014 CW Bond Claim, such holder's Pro Rata Share of (a) the 2014 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2014 CW Bond Claims; provided, however, that, in the event that Class 47 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2014 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2014 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

51.2 **Right of Election to Retail 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 51.1 of the Plan, each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by

such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

**ARTICLE LII**

**PROVISIONS FOR TREATMENT OF 2014
CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 48)**

52.1     **Provisions for Treatment of 2014 CW Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Taxable Bond Distribution.

**ARTICLE LIII**

**PROVISIONS FOR TREATMENT OF
2014 CW GUARANTEE BOND CLAIMS (CLASS 49)**

53.1     **Treatment of 2014 CW Guarantee Bond Claims:**  On the Effective Date, subject to the right of election set forth in Section 53.2 hereof, each holder of an Allowed 2014 CW Guarantee Bond claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

53.2     **Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election):**  Notwithstanding the provisions of Section 53.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 54.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

**ARTICLE LIV**

**PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
BOND CLAIMS (TAXABLE ELECTION) (CLASS 50)**

54.1     **Treatment of 2014 CW Guarantee Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election)

96

shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Guarantee Taxable Bond Distribution.

**ARTICLE LV**

**PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED
EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)**

51.1      **Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A):**

(a)      Treatment. Each holder of an Allowed Retired ERS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.2      **Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B):**

(a)      Treatment. Each holder of an Allowed Retired JRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.3      **Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C):**

(a)      Treatment. Each holder of an Allowed Retired TRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.4      Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D):

(a)      Treatment.  Each holder of an Allowed Retired ERS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.5      Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E):

(a)      Treatment.  Each holder of an Allowed Retired JRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statues, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.6      Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F):

(a)      Treatment.  Each holder of an Allowed Retired TRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive order, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part

herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.7    **Treatment of Active ERS Participant Claims (Class 51G):**

(a)    Treatment.  Each holder of an Allowed Active ERS Participant Claim shall be entitled to receive on account of such Allowed Active ERS Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date; provided, however, that, notwithstanding the foregoing, Active ERS Participant Claims of Active ERS Participants hired prior to January 1, 2000, but which accrued after June 30, 2013 pursuant to Act 3-2013, shall not be subject to reduction in accordance with the Plan.  Benefits which accrued after June 30, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 shall include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date and such Participants' balances shall have a four percent (4%) interest rate applied to them upon conversion of the balances to an annuity.  Each holder of an Active ERS Participant Claim (who is actively employed by an employer within the ERS as of the Effective Date) shall also receive a one-time payment in the amount of Two Thousand Six Hundred Dollars ($2,600.00), to be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each Participant will reach age 65, unless any such Participant has affirmatively elected different investment options.  Holders of Allowed Active ERS Participant Claims who have already retired as of April 1, 2021 and who have converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g. Act 211-2015 or 70-2016), are not eligible for the treatment described in this Section 55.7(a) and shall not receive a cash payment, and will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1, 55.4, 55.11, or 55.12 of the Plan, as applicable.

(b)    Preemption:  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(c)    Payroll Deductions:  As further consideration to assure active Participants' future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to their individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

55.8    **Treatment of Active JRS Participant Claims (Class 51H):**

99

(a)     Treatment.  Each holder of an Allowed JRS Participant Claim shall be entitled to receive on account of such Allowed Active JRS Participant Claim (i) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "E" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, frozen as of the date as set forth on the term sheet attached as Exhibit "E" hereto, as applicable, to such holder of an Allowed Active JRS Participant Claim, including the social security benefits defined therein.

(b)     Rejection.  To effectuate the freeze of contractual rights of Active JRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "E" hereto, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active JRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

## 55.9     Treatment of Active TRS Participant Claims (Class 51I):

(a)     Treatment.

(i)     Each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (i) his or her, as applicable, benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification, as applicable, and the terms set forth on Exhibit "F-1" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the Effective Date as set forth on the term sheet attached as Exhibit "F-1" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein; provided, however, that, notwithstanding the foregoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(ii)     Notwithstanding the terms and provisions of Section 55.9(a)(i) hereof, in the event that, on or prior to September 30, 2021, AMPR (A) notifies the Oversight Board, in writing, that the terms set forth in the term sheets annexed hereto as Exhibit "F-2" have been ratified, and (B) executes a plan support agreement with, among others, the Oversight Board, on behalf of the Commonwealth, that incorporates the terms set forth on Exhibit "F-2" hereto, each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (1) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "F-2"

hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, (2) such additional benefits for service during the period from and after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the six (6) month anniversary of the Effective Date as set forth on the term sheet attached as Exhibit "F-2" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein, and (3) the benefits of the terms of a new collective bargaining agreement and all other terms as set forth on the term sheet attached hereto as Exhibit "F-2", in which case any existing collective bargaining agreement(s) with AMPR shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code. Without limiting the foregoing, on or as soon as reasonably practicable from and after the Effective Date, the Active TRS Participants shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "F-2" hereto. Notwithstanding the forgoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(b)     Rejection.  To effectuate the freeze of the contractual rights of Active TRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "F-1"or "F-2" hereto, as applicable, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, the statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(d)     Payroll Deductions.  As further consideration to assure Active TRS Participants' future contributions and benefits, such Participants shall have his, her or their payroll deductions for contributions to the Participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

55.10   **Treatment of System 2000 Participant Claims (Class 51J):**

(a)     System 2000 Benefits:  Except as set forth in Sections 55.7(b), 55.8(c) and 55.9(c) hereof, holders of Allowed System 2000 Participant Claims shall receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued thereon pursuant to applicable law for the period up to, but not including, the Commonwealth Petition Date, which amount shall be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant unless any such participant has affirmatively elected different investment options.  If the total amount of contributions, plus accrued interest thereon as described above, is less than or equal to One Billion Five Hundred Million Dollars

($1,500,000,000.00), on the Effective Date, each holder of an Allowed System 2000 Participant Claim shall receive such holder's Pro Rata Share of such aggregate amount. If the total amount of contributions described in this Section 55.10(a), plus accrued interest thereon as described above, exceeds One Billion Five Hundred Million Dollars ($1,500,000,000.00), the Oversight Board and AFSCME shall develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions (for the avoidance of doubt, the amount in excess of One Billion Five Hundred Million Dollars ($1,500,000,000.00)) described in this Section 55.5(a). In all events, the full amount of contributions described in this Section 55.5(a) will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025. As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits. Holders of Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g., Act 211-2015 or Act 70-2010) are not eligible for the treatment described in this Section 55.5(a) and shall not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1 of the Plan.

(b)        Preemption: All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment afforded pursuant to Section 55.5(a) hereof, are preempted as inconsistent with PROMESA.

(c)        Payroll Deductions: As further consideration to assure active participant's future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to a participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deposited from such participant's payroll distribution.

55.11    **Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K):**

(a)        Treatment. Each holder of a VTP Payroll Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)        Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.12    **Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L):**

(a)     Treatment.  Each holder of a VTP Payroll Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

## ARTICLE LVI

### PROVISIONS FOR TREATMENT OF
### AFSCME CLAIMS (CLASS 52)

56.1     **Treatment of AFSCME Claims:**

(a)     Modified AFSCME Collective Bargaining Agreements:  The existing collective bargaining agreements between the Commonwealth, its applicable agencies and instrumentalities, on the one hand, and AFSCME and its related union affiliates, on the other hand, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code and replaced with modified collective bargaining agreements to be entered into in accordance with the terms and conditions agreed to by AFSCME and the Oversight Board, as set forth on Exhibit "G" hereto. Without limiting the foregoing, such modifications shall include, among other matters, (a) a term of five (5) years, commencing as of the Effective Date, (b) provisions regarding layoffs and downsizing, (c) terms regarding System 2000 and (d) provisions for sharing Excess Cash Surplus. Each holder of an Allowed AFSCME Claim shall be entitled to receive the treatment set forth in Sections 56.1(a), (b), (c) and (d) hereof in full consideration, satisfaction, release, and exchange of such holder's Allowed AFSCME Claim resulting from such rejection.  The Commonwealth shall have no obligation to bargain with AFSCME over terms of a new or modified collective bargaining agreements throughout the term of such modified collective bargaining agreements and the failure to bargain during such period shall not constitute, nor shall it be construed to be, an unfair labor practice under any Puerto Rico law.  No adjudicative forum shall take into consideration prior practices or bargaining history when interpreting the terms of the modified collective bargaining agreements set forth on Exhibit "G" hereto.

(b)     Additional AFSCME Distribution.  On or as soon as reasonably practicable after the Effective Date, AFSCME and its member employees, as applicable, shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "G" hereto.

(c)     Pre-Petition Arbitration and Grievance Claims.  Any distributions on account of Claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures arising under the collective bargaining agreements between the Commonwealth and AFSCME shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) thirty (30) days after such disposition and (ii) sixty (60) days after the Effective Date.

(d)        Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified herein, to the extent inconsistent with the treatment afforded in this Section 56.1, are preempted as inconsistent with PROMESA and shall be of no further force or effect.

## ARTICLE LVII

## PROVISIONS FOR TREATMENT OF
## DAIRY PRODUCER CLAIMS (CLASS 53)

57.1    **Treatment of Dairy Producer Claims:**  On the Effective Date, each holder of a Dairy Producer Claim be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Dairy Producer Claim, an amount equal to fifty percent (50%) of such Allowed Dairy Producer Claim, with such amount being payable by the Commonwealth in three (3) equal installments commencing on the Effective Date and each subsequent payment thereof being made on July 1st of each FY.  Notwithstanding anything contained in the Plan to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise, discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth in decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Produce Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

## ARTICLE LVIII

## PROVISIONS FOR TREATMENT OF CW EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54)

58.1    **Treatment of Eminent Domain/Inverse Condemnation Claims:**  From and after the Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and (b) subject to the entry of the Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the Plan providing such Claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse

Condemnation Claim; provided, however, that, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

## ARTICLE LIX

## PROVISIONS FOR TREATMENT OF
## ENERGY INCENTIVE CLAIMS (CLASS 55)

59.1 **Treatment of Energy Incentive Claims:** From and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive Act, and (ii) in connection therewith, assume Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

## ARTICLE LX

## PROVISIONS FOR TREATMENT OF
## MED CENTER CLAIMS (CLASS 56)

60.1 **Treatment of Med Center Claims:** On the Effective Date, and provided that Class 56 votes to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (a) receive an Allowed Med Center Claim in the amount set forth in Column "A" set forth on Exhibit "H" hereto, and (b) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim; provided, however, that, in the event that Class 56 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (y) receive an Allowed Med Center Claim in the amount set forth in Column "B" set forth on Exhibit "H" hereto, and (z) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim set forth in Column "B" set forth on Exhibit "H" hereto, with either such amount being payable by the Commonwealth in three (3) equal annual installments,

commencing on the Effective Date and each subsequent payment thereof being made on the anniversary thereof.

60.2 **Dismissal of Med Center Litigation**:  On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of the Effective Date, filing notices with the clerk of such court setting forth the resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action), with prejudice; provided, however, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal; and, provided, further, that the Commonwealth and the Med Centers shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DC Action shall be stayed; provided, however, that any claims and causes of action relating to the period up to and including the Effective Date shall be deemed dismissed, with prejudice, (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth may present any and all defenses with respect to such alleged defaults, and (c) any Med Center claims for injunctive relief relating to the period from and after July 1, 2022 shall be brought in the Med DC Action and shall proceed in the ordinary course upon the expiration or the lifting of the automatic stay, subject to the reservation of all rights, claims, and defenses of the Med Centers and the Commonwealth with respect to any such claims.

## ARTICLE LXI

## PROVISIONS FOR TREATMENT OF
## TAX CREDIT CLAIMS (CLASS 57)

61.1 **Treatment of Tax Credit Claims:**  From and after the Effective Date, the Commonwealth shall assume Allowed Tax Credit Claims and the instruments and agreements in existence as of the Effective Date with respect thereto and the holders of Allowed Tax Credit Claims shall be permitted to exercise and claim the tax benefits and entitlements with respect thereto in accordance with the terms and provisions of such documents, instruments, and applicable law.

## ARTICLE LXII

## PROVISIONS FOR TREATMENT OF CW GENERAL
## UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58 AND 58A)

62.1 **Treatment of CW General Unsecured Claims:**

(a) Treatment of CW General Unsecured Claims.  Subject to the election set forth in Section 62.1(b) hereof, on the Effective Date, each holder of an Allowed CW General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and

exchange of such holder's Allowed CW General Unsecured Claim, such holder's Pro Rata Share of the CW GUC Recovery up to the GUC Recovery Cap.

(b)        Election to be Treated as Convenience Claim.  Notwithstanding the provisions of Section 62.1(a) of the Plan, any holder of an Allowed CW General Unsecured Claim, other than a CW General Unsecured Claim that is a component of a larger CW General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, may elect to be treated as the holder of an Allowed Convenience Claim.  Such election must be made on Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

62.2        **Limitation on Recovery:**  Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust, any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes.

62.3        **GUC Reserve:**  The GUC Reserve shall be funded as follows: (a) Two Hundred Million Dollars ($200,000,000.00) on the Effective Date, (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022, (c) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2023, (d) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024, and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025; provided, however, that amounts necessary (a) to fund the Avoidance Actions Trust in accordance with Section 78.11 hereof shall be funded directly to the Avoidance Actions Trust and not into the GUC Reserve, and (b) to satisfy Allowed Convenience Claims shall be funded directly to the Disbursing Agent and not into the GUC Reserve; and provided, further, that, in the event that the Avoidance Actions Trust ceases pursuit of Avoidance Actions, including, without limitation, pursuant to settlement or dismissal of all Avoidance Actions, all funds in the Avoidance Actions Trust (including amounts necessary to fund the administration and operation of the Avoidance Action Trust) shall be transferred to the GUC Reserve for distribution to holders of Allowed CW General Unsecured Claims; and, provided, further, that, in accordance with Section 62.2 hereof, in the event recoveries on account of Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, (a) any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes, or (b) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, the Commonwealth shall be relieved of such future funding obligation; and, provided, further, that, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and such Claims for just compensation must be paid in full and the Oversight Board prosecutes such appeal in good faith, the GUC Reserve shall be reduced as follows: (a) in the event such appeal is successful and a Final Order is entered holding that the

Eminent Domain/Inverse Condemnation Claims are dischargeable and may be impaired, the GUC Reserve shall be reduced by the lesser of (i) Thirty Million Dollars ($30,000,000.00) and (ii) ten percent (10%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims, or (b) in the event such appeal is not successful and a Final Order is entered holding that Eminent Domain/Inverse Condemnation Claims are non-dischargeable or may not be impaired, the GUC Reserve shall be reduced by the lesser of (i) Fifteen Million Dollars ($15,000,000.00) and (ii) five percent (5%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims. For the avoidance of doubt, regardless of whether or not such appeal is successful, Eminent Domain/Inverse Condemnation Claims shall not be deemed CW General Unsecured Claims.

62.4    **Treatment of GDB/PET Claims:**  On the Effective Date, the holder of the GDB/PET Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of the Allowed GDB/PET Claim, payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions of Sections 62.1, 62.2 and 62.3 hereof.

## ARTICLE LXIII

## PROVISIONS FOR TREATMENT
## OF CW/HTA CLAIMS (CLASS 59)

63.1    **Treatment of CW/HTA Claims:**  On the Effective Date, and subject to the satisfaction of the HTA Distribution Conditions, each holder of an Allowed CW/HTA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/HTA Claim, such holder's Pro Rata Share of the CW/HTA Clawback Recovery; provided, however, that, upon satisfaction of the HTA Distribution Conditions, Ambac, Assured, and National shall receive their respective shares of the CW/HTA Clawback Recovery on account of the Ambac CW/HTA Bond Claims, Assured CW/HTA Bond Claims, and National CW/HTA Bond Claims, respectively; and provided, further, that, upon satisfaction of the HTA Distribution Conditions, the CW/HTA Clawback Recovery allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

63.2    **Distribution of the CW/HTA Clawback Recovery**:  Notwithstanding anything contained in the Plan to the contrary, upon satisfaction of the HTA Distribution Conditions, the Commonwealth shall take such actions as are necessary to distribute the CW/HTA Clawback Recovery to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto; provided, however, that, until receipt of the GDB Loan Priority Determination, (a) Cash payable with respect to the HTA Clawback CVI and allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (b) the CW/HTA Clawback Recovery otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any

undistributed CW/HTA Clawback Recovery shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (y) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (z) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto. Notwithstanding the foregoing, the HTA Clawback CVI to be issued and distributed pursuant to this Article LXIII and any payments made thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the HTA Distribution Conditions are satisfied, and, in the event the HTA/CCDA Plan Support Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto.

ARTICLE LXIV

PROVISIONS FOR TREATMENT OF
CW/CONVENTION CENTER CLAIMS (CLASS 60)

64.1 **Treatment of CW/Convention Center Claims:** Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed CW/Convention Center Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/Convention Center Claim, such holder's Pro Rata Share of the CW/Convention Center Clawback Recovery; provided, however, that Ambac and Assured shall receive their respective share of the CW/Convention Center Clawback Recovery on account of the Allowed Ambac CW/Convention Center Claims and the Allowed Assured CW/Convention Center Claims, respectively; and, provided, further, that the CW/Convention Center Clawback Recovery on account of the Allowed FGIC CW/Convention Center Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

ARTICLE LXV

PROVISIONS FOR TREATMENT OF
CW/PRIFA RUM TAX CLAIMS (CLASS 61)

65.1 **Treatment of CW/PRIFA Rum Tax Claims:** On the Effective Date, subject to the satisfaction of the PRIFA Distribution Conditions, each holder of an Allowed CW/PRIFA Rum Tax Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/PRIFA Rum Tax Claim, such holder's Pro Rata Share of the CW/PRIFA Clawback Recovery; provided, however that, upon satisfaction of the PRIFA Distribution Conditions, Ambac and Assured shall receive their respective share of the CW/PRIFA Clawback Recovery on account of Allowed Ambac CW/PRIFA Rum Tax Claims and the Allowed Assured CW/PRIFA Rum Tax Claims, respectively; and, provided, further, that the CW/PRIFA Clawback Recovery on account of the Allowed FGIC PRIFA Rum Tax Claims shall

109

be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

65.2    **Distribution of the Beneficial Interests in the PRIFA Trust:**  Notwithstanding anything contained in the Plan to the contrary, (a) on the Effective Date, the Commonwealth shall take such actions as are necessary to deposit (i) the PRIFA Clawback CVI and the Rum Tax CVI, and all payments to be made in connection therewith, and (ii) One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00) into the PRIFA Trust, each for the benefit of holders of PRIFA Bond Claims (including the Monolines), and (b) upon satisfaction of the PRIFA Distribution Conditions, cause the distribution of the beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims (including the Monolines); provided, however, that the beneficial interests in the PRIFA Trust on account of the FGIC Insured PRIFA Bond Claims shall be treated and distributed in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

## ARTICLE LXVI

### PROVISIONS FOR TREATMENT OF
### CW/MBA CLAIMS (CLASS 62)

66.1    **Treatment of CW/MBA Claims:**  On the Effective Date, each holder of an Allowed CW/MBA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/MBA Claim, such holder's Pro Rata Share of the CW/MBA Clawback Recovery.

## ARTICLE LXVII

### PROVISIONS FOR TREATMENT OF
### CW APPROPRIATIONS CLAIMS (CLASS 63)

67.1    **Treatment of CW Appropriations Claims:**  CW Appropriations Claims shall not receive a distribution pursuant to the Plan and each holder of a CW Appropriations Claim shall be deemed to have rejected the Plan with respect to such CW Appropriations Claim.

## ARTICLE LXVIII

### PROVISIONS FOR TREATMENT OF
### SECTION 510(b) SUBORDINATED CLAIMS (CLASS 64)

68.1    **Treatment of Section 510(b) Subordinated Claims:**  Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

**ARTICLE LXIX**

**PROVISIONS FOR TREATMENT OF
ERS BOND CLAIMS (CLASS 65)**

69.1 **Treatment of ERS Bond Claims:** On the Effective Date, each holder of an Allowed ERS Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS Bond Claim, such holder's Pro Rata Share of the ERS Bond Recovery, without setoff or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

69.2 **ERS Private Equity Portfolio:**

(a) Commonwealth Election to Purchase. From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price. In the event the Commonwealth determines to the exercise the Commonwealth Election, the Commonwealth shall provide notice thereof by publication to holders of Allowed ERS Bond Claims on or prior April 10, 2023, and shall consummate the purchase thereof on or prior to April 25, 2023, with the proceeds thereof being distributed, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(b) Bondholder Election to Purchase. In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023. In the event that one or more holders of Allowed ERS Bond Claims determine to exercise the Bondholder Election, such electing holder(s) shall pay such purchase price, on a pro rata basis calculated with respect to the amount of such holders' Allowed ERS Bond Claims, to the Commonwealth no later than April 20, 2023. Upon payment thereof, the Commonwealth shall distribute such proceeds, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(c) Commonwealth Obligation to Purchase. In the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, and (ii) the Commonwealth shall distribute the proceeds thereof, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

111

(d)      <u>Quarterly Reporting</u>.  From the Effective Date up to, but not including, the sale of ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, the Commonwealth shall provide quarterly portfolio summaries to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement, with the understanding that any information provided thereto shall not be subject to public disclosure.

(e)      <u>Tax Accounting</u>.  From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, ERS shall be deemed the owner of the ERS Private Equity Portfolio and the ERS Trust for all applicable tax purposes, and that no items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to holders of Allowed ERS Bond Claims unless and until such holder(s) have purchased the interests in the ERS Trust pursuant to the Bondholder Election and Section 69.2(b) hereof.

69.3     **Dismissal of Litigation:**  On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action as may be reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

## ARTICLE LXX

## PROVISIONS FOR TREATMENT OF
## ERS GENERAL UNSECURED CLAIMS (CLASS 66)

70.1     **Treatment of ERS General Unsecured Claims:**

(a)      <u>Treatment of ERS General Unsecured Claims</u>.  On the Effective Date, and subject to the election set forth in Section 70.1(b) hereof, each holder of an Allowed ERS General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS General Unsecured Claim, such holder's Pro Rata Share of the ERS GUC Pool.

(b)      <u>Allowed Claims of Twenty Thousand Dollars ($20,000.00) or More/Election to be Treated as a Convenience Claim</u>.  Notwithstanding the provisions of Section 70.1(a) of the Plan, any holder of an Allowed ERS General Unsecured Claim, other than an ERS General Unsecured Claim that is a component of a larger ERS General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed ERS General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed ERS General Unsecured Claim to Twenty Thousand Dollars ($20,000.00), or, if a holder of multiple Allowed ERS General Unsecured Claims, elects to reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of

112

Forty Thousand Dollars ($40,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed ERS General Unsecured Claim as so reduced, distributions pursuant to Section 72.1 hereof. Such election must be made on Ballot/Election Form and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

70.2    **Limitation on Recovery**:  Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to holders of an Allowed ERS General Unsecured Claim in accordance with the provisions of Section 70.1 hereof, in the event that the sum of the distributions of Cash and Cash received on account of Avoidance Actions net recoveries are equal to or in excess of one hundred percent (100%) of such holder's Allowed ERS General Unsecured Claim, the Avoidance Actions Trust Interests allocable to the ERS GUC Pool and Cash otherwise distributable to such holder on account of net recoveries from the Avoidance Actions Trust shall be deemed redistributed, on a pro rata basis, to the benefit of holders of Allowed CW General Unsecured Claims.

## ARTICLE LXXI

## PROVISIONS FOR TREATMENT OF
## GRACIA GRACIA CLAIMS (CLASS 67)

71.1    **Treatment of Gracia Gracia Claims**:  On the Effective Date, the Gracia Gracia Settlement shall be deemed assumed and (a) the members of the class certified in the Gracia Gracia CW Action and the Gracia Gracia Federal Action and the counsel to such classes shall be entitled to receive funds in accordance with the terms and provisions of the Gracia Gracia Settlement and (b) pursuant to the Confirmation Order, all pending motions, applications, litigations and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action shall be deemed withdrawn with prejudice.

## ARTICLE LXXII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 68)

72.1    **Treatment of Convenience Claims**:  On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

# ARTICLE LXXIII

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 69)

73.1    **Treatment of Federal Claims:** On the later to occur of (a) the Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) in their sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as the Reorganized Debtors and the holder of any such Allowed Federal Claim shall agree.

# ARTICLE LXXIV

## PROVISIONS REGARDING NEW GO BONDS,
## CVIS AND ADDITIONAL INDEBTEDNESS

74.1    **Issuance and Distribution of the New GO Bonds:**  On the Effective Date, Reorganized Commonwealth shall issue the New GO Bonds, consisting of New GO CIBs, New GO 5.375% CABs and New GO 5.0% CABs, as more particularly described herein.  The maturities, interest rates and amortization schedules for the New GO Bonds are annexed hereto as Exhibit "I".  All debt service on the New GO Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid.  Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate for CABs), compounding semiannually, until the applicable New GO Bonds are paid or satisfied in full in accordance with their terms.  Interest on the New GO Bonds shall be calculated on a 30/360 basis.  To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New GO Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with up to two (2) Initial GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Syncora, Assured (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), and National (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), each of which shall have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Board and restricting such Initial GO/PBA PSA Creditors from trading New GO Bonds, including based upon the Government Parties' judgment with respect to expected benefits.  After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.  Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such

114

Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) first, to holders of Allowed Taxable Election CW Claims and (2) second, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

       (a)    **New GO CIBs:**  Subject to any adjustments provided for herein, the New GO CIBs shall have the original principal amount, interest rate, maturity date and taxable status as follows: (a) Seven Hundred Forty-Five Million Fifty Thousand Dollars ($745,050,000.00), five percent (5.0%), July 1, 2023, and tax exempt, (b) Seven Hundred Forty Million Eight Hundred Twenty Thousand Dollars ($740,820,000.00), five percent (5.0%), July 1, 2025, and tax-exempt, (c) Seven Hundred Twenty-Nine Million Five Hundred Sixty-Five Thousand Dollars ($729,565,000.00), five percent (5.0%), July 1, 2027, and tax exempt, (d) Seven Hundred Ten Million Forty Thousand Dollars ($710,040,000.00), five percent (5.0%), July 1, 2029, and tax-exempt, (e) Six Hundred Eighty Million Eight Hundred Thirty-Five Thousand ($680,835,000.00), five percent (5.0%), July 1, 2031, and tax-exempt, (f) Six Hundred Thirty-Seven Million Forty Thousand Dollars ($637,040,000.00), four percent (4.0%), July 1, 2033, and tax-exempt, (g) Four Hundred Forty-Eight Million Five Hundred Eighty Thousand Dollars ($448,580,000.00), four percent (4.0%), July 1, 2035, and tax-exempt, (h) Two Hundred Fifty-Five Million Six Hundred Sixty Thousand Dollars ($255,660,000.00), four percent (4.0%), July 1, 2037, and tax-exempt, (i) Two Hundred Four Million Six Hundred Thousand Dollars ($204,600,000.00), four percent (4.0%), July 1, 2041, and tax-exempt, (j) Eight Hundred Twenty-Two Million Two Hundred Sixty Thousand Dollars ($822,260,000.00), five percent (5.0%), July 1, 2041, and taxable, and (k) Seven Hundred Eight Million Eight Hundred Sixty-Five Thousand Dollars ($708,865,000.00, four percent (4.0%), July 1, 2046, and tax-exempt.  New GO CIBs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrue on all overdue debt service, at the regular coupon rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

       (b)    **New GO CABs:**  Subject to any adjustments provided for herein, the New GO CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: (a) Two Hundred Eighty-Eight Million Two Hundred Forty-One Thousand Nine Hundred Eighty-Nine Dollars and Seventy-Five Cents ($288,241,989.75), five percent (5.0%), July 1, 2024, and tax-exempt, and (b) Four Hundred Forty-Two Million Five Hundred Six Thousand Five Hundred Fifty-Three Dollars and Fifty Cents ($442,506,553.50), five and three hundred seventy-five one thousandths percent (5.375%), July 1, 2033, and tax-exempt.  New GO CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

       (c)    **Deemed Issuance Date:**  Notwithstanding the timing of the Effective Date, interest on the New GO Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2021 and (ii) the Effective Date, which date shall be designated as the "dated" date of the New GO Bonds.

       (d)    **Call Provisions/Optional Redemption:**  The New GO Bonds shall be callable, in whole or in part, in any order of maturity, at par (or at the accreted value for the 2033 CABs) plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

2023 CIBS:  Non-Callable
2024 CABS: Non-Callable
2025 CIBS:  Non-Callable
2027 CIBS:  Non-Callable
2029 CIBS:  Non-Callable
2031 CIBS:  Non-Callable
2033 CIBS:  Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |

2035, 2037, 2041 and 2046 CIBS (Taxable and Tax-Exempt): Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |
| July 1, 2033 through June 30, 2034 | 101% of Par |
| July 1, 2034 and thereafter | 100% of Par |

2033 CABS: Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 and thereafter | 100% of Accreted Value |

If less than all of the New GO Bonds of a particular series are called for prior redemption, Reorganized Commonwealth will select the maturity or maturities of such series of the New GO Bonds to be redeemed, and, if less than all of the New GO Bonds within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

(e)     **Deemed Annual Allocation:**  Pursuant to the New GO Bonds Legislation, the Reorganized Commonwealth shall covenant that, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each FY, the Reorganized Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest (and accreted value) with respect to the New GO Bonds issued to such holders, first, the 1.03% property tax levied pursuant to Act 83-1991 and collected by CRIM with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, second, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and third other resources of the Reorganized Commonwealth.  Without limiting the foregoing, within thirty (30) days following the conclusion of each quarter of each FY, CRIM shall pay to the Commonwealth amounts collected by CRIM in connection with the 1.03% property tax levied pursuant to Act 83-1991 and which are due and owing to the Commonwealth.

(f)     **Monthly Deposits of Interest and Principal:**  From and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their

116

terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds. Upon deposit thereof, pursuant to the New GO Bonds Legislation, the New GO Bonds Trustee, on behalf of the holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on such monies deposited with the New GO Bond Trustee, which monies shall be held in trust for the benefit of holders of the New GO Bonds. Without limiting the foregoing, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

(g)　**Covenants for New GO Bonds**:  On the Effective Date, the Definitive Documents, including the New GO Bonds Indenture, New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants for similarly structured and supported bonds, including, without limitation, the following covenants and other provisions with respect to New GO Bonds:

(i)　**Non-Impairment Covenant**:  Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of New GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Reorganized Commonwealth will take no action that would (1) impair the monthly deposits of interest and principal referred to in Section 74.1(f) hereof,  (2) limit or alter the rights vested in the Debtors or Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New GO Bonds or (3) impair the rights and remedies of the holders of the New GO Bonds.

(ii)　**Tax-Exemption Covenant**:  Pursuant to the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of federally tax-exempt New GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, Reorganized Commonwealth will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt New GO Bonds shall be and remain excludable from gross income for federal income tax purposes.

(h)　**Rights of Acceleration**:  The New GO Bonds shall not have rights of acceleration.

(i)　**Residual Interest of the Commonwealth**:  Pursuant to the New GO Bonds Indenture, and subject to such additional rights and obligations as provided therein, any funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New GO Bonds Indenture shall be released by the New GO Bonds Trustee to, or at the direction of, the Reorganized Commonwealth, upon payment or satisfaction in full of the New GO Bonds in

117

accordance with their terms, such amounts shall revert and be distributed to, or at the direction of, the Reorganized Commonwealth.

(j) **Direct Right of Action**: Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance and other available remedies for any breach of covenants in the New GO Bonds Indenture.

(k) **Governing Law**: The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the New GO Bonds Indenture and the New GO Bonds, the holders of New GO Bonds shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.2 **Issuance and Distribution of the CVIs:**

(a) **Issuance of GO CVIs**: On the Effective Date, Reorganized Commonwealth shall issue the GO CVIs, in the aggregate original notional amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00), having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(b) **Issuance of Clawback CVIs**: On the Effective Date, Reorganized Commonwealth shall issue the Clawback CVIs, in the aggregate original notional amount equal to Five Billion Three Hundred Eighty-Four Million One Hundred Twenty-Seven Thousand Seven Hundred Sixty-Four Dollars ($5,384,127,764.00), having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(c) **Payment Waterfall and Redemption Provisions**: The GO CVIs shall be subject to mandatory redemption in accordance with priorities set forth in the "Subject to Waterfall Annual Mandatory Redemption Payments" provisions set forth on Exhibit "J" annexed hereto, subject to the provisions set forth in Annex 1 thereto and the allocation set forth in Annex 3 thereto. The Clawback CVIs shall be subject to mandatory redemption in accordance with the "Mandatory Redemption Payments to Subject to Waterfall Clawback CVI" and "Mandatory Redemption Payments to Not Subject to Waterfall Clawback CVI" provisions set forth on Exhibit "J" annexed hereto, subject to provisions set forth in Annex 2 thereto, the allocation set forth in Annex 4 thereto and the priorities set forth in Annex 6 thereto.

(d) **Direct Right of Action**: Pursuant to the CVI Indenture, and subject to such additional rights as provided therein, the CVI Trustee shall have a direct right of action to

118

enforce the terms of the CVI Indenture, including, without limitation, with respect to payments in respect of the CVIs and seeking specific performance and other available remedies for any breach of covenants in the CVI Indenture.

(e)    **Full Faith and Credit**: For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law.

(f)    **Non-Impairment Covenant**: The Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Reorganized Commonwealth will not: (a) take any action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Reorganized Commonwealth to fulfill the terms of any agreements made with respect to the CVIs; (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Reorganized Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Reorganized Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in Exhibit "J" annexed hereto or (d) not now or in the future, subject payments or redemptions made with respect to the CVIs to any Commonwealth tax or withholding obligation imposed by the Commonwealth regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(g)    **Governing Law**: The CVI Indenture and the CVIs issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the CVI Indenture and the CVIs, the holders of CVIs shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.3    **Tax-Exempt Treatment of the New GO Bonds:** Notwithstanding the terms and provisions of Sections 74.1 and 74.2 hereof, in the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Favorable Determination") that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date (the "New Ratio") to the total aggregate amount of all New GO Bonds is less than thirteen percent (13%) (the "Existing Ratio"), (i) in the event that the Favorable Determination is obtained on or prior to the Effective Date, the holders of any Claims receiving New GO Bonds pursuant to the Plan shall receive the benefit of such Favorable Determination in the form of tax-exempt New GO Bonds issued pursuant to the Plan with coupons for all maturities

equal to the coupons on the tax-exempt New GO Bonds set forth on Exhibit "I" hereto, and, to the extent that the Government Parties and the Initial GO/PBA PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit "I" hereto, the amount of par New GO Bonds will either increase or decrease, on a dollar-for-dollar basis, depending upon the coupon structure, subject to the amount of the maximum annual debt service provided for in Exhibit "I" hereto, and any such modification being applied to creditors pro rata on a post-application of GO/PBA PSA Restriction Fee and GO/PBA Consummation Costs recovery basis as described in footnote 8 to Annex 2-A to Exhibit "I" of the GO/PBA Plan Support Agreement, (ii) in the event that the Favorable Determination is obtained subsequent to the Effective Date and the New Ratio is less than the Existing Ratio, then the holders of the Taxable Bonds affected by such determination  (the "Invited Bonds")  shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; provided, however, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and (iii) in the event that neither of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New GO Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

74.4    **Comprehensive Cap on All Net Tax-Supported Debt:**  During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than

the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The Secretary of Treasury's certification of compliance with the Debt limit pursuant to this Section 74.4 shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

74.5 **Adoption and Maintenance of a Debt Management Policy:** During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated. While the Reorganized Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a) **Long-Term Borrowing for Capital Improvements Only:** To ensure the Reorganized Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements, as determined by the issuer of such Debt and approved by AAFAF, or to refinance Tax-Supported Debt in accordance with the terms and provisions of Section 74.5(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b) **30-Year Maturity Limitation on All Tax-Supported Borrowing:** No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to (a) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution or (b) Tax-Supported Debt issued to refinance Debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to terms and provisions of Section 74.5(d) hereof.

(c) **Required Principal Amortization:** No series of Tax-Supported Debt issued from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such Debt is no longer outstanding.

(d) **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year**: Refinancings of Tax-Supported Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Reorganized Commonwealth in its Debt Management Policies; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

(e) **Fiscal Plan Debt Service**: Any post-Effective Date Fiscal Plan shall include provisions for the payment, in each FY of (a) principal and interest (and accreted value) with respect to the New GO Bonds, including, without limitation, sinking fund payments due in such FY and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Reorganized Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE LXXV

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, SYNCORA INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

75.1 **Treatment of Assured Insured Bond Claims**: In the event that Classes 2, 17, 24, 32, 37, and 42 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force and effect or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, holders of Assured Insured Bond Claims shall receive the following treatments:

(a) **Assured Election**: With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, Assured shall receive the Cash and CVIs allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of such Assured Insured Bonds, which Assured New GO Bonds shall be (i)

122

insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12, and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Assured Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any such deficiency amount with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured. The principal amounts, maturities and interest rates on such Assured New GO Bonds allocated on account of the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice shall be determined by Assured in consultation with applicable underwriter(s), such that the interest rates on such Assured New GO Bonds shall be the lowest interest rates necessary for such Assured New GO Bonds to be issued with increased par amounts relative to other New GO Bonds and otherwise result in the Assured New GO Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Assured New GO Bonds due in any FY shall not be greater than the annual debt service that would have been due in such FY if such Assured New GO Bonds had the same terms as the other New GO Bonds. If either (i) at or prior to the time of pricing of Assured New GO Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (ii) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, then, in either case, Assured (A) may elect, in its sole discretion, to exercise the Assured Acceleration Price Payment Option by paying the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself the Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured, and (B) shall receive, on the Effective Date the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash and other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it. Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election or the Assured Acceleration Price Payment Option, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)  **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2; and, provided, further, that, for the avoidance of doubt, Assured Insured Bonds owned by Assured (by subrogation or otherwise) shall not be subject to the Assured Bondholder Elections set forth in this

Section 75.1(b), and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds.

(i) **Assured Bondholder Election 1:** Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Assured Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Cash and Assured New Securities allocable to such holder under the Plan, which Assured New Securities, in the case of Assured New GO Bonds, may, at Assured's selection, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it, but at no cost or premium to the Commonwealth; or

(ii) **Assured Bondholder Election 2:** Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) certain Assured New Securities in accordance with terms acceptable to Assured. The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 75.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment. Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the Effective Date upon thirty (30) days' prior written notice to the relevant holders. Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation. From and after payment of the Assured Acceleration Price on the Effective Date or other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable. Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(c) **Acceleration of Assured Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the

124

Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)      **Assignment of Redemption Rights:**  Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth, PBA and CCDA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth, PBA and CCDA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

(e)      **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA.

75.2    **Treatment of National Insured Bond Claims:**  In the event that Classes 3, 18, and 25 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing; provided, however, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Section 75.2 and National shall receive the National Plan Consideration on account of such bonds:

(a)      **National Commutation Treatment:**  Each holder of an Allowed National Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, and (ii) National shall receive the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim. If a holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment or (2) submits an election for less than all of its National Insured Bond Claims (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in this subsection (a), to commute the National Insurance Policies, to release and discharge National's obligations under the National Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the

125

related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

(b) **National Non-Commutation Treatment**: In the event that a holder of an Allowed National Insured Bond Claim timely and validly elects not to receive the National Commutation Treatment in accordance with the provisions Section 75.2(a) hereof, such holder of an Allowed National Insured Bond Claim shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing:

(i) **Custodial Trusts**: Such holder of an Allowed National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration and the National Insured Bonds allocable to such electing holder into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Plan Consideration and National Certificates in consideration therefor and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

(ii) **Escrow**: Such holder of an Allowed National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration in the National Escrow Account and such deposited National Plan Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Plan Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii) **Payment of Accelerated Amounts**: National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price.

(iv) **Alternative Treatment**: The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of National Insured Bonds.

(c) **Acceleration of National Insured Bonds**: Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the

126

National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of National Insured Bond Claims and National CW/HTA Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment and the National Non-Commutation Treatment as set forth in Section 75.2(a) hereof shall be made by the beneficial holders of National Insured Bonds; provided, however, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Section 75.2(b) hereof.

(f) **Deemed Election**: Each holder of an Allowed Vintage PBA Bond Claim (National) and an Allowed Vintage CW Guarantee Bond Claim (National) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.2 as described above; provided, however, that holders making an election pursuant to Section 75.2 with respect to such holders' Allowed Vintage PBA Bond Claim (National) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (National) pursuant to Section 75.2 hereof.

75.3 **Treatment of Syncora Insured Bond Claims:** In the event that Classes 6, 21, and 28 vote to accept the Plan in accordance with Section 1126 of the Bankruptcy Code, on the Effective Date, notwithstanding any other provision of the Plan, Syncora Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Syncora, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing:

(a) **Syncora Commutation Treatment:** Each holder of an Allowed Syncora Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Syncora Commutation Consideration, distributable by or at the direction of Syncora, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Syncora Insurance Policy or any Syncora Trust or Syncora Escrow Account and (ii) Syncora shall receive the Syncora Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Syncora Insured Bond Claim. If a

127

holder of an Allowed Syncora Insured Bond Claim (1) fails to timely and validly elect the Syncora Non-Commutation Treatment or (2) submits an election for less than all of its Syncora Insured Bond Claims (in which case, such election shall be void and of no force of effect), such holder shall be deemed to have elected to receive the Syncora Commutation Treatment set forth in this subsection (a), to commute the Syncora Insurance Policies, to release and discharge Syncora's obligations under the Syncora Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed Syncora Insured Bond Claim that does not validly elect to receive the Syncora Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the Syncora Insured Bonds, including the obligations of Syncora under the related Syncora Insurance Policies, underlying such holder's Allowed Syncora Insured Bond Claim cancelled.

(b) **Syncora Non-Commutation Treatment**: In the event that a holder of an Allowed Syncora Insured Bond Claim timely and validly elects not to receive the Syncora Commutation Treatment in accordance with the provisions Section 75.3(a) hereof, such holder of an Allowed Syncora Insured Bond Claim shall receive one or more of the following treatments, at Syncora's election, which election shall be exercised by Syncora at or prior to the commencement of the Disclosure Statement Hearing.

(i) **Custodial Trusts**: Such holder of an Allowed Syncora Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration and the Syncora Insured Bonds allocable to such electing holder into the applicable Syncora Trust, (B) be deemed to have received its Pro Rata Share of the Syncora Plan Consideration and Syncora Certificates in consideration therefor, and (C) have no recourse to Syncora or the Syncora Insurance Policies other than as provided for under the terms of the Syncora Trust.

(ii) **Escrow**: Such holder of an Allowed Syncora Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration in the Syncora Escrow Account and such deposited Syncora Plan Consideration shall be held as security for Syncora's obligations to the holders of the Syncora Insured Bonds whose Syncora Plan Consideration was deposited in the Syncora Escrow Account under the Syncora Insurance Policies.

(iii) **Payment of Accelerated Amounts**: Syncora shall receive the Syncora Plan Consideration that would be otherwise allocable to such holder of an Allowed Syncora Insured Bond Claim and Syncora shall fully and completely discharge its obligation to such holder of an Allowed Syncora Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Syncora Acceleration Price.

(iv) **Alternative Treatment**: The Oversight Board and Syncora reserve the right to formulate an alternative election or implementation option with respect to the Syncora Insured Bonds that is mutually acceptable to the Oversight Board and Syncora, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, Syncora may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Syncora Insured Bonds.

(c) **Acceleration of Syncora Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Syncora any and all rights to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Syncora Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Syncora Insured Bond Claims shall be made by the Oversight Board to Syncora in accordance with the provisions of Section 301(c)(3) of PROMESA, and (b) the election to choose between the Syncora Commutation Treatment and the Syncora Non-Commutation Treatment as set forth in Section 75.3(a) hereof shall be made by the beneficial holders of Syncora Insured Bonds; provided, however, that the form of the Syncora Non-Commutation Treatment shall be selected by Syncora in accordance with Section 75.3(b) hereof.

(f) **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Syncora) and an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.3 as described above; provided, however, that holders making an election pursuant to Section 75.3 with respect to Allowed Vintage PBA Bond Claim (Syncora) shall be deemed to have made the same election with respect to corresponding Allowed Vintage CW Guarantee Bond Claim (Syncora) pursuant to Section 75.3 hereof.

75.4 **Treatment of FGIC Insured Bond Claims**: In the event that Classes 5, 20, and 27 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the Plan, holders of FGIC Insured Bond Claims shall receive the following treatments:

(a) **FGIC Insured Bond Claims Treatment:** Each holder of an Allowed FGIC Insured Bond Claim (except as provided in Section 75.4(b) hereof) shall (A) deposit, or be

deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor. All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy. For the avoidance of doubt, each distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable Insurance Policies.

(b)     **FGIC Insured Bond Claims Owned By FGIC:** With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the Effective Date, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, its Pro Rata Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c)     **Acceleration of FGIC Insured Bonds:** Notwithstanding any other provision of the Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(d)     **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive insurance documents and the applicable FGIC Insurance Policy, on the Effective Date, the Commonwealth and PBA, shall be deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by FGIC as if it were the Commonwealth or PBA, as applicable, for such purpose.

(e)     **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of FGIC Insured Bond Claims and FGIC CW/HTA Bond Claims shall be made by the Oversight Board to FGIC in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents.

75.5 **Treatment of Ambac Insured Bond Claims**: In the even that Classes 4, 19, and 26 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatments, which treatments shall be selected by the Ambac, in its sole and absolute discretion, not later than twenty-one (21) days prior to the Ballot Date:

(a) **Ambac Commutation Treatment:** Each holder of an Allowed Ambac Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s) or Ambac Escrow Account(s), and (ii) Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Ambac Insured Bond Claim. A holder of an Allowed Ambac Insured Bond Claim that validly elects to receive the Ambac Commutation Treatment, or makes an improper election as described in Section 75.5(f) hereof, shall be deemed to have had, on or after Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies, underlying such holder's Allowed Ambac Insured Bond Claims cancelled.

(b) **Ambac Non-Commutation Treatment:** In the event that a holder of an Allowed Ambac Insured Bond Claim timely and validly elects to receive the Ambac Non-Commutation Treatement, such holder of an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments, at Ambac's election, which election shall be exercised by Ambac not later than twenty-one (21) days prior to the Ballot Date;

(i) **Custodial Trusts:** Such holder of an Allowed Ambac Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration and the Ambac Insured Bonds allocable to such electing holder into the applicable Ambac Trust(s), (B) be deemed to have received its Pro Rata Share of the Ambac Plan Consideration and Ambac Certificates in consideration therefor, and (C) have no recourse to Ambac or the Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s). The terms of the Ambac Trust(s) shall be set forth in a trust agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall include the following terms, without limitation: (i) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement governing the Ambac Trust(s); (ii) Ambac shall be deemed the sole holder of the Ambac Insured Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings; and (iii) the agreement governing the Ambac Trust(s) will provide that (a) all rights of a holder of Ambac Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the

131

Ambac Certificates shall be entitled to any right with respect to the Ambac Insured Bonds (other than as otherwise described in the Ambac Trust(s)), and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

(ii) **Escrow:** Such holder of an Allowed Ambac Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration in the applicable Ambac Escrow Account(s) and such deposited Ambac Plan Consideration shall be held as security for Ambac's obligations to the holders of the Ambac Insured Bonds whose Ambac Plan Consideration was deposited in the applicable Ambac Escrow Account(s) under the Ambac Insurance Policies.

(iii) **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to such holder of an Allowed Ambac Insured Bond Claim and Ambac shall fully and completely discharge its obligation to such holder of an Allowed Ambac Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Ambac Acceleration Price.

(iv) **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Ambac Insured Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, not later than twenty-one (21) days prior to the Ballot Date.

Notwithstanding the foregoing and for the avoidance of doubt, Ambac may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Ambac Insured Bonds.

(c) **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date. Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv)) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

132

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Ambac any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Ambac Insured Bond Claims and Ambac CW/HTA Bond Claims shall be made by the Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (b) the election to choose between the Ambac Commutation Treatment as set forth in Section 75.5(a) hereof and the Ambac Non-Commutation Treatment as set forth in Section 75.5(b) hereof shall be made by the beneficial holders of Ambac Insured Bonds; provided, however, that the form of the Ambac Non-Commutation Treatment shall be selected by Ambac in accordance with Section 75.5(b) hereof.

(f) **Improper Election:** If a holder of an Allowed Ambac Insured Bond Claim (1) fails to timely and validly elect either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to Section 75.5(a) or 75.5(b) hereof, or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the Ambac Commutation Treatment set forth in Section 75.5(a) hereof with respect to such Ambac Insured Bond Claims, to commute the applicable Ambac Insurance Policies, to release and discharge Ambac's obligations under such Ambac Insurance Policies, and to receive distributions in accordance with Section 75.5(a) hereof. In addition, a holder of an Allowed Ambac Insured Bond claim that does not validly elect to receive either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed to have had, on or after the Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies underlying such holder's Allowed Ambac Insured Bond Claim, cancelled.

(g) **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Ambac) and an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.5 as described above; provided, however, that holders making an election pursuant to Section 75.5 with respect to such holder's Allowed Vintage PBA Bond Claim (Ambac) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (Ambac) pursuant to Section 75.5 hereof.

# ARTICLE LXXVI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

76.1 **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**:  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Section 76.5 and 76.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico Pursuant to 2 L.P.R.A § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 76.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 76.1, by serving a separate notice to the relevant counterparties to such agreements.  To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

76.2 **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**:  Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 76.1 of the Plan.

76.3 **Inclusiveness**:  Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements

made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

76.4    **Cure of Defaults**:  Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 76.1 of the Plan, the Debtors shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within ten (10) Business Days of entry of a Final Order setting forth the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the case may be, shall pay or otherwise satisfy such cure amount.  Notwithstanding the terms and provisions of Section 76.1 of the Plan, each of the Debtors shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

76.5    **Insurance Policies**:  Subject to the terms and provisions of Section 76.7 hereof, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan; provided, however, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

76.6    **Rejection Damage Claims**:  If the rejection of an Executory Contract and Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

76.7    **Indemnification and Reimbursement Obligations**:  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be Administrative Expense Claims; provided, however, that, under no circumstances shall the Debtors or the Reorganized Debtors, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

76.8    **Nonoccurrence of Effective Date**:  In the event that the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

76.9    **Reservation of Rights**:  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

76.10    **Collective Bargaining Agreements**:  Except as provided in Articles LV and LVI hereof, none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Articles LV and LVI regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE LXXVII

## PROVISIONS GOVERNING DISTRIBUTIONS

77.1    **Time and Manner of Distribution**:  Except as otherwise provided herein, distributions under the Plan shall be made to each holder of an Allowed Claim as follows:

(a)    **Distributions to Holders of PBA Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed PBA Bond Claim, and in each case consistent with the terms hereof, such Creditor's Pro Rata Share, if any, of the PBA Bond Distribution, GO/PBA PSA Restriction Fee, Retail Support Fee, Retail Support Fee Return, and GO/PBA Consummation Costs, if applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim is subject to the delivery, on the prior to the Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(b)    **Distributions to Holders of CW Bond Claims and CW Guarantee Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed CW Bond Claim or an Allowed CW Guarantee Bond Claim, such Creditor's (i) applicable recovery provided hereunder, (ii) the GO/PBA PSA Restriction Fee, (iii) the Retail Support Fee, (iv) the Retail Support Fee Return, and (v) the GO/PBA Consummation Costs, in each case, to the extent applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed CW Bond Claim is subject to the delivery, on or prior to the

Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(c)  **Distributions to Holders of ERS Bond Claims:**  Except as otherwise provided herein, (i) within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed ERS Bond Claim, such Creditor's Pro Rata Share of the ERS Bond Recovery, calculated based upon the amount of Net Allowed ERS Bond Claims, and (ii) upon making distributions in accordance with the provisions of this Section 77.1(c), including, without limitation, the distribution of any proceeds from the sale of the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the terms and provisions of Section 69.2 hereof, the ERS Fiscal Agent shall close and terminate the original CUSIPs with respect to the ERS Bonds and shall have no further distribution obligations thereafter.

(d)  **Distributions with Respect to General Unsecured Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, (i) to each holder of an Allowed CW General Unsecured Claim and Allowed ERS General Unsecured Claim such Creditor's Pro Rata Share, if any, of the CW GUC Recovery and the ERS GUC Pool, respectively, and (ii) to each holder of an Allowed PBA General Unsecured Claim distributions in accordance with the terms and provisions of Section 17.1 hereof.

(e)  **Distributions with respect to Eminent Domain/Inverse Condemnation Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Eminent Domain/Inverse Condemnation Claim, Cash in the amount of such Allowed Claim.

(f)  **Distribution of Cash to Holders of Allowed Administrative Expense Claims:**  Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

77.2  **Timeliness of Payments**:  Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan.  Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 77.1(a) hereof to have been made on the Effective Date.

77.3  **Distributions by the Disbursing Agent**:  Except as otherwise provided herein or in the Confirmation Order, and except to the extent the Avoidance Actions Trustee selects a

different disbursing agent pursuant to the terms of the Avoidance Actions Trust Agreement, all distributions to be made pursuant to the Plan, including, without limitation, distributions to be made pursuant to the Avoidance Actions Trust Agreement, shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

77.4 **Manner of Payment under the Plan**: Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

77.5 **Delivery of Distributions**: Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Confirmation Order or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each such obligation shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents. The Debtors, its agents and servicers, and the Disbursing Agent shall have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date; provided, however, that the New GO Bonds and the CVIs will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

77.6 **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 hereof), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the PBA Bonds, ERS Bonds and GO

138

Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 75.1 and 75.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.  Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

      77.7     **Undeliverable/Reserved Distributions**:

        (a)    **Holding of Undeliverable Distributions by the Disbursing Agent**:  If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address.  Subject to the terms and provision of Section 77.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind.  Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

        (b)    **Failure to Claim Undeliverable Distributions**:  If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against

139

Reorganized Debtors, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized Debtors for use to discharge operating expenses of Reorganized Debtors and (2) the New GO Bonds and the CVIs in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized Debtors for cancellation or deposit into the treasury of Reorganized Debtors, as determined by Reorganized Debtors in their sole and absolute discretion.

77.8    **Withholding and Reporting Requirements**:  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

77.9    **Time Bar to Cash Payments**:  Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

77.10    **Distributions After Effective Date**:  Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XCII of the Plan.

77.11    **Setoffs**:  Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account

140

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this Section 77.11 shall affect the releases and injunctions provided in Article XCII of the Plan.

77.12 **Allocation of Plan Distributions Between Principal and Interest**: Unless otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; provided, however, that the Debtors or Reorganized Debtors' treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

77.13 **Payment of Trustee Fees and Expenses**: The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses which may be allegedly due and owing by the Commonwealth, ERS and PBA with respect to amounts discharged pursuant to the Plan. The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

77.14 **Beneficial Owner**: For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article LXXVII, except with respect to Claims arising from bonds insured by Syncora, the "holder" of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; provided, however, that, for purposes of Article LXXV hereof and section 1126 of the Bankruptcy Code, (a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA

Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the "holder" of and FGIC Insured Bond Claims any FGIC CW/Convention Center Claims, and FGIC CW/HTA Bond Claims, and any CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/Convention Center Claims, the FGIC CW/HTA Bond Claims, and the FGIC CW/PRIFA Rum Tax Claims, and (e) the "holder" of any other Insured Bond Claims shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured Bond Claims.

77.15 **Value of Distributions**: For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New GO Bonds and CVIs shall be valued at the original principal amount thereof.

## ARTICLE LXXVIII

## AVOIDANCE ACTIONS TRUST

78.1 **Execution of Avoidance Actions Trust Agreement**: On or before the Effective Date, the Debtors and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on or after the Effective Date. The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

78.2 **Purpose of the Avoidance Actions Trust**: The Avoidance Actions Trust shall be established for the sole purpose of Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

78.3 **Avoidance Actions Trust Assets**: The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets. On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Section 88.2 hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

78.4 **Administration of the Avoidance Actions Trust**: The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan. In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

78.5 **The Avoidance Actions Trustee**: In the event the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; provided, however, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

78.6 **Role of the Avoidance Actions Trustee**: In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers and duties, (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust, (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust, (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible, (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority and (vii) to not unduly prolong the duration of the Avoidance Actions Trust. In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

78.7 **Avoidance Actions Trustee's Tax Power for Debtors**: From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns or other tax information statements required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate.

78.8 **Transferability of Avoidance Actions Trust Interests**: The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law

78.9 **Cash**: The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

78.10 **Distribution of Avoidance Actions Trust Assets**: The Avoidance Actions Trustee shall distribute to the holders of Allowed Claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 78.10), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts' as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 hereof to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to this Section 78.10 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and, provided, further, that the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to those holders of Avoidance Actions Trust Interests with respect to which the Avoidance Actions Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

78.11 **Funding, Costs and Expenses of the Avoidance Actions Trust**: On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing. The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

78.12 **Compensation of the Avoidance Actions Trustee**: The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Title III Court.

78.13 **Retention of Professionals/Employees by the Avoidance Actions Trustee**: Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

78.14 **Federal Income Tax Treatment of the Avoidance Actions Trust:**

(a) <u>Avoidance Actions Trust Assets Treated as Owned by Creditors</u>. For all United States federal income tax purposes, all parties (including, without limitation, the Debtors,

144

the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust Claims Reserve) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to the Avoidance Actions Trust Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)     Tax Reporting.

(i)     The Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 78.14. The Avoidance Actions Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(ii)     The Avoidance Actions Trustee will then in good faith value all other Avoidance Actions Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Avoidance Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee, and Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.

(iii)     Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance Actions Trust Claims Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets for

purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee shall (A) timely elect to treat any Avoidance Actions Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Avoidance Actions Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(v)     The Avoidance Actions Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets, including the Avoidance Actions Trust Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of such Disputed Claims.

(c)     <u>Tax Withholdings by Avoidance Actions Trustee</u>.  The Avoidance Actions Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.  The Avoidance Actions Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Avoidance Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement.  In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings, to the extent the Avoidance Actions Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Avoidance Actions Trustee for these purposes.  This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their securities in street name.  The Avoidance Actions Trustee

146

may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to
furnish such information in a timely fashion, and until such information is delivered, and may treat
such holder's Avoidance Actions Trust Interests as disputed; provided, however, that, if such
information is not furnished to the Avoidance Actions Trustee within six (6) months of the original
request to furnish such information, no further distributions shall be made to the holder of such
Avoidance Actions Trust Interest; and, provided, further, that, upon the delivery of such
information  by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee
shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled,
without additional interest occasioned by such holder's delay in providing tax information; and,
provided, further, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts
received or distributable with respect to any such holder and the Avoidance Actions Trustee is later
held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions
Trustee for such liability (to the extent such amounts were actually distributed to such holder).

      (d)     The Avoidance Actions Trustee and the Avoidance Actions Trust shall be
discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance
Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust
Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance
Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is
not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit,
and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and
the Avoidance Actions Trust Agreement have been made; provided, however, in no event shall the
Avoidance Actions Trust be dissolved later than three (3) years from the Effective Date unless the
Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or
within the six-month period prior to the end of an extension period), determines that a fixed period
extension (not to exceed three (3) years, together with any prior extensions, without a favorable
private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions
Trustee and the Avoidance Actions Trust Board that any further extension would not adversely
affect the status of the trust as an Avoidance Actions Trust for United States federal income tax
purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance
Actions Trust Assets.  If at any time the Avoidance Actions Trustee determines, in reliance upon
such professionals as the Avoidance Actions Trustee may retain, that the expense of administering
the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to
exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions
Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to
dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A)
described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under
section 501(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the
Avoidance Actions Trust, and any insider of the Avoidance Actions Trustee, and (iii) dissolve the
Avoidance Actions Trust.

    78.15    **Indemnification of Avoidance Actions Trustee and Members of Avoidance
Actions Trust Bond**:  The Avoidance Actions Trustee or the individual(s) comprising the
Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members
of the Avoidance Actions Trust Board and their respective employees, agents and professionals,

shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

## ARTICLE LXXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTORS

79.1 **Prosecution of Claims**: Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

## ARTICLE LXXX

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

80.1 **Impaired Classes to Vote**: Each holder, as of the Voting Record Date, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan in accordance with Sections 26.1, 33.1, 37.1, 39.1, 43.1, 47.1, 49.1, 52.1, 54.1, 58.1, 59.1, 61.1, 67.1, 68.1, and 71.1 of the Plan, shall be entitled to vote separately to accept or reject the Plan.

80.2 **Acceptance by Class of Creditors**: An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

80.3 **Cramdown**: In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Title III Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the GO/PBA PSA

Creditors, in accordance with the provisions of the GO/PBA Plan Support Agreement, amend the Plan.

## ARTICLE LXXXI

### RIGHTS AND POWERS OF DISBURSING AGENT

81.1 **Exculpation**: From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

81.2 **Powers of the Disbursing Agent**: Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

81.3 **Fees and Expenses Incurred From and After the Effective Date**: Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## ARTICLE LXXXII

### PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS AND CLAIMS SUBJECT TO ACR PROCEDURES

82.1 **Objections to Claims; Prosecution of Disputed Claims**:

(a) Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final

Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtors, Reorganized Debtors shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event that an order reversing or vacating the Confirmation Order with respect to Bond Claims becomes a Final Order, such Bond Claims shall be reinstated on the claims registry.

(b)     The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. With respect to the foregoing obligations and responsibilities, such appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), which amounts shall be funded from the GUC Reserve.

82.2     **Estimation of Claims**: Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized Debtors, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without

limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized Debtors, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### 82.3    Payments and Distributions on Disputed Claims:

(a)    **Disputed Claims Holdback:**  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.  To the extent that any of the Reorganized Debtors retains any New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs are distributed, such Reorganized Debtors shall exercise voting or consent rights with respect to such obligations.

(b)    **Allowance of Disputed Claims:**  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Debtors shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.

82.4    **Authority to Amend Lists of Creditors**:  Except with respect to Bond Claims, and subject to the limitations in Section 82.1(b) hereof, the Debtors shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court.  If no such

objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

82.5  **Non-Accrual of Interest**:  Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as the case may be, on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

82.6  **Disallowance of Claims**:  All Claims of any Entity from which property is sought by the Debtors under sections 550, or 553 of the Bankruptcy Code or that the Debtors alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

82.7  **Claims Subject to ACR Procedures**:  To the extent not already transferred as of the Effective Date in accordance with the terms and conditions of the ACR Order, the Debtors or the Reorganized Debtors, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtors and the Reorganized Debtors, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims.  Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 54, Class 58, Class 66, or Class 68 under the Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 82.7.

82.8  **National Action Claims**:  Notwithstanding anything contained herein, in the GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary, National may continue to litigate to final judgment or settlement all claims and causes of action asserted in the National Action; provided, however, that, in the event that notwithstanding the application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the defendants and, to the extent named, third-party defendants in the National Action assert against

the Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth (collectively, the "CW Entities") claims or counterclaims for indemnification, contribution, reimbursement, setoff or similar theories of recovery based on, arising from or relating to the National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including, without limitation, invoking the Bar Date Orders and discharge provisions set forth in Article XCII of the Plan and the Confirmation Order, objecting to any proof of claim, and prosecuting available appeals based upon, arising from or related to the National Action, (B) to allow National, at its option, to participate in or undertake such defense and to settle such action in its sole discretion, and (C) not to settle any such CW Entities' Claims without National's written consent, which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and hold the CW Entities harmless to the extent of the CW Entities' liability pursuant to a Final Order or settlement as a result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees and expenses incurred in connection with the defense against any such CW Entities' Claims, including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement exceed any recovery realized by National in connection with the National Action; provided, however, that National shall have no obligation pursuant to the Plan or the Confirmation Order to indemnify and hold the CW Entities harmless for claims based upon, arising from or related to the Underwriter Actions that are not the National Action or in which National is not involved. For the avoidance of doubt, any CW Entities' Claims shall not constitute CW General Unsecured Claims.

## ARTICLE LXXXIII

## GOVERNANCE AND PROVISIONS REGARDING PENSION RESERVE AND PENSION SYSTEM

83.1  **Formation and Responsibilities of the Pension Reserve**: On or prior to the Effective Date, the Commonwealth shall take all necessary steps to establish the Pension Reserve Trust, including, without limitation, by execution and delivery of the Pension Reserve Deed of Trust.

83.2  **Funding of the Pension Reserve Trust**: On the Effective Date, the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars ($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve Trust. From and after the FY in which the Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be made, annual (but in no event later than October 1st following the conclusion of each FY) contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b) such additional amount calculated as the lower of the actual unrestricted primary surplus minus the actual CVI payments for such FY and the Projected Fiscal Plan Surplus for such FY, minus the sum of (i) the Base Contribution for such FY, plus (ii) the Commonwealth debt service obligation pursuant to the plan for such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to applicable laws,

153

including, without limitation, Titles I and II of PROMESA, such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The Pension Reserve Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations.

83.3　　**Non-Impairment Covenant**:　The Commonwealth covenants herein, and will covenant in the Pension Reserve Deed of Trust, for the benefit of all Participants that, with respect to payments and other obligations owed to Participants pursuant to the Plan, including, without limitation, PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation, enforceable by any and each of the Oversight Board, and any affected Retirees and, with respect to any such provision, the Pension Reserve Deed of Trust shall not be amended or modified by the Commonwealth except (i) with the express prior written consent of the Oversight Board (if in existence), and a majority in number of the Retirees receiving benefits pursuant to the Plan who are affected by such amendment or modification, or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.

83.4　　**Maintenance of Pension**:　Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

## ARTICLE LXXXIV

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
## AND NOT IMPAIRED BY THE PLAN

84.1    **Impaired Classes**:  The Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 53, 56, 58 through 62, 65, 66 and 69 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, and 68 are deemed to have accepted the Plan.  The Claims in Classes 63 and 64 are impaired and not receiving a distribution pursuant to the Plan and, therefore, Classes 63 and 64 are deemed to have rejected the Plan.

84.2    **Unimpaired Classes**:  Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired pursuant to the Plan, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## ARTICLE LXXXV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

85.1    **Conditions Precedent to Confirmation of the Plan**:  Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

(a)    **Fiscal Plan Certification:**  The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b)    **Required Orders:**  The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order providing for the following:

(i)    Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)    Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)    Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)    Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XCII of the Plan;

155

(v)     Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

(vi)     Determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors and the Plan;

(vii)     Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the CVI Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties with respect thereto;

(viii)     Determining that the New GO Bonds Legislation and the CVI Legislation, to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and the CVIs, respectively; and

(ix)     Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

(c)     **Form of Orders**:  The Confirmation Order and the Plan are each in form and substance reasonably acceptable to the Oversight Board, the Debtors, the Initial GO/PBA PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee.

(d)     **Confirmation Order**:  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XCII of the Plan and (iii) the applicable provisions set forth in Section 85.2 (b) hereof.

85.2     **Waiver of Conditions Precedent to Confirmation**:  Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 85.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtors, the Initial PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee, which consent shall not be unreasonably withheld.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

## ARTICLE LXXXVI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

86.1 **Conditions Precedent to the Effective Date**: The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a) **Fiscal Plan Certification:** The Oversight Board shall have determined that the Plan is consistent with the Debtors' Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA. The Fiscal Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds, including, without limitation, sinking fund payments and the mechanisms and procedures for payment of the CVIs in the event that the Outperformance Condition is satisfied and payment is due in accordance with the CVI Indenture.

(b) **Entry of the Confirmation Order:** The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Cases pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial PSA Creditors, and the Creditors' Committee and the Confirmation Order shall provide for the following:

(i) Authorize the Debtors and the Reorganized Debtors, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii) Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii) Authorize the Debtors and Reorganized Debtors, as the case may be, to (1) make all distributions and issuances as required under the Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv) Authorize the implementation of the Plan in accordance with its terms;

(v) Determine the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York and federal law;

157

(vi)     Determine that, the Commonwealth shall have pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds and payment on the CVIs;

(vii)     Determine that, pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory first liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

(viii)     Determine the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (5) any other Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(ix)     Provide that the Fiscal Plan, certified as of the Effective Date, and any post-Effective Date Fiscal Plan include provisions for the payment in each FY of (a) principal and interest payable on the New GO, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

(x)     Determine that the statutory first lien on funds once deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order);

(xi)     Provide that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund as of the commencement thereof;

(xii)     Determine that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

(xiii)     Provide that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding;

(xiv)     Determine that the Plan is consistent with the Debtors' Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xv)     Provide that, in consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and upon satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xvi)     Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xvii)     Provide that neither the Governor nor the Legislature shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan;

(xviii)     Provide that the Governor and the Legislature, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the Plan; and

(xix)     Provide that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(c)     **No Injunction:**  The Confirmation Order shall not be stayed in any respect.

(d)     **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New GO Bonds Legislation and the CVI Legislation, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and

not inconsistent with any other provision of the Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan.

     (e)    **Execution of Documents; Other Actions:**  All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, are effected or executed and delivered, as applicable, and are in full force and effect.

     (f)    **Opinions:**  Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the CVIs by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial GO/PBA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

     (g)    **Constitutional Claims:**  The Title III Court shall have entered an order finding that any Claim asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall be determined to be a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and shall be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors and the Reorganized Debtors shall have no liability on account of such Claims.

     (h)    **Lift Stay Motions and Clawback Actions:**  The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

     (i)    **Preemption**:  The Title III Court shall have entered an order finding or determining that (1) Act 80, Act 81, and Act 82, each enacted on August 3, 2020, and (2) Joint Resolution 33-2021, signed into law on December 16, 2021 and requiring the partial implementation of Act 80, are either preempted by the provisions of PROMESA or nullified or unenforceable pursuant to PROMESA, including, without limitation, Sections 104(k), 108, 201, 202, and 204 thereof.

    86.2    **Waiver of Conditions Precedent**:  Subject to the provisions of the GO/PBA Plan Support Agreement, the Oversight Board may waive any of the conditions to the Effective Date set forth in Section 86.1 hereof at any time without any notice to any other parties in interest, other than the Initial GO/PBA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan; provided, however, that, subject to the terms and provisions of Committee Agreement, each of the conditions precedent in Section 86.1 hereof with respect to provisions affecting Classes 54, 58, 66 and 68 may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

86.3     **Effect of Non-Occurrence of Conditions to Effective Date**:  If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtors, the Oversight Board, the Creditor's  Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity.

## ARTICLE LXXXVII

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

87.1     **Modification of Plan**:  Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Oversight Board may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

87.2     **Revocation or Withdrawal**:

        (a)     Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.

        (b)     If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

87.3     **Amendment of Plan Documents**:  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

87.4     **No Admission of Liability**:

161

(a)     The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)     None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtors, the Debtors, or any other Entity with respect to the validity of any Claim.  None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE LXXXVIII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED DEBTORS

88.1    **Corporate Action**:  On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, the Debtors and Reorganized Debtors shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable.

88.2 **Dissolution of ERS**: On or as soon as practicable subsequent to the Effective Date, ERS shall be dissolved and all existing directors and officers of ERS shall be relieved of any further duties and obligations. Upon such dissolution, all remaining assets of ERS shall be transferred to the Commonwealth.

88.3 **Officers of Reorganized Debtors**: To the extent applicable, the board of directors of Reorganized Debtors shall elect officers of Reorganized Debtors as of or after the Effective Date.

88.4 **PBA and CCDA Governance Structure**: No changes to the PBA governance structure or PBA collective bargaining agreements will be implemented during or following the PBA Title III Case, unless any such changes are approved by the Oversight Board and AAFAF.

## ARTICLE LXXXIX

## PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

89.1 **Effect of Confirmation**: Nothing in this Plan or the Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtors shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

89.2 **Ongoing Role of the Oversight Board**: Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtors' duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

89.3 **Preemption of Laws**: As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws that are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, such preempted provisions include, without limitation, (a) pursuant to section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, and (b) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the Plan's discharge of the Debtors' obligations, and all such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations or any of the transactions contemplated by the Plan. Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by

163

PROMESA include, without limitation, those listed on Exhibit "K" hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law and (z) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

## ARTICLE XC

## PROVISIONS REGARDING COMMITTEES

90.1    **Dissolution of Committees**:  On the Effective Date, each of the Creditors' Committee and the Retiree Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases; provided, however, that (x) in the event that an appeal of the Confirmation Order is taken, neither the Creditors' Committee nor the Retiree Committee shall be dissolved until the Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with the HTA and PREPA Title III cases, and (z) each of the Creditors' Committee and the Retiree Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals.  To the extent that, as of the date immediately prior to the Effective Date, either the Creditors' Committee or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, without limitation, the Debt Related Objections, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtors or the Avoidance Actions Trustee shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon such assumption, the Creditors' Committee or the Retiree Committee, as the case may be, shall be relieved of any role, responsibility or obligation with respect thereto; provided, however, and, for the avoidance of doubt, in no event shall the Avoidance Actions Trustee assume any role with respect to the Debt Related Objections, the PBA Litigation, the Invalidity Actions or the Lien Challenge Actions, which litigation shall be settled as set forth in Section 2.1 hereof and the Confirmation Order.

## ARTICLE XCI

## RETENTION OF JURISDICTION

91.1    **Retention of Jurisdiction**:  The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b)      to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)      to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought thereafter;

(e)      to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan or orders entered by the Title III Court;

(f)      to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Cases and (b) the Plan, the Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan,

(g)      to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)      to approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections

165

945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

(i) to adjudicate, decide or resolve any matters relating to the Debtors' compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j) to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k) to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order, including, without limitation, the provisions of Section 92.2 and 92.3 hereof;

(l) to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New GO Bonds and the CVIs, and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m) to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n) to enter an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

(o) to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee's appointees to the Avoidance Actions Trust Board in connection with the settlement of Claims in accordance with the provisions of Section 82.1(b) of the Plan;

(p) to enforce and clarify any orders previously entered by the Title III Court in the Title III Cases; and

(q) to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XCII

## MISCELLANEOUS PROVISIONS

92.1 **Title to Assets**:  Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in

Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

92.2 **Discharge and Release of Claims and Causes of Action:**

        (a) Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors. Upon the Effective Date, the Debtors and Reorganized Debtors shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan. For the avoidance of doubt, nothing contained herein or in the Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity. Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

        (b) Except as expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective

167

Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the Effective Date, and in consideration for the value provided under the Plan, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property and all such Claims.

(c)    Notwithstanding any other provisions of this Section 92.2, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 92.2.

(d)    SEC Limitation.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)    United States Limitation.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtors or the Reorganized Debtors, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized Debtors' obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor.  Without limiting the foregoing, nothing contained herein or in the Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

       (f)     <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "<u>Defensive Rights</u>"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by any of the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth in connection with an Underwriter Action; and <u>provided</u>, <u>further</u>, that, no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or the Confirmation Order; and/or (ii) against the Debtors, the Reorganized Debtors, PREPA, HTA, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provisions of the Plan and the Confirmation Order; and <u>provided</u>, <u>further</u>, that nothing herein or in the Confirmation Order is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the Underwriter Actions shall be permanently barred, enjoined and restrained from commencing, prosecuting, or asserting, against the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum or in any other manner.

92.3     **Injunction on Claims**:  Except as otherwise expressly provided in the Plan, the Confirmation Order or such other Final Order of the Title III Court that is applicable, all Entities who have held, hold or in the future hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 hereof or who have held, hold or in the future hold Claims or any other debt or liability discharged or released pursuant to Section 92.2 of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.  Notwithstanding the foregoing, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of Debtors.

92.4     **Integral to Plan**:  Each of the discharge, injunction, exculpation and release provisions provided in this Article XCII is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XCII.

92.5     **Releases by the Debtors and Reorganized Debtors**:  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

92.6     **Injunction Related to Releases**:  As of the Effective Date, all Entities that hold, have held, or in the future hold a Released Claim that is released pursuant to Section 92.2 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:

170

(i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 92.5 hereof; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of the Confirmation Order: the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended.

92.7  **Exculpation**:

(a)  **Government Parties**:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in the foregoing provisions of this Section 92.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)  **PSA Creditors**:  Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document

171

provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)     **Retiree Committee:**  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     **Creditors' Committee:**  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)     **AFSCME:**  AFSCME, solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date, and each of its respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the

Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing provisions of this Section 92.7(e) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f) **Monoline Insurers:** Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable).

92.8 **Appointments Related Litigation/Uniformity Litigation**: Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and the Confirmation Order, including, without limitation, the releases, exculpations and injunctions provided pursuant to Article XCII of the Plan; provided, however, that, to the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement or the ERS Stipulation, within five (5) Business Days of the Effective Date, such plaintiff shall take any and all actions to dismiss, with prejudice, or, in the event other plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

92.9 **Bar Order**: To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted); provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.10 **No Waiver**: Notwithstanding anything to the contrary contained in Sections 92.5 and 92.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors, the PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

92.11 **Supplemental Injunction**: Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

174

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.12     **Post-Effective Date Fees and Expenses**:  From and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized Debtors related to implementation and consummation of the Plan without further approval from the Title III Court.  Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

92.13     **Securities Act Exemption**:  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds and the CVIs pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

92.14 **Severability**: Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the Committee Agreement, and Section 3.7 hereof, if, prior to the Confirmation Date, (a) any term or provision of the Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the Plan, including, without limitation, to remove a Debtor (other than the Commonwealth and PBA) from the treatments set forth in the Plan, the Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

92.15 **Governing Law**: Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

92.16 **Closing Case**: The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XCI of the Plan.

92.17 **Section Headings**: The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

92.18 **Inconsistencies**: To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

92.19 **Document Retention**: From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors.

92.20 **Immediate Binding Effect**: Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the

Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

92.21 **Additional Documents**: On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

92.22 **Reservation of Rights**: Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

92.23 **Successors and Assigns**: Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

92.24 **Notices**: All notices, requests to, demands or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, the Debtors or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:


If to the Oversight Board, to:      Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave, Suite 1107

San Juan, PR 00918-1813
Attn:  Natalie A. Jaresko, Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
         Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

If to the Debtors, to:          The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Office of the Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
       Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

– and –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
       Peter Friedman, Esq.
       Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

If to AAFAF, to:                  Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

– with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

92.25    **Term of Injunctions or Stays**:  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

92.26    **Entire Agreement**:  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

92.27    **Plan Supplement**:  All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://cases.primeclerk.com/ puertorico/ or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New GO Bonds Indenture or the CVI Indenture, to the extent that any provisions of the Plan are inconsistent with the New GO Bonds Indenture or the CVI Indenture, the New GO Bonds Indenture or the CVI Indenture, as the case may be, shall control.

Dated: San Juan, Puerto Rico
January 14, 2021

THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
    Name:  Natalie A. Jaresko
    Title:  Executive Director

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
    Name:  Natalie A. Jaresko
    Title:  Executive Director

PUERTO RICO PUBLIC BUILDINGS AUTHORITY, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
    Name:  Natalie A. Jaresko
    Title:  Executive Director

**EXHIBIT A**

SCHEDULE OF AVOIDANCE ACTIONS

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| ALEJANDRO ESTRADA MAISONET | Adversary | 19-00059 |
| AMBASSADOR VETERANS SERVICES OF PR LLC | Adversary | 19-00048 |
| APEX GENERAL CONTRACTORS | Adversary | 19-00062 |
| BIO NUCLEAR OF P R INC | Adversary | 19-00091 |
| BRISTOL /MYERS SQUIBB P R INC | Adversary | 19-00042 |
| CARIBBEAN EDUCATIONAL SERVICES INC | Adversary | 19-00098 |
| CARIBE GROLIER INC | Adversary | 19-00051 |
| CCHPR HOSPITALITY, INC | Adversary | 19-00116 |
| CENTRO DE DESARROLLO ACADEMICO INC. | Adversary | 19-00053 |
| CITIBANK N A | Adversary | 19-00265 |
| CLINICA DE TERAPIAS PEDIATRICA | Adversary | 19-00054 |
| COMMUNITY CORNESTONE OF P R | Adversary | 19-00043 |
| COMPUTER LEARNING CENTERS, INC. | Adversary | 19-00055 |
| COMPUTER NETWORK SYSTEMS CORP | Adversary | 19-00150 |
| Core Laboratories N.V. d/b/a Saybolt | Adversary | 19-00381 |
| CREATIVE EDUCATIONAL & PSYCHOLOGICAL SER | Adversary | 19-00152 |
| DIDACTICOS, INC. | Adversary | 19-00161 |
| DISTRIBUIDORA LEBRON | Adversary | 19-00167 |
| Ecolift Corp. | Adversary | 19-00172 |
| EDWIN CARDONA & ASOC | Adversary | 19-00056 |
| EMPRESAS ARR INC | Adversary | 19-00084 |
| ENTERPRISE SERVICES CARIBE LLC | Adversary | 19-00060 |
| EVERTEC INC | Adversary | 19-00044 |
| EXPLORA CENTRO ACADEMICO Y TERAPEUTICO | Adversary | 19-00143 |
| FACSIMILE PAPER CONNECTION CORP | Adversary | 19-00092 |
| FAST ENTERPRISES LLC | Adversary | 19-00266 |
| FIRST HOSPITAL PANAMERICANO | Adversary | 19-00093 |
| FP+1,LLC | Adversary | 19-00148 |
| GF SOLUTIONS, INC. | Adversary | 19-00063 |
| GIRARD MANUFACTURING INC DBA/BANCO DE | Adversary | 19-00103 |
| GM SECURITY TECHNOLOGIES | Adversary | 19-00273 |
| GREAT EDUCATIONAL SERVICE, CORP. | Adversary | 19-00277 |
| GUIMERFE INC | Adversary | 19-00182 |
| HEWLETT PACKARD PR BV | Adversary | 19-00183 |
| HOSPIRA | Adversary | 19-00186 |
| I.D.E.A. INC. | Adversary | 19-00268 |
| INSTITUCION EDUCATIVA NETS, LLC | Adversary | 19-00067 |
| INTERNATIONAL SURVEILLANCE SERV CORP | Adversary | 19-00202 |
| INTERVOICE COMMUNICATIONS OF PR INC | Adversary | 19-00068 |
| JOSE SANTIAGO INC | Adversary | 19-00075 |
| JUNIOR BUS LINE, INC. | Adversary | 19-00229 |

| L.L.A.C., INC. | Adversary | 19-00122 |
|---|---|---|
| LAW OFFICES WOLF POPPER, INC | Adversary | 19-00236 |
| MACAM S.E. | Adversary | 19-00255 |
| MANAGEMENT, CONSULTANT & COMPUTER SERV | Adversary | 19-00081 |
| MANPOWER | Adversary | 19-00088 |
| MERCK SHARP & DOHME | Adversary | 19-00276 |

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| MICHICA INTERNATIONAL CO INC | Adversary | 19-00238 |
| MICROSOFT CORPORATION | Adversary | 19-00290 |
| N. HARRIS COMPUTER CORPORATION | Adversary | 19-00102 |
| NATIONAL COPIER | Adversary | 19-00251 |
| NELSON D. ROSARIO GARCIA | Adversary | 19-00125 |
| NETWAVE EQUIPMENT CORP | Adversary | 19-00253 |
| NEXT LEVEL LEARNING, INC | Adversary | 19-00129 |
| ORACLE CARIBBEAN INC | Adversary | 19-00112 |
| PCPS - Professional Consulting Psychoeducational Services, LLC | Adversary | 19-00188 |
| PERFECT CLEANING SERVICES INC | Adversary | 19-00249 |
| POSTAGE BY PHONE RESERVE ACCOUNT | Adversary | 19-00181 |
| PROSPERO TIRE EXPORT INC | Adversary | 19-00196 |
| Puerto Nuevo Security Guard | Adversary | 19-00384 |
| PUERTO RICO SUPPLIES GROUP INC | Adversary | 19-00199 |
| PUERTO RICO TELEPHONE COMPANY | Adversary | 19-00127 |
| QUEST DIAGNOSTICS | Adversary | 19-00440 |
| Ready & Responsible Security, Inc | Adversary | 19-00387 |
| REYES CONTRACTOR GROUP | Adversary | 19-00220 |
| RICARDO ESTRADA MAISONET | Adversary | 19-00227 |
| ROCK SOLID TECHNOLOGIES INC | Adversary | 19-00230 |
| ROCKET LEARNING INC | Adversary | 19-00232 |
| ROCKET TEACHER TRAINING | Adversary | 19-00235 |
| RODRIGUEZ PARISSI VAZQUEZ & CO PCS | Adversary | 19-00155 |
| ROSSO GROUP INC | Adversary | 19-00239 |
| S H V P MOTOR CORP | Adversary | 19-00134 |
| SEGUROS COLON INC | Adversary | 19-00130 |
| SESCO TECHNOLOGY SOLUTIONS LLC | Adversary | 19-00162 |
| ST. JAMES SECURITY SERVICES, INC. | Adversary | 19-00145 |
| TACTICAL EQUIPMENT CONSULTANTS INC | Adversary | 19-00222 |
| TALLER DESARROLLO INFANTIL CHIQUIRIMUNDI | Adversary | 19-00049 |
| Total Petroleum Puerto Rico Corp. | Adversary | 19-00114 |
| TRANSPORTES SONNEL INC | Adversary | 19-00149 |
| TRINITY METAL ROOF AND STEEL STRUC CO | Adversary | 19-00187 |
| TRUENORTH CORP | Adversary | 19-00160 |
| WF COMPUTER SERVICES | Adversary | 19-00200 |
| XEROX CORPORATION | Adversary | 19-00218 |

# EXHIBIT B

SCHEDULE OF AFFIRMATIVE RECOVERY ACTIONS

<u>Special Claims Committee v. Barclays Capital, et al.</u>, Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court

# EXHIBIT C

SCHEDULE OF INVALIDITY ACTIONS

## Invalidity Actions

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

# EXHIBIT D

SCHEDULE OF LIEN CHALLENGE ACTIONS

**Lien Challenge Actions**

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., Adv. Proc. No. 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, Adv. Proc. No. 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, Adv. Proc. No. 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, Adv. Proc. No. 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, Adv. Proc. No. 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., Adv. Proc. No. 19-00297

# EXHIBIT E

MODIFICATIONS TO JRS PENSION BENEFITS

## MODIFICATIONS FOR JRS CLAIMS

The following is a summary of modifications with respect to outstanding benefits of the Judiciary Retirement System for the Commonwealth of Puerto Rico ("JRS") as it applies to judges serving without a fixed tenure. The modifications listed herein modify the benefits provided by JRS as established in Act 12-2954 and all subsequent amendments through the Plan Effective Date and are to be adhered to in the administration of JRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

JRS members hired (a) prior to July 1, 2014 are currently accruing benefits under a defined benefit ("DB") formula and (b) on or after July 1, 2014 are currently accruing benefits pursuant to an alternative DB formula and paired with a hybrid formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the JRS plan benefit accrual shall be modified. In doing so, JRS members will retain the benefits they have accrued up to and including the Effective Date, as defined in the Plan; provided, however, that any future cost of living adjustments are eliminated pursuant to the Plan, as any right to such future adjustments is not an accrued benefit and will not be an accrued benefit as of the Effective Date. Benefits accrued from and after the Effective Date shall be based on contributions and earnings in new segregated DC retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| Pension System | The terms of this document and references to Pension System pertain to the freeze of pension obligations of JRS members. |
| Retirement Eligibility Age | The age at which a member may commence receipt of a monthly pension benefit. |
| Freeze Date | The Effective Date. |
| Retirement Benefit | The amount of benefit payable to a JRS member each month. |
| Creditable Service | For purposes of calculating Creditable Service, the years and months (where fractional months are counted as full months of service) begin on the Credit Date. Years and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| Credit Date | The Credit Date for JRS members hired on or after July 1, 2014, is the date of appointment as a judge, and for all other JRS members shall be the date first employed by the Government of Puerto Rico (provided that |

| Definitions | |
|---|---|
| | accumulated contributions for prior government service are transferred to the Pension System). |
| **Highest Salary** | The highest salary received as a judge. Compensation earned after the effective date of the freeze will not be considered. (Applicable for JRS members hired prior to July 1, 2014) |
| **Average Compensation** | The average of the last sixty (60) months of salary that a JRS member has received for Creditable Service. (Applicable for JRS members hired on or after July 1, 2014) |
| **Hybrid Account** | The notional individual account established for each new JRS member on or after July 1, 2014. Such accounts shall be credited with JRS member contributions and interest through the Freeze Date. |
| **Defined Contribution Account** | New accounts to be credited with JRS member contributions and interest in conjunction with the Act 106-2017 defined contribution ("DC") plan, to be established effective as of the Effective Date for JRS members, in connection with the freeze of the JRS pension. |
| **Basic Retirement Eligibility Age** | Age at which the JRS member attains age sixty (60) and ten (10) years of Creditable Service. (Applicable for JRS members hired prior to July 1, 2014) |
| **Optional Retirement Eligibility Age** | For judges with at least eight (8) years of Creditable Service as a judge, the attainment of either:<br><br>a.　　Thirty (30) years of total Creditable Service, or<br><br>b.　　Age fifty-five (55) with eighty-two (82) combined years of age plus Creditable Service ("Points")<br><br>(Applicable for JRS members hired prior to July 1, 2014) |

| Timing | |
|---|---|
| **Pension Freeze** | JRS pension benefit accrual freeze becomes effective as of the Effective Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

E-3

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefits frozen as of Freeze Date. New DC account balances shall be funded with employee contributions to be established in connection with the freeze. The minimum employee contribution shall be eight and one-half percent (8.5%), as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Retirement Eligibility Enhancement If Within Six (6) Months of Unreduced Retirement Eligibility** | For JRS members hired prior to July 1, 2014, if not already eligible for retirement as of the freeze, JRS members hired prior to July 1, 2014 will be permitted to grow into eligibility for retirement provided the JRS member reaches any of the following within six (6) months of the Freeze Date:<br><br>a.    Basic Retirement Eligibility Age,<br>b.    Optional Retirement Eligibility Age, or<br>c.    Attainment of 20 years of creditable service |
| **Delay in Retirement Eligibility for All Others** | For individuals hired prior to July 1, 2014 who do not meet the criteria listed above, retirement eligibility is delayed up to three (3) years. Retirement is also delayed for terminated JRS members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Cost-of-Living Adjustment (COLA)** | The statutory three percent (3%) COLA which has been granted every three (3) years since 2002 will be eliminated for all JRS members effective as of the Freeze Date. |
| **Freezing of Certain Bonuses** | Christmas, Summer and Medicine bonus will no longer be paid to JRS members who retire after the Freeze Date. Further, the Medical Insurance Plan contribution will also be eliminated for retirements taken after the Freeze Date. |
| **Elimination of Enhanced Disability Benefits** | JRS members terminating due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated JRS members. |
| **Elimination of Occupational and One Year of Salary Death Benefits for** | Terminations due to death would be eligible for a refund of accumulated contributions. |

| Provisions of the Modification | |
|---|---|
| **Future in-Service Deaths** | |
| **Elimination of Free Post-Retirement Death Benefit** | The normal form of payment for annuity benefit provided for future retirements will be a single life annuity. JRS members will be able to elect a joint and survivor benefit that will be the actuarial equivalent benefit to the normal form of payment. |

| More detailed provisions of the Modifications | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to July 1, 2014** | A.      JRS members who are eligible to retire prior to the Freeze Date will continue to be eligible to retire at any time.<br><br>B.      JRS members who would attain either any of the following on or prior to the date that is six (6) months following the Freeze Date had service continued to accrue past the Freeze Date will continue to be eligible to retire at any time:<br><br>a.      Basic Retirement Eligibility Age<br>b.      Optional Retirement Eligibility Age<br>c.      Attainment of 20 years of Creditable Service<br><br>C.      JRS members who are not eligible to retire as of the Freeze Date and will not meet the criterion listed in B. above as of six (6) months after the Freeze Date will be eligible to retire upon the date the JRS member would have attained ten (10) years of Creditable Service had the freeze not occurred and reaching the ages shown in the following table:<br><br>  <table><tr><th>Attained Age as of the Freeze Date</th><th>Retirement Eligibility Age Six Months After the Freeze Date</th></tr><tr><td>57 and up</td><td>61</td></tr><tr><td>56</td><td>62</td></tr><tr><td>55 or under</td><td>63</td></tr></table> |
| **Specific Implications on Retirement Benefit if Hired Prior to July 1, 2014** | **Retirements on or before the date that is six (6) months following the Freeze Date:**<br><br>A.      If a JRS member attains the Optional Retirement Eligibility Age, the benefit payable will be equal to seventy-five percent (75%) of Highest Salary (sixty percent (60%) of Highest Salary if hired after December 24, 2013).<br><br>B.      If a JRS member attains the Basic Retirement Eligibility Age, but has not yet attained the Optional Retirement Eligibility Age, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five |

| More detailed provisions of the Modifications |
|---|

percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.    If a JRS member has attained age seventy (70) with fewer than ten (10) years of Creditable Service at retirement, the benefit payable is twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10).

D.    If a JRS member has attained at least twenty (20) years of Creditable Service, but has not attained either the Basic Retirement Eligibility Age or the Optional Retirement Eligibility Age, the benefit payable is twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary sixty percent (60%) of highest salary if hired after December 24, 2013), actuarially reduced to current retirement age from the earlier of the date the JRS member would have attained either age sixty (60) or the Optional Retirement Eligibility age based on their service at retirement.

**Retirements after Six Months After the Freeze Date:**

A.    If a JRS member has attained Optional Retirement Eligibility as of the Freeze Date (or would have attained Optional Retirement Eligibility by the date that is six (6) months after the Freeze Date), the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

B.    If a JRS member has attained Basic Retirement Eligibility as of the Freeze Date (or would have attained Basic Retirement Eligibility as of the six (6) month anniversary of the Freeze Date), the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.    If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from the earlier of the date the JRS member would have attained

| More detailed provisions of the Modifications | |
|---|---|
| | either age sixty (60) and the Optional Retirement Eligibility Age based on their service as of the Freeze Date.<br><br>D.    If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has not attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from age sixty (60).<br><br>E.    If a JRS member has attained at least ten (10) years of Creditable Service as of the Freeze Date and would not have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).<br><br>F.    If a JRS member has not attained at least ten (10) years of Creditable Service at the Freeze Date, and retires after the date the participant would have earned ten (10) years of service had the freeze not occurred the benefit payable equals twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10). |
| **Specific Implications on Retirement Eligibility Age if Hired on or After July 1, 2014** | A.    JRS members that are eligible to retire or would have been eligible to retire prior to the date six (6) months after the Freeze Date will remain eligible to retire at any time.  Current eligibility is attainment of age fifty-five (55) with twelve (12) years of Creditable Service.<br><br>B.    JRS members who would not meet retirement eligibility by the date six (6) months after the Freeze Date will become retirement eligible upon attainment of age sixty-five (65) with twelve (12) years of Creditable Service. |
| **Specific Implications on Retirement Benefit Amount if Hired on or After July 1, 2014** | A.    JRS members will continue to receive a benefit of one and one-half percent (1.5%) of Average Compensation plus the annuitized value of the balance of the Hybrid Account at the time of retirement.<br><br>B.    JRS members who would have attained retirement eligibility prior to the date six (6) months after the Freeze Date and who have not yet attained age sixty (60) will receive a benefit of one and one-half |

| More detailed provisions of the Modifications | |
|---|---|
| | percent (1.5%) of Average Compensation reduced by 1/180 for each of the first sixty months (60) months and by 1/360 for each of the next sixty (60) months by which the retirement date precedes age sixty-five (65), plus the annuitized value of the Hybrid Account. |
| **Implications for Judges serving without fixed tenure and appointed prior to June 28, 2007** | Judges serving without a fixed tenure and appointed prior to June 28, 2007 will receive the benefit they had accrued as of the Freeze Date, calculated based on the Creditable Service and Salary earned prior to the Plan Effective Date and otherwise under the provisions in effect prior to the Freeze Date. As these judges have been identified as having been eligible for retirement and are fully accrued in their plan benefit as of the Freeze Date, the only limitation will be that the Salary used for calculating the benefit will be limited to those earnings prior to the Plan Effective Date. |
| **Social Security** | The Oversight Board and the Government will take appropriate actions to provide that all members hired after the Freeze Date and all judges under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current judges 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security. |
| | Elections by current judges 45 and older to enroll must be completed within the sixty (60) days after the Effective Date. By default, current judges age 45 or older will be assumed to have opted out of Social Security coverage. |
| | For JRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

# **EXHIBIT F-1**

MODIFICATIONS TO TRS PENSION BENEFITS
(WITHOUT AMPR PSA)

## MODIFICATIONS FOR FREEZE OF TRS BENEFIT OBLIGATIONS[1]

The following is a summary of modifications with respect to a freeze of pension benefits accrued under the TRS. The modifications listed herein modify the benefits provided by TRS as established in Act 218-1951 and all subsequent amendments through the Plan Effective Date (including but not limited to Act 91-2004, Act 160-2013, and Act 106-2017) and are to be adhered to in the administration of TRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual shall be frozen as of the Effective Date of the Plan (the "Freeze Date") Such freeze shall apply to all members of TRS, regardless of title or job classification. TRS members will retain the benefits they have accrued to date, provided that any future cost of living adjustments, which are not accrued benefits and will not be accrued benefits as of the Effective Date, shall be eliminated as of the Effective Date. Future benefits shall be based on contributions and earnings in new segregated defined contribution ("DC") retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of TRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement Benefit** | The amount of benefit payable to a member each month. |
| **Creditable Service** | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, fifteen (15) calendar days of a school year month shall be equal to one (1) calendar month worked during the school year for teachers; and twenty-one (21) calendar days of a month shall be equal to one (1) calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |

---

[1] Milliman actuarial valuation report as of June 30, 2017, using July 1, 2016, Census data collection, which is the latest dataset currently available. If a new dataset from 2017 or 2018 becomes available, the values will be updated accordingly.

F-1

| Definitions | |
|---|---|
| **Average Compensation** | The average of the thirty-six (36) highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| **Defined Contribution Account** | New accounts to be established as soon as administratively feasible and effective after the Freeze Date for members hired prior to August 1, 2014, in connection with the freeze of the DB formula. |

| Timing | |
|---|---|
| **Pension Freeze** | TRS pension benefit accrual freeze shall become effective on the Freeze Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefit frozen as of Freeze Date, as noted below. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution shall be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Delay in Retirement Eligibility for Members not yet Eligible** | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, retirement eligibility is delayed three (3) years. Retirement is also delayed for terminated members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Minimum Benefit** | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| **Elimination of Service Purchase** | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| Provisions of the Modification | |
|---|---|
| **Elimination of Enhanced Disability Benefits** | Active members hired prior to August 1, 2014 who terminate employment due to disability have been able to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8% of Average Compensation per year of Creditable Service. Terminations due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated participants (i.e., deferred retirement benefits without enhancement). |
| **Suspension of Benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined Contribution Transfer from Prior Plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be subject to the provisions of the Act 106 DC plan regarding the to transfer these amounts to their DC Account.. |

| More Detailed Provisions of the Modification | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to August 1, 2014** | A. Members who meet the following age and service combinations prior to the Freeze Date, will continue to be eligible to retire at any time:<br><br>a. At least age 60 with at least ten (10) years of Creditable Service<br>b. At least age 47 with at least twenty-five (25) years of Creditable Service<br><br>B. Members who are not eligible to retire as of the Freeze Date, will be eligible to retire upon attaining ten (10) years of Creditable Service and reaching the age 63. |
| **Specific Implications on Retirement Benefit if Hired Prior to August 1, 2014** | **Retirements on or after the Freeze Date:**<br><br>Minimum benefits will no longer apply to future retirees.<br><br>The freeze also eliminates accelerated payment of benefits due to future disabilities and the ability to purchase additional service.<br><br>A. If a member is at least age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals seventy-five percent (75%) of Average Compensation as of the Freeze Date. |

F-3

| **More Detailed Provisions of the Modification** | |
| --- | --- |
| | B.    If a member is under age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals sixty-five percent (65%) of Average Compensation as of the Freeze Date.<br><br>C.    If a member is at least age 50 as of the Freeze Date and does not attain at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date.<br><br>D.    If a member is under age 50 as of the Freeze Date and does not attain at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals ninety-five percent (95%) of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

| **Miscellaneous** | |
| --- | --- |
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all members hired after the Freeze Date and all teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security within sixty (60) days of the Effective Date all members who are eligible to accrue Social Security credits; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have opted out of Social Security coverage.<br><br>For TRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

**EXHIBIT F-2**

**SUMMARY OF SUPPLEMENTAL MODIFICATIONS TO TRS PENSION BENEFITS AND COLLECTIVE BARGANING AGREEMENT WITH AMPR PSA**

## APPENDIX I

### MODIFICATIONS TO AFT COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of material terms included in the new collective bargaining agreement (the "AFT Operative CBA") between AFT and the Commonwealth. For the duration of the AFT Operative CBA, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express written agreement of AFT, AMPR and AMPR-LS. Nothing contained herein shall prohibit changes to the AFT Operative CBA by mutual written agreement of the unions, the FOMB, and the Department.

| Definitions | |
|---|---|
| **Administration** | The management for the division (agency/grouping) in which the employee is assigned. |
| **Department** | The division (agency/grouping) in which the employee is assigned (Department of Education). |
| **Union Affiliates** | <ul><li>American Federation of Teachers ("AFT"),</li><li>Asociacion de Maestros de Puerto Rico ("AMPR"),</li><li>Asociacion de Maestros de Puerto Rico -Local Sindical ("AMPR-LS")</li></ul> |

| Timing | |
|---|---|
| **Terms** | Five (5) year CBA effective as of the effective date of the Commonwealth Plan. AFT Operative CBA start date will be retroactive to the beginning (i.e. July 1) of the Commonwealth Fiscal Year in which the POA becomes effective. Final version of the AFT Operative CBA will be attached to the contemplated plan support agreement among AFT, AMPR, AMPR-LS, and the Oversight Board.. |
| **Implementation** | Commonwealth Plan of Adjustment |

| More Detailed Provisions of the Proposal | |
|---|---|
| **Healthcare plan / Medical services** | The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, including transitory employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |

F-6

| **More Detailed Provisions of the Proposal** |
|---|

| Sick leave | **Section 1** When a member of the Appropriate Unit covered by the Operative CBA is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished. |
|---|---|
| | **Section 2** |
| | A. **Leave for Parents with Children with Physical and / or Mental Disabilities.** In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him as a person with disabilities. |
| | They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it. |
| | B. **Leave for Elderly Persons.** In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person evidencing that he / she is sixty (60) years or more. They must comply with Section 3's provisions. |
| | **Section 3** The Administration shall authorize the father or mother of children with disabilities to stay with them when they are hospitalized. The father or mother must submit evidence of the hospitalization and the duration of the hospitalization. The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave. So that the licenses are not affected in a dangerous manner, the member of the Appropriate Unit that requests |

F-7

| More Detailed Provisions of the Proposal | |
|---|---|
| | this special license must leave accrue fifteen (15) or more days due to illness. |
| **Additional Language for Holidays, Sick and Vacation Leaves** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement, except that Union members shall retain Funeral Leave and Teachers' Day as provided in the existing CBA. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | To comply with the Fiscal Plan in force and during the term of this Agreement, employees shall be entitled to those bonuses that are provided for in the certified Budget for the Commonwealth or otherwise lawfully granted by the Administration. |
| **Institutional representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of 4 individual members, appointed by the Union to represent labor. <br><br> **Section 2** The members may be appointed for terms of 12 months, and may be reappointed by the Union. <br><br> **Section 3** The members will meet with representatives of the Department management three (3) times a year to discuss and share perspectives on Department status, actions and proposed future plans, to include school closures, restructuring actions and future identification and development of new schools and transition plans. <br><br> **Section 4** For the avoidance of doubt, these three (3) meetings a year with the Department are not a substitution for collective bargaining. <br><br> **Section 5** The members will meet with representatives of the Financial Oversight and Management Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget. <br><br> **Section 6** The three (3) meetings with the Department and annual meeting with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |

| More Detailed Provisions of the Proposal | |
|---|---|
| | |
| **Medicare** | The oversight board and the government will take appropriate actions with the social security administration to facilitate access and enrollment into Medicare for those members who are eligible. |
| **Dues Deduction, Charges** | **Section 1** The Department shall inform new employees of the right conferred by Act No. 45-1998 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45-1998, as amended. The Administration shall not discourage union membership<br><br>**Section 2** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.<br><br>**Section 3** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.<br><br>**Section 4** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund as soon as it is required. If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |
| **Improvement of terms** | If the Commonwealth government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45, and such more beneficial economic terms are lawfully implemented, expressly including but not limited to more beneficial pension terms or benefits, such more beneficial economic terms shall be provided to AFT, AMPR, and AMPR-LS bargaining unit employees. |

**APPENDIX II**

## PROPOSED TERMS FOR TRS SYSTEM BENEFITS

This is a summary of proposed indicative terms for a freeze of the outstanding benefits of the Teachers Retirement System for the Commonwealth of Puerto Rico ("TRS").

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual will be frozen upon the six (6) month anniversary of the Effective Date of the Plan of Adjustment (the "Freeze Date")

| Definitions | |
|---|---|
| Pension System | The terms of this document and references to Pension System pertain to the freeze of pension obligations of the Teachers Retirement System (TRS). |
| Eligibility for Membership | This applies to all active participants of TRS ("Member" or "Members"), regardless of title or job classification. Members will retain the benefits they have accrued to date, subject to the benefit reduction formula. |
| Retirement eligibility age | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| Retirement benefit | The Retirement Benefit is the amount of benefit payable to a member each month. |
| Creditable service | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, 15 calendar days of a school year month shall be equal to 1 calendar month worked during the school year for teachers; and 21 calendar days of a month shall be equal to 1 calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| Average compensation | The average of the 36 highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| Defined contribution account | The individual account established under Act 106-2017 for each new member hired on or after August 1, 2014. These accounts have been credited with member contributions to the prior hybrid benefit plan in which they were enrolled, with interest. New accounts will be established for members hired prior to August 1, 2014, in connection with the freeze of the DB formula, and in accordance with the provisions of Appendix IV. |

F-11

| Timing | |
|---|---|
| **Pension freeze** | TRS pension benefit accrual freeze becomes effective upon the Freeze Date. |
| **Pension benefits date** | The data set used to calculate the freeze of pension benefits required is based on the July 1, 2017 dataset provided by the Pension System actuary, which is the latest dataset currently available. If a new dataset becomes available, the values will be updated accordingly. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits earned under and paid by the plan on or after the Freeze Date, also subject to the benefit reduction formula discussed in the separate benefit cut term sheet and as clarified in this document. |

| Provisions of the proposal | |
|---|---|
| **Freeze of benefit accruals and implementation of DC account** | Accrued benefit frozen as of the Freeze Date. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution will be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Maintaining retirement eligibility for individuals over age 50** | Members hired prior to August 1, 2014 who were over age 50 as of the Freeze Date, but not eligible for retirement at the Freeze Date will have the opportunity to achieve the previous milestones for retirement eligibility (i.e. age 60 with 10 years of service, age 47 with 25 years of service or 30 years of service) and then would be eligible to retire upon achieving those milestones. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service as of the Freeze Date, not inclusive of service after the freeze. |
| **Maintaining retirement eligibility for individuals under age 50 and within 3 years of retirement eligibility** | Members hired prior to August 1, 2014 who were under age 50 and within 3 years of achieving the age 47 and 25 years of service milestone for retirement eligibility will have an opportunity to achieve the milestone for retirement eligibility. Members who achieve that milestone would then be eligible to retire such that they will not be subject to any delay in retirement eligibility and corresponding early retirement benefit reduction. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date, not inclusive of service after the freeze. |

| Delay in retirement eligibility for all others | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, not within 3 years of retirement eligibility as of the Freeze Date, and were under age 50 at the Freeze Date, retirement eligibility is delayed to age 63 (or later upon completion of 10 years of service). Retirement is also delayed for terminated members that have not yet commenced.

For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date; however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
|---|---|
| Benefit formula upon achieving 30 years of service | Members hired prior to August 1, 2014 who had not earned 30 years of service as of the Freeze Date will be eligible to receive a modified benefit enhancement upon reaching 30 years of service regardless of the Creditable Service at the Freeze Date. The enhancement will provide members the following:<br>    a. Members age 50 and over at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0%<br>    b. Members under age 50 at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0% but will continue to be reduced by a 95% factor.<br>The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date.

Under no circumstances shall any member who is not subject to the benefit reduction formula trigger a benefit cut by virtue of achieving 30 years of service and the corresponding benefit enhancement described in this section. This provision is an explicit modification to any pension benefit reductions provisions of the Commonwealth Plan of Adjustment, as applicable. |
| Elimination of minimum benefit | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| Elimination of service purchase | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| | |
|---|---|
| **Elimination of continued contributions under age 55** | Employee contributions that were required of pensioners under age 55 will be eliminated after the Freeze Date. |
| **Separation from service** | The Oversight Board and Government will take appropriate actions to support efforts to afford teachers with frozen defined benefits access to their defined contribution plan accounts upon early retirement or separation of service at age 55 or over under the same conditions as if distributions were taken at age 62. |
| **Suspension of benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined contribution transfer from prior plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be eligible to transfer these amounts to their DC account, either as a single transfer upon enrolling in the plan or through an initial election to defer compensation through payroll, subject to tax considerations. |
| **Disability benefits for DB plan participants** | Active members hired prior to August 1, 2014 who terminate employment due to disability will continue to be eligible to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8 percent of Average Compensation per year of Creditable Service with both determined as of the Freeze Date. Eligibility requirements and compensation averaging periods for Occupational and Non-Occupational disabilities will also be preserved. |
| **More detailed provisions of the proposal** | |
| **Specific implications on retirement eligibility age if hired prior to August 1, 2014** | **Retirements after the Freeze Date**:<br><br>A. Members who meet the following age and service combinations as of the Freeze Date, will continue to be eligible to retire at any time and members age 50 or older as of the Freeze Date, will become eligible once they meet the following age and service combinations:<br>    a. At least age 60 with at least 10 years of Creditable Service<br>    b. At least age 47 with at least 25 years of Creditable Service<br>    c. At least 30 years of Creditable Service |

F-14

|  | B. Members under age 50 as of the Freeze Date who will attain any of the age/service conditions listed below within 3 years of the Freeze Date will become eligible to retire once they meet the age/service criterion listed below: <br>    a. At least age 47 with at least 25 years of Creditable Service <br>    b. At least 30 years of Creditable Service <br><br>C. Members under age 50 as of the Freeze Date who are not eligible to retire within 3 years of the Freeze Date will be eligible to retire upon attaining 10 years of Creditable Service and reaching the age 63. <br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date, however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
|---|---|
| **Specific implications on Retirement Benefit if hired prior to August 1, 2014** | **Retirements after the Freeze Date**: <br><br>A. Minimum benefits will no longer apply to future retirees. <br><br>B. The freeze also eliminates the ability to purchase additional service. <br><br>C. If a member is at least age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 75 percent of Average Compensation as of the Freeze Date. <br><br>D. If a member is under age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 65 percent of Average Compensation as of the Freeze Date. <br><br>E. If a member is at least age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

|  | F. If a member is under age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 95 percent of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |
|  | G. If a member is at least age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
|  | H. If a member is under age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 95 percent of 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
| **Implications if hired on or after August 1, 2014** | These members have been enrolled in the new defined contribution accounts under Act 106-2017. Any balances from the prior hybrid benefit plan have been deposited in these teachers' Act 106 accounts and will not be impacted by the Pension Freeze. |
| **Miscellaneous** | |
| ***Asociacion de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de*** | Nothing in this term sheet or the Plan of Adjustment shall impact the precedential effect of this decision. |

F-16

| | |
|---|---|
| ***Puerto Rico* 190 D.P.R. 854 (2014)** | |
| **Recognition Payment** | One-time payment of $3,000 to each of the Union represented participants (expressly including Transitory Participants) to be made upon the effective date of a confirmed Plan of Adjustment for the purpose of recognizing the outstanding service of the teachers of Puerto Rico and their importance to Puerto Rico's future, and of acknowledging the challenges resulting from the freeze of the teachers' TRS defined benefit accruals.<br><br>Payable 60 days after the Effective Date of the Plan of Adjustment. |
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all teachers hired after the Freeze Date and all current teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis. Alternatively, current teachers 45 and older may choose not to be enrolled in Social Security by electing to contribute 8.5% of compensation to the defined contribution plan. Enrollment in Social Security will be effective in accordance with Appendix IV. Teachers enrolled in Social Security will contribute 2.3% of compensation to the defined contribution plan and will have elective deferrals capped so that the total contribution made to the defined contribution plan remains below 7.5%. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security all teachers who are eligible to accrue Social Security credits in accordance with Appendix IV; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have elected to contribute 8.5% to the defined contribution plan and thus opted out of Social Security coverage. |
| **Law 160** | For the avoidance of doubt, any contributions made to Law 160 accounts will not be subject to any pension benefit cut. |
| **JRS Defined Benefit Plan** | The Oversight Board will not propose a plan or enter into agreements that would impose a freeze of the TRS defined benefit plan but not of the JRS defined benefit plan. |

**APPENDIX III**

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFT, AMPR and AMPR-LS Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
| --- | --- |
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with AMPR and AMPR member participants (expressly including participants with transitory status in the same status as other participants (the "Transitory Participants")) for each fiscal year of the AFT Operative CBA to provide participation of AMPR in sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFT, AMPR and AMPR-LS ("Union") |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | Excess Cash Surplus is defined as excess cash surplus above and beyond the projected Fiscal Plan surplus contained in the Certified Fiscal Plan in effect as of the Effective Date for the Plan of Adjustment for the Commonwealth.<br><br>If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. |

| Timing | |
| --- | --- |
| **Implementation** | To be aligned with the implementation of the AFT Operative CBA, currently targeted for implementation with the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date. |

| Provisions of the proposal | |
|---|---|
| **Upside Participation Bonus** | For the term of the AFT Operative CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants (expressly including Transitory Participants) and all rank-and-file Commonwealth employees each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus, up to a 7.5% total Defined Contribution cap in total for the year, to their Defined Contribution account; any remainder will be distributed in cash. The 7.5% cap is a requirement to ensure participants maintain continued enrollment in Social Security. |

**APPENDIX IV**
**SOCIAL SECURITY/DEFINED CONTRIBUTION PLAN IMPLEMENTATION**

Below is a summary of procedures for enrollment of teachers into Social Security and, as applicable, defined contribution accounts under Act 106-2017 (the "Defined Contribution Plan"), and enforcement thereof.

| Provisions of the proposal |
|---|

| | |
|---|---|
| **Timing of Pension Freeze** | a. The Pension Freeze will take effect six (6) months following the Effective Date of the Commonwealth Plan of Adjustment.<br>b. The order confirming the Plan (the "Confirmation Order") will provide that the Commonwealth will fully implement enrollment in Social Security and the Defined Contribution Plan such that in the first full pay period following the Pension Freeze, the Commonwealth will withhold payroll contributions and remit said contributions to Social Security and the Defined Contribution Plan in a timely manner.<br>  i. With respect to the Defined Contribution Plan, full implementation includes the transfer of funds in a timely manner, as described in Section (b)(iii)(1) in "Penalties for Noncompliance" below, from withholding of payroll contribution to individual accounts over which participants have investment direction rights.<br>  ii. Failure by the Commonwealth to act in accordance with this section (b) will be deemed a violation of the provisions of the Plan and the Confirmation Order and will give rise to enforcement remedies set forth herein but will not affect the Freeze Date noted above.<br>  iii. If timing is not met, penalties for noncompliance, as described in the next section, "Penalties for Noncompliance," will apply.<br>c. Prior to the Freeze Date, the Commonwealth will provide notice to the Puerto Rico Social Security State Administrator and the applicable administrator of the New York Region of the Social Security Administration that teachers will no longer be covered by a qualified replacement plan as of the Pension Freeze effective date. At that time, the Commonwealth will send such parties a data file containing a list of all affected teachers who will be eligible for Social Security coverage as of the Pension Freeze effective date. |

F-21

| | |
|---|---|
| **Penalties for Noncompliance** | a. Three Groups<br>   i. Group 1 – Members who experience a delay in the withholding and remittance of their Social Security contributions<br>   ii. Group 2 – Members who experience a delay in the withholding and remittance of their Social Security contributions and suffer a loss of benefits as a result of delay upon applying for Social Security benefits. For avoidance of doubt, these are members who retire prior to full implementation of Social Security and are otherwise eligible to retire under Social Security (whether: (a) they have enough quarters of prior Social Security service without counting post-freeze service; or (b) they only have enough Social Security creditable service on account of post-freeze service .<br>   iii. Group 3 – Members who experience a delay in the withholding and remittance of defined contributions.<br>b. Remedies<br>   i. Group 1 – Members will be held harmless for the failure of the Commonwealth to contribute Social Security taxes by retroactively making contributions to Social Security on behalf of affected members to the extent necessary.<br>      1. Will include tax gross up on contributions so member earnings net of taxes is not impacted<br>   ii. Group 2 – In addition to Group 1 remedy, the Commonwealth will pay reconciliation damages to members whose actual Social Security benefits are affected in an amount to be determined as follows:<br>      1. Payment will be in the form of one-time cash damages payment<br>      2. No payment shall be less than $1,500<br>      3. Payment is based on two (2) key tiers impacting the size of lost income<br>         a. Whether or not individuals have enough quarters of prior Social Security service (i.e., with another employer) to qualify for Social Security benefits without counting post-freeze service |

b. Proximity of retirement date to Freeze Date based on the assumption, for the sole purpose of calculating payments, of a 3-year assumed delay period.

c. Schedule is as follows (single one-time payment only):

**40 or more quarters from previous employer**

|        | <u>Yes</u> | <u>No</u> |
|--------|------------|-----------|
| Year 1 | $1,500     | $9,000    |
| Year 2 | $1,500     | $7,200    |
| Year 3 | $1,500     | $3,600    |

4. Will include tax gross up on damages payment, if any, so member earnings net of taxes is not impacted

5. One-time payments will no longer be made for any future Social Security retirements once Social Security recognizes post-freeze service for determining retirement benefits

iii. All Groups – Members will be held harmless for the failure of the Commonwealth to contribute defined contributions in a timely manner by the Commonwealth retroactively making contributions and compensatory earnings to Defined Contribution Plan on behalf of affected members.

1. Timely manner defined as within 30 days of the payroll withholding date when funds are taken out of the employee payroll and held by employer, unless otherwise defined by Alight agreement

2. Compensatory earnings to be calculated using the greater of 0% or the return on the T. Rowe Price Retirement Blend 2045 (Tr-B) fund.

3. Compensatory earnings to be calculated from Freeze Date for pre-2014 hires, to the month end prior to full Defined Contribution Plan implementation.

4. Members who are enrolled in Defined Contribution Plan prior to the Freeze Date

| | |
|---|---|
| | will not be covered under this remedy. |
| **Enforcement Incentive** | a. This Section will take effect immediately upon the Plan Effective Date.<br>b. FOMB will establish a budget appropriation under the custody of Hacienda immediately following the Plan effective date. If the Commonwealth does not fully implement either Social Security or the Defined Contribution Plan by the Freeze Date, as determined by the Funds Committee, then the appropriated funds will be segregated into a separate account at Hacienda to be administered by the Funds Committee.<br>    i. Appropriation will be held in place with initial funding until Commonwealth has withheld and remitted funds on behalf of Social Security and/or defined contribution accounts as described in (III)(d)(ii) below.<br>    ii. Social Security withholding defined as Commonwealth withholding 6.2% from teacher payroll<br>    iii. Defined contribution withholding defined as Commonwealth withholding 2.3% or 8.5% from teacher payroll, dependent on applicable plan selected by a teacher.<br>c. Hacienda will support the Funds Committee (see Section (h)(i) below) to use funds to address penalties for noncompliance and pay Group 1, Group 2, and Group 3 remedies.<br>d. Agreement will include required Appropriation level based upon meeting Social Security and defined contribution milestones. The Appropriation shall be replenished as described in section (d)(iii) below.<br>    i. The Commonwealth will make an initial appropriation of $77 million<br>    1. $77 million protects employee Social Security and defined contribution amounts for approximately 1 year ($900m payroll * 8.5% = $77m)<br>    2. Commonwealth will appropriate employer 6.2% Social Security contribution for exclusive use in PRDE budget<br>    ii. Staggered release of appropriated funds<br>    1. Upon Commonwealth withholding and transferring funds to Social Security Administration, the fund balance will be reduced to no more than $50 million ($27 million released). |

F-24

2. Upon Commonwealth withholding and transferring 95% of defined contributions to individual accounts, the fund balance will be reduced to no more than $30 million ($20 million released). When 100% of teachers are properly enrolled, the fund balance will be no more than $25 million ($5 million released).

3. A minimum amount of $25 million will be held in the segregated account for a period of two (2) years following the release of 100% of the defined contribution portion of funds or of 100% of the Social Security portion of the fund, whichever is later, for the exclusive purpose of settling outstanding noncompliance claims. Once the two (2) year period ends, the remaining balance will be released out of the segregated account.

iii. Replenishment of budget appropriation

1. For each year of delay following the Pension Freeze date in which the Commonwealth fails to fully implement Social Security and/or the Defined Contribution Plan, the Commonwealth will make an annual additional appropriation to maintain a balance of $77m (as modified by (3)(d)(ii) above) in the segregated account.

2. The appropriation shall not affect funding levels available to the Department of Education or any other program for targeted for public education or students.

e. In addition to appropriation, FOMB will use the Confirmation Order, Fiscal Plan and all legal actions available to reasonably enforce timely implementation of both Social Security and Defined Contribution accounts for members. In addition, all parties in interest, including AMPR/AFT, retain their rights to seek enforcement of the timely implementation of both Social Security and the Defined Contribution accounts whether by seeking enforcement of the provisions of the Confirmation Order and/or by exercising any other available legal remedies.

f. Commonwealth will also face federal liability to the extent the new Defined Contribution plan is not a qualified retirement replacement plan and Social Security is not implemented.

g. The Commonwealth/FOMB will provide a monthly written report to AMPR/AFT on progress made toward implementation of Social Security and DC plan enrollment that details the status of payroll withholdings, remittances to Social Security and the DC plan, and the

funding of individual defined contribution accounts until enrollment is fully implemented.

h. Appropriation would be administered with support of a Funds Committee

    i. Funds Committee will be comprised of five (5) members to include two (2) appointees by FOMB, two (2) appointees by AMPR, one of which will serve as Committee Chair, and one appointee by AAFAF.

    ii. The Commonwealth will establish a recurring annual budget appropriation for the Funds Committee in the amount of $300,000 until such time as the Commonwealth has satisfied the conditions set forth in Section (d)(ii)(2) above. Initial funding will be made available at the Plan Effective Date. For the next two years after satisfaction of the conditions set forth in Section (d)(ii)(2) above, the Commonwealth will establish a $150,000 annual budget for the Funds Committee. At the end of any fiscal year, unspent funds will carry over into the next fiscal year, except in the second year following satisfaction of the conditions set forth in Section (d)(ii)(2) above.

    iii. A portion of the Funds Committee appropriation will be used to create a teacher-facing Ombudsman with responsibility for educating teachers about noncompliance issues and shepherding teachers with individual claims through the Funds Committee claims process.

    iv. Funds Committee structure to be further detailed, with dispute resolution options

    v. Funds Committee would be charged with:

        1. Determining if the Commonwealth has fully implemented Social Security and the Defined Contribution Plan prior to the Freeze Date in accordance with Section (b) of "Timing of Pension Freeze" above.

        2. Determining when the Commonwealth has satisfied the aforementioned conditions for the incremental release or increase of the Enforcement Incentive funds. The Funds Committee will be entitled to such documentation as requested to validate compliance, including without limitation payroll records, defined contribution account records, and

|  | forms submitted to Social Security/IRS. Documentation will not contain personal identifiable information. To the extent the Funds Committee requires any documentation containing personal identifiable information, the Funds Committee must obtain waivers from each individual and present those to the Commonwealth prior to receipt of personal identifiable information.<br>3. Reviewing claims and approving/disallowing claims for damages<br>4. Determining compensatory earnings as a result of any delay in the funding of individual Defined Contribution Plan accounts<br>5. Identifying and pursuing resolution of issues and communicating same with Commonwealth, FOMB, AMPR and Social Security/defined contribution Implementation team, including an Ombudsman if appointed<br>vi. FOMB will use best efforts to bind Hacienda to the decisions of the Funds Committee through the Plan. |
|---|---|
| **Group Annuity Contracts** | The FOMB will use best efforts to require the Commonwealth to adhere to ERISA/U.S. Department of Labor fiduciary requirements when entering into any annuity contracts in the future through language in the Plan |

## **EXHIBIT G**

SUMMARY TERMS OF AFSCME COLLECTIVE BARGAINING AGREEMENT

### MODIFICATIONS TO AFSCME COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of agreed upon modifications to the collective bargaining agreements (collectively, the "<u>AFSCME CBAs</u>") between AFSCME and the Commonwealth. Provisions of existing AFSCME CBAs not in conflict with terms and conditions set forth below shall remain unchanged and remain in full force and effect in the new AFSCME CBAs.  Only those AFSCME CBAs listed below shall be modified at this time[2].

| Definitions | |
|---|---|
| **Administration** | The management for the division (agency/grouping) in which the employee is assigned. |
| **Department** | The division (agency/grouping) in which the employee is assigned. |
| **Union Affiliates** | <ul><li>Parole Board and Local 3584 / United Public Servants</li><li>Department of Consumer Affairs and Local 3986 / United Public Servants</li><li>Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants</li><li>Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants</li><li>Department of Education and Local 3840 covering only employees within the AFSCME jurisdiction of PASO</li><li>Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants</li><li>Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants</li><li>Department of Transportation and Public Works and Local 3889 / United Public Servants</li><li>Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants</li><li>Department of the Family and Local 3227-Unit A / United Public Servants</li><li>Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants</li><li>Bureau of Forensic Sciences and Local 2099 / United Public Servants</li><li>Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants</li></ul> |

---

[2] If the Government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45 with the exception of members of the Teachers Retirement System (TRS) (or employees who would have been eligible for membership in TRS but for the adoption of Act 3-2013), and such more beneficial economic terms are lawfully implemented, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees.

| | ▪ Bureau of Transport and Other Public Services and Local 3897 / United Public Servants |
|---|---|

| **Timing** | |
|---|---|
| **Terms** | Five (5) year CBAs effective as of the effective date of the Commonwealth Plan. |
| **Implementation** | The Plan. |

| **More detailed provisions of the proposal** | |
|---|---|
| **Terminations / Layoffs** | **Section 1** In order to avoid the involuntary layoff of personnel and to give personnel adequate notice of reassignments or relocations, the Union and the Oversight Board agree to discuss modifying the regulations implementing Act 8-2017 with the Government.<br><br>**Section 2** In the event that the Administration needs to carry out downsizing of personnel (layoffs) to comply with the provisions of the approved Fiscal Plan, the parties agree to the following:<br><br>A. **Temporary Suspension.** The immediate commencement of the layoff plan will entail the automatic suspension of any clause, precept and/or provision applicable to employees and/or positions covered by this agreement, contained in laws, collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contract letters, certifications, regulations, rules and conditions of employment, regulatory letters, classification plans and/or retribution plans that conflict with this Article<br><br>The suspension of the clauses and provisions provided herein will be for a term of five (5) years, and the Administration may reduce this period after the Oversight Board certifies compliance with the objectives of the Administration and/or Department's Fiscal Plan.<br><br>B. **Reassignment and Relocation.** The Administration may implement any reassignment of positions and relocation of personnel when its budgetary interests so require to avoid layoffs. If reassignments and/or relocations are necessary and budgetary feasible, the Administration shall reassign/relocate the most qualified volunteer(s) who would otherwise be subject to layoff. If there are insufficient qualified volunteers, the least senior qualified employee will be involuntary reassigned/relocated. An employee who has been involuntarily relocated because her/his position has been eliminated may request the position she/he previously held, if the Administration creates it again within the term of two (2) years following the relocation. The employee must make the corresponding request to the |

G-3

| More detailed provisions of the proposal |
| --- |

Human Resources Division.  Seniority shall be the determining criteria to the extent that the position is requested by more than one relocated employee.  This provision shall establish the order of voluntary and involuntary employee reassignment, relocation and mobility but shall not be interpreted as a limitation to the Administration's right to implement mobility plans pursuant to Act 8-2017.

C.      **Layoffs.**

a.      In view of the state of fiscal emergency, the scarcity of fiscal resources, the gravity of the problems that the Administration faces, and the urgency required to correct the fiscal problems, it is exempted from exhausting measures such as retraining employees, the enjoyment of accrued vacations, the enjoyment of unpaid leave, a reduction in work hours, or demotions, prior to implementing the layoffs.

b.      The Administration will notify in the first place the termination to all employees of the appropriate unit who as of the date of effectiveness of this Agreement have a temporary or irregular appointment, so that it will not be necessary to observe, with respect to these employees, the criterion of seniority.  The notification will be made by hand delivery or by certified mail, return receipt requested, to the address that appears in the Administration's files.

c.      The layoffs of employees with permanent or career appointment will be carried out observing exclusively the criterion of seniority by occupational classification affected by the layoff and consonant with the need to ensure the continuity and quality of Administration services, so that those who have less seniority in each affected occupational classification will be laid off in the first place.

d.      In order to determine the seniority of affected employees, all of the services provided by the employees affected in the public service will be considered, regardless of the provisions of the collective bargaining agreements, regulations, circulars, and other normative documents.

e.      The Administration will notify the layoffs at least thirty (30) calendar days in advance of the date of effectiveness, through written communication addressed to the employee and to the Union, indicating the date of effectiveness thereof.

f.      The affected employee and Union may request a review of the final determination made by the Administration, only as to their seniority and

| More detailed provisions of the proposal |
|---|

|  | the occupational classification, within a period no greater than thirty (30) calendar days from receipt of the notification from the Administration. |
|---|---|
| **Healthcare plan / Medical services** | **Section 1** The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. <br><br> **Section 2** Employees have opted for syndication and shall be entitled to have an exclusive representative negotiate on their behalf regarding all matters concerning health benefits and the contracting of a health plan. The exclusive representative shall designate a Health Plans Evaluating Committee to represent the different sectors and interests of the members. Such committee shall be responsible for the analysis and evaluation of all health plans in the market in order to select those that offer the lowest and most reasonable premiums, the best coverage and health services benefits and the best medication coverage. <br><br> **Section 3** The exclusive representative shall call the members to an Assembly in which he/she shall present the health plans selected by the Committee, so that the Assembly, by the express vote of the majority constituting quorum to such effects, selected the health plan that better suits its needs. Once the health plan has been selected in a legally convened Assembly, it shall be compulsory for all the members represented by said exclusive representative, except as provided by Act 95-1963, as amended. |
| **Holidays** | **Section 1** Holidays shall include all twenty-four (24) hours, after midnight, of the calendar day in question. <br><br> **Section 2** The Administration recognizes that the days listed below shall be paid holidays for employees covered by the AFSCME CBAs; <u>provided</u>, <u>however</u>, that the Administration shall have the right to assign work to the members of the Appropriate Unit in any of them, when the need for service so requires. The time worked shall be compensated in time and a half (1½) of the time worked. On years where general elections shall be held, Election Day shall be considered as included among the holidays listed below. <br><br> |  | **Date** | **Holiday** | <br> | 1 | January 1st | New Year's Day | <br> | 2 | January 6th | Three Kings' Day | |

G-5

| | | | |
|---|---|---|---|
| **More detailed provisions of the proposal** | | | |

| | 3 | Third Monday of January | Dr. Martin Luther King Day |
|---|---|---|---|
| | 4 | Third Monday of February | George Washington / Presidents' Day |
| | 5 | March 2nd | American Citizenship Day |
| | 6 | March 22nd | Abolition of Slavery Day |
| | 7 | Movable | Good Friday |
| | 8 | Last Monday of May | Memorial Day |
| | 9 | July 4th | Independence Day |
| | 10 | First Monday of September | Labor Day |
| | 11 | October 12th | Race Day (Discovery of America) |
| | 12 | November 11th | Veteran's Day |
| | 13 | November 19th | Discovery of Puerto Rico |
| | 14 | Fourth Thursday of November | Thanksgiving |
| | 15 | December 25th | Christmas |

**Section 3** The Administration recognizes that holidays that fall on a Sunday shall be enjoyed during the next day and holidays that fall on a Saturday shall be enjoyed on the previous business day.

**Section 4** Days or half days that by proclamations of the Governor of Puerto Rico or the President of the United States are declared as holidays to be observed in Puerto Rico, shall also be considered paid holidays and included as part of the previous list, as long as they are not discounted from ordinary leave.

**Sick leave**

**Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs, which were hired prior to February 4, 2017 shall have the right to accrue sick leave at the rate of one and a half days (1½) for each month of service. Members hired on or after February 4, 2017 shall accrue at the rate of one (1) day for each month of service.

**Section 2** Sick leave may be accrued up to a maximum of ninety (90) business days at the end of each calendar year. Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.

| More detailed provisions of the proposal |
| :--- |

**Section 3** Accrued sick leave days that have not been enjoyed shall not be liquidated in any way.

**Section 4** Sick leave shall be used:

A.      When the employee is sick, physically or mentally incapacitated, or exposed to a contagious disease which requires his/her absence from work to protect his/her or other persons' health.

B.      A maximum of five (5) days a year may also be used for the following, provided that the employee has accrued a minimum balance of twelve (12) days:

a.      The care and attention of his/her sick children.

b.      Management of sick, elderly or disabled persons within his/her familial nucleus, within the fourth degree of consanguinity, second of affinity, persons that live within the same household, persons over which employee has legal custody or guardianship.

c.      First appearance of any petitioner, victim or complainant before the Department, Agency, Corporation or Public Instrumentality of the Commonwealth of Puerto Rico, in matters regarding alimonies, domestic violence, sexual harassment in the workplace or gender-based discrimination.

C.      The employee shall present evidence issued by the competent authority which credits such appearance.

D.      For the purposes of this Section, the following definitions shall apply:

a.      "Elderly person":  any person sixty (60) years or older.

b.      "Person with disabilities":  any person with a physical, mental or sensory disability that substantially limits one (1) or more essential activities in his/her life.

**Section 5** Only in sickness absences for more than three (3) consecutive days shall the employee submit a medical certificate justifying such absences. Notwithstanding, the employee or any of his/her relatives must notify his/her immediate supervisor of his absence.  This shall be applied or interpreted in a manner consistent with the Americans with Disabilities Act, better known as ADA, the Family Medical Leave Act of 1993, or any other applicable law.

| **More detailed provisions of the proposal** |
|---|

**Section 6** In the event that the employee exhausts his/her sick leave and remains ill, he/she may use the leave he/she has accrued, in accordance with the provisions of this Collective Agreement.

**Section 7** Sick leave charges shall be made on the basis of the working day's daily work assigned to the employee, it being understood that it shall not be charged for days off in cases where the employee works rotating shifts or for holidays.

**Section 8** When a member of the Appropriate Unit covered by the AFSCME CBAs is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.

**Section 9** The Administration may advance sick leave up to a maximum of eighteen (18) working days, to any member of the Appropriate Unit covered by these CBAs which requests it by presenting proper justification. He/she must have worked for the Administration for one (1) year or more. Advanced leave may only be granted after the accrued sick and regular leave have been exhausted.

**Section 10**

A.      **Leave for Parents with Children with Physical and / or Mental Disabilities**.  In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments.  The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him/her as a person with disabilities.

They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment.  In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.

B.      **Leave for Elderly Persons**.  In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons.  The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware.  The employee in turn must provide a certificate of birth of the elderly person

| More detailed provisions of the proposal | |
|---|---|
| | evidencing that he / she is sixty (60) years or more.  They must comply with Section 11's provisions.<br><br>**Section 11** The Administration shall authorize the father or mother of children to stay with them when they are hospitalized.  The father or mother must submit evidence of the hospitalization and the duration of the hospitalization.  The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave.  An employee that requests this leave must have an accrued sick leave balance of fifteen (15) or more days. |
| **Vacation Leave** | **Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs shall have the right to accrue regular vacation leave at the rate of one and a quarter (1¼) days for each month of service.  Employees with reduced or part-time regular working hours will accumulate vacation leave proportionally to the number of hours they regularly provide service in.  Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.<br><br>**Section 2** Regular vacation leave shall be accrued up to a maximum of sixty (60) business days at the end of each calendar year.<br><br>**Section 3** Every employee shall have the right to enjoy his accrued vacation leave for a period of fifteen (15) business days during each calendar year, of which no less than ten (10) days shall be consecutive.  By agreement between the Director and / or Supervisor and the employee, he may be granted periods of less than ten (10) business vacation days, but never less than five (5) days.<br><br>Employees, who, due to the need for service and at the request of the Administration, cannot enjoy their vacation leave during a specific calendar year, shall be exempt from this provision.  In this case, the Department is required to make the necessary adjustments so that the employee is able to enjoy at least leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.<br><br>**Section 4** The enjoyment of regular vacation leave shall not be interrupted nor rescheduled for any member of the Appropriate Unit covered by these CBAs.  The only exceptions are clear and unavoidable emergencies related to the need for the service.  The Administration shall replenish the time used by the employee. |

| More detailed provisions of the proposal |
| --- |

**Section 5** The Administration shall formulate a Vacation Plan each calendar year, according to the need of service and in coordination with the employees of the Appropriate Unit covered by this Collective Agreement and their respective supervisors, which establishes the period (s) within of which each employee shall enjoy their vacations. The Plan must be established by December 31st of each year so that it becomes effective the first (1st) of January of each year. Both parties agree to comply with the Plan. By agreement between the Director and / or Supervisor and the employee, he / she may enjoy a maximum of two (2) vacation periods per calendar year.

**Section 6** The Administration shall formulate and administer the Vacation Plan harmonizing the observations, recommendations and preferences of the employees with the needs of service, so that they do not lose their vacation leave at the end of the calendar year and enjoy their regular vacation leave annually without affecting the service.

If there is a conflict between two (2) or more employees regarding the date to take vacations, the Director and / or Supervisor shall determine, according to the need of service, which employee shall leave first. In case the only conflict is that both chose the same date and cannot leave at the same time, the employee with the most seniority will leave first and from then on it will be done alternately.

**Section 7** The Administration shall inform the accrued vacation leave balance to all Appropriate Unit members covered by these CBAs, a total of three (3) times a year. In case of any calculation error, the information may be corrected at the initiative of any of the Parties. Any request for review by the employee must be made in writing within fifteen (15) working days before the Director of the Human Resources Division of the Administration. The Director shall have fifteen (15) working days to answer the request. If the employee is not satisfied, he/she may use the Complaint and Grievance Procedure established in this Collective Agreement.

**Section 8** The Administration shall evaluate, if so requested by the employee, granting regular leave in excess of fifteen (15) days in a calendar year, up to a maximum of fifty (50) days in any calendar year to those employees who have accrued leave. The employee shall maintain a minimum of five (5) days of regular vacation leave. When granting said leave, the Administration shall consider the needs of service and any other factor established in applicable law.

**Section 9** When a member of the Appropriate Unit covered by CBAs is using his / her regular leave, he / she shall be entitled to the accrual of

G-10

| More detailed provisions of the proposal |
|---|

regular and sick leave, for the time that he / she is enjoying said leave, as long as he / she is reinstated to his work when he / she finishes such enjoyment.

**Section 10** Due to special circumstances, the Administration may advance regular leave to any member of the Appropriate Unit covered by CBAs who requests it and has worked for the Administration for more than one (1) year, up to a maximum of fifteen (15) work days, provided that the employee shall return to service. The Administration shall evaluate said request according to the needs of service.

**Section 11** Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him/her for said advanced leave.

**Section 12** At the option of the Appropriate Unit member covered by CBAs, the payment of regular scheduled vacations shall be effective before beginning to enjoy them. Said request must be submitted forty-five (45) calendar days in advance of the date on which the vacation begins.

**Section 13** In those cases in which a proclamation or administrative order of the Governor of Puerto Rico is issued, granting official time without charge to vacations, the same shall be applicable to all members of the Appropriate Unit covered by CBAs who are in use of regular leave. When the employee is enjoying his/her regular vacation leave, the period of his/her vacation will be extended for the official time granted.

**Section 14** Any member of the Appropriate Unit covered by CBAs who becomes ill while enjoying regular leave may request that the period of illness be credited to his / her accrued sick leave. The employee must certify his/her illness in conjunction with his/her request.

**Section 15** The members of the Appropriate Unit covered by CBAs shall have the right to authorize the Administration to assign five (5) days per month of their accumulated vacation license, in favor of other employees of the agency. It shall be in accordance with the provisions established by Act No. 44 of May 22, 1996, as amended, known as the "Holiday License Assignment Act".

| | |
|---|---|
| **Additional Language for Holidays, Sick** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the |

| More detailed provisions of the proposal | |
|---|---|
| **and Vacation Leaves** | provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | **Section 1** To the extent that bonuses not otherwise provided for in CBAs are lawfully provided to similarly situated Commonwealth employees, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Institutional Representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of four (4) individual members, appointed by the Union to represent labor.<br><br>**Section 2** The members may be appointed for terms of twelve (12) months, and may be reappointed by the Union.<br><br>**Section 3** The members will meet with representatives of the Oversight Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget.<br><br>**Section 4** Annual meetings with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |
| **Full Agreement** | **Section 1** The provisions of this term sheet, combined with the most recent CBAs, shall constitute the CBAs commencing on the effective date of the Commonwealth Plan; provided, however, that the provisions of this term sheet control if there is any conflict with the most recent CBAs. For the duration of the Agreement, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express agreement of the Union. In addition, no other changes inconsistent with the terms of the term sheet shall be implemented without the express agreement of the Union. Nothing in this Agreement shall be interpreted in a manner to preclude employees represented by the Union from receiving any benefit that is lawfully granted by the Governor or Administration to other employees of the Government. |
| **Dues Deduction, Charges** | **Section 1** During the term of these agreements and during any extension thereof, the Department shall deduct from the salary of each bargaining unit employee who authorizes payroll deduction of union dues or payments on a form provided by the union the regular dues that the Union certifies in accordance with its regulations and the applicable provisions |

G-12

| More detailed provisions of the proposal |
| --- |

of Act 45 as amended. The dues amount shall be reported to the Department by the Union. For such purposes, the Department shall notify the Department of the Treasury of dues charges to be deducted from employees included in the Appropriate Unit within thirty (30) working days from the date on which the Union informs the Department regarding the amount to be deducted.

**Section 2** The Department shall send a copy to the Union on a monthly basis of the list provided by the Department of the Treasury, reflecting the name of each employee included in the Appropriate Unit, with Social Security number and amount deducted for dues charges.

**Section 3** The Department shall inform new employees of the right conferred by Act No. 45 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45 of February 25, 1998, as amended. The Administration shall not discourage union membership

**Section 4** The Department shall have fifteen (15) working days to inform the Union in writing of the name, Social Security number, position, date of employment and salary of newly recruited employees and that come to occupy positions included in the Appropriate Unit.

**Section 5** The authorization to deduct membership dues is in effect and irrevocable pursuant to the terms stated on the employee authorization, but employees must be permitted to rescind their authorization prior to any renewal at least annually.

**Section 6** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.

**Section 7** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.

**Section 8** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund

| More detailed provisions of the proposal | |
|---|---|
| | as soon as it is required.  If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |

**APPENDIX I**

## PROPOSED TERMS FOR ERS SYSTEM BENEFITS

The following is a summary of indicative terms for the Puerto Rico Government Employees Retirement System ("ERS") for:

1.      System 2000 members;

2.      participants who participated exclusively in the Act 3 benefit but not in Act 1 or Act 447 benefit tiers; and

3.      Act 3 participants who participated in Act 1 or Act 447 benefit tiers.

These terms do not address benefits earned under Act 1 and Act 447.

| Definitions | |
|---|---|
| **Pension System** | The Puerto Rico Government Employees Retirement System (ERS). |
| **System 2000 Members** | Generally, those members hired on or after January 1, 2000 and on or before June 30, 2013.  In addition, for purposes of this Agreement, employees hired on or after July 1, 2013 and on or before June 30, 2017 shall be treated the same as System 2000 members. |
| **Type of Plan** | System 2000 and Act 3 plans are contributory, hybrid defined benefit plans. |
| **Effective date of the Plan** | The Pension System was established in 1951 by Act 447 to be effective January 1, 1952.  The Plan was last amended under Act 3, approved April 4, 2013. |
| **Eligibility for Membership** | Members of the ERS and its Instrumentalities include all regular full-time and non-municipal temporary employees who are not contributing to other Retirement Systems (Articles 1-104 and 1-105). |
| **Contributions** | Contributions to System 2000 and Act 3 benefits are made exclusively from mandatory employee payroll deductions of 8.275 percent until 2013 and 10 percent of pay thereafter (starting with the passage of Act 3-2013). |

| Timing | |
|---|---|
| **Effective date** | Commonwealth Plan Effective Date. |
| **Implementation** | Applies to benefits earned under the Plan on or before June 30, 2017. |

| Provisions of the proposal |
|---|

G-16

| Segregate cash upfront | Segregate full System 2000 contributions from 2000 through 2013 (no reduction ), full System 2000 participant Act 3-2013 contributions, and full Act 3 participant (who had not participated in either Act 1 or Act 447) contributions through 2017 (no reduction), with interest through the Commonwealth Petition Date. Roll balances into Defined Contribution accounts currently being set up under Act 106-2017 and invested by default into a target date life-cycle fund. As of the Effective Date, participants with System 2000 contributions from 2000 through 2013, and Act 3-2013 contributions through 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability provisions, etc.

Participants who had not participated in either Act 1 or Act 447 retirement plans and who have already retired and converted their System 2000 or Act 3 contributions to a system paid annuity are not eligible for the treatment described in this section and will not receive a cash payment. |
| Exempt from Reduction Formula | Pay up to full accumulated contributions value, with interest up to, but not including, the Commonwealth Petition Date, for all Act 1 and Act 447 contributions made in Act 3 after July 1, 2013 annuitized upon retirement in accordance with applicable law. |

## More detailed Provisions of the Proposal as of July 1, 2015

|  | System 2000 | | | |
|---|---|---|---|---|
|  | Active members | Retired members | Disabled members | Beneficiaries in payment |
| Count | 65,605 | 273 | 72 | 81 |
| Average age | 42.7 | 67.8 | 54.2 | 62.5 |
| Average salary | $24,891 | | | |
| Average creditable service | 9.5 | | | |
| Average monthly basic system benefit | | $758 | $853 | $997 |
| Average monthly system administered benefit | | $16 | $9 | $8 |

G-17

# APPENDIX II

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFSCME Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with Unions and Union member participants for each fiscal year of this Agreement to provide participation of Unions on sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFSCME |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. Notwithstanding the foregoing, the Upside Participation Bonus to be paid to AFSCME-represented employees for each of the five fiscal years of the Agreement shall be no less than $2,000 per employee per year regardless of the amount of the Excess Cash Surplus. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of proposed changes to CBAs, as well as the overall agreement with AFSCME, currently targeted for the Effective Date. |
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a Cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For signing bonus:** Payable to Union represented participants upon the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| | **For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date.<br><br>**For Support Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment.<br><br>**For Additional Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment. |

| Provisions of the proposal | |
|---|---|
| **Signing Bonus (see Summary of bonuses)** | Upon the Effective Date, a one-time signing bonus of Five Hundred Dollars ($500.00) to each of the Union represented participants. |
| **Upside Participation Bonus** | For the term of the CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants and all other eligible Commonwealth employees designated by the Oversight Board each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus to their Defined Contribution account and any remainder will be distributed in cash. |
| **Support Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, as compensation for its efforts serving as the lead negotiator of and as a signatory to this Agreement. |
| **Additional Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, to be disbursed as a cash bonus to its represented participants. Accordingly, the bonuses that Union represented participants are receiving pursuant to this Agreement are a one-time $1000 bonus (approximate) and any Upside Participation Bonus. In addition, to the extent that similarly situated Commonwealth employees lawfully receive a bonus, such as a Christmas bonus, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Payment of Pre-petition** | Any distributions under and pursuant to the Plan on account of claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures |

| Arbitration and Grievance Claims | arising under the CBAs between the Commonwealth and AFSCME's local affiliate(s) in Puerto Rico shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after such disposition or (ii) 60 days after the Effective Date of the Plan. |
|---|---|

# EXHIBIT H

SCHEDULE OF MED CENTER CLAIMS

| Claim Numbers | Facility | Group | Column "A" | Column "B" |
|---|---|---|---|---|
| 27630, 30530, 166265 | Centro De Salud Familiar Dr. Julio Palmieri Ferri Claims: 166265 Facility: Arroyo | AMC Group | $12,639,331.92 | $11,871,346.29 |
| 158091 | Atlantic Medical Center, Inc. Claims: 158091 Facility: Barceloneta | AMC Group | $11,518,922.99 | $3,030,376.45 |
| 167114 | Camuy Health Services, Inc. Claims: 167114 Facility: Camuy | AMC Group | $31,349,345.60 | $13,470,273.43 |
| 146462 | Hospital General Castaner, Inc. Claims: 146462 Facility: Castaner | AMC Group | $5,489,636.26 | $1,506,047.44 |
| 137070 | Ciales Primary Health Care Services, Inc. Claims: 137070 Facility: Ciales | AMC Group | $6,155,787.47 | $3,036,743.77 |
| 167361 | Corporacion De Servicios Medicos De Hatillo Claims: 167361 Facility: Hatillo | AMC Group | $11,948,076.45 | $4,507,785.17 |
| 166254 | Centro De Salud De Lares, Inc. Claims: 166254 Facility: Lares | AMC Group | $28,276,675.12 | $10,296,151.19 |
| 158138 | Centro De Servicios Primarios De Salud De Patillas Claims: 158138 Facility: Patillas | AMC Group | $19,497,267.19 | $19,596,454.39 |
| 157161 | Costa Salud Community Health Center Claims: 157161 Facility: Rincon | AMC Group | $12,310,505.80 | $5,931,865.47 |
| 93971 | Rio Grande Community Health Center Claims: 93971 Facility: Rio Grande (1) | AMC Group | $9,949,732.57 | $1,735,779.32 |
| 114996, 176157 | Migrant Health Center, Inc. Claims: 114996,176157 Facility: Migrant | Migrant Group | $17,691,291.17 | $9,772,993.70 |
| 98437, 108527 | HPM Foundation Inc. Claims: 98437,108527 Facility: Belaval | Morovis Group | $4,918,873.90 | $(2,405,967.79) |
| 34436, 122862 | Corporacion De Servicios De Salud Y Medicina Avanzada Claims: 34436,122862 Facility: Cossma | Morovis Group | $25,655,184.64 | $5,737,364.38 |
| 20254, 20301, 20392, 52387, 111373 | NeoMed Center, Inc Claims: 20254, 20301, 20392, 52387, 111373 Facility: Gurabo | Morovis Group | $29,258,557.90 | $36,253,807.51 |
| 101569, 108464, 139655 | Salud Integral De La Montana Inc. Claims: 101569,108464,139655 Facility: La Montana | Morovis Group | $33,906,988.74 | $2,525,918.30 |
| 20756, 20794, 39401, 130107 | Concilio De Salud Integral De Loiza, Inc Claims: 20756, 20794, 39401, 130107 Facility: Loiza | Morovis Group | $27,119,329.96 | $16,658,798.02 |
| 34431, 110999 | Morovis Community Health Center Claims: 34431,110999 Facility: Morovis | Morovis Group | $5,898,265.08 | $2,456,721.37 |
| | | Total | $293,583,772.78 | $145,982,458.41 |

(1) – Rio Grande Community Health Center provided actual data for period 1997 – 2000 asserting liabilities of approximately $7.6 m. They asserted additional liabilities related to 2001 which does not provide sufficient data to determine averages. A&M is not able to validate the asserted amounts and recommends further discussions with the FQHC related to this period.

**EXHIBIT I**

SCHEDULE OF CASH FLOWS OF NEW GO BONDS

Tax-Exempt and Taxable Current Interest Bonds Debt Service

| Fiscal Year (7/1) | Tax-Exempt Annual Debt Service Cash Flows | | | Taxable Annual Debt Service Cash Flows | | | Aggregate Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service |
| Total | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 | $822,260,000 | $698,096,750 | $1,520,356,750 | $6,683,315,000 | $3,163,702,400 | $9,847,017,400 |
| 2022 | $372,660,000 | $270,505,300 | $643,165,300 | | $41,113,000 | $41,113,000 | $372,660,000 | $311,618,300 | $684,278,300 |
| 2023 | 372,390,000 | 251,872,300 | 624,262,300 | | 41,113,000 | 41,113,000 | 372,390,000 | 292,985,300 | 665,375,300 |
| 2024 | 371,350,000 | 233,252,800 | 604,602,800 | | 41,113,000 | 41,113,000 | 371,350,000 | 274,365,800 | 645,715,800 |
| 2025 | 369,470,000 | 214,685,300 | 584,155,300 | | 41,113,000 | 41,113,000 | 369,470,000 | 255,798,300 | 625,268,300 |
| 2026 | 366,675,000 | 196,211,800 | 562,886,800 | | 41,113,000 | 41,113,000 | 366,675,000 | 237,324,800 | 603,999,800 |
| 2027 | 362,890,000 | 177,878,050 | 540,768,050 | | 41,113,000 | 41,113,000 | 362,890,000 | 218,991,050 | 581,881,050 |
| 2028 | 358,030,000 | 159,733,550 | 517,763,550 | | 41,113,000 | 41,113,000 | 358,030,000 | 200,846,550 | 558,876,550 |
| 2029 | 352,010,000 | 141,832,050 | 493,842,050 | | 41,113,000 | 41,113,000 | 352,010,000 | 182,945,050 | 534,955,050 |
| 2030 | 344,740,000 | 124,231,550 | 468,971,550 | | 41,113,000 | 41,113,000 | 344,740,000 | 165,344,550 | 510,084,550 |
| 2031 | 336,095,000 | 106,994,550 | 443,089,550 | | 41,113,000 | 41,113,000 | 336,095,000 | 148,107,550 | 484,202,550 |
| 2032 | 325,990,000 | 90,189,800 | 416,179,800 | | 41,113,000 | 41,113,000 | 325,990,000 | 131,302,800 | 457,292,800 |
| 2033 | 311,050,000 | 77,150,200 | 388,200,200 | | 41,113,000 | 41,113,000 | 311,050,000 | 118,263,200 | 429,313,200 |
| 2034 | 294,385,000 | 64,708,200 | 359,093,200 | | 41,113,000 | 41,113,000 | 294,385,000 | 105,821,200 | 400,206,200 |
| 2035 | 154,195,000 | 52,932,800 | 207,127,800 | $121,695,000 | 41,113,000 | 162,808,000 | 275,890,000 | 94,045,800 | 369,935,800 |
| 2036 | 137,290,000 | 46,765,000 | 184,055,000 | 118,735,000 | 35,028,250 | 153,763,250 | 256,025,000 | 81,793,250 | 337,818,250 |
| 2037 | 118,370,000 | 41,273,400 | 159,643,400 | 115,625,000 | 29,091,500 | 144,716,500 | 233,995,000 | 70,364,900 | 304,359,900 |
| 2038 | 97,300,000 | 36,538,600 | 133,838,600 | 112,360,000 | 23,310,250 | 135,670,250 | 209,660,000 | 59,848,850 | 269,508,850 |
| 2039 | 64,880,000 | 32,646,600 | 97,526,600 | 117,980,000 | 17,692,250 | 135,672,250 | 182,860,000 | 50,338,850 | 233,198,850 |
| 2040 | 29,640,000 | 30,051,400 | 59,691,400 | 123,880,000 | 11,793,250 | 135,673,250 | 153,520,000 | 41,844,650 | 195,364,650 |
| 2041 | 12,780,000 | 28,865,800 | 41,645,800 | 111,985,000 | 5,599,250 | 117,584,250 | 124,765,000 | 34,465,050 | 159,230,050 |
| 2042 | 130,875,000 | 28,354,600 | 159,229,600 | | | | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 136,110,000 | 23,119,600 | 159,229,600 | | | | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 141,555,000 | 17,675,200 | 159,230,200 | | | | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 147,220,000 | 12,013,000 | 159,233,000 | | | | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 153,105,000 | 6,124,200 | 159,229,200 | | | | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

Detail on Tax-Exempt Current Interest Bonds

| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Detailed Summary of Tax-Exempt Term Bonds** | | | | | **Tax-Exempt Annual Debt Service Cash Flows** | | |
| Total | | | $5,861,055,000 | $5,861,055,000 | | | | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 |
| 2022 | 7/1/22 | 2023 | 372,660,000 | | 5.000% | | 2022 | $372,660,000 | $270,505,300 | $643,165,300 |
| 2023 | 7/1/23 | 2023 | 372,390,000 | $745,050,000 | 5.000% | | 2023 | 372,390,000 | 251,872,300 | 624,262,300 |
| 2024 | 7/1/24 | 2025 | 371,350,000 | | 5.000% | | 2024 | 371,350,000 | 233,252,800 | 604,602,800 |
| 2025 | 7/1/25 | 2025 | 369,470,000 | $740,820,000 | 5.000% | | 2025 | 369,470,000 | 214,685,300 | 584,155,300 |
| 2026 | 7/1/26 | 2027 | 366,675,000 | | 5.000% | | 2026 | 366,675,000 | 196,211,800 | 562,886,800 |
| 2027 | 7/1/27 | 2027 | 362,890,000 | $729,565,000 | 5.000% | | 2027 | 362,890,000 | 177,878,050 | 540,768,050 |
| 2028 | 7/1/28 | 2029 | 358,030,000 | | 5.000% | | 2028 | 358,030,000 | 159,733,550 | 517,763,550 |
| 2029 | 7/1/29 | 2029 | 352,010,000 | $710,040,000 | 5.000% | | 2029 | 352,010,000 | 141,832,050 | 493,842,050 |
| 2030 | 7/1/30 | 2031 | 344,740,000 | | 5.000% | | 2030 | 344,740,000 | 124,231,550 | 468,971,550 |
| 2031 | 7/1/31 | 2031 | 336,095,000 | $680,835,000 | 5.000% | | 2031 | 336,095,000 | 106,994,550 | 443,089,550 |
| 2032 | 7/1/32 | 2033 | 325,990,000 | | 4.000% | 7/1/31 | 2032 | 325,990,000 | 90,189,800 | 416,179,800 |
| 2033 | 7/1/33 | 2033 | 311,050,000 | $637,040,000 | 4.000% | 7/1/31 | 2033 | 311,050,000 | 77,150,200 | 388,200,200 |
| 2034 | 7/1/34 | 2035 | 294,385,000 | | 4.000% | 7/1/31 | 2034 | 294,385,000 | 64,708,200 | 359,093,200 |
| 2035 | 7/1/35 | 2035 | 154,195,000 | $448,580,000 | 4.000% | 7/1/31 | 2035 | 154,195,000 | 52,932,800 | 207,127,800 |
| 2036 | 7/1/36 | 2037 | 137,290,000 | | 4.000% | 7/1/31 | 2036 | 137,290,000 | 46,765,000 | 184,055,000 |
| 2037 | 7/1/37 | 2037 | 118,370,000 | $255,660,000 | 4.000% | 7/1/31 | 2037 | 118,370,000 | 41,273,400 | 159,643,400 |
| 2038 | 7/1/38 | 2041 | 97,300,000 | | 4.000% | 7/1/31 | 2038 | 97,300,000 | 36,538,600 | 133,838,600 |
| 2039 | 7/1/39 | 2041 | 64,880,000 | | 4.000% | 7/1/31 | 2039 | 64,880,000 | 32,646,600 | 97,526,600 |
| 2040 | 7/1/40 | 2041 | 29,640,000 | | 4.000% | 7/1/31 | 2040 | 29,640,000 | 30,051,400 | 59,691,400 |
| 2041 | 7/1/41 | 2041 | 12,780,000 | $204,600,000 | 4.000% | 7/1/31 | 2041 | 12,780,000 | 28,865,800 | 41,645,800 |
| 2042 | 7/1/42 | 2046 | 130,875,000 | | 4.000% | 7/1/31 | 2042 | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 7/1/43 | 2046 | 136,110,000 | | 4.000% | 7/1/31 | 2043 | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 7/1/44 | 2046 | 141,555,000 | | 4.000% | 7/1/31 | 2044 | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 7/1/45 | 2046 | 147,220,000 | | 4.000% | 7/1/31 | 2045 | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 7/1/46 | 2046 | 153,105,000 | $708,865,000 | 4.000% | 7/1/31 | 2046 | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

I-3

Detail on Taxable Current Interest Bonds

| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Detailed Summary of Taxable Term Bonds** | | | | | **Taxable Annual Debt Service Cash Flows** | | |
| Total | | | $822,260,000 | $822,260,000 | | | | $822,260,000 | $698,096,750 | $1,520,356,750 |
| 2022 | 7/1/22 | | | | | | 2022 | | $41,113,000 | $41,113,000 |
| 2023 | 7/1/23 | | | | | | 2023 | | 41,113,000 | 41,113,000 |
| 2024 | 7/1/24 | | | | | | 2024 | | 41,113,000 | 41,113,000 |
| 2025 | 7/1/25 | | | | | | 2025 | | 41,113,000 | 41,113,000 |
| 2026 | 7/1/26 | | | | | | 2026 | | 41,113,000 | 41,113,000 |
| 2027 | 7/1/27 | | | | | | 2027 | | 41,113,000 | 41,113,000 |
| 2028 | 7/1/28 | | | | | | 2028 | | 41,113,000 | 41,113,000 |
| 2029 | 7/1/29 | | | | | | 2029 | | 41,113,000 | 41,113,000 |
| 2030 | 7/1/30 | | | | | | 2030 | | 41,113,000 | 41,113,000 |
| 2031 | 7/1/31 | | | | | | 2031 | | 41,113,000 | 41,113,000 |
| 2032 | 7/1/32 | | | | | | 2032 | | 41,113,000 | 41,113,000 |
| 2033 | 7/1/33 | | | | | | 2033 | | 41,113,000 | 41,113,000 |
| 2034 | 7/1/34 | | | | | | 2034 | | 41,113,000 | 41,113,000 |
| 2035 | 7/1/35 | 2041 | $121,695,000 | | 5.000% | 7/1/31 | 2035 | $121,695,000 | 41,113,000 | 162,808,000 |
| 2036 | 7/1/36 | 2041 | 118,735,000 | | 5.000% | 7/1/31 | 2036 | 118,735,000 | 35,028,250 | 153,763,250 |
| 2037 | 7/1/37 | 2041 | 115,625,000 | | 5.000% | 7/1/31 | 2037 | 115,625,000 | 29,091,500 | 144,716,500 |
| 2038 | 7/1/38 | 2041 | 112,360,000 | | 5.000% | 7/1/31 | 2038 | 112,360,000 | 23,310,250 | 135,670,250 |
| 2039 | 7/1/39 | 2041 | 117,980,000 | | 5.000% | 7/1/31 | 2039 | 117,980,000 | 17,692,250 | 135,672,250 |
| 2040 | 7/1/40 | 2041 | 123,880,000 | | 5.000% | 7/1/31 | 2040 | 123,880,000 | 11,793,250 | 135,673,250 |
| 2041 | 7/1/41 | 2041 | 111,985,000 | $822,260,000 | 5.000% | 7/1/31 | 2041 | 111,985,000 | 5,599,250 | 117,584,250 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

Capital Appreciation Bonds: 5.000% July 1, 2024 Maturity

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/22 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 7/1/23 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 7/1/24 (1) | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |
| Total | $288,241,989.75 | $317,908,737.85 | $334,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.

Capital Appreciation Bonds: 5.375% July 1, 2033 Maturity*

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/29 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 7/1/30 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 7/1/31 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 7/1/32 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 7/1/33 (1) | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |
| Total | $442,506,553.50 | $749,992,315.35 | $836,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.
*Callable on 7/1/2031 and thereafter at accreted value.

**EXHIBIT J**

DESCRIPTION OF CVI TERMS AND WATERFALL PROVISIONS

**Exhibit J**

**General Terms Applicable to Both GO CVI and Subject to Waterfall Clawback CVI**

| TERM | DESCRIPTION |
|---|---|
| **Outperformance Metric** | ▪ See Annex 5 |
| **Structure** | ▪ Attachment Point: 100% of CW Fiscal Plan projections as included in Annex 5 (the "Baseline SUT") of this exhibit<br>▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the GO CVI, Subject to Waterfall Clawback CVI, and Not Subject to Waterfall Clawback CVI<br>   o See Annex 1 for terms specific to GO CVI<br>   o See Annex 2 for terms specific to Clawback CVI<br>▪ For the avoidance of doubt, when the term "Clawback CVI" is used on its own throughout this exhibit, the term encompasses both the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, defined as follows<br>   o **Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Subject to Waterfall Outperformance Amount,<br>   o **Not Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Not Subject to Waterfall Outperformance Amount<br>▪ Security provisions as described in Section 4.10 (b) of the CW Plan Support Agreement<br>▪ Amounts paid to various CVI instruments are subject to applicable caps, including GO CVI Maximum Annual Payment, GO CVI Lifetime Cap, Clawback CVI Maximum Annual Payment, and Clawback CVI Lifetime Cap (as defined throughout this exhibit) |
| **Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Subject to Waterfall Outperformance Amount"):<br>   o (i) 50% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to GO CVI and Subject to Waterfall Clawback CVI<br>      ▪ For the avoidance of doubt, amounts paid to Clawback CVI will first be allocated to Subject to Waterfall Clawback CVI (from Subject to Waterfall Annual |

| TERM | DESCRIPTION |
|------|-------------|
| | <ul><li>Payments, as defined below) for purposes of calculation of payments previously made</li><ul><li>(ii) 75% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance)</li></ul><li>For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year</li></ul> |
| **Subject to Waterfall Annual Mandatory Redemption Payments** | <ul><li>Years 1-22: From the Subject to Waterfall Outperformance Amount, annual payment waterfall is as follows (the "Annual Payment Waterfall"):</li><ul><li>(a) First $100,000,000 to GO CVI</li><li>(b) Next $11,111,111 to Subject to Waterfall Clawback CVI</li><li>(c) Thereafter, pro rata sharing as follows:</li><ul><li>90% to GO CVI</li><li>10% to Subject to Waterfall Clawback CVI</li></ul></ul><li>To the extent that the GO CVI Lifetime Cap (as defined below) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Subject to Waterfall Clawback CVI beginning in the following year</li><li>Years 23-30: 100% of Subject to Waterfall Outperformance Amount to Subject to Waterfall Clawback CVI</li></ul> |
| **SUT True-Up** | <ul><li>No adjustment required:</li><ul><li>Exemptions / holidays included in the Puerto Rico Internal Revenue Code as of the date of the Plan Support Agreement (sections 4030.01 through 4030.27)</li></ul><li>Baseline SUT Reduced (the "Baseline SUT Reduction"):</li><ul><li>Exemptions/Holiday during U.S. Presidential Declaration of Disaster for a period not to exceed 30 days and only for emergency-related categories of spend. If Exemptions/Holiday exceed 30 day period, the amount of any exemptions beyond such 30 day period will be included under the SUT True-Up mechanism defined below</li></ul><li>In-Year SUT Revenue Increased ("SUT True-Up"):</li><ul><li>Any other exemption implemented by the Government under applicable law</li></ul><li>For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation will be determined by the Treasury Secretary and validated by an independent third party and will be publicly disclosed. Validation of independent third party binding on both the Government and Creditors</li></ul> |

| TERM | DESCRIPTION |
|------|-------------|
| | ▪ Documentation in a separate agreement on the methodology the independent third party will use to verify the Treasury Secretary's calculation<br>▪ To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, a formulaic adjustment to be agreed upon by the Board and Initial PSA Creditors to maintain the same amount of outperformance had the Measured SUT remained at 5.5%. Further protections provided in Section 4.10 (b)(xi) of the CW Plan Support Agreement |

## ANNEX 1: GO CVI-SPECIFIC TERMS

| TERM | DESCRIPTION |
|------|-------------|
| **GO CVI Lifetime Cap** | ▪ $3,500 million (the "GO CVI Lifetime Cap") |
| **GO CVI Term** | ▪ 22 years (FY2043)<br>▪ Deemed issuance date of July 1, 2021 |
| **Payments to GO CVI** | ▪ As referenced within (a) and (c) of Annual Payment Waterfall, subject to the GO CVI Maximum Annual Payment and the GO CVI Lifetime Cap |
| **GO CVI Maximum Annual Payment** | ▪ Maximum annual payment of $200 million for the GO CVI plus any unused amounts from previous years, subject to annual payment not being greater than $400 million for the GO CVI. For the avoidance of doubt, the GO CVI Maximum Annual Payment is calculated as the lesser of the (i) the sum of GO CVI Carryforward Balance (see below) and $200 million and (ii) $400 million<br>▪ The GO CVI Carryforward Balance shall be calculated as follows:<br>  o (a) In year 1, an amount equal to $0<br>  o (b) For each year thereafter, the Annual GO CVI Carryforward Amount (see below) shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance.<br>    ▪ The Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $200 million and (z) CVI payments (if any) made to the GO CVI in the prior fiscal year<br>▪ To the extent there is a positive GO CVI Carryforward Balance remaining at the end of the 22-year term, the Commonwealth will not owe any further amount to GO CVI |
| **GO CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI |
| **GO CVI Allocation** | ▪ See Annex 3 |

J-5

**ANNEX 2: CLAWBACK CVI-SPECIFIC TERMS**

| TERM | DESCRIPTION |
|---|---|
| **Clawback CVI Lifetime Cap** | ▪ $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Claims, $22,580,090 for Allowed CW/MBA Claim, and $1,301,525,288 for Allowed CW/PRIFA Rum Tax Claims[3] (in total, $5,239,002,764)<br>   ○ Applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI |
| **Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **Mandatory Redemption Payments to Subject to Waterfall Clawback CVI** | ▪ Years 1-22: As referenced within (b) and (c) of Annual Payment Waterfall, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>▪ Years 23-30: From 100% of the Subject to Waterfall Outperformance Amount, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>   ○ To the extent that GO CVI Lifetime Cap (as defined above) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Clawback CVI beginning in the following year subject to applicable Clawback CVI Maximum Annual Mandatory Redemption Payment (as specified below) and Clawback CVI Lifetime Cap |
| **Not Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Not Subject to Waterfall Outperformance Amount"):<br>   ○ (i) 40% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to Not Subject to Waterfall Clawback CVI<br>   ○ (ii) 95% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance), less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year<br>▪ For the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |

---

[3] Both (i) Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and (ii) Rum Tax CVI Annual Payments (as defined in Exhibit "F" to the PRIFA Plan Support Agreement) to holders of Allowed CW/PRIFA Rum Tax Claims will be subject to an aggregate $1,301,525,288.00 lifetime cap.

| TERM | DESCRIPTION |
|------|-------------|
| **Mandatory Redemption Payments Not Subject to Waterfall Clawback CVI** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable caps, including both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap |
| **Clawback CVI Maximum Annual Payment** | ▪ <u>Years 1-22</u>: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $350 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of Clawback CVI Carryforward Balance (see below) and $175 million and (ii) $350 million<br>   ○ The Clawback CVI Carryforward Balance shall be calculated as follows:<br>     ▪ (a) In year 1, an amount equal to $0<br>     ▪ (b) For each year thereafter, the Annual Clawback CVI Carryforward Amount shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance. The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $175 million and (z) aggregate CVI payments made to the Subject to Waterfall Clawback CVI (if any) and the Not Subject to Waterfall Clawback CVI (if any) in the prior fiscal year<br> ▪ <u>Years 23-30</u>: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance (see below) and $375 million and (ii) $750 million.<br>   ○ The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $375 million and (z) aggregate CVI payments made (if any) to the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI in the prior fiscal year<br>   ○ Such Annual Clawback CVI Carryforward Amount will be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance<br> ▪ To the extent that GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the $375 million annual payment cap – and annual payment cap up to $750 |

J-8

| TERM | DESCRIPTION |
|------|-------------|
|  | million to the extent sufficient Clawback CVI Carryforward Balance is available – for the Clawback CVI, including CVI payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, would begin in the following year<br>▪ To the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI<br>▪ For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted |
| **Clawback CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| **Clawback CVI Allocation** | ▪ See Annex 4 |

## ANNEX 3: GO CVI ALLOCATION SUMMARY

| Claim | GO CVI Allocation % |
|-------|---------------------|
| Vintage CW Bond Claim | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | 3.514% |
| 2011 CW Bond Claim | 2.479% |
| 2012 CW Bond Claim[4] | 15.157% |
| 2014 CW Bond Claim[5] | 20.266% |
| Vintage CW Guarantee Claim | 15.194% |
| 2011 CW Guarantee Bond Claim | 7.552% |
| 2012 CW Guarantee Bond Claim | 3.594% |

---

[4] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter Loan.
[5] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports bonds.

## ANNEX 4: CLAWBACK CVI ALLOCATION SUMMARY

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[6] | 68.6% |
| Allowed CW/Convention Claims | 4.0% |
| Allowed CW/PRIFA Rum Tax Claims | 27.0% |
| Allowed CW/MBA Claims | 0.4% |

---

[6] See Annex 6 for details of priority distribution waterfall of CVI payments from Clawback CVI allocation to Allowed CW/HTA Claims.

## ANNEX 5: 5.5% SUT BASELINE[7]

*($ USD)*

| 5.5% SUT Baseline | | | |
|---|---|---|---|
| Fiscal Year | Amount | Fiscal Year | Amount |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | 2050[4] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | 2051[4] | 1,810,682,942.40 |

---

[7] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

## ANNEX 6: PRIORITY DISTRIBUTION WATERFALL FROM CLAWBACK CVI ALLOCATION TO ALLOWED CW/HTA CLAIMS

| TERM | DESCRIPTION |
|---|---|
| **HTA Clawback CVI Priority Distribution Waterfall**[8] | ▪ <u>First</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, Clawback CVI payments, if any, to the HTA 68 Bond Claims up to $179,462,539<br>▪ <u>Second</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Senior Bond Claims up to $1,833,405,578<br>▪ <u>Third</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Sub Bond Claims up to $207,294,178<br>▪ <u>Fourth</u>, after paying the permitted amounts above in full, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to the GDB HTA Loans up to $1,477,506,700<br>▪ Waterfall implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination |

---

[8] Capitalized terms used but not otherwise defined within Annex 6 shall have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement.

**EXHIBIT K**

SCHEDULE OF PREEMPTED STATUTES

**List of Main Statutes Preempted by PROMESA**[9]

I. **Commonwealth good faith and credit pledge statutes**
    A. General Obligation Bonds
        1. Act 2 approved October 10, 1985.
        2. Act 1 approved June 26, 1987, as amended.
        3. Act 34 approved March 4, 2014.
        4. Act 79 approved June 1, 2011.
        5. Act 243 approved August 9, 2008.
        6. Act 43 approved August 1, 2005, as amended.
        7. Act 216 approved August 19, 2004.
        8. Act 100 approved July 12, 2002, as amended.
        9. Act 161 approved July 5, 2003.
        10. Act 149 approved August 9, 2002, as amended.
        11. Joint Resolution No. 57 approved July 12, 1993.
        12. Act 54 approved July 6, 2001.
        13. Act 118 approved July 13, 2000.
        14. Act 153 approved July 16, 1999.
        15. Act 219 approved August 9, 1998.
        16. Act 81 approved August 14, 1997.
        17. Act 119 approved August 9, 1995.
        18. Act 46 approved July 28, 1994.
        19. Act 39 approved May 13, 1976, as amended.
        20. Act 83 approved August 30, 1991.[10]

    B. General Obligation Loans
        1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
        2. GDB Loans to the Commonwealth
            1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
            2. Joint Resolution No. 96 approved November 27, 2013.  [$30 million line of credit].

    C. Commonwealth Guaranty – Public Buildings Authority Bonds
        1. Act 17 approved April 11, 1968, as amended.

    D. Commonwealth Guaranty – APLA
        1. Act 409 approved September 22, 2004.

    E. Commonwealth Guaranty – PRIFA-BANs
        1. Act 1 approved January 1, 2015.

    F. [Commonwealth Guaranty – PRASA

---

[9] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.
[10] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

1. Act 45 approved July 28, 1994.]

II.  **Statutes appropriating Commonwealth revenues**
   A.  HTA
      1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]
      2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
      3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
   B.  PRIFA
      1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
   C.  PRIFA BANs
      1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
   D.  MBA
      1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]
   E.  PRITA
      1.  13 L.P.R.A. § 31751(a)(5). [cigarette tax]

   F.  CCDA
      1.  13 L.P.R.A. § 2271v(a). [hotel room tax]
   G.  Act 147 enacted June 18, 1980, as amended
      1. 23 L.P.R.A. § 104.[11] [judiciary appropriation]
   H.  UPR
      1. 18 L.P.R.A. § 621-1.[12]
   I.  Act 83 approved August 30, 1991, as amended[13]
      1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[14]
   J.  Act 221 approved May 15, 1948, as amended
      1. 15 L.P.R.A. § 74(d).[15]
   K.  Act 18 approved January 24, 2014, as amended
      1. 21 L.P.R.A. § 6742.[16]
   L.  Act 41 approved July 22, 2011, as amended
      1. 12 L.P.R.A. §8105

---

[11] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[12] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[13] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[14] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted.  In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[15] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

[16] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

III.    **TRS and JRS Statutes**
      A.  Act 106 approved August 23, 2017
      B.  Act 160 approved December 24, 2013
      C.  Act 91 of March 24, 2004
      D.  Act 12 approved October 19, 1954
      E.  Act 162 approved December 24, 2013

IV.    **Article VI of the Puerto Rico Constitution**
      A.  Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are Preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan. Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future purpose.

## EXHIBIT L

### BOND RECOVERY CATEGORIES

| Bond Recovery Category | Classes Included |
|---|---|
| Vintage PBA Bond Claims | 1, 2, 3, 4, 5, 6 and 7 |
| 2011 PBA Bond Claims | 8 and 9 |
| 2012 PBA Bond Claims | 10 and 11 |
| Vintage CW Bond Claims | 15, 16, 17, 18, 19, 20, 21, and 22 |
| 2011 CW Series D/E/PIB Bond Claims | 36, 37, 38, and 39 |
| 2011 CW Bond Claims | 30, 31, 32, and 33 |
| 2012 CW Bond Claims | 40, 41, 42, and 43 |
| 2014 CW Bond Claims | 46, 47, 48, 49 and 50 |
| Vintage CW Guarantee Bond Claims | 23, 24, 25, 26, 27, 28, and 29 |
| 2011 CW Guarantee Bond Claims | 34 and 35 |
| 2012 CW Guarantee Bond Claims | 44 and 45 |

**EXHIBIT M**

DESCRIPTION OF RUM TAX CVI ANNUAL PAYMENT TERMS

**Exhibit M**
**Terms Applicable to Rum Tax CVI Annual Payment**

| TERM | DESCRIPTION |
|---|---|
| **1) Rum Tax CVI Annual Payment** | |
| **a) Outperformance Metric** | ▪ See Annex 1, which is equivalent to 100% of general fund rum tax collections (i.e., aggregation of Items B, E, and I in Annex 2) per Rum Tax Waterfall (see Annex 2) within CW 2021 Fiscal Plan projections (the "Outperformance Metric") |
| **b) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **c) Rum Tax CVI Notional / Lifetime Cap** | ▪ Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and Rum Tax CVI Annual Payments to holders of Allowed CW/PRIFA Rum Tax Claims subject to an aggregate $1,301,525,288 lifetime cap. |
| **d) Rum Tax CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **e) Supplemental Cover Over** | ▪ Amount per proof-gallon that the U.S. Treasury can cover-over to the Commonwealth of Puerto Rico on account of rum taxes, less $10.50, for the applicable fiscal year |
| **f) Supplemental Cover Over Revenues** | ▪ The amount of Supplemental Cover Over Revenues is calculated as the product of (i) the ratio of Supplemental Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) $10.50 (the "Base Cover Over") and (ii) total rum tax collections received by the Commonwealth as documented within the U.S. Department of Treasury monthly detailed activity report of net excise tax due to the Government of Puerto Rico and certified by Hacienda ("Commonwealth Rum Tax Revenues")<br>  o For purposes of calculating the Rum Tax CVI Annual Payment based on outperformance of Waterfall General Fund Rum Tax Collections (as defined below) relative to the Outperformance Metric, the maximum amount of Supplemental Cover Over Revenues in each applicable fiscal year is $88,000,000 ("Supplemental Cover Over Revenues Cap") |

M-2

| TERM | DESCRIPTION |
|---|---|
| **g) Waterfall Supplemental Cover Over Revenues** | ▪ The amount of Waterfall Supplemental Cover Over Revenues is calculated as the lesser of (i) Supplemental Cover Over Revenues and (ii) Supplemental Cover Over Revenues Cap |
| **h) Base Cover Over Revenues** | ▪ The amount of Base Cover Over Revenues is calculated as the product of (i) the ratio of the Base Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) the Base Cover Over and (ii) Commonwealth Rum Tax Revenues |
| **i) Waterfall Cover Over Revenues** | ▪ The amount of Waterfall Cover Over Revenues is calculated as the sum of (i) Waterfall Supplemental Cover Over Revenues and (ii) Base Cover Over Revenues |
| **j) Rum Producer Incentive** | ▪ The permitted incentive percentage ("Rum Producer Incentive Percentage", included in calculations of Items D and H in Annex 2) that is utilized in calculating amounts paid to rum producers ("Rum Producer Incentive Payments") is subject to the following constraints:<br>    ○ For the first 10 years (i.e. FY2022-2031), maximum of 46%<br>    ○ For the next 5 years (i.e. FY2032-2036), maximum of 48%<br>    ○ For the following 15 years (i.e. FY2037-2051), maximum of 50%<br>▪ For the avoidance of doubt, any increase in Rum Producer Incentive Percentage within the limits set forth above will not affect the Outperformance Metric<br>▪ Notwithstanding the limits for the purposes of the Rum Tax Waterfall calculation as set forth in this section 1(k), the Rum Producer Incentive Percentage may be increased beyond the limits set forth above at the Commonwealth's discretion, subject to those increases not impacting the Outperformance Condition calculation and payment |
| **k) Permitted Rum Tax Waterfall Deductions** | Permitted Rum Tax Waterfall Deductions are calculated as the sum of the following:<br>▪ Science and Technology Trust (i.e., Item C in Annex 2)<br>    ○ $5 million transferred to the Puerto Rico Science, Research, and Technology Trust Fund account<br>▪ Rum Producer Incentive Payments (i.e., Items D and H in Annex 2)<br>    ○ As described above in section 1(k)<br>▪ Conservation Trust (i.e., Item F in Annex 2) |

| TERM | DESCRIPTION |
|---|---|
| | o Calculated as the product of (a) Supplemental Cover Over Revenues and (b) $1/6^{th}$<br>o Amount transferred to Puerto Rico Conservation Trust account<br>▪ PRIDCO (i.e., Item G in Annex 2)<br>  o Calculated as the lesser of (i) $5 million and (ii) (a) 2.5% multiplied by (b) Commonwealth Rum Tax Revenues<br>  o Amount transferred to Puerto Rico Industrial Development Company account |
| l) **Waterfall General Fund Rum Tax Collections** | ▪ Waterfall General Fund Rum Tax Collections are calculated as (i) Waterfall Cover Over Revenues less (ii) Permitted Rum Tax Waterfall Deductions |
| m) **Rum Tax CVI Annual Payment** | ▪ On an annual basis, the lesser of the following:<br>  o (i) 40% of cumulative outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, starting on July 1, 2021, less the aggregate amount of previous Rum Tax CVI Annual Payments<br>  o (ii) 50% of annual outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, measured at the conclusion of each fiscal year<br>  o (iii) $30 million |
| n) **Reporting** | ▪ Reporting obligations and audit rights related to the Rum Tax Revenues and calculation of the Rum Tax CVI Annual Payment to be agreed upon by no later than the PRIFA Effective Date (as defined within the PRIFA Related Plan Support Agreement) |

**ANNEX 1: OUTPERFORMANCE METRIC**
*($ in USD)*

| Outperformance Metric | | | |
|---|---|---|---|
| **Fiscal Year** | **Amount** | **Fiscal Year** | **Amount** |
| 2022 | $208,569,215.76 | 2037 | $208,781,748.91 |
| 2023 | 200,354,469.05 | 2038 | 209,289,240.57 |
| 2024 | 201,031,406.80 | 2039 | 209,788,269.00 |
| 2025 | 201,692,902.40 | 2040 | 210,278,694.61 |
| 2026 | 202,348,675.07 | 2041 | 210,749,432.35 |
| 2027 | 202,998,555.87 | 2042 | 211,211,199.81 |
| 2028 | 203,632,157.16 | 2043 | 211,674,906.69 |
| 2029 | 204,259,404.03 | 2044 | 212,129,474.13 |
| 2030 | 204,869,786.20 | 2045 | 212,574,772.82 |
| 2031 | 205,473,363.12 | 2046 | 213,021,852.71 |
| 2032 | 206,059,507.07 | 2047 | 213,459,499.22 |
| 2033 | 206,627,882.49 | 2048 | 213,898,852.55 |
| 2034 | 207,188,744.83 | 2049 | 214,339,919.35 |
| 2035 | 207,731,302.94 | 2050 | 214,782,706.32 |
| 2036 | 208,265,935.46 | 2051 | 215,227,220.15 |

# ANNEX 2: RUM TAX WATERFALL[17]

*($ in USD millions)*

| Fiscal Year | Item | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $383 | $341 | $344 | $346 | $348 | $350 | $353 | $355 | $357 | $359 | $361 | $363 | $365 | $367 | $369 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $266 | $224 | $227 | $229 | $231 | $233 | $236 | $238 | $240 | $242 | $244 | $246 | $248 | $250 | $252 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $261 | $219 | $222 | $224 | $226 | $228 | $231 | $233 | $235 | $237 | $239 | $241 | $243 | $245 | $247 |
| Incentive Pay. to Rum Producers | D | (120) | (101) | (102) | (103) | (104) | (105) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (113) | (113) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $141 | $118 | $120 | $121 | $122 | $123 | $125 | $126 | $127 | $128 | $129 | $130 | $131 | $132 | $133 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $93 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| Conservation Trust | F | (8) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $65 | $67 | $68 | $69 | $70 | $72 | $73 | $74 | $75 | $76 | $77 | $78 | $79 | $80 |
| Rum Producers | H | (37) | (30) | (31) | (31) | (32) | (32) | (33) | (33) | (34) | (34) | (35) | (35) | (36) | (36) | (37) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $35 | $36 | $37 | $37 | $38 | $39 | $39 | $40 | $40 | $41 | $42 | $42 | $43 | $43 |
| General Fund | I | (44) | (35) | (36) | (37) | (37) | (38) | (39) | (39) | (40) | (40) | (41) | (42) | (42) | (43) | (43) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $200 | $201 | $202 | $202 | $203 | $204 | $204 | $205 | $205 | $206 | $207 | $207 | $208 | $208 |

| Fiscal Year | Item | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $370 | $372 | $374 | $375 | $377 | $379 | $380 | $382 | $383 | $385 | $386 | $388 | $389 | $391 | $392 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $253 | $255 | $257 | $258 | $260 | $262 | $263 | $265 | $266 | $268 | $269 | $271 | $272 | $274 | $275 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $248 | $250 | $252 | $253 | $255 | $257 | $258 | $260 | $261 | $263 | $264 | $266 | $267 | $269 | $270 |
| Incentive Pay. to Rum Producers | D | (114) | (115) | (116) | (117) | (117) | (118) | (119) | (119) | (120) | (121) | (122) | (122) | (123) | (124) | (124) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $134 | $135 | $136 | $137 | $138 | $139 | $139 | $140 | $141 | $142 | $143 | $144 | $144 | $145 | $146 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| Conservation Trust | F | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $82 | $83 | $84 | $85 | $86 | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 |
| Rum Producers | H | (37) | (38) | (38) | (39) | (39) | (39) | (40) | (40) | (41) | (41) | (41) | (41) | (42) | (42) | (43) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $44 | $45 | $45 | $46 | $46 | $47 | $47 | $48 | $48 | $48 | $49 | $49 | $50 | $50 |
| General Fund | I | (44) | (44) | (45) | (45) | (46) | (46) | (47) | (47) | (48) | (48) | (48) | (49) | (49) | (50) | (50) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $209 | $210 | $210 | $211 | $211 | $212 | $212 | $213 | $213 | $213 | $214 | $214 | $215 | $215 |

[17] For the avoidance of doubt, to the extent the Supplemental Cover Over is extended, payments to annual Conservation Trust will be calculated as set forth in section 1(l) above.

**Exhibit B**

**Form of Notice**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF (A) ENTRY OF ORDER CONFIRMING MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL. PURSUANT TO TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that, pursuant to an order, dated _____ [ECF No. ____] (the "Confirmation Order"), the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* dated January 14, 2022 (as amended, supplemented, or modified, the "Plan"), was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan and the Confirmation Order.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on _____ and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2022; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, (e) relates to actions occurring from and after the respective Debtor's petition date, (f) relates to a Claim that is subject to the provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking allowance of any administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent to the following:

[_____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [_____], 2022 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with**

respect to such Administrative Expense Claim) against the Debtors and their property, and the Debtors and Reorganized Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 76.6 of the Plan and decretal paragraph 31 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is a full, final, and complete order, intended to be, conclusive and binding upon all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in the Court and appealed as provided in PROMESA and other applicable federal laws, rules and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

Dated: _____

San Juan, Puerto Rico

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtors*

/s/_____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtors*

# Exhibit C

**Preempted Laws**

**List of Main Statutes Preempted by PROMESA[8]**

I. **Commonwealth good faith and credit pledge statutes**
   A. General Obligation Bonds
      1. Act 2 approved October 10, 1985.
      2. Act 1 approved June 26, 1987, as amended.
      3. Act 34 approved March 4, 2014.
      4. Act 79 approved June 1, 2011.
      5. Act 243 approved August 9, 2008.
      6. Act 43 approved August 1, 2005, as amended.
      7. Act 216 approved August 19, 2004.
      8. Act 100 approved July 12, 2002, as amended.
      9. Act 161 approved July 5, 2003.
      10. Act 149 approved August 9, 2002, as amended.
      11. Joint Resolution No. 57 approved July 12, 1993.
      12. Act 54 approved July 6, 2001.
      13. Act 118 approved July 13, 2000.
      14. Act 153 approved July 16, 1999.
      15. Act 219 approved August 9, 1998.
      16. Act 81 approved August 14, 1997.
      17. Act 119 approved August 9, 1995.
      18. Act 46 approved July 28, 1994.
      19. Act 39 approved May 13, 1976, as amended.
      20. Act 83 approved August 30, 1991.[9]

   B. General Obligation Loans
      1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2. GDB Loans to the Commonwealth
         1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         2. Joint Resolution No. 96 approved November 27, 2013. [$30 million line of credit].

   C. Commonwealth Guaranty – Public Buildings Authority Bonds
      1. Act 17 approved April 11, 1968, as amended.

   D. Commonwealth Guaranty – APLA
      1. Act 409 approved September 22, 2004.

   E. Commonwealth Guaranty – PRIFA-BANs
      1. Act 1 approved January 1, 2015.

---

[8] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

[9] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

1

F. [Commonwealth Guaranty – PRASA
   1. Act 45 approved July 28, 1994.]

**II.**   **Statutes appropriating Commonwealth revenues**
   A. HTA
      1. Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681 [motor vehicle license fees]
      2. 13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
      3. 13 L.P.R.A. § 31751(a)(3). [cigarette tax]
   B. PRIFA
      1. Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
   C. PRIFA BANs
      1. Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
   D. MBA
      1. 13 L.P.R.A. § 31751(a)(4). [cigarette tax]
   E. PRITA
      1. 13 L.P.R.A. § 31751(a)(5). [cigarette tax]

   F. CCDA
      1. 13 L.P.R.A. § 2271v(a). [hotel room tax]
   G. Act 147 enacted June 18, 1980, as amended
      1. 23 L.P.R.A. § 104.[10] [judiciary appropriation]
   H. UPR
      1. 18 L.P.R.A. § 621-1.[11]
   I. Act 83 approved August 30, 1991, as amended[12]
      1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[13]
   J. Act 221 approved May 15, 1948, as amended
      1. 15 L.P.R.A. § 74(d).[14]
   K. Act 18 approved January 24, 2014, as amended

---

[10] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[11] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[12] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[13] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted. In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[14] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

                     1. 21 L.P.R.A. § 6742.[15]

    L.  Act 41 approved July 22, 2011, as amended

                     1. 12 L.P.R.A. §8105

**III.    TRS and JRS Statutes**

    A.  Act 106 approved August 23, 2017

    B.  Act 160 approved December 24, 2013

    C.  Act 91 of March 24, 2004

    D.  Act 12 approved October 19, 1954

    E.  Act 162 approved December 24, 2013

**IV.    Article VI of the Puerto Rico Constitution**

    A.  Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan. Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future purpose.

---

[15] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

**Exhibit D**

**List of Agencies and Amounts to be Transferred**

| Sources | | | $ millions | 30-Jun-21 |
|---|---|---|---|---|
| **TSA Bank Account Balances** | | | | |
| | **Account** | | | |
| **Account Description** | **Number** | **Bank Name** | | |
| TSA Operational | X9458 | Banco Popular | $ | 2,000 |
| TSA Reserve (Per Fiscal Plan) | X1012 | Banco Popular | | 304 |
| TSA Cash Concentration | X1020 | Banco Popular | | 5,742 |
| TSA Overnight Sweep (Repos) | X9036 | Citibank | | 3,624 |
| TSA Accumulation Account | X2463 | Banco Santander | | - |
| | | | | 11,671 |
| | | | | |
| **TSA Cash Adjustments** | | | | |
| | | | | |
| Federal Funds in the TSA | | | | (76) |
| | | | | |
| **TSA Bank Accounts** | | | $ | 11,595 |
| | | | | |
| **Sweep Account Balances** | | | | |
| | **Account** | | | |
| **Account Description** | **Number** | **Bank Name** | | |
| Excise, Inheritance, Gifts, and Licenses | X3630 | Banco Popular | $ | 158 |
| Sales & Use Tax (SUT/IVU) | X4406 | Banco Popular | | 54 |
| | | | | 212 |

| Sources | | | $ millions | 30-Jun-21 |
|---|---|---|---|---|
| **Cash at Commonwealth Agencies** | | | | |
| | **Account** | | | |
| **Account Holder** | **Number** | **Bank Name** | | |
| Hacienda | X7205 | Banco Popular | $ | 46 |
| Hacienda | X7044 | Banco Popular | | 339 |
| Hacienda | X9038 | Banco Popular | | 556 |
| Hacienda | X9857 | Banco Popular | | 147 |
| Controller's Office | X0251 | Banco Popular | | 11 |
| Department of Economic Development and Commerce | X4551 | Banco Popular | | 22 |
| Department of Economic Development and Commerce | X4527 | Banco Popular | | 6 |
| Department of Economic Development and Commerce | X4519 | Banco Popular | | 4 |
| Department of Economic Development and Commerce | X1301 | Banco Popular | | 10 |
| Department of Economic Development and Commerce | X5730 | Banco Popular | | 50 |
| Department of Housing | X5636 | Banco Popular | | 8 |
| Department of Housing | X5571 | Banco Popular | | 5 |
| Department of Housing | X0037 | Banco Popular | | 0 |
| Department of Education | X3706 | Banco Popular | | 13 |
| Department of Labor | X0308 | Banco Popular | | 178 |

| | | | |
|---|---|---|---:|
| Department of Labor | X0286 | Banco Popular | 13 |
| Environmental Quality Board | X0316 | Banco Popular | 10 |
| Office of Court Administration | X9562 | First Bank | 102 |
| Office of Court Administration | X1022 | Citibank | 6 |
| Office of Court Administration | X0974 | First Bank | 10 |
| Puerto Rico Energy Commission | X3064 | Banco Popular | 7 |
| Puerto Rico Energy Commission | X3056 | Banco Popular | 33 |
| Puerto Rico Police Bureau | X9598 | Banco Popular | 30 |
| Senate | X2665 | First Bank | 8 |
| Senate | X2687 | First Bank | 1 |
| Statistics Institute of PR | X7055 | Banco Popular | 4 |
| Superintendent of the Capitol | X2775 | First Bank | 1 |
| Superintendent of the Capitol | X2764 | First Bank | 1 |
| Department of Justice – Office of Inspector General | X6054 | Banco Popular | 3 |
| Forensics Science Bureau | X4496 | Banco Popular | - |
| Forensics Science Bureau | X1681 | Banco Popular | 3 |
| Government Ethics Office | X0828 | First Bank | 0 |
| Government Ethics Office | X1067 | Banco Popular | 4 |
| Government Ethics Office | X1059 | Banco Popular | 0 |
| Government Ethics Office | X2001 | Banco Popular | 3 |
| House of Representatives | X2610 | First Bank | 5 |
| Office of Legislative Services | X2819 | First Bank | 3 |
| Office of Legislative Services | X2808 | First Bank | - |
| Office of Legislative Services | X2797 | First Bank | - |
| Office of Legislative Services | X2786 | First Bank | 6 |
| PR Federal Affairs Administration | X3037 | Citibank | 0 |
| PR Federal Affairs Administration | X9332 | Citibank | 1 |
| PR Federal Affairs Administration | X9316 | Citibank | 0 |
| Electric Lottery | X5328 | First Bank | 20 |
| | | | 1,668 |

| Sources | | $ millions | 30-Jun-21 |
|---|---|---|---:|

**Cash from ERS and PBA**

| Account Holder | Account Number | Bank Name | | |
|---|---|---|---|---:|
| Employee Retirement System | X0514 | BNY Mellon | $ | 141 |
| Employee Retirement System | X8059 | Banco Popular | | 95 |
| Employee Retirement System | X4554 | Banco Popular | | 30 |
| Employee Retirement System | X4546 | Banco Popular | | 111 |
| Employee Retirement System | X1185 | Banco Popular | | 3 |
| Employee Retirement System | X1177 | Banco Popular | | 10 |
| Public Building Authority | X2002 | US Bank | | 3 |
| Public Building Authority | X9006 | US Bank | | 4 |
| Public Building Authority | X7589 | Oriental Bank | | 16 |
| Public Building Authority | X4707 | Oriental Bank | | 13 |

| Public Building Authority | X1571 | Oriental Bank | 5 |
|---|---|---|---|
| Public Building Authority | X5578 | Oriental Bank | 10 |
| Public Building Authority | X4128 | Banco Popular | 62 |
| Public Building Authority | X5019 | Banco Popular | 9 |
| | | | 512 |

| Sources | | $ millions | 30-Jun-21 |
|---|---|---|---|

**Cash from TRS and JRS**

| Account Holder | Account Number | Bank Name | |
|---|---|---|---|
| Teacher Retirement System | X7036 | Banco Popular | 116 |
| Teacher Retirement System | X0244 | Banco Popular | 13 |
| Teacher Retirement System | X8820 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X1223 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X5199 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X4538 | Banco Popular | 35 |
| | | | 164 |

**Exhibit E**

**Certification Notice**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | |
| | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | (Jointly Administered) |
| Debtors.[1] | |

## NOTICE OF RETAIL INVESTOR CERTIFICATION

On [_____], the United States District Court for the District of Puerto Rico (the "Court") entered an order confirming the *Modified Eight Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (as amended, supplemented, or modified, the "Plan").[2] The Plan provides for certain distributions to be made to "Retail Investors."

A "Retail Investor" is an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s).

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings given to them in the Plan.

If you are a "Retail Investor" and did <u>not</u> submit a vote to accept or reject the Plan on or before 5:00 p.m. (Atlantic Standard Time) on October 18, 2021 (or submitted such vote, which you timely revoked), you must identify yourself to be eligible to receive the appropriate distributions as a "Retail Investor" pursuant to the Plan. Instructions to identify yourself and certify (the "<u>Certification</u>") that you meet the requirements to be a "Retail Investor" are provided below.

For the avoidance of doubt, if you submitted a valid vote into ATOP on or before October 18, 2021, and your bonds were subsequently released from ATOP after October 18, 2021 in accordance with the Disclosure Statement Order, you are not eligible to submit a Certification.

The deadline for your broker or nominee to submit your certification as a Retail Investor is **[        ], 2022 at 6:00 p.m. (Atlantic Standard Time)** (the "<u>Certification Deadline</u>").[3]  **Note that your broker or nominee may set an earlier deadline to provide it sufficient time to submit your certification before the Certification Deadline.**

The record date to determine holders of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** eligible to receive this Certification Notice and make the Certification is 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, which coincides with the conclusion of the original voting and distribution election events for the Plan.

For the avoidance of doubt, if you traded the bonds associated with the **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** after the Certification Record Date, but submit a valid Certification into ATOP pursuant to these instructions, only you will receive the Retail Support Fee based on the Certification. Any other entitlement or distribution pursuant to the terms of the Plan will be made to the holder of such bonds at the time of distribution.

## How to Submit a Valid Certification

If you wish to certify that, as of 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, you were:

> an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s)

---

[3] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

you must instruct your broker or nominee (each, a "**Nominee**") to electronically deliver all of your aforementioned bonds via the Automated Tender Offer Program ("**ATOP**") at The Depository Trust Company ("**DTC**") in accordance with your desire to instruct on the above certification.

**If you and/or your Nominee do not electronically deliver your bonds via ATOP (i.e., take no action), you will be deemed not to be a Retail Investor.**

\*   \*   \*   \*   \*

In addition, by delivering your bonds via ATOP, you are certifying that:

1. either (a) your certification is the only certification by you on account of a **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]**, or (b) in addition to the certification, one or more additional certifications ("**Additional Certifications**") on account of other bonds have been submitted by one or more Nominees, and you have provided (or coordinated with your Nominee to provide) the Numerosity Spreadsheet (as defined below) to the Balloting Agent by the Certification Deadline;

2. you have submitted a Certification for all of your Claims on account of the bonds to which this Notice pertains and acknowledge that no split Certifications will be permitted;

3. you are the holder of the Claims on account of bonds to which this Notice pertains or is an authorized signatory of such holder, and has full power and authority to make the Certification; and

4. your Certification is subject to all the terms and conditions set forth in the Plan, Disclosure Statement, and Disclosure Statement Order.

No paperwork is required to be delivered to Prime Clerk LLC to effectuate the Certification (except in the limited circumstance noted below in the section titled "*Numerosity Information Request – Applicable Only for Beneficial Holders Submitting More Than One Instruction Through ATOP*"). The sole means of effectuating this Certification is to (i) validly tender your bonds into the proper ATOP envelope at DTC, and (ii) make the required certification set forth above, each as described on DTC's ATOP system.

---

**THE CERTIFICATION  DEADLINE IS
6:00 P.M. (ATLANTIC STANDARD TIME) ON [_____], 2022.[4]**

This date and time is referred to as the "**Certification Deadline**."

---

[4] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR BONDS THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR BONDS THROUGH THE EFFECTIVE DATE.**

**YOU MAY REVOKE YOUR CERTIFICATION AND WITHDRAW ANY TENDERED BONDS AT ANY TIME BEFORE THE CERTIFICATION DEADLINE.**

\* \* \* \* \*

### How to Revoke a Valid Certification

You may revoke your Certification and withdraw your bonds tendered through DTC's ATOP at any time on or before the Certification Deadline.

If you wish to revoke your Certification, you must instruct your Nominee to revoke your Certification and withdraw your bonds via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the revocation.

If you revoke your Certification any time before the Certification Deadline, you may make a Certification again at any time before the Certification Deadline, in accordance with the instructions to submit a valid Certification above.

\* \* \* \* \*

### Numerosity Information Submission
### (Applicable Only for Beneficial Holders Submitting More than One Certification Through ATOP)

Any beneficial holder of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** that holds multiple CUSIPs of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** and submits more than one certification through one or more Nominees, MUST submit (or coordinate with your Nominee(s) to submit) a list of all such ATOP instruction confirmation numbers (also referred to as ATOP voluntary offer instructions or "**VOIs**"). The Balloting Agent has made available a template electronic spreadsheet (the "**Numerosity Spreadsheet**") on its website at: https://cases.primeclerk.com/puertorico (click on the link titled "Numerosity Spreadsheet").

Please return (or coordinate with your Nominee to return) the Numerosity Spreadsheet to the Balloting Agent in excel format via email to puertoricoinfo@primeclerk.com. If you anticipate any difficulty in submitting your Numerosity Spreadsheet in excel format, please contact Prime Clerk at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international

callers) or by e-mail at puertoricoballots@primeclerk.com .

\*   \*   \*   \*   \*

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK, LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOINFO@PRIMECLERK.COM AND REFERENCE "RETAIL INVESTOR SOLICITATION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

**Attachment 1**

**5.5% SUT BASELINE**

| Fiscal Year ending June 30, | Amount | SUT True-Up, if any (see below) |
|---|---|---|
| 2022 | $1,282,901,069.30 | |
| 2023 | 1,279,617,661.88 | |
| 2024 | 1,301,220,703.34 | |
| 2025 | 1,315,295,083.41 | |
| 2026 | 1,345,037,783.09 | |
| 2027 | 1,377,398,882.61 | |
| 2028 | 1,403,141,426.98 | |
| 2029 | 1,414,785,980.78 | |
| 2030 | 1,427,393,695.32 | |
| 2031 | 1,437,998,166.98 | |
| 2032 | 1,447,406,781.79 | |
| 2033 | 1,428,210,572.57 | |
| 2034 | 1,426,102,595.91 | |
| 2035 | 1,429,798,842.15 | |
| 2036 | 1,438,540,327.00 | |
| 2037 | 1,452,657.050.02 | |
| 2038 | 1,477,755,111.63 | |
| 2039 | 1,495,355,971.13 | |
| 2040 | 1,518,089,898.19 | |
| 2041 | 1,541,405,892.18 | |
| 2042 | 1,565,457,864.38 | |
| 2043 | 1,590,148,747.39 | |
| 2044 | 1,616,252,365.93 | |
| 2045 | 1,642,150,220.79 | |
| 2046 | 1,668,748,988.64 | |
| 2047 | 1,696,060,240.60 | |
| 2048 | 1,724,082,302.73 | |
| 2049 | 1,752,859,808.94 | |
| 2050[§] | 1,781,536,796.27 | |
| 2051[§] | 1,810,682,942.40 | |

---

[§]   May 2020 Fiscal Plan contains projections through FY2049.  FY2050 and FY2051 baseline calculated using FY 2049 projections and the average growth rate from FY2045-FY2049.

**Attachment 1 (con't)**

Description of Baseline Reduction and SUT True-Up, if any, by Fiscal Year

Description of each Baseline Reduction and SUT True-Up to be added incrementally

Description and Effective Date of Substitute Measured Tax, if any

## Attachment 2

## PRIFA RUM TAX CVI OUTPERFORMANCE METRIC

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $208,569,215.76 |
| 2023 | 200,354,469.05 |
| 2024 | 201,031,406.80 |
| 2025 | 201,692,902.40 |
| 2026 | 202,348,675.07 |
| 2027 | 202,998,555.87 |
| 2028 | 203,632,157.16 |
| 2029 | 204,259,404.03 |
| 2030 | 204,869,786.20 |
| 2031 | 205,473,363.12 |
| 2032 | 206,059,507.07 |
| 2033 | 206,627,882.49 |
| 2034 | 207,188,744.83 |
| 2035 | 207,731,302.94 |
| 2036 | 208,265,935.46 |
| 2037 | 208,781,748.91 |
| 2038 | 209,289,240.57 |
| 2039 | 209,788,269.00 |
| 2040 | 210,278,694.61 |
| 2041 | 210,749,432.35 |
| 2042 | 211,211,199.81 |
| 2043 | 211,674,906.69 |
| 2044 | 212,129,474.13 |
| 2045 | 212,574,772.82 |
| 2046 | 213,021,852.71 |
| 2047 | 213,459,499.22 |
| 2048 | 213,898,852.55 |
| 2049 | 214,339,919.35 |
| 2050 | 214,782,706.32 |
| 2051 | 215,227,220.15 |

Attachment 2-1

**Attachment 3**

**GO CVI Allocation Summary**

| Claim | GO CVI Allocation % |
|---|---|
| Vintage CW Bond Claim | 32.243 |
| 2011 CW Series D/E/PIB Bond Claim | 3.514 |
| 2011 CW Bond Claim | 2.479 |
| 2012 CW Bond Claim[1] | 15.157 |
| 2014 CW Bond Claim[2] | 20.266 |
| Vintage CW Guarantee Claim | 15.195 |
| 2011 CW Guarantee Bond Claim | 7.552 |
| 2012 CW Guarantee Bond Claim | 3.594 |

---

[1]   2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter loan.

[2]   2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports Bonds.

**Attachment 4**

**Clawback CVI Allocation Summary**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[1] | 68.6 |
| payable in the following order of priority: | |
| First, HTA 68 Bond Claims up to $179,462,539; | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578; | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178; and | |
| Fourth, GDB HTA Loans up to $1,477,506,700. | |
| Allowed CW/Convention Center Claims | 4.0 |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 |
| Deemed Paid CVIs Payments relating to Allowed CW/MBA Claims, consisting of | 0.4 |

---

[1]     Capitalized terms have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement.

**Attachment 5**

**FORM OF GO CVI**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                                                    $3,500,000,000

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

| Delivery Date | Deemed Issuance Date | CUSIP No. |
|---|---|---|
| March 15, 2022 | July 1, 2021 | |

Registered Owner:    Cede & Co.

Initial Notional Amount and GO CVI Lifetime Cap:  Three Billion Five Hundred Million Dollars

1.     All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and The Bank of New York Mellon, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.     The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the GO CVI Lifetime Cap specified above.

3.     The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the GO CVIs Final Maturity Date of an SUT Outperformance Condition, (b) the annual limitations hereinafter referred to, and (c) the GO CVI Lifetime Cap, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent (the "Corporate Trust Office").  This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on November 1 of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition occurred (the "CVIs Annual Payment Date").  The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.     The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof.  The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.     This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $3,500,000,000, known as "Commonwealth of Puerto Rico GO CVIs", issued under the authority of and in full compliance with the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order"), and the CVI Legislation.

6.     In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs".  This Note is a GO CVI.  The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more

fully described in the Trust Agreement.  The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.

7.    The Commonwealth will determine if an SUT Outperformance Condition has occurred on each CVIs Outperformance Condition Determination Date, which is September 15 of each Fiscal Year, beginning September 15, 2022.  An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement.  Once the amount of the excess is determined and calculated by an Independent Consultant, such excess amount is then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.    These Notes are subject to mandatory redemption on each CVIs Annual Payment Date, subject to the limitations described in the Trust Agreement, in amounts equal to the GO CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all GO CVIs on such CVIs Annual Payment Date, but in no event in an amount that in the aggregate exceeds the GO CVI Lifetime Cap prior to the GO CVIs Final Maturity Date.

9.    The GO CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the GO CVIs have been paid in an amount equal to the GO CVI Lifetime Cap, and (b) (1) September 15, 2043, in the event an SUT Outperformance Condition did not occur in the Fiscal Year ending on June 30, 2043, and (2) November 1, 2043, in the event an SUT Outperformance Condition did occur in the Fiscal Year ending on June 30, 2043, whether or not the Holders of all GO CVIs have been paid in the aggregate an amount equal to the GO CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

10.    The GO CVIs are also subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVIs.

11.    Whenever Notes or portions thereof are to be redeemed in accordance with paragraph 10 hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed.  If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

12.     The Trustee shall, if any of the Notes or portions thereof to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

13.     Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series and Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

14.     If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

15.     The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof.  At the Corporate Trust Office of the Trustee, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

16.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series and Subseries and tenor as the surrendered Note.

17.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

18.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

19.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

[Remainder of this page intentionally left blank]

Attachment 5-5

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this Note to be executed with the facsimile signature of the Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the Deemed Issuance Date specified above.

————————————————————
[Facsimile signature]
Governor of the Commonwealth of Puerto Rico

————————————————————
[Facsimile signature]
Secretary of the Treasury of Puerto Rico

Attest:

————————————————————
[Facsimile signature]
Secretary of State of Puerto Rico

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____

Authorized Officer

Date of authentication: March 15, 2022

Attachment 5-7

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto _____

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within Note on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____     Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

**Attachment 6**

**FORM OF CLAWBACK CVI**
**(includes variations for different Clawback CVI Subseries and Sub-Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-____                                                                   $[_____][1]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

---

[1]      To reflect Notional Amount for each Subseries and Sub-Subseries of the Clawback CVIs.

| Subseries[2] | Clawback CVI Allocation Percentage | Delivery Date | Deemed Issuance Date | CUSIP No. |
|---|---|---|---|---|
| Allowed CW/HTA Claims[3] | 68.60% | March 15, 2022 | --- | --- |
| payable in the following order of priority: | | March 15, 2022 | --- | --- |
| First, HTA 68 Bond Claims up to $179,462,539; | | March 15, 2022 | July 1, 2021 | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578; | | March 15, 2022 | July 1, 2021 | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178; and | | March 15, 2022 | July 1, 2021 | |
| Fourth, GDB HTA Loans up to $1,477,506,700 | | March 15, 2022 | July 1, 2021 | |
| Allowed CW/Convention Center Claims | 4.00 | March 15, 2022 | July 1, 2021 | |
| Allowed CW/PRIFA Rum Tax Claims | 27.00 | March 15, 2022 | July 1, 2021 | |

Registered Owner: Cede & Co.

Initial Notional Amount and Clawback CVI Lifetime Cap Allocable to Subseries/Sub-Subseries[1]: _____ Dollars

     1.       All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and The Bank of New York Mellon, as Trustee and Paying Agent. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

     2.       The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the Clawback CVI Lifetime Cap specified above.

     3.       The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the Clawback CVIs Final Maturity Date of an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12], (b) the annual limitations hereinafter referred to, and (c) the Clawback CVI Lifetime Cap applicable to this Note, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition on November 1 of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] occurred (the "CVIs Annual Payment Date"). The Notional Amount of this Note is payable in such coin or

---

[2]    <u>Note</u>: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority and Clawback CVI Lifetime Cap.

[3]    Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.

currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof.  The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.      This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[_____][1], known as "Commonwealth of Puerto Rico Clawback CVIs – [_____ Subseries or Sub-Subseries]", issued under the authority of and in full compliance with the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.      In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs".  This Note is a Clawback CVI.  The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement.  The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.  [If this Note is a PRIFA Rum Tax Clawback CVI, this Note is additionally payable from the Rum Tax CVI Annual Payment Amount.][12]

7.      The Commonwealth will determine if an SUT Outperformance Condition [and/or a Rum Tax Outperformance Condition][12] has occurred on each CVIs Outperformance Condition Determination Date, which is September 15 of each Fiscal Year, beginning September 15, 2022. An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement.  [A Rum Tax Outperformance Condition in any Fiscal Year will occur if the Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric for that Fiscal Year set forth in the Trust Agreement][12].  Once the amount of the excess is determined and calculated by an Independent Consultant, such excess amount is then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment Date in an amount equal to the Clawback CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all Clawback CVIs on such CVIs Annual Payment Date, but in no event in an amount that in the aggregate exceeds the Clawback CVI Lifetime Cap prior to the Clawback CVIs Final Maturity Date.

9.    [This Note is an Allowed CW/HTA Claims Subseries, so amounts distributed on the CVIs Annual Payment Date from the Clawback CVI Allocation Percentage allocated to the Allowed CW/HTA Claims Subseries shall be distributed in the following order of priority: first to the Holders of the Sub-Subseries relating to HTA 68 Bond Claims until such Holders receive $179,462,539; second to the Holders of the Sub-Subseries relating to HTA 98 Senior Bond Claims until such Holders receive $1,833,405,578; third to the Holders of the Sub-Subseries relating to HTA 98 Sub Bond Claims until such Holders receive $207,294,178; and fourth to the Holders of the Sub-Subseries relating to GDB HTA Loans until such Holders receive $1,477,506,700.  No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries have been paid in full.][4]

10.    [This Note is a PRIFA Rum Tax Clawback CVI and is additionally payable from PRIFA Rum Tax CVI Annual Payment Amounts.][12]

11.    The Clawback CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the Clawback CVIs have been paid in an amount equal to the Clawback CVI Lifetime Cap, and (b) (1) September 15, 2051, in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] did not occur in the Fiscal Year ending on June 30, 2051, and (2) November 1, 2051, in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] did occur in the Fiscal Year ending on June 30, 2051, whether or not the Holders of all Clawback CVIs have been paid in the aggregate an amount equal to the Clawback CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

12.    The Clawback CVIs are subject to redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVIs.

13.    Whenever Notes are to be redeemed in accordance with paragraph [12] hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed.  If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice.  Such notice shall be given by mailing a copy of such notice not less than twenty (20) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

14.    The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than twenty (20) days nor more than sixty (60) days prior to the redemption at the most recent

---

[4]    To be included in Clawback CVIs relating to Allowed CW/HTA Claims.

address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

15.     Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

16.     If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

17.     The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the Corporate Trust Office of the Trustee, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

18.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

19.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

20.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

21.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this Note to be executed with the facsimile signature of the Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the Deemed Issuance Date specified above.

[Facsimile signature]
Governor of the Commonwealth of Puerto Rico

[Facsimile signature]
Secretary of the Treasury of Puerto Rico

Attest:

[Facsimile signature]
Secretary of State of Puerto Rico

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____

Authorized Officer

Date of authentication:  March 15, 2022

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto _____

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to register the transfer of the within Note
on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____     Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears
upon the face of the within Note in every particular, without alteration or enlargement or any
change whatever and must be guaranteed by an "eligible guarantor institution" meeting the
requirements of the Trustee which requirements will include membership or participation in the
Securities Transfer Agents Medallion Program or such other "signature guarantee program" as
may be determined by the Trustee in addition to, or in substitution for the Securities Transfer
Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as
amended.

**Attachment 7**

Commonwealth of Puerto Rico

Calculations relating to GO CVIs and Clawback CVIs Payments

(calculations attached)

For Fiscal Year Ending:  June 30, 20__

CVIs Outperformance Condition Determination Date:  September 15, 20__

      SUT Outperformance Condition has/has not occurred.

      Rum Tax Outperformance Condition has/has not occurred.

CVIs Annual Payment Amount Calculation Date:  September 15, 20__

CVIs Annual Payment Date:  November 1, 20__

**Any and all calculations provided to the Trustee in this Attachment 7 by the Calculation Agent may be conclusively relied upon by the Trustee for all purposes and the Trustee shall have no responsibility whatsoever to validate, verify or ensure the accuracy of such information.**

<u>Calculations Relating to GO CVIs Upon Occurrence of SUT Outperformance Condition</u>

(calculations attached)

Measured SUT                                                    $_____

SUT True-Up                                                    $_____

Less: 5.5% SUT Baseline                                        $_____

Subject to Waterfall Outperformance Amount:                    $_____

    Less Deemed Paid CVIs Payments Allocable to GO CVIs:    $_____

Amount to be Transferred to Trustee:                           $_____

        Payment to Holders of GO CVIs:  $_____ (deposit to GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account)

        Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs: $_____ (deposit to Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account)

GO CVI Carryforward Amount:

GO CVI Carryforward Balance:

        Payment to Holders of PRIFA Rum Tax Clawback CVIs:  $_____ (deposit to PRIFA Rum Tax Clawback CVIs Payment Account)

Remaining GO CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining GO CVI Lifetime Cap after CVIs Annual Payment Date:  $_____

Application of Subject to Waterfall Outperformance Amount to GO CVIs (from GO CVIs Subaccount): $_____

        Amount per $1 Authorized Denomination of GO CVI:  $0._____

| Claim | GO CVI % | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|---|
| Vintage CW Bond | 32.243 | | | |
| 2011 CW Series D/E/PIB Bond | 3.514 | | | |
| 2011 CW Bond | 2.479 | | | |
| 2012 CW Bond | 15.157 | | | |
| 2014 CW Bond | 20.266 | | | |
| Vintage CW Guarantee | 15.195 | | | |
| 2011 CW Guarantee Bond | 7.552 | | | |
| 2012 CW Guarantee Bond | 3.594 | | | |

Calculations Relating to Clawback CVIs Upon Occurrence of
<u>SUT Outperformance Condition and/or Rum Tax Outperformance Condition</u>

(calculations attached)

Not Subject to Waterfall Outperformance Amount:                    $_____

Less Deemed Paid CVIs Payments Allocable to Clawback CVIs[1]:     $_____

Amount to be Transferred to Trustee:                              $_____

Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs: $_____ (deposit to Not Subject to Waterfall CVIs Payment Account)

Payment to Holders of PRIFA Rum Tax Clawback CVIs: $_____ (deposit to PRIFA Rum Tax Clawback CVIs Payment Account)

Amount Payable to Holders of Clawback CVIs other than Holders of PRIFA Rum Tax Clawback CVIs:

From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount: $_____

From Not Subject to Waterfall Payment Amount: $_____

Total: $_____

Amount per $1 Authorized Denomination: $0._____

Amount Payable to Holders of PRIFA Rum Tax Clawback CVIs:

From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount: $_____

From Not Subject to Waterfall Payment Amount: $_____

From Rum Tax CVI Annual Payment Amount: $_____

Total: $_____

Amount per $1 Authorized Denomination: $0._____

Clawback CVI Carryforward Amount:

Clawback CVI Carryforward Balance:

Remaining Clawback CVI Lifetime Cap as of June 30, 20__: $_____

---

[1]     Currently consists solely of settlement of Allowed CW/MBA Claims on or prior to Effective Date.

Remaining Clawback CVI Lifetime Cap after CVIs Annual Payment Date:  $_____

| Claim | Percentage of Distribution | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|---|
| Allowed CW/HTA | 68.60% | | | |
| HTA 68 Bond (first priority) | | | | |
| HTA 98 Senior Bond (second priority) | | | | |
| HTA 98 Sub Bond (third priority) | | | | |
| GDB HTA Loans (fourth priority) | | | | |
| CW/Convention Center | 4.00 | | | |
| CW/PRIFA Rum Tax Claims | 27.00 | | | |

| Claim | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
| HTA 68 Bond (first priority) | | | |
| HTA 98 Senior Bond (second priority) | | | |
| HTA 98 Sub Bond (third priority) | | | |
| GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |

**Attachment 8**

**Illustrative scenarios of the calculation of the
GO and Clawback CVIs Annual Payment Amounts**

| ($ in millions) | | | FY21 | FY22 |
|---|---|---|---|---|
| 5.5% SUT Collections[1] | | | **$1,569** | **$1,383** |
| (-) 5.5% SUT Baseline, per 2020 Certified Fiscal Plan | | | (1,267) | (1,283) |
| Outperformance Amount | | | $302 | $100 |
| **Cumulative Outperformance** | | | **$302** | **$402** |
| (x) 50% Sharing of Cumulative Outperformance | | 50% | 50% | 50% |
| **50% of Cumulative Outperformance** | | | **$151** | **$201** |
| (-) Cumulative Payments to GO CVI + Subject to Waterfall Clawback CVI | | | – | (151) |
| **50% of Cumulative Outperformance Less Payments to GO + Subject to Waterfall Clawback CVIs** | | | **$151** | **$50** |
| **GO CVI** | | | | |
| *Subject to Waterfall Outperformance Amount calculated as the Lesser of:* | | | | |
| (i) 50% Cumulative Outperformance[2] | | 50% | $151 | $50 |
| (ii) 75% Annual Outperformance | | 75% | 226 | 75 |
| **Subject to Waterfall Outperformance Amount** | | | **$151** | **$50** |
| **Subject to Waterfall Annual Mandatory Redemption Payments** | | | | |
| **Step 1: Creditor Share of Outperformance** | | | | |
| First $100 to GO CVI | A | $100 | $100 | $50 |
| **Remaining Subject to Waterfall Outperformance Amount** | | | **$51** | **$–** |
| Next $11.1 to Subject to Waterfall Clawback CVI | B | $11 | $11 | $– |
| **Remaining Subject to Waterfall Outperformance Amount** | | | **$40** | **$–** |
| **Remaining Subject to Waterfall Outperformance Amount** | C | | **$40** | **$–** |
| 90% to GO CVI | C * 90% = D | 90% | $36 | $– |
| 10% to Subject to Waterfall Clawback CVI | C * 10% = E | 10% | 4 | – |
| **GO CVI Annual Payment Amount Before Caps[3]** | A + D = F | | **$136** | **$50** |
| Clawback CVI Annual Subject to Waterfall Payment Amount Before Caps[4] | B + E = G | | 15 | |
| **Step 2: GO CVI Maximum Annual Payment** | | | | |
| GO CVI Annual Cap | | $200 | $200 | $200 |
| (-) Amounts Paid to GO CVI in Fiscal Year | | | (136) | (50) |
| Annual GO CVI Carryforward Amount[5] | | | $64 | $150 |
| GO CVI Carryforward Balance (Beginning) | | | $–  [6] | $64 |
| (+) Annual GO CVI Carryforward Amount[5] | | | 64 | 150 |
| GO CVI Carryforward Balance (Ending) | | | $64 | $214 |
| GO CVI Annual Cap (Pre-Application of GO CVI Carryforward Balance) | | $200 | $200 | $200 |
| (+) GO CVI Carryforward Balance (Beginning) | | | – | 64 |
| GO CVI Maximum Annual Payment (Pre-$400mm Cap) | | | $200 | $264 |
| *GO CVI Maximum Annual Payment calculated as the Lesser of:* | | | | |
| (i) GO CVI Maximum Annual Payment (Pre-$400mm Cap) | | | $200 | $264 |
| (ii) $400mm Annual Payment Cap | | $400 | 400 | 400 |
| **GO CVI Maximum Annual Payment[7]** | H | | **$200** | **$264** |
| **Step 3: GO CVI Annual Payment Amount[2]** | | | | |
| *GO CVI Payment calculated as the Lesser of:* | | | | |
| (i) GO CVI Annual Payment Amount Before Caps[3] | F | | $136 | $50 |
| (ii) GO CVI Maximum Annual Payment[7] | H | $200 | 200 | 264 |
| (iii) Remaining GO CVI Lifetime Cap (Beginning) | | $3,500 | 3,500 | 3,364 |
| **GO CVI Annual Payment Amount** | | | **$136** | **$50** |
| **Remaining GO CVI Lifetime Cap** | | | | |
| Remaining GO CVI Lifetime Cap (Beginning) | | $3,500 | $3,500 | $3,364 |
| (-) GO CVI Annual Payment Amount | | | (136) | (50) |
| **Remaining GO CVI Lifetime Cap (Ending)** | | | **$3,364** | **$3,314** |
| Memo: Incremental Amounts Available to Subject to Waterfall Clawback CVI[8] | | | $– | $– |

(1) For FY21, Actual FY21 5.5% SUT Collections. For FY22, illustratively assumes $100 million annual outperformance.

(2) Less cumulative payments previously made to GO CVI and Subject to Waterfall Clawback CVI.

(3) GO CVI Annual Payment Amount subject to both GO CVI Maximum Annual Payment and Remaining GO CVI Lifetime Cap.

(4) Clawback CVI Annual Subject to Waterfall Payment Amount, together with Not Subject to Waterfall Clawback CVI Annual Payment Amount, subject to both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap.

(5) Calculated as the difference between $200 million and payments, if any, made to the GO CVI in the Fiscal Year.

(6) Set at $0 at the beginning of year 1.

(7) GO CVI Maximum Annual Payment calculated as the sum of (i) $200 million and (ii) GO CVI Carryforward Balance (Beginning), subject to the GO CVI Maximum Annual Payment not being greater than $400 million.

(8) To the extent the GO CVI Lifetime Cap is met in year 21 or prior, 100% of Subject to Waterfall Outperformance Amount accrues to Clawback CVI in the following year, subject to applicable Clawback CVI Maximum Annual Mandatory Redemption Payment and Clawback CVI Lifetime Cap.

($ in millions)

| | | | FY21 | FY22 |
|---|---|---|---|---|
| **CLAWBACK CVI** | | | | |
| Outperformance Amount | | | $302 | $100 |
| **Cumulative Outperformance** | | | **$302** | **$402** |
| (x) 40% Sharing of Cumulative Outperformance | | 40% | 40% | 40% |
| **40% of Cumulative Outperformance** | | | **$121** | **$161** |
| (-) Cumulative Payments to Not Subject to Waterfall Clawback CVI | | | – | (121) |
| **40% of Cumulative Outperformance Less Payments to Not Subject to Waterfall Clawback CVI** | | | **$121** | **$40** |
| **Clawback CVI Mandatory Redemption Payments** | | | | |
| **Step 1: Not Subject to Waterfall Outperformance Amount** | | | | |
| *Not Subject to Waterfall Outperformance Amount calculated as the Lesser of:* | | | | |
| (i) 40% Cumulative Outperformance[1] | | 40.0% | $121 | $40 |
| (ii) 95% Annual Outperformance[2] | | 95.0% | 136 | 45 |
| **Not Subject to Waterfall Outperformance Amount[3]** | I | | **$121** | **$40** |
| | | | | |
| **Step 2: Clawback CVI Maximum Annual Payment** | | | | |
| Clawback CVI Annual Cap[4] | | | $175 | $175 |
| (-) Amounts Paid to Clawback CVI in Fiscal Year[5] | | | (136) | (40) |
| Clawback CVI Carryforward Amount | | | $39 | $135 |
| | | | | |
| Clawback CVI Carryforward Balance (Beginning) | | | $– [6] | $39 |
| (+) Annual Clawback CVI Carryforward Amount | | | 39 | 135 |
| Clawback CVI Carryforward Balance (Ending) | | | $39 | $174 |
| | | | | |
| Clawback CVI Annual Cap (Pre-Application of Clawback CVI Carryforward Balance) | | | $175 | $175 |
| (+) Annual Clawback CVI Carryforward Balance (Beginning) | | | – | 39 |
| Clawback CVI Maximum Annual Payment (Pre-Aggregate Annual Cap) | | | $175 | $214 |
| | | | | |
| *Clawback CVI Maximum Annual Payment calculated as the Lesser of:* | | | | |
| (i) Clawback CVI Maximum Annual Payment (Pre-Aggregate Annual Cap) | | | $175 | $214 |
| (ii) Clawback CVI Maximum Annual Payment incl. Use of Clawback CVI Carryforward Balance | | 2.0x [7] | 350 | 350 |
| **Clawback CVI Maximum Annual Payment[7]** | J[8] | | **$175** | **$214** |
| | | | | |
| **Step 3: Aggregate Clawback CVI Annual Payment Amount (Prior to Application of Remaining Clawback CVI Lifetime Cap)** | | | | |
| Clawback CVI Annual Subject to Waterfall Payment Amount Before Application of Clawback CVI Lifetime Cap and Clawback CVI Annual Cap | G | | $15 | $– |
| (+) Not Subject to Waterfall Outperformance Amount | I | | 121 | 40 |
| Aggregate Clawback CVI Annual Payment Before Caps | K | | $136 | $40 |
| | | | | |
| *Clawback CVI Annual Payment Amount (Prior to Application of Remaining Clawback CVI Lifetime Cap) calculated as the Lesser of:* | | | | |
| (i) Aggregate Clawback CVI Annual Payment Amount Before Caps | K | | $136 | $40 |
| (ii) Clawback CVI Maximum Annual Payment[7] | J[8] | | 175 | 214 |
| **Clawback CVI Annual Payment Amount (Prior to Application of Lifetime Cap)** | | | **$136** | **$40** |
| | | | | |
| **Step 4: Clawback CVI Annual Payment Amounts by Clawback Claim (Post Application of Remaining Clawback CVI Lifetime Caps)** | | | | |
| *Clawback CVI Annual Payment Amount to CW/HTA Claims calculated as the Lesser of:* | | | | |
| (i) CW/HTA Allocation of Clawback CVI Annual Payment Amount (Pre-Lifetime Cap) | | 68.6% | $93 | $27 |
| (ii) CW/HTA Claims Remaining Clawback CVI Lifetime Cap | | $3,698 | 3,698 | 3,604 |
| **Clawback CVI Annual Payment Amount to Allowed CW/HTA Claims[9]** | | | **$93** | **$27** |
| | | | | |
| *Clawback CVI Annual Payment Amount to CW/PRIFA Rum Tax Claims calculated as the Lesser of:* | | | | |
| (i) CW/PRIFA Rum Tax Allocation of Clawback CVI Annual Payment Amount (Pre-Lifetime Cap) | | 27.0% | $37 | $11 |
| (ii) CW/PRIFA Rum Tax Claims Remaining Clawback CVI Lifetime Cap | | $1,302 | 1,302 | 1,265 |
| **Clawback CVI Annual Payment Amount to Allowed CW/PRIFA Rum Tax Claims** | | | **$37** | **$11** |
| | | | | |
| *Clawback CVI Annual Payment Amount to CW/Convention Center Claims calculated as the Lesser of:* | | | | |
| (i) CW/Convention Center Allocation of Clawback CVI Annual Payment Amount (Pre-Lifetime Cap) | | 4.0% | $5 | $2 |
| (ii) CW/Convention Center Claims Remaining Clawback CVI Lifetime Cap | | $217 | 217 | 212 |
| **Clawback CVI Annual Payment Amount to Allowed CW/Convention Center Claims** | | | **$5** | **$2** |
| | | | | |
| **Clawback CVI Annual Payment Amount (Post Application of Lifetime Cap)[10]** | | | **$135** | **$40** |
| | | | | |
| Memo: GO CVI Annual Payment Amount + Clawback CVI Annual Subject to Waterfall Payment Amount | | | $151 | $50 |
| Memo: Clawback CVI Annual Not Subject to Waterfall Payment Amount | | | 121 | 40 |

(1) Less cumulative payments previously made to Not Subject to Waterfall Clawback CVI.

(2) 95% of Outperformance Amount, less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year.

(3) Not Subject to Waterfall Clawback CVI Payment, together with Subject to Waterfall Clawback CVI Payment, are subject to both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap.

(4) For years 1-22, $175 million. For years 23-30, $375 million.

(5) Includes payments, if any, made to both (i) the Subject to Waterfall Clawback CVI in the Fiscal Year and (ii) the Not Subject to Waterfall Clawback CVI in the Fiscal Year.

(6) Set at $0 at the beginning of year 1.

(7) For years 1-22, Clawback CVI Maximum Annual Payment calculated as the sum of (i) $175 million and (ii) Clawback CVI Carryforward Balance (Beginning), subject to the Clawback CVI Maximum Annual Payment not being greater than $350 million. For years 23-30, Clawback CVI Maximum Annual Payment calculated as the sum of (i) $375 million and (ii) Clawback CVI Carryforward Balance (Beginning), subject to the Clawback CVI Maximum Annual Payment not being greater than $750 million.

(8) To the extent the GO CVI Lifetime Cap is met in year 21 or prior, $375 million annual payment cap (excluding Clawback CVI Carryforward Balance) up to $750 million annual payment cap (excluding Clawback CVI Carryforward Balance) will begin to apply in the following year.

(9) Subject to priority distribution waterfall among Allowed CW/HTA Claims. See following page.

(10) Excludes payments on account of 0.4% of Clawback CVI due to CW/MBA Allocation of Clawback CVI treated as a Deemed Paid CVIs Payment.

*($ in millions)*

| | FY21 | FY22 |
|---|---|---|
| **PRIORITY DISTRIBUTION WATERFALL FROM CLAWBACK CVI ALLOCATION TO ALLOWED CW/HTA CLAIMS** | | |
| **Clawback CVI Payment to Allowed CW/HTA Claims** | **$93** | **$27** |
| | | |
| *HTA 68 Bond Claims* | | |
| Maximum Payments to HTA 68 Bond Claims | 179 | 86 |
| **Payments to HTA 68 Bond Claims** | **$93** | **$27** |
| | | |
| Remaining Available Clawback CVI Payment to Allowed CW/HTA Claims | $– | $– |
| | | |
| *HTA 98 Senior Bond Claims* | | |
| Maximum Payments to HTA 98 Senior Bond Claims | 1,833 | 1,833 |
| **Payments to HTA 98 Senior Bond Claims** | **$–** | **$–** |
| | | |
| Remaining Available Clawback CVI Payment to Allowed CW/HTA Claims | $– | $– |
| | | |
| *HTA 98 Sub Bond Claims* | | |
| Maximum Payments to HTA 98 Sub Bond Claims | 207 | 207 |
| **Payments to HTA 98 Sub Bond Claims** | **$–** | **$–** |
| | | |
| Remaining Available Clawback CVI Payment to Allowed CW/HTA Claims | $– | $– |
| | | |
| *GDB HTA Loans* | | |
| Maximum Payments to GDB HTA Loans | 1,478 | 1,478 |
| **Payments to GDB HTA Loans** | **$–** | **$–** |

Boxed values alongside rows: $179, $1,833, $207, $1,478.

**Attachment 9**

**Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount**

*($ in millions)*

| | | | FY21 |
|---|---|---|---|
| **Rum Tax CVI Payments** | | | |
| Waterfall General Fund Rum Tax Collections (Illustrative, see below)[1] | | JJ | $236 |
| (-) Rum Tax Outperformance Metric, per 2021 Certified Fiscal Plan | | | (214) |
| **Rum Tax Outperformance Condition amount** | | | **$22** |
| **Cumulative Outperformance relative to Outperformance Metric** | | | **$22** |
| (x) 40% Sharing | | 40% | 40% |
| **40% of Cumulative Outperformance** | | | **$9** |
| (-) Cumulative Rum Tax CVI Annual Payment Amounts | | | – |
| **40% of Cumulative Outperformance Less Cumulative Rum Tax CVI Annual Payment Amounts** | | | **$9** |
| **PRIFA Rum Tax Clawback CVI** | | | |
| *Pre-Cap Rum Tax CVI Amount Calculated as the Lesser of:* | | | |
| (i) 40% Cumulative Outperformance Less Payments to Rum Tax CVI | | 40% | $9 |
| (ii) 50% Annual Outperformance | | 50% | 11 |
| (ii) $30 million | | $30 | 30 |
| **Rum Tax CVI Annual Payment Amount (Pre-PRIFA Clawback CVI Lifetime Cap)** | | | **$9** |
| **Payments Prior to Application of PRIFA CVI Lifetime Cap** | | | |
| Clawback CVI Annual Payment Amount to Allowed CW/PRIFA Rum Tax Claims[2] | W | | $37 |
| Rum Tax CVI Annual Payment Amount Pre-PRIFA Clawback CVI Lifetime Cap | X | | 9 |
| CVI Payments Prior to Application of PRIFA Clawback CVI Lifetime Cap | | | $46 |
| **PRIFA CVI Lifetime Cap Application** | | | |
| Beginning PRIFA Clawback CVI Lifetime Cap | Y | $1,302 | $1,302 |
| (-) PRIFA Clawback CVI Payments to Allowed CW/PRIFA Rum Tax Claims | | | (46) |
| Ending PRIFA Clawback CVI Lifetime Cap | | | $1,256 |
| **Payments Following Application of PRIFA CVI Lifetime Cap** | | | |
| Clawback CVI Payments to Allowed CW/PRIFA Rum Tax Claims | Min. of W & Y = Z | | $37 |
| (+) Rum Tax CVI Annual Payment Amount | Min. of X & Y-Z | | 9 |
| **PRIFA Clawback CVI Payments Following Application of PRIFA CVI Lifetime Cap** | | | **$46** |

(1) See below for further detail regarding calculation of Waterfall General Fund Rum Tax Collections Supplemental Cover Over at $2.75/proof-gallon.
(2) Please reference Attachment 8.

*($ in millions)*

| Rum Tax Waterfall (Baseline / Outperformance Metric)[1] | | FY21 |
|---|---|---|
| | **Item** | |
| Total Projected Commonwealth Rum Tax Revenues per 2021 Certified Fiscal Plan | A | $425 |
| General Fund | B | (117) |
| Remaining | | $308 |
| Science and Technology Trust | C | (5) |
| Remaining | | $303 |
| Rum Producer Incentive Payments | D | (139) |
| *Rum Producer Incentive Payments Percentage[2]* | *46%* | *46%* |
| Remaining | | $164 |
| General Fund | E | (48) |
| Remaining | | $116 |
| Conservation Trust | F | (15) |
| Remaining | | $101 |
| PRIDCO | G | (5)[3] |
| Remaining | | $96 |
| Rum Producer Incentive Payments | H | (44) |
| *Rum Producer Incentive Payments Percentage[2]* | *46%* | *46%* |
| Remaining | | $52 |
| General Fund | I | (52) |
| Remaining | | – |
| **Outperformance Metric, per 2021 Certified Fiscal Plan** | B+E+I = J | **$217** |

Note: Calculation of various deductions within waterfall described in Annex 1 of Exhibit M of Modified Eighth Amended Plan of Adjustment.
(1) Based on FY21 Actuals.
(2) Subject to the following constraints: (i) for the first 10 fiscal years (i.e. FY2022-2031), maximum of 46%; (ii) for the next 5 years (i.e. FY2032-2036), maximum of 48%; (iii) for the following 15 fiscal years (i.e. FY2037-2051), maximum of 50%.
(3) Assumes lesser of (i) $5mm and (ii) 2.5% multiplied by Commonwealth Rum Tax Revenues, per waterfall described in Annex 1 of Exhibit M of Modified Eighth Amended of Adjustment. FY21 budgeted amount was $10mm.

($ in millions)                                                                                          **FY21**

### Illustrative FY21 Rum Tax Waterfall (Adjusted for Extension of Supplemental Cover Over at $2.75/proof-gallon)[1]

|  | Item |  |
|---|---|---|
| Waterfall Cover Over Revenues[1] | AA | $496 |
| General Fund | BB | (117) |
| Remaining |  | $379 |
| Science and Technology Trust | CC | (5) |
| Remaining |  | $374 |
| Rum Producer Incentive Payments | DD | (172) |
| *Rum Producer Incentive Payments Percentage[2]* | *46%* | *46%* |
| Remaining |  | $202 |
| General Fund | EE | (48) |
| Remaining |  | $154 |
| Conservation Trust | FF | (18) |
| Remaining |  | $136 |
| PRIDCO | GG | (5) |
| Remaining |  | $131 |
| Rum Producer Incentive Payments | HH | (60) |
| *Rum Producer Incentive Payments Percentage[2]* | *46%* | *46%* |
| Remaining |  | $71 |
| General Fund | II | (71) |
| Remaining |  | – |
| **Waterfall General Fund Rum Tax Collections (Illustrative)[1]** | **AA - CC - DD- FF - GG - HH = JJ** | **$236** |

### Waterfall General Fund Rum Tax Collections (Including Illustrative Application of $88mm Cap on Supplemental Cover Over Revenues)[1]

| | | |
|---|---|---|
| **Total Cover Over** | | |
| Supplemental Cover Over | | $2.75 |
| Base Cover Over | | 10.50 |
| Total Cover Over ($/proof-gallon) | | $13.25 |
| *Memo: Ratio of Supplemental Cover Over to Total Cover Over ($/proof-gallon)* | | *21%* |
| *Memo: Ratio of Base Cover Over to Total Cover Over ($/proof-gallon)* | | *79%* |
| **Supplemental Cover Over Revenues** *(Prior to Application of Supplemental Cover Over Revenues Cap)* Calculated as: | | |
| Commonwealth Rum Tax Revenues[3] | | $515 |
| (x) Ratio of Supplemental Cover Over to Total Cover Over ($/proof-gallon) | | 21% |
| Supplemental Cover Over Revenues *(Prior to Application of Supplemental Cover Over Revenues Cap)* | | $107 |
| **Waterfall Supplemental Cover Over Revenues Calculated as the Lesser of:** | | |
| Supplemental Cover Over Revenues *(Prior to Application of Supplemental Cover Over Revenues Cap)* | | $107 |
| Supplemental Cover Over Revenues Cap | $88 | 88 |
| Waterfall Supplemental Cover Over Revenues | | $88 |
| **Base Cover Over Revenues Calculated as:** | | |
| Commonwealth Rum Tax Revenues | | $515 |
| (x) Ratio of Base Cover Over to Total Cover Over ($/proof-gallon) | | 79% |
| Base Cover Over Revenues | | $408 |
| **Waterfall Cover Over Revenues** | | |
| Waterfall Supplemental Cover Over Revenues | | $88 |
| Base Cover Over Revenues | | 408 |
| Waterfall Cover Over Revenues | AA | $496 |
| **Permitted Rum Tax Waterfall Deductions** | | |
| Science and Technology Trust | CC | $5 |
| Rum Tax Producer Incentive Payments | DD | 172 |
| Conservation Trust | FF | 18 |
| PRIDCO | GG | 5 |
| Rum Producers | HH | 60 |
| **Permitted Rum Tax Waterfall Deductions** | **KK** | **$260** |
| **Waterfall General Fund Rum Tax Collections Calculated as:** | | |
| Waterfall Cover Over Revenues | AA | $496 |
| (-) Permitted Rum Tax Waterfall Deductions | KK | (260) |
| **Waterfall General Fund Rum Tax Collections** | **JJ** | **$236** |

Note: Calculation of various deductions within waterfall described in Annex 1 of Exhibit M of Modified Eighth Amended Plan of Adjustment.

(1) Assumes application of $88mm cap, illustratively applied to Supplemental Cover Over Revenues for purposes of demonstrating mechanics of cap.

(2) Subject to the following constraints: (i) for the first 10 fiscal years (i.e. FY2022-2031), maximum of 46%; (ii) for the next 5 fiscal years (i.e. FY2032-2036), maximum of 48%; (iii) for the following 15 fiscal years (i.e. FY2037-2051), maximum of 50%.

(3) FY21 actual collections.

**Attachment 10**

**Form of Reporting Agreement**

## REPORTING AGREEMENT

(*Commonwealth of Puerto Rico
Contingent Value Instruments*)

This Reporting Agreement (the "<u>Agreement</u>") is executed and delivered by the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") as of March 15, 2022 (the "<u>Effective Date</u>") in connection with the issuance of its $8,716,422,674.00 aggregate nominal amount of contingent value instruments issued as notes of the Commonwealth (the "<u>CVIs</u>"), pursuant to the terms of the Trust Agreement (as defined herein).

### Section 1.   Definitions.

Capitalized terms not otherwise defined herein shall have the same meanings ascribed thereto in the Trust Agreement.

*"Agreement"* has the meaning set forth in the preamble.

*"Annual Report"* means the report provided by the Commonwealth pursuant to and as specified in Sections 3(b), 3(c) and 4 hereof.

*"Catch Up Period"* means the period between the Effective Date and the earlier of (i) the last day of the Fiscal Year in which audited financial statements for all prior Fiscal Years of the Commonwealth have been completed and made available and (ii) June 30, 2023.

*"Commonwealth"* has the meaning set forth in the preamble.

*"CVIs"* has the meaning set forth in the preamble.

*"Dissemination Agent"* means the Puerto Rico Fiscal Agency and Financial Advisory Authority, acting in its capacity as Dissemination Agent hereunder, or any successor Dissemination Agent designated in writing by the Commonwealth and which has filed with the Commonwealth a written acceptance of such designation.

*"Effective Date"* has the meaning set forth in the preamble.

*"EMMA System"* means the MSRB's Electronic Municipal Market Access system or any successor nationally recognized municipal securities information repository.

"*Financial Obligation*" means (i) a debt obligation (including a contingent value instrument); (ii) derivative instrument entered into in connection with, or pledged as a security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii).  The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB.

*"Fiscal Year"* means the twelve-month period at the end of which the financial position of the Commonwealth and results of its operation for such period are determined. Currently, the Commonwealth's Fiscal Year begins July 1 and continues through June 30 of the next year.

*"Holder"* means any registered owner of CVIs and any beneficial owner of CVIs within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

*"Listed Events"* means any of the events listed in Section 5(a) hereof.

"*MSRB*" means the Municipal Securities Rulemaking Board established in accordance with the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

"*PR Treasury*" means the Department of Treasury of the Commonwealth.

"*Trust Agreement*" means the Trust Agreement related to the CVIs, as may be amended and supplemented from time to time, dated as of March 15, 2022, by and between the Commonwealth and the Trustee.

"*Trustee*" means The Bank of New York Mellon, as trustee under the Trust Agreement.

"*US Treasury*" means the United States Department of Treasury.

**Section 2.   Purpose of the Agreement.** This Agreement is being executed and delivered by the Commonwealth for the benefit of the Holders of the CVIs and the Trustee, on behalf of the Holders.

**Section 3.   Provision of Annual Audited Financial Statements and Annual Report.**

(a)   During the Catch Up Period, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the audited financial statements of the Commonwealth, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units, promptly upon such audited financial statements being available.

(b)   Not later than 180 days following the date on which the audited financial statements for the Fiscal Year ending June 30, 2022 are provided to the MSRB through the EMMA System pursuant to (a) above, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating the Fiscal Year ending June 30, 2022 that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(c)   After the Catch Up Period, not later than 305 days following the end of each Fiscal Year, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating to the immediately preceding Fiscal Year (commencing with the Annual Report for the last Fiscal Year of the Catch Up Period) that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(d)   If in any Fiscal Year, the Commonwealth does not provide the Annual Report to the MSRB by the time specified in subsections (b) or (c) above, the Commonwealth shall, in each case, instead file, or shall cause the Dissemination Agent to file, a notice, substantially in the form of Exhibit A, to the MSRB through the EMMA System stating that the Annual Report has not been timely completed and, if known, stating the date by which the Commonwealth expects to file the Annual Report. For the avoidance of doubt, provision of the notice described in this Section 3(d) will not satisfy the Commonwealth's obligation to file the Annual Reports required by Section 3(b) and 3(c).

**Section 4.   Content of Annual Report.**

The Annual Report shall contain or incorporate by reference the following:

(a)    the audited financial statements of the Commonwealth for the prior Fiscal Year, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units;

(b)    a summary of the Commonwealth's budget for the corresponding Fiscal Year;

(c)    other material information related to the Commonwealth's economy, revenues, expenditures, indebtedness, and pending litigation, in each case, to the extent not included in the Commonwealth's audited financial statements;

(d)    illustrative calculations of the Comprehensive Cap and the limitation on the incurrence of public debt established in Article VI, Section 2 of the Constitution of the Commonwealth of Puerto Rico; and

(e)    such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

**Section 5.   Reporting of Listed Events.**

(a)    The Commonwealth shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the CVIs not later than ten (10) business days after the occurrence of the event:

1.   Principal and interest payment delinquencies;

2.   Non-payment related defaults, if material;

3.   Unscheduled draws on debt service reserves reflecting financial difficulties;

4.   Unscheduled draws on credit enhancements reflecting financial difficulties;

5.   Substitution of credit or liquidity providers, or their failure to perform;

6.   Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the CVIs, or other material events affecting the tax status of the CVIs;

7.   Modifications to rights of Holders of CVIs, if material;

8.   Bond calls, if material, and tender offers;

9.   Defeasances;

10.   Release, substitution, or sale of property securing repayment of the CVIs, if material;

11.   Rating changes;

3

12. Bankruptcy, insolvency, receivership or similar event of the Commonwealth; or

13. The consummation of a merger, consolidation, or acquisition involving the Commonwealth or the sale of all or substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

14. The appointment of a successor or additional trustee or the change of name of a trustee, if material;

15. Incurrence of a Financial Obligation of the Commonwealth, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the Commonwealth, any of which affect security holders, if material; and

16. The default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Commonwealth, any of which reflect financial difficulties.

**Note:** For purposes of the event identified in subparagraph (1), the event is considered to occur if, following the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the CVIs the amounts due and payable under the Trust Agreement by the CVIs Annual Payment Date or any applicable extraordinary redemption date. For the purposes of the event identified in subparagraph (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Commonwealth in a proceeding under the U.S. Bankruptcy Code, PROMESA (or a successor thereof) or in any other proceeding under state, Commonwealth or federal law in which a court (including, but not limited to, the Title III Court) or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Commonwealth, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court (including, but not limited to, the Title III Court) or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Commonwealth, other than in connection with the filing of the Plan with the Title III Court and approval of the Plan by the Title III Court or the retention of jurisdiction by the Title III Court in connection with the Plan.

(b) The Commonwealth shall, within ten (10) business days of occurrence of a Listed Event, file a notice of such occurrence with the MSRB through the EMMA System in electronic format, accompanied by such identifying information as is prescribed by the MSRB. Notwithstanding the foregoing, the Listed Events in subsections (a)(3), (4), and (5) of this Section 5 are not applicable to the CVIs. For the avoidance of doubt, subsection (a)(3) of this Section 5 is not intended to permit withdrawals from the CVIs Payment Fund or any other fund or account except as contemplated by the Trust Agreement. Moreover, notice of the Listed Event described in subsection (a)(8) of this Section 5 need not be given (i) in the event of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in the Trust Agreement or the corresponding Supplemental Trust Agreement, the only open issue is which CVIs will be redeemed in the case of a partial redemption, and the notice of redemption is given to the Holders as required pursuant to Securities Exchange Act of 1934 Release No. 34-23856, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of CVIs or (ii) any earlier than the notice (if any) of the underlying event is given to Holders of affected CVIs pursuant to the Trust Agreement.

4

**Section 6.   Reporting on Outperformance Metrics**

(a)      The Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the following reports within the time frames set forth below:

1.    no later than the 15th day of the second month following the end of each calendar month (other than the last calendar month of a Fiscal Year), a report setting forth the 5.5% SUT or  the Substitute Measured Tax, as applicable, collected by the PR Treasury during such month;

2.    no later than the 15th day of the second month following the end of each Fiscal Year, a report setting forth the 5.5% SUT or the Substitute Measured Tax, as applicable, collected by the PR Treasury during such Fiscal Year and the Measured SUT for such Fiscal Year;

3.    no later than the 15th day of the second month following the end of each calendar month (other than the last calendar month of a Fiscal Year), a report setting forth the Commonwealth Rum Tax Revenues received by the PR Treasury from the US Treasury during such month; and

4.    no later than the 15th day of the second month following the end of each Fiscal Year, a report setting forth the Commonwealth Rum Tax Revenues received by the PR Treasury from the US Treasury during such Fiscal Year and the Waterfall General Fund Rum Tax Collections for such Fiscal Year.

(b)      Anything herein to the contrary notwithstanding, the Commonwealth shall not be required to provide the reports required by subsections (a)(3) and (4) above earlier than five (5) business days following the receipt by the PR Treasury from the US Treasury of the monthly detailed activity report of net excise taxes due to the Commonwealth or any equivalent documentation of such collections for the corresponding calendar month or Fiscal Year.

**Section 7.   Remedies.** If the Commonwealth shall fail to comply with any provision of this Agreement, then the Trustee or any Holder may enforce, for the equal benefit and protection of all Holders similarly situated, by mandamus or other suit or proceeding in law or in equity, this Agreement against the Commonwealth and any of the officers, agents and employees of the Commonwealth, and may compel the Commonwealth or any such officers, agents or employees to perform and carry out their duties under this Agreement; provided that the sole and exclusive remedy for breach of this Agreement shall be an action to compel specific performance of the obligations of the Commonwealth hereunder and no person or entity shall be entitled to recover monetary damages hereunder under any circumstances, and, provided further, that any challenge to the adequacy of any information provided pursuant to Section 3, 4 or 5 hereof may be brought only by the Holders holding a Quarter in Interest of the CVIs at the time outstanding or the Trustee as directed in writing by the Holders of such amount of CVIs. Provided; however, neither the Trustee nor such Holders may institute any suit, action or proceeding at law or in equity for the enforcement of this Agreement or for any remedy for breach thereof, unless such Trustee or Holders, as the case may be, shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have failed to comply within a reasonable time (and in no event in excess of 60 days after such request). Any action shall be instituted in the Title III Court and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in

Puerto Rico and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, a court of Commonwealth of Puerto Rico located in the Municipality of San Juan, Puerto Rico or any appellate court therefrom. A failure by the Commonwealth to comply with the provisions of this Agreement shall not constitute an event of default under the Trust Agreement or any other applicable resolution, trust agreement, indenture or other debt authorization of the Commonwealth.

**Section 8.   Dissemination Agent.** The Commonwealth may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Agreement and may discharge any such agent, with or without appointing a successor Dissemination Agent. If at any time there is not any other designated Dissemination Agent, the Commonwealth shall be the Dissemination Agent.

**Section 9.   Parties in Interest.** This Agreement is executed and delivered solely for the benefit of the Holders and the Trustee on behalf of such Holders under the Trust Agreement. No other person shall have any right to enforce the provisions hereof or any other rights hereunder.

**Section 10.  Amendment.** Without the consent of any Holders of CVIs, the Commonwealth at any time and from time to time may enter into any amendments or changes to this Agreement for any of the following purposes:

(a)     to add a dissemination agent for the information required to be provided hereby and to make any necessary or desirable provisions with respect thereto;

(b)     to add to the covenants of the Commonwealth for the benefit of the Holders, or to surrender any right or power herein conferred upon the Commonwealth; or

(c)     to modify the contents, presentation and format of the Annual Report from time to time as a result of a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of the Commonwealth.

**Section 11.   Additional Information.** Nothing in this Agreement shall be deemed to prevent the Commonwealth from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Report, in addition to that which is required by this Agreement. If the Commonwealth chooses to include any information in any Annual Report not specifically required by this Agreement, the Commonwealth shall not have any obligation under this Agreement to update such information, and the Commonwealth shall have no obligation to include it in any future Annual Report.

**Section 12.   Termination of Obligation.** This Agreement shall remain in full force and effect until the later of the Clawback CVI Final Maturity Date and the GO CVI Final Maturity Date, or any earlier date on which all CVIs shall have been legally defeased pursuant to the Trust Agreement. Upon any such legal defeasance, the Commonwealth shall provide notice of such defeasance to the EMMA System. Such notice shall state whether the CVIs have been defeased to maturity or to redemption and the timing of such maturity or redemption.

**Section 13.   Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO DETERMINED WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

[Remainder of page intentionally left blank]

6

IN WITNESS WHEREOF, the undersigned has executed this Reporting Agreement on the date first written above.

**COMMONWEALTH OF PUERTO RICO**

By: _____
Name: ███████████████
Title: ██████████

**REPORTING AGREEMENT**
**EXHIBIT A**

FORM OF NOTICE TO THE MUNICIPAL SECURITIES RULEMAKING BOARD
OF FAILURE TO FILE ANNUAL REPORT

Name of Issuer:               Commonwealth of Puerto Rico
Name of Bond Issue:           Commonwealth of Puerto Rico, Contingent Value Instruments
Date of Issuance:             March 15, 2022

NOTICE IS HEREBY GIVEN that the Issuer has not provided the Annual Report for fiscal year
[_____] as required by Section 3(b) or 3(c) of the Reporting Agreement of the Issuer, dated the Date of
Issuance. [The Issuer anticipates that the Annual Report for fiscal year [_____] will be filed by
_____.]

Dated:

                              COMMONWEALTH OF PUERTO RICO


                              By:  [to be signed only if filed]

**Attachment 11**

**Form of Initial Calculation Agent Agreement**

CALCULATION AGENT AGREEMENT


DATED AS OF MARCH 15, 2022


AMONG


COMMONWEALTH OF PUERTO RICO,


THE BANK OF NEW YORK MELLON, AS TRUSTEE


AND


ALIXPARTNERS, LLP, AS CALCULATION AGENT

# **TABLE OF CONTENTS**

**Page**

PART 1 - Definitions and Common Provisions ................................................................... 1

    Section 101.    Definitions ................................................................................ 1
    Section 102.    Appointment of the Calculation Agent ..................................... 7
    Section 103.    Rules of Construction .............................................................. 7

PART 2 - CVIs .................................................................................................................. 7

    Section 201.    Duties of Calculation Agent With Respect to CVIs .................. 7
    Section 202.    Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and Supporting Information ............................... 9
    Section 203.    Calculation of Subject to Waterfall Outperformance Amount and Annual Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum Tax CVI Annual Payment Amount ...................................................... 12
    Section 204.    Challenges to Determinations and Calculations of Amounts ............................. 13

PART 3 - EVENTS OF DEFAULT AND REMEDIES ......................................................... 15

    Section 301.    Events of Default ..................................................................... 15
    Section 302.    Enforcement of Remedies ....................................................... 15
    Section 303.    Remedies Not Exclusive ......................................................... 16

PART 4 - MISCELLANEOUS ........................................................................................... 16

    Section 401.    Limits of Trustee's and Calculation Agent's Responsibility .............................. 16
    Section 402.    Indemnification of Calculation Agent ...................................... 18
    Section 403.    Term of Agreement; Termination ............................................ 18
    Section 404.    Fees and Expenses .................................................................. 19
    Section 405.    Notices .................................................................................... 19
    Section 406.    Entire Agreement; Trustee shall be entitled to enforce Agreement ................... 20
    Section 407.    Amendment .............................................................................. 20
    Section 408.    Assignment; Successors and Assigns ....................................... 20
    Section 409.    Execution, Delivery and Performance by Calculation Agent ............................ 21
    Section 410.    Governing Law ........................................................................ 21
    Section 411.    Retention of Jurisdiction of Title III Court ............................... 21
    Section 412.    Severability of Invalid Provision ............................................. 21
    Section 413.    Parties of Interest .................................................................... 22
    Section 414.    Headings ................................................................................. 22
    Section 415.    Force Majeure ......................................................................... 22
    Section 416.    Signatures and Counterparts .................................................... 22

CALCULATION AGENT AGREEMENT

This CALCULATION AGENT AGREEMENT (this "Calculation Agent Agreement" or this "Agreement") made this 15th day of March, 2022, by and among the Commonwealth of Puerto Rico (together with any successors thereto, the "Commonwealth"), The Bank of New York Mellon, as Trustee (the "Trustee") under the Trust Agreement as herein defined, and AlixPartners, LLP, as calculation agent hereunder and under the Trust Agreement (the "Calculation Agent").

W I T N E S S E T H:

WHEREAS, the Commonwealth and the Trustee have entered into a Trust Agreement, dated as of March 15, 2022 (the "Trust Agreement"), pursuant to which the Commonwealth has provided for the issuance of two Series of Notes – the GO CVIs and the Clawback CVIs (each as defined herein);

WHEREAS, the GO CVIs are being issued under the Trust Agreement in one Series relating to certain Allowed Claims (as defined in the Trust Agreement), as listed in Attachment 3 to the Trust Agreement; and

WHEREAS, the Clawback CVIs are being issued under the Trust Agreement in three Subseries relating to certain Allowed Claims, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS, within the Subseries of the Clawback CVIs related to the Allowed CW/HTA Claims, there are being issued four Sub-Subseries to reflect a priority of payments, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS, on or prior to each CVIs Outperformance Condition Determination Date (as defined herein), the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition (each as defined herein) shall have occurred in the prior Fiscal Year; and

WHEREAS, following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Commonwealth is obligated, depending upon whether either or both of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition have occurred, to provide for the calculation of certain amounts under the Trust Agreement that are to be paid to the Holders of the GO CVIs and/or the Clawback CVIs;

WHEREAS, the Commonwealth desires to retain the Calculation Agent to make the determinations and calculations referred to above, and the Calculation Agent is willing to perform such services, subject to and in accordance with the provisions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## PART 1 - DEFINITIONS AND COMMON PROVISIONS

Section 101.    **Definitions**

Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed thereto in the Trust Agreement.

"5.5% SUT" means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%). In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 of the Trust Agreement, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

"5.5% SUT Baseline" reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 to the Trust Agreement. Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall cause the Calculation Agent to prepare a revised Attachment 1 and the Commonwealth will then substitute a revised Attachment 1 to the Trust Agreement for the then applicable Attachment 1 as provided herein and in the Trust Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1 to the Trust Agreement.

"5.5% SUT Projections" has the meaning given to such term in Section 202(d) hereof.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"Annual Waterfall Payment" has the meaning ascribed thereto in the Trust Agreement.

"Authorized Officer of the Commonwealth" means the Secretary of Treasury and his or her designees.

"Baseline SUT Reduction" has the meaning ascribed thereto in the Trust Agreement.

"Business Day" has the meaning ascribed thereto in the Trust Agreement.

"Calculation Agent" means the Person serving in such capacity under the Calculation Agent Agreement from time to time. The Calculation Agent must be an Independent Consultant for all purposes of this Calculation Agent Agreement and the Trust Agreement.

"Calculation Agent Agreement" means this Calculation Agent Agreement, dated as of March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time, including any successor agreements thereto serving substantially the same purposes.

"Challenge Payment Date" means the date of distribution of moneys following the final settlement or resolution of a challenge or Proceeding under this Calculation Agent Agreement, which distribution shall be not later than fifteen (15) Business Days following the finalization of such challenge or Proceeding.

"Clawback CVI Annual Not Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 of the Trust Agreement.

"Clawback CVI Annual Payment Amount" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"Clawback CVI Annual Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"Clawback CVI Lifetime Cap" means a total of $5,239,002,764 allocated under the Plan to be paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims, and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims. On or prior to the Effective Date, the Commonwealth and the entity that would be entitled as of the Effective Date to the payment of the $22,580,090 Allowed CW/MBA Claims have settled such Claims. Consequently, Clawback CVIs relating to the Allowed CW/MBA Claims will not be issued under the Trust Agreement and the full amount of the $22,580,090 in Allowed CW/MBA Claims will be treated for all purposes hereunder and under the Trust Agreement as Deemed Paid CVIs Payments. The Clawback CVI Lifetime Cap as of the Effective Date following the settlement of the Allowed CW/MBA Claims relating to Allowed CW/HTA Claims, Allowed CW/Convention Center Claims and Allowed CW/PRIFA Rum Tax Claims is $5,216,422,674.

"Clawback CVIs" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to the Trust Agreement, for payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement. For the avoidance of doubt, unless otherwise provided in the Trust Agreement, the term "Clawback CVI" as used in this Calculation Agent Agreement and the Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"Commonwealth" has the meaning given to such term in the Recitals.

"Commonwealth Rum Tax Revenues" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"CVIs Annual Payment Amount" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"CVIs Annual Payment Amount Calculation Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, September 15 of the next Fiscal Year.

"CVIs Annual Payment Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, November 1 of the next Fiscal Year.

"CVIs Outperformance Condition Determination Date" means, for each Fiscal Year, September 15 of the next Fiscal Year.

"CVIs Payment Fund" means the fund established in accordance with Section 5.08 of the Trust Agreement.

"Deemed Paid CVIs Payments" means amounts that would otherwise have been payable to the Holders of either (a) the $22,580,090 Allowed CW/MBA Claims settled on or prior to the Effective Date, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 of the Trust Agreement.  As of the Effective Date, Attachments 2, 3 and 7 to the Trust Agreement reflect the settlement of Claims on or prior to the Effective Date and, contemporaneously with the extraordinary redemption of Notes pursuant to Section 4.02 and 4.03 of the Trust Agreement, the Commonwealth shall provide substitute Attachments 2, 3 and 7 to the Trustee and the Calculation Agent reflecting such redemptions.  Deemed Paid CVIs Payments shall be deducted from the Subject to Waterfall Payment Amount available to be paid to the Holders of the Clawback CVIs and the Not Subject to Waterfall Payment Amount prior to the transfer to the Trustee in accordance with Section 5.08 of the Trust Agreement.

"Electronic Means" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee or the Calculation Agent, as applicable, or another electronic method or system specified by the Trustee or the Calculation Agent, as applicable, as available for use in connection with its services hereunder.

"Event of Default" has the meaning given to such term in Section 301 hereof.

"GO CVI Annual Payment Amount" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"GO CVI Lifetime Cap" means $3,500,000,000.

"GO CVI Maximum Annual Payment" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) of the Trust Agreement.

"GO CVIs" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to the Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement.

"Holder" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"Indemnified Party" has the meaning given to such term in Section 402 hereof.

"Indemnified Amounts" has the meaning given to such term in Section 402 hereof.

"Majority in Interest" means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

"Measured SUT" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose

established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"Note" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 of the Trust Agreement to evidence the interests of (a) Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"Not Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) of the Trust Agreement.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"PRIFA Rum Tax Clawback CVIs" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

"Quarter in Interest" means as of any particular date of calculation, the Holders of not less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.  Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"Remaining Clawback CVI Lifetime Cap" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims individually, (b) less the aggregate amounts of the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims settled, as applicable, after the Effective Date, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.03 of the Trust Agreement.

"Remaining GO CVI Lifetime Cap" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.02 of the Trust Agreement.

"Rum Tax" means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

"Rum Tax CVI Annual Payment Amount" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 of the Trust Agreement.

"Rum Tax Outperformance Condition" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year.  A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

"Rum Tax Outperformance Metric" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 2 to the Trust Agreement.

"Sales Tax" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

"Series" means either Clawback CVIs or GO CVIs.

"Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) of the Trust Agreement.

"Subseries" means the three categories of Claims against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries, and the CW/PRIFA Rum Tax Claims Subseries.

"Substitute Measured Tax" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth as provided in Section 202(c) hereof.

"Substitute Measured Tax Projections" has the meaning given to such term in Section 202(d) hereof.

"Substitute Measured Tax Report" has the meaning given to such term in Section 202(d) hereof.

"Sub-Subseries" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"SUT Outperformance Condition" means that the 5.5% SUT collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year.  An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"SUT True-Up" has the meaning set forth in Section 7.08(c) and (d) of the Trust Agreement.

"Trust Agreement" has the meaning given to such term in the recitals of this Calculation Agent Agreement.

"Trustee" means the entity or organization appointed as Trustee for the Notes pursuant to the Trust Agreement and having the duties, responsibilities and rights provided for therein and herein, and its successor or successors and any other entity or organization which may at any time be substituted in its place pursuant thereto.  The Bank of New York Mellon is the initial Trustee under the Trust Agreement.

Section 102.   **Appointment of the Calculation Agent**

(a)   The Commonwealth hereby appoints the Calculation Agent to perform the services of the Calculation Agent hereunder and under the Trust Agreement.

(b)   The Calculation Agent hereby accepts such appointment and agrees for the term of this Agreement to render such services and to assume the duties and obligations of the Calculation Agent as set forth herein and in the Trust Agreement, including, without limitation, the services, duties and obligations required of the Calculation Agent including, but not limited to Sections 5.03 through 5.08 and Section 7.09 of the Trust Agreement, the calculation or verification of the amount of the Redemption Price applicable to each extraordinary redemption pursuant to Sections 4.02 and 4.03 of the Trust Agreement, and the verification of the calculations of either the Baseline SUT Reduction or SUT True-Up as provided in Section 7.08(e) of the Trust Agreement, which such Sections of the Trust Agreement are incorporated by reference herein, together with the relevant Attachments to the Trust Agreement that are necessary to the completion of the duties and obligations required by such Sections.

(c)   The Calculation Agent must at all times be a Person that is an Independent Consultant meeting all of the requirements of the Trust Agreement, organized and doing business under the laws of the United States or of any State or Territory thereof (including the Commonwealth), or the District of Columbia and professionally qualified to perform the services required under the Trust Agreement and hereunder.

Section 103.   **Rules of Construction**

(a)   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

(b)   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Calculation Agent Agreement, refer to this Calculation Agent Agreement. All references to Parts and Sections in this Calculation Agent Agreement refer to the Parts and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

(c)   "$" and "dollars" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

### PART 2 - CVIS

Section 201.   **Duties of Calculation Agent With Respect to CVIs**

(a)   The Calculation Agent shall perform the duties of the Calculation Agent contemplated by the Trust Agreement and as provided for in this Calculation Agent Agreement, including the following, in each case based upon the information provided by the Commonwealth on a timely basis in order to allow

the Calculation Agent to meet the timeframes detailed herein and in the Trust Agreement and such other information as may be reasonably requested from the Commonwealth by the Calculation Agent:

(i)        By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, as provided in Section 5.03(a) of the Trust Agreement and Section 202 hereof; and

(ii)        By no later than each CVIs Annual Payment Amount Calculation Date, (A) if an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 of the Trust Agreement and Section 203 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement and Section 203 hereof, and (B) if a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Rum Tax CVI Annual Payment Amount, if any, as provided in Section 5.06 of the Trust Agreement and Section 203 hereof.  In each case, the Calculation Agent shall calculate the respective amounts by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Date with such amounts to be recorded on a schedule in substantially the form of Attachment 7 to the Trust Agreement, together with such other information required to complete such Attachment 7 including, without limitation, the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be paid with respect to Clawback CVIs and GO CVIs on such CVIs Annual Payment Date.

(b)        The Calculation Agent shall also perform such other services, duties or obligations as are reasonably related to and necessary, convenient or desirable to perform the Calculation Agent's services, duties and obligations contemplated by the Trust Agreement and this Calculation Agent Agreement, or such other services, duties or obligations as reasonably requested by the Commonwealth in connection therewith and not inconsistent with this Calculation Agent Agreement or the Trust Agreement, including the calculation or verification of the amount of the Redemption Price applicable to each extraordinary redemption pursuant to Sections 4.02 and 4.03 of the Trust Agreement, and the verification of the calculations of either the Baseline SUT Reduction or SUT True-Up as provided in Section 7.08(e) of the Trust Agreement.  In the event such additional services, duties or obligations are mutually agreed on, the parties will discuss in good faith any necessary adjustments to the fee arrangement, including any adjustment needed to any fee caps or funding in place.

(c)        In the event of a conflict in the description of the services, duties or obligations required of the Calculation Agent hereunder and under the Trust Agreement, the provisions of the Trust Agreement shall apply.

Section 202.     **Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and Supporting Information**

(a)     Beginning on the 15th day of the second month following the end of the month of the execution and delivery of this Calculation Agreement, the Commonwealth shall provide to the Calculation Agent the following information:

(i)     no later than the 15th day of the second month following the end of each month, (A) a report setting forth the amount of 5.5% SUT collected in such month and the amount of 5.5% SUT collected on a Fiscal Year-to-date basis including such month, (B) (1) in accordance with Section 7.08 of the Trust Agreement, a statement as to whether or not any events or actions that could result in Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline have occurred within such month and the recommended adjustments to the Baseline SUT Reduction and/or SUT True-Up due to such events or actions reflected in the report prepared by the Calculation Agent in paragraph (b) below; and

(ii)     no later than the 15th day of the second month following the end of each month, a report setting forth the amount of Commonwealth Rum Tax Revenues collected in such month and the amount of Commonwealth Rum Tax Revenues collected on a Fiscal Year-to-date basis.

The first report delivered by the Commonwealth on May 15, 2022, in accordance with this subsection (a) following the effective date of this Calculation Agent Agreement shall include details relating to each month through March 2022, and Fiscal Year-to-date numbers from and including July 2021 through March 2022.

(b)     Promptly upon the occurrence of any events or actions that could result in a Baseline SUT Reduction or SUT True-Up, and in any event within five (5) Business Days of the occurrence thereof, the Commonwealth shall give the Calculation Agent notice of such events or actions and the details relating thereto and provide the Calculation Agent with the information reasonably requested by the Calculation Agent to give the Calculation Agent an opportunity to assess the economic impact of each such event or action and to propose relevant required adjustments to the 5.5% SUT Baseline set forth in the then existing Attachment 1. Promptly upon receipt of the information provided by the Commonwealth in accordance with the first sentence hereof, (i) if any Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline and/or the Measured SUT have occurred within the month of occurrence, the Calculation Agent shall prepare in sufficient time for inclusion in the report provided by the Commonwealth described in paragraph (a)(i) above (A) a report detailing each such Baseline SUT Reduction and SUT True-Up and the amount by which the 5.5% SUT Baseline should be adjusted to reflect each such Baseline SUT Reduction and the amount by which the Measured SUT should be adjusted to reflect each such SUT True-Up, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the 5.5% SUT Baseline and/or Measured SUT caused by such Baseline SUT Reductions and SUT True-Ups, and (ii) if during the month of the report the Commonwealth reduced the 5.5% SUT to a lower rate, (A) a report detailing the amount of the adjustment to the Measured SUT for that Fiscal Year and each subsequent Fiscal Year to maintain the same dollar amount of outperformance had the Measured SUT remained at 5.5% by multiplying (x) the projected Measured SUT generated at the lower rate by (y) the fraction equal to 5.5% divided by the lower rate, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the Measured SUT.

(c)     Upon agreement with the Commonwealth of the economic impact of the Baseline SUT Reductions, SUT True-Ups and reductions to the 5.5% SUT to a lower rate as set forth in paragraph (b) above that require adjustments to the then existing Attachment 1 and Attachment 7, the Calculation Agent shall prepare a final version of the substitute Attachment 1 and Attachment 7 to the Trust Agreement reflecting the changes required by such Baseline SUT Reductions, SUT True-Ups and adjustments to the Measured SUT.  The Calculation Agent shall send a copy of the final substitute Attachment 1 and Attachment 7 to the Commonwealth and to the Trustee for replacement of the Attachment 1 and Attachment 7 in the Trust Agreement.  The Trustee shall post such final substitute Attachment 1 and Attachment 7, if applicable, together with such calculations and supporting narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(d)     In accordance with Section 7.09 of the Trust Agreement, the Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, which Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth. The Commonwealth shall provide the Calculation Agent with (i) copies of the change in law or executive or judicial action (or a reference to where versions can be reasonably found), (ii) projections for the remaining Fiscal Years through the Fiscal Year ending June 30, 2051, relating to the 5.5% SUT (the "5.5% SUT Projections") based upon the economic projections in the most recently approved fiscal plan of the Commonwealth, and (iii) projections for the remaining Fiscal Years through the Fiscal Year ending June 30, 2051, relating to the expected receipts from the Substitute Measured Tax (the "Substitute Measured Tax Projections") based upon the economic projections in the most recently approved fiscal plan of the Commonwealth, which Substitute Measured Tax Projections shall reflect the receipt of amounts at least equal to the amounts of 5.5% SUT projected in the 5.5% SUT Projections.  Such economic projections shall be updated to reflect actual results occurring during the intervening period between the date of the most recently approved fiscal plan and the date the Commonwealth proposes to substitute the Substitute Measured Tax.  In the event a fiscal plan is no longer being presented for approval by the Oversight Board, the Commonwealth shall engage a third party expert knowledgeable in preparing such projections to advise the Commonwealth in connection with the preparation of such projections or to prepare such projections. Following receipt of such change in law or executive or judicial action, the 5.5% SUT Projections and the Substitute Measured Tax Projections, the Calculation Agent shall review the basis for such 5.5% SUT Projections and the Substitute Measured Tax Projections and the assumptions relating thereto, and such other information as it shall reasonably request from the Commonwealth or such other sources as it deems necessary or appropriate in connection with such review, and promptly after receipt of such material and information issue a report (the "Substitute Measured Tax Report"), taking into consideration any adjustments (positive or negative) to the 5.5% SUT Projections and/or the Substitute Measured Tax Projections as the Calculation Agent deems necessary following its review, to the effect that that there is, or there is not, a reasonable basis for concluding that the Commonwealth is likely to collect the Substitute Measured Tax in amounts at least equal to the amounts projected in the 5.5% SUT Projections (as the Calculation Agent may adjust (positively or negatively)).  The Substitute Measured Tax Report shall contain such other information as necessary or required to permit the Calculation Agent to reach its conclusion, including alternative projections of the 5.5% SUT and the Substitute Measured Tax, if any, and a copy of such Substitute Measured Tax Report shall be sent promptly to the Commonwealth and the Trustee.  The Trustee shall then promptly provide the Holders with a copy of the Substitute Measured Tax Report by posting such Report with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.  After completing its review, if the Calculation Agent concludes that the Substitute Measured Tax will provide for collections at least equal to the amounts projected in the 5.5% SUT Projections (as the Calculation Agent may adjust (positively or negatively)), the Calculation Agent shall prepare a summary of the material provisions describing the Substitute Measured Tax and send a copy of a final substitute Attachment 1, with the only change in Attachment 1 to reflect that the

substitution of the Substitute Measured Tax has become effective without any change in the 5.5% SUT Baseline as a result of such substitution, to the Commonwealth and to the Trustee for replacement of the Attachment 1 in the Trust Agreement. The Trustee shall post such final substitute Attachment 1, together with the Substitute Measured Tax Report, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(e)      At least quarterly following each March 31, September 30 and December 31 after the monthly information for the final month of such quarter is available under subsection (a) above, commencing with the quarter ending March 31, 2022, the Commonwealth and the Calculation Agent shall confer to review the results for each such quarter and reconcile any issues relating to the information theretofore provided to the Calculation Agent. Such quarterly conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-to-date collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder. The conference for the quarter ending March 31, 2022 shall include details relating to year-to-date numbers from and including July 2021.

(f)      By no later than August 15 of each year, beginning on August 15, 2022, the Commonwealth shall provide to the Calculation Agent the information relating to the June monthly and Fiscal Year-end numbers described in subsection (a) above. It is understood among the parties hereto that:

(i)      taxpayers may submit payments relating to their projected 5.5% SUT collections prior to the filing of their tax returns;

(ii)      the Commonwealth cannot determine how much of the payments submitted by a taxpayer is attributable to such taxpayer's 5.5% SUT tax liability until the taxpayer's tax return is received and reviewed and processed;

(iii)      historically, quantification of the June and Fiscal Year-end 5.5% SUT collections cannot be finalized by the Commonwealth until the review of the tax returns received in July following the end of the Fiscal Year;

(iv)      amounts received by the Commonwealth from taxpayers as 5.5% SUT collections through July that represent the payment by such taxpayers of their 5.5% SUT tax liability for the Fiscal Year ended in the preceding month, as reported by the Commonwealth after the processing of tax returns in July, shall be used by the Calculation Agent in its determination as to whether an SUT Outperformance Condition and Rum Tax Outperformance Condition have occurred, and the amounts to be subsequently calculated by the Calculation Agent in accordance with Section 203 hereof; provided, for the avoidance of doubt, that amounts received or credited thereafter that represent the payment by taxpayers of their 5.5% SUT tax liability for the most recently ended Fiscal Year shall thereafter be taken into consideration in the subsequent determination of SUT Outperformance Conditions and related calculations; and

(v)      amounts received by the Commonwealth as 5.5% SUT collections that are not subsequently confirmed as attributable to taxpayer liabilities through tax returns are not to be taken into account as 5.5% SUT collections for the preceding Fiscal Year.

(g)      By no later than five (5) Business Days before each CVIs Outperformance Condition Determination Date of each year, beginning with the CVI Outperformance Condition Determination Date occurring in calendar year 2022, and following the delivery of the information provided in subsection (f) above, the Commonwealth and the Calculation Agent shall confer to review the results for such Fiscal Year and reconcile any issues relating to the information theretofore provided to the Calculation Agent.  Such conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-end collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, the Substitute Measured Tax, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder, all to allow the Calculation Agent to calculate the amounts required by Section 203 hereof.

(h)      The Calculation Agent shall make its determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred by no later than the CVIs Outperformance Condition Determination Date and provide the Trustee and the Commonwealth with its determinations thereof on or prior to such date, promptly confirmed in writing, together with the calculations used to make such determinations.  The Trustee shall post such determinations, together with the calculations relating thereto provided by the Calculation Agent, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Days of its receipt of the written confirmation of such determinations.

(i)      Within fifteen (15) Business Days of the posting of such determinations on EMMA as provided in subsection (h) above, the Commonwealth and/or a Majority in Interest may challenge in accordance with Section 204 hereof (A) adjustments to the Baseline SUT Reductions, SUT True-Ups and Measured SUT determined in accordance with Section 202(b) hereof, (B) the conclusion that the Substitute Measured Tax will provide for collections at least equal to the amounts projected in the 5.5% SUT Projections, all as provided in Section 202(d) hereof, or (C) the determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred as provided in Section 202(h) hereof.

Section 203.     **Calculation of Subject to Waterfall Outperformance Amount and Annual Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum Tax CVI Annual Payment Amount**

(a)      In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Calculation Agent shall proceed to calculate the following:

    (i)      if an SUT Outperformance Condition has occurred, the Subject to Waterfall Outperformance Amount and the Annual Waterfall Payment as provided in Section 5.04 of the Trust Agreement and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement;

    (ii)      if a Rum Tax Outperformance Condition has occurred, the Rum Tax CVI Annual Payment Amount as provided in Section 5.06 of the Trust Agreement;

    (iii)      the deposits and transfers required to be made to the CVIs Payment Fund in accordance with Section 5.08 of the Trust Agreement; and

(iv)     all other amounts necessary to complete a final Attachment 7 to the Trust Agreement.

(b)     The Calculation Agent may request that the Commonwealth provide such additional information as is reasonably necessary for the Calculation Agent to timely finalize the calculations referred to in subsection (a) of this Section 203, and the Commonwealth shall timely provide such information.

(c)     By no later than each CVIs Annual Payment Amount Calculation Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall send written copies of the calculations referred to in subsection (a) of this Section 203 to the Commonwealth and the Trustee.  The Trustee shall post such calculations, including a final Attachment 7 to the Trust Agreement, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)     Within fifteen (15) Business Days of the posting of such notice on EMMA as provided in subsection (c) above, the Commonwealth and a Majority in Interest may challenge in accordance with Section 204 herein the Determination(s) and calculations referred to in this Section 203.

Section 204.    **Challenges to Determinations and Calculations of Amounts**

(a)     If the Commonwealth has filed a challenge with the Calculation Agent and the Trustee within the time period permitted by Section 202(i) or Section 203(d) hereof, or if a Majority in Interest has filed a challenge with the Calculation Agent, the Trustee and the Commonwealth within the time period permitted by Section 202(i) or Section 203(d) hereof, in each case detailing the nature of its challenge(s), the Commonwealth or the Majority in Interest making the challenge, as the case may be, may exercise the remedies hereinafter referred to with respect to each such challenge.  Either the Commonwealth or a Majority in Interest may combine their respective challenges under Section 202(i) and Section 203(d).  The Trustee shall post a copy of each such challenge (or a summary thereof) with EMMA under all of the CUSIP numbers applicable to the Notes affected by such challenge within one (1) Business Day of its receipt thereof.

(b)     The Calculation Agent, the Trustee, a representative of each Majority in Interest making a challenge and the Commonwealth shall promptly arrange for a meeting or meetings to attempt to resolve such challenge(s) and each party shall use reasonable efforts to resolve such matters in dispute.

(c)     In the event that the Calculation Agent, the Trustee, the representatives of each Majority in Interest making a challenge and the Commonwealth are unable to resolve all challenges prior to October 25, then (i) the Calculation Agent shall determine the portion of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount and the Rum Tax CVI Annual Payment Amount that is not in dispute and the payment of which will not prejudice any party's interest in the future receipt or payment, as the case may be, of such amounts and provide notice to the Trustee, the representatives of each Majority in Interest making a challenge and the Commonwealth as to the amounts that will be paid to the Holders on the CVIs Annual Payment Date, (ii) the Calculation Agent shall make the final calculations applicable to complete Attachment 7 with respect to such amounts for the CVIs Annual Payment Date, and shall promptly forward a copy of such final Attachment 7 to the Commonwealth, the representatives of each Majority in Interest making a challenge and the Trustee, (iii) the Commonwealth shall transfer to the Trustee for deposit on the Business Day prior to the CVIs Annual Payment Date the amounts reflected in the final Attachment 7, and (iv) the Trustee shall post a copy of the final Attachment 7 with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)      In the event all of the challenges have not been finally resolved in accordance with subsection (c) above as provided therein, the Commonwealth and/or a Majority in Interest making a challenge may bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) and (ii) seek any other remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.  The failure to resolve any such challenge on or prior to the CVIs Annual Payment Date shall not be an Event of Default hereunder or under the Trust Agreement.

(e)      Upon the finalization of any challenge or Proceeding hereunder, the Calculation Agent, the Trustee and the Commonwealth shall take all steps reasonably necessary to establish a Challenge Payment Date no later than fifteen (15) Business Days following such finalization to provide for the payment of the amounts set forth in the settlement or resolution of any challenge or Proceeding.  A revised final Attachment 7 relating to such Challenge Payment Date shall be prepared by the Calculation Agent and posted by the Trustee with EMMA under all of the CUSIP numbers applicable to the Notes receiving a payment on the Challenge Payment Date not less than five (5) calendar days prior to such Challenge Payment Date.  On the Business Day prior to the Challenge Payment Date, the Commonwealth shall transfer into the applicable account(s) within the CVIs Payment Fund such amounts as are determined to be payable pursuant to any challenge or Proceeding under this Section 204.

(f)      All parties to the challenge or Proceeding shall pay their own costs and expenses, except that the Calculation Agent shall be reimbursed in accordance with its agreement with the Commonwealth.

(g)      For purposes of clarification, parties who have an interest in initiating or directing challenges or Proceedings or taking other actions hereunder shall refer to the following:

    (i)      the Holders of all GO CVIs and Clawback CVIs with respect to the determination of whether an SUT Outperformance Condition has occurred and calculations relating to the (A) effects of Baseline SUT Reductions, SUT True-Ups and a Substitute Measured Tax, (B) Subject to Waterfall Outperformance Amount and Annual Waterfall Payment and (C) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto;

    (ii)      the Holders of all Clawback CVIs with respect to calculations relating to the (A) Not Subject to Waterfall Outperformance Amount, and (B) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto; and

    (iii)      the Holders of all PRIFA Rum Tax Clawback CVIs with respect to the determination of whether a Rum Tax Outperformance Condition has occurred and calculations relating to the (A) Rum Tax CVI Annual Payment Amount, and (B) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto.

## PART 3 - EVENTS OF DEFAULT AND REMEDIES

Section 301.    **Events of Default**

An Event of Default shall exist hereunder if the Commonwealth, the Trustee or the Calculation Agent shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein on the part of the Commonwealth, the Trustee or the Calculation Agent to be performed, as applicable, and such default shall continue for ten (10) Business Days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth, the Trustee or the Calculation Agent, as applicable, by any of the other parties hereto, each of which may give such notice in its discretion; provided, however, that the Trustee shall give such notice of a default at the written request of the Holders of not less than a Majority in Interest of the Outstanding Notes to which the Event of Default relates in the case of matters relating to challenges as provided in Section 204 hereof, or of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates in the case of all other matters.  A copy of any such default notice shall also be provided to the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof).  Notwithstanding the foregoing, no Event of Default shall occur due to a challenge under Section 204 hereof that has not been resolved and is proceeding.

Section 302.    **Enforcement of Remedies**

(a)    If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Trustee may, and upon written request of Holders holding not less than a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, to which an Event of Default relates shall (i) bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) against the Commonwealth and (ii) seek any other remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(b)    If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)    If an Event of Default by the Trustee occurs under Section 301 hereof and is continuing, each of the Commonwealth and the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)    If an Event of Default by the Calculation Agent occurs under Section 301 and is continuing, each of the Commonwealth, without any request by, or consent of, any other Person, or the Trustee may, and upon written request of Holders holding not less than a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, to which such Event of Default relates the Trustee shall, seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists; provided, that under no circumstances shall the Commonwealth or the

Calculation Agent be entitled to terminate this Agreement or its respective obligations hereunder as a result of any Event of Default by the Trustee.

Section 303.    **Remedies Not Exclusive**

No remedy herein conferred upon or reserved to the Calculation Agent, the Commonwealth, the Trustee or the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## PART 4 - MISCELLANEOUS

Section 401.    **Limits of Trustee's and Calculation Agent's Responsibility**

(a)     The recitals of fact contained herein shall be taken as the statements of the Commonwealth and neither the Trustee nor the Calculation Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor the Calculation Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded by the Trust Agreement, and neither the Trustee nor the Calculation Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor the Calculation Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith or in accordance with the Trust Agreement except as to the application of any money paid to the Trustee in its capacity as Trustee under the Trust Agreement.  Neither the Trustee nor the Calculation Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own gross negligence or willful misconduct.

(b)     The duties and obligations of the Trustee and the Calculation Agent shall be determined by the express provisions hereof and neither the Trustee nor the Calculation Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Calculation Agent Agreement against the Trustee or the Calculation Agent.  If any Event of Default under this Calculation Agent Agreement shall have occurred and be continuing, the Trustee and the Calculation Agent shall exercise such of the rights and powers vested in it by this Calculation Agent Agreement and shall use the same degree of care as a prudent person, as a trustee under a similar agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

(c)     The Trustee and the Calculation Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it to be genuine, and to have been signed or presented by the proper party or parties, in the absence of gross negligence or willful misconduct.  The Trustee and the Calculation Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it and in accordance therewith, in the absence of gross negligence or willful misconduct on the Trustee's part.

(d)     Whenever the Trustee or the Calculation Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or the Calculation Agent, in lieu thereof, may either accept other

evidence of such fact or matter or require such further or additional evidence. Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or the Calculation Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

(e)     Neither the Trustee nor the Calculation Agent shall be deemed to have notice of any default or Event of Default hereunder unless an Authorized Officer of the Trustee or an authorized officer of the Calculation Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee or the Calculation Agent at the designated corporate trust office of the Trustee or the Calculation Agent and such notice references the Notes relative to which an Event of Default has occurred.

(f)     The Trustee and the Calculation Agent may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Calculation Agent Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(g)     The Trustee and the Calculation Agent shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, pursuant to the terms hereof and of the Trust Agreement in respect of such action or failure to act, except to the extent of its gross negligence or willful misconduct in connection therewith.

(h)     In no event shall the Trustee or the Calculation Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee or the Calculation Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The Trustee and the Calculation Agent shall not be liable for any error of judgment made in good faith by an Authorized Officer, unless it is proven that the Trustee or the Calculation Agent was negligent.

(j)     The Trustee and the Calculation Agent shall be under no obligation to exercise any of the rights or powers vested in it under this Calculation Agent Agreement at the request or direction of any of the Holders pursuant to this Calculation Agent Agreement unless such Holders shall have offered to the Trustee and/or the Calculation Agent reasonable security or indemnity against the costs, expenses and liabilities (except as may result from the Trustee's and/or the Calculation Agent's own gross negligence or willful misconduct) which might be incurred by it in compliance with such request or direction).

(k)     The Trustee and the Calculation Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Calculation Agent Agreement and delivered using Electronic Means ("Instructions"); provided, however, that the Commonwealth shall provide to the Trustee and the Calculation Agent an incumbency certificate signed by an Authorized Officer of the Commonwealth listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or the Calculation Agent Instructions using Electronic Means and the Trustee or the Calculation Agent in its discretion elects to act upon such Instructions, the Trustee's or the Calculation Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands

and agrees that the Trustee or the Calculation Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and the Calculation Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or the Calculation Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or the Calculation Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor the Calculation Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or the Calculation Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee or the Calculation Agent. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or the Calculation Agent, including without limitation the risk of the Trustee or the Calculation Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or the Calculation Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and the Calculation Agent, in writing, immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

Section 402.    **Indemnification of Calculation Agent.**

Without limiting any other rights which the Calculation Agent may have hereunder or under applicable law, the Commonwealth hereby agrees, to indemnify the Calculation Agent and its officers, directors, employees and agents (each, an "Indemnified Party") from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts"), awarded against or incurred by any of them arising out of or as a result of this Agreement, the Calculation Agent's services hereunder or the Indemnified Party's enforcement of Commonwealth's indemnification commitments, excluding, however, Indemnified Amounts to the extent determined by a court of competent jurisdiction, which determination is not subject to appeal, to have been directly caused predominantly by the gross negligence or willful misconduct on the part of an Indemnified Party. The indemnities set forth in this section shall survive the termination of this Agreement.

Section 403.    **Term of Agreement; Termination**

(a)    This Agreement will terminate on the earlier of (i) March 15, 2027, and (ii) the date on which an optional termination as set forth in Section 403(b) becomes effective; provided, however, that in no event shall this Agreement terminate prior to the date on which a successor Calculation Agent has been appointed and, provided further that this Agreement may not be terminated from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date.

(b)    The Commonwealth and the Calculation Agent shall have the option to terminate this Agreement at any time upon stating their intention to do so pursuant to this Section 403(b) and which date shall not be less than thirty (30) days in the case of the Commonwealth terminating this Agreement, and ninety (90) days in the case of the Calculation Agent terminating this Agreement, from the proposed termination date. Upon any termination, the Commonwealth shall pay to the Calculation Agent compensation through the effective date of such termination, which compensation shall include, but not be

limited to, the reasonable compensation, disbursements and expenses of the Calculation Agent's counsel, as described in Section 404.

Section 404.    **Fees and Expenses**

The Commonwealth and the Trustee agree to pay the documented fees and expenses of the Calculation Agent for its services under this Calculation Agent Agreement and the Trust Agreement consistent with the Scope of Services and Fees and Expenses of the Calculation Agent generally set forth in Attachment 1 hereto.  Such Attachment 1 may be revised from time to time by the Commonwealth and the Calculation Agent without the consent of the Trustee or any Holders.  Such fees and expenses shall be payable by the Trustee from the Calculation Agent Payment Account from amounts on deposit in the Trustee and Independent Consultant Expenses Fund, but the amount on deposit in the Trustee and Independent Consultant Expenses Fund is not a limitation on the obligation of the Commonwealth and the Trustee to pay such fees and expenses in accordance with the Attachment 1 referenced in the preceding sentence.

Section 405.    **Notices**

Any direction, notice, report or other communication required or permitted hereunder shall be furnished or given in English and in writing and such direction, notice, report or other communication may be given by United States mail, reputable overnight courier service, facsimile transmission or electronic mail (confirmed by telephone, United States mail or reputable overnight courier service in the case of notice by facsimile transmission or electronic mail) or any other customary means of communication, and any such direction, notice, report or other communication shall be effective when delivered or transmitted, or if mailed, five days after deposit in the United States mail with proper postage for ordinary mail prepaid:

       If to the Commonwealth, to:

       Commonwealth of Puerto Rico



       with a copy to AAFAF at:

       Puerto Rico Fiscal Agency and Financial Advisory Authority



       If to the Trustee, to:

       The Bank of New York Mellon

If to the Calculation Agent, to:

AlixPartners, LLP



**Section 406.**   **Entire Agreement; Trustee shall be entitled to enforce Agreement**

This Calculation Agent Agreement, including the provisions of the Trust Agreement incorporated herein by reference, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

**Section 407.**   **Amendment**

(a)      In the event that any of the definitions or provisions of the Trust Agreement that are duplicated or incorporated herein are amended or supplemented in compliance with the terms of the Trust Agreement, unless otherwise provided in such amendment or supplement, such amendment or supplement shall automatically amend or supplement the duplicative or incorporated definition or provision herein without further approval, except the consent of the Calculation Agent shall be required to the extent such amendment or supplement affects its duties or obligations hereunder.  The parties hereto may not amend any definition or provision of this Calculation Agent Agreement that is duplicated or incorporated herein from the Trust Agreement with the intention of changing the requirements of the Trust Agreement without such definition or provision also being approved or consented to in accordance with the terms of Article IX or X or the Trust Agreement, as applicable.

(b)      Otherwise, this Calculation Agent Agreement may not be modified or amended other than by an agreement in writing signed by each party hereto.

**Section 408.**   **Assignment; Successors and Assigns**

(a)      This Agreement shall inure to the benefit of and bind the parties hereto and their respective successors and assigns; provided that neither the Commonwealth nor the Trustee may assign its rights and delegate its obligations hereunder except as provided in the Trust Agreement and the Calculation Agent may not assign its rights and delegate its obligations hereunder without the prior written consent of the Commonwealth and the Trustee, unless such assignment is to a wholly-owned, direct or indirect subsidiary of the Calculation Agent, which such subsidiary must be an Independent Consultant meeting the requirements of the Trust Agreement, which shall not require the consent of the Commonwealth or the Trustee.  Unless assigned to a wholly-owned, direct or indirect subsidiary of the Calculation Agent, which such subsidiary must be an Independent Consultant meeting the requirements of the Trust Agreement, no such assignment by the Calculation Agent shall take place from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date.

(b)      The Commonwealth may remove the Calculation Agent at any time upon thirty (30) days' prior written notice.   The Calculation Agent may resign its duties hereunder by providing the Commonwealth and the Trustee with at least ninety (90) days' written notice.  Any successor Calculation Agent may be appointed by the Commonwealth and must be an Independent Consultant meeting the

requirements of the Trust Agreement.  Any successor shall have agreed in writing to assume all of the obligations and duties of the Calculation Agent hereunder, whether as a successor or assign under this Calculation Agent Agreement or a replacement agreement in substantially the form of this Calculation Agent Agreement.  In the event that the Calculation Agent should resign or be discharged, the Commonwealth shall take all necessary action to cause a new Calculation Agent to be appointed hereunder prior to the resignation of the current Calculation Agent. Notwithstanding the foregoing, in no event may the Calculation Agent be removed or resign prior to the date on which a successor Calculation Agent has been appointed.

(c)       The Commonwealth shall post notices of resignation, removal and replacement of the Trustee and the Calculation Agent with EMMA under all of the CUSIP numbers applicable to the Notes within ten (10) Business Days of such resignation, removal and replacement.

Section 409.       **Execution, Delivery and Performance by Calculation Agent**

The execution, delivery and performance of this Agreement, to the best of the knowledge of the Calculation Agent, after reasonable investigation, will not conflict with or constitute a default under any order, judgment, decree, agreement, injunction or other instrument binding on or affecting the property or assets of the Calculation Agent.

Section 410.       **Governing Law**

This Calculation Agent Agreement shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Calculation Agent Agreement; provided, however, that the authorization of this Calculation Agent Agreement by the Commonwealth shall be governed by the laws of the Commonwealth.

Section 411.       **Retention of Jurisdiction of Title III Court**

The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Calculation Agent Agreement (a) shall be brought in accordance with the terms of this Calculation Agent Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

Section 412.       **Severability of Invalid Provision**

If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth, the Calculation Agent or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Trust Agreement or the Notes.

Section 413.   **Parties of Interest**

Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Calculation Agreement and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Calculation Agent and the Holders, and each shall be third party beneficiaries hereof.

Section 414.   **Headings**

Any headings preceding the text of the several Parts and Sections hereof, and any table of contents hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

Section 415.   **Force Majeure**

In no event shall the Trustee or the Calculation Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, pandemics, epidemics, recognized public emergencies, quarantine restrictions, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services and hacking, cyber-attacks, or other use or infiltration of the Trustee's or the Calculation Agent's technological infrastructure exceeding authorized access; it being understood that the Trustee and the Calculation Agent shall use reasonable efforts which are consistent with accepted practices in the banking and consultant industries, as applicable, to resume performance as soon as practicable under the circumstances.

Section 416.   **Signatures and Counterparts**

This Calculation Agent Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Calculation Agent Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Calculation Agent Agreement.

[Remainder of page intentionally left blank]

4839-0097-7915.19                                    - 22 -

IN WITNESS WHEREOF, the parties hereto have caused this Calculation Agent Agreement to be duly executed as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By:

Name:

Title:

THE BANK OF NEW YORK MELLON, as Trustee

By:

Name:

Title:

ALIXPARTNERS, LLP

By:

Name:

Title:

[Signature page to Calculation Agent Agreement – CVIs]

**<u>Attachment 1 – Scope of Services and Fees and Expenses of Calculation Agent</u>**





Attachment 1-2



Attachment 1-3



Attachment 1-4



Attachment 1-5

**Attachment 2 – Hourly Fees**

| As of January 1, 2022* | |
|---|---|
| **Title** | **Hourly Rate** |
| Managing Director | ██████████ |
| Director | ███████ |
| Senior Vice President | ███████ |
| Vice President | ███████ |
| Consultant | ███████ |
| Paraprofessional | ███████ |

\*   Hourly rates are adjusted on an annual basis

## Attachment 3 – Commonwealth Taxes

UNITED STATES OF AMERICA   )
STATE OF                               )               SS
CITY OF                                )

███████████, of legal age, married, and a resident of Michigan, USA, in his capacity as Assistant Treasurer of AlixPartners LLP, Tax ID Number ██████████, being duly sworn deposes and says:

AlixPartners LLP (the "Calculation Agent") has its offices at ████████████ ████████████, USA

The Calculation Agent certifies that it has not been engaged in trade or business in Puerto Rico during the past five (5) years and will not be engaged in trade or business in Puerto Rico as a result of the services to be provided under the Calculation Agent Agreement. As a result, the Calculation Agent certifies that it is not required to file income tax returns in Puerto Rico and has not been required to file income tax returns in Puerto Rico during the past five (5) years.

The Calculation Agent also certifies that it does not have any outstanding debts with the Government of Puerto Rico for income taxes, real or chattel property taxes, unemployment insurance premiums, workers compensation payments, social security for chauffeurs in Puerto Rico or the Administration for the Sustenance of Minors (known by its Spanish acronym, ASUME).

For the purposes of this Sworn Statement, tax debt shall mean any debt that the Calculation Agent may have with the Government of Puerto Rico, its instrumentalities and municipalities for income taxes, excise taxes, real or chattel property taxes, including any special taxes levied, license rights, tax withholdings for payment of salaries and professional services, taxes for payment of interest, dividends and other earnings, unemployment insurance premiums, workers compensation payments, social security, and debts with the Puerto Rico Child Support Administration.

In Southfield, Michigan, this 15 day of March, 2022.

ALIXPARTNERS LLP

By: ___████████████████████
Name:
Title:

4839-0097-7915.19

**Attachment 4 – Anticorruption Sworn Statement**

UNITED STATES OF AMERICA   )
STATE OF                                    )                SS
CITY OF                                     )

        I, ▮▮▮▮▮▮▮, of legal age, married, consultant and resident of Illinois, USA, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That I hold the position of Managing Director of AlixPartners, LLP (the "<u>Calculation Agent</u>").

3.      That neither the Calculation Agent nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or any person that has similar responsibilities, has been convicted or pleaded guilty of any of the crimes identified in (a) Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico," (b) Act 2-2018, as amended, known as the Anticorruption Code for a New Puerto Rico, or (c) Article 24 of the Plan of Reorganization 3-2011, as amended, known as the "Plan of Reorganization of the General Services Administration of 2011."

4.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in [●], this 15th day of March, 2022.

By: _
Name:
Title:



**Attachment 12**

**Trustee Fee Schedule**

<u>Acceptance Fee -</u> ██████

<u>Annual Trustee Fee Per Series or Subseries -</u> █████

<u>Counsel Fees – External – Per Indenture -</u> ██████

<u>Amendments and Revisions</u>

      This Attachment 12 may be revised from time to time with the written consent of the Commonwealth and the Trustee without the consent of any other party or any Holders.

# **EXHIBIT C**

Avoidance Actions Trust Agreement

AVOIDANCE ACTION TRUST AGREEMENT

**AVOIDANCE ACTIONS TRUST AGREEMENT** dated as of March 15, 2022 (this "Trust Agreement"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth ("ERS") and the Puerto Rico Public Buildings Authority ("PBA" and, together with the Commonwealth and ERS, the "Debtors"); Drivetrain, LLC, as trustee (together with any successor or additional Trustee appointed under the terms hereof, the "Trustee") of the Commonwealth Avoidance Actions Trust (the "Avoidance Actions Trust"); and, solely with respect to Sections 1.3 and 9.11, the Financial Oversight and Management Board for Puerto Rico on behalf of itself and its committees (the "FOMB").

Section 9.14 hereof contains a list of capitalized terms used herein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated January 14, 2022 (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

## RECITALS

A.    On June 30, 2016, the President of the United States signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*.  Titles III and VI of PROMESA provide for debt restructurings for Puerto Rico and its instrumentalities.

B.    The FOMB commenced Title III cases for the Commonwealth, ERS, and PBA on May 3, 2017, May 5, 2017, and September 27, 2019, respectively (the "Title III Cases").

C.    On January 18, 2022, the Court entered the Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority (the "Confirmation Order"), which, among other things, confirmed the Plan and the transactions contemplated thereby.

D.    The Plan provides for the creation of the Avoidance Actions Trust on or before the Effective Date to hold, manage and administer the Avoidance Actions Trust Assets and distribute the proceeds thereof, if any, to the Avoidance Actions Trust Beneficiaries, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

E.    The Avoidance Actions Trust is being created on behalf of, and for the benefit of, the Avoidance Actions Trust Beneficiaries.

F.    The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Avoidance Actions Trust, including the power to:  (i) prosecute for the benefit of the Avoidance Actions Trust Beneficiaries through Trust Professionals any Avoidance Action or other causes of action that may from time to time be held by the Avoidance Actions Trust; (ii) preserve, maintain and liquidate the Avoidance Actions Trust Assets; (iii) distribute the Avoidance Actions Trust proceeds to the Avoidance Actions Trust

Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Sections 6.3, 6.4, and 6.5 hereof regarding limitation on the Trustee and the oversight and consent rights of the Trust Advisory Board and the Title III Court as provided for herein.

G.      The Avoidance Actions Trust is organized for the sole purpose of liquidating and distributing the Avoidance Actions Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

H.      The Avoidance Actions Trust is intended to qualify as a "Liquidating Trust" under the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder (the "Treasury Regulations"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Avoidance Actions Trust Beneficiaries treated as the grantors and owners of the Avoidance Actions Trust.

I.      Pursuant to the Plan, the Trust is intended to be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.

J.      In accordance with the Plan, the Trust is further intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

**AGREEMENT**

**ARTICLE I**

**DECLARATION OF TRUST**

1.1      Creation of Trust.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the Avoidance Actions Trust, which shall bear the name "Commonwealth Avoidance Actions Trust." In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

1.2      Purpose of Avoidance Actions Trust.  The sole purpose of the Avoidance Actions Trust is to implement the Plan on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent

2

reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

1.3    Transfer of Avoidance Actions Trust Assets.  The Debtors shall transfer, for the sole benefit of the Avoidance Actions Trust Beneficiaries, and in accordance with the Plan and the Confirmation Order, all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan and Confirmation Order.  Such transfer shall occur on the Effective Date for all Avoidance Actions Trust Assets other than the settlement funds residing in the account at Banco Popular de Puerto Rico with account number 75-0277-01-4 (the "Escrow Account Funds").  On or after the Effective Date, upon the written request of the Trustee, the Debtors or the Reorganized Debtors, as the case may be, with the assistance of the FOMB and its Special Claims Committee, shall take actions necessary to cause the Escrow Account Funds to be disbursed to the Avoidance Actions Trust in accordance with that certain Escrow Agreement dated as of March 11, 2021, by and among the Special Claims Committee, the Official Committee of Unsecured Creditors for all Title III Debtors (other than PBA and COFINA), and Banco Popular de Puerto Rico.  In addition, the Commonwealth shall fund the Avoidance Actions Trust, on a one time basis, in the amount of Fifteen Million U.S. Dollars ($15,000,000) (the "Administrative Funding") by transferring such funds to the Avoidance Actions Trust within two business days of receiving written transfer instructions for such purpose from the Trustee. Any portion of the Administrative Funding that is not used to fund the activities of the Avoidance Actions Trust shall be distributed in accordance with Section 4.2.  The FOMB shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by the Debtors of the Avoidance Actions Trust Assets pursuant to this Section 1.3.

1.4    No Rights of Debtors.   Following the Effective Date and the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors shall have no authority or control over the Avoidance Actions Trust Assets, including no rights to appear in, prosecute, compromise, or otherwise direct the litigation or settlement of the Avoidance Actions, except as may be necessary to ensure, and for the sole purpose of ensuring, the full transfer of control and authority over the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Debtors agree to take whatever actions may be reasonably necessary, including seeking the amendment of complaints or the restatement of tolling agreements, to ensure that all such authority and control over the Avoidance Actions and other Trust Assets is so transferred to the Trust.  The limitations on the Debtors' rights in this subsections shall not prejudice the ability of any of the Debtors to appear in or provide testimony in Avoidance Actions or other litigation in order to fulfil the Debtors' cooperation obligations set forth in Section 9.11 hereof.

1.5    Appointment and Acceptance of Trustee.  As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby designate Drivetrain, LLC to serve as the initial Trustee under the Plan.  The Trustee accepts the Avoidance Actions Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Avoidance Actions Trust Assets, upon the terms and subject to the conditions set forth herein, in the Plan and in the Confirmation Order.  The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the

3

purpose of the Avoidance Actions Trust and not otherwise.  The Trustee shall have the authority to bind the Avoidance Actions Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6     <u>Liquidation of Avoidance Actions Trust Assets</u>.   The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including Article LXXVIII of the Plan), the Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Avoidance Actions Trust Assets, make timely distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Avoidance Actions Trust.  The Trustee shall exercise reasonable business judgment and liquidate the Avoidance Actions Trust Assets to maximize net recoveries; <u>provided</u>, <u>however</u>, that the Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Trustee shall in all cases be subject to the limitations provided elsewhere herein. Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Avoidance Actions Trust or through the sale or other disposition of the Avoidance Actions Trust Assets (in whole or in combination, and including the sale of any claims, rights or causes of action of the Avoidance Actions Trust).  The Trustee may incur any reasonable and necessary expenses in connection with the liquidation or conversion into Cash of the Avoidance Actions Trust Assets or in connection with the administration of the Avoidance Actions Trust and, to the extent that any Administrative Funding is available, such expenses shall first be deducted from the Administrative Funding.  Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

1.7     <u>No Reversion to Debtors</u>.  In no event shall any part of the Avoidance Actions Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor.

1.8     <u>Incidents of Ownership</u>.  The Avoidance Actions Trust Beneficiaries shall be the sole beneficiaries of the Avoidance Actions Trust and the Avoidance Actions Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in <u>Section 6.2</u> hereof.

1.9     <u>Privileges and Obligation to Respond to Ongoing Investigations</u>.

(a)     All attorney-client privileges, work product protections and other immunities or protections from disclosure held by the Debtors ("<u>Privileges</u>") shall be transferred, assigned and delivered to the Avoidance Actions Trust, without waiver and in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee, with the consent of the Trust Advisory Board, may designate; it being understood that, as of the date of this Trust Agreement, the Trustee shall designate the Trust Advisory Board, solely in its capacity as such, as well as any other Person designated in this Trust Agreement).  The FOMB, the Debtors, as the case may be, and the Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such Privileges.

129035426v6

(b)    Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the FOMB, the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Trustee, the Avoidance Actions Trust's professionals, or the Trust Advisory Board of the FOMB's or the Debtors' information subject to attorney-client privileges, work product protections or other immunities or protections from disclosure, or by disclosure among the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board. The Trustee shall be obligated to respond, on behalf of the Debtors, and with their reasonable cooperation, to all information demands with respect to the Avoidance Actions. The Trustee may waive, and/or disclose documents subject to, Privileges that are held by the FOMB and/or the Debtors (including the deliberative process privilege) only with the prior written consent of (i) the applicable holder(s) of such Privilege (*i.e.*, the FOMB and/or the Debtors, as the case may be), and (ii) the Trust Advisory Board, and only to the extent the Trustee determines in good faith that doing so is in the best interests of the Avoidance Actions Trust and its beneficiaries.

(c)    Notwithstanding anything in Section 1.9(b) to the contrary, the Trustee may disclose information that is subject to attorney-client privileges, work product protections or other immunities held by the FOMB or the Debtors (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law. If the Trustee or the Trust Advisory Board receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee and/or the Trust Advisory Board, the party or parties who receives such request will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (B) notify the Trustee or the Trust Advisory Board, as the case may be, (C) notify AAFAF, (D) allow the Trustee or the Trust Advisory Board, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (E) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee or the Trust Advisory Board is resolved in favor of disclosure. For the avoidance of doubt, this Section 1.9(c) does not limit the Trustee's obligations under Section 1.9(b) to seek, and be granted, AAFAF and Trust Advisory Board consent prior to waiving Privileges held by the Debtors or Avoidance Action Trust.

## ARTICLE II

## AVOIDANCE ACTIONS TRUST BENEFICIARIES

2.1    Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to an Avoidance Actions Trust Interest, the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Avoidance Actions Trust Interest subject to the claims or demands involved, or any part thereof,

129035426v6

and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands.  The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Avoidance Actions Trust and the Trustee (the occurrence of either (a) or (b) in this Section 2.1 being referred to as a "Dispute Resolution").  Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.  Any payment of any interest or income should be net of any taxes attributable thereto in accordance with Section 5.3.

2.2    Rights of Avoidance Actions Trust Beneficiaries.  Each Avoidance Actions Trust Beneficiary shall be entitled to participate in the rights and benefits due to an Avoidance Actions Trust Beneficiary hereunder according to the terms of its Avoidance Actions Trust Interest.  The interest of an Avoidance Actions Trust Beneficiary is hereby declared and shall be in all respects personal property.  Except as expressly provided hereunder, an Avoidance Actions Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Avoidance Actions Trust or the Avoidance Actions Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.  No surviving spouse, heir or devisee of any deceased Avoidance Actions Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Actions Trust Assets, but the whole title to the Avoidance Actions Trust Assets shall be vested in the Trustee and the sole interest of each Avoidance Actions Trust Beneficiary shall be the rights and benefits given to such Person under this Trust Agreement and the Plan.

2.3    Evidence of Avoidance Actions Trust Interest. Ownership of an Avoidance Actions Trust Interest in the Avoidance Actions Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "Book Entry System") maintained either by the Avoidance Actions Trust or an agent of the Avoidance Actions Trust and containing information provided by the Debtors or an agent of the Debtors.  An Avoidance Actions Trust Beneficiary shall be deemed the "holder of record" (hereinafter "holder") of such Avoidance Actions Trust Beneficiary's Avoidance Actions Trust Interest(s) for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations.  The Trustee shall, upon the written request of a holder of an Avoidance Actions Trust Interest, provide reasonably adequate documentary evidence of such holder's Avoidance Actions Trust Interest, as indicated in the Book Entry System.  The expense of providing such documentation shall be borne by the requesting holder.

2.4    Claims Reports.  Within sixty (60) days after the Effective Date, the Debtors shall arrange for the Trustee to receive a report (the "Initial Claims Report") regarding Avoidance Actions Trust Interests containing (a) an updated claims register for General Unsecured Claims, and (b) a written report of the status of any previously filed objections to General Unsecured Claims and the status of any reconciliations of General Unsecured Claims, showing which General Unsecured Claims are Allowed Claims, which are Disputed Claims (as defined below), and which are still being evaluated for possible objection.  Further, the Debtors shall arrange for the Trustee

6

to receive a monthly report within ten (10) days of the end of each month (the "Monthly Claims Report"), which report shall include all material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports.  In addition, the Debtors shall, upon reasonable request, periodically supply the Trustee with any other reports or information the Avoidance Actions Trust may reasonably request related to the reconciliation of General Unsecured Claims and the payment of distributions to Avoidance Actions Trust Beneficiaries.

2.5    Reliance on Debtors for Information.  It is the responsibility of the Debtors, pursuant to, among other things, their cooperation obligations established herein, to provide to the Avoidance Actions Trust reasonably complete and accurate information regarding Avoidance Actions Trust Interests and to provide periodic updates regarding such information as set forth in Section 2.4 hereof.  The (a) Trustee, (b) individual(s) comprising the Trustee, as the case may be, (c) Trust Advisory Board, and (d) members of the Trust Advisory Board (each, a "Trust Party" and, collectively, the "Trust Parties") shall be entitled to rely on information supplied by the Debtors and their agents (including the Disbursing Agent) concerning the Avoidance Actions Trust Interests, and shall not be held liable to any party for any incompleteness or inaccuracy of such information.

2.6    Transfers of Avoidance Actions Trust Interests.

(a)    General.  Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b)    Book Entry System.  The Book Entry System shall include a register (which may be electronic) setting forth the names and addresses of the Avoidance Actions Trust Beneficiaries, and the amount and class of their Avoidance Actions Trust Interests from time to time.  Any transfer or assignment of an Avoidance Actions Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable.  Subject to Section 2.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the Avoidance Actions Trust and the Trustee shall treat each Person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Avoidance Actions Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)    Registration.  In accordance with the Plan, the Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.  If the Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Avoidance Actions Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission (the "SEC") or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such

7

statute (it being understood and agreed that the Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class). To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(d)     Further Limitations on Transfer. Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Avoidance Actions Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.7     Limited Liability. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Avoidance Actions Trust Beneficiary, shall give rise to any liability of such Avoidance Actions Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct). Avoidance Actions Trust Beneficiaries are deemed to receive the Avoidance Actions Trust Assets in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order in exchange for their Allowed Claims, without further obligation or liability of any kind (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct), but subject to the provisions of this Trust Agreement.

## ARTICLE III

## DURATION AND TERMINATION OF AVOIDANCE ACTIONS TRUST

3.1     Duration. The Avoidance Actions Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved as provided for in Section 78.14(d) of the Plan.

3.2     Dissolution of the Avoidance Actions Trust.

(a)     The Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all of the Avoidance Actions Trust Assets having been distributed pursuant to the Plan and this Trust Agreement and (ii) following the reconciliation of all General Unsecured Claims, the Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; provided, however, that in no event shall the Avoidance Actions Trust be dissolved later than five (5) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or

an opinion of counsel satisfactory to the Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a "Liquidating Trust" for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets.

(b)     If at any time the Trustee determines, in reliance upon such Trust Professionals as the Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to the Avoidance Actions Trust Beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) of the type described in Section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under Section 501(a) of the IRC, and (C) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Trustee, and (iii) dissolve the Avoidance Actions Trust.  Upon receipt of such authority from the Title III Court, the Trustee shall notify each Avoidance Actions Trust Beneficiary.

3.3     Continuance of Avoidance Actions Trust for Winding Up.  After the dissolution of the Avoidance Actions Trust and solely for the purpose of liquidating and winding up the affairs of the Avoidance Actions Trust, the Trustee shall continue to act as such until its duties have been fully performed.  Upon distribution of all the Avoidance Actions Trust Assets, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Avoidance Actions Trust Assets, subject to any joint prosecution and common interests agreement(s) to which the Trustee may be party.  Provisions with respect to the destruction of documents in this Section 3.3 shall not limit the Trustee's right, prior to the dissolution of the Avoidance Actions Trust, to destroy documents that the Trustee considers no longer necessary to retain, subject to applicable law, the Plan, the Confirmation Order and this Trust Agreement.

## ARTICLE IV

## ADMINISTRATION OF AVOIDANCE ACTIONS TRUST

4.1     Payment of Claims, Expenses and Liabilities.  Subject to the Budget from time to time approved by the Trust Advisory Board in accordance with Section 4.13(b), and in accordance with Sections 6.7(j), 6.9(b),  and 7.6 hereof, and except as otherwise provided herein, the Trustee shall use the Avoidance Actions Trust Assets:  (a) to pay reasonable costs and expenses of the Avoidance Actions Trust (including any taxes imposed on the Avoidance Actions Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets, as provided in Section 6.7 hereof, and the preservation of books and records of the Avoidance Actions Trust); (b) to satisfy other obligations or other liabilities incurred or assumed by the Avoidance Actions Trust (or to which the Avoidance Actions Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order or this Trust Agreement, including reasonable fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Avoidance Actions Trust Assets and the reasonable costs of investigating, prosecuting, resolving and/or settling any

129035426v6

Claims; (c) as reasonably necessary to meet contingent liabilities and to maintain the value of the Avoidance Actions Trust Assets during liquidation; and (d) to satisfy any other obligations of the Avoidance Actions Trust expressly set forth in the Plan, this Trust Agreement, and the Confirmation Order. The costs, expenses and other obligations or other liabilities set forth in this Section 4.1 shall first be deducted from the Administrative Funding.  Incurrence of any such costs, expenses and other obligations or other liabilities requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

4.2    Distributions.

(a)    Generally.  All distributions to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests shall be made, at the election and direction of the Trustee with notice to the Debtors and AAFAF, by either (i) the Disbursing Agent selected by the Debtors under the Plan or (ii) such other disbursing agent as may be selected by the Trustee (the disbursing agent selected by the Trustee under either (i) or (ii) being the "Trust Disbursing Agent"), in either case in accordance with the terms and provisions of Article LXXVII of the Plan, except as otherwise provided herein.  The Trust Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same.  The Trust Disbursing Agent shall not hold an economic or beneficial interest in such property.   The Debtors will direct the Disbursing Agent to share information with and otherwise reasonably cooperate with the Trustee to generate administrative efficiencies and reduce duplication of effort in the distribution processes contemplated hereunder and under the Plan, including by sharing claimant tax information with the Trustee and providing access to the Debtors' Claims register.

(b)    Distributions by the Trust Disbursing Agent. The Trust Disbursing Agent is required to distribute to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests, on a semi-annual basis (each such date, a "Distribution Date"), in accordance with the terms of the Plan, all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 4.2), except (i) Cash reserved pursuant to this Trust Agreement to fund the activities of the Avoidance Actions Trust, and (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 of the Plan to pay reasonable incurred or anticipated expenses (including any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Trust Disbursing Agent shall not be required to make a distribution pursuant to this Section 4.3 if the aggregate net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate net amount is less than Twenty-Five Million Dollars ($25,000,000.00); provided further, however, that the Trustee, with consent of the Trust Advisory Board, may decide to direct the Trust Disbursing Agent to forego the first distribution to those Avoidance Actions Trust Beneficiaries with respect to which the Trustee, in its reasonable judgment, is not administratively prepared to direct such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Trustee is administratively prepared to do so, not to exceed three (3) months from the date of the first semi-annual distribution.

(c)     Payment of Distributions.  Each Avoidance Actions Trust Beneficiary's share of the Avoidance Actions Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Avoidance Actions Trust Interests) shall be allocated and distributed, and the Avoidance Actions Trust Assets shall be allocated and distributed, in accordance with Article LXXVII of the Plan.

4.3     De Minimis Distributions.  No Cash payment shall be made to any holder of an Avoidance Actions Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Avoidance Actions Trust, is equal to or greater than Ten Dollars ($10.00). Any holder of an Avoidance Actions Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Avoidance Actions Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Avoidance Actions Trust or the Avoidance Actions Trust Assets. Subject to Section 4.6, any Cash not distributed pursuant to this Section 4.3 hereof shall be the property of the Avoidance Actions Trust free of any restrictions thereon, and shall be available for distribution to the other Avoidance Actions Trust Beneficiaries, in accordance with the Plan and this Trust Agreement.

4.4     Undeliverable Distributions.    For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued.  If any distribution to the holder of a Avoidance Actions Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable.  All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution. Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Avoidance Actions Trust Interest.

4.5     Interest on Avoidance Actions Trust Interests.  As set forth in the Plan, interest shall not accrue and be paid on the Avoidance Actions Trust Interests.

4.6     Distributions After the Effective Date.  Distributions made after the Effective Date to holders of Avoidance Actions Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article LXXVII of the Plan.

4.7     Compliance with Laws.  Any and all distributions of Avoidance Actions Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

4.8     Fiscal Year.  Except for the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be the calendar year.  For the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be such portion of the calendar year that the Avoidance Actions Trust is in existence.

129035426v6

4.9    <u>Books and Records</u>.   The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee.  Subject to <u>Section 3.3</u>, the Trustee shall maintain, in respect of the Avoidance Actions Trust and the Avoidance Actions Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Avoidance Actions Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Avoidance Actions Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws.  Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Avoidance Actions Trust, or as a condition for making any payment or distribution out of the Avoidance Actions Trust Assets.  The Trustee shall provide AAFAF and any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with three (3) Business Days' advance notice.  Avoidance Actions Trust Beneficiaries holding Allowed Claims shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; <u>provided</u>, <u>however</u>, that if so requested, all costs associated with such inspection shall be paid in advance by such requesting Avoidance Actions Trust Beneficiary and such Avoidance Actions Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10    <u>Cash Payments</u>.   All distributions required to be made to the Avoidance Actions Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; <u>provided</u>, <u>however</u>, that Cash payments to foreign holders of Avoidance Actions Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11    <u>Insurance</u>.   The Avoidance Actions Trust shall maintain customary insurance coverage for the protection of the Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Avoidance Actions Trust on and after the Effective Date.  The Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become Avoidance Actions Trust Assets, if any.

4.12    <u>Disputes</u>.   To the extent a dispute arises between the Trustee and the Trust Advisory Board concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee or the Trust Advisory Board may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties.  In the event of a dispute, the Trustee and the Trust Advisory Board, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, if the Administrative Funding has been spent, any other unrestricted Cash in the Avoidance Actions Trust, subject to the approval of a majority of the Trust Advisory Board and subject to <u>Section 7.5</u>.  A motion and/or

12

other pleading described in this <u>Section 4.12</u> filed by the Trust Advisory Board may only be filed upon the consent of a majority of its members.

4.13    <u>Reports from the Trustee</u>

(a)    The Trustee shall deliver reports to members of the Trust Advisory Board and AAFAF not later than thirty (30) days following the end of each fiscal quarter, or less frequently as may be agreed upon between the Trustee and the Trust Advisory Board.  Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Avoidance Actions Trust or the Avoidance Actions Trust Assets, including Avoidance Actions, including any settlements entered into by the Avoidance Actions Trust, (ii) the costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and preservation of books and records as provided in <u>Section 4.8</u>) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of Cash and other assets received by the Avoidance Actions Trust during the prior fiscal quarter, (v) the aggregate amount of Cash and other assets received by the Avoidance Actions Trust since the Effective Date, (vi) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to <u>Section 4.2(a)</u> above, (vii) the aggregate amount of distributions from the Avoidance Actions Trust to the Avoidance Actions Trust Beneficiaries since the Effective Date, and (viii) such other information as the Trust Advisory Board may reasonably request from time to time. The Trustee also shall timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Avoidance Actions Trust and the Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

(b)    The Trustee shall prepare and submit to the Trust Advisory Board for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Avoidance Actions Trust; <u>provided</u>, <u>however</u>, that the first such annual plan and budget shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail:  (i) the Trustee's anticipated actions to administer and liquidate the Avoidance Actions Trust Assets; and (ii) the anticipated expenses, including the expenses of Trust Professionals, associated with conducting the affairs of the Avoidance Actions Trust.  Such annual plan and budget shall be updated and submitted to the Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Avoidance Actions Trust to date.  Any such annual plan and budget as approved by the Trust Advisory Board is referred to herein as the "<u>Budget</u>".  All actions by the Trustee must be substantially consistent with the then current Budget, provided that the Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board.

(c)    In accordance with the Plan, the Avoidance Actions Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the

13

Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to Sections 7(a) and 7(b) of that Investment Company Act of 1940, as amended, and section 1145 of the Bankruptcy Code. Notwithstanding the forgoing, if required to do so, and until such time as the Avoidance Actions Trust is dissolved in accordance with Section 78.14(d) of the Plan (or otherwise in accordance with this Trust Agreement), the Avoidance Actions Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the Avoidance Actions Trust is required to file pursuant to the Exchange Act.

## ARTICLE V

## TAX MATTERS

5.1     Avoidance Actions Trust Assets Treated as Owned by Avoidance Actions Trust Beneficiaries. For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (a) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the reserve for such claims, *followed by* (b) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to a reserve for disputed claims) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to a reserve for disputed claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The establishment of the Avoidance Actions Trust under United States law shall not, by itself, be deemed to subject the Avoidance Actions Trust Beneficiaries to United States federal income taxes.

5.2     Tax Reporting.

(a)     The Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation 1.671-4(a) and in accordance with this Article V. To the extent and in the manner required by applicable law, the Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee also shall file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(b)     To the extent and in the manner required by applicable law, allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to a reserve for disputed claims) shall be determined by reference to

14

the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to a reserve for disputed claims) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, to the extent an in the manner required by applicable law, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. To the extent and in the manner required by applicable law, the tax book value of the Avoidance Actions Trust Assets for purposes of this Section 5.2(b) shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any reserve for disputed claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(d)     The Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the Avoidance Actions Trust or its assets, including any reserve for disputed claims. If, and to the extent, any Cash retained on account of Disputed Claims in the reserve for such claims is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from such reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the resolution of such Disputed Claims.

5.3     Tax Withholdings by Trustee. The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Trust Agreement, it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement. In order

15

to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.  To the extent the Disbursing Agent collects such tax information in performance of its duties under the Plan, the Debtors agree to direct the Disbursing Agent to provide such tax information concerning Avoidance Action Trust Beneficiaries to the Trust Disbursing Agent for use in accordance with this Trust Agreement.   This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided further, however, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; provided further, however, that if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such holder).

Notwithstanding the above, and without limiting any of the other obligations of the Debtors or rights of the Trustee described herein, (a) the Debtors shall be required to supply to the Trustee such tax information of the holders of Avoidance Actions Trust Interests that is in the possession or control of the Debtors or any of their agents, representatives or professionals, including the Disbursing Agent and that the Trustee may reasonably request be provided to it by the Debtors, and (b) the Trust Parties shall be entitled to rely on, and shall not be held liable for any omission or inaccuracy with respect to, such tax information so supplied to the Trustee.

## ARTICLE VI

## POWERS OF AND LIMITATIONS ON THE TRUSTEE

6.1   Trustee.

(a)   "Trustee" means Drivetrain, LLC so long as it continues in office, and all other Person(s) who have been duly elected and qualify as Trustee of the Avoidance Actions Trust hereunder pursuant to Section 1.4 or Article VIII.  Subject to Article VIII, the Trustee shall hold office until disability, death, resignation, or the termination of the Avoidance Actions Trust in accordance with the terms set forth herein.  References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its capacity as Trustee hereunder.  The Trustee shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest.

(b)   Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

16

6.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the proceeds of the Avoidance Actions Trust Assets and the administration of the Avoidance Actions Trust.

(b)     Nothing in this Trust Agreement shall be deemed to limit the Trust Parties' protections and benefits under the Plan or to prevent a Trust Party from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trust Party determines it is obligated to take or to refrain from taking in the performance of any duty that the Trust Party may owe the Avoidance Actions Trust Beneficiaries or any other Person under the Plan, Confirmation Order or this Agreement.

(c)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan and this Trust Agreement and as otherwise provided by applicable law.  Subject to the Confirmation Order, the Plan and the provisions of this Trust Agreement, including the oversight and approvals by and of the Trust Advisory Board and the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions:

(i)      to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust;

(ii)     to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii)    in the Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Avoidance Actions Trust;

(iv)     to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust;

(v)      in the Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Trustee will be responsible;

(vi)     to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority;

(vii)    to enter into any agreements binding the Avoidance Actions Trust, and to execute, acknowledge and deliver any and all instruments that are necessary or

17

deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Avoidance Actions Trust;

(viii)   to open and maintain bank accounts on behalf of or in the name of the Avoidance Actions Trust;

(ix)   to cause the Avoidance Actions Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties, in accordance with the terms and limitations set forth herein;

(x)   to cause the Avoidance Actions Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments;

(xi)   to cause the Avoidance Actions Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(xii)   to cause the Avoidance Actions Trust seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(xiii)   to cause the Avoidance Actions Trust to establish out of all Avoidance Actions Trust Assets such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Avoidance Actions Trust;

(xiv)   to establish and maintain a website, to the extent the Trustee deems necessary, to provide notice of the Avoidance Actions Trust's activities to Avoidance Actions Trust Beneficiaries, provided that the Trustee determines, on the advice of counsel, that establishing such website does not implicate any securities or other applicable law;

(xv)   to undertake all administrative functions of the Avoidance Actions Trust, including overseeing the winding down and termination of the Avoidance Actions Trust;

(xvi)   to exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

(xvii)   to take all other actions consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

(d)   In all circumstances, the Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

6.3   <u>Title III Court</u>. Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of

competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Avoidance Actions Trust, or the Avoidance Actions Trust Assets, including the administration and distribution of the Avoidance Actions Trust Assets and the termination of the Avoidance Actions Trust. Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.4     Exclusive Authority to Pursue Avoidance Actions. The Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court. The Trustee shall be the sole representative of the Debtors under section 1123(b)(3) of the Bankruptcy Code with respect to the Avoidance Actions. The Trustee shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant in an Avoidance Action. The Trustee also shall be vested with and entitled to assert all of the Debtors' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

6.5     Limitations on Trustee. The Trustee shall, on behalf of the Avoidance Actions Trust, hold the Avoidance Actions Trust out as a trust in the process of liquidation and not as an investment company. The Trustee shall be restricted to the liquidation of the Avoidance Actions Trust Assets on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the distribution and application of Avoidance Actions Trust Assets for the purposes set forth in, and the conservation and protection of the Avoidance Actions Trust Assets and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan and the Confirmation Order.

6.6     Conflicts of Interest. The Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified it has a conflict of interest or the Title III Court, on motion of the any party in interest, determines one exists. If the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Title III Court, on notice and hearing, may do so.

6.7     Establishment of Trust Advisory Board.

(a)     The "Trust Advisory Board" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Avoidance Actions Trust Assets by the Trustee in accordance with this Trust Agreement, the Plan and the Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement. Notwithstanding anything that may be to the contrary contained herein, the initial OB Director need not be selected by the FOMB on the date hereof, but may be selected at any time after the date hereof.

19

(b)     The Trust Advisory Board initially shall be comprised of (i) two (2) directors selected by the Creditors' Committee (the "Creditor Directors"), and (ii) one (1) director selected by the FOMB (the "OB Director").  The initial members of the Trust Advisory Board are set forth on Annex A hereto.  Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Avoidance Actions Trust Beneficiaries as a whole. The Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

(c)     The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Avoidance Actions Trust is dissolved in accordance with Section 3.2.  The service of the members of the Trust Advisory Board shall be subject to the following:

(i)     the members of the Trust Advisory Board shall serve until disability, death, or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii)    a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board.  Such resignation shall be effective when a successor is appointed as provided herein;

(iii)   a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud, gross negligence or willful misconduct in connection with the affairs of the Avoidance Actions Trust, or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a).  Such removal shall be effective immediately upon such vote;

(iv)    in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a Creditor Director, (i) by the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the remaining Creditor Director, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (B) in the case of the OB Director (i) by the FOMB, as notified in writing to the Trust Advisory Board within ten (10) Business Days, or (ii) if the FOMB has been dissolved, by AAFAF, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days.  In each case, the appointment of a successor member of the Trust Advisory Board shall be evidenced by the filing with the Title III Court by the Trustee of a notice of appointment, which notice shall include the name, address, and telephone number of the successor member of the Trust Advisory Board; and

(v)     immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act;

129035426v6

and the successor member of the Trust Advisory Board shall not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

(d)     Each member of the Trust Advisory Board shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Trust Advisory Board, and (ii) an alternate representative to attend meetings and participate in other activities of the Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable.

(e)     Notwithstanding anything in this Trust Agreement to the contrary, the Trust Advisory Board shall not take any action which will cause the Avoidance Actions Trust to fail to qualify as a "Liquidating Trust" for United States federal income tax purposes.

(f)     A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused, voting members of the Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in Person, by telephone or by proxy.

(g)     Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or agreement of such board.  If an equal number of the non-recused voting members of the Trust Advisory Board vote for and against a particular matter, the Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter.  Any of or all the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in Person at the meeting.  In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy.  In a matter in which the Trustee cannot obtain direction or authority from the Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Title III Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(h)     A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest.  If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the unanimous vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(i)     Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent

21

of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(j)     The members of the Trust Advisory Board shall be compensated as the Trust Advisory Board shall determine in an amount not to exceed $75,000 per board member per year.  Any member of the Trust Advisory Board shall also be reimbursed by the Trustee for its actual, reasonable out-of-pocket expenses, not to include outside counsel fees, incurred for serving on such board in the same manner and priority as the compensation and expenses of the Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Title III Court.  Except as provided for in this Section 6.7, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members.  The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.  Payment of the compensation and expenses set forth in this Section 6.7(j) shall first be deducted from the Administrative Funding.  Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

6.8     Cooperation with Respect to Claim Allowance:  The Trustee and the Debtors shall cooperate and consult each other with respect to the disallowance or allowance of claims in connection with the litigation and/or resolution of Avoidance Actions, including with respect to any issues arising under sections 502(d) or 502(h) of the Bankruptcy Code.

6.9     Agents, Employees and Professionals.

(a)     The Avoidance Actions Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain members, managers, agents, representatives, employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Avoidance Actions Trust (collectively, the "Trust Professionals"), on such terms as the Trustee deems appropriate, including counsel retained on a contingency-fee basis, subject to the approval of the Trust Advisory Board.  The Debtors agree that the Avoidance Actions Trust may (but shall not be obligated to) retain as disbursing agent the same disbursing agent as retained by one or more of the Debtors, on terms and conditions to facilitate timely and efficient distributions of the Cash proceeds of Avoidance Actions.  None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)     After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such Person, plus an itemized statement of expenses. The Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Trustee.  In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)    All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Avoidance Actions Trust Assets, subject to the approval of the Trust Advisory Board.

(d)    Nothing in this Agreement shall prevent the Trustee, subject to the approval of the Trust Advisory Board, from seeking and obtaining outside credit or other funding for the prosecution of the Avoidance Actions.

6.10    <u>Investment of Avoidance Actions Trust Monies</u>.    All monies and other assets received by the Trustee as Avoidance Actions Trust Assets (including the proceeds thereof as a result of investment in accordance with this <u>Section 6.10</u>) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Avoidance Actions Trust Beneficiaries, and shall not be segregated from other Avoidance Actions Trust Assets, unless and to the extent required by the Plan.  The Trustee may invest any Cash (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this <u>Section 6.10</u>, but shall otherwise be under no liability for interest or income on any monies received by the Avoidance Actions Trust hereunder and held for distribution or payment to the Avoidance Actions Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Avoidance Actions Trust shall be administered in accordance with the general duties and obligations hereunder.  The right and power of the Trustee to invest the Avoidance Actions Trust Assets, the proceeds thereof, or any income earned by the Avoidance Actions Trust, shall be limited to the right and power to:  (a) invest such Avoidance Actions Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in either (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "<u>Permissible Investments</u>"); <u>provided</u>, <u>however</u>, that the scope of any Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.11    <u>Termination</u>.  The duties, responsibilities and powers of the Trustee shall terminate on the date the Avoidance Actions Trust is wound up and dissolved in accordance with New York law pursuant to <u>Section 3.2</u> hereof, under applicable law in accordance with the Plan, by an order of the Title III Court or by entry of a final decree closing the Debtors' Title III Cases; <u>provided</u>, that <u>Sections 7.1</u>, <u>7.2</u>, <u>7.3</u>, <u>7.4</u> and <u>7.5</u> hereof shall survive such termination, dissolution and entry.

## ARTICLE VII

## <u>LIABILITY AND INDEMNITY</u>

7.1    <u>Liability to Third Persons</u>.  No Avoidance Actions Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Avoidance Actions Trust Assets or the affairs of the Trustee (except to the

extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct).  Notwithstanding anything herein to the contrary and without limitation of section 78.15 of the Plan, neither the Trust Parties nor the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents or agents, or any of such Person's successors and assigns shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee and members of the Trust Advisory Board, to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Avoidance Actions Trust Assets or the affairs of the Avoidance Actions Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Title III Court to be due to their respective gross negligence, fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Avoidance Actions Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Avoidance Actions Trust.  Other than as set forth in the Plan or in the Confirmation Order, nothing in this <u>Section 7.1</u> shall be deemed to release any Avoidance Actions Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.2    <u>Nonliability for Acts of Others</u>.  Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by Trustee, the Trust Advisory Board (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the such persons to assume or accept any such liability, obligation or duty.  Any successor Trustee or Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee or Trust Advisory Board hereunder, and any statement or representation made as to the assets comprising the Avoidance Actions Trust Assets or as to any other fact bearing upon the prior administration of the Avoidance Actions Trust, so long as it has a good faith basis to do so.  The Trustee and the Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue (except to the extent of the Trustee's, or the Trust Advisory Board members', fraud, gross negligence or willful misconduct).  The Trustee or any successor Trustee and the Trust Advisory Board members  or any successor Trust Advisory Board member shall not be liable for any act or omission of any predecessor Trustee or Trust Advisory Board member.  No provision of this Trust Agreement shall require the Trustee or any Trust Advisory Board member to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Trustee or Trust Advisory Board member has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

7.3    <u>Exculpation.</u>  As of the Effective Date, the Trust Parties, the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns shall be and hereby are exculpated by all Persons, including Avoidance Actions Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement or any order of the Title III Court entered pursuant to or in furtherance of the

129035426v6

Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective fraud, criminal conduct, gross negligence or willful misconduct.  No Avoidance Actions Trust Beneficiary, holder of a Claim, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trust Parties, their employees, professionals, or representatives, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement.  Any action taken or omitted to be taken with the express approval of the Title III Court or the Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, that would result in a change to the distribution provisions of this Trust Agreement and the Plan. In such instance, the Trustee shall request, within fourteen (14) days, the Title III Court's ratification of its determination not to comply with a direction of the Trust Advisory Board.

7.4   Limitation of Liability.  The Trustee, the members of the Trust Advisory Board, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except for those resulting from acts arising out of their own fraud, willful misconduct, or gross negligence.

7.5   Indemnity.  The Trust Parties and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except those acts arising out of their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence. Any indemnification claim of an Indemnified Party under this Section 7.5 shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.   The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6   Compensation and Expenses.  The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Avoidance Actions Trust Assets, in the manner and amount determined by the Trust Advisory Board, subject to the approval of the Title III Court.  In addition, the Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Title III Court, to reimburse itself from the Avoidance Actions Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan so long as it falls within the amounts provided for in the Budget; otherwise, approval of the Trust Advisory Board is required.  Payment of the compensation and expenses set forth in this Section 7.6 shall first be deducted from the Administrative Funding.  Payment of amounts

25

from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

## ARTICLE VIII

## SUCCESSOR TRUSTEE

8.1     Resignation.  The Trustee may resign from the Avoidance Actions Trust by giving at least sixty (60) days' prior written notice thereof to each member of the Trust Advisory Board. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2     Removal.  The Trustee may be removed by a majority vote of the members of the Trust Advisory Board.  Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

8.3     Effect of Resignation or Removal.   The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the Avoidance Actions Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Trustee.  All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the Avoidance Actions Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board, or (b) the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the Avoidance Actions Trust Assets.  In the event of the resignation or removal of the Trustee, such Trustee shall:  (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the Avoidance Actions Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

8.4     Appointment of Successor.   In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Trust Advisory Board; provided, however, that under no circumstance shall the successor Trustee be a director or officer of any Affiliate of the Avoidance Actions Trust.

8.5     Acceptance of Appointment by Successor Trustee.   Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee.  Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Avoidance Actions Trust with like effect as if originally

26

named Trustee.  The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Title III Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE IX

## **MISCELLANEOUS PROVISIONS**

9.1     Binding on the Debtors.  This Trust Agreement shall be binding on the Debtors and shall remain binding on the Debtors notwithstanding any dissolution of the FOMB or any other event that may cause the FOMB to cease to exist or to cease serving as a representative of the Debtors.

9.2     Governing Law.  This Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of laws; provided, however, that the Trust Advisory Board shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

9.3     Jurisdiction.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the Avoidance Actions Trust and the Trustee, including the administration and activities of the Avoidance Actions Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; provided, however, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any Claims or Causes of Action assigned to the Avoidance Actions Trust.

9.4     Severability.  If any provision of this Trust Agreement or the application thereof to any Person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.5     Notices.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by facsimile transmission or e-mail, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(i)      if to the Trustee, to:

Drivetrain LLC
410 Park Avenue, Suite 900
New York, NY 10022
dmack@drivetrainllc.com

129035426v6

sleduc@drivetrainllc.com
tdaileader@drivetrainllc.com

with a copy to counsel to be identified by the Trustee.

(ii)     if to members of the Trust Advisory Board, then to each of;

Carol Flaton
Hamlin Partners LLC
39 Bank Street
New York, NY 10014
carol.flaton@hamlinpartners.com

Ramon Ortiz
Urb. Sabanera
40 Camino de la Cascada
Cidra, Puerto Rico 00739
ruoc1958@hotmail.com

(iii)    if to any Avoidance Actions Trust Beneficiary, to the last known address of such Avoidance Actions Trust Beneficiary according to the Debtors' Schedules, such Avoidance Actions Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

(iv)     if to the FOMB

Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave,
Suite 1107 San Juan, PR 00918-1813
Attn: Natalie A. Jaresko, Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq. Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

O'Neill & Borges LLC
250 Muñoz Rivera Ave,
Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.

28

129035426v6

Tel: (787) 764-8181
Fax: (212) 753-8944

(v)     if to each of the Debtors or the Post-Effective Date Debtors:

The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director
AND

The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Executive Director

AND

The Puerto Rico Public Buildings Authority
PO Box 41029
San Juan, PR 00940-1029
Attn: Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

With a copy to:

O'Melveny & Myers LLP

29

Seven Times Square
New York, NY 10036
Attn:    John Rapisardi, Esq.
Peter Friedman, Esq.
Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

9.6      <u>Deemed Delivery</u>. All notices shall be effective and shall be deemed delivered : (a) if by personal delivery, delivery service or courier, on the date of delivery; (b) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (c) if by mail, on the date of receipt. Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

9.7      <u>Headings</u>.    The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.8      <u>Actions Taken on a Date Other Than A Business Day</u>.  If any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.9      <u>Relationship to the Plan</u>.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan).  Additionally, the Trustee and the Trust Advisory Board may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the Confirmation Order and this Trust Agreement.  However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement; (b) *second*, the Confirmation Order; and (c) *third*, the Plan.

9.10      <u>Entire Trust Agreement</u>.  This Trust Agreement (including the recitals and annexes hereto), the Plan and the Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings, statements, or exchanges by and among the parties or any other person with respect to the subject matter hereof.

9.11      <u>Cooperation</u>.  Each of the Debtors and the FOMB shall turn over or otherwise make available to the Trustee at no cost to the Avoidance Actions Trust or the Trustee, all books and records (or copies thereof) and other information, in each as may be reasonably requested by the Trustee, including (a) all communications by and between the FOMB and its professionals and the Avoidance Action defendants, and (b) all data and documents the FOMB and its professionals

30

have received from the Avoidance Action defendants through the "information exchange" process contemplated by the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee and the Official Committee of Unsecured Creditors to (i) Establish Litigation Case Management Procedures and (ii) Establish Procedures for Approval of Settlements* [Docket No. 7941]. The Debtors and the FOMB further agree to reasonably cooperate with the Trustee in carrying out its duties hereunder, including by, among other things:  (i) delivering to the Trustee work product developed by their respective professionals in connection with the prosecution of the Avoidance Actions, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' and the FOMB's books and records; (ii) following the Effective Date, participating in meetings with the Trustee, at the Trustee's reasonable request and at such times and upon such notice as does not unreasonably interfere with the operations of such party, for purposes of coordinating the transition of the Avoidance Actions Trust Assets; (iii) providing assistance in discovery responses and witness testimony as is reasonably necessary for the resolution of the Avoidance Actions; and (iv) maintaining all data rooms, hard drives and other media containing information and/or documents related to the Avoidance Actions, as reasonably requested by the Trustee, to facilitate access to such information and/or documents. Notwithstanding the foregoing or anything else that may be to the contrary herein, the FOMB shall not be required to disclose any information or work product if the same constitutes or relates to communications between a committee of the FOMB and another part or a member of the FOMB; provided, however, that the FOMB shall provide to the Trustee the relevant portion of any memoranda or other documents containing research or analysis concerning legal or factual issues arising in the Avoidance Actions, regardless of whether such memoranda or other documents were shared between a committee of the FOMB and another part or a member of the FOMB. The Trustee agrees to give the Debtors and/or their designated counsel reasonable access to attend (A) witness preparations related to the Avoidance Actions for any witness who will be providing testimony in his or her capacity as a current or former employee of any of the Debtors, and (B) the depositions of any witness who provides testimony related to the Avoidance Actions in his or her capacity as a current or former employee of any of the Debtors; provided, however, that such attendance (1) will be solely as an observer, and (2) shall not constitute a waiver of any privileges.

9.12    Amendment and Waiver.  Any provision of this Trust Agreement may be amended or waived by the Trustee with the unanimous consent of all voting members of the Trust Advisory Board.  Notwithstanding this Section 9.12, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Avoidance Actions Trust to liquidate in an expeditious but orderly manner the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.2.

9.13    Confidentiality.    The Trust Parties and their advisors, including the Trust Professionals (each a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor or the FOMB to which any of the Avoidance Actions Trust Assets relates; provided, however, that such information may be disclosed if:  (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process. including subpoena or other court order or other applicable laws or regulations.  If any Confidential Party is requested to divulge

confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Trust Advisory Board in case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

9.14    Rules of Construction.  Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and *vice versa*.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement.  The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement.  The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

9.15    Counterparts.  This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

9.16    Intention of Parties to Establish Avoidance Actions Trust.  This Trust Agreement is intended to create a Avoidance Actions Trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

9.17    Definitions.

"**AAFAF**" shall have the meaning ascribed to such term in the Plan.

"**Administrative Funding**" shall have the meaning ascribed to such term in Section 1.3 hereof.

"**Affiliate**" shall have the meaning ascribed to such term in the Plan.

"**Allowed**" shall have the meaning ascribed to such term in the Plan.

"**Allowed Claim**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

129035426v6

"**Avoidance Actions Trust Assets**" shall have the meaning ascribed to such term in the Plan and, for the avoidance of doubt, shall include the account at Banco Popular with account number 75-0277-01-4.

"**Avoidance Actions Trust Beneficiaries**" shall have the meaning ascribed to such term in the Plan.

"**Avoidance Actions Trust Interests**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Code**" shall have the meaning ascribed to such term in the Plan.

"**Bankruptcy Rules**" shall have the meaning ascribed to such term in the Plan.

"**Book Entry System**" shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

"**Budget**" shall have the meaning ascribed to such term in <u>Section 4.13</u> hereof.

"**Business Day**" shall have the meaning ascribed to such term in the Plan.

"**Cash**" shall have the meaning ascribed to such term in the Plan.

"**Causes of Action**" shall have the meaning ascribed to such term in the Plan.

"**Claims**" shall have the meaning ascribed to such term in the Plan.

"**Commonwealth**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Commonwealth Avoidance Actions Trust**" shall have the meaning ascribed to such term in <u>Section 1.1</u> hereof.

"**Confidential Party**" shall have the meaning ascribed to such term in <u>Section 9.13</u> hereof.

"**Confirmation Order**" shall have the meaning ascribed to such term in the Recitals.

"**Creditors' Committee**" shall have the meaning ascribed to such term in the Plan.

"**Creditor Directors**" shall have the meaning ascribed to such term in <u>Section 6.7(b)</u> hereof.

"**Debtors**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Disbursing Agent**" shall have the meaning ascribed to such term in the Plan.

129035426v6

"**Dispute Resolution**" shall have the meaning ascribed to such term in <u>Section 2.1</u> hereof.

"**Disputed Claim**" shall have the meaning ascribed to such term in the Plan but shall include, in the period prior to the Debtors' deadline to object to claims, all Claims that have not been Allowed.

"**Distribution Date**" shall have the meaning ascribed to such term in <u>Section 4.2(b)</u> hereof.

"**Effective Date**" shall have the meaning ascribed to such term in the Plan.

"**Eminent Domain Claim**" shall have the meaning ascribed to such term in the Plan.

"**Entities**" shall have the meaning ascribed to such term in the Plan.

"**Equity**" shall have the meaning ascribed to such term in the Plan.

"**ERS**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**ERS General Unsecured Claim**" shall have the meaning ascribed to such term in the Plan.

"**Exchange Act**" shall have the meaning ascribed to such term in <u>Section 2.6(c)</u> hereof.

"**Final Order**" shall have the meaning ascribed to such term in the Plan.

"**FOMB**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**General Unsecured Claims**" shall have the meaning ascribed to such term in the Plan.

"**Indemnified Party**" shall have the meaning ascribed to such term in <u>Section 7.5</u> hereof.

"**Initial Claims Report**" shall have the meaning ascribed to such term in <u>Section 2.4</u> hereof.

"**IRC**" shall have the meaning ascribed to such term in the Recitals.

"**IRS**" shall have the meaning ascribed to such term in the Plan.

"**Liquidating Trust**" shall have the meaning ascribed to such term in Recitals.

"**Monthly Claims Report**" shall have the meaning ascribed to such term in <u>Section 2.4</u> hereof.

"**OB Director**" shall have the meaning ascribed to such term in <u>Section 6.7(b)</u> hereof.

**"PBA"** shall have the meaning ascribed to such term in the Recitals.

**"Permissible Investments"** shall have the meaning ascribed to such term in <u>Section 6.10</u> hereof.

**"Person"** shall have the meaning ascribed to such term in the Plan.

**"Plan"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

**"Privileges"** shall have the meaning ascribed to such term in <u>Section 1.9</u> hereof.

**"PROMESA"** shall have the meaning ascribed to such term in the Recitals.

**"Reorganized Debtors"** shall have the meaning ascribed to such term in the Plan.

**"SEC"** shall have the meaning ascribed to such term in <u>Section 2.6(c)</u> hereof.

**"Title III Cases"** shall have the meaning ascribed to such term in the Recitals.

**"Title III Court"** shall have the meaning ascribed to such term in the Plan.

**"Treasury Regulations"** shall have the meaning ascribed to such term in the Recitals.

**"Trust Advisory Board"** shall have the meaning ascribed to such term in <u>Section 6.7(a)</u> hereof.

**"Trust Agreement"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

**"Trust Disbursing Agent"** shall have the meaning ascribed to such term in <u>Section 4.2</u> hereof.

**"Trust Parties"** shall have the meaning ascribed to such term in <u>Section 2.5</u> hereof.

 **"Trust Professionals"** shall have the meaning ascribed to such term in <u>Section 6.9</u> hereof.

**"Trustee"** shall have the meaning ascribed to such term in the head of this Trust Agreement.


[Remainder of Page Blank — Signature Page Follows]

129035426v6

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ *Natalie A. Jaresko*
    Name:  Natalie Jaresko
    Title:    Executive Director

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ *Natalie A. Jaresko*
    Name:  Natalie Jaresko
    Title:    Executive Director

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ *Natalie A. Jaresko*
    Name:  Natalie Jaresko
    Title:    Executive Director

**DRIVETRAIN LLC, AS TRUSTEE**

By: /s/
    Name:  ~~David Mack~~
                Timothy Daileader
                Authorized Signatory

129035426v6

***And, solely with respect to <u>Sections 1.3</u> and <u>9.11</u> hereof:***

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By: <u>/s/   Natalie A. Jaresko</u>
      Name:   Natalie Jaresko
      Title:   Executive Director

129035426v6

**Annex A**

<u>Initial Trust Advisory Board Members</u>

*Creditor Directors*:

1.      Carol Flaton
2.      Ramon Ortiz Carro

*OB Director*:

3.      None

# **EXHIBIT D**

Schedule of Executory Contracts and Unexpired Leases to be Assumed

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-DS0239 | 3 Rios LTD Corp | Departamento de Salud | 27 Gonzalez Giusti Ave, Suite 300, Guaynabo, PR 00968 | 117 Eleanor Roosevelt, Hato Rey, PR 00918 | $0.00 |
| 2018-000016 | Administración de la Industria y el Deporte Hípico | Sucesión Díaz Bonet, representada por el Sr. José A. Díaz Dávila | P.O. Box 361887, San Juan,PR 00936 | Avenida 65 de Infantería, Calle Rafael Arcelay, San Juan, P.R. 00924 | $0.00 |
| 2018-000065 | Administración de los Sistemas de Retiro de los Empleados del Gobierno y Judicatura | Atlantic Master Parking Service, Inc. | Urb. Levittown 3407 Paseo Camaron Toa Baja, PR 00949 | Estacionamiento Nuevo Centro Gubernamental de Minillas, Santurce Puerto Rico 00907 | $0.00 |
| 2018-000144 | Administración de Rehabilitación Vocacional (ARV) | Ariel Z. Ortiz Blanco | Villa Alba D-27 CALLE D Villalba, PR 00766-1601 | Edif. Ortiz Burgos Urb. La Vega #205, Villalba, PR 00766 | $0.00 |
| 2004-000002 | Administración de Rehabilitación Vocacional (ARV) | Bienvenido Perez Ramirez | PO BOX 3964 Aguadilla, PR 00605 | Carretera #2 Bo. Corrales de Aguadilla, Aguadilla, PR 00603 | $0.00 |
| 2007-000078 | Administración de Rehabilitación Vocacional (ARV) | Edwin Ramos | PO BOX 197 La Plata, Aibonito,PR 00786 | Edificio Médico Guayacán #217, Aibonito, PR 00705 | $0.00 |
| 2018-000143 | Administración de Rehabilitación Vocacional (ARV) | Fidecomiso Hernández Castrodad | HC 06 BOX 72502 Caguas, PR 00725-9511 | Ave. Angora Solar #4 Secor Bairoa, Caguas, PR 00725 | $0.00 |
| 2006-000097 | Administración de Rehabilitación Vocacional (ARV) | FMA Realty, Inc. | Carr. # 2 km 17.0 Barrio Candelaria Toa Baja, PR 00949 | Carretera #2 KM17.0 Barrio Candelaria, Toa Baja, PR 00949 | $0.00 |
| 2003-000004 | Administración de Rehabilitación Vocacional (ARV) | Hector D. Ríos | PO  Box 403 Barranquitas, PR 00794 | Calle Barceló #9, Guaynabo, PR  00969 | $0.00 |
| N/A | Administración de Rehabilitación Vocacional (ARV) | INTER San Germán | Av. Universidad Interamericana, San Germán, 00683 | N/A | $0.00 |
| N/A | Administración de Rehabilitación Vocacional (ARV) | Jhon Javy Corp. | Boulevard Paza Offices Buildings Po Box 246, Las Piedras, PR 771 | Boulevard del Rio Offices Buildings, Boulevard del Río Ramal #3, Humacao, PR, 00792 | $0.00 |
| 2018-000158 | Administración de Rehabilitación Vocacional (ARV) | Laboratorio Clínico Mercado | PO BOX 1291 Orocovis, PR 00720-1291 | Carretera 155 Ave. Luis Muñoz Marín #12 KM 26.4, Orocovis, PR  00720 | $0.00 |
| 2007-000117 | Administración de Rehabilitación Vocacional (ARV) | Office Park Inc. | 1 Calle 65 Infantería NorteSuite #2 Lajas, PR 00667 | 00681 Cll Providencia Edificio Medical Emporium, Mayaguez, PR  00682 | $0.00 |
| 00-00193 | Administración de Rehabilitación Vocacional (ARV) | PCDM Associates, SE | PO Box 190858 San Juan, PR 00919-0858 | Carretera 167 KM 20.5 Victory Shopping Center, Bayamon, PR  00957 | $0.00 |
| 2017-000080 | Administración de Rehabilitación Vocacional (ARV) | Pjay Investment Corp | Po Box 486 Fajardo, PR 00738-0486 | Calle Jorge Bird #12, Fajardo, PR  00738 | $0.00 |
| 2016-000058 | Administración de Rehabilitación Vocacional (ARV) | RRD CASH & CARRY | PO BOX 140189 Arecibo, PR 00614 | Carretera #2 KM 80.06 Bo Hato Abajo Arecibo, PR 00612 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 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 | Administración de Rehabilitación Vocacional (ARV) | S & L DEVELOMENT | PO BOX 29047 Carolina. PR 00927-0047 | Bo. Trujillo Bajo, Carolina, PR 00985 | $0.00 |
| 2017-000001 | Administración de Rehabilitación Vocacional (ARV) | Union Holdings | Mercantil Plaza Oficina 1501 Avenida Ponce de Leon, San Juan, PR 00918 | Ave. Malecón, Esq. Carretera Estatal #2, Finca Multeada Estrella, Bo. San Antón, Ponce, PR 00717 | $0.00 |
| 2017-000001 | Administración de Rehabilitación Vocacional (ARV) | Union Holdings | PO BOX 190858 San Juan, 00918 | Ave. Malecón, Esq. Carretera Estatal #2, Finca Multeada Estrella, Bo. San Antón, Ponce, PR 00717 | $0.00 |
| 2015-000052 2015-000046 2014-000198 2014-000103 2014-000046 | Administración de Rehabilitación Vocacional (ARV) | Universidad Metropolitana | 1399 Av. Ana G. Méndez, San Juan, PR 00926 | N/A | $0.00 |
| 2017-950462 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Buenaventura Morales Santiago | Reparto FlamingoK-8 Calle del Turabo Bayamón, PR 00959 | Solar #1, bloque 41 de la Urb. Sierra de Bayamón Bo Hato Tejas, Bayamón, PR 00961 | $0.00 |
| 2018-950322 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Carlos Martínez Serrano | Urb. Sunny HillsC-01 Calle 1 Bayamón, PR 00956 | Sola #1 del bloque B, Urb Sunny Hills, Bayamón, PR 00956 | $0.00 |
| 2017-950471 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Carlos Rodríguez Rivera | Urb. Lomas Verdes4 S 15 Calle Petrea Bayamón, PR 00956-2937 | #2 de la manzana 4G de la Urb. Lomas Verdes en Bayamón, PR 00956 | $0.00 |
| 2017-950323 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Diego M. Schenquerman | Urb. La Alameda 780 Calle Rubí San Juan, PR 00926 | Solar #200 del bloque M-8, Urb. Reparto Metropolitano, Rio Piedras, PR 00921 | $0.00 |
| 2018-950620 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Fideicomiso Hernández Castrodad | P.O Box 4985 PMB 265 Caguas, PR 00726-4985 | Calle Gautier Benítez 3162, Caguas, PR 00778 | $0.00 |
| 2017-950464 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Johnny Ramos Ortiz | Urb. RexvilleC2-43 Calle 15A Bayamón, PR 00957-3955 | Calle 3-A #159 de la Urb. Hermanos Dávila en Baymón, PR 00961 | $0.00 |
| 2017-950279 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juan A. Negrón Berrios | P.O. Box 1291 Orocovis, PR 00720-1291 | Calle Jose C. Vázquez #60 Aibonito, PR 00705 | $0.00 |
| 2017-950172 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juan Lopez Malave | PO Box 246 Las Piedras, PR 00770 | Blvd. del Rio Office Bldg, Ave. Nicanor Ramal #3, Torre 3 4to Piso, Humacao,PR 00791 | $0.00 |
| 2017-950449 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juanita Rodríguez Noble | P.O Box 673 Bayamón, PR 00960 | N/A | $0.00 |
| 2017-950470 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | La Fondita de Jesús | P.O Box 19384 San Juan, PR 00910-1384 | N/A | $0.00 |
| 2016-950316 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Magaly Rodríguez Hernández | Ave. Sebariano CuevasAnexo Hospital Buen Samaritano Aguadilla, PR 00603 | Ave. Sebariano Cuevas, Anexo Hopital Buen Samaritano de Aguadilla, PR 00603 | $0.00 |
| 2015-950745 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Maria del C. Torres Calderon | PO BOX 221 Luquillo, PR 00773 | Santiago Veve Calle 26 #179 Fajardo, PR 00738 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-950448 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Mirta R. Lugo | P.O Box 712 Toa Baja, PR 00951 | #1 Bloque BJ de la Urb. Levittown, Bo Sabana Seca Toa Baja, PR 00949 | $0.00 |
| 2016-950102 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | PGY. Inc | P.O. Box 1200 Guayama,PR 00785 | Centro Comercial Galerías Plaza Guayama, Carretera PR-3, Km 135.6 Guayama, PR 00784 | $0.00 |
| 2017-950325 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | PJAY INV. COPR | Calle Jorge Bill León #6P.O. Box 486 Fajardo, PR 00738 | Calle Jorge Bird #6, Fajardo, Puerto Rico 00738 | $0.00 |
| 2013-950831 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Rafael Soto Silva | P.O Box 366795 San Juan, PR 00936-6795 | Avenida Barbosa #599 (Primer Piso) Rio Piedras, PR 00917 | $0.00 |
| 2017-950473 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Robert Deliz Carlo | Santa JuanitaBQ-24 Calle Yokohama Bayamón, PR 00956 | Solar #16 del bloque RR, Urb. Santa Juanita, Bayamón, PR 00956 | $0.00 |
| 2017-950452 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Santiago Ortiz Rodríguez | Urb. Panorama VLG131 Vista de la Bahía Bayamón, PR 00957-4402 | Urb. Lomas Verdes, Bo Mimillas, Bayamón, PR 00956 | $0.00 |
| 2017-950450 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Sucesión Norberto Marrero González | P.O Box 3630 Bayamón, PR 00958 | Solar #52 en la Avenida Santa Juanita, Esquina Avenida Laurel, Urbanización Santa Juanita en Baymón, Bayamon PR 00956 | $0.00 |
| 2015-950840 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Sucesión Ramón Laureano Rivera | P.O. Box 8830 Carolina, PR 00988-8830 | Carr.853, Km. 0, Hm 3, Carolina ,Puerto Rico 00988 | $0.00 |
| 2012-950775 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | The New Ponce Shopping Center | P.O. Box 331943, Ponce, PR 00733 | Santa Maria Shopping Center, Esq. Ferrocarril, Ponce, PR 00780 | $0.00 |
| 2005-000013 | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2005-000013A | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2005-000013B | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2013-000027 | Administracion Rehabilitacion Vocacional | F.M.A. Realty II, LLC | PO Box 363727 San Juan, PR 00936-3227 | Carr. #2 KM 17.0 Bo. Candelaria Toa Baja, PR 00949 | $0.00 |
| 2018-DS0385 | Angel Luis Trinidad Ocasio | Departamento de Salud | PO Box 43, Barceloneta, PR 00617 | Urb Catalana 79-A, Local C-3, Barceloneta, PR 00617 | $0.00 |
| 2020-DS0961 | Banfin Realty, S.E. | Departamento de Salud | Edificio Nacional Plaza, 431 Ave. Ponce de Leon, Suite 702, San Juan PR 00917 | Local 902 & 903, 431 Av. Ponce de Leon, San Juan, 00917 | $0.00 |
| 2014-000282/ 2022-000110 | Bianca Convention | Departamento de la Familia | CRUCE VARIANTE AÑASCO, PR 00610 | Calle Mckinley 190 Mayaguez | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000114 | Bienvenido Sierra Ortiz | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | P O BOX 326, Lares, PR 00669 | 387 Calle Gladiola  Bo Junquito, Humacao PR 00791 | $0.00 |
| 2018-DS0318 | Carmen Victoria Carrasquillo Diaz | Departamento de Salud | URB JARDINES FAGOT 1811 CALLE CASCADA, Ponce, PR 00716-3602 | Calle Comercio #100, Juana Diaz, PR 00795 | $0.00 |
| 2015-000001A | Comisión de Desarrollo Cooperativo de Puerto Rico (CDCOOP) | Cooperativa de Seguros de Vida (COSVI) | Américo Miranda 400 San Juan, PR 00927 | 400 Américo Miranda, San Juan, PR 00927 | $0.00 |
| 2018-DS0716 | Centro de Piezas Patillas Inc | Departamento de Salud | PO BOX 813, Patillas PR 00723 | Carr. #3 km 123, Patillas, PR 00723 | $0.00 |
| 2014-DS0713 | Centro Medico del Turabo Inc | Departamento de Salud | PO BOX 4980, Caguas, PR 00726 | Avenida General Valero #404, Fajardo PR 00738 | $0.00 |
| 2016000014 | CENTRO COMERCIAL JOVE, ARECIBO | Jove | Hato Tejas Ward Road #2 KM 77.2 Miramar Ave., AreciboPO Box 555, Arecibo, PR 00613 | Hato Tejas Ward, Road # 2 KM 77.2 Miramar Arecibo, PR 00612 | $0.00 |
| 2011-000015-A | Comisión de Servicio Público | Adolfo Rosario Quinones | PO Box 487Aguadilla, P.R.,605 | Carr 111, Km 0.1 Barrio Victoria, Aguadilla P.R. 00603 | $0.00 |
| 2013-000023 | Comisión de Servicio Público | David Mercado Montalvo | PO Box 1307Arecibo, PR,688 | Carr 639, Km 1.0 Barrio Sabana Hoyos, Arecibo, P.R. 00688 | $0.00 |
| 2013-000026 | Comisión de Servicio Público | Lu Quing Cheng | Urb. Punto Oro #503, Local #2 Ponce, P.R.,00728-2066 | Ave. Punto Oro #503, Local #2, Ponce, P.R. 00728 | $0.00 |
| 2015-000011 | Comisión Industrial de Puerto Rico | Ángel M. Núñez Vargas | PO Box 1944 Arecibo, PR,00613 | 105 Calle Jesús Cortés, Arecibo, PR 00612 | $0.00 |
| 2014-000038 | Comisión Industrial de Puerto Rico | Dife, Inc. | PO Box 3685 Mayaguez, PR, 00681-3685 | 509-Sur, Calle Ramon E. Betances, Mayaguez, PR 00680 | $0.00 |
| 2016-000046 | Comisión Industrial de Puerto Rico | IR Investment, Corp. | PO Box 19600 San Juan, PR,00909 | San Jorge Commercial & Office Building, Carretera #2, Ponce By Pass, Lote 3, Ponce, PR 00731 | $0.00 |
| 2017-000032 | Computer Network Systems CoRp (Computerlink) | Administración para el Sustento de Menores (ASUME) | P.O. Box 70376 San Juan, PR 00936-8376 | N/A | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2020-DS0786 | Concilio de Salud Integral de Loiza | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00917 | Centro de Diagnostico y Tratamiento, Loiza Carr # 188, PR-187, Loíza, PR 00772 | $0.00 |
| 2014-DS0552 | Concilio de Salud Integral de Loiza | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00917 | Centro de Diagnostico y Tratamiento, Loiza Carr # 188, PR-187, Loíza, PR 00772 | $0.00 |
| 2015-000034 | Consejo de Educación | SFIIIPR, LLC | Hato Rey Center Suite 402268 Ave. Ponce de León Hato Rey, PR 00918 | Ave. Ponce de León 268, San Juan, PR 00917 | $0.00 |
| 2017CM0263 | Conservatorio de Música Puerto Rico | Parking Services Company, Inc. | 951 Ave Ponce de León San Juan, PR 00907 | 951 Ave Ponce de León, San Juan, PR 00907 | $0.00 |
| 2017-DS0311 | CP Coppelia Inc | Departamento de Salud | P O BOX 596, Aguada PR 00602 | Plaza Coppelia, Ave Alers, Aguada, PR 00602 | $0.00 |
| 2019-DS0225 | Departamento de Salud | Carolina Shopping Court Inc. | CAROLINA SHOPPING COURT INC. P.O. Box 29112, Carolina P.R. 00929-0112 | 10000 Av. 65 de Infantería, Carolina, PR 00985 | $0.00 |
| 2014-DS0486 | Departamento de Salud | Guaynabo Health Providers Corp. | P.O. Box 70184, San Juan, PR 00936-0184 | 140 Av. Las Cumbres, Guaynabo, PR 00969 | $0.00 |
| 2015-DS0880 | Departamento de Salud | Hector Luis Ortiz Torres y Evelyn Lizzette Rodriguez | P.O. Box 70184, San Juan, PR 00936-0184 | Calle Morse #69, Arroyo, PR 00714 | $0.00 |
| 2015-DS0833 | Departamento de Salud | Ana Eileen Morales Perez | P.O. Box 1903 Arecibo, PR 00613-1903 | Calle Georgetti #104 en Naranjito, PR 00957 | $0.00 |
| 2016-DS0799 | Departamento de Salud | Alberto Luis Cossio Soto | Urb. Altamira #546, Calle Aldebaran, Guaynabo, PR 00921 | Parque Industrial Julio N. Matos, Lote 22 Edificio 28 en Carolina, PR 00985 | $0.00 |
| 2016-DS0633 | Departamento de Salud | Alfredo Rivera Diaz | P.O. Box 835, Gurabo, PR 00778 | Calle Ángel C. Morales #54 Gurabo, PR 00778 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS0876 | Departamento de Salud | Angel Manuel Nunez Vargas | P.O. Box 1944, Arecibo, PR 00613-1944 | Calle Jesús Cortés 103 Y 105 en Arecibo, PR 00612 | $0.00 |
| 2013-DS0312 | Departamento de Salud | Antonio Rivera Torres | Estancias Yidomar, Calle Comet #7, Yauco, PR 00698 | N/A | $0.00 |
| 2013-DS0315 | Departamento de Salud | Antonio Rivera Torres | P.O. Box 70184, San Juan, PR 00936-0184 | N/A | $0.00 |
| 2014-DS0430 | Departamento de Salud | Banfin Realty, S.E. | P.O. Box 70184, San Juan, PR 00936-0184 Edif. Nacional Plaza, Suite 702, Ave. Ponce de Leon, San Juan, PR 00917 | N/A | $0.00 |
| 2013-DS0544 | Departamento de Salud | Carolina Shopping Court Inc. | CAROLINA SHOPPING COURT INC. P.O. Box 29112, Carolina, P.R. 00929-0112 | 10000 Av. 65 de Infantería, Carolina, PR 00985 | $0.00 |
| 2015-DS0875 | Departamento de Salud | Centro Falu Inc. | Punta Las Marias #4 Calle Doncella, San Juan, PR 00913 | Parcelas Falú #3338, Calle 8 Esquina 49 en Sabana Llana, Río Piedras, PR 00924 | $0.00 |
| 2015-DS0874 | Departamento de Salud | COEDRO, S.E. | 3203 Carretera 351, Mayagüez, PR 00680 | Edificio Park Plaza, Oficinas 105 Y 106 de la Calle Martínez Nadal #59, Mayagüez, PR 00682 | $0.00 |
| 2015-DS1059 | Departamento de Salud | Concilio de Salud Integral de Loiza | P.O. Box #509, Loiza, PR, 00772 | PR-187, Loíza, 00772 | $0.00 |
| 2015-DS0953 | Departamento de Salud | CP COPPELIA INC | P.O. Box 596, Aguada, PR 00602-0596 | Edificio Plaza Coppelia Ave. Nativo Alers, Aguada P.R 00602 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS1115 | Departamento de Salud | CP COPPELIA INC | P.O. Box 596, Aguada, PR 00602-0596 | Edificio Plaza Coppelia<br>Ave. Nativo Alers, Aguada, PR 00602 | $0.00 |
| 2015-DS0975 | Departamento de Salud | Fernando Ortiz Maldonado | P.O. Box 1725, Juncos, PR 00777 | Marifel Plaza, Calle Sánchez López 151, Esquina Zenón Vázquez, Gurabo, PR 00778 | $0.00 |
| 2016-DS0455 | Departamento de Salud | Francisco Jose Rivera Lopez | 27 Calle Correo, Camuy, PR 00627-2343 | Calle San Jose # 3, Camuy PR 00627 | $0.00 |
| 2014-DS0261 | Departamento de Salud | EDIFICIO VICTORIA DE AGUADILLA INC. | PO BOX 6, Aguadilla, PR 00605 | Edificio Victoria de la Calle Mercedes Moreno #17, en Aguadilla, PR 00603 | $0.00 |
| 2015-DS0775 | Departamento de Salud | General Investment, S.E. | P.O. Box 365051, San Juan, PR 00936-0510 | Avenida Ponce de León #1590, Urb El Cerezal en R.ío Piedras, PR 00926 | $0.00 |
| 2015-DS0226 | Departamento de Salud | Hector Luis Ortiz Torres y Evelyn Lizzette Rodriguez | Calle Morse #75, Arroyo, PR 00714 | Calle Morse #69 Arroyo, PR 00714 | $0.00 |
| 2016-DS0903 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0717 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0718 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0700 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas, Urbanización Montebrisas. Calle E, Fajardo, PR 00738 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-DS0771 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2019-DS0212 | Departamento de Salud | IP Investment Group LLC | Urb. Paraiso de Coamo, #832 Coamo, PR 00769 | Calle Florencio Santiago, Esquina Carrión Maduro #54, Coamo PR 00769 | $0.00 |
| 2013-DS0562 | Departamento de Salud | JAYVE Development Corp. | P.O. Box 267, Salinas, PR 00751 | Portobello Town Center. Carretera #3. KM 158.4 Intersección Desvío PR 180, Paseo Manuel González Martínez 80. Salinas, PR 00751 | $0.00 |
| 2016-DS0664 | Departamento de Salud | Jesus M. Hernandez Contreras | Urb. Valencia I, Calle Pedro Cruz #155, Juncos, PR 00777 | Urbanización Valencia I Calle Pedro Cruz #156 Juncos, PR 00777 | $0.00 |
| 2018-DS0144 | Departamento de Salud | Jose Alberto Torrado Perez y Blanca Emerita Delgado | P.O. Box 1323, Hatillo, PR 00659-1323 | Carretera #130 KM. 4.8 Bo. Naranjito, Sector Lechuga en Hatillo, Puerto Rico 00659 | $0.00 |
| 2014-DS0294 | Departamento de Salud | Jose Angel Serrano Castro y Maria de los Angeles Ruiz Irizarry | P.O. Box 122, Castaner, PR 00631-0122 | N/A | $0.00 |
| 2015-DS0991 | Departamento de Salud | Jose Luis Cartagena Alcala y Melissa Munoz Rivera | P.O. Box 1267, Orocovis, PR 00720 | Carretera 155 km. 28.3 Calle Ernesto Ramos Antonini en Orocovis, PR 00720 | $0.00 |
| 2016-DS0842 | Departamento de Salud | Jose Uderico Perez Maldonado | P.O. Box 1 Penuelas, PR 00624 | Calle Dr. Loyola #705 Peñuelas, PR 00624 | $0.00 |
| 2017-DS0172 | Departamento de Salud | Juanita Roldan Medina | P.O. Box 1210 Juncos, PR 00777 | Calle Dr. Barreras, Esquina Daniel Flores, Juncos, PR 00777 | $0.00 |

## Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-DS0737 | Departamento de Salud | Lcdo. Jose Luis Collazo y Lcda. Lillian Mojica Rivera | P.O. Box 70184, San Juan, PR 00936-0184 | Calle Ignacio Morales Acosta #43,  Naranjito, PR 00638 | $0.00 |
| 2017-DS0125 | Departamento de Salud | Luis Antonio Colon Perales | Urb. Dos Rios Num. 74, Ciales, PR 00638 | Country Mall, Carretera 149 KM. 12, HM. 1, Barrio Jaguas en Ciales | $0.00 |
| 2015-DS1091 | Departamento de Salud | Luis Hiram Villafane Cruz | P.O. Box 203, Utuado, PR 00641 | Carretera #111, KM.1.1 interior Utuado,Puerto Rico, 00641 | $0.00 |
| 2015-DS0879 | Departamento de Salud | Luis Hiram Villafane Cruz | PO Box 203, Utuado, PR 00641 | Carretera #111, KM.1.1 interior Utuado,Puerto Rico, 00641 | $0.00 |
| 2017-DS0354 | Departamento de Salud | Luz Esther Acevedo Nieves | 2 Muñoz Rivera P.M.B., Lares, PR 00669 | Calle Pedro Albizu Campos Núm. 7 Lares. P R. 00669 | $0.00 |
| 2015-DS0873 | Departamento de Salud | Master's Donuts, Inc. | Villas Buena Vista, Calle Isis J-5 Bayamon, PR 00957 | Barrio Buena Vista, Carretera 167, Km. 15.1 Bayamón, Puerto Rico 00956 | $0.00 |
| 2014-DS0292 | Departamento de Salud | Norman Luis Santiago Gomez | P.O. Box 1316, San German, PR 00683-1316 | Centro Comercial San Germán, Calle Luna, Ave Castro Pérez. San Germán, PR 00683 | $0.00 |
| 2016-DS0454 | Departamento de Salud | One by One Inc. | P.O. Box 441, Fajardo, PR 00738-0441 | Fajardo Market Square, Carretera #3, Fajardo PR 00738 | $0.00 |
| 2016-DS0374 | Departamento de Salud | PEPINO HEALTH GROUP INC | P.O. Box 1537, San Sebastian, PR 00685 | Centro de Salud Calle Pavía Fernández # 120, San Sebastián, PR 00685 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS0886 | Departamento de Salud | San Sebastian Properties LLC | P.O. Box 367849, San Juan, PR 00936-0193 | San Sebastián Gallery Mall. Suite 213. Avenida Arcadio Estrada Rivera #4160, San Sebastián, PR 00685 | $0.00 |
| 2015-DS1107 | Departamento de Salud | Santos Velez Sanchez | Edificio Santos Velez I, 2770 Ave. Hostos, Ste 201, Mayaguez, PR 00682-6384 | Local Comercial #314, Bo. Sabanetas, Carr. 2 KM 149.5, Mayagüez, 00680 | $0.00 |
| 2015-DS1090 | Departamento de Salud | SM Medical Services, C.S.P. | P.O. Box 1649 Canovanas, PR 00729 | Local ubicado en el Centro de Diagnóstico y Tratamiento en Canóvanas | $0.00 |
| 2015-DS0877 | Departamento de Salud | Victor Manuel Varela Berrios | P.O. Box 104, Corozal, PR 00783 | Local ubicado en la Carretera #891 Km.14.7 Barrio Pueblo. Corozal Puerto Rico | $0.00 |
| 2015-DS0878 | Departamento de Salud | Pedro Umpierre Torregrosa | P.O. Box 366892 San Juan, PR 00936 | Luquillo Plaza de la Calle Fernando García #28, Luquillo, PR 00773 | $0.00 |
| 2019-DS0257 | Delia del Valle Diaz | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | P.O. BOX 131, Toa Alta PR 00954 | $0.00 |
| 2018-DS0145 | Delia Pagan Robles | Departamento de Salud (WIC) | Condominio Los Olmos, Apartamento 11-C, Calle Nevarez #36, San Juan, PR 00927 | Calle Muñoz Rivera #24, Patillas, PR 00723 | $0.00 |
| 2016-000044 | Departamento De Corrección y Rehabilitación | Luis A. Rivera Siaca | P.O. Box 190681 SAN JUAN PR,00919-0681 | Ave. Tnte. Cesar Gonzalez, Esq. Calaf. Urb. Industrial Tres Monjitas, Hato Rey PR 00917 | $0.00 |
| 2007-000121 | Departamento De Corrección y Rehabilitación | JOSE E. RIVERA LUPIANEZ | P.O. Box 160 AIBONITO PR,00705 | Ave. San José #51. Aibonito, PR 00705 | $0.00 |
| 2007-000183A | Departamento De Corrección y Rehabilitación | S&L DEVELOPMENT | P.O. Box 29047 SAN JUAN PR,00929-0047 | Edif. 4, Calle Martínez, Bo. Trujillo Alto, Carolina PR 00987 | $0.00 |
| 2004-000045 | Departamento De Corrección y Rehabilitación | ANGEL L. MARTINEZ GONZALEZ | CALLE MANUEL RUIZ GANDIA #102 ARECIBO PR,00612 | CALLE MANUEL RUIZ GANDIA #102 ARECIBO PR, 00612 | $0.00 |
| 2009-000179A | Administración de Corrección | BIENES NIEVES, INC. | P.O. Box 2580 GUAYAMA PR,00785-3858 | CalleDerkes #2, Esq. Calimano, Guayama PR 00784 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000109Z | Departamento De Corrección y Rehabilitación | CESAR A. CORTES GARCIA | P.O. BOX 5 UTUADO PR, 00641-0005 | Calle Dr. Cueto # 80 Altos Utuado PR 00641 | $0.00 |
| 2004-000121A | Departamento De Corrección y Rehabilitación | EMPRESAS OMAJEDE | P.O. Box 1641 Cidra, PR,739 | EDIF. LA ELECTRONICA CALLE BORI 1608 SAN JUAN, PR 00927 | $0.00 |
| 2004-000121 | Departamento De Corrección y Rehabilitación | EMPRESAS OMAJEDE | 1608 CALLE BORI  - OFICINA 218 EDIFICIO LA ELECTRONICA SAN JUAN PR, 00927-6112 | EDIF. LA ELECTRONICA CALLE BORI 1608 SAN JUAN, PR 00927 | $0.00 |
| 2009-000196 | Administración de Corrección | ANA RODRÍGUEZ SAINT-FUSSI / FELIX A. LEBRON SALDAÑA | 400 CALLE CALAF PMB 128 SAN JUAN PR, 00918-1314 | 1-1F Villa Blanca, Ave. Muñoz Marín, Caguas PR 00725 | $0.00 |
| 2005-000062 | Departamento De Corrección y Rehabilitación | SUCESION HERIBERTO MARTINEZ | APARTADO 144032 ARECIBO PR,00614 | Ave. Miramar #601, Arecibo PR 006112 | $0.00 |
| 2009-000037-B | Administración De Corrección | VALMEDICAL INC. | 261 Ave, Domenech SAN JUAN, PR,00916 | Calle 11, Parque Industrial Correa, Bayamón, PR 00961 | $0.00 |
| 2011-000477 | Departamento del Trabajo | 577 Headquarters, Corp. | PO Box 486 Fajardo, PR,00738 | Edif. Real Hermanos Ave.Ponce de Leon Hato Rey, PR 00918 | $0.00 |
| 2016-000635 | Departamento del Trabajo | BANFIN REALTY, S.E. | P.O. Box 190858 San Juan, 00919-0858 | 431 de la Avenida Ponce de Le6n en Hato Rey (National Plaza Hato Rey), PR  00919 | $0.00 |
| 2013-000697 | Departamento del Trabajo | BORINQUEN TOWN PLAZA CORP., | PO BOX 3861 Aguadilla, PR 00605 | Carr. 107 Km. 2.9, Bo. Borinquén, Aguadilla, Puerto Rico 00603 | $0.00 |
| 2015-000526 | Departamento del Trabajo | CARIBBEAN CITY BUILDERS, INC. | PO BOX 2399 Toa Baja, PR 00951 | C/ Puerto Viejo, Esq. C/ Santiago de los Caballeros en Playa Ponce, PR  00716 | $0.00 |
| 2012-000382 | Departamento del Trabajo | Colonial Parking Corporation | 65 Calle del Parque Suite 3 Santurce PR, 00909 | Edif. Roberto H Todd 501 Pda,18, Santurce, PR 00908 | $0.00 |
| 2015-000426 | Departamento del Trabajo | EDIFICIO BULA, INC. | P.O. BOX 190525 San Juan, PR 00919-0525 | Carretera #2, Km. 8.3 (Calle Marginal) en Bayamon, PR 00956 | $0.00 |
| 2012-000538 | Departamento del Trabajo | EMPRESAS LOYOLA I, S. EN C-S.E. | PO BOX 366638 San Juan, PR 00936-6638 | Calle Guayama 198 Hato Rey, Puerto Rico 00917 | $0.00 |
| 2017-000490 | Departamento del Trabajo | FISA S.E. | PO BOX 2286 Guayama, PR 00785-2286 | Paseo Pueblo, Carr. 54 Int. Solar 6-A, Segundo Piso, Guayama, PR  00784 | $0.00 |
| 2016-000612 | Departamento del Trabajo | GENERAL INVESTMENT, S.E. | POX BOX 365051, San Juan, PR 00936 | GM Group Plaza, Suite 400 en la Avenida Ponce de Leon Numero 1590, San Juan, PR  00919 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2012-000507 | Departamento del Trabajo | IGNACIO RÍOS AGOSTO | HC-01 PO Box 6578 Ciales, PR 00638 | Carr. 615 Km.8.3 Bo. Pozas Ciales, PR 00638 | $0.00 |
| 2018-000079 | Departamento del Trabajo | IGNACIO RÍOS AGOSTO | HC-01 Box 6578 Ciales, PR 00638 | Carr. 615 Km.8.3 Bo. Pozas Ciales, PR  00638 | $0.00 |
| 2017-000480 | Departamento del Trabajo | INMOBILIARIA CRESPO, CORP. | PO BOX 486 Fajardo, PR 00738-0486 | C/Jorge Bird #10 Fajardo PR 00738 | $0.00 |
| 2016-000520 | Departamento del Trabajo | MIGDALIA CASILLAS FERNÁNDEZ (LOCAL HUMACAO) | PO Box 667 HUMACAO, PR 00792-0667 | Calle Noya y Hernandez #2 Humacao, PR  00792 | $0.00 |
| 2013-000713 | Departamento del Trabajo | NORA H. TIRADO MOREIRA | 166 CALLE UNION   FAJARDO, PR, 00738 | Calle Benitez Guzmán #46 Vieques, PR  00765 | $0.00 |
| 2017-000626 | Departamento del Trabajo | OCHOA ROIG, INC. | PO BOX 428 Caguas, PR 00726 | Calle Acosta #1 Caguas, PR 00726 | $0.00 |
| 2016-000634 | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. | PO BOX 190858 San Juan, PR 00919-0858 | Carr. PR 848 Int. PR 887 Carolina, PR 00984 | $0.00 |
| 2016-000634A | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. | PO BOX 190858 San Juan, PR 00919-0858 | Carr. PR 848 Int. PR 887 Carolina, PR 00984 | $0.00 |
| 2011-000333 | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. (LOCAL DE COAMO) | PO BOX 190858 San Juan, PR 00919-0858 | Carr. 153, Plaza Coamo, Coamo, PR 00769 | $0.00 |
| 2017-000471 | Departamento del Trabajo | SSSC, S.E. | 1 C/65 Inf. Norte Suite #2 Lajas, PR 00667 | Edif. Villa Capitan 1 KM 159.6 Bo. Guanajibo Mayaguez, PR  00682 | $0.00 |
| 2017-000627 | Departamento del Trabajo | SSSC, S.E. | 1 C/65 Inf. Norte Suite #2 Lajas, PR 00667 | Carr. 2 Villa Capitán Km 159 Mayaguez, PR 00680 | $0.00 |
| 2014-000129/ 2021-000151 | Des. Inm Hato Tejas | Departamento de Educacion | Desarrollos inmobiliarios de Hato Tejas, Inc. Metro Office Park Guaynabo, Puerto Rico 00968-1705 | Carr 2 Urb Industrial Corujo, Bayamon, PR 00959 | $0.00 |
| 2014-000043 | Departamento de Estado | Empresas Puertorriqueñas de Desarrollo, Inc. | PO BOX 36606 San Juan, PR 00936-6006 | Local #55 1er Nivel Centro Comercial Mayagüez Mall, Mayagüez, PR 00680 | $0.00 |
| 2014-000068 | Departamento de Justicia | AMB INVESTMENT CORP. | PO Box 86, Barranquitas, PR 00794-0086 | Carretera # 152, KM 1.2 , Bo. Quebardillas Barranquitas, PR 00794 | $0.00 |
| AF98-410 | Departamento de Justicia | CARHILL DEVELOPMENT | 1 Ave Marcelito Gotay, Fajardo, Puerto Rico 00738 | Centro Judicial de Fajardo, Calle Marelino Gotay # 458, Fajardo, PR 00738 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000117 | Departamento de Justicia | CECORT PROPERTIES & SERVICES COPR. | Box 5, Utuado, PR 00641 UTUADO, PR 00641 | Carretera # 111, Intersección Carretera # 611, Bo. Viví Abajo, Utuado, PR 00641 | $0.00 |
| 2016-000129 | Departamento de Justicia | EL CAPITAN INVESTMENT CORP. | Box 107, Arecibo, PR 00613 | Edificio Martínez Umpierre, Ave. Rotarios # 64, Arecibo, PR 00612 | $0.00 |
| 2018-000028 | Departamento de Justicia | EL CAPITAN INVESTMENT CORP. | Box 107, Arecibo, PR 00613 | Edificio Martínez Umpierre, Ave. Rotarios # 64, Arecibo, PR 00738 | $0.00 |
| 2018-000054 | Departamento de Justicia | ESTANCIA AIBONITO, INC | 654 Plaza, Suite 1024, Avenida Muñoz Rivera SAN JUAN, PR 00918 | Carretera # 722, KM 7.3, Bo. Robles Rabanal, Aibonito PR 00705 | $0.00 |
| 2012-000043 | Departamento de Justicia | Horizone Parking | PO Box 143265 Arecibo, PR 00614 | Carretera #129, Ave. San Luis, Arecibo, PR 00614 | $0.00 |
| 2012-000003 | Departamento de Justicia | Horizone Parking | PO Box 143265 Arecibo, PR 00614 | Carretera #129, Ave. San Luis, Arecibo, PR 00738 | $0.00 |
| 2016-000115 | Departamento de Justicia | IR INVESTMENT COPR. | PO Box 19600, San Juan, PR 00910 | Carrtera # 2, KM 23.8, Bo. Canas, Ponce, PR 00731 | $0.00 |
| 2015-000037 | Departamento de Justicia | LCDA. CARMEN M. CORREA | PO Box 8987, Bayamón, PR 00960 | Calle Esteban Padilla # 103, Bayamón, PR 00959 | $0.00 |
| AF98-409 | Departamento de Justicia | LIBRA GOVERNMENT BUILDING, INC. | P.O. BOX 8879 HUMACAO, PR 00792 | Centro judicial de Humacao, Avenida Nicanor Vázquez, Boulevar del Río Humacao, PR 00792 | $0.00 |
| 2000-000152 | Departamento de Justicia | West Coast Development | Ave. Hiram D. Cabassa Interseccion # 2 Km 156.1 Mayaguez, PR 00608 | Centro Judicial de Mayaguez, 91 Av. Hiram David Cabassa, Mayagüez, PR 00680 | $0.00 |
| 2013-000010 | Departamento de Justicia | RAFAEL HERNÁNDEZ BARRERAS | PO Box 4985 PMB 265, Caguas, PR 00726-4985 | Angora Office Park, Avenida Gautier Benitez # 162, Caguas, PR 00727 | $0.00 |
| 2016-000128 | Departamento de Justicia | S&L DEVELOPMENT, SE | PO Box 29047, San Juan, PR 00929-0047 | Carolina Industrial Park, Carretera # 3, KM 12.6, Carolina, PR 00948 | $0.00 |
| 2014-000074 | Departamento de Justicia | VICAR BUILDERS DEVELOPMENT | PO Box 929, Fajardo, PR 00738 | Carretera # 167, KM 18.8, Bo. Pajaros, Bayamón, PR 00957 | $0.00 |
| 2004-000566 | Departamento de Justicia | WEST COAST DEVELOPMENT | PO Box 190917, San Juan, PR 00919-0917 | Centro Judicial de Mayaguez, Avenida hiram david Cabassa, KM 156.5, Bo. Sábalos, Mayaguez, PR 00681 | $0.00 |
| N/A | Departamento de Justicia | WMI, LLC | PO Box 190573 SAN JUAN, PR 00919 | Avenida Cesar Gonzalez # 675, San Juan, PR 00918 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000085 | Departamento de Justicia | WMI, LLC | PO Box 190573 SAN JUAN, PR 00919 | Avenida Cesar Gonzalez # 675, San Juan, PR 00918 | $0.00 |
| 2003-000204 | Departamento de Justicia | YABUCOA DEVELOPMENT, SE | PO Box 839, San Juan, PR 00919-0839 | San Sebastian Shopping Center, Carretera # 111, Km 18.0, San Sebastián, PR 00685 | $0.00 |
| 2011-000104 | Departamento De Recursos Naturales Y Ambientales (DRNA) | Jennymar Corp | P.O. Box 781 Hormigueros, PR 00660 | Plaza Monserrate  Bo. Lavadero Carretera PR-2 Km 2.0 Inter Carr. 345 Hormigueros, PR  00660 | $0.00 |
| 2016-000059 | Departamento De Recursos Naturales Y Ambientales (DRNA) | Lourdes Vera Roldán | 310 Passaic AvenueApt. 315, Harrison NJ,07029-2837 | Barrio Caimital Alto Carr. 2 Km. 120.6                        Aguadilla, PR  00603 | $0.00 |
| 2016-000007 | Departamento De Recursos Naturales Y Ambientales (DRNA) | V & Q Management Inc | Gardens HillsZ-20 Hasting Guaynabo, PR 00966 | Tuque Industrial Park #25 , Municipio de Ponce, Ponce PR  00716 | $0.00 |
| 2017-000014A | Departamento de Transcportacion y Obras Publicas (DTOP) | Ana E. Roldan Pérez, Regional de Aguadilla | P.O. Box 3148 Aguadilla, PR 00605 | Carr. PR-2 km. 120.3 Bo. Caimital Alto, Aguadilla, PR 00603 | $0.00 |
| 2017-000014A | Departamento de Transcportacion y Obras Publicas (DTOP) | Ana E. Roldan Pérez, Regional de Aguadilla | P.O. Box 3148 Aguadilla, PR 00605 | Carr. PR-2 km. 120.3 Bo. Caimital Alto, Aguadilla, PR 00603 | $0.00 |
| 2015-000014 | Departamento de Transcportacion y Obras Publicas (DTOP) | Corporación Punta Borinquen, CESCO Aguadilla | P.O. Box 250444 Aguadilla, PR 00604-0444 | Punta Borinquen Shopping Center, Calle Belt Edf. 703 Base Ramey, Aguadilla  PR, 00603 | $0.00 |
| 2015-000014 | Departamento de Transcportacion y Obras Publicas (DTOP) | Corporación Punta Borinquen, CESCO Aguadilla | P.O. Box 250444 Aguadilla, PR 00604-0444 | Punta Borinquen Shopping Center, Calle Belt Edf. 703 Base Ramey, Aguadilla  PR, 00603 | $0.00 |
| 2015-000154 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Caguas | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | km. 34.7 Lote 2 Bairoa Industrial Park, Caguas, PR 00725 | $0.00 |
| 2015-000154 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Caguas | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | km. 34.7 Lote 2 Bairoa Industrial Park, Caguas, PR 00725 | $0.00 |
| 2018-000024 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Ponce | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | Lote 19, Calle A. El Tuque Industrial Park, Ponce, PR 00716 | $0.00 |
| 2018-000024 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Ponce | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | Lote 19, Calle A. El Tuque Industrial Park, Ponce, PR 00716 | $0.00 |
| 2016-000163 | Departamento de Transcportacion y Obras Publicas (DTOP) | Educon Management, Corp., CESCO Metropolitano | Box 3244 Carolina, PR 00984 | Marginal PR-3 km. 12.5, Trujillo Bajo, Carolina, PR 00981 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000163 | Departamento de Transcportacion y Obras Publicas (DTOP) | Educon Management, Corp., CESCO Metropolitano | Box 3244 Carolina, PR 00984 | Marginal PR-3 km. 12.5, Trujillo Bajo, Carolina, PR 00981 | $0.00 |
| 2013-000178A | Departamento de Transcportacion y Obras Publicas (DTOP) | Hesan, Inc. CESCO Bayamón | Carr. PR-174 km. 2.6 Parque Industrial Minillas, Bayamón, PR 00959 | Carr. PR-174 km. 2.6 Parque IndustrialMinillas, Bayamón PR 00956 | $0.00 |
| 2013-000178A | Departamento de Transcportacion y Obras Publicas (DTOP) | Hesan, Inc. CESCO Bayamón | Carr. PR-174 km. 2.6Parque Industrial Minillas, Bayamón, PR 00959 | Carr. PR-174 km. 2.6 Parque IndustrialMinillas, Bayamón PR 00956 | $0.00 |
| 2014-000041A | Departamento de Transcportacion y Obras Publicas (DTOP) | JCH Realty, Corp., CESCO Manati | P.O. Box 848 Manatí, PR 00674 | Centro Comercial Puerta del Sol, Carr. PR-2 km. 49.7 Bo. Tierras Nuevas, Manatí PR 00674 | $0.00 |
| 2014-000041A | Departamento de Transcportacion y Obras Publicas (DTOP) | JCH Realty, Corp., CESCO Manati | P.O. Box 848 Manatí, PR 00674 | Centro Comercial Puerta del Sol, Carr. PR-2 km. 49.7 Bo. Tierras Nuevas, Manatí PR 00674 | $0.00 |
| 2016-000145 | Departamento de Transcportacion y Obras Publicas (DTOP) | John Javi, Corporation, CESCO Humacao | P.O. Box 246 Boulevard Plaza Office Buldings, Las Piedras, PR 00771 | Buolevard del Rio, Ramal #3, Humacao, PR 00791 | $0.00 |
| 2016-000145 | Departamento de Transcportacion y Obras Publicas (DTOP) | John Javi, Corporation, CESCO Humacao | P.O. Box 246 Boulevard Plaza Office Bulding s Las Piedras, PR 00771 | Buolevard del Rio, Ramal #3, Humacao, PR 00791 | $0.00 |
| 2014-000001A | Departamento de Transcportacion y Obras Publicas (DTOP) | PJAY Investment, CESCO Fajardo | P.O. Box 486 Fajardo, PR 00738 | Edf. Crespo, calle Ruiz Velvis Int. calle Garrido Morales, Centro Urbano, Fajardo, PR 00738 | $0.00 |
| 2014-000001A | Departamento de Transcportacion y Obras Publicas (DTOP) | PJAY Investment, CESCO Fajardo | P.O. Box 486, Fajardo, PR 00738 | Edf. Crespo, calle Ruiz Velvis Int. calle Garrido Morales, Centro Urbano, Fajardo, PR 00738 | $0.00 |
| 2017-000160A | Departamento de Transcportacion y Obras Publicas (DTOP) | Plaza Guayama, SE., CESCO Guayama | Carr. Estatal PR-174 km. 2.6 Guayama, PR 00784 | Carr. PR-3 km. 134.7, Guayama, PR 00784 | $0.00 |
| 2017-000160A | Departamento de Transcportacion y Obras Publicas (DTOP) | Plaza Guayama, SE., CESCO Guayama | Carr. Estatal PR-174 km. 2.6 Guayama, PR 00784 | Carr. PR-3 km. 134.7, Guayama, PR 00784 | $0.00 |
| 2013-000129 | Departamento de Transcportacion y Obras Publicas (DTOP) | Profesional Record & Information Management | P.O. Box 13323 San Juan, PR 00908 | Calle San Marcos #10100 Bo. Sabana Bajo, Carolina, PR 00983 | $0.00 |
| 2013-000129 | Departamento de Transcportacion y Obras Publicas (DTOP) | Profesional Record & Information Management | P.O. Box 13323San Juan, PR 00908 | Calle San Marcos #10100 Bo. Sabana Bajo, Carolina, PR 00983 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000089 | Departamento de Transcportacion y Obras Publicas (DTOP) | Rafael López Pagan, CESCO Barranquitas (falleció) | Box 699 Barranquitas, PR 00794 | Carr. PR-162 km. 10.4, Barranquitas, PR 00794 | $0.00 |
| 2014-000089 | Departamento de Transcportacion y Obras Publicas (DTOP) | Rafael López Pagan, CESCO Barranquitas (falleció) | Box 699 Barranquitas, PR 00794 | Carr. PR-162 km. 10.4, Barranquitas, PR 00794 | $0.00 |
| 2014-000040 | Departamento de Transcportacion y Obras Publicas (DTOP) | Santiago González, CESCO Utuado | P.O.Box 1737 Utuado, PR 00641 | Carr. PR-10 km. 57.4, Utuado, PR 00641 | $0.00 |
| 2014-000040 | Departamento de Transcportacion y Obras Publicas (DTOP) | Santiago González, CESCO Utuado | P.O. Box 1737 Utuado, PR 00641 | Carr. PR-10 km. 57.4, Utuado, PR 00641 | $0.00 |
| 2019-000010 | Electra Corporation | Administración para el Sustento de Menores (ASUME) | P.O. Box 364443, San Juan, Puerto Rico 00936-4443 | 4 Calle Vieques, Hato Rey, PR 00917 | $0.00 |
| 2017-DS0351 | Eliud Soto Alcanzar | Departamento de Salud | PO BOX 441, Florida, PR 00650 | km 55.2 carr PR-140 Barrio Pueblo Sector San Luis, Florida, PR 00650 | $0.00 |
| 2019-DS0117 | Empresas Pucho INC | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 991, Aguada, PR 00602 | $0.00 |
| 2013-DS0545 | Fanovidal SE | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | MSC 6152, Estacion 1, Bayamon, PR 00959 | $0.00 |
| PO# 4771 | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Extra Space Storage | #227 Calle Betances San Juan, PR 00911 | #227 Calle Betances San Juan, PR 00917 | $0.00 |
| 2015-000205 (A,B,C,D,E) | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Plaza del Caribe, S.E. | #2050 Ponce By Pass Suite 111 Ponce, PR 00717 | Local #260 en Segundo Nivel Plaza del Caribe #2050 Ponce By Pass Suite 111 Ponce, PR 00717 | $0.00 |
| 2015-000206 (A,B,C,D,E) | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Plaza las Americas, Inc. | #525 Ave Roosevelt San Juan, PR 00918 | Local #606 en Tercer Nivel Plaza las Americas #525 Ave. Roosevelt, San Juan PR 00918 | $0.00 |
| 2018-000201/ 2020-000080 | Fideicomiso Hernandez Castrodad | Departamento de la Familia | Avenida Luis Muñoz Marín Esquina Georgetti Carr. 183 Caguas, PR 00725 | Edificio Angora Office, Ave Gautier Benitez #162, Caguas, PR 00725 | $0.00 |
| 2015-DS1228 | Francisco Jose Rivera Lopez | Departamento de Salud | 27 CALLE CORREO, Camuy, PR 00627 | Calle San Jose #3, Camuy, PR 00627 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000164 | Frank Gregory Santiago | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | 323 Calle Fernandez Garcia, Luquillo, PR 00773 | 323 Calle Fernandez Garcia, Luquillo, PR 00773 | $0.00 |
| 2016-DS0843 | Galeria 100 Estate Corp. | Departamento de Salud | PO BOX 6447, Mayaguez, PR 00681 | Galeria 100 Shopping Center PR 100, Cabo Rojo, PR 00623 | $0.00 |
| 2018-DS0261 | Gerardo Otero Cortes | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 357, Manati PR 00707 | $0.00 |
| 2018-DS0518 | GIB Development | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 2399, Toa Baja, PR 00951 | $0.00 |
| N/A | Hacienda | Intership | PO Box 9022748 San Juan, PR 00902-2748 | Zona Portuaria Avenida Kennedy San Juan PR 00902 | $0.00 |
| 2009-000186 2016-000208 2021-000213 | Hacienda | Inversiones C y A SE | PO Box 1403 Bayamón PR 00960 | Carretera Núm. 2 Km 12.3 Bayamón, PR 00960 | $0.00 |
| N/A | Hacienda | Luis Ayala Colón | Building 1211 Road 28 Port Zone Puerto Nuevo, PR 00920 San Juan, PR 00902 | Zona Portuaria Avenida Kennedy, San Juan, PR 00902 | $0.00 |
| 2018-000170 2019-000085 | Hacienda | Moreda Cabán Investment | Avenida José de Diego 158, Arecibo, PR 00612 | Avenida José de Diego 158 Arecibo, PR 00612 | $0.00 |
| 2012-000167 2017-000195 2018-000141 2019-000045 | Hacienda | Profesional Record & Information Management | PO Box13323 San Juan, PR 00908 | San Marcos St 10100 Sabana Abajo Ward Carolina, PR 00982 | $0.00 |
| 2021-000215 | Hacienda | Punta Borinquen Shopping Center Inc. | P.O. Box 250444 Aguadilla, PR 00604 | Calle Bert Intersección Calle East Parade Bo Maleza Abajo Base Ramey Aguadilla, PR 00604 | $0.00 |
| N/A | Hacienda | TOTE (Sea Star) | 10401 Deerwood Park Boulevard Building 1, Suite 1300 Jacksonville, FL 32256 | Zona Portuaria Avenida Kennedy, San Juan, PR 00902 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| N/A | Hacienda | Trailer Bridge Inc. | Metro Officce Park Oficina 302 Guaynabo, PR 00968-1705 | Zona Portuaria Avenida Kennedy San Juan, PR, 00902 | $0.00 |
| 2018-DS0377 | Hector David Rios Ortiz | Departamento de Salud | PO BOX 71, Barranquitas, PR 00794 | Carretera 156 Km. 16.9, Barrio Quebrada Grande, Barranquitas, PR 00794 | $0.00 |
| 2018-DS0259 | Hector Manuel Rivera Guzman | Departamento de Salud | Calle Guillermo Esteves 57, Jayuya PR 00664 | Calle Guillermo Esteves 57, Jayuya, PR 00664 | $0.00 |
| 2016-000239/ 2021-000102 | Inmobiliaria Rodmor Inc | Departamento de la Familia | PO BOX 28, Yauco PR 00698 | Carr. 127, Km. 2.3, Yauco, PR 00698 | $0.00 |
| 2018-DS0333 | Inmobiliaria Witoche Inc | Departamento de Salud | PO BOX 441, Fajardo PR 00738 | Calle E Suite 77 Urb Monte Brisas, Fajardo, PR 00738 | $0.00 |
| 2017-DS0121 | Israel Acevedo Barreto | Departamento de Salud | Buzón 4110 Ave. Militar, Isabela P.R. 00662 | Carr #2 km 110 Bo. Mora, Isabela, PR 00662 | $0.00 |
| 2018-DS0475 | Jayve Development | Departamento de Salud | 568 Km 28.8 Bo Padilla, Corozal, Puerto Rico 00783 | Portobello Town Center, Salinas, Puerto Rico 00751 | $0.00 |
| 2017-DS0120 | JF Building Lease and Maintenance Corp | Departamento de Salud | PO BOX 1804, Cidra PR 00739 | Calle Jose de Diego, hacia Comerio en Cidra, PR 00739 | $0.00 |
| 2019-000002 | Johnjavi Corporation | Administración para el Sustento de Menores (ASUME) | PO Box 246 Las Piedras, PR 00771 | Calle Boulevard del Rio, Ramal #3, Humacao, PR 00792 | $0.00 |
| 2018-DS0319 | Jorge Luis Ortiz Morales | Departamento de Salud | PMB 637 HC 01 BOX 29030, Caguas PR 00725 | Calle 5 Numero 33, Bayamon PR, 00959 | $0.00 |
| 2008-000311 | Departamento de Educacion | Sucn. Jose N Colon | P.O. Box 358 Barranquitas, PR 00794 | Barrio Honduras Sector El Porton Carr 156 km 17.7, Barranquitas, PR 00705 | $0.00 |
| 2019-DS0224 | Jose Raul Ortiz Rubio; Nilsa Morales Lehman | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PASEO ATOCHA #30 SUITE 3 PONCE, PR 00730 | $0.00 |
| 2007-000011F | Junta de Relaciones del Trabajo | Empire Plaza, S.E. | P. O. Box 360983 San Juan, P.R.,00936-0983 | 1052 Ave. Muñoz Rivera, Edif. G. A. Plaza Río Piedras, PR 00927 | $0.00 |
| 2016-DS0807/ 2021-DS1218 | Juan Antonio Negron Berrios | Departamento de Salud -WIC | P.O. Box 1095, Barranquitas, P.R. 00794 | Calle San Jose #214, Aibonito PR, 00705 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-DS0146 | Juan B Melendez y Carmeno O Melendez | Departamento de la Familia | Box 40 Urb. Villas De las Americas San Juan, PR 00927 | Calle Munoz Rivera  2, Orocovis, PR 00720 | $0.00 |
| 99-081-0004/ 2021-000145 | Departamento de Educacion | Juan I Lopez | Boulevard Plaza Offices Buildings PO Box 246 Las Piedras PR. 00771 | RD 3 km 80.2 Boulevard del Rio, Humacao PR, 00791 | $0.00 |
| 2016-000022 | Junta de Planificación | VIG Leasing LLC. | Oficina GF-3Ave. Ponce de León 1225 Santurce PR, 00907 | Oficina GF-3Ave. Ponce de León 1225 Santurce PR,00907 | $0.00 |
| 2014-DS0751 | Luis Francisco Rodriguez Gotay | Departamento de Salud | EDIF. ORO OFFICE CENTER, SUITE 4 AVE. MUÑOZ MARIN , Orocovis PR 00720 | Ave Luis Muñoz Marin 568, Orocovis, PR 00720 | $0.00 |
| 2017-DS0119 | Luis Oscar Roig Pacheco | Departamento de Salud | P O BOX 3027, Yauco PR 00698 | Calle Munoz Rivera # 47, Guayanilla PR 00656 | $0.00 |
| 200-000150, 2009-000254, 2020-000192, and 2022-000027 | Macam SE | Departamento de Educacion | Departamento de Educación P. 0. Box 190759 San Juan, Puerto Rico 00919-0759 | Urb Industrial Tres Monjitas Finca 14743, HaTo Rey, PR 00917 | $0.00 |
| 2018-000209/ 2019-000164 | Manuel Mediavilla Inc | Departamento de la Familia | PO Box 638 Humacao, PR 00792 | carr #189 R914 Tejas Sector Asturiana, Humacao, PR 00791 | $0.00 |
| 2015-DS0526 | Maria Jose Ibanez Sanchez | Departamento de Salud | URB JARD FAGOT C 24 CALLE 3, Ponce PR 00731 | calle Muñoz Rivera #77, Juana Diaz, PR 00795 | $0.00 |
| 2014-000161 | Mario Delgado Miranda | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | 320 Calle Fernandez Garcia Luquillo, PR 00773 | 320 calle Fernandez Garcia, Luquillo, PR 00773 | $0.00 |
| 2014-DS0436 | Mennonite General Hospital Inc | Departamento de Salud | PO BOX 373130, Cayey PR 00737 | 80 Calle Luis Munoz Rivera #90, Caguas, Aguas Buenas PR, 00725 | $0.00 |
| 2019-00007 | Metro Center Associates | Administración para el Sustento de Menores (ASUME) | P.O Box 70376 San Juan , PR 00936-8376 | Metro Center, 5 Calle Mayaguez, Hato Rey, P.R 00917 | $0.00 |
| 2018-DS0379 | Miembros Coberge SE | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Carr #154 Barrio Quebrada Grande  Calle Barcelo #10 Barranquitas, PR 00794 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000100/ 2022-000001 | MT Investments SE | Departamento de la Familia | SUITE 112 MSC 370 #100 GRAND BOULEVARD PASEO SAN JUAN, PR 00926 | Ave FD Roosevelt, Esq Trinidad, Hato Rey, PR 00917 | $0.00 |
| 2016-000109 | Negociado de Sistemas de Emergencia 9-1-1 | 3 Ríos LTD | 27 Calle González GiustiSuite 300 Guaynabo, Puerto Rico, 00968-3076 | Edif. 115 Avenida Eleonor Roosevelt Hato Rey, San Juan, P.R. 00918 | $0.00 |
| 2013-000011 | Negociado de Sistemas de Emergencia 9-1-1 | Arrivea, Inc. | Garden Hills Plaza PMB 691Ave. Luis Vigoreaux Guaynabo, Puerto Rico,00966 | Carr. 20 k.m. 2.3 Bo. Monacillos Calle Filipo de Plana Rio Piedras, P.R. 00966 | $0.00 |
| 2018-000004 | Negociado de Sistemas de Emergencia 9-1-1 | Electra Corp. | Vieques ST. #4 San Juan, Puerto Rico ,00917 | Royal Industrial Park Carr. 869 k.m. 1.5 Cataño, P.R. 00968 | $0.00 |
| 2018-000021 | Negociado de Sistemas de Emergencia 9-1-1 | Moyba, LLC | P.o. Box 902150 San Juan, Puerto Rico ,00902 | Solar F Corporate Office Park Bo. Monacillos, San Juan P.R. 00966 | $0.00 |
| 2017-000074A | Negociado para el Manejo de Emergencias (NMEAD) | Albors & C Corporation | PO BOX 363041 SAN JUAN PR,00936-3041 | Belmonte Centro Calle Ramón Emiterio Betance Núm. 345 Sur Antigua Calle Pous Mayaguez, PR. 00682 | $0.00 |
| 2017-000072 | Negociado para el Manejo de Emergencias (NMEAD) | Consultec Construction | PO BOX 8627 HUMACAO PR,00792 | 69 Ave. Cruz Ortiz Stella Esq. Curvelo, Humacao, PR. 00791 | $0.00 |
| 2015-00034D | Negociado para el Manejo de Emergencias (NMEAD) | FISA, LLC | PO BOX 2286 GUAYAMA PR,00785-2286 | 1 Edif. FISA II Loca, Ave Paseo del Pueblo Guayama, PR. 00784 | $0.00 |
| 2014-DS0291 | Norman Luis Santiago Gomez | Departamento de Salud | PO BOX 1316, San German PR 00683 | Centro Comercial San German, Calle Luna , San German PR, 00683 | $0.00 |
| 2014-DS0293 | Norman Luis Santiago Gomez | Departamento de Salud | PO BOX 1316, San German PR 00683 | Centro Comercial San German, Calle Luna , San German PR, 00683 | $0.00 |
| 2017-DS0240 | Ochoa Roig, INC. | Departamento de Salud | PO BOX 428, Caguas PR 00726 | Edificio Comercial Calle Acosta #1, Caguas PR 00725 | $0.00 |
| 2017-DS0461 | Office Park Inc. | Departamento de Salud | 1 Calle de 65 de Infanteria Nte. Suite 2, Lajas PR 00667 | Office Park I, Suite 308 Carr. 2 Km 157, Frente centro medico, Mayaguez, PR 00682 | $0.00 |
| 2011-000244 | Oficina de Administracion de los Tribunales | Ramhil Developers, Inc. | PO Box 491, Caguas PR 00726-0491 | Nuevo Centro Judicial de Caguas, Carretera a Estatal PR# 1, Esquina Carretera Estatal PR #189, en el Barrio Bairoa, del Municipio de Caguas, Puerto Rico, 00725 | $0.00 |
| 2018-000005 | Oficina de Ética Gubernamental | EPC Corporation | Roural Route Num 9 Box 1870, San Juan, PR 00926 | Urb. Industrial El Paraíso, Calle Ganges 107, San Juan, Puerto Rico 00907 | $0.00 |
| 2015-000014 | Oficina de Gerencia y Presupuesto (OGP) | Atlantic Ocean View II, LLC | PO Box 140400 Arecibo, PR,00614 | 2do Piso Edificio Galería Norte, Carretera #2 Km. 87.0, Hatillo, PR 00659 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014000002 | OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS | BANCO POPULAR DE PR | REAL ESTATE DIVISION (716) BANCO POPULAR DE PUERTO RICO PO BOX 362708 SAN JUAN PR ,00936-2708 | 1492 AVENIDA PONCE DE LEON EDIFICIO CENTRO EUROPA SUITE 600 SAN JUAN PR 00907 | $0.00 |
| 2018-000020 | Oficina del Comisionado de Seguros de PR (OCS) | Advantage Self Storage, Inc. | PO Box 192153 Guaynabo, PR, 00919-2153 | N/A | $0.00 |
| 2018-000005 | Oficina del Comisionado de Seguros de PR (OCS) | Caparra Hills, LLC | Tabonuco B-5, Galería San Patricio Suite 212 GUAYNABO, PR 00968 Puerto Rico | Edificio GAM TOWER, Calle Tabonuco, Guaynabo, PR 00968 | $0.00 |
| 2016-000033 | Oficina del Comisionado de Seguros de PR (OCS) | GAM Realty, LLC; GAM Realty, Sociedad en Comandita, S.E. | PO Box 363609 San Juan, PR,00936-3609 | Edificio GAM TOWER, Calle Tabonuco, Guaynabo, PR 00968 | $0.00 |
| 2018-000001 | Oficina del Comisionado de Seguros de PR (OCS) | International Safe Deposit & Courier Services, Corp. | B-5 Calle Tabonuco 216, PMB 353 Guaynabo, PR, 00968 | B-5 Calle Tabonuco 216, PMB 353, Guaynabo PR, 00968 | $0.00 |
| 2018-000021 | Oficina del Comisionado de Seguros de PR (OCS) | Ricoh Puerto Rico, Inc. | PO Box 2110 Carolina, PR,00984-2110 | N/A | $0.00 |
| 2016-000022 | Oficina del Procurador de las Personas de Edad Avanzada (O.P.P.E.A) | The New Ponce Shopping Center, LP | P.O. BOX 331943 PONCE, PR 00731 | Santa María Shopping Center, Calle Ferrocarril Esquina Calle Capitán, Ponce, PR 00728 | $0.00 |
| 2009-000027 | Oficina del Procurador de las Personas de Edad Avanzada (O.P.P.E.A) | 1064 Ponce de León | 252 Ponce de León, Suite 700 SAN JUAN, PR 00918 | Ave. Ponce de León, parada 16, Edificio 1064, tercer piso, San Juan, PR 00907 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-DS0308 | Olga Rodriguez Negron | Departamento de Salud | P.O. Box 485 Villalba, PR 00766 | Urb La Vega Calle A C-2 Villalba, PR 00766 | $0.00 |
| 2019-DS0214 | One by One Inc | Departamento de Salud - Medicaid | P.O. Box 441, Fajardo, PR 00738-0441 | Local #10 Fajardo Market square Carr #3, Fajardo PR, 00738/ 328 Calle Matadero Puerto Real Fajardo, PR 00738 Puerto Rico | $0.00 |
| 961200001 | OPM | KLAP REALTY AND MANAGEMENT | PO BOX 51486, TOA BAJA, PR 00950 | 161 AVE PONCE DE LEON SAN JUAN, PR 00919 | $0.00 |
| 2018-000011 | Oficina del Procurador del Paciente (OPP) | Union Holdings, Inc. | Edificio Mercantil Plaza Ave. Ponce de León Ofic. 1501 San Juan, PR 00918 | Ave. Ponce de León Edif. Mercantil Plaza Piso 9, San Juan, PR 00919 | $0.00 |
| 2018-000014 | Oficina del Procurador del Paciente (OPP) | Union Holdings, Inc. | Edificio Mercantil PlazaAve. Ponce de León Ofic. 1501 San Juan, PR 00918 | Ave. Ponce de León Edif. Mercantil Plaza Piso 9, San Juan, PR 00919 | $0.00 |
| 2017-DS0242 | Pablo Melendez Burgado | Departamento de Salud | P.O BOX 442, Guaynabo PR, 00970 | Calle jose de Diego 164, Cayey PR 00736 | $0.00 |
| 2014-000163 | Parroquia San Ramon | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR 00901 | Calle Muñoz Rivera, Juana Diaz, PR 00795 | $0.00 |
| 2001-000627 | Departamento de Educacion | Pedro Russe Santiago | HC-02 Box 6035 Morovis, PR 00687 | Carr Ramal 6622, Morovis, PR, 00687 | $0.00 |
| 2015-DS1104 | Pepino Health Group Inc | Departamento de Salud | PO BOX 1537, San Sebastian PR 00685 | Centro de Salud Calle Pavia Fernandez #120, San Sebastian PR, 00685 | $0.00 |
| 2018-DS0469 | Plaza San Miguel, Inc. | Departamento de Salud | PO BOX 68, Saint Just, Trujillo Alto, PR 00978 | Ave Trujillo Alto, PR 00976 | $0.00 |
| 2017-000062 | Quality Water Services and Distribution, Corp | Oficina Independiente de Proteccion al Consumidor | PO Box 9020096 San Juan, PR,902 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 081-2016-0022/ 2016-000022 | Rafael Hernandez Barreras | Departamento de Educacion | P.O. Box 190759 San Juan, PR 00919-0759 | Local 5 Angora Park Plaza, Carretera #1, KM 33.3, Caguas, PR 00726 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000250/ 2020-000025 | Rafael Muratti Pesquera y Teresa Vazquez Rolon | Departamento de la Familia | PO Box 11398 San Juan, PR 00910-1398 | Calle Comercio, Sector Hermanas Davila, Bayamon, PR 00959 | $0.00 |
| 2017-DS0275 | REF Realty LLC | Departamento de Salud | PO BOX 361401, San Juan PR 00936-1401 | Ave Barbosa #340, Hato Rey, PR 00917 | $0.00 |
| 2017-DS0241 | Reinaldo Morales Martinez | Departamento de Salud | PO BOX 361401, San Juan PR 00936-1401 | Carr 111 km 2.1 Ave Rivas Dominichi, Utuado PR, 00641 | $0.00 |
| 2018-000018 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2018-00004 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2017-000029 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2015-000036 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2014-DS0297 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Preparacion y Coordinacion de Respuesta en salud Publica , calle Casia #2 Bo Monacillos Rio Piedras | $0.00 |
| 2014-DS0080 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Hopital Pediatrico  Universitario | $0.00 |
| 2014-DS0212 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | secretaria Auxiliar de Salud Ambiental | $0.00 |
| 2014-DS0210 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Recursos Humanos , Division de Reclutamiento, Hospital psiquiatrico, Rio Piedras | $0.00 |
| 2014-DS0081 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Hospital Universitario Dr. Ramon Ruiz Arnau, Bayamon | $0.00 |
| 2014-DS0604 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Comision Prevencion del Suicidio | $0.00 |
| 2014-DS0548 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | oficina de Reglamentacion y Certificacion de profesionales de la salud | $0.00 |
| 2014-DS0687 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Auditoria Interna | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-DS0686 | Ricoh PR | departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | OCASET | $0.00 |
| 2014-DS0547 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Promocion a la Salud | $0.00 |
| 2014-DS0484 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region de Salud de Ponce | $0.00 |
| 2014-DS0398 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region de Salud de caguas | $0.00 |
| 2014-DS0298 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Salud Familiar y servicios Integrados | $0.00 |
| 2015-DS0714 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de salud ambiental , oficinas de Guayama, Hato Rey, Rio Piedras, San German y Trujillo Alto | $0.00 |
| 2015-DS0713 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Servicios Medicos y Enfermeria | $0.00 |
| 2015-DS0003 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Salud Ambiental Division de Agua Potable | $0.00 |
| 2015-DS0002 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region Oeste de salud | $0.00 |
| 2015-DS1226 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Division de Madres y Niños, Programa Avanzando Juntos | $0.00 |
| 2015-DS1198 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de l secretaria de la Salud | $0.00 |
| 2015-DS1197 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de servicios generales Area de Reproduccion | $0.00 |
| 2015-DS1196 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de comunicaciones | $0.00 |
| 2016-DS0713 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar para la promocion de la salud ( Aguadilla, Arecibo, Las Piedras, mayaguez y ponce) | $0.00 |
| 2016-DS0520 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar | $0.00 |
| 2016-DS0509 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Servicios a Niños con necesidades especiales | $0.00 |
| 2016-DS0486 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Division de Prevencion ETS/VIH | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-DS0485 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | oficina de Reglamentacion y Certificacion de profesioanles de la salud | $0.00 |
| 2016-DS0277 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Programa de Retardo Mental (Aibonito, Aguadilla, Bayamon,Cayey,Ponce, Rio Grande, Vega Baja, | $0.00 |
| 2015-DS1260 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Enfermedades catastroficas | $0.00 |
| 2015-DS1234 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina d Recursoso Humanos Division de Clasificacion y Retribucion | $0.00 |
| 2016-DS0809 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Programa Medicaid Central y Oficinas regionales | $0.00 |
| 09-3C-145 | Ricoh PR | Oficina Independiente de proteccion al Consumidor | PO BOX 2110, Carolina, PR 00984-2110 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 2016-DS0902 | Salvador Roldan Figueroa | Departamento de Salud | PO BOX 379, San Lorenzo PR 00754 | Calle Munoz Rivera #5, San Lorenzo PR, 00754 | $0.00 |
| 2015-DS1016 | San Sebastian Properties LLC | Departamento de Salud | PO BOX 367849, San Juan, PR 00936 | Oficinas Medicaid San Sebastian, San Sebastián Gallery Mall San Sebastián, Puerto Rico 00685 | $0.00 |
| 2016-000123 | STATE ELECTIONS COMMISSION | Margaro López Inc. | PO BOX 55, Las Piedras PR 00771 | Alheji Plaza Jesús T. Piñero #77 Interior, San Juan PR | $0.00 |
| 2012-000220 | Departamento de la Familia | 65TH INFANTERÍA SHOPPING CENTER, LLC | PO Box 362983, San Juan, PR 00936-2983 | Avenida 65 de Infantería #49, Suite 31, Rio Piedras, PR 00921 | $0.00 |
| 2015-000070 | Administración de Desarrollo Socioeconómico de la Familia | 800 Ponce de León Corp. | PO Box 195192 San Juan, PR 00919-5192 | Ave. Ponce de León #800, Miramar, San Juan PR 00907 | $0.00 |
| 2013-000078 | Departamento de la Familia | AMD DEVELOPMENT, INC. | PO BOX 362588, San Juan PR 00936 | Carretera 848, Km. 3, Hm. 6, Saint Just, frente Expreso Trujillo Alto, 00976 | $0.00 |
| 2009-000150 | Departamento de la Familia | Antonio J. Leal / Mirtha B. Cruz Valladares | Calle Patio Hill M-7 Torrimar GUAYNABO, PR 00969 Puerto Rico | Avenida de Diego 124 Urbanización La Riviera Puerto Nuevo, San Juan, PR 00921 | $0.00 |
| 2016-000239 | Departamento de la Familia | Inmobiliaria Rodmor, Inc. | PO BOX 28, Yauco PR 00698 | Carr. 127, Km. 2.3, Int Santa Catalina, Int. Yauco, PR 00698 | $0.00 |
| 2015-000296 | Departamento de la Familia | ARJC Realty SE | Urb. Industrial las Flores, Carr. PR #3, Rio Grande, PR 00745 | Urb. Industrial las Flores, Carr. PR #3, Rio Grande, PR 00745 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2013-000315 | Departamento de la Familia | BIANCA CONVENTION CENTER INC | PO BOX 2123 Anasco, PR 00610 | Barrio Caracol, Carr. 2, Km. 143, Marginal, Añasco PR 00610 | $0.00 |
| 2009-000141 | Departamento de la Familia | BIANCA CONVENTION CENTER INC | PO BOX 2123 Anasco, PR 00610 | Calle Mckinley 190 Mayaguez, PR 00680 | $0.00 |
| 2015-000305/ 2022-000055 | Departamento de la Familia | Centerplex Inc. | CARR #2 KM 133.5 BO. GUANABANOS EDIF CENTERPLEX AGUADA, PR 00602 | CARR #2 KM 133.5 BO. GUANABANOS EDIF CENTERPLEX AGUADA, PR 00602 | $0.00 |
| 2012-000216 | Departamento de la Familia | Dorado Sales, Corp | MENDEZ VIGO #271 PO BOX 705 DORADO, PR 00646 Puerto Rico | PO BOX 705, Dorado PR 00646 | $0.00 |
| 2013-000264 | Departamento de la Familia | Ernesto Vázquez Gomez | P.O. Box 2021 Guayama, PR 00785 | Calle Ashford, Esquina Calle Pales NE, Guayama, PR 00784 | $0.00 |
| 2018-000140 (127-2018-140)/ 2021-000008 | Administración de Desarrollo Socioeconómico de la Familia | Fideicomiso Hernández Castrodad | Km 33 3, RR 1 Caguas, PR 00726 | Caguas Industrial Park, Carr. #1, Km. 29, Barrio Cañas, Caguas, PR 00727 | $0.00 |
| 2018-000139 (127-2018-139)/ 2021-000009 | Administración de Desarrollo Socioeconómico de la Familia | Fideicomiso Hernández Castrodad | Km 33 3, RR 1 Caguas, PR 00726 | Carr. #1, Km. 33.3, Barrio Bairoa, Ave. Angora, Caguas, PR 00725 | $0.00 |
| 2015-000037/ 2021-000081 | Departamento de la Familia | FISA S.E. | 54 Km 0 9 Bo Pueblo Guayama, PR 0078 | Paseo del Pueblo, Carretera PR 54 frente Hotel El Molino, Guayama, PR 00784 | $0.00 |
| 2014-000272 | Departamento de la Familia | FMA Realty II LLC | Carr. # 2 km 17.0 Barrio Candelaria Toa Baja, PR 00949 | FMA Commercial Park, Edificio A HA-3, Carr. 2, Km. 17.0 , Toa Baja, PR 00949 | $0.00 |
| 2016-000306 | Departamento de la Familia | Gonzalez Padín Realty Santurce, Inc. | EDIFICIO GONZALEZ PADIN SAN JUAN, PR 00902-4076 | Edificio González Padin, Avenida Ponce de León #1400, San Juan, PR 00919 | $0.00 |
| 2016-000307 | Departamento de la Familia | Héctor Cortés Vargas | P.O Box 599 Moca, PR 00676 | Carretera 115, Km. 12.8, Rincón, PR 00677 | $0.00 |
| 2013-000265 | Departamento de la Familia | Héctor L. Rivera | Ave. Buena Vista HC2 Box# 6617 Morovis, PR 00687 | Avenida Buena Vista #22 Morovis, PR 00687 | $0.00 |
| 2012-000215 | Departamento de la Familia | Jennymar Corp. | PLAZA MONSERRATE CARR. #2 KM 164 INT. HORMIGUEROS, PR 00660 | Local 5, Plaza Monserrate, Carr. 345, Km. 21, Hormigueros, PR 00660 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2013-000266 | Departamento de la Familia | JF BUILDING & MAINTENANCE CORP. | Calle Jose de Diego Final Cidra, PR 00739 | Calle de Diego final 1 salida Comerio a Cidra,Cidra, PR 00739 | $0.00 |
| 2014-000281/ 2020-000094 | Departamento de la Familia | Lorenzo G. Llerandi | 360 AVE JOSE CEDENO, Arecibo, Puerto Rico 00612-4655 | Calle Delfín Olmo #156, Arecibo, PR 00614 | $0.00 |
| 2012-000227 | Departamento de la Familia | Manuel Mediavilla, Inc. | FONT MARTELLO HUMACAO, PR 00971 | Carretera 189 R 914, Barrio Tejas, Sector Asturiana, Humacao, PR 00791 | $0.00 |
| 2012-000214 | Departamento de la Familia | MARIA MILAGROS HORMAZABAL RUIBAL | Box 15 Juncos, PR 00777 | Edificio Caray #1, Calle Emilio López, Hormazabal, Juncos, PR 00777 | $0.00 |
| 2012-000219 | Departamento de la Familia | Marla D. Quintana | P.O. Box 2525 Utuado, PR 00641 | Carretera 111, Km. 8.2, Barrio Caguana, Utuado, PR 00641 | $0.00 |
| 2013-000080 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Avenida Antonio R. Barceló, Carretera 14, Km. 72.3, Barrio Montellano, Cayey, PR 00736 | $0.00 |
| 2013-000079 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Calle 181, Km. 34, salida a San Lorenzo, Trujillo Alto, PR 00976 | $0.00 |
| 2013-000081 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Urbanización Industrial Sabaneta #210, Barrio Sabaneta, Ponce, PR 00730 | $0.00 |
| 2016-000240/ 2020-000078 | Departamento de la Familia | Puerta del Norte Mall and Parking Systems, Inc. | COND. CARIBBEAN TOWERS, SUITE 17 670 PONCE DE LEON AVE. SAN JUAN, PR 00907 | Calle Socorro 109, Quebradillas, PR 00678 | $0.00 |
| 2012-000229 | Departamento de la Familia | Rafael A. Hernández / LUDOVIGIA CASTRODAD MENENDEZ/Fideicomiso Hernández Castrodad- Sr. José Hernández Castrodad | HC-06 Box 72502 Caguas, PR 00725-9511 | Angora Industrial Park, Sector Bairoa, Caguas, PR 00725 | $0.00 |
| 2012-000213 | Departamento de la Familia | Rafael A. Hernández / LUDOVIGIA CASTRODAD MENENDEZ/Fideicomiso Hernández Castrodad- Sr. José Hernández Castrodad | HC-06 Box 72502 Caguas, PR 00725-9511 | Avenida Gautier Benítez 162 Edificio Angora, Caguas, PR 00725 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000279 | Departamento de la Familia | Rafael A. López Pagán | P.O.Box 699 Barranquitas, PR 00794 | Calle del Parque Final, Sector Luciana, Barranquitas, PR 00794 | $0.00 |
| 2013-000077 | Secretariado del Departamento de la Familia | Rafael A. Soto | P.O. Box 730 Las Piedras, P.R. 00771 | Calle Dr. Vidal, Esquina Georgetti, Humacao, PR 00791 | $0.00 |
| 2012-000218 | Secretariado del Departamento de la Familia | Rafael Muratti | P.O. Box 3796 Bayamón Garden Station Bayamón, PR 00958 | Calle Comercio, Hermanas Dávila final, Centro Comercial San Fernando, Carolina, PR 00985 | $0.00 |
| 2017-000025 | Departamento de la Familia | RAMOS & RAMOS REALTY, INC. | CALLE DR VEVE # 41 BAYAMON, PR 00960 Puerto Rico | Edificio Ramos (Oriental Bank) Marginal Carr.2, Intersección 167, Bayamon, PR 00959 | $0.00 |
| 2014-000273/ 2020-000187 | Departamento de la Familia | Río del Plata Mall, Inc. | CARR 165 KM 7.4 BO GALATEO TOA ALTA, PR 00953 | Carr. 165, Esquina Calle 1 #S7, Urb. Jardines de Toa Alta, Toa Alta, PR 00953 | $0.00 |
| 2014-000263 | Secretariado del Departamento de la Familia | Roberto Huyke Luigi | 3203 CARR 351 MAYAGUEZ, PR 00682-7817 | Calle Jesús T. Piñeiro #65 San Juan, PR 00920 | $0.00 |
| 2012-000230 | Departamento de la Familia | San Sebastián Properties, LLC | SAN JOSE 252 OFIC 1-B SAN JUAN, PR 00901 | Carretera 111, Km 17.9, Barrio Guatemala, San Sebastián, PR 00965 | $0.00 |
| 2012-000223 | Departamento de la Familia | Servicentro Ciales, Inc. | Jose De Diego #54 Ciales, PR 00638 | Calle Hernández Userra #18 Ciales, PR 00638 | $543,750.00 |
| 2014-000295 | Departamento de la Familia | SSSC SE Ellinette Pérez Laracuente | PO BOX 594, Lajas PR 00667 | Avenida 65 de Infantería #49 Interior, Rio Piedras, PR 00927 | $0.00 |
| 2013-000262 | Departamento de la Familia | TAM INVESTMENT GROUP, CORP. | PO BOX 194126, San Juan, PR 00919 | Ave. Barbosa 618, Esq. Mayaguez, Río Piedras, PR 00920 | $0.00 |
| 122-2016-000056 | Secretariado del Departamento de la Familia | Vieques Office Park | PO BOX 275, Vieques PR 00765 | Calle Benítez Castaño, Esquina Carlos Le Brum, San Juan, PR 00911 | $0.00 |
| 2012-000222 | Secretariado del Departamento de la Familia | Virginia Ramirez/Tomas Omar Coriano Ramirez | Urbanización Sultana Calle Tolosa #78 Mayaguez, PR 00680 | Calle San Benito #14, frente a la Plaza de Recreo Las Marias, PR 00670 | $0.00 |
| 2013-000314 | Secretariado del Departamento de la Familia | Wilfredo Fontanez | P.O. Box 3274 Carolina, PR 00984 | Avenida Betances 464, Esquina Los Millones Urbanización Hermanas Dávila, Bayamon, PR 00959 | $0.00 |
| 2016-000010 | SF III PR, LLC | Oficina Independiente de proteccion al Consumidor | 767 5th Ave 12th Floor NYC, New York, 10153 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 2017-000001 | Sistema de Retiro para Maestros | La Rambla Plaza Corp, | Suite 131 Ponce, PR, 00716-0218 | 606 Ave Tito Castro Suite 131, La Rambla, Ponce, PR 00716 | $0.00 |

## Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000035 | Sistema de Retiro para Maestros | Vista Verde Shopping, Corporation | PO Box 3065 Mayaguez, PR, 00681-3065 | Carretera # 2, Km. 156.6, Mayaguez, PR 00680 | $0.00 |
| 2014-DS0692 | Sociedad Especial Plaza Hato Arriba | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Local Num 7 Centro Plaza Hato arriba Carr 111 km 14.5, San Sebastian PR, 00685 | $0.00 |
| 2019-DS0210 | Sucesion william Davila Torres | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Carr. #2 km. 11.9 Primer Piso, Bayamon PR, 00959 | $0.00 |
| 2019-DS0227 | Sucn Jose Antonio Hernandez Vibo; Ileana Hernandez Brito y Vivian Hernandez Brito | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Calle Eleanor Roosevelt #231 Hato Rey, PR 00918 | $0.00 |
| 2021-DS1312 | Sucn Mirta Celeste Ramos Cruz | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Marbella Shopping Center Carr 107 km 1.4, Aguadilla PR, 00603 | $0.00 |
| 2014-000154 | Sucn Ortiz Melendez | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR, 00901 | carr 155 km 27.4 Bo Pueblo, Orocovis, PR 00720 | $0.00 |
| 2019-000003 | Sucn Rafael Hernandez Barreras | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR, 00901 | Edificio Angora Park , Ave Luis Muñoz Marin, Esq Calle Georgetti, Bo Tomas de Castro, Caguas, PR 00970 | $0.00 |
| 2014-DS0260 | Sucn Victor Inocencio Ramirez Ramirez | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Calle Brau # 68, Cabo Rojo, PR 00623 | $0.00 |
| 2017-DS0124 | Supermercado Agueybana, Inc. | Departamento de Salud | PO BOX 3009, Yauco PR 00768 | Calle Buenaventura Quiñones #28, Guanica PR, 00653 | $0.00 |
| 2002-081-0016/ 2021-000179 | TAMM Investment | Departamento de Educacion | P.O. Box 190759 San Juan, PR 00919-0759 | Ave Jose De Diego 181-183, Arecibo PR 00612 | $0.00 |
| 2017-000044 | Union Holdings, Inc. | Panel sobre el FEI | Ave. Ponce de León Edif.Mercantil Plaza Suite 1501 Hato Rey, PR,00918 | Edif. Mercantil Plaza, Piso 10 , Suite 1000, San Juan, PR 00919 | $0.00 |

# Schedule of Executory Contracts and Unexpired Nonresidential Leases to be Assumed

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-DS0251 | Villa Coop Agustin Burgos rivera | Departamento de Salud | PO BOX 1554, Villalba PR 00766 | Calle Muõz Rivera #39, Villalba PR 00766 | $0.00 |
| 2018-DS0699 | William Fuertes Romeu; Joy Masarovic Espino | Departamento de Salud | 185 Av. Franklin Delano Roosevelt, San Juan, PR, 00918 | East Ocean Drive 10 Urb Bahia , Cataño, PR 00962 | $0.00 |
| 2014-000275/ 2022-000009 | WPR la Ceramica LP SE | Departamento de la Familia | 185 Av. Franklin Delano Roosevelt, San Juan, PR, 00918 | Edificio 1 D-7 calle Rosario y PR 190 Parque Industrial La Ceramica, Carolina PR, 00979 | $0.00 |
| 2014-DS0650 | Xerox Corp | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR | Laboratorio de Salud Publica de PR | $0.00 |
| 2015-DS0934 | Xerox Corp | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR | Programa de Vacunacion Nivel Cetral y Regiones | $0.00 |

## <u>EXHIBIT E</u>

Assured Custodial Trust Agreement[1]

---

[1]  Due to the numerous Assured custodial trust agreements for the various series of bonds, only one Assured Custodial Trust Agreement is included in the Plan Supplement.

GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST

———————————

TRUST AGREEMENT

among

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF
PUERTO RICO, as Depositor,

ASSURED GUARANTY CORP.,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee

DATED AS OF

March 15, 2022

———————————

TABLE OF CONTENTS

Page

SECTION 1.    STANDARD TERMS ....................................................................... 1

SECTION 2.    DEFINED TERMS ......................................................................... 1

SECTION 3.    ORGANIZATION OF TRUST ....................................................... 2

SECTION 4.    NOTIONAL AMOUNT .................................................................. 3

SECTION 5.    FORMS OF TRUST UNITS ........................................................... 3

SECTION 6.    SCHEDULES ................................................................................. 3

SECTION 7.    PATRIOT ACT .............................................................................. 3

SECTION 8.    GOVERNING LAW; VENUE; JURY WAIVER ............................ 3

SECTION 9.    FORCE MAJEURE ........................................................................ 4

SECTION 10.   INTENT OF PARTIES ................................................................... 4

SECTION 11.   NON-PETITION .............................................................................. 7

SECTION 12.   CERTAIN TERMS REGARDING THE DEPOSITOR ................................. 7

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of March 15, 2022 (this "Agreement"), is hereby executed by and among Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO  (the "Commonwealth" or the "Depositor"), and ASSURED GUARANTY CORP. ("Assured"), U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of March 15, 2022 (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the GO PIB 2002A-74514LGL5 Assured Custodial Trust, a Delaware statutory trust (the "Trust").   In furtherance of the structure approved in the Commonwealth Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor and the Trustees solely for the benefit of and on behalf of the applicable Assured Legacy Bondholders holding Assured Legacy Bonds CUSIP 74514LGL5 that elected, or are deemed to have elected, Assured Bondholder Election 2 pursuant to the terms and provisions of the Commonwealth Plan.  Except for the establishment of the Trust and the deposit therein pursuant to the Commonwealth Plan at the election (or deemed election) of the applicable Assured Legacy Bondholders, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof.  The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof.  The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder".  The issue of Trust Units authorized under this Trust Agreement shall have a unique CUSIP, and the Book-Entry Trust Units authorized hereunder shall be issued in global form and be transferable through the Depository.

**Section 1.**    **Standard Terms.**

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units.  The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**    **Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below.  To the extent the meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned to such terms in the Standard Terms, the meanings assigned herein shall control.  Capitalized terms

used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the Commonwealth Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. Section 101 et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**": U.S. Bank Trust National Association, not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": July 1, 2029, the original maturity date of the relevant Assured Legacy Bonds (prior to acceleration).

"**Trustee**": U.S. Bank Trust Company, National Association, in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**": The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

**Section 3.** **Organization of Trust**.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "GO PIB 2002A-74514LGL5 Assured Custodial Trust" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust. Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in substantially the form attached as Exhibit B hereto. The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Trust Unit Holders and Assured.

**Section 4.**      <u>**Notional Amount**</u>.

The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) as of the Effective Date of the Assured Legacy Bonds deposited into the Trust as set forth on <u>Schedule I</u> hereto.

**Section 5.**      <u>**Forms of Trust Units**</u>.

The Trust Units shall be substantially in the form attached as <u>Exhibit A</u> hereto.  The Book-Entry Trust Units shall be issued in global form and transferable through the Depository.

**Section 6.**      <u>**Schedules**</u>.

<u>Schedule I</u> and <u>Schedule II</u> are attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.**      <u>**Patriot Act**</u>.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees.  The parties to this Trust Agreement agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

**Section 8.**      <u>**Governing Law; Venue; Jury Waiver**</u>.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW

EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE.   EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.   EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.**     <u>Force Majeure</u>.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.**     <u>Intent of Parties</u>.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Assured Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Assured Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor or of the Depositor's estate in the event of a liquidation, reorganization, or similar proceeding of the Depositor and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor.

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Assured, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

4

(i)      engage in any business or engage in any activity other than those activities expressly permitted under Section 2.03 of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

(ii)      acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

(iii)      fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

(iv)      fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)      fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

(vi)      provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)      have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)      commingle its assets or liabilities with those of any other Person;

(ix)      fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)      divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)      enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor, Assured, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

(xii)      maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)      incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

5

(xiv)   perform any duties or obligations of the Depositor or any other Person;

(xv)   make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)   supplement, modify, amend, restate, replace, waive or repeal this Section 10 or Sections 2.03, 2.04, 9.01 or 9.03 of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

6

(xxiv)  supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by Section 9.01 of the Standard Terms.

(d) Failure of the Trust, the Depositor, Assured, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 10 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this Section 10 conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this Section 10 shall be controlling as expressly set forth herein.

**Section 11.**     **Non-Petition**.  The Depositor, Assured, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Assured Bondholder Election 2, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim. For the avoidance of doubt, no adequate remedy at law exists with respect to any breach of this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.**     **Certain Terms Regarding the Depositor**.   For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor, and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)     The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor assumes no responsibility for their correctness.  The Depositor makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing or acquiring any Trust Units in certificated form, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, and in purchasing or acquiring any book-entry beneficial interests in the Trust Units, the purchaser or acquirer shall be deemed to acknowledge, represent and agree, that none of the Depositors nor any of their affiliates, is acting as a fiduciary or a financial or investment

7

advisor for such purchaser or acquirer, and such purchaser or acquirer is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositors or any of their affiliates.

(iv)   The Depositor shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**IN WITNESS WHEREOF**, the Depositor, Assured, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,**
As Depositor

By: _Francisco París III_____

Name:  Francisco Parés Alicea_____

Its:  Secretary of the Treasury_____

[GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST]

**ASSURED GUARANTY CORP.**

By: _____

Name:  Daniel Weinberg

Its:  Chief Surveillance Officer, U.S. Public Finance

[GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST]

**U.S. BANK TRUST NATIONAL
ASSOCIATION**,
As Delaware Trustee

By: _____
Name: Michelle Mena-Rosado
Its: Vice President

[GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST]

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
As Trustee

By: _____
Name: Michelle Mena-Rosado
Its: Vice President

[GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST]

## SCHEDULE I

### Assured Legacy Bonds Schedule

| Insured CUSIP | Original CUSIP | Bondholder Election 2 contraCUSIP | Insurance Policy Number(s) | Tax-Exempt/ Taxable | Coupon | Outstanding Principal Amount (or Compounded Amount) as of the Effective Date |
|---|---|---|---|---|---|---|
| 74514LGL5 | 745145XZ0 | 74599GVZ6 | SM-2006-013 | Tax-Exempt | 5.500% | $41,335,000 |

## SCHEDULE II

### Relevant Trust Information

**I. Trust Accounts**

| Account | Account Number |
|---|---|
| Tax-Exempt Bond Account | ■■■■■■■■■■■■ |
| Taxable Bond Account | ■■■■■■■■■■■■ |
| Cash Account | ■■■■■■■■■■■■ |
| CVI Account | ■■■■■■■■■■■■ |
| Insurance Policy Account | ■■■■■■■■■■■■ |

**II.   Trust Unit CUSIP**

The CUSIP of the Trust Units initially issued pursuant to this Trust Agreement is: 38018PAA2

**III.   References in Standard Terms**

In the Standard Terms, CUSIP 74514LGL5 is referred to as a:

(i) Assured Legacy Bonds CUSIP; and

(ii) Secondary Market Assured Legacy Bonds CUSIP.

See Section 2.01(a) and 2.01(c) of the Standard Terms for more information regarding the Trust Assets deposited in this Trust.

See Section 3.01(a) of the Standard Terms for more information regarding the accounts for this Trust.

See Section 3.02(a) of the Standard Terms for more information regarding distributions to be made in connection with this Trust.

## **EXHIBIT A**

FORM OF TRUST UNIT CERTIFICATE

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW SECURITIES UNDERLYING THE UNITS.

A-1

GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST

Trust Unit Certificate No. __

Original Notional Amount: _____

CUSIP: 38018PAA2

Each Trust Unit represented by this Trust Unit certificate is one of a duly authorized issue of certificates designated as the Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in the Trust Estate created by the Trust Agreement referred to below.

This certifies that [CEDE & CO.] is the registered owner of the Notional Amount of Trust Units evidenced by this certificate. Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement and Standard Terms referred to below and the Trust Agreement contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of March 15, 2022, by and among the Commonwealth of Puerto Rico (the "Depositor"), Assured Guaranty Corp. ("Assured"), U.S. Bank Trust Company, National Association, (the "Trustee") and U.S. Bank Trust National Association (the "Delaware Trustee", which term includes any successor under the Trust Agreement, and together with the Trustee, the "Trustees"), and the Standard Terms to Trust Agreement, dated as of March 15, 2022 (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter. This certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this certificate shall be made by the Trust Unit Paying Agent under the Trust Agreement.

This certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor, the Trustees, Assured and the Holder of the certificate and the terms upon which the certificate is executed and delivered.

This certificate does not bear interest. Distributions on this certificate represent a combination of certain payments made on the New Securities and certain other payments which derive from the Trust Estate and may vary from period to period. Each such Distribution shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution, as set forth in the Standard Terms.

In certain circumstances, Assured may instruct the Trustee in writing to sell the New Securities (the "Subject Bonds") underlying the Units for cash (a "Bond Sale"). The Holder of this certificate shall have the option to elect to receive in-kind delivery of a pro rata share of the Subject

A-2

Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs, in lieu of receiving a pro rata share of the actual net cash proceeds from the Bond Sale, as set forth in the Standard Terms.

This certificate is not subject to repurchase by the Trust at the option of the Holder of this certificate.

The Holder, by its acceptance of this certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Trust Unit Paying Agent in their individual capacities nor the Depositor is personally liable to such Holder for any amount payable under this certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this certificate hereby agrees that (i) the Trust Agreement is executed and delivered by U.S. Bank Trust Company, National Association and U.S. Bank Trust National Association, not individually or personally, but solely as Trustee and Delaware Trustee, respectively, in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee, the Delaware Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, (iii) nothing herein contained shall be construed as creating or imposing any liability upon U.S. Bank Trust Company, National Association or U.S. Bank Trust National Association, individually or personally, or the Depositor to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall U.S. Bank Trust Company, National Association, U.S. Bank Trust National Association or the Depositor be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this certificate, covenants and agrees that it will not at any time institute against the Depositor, Assured or the Trust, or join in any institution against the Depositor, Assured or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to this certificate or the Trust Agreement, that no adequate remedy at law exists with respect to any breach of such covenant and agreement, and that specific performance shall in all circumstances be available as a remedy for any breach of such covenant and agreement.

Distributions on this certificate will be made as provided in the Trust Agreement by the Trust Unit Paying Agent by wire transfer or check to such Holder without the presentation or surrender of this certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this certificate will be made after due notice by the Trust Unit Paying Agent of the pendency of such distribution and

only upon presentation and surrender of this certificate at the office or agency maintained by the Unit Registrar for that purpose.

Reference is hereby made to the further provisions of this certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this certificate has been executed by the manual or electronic signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual or electronic signature, this certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this certificate to be duly executed.

GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST

By: U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Trustee

By:_____
    Authorized Signatory

Dated: _____

CERTIFICATE OF AUTHENTICATION

This is the Trust Unit certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
not in its individual capacity, but solely as Unit Registrar

By:_____
    Authorized Signatory

Dated: _____

A-5

## GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST

## REVERSE OF TRUST UNIT CERTIFICATE

This certificate does not represent an obligation of, or an interest in, Assured, the Trustees, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement.  In addition, this certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement.  A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement (including the Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including the Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

a)  except as otherwise provided in the Trust Agreement (including the Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

b)  compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

c)  alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

d)  amend Section 9.01 of the Standard Terms without the written consent of each Trust Unit Holder;

e)  adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in a), b), or c) without the written consent of the Trust Unit Holders evidencing at least a majority of the Trust Units (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

f)  reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

A-6

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this certificate is registrable in the Unit Register upon the surrendering of this certificate for registration of transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new certificate will be issued to the designated transferee.  The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Trust Units of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustees under the Trust Agreement or of any other costs or expenses as provided in the Trust Agreement.

A-7

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

(Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within certificate stating in the names of the undersigned in the Unit Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Unit Register of the Trust.

I [we] further direct the Unit Registrar to issue a new certificate of like principal to the above-named assignee and deliver such certificate to the following address:

_____

_____

Dated:_____          _____
                                     Signature by or on behalf of Assignor

_____
       Authorized Officer            _____
                                     Signature Guaranteed

_____
    Name of Institution              NOTICE: The signature(s) of this assignment must
                                     correspond with the name(s) on the face of this
                                     certificate without alteration or any change
                                     whatsoever.  The signature must be guaranteed by a
                                     participant in the Securities Transfer Agents
                                     Medallion Program, the New York Stock Exchange
                                     Medallion Signature Program or the Stock
                                     Exchanges Medallion Program.  Notarized or
                                     witnessed signatures are not acceptable as
                                     guaranteed signatures.

A-8

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

**EXHIBIT B**

FORM OF CERTIFICATE OF TRUST OF
GO PIB 2002A-74514LGL5 ASSURED CUSTODIAL TRUST

THIS Certificate of Trust of GO PIB 2002A-74514LGL5 Assured Custodial Trust (the "Trust"), is being duly executed and filed by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801 *et seq*.) (the "Act").

1.    NAME.   The name of the statutory trust formed hereby is "GO PIB 2002A-74514LGL5 Assured Custodial Trust."

2.    DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware 19805.

3.    EFFECTIVE DATE.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S. BANK TRUST NATIONAL
ASSOCIATION,
as Delaware Trustee


By:_____
Name:
Title:


U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,
as Trustee


By:_____
Name:
Title:

B-1

# **EXHIBIT F**

FGIC Custodial Trust Agreement[1]

---

[1]  Due to the numerous FGIC custodial trust agreements for the various series of bonds, only one FGIC Custodial Trust Agreement is included in the Plan Supplement.

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST

RELATED TO

SETTLEMENT OF COMMONWEALTH
OF PUERTO RICO

$4,245,000 Puerto Rico Infrastructure Financing Authority, Special Tax Revenue Bonds, Series 2005A maturing July 1, 2016

This Agreement is

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company,

U.S. Bank Trust Company, National Association,

(as Trustee)

and

U.S. Bank Trust National Association,

(as Delaware Trustee)

# Table of Contents

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................. 1
    Section 1.1    Definitions................................................................................ 1

    Section 1.2    Rules of Construction ............................................................. 7

    Section 1.3    Article and Section References ............................................... 7

ARTICLE II TRUST ESTATE ............................................................................................ 8
    Section 2.1    Creation of Trust. .................................................................... 8

    Section 2.2    Trust Assets............................................................................. 8

    Section 2.3    Acceptance by Trustee. ........................................................... 9

    Section 2.4    Purpose, Activities of the Trust. ............................................. 9

    Section 2.5    Limitations of the Trust. ....................................................... 10

ARTICLE III ADMINISTRATION OF TRUST ................................................................. 11
    Section 3.1    Accounts. ............................................................................... 11

    Section 3.2    Investment of Funds in the Collection Accounts..................... 12

    Section 3.3    FGIC Insurance Policy and Effect of Distributions................. 12

    Section 3.4    Distributions.......................................................................... 14

    Section 3.5    Threshold Event or Permitted Sale Event. .............................. 15

    Section 3.6    Surrendered Units. ................................................................. 15

    Section 3.7    FGIC Election to Accelerate Policy Payments. ....................... 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS........................................ 17
    Section 4.1    Statements to Unitholders and FGIC. ..................................... 17

    Section 4.2    Compliance with Withholding Requirements.......................... 17

ARTICLE V THE UNITS ................................................................................................... 18
    Section 5.1    The Units................................................................................ 18

    Section 5.2    The Certificate; Book-Entry-only System. .............................. 18

    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate................... 19

    Section 5.4    No Obligation to Register. ...................................................... 20

    Section 5.5    Persons Deemed Owners. ....................................................... 20

    Section 5.6    Cancellation. .......................................................................... 20

ARTICLE VI PRIFA RUM TAX CLAWBACK CVI**s** ................................................... 20
    Section 6.1    Voting Rights with Respect to PRIFA Rum Tax Clawback CVIs. .......... 20

ARTICLE VII CONCERNING THE TRUSTEE................................................................. 21
    Section 7.1    Duties of Trustee.................................................................... 21

Section 7.2     Certain Matters Affecting the Trustee. ...................................................... 22

Section 7.3     Trustee Not Liable for Units or PRIFA Rum Tax Clawback CVIs, the
                Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy. ... 24

Section 7.4     Trustee May Own Units. ................................................................................ 25

Section 7.5     Trustee Costs and Expenses. ......................................................................... 25

Section 7.6     Eligibility Requirements for Trustee and Successor Trustee. .................... 26

Section 7.7     Resignation and Removal of the Trustee. ................................................... 26

Section 7.8     Successor Trustee. ........................................................................................ 27

Section 7.9     Merger or Consolidation of Trustees. .......................................................... 28

Section 7.10    Appointment of Trustee Custodians. ........................................................... 28

Section 7.11    Trustee May Enforce Claims Without Possession of Certificate. ............. 28

Section 7.12    Trustee Indemnity. ....................................................................................... 28

Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees. ..... 29

Section 7.14    The Delaware Trustee. .................................................................................. 30

ARTICLE VIII DEFAULT ON PRIFA RUM TAX CLAWBACK CVIs ................................. 32

Section 8.1     Realization Upon Default. ............................................................................ 32

ARTICLE IX TERMINATION OF TRUST ............................................................................... 32

Section 9.1     Termination; No Redemption Rights. ........................................................... 32

Section 9.2     Procedure for Termination. .......................................................................... 33

ARTICLE X TAX PROVISIONS ............................................................................................... 33

Section 10.1    Grantor Trust Provisions. ............................................................................ 33

Section 10.2    Characterization. .......................................................................................... 34

Section 10.3    Grantor Trust Administration. ..................................................................... 34

Section 10.4    Reports to Unitholders and Tax Authorities. ............................................... 35

ARTICLE XI MISCELLANEOUS PROVISIONS ...................................................................... 36

Section 11.1    Amendment of Trust Agreement. ................................................................. 36

Section 11.2    Counterparts. ................................................................................................ 37

Section 11.3    Limitation on Rights of Unitholders. ............................................................ 37

Section 11.4    Notices. ......................................................................................................... 38

Section 11.5    Severability of Provisions. ........................................................................... 38

Section 11.6    Acts of Unitholders. ...................................................................................... 38

Section 11.7    Headings. ...................................................................................................... 39

Section 11.8    No Waiver; Cumulative Remedies. ............................................................... 39

Section 11.9    Merger and Integration. ............................................................................... 39

Section 11.10   [Reserved]. ............................................................................................... 39

Section 11.11   Patriot Act. .............................................................................................. 39

Section 11.12   Governing Law; Venue Jury Waiver. ....................................................... 39

Section 11.13   Force Majeure. ......................................................................................... 40

Section 11.14   Intent of Parties. ...................................................................................... 40

Section 11.15   Non-Petition. ............................................................................................ 43

Section 11.16   Certain Terms Regarding the Commonwealth. ........................................ 43

Section 11.17   Certain Terms Regarding FGIC. .............................................................. 44

**EXHIBITS**

Exhibit A – Trust Assets ................................................................................................. A-1

Exhibit B -  Form of Notice to Unitholder and FGIC ...................................................... B-1

Exhibit C – Form of Certificate ...................................................................................... C-1

Exhibit D – Form of Certificate of Trust ....................................................................... D-1

Exhibit E-1- Form of Notice Relating to Permitted Sale Event ................................... E-1-1

Exhibit E-2- Form of Notice and Instruction Relating to Threshold Event ................. E-2-1

Exhibit E-3- Form of Instruction Relating to Permitted Sale Event ........................... E-3-2

Exhibit F – Form of Trustee's Certification of Receipt of Certain Trust Assets ............ F-1

Exhibit G – Form of Assignment .................................................................................... G-1

**SCHEDULES**

Schedule I – Threshold Price ........................................................................................ S-I-1

Schedule II - Trustees Fee  Schedule .......................................................................... S-II-1

# PRIFA SERIES 2005A (2016) CUSTODIAL TRUST

# TRUST AGREEMENT

**THIS TRUST AGREEMENT**, dated as of March 15, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the PRIFA Series 2005A (2016) Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with the Commonwealth, and FGIC, collectively, the "Parties").

**WHEREAS**, in furtherance of the structure approved in the Plan of Adjustment and the PRIFA QM, including the obligation of the Commonwealth to issue PRIFA Rum Tax Clawback CVIs, and in order to facilitate the implementation thereof, the Trust is being established by the Commonwealth and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment, the PRIFA QM and as contemplated hereby, the Commonwealth shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Sections 65.1, 65.2 75.4(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving the consideration allocable or distributable in accordance with the PRIFA QM and Sections 65.1 and 65.2 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable PRIFA Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)     Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":   The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date": March 15, 2022, the date on which the PRIFA Distribution Conditions are satisfied.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders, FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii)

neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any PRIFA Rum Tax Clawback CVI as of any date of determination, the lower of (i) the price for such PRIFA Rum Tax Clawback CVI, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such PRIFA Rum Tax Clawback CVI, as of such Business Day, and (ii) the fair market price for such PRIFA Rum Tax Clawback CVI, including accrued and unpaid interest determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and

3

unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount , to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount set forth in the Trustee Fee Schedule.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by PRIFA, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"Moody's": Moody's Investors Service, Inc.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as contemplated by Sections 65.1, 65.2 and 75.4(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to the PRIFA Rum Tax Clawback CVIs, the satisfaction of all of the following requirements:

(i)      FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)     FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of the PRIFA Rum Tax Clawback CVIs and setting forth the Permitted Sale Price for such PRIFA Rum Tax Clawback CVIs, as applicable;

(iii)    The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)     The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of the PRIFA Rum Tax Clawback CVIs, the price equal to the percentage of the outstanding notional amount of such PRIFA Rum Tax Clawback CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The Seventh Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority, Case No. 17 BK 3283-LTS, filed on July 30, 2021, as amended, modified or supplemented from time to time.

"PRIFA QM": The PRIFA Qualifying Modification pursuant to Title VI of PROMESA by and among the Oversight Board, as administrative supervisor, PRIFA ,as issuer, and AAFAF, as fiscal agent for the issuer, dated  October 5, 2021 and approved by the United States District Court for the District of Puerto Rico on January 20, 2022.

"PRIFA Rum Tax Clawback CVIs" means the CVIs identified in Exhibit A.

"PRIFA Rum Tax Clawback CVI Distribution Date": With respect the PRIFA Rum Tax Clawback CVIs, each date specified in the CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii), based on any scheduled payment of any amount due in respect of PRIFA Rum Tax Clawback CVIs, the tenth day preceding the related PRIFA Rum Tax Clawback CVI Distribution Date, and (iii) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) above is not a Business Day, the Record Date shall be the preceding Business Day.

 "Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the PRIFA Rum Tax Clawback CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to the PRIFA Rum Tax Clawback CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of the PRIFA Rum Tax Clawback CVIs exceeds the Threshold Price for such PRIFA Rum Tax Clawback CVIs, coupled with a written instruction from FGIC to sell some or all of such PRIFA Rum Tax Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Schedule": The Schedule II to this Trust Agreement.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units":  The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2      Rules of Construction

Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)      "or" is not exclusive;

(iv)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)      the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)      the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3      Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearingwithin a particular paragraph of a Section is a reference to such Section as a whole.

# ARTICLE II

# TRUST ESTATE

Section 2.1     <u>Creation of Trust.</u>

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "<u>Secretary of State</u>"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2     <u>Trust Assets.</u>

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)     The Commonwealth shall, on behalf of the Original Holders and as required by Sections 65.1, 65.2 and 75.4(a) of the Plan, deposit, or cause to be deposited, into the Trust (i) the Allocable PRIFA Consideration comprising Cash and PRIFA Rum Tax Clawback CVIs as specified on Exhibit A hereto; and (ii) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy;

(b)     All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Sections 65.1, 65.2 and 75.4(a) of the Plan. All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)     Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Sections 65.1, 65.2 and 75.4(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

8

Section 2.3    Acceptance by Trustee.

(a)    By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)    The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) is in possession of Allocable PRIFA Consideration comprising cash in the amount specified on Exhibit A hereto, (ii) either (x) confirms that the PRIFA Rum Tax Clawback CVIs have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC or (y) has received written statements from the trustees with respect to the PRIFA Rum Tax Clawback CVIs, confirming that the PRIFA Rum Tax Clawback CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of the PRIFA Rum Tax Clawback CVIs to such account, and (iii) confirms that the Trust Units have been issued to the Original Holders.

(c)    The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the PRIFA Rum Tax Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such PRIFA Rum Tax Clawback CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the PRIFA Rum Tax Clawback CVIs have been deposited to and are being held in such account.

(d)    Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4    Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)    accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)    create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)      make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)      receive payments pursuant to the Plan;

(e)      issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the PRIFA Rum Tax Clawback CVIs to the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)      make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)      coordinate Unitholder communications through the Depositary;

(h)      follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)      hold the Trust Assets;

(j)      sell or assign PRIFA Rum Tax Clawback CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)      effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)      make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)      make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)      otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)      engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5      Limitations of the Trust.

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither the Commonwealth or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Commonwealth or FGIC or their respective Affiliates;

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)     There will be no guarantees made by the Trust with respect to obligations of the Commonwealth or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and the Commonwealth or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)     The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Commonwealth or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Commonwealth or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of the Commonwealth or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)     The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1     <u>Accounts.</u>

(a)     The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank Trust Company, National Association has established and will maintain its participant account at the Depositary into which the PRIFA Rum Tax Clawback CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts

shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding of the Fee Reserve from time to time in accordance with the terms of this Trust Agreement. All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)     If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection  Account under this Trust Agreement.

(c)     The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2     Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3     FGIC Insurance Policy and Effect of Distributions.

(a)     The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)     The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein,  claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered

12

FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action(s) as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case, as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered FGIC Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC

ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)     Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Sections 65.1, 65.2 and 75.4 of the Plan.

(g)     In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4     Distributions.

(a)     All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, or (ii) any scheduled payment due on the PRIFA Rum Tax Clawback CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments.  Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA.  On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5        Threshold Event or Permitted Sale Event.

(a)        The Trustee shall not sell any PRIFA Rum Tax Clawback CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6.  Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)        Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of the PRIFA Rum Tax Clawback CVIs, the Trustee shall seek to sell such PRIFA Rum Tax Clawback CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such PRIFA Rum Tax Clawback CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6        Surrendered Units.

(a)        Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of the PRIFA Rum Tax Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)        The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and

15

immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the PRIFA Rum Tax Clawback CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7   <u>FGIC Election to Accelerate Policy Payments.</u>

(a)   Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)   Pursuant to the PRIFA QM and the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; <u>provided</u>, <u>however</u>, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "<u>Cash Acceleration Payment</u>"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)   At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

# ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1      Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)      all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; and (ii) PRIFA Rum Tax Clawback CVI payments;

(b)      all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)      the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of the PRIFA Rum Tax Clawback CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)      the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)      the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)      any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)      (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)      any required tax reporting for such period.

Section 4.2      Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the

Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     The aggregate Notional Amount of the Units issued under this Trust Agreement shall be limited to the aggregate outstanding principal amount of the Covered FGIC Insured Bonds as of the Closing Date that are deposited into the Trust on the Closing Date, as shown on Exhibit A. The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on their respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)      No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)     The Trust shall issue the Certificates to the Depositary. Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee. There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)     DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)     Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)     A CUSIP number will be imprinted on the Certificate, but such CUSIP number shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3     Mutilated, Destroyed, Lost and Stolen Certificate.

(a)     If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)     Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other

19

governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)     Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)     The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4     No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5     Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6     Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

## ARTICLE VI

## PRIFA RUM TAX CLAWBACK CVIs

Section 6.1     Voting Rights with Respect to PRIFA Rum Tax Clawback CVIs.

(a)     Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the

PRIFA Rum Tax Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)     The voting and direction rights allocable to the owners of the PRIFA Rum Tax Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request. Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

## ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1    Duties of Trustee.

(a)     Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)     The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)     The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)     The Trustee shall deliver to all Unitholders copies of all notices and written communications received from the Commonwealth as they relate to the PRIFA Rum Tax Clawback CVIs.

(e)     Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the PRIFA Rum Tax Clawback CVIs

exercising any trust or power conferred upon the Trustee with respect to the PRIFA Rum Tax Clawback CVIs, under this Trust Agreement;

(iii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)     Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2     Certain Matters Affecting the Trustee.

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)    The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)    The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the Commonwealth, the Trust or this Trust Agreement;

(j)    None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such

23

recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or PRIFA Rum Tax Clawback CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the PRIFA Rum Tax Clawback CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the PRIFA Rum Tax Clawback CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the CVI Legislation or the CVI Indentures.

Section 7.4     Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5     Trustee Costs and Expenses.

(a)     The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including such fees set forth in the Trustee Fee Schedule, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs").  For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which the Commonwealth, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1. All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)     In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against the Commonwealth, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)     For the avoidance of doubt, neither the Commonwealth nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

25

Section 7.6      Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Commonwealth or FGIC; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7      Resignation and Removal of the Trustee.

(a)      The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)      If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)      FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

26

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)     Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)      No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)      Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9      Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10      Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of the Commonwealth or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11      Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12      Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or

28

liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of the Commonwealth, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)     it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)     it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)     the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)     as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)     it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)     there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

29

(g)      no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14     The Delaware Trustee.

(a)      There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)      The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)      The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)      The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)     No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)     Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness.  The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)     In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)     The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the

31

Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON PRIFA RUM TAX CLAWBACK CVIs

Section 8.1    Realization Upon Default.

(a)    The Trustee shall assert claims under the PRIFA Rum Tax Clawback CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the PRIFA Rum Tax Clawback CVIs, in accordance with Section 6.1(b) hereof.

(b)    If there is a breach, a default or an event of default with respect to any PRIFA Rum Tax Clawback CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any PRIFA Rum Tax Clawback CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)    The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the PRIFA Rum Tax Clawback CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1    Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the PRIFA Rum Tax Clawback CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the PRIFA Rum Tax Clawback CVIs be redeemed (except in the case of a redemption of the PRIFA Rum Tax Clawback CVIs permitted under the terms of the CVI Indentures or the CVI Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been

indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2    Procedure for Termination.

(a)    During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)    If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)    Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE X

## TAX PROVISIONS

Section 10.1    Grantor Trust Provisions.

The Trustee, the Commonwealth, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the

33

investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Commonwealth makes no representation as to whether this Trust qualifies for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit.

Section 10.2    Characterization.

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3    Grantor Trust Administration.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the

34

cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4   <u>Reports to Unitholders and Tax Authorities.</u>

(a)   The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)   Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or the Commonwealth be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)   If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)   The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)   All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)   For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in

35

a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    <u>Amendment of Trust Agreement.</u>

(a)     This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; <u>provided</u>, <u>however</u>, that no such amendment shall:

(i)     reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)     alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)     amend this Section 11.1 without the written consent of each Unitholder; or

(iv)     amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)     adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)     Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)     Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA. Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)     The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2    Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3    Limitation on Rights of Unitholders.

(a)     The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)     No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)     No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

37

Section 11.4   Notices.

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank Trust Company, National Association, 100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association, 100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of the Commonwealth , c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing. Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee. The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5   Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6   Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7    Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9    Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10   [Reserved].

Section 11.11   Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A.PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A.PATRIOT Act.

Section 11.12   Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR

RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13   Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14   Intent of Parties.

(a)     The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, the Commonwealth will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Commonwealth or the Commonwealth's estate in the event of a liquidation, reorganization, or similar proceeding of the Commonwealth and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)     The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Commonwealth.

(c)     Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long

as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)     engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)    acquire or own any assets other than the Trust Estate or lease any assets;

(iii)   fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)     fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)   have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)  commingle its assets or liabilities with those of any other Person;

(ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)    enter into any contract, agreement or transaction with any Unitholders, the Commonwealth, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)  incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement);

guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)    perform any duties or obligations of the Commonwealth or any other Person;

(xv)    make any loans or advances to any third party, including any Unitholder, the Commonwealth or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)    fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)    identify itself as a department or division of any other Person;

(xix)    fail to observe all formalities required of a Delaware statutory trust;

(xx)    fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Commonwealth to sell any assets, or make any capital contribution, to the Trust;

(xxi)    conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)    (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)    Failure of the Trust, the Commonwealth, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

42

(e)     To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15  Non-Petition.

The Commonwealth, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16  Certain Terms Regarding the Commonwealth.

For the avoidance of doubt andnotwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, the Commonwealth, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of the Commonwealth, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)    The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Commonwealth assumes no responsibility for their correctness. The Commonwealth makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)   In purchasing any Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Commonwealth nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Commonwealth or any of its affiliates.

(iv)    The Commonwealth shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17  <u>Certain Terms Regarding FGIC.</u>

(a)    In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)    any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii)    the amount of any cash received by the Trust, and the date on which it was received; and

(iii)    the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)    The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)    The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from the Commonwealth information concerning the PRIFA Rum Tax Clawback CVIs and thereafter providing any such information received to FGIC.

(d)    The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the PRIFA Rum Tax Clawback CVIs held by the Trust.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO**

By: _Francisco Parés III_

Name: Francisco Parés Alicea

Title:   Secretary of the Treasury

[Signature Page]

Custodial Trust Agreement

**FINANCIAL GUARANTY INSURANCE
COMPANY**

By: _____
Name:  Derek Donnelly
Title: Senior Managing Director

[Signature Page ]

Custodial Trust Agreement

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**,
as Trustee


By: _____
Name: Michelle Mena-Rosado
Title: Vice President


**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Delaware Trustee


By: _____
Name: Michelle Mena-Rosado
Title: Vice President


[Signature Page]


Custodial Trust Agreement

**<u>EXHIBIT A</u>**

**Trust Assets – CUSIP: 69362JAA3**

| | | |
|---|---|---|
| **FGIC Insurance Policy Number:** | 05010416 | |
| **FGIC Insured Bonds description and CUSIP number:** | 745220DW0 | Puerto Rico Infrastructure Financing Authority – Special Tax Revenue Bonds – Series 2005A |
| **Covered FGIC Insured Bond principal amount:** | $2,137,357.50 in aggregate principal amount | |
| **Allocable Plan Consideration:** | | |
| **Cash:** | $221,422.36 | |
| **PRIFA CVI – CUSIP 74514L4G9:** | $1,489,337.00 | |

<u>**EXHIBIT B**</u>

[Form of Notice to Unitholders and FGIC]

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [_], 20[__]

<u>**POSTED TO EMMA**</u>
U.S. Bank Trust Company, National Association as Trustee

**1.    Distributions to <u>Unitholders</u> (Sections 4.1(a) and (b))**

|  | For Quarter Ended [_], 20__ | | Year to date, [_], 20[__] | |
|---|---|---|---|---|
| Source of Distributions | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| CVI payments (Section 4.1(a)(ii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

**2.    Balances of PRIFA Rum Tax Clawback CVIs (Section 4.1(c))**

| As of [_], 20[__] | | |
|---|---|---|
|  | Aggregate principal/accreted amount of PRIFA Rum Tax Clawback CVIs (by CUSIP) | Per Unit principal/accreted amount of PRIFA Rum Tax Clawback CVIs (by CUSIP) |
| PRIFA Rum Tax Clawback CVIs CUSIP | $ | $ |

**3.    <u>DPO and DPO Accretion Balances</u> (Section 4.1(d))**
DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

**4.    Covered FGIC Insured Bonds (Section 4.1(e))**

B-1

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:


**5.     Payments to Trustees for such Quarter (Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:


**6.     Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]


**7.     Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[1]]


**[8.     Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][2]

---

[1] May be used for quarterly reporting only.
[2] Include item 8 only if applicable to the Quarter.

**EXHIBIT C**

[Form of Certificate]

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTERESTTHEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITHTHE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF SUCH PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFICATE RELATES.

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST

Certificate No.  1

Initial Notional Amount of Units: $4,245,000.00

CUSIP: 69362JAA3

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of March 15, 2022, with respect to the PRIFA Series 2005A (2016) Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions andconditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable PRIFA Consideration comprising Cash and PRIFA Rum Tax CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

DATED:_____

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

C-3

## **EXHIBIT D**

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
PRIFA SERIES 2005A (2016) CUSTODIAL TRUST

THIS Certificate of Trust of PRIFA Series 2005A (2016) Custodial Trust (the "Trust"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801, *et seq.*) (the "Act").

1.      NAME.  The name of the statutory trust formed hereby is "PRIFA Series 2005A (2016) Custodial Trust."

2.      DELAWARE TRUSTEE.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware  19805.

3.      EFFECTIVE DATE.  This Certificate of Trust shall be effective March 15, 2022.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S.  BANK  TRUST  NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

U.S.  BANK  TRUST  COMPANY, NATIONAL ASSOCIATION,
as Trustee

By:_____
Name: Michelle Mena-Rosado
Title: Vice President

**EXHIBIT E-1**

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

Re: Permitted Sale Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the PRIFA Series 2005A (2016) Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [the PRIFA Rum Tax CVIs] listed in Annex A in the [respective] amount[s] specified on Annex A, and notifies the Trustee that the [respective] Permitted Sale Price[s] for [the PRIFA Rum Tax CVIs] are as set forth on Annex A.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

**FINANCIAL GUARANTY INSURANCE COMPANY**

By:_____
Name:_____
Title:_____

E-1-1

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By: _____
Name: _____
Title: _____

E-1-2

**Annex A**

| **PRIFA Rum Tax CVIs** |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

**EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005
　　　Re: <u>Threshold Event</u>

Ladies and Gentlemen:

　　　Reference is made to the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "<u>Trust Agreement</u>"), with respect to the PRIFA Series 2005A (2016) Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("<u>FGIC</u>"), U.S. Bank Trust Company, National Association, as trustee (the "<u>Trustee</u>"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

　　　This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event". Accordingly, FGIC hereby (i) notifies the Trustee that the [respective] current market price[s] of [[the PRIFA Rum Tax CVIs listed in <u>Annex A</u> exceed[s] the [respective] Threshold Price[s] for [such series of New GO Bonds] [and] [such PRIFA Rum Tax CVIs] specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such PRIFA Rum Tax CVIs] in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on <u>Annex A</u>.

　　　**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

　　　　　　　　　　　　　　　FINANCIAL GUARANTY INSURANCE
　　　　　　　　　　　　　　　COMPANY

　　　　　　　　　　　　　　　By:_____
　　　　　　　　　　　　　　　Name:_____
　　　　　　　　　　　　　　　Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S.   BANK   TRUST   COMPANY, NATIONAL  ASSOCIATION, as Trustee

By: _____
Name: _____
Title: _____

**Annex A**

| PRIFA Rum Tax CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]


[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

**EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank Trust Company, National Association
100 Wall Street, 6th floor
New York, NY 10005

      Re: Permitted Sale Event

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the PRIFA Series 2005A (2016) Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred. Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the [respective] amount[s] of [the PRIFA Rum Tax CVIs] referenced in the Notice, at the sale price[s] (which equal[s] or exceed[s] the [respective] Permitted Sale Price[s]) and to the person[s] and account[s], and utilizing the broker[s], if any, specified in Annex A hereto.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

                                        FINANCIAL GUARANTY INSURANCE COMPANY

                                        By:_____
                                        Name:_____
                                        Title:_____

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| PRIFA Rum Tax CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Sale Price:[_____]³

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

³ Equals or exceeds the Permitted Sale Price of [_____].

**EXHIBIT F**

[Form of Trustee's Certification of Receipt of Certain Trust Assets]

CERTIFICATION

To:  FGIC and the Unitholders

      Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the PRIFA Series 2005A (2016) Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) is in possession of Allocable Plan Consideration comprising cash in the amount set forth on Exhibit A of the Trust Agreement, (ii) confirms that [the PRIFA Rum Tax CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank Trust Company, National Association at the Depositary for the benefit of the Unitholders and FGIC] [it has received written statements from the trustees with respect to the PRIFA Rum Tax CVIs, respectively, confirming that the PRIFA Rum Tax CVIs listed on Exhibit A of the Trust Agreement are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of such PRIFA Rum Tax CVIs to such account], and (iii) confirms that the Trust Units have been issued to the Original Holders.

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 20__.

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:_____
Title:_____

**Annex A**

| PRIFA Rum Tax CVIs | |
|---|---|
| CUSIP No. | [Notional] Amount Outstanding |
| | |

## EXHIBIT G

[Form of Assignment]

PRIFA SERIES 2005A (2016) CUSTODIAL TRUST ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____(this "Assignment"), by U.S. Bank Trust Company, National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "Trust", and such trustee being the "Trustee"), to and for the benefit of Financial Guaranty Insurance Company ("FGIC").

## WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as March 15, 2022 (the "Trust Agreement"), with respect to the Trust, by and among the Commonwealth of Puerto Rico, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[4] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "Proportionate Share")) of the Trust Assets held by the Trust;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[4] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provision of the Trust Agreement the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)   Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.  The Trustee shall revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)   The Trustee hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.** The Trustee hereby represents and warrants to FGIC that:

(a)   The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)   This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a  legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)      The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.  <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.  <u>COUNTERPARTS</u>. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee


By:_____
Name:_____
Title:_____

G-3

**ANNEX A**

Trust:  PRIFA Series 2005A (2016) Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this Assignment (immediately prior to receiving, or being deemed to have received, the Cash Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

    Cash:

    PRIFA Rum Tax CVIs:

## **SCHEDULE I**

Threshold Price

 With respect to the PRIFA Rum Tax CVIs, the price equal to 30% of the Notional Amount of such PRIFA Rum Tax CVIs.

## SCHEDULE II

Trustee Fee Schedule

The fees and expenses set forth below are payable or reimbursable to the Trustees[5] for their services as Trustees under the Trust Agreement to which this Schedule II is attached (the "Trust Agreement"). The Trust Agreement is by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company, U.S. Bank Trust Company, National Association, as Trustee, and U.S. Bank Trust National Association, as Delaware Trustee. Such fees and expenses are each payable or reimbursable by or on behalf of the Trust in accordance with the terms of the Trust Agreement.

**Acceptance Fee:**
The acceptance fee includes the review and execution of the Trust Agreement and the certificates and other documents related to the Trust, the creation of the Trust and initial establishment of the accounts referred to in Section 3.1 of the Trust Agreement. Additional duties covered by this acceptance fee include the acceptance of the Trust Assets, actions referred to in Section 2.3 of the Trust Agreement, the initial issuance of the Certificate and Units, distributions under Section 3.4(a)(i) of the Trust Agreement and any other activity contemplated under the Trust Agreement to occur on or in connection with the Closing Date. The acceptance fee is payable on the Closing Date.

**Fee Reserve Threshold Amount:**

**Annual Administration Fee:**
The annual administration fee covers the routine duties of the Trustees associated with the administration of the Trust in accordance with the terms of the Trust Agreement, including without limitation the distribution of payments on any Trust Assets received from time to time by the Trust, processing of trades, presentation of claims under the FGIC Insurance Policy and effecting the related assignments and transfers of Trust Assets to FGIC, distribution of policy claims payments and DPO and DPO Accretion payments made by FGIC, preparation, posting and distribution of statements, reports and notices and other routine responsibilities, in each case as contemplated by the Trust Agreement. The administration fee is payable in advance and not subject to proration.

---

[5] Capitalized terms used and not otherwise defined in this Schedule II have the respective meanings ascribed thereto in the Trust Agreement.

**Fee for Sales of Trust Assets due to Threshold Event or Permitted Sale Event/Unitholder Election (per effectuated Threshold Event, Permitted Sale Event or Unitholder Election), and for other Non-Routine Disbursements:**
This fee is payable separate from the annual administration fee and not inclusive of DTC charges.

**Legal Fee & Expenses:**
Includes fees and expenses for legal services provided by legal counsel to the Trustees as and to the extent such fees and expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**Out-of-Pocket Expenses:**
Includes all related expenses of the Trustees as and to the extent such expenses are payable or reimbursable to the Trustees pursuant to the terms of the Trust Agreement.

**Extraordinary administration services ("EAS"):**
EAS are duties, responsibilities or activities not expected to be provided by the Trustees at the outset of the matter, not routine or customary, and/or not incurred in the ordinary course of business and may require analysis or interpretation, in each case unless contemplated by any other fee description in this Schedule II and if not in contravention of the Trust Agreement, provided that it is acknowledged and agreed by the Parties that duties, responsibilities and activities performed by the Trustee as contemplated under Article VIII of the Trust Agreement, or in connection with litigation, enforcement actions or other proceedings that are brought against the Trust or the Trustees and don't relate to or arise out of or in connection with either of the Trustees' gross negligence, bad faith or willful misconduct, constitute EAS. Billing for reasonable fees and expenses related to EAS is appropriate in instances where particular inquiries, events or developments are unexpected, even if the possibility of such circumstances could have been identified at the inception of the matter, or as changes in law, or in procedures or the cost of doing business related to EAS, demand. At the Trustees' option, EAS may be charged to the Trust on an hourly (time expended multiplied by current hourly rate), flat or special fee basis at such rates or in such amounts in effect at the time of such services. EAS fees are due and payable in addition to annual or ordinary administration fees. Failure to pay for EAS owed to the Trustees when due may result in interest being charged on amounts owed to the Trustees for extraordinary administration services fees and expenses at the prevailing market rate.

**General terms and conditions**
The Trust's obligation to pay under this Trustee Fee Schedule pursuant to the terms of the Trust Agreement shall govern the matters described herein and shall, in accordance with the terms of the Trust Agreement, survive any termination of the Trust or Trust Agreement and the resignation or removal of the Trustees. This Trustee Fee Schedule shall be construed and interpreted in accordance with the laws of the state identified in the Trust Agreement without giving effect to the conflict of laws principles thereof. The Parties agree to the sole and exclusive jurisdiction of the state and federal courts of the state identified in the Trust Agreement over any proceeding relating

to or arising regarding the matters described herein. Payment of fees constitutes acceptance of the terms and conditions described herein.

Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof by the Parties pursuant to the terms of the Trust Agreement are part of the Trust Agreement. Execution of the Trust Agreement or acceptance of the Certificate or any Unit constitutes agreement to the above Trustee Fee Schedule.

## **EXHIBIT G**

Act 53-2021 approved on October 26, 2021[1]

---

[1] The English version of Act 53-2021 begins on page 36 of Exhibit G.

(P. de la C. 1003)
(Segunda Conferencia)

# LEY

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de apoyo a los municipios afectados; establecer la política pública de apoyo a las pensiones de nuestros retirados; establecer la política pública de apoyo a la Universidad de Puerto Rico; declarar los propósitos del Gobierno sobre temas de educación superior, cubiertas médicas de empleados públicos y los ciudadanos, así como para el desarrollo económico y de establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva; establecer un mecanismo que le permita al Gobierno del Estado Libre Asociado de Puerto Rico adelantar los términos de pagos y cancelación de la deuda de conformidad con la ley aplicable; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como derogar los Artículos 25 y 34 y renumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada; enmendar el Artículo 23.01, derogar el inciso (e) y renumerar los actuales incisos (f) y (g) como los nuevos incisos (e) y (f) del Artículo 23.02 de la Ley 22-2000, según enmendada; derogar el inciso (l) y renumerar los actuales incisos (m), (n), (ñ), (o), y (p) como los nuevos incisos (l), (m), (n), (ñ), y (o), respectivamente, del Artículo 1.03(B), enmendar el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada; enmendar el Artículo 8 de la Ley 179-2002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada; enmendar el Artículo 7.018 y el Artículo 7.027 de la Ley 107-2020, según enmendada; y para derogar el Artículo 3 de la Ley Núm. 9 de 12 de agosto de 1982; a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; y para otros fines relacionados.

2

EXPOSICIÓN DE MOTIVOS

En el año 2016, con el objetivo de proveerle un mecanismo al Gobierno de Puerto Rico para renegociar su deuda y controlar la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal titulada "Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico", conocida como PROMESA. Esta Ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de reestructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Financial Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF o Junta). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos financieros, fiscales y presupuestarios del Gobierno del Estado Libre Asociado de Puerto Rico.

El 3 de mayo de 2017, la JSAF, presentó una petición de reestructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estimaba que el Estado Libre Asociado tendría que reestructurar $35 mil millones como parte del mencionado proceso de reestructuración.

Tras más de cuatro años después de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA o el Plan) para Puerto Rico ante el Tribunal de Título III, radicada el 30 de julio del 2021. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de los Deudores, incluyendo al Estado Libre Asociado de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno Central.

Por virtud de esta Ley, el Estado Libre Asociado de Puerto Rico apoya el Plan y la política pública que se expone en esta Ley, que sujeto al mandato de PROMESA de reestablecer la responsabilidad fiscal en Puerto Rico y a las facultades presupuestarias de la Junta bajo PROMESA, incluye cero recortes a las pensiones de los empleados públicos retirados a los beneficios acumulados de los empleados activos y el deseo de promover el bienestar del pueblo de Puerto Rico:

1.  Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

2.  Asignarle fondos adicionales a la Universidad de Puerto Rico, para ser utilizados para el mejoramiento de la experiencia y el ambiente estudiantil, de modo que las asignaciones para la entidad sean en total $500 millones anuales por un período de cinco (5) años desde el Año Fiscal 2023 al año fiscal 2027. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y de asegurar los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas, y a la misma vez promover eficiencias.

3.  Apoyar la creación de un Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR.

4.  Apoyar planes médicos razonables para los empleados del Gobierno central. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

5.  Apoyar la asignación de fondos adicionales para los municipios. Este objetivo pretende otorgar estabilidad fiscal a los municipios y la continuidad de los servicios esenciales que ofrecen.

6.  Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos.

7.  Establecer la meta de aumentar la población que tiene cubierta médica. El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos.

8.  Endosar la creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3) el desarrollo de

programas de crecimiento empresarial mediante la capitalización empresarial; y (4) capitalización del sector cooperativista de ahorro y crédito.

9. Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda después que termine la Junta bajo PROMESA. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pagos de la deuda después que termine la Junta bajo PROMESA, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios esenciales y prioritarios del Gobierno de Puerto Rico.

10. Establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelvan a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos.

De ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, el Plan representaría el último peldaño en el proceso de reestructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno Central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente de $3,300 millones a $1,100 millones. Asimismo el servicio de la deuda del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos, estas reducciones representan más dinero en las arcas del Gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, el Plan requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC). Debe destacarse que el Plan también dispone para la creación de un fideicomiso que suplementaría ingresos futuros para el pago de pensiones, el disfrute del Gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno Central debe emitir nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del Impuesto Sobre Ventas y Uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno del Estado Libre Asociado de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, el Gobierno de Puerto Rico debe aprobar la presente legislación para facilitar la confirmación del Plan, lo que tiene que ocurrir antes de la salida de la Junta.

Sin embargo, esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, para prevenir la insolvencia de los sistemas de retiro del Gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. A estos fines, esta legislación está condicionada a que la Junta radique para su confirmación por el Tribunal de Título III un Plan enmendado que elimine los recortes contemplados a los pagos mensuales de las pensiones de los empleados del Gobierno del Estado Libre Asociado que están actualmente retirados y de los empleados públicos activos que han acumulado beneficios de pensión. Además, esta legislación provee fondos adicionales para los municipios, y por separado para la Universidad de Puerto Rico.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado a nuestros ayuntamientos. En la medida en que el Plan logre recortes a la deuda estatal, una porción de estas economías estarán disponibles para medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que estas entidades puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará

con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el Año Fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta un esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta.

DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:

**CAPÍTULO 1.- DISPOSICIONES GENERALES.**

**ARTÍCULO 101.- TÍTULO.**

Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

**ARTÍCULO 102.- DEFINICIONES.**

(a)    5.5% del IVU:   significa los ingresos y recaudos presentes y futuros generados por la porción del Impuesto Sobre Ventas y Uso establecido bajo las Secciones 4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

(b)    Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General, el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento (incluyendo cualquier fideicomiso) relacionado o suscrito con relación a, o en apoyo de, una Transacción de Reestructuración y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

(c)    ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico, creada en virtud de la Ley Núm. 74 de 23 de junio de 1965, según enmendada o su ley sucesora.

(d)    ADCC: significa la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, creada en virtud de la Ley 351-2000, según enmendada o su ley sucesora.

(e)    AEP: significa la Autoridad de Edificios Públicos de Puerto Rico, creada en virtud de la Ley Núm. 56 de 19 de junio de 1958, según enmendada, o su ley sucesora.

7

(f)      AFI: significa la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, creada en virtud de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, o su ley sucesora.

(g)      AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico, creada en virtud de la Ley Núm. 5 de 11 de mayo de 1959, según enmendada, o su ley sucesora.

(h)      Año Fiscal:  significa el año fiscal del Estado Libre Asociado, que empieza el 1ro de julio y termina el 30 de junio.

(i)      Bonos de Obligación General: significa los bonos de obligación general emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente emitidos conforme al Plan y la Orden de Confirmación.

(j)      Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para Puerto Rico de 2011."

(k)      Condición de Rendimiento Superior del Arbitrio al Ron: significa que los Ingresos del Arbitrio al Ron del Estado Libre Asociado en un año fiscal, calculados conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(l)      Condición de Rendimiento Superior del IVU: significa que los recaudos del IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier año fiscal exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(m)      Contrato de Bonos de Obligación General: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionado a los Bonos de Obligación General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1) la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

(n)      Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre

Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs, cada uno conforme a los términos del Plan.

(o)     Costos de Financiamiento: significa los costos asociados a las Transacciones de Reestructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable, ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según requeridos por los Acuerdos Complementarios, (iii) pagar cualquier  sello, emisión o impuesto similar y otros cargos relacionados a las Transacciones de Reestructuración (si algunas), (iv) prepararse para y efectuar las Transacciones de Reestructuración, y (v) llevar a cabo todas las actividades en curso relacionadas a las Transacciones de Reestructuración. Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos Complementarios.

(p)     Entidad Gubernamental: significa cualquier agencia, departamento, oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Estado Libre Asociado.

(q)     Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico creado en virtud de las disposiciones del Artículo 1 de la Constitución del Estado Libre Asociado de Puerto Rico.

(r)     Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor conforme a sus términos.

(s)     Fiduciario de los Bonos de Obligación General: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de conformidad con los términos y condiciones del Contrato de Bonos de Obligación General.

(t)     Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del Contrato de IVC.

(u)     Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda establecido de conformidad con el Contrato de Bonos de Obligación General.

(v)     Impuesto Sustituto Medido: significa toda o una porción de un impuesto de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley, sea legislado para sustituir completamente el IVU Medido o que de lo contrario

constituya una medida similar o comparable de actividad económica en el Estado Libre Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

(w)    Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo) recibidos por el Estado Libre Asociado, según documentado en el reporte del Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o en cualquier otro reporte análogo según establecido en el Contrato de IVC.

(x)    IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, las notas de obligación general emitidas bajo el Contrato de IVC de conformidad con esta Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General y los IVCs "Clawback".

(y)    IVCs "Clawback": significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o se relacionan a la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la Subserie de las Reclamaciones del Arbitrio al Ron.

(z)    IVC de Obligación General: significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o están relacionadas a la deuda de obligación general del Estado Libre Asociado.

(aa)   IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre Asociado durante un año fiscal, menos aquellos ingresos transferidos al Fondo para el Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00) por año fiscal.

(bb)   Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

(cc)   Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback" se reducirá cada año fiscal en una cantidad igual a los pagos efectuados bajo los IVCs "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del Arbitrio al Ron se reducirá aún más cada año fiscal en una cantidad igual a los pagos

efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del Arbitrio al Ron.

(dd)   Máximo Agregado de los IVC de Obligación General: significa, inicialmente desde la Fecha de Efectividad, $3,500,000,000.   El Máximo Agregado de los IVC de Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados en los IVC de Obligación General conforme al Contrato de IVC.

(ee)   Modificación Elegible: significa una "Modificación Elegible" para ADCC y/o AFI aprobada conforme al Título VI de PROMESA.

(ff)   Orden de Confirmación:   significa la orden del Tribunal de Título III confirmando el Plan.

(gg)   Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación o corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América, de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América, cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

(hh)   Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado, SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan ser enmendados, suplementados o modificados de tiempo en tiempo.

(ii)   PROMESA: significa la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et seq., según enmendada o modificada.

(jj)   Reclamaciones Existentes: significa las reclamaciones en contra del Estado Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

(kk)   Representante del Gobernador: significa el Gobernador, el Secretario de Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el Gobernador mediante Orden Ejecutiva.

(ll)   Secretario de Hacienda: significa el Secretario del Departamento de Hacienda del Estado Libre Asociado.

(mm)  Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro de Empleados del Gobierno, el Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico.

(nn)  SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, creado en virtud de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada o su ley sucesora.

(oo)  Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por el Estado Libre Asociado y no transferidos a AFI.

(pp)  Transacciones de Reestructuración: significa cada una de las transacciones contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación Elegible, según sea el caso.

(qq)  Modificación del Beneficio Mensual: significa el "Monthly Benefit Modification" según se define en el Plan.

## ARTÍCULO 103. – AUTORIZACIÓN DE ACCIONES POR LAS ENTIDADES GUBERNAMENTALES.

No obstante cualquier disposición, prohibición o restricción establecida en cualquier ley, orden, regla o reglamento del Estado Libre Asociado, cada entidad gubernamental requerida a tomar o llevar a cabo cualquier acción necesaria o conveniente para implementar el Plan y/o las Transacciones de Reestructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo todas aquellas acciones necesarias o convenientes para implementar el Plan o las Transacciones de Reestructuración, sin estar sujeta a los requisitos de cualquier disposición, prohibición o restricción establecida en cualquier otra ley, orden, regla o reglamento, incluyendo, pero sin limitarse a, (a) negociar, entrar en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o transferir fondos según provisto y/o requerido en el Plan. La autorización provista en este Artículo será suficiente para que el Representante del Gobernador, a nombre del Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de Reestructuración y ninguna otra autorización será requerida, incluyendo, pero sin limitarse a, la autorización de cualquier junta de directores, comisión, departamento, o regulador de Puerto Rico. Además, la Autoridad de Asesoría

Financiera y Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

Sin limitar la generalidad de lo anterior y no obstante cualquier disposición de cualquier ley del Estado Libre Asociado, en o antes de la Fecha de Efectividad, el Representante del Gobernador queda por la presente autorizado, en la medida necesaria, si alguna, luego de que se emita la Orden de Confirmación, a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre Asociado, en la medida en que no haya sido aprobada por la Orden de Confirmación; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u otra condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o cualesquiera otros asuntos relacionados a las Transacciones de Reestructuración, y (2) la creación de gravámenes sobre los dineros, valores y otros activos depositados con el Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las Transacciones de Reestructuración. Para evitar dudas, no obstante la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar los Bonos de Obligación General, los IVCs, Contrato de Bonos de Obligación General, el Contrato de IVC, y cualquier Acuerdo Complementario, los tenedores de los Bonos de Obligación General y de los IVCs tendrán los derechos y remedios de tenedores de deuda pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de la Constitución del Estado Libre Asociado.

La autorización para emitir bonos conferida mediante la presente Ley estará limitada únicamente a aquellos bonos contemplados por y requeridos para implementar el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación General, la Orden de Confirmación y los demás Acuerdos Complementarios. El Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí permitida.

## ARTÍCULO 104: PROTECCIÓN DE LAS PENSIONES DE LOS RETIRADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO.

El Gobierno del Estado Libre Asociado, por la presente, declara que es la política pública de la más alta prioridad proteger las pensiones acumuladas de sus servidores públicos, que son uno de los grupos más importantes de nuestra sociedad. Como parte esencial de esta política pública, la protección de las pensiones de todos nuestros retirados es un compromiso esencial e inquebrantable. Por lo tanto, en relación a las pensiones acumuladas de los empleados del Gobierno, se dispone lo siguiente: La Asamblea Legislativa por la presente autoriza la emisión de los Bonos de Obligación General y los IVCs, sujeto a que la JSAF radique para su confirmación por el Tribunal del Título III un Plan enmendado que elimine la Modificación del Beneficio Mensual ("Monthly Benefit Modification," según se define en el Plan).

## ARTÍCULO 105: FINANCIAMIENTO DE LA UNIVERSIDAD DE PUERTO RICO.

Con el propósito de adelantar el objetivo del Gobierno del Estado Libre Asociado de Puerto Rico de conservar la capacidad de la Universidad de Puerto Rico de llevar a cabo su vital misión educativa y asegurar los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas, los presupuestos que se le sometan a la Junta incluirán una asignación de fondos para la Universidad de Puerto Rico por un total de $500 millones en cada uno de los cinco años fiscales 2023 al 2027, disponiéndose que las asignaciones adicionales por encima de las cantidades asignadas en el plan fiscal del Estado Libre Asociado certificado en abril del 2021 se utilizarán para el mejoramiento de la experiencia y el ambiente estudiantil.

## ARTÍCULO 106: FONDOS PARA ESTUDIO SOBRE SEGURO DE SALUD.

El Departamento de Salud del Estado Libre Asociado de Puerto Rico realizará un estudio sobre la viabilidad de proveer o facilitar acceso a cubierta de seguro médico a aproximadamente 225,000 ciudadanos que hoy carecen de planes médicos. Se le asigna un millón de dólares al Departamento de Salud para dicho estudio.

## ARTÍCULO 107: DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA.

Por virtud de esta Ley, el Estado Libre Asociado de Puerto Rico apoya el Plan y la política pública que se expone en esta Ley, sujeto al mandato de PROMESA de reestablecer la responsabilidad fiscal y las facultades presupuestarias en Puerto Rico. De conformidad a ello se expresa como objetivos prioritarios las siguientes acciones:

(a) Apoyar la creación de un Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR.

(b) Apoyar planes médicos razonables para los empleados del Gobierno Central. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

(c) Endosar la creación del Fondo Especial para la Igualdad Social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos.

(d) Endosar la creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3) el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial; y (4) capitalización del sector cooperativista de ahorro y crédito.

(e) Establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelvan a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos.

La implementación de este Artículo estará sujeto a la disponibilidad de fondos y que no sea significativamente inconsistente con el Plan Fiscal.

## CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL

## ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.

(a)     A partir y luego de la Fecha de Efectividad, el Representante del Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el Plan y establecidas en el Contrato de Bonos de Obligación General para retirar, refinanciar o cancelar (defease) los Bonos de Obligación General originalmente emitidos conforme al Plan y a la Orden de Confirmación.

(b)     Los Bonos de Obligación General incluirán bonos de interés corriente y bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable y según sea determinado por el Representante del Gobernador, como representante del Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de conformidad y consistente con el Plan. En la medida, si alguna, en que no hayan sido determinados por el Plan y los Acuerdos Complementarios aprobados por la Orden de Confirmación, el Representante del Gobernador, como representante del Estado Libre Asociado, determinará la forma de los Bonos de Obligación General y la manera de emitir los Bonos de Obligación General, y establecerá la denominación o denominaciones de los Bonos de Obligación General y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan. A discreción del Representante del Gobernador, los Bonos de Obligación General podrán ser emitidos en una o más series separadas.

(c)     Los Bonos de Obligación General serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

(d)     Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega.  Además, cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales

autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no ocupaban su puesto.

(e)    Los Bonos de Obligación General emitidos de conformidad con las disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)    Los Bonos de Obligación General autorizados por esta Ley se podrán emitir como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato de Bonos de Obligación General.

## ARTÍCULO 202.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado quedan por la presente irrevocablemente comprometidos para el pago puntual del principal e interés de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley, según y cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar el principal e interés de los Bonos de Obligación General según venzan o tras su redención o prepago de conformidad con el Contrato de Bonos de Obligación General, de los recursos disponibles del Estado Libre Asociado en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley con relación al pago de principal e interés en los Bonos de Obligación General se considerarán una obligación continua para que el Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones específicas para dichos propósitos. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de Bonos de Obligación General el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los Bonos de Obligación General, y deberá establecerse en dichos Bonos de Obligación General que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN ESTATUTARIO.

(a)    Se autoriza al Representante del Gobernador a establecer el Fondo de Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan sido completamente pagados o satisfechos de conformidad con sus términos, mensualmente, el Estado Libre Asociado de Puerto Rico depositará con el Fiduciario de los Bonos de Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta parte (1/6) de la obligación semianual del Estado Libre Asociado de Puerto Rico con relación al pago de interés devengado sobre los Bonos de Obligación General y

(ii) una doceava parte (1/12) de la obligación anual del Estado Libre Asociado de Puerto Rico con relación al pago del principal de los Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del Contrato de Bonos de Obligación General.

(b)    A partir de su emisión, los Bonos de Obligación General estarán garantizados automáticamente por un gravamen estatutario de primer rango sobre los fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento alguno en ningún récord oficial ni en registro u oficina del Gobierno alguna para perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para establecer o mantener la prioridad aquí establecida. El gravamen establecido en este Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de si dichas Personas fueron notificadas sobre dicho gravamen.

## ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los Bonos de Obligación General, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse, a contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y dueños de los Bonos de Obligación General no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir Bonos de Obligación General.

## ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones relacionadas a dichos bonos hayan sido completamente satisfechas,

de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico se obliga a lo siguiente:

(a)  no llevar a cabo ninguna acción que (1) impida el depósito mensual de los fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2) limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios de los tenedores de los Bonos de Obligación General;

(b)  hacer y llevar a cabo todos los actos permitidos por ley y que sean razonablemente necesarios o deseables para asegurar que el pago de interés a los tenedores de cualesquiera Bonos de Obligación General esté exento de pago de contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

(c)  causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad incluya disposiciones para el pago en cada año fiscal del principal e intereses sobre los Bonos de Obligación General de conformidad con los términos del Contrato de Bonos de Obligación General; y

(d)  en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03% recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico", por el Centro de Recaudación de Ingresos Municipales del Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado de Puerto Rico y (iii) cualquier otro recurso disponible del Estado Libre Asociado de Puerto Rico para el pago del principal y los intereses (y el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A) este convenio no le concede a los tenedores de dichos Bonos de Obligación General un gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos se transfieran al Fondo General del Estado Libre Asociado de Puerto Rico, se considerará que los pagos de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos de Obligación General provenientes del Fondo General del Estado Libre Asociado de Puerto Rico se han hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

## CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE

## ARTÍCULO 301.- EMISIÓN DE LOS IVCS.

(a)     A partir y luego de la Fecha de Efectividad, el Representante del Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs "Clawback" – hasta una cantidad agregada de \$3,500,000,000 y \$5,239,002,764, respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

(b)     Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine el Representante del Gobernador, como representante del Estado Libre Asociado de Puerto Rico, y autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención según sea determinado por el Representante del Gobernador y autorizado en el Contrato de IVC de conformidad y consistente con el Plan. El Representante del Gobernador determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan.

(c)     Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado de Puerto Rico, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el Contrato de IVC:

(1)   no se hará pago alguno a los tenedores de los IVCs (a menos que sean tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las circunstancias establecidas en el inciso (2) a continuación) en un año fiscal a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU;

(2)   no se hará pago alguno en un año fiscal a los tenedores de la Subserie de Reclamaciones del Arbitrio al Ron a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU o una Condición de Rendimiento Superior del Arbitrio al Ron;

(3)   no se hará pago alguno a los tenedores de IVCs de Obligación General o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de Obligación General o del Máximo Agregado de los IVCs "Clawback", respectivamente;

(4)   a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado Libre Asociado de Puerto Rico ha hecho todos los pagos requeridos bajo dichas

series conforme al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre Asociado de Puerto Rico bajo dichas series han sido satisfechas y que las series no están en circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para dicha fecha.

(d)     Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado ocupando sus puestos.

(e)     Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado Libre Asociado de Puerto Rico para todos los propósitos y se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)     Los IVCs autorizados por esta Ley se emitirán de forma registrada.

(g)     Solamente para propósitos de calcular el servicio anual máximo de la deuda pública del Estado Libre Asociado de Puerto Rico conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs en cualquier año fiscal será igual a las cantidades máximas que podrían ser pagaderas durante dicho año fiscal bajo los IVCs de conformidad con el Contrato de IVC.

(h)     Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier año fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

## ARTÍCULO 302.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico quedan por la presente irrevocablemente comprometidos para el pago puntual de los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser redimidos de conformidad con el Contrato de IVC, de los recursos disponibles del Estado Libre Asociado de Puerto Rico en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley relacionadas al pago de los IVCs se considerarán una

obligación continua del Secretario de Hacienda para hacer los pagos en el año fiscal en que dicho pago sea requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera todas las retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado de Puerto Rico o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño de los IVCs no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir IVCs.

## ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos bonos hayan sido completamente pagadas o satisfechas de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico:

(a)    no llevará a cabo acción alguna que:

(i)    limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los IVCs;

(ii)    perjudique los derechos y remedios de los tenedores de los IVCs; o

(iii)    limite la habilidad de los tenedores de los IVCs de monitorear el rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del Estado Libre Asociado de Puerto Rico disponibles para el pago de los IVCs (de conformidad con el Plan y según establecido en el Contrato de IVC); disponiéndose, sin embargo, que lo anterior no impedirá que el Estado Libre Asociado de Puerto Rico pueda ejercer su poder, mediante un cambio en la ley, de eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo reduzca la probabilidad de que la Condición de Rendimiento Superior del IVU se cumpla; y disponiéndose además que el Estado Libre Asociado de Puerto Rico divulgará a tiempo la información que pueda ser requerida bajo el Contrato de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU realizados de conformidad con el Contrato de IVC;

(b)    causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en Puerto Rico incluya disposiciones para el pago en cada año fiscal de las cantidades adeudadas para los IVCs de conformidad con los términos del Contrato de IVC en la medida en que la Condición de Rendimiento Superior del IVU o la Condición de Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el año fiscal anterior.

## CAPÍTULO 4 – MUNICIPIOS

## ARTÍCULO 401.- FONDO EXTRAORDINARIO.

Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios", en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada, pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los propósitos específicos dispuestos en esta Ley.

## ARTÍCULO 402.- DECLARACIÓN DE POLÍTICA PÚBLICA.

El Gobierno de Puerto Rico por la presente declara que es la política pública del Estado Libre Asociado de Puerto Rico el garantizar a su población el recogido y

disposición eficiente de la basura, desperdicios sólidos, escombros, así como la implementación de programas de reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la Deuda incluya reducciones en el monto de la deuda garantizada una porción de estas economías que se generarán deberán hacerse accesibles a los municipios para que puedan brindar estos servicios.

## ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO EXTRAORDINARIO.

El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de una asignación anual del Fondo General, la cual será equivalente en cada año fiscal al 42% de la cantidad cobrada durante el año fiscal anterior por virtud de la contribución sobre la propiedad del 1.03%. Esta asignación solo podrá incluirse en el presupuesto de un año fiscal si la cantidad de fondos Medicaid recibidos durante el año fiscal anterior exceden la cantidad proyectada para el año fiscal anterior en el plan fiscal del Gobierno de Puerto Rico certificado por la Junta de Supervisión y Administración Financiera para Puerto Rico en abril de 2021.

## ARTÍCULO 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO.

Los municipios solo podrán acceder a los recursos económicos del Fondo Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos a continuación:

(a)     recogido y disposición de basura;

(b)     recogido y disposición desperdicios sólidos;

(c)     recogido y disposición de escombros;

(d)     implementación, recogido y disposición de reciclaje.

## ARTÍCULO 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS.

A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se utilizará los siguientes criterios para determinar las cantidades a las que pueden tener acceso los municipios:

(a)     El total de personas beneficiarias del Programa de Asistencia Nutricional, per cápita, según certificación al efecto emitida por el Departamento de la Familia, que sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo que se tenga la información.

(b)     El presupuesto funcional per cápita de cada municipio, del año fiscal inmediatamente anterior o del año fiscal más próximo que se tenga la información.

(c)     El valor tasado de la propiedad tributable per cápita ubicada dentro de los límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente anterior o al año fiscal más próximo que se tenga la información.

(d)     La población del municipio por milla cuadrada, según el último censo decenal.

La metodología para la distribución será determinada por los parámetros dispuestos en este Artículo, pero podrán incorporarse aquellos parámetros existentes para la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos municipios que reciben el menor ingreso por contribución sobre la propiedad u otras fuentes, así como a los municipios con el mayor número de dependientes del Programa de Asistencia Nutricional y de mayor densidad poblacional.

## CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN FISCAL.

**ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

(a)     La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos, instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las Corporaciones Públicas. A su vez, velará por que la ejecución y administración del presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los

propósitos programáticos para los cuales se asignan o proveen los fondos públicos. Evaluará los programas y actividades de los organismos públicos en términos de economía, eficiencia y efectividad y le someterá al Gobernador informes con recomendaciones para la implantación de las mismas. Además, preparará y mantendrá el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto al Secretario de Hacienda un informe detallado con respecto a las proyecciones de ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno del Estado Libre Asociado de Puerto Rico por parte del Gobernador. Se mantendrá atento a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que apliquen al campo administrativo local, tanto en la formulación y ejecución del presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría operacional y administrativa. Además, deberá proponer aquella legislación que se considere necesaria y conveniente para incorporar dichos enfoques y tendencias a nuestro proceso presupuestario y administrativo.

(b)     …"

**ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO, PARA QUE LEA COMO SIGUE:**

"**Artículo 3.- Definiciones**

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que del contexto se entienda claramente otra cosa:

(a) …

…

(j) Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de agosto de 1997 (27 L.P.R.A. § 431 et seq.)

(k) …

…

(r) Cuenta del Corpus — Significará la Cuenta del Corpus del Fondo de Desarrollo según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

(s) Cuentas adicionales — Significará cuentas creadas dentro del Fondo de Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

**ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7. – Poderes Generales.

La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se entienda como limitación, lo siguiente:

(a) …

…

(m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad recibiese.

(n) …

…"

**ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ARTÍCULOS 25-A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

**ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.01. — Procedimiento para el pago de derechos.

Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales de inspección, bancos o en el lugar que designe el Secretario, los derechos que correspondan al vehículo para cada año, según se indican estos en la notificación que al efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán anticipadamente por todo el año excepto que cuando al momento de pagar los derechos resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago equivalente a los meses que resten por transcurrir en la fecha en que se devengan, contándose las fracciones de meses como un mes completo. Esta disposición aplicará a todos los vehículos de motor, independientemente de la cantidad que paguen por derecho de licencia por año. Al recibo de los derechos correspondientes, el colector expedirá el permiso para vehículo de motor que consistirá del formulario de notificación emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el correspondiente marbete o placas de número, según sea el caso. Solo se exhibirá un (1) marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial para que el Departamento de Hacienda haga transferencias diarias de los marbetes expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje, expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de Hacienda. El importe de los derechos recaudados de acuerdo con los Artículos 23.01 y 23.02 de esta Ley ingresará en su totalidad en el Fondo General del Estado Libre Asociado de Puerto Rico."

**ARTÍCULO 506. - SE DEROGA EL INCISO (E) Y SE RENUMERAN LOS ACTUALES INCISOS (F) Y (G) COMO LOS NUEVOS INCISOS (E) Y (F) DEL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.02. — Derechos a pagar.

(a)…

…

(d) …

(e) …

(f) …"

**ARTÍCULO 507. - SE DEROGA EL INCISO (L) Y SE RENUMERAN LOS ACTUALES INCISOS (M), (N), (Ñ), (O), Y (P) COMO LOS NUEVOS INCISOS (L), (M), (N), (Ñ), Y (O), RESPECTIVAMENTE, DEL ARTÍCULO 1.03(B) DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 1.03(b).- Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del contexto surja otro significado:

(a)      …

…

(l) …

(m) …

(n) …

(ñ) …

(o) …"

**ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 2.02 – Poderes Específicos de la Autoridad.

La Autoridad tendrá las siguientes facultades y derechos:

(a) …

(h) Tomar préstamos con el propósito de financiar los costos del Centro, los proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos, arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los compradores o tenedores de dichos bonos o con otras personas con las cuales la Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según la Autoridad considere aconsejable, los cuales constituirán contratos con dichos compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general, proveer garantías para el pago de los bonos y los derechos de los tenedores de estos."

(i)…

…"

**ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los mismos para otros propósitos o fines que no estén señalados de manera categórica y específica en la resolución conjunta aprobada.

Cualquier cambio o modificación de los propósitos o fines establecidos en la resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa de todos los procedimientos.

El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se hará siguiendo las normas y procedimientos aplicables a los municipios y a las instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

Con el propósito de que la Asamblea Legislativa pueda analizar que las asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas."

**ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY 272-2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 31. — Disposición de Fondos.

La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto fijado en el Artículo 24 de esta Ley, luego de transferir al Fondo General del Estado Libre Asociado de Puerto Rico las cantidades que anteriormente se le transferían a la Autoridad (según detallado en el Plan Fiscal del Estado Libre Asociado de Puerto Rico vigente en ese momento, si alguno), de acuerdo con el siguiente orden de prioridad:

(i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008- 2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una

reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%) se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva especial y estará disponible para el uso del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes, este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá presentar sus estados financieros auditados, conjuntamente con un informe evidenciando el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo, en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii) y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00) dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que se proponga presentar un presupuesto modificado, el presupuesto de la Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) hasta cuatro millones (4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) el remanente que resulte después de las asignaciones y reservas dispuestas en los incisos (i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares,

dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones dedicadas a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la Autoridad y a la Corporación un desglose de los recaudos por concepto del Impuesto."

**ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de treinta (30) días laborables contados a partir desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta disponible, sea mayor o menor a la dispuesta en la medida en consideración.

Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la disponibilidad de dichos fondos. Una certificación oficial en donde se informe que los fondos están comprometidos para una obra o uso específico distinto a lo dispuesto en la medida legislativa que se solicita deberá venir acompañada con la evidencia de la obligación, copia de las facturas y cualquier otra información pertinente que demuestre la no disponibilidad de dichos fondos.

El proceso para requerir las certificaciones oficiales de disponibilidad de fondos por parte de las comisiones legislativas no requerirá de ningún formulario o trámite especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación que se trate.

Cuando cualquier comisión permanente, especial o conjunta de la Asamblea Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de Gerencia y Presupuesto referente a disponibilidad de fondos". En esta Sección, se aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades o corporaciones públicas. Si la Oficina de Gerencia y Presupuesto no emite la correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha Sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según

enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006".

**ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY 1-2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Sección 3060.11 – Disposición de Fondos.

El producto de los impuestos y derechos de licencia recaudados por virtud de este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

**ARTÍCULO 513.- SE ELIMINA LA SECCIÓN 3060.11A DE LA LEY 1-2011, SEGÚN ENMENDADA.**

**ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN ENMENDADA.**

**ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.018 – Fondos – Fideicomisos; Distribución

Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en el orden de prioridad que a continuación se indica:

(a) La cantidad que corresponda a la contribución especial del 1.03% será depositado en el Fondo General.

(b) …

(c) …

…"

**ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del Producto de las Contribuciones (Fondo de Redención de Bonos)

El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría

Financiera y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

(a)  El producto de las contribuciones especiales sobre la propiedad impuesta por el Artículo 7.026 ingresará al Fondo General.

(b)  …

(c)  …

(d)  …"

**ARTÍCULO 517.- Las transacciones del Plan de Ajuste no se pueden utilizar para mitigar causas de acción al amparo de la Ley 3-2013, según enmendada.**

**ARTÍCULO 518.- DEROGACION DE CIERTAS LEYES O SECCIONES DE ESTAS.**

Se deroga el Artículo 3 de la Ley 9 de 12 de agosto de 1982, disponiéndose que los fondos que se transferían por virtud de dicha Ley a la Autoridad de Transportación y Carreteras ingresarán al Fondo General del Estado Libre Asociado de Puerto Rico.

**CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS**

**Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA)**

Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

**Artículo 602.-Autorización al Representante del Gobernador**

Las responsabilidades, facultades, deberes y autorizaciones concedidas por la presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo dispuesto en esta Ley y no a futuras emisiones de deudas.

**Artículo 603.- Separabilidad.**

Si cualquier cláusula, párrafo, subpárrafo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así

hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Disponiéndose que la separabilidad de este Artículo no será de aplicación al Artículo 605. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que no se hagan cumplir las Transacciones de Reestructuración y sus respectivas autorizaciones en los Artículos 103, 201 y 301, si se deja sin efecto, invalida o declara inconstitucional la condición suspensiva para evitar cualquier recorte de pensiones a empleados gubernamentales en el Plan de Ajuste, o las disposiciones del Artículo 104 de esta Ley.

**Artículo 604.- Supremacía.**

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno (excluyendo leyes y reglamentos federales) que sea inconsistente con esta Ley. Esta Ley está sujeta a PROMESA. Si hubiera conflicto entre las versiones en inglés y en español de esta Ley, prevalecerá la versión en inglés.

Todas las leyes del Estado Libre Asociado de Puerto Rico (i) que son inconsistentes con los términos y disposiciones del Plan, las transacciones contempladas por el Plan, o las disposiciones de PROMESA, o (ii) que transfieren, asignan, o requieren la asignación de fondos del Estado Libre Asociado de Puerto Rico o de alguna de sus instrumentalidades a alguna agencia o instrumentalidad del Estado Libre Asociado de Puerto Rico, incluyendo las leyes enumeradas en el Exhibit K del Plan, en la medida en que dicha transferencia o asignación sea inconsistente con esta Ley, o con PROMESA, o con un presupuesto certificado por la JSAF (en la medida en que dicha certificación sea requerida por PROMESA), quedan por virtud de esta Ley desplazadas y enmendadas para disponer que todos los fondos transferidos o asignados por virtud de dichas leyes (o disposiciones de dichas leyes) inconsistentes, serán transferidos al Fondo General del Estado Libre Asociado de Puerto Rico para ser desembolsados solamente según se disponga en un presupuesto aprobado.

**Artículo 605.- Vigencia.**

Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. La vigencia de esta Ley queda condicionada a que la JSAF radique para su confirmación por el Tribunal del Título III un Plan enmendado que elimine la Modificación del Beneficio Mensual ("Monthly Benefit Modification," según se define en el Plan). Para propósitos de claridad, quedará inmediatamente sin vigencia esta Ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta Ley queda condicionada a cero recortes en las pensiones.

**ENGLISH VERSION OF THIS ACT**

**(H.B. 1003)**
**(Second Conference)**

**LAW**

To create the "Law to End the Bankruptcy of Puerto Rico", to establish the provisions and conditions to approve the offer, sale, and issuance of the different types of General Obligation Bonds, as well as to provide the creation of Contingent Value Instruments; to establish public policy to support affected municipalities; to establish the public policy to support the pensions of our retirees; establish the public policy to support the University of Puerto Rico; declare the Government's purposes on higher education issues, health coverages for public employees and citizens, as well as for economic development and to establish a joint working group between the Legislative Branch and the Executive Branch; to establish a mechanism that allows the Government of the Commonwealth of Puerto Rico to advance the terms of payments and cancellation of the debt subject to controlling law; to repeal Law No. 39 of May 13, 1976, as amended; to amend subsection (a) of Section 3 of Law No. 147 of June 18, 1980, as amended; to amend Article 3 and subsection (m) of Article 7, as well as to repeal Articles 25 and 34 and to renumber Articles 25-A and 35 as Articles 25 and 34, respectively, of Law No. 44 of 21 of June 1988, as amended; to amend Article 23.01, to repeal subsection (e), and current subsections (f) and (g) are renumbered as new subsections (e) and (f), respectively, of Article 23.02 of Law 22-2000, as amended; repeal subsection (l), and renumber current subsections (m), (n), (ñ), (o), y (p) as new subsections (l), (m), (n), (ñ), y (o), respectively, of Article 1.03(B), and to amend subsection (h) of Article 2.02 of Law 351-2000, as amended; to amend Article 8 of Law 179- 2002, as amended; to amend Article 31 of Law 272-2003, as amended; to add a new Article 7A to Law 103-2006, as amended; to amend Section 3060.11 and eliminate Section 3060.11A of Law 1-2011, as amended; to amend Section 7.018 and Article 7.027 of Law 107-2020, as amended; and to repeal Article 3 of Act 9 of August 12, 1982; in order to take the affirmative steps necessary to direct the exit of Puerto Rico from the bankruptcy

proceedings created under Title III of PROMESA; to comply with the provisions of the aforementioned federal law with respect to the minimum conditions necessary for the culmination of the Financial Oversight and Management Board; and for other related purposes.

## STATEMENT OF MOTIVES

In the year 2016, in order to provide a mechanism for the Government of Puerto Rico to renegotiate its debt and to control the potential avalanche of claims by its creditors, the U.S. Congress enacted the federal law entitled "the Puerto Rico Oversight, Management, and Economic Stability Act", known as PROMESA. This law established, in its Title III, a bankruptcy proceeding that incorporated a broad portion of the provisions of the Bankruptcy Code, to which Puerto Rico would have access in order to restructure its monumental debt. Likewise, it created an entity that would take control of all budgetary, financial, and fiscal administration aspects of Puerto Rico called the Financial Oversight and Management Board (FOMB or the Board). In effect, the FOMB would essentially supervise and control all financial, fiscal, and budgetary aspects of the Government of the Commonwealth of Puerto Rico.

On May 3, 2017, the FOMB filed a debt restructuring petition under Title III of PROMESA. The filing of this petition before the Title III Court gave rise to the largest bankruptcy proceeding in the history of the U.S. municipal markets, to which the bonds and obligations of the Commonwealth of Puerto Rico belong. To bear in mind the magnitude of this event, it must be considered that it was estimated that the Commonwealth would have to restructure $35 billion as part of the aforementioned restructuring process.

After more than four years since the filing of the bankruptcy petition under Title III of PROMESA, the Board has presented a seventh amended version of the Debt Adjustment or Restructuring Plan (DAP or the Plan) for Puerto Rico before the Title III Court as filed on July 30, 2021. This Plan is the result of several years of negotiation between the FOMB, in its capacity as the exclusive representative of the Debtors, including the Commonwealth of Puerto Rico, before the Title III Court, and a number of classes of creditors of obligations of the central Government.

Pursuant to this law, the Commonwealth supports the Plan, along with the public policies set forth in this Law which, subject to PROMESA's mandate to restore fiscal responsibility in Puerto Rico and the Oversight Board's fiscal plan and budget powers under PROMESA, includes zero cuts to pensions of current retirees and current accrued benefits of active public employees and a desire to promote the welfare of the people of Puerto Rico:

1. Protect the pensions of our retirees. This objective is intended to avoid cuts to the pensions of 100% of the retirees. To achieve this objective, a specific clause on this issue is provided in this Law.

2. Provide additional funding for the University of Puerto Rico to be utilized to improve the student experience and environment, such that appropriations to UPR total $500 million per year, for five (5) years from fiscal year 2023 through fiscal year 2027. This goal is intended to preserve the capacity of the UPR to carry out its vital educational mission and to ensure the necessary resources to guarantee the accreditation of all of its programs and to achieve fair access for those students with financial needs, while also promoting efficiencies.

3. Support the creation of a University Scholarships Trust Fund. This initiative is intended to create an investment trust to preserve the capital that would be awarded for scholarships for UPR students.

4. Support reasonable health plans for central government employees. This measure would benefit more than 60,000 Puerto Rican workers and families.

5. Support additional funding for the municipalities. This objective aims to grant fiscal stability to the municipalities and the continuity of the essential services they offer.

6. Endorse the creation of the special fund for social equality. This proposal - to be legislated soon - aims to create a permanent fund entrusted with combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, combating school dropouts, establishing an integrated plan for the homeless, and gradually increasing the allocations for nonprofit, community self-management, and faith-based entities to offer direct services.

7. Establish the goal of increasing health coverage. The purpose of this initiative is to extend and/or facilitate access to health coverage to some 225,000 citizens who today lack health plans, depending on the availability of funds.

8. Endorse the creation of the Strategic Investment Fund for Economic Development that injects continuous investments. This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization

programs; (3) the development of business growth programs through entrepreneurial capitalization; and (4) capitalization of the savings and credit cooperatives sector.

9. Establish a mechanism that allows the Government of Puerto Rico to advance the terms of payments and debt cancellation, following the termination of the FOMB under PROMESA. The sole purpose of this mechanism is to authorize the Government of Puerto Rico to refinance the debt payment agreements following the termination of the FOMB under PROMESA, with the sole objective of accelerating or paying off the agreed payments, in accordance with the future fiscal situation and without affecting essential and priority services of the Government of Puerto Rico.

10. Establish a joint working group between the Legislative Branch and the Executive Branch. This initiative has the objective of designing the legislation that is necessary to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go into debt again without having the economic resources to meet its payment obligations; or repeat the improper practices of approving unbalanced budgets, with estimates of unrealistic income or excessive expenses.

If ratified by the Government and the creditors, and later confirmed by the Title III Court, the Plan would represent the last step in the process of restructuring Puerto Rico's debt. This Plan incorporates the agreements reached with the various classes of creditors of Central Government obligations. These classes include general obligation bondholders, public employee unions, the Non-secured Creditors Committee, and the Official Retirees Committee, among others.

In total, the agreements included in the DAP reduce the Central Government's public debt by approximately 50%. That is, the public debt would be reduced from approximately $70 billion to $34 billion, and the General Obligations (GO) and Public Buildings Authority bonds debt would be reduced from $18.8 billion to $7.4 billion. In turn, the annual payment of Puerto Rico's public debt would be reduced from approximately $3.3 billion to $1.1 billion. Likewise, the Commonwealth's debt service would be reduced from 25% to 7.5%, a figure that represents half the constitutional maximum allowed. In practical terms, these reductions represent more money in the government's coffers, which implies that Puerto Rico will have a new opportunity to invest in its people through improvements to the infrastructure, to defray the costs of the essential services that it is called upon to offer; and to prepare for and deal with future emergencies.

To achieve this reduction in government debt, the Plan requires the Puerto Rico Legislature to enact legislation that makes possible the issuance of a series of general obligation bonds (GO) and the creation of contingent value instruments (CVI). It should be noted that the Plan also provides for the creation of a trust that will supplement future revenues for the payment of pensions, the government's enjoyment of up to $200 million in funds generated in excess of the projections contained in the Fiscal Plans of 2020 and 2021, and other repayment mechanisms.

In essence, the Central government must issue new general obligation bonds, and authorize the creation of the CVIs. The CVIs would only be payable upon meeting certain sales and use tax (SUT) collection metrics and, in the case of a limited portion of CVIs, the portion of the federal tax on rum that the Federal Treasury Department transfers to the Government of the Commonwealth of Puerto Rico. That is, only a specific maximum of debt would be paid if certain conditions are present.

Pursuant to Section 314 of PROMESA, the Government of Puerto Rico must enact this legislation to facilitate confirmation of the Plan, which must occur before the departure of the Board.

However, this Legislature has not lost sight of the fact that our retirees, unlike other groups of creditors, have already suffered cuts in their pensions as a result of the enactment of statutes that, to prevent the insolvency of the government retirement systems, reduced pension benefits, increased the amount of employee contributions, and raised the retirement age for the pension plans of each of the three major government retirement systems. To this end, this legislation is conditioned on the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the contemplated cuts to the monthly pension payments to currently retired employees of the government of the Commonwealth and current public employees who have accrued pension benefits. In addition, this legislation provides additional funding for the municipalities, and separately for the University of Puerto Rico.

Municipalities are our population's closest government entities. The crisis and the fiscal plans have impacted our municipalities. To the extent that the Plan achieves cuts to the state debt, some of these savings will be made available for the collection and disposal of residuals, waste, and to implement recycling programs in the municipalities, so that these entities can guarantee these essential and indispensable services to guarantee and improve the quality of life of our citizens.

The Legislature will continue to promote proposals that defend the best interests of the people. In this feat, we trust that the Legislative Branch will have the support of the Executive to guide Puerto Rico on the road ahead. The approval of the General Budget of Puerto Rico for fiscal year 2021-2022, Jt. Res. 8-2021, was a right step in that direction. So is the approval of this bill, which will allow the current General Budget to become the

first balanced budget of four. At the end of this process, Puerto Rico will have met half of the requirements set forth by PROMESA. This Law establishes a historical, multisectoral, and consensus effort to put an end to the Fiscal Oversight Board.

**BE IT DECREED BY THE PUERTO RICO LEGISLATIVE ASSEMBLY:**

**CHAPTER 1: GENERAL PROVISIONS**

**Article 101.- Title**

This Act shall be known and may be cited as the "Ending Puerto Rico's Bankruptcy Act."

**Article 102.- Definitions.**

(a)     5.5% SUT: means the present and future revenues and collections generated by the portion of the sales and use tax imposed by the Government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of the Puerto Rico Internal Revenue Code that corresponds to a tax rate of five and one-half percent (5.5%).

(b)     Ancillary Agreements: means the Plan, the Confirmation Order, the GO Bond Indenture, the form of the GO Bonds, the CVI Indenture, the form of the CVIs, and any other agreement or instrument (including any trust) related thereto or entered into in connection with, or in furtherance of, a Restructuring Transaction and in accordance with, or in furtherance of, the Plan or a Qualifying Modification.

(c)     HTA: means the Puerto Rico Highways and Transportation Authority, created under Law 74 of June 23, 1965, as amended or its successor law.

(d)     CCDA: means the Puerto Rico Convention Center District Authority, created under Law 351-2000, as amended or its successor law.

(e)     PBA: means the Puerto Rico Public Buildings Authority, created under Law 56 of June 19, 1958, as amended or its successor law.

(f)     PRIFA: means the Puerto Rico Infrastructure Financing Authority, created under Law 44 of June 21, 1988, as amended or its successor law.

(g)     MBA: means the Puerto Rico Metropolitan Bus Authority, created under Law 5 of May 11, 1959, as amended or its successor law.

(h)     Fiscal Year: means the fiscal year of the Commonwealth, which begins on July 1 and ends on June 30.

(i)     GO Bonds: means the general obligation bonds issued by the Commonwealth under the GO Bond Indenture pursuant to this Act, the Plan, and the Confirmation Order, and any general obligation bonds subsequently issued by the Commonwealth under the GO Bond Indenture in accordance and consistent with the terms of the Plan to retire, refinance or defease general obligation bonds originally issued pursuant to the Plan and the Confirmation Order.

(j)     Puerto Rico Code: means Act No. 1-2011, as amended, and known as the "Internal Revenue Code for a New Puerto Rico."

(k)     Rum Tax Outperformance Condition: means that Commonwealth Rum Tax Revenues in any given Fiscal Year, calculated in accordance with and net of permitted deductions contemplated by the Plan and set forth in the CVI Indenture, exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(l)     SUT Outperformance Condition: means that the Measured SUT or the Substitute Measured Tax collections, as applicable, in any given Fiscal Year exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(m)     GO Bond Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the GO Bonds to be executed and delivered by the Governor's Designee authorizing: (1) the issuance of the GO Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Plan.

(n)     CVI Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the CVIs to be executed and delivered by the Commonwealth authorizing: (1) the issuance of the CVIs by the Commonwealth and describing the terms thereof; and (2) the payment of the Financing Costs of the CVIs, each in accordance with the terms of the Plan.

(o)     Financing Costs: means the costs associated with the Restructuring Transactions, including, without limitation, the costs, fees and expenses to (i) issue, service or repay the GO Bonds and the CVIs, as applicable, whether such costs are incurred upon issuance of such GO Bonds or CVIs or over the term of such instruments, (ii) make payments as required by the applicable Ancillary Agreements, (iii) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transactions (if any), (iv) prepare for and enter into the Restructuring Transactions, and (v) perform any ongoing activities relating to the Restructuring Transactions. For the avoidance of doubt, Financing Costs also includes pre-closing and post-closing

administrative fees and expenses incurred in connection with the applicable Ancillary Agreements.

(p)    Government Entity: means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

(q)    Commonwealth: means the Commonwealth of Puerto Rico.

(r)    Effective Date: means the date on which the Plan becomes effective in accordance with its terms.

(s)    GO Bonds Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the GO Bond Indenture.

(t)    CVI Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

(u)    Debt Service Fund: shall mean a debt service fund established pursuant to the GO Bond Indenture.

(v)    Substitute Measured Tax: means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Indenture.

(w)    Commonwealth Rum Tax Revenues: means the total collections of the excise tax on distilled spirits imposed under the U.S. Internal Revenue Code of 1986 (as amended from time to time) received by the Commonwealth as documented in the U.S. Department of the Treasury monthly detailed activity report of net excise tax paid to the Commonwealth and certified by the Puerto Rico Department of Treasury or in any other analogous report as established in the CVI Indenture.

(x)    CVIs or Contingent Value Instruments: means, collectively, the general obligation notes issued under the CVI Indenture pursuant to this Act, the Plan, and the Confirmation Order, consisting of the GO CVIs and the Clawback CVIs.

(y)    Clawback CVIs:  means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to debt issued by HTA, CCDA, PRIFA and MBA. For the avoidance of doubt, the

Clawback CVIs may be issued in one or more subseries, including, without limitation, the Rum Tax Claims Subseries.

(z)     GO CVI: means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to direct or guaranteed general obligation debt of the Commonwealth.

(aa)    Measured SUT: means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the Puerto Rico Code (or used for any other purpose established by law), up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

(bb)    Act means the "Act to End Puerto Rico's Bankruptcy."

(cc)    Clawback CVI Lifetime Cap: means, initially as of the Effective Date, $5,239,002,764. The Clawback CVI Lifetime Cap shall be reduced each Fiscal Year in an amount equal to payments made on the Clawback CVIs pursuant to the CVI Indenture upon, and as a result of, the occurrence of an SUT Outperformance Condition. In addition, the portion of the Clawback CVI Lifetime Cap allocable to the Rum Tax Claims Subseries shall be further reduced each Fiscal Year in an amount equal to payments made on the Rum Tax Claims Subseries pursuant to the CVI Indenture upon, and as a result of, the occurrence of a Rum Tax Outperformance Condition.

(dd)    GO CVI Lifetime Cap: means, initially as of the Effective Date, $3,500,000,000. The GO CVI Lifetime Cap is reduced annually in an amount equal to payments made on the GO CVIs pursuant to the CVI Indenture.

(ee)    Qualifying Modification: means a "Qualifying Modification" for CCDA and/or PRIFA approved pursuant to Title VI of PROMESA.

(ff)    Confirmation Order: means the order of the Title III Court confirming the Plan.

(gg)    Person: means any natural person or legal entity, including, but not limited to, the Commonwealth, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(hh)   Plan: means the joint Plan of Adjustment for the Commonwealth, ERS, and PBA (and any other Government Entity included in any such plan) confirmed under Title III of PROMESA, including the exhibits and schedules thereto, as the same may be amended, supplemented, or modified from time to time.

(ii)   PROMESA: means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq., as it may be amended or modified.

(jj)   Existing Claims:   means claims against the Commonwealth, PBA, ERS, HTA, PRIFA, CCDA, and MBA.

(kk)   Governor's Designee: means the Governor, the Secretary of the Treasury or such other officer of a Government Entity as may be designated by the Governor through Executive Order.

(ll)   Secretary of the Treasury: means the Secretary of the Treasury of the Commonwealth.

(mm) Commonwealth Retirement Systems: means the ERS, the Teacher's Retirement System and the Judiciary Retirement System.

(nn)   ERS: means the Retirement System of the Employees of the Government of the Commonwealth of Puerto Rico, created under Law 447 of May 15, 1951, as amended or its successor law.

(oo)   Rum Tax Claims Subseries: means a subseries of Clawback CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to Commonwealth Rum Tax Revenues retained by the Commonwealth and not transferred to PRIFA.

(pp)   Restructuring Transactions: means each of the transactions contemplated by, or in furtherance of, the Plan or a Qualifying Modification, including, without limitation, the issuance of the GO Bonds, the CVIs, and any trust related thereto and the cancellation and extinguishment of the Existing Claims pursuant to the Plan or a Qualifying Modification, as applicable.

(qq)   Monthly Benefit Modification: has the meaning ascribed to such term in the Plan.

**Article 103. – Authorization on Actions of Government Entities.**

Notwithstanding any provision, prohibition or restriction of any law, order, rule or regulation of the Commonwealth, each Government Entity required to take or perform any action necessary or convenient to carry out the Plan and/or a Restructuring Transaction is hereby authorized to take and shall take any such actions necessary or convenient to carry out the Plan and/or a Restructuring Transaction, without being subject to the requirements of any provision, prohibition, or restriction of any other law, order, rule or regulation, including, but not limited to, (a) negotiating, entering into and executing any agreement, deed, certificate or document, and (b) disbursing or transferring funds as provided for and/or required by the Plan. The authorization provided by this Article 103 shall be sufficient for the Governor's Designee, on behalf of the Commonwealth, and any executive director, president or officer of similar rank and authority, on behalf of the Government Entity they represent, to take any action contemplated by the Plan and/or a Restructuring Transaction and no other authorization shall be required, including the authorization of any board of directors, commission, department, or Puerto Rico regulator. Moreover, the Puerto Rico Fiscal Agency and Financial Advisory Authority is hereby authorized to require any Government Entity to comply with the requirements of this Article.

Without limiting the generality of the foregoing and notwithstanding any provision of any law of the Commonwealth, on and after the Effective Date, the Governor's Designee shall be authorized, to the extent, if any, required after issuance of the Confirmation Order, to: (a) approve the offering, sale and issuance of the GO Bonds and the CVIs as contemplated by the Plan and provided in Chapters 2 and 3 of this Act, respectively; (b) provide for the cancellation and extinguishment of the Existing Claims pursuant to and in accordance with the terms of the Plan or a Qualifying Modification, as applicable; (c) authorize the payment of the Financing Costs in accordance with the terms of the Plan; (d) approve the form of the GO Bond Indenture, CVI Indenture, and other Ancillary Agreements and enter into the GO Bond Indenture, the CVI Indenture and other Ancillary Agreements on behalf of the Commonwealth, all to the extent not approved by the Confirmation Order; (e) include in the Ancillary Agreements any covenant, term, or other condition as may be required by the Plan, including (1) consenting on behalf of the Commonwealth to the application of the laws of the State of New York to govern and interpret such Ancillary Agreements, and the jurisdiction of any state or federal court with respect to any suit or proceeding related to the GO Bonds, the CVIs, the Ancillary Agreements and/or any other matters related to the Restructuring Transactions, and (2) the creation of liens over the money, securities and other assets on deposit with the GO Bonds Trustee or the CVI Trustee for the benefit of the holders of GO Bonds and CVIs, respectively; and (f) take any and all other actions necessary or convenient to carry out the Restructuring Transactions. For the avoidance of doubt, notwithstanding the application of the laws of the State of New York to govern and interpret the GO Bonds, the CVIs, the GO Bond Indenture, the CVI Indenture and any other Ancillary Agreement, the holders of the GO Bonds and the CVIs shall be entitled to

the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

The authorization to issue bonds conferred by the Present Act will be limited exclusively to the bonds mentioned and required to implement the Plan and will be done in accordance with the Plan, the GO Indentures, the Confirmation Order, and the other Ancillary Agreements. The Governor of Puerto Rico or his designee must request the authorization of the Legislative Assembly for any future bond issuance that is separate from the one hereby authorized.

## ARTICLE 104 - PUBLIC POLICY; PROTECTION OF THE PENSIONS OF THE RETIREES OF THE GOVERNMENT OF THE COMMONWEALTH.

The Government of the Commonwealth of Puerto Rico hereby declares that it is public policy of the highest priority to protect the accrued pensions of its public servants, who are one of the most important groups in our society. As an essential part of this public policy, the protection of the pensions of all our retirees is an important and unwavering commitment. Therefore, with regard to the accrued pensions of government employees, it is hereby provided as follows: The Legislative Assembly authorizes the issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification.

## ARTICLE 105 - FUNDING OF THE UNIVERITY OF PUERTO RICO.

In order to advance the goal of the Government of the Commonwealth of Puerto Rico of preserving the capacity of the UPR to carry out its vital educational mission and ensuring the necessary resources to guarantee the accreditation of all its programs, and achieve fair access for those students who have financial needs, the budgets submitted to the Oversight Board will appropriate funding to UPR totaling $500 million for each of the five fiscal years 2023 through 2027, provided that the additional appropriations above the amounts appropriated in the Commonwealth fiscal plan certified in April 2021 and the certified budget for the Commonwealth are to be utilized to improve the student experience and environment.

## ARTICLE 106 – FUNDING OF HEALTH INSURANCE STUDY.

The Puerto Rico Health Department shall conduct a study of the feasibility of extending and/or facilitating access to medical coverage to some 225,000 citizens who currently lack medical plans. The Puerto Rico Health Department is hereby appropriated One Million Dollars ($1,000,000) to fund such a study.

## ARTICLE 107 – PUBLIC POLICY STATEMENT OF THE COMMONWEALTH GOVERNMENT

Pursuant to this law, the Commonwealth supports the Plan, along with the public policies set forth in this Law which, subject to PROMESA's mandate to restore fiscal responsibility and the budget powers in Puerto Rico. We declare that the priority objectives of this legislation are the following actions:

(a) Support the creation of a University Scholarships Trust Fund. This initiative is intended to create an investment trust to preserve the capital that would be awarded for scholarships for UPR students.

(b) Support reasonable health plans for central government employees. This measure would benefit more than 60,000 Puerto Rican workers and families.

(c) Endorse the creation of the special fund for social equality. This proposal - to be legislated soon - aims to create a permanent fund entrusted with combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, combating school dropouts, establishing an integrated plan for the homeless, and gradually increasing the allocations for nonprofit, community self-management, and faith-based entities to offer direct services.

(d) Endorse the creation of the Strategic Investment Fund for Economic Development that injects continuous investments. This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization programs; (3) the development of business growth programs through entrepreneurial capitalization; and (4) capitalization of the savings and credit cooperatives sector.

(e) Establish a joint working group between the Legislative Branch and the Executive Branch. This initiative has the objective of designing the legislation that is necessary to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go into debt again without having the economic resources to meet its payment obligations; or repeat the improper practices of approving unbalanced budgets, with estimates of unrealistic income or excessive expenses.

The implementation of the foregoing article shall be contingent upon the availability of funds and to it not being significantly inconsistent with the Fiscal Plan.

## CHAPTER 2 – THE GENERAL OBLIGATION BONDS

**Article 201.- Issuance of the General Obligation Bonds.**

(a)     From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance of the GO Bonds, from time to time, pursuant to the terms of the GO Bond Indenture, the Confirmation Order, the Plan and the other Ancillary Agreements, up to an aggregate initial principal amount of $7,414,063,543.25, and to approve the offering, sale and issuance, from time to time, of additional GO Bonds, subject to the limitations contemplated by the Plan and set forth in GO Bond Indenture, to retire, refinance or defease GO Bonds originally issued pursuant to the Plan and the Confirmation Order.

(b)     The GO Bonds shall include current interest bonds and capital appreciation bonds,  shall be dated, shall bear interest at such rate, shall mature at such time or times, not exceeding thirty (30) years from their date or dates of issuance, and shall be subject to redemption or prepayment, in each case, to the extent applicable and as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the GO Bond Indenture in accordance and consistent with the Plan. To the extent, if any, not already determined by the Plan and Ancillary Documents approved by the Confirmation Order, the Governor's Designee, as representative of the Commonwealth, shall determine the form of the GO Bonds and the manner of execution of the GO Bonds, and shall fix the denomination or denominations of the GO Bonds and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan. At the discretion of the Governor's Designee, the GO Bonds may be issued in one or more separate series.

(c)     The GO Bonds shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the GO Bond Indenture and the other Ancillary Agreements.

(d)     When any official whose signature or facsimile thereof appears on any GO Bond authorized under this Act ceases to hold office before the delivery of said GO Bonds, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any GO Bond may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the GO Bond, were not holding office.

(e)     The GO Bonds issued pursuant to the provisions of this Act shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)     The GO Bonds authorized by this Act may be issued as coupon bonds or in registered form, or both, as determined in the GO Bond Indenture.

## Article 202.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of principal and interest on the GO Bonds issued under the provisions of this Act as and when due in accordance with the terms of the GO Bond Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the principal and interest on the GO Bonds as they mature or upon their earlier redemption or prepayment in accordance with the GO Bond Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the principal and interest on the GO Bonds shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the GO Bond Indenture the commitment which the Commonwealth hereby enters into with respect to the GO Bonds, and it shall be stated on said GO Bonds that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 203.- Debt Service Fund; Statutory Lien

(a)     The Governor's Designee is hereby authorized to establish the Debt Service Fund with the GO Bonds Trustee for the payment of the GO Bonds. Until the GO Bonds have been paid or satisfied in full in accordance with their terms, on each calendar month, the Commonwealth shall deposit with the GO Bonds Trustee cash in the aggregate amount equal to (i) one-sixth (1/6) of the Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the GO Bonds and (ii) one twelfth (1/12) of the Commonwealth's annual obligation with respect to the payment of principal on the GO Bonds. Such funds shall be held and invested by the GO Bonds Trustee in accordance with the provisions of the GO Bond Indenture.

(b)     Upon their issuance, the GO Bonds shall automatically be secured by a first priority statutory lien over the funds deposited in the Debt Service Fund, including any income and revenues generated therefrom.  Such first priority statutory lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such first priority statutory lien or to establish or maintain the priority thereof, and such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of such lien.

**Article 204.- Tax Exemption.**

The GO Bonds, including, but not limited to, any payments or income with respect to the GO Bonds and the transfer of the GO Bonds, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes, assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith). Holders and beneficial owners of the GO Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the GO Bonds.

**Article 205.- Commonwealth Covenants.**

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will:

(a)    take no action that would (1) impair the monthly deposit of funds to the Debt Service Fund pursuant to Article 203 hereof, (2) limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the GO Bonds or (3) impair the rights and remedies of the holders of the GO Bonds;

(b)    do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt GO Bonds shall be and remain excludable from gross income for federal income tax purposes, to the extent applicable;

(c)    cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico under PROMESA to include provisions for the payment in each Fiscal Year of the principal of and interest on the GO Bonds in accordance with the terms of the GO Bond Indenture; and

(d)    to the extent necessary to satisfy its obligations to pay the GO Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution, and (iii) any other available resources of the Commonwealth to the payment of the principal of and interest (and accreted value) on such GO Bonds; provided that (A) this covenant is not intended to grant to the holders of such GO Bonds any lien on such proceeds, monies and resources, and (B) for purposes of compliance

with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the holders of the GO Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth above.

## CHAPTER 3 – THE CONTINGENT VALUE INSTRUMENTS

### Article 301.- Issuance of the CVIs.

(a)    From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance, pursuant to the terms of the CVI Indenture, the Confirmation Order, the Plan and the Ancillary Agreements, of CVIs in two subseries – the GO CVIs and the Clawback CVIs – up to an aggregate notional amount of $3,500,000,000 and $5,239,002,764, respectively. Each series of CVIs may include one or more subseries.

(b)    The CVIs shall be dated and mature at such time or times as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture, provided that the GO CVIs shall mature no later than Fiscal Year 2044 and the Clawback CVIs shall mature no later than Fiscal Year 2052. The CVIs shall not bear interest and shall be subject to redemption as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the CVIs and the manner of execution of the CVIs, and shall fix the denomination or denominations of the CVIs and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan.

(c)    The CVIs shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the CVI Indenture and the other Ancillary Agreements, provided that, pursuant to the CVI Indenture:

(1)    no payments shall be made to the holders of the CVIs (other than the Rum Tax Claims Subseries under the circumstances set forth in clause (2) below) in any given Fiscal Year unless an SUT Outperformance Condition occurred during the prior Fiscal Year;

(2)    no payments shall be made to the holders of the Rum Tax Claims Subseries in any given Fiscal Year unless either an SUT Outperformance Condition or a Rum Tax Outperformance Condition occurred during the prior Fiscal Year

(3)      no payments shall be made to the holders of the GO CVIs or the Clawback CVIs in excess of the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, respectively;

(4)      as of the maturity date of each series of CVIs, if the Commonwealth has made all payments required to be made on such series pursuant to the CVI Indenture, all of the obligations of the Commonwealth under such series shall be deemed to have been satisfied and the series shall no longer be deemed to be outstanding, even if the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, as applicable, has not been reached as of such date.

(d)      When any official whose signature or facsimile thereof appears on any CVIs authorized under this Act ceases to hold office before the delivery of said CVIs, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any CVIs may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the CVIs, were not holding office.

(e)      The CVIs issued pursuant to the CVI Indenture are notes of the Commonwealth for all purposes and shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)      The CVIs authorized by this Act shall be issued in registered form.

(g)      Solely for purposes of calculating the maximum annual debt service payable on the Commonwealth's public debt pursuant to Article VI, Section 2 of the Commonwealth Constitution, the debt service payable on the CVIs in any given Fiscal Year shall be deemed to be equal to the maximum amounts that could be payable with respect to the CVIs during such Fiscal Year in accordance with the CVI Indenture.

(h)      The debt service payable to CVIs in any given Fiscal Year will not impair under any concept the debts, obligations, and reserves created by COFINA.

**Article 302.- Pledge of Good Faith, Credit and Taxing Power.**

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of the CVIs issued under the provisions of this Act as and when due in accordance with the terms of the CVI Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the CVIs as they become due or upon their earlier redemption in accordance with the CVI Indenture, from available resources of the Commonwealth in the Fiscal Year in which such payment is

required, and the provisions of this Act concerning the payment of the CVIs shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments in the Fiscal Year in which such payment is required, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the CVI Indenture the commitment which the Commonwealth hereby enters into with respect to the CVIs, and it shall be stated on said CVIs that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 303.- Tax Exemption.

The CVIs, including, but not limited to, any payments or income with respect to the CVIs and the transfer of the CVIs, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes, assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith). If the CVIs are originally issued to a trust, the distributions made by said trust to its beneficiaries attributable to payments or income received by the trust in connection with the CVIs and the transfer of the CVIs by the trust, if permitted, as well as the transfer of interest in said trust, will at all times be totally exempt from all types of taxes (including, but not limited to, income taxes, tariffs, licenses, stamps, and other fees charged by the Commonwealth of Puerto Rico or by any Government Entity, and from any and all related withholdings). The holders and beneficial owners of the CVIs and / or an interest in the trust that owns the CVIs shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the CVIs.

## Article 304.- Commonwealth Covenants.

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect to the CVIs have been paid or satisfied in full in accordance with their terms the Commonwealth will:

(a)    take no action that would:

(i)    limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the CVIs;

(ii)    impair the rights and remedies of the holders of the CVIs; or

(iii)    impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs (in accordance with the Plan and as set forth in the CVI Indenture); provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of the CVIs from such elimination or replacement reducing the likelihood that SUT Outperformance Condition will be satisfied; and provided further that the Commonwealth shall provide for the timely disclosure of such information as may be required by the CVI Indenture regarding the Measured SUT, sales and use tax collections, and any adjustments to the 5.5% SUT baseline thresholds made pursuant to the CVI Indenture; and

(b) cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico while it is present in Puerto Rico pursuant to PROMESA to include provisions for the payment in each Fiscal Year of the amounts due on the CVIs in accordance with the terms of the CVI Indenture to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, occurs during the prior Fiscal Year.

## CHAPTER 4 –MUNICIPALITIES

## ARTICLE 401.-EXTRAORDINARY FUND

The "Extraordinary Fund to Address the Collection and Disposal of Residuals, Wastes, and to Implement Recycling Programs in the Municipalities," hereinafter the "Extraordinary Fund," is created, which will be within the "Municipalities Equalization Fund" provided in Article 7.015 of Law 107-2020, as amended, but in an account separate from other income of said fund, and which will be used for the specific purposes provided in this Law.

## ARTICLE 402.- DECLARATION OF PUBLIC POLICY

The Government of Puerto Rico hereby declares that it is the public policy of the Commonwealth of Puerto Rico to guarantee to its population the efficient collection and disposal of garbage, solid wastes, debris, as well as the implementation of recycling programs to address these residuals, thus to the extent that the Debt Adjustment Plan includes reductions in the amount of guaranteed debt, some portion of these savings that will be generated must be made accessible to the municipalities so that they can provide these services.

## ARTICLE 403.- REMISSION OF SAVINGS IN THE PAYMENT OF DEBT TO THE EXTRAORDINARY FUND

The Extraordinary Fund established in Article 401 of this Law will be funded from an annual allocation from the General Fund, which will be equivalent in each fiscal year to 42% of the amount collected during the prior fiscal year on account of the 1.03% property tax. This appropriation may only be included in the budget for a fiscal year if the amount of Medicaid funds actually received during the prior fiscal year exceeds the projected amount of Medicaid funds for such prior fiscal year as set forth in the fiscal plan of the Commonwealth of Puerto Rico certified by the FOMB in April 2021.

## ARTICLE 404.- PURPOSES OF THE EXTRAORDINARY FUND

The municipalities will only be able to access the economic resources of the Extraordinary Fund provided herein, exclusively and specifically, for the purposes described as follows:

(a) garbage collection and disposal;

(b) collection and disposal of solid wastes;

(c) collection and disposal of debris;

(d) implementation, collection, and disposal of recycling.

## ARTICLE 405.- FORMULA FOR DISTRIBUTION BETWEEN MUNICIPALITIES

In order to achieve a fair distribution of the resources of the Extraordinary Fund, the following criteria will be used to determine the amounts to which the municipalities may have access:

(a) The total number of beneficiaries of the Nutritional Assistance Program, per capita, according to the certification to that effect issued by the Department of the Family, which is determined in the immediately preceding fiscal year or in the closest fiscal year for which the information is available.

(b) The functional budget per capita of each municipality, for the immediately preceding fiscal year or the closest fiscal year for which the information is available.

(c) The appraised value of taxable property per capita located within the territorial limits of each municipality, corresponding to the immediately preceding fiscal year or to the closest fiscal year for which the information is available.

(d) The population of the municipality per square mile, according to the last ten-year census.

The methodology for the distribution will be determined by the parameters provided in this Article, but those parameters existing for the distribution of the resources of the Municipalities Equalization Fund may be incorporated, as long as they are not contrary to the purposes and objectives described herein by the Board of Directors of CRIM. The application of this methodology should benefit those municipalities that receive the least income from property taxes or other sources, as well as those municipalities with the largest number of dependents in the Nutritional Assistance Program and with the highest population density.

## CHAPTER 5 – AMENDMENT AND REPEAL OF CERTAIN LAWS FOR THE DEPOSIT OF FUNDS IN THE GENERAL FUND AND GUARANTEE THAT ALL LEGISLATION COMPLIES WITH THE AVAILABILITY OF FUNDS ESTABLISHED IN THE FISCAL PLAN

**ARTICLE 501.- SECTION (A) OF ARTICLE 3 OF LAW NO. 147 OF JUNE 18, 1980, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 3.- Authorities and Duties of the Office of Management and Budget.

(a)     The Office of Management and Budget, under the rules, regulations, instructions, and orders that the Governor may prescribe, will advise the Chief Executive, the Legislative Assembly, and the government agencies on matters of a budgetary, programmatical, and administrative management nature, as well as in matters of a fiscal nature related to their functions; it will carry out the necessary functions that allow the Governor to submit to the Legislative Assembly the proposal of the General Government Budget, in accordance with Article 4 of this Law, including the Public Corporations. At the same time, it will ensure that the execution and administration of the budget by the public agencies are conducted in accordance with the laws and allocations resolutions, with the soundest and most appropriate fiscal and managerial administration norms, and in harmony with the provisions of the Economic and Fiscal Growth Plan approved in accordance with the Puerto Rico Fiscal Responsibility and Revitalization Act (the "Fiscal and Economic Growth Plan") and with the programmatical purposes for which public funds are allocated or provided. It will evaluate the programs and activities of public agencies in terms of economy, efficiency, and effectiveness and will submit to the Governor reports with recommendations for the implementation thereof. In addition, it will prepare and maintain control of all of those fiscal and budgetary documents that may be necessary for the administration of the budget and will make the changes, amendments, or adjustments that are warranted, subject to the legal provisions and norms established by the Legislative Assembly, and the Governor. To these ends, and in order for the Legislative Assembly to be able to analyze that the legislative measures comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the

availability of funds regarding the legislative measures that are requested of it by the legislative commissions within a period of five (5) business days from the time they are required. It will present together with the Secretary of the Treasury a detailed report regarding the projections of income and expenses for the following fiscal year and corresponding to the General Budget proposed before the Legislative Assembly within a term that will not exceed five (5) calendar days after the presentation of the proposal of the General Government Budget of the Commonwealth of Puerto Rico by the Governor. It will remain watchful of new tendencies and trends in the budgetary and managerial field of public administration to evaluate and adapt those techniques, methods, and approaches that apply to the local administrative field, both in the formulation and execution of the budget as in program evaluation, management analysis, and operational and administrative auditing. In addition, it must propose the legislation that it considers necessary and convenient to incorporate such approaches and trends into our budgetary and administrative process.

(b)      …"

**ARTICLE 502.- ARTICLE 3 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, KNOWN AS THE LAW OF THE PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY, IS AMENDED TO READ AS FOLLOWS:**

"**Article 3.- Definitions**

The following words and terms, when used or referred to in this Law, will have the meanings indicated below, unless otherwise clearly understood from the context:

(a)      …

…

(j)      Development Fund – Will mean the Infrastructure Development Fund created under Article 25 of this Law, in accordance with the provisions of Law No. 54 of August 4, 1997 (27 L.P.R.A. § 431, et seq.)

(k)      …

…

(r)      Corpus Account – Will mean the Development Fund Corpus Account as established in subsection (a) of Article 25 of this Law. The capital returns generated by this account must be used as established in Article 25 of this Law.

(s)     Additional accounts – Will mean accounts created within the Development Fund, in addition to the Corpus Account, that are necessary to carry out the purposes of this Law, as established in subsection (a) of Article 25 of this Law."

**ARTICLE 503.- SUBSECTION (M) OF ARTICLE 7 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 7. – General Powers.

The Authority will have all of the necessary and convenient powers to carry out and effect the purposes and provisions of this Law, including, but without it being construed as a limitation, the following:

(a)     …

…

(m)     Mortgage or pledge any property for the payment of the principal and interest on any bonds issued by the Authority or bonds issued by a benefited entity, and pledge all or part of the income that the Authority receives.

(n)     …

…"

**ARTICLE 504.- ARTICLES 25 AND 34 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, ARE REPEALED AND ARTICLES 25-A AND 35 ARE RENUMBERED AS ARTICLES 25 AND 34, RESPECTIVELY.**

**ARTICLE 505.- ARTICLE 23.01 OF LAW 22-2000, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 23.01. – Procedure for the Payment of Fees

Every owner of a motor vehicle, subject to the payment of annual permit fees will pay in any internal revenue collection office of any municipality, in the place designated by the Secretary of the Department of the Treasury, at official inspection stations, banks, or in the place designated by the Secretary, the fees corresponding to the vehicle for each year, as indicated in the notification that to that effect must be sent by the Secretary. The fees for this concept will be paid in advance for the entire year except that when at the time of paying the fees less than six (6) months remain for the next renewal, payment will

only be required equivalent to the remaining months to elapse on the date they accrue, counting the fractions of months as a whole month. This provision will apply to all motor vehicles, regardless of how much they pay for license fee per year. Upon receipt of the corresponding fees, the collector will issue the motor vehicle permit, which will consist of the notification form issued by the Secretary, with the proper annotations and signature of the collector, indicative that the payment of the fees has been made. Together with the permit, the collector will deliver the corresponding tag or number plates, as the case may be. Only one (1) motor vehicle tag will be displayed during the year of validity of the payment of fees. The Secretary is authorized to, after consulting with the Secretary of the Treasury, adopt a Regulation for the purpose of granting a discount of up to ten percent (10%) to those drivers who choose to acquire and prepay multi-year tags for your vehicles. The owner of the inspection station will deposit in a special account for the Department of the Treasury to make daily transfers of the tags issued. The Department of the Treasury will approve a regulation to those ends, in the which he will require a bond and insurance to guarantee that the collections from the tags sold are received. The service fee charged by the inspection station, bank, or any other place designated by the Secretary of the Treasury will not be greater than five dollars ($ 5). In cases relating to examination fees, including learners permits, the issuance of duplicate licenses, driver's license renewals, the transfer of vehicles, and all other collection of fees, payment vouchers, internal revenue stamps, or any other payment mechanism established by the Secretary of the Treasury authorities will be used. The total amount of the proceeds of the fees collected pursuant to Articles 23.01 and 23.02 of this law shall be deposited in the Commonwealth's General Fund."

**ARTICLE 506. - SUBSECTION (E) OF ARTICLE 23.02 OF LAW 22-2000, AS AMENDED, IS REPEALED AND CURRENT SUBSECTIONS (F) AND (G) ARE RENUMBERED AS NEW SUBSECTIONS (E) AND (F), RESPECTIVELY, TO READ AS FOLLOWS:**

"Article 23.02. – Payment of fees.

     (a)    …

     …

     (d)    …

     (e)    …

     (f)    …"

**ARTICLE 507. - SUBSECTION (L) OF ARTICLE 1.03 (B) OF LAW 351-2000, AS AMENDED, IS REPEALED AND CURRENT SUBSECTIONS (M), (N), (Ñ), (O), AND**

**(P), ARE RENUMBERED AS NEW SUBSECTIONS (L), (M), (N), (Ñ), AND (O), RESPECTIVELY, TO READ AS FOLLOWS:**

"Article 1.03(b).- Definitions.

The following words and terms, when used or referred to in this Law, will have the meaning indicated below, unless another meaning arises from the context:

(a)     …

…

(l)     …

(m)     …

(n)     …

(ñ)     …

(o)     …"

**ARTICLE 508. - SUBSECTION (H) OF ARTICLE 2.02 OF LAW 351-2000, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"**Article 2.02 – Specific Powers of the Authority.**

The Authority will have the following authorities and rights:

(a)     …

(h)     Take loans for the purpose of financing the costs of the Center, the improvement projects and projects on private parcels or the District and comply with any of its corporate purposes and powers, at the discretion of the Board; prepare and issue negotiable bonds of the Authority; guarantee the payment of such bonds, or any part thereof, through the pledge, mortgage, assignment, or deed of trust of Authority properties located in or outside the District, charges for profit, other income, rents, fees, receipts, and any interest in contracts, leases or subleases; enter into any agreements with buyers or holders of such bonds or with other persons with whom the Authority is obligated in connection with any bond, issued or to be issued, as the Authority deems advisable, which will constitute contracts with such buyers or holders; obtain any facility that increases its ability to take money on loan or to issue debt or that increase its liquidity in connection with any bonds in the manner in which the Authority finds advantageous;

and, in general, provide guarantees for the payment of the bonds and the fees of the holders thereof.

(i)      …

…"

## ARTICLE 509.- ARTICLE 8 OF LAW 179-2002, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 8.- The government agencies, municipalities, as well as entities receiving allocations of public funds will use them for the purposes established in the corresponding joint resolution and in no way will they dispose of them for other purposes or ends that are not categorically and specifically indicated in the joint resolution approved.

Any change or modification of the purposes or ends established in the original joint resolution will entail the commencement or repetition by the Legislative Assembly of all of the proceedings.

Compliance with these joint resolutions, allocating public funds, will be done following the rules and procedures applicable to the municipalities and to the government instrumentalities. With the exception of natural persons, all contracts signed and any other legal document will be subject to the laws of the Commonwealth of Puerto Rico and will be interpreted in accordance therewith.

In order for the Legislative Assembly to be able to analyze that the allocations or reallocations of public funds provided in this Law comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the availability of funds with respect to the legislative measures that are requested by the legislative commissions within a period of five (5) business days from when they are required."

## ARTICLE 510.—ARTICLE 31 OF LAW 272-2003, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 31. – Disposition of Funds.

The Tourism Office will distribute the amounts collected on account of the Tax established in Article 24 of this Law, after transferring to the General Fund of the Commonwealth the amounts that were previously transferred to the Authority (as set forth in the Fiscal Plan of the Commonwealth, if any, in effect at that time), in the following order of priority:

(i) two (2) percent of the total Tax collected will be paid monthly to the general funds of the Office of Tourism to cover the operating, management, and distribution of tax collections, or for any other use provided by the Office of Tourism. (ii) five (5) percent of the total Tax collected will enter monthly to the General Fund of the Department of the Treasury for Fiscal Years 2005-2006 and 2006-2007, to the coffers of the National Parks Company for Years Fiscal 2007-2008 and 2008-2009, and from Fiscal Year 2009-2010 to the coffers of the Office of Tourism. As of the year in which the Authority certifies to the Department of the Treasury and the Office of Tourism, the start of operations of the Convention Center, and during the subsequent ten (10) years, this five percent (5%) will be available to cover any shortfall, if any, arising from the operations of the facilities that operate the Convention Center District Authority, in reserve that will maintain the Office of Tourism. Provided, however, that for each fiscal year and/or each time the Convention Center District Authority proposes to present a budget that exceeds the two million five hundred thousand dollars ($2,500,000) deficit, the budget of the Convention Center District Authority must be presented to the Board of Directors of the Authority to the Office of Tourism and the Secretary of the Treasury for Fiscal Years 2005-2006 and 2006-2007 and to the Board of Directors of the National Parks Company for Fiscal Years 2007-2008 and 2008-2009 in a specific meeting for these purposes, and the Board of Directors of the Authority and to the Office of Tourism, beginning Fiscal Year 2010-2011 onwards. This five percent (5%) will remain available during each fiscal year in a special reserve account that the Office of Tourism will maintain to cover any deficit in excess of two million five hundred thousand dollars ($2,500,000), arising from the operation of the facilities of the Convention Center District Authority. For each fiscal year, any surplus, after covering said operational deficit, if any, will be released from the special reserve and will be available for use by the Department of the Treasury for the Fiscal Years 2005-2006 and 2006-2007, of the National Parks Company for the Fiscal Years 2007-2008 and 2008-2009, and from Fiscal Year 2010-2011 for use by the Office of Tourism. As of Fiscal Year 2015-2016, and during the subsequent five (5) years, this five percent (5%) will be transferred through quarterly contributions by the Department to the Authority to cover the costs associated exclusively with the operation of the Puerto Rico Convention Center. Provided, however, that for each fiscal year the Convention Center District Authority will present their audited financial statements, together with a report evidencing the use of the transferred funds as established in subsections (ii) and (iv) of this section to the Board of Directors of the Authority and to the Director of the Office of Tourism, at a specific meeting for that purpose. If at the end of a fiscal year such audited financial statements reflect a net profit, the Convention Center District Authority will return to the Office of Tourism the amount generated as net profit without exceeding the total amount transferred by the Office of Tourism to the Convention Center District Authority in that same fiscal year, pursuant to subsections (ii) and (iv) of this section. (iii) two million five hundred thousand dollars ($2,500,000) will be transferred by the Office of Tourism to the Convention Center District Authority in quarterly contributions of six hundred twenty-five thousand dollars ($625,000.00) to cover the costs associated exclusively with the

operation of the Convention Center District. Provided, however, that for each fiscal year and/or each time a modified budget is intended to be presented, the budget of the Convention Center Authority must be presented to the Authority's Board of Directors and the Executive Director of the Office of Tourism, at a specific meeting to those ends. This amount will be transferred as established in this section from Fiscal Year 2015-2016, and for a period of five (5) years. (iv) Up to four million dollars ($4,000,000) will remain available during each fiscal year, in a special reserve account that the Office of Tourism will maintain for operating expenses dedicated to the sector's specialized matters, its expenses and/or the oversight and implementation by the latter of the Destination Marketing Services Contract contemplated in Article 8 of the "Law for the Promotion of Puerto Rico as a Destination." (v) The remainder resulting after the allocations and reserves provided in the subsections (i), (ii), (iii) and (iv), up to a maximum of twenty-five million dollars ($25,000,000), will be allocated to the Corporation. The funds allocated to the Corporation will be used by it for the promotion, marketing, development, and strengthening of the tourism industry in Puerto Rico. If the remainder exceeds twenty-five million dollars ($25,000,000), said surplus will be used by the Office of Tourism for the performance of its functions dedicated to the specialized matters of the sector and its expenses. The Office of Tourism of the Department of Economic Development and Commerce will submit monthly to the Authority and to the Corporation a breakdown of the collections for the concept of tax."

## ARTICLE 511.- A NEW ARTICLE 7A IS ADDED TO LAW 103-2006, AS AMENDED, TO READ AS FOLLOWS:

"Article 7A.- Ministerial Duty of the Office of Management and Budget

In order for the Legislative Assembly to be able to analyze that the Legislative measures comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the availability of funds with respect to the legislative measures that are requested by the legislative committees within a term of thirty (30) business days from the time that they are requested. Said certification must include the exact amount available, whether greater or less than that provided in the measure under consideration.

By issuing the official certification, the Office of Management and Budget guarantees the availability of such funds. An official certification where it is reported that the funds are committed for a specific work or use other than that provided in the legislative measure that is requested must be accompanied by evidence of the obligation, copy of invoices, and any other pertinent information that shows the unavailability of such funds.

The process to request the official certifications of availability of funds by the legislative commissions will not require any special form or procedure, it will only require a letter from the legislative commission requesting the certification in question.

When any permanent, special, or joint committee of the Puerto Rico Legislative Assembly presents any report recommending the approval of any legislative measure in which an official certification has been requested it will have to include in the aforementioned report a section titled "Ministerial Duty of the Office of Management and Budget regarding availability of funds." In this Section, it must assert the fiscal impact, if any, that it is estimated that the approval of the measure would have on the budgets of the agencies, departments, bodies, instrumentalities, or public corporations. If the Office of Management and Budget does not issue the corresponding certification within the time provided in this Article, the following text will be included in said Section of the report: "The Office of Management and Budget did not submit the official certification of availability of funds within the time provided by law breaching the ministerial duty provided in Law 103-2006, as amended, better known as the "Law for the Fiscal Reform of the Government of the Commonwealth of Puerto Rico of 2006."

**ARTICLE 512.- SECTION 3060.11 OF LAW 1-2011, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Section 3060.11 - Disposition of Funds.

The product of the taxes and license fees collected pursuant to this Subtitle will enter the General Fund of the Puerto Rico Treasury."

**ARTICLE 513.- SECTION 3060.11A OF LAW 1-2011, AS AMENDED, IS ELIMINATED.**

**ARTICLE 514.- LAW NO. 39 OF MAY 13, 1976, AS AMENDED, IS REPEALED.**

**ARTICLE 515.- ARTICLE 7.018 OF LAW 107-2020, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 7.018 - Funds - Trusts; Distribution

The funds in the general trust that the CRIM establishes with the Designated Trustee according to subsection (c) of Article 7.003 of this Chapter, will be distributed by CRIM in the order of priority indicated below:

(a) The amount corresponding to the 1.03% special tax will be deposited in the General Fund.

(b) …

(c) …

…"

## ARTICLE 516.- ARTICLE 7.027 OF LAW 107-2020, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 7.027 - Collection and Entry of Taxes in Funds and Application of the Product of the Taxes (Bond Redemption Fund)

The product of the taxes imposed by Articles 7.025 and 7.026 will enter the general trust established by CRIM with the Puerto Rico Financial Advisory and Fiscal Agency Authority (AAFAF), in accordance with Chapter I of this book.

(a) The product of the special property taxes imposed by Section 7.026 will enter the General Fund.

(b) …

(c) …

(d) …"

## ARTICLE 517.- Adjustment Plan transactions cannot be used to mitigate causes of action under Law 3-2013, as amended.

## ARTICLE 518.- REPEAL OF CERTAIN LAWS OR PORTIONS THEREOF.

Article 3 of Act 9 of August 12, 1982, is hereby repealed, provided that the funds that were previously transferred to the Highways and Transportation Authority pursuant to such law shall hereafter be deposited to the Commonwealth's General Fund.

## CHAPTER 6 – MISCELLANEOUS PROVISIONS

## Article 601.- Prohibition of the Reduction of the Obligations of the Puerto Rico Sales Tax Financing Corporation (COFINA, by its Spanish acronym)

It is established that the debt services payable under the IVCs in any Fiscal Year will not under any circumstances reduce the obligations of the Puerto Rico Sales Tax Financing Corporation (COFINA), including the obligations and reserves created.

**Article 602.-Authorization to the Governor's Representative**

The responsibilities, powers, duties, and authorizations granted by this Law to the Governor's Representative will be limited exclusively to the provisions of this Law and not to future debt issuances.

**Article 603.- Severability.**

If any clause, paragraph, subparagraph, heading, or part of this Law were annulled or declared unconstitutional, the order issued to that effect will not affect, harm, or invalidate the remainder of this Law. The effect of said order will be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part thereof that has been so annulled or declared unconstitutional. If the application to a Person or to a circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law were invalidated or declared unconstitutional, the resolution, opinion, or judgment issued to that effect will not affect or invalidate the application of the remainder of this Law to those Persons or circumstances to which it may be validly applied. It is the express and unequivocal will of this Legislature that the courts enforce the provisions and the application of this Law, even if any of its parts is rendered ineffective, annulled, invalidated, impaired, or declared unconstitutional, or even if it its application to any person or circumstance is left without effect, invalidated, or declared unconstitutional.

The above notwithstanding, it is held that the severability provisions in this article shall not be applicable to Article 605. It is the express and unequivocal will of this Legislative Assembly that the Restructuring Transactions and their respective authorizations in Articles 103, 201 and 301 are not enforced, if the suspensive condition to avoid any cut of pensions to government employees in the Adjustment Plan or the provisions of Article 104 of this Law are left without effect, invalidated or decreed unconstitutional.

**Article 604.- Supremacy.**

The provisions of this Law will prevail over any other general or specific provision of any other non-federal law or Government regulation that is inconsistent with this Law. This Law is subject to PROMESA. If there is a conflict between the English and Spanish versions of this Law, the English version will prevail.

All laws of the Commonwealth of Puerto Rico that (i) are inconsistent with the terms and provisions of the Plan, the transactions contemplated therein, and/or the provisions of PROMESA, or (ii) that transfer, appropriate, or require appropriations of funds from the Commonwealth or one of its instrumentalities to any agency or

instrumentality of the Commonwealth, including the laws listed on Exhibit K of the Plan, to the extent such transfer or appropriation is inconsistent with this Act, or with PROMESA, or with a budget certified by the Board (to the extent such certification is required by PROMESA), are hereby preempted and amended to provided that all funds previously transferred or appropriated pursuant to such inconsistent laws or portions thereof to any agency or instrumentality of the Commonwealth shall hereafter be transferred to the Commonwealth's General Fund for disbursement only in accordance with an approved annual Budget.

**Article 605.- Effectiveness.**

This Law will take effect immediately after its enactment, except for Chapter 5 of this Law, which will take effect on the Date of Effectiveness. The effectiveness of this Law is conditioned to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan. For the sake of clarity, this act shall immediately cease to be in effect and any transactions undertaken pursuant to it if reductions to the pensions of government employees are decreed or implemented under the Debt Adjustment Plan or the restructuring of the debt.  The continued effect of this act is contingent upon cero cuts to pensions.

..............................................
*Presidente de la Cámara*

..............................................
*Presidente del Senado*

Aprobada en 26/10/21

Gobernador

# **<u>EXHIBIT H</u>**

Pension Reserve Deed of Trust and Guidelines

-------------------------- **DEED NUMBER TWO (2)** --------------------------

-------------------------- **DEED OF PUBLIC TRUST**--------------------------

---In the City of San Juan, Puerto Rico, this fourteenth (14th) day of March, two thousand twenty-two (2022).----------------------------------------------------

----------------------------------- **BEFORE ME** -----------------------------------

---Edgardo Nieves Quiles, Attorney-at-Law and Notary Public in and for the Commonwealth of Puerto Rico with offices located on the eight (8th) floor, of two hundred and fifty (250) Muñoz Rivera Avenue in San Juan, Puerto Rico, and residence in San Juan, Puerto Rico. --------------------------

-------------------------------------- **APPEAR** --------------------------------------

---**AS PARTY OF THE FIRST PART:** The Commonwealth of Puerto Rico (the "**Commonwealth**"), represented by its Secretary of Treasury, Francisco Parés Alicea, of legal age, government official, single, and resident of San Juan, Puerto Rico, who is authorized to appear in this deed on behalf of the Commonwealth by Section 103 of Act 53-2021 of the Legislative Assembly of the Commonwealth and a Resolution of the Financial Oversight and Management Board for Puerto Rico dated February twenty-second (22nd), two thousand twenty-two (2022), which the undersigned Notary Public has received, reviewed and confirmed, and hereby certify and attest that the same provides the corresponding authority described hereto and complies with all requirements provided by law.------

---**AS PARTY OF THE SECOND PART:** the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), represented by its Executive Director, Natalie Ann Jaresko, of legal age, executive, single, and resident of Dorado, Puerto Rico, who is authorized to appear in this deed on behalf of the Oversight Board by a Resolution of the Oversight Board dated March eleven (11), two thousand twenty-two (2022), which the undersigned Notary Public has received, reviewed and confirmed, and hereby certify and attest that the same provides the corresponding authority



01021019; 1                                                                                    1

described hereto and complies with all requirements provided by law.------

---I, the Notary, hereby attest that I am personally acquainted with the appearing parties, and from their statements I also attest as to their age, civil status, occupation and residence. They assure me that they have, and in my judgment they do have, the legal capacity necessary and representative authority for this act, and for that purpose they freely--------------------------

---------------------------------------**STATE**----------------------------------------

------------------------------- **ARTICLE I – RECITALS** ----------------------------

---1.1.  On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act, Public Law 114-187 ("**PROMESA**") was enacted into law by the Congress of the United States. PROMESA created the Oversight Board and established a mechanism under its Title III that allows the Commonwealth to file a petition in federal district court to adjust its debts. PROMESA provides that the Oversight Board would represent the Commonwealth in such debt restructuring proceeding. -----------------------

---1.2.  On May 3, 2017, the Oversight Board, as the representative of the Commonwealth under PROMESA, filed a petition for the Commonwealth under Title III of PROMESA in the United States District Court for the District of Puerto Rico (the "**Court**"), in Case No. 17-BK-3283-LTS (the "**Commonwealth Title III Case**"). -------------------------------------------------

---1.3.  On January 18, 2022, the Court entered an order (the "**Confirmation Order**") (Docket Entry No. 19813), approving and confirming the terms of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated January 14, 2022 (Docket Entry No. 19784) (the "**Plan**"), in the Commonwealth Title III Case. The Plan incorporates certain documents filed as part of a Plan Supplement (the "**Plan Supplement**"), including the "Guidelines for the Governance and Administration of the Puerto Rico Plan of Adjustment Pension Reserve Trust and Monitoring of Plan of Adjustment Pension Benefits" (the "**Guidelines**"). References herein to the Plan shall be deemed to include the

Guidelines, which are attached hereto as Exhibit A. --------------------------

---1.4.  The Plan contemplates the establishment of a pension reserve trust

(the "**Pension Reserve Trust**") to provide financial support for the

Commonwealth's pension obligations under the pay-as-you-go pension

system (the "**PayGo System**") created under the Commonwealth's Act 106

of 2017. Section 83.1 of the Plan provides that "On or prior to the Effective

Date, the Commonwealth shall take all necessary steps to establish the

Pension Reserve Trust, including, without limitation, by execution and

delivery of the Pension Reserve Deed of Trust." The "**Effective Date**"

refers to the date on which all the conditions to confirmation and

consummation of the Plan are satisfied or waived. Section 22 of the

Confirmation Order (Creation of Pension Reserve Trust) provides that

"Upon execution of the Pension Reserve Deed of Trust pursuant to Section

83.1 of the Plan, the Pension Reserve Trust shall be established and validly

created pursuant to the terms of the Pension Reserve Deed of Trust, with no

further authorization or legislative action being required, and shall not be

subject to taxation by the Commonwealth." -------------------------------------

---1.5.  The Plan defines the "**Pension Reserve Deed of Trust**" as "the deed

of trust to be executed and delivered on or prior to the Effective Date,

reasonably acceptable to the Government of Puerto Rico, the Retiree

Committee and labor organizations party to plan support agreements for the

Plan, substantially in the form included in the Plan Supplement, providing

for, among other things, creating the Pension Reserve Trust and providing

for the terms for the deposit and withdrawal of monies in the Pension

Reserve Trust for the benefit of the Retirees." The "**Retiree Committee**"

refers to the committee of retired former employees of the Commonwealth,

its agencies and instrumentalities appointed by the Office of the United

States Trustee in the Commonwealth Title III Case. --------------------------

---1.6.  Section 83.2 of the Plan provides that the Pension Reserve Trust

"will be managed by an independent entity whose members shall meet the



01021019; 1

independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations." -------------------------------------------------------------------------

---1.7. Prior to confirmation of the Plan, the Oversight Board and the Retiree Committee entered into a Plan Support Agreement dated June 7, 2019 (the "**Retiree Committee PSA**"). The Retiree Committee PSA requires the establishment of the Pension Reserve Trust and independent management of the funds held in the Pension Reserve Trust. The Guidelines further provide for the establishment of an independent council to monitor on behalf of Commonwealth retirees the funding of and withdrawals from the Pension Reserve Trust by the Commonwealth, as more fully set forth in the Guidelines. -------------------------------------------------------------------------

---1.8. A separate Plan Support Agreement between the Oversight Board and the American Federation of State, County, and Municipal Employees ("**AFSCME**"), also dated June 7, 2019 (collectively with the Retiree Committee PSA, the "**PSAs**"), includes substantially similar provisions.---

---1.9. In accordance with the PSAs, the Oversight Board, the Retiree Committee, AFSCME, and the Puerto Rico Fiscal Agency and Financial Advisory Authority, as fiscal agent of the Commonwealth, negotiated and drafted the Guidelines. ----------------------------------------------------------------

---1.10. The Guidelines provide for: (i) the creation and administration of the Pension Reserve Trust, (ii) the creation and governance of a board of trustees to provide the independent and professional management of the Pension Reserve Trust required by the Plan and the PSAs (the "**Pension Reserve Board**"), and (iii) the creation and governance of an independent council to monitor on behalf of retirees the funding of and withdrawals from the Pension Reserve Trust by the Commonwealth, as required by the PSA (the "**Pension Benefits Council**"), all as more fully set forth in the Guidelines.-------------------------------------------------------------------------



01021019; 1

4

---1.11.  Section 83.2 of the Plan and Section 23 of the Confirmation Order provide for the funding of the Pension Reserve Trust. Section 23 of the Confirmation Order also provides for the funding of the Pension Reserve Board and the Pension Benefits Council. ----------------------------------------

---1.12.  The Guidelines provide that the terms thereof shall be incorporated into the Pension Reserve Deed of Trust.-------------------------------------------

---1.13.  Pursuant to Sections 6.1(A) and (B) of the Guidelines, the Oversight Board will perform certain of the start-up functions of the Pension Benefits Council and the Pension Reserve Board on behalf of the Pension Reserve Trust to commence the administration of the Pension Reserve Trust as set forth in the Guidelines, for a period commencing as of the date of execution of this Deed of Public Trust and concluding upon the earlier to occur of October 1, 2022, or the day the Pension Reserve Board commences its inaugural Board meeting -----------------------------------------------------------

---1.14.  The Commonwealth and the Oversight Board are entering into this Deed of Public Trust (this "**Deed**") for the purpose of creating the Pension Reserve Trust, incorporating the Guidelines into this Deed and providing for their implementation, and otherwise complying with the relevant provisions of the Plan, the Confirmation Order, and the PSAs. --------------

---1.15.  The Commonwealth and the Oversight Board represent and warrant that the terms of this Deed are reasonably acceptable to the Commonwealth, the Retiree Committee, and labor organizations party to the PSAs, as contemplated in Section 1.388 of the Plan; --------------------------------------

---1.16.  Capitalized terms used in this Deed and not defined herein shall have the meaning set forth in the Plan. -------------------------------------------

-------------------- ARTICLE II – CREATION OF THE TRUST --------------------

---2.1.  The Commonwealth hereby creates the Pension Reserve Trust contemplated by the Plan, the Confirmation Order, and the PSAs. The Pension Reserve Trust is created in accordance with the Commonwealth's Act 219 of August 31, 2012, as amended, 32 L.P.R.A. §3351 et. seq. (the



01021019; 1

"**Trust Act**"). This Deed is the Pension Reserve Deed of Trust contemplated by the Plan and the Confirmation Order. -----------------------

---2.2. The Guidelines are attached hereto as Exhibit A and are incorporated in their entirety into and made a part of this Deed. References to this Deed shall be deemed to include the Guidelines and any other Exhibit attached to this Deed. If there is any conflict between the Guidelines and the other provisions of this Deed, the provisions of the Guidelines shall control. -----

---2.3. The Oversight Board agrees to perform the functions it is authorized to perform on behalf of the Pension Reserve Trust as set forth in the Guidelines.-------------------------------------------------------------------------

---2.4. The Pension Reserve Trust shall be deemed to be an irrevocable public trust within the meaning of Chapter III of the Trust Act (32 L.P.R.A. §3354 et. seq.). ---------------------------------------------------------------------

---2.5. The Pension Reserve Trust hereby established shall also be designated and known by its full legal title as the Plan of Adjustment Pension Reserve Trust. ------------------------------------------------------------

---2.6. **Independent Legal Entity.** The Pension Reserve Trust shall be a legal entity separate and independent from the Commonwealth, with full legal personality. The property, assets, title, and rights of the Pension Reserve Trust together constitute a fully autonomous separate estate from the Commonwealth and the administration of the estate is limited to the specific purposes established by the Plan and this Deed. Creditors of the Commonwealth shall have no recourse against the Pension Reserve Trust or any of its assets. --------------------------------------------------------------------

---2.7. In accordance with the Plan, this Deed, because it incorporates the Guidelines, also establishes and provides for the governance of the Pension Reserve Board and the Pension Benefits Council. -----------------------------

---2.8. **Not a Commonwealth Instrumentality.** The Pension Reserve Trust, the Pension Reserve Board, and the Pension Benefits Council shall not be, and shall not be deemed to be, instrumentalities of the

01021019; 1

6

Commonwealth. --------------------------------------------------------------------

---2.9.  **Legal Capacity.** The Pension Reserve Trust, the Pension Reserve Board and the Pension Benefits Council shall each have the authority to bring and prosecute any cause of action for the proper administration and funding of the Pension Reserve Trust in accordance with the Guidelines. --

---2.10.  As contemplated by the Trust Act, the administration of the Pension Reserve Trust and the rights, powers, duties, obligations, liabilities, limitations and responsibilities of the Oversight Board, the Pension Reserve Board and the Pension Benefits Council shall be governed exclusively by the provisions of this Deed (including the Guidelines), the Plan, and the Confirmation Order; therefore, the provisions of the Trust Act related to such matters shall not apply in any manner to this Deed or to the Pension Reserve Trust, the Oversight Board, the Pension Reserve Board, or the Pension Benefits Council.-------------------------------------------------------------

---2.11. **Assets of the Pension Reserve Trust Not Subject to Attachment or Seizure by Creditors.** The assets of the Pension Reserve Trust shall not be subject to attachment or any other legal remedy by or on behalf the creditors of the Commonwealth, the Pension Reserve Trust, the Pension Reserve Board, any Trustee, the Pension Benefits Council, any Council Member, or any other person. Without limiting the generality of the foregoing, the Pension Reserve Trust shall have the protections set forth in Article 44 of the Trust Law. ---------------------------------------------------------

--------- **ARTICLE III – ASSETS OF THE PENSION RESERVE TRUST** ---------

---3.1.  **Funding.** The funding of the Pension Reserve Trust shall be governed by the Plan and the Guidelines. In accordance with the Plan and the Guidelines, on or about the Effective Date of the Plan, the Commonwealth shall transfer to the Pension Reserve Trust the initial amount provided in the Plan, to be allocated by the Oversight Board among the accounts described in the Guidelines. ----------------------------------------

---3.2.  **Corpus of the Trust.** The assets of the Pension Reserve Trust shall



consist of (a) all funds deposited in the Pension Reserve Trust by or on behalf of the Commonwealth pursuant to the Plan; (b) any other funds deposited in the Pension Reserve Trust by the Commonwealth or any other entity; and (c) the investment returns, rent, income, proceeds and earnings of the assets of the Pension Reserve Trust.----------------------------------------

--------------- **ARTICLE IV – PUBLIC PURPOSE; BENEFICIARY** ---------------

----------------------- **OF THE PENSION RESERVE TRUST** -----------------------

---4.1. **Public Purpose.** The funds of the Pension Reserve Trust shall be used exclusively (i) to provide financial support for the Commonwealth's pension obligations under the PayGo System in accordance with the Guidelines and (ii) to pay the expenses of the Pension Reserve Board and the Pension Benefits Council, as provided in the Guidelines. Upon termination of the Pension Reserve Trust, any remaining assets of the Pension Reserve Trust shall be transferred to the Commonwealth as provided in Section 9.2. ------------------------------------------------------------

---4.2. **Beneficiary of the Trust**. The beneficiary of the Pension Reserve Trust shall be the Commonwealth of Puerto Rico. The funds in the Pension Reserve Trust shall be used solely for the payment of the defined benefit pensions and annuities of Pension Reserve Trust Participants (as defined in the Guidelines) in accordance with the terms and procedures established in the Plan and the Guidelines, and to pay the expenses of the Pension Reserve Trust, the Pension Reserve Board, and the Pension Benefits Council as provided in the Guidelines. ---------------------------------------------------------

---4.3. **Non-Impairment Covenant**. As required by Section 83.3 of the Plan, the Commonwealth covenants, for the benefit of all Participants, that, with respect to payments and other obligations owed to Participants pursuant to the Plan, including, without limitation, PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified or amended until all such obligations



01021019; 1

8

have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation, enforceable by any and each of the Oversight Board and any affected Retirees and, with respect to any such provision, this Pension Reserve Deed of Trust shall not be amended or modified by the Commonwealth except (i) with express prior written consent of the Oversight Board (if in existence), and a majority in number of the Retirees receiving benefits pursuant to the Plan who are affected by such amendment or modification, or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.-------------------------------------

-------------ARTICLE V– TRUSTEES; PENSION RESERVE BOARD ------------

---5.1. The trustees of the Pension Reserve Trust shall be the members of the Pension Reserve Board (the "**Trustees**"). The Pension Reserve Board shall be the "independent entity" that will manage the Pension Reserve Trust as contemplated by Section 83.2 of the Plan. -----------------------------

---5.2. **Appointment of Trustees; Qualification of Trustees.** The Trustees shall be appointed as set forth in the Guidelines. As required by Section 83.2 of the Plan, the Trustees shall meet the independence, professionalism, experience and qualification standards set forth in the Guidelines and shall be subject to all applicable Commonwealth contracting, ethics and conflicts of interest laws and regulations, as provided in greater detail below. --------

---5.3. **Acceptance of Appointment or Election.** Once a person is appointed as a Trustee, that person's acceptance of such position shall be set forth in a supplement to this Deed. --------------------------------------------

---5.4. **Duties of the Trustees.** Upon acceptance of their appointment in accordance with section 5.3 above, the Trustees shall be required to discharge their duties as set forth in the Guidelines. --------------------------

---5.5. **Commonwealth Contracting, Ethics and Conflicts of Interest Laws and Regulations Applicable to Trustees; Code of Conduct and Ethics Policy**. As required by Section 83.2 of the Plan, the Pension Reserve



01021019; 1

9

Trust and the Trustees shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations ("**Applicable Puerto Rico Laws**"). In furtherance of the foregoing and in accordance with Section 7.2 of the Guidelines, the Pension Reserve Board shall create under its bylaws a Code of Conduct and Ethics Policy (the "**Pension Reserve Board Code of Conduct**") that is appropriate and consistent with all Applicable Puerto Rico Laws and the best practices of similar bodies operating within the United States: (a) governing matters such as independence, conflicts of interest, anti-corruption, procurement, contracting, document retention, and confidentiality policies; and (b) setting forth the Trustees' fiduciary obligation to act ethically in connection with the use of public funds and affirming the Pension Reserve Board's commitment to do so. By accepting their appointment as Trustees, the Trustees shall be deemed to have agreed to comply with all Applicable Puerto Rico Laws and the Pension Reserve Board Code of Conduct. -------- ---5.6. **Management and Ownership of Assets.** The Pension Reserve Board shall have the exclusive custody and management of the assets of the Pension Reserve Trust. The Pension Reserve Trust shall be considered a single investment pool and shall not be segregated into separate trusts. Title to all assets of the Pension Reserve Trust shall at all times be considered vested in the Pension Reserve Trust. The Trustees shall have the authority to take all actions, in conformance with the Plan and the Guidelines, that in their judgment, in the exercise of their fiduciary duties, are necessary or desirable for the proper administration of the Pension Reserve Trust or with respect to the investment, disposition or liquidation of any assets of the Pension Reserve Trust, although such actions may not be specifically set forth herein. ----------------------------------------------------------------------- ---5.7. **Books and Records.** The Trustees shall cause to be kept full and accurate records and books of account of all transactions affecting the assets



of the Pension Reserve Trust, following standards that are generally accepted in public pension funds in the United States. -------------------------

---5.8. **Audit.** The Trustees shall at least once each year cause an independent certified public accountant to audit the Pension Reserve Trust.

----------------- ARTICLE VI – PENSION BENEFITS COUNCIL -----------------

---6.1. Pursuant to the Guidelines, a Pension Benefits Council shall be established. ----------------------------------------------------------------------

---6.2. **Election and Appointment of Council Members.** The members of the Pension Benefits Council (the "**Council Members**") shall be elected or appointed as set forth in the Guidelines. ------------------------------------------

---6.3. **Acceptance of Appointment or Election.** Once a person is appointed or elected as a Council Member, that person's acceptance of such position shall be set forth in a supplement to this Deed. -----------------------

---6.4. **Duties of the Council Members.** Upon acceptance of their appointment in accordance with section 6.3 above, the Council Members shall be required to discharge their duties as set forth in the Guidelines. ----

---6.5. **Code of Conduct and Ethics Policy of Pension Benefits Council.** In accordance with Section 3.2 of the Guidelines, the Pension Benefits Council shall create under its bylaws a Code of Conduct and Ethics Policy (the "**Pension Benefits Council Code of Conduct**") that is appropriate and consistent with all Applicable Puerto Rico Laws and the best practices of similar bodies operating within the United States: (a) governing matters such as independence, conflicts of interest, anti-corruption, procurement, contracting, document retention, and confidentiality policies; and (b) setting forth the    Council Members' fiduciary obligation to act ethically in connection with the performance of their duties as set forth herein and in the Guidelines and affirming the Pension Benefit Council's commitment to do so. By accepting their election or appointment as Council Members, the Council Members shall be deemed to have agreed to comply with the Pension Benefits Council Code of Conduct. -------------------------------------



01021019; 1

------------------- ARTICLE VII – WITHDRAWAL OF FUNDS -------------------

---7.1. **Approval of Release of Funds.** The funds held in the Pension Reserve Trust shall be released to the Commonwealth to satisfy its obligations under the Plan to all Pension Reserve Trust Participants (as defined in the Guidelines), solely in accordance with the Guidelines. -------

---7.2. **Budget and Administrative Expenses.** The Pension Reserve Board and the Pension Benefits Council shall each approve a budget as provided in the Guidelines. The administrative expenses to administer the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board, including compensation and expense reimbursement to the Council Members and the Trustees (as applicable) and professionals shall be made from the account for administrative and operating expenses of the Pension Benefits Council and the Pension Reserve Board, as applicable, and funded from the Pension Reserve Trust as provided in the Guidelines.---------------

---7.3. **Compensation.** Trustees and Council Members shall be entitled to compensation and reimbursement of reasonable expenses as set forth in the Guidelines and the bylaws of the Pension Benefits Council and the Pension Reserve Board established pursuant to the Guidelines, as applicable. -------

------ARTICLE VIII – DOCUMENT PRESERVATION AND DISCLOSURE------

---8.1. **General**. Each of the Pension Benefits Council and the Pension Reserve Board shall provide the reports and information required by the Guidelines. -----------------------------------------------------------------

---8.2. **Preservation of Documents**. The documents originated or received by the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board shall be subject to and preserved under the same laws and regulations applicable to public documents of the Commonwealth.

---8.3. **Access to Documents**. The documents originated, kept, or received by the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board shall be public, unless deemed confidential or privileged as established under the laws, jurisprudence, and regulations





01021019; 1

pertaining to public documents of the Commonwealth.-----------------------

--------- **ARTICLE IX — DURATION AND TERMINATION OF TRUST** ---------

---9.1. **Termination.** The Pension Reserve Trust shall terminate on the earlier of (i) sixty (60) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with the Guidelines or (ii) such time when the retirement benefits owed to all Pension Reserve Trust Participants under the Plan have been fully satisfied, all as more specifically described in the Guidelines. -----------------------------------------

---9.2. **Transfer of Assets.** Upon termination of the Pension Reserve Trust, all of its assets, property and causes of action shall be transferred to the Commonwealth. Any termination of the Pension Reserve Trust and transfer of assets and property to the Commonwealth shall take into account and provide for the Wind-Down Expenses (as defined in the Guidelines).-------

-------------------------- **ARTICLE X — AMENDMENTS** -------------------------

---10.1. This Deed of Public Trust shall not be amended or modified by the Commonwealth except as provided in Section 10.1 of the Guidelines, and, as applicable, in compliance with Section 4.3 hereof and Section 83.3 of the Plan. ---------------------------------------------------------------------------

----------------------- **ARTICLE XI — MISCELLANEOUS** -----------------------

---11.1. **Interpretation.** Any capitalized terms not defined in this Deed (including the Guidelines) shall have the meanings ascribed to such terms in the Plan. If there is a conflict between the Guidelines and the other provisions of the Plan, the Plan shall control. The titles and the headings of sections of this Deed are for convenience of reference only and shall not affect the interpretation of this Deed. -----------------------------------------------

---11.2. **Statutory References.** Except as set forth herein, statutory references in this Deed are intended to include any amending, revising, or superseding statutory provisions governing the referenced subject matter, and, for the avoidance of doubt, all such statutes and such amending, revising, or superseding provisions apply herein only insofar as they are



01021019; 1

13

(i) consistent with the Plan and this Deed, and (ii) do not impair the independence of the Pension Reserve Trust, the Pension Reserve Board, and the Pension Benefits Council from the Commonwealth of Puerto Rico under the Guidelines.------------------------------------------------------------------------

---11.3.  **Severability.** In the event that any provision of this Deed shall be held illegal or invalid for any reason whatsoever, said illegality or invalidity shall not affect the validity or enforceability of the remaining provisions of this Deed and shall be construed and enforced as if said illegal or invalid provision had never been inserted herein. ----------------------------------------

---11.4.  This Deed shall be filed in the Registry of Trusts of the Office of Notary Inspections of the Commonwealth of Puerto Rico and with the Court as part of the Plan Supplement on or prior to the Effective Date.-------------

---11.5. **Internal Revenue Stamps**. The Secretary of Treasury hereby certifies that this deed is exempt from the payment of internal revenue stamps, as it is executed by and for the benefit of the Commonwealth. In the event that any such internal revenue stamps were to be required, the Commonwealth agrees to pay the same. ----------------------------------------

------------------------------------- ACCEPTANCE -------------------------------------

---The appearing parties hereby accept, ratify, and confirm this Deed, and I, the Notary, do hereby certify that I have advised them as to the pertinent legal warnings and of the legal effects of this Deed, as well as of their right under the Notarial Law of Puerto Rico to have one or more witnesses to appear herein and read and sign this Deed together with them, which right they have waived, and this Deed having been read by them, to which fact I hereby certify, the appearing parties sign the same before me, and affix their initials on each and every page of this instrument, all before me, the Notary.-



-------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------

01021019; 1

14

---Wherefore, I, the Notary authorizing this instrument, certify upon my
notarial faith and under my signature, mark, and seal attest to all which is
hereinabove stated.------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------



01021019; 1

15

**GUIDELINES FOR THE GOVERNANCE AND ADMINISTRATION
OF THE PUERTO RICO PLAN OF ADJUSTMENT PENSION RESERVE TRUST AND
MONITORING OF PLAN OF ADJUSTMENT PENSION BENEFITS**

**I.      INTRODUCTION; PENSION RESERVE TRUST; PENSION BENEFITS
COUNCIL; PENSION RESERVE BOARD**

**1.1      Purpose:** The Plan Support Agreement between the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") and the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**"),  dated June 7, 2019 (the "**COR PSA**")[1], in connection with the prospective confirmed Plan of Adjustment (the "**Plan of Adjustment**" or "**Plan**") for the Commonwealth of Puerto Rico ("**Puerto Rico**" or the "**Commonwealth**") in its PROMESA Title III case, provides for (among other things) the creation of: (a) a Commonwealth Plan of Adjustment Pension Reserve Trust (the "**Pension Reserve Trust**") to provide financial support for the Commonwealth's pension obligations under the PayGo System (defined below); and (b) a Commonwealth Plan of Adjustment Pension Reserve Board of Trustees (the "**Pension Reserve Board**") that shall be responsible for, among other things, the custody, administration, and investment of the funds held in the Pension Reserve Trust.  In accordance with the COR PSA, the guidelines set forth herein (the "**Guidelines**") provide for the creation and governance of the Pension Reserve Trust and Pension Reserve Board, as set forth below. In addition, these Guidelines set forth the terms under which a Commonwealth Plan of Adjustment Pension Benefits Council (the "**Pension Benefits Council**") shall be established for the purpose of ensuring the Commonwealth's compliance with certain provisions of the Plan of Adjustment related to the funding of the Pension Reserve Trust and shall, along with the Pension Reserve Board, administer requests by the Commonwealth to withdraw funds from the Pension Reserve Trust.  These Guidelines will be included in the Plan Supplement[2], and the terms and conditions set forth herein shall be incorporated into the Pension Reserve Deed of Trust, which will be executed and put into effect on or before the Plan Effective Date.[3] The Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board shall operate on a July 1 to June 30 fiscal year.

**1.2      Responsibilities of the Pension Benefits Council**

A.      Pension Reserve Trust Funding and Withdrawals.  The Pension Benefits Council shall have responsibility and authority to monitor the proper and timely funding of the Pension Reserve Trust by the Commonwealth in accordance with the terms and conditions of the Plan.  The Pension Benefits Council shall also have responsibility and authority, in consultation with the Pension Reserve Board pursuant to Sections 5.2(B) and (C) below, to approve the release of funds deposited into the Pension Reserve Trust as necessary for the Commonwealth to satisfy its obligations pursuant to the Plan to all Participants who are entitled to receive, as of the Effective Date or thereafter, defined benefit pension payments or annuities through the PayGo system (or any substitute or successor system) pursuant to the Plan for services rendered on or prior to the Effective Date (the "**Pension Reserve Trust Participants**"), as further set forth in Article V below.  The Pension Reserve Council shall have no authority with respect to the management or investment of the assets of the Pension Reserve Trust other than as expressly set forth in these Guidelines.

B.      PayGo Fees.  The Pension Benefits Council shall monitor the calculation and collection of PayGo Fees (as defined in Act 106 of 2017; such act, as it may be amended from time to time or supplanted by subsequent legislation, "**Act 106**") by

---

1      The Oversight Board also entered into a Plan Support Agreement (the "**AFSCME PSA**") with the American Federation of State, County and Municipal Employees ("**AFSCME**"), which also provides (albeit with somewhat different terminology) for the creation of a Pension Reserve Board and a Pension Reserve Trust as reflected in the term sheet annexed to the AFSCME PSA.

2      Any capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan of Adjustment.

the pension board created under Act 106 (together with any successor to such board under any supplanting legislation, the "**Act 106 Board**"), consistent with Section 4.3 below, for the purposes of (i) performing its AWM Study pursuant to Section 1.4(B) below and (ii) confirming whether the conditions for withdrawal of funds from the Pension Reserve Trust in Section 5.3(C) below have occurred. For the avoidance of doubt, the Pension Benefits Council shall not have any responsibility or authority to administer the calculation and collection of PayGo Fees (such matters being governed, without limitation, by Act 106 and the Act 106 Board).

C.  Enforcement Rights.  The Pension Benefits Council's enforcement remedy for a failure to properly and timely fund the Pension Reserve Trust, per subparagraph 1.2(A) above, the failure by the Commonwealth to provide sufficient and necessary information to the Pension Benefits Council so that it may effectively meet its responsibilities under these Guidelines and the Deed of Trust, or the failure to return any Advance Withdrawal Amount to the Trust pursuant to Section 5.6 below, shall be limited to seeking in the U.S. District Court for the District of Puerto Rico or any other court having jurisdiction (and any appellate court) to enjoin or compel the Commonwealth, the Act 106 Board, and/or such other entity or entities as may have responsibility for such matters to comply with the Plan and, provided further, that the Pension Benefits Council shall provide the Commonwealth, the Act 106 Board, and/or such other entity or entities with written notice setting forth a description of such failure or issue at least ninety (90) calendar days prior to the Pension Benefits Council bringing an action as described above.

**1.3     Term of the Pension Benefits Council:**  Subject to modification of the Pension Reserve Deed of Trust, the Pension Benefits Council shall exist until the earlier of (i) thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines or (ii) such time when the retirement benefits owed to all Pension Reserve Trust Participants under the Plan have been fully satisfied.

**1.4     Responsibilities of the Pension Reserve Board**

A.  Management of Funds.  The Pension Reserve Board shall have sole responsibility for the custody, administration, and investment of the funds held in the Pension Reserve Trust.

B.  Asset and Withdrawal Modeling. To prudently invest the assets held in the Pension Reserve Trust in anticipation of future funding levels and withdrawals pursuant to Article V, the Pension Reserve Board shall retain a nationally recognized actuarial firm to perform an asset and withdrawal management study (the "**AWM Study**") no less frequently than every three (3) years, which shall be presented to the Pension Reserve Board for consideration in the evaluation of different investment strategies. The projected cash inflows and related assumptions in the AWM Study shall be based on best estimates of the funding into the Pension Reserve Trust by the Commonwealth and investment returns at the time the AWM Study is being performed. The projected cash outflows and related assumptions in the AWM Study shall be based on best estimates of projected Commonwealth cash flow deficits and projected PayGo payments.

C.  Pension Reserve Trust Withdrawals.  The Pension Reserve Board shall also have responsibility and authority to review and evaluate any request made for the withdrawal of any funds from the Pension Reserve Trust pursuant to Article V below and to make a recommendation to the Pension Benefits Council regarding the propriety of such request pursuant to Section 5.2(B) or (C) below.

**1.5     Term of the Pension Reserve Board:**  The Pension Reserve Board shall exist until thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines.

**1.6     Relationship Between the Pension Benefits Council and the Pension Reserve Board:** These Guidelines set forth separate and distinct roles and responsibilities for each of the Pension Benefits Council and the Pension Reserve Board (each, a **"Pension Reserve Trust Entity"**), and are designed to provide each Pension Reserve Trust Entity with sufficient authority to discharge

its respective duties independent of the other.  Notwithstanding the foregoing, in the event that a Pension Reserve Trust Entity determines that the other Pension Reserve Trust Entity is not complying with its obligations under these Guidelines or applicable law, each Pension Reserve Trust Entity shall attempt to resolve such dispute in good faith.  In the event those efforts do not resolve the dispute, either Pension Reserve Trust Entity may commence a lawsuit to resolve the dispute in accordance with Sections 4.4 or 8.4 below, as applicable.

    A.    In the development of the separate annual budget limitations for each of the Pension Benefits Council and the Pension Reserve Board set forth in Sections 3.5 and 7.4 below, respectively, it is anticipated that the Pension Reserve Board shall retain an Executive Director and/or other administrative staff.  The staff retained by the Pension Reserve Board shall also execute such administrative tasks as requested of it by the Pension Benefits Council consistent with the Pension Benefits Council's duties and authority under these Guidelines, including but not limited to financial management, procurement, maintenance of a website (which may be a single website if the Council and Board agree), logistical support for meetings and any other operational functions of the Council.  Similarly, for ordinary-course administrative accounting services of the two Pension Reserve Trust Entities, absent any conflict of interest, the Pension Reserve Board shall retain an independent and nationally-recognized accounting firm to render accounting services on behalf of both Pension Reserve Trust Entities and the Pension Reserve Trust itself; provided further, that where there are issues and required analyses (apart from ordinary-course administrative accounting) that touch upon the responsibilities of both Entities, the Entities may (as deemed appropriate in each Entity's judgment), and are encouraged to, jointly engage the requisite professional(s) under a common interest agreement in order to avoid duplication of efforts and unnecessary expenses.  For the avoidance of doubt, ordinary-course administrative accounting services would not include, without limitation, any accounting services that the Pension Benefits Council determines are needed in order to discharge its responsibilities under Section 1.2(A) or 1.2(B) above.

**1.7**    **Account Structure and Initial Funding of the Pension Reserve Trust:**

    A.    <u>Account Structure of the Pension Reserve Trust:</u>  The Pension Reserve Trust shall include (i) investment accounts, (ii) an account for administrative and operating expenses of the Pension Reserve Board, and (iii) an account for administrative and operating expenses of the Pension Benefits Council. The Pension Reserve Board shall have the authority to establish additional accounts as deemed necessary in the exercise of the Pension Reserve Board's duties. All such accounts shall be in the name of, and controlled by, the Pension Reserve Board, except that the account for administrative and operating expenses of the Pension Benefits Council shall be in the name of, and controlled by, the Pension Benefits Council. From time to time as appropriate, the Pension Reserve Board shall promptly transfer appropriate sums into the account for administrative and operating expenses of the Pension Benefits Council for the payment of the Pension Benefits Council's expenses.

    B.    <u>Initial Funding:</u>  The Commonwealth shall deposit an initial funding of $5,000,000.00 as provided for in the Plan into the Pension Reserve Trust, as follows: (i) $550,000.00 shall be deposited into the administrative and operating account of the Pension Benefits Council immediately after the establishment of said account by the Oversight Board pursuant to Section 8.6 below; and (ii) $4,450,000 shall be deposited into the administrative and operating account of the Pension Reserve Board immediately after the establishment of said account by the Oversight Board pursuant to Section 8.6 below;.

## II.     PENSION BENEFITS COUNCIL MEMBERS & ELECTIONS

**2.1     Composition of the Pension Benefits Council Following the Transitional Period:**

A.     <u>Membership</u>: Following the Transitional Period defined in Section 2.2 below, the Pension Benefits Council shall consist of nine (9) members, as follows:

i.     Five (5) members, each of whom as of the date the Election Process Notice is posted pursuant to Section 2.3(B) below (the "**Election Process Notice Date**"), (x) must be receiving a pension or annuity as a Pension Reserve Trust Participant, and (y) is not an active employee of Puerto Rico or any of its agencies, instrumentalities, or public corporations (each, an "**Eligible Retiree**"); <u>provided</u>, <u>however</u>, that at all times there shall specifically be two (2) Pension Benefits Council members who were participants in the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**"), two (2) Pension Benefits Council members who were participants in the Teachers Retirement System ("**TRS**"), and one (1) Pension Benefits Council member who was a participant in the Judiciary Retirement System ("**JRS**"); and <u>provided</u> <u>further</u>, that if there are insufficient Eligible Retirees who were participants in ERS, JRS or TRS, as the case may be, elected to fill the applicable seat or seats on the Pension Benefits Council, such seat or seats shall then be filled by Eligible Retirees who were not participants in such retirement system receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements above.  In the event an Eligible Retiree receives a pension or annuity as a result of being a participant in more than one of ERS, TRS and JRS, that person shall be deemed to be an Eligible Retiree with respect to the last retirement system as to which he/she accrued any vested pension benefits;

ii.     One (1) member who as of the Election Process Notice Date (x) is a Pension Reserve Trust Participant, and (y) is an active employee of the Commonwealth or any of its agencies, instrumentalities, or public corporations (other than PREPA and UPR) (an "**Eligible Active Employee**"); <u>provided</u>, <u>however</u>, that if an Eligible Active Employee is not elected to fill the seat on the Pension Benefits Council, such seat(s) shall then be filled by the Eligible Retiree receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements of this Section 2.1;



iii.     One (1) appointee by AFSCME, who may but is not required to meet the qualifications of an Eligible Active Employee;

iv.     One (1) appointee by the Governor of Puerto Rico; and

v.     One (1) member appointed by the Oversight Board, while it is in existence in accordance with the Plan.

Upon termination of the Oversight Board, the Governor of Puerto Rico shall appoint a member to the Pension Benefits Council to fill the seat occupied by the Oversight Board's appointee, as necessary, and shall then have the right prospectively to appoint two (2) members to the Pension Benefits Council in accordance with these Guidelines.

B.     <u>Eligibility</u>: Each Pension Benefits Council member, other than the appointees of the Governor, the Oversight Board, and AFSCME, must be a Pension Reserve Trust Participant, as described above, and individuals who are solely beneficiaries of such participants cannot be members of the Pension Benefits Council.  Members of the Pension Benefits Council other than the appointees of the Oversight Board and AFSCME, must be residents of Puerto Rico.  Members of the Pension Benefits Council cannot concurrently be members of the Act 106 Board.  In addition, each

person seeking to be elected to the Pension Benefits Council must comply with the requirements set forth in Section 2.3(C) below.

C.   Term: Following the Transitional Period, members of the Pension Benefits Council shall serve for terms of four (4) years, beginning on January 1 of the applicable calendar year. If the term of the initial Pension Benefits Council elected during the Transitional Period begins on a date other than January 1, the term of service for the members of that initial Pension Benefits Council shall consist of that partial first year plus three (3) additional years. If a member of the Pension Benefits Council who is an Eligible Retiree does not complete his or her term for any reason, the remaining Eligible Retirees on the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position and shall seek to maintain the composition of the Eligible Retiree seats in accordance with Section 2.1(A)(i) above. If a member of the Pension Benefits Council who is an Eligible Active Employee retires, leaves his or her government employment, or otherwise does not complete his or her term for any reason, the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position. If the Governor's or the Oversight Board's appointee does not complete his or her term for any reason, then the Governor or the Oversight Board, as applicable, shall promptly appoint a new appointee. The term of any such appointment under this Section 2.1(C) shall be until the next regularly scheduled election for any Pension Benefits Council seat, at which point such position shall be filled in accordance with this Article II. If the member being replaced does not remain on the Pension Benefits Council pending appointment of a replacement member, the Pension Benefits Council shall nonetheless be authorized to conduct business as if it had a full roster of members.

**2.2   Transitional Period:**

A.   Membership During Transitional Period: The Pension Benefits Council shall initially consist of (w) five (5) Eligible Retirees appointed by the Retiree Committee, (x) two (2) appointees by AFSCME who may but are not required to meet the qualifications of an Eligible Active Employee, (y) the Governor's appointee, and (z) the Oversight Board's appointee. The persons described in clauses (w) through (z) shall be appointed or designated no later than the Effective Date of the Plan; provided, however, that in the event any of such persons is not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Benefits Council. The period from the Effective Date to the date of commencement of the terms of the Pension Benefits Council members elected pursuant to Sections 2.1, 2.2(B), and 2.3 shall be referred to herein as the "**Transitional Period**." Each member of the Pension Benefits Council serving during the Transitional Period, other than the appointees of AFSCME, the Governor, and the Oversight Board, shall serve until replaced by the applicable new member elected in accordance with Sections 2.1, 2.2(B), and 2.3. During the Transitional Period, an election shall be conducted as provided in Sections 2.2(C) and 2.3 below.

B.   Initial Meeting: An initial meeting of the Pension Benefits Council shall be scheduled by the Oversight Board's designee for a date, time, and location reasonably convenient to all Pension Benefits Council members for as soon as practicable after the Effective Date (subject to the proviso above that tardy appointment or designation of a member shall not delay or impair the calling of the meeting); provided, however, that if the Oversight Board has failed to designate its member as of the Effective Date, any other Pension Benefits Council member may call the meeting. This initial meeting shall address, among other potential matters, initiatives for (i) the selection of counsel to the Pension Benefits Council and any other professionals it deems necessary to fulfill its responsibilities in accordance with Section 4.5 below, (ii) the development of bylaws for the Pension Benefits Council in accordance with Section 3.1 below, and (iii) the creation and conducting of an orientation program for the Pension Benefits Council members in accordance with Section 3.7 below.

C.   Transitional Period Election: The Pension Benefits Council shall facilitate an election among the Eligible Retirees and the Eligible Active Employees to elect the six (6) new members who will, along with the appointees by the Governor, the Oversight Board, and AFSCME, constitute the Pension Benefits Council in accordance with Section 2.1 above.  Such election shall be conducted with the intent of being completed by October 1, 2023, so that the elected slate can assume their positions on the Council on or about January 1, 2024, in accordance with Section 2.3(H) below, or to be completed as soon as practicable thereafter, but no later than two (2) years after the Effective Date of the Plan, subject to the requirements of Section 2.1(A) above, as follows:

i.   Two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in ERS, two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in TRS, one (1) Pension Benefits Council seat shall be designated for an Eligible Retiree who shall have been a participant in JRS, and one (1) Pension Benefits Council seat shall be designated for Eligible Active Employees.

ii.   Each Eligible Retiree who was a participant in a particular retirement system may only vote for an Eligible Retiree who was a participant in that system and who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below.  The number of votes cast by an Eligible Retiree in any election shall be equal to the number of Pension Benefits Council seats designated for an Eligible Retiree who was a participant of the voting Eligible Retiree's retirement system (i.e., one or two).  The elected Eligible Retirees shall be those who are proper candidates pursuant to the procedures set forth in Section 2.3(C) below and who garner the highest number of votes in each applicable retirement-system category.  Each Eligible Active Employee may cast one vote for an Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below for the Pension Benefits Council seat designated for an Eligible Active Employee.  The elected Eligible Active Employee shall be the Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below and who garners the highest number of votes.

**2.3   Transitional Period Election Process:** The election occurring during the Transitional Period shall follow the process set forth in this Section 2.3.

A.   Election Process: The Pension Benefits Council shall retain an independent third party service with experience in conducting elections similar to the Pension Benefits Council elections (the "**Election Administrator**") to be responsible for providing notices, facilitating the nomination and balloting process, and determining candidate eligibility as provided for in Sections 2.3(B), (C), and (F) below and may retain such Election Administrator to assist, as deemed desirable by the Council, in conducting the election in any other respect in accordance with methods decided by the Pension Benefits Council. The Pension Benefits Council, in consultation with the Election Administrator, shall develop procedures for voting in the election after consideration of best practices in order to reasonably meet the specific needs and purposes of the election.  Such procedures shall be set forth in the Election Process Notice and/or in the Election Notice.

B.   Election Process Notice: A notice of the process for nominating and electing Pension Benefits Council members (the "**Election Process Notice**") will be posted by the Election Administrator in at least two (2) newspapers of general daily circulation in Puerto Rico, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, at least ninety (90) days prior to the election.  The Election Process Notice will also be posted on the website of the Pension Benefits Council no later than the time of the first publication and will remain continuously posted on the website until completion of the election process.

C.   Nomination Process:

i.    *Nomination*: In the Election Process Notice, the Election Administrator will give notice of the availability of a nomination form ("**Nomination Form**"), which each Eligible Retiree and Eligible Active Employee may obtain electronically from the Pension Benefits Council's website or by making a written request by mail to the Pension Benefits Council or Election Administrator.  Any Eligible Retiree or Eligible Active Employee may nominate himself or herself to stand for election to serve on the Pension Benefits Council by submitting a completed Nomination Form to the Election Administrator or by serving on the Election Administrator other written notice that contains all of the information required by the nomination form.  The Nomination Form will request such information as the Election Administrator reasonably determines is required to establish whether a person meets the eligibility requirements set forth in these Guidelines, and shall identify the date by which a completed Nomination Form must be submitted to the Election Administrator.  Members of the Pension Benefits Council may be a candidate for re-election; provided, however, that members who have served two consecutive terms (with service during the Transitional Period not qualifying as a term for purposes of this provision) may not be a candidate in the election immediately following their second term; provided further, however, that such member may be a candidate in any subsequent election (subject to a new two-consecutive-term limitation).

ii.   *Candidate Eligibility Determinations*: All Eligible Retirees and Eligible Active Employees are eligible to be a candidate unless such person is disqualified by the express terms of these Guidelines. The Election Administrator shall, in consultation with the Pension Benefits Council, determine the eligibility of all candidates but may not create additional eligibility requirements. Eligible candidates shall be notified by mail by the Election Administrator (and, to the extent practicable, electronic mail) of their eligibility and mailed a copy of the election rules no later than fifteen (15) calendar days prior to commencement of the Candidate Meetings described in Section 2.3(C)(iii) below.  Ineligible nominees shall also be advised by overnight mail by the Election Administrator (and, to the extent practicable, electronic mail) not later than fifteen (15) calendar days prior to commencement of the Candidate Meetings of the reason(s) they are not eligible. Such nominees shall have ten (10) calendar days from the date of mailing of said notice to appeal the decision to the Pension Benefits Council.  If the appeal has not been resolved prior to the Candidate Meetings, the nominee may attend a Candidate Meeting pending resolution of the appeal.

iii.  *Candidate Meetings*:  The Pension Benefits Council will hold at least one meeting in San Juan and one meeting in Ponce, on separate days, to provide information about the term of service and responsibilities of the members (each, a "**Candidate Meeting**").  Each candidate who has been notified of their eligibility to serve must attend at least one Candidate Meeting, which attendance may be by videoconference.  In the event a person who has submitted a Nomination Form does not attend a Candidate Meeting, that person shall not be eligible to stand for election.

iv.   *Election Notification*: Once a definitive list of candidates is assembled by the Election Administrator, the list will be included in an election notice (the "**Election Notice**") posted by the Election Administrator in the same newspaper(s) as employed in Section 2.3(B) above, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, and on the Pension Benefits Council's website.  The Election Notice shall also provide any additional specific information not previously included in the Election Process Notice regarding the manner by which the election shall take place.



D.    Tally of Ballots: Ballots shall be submitted by voters directly to the Election Administrator, who shall then tabulate and certify the election results promptly after the deadline for submitting ballots.  The candidate who receives the highest number of votes cast for each vacant seat (determined pursuant to Section 2.2(B) above) shall be declared elected.  Any tie votes shall be decided by a coin toss conducted by the Election Administrator, in the presence of the candidates who are tied, and in the presence of the Election Administrator and the Pension Benefits Council or their designees.

E.    Notification of Election Results: Notification of the election results shall be mailed by the Election Administrator to the candidates, posted on the Pension Benefits Council's website, and concurrently issued by general press release.

F.    Protests and Appeals: Any candidate may challenge an election by delivering a protest in writing to the Pension Benefits Council so that is received by the Council within ten (10) calendar days after the election results are mailed and posted on the Pension Benefits Council's website.

G.    Arbitration: Any timely request for appeal submitted pursuant to Section 2.3(C)(ii) or Section 2.3(F) above shall be resolved through a mandatory expedited arbitration process to be conducted by an arbitrator licensed by the Supreme Court of Puerto Rico and selected by the Pension Benefits Council.  The arbitrator's award and decision shall be final and binding as to all parties.  The Pension Reserve Trust shall bear the expenses of the arbitration process incurred by the Pension Benefits Council and the arbitrator.  Candidates shall be responsible for the cost of their own representation in the arbitration process.

H.    Commencement of Term:  The term of service for the members of the Pension Benefits Council elected during the Transitional Period pursuant to Sections 2.1, 2.2(B), and 2.3 shall begin sixty (60) calendar days following the certification of the results of the election by the Pension Benefits Council; provided, however, that the term of a replacement member appointed pursuant to Section 2.1(C) shall begin immediately upon appointment.

I.    Rules and Procedures for the Election: Except as otherwise provided in Section 2.3(C)(ii) above with respect to establishing additional eligibility criteria, the Pension Benefits Council is authorized to adopt, amend, or supplement all rules and regulations that it deems necessary and prudent to implement the Transitional Period election process established in this Section 2.3.

2.4    **Elections Following the Transitional Period**

Election Cycle: Subject to Section 2.1(C) above, following the Transitional Period, elections of new members shall occur every four (4) years, in the fourth year of the term of the Pension Benefits Council, with the intention to complete the election process and certification of the results on or before November 15 of the fourth year following the prior elections.  Subject to Pension Benefits Council bylaws, new member terms shall begin on January 1 of the calendar year following the elections.

Election Policies and Procedures: Subject to the limitation in Section 2.3(C)(ii) above on creating additional eligibility criteria, following the end of the Transitional Period, the Pension Benefits Council may, but is not required to, adopt the Transitional Period election process, as set forth in Section 2.3, for future elections.  The Pension Benefits Council may establish at any time and from time to time new election policies and procedures that are designed to create a process that reasonably promotes accessibility for voters and an efficient and cost-effective process.  In designing the election policies and procedures, the Pension Benefits Council will consider the merits of the Transitional Period election process and any voting impediments known to the Pension Benefits Council.  These election policies and procedures shall be included in or incorporated by reference into the Pension Benefits Council's bylaws.

## III.   PENSION BENEFITS COUNCIL GOVERNANCE

**3.1     Bylaws:**  As soon as practicable after formation of the Pension Benefits Council, the Pension Benefits Council shall adopt by an affirmative vote of at least six of its members, with at least one of said votes being that of the Governor's or the Oversight Board's appointees, a set of bylaws to govern the Pension Benefits Council's conduct, which shall be consistent with the Plan and these Guidelines.  Such bylaws shall include appropriate provisions regarding fiduciary duties and obligations of the Pension Benefits Council; meetings of the Pension Benefits Council (which shall allow for attendance by videoconference); guidelines for disclosure of conflicts of interest for Pension Benefits Council members; removal and replacement of Pension Benefits Council members; voting on matters by Pension Benefits Council members.  In particular, without otherwise limiting the Pension Benefits Council's ability to develop appropriate bylaws, the Pension Benefits Council's bylaws shall provide that each Pension Benefits Council member shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon.  The bylaws shall also provide that, if any subcommittee is formed by the Pension Benefits Council, at least one appointee of the Governor shall be a member of such subcommittee.  The Pension Benefits Council bylaws shall also include provisions governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds and public disclosure.  As appropriate, these provisions shall be consistent with Puerto Rico laws applicable to instrumentalities of the Commonwealth; provided, however, that inclusion of such provisions into the bylaws shall not affect the independence of the Pension Benefits Council and shall not subject it to governance and regulation as an instrumentality of Puerto Rico.  The Pension Benefits Council may, from time to time, amend the Pension Benefits Council's bylaws by an affirmative vote of at least six of its members, solely to facilitate the purposes and functions of the Pension Benefits Council pursuant to the Plan and these Guidelines; <u>provided</u>, <u>however</u>, that if any non-consenting member believes the amendment is improper and inconsistent with the purposes and functions of the Pension Benefits Council, that member may bring the issue before the U.S. District Court for the District of Puerto Rico for resolution. Any such amendments shall be promptly posted to the Council's website and on its social media platforms.

**3.2     Code of Conduct and Ethics Policy:** The Pension Benefits Council's bylaws shall include a Code of Conduct and Ethics Policy setting forth the Pension Benefits Council members' obligation to act ethically in connection with the use of public funds and in the interest of all Pension Reserve Trust Participants, each as defined in the Plan, and affirming the Pension Benefits Council's commitment to do so. The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy, each consistent with provisions of relevant Puerto Rico law.  Specifically, and without limitation, such policy must expressly forbid any Council member, members of their extended families (within three degrees of consanguinity), professional, or vendor of goods or services employed by the Pension Benefits Council from accepting any payment or other thing of value from any party seeking or having responsibility to provide goods or services for compensation to the Council directly, or indirectly by subcontractor, affiliate, or other such relationship with a professional or vendor.

**3.3     Compensation:**  Pension Benefits Council members shall meet as often as is reasonably necessary and prudent to address the business of the Pension Benefits Council. For each meeting of the Pension Benefits Council or any designated sub-committees of the Pension Benefits Council, members shall be entitled to a reasonable stipend.  As of the Effective Date of the Plan of Adjustment, the stipend shall be $125 per meeting.  The amount of the stipend may be reviewed and adjusted from time to time by a two-thirds vote of the Pension Benefits Council, consistent with reasonable and customary practice in the market and to reflect regular increases in respect of inflation.  Pension Benefits Council members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Benefits Council members. The Pension Benefits Council's compensation and travel policy will be incorporated into the Pension Benefits Council's bylaws.

**3.4     Transitional Operating Budget:**  For informational purposes, as soon as practicable after its establishment, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred during the period from the Effective Date through the following June 30 for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur during said period; <u>provided</u>, <u>however</u>, that such budget shall not exceed the amount of the initial deposit made into the

administrative and operating expense account of the Pension Benefits Council pursuant to Section 1.7(B) above.

**3.5     Administrative Operating Budget:**  For informational purposes, by June 1 of each year, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur in such fiscal year, which budget shall have been approved by a two-thirds vote of the Pension Benefits Council. The annual actual aggregate administrative expenses for the Pension Benefits Council in any given fiscal year shall not be higher than $400,000.00 (adjusted for actual inflation rate); provided that non-ordinary course expenses including, but not limited to, (i) litigation-related fees and expenses, if any, and (ii) election-related expenses are excluded from the calculation of administrative expenses. The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Benefits Council and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board, or the Commonwealth upon termination of the Oversight Board, and the Pension Benefits Council regarding the budget or expenses incurred by the Council, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico; and provided further, however, that pending resolution of the matter the Pension Benefits Council shall receive funding in accordance with the prior year's budget.  The payment of these administrative expenses shall be made from the account for administrative and operating expenses of the Pension Benefits Council of the Pension Reserve Trust. Additionally, to the extent that legal action is taken against the Pension Benefits Council or other parties which would require funds from the Pension Reserve Trust, the Commonwealth will reimburse the Pension Reserve Trust for such expenses.

**3.6     Annual Report**:  Following the end of each fiscal year, the Pension Benefits Council, with the assistance of its retained professionals as described in Section 4.5 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (x) any projected or actual deposits into, or withdrawals from, the Pension Reserve Trust, (y) an itemized report of all expenditures made to Council professionals and an itemized report of any payments made to Council members, including payments made on behalf of Council members to travel to and attend any meeting, and (z) such other information related to the Pension Benefits Council's responsibilities and activities that the Pension Benefits Council determines is relevant to Participants, including, for example, a comparison of the Pension Benefits Council's expenses that were actually incurred during such fiscal year to the Pension Benefits Council's budgeted expenses.  Each such annual report shall be posted on the Pension Benefits Council's website and social media platforms.

**3.7     Orientation and Continuing Education Policy:**  The Pension Benefits Council shall adopt a program for the orientation of new members and the continued education of existing members regarding their duties, relevant provisions of the Plan, financial matters, and governance of the Pension Benefits Council. The goal of the program shall be for the Pension Benefits Council members to maintain the skill and knowledge necessary to meet their obligations and duties. With respect to the initial Pension Benefits Council formed on or about the Effective Date of the Plan, the Pension Benefits Council shall use its reasonable best efforts to develop and conduct an initial orientation program as soon as practicable after the Effective Date, pursuant to the Initial Meeting described in Section 2.2(B) above. Pending the conducting of such orientation program, the initial Pension Benefits Council members may conduct business solely to address initial start-up matters, in accordance with the Initial Meeting described in Section 2.2(B) above. For the avoidance of doubt, the items described in Section 2.2(B) constitute a non-exhaustive list of start-up matters, and the Pension Benefits Council may address any other such matters that it deems prudent to address pending conducting of the orientation program.  With respect to any person elected or appointed to the initial or any subsequent Pension Benefits Council after the orientation program is developed, such person must attend the orientation program before assuming its position on the Pension Benefits Council.

## IV.    POWERS OF THE PENSION BENEFITS COUNCIL

The Pension Benefits Council shall have the power to take any action reasonably necessary in order to fulfill its responsibilities as set forth in Section 1.2 above, including, but not limited to:

**4.1    Request for Documents and Information:**  The Pension Benefits Council shall have the right to request and receive from the Commonwealth (on behalf of itself and any of its agencies and instrumentalities) and the Act 106 Board the following information deemed by the Pension Benefits Council as reasonably necessary to carry out its responsibilities as set forth in Section 1.2 above:

> A.    <u>Contact Information</u>: The Pension Benefits Council shall have the right to request and receive the Commonwealth's most current information regarding the mailing address and such other contact information (e.g., telephone number and electronic mail address, if available) on file for each person who is entitled to cast a ballot in any election to select the members of the Pension Benefits Council, at any time within the six (6) month period preceding such election.  The received information shall exclusively be used for said election process.

> B.    <u>Actuarial/Valuation Data</u>: In addition to the information and documents above, the Pension Benefits Council shall receive from the Commonwealth, and shall share with the Pension Reserve Board, the most current actuarial and valuation data on an annual basis within a reasonable time after this information is available.

**4.2    Review Regarding Funding of and Withdrawals from Pension Reserve Trust:**  Pursuant to Section 1.2(A) above, in addition to the right to request documents and information set forth in Section 4.1 above, the Pension Benefits Council shall have the right, once every fiscal year, to review all records and processes related to the calculation and deposit of funds into the Pension Reserve Trust by the Commonwealth, including, without limitation, any report of the Commonwealth's independent calculation agent relating to such deposit or lack of deposit.  The Pension Benefits Council and the Pension Reserve Board shall also have the right to review all information reasonably necessary to evaluate the calculation and propriety of a request by the Commonwealth for the withdrawal of funds from the Pension Reserve Trust, in accordance with Article V below, including, without limitation, any report of the Commonwealth's independent calculation agent relating to such withdrawal request.  The Pension Benefits Council and Pension Reserve Board shall also be given reasonable access to the independent calculation agent to review such materials.

**4.3    Review of PayGo Fee Collections:**  The Pension Benefits Council shall have the right, once every fiscal year, to review the collections of PayGo Fees, in order to assess compliance with Act 106.  The Commonwealth shall continue to publish information regarding the calculation and collection of PayGo Fees in accordance with its current practices.

**4.4    Power to Sue and Jurisdiction of U.S. District Court:**  Subject to the limitations on scope of authority and responsibility in Section 1.2 and on remedies in Section 1.2(C) above, the Pension Benefits Council has legal capacity and the power to bring any cause of action on behalf of the Pension Benefits Council and/or the Pension Reserve Trust, as appropriate, against the Commonwealth, or any other appropriate party (as to the Oversight Board, subject to Section 8.6(C) below), regarding: the improper implementation of the Pension Reserve Trust relative to the Council's scope of responsibilities under Section 1.2 above, including deposits into and proper return of any Advance Withdrawal Amount to the Pension Reserve Trust pursuant to Article V below; and the Commonwealth's non-compliance with any Plan provision pertaining to the rights of all Pension Reserve Trust Participants, as well as any other dispute or matter in connection with the performance of the Pension Benefits Council's duties under these Guidelines.  The Pension Benefits Council on behalf of the Council and/or the Pension Reserve Trust, as appropriate, may also bring any cause of action to resolve a dispute pursuant to Section 1.6 or 3.1 above.   Except as provided in Section 2.3(G) above, the U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Benefits Council described in this paragraph, as well as any causes of action against the Pension Benefits Council.

**4.5    Employment of Professionals:** Subject to Section 1.6(A) above, the Pension Benefits Council shall engage in a public Request for Proposal ("**RFP**") process in order to obtain certain

service providers, such as attorneys, insurance advisors, accountants, the Election Administrator, and actuaries, and whose contract amount is greater than $250,000.00 for a fiscal year (provided that retention of the Election Administrator and any outside counsel shall require an RFP process regardless of the projected contract amount).  Selection of all such providers shall require a positive vote of a 2/3 majority of the Pension Benefits Council members who participate in the vote.  The Pension Benefits Council shall have the authority to enter into contracts to assist in the performance of the duties of the Pension Benefits Council hereunder, and incur reasonable fees and expenses in connection with hiring such service providers; provided, however, that (i) while the Oversight Board is in existence with respect to the Commonwealth, all engagement agreements with any such service providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Council shall be made public and shall be registered with the Office of the Comptroller of Puerto Rico (the "**Comptroller Office**") pursuant to applicable Puerto Rico laws.  All such fees and expenses shall be paid from the Pension Reserve Trust. An individual or organization that has provided a cash or in-kind contribution to any candidate for membership or any member of the Pension Benefits Council shall be ineligible to serve as a professional for five years from the date of such contribution.

**4.6     Independence:** The Pension Benefits Council shall be incorporated under the laws of Puerto Rico as a not-for-profit entity.  For the avoidance of doubt, the Pension Benefits Council shall not be, and shall not be deemed, an instrumentality of the Commonwealth, nor is it responsible for the obligations of the Commonwealth under the Plan.

## V.     PENSION RESERVE TRUST WITHDRAWALS

**5.1     Scope:** This Article V governs, among other things, withdrawals from the Pension Reserve Trust that shall be made pursuant to the request of the Commonwealth.  No provision of these Guidelines modifies the obligation of the Commonwealth to deposit funds into the Pension Reserve Trust pursuant to the Plan of Adjustment.  For the avoidance of doubt, any disputes arising in connection with the matters governed by this Article V shall be heard by the U.S. District Court for the District of Puerto Rico, which shall have original and exclusive jurisdiction.

**5.2     Withdrawals:**

A.     Funds may be withdrawn from the Pension Reserve Trust at any time to pay the costs and expenses of the Pension Benefits Council and the Pension Reserve Board as budgeted pursuant to these Guidelines, respectively, in each case in accordance with these Guidelines.  The Pension Benefits Council and the Pension Reserve Board shall each have the authority to withdraw funds necessary to pay such costs and expenses.  Funds cannot be withdrawn for any other purpose during the period beginning as of the Effective Date of the Plan of Adjustment and ending on the last day of the 2031 Fiscal Year, subject to Section 5.2(D) below.

B.     Beginning on the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Withdrawal Request**") (with a copy served concurrently upon the Pension Reserve Board) in which it asserts that the conditions set forth in Section 5.3 below were fully satisfied with respect to the prior fiscal year (the "**Applicable Fiscal Year**") and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.4 below ("**Withdrawal**").  The Commonwealth shall submit to the Pension Benefits Council and the Pension Reserve Board all necessary information for their evaluation of such Withdrawal Request, consistent with their rights to receive and review such information under Section 4.2 above. Within 45 days of receiving the Withdrawal Request and said necessary information, the Pension Reserve Board shall make a written recommendation to the Pension Benefits Council regarding the Board's view as to whether each of the conditions set forth in Section 5.3 below is satisfied and, if so, the amount of the Withdrawal that is appropriate under Section 5.4 below. Within 60 days of receiving the Withdrawal Request and said necessary information, and taking into consideration the recommendation of the Pension Reserve Board, the Pension Benefits Council shall determine whether each of the conditions set forth in Section 5.3 below is satisfied and, if so, the Pension Benefits Council shall determine

the amount of the Withdrawal and (b) authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Withdrawal and (ii) facilitate the Withdrawal and transfer of such sum to the Treasury Single Account (the "**TSA**") or other appropriate account designated by the Commonwealth. If the Pension Reserve Board disagrees with the determination of the Pension Benefits Council with respect to a Withdrawal Request under this Section 5.2(B), any such disagreement shall be resolved by the U.S. District Court for the District of Puerto Rico, consistent with Sections 1.6, 4.4, and 8.4.

C.  Beginning with the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Fully Funded Withdrawal Request**") (with a copy served concurrently upon the Pension Reserve Board) in which it asserts that the condition set forth in Section 5.5 below was fully satisfied with respect to the prior fiscal year (the "**Fully Funded Fiscal Year**"), and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.5 below (the "**Fully Funded Pension Reserve Trust Withdrawal**"). The Commonwealth shall submit to the Pension Benefits Council and the Pension Reserve Board all necessary information for their evaluation of such request, consistent with their rights to receive and review such information under Section 4.2 above. Within 45 days of receiving the Withdrawal Request and said necessary information, the Pension Reserve Board shall make a written recommendation to the Pension Benefits Council regarding the Board's view as to whether each of the conditions set forth in Section 5.5 below is satisfied. Within 60 days of receiving the Fully Funded Withdrawal Request and said necessary information, having taken into consideration the recommendation of the Pension Reserve Board, and in the event the Pension Benefits Council determines that the condition set forth in Section 5.5 below is satisfied, the Pension Benefits Council shall authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Fully Funded Pension Reserve Trust Withdrawal and (ii) facilitate the Fully Funded Pension Reserve Trust Withdrawal and transfer of such sum to the TSA or other appropriate account designated by the Commonwealth. If the Pension Reserve Board disagrees with the determination of the Pension Benefits Council with respect to a Withdrawal Request under this Section 5.2(C), any such disagreement shall be resolved by the U.S. District Court for the District of Puerto Rico, consistent with Sections 1.6, 4.4, and 8.4.

D.  The Pension Benefits Council shall not have the authority to approve any withdrawal of funds that is not in compliance with these Guidelines, subject to amendment of the Guidelines as set forth in Section 10.1 below.

**5.3**     **Conditions for Withdrawals:** The Pension Benefits Council shall approve a Withdrawal Request if the Pension Benefits Council determines that each of the following conditions is satisfied:



A.  Puerto Rico generates an actual cash flow deficit after contractual debt service pursuant to the Certified Fiscal Plan in effect as of the Effective Date of the Plan of Adjustment for the Applicable Fiscal Year (a "**Cash Flow Deficit**"), determined in each case pursuant to the "cash surplus" reported in the Net Cash Flow in the Treasury Single Account Cash Flow Report issued by AAFAF. For the avoidance of doubt, the calculation and reporting of the Cash Flow Deficit and the Unrestricted Cash Balance of Puerto Rico, as defined in Section 5.3(B) below, shall remain consistent with the calculation and reporting methodology in effect as of the Effective Date regardless of any subsequent or future changes to the Commonwealth's central cash management system and/or reporting of the TSA.

B.  The sum of the cash balance in all TSA accounts plus the cash balances in the two TSA sweep accounts (the "**Unrestricted Cash Balance of Puerto Rico**") is lower than $2.0 billion as of the end of the Applicable Fiscal Year. For the avoidance of doubt, the Unrestricted Cash Balance of Puerto Rico shall exclude any such amounts related to the emergency reserve fund (of up to $1.3 billion) and the revolving facility for reconstruction and capital works (of up to $750 million).

C.   (i) the municipalities and government entities obligated to pay PayGo Fees, as identified in the monthly PayGo reporting package periodically published by AAFAF, have paid at least 75% of their PayGo Fees on an aggregate and cumulative basis during the period beginning as of July 1, 2017 (the inception of the PayGo System) and ending as of the last day of the Applicable Fiscal Year, (ii) the Commonwealth has offset delinquent PayGo Fees against any appropriations from and obligations of the Commonwealth to the delinquent municipalities and government entities, (iii) the Commonwealth and/or ERS have instructed CRIM to withhold amounts from the Basic Tax remittances to satisfy any past due PayGo Fees, if applicable, (iv) the Commonwealth has instructed AAFAF to withhold amounts to fund any past due PayGo Fees from any request by a municipality for release of any excess Special Additional Tax ("**Excess CAE**"), if applicable, and (v) the Commonwealth is diligently pursuing payment plans pursuant to ERS Resolution 2019-02 to collect past due PayGo Fees from all municipalities and government entities that were more than six (6) months past due as of the end of the Applicable Fiscal Year.

**5.4    Amount of Withdrawal:**  In the event the Pension Benefits Council determines that each of the conditions in Section 5.3 has been satisfied for a Withdrawal, then the Pension Benefits Council shall, in consultation with the Pension Reserve Board, perform the following calculations to determine the amount of the Withdrawal:

A.   First, determine the present value as of the end of the Applicable Fiscal Year of all projected pension benefits to be paid by the PayGo System based on the most recent actuarial valuation report prepared by the Commonwealth's actuarial advisor, by discounting each projected pension benefit cash flow with the segment rate from the corresponding year of the rates defined by the US Internal Revenue Service under Internal Revenue Code Section 417(e)(3) (the "**417(e) rates**") published for the third month prior to the measurement date used for the present value calculation (the "**Benefits Present Value**"); provided, however, that in the event the measurement date of the most recent valuation report is more than eighteen (18) months old, then the Pension Benefits Council shall use the most recent estimates of the projected pension benefits provided by the Commonwealth to the Pension Benefits Council or, absent such information, the Pension Benefits Council shall use the projected PayGo liabilities contained in the most recent AWM Study prepared for the Pension Reserve Board if such data is more current than the most recent actuarial valuation report.  In the event that the IRS ceases to publish 417(e) rates, the Retirement Board shall implement a new publicly available basis for determining the present value that is market based and reflects a similar level of risk to the rates most recently reflected in the 417(e) rates;

B.   Second, divide the balance of the Pension Reserve Trust as of the end of the Applicable Fiscal Year by the Benefits Present Value, and express the result as a percentage (the "**Funded Percentage**");

C.   Third, determine the product of (x) the Funded Percentage, and (y) the amount of all pension benefits actually paid by the PayGo System during the Applicable Fiscal Year, excluding all administrative and other costs that are not pension benefits (the "**PayGo Benefits Amount**"), with such product expressed as an amount in U.S. dollars (the "**Withdrawal Formula Amount**"); provided, however, that in the event in any Fiscal Year (i) of a federally-declared natural disaster, (ii) of a federally – declared pandemic other than the current Covid-19 pandemic, or (iii) that the Cash Flow Deficit is generated by a material negative variance between projected Non-Own Source Revenues and actual Non-Own Source Revenues for such Fiscal Year, the PayGo Benefits Amount shall be multiplied by two (2) for such Fiscal Year; and

D.   Fourth, determine the lower of (y) the PayGo Benefits Amount and (z) the Withdrawal Formula Amount (such lower amount defined as the "**Applicable Withdrawal Amount**"); provided, however, that in the event that the Funded Percentage as of the end of any Applicable Fiscal Year is ten (10) percent or lower, then the Applicable Withdrawal Amount shall be equal to (i) the lower of (a) the PayGo Benefits Amount and (b) the balance of the Pension Reserve Trust less (ii)



the sum of (A) the amount, if any, that the Pension Benefits Council reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses to complete its functions under these Guidelines, plus (B) the amount, if any, that the Pension Reserve Board reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses to complete its functions under these Guidelines (the sum of (ii)(A) and (B), the "**Wind-Down Expenses**").

The amount that shall be withdrawn from the Pension Reserve Trust shall be the lesser of (y) the Applicable Withdrawal Amount and (z) the Cash Flow Deficit for the Applicable Fiscal Year (the "**Pension Reserve Trust Withdrawal Amount**").

**5.5     Fully Funded Pension Reserve Trust Withdrawals**: The Pension Benefits Council shall approve a Fully Funded Withdrawal Request in the event that the Pension Benefits Council determines that the Funded Percentage as of the end of the Fully Funded Fiscal Year is one hundred (100) percent or higher after accounting for any Applicable Withdrawal Amount for such Fully Funded Fiscal Year.  In the event that the Pension Benefits Council determines this criterion is satisfied, the amount of the Fully Funded Pension Reserve Trust Withdrawal shall be equal to the amount of the aggregate pension benefits to be paid by the PayGo System during the following fiscal year.  For the avoidance of doubt, the conditions and provisions of Sections 5.3 and Section 5.4 above shall not be applicable with respect to any Fully Funded Withdrawal Request or Fully Funded Pension Reserve Trust Withdrawal.

**5.6     Timing of Pension Reserve Trust Withdrawals**: Withdrawals from the Pension Reserve Trust, as allowed for an Applicable Fiscal Year pursuant to Sections 5.3, 5.4, and 5.5 above, shall occur within six (6) months after the end of such Applicable Fiscal Year, provided that all requisite information pursuant to Section 5.3 has been provided to the Pension Benefits Council; provided, however, that if at the beginning of an Applicable Fiscal Year the sum of (a) the Unrestricted Cash Balance of Puerto Rico at the beginning of such Applicable Fiscal Year and (b) the projected Net Cash Flow for such Applicable Fiscal Year in the Treasury Single Account Cash Flow Report is less than $500 million, the Commonwealth may request to withdraw funds from the Pension Reserve Trust during the Applicable Fiscal Year (the "**Advance Withdrawal Request**"); provided that the condition pursuant to Section 5.3(C) has been satisfied

A.    Advance Withdrawal Amount: The allowed withdrawal amount for an Advance Withdrawal Request shall be the product of (a) 50% and (b) the calculation of the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 but replacing (x) the actual Cash Flow Deficit for such Applicable Fiscal Year with the projected Cash Flow Deficit for such Applicable Fiscal Year, (y) the Benefits Present Value at the end of the Applicable Fiscal Year with the Benefits Present Value at the beginning of the Applicable Fiscal Year, and (z) the Pension Reserve Trust balance at the end of such Applicable Fiscal Year with the Pension Reserve Trust balance at the beginning of such Applicable Fiscal Year (the "**Advance Withdrawal Amount**").

B.    True-up of Advance Withdrawal Request: At the end of the Applicable Fiscal Year in which an Advance Withdrawal Request is made, the absolute difference between the Advance Withdrawal Amount and the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 shall be calculated (the "**Advance True-up Amount**"). If the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year exceeds the Advance Withdrawal Amount already made during the Applicable Fiscal Year, additional withdrawal in the amount of the Advance True-up Amount shall be permitted. However, if the Advance Withdrawal Amount made during the Applicable Fiscal Year exceeds the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year, the Commonwealth shall deposit the Advance True-up Amount back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year. For the avoidance of doubt, if the conditions pursuant to Section 5.3 are not met at the end of the Applicable Fiscal Year, the Commonwealth shall deposit the Advance Withdrawal Amount in its entirety back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year.

**5.7**     **Commonwealth Power to Sue and Jurisdiction of U.S. District Court:** In addition to any rights under applicable law, the Commonwealth shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to or arising from this Article V of these Guidelines, including but not limited to, any claim or matter related to or arising from a Withdrawal Request, a Fully Funded Withdrawal Request, or Advance Withdrawal Request.  The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any said causes of action, as well as any other causes of action against the Pension Benefits Council or the Pension Reserve Board.

**5.8**     **Taxes:** The funds held in the Pension Reserve Trust shall be exempt from the payment of any taxes to Puerto Rico and its municipalities and instrumentalities to the maximum extent permitted by applicable law (including PROMESA)**.**

## VI.    PENSION RESERVE BOARD MEMBERS

**6.1     Composition of the Pension Reserve Board:**

A.    <u>Membership</u>:  The Pension Reserve Board shall consist of five (5) trustees, to be appointed within three (3) months after the occurrence of the Effective Date.  The Pension Benefits Council shall, by a two-thirds vote of the Pension Benefits Council's members, appoint two (2) trustees, the Governor of Puerto Rico shall appoint two (2) trustees, and the Oversight Board shall appoint one (1) trustee; <u>provided</u>, <u>however</u>, that in the event any of such persons are not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Reserve Board, which shall commence its activities on the first business day of the first calendar week following expiration of the three-month period following the Effective Date on which there are at least three (3) appointed Pension Reserve Board trustees (the "**Commencement Date**").  As each trustee is appointed, the appointing entity shall certify to the Oversight Board, the Governor's office, and the Pension Benefits Council such appointment and the trustee's specific qualifications that satisfy the criteria in Section 6.1(B) below.  If the Oversight Board no longer exists, the fifth trustee shall be appointed by the Pension Benefits Council.  A person may not serve more than two (2) terms as a member of the Pension Reserve Board, regardless of whether such person has served consecutive terms.

B.    Inaugural Meeting. On or as soon as practicable after the Commencement Date, the Pension Reserve Board shall call and convene an inaugural meeting of the Board.  At that meeting, the Oversight Board shall deliver custody of all documents and information regarding or related to the Oversight Board's activities on behalf of the Pension Reserve Trust and the Pension Reserve Board, including, without limitation, all bank account information for the administrative and operating accounts opened by the Oversight Board for the Pension Reserve Trust in the name of the Pension Reserve Board and the Pension Benefits Council. By convening said meeting, the Oversight Board's duties and authority under Section 8.6 of these Guidelines shall automatically cease. At or immediately after the inaugural meeting, the Oversight Board shall take all other necessary and reasonable steps to transfer to the Pension Reserve Board control of all bank accounts and any other assets of the Pension Reserve Trust, and any documents and information of or belonging to the Pension Reserve Trust or the Pension Reserve Board.

C.    <u>Eligibility and Qualifications</u>: No trustee shall be appointed to the Pension Reserve Board who has a known or reasonably perceived conflict of interest.  Except for the Governor's appointee, trustees of the Pension Reserve Board cannot concurrently be active employees of Puerto Rico or any of its agencies, instrumentalities, or public corporations, and for the avoidance of doubt, no trustee (including the Governor's appointee) can concurrently be a member of the Act 106 Board.  In addition, no trustee can be a former member of the boards of ERS, TRS, or JRS.  Each trustee of the Pension Reserve Board shall have proven leadership skills and have expert knowledge or extensive experience with respect to either (with at least one Board trustee satisfying each of the two categories of qualifications below):

i.   Economics, finance, or institutional investments, as evidenced by one or more of the following:

(a)   An earned masters or Ph.D. in economics or finance from a doctorate-granting U.S.-accredited institution;

(b)   The Chartered Financial Analyst credential of the CFA Institute; or

(c)   A minimum of fifteen (15) years of professional experience as a certified public accountant with audit expertise of financial management, pension, or insurance clients;

*or*

ii.   Asset management expertise, as evidenced by one or both of the following:

(a)   At least fifteen (15) years of asset management industry experience; and

(b)   Technical competencies including investment strategy, investment management across different asset classes, investment risk management, third party management of external asset managers and custodians, corporate governance, financial management, strategic leadership, communication and stakeholder management and networking.

D.   <u>Term</u>:  Trustees of the Pension Reserve Board shall serve for a term of six (6) years, beginning on January 1 of the relevant year; <u>provided</u>, <u>however</u>, that if the term of the initial Pension Reserve Board begins on a date other than January 1, the term of service for the members of that initial Pension Reserve Board shall consist of that partial first year plus five (5) additional calendar years; <u>provided further</u>, that a Trustee can be reappointed at the expiration of his or her term.  If a trustee of the Pension Reserve Board does not complete his or her term for any reason, the entity or person that appointed such person pursuant to Section 6.1(A) above or 6.1(D) below shall appoint a replacement trustee who is eligible to serve in such position. In each case, the replacement trustee shall serve for the remainder of the six-year term.



## VII.   PENSION RESERVE BOARD GOVERNANCE

**7.1    Bylaws:** As soon as practicable after the Commencement Date, the Pension Reserve Board shall by an affirmative vote of at least four trustees (or a simple majority if any appointing party fails to timely appoint trustees to the Pension Reserve Board) adopt a set of bylaws to govern the Pension Reserve Board's conduct, which shall be consistent with the Plan and these Guidelines. It shall include appropriate provisions regarding fiduciary duties, obligations of the Pension Reserve Board, meetings of the Pension Reserve Board, removal and replacement of Pension Reserve Board trustees, and voting on matters by Pension Reserve Board trustees.  In particular, without otherwise limiting the Pension Reserve Board's ability to develop appropriate bylaws, the Pension Reserve Board's bylaws shall provide that each Pension Reserve Board trustee shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon.   The bylaws shall also provide that, if any subcommittee is formed by the Pension Reserve Board, at least one appointee of the Governor shall be a member of such subcommittee.  The Pension Reserve Board may, from time to time, amend its bylaws by an affirmative vote of at least four trustees (or a simple majority if any appointing party fails to timely appoint a trustee to fill a vacancy on the Board) to ensure that the Pension Reserve Board satisfies its purposes and functions pursuant to these Guidelines; <u>provided</u>, <u>however</u>, that if any non-consenting trustee believes the amendment is improper and inconsistent with the purposes and functions of the Pension Reserve Board, that member may bring the issue before the U.S. District Court for the District of Puerto Rico for resolution.  Any such amendments shall be promptly posted to the Board's website and on its social media platforms. Consistent with the Plan and the Confirmation Order, the Pension Reserve Board shall be subject to Puerto Rico laws governing ethics, anti-corruption, conflicts of

01020868; 1                                        32

interest, contracting, and public disclosure applicable to instrumentalities of the Commonwealth, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Board's bylaws; provided, however, that the application of such laws to the Pension Reserve Board shall not affect its status as an independent entity that is not an instrumentality of Puerto Rico, as more fully described in Section 8.5 below.

**7.2     Code of Conduct and Ethics Policy:** The Pension Reserve Board's bylaws shall include a Code of Conduct and Ethics Policy setting forth the Pension Reserve Board's obligation to act ethically in connection with the use of public funds and in the interest of the Commonwealth and the Pension Reserve Trust Participants, and affirming the Pension Reserve Board's commitment to do so.  The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy consistent with relevant provisions of Puerto Rico law and as required by the Plan and the Confirmation Order.  Specifically, and without limitation, such policy must expressly forbid any Board member, professional, or vendor of goods or services employed by the Pension Reserve Board from accepting any payment or other thing of value from any party seeking or having responsibility to invest Pension Reserve Trust funds or provide goods or services for compensation to the Board directly, or indirectly by subcontractor, affiliate, or other such relationship with a professional or vendor.  The Code of Conduct and Ethics Policy for the Board must also expressly forbid the placement of Pension Reserve Trust assets for investment with any advisor, or the use of a placement agent or similar service provider, who at the individual or entity level, has contributed to a political candidate for any elected office of the Commonwealth government during the preceding five (5) years or contributed towards a Commonwealth plebiscite during the previous five (5) years.  Such contributions must be prohibited while providing such services to the Board.

**7.3     Compensation:** Pension Reserve Board members shall be paid an annual compensation in an amount not to exceed $50,000.00 (subject to adjustment for inflation), paid in four equal installments at the end of each calendar quarter; provided, however, that if, in the judgment of the Oversight Board or the Pension Benefits Council, it is determined that this amount is inadequate to attract appropriate and desirable trustees to serve on the Board with the requisite level of skills and qualifications identified in Section 6.1B above, the Oversight Board or Pension Benefits Council, as the case may be, may seek to amend this annual compensation amount upon application to the U.S. District Court for the District of Puerto Rico, in accordance with Section 8.4 below. Compensation for the period from the Commencement Date to the end of the first calendar quarter thereafter shall be prorated and paid on the first business day following said calendar quarter. Pension Reserve Board members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Reserve Board members.  The Pension Reserve Board's compensation and travel policy shall be incorporated into the Pension Reserve Board's bylaws.  Notwithstanding the foregoing, any Pension Reserve Board member employed by the Government of Puerto Rico or any public corporation or instrumentality shall not receive compensation for his or her service on the Pension Reserve Board while so employed, but may receive reimbursement of expenses as provided in this Section 7.3.

**7.4     Budget:** For informational purposes, by June 1 of each year, the Pension Reserve Board shall make public on its website and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Reserve Board and for other non-recurring activities reasonably foreseeable to occur in the forthcoming fiscal year.  The annual actual aggregate administrative expenses for the Pension Reserve Board in any given fiscal year shall not be higher than $1,400,000.00 (adjusted for inflation rate); provided that non-ordinary course expenses including, but not limited to, litigation-related fees and expenses, if any, as well as investment-related expenses are excluded from the calculation of administrative expenses.   The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Reserve Board and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board, or the Commonwealth upon termination of the Oversight Board, and the Pension Reserve Board regarding the budget, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico; and provided further, however, that pending resolution of the matter the Pension Reserve Board shall receive funding in accordance with the prior year's budget.  The payment of these administrative expenses shall be made from

the account for administrative and operating expenses of the Pension Reserve Board within the Pension Reserve Trust.

**7.5    Reports to Pension Benefits Council:**  On a quarterly basis, the Pension Reserve Board will participate in a meeting with the Pension Benefits Council and the Act 106 Board to report on (w) the composition of the Pension Reserve Trust assets and investments, and the performance of said investments, (x) all investment management fees, commissions and similar compensation to investment managers and (y) other matters regarding the performance of the Pension Reserve Board pursuant to these Guidelines. Such quarterly reports shall be posted to a website to be maintained by the Pension Reserve Board and its social media platforms.

**7.6    Annual Report**:  Following the end of each fiscal year, the Pension Reserve Board, with the assistance of its retained professionals as described in Section 8.1 and Section 8.3 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (w) the composition of the Pension Reserve Trust assets and investments over the course of the reporting period and the performance of said investments by asset class and by each investment manager during the calendar year just ended, (x) a list of current investment managers and assets under management within the Pension Reserve Trust, (y) an itemized report of all receipts and distributions during the reporting period, all expenditures made to professionals and investment managers, and an itemized report of any payments made to Board members, including payments made on behalf of Board members to travel to and attend any meeting, and (z) such other information that the Pension Reserve Board determines is relevant to Participants, including a comparison of the Pension Reserve Board's expenses that were actually incurred during such fiscal year to the Pension Reserve Board's budgeted expenses. Each such annual report shall be posted on the Pension Reserve Board's website and its social media platforms.

## VIII.   POWERS OF THE PENSION RESERVE BOARD

**8.1    Management of Pension Reserve Trust**:  The Pension Reserve Board shall be responsible for the management of the Pension Reserve Trust, including, but not limited to, employing staff as needed for the Pension Reserve Trust, selecting a custodian to hold the assets of the Pension Reserve Trust, directing (in consultation with the investment advisor(s) selected pursuant to this Section 8.1) the investment of the assets of the Pension Reserve Trust, and managing the administration of the Pension Reserve Trust.  The Pension Reserve Board shall also have responsibilities with respect to withdrawal requests pursuant to Article V of these Guidelines, including making recommendations to the Pension Benefits Council with respect to withdrawal requests pursuant to Sections 5.2(B) and (C). The Pension Reserve Board will also have the authority to take any and all steps it determines are necessary or desirable in its discretion to maximize the tax efficiency of the assets and investments of the Pension Reserve Trust.



A.    <u>Selection of Investment Advisor(s)</u>: The Pension Reserve Board shall retain one or more qualified investment advisors through a competitive and public process.  The Pension Reserve Board shall set minimum qualification requirements, including the following requirements: (i) the investment advisor must be registered as an investment advisor under the Investment Advisers Act of 1940, (ii) the investment advisor and each of its key professionals must not have material conflicts of interest with the Pension Reserve Board, (iii) the investment advisor must agree to serve as a fiduciary, and (iv) the investment advisor must have a verifiable and successful operating history with at least three (3) pension fund clients each of which has a minimum of $5 billion in assets under management.  As soon as reasonably practicable following the Effective Date of the Plan, the Pension Reserve Board shall conduct a public RFP process in order to search for such investment advisor(s).  The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public.  The Pension Reserve Board may retain a qualified consultant to manage the RFP process.  As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment advisor(s).  Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment advisor(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Reserve Board on behalf of the Pension

Reserve Board and/or the Pension Reserve Trust shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

B.   Roles & Responsibilities: The investment advisor(s) shall have the following roles and responsibilities, and the terms of such relationship shall be set forth in a written agreement in which the advisor shall acknowledge its fiduciary status:

i.   Advising the Pension Reserve Board on issues concerning the selection of investments for the Pension Reserve Trust;

ii.   Assisting in the development and maintenance, and periodic review and modification as appropriate, of an investment policy statement designed to set forth the goals, objectives and risk tolerances of the Pension Reserve Trust's investment program (the "**Investment Policy Statement**"), as described below;

iii.   Advising in the development of the Pension Reserve Trust's asset allocation strategy;

iv.   Providing investment advice to the Pension Reserve Board with respect to the Pension Reserve Trust;

v.   Assisting in the analysis, selection, monitoring and replacement of investments and investment managers;

vi.   Assisting the Pension Reserve Board with the review of the performance and risk of the selected investments, on at least a semi-annual basis, in comparison to their stated objectives and their related performance and pricing as compared to their peers and benchmarks;

vii.   Bringing information to the Pension Reserve Board, on an ad hoc basis as appropriate, that the investment advisor feels may be relevant to the Pension Reserve Board's assessment of a given investment, asset class or strategy.

The Pension Reserve Board, working with the investment advisor(s), shall select investment manager(s) to manage the investments of the Pension Reserve Trust. The Pension Reserve Board shall conduct a public RFP process in order to search for such investment manager(s). The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public. The Pension Reserve Board may retain a qualified consultant to manage the RFP process. As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment manager(s); provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment manager(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board on behalf of the Pension Reserve Board and/or the Pension Reserve Trust shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws. Subject to the provisions of these Guidelines, the roles and responsibilities of the Pension Reserve Board and any third party shall be set forth in a written agreement and, as appropriate, the Investment Policy Statement.

C.   Development of Investment Policy Statement: The Pension Reserve Board, together with expert assistance from its investment advisor(s), shall develop the Investment Policy Statement. The Investment Policy Statement shall be designed to provide meaningful direction for the Pension Reserve Board, the investment advisor(s), and investment managers in the management of the Pension Reserve Trust. The Investment Policy Statement shall:

i.   Provide a mechanism to establish and review the Pension Reserve Trust's investment objectives and risk tolerances;

ii.     Establish the roles, responsibilities and reporting requirements of the Pension Reserve Board, investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust service providers;

iii.    Establish a public RFP process in order to search for investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust service providers with the goal of soliciting and evaluating proposals in a fair and objective manner in a documented and public process;

iv.     Identify appropriate investment asset classes, asset allocation targets and ranges that are designed to facilitate achievement of the Pension Reserve Trust's objectives;

v.      Identify asset class and investment manager guidelines, evaluation, selection and monitoring criteria and performance benchmarks;

vi.     Document a prudent monitoring and measurement process that includes criteria for replacing and retaining investment managers;

vii.    Identify investment constraints and limitations, including any prohibited types of investments and minimum ratings for assets.

viii.   Require any private equity manager with whom the Pension Reserve Board invests to comply with the reporting guidelines developed by the Institutional Limited Partners Association (the **"ILPA"**) as such guidelines are amended from time to time by the ILPA and require any private equity manager to offer financial terms for any investment placed by the Pension Reserve Board that are no less favorable than the terms offered by that private equity manager to other investors in the same fund or investment.

D.      <u>Investment Objective</u>: The Pension Reserve Board, investment advisor(s), and investment managers shall perform their duties for the exclusive benefit of and in the best economic interest of the Commonwealth and the Pension Reserve Trust Participants. The objective of the Pension Reserve Trust's investment program is to generate returns within an appropriately risk-constrained framework, net of reasonable investment fees and expenses, in order to serve the intended purposes of the Pension Reserve Trust under the Plan of Adjustment. This will be accomplished through a carefully planned and executed long-term investment program that allocates and manages the assets of the Pension Reserve Trust.



<u>Prudent Management of the Pension Reserve Trust</u>: This Section 8.1 is meant to serve as a general framework for the prudent management of the Pension Reserve Trust. Changing conditions, economic trends or other factors may necessitate modification of this framework. The Investment Policy Statement at all times shall reflect the current objectives and guidelines for the Pension Reserve Board's management of the Pension Reserve Trust, and the Investment Policy Statement may be modified by written approval of the Pension Reserve Board. The Pension Reserve Board shall promptly provide a copy of such modified Investment Policy Statement to the Pension Benefits Council and the Act 106 Board, and shall post that documentation at the Pension Reserve Board website.

**8.2     Requests for Documents and Information:** In order to prudently invest the assets held in the Pension Reserve Trust in view of the intended purposes of the Pension Reserve Trust under the Plan of Adjustment, the Pension Reserve Board shall have the right to request and receive, on an annual basis, such actuarial and pension benefit information regarding Eligible Retirees and Eligible Active Employees, or information related to projections of future Commonwealth surpluses, as it reasonably determines is necessary.

**8.3     Employment of Professionals:** In addition to the investment professionals retained pursuant to Section 8.1 above, the Pension Reserve Board shall engage in a public RFP process in order to retain necessary and desirable service providers whose contract amount is greater than $250,000.00 (provided that retention of any outside counsel shall require an RFP process regardless of the projected contract amount). The Pension Reserve Board shall have the authority

to enter into contracts and incur fees and expenses in connection with hiring such service providers. All such fees and expenses shall be paid from the Pension Reserve Trust. Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such service providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board on behalf of the Pension Reserve Board and/or the Pension Reserve Trust shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

**8.4    Power to Sue and Jurisdiction of U.S. District Court:** The Pension Reserve Board has legal capacity and the power to bring any cause of action in the name of the Pension Reserve Board and/or the Pension Reserve Trust, as appropriate, against the Commonwealth and/or the Act 106 Board, or any other appropriate party, regarding any matters in connection with the performance of the Pension Reserve Board's duties pursuant to these Guidelines. The Pension Reserve Board has legal capacity and power to bring any cause of action in the name of the Pension Reserve Board and/or the Pension Reserve Trust, as appropriate, to resolve a dispute pursuant to Section 1.6 or 7.1 above. The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Reserve Trust, as well as any causes of action against the Pension Reserve Board or Pension Reserve Trust. In addition to any rights under applicable law, the Commonwealth, as grantor, shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to the performance of the Pension Reserve Board, including and not limited to the administration and investment of the funds held in the Pension Reserve Trust. The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any said causes of action, as well as any causes of action against the Pension Reserve Board.

**8.5    Independence:** For the avoidance of doubt, neither the Pension Reserve Board nor the Pension Reserve Trust shall be an instrumentality of the Commonwealth, nor are they responsible for the obligations of the Commonwealth under the Plan. The Pension Reserve Board from time to time may adopt such rules and regulations as may be necessary or desirable for its proper and efficient administration. All reasonable and proper expenses incurred in the administration of the Pension Reserve Board's responsibilities pursuant to an approved budget will be paid out of the Pension Reserve Trust. Further, for the avoidance of doubt, notwithstanding the foregoing, the Pension Reserve Board is not to be incorporated and is not to be deemed to have legal personality separate from the Pension Reserve Trust.

**8.6    Interim Role of the Oversight Board:** Upon the execution of the Pension Reserve Deed of Trust, the Oversight Board shall perform certain of the start-up functions of the Pension Benefits Council and the Pension Reserve Board for the purpose of performing initial tasks to establish and commence administration of the Pension Reserve Trust as set forth below, for a period concluding upon the earlier to occur of October 1, 2022 or the day the Pension Reserve Board commences its inaugural Board meeting.

    A.    Upon the execution of the Pension Reserve Deed of Trust, the Oversight Board shall have the authority to establish two interest-bearing checking accounts with a federally-insured bank, one in the name of the Pension Benefits Council and one in the name of the Pension Reserve Board, to serve as administrative and operating accounts and to receive the initial funding under Section 1.7(B) above. Pending the inaugural meeting of the Pension Reserve Board pursuant to Section 6.1(B) above, the Oversight Board shall be authorized to pay all expenses of the Pension Benefits Council consistent with the Council's budget from the Council's administrative and operating account. The Oversight Board shall keep complete records of any such payment and undertake reasonable steps to confirm that such expenses are consistent with the Council's budget. For the avoidance of doubt, the Oversight Board shall not invest the funds in the administrative and operating accounts or otherwise manage them other than as described herein. In accordance with Section 6.1(B), the Oversight Board shall cease any bank authorization it has upon the convening of the inaugural Board meeting and deliver any records and documents in its possession or control in connection with the Pension Reserve Trust to the Pension Reserve Board and the Pension Benefits Council, as applicable. The Oversight Board shall also file appropriate documents with the appropriate agency for the incorporation of the Pension Benefits Council as a not-for-profit corporation.

B.   If, after expiration of the three-month period following the Effective Date, the Commencement Date and the inaugural Pension Reserve Board meeting have not occurred pursuant to Sections 6.1(A) and (B) above, but the Oversight Board has made its appointment of a trustee to the Pension Reserve Board, then pending the Commencement Date and inaugural meeting, the Oversight Board is authorized to take any reasonable actions to support the timely and effective operations of the Pension Reserve Board, which may include any of the following:

    i.   commence and engage in an RFP process to select an investment advisor pursuant to Section 8.1 above, subject to Pension Reserve Board review and approval;

    ii.   commence and engage in an Expression of Interest (EOI) and RFP process to recommend a custodian bank, subject to Pension Reserve Board review and approval;

    iii.   commence and engage in an EOI and RFP process regarding a third party asset servicer, asset managers and other essential partners. Any formal retention decisions will be subject to formal ratification by the Pension Reserve Board;

    iv.   conduct reasonable steps to identify and recommend to the Pension Reserve Board suitable Executive Director candidates;

    v.   if applicable, interact with the United States Internal Revenue Service regarding the taxation of the Pension Reserve Trust; and

    vi.   undertake any other reasonable measures or initiatives that a prudent board of trustees would undertake to enable governance, operational and organizational readiness of the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board by October 1, 2022, subject to review and ratification by the Pension Reserve Board or Pension Benefits Council in accordance with their respective roles as set forth in these Guidelines.



C.   The actions of the Oversight Board described in this Section 8.6 are in furtherance of the implementation of the Plan of Adjustment and carrying out its responsibilities in accordance with PROMESA. Pursuant to PROMESA section 105, the Oversight Board, its members, and its employees shall not be liable for any obligation of or claim against the Oversight Board or its members or employees or the territorial government resulting from actions taken with respect to these Guidelines.

## IX.   INDEMNIFICATION & INSURANCE

**9.1   Indemnification:**  Except for acts determined by a final order of the U.S. District Court for the District of Puerto Rico or an appellate court to constitute criminal acts, willful misconduct, fraud, or a material violation of the Code of Conduct and Ethics Policy, and to the extent not covered by insurance as set forth in Section 9.2, the members of the Pension Benefits Council, the trustees of the Pension Reserve Board, and the Election Administrator shall be indemnified by the Pension Reserve Trust against all expenses (including costs and attorneys' fees) actually and necessarily incurred or payable by the member or the Election Administrator in connection with the defense of any action, suit or proceeding to which the member may be made a party by reason of the member being or having been so designated as a member of the Pension Benefits Council or the Pension Reserve Board, respectively, or by reason of any action or omission or alleged action or omission by the member in such capacity or to which the Election Administrator may be made a party.

**9.2   Insurance:**  The Pension Benefits Council, the Pension Reserve Board shall each maintain appropriate amounts of fiduciary liability insurance (as to the Pension Reserve Board) or other professional liability/error and omissions insurance, crime and computer crime insurance covering any loss due to dishonest acts, and any other insurance that the Pension Benefits Council and Pension Reserve Board each reasonably determines is necessary. Such insurance shall be provided

by a nationally-recognized insurance carrier.  Such insurance policies shall provide for both (i) non-indemnifiable coverage (commonly referred to as "Side A" coverage) pursuant to which the insurer will pay to, or on behalf of, the insured person the applicable amount with respect to any covered loss, except to the extent the Pension Reserve Trust has paid such amount to, or on behalf of, the insured person as indemnification or as an advance, and (ii) indemnification coverage (commonly referred to as "Side B" coverage) pursuant to which the insurer will pay to, or on behalf of, the Pension Reserve Trust the applicable amount with respect to any covered loss arising from claims first made against an insured person, to the extent that the Pension Reserve Trust has paid such amount to, or on behalf of, the insured person as indemnification or advancement.  All reasonable insurance costs shall be paid from the Pension Reserve Trust.

## X.    OTHER PROVISIONS

**10.1    Amendment of Guidelines:**  The Pension Reserve Board, the Pension Benefits Council, or the Commonwealth may recommend that these Guidelines and/or the Deed of Trust, as applicable, be amended to ensure that the Pension Reserve Trust satisfies its purpose and function pursuant to the Plan.  In the event of such a recommendation, the Pension Reserve Board, the Pension Benefits Council, and the Commonwealth shall confer in good faith to reach agreement on any such amendment.  If a consensus is reached, then the parties shall present such amendment to the U.S. District Court for the District of Puerto Rico for its approval, with notice and opportunity to be heard.  If consensus is not reached by the parties, the recommending party may nonetheless seek such amendment in the District Court.  The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction to approve or reject any proposed amendments of these Guidelines, and these Guidelines may only be modified pursuant to a final, non-appealable order of that Court.  For the absence of doubt, pursuant to Section 83.3 of the Plan, any amendments to these Guidelines or the Pension Reserve Deed of Trust shall not affect the Commonwealth's obligations to Participants under the Plan, unless the procedures for doing so under Section 83.3 of the Plan are complied with.

**10.2    Termination of Pension Reserve Trust:**  The Pension Reserve Trust shall terminate on the earlier of (i) sixty (60) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with Article V above or (ii) such time when the retirement benefits owed to all Pension Reserve Trust Participants have been fully satisfied.  Upon termination of the Pension Reserve Trust, all of its assets, property, and causes of action shall be transferred to the Commonwealth.  Consistent with Section 5.4(D) above, any termination of the Pension Reserve Trust and transfer of assets and property to the Commonwealth shall take into account and provide for the Wind-Down Expenses.

**End of Document**

---(Signed): The **COMMONWEALTH OF PUERTO RICO**, represented by its Secretary of Treasury, Francisco Parés Alicea. -------------------------

---(Signed): The **FINANCIAL OVERSIGHT MANAGEMENT BOARD FOR PUERTO RICO**, represented by its Executive Director, Natalie Ann Jaresko. -------------------------------------------------------

---(Signed, sealed, marked and flourished): **EDGARDO NIEVES QUILES** . -----------------------------------------------------------------

---The original and the certified copy the deed are exempt from the payment of internal revenue stamps as it is executed by and for the benefit of the Commonwealth of Puerto Rico, pursuant to Section 11.5 above. ------------

---The initials of the appearing parties are found on each page of the original of this Deed. -------------------------------------------------------------

---All pages of the original of this Deed are flourished and sealed by the undersigned Notary Public. ----------------------------------------------------

---I, the undersigned Notary Public, certify that the foregoing is a true and exact copy of Deed Number Two (2), the original of which consists of thirty-nine (39) pages, which forms part of my protocol of public instruments for the current year. -----------------------------------------------

---IN WITNESS WHEREOF, and to deliver to The **COMMONWEALTH OF PUERTO RICO**, I issue the first (1st) certified copy of this Deed, consisting of forty (40) pages, which I sign, seal, mark and flourish in San Juan, Puerto Rico, on the same date of its execution.-----------------------------

NOTARY PUBLIC





01021019; 1

40

# **EXHIBIT I**

CVI Calculation Agent Agreement

CALCULATION AGENT AGREEMENT

DATED AS OF MARCH 15, 2022

AMONG

COMMONWEALTH OF PUERTO RICO,

THE BANK OF NEW YORK MELLON, AS TRUSTEE

AND

ALIXPARTNERS, LLP, AS CALCULATION AGENT

# **TABLE OF CONTENTS**

**Page**

PART 1 - Definitions and Common Provisions ................................................................................... 1

    Section 101.    Definitions ............................................................................................ 1
    Section 102.    Appointment of the Calculation Agent ......................................... 7
    Section 103.    Rules of Construction ......................................................................... 7

PART 2 - CVIs ................................................................................................................................... 7

    Section 201.    Duties of Calculation Agent With Respect to CVIs ....................... 7
    Section 202.    Determination of Occurrence of an SUT Outperformance Condition and Rum
                   Tax Outperformance Condition and Supporting Information ........................... 9
    Section 203.    Calculation of Subject to Waterfall Outperformance Amount and Annual
                   Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum
                   Tax CVI Annual Payment Amount ....................................................... 12
    Section 204.    Challenges to Determinations and Calculations of Amounts ............................ 13

PART 3 - EVENTS OF DEFAULT AND REMEDIES ...................................................................... 15

    Section 301.    Events of Default .......................................................................... 15
    Section 302.    Enforcement of Remedies ............................................................. 15
    Section 303.    Remedies Not Exclusive ............................................................... 16

PART 4 - MISCELLANEOUS ........................................................................................................... 16

    Section 401.    Limits of Trustee's and Calculation Agent's Responsibility ........................... 16
    Section 402.    Indemnification of Calculation Agent ............................................ 18
    Section 403.    Term of Agreement; Termination .................................................. 18
    Section 404.    Fees and Expenses ......................................................................... 19
    Section 405.    Notices ........................................................................................... 19
    Section 406.    Entire Agreement; Trustee shall be entitled to enforce Agreement ................. 20
    Section 407.    Amendment .................................................................................... 20
    Section 408.    Assignment; Successors and Assigns ............................................ 20
    Section 409.    Execution, Delivery and Performance by Calculation Agent .......................... 21
    Section 410.    Governing Law .............................................................................. 21
    Section 411.    Retention of Jurisdiction of Title III Court .................................... 21
    Section 412.    Severability of Invalid Provision ................................................... 21
    Section 413.    Parties of Interest .......................................................................... 22
    Section 414.    Headings ........................................................................................ 22
    Section 415.    Force Majeure ............................................................................... 22
    Section 416.    Signatures and Counterparts ......................................................... 22

CALCULATION AGENT AGREEMENT

This CALCULATION AGENT AGREEMENT (this "Calculation Agent Agreement" or this "Agreement") made this 15th day of March, 2022, by and among the Commonwealth of Puerto Rico (together with any successors thereto, the "Commonwealth"), The Bank of New York Mellon, as Trustee (the "Trustee") under the Trust Agreement as herein defined, and AlixPartners, LLP, as calculation agent hereunder and under the Trust Agreement (the "Calculation Agent").

W I T N E S S E T H:

WHEREAS, the Commonwealth and the Trustee have entered into a Trust Agreement, dated as of March 15, 2022 (the "Trust Agreement"), pursuant to which the Commonwealth has provided for the issuance of two Series of Notes – the GO CVIs and the Clawback CVIs (each as defined herein);

WHEREAS, the GO CVIs are being issued under the Trust Agreement in one Series relating to certain Allowed Claims (as defined in the Trust Agreement), as listed in Attachment 3 to the Trust Agreement; and

WHEREAS, the Clawback CVIs are being issued under the Trust Agreement in three Subseries relating to certain Allowed Claims, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS, within the Subseries of the Clawback CVIs related to the Allowed CW/HTA Claims, there are being issued four Sub-Subseries to reflect a priority of payments, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS, on or prior to each CVIs Outperformance Condition Determination Date (as defined herein), the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition (each as defined herein) shall have occurred in the prior Fiscal Year; and

WHEREAS, following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Commonwealth is obligated, depending upon whether either or both of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition have occurred, to provide for the calculation of certain amounts under the Trust Agreement that are to be paid to the Holders of the GO CVIs and/or the Clawback CVIs;

WHEREAS, the Commonwealth desires to retain the Calculation Agent to make the determinations and calculations referred to above, and the Calculation Agent is willing to perform such services, subject to and in accordance with the provisions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## PART 1 - DEFINITIONS AND COMMON PROVISIONS

Section 101.   **Definitions**

Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed thereto in the Trust Agreement.

"5.5% SUT" means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%). In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 of the Trust Agreement, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

"5.5% SUT Baseline" reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 to the Trust Agreement. Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall cause the Calculation Agent to prepare a revised Attachment 1 and the Commonwealth will then substitute a revised Attachment 1 to the Trust Agreement for the then applicable Attachment 1 as provided herein and in the Trust Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1 to the Trust Agreement.

"5.5% SUT Projections" has the meaning given to such term in Section 202(d) hereof.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"Annual Waterfall Payment" has the meaning ascribed thereto in the Trust Agreement.

"Authorized Officer of the Commonwealth" means the Secretary of Treasury and his or her designees.

"Baseline SUT Reduction" has the meaning ascribed thereto in the Trust Agreement.

"Business Day" has the meaning ascribed thereto in the Trust Agreement.

"Calculation Agent" means the Person serving in such capacity under the Calculation Agent Agreement from time to time. The Calculation Agent must be an Independent Consultant for all purposes of this Calculation Agent Agreement and the Trust Agreement.

"Calculation Agent Agreement" means this Calculation Agent Agreement, dated as of March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time, including any successor agreements thereto serving substantially the same purposes.

"Challenge Payment Date" means the date of distribution of moneys following the final settlement or resolution of a challenge or Proceeding under this Calculation Agent Agreement, which distribution shall be not later than fifteen (15) Business Days following the finalization of such challenge or Proceeding.

"Clawback CVI Annual Not Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 of the Trust Agreement.

"Clawback CVI Annual Payment Amount" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"Clawback CVI Annual Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"Clawback CVI Lifetime Cap" means a total of $5,239,002,764 allocated under the Plan to be paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims, and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.  On or prior to the Effective Date, the Commonwealth and the entity that would be entitled as of the Effective Date to the payment of the $22,580,090 Allowed CW/MBA Claims have settled such Claims.  Consequently, Clawback CVIs relating to the Allowed CW/MBA Claims will not be issued under the Trust Agreement and the full amount of the $22,580,090 in Allowed CW/MBA Claims will be treated for all purposes hereunder and under the Trust Agreement as Deemed Paid CVIs Payments.  The Clawback CVI Lifetime Cap as of the Effective Date following the settlement of the Allowed CW/MBA Claims relating to Allowed CW/HTA Claims, Allowed CW/Convention Center Claims and Allowed CW/PRIFA Rum Tax Claims is $5,216,422,674.

"Clawback CVIs" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to the Trust Agreement, for payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement.  For the avoidance of doubt, unless otherwise provided in the Trust Agreement, the term "Clawback CVI" as used in this Calculation Agent Agreement and the Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"Commonwealth" has the meaning given to such term in the Recitals.

"Commonwealth Rum Tax Revenues" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"CVIs Annual Payment Amount" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"CVIs Annual Payment Amount Calculation Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, September 15 of the next Fiscal Year.

"CVIs Annual Payment Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, November 1 of the next Fiscal Year.

"CVIs Outperformance Condition Determination Date" means, for each Fiscal Year, September 15 of the next Fiscal Year.

"CVIs Payment Fund" means the fund established in accordance with Section 5.08 of the Trust Agreement.

"Deemed Paid CVIs Payments" means amounts that would otherwise have been payable to the Holders of either (a) the $22,580,090 Allowed CW/MBA Claims settled on or prior to the Effective Date, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 of the Trust Agreement.  As of the Effective Date, Attachments 2, 3 and 7 to the Trust Agreement reflect the settlement of Claims on or prior to the Effective Date and, contemporaneously with the extraordinary redemption of Notes pursuant to Section 4.02 and 4.03 of the Trust Agreement, the Commonwealth shall provide substitute Attachments 2, 3 and 7 to the Trustee and the Calculation Agent reflecting such redemptions.  Deemed Paid CVIs Payments shall be deducted from the Subject to Waterfall Payment Amount available to be paid to the Holders of the Clawback CVIs and the Not Subject to Waterfall Payment Amount prior to the transfer to the Trustee in accordance with Section 5.08 of the Trust Agreement.

"Electronic Means" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee or the Calculation Agent, as applicable, or another electronic method or system specified by the Trustee or the Calculation Agent, as applicable, as available for use in connection with its services hereunder.

"Event of Default" has the meaning given to such term in Section 301 hereof.

"GO CVI Annual Payment Amount" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"GO CVI Lifetime Cap" means $3,500,000,000.

"GO CVI Maximum Annual Payment" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) of the Trust Agreement.

"GO CVIs" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to the Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement.

"Holder" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"Indemnified Party" has the meaning given to such term in Section 402 hereof.

"Indemnified Amounts" has the meaning given to such term in Section 402 hereof.

"Majority in Interest" means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

"Measured SUT" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose

established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"Note" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 of the Trust Agreement to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"Not Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) of the Trust Agreement.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"PRIFA Rum Tax Clawback CVIs" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

"Quarter in Interest" means as of any particular date of calculation, the Holders of not less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.  Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"Remaining Clawback CVI Lifetime Cap" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims individually, (b) less the aggregate amounts of the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, and Allowed CW/PRIFA Rum Tax Claims settled, as applicable, after the Effective Date, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.03 of the Trust Agreement.

"Remaining GO CVI Lifetime Cap" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.02 of the Trust Agreement.

"Rum Tax" means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

"Rum Tax CVI Annual Payment Amount" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 of the Trust Agreement.

"Rum Tax Outperformance Condition" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

"Rum Tax Outperformance Metric" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 2 to the Trust Agreement.

"Sales Tax" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

"Series" means either Clawback CVIs or GO CVIs.

"Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) of the Trust Agreement.

"Subseries" means the three categories of Claims against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries, and the CW/PRIFA Rum Tax Claims Subseries.

"Substitute Measured Tax" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth as provided in Section 202(c) hereof.

"Substitute Measured Tax Projections" has the meaning given to such term in Section 202(d) hereof.

"Substitute Measured Tax Report" has the meaning given to such term in Section 202(d) hereof.

"Sub-Subseries" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"SUT Outperformance Condition" means that the 5.5% SUT collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year. An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"SUT True-Up" has the meaning set forth in Section 7.08(c) and (d) of the Trust Agreement.

"Trust Agreement" has the meaning given to such term in the recitals of this Calculation Agent Agreement.

"Trustee" means the entity or organization appointed as Trustee for the Notes pursuant to the Trust Agreement and having the duties, responsibilities and rights provided for therein and herein, and its successor or successors and any other entity or organization which may at any time be substituted in its place pursuant thereto.  The Bank of New York Mellon is the initial Trustee under the Trust Agreement.

Section 102.     **Appointment of the Calculation Agent**

(a)     The Commonwealth hereby appoints the Calculation Agent to perform the services of the Calculation Agent hereunder and under the Trust Agreement.

(b)     The Calculation Agent hereby accepts such appointment and agrees for the term of this Agreement to render such services and to assume the duties and obligations of the Calculation Agent as set forth herein and in the Trust Agreement, including, without limitation, the services, duties and obligations required of the Calculation Agent including, but not limited to Sections 5.03 through 5.08 and Section 7.09 of the Trust Agreement, the calculation or verification of the amount of the Redemption Price applicable to each extraordinary redemption pursuant to Sections 4.02 and 4.03 of the Trust Agreement, and the verification of the calculations of either the Baseline SUT Reduction or SUT True-Up as provided in Section 7.08(e) of the Trust Agreement, which such Sections of the Trust Agreement are incorporated by reference herein, together with the relevant Attachments to the Trust Agreement that are necessary to the completion of the duties and obligations required by such Sections.

(c)     The Calculation Agent must at all times be a Person that is an Independent Consultant meeting all of the requirements of the Trust Agreement, organized and doing business under the laws of the United States or of any State or Territory thereof (including the Commonwealth), or the District of Columbia and professionally qualified to perform the services required under the Trust Agreement and hereunder.

Section 103.     **Rules of Construction**

(a)     Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

(b)     The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Calculation Agent Agreement, refer to this Calculation Agent Agreement. All references to Parts and Sections in this Calculation Agent Agreement refer to the Parts and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

(c)     "$" and "dollars" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## PART 2 - CVIS

Section 201.     **Duties of Calculation Agent With Respect to CVIs**

(a)     The Calculation Agent shall perform the duties of the Calculation Agent contemplated by the Trust Agreement and as provided for in this Calculation Agent Agreement, including the following, in each case based upon the information provided by the Commonwealth on a timely basis in order to allow

the Calculation Agent to meet the timeframes detailed herein and in the Trust Agreement and such other information as may be reasonably requested from the Commonwealth by the Calculation Agent:

> (i)  By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, as provided in Section 5.03(a) of the Trust Agreement and Section 202 hereof; and

> (ii)  By no later than each CVIs Annual Payment Amount Calculation Date, (A) if an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 of the Trust Agreement and Section 203 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement and Section 203 hereof, and (B) if a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Rum Tax CVI Annual Payment Amount, if any, as provided in Section 5.06 of the Trust Agreement and Section 203 hereof.  In each case, the Calculation Agent shall calculate the respective amounts by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Date with such amounts to be recorded on a schedule in substantially the form of Attachment 7 to the Trust Agreement, together with such other information required to complete such Attachment 7 including, without limitation, the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be paid with respect to Clawback CVIs and GO CVIs on such CVIs Annual Payment Date.

(b)  The Calculation Agent shall also perform such other services, duties or obligations as are reasonably related to and necessary, convenient or desirable to perform the Calculation Agent's services, duties and obligations contemplated by the Trust Agreement and this Calculation Agent Agreement, or such other services, duties or obligations as reasonably requested by the Commonwealth in connection therewith and not inconsistent with this Calculation Agent Agreement or the Trust Agreement, including the calculation or verification of the amount of the Redemption Price applicable to each extraordinary redemption pursuant to Sections 4.02 and 4.03 of the Trust Agreement, and the verification of the calculations of either the Baseline SUT Reduction or SUT True-Up as provided in Section 7.08(e) of the Trust Agreement.  In the event such additional services, duties or obligations are mutually agreed on, the parties will discuss in good faith any necessary adjustments to the fee arrangement, including any adjustment needed to any fee caps or funding in place.

(c)  In the event of a conflict in the description of the services, duties or obligations required of the Calculation Agent hereunder and under the Trust Agreement, the provisions of the Trust Agreement shall apply.

Section 202.    **Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and Supporting Information**

(a)    Beginning on the 15th day of the second month following the end of the month of the execution and delivery of this Calculation Agreement, the Commonwealth shall provide to the Calculation Agent the following information:

(i)    no later than the 15th day of the second month following the end of each month, (A) a report setting forth the amount of 5.5% SUT collected in such month and the amount of 5.5% SUT collected on a Fiscal Year-to-date basis including such month, (B) (1) in accordance with Section 7.08 of the Trust Agreement, a statement as to whether or not any events or actions that could result in Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline have occurred within such month and the recommended adjustments to the Baseline SUT Reduction and/or SUT True-Up due to such events or actions reflected in the report prepared by the Calculation Agent in paragraph (b) below; and

(ii)    no later than the 15th day of the second month following the end of each month, a report setting forth the amount of Commonwealth Rum Tax Revenues collected in such month and the amount of Commonwealth Rum Tax Revenues collected on a Fiscal Year-to-date basis.

The first report delivered by the Commonwealth on May 15, 2022, in accordance with this subsection (a) following the effective date of this Calculation Agent Agreement shall include details relating to each month through March 2022, and Fiscal Year-to-date numbers from and including July 2021 through March 2022.

(b)    Promptly upon the occurrence of any events or actions that could result in a Baseline SUT Reduction or SUT True-Up, and in any event within five (5) Business Days of the occurrence thereof, the Commonwealth shall give the Calculation Agent notice of such events or actions and the details relating thereto and provide the Calculation Agent with the information reasonably requested by the Calculation Agent to give the Calculation Agent an opportunity to assess the economic impact of each such event or action and to propose relevant required adjustments to the 5.5% SUT Baseline set forth in the then existing Attachment 1.  Promptly upon receipt of the information provided by the Commonwealth in accordance with the first sentence hereof, (i) if any Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline and/or the Measured SUT have occurred within the month of occurrence, the Calculation Agent shall prepare in sufficient time for inclusion in the report provided by the Commonwealth described in paragraph (a)(i) above (A) a report detailing each such Baseline SUT Reduction and SUT True-Up and the amount by which the 5.5% SUT Baseline should be adjusted to reflect each such Baseline SUT Reduction and the amount by which the Measured SUT should be adjusted to reflect each such SUT True-Up, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the 5.5% SUT Baseline and/or Measured SUT caused by such Baseline SUT Reductions and SUT True-Ups, and (ii) if during the month of the report the Commonwealth reduced the 5.5% SUT to a lower rate, (A) a report detailing the amount of the adjustment to the Measured SUT for that Fiscal Year and each subsequent Fiscal Year to maintain the same dollar amount of outperformance had the Measured SUT remained at 5.5% by multiplying (x) the projected Measured SUT generated at the lower rate by (y) the fraction equal to 5.5% divided by the lower rate, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the Measured SUT.

(c)     Upon agreement with the Commonwealth of the economic impact of the Baseline SUT Reductions, SUT True-Ups and reductions to the 5.5% SUT to a lower rate as set forth in paragraph (b) above that require adjustments to the then existing Attachment 1 and Attachment 7, the Calculation Agent shall prepare a final version of the substitute Attachment 1 and Attachment 7 to the Trust Agreement reflecting the changes required by such Baseline SUT Reductions, SUT True-Ups and adjustments to the Measured SUT.  The Calculation Agent shall send a copy of the final substitute Attachment 1 and Attachment 7 to the Commonwealth and to the Trustee for replacement of the Attachment 1 and Attachment 7 in the Trust Agreement.  The Trustee shall post such final substitute Attachment 1 and Attachment 7, if applicable, together with such calculations and supporting narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(d)     In accordance with Section 7.09 of the Trust Agreement, the Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, which Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth. The Commonwealth shall provide the Calculation Agent with (i) copies of the change in law or executive or judicial action (or a reference to where versions can be reasonably found), (ii) projections for the remaining Fiscal Years through the Fiscal Year ending June 30, 2051, relating to the 5.5% SUT (the "5.5% SUT Projections") based upon the economic projections in the most recently approved fiscal plan of the Commonwealth, and (iii) projections for the remaining Fiscal Years through the Fiscal Year ending June 30, 2051, relating to the expected receipts from the Substitute Measured Tax (the "Substitute Measured Tax Projections") based upon the economic projections in the most recently approved fiscal plan of the Commonwealth, which Substitute Measured Tax Projections shall reflect the receipt of amounts at least equal to the amounts of 5.5% SUT projected in the 5.5% SUT Projections.  Such economic projections shall be updated to reflect actual results occurring during the intervening period between the date of the most recently approved fiscal plan and the date the Commonwealth proposes to substitute the Substitute Measured Tax.  In the event a fiscal plan is no longer being presented for approval by the Oversight Board, the Commonwealth shall engage a third party expert knowledgeable in preparing such projections to advise the Commonwealth in connection with the preparation of such projections or to prepare such projections. Following receipt of such change in law or executive or judicial action, the 5.5% SUT Projections and the Substitute Measured Tax Projections, the Calculation Agent shall review the basis for such 5.5% SUT Projections and the Substitute Measured Tax Projections and the assumptions relating thereto, and such other information as it shall reasonably request from the Commonwealth or such other sources as it deems necessary or appropriate in connection with such review, and promptly after receipt of such material and information issue a report (the "Substitute Measured Tax Report"), taking into consideration any adjustments (positive or negative) to the 5.5% SUT Projections and/or the Substitute Measured Tax Projections as the Calculation Agent deems necessary following its review, to the effect that that there is, or there is not, a reasonable basis for concluding that the Commonwealth is likely to collect the Substitute Measured Tax in amounts at least equal to the amounts projected in the 5.5% SUT Projections (as the Calculation Agent may adjust (positively or negatively)).  The Substitute Measured Tax Report shall contain such other information as necessary or required to permit the Calculation Agent to reach its conclusion, including alternative projections of the 5.5% SUT and the Substitute Measured Tax, if any, and a copy of such Substitute Measured Tax Report shall be sent promptly to the Commonwealth and the Trustee.  The Trustee shall then promptly provide the Holders with a copy of the Substitute Measured Tax Report by posting such Report with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.  After completing its review, if the Calculation Agent concludes that the Substitute Measured Tax will provide for collections at least equal to the amounts projected in the 5.5% SUT Projections (as the Calculation Agent may adjust (positively or negatively)), the Calculation Agent shall prepare a summary of the material provisions describing the Substitute Measured Tax and send a copy of a final substitute Attachment 1, with the only change in Attachment 1 to reflect that the

substitution of the Substitute Measured Tax has become effective without any change in the 5.5% SUT Baseline as a result of such substitution, to the Commonwealth and to the Trustee for replacement of the Attachment 1 in the Trust Agreement.  The Trustee shall post such final substitute Attachment 1, together with the Substitute Measured Tax Report, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(e)     At least quarterly following each March 31, September 30 and December 31 after the monthly information for the final month of such quarter is available under subsection (a) above, commencing with the quarter ending March 31, 2022, the Commonwealth and the Calculation Agent shall confer to review the results for each such quarter and reconcile any issues relating to the information theretofore provided to the Calculation Agent.  Such quarterly conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-to-date collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder.  The conference for the quarter ending March 31, 2022 shall include details relating to year-to-date numbers from and including July 2021.

(f)     By no later than August 15 of each year, beginning on August 15, 2022, the Commonwealth shall provide to the Calculation Agent the information relating to the June monthly and Fiscal Year-end numbers described in subsection (a) above.  It is understood among the parties hereto that:

(i)     taxpayers may submit payments relating to their projected 5.5% SUT collections prior to the filing of their tax returns;

(ii)     the Commonwealth cannot determine how much of the payments submitted by a taxpayer is attributable to such taxpayer's 5.5% SUT tax liability until the taxpayer's tax return is received and reviewed and processed;

(iii)     historically, quantification of the June and Fiscal Year-end 5.5% SUT collections cannot be finalized by the Commonwealth until the review of the tax returns received in July following the end of the Fiscal Year;

(iv)     amounts received by the Commonwealth from taxpayers as 5.5% SUT collections through July that represent the payment by such taxpayers of their 5.5% SUT tax liability for the Fiscal Year ended in the preceding month, as reported by the Commonwealth after the processing of tax returns in July, shall be used by the Calculation Agent in its determination as to whether an SUT Outperformance Condition and Rum Tax Outperformance Condition have occurred, and the amounts to be subsequently calculated by the Calculation Agent in accordance with Section 203 hereof; provided, for the avoidance of doubt, that amounts received or credited thereafter that represent the payment by taxpayers of their 5.5% SUT tax liability for the most recently ended Fiscal Year shall thereafter be taken into consideration in the subsequent determination of SUT Outperformance Conditions and related calculations; and

(v)     amounts received by the Commonwealth as 5.5% SUT collections that are not subsequently confirmed as attributable to taxpayer liabilities through tax returns are not to be taken into account as 5.5% SUT collections for the preceding Fiscal Year.

(g)      By no later than five (5) Business Days before each CVIs Outperformance Condition Determination Date of each year, beginning with the CVI Outperformance Condition Determination Date occurring in calendar year 2022, and following the delivery of the information provided in subsection (f) above, the Commonwealth and the Calculation Agent shall confer to review the results for such Fiscal Year and reconcile any issues relating to the information theretofore provided to the Calculation Agent.  Such conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-end collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, the Substitute Measured Tax, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder, all to allow the Calculation Agent to calculate the amounts required by Section 203 hereof.

(h)      The Calculation Agent shall make its determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred by no later than the CVIs Outperformance Condition Determination Date and provide the Trustee and the Commonwealth with its determinations thereof on or prior to such date, promptly confirmed in writing, together with the calculations used to make such determinations.  The Trustee shall post such determinations, together with the calculations relating thereto provided by the Calculation Agent, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Days of its receipt of the written confirmation of such determinations.

(i)      Within fifteen (15) Business Days of the posting of such determinations on EMMA as provided in subsection (h) above, the Commonwealth and/or a Majority in Interest may challenge in accordance with Section 204 hereof (A) adjustments to the Baseline SUT Reductions, SUT True-Ups and Measured SUT determined in accordance with Section 202(b) hereof, (B) the conclusion that the Substitute Measured Tax will provide for collections at least equal to the amounts projected in the 5.5% SUT Projections, all as provided in Section 202(d) hereof, or (C) the determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred as provided in Section 202(h) hereof.

Section 203.      **Calculation of Subject to Waterfall Outperformance Amount and Annual Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum Tax CVI Annual Payment Amount**

(a)      In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Calculation Agent shall proceed to calculate the following:

(i)      if an SUT Outperformance Condition has occurred, the Subject to Waterfall Outperformance Amount and the Annual Waterfall Payment as provided in Section 5.04 of the Trust Agreement and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement;

(ii)      if a Rum Tax Outperformance Condition has occurred, the Rum Tax CVI Annual Payment Amount as provided in Section 5.06 of the Trust Agreement;

(iii)      the deposits and transfers required to be made to the CVIs Payment Fund in accordance with Section 5.08 of the Trust Agreement; and

(iv)     all other amounts necessary to complete a final Attachment 7 to the Trust Agreement.

(b)     The Calculation Agent may request that the Commonwealth provide such additional information as is reasonably necessary for the Calculation Agent to timely finalize the calculations referred to in subsection (a) of this Section 203, and the Commonwealth shall timely provide such information.

(c)     By no later than each CVIs Annual Payment Amount Calculation Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall send written copies of the calculations referred to in subsection (a) of this Section 203 to the Commonwealth and the Trustee.  The Trustee shall post such calculations, including a final Attachment 7 to the Trust Agreement, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)     Within fifteen (15) Business Days of the posting of such notice on EMMA as provided in subsection (c) above, the Commonwealth and a Majority in Interest may challenge in accordance with Section 204 herein the Determination(s) and calculations referred to in this Section 203.

Section 204.     **Challenges to Determinations and Calculations of Amounts**

(a)     If the Commonwealth has filed a challenge with the Calculation Agent and the Trustee within the time period permitted by Section 202(i) or Section 203(d) hereof, or if a Majority in Interest has filed a challenge with the Calculation Agent, the Trustee and the Commonwealth within the time period permitted by Section 202(i) or Section 203(d) hereof, in each case detailing the nature of its challenge(s), the Commonwealth or the Majority in Interest making the challenge, as the case may be, may exercise the remedies hereinafter referred to with respect to each such challenge.  Either the Commonwealth or a Majority in Interest may combine their respective challenges under Section 202(i) and Section 203(d).  The Trustee shall post a copy of each such challenge (or a summary thereof) with EMMA under all of the CUSIP numbers applicable to the Notes affected by such challenge within one (1) Business Day of its receipt thereof.

(b)     The Calculation Agent, the Trustee, a representative of each Majority in Interest making a challenge and the Commonwealth shall promptly arrange for a meeting or meetings to attempt to resolve such challenge(s) and each party shall use reasonable efforts to resolve such matters in dispute.

(c)     In the event that the Calculation Agent, the Trustee, the representatives of each Majority in Interest making a challenge and the Commonwealth are unable to resolve all challenges prior to October 25, then (i) the Calculation Agent shall determine the portion of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount and the Rum Tax CVI Annual Payment Amount that is not in dispute and the payment of which will not prejudice any party's interest in the future receipt or payment, as the case may be, of such amounts and provide notice to the Trustee, the representatives of each Majority in Interest making a challenge and the Commonwealth as to the amounts that will be paid to the Holders on the CVIs Annual Payment Date, (ii) the Calculation Agent shall make the final calculations applicable to complete Attachment 7 with respect to such amounts for the CVIs Annual Payment Date, and shall promptly forward a copy of such final Attachment 7 to the Commonwealth, the representatives of each Majority in Interest making a challenge and the Trustee, (iii) the Commonwealth shall transfer to the Trustee for deposit on the Business Day prior to the CVIs Annual Payment Date the amounts reflected in the final Attachment 7, and (iv) the Trustee shall post a copy of the final Attachment 7 with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)      In the event all of the challenges have not been finally resolved in accordance with subsection (c) above as provided therein, the Commonwealth and/or a Majority in Interest making a challenge may bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) and (ii) seek any other remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.  The failure to resolve any such challenge on or prior to the CVIs Annual Payment Date shall not be an Event of Default hereunder or under the Trust Agreement.

(e)      Upon the finalization of any challenge or Proceeding hereunder, the Calculation Agent, the Trustee and the Commonwealth shall take all steps reasonably necessary to establish a Challenge Payment Date no later than fifteen (15) Business Days following such finalization to provide for the payment of the amounts set forth in the settlement or resolution of any challenge or Proceeding.  A revised final Attachment 7 relating to such Challenge Payment Date shall be prepared by the Calculation Agent and posted by the Trustee with EMMA under all of the CUSIP numbers applicable to the Notes receiving a payment on the Challenge Payment Date not less than five (5) calendar days prior to such Challenge Payment Date.  On the Business Day prior to the Challenge Payment Date, the Commonwealth shall transfer into the applicable account(s) within the CVIs Payment Fund such amounts as are determined to be payable pursuant to any challenge or Proceeding under this Section 204.

(f)      All parties to the challenge or Proceeding shall pay their own costs and expenses, except that the Calculation Agent shall be reimbursed in accordance with its agreement with the Commonwealth.

(g)      For purposes of clarification, parties who have an interest in initiating or directing challenges or Proceedings or taking other actions hereunder shall refer to the following:

(i)      the Holders of all GO CVIs and Clawback CVIs with respect to the determination of whether an SUT Outperformance Condition has occurred and calculations relating to the (A) effects of Baseline SUT Reductions, SUT True-Ups and a Substitute Measured Tax, (B) Subject to Waterfall Outperformance Amount and Annual Waterfall Payment and (C) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto;

(ii)     the Holders of all Clawback CVIs with respect to calculations relating to the (A) Not Subject to Waterfall Outperformance Amount, and (B) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto; and

(iii)    the Holders of all PRIFA Rum Tax Clawback CVIs with respect to the determination of whether a Rum Tax Outperformance Condition has occurred and calculations relating to the (A) Rum Tax CVI Annual Payment Amount, and (B) amounts on proposed Attachment 7 to the Trust Agreement to be distributed to the Holders entitled thereto.

## PART 3 - EVENTS OF DEFAULT AND REMEDIES

Section 301.    **Events of Default**

An Event of Default shall exist hereunder if the Commonwealth, the Trustee or the Calculation Agent shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein on the part of the Commonwealth, the Trustee or the Calculation Agent to be performed, as applicable, and such default shall continue for ten (10) Business Days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth, the Trustee or the Calculation Agent, as applicable, by any of the other parties hereto, each of which may give such notice in its discretion; provided, however, that the Trustee shall give such notice of a default at the written request of the Holders of not less than a Majority in Interest of the Outstanding Notes to which the Event of Default relates in the case of matters relating to challenges as provided in Section 204 hereof, or of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates in the case of all other matters.  A copy of any such default notice shall also be provided to the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof).  Notwithstanding the foregoing, no Event of Default shall occur due to a challenge under Section 204 hereof that has not been resolved and is proceeding.

Section 302.    **Enforcement of Remedies**

(a)    If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Trustee may, and upon written request of Holders holding not less than a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, to which an Event of Default relates shall (i) bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) against the Commonwealth and (ii) seek any other remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(b)    If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)    If an Event of Default by the Trustee occurs under Section 301 hereof and is continuing, each of the Commonwealth and the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)    If an Event of Default by the Calculation Agent occurs under Section 301 and is continuing, each of the Commonwealth, without any request by, or consent of, any other Person, or the Trustee may, and upon written request of Holders holding not less than a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, to which such Event of Default relates the Trustee shall, seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists; provided, that under no circumstances shall the Commonwealth or the

Calculation Agent be entitled to terminate this Agreement or its respective obligations hereunder as a result of any Event of Default by the Trustee.

Section 303.    **Remedies Not Exclusive**

No remedy herein conferred upon or reserved to the Calculation Agent, the Commonwealth, the Trustee or the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## PART 4 - MISCELLANEOUS

Section 401.    **Limits of Trustee's and Calculation Agent's Responsibility**

(a)     The recitals of fact contained herein shall be taken as the statements of the Commonwealth and neither the Trustee nor the Calculation Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor the Calculation Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded by the Trust Agreement, and neither the Trustee nor the Calculation Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor the Calculation Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith or in accordance with the Trust Agreement except as to the application of any money paid to the Trustee in its capacity as Trustee under the Trust Agreement.  Neither the Trustee nor the Calculation Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own gross negligence or willful misconduct.

(b)     The duties and obligations of the Trustee and the Calculation Agent shall be determined by the express provisions hereof and neither the Trustee nor the Calculation Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Calculation Agent Agreement against the Trustee or the Calculation Agent.  If any Event of Default under this Calculation Agent Agreement shall have occurred and be continuing, the Trustee and the Calculation Agent shall exercise such of the rights and powers vested in it by this Calculation Agent Agreement and shall use the same degree of care as a prudent person, as a trustee under a similar agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

(c)     The Trustee and the Calculation Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it to be genuine, and to have been signed or presented by the proper party or parties, in the absence of gross negligence or willful misconduct.  The Trustee and the Calculation Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it and in accordance therewith, in the absence of gross negligence or willful misconduct on the Trustee's part.

(d)     Whenever the Trustee or the Calculation Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or the Calculation Agent, in lieu thereof, may either accept other

evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or the Calculation Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

(e)     Neither the Trustee nor the Calculation Agent shall be deemed to have notice of any default or Event of Default hereunder unless an Authorized Officer of the Trustee or an authorized officer of the Calculation Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee or the Calculation Agent at the designated corporate trust office of the Trustee or the Calculation Agent and such notice references the Notes relative to which an Event of Default has occurred.

(f)     The Trustee and the Calculation Agent may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Calculation Agent Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(g)     The Trustee and the Calculation Agent shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Majority in Interest of the Outstanding Notes, or a Quarter in Interest of the Outstanding Notes, as applicable, pursuant to the terms hereof and of the Trust Agreement in respect of such action or failure to act, except to the extent of its gross negligence or willful misconduct in connection therewith.

(h)     In no event shall the Trustee or the Calculation Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee or the Calculation Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The Trustee and the Calculation Agent shall not be liable for any error of judgment made in good faith by an Authorized Officer, unless it is proven that the Trustee or the Calculation Agent was negligent.

(j)     The Trustee and the Calculation Agent shall be under no obligation to exercise any of the rights or powers vested in it under this Calculation Agent Agreement at the request or direction of any of the Holders pursuant to this Calculation Agent Agreement unless such Holders shall have offered to the Trustee and/or the Calculation Agent reasonable security or indemnity against the costs, expenses and liabilities (except as may result from the Trustee's and/or the Calculation Agent's own gross negligence or willful misconduct) which might be incurred by it in compliance with such request or direction).

(k)     The Trustee and the Calculation Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Calculation Agent Agreement and delivered using Electronic Means ("Instructions"); provided, however, that the Commonwealth shall provide to the Trustee and the Calculation Agent an incumbency certificate signed by an Authorized Officer of the Commonwealth listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or the Calculation Agent Instructions using Electronic Means and the Trustee or the Calculation Agent in its discretion elects to act upon such Instructions, the Trustee's or the Calculation Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands

and agrees that the Trustee or the Calculation Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and the Calculation Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or the Calculation Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or the Calculation Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor the Calculation Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or the Calculation Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to gross negligence or willful misconduct of the Trustee or the Calculation Agent. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or the Calculation Agent, including without limitation the risk of the Trustee or the Calculation Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or the Calculation Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and the Calculation Agent, in writing, immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

Section 402.     **Indemnification of Calculation Agent.**

Without limiting any other rights which the Calculation Agent may have hereunder or under applicable law, the Commonwealth hereby agrees, to indemnify the Calculation Agent and its officers, directors, employees and agents (each, an "Indemnified Party") from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts"), awarded against or incurred by any of them arising out of or as a result of this Agreement, the Calculation Agent's services hereunder or the Indemnified Party's enforcement of Commonwealth's indemnification commitments, excluding, however, Indemnified Amounts to the extent determined by a court of competent jurisdiction, which determination is not subject to appeal, to have been directly caused predominantly by the gross negligence or willful misconduct on the part of an Indemnified Party. The indemnities set forth in this section shall survive the termination of this Agreement.

Section 403.     **Term of Agreement; Termination**

(a)     This Agreement will terminate on the earlier of (i) March 15, 2027, and (ii) the date on which an optional termination as set forth in Section 403(b) becomes effective; provided, however, that in no event shall this Agreement terminate prior to the date on which a successor Calculation Agent has been appointed and, provided further that this Agreement may not be terminated from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date.

(b)     The Commonwealth and the Calculation Agent shall have the option to terminate this Agreement at any time upon stating their intention to do so pursuant to this Section 403(b) and which date shall not be less than thirty (30) days in the case of the Commonwealth terminating this Agreement, and ninety (90) days in the case of the Calculation Agent terminating this Agreement, from the proposed termination date. Upon any termination, the Commonwealth shall pay to the Calculation Agent compensation through the effective date of such termination, which compensation shall include, but not be

limited to, the reasonable compensation, disbursements and expenses of the Calculation Agent's counsel, as described in Section 404.

Section 404.    **Fees and Expenses**

The Commonwealth and the Trustee agree to pay the documented fees and expenses of the Calculation Agent for its services under this Calculation Agent Agreement and the Trust Agreement consistent with the Scope of Services and Fees and Expenses of the Calculation Agent generally set forth in Attachment 1 hereto.  Such Attachment 1 may be revised from time to time by the Commonwealth and the Calculation Agent without the consent of the Trustee or any Holders.  Such fees and expenses shall be payable by the Trustee from the Calculation Agent Payment Account from amounts on deposit in the Trustee and Independent Consultant Expenses Fund, but the amount on deposit in the Trustee and Independent Consultant Expenses Fund is not a limitation on the obligation of the Commonwealth and the Trustee to pay such fees and expenses in accordance with the Attachment 1 referenced in the preceding sentence.

Section 405.    **Notices**

Any direction, notice, report or other communication required or permitted hereunder shall be furnished or given in English and in writing and such direction, notice, report or other communication may be given by United States mail, reputable overnight courier service, facsimile transmission or electronic mail (confirmed by telephone, United States mail or reputable overnight courier service in the case of notice by facsimile transmission or electronic mail) or any other customary means of communication, and any such direction, notice, report or other communication shall be effective when delivered or transmitted, or if mailed, five days after deposit in the United States mail with proper postage for ordinary mail prepaid:

If to the Commonwealth, to:

Commonwealth of Puerto Rico
10 Paseo Covadonga
San Juan, Puerto Rico 00901
Attention: Secretary of the Treasury

with a copy to AAFAF at:

Puerto Rico Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Avenue Stop 22
San Juan, Puerto Rico 00907
Attention: Executive Director

If to the Trustee, to:

The Bank of New York Mellon
240 Greenwich Street, Floor 7 East
New York, New York 10286
Attention: Corporate Trust

If to the Calculation Agent, to:

AlixPartners, LLP
2000 Town Center
Southfield, Michigan 48075
Attention: General Counsel
E-mail: legal@alixpartners.com

Section 406.    **Entire Agreement; Trustee shall be entitled to enforce Agreement**

This Calculation Agent Agreement, including the provisions of the Trust Agreement incorporated herein by reference, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

Section 407.    **Amendment**

(a)    In the event that any of the definitions or provisions of the Trust Agreement that are duplicated or incorporated herein are amended or supplemented in compliance with the terms of the Trust Agreement, unless otherwise provided in such amendment or supplement, such amendment or supplement shall automatically amend or supplement the duplicative or incorporated definition or provision herein without further approval, except the consent of the Calculation Agent shall be required to the extent such amendment or supplement affects its duties or obligations hereunder.  The parties hereto may not amend any definition or provision of this Calculation Agent Agreement that is duplicated or incorporated herein from the Trust Agreement with the intention of changing the requirements of the Trust Agreement without such definition or provision also being approved or consented to in accordance with the terms of Article IX or X or the Trust Agreement, as applicable.

(b)    Otherwise, this Calculation Agent Agreement may not be modified or amended other than by an agreement in writing signed by each party hereto.

Section 408.    **Assignment; Successors and Assigns**

(a)    This Agreement shall inure to the benefit of and bind the parties hereto and their respective successors and assigns; provided that neither the Commonwealth nor the Trustee may assign its rights and delegate its obligations hereunder except as provided in the Trust Agreement and the Calculation Agent may not assign its rights and delegate its obligations hereunder without the prior written consent of the Commonwealth and the Trustee, unless such assignment is to a wholly-owned, direct or indirect subsidiary of the Calculation Agent, which such subsidiary must be an Independent Consultant meeting the requirements of the Trust Agreement, which shall not require the consent of the Commonwealth or the Trustee.  Unless assigned to a wholly-owned, direct or indirect subsidiary of the Calculation Agent, which such subsidiary must be an Independent Consultant meeting the requirements of the Trust Agreement, no such assignment by the Calculation Agent shall take place from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date.

(b)    The Commonwealth may remove the Calculation Agent at any time upon thirty (30) days' prior written notice.   The Calculation Agent may resign its duties hereunder by providing the Commonwealth and the Trustee with at least ninety (90) days' written notice.  Any successor Calculation Agent may be appointed by the Commonwealth and must be an Independent Consultant meeting the

requirements of the Trust Agreement. Any successor shall have agreed in writing to assume all of the obligations and duties of the Calculation Agent hereunder, whether as a successor or assign under this Calculation Agent Agreement or a replacement agreement in substantially the form of this Calculation Agent Agreement. In the event that the Calculation Agent should resign or be discharged, the Commonwealth shall take all necessary action to cause a new Calculation Agent to be appointed hereunder prior to the resignation of the current Calculation Agent. Notwithstanding the foregoing, in no event may the Calculation Agent be removed or resign prior to the date on which a successor Calculation Agent has been appointed.

(c)     The Commonwealth shall post notices of resignation, removal and replacement of the Trustee and the Calculation Agent with EMMA under all of the CUSIP numbers applicable to the Notes within ten (10) Business Days of such resignation, removal and replacement.

Section 409.     **Execution, Delivery and Performance by Calculation Agent**

The execution, delivery and performance of this Agreement, to the best of the knowledge of the Calculation Agent, after reasonable investigation, will not conflict with or constitute a default under any order, judgment, decree, agreement, injunction or other instrument binding on or affecting the property or assets of the Calculation Agent.

Section 410.     **Governing Law**

This Calculation Agent Agreement shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Calculation Agent Agreement; provided, however, that the authorization of this Calculation Agent Agreement by the Commonwealth shall be governed by the laws of the Commonwealth.

Section 411.     **Retention of Jurisdiction of Title III Court**

The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Calculation Agent Agreement (a) shall be brought in accordance with the terms of this Calculation Agent Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

Section 412.     **Severability of Invalid Provision**

If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth, the Calculation Agent or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Trust Agreement or the Notes.

Section 413.      **Parties of Interest**

Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Calculation Agreement and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Calculation Agent and the Holders, and each shall be third party beneficiaries hereof.

Section 414.      **Headings**

Any headings preceding the text of the several Parts and Sections hereof, and any table of contents hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

Section 415.      **Force Majeure**

In no event shall the Trustee or the Calculation Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, pandemics, epidemics, recognized public emergencies, quarantine restrictions, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services and hacking, cyber-attacks, or other use or infiltration of the Trustee's or the Calculation Agent's technological infrastructure exceeding authorized access; it being understood that the Trustee and the Calculation Agent shall use reasonable efforts which are consistent with accepted practices in the banking and consultant industries, as applicable, to resume performance as soon as practicable under the circumstances.

Section 416.      **Signatures and Counterparts**

This Calculation Agent Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Calculation Agent Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Calculation Agent Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Calculation Agent Agreement to be duly executed as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____

Name:  Franciso Parés Alicea
Title:   Secretary of the Treasury


THE BANK OF NEW YORK MELLON, as Trustee


By: _____

Name:  Oreste Casciaro
Title:   Vice President


ALIXPARTNERS, LLP


By: _____

Name:  Marc Brown
Title:   Managing Director


4839-0097-7915

[Signature page to Calculation Agent Agreement – CVIs]

IN WITNESS WHEREOF, the parties hereto have caused this Calculation Agent Agreement to be duly executed as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____
Name:   Franciso Parés Alicea
Title:     Secretary of the Treasury

THE BANK OF NEW YORK MELLON, as Trustee

By: _____
Name:   Oreste Casciaro
Title:     Vice President

ALIXPARTNERS, LLP

By: _____
Name:   Marc Brown
Title:     Managing Director

4839-0097-7915                    [Signature page to Calculation Agent Agreement – CVIs]

IN WITNESS WHEREOF, the parties hereto have caused this Calculation Agent Agreement to be duly executed as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____

Name:  Franciso Parés Alicea

Title:    Secretary of the Treasury

THE BANK OF NEW YORK MELLON, as Trustee

By: _____

Name:  Oreste Casciaro

Title:    Vice President

ALIXPARTNERS, LLP

By: _____

Name:  Marc Brown

Title:    Managing Director

**Attachment 1 – Scope of Services and Fees and Expenses of Calculation Agent**

Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed thereto in the Trust Agreement.

General Scope of Services

On the Effective Date, the Commonwealth shall issue the GO CVIs, in the aggregate original notional amount of $3,500,000,000.00, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043.

On the Effective Date, the Commonwealth shall issue the Clawback CVIs, in the aggregate original notional amount of $5,216,422,674.00, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.

The GO CVIs and the Clawback CVIs shall be subject to mandatory redemption in accordance with the provisions of Article IV of the Trust Agreement.

In coordination with the Puerto Rico Department of the Treasury ("Hacienda"), the scope of services under the Calculation Agent Agreement and the Trust Agreement include, but are not limited to, calculation and/or verification of certain outperformance metrics and redemption prices pursuant to the Plan, including:

(a)     The duties, services and obligations referred to in Parts 2 and 3 of this Agreement, including the provisions of the Trust Agreement incorporated herein by reference.

(b)     5.5% SUT – pursuant to the provisions set forth in the Plan, with respect to the GO CVIs and Clawback CVIs, based on information provided by Hacienda, annual calculation of actual 5.5% SUT and the Measured SUT or the Substitute Measured Tax, as applicable, as compared to the 5.5% SUT Baseline to determine if an Outperformance Condition has occurred.

(c)     Adjustments to SUT Baseline and 5.5% SUT Collections – based on information provided by Hacienda, determine whether a Baseline SUT Reduction or an SUT True-Up should be applied to the annual calculation referenced in clause (b).

(d)     General Fund Rum Tax Collections – pursuant to the Rum Tax CVI provisions included in the Plan and as detailed in the settlement summary annexed to the Plan as Exhibit M, based on information provided by Hacienda, calculation of actual general fund rum tax collections as compared to the general fund rum tax collections forecast included in Annex 1 of Exhibit M of the Plan.

(e)     No Double Counting – with respect to the above paragraphs, ensuring that the calculations of outperformance do not result in the Commonwealth distributing in excess of 100% of outperformance relative to the Certified Fiscal Plan in effect as of the Effective Date.

(f)     Determination Challenges – The scope will also include participating in discussions with, and in contests by, Holders of the CVIs and other interested parties to finalize determinations, calculations and payments, including the preparation and posting on public websites of material financial information relating to the foregoing.

Method of Payment

The Commonwealth has directed the Trustee to establish on the Effective Date within the Trustee and Independent Consultant Expenses Fund Account, a separate account named the "Calculation Agent Payment Account," which shall be held by the Trustee for the benefit of the Calculation Agent.

On the Effective Date, the Commonwealth will deposit $500,000 for the payment of the fees and expenses of the Calculation Agent.  No later than January 1 of each year, the Commonwealth will deposit with the Trustee for deposit into the Calculation Agent Payment Account an amount sufficient to bring the amount on deposit therein to $500,000 or such other amount as may be established pursuant to written agreement of the Calculation Agent and the Commonwealth (the "CA Deposit Amount").

Unless otherwise agreed to by the Commonwealth, the Calculation Agent may submit invoices to the Trustee for payment no more often than monthly in a cumulative amount for work done to determine the occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and the related calculations for a specific fiscal year up to the CA Deposit Amount.  A copy of each invoice submitted to the Trustee for payment by the Calculation Agent shall be forwarded to the Commonwealth for review.  The Department of Treasury and AAFAF shall have thirty (30) days from the date they receive the invoice to approve it. The passage of thirty (30) days after receipt by the Department of Treasury and AAFAF of the invoice without written notice from the Department of Treasury or AAFAF to the Trustee objecting to the payment thereof shall be deemed approval. If the Commonwealth objects to the payment, it shall provide reasonable detail of its objection to the Calculation Agent. In the absence of an objection raised by the Commonwealth, the Trustee will use its best efforts to pay such invoices within five (5) Business Days of the later of the approval or deemed approval by the Department of Treasury and AAFAF or the resolution of any objection.  To the extent there is an objection raised by the Commonwealth, all undisputed amounts will be paid in accordance with the payment terms hereof.

Current Schedule of Fees and Expenses

The Calculation Agent will perform the services required on a rate per hour basis at the hourly rates set forth in Attachment 2 hereof. In accordance with the customary practices of the Calculation Agent, hourly rates are adjusted annually. However, the fees charged by the Calculation Agent under this Agreement, together with any fees charged by the Calculation Agent for the services rendered by the Calculation Agent with respect to the calculation of surplus revenues to determine the amount of the contributions (if any) required to be made by the Commonwealth to the Pension Reserve Trust and the American Federation of State, County and Municipal Employees (AFSCME) under the Plan, shall in no event exceed $500,000 per fiscal year (the "Annual Cap"). The Calculation Agent shall be entitled to the reimbursement of reasonable and necessary out-of-pocket expenses, subject to an annual cap equal to 5% of the Annual Cap (the "Annual Expenses Cap"). For the avoidance of doubt, the Annual Expenses Cap shall be separate and apart from, and the expenses shall not be counted towards, the Annual Cap. At any time during the contract period, the Annual Cap and the Annual Expenses Cap can be increased if (a) an audit of financial information provided by the Commonwealth in connection with the determinations and/or calculations is required and (b) a material dispute of the determinations and/or calculations is raised.

Additional Government Contracting Provisions

In addition to the other terms and conditions set forth in this Agreement, the Commonwealth and the Calculation Agent agree as follows:

1.      Subcontracting. Unless (i) otherwise expressly provided in the Agreement, (ii) the Calculation Agent obtains a written authorization from the Commonwealth, or (iii) the subcontracting is with a subsidiary or affiliate of the Calculation Agent, the Calculation Agent may not subcontract the services to be provided hereunder. The request to subcontract must specify the matters in which the subcontractor would intervene. The fees accrued by the subcontractor will be deducted from the maximum amount that the Calculation Agent can charge under this Agreement.

2.      Invoices. Each invoice submitted by the Calculation Agent will include a reasonably detailed description of the services and must include the following certification:

"*Under penalty of absolute nullity, I certify that no public servant of the Commonwealth of Puerto Rico is a party or has any interest in the profits or benefits resulting from the contract object of this invoice. The only consideration for supplying the services object of the contract has been the payment agreed with the authorized representative of the Commonwealth. The amount of this invoice is fair and correct. The works have been provided and products delivered, and they haven't been paid for.*"

All invoices must be submitted within one hundred twenty (120) days of the end of the month in which the corresponding services were rendered. Upon the approval of the invoices as set forth above, payment to the Calculation Agent will be made by the Trustee from the CA Deposit Amount on deposit in the Calculation Agent Payment Account. All invoices shall be submitted to the Commonwealth, with a copy to AAFAF, at the addresses set forth in Section 405 of the Calculation Agent Agreement.

3.      Withholdings. Pursuant to Section 1035.02(a)(3) of Act 1-2011, as amended, known as the Puerto Rico Internal Revenue Code of 2011, provided that the Calculation Agent Agreement is registered with the Office of the Comptroller of Puerto Rico pursuant to Section 10 hereof and unless otherwise required by future legislation, the fees payable by the Commonwealth to the Calculation Agent hereunder with respect to services rendered outside of Puerto Rico shall not be subject to income tax withholdings. Notwithstanding the foregoing, the Calculation Agent hereby acknowledges and agrees that it shall be subject to the withholding of the special contribution of one point five percent (1.5%) of the gross amounts paid by the Commonwealth hereunder as required by Act No. 48-2013, as amended. Any applicable withholding shall be transferred by the Trustee to the Commonwealth.

4.      Conflicts of Interest. The Calculation Agent recognizes that it does not represent particular interests in cases or matters that imply a conflict of interest or public policy between the Commonwealth and the particular interests it represents. The Calculation Agent shall disclose to the Commonwealth all the circumstances of its relationships with clients and with third parties with any interest that may result in a conflict of interest with the Calculation Agent's ability to perform its services under this Calculation Agent Agreement.

5.      Representations. The Calculation Agent recognizes, represents, guarantees and certifies to the Commonwealth that:

        a.      it has no contracts with other entities of the Government of Puerto Rico;

b.      none of its directors, officers, shareholders or employees is an officer or employee of the Commonwealth or of any of its agencies or instrumentalities, or receives any payment or compensation for regular services rendered under appointment to an agency or instrumentality of the Commonwealth;

c.      it received a copy of Act No. 2-2018, as amended, by which the Code of Ethics for Contractors, Suppliers and Applicants for Economic Incentives from the Executive Agencies of the Commonwealth of Puerto Rico is established, and undertakes to comply with the provisions of such law;

d.      as of the date of this Agreement, the Calculation Agent has not been convicted in any Commonwealth or United States Federal court of any of the crimes in (i) Articles 4.2, 4.3 or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, (ii) Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, or (iii) Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico, or of any other crime that involves misuse of public funds or property, including but not limited to the crimes identified in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico;

e.      it maintains an insurance policy to cover claims for errors or omissions appropriate to cover contingencies arising under this Agreement;

f.      if there is any judicial or administrative order demanding payment or any economic support under the Act for the Improvement of Family Assistance and for the Support of the Elderly (known in Spanish as "*Ley de Mejoras al Sustento de Personas de Edad Avanzada de Puerto Rico*"), Act. No. 168-2000, as amended, the same is current and the Calculation Agent is in compliance therewith;

g.      it is not required to obtain a waiver from any Commonwealth government entity prior to or in connection with the execution of this Agreement; and

h.      it is responsible for performing the services hereunder in accordance with the industry standards.

6.      <u>Independent Contractor</u>. The Calculation Agent and the Commonwealth acknowledge and agree that the Calculation Agent is an independent contractor and, therefore, that nothing in this Agreement shall be construed as creating an employer-employee relationship between the Calculation Agent or any of its directors, officers, shareholders or employees, and the Commonwealth. As such, the Calculation Agent agrees and acknowledges that it has sole responsibility and liability for any and all taxes, contributions, penalties, interest, licenses, fees or other sums payable in connection with the fees paid pursuant to this Agreement.

7.      <u>Sworn Statement – Commonwealth Taxes</u>. On or prior to the date hereof, the Calculation Agent has delivered to the Commonwealth a sworn statement substantially in the form of <u>Attachment 3</u> hereto.

8.    <u>Sworn Statement – Anticorruption Laws</u>. On or prior to the date hereof, the Calculation Agent has delivered to the Commonwealth a sworn statement in substantially in the form of <u>Attachment 4</u> hereto.

9.    <u>ASUME</u>. Within thirty (30) days from the execution of this Agreement, the Calculation Agent shall deliver to the Commonwealth a no debt certification issued by the Puerto Rico Child Support Administration.

10.   <u>Office of the Comptroller</u>. This Agreement shall be registered in the Office of the Comptroller of Puerto Rico pursuant to Act No. 18 of October 30, 1975, as amended.

**Attachment 2 – Hourly Fees**

| As of January 1, 2022* | |
|---|---|
| **Title** | **Hourly Rate** |
| Managing Director | $1,060 – $1,335 |
| Director | $840 – $990 |
| Senior Vice President | $700 – $795 |
| Vice President | $510 – $685 |
| Consultant | $190 – $505 |
| Paraprofessional | $320 – $340 |

\* Hourly rates are adjusted on an annual basis

**Attachment 3 – Commonwealth Taxes**

UNITED STATES OF AMERICA   )
STATE OF                                    )               SS
CITY OF                                      )

     Robert J. Krupa, of legal age, married, and a resident of Michigan, USA, in his capacity as Assistant Treasurer of AlixPartners LLP, Tax ID Number38-3637158, being duly sworn deposes and says:

     AlixPartners LLP (the "Calculation Agent") has its offices at 2000 Town Center, Suite 2400, Southfield, Michigan, USA

     The Calculation Agent certifies that it has not been engaged in trade or business in Puerto Rico during the past five (5) years and will not be engaged in trade or business in Puerto Rico as a result of the services to be provided under the Calculation Agent Agreement. As a result, the Calculation Agent certifies that it is not required to file income tax returns in Puerto Rico and has not been required to file income tax returns in Puerto Rico during the past five (5) years.

     The Calculation Agent also certifies that it does not have any outstanding debts with the Government of Puerto Rico for income taxes, real or chattel property taxes, unemployment insurance premiums, workers compensation payments, social security for chauffeurs in Puerto Rico or the Administration for the Sustenance of Minors (known by its Spanish acronym, ASUME).

     For the purposes of this Sworn Statement, tax debt shall mean any debt that the Calculation Agent may have with the Government of Puerto Rico, its instrumentalities and municipalities for income taxes, excise taxes, real or chattel property taxes, including any special taxes levied, license rights, tax withholdings for payment of salaries and professional services, taxes for payment of interest, dividends and other earnings, unemployment insurance premiums, workers compensation payments, social security, and debts with the Puerto Rico Child Support Administration.

     In Southfield, Michigan, this 15 day of March, 2022.

                   ALIXPARTNERS LLP

                   By: _____
                   Name:
                   Title:

**Attachment 4 – Anticorruption Sworn Statement**

UNITED STATES OF AMERICA   )
STATE OF                                   )                    SS
CITY OF                                    )

I, Marc Brown, of legal age, married, consultant and resident of Illinois, USA, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That I hold the position of Managing Director of AlixPartners, LLP (the "Calculation Agent").

3.      That neither the Calculation Agent nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or any person that has similar responsibilities, has been convicted or pleaded guilty of any of the crimes identified in (a) Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico," (b) Act 2-2018, as amended, known as the Anticorruption Code for a New Puerto Rico,  or (c) Article 24 of the Plan of Reorganization 3-2011, as amended, known as the "Plan of Reorganization of the General Services Administration of 2011."

4.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in [●], this 15th day of March, 2022.


By: _____
Name: Marc Brown
Title: Managing Director

# **EXHIBIT I**

FGIC – CW/HTA Bond Claim Escrow Account Agreements

**BUTLER SNOW DRAFT**
**AS OF 03/15/2022**

ESCROW ACCOUNT AGREEMENT

FGIC CW/HTA BOND CLAIMS ARISING FROM HTA 98 SUB BONDS

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company, as Bond Insurer,

and

Financial Guaranty Insurance Company, as Escrow Agent

Dated as of March 15, 2022

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................ 2
    Section 1.1    Definitions ................................................................................ 2
    Section 1.2    Rules of Construction .............................................................. 3
    Section 1.3    Article and Section References ................................................ 4

ARTICLE II ESCROW ACCOUNT .............................................................................. 4
    Section 2.1    Appointment of Escrow Agent ................................................ 4
    Section 2.2    Escrowed Assets ...................................................................... 4
    Section 2.3    Acceptance by Escrow Agent. ................................................. 4

ARTICLE III ADMINISTRATION OF ACCOUNT ......................................................... 5
    Section 3.1    The Account. ........................................................................... 5
    Section 3.2    Investment of Cash in the Account .......................................... 5
    Section 3.3    Threshold Event. ..................................................................... 5
    Section 3.4    Transfer of Escrowed Assets. .................................................. 5
    Section 3.5    Termination of the Account. .................................................... 6
    Section 3.6    Statements. ............................................................................... 6
    Section 3.7    Voting Rights with Respect to Escrowed Assets ..................... 7

ARTICLE IV CONCERNING THE ESCROW AGENT .................................................... 7
    Section 4.1    Duties and Liability of Escrow Agent. ..................................... 7
    Section 4.2    The Escrow Agent's Costs and Expenses. ............................... 8
    Section 4.3    Reporting. ............................................................................... 8

ARTICLE V MISCELLANEOUS PROVISIONS ............................................................ 8
    Section 5.1    Amendment of Agreement. ..................................................... 8
    Section 5.2    Counterparts. ........................................................................... 9
    Section 5.3    Notices. ................................................................................... 9
    Section 5.4    Severability of Provisions .................................................... 10
    Section 5.5    Headings ............................................................................... 10
    Section 5.6    No Waiver; Cumulative Remedies. ....................................... 10
    Section 5.7    Merger and Integration. ........................................................ 10
    Section 5.8    Governing Law, Jurisdiction and Venue ............................... 11

**EXHIBITS**

Exhibit A – Escrowed Assets .................................................................................................A-1

Exhibit B - Form of Notice and Instruction Relating to Threshold Event ................................B-1

**SCHEDULES**

Schedule I - Threshold Price ................................................................................................S-I-1

## ESCROW ACCOUNT AGREEMENT

**THIS ESCROW ACCOUNT AGREEMENT**, dated as of March 15, 2022 (this "Agreement"),with respect to the escrow account for certain FGIC CW/HTA Bond Claims arising from HTA 98 Sub Bonds (the "Account"), by and among the Commonwealth of Puerto Rico (the "Depositor" or the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), not in its individual or corporate capacity but solely as escrow agent hereunder (the "Escrow Agent"), and FGIC, solely in its capacity as the bond insurer of FGIC Insured HTA 98 Sub Bonds (as defined below) (the "Bond Insurer" and, together with the Depositor and Escrow Agent, collectively, the "Parties").

**WHEREAS,** in furtherance of the Plan (as defined below) and in order to facilitate the implementation thereof, the Account is being established by the Depositor and the Escrow Agent solely for the benefit of the Claim Holders (as defined below) and the Bond Insurer; and

**WHEREAS**, it is necessary to establish the Account to facilitate the implementation of the second proviso to Section 63.1 of the Plan, which effectively provides that the Clawback CVIs allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 of the Plan, as applicable; and

**WHEREAS**, to facilitate such treatment, upon satisfaction of the HTA Distribution Conditions, FGIC hereby requests, and the Commonwealth hereby agrees, to deposit the Clawback CVIs allocable to Sub FGIC CW/HTA Bond Claims (as defined below) in the Account, to be held, administered and transferred by the Escrow Agent solely in accordance with the terms of this Agreement; and

**WHEREAS**, except for the establishment of the Account and the deposit therein of such Clawback CVIs, the Depositor shall have no implied or express duties or obligations under this Agreement and no other rights or obligations with respect to the Account, the Escrowed Assets (except as provided in the Plan) or any amounts from time to time on deposit in the Account and once the Depositor has established the Account and deposited the Clawback CVIs, it shall have no further obligation with respect to the Claim Holders except as set forth in the Plan; and

**WHEREAS**, the Escrow Agent has agreed to accept, hold, and disburse the Account, the Escrowed Assets and any amounts from time to time on deposit in the Account in accordance with the terms of this Agreement; and

**WHEREAS**, the Depositor and Bond Insurer acknowledge that the Escrow Agent shall have no implied duties or obligations beyond the express duties and obligations set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Agreement, the Parties hereby agree as follows:

1

# ARTICLE I

## DEFINITIONS; CONSTRUCTION

Section 1.1      <u>Definitions</u>

(a)      Capitalized terms used in this Agreement (including the recitals hereto), and not otherwise defined in this Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)      Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Account": The account established by this Agreement as specified in the preamble hereto.

"Agreement": The meaning specified in the preamble hereto.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Claim Holders": As of any date, the then holders of Sub FGIC CW/HTA Bond Claims. For purposes of this Agreement, as of any date, any Sub FGIC CW/HTA Bond Claim shall be deemed held by the holder of the payment rights with respect to the related FGIC Insured HTA 98 Sub Bond (including accrued and unpaid interest thereon) from which such claim has arisen. For the avoidance of doubt, FGIC may be a Claim Holder, and FGIC is a Claim Holder as of the date hereof.

"Depositary":   DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Escrow Agent": The meaning specified in the preamble hereto and any successor Escrow Agent.

"Escrowed Assets": The property, assets and rights set forth in Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Fair Market Value": In respect of any Clawback CVIs as of any date of determination, the lower of (i) the price for such Clawback CVIs, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such Clawback CVIs, as of such Business Day, and (ii) the

fair market price for such Clawback CVIs, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Escrow Agent, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"FGIC Insured HTA 98 Sub Bonds": The HTA 98 Sub Bonds insured by FGIC, including pursuant to a secondary market insurance policy, which are described and the CUSIP numbers for which are identified on Exhibit [A] hereto.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan": The *Modified Eighth Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority*, Case No. 17 BK 3283-LTS, confirmed by order entered January 18, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any date of determination and any payment, transfer or distribution, or any other allocation, to or for the benefit of Claim Holders hereunder, pro rata shall be calculated based on the amount of the Sub FGIC CW/HTA Bond Claims held or deemed held by the subject Claim Holders as of such date.

"Record Date": The meaning specified in Section 3.3(c).

"Sub FGIC CW/HTA Bond Claims": The Allowed FGIC CW/HTA Bond Claims arising from the FGIC Insured HTA 98 Sub Bonds.

"Threshold Price": With respect to the Clawback CVIs, the price set forth on Schedule I.

"Threshold Event": With respect to the Clawback CVIs, the receipt by the Escrow Agent of a notice by the Bond Insurer that the current market price of such Clawback CVIs exceeds the Threshold Price for such Clawback CVIs, coupled with a written instruction from the Bond Insurer to sell some or all of such Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit B attached hereto.

Section 1.2      Rules of Construction

Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)      "or" is not exclusive;

(iv)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)    the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)    the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3    Article and Section References

All Article and Section references used in this Agreement, unless otherwise provided, are to Articles and Sections in this Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearing within a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## ESCROW ACCOUNT

Section 2.1    Appointment of Escrow Agent.

The Escrow Agent is hereby appointed to serve as escrow agent hereunder.

Section 2.2    Escrowed Assets.

Pursuant to and in accordance with this Agreement and the Plan, on the Effective Date: FGIC hereby directs, and the Commonwealth hereby agrees, on behalf of the Claim Holders and in accordance with Section 63.1 of the Plan, to deposit or cause to be deposited into the Account the Clawback CVIs specified in Exhibit A hereto.

Section 2.3    Acceptance by Escrow Agent.

(a)    By its execution of this Agreement, the Escrow Agent acknowledges and declares that it will hold or has agreed to hold all Escrowed Assets, any earnings thereon and any proceeds thereof, including all documents or instruments delivered to it or received by it from time to time with respect to the Escrowed Assets, in each case in the Account for the benefit of the Claim Holders. The Escrow Agent represents, warrants and agrees that, except as expressly permitted by this Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Escrowed Assets and will hold (or its agent will hold) such Escrowed Assets, any earnings thereon and any proceeds thereof in the Account pursuant to the terms of this Agreement, (ii) it has not encumbered or transferred any right, title or interest as Escrow Agent in the Escrowed Assets and (iii) all Escrowed Assets shall be held separate from, shall not be comingled with, and shall at all times be explicitly identifiable from any other assets held by the Escrow Agent.

4

(b)     The Escrow Agent shall, on the Effective Date, take such reasonable action as shall be necessary to facilitate or permit the deposit by the Depositor of the Clawback CVIs specified in Exhibit A hereto to the Account for the benefit of the Claim Holders and the Bond Insurer,

(c)     Except as specifically provided herein, the Escrow Agent shall not sell, pledge or assign, transfer or otherwise encumber any interest in the Account or the Escrowed Assets.

## ARTICLE III

## ADMINISTRATION OF ACCOUNT

**Section 3.1     The Account.**

(a)     The Escrow Agent has established and will maintain the Account (i) to hold the Escrowed Assets and (ii) to hold all amounts received on account of the Escrowed Assets, including any earnings thereon and any proceeds thereof, with each held in escrow for the benefit of the Claim Holders and the Bond Insurer. The Account shall be under the sole dominion and control of the Escrow Agent.

**Section 3.2     Investment of Cash in the Account.**

The Escrow Agent is directed to hold all cash uninvested.

**Section 3.3     Threshold Event.**

(a)     The Escrow Agent shall not sell any Escrowed Assets except upon a Threshold Event and subject to the terms of Section 3.3(b).

(b)     Upon the occurrence of a Threshold Event with respect to which the Bond Insurer has provided written instruction to the Escrow Agent (substantially in the form of Exhibit B hereto, to sell some or all of the Escrowed Assets, the Escrow Agent shall seek to sell such Escrowed Assets to the person(s) identified to the Escrow Agent by the Bond Insurer in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such Escrowed Assets shall be transferred by the Escrow Agent and any other details, including relevant broker(s), to be utilized by the Escrow Agent for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Escrow Agent by the Bond Insurer, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price, and (iii) all proceeds of such sales shall be deposited into the Account.

**Section 3.4     Transfer of Escrowed Assets.**

(a)     On the HTA Effective Date (or as soon thereafter as is reasonably practicable), the Escrow Agent shall transfer all Escrowed Assets then on deposit in the

5

Account on a pro rata basis to (i) the applicable custodial trusts formed in accordance with the HTA Plan for the benefit of the holders of the applicable FGIC Insured HTA 98 Sub Bond claims (i.e., Claim Holders other than FGIC) and (ii) FGIC directly for its share as a Claim Holder, as applicable, in order to implement the HTA Plan and Section 63.1 of the Plan.

   (b) Notwithstanding anything in this Agreement to the contrary, if the HTA Effective Date has not occurred on or before March 16, 2023, then on any Business Day following March 16, 2023, the Bond Insurer shall have the right, in its sole and absolute discretion, to direct in writing the Escrow Agent to transfer all Escrowed Assets then on deposit in the Account to Claim Holders, on a pro-rata "pass-through" basis to each Claim Holder as of the Record Date.

   (c) The Escrow Agent shall establish the record date (the "Record Date") for the distribution of Escrowed Assets provided in Section 3.4(b), and the Escrow Agent shall send notice to the Claim Holders as of such Record Date and the related anticipated distribution date of such amounts, in each case not later than three (3) Business Days after the Escrow Agent's receipt of the written direction from the Bond Insurer as provided in Section 3.4(b) (or as soon thereafter as is reasonably practicable). The Escrow Agent shall promptly post such notice on the website set forth in Section 3.6 hereof. On such distribution date, the Escrow Agent shall distribute such amounts to the Depositary for distribution on a pro rata "pass through" basis to each Claim Holder as of the related Record Date.

   (d) Any distribution to a Claim Holder pursuant to Section 3.4(b) shall be made to the Person in whose name a related FGIC Insured HTA 98 Sub Bond is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary; provided, however, that any such distribution that FGIC, as a Claim Holder, is entitled to receive shall be made directly to FGIC.

Section 3.5 Termination of the Account.

  The Account shall automatically terminate the next Business Day after the transfers contemplated by Section 3.4(a) or the distribution contemplated by 3.4(b) are completed.

Section 3.6 Statements.

  On a quarterly basis, the Escrow Agent shall prepare and post on FGPRHTAESCROW.com, a statement setting forth:

   (a) The amount of Clawback CVIs held in the Account as of the end of the prior quarter; and

   (b) The amount, if any, of Clawback CVIs that were sold during the prior quarter pursuant to Section 3.3(b), and the amount of net cash proceeds received from any such sale and held in the Account as of the end of the prior quarter.

Section 3.7      Voting Rights with Respect to Escrowed Assets.

(a)      Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Escrow Agent shall deliver a copy of such notice to the Bond Insurer.

(b)      The voting and direction rights allocable to the Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) held in the Account (including voting and direction rights in respect of remedies) shall be allocated to the Bond Insurer.

## ARTICLE IV

## CONCERNING THE ESCROW AGENT

Section 4.1      Duties and Liability of Escrow Agent.

The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent has no fiduciary or discretionary duties of any kind. The Escrow Agent's permissive rights shall not be construed as duties. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any document other than this Agreement, including without limitation any other agreement between any of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to the Escrow Agent. The Escrow Agent's sole responsibility shall be for the safekeeping of the Escrowed Assets in accordance with the Escrow Agent's customary practices and disbursement thereof in accordance with the terms of this Agreement. The Escrow Agent shall not be responsible for or have any duty to make any calculations under this Agreement, or to determine when any calculation required under the provisions of this Agreement should be made, how it should be made or what it should be, or to confirm or verify any such calculation. The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. This Agreement shall terminate upon the distribution of all the Escrowed Assets pursuant to any applicable provision of this Agreement, and the Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Agreement or the Escrowed Assets.

(a)      The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines, which determination is not subject to appeal, that the Escrow Agent's gross negligence or willful misconduct in connection with its material breach of this Agreement was the sole cause of any loss. The Escrow Agent may retain and act hereunder through agents and shall not be responsible for or have any liability with respect to the acts of any such agent retained by the Escrow Agent in good faith.

(b)     The Escrow Agent may conclusively rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent believes to be genuine and to have been signed or presented by the person purporting to sign it and shall have no responsibility or duty to make inquiry as to or to determine the truth, accuracy or validity thereof (or any signature appearing thereon). In no event shall the Escrow Agent be liable for (i) acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document believed by the Escrow Agent to have been created by or on behalf of the Depositor or the Bond Insurer, (ii) incidental, indirect, special, consequential or punitive damages or penalties of any kind (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action or (iii) any amount greater than the value of the Escrowed Assets as valued upon deposit with the Escrow Agent.

(c)     The Escrow Agent shall not be responsible for delays or failures in performance resulting from acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, attacks or intrusions, power failures, earthquakes or any other circumstance beyond its control. The Escrow Agent shall not be obligated to take any legal action relating to the Escrowed Assets or this Agreement or to appear in, prosecute or defend any such legal action or to take any other action that in the Escrow Agent's sole judgment may expose it to potential expense or liability.

Section 4.2     The Escrow Agent's Costs and Expenses.

The Escrow Agent shall not charge a fee nor seek reimbursement of expenses for its services hereunder.

Section 4.3     Reporting.

The Escrow Agent has no responsibility for the tax consequences of this Agreement. Except as otherwise may be agreed by the Escrow Agent in writing, the Escrow Agent has no tax reporting or withholding duties or obligations hereunder, including with respect to the Foreign Investment in Real Property Tax Act.

## ARTICLE V

## MISCELLANEOUS PROVISIONS

Section 5.1     Amendment of Agreement.

(a)     This Agreement may not be amended, waived, or supplemented without the prior written consent of the Bond Insurer and Escrow Agent. This Agreement may be amended, waived or supplemented from time to time by the Bond Insurer and the Escrow Agent without the consent of the Depositary or any Claim Holders; provided, however, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Claim Holder without the written consent of such Claim Holder;

(ii)    alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Claim Holder affected;

(iii)    amend any provision of Article III (including Schedule 1) or this Section 5.1 without the written consent of each Claim Holder affected; or

(iv)    amend the definition of Claim Holders without the written consent of all Claim Holders affected; or

(v)    adversely affect in any material respect the interests of the Claim Holders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of Claim Holders holding a majority of the Sub FGIC CW/HTA Bond Claims. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.

(b)    Promptly following the execution of this Agreement, the Escrow Agent shall post full and complete copies of this Agreement on FGHTAESCROW.com. Promptly after the execution of any amendment to this Agreement, the Escrow Agent shall post a copy of such amendment on FGHTAESCROW.com.

Section 5.2    <u>Counterparts.</u>

This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 5.3    <u>Notices.</u>

All demands, notices and certifications under this Agreement shall be in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Commonwealth when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to the Commonwealth at c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or such other address as may hereafter be furnished by the Commonwealth to each other Party in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Bond Insurer when transmitted by email to the Bond Insurer at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by the Bond Insurer to each other Party in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Escrow Agent when transmitted by email to the Escrow Agent at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by the Escrow Agent to each other Party in writing.

Section 5.4    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or the related rights of the Claim Holder.

Section 5.5    Headings.

Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

Section 5.6    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law. Each of the Claim Holders shall be a third party beneficiary of this Agreement, but only Claim Holders holding a majority of the Sub FGIC CW/HTA Bond Claims shall have the right to enforce this Agreement.

Section 5.7    Merger and Integration.

This Agreement, the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Agreement.

10

Section 5.8    <u>Governing Law, Jurisdiction and Venue</u>

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof that would require the application of any other laws.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,** as Depositor


By:_____
Name: Francisco Parés Alicea
Title:   Secretary of the Treasury

[Signature Page]

Escrow Agreement

**FINANCIAL GUARANTY INSURANCE
COMPANY**, as Bond Insurer


By:_____
Name:  Derek Donnelly
Title: Senior  Managing  Director


**FINANCIAL GUARANTY INSURANCE
COMPANY**, as Escrow Agent



By:_____
Name:  Derek Donnelly
Title: Senior  Managing  Director

[Signature  Page]

Escrow  Agreement

## **EXHIBIT A**

Escrowed Assets:$49,323,279 total amount of Clawback CVIs with CUSIP No. 74514L4D6, with the FGIC Insured HTA 98 Sub Bonds' respective pro rata shares set forth below:

| FGIC Insured HTA 98 Sub Bond Description | CUSIP Number | Sub FGIC CW/HTA Bond Claims Amount | Clawback CVI Amount | % of Total Clawback CVI Amount |
|---|---|---|---|---|
| Subordinated Transportation Revenue Bonds, Series 2003 | 745190NB0 | 7,094,077.64 | 5,305,594.00 | 10.7568% |
| Subordinated Transportation Revenue Bonds, Series 2003 | 745190NA2 | 11,244,215.28 | 8,409,443.00 | 17.0496% |
| Subordinated Transportation Revenue Bonds, Series 2003 | 745190MN5 | 16,682,326.67 | 12,476,555.00 | 25.2955% |
| Subordinated Transportation Revenue Bonds, Series 2003 | 745190MF2 | 14,997,981.25 | 11,219,545.00 | 22.7470% |
| | 745190MG0 | 507,915.28 | 380,059.00 | 0.7705% |
| | 745190MH8 | 15,304,062.50 | 11,448,516.00 | 23.2112% |
| | 745190MJ4 | 111,783.83 | 83,567.00 | 0.1694% |
| | **Total Sub** | $ **65,942,362.44** | $ **49,323,279.00** | **100.000%** |

**EXHIBIT B**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

Financial Guaranty Insurance Company
463 Seventh Avenue, 16th floor
New York, NY 10018

      Re: <u>Threshold Event</u>

Ladies and Gentlemen:

      Reference is made to the Escrow Account Agreement FGIC CW/HTA Bond Claims Arising from HTA 98 Senior Bonds, dated as of March [15], 2022 (as amended and supplemented from time to time, the "<u>Agreement</u>"), by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("<u>FGIC</u>"), not in its individual or corporate capacity but solely as escrow agent thereunder (the "<u>Escrow Agent</u>"), and FGIC, solely in its capacity as the bond insurer of FGIC Insured HTA 98 Senior Bonds (the "<u>Bond Insurer</u>"). Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Agreement.

      This notice and instruction is being provided to the Escrow Agent, pursuant to and in accordance with Section 3.3(b) of the Agreement and as contemplated by the definition of "Threshold Event". Accordingly, the Bond Insurer hereby (i) notifies the Escrow Agent that the [respective] current market price[s] of the Clawback CVIs listed in <u>Annex A</u> exceed[s] the [respective] Threshold Price[s] for such Clawback CVIs specified on Annex A, and (ii) instructs the Escrow Agent to sell, in accordance with the provisions of Section 3.3(b) of the Agreement, such Clawback CVIs in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on <u>Annex A</u>.

      **IN WITNESS WHEREOF,** the Bond Insurer has executed and delivered this Notice as of _____, 20__.

                          FINANCIAL GUARANTY INSURANCE
                          COMPANY, as Bond Insurer
                          By:_____
                          Name:_____
                          Title:_____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Escrow Agent under the Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

FINANCIAL GUARANTY INSURANCE COMPANY, as Escrow Agent

By:_____

Name:_____

Title:_____

**Annex A**

| Clawback CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold:  $[_____]

Threshold Price:[_____]

Sale Price:[_____]


[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

B-1

## <u>SCHEDULE I</u>

Threshold Price

     With respect to the Clawback CVIs, the price equal to 14% of the notional amount of such Clawback CVIs

**BUTLER SNOW DRAFT**
**AS OF 03/15/2022**

ESCROW ACCOUNT AGREEMENT

FGIC CW/HTA BOND CLAIMS ARISING FROM HTA 98 SENIOR BONDS

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company, as Bond Insurer,

and

Financial Guaranty Insurance Company, as Escrow Agent

Dated as of March 15, 2022

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................ 2
    Section 1.1    Definitions ................................................................................ 2

    Section 1.2    Rules of Construction .............................................................. 3

    Section 1.3    Article and Section References ................................................. 4

ARTICLE II ESCROW ACCOUNT ................................................................................ 4
    Section 2.1    Appointment of Escrow Agent ................................................. 4

    Section 2.2    Escrowed Assets ..................................................................... 4

    Section 2.3    Acceptance by Escrow Agent. ................................................. 4

ARTICLE III ADMINISTRATION OF ACCOUNT ....................................................... 5
    Section 3.1    The Account. ............................................................................ 5

    Section 3.2    Investment of Cash in the Account ........................................... 5

    Section 3.3    Threshold Event. ...................................................................... 5

    Section 3.4    Transfer of Escrowed Assets. .................................................. 5

    Section 3.5    Termination of the Account. ..................................................... 6

    Section 3.6    Statements. ............................................................................... 6

    Section 3.7    Voting Rights with Respect to Escrowed Assets ...................... 7

ARTICLE IV CONCERNING THE ESCROW AGENT .................................................. 7
    Section 4.1    Duties and Liability of Escrow Agent. ..................................... 7

    Section 4.2    The Escrow Agent's Costs and Expenses. ............................... 8

    Section 4.3    Reporting. ................................................................................ 8

ARTICLE V MISCELLANEOUS PROVISIONS ........................................................... 8
    Section 5.1    Amendment of Agreement. ...................................................... 8

    Section 5.2    Counterparts. ........................................................................... 9

    Section 5.3    Notices. ................................................................................... 9

    Section 5.4    Severability of Provisions ...................................................... 10

    Section 5.5    Headings ................................................................................ 10

    Section 5.6    No Waiver; Cumulative Remedies. ........................................ 10

    Section 5.7    Merger and Integration. ......................................................... 10

    Section 5.8    Governing Law, Jurisdiction and Venue ................................ 11

**EXHIBITS**

Exhibit A – Escrowed Assets ..................................................................................A-1
Exhibit B - Form of Notice and Instruction Relating to Threshold Event ...............................B-1

**SCHEDULES**

Schedule I - Threshold Price ...............................................................................S-I-1

## ESCROW ACCOUNT AGREEMENT

**THIS ESCROW ACCOUNT AGREEMENT**, dated as of March 15, 2022 (this "Agreement"), with respect to the escrow account for certain FGIC CW/HTA Bond Claims arising from HTA 98 Senior Bonds (the "Account"), by and among the Commonwealth of Puerto Rico (the "Depositor" or the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), not in its individual or corporate capacity but solely as escrow agent hereunder (the "Escrow Agent"), and FGIC, solely in its capacity as the bond insurer of FGIC Insured HTA 98 Senior Bonds (as defined below) (the "Bond Insurer" and, together with the Depositor and Escrow Agent, collectively, the "Parties").

**WHEREAS,** in furtherance of the Plan (as defined below) and in order to facilitate the implementation thereof, the Account is being established by the Depositor and the Escrow Agent solely for the benefit of the Claim Holders (as defined below) and the Bond Insurer; and

**WHEREAS**, it is necessary to establish the Account to facilitate the implementation of the second proviso to Section 63.1 of the Plan, which effectively provides that the Clawback CVIs allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 of the Plan, as applicable; and

**WHEREAS**, to facilitate such treatment, upon satisfaction of the HTA Distribution Conditions, FGIC hereby requests, and the Commonwealth hereby agrees, to deposit the Clawback CVIs allocable to Senior FGIC CW/HTA Bond Claims (as defined below) in the Account, to be held, administered and transferred by the Escrow Agent solely in accordance with the terms of this Agreement; and

**WHEREAS**, except for the establishment of the Account and the deposit therein of such Clawback CVIs, the Depositor shall have no implied or express duties or obligations under this Agreement and no other rights or obligations with respect to the Account, the Escrowed Assets (except as provided in the Plan) or any amounts from time to time on deposit in the Account and once the Depositor has established the Account and deposited the Clawback CVIs, it shall have no further obligation with respect to the Claim Holders except as set forth in the Plan; and

**WHEREAS**, the Escrow Agent has agreed to accept, hold, and disburse the Account, the Escrowed Assets and any amounts from time to time on deposit in the Account in accordance with the terms of this Agreement; and

**WHEREAS**, the Depositor and Bond Insurer acknowledge that the Escrow Agent shall have no implied duties or obligations beyond the express duties and obligations set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Agreement, the Parties hereby agree as follows:

1

# ARTICLE I

# DEFINITIONS; CONSTRUCTION

Section 1.1    <u>Definitions</u>

(a)    Capitalized terms used in this Agreement (including the recitals hereto), and not otherwise defined in this Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Account": The account established by this Agreement as specified in the preamble hereto.

"Agreement": The meaning specified in the preamble hereto.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Claim Holders": As of any date, the then holders of Senior FGIC CW/HTA Bond Claims. For purposes of this Agreement, as of any date, any Senior FGIC CW/HTA Bond Claim shall be deemed held by the holder of the payment rights with respect to the related FGIC Insured HTA 98 Senior Bond (including accrued and unpaid interest thereon) from which such claim has arisen. For the avoidance of doubt, FGIC may be a Claim Holder, and FGIC is a Claim Holder as of the date hereof.

"Depositary":   DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Escrow Agent": The meaning specified in the preamble hereto and any successor Escrow Agent.

"Escrowed Assets": The property, assets and rights set forth in Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Fair Market Value": In respect of any Clawback CVIs as of any date of determination, the lower of (i) the price for such Clawback CVIs, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such Clawback CVIs, as of such Business Day, and (ii) the

2

fair market price for such Clawback CVIs, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Escrow Agent, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"FGIC Insured HTA 98 Senior Bonds": The HTA 98 Senior Bonds insured by FGIC, including pursuant to a secondary market insurance policy, which are described and the CUSIP numbers for which are identified on Exhibit [A] hereto.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan": The *Modified Eighth Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority*, Case No. 17 BK 3283-LTS, confirmed by order entered January 18, 2022, as amended, modified or supplemented from time to time.

"pro rata": With respect to any date of determination and any payment, transfer or distribution, or any other allocation, to or for the benefit of Claim Holders hereunder, pro rata shall be calculated based on the amount of the Senior FGIC CW/HTA Bond Claims held or deemed held by the subject Claim Holders as of such date.

"Record Date": The meaning specified in Section 3.3(c).

"Senior FGIC CW/HTA Bond Claims": The Allowed FGIC CW/HTA Bond Claims arising from the FGIC Insured HTA 98 Senior Bonds.

"Threshold Price": With respect to the Clawback CVIs, the price set forth on Schedule I.

"Threshold Event": With respect to the Clawback CVIs, the receipt by the Escrow Agent of a notice by the Bond Insurer that the current market price of such Clawback CVIs exceeds the Threshold Price for such Clawback CVIs, coupled with a written instruction from the Bond Insurer to sell some or all of such Clawback CVIs, such notice and instruction to be substantially in the form of Exhibit B attached hereto.

Section 1.2     Rules of Construction

Unless the context otherwise requires:

    (i)     a term has the meaning assigned to it;

    (ii)     an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

    (iii)     "or" is not exclusive;

(iv)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)     the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)     the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3     Article and Section References

All Article and Section references used in this Agreement, unless otherwise provided, are to Articles and Sections in this Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearing within a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

### ESCROW ACCOUNT

Section 2.1     Appointment of Escrow Agent.

The Escrow Agent is hereby appointed to serve as escrow agent hereunder.

Section 2.2     Escrowed Assets.

Pursuant to and in accordance with this Agreement and the Plan, on the Effective Date: FGIC hereby directs, and the Commonwealth hereby agrees, on behalf of the Claim Holders and in accordance with Section 63.1 of the Plan, to deposit or cause to be deposited into the Account the Clawback CVIs specified in Exhibit A hereto.

Section 2.3     Acceptance by Escrow Agent.

(a)     By its execution of this Agreement, the Escrow Agent acknowledges and declares that it will hold or has agreed to hold all Escrowed Assets, any earnings thereon and any proceeds thereof, including all documents or instruments delivered to it or received by it from time to time with respect to the Escrowed Assets, in each case in the Account for the benefit of the Claim Holders. The Escrow Agent represents, warrants and agrees that, except as expressly permitted by this Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Escrowed Assets and will hold (or its agent will hold) such Escrowed Assets, any earnings thereon and any proceeds thereof in the Account pursuant to the terms of this Agreement, (ii) it has not encumbered or transferred any right, title or interest as Escrow Agent in the Escrowed Assets and (iii) all Escrowed Assets shall be held separate from, shall not be comingled with, and shall at all times be explicitly identifiable from any other assets held by the Escrow Agent.

(b)      The Escrow Agent shall, on the Effective Date, take such reasonable action as shall be necessary to facilitate or permit the deposit by the Depositor of the Clawback CVIs specified in Exhibit A hereto to the Account for the benefit of the Claim Holders and the Bond Insurer,

(c)      Except as specifically provided herein, the Escrow Agent shall not sell, pledge or assign, transfer or otherwise encumber any interest in the Account or the Escrowed Assets.

# ARTICLE III

## ADMINISTRATION OF ACCOUNT

Section 3.1      The Account.

(a)      The Escrow Agent has established and will maintain the Account (i) to hold the Escrowed Assets and (ii) to hold all amounts received on account of the Escrowed Assets, including any earnings thereon and any proceeds thereof, with each held in escrow for the benefit of the Claim Holders and the Bond Insurer. The Account shall be under the sole dominion and control of the Escrow Agent.

Section 3.2      Investment of Cash in the Account.

The Escrow Agent is directed to hold all cash uninvested.

Section 3.3      Threshold Event.

(a)      The Escrow Agent shall not sell any Escrowed Assets except upon a Threshold Event and subject to the terms of Section 3.3(b).

(b)      Upon the occurrence of a Threshold Event with respect to which the Bond Insurer has provided written instruction to the Escrow Agent (substantially in the form of Exhibit B hereto, to sell some or all of the Escrowed Assets, the Escrow Agent shall seek to sell such Escrowed Assets to the person(s) identified to the Escrow Agent by the Bond Insurer in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such Escrowed Assets shall be transferred by the Escrow Agent and any other details, including relevant broker(s), to be utilized by the Escrow Agent for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Escrow Agent by the Bond Insurer, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price, and (iii) all proceeds of such sales shall be deposited into the Account.

Section 3.4      Transfer of Escrowed Assets.

(a)      On the HTA Effective Date (or as soon thereafter as is reasonably practicable), the Escrow Agent shall transfer all Escrowed Assets then on deposit in the

Account on a pro rata basis to (i) the applicable custodial trusts formed in accordance with the HTA Plan for the benefit of the holders of the applicable FGIC Insured HTA 98 Senior Bond claims (i.e., Claim Holders other than FGIC) and (ii) FGIC directly for its share as a Claim Holder, as applicable, in order to implement the HTA Plan and Section 63.1 of the Plan.

(b)    Notwithstanding anything in this Agreement to the contrary, if the HTA Effective Date has not occurred on or before March 16, 2023, then on any Business Day following March 16, 2023, the Bond Insurer shall have the right, in its sole and absolute discretion, to direct in writing the Escrow Agent to transfer all Escrowed Assets then on deposit in the Account to Claim Holders, on a pro-rata "pass-through" basis to each Claim Holder as of the Record Date.

(c)    The Escrow Agent shall establish the record date (the "Record Date") for the distribution of Escrowed Assets provided in Section 3.4(b), and the Escrow Agent shall send notice to the Claim Holders as of such Record Date and the related anticipated distribution date of such amounts, in each case not later than three (3) Business Days after the Escrow Agent's receipt of the written direction from the Bond Insurer as provided in Section 3.4(b) (or as soon thereafter as is reasonably practicable). The Escrow Agent shall promptly post such notice on the website set forth in Section 3.6 hereof. On such distribution date, the Escrow Agent shall distribute such amounts to the Depositary for distribution on a pro rata "pass through" basis to each Claim Holder as of the related Record Date.

(d)    Any distribution to a Claim Holder pursuant to Section 3.4(b) shall be made to the Person in whose name a related FGIC Insured HTA 98 Senior Bond is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary; provided, however, that any such distribution that FGIC, as a Claim Holder, is entitled to receive shall be made directly to FGIC.

Section 3.5    Termination of the Account.

The Account shall automatically terminate the next Business Day after the transfers contemplated by Section 3.4(a) or the distribution contemplated by 3.4(b) are completed.

Section 3.6    Statements.

On a quarterly basis, the Escrow Agent shall prepare and post on FGPRHTAESCROW.com, a statement setting forth:

(a)    The amount of Clawback CVIs held in the Account as of the end of the prior quarter; and

(b)    The amount, if any, of Clawback CVIs that were sold during the prior quarter pursuant to Section 3.3(b), and the amount of net cash proceeds received from any such sale and held in the Account as of the end of the prior quarter.

6

Section 3.7     <u>Voting Rights with Respect to Escrowed Assets.</u>

(a)     Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Escrow Agent shall deliver a copy of such notice to the Bond Insurer.

(b)     The voting and direction rights allocable to the Clawback CVIs (or any other securities or property received in respect thereof or in exchange therefor) held in the Account (including voting and direction rights in respect of remedies) shall be allocated to the Bond Insurer.

## ARTICLE IV

## CONCERNING THE ESCROW AGENT

Section 4.1     <u>Duties and Liability of Escrow Agent.</u>

The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent has no fiduciary or discretionary duties of any kind. The Escrow Agent's permissive rights shall not be construed as duties. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any document other than this Agreement, including without limitation any other agreement between any of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to the Escrow Agent. The Escrow Agent's sole responsibility shall be for the safekeeping of the Escrowed Assets in accordance with the Escrow Agent's customary practices and disbursement thereof in accordance with the terms of this Agreement. The Escrow Agent shall not be responsible for or have any duty to make any calculations under this Agreement, or to determine when any calculation required under the provisions of this Agreement should be made, how it should be made or what it should be, or to confirm or verify any such calculation. The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. This Agreement shall terminate upon the distribution of all the Escrowed Assets pursuant to any applicable provision of this Agreement, and the Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Agreement or the Escrowed Assets.

(a)     The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines, which determination is not subject to appeal, that the Escrow Agent's gross negligence or willful misconduct in connection with its material breach of this Agreement was the sole cause of any loss. The Escrow Agent may retain and act hereunder through agents and shall not be responsible for or have any liability with respect to the acts of any such agent retained by the Escrow Agent in good faith.

(b)      The Escrow Agent may conclusively rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent believes to be genuine and to have been signed or presented by the person purporting to sign it and shall have no responsibility or duty to make inquiry as to or to determine the truth, accuracy or validity thereof (or any signature appearing thereon). In no event shall the Escrow Agent be liable for (i) acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document believed by the Escrow Agent to have been created by or on behalf of the Depositor or the Bond Insurer, (ii) incidental, indirect, special, consequential or punitive damages or penalties of any kind (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action or (iii) any amount greater than the value of the Escrowed Assets as valued upon deposit with the Escrow Agent.

(c)      The Escrow Agent shall not be responsible for delays or failures in performance resulting from acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, attacks or intrusions, power failures, earthquakes or any other circumstance beyond its control. The Escrow Agent shall not be obligated to take any legal action relating to the Escrowed Assets or this Agreement or to appear in, prosecute or defend any such legal action or to take any other action that in the Escrow Agent's sole judgment may expose it to potential expense or liability.

Section 4.2      The Escrow Agent's Costs and Expenses.

The Escrow Agent shall not charge a fee nor seek reimbursement of expenses for its services hereunder.

Section 4.3      Reporting.

The Escrow Agent has no responsibility for the tax consequences of this Agreement. Except as otherwise may be agreed by the Escrow Agent in writing, the Escrow Agent has no tax reporting or withholding duties or obligations hereunder, including with respect to the Foreign Investment in Real Property Tax Act.

**ARTICLE V**

**MISCELLANEOUS PROVISIONS**

Section 5.1      Amendment of Agreement.

(a)      This Agreement may not be amended, waived, or supplemented without the prior written consent of the Bond Insurer and Escrow Agent. This Agreement may be amended, waived or supplemented from time to time by the Bond Insurer and the Escrow Agent without the consent of the Depositary or any Claim Holders; provided, however, that no such amendment shall:

(i)      reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Claim Holder without the written consent of such Claim Holder;

(ii)     alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Claim Holder affected;

(iii)    amend any provision of Article III (including Schedule 1) or this Section 5.1 without the written consent of each Claim Holder affected; or

(iv)    amend the definition of Claim Holders without the written consent of all Claim Holders affected; or

(v)     adversely affect in any material respect the interests of the Claim Holders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of Claim Holders holding a majority of the Senior FGIC CW/HTA Bond Claims. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.

(b)     Promptly following the execution of this Agreement, the Escrow Agent shall post full and complete copies of this Agreement on FGHTAESCROW.com. Promptly after the execution of any amendment to this Agreement, the Escrow Agent shall post a copy of such amendment on FGHTAESCROW.com.

Section 5.2    <u>Counterparts.</u>

This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 5.3    <u>Notices.</u>

All demands, notices and certifications under this Agreement shall be in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Commonwealth when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to the Commonwealth at c/o Fiscal Agency and Financial Advisory Authority, Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, Puerto Rico 00907, Attn: Office of the Executive Director, or such other address as may hereafter be furnished by the Commonwealth to each other Party in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Bond Insurer when transmitted by email to the Bond Insurer at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by the Bond Insurer to each other Party in writing. All demands, notices and certifications under this Agreement shall be deemed to have been duly given to the Escrow Agent when transmitted by email to the Escrow Agent at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by the Escrow Agent to each other Party in writing.

Section 5.4      Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or the related rights of the Claim Holder.

Section 5.5      Headings.

Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

Section 5.6      No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law. Each of the Claim Holders shall be a third party beneficiary of this Agreement, but only Claim Holders holding a majority of the Senior FGIC CW/HTA Bond Claims shall have the right to enforce this Agreement.

Section 5.7      Merger and Integration.

This Agreement, the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Agreement.

Section 5.8      <u>Governing Law, Jurisdiction and Venue</u>

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof that would require the application of any other laws.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,** as Depositor

By:_____
Name: Francisco Parés Alicea
Title:   Secretary of the Treasury

[Signature Page]

Escrow Agreement

**FINANCIAL GUARANTY INSURANCE
COMPANY**, as Bond Insurer


By:_____
Name: Derek Donnelly
Title: Senior Managing Director


**FINANCIAL GUARANTY INSURANCE
COMPANY**, as Escrow Agent



By:_____
Name: Derek Donnelly
Title: Senior Managing Director

[Signature Page]

Escrow Agreement

## EXHIBIT A

Escrowed Assets: $228,401,113 total amount of Clawback CVIs with CUSIP No. 74514L4C8, with the
FGIC Insured HTA 98 Senior Bonds' respective pro rata shares set forth below:

| FGIC Insured HTA 98 Senior Bond Description | CUSIP Number | Senior FGIC CW/HTA Bond Claims Amount | Clawback CVI Amount | % of Total Clawback CVI Amount |
|---|---|---|---|---|
| Transportation Revenue Bonds, Series G | 7451902Q0 | 5,866,557.29 | 3,435,906.00 | 1.5043% |
| | 7451902R8 | 260,169.06 | 152,375.00 | 0.0667% |
| | 745190KC1 | 11,329,581.25 | 6,636,271.00 | 2.9055% |
| Transportation Revenue Refunding Bonds, Series H | 7451902W7 | 137,215.31 | 80,336.00 | 0.0352% |
| | 745190KX5 | 767,753.73 | 449,504.00 | 0.1968% |
| | 745190KY3 | 803,421.22 | 469,490.00 | 0.2056% |
| | 745190KZ0 | 839,334.38 | 490,638.00 | 0.2148% |
| Transportation Revenue Refunding Bonds, Series I | 745190PF9 | 487,413.33 | 285,586.00 | 0.1250% |
| | 745190PG7 | 507,915.28 | 297,493.00 | 0.1303% |
| | 745190PH5 | 528,432.67 | 309,443.00 | 0.1355% |
| | 745190PJ1 | 548,861.25 | 321,037.00 | 0.1406% |
| | 745190PK8 | 574,380.57 | 335,411.00 | 0.1469% |
| | 7451902Z0 | 12,359,079.86 | 7,239,297.00 | 3.1696% |
| | 745190PM4 | 14,601,552.08 | 8,552,819.00 | 3.7446% |
| | 745190PN2 | 15,330,355.56 | 8,979,713.00 | 3.9316% |
| | 745190PP7 | 16,094,834.72 | 9,427,505.00 | 4.1276% |
| | 745190PQ5 | 16,905,182.64 | 9,902,164.00 | 4.3354% |
| Transportation Revenue Bonds, Series J | 745190QH4 | 7,130,042.36 | 4,176,403.00 | 1.8285% |
| | 7451903M8 | 5,769,269.44 | 3,379,334.00 | 1.4796% |
| Transportation Revenue Refunding Bonds, Series L | 745190UG1 | 20,277,882.81 | 11,876,283.00 | 5.1997% |
| | 745190UH9 | 8,029,531.46 | 4,702,709.00 | 2.0590% |
| | 745190UM8 | 2,576,183.85 | 1,508,811.00 | 0.6606% |
| Transportation Revenue Refunding Bonds, Series N | 745190ZT8 | 248,247,197.81 | 145,392,585.00 | 63.6567% |
| | **Total Senior** | **$ 389,972,147.95** | **$ 228,401,113.00** | **100.000%** |

## EXHIBIT B

[Form of Notice and Instruction Relating to Threshold Event]

## EXHIBIT B

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

Financial Guaranty Insurance Company
463 Seventh Avenue, 16th floor
New York, NY 10018
Re: Threshold Event

Ladies and Gentlemen:

Reference is made to the Escrow Account Agreement FGIC CW/HTA Bond Claims Arising from HTA 98 Senior Bonds, dated as of March [15], 2022 (as amended and supplemented from time to time, the "Agreement"), by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), not in its individual or corporate capacity but solely as escrow agent thereunder (the "Escrow Agent"), and FGIC, solely in its capacity as the bond insurer of FGIC Insured HTA 98 Senior Bonds (the "Bond Insurer"). Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Agreement.

This notice and instruction is being provided to the Escrow Agent, pursuant to and in accordance with Section 3.3(b) of the Agreement and as contemplated by the definition of "Threshold Event". Accordingly, the Bond Insurer hereby (i) notifies the Escrow Agent that the [respective] current market price[s] of the Clawback CVIs listed in Annex A exceed[s] the [respective] Threshold Price[s] for such Clawback CVIs specified on Annex A, and (ii) instructs the Escrow Agent to sell, in accordance with the provisions of Section 3.3(b) of the Agreement, such Clawback CVIs in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on Annex A.

**IN WITNESS WHEREOF,** the Bond Insurer has executed and delivered this Notice as of _____, 20__.

FINANCIAL GUARANTY INSURANCE
COMPANY, as Bond Insurer
By:_____
Name:_____
Title:_____

E-2-1

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Escrow Agent under the Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

FINANCIAL GUARANTY INSURANCE
COMPANY, as Escrow Agent

By:_____

Name:_____

Title:_____

**Annex A**

| Clawback CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold:  $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

B-1

## **SCHEDULE I**

Threshold Price

    With respect to the Clawback CVIs, the price equal to 38% of the notional amount of such Clawback CVIs

**<u>EXHIBIT J</u>**

Debt Management Policy



**GOVERNMENT OF PUERTO RICO**
**DEBT MANAGEMENT POLICY**

**MARCH 9, 2022**

# TABLE OF CONTENTS

**Page**

ARTICLE I- GENERAL PROVISIONS ..................................................................................... 1

    1.1    Title ........................................................................................................................ 1
    1.2    Statutory Authority ................................................................................................. 1
    1.3    Application .............................................................................................................. 1
    1.4    Definitions.............................................................................................................. 1
    1.5    Effectiveness .......................................................................................................... 7
    1.6    Amendments .......................................................................................................... 7
    1.7    Derivatives ............................................................................................................. 8
    1.8    Capital Leases ........................................................................................................ 8

ARTICLE II - COMPREHENSIVE CAP ON ALL NET TAX-SUPPORTED DEBT ................ 8

    2.1    Comprehensive Cap ............................................................................................... 8
    2.3    Certification of the Secretary of Treasury ............................................................ 8

ARTICLE III - ADDITIONAL RESTRICTIONS ON THE ISSUANCE OF TAX-
           SUPPORTED DEBT ................................................................................................ 9

    3.1    AAFAF Approval ................................................................................................... 9
    3.2    Long-Term Borrowing for Capital Improvements Only ........................................ 9
    3.3    Maturity Limitation on Tax-Supported Debt......................................................... 9
    3.4    Mandatory Principal Amortization ........................................................................ 9
    3.5    Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year ......... 10

ARTICLE IV– RESTRICTIONS ON THE ISSUANCE OF DEBT BY PUBLIC
           CORPORATIONS ................................................................................................... 10

    4.1    Application............................................................................................................ 10
    4.2    AAFAF Approval ................................................................................................. 10
    4.3    Borrowing for Capital Improvements Only.......................................................... 10
    4.4    Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year ......... 10

ARTICLE V– LIMITATIONS ON SHORT-TERM BORROWING AND ADVANCE
           FUNDING................................................................................................................ 11

    5.1    Limitations on the Issuance of Tax and Revenue Anticipation Notes.................. 11
    5.2    Limitations on the Issuance of Bond or Grant Anticipation Notes....................... 11

ARTICLE VI– DEBT AFFORDABILITY REPORT ................................................................. 11

i

# GOVERNMENT OF PUERTO RICO
# DEBT MANAGEMENT POLICY

## ARTICLE I- GENERAL PROVISIONS

### 1.1    Title

This document shall be known and may be cited as the "Government of Puerto Rico Debt Management Policy" (the "**Policy**").

### 1.2    Statutory Authority

This Policy is adopted pursuant to Article 3 of Act No. 101-2020, as amended, known as the "Puerto Rico Debt Responsibility Act" (the "**Debt Responsibility Act**"), which requires that the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**", by its Spanish acronym) adopt and maintain a debt management policy that is consistent with the Plan of Adjustment (as defined herein).

### 1.3    Application

Except as otherwise provided herein, this Policy shall apply to the Commonwealth and to any other Government Entity (each of such terms as defined herein).

### 1.4    Definitions

As used in this Policy, the following terms have the meanings set forth below:

a.    **AAFAF:** has the meaning provided in Article 1.2 hereof.

b.    **Appropriation Funded Debt:** means a Debt that carries a promise, though not a legal obligation, of the Commonwealth to appropriate funds to cover debt service.

c.    **Capital Improvements:** means (i) any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including, without limitation, buildings, park facilities, infrastructure, information technology systems or other equipment, with a useful life of 5 years or more that is funded on a necessarily non-recurring basis that is to be used as a public asset or for the public benefit and when it is appropriate to spread such costs over multiple Fiscal Years and (ii) any projects or programs or loans to finance projects or programs pursuant to Act No. 121 of June 27, 1977, as amended, known as the "Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority Act" and Act No. 103-2001, as amended, known as the "Puerto Rico Housing Finance Authority Act."

d.    **CCDA:** means the Puerto Rico Convention Center District Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 351-2000, as amended.

1

e.    **COFINA:** means the Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth created by Act No. 91-2006, as amended.

f.    **Commonwealth:** means the Commonwealth of Puerto Rico.

g.    **Commonwealth Constitution:** means the Constitution of the Commonwealth of Puerto Rico.

h.    **Commonwealth Instrumentality Plan:** means a plan of adjustment or Qualifying Modification for a Government Entity, including any plan of adjustment or Qualifying Modification for HTA, CCDA or PRIFA.

i.    **Comprehensive Cap:** means, collectively, the Primary Debt Limit and the Secured Debt Sub-Limit.

j.    **Cumulative Cash Flow Deficit:** means the excess of the expenses to be paid during a Fiscal Year that would ordinarily be paid out of or financed by anticipated tax or other revenues over the aggregate amount available (other than from the proceeds of the notes issued to fund the cumulative cash flow deficit) during such period for the payment of such expenses, as further provided in Section 148 of the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury regulations and rulings thereunder

k.    **CVIs:** means the contingent value instruments to be issued pursuant to the Plan.

l.    **Debt:** means, collectively, bonds, notes, loans, contingent value instruments, and any other evidence of indebtedness for borrowed money, including lease revenue bonds or notes, bond and grant anticipation notes, certificates of participation, land-secured financings (such as special tax revenue bonds and limited obligation assessment bonds), conduit financings (such as financings for affordable rental housing and qualified 501(c)(3) organizations), lines of credit, interfund borrowing, special financing programs or structures offered by the federal or state government (such as Qualified Energy Conservation Bonds) or other tax credit obligations or obligations that provide subsidized interest payments, but excluding capital leases and lease-purchase transactions unless otherwise determined by AAFAF in accordance with Article 1.8 hereof.

m.    **Debt Responsibility Act:** has the meaning provided in Article 1.2 hereof.

n.    **Debt Policy Period:** has the meaning provided in Article 1.5 hereof.

o.    **Debt Policy Revenues:** means, collectively, without duplication:

   i.    revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue owned by, or assigned to, any Government Entity (including COFINA);

   ii.    all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Government; and

2

       iii.   the revenues generated or imposed and owned by any of the entities identified in **Exhibit A** hereto;

       provided, however, that "Debt Policy Revenues" shall exclude any of the foregoing which:

   1.   is generated or imposed and owned by any of the entities identified in **Exhibit B** hereto;

   2.   is imposed by law or municipal ordinance and owned by any municipality of the Commonwealth (including without limitation, municipal property taxes, municipal sales and use taxes, volume of business taxes (*patente*) and construction excise taxes);

   3.   consists of proceeds from the issuance of Debt, including from a refinancing transaction;

   4.   is transferred or received from the federal government (other than federal excise tax revenues from rum and other distilled spirits produced in the Commonwealth and covered over to the General Fund); or

   5.   consists of proceeds from claims on property or casualty insurance policies.

       For illustrative purposes, included as **Exhibit C** hereto is the calculation of Debt Policy Revenues for Fiscal Year 2021.

   p.   **Effective Date:** means the date on which the Plan of Adjustment becomes effective in accordance with its terms.

   q.   **Fiscal Year:** means a fiscal year of the Commonwealth, commencing on July 1st and concluding on June 30th of the following calendar year.

   r.   **General Fund:** means the Government's primary operating fund.

   s.   **GO Bonds:** means the general obligation bonds of the Commonwealth that were Outstanding prior to the Effective Date and are set to be extinguished on the Effective Date.

   t.   **Government:** means the Government of the Commonwealth.

   u.   **Government Entities:** means all agencies, departments, offices, public corporations, boards, and any other instrumentalities of the Commonwealth, including any entities not in existence as of the Effective Date.

   v.   **HTA:** means the Puerto Rico Highways and Transportation Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 74 of June 23, 1965, as amended.

w. **Maximum Annual Debt Service:** means the maximum scheduled annual debt service (including principal and interest payments due and payable on Debt bearing current interest and, in the case of capital appreciation bonds or similar instruments, the maturity value due and payable on such instruments in the year in which it is due and payable) for any Fiscal Year on all Net Tax-Supported Debt; provided, however, that:

    i.    in the case of variable rate Debt, the calculation shall assume that such Debt bears interest at the maximum annual rate permitted by law;

    ii.   in the case of bond anticipation notes, the calculation shall assume that the debt service payable thereunder is equivalent to the debt service expected to be payable on the bonds in anticipation of which such bond anticipation notes are being issued, as determined by AAFAF, provided that the interest rate assumed for such Debt shall be equal to the greater of (x) the interest rate of the most recent General Obligation Debt issued plus 200 basis points and (y) the applicable municipal bond BBB Index  plus 300 basis points;

    iii.  in the case of grant anticipation notes, the debt service payable thereunder will not be included in the calculation of Maximum Annual Debt Service if (x) such grant anticipation notes are secured and payable solely from proceeds of money that are not Debt Policy Revenues or (y) based on a grant agreement or legislation, AAFAF determines that there is a reasonable expectation that the grant will be received, provided that if the grant is cancelled, the funds are deobligated or AAFAF otherwise determines that there is no longer a reasonable expectation that the grant will be received, the calculation of Maximum Annual Debt Service shall assume that the grant anticipation notes are amortized through a thirty (30) year term with an interest rate equal to the greater of (x) the interest rate of the most recent General Obligation Debt issued plus 200 basis points and (y) the applicable municipal bond BBB Index  plus 300 basis points;

    iv.   the debt service payments on New GO CABs issued pursuant to the Plan of Adjustment to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs issued pursuant to the Plan of Adjustment or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (x) holders or insurers of bonds issued by such Government Entity or (y) other creditors of such Government Entity, will not be included in the calculation of Maximum Annual Debt Service.

For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan of Adjustment or any Commonwealth Instrumentality Plan, shall be included in the calculation of Maximum Annual Debt Service, irrespective of whether issued prior to or after the Effective Date. For illustrative

4

purposes, attached as **Exhibit D** hereto is the calculation of the Maximum Annual Debt Service as of the date of the approval of this Policy.

a. **Natural Disaster:** A disaster, such as a hurricane, earthquake, pandemic, terrorism or other natural disaster or similar emergency, that results in a federally declared disaster declaration.

b. **Net Tax-Supported Debt:** means any Tax-Supported Debt, excluding:

i. Debt guaranteed by the good faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that (i) there is a reasonable expectation at the time of the issuance of such Debt, as determined by AAFAF, that the non-Debt Policy Revenues will be sufficient to pay debt service on such Debt through its maturity, such that the guarantee is only provided as a credit enhancement to reduce the cost of capital and (ii) the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed Fiscal Years; and

ii. Debt being refinanced through the proceeds of the proposed Debt issuance for which compliance with the Comprehensive Cap is being certified by the Secretary of Treasury in accordance with Article 2.3 hereof, _provided_ that a verification agent has certified that sufficient monies will be available to satisfy in full the refinanced Debt.

x. **New GO CABs:** means the New GO Bonds issued as capital appreciation bonds under the Plan.

y. **New GO Bonds:** means the new general obligation bonds of the Commonwealth issued on the Effective Date pursuant to the Plan.

z. **Outstanding:** means Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

aa. **PBA:** means the Puerto Rico Public Buildings Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 56 of July 19, 1958, as amended.

bb. **PBA Bonds:** means the bonds issued by PBA that were Outstanding prior to the Effective Date.

cc. **Plan of Adjustment:** means the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including the exhibits and schedules thereto (including, for the avoidance of doubt, the Plan Supplement), certified under Title III of PROMESA, as the same is amended, supplemented, or modified from time to time.

dd. **Policy**: has the meaning provided in Article 1.1 hereof.

ee.     **PRASA:** means the Puerto Rico Aqueduct and Sewer Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 40 of May 1, 1945, as amended.

ff.     **PREPA:**  means the Puerto Rico Electric Power Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 83 of May 2, 1941, as amended.

gg.     **PRIFA:** means the Puerto Rico Infrastructure Financing Authority, a public corporation and instrumentality of the Commonwealth created by Act No. 44 of June 21, 1988, as amended.

hh.     **Primary Debt Limit:** means seven and ninety-four hundredths percent (7.94%).

ii.     **PROMESA:** means the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.

jj.     **Qualifying Modification:** means a qualifying modification under Title VI of PROMESA.

kk.     **Secured Debt Sub-Limit:** means twenty-five one hundredths percent (0.25%) of Debt Policy Revenues.

ll.     **Secured Net Tax-Supported Debt:** means Net Tax-Supported Debt that is securitized or secured by a lien on or pledge of revenues constituting Debt Policy Revenues.

mm.     **Secretary of Treasury:** means the Secretary of Treasury of the Commonwealth.

nn.     **Tax-Supported Debt:** means, collectively, without duplication:

    i.     direct Debt of the Commonwealth for the payment of which the good faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds);

    ii.     Debt issued by any Government Entity and guaranteed by the good faith, credit and taxing power of the Commonwealth;

    iii.     Appropriation Funded Debt; and

    iv.     Debt issued by any Government Entity (including COFINA), whether or not guaranteed by the Commonwealth, that is secured by or payable from:

        1.   Debt Policy Revenues; or

        2.   lease or other agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations;

provided, however, that the following shall not be considered "Tax-Supported Debt":

6

a.   tax anticipation notes, revenue anticipation notes, and tax and revenue anticipation notes, provided that they are issued in compliance with Article 5.1 hereof;

b.   grant anticipation notes that are secured or payable in whole or in part by Debt Policy Revenues, _provided_ that they are issued in compliance with Article 5.2 hereof and that, based on a grant agreement or legislation, AAFAF determines that there is a reasonable expectation that the grant will be received;

c.   Debt issued in connection with a Natural Disaster to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico, _provided_ such funding is used exclusively to respond to the health, safety and welfare needs associated with the Natural Disaster;

d.   revenue bonds of Government Entities payable solely from user charges or securitizations and transition charges imposed upon customers or former customers of a utility or transportation system, including, without limitation, the self-supporting Debt of PRASA, PREPA, HTA or any related securitization entity and any other Debt that is not payable from Debt Policy Revenues, in each case, and only to the extent such Debt is not guaranteed by the good faith, credit and taxing power of the Commonwealth;

e.   contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan in satisfaction of claims asserted by (i) holders or insurers of bonds issued by such Government Entity or (ii) other creditors of such Government Entity;

f.   Debt of a Government Entity owed to another Government Entity that is outstanding as of the Effective Date (including, for the avoidance of doubt, any Debts owed to the GDB Debt Recovery Authority, the GDB Public Entity Trust, and Government Development Bank for Puerto Rico); and

g.   Debt incurred by a Government Entity under the Clean Water State Revolving Fund or the Drinking Water State Revolving Fund programs.

**1.5    Effectiveness**

This Policy shall become effective on the first calendar day immediately following the Effective Date and shall end on the date on which there are no New GO Bonds or CVIs Outstanding (the "**Debt Policy Period**").

**1.6    Amendments**

This Policy may be amended, modified or supplemented by AAFAF from time to time provided that such amendments, modifications or supplements are consistent with the Plan of Adjustment and the Debt Responsibility Act.

**1.7     Derivatives**

The use of derivatives and structured products by Government Entities shall be governed by a separate derivatives policy to be adopted by AAFAF within six (6) months from the date hereof.

**1.8     Capital Leases**

Within sixty (60) days from the approval of this Policy, each Government Entity shall provide AAFAF a report identifying all capital leases and lease-purchase transactions of such Government Entity, including the term, annual payments, residual payments, and any other information requested by AAFAF. Such information will be used by AAFAF to, within nine (9) months from the date of this Policy, develop a separate policy and/or amend this Policy to regulate and establish limitations for capital leases and lease-purchase transactions.

**ARTICLE II - COMPREHENSIVE CAP ON ALL NET TAX-SUPPORTED DEBT**

**2.1     Comprehensive Cap**

A.     <u>Primary Debt Limit</u>

During the Debt Policy Period, neither the Commonwealth nor any other Government Entity shall incur additional Net Tax-Supported Debt if the proposed issuance of such Debt would cause the ratio of (i) the Maximum Annual Debt Service due in any future Fiscal Year on all Net Tax-Supported Debt (including any Net Tax-Supported Debt Outstanding and the additional Net-Tax Supported Debt to be issued) to (ii) the average of the annual Debt Policy Revenues during the immediately preceding two (2) Fiscal Years, in the case of each of (i) and (ii), as certified by the Secretary of the Treasury, to exceed the Primary Debt Limit.

B.     <u>Secured Debt Sub-Limit</u>

During the Debt Policy Period, neither the Commonwealth nor any other Government Entity shall incur additional Secured Net Tax-Supported Debt (except for any Debt issued by COFINA to refinance the COFINA bonds outstanding as of the Effective Date) if the proposed issuance of such Debt would cause the ratio of (i) the Maximum Annual Debt Service due in any future Fiscal Year on all Secured Net Tax-Supported Debt (including (x) any Secured Net Tax-Supported Debt Outstanding (other than the COFINA bonds Outstanding as of the Effective Date) and (y) the additional Secured Net-Tax Supported Debt to be issued) to (ii) the average of the annual Debt Policy Revenues during immediately preceding two (2) Fiscal Years, in the case of each of (i) and (ii), as certified by the Secretary of the Treasury, to exceed the Secured Debt Sub-Limit. For the avoidance of doubt, any proposed issuance of Secured Net Tax-Supported Debt must also comply with the Primary Debt Limit.

**2.2     Certification of the Secretary of Treasury**

The Secretary of Treasury's certification of compliance with the Comprehensive Cap shall be conclusive and binding absent manifest error, and the validity of such Net Tax-Support Debt

shall not be subject to legal challenge; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of the Treasury may rely on certifications from officers of such public corporations. For the avoidance of doubt, the Comprehensive Cap shall apply in addition to the limitation imposed on the incurrence of public Debt established pursuant to Article VI, Section 2 of the Commonwealth Constitution.

## ARTICLE III - ADDITIONAL RESTRICTIONS ON THE ISSUANCE OF TAX-SUPPORTED DEBT

### 3.1   AAFAF Approval

Any issuance of Tax Supported Debt must be approved by resolution of the Board of Directors of AAFAF, in its role as fiscal agent, prior to its issuance.

### 3.2   Long-Term Borrowing for Capital Improvements Only

Tax-Supported Debt may only be incurred during the Debt Policy Period to finance Capital Improvements, as determined by the issuer of such Debt and approved by AAFAF, or to refinance Tax-Supported Debt in accordance with the terms and provision of Article 3.5 hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

### 3.3   Maturity Limitation on Tax-Supported Debt

No Tax-Supported Debt issued during the Debt Policy Period may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt (except for bond or grant anticipation notes) may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation or, if the legal original issuance maturity date is less than 30 years,  beyond such original issuance maturity date; provided, however, that, the foregoing shall not apply to (a) Tax Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution, or (b) Tax-Supported Debt issued to refinance Debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to terms and provision of Article 3.5 hereof. In the case of the Debts described in (a) and (b) above, no such Debt may be refinanced by any Debt extending the legal final maturity date beyond the original issuance maturity date.

### 3.4   Mandatory Principal Amortization

No series of Tax-Supported Debt issued during the Debt Policy Period may be issued unless (a) its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financing of new construction or reconstruction of Capital Improvements, and (b) continues amortizing in each and every year until such Debt is no longer outstanding. Required principal amortization shall be set according to the type, purpose and size of the Debt being issued.

**3.5**    **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year**

Refinancings of Tax-Supported Debt are permitted only if (a) there is no increase in the aggregate amount of principal and interest payable in any fiscal year and (b) such refinancing produces positive net present value savings of at least three percent (3%), after taking into consideration transaction expenses, which shall not exceed three percent (3%) of the principal amount of the refinanced Debt unless otherwise specifically authorized by AAFAF; provided, however, that, (i) refinancings without cash flow savings in every fiscal year are permitted if the refinancing is completed in direct response to a Natural Disaster, the debt service due in any future fiscal year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years and does not exceed the Primary Debt Limit and (ii) refinancings with net present value savings of less than three percent (3%) shall be permitted if the refinancing allows for amendments to the underlying bond resolution, indenture or trust agreement or for other reasons, that AAFAF determines, in its discretion, are beneficial to the Government or the issuer of such Debt. For the avoidance of doubt, the provisions of this Article 3.5 shall not apply to Debt issued to refinance or repay bond or grant anticipation notes.

## ARTICLE IV– RESTRICTIONS ON THE ISSUANCE OF DEBT BY PUBLIC CORPORATIONS

**4.1**    **Application**

Except as otherwise expressly provided herein, the provisions of this Article IV shall be applicable to the issuance of Debt by all Government Entities (other than any such Debt that is Tax-Supported Debt, which is subject to Article III hereof). Notwithstanding the foregoing, the provisions of Articles 4.3 and 4.4 hereof shall not be applicable to PREPA, PRASA or HTA.

**4.2**    **AAFAF Approval**

Any issuance of Debt by a Government Entity shall be approved by resolution of the Board of Directors of AAFAF, in its role as fiscal agent, prior to its issuance, regardless of whether such Debt is Tax-Supported Debt.

**4.3**    **Borrowing for Capital Improvements Only**

Government Entities may only issue Debt to (a) finance Capital Improvements aimed at improving the services provided by such Government Entity (if applicable), as determined by the issuer of such Debt and approved by AAFAF, (b) refinance Debt in accordance with the terms and provisions of Article 4.4 hereof, or (c) restructure Debt issued prior to the enactment of the Debt Responsibility Act.

**4.4**    **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year**

Refinancings of Debt by any Government Entity are permitted only if (a) there is no increase in the aggregate amount of principal and interest payable in any fiscal year and (b) such refinancing produces positive net present value savings of at least three percent (3%), after taking into consideration transaction expenses, which shall not exceed three percent (3%) of the principal amount of the refinanced Debt unless otherwise specifically authorized by AAFAF; provided,

however, that, (i) refinancings without cash flow savings in every fiscal year are permitted if the refinancing is completed in direct response to a Natural Disaster, the debt service due in any future fiscal year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years and (ii) refinancings with net present value savings of less than three percent (3%) shall be permitted if the refinancing allows for amendments to the underlying bond resolution, indenture or trust agreement or for other reasons, that AAFAF determines, in its discretion, are beneficial to the Government or the issuer of such Debt.  For the avoidance of doubt, the provisions of this Article 4.4 shall not apply to Debt issued to refinance or repay bond or grant anticipation notes.

## ARTICLE V– LIMITATIONS ON SHORT-TERM BORROWING AND ADVANCE FUNDING

### 5.1    Limitations on the Issuance of Tax and Revenue Anticipation Notes

No tax or revenue anticipation note shall be issued in any given Fiscal Year which would cause the principal amount of all tax and revenue anticipation notes outstanding to be greater than 110% of the projected Cumulative Cash Flow Deficit for such Fiscal Year.

Tax anticipation notes, revenue anticipation notes, tax and revenue anticipation notes shall mature no later than the last day of the Fiscal Year in which they were issued.

### 5.2    Limitations on the Issuance of Bond or Grant Anticipation Notes

No bond or grant anticipation note that is secured in whole or in part by Debt Policy Revenues shall mature later than one year after their date of issuance or be renewed for a period exceeding two years from the date of original issue.

## ARTICLE VI– DEBT AFFORDABILITY REPORT

AAFAF will conduct periodic reviews of the affordability of all Tax-Supported Debt Outstanding and publish an annual debt affordability report. Such report may include, among other things, details on the debt portfolio, a risk assessment, as well as a debt affordability analysis for short- and long-term periods.

**EXHIBIT A**

## PUBLIC CORPORATIONS WHOSE REVENUES ARE INCLUDED AS DEBT POLICY REVENUES

1.  Puerto Rico Tourism Company
2.  Puerto Rico Health Insurance Administration (ASES)
3.  Puerto Rico Medical Services Administration (ASEM)
4.  Agricultural Enterprises Development Administration (ADEA)
5.  Puerto Rico Integrated Transport Authority (PRITA)
6.  Puerto Rico Public Buildings Authority (PBA)
7.  Cardiovascular Center of Puerto Rico and the Caribbean
8.  Puerto Rico Convention Center District Authority (CCDA)
9.  State Insurance Fund Corporation (SIFC)
10. Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF)
11. Redevelopment Authority of Roosevelt Roads
12. Automobile Accidents Compensation Administration (AACA)
13. Institute of Puerto Rican Culture
14. Public Housing Administration
15. Puerto Rico School of Plastic Arts
16. Institutional Trust of the National Guard of Puerto Rico
17. Puerto Rico Infrastructure Financing Authority (PRIFA)
18. Integral Development of the Cantera Peninsula
19. Land Authority of Puerto Rico
20. Culebra Conservation and Development Authority
21. Musical Arts Corporation
22. Fine Arts Center Corporation
23. Puerto Rico Public Broadcasting Corporation
24. Agricultural Insurance Corporation
25. Puerto Rico Conservatory of Music Corporation
26. Corporation for the "Caño Martin Peña" Enlace Project
27. Puerto Rico Public-Private Partnership Authority
28. University of Puerto Rico Comprehensive Cancer Center
29. Center for Diabetes

**EXHIBIT B**

**GOVERNMENT ENTITIES WHOSE REVENUES ARE NOT INCLUDED**

**AS DEBT POLICY REVENUES**

1. Agency Fund (Special Deposit Fund)
2. Government Development Bank for Puerto Rico (GDB)
3. Municipal Revenues Collection Center (CRIM)
4. Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (COSSEC)
5. Puerto Rico Aqueduct and Sewer Authority (PRASA)
6. Puerto Rico Electric Power Authority (PREPA)
7. Puerto Rico Highways and Transportation Authority (PRHTA)
8. Puerto Rico Industrial Development Company (PRIDCO)
9. Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (AFICA)
10. Puerto Rico Municipal Finance Agency (MFA)
11. Puerto Rico Municipal Finance Corporation (COFIM)
12. Puerto Rico Public Finance Corporation (PFC)
13. Puerto Rico Tourism Development Fund (TDF)
14. Puerto Rico Water Pollution Control Revolving Fund
15. Safe Drinking Water Treatment Revolving Fund
16. The Children's Trust Fund
17. University of Puerto Rico (UPR)
18. Puerto Rico Housing Finance Authority (HFA)
19. Puerto Rico Ports Authority

<u>**EXHIBIT C**</u>

**DEBT POLICY REVENUES**

| # | Description | Estimated[1] Actuals FY2021 (in millions) |
|---|---|---|
| 1. | General Fund Revenues | |
| 2. | Sales and Use Tax | 2,498 |
| 3. | Individual Income Taxes | 2,343 |
| 4. | Corporate Income Taxes | 2,144 |
| 5. | Act 154 | 1,753 |
| 6. | Non-Resident Withholdings | 367 |
| 7. | Alcoholic Beverages | 266 |
| 8. | Cigarettes | 114 |
| 9. | Motor Vehicles | 612 |
| 10. | Excises on Off-Shore Shipment Rum | 155 |
| 11. | Partnerships | 474 |
| 12. | Other Excise Taxes | 319 |
| 13. | Other General Fund Revenue[2] | 622 |
| 14. | **Sub-total, GF Revenues (Excl. Other Tax Revenue)** | **11,668** |
| 15. | GF Portion of Misc. Tax Streams[3] | 479 |
| 16. | Conditionally Allocable Revenues[4] | 993 |
| 17. | **Total General Fund Revenues** | **13,140** |
| 18. | Special Revenue Funds | |
| 19. | SRF Revenues - Commonwealth Agencies and Public Corporations[5] | 1,290 |
| 20. | SRF Revenues - IFCUs[6] | 1,205 |
| 21. | Enterprise Fund Revenues[7] | 794 |
| 22. | **Total, Special Revenue Funds** | **3,289** |
| 23. | **Total, Own Source Revenue (Excl. COFINA)** | **16,428** |
| 24. | COFINA Settlement Amount | 448 |
| 25. | **Total, Debt Policy Revenues** | **16,876** |

Notes
(1) Amounts shown reflect estimated actual revenues per the Government parties as of the date of this Policy.
(2) Other General Fund includes select, smaller revenue streams contributing to General Fund revenues, such as property taxes, interest, tax on dividends, inheritance and gift taxes, other petroleum products, horse races, insurance premiums, penalties and fees, slot machine revenue, other motor vehicles licenses, alcoholic beverage licenses, and excise tax on cement, among others.
(3) Total General Fund portion of misc. tax streams includes select portions of various revenue streams tied to General Fund and specific allocations (e.g., FAM portion of SUT, CINE allocation from SUT, portion of Rum Cover Over Tax transferred to third parties such as the Conservation Trust, portions of Cigarette Excise Tax collections allocated to third parties).
(4) Total Conditionally Allocable Revenues includes select revenue streams based on legal designation. These revenue streams include: Commonwealth property taxes, Gasoline Excise Taxes, Gas Oil and Diesel Taxes, Vehicle License Fees, certain portions of the petroleum products excise tax, and portions of the rum tax cover over.
(5) Includes all Special State Funds (FEE), Ingresos Propios (IP), and Otros Ingresos (OI) related to all Commonwealth agencies and public corporations (*e.g.*, Gaming Commission, Department of Health, Automobile Accidents Compensation Administration (AACA), Department of Transportation and Public Works, Department of Education, Department of Justice, General Services Administration), among approximately 80 other Government Entities and programs.
(6) Includes: Puerto Rico Tourism Company; Puerto Rico Health Insurance Administration (ASES); Agricultural Enterprises Development Administration (ADEA); Puerto Rico Integrated Transit Authority (PRITA); Medical Services Administration of Puerto Rico (ASEM); Public Building Authority (PBA); Cardiovascular Center Corporation of Puerto Rico and the Caribbean; Convention Center of District Authority; State Insurance Fund Corporation (SIFC); Fiscal Agency and Financial Advisory Authority (AAFAF). This line item excludes Puerto Rico Housing Finance Authority (HFA) and Puerto Rico Ports Authority.
(7) Enterprise Revenues include all revenues associated with the 9-1-1 Fund, the Lottery Fund, and the Unemployment Fund.

**EXHIBIT D**

## MAXIMUM ANNUAL DEBT SERVICE

(in millions)

| Description | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 | FY 2029 | FY 2030 | FY 2031 |
|---|---|---|---|---|---|---|---|---|---|---|
| Commonwealth Debt Service - Principal | (377) | (376) | (376) | (374) | (371) | (368) | (363) | (357) | (350) | (342) |
| Commonwealth Debt Service - Interest | (308) | (289) | (270) | (251) | (233) | (214) | (196) | (178) | (160) | (142) |
| Commonwealth Debt Service - Total | (684) | (665) | (646) | (625) | (604) | (582) | (559) | (535) | (510) | (484) |
| COFINA Debt Service Payment | (466) | (485) | (504) | (525) | (546) | (568) | (591) | (615) | (640) | (666) |
| **Total Debt Service[1]** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** |

| Description | FY 2032 | FY 2033 | FY 2034 | FY 2035 | FY 2036 | FY 2037 | FY 2038 | FY 2039 | FY 2040 | FY 2041 |
|---|---|---|---|---|---|---|---|---|---|---|
| Commonwealth Debt Service - Principal | (332) | (318) | (301) | (283) | (262) | (239) | (214) | (186) | (156) | (126) |
| Commonwealth Debt Service - Interest | (125) | (112) | (99) | (87) | (76) | (65) | (56) | (47) | (40) | (33) |
| Commonwealth Debt Service - Total | (457) | (429) | (400) | (370) | (338) | (304) | (270) | (233) | (195) | (159) |
| COFINA Debt Service Payment | (693) | (721) | (750) | (780) | (812) | (846) | (880) | (917) | (955) | (991) |
| **Total Debt Service[1]** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** |

| Description | FY 2042 | FY 2043 | FY 2044 | FY 2045 | FY 2046 |
|---|---|---|---|---|---|
| Commonwealth Debt Service - Principal | (131) | (136) | (142) | (147) | (153) |
| Commonwealth Debt Service - Interest | (28) | (23) | (18) | (12) | (6) |
| Commonwealth Debt Service - Total | (159) | (159) | (159) | (159) | (159) |
| COFINA Debt Service Payment | (991) | (991) | (991) | (991) | (991) |
| **Total Debt Service[1]** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** | **(1,150)** |

Notes

(1) Excludes Capital Appreciation Bonds.