# United States Court of Appeals
## For the First Circuit

---

No. 22-1080

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

Debtors,

---

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

Debtors, Appellees,

v.

FEDERACION DE MAESTROS DE PUERTO RICO, INC.; GRUPO MAGISTERIAL EDUCADORES(AS) POR LA DEMOCRACIA, UNIDAD, CAMBIO, MILITANCIA Y ORGANIZACION SINDICAL, INC.; UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACION, INC.,

Objectors, Appellants,

PFZ PROPERTIES, INC.; OSCAR ADOLFO MANDRY APARICIO; MARIA DEL
CARMEN AMALIA MANDRY LLOMBART; SELMA VERONICA MANDRY LLOMBART;
MARIA DEL CARMEN LLOMBART BAS; OSCAR ADOLFO MANDRY BONILLA;
GUSTAVO ALEJANDRO MANDRY BONILLA; YVELISE HELENA FINGERHUT
MANDRY; MARGARET ANN FINGERHUT MANDRY; VICTOR ROBERT FINGERHUT
MANDRY; JUAN CARLOS ESTEVA FINGERHUT; PEDRO MIGUEL ESTEVA
FINGERHUT; MARIANO JAVIER MCCONNIE FINGERHUT; JANICE MARIE
MCCONNIE FINGERHUT; VICTOR MICHAEL FINGERHUT COCHRAN; MICHELLE
ELAINE FINGERHUT COCHRAN; ROSA ESTELA MERCADO GUZMAN; EDUARDO
JOSE MANDRY MERCADO; SALVADOR RAFAEL MANDRY MERCADO; MARGARITA
ROSA MANDRY MERCADO; ADRIAN ROBERTO MANDRY MERCADO; VICENTE
PEREZ ACEVEDO; CORPORACION MARCARIBE INVESTMENT; ANTONIO MARTIN
CERVERA; MARIA TERESITA MARTIN; WANDA ORTIZ SANTIAGO; NANCY I.
NEGRON-LOPEZ; DEMETRIO AMADOR INC.; DEMETRIO AMADOR ROBERTS;
SUIZA DAIRY CORP.; MARUZ REAL ESTATE CORP.; GROUP WAGE
CREDITORS; YASHEI ROSARIO; ANA A. NUNEZ VELAZQUEZ; EDGARDO
MARQUEZ LIZARDI; MARIA M. ORTIZ MORALES; ARTHUR SAMODOVITZ;
MIGUEL LUNA DE JESUS; ISMAEL L. PURCELL SOLER; ALYS COLLAZO
BOUGEOIS; MILDRED BATISTA DE LEON; JAVIER ALEJANDRINO OSORIO;
SERVICE EMPLOYEES INTERNATIONAL UNION (SEIU); INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; MAPFRE PRAICO INSURANCE COMPANY; CERTAIN
CREDITORS WHO FILED ACTIONS IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO; MED CENTRO, INC., f/k/a Consejo
de Salud de la Comunidad de la Playa de Ponce, Inc.; ASOCIACION
DE JUBILADOS DE LA JUDICATURA DE PUERTO RICO; HON. HECTOR URGELL
CUEBAS; COOPERATIVA DE AHORRO Y CREDITO VEGABAJENA; LORTU-TA
LTD., INC.; LA CUARTEROLA, INC.; JUAZA, INC.; CONJUGAL
PARTNERSHIP ZALDUONDO-MACHICOTE; FRANK E. TORRES RODRIGUEZ; EVA
TORRES RODRIGUEZ; FINCA MATILDE, INC.; UNIVERSITY OF PUERTO RICO
RETIREMENT SYSTEM TRUST; PETER C. HEIN; MIRIAM E. LIMA COLON;
BETZAIDA FELICIANO CONCEPCION; ANGEL L. MENDEZ GONZALEZ;
ASOCIACION DE MAESTROS PUERTO RICO; ASOCIACION DE MAESTROS DE
PUERTO RICO-LOCAL SINDICAL; MORGAN STANLEY & CO. LLC; GOLDMAN
SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; SANTANDER
SECURITIES LLC; SIDLEY AUSTIN LLP; BMO CAPITAL MARKETS GKST,
INC.; CITIGROUP GLOBAL MARKETS INC.; SAMUEL A. RAMIREZ & CO.,
INC.; MESIROW FINANCIAL, INC.; MERRILL LYNCH, PIERCE, FENNER &
SMITH INC.; MERRILL LYNCH CAPITAL SERVICES, INC.; BARCLAYS
CAPITAL INC.; RBC CAPITAL MARKETS, LLC; RAYMOND JAMES &
ASSOCIATES, INC.; COMMUNITY HEALTH FOUNDATION OF P.R. INC.;
QUEST DIAGNOSTICS OF PUERTO RICO, INC.; U.S. BANK TRUST NATIONAL
ASSOCIATION, as Trustee for the PRPFC Outstanding Bonds and
PRIFA Bonds, and Fiscal Agent for PRPBA Bonds; U.S. BANK
NATIONAL ASSOCIATION, as Trustee for the PRPFC Outstanding Bonds
and PRIFA Bonds, and Fiscal Agent for PRPBA Bonds; NILSA
CANDELARIO; JORGE RAFAEL EDUARDO COLLAZO QUINONES; EL OJO DE

