## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |



## MOTION TO INTERVENE AND TO INFORM THE EXISTENCE AND CONTINUANCE OF AN UNRESOLVABLE CONFLICT OF INTEREST IN VIOLATION OF THE PUERTO RICO RECOVERY ACCURACY IN DISCLOSURES ACT OF 2021, 48 U.S.C. 2101 ET SEQ., AND PETITION FOR: (A) THE PERMANENT DISQUALIFICATION OF O'NEILL & BORGES, LLC AS LEGAL COUNSEL TO THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AND (B) THE DISALLOWMENT AND DISGORGEMENT OF LEGAL FEES

**To the Honorable Judge Laura Taylor Swain:**

Citizen Carlos Lamoutte (the "Relator"), appearing *pro se*, hereby respectfully moves for an Order from this Honorable Court to permanently disqualify the law firm O'Neill & Borges, LLC ("O&B") as local legal counsel to the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as well as to disallow and disgorge fees paid and/or otherwise payable to O&B for conflicts of interest and other violations incurred by O&B pursuant to The Puerto Rico Recovery Accuracy in Disclosures Act of 2021, 48 U.S.C. 2101 et seq., resultant from O&B's concurrent legal representation of the Oversight Board and of several private clients of O&B that possess interests that are adverse to the Commonwealth of Puerto Rico, the debtor.

The Relator respectfully states and prays as follows:

1

1.      The Puerto Rico Recovery Accuracy in Disclosures Act of 2021, 48 U.S.C. 2101 et seq. (hereinafter, "PRRADA"), is a special federal statute that restricts compensation to professionals retained by the Oversight Board under the Puerto Rico Oversight Management and Economic Stability Act (hereinafter, "PROMESA") who incur in conflicts of interest and/or otherwise fail to properly disclose to this court (hereinafter, the "Title III Court"), to the U.S. Trustee, and to other parties in interest, their association with Material Interested Parties (as such term is defined in Section 2(c) of PRRADA).

2.      This motion serves to report to the Title III Court that the law firm O&B, local legal counsel to the Oversight Board since its inception, intentionally incurred in an unresolvable conflict of interest to financially benefit several private clients of that firm, to the corresponding economic detriment of the bankruptcy estate of the debtor in this case, the Commonwealth of Puerto Rico (the "Commonwealth"), in an amount of no less than $384 million, acts which merit a ruling providing for the denial of compensation, disgorgement of legal fees, and the permanent disqualification of O&B as counsel to the Oversight Board.

3.      This motion further serves to report to the Title III Court that several executives of the Oversight Board have assisted O&B's attorneys in the ongoing concealment of O&B's unresolvable conflict of interest, including, but not limited to, the Oversight Board's General Counsel, Jaime A. El-Koury, and the Oversight Board's Independent Ethics Advisor, Andrea Bonime-Blanc, acts which have financially benefitted O&B as well as certain private clients of that firm, also to the corresponding economic detriment of the bankruptcy estate of the Commonwealth in an amount of no less than $384 million.

4.      The Title III Court and the U.S. Trustee must intervene in this public matter that significantly impacts the bankruptcy estate of the Commonwealth in PROMESA Title III Case No. 3:17-BK-3282 (the "Title III Case").

5.      PRRADA sets forth that: (a) no attorney or other professional person may be

2

compensated under section 316 or 317 of PROMESA (48 U.S.C. 2176, 2177) unless prior to making a request for compensation, the professional person has filed with the court a verified statement conforming to the disclosure requirements of Rule 2014(a) of the Federal Rules of Bankruptcy Procedure setting forth the connection of such professional person with any entity or person on the list of Material Interested Parties; and (b) in a case commenced under section 304 of PROMESA (48 U.S.C. 2164), in connection with the review and approval of professional compensation under section 316 or 317 of PROMESA (48 U.S.C. 2176, 2177) filed after the date of enactment of PRRADA, the court may deny allowance of compensation or reimbursement of expenses if: (i) the professional person has failed to file the verified disclosure statements or has filed inadequate disclosure statements under that subsection; or (ii) during the professional person's employment in connection with the case, the professional person: (A) is not a disinterested person (as defined in section 101 of title 11, United States Code) relative to any entity or person on the list of Material Interested Parties; or (B) represents or holds an adverse interest in connection with the case.

