BDEPR-2019-000044

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT is entered into as of September 7, 2018, by and among PR Recovery and Development JV, LLC, ("JV") solely with respect to those Assets attributed to this purchasing entity on the Loan Schedule, and PR Recovery and Development REO, LLC ("REO"), solely with respect to those Assets attributed to this purchasing entity on the Loan Schedule (each a "Buyer") and Banco de Desarrollo Económico para Puerto Rico ("Seller").

### WITNESSETH

**WHEREAS,** Seller owns legal title to certain Assets (as defined below); and

**WHEREAS,** Seller desires to sell the Assets to Buyer, on a servicing-released basis, and Buyer desires to purchase the Assets from Seller, in accordance with the terms hereof.

**NOW, THEREFORE,** in consideration of the mutual premises herein set forth and other valuable consideration, the receipt of which is hereby acknowledged and intending to be legally bound, Seller and Buyer agree as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated below:

**Additional Advances** means the total amount, as of the Closing Date, of: (a) with respect to any Asset that includes an open line of credit, the Adjustment Percentage for such Asset multiplied by the outstanding balance of any advances made by Seller under such line of credit after the Cutoff Date pursuant to the terms of the Collateral Documents for such Asset (which additional advances, in the aggregate with the outstanding balance of any and all other advances by Seller under such line of credit, shall not at any time exceed the maximum amount of Seller's commitment under such line of credit), plus (b) with respect to any Loan that has not been fully disbursed, the Adjustment Percentage for such Asset multiplied by the outstanding balance of any disbursements made by Seller after the Cutoff Date pursuant to the terms of the Collateral Documents for such Asset (which additional advances, in the aggregate with the outstanding balance of any and all other disbursements by Seller for such Asset, shall not at any time exceed the maximum amount of Seller's commitment for such Asset), plus (c)with respect to any Loan, all protective advances made to or on behalf of an Obligor by the Seller after the Cutoff Date and prior to the Closing Date, plus (d) all maintenance and improvement costs related to the REOs incurred by Seller after the Cutoff Date and prior to Closing Date, and plus (e) any delinquent taxes paid by Seller related to REOs or Mortgaged Properties (i) after the Cutoff Date and/or (ii) covering the semester which includes the Cutoff Date irrespective of when such delinquent taxes were actually paid.

**Adjustment Percentage** means for each Asset, the Allocated Repurchase Price, as applicable, divided by the Unpaid Principal Balance.

**Affiliate** means, with respect to any specified person or entity, any other person or entity controlling, controlled by, or under common control with, such specified person or entity.

**Agreement** means this Loan Sale Agreement, including all Addenda and Exhibits, as the same may be amended, supplemented, restated or modified.

**Allocated Repurchase Price** means an amount for each Relationship and each REO, as reflected on Exhibit J.

**Assets** means each of the Loans and REO listed on the Loan Schedule and all servicing rights associated therewith. The Assets consist of both Loans and REOs; furthermore, it is possible that, as a result of Seller's enforcement of the Loans before the Closing Date, some Loans may convert to REO by the time of Closing.

**Base Purchase Price** means $41,500,000.00.

**Borrower** means any current and unreleased borrower under a Loan Agreement.

**Borrower Escrow Amounts** mean all escrows for taxes, governmental assessments and insurance, deposits, security deposits, utility deposits, replacement reserves, other escrows or other funds relating to the Loans and deposited by or on behalf of any Borrower with Seller and held by Seller on the Closing Date.

**Business Day** means any day other than a Saturday, Sunday or day on which the banks in the Commonwealth of Puerto Rico are authorized or obligated by law to be closed.

**Buyer's Representatives** means the directors, members, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors of Buyer.

**Closing** means the exchange of documents and monies to effect the sale of the Assets by Seller to Buyer on the Closing Date as set forth in this Agreement.

**Closing Date** means the Initial Closing Date for all Assets that are not Government Guaranteed Loans, and Final Closing Date for Government Guaranteed Loans.

**Collateral Documents** means, with respect to each Loan, the documents listed in Exhibit A.

**CRIM** means the Municipal Revenue Collections Center.

**Cutoff Date** means midnight on April 30, 2018, at which time Unpaid Principal Balances shall be frozen for purposes of Closing. Buyer shall be entitled to any payments (whether for principal, interest, late fees, charges, penalties, proceeds or any other funds related to an Asset, excluding the pending insurance claims listed in Schedule M ) received after the Cutoff Date, except as otherwise provided herein.

**Deed** means an executed public instrument, in recordable form, substantially in the form of Exhibit B, sufficient to convey title to an REO in accordance with the laws of the Commonwealth of Puerto Rico.

**Deposit** means 10% of the Base Purchase Price for all Assets, and 40% of the Government Guaranteed Loans.

**Due Diligence Materials** means any and all of the written information (including written information in electronic or digital form), documents and materials provided to Buyer and/or Buyer's Representatives related to the Assets, including but not limited to the Loan Files, data files, and payment histories with respect to the Loans.

**Environmental Law** means any federal, Commonwealth of Puerto Rico or local laws, ordinances, statutes, decrees, codes and regulations, relating to wildlife, protected animal and plant species, natural resources, the environment, recycling, waste management and disposal and Hazardous Materials, as each may from time to time be amended, supplemented or supplanted, including without limitation CERCLA, the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq. and 40 C.F.R. §§ 116.1 et seq.), and the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.).

**Escrow Account** means the non-interest-bearing escrow account maintained with Escrow Agent.

**Escrow Account Wiring Instructions** means

| | |
|---|---|
| Bank: | Capital One Bank, White Plains, NY |
| ABA: | 065-000-090 |
| Acct Number: | ▆▆▆▆▆ |
| Acct Name: | Garnet Escrow Account |
| Reference: | [sale #] [bidder name] |

**Escrow Agent** means Garnet Capital Advisors, LLC

**Final Closing Date** means the earlier of the date which is (i) 3 Business Days after Buyer obtains any necessary licenses required to not lose the guaranty on Government Guaranteed Loans, or (ii) 60 days after the Initial Closing Date, unless extended by mutual agreement of Seller and Buyer or in accordance with Section 2.7.

**Government-Guaranteed Loan** means any Loan, or portion thereof, with a guaranty by the SBA, USDA, or FSA in place as of the Closing Date.

**Governmental Entity** means the government of the United States of America, any political subdivision thereof, the government of the Commonwealth of Puerto Rico, and any board, commission, department, division, organ, instrumentality, agency, municipality, regulatory body, court or agency of any of the foregoing or any other agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

**Guarantor** means an unreleased guarantor of a Loan pursuant to a Guaranty.

**Guaranty** means any unreleased guaranty agreement executed by a Guarantor for the benefit of Seller as may have been modified from time to time as evidenced by the documents available in the Loan Files.

**Hazardous Materials** means any substance, material or waste that has been (or which in the future is) defined, listed or interpreted as "hazardous waste," "hazardous material," "hazardous substance," "controlled industrial waste," "pollutant" or "contaminant" under any Environmental Law or which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous or any other substance or material that is or becomes regulated by any Governmental Entity or under any Environmental Law or which contains gasoline, diesel fuel or other petroleum products, asbestos, lead paint or polychlorinated biphenyls (PCB).

**Initial Closing Date** means September 7, 2018 or such other date as may be mutually agreed upon by Seller and Buyer.

**Loan** means a commercial loan or line of credit being sold hereby and all servicing rights associated therewith which is included on the Loan Schedule, including any claim made to the insurance companies for any casualty and/or loss of property that may have affected a Mortgaged Property or any collateral securing a Loan as a result of hurricane and/or the occurrence of any natural disaster and/or the occurrence of any other matter covered by an insurance policy except for those insurance claims listed in Schedule M.

**Loan Agreement** means any loan agreement or credit agreement executed in connection with a Loan as the same may have been amended, modified or extended from time to time.

**Loan File** means that certain file for each Asset made available by Seller for review by Buyer and Buyer's Representatives, including, but not limited to, the Collateral Documents, and any amendments, supplements, corrections or modifications to such file through the Cutoff Date, and any further amendments, supplements, corrections or modifications to such file to the extent the same have been provided to Buyer prior to the Closing Date or executed by Seller and the applicable Obligor prior to the Cutoff Date and provided to Buyer prior to or after the Cutoff Date.

**Loan Payments** means any payments related to an Asset received after the Cutoff Date, including but not limited to principal, interest, late fees, insurance proceeds, Net Sale Proceeds and any other payments related to an Asset.

**Loan Schedule** means the schedule identifying the Assets to be sold, transferred and conveyed hereunder and setting forth the following information, as applicable, which is attached hereto as <u>Exhibit C</u>:

For all Assets:

    (a)  Loan number;
    (b)  Pool;
    (c)  Relationship designator;
    (d)  Name of Borrower;
    (e)  Unpaid Principal Balance ;
    (f)  Maturity Date;
    (g)  Current interest rate;
    (h)  Amount of accrued and unpaid interest;
    (i)  Borrower Escrow Amount;
    (j)  Future Funding Flag;
    (k)  REO Flag;
    (l)  Optioned and/or Leased REO Flag;
    (m)  Pending Litigation Flag;
    (n)  Bankruptcy Flag of an Obligor;
    (o)  Purchasing Entity

For all Loans with a Pool designation of "Pool 1A", "Pool 1B", or "Pool 2":

    (p)  Litigation Flag for any litigation commenced by any Obligor or wherein a counterclaim has been filed by an Obligor;
    (q)  Mortgage(s) Securing the Loan and Lien Position for Mortgaged Property Collateral related to such Mortgaged Loans (other real estate collateral may be in place);
    (r)  Milk quota Flag for Loans with milk quota collateral and/or assignments of receivables under milk production quotas;

(s) Lien Position;

(t) Property tax identification number (*número de catastro*) assigned by the CRIM in connection to each Mortgaged Property and REO, except for those listed in Schedule Schedule 6.3 (c)(ii)(5) for which such number is not available ; and

(u) Government Guaranty Flag, specifying USDA, SBA, or FSA.

**Mortgage** means with respect to each Loan that is secured by an unreleased Mortgaged Property, the deed of mortgage securing a Mortgage Note and creating a lien upon the Mortgaged Property described therein, as such mortgage may have been amended, modified or extended from time to time.

**Mortgage Note** means the originally executed Mortgage Note pledged to Seller to secure the indebtedness of an Obligor with respect to a Loan, as may have been amended, modified or extended from time to time.

**Mortgaged Property** means the real property, together with any improvements thereon set forth in the Mortgage securing the indebtedness of an Obligor under the related Loan.

