## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| COMMUNITY HEALTH FOUNDATION OF P.R. INC.,<br><br>Movant,<br><br>-against-<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Respondent. | Re: ECF Nos. 18602 |

## OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO THE MOTION OF COMMUNITY HEALTH FOUNDATION OF P.R. INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Building Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 4

      A.    Statutory and Regulatory Framework ........................................................ 4

      B.    Calculation of PPS Rate in the Commonwealth ........................................ 6

      C.    Obligation to Ensure Accurate Wraparound Payments ............................ 7

      D.    Background on CHF .................................................................................. 9

ARGUMENT ........................................................................................................................ 10

    I.    The Motion Uses an Incorrect Methodology to Calculate CHF's PPS Rate ....... 11

    II.    The Motion Does Not Provide Any Visit Data .................................................. 13

    III.    CHF Has Not Provided Any Data Regarding Its Receipt of Fee-for-
Service Payments .......................................................................................... 15

    IV.    The Commonwealth Cannot Make Any Payments to CHF Because It Is
Unable to Validate the Motion ........................................................................ 17

CONCLUSION ..................................................................................................................... 18

## TABLE OF AUTHORITIES

**CASES**

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*,
  536 F.2d 950 (1st Cir. 1976) ..........................................................................2

*In re Drexel Burnham Lambert Grp.*,
  134 B.R. 482 (Bankr. S.D.N.Y. 1991) ...........................................................11

*In re Fin. Oversight & Mgmt. Bd.*,
  631 B.R. 596 (D.P.R. 2021) ....................................................................... 10-11

*In re Jeans.com*,
  491 B.R. 16 (Bankr. D.P.R. 2013) ..................................................................11

*Reading Co. v. Brown*,
  391 U.S. 471 (1968) .........................................................................................2

**STATUTES**

11 U.S.C. § 503 ..............................................................................................1, 2

31 U.S.C. § 3729 .................................................................................................8

42 U.S.C. § 1320a-7k .........................................................................................8

42 U.S.C. § 1396 *et seq* .....................................................................................1

42 U.S.C. § 1396a ....................................................................................5, 6, 13

42 U.S.C. § 1396b ...............................................................................................5

42 U.S.C. § 1396d ...............................................................................................4

48 U.S.C. §§ 2101–2241 .....................................................................................1

P.L. 106-554, 114 Stat. 2763 (Dec. 21, 2000) ...................................................5

P.L. 111-148, 124 Stat. 119 (Mar. 23, 2010) .....................................................5

PROMESA § 301 .................................................................................................1

**OTHER AUTHORITIES**

42 C.F.R. § 430.10 ..............................................................................................8

42 C.F.R. § 430.32 ..............................................................................................9

42 C.F.R. § 430.33 .............................................................................................................9

42 C.F.R. § 430.35 .......................................................................................................9, 17

42 C.F.R. § 405 .................................................................................................................6

CMS.gov, FQHC PPS, https://www.cms.gov/Medicare/Medicare-Fee-for-
Service-Payment/FQHCPPS (last visited May 23, 2022).........................................5

HRSA, Federally Qualified Health Centers, Eligibility,
https://www.hrsa.gov/opa/eligibility-and-registration/health-
centers/fqhc/index.html (last visited May 23, 2022) .................................................4

HRSA, Health Center Program Look-Alikes,
https://bphc.hrsa.gov/programopportunities/lookalike/index.html (last visited
May 23, 2022)........................................................................................................4, 5

MACPAC, Medicaid Payment Policy for Federally Qualified Health Centers,
https://www.macpac.gov/wp-content/uploads/2017/12/Medicaid-Payment-
Policy-for-Federally-Qualified-Health-Centers.pdf (last visited May 23, 2022) .............. 13-14

MACPAC, State Plan, https://www.macpac.gov/subtopic/state-plan/ (last visited
May 23, 2022).............................................................................................................8

Medicaid.gov, Medicaid State Plan Amendments,
https://www.medicaid.gov/medicaid/medicaid-state-plan-
amendments/index.html (last visited May 23, 2022).................................................8

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as its sole Title III representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] respectfully submits this objection (the "Objection") to *Community Health Foundation of P.R. Inc.'s Motion for Allowance and Payment of Administrative Expense* [ECF No. 18602] (the "Motion" or "Mot."). In support of the Objection, the Commonwealth respectfully states as follows:

## PRELIMINARY STATEMENT

1.    Community Health Foundation of P.R. Inc. ("Movant" or "CHF") asserts it is entitled to administrative expense priority for over $20 million in payments allegedly owed to it based on its asserted status as a federally qualified health center ("FQHC") pursuant to 42 U.S.C. § 1396 *et seq*. (the "Medicaid Act"). Specifically, Movant asserts that, for the period from the fourth quarter of 2017 through the third quarter of 2021, it is owed certain payments, called "wraparound payments," to compensate it for postpetition health care services it has provided to residents of Puerto Rico as part of the Commonwealth's public health care system. Mot. at 1. CHF claims its eligibility for administrative expense claim treatment is based on the postpetition benefits conferred onto the Commonwealth and its residents through its provision of health care services, which qualifies it for priority payment of an administrative expense under section 503(a) of the Bankruptcy Code (made applicable to these proceedings by PROMESA § 301). Mot. at 6-7. Alternatively, CHF asserts the wraparound payments that it claims to be owed should be treated

---

[1]    PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

as administrative expenses under the fundamental fairness doctrine, due to the Commonwealth's failure to make such payments pursuant to federal law.  *Id.* at 8-9.