AGUA DEVELOPMENT, INC.; PEDRO JOSE NAZARIO SERRANO; JOEL RIVERA
MORALES; MARIA DE LOURDES GOMEZ PEREZ; HECTOR CRUZ VILLANUEVA;
LOURDES RODRIGUEZ; LUIS M. JORDAN RIVERA; TACONIC CAPITAL
ADVISORS LP; AURELIUS CAPITAL MANAGEMENT, LP; CANYON CAPITAL
ADVISORS LLC; FIRST BALLANTYNE LLC; MOORE CAPITAL MANAGEMENT,
LP; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY;
HON. PEDRO R. PIERLUISI URRUTIA; UNITED STATES, on behalf of the
Internal Revenue Service; ASOCIACION PUERTORRIQUENA DE LA
JUDICATURA, INC.; COOPERATIVA DE AHORRO Y CREDITO ABRAHAM ROSA;
COOPERATIVA DE AHORRO Y CREDITO DE CIALES; COOPERATIVA DE AHORRO
Y CREDITO DE JUANA DIAZ; COOPERATIVA DE AHORRO Y CREDITO DE
RINCON; COOPERATIVA DE AHORRO Y CREDITO DE VEGA ALTA;
COOPERATIVA DE AHORRO Y CREDITO DR. MANUEL ZENO GANDIA; MARIA A.
CLEMENTE ROSA; JOSE N. TIRADO GARCIA, as President of the United
Firefighters Union of Puerto Rico,

Objectors, Appellees,

VAQUERIA TRES MONJITAS, INC.; BLACKROCK FINANCIAL MANAGEMENT,
INC.; EMSO ASSET MANAGEMENT LIMITED; MASON CAPITAL MANAGEMENT,
LLC; SILVER POINT CAPITAL, L.P.; VR ADVISORY SERVICES, LTD;
AURELIUS CAPITAL MANAGEMENT, LP, on behalf of its managed
entities; GOLDENTREE ASSET MANAGEMENT LP, on behalf of funds
under management; WHITEBOX ADVISORS LLC, on behalf of funds
under management; MONARCH ALTERNATIVE CAPITAL LP, on behalf of
funds under management; TACONIC CAPITAL ADVISORS L.P., on behalf
of funds under management; ARISTEIA CAPITAL, LLC, on behalf of
funds under management; FARMSTEAD CAPITAL MANAGEMENT, LLC, on
behalf of funds under management; FOUNDATION CREDIT, on behalf
of funds under management; CANYON CAPITAL ADVISORS LLC, in its
capacity as a member of the QTCB Noteholder Group; DAVIDSON
KEMPNER CAPITAL MANAGEMENT LP, in its capacity as a member of
the QTCB Noteholder Group; SCULPTOR CAPITAL LP, in its capacity
as a member of the QTCB Noteholder Group; SCULPTOR CAPITAL II
LP, in its capacity as a member of the QTCB Noteholder Group;
AMBAC ASSURANCE CORPORATION;  ANDALUSIAN GLOBAL DESIGNATED
ACTIVITY COMPANY; CROWN MANAGED ACCOUNTS, for and on behalf of
Crown/PW SP; LMA SPC, for and on behalf of Map 98 Segregated
Portfolio; MASON CAPITAL MASTER FUND LP; OAKTREE-FORREST MULTI-
STRATEGY, LLC (SERIES B); OAKTREE OPPORTUNITIES FUND IX, L.P.;
OAKTREE OPPORTUNITIES FUND IX (PARALLEL), L.P.; OAKTREE
OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE HUNTINGTON
INVESTMENT FUND II, L.P.; OAKTREE OPPORTUNITIES FUND X, L.P.;
OAKTREE OPPORTUNITIES FUND X (PARALLEL), L.P.; OAKTREE
OPPORTUNITIES FUND X (PARALLEL 2), L.P.; OAKTREE VALUE
OPPORTUNITIES FUND HOLDINGS, L.P.; OCEANA MASTER FUND LTD.;
OCHER ROSE, L.L.C.; PENTWATER MERGER ARBITRAGE MASTER FUND LTD.;