6.      The Economic Development Bank for Puerto Rico (by its Spanish acronym, the "BDE") is a covered instrumentality of the Commonwealth that is subject to PROMESA.

7.      In the Commonwealth's Title III Case, the Oversight Board serves as the sole representative of the debtor, which includes the BDE.

8.      On November 23, 2016, the Oversight Board employed O&B to serve as the Oversight Board's local legal counsel in the Commonwealth's Title III Case, an appointment which continues to date, as evidenced by the Title III Case's voluminous docket and recent filings. To date, O&B has collected millions of dollars in legal fees paid by the Commonwealth for services rendered to the Oversight Board.

9.      On March 30, 2022, the Title III Court issued an order in the Commonwealth's Title III Case (Doc. 20476) approving the amended list of Material Interested Parties submitted by the Oversight Board pursuant to PRRADA on March 29, 2022 (Doc. 20458).

3

10.     The amended list of Material Interested Parties approved by the Title III Court identifies Jaime A. El-Koury and Andrea Bonime Blanc as officers and employees of the Oversight Board, and also identifies O&B as a professional service provider retained by the Oversight Board in the Commonwealth's Title III Case.

11.     O&B, the Oversight Board's General Counsel Jaime A. El-Koury, and the Oversight Board's Independent Ethics Advisor Andrea Bonime Blanc jointly owe a fiduciary duty to the Oversight Board and to the Commonwealth that they conjointly failed to discharge in the Title III Case, by preferring to enable and to conceal from the Title III Court and the U.S. Trustee, respectively, a $384 million government transaction that financially benefitted several private clients of O&B and that directly injured the Commonwealth, as alleged by the Commonwealth.

12.     An unresolvable and undisclosed conflict of interest involving O&B exists and is continuing, due to the fact that O&B simultaneously represented: (a) the Oversight Board, who is the sole representative of the Commonwealth (who is the debtor in the Title III Case), since the inception of the Title III Case, which includes the BDE; and (b) certain long-standing private clients of O&B named PR Recovery and Development JV, LLC ("PR Recovery"), Parliament Capital Management, LLC ("PCM"), Parliament High Yield Fund, LLC ("PHYF"), and Island Portfolio Services, LLC ("IPS"), respectively, in the controversial acquisition of a $384,269,047 commercial loan portfolio owned by the BDE, a covered instrumentality under PROMESA. (PR Recovery, PCM, PHYF and IPS are hereinafter collectively referred to as the "Stalking Horse Parties").

13.     In bad faith, knowingly, and intentionally, O&B excluded the Stalking Horse Parties from the amended list of Material Interested Parties submitted by the Oversight Board to the Title III Court pursuant to PRRADA.

14.     The $384,269,047 Loan Sale Agreement entered into as of September 7, 2018 by and between the BDE, as seller, and PR Recovery, as purchaser, is a post-petition contract under PROMESA that clearly identifies O&B as legal counsel to PR Recovery in that transaction, which took

4

place at the same time that O&B also concurrently served as legal counsel to the Oversight Board in the Commonwealth's Title III Case. (See pages 29-30 of the Loan Sale Agreement, a true and exact copy of which is attached hereto.) Furthermore, discovery disclosures in the Commonwealth's Contract Rejection Case also situate PCM, PHYF and IPS, also clients of O&B, as co-arrangers of the $384,269,047 Loan Sale Agreement, together with PR Recovery.[1]

15.     It is of public record that the $384,269,047 Loan Sale Agreement is shrouded in controversy. The Puerto Rico Senate recently launched a bipartisan initiative to investigate the aforesaid contract and the secrecy that surrounds it.

16.     Today, the Loan Sale Agreement is the object of intense litigation, due to the fact the Oversight Board never reviewed and approved such contract prior to its execution in the manner required by the Oversight Board's own Contract Review Policy, of which fact the BDE, all Oversight Board members, executives and staff, and O&B itself, in its capacity as legal counsel to both the Oversight Board and to the Stalking Horse Parties, have clear and present knowledge.

17.     The BDE is actively challenging the legality of the Loan Sale Agreement under allegations of fraud and criminal conduct. The matter is presently *sub judice* before the Puerto Rico Court of First Instance, San Juan Part, in Civil Case Number SJ2019CV11697, captioned *Banco de Desarrollo Económico Para Puerto Rico v. Garnet Capital Advisors LLC, PR Recovery and Development REO, LLC, PR Recovery and Development JV, LLC, and Parliament Capital Management LLC* (the "Commonwealth's Contract Rejection Case").