**Note** means the originally executed promissory note or notes, line of credit agreement if applicable, or other evidence of indebtedness with respect to a Loan, as may have been amended, modified or extended from time to time.

**Net Sale Proceeds** with respect to any REO sold by Seller after the Cutoff Date and prior to the Closing Date, the aggregate of all cash payments received by Seller with respect thereto, less the related REO Closing Costs.

**Obligor** means any unreleased Borrower, Guarantor or Pledgor.

**Pending Litigation** means any Loan identified as having pending litigation by a "yes" in the Pending Litigation Flag on the Loan Schedule, which is reflected in Seller's records as being subject to litigation commenced by Seller, by any Obligor or wherein any Obligor has filed a counterclaim against Seller. There may be additional Loans which are the subject of litigation commenced by Seller which are not reflected as such in Seller's system ("**Unscheduled Pending Litigation Loans**").

**Pledgor** means any party that has pledged property as security for a Loan.

**Pool** means the classification shown on the Loan Schedule for the sole purpose of specifying certain matters herein.

**Prohibited Person** means a country, individual or entity named on the Specifically Designated National and Blocked Persons list issued by the Office of Foreign Asset Control of the Department of the Treasury of the United States of America or is a person or entity with whom a United States citizen or entity is prohibited from transacting business, whether such prohibition arises under United States law, regulation, executive order, anti-money laundering laws, regulations or orders, or as a result of any list published by the U.S. Department of Commerce, U.S. Department of the Treasury or U.S. Department of State, including any agency or office thereof.

**Property Registry** means the sections or offices of the Registry of the Property that are administered by the Department of Justice of the Commonwealth of Puerto Rico.

**Related Purchasing Entity** means any corporation, partnership, LLC, institution, individual or other such entity which is a subsidiary, affiliate or related entity of Buyer, a member, equity owner or servicing

provider of Buyer, or which worked in coordination with Buyer to submit the offer for the Assets being sold hereby as a part of a combined due diligence, purchasing or resolution participant.

**Relationship** means a group of Loans that are related and identified as such on the Loan Schedule.

**REO** means any Asset identified as REO by a "yes" in the REO Flag on the Loan Schedule, which was a Mortgaged Property or a real estate property that was owned by an Obligor, and has been acquired by Seller from an Obligor through foreclosure, deed-in-lieu of foreclosure or otherwise, and, to the extent transferable and owned by Seller, all rights, title and interests of Seller relating thereto, including, without limitation, any of Seller's rights, title and interests in and to (a) all easements, covenants and other rights related to such REO, and any claim made to the insurance companies for any casualty and/or loss of property that may have affected an REO as a result of hurricane and/or the occurrence of any other natural disaster and/or the occurrence of any other matter covered by an insurance policy, except for those insurance claims listed in Schedule M; and (b) all fixtures which, on the Closing Date, are placed in or attached to such REO, to the extent transferable and owned by Seller.

**REO Closing Costs** with respect to the sale of any REO by Seller after the Cutoff Date and prior to the date the Deed with respect to such REO is executed, an amount equal to the sum of (i) the amount of any real estate brokerage fees paid (provided such real estate brokerage fees have been established on an arm's-length basis and are customary and consistent with the market) and (ii) usual and customary closing costs paid by Seller (including customary proration of taxes, notary fees, closing expenses and condominium association dues and assessments and homeowner association dues and assessments).

**Seller's Knowledge** or words of similar import, means the knowledge of the executive officers of Seller responsible for the administration of the applicable Loan within the six month period preceding the Closing Date.

**Security Agreement** means any unreleased security agreement or pledge agreement entered into by an Obligor creating a lien upon collateral securing a Loan (such as personal property, receivables, mortgage notes, milk production quotas, payment and performance bonds, insurance proceeds, etc.) that is contained in the Loan File, including all amendments, extensions, reinstatements or replacements thereof.

**Servicing Transfer Date** means the Initial Closing Date or Final Closing Date, as applicable, with respect to Loans, and the date on which Deeds are executed in accordance with Section 2.4 with respect to REO.

**Settlement Statement** means the settlement statement substantially in the form of Exhibit D which reflects the Total Amount Payable.

**Total Amount Payable** means the (i) Base Purchase Price, (ii) less the applicable Deposit, (iii) plus with respect to Loans with a Pool designation of "Pool 1A" on the Loan Schedule which are less than 30 days past due as of the Cutoff Date, accrued interest from the interest paid to date to the day prior to the Closing Date, and (iv) less the aggregate of all Net Sales Proceeds received by Seller with respect to the REOs (or portion thereof) after the Cutoff Date and prior to the Closing Date.

**UCC Financing Statement** means a financing statement related to a Loan executed under a Security Agreement and filed pursuant to the Uniform Commercial Code, as in effect in the Commonwealth of Puerto Rico.

**Unpaid Principal Balance** means, with respect to any Loan, the unpaid principal balance as of the Cutoff Date. As to each REO, the book balance as reflected in Seller's books and records as of the Cutoff Date.

## ARTICLE 2

### PURCHASE AND SALE OF THE ASSETS

**Section 2.1**    **Purchase and Sale of the Assets.** On the Closing Date, subject to the terms, provisions and conditions of this Agreement, Seller hereby agrees to sell, assign and convey to Buyer, without recourse except as provided in this Agreement, and Buyer hereby agrees to purchase and accept from Seller, all of Seller's right, title and interest in and to the Assets for the Total Amount Payable. With the exception of the REOs, the sale of such Assets shall be on a whole-loan, servicing-released basis, and shall include all of Seller's right, title and interest in and to the related Collateral Documents, to the extent assignable. On the Servicing Transfer Date, Seller shall transfer the servicing of all Assets to Buyer. Seller shall have no obligation to service the Assets after the Servicing Transfer Date and Buyer shall take such actions as Buyer deems appropriate for the servicing of the Assets after the Servicing Transfer Date.

**Section 2.2**    **Retained Rights.** Subject to the provisions of Section 4.2(d), Buyer acknowledges that Seller may retain certain credit, depository or trust relationships with an Obligor and their respective agents, employees and affiliates, which loans and other relationships may continue following Closing. All documents, instruments, rights and obligations relating thereto are not and shall not be deemed Collateral Documents, it being understood that the Collateral Documents relate only to those Loans that are part of the Assets listed on the Loan Schedule and the Loan Files related thereto.

**Section 2.3**    **Payment and Release of the Deposit.** Buyer shall fund the Deposit into the Escrow Account on the Business Day after the date of execution of this Agreement using the Escrow Account Wiring Instructions. Escrow Agent shall hold the Deposit in the Escrow Account and disburse the Deposit as described in this section. If the sale of the Assets is consummated as set forth herein, subject to Section 2.4, Section 2.7, and Section 6.2, Escrow Agent shall release the portion of the Deposit related to the non-Government Guaranteed Loans to Seller on the Initial Closing Date, and the portion of the Deposit related to the Government Guaranteed Loans to Seller on the Final Closing Date. Except in the event of a default by Buyer, if Seller does not consummate the subject transaction as set forth herein within thirty (30) days after each of the Initial Closing Date and Final Closing Date, this Agreement shall terminate immediately and Escrow Agent shall return the Deposit to Buyer within two Business Days thereafter. Except in the event of a default by Seller, if Buyer does not consummate the subject transaction as set forth herein, this Agreement shall terminate immediately and Escrow Agent shall deliver the Deposit to Seller as liquidated damages within two (2) Business Days thereafter.

Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Buyer, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon the Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence or willful misconduct. Escrow Agent shall have no duties or responsibilities except those set forth herein.

If Escrow Agent timely receives a notice of objection to disbursement of the Deposit prior to disbursement of the Deposit as set forth herein, Escrow Agent shall continue to hold the Deposit until (i) Escrow Agent receives written notice executed by both Seller

and Buyer directing the disbursement of Deposit, or (ii) litigation is commenced between Seller and Buyer, in which case Escrow Agent shall deposit the Deposit with the clerk of the court in which said litigation is pending.

Escrow Agent shall be reimbursed by Seller and Buyer for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Buyer and Seller, the prevailing party (as determined by a court of competent jurisdiction after the expiration of all applicable appeals periods) in any dispute shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent.

**Section 2.4**   Postponed Transfer of REOs.

(a)   Post-Closing Servicing of REO. Until the applicable Servicing Transfer Date for any REO which is expected to be within thirty (30) Business Days following the Closing Date for the majority of the REO,  Seller shall, at its own expense, service and administer such REO in the same manner as previously serviced by or on behalf of Seller (except that Seller shall not take any material action including, but not limited to selling, leasing or otherwise transferring, conveying, or encumbering any such REO); provided, however, that Buyer shall, following execution of the Deed, reimburse Seller for such reasonable costs and expenses by wire transfer in immediately available funds within five (5) Business Days after Buyer has verified any invoice (together with documentation reasonably necessary to support such invoice) provided by Seller with respect thereto. Buyer shall also reimburse Seller, following the execution of the corresponding Deed, the cost and expenses related to on-site security for the Assets listed in the Schedule 2.4 of this Agreement, for which a spreadsheet of such costs during the last six (6) months before the execution of this Agreement will be attached to such Schedule 2.4 .

(b)   Delayed Closing on REO. On the Closing Date, the Allocated Repurchase Price for each REO (minus the Deposit allocated to such REOs) shall be delivered by Buyer to the Escrow Agent and held (along with the Deposit allocated to such REO) in the Escrow Account pursuant to Section 2.3. The Allocated Repurchase Price for each REO shall be released by the Escrow Agent upon (i) Buyer's receipt of an acceptable title commitment for such REO issued by a title insurer acceptable to the Buyer, in the amount of the Allocated Repurchase Price for such REO and insuring title to such REO to be in the Buyer as of the date the required Deed for such REO is executed by the Seller and the Buyer, and (ii) execution of the required Deed by Buyer and Seller.  If the Deed for any REO is not executed by Buyer and Seller or if the required title commitment is not received within 45 days after the Closing Date, then Buyer shall have five (5) Business Days after the end of the 45-day period to provide written notice to Seller of its decision not to purchase any or all such affected REO.  Within five (5) Business Days of Escrow Agent's receipt of written notice of Buyer's decision to not purchase any REO for the reasons established in this Section 2.4(b), Escrow Agent shall return to Buyer the Allocated Repurchase Price for such excluded REO.