2.      The Oversight Board does not file this Objection to challenge CHF's entitlement to administrative expense priority as a legal matter.   On the contrary, the Oversight Board acknowledges the postpetition services provided by FQHCs – including CHF – operating on the Island, especially as to indigent, uninsured, under-insured, or otherwise medically underserved residents, are beneficial to the Commonwealth.[2]   Notwithstanding the foregoing, CHF's accounting of the amounts it is purportedly owed suffers from multiple fundamental flaws that the Oversight Board cannot overlook.   The Oversight Board is therefore filing this Objection to prevent the Commonwealth from violating its own legal obligations, pursuant to the Medicaid Act and other applicable federal law, to not issue overpayments to FQHCs beyond what they are entitled to receive.

3.      CHF has not sustained its burden to show a clear relationship to the amounts asserted in the Motion.   First, the calculation of wraparound payments due to an FQHC is based on the calculation of what is known as a Prospective Payment System ("PPS") rate, and CHF has used an incorrect formula to determine its PPS rate.   CHF's calculation of its PPS rate is based on a methodology that, although used for Medicare, is not the methodology used in Puerto Rico for Medicaid (the only program for claims at issue in the Motion).   Rather, the Commonwealth's State Plan Amendment (as defined below) demonstrates the Commonwealth established an alternative

---

[2]      The Oversight Board acknowledges that the provision of such services is "beneficial" to the Debtors, pursuant to the applicable standard in the First Circuit governing 11 U.S.C. § 503(b)(1)(A) articulated in *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976).  However, the Oversight Board reserves all rights to dispute Movant's legal basis, if any, for administrative expense priority under the "fundamental fairness" exception to the traditional benefit requirement set forth in *Reading Co. v. Brown*, 391 U.S. 471 (1968).  Regardless of legal theory, CHF fails to sustain its required burden of proof for the reasons set forth in detail herein.

PPS rate for services provided by FQHCs.  CHF's incorrect application of the non-Commonwealth

PPS rate methodology overstates the amount that CHF is owed by millions of dollars.

4.      Second, CHF does not provide *any* data documenting the number of visits for which

it should receive compensation, and accurate visit counts are integral to determining the amount

of any "wraparound" payment due to an FQHC.  Rather than providing such information, the

Motion lists only estimated visits based on the percentage of Puerto Rico residents who were

Medicaid enrollees in a given year.  Notably, the Motion does not even provide the total number

of Medicaid and non-Medicaid visits to which these percentages are applied.  This is not a

substantial or verifiable basis upon which the Commonwealth may issue payment.

5.      Third, the Motion does not account for all payments already received by CHF from

other sources, such as payments directly from patients or payments from insurers.  Such payments

must be discounted from any wraparound payment issued by the Commonwealth, as the purpose

of the wraparound payment is not to provide the FQHC with a profit, but to make it whole given

what the FQHC would receive under Medicaid and what it has already received from managed

care organizations. Although the Motion does include "capitation payments" (which, as further

discussed below, are payments made by a managed care organization to a provider per member,

per month) made to CHF for each of the years in question and for each applicable patient that

received services, it does not account for *any* "fee-for-service" payments (payments for each

service provided not otherwise covered by a capitation payment).  The Commonwealth has records

of significant fee-for-service payments made to CHF and another health services provider with

which it is affiliated (as defined below, Anchor), all of which must be discounted from any amount

paid to CHF in order to properly make it whole under the Medicaid Act.

6.      In light of the inaccurate calculation methodology used by CHF, as well as its lack of proper accounting of visits and payments, the Oversight Board respectfully requests that the Motion and the relief requested therein be denied.

## BACKGROUND

### A.      Statutory and Regulatory Framework

7.      FQHCs are community-based healthcare providers established pursuant to section 1905 of the Social Security Act.  They receive federal grant funds in accordance with section 330 of the Public Health Service Act (the "PHS Act") from the United States Department of Health and Human Services ("HHS") through the Health Resources & Services Administration ("HRSA") to provide primary care services in medically underserved areas.  *See* 42 U.S.C. § 1396d(1)(2); *id.* § 254b.  These centers "must meet a stringent set of requirements" in order to be qualified as FQHCs.  *See* HRSA, Federally Qualified Health Centers, Eligibility, https://www.hrsa.gov/opa/eligibility-and-registration/health-centers/fqhc/index.html (last visited May 23, 2022).