PWCM MASTER FUND LTD.; REDWOOD MASTER FUND, LTD.; BANK OF NEW
YORK MELLON; OFFICIAL COMMITTEE OF UNSECURED CREDITORS; ASSURED
GUARANTY CORP.; ASSURED GUARANTY MUNICIPAL CORP.; OFFICIAL
COMMITTEE OF RETIRED EMPLOYEES; NATIONAL PUBLIC FINANCE
GUARANTEE CORP.; FINANCIAL GUARANTY INSURANCE COMPANY;
AMERINATIONAL COMMUNITY SERVICES, LLC, as servicer for the GDB
Debt Recovery Authority; CANTOR-KATZ COLLATERAL MONITOR LLC, as
Collateral Monitor for GDB Debt Recovery Authority; ATLANTIC
MEDICAL CENTER, INC.; CAMUY HEALTH SERVICES, INC.; CENTRO DE
SALUD FAMILIAR DR. JULIO PALMIERI FERRI, INC.; CIALES PRIMARY
HEALTH CARE SERVICES, INC.; CORP. DE SERV. MEDICOS PRIMARIOS Y
PREVENCION DE HATILLO, INC.; COSTA SALUD, INC.; CENTRO DE SALUD
DE LARES, INC.; CENTRO DE SERVICIOS PRIMARIOS DE SALUD DE
PATILLAS, INC.; HOSPITAL GENERAL CASTANER, INC.; GNMA & US
GOVERNMENT TARGET MATURITY FUND FOR PUERTO RICO RESIDENTS, INC.,
f/k/a Puerto Rico GNMA & U.S. Government Target Maturity Fund,
Inc.; MORTGAGE-BACKED & US GOVERNMENT SECURITIES FUND FOR PUERTO
RICO RESIDENTS, INC., f/k/a Puerto Rico Mortgage-Backed & U.S.
Government Securities Fund, Inc.; PUERTO RICO RESIDENTS BOND
FUND I, f/k/a Puerto Rico Investors Bond Fund I; PUERTO RICO
RESIDENTS TAX-FREE FUND, INC., f/k/a Puerto Rico Investors Tax-
Free Fund, Inc.; PUERTO RICO RESIDENTS TAX-FREE FUND II, INC.,
f/k/a Puerto Rico Investors Tax-Free Fund II, Inc.; PUERTO RICO
RESIDENTS TAX-FREE FUND III, INC., f/k/a Puerto Rico Investors
Tax-Free Fund III, Inc.; PUERTO RICO RESIDENTS TAX-FREE FUND IV,
INC., f/k/a Puerto Rico Investors Tax-Free Fund IV, Inc.; PUERTO
RICO RESIDENTS TAX-FREE FUND V, INC., f/k/a Puerto Rico
Investors Tax-Free Fund V, Inc.; PUERTO RICO RESIDENTS TAX-FREE
FUND VI, INC., f/k/a Puerto Rico Investors Tax-Free Fund VI,
Inc.; TAX-FREE FIXED INCOME FUND FOR PUERTO RICO RESIDENTS,
INC., f/k/a Puerto Rico Fixed Income Fund, Inc.; TAX-FREE FIXED
INCOME FUND II FOR PUERTO RICO RESIDENTS, INC., f/k/a Puerto
Rico Fixed Income Fund II, Inc.; TAX-FREE FIXED INCOME FUND III
FOR PUERTO RICO RESIDENTS, INC., f/k/a Puerto Rico Fixed Income
Fund III, Inc.; TAX-FREE FIXED INCOME FUND IV FOR PUERTO RICO
RESIDENTS, INC., f/k/a Puerto Rico Fixed Income Fund IV, Inc.;
TAX-FREE FIXED INCOME FUND V FOR PUERTO RICO RESIDENTS, INC.,
f/k/a Puerto Rico Fixed Income Fund V, Inc.; TAX-FREE FIXED
INCOME FUND VI FOR PUERTO RICO RESIDENTS, INC., f/k/a Puerto
Rico Fixed Income Fund VI, Inc.; TAX FREE FUND FOR PUERTO RICO
RESIDENTS, INC., f/k/a Tax-Free Puerto Rico Fund, Inc.; TAX FREE
FUND II FOR PUERTO RICO RESIDENTS, INC., f/k/a Tax-Free Puerto
Rico Fund II, Inc.; TAX-FREE HIGH GRADE PORTFOLIO BOND FUND FOR
PUERTO RICO RESIDENTS, INC., f/k/a Puerto Rico AAA Portfolio
Bond Fund, Inc.; TAX-FREE HIGH GRADE PORTFOLIO BOND FUND II FOR
PUERTO RICO RESIDENTS, INC., f/k/a Puerto Rico AAA Portfolio
Bond Fund II, Inc.; TAX-FREE HIGH GRADE PORTFOLIO TARGET

MATURITY FUND FOR PUERTO RICO RESIDENTS, INC., f/k/a Puerto Rico
AAA Portfolio Target Maturity Fund, Inc.; TAX FREE TARGET
MATURITY FUND FOR PUERTO RICO RESIDENTS, INC., f/k/a Tax-Free
Puerto Rico Target Maturity Fund, Inc.; UBS IRA SELECT GROWTH &
INCOME PUERTO RICO FUND; SERVICIOS INTEGRALES EN LA
MONTANA (SIM),

Creditors, Appellees,

UNITED STATES,

Respondent, Appellee.

────────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

────────────────

Before

Thompson, Howard, and Kayatta, Circuit Judges.

────────────────

Jessica E. Méndez Colberg, with whom Rolando Emmanuelli
Jiménez and Bufete Emmanuelli, C.S.P., were on brief, for
appellants.
Martin J. Bienenstock, with whom Jeffrey W. Levitan, Mark D.
Harris, Brian S. Rosen, Ehud Barak, Lucas Kowalczyk, Timothy W.
Mungovan, John E. Roberts, Paul V. Possinger, Jordan Sazant, and
Proskauer Rose LLP, were on brief, for appellee Financial Oversight
and Management Board for Puerto Rico.
John E. Mudd on brief for appellee Servicios Integrales en la
Montaña.
Joseph R. Palmore, James M. Peck, Gary S. Lee, James A.
Newton, Lena H. Hughes, Andrew R. Kissner, and Morrison & Foerster
LLP, on brief for appellee Ad Hoc Group of Constitutional
Debtholders.
Mark T. Stancil and Willkie Farr & Gallagher LLP on brief for
appellee Ad Hoc Group of General Obligation Bondholders.
Gregory Silbert and Weil, Gotshal & Manges LLP on brief for
appellee National Public Finance Guarantee Corporation.

────────────────

* Of the Southern District of New York, sitting by
designation.

Kurt A. Mayr, David L. Lawton, David K. Shim, P. Sabin Willett, and Morgan, Lewis & Bockius LLP on brief for appellee QTCB Noteholder Group.

Howard R. Hawkins, Jr., Mark C. Ellenberg, Casey J. Servais, William J. Natbony, Thomas J. Curtin, Cadwalder, Wickersham & Taft LLP, Heriberto Burgos Pérez, Ricardo F. Casellas-Sánchez, Diana Pérez-Seda, and Casellas Alcover & Burgos P.S.C. on brief for appellees Assured Guaranty Corp. and Assured Guaranty Municipal Corp.

Rafael Escalera, Sylvia M. Arizmendi, Carlos R. Rivera-Ortiz, Reichard & Escalera, Susheel Kirpalani, Daniel Salinas, and Quinn Emanuel Urquhart & Sullivan, LLP on brief for appellee Lawful Constitutional Debt Coalition.