18.     In the Commonwealth's Contract Rejection Case, the BDE demands that the Loan Sale Agreement be declared null and void, seeks that the entire $384,269,047 BDE loan portfolio be reverted to the BDE, and requests monetary damages and other judicial relief in excess of $384 million.

19.     The pendency of the Commonwealth's Contract Rejection Case creates value for the

---

[1] The relevant discovery disclosures in the Commonwealth's Contract Rejection Case are in the possession of the U.S. Trustee Program.

5

Commonwealth and also creates claims against the Commonwealth.

20.     The Oversight Board has repeatedly denied to review of the Loan Sale Agreement, an act which is clearly contrary to the Oversight Board's own Contract Review Policy and past precedent in relation to all Commonwealth contracts having a transactional value of $10 million or more.

21.     The Relator contends that the Oversight Board must perform the *ex post facto* review of the Loan Sale Agreement, either to approve it or to reject it, given that: (a) the Loan Sale Agreement was circumvented away from the Oversight Board's evaluation by the Oversight Board's own legal counsel, *sub silentio*, to secretly benefit the Stalking Horse Parties; and (b) the BDE, an instrumentality of the Commonwealth, has publicly denounced fraud and wrongdoing in relation to that same Commonwealth government contract that the Oversight Board has deliberately denied to review.

22.     Even though the Oversight Board never examined nor approved the $384,269,047 Loan Sale Agreement prior to its execution, acts which are contrary to the Oversight Board's own Contract Review Policy and past precedent, the Oversight Board has been continually advised by its legal counsel not to take any enforcement action in relation to the Loan Sale Agreement, thereby benefitting the Stalking Horse Parties that are long-standing clients of O&B.

23.     The Oversight Board continues to stand still in relation to the controversial Loan Sale Agreement, even though it possesses the federal power and authority to summarily invalidate the Loan Sale Agreement on multiple grounds, including, but not limited to, the following:

        (a)     The unlawful disposition of public assets conducted pursuant to the Loan Sale Agreement rendered the BDE insolvent, at significant economic loss to the Commonwealth, as alleged by the BDE in its court pleadings in the Commonwealth's Contract Rejection Case;

        (b)     The Loan Sale Agreement was conducted in secrecy to financially benefit PR Recovery, who is not qualified as an eligible transferee of the public assets in question, to the extent that PR Recovery is not a bank, a trust company, or a financial institution, and does not possess a banking license of any recognizable sort;

                                              6

(c)      The Loan Sale Agreement was conducted by the Stalking Horse Parties without the authorization and consent of the BDE's Board of Directors, as alleged by the BDE in its court pleadings in the Commonwealth's Contract Rejection Case;

(d)      The Loan Sale Agreement was conducted by the Stalking Horse Parties without the prior written authorization of the Oversight Board, an essential formal requirement ("*requisito de forma indispensable*"), *ad solemnitatem*, under the Oversight Board's strict Contract Review Policy that requires the Oversight Board's review of all Puerto Rico government contracts having a transactional value in excess of $10 million, without exception;

(e)      The cancellation of the Loan Sale Agreement by the Title III Court will create substantial value for the bankruptcy estate of the Commonwealth in the Commonwealth's Title III Case;

(f)      The Loan Sale Agreement was conducted by the Stalking Horse Parties in the absence of a competitive bidding process, as alleged by the BDE in its court pleadings in the Commonwealth's Contract Rejection Case;

(g)      The Loan Sale Agreement was conducted for unlawful consideration ("*causa ilícita*") and inadequate compensation to the Commonwealth, to the extent that the underlying government assets were disposed of at a 91% liquidation discount, as alleged by the BDE in its court pleadings in the Commonwealth's Contract Rejection Case;

(h)      The Loan Sale Agreement was conducted with an unlawful object ("*objeto ilícito*"), since the BDE is and remains contractually precluded from transferring its commercial loan portfolio to any assignee that is not a bank, a trust company, or a financial institution, such as PR Recovery;

(i)      The Loan Sale Agreement has been characterized by the BDE in its court pleadings as a multimillion-dollar sham;