**Section 2.5**   <u>Payment of Costs and Expenses.</u>  Seller and Buyer shall each bear their own costs and expenses in connection with the purchase and sale of the Assets including, without limitation, the legal fees and expenses of their respective attorneys.  Notwithstanding the foregoing, however, Buyer shall bear any and all costs and expenses incurred in connection with conducting due diligence on the Assets.  With respect to the transferring title to the Assets from Seller to Buyer, Seller shall be responsible for the preparation of all endorsements to the Notes and Mortgage Notes, subject to the provisions of Section 6.3(c)(i).  Buyer shall be responsible for the costs in connection with the shipment of any and all Loan Files to Buyer or Buyer's designee and all other costs and expenses relating to transferring title to the Assets from Seller to Buyer, including, without limitation, all internal revenue stamps and legal assistance stamps to be cancelled on the original and first certified copy of each Deed, the filing fees in connection with the recordation of the certified copies of such Deeds in the Property Registry, notarial tariffs applicable to each sale Deed, and the cost of all title abstracts and title insurance policies with respect to each REO; provided, however, that, to the extent that Seller is entitled to an exemption in connection with payment of internal revenue stamps and legal assistance stamps to be cancelled in the original of such Deeds, the cost of such stamps shall be for the account of Seller.  The Commonwealth of Puerto Rico notary public preparing and authorizing the Deeds for the REOs shall be chosen and paid for by Buyer.

**Section 2.6**   <u>Property Taxes, Assessments and other Charges.</u>

A.  <u>Mortgaged Property.</u>  There shall be no credit to the Amount Due at Closing for any and all real estate taxes and special assessments, utility charges and payments, maintenance charges, homeowner association fees and assessment, condominium fees and assessments, resort fees and assessments and any other fees, assessments or charges unpaid by the Borrower and relating to any Mortgaged Property, whether now known or unknown, due or accruing before, on or after the Cutoff Date.

B.  <u>REOs.</u>

Seller shall within thirty (30) days from the Closing Date execute any and all documents necessary to obtain the real estate taxation exemptions in connection with the REOs. The aforementioned timeframe may be extended with the written consent of the Buyer.

Seller will cooperate with Buyer for the transfer of the REOs free and clear of any real estate taxes.

Seller will obtain the taxation exemption  for the REOs in connection with any real estate taxes accrued under CRIM or taxes imposed under Act No. 7-2009.

Seller shall pay any and all property taxes accrued under CRIM and Act No. 7-2009 in connection with the REOs due as of the Closing Date.

Seller shall pay any and all homeowners association fees for the REOs due as of the Closing Date.

Seller will cooperate with Buyer in curing, fixing and/or taking any steps, at Buyer's cost, to record title in the name of Seller in order to transfer the REOs to Buyer.

**Section 2.7**   **Government Guaranteed Loans.**  Immediately following the Initial Closing Date for a maximum period of 60 days, Buyer shall use its best efforts to apply for and obtain any necessary licenses or meet any requirements in order that Buyer does not lose the guaranty on Government Guaranteed Loans when such Loans are transferred to it on the Final Closing Date. If such licenses and/or requirements are not in place after such 60-day period, Buyer shall have 5 Business Days to provide notice to Seller that it elects to extend the Final Closing Date up to 180 days. If Buyer does not elect such extension of the Final Closing Date or after the expiration of the 180 days extension, then the Final Closing Date shall occur 3 Business Days after such 5 Business Day notice period. In such case, Buyer assumes the risk of having the corresponding governmental guaranty revoked.

Notwithstanding the above, Buyer shall have the right to advance the Final Closing Date without having obtained any necessary licenses and acquire the Government Guaranteed Loans and assume the risk of having the corresponding governmental guaranty revoked.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF BUYER

**Section 3.1**   **Representations and Warranties by Buyer.**  Buyer makes the following representations and warranties, each of which is true and correct in all material respects on the date hereof:

(a)   Authority; Binding on Buyer; Enforceability.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware with powers adequate for the making and performing of this Agreement and for carrying on the business now conducted or proposed to be conducted by it.  Buyer is qualified to transact business in and is in good standing and in compliance with any and all applicable licensing and other requirements under the laws of each state or jurisdiction in which the nature of the business transacted by it or the character of the properties owned or leased by it requires such licensing or qualification.  Buyer has taken all necessary action required to execute, deliver and perform this Agreement and all related documents and to make all of the provisions of this Agreement and such related documents the valid and enforceable obligations they purport to be and has caused this Agreement to be duly executed and delivered by a duly authorized officer.

(b)   Conflict with Existing Laws or Contracts.  The execution and delivery of this Agreement and all related documents and the performance of its obligations hereunder and thereunder and the compliance with the terms contained herein and therein by Buyer do not violate Buyer's articles or certificate of incorporation or by-laws or conflict with any provision of any law or regulation to which Buyer is subject, conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which Buyer is bound or any order or decree applicable to Buyer, or result in the creation or imposition of any lien on any of Buyer's assets or property, which would materially and adversely affect the ability of Buyer to perform its obligations under this Agreement and all related documents; and Buyer has obtained all consents, approvals,

authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement and all related documents.

(c) <u>Validity of Agreement</u>. This Agreement, assuming due authorization, execution and delivery by Seller, constitutes the valid, legal and binding obligations of Buyer, enforceable against Buyer in accordance with the terms hereof, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(d) <u>Legal Action Against Buyer</u>. There are no judgments, orders or decrees of any kind against Buyer unpaid or unsatisfied of record or any legal action, suit or other legal or administrative proceeding pending, threatened or reasonably anticipated which could be filed before any court or administrative agency which has, or is likely to have, any material adverse effect on (a) the business or assets or the condition, financial or otherwise, of Buyer or (b) the ability of Buyer to perform its obligations under this Agreement.

(e) <u>Bankruptcy or Debt of Buyer; Financial Condition</u>. Buyer has not filed any petition seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency, nor has any such petition been filed against Buyer. No general assignment of Buyer's property has been made for the benefit of creditors, and no receiver, master, liquidator or trustee has been appointed for Buyer or any of its property. Buyer is not insolvent and the consummation of the transactions contemplated by this Agreement shall not render Buyer insolvent. Buyer has now and will have as of the Closing Date sufficient capital or net worth to meet its current obligations, including, without limitation, payment of the Total Amount Payable.

(f) <u>Decision to Purchase</u>. Buyer is a sophisticated investor and its bid and decision to purchase the Assets and to acquire the Collateral Documents is based upon Buyer's and Buyer's Representatives own independent evaluation of the Loan Files and other materials deemed relevant by Buyer and Buyer's Representatives. Buyer and Buyer's Representatives have made such due diligence review and independent investigations as Buyer and Buyer's Representatives deem to be warranted as to the validity, enforceability and collectability of the Assets and the nature and value of the Assets, and all other facts Buyer and Buyer's Representatives deem material to this transaction and Buyer is entering into this Agreement solely upon the basis of such review and investigation by Buyer and Buyer's Representatives and Buyer's own judgment. Buyer has not relied in entering into this Agreement upon any oral or written information from Seller, or any of Seller's employees, affiliates, agents, consultants, advisors or representatives, other than the representations and warranties of Seller specifically set forth herein. Buyer further acknowledges that no employee, agent, consultant, advisor or representative of Seller (including, without limitation, Garnet Capital Advisors, LLC) has been authorized to make, and that Buyer has not relied upon, any statement or representations other than those specifically contained in this Agreement. Without limiting the generality of the

foregoing, Buyer acknowledges and agrees that, except as expressly set forth in Section 4.1, 4.2 and 4.3 hereof, Buyer is purchasing the Assets "as is" and "where is" on the Closing Date, and, except as expressly set forth in Sections 4.1, 4.2 and 4.3 hereof, Seller is making no representation or warranty, express or implied, and Buyer has not relied on any representation or warranty, express or implied, regarding any Obligor, any of the Assets (including any REO) or any Mortgaged Property, including, without limitation, any representation or warranty with respect to (a) the business, financial condition or prospects of any Obligor, any third party (including any Guarantor) or any tenants, (b) the physical condition of any building, improvement, machinery, equipment or personal property comprising all or a part of any Mortgaged Property or REO, (c) the leases, rents, income or expenses of any Mortgaged Property or REO, (d) the enforceability, validity, transferability, currency or legality of any insurance policy which is transferred or conveyed to Buyer pursuant to this Agreement as a Collateral Documents; (e) the compliance of any Obligor, REO or Mortgaged Property with any land use, zoning and/or Environmental Law (including but not limited to those pertaining to the use, handling, generating, treating, storing or disposing of any Hazardous Materials and/or petroleum product storage tanks, asbestos, asbestos containing materials, lead paint and/or lead paint containing materials); (f) any and all real property taxes, special assessments, utility charges, maintenance charges, condominium and homeowner association and resort fees and assessments and any other fees, assessments or charges relating to any Mortgaged Property or REO; and (g) the condition, value or collectability of any personal property, whether tangible or intangible securing any Loan.

(g) <u>Confidentiality Agreement</u>. Neither Buyer nor Buyer's Representatives have violated any of the terms of any confidentiality agreement Buyer has executed or otherwise agreed to for the benefit of Seller. At no time has Buyer or any of Buyer's Representatives or agents communicated with any Obligor or with any Obligor's representatives or agents regarding the Assets (including any REO). Buyer has no affiliation with, no ownership interest in, and no agreement regarding the Assets with any Obligor or with any Obligor's representatives or agents.

(h) <u>No Financing Contingency</u>. Buyer expressly agrees and acknowledges that Buyer's obligations hereunder are not in any way conditional upon, or qualified by, Buyer's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt, financing or equity investment or otherwise) to consummate the transactions contemplated hereby. Buyer has liquid financial resources adequate to consummate the transactions contemplated herein.

(i) <u>Compliance with Law</u>. Buyer shall, and shall cause its servicers to, comply with all applicable federal, state and local laws and regulations, and shall perform, comply with, and act in accordance with the terms of the related Asset.

(j) <u>Waiver of REO Representations.</u> In the event Seller is required by any applicable law to provide Buyer with any representations or disclosures regarding the condition of the REOs, or any other requirements with regard to any individual REO, Buyer waives such requirements and agrees that it will not take any action to obtain any remedy to which it may be entitled arising therefrom. If

any condition of any property is required to be in existence or improved in connection with a sale thereof, Buyer hereby agrees that it shall make any and all such improvements at its cost. Buyer agrees to accept each REO and title thereto subject to such facts, circumstances, defects and problems which exist as of the date hereof and as of the Closing Date on an "as is-where is" basis except for the statutory warranty of title ("*saneamiento por evicción*") imposed by the Civil Code of Puerto Rico upon sellers of real property, as set forth in Article 1363(1) of the Civil Code of Puerto Rico (31 L.P.R.A. § 3831(1)). Except as expressly set forth in this Agreement, Buyer represents and warrants that it is not relying on any representations or warranties of Seller or any other person as to the state or condition of the REOs. Buyer knowingly and expressly waives the warranties against latent and hidden defects ("*saneamiento por vicios ocultos*") imposed by the Puerto Rico Civil Code upon sellers of real and personal property with respect to the sale of the REOs.