8.      Because of the strict requirements governing FQHCs, HRSA instituted a program to identify healthcare providers who provide primary care services to medically underserved areas that are eligible to receive federal grant funds under the PHS Act but have not yet been designated as an FQHC by HHS.  *See* HRSA, Health Center Program Look-Alikes, https://bphc.hrsa.gov/programopportunities/lookalike/index.html (last visited May 23, 2022). These centers are called look-alike centers, or "LALs."

9.      Both FQHCs and LALs are compensated by HHS for the services they provide to Medicare and Medicaid beneficiaries through the Centers for Medicare and Medicaid Services

("CMS").[3]  For purposes of payments by HHS through CMS for Medicare and Medicaid services, LALs are not treated differently than FQHCs. As such, for purposes of this Objection, the distinction between FQHCs and LALs is not relevant, and this Objection will reference only FQHCs, including for the periods when CHF was a LAL, except where explicitly indicated.

10.     Although the Medicare payment rates and methodologies have evolved over time, Section 10501 of the Patient Protection and Affordable Care Act of 2010, P.L. 111-148, 124 Stat. 119 (Mar. 23, 2010) (the "ACA"), most recently modified how payment is made for Medicare services provided by FQHCs.   Under this methodology, FQHCs "began transitioning to a prospective payment system (PPS) in which Medicare payment is made based on a national rate which is adjusted based on the location of where the services are furnished."  *See* CMS.gov, FQHC PPS, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FQHCPPS (last visited May 23, 2022).   The location-based adjustment is known as a geographic adjustment factor ("GAF").

11.     Medicaid payments are calculated pursuant to a different statute and using a different methodology.  Effective January 1, 2001, the Medicare, Medicaid, and State Children's Health Insurance Program Benefits and Protection Act of 2000, P.L. 106-554, 114 Stat. 2763 (Dec. 21, 2000) ("BIPA"), created the PPS methodology for Medicaid payments to FQHCs.  BIPA requires states and territories to adopt the PPS rate methodology set forth in BIPA, or to create an alternative payment methodology. 42 U.S.C. § 1396a(bb).  Furthermore, under BIPA, state plans may contract with Medicaid managed care organizations ("MCOs") for the provision of services to Medicaid beneficiaries. 42 U.S.C. § 1396b.  When an FQHC participates in a Medicaid MCO's

---

[3]     *See* HRSA, Health Center Program Look-Alikes, https://bphc.hrsa.gov/programopportunities/ lookalike/index.html (last visited May 23, 2022) ("While [LALs] do not receive Health Center Program funding, they are eligible to apply for the following benefits: [FQHC PPS] reimbursement through [CMS]" (which administers the Medicare and Medicaid programs).

network, the state plan must pay the difference, if any, between what the Medicaid MCO pays the FQHC and what the FQHC would have been paid under the PPS rate methodology set forth in BIPA. 42 U.S.C. §§ 1396a(bb)(5), (6). This supplemental "wraparound" payment ensures the FQHC is made whole in an amount at least equal to the amount it would be paid under BIPA. Accordingly, the formula for calculating a wraparound payment for Medicaid providers is as follows:

((Medicaid + CHIP visits) x PPS Rate) – Payments Received = Wraparound Payment

### B. Calculation of PPS Rate in the Commonwealth

12.     Through its State Plan Amendment, the Commonwealth received approval from CMS to establish an alternative PPS rate methodology for services provided by FQHCs.[4]  Pursuant to this methodology, the PPS rate is determined by dividing an FQHC's total cost of Medicaid-covered services during fiscal years 1999 and 2000 by the total number of Medicaid visits made during that same period.  *See* SPA, Attachment 4.19-B, p. 1.1 (.pdf p. 66).  The State Plan Amendment further states that the PPS Rate shall be increased annually in accordance with the Medicaid Economic Index ("MEI").  For entities receiving FQHC certification after 2000 (which is the case for CHF), the State Plan Amendment provides for the calculation of an *interim* PPS rate, which is the Commonwealth's average PPS rate across the Island for the first two years of the FQHC's certification.  *Id.*

13.     Through the State Plan Amendment, the Commonwealth also established the methodology for calculating wraparound payments to FQHCs in accordance with BIPA.  Therein,

---

[4]     Beginning in the 1990s, Puerto Rico's State Plan incorporated by reference 42 C.F.R. § 405 (the Medicare statute) for purposes of setting forth how FQHCs "will be reimbursed."  *See* Puerto Rico State Plan Amendment ("State Plan Amendment" or "SPA") at Attachment 4.19-B, p. 1 (.pdf p. 63).  A copy of the State Plan Amendment is attached as **Exhibit A** to the Declaration of Felmarie Cruz Morales, being filed simultaneously herewith (the "Cruz Declaration").  The Amendment to the State Plan Amendment, effective July 1, 2002, changed the methodology to that set forth in BIPA, as discussed herein.

the amount of the wraparound payment is calculated based on the difference between the PPS rate and the payment the FQHC received from MCOs for services rendered to federally matchable Medicaid beneficiaries.  If revenues received from the MCO are equal to or in excess of what the FQHC would have received under PPS, no wraparound payment is made.