Dennis F. Dunne, Atara Miller, Grant R. Mainland, John J. Hughes, III, Jonathan Ohring, and Milbank LLP on brief for appellees Ambac Assurance Corporation.

Martin A. Sosland, James E. Bailey III, Adam M. Langley, Butler & Snow LLP, María E. Picó, and Rexach & Picó, CSP on brief for appellee Financial Guaranty Insurance Company.

Arturo J. García-Solá, Nayuan Zouairabani, and McConnell Valdes LLC on brief for appellee AmeriNational Community Services, LLC.

Douglas I. Koff, Peter Amend, Douglas S. Mintz, and Schulte, Roth & Zabel on brief for appellee Cantor-Katz Collateral Monitor LLC.

---

April 26, 2022

---

**KAYATTA**, **Circuit Judge**.   This case presents several issues of first impression.  It arises out of the years-long effort to put Puerto Rico on the path to financial recovery by restructuring the Commonwealth's sovereign debt under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA).   In January, the court charged with overseeing the Title III proceedings confirmed a plan of adjustment for the debts of the Commonwealth and two of its instrumentalities ("the Plan of Adjustment" or "the Plan").   The appellants -- various organizations that represent some public school teachers and educators participating in the Commonwealth's pension system (collectively, "the Teachers' Associations") -- object to the manner in which the Plan treats their claims to current and future pension payments.   In a nutshell, the Plan rejects the right of public school teachers to accrue further retirement pension benefits under the Commonwealth's existing defined benefit plan, and makes them eligible instead to receive benefits under a defined contribution plan that is materially less favorable for most participants.

After the Title III court approved the Plan of Adjustment over the objections of the Teachers' Associations, the associations appealed that order, sought a stay pending appeal by the Title III court, see Fed. R. Bankr. P. 8007(a)(1)(A), and then, after that stay was denied, moved in this court on March 3 for

such a stay, see Fed. R. App. P. Rule 8(a)(2)(A)(ii).  By order
dated March 11, 2022, we denied that request for a stay, and the
Plan became effective on March 15.[1]  We now consider the merits of
the Teachers' Associations' appeal from the Title III court's
order confirming the Plan.  For the following reasons, we affirm.

## I.

By 2017 the Commonwealth of Puerto Rico had accumulated
approximately $55 billion in unfunded pension liabilities.  That
is to say, the Commonwealth's government had promised its public
servants $55 billion that it neither had nor could reasonably
expect to have when those bills became due.  The Commonwealth also
had outstanding approximately $30.5 billion in government-backed
bonds without the wherewithal to make the payments due under the
bonds.  These excessive liabilities left the island of over three
million people in a serious fiscal crisis, threatening the
Commonwealth's economic stability and contributing to an
accelerated out-migration of residents and businesses.  See 48
U.S.C. § 2194(m)(1)-(3).  Congress reacted to Puerto Rico's fiscal
emergency by passing the Puerto Rico Oversight, Management, and
Economic Stability Act, 48 U.S.C. § 2101 et seq., known as PROMESA.

---

[1] By notice on March 15, 2022, the Board informed the
Title III court that the Plan of Adjustment went into effect and
was "substantially consummated."

See *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 916 F.3d 98, 103
(1st Cir. 2019).

In enacting PROMESA, Congress found that "[a]
comprehensive approach to fiscal, management, and structural
problems and adjustments . . . is necessary, involving independent
oversight and a Federal statutory authority for the Government of
Puerto Rico to restructure debts in a fair and orderly process."
48 U.S.C. § 2194(m)(4). To develop and implement this
comprehensive approach, Congress created the Financial Oversight
and Management Board (the "Board"), see id. § 2121(b)(1), "to
assist the Government of Puerto Rico in reforming its fiscal
governance and support the implementation of potential debt
restructuring," id. § 2194(n)(3).

Among the numerous responsibilities assigned to the
Board was the development of fiscal plans for the Commonwealth and
its instrumentalities to "provide a method to achieve fiscal
responsibility and access to the capital markets." Id.
§ 2141(b)(1). Toward that end, PROMESA established the Board as
a creature of the territorial government, see id. § 2121(c), and
empowered the Board, even absent agreement from the Governor and
the Legislature, to develop, review, approve, and certify fiscal
plans that would in turn dictate the bounds of any annual budgets
adopted by the Commonwealth, see id. §§ 2141(c)-(e), 2142(c)(1).

PROMESA also created in Title III a modified version of the municipal bankruptcy code for territories and their instrumentalities.  Id. § 2161 et seq.  Title III authorized the Board to place the Commonwealth and its instrumentalities into bankruptcy proceedings and to develop a plan of adjustment for restructuring the Commonwealth's debts to wind down the bankruptcy in a manner that would "reform[] . . . fiscal governance," id. § 2194(n)(3).  See id. § 2175.

Beginning in 2017, the Board initiated proceedings under Title III to restructure the debts of the Commonwealth and a number of its instrumentalities.  After several years of labor -- involving extensive mediation and negotiations with numerous stakeholders -- the Board presented the Plan of Adjustment (the Eighth Amended version) for the Commonwealth and two of its instrumentalities.  Pursuant to section 1123(a)(1) and (3) of the Bankruptcy Code, as incorporated into Title III, 48 U.S.C. § 2161, the Plan designated classes of claims and specified a treatment for any class of claims that was impaired by the Plan.  Among the claims treated under the Plan were those held by the Commonwealth's public pensioners.