(j)      The former President of the BDE, Luis Burdiel Agudo, manipulated the

7

execution of the Loan Sale Agreement, *sub silentio*, acts which resulted in the termination of his tenure

at the BDE and in criminal indictments for two state felonies involving moral turpitude ("*depravación*

*moral*") for which he has plead guilty and has been sentenced in Criminal Case Numbers

KEG2020G0024 and KLE2020G00445, both captioned *Pueblo de Puerto Rico v. Luis Burdiel Agudo*;

(k)     It is extremely odd and strange that the Oversight Board routinely reviews and

enforces all types of Commonwealth government contracts and proposed bills of legislation, including

*de minimis* Commonwealth government contracts and legislative bills that fall below the $10 million

threshold, yet has elected to specifically exclude the controversial $384,269,047 Loan Sale Agreement

from its customary scrutiny;

(l)     The Oversight Board and the Title III Court cannot continue to allow the

Stalking Horse Parties to utilize the Puerto Rico judicial system to collect monies from and/or to

receive title to assets belonging to the BDE or to hundreds of small business owners located throughout

the island of Puerto Rico;

(m)     The Oversight Board and the Title III Court cannot continue to allow PR

Recovery to claim title to government assets belonging to the Commonwealth or to hundreds of small

business owners located throughout the island of Puerto Rico that were illegally seized by PR Recovery

thru deceit, as alleged by the BDE in its court pleadings in the Commonwealth's Contract Rejection

Case;

(n)     Contrary to the legislated spirit and intent of PROMESA and PRRADA, the

suspect circumstances surrounding the execution and implementation of the Loan Sale Agreement do

not "*make the government contracting process more effective*," do not "*increase the public's faith in*

*this process*," and do not "*promote market competition*";

(o)     A large portion of the commercial loans included in the Loan Sale Agreement

were extended by the BDE, as a conduit, under programs that are federally funded and/or guaranteed

by the U.S. Small Business Administration, U.S. Farm Service, and other federal agencies, a fact

8

requiring closer investigation by the Oversight Board, the U.S. Trustee, the Title III Court in the Commonwealth's Title III Case; and

        (p)      Even if the various grounds for termination expressed in subparagraphs (a) thru (o) above were to be fully ignored and set aside, the Loan Sale Agreement is simply inconsistent with the Commonwealth's fiscal plan and PROMESA's statutory mandates.

24.     Denial of compensation, disgorgement of legal fees, and the permanent disqualification of O&B is merited in this case.

25.     The docket in the Title III Case presently reflects that O&B has failed to disclose to the U.S. Trustee, to the Title III Court, and to the other parties having an interest in the Title III Case: (a) all of O&B timekeepers' past and present association with: (i) the Stalking Horse Parties; (ii) their principal members, and (iii) any natural person holding a direct or ultimate beneficial interest in each of the Stalking Horse Parties and the Loan Sale Agreement, respectively; and (b) of the pervasive conflict of interest that resulted from O&B's dual, concurrent representation of the Oversight Board and the Stalking Horse Parties in the same $384 million public transaction that was never subjected to formal review and approval by the Oversight Board for motives that remain a mystery.

26.     In accordance with PRRADA, O&B may not be compensated under section 316 or 317 of PROMESA (48 U.S.C. 2176, 2177) unless prior to making a request for compensation O&B files with the Title III Court a verified statement conforming to the disclosure requirements of Rule 2014(a) of the Federal Rules of Bankruptcy Procedure setting forth the connection of O&B with the Stalking Horse Parties.

27.     In the Commonwealth's Title III Case, the Title III Court must deny O&B allowance of compensation and reimbursement of expenses if O&B's timekeepers fail to file the verified disclosure statements or file inadequate disclosure statements or if during O&B's employment in connection with the Commonwealth's Title III Case the Title III Court determines that any of O&B's timekeepers is not a disinterested person (as defined in section 101 of title 11, United States Code)

relative to any entity or person on the list of Material Interested Parties or represents or holds an interest adverse to the Commonwealth, such as the Stalking Horse Parties that O&B represented at the time of execution of the Loan Sale Agreement (and that O&B continues to represent as of the date of this motion).

28.     O&B's undisclosed dual, concurrent representation of the Oversight Board and of the Stalking Horse Parties has placed the BDE at risk of forfeiting to one or more private clients of O&B in excess of $384 million in state-owned assets that form part of the bankruptcy estate in the Commonwealth's Title III Case.