(k) <u>OFAC List/Prohibited Persons</u>. Neither Buyer nor any of its Affiliates, nor any of its or its Affiliates' respective officers, directors, agents, partners, members, controlling entities and employees: (i) is a Prohibited Person, and the funds to be used by Buyer to pay all amounts payable by Buyer hereunder are delivered from legitimate and legal sources and not from any Prohibited Person; (ii) is a party to or is otherwise involved in, or is aware of Buyer's, any of Buyer's Affiliates' or any of Buyer's or its Affiliates' respective officers', directors', agents', partners', members', controlling entities' and employees' involvement in, any threatened litigation or other administration or adversarial proceedings affecting Seller or any of its Affiliates; or (iii) is an Obligor, principal of any Obligor, or Affiliate of any Obligor, on any Loan.

(l) <u>Government-Guaranteed Loans</u>. Certain Government-Guaranteed Loans may require the servicer to be approved by the applicable governmental authority. Buyer acknowledges that if it, or its designated servicer, does not have such approvals in place, the guaranty(s) under such Government-Guaranteed Loans may terminate. Buyer further agrees to comply with any required servicing guidelines specific to Government-Guaranteed Loans.

Section 3.2 <u>Survival of Representations and Warranties</u>. Each representation and warranty made by Buyer in Section 3.1 of this Agreement shall survive the Closing and, except for the Deeds, shall not merge into any document executed as part of the Closing, but instead shall be independently enforceable except to the extent expressly limited in this Agreement.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Section 4.1 <u>Representations and Warranties by Seller</u>. Seller makes the following representations and warranties, each of which is true and correct in all material respects on the date hereof:

(a) <u>Authority; Binding on Seller; Enforceability</u>. Seller is duly organized, validly existing and in good standing in the Commonwealth of Puerto Rico. Seller has corporate powers adequate for the making and performing of this Agreement, has

taken all corporate action required to execute, deliver and perform this Agreement and to make all of the provisions of this Agreement the valid obligations they purport to be and has caused this Agreement to be duly executed and delivered by a duly authorized officer or officers of Seller. This Agreement, assuming due authorization, execution and delivery by Buyer, constitutes a valid, legal and binding obligation of Seller, enforceable against Seller in accordance with the terms hereof, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

Seller does not require any consent from the Puerto Rico Oversight Board to enter into this Agreement or such consent has been duly obtained.

(b) <u>Conflict with Existing Laws or Contracts</u>. The execution and delivery of this Agreement and all related documents and the performance of the obligations hereunder and thereunder by Seller do not violate Seller's enabling law or conflict with any provision of any law or regulation to which Seller is subject, conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which Seller is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any asset or property of Seller, any of which, in Seller's commercially reasonable judgment, would materially and adversely affect the ability of Seller to perform its obligations under this Agreement; and Seller has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by it of this Agreement.

(c) <u>Legal Action Against Seller</u>. Seller has not received written notice of any action, suit or proceeding pending against Seller in any court or by or before any other governmental agency or instrumentality which is likely, in Seller's commercially reasonable judgment, to materially and adversely affect the ability of Seller to perform its obligations under this Agreement.

(d) <u>Bankruptcy of Seller</u>. Seller has not filed any petition seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency, nor has Seller received written notice that any such petition been filed against Seller. Seller is not insolvent and the consummation of the transactions contemplated by this Agreement shall not render Seller insolvent.

(e) <u>OFAC List/Prohibited Persons</u>. Neither Seller nor, to its knowledge, any of its Affiliates, nor, to its knowledge, any of its or its Affiliates' respective officers, directors, agents, partners, members, controlling entities and employees: (i) is a Prohibited Person, (ii) is a party to or is otherwise involved in, or is aware of Seller's, any of Seller's Affiliates' or any of Seller's or its Affiliates' respective officers', directors', agents', partners', members', controlling entities' and employees' involvement in, any threatened litigation or other administration or adversarial proceedings affecting Buyer or any of its Affiliates.

**Section 4.2** <u>**Representations and Warranties by Seller as to the Assets**</u>.  Seller makes the following representations and warranties 4.2(a)-(d) , each of which is true and correct in all material respects on the date hereof, for all Loans sold hereby, and Seller makes the following representations and warranties 4.2(e)-(l), each of which is true and correct in all material respects on the date hereof, for only those Loans sold hereby with a Pool designation of  "Pool 1A", "Pool 1B", or "Pool 2" on the Loan Schedule:

(a) <u>Ownership and Right to Sell</u>.  Except for the Assets listed in Schedule 4.2(a), Seller is the sole owner and holder of each Asset and has full right to sell and assign each Asset, and Seller's interest in any Collateral Documents related thereto offered by it hereunder are free and clear of any lien or security interest of any third party and without the consent of any third party, except such consent as has been obtained or will be obtained on or prior to the Closing Date or is unnecessary under applicable law. Notwithstanding the foregoing, (i) a Loan could be secured by Collateral that may be subject to, senior or prior liens, mortgages, security interest or encumbrances having priority over the Mortgages or the other Collateral securing such underlying Loan, as stated in the Loan Schedule (ii) an Asset or its Collateral, in the case of a Loan, can be subject to Pending Litigation, liens for real property taxes and assessments, and condominium association, resort and homeowner association dues and assessments, and (iii) the Assets for which the Seller has already commenced a collection or foreclosure action against an Obligor of the Loan related to such Asset will be subject to the rights provided to such Obligor under Article 1425 of the Puerto Rico Civil Code (31 L.P.R.A. § 3950) regarding the sale of a litigious credit.

(b) <u>Loan Schedule</u>.  The information as set forth on the Loan Schedule is true and correct as of the Cutoff Date.

(c) <u>Bulk Sales Act.</u> That the consummation of the transactions contemplated by this Agreement is in the ordinary course of business of Seller and that no sale of the Assets by Seller pursuant to this Agreement will be subject to the bulk transfer law or any similar statutory provisions in effect in any applicable jurisdiction.

(d) <u>Cross-Collateralization</u>. No Loan is cross-collateralized with any other loan owned by Seller, other than to another Loan set forth in the Loan Schedule.

In abundance of caution and as a consideration to the transactions effectuated herein, Seller hereby expressly and irrevocably releases and de-crosses any and all collateral security granted to the Seller by an Obligor under the Loans which also were intended to secure other obligations and/or loans not being sold, transferred or conveyed herein to Buyer, and accordingly, such released collateral shall no longer be deemed to secure and/or guarantee such obligations or loans not being sold, transferred or conveyed to Buyer.

Notwithstanding the above, Buyer shall have the right to remove from this Agreement any Loan that is subject to a cross-collateralization and follow the repurchase procedure set forth in Section 5.1(b).

(e)    <u>No Undisclosed Modification</u>. Except as disclosed in the Due Diligence Materials, Seller has not modified any related Note, Mortgage Note, Guaranty, Mortgage or Security Agreement or satisfied, canceled, postponed or subordinated any such Note, Mortgage Note, Guaranty, Mortgage or Security Agreement in whole or in part or released all or any material portion of (i) a Mortgaged Property from the lien of the Mortgage secured thereby or (ii) the personal property from the security interest granted by the Security Agreement, or executed any instrument of release, cancellation, termination or satisfaction or (iii) any Guarantor from its obligations under the Guaranty or (iv) any Pledgor from its Security Agreement.

(f)    <u>Disbursement of Loan Proceeds</u>. Unless such Loan has a "Yes" in the Future Funding Flag on the Loan Schedule, no Borrower has the right to disbursement of additional loan proceeds or future advances with respect to any Loan.

(g)    <u>Loan Files</u>. With respect to each Loan, the related Note, Mortgage Note, Guaranty, Mortgage and Security Agreement, if any, and any documents modifying the terms of such Note, Mortgage Note, Guaranty, Mortgage and Security Agreement included in the Loan File are true and correct copies of the documents they purport to be. The Loan File for each Loan includes all material documents relating to such Loan that are in the possession of Seller, including, but not limited to, correspondences to and from Obligors and reports prepared by third parties, but excluding, however, internal analysis and correspondences, emails, privileged information, and regulatory correspondence so long as the terms of the Loans and related Collateral Documents are not modified by any such excluded documents and information. Anything to the contrary notwithstanding, Seller makes no representation or warranty as to the accuracy of facts, analyses or abstracts recited or contained in any documents, reports and papers which are included in the Loan Files, including, without limitation, rent rolls, financial statements, operating statements, appraisals, environmental reports and any other information in the Loan Files or which may have been provided by third parties.

(h)    <u>Enforceability</u>. Except as otherwise provided herein or in the Due Diligence Materials, each Mortgage, Mortgage Note, Security Agreement or Guaranty and the Note and/or Loan that they secure, supports or evidences is the legal, valid, binding and enforceable obligation of the maker thereof, except to the extent such enforcement may be subject to or limited by (A) any bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, pending foreclosure action, or similar laws, or (B) legal or equitable principles relating to or affecting creditors' rights generally, or (C) applicable state anti-deficiency legislation, or (D) the effect of other laws and interpretations thereof and court decisions which may modify or delay certain remedies provided in the Collateral Documents, or (E) certain covenants in each Note, Loan Agreement, Guaranty, Security Agreement or Mortgage that may not be enforceable, but the unenforceability of any particular provision or provisions will not materially affect the ability of the holder thereof to realize the intended benefits of any of

the Collateral Documents, or (F) Article 1425 of the Puerto Rico Civil Code (31 L.P.R.A. § 3950) regarding the sale of litigious credits.

Moreover, Seller is the holder by endorsement of all Notes and Mortgage Notes executed in connection with the Loans, except that such endorsements are not required in those cases where the corresponding Note and/or Mortgage Note is payable in favor of the bearer.

(i)     Loan Title Insurance.  The lien as set forth on the Loan Schedule of each related Mortgage encumbering a Mortgaged Property that serves as primary collateral for the related Loan, is insured by an ALTA lender's title insurance policy in the jurisdiction in which the Mortgaged Property is located.

Such Existing Title Policy (i) was issued on or about the date of the closing of the corresponding Loan purporting to insure such Mortgage in an amount not less than the original principal amount of such Loan; (ii) is in full force and effect and all premiums thereon have been paid (other than any premiums associated with any endorsements requested by Buyer); (iii) has not been terminated or cancelled; (iv) is not subject to any claim in writing; or (v) has not paid for any claim under such title policy.