14.     Following the approval of the State Plan Amendment, the Puerto Rico Department of Health (the "PRDOH") promulgated a manual with respect to reimbursement for FQHCs.  *See* Puerto Rico Department of Health, *Reimbursement Ruling Federally Qualified Health Centers (FQHC) Medicaid Program* (the "Manual").[5]  The Manual sets forth the same PPS rate methodologies as in the State Plan Amendment for FQHCs existing both before and after January 1, 2001.  *See id.* §§ 4.2.1 (existing FQHCs), 4.2.2 (new FQHCs).  It also provides instructions on how an FQHC certified after January 1, 2001 must demonstrate its actual cost to establish its base visit rate after two years of applying the interim payment rate.  *Id.*  Importantly, this includes the requirement that an FQHC "provide evidence of the Medicaid beneficiaries' visits for the same two (2) years." *Id.*

### C.     Obligation to Ensure Accurate Wraparound Payments

15.     Both the Commonwealth and CHF are obligated to ensure that any wraparound payments made to CHF are accurate, in that they appropriately apply the formula and they make CHF whole in terms of what it would have received under the Medicaid Act, less any payments it has already received.  First, CHF must ensure it only requests payments that are actually due.  If the Commonwealth (or any other state or territory) erroneously overpays an FQHC (*e.g.*, by making a wraparound payment when none was due), the FQHC must reimburse the Commonwealth for the amount of the overpayment within ninety (90) days of being notified of

---

[5]     A copy of the Manual is attached as **Exhibit B** to the Cruz Declaration.

the overpayment.  *See* SPA. at p.1.1.2 (.pdf p.67).  This requires FQHCs to return to CMS (*viz.* the State or Territory Medicaid program) any amounts they have been overpaid when such provider has "identified" such overpayment.  *See* 42 U.S.C. § 1320a-7k(d).  If a provider (including an FQHC) "identifie[s]" and "retain[s]" any overpayment, the Department of Justice may bring a cause of action under the False Claims Act.  *See id.* at §§ 1320a-7k(d)(2), (3); 31 U.S.C. §§ 3729(a)(1)(G), (b)(3).

16.     The PRDOH is also obligated to make accurate payments under the Medicaid program to FQHCs.  *See* Medicaid.gov, Medicaid State Plan Amendments, https://www.medicaid.gov/medicaid/medicaid-state-plan-amendments/index.html (last visited May 23, 2022) ("A Medicaid and CHIP State Plan is an agreement between a state and the Federal government [i.e., HHS and CMS] describing how the state administers its Medicaid and CHIP programs.  It gives an assurance that a state will abide by Federal rules and may claim Federal matching funds for its program activities.").  States specify the nature and scope of their Medicaid programs through their respective plans, which must be approved by CMS in order for the state to access federal Medicaid funds.  Because state plans "giv[e] assurance that [they] will be administered in conformity with the specific requirements of title XIX, the regulations in Chapter IV of Title 42, and other applicable official issuances of [HHS]," they "contain[] all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation . . . in the State program."  42 C.F.R. § 430.10; *see also* Medicaid and CHIP Payment and Access Commission ("MACPAC"), "State Plan," https://www.macpac.gov/subtopic/state-plan/ (last visited May 23, 2022) (describing applicable regulations).

17.     To determine whether states are "complying with federal requirements and the provisions of [their] plan[s], CMS reviews State and local administration through analysis of the State's policies and procedures, on-site review of selected aspect of agency operation, and examination of samples of individual case records."  42 C.F.R. § 430.32(a).  States themselves (including the Commonwealth) are "required to carry out a continuing quality control program" to ensure their state plans are running properly.  42 C.F.R. § 430.32(b).  And, HHS "periodically audits State operations in order to determine whether the program is being operated in a cost-efficient manner; and funds are being properly expended for the purposes for which they were appropriated under Federal and State law and regulations."  42 C.F.R. § 430.33(a).  If there is failure to comply with any of these provisions, CMS may withhold payments to a state for Medicaid services.  42 C.F.R. § 430.35(a).