The Plan elicited objections from several stakeholders, including the Teachers' Associations.  Of particular concern to the Teachers' Associations is the Plan's treatment of the terms of the publicly funded pensions provided through the Commonwealth's

Teachers Retirement System, in which many of the associations' members participate.

Prior to 2013, the Teachers Retirement System provided for all participants a defined benefit pension plan, which promised a specified monthly benefit amount upon retirement based on, among other things, age and years of service, and included cost-of-living adjustments. See 2004 P.R. Act 91 § 40; see also 2007 P.R. Act 35. That pension arrangement proved to be unsustainable for the Commonwealth's finances. And the attempt to fund the pension plan and other current expenses with debt proved ruinous for the fiscal wellbeing of the Commonwealth.

In 2013, the Puerto Rico Legislative Assembly enacted Act 160-2013 ("Act 160") which sought to end the defined benefit program by freezing accruals under the existing plan and transferring active and future members to a defined contribution plan, which would be funded by employee and employer contributions. See 2013 P.R. Act 160, art. 5. The Puerto Rico Supreme Court ultimately overturned Act 160, but only as to teachers who were hired before the law went into effect in August 2014. See Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R., 190 P.R. Dec. 854, 2014 TSPR 58 (2014). The net result was that teachers hired before August 2014 remained on the defined benefit plan while teachers hired after August 2014 were enrolled in the defined contribution plan.

Under the Plan, participants in the Teachers Retirement
System who have already accrued rights to payments are still
entitled to receive 100% of those benefits.  See Plan §§ 55.3(a),
55.6(a), 55.9(a).  However, the Plan freezes future accruals under
the defined benefit plan held by teachers hired prior to August
2014 and eliminates for all teachers certain cost-of-living
adjustments going forward.  See id.; see also id. Ex. F-1.  The
Teachers' Associations objected to the Plan insofar as it proposed
to change the manner in which pension benefits would be determined
under the Plan from March 15, 2022, onward.

The Title III court heard and overruled these
objections, entering an order confirming the Plan, see In re Fin.
Oversight & Mgmt. Bd. for P.R., 636 B.R. 1 (D.P.R. 2022), along
with findings of fact and conclusions of law supporting that order,
see In re Fin. Oversight & Mgmt. Bd. for P.R., No. 17-BK-3283,
2022 WL 504226 (D.P.R. Jan. 18, 2022).  This appeal followed.[2]

**II.**

We review the Title III court's legal conclusions de
novo and factual findings for clear error.  See In re Fin.
Oversight & Mgmt. Bd. for P.R., 9 F.4th 1, 10 (1st Cir. 2021); cf.
In re SW Bos. Hotel Venture, LLC, 748 F.3d 393, 402 (1st Cir.
2014).  And we review the Title III court's application of the law

---

[2]  We thank the parties for their expedited briefing and
argument on these complex issues in an exigent posture.

to the facts for abuse of discretion.  See <u>In re Fin. Oversight &</u>

<u>Mgmt. Bd. for P.R.</u>, 7 F.4th 31, 36 (1st Cir. 2021).

**III.**

Under PROMESA, the Title III court shall confirm a plan

of adjustment so long as certain requirements are met, including

that:

> the debtor is not prohibited by law from
> taking any action necessary to carry out the
> plan; . . . any legislative, regulatory, or
> electoral approval necessary under applicable
> law in order to carry out any provision of the
> plan has been obtained, or such provision is
> expressly conditioned on such approval; . . .
> [and] the plan is feasible.

48 U.S.C. § 2174(b).

The Teachers' Associations put forward three reasons why

the Plan of Adjustment cannot be confirmed and must be set aside.

First, they challenge the Plan's provision and the Title III

court's finding that portions of several Commonwealth statutes

providing for the continued payment of pension benefits under the

pre-March 15 regime are rendered ineffective, either as rejected

executory contracts or as preempted by PROMESA.  Second, they argue

that the Plan lacks the requisite enabling legislation to implement

its proposed changes to the Teachers Retirement System.  Third,

the associations assert that the Plan requires and has not obtained

effective legislative authorization for the issuance of the new

debt instruments called for by the Plan.  We consider each of these arguments in turn.

### A.

The Teachers' Associations' lead argument trains on the fact that the Commonwealth's legislature has not revoked the statutes establishing the continued accrual of defined pension benefits with cost-of-living adjustments just as they were paid prior to March 15.[3]  The Plan of Adjustment deems those laws preempted to the extent they conflict with PROMESA.  See Plan §§ 55.3(b), 55.6(b), 55.9(c); see also id. Ex. K-1 § III.  And the Title III court's findings of fact and conclusions of law explain that the relevant statutes conflict with PROMESA "to the extent they are inconsistent with the discharge of claims and treatment provided for pension benefits and payments by the Plan . . . and would undermine the restructuring contemplated by the Plan."  In re Fin. Oversight & Mgmt. Bd. for P.R., 2022 WL 504226, at *39; see also id. at *37.

The associations agree that pension obligations are contractual in nature and may be rejected under section 365 of the Bankruptcy Code.  Cf. Bayrón Toro v. Serra, 119 P.R. Dec. 605, 19 P.R. Offic. Trans. 646, 663 (1987) (recognizing that

---

[3] The Teachers' Associations identify these laws as Act 106-2017, Act 160-2013, and Act 91-2004.  See 2017 P.R. Act 106; 2013 P.R. Act 160; 2004 P.R. Act 91.

"[Commonwealth] pension plans are obligations in the nature of contracts"). And the record is clear that the Plan rejects any obligation owed to individual workers for accrual of future benefits under the existing regime. See Plan § 55.9(b) ("To effectuate the freeze of the contractual rights of Active [Teachers Retirement System] Participants to accrue pension benefits under Puerto Rico law . . . the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the [Teachers Retirement System laws], shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code."). The Teachers' Associations nevertheless contend that the Commonwealth laws calling for such pension payments remain extant unless preempted by PROMESA, and they explain that there is no basis for preempting those laws because PROMESA's text is silent as to the Commonwealth's pension obligations.