29.     PRRADA entirely applies to O&B's secretive and preferential treatment of the Stalking Horse Parties, its private clients, in relation to the Loan Sale Agreement.

30.     The prompt intervention of the Title III Court and the U.S. Trustee is merited in this public matter that significantly impacts the bankruptcy estate of the Commonwealth in the Title III Case in an amount of no less than $384 million.

31.     Professionals employed by the Oversight Board cannot be allowed to take advantage of their privileged association with the Oversight Board in order to financially benefit private clients, injure the Commonwealth, and deprive the creditors of the Commonwealth of attainable remedies in the Title III Case.

32.     In accordance with PRRADA, professionals representing the Oversight Board, such as O&B, are obligated to disclose their connections to all parties in the Title III Case and to satisfy the other conflict of interest standards supplementally imposed by the U.S. Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

33.     The purpose of PRRADA and Rule 2014(a) is to provide the Title III Court and the U.S. Trustee with sufficient information to determine whether any professional person's continued

employment in the Title III Case is in the best interest of the estate.[2]

34.     The duty of disclosure by professionals that serve the debtor is not merely critical, it is "*sacrosanct.*"[3]

35.     The conflicts' disclosure required of professionals that represent the debtor "*goes to the heart of the integrity of the bankruptcy system.*"[4]

36.     The Title III Court and the U.S. Trustee must require broad and complete disclosure of all connections of professionals with debtors, creditors, and any other party-in-interest.[5]

37.     The Title III Court and the U.S. Trustee cannot allow professionals like O&B to pick and choose the connections to disclose and those to ignore as unimportant or trivial.[6]

38.     In light of all controversies that surround the Loan Sale Agreement and the pendency of the Commonwealth's Contract Rejection Case, O&B must be compelled to disclose its association with each of the Stalking Horse Parties during the same time periods in which O&B concurrently represented the Oversight Board in the Title III Case.

39.     The obligation to disclose connections is an independent obligation of the professional person serving the debtor, and any failure of a professional person to disclose a connection can warrant sanctions, including disqualification and disgorgement of legal fees, even absent a conflict of interest.[7] The court need not find intent.[8]

40.     The Commonwealth's Title III Case is no different from any other bankruptcy case as it relates to conflicts of interest.

---

[2] See In Re Enron, No. 02-5638, 2003 WL 223455 (Bankr. S.D.N.Y. Feb. 3, 2003).
[3] See In Re eToys, Inc., 331 B.R. 176, 189 (Bankr. D. Del. 2005).
[4] See In Re Universal Building Products, 486 B.R. 650, 663 (Bankr. D. Del. 2010)
[5] See In Re Leslie Fay Cos. Inc., 175 B.R. 525 (Bankr. S.D.N.Y. 1994).
[6] See In Re Jore Corp., 298 B.R. 703, 726 (Bankr. D. Mont. 2003). See also In Re Fibermark Inc., No. 04-10463, 2006 WL 723495 (Bankr. D. Vt. March 11, 2006), In Re Saturley, 131 B.R. 509, 517 (Bankr. D. Me. 1991), In Re BH&P Inc., 949 F.2d 1300, 1317-18 (3d Cir. 1991), and In Re Granite Partners LP, 219 B.R. 22, 44 (Bankr. S.D.N.Y. 1998).
[7] See In Re Universal Building Products, 486 B.R. 663.
[8] See In Re Indep. Eng. Co. Inc., 232 B.R. 529, 532 (B.A.P. 1st Cir. 1999).

41.     As the "*watchdog*" of the U.S. bankruptcy system[9], the U.S. Trustee is obligated to raise conflict and disclosure issues in the Title III Case, so that the Title III Court may adjudicate professional employment applications under PRRADA.

42.     O&B's concurrent representation of the Oversight Board and of the Stalking Horse Parties has created conflicts which are adverse to the bankruptcy estate and is in violation of PROMESA, PRRADA, the U.S. Bankruptcy Code, and professional rules of conduct.

43.     O&B's failure to provide clear and candid disclosures as to its connections with the Stalking Horse Parties warrants O&B's disqualification as attorneys to the Oversight Board, as well as the disallowment and disgorgement of all fees.

44.     PRRADA and the Federal Rules of Bankruptcy Procedure require that an application for employment must be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest.  Fed. R.Bankr. P. 2014(a).