Moreover, such title insurance policies cover the Seller, its successors and assigns.

Mortgages encumbering Mortgage Property that serves as secondary collateral for the related Loan may or may not have Loan title insurance.

(j)     Optioned REOs.  Other than set forth in the Loan Schedule, no REO is the subject of an effective contract between Seller and any other person, including but not limited to brokerage agreements (both rental and sale), leases, property management agreements, property maintenance and/or improvement contracts (or offers to sell or lease); and Seller has no knowledge of the existence of any such contracts to which Seller is not party.  The Loan Schedule sets forth a true, correct and complete list of all leases of any portion of an REO.

In the event that Seller has executed an option to sell to a third party any REO and the closing to execute the deed of purchase and sale of such REO is scheduled to occur up to 60 days after the Closing Date, then Buyer may, at its sole discretion, decide not to execute the deed of purchase and sale to acquire the REO (as per the terms of this Agreement), but instead instruct the Seller to make the sale directly to the third party and Seller shall deliver the proceeds of such sale to Buyer within 2 Business Days of the corresponding closing.  Buyer shall be responsible for all reasonable costs and expenses associated with such sale.

(k)     New Acquired REOs.  If, during the period between the date hereof and the Closing Date, Seller receives title to a Mortgaged Property as a result of foreclosure, deed-in-lieu of foreclosure, power of sale or otherwise, such Mortgaged Property shall be treated as an REO and shall be sold to Buyer pursuant to such provisions relating to the sale of an REO.  The representations and warranties of this Section applicable to the Assets (or any part acquired thereof by Seller) shall be those corresponding to the Loans until the date that

Seller acquires a Mortgaged Property and those corresponding to the REOs thereafter. In such event, the Base Purchase Price shall not be adjusted with respect to such Asset.

(l) <u>Escrows</u>. Seller has funded, held, administered and disbursed all escrows and reserve accounts, and collected, held and disbursed all insurance and condemnation proceeds, associated with each Loan in accordance with applicable law and the terms and conditions of the documents governing same, all amounts to be paid from funds escrowed, reserved or otherwise received by Seller in connection with the Loan have been properly applied or disbursed and when due, and the accountings provided to Buyer with respect to the Escrow Amounts are true, correct and complete. No tenant deposits required to be segregated by applicable law are included in any Escrow Amounts and no such segregated escrow accounts exist. None of the Escrow Amounts are subject to any claim, lien or security interest unless in favor of Lender as provided under the Collateral Documents.

**Section 4.3** <u>**Survival of Representations and Warranties.**</u> Notwithstanding anything to the contrary contained in this Agreement, (i) each of the representations and warranties made by Seller in Sections 4.1 shall survive the Closing Date, and (ii) each of the representations and warranties made by Seller in Sections 4.1 and 4.2 shall terminate one-hundred eighty (180) days following the delivery of the Loan File for such particular Loan or the execution of the Deed to transfer the applicable REO, as each case may be, and thereafter, Buyer shall be permanently estopped from asserting against Seller any claim that is based upon an alleged breach of any such representation or warranty. Any claim by Buyer for a breach of any representation by Seller in Sections 4.1 and/or 4.2 of this Agreement shall be made by Buyer delivering to Seller written notice thereof promptly after Buyer has learned of such breach. If Buyer provides written notice to Seller of a breach of any representation by Seller in Sections 4.1 and/or 4.2 of this Agreement prior to the expiration of the applicable deadline established in this Section 4.3, then the applicable claim shall survive until resolved, in accordance with Section 5.1 hereof.

# ARTICLE 5

## DEFAULTS AND INDEMNIFICATION

**Section 5.1** <u>**Defaults.**</u>

(a) <u>Breach</u>. Subject to the limitations set forth in Section 4.3, in the event of one or more material breaches by Seller of any representation, warranty, covenant or agreement contained in Sections 4.1 and/or 4.2 of this Agreement resulting (individually or in the aggregate) in a reduction of the value of an Asset and/or the underlying collateral of a Loan, by an amount equal to or exceeding ten percent (10%) of the Allocated Repurchase Price of such Asset, then Seller shall have a period of sixty (60) days after written notice by Buyer to cure such breach or breaches. Such notice shall contain detailed information regarding the basis for such request, and such notice shall be sufficient to demonstrate to Seller's reasonable satisfaction that the breach or breaches do in fact result in a reduction of the value of such Asset and/or the underlying collateral of a Loan, as described above. If Seller does not substantially cure or correct such breach or breaches within the 60-day period, or if both parties are unable to agree in writing upon an

amount to be paid by Seller to Buyer to remedy or compensate Buyer for one or more breaches, then Seller shall repurchase the Asset as set forth below; provided, however, that with respect to a breach that can reasonably be cured non-monetarily but such non-monetary cure cannot reasonably be completed in sixty (60) days, Seller shall have an additional thirty (30) day period to complete such cure provided that Seller has diligently and continuously exercised commercially reasonable efforts to complete such cure and continues to do so throughout such period (the "**Breach Cure Period**"); provided, further, that if Seller reasonably requires, in the Seller's discretion, information and/or access to copies of any document or documents in any Loan File or other documents that Seller had provided to Buyer, in each case solely to the extent such documents are in the possession of Buyer, any of its Affiliates or its designees, Seller shall provide written notice to Buyer and Buyer shall, to the extent permitted by applicable law, provide such documents (or copies thereof) or access to such documents within three (3) Business Days thereafter; provided, further, that if Buyer does not provide such requested documents within such three (3) Business Days (subject to the limitations set forth above), the Breach Cure Period shall be extended by one additional Business Day for each Business Day that Buyer is late in delivering such documents. If Buyer provides Seller with written notice of a breach prior to the applicable deadline, the applicable claim shall survive until resolved in accordance with this Section 5.1(a).

(b)     Repurchase Procedure. If, pursuant to Sections 4.2 (d), 5.1(b), 6.2, 7.1, and 7.11 of this Agreement, Seller is required to repurchase any Asset, then, on the repurchase date:

(i)     Seller shall pay to Buyer, in immediately available funds, the repurchase price as follows: (1) the Allocated Repurchase Price (2) minus any collections (including, but not limited to, the proceeds of any insurance policy and the awards from any condemnation proceedings) received with respect to the Loan since the Cutoff Date, (3) minus the amount held by Buyer in any escrow account with respect to the applicable Asset, (4) plus an amount equal to the sum of any insurance premiums advanced by Buyer on behalf of the mortgagor in accordance with the terms of the Mortgage and any real estate tax payment advanced by Buyer on behalf of the Borrower in accordance with the terms of the Mortgage with respect to the applicable Loan, and (5) plus any protective advances made by Buyer after the Closing Date with respect to any Mortgaged Property that is part of the collateral for the applicable Loan.

(ii)     Buyer shall deliver to Seller all originals and copies of the Loan Agreement(s), Note(s), Mortgage Note(s) and any other Collateral Documents, and related Loan Files and any other transfer documents or other documents that were delivered to Buyer pursuant to this Agreement regarding such Loan Agreement, Note(s), Mortgage Note(s) and other Collateral Documents, together with any addenda, exhibits and schedules thereto and together with any post-closing correspondence and documents.

(iii)     With respect to each such Note and Mortgage Note, Buyer shall endorse, transfer, convey or assign to Seller the Note and Mortgage Note and

Collateral Documents in the same manner as such Note and Mortgage Note and the associated Collateral Documents was transferred and assigned from Seller to Buyer by documentation in the same form as that delivered from Seller to Buyer.

(iv) If at the time of repurchase, Buyer owns the Mortgaged Property related to the transferred Loan, Buyer shall convey to Seller all right, title and interest in and to such Mortgaged Property pursuant to a deed equivalent in form to the Deed and other appropriate documents and shall make all deliveries and take all other actions on substantially the same terms and conditions under which Seller had conveyed the related Asset to Buyer and provided that the Mortgaged Property shall be so conveyed in substantially the same condition it was in when Seller conveyed the related Asset to Buyer.

(v) Seller shall be responsible for, and shall pay when due and payable, all transfer, filing and recording fees and taxes, costs and expenses, and any state or county documentary taxes, if any, with respect to the filing or recording of any document or instrument contemplated hereby in connection with such repurchase, and shall be responsible for recording any documents evidencing the transfers contemplated in connection with such repurchase.

(vi) After the date of repurchase hereunder, Buyer shall promptly endorse, assign over and deliver to Seller any and all additional Loan Payments received from or on behalf of any Obligor on the repurchased Note. All amounts paid over to Seller hereunder shall be without payment of interest thereon.

(vii) Upon repurchase of any Note, Buyer agrees to immediately terminate, at its sole cost, any servicing agreement regarding the Loan repurchased.

(viii) To the extent that the Loan or Asset being repurchased is part of a Relationship, then all Loans or Assets in such Relationship shall be repurchased as described herein.

**Section 5.2    Indemnification and Release of Seller.**

(a)    Buyer's Indemnification. Buyer shall indemnify, defend and hold Seller harmless, from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, reasonable legal fees and any other reasonable costs, fees, and expenses incurred by Seller asserted by any third-party in connection with (i) the material inaccuracy of any of Buyer's representations or warranties herein, (ii) the material breach of any of Buyer's covenants herein, or (iii) any claim by any Obligor regarding subsequent assignment, enforcement, servicing or administration of the Assets by Buyer following the Closing. The obligations of Buyer under Section 5.2(a)(i) and 5.2(a)(ii) shall survive the Closing for a period of two years (2) years after the Closing Date. The obligations of Buyer under Section 5.2(a)(iii) shall survive the Closing for a period that is the greater of (A) two (2) years and (B) the period during which Buyer or Buyer's agents service or collect the Assets.

(b)    <u>Seller's Indemnification</u>. Seller shall indemnify, defend and hold Buyer harmless, from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, reasonable legal fees and any other reasonable costs, fees, and expenses incurred by Buyer asserted by any third-party that is not an Affiliate of Buyer in connection with (i) the material breach of any of Seller's covenants herein, or (ii) any claim by any Obligor regarding the enforcement, origination, servicing or administration of the Assets by Seller prior to the Closing. The obligations of Seller under this Section 5.2(b) will survive the Closing for a period of two (2) years after the Closing Date.