### D.     Background on CHF

18.     CHF was designated as an LAL by HRSA in July 2017.  *See* Mot. at 2; *see also* HRSA, Notice of Look-Alike Designation, attached as **Exhibit C** to the Cruz Declaration.  CHF requested and received CMS approval to participate as an FQHC in the Medicare program effective August 21, 2017.  Mot. at 2.  It was then designated as an FQHC under the Medicaid Act on September 3, 2019.  *See* Ltr. from J. Macrae to V. Medina, October 2, 2019, attached as **Exhibit D** to the Cruz Declaration.[6]

19.     On October 19, 2021, CHF filed the Motion, in which it claims that it is owed quarterly wraparound payments for the period from the fourth quarter of 2017 through the third quarter of 2021, based on its provision of postpetition health care services to Commonwealth

---

[6]     Although CHF claims in the Motion (at 2) that it was designated under the Medicaid Act as an FQHC in October 2018, this is inconsistent with the Commonwealth's records.

residents.  The Motion asserts that CHF is entitled to administrative expense treatment because these services were provided to "the indigent, uninsured, under-insured, and/or otherwise medically under-served community," that they "benefitted the Commonwealth to the extent they have allowed the Commonwealth to receive federal funds and to comply with its health care obligations . . . under the Medicaid Act," and that such payments arose from postpetition transactions.  Mot. at 2, 7.  Alternatively, the Motion claims CHF is entitled to administrative expense treatment pursuant to the fundamental fairness doctrine.  Mot. at 8.

20.     CHF claims that it is owed $20,032,477 for wraparound payments during the period in question. Mot. at 6.  In support, CHF provides a table listing its estimated total cost for providing services to Medicaid and CHIPs beneficiaries and its total adjusted income.  Mot., Ex. 1.  Notably, Exhibit 1 does not include the total number of eligible Medicaid and CHIPs visits that CHF saw per quarter, nor does it include any information regarding the total number of non-Medicaid visits CHF saw at any point during the relevant period.  The Motion also does not contain any declarations or other verification of the information provided in Exhibit 1.

21.     Since CHF filed the Motion, the Oversight Board has been engaged with the PRDOH to evaluate the data provided in the Motion, and, in particular, Exhibit 1.  The Oversight Board also requested information from CHF in support of the Motion, which CHF provided on a limited basis.  However, as explained further below, the Oversight Board and the PRDOH have been unable to verify the amounts asserted in the Motion even with the provision of such information.

## ARGUMENT

22.     "The burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it, and the Court has broad discretion in determining whether to grant a request for such priority treatment." *In re Fin. Oversight & Mgmt. Bd.*, 631

B.R. 596, 604 (D.P.R. 2021) (citing *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992)); *see also In re Jeans.com*, 491 B.R. 16, 23 (Bankr. D.P.R. 2013).  A party seeking administrative expense treatment must show a "clear relationship between the expenditures made and the benefit conferred on the estate . . . ."  *In re Drexel Burnham Lambert Grp.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991).

23.     As noted above, the Oversight Board does not challenge CHF's eligibility to receive administrative expense treatment for postpetition benefits it conferred on the Commonwealth. However, the clear basis for the amounts CHF asserts it is owed is lacking, and CHF has failed to meet its burden under the Bankruptcy Code.  Indeed, CHF's calculation of the amount it claims to be owed for its provision of services from 2017 through 2021 suffers from numerous deficiencies that must render denial of the relief requested.  First, it applies an incorrect PPS rate in calculating the wraparound payments it claims to be owed, rather than using the alternative payment methodology for which the Commonwealth received CMS approval.  Second, it does not provide sufficient data regarding the Medicaid and CHIPs beneficiary visits as needed for reimbursement. Third, although the Motion does take into account certain types of payments received by CHF, it does not include any fee-for-service payments made to CHF that must be applied against the wraparound payment ultimately due.

## I.     The Motion Uses an Incorrect Methodology to Calculate CHF's PPS Rate

24.     In calculating the wraparound payments it is allegedly owed, CHF appears to rely on the Medicare regulations governing payments to FQHCs, as amended by the ACA.  *See* Mot. at 4-5 ("Health Care Reform Legislation [enacted prior to the applicable period] mandated a transition from the cost-based reimbursement system to prospective payment system where payment is based on a *national rate*.") (emphasis added).  By using the national Medicare rate,

adjusted by the GAF for Puerto Rico, CHF claims the PPS rate that should be applied to its visit data is the following:

| Year | PPS base rate | GAF PR | Adjusted PPS rate |
|------|---------------|--------|-------------------|
| 2017 | $163.49 | 0.933 | $152.54 |
| 2018 | $166.60 | 1.003 | $167.10 |
| 2019 | $169.77 | 1.003 | $170.28 |
| 2020 | $173.50 | 1.003 | $174.02 |
| 2021 | $176.45 | 1.003 | $176.98 |

*Id.*

25.     In the Commonwealth, however, this is not the correct methodology for determining an FQHC's Medicaid PPS rate.  As noted above, the Commonwealth amended its state plan consistent with the ACA's mandate and implemented an appropriate methodology under BIPA *viz.* a State Plan Amendment under (bb)(6) for calculating payments to FQHCs for their provision of Medicaid services.  *See* SPA Attachment 4.19B, Page 1.1 (.pdf p. 66).