The Teachers' Associations, however, do not explain why the Plan's rejection of the Commonwealth's forward-going obligation to provide certain pension benefits does not render unenforceable the statutes that give rise to that obligation. This is not a case in which the debtor is a private party and seeks to override a law. Rather, this is a case in which the debtor is the Commonwealth and seeks to reject its own commitment which, while effected by statute, is by Puerto Rico law deemed to be a

- 15 -

contractual commitment as between the Commonwealth and its covered employers.  See Bayrón Toro, 19 P.R. Offic. Trans. at 663.[4]

In any event, the Board need not ride on rejection alone. Its quiver contains more pointedly the concept of preemption. PROMESA includes an express preemption provision, which provides that:  "The provisions of this chapter shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this chapter."  48 U.S.C. § 2103.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 916 F.3d at 104 (explaining that "PROMESA's provisions preempt any inconsistent 'general or specific provisions of territory law'" (quoting 48 U.S.C. § 2103)).  While this provision need not necessarily mean that every Commonwealth law inconsistent with the Plan is also inconsistent with PROMESA, the Plan's treatment of the Teachers Retirement System participants' claims makes clear that the portions of existing laws that enshrine defined-benefit-plan accruals and cost-of-living adjustments are preempted.

To see why this is so, we break down the Plan's proposed treatment of the pensioners' claims into its component parts.  We begin with the claims in question.  Participants in the Teachers

---

[4]  To the extent the Teachers' Associations claim that there could not be rejection due to the absence of notice and a hearing, the rejection language was in the Plan of Adjustment, and the Title III court permitted objections and held multiple hearings on those objections throughout the process.  Indeed, the Teachers' Associations have regularly made use of those procedures.

Retirement System possess claims to further payments under the existing retirement regime.  Having determined that it must adjust these claims, the Plan's treatment of the claims is to reject some set of promised future obligations -- i.e., further accrual of defined benefit plans and cost-of-living adjustments -- and to transfer participants in defined benefit plans to defined contribution plans.  This treatment would not be possible if the same participants also remain eligible to receive duplicative and additional benefit payments under the Commonwealth statutes as they currently exist.

So, which gives way, the Plan's proposed treatment or the Commonwealth's laws?  Congress provided the answer by incorporating section 1123(a)(3) and (5) of the Bankruptcy Code into PROMESA.  See 48 U.S.C. § 2161(a).  Those provisions provide that a plan of adjustment under Title III will "specify the treatment of any class of claims or interests that is impaired by the plan" and "provide adequate means for the plan's implementation" "[n]otwithstanding any otherwise applicable nonbankruptcy law." 11 U.S.C. § 1123(a)(3), (5).  Preemption under section 1123(a) is, of course, "not unbounded"; the "purpose of Congress is the ultimate touchstone." In re Irving Tanning Co., 496 B.R. 644, 663 (Bankr. App. 1st Cir. 2013) (quoting In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 365 (3d Cir. 2012)).  Here, we need not dwell any longer on the appropriate limits of

section 1123(a) preemption in the context of Title III, for Title III was designed by Congress with the clear purpose of facilitating the adjustment of the Commonwealth's debt obligations. PROMESA therefore preempts Commonwealth law insofar as that law purports to dictate (contrary to the Plan) the adjustment of the Commonwealth's financial obligations to participants in its pension plans.[5]

This conclusion makes particular sense in the broader context of PROMESA. We have previously noted the "sui generis nature of PROMESA." Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 513 (1st Cir. 2017). The Teachers' Associations say that "Congress enacted [PROMESA] with the purpose of restructuring the island's outstanding debt." This is true, but incomplete. Congress also enacted PROMESA because it found that "[a] comprehensive approach to fiscal, management, and structural problems and adjustments . . . is necessary." 48 U.S.C. § 2194(m)(4). And in creating the Board as a part of the Commonwealth government, Congress sought "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a).

---

[5] Because our review of legal conclusions is de novo, see In re SW Bos. Hotel Venture, LLC, 748 F.3d 393, 402 (1st Cir. 2014), the Teachers' Associations' complaint that the Title III court did not discuss this issue at greater length is of no moment.

Toward these ends, Congress gave the Board a controlling role in creating a fiscal plan for the Commonwealth, see 48 U.S.C. § 2141(c)-(e); required that Commonwealth budgets align with the fiscal plan, see id. §§ 2104(6), 2142(c)-(e); and provided for the Board to retain an oversight role for at least four years after a successful restructuring, see id. § 2149.  In short, Congress was plainly intent on not just reducing the island's debt, but also improving its government's fiscal practices going forward.

Given this context, it would make little sense for the Board to have no ability to restrict accruals under the very pension payment regime that helped create the crisis in the first place.  Indeed, the Commonwealth's 2021 fiscal plan makes clear that "[o]nly with pension reform can the Government help restore both fiscal balance and the promise for current and future retirees to safeguard their assets and their future pensions."  Fin. Oversight & Mgmt. Bd. for P.R., 2021 Fiscal Plan for Puerto Rico 274 (Apr. 23, 2021).  The Title III court echoed this sentiment when it found that the contemplated elimination of defined-benefit-plan accruals and cost-of-living adjustments was critical to the viability of the Plan, noting that the estimated impact of retaining such benefits would amount to $5.6 billion over thirty years.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 2022 WL 504226, at *52.  In light of these uncontested findings, the Title III court concluded -- and we agree -- that "[a]bsent

preemption," the Commonwealth statutes establishing these obligations "would undermine the restructuring contemplated by the Plan." Id. at *37.