45.     O&B is and remains required to provide clear and candid disclosures regarding all connections to the debtor, creditors, and parties in interest, such as the Stalking Horse Parties. See In re Park-Helena Corp., 63 F.3d 877, 881 (9th Cir. 1995); In re Wood, 408 B.R. 841, 853 (Bankr. D. Kan. 2009); In re Laferriere, 286 B.R. 520, 526 (Bankr. D. Vt. 2002).

46.     O&B's duty to disclose under Rule 2014(a) is a continuous one.  In re Sandpoint Cattle Company, LLC, 556 B.R. 408, 421 (Bankr. D.Neb. 2016).

47.     Courts, creditors, and the U.S. Trustee rely upon a professional's voluntary disclosures to evaluate whether their retention is appropriate or not.

---

[9] Congress recently encouraged the U.S. Trustee Program "*to continue its efforts to ensure a fair and transparent bankruptcy process for stakeholders and for the public*" and required the U.S. Trustee Program to report its efforts in FY 2020 and FY 2021 to enforce professionals' compliance with the disclosure requirements of Bankruptcy Rule 2014(a).  See Explanatory Statement for Commerce, Justice, Science and Related Agencies Appropriations Act of 2021, accompanying the Consolidated Appropriations Act of 2021 (Publ. L. No. 116-260).

48.     The duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate. In re eToys, Inc., 331 B.R. 176, 189 (Bankr. D.Del. 2005).

49.     Accordingly, *"[i]t is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest. That obligation belongs to the party who seeks employment by the estate."* In re BH & P, Inc., 949 F.2d 1300, 1317 (3d Cir. 1991).

50.     An applicant's failure to provide clear and candid disclosures inhibits the ability to conduct a meaningful evaluation of disqualifying connections. See In re LSS Supply Inc., 247 B.R. 280, 282 (Bankr. D.Ariz. 2000) (*"The burden is on the person to be employed to comeforward and make full, candid, and complete disclosure."*); see also In re Champagne Services, LLC, 560 B.R. 196, 201 (Bankr. E.D.Va. 2016) (*"It is not the United States Trustee's burden to show that [the Applicant] is not disinterested."*).

51.     In the recent decision of Vascular Access Ctrs., 2020 Bankr. LEXIS 923, Debtor's counsel, Dilworth Paxson LLP, initially performed services and entered into an engagement letter with, the debtor's general partner. Dilworth then determined that the debtor should be in bankruptcy and proceeded to represent the debtor. Dilworth failed to disclose its initial representation of the general partner, as well as connections to affiliates of the debtor's CEO. Dilworth did not formally disclose the connections until it filed a supplemental declaration approximately seven weeks after the petition date. Although the Court did not disqualify Dilworth, citing its *"limited representation"* of the general partner it prospectively denied all fees and costs to Dilworth until the date of actual disclosure based upon the firm's *"flagrant violation of Rule 2014(a), and in order to deter Dilworth from violating Rule 2014(a) in the future[.]"* Id. at 2-3.

52.     Here, O&B failed to disclose that it concurrently represented the Oversight Board and

13

the Stalking Horse Parties.

53.     It is unfathomable that O&B was not aware of its concurrent representation of adverse

parties, based on the fact that O&B appears identified as counsel to PR Recovery in the $384 million

Loan Sale Agreement executed in 2018 and the Stalking Horse Parties are in fact long-standing private

clients of O&B. (See pages 29-30 of the Loan Sale Agreement, a true and exact copy of which is

attached hereto.)

54.     O&B's incomplete and woefully late disclosures fall short of its mandatory obligation

to provide "*full, candid, and complete disclosures.*" In re Kings River Resorts, Inc., 342 B.R. 76, 85

(Bankr. E.D.Cal. 2006).

55.     O&B cannot unilaterally decide what disclosures it desires to make in the Title III Case

or when to make them.

56.     O&B's manipulative actions as to the Stalking Horse Parties inappropriately shift

O&B's statutory burden to the Title III Court, to the U.S. Trustee, and to other parties in interest in the

Title III Case, to pry the information necessary to evaluate the ongoing conflicts of interest.

57.     Simply put, O&B "*cannot usurp the court's function by choosing, ipse dixit, which

connections impact disinterestedness and which do not. The existence of an arguable conflict must be

disclosed if only to be explained away.*" In re Midway Industry Contractors, Inc., 272 B.R. 651 (Bankr.