(c)    <u>Procedure for Indemnification</u>. Any party seeking indemnification with respect to a claim or loss shall give prompt written notice thereof to the party against whom indemnification is sought. If the party seeking indemnification hereunder provides written notice prior to the applicable deadline, the applicable claim shall survive until resolved. Indemnitor shall have the right to assume the defense of any and all claims for which indemnification is sought hereunder, and indemnitee agrees to cooperate with indemnitor in any such defense. If the amount of any claim or loss shall, at any time subsequent to payment pursuant to this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the indemnitee to the indemnitor.

(d)    <u>Conflicts; Separate Counsel</u>. Notwithstanding anything to the contrary herein, if the defendants in any action for which indemnification is claimed under this Section 5.2 include both the indemnitee and the indemnitor and the indemnitee shall have reasonably concluded that a conflict may arise between the positions of the indemnitor and the indemnitee in conducting the defense of any such action or that there may be legal defenses available to it which are different from or additional to those available to the indemnitor, the indemnitee shall have the right to select separate counsel, assume such legal defenses, and otherwise participate in the defense of such action on behalf of such indemnitee. Upon receipt of notice from the indemnitor to the indemnitee of such indemnitor's election so to assume the defense of such action and approval by the indemnitee of counsel, the indemnitor will not be liable to such indemnitee under this Section 5.2 for any legal or other expenses subsequently incurred by such indemnitee in connection with the defense thereof unless (i) the indemnitee shall have employed separate counsel in accordance with the proviso to the preceding sentence (it being understood, however, that the indemnitor shall not be liable for the fees and expenses of more than one separate counsel, together with local counsel (if any), representing the indemnitee who is a party to such action), (ii) the indemnitor shall not have employed counsel reasonably satisfactory to the indemnitee to represent the indemnitee within a reasonable time after notice of commencement of the action, or (iii) the indemnitor has authorized in writing the employment of counsel for the indemnitee at the expense of the indemnitor, in each of which cases the fees and expenses of counsel shall be at the expense of the indemnitor and shall be paid as they are incurred.

(e)    <u>Settlements</u>. The indemnitor under this Section 5.2 shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnitor agrees to indemnify the indemnitee against any loss, claim, damage, liability or

expense by reason of such settlement or judgment.  Notwithstanding the foregoing sentence, if at any time an indemnitee shall have requested the indemnitor to reimburse the indemnitee for fees and expenses of counsel as contemplated by 5.2(d), the indemnitor shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than forty-five (45) days after receipt by such indemnitor of the aforesaid request and (ii) such indemnitor shall not have reimbursed the indemnitee in accordance with such request prior to the date of such settlement. No indemnitor shall, without the prior written consent of the indemnitee, effect any settlement, compromise or consent to the entry of judgment in any pending or threatened action, suit or proceeding in respect of which any indemnitee is or could have been a party and indemnity was or could have been sought hereunder by such indemnitee, unless such settlement, compromise or consent includes an unconditional release of such indemnitee from all liability on claims that are the subject matter of such action, suit or proceeding and does not include an admission of fault or culpability or a failure to act by or on behalf of such indemnitee.

(f)     Release of Seller. In connection with any modification and/or negotiated settlement of any Loan, the Buyer shall (or shall cause the servicer of such Loan to) use commercially reasonable efforts to obtain from any related Obligor a full and unconditional release of Seller and its Affiliates, to the extent and in the form the Buyer obtains such a release for itself, in connection with any negotiation and/or negotiated settlement of such Loan, and any other acts or omissions of Seller in connection therewith; provided, however, that using commercially reasonable efforts shall not obligate Buyer to accept less favorable terms in the modification or negotiated settlement in order to obtain such release of Seller and its Affiliates.  If Buyer (or the servicer on its behalf) is unable to obtain any such full and unconditional release from any Obligor (which Buyer has obtained a release for itself) in connection with any such proposed modification or settlement, the Buyer shall use reasonable efforts to notify Seller of such failure to obtain the release.

**Section 5.3**     **Specific Performance.** Notwithstanding the above, if Seller fails to perform its obligations of this Agreement to sell any or all of the Assets to Buyer, Buyer shall have the right to pursue specific performance of the sale of the Assets to Buyer.

## ARTICLE 6

## CLOSING

**Section 6.1**     **Closing; Conditions Precedent.** The Closing of the sale of the Assets shall take place by fax or email on the Closing Date, except for the Deeds and any other closing document required to be notarized on the Closing Date which shall be executed by an authorized representative of the Seller and the Buyer in Puerto Rico on the Closing Date. Seller and Buyer agree that time is of the essence with respect to the performance of each of their obligations hereunder.

In the event the Closing does not occur because of a failure of a condition precedent attributable only to Seller, then Buyer shall be entitled to a prompt return of the Deposit.

The Closing shall be subject to each of the following conditions:

(a)   all of the representations and warranties under this Agreement shall be true and correct in all material respects as of the Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

(b)   the parties shall have exchanged all Closing documents (which shall be in acceptable form to both Buyer and Seller) as specified in Sections 6.3(d) and (e) below; and

(c)   all terms and conditions of this Agreement shall have been complied with.

**Section 6.2**   **Review of Collateral Documents.** Buyer may, at its option and at its expense, perform an inventory of Collateral Documents prior to the Initial Closing Date for any Loans with a Pool designation of "Pool 1A", "Pool 1B", or "Pool 2" on the Loan Schedule. Such review shall take place by Buyer's personnel on-site at Seller's offices on dates and times mutually agreed to by the parties.

To the extent that any Collateral Documents are found to be missing, Buyer shall provide Seller with a detailed list of affected Assets and such missing Collateral Documents. Prior to the Initial Closing Date, Seller may cure any of the missing Collateral Documents. Buyer and Seller shall mutually agree, prior to the Closing Date, as to which missing Collateral Documents are material ("Missing Material Collateral Documents").

On the Closing Date, Buyer shall pay the portion of the Total Amount Payable attributable to the Assets with Missing Material Collateral Documents to the Escrow Agent to be held as a repurchase reserve in escrow with the Escrow Agent pursuant to the terms hereof.

Within sixty (60) days following the Closing Date, Seller shall deliver to Buyer any Missing Material Collateral Documents that Seller has found, at which time the Escrow Agent shall release to Seller the amounts held in escrow related to such Assets for which the Missing Material Collateral Documents have been provided to Buyer.

To the extent that any Missing Material Collateral Documents are not found within such 60-day period, Buyer shall have thirty (30) Business Days after the end of such 60-day period to provide written notice to Seller requiring repurchase of those Assets with uncured Missing Material Collateral Documents. In such case, upon receipt of written notice of Buyer's notice requiring repurchase, Seller shall repurchase such Assets in accordance with the procedures described in Section 5.1(b), except that the funds required to be transferred to Buyer in connection with such repurchase shall be those held in escrow related to such Assets, and shall be transferred to Buyer by Escrow Agent from the Escrow Account.

If Buyer does not provide the notice requiring the repurchase of the applicable Asset(s) within the thirty (30) Business Days period established above, then after providing written notice to Buyer and Seller, Escrow Agent shall release to Seller the amounts held in the Escrow Account related to such Assets.

**Section 6.3**   **Closing Documents.**

(a)   Before 5PM eastern time three (3) Business Days prior to the Closing Date:

(i)    Seller shall deliver to Buyer a draft of the Loan Schedule and the Settlement Statement;

(ii)    Buyer shall deliver to Seller the list of Loans referenced in Section 6.3(c)(i); and

(iii)    If applicable, UCC-3 and/or deed of cancellation of mortgage to cancel any existing lien over the Assets in favor of any person where Seller is the debtor.

(b)    On or before 5PM eastern time on the Business Day prior to the Closing Date, the parties shall exchange the following:

(i)    One (1) original of this Agreement, fully-executed;

(ii)    each party's approval of the Loan Schedule and Settlement Statement;

(iv)    consents, to the extent required, executed by the required parties in order to transfer any Asset hereunder; and

(v)    list of all Notes and Mortgage Notes, for those Assets with a Pool designation of "Pool 1A", "Pool 1B", and "Pool 2".

(c)    On the Closing Date, after confirmation of receipt of the funds required under Section 6.4, Seller shall deliver the following documentation to Buyer, as applicable:

(i)    Three (3) certified copies of the Limited Power of Attorney, substantially in the form of Exhibit L, fully executed by Seller, in order to authorize Buyer to execute the corresponding allonges to the Notes and Mortgage Notes in the form of Exhibit I; provided, however, that, even though that the endorsement in the allonges will be made without recourse, all and any representation or warranty set forth in this Agreement shall survive the Closing as per the terms of this Agreement. Buyer's remedies upon a breach of any representation or warranty are limited solely to those remedies of Buyer expressly set forth therein.

(ii)    In connection with the REOs, Seller shall deliver the following:

1.    all material documents and agreements relating to the acquisition of the REO by Seller, including, without limitation, any foreclosure or deed in lieu of foreclosure. In the case of any foreclosure, copies of all judicial documents and other documents relating to such foreclosure;

2.    any title insurance report, title insurance policy or title insurance commitment obtained at or prior to the acquisition of the REO by Seller;

3.    in connection with any leased REO, copy of such lease and an assignment of such lease in favor of Buyer;

4.    in connection with any REO under a contract for sale, copy of the same

and an assignment in favor of Buyer of any such contract and a transfer of any earnest money in connection therewith;

5. the property tax identification number (*número de catastro*) assigned by the CRIM to each REO, except for those REOs listed in Schedule 6.3 (c)(ii)(5) for which such number is not available, and copy of the certificates of debt and value that Seller may have on file.

Delivery of the items above shall be, at Buyer's expense and choice, by (i) Buyer picking up such documentation from Seller or (ii) overnight delivery using Buyer's customary courier.

(d) On the Business Day following the Servicing Transfer Date:

(i) Buyer shall execute and mail the combined "hello/goodbye" letters received from Seller in accordance with Section 6.3(c)(iii), and shall provide Seller with a copy of the fully-executed and mailed letters within 2 Business Days thereafter.

(ii) For those Loans with a Borrower in bankruptcy, Buyer, at its own expense, shall file a Notice of Transfer of Claim with the respective Bankruptcy court within ten (10) Business Days following the Closing Date;

(iii) Buyer shall execute and mail the combined "pending litigation notice" letters received from Seller in accordance with Section 6.3(c)(iv), and shall provide Seller with a copy of the fully-executed and mailed letters within 2 Business Days thereafter; and

(iv) Loan Files are physically held by Seller either in facilities controlled by Seller or in Iron Mountain. The majority of Loan Files for Pool 1A and Pool 1B are in a Seller-controlled facility. The Loan Files for Pool 2 are in both locations. The Loan Files for Pool 3 are substantially all in Iron Mountain. Seller shall make the Loan Files held in a Seller-controlled facility available to Buyer for pickup within seven (7) Business Days after Closing. Seller shall make the Loan Files held in Iron Mountain available to Buyer for pickup based on the file extraction terms of the contract between Seller and Iron Mountain in a period to be reasonably agreed upon by the parties. In both cases, Buyer shall be responsible for arranging pickup of the Loan Files by a shipping company and the related shipping costs. Notwithstanding anything to the contrary herein, if any such Loan Files (excluding the Note and Mortgage Note and any other document required by applicable law to be executed in paper format) are kept by Seller in electronic or digital format, they shall be delivered by Seller to Buyer in such electronic or digital format.