26.     Because CHF qualified as an LAL after 2000, for the first two years when CHF was an LAL, the Commonwealth's alternative payment methodology requires using an interim PPS rate based on a neighboring, similarly situated FQHC in the same region.  One such FQHC is Centro Health Pro Med (facility: Belaval) ("Belaval"), which had a PPS rate of $146.72 in 2017. *See* Determinar el PPS Rate Community Health Foundation, attached as **Exhibit E-1** to the Cruz Declaration, at 2; *see also* Cruz Declaration ¶ 18.  For the remaining years that CHF was an LAL, under the Commonwealth's alternative payment methodology, its PPS rate is equivalent to the Belaval rate, as increased by the MEI.  *Id.*

27.     In 2019, CHF received approval to participate in the FQHC program and had its LAL designation removed.  Accordingly, under the State Plan Amendment, CHF's PPS rate changed – rather than being calculated based on Belaval's PPS rate, its PPS rate was determined

based on its own costs and visits for the prior two years, with annual adjustments pursuant to the MEI. *Id.*; *see also* Manual § 4.2.2.

28.     Applying this methodology, CHF's PPS rate for 2017 through 2021 should be as follows:

| Year | PPS Base Rate | MEI[7] | Correct PPS rate |
|------|---------------|--------|------------------|
| 2017 | $146.72 | n/a | $146.72 |
| 2018 | $146.72 | 1.9% | $149.51 |
| Q1 and Q2 2019 | $146.72 | 1.9% | $155.25 |
| Q3 and Q4 2019 | $44.52[8] | n/a | $44.52 |
| 2020 | $44.52 | 2.2% | $45.50 |
| 2021 | $44.52 | 1.7% | $46.27 |

*See* Cruz Declaration ¶ 20.

29.     Use of the correct PPS rate formula, as set forth in the Commonwealth's State Plan Amendment and approved by CMS, results in a PPS rate that is more than $100 less than the rate CHF uses in its Motion.  Even assuming all of the visit and payment receipt information in the Motion were otherwise accurate (which, as explained below, is not warranted), applying the correct PPS rate results in a total wraparound payment of $9.1 million, approximately $11 million less than what CHF claims to be owed in the Motion.  *See* Appendix A, attached hereto.

**II.     The Motion Does Not Provide Any Visit Data**

30.     The Motion lacks any data regarding the number of visits for which CHF provided services and is seeking compensation.  As noted above, visit data is an integral part to determining the wraparound payment owed to an FQHC.  Importantly, only certain types of Medicaid and

---

[7]     *See* 42 U.S.C. § 1396a(bb)(3)(A).

[8]     CHF submitted its 2017 and 2018 cost and visit data to the PRDOH in order to calculate its new PPS rate. Following the receipt of these materials, PRDOH calculated CHF's PPS rate for 2019 as $43.69.  *See* Determinar el PPS Rate Community Health Foundation, attached as **Exhibit E-1** to the Cruz Declaration, at 1.  This was increased to $44.52 by application of the MEI of 1.9% for 2019.  *See* Cruz Declaration ¶ 18.

CHIP visits may be counted for determining wraparound payments under applicable regulations. *See* MACPAC, Medicaid Payment Policy for Federally Qualified Health Centers, https://www.macpac.gov/wp-content/uploads/2017/12/Medicaid-Payment-Policy-for-Federally-Qualified-Health-Centers.pdf (last visited May 23, 2022).

31.     In the Motion, however, CHF provides *no* actual data or other information regarding its visit counts for the periods in which it claims to be owed wraparound payments by the Commonwealth.  Rather, it only provides the percentage of Medicaid enrollees for each quarter.  *See* Mot. Ex. 1.  It then provides what the *estimated* number of Medicaid visits are for each quarter.  *Id.*  It is that estimated number to which CHF applies its (incorrect) PPS rate to determine its total cost for each quarter.  *Id.*

32.     This is insufficient information for the Oversight Board to evaluate the wraparound payment owed, if any, to CHF.  CHF has not provided any data on the total number of visits to which it is applying the percentage of Medicaid enrollees.  Because only certain types of visits are eligible for reimbursement by means of a wraparound payment, the Oversight Board is unable to determine whether CHF's visit count is correct.  It is also unclear whether the total number of visits to which CHF has applied the Medicaid percentage is an estimated number or based on actual data.  *Id.* (including a row – that does not have any data – for "estimated total visits").  And, despite its best efforts, PRDOH has been unable to verify CHF's visit numbers provided in Exhibit 1 to the Motion.  *See* Cruz Declaration ¶ 21.

33.     Because CHF has not provided any actual visit data for the Oversight Board to review, it is unable to determine whether the total cost claimed by CHF is correct.  Indeed, although PRDOH has endeavored to validate CHF's claimed visit numbers, CHF is "the primary responsible party to provide" "the number of visits from Medicaid beneficiaries" in order to calculate

14

wraparound payment amounts.  *See* Manual § 4.1.5.  Accordingly, the Motion must be denied due to CHF's failure to provide such information.  Alternatively, CHF must be instructed to provide the Oversight Board with certifications of its Medicaid visits for each of the quarters at issue in the Motion – including visit data for any other FQHCs or medical providers with whom it contracts to provide Medicaid services.