Apart from express preemption, the Teachers' Associations' arguments would also fail as a matter of conflict preemption. Cf. 48 U.S.C. § 2103 (preempting Commonwealth law "inconsistent with" PROMESA). We have explained that "federal law preempts state laws that 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Franklin Cal. Tax-Free Tr. v. Puerto Rico, 805 F.3d 322, 343 (1st Cir. 2015) (quoting Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 204 (1983)). For the reasons discussed already, compliance with the Commonwealth's laws mandating future defined-benefit-plan accruals and cost-of-living adjustments would plainly "frustrate the purposes of the federal scheme" set out in PROMESA. SPGGC, LLC v. Ayotte, 488 F.3d 525, 531 (1st Cir. 2007).

The Teachers' Associations try to recharacterize the preemptive effect of the Plan under PROMESA by contending that the Plan's treatment of their members' claims effectively constitutes the enactment of new Commonwealth law. But their argument misapprehends what the Plan does. The pension laws previously in effect established obligations of the Commonwealth that the Commonwealth treats as equivalent to contractual commitments. The

Plan of Adjustment simply replaces those commitments.  Although
the Teachers' Associations insist that this replacement
constitutes a de jure amendment of the current laws, this is not
so.  Rather, the Plan rejects pre-Plan obligations going forward,
adopts substitute obligations as part of the Plan, and preempts
Commonwealth laws only "to the extent [they are] inconsistent with
the treatment" of the pensioners' claims under the Plan.  Plan
§ 55.9; see also id. §§ 55.3, 55.6.  In short, the Plan does not
amend or replace any law but instead treats pensioners' claims
through a combination of rejection, assumption of new obligations
as creatures of the Plan, and preemption of only inconsistent
components of Commonwealth laws.  And that preemption, as we have
already explained, is authorized by section 1123(a) as construed
in the context of PROMESA.

        The Teachers' Associations, primarily in reply, also
complain that the precise nature of the effect on Commonwealth
pension laws is "confusing."  We agree that in an ideal world the
Plan and the Title III court's order might have included a copy of
the relevant pension laws with all preemptive effects highlighted
in redline or by annotation.  But on the whole, the main thrust of
the Plan's resulting treatment is reasonably clear.  As the Board
explains in its brief, and the Teachers' Associations do not
dispute, the Plan "ensur[es] full payment of any defined benefits
accrued up to the Plan's effective date, . . . enroll[s] affected

teachers in the Commonwealth's tax-deferred defined contribution plan, and . . . enroll[s] certain teachers in the federal Social Security system with mandatory contributions to be made by the Commonwealth."  As to the details of the Plan's administration, we find no abuse of discretion in the Title III court's approval of a more general test that preempts portions of laws "inconsistent" with the treatments specified by the Plan but leaves the details of what constitutes inconsistency to be determined if and as concrete issues arise.  This conclusion draws reinforcement from the fact that even the Teachers' Associations, in objecting to the Plan in the Title III court, pointed to no matters of implementation or administration that could not be handled under the approach taken in the Plan.

**B.**

The Teachers' Associations next contend that the Plan lacks essential enabling legislation, as required by PROMESA, to change the Commonwealth's retirement laws. Here, the associations rely on language from PROMESA section 314(b)(5), which conditions confirmation of the Plan on obtaining "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan."  48 U.S.C. § 2174(b)(5).  Thus, the associations argue, before the Plan can require any modification to the Commonwealth's retirement systems,

the Puerto Rico Legislative Assembly must first enact those reforms.

However, section 314(b)(5) only requires any "approval necessary under applicable law" and does not by its plain terms require enabling legislation for every component of the Plan. Indeed, the Teachers' Associations point us to no law that requires any legislative approval before discharging the obligations in question.

Finally, the Plan's adjustment of pension obligations is authorized by enabling legislation, namely section 1123 of the Bankruptcy Code. See 11 U.S.C. § 1123(a) (requiring, among other things, that a plan of adjustment "specify the treatment of any class of claims or interests that is impaired under the plan" and "provide adequate means for the plan's implementation"); see also id. § 1123(b)(2) (explaining that a plan of adjustment may provide for the rejection of the executory contracts of the debtor).

Accordingly, we conclude that the lack of specific Commonwealth legislation permitting the Plan to modify the Commonwealth's obligations to public school teachers does not bar the Plan's confirmation.

### c.

The Teachers' Associations' final contention is that the Plan is not confirmable because a Commonwealth law, Act 53-2021 ("Act 53"), prevents the issuance of new securities through the

Plan.   In the negotiations leading up to the Plan, a set of
bondholders entitled to receive new securities under the Plan
secured the Board's agreement that the Commonwealth would obtain
affirmative legislation authorizing the issuance of the new
securities that would replace (in smaller amounts) certain pre-
petition debt.  Act 53 was enacted by the Puerto Rico Legislative
Assembly to do precisely that.  But it also contained a caveat
conditioning its effectiveness on a change to the manner in which
the then-current, Seventh Amended version of the proposed plan of
adjustment treated pension benefits.

The Seventh Amended version of the plan of adjustment
contained three sets of provisions that are relevant here.  The
first two did not lower the amount owed to any participant as of
the plan's effective date; rather they proposed eliminating any
additional accrual of rights in the defined benefit plan and any
future cost-of-living adjustments that would otherwise increase
benefits due.  By contrast, the third provision, called the Monthly
Benefit Modification, cut already accrued benefits for some
participants by reducing by up to 8.5% pension payments in excess
of $1,500 per month.