N.D.Ill. 2001) (citing In re Granite Partners, L.P., 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998).

58.     O&B's lack of full disclosure in relation to the Stalking Horse Parties is a sufficient

basis, by itself, to warrant denial of its employment in the Title III Case. See In re Lewis Road, LLC,

Case No. 09–37672, 2011 WL 6140747, at *9 (Bankr. E.D.Va. December 9, 2011); see also In re

Biddle, Case No. 12- 05171, 2012 WL 6093926, at *4 (Bankr. D.S.C. December 6, 2012).

59.     Professionals for a bankruptcy estate must be committed to protecting the estate's

interests and be free of the "*interests of any other person*" so that their "*basic judgment and

responsibility to the estate*" is not affected.  See In re Philadelphia Athletic Club, Inc., 20 B.R. 328,

14

337 (E.D. Pa. 1982).

60.     A professional "*should not place himself in a position where he may be required to choose between conflicting interests or duties.*" See In re 765 Assocs., 14 B.R.449, 451 (Bankr. D. Hawaii 1981).

61.     Under the clear language of 11 U.S.C. § 327(a), any professional employed by a debtor-in-possession must be "*disinterested*" and neither hold nor represent an interest adverse tothe estate. One court has described Section 327(a) as "*a prophylactic provision designed to insure that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in bankruptcy is not compromised or eroded.*" In re Prudent Holding Corp., 153 B.R. 629, 631 (Bankr. E.D.N.Y. 1993).

62.     Section 101(14), in turn, defines "*disinterested person*" as a person who does nothave an "*interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.*"

63.     Section 101(14)(C), referred to as the "*catch-all clause*", has been characterized as "*broad enough to include anyone who in the slightest degree might have some interest or relationship that would distract from the independent and impartial attitude which is required bythe [Bankruptcy] Code.*" See In re Glenn Elec. Sales Corp., 89 B.R. 410, 413 (Bankr. D.N.J.), aff'd, 99 B.R. 596 (D.N.J. 1988); see also In re Black Hills Greyhound Racing Ass'n, 154 B.R. 285, 292 (Bankr. D.S.D. 1993).

64.     Although not defined in the Bankruptcy Code, "*adverse interest*" has beeninterpreted to mean: (a) to possess or assert any economic interest that would tend to lessen the value of the bankrupt estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (b) to possess a predisposition under circumstances that render such a bias against the estate.  In re Glenn Elec. Sales Corp., 89 B.R. 410, 413 (Bankr. D.N.J.), aff'd, 99 B.R. 596 (D.N.J. 1988) (quoting In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr. D.N.J. 1988)). In applying this definition, the court in In re Glenn Elec. Sales Corp. relied upon a trilogy of cases published from the

15

District of Hawaii dealing with conflict of interests between debtors and counsel in bankruptcy proceedings.

65. The Third Circuit in In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3rdCir. 1998), determined that the District Court applied the wrong legal standard in disqualifying trustee's counsel under Sections 327(a) and 101(14)(E). The Third Circuit held that Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion — pursuant to § 327(a) and consistent with § 327(c) — disqualify an attorney who has a potential conflict of interest; and (3) the district court may not disqualify an attorney on the appearance of conflict alone. Id. at 476. Any professional person that does not meet both the "*no adverse interest*" and "*disinterested person*" tests is disqualified from employment under Section 327(a). See In re BH&P Inc., 949 F.2d 1300, 1314 (3d Cir. 1991) (Section 327(a) "*creates a two-part requirement for retention of counsel*").

66. Thus, a professional that holds or represents an adverse interest is per se disqualified, and a professional that does not hold or represent an adverse interest is nevertheless disqualified unless it falls within the definition of "*disinterested person*" set forth in11 U.S.C. § 101(14). See, e.g., United States Trustee v. Price Waterhouse, 19 F.3d at 141 (disqualified because not disinterested); Michel v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 999 F.2d 969, 972 (6th Cir. 1993) (can lack disinterestedness without having adverse interest).

67. Potential conflicts of interest are disfavored, and courts should "*generally disapprove employment of a professional with a potential conflict, with certain possible exceptions*" which include when the potential for a conflict to become actual is remote, and if thereasons for employing the professional are particularly compelling. In re Marvel EntertainmentGroup, Inc., 140 F.3d at 476.