(e) Within three (3) Business Days following the Closing Date:

(i) Seller shall transfer to Buyer that sum of money, if any, held by Seller as of the Closing Date relating to said Borrower Escrow Amounts;

  (ii)  For any Government-Guaranteed Loans, Buyer shall execute any documentation required by the applicable government authority to effect the transfer of such Loans;

  (iii)  Seller shall forward and remit to Buyer any Loan Payments on any Loan received by Seller after the Cutoff Date through and including the Closing Date; and

  (iv)  Buyer and Seller shall exchange fully-executed originals of this Agreement such that Seller shall have two fully-executed originals and Buyer shall have one fully-executed original.

 (f)  Buyer shall be responsible for preparing and filing the UCC Financing Statements assignments assigning to Buyer all UCC Financing Statements that have been filed in connection with the Loans.

 (g)  In the time period set forth in Section 2.4, for each REO, a Deed and such other documents as may be necessary in the Commonwealth of Puerto Rico for transferring title to a real property.

 (h)  Each party shall provide the other party with notice of any Unscheduled Pending Litigation Loans that it identifies after the Closing Date.  Seller shall, within 3 Business Days following such notice, execute and deliver to Buyer written notice of the sale to the attorneys handling such Unscheduled Pending Litigation, substantially in the form of <u>Exhibit K</u>.  Buyer shall countersign and mail such letters within ten (10) Business Days therafter, and provide copies to Seller within five (5) Business Days after such notices are sent to the attorneys.

**Section 6.4**  <u>**Payment of Total Amount Payable and Post-Closing Payment**</u>.  Buyer shall pay to Escrow Agent on the Closing Date prior to 3:00pm eastern time the Total Amount Payable as reflected on the Settlement Statement by wire transfer of immediately available funds to the account(s) designated on the Settlement Statement.

  Within 10 Business Days following the Closing Date, Seller shall provide Buyer with a detailed list of any (a) legal fees payable by Buyer in accordance with Section 7.6(c) and (b) any Additional Advances.  Buyer shall pay such amounts to Seller by wire transfer of immediately available funds to the account(s) designated by Seller within 5 Business Days of Buyer's receipt of such list.

**Section 6.5**  <u>**Recording Documents**</u>.  Buyer shall, at its own expense and as soon as practicable following Closing, but in no event more than thirty (30) days after the applicable Servicing Transfer Date, properly submit for recording or filing, as the case may be, in the appropriate public offices, all assignments, Deeds, and any other documents required to properly evidence the assignments and conveyances contemplated by this Agreement and to properly perfect Buyer's interest in the Assets and interests purchased hereunder, or as may be required for any other reason by any applicable law, statute, ordinance, order, finding, decree, rule or regulation.

  To the extent that any documentation provided by Seller to Buyer in connection with closing is rejected due to form by recording personnel in the Commonwealth of Puerto Rico, the parties shall, within thirty (30) days following notice of such rejection, conform

such documentation to jurisdictional requirements, execute such modified documentation, and resubmit such modified documentation to the applicable authority in the Commonwealth of Puerto Rico for recording.

## ARTICLE 7

## SERVICING AND POST-CLOSING COVENANTS

**Section 7.1    Seller's Servicing of the Assets Until Closing.**

(a)    Seller shall continue to service and administer the Assets until the Servicing Transfer Date in the same manner as previously serviced by or on behalf of Seller, except that Seller shall not take any material action, including but not limited to make Additional Advances, foreclose on any Mortgaged Property (except to the extent required by law in connection with any Pending Litigation), accept deeds in lieu of foreclosure, release (including partial releases) any collateral, or accept discounted payoffs with respect to any of the Assets (except as expressly required by the terms of the Loan Agreements and the other Collateral Documents) without the prior written consent of Buyer. Buyer shall provide notice by email of its consent or denial of consent within three (3) Business Days; if Seller does not receive such notice, Seller shall proceed with such action(s) in accordance with its current policies and procedures.

To the extent Seller breaches this covenant, Buyer shall have the right to remove the applicable Asset from this Agreement following the repurchase procedure set forth in Section 5.1(b).

(b)    On the Servicing Transfer Date, Seller shall transfer to Buyer all servicing rights to, and Buyer shall assume all liability and responsibility for, the servicing of each Asset and Seller shall be discharged from all liability therefor with respect to the servicing of such Assets.

**Section 7.2    Servicing Transfer Information.** In addition to providing the Loan Files as described in Section 6.3(d)(iv) above, Seller shall provide Buyer with information described on **Exhibit G** on the 5th Business Day following the Servicing Transfer Date to facilitate an orderly transfer of servicing.

**Section 7.3    Buyer's Assumptions Post-Closing.** Seller agrees to delegate to Buyer, and Buyer agrees to assume and to perform faithfully all of Seller's duties, obligations and liabilities accruing on or after the Closing in respect of each of the Assets, subject to the terms of this Agreement. Such duties, obligations and liabilities include, without limitation: (a) all obligations and responsibilities of servicing the Assets; (b) all of Seller's obligations under each and every contract of insurance or Guaranty then existing and transferred to Buyer in respect of any Asset; and (c) all obligations of the holder of the Loan in respect of any Borrower Escrow Amounts.

**Section 7.4    Insurance with Respect to the Assets.** Buyer shall be solely responsible for having itself substituted as loss payee or additional insured on all hazard or mortgage insurance that has been paid by the applicable Obligor prior to the Closing Date in respect of any Asset in which Seller is listed as a loss payee or additional insured on the Closing Date; and any loss after the Closing Date to either a Borrower or to Buyer or to the value or

collectability of any Asset which arises either by reason of the termination or expiration of any such insurance, or of Buyer's failure to identify itself as loss payee or additional insured, is the sole responsibility of Buyer.

Section 7.5   **Borrower Escrow Amounts.**  Effective as of the Servicing Transfer Date, and except to the extent expressly stated to the contrary in this Agreement, Buyer shall assume, undertake, and discharge any and all obligations under the Loans as may relate to the Borrower Escrow Amounts.

Section 7.6   **Litigation Cooperation.**  Seller and Buyer shall cooperate with each other so as to, as soon as practicable after the Closing Date, substitute Buyer as the party plaintiff in any Pending Litigation.6.3(d)(iii) and 6.3(i)

(a)   After the Closing, Buyer shall assume the prosecution solely in Buyer's name of all Pending Litigation and related claims. Within twenty (20) days after the date of the letters referenced in Sections 6.3(d)(iii) and 6.3(i) ("Attorney Notice Date"), Buyer, at its own expense, shall (i) draft substitutions of parties and counsel in such a form and content consistent with the rules of the court exercising jurisdiction over the matter to be filed after the Closing Date with appropriate courts and to be served on the opposing party(ies), (ii) forward same to the attorneys presently handling the Pending Litigation for signatures, and (iii) file and serve such substitutions within thirty (30) days after the Attorney Notice Date.

(b)   Notwithstanding the foregoing, Seller in its sole discretion may elect at its own expense and with legal counsel selected by Seller to defend any claims against Seller asserted in any Pending Litigation.  Buyer and Seller shall cooperate with each other in connection with any Pending Litigation in which Seller elects to defend against claims asserted against Seller.

(c)   Seller will be responsible for any and all legal expenses related to judicial proceedings (including, but not limited to, foreclosure attorney fees and related expenses) that were accrued or incurred by Seller for services performed on or prior to the Closing Date in connection with the Assets, regardless of whether such expenses have been adequately invoiced to Seller, except that Buyer shall be responsible for such expenses that Seller incurred after the Cutoff Date if such expense was incurred because delaying such action would have been prejudicial to Buyer's interest in the Loan after Closing.  Seller agrees to pay or settle all such expenses as soon as practicable, but no later than thirty (30) days following the Closing Date.  Buyer shall be responsible for all such expenses for services performed after the Closing Date in connection with the Assets.

Section 7.7   **Forwarding Loan Payments.**  Seller shall, on not less than a weekly basis, forward and remit to Buyer any Loan Payments on any Loan received by Seller after the Closing Date.

Section 7.8   **Forwarding Correspondence.**  For 180 days after the Closing Date, Seller shall, promptly after receipt, deliver, forward and remit to Buyer any copies or originals of any and all bills, invoices, insurance policies, letters, documents and other correspondence or communications relating to any Asset which are received by Seller.

**Section 7.9**   **Use of Seller's Name.** Buyer will not use or refer to the name of Seller and will not portray itself as Seller's agent, partner, or joint venturer with respect to the Assets. However, Buyer may use the name of Seller for purposes of identifying an Asset in communications with Obligors in order to service or enforce the Loans or enforce this Agreement. In contacting an Obligor or filing suit, Buyer will not state or represent in any way that Buyer is contacting or filing suit for or on behalf of Seller or that Seller will take any action with regard to the Asset or the Obligor.

**Section 7.10**   **Notice of Obligor Claims or Litigation.** If either party receives notice of (i) any claim, demand or legal proceeding, (ii) threatened claim, demand or legal proceeding or (iii) litigation filed by an Obligor which arises from or relates to the Assets, such party shall promptly notify the other party.

**Section 7.11**   **Revolving Line of Credit Advances and Loans Not Fully-Disbursed.** On the Closing Date, Buyer shall assume any obligations and liabilities related to the Loans arising on the Closing Date and thereafter, including the obligation to make advances on revolving lines of credit and disbursements on Loans that are not fully disbursed to the extent such Loans have been duly identified by Seller in the Loan Schedule with a future funding flag.

Buyer shall have the right to remove from this Agreement any Loan that is subject to a future funding obligation if such Loan is not identified by the Seller with a "future funding flag" in the Loan Schedule and follow the repurchase procedure set forth in Section 5.1(b).