### III.   CHF Has Not Provided Any Data Regarding Its Receipt of Fee-for-Service Payments

34.   CHF represents that it has received no fee-for-service payments during the period for which it is seeking reimbursement from the Commonwealth.  *See* Mot. Ex. 1.  As set forth below, the Oversight Board, through its investigation of CHF's claims, has discovered this is not accurate.  Because CHF is not entitled to receive double-payment and it has received at least some fee-for-service ("FFS") payments since 2017, the Motion should be denied.

35.   In the normal course, MCOs may remit both capitation and FFS payments to FQHCs.  While capitation payments are contractually agreed upon payments based on the FQHC's monthly membership, FFS payments are additional payments made by MCOs to FQHCs, including for third-party services.  *See* Manual §§ 4.3.1, 4.3.2.  Regardless of the type of payment, "any amount paid by the MCO or any other entity, related to Medicaid beneficiaries, has to be deducted from the wraparound computation."  *Id.* § 4.3 (noting such "payments could be made in the form of net capitation payments, fee for services and other concepts").

36.   The Motion provides the amount of capitation payments it received for each quarter that it claims it is owed wraparound payments by the Commonwealth, and that amount is deducted from the costs CHF claims to have incurred.  *See* Mot. Ex. 1.  However, there is no data provided in the Motion or Exhibit 1 thereto for "FFS Medicaid and Chips Beneficiaries" for any of the quarters at issue.  *Id.*

37.     As mentioned above, since the filing of the Motion, the Oversight Board has

worked with the PRDOH to investigate the amount, if any, that CHF is owed.  Over the course of

its investigation, the Oversight Board and PRDOH have determined that CHF has, in fact, received

FFS payments from various MCOs.  For example, in the fourth quarter of 2019, CHF received

$499,740.31 from First Medical Health Plan, one of the MCOs with which CHF contracts.[9]

Although the PRDOH's investigation of payments made to CHF is ongoing, because CHF has not

recorded *any* FFS payments in its Motion, the amount that it claims to be owed by the

Commonwealth for the provision of Medicaid services is incorrect and overstated.

38.     CHF is not entitled to receive payment from the Commonwealth for services for

which it has already been paid by other sources.  This is contrary to the purpose of the wraparound

payment system, which is intended to make FQHCs whole for what they would have received with

a PPS rate under BIPA, which is in essence costs incurred, for providing medical care to indigent

patients, not provide them with a profit.  CHF's failure to include any FFS data in its Motion is at

best a serious oversight that forces the Oversight Board to question the rest of the data included in

their Motion.   At worst, it is indicative of CHF's bad faith in seeking a windfall from the

Commonwealth on the heels of the confirmation of its plan of adjustment.  The Motion must

therefore be denied on this basis.  In the alternative, and in addition to the visit data discussed

above, CHF must be instructed to provide claims data for all of the revenue it received from MCOs,

either directly or indirectly, through Anchor Health Management ("Anchor"), a health services

---

[9]     A collection of the FFS payments made to CHF that have been collected by the PRDOH thus far is attached as
**Exhibit F** to the Cruz Declaration.

provider operating in the Commonwealth with whom CHF has a contractual relationship.  *See*

Cruz Declaration ¶ 14.[10]

## IV.    The Commonwealth Cannot Make Any Payments to CHF Because It Is Unable to Validate the Motion

39.    Should the Commonwealth pay the $20.1 million that CHF claims it is owed, it could put its own receipt of federal funding for Medicaid services in jeopardy.  As noted above, the State Plan Amendment requires the Commonwealth to provide payment to an FQHC equal to the amount such a center would be paid under BIPA.  If CMS were to determine that the Commonwealth was no longer complying with the Medicaid Act, then CMS could withhold payments to the Commonwealth for Medicaid funding.  42 C.F.R. § 430.35(a).  Moreover, CHF's receipt of an overpayment could put itself at risk for knowingly retaining federal funds to which it is not entitled; this could result in claims asserted against CHF for unjust enrichment and damages under the False Claims Act.

40.    Given the lack of information provided in the Motion and the risks any overpayment could pose to the Commonwealth and CHF, the Commonwealth is unable to discuss a consensual resolution of CHF's claims.  However, as noted above, the Commonwealth and the Oversight Board understand the benefits provided by CHF to Puerto Rico residents.  Accordingly, should CHF provide the data necessary to validate the claims made in the Motion – and specifically the data set forth in Exhibit 1 thereto – the Commonwealth is willing to engage with CHF on a consensual resolution of its Motion, as long as such resolution incorporates the proper statutory formula for determining CHF's PPS rate (*see* § I, *supra*).  As things currently stand, however, the

---

[10]    Through its relationship with Anchor, CHF has direct and indirect contractual relationships with MCOs operating with the Commonwealth, including Triple S Salud, First Medical Health Plan, Inc., and MMM Multi Health, LLC.  *Id.*

Court should deny CHF's Motion for failure to meet its burden for establishing the amount it is purportedly owed with administrative expense priority.