All parties agree that Act 53 plainly conditioned the
approval of the new instruments on the elimination of the Monthly
Benefit Modification.  The law said so expressly in article 104:
"The Legislative Assembly authorizes the issuance of the [new

securities] subject to the [Board] filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification."   And, it repeated this sentiment in article 605:  "The effectiveness of this Law is conditioned to the [Board] filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification . . . ."

The parties' disagreement concerns, instead, whether Act 53 should also be read as conditioning approval of the new securities on the elimination of the provisions in the plan of adjustment that bar further accruals under the defined benefit plans and eliminate cost-of-living adjustments.  Act 53 mentions neither provision by name.  However, three passages voice a legislative purpose to avoid "cuts" to public pensions.  First, in its Statement of Motives, Act 53 explains that a policy aim of the law is "zero cuts to pensions of current retirees and current accrued benefits of active public employees."  Second, article 603 states that "[i]t is the express and unequivocal will of [the] Legislative Assembly that [the relevant authorizations] are not enforced, if the suspensive condition to avoid any cut of pensions . . . are left without effect."  And finally, article 605 of the law specifies that "[t]he continued effect of this act is contingent upon [z]ero cuts to pensions."

The Teachers' Associations urge that we should read these references to "zero cuts" as specifying an additional

condition in Act 53 -- namely that the plan of adjustment must be
modified to remove the freeze to defined-benefit-plan accruals and
restore the cost-of-living adjustments before the necessary
securities can be issued.  For two reasons, we do not read Act 53
in this manner.

First, it is not at all evident that the freeze to
further accruals or cost-of-living eliminations are "cuts" in the
same sense that the Monthly Benefit Modification plainly is.  Those
two provisions preclude further increases to pension benefits
rather than reduce already accrued benefits.  Of course, a plan
participant who hopes to secure a larger benefit in the future
will regard any loss of the chance to earn such an increase as a
"cut" if not to benefits, at least to the value of future plan
participation.  And these measures undoubtedly reduce the benefit
amount that a participant would have expected to gain under
existing retirement laws.  So, a broad reading of "cuts" as
covering a lost opportunity for an increase might be tenable in
some contexts.

Here, though, the context points otherwise.  Act 53 was
enacted against the backdrop of negotiations over the Seventh
Amended version of the plan of adjustment.  It specifically named
the elimination of the Monthly Benefit Modification -- the
provision that reduced already accrued benefits -- as an aim.  Were
we to read the reference to "zero cuts" to also include the accrual

freeze and the elimination of cost-of-living adjustments, it would render the law's reference to the Monthly Benefit Modification largely superfluous. Cf. Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 94 (1st Cir. 2020) ("Whenever feasible, courts ought to interpret statutory language in ways that avoid rendering specific words or phrases superfluous."). Moreover, Article 104 of the law describes its policy as "protect[ing] the accrued pensions of [the Commonwealth's] public servants." (Emphasis added). Seen in this light, the most natural reading of the references to "zero cuts" in Act 53 is to emphasize that -- with the Monthly Benefit Modification eliminated -- there will be no reduction at all in any already accrued benefits.

Second, if the Legislative Assembly had intended to adopt a broader definition of a cut or reduction to pension benefits that would have encompassed the two other changes prominently called for by the Plan, it could have quite easily said so. As the Title III court found, the financial implications of the accrual freeze and cost-of-living adjustment provisions are more substantial than are the financial implications of the Monthly Benefit Modification. See In re Fin. Oversight & Mgmt. Bd. for P.R., 2022 WL 504226, at *52. We think it very unlikely that a legislature intending to refer to all three would only mention by name the seemingly least significant.

- 27 -

Accordingly, we conclude that Act 53 conditioned the issuances of new bonds on the elimination of the Monthly Benefit Modification. And given that the Teachers' Associations concede that the Plan of Adjustment as approved by the Title III court eliminated that reduction, the Teachers' Associations' argument that a lack of authorization to issue the new bonds rendered the Plan of Adjustment unconfirmable fails.[6]

### IV.

None of the foregoing should be read as overlooking the fact that any substantial reduction in hoped for future pension benefits may create great distress and economic harm for affected pensioners, or that public school teachers provide critical government services for the Commonwealth's residents. It is presumably for these reasons that the Plan treats pension plan participants in substantial respects more favorably than many other persons affected by the Plan.[7] In the end though, teachers,

---

[6]  The Teachers' Associations' final contention that the Plan of Adjustment cannot be confirmed because it is not feasible relies on the success of its other arguments. Because the associations have not convinced us on any of those points, we see no reason to disturb the Title III court's conclusion that the Plan is feasible.

[7]  For instance, while participants in the Teachers Retirement System are entitled to receive 100% of their already accrued defined pension benefits, the claims of other unsecured creditors are subject to only percentage-based recovery caps and/or pro-rated shares of aggregate recovery. See, e.g., Plan §§ 17.1 (providing that holders of general unsecured claims against the Puerto Rico Building Authority will receive cash in the amount equal to 10% of their claims), 62.1 (providing that holders of

like many others, were given unfunded promises.  Congress left it
to the Board, subject to review by the Title III court, to adjust
those unfunded promises so that the Commonwealth would have a
chance to reset its financial footing and, in so doing, ultimately
benefit all of the island's residents.  Accordingly, with respect
to the specific challenges lodged by the Teachers' Associations,
we <u>affirm</u> the Title III court's order confirming the Plan of
Adjustment.

---

general unsecured claims against the Commonwealth will receive
only a pro-rated share of recovery capped, generally, at 40%).