68. Here, as set forth above, O&B concurrently represented the Oversight Board and the Stalking Horse Parties that entered into the $384 million Loan Sale Agreement with the BDE, post petition.

16

69.     Multiple representations that may be allowed in commercial settings, especially with the informed consent of the clients, may not be acceptable in a bankruptcy setting, especially in the Title III Case, which is the largest municipal bankruptcy in U.S. history. The Bankruptcy Code provisions dealing with conflicts of interest are generally much stricter that the comparable rules of professional conduct.

70.     "*In addition to the standards established by professional ethics, attorneys retained in bankruptcy proceedings are also required to meet the restrictions imposed by section 327 of the Bankruptcy Code.*" See, In re Congoleum Corp., 426 F.3d 675, 688 (3rd Cir. 2005).

71.     PRRADA and bankruptcy case law clearly establish that O&B's undisclosed representation of the Stalking Horse Parties creates an actual conflict of interest which prohibits the retention of O&B as attorneys to the Oversight Board.

72.     As a result of the $384 million post-petition Loan Sale Agreement being actively contested by the debtor in the Commonwealth's Contract Rejection Case, the Stalking Horse Parties unlawfully received in excess of $384 million in assets of the bankruptcy estate during the pendency of the Title III Case. Clearly, upon receiving the $384 million BDE loan portfolio, the Stalking Horse Parties and their legal counsel hold an interest which is adverse to the Commonwealth that the Oversight Board represents and to the Commonwealth's bankruptcy estate in the Title III Case.

73.     By concurrently representing the Oversight Board and the Stalking Horse Parties, O&B has a conflicting decision whether to side with the BDE in the Commonwealth's Contract Rejection Case and in the Title III Case, or to side with the Stalking Horse Parties in those same two cases. Based on this actual conflict of interest, representation by O&B of the Oversight Board and the Stalking Horse Parties is prohibited.

74.     O&B placed itself in the position of choosing between conflicting interests and, in connection with the controversial Loan Sale Agreement, preferred to advance the interests of the Stalking Horse Parties over obtaining the best possible value and outcome for the Commonwealth's

17

estate in the Title III Case.

75.     The Relator leaves the Commonwealth and the U.S. Trustee to their respective legal burdens, and reserves any and all rights, remedies and obligations to, inter alia, complement, supplement, augment, alter and/or modify this motion, file any appropriate additional pleadings and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further certifications submitted by the knowledge parties in the Title III Case or facts learned through factual discovery.

76.     Given the *sui generis* nature of PROMESA, the Title III Court is the sole venue where PRRADA violations may be submitted for adjudication in cases where professionals retained by the Oversight Board incur in conflicts of interests and fail to properly disclose them.

77.     Under PRRADA and applicable bankruptcy law standards, O&B is required to either "*explain away*"[10] its long-standing connections to each of the Stalking Horse Parties in relation to the controversial $384 million Loan Sale Agreement that caused injury to the Commonwealth or be immediately disqualified as legal counsel to the Oversight Board in the Commonwealth's Title III Case.

For the reasons set forth above, the Relator requests that the Title III Court grants this motion as presented and issues an Order that: (a) permanently disqualifies the law firm O'Neill & Borges, LLC from serving as local legal counsel to the Financial Oversight and Management Board for Puerto Rico; (b) provides for the disallowment and disgorgement of fees; and (c) and grants such other relief that the Title III Court deems just, fair and equitable in light of the conflicts of interest that exist, that are continuing, and that are injuring the Commonwealth of Puerto Rico and hundreds of small Puerto Rican business owners that contracted with the BDE.

---

[10] See In re Midway Industry Contractors, Inc., 272 B.R. 651 (Bankr. N.D.Ill. 2001) (citing In re Granite Partners, L.P., 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998).

Dated: May 18, 2022
San Juan, Puerto Rico

Respectfully submitted,

Carlos Lamoutte, *pro se*
87 De Diego
Villas de San Francisco Plaza II
Suite 215
San Juan, Puerto Rico 00927
787-688-6036
cl@carloslamoutte.com

**Certificate of Service**

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this matter.

In San Juan, Puerto Rico, this 18th day of May 2022.

Carlos Lamoutte, *pro se*
87 De Diego
Villas de San Francisco Plaza II
Suite 215
San Juan, Puerto Rico 00927
787-688-6036
cl@carloslamoutte.com