## ARTICLE 8

## MISCELLANEOUS PROVISIONS

**Section 8.1**   **Notices.** Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given (a) when delivered if delivered by overnight courier with receipt of delivery acknowledged, or by registered or certified mail, with return receipt requested, (b) when delivered, if sent by facsimile and receipt is confirmed by telephone, or (c) when received, if sent by e-mail and an e-mail confirming receipt is sent by the recipient, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

(a)      If to Seller:

C/O Mr. Gilberto Hernández - CFO
Banco de Desarrollo Económico para Puerto Rico
P.O. Box 2134
San Juan PR 00922-2134
Fax. (787) 277-8055
Email: ghernandez@bde.pr.gov

(b)      If to Buyer:

Maribel Ortíz-Castro, CFA
Portfolio Manager

221 Ponce de León Ave., Suite 801, San Juan, PR 00918
Tel. 787-200-9004
mo@parliamentcapital.com

Cc:
Walter F. Alomar
O'Neill & Borges LLC
250 Ave. Muñoz Rivera, Ste. 800, San Juan, P.R. 00918-1813
Tel.787-764-8181
Walter.Alomar@oneillborges.com

The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication within any corporation or firm to the persons designated to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

**Section 8.2**   **Severability.** Each part of this Agreement is intended to be severable. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 8.3**   **Amendment.** This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

**Section 8.4**   **Waiver.** Any term, condition or provision of this Agreement may be waived at any time but only in writing signed by the party to be bound thereby.

**Section 8.5**   **Headings.** The headings contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 8.6**   **Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun, pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender; and references to a particular Section, Schedule, Addendum, or Exhibit shall be deemed to mean the particular Section of this Agreement or Schedule, Addendum or Exhibit attached hereto, respectively; and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision.

**Section 8.7**   **Resale.** Only after thirty (30) days following the Closing Date, Buyer may sell Assets to any third party. Any sale or transfer shall not include Buyer assigning its rights under this Agreement without the prior written consent of Seller, except as permitted under Section 8.8.

**Section 8.8**   **Assignment.** Seller may assign its rights under this Agreement without the consent of Buyer. This Agreement and the terms, covenants, conditions, provisions, obligations,

undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, Seller's and its respective heirs, executors, administrators, representatives, successors, and assigns.

All representations, warranties and covenants of Seller shall be transferred to any successor entity that may be created to substitute the Seller.

In addition, Buyer may assign its rights under this Agreement to any Related Purchasing Entity, provided such entity (i) is not a Prohibited Person; and (ii) assumes all obligations of Buyer under this Agreement. Such assignments shall not release Buyer from its obligations under this Agreement.

**Section 8.9**  **Prior Understandings; Integrated Agreement.** This Agreement supersedes any and all prior discussions and agreements (written or oral) between Seller and Buyer with respect to the purchase of the Assets and other matters contained herein, and this Agreement, including the Assignment and Assumption Agreement and the Deeds, contain the sole, final and complete expression and understanding between Seller and Buyer with respect to the transactions contemplated herein. In the event of any inconsistency among this Agreement, the Assignment and Assumption, the Deeds or any other document executed in connection with the transaction contemplated in this Agreement, the terms and conditions of this Agreement shall prevail.

**Section 8.10**  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

**Section 8.11**  **No Third-Party Beneficiaries; No Broker.** No person, firm or other entity other than Seller and Buyer and their permitted successors or assigns, shall have any rights or claims under this Agreement. Buyer and Seller each represent to the other that it has not dealt with any broker, finder or other party entitled to a commission or other compensation or which was instrumental or had any role in bringing about the sale of the Assets other than Garnet Capital Advisors, LLC, whose commissions shall be paid by Seller pursuant to the terms of a separate agreement between Seller and Garnet Capital Advisors, LLC. Seller and Buyer each agree that should any claim be made for a commission, finder's fee or other compensation by any other broker, finder or other party who alleges to have had dealings or negotiations with Buyer or Seller in breach of the foregoing representation, the party who is alleged to have breached such representation shall hold the other party free and harmless from any and all claims, liabilities, losses, damages, costs of expenses as a result of a breach of the foregoing representation, including, without limitation, reasonable attorneys' fees and expenses, in connection therewith. Notwithstanding any provision of this Agreement to the contrary, the representation and indemnity of Buyer and Seller set forth in this section shall survive the Closing or the termination of this Agreement.

**Section 8.12**  **Further Assurances.** Each party agrees that it will without further consideration execute and deliver documents as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. If Seller agrees to cooperate or provide assistance with respect to any litigation or other disputes subsequent to the Closing at Buyer request, then Buyer shall, upon demand, reimburse Seller for any reasonable costs, fees, expenses (including attorneys' fees and expenses) and other amounts that Seller incurs in connection with providing such cooperation and assistance.

Also, if Buyer requests or subpoenas an official or employee of Seller to appear at a trial, hearing or to testify about any Asset or this Agreement, Seller shall provide an appropriate official or employee to so appear.

**Section 8.13** **Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Buyer and Seller each hereby irrevocably consent to the personal jurisdiction of the courts of Puerto Rico, in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement. Each Party irrevocably agrees that any action or proceeding against it arising out of or in any manner relating to this Agreement shall be brought and litigated in a state court of competent jurisdiction in San Juan, Puerto Rico. THE PARTIES IRREVOCABLY AGREE TO WAIVE ANY RIGHTS IT MAY HAVE TO A JURY TRIAL IN ANY ACTION OR PROCEEDING AGAINST IT, ARISING OUT OR OF RELATING IN ANY MANNER TO THIS AGREEMENT. Notwithstanding the foregoing, the Parties shall use their respective best efforts to settle amicably all disputes or differences concerning the interpretation or application of any provision of this Agreement. If any such dispute or difference is not so settled within a commercially reasonable time, however, each Party shall have the right to refer it to avail itself of any remedies provided for in this Agreement.

**Section 8.14** **Confidentiality.** Each party agrees that, without the prior consent of the other party, it shall keep the contents of this Agreement confidential (including, without limitation, the Total Amount Payable and Base Purchase Price), except that either party may make any such disclosure (a) to its Affiliates and its Affiliates' respective directors, officers, counsel, lenders, prospective joint venture partners, auditors and other professional advisors, (b) as may be required by any law, rule or regulation, (c) request or demand of any governmental authority having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability, or (e) in the case of the Seller to the Office of the Controller. Subject to the requirements of applicable law and regulation (including the U.S. Federal Securities Laws), none of the parties to this Agreement shall issue, or cause to be issued, any public announcement or press release or make any public statement with respect to the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably conditioned, withheld or delayed). Notwithstanding the foregoing, nothing herein shall prohibit Seller or Buyer from making any disclosure that, in the opinion of its counsel, is required by law or regulation or otherwise required by a governmental agency with jurisdiction of a party hereto, applicable to such party or any of its Affiliates.

**Section 8.15** **Interpretation.** The parties hereby agree that: (a) any person interpreting or construing this Agreement shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same; and (b) all parties have participated in the preparation of this Agreement.

**Section 8.16** **Intention of the Parties; Sale Treatment.** It is the express intention of the Seller and Buyer that the transactions contemplated by this Agreement be, and be construed as, a sale of the Assets by Seller and not a pledge of the Assets by Seller to Buyer to secure a debt or other obligation of Seller. Consequently, the sale of each Asset shall be reflected as a sale on Seller's and Buyer's business records, tax returns and financial statements.

Accordingly, Seller and Buyer shall each treat the transactions for federal, state and local income tax purposes (as applicable) as a sale by Seller, and a purchase by Buyer, of the Assets.

However, in the event that, notwithstanding the intent of the parties, the Loans are held to be the property of Seller, or if for any other reason this Agreement is held or deemed to create a security interest in the Loans, then:

(a) this Agreement shall constitute a security agreement;

(b) the conveyance provided for in this Agreement shall be deemed to be a grant by Seller to Buyer of, and Seller hereby grants to Buyer, to secure all of Seller's obligations hereunder, a security interest in all of Seller's right, title, and interest, whether now owned or hereafter acquired, in and to:

    (i) The Assets;

    (ii) All accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights, letters of credit, money and oil, gas and other minerals, consisting of, arising from or relating to, any of the Loans; and

    (iii) All proceeds of the foregoing.

Seller shall file such financing statements, and Seller, the Buyer shall, to the extent consistent with this Agreement, take such other actions as may be necessary to ensure that if this Agreement were found to create a security interest in the Loans, such security interest would be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. In connection herewith, Buyer shall have all of the rights and remedies of a secured party and creditor under the Uniform Commercial Code as in force in the relevant jurisdiction.

**Section 8.17**    **Registration of this Agreement.** The parties acknowledge that this Agreement is subject to the provisions of Act No. 18 of October 30, 1975, as amended and will be presented for registration at the Office of the Comptroller of Puerto Rico and that Seller shall perform such registration promptly after the Closing Date.

Notwithstanding the above, Seller acknowledges that the registration of this Agreement must be redacted in order to protect the business information of the Buyer, including but not limited the Base Purchase Price and the Allocated Repurchase Price. Accordingly, Seller and Buyer must approve in writing the final redacted version to be filed at the Office of the Comptroller of Puerto Rico.

**Section 8.18**    **Confirmation of Seller's Name.** The Parties acknowledge and agree that a reference to Seller's name can be either "Economic Development Bank of Puerto Rico" or "Economic Development Bank for Puerto Rico" or "Banco de Desarrollo Economico para Puerto Rico". The Parties further acknowledge and agree that any references to "Economic Development Bank of Puerto Rico" or "Economic Development Bank for Puerto Rico" or "Banco de Desarrollo Economico para Puerto Rico" in this Agreement, the "Collateral Documents and/or any other instruments related to the transaction contemplated by this Agreement shall be valid, legal references to Seller. Seller hereby ratifies and affirms

this Agreement, the Loan Documents and any other instruments related to the transaction contemplated by this Agreement.

**REMAINDER OF PAGE INTENTIONALLY BLANK**

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the date first written above.

BUYER:

PR Recovery and Development JV, LLC      PR Recovery and Development REO, LLC

EIN:                                      EIN:

By: _Maribel Ortiz Castro_                By: _Maribel Ortiz Castro_
Name:  Maribel Ortiz-Castro              Name:  Maribel Ortiz-Castro
Title:  Authorized Representative         Title:  Authorized Representative

SELLER:

Banco de Desarrollo Económico para Puerto Rico
EIN:

By: _____               By: _____
Name:  Gilberto Hernández Negrón         Name:  Luis Burdiel Agudo
Title:  Chief Financial Officer           Title:  President


ACKNOWLEDGED AND AGREED TO WITH RESPECT TO ESCROW ACCOUNT MATTERS HEREIN:

ESCROW AGENT:

Garnet Capital Advisors, LLC
EIN:

By: _____
Name:  Robin Ishmael
Title:  Managing Partner