## **CONCLUSION**

41.     For the foregoing reasons, the Oversight Board respectfully requests the Court deny the Motion.

[*Remainder of Page Intentionally Left Blank*]

Dated: May 25, 2022
San Juan, Puerto Rico

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
Email: hermann.bauer@oneillborges.com

**PROSKAUER ROSE LLP**

By: /s/ Brian S. Rosen
Martin J. Bienenstock*
Brian S. Rosen*
Julia D. Alonzo*
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
           brosen@proskauer.com
           jalonzo@proskauer.com

* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board and as Representative
of the Commonwealth*

## **Appendix A**

**Application of Corrected PPS Rate to CHF's Alleged Visit and Payment Data**

Appendix A

**Application of Corrected PPS Rate to CHF's Alleged Visit and Payment Data**

| Period | 2017 Q4 | 2018 Q1 | 2018 Q2 | 2018 Q3 | 2018 Q4 | 2019 Q1 | 2019 Q2 |
|---|---|---|---|---|---|---|---|
| **Estimated % of Total Visits by Medicaid Enrollees** (Mot. Ex. 1) | 14,913 | 18,823 | 4,112 | 17,435 | 9,958 | 7,012 | 8,735 |
| **PPS Rate** (State Plan Amendment) | $146.72 | $149.51 | $149.51 | $149.51 | $149.51 | $155.25 | $155.25 |
| **Total Cost** (Visits x PPS Rate) | $2,188,035.36 | $2,814,226.73 | $614,785.12 | $2,606,706.85 | $1,488,820.58 | $1,088,613.00 | $1,356,108.75 |
| **Capitation Payments** (Mot. Ex. 1) | $416,545.00 | $397,508.00 | $367,073.00 | $354,986.00 | $366,151.00 | $363,830.00 | $372,497.00 |
| **Fee For Service Payments** (Mot. Ex. 1) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Payments Received** (Capitation + FFS Payments) | $416,545.00 | $397,508.00 | $367,073.00 | $354,986.00 | $366,151.00 | $363,830.00 | $372,497.00 |
| **Net Wraparound Payment Due** (Total Cost - Total Payments Received) | $1,771,490.36 | $2,416,718.73 | $247,712.12 | $2,251,720.85 | $1,122,669.58 | $724,783.00 | $983,611.75 |

Appendix A

**Application of Corrected PPS Rate to CHF's Alleged Visit and Payment Data**

| Period | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
|---|---|---|---|---|---|---|---|
| **Estimated % of Total Visits by Medicaid Enrollees (Mot. Ex. 1)** | 8,857 | 7,785 | 7,090 | 5,474 | 8,635 | 9,258 | 6,906 |
| **PPS Rate (State Plan Amendment)** | $44.52 | $44.52 | $45.50 | $45.50 | $45.50 | $45.50 | $46.27 |
| **Total Cost (Visits x PPS Rate)** | $394,313.64 | $346,588.20 | $322,595.00 | $249,067.00 | $392,892.50 | $421,239.00 | $319,540.62 |
| **Capitation Payments (Mot. Ex. 1)** | $376,289.00 | $389,710.00 | $392,678.00 | $405,571.00 | $419,032.00 | $433,908.00 | $396,903.00 |
| **Fee For Service Payments (Mot. Ex. 1)** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Payments Received (Capitation + FFS Payments)** | $376,289.00 | $389,710.00 | $392,678.00 | $405,571.00 | $419,032.00 | $433,908.00 | $396,903.00 |
| **Net Wraparound Payment Due (Total Cost - Total Payments Received)** | $18,024.64 | -$43,121.80 | -$70,083.00 | -$156,504.00 | -$26,139.50 | -$12,669.00 | -$77,362.38 |

**Appendix A**

**Application of Corrected PPS Rate to CHF's Alleged Visit and Payment Data**

| Period | 2021 Q2 | 2021 Q3 | Total |
|---|---|---|---|
| **Estimated % of Total Visits by Medicaid Enrollees (Mot. Ex. 1)** | 6,912 | 9,149 | |
| **PPS Rate (State Plan Amendment)** | $46.27 | $46.27 | |
| **Total Cost (Visits x PPS Rate)** | $319,818.24 | $423,324.23 | |
| **Capitation Payments (Mot. Ex. 1)** | $375,512.00 | $375,566.00 | |
| **Fee For Service Payments (Mot. Ex. 1)** | $0.00 | $0.00 | |
| **Total Payments Received (Capitation + FFS Payments)** | $375,512.00 | $375,566.00 | |
| **Net Wraparound Payment Due (Total Cost - Total Payments Received)** | -$55,693.76 | $47,758.23 | $9,142,915.82 |