## EXHIBIT A

SPANISH TRANSLATION OF AMENDED HTA DISCLOSURE STATEMENT

AND SUPPORTING EXHIBITS (OTHER THAN EXHIBIT D AND EXHIBIT J)

## TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS
## DISTRITO DE PUERTO RICO

| | |
|---|---|
| En el caso:<br><br>LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>como representante de<br><br>EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, *y otros*,<br><br>Deudores.[1] | Título III de PROMESA<br><br>Núm. 17 BK-3283-LTS<br><br>(Con administración conjunta) |
| En el caso:<br><br>LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>como representante de<br><br>LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO,<br><br>Deudor. | Título III de PROMESA<br><br>Núm. 17 BK-3567-LTS<br><br>Esta Declaración de Divulgación se relaciona exclusivamente con la ACT, y se ha presentado en el Caso Principal Núm. 17 BK-3283-LTS y 17 BK-3567-LTS (ACT) |

### DECLARACIÓN DE DIVULGACIÓN PARA EL PLAN DE AJUSTE ENMENDADO DE TÍTULO III PARA LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813 |

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico como representantes de la Autoridad de Carreteras y Transportación de Puerto Rico*

---

[1]   Los Deudores en estos Casos de Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número de identificación fiscal federal de cada Deudor, según corresponda, son (i) el Estado Libre Asociado (ELA) de Puerto Rico (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 9686); (v) la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3747); y (vi) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3801). Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software.

Fecha:  16 de mayo de 2022

---

Si tiene preguntas sobre esta Declaración de Divulgación, comuníquese con el Agente de la Convocatoria, Kroll Restructuring Administration LLC ("<u>Kroll</u>"):

**Teléfono** (disponible de 10:00 a.m. a 7:00 p.m. Horario Estándar del Atlántico):

(844) 822-9231 (llamada gratuita para EE.UU. y Puerto Rico)

(646) 486-7944 (para llamadas internacionales)

**Correo electrónico**: <u>puertoricoballots@ra.kroll.com</u> (referencia "HTA Plan of Adjustment/Plan de Ajuste de la ACT" en el asunto)

Tenga en cuenta que Kroll no está autorizado a proporcionar asesoramiento jurídico y no lo hará.

---

**LA PRESENTE NO CONSTITUYE UNA CONVOCATORIA A VOTAR SOBRE EL PLAN DE AJUSTE. LA CONVOCATORIA A VOTAR SE ENCUENTRA VEDADA HASTA QUE EL TRIBUNAL DE TÍTULO III HAYA APROBADO UNA DECLARACIÓN DE DIVULGACIÓN. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN SE PRESENTA PARA SU APROBACIÓN, PERO AÚN NO HA SIDO APROBADA POR EL TRIBUNAL DE TÍTULO III. LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN SE ENCUENTRA SUJETA A CAMBIOS. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN NO REPRESENTA UNA OFERTA PARA VENDER TÍTULOS VALORES NI UNA OFERTA PARA ADQUIRIR DICHOS TÍTULOS.**

---

<u>**NO SE HA APROBADO JUDICIALMENTE NINGUNA OTRA INFORMACIÓN**</u>**.**

**LA JUNTA DE SUPERVISIÓN, COMO REPRESENTANTE EXCLUSIVO DE LA ACT, CONFORME A LA SECCIÓN 315(b) DE PROMESA, NO HA AUTORIZADO A NINGUNA PERSONA A OFRECER NINGÚN TIPO DE INFORMACIÓN CON RESPECTO AL PLAN DE LA ACT O EL DEUDOR, O EL VALOR DE LAS PROPIEDADES DEL DEUDOR, SALVO SEGÚN SE ESTIPULA EN ESTA DECLARACIÓN DE DIVULGACIÓN O EN LA ORDEN DE LA DECLARACIÓN DE DIVULGACIÓN.[2] LOS TENEDORES DE RECLAMACIONES DEBEN TENER CONOCIMIENTO DE QUE CUALQUIER INFORMACIÓN, DECLARACIÓN, GARANTÍA O INCENTIVO OFRECIDOS PARA OBTENER LA ACEPTACIÓN O EL RECHAZO DEL PLAN DE LA ACT, U OBTENER UNA DECISIÓN DE TRANSIGIR CIERTAS RECLAMACIONES DE CONFORMIDAD CON EL PLAN DE LA ACT NO HAN SIDO APROBADOS POR EL TRIBUNAL DE TÍTULO III. Además, los tenedores de reclamaciones no deben actuar de conformidad con ninguna información que se distribuya a través de las redes sociales, entre ellas, sin limitación, Facebook, Twitter e Instagram.**

---

**EL PLAN DE LA ACT ES EL PRODUCTO DE NEGOCIACIONES SUSTANCIALES ENTRE LA JUNTA DE SUPERVISIÓN (COMO ÚNICO REPRESENTANTE DEL DEUDOR EN SU CASO DE TÍTULO III), LAS PARTES DE LOS ACUERDOS DE**

---

[2]   Los términos con mayúsculas que se usan en esta Declaración de Divulgación pero no estén definidos en ella tienen los significados respectivos que se les dan en el Plan de la ACT.

i

**APOYO AL PLAN (COLECTIVAMENTE, LAS "PARTES DE APOYO"), Y OTRAS PARTES. LA JUNTA DE SUPERVISIÓN Y LAS PARTES DE APOYO CONSIDERAN QUE EL PLAN DE LA ACT REPRESENTA UN RESULTADO JUSTO Y RAZONABLE PARA TODOS LOS ACREEDORES DEL DEUDOR Y, POR LO TANTO, LA CONFIRMACIÓN DEL PLAN DE LA ACT REDUNDA EN EL INTERÉS DE LOS DEUDORES Y DE SUS ACREEDORES. LA JUNTA DE SUPERVISIÓN Y LAS PARTES DE APOYO RECOMIENDAN QUE USTED VOTE PARA ACEPTAR EL PLAN DE LA ACT.**

**PARA EVITAR DUDAS, ESTA DECLARACIÓN DE DIVULGACIÓN FUE REDACTADA POR LA JUNTA DE SUPERVISIÓN, Y ALGUNAS DE LAS DECLARACIONES DE LA PRESENTE PUEDEN SER IMPUGNADAS POR CIERTOS ACREEDORES O EL GOBIERNO, LO QUE INCLUYE, SIN LIMITACIÓN, DECLARACIONES SOBRE LA INTERPRETACIÓN DE PROMESA Y LOS DERECHOS Y REMEDIOS DEL DEUDOR Y LOS ACREEDORES. SALVO DISPOSICIÓN EXPRESA EN CONTRARIO EN LA PRESENTE, LAS OPINIONES EXPRESADAS EN LA PRESENTE DECLARACIÓN DE DIVULGACIÓN SON ÚNICAMENTE LAS DE LA JUNTA DE SUPERVISIÓN Y DEL DEUDOR Y NO PUEDEN ATRIBUIRSE A NINGUNA DE LAS PARTES DE APOYO O A NINGUNA OTRA PARTE.**

[*El resto de la página se deja intencionalmente en blanco*]

## INFORMACIÓN IMPORTANTE

**AUTORIDAD DE LA JUNTA DE SUPERVISIÓN. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO ("PROMESA", POR SUS SIGLAS EN INGLÉS) DISPONE QUE LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO (LA "JUNTA DE SUPERVISIÓN") PUEDE TOMAR CUALQUIER MEDIDA QUE SEA NECESARIA PARA ENTABLAR UN CASO CONFORME AL TÍTULO III DE PROMESA DE UN DEUDOR, LO QUE INCLUYE LA PRESENTACIÓN DE UNA PETICIÓN DE TÍTULO III, PRESENTAR UN PLAN DE AJUSTE PARA UN DEUDOR Y HACER CUALQUIER OTRA PRESENTACIÓN DE MODO GENERAL EN RELACIÓN CON EL CASO DE TÍTULO III. PROMESA TAMBIÉN DISPONE QUE ÚNICAMENTE LA JUNTA DE SUPERVISIÓN PUEDE PRESENTAR UN PLAN DE AJUSTE PARA LAS DEUDAS DE UN DEUDOR. PROMESA REQUIERE QUE EL PLAN DE AJUSTE PARA UN DEUDOR DE TÍTULO III SE PRESENTE EN SU CASO DE TÍTULO III JUNTO CON UN DOCUMENTO DENOMINADO "DECLARACIÓN DE DIVULGACIÓN".**

**PROPÓSITO DE LA DECLARACIÓN DE DIVULGACIÓN. EL PRESENTE DOCUMENTO CONSTITUYE LA DECLARACIÓN DE DIVULGACIÓN (LA "DECLARACIÓN DE DIVULGACIÓN") PARA EL PLAN DE AJUSTE ENMENDADO DE TÍTULO III DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO (EL "PLAN DE LA ACT"). LA FUNCIÓN DE UNA DECLARACIÓN DE DIVULGACIÓN ES PROPORCIONAR A UN INVERSIONISTA HIPOTÉTICO TÍPICO DE LOS TENEDORES DE RECLAMACIONES DEL CASO INFORMACIÓN RAZONABLEMENTE FACTIBLE A LA LUZ DE LA NATURALEZA Y LA HISTORIA DEL DEUDOR Y LAS CONDICIONES DE SUS LIBROS Y REGISTROS PARA PERMITIR QUE EL INVERSIONISTA HIPOTÉTICO TOME UNA DECISIÓN INFORMADA DE ACEPTAR O RECHAZAR EL PLAN DE LA ACT.**

**DEUDOR. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN ACOMPAÑA AL PLAN DE AJUSTE ENMENDADO DE TÍTULO III PARA LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO ("ACT" O EL "DEUDOR").**

**FUENTE DE LOS DATOS. LA PRESENTE DECLARACIÓN DE DIVULGACIÓN INCLUYE CIERTOS APÉNDICES, CADA UNO DE LOS CUALES SE INCORPORA A LA PRESENTE DECLARACIÓN DE DIVULGACIÓN COMO SI SU TEXTO FIGURARA EN LA PRESENTE EN SU TOTALIDAD. ESTA DECLARACIÓN DE DIVULGACIÓN HA SIDO PREPARADA Y PRESENTADA POR LA JUNTA DE SUPERVISIÓN EN NOMBRE DEL DEUDOR.**

**EL GOBIERNO DE ESTADOS UNIDOS CREÓ LA JUNTA DE SUPERVISIÓN EL 30 DE JUNIO DE 2016. EL PRESIDENTE DE ESTADOS UNIDOS (EL ENTONCES PRESIDENTE EN FUNCIONES BARACK OBAMA) DESIGNÓ A LOS SIETE MIEMBROS CON DERECHO AL VOTO DE LA JUNTA DE SUPERVISIÓN EL**

iii

31 DE AGOSTO DE 2016. EN SUS COMIENZOS, LA JUNTA DE SUPERVISIÓN NO DISPONÍA DE INFORMACIÓN NI BASE DE DATOS PROPIA, PERO TENÍA EL DERECHO LEGAL DE OBTENER INFORMACIÓN Y DATOS DEL ELA Y SUS INSTRUMENTALIDADES.

ORIGEN DE LA INFORMACIÓN FINANCIERA. TODA LA INFORMACIÓN FINANCIERA QUE FIGURA EN LA PRESENTE SE BASA EN DATOS QUE LA JUNTA DE SUPERVISIÓN HA RECIBIDO DE LA ACT Y DEL ELA, O QUE SE ENCUENTRA DISPONIBLE PARA EL PÚBLICO EN GENERAL. A LA FECHA DE ESTA DECLARACIÓN DE DIVULGACIÓN, LA DECLARACIÓN FINANCIERA AUDITADA MÁS RECIENTE PUBLICADA PARA LA ACT ES PARA EL AÑO FISCAL 2021 ("FY"). POR CONSIGUIENTE, SI BIEN LA JUNTA DE SUPERVISIÓN HA HECHO LO POSIBLE PARA OBTENER INFORMACIÓN COMPLETA Y VERAZ, SE ENCUENTRA LIMITADA AL USO DE LOS SISTEMAS Y DATOS DE LA ACT Y DEL ELA COMO FUENTES Y NO PUEDE CORROBORAR INDEPENDIENTEMENTE LA VERACIDAD DE ESTOS DATOS. ESTA DECLARACIÓN DE DIVULGACIÓN Y LA INFORMACIÓN ECONÓMICA Y FINANCIERA QUE SE PROPORCIONA EN LA PRESENTE NO HA SIDO APROBADA POR EL AGENTE FISCAL DE LA ACT, LA AUTORIDAD DE ASESORÍA FINANCIERA Y AGENCIA FISCAL DE PUERTO RICO ("AAFAF").[3]

REVISIÓN DEL TRIBUNAL. EL TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO (EL "TRIBUNAL DE TÍTULO III") HA EXAMINADO ESTA DECLARACIÓN DE DIVULGACIÓN Y HA DETERMINADO QUE CONTIENE INFORMACIÓN ADECUADA CONFORME A LA SECCIÓN 1125(B)[4] DEL CÓDIGO DE QUIEBRAS Y PUEDE SER ENVIADA A USTED PARA CONVOCARLO A VOTAR O ELEGIR LA FORMA DE DISTRIBUCIÓN A RECIBIRSE CONFORME AL PLAN DE LA ACT. SIN EMBARGO, EL TRIBUNAL DE TÍTULO III NO HA DETERMINADO SI LA INFORMACIÓN CONTENIDA EN LA PRESENTE ES CORRECTA O COMPLETA.

VOTO DESPUÉS DE LA CONSIDERACIÓN DE LOS FACTORES DE RIESGO. SE RECOMIENDA QUE TODOS LOS TENEDORES DE RECLAMACIONES CON DERECHO A VOTAR SOBRE EL PLAN DE LA ACT, O A TOMAR UNA DECISIÓN, LEAN Y ANALICEN CUIDADOSAMENTE ESTA DECLARACIÓN DE DIVULGACIÓN EN SU TOTALIDAD, INCLUYENDO LOS FACTORES DE RIESGO MENCIONADOS EN ESTA DECLARACIÓN DE DIVULGACIÓN Y EL PLAN DE LA ACT QUE SE ADJUNTA ANTES DE VOTAR POR ACEPTAR O RECHAZAR EL PLAN DE LA ACT O DE TOMAR UNA DECISIÓN. CONSULTE LA SECCIÓN VIII DE ESTA

---

[3]  El Gobierno de Puerto Rico, con sus agencias e instrumentalidades (incluida la AAFAF), no ha verificado ni aprobado independientemente la información que figura en las declaraciones hechas en esta Declaración de Divulgación.

[4]  Todas las disposiciones del Título 11 del Código de Estados Unidos (el "Código de Quiebras") a los que se hace referencia en la presente son aplicables a estos casos de Título III conforme a la Sección 301(a) de PROMESA.

DECLARACIÓN DE DIVULGACIÓN, BAJO EL TÍTULO "CIERTOS FACTORES DE RIESGO A CONSIDERAR".

**DECLARACIONES A FUTURO.** ESTA DECLARACIÓN DE DIVULGACIÓN CONTIENE AFIRMACIONES QUE SON "DECLARACIONES A FUTURO" CONFORME A LA DEFINICIÓN DE ESTAS EN CIERTAS LEYES FEDERALES DE TÍTULOS VALORES. TODAS LAS AFIRMACIONES QUE FIGURAN EN LA PRESENTE Y QUE NO SON DE NATURALEZA CLARAMENTE HISTÓRICA SON A FUTURO, Y LAS PALABRAS "PREVER", "CREER", "PODRÍA", "DEBERÍA", "ESPERAR", "ESTIMAR", "PRONÓSTICO", "INTENCIÓN", "POTENCIAL", "PROYECTO", "OBJETIVO" Y EXPRESIONES SIMILARES SE ENCUENTRAN GENERALMENTE DESTINADAS A IDENTIFICAR DECLARACIONES A FUTURO. TODAS LAS DECLARACIONES QUE FIGURAN EN ESTA DECLARACIÓN DE DIVULGACIÓN, QUE NO SEAN AFIRMACIONES SOBRE HECHOS HISTÓRICOS, INCLUYENDO LAS DECLARACIONES SOBRE EL PLAN DE LA ACT, ESTRATEGIAS, PERSPECTIVAS Y EXPECTATIVAS CON RESPECTO A EVENTOS FUTUROS Y EL DESEMPEÑO FINANCIERO DEL DEUDOR SON DECLARACIONES A FUTURO QUE INVOLUCRAN CIERTOS RIESGOS E INCERTIDUMBRES. SI BIEN ESTAS DECLARACIONES REPRESENTAN EL JUICIO ACTUAL DEL DEUDOR SOBRE LO QUE PUEDE ESPERARSE A FUTURO, Y EL DEUDOR CONSIDERA QUE ESTAS DECLARACIONES SE BASAN EN SUPOSICIONES QUE SON RAZONABLES BAJO LAS CIRCUNSTANCIAS, ESTAS DECLARACIONES NO SON GARANTÍAS DE CUALQUIER EVENTO O RESULTADO FINANCIERO, Y LOS RESULTADOS REALES DEL DEUDOR PUEDEN PRESENTAR DIFERENCIAS MATERIALES CON RESPECTO A ELLAS. LA INFORMACIÓN QUE SE INCLUYE EN ESTA DECLARACIÓN DE DIVULGACIÓN, INCLUSO LAS DECLARACIONES A FUTURO Y PROYECCIONES DE CIERTOS DATOS FINANCIEROS POSTERIORES AL PERFECCIONAMIENTO DEL PLAN DE LA ACT, SOLO SE HACEN A LA FECHA DE LA PRESENTE DECLARACIÓN DE DIVULGACIÓN A MENOS QUE SE ESPECIFIQUE LO CONTRARIO. EL DEUDOR NO SE COMPROMETE A NINGUNA OBLIGACIÓN DE ACTUALIZAR PÚBLICAMENTE LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN, INCLUYENDO CUALQUIER DECLARACIÓN A FUTURO, PARA REFLEJAR NUEVA INFORMACIÓN, EVENTOS FUTUROS U OTROS, SALVO SEGÚN SEA EXIGIDO POR LEY. TODAS LAS DECLARACIONES A FUTURO INVOLUCRAN RIESGOS E INCERTIDUMBRES, MUCHAS DE LAS CUALES SE ENCUENTRAN FUERA DEL CONTROL DEL DEUDOR, Y QUE PUEDEN HACER QUE LOS RESULTADOS, DESEMPEÑOS O LOGROS REALES DIFIERAN MATERIALMENTE DE LOS RESULTADOS, DESEMPEÑOS O LOGROS PREVISTOS. EL DEUDOR NO PUEDE GARANTIZAR QUE LOS RESULTADOS O EVENTOS PROYECTADOS SE CONCRETEN. LOS FACTORES QUE PODRÍAN HACER QUE LOS RESULTADOS REALES DEL DEUDOR SEAN MATERIALMENTE DIFERENTES DE LAS EXPECTATIVAS DEL DEUDOR INCLUYEN LOS FACTORES QUE SE DESCRIBEN EN LA PRESENTE BAJO LA SECCIÓN VIII, "CIERTOS FACTORES DE RIESGO A CONSIDERAR". EL DEUDOR EXHORTA A LOS TENEDORES DE RECLAMACIONES A ANALIZAR CUIDADOSAMENTE ESTOS FACTORES AL EVALUAR LAS DECLARACIONES A

**FUTURO Y NO COLOCAR EXCESIVA CONFIANZA EN ESTAS DECLARACIONES A FUTURO.**

**LOS HECHOS PUEDEN CAMBIAR. LAS DECLARACIONES Y OTRA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN SE REALIZARON A LA FECHA QUE FIGURA EN LA CARÁTULA, A MENOS QUE SE ESPECIFIQUE LO CONTRARIO. LOS TENEDORES DE RECLAMACIONES QUE LEAN ESTA DECLARACIÓN DE DIVULGACIÓN NO DEBEN SUPONER QUE LOS HECHOS QUE SE DESCRIBEN EN ESTE DOCUMENTO SE HAN MANTENIDO INALTERADOS DESDE LA FECHA QUE FIGURA EN LA CARÁTULA. CADA TENEDOR DE UNA RECLAMACIÓN CON DERECHO AL VOTO, O A TOMAR UNA DECISIÓN CON RESPECTO AL PLAN DE LA ACT DEBE BASARSE EN SU PROPIA EVALUACIÓN DEL DEUDOR Y SU PROPIO ANÁLISIS DE LOS TÉRMINOS DEL PLAN AL ACEPTAR O RECHAZAR O TOMAR UNA DECISIÓN CON RESPECTO AL PLAN DE LA ACT.**

**SUPLEMENTO DEL PLAN. UN SUPLEMENTO DEL PLAN, CON VERSIONES EN BORRADOR O DEFINITIVAS DE LOS DOCUMENTOS PRIMARIOS REQUERIDOS PARA PERFECCIONAR LAS TRANSACCIONES CONTEMPLADAS POR EL PLAN DE LA ACT SE PRESENTARÁ ANTE EL TRIBUNAL DE TÍTULO III TAN PRONTO COMO RESULTE FACTIBLE (PERO EN NINGÚN CASO DESPUÉS DE LOS SIETE (7) DÍAS) ANTES DE LA FECHA LÍMITE PARA LA VOTACIÓN,[5] O EN CUALQUIER OTRA FECHA DETERMINADA POR EL TRIBUNAL DE TÍTULO III. EL SUPLEMENTO DEL PLAN SE CONSIDERARÁ INCORPORADO Y PARTE DEL PLAN DE LA ACT COMO SI SU TEXTO FIGURARA EN EL PLAN EN SU TOTALIDAD.**

**LA DECLARACIÓN DE DIVULGACIÓN SE DESTINA ÚNICAMENTE PARA VOTACIONES Y/O DECISIONES. EL DEUDOR PROPORCIONA LA INFORMACIÓN QUE FIGURA EN ESTA DECLARACIÓN DE DIVULGACIÓN ÚNICAMENTE PARA LOS FINES DE CONVOCAR A LOS TENEDORES DE RECLAMACIONES CON DERECHO AL VOTO PARA QUE ACEPTEN O RECHACEN EL PLAN DE LA ACT U OPTEN POR LA FORMA DE DISTRIBUCIÓN CONFORME A ESTE. NINGUNA DISPOSICIÓN DE LA PRESENTE DECLARACIÓN DE DIVULGACIÓN PUEDE SER USADA POR NINGUNA PERSONA PARA NINGÚN OTRO FIN. NO SE CONSIDERARÁ QUE EL CONTENIDO DE ESTA DECLARACIÓN DE DIVULGACIÓN PROPORCIONA ALGÚN TIPO DE ASESORAMIENTO LEGAL, FINANCIERO, SOBRE TÍTULOS VALORES, IMPOSITIVO, DE NEGOCIOS O DE OTRO TIPO. EL DEUDOR EXHORTA A CADA TENEDOR DE RECLAMACIONES QUE CONSULTEN A SUS PROPIOS ASESORES PARA OBTENER DICHO ASESORAMIENTO LEGAL, FINANCIERO, SOBRE TÍTULOS VALORES, IMPOSITIVO, DE NEGOCIOS O DE OTRO TIPO AL EXAMINAR LA DECLARACIÓN DE DIVULGACIÓN Y EL PLAN DE LA ACT.**

---

[5] La "Fecha límite para la votación" se define como [___] (Horario Estándar del Atlántico) el [___], a menos que dicho plazo se extienda.

**LA APROBACIÓN JUDICIAL NO SIGNIFICA QUE TODOS LOS HECHOS SEAN CORRECTOS. ESTA DECLARACIÓN DE DIVULGACIÓN Y LA APROBACIÓN DEL TRIBUNAL DE TÍTULO III SOBRE LA ADECUACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYEN, Y NO DEBEN INTERPRETARSE COMO, UNA ADMISIÓN DE HECHOS, OBLIGACIONES, ESTIPULACIONES O RENUNCIAS.[6] ADEMÁS, LA APROBACIÓN DEL TRIBUNAL DE TÍTULO III SOBRE LA ADECUACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYE LA DETERMINACIÓN DEL TRIBUNAL DE TÍTULO III DE QUE LA INFORMACIÓN QUE FIGURA EN LA PRESENTE ES CORRECTA O COMPLETA Y NO SIGNIFICA QUE EL TRIBUNAL VAYA A CONFIRMAR EL PLAN DE LA ACT. EL TRIBUNAL DE TÍTULO III HA PROGRAMADO UNA VISTA EL [_____] DE 2022 PARA ANALIZAR LA CONFIRMACIÓN DEL PLAN DE LA ACT CONFORME A PROMESA Y LAS DISPOSICIONES ESPECÍFICAS DEL CÓDIGO DE QUIEBRAS APLICABLES A LOS CASOS DE TÍTULO III CONFORME A LAS SECCIONES 301 Y 314 DE PROMESA.**

**SIN APROBACIÓN GUBERNAMENTAL. NI LA COMISIÓN DE TÍTULOS VALORES DE ESTADOS UNIDOS NI NINGUNA COMISIÓN DE TÍTULOS VALORES DEL EXTRANJERO O DE ALGÚN ESTADO HA APROBADO O DESAPROBADO LOS TÍTULOS VALORES QUE SE DESCRIBEN EN LA PRESENTE, NI ESTA DECLARACIÓN DE DIVULGACIÓN, NI HAN EMITIDO SU OPINIÓN SOBRE LA EXACTITUD O ADECUACIÓN DE LAS DECLARACIONES CONTENIDAS EN LA PRESENTE. CUALQUIER DECLARACIÓN EN CONTRARIO PUEDE CONSTITUIR UN DELITO PENAL.**

**TÍTULOS VALORES NO REGISTRADOS. NINGUNO DE LOS TÍTULOS VALORES A EMITIRSE A LOS TENEDORES DE RECLAMACIONES PERMITIDAS CONFORME AL PLAN DE LA ACT HABRÁN SIDO REGISTRADOS ANTE LA COMISIÓN DE TÍTULOS VALORES (LA "SEC", POR SUS SIGLAS EN INGLÉS) CONFORME A LA LEY DE TÍTULOS VALORES DE 1933, CON SUS ENMIENDAS, O CONFORME A LAS LEYES "BLUE SKY" DE CUALQUIER ESTADO, Y DICHOS TÍTULOS VALORES SERÁN EMITIDOS EN BASE A LAS EXENCIONES DE LOS REQUISITOS DE REGISTRO DE LA LEY DE TÍTULOS VALORES Y LAS LEYES EQUIVALENTES DE LOS ESTADOS.**

**CONSECUENCIAS DE LA TENENCIA DE TÍTULOS VALORES EMITIDOS CONFORME AL PLAN DE AJUSTE. EL DEUDOR RECOMIENDA A LOS POTENCIALES DESTINATARIOS DE LOS NUEVOS BONOS DE LA ACT EMITIDOS CONFORME AL PLAN DE LA ACT QUE CONSULTEN A SUS PROPIOS ASESORES CON RESPECTO A CUALQUIER RESTRICCIÓN SOBRE LA TENENCIA O LA**

---

[6] Para evitar dudas, el uso del término "recuperación" en la presente Declaración de Divulgación no constituye, ni deberá interpretarse como, una admisión de hechos, obligaciones, estipulaciones o renuncias en litigios en curso o futuros con respecto a fondos históricamente asignados de manera condicional por el ELA a ciertas instrumentalidades del ELA.

**TRANSFERIBILIDAD DE DICHOS TÍTULOS VALORES, O CUALQUIER OTRA CONSECUENCIA POTENCIAL DE LA TENENCIA DE DICHOS TÍTULOS VALORES.**

**CONSIDERACIONES IMPOSITIVAS.** LAS CONSECUENCIAS IMPOSITIVAS DEL PLAN DE LA ACT PARA LOS TENEDORES DE RECLAMACIONES SON COMPLEJAS, Y DEPENDEN EN PARTE DEL TIPO DE RECLAMACIÓN Y LAS CIRCUNSTANCIAS INDIVIDUALES DE CADA TENEDOR DE UNA RECLAMACIÓN. EL DEUDOR RECOMIENDA QUE TODOS LOS TENEDORES DE RECLAMACIONES CONSULTEN A SUS RESPECTIVOS ASESORES IMPOSITIVOS CON RESPECTO A LAS CONSECUENCIAS IMPOSITIVAS DEL PLAN DE LA ACT CONFORME A LAS NORMAS FEDERALES, DE LOS ESTADOS, DE LOS TERRITORIOS (LO QUE INCLUYE PUERTO RICO) Y LOCALES DE ESTADOS UNIDOS Y DE OTROS PAÍSES EN SUS CIRCUNSTANCIAS INDIVIDUALES RESPECTIVAS.

**CONTROLES DEL PLAN DE AJUSTE SOBRE ESTA DECLARACIÓN DE DIVULGACIÓN.** ESTA DECLARACIÓN DE DIVULGACIÓN RESUME CIERTAS DISPOSICIONES DEL PLAN DE LA ACT, CIERTOS OTROS DOCUMENTOS Y CIERTA INFORMACIÓN FINANCIERA RELACIONADA CON EL DEUDOR. EL DEUDOR CONSIDERA QUE ESTOS RESÚMENES SON JUSTOS Y VERACES. NINGUNA OTRA PARTE, INCLUYENDO LAS PARTES DE UN ACUERDO DE APOYO AL PLAN, HACE NINGUNA DECLARACIÓN CON RESPECTO A LA JUSTICIA O VERACIDAD DE ESTOS RESÚMENES O LAS DESCRIPCIONES DE LOS DERECHOS LEGALES DE LAS PARTES Y LOS REMEDIOS CONTENIDOS EN LA PRESENTE. SI EXISTEN INCOHERENCIAS O DISCREPANCIAS ENTRE UNA DESCRIPCIÓN QUE FIGURA EN LA PRESENTE DECLARACIÓN DE DIVULGACIÓN Y LOS TÉRMINOS Y DISPOSICIONES DEL PLAN DE LA ACT O CUALQUIERA DE LOS DEMÁS DOCUMENTOS O INFORMACIÓN FINANCIERA A LOS QUE SE HACE REFERENCIA EN LA PRESENTE, LOS TÉRMINOS Y DISPOSICIONES DEL PLAN DE LA ACT O DEMÁS DOCUMENTOS O INFORMACIÓN FINANCIERA, SEGÚN CORRESPONDA, SERÁN LOS QUE PREVALEZCAN PARA TODOS LOS FINES.

**EL PLAN DE AJUSTE PUEDE RECIBIR ENMIENDAS.** LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE ENMENDAR, MODIFICAR O RETIRAR EL PLAN DE LA ACT EN CUALQUIER MOMENTO, CONFORME A LOS TÉRMINOS DE LOS ACUERDOS DE APOYO DEL PLAN, EL PLAN DE LA ACT Y EL TÍTULO III DE PROMESA.

## Índice

**Página**

I.   Prefacio ....................................................................................................................1

II.  Introducción ...........................................................................................................18

    A.   Plan de ajuste de Título III de PROMESA: Descripción general ........................20

    B.   Resumen de los componentes clave del Plan de Ajuste de la ACT .....................21

    C.   Tenedores de Reclamaciones con derecho a votar sobre el Plan de Ajuste..........36

    D.   Procedimientos de convocatoria y voto ..............................................................39

    E.   Vista de confirmación y fecha límite para las objeciones a la confirmación.........40

    F.   Resumen de las disposiciones de descargo, exculpación e interdicto que
contiene el Plan de la ACT .................................................................................40

III. Descripción general de la ACT ..............................................................................47

    A.   Información general .............................................................................................47

    B.   Obligaciones financieras de la ACT a la Fecha de Petición de la ACT ...............49

    C.   Régimen de ingresos de la ACT ..........................................................................52

    D.   Sistema de Administración de efectivo de la ACT ...............................................59

    E.   Cuentas de Efectivo de la ACT ............................................................................62

IV.  Acontecimientos significativos que dieron origen al Caso de Título III de la ACT ....71

    A.   El constante deterioro operativo y financiero del ELA y de la ACT ....................71

    B.   Legislación promulgada por el ELA y órdenes ejecutivas emitidas por el
Gobernador para abordar la crisis fiscal y de deuda ...........................................75

    C.   PROMESA..........................................................................................................81

    D.   Adopción de los presupuestos y planes fiscales del año fiscal de la ACT ...........93

    E.   Negociaciones con acreedores ...........................................................................108

V.   Descripción de los Casos de Título III de los Deudores .................................110

    A.   Inicio del Caso de Título III de la ACT .............................................................110

    Los huracanes Irma, María y Dorian, los terremotos de enero de 2020, COVID-
19, el ciclón tropical 9, la tormenta tropical Laura y el huracán Isaías, y la
respuesta de la Junta de Supervisión...................................................................111

    C.   Proceso de reclamaciones y fecha límite ............................................................124

    D.   Rechazo o aceptación de arrendamientos no vencidos de bienes inmuebles
no residenciales..................................................................................................127

    E.   Aspectos de la paralización de Título III ............................................................129

    F.   Procesos contenciosos y cuestiones controvertidas de importancia ...................137

ix

G.   Investigación de la Junta de Supervisión sobre potenciales causas de acción .................................................................................................188

H.   La orden de paralización y los informes del Equipo de Mediación ...................200

I.   Reestructuraciones relacionadas de la deuda ...........................................203

VI.   Plan de ajuste de Título III de la ACT ............................................................222

A.   Generalidades ..........................................................................................222

B.   Descripción general del plan de ajuste ...................................................224

C.   Acuerdo mutuo y conciliación de disputas / Reestructuración de entidades .......225

D.   Disposiciones para el pago de reclamaciones de gastos administrativos ...........227

E.   Clasificación y tratamiento de las reclamaciones ................................231

F.   Disposiciones con respecto a las Obligaciones Garantizadas y deudas adicionales ...........................................................................................245

G.   Disposiciones con respecto a los Bonos Asegurados de Assured, los Bonos Asegurados de National y los Bonos Asegurados de Syncora ...........................263

H.   Tratamiento de contratos a ejecutarse y arrendamientos no vencidos ................275

I.   Disposiciones que rigen las distribuciones .........................................278

J.   Enjuiciamiento y extinción de reclamaciones del Deudor.....................285

K.   Aceptación o rechazo del Plan de la ACT, efecto del rechazo por una o más Clases de Reclamaciones ...............................................................285

L.   Derechos y facultades del agente pagador .........................................286

M.   Procedimientos de tratamiento de reclamaciones en disputa y reclamaciones sujetas a los procedimientos de ACR...........................287

N.   Condiciones suspensivas a la confirmación del Plan de la ACT ....................290

O.   Condiciones suspensivas a la Fecha de Entrada en Vigencia .............................291

P.   Modificación, revocación o desistimiento del Plan de la ACT ........................296

Q.   Gobernanza corporativa y administración de la ACT Reorganizada..................297

R.   Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de PROMESA ...........................................................................................298

S.   Disposiciones sobre el comité .............................................................298

T.   Retención de jurisdicción ....................................................................299

U.   Disposiciones varias.............................................................................301

VII.   Confirmación del plan de ajuste .................................................................316

A.   Vista de confirmación .........................................................................316

B.   Fechas límite para objetar la confirmación .......................................316

x

C.      Requisitos para la confirmación del plan de ajuste.............................................316

VIII.   Ciertos factores de riesgo a considerar .................................................................322

A.      Riesgos relacionados con los Casos del Título III ................................................322

B.      Riesgos relacionados con la ACT .........................................................................325

C.      Riesgos relacionados con los Nuevos Bonos de la ACT .....................................327

D.      Riesgos relacionados con la Elección de Assured ...............................................331

E.      Riesgos relacionados con las elecciones de los tenedores de bonos de
        Assured ................................................................................................................331

F.      Riesgos relacionados con la Elección del Tratamiento de Conmutación de
        National.................................................................................................................337

G.      Riesgos relacionados con el tratamiento de no conmutación de National...........337

H.      Riesgos relacionados con hacer u omitir hacer una elección de
        conmutación de National .....................................................................................338

I.      Riesgos relacionados con los Certificados de National .......................................339

J.      Riesgos relacionados con la Cuenta de Plica de National ..................................341

K.      Riesgos relativos a las proyecciones de ingresos y gastos del Plan Fiscal
        de la ACT .............................................................................................................342

L.      Riesgos relacionados con la recaudación de ingresos que respaldan el pago
        de los Nuevos Bonos de la ACT ..........................................................................349

M.      Factores de riesgo relacionados con futuras acciones judiciales ........................351

N.      Factores de riesgo relacionados con el tratamiento tributario de los Nuevos
        Bonos de la ACT...................................................................................................352

IX.     Consideraciones materiales a efectos del Impuesto federal sobre la renta de
        EE.UU. ..................................................................................................................355

A.      Generalidades.......................................................................................................355

B.      Tenedores de EE.UU. ...........................................................................................356

C.      Personas naturales y jurídicas de Puerto Rico ....................................................368

D.      Tenedores no estadounidenses ............................................................................371

X.      Consideraciones materiales a efectos del impuesto sobre la renta de Puerto Rico..........374

A.      Generalidades.......................................................................................................374

B.      Tenedores de P.R. ................................................................................................375

C.      Tenedores no de P.R. ...........................................................................................380

XI.     Aplicabilidad de ciertas leyes federales y estatales de títulos valores ...............382

A.      Nuevos Bonos de la ACT .....................................................................................382

xi

XII.   Información y proyecciones financieras .......................................................................384

    A.     Información financiera histórica ..........................................................384

    B.     Plan fiscal y proyecciones de la ACT .................................................385

XIII.  Información adicional ..............................................................................................387

XIV.  Conclusión ..............................................................................................................387

**Tabla de Anexos**

**Anexo A** – Plan de Ajuste Enmendado de Título III de la Autoridad de Carreteras y Transportación (el "Plan de la ACT")

**Anexo B** – Acuerdo de Apoyo al Plan, de fecha 5 de mayo de 2021, por y entre la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico, ciertos tenedores de Reclamaciones de Bonos de la ACT, ciertos tenedores de reclamaciones de bonos de la ADCC, Assured Guaranty Corp. y Assured Guaranty Municipal Corp., y National Public Finance Guarantee Corporation (el "AAP de la ACT/ADCC")

**Anexo C** – Estipulación relacionada con las Disputas Relacionadas de la ARD, de fecha 5 de noviembre de 2021, por y entre la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Edificios Públicos de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, y la Autoridad de Carreteras y Transportación de Puerto Rico, AmeriNational Community Services, LLC, y Cantor-Katz Collateral Monitor LLC

**Anexo D** – Plan fiscal certificado de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo E** – Presupuesto certificado de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo F** – Cronograma de los bonos de la ACT

**Anexo G** – Lista de Cuentas Bancarias, Balances y Categorizaciones de Restricciones Preliminares de la Autoridad de Carreteras y Transportación de Puerto Rico al 31 de diciembre de 2021

**Anexo H** – Estados financieros auditados más recientes de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo I** – Cuadros ilustrativos de las distribuciones de recuperación de bonos

**LAS DECLARACIONES CONTENIDAS EN LAS SECCIONES I Y II HAN QUEDADO ÍNTEGRAMENTE CALIFICADAS POR LA INFORMACIÓN MÁS DETALLADA CONTENIDA EN OTRAS PARTES DE ESTA DECLARACIÓN DE DIVULGACIÓN, EN EL PLAN DE LA ACT Y EN SUS RESPECTIVOS ANEXOS.**

## I.   Prefacio[7]

*La decadencia económica del Estado Libre Asociado y de la ACT.* En las últimas décadas, diversos factores contribuyeron a una abrupta desaceleración económica del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado" o "ELA"), entre ellos la contracción de la economía, la disminución de la población, las variaciones en la situación fiscal y la disponibilidad de créditos de conformidad con el código tributario estadounidense. Desde principios de la década de 2000 hasta 2016, la deuda pública de Puerto Rico se incrementó rápidamente, en parte por la toma de préstamos para cubrir los déficits (incluyendo el pago del servicio de la deuda), y por las perspectivas de continua contracción de la economía de Puerto Rico.

En 2016, Puerto Rico se encontraba "en medio de una crisis fiscal".[8] En esa época, el Estado Libre Asociado estaba "aplastado bajo el peso de una deuda pública mayor" que su producto bruto interno ("PBI"), "había comenzado a incumplir sus obligaciones de deuda" y había perdido el acceso al financiamiento exterior.[9] El Estado Libre Asociado sumaba más de $120,000 millones combinados entre deuda y pasivos de pensiones sin fondos. Peor aún, esta calamitosa situación financiera amenazaba con provocar una crisis humanitaria a los más de 3 millones de ciudadanos estadounidenses residentes en la isla de Puerto Rico. Como señaló el Secretario del Tesoro de EE.UU., la capacidad del Estado Libre Asociado de proporcionar "servicios sanitarios, legales y educativos básicos" estaba en serias dudas.[10]

La Autoridad de Carreteras y Transportación de Puerto Rico ("ACT") es una corporación pública y una instrumentalidad territorial cubierta del Estado Libre Asociado creada en 1965 conforme a la Ley 74 del 23 de junio de 1965 (conocida como la "Ley de la Autoridad de Carreteras y Transportación de Puerto Rico") con el fin de diseñar, construir y administrar las carreteras con peaje de Puerto Rico. La ACT está también a cargo de la construcción de carreteras, autopistas y otras obras relacionadas destinadas al transporte en Puerto Rico. Las facultades y obligaciones de la ACT son ejecutadas por su Director Ejecutivo y su Directorio en coordinación con el Secretario del Departamento de Transportación y Obras Públicas de Puerto Rico ("DTOP", por sus siglas en español). La ACT es un actor clave en el sector de transporte de Puerto Rico, debido a que se dedica a la administración, la operación y el mantenimiento de la mayor parte del sistema de

---

[7]   Los términos en mayúsculas utilizados en este documento que no estén definidos de otra manera tendrán los significados que se les atribuyen en el Plan de la ACT (tal como se define a continuación).

[8]   *Puerto Rico c. Franklin Cal. Tax–Free Tr.*, 136 S. Ct. 1938, 1942 (2016).

[9]   *Wal-Mart Puerto Rico, Inc. c. Zaragoza-Gómez*, 174 F. Sup. 3d 585, 602 (D.P.R. 2016); H.R. Rep. Núm. 114- 602, en 40 (2016).

[10]   Carta de Jacob L. Lew, Secretario del Tesoro, a Paul Ryan, Presidente de la Cámara de Representantes de Estados Unidos (15 de enero de 2016), https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

transporte del ELA. Como tal, la ACT tiene una influencia fundamental a la hora de determinar la situación actual y futura del sector del transporte en Puerto Rico.

El panorama fiscal y económico negativo del ELA ha tenido un impacto directo sobre la ACT. Como instrumentalidad del gobierno del ELA, la ACT ha recibido históricamente un apoyo financiero y fiscal significativo del ELA debido al papel de la ACT en la construcción de carreteras, autopistas y proyectos y sistemas de transporte relacionados en Puerto Rico. La ACT ha experimentado pérdidas recurrentes significativas en sus operaciones y se enfrenta a una serie de desafíos comerciales que se han visto exacerbados por la recesión económica y la emergencia fiscal del ELA. Esto ha tenido como resultado que la ACT se vea imposibilitada de proporcionar a los ciudadanos de Puerto Rico servicios eficaces de transporte, y que las carreteras y autopistas de Puerto Rico sigan atrasadas con respecto a su calidad, confiabilidad y seguridad en relación con los estándares nacionales, debido a una falta significativa de fondos.

Como se describe adicionalmente en esta Declaración de Divulgación, la ACT ha emitido varias series de bonos para continuar con su programas de construcción de carreteras y refinanciar sus obligaciones. Sin embargo, en 2010 dejó de emitir bonos, recurriendo en lugar de ello al Banco Gubernamental de Fomento ("BGF") para recibir apoyo de liquidez y manejo fiscal. La entidad reiteradamente utilizó sus líneas de crédito del BGF para financiar sus necesidades operativas, de capital de trabajo y de construcción, además de sus déficits permanentes. Entre 2008 y 2012, la ACT pidió prestados más de 2 mil millones de dólares del BGF para financiar diversos proyectos de infraestructura y otros gastos operativos relacionados. El saldo pendiente de estas líneas de crédito al 30 de junio de 2015 ascendían a 1.8 mil millones de dólares, que posteriormente vencieron en enero de 2016 y han quedado en mora. Al 30 de junio de 2021, el capital pendiente de estas líneas de crédito adeudadas a la Autoridad de Recuperación de la Deuda (sucesor en interés de esas deudas tras la reestructuración del BGF conforme al Título VI de PROMESA) ascendían a aproximadamente $1.7 mil millones, más intereses acumulados por $0.9 mil millones.

Por otro lado, el 1 de diciembre de 2015, el Gobernador emitió la Orden Ejecutiva 2015-046 que ordenó que el Departamento de Hacienda de Puerto Rico retuviera ciertos ingresos asignados condicionalmente (colectivamente, los "Ingresos asignados condicionalmente"), de la ACT, incluyendo pagos por licencias de vehículos automotores, además de arbitrios sobre la gasolina, el petróleo, los productos petrolíferos y los cigarrillos del ELA. El Gobierno posteriormente promulgó legislación, incluyendo la Ley de Moratoria (Ley 21-2016, con sus enmiendas) y la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico (Ley 5-2017, con sus enmiendas), y una serie de órdenes ejecutivas relacionadas, que, entre otras cosas, suspendió la obligación del ELA de transferir los Ingresos Asignados Condicionalmente a la ACT.

***Promulgación de PROMESA.*** El 30 de junio de 2016, el Presidente promulgó la ley aprobada por el Congreso denominada Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (en inglés, *Puerto Rico Oversight, Management, and Economic Stability Act*, o "PROMESA"), 48 U.S.C. § 2101 *y ss.*, con el objeto de buscar una solución a la crisis fiscal y humanitaria de Puerto Rico. El objetivo de PROMESA es abordar la necesidad inmediata de prestar servicios eficaces a sus ciudadanos, formular una reestructuración de la deuda e implementar la reforma fiscal que lleve a una economía sostenible, responsabilidad fiscal y acceso a los mercados.

*Principales componentes de la Ley PROMESA.* PROMESA establece dos mecanismos fundamentales para restablecer la responsabilidad fiscal. En primer lugar, los Títulos I, II, IV y V de PROMESA establecen la constitución de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión") y determinan las facultades y obligaciones que rigen la supervisión y aceptación de los planes fiscales multianuales, los presupuestos anuales, la revitalización de las infraestructuras y la agilización de proyectos clave de infraestructura. En segundo lugar, los Títulos III y VI de PROMESA contemplan reestructuraciones de la deuda, similares a casos de quiebras y reestructuraciones extrajudiciales, respectivamente, de Puerto Rico y sus instrumentalidades.[11] Al incorporar varias disposiciones del Título 11 del Código de Estados Unidos (el "Código de Quiebras") en el Título III de PROMESA, que estipula reestructuraciones similares a las previstas por los Capítulos 9 y 11 del Código de Quiebras, la ley también protege a los deudores contra las actuaciones judiciales de los acreedores[12] que, de otra manera podrían absorber miles de millones de dólares del Estado Libre Asociado e infligir daños irreparables a la economía puertorriqueña. La ley incluye atributos únicos, como la activación de una paralización automática una vez que el proyecto de ley fuera promulgado como legislación. La Junta de Supervisión pasó a ser la representante única de toda entidad deudora en cualquier caso de Título III, con facultades exclusivas para proponer un plan de ajuste. El Título VI de la Ley PROMESA prevé un proceso de reestructuración alternativa y extrajudicial sujeto a umbrales de votación.

*Problemas históricos que llevaron a la creación de la Junta de Supervisión.* Con el objeto de superar varias décadas de grave retroceso económico, déficits de explotación, falta de transparencia fiscal, ineficiencia de la gestión y excesivo endeudamiento,[13] la Ley PROMESA estableció una entidad autónoma dentro del gobierno de Puerto Rico: la Junta de Supervisión.[14] La Junta de Supervisión es "una entidad dentro del gobierno territorial", en lugar de un "departamento, agencia, institución o instrumentalidad del Gobierno Federal".[15] La Junta de Supervisión está encargada por ley de restablecer la responsabilidad fiscal del Estado Libre Asociado y su acceso a los mercados.[16] Para cumplir su obligación legal, la Junta de Supervisión está facultada para supervisar la reestructuración de la deuda del Estado Libre Asociado y de sus instrumentalidades, y para exigir reformas fiscales. Algunos elementos de esta autoridad han sido objetados,[17] aunque fueron confirmados por el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal de Título III") y el Tribunal de Apelaciones de los Estados

---

[11]   48 U.S.C. § 2161.

[12]   11 U.S.C. § 362(a) (incorporado al Caso de Título III por 48 U.S.C. § 2161(a)).

[13]   PROMESA § 405(m)(1).

[14]   48 U.S.C. § 2121(b)(1).

[15]   *Ibidem* § 2121(c); *véase también* 48 U.S.C. § 2194(i)(2) (donde se define el término "Gobierno de Puerto Rico" para incluir a la Junta de Supervisión para todos los fines de esa sección); 48 U.S.C. § 2127(b) (que estipula que la Junta de Supervisión es financiada exclusivamente por el gobierno territorial de Puerto Rico).

[16]   PROMESA § 101(a).

[17]  Los resúmenes de las presentaciones judiciales de esta Declaración de Divulgación han sido plenamente calificados por los documentos presentados públicamente.

Unidos para el Primer Circuito (el "Primer Circuito") y la Corte Suprema de los Estados Unidos (la "Corte Suprema").[18]

*Actuaciones iniciales de la Junta de Supervisión para cumplir el mandato de la Ley PROMESA.* El 31 de agosto de 2016, el Presidente Obama designó a los siete integrantes con derecho a voto de la Junta de Supervisión que, en virtud de PROMESA, prestarían sus servicios sin remuneración, aunque tendrían derecho al reintegro de los gastos razonables y necesarios incurridos en el desempeño de sus funciones.[19]   Cuando fue designada, la Junta de Supervisión carecía de personal, de instalaciones y de datos. Sus primeros pasos consistieron en conseguir instalaciones y en captar expertos para cumplir su cometido.

El 30 de septiembre de 2016, la Junta de Supervisión (i) anunció un proceso para la elaboración, presentación, aprobación y certificación de planes fiscales para el Estado Libre Asociado y las instrumentalidades territoriales correspondientes cubiertas, entre ellas la ACT, (ii) designó un grupo inicial de 63 entidades sujetas a la Ley PROMESA,[20] (iii) solicitó al Gobernador un volumen significativo de información financiera y presupuestaria como primer paso para elaborar mejoras de la gobernanza tributaria, la rendición de cuentas, los controles internos y los asuntos financieros del Gobierno, e (iv) inició el proceso de proyectos críticos autorizados por el Título V de la Ley PROMESA estableciendo criterios y procesos de selección para agilizar ciertos proyectos de energía e infraestructura críticos. Además, la Junta de Supervisión inició reuniones con representantes de varios grupos de acreedores, entre ellos tenedores de bonos y aseguradoras de la ACT, y varios otros.

*Inicio de los Casos de Título III del ELA y la ACT.* Cuando se promulgó la Ley PROMESA, estableció una paralización automática temporal para proteger al Estado Libre Asociado y a sus instrumentalidades territoriales contra actuaciones de acreedores para cobrar sus deudas hasta el 1 de mayo de 2017.[21]   Una vez concluida la paralización prevista por PROMESA, la Junta de Supervisión inició los casos de Título III del Estado Libre Asociado el 3 de mayo de 2017, de la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") el 5 de mayo de 2017, del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") y la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") el 2 de julio de 2017. El 27 de septiembre de 2019, la Junta de Supervisión también inició un caso de Título III para la Autoridad de Edificios Públicos de Puerto Rico ("AEP").

Asimismo, en el caso de la ACT, después de que la Junta de Supervisión participó en discusiones y deliberaciones amplias con la ACT, la Junta de Supervisión determinó que debía presentarse una petición voluntaria conforme al Título III para la ACT porque era lo que mejor

---

[18]   Para consultar los resúmenes de los litigios pertinentes que impugnan las facultades de la Junta de Supervisión, *véase* la Sección V.F.5 de esta Declaración de Divulgación.

[19]   PROMESA § 101(g).

[20] El 9 de mayo de 2019, la Junta de Supervisión designó asimismo a 78 municipios como entidades cubiertas.

[21] PROMESA §§ 5(11), 405(b). Inicialmente, estaba previsto que la paralización impuesta por PROMESA se extinguiera el 15 de febrero de 2017, pero la Junta de Supervisión la prorrogó setenta y cinco (75) días más, como lo permite la sección 405(d)(1)(B) de PROMESA.

defendía los intereses de los acreedores de la ACT y era necesario y adecuado para proteger a los residentes de Puerto Rico. El 21 de mayo de 2017, la Junta de Supervisión dictó certificaciones de reestructuración de la ACT conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para la ACT conforme a la Sección 304(a) de PROMESA ante el Tribunal de Título III, iniciando un caso bajo el Título III de PROMESA. El inicio de los casos de Título III activó la paralización automática prevista por la Sección 362 de Código de Quiebras, con lo cual las entidades citadas siguieron protegidas contra acciones judiciales hasta tanto se resolviesen los casos de Título III.[22]

Entre el 1 de junio de 2017 y el 9 de octubre de 2019, el Tribunal de Título III presentó ciertas órdenes que concedían de forma colectiva la administración conjunta de los casos de Título III para el ELA, COFINA, la ACT, el SRE, la AEE, y la AEP (colectivamente las "Ordenes de administración conjunta").[23]

***Un nuevo panorama: los huracanes Irma y María.*** En septiembre de 2017 empeoraron las perspectivas de mejorar la situación financiera de Puerto Rico cuando el territorio resultó devastado por los huracanes Irma y María. Estos fenómenos meteorológicos arrasaron gran parte de las infraestructuras de Puerto Rico y trastocaron las vidas de todos los puertorriqueños, así como el trabajo de la Junta de Supervisión.

Inmediatamente después de los huracanes, la Junta de Supervisión ofreció al Gobierno la posibilidad de reasignar hasta $1.000 millones en gastos presupuestados para cubrir los desembolsos vinculados con los desastres. Tras varias reuniones, testimonios ante el Congreso y otras interacciones con el Gobierno Federal y las autoridades de Puerto Rico, la Junta de Supervisión abogó activamente por la obtención de los recursos necesarios para sustentar la recuperación de Puerto Rico, las iniciativas de reconstrucción críticas y la liquidez necesaria.

Los huracanes Irma y María causaron estragos en la infraestructura de transporte de Puerto Rico, provocando daños sin precedentes a las carreteras y otros sistemas de transporte de Puerto Rico. Como resultado del grado sustancial de daño, Puerto Rico se vio obligado a presentar 1,175 Informes Detallados de Inspección de Daños ("DDIR", por sus siglas en inglés). Los DDIR son formularios que deben presentarse ante la Administración Federal de Carreteras (FWHA, por sus siglas en inglés) para evaluar si un evento califica como un desastre que necesita reparación de emergencia, estima los daños que califican como desastres y proporciona un plan del alcance de las obras propuestas para la restauración.

Además de los daños a la infraestructura de los sistemas de transporte de la ACT, los ingresos operativos de la ACT también disminuyeron como resultado directo de la destrucción causada por la acción combinada de los huracanes. Los ingresos operativos de la ACT consisten principalmente en el cobro de peajes, multas de peaje y tarifas de tránsito. Debido a los efectos de los huracanes sobre el sistema de peajes de la ACT, Puerto Rico se vio obligada a suspender el cobro de multas, que ya constituía un problema preexistente para Puerto Rico debido a deficiencias

---

[22]  PROMESA § 301(a).

[23]  Caso Núm. 17-3283 ECF Núm. 242, 537, 1417 y 8829. Los números de ECF que se citan en la Declaración de Divulgación se refieren al Caso Principal Núm. 17-03283 (el caso de Título III del ELA) a menos que se indique lo contrario.

04/30/2022 3:29 PM" ""

preexistentes en el sistema de cobros. Durante FY2021-FY2022, los ingresos por peajes volvieron a los niveles previos al desastre; sin embargo, el cobro de multas de peajes todavía presentaban un atraso con respecto a los niveles previos al desastre, debido a que las multas se estipularon como $0 en el FY2020 y el FY2021 y no se reestablecieron hasta el FY2022 (julio de 2021). Durante el primer semestre del FY2022 (diciembre de 2021), la ACT recaudó $20.5 millones en multas de peaje, lo que supera significativamente el presupuesto para ese período ($8.1 millones). Este aumento positivo fue causado por porcentajes de infracciones superiores a las esperadas, además de un cobro más elevado de multas después de que estas se restauraron. El número de pasajeros en el Tren Urbano cayó en casi un 30% después de los huracanes[24] y todavía no ha alcanzado los niveles anteriores a los huracanes. A junio de 2021, el número de pasajeros en el Tren Urbano todavía estaba 78% por debajo de los niveles previos a los huracanes, lo que se atribuye principalmente a la pandemia de COVID-19.

Para el 16 de diciembre de 2021, se han desembolsado aproximadamente el sesenta por ciento (60%) de los fondos para reparaciones de emergencia relacionadas con los huracanes Irma y María. Durante FY2022-FY2026, es necesario que se acelere el cumplimiento del programa de obras de reparación de emergencia. Las mejoras que la ACT todavía no ha completado incluyen la instalación de un puente modular, reparaciones de aludes, limpieza de puentes, instalación de dispositivos de seguridad y otros proyectos de reconstrucción de las carreteras. Se han presentado propuestas para los primeros proyectos de reparación permanentes asociados con la señalización, la seguridad y la mejora del alumbrado.

***Terremotos y réplicas.*** El 7 de enero de 2020, un terremoto de magnitud 6.4 causó daños considerables en toda la región sur y sudoeste de Puerto Rico, causando el cierre de segmentos de carreteras, incluyendo dos segmentos cortos de dos carreteras importantes: PR-52 (km 106 en Ponce), PR-2 (km 218 en Peñuelas y km 153.9 en Mayagüez). Este terremoto se produjo después de una serie de terremotos que se inició en diciembre de 2019. Como resultado, el Gobierno Federal clasificó a varias municipalidades como áreas de desastres de gran magnitud.[25] Como respuesta ante estos terremotos, la Junta de Supervisión autorizó el uso de Fondos de Reserva para Emergencias, asignando $260 millones en reservas. Además, el presidente Trump firmó una declaración de catástrofe grave que autorizaba asistencia individual y asistencia pública para las municipalidades afectadas y mitigación de riesgos en todo el ELA, habilitando una serie de ayudas federales en virtud de la Ley Stafford. Esta declaración autoriza a los fondos de asistencia ante desastres a complementar los esfuerzos de recuperación del ELA y los gobiernos locales ante las consecuencias de los terremotos.

***Impacto y respuesta a la pandemia de COVID-19.*** El 11 de marzo de 2020, la Organización Mundial de la Salud declaró a la Enfermedad del Coronavirus 2019 ("COVID-19") como una pandemia mundial. Como resultado de la amenaza sanitaria y para contener la propagación del virus en Puerto Rico, el entonces gobernador Vázquez-Garced emitió una orden ejecutiva el 12 de marzo de 2020, declarando el estado de emergencia en Puerto Rico para

---

[24]  Datos del número de pasajeros del Tren Urbano de la ACT, que comparan los 12 meses anteriores al Huracán María con los 12 meses posteriores a la reanudación del servicio del Tren Urbano.

[25]  Las municipalidades de Ponce, Guanica, Guayanilla, Yauco, Utuado, Peñuelas, Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San Germán, San Sebastián, y Villalba fueron declaradas áreas de desastre de magnitud como resultado de los terremotos del 7 de enero de 2020.

concentrar todos los esfuerzos e implementar las medidas necesarias para salvaguardar la salud, el bienestar y la seguridad pública de los ciudadanos de Puerto Rico. Como resultado de la cuarentena implementada para contener al virus, las operaciones y el desempeño financiero de la ACT sufrieron una caída drástica. La cuarentena tuvo un efecto negativo directo sobre las transacciones mensuales de peaje de la ACT, el tráfico de vehículos y la ejecución de proyectos de capital.

La ACT tuvo una importante disminución de las transacciones de peajes debido a la pandemia de COVID-19, que en definitiva causó una disminución de los ingresos de la ACT porque los ingresos operativos de la ACT consisten principalmente en el cobro de peajes, multas de peajes y tarifas de tránsito. Las cuatro carreteras con peaje de la ACT experimentaron una reducción del cuarenta y cinco por ciento (45%) en el número de transacciones mensuales de peajes, con una caída desde 10.3 millones de dólares por mes[26] como promedio en transacciones de peajes antes de la pandemia de COVID-19, a un promedio de 5.6 millones de dólares por mes[27] durante el punto más alto de la pandemia. No obstante, durante el FY2021 y el FY2022, las transacciones mensuales de peajes se han aproximado a los niveles pre-COVID, alcanzando un promedio mensual de 9.8 millones de transacciones de peaje para el FY2021[28] y un promedio de 10.7 millones de transacciones de peajes registradas para el FY2022 hasta diciembre de 2021.

A diferencia de las transacciones de peaje, la demanda de tránsito ha mostrado escasos signos de mejora, dado que los ingresos mensuales promedios del Tren Urbano permanecen por debajo de los niveles pre-COVID a aproximadamente sesenta y cuatro por ciento (64%) para el FY2021 y cincuenta y dos por ciento (52%) para el primer semestre del FY2022.[29] La demanda estancada del tránsito se ha visto exacerbada por ineficiencias operativas en el sistema de tránsito de la ACT (por ej., molinetes averiados, sistemas de TI obsoletos) que han reducido la accesibilidad para el público y el atractivo de las instalaciones, y han sido el motivo de un servicio de calidad inferior.

La pandemia de COVID-19 también ha causado demoras significativas en los cronogramas de obras de construcción, por lo cual la ACT no ha podido alcanzar su Indicador Clave de Rendimiento ("KPI", por sus siglas en inglés) para la duración de las obras. Al 31 de marzo de 2020, la ACT cumplió el KPI objetivo establecido por el Memorando de Entendimiento ("MOU", por sus siglas en inglés) con la Administración Federal de Carreteras ("FHWA", por sus siglas en

---

[26] Transacciones mensuales promedio para el período de seis meses desde septiembre de 2019 hasta febrero de 2020 (antes de COVID-19).

[27] Transacciones mensuales promedio para el período de tres meses desde marzo de 2020 hasta mayo de 2020 (cuarentena de COVID-19).

[28] Transacciones mensuales promedio para el período de doce meses desde julio de 2020 hasta junio de 2020 (período posterior a la cuarentena).

[29] Al comparar el período de seis meses desde septiembre de 2019 hasta febrero de 2020 (es decir, un período anterior a la pandemia de COVID-19) con el período de seis meses desde enero de 2021 hasta junio de 2021 — los últimos seis meses del FY2021 (es decir, el período posterior a la cuarentena) y el período de seis meses desde julio de 2021 hasta diciembre de 2021 para el FY2022 (es decir, el período de seis meses más reciente).

inglés) de la ACT.[30]   Sin embargo, como resultado de la pandemia de COVID-19, se ha calculado que la duración proyectada de las obras de reparaciones posteriores a los huracanes aumentará un 64.3%[31], lo que no cumple el objetivo de finalización "a tiempo" establecida en el MOU de la ACT con la FHWA. Este aumento significativo es ampliamente atribuible a los cincuenta y seis días de cuarentena, que requirieron medidas de protección y limitaciones laborales sobre los contratos, lo que tuvo como resultado extensiones y demoras adicionales proyectadas.

Para ayudar a combatir los efectos económicos de los procedimientos de cuarentena por COVID-19, la orden ejecutiva del Gobernador autorizó a la Secretaría de Hacienda del ELA y el Director de la Oficina de Gerencia y Presupuesto de Puerto Rico ("OGP") a establecer un presupuesto especial, a partir de cualquier fondo disponible, incluyendo la Reserva de Emergencia, para cubrir todos los costos necesarios para la contención de COVID-19 en todo Puerto Rico y compartiendo información con las municipalidades.

Se proporcionaron fondos del gobierno federal y local a personas físicas, familias, empresas, organizaciones sin fines de lucro y otras organizaciones en todo Estados Unidos, incluido Puerto Rico. El 3 de marzo de 2020, la Junta de Supervisión puso a disposición del Gobierno un monto inicial de $5 millones de los Fondos de la Reserva de Emergencia para contener y mitigar la pandemia de COVID-19. El 13 de marzo de 2020, la Junta de Supervisión puso a disposición el resto de los $260 millones de los Fondos de Reserva de Emergencia para responder a la pandemia. El 23 de marzo de 2020, el Gobierno y la Junta de Supervisión acordaron proporcionar $787 millones en apoyo financiero (Paquete de Apoyo a las Medidas de Emergencia) a quienes están en primera línea de la pandemia de COVID-19 y a los más afectados por las medidas de emergencia que se han producido. La ACT intentó mitigar los efectos de COVID-19 en las propias operaciones de tránsito de la ACT con la implementación de procedimientos operativos estándar ("SOP") durante la cuarentena. La ACT estableció procedimientos para el pago de contratistas, proveedores y consultores clave que trabajaban con la ACT y en las carreteras de la ACT durante la cuarentena, y al reanudarse las operaciones de construcción y otras operaciones de campo. La ACT priorizó el pago del trabajo ya completado para mitigar los efectos económicos duraderos y para proporcionar a los contratistas una mayor seguridad financiera y estabilidad durante la cuarentena. La ACT creó SOP para mantener el cumplimiento de los protocolos y la alineación de los recursos para manejar el proceso federal de reembolso a distancia. La ACT también implementó procedimientos remotos para la documentación requerida cuando se reanuden las operaciones parciales de campo, incluyendo solicitudes de información, órdenes de cambio y órdenes de trabajo extra. La ACT también autorizó la aceptación de documentos electrónicos en lugar de aceptar únicamente copias físicas firmadas.

El 27 de marzo de 2020, la Ley de Ayuda, Alivio y Seguridad Económica por el Coronavirus, Ley Pública Núm. 116-136 (la "Ley CARES", por sus siglas en inglés), fue promulgada por el presidente Donald J. Trump. La Ley CARES creó el Fondo de Ayuda para el Coronavirus ("CRF", por sus siglas en inglés), que proporcionó $150 mil millones en asistencia

---

[30]   Los KPI establecidos dentro del MOU de la ACT con la FHWA establecieron el objetivo para el cambio en la duración (a nivel de programa) a menos de 25% para que sea aceptable. Al 31 de marzo de 2020, las obras de reparación posteriores a María presentan un aumento del 22.8% en la duración de los proyectos.

[31]   Como aparece en los informes B2A de la ACT para el mes terminado el 30 de junio de 2021.

general para los gobiernos del país. Se asignaron $2.2 mil millones en concepto de reparación a Puerto Rico a través del CRF. La fecha límite para gastar los fondos del CRF era inicialmente el 30 de diciembre de 2020, pero se extendió hasta el 31 de diciembre de 2021 mediante la Ley de Asignaciones Consolidadas de 2021, Ley Pública Núm. 116-260, que se promulgó el 27 de diciembre de 2020. Además de la extensión, la Ley también combina $900 mil millones de ayuda de estímulo para la pandemia de COVID-19 en los Estados Unidos con un proyecto de ley general de gastos de $1.4 billones para el año fiscal federal 2021. De los aproximadamente $900 mil millones de ayuda de estímulo, se estima que Puerto Rico recibirá $7 mil millones. El 11 de marzo de 2021, el presidente Biden promulgó la Ley del Plan de Rescate Estadounidense de 2021 ("ARP", por sus siglas en inglés). ARP asignó $1.9 billones a nivel nacional para financiamiento, cambios en los programas y políticas impositivas con el fin de mitigar los efectos persistentes de la pandemia. ARP otorgó $350 mil millones adicionales en ayuda para los gobiernos estatales y locales, de los cuales $4 mil millones están destinados a Puerto Rico (incluyendo las municipalidades).

Con respecto a las leyes antes mencionadas de emergencia federal, la ACT ha recibido asignaciones de emergencia de la Administración Federal de Tránsito ("FTA", por sus siglas en inglés) y la FHWA. Más específicamente, dentro de la Ley de Asignaciones Consolidadas de 2021, la FHWA asignó un monto de aproximadamente $35 al Programa de Carreteras de Puerto Rico.

***Nuevos fondos federales.*** El 11 de noviembre de 2021, el presidente Biden promulgó la Ley de Inversión en Infraestructura y Empleos (la "IIJA", por sus siglas en inglés), que otorga fondos por $1.2 billones y que tuvo el propósito doble de (1) proporcionar extensiones y aumentos al financiamiento para el FY2022 hasta el FY2026 para varios programas de la Ley de Reparación del Transporte de Superficie de Estados Unidos (la "Ley FAST", por sus siglas en inglés) y (2) crear nuevos programas de financiamiento y asignaciones para el transporte de superficie, la aviación, el agua, el clima y la banda ancha. La IIJA asigna más de $550 mil millones en nuevos gastos a lo largo de cinco años. La ACT recibirá aumentos a las fuentes existentes de financiamiento federal (como el Programa de Autopistas de Puerto Rico) y nuevos programas como el Programa de Reemplazo, Rehabilitación, Conservación, Protección y Construcción de Puentes. Puerto Rico es elegible para recibir aproximadamente $2.5 mil millones en subsidios por fórmula entre el FY2022 y el FY2026 y es elegible para competir por una parte de aproximadamente $380 mil millones en programas discrecionales. Se espera que la ACT en particular sea elegible para recibir hasta $300-400 en financiamiento incremental por fórmula de la IIJA entre FY2022-2026 (autopistas, tránsito y puentes, suponiendo que la ACT expandiera su programa de capital de manera tal que los gastos de capital fueran equivalentes a los fondos de fórmula disponibles).

***Primer Plan Fiscal certificado de la ACT.*** Para cumplir su misión de alcanzar la responsabilidad fiscal y el acceso al mercado, desde 2016 la Junta de Supervisión ha trabajado estrechamente con la AAFAF, la ACT y sus asesores, con el fin de desarrollar e implementar planes fiscales y presupuestos para la ACT de acuerdo con los requisitos de PROMESA. La Junta de Supervisión, junto con sus asesores, han pasado cientos de horas en sesiones de investigación y trabajo para entender la situación actual de la ACT, incluyendo las interacciones de la ACT con el ELA y el Gobierno Federal. La Junta de Supervisión también analizó oportunidades potenciales para mejorar el desempeño financiero y operativo de la ACT, por medio de mejores prácticas, fuentes externas de datos y fuentes internas de datos proporcionados por la ACT.

En noviembre de 2016, la Junta de Supervisión anunció que la ACT estaría obligada a desarrollar y certificar su propio plan fiscal. El Gobierno presentó su primera propuesta de plan fiscal para la ACT el 21 de febrero de 2017. Después de incorporar revisiones adicionales y comentarios del público, la Junta de Supervisión certificó el primer plan fiscal de la ACT el 28 de abril de 2017 (el "Plan Fiscal de la ACT de abril de 2017"). El plan fiscal certificado de la ACT se basaba en la propuesta de plan fiscal del Gobierno, con seis enmiendas agregadas por la Junta de Supervisión. Se han certificado anualmente planes fiscales subsiguientes para la ACT y se describen con más detalle a continuación.

***Nuevos planes fiscales.*** Después de los huracanes Irma y María, ocurridos en septiembre de 2017, la Junta de Supervisión procuró recertificar el Plan Fiscal de la ACT de abril de 2017 para abordar los efectos fundamentales de los huracanes sobre Puerto Rico. El 20 de abril de 2018, la Junta de Supervisión votó para certificar el plan fiscal de la ACT (el "Plan Fiscal de la ACT de abril de 2018"), que debía describir un programa para transformar los sistemas de infraestructura de tránsito y autopistas de todo Puerto Rico como catalizador del crecimiento económico y para combatir los efectos de la destrucción causada por los huracanes. El plan fiscal revisado de la ACT proyectó un superávit total de $355 millones posterior a las medidas de seis (6) años sobre la base de varios cambios, incluyendo información financiera actualizada previa a las medidas, aumentos en los peajes y reducciones en el costo de personal a un nivel similar al del resto del ELA.

En junio de 2018, la Junta de Supervisión anunció que se revisaría el Plan Fiscal de la ACT de abril de 2018 (el "Plan Fiscal de la ACT de junio de 2018") con cambios técnicos que debían estar en línea con los ajustes al plan fiscal de junio de 2018 del ELA, después del intento fallido de la Legislatura para derogar la Ley 80. Las actualizaciones realizadas al Plan Fiscal de la ACT de junio de 2018 durante el proceso de recertificación fueron en gran medida de naturaleza meramente técnica.

El 5 de junio de 2019, la Junta de Supervisión certificó el plan fiscal de la ACT (el "Plan Fiscal de la ACT de junio de 2019"), que incluyó nueva información y proyecciones financieras para mejorar la calidad de los sistemas de autopistas y tránsito de Puerto Rico. El Plan Fiscal de junio de 2019 reconoció los logros de la ACT en la implementación de medidas con respecto a planes fiscales certificados anteriores para iniciar la transformación de la ACT, proporcionando al mismo tiempo nuevos planes para ciertas medidas e hitos proyectados actualizados acordes al proceso de recuperación de la ACT después del Huracán María. Sin embargo, el Plan Fiscal de la ACT de junio de 2019 también enfatizó la necesidad de una transformación drástica y advirtió que sigue existiendo una brecha significativa entre el desempeño actual de la ACT y los objetivos del plan fiscal.

El 26 de junio de 2020, la Junta de Supervisión certificó un nuevo plan fiscal para la ACT que reflejara los impactos sustanciales de los terremotos de 2020 y la pandemia de COVID-19 sobre la infraestructura de las carreteras de Puerto Rico (el "Plan Fiscal de la ACT de junio de 2020"). El Plan Fiscal de la ACT de junio de 2020 respaldó una transformación total del sistema de transporte de Puerto Rico para proporcionar un futuro económico más productivo, competitivo y flexible para el sistema de transporte de Puerto Rico.

El 27 de mayo de 2021, la Junta de Supervisión certificó el nuevo plan fiscal para la ACT (el "Plan Fiscal de la ACT de mayo de 2021"). El Plan Fiscal de la ACT de mayo de 2021 fue el

2" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

reflejo de nuevos eventos macroeconómicos, de políticas y tecnológicos, teniendo en cuenta los impactos de COVID-19 sobre el sistema de transporte de Puerto Rico. El Plan Fiscal de la ACT de mayo de 2021 resaltó tres cuestiones clave, que constituyen las causas raíz de los desafíos actualmente enfrentados por el sector de transportes: (1) modos individuales de transporte bajo propiedad superpuesta y fragmentada; (2) el manejo de desempeño dentro de los modos de transporte individuales es deficiente y existe escasa coordinación multimodal; y (3) el sistema no aprovecha al máximo el potencial, dejando sin usar fondos públicos y privados. El Plan Fiscal de la ACT de mayo de 2021 introdujo la Reforma del Sector de Transporte, que establece iniciativas clave para abordar el desempeño deficiente del sector de transporte en Puerto Rico. La Reforma del Sector de Transporte emerge de una serie de recomendaciones propuestas por la Junta de Supervisión en la carta de la Sección 205 dirigida al Gobierno el 29 de enero de 2021. Mientras que la implementación de la Reforma del Sector de Transporte requiere el apoyo de las entidades existentes de transporte de la Isla, exige que la ACT, como participante clave en el sector de transporte de Puerto Rico, desempeñe un rol clave en la ejecución de las medidas necesarias para permitir la reforma. La Reforma del Sector de Transporte pretende reorganizar los activos de transporte para mejorar la eficiencia global y el desempeño de los sistemas de transporte en Puerto Rico a través de medidas que promuevan la sostenibilidad a largo plazo. Las medidas fiscales descritas en el Plan Fiscal de la ACT de mayo de 2021 son fundamentales para el éxito financiero a largo plazo de la ACT y encarnan la necesidad de que la ACT optimice los gastos, genere ingresos, y prepare la red de transporte para la sostenibilidad fiscal a largo plazo. Si se implementan de manera correcta y completa, las medidas fiscales incluidas en el Plan Fiscal de la ACT de mayo de 2021 tienen la capacidad de generar $5.6 mil millones en impacto entre FY2022-FY2051, llevando el déficit de base de $2.8 mil millones de la ACT a un superávit de $2.8 mil millones después de las medidas. Se espera que las mejoras de los ingresos, emergentes principalmente del cobro de peajes y de los ajustes de las multas de peajes, sean el origen de la mayor parte del aumento de $5.6 mil millones en los ingresos y ahorros de costos a lo largo del período de treinta (30) años, generando aproximadamente $4.7 mil millones. Los ahorros en los costos contribuirían aproximadamente $1.0 mil millones y el aumento de los cobros de peajes y multas a través de aumentos en los precios y mejoras en el desempeño representaría $4.0 mil millones de los $5.6 mil millones.

El 22 de febrero de 2022, la Junta de Supervisión certificó el nuevo plan fiscal para la ACT (el "Plan Fiscal de la ACT de febrero de 2022"). El Plan Fiscal de la ACT de febrero de 2022 recomienda que la ACT continúe con la Reforma del Sector del Transporte, transfiriendo la propiedad del Tren Urbano a la Autoridad de Tránsito Integrado de Puerto Rico ("ATI"), estableciendo una Oficina de Administración de Peajes con dedicación exclusiva, y promoviendo una asociación público-privada ("P3") para acceder a nuevas fuentes de financiamiento de capital. El Plan Fiscal de la ACT de febrero de 2022 también establece medidas fiscales que generan ingresos y optimizan los gastos. Las medidas de generación de ingresos incluyen aumentos según la inflación sobre tarifas y multas,[32] nuevos sistemas electrónicos para el cobro de peajes y mejoras en el tránsito que permitirían que el Tren Urbano alcance una recuperación de los pasajeros del dieciocho por ciento (18%) para el FY2026. Las medidas de optimización de gastos incluyen la

---

[32]  Entre FY2022 y FY2024, el Plan Fiscal de la ACT de febrero de 2022 estipula aumentos anuales en las tarifas del 8.3%. Desde FY2025 en adelante, los aumentos anuales se ajustan al Índice de Precios al Consumidor ("IPC") más 1.5%, en línea con los acuerdos en vigor con los concesionarios en Puerto Rico.

reevaluación de los contratos del Tren Urbano y la reducción de los gastos en atención médica. Estas medidas generarían aproximadamente $6.0 mil millones en impacto positivo en FY2022-FY2051, llevando el déficit de base de aproximadamente $1.2 mil millones a un superávit de aproximadamente $4.8 mil millones y permitiendo que la ACT ejecute mejoras de capital por aproximadamente $11.6 mil millones que pondrían a las carreteras de Puerto Rico en buen estado.[33]

**Elección del gobernador Pierluisi.** El 3 de noviembre de 2020, Pedro Pierluisi fue elegido Gobernador de Puerto Rico. El Gobernador Pierluisi prestó juramento para un mandato de cuatro años el 2 de enero de 2021.

**Reestructuraciones relacionadas.** En el transcurso de los Casos de Título III, la Junta de Supervisión ha encabezado las negociaciones tendientes a la reestructuración de la deuda, con la convicción de que las negociaciones consensuadas suelen ser mejores que las resoluciones objetadas. Con tal fin, la Junta de Supervisión y el Gobierno obtuvieron avances significativos con las partes interesadas de COFINA sobre una cuestión de si ciertos fondos procedentes del Impuesto sobre Ventas y Uso ("IVU") eran propiedad del Estado Libre Asociado o de COFINA. Estas negociaciones desembocaron en una asignación consensuada de los ingresos del IVU y, en última instancia, a la confirmación exitosa de un plan de ajuste para COFINA el 5 de febrero de 2019, con lo que la deuda de COFINA se redujo de unos $17 mil millones a aproximadamente $12 mil millones. Una vez solucionada la cuestión del IVU, el ELA estuvo un paso más adelante a la hora de reestructurar su deuda, dado que sabía cuáles eran los ingresos del IVU que podría usar. Esto eliminó la incertidumbre sobre miles de millones de dólares reclamados por el ELA y por COFINA.

Una vez resuelta esta cuestión, la Junta de Supervisión reconcentró sus esfuerzos en la generación de un consenso sustancial y apoyo para el marco de un plan de ajuste para el ELA. Para lograr este objetivo, la Junta de Supervisión participó en sesiones de mediación y negociaciones dirigidas por y bajo los auspicios del equipo de mediación designado por el tribunal, presidido por la Juez Principal Barbara J. Houser del Tribunal de Quiebras de Estados Unidos para el Distrito Norte de Texas. Estas sesiones de mediación culminaron con la firma de ciertos acuerdos de apoyo al plan de los acreedores que en definitiva llevaron a la presentación por parte de la Junta de Supervisión del *Octavo Plan de Ajuste Conjunto Enmendado de Título III Modificado del Estado Libre Asociado de Puerto Rico, y otros.* [Caso Núm. 17-3283, ECF Núm. 19367] (el "Plan del Estado Libre Asociado") y la declaración de divulgación relacionada. El Plan del Estado Libre Asociado fue confirmado por el Tribunal de Título III el 18 de enero de 2022, que describió las disposiciones, entre otras cosas, para el arreglo y la transacción de disputas contra el Estado Libre

---

[33] Conforme al Programa de Administración de Activos de Transporte de Puerto Rico ("TAMP", por sus siglas en inglés), la FHWA permite que cada agencia defina lo que significa "buen estado". La ACT define el buen estado para los pavimentos como que, dentro de un período de 25 años, no más del cinco por ciento (5%) de los pavimentos interestatales esté en condiciones deficientes y no más del veinte por ciento (20%) de los pavimentos no interestatales esté en condiciones deficientes. Condición deficiente se define como que el pavimento se califique como deficiente en dos de las siguientes cuatro categorías: aspereza, grietas, surcos y fallas. Programa de Administración de Activos de Transporte de Puerto Rico 2028 (TAMP), en 103, *disponible en* https://act.dtop.pr.gov/wp-content/uploads/2019/10/2028-PRTAMP-Final-Revised-Document-8-Oct-20191.pdf.

Asociado en relación con los Ingresos Asignados Condicionalmente y la emisión de ciertos CVI de recuperación en relación con dicho arreglo y transacción. El 15 de marzo de 2022 fue la fecha de entrada en vigencia del Plan Estado Libre Asociado, y dicho plan se perfeccionó sustancialmente.

Además, en noviembre de 2018, el Gobierno y la Junta de Supervisión completaron una reestructuración del BGF conforme al Título VI de PROMESA (la "Modificación calificatoria del BGF"). El BGF tenía más de $4 mil millones en deuda de bonos heredados y aproximadamente $8 mil millones en pasivos totales. Estas reclamaciones se resolvieron con la emisión de $2.6 mil millones en nuevos bonos bajo el procedimiento del Título VI de PROMESA. Dichos bonos están garantizados principalmente por el flujo de caja de los préstamos que el BGF hizo previamente a los municipios de Puerto Rico y otros activos del BGF. Los objetivos políticos de la Junta de Supervisión y del Gobierno en la reestructuración del BGF eran asegurar que estos nuevos bonos fueran pagaderos únicamente con los activos heredados del BGF, sin recurrir a ninguna futura asignación del gobierno general del Estado Libre Asociado, y amortiguar el efecto financiero de la reestructuración del BGF sobre los numerosos municipios de Puerto Rico que también eran acreedores del BGF.

Además, la Junta de Supervisión obtuvo la aprobación de los tribunales de dos reestructuraciones adicionales a través de modificaciones calificatorias conforme al Título VI de PROMESA con acuerdos con la mayoría de los acreedores de deuda en bonos de (i) la Autoridad de Financiamiento de la Infraestructura de Puerto Rico, y (ii) la Autoridad del Distrito del Centro de Convenciones.

***Motivos para los desacuerdos.*** Mientras que la Junta de Supervisión asumió los desafíos identificados por el Congreso en PROMESA y acumulados en décadas anteriores, exacerbados por los huracanes Irma y María, los terremotos permanentes y la pandemia en curso de COVID-19, varios acreedores, partes interesadas y, a veces, el Gobierno, se mostraron en desacuerdo con las reformas de la Junta de Supervisión y procuraron impugnar el ejercicio de la autoridad y el mandato de la Junta de Supervisión y conforme a PROMESA para lograr la estabilidad económica y el acceso a los mercados de capital para el ELA y sus instrumentalidades cubiertas. También se han producido desacuerdos como resultado de la decisión de la Junta de Supervisión de incluir aumentos a las tarifas de peaje en el plan fiscal certificado que no se han ajustado desde 2005, para mejorar los ingresos de la ACT. Durante el Caso de Título III de la ACT, la Junta de Supervisión procuró aumentar los peajes, pero el entonces gobernador Ricardo Rosselló Nevares no se mostró dispuesto a implementar las reformas necesarias. Algunas de las disputas emergieron de diferentes interpretaciones de PROMESA, la Constitución del ELA, las resoluciones de bonos y otros contratos y leyes aplicables. En general, se producen diferencias entre las personas razonables, y estas diferencias se produjeron y se llevaron a los tribunales.

***Litigios que afectan las reestructuraciones de la deuda.*** En un caso de Título III conforme a PROMESA, se requiere que el plan de ajuste sea coherente con el plan fiscal certificado del deudor.[34] A su vez, el plan fiscal debe contener, entre otras cosas, un análisis de sustentabilidad

---

[34] PROMESA § 314(b)(7).

" = "1" "2621/33260-009 CURRENT/127656480v7                                04/30/2022 3:29 PM" ""

de la deuda.[35] Los acreedores que consideraron que el plan fiscal certificado del ELA contenía un análisis de sustentabilidad de la deuda que demostraba que el ELA podía emitir menos deuda nueva para pagar las reclamaciones de los acreedores que lo que los acreedores consideraban sustentable, iniciaron acciones legales y procuraron evitar que la Junta de Supervisión propusiera un plan de ajuste coherente con el plan fiscal certificado del ELA. Algunos acreedores también pidieron la anulación del plan fiscal certificado del ELA, y obligar al traspaso de miles de millones de dólares en ingresos. *Véase* la sección V.F.5 de esta Declaración de Divulgación para obtener un resumen de los litigios contra la Junta de Supervisión.

PROMESA dispone expresamente que "Ningún tribunal de distrito de los Estados Unidos tendrá jurisdicción para atender objeciones a las determinaciones de certificación tomadas por la Junta de Supervisión bajo esta Ley".[36] Ningún acreedor solicitó un interdicto contra la Junta de Supervisión y las reclamaciones de los acreedores para el traspaso de ingresos fueron desestimadas por falta de jurisdicción o denegadas por sus méritos. Específicamente, los tribunales de primera y segunda instancia determinaron que la Sección 922(d) del Código de Quiebras no requiere la aplicación de ingresos especiales pignorados a la deuda de ingresos especiales durante los Casos de Título III, y la Corte Suprema de Estados Unidos denegó dos peticiones de *certiorari* solicitando revisión adicional.[37]

***Antecedentes del Acuerdo de Apoyo al Plan de la ACT/ADCC.*** Las negociaciones que culminaron con la presentación del Plan de la ACT se iniciaron en el contexto de negociaciones amplias con respecto al ELA y a ciertas de sus otras instrumentalidades deudoras. Durante el Caso de Título III de la ACT, la Junta de Supervisión, con la asistencia del Equipo de Mediación,[38] desarrolló negociaciones en profundidad con varios grupos de acreedores del ELA y la ACT.

El 9 de febrero de 2021, con el fin de cumplir una fecha límite impuesta por el Tribunal para presentar un plan conjunto de ajuste para el ELA, la AEP, y el SRE, y como resultado de meses de negociaciones, mediaciones y discusiones informales, la Junta de Supervisión, como representante del ELA, llegó a un acuerdo en principio con ciertos tenedores de bonos del ELA y la AEP sobre los términos de un plan de ajuste para el ELA y la AEP. El 22 de febrero de 2021, se memorializó el acuerdo en el acuerdo de Apoyo al Plan (el "AAP de GO/AEP") con tenedores de más de $11.7 mil millones de reclamaciones de bonos del ELA y la AEP, incluyendo ciertos inversionistas municipales tradicionales y las aseguradoras de bonos monolínea Assured Guaranty Corp. y Assured Guaranty Municipal Corp. (colectivamente, "Assured"), Syncora Guarantee Inc. ("Syncora"), y National Public Finance Guarantee Corp. ("National") en sus capacidades limitadas como se acordó en el AAP de GO/AEP. El AAP de GO/AEP resolvió disputas pendientes con

---

[35] PROMESA § 201(b)(1)(I).

[36] PROMESA § 106(e).

[37] *Assured Guar. Corp. c. Junta de Sup. y Admin. Financiera para Puerto Rico (En el caso Junta de Sup. y Admin. Fin. para P.R.)*, 919 F.3d 121 (1er Cir. 2019), *cert. denegado*, Núm. 19-391, 140 S. Ct. 855 (2020).

[38] El "Equipo de Mediación" es el grupo mediador presidido por la Juez Barbara J. Houser, del Tribunal de Quiebras de los Estados Unidos para el Distrito Norte de Texas (la "Presidente del Equipo de Mediación"), establecido por el Tribunal de Título III en virtud de su *Orden de nombramiento del Equipo de Mediación* del 23 de junio de 2017 [ECF Núm. 430].

tenedores de Bonos GO y Bonos de la AEP, incluyendo, entre otras, disputas relacionadas con la validez, prioridad y situación asegurada de los bonos.[39] Poco después, el 8 de marzo de 2021, la Junta de Supervisión presentó el *Segundo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* ("Segundo Plan Enmendado del ELA")[40] y la declaración de divulgación asociada,[41] que reflejaba las transacciones alcanzadas en el AAP de GO/AEP.

El Segundo Plan Enmendado del ELA también disponía el tratamiento de reclamaciones contra el Estado Libre Asociado por parte de los tenedores y aseguradoras de bonos de la ACT, la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCC") y la Autoridad de Financiamiento de la Infraestructura de Puerto Rico ("AFI") emergentes de o relacionadas con la retención por parte del ELA de ciertos fondos históricamente asignados y transferidos a la ACT, la ADCC y la AFI, respectivamente (las "Reclamaciones de bonos de ingresos"). Sin embargo, en el momento de la presentación del Segundo Plan Enmendado del ELA, no se había llegado a ningún acuerdo específico con estos tenedores de reclamaciones, y una serie significativa de litigios con respecto a las Reclamaciones de Bonos de Ingresos continuaba pendiente contra el ELA entre la Junta de Supervisión, como representante del ELA, por un lado y las Aseguradoras Monolínea (entre otros), por otro lado, con respecto, entre otras cosas, supuestos sobre propiedad, interés de seguridad, fideicomisos y otros intereses de propiedad consuetudinarios, en esos ciertos ingresos retenidos por el ELA.

Después de la presentación del Segundo Plan Enmendado del ELA y la celebración del AAP de GO/AEP en febrero de 2021, se desarrollaron negociaciones con respecto a la posibilidad de lograr una resolución consensuada del tratamiento de las Reclamaciones de Bonos de Ingresos y la reestructuración de los Bonos de la ACT y los Bonos de la ADCC que involucrarían a las Aseguradoras Monolínea y otros.

***Celebración del Acuerdo de Apoyo al Plan de la ACT/ADCC.*** La Junta de Supervisión y las Aseguradoras Monolínea (a través de sus respectivos asesores y directamente entre sí) participaron en sesiones formales de mediación y también en discusiones informales, procurando resolver cualquier reclamación emergente de o relacionada con los fondos históricamente asignados y transferidos a la ACT y la ADCC por el ELA, incluyendo reclamaciones de una propiedad u otro interés sobre estos ingresos, independientemente de si los ingresos fueron realmente transferidos por el ELA a la ACT y la ADCC, respectivamente.

Como resultado de esas negociaciones, el 5 de mayo de 2021, la Junta de Supervisión, como representante del ELA y la ACT, ciertos tenedores de Reclamaciones de Bonos de la ACT, ciertos tenedores de Reclamaciones de Bonos de la ADCC (ambos definidos en el Acuerdo de Apoyo al Plan de la ACT/ADCC), Assured y National celebraron el Acuerdo de Apoyo al Plan de la ACT/ADCC. El Acuerdo de Apoyo al Plan de la ACT/ADCC fue firmado por los tenedores de reclamaciones por más de $2 mil millones con respecto a los Bonos de la ACT, incluyendo más del 85% de los Bonos de la ACT de 1968, casi el 50% de los Bonos Prioritarios (Senior) de la

---

[39]  ECF Núm. 18791-6.

[40]  ECF Núm. 15976.

[41]  ECF Núm. 15977.

ACT de 1998, y casi el 40% de los tenedores de reclamaciones relacionadas con los Bonos de la ADCC. Entre otras cosas. el Acuerdo de Apoyo al Plan de la ACT/ADCC proporcionó el marco para resolver las Reclamaciones de Bonos de Ingresos contra el ELA.

***Apoyo adicional para el Acuerdo de Apoyo al Plan de la ACT/ADCC.*** Después de la celebración del Acuerdo de Apoyo al Plan de la ACT/ADCC, continuaron las negociaciones iniciadas con la asistencia y la orientación del Equipo de Mediación entre la Junta de Supervisión, en nombre del ELA, y ciertas Aseguradoras Monolínea — Ambac Assurance Corporation ("<u>Ambac</u>") y Financial Guaranty Insurance Company ("<u>FGIC</u>") (ninguna de las cuales había sido firmante del Acuerdo de Apoyo al Plan de la ACT/ADCC en ese momento) — con respecto a una posible reestructuración consensuada de los Bonos de la AFI y reclamaciones contra el ELA emergentes de o relacionadas con los Bonos de la AFI. A lo largo de varias semanas, se realizaron numerosas sesiones de mediación y discusiones informales entre representantes de la Junta de Supervisión, Ambac y FGIC, y sus respectivos asesores.

Durante el transcurso de las negociaciones, Ambac y FGIC presentaron acumulaciones al Acuerdo de Apoyo al Plan de la ACT/ADCC, sujetas al derecho de rescindir el Acuerdo de Apoyo al Plan de la ACT/ADCC, únicamente con respecto a sí mismos, en o antes del 26 de julio de 2021. Mientras tanto, continuaron las negociaciones entre las partes con respecto a reclamaciones relacionadas con los ingresos por el impuesto al ron cubiertos por el gobierno de Estados Unidos al ELA y luego transferidos históricamente a la AFI por el ELA, pero que habían sido retenidos por el ELA en años recientes. Como resultado de esas negociaciones, el 27 de julio de 2021, la Junta de Supervisión, como representante del ELA, ciertos tenedores de Reclamaciones de Bonos de la AFI, incluyendo a Ambac y FGIC (en sus capacidades limitadas acordadas en el Acuerdo de Apoyo al Plan de la AFI), celebraron el Acuerdo de Apoyo al Plan de la AFI.[42] Como parte de este acuerdo, Ambac y FGIC también aceptaron como vinculantes los términos del Acuerdo de Apoyo al Plan de la ACT/ADCC, sin derecho adicional a la rescisión.[43]

Las acumulaciones de Ambac y FGIC al Acuerdo de Apoyo al Plan de la ACT/ADCC y la firma del Acuerdo de Apoyo al Plan de la AFI resolvieron los litigios de las Reclamaciones de los Bonos de Ingresos restantes contra el ELA, dado que involucraba a las Monolíneas.

En el momento de la presentación de esta Declaración de Divulgación, el Acuerdo de Apoyo al Plan de la ACT/ADCC tiene el respaldo de (i) $384 millones de reclamaciones de la ADCC (100%), (ii) más de $700 millones del monto total de las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), y Reclamaciones de Bonos de la ACT 68 (National), (más de 85%), y (iii) más de $2.1 mil millones del monto total de Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC), y Reclamaciones de Bonos

---

[42]  ECF Núm. 18791-8.

[43]  ECF Núm. 18791-7, 18791-8.

Prioritarios (Senior) de la ACT 98 (National) (más de 67%, en base a la presentación EMMA de fecha 16 de julio de 2021).

*Antecedentes de la Estipulación de la ARD.* El 7 de noviembre de 2018, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico aprobó la Modificación Calificatoria del BGF. Para que la Modificación Calificatoria del BGF entre en vigencia, el ELA creó, conforme a la *Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento de Puerto Rico*, Ley 109-2017 (la "Ley de Reestructuración del BGF"), la Autoridad de Recuperación de la Deuda del BGF ("ARD"), un fideicomiso público legal e instrumentalidad pública del gobierno del ELA.[44]

Conforme a un Acuerdo Maestro de Transferencia, de fecha 29 de noviembre de 2018 (el "Acuerdo de Transferencia"), entre la ARD y el BGF, el BGF transfirió sustancialmente todos sus activos a la ARD, incluyendo, entre otras cosas, los derechos legales, título e interés del BGF en veintitrés pagarés emitidos por las ACT a favor del BGF (los "Pagarés de la ACT") y $200,000,000 en concepto de monto original total del capital de los Bonos Prioritarios (Senior) de la ACT 98.

AmeriNational Community Services, LLC (como administrador de préstamos de la ARD), y Cantor-Katz Collateral Monitor LLC (una sociedad de responsabilidad limitada constituida en Delaware y como monitor de garantía para Wilmington Trust, N.A.) (colectivamente, las "Partes de la ARD") iniciaron acciones, presentaron escritos y participaron en relación con numerosas acciones relacionadas con los casos de Título III del ELA y de la ACT (colectivamente, las "Disputas relacionadas con la ARD"), incluyendo, entre otros:[45] (1) mociones de levantamiento de la paralización de las Partes de la ARD, (2) moción de gastos administrativos, (3) procedimiento contradictorio de la ARD, (4) proceso contencioso de la AEP, (5) moción de la Sección 926, (6) mociones de levantamiento de la paralización de otras partes, (7) Objeciones vinculadas a la deuda, (8) Acciones de Recuperación  y (9) Litigio de Uniformidad.

*Celebración de la Estipulación de la ARD.* El 5 de noviembre de 2021, las Partes de la ARD y la Junta de Supervisión celebraron una estipulación (la "Estipulación de la ARD") [ECF Núm. 19100], en la que las partes acordaron acordar y transigir las Disputas Relacionadas con la ARD y para las Partes de la ARD en respaldo del Plan de la ACT y los procesos de convocatoria relacionados, y votar para aceptar el Plan de la ACT, entre otras cosas.

*Celebración del Acuerdo del Comité de la ACT.* El 9 de mayo de 2022, la Junta de Supervisión y el Comité de Acreedores celebraron un acuerdo de fecha 9 de mayo de 2022 (el "Acuerdo del Comité de la ACT"), que disponía los términos de una conciliación global con respecto al tratamiento de las Reclamaciones Generales Sin Garantía de la ACT, incluyendo, entre otras cosas, el aumento del Recobro de GUC de la ACT, de $25 millones a $48 millones. Conforme al Acuerdo del Comité de la ACT, el Comité de Acreedores aceptó apoyar el Plan de la ACT incorporando dicha conciliación global.

---

[44]  7  An. Leyes P.R. § 3171.

[45]  *Véase* la Sección II.B.1(b) de esta Declaración de Divulgación para obtener una lista de las disputas vinculadas a la ARD.

[*El resto de la página se deja intencionalmente en blanco*]

## II.   **Introducción**

***Inicio del Caso de Título III.*** El 3 de mayo de 2017 (la "Fecha de Petición del ELA"), la Junta de Supervisión dictó una certificación de reestructuración para el ELA conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para el ELA conforme a la Sección 304(a) de PROMESA ante el Tribunal de Título III, iniciando un caso bajo el Título III de PROMESA (el "Caso de Título III del ELA").

El 21 de mayo de 2017 (la "Fecha de Petición de la ACT"), la Junta de Supervisión dictó una certificación de reestructuración para ACT conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para ACT conforme a la Sección 304(a) de PROMESA ante el Tribunal de Título III, iniciando un caso bajo el Título III de PROMESA (el "Caso de Título III de la ACT"). El Caso de Título III del ELA y el Caso de Título III de la ACT son administrados conjuntamente para fines administrativos bajo el Caso Principal Núm. 17-3283-LTS. Tal como lo prevé la Sección 315 de PROMESA, la Junta de Supervisión es la representante exclusiva del ELA y de la ACT en sus Casos de Título III.

***Certificación del Plan de la ACT.*** El 13 de mayo de 2022, conforme a la Sección 104(j) de PROMESA, la Junta de Supervisión certificó la presentación del *Plan de Ajuste Enmendado de Título III de la Autoridad de Carreteras y Transportación de Puerto Rico*, de fecha 16 de mayo de 2022 (el "Plan de la ACT"). El 16 de mayo de 2022, el Deudor presentó (a) el Plan de la ACT [ECF Núm. _____], y (b) esta declaración de divulgación [ECF Núm. _____] (la "Declaración de Divulgación").[46]

***Cronograma de la Declaración de Divulgación.*** El [_____] de 2022, el Tribunal de Título III presentó la *Orden (I) de aprobación de la Declaración de Divulgación, (II) de Fijación de la fecha de registro de votación, (III) de Aprobación de la vista de confirmación y el cronograma de confirmación, (IV) de Aprobación de paquetes de convocatoria y procedimientos de distribución, (V) de Aprobación de formularios de papeletas, y procedimientos de elección y votación, (VI) de Aprobación de la notificación de situación de no votante, (VII) de Fijación de las fechas límite de votación, elección y confirmación, y (VIII) de Aprobación de los procedimientos de tabulación de los votos* [ECF Núm. _____] que aprueba la Declaración de Divulgación (la "Orden de Declaración de Divulgación"). **LA APROBACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN, SIN EMBARGO, NO CONSTITUYE UNA DETERMINACIÓN POR PARTE DEL TRIBUNAL DE TÍTULO III CON RESPECTO A LA EQUIDAD O LOS MÉRITOS DEL PLAN DE LA ACT. EL TRIBUNAL DE TÍTULO III CONSIDERARÁ LA CONFIRMACIÓN DEL PLAN DE LA ACT EN LA VISTA DE CONFIRMACIÓN PROGRAMADA PARA INICIARSE EL [____] DE 2022.**

---

[46]   Las referencias al expediente son al Caso Principal Núm. 17-BK-3283-LTS, a menos que se especifique lo contrario.

La Vista de Confirmación puede posponerse o continuarse periódicamente. Por lo tanto las partes interesadas deben consultar el expediente en línea en https://cases.ra.kroll.com/puertorico/ para confirmar la fecha y hora programadas más recientes para la Vista de Confirmación.

El Tribunal de Título III ha establecido el siguiente cronograma en relación con los procedimientos de confirmación:

- **[____] de 2022:** Fecha límite para la votación y elección;
- **[____] de 2022:** Fecha límite para presentar objeciones a la confirmación del Plan de la ACT;
- **[____] de 2022:** Vista de confirmación.

El Deudor proporciona esta Declaración de Divulgación como proponente del Plan de la ACT conforme a la Sección 1125 del Código de Quiebras y en relación con la convocatoria de votación para aceptar o rechazar, y decisiones sobre la forma de las distribuciones conforme a, el Plan de la ACT, con las enmiendas o suplementos que puedan establecerse periódicamente conforme al Título III de PROMESA y las Reglas Federales de Procedimientos de Quiebra (las "Reglas de Quiebras"), según sean aplicables al Título III conforme a la Sección 310 de PROMESA.

Esta Declaración de Divulgación proporciona la información requerida por la Sección 1125 del Código de Quiebras y resume el Plan de la ACT, las operaciones de la ACT, su situación financiera, incluyendo proyecciones financieras y otras cuestiones relacionadas, incluyendo el tratamiento de los tenedores de Reclamaciones contra la ACT. Esta Declaración de Divulgación también describe ciertas consecuencias potenciales con respecto al impuesto a la renta federal y de Puerto Rico para los tenedores de Reclamaciones, los procedimientos de votación y elección y el proceso de confirmación.

***Formas de papeletas y elecciones.*** Se adjunta una papeleta para votar por la aceptación o el rechazo del Plan de la ACT (una "Papeleta") y/o una notificación de elección conforme al Plan de la ACT (una "Notificación de Elección") junto con el ejemplar de esta Declaración de Divulgación que se distribuye a los tenedores de Reclamaciones de las Clases con derecho al voto para aceptar o rechazar el Plan de la ACT, decidir transigir ciertas reclamaciones conforme al Plan de la ACT, y/o elegir la forma de las distribuciones conforme al Plan de la ACT. La Papeleta incluye información con respecto a las fechas límite de votación e instrucciones detalladas para votar por aceptar o rechazar el Plan de la ACT. La Notificación de Elección incluye información con respecto a la fecha límite de la elección e instrucciones detalladas para elegir la forma de las distribuciones conforme al Plan de la ACT. Antes de votar y/o hacer la elección correspondiente, cada tenedor de una Reclamación con derecho a votar y/o hacer una elección debe leer esta Declaración de Divulgación (incluyendo sus anexos y documentos incorporados al presente por referencia) y las instrucciones que acompañan la Papeleta y la Notificación de Elección. Estos documentos contienen, entre otras cosas, información importante con respecto a la clasificación de las Reclamaciones para la votación y la tabulación de votos. No se puede hacer ninguna convocatoria a la votación sobre el Plan de la ACT salvo conforme a la presente Declaración de Divulgación, con las enmiendas que pueda recibir, la Orden de Declaración de Divulgación y la Sección 1125 del Código de Quiebras.

***Anexos a la Declaración de Divulgación.*** Esta Declaración de Divulgación incluye los siguientes anexos y suplementos:

**Anexo A** – Plan de Ajuste Enmendado de Título III de la Autoridad de Carreteras y Transportación (el "Plan de la ACT")

**Anexo B** – Acuerdo de Apoyo al Plan, de fecha 5 de mayo de 2021, por y entre la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico, ciertos tenedores de Reclamaciones de Bonos de la ACT, ciertos tenedores de reclamaciones de bonos de la ADCC, Assured Guaranty Corp. y Assured Guaranty Municipal Corp., y National Public Finance Guarantee Corporation (el "AAP de la ACT/ADCC")

**Anexo C** – Estipulación relacionada con las Disputas Relacionadas de la ARD, de fecha 5 de noviembre de 2021, por y entre la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico, la Autoridad de Edificios Públicos de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, y la Autoridad de Carreteras y Transportación de Puerto Rico, AmeriNational Community Services, LLC, y Cantor-Katz Collateral Monitor LLC

**Anexo D** – Plan fiscal certificado de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo E** – Presupuesto certificado de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo F** – Cronograma de los bonos de la ACT

**Anexo G** – Lista de Cuentas Bancarias, Balances y Categorizaciones de Restricciones Preliminares de la Autoridad de Carreteras y Transportación de Puerto Rico al 31 de diciembre de 2021

**Anexo H** – Estados financieros auditados más recientes de la Autoridad de Carreteras y Transportación de Puerto Rico

**Anexo I** – Cuadros ilustrativos de las distribuciones de recuperación de bonos

En la medida en que existan diferencias entre esta Declaración de Divulgación, cualquiera de los Acuerdos de Apoyo al Plan (y cualquier anexo u hoja de términos adjuntado a estos), y el Plan de la ACT, los términos y disposiciones del Plan de la ACT serán los que prevalezcan.

**A.   Plan de ajuste de Título III de PROMESA: Descripción general**

La confirmación de un plan de ajuste de Título III por parte del Tribunal de Título III obliga al deudor, a cualquier emisor de títulos valores conforme al plan de ajuste, a cualquier persona que adquiera propiedades conforme al plan de ajuste y a cualquier acreedor de un deudor. Salvo de

conformidad con las disposiciones de PROMESA, el plan de ajuste o la orden de confirmación, la confirmación de un plan de ajuste exonera a un deudor de una deuda asumida antes de la fecha de confirmación del plan y reemplaza para dicha deuda las obligaciones correspondientes por las especificadas en el plan de ajuste confirmado.

El Tribunal de Título III confirmará un plan de ajuste si satisface tanto la Sección 314(b) de PROMESA como las subsecciones incorporadas de la Sección 1129 del Código de Quiebras, que se discuten adicionalmente en la Sección VII.C de esta Declaración de Divulgación, titulada "Requisitos para la confirmación del plan de ajuste". Entre otras cosas, la Sección 314(b) de PROMESA requiere que (i) el plan de ajuste cumpla las disposiciones de PROMESA y las disposiciones aplicables del Código de Quiebras, (ii) se hayan obtenido todas las aprobaciones legislativas, regulatorias, o electorales obligatorias que son necesarias para ejecutar cualquier disposición del plan de ajuste, o dicha disposición está bajo la condición de que se obtenga dicha aprobación, (iii) el plan de ajuste es factible y defiende los intereses de los acreedores, y (iv) el plan de ajuste es coherente con el plan de ajuste aplicable certificado por la Junta de Supervisión conforme al Título II de PROMESA.

Si bien el Deudor cree que todas las clases de Reclamaciones deberían votar para aceptar el Plan de la ACT, el Plan de la ACT puede confirmarse sin la aceptación por todas las clases. La Sección 1129(b)(1) del Código de Quiebras dispone que, si se cumplen todos los requisitos aplicables de la Sección 1129(a) (incluyendo el requisito de que por lo menos una clase afectada acepte el plan de ajuste) salvo la aceptación por todas las clases (como lo dispone la Sección 1129(a)(8)) con respecto a un plan de ajuste, el Tribunal de Título III, a pedido de los proponentes, deberá confirmar el plan de ajuste si no discrimina injustamente y si es justo y equitativo con respecto a cada clase de reclamaciones que esté afectada conforme al plan de ajuste y no lo ha aceptado.

## B.    Resumen de los componentes clave del Plan de Ajuste de la ACT

Salvo en el caso de Reclamaciones Administrativas y Reclamaciones Profesionales, que no están clasificadas y que no votan sobre el Plan de la ACT, todas las Reclamaciones que existían en la Fecha de Petición de la ACT se dividen en clases conforme al Plan de la ACT. Conforme al Código de Quiebras, un plan puede presentar una reclamación en una clase en particular solo si dicha reclamación es sustancialmente similar a las otras reclamaciones de dicha clase. Conforme a la Sección 301(e) de PROMESA, al determinar si las reclamaciones son "sustancialmente similares", la Junta de Supervisión debe considerar si dichas reclamaciones son garantizadas y si dichas reclamaciones tienen prioridad sobre otras reclamaciones. La siguiente tabla muestra las clases de reclamaciones contra el Deudor, el monto estimado aproximado de la reclamación y aproxima el porcentaje de recuperación fija propuesta para pagarse a las reclamaciones en cada clase. El monto que un acreedor puede recobrar en realidad puede variar materialmente con respecto a las estimaciones siguientes.

| Reclamación | Clase | Monto estimado de la reclamación | Aprox. Recobro fijo del Deudor (%) | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones de Bonos de la ACT 68 | 1 | 145,642,034 | 100% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos de la ACT 68 (Ambac) | 2 | 30,563,816 | 100% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos de la ACT 68 (Assured) | 3 | 567,219,573 | 100% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos de la ACT 68 (National) | 4 | 87,763,682 | 100% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 | 5 | 852,031,349 | 22% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) | 6 | 491,939,990 | 22% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) | 7 | 877,474,059 | 22% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) | 8 | 377,726,512 | 22% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) | 9 | 530,496,068 | 22% | Nuevos Bonos de la ACT / Efectivo |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 | 10 | 121,457,958 | * | N/A |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) | 11 | 51,283,015 | * | N/A |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) | 12 | 65,942,129 | * | N/A |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) | 13 | 38,424,132 | * | N/A |
| Reclamaciones de Bonos Moscoso de la ACT | 14 | 104,215,000[47] | 100% | [48] |
| Reclamaciones de Dominio Eminente / Expropiación Inversa | 15 | 83,687,663 | [49] | Efectivo |

---

[47]  Representa el monto del capital únicamente.

*  Los tenedores de reclamaciones de Bonos Subordinados (Sub) de la ACT 98, Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC), y Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) recibirán recobros a través de los CVI de recuperación por cuenta de las Reclamaciones del ELA/ACT contra el ELA conforme al Plan del ELA.

[48]  No afectados conforme al Plan de la ACT y recibirán pagos de capital e intereses de acuerdo con los términos y condiciones de los Bonos Moscoso de la ACT. Los valores de la reclamación representan el capital pendiente actual.

[49]   El balance de cualquier reclamación después de la aplicación del dinero en depósito ante el Tribunal de Primera Instancia se pagará en su totalidad en efectivo. Sin embargo, si la apelación de la Junta de Supervisión de la Orden de Confirmación del ELA y las Averiguación de Hechos y Conclusiones de Derecho relacionadas con la no

| Reclamación | Clase | Monto estimado de la reclamación | Aprox. Recobro fijo del Deudor (%) | Forma de contraprestación fija |
|---|---|---|---|---|
| Reclamaciones Generales Sin Garantía de la ACT | 16 | 255,972,641 | 19% | Efectivo |
| Reclamaciones de la ACT/BGF | 17 | 2,149,579,432 | 0% | N/A |
| Reclamaciones Subordinadas de la Sección 510(b) | 18 | Se desconoce | 0% | N/A |
| Reclamaciones de conveniencia | 19 | 616,519[50] | 100% | Efectivo |

\* \* \* \* \*

El Deudor considera que la reestructuración contemplada por el Plan de la ACT es factible y representa los mejores intereses de los acreedores del Deudor. Si se deniega la confirmación del Plan de la ACT, las opciones del Deudor serían que la Junta de Supervisión proponga un plan de ajuste alternativo de Título III después de reencontrarse y renegociar con los acreedores para que el Caso de Título III sea desestimado, en cuyo caso se pondría fin a la paralización automática y comenzará un litigio de varias partes y multifacético (incluyendo litigios iniciados por tenedores de bonos y otras partes contra la ACT y sus funcionarios), cuando los tenedores de reclamaciones compitan por los recursos disponibles limitados para pagar estas reclamaciones.

La siguiente descripción general resume ciertos componentes clave del Plan de la ACT. La descripción general se encuentra calificada en su totalidad por el texto completo del Plan de la ACT.

1.     **Implementación de los Acuerdos de Apoyo al Plan en el Plan de Ajuste**

(a)     **Acuerdo de Apoyo al Plan con ciertos Tenedores de Reclamaciones de Bonos de la ACT y de Reclamaciones de Bonos de la ADCC**

El 5 de mayo de 2021, la Junta de Supervisión, como representante del ELA y de la ACT en sus Casos de Título III, anunció que, tras amplias discusiones, había celebrado el Acuerdo de Apoyo al Plan de la ACT/ADCC (adjunto al presente como **Anexo B**) con ciertos tenedores de más de $2 mil millones en reclamaciones contra la ACT, incluyendo más de 85% de los Bonos de la ACT de 1968, casi el 50% de los Bonos Prioritarios (Senior) de 1998, y casi el 40% de los Bonos de la ADCC, que incluyen inversionistas municipales tradicionales y las aseguradoras de bonos monolínea Assured y National, sobre el marco de planes de ajuste que propone, entre otras cosas, resolver reclamaciones "clawback" contra el ELA y la emisión de ciertos instrumentos de valor

---

exonerabilidad de las reclamaciones de dominio eminente / expropiación inversa resulta exitosa, dicha reclamación recibirá un tratamiento similar al de los tenedores de las Reclamaciones Generales Sin Garantía de la ACT en la Clase 16.

[50]     No tiene en cuenta los tenedores de Reclamaciones Permitidas Generales Sin Garantía de la ACT que pueden elegir reducir su Reclamación Permitida y ser tratados como una Reclamación de Conveniencia.

contingente basados en el potencial exceso de rentabilidad del Impuesto sobre Ventas y Uso del 5.5% de Puerto Rico relativamente a las proyecciones en el plan fiscal certificado de 2020 para el ELA, como se explica con más detalle en el Anexo I al Acuerdo de Apoyo al Plan de la ACT/ADCC.

Durante el transcurso de las negociaciones, Ambac y FGIC presentaron acumulaciones al Acuerdo de Apoyo al Plan de la ACT/ADCC, sujetas al derecho de rescindir el Acuerdo de Apoyo al Plan de la ACT/ADCC, únicamente con respecto a sí mismos, en o antes del 26 de julio de 2021. Las acumulaciones de Ambac y FGIC al Acuerdo de Apoyo al Plan de la ACT/ADCC y la firma del Acuerdo de Apoyo al Plan de la AFI resolvieron los litigios de las Reclamaciones de los Bonos de Ingresos restantes contra el ELA, dado que involucraba a las Monolíneas.

En el momento de la presentación de esta Declaración de Divulgación, el Acuerdo de Apoyo al Plan de la ACT/ADCC tiene el apoyo de (i) $384 millones en reclamaciones de la ADCC (100%), (ii) más de $700 millones en reclamaciones de la ACT 68 (más del 85%), y (iii) más de $2.1 mil millones en Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (más de 67%, basados en una presentación EMMA del 16 de julio de 2021).

***Transacción de disputas pendientes relacionadas con reclamaciones de recuperación.*** A cambio de la contraprestación a proporcionarse en el Plan del ELA y en el Plan de la ACT, las siguientes disputas relacionadas con las reclamaciones de recuperación ("clawback") relacionadas con Assured y National fueron acordadas y transigidas conforme a la confirmación del Plan del ELA:

- **Acciones de recuperación**:

  o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00005-LTS,

  o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00004-LTS,

  o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00003-LTS, y

  o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00007-LTS.

- **Mociones de levantamiento de la paralización:**

  o *Assured Guaranty Corp., y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso de Título III de la ACT [ECF Núm. 673],

  o *Assured Guaranty Corp., y otros. c. la Junta de Supervisión y Administración Financiera*, presentada en el Caso de Título III del ELA [ECF Núm. 10104],

o   *Ambac Assurance Corporation, y otros. c. la Junta de Supervisión y Administración Financiera*, presentada en el Caso de Título III del ELA [ECF Núm. 10602],

o   *AmeriNational Community Services, LLC, y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso de Título III de la ACT [ECF Núm. 591],

o   *Assured Guaranty Corp., y otros c. el Estado Libre Asociado de Puerto Rico, y otros*, Caso Núm. 20-1930, actualmente en trámite ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito,

o   *Ambac Assurance Corporation, y otros c. el Estado Libre Asociado de Puerto Rico, y otros*, Caso Núm. 2— 1931, actualmente en trámite ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito,

o   *Peaje Investments, LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. Cont. Núm. 17-00152-LTS, presentado en el Caso de Título III de la ACT [ECF Núm. 1], y

o   cualquier moción o proceso contencioso que procure levantar la paralización automática dispuesta de acuerdo con las Secciones 362 y 922 del Código de Quiebras (dentro de lo aplicable) con respecto a los ingresos similares a aquellos en cuestión en las antes mencionadas Mociones de Levantamiento de la Paralización.

**(b)      Estipulación con las Partes de la ARD**

***Antecedentes de la Estipulación de la ARD.*** El 7 de noviembre de 2018, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico aprobó la Modificación Calificatoria del BGF. Para que la Modificación Calificatoria del BGF resulte vigente, el ELA creó, conforme a la Ley de Reestructuración del BGF, la ARD, un fideicomiso legal público e instrumentalidad gubernamental pública del ELA.[51]

Conforme al Acuerdo Maestro de Transferencia, de fecha 29 de noviembre de 2018, entre la ARD y el BGF, el BGF transfirió sustancialmente todos sus activos a la ARD, incluyendo, entre otras cosas, los derechos legales, título e interés del BGF sobre los Pagarés de la ACT y $200,000,000 en concepto de monto original total del capital de los Bonos Prioritarios (Senior) de la ACT 98.

Las Partes de la ARD iniciaron ciertas acciones, presentaron escritos y participaron en relación con numerosas acciones relacionadas con los casos de Título III del ELA y de la ACT, incluyendo, entre otros, los siguientes:

---

[51]   7 An. Leyes P.R. § 3171.

- **Mociones de levantamiento de paralización de la ARD:**

  o *Moción y Memorando de Ley de las Partes de la ARD en apoyo a su moción de reparación de la paralización automática, o, como alternativa, la orden de pago de una protección adecuada* [ECF Núm. 7643]

  o *Moción y Memorando de Ley de las Partes de la ARD en apoyo de su petición de protección adecuada o reparación de la Paralización Automática* [ECF Núm. 16276]

- **Moción de gastos administrativos:**

  o *Moción de las Partes de la ARD para la asignación de una reclamación de gastos administrativos* [ECF Núm. 17009]

- **Proceso contencioso de la ARD:**

  o *AmeriNational Community Services, LLC, y otros. c. Ambac Assurance Corporation, y otros*, Proc. Cont. Núm. 21-00068

- **Proceso contencioso de la AEP:**

  o *Autoridad de Edificios Públicos de Puerto Rico c. AmeriNational Community Services, LLC, y otros*, Proc. Cont. Núm. 21-00100

- **Moción de la sección 926:**

  o *Moción urgente de orden puente, y moción para la designación de fideicomisario conforme a 11 U.S.C. §926 de Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, y National Public Finance Guarantee Corporation*, de fecha 17 de julio de 2020 [ECF Núm. 871 en el Caso Núm. 17-3567; ECF Núm. 13708 en el Caso Núm. 17-3283],

  o *Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 20-1847

- **Mociones de levantamiento de la paralización de otras partes:**

  o *Assured Guaranty Corp., y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico* [ECF Núm. 673 en el Caso Núm. 17-3567]

  o *Ambac Assurance Corporation, y otros. c. la Junta de Supervisión y Administración Financiera*, presentada en el Caso de Título III del ELA [ECF Núm. 10104],

- o *Ambac Assurance Corporation, y otros. c. la Junta de Supervisión y Administración Financiera* [ECF Núm. 10602]

- o *AmeriNational Community Services, LLC, y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, presentada en el Caso de Título III de la ACT [ECF Núm. 591 en el Caso Núm. 17-3567]

- o *Assured Guaranty Corp., y otros c. el Estado Libre Asociado de Puerto Rico, y otros*, Caso Núm. 20-1930, actualmente en trámite ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito

- o *Ambac Assurance Corporation, y otros c. el Estado Libre Asociado de Puerto Rico, y otros*, Caso Núm. 20-1931, actualmente en trámite ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito

- o *Peaje Investment, LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. Cont. Núm. 17-00151- LTS

- o *Peaje Investment, LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. Cont. Núm. 17-00152-LTS

- **Objeciones vinculadas a la deuda:**

  - o *Objeción general de la (I) Junta de Supervisión y Administración Financiera, actuando a través del Comité de Reclamaciones Especiales, y (II) el Comité Oficial de Acreedores Sin Garantía, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas por los tenedores de ciertos bonos de obligaciones generales del ELA*, de fecha 14 de enero de 2019 [ECF Núm. 4784]

  - o *Objeción general del Comité Oficial de Acreedores Sin Garantía, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas por los tenedores de ciertos bonos de obligaciones generales de 2011 del ELA*, de fecha 21 de mayo de 2019 [ECF Núm. 7057]

  - o *Objeción general del Comité Oficial de Acreedores Sin Garantía, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas contra el ELA por los tenedores de ciertos bonos de la Autoridad de Edificios Públicos de Puerto Rico*, de fecha 18 de julio de 2019 [ECF Núm. 8141]

  - o *Objeción general de la Coalición de Deuda Constitucional Legítima, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas por Tenedores de ciertos bonos emitidos o garantizados por el ELA*, de fecha 8 de enero de 2020 [ECF Núm. 9731]

   o *Objeción general del Comité Oficial de Acreedores Sin Garantía, conforme a la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a reclamaciones presentadas o aseveradas contra el ELA por los tenedores de bonos de obligaciones generales aseverando prioridad sobre otros acreedores sin garantía del ELA*, de fecha 3 de febrero de 2020 [ECF Núm. 10638]

- **Acciones de recuperación:**

   o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00005-LTS

   o *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00007-LTS

- **Litigio de uniformidad:**

   o *Ambac Assurance Corporation c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 20-00068-LTS

  ***Celebración de la Estipulación de la ARD.*** El 5 de noviembre de 2021, las Partes de la ARD y la Junta de Supervisión celebraron la Estipulación de la ARD, que disponía, entre otras cosas:

i) Las Partes de la ARD respaldarían el Plan del ELA y el Plan de la ACT y los procesos relacionados de convocatoria;

ii) Las Partes de la ARD votarían para aceptar el Plan de la ACT;

iii) Las Partes de la ARD retirarían y/o desestimarían sin derecho a nueva acción, según corresponda, cada una de las Disputas relacionadas con la ARD; y

iv) como contraprestación de los acuerdos establecidos en la Estipulación de la ARD, incluyendo el acuerdo para "bloquear" sus Bonos Prioritarios (Senior) de la ACT 98 y los Pagarés de la ACT, la ARD tendría derecho a recibir un pago de restricción por $15 millones, bajo la forma de una reclamación de gastos administrativos permitida.

  **(c)** **Acuerdo con el Comité de Acreedores**

  El 9 de mayo de 2022, la Junta de Supervisión y el Comité de Acreedores celebraron el Acuerdo del Comité de la ACT, que disponía los términos de una conciliación global con respecto al tratamiento de las Reclamaciones Generales Sin Garantía de la ACT, incluyendo, entre otras cosas, el aumento del Recobro de GUC de la ACT de $25 millones a $48 millones. Conforme al Acuerdo del Comité de la ACT, el Comité de Acreedores aceptó apoyar el Plan de la ACT incorporando dicha conciliación global.

2.      **Se permite que los tenedores de reclamaciones permitidas hagan elecciones**

Conforme a la Orden de la Declaración de Divulgación y el Plan de la ACT, ciertos tenedores de reclamaciones tendrían derecho a hacer una elección con respecto a la distribución que recibirán conforme al Plan de la ACT. La siguiente es una descripción general de las decisiones y las limitaciones sobre la votación que son aplicables a ciertos tenedores de Reclamaciones.

***Reclamaciones de bonos asegurados por Assured – Elección y votación de la distribución***. Si usted es un tenedor beneficiario de un Bono Asegurado por Assured identificado en el Anexo A del Formulario de Elección de Tenedores de Bonos de Assured, puede elegir en su formulario de elección recibir a plena satisfacción el descargo y el canje de su reclamación permitida de bono asegurado por Assured y sus derechos conforme a la Póliza de Seguros de Assured correspondiente, la Opción 1 de Tenedores de Bonos de Assured o la Opción 2 de Tenedores de Bonos de Assured, cada uno como se describe en la Sección VI.G.1(b) más adelante en esta Declaración de Divulgación.

Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos Asegurados por Assured no tienen derecho a votar por la aceptación o rechazo del Plan de la ACT. Assured tiene derecho a votar por cuenta de las Reclamaciones Permitidas de Bonos Asegurados por Assured emergentes de los bonos asegurados por Assured en virtud del Plan de la ACT, de acuerdo con la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

***Reclamaciones de bonos asegurados por National — Elección y votación de la distribución***. Si usted es un tenedor beneficiario de Reclamaciones Permitidas de Bonos Asegurados por National, puede elegir en su Formulario de Elección recibir en plena satisfacción, descargo y canje de su Reclamación Permitida de Bonos Asegurados por National y sus derechos bajo la Póliza de Seguro de National aplicable, (1) el Tratamiento de Conmutación de National o (2) el Tratamiento de No Conmutación de National.

Los tenedores de Reclamaciones Permitidas de Bonos Asegurados por National no tienen derecho a votar por la aceptación o rechazo del Plan de la ACT. National tiene derecho a votar por cuenta de las Reclamaciones Permitidas de Bonos Asegurados por National en virtud del Plan de la ACT en nombre de los tenedores beneficiarios de estas, de acuerdo con la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

***Reclamaciones de bonos asegurados por Ambac — Elección y votación de la distribución***. Si usted es un tenedor beneficiario de Reclamaciones Permitidas de Bonos de la ACT 68 (Ambac), recibirá a plena satisfacción y descargo las obligaciones de Ambac conforme a la Póliza de Seguros de Ambac correspondiente, bajo la forma de efectivo por un monto equivalente al Precio de Aceleración de Ambac. Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos de la ACT 68 (Ambac) no tendrán derecho al voto para aceptar o rechazar el Plan de la ACT, y Ambac tiene derecho a votar por cuenta de dichas Reclamaciones conforme al Plan de la ACT en nombre de tenedores beneficiarios de estas conforme a la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

Si usted es un tenedor beneficiario de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), dentro del alcance ofrecido por Ambac, puede elegir en su

Formulario de Elección recibir a plena satisfacción, descargo y canje de sus Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) conforme a la Póliza de Seguro de Ambac aplicable, (1) el Tratamiento de Conmutación de Ambac o (2) el Tratamiento de No Conmutación de Ambac.

Los tenedores de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) no tienen derecho a votar por la aceptación o rechazo del Plan de la ACT. Ambac tiene derecho a votar por cuenta de las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) en virtud del Plan de la ACT en nombre de los tenedores beneficiarios de estas, de acuerdo con la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

***Reclamaciones de Bonos Asegurados por FGIC — Votación.*** Si usted es tenedor beneficiario de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) o Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (FGIC), conforme a la Sección 25.3 del Plan de la ACT, las pólizas de seguros correspondientes a las Reclamaciones de Bonos Asegurados por FGIC se mantendrán en un Fideicomiso de FGIC. Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) y Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (FGIC) no tendrán derecho al voto para aceptar o rechazar el Plan de la ACT, y FGIC tiene derecho a votar por cuenta de dichas Reclamaciones conforme al Plan de la ACT en nombre de tenedores beneficiarios de estas conforme a la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

UNA VEZ TRANSCURRIDA LA FECHA LÍMITE DE LA DECISIÓN, SE APLICARÁ A TODOS LOS TÍTULOS VALORES QUE HAYAN SIDO OFRECIDOS CON RESPECTO A UNA DECISIÓN UNA RESTRICCIÓN DE NEGOCIACIÓN O TRANSFERENCIA ADICIONALES HASTA LA FECHA DE ENTRADA EN VIGENCIA DE LA ACT DEL PLAN DE LA ACT. ESTO ES NECESARIO DEBIDO A LOS PROCEDIMIENTOS DE LA DEPOSITORY TRUST COMPANY, QUE ASOCIAN UNA DECISIÓN CON EL TÍTULO VALOR CORRESPONDIENTE, LO QUE SOLO PUEDE LOGRARSE MEDIANTE LA OFERTA DEL TÍTULO VALOR CORRESPONDIENTE.

***Elección de Reclamaciones de Conveniencia.*** Los tenedores de Reclamaciones Permitidas Generales Sin Garantía de la ACT (Clase 16) pueden decidir:

(a) reducir el monto de la Reclamación Permitida de dicho tenedor a $20,000.00 y recibir el pago en su totalidad de dicha reclamación reducida en efectivo conforme al tratamiento de las Reclamaciones de Conveniencia de la Clase 19; y

(b) aceptar el Plan de la ACT como tenedor de una Reclamación de Clase 19.

Los tenedores de Reclamaciones Permitidas Generales Sin Garantía de la ACT pueden decidir:

(a) reducir el monto de dichas reclamaciones múltiples a un monto total de $40,000.00 y recibir el pago en su totalidad en efectivo de dicha reclamación total reducida conforme al tratamiento de las Reclamaciones de Conveniencia de la Clase 19; y

(b) aceptar el Plan de la ACT como tenedor de una Reclamación de Clase 19.

*Tope de conveniencia:* El monto total de la contraprestación a ponerse a disposición de las Reclamaciones de Conveniencia será de $2,500,000.00, y el Comité de Acreedores puede renunciar a dicho Tope de Conveniencia en o antes del inicio de la Vista de Confirmación de la ACT en ejercicio exclusivo de sus facultades discrecionales. Si se supera el Tope de Conveniencia (y si el Comité de Acreedores no renuncia a él en o antes del inicio de la Vista de Confirmación de la ACT), los tenedores de Reclamaciones Permitidas de Conveniencia recibirán una participación prorrateada del Tope de Conveniencia.

3.      **Descripción general de los Nuevos Bonos de la ACT a emitirse en la Fecha de Entrada en Vigencia de la ACT**

En la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada emitirá Nuevos Bonos de la ACT, consistentes en:

(i)      $237,955,868.13 correspondientes al monto del capital inicial de bonos de apreciación de capital, Serie 2022B ("Nuevos CAB de la ACT"), con fecha de vencimiento del 1 de julio de 2032, y una tasa de interés de 5.0% anual;

(ii)      $407,044,597.57 correspondientes al monto del capital inicial de bonos convertibles de apreciación de capital, Serie 2022C ("Nuevos CCAB de la ACT"), con fecha de vencimiento del 1 de julio de 2032, y una tasa de interés de 5.0% anual;

(iii)      $600,000,000.00 correspondientes al monto del capital inicial de bonos de interés corriente, Serie 2022A ("Nuevos CIB de la ACT"), con fecha de vencimiento del 1 de julio de 2062, y una tasa de interés de 5.0% anual.

Los Nuevos Bonos de la ACT solo se pagarán a partir de ciertos activos (el "Patrimonio del Fideicomiso"), que estará compuesto principalmente de ingresos de peaje. *Véase* la sección VI.F.2(a) de esta Declaración de Divulgación para obtener una descripción más detallada del Patrimonio del Fideicomiso. Los Nuevos Bonos de la ACT estarán garantizados por un gravamen de primer rango sobre el Patrimonio del Fideicomiso.

Los Nuevos Bonos de la ACT tendrán la fecha de, y las tasas de interés sobre ellos devengarán desde, (i) el 1 de julio de 2022 o (ii) la Fecha de Entrada en Vigencia de la ACT, lo que ocurra primero. Los Nuevos Bonos de la ACT no tendrán una tasa de interés o rendimiento devengado predeterminado, siempre que la tasa de interés aplicable continúe devengando sobre todo la amortización de la deuda no pagada a la tasa regular, componiendo semestralmente, hasta que se pague o satisfaga totalmente de acuerdo con sus términos.

Los vencimientos, tasas de interés, y cronogramas de amortización de los Nuevos Bonos de la ACT se incluyen en la Sección II.B.3(a) más adelante en esta Declaración de Divulgación y como Anexo D al Plan.

Además. en la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada también emitirá su Deuda Subordinada por un monto de capital inicial equivalente al monto del capital pendiente del Préstamo del ELA en la fecha de dicha emisión, más cualquier interés devengado y no pagado sobre él, bajo los términos de la Escritura de los Nuevos Bonos de la ACT. La Deuda Subordinada estará garantizada por un gravamen sobre el Patrimonio del Fideicomiso, que en

todos los aspectos será no prioritario y subordinado al gravamen prioritario concedido a todos los tenedores de los Nuevos Bonos de la ACT. *Véase* la Sección VI.F.6 de esta Declaración de Divulgación para obtener una descripción más detallada de la Deuda Subordinada.

### (a)      Resumen de las Distribuciones de Nuevos Bonos de la ACT

Los gobiernos municipales emiten deuda que se amortiza, es decir deuda con vencimientos de capital adeudados según plazos regulares a lo largo de un período que varía generalmente entre 20 y 40 años. Los Nuevos Bonos de la ACT incluirán (i) Nuevos CIB de la ACT que vencerán en 40 años, (ii) Nuevos CAB de la ACT que vencerán en 10 años y (iii) Nuevos CCAB de la ACT que vencerán en más de 36 años. Todos los Nuevos CAB de la ACT, Nuevos CCAB de la ACT y Nuevos CIB de la ACT se ven representados por bonos a plazo con pagos obligatorios de un fondo de amortización. Esto se destina a optimizar el efectivo disponible para pagar la amortización de la deuda dado que el mercado municipal tiene una curva de rendimiento, y los bonos no tienen un precio conforme a su duración promedio como es el caso con otros mercados, debido a que inversionistas específicos pueden adquirir bonos en diferentes partes de la curva de vencimiento, incluyendo inversionistas individuales, sociedades y fondos mutuos.

Los tenedores de bonos existentes poseían bonos en circulación con diferentes vencimientos. Sin embargo, las reclamaciones de dichos tenedores tal como se tratan en el Plan de la ACT no se distinguen según su vencimiento actual. Por lo tanto, cada tenedor existente recibirá una parte prorrateada de los Nuevos Bonos de la ACT a emitirse, enumerados a continuación, asignados según la distribución estipulada en la Clase correspondiente y la Reclamación de cada tenedor, lo que se destina a proporcionar a todos los tenedores de bonos recobros y distribuciones similares de los Nuevos Bonos de la ACT por Clase. Los Nuevos Bonos de la ACT se emitirán en denominaciones de $1.00 con cada bono redondeado hacia abajo hasta el valor en dólares más cercano. La denominación de $1.00 para los Nuevos Bonos de la ACT se asignará según el valor al vencimiento de cada bono a plazo respectivo. Usted debe consultar a su propio asesor impositivo con respecto a las consecuencias fiscales federales, de los estados, de los territorios (incluyendo Puerto Rico) y locales de Estados Unidos y de fuera de Estados Unidos, de recibir la distribución de títulos valores que se indica a continuación.

Los Nuevos Bonos de la ACT se emitirán conforme a la Escritura de los Nuevos Bonos de la ACT y se distribuirán como se estipula en el Plan de la ACT.

Se adjuntan a esta Declaración de Divulgación, en el <u>Anexo I</u>, cuadros ilustrativos de las distribuciones a realizarse a cada Clase de reclamaciones de bonos conforme al Plan de la ACT.

Para los fines de esta Declaración de Divulgación, todas las referencias a "<u>Tasa de interés</u>" se refieren a (i) con respecto a los CAB de la ACT y los Nuevos CCAB de la ACT, hasta la Fecha de Conversión (según la definición de más adelante), la tasa de acumulación establecida en la Escritura de los Nuevos Bonos de la ACT, (ii) con respecto a los Nuevos CCAB de la ACT después de la Fecha de Conversión y los Nuevos CIB de la ACT, la tasa de interés estipulada en la Escritura de los Nuevos Bonos de la ACT, y (iii) con respecto a la Deuda Subordinada, la tasa de interés establecida en la Escritura de los Nuevos Bonos de la ACT.

La siguiente es una tabla que ilustra los Nuevos CIB de la ACT a distribuirse conforme al Plan y sus pagos de fondo de amortización.

| Nuevos CIB de la ACT | | | | |
|---|---|---|---|---|
| Pagos de capital | Pagos de tasa de interés | Servicio total de la deuda | Tasa de interés | Fecha |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2023 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2024 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2025 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2026 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2027 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2028 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2029 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2030 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2031 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2032 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2033 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2034 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2035 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2036 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2037 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2038 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2039 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2040 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2041 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2042 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2043 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2044 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2045 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2046 |

| Nuevos CIB de la ACT | | | | |
|---|---|---|---|---|
| Pagos de capital | Pagos de tasa de interés | Servicio total de la deuda | Tasa de interés | Fecha |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2047 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2048 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2049 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2050 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2051 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 1/7/2052 |
| $14,190,000.00 | $30,000,000.00 | $ 44,190,000.00 | 5.000% | 1/7/2053 |
| $53,125,000.00 | $29,290,500.00 | $ 82,415,500.00 | 5.000% | 1/7/2054 |
| $55,785,000.00 | $26,634,250.00 | $ 82,419,250.00 | 5.000% | 1/7/2055 |
| $58,575,000.00 | $23,845,000.00 | $ 82,420,000.00 | 5.000% | 1/7/2056 |
| $61,500,000.00 | $20,916,250.00 | $ 82,420,000.00 | 5.000% | 1/7/2057 |
| $64,575,000.00 | $17,841,250.00 | $ 82,416,250.00 | 5.000% | 1/7/2058 |
| $67,805,000.00 | $14,612,500.00 | $ 82,417,500.00 | 5.000% | 1/7/2059 |
| $71,195,000.00 | $11,222,250.00 | $ 82,417,250.00 | 5.000% | 1/7/2060 |
| $74,755,000.00 | $7,662,500.00 | $ 82,417,500.00 | 5.000% | 1/7/2061 |
| $78,495,000.00 | $3,924,750.00 | $ 82,419,750.00 | 5.000% | 1/7/2062 |
| $600,000,000.00 | $1,085,949,250.00 | $1,685,949,250.00 | Total | |

La siguiente es una tabla que ilustra los Nuevos CAB de la ACT a distribuirse conforme al Plan y sus pagos de fondo de amortización.

| Nuevos CAB de la ACT | | | | |
|---|---|---|---|---|
| Inicial Capital | Valor acumulado en cada fecha de amortización (1) | Vencimiento Valor (2) | Tasa de interés | Fecha |
| $25,289,588.80 | $29,327,916.80 | $41,440,000.00 | 5.000% | 1/7/2025 |
| $22,310,860.93 | $27,183,444.45 | $36,559,000.00 | 5.000% | 1/7/2026 |
| $25083,317.54 | $32,108,471.38 | $41,102,000.00 | 5.000% | 1/7/2027 |

| Nuevos CAB de la ACT | | | | |
|---|---|---|---|---|
| Inicial Capital | Valor acumulado en cada fecha de amortización (1) | Vencimiento Valor (2) | Tasa de interés | Fecha |
| $28,817,559.67 | $38,756,163.54 | $47,221,000.00 | 5.000% | 1/7/2028 |
| $35,543,345.34 | $50,221,494.18 | $58,242,000.00 | 5.000% | 1/7/2029 |
| $35,310,832.47 | $52,419,172.95 | $57,861,000.00 | 5.000% | 1/7/2030 |
| $33,610,009.98 | $52,419,983.94 | $55,074,000.00 | 5.000% | 1/7/2031 |
| $31,990,353.40 | $52,420,000.00 | $52,420,000.00 | 5.000% | 1/7/2032 (3) |
| **$237,955,868.13** | **$334,856,647.24** | **$389,919,000.00** | Total | |

(1) Equivalente al monto del capital inicial más la tasa de interés para cada fecha de pago del fondo de amortización.
(2) Equivalente al valor acumulado total que será representado por la parte de los bonos que se recobran si se conservan hasta su fecha de vencimiento.
(3) Fecha de vencimiento declarada; no es un pago del fondo de amortización.

  La siguiente es una tabla que ilustra los Nuevos CCAB de la ACT (posteriores a la Fecha de Conversión) a distribuirse conforme al Plan y sus pagos de fondo de amortización. Los Nuevos CCAB de la ACT se acumulan a una tasa de interés del 5.0% anual desde la fecha de emisión hasta la fecha de composición final del 1 de julio de 2032 (la "Fecha de Conversión").

| Nuevos CCAB de la ACT | | | | |
|---|---|---|---|---|
| Inicial Capital | Valor al vencimiento | Pagos de tasa de interés | Tasa de interés | Fecha |
| $11,637,848.90 | $ 19,070,000.00 | 33,349,550.00 | 5.000% | 1/7/2033 |
| $12,220,046.48 | $ 20,024,000.00 | 32,396,050.00 | 5.000% | 1/7/2034 |
| $12,830,926.75 | $ 21,025,000.00 | 31,394,850.00 | 5.000% | 1/7/2035 |
| $13,472,320.52 | $ 22,076,000.00 | 30,343,600.00 | 5.000% | 1/7/2036 |
| $14,146,058.60 | $ 23,180,000.00 | 29,239,800.00 | 5.000% | 1/7/2037 |
| $14,853,361.53 | $ 24,339,000.00 | 28,080,800.00 | 5.000% | 1/7/2038 |
| $15,596,060.12 | $ 25,556,000.00 | 26,863,850.00 | 5.000% | 1/7/2039 |
| $16,375,985.18 | $ 26,834,000.00 | 25,586,050.00 | 5.000% | 1/7/2040 |
| $17,194,967.52 | $ 28,176,000.00 | 24,244,350.00 | 5.000% | 1/7/2041 |
| $18,054,837.95 | $ 29,585,000.00 | 22,835,550.00 | 5.000% | 1/7/2042 |
| $18,957,427.28 | $ 31,064,000.00 | 21,356,300.00 | 5.000% | 1/7/2043 |

| Nuevos CCAB de la ACT | | | | |
|---|---|---|---|---|
| Inicial Capital | Valor al vencimiento | Pagos de tasa de interés | Tasa de interés | Fecha |
| $19,905,176.59 | $ 32,617,000.00 | 19,803,100.00 | 5.000% | 1/7/2044 |
| $20,900,526.96 | $ 34,248,000.00 | 18,172,250.00 | 5.000% | 1/7/2045 |
| $21,945,309.20 | $ 35,960,000.00 | 16,459,850.00 | 5.000% | 1/7/2046 |
| $23,042,574.66 | $ 37,758,000.00 | 14,661,850.00 | 5.000% | 1/7/2047 |
| $24,194,764.42 | $ 39,646,000.00 | 12,773,950.00 | 5.000% | 1/7/2048 |
| $25,404,319.56 | $ 41,628,000.00 | 10,791,650.00 | 5.000% | 1/7/2049 |
| $26,674,901.70 | $ 43,710,000.00 | 8,710,250.00 | 5.000% | 1/7/2050 |
| $28,008,341.65 | $ 45,895,000.00 | 6,524,750.00 | 5.000% | 1/7/2051 |
| $29,408,911.30 | $ 48,190,000.00 | 4,230,000.00 | 5.000% | 1/7/2052 |
| $22,219,930.70 | $36,410,000.00 | 1,820,500.00 | 5.000% | 1/7/2053 (1) |
| $407,044,597.57 | $666,991,000.00 | $419,638,900.00 | Total | |

(1) Fecha de vencimiento declarada; no es un pago del fondo de amortización.

## C.  Tenedores de Reclamaciones con derecho a votar sobre el Plan de Ajuste

De conformidad con el Título III de PROMESA y del Código de Quiebras, solamente los tenedores de Reclamaciones Permitidas en clases que son afectadas y que no se considere automáticamente que han aceptado o rechazado una propuesta de Plan de Ajuste de Título III, tendrán derecho a votar si aceptan o rechazan dicho Plan de Ajuste. Se considerará que las clases de reclamaciones cuyos tenedores no están afectados en virtud del Plan de la ACT lo han aceptado y no tienen derecho a votar para aceptarlo o rechazarlo. Se considerará que las clases de reclamaciones cuyos tenedores no percibirán ningún recobro según el plan de ajuste lo han rechazado y, por consiguiente, no tienen derecho a votar.

Los tenedores de Reclamaciones Permitidas Moscoso de la ACT (Clase 14) se considerarán no afectados y los tenedores de las Reclamaciones Permitidas de Conveniencia (Clase 19) recibirán el pago en efectivo en su totalidad, y no tendrán derecho al voto.

Los tenedores de Reclamaciones Permitidas de la Clase 18 (Reclamaciones subordinadas de la Sección 510(b) no percibirán ninguna distribución conforme al Plan, considerándose que han rechazado el Plan de la ACT y que no tienen derecho a votar.

Los tenedores de reclamaciones elegibles para ACR no tendrán derecho al voto.

A continuación, presentamos un resumen de los formularios que se enviarán a los miembros de las Clases de Reclamaciones (a) con derecho a votar si aceptar o rechazar el Plan de la ACT, (b) con

derecho a hacer una elección de distribución, y (c) sin derecho a votar si aceptar o rechazar el Plan de la ACT:

| Reclamación | Clase | Papeleta | Elegible para elección | Notificación de sin derecho al voto |
|---|---|---|---|---|
| Reclamaciones de Bonos de la ACT 68 | 1 | X | - | - |
| Reclamaciones de Bonos de la ACT 68 (Ambac) | 2 | * | - | X |
| Reclamaciones de Bonos de la ACT 68 (Assured) | 3 | * | X | - |
| Reclamaciones de Bonos de la ACT 68 (National) | 4 | * | X | - |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 | 5 | X | - | - |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) | 6 | * | X | - |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) | 7 | * | X | - |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) | 8 | * | - | X |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) | 9 | * | X | - |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 | 10 | X | - | - |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) | 11 | * | X | - |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) | 12 | * | - | X |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) | 13 | * | X | |
| Reclamaciones de Bonos Moscoso de la ACT | 14 | - | - | X |
| Reclamaciones de Dominio Eminente / Expropiación Inversa | 15 | X | - | - |
| Reclamaciones Generales Sin Garantía de la ACT | 16 | X | - | - |
| Reclamaciones de la ACT/BGF | 17 | X | - | - |
| Reclamaciones Subordinadas de la Sección 510(b) | 18 | - | - | X |
| Reclamaciones de conveniencia | 19 | - | - | X |

        * Los tenedores beneficiarios de las siguientes Reclamaciones no tienen derecho a votar por la aceptación o rechazo del Plan de la ACT:

| Reclamación | Clase |
|---|---|
| Reclamaciones de Bonos de la ACT 68 (Ambac) | 2 |
| Reclamaciones de Bonos de la ACT 68 (Assured) | 3 |
| Reclamaciones de Bonos de la ACT 68 (National) | 4 |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) | 6 |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) | 7 |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) | 8 |
| Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) | 9 |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) | 11 |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) | 12 |
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) | 13 |

En lugar de ello, Ambac, Assured, FGIC y National tienen derecho a votar por cuenta de dichas reclamaciones, según corresponda, en virtud del Plan de la ACT en nombre de los tenedores beneficiarios de estas, de acuerdo con la Sección 301(c)(3) de PROMESA y otras leyes y documentos rectores aplicables.

*     *     *     *     *

La Sección 1126 del Código de Quiebras define "aceptación" de un plan de ajuste por parte de una clase de reclamaciones como la aceptación por parte de los acreedores de esa clase que son tenedores de por lo menos dos tercios del monto monetario y más de la mitad del número de las reclamaciones permitidas de dicha clase en manos de acreedores que votaron por aceptar o rechazar el Plan de la ACT. De esta manera, la aceptación del Plan de la ACT por las reclamaciones de cada clase con derecho al voto sobre el Plan de la ACT puede ocurrir solo si por lo menos dos tercios del monto monetario y la mayoría numérica de los tenedores de las Reclamaciones Permitidas de dicha clase que han realmente votado con sus papeletas hayan votado a favor del Plan de la ACT. Se puede desestimar un voto si el Tribunal de Título III determina, tras notificación y una vista, que no se convocó o procuró la aceptación o rechazo de buena fe o de acuerdo con las disposiciones aplicables de PROMESA o del Código de Quiebras.

Es importante que los tenedores de reclamaciones de las clases del cuadro anterior que sean elegibles para votar ejerzan su derecho al voto para aceptar o rechazar el Plan de la ACT. **INCLUSO SI USTED NO VOTA O SI NO TIENE EL DERECHO A VOTAR PARA ACEPTAR EL PLAN DE LA ACT, PUEDE VERSE OBLIGADO POR EL PLAN DE LA ACT SI ESTE ES CONFIRMADO POR EL TRIBUNAL DE TÍTULO III.** El monto y el número de votos requeridos para la aceptación o rechazo del Plan de la ACT por una clase se

calculan según las reclamaciones que realmente voten por aceptar o rechazar el Plan de la ACT. No hay requisitos de quórum con respecto al número de reclamaciones en una clase que realmente voten.

Si por lo menos una clase afectada de reclamaciones acepta un plan de ajuste de Título III (sin contar los votos de personas internas), la Sección 1129(b) del Código de Quiebras, aplicable al Título III de PROMESA conforme a la Sección 301(a) de PROMESA, permite la confirmación del plan de ajuste bajo ciertas circunstancias, no obstante el rechazo del plan de ajuste por una o más clases afectadas de reclamaciones. Bajo esta sección, un plan de ajuste puede ser confirmado por un tribunal si el plan de ajuste no "discrimina injustamente" y si es "justo y equitativo" con respecto a cada clase rechazante. *Véase* la Sección VII.C de esta Declaración de Divulgación para obtener más información.

La determinación del Deudor con respecto a si solicitar la confirmación del Plan de la ACT conforme a la Sección 1129(b) del Código de Quiebras se anunciará antes o en la Vista de Confirmación.

**D.      Procedimientos de convocatoria y voto**

El 2 de mayo de 2022, el Deudor presentó la *Moción de la Autoridad de Carreteras y Transportación de Puerto Rico para solicitar una Orden (I) que apruebe la Declaración de Divulgación, (II) que fije la Fecha de Registro de la Votación, (III) que apruebe la Notificación de la Vista de Confirmación y el Cronograma de Confirmación, (IV) que apruebe los Paquetes de Convocatoria y los Procedimientos para su Distribución, (V) que apruebe los Formularios de Papeletas y los Procedimientos de Votación y Elección, (VI) que apruebe la Notificación de la condición de miembro sin derecho al Voto, (VII) que fije las fechas límite para la Votación, Elección y Confirmación, y (VIII) que apruebe los Procedimientos de tabulación de Votos* [ECF Núm. _____] (la "Moción de aprobación de la Declaración de Divulgación"), peticionando una orden del Tribunal de Título III que (i) apruebe la adecuación de la información contenida en la Declaración de Divulgación propuesta, (ii) fije la Fecha de Registro de la Votación (tal como se define en dicha orden) para la votación sobre el Plan de la ACT, (iii) apruebe la Notificación de la Vista de Confirmación (como se define en dicha orden) y el Cronograma de Confirmación, (iv) apruebe el contenido propuesto del Paquete de Convocatoria (como se define en dicha orden) y los procedimientos para su distribución, (v) apruebe los formularios de Papeletas y establezca los procedimientos de convocatoria, votación, distribución, elección y conteo de los votos, (vi) apruebe el formulario y la forma de la notificación de la condición de miembro sin derecho a voto (como se define dicha orden), (vii) fije las fechas límite para la votación (como se define en dicha orden), elección (como se define en dicha orden) y confirmación, y (viii) que apruebe los procedimientos de tabulación de los votos de los acreedores. El [_____] de 2022, el Tribunal de Título III ratificó la Orden de Declaración de Divulgación.

Para más información con respecto a los procedimientos de convocatoria y votación en torno al Plan, *véase* la Orden de Declaración de Divulgación.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                    04/30/2022 3:29 PM" ""

### E.   Vista de confirmación y fecha límite para las objeciones a la confirmación

Conforme a la Sección 1128 del Código de Quiebras, el Tribunal de Título III ha programado la Vista de Confirmación de que el Deudor ha satisfecho los requisitos de confirmación de la Sección 314 de PROMESA y las subsecciones incorporadas a la Sección 1129 del Código de Quiebras para iniciarse el [____] de 2022 a las ____ a.m./p.m. (Horario estándar del Atlántico) ante la Honorable Laura Taylor Swain, Juez de Distrito de Estados Unidos designada por John Roberts, presidente de la Suprema Corte de Estados Unidos para presidir el Caso de Título III de la ACT, en el tribunal de Estados Unidos Clemente Ruiz Nazario, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 en una sala de tribunal o mediante vista virtual, según se determine posteriormente. La Vista de Confirmación puede posponerse periódicamente sin notificación previa, salvo según se estipule en la Vista de Confirmación o en cualquier Vista de Confirmación pospuesta posteriormente.

El Tribunal de Título III ha (i) establecido como Fecha Límite de Votación y una Fecha Límite de Elección a más tardar a las 5:00 p.m. (horario estándar del Atlántico) el [____] de 2022, y (ii) ordenado que cualquier objeción, de haberla, a la confirmación del Plan de la ACT sea presentada y notificada en o antes del [____] de 2022 a las 5:00 p.m. (horario estándar del Atlántico).

### F.   Resumen de las disposiciones de descargo, exculpación e interdicto que contiene el Plan de la ACT

*El Plan de la ACT dispone ciertos descargos de reclamaciones y causas de acción. Si se confirma el Plan de la ACT, serán obligatorios para usted, independientemente de si vota o no. Tendrá el derecho a exigir que el Deudor le pague los montos totales originales que se le adeudan, salvo según lo estipule el Plan de la ACT. Solo tendrá los derechos al tratamiento provisto a su Reclamación conforme al Plan de la ACT. EL SIGUIENTE ES UN RESUMEN DE LOS DESCARGOS QUE CONTIENE EL PLAN DE LA ACT, CALIFICADOS EN SU TOTALIDAD POR LOS TÉRMINOS DEL PLAN DE LA ACT. LÉALOS ATENTAMENTE, JUNTO CON EL ARTÍCULO XL DEL PLAN DE LA ACT.*

**Descargo; descargo de reclamaciones y causas de acción**:[52]

| Parte exoneradora | Parte exonerada | Alcance de la exoneración o descargo |
|---|---|---|
| Todos los tenedores de reclamaciones de cualquier clase conforme al Plan de la ACT. | • ACT<br>• ACT Reorganizada | • Todas las reclamaciones, causas de acción y otras deudas emergentes, en su totalidad o en parte, antes de la Fecha de Entrada en Vigencia de la ACT, incluyendo las relacionadas con:<br>  o el Caso de Título III,<br>  o el Deudor o la ACT Reorganizada o cualquiera de sus respectivos activos, propiedad o intereses de |

---

[52]   *Véase* Plan de la ACT § 40.2(a), (b), (c).

| Parte exoneradora | Parte exonerada | Alcance de la exoneración o descargo |
|---|---|---|
| | | cualquier naturaleza, incluyendo cualquier interés devengado sobre dichas reclamaciones a partir de y después de la Fecha de Petición.<br>• Reclamaciones del tipo especificado en las Secciones 502(g), 502(h) o 502(i) del Código de Quiebras o la Sección 407 de PROMESA. |
| Acreedores del AAP de la ACT/ADCC y sus respectivas Personas Relacionadas, únicamente como Acreedores del AAP de la ACT/ADCC de la ACT. | • Junta de Supervisión<br>• Comités y subcomités de la Junta de Supervisión<br>• ACT<br>• AAFAF<br>• Todas las instrumentalidades, municipalidades, sociedades públicas y agencias públicas del Estado Libre Asociado<br>• Miembros del Directorio, directores, jefes, agentes, funcionarios, empleados, asesores y profesionales, antiguos o actuales, de las entidades antes mencionadas. | • Todas las reclamaciones o causas de acción surgidas antes de la Fecha de Entrada en Vigencia de la ACT relacionadas con el Deudor, reclamaciones (incluyendo, en relación con los Bonos de la ACT), las objeciones vinculadas a la deuda y las acciones de Impugnación de Gravámenes.<br><br>No incluye:<br>• Reclamaciones o causas de acción:<br>   o contra el Deudor (o su sucesor, incluyendo la ACT Reorganizada), el ELA, SRE, AEP o COFINA en relación con las obligaciones del Deudor, el ELA y COFINA conforme al Plan de la ACT o los títulos valores a emitirse conforme al Plan de la ACT o que se emitieron conforme al Plan de COFINA o el Plan del ELA.<br>   o contra una Parte Exonerada del Gobierno no vinculada a los Deudores o las Reclamaciones exoneradas conforme al Plan de la ACT.<br>   o vinculado a cualquier acto u omisión que constituya fraude intencional o conducta ilícita dolosa.<br>   o vinculado a reclamaciones o bonos emitidos, o contratos o arrendamientos celebrados, por el ELA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE. |

**Descargos del Deudor:**[53]

| Parte exoneradora | Parte exonerada | Alcance de la exoneración o descargo |
|---|---|---|
| • ACT<br>• ACT Reorganizada<br>• Agente Pagador<br>• Personas relacionadas de la ACT y la ACT Reorganizada | • Junta de Supervisión<br>• Comités y subcomités de la Junta de Supervisión[54]<br>• ACT<br>• AAFAF<br>• Acreedores del AAP de la ACT/ADCC<br>• Comité de Acreedores<br>• Personas Relacionadas[55] de las partes anteriores. | • Con respecto a las partes del Acuerdo de Apoyo al Plan de ACT/ADCC:<br>  o Reclamaciones y causas de acción liberadas conforme al Plan de la ACT y de acuerdo con el Acuerdo de Apoyo al Plan de la ACT/ADCC.<br>• Reclamaciones y causas de acción emergentes de, relacionadas con o que hayan sido o podrían haber sido invocadas contra el Deudor o sus Activos del Caso de Título III.<br>• Reclamaciones y causas de acción que han sido o podrían haber sido invocadas por el Deudor.<br>• Reclamaciones y causas de acción relacionadas con:<br>  o la *Cuarta Estipulación Enmendada entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico con respecto a la Suspensión de la Prescripción y Orden de Consentimiento* [Caso Núm. 17-3283-LTS, ECF Núm. 15854] (con sus enmiendas), y<br>  o la *Cuarta Estipulación enmendada y Orden de Consentimiento entre los Deudores de Título III (salvo COFINA) y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico actuando en nombre de las entidades gubernamentales enumeradas en el Apéndice "B" con respecto a la Suspensión de la* |

---

[53] *Véase* Plan de la ACT § 40.5.

[54] Incluye el Comité de Reclamaciones Especiales de la Junta de Supervisión.

[55] "Personas relacionadas" significa, con respecto a cualquier Entidad (incluyendo, para evitar dudas, el ELA, las Partes del Gobierno, y el Comité de Acreedores), sus predecesores, sucesores y cesionarios (ya sea de pleno derecho o de otra manera) y sus respectivos empleados, gerentes, funcionarios electos o designados, directores, funcionarios, miembros del Directorio, directivos, miembros, tenedores de patrimonio (ya sea que sean tenedores directos o indirectos de intereses), asociados, asesores financieros, abogados, contadores, consultores, agentes y profesionales (incluyendo, entre otros, todo y cualquier Profesional contratado por el Deudor, AAFAF, y el Comité de Acreedores), antiguos o actuales, o cualquier otro representante, candidato o gerente de inversiones, cada uno actuando en tal capacidad, y cualquier Entidad que invoque por o a través de cualquiera de ellos (incluyendo sus respectivos funcionarios, directores, gerentes, accionistas, asociados, empleados, miembros y profesionales), cada uno en su respectiva capacidad como tal; sin embargo, "Personas relacionadas" no está destinado a incluir ni se interpretará como que incluye al ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR, y AEE.

| Parte exoneradora | Parte exonerada | Alcance de la exoneración o descargo |
|---|---|---|
| | | *Prescripción* [Caso Núm. 17-3283-LTS, ECF Núm. 17394], con sus enmiendas.<br>• Reclamaciones emergentes de o relacionadas de otra manera con el Caso de Título III, el Acuerdo de Apoyo al Plan de la ACT/ADCC, el Acuerdo del Comité de la ACT y las transacciones estipuladas en el Plan de la ACT. |
| | | <u>Exclusiones específicas de los descargos</u>:<br>• Reclamaciones o causas de acción no relacionadas con el Deudor.<br>• Reclamaciones o causas de acción por culpa grave, conducta ilícita dolosa o fraude intencional.<br>• cualquier Entidad en su capacidad como demandado en cualquier Acción de Reintegración, incluyendo una parte de un acuerdo de suspensión con el ELA y/o el SRE relacionado con dicha causa de acción.<br>• Cualquier parte del desempeño de sus obligaciones de acuerdo con la Orden de Confirmación de la ACT o el Plan de la ACT.<br>• Reclamaciones o causas de acción contra el ELA, ADCC, COFINA, SRE, AMA, AFM, AEP, CPF, AAA, PRIDCO, AFI, UPR, y AEE. |

## Exculpaciones:[56]

| Parte exculpante | Parte exculpada | Alcance de la exculpación |
|---|---|---|
| Todas las entidades. | Partes del Gobierno:[57]<br>• Junta de Supervisión<br>• AAFAF<br>• ACT | • Cualquier acto u omisión en relación con:<br>  ○ el Caso de Título III.<br>  ○ el Plan de la ACT o cualquier transacción o acuerdo relacionado.<br>  ○ la Declaración de Divulgación.<br>  ○ cualquier documento dispuesto o contemplado en relación con el perfeccionamiento del Plan de la ACT. |

---

[56] *Véase* Plan de la ACT § 40.7.

[57] Incluye cada una de las respectivas Personas Relacionadas, únicamente actuando en su capacidad como tales en cualquier momento hasta e incluyendo la Fecha de Entrada en Vigencia.

| Parte exculpante | Parte exculpada | Alcance de la exculpación |
|---|---|---|
| | | • <u>No</u> incluye actos u omisiones que constituyan fraude intencional o conducta ilícita dolosa. |
| Todas las entidades. | Acreedores del AAP:[58]<br>• Cada uno de los Acreedores del AAP de la ACT/ADCC[59] | • Cualquier acto u omisión en relación con:<br>　○ el Caso de Título III.<br>　○ el Plan de la ACT o cualquier transacción o acuerdo relacionado.<br>　○ la Declaración de Divulgación.<br>　○ el Acuerdo de Apoyo al Plan de la ACT/ADCC.<br>　○ los Documentos Definitivos.<br>　○ cualquier documento dispuesto o contemplado en relación con el perfeccionamiento del Plan de la ACT.<br>• <u>No</u> incluye actos u omisiones que constituyan fraude intencional o conducta ilícita dolosa. |
| Todas las entidades. | Aseguradoras Monolínea:[60]<br>• Ambac<br>• Assured<br>• FGIC<br>• National | • Cualquier acto u omisión en relación con el Plan de la ACT.[61]<br>• <u>No</u> incluye:<br>　○ la obligación de pago de la aseguradora correspondiente a cualquier tenedor beneficiario de los bonos asegurados aplicables conforme a los términos de la póliza de seguros correspondiente, en la medida en que dicho tenedor no reciba el Tratamiento de Ambac, el Tratamiento de Assured, el Tratamiento de FGIC o el Tratamiento de National, según corresponda.<br>　○ cualquier reclamación de que la aseguradora correspondiente puede tener contra el tenedor beneficiario de los respectivos bonos asegurados con respecto a las obligaciones de la aseguradora correspondiente conforme a la póliza de seguros correspondiente. |

---

[58]  Incluye a cada una de sus respectivas Personas Relacionadas.

[59]  Únicamente en su capacidad como parte del Acuerdo de Apoyo al Plan de la ACT/ADCC y un Acreedor y/o Aseguradora, según corresponda, desde la Fecha de Petición de la ACT hasta e incluyendo la Fecha de Entrada en Vigencia de la ACT.

[60]  Incluye a cada una de sus respectivas Personas Relacionadas.

[61]  Incluye en relación con el tratamiento de las Reclamaciones de Bonos Asegurados por Ambac, Reclamaciones de Bonos Asegurados por Assured, Reclamaciones de Bonos Asegurados por FGIC, Reclamaciones de Bonos Asegurados por National, los procedimientos de votación, los procedimientos de elección, y cualquier descargo de obligaciones conforme a las Pólizas de Seguros de Ambac, las Pólizas de Seguros de Assured, las Pólizas de Seguros de FGIC o las Pólizas de Seguros de National correspondientes.

| Parte exculpante | Parte exculpada | Alcance de la exculpación |
|---|---|---|
| Todas las entidades. | • Cada miembro de los Comités de Acreedores (únicamente en su capacidad como miembro del Comité de Acreedores) <br> • Comité de Acreedores | • Cualquier acto u omisión en relación con: <br> o el Caso de Título III. <br> o el Plan de la ACT o cualquier transacción o acuerdo relacionado. <br> o la Declaración de Divulgación. <br> o cualquier documento dispuesto o contemplado en relación con el perfeccionamiento del Plan de la ACT. <br> • <u>No</u> incluye actos u omisiones que constituyan fraude intencional o conducta ilícita dolosa. |

**Descargos en relación con litigios relacionados con designaciones/litigios de uniformidad:[62]**

| Parte exoneradora | Parte exonerada | Alcance de la exoneración o descargo |
|---|---|---|
| • Todos los acreedores. <br> • Todas las entidades que reciban, o se considere que han recibido, distribuciones conforme al Plan de la ACT. | • Todas las partes que reciban descargos y exculpaciones conforme al Plan de la ACT. | • Una Orden Final en relación con el Litigio Relacionado con Designaciones o el Litigio de Uniformidad no modificará de ninguna manera las transacciones contempladas en el Plan de la ACT y la Orden de Confirmación de la ACT, incluyendo, los descargos, exculpaciones e interdictos dispuestos en el Plan de la ACT. |

**Interdictos del Plan:[63]**

| Partes inhabilitadas | Alcance del interdicto |
|---|---|
| • Todas las entidades, incluyendo las entidades que actúan en su nombre. | • Inhabilitadas de instituir, juzgar, promover o litigar de cualquier manera contra cualquiera de las reclamaciones de las Partes Exoneradas en relación con: <br> o las reclamaciones exoneradas. <br> o las Reclamaciones Exoneradas (véase el alcance de los descargos anteriormente). <br> o confirmación y perfeccionamiento del Plan de la ACT. <br> o la negociación y perfeccionamiento del Acuerdo de Apoyo al Plan de la ACT/ADCC. <br> o cualquier acto u omisión en relación con o supuesto o que pueda haberse supuesto en el Caso de Título III. |

---

[62] *Véase* Plan de la ACT § 40.8.

[63] *Véase* Plan de la ACT §§ 40.3, 40.9, 40.11.

| Partes inhabilitadas | Alcance del interdicto |
|---|---|
| | • Incluye las siguientes acciones:<br>  ○ Iniciar o continuar de cualquier procedimiento con respecto a dichos Reclamaciones Exoneradas contra cualquiera de las Partes Exoneradas o los activos o los bienes de cualquier Parte Exonerada.<br>  ○ Hacer valer, embargar, cobrar o recobrar, cualquier sentencia, laudo, decreto u orden en contra de cualquiera de las Partes Exoneradas o los activos o los bienes de estas, con relación a dichas Reclamaciones Exoneradas.<br>  ○ Crear, perfeccionar o ejecutar un Gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada.<br>  ○ Hacer valer, implementar o efectuar cualquier compensación, derecho de subrogación, indemnización, contribución o recuperación contra cualquier obligación exigible a cualquiera de las Partes Exoneradas o contra los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada. |

*[El resto de la página se deja intencionalmente en blanco]*

### III. Descripción general de la ACT

**A. Información general**

**1. Autoridad de Carreteras y Transportación de Puerto Rico (ACT)**

La ACT es una corporación pública y unidad componente del Estado Libre Asociado creada por la Ley 74 del 23 de junio de 1965, con sus enmiendas ("Ley 74-1965"), para diseñar, construir y administrar carreteras con peaje, autopistas y otras instalaciones para la movilidad de personas, vehículos y embarcaciones, y para la planificación, promoción y viabilidad de sistemas de transporte masivo. Como tal, la ACT tiene una influencia fundamental a la hora de determinar la situación actual y futura del sector del transporte en Puerto Rico. La ACT planifica y administra la construcción de todos los proyectos importantes relacionados con el sistema de transporte de Puerto Rico, lo que incluye la realización de reparaciones importantes y el mantenimiento de las autopistas con peaje y otras carreteras de acuerdo con las políticas globales de transporte del DTOP. La Ley 74-1965 otorgó a la ACT amplios poderes para llevar adelante sus responsabilidades, incluyendo, entre otras cosas, el control completo y la supervisión de cualquier carretera y otras instalaciones de transporte que posea, opere o construya; la facultad de establecer peajes y otros cargos para el uso de las carreteras y otras instalaciones de transporte y la facultad de emitir bonos, pagarés u otras obligaciones.

La ACT es una entidad independiente del DTOP a efectos del financiamiento y la construcción del sistema de transporte de Puerto Rico. Las facultades y deberes de la ACT son ejecutados por su Directorio en coordinación con el Secretario del DTOP, designado por el Gobernador. El Director Ejecutivo de la ACT depende del Directorio de la ACT.

Según lo establecido por la Ley 74-1965, la ACT cuenta con un Directorio de siete miembros que se compone de cuatro miembros ex-oficio, que incluyen el Secretario del DTOP, el Presidente de la Junta de Planificación de Puerto Rico, el Director Ejecutivo de la Agencia Fiscal, y la Autoridad de Asesoría Financiera y el Secretario de Hacienda. Los otros tres puestos restantes están destinados a ser ocupados por profesionales del sector, pero actualmente están vacantes. Los miembros ex oficio del Directorio tienen un mandato ilimitado, mientras que los profesionales de la industria tienen un mandato limitado de hasta cuatro (4) años. El Directorio de la ACT guía la estrategia general de la ACT y ayuda a establecer las prioridades. En enero de 2021, el Dr. Edwin E. González-Montalvo, fue designado por el Directorio de la ACT como Director Ejecutivo de la ACT. El Plan Fiscal de la ACT de febrero de 2022 esboza una serie de medidas fiscales organizativas, que incluyen la formación de un nuevo Directorio. Esta medida específica que el Directorio seguirá estando compuesto por siete miembros, pero señala que cuatro de esos miembros deben ser cargos privados e independientes. La medida también establece que los mandatos sean de seis años para evitar las interrupciones relacionadas con el ciclo político.

En 1990, mediante la promulgación de la Ley 4 del 24 de agosto de 1990, se autorizó a la ACT a celebrar contratos con operadores privados para la construcción, explotación y mantenimiento de nuevas autopistas, puentes, avenidas y otras instalaciones de tráfico. En calidad de tal, la ACT completó una P3 bajo jurisdicción estadounidense mediante la finalización del puente Teodoro Moscoso en 1994.

En 1991, mediante la promulgación de la Ley 1-1991, la antigua Autoridad de Carreteras se convirtió en la ACT, una autoridad de transporte integrada y el principal promotor y desarrollador del transporte en Puerto Rico. Originalmente, la ACT se creó para administrar la red de peajes. Sin embargo, la ACT ha crecido hasta administrar la red de autopistas, el sistema de transporte Tren Urbano y el sistema de autobuses alimentadores. En la actualidad, la ACT

construye nuevas carreteras y mantiene sus redes existentes de carreteras con y sin peaje, y también apoya a otras entidades públicas (por ejemplo, los municipios) con la gestión de subvenciones federales para la construcción y finalización de obras de capital.

La ACT clasifica sus autopistas y carreteras en las siguientes categorías: (i) primarias, (ii) primarias urbanas, (iii) secundarias, (iv) terciarias, (v) y carreteras locales. Existe una superposición entre el DTOP y la ACT, ya que la propiedad de los activos de las carreteras sin peaje está fragmentada entre los organismos, lo que ha provocado un retraso en las obras de mantenimiento debido a la mezcla de flujos de ingresos privados con fondos públicos. En el FY2020, el Estado tenía aproximadamente 4,647 millas de autopistas y 12,740 millas de calles locales y carreteras adyacentes. El sistema de carreteras comprende 389 millas de autopistas del sistema primario, que son las rutas de tráfico interregional más importantes e incluyen (i) las autopistas con peaje Luis A. Ferré ("PR-52"), De Diego ("PR-22"), PR-53, Corredor del Este ("PR-66"), PR-5, y Martínez Nadal ("PR-20"), (ii) 233 millas de autopistas del sistema urbano primario, (iii) 959 millas de autopistas del sistema secundario que sirven a las necesidades de tráfico intrarregional e intermunicipal, (iv) 3,064 millas de autopistas terciarias, y (v) 12,740 millas de tráfico local e intramunicipal.

La ACT es propietaria de instalaciones de peaje en cuatro carreteras principales de la isla (PR-20, PR-52, PR-53 y PR-66). En febrero de 2022, dos autopistas de peaje (PR-5 y PR-22) son administradas y operadas por Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas") en virtud de un contrato de concesión celebrado en septiembre de 2011, como parte de una transacción P3. La reforma del sector del transporte incluye el avance de una futura concesión de autopistas de peaje mientras la Autoridad de Alianzas Público-Privadas de Puerto Rico ("P3A") evalúa la viabilidad de un posible contrato de concesión de las restantes autopistas de peaje.

Además de la gestión de carreteras, la ACT también gestiona activos de tránsito, entre ellos el Tren Urbano, el sistema de ferrocarril pesado de San Juan, y sus autobuses alimentadores asociados. El Tren Urbano, cuya construcción finalizó en 2004, es el primer sistema de transporte urbano rápido del Caribe. Consiste en una única línea de 10.7 millas con dieciséis estaciones desde Bayamón hasta Sagrado Corazón en el centro de San Juan. La mayor parte del sistema es elevado, con un tramo de túnel de 1.1 millas en el distrito de Río Piedras.

La ACT es una de las tres agencias que gestionan la operación de los activos de transporte público en el área metropolitana de San Juan. La ATI gestiona la principal red de autobuses del área metropolitana de San Juan, y la Autoridad de Transporte Marítimo opera el ferry entre el Viejo San Juan y Cataño.

La gestión de múltiples activos de transporte y la falta de propiedad y responsabilidad específicas de cada clase de activos contribuyen a la falta de integración y planificación coordinada por modo en todo Puerto Rico. El mandato de la ACT más allá de la gestión de las autopistas de peaje crea una posible superposición con otras agencias de transporte, una de las causas fundamentales del retraso en los resultados de desempeño del sistema, que debe abordarse mediante una amplia reforma del sector del transporte.

Además, la ACT ha experimentado importantes pérdidas recurrentes en sus operaciones y se enfrenta a una serie de retos empresariales que se han visto agravados por la recesión económica

y la emergencia fiscal del ELA. Como resultado, la ACT no ha podido proporcionar a los ciudadanos de Puerto Rico servicios eficaces relacionados con el tránsito. La ACT sigue sin mantenerse a la altura de los estándares nacionales de calidad, seguridad y fiabilidad debido a una importante falta de financiamiento.

**B.     Obligaciones financieras de la ACT a la Fecha de Petición de la ACT**

  1.     Resoluciones de Bonos y Bonos en Circulación

    **(a)     Deuda de la ACT**

La ACT emitió múltiples series de bonos (los "Bonos de la ACT") en virtud de determinadas resoluciones sobre bonos, entre ellas: (i) la Resolución Núm. 98-06, adoptada el 26 de febrero de 1998 (la "Resolución de Bonos 1998") y (ii) la Resolución Núm. 68-18, adoptada el 13 de junio de 1968 (la "Resolución de Bonos 1968", y junto con la Resolución de Bonos 1998, las "Resoluciones de Bonos de la ACT"), complementadas por resoluciones independientes que autorizan la emisión de cada serie de bonos.

***Resoluciones de Bonos de la ACT***. La ACT emitió bonos en virtud de la Resolución de Bonos de 1968 (los "Bonos de la Resolución de 1968") con el fin de continuar con su programa de construcción de carreteras y pagar los pagarés pendientes mediante una línea de crédito concedida en relación con dicho programa de carreteras. Los Bonos de la Resolución de 1968 están supuestamente[64] garantizados y son pagaderos con los ingresos por impuestos y tasas pignorados, que incluyen (1) los ingresos brutos del arbitrio de $0.16 por galón sobre la gasolina; (2) los ingresos brutos del arbitrio de $0.04 por galón sobre el gas oil y el diesel oil; (3) los ingresos brutos del aumento de $15 de los derechos de licencias anuales de los vehículos automotores; (4) los ingresos de los peajes de las instalaciones financiadas con el producto de los bonos emitidos en virtud de la Resolución de Bonos de 1968; y (5) los beneficios de las inversiones en los depósitos al crédito de los fondos y cuentas establecidos en virtud de la Resolución de Bonos de 1968, excepto el Fondo de Construcción establecido en virtud de esta.

Posteriormente se emitieron bonos adicionales en virtud de la Resolución de 1998 (los "Bonos de la Resolución de 1998"). Los Bonos de la Resolución de 1998 están supuestamente garantizados y son pagaderos con, (1) hasta $120 millones de dólares por año fiscal del arbitrio sobre productos derivados del petróleo; (2) los ingresos de los peajes distintos de los peajes de las instalaciones financiadas con el producto de los bonos emitidos en virtud de la Resolución de Bonos de 1968; (3) los ingresos pignorados en virtud de la Resolución de Bonos de 1968 que queden tras el pago o la provisión para el pago de la amortización de la deuda y las reservas requeridas de los bonos emitidos en virtud de la Resolución de Bonos de 1968; y (4) los beneficios de las inversiones depositados en el crédito de los fondos y cuentas establecidos en virtud de la Resolución de Bonos de 1998. La Resolución de Bonos de 1998 prevé tanto bonos prioritarios (senior) como subordinados de la Resolución de 1998.

---

[64]  La garantía de dichos bonos ha sido objeto de impugnación. *Véase* la Sección V.F.1 de esta Declaración de Divulgación para obtener más información.

Cada serie de los Bonos de la ACT se emitió en virtud de una resolución complementaria que establecía su emisión y los términos de dicha serie, en cada caso adoptada por la ACT. En virtud de las Resoluciones de la ACT, el Bank of New York Mellon ("BNYM") actúa como agente fiscal de los Bonos de la ACT.

Los ingresos tributarios y los derechos de licencia supuestamente pignorados en relación con los Bonos de la Resolución de 1968 y 1998 están sujetos a la disposición de "recuperación" (clawback) de la Sección 8 del Artículo VI de la Constitución de Puerto Rico. Los ingresos de peaje supuestamente pignorados en relación con los Bonos de la Resolución de 1968 y 1998, sin embargo, no están sujetos a recuperación.

Por otra parte, el Estado también asignó a la ACT los impuestos procedentes de los derechos de licencia de vehículos, los arbitrios sobre los cigarrillos y el pago en exceso de arbitrios sobre los productos derivados del petróleo, que no están pignorados ni asignados a ningún bono, pero que están pignorados para el reembolso de las líneas de crédito del BGF.[65] Estos también están sujetos a la disposición de recuperación de la Sección 8 del Artículo VI de la Constitución de Puerto Rico.

De acuerdo con el Plan del ELA, las disputas con respecto a la recuperación de los ingresos supuestamente pignorados en relación con los Bonos de la Resolución de 1968 y 1998 han sido resueltas y acordadas con respecto a las reclamaciones contra el ELA.

***Bonos de refinanciamiento de ingresos de la instalación especial del puente Teodoro Moscoso de la ACT.*** La ACT y Autopistas de Puerto Rico y Compañía, S.E. ("Autopistas") son partes de un Contrato de Concesión con fecha del 20 de diciembre de 1991, según el cual Autopistas construyó y tiene derecho a explotar el Puente Teodoro Moscoso, un puente de peaje que cruza la Laguna de San José, que se abrió al tráfico en febrero de 1994. Para pagar una parte de los costos relacionados con la construcción del puente, la ACT emitió sus bonos de ingresos y prestó el producto de estos a Autopistas (los "Bonos Puente" y, junto con los Bonos de la Resolución de 1968 y los Bonos de la Resolución de 1998, los "Bonos existentes de la ACT"). En virtud del contrato de préstamo con Autopistas, esta se comprometió a reembolsar el préstamo únicamente con los ingresos generados por el puente (netos de los gastos de explotación y mantenimiento del puente). En virtud del contrato de fideicomiso de la ACT por el que se emitieron los Bonos Puente, dichos ingresos netos están pignorados para garantizar el pago de los Bonos Puente. Está previsto que el Contrato de Concesión finalice el 24 de febrero de 2044. Sin embargo, Autopistas tiene la opción de rescindir el Contrato de Concesión si el tráfico del puente está por debajo de ciertos niveles especificados en el Contrato de Concesión. Aunque Autopistas puede tener la capacidad de rescindir el Contrato de Concesión del Puente Teodoro Moscoso, según los estados financieros auditados del FY2021 emitidos el 1 de abril de 2022, la ACT no ha recibido una notificación de rescisión y no esperaba que el Contrato de Concesión fuera rescindido. Sin embargo, si Autopistas ejerce su derecho a rescindir el Contrato de Concesión, la ACT estaría obligada a asumir la obligación de pagar los Bonos Puente, y tendría que emitir bonos en virtud de este a cambio de los Bonos Puente. Si la ACT no puede emitir bonos en virtud de su Resolución de 1998 porque no cumple la prueba de los bonos adicionales, los Bonos Puente seguirían siendo

---

[65] Estas líneas de crédito se transfirieron a la Autoridad de Recuperación tras el cierre del procedimiento del Título VI del BGF.

pagaderos con los ingresos netos de peaje del puente disponibles y con cualquier otro ingreso de que disponga la ACT tras el pago de la amortización de la deuda de sus bonos prioritarios (senior) y subordinados.

*Bonos en Circulación y otras obligaciones.*[66] Los Bonos de la ACT en circulación[67] fueron emitidos entre 1996 y 2007, con tasas de interés de entre 2.25% y 6.50%, y vencimiento el 1º de julio de 2018 y el 1º de julio de 2046. A la Fecha de la Petición de la ACT, esta tenía aproximadamente $4.3 mil millones en montos totales de capital en circulación en virtud de las Resoluciones de Bonos de la ACT, con tasas de interés entre el 3.12% y el 6.25%. Aproximadamente $1.46 mil millones de los Bonos de ACT en circulación están asegurados por Assured, aproximadamente $640 millones están asegurados por National, aproximadamente $430 millones están asegurados por FGIC, aproximadamente $6 millones están asegurados por Syncora, y aproximadamente $515 millones están asegurados por Ambac. En el Anexo F se adjunta una lista de los Bonos de la ACT en circulación. De conformidad con la Ley Orgánica de la ACT y las Resoluciones de Bonos de la ACT, los Bonos de la ACT son pagaderos con los Ingresos Asignados Condicionalmente.[68]

En virtud de las órdenes ejecutivas emitidas en el marco de la Ley de Moratoria promulgada por el Estado Libre Asociado en mayo de 2016, el entonces Gobernador suspendió la obligación de la ACT de transferir los fondos pignorados al fideicomisario de los Bonos de la Resolución de 1968 y 1998 y ordenó la suspensión de la obligación del ELA de transferir los ingresos tributarios asignados a la ACT.[69] El agente fiscal de los Bonos de la Resolución de 1968 y 1998 pagó los intereses y el capital de dichos bonos (excepto los bonos subordinados emitidos en virtud de la resolución de 1998) el 1 de julio de 2016 utilizando los fondos disponibles, incluidas las reservas de la amortización de la deuda. En el caso de los bonos subordinados emitidos en virtud de la resolución de 1998, las reservas de la amortización de la deuda se mantenían en el BGF y no estaban disponibles para pagar dichos bonos como consecuencia de las limitaciones de retiro de depósitos impuestas por las órdenes ejecutivas emitidas en virtud de la Ley de Moratoria.[70]

Al 30 de junio de 2020, la ACT tenía en circulación aproximadamente $1.7 mil millones en montos de capital total de préstamos del BGF (los "Préstamos de la ACT"), que posteriormente fueron transferidos a la Autoridad de Recuperación de Deuda para el Banco Gubernamental de Fomento conforme a la Modificación Calificadora del BGF. Para ver un resumen de la Modificación Calificadora del BGF, véase la Sección V.I.2 de esta Declaración de Divulgación. Todos los Préstamos de la ACT han vencido y devengan un interés variable equivalente a la Tasa

---

[66]   Los montos de los bonos en circulación se basan en la información publicada en los Estados Financieros Básicos del Estado Libre Asociado de Puerto Rico y la Información Suplementaria Requerida del 30 de junio de 2018.

[67]   En el Anexo F de esta Declaración de Divulgación se incluye una lista de los Bonos de la ACT en circulación.

[68]   9 L.P.R.A. § 2004(l).

[69]   Las Resoluciones de la ACT no prevén la aceleración de los vencimientos de los Bonos en caso de mora

[70]   La Ley de Moratoria fue modificada por el Estado Libre Asociado en enero de 2017 mediante la Ley 5-2017, que declara una emergencia financiera y permite al Gobernador emitir órdenes ejecutivas que designen la prioridad para el uso de los recursos disponibles y otorgan al Gobernador amplios poderes de sindicatura sobre las agencias gubernamentales. Para una discusión adicional sobre la Ley 5-2017, *véase* la sección IV.B.11 de esta Declaración de Divulgación.

Preferencial de los EE.UU. más 150 puntos básicos, con un límite mínimo del 6% y un tope legal del 12%. Los Préstamos de la ACT fueron pagados principalmente con los ingresos asignados por el ELA a la ACT por la Ley 30-2013 y la Ley 31-2013 (colectivamente, los "Ingresos de la Ley 30-31").

Los ingresos de la Ley 30-31 consisten en (i) los ingresos procedentes del aumento del arbitrio sobre los productos derivados del petróleo del ELA introducido por la Ley 31-2013, (ii) la parte de los derechos sobre licencia de vehículos automotores que superan los 15 dólares pignorados para el pago de algunos bonos públicos en circulación de la ACT, y (iii) $20 millones del arbitrio sobre los cigarrillos del ELA cada año fiscal. Como se describe en la Sección I.B.1(a) de esta Declaración de Divulgación, los Ingresos de la Ley 30-31 supuestamente pignorados en relación con los Préstamos de la ACT están sujetos a la disposición de "recuperación" (clawback) de la Sección 8 del Artículo VI de la Constitución de Puerto Rico.

***Litigios relacionados con Bonos de la ACT y otras obligaciones.*** Pueden consultarse los resúmenes de ciertos litigios relacionados con los Bonos de la ACT y otras obligaciones de la ACT en la Sección V.F. de esta Declaración de Divulgación.

## C.    Régimen de ingresos de la ACT[71]

Los ingresos de la ACT proceden de dos categorías principales: (1) los ingresos de explotación, que consisten principalmente en las tarifas de peaje, las multas de peaje, las tarifas de tránsito y los contratos de concesión; y (2) los ingresos no relacionados con explotación, que consisten principalmente en transferencias y subvenciones federales y del ELA, tanto para fines operativos como de capital. Antes del 1 de diciembre de 2015, la ACT recibía varios Ingresos Asignados Condicionalmente, entre los que se encontraban unos impuestos sobre la gasolina, el diésel y los productos derivados del petróleo, así como los impuestos sobre los cigarrillos y las tarifas de licencias de vehículos automotores. Sin embargo, desde la publicación de la Orden Ejecutiva 2015-046, el Departamento de Hacienda ha retenido estos impuestos. Estos Ingresos Asignados Condicionalmente se conocen comúnmente como "fondos de recuperación".

Para el FY2021, la ACT declaró unos ingresos totales de aproximadamente $824 millones. Para el FY2020, la ACT declaró unos ingresos totales de aproximadamente $490 millones en ingresos totales (véase la Tabla 1 a continuación).

**Tabla 1: Ingresos históricos de la ACT de FY2018 a FY2021**

| (*miles de* $) | Ingresos[72] FY2018 | FY2019 | FY2020 | FY2021 |
|---|---|---|---|---|
| **Ingresos de explotación** | | | | |
| Tarifas de peaje y tren | $115,783 | $142,293 | $129,279 | $152,674 |
| Otros ingresos de explotación | 5,941 | 18,245 | 7,518 | 6,465 |

---

[71]  Esta sección no pretende describir exhaustivamente todos los ingresos de la ACT, sino que más bien ofrece una descripción general de algunas de las fuentes de ingresos más importantes de la ACT.

[72]  Estos importes representan los ingresos auditados comunicados por la ACT en sus estados financieros anuales auditados para los años fiscales cerrados en 2018, 2019, 2020 y 2021.

| (*miles de* $) | Ingresos[72] FY2018 | FY2019 | FY2020 | FY2021 |
|---|---|---|---|---|
| Multas de peaje electrónico y venta de etiquetas | 54,204 | 14,282 | - | - |
| Contratos de concesión | 34,140 | 34,426 | 39,946 | 41,165 |
| **Subtotal de ingresos de explotación** | **210,068** | **209,246** | **176,743** | **200,304** |
| **Ingresos no de explotación** | | | | |
| Transferencias de explotación del Estado Libre Asociado de Puerto Rico [73] | 117,088 | 97,300 | - | 206,136 |
| Subvención de capital - Estado Libre Asociado | 159,000 | 61,397 | 90,851 | 183,525 |
| Subvenciones de explotación del Gobierno Federal de EE.UU. | 20,602 | 31,828 | 24,310 | 16,565 |
| Subvención de capital - Gobierno Federal | 92,313 | 164,101 | 198,290 | 217,698 |
| **Subtotal de ingresos no de explotación** | **389,003** | **354,626** | **313,451** | **623,924** |
| **Ingresos totales** | **599,071** | **563,872** | **490,195** | **824,228** |

## 1.  Fuentes de ingresos de la ACT

### (a)  Ingresos de explotación

La ACT tiene cuatro fuentes principales de ingresos de explotación: (1) tarifas de peaje y tren; (2) otros ingresos de explotación; (3) multas de peaje electrónico y venta de etiquetas; y (4) contratos de concesión.

*Tarifas de peaje y tren*. Los ingresos por tarifas de peaje y tren suman aproximadamente $153 millones y contribuyen a la mayor parte de los ingresos de explotación actuales de la ACT (aproximadamente el setenta y seis por ciento (76%) de los ingresos de explotación del FY2021). La ACT opera actualmente cuatro autopistas de peaje, la PR-20, la PR-52, la PR-53 y la PR-66. Las tarifas de peaje en las cuatro autopistas operadas por la ACT no han aumentado desde 2005.

El Tren Urbano, el sistema de trenes pesados de San Juan, recauda las tarifas de sus pasajeros. La recaudación total del tránsito ha sido siempre inferior a las previsiones iniciales. Inicialmente se preveía que el Tren Urbano alcanzaría un número de pasajeros mensuales de aproximadamente 3.4 millones en 2010; sin embargo, en la actualidad solo tiene un número aproximado de 0.22 millones[74] de pasajeros al mes. Además, el coeficiente de recuperación de la caja de tarifas de transporte del Tren Urbano (la parte de los gastos cubiertos por los ingresos de las tarifas) se reduce actualmente al cuatro por ciento (4%) desde el diecisiete por ciento (17%) en 2017,[75] en comparación con el doce por ciento (12%) de los sistemas similares de EE.UU. En una

---

[73]  Consiste en fondos del Estado Libre Asociado para financiar los gastos de funcionamiento de la ACT asociados a los activos no relacionados con el peaje. En el FY2021, este monto también incluye $115.5 millones como una reserva por única vez para financiar las obligaciones de servicio público de la ACT adeudadas a la AEE y la AAA, los gastos imprevistos de litigios no relacionados con el Título III y los eventos imprevistos de emergencia operativa.

[74]  Promedio para el período de julio de 2021 a enero de 2022.

[75]  Refleja el coeficiente de ingresos de la caja de tarifas ("FRR") del FY2022 (en diciembre de 2021); el FRR del FY2021 está más cerca del 2% debido a los períodos de cuarentena en 2020.

evaluación realizada en 2018 tras los huracanes Irma y María se constató que más del cincuenta por ciento (50%) de los molinetes (barreras) del Tren Urbano no funcionaban; el veinte por ciento (20%) de las máquinas expendedoras de billetes presentaban defectos; el software es obsoleto; y el sistema no es compatible con la industria de las tarjetas de pago, lo que impide a los usuarios comprar billetes con tarjetas de débito y crédito.

*Otros ingresos de explotación.* En el FY2021, la ACT registró aproximadamente $6 millones en otros ingresos de explotación, lo que representa el tres por ciento (3%) de los ingresos de explotación del FY2021. Otros ingresos de explotación consisten en: (i) los ingresos de Teodoro Moscoso, que ascienden a aproximadamente el cinco por ciento (5%) de las tarifas recaudadas por Autopistas y remitidas a la ACT anualmente, (ii) los ingresos por alquileres y arrendamientos, (iii) el pesaje de camiones, (iv) las tarifas del Metrobús, y (v) otros ingresos no relacionados con el peaje basados en el tránsito.

*Multas de peaje electrónico y venta de etiquetas.* Los ingresos por multas de peaje se basan en las infracciones relacionadas con el funcionamiento del peaje (una multa fija de $15 según la Ley 220-2018). Por ejemplo, se imponen multas a los conductores que pasan por las estaciones de peaje sin transpondedor o sin balance en su cuenta y no pagan la tarifa de peaje correspondiente en los cinco (5) días siguientes a la fecha de su respectiva infracción. La legislación de condonación de multas de peaje aprobada en septiembre de 2018 retrasó el cobro de multas de peaje electrónico hasta julio de 2021. La ACT reanudó el cobro de multas de peaje en julio de 2021. Históricamente, la ACT recaudaba aproximadamente el sesenta por ciento (60%) de todas las multas impuestas. Desde julio de 2021 hasta diciembre de 2021, la ACT recaudó $20.5 millones en multas de peaje, lo que es significativamente superior a la cantidad presupuestada de $8.1 millones para ese período. Este aumento se debe a los elevados índices de infracción, así como a los mayores índices de recaudación tras el restablecimiento de las multas. Las ventas de etiquetas se refieren a los ingresos registrados por las ventas de transpondedores y etiquetas de peaje para AutoExpreso.

*Contratos de concesión.* La ACT mantiene dos contratos de concesión de autopistas de peaje. En 1992, la ACT firmó un contrato de concesión de servicios de puentes con Autopistas para el diseño, la construcción, la operación y el mantenimiento del puente Teodoro Moscoso, un puente de peaje que cruza la laguna de San José entre los municipios de San Juan y Carolina. Según el contrato, Autopistas paga el cinco por ciento (5%) de los ingresos anuales de peaje a la ACT hasta 2027 y luego el 61.5% desde el 23 de febrero de 2027 hasta el final del contrato. Además, según los términos del contrato, Autopistas es responsable del pago de la amortización de la deuda de los bonos a plazo y de apreciación de capital utilizados para financiar la construcción del puente. Dado que estos bonos están siendo pagados por Autopistas, la ACT registrará los ingresos de la concesión por el importe del capital y los intereses pagados por Autopistas anualmente hasta su liquidación.

El 22 de septiembre de 2011, la ACT suscribió con Metropistas un Contrato de Concesión de Autopistas de Peaje en el que se concedía a Metropistas el derecho a explotar las autopistas PR-5 y PR-22 por un período de 40 años. Como parte del contrato, Metropistas recibió el derecho de cobrar y recaudar los peajes impuestos en las autopistas a cambio de un pago inicial de derechos de concesión de aproximadamente $1.13 mil millones, por lo que la ACT registró los pagos como una entrada diferida de recursos que se está amortizando y reconociendo como ingresos durante

los 40 años de duración del contrato. Metropistas opera las carreteras con un Índice de Precios al Consumidor ("IPC") más un cronograma adicional de incrementos anuales del 1.5% y ha aumentado las tarifas cada año desde 2014.

Dado el éxito de la utilización de esta concesión para mejorar la calidad de las carreteras y la sostenibilidad financiera, el 19 de abril de 2016, la ACT suscribió una modificación del Contrato de Concesión de Servicios de Autopistas de Peaje para ampliar el plazo original del contrato con Metropistas por 10 años adicionales y crear cinco puntos de peaje bidireccionales en las autopistas a cambio de un pago inicial del derecho de concesión de $100 millones. Más recientemente, en junio de 2017, la ACT recibió un pago adicional de $15 millones simultáneamente con el inicio del sistema bidireccional descrito anteriormente. Además de la recaudación de fondos, Metropistas ha demostrado su éxito con las mejoras de calidad basadas en la mejora de las métricas del estado de las carreteras. A partir de 2019, el noventa y nueve por ciento (99%) del pavimento de la PR-22 está en condiciones "buenas" o "regulares", en comparación con el ochenta y tres por ciento (83%) del sistema interestatal de Puerto Rico en su conjunto.

La ACT también tiene un contrato con el Municipio de Guaynabo para recaudar los ingresos de peaje de la autopista municipal a través del operador AutoExpreso por una tarifa.

***Impacto de COVID-19 en los ingresos de explotación de la ACT.*** El inicio de la pandemia de COVID-19 en marzo de 2020 afectó rápida y drásticamente a las operaciones y los resultados financieros de la ACT. Las transacciones mensuales en las cuatro autopistas de peaje de la ACT, por ejemplo, se redujeron en un cuarenta y cinco por ciento (45%), pasando de un promedio de 10.3 millones por mes[76] antes de la epidemia de COVID-19 a un promedio de 5.6 millones por mes[77] durante el punto álgido de la pandemia. No obstante, en los años fiscales 2021 y 2022, las transacciones de peaje han rondado los niveles previos a COVID-19, alcanzando un promedio mensual de 9.8 millones de transacciones de peaje para el FY2021[78] y 10.7 millones de transacciones de peaje para el FY2022 (a partir de julio de 2021) hasta diciembre de 2021. Los activos de tránsito experimentaron una disminución más drástica de los ingresos, porque el Tren Urbano y el servicio de autobuses alimentadores se cerraron por completo desde mediados de marzo de 2020 hasta julio de 2020, y de nuevo en agosto y septiembre de 2020. A diferencia de las transacciones de peaje, la demanda de tránsito ha mostrado pocos signos de mejora, ya que el promedio de los ingresos mensuales del Tren Urbano se mantiene por debajo de sus niveles previos a COVID en aproximadamente el sesenta y cuatro por ciento (64%) para el FY2021 y el cincuenta y dos por ciento (52%) para la primera mitad del FY2022.[79] La demanda estancada del tránsito se

---

[76] Transacciones mensuales promedio para el período de seis meses desde septiembre de 2019 hasta febrero de 2020 (antes de COVID-19).

[77] Transacciones mensuales promedio para el período de tres meses desde marzo de 2020 hasta mayo de 2020 (cuarentena de COVID-19).

[78] Transacciones mensuales promedio para el período de doce meses desde julio de 2020 hasta junio de 2020 (período posterior a la cuarentena).

[79] Al comparar el período de seis meses desde septiembre de 2019 hasta febrero de 2020 (es decir, un período anterior a la pandemia de COVID-19) con el período de seis meses desde enero de 2021 hasta junio

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                                04/30/2022 3:29 PM "" ""

ha visto exacerbada por ineficiencias operativas en el sistema de tránsito de la ACT (por ej., molinetes averiados, sistemas de TI obsoletos) que han reducido la accesibilidad para el público y el atractivo de las instalaciones, y han sido el motivo de un servicio de calidad inferior.

(b)     **Aportes de capital e ingresos no vinculados a la explotación**

La ACT ha recibido históricamente aportes de capital e ingresos no vinculados a la explotación de dos fuentes: (1) el gobierno federal, y (2) las asignaciones del presupuesto del fondo operativo principal del gobierno del Estado Libre Asociado (el "Fondo General").

***Transferencias de explotación y subvenciones de capital del Estado Libre Asociado.*** A finales de 2015, el Gobernador en funciones emitió la Orden Ejecutiva 2015-046, en la que se ordenaba al Departamento de Hacienda que retuviera ciertos Ingresos Asignados Condicionalmente de la ACT, incluidas las tarifas sobre las licencias de vehículos automotores, así como los arbitrios del ELA sobre la gasolina, el petróleo, los productos derivados del petróleo y los cigarrillos. Para garantizar que la ACT mantuviera los recursos suficientes para financiar el mantenimiento y los gastos de capital ("CapEx") necesarios para mantener en funcionamiento el sistema de transporte de Puerto Rico, el ELA comenzó posteriormente a realizar dos nuevas asignaciones: (1) una asignación para gastos de capital destinada a ayudar a la ACT a avanzar en sus prioridades de infraestructura; y (2) una transferencia general operativa destinada a ser utilizada por la ACT únicamente para financiar los costos asociados a los activos no relacionados con el peaje y que no está disponible para ser utilizada para ningún otro propósito. En consonancia con los planes fiscales certificados para 2021 y 2022 tanto de la ACT como del ELA, el importe de la transferencia del ELA varía en una cantidad que se vincula con el nivel estimado de financiamiento necesario para mantener las carreteras sin peaje y los activos de tránsito de la ACT, cubrir sus gastos operativos y satisfacer sus necesidades de capital. En el año fiscal 2021, este nivel de financiamiento se basó en las proyecciones del Plan Fiscal de la ACT de mayo de 2021, suponiendo la aplicación plena y exitosa de las medidas fiscales.

En el FY2021 se financió una reserva por única vez para la ACT con un balance total de aproximadamente $115.5 millones. Esta reserva estaba destinada a abonar las obligaciones de servicios públicos pendientes adeudadas a la AEE y la AAA (aproximadamente $40 millones), los gastos imprevistos de los litigios no relacionados con el Título III (aproximadamente $9 millones), y los eventos imprevistos de emergencia operativa (aproximadamente $67 millones). La ACT no puede acceder a esta reserva sin la autorización previa por escrito de la Junta de Supervisión. La reserva se gestiona en una cuenta separada y no se utiliza para el programa de gastos de capital de la ACT. No hay intención de reponer esta reserva en el futuro. A partir del FY2021 y hasta enero de 2022, la ACT desembolsó aproximadamente $30.4 millones de esta reserva por única vez (99.7% de los cuales estaban relacionados con las obligaciones de servicio público pendientes de pago a la AEE y la AAA), lo que resultó en un balance final de aproximadamente $85 millones.

En el futuro, todas las asignaciones del Fondo General a la ACT estarán vinculadas al nivel estimado de inversión necesario para mantener las carreteras sin peaje y los activos de tránsito, ya

---

de 2021 — los últimos seis meses del FY2021 (es decir, el período posterior a la cuarentena) y el período de seis meses desde julio de 2021 hasta diciembre de 2021 para el FY2022 (es decir, el período de seis meses más reciente).

que las autopistas de peaje financiarán totalmente sus propios gastos de funcionamiento y de capital y los ingresos de peaje no estarán disponibles para financiar las operaciones no sujetas a peaje. El nivel de financiamiento se basa en la estimación de la distribución de los costos e ingresos entre las clases de activos y está sujeto a un refinamiento adicional, en particular a medida que se finalizan los planes de proyectos de capital. En el período comprendido entre el FY2022 y el FY2051, el Plan Fiscal Certificado del ELA de 2022 prevé que la asignación del Fondo General a la ACT sea de un promedio de aproximadamente $109 millones al año, más un promedio adicional de $67 millones al año en asignaciones de gastos de capital. El ELA transfiere anualmente a la ACT asignaciones de gastos de capital con el fin de permitir un financiamiento suficiente para el Programa de Mejoras de Capital de la ACT, que está previsto que comience en el FY2023.

Además, conforme al Plan del ELA, y siempre que se cumplan ciertas condiciones, la ACT realizará pagos en efectivo por valor de $184.8 millones a los tenedores de Reclamaciones de Bonos de la ACT 68 y $79.2 millones a los tenedores de Reclamaciones de Bonos de la ACT Prioritarios (Senior) 98. La ACT también hará un pago en efectivo de $125 millones para los costos de perfeccionamiento como contraprestación de los honorarios y gastos incurridos por un Acreedor Inicial del AAP y cubrirá $15 millones a las Partes de la ARD de acuerdo con la Estipulación de la ARD. Del total adeudado por la ACT de $404 millones, el ELA proporcionará un préstamo por única vez a la ACT para el FY2022 por un importe de $362 millones, además de las asignaciones anuales de funcionamiento y de capital mencionadas anteriormente, para garantizar la liquidez de la ACT tras la implementación del Plan del ELA. El Plan Fiscal Certificado del ELA de 2022 parte de la base de una amortización del préstamo subordinado a 30 años con fines ilustrativos.

***Ley de Inversión en Infraestructura y Empleos (IIJA).*** El 11 de noviembre de 2021, el presidente Biden promulgó la Ley IIJA, que otorga fondos por $1.2 billones y que tuvo el propósito doble de (1) proporcionar extensiones y aumentos al financiamiento para el FY2022 hasta el FY2026 para varios programas de la Ley FAST y (2) crear nuevos programas de financiamiento y asignaciones para el transporte de superficie, la aviación, el agua, el clima y la banda ancha. La IIJA asigna más de $550 mil millones en nuevos gastos a lo largo de cinco años. Entre otras iniciativas, la IIJA apunta a la reparación y reconstrucción de carreteras y puentes, con especial énfasis en la mitigación del cambio climático, la resiliencia, la equidad y la seguridad para todos los usuarios, y la mejora de las opciones de transporte y la reducción de las emisiones de efecto invernadero mediante una gran inversión en el transporte público. La ACT se beneficiará de los aumentos de las fuentes de financiamiento federales existentes (como el Programa de Carreteras de Puerto Rico) y de nuevos programas, como el Programa de Sustitución, Rehabilitación, Preservación, Protección y Construcción de Puentes, además de tener la capacidad de competir por múltiples programas discrecionales como el de Infraestructura para Reconstruir Estados Unidos. Se estima que Puerto Rico puede recibir aproximadamente $2.5 mil millones[80] en concepto de financiamiento de fórmula entre el FY2022 y el FY2026 de la IIJA. Se espera que la ACT pueda recibir hasta unos $300-$400 millones en financiamiento de fórmula incremental de la IIJA entre los años FY2022 y FY2026 (autopistas, tránsito y puentes), suponiendo que la ACT amplíe su programa de capital de forma que los gastos de capital sean equivalentes a la fórmula de financiamiento disponible). Más ampliamente, Puerto Rico podría competir por una parte de aproximadamente $380 mil millones en programas discrecionales.

---

[80]   Esta cifra incluye tanto la renovación del financiamiento de base como el nuevo financiamiento incremental.

**Subvenciones de explotación y de capital del Gobierno Federal de EE.UU.** La ACT recibe subvenciones de capital y de explotación del gobierno federal. Las subvenciones de capital solo pueden utilizarse para la construcción, las mejoras de importancia y la conservación de carreteras y puentes, mientras que las subvenciones de explotación se utilizan para financiar la reparación y el mantenimiento de carreteras y puentes y otros gastos de funcionamiento de otros sistemas de transporte masivo. Por ejemplo, la ACT recibe una asignación anual de la FHWA para la construcción, las mejoras de importancia y la conservación de autopistas y puentes. Históricamente, estos fondos no podían utilizarse para otros fines de explotación; sin embargo, conforme a la nueva ley IIJA, una parte de los fondos de fórmula que la FHWA proporcionará a la ACT permitirá realizar trabajos de mantenimiento. La ACT también recibe subvenciones de explotación de la FTA para los servicios de mantenimiento del Tren Urbano. Además de las contribuciones de curso normal, la ACT también espera recibir financiamiento *ad hoc* hasta al menos el FY2026 de la FHWA y de los fondos de emergencia de la Agencia Federal para el Manejo de Emergencias ("FEMA") y fondos no regulares de la FTA de Capital.

(c)      **Ingresos Asignados Condicionalmente**

Históricamente, la ACT también ha recibido financiamiento de varios Ingresos Asignados Condicionalmente, entre los que se encuentran las tarifas sobre las licencias de vehículos automotores, así como los arbitrios del ELA sobre la gasolina, el petróleo, los productos derivados del petróleo y los cigarrillos. El 1 de diciembre de 2015, el Gobernador emitió la Orden Ejecutiva 2015-046 que ordenaba al Departamento de Hacienda comenzar a retener estas tasas e impuestos. Posteriormente, tras la presentación del Caso de Título III del ELA el 3 de mayo de 2017, los Ingresos Asignados Condicionalmente fueron retenidos por el ELA por numerosas razones, incluyendo la aplicación de la paralización automática bajo el Título III de PROMESA. Desde el perfeccionamiento del Plan del ELA, el 15 de marzo de 2022, estos ingresos ya no serán objeto de transferencia a la ACT en el futuro.

**Arbitrio sobre la gasolina.** El Código de Rentas Internas de Puerto Rico impone actualmente un impuesto de $0.16 por galón sobre la gasolina. Antes de la promulgación de la Orden Ejecutiva 2015-046, la totalidad de la cantidad recaudada en virtud de este impuesto se transfería a la ACT como asignación condicional. En el FY2021, el Fondo General recaudó aproximadamente $126 millones en arbitrios sobre gasolina.

**Arbitrio sobre el gasoil.** El Código de Rentas Internas de Puerto Rico impone actualmente un impuesto de $0.04 por galón sobre el gas oil. y el diésel oil. En el FY2021, el Fondo General recaudó aproximadamente $13 millones en arbitrios sobre combustibles diésel.

**Arbitrio sobre productos de petróleo y sus derivados ("crudita").** El arbitrio bruto sobre los productos de petróleo y sus derivados es actualmente de $15.50 por barril ($6.25 de los cuales no se aplican a los productos diésel). A partir del 25 de junio de 2013, Puerto Rico aumentó la parte condicionalmente asignada del arbitrio que la ACT recibió sobre los productos petrolíferos de $3.00 por barril a $9.25 por barril, y también comenzó a transferir a la ACT la parte de los ingresos por tasas de licencia de vehículos automotores que originalmente era retenida por el Departamento de Hacienda. Los otros $6.25 se enviaban históricamente de forma condicionada a la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico. Este impuesto está sujeto

a un ajuste basado en el consumo y la inflación cada cuatro años. En el FY2021, el Fondo General recaudó aproximadamente $343 millones en concepto de arbitrio sobre la "crudita".

*Arbitrio sobre productos del tabaco.* La Sección 3020.05 del Código de Rentas Internas de Puerto Rico impone un arbitrio sobre los cigarrillos. El arbitrio ha aumentado varias veces en la última década y actualmente es de $25.50 por cada cien cigarrillos. El Código de Rentas Internas de Puerto Rico de 2011 también grava un impuesto sobre los cigarros puros, el tabaco para liar, el tabaco de mascar, el tabaco en polvo (rapé), los cigarrillos electrónicos, los vaporizadores y otros productos derivados del tabaco.

El Código de Rentas Internas de Puerto Rico de 2011 establece que la Secretaría de Hacienda depositará las recaudaciones derivadas de los arbitrios sobre los productos del tabaco directamente en el Fondo General del ELA. La Ley 26-2017 modificó la disposición del Código de Rentas Internas de Puerto Rico de 2011 relativa a la asignación de fondos para dirigir el depósito de todos los fondos recaudados al Fondo General en lugar de distribuir una parte de los fondos entre la Escuela de Bellas Artes (33%), el Conservatorio de Música (33%) y la Corporación de Artes Musicales (34%).

Antes de la promulgación de la Orden Ejecutiva 2015-046, una parte de la recaudación del arbitrio sobre los productos del tabaco, aproximadamente $20 millones, se asignó de manera condicional a la ACT. En el FY2021, el Fondo General recaudó aproximadamente $55 millones en arbitrio sobre los productos del tabaco.

*Arbitrio sobre la licencia de vehículos automotores.* En virtud de la Ley 22-2000, con sus enmiendas, conocida como la Ley de Vehículos y Tránsito de Puerto Rico, el ELA impone tasas anuales de licencia a varias clases de vehículos automotores. La Ley 22-2000 derogó la Ley 141-1960, con sus enmiendas, conocida como Ley de Vehículos y Tránsito de Puerto Rico, que anteriormente regulaba las tasas de las licencias de vehículos automotores. Las tasas de licencia actuales oscilan entre $25 y $40 para los automóviles y varían para otros vehículos. Antes de la promulgación de la Orden Ejecutiva 2015-046, quince dólares ($15) de cada una de esas tasas de licencia anuales se asignaban condicionalmente a la ACT para ser utilizadas como fuente de ingresos. Además, la Ley 30-2013 asignó condicionalmente los veinticinco dólares ($25) restantes de cada una de esas tasas anuales de licencia a la ACT. En el FY2021, el Fondo General recaudó aproximadamente $103 millones procedentes de las tasas de licencia de los vehículos automotores.

**D.    Sistema de Administración de efectivo de la ACT**

**(a) Flujo de fondos de las cuentas bancarias de la ACT**

*Ingresos de peaje.* Los ingresos de peaje recaudados en el punto de venta, incluyendo todos los prepagos realizados en las cuentas de AutoExpreso a través de la reposición electrónica automática de fondos, se depositan en las cuentas de plica de transferencia del Banco Popular de Puerto Rico ("BPPR") Núm. 0303 y Núm. 6438. Posteriormente, estos fondos se transfieren diariamente a la cuenta de plica consolidada Núm. 6411 del BPPR. Al 31 de diciembre de 2021 (la "Fecha de medición de diciembre de 2021"), la cuenta Núm. 6411 tenía un balance de aproximadamente $23.7 millones. Las cuentas Núm. 0303 y Núm. 6438 tenían un balance de $5,000 cada una, tal y como exige el contrato de plica. Los ingresos de peaje pertenecientes a la

ACT, calculados semanalmente sobre la base del informe de tráfico de peaje, se distribuyen desde la cuenta de plica consolidada Núm 6411 a la cuenta Núm. 5116 del BPPR, que tenía un balance de aproximadamente $13.0 millones a la fecha de medición de diciembre de 2021. Si algún fondo de peaje se transfiere incorrectamente a la ACT desde la cuenta de plica consolidada Núm. 6411 del BPPR, estos fondos se transfieren de vuelta a la cuenta de plica de transferencia (cuenta Núm. 0303 del BPPR).

Los fondos pueden ser transferidos de la cuenta Núm. 5116 a varias cuentas, incluyendo (1) las cuentas Núm. 5078 y Núm. 5353 del BPPR, desde las cuales se desembolsan las nóminas y, en conjunto, tenían un balance de aproximadamente $0.9 millones a la Fecha de Medición de diciembre de 2021; (2) Cuenta de Oriental Bank Núm. 9874 (cuenta operativa principal) desde la que se desembolsan los gastos de explotación y que tenía un balance de aproximadamente $3.4 millones a la Fecha de Medición de diciembre de 2021; (3) cuenta restringida Núm. 0510 del BPPR, a la que se transfiere la parte estatal de los programas federales y que tenía un balance de aproximadamente $7.4 millones a la Fecha de Medición de diciembre de 2021; y (4) la cuenta Núm. 5210 del BPPR, que tenía un balance de $6.4 millones a la Fecha de Medición de diciembre de 2021 en relación con los fondos de peaje restringidos reservados para proyectos de capital específicos, de conformidad con la Ley 91-2013. Actualmente no se están transfiriendo fondos adicionales a la cuenta Núm. 5210 del BPPR.

El flujo de fondos se ilustra a continuación:



***Ingresos por multas de peaje.*** Los ingresos por multas de peaje se recaudan en la cuenta Núm. 1520 del BPPR y se destinan a los gastos de explotación, incluido el pago de los servicios de operadores externos. A la Fecha de Medición de diciembre de 2021, la cuenta Núm. 1520 del BPPR tenía un balance de aproximadamente $9.5 millones. El flujo de fondos se ilustra a continuación:



***Transferencias del ELA a la ACT Las*** transferencias del ELA a la ACT, incluidas las asignaciones del Fondo General y los fondos de Abriendo Caminos, se depositan en la cuenta Núm. 2489 de Oriental Bank, que tenía un balance de $0.2 millones en la Fecha de Medición de diciembre de 2021, y se transfieren a la cuenta principal de operaciones de la ACT (cuenta Núm.

9874 del Oriental Bank). Algunos fondos de reembolso de gastos de capital del ELA se transfieren directamente a la cuenta operativa principal.

La ACT separa ciertos fondos para fines específicos de la cuenta operativa principal en tres cuentas separadas. Los fondos para los proyectos estatales de gastos de capital se mantienen en la cuenta Núm. 2473 de First Bank, que tenía un balance de aproximadamente $24.6 millones a la Fecha de Medición de diciembre de 2021. Los fondos para los proyectos Abriendo Caminos se mantienen en la cuenta Núm. 7726 de First Bank, que tenía un balance mínimo a la Fecha de Medición de diciembre de 2021. Por último, los fondos para la reserva de gastos de explotación se mantienen en la cuenta Núm. 3768 de First Bank, que tenía un balance de aproximadamente $85.2 millones a la Fecha de Medición de diciembre de 2021. Los fondos de la reserva de gastos de explotación se utilizan para cubrir eventos de emergencia e imprevistos, obligaciones pendientes de servicio público y cualquier costo imprevisto de litigios no relacionados con el Título III. La ACT no puede acceder a esta reserva sin la autorización previa por escrito de la Junta de Supervisión. Actualmente no hay intención de reponer esta reserva en el futuro, aunque la ACT seguirá utilizando los fondos según sea necesario y lo permita la Junta de Supervisión. Los fondos de estas cuentas segregadas pueden transferirse de vuelta a la cuenta operativa (Núm. 9874) según sea necesario cuando la ACT necesite pagar estos proyectos o gastos específicos. Además, los fondos para los gastos de explotación se transfieren a una cuenta de transferencias (cuenta Núm. 9574 de Oriental Bank) para pagar los gastos de explotación.

El flujo de fondos se ilustra a continuación:



**Fondos de la FTA.** Las subvenciones de la FTA se cobran en la cuenta Núm. 6672 de Oriental Bank, que tenía un balance de aproximadamente $0.1 millones a la Fecha de Medición de diciembre de 2021. Según el proyecto, los fondos pueden transferirse a las municipalidades para reembolsar los proyectos calificados o transferirse a la cuenta Núm. 9874 de Oriental Bank, la cuenta operativa principal. El flujo de fondos se ilustra a continuación:



**Fondos de la FHWA.** Los fondos de la FHWA se cobran en la cuenta Núm. 0510 de BPPR, que tenía un balance de aproximadamente $7.4 millones a la Fecha de Medición de diciembre de 2021. La ACT mantiene una cuenta de reserva Núm. 0220 del BPPR, que tenía un balance cero en la Fecha de Medición de diciembre de 2021. Los fondos de estas dos cuentas se destinan para proyectos de construcción federales. El flujo de fondos se ilustra a continuación:



**Fondos de la FEMA.** Los fondos de la FEMA relacionados con los huracanes Irma y María son recibidos por la Oficina Central de Recuperación, Reconstrucción y Resiliencia ("COR3"). COR3 es responsable de depositar estos fondos en la cuenta Núm. 6671 de BPPR, que tenía un balance de aproximadamente $0.9 millones a la Fecha de Medición de diciembre de 2021. El flujo de fondos se ilustra a continuación:

## E. Cuentas de Efectivo de la ACT

La lista de las cuentas bancarias del Deudor, los balances al 31 de diciembre de 2021 y las categorizaciones preliminares de las restricciones se adjuntan como Anexo G. La lista se basa en la información más actualizada de la que disponen los profesionales de la Junta de Supervisión y el análisis jurídico y el criterio de la Junta de Supervisión en cuanto a la categorización de las restricciones se basan en dicha información.

1.    **Informe del Equipo Independiente de Análisis Forense**

El 31 de enero de 2018, la Junta de Supervisión, actuando a nombre de y de parte del Comité de Investigación Especial (el "Comité de Investigación Especial"),[81] encargó a un Equipo Independiente de Análisis Forense (el "IFAT", por sus siglas en inglés), a través de la contratación de Duff and Phelps, LLC ("D&P"), para conducir una investigación de las cuentas bancarias de las entidades gubernamentales, incluyendo las entidades cubiertas por el plan fiscal del ELA, UPR, ACT, SRE, y AEE. El alcance de la encomienda incluyó (i) un inventario del efectivo, equivalentes de efectivo, e inversiones del Gobierno de Puerto Rico, (ii) un análisis de las fuentes de dichos fondos y sus usos pretendidos, y (iii) cualquier restricción legal documentada sobre estos fondos.

El objetivo principal del IFAT era la publicación de un informe que describiera los procesos empleados, los resultados obtenidos y una opinión del IFAT sobre si los procedimientos realizados validan o no, entre otras cosas, las cuentas bancarias y de inversión de la ACT identificadas y los balances de las cuentas divulgados. La investigación dependía de la suposición de que la ACT, entre otros, le proporcionaría voluntariamente la información financiera específica a la Junta de Supervisión   El diseño de la investigación se adaptó para recoger y desarrollar información sobre si las cuentas bancarias identificadas por la ACT, entre otros, contenían fondos restringidos, y sus montos y naturaleza.

**(a) Procedimientos de investigación**

Para los fines del informe, el IFAT identificó una fecha de medición del 30 de junio de 2018 (la "Fecha de Medición de junio 2018"). La investigación incluyó tres componentes: (i) un proceso de recopilación de información; (ii) un proceso de indagación y recolección de datos; y (iii) un proceso de análisis y elaboración de informes.

***Recopilación de información.*** La recopilación de información fue un proceso secuencial. Se generó una base de datos maestra de las entidades gubernamentales, incluida la ACT, y sus cuentas bancarias respectivas a la Fecha de Medición de junio 2018. La información se recibió principalmente del Departamento de Hacienda de Puerto Rico, la AAFAF y la información oficial disponible al público.

***Proceso de Indagación y Recolección de Datos.*** Una vez creada la base de datos maestra, cada entidad gubernamental identificada, incluyendo la ACT, fue contactada utilizando un formato estandarizado. Las entidades gubernamentales fueron contactadas para obtener la información de las cuentas bancarias pertinentes y la autorización de las entidades gubernamentales para que las instituciones financieras que mantenían las cuentas bancarias de las entidades gubernamentales pudieran proporcionar información directamente al IFAT.

---

[81]    El Comité Especial de Investigación de la Junta de Supervisión estaba compuesto en ese momento por los miembros Ana J. Matosantos, David A. Skeel y el juez Arthur J. González (retirado), y estaba encargado de llevar a cabo investigaciones conforme a la autoridad otorgada a la Junta de Supervisión por la Sección 104(o) de PROMESA y cualquier otra autoridad conferida a la Junta de Supervisión conforme a PROMESA.

*Proceso de análisis y elaboración del informe.* El último paso fue ponerse en contacto con las instituciones financieras identificadas, para confirmar y verificar la información autodeclarada por las entidades gubernamentales, incluida la ACT.

### (b) Medidas adicionales sugeridas en el informe del IFAT

El IFAT emitió su informe el 12 de marzo de 2019. El informe del IFAT sugería tareas y actividades adicionales para desarrollar de forma más completa la información a la que se refería el informe, que incluía la actualización de la Fecha de Medición de junio de 2018 a una fecha de medición más actual, en vista de que los montos podrían haber cambiado materialmente entre estas fechas. A continuación, se abordan los cambios en los balances a partir de las nuevas Fechas de Medición, así como los procedimientos adicionales para conciliar los balances y categorizar las restricciones.

### 2.  Análisis continuo de cuentas bancarias

Tras la publicación del informe del IFAT, la Junta de Supervisión, con la ayuda de sus asesores exceptuando a Duff & Phelps, continuó ampliando la investigación del IFAT y realizando análisis de las cuentas de efectivo del Estado Libre Asociado y de sus instrumentalidades, incluida la ACT, de forma periódica, la más reciente al 31 de diciembre de 2021 o Fecha de Medición de diciembre de 2021.

Como se describe a continuación, los análisis continuos de las cuentas de la ACT por parte de la Junta de Supervisión incluyeron la recopilación, el procesamiento y la revisión de los documentos proporcionados por las instituciones financieras, los agencias y otras entidades gubernamentales. La recopilación de documentos incluía los extractos de cuenta (incluidos los extractos bancarios, los extractos de corretaje, los certificados de depósito o las cartas de confirmación de balance, según el tipo de cuenta y la disponibilidad de la información), la información sobre restricciones (incluidos los contratos y la legislación federal y local) y la información sobre los firmantes. Además, esta información se obtuvo por correo electrónico, teléfono, reuniones en persona y mediante la revisión contable y jurídica.

### (a) Resumen de los procedimientos realizados

La Junta de Supervisión se ocupó especialmente, entre otras cosas, de (i) confirmar la población de cuentas bancarias y establecer sus balances, y (ii) evaluar, basándose en la información disponible y en el análisis legal, el importe de cualquier fondo restringido dentro de esas cuentas.

La Junta de Supervisión aprovechó y mejoró los procedimientos señalados en el informe del IFAT para reprogramar los balances, últimamente hasta la Fecha de Medición de diciembre de 2021. Específicamente, además de obtener información sobre los balances de un conjunto determinado de cuentas mediante solicitudes a las entidades gubernamentales, los procedimientos de la Junta de Supervisión incluyeron la obtención de credenciales de acceso a las plataformas de cuentas en línea de cada entidad, incluyendo la ACT, para la mayoría de los balances de las cuentas bancarias. El acceso a las cuentas en línea permite reprogramar los balances e identificar la población de cuentas en cada institución financiera para cada entidad gubernamental, incluida la ACT. También se enviaron solicitudes de información financiera a entidades gubernamentales e

instituciones financieras en los casos en los que el acceso en línea no estaba disponible. Se realizaron procedimientos adicionales para alinear los datos de las instituciones financieras con la información aportada por las entidades gubernamentales para conciliar diferencias.

Al mismo tiempo, la Junta de Supervisión solicitó la documentación relativa a la clasificación de restricciones autodeclarada por las entidades gubernamentales. Se condujeron procedimientos adicionales para brindar soporte continuo a las entidades gubernamentales en el suministro de la documentación para la revisión de la diligencia debida legal. En el caso de la ACT, la gran mayoría (98%) del valor de los balances de las cuentas se concentraba en 15 de las 74 cuentas. Los asesores jurídicos de la Junta de Supervisión llevaron a cabo la diligencia debida legal en estas 15 cuentas, todas ellas con balances superiores a \$2.0 millones, para obtener una cobertura superior al 95% del total del efectivo mantenido en las cuentas de la ACT en la Fecha de Medición de diciembre de 2021. Las 59 cuentas restantes contenían \$4.9 millones y equivalían al 2% del balance total de efectivo en las cuentas de la ACT a la Fecha de Medición de diciembre de 2021.

<i>(i)   Identificación de la población de cuentas bancarias y determinación de sus balances:</i>

La Junta de Supervisión envió cartas para solicitar a las Instituciones Financieras (las "<u>IF</u>") los balances de cuentas a la Fecha de Medición de diciembre de 2021 para las cuentas de la ACT. Las cartas fueron enviadas junto con una lista de las cuentas conocidas de la ACT en las respectivas IF y en ellas se solicitaba que las IF presentaran lo siguiente a la Junta de Supervisión:

- los extractos bancarios o de corretaje para cualquier balance en efectivo y/o de inversión para las cuentas en poder de las IF, relacionados con la ACT, o acceso en línea para que la Junta de Supervisión obtuviera los datos pertinentes de cada cuenta;

- una lista de signatarios con poderes sobre cada cuenta;

- información relativa a cualquier gravamen, derecho de retención, o reclamación de terceros conocidos; y

- los detalles sobre cualquier otra cuenta de la ACT que no se haya incluido en el informe del IFAT.

Simultáneamente, se enviaron cartas a la ACT donde se solicitó la siguiente información para una lista de cuentas identificadas:

- los extractos bancarios o de corretaje de los balances en efectivo y/o de inversión de las cuentas de las que es titular la ACT, o un formulario de consentimiento cumplimentado que permita el acceso en línea para obtener los datos pertinentes de cada cuenta de una IF;

- el estado de cada cuenta, como abierta, cerrada, suspendida, etc.;

- una lista de signatarios con poderes sobre cada cuenta;

2" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

- los detalles de cualquier otra cuenta de ACT (es decir, cualquiera que no esté identificada en la lista de cuentas enviada a la ACT); y

- una indicación de si los fondos en cada cuenta deben clasificarse como restringidos, no restringidos, o mancomunados (como se explica con más detalle a continuación).[82]

    *(ii)*    ***Determinación con respecto a si las cuentas y los balances incluyen fondos legalmente restringidos:***

Como se ha señalado, las solicitudes enviadas a las entidades gubernamentales, incluida la ACT, incluían una petición para que la entidad clasificara sus cuentas como restringidas, no restringidas o mancomunadas. Para ayudar a orientar a las agencias, se les entregaron descripciones de diversas designaciones de cuentas restringidas y no restringidas. Si la entidad gubernamental consideraba que una cuenta estaba restringida, se pedía a la entidad gubernamental, incluida la ACT, que seleccionara la categoría de restricción aplicable y proporcionara a la Junta de Supervisión la documentación de apoyo para la restricción reclamada, incluyendo la información sobre las fuentes y usos de los fondos. Si la entidad gubernamental consideraba que una cuenta no tenía restricciones, se pedía a la entidad gubernamental, incluida la ACT, que proporcionara las fuentes y usos de los fondos de las cuentas.

Los asesores jurídicos de la Junta de Supervisión realizaron una evaluación minuciosa de los documentos entregados por las entidades gubernamentales, incluida la ACT, para investigar y evaluar las restricciones legales alegadas, entre las que se incluyen:

- la evaluación de la documentación recabada como parte del informe del IFAT;

- la revisión de los documentos obtenidos desde el informe del IFAT en relación con las clasificaciones de cuentas; y

- la colaboración con otras partes, como el Departamento de Hacienda de Puerto Rico y la AAFAF, para obtener y revisar documentación adicional relevante para las clasificaciones de las restricciones legales de las cuentas bancarias de la ACT.

A continuación, las cuentas se clasificaron en las siguientes categorías sobre la base de la revisión de la información de las cuentas descrita anteriormente y de los análisis jurídicos (la designación preliminar de cada cuenta por encima del umbral de revisión de $2.0 millones a la Fecha de Medición de diciembre de 2021 figura en el Anexo G):

- **Cuentas no revisadas:** Salvo lo indicado en la nota a pie de página 83, las cuentas con un balance inferior a $2.0 millones a la Fecha de Medición de diciembre de 2021 se han

---

[82]   Las cuentas mancomunadas contienen fondos restringidos y no restringidos.

designado como "No revisadas" en el <u>Anexo G</u>.[83]

- **Fondos Federales Restringidos/Ley:** Fondos recibidos del gobierno federal, y/o restringidos por la ley o reglamento federal, para usos específicos (por ejemplo, subvenciones o fondos de apoyo del Departamento de Transporte de los Estados Unidos en relación con las carreteras y los proyectos del sistema de transporte). Este dinero podría ser recuperado por el gobierno federal si no se utiliza como se ha designado.

- **Fondos restringidos de terceros:** Fondos que pertenecen a y se mantienen en nombre de terceros (p. ej., ingresos de peaje prepagados cobrados pero aún no percibidos por la ACT).

- **No concluyente**: Cuentas sobre las que el equipo jurídico no tiene hasta ahora suficiente información para determinar si los fondos están legalmente restringidos.

- **Fondos no restringidos**: Fondos que no están sujetos a restricciones legales y que pueden utilizarse para pagar a los acreedores conforme a un plan de ajuste.[84]

     **(b)**       **Resumen de conclusiones preliminares[85]**

Mientras el análisis de la Junta de Supervisión está en curso, la investigación preliminar muestra que la ACT mantiene aproximadamente $271.4 millones a la Fecha de Medición de diciembre de 2021 en 74 cuentas mantenidas por la ACT en varias IF. La lista de dichas cuentas se adjunta como <u>Anexo G</u>, y a continuación se presenta un resumen de estas:

| Agencia | Núm. de cuentas | Balance al 31/12/2021 | No revisada | Restringida | No concluyente[86] | No restringida[87] |
|---------|-----------------|-----------------------|-------------|-------------|--------------------|--------------------|
| ACT | 74 | $ 271,447,842 | $ 1,106,754 | $ 31,115,940 | $ 6,438,058 | $ 232,787,090 |

---

[83]    También se revisaron y categorizaron treinta y siete (37) cuentas de menos de $2 millones como no restringidas. Estas cuentas, por un total de $3,7 millones, incluyen 35 cuentas (por un total de $2,9 millones) mantenidas en el Bank of New York Mellon, el agente fiscal de los bonos de la ACT.

[84]    En el año fiscal 2021 se financió una reserva por única vez para la ACT con un balance total de aproximadamente $115.5 millones. Esta reserva estaba destinada a abonar las obligaciones de servicios públicos pendientes adeudadas a la AEE y la AAA, los gastos de los litigios de Título III, y los eventos imprevistos de emergencia operativa. La reserva se gestiona en una cuenta separada y no se utiliza para el programa de gastos de capital de la ACT. No hay intención de reponer esta reserva en el futuro, aunque la ACT seguirá utilizando los fondos según lo permitido. El balance de este fondo de reserva al 31 de diciembre de 2021 era de aproximadamente $85 millones y se considera no restringido a efectos del análisis de diligencia debida.

[85]    La información incluida en este documento es veraz a la fecha de la presente Declaración de Divulgación y debe considerarse preliminar y sujeta a cambios materiales. Los montos incluidos en esta Declaración de Divulgación con respecto a las cuentas de efectivo del Deudor están sujetos a modificaciones basadas en la recepción de información adicional y la revisión por parte de los asesores legales.

[86]    El balance no concluyente de $6.4 millones está compuesto por una cuenta con documentación insuficiente para determinar si está sujeta a una restricción legal que regule el uso de los fondos.

[87]    De los $232,8 millones de balance no restringido, 90,3 millones se mantienen en el Bank of New York Mellon, el agente fiscal de los bonos de la ACT.

La revisión de diligencia debida legal para la clasificación de restricciones se realizó para $270.3 millones de los $271.4 millones en balances para la Fecha de Medición de diciembre de 2021. Las cuentas restantes, que suman un total de aproximadamente $1.1 millones, no fueron revisadas en cuanto a la designación de restricciones debido al tamaño de los balances individuales. Cada uno de los balances de esas cuentas era inferior a $2.0 millones a la Fecha de Medición de diciembre de 2021 y se ha clasificado como no revisado. La diligencia debida legal continúa; sin embargo, de los $270.3 millones de los balances de cuentas analizados, aproximadamente $31.1 millones se clasificaron como restringidos, y $232.8 millones se clasificaron como no restringidos. Los $6.4 millones restantes en balances de cuentas se clasificaron como no concluyentes a la espera de recibir más documentación.

Del balance de $232.8 millones clasificado como no restringido, (i) $85.2 millones están relacionados específicamente con el financiamiento de la reserva de emergencia proporcionada por el ELA para usos específicos y requiere la autorización de la Junta de Supervisión antes del gasto y (ii) $90,3 millones reservados para los pagos relacionados con el plan. Además, debe mantenerse una cantidad amplia del balance restante para fines generales de capital de trabajo, así como para los gastos de capital planificados. Sobre la base de lo anterior, se concederá un préstamo por única vez de $362 millones por parte del ELA a la ACT para facilitar los pagos en efectivo relacionados con el plan y garantizar una liquidez adecuada.

### (c) Actualizaciones de la información mencionada en el informe del IFAT

A continuación, se ofrece un resumen en el que se destacan las áreas de progreso realizadas desde la Fecha de Medición de junio de 2018:

- Desde la Fecha de Medición de junio de 2018, se identificaron seis (6) nuevas cuentas de la ACT por un total aproximado de $85.2 millones, respaldadas por documentos financieros. Estas seis cuentas se identificaron a partir de la información proporcionada por las entidades gubernamentales y las IF.

- Desde la Fecha de Medición de junio de 2018, veintitrés (23) cuentas de la ACT que se incluyeron dentro del informe del IFAT se identificaron como cuentas cerradas, cuentas duplicadas o cuentas inexistentes y esto fue confirmado por las IF o las entidades gubernamentales. El informe del IFAT incluía 13 cuentas con balances declarados por un total de $ 1,305 que se consideraron duplicados y una cuenta con un balance declarado de aproximadamente $ 6.0 millones que se cerró antes de la Fecha de Medición de junio de 2018.

### (d) Continuación de las tareas y actividades mencionadas en el informe del IFAT

El informe del IFAT sugirió nueve (9) tareas y actividades adicionales para desarrollar más plenamente la información pertinente. La Junta de Supervisión ha adoptado las sugerencias y ha continuado los procedimientos para mejorar la información tras la publicación del informe del IFAT. En consecuencia, a continuación, se ofrece una actualización, específica para la ACT, de las nueve sugerencias:

- La Junta de Supervisión continuó y actualizó sus procedimientos para revisar y actualizar los balances de las cuentas y las clasificaciones de las restricciones legales, la última vez en la Fecha de Medición de diciembre de 2021.

- La Junta de Supervisión actualizó sus procedimientos para revisar las cuentas en busca de clasificaciones de restricciones legales en toda la población de cuentas para la ACT que dieran lugar a una revisión de más del 95% del total de los balances de cuenta combinados.

- Los procedimientos para revisar y actualizar los balances de las cuentas y las clasificaciones de las restricciones legales incluyeron la recopilación de documentos adicionales para todas las entidades gubernamentales, que se utilizaron para actualizar y mejorar los procedimientos de diligencia debida financiera y legal. Específicamente, se contactó con la ACT y con las respectivas IF en relación con las cuentas y se les pidió que proporcionaran más información sobre las cuentas cerradas o suspendidas, así como sobre las posibles cuentas duplicadas, inexistentes o nuevas. Se programaron llamadas y reuniones de seguimiento para aclarar y hacer preguntas sobre la información proporcionada.

- Se realizaron procedimientos analíticos adicionales para la revisión de las clasificaciones de las restricciones legales, incluyendo la obtención de las descripciones de la ACT de las diversas categorías de restricciones legales afirmadas por la ACT y la revisión de las fuentes y usos de los fondos para las cuentas.

- Se aplicaron procedimientos actualizados para obtener la documentación respaldatoria adecuada de la ACT que sirviera de base para la evaluación de las designaciones de cuentas por parte del equipo jurídico.

- Se aplicaron procedimientos actualizados para identificar los fondos federales en las cuentas de la ACT. Los procedimientos incluyeron la obtención de información del Departamento del Hacienda de Puerto Rico, la AAFAF y la ACT.

- Las discrepancias observadas entre las conclusiones del informe del IFAT y la información obtenida posteriormente de las agencias, incluida la ACT, y las IF se conciliaron mediante procedimientos adicionales, como la obtención de una confirmación directa de las IF y la aclaración del estado actual de una cuenta bancaria. Del mismo modo, las discrepancias observadas entre las conclusiones del informe del IFAT y la información obtenida de la AAFAF, como se comenta más adelante, se conciliaron mediante procedimientos adicionales, como la identificación y conciliación de las diferencias entre el ámbito y el plazo cubiertos por el informe del IFAT y los de la información comunicada por la AAFAF. Actualmente, las diferencias no conciliadas entre los balances de la ACT comunicados por la AAFAF y los balances de la ACT comunicados por las IF son inferiores al cinco por ciento (5%) del balance total a la Fecha de Medición de diciembre de 2021.

**(e) Estado de la revisión**

A la Fecha de Medición de diciembre de 2021, la ACT mantiene 74 cuentas en cinco IF, para todas las cuales la Junta de Supervisión ha recibido documentación respaldatoria de los balances. La ACT también facilitó el acceso a las cuentas bancarias en línea a través de las IF para $155.8 millones depositados en 70 de las 74 cuentas bancarias (aproximadamente el 95% de las cuentas y el 57% de los balances de la población total). Los extractos de las cuentas bancarias de los $115.7 millones restantes, depositados en cuatro de las 74 cuentas bancarias (aproximadamente el 5% de la población total), se obtienen directamente de las IF y de la ACT debido a las limitaciones de acceso a las cuentas bancarias en línea.

Los balances indicados anteriormente a la Fecha de Medición de diciembre de 2021 para la ACT se han conciliado sustancialmente con el Informe de Balances de Cuentas Bancarias de AAFAF al 31 de diciembre de 2021 ("Informe de AAFAF").[88]

La lista de las cuentas bancarias del Deudor, los balances a la Fecha de Medición de diciembre de 2021 y las categorizaciones preliminares de las restricciones legales se adjuntan al presente documento como Anexo G. La información presentada en el Anexo G incluye las cuentas cuyos balances han sido confirmados con información de la IF a la Fecha de Medición de diciembre de 2021. La Junta de Supervisión y sus asesores siguen analizando las evaluaciones de las restricciones legales para las cuentas, y cualquier determinación que se ofrezca en el Anexo G es preliminar y, en todos los aspectos, está sujeta a cambios basados en información nueva y adicional a medida que esté disponible. La Junta de Supervisión actualizará esta Declaración de Divulgación a una nueva fecha de medición según se justifique hasta que sea aprobada por el Tribunal.

*[El resto de la página se deja intencionalmente en blanco]*

---

[88] *Resumen de Balances de Cuentas Bancarias para el Gobierno de Puerto Rico y sus Instrumentalidades, Información al 30 de diciembre de 2021* publicada por la AAFAF el 31 de enero de 2022.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

**IV.**    **Acontecimientos significativos que dieron origen al Caso de Título III de la ACT**

**A.    El constante deterioro operativo y financiero del ELA y de la ACT**

*El ELA.* El ELA y algunas de sus corporaciones públicas se encuentran en medio de una profunda crisis fiscal. A pesar de diversas medidas tomadas en años recientes para estimular el crecimiento económico, reducir el gasto público y aumentar los ingresos, el ELA no ha podido incentivar el crecimiento económico ni eliminar el problema recurrente de los gastos que superan los ingresos. Esto se debe principalmente a años de recesión económica, déficits presupuestarios recurrentes, el financiamiento de gastos recurrentes con deuda a largo plazo y la falta de financiamiento adecuado para obligaciones preexistentes como las pensiones. La situación económica del ELA se agravó posteriormente por la devastación causada por los huracanes de 2017, los terremotos de 2020 y la pandemia de COVID-19.

El deterioro del balance del ELA, combinado con los permanentes desequilibrios estructurales entre ingresos y gastos y la imposibilidad de que el ELA acceda a los mercados de capitales, tuvo como resultado que el ELA y algunas de sus instrumentalidades no puedan realizar los pagos programados de la deuda y continuar proporcionando al mismo tiempo servicios públicos, lo que en definitiva lleva a la presentación de casos de reestructuración de la deuda conforme al Título III de PROMESA.

*La ACT.* La ACT ha experimentado importantes pérdidas recurrentes en sus operaciones y se enfrenta a numerosos retos empresariales que se han visto agravados por la recesión económica del ELA. Sus principales retos, algunos de ellos interrelacionados, consisten en ejecutar: (1) la maximización de los ingresos; (2) la reducción de los costos operativos y (3) la mejora de la liquidez.

En 2010, la ACT dejó de emitir bonos y en su lugar recurrió al BGF para obtener liquidez y apoyo a la gestión fiscal. La ACT recurrió repetidamente a sus líneas de crédito con el BGF para financiar sus necesidades operativas, de capital de trabajo y de construcción, así como sus déficits permanentes. Según Kobre & Kim LLP, un investigador independiente contratado por la Junta de Supervisión para investigar ciertos asuntos relacionados con la crisis fiscal de Puerto Rico, el BGF evaluó y aprobó las solicitudes de préstamo de la ACT muy rápidamente, a veces en cuestión de horas, tras la presentación de una solicitud. Al parecer, esta práctica era necesaria para evitar posibles consecuencias adversas derivadas de la falta de salud fiscal de la ACT, como que la ACT hubiera tenido que cerrar el Tren Urbano si no se hubiera pagado a su operador. Los cambios de política gubernamental de todos los gobiernos también afectaron la toma de decisiones de BGF con respecto a la carga de la deuda de la ACT. Por ejemplo, durante el gobierno del gobernador Fortuño, el BGF aumentó la línea de crédito de la ACT a aproximadamente $2 mil millones. En ese momento, el total de los préstamos por cobrar del BGF era ya de aproximadamente 9 mil millones de dólares. El BGF hizo esto supuestamente para que la ACT no tuviera que aumentar las tarifas de registro de vehículos, el transporte público, los peajes, o el impuesto a la gasolina; todo lo cual habría aumentado los costos para los votantes comunes.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

El actual sistema de transporte de Puerto Rico sigue sin mantenerse a la altura de los estándares nacionales de calidad, seguridad y confiabilidad. Solo el 13%[89] de las carreteras de Puerto Rico están en buen estado, en comparación con una mediana del 84% en los EE.UU., mientras que las tasas de mortalidad son aproximadamente un 43% más altas que la mediana de los EE.UU. (en 2020: 1.96 víctimas mortales por cada 100 VMT frente a la mediana estadounidense de 1.37).[90] Además, la ausencia de un sistema de transporte confiable aumenta la congestión del tráfico, ya que los residentes carecen de una alternativa al transporte en vehículo privado. Entre las ciudades de EE.UU., San Juan es la séptima ciudad con el recorrido diario al trabajo medio más largo, con 31.2 minutos.[91] Los conductores pierden 58 horas al año por la congestión del tráfico, con un costo de $1,150 por conductor y $400 millones para la ciudad.[92] Mientras tanto, la principal alternativa de transporte público, el Tren Urbano, tiene una de las cifras más bajas de pasajeros entre los sistemas de transporte de Norteamérica, con aproximadamente 5 millones de usuarios anuales antes del inicio de la pandemia de COVID-19, por debajo del Metrorail de Miami (19 millones), la RTA de Cleveland (6 millones), el SubwayLink de Baltimore (8 millones) y PATCO Speedline de Filadelfia (11 millones). Tren Urbano también tiene uno de los peores rendimientos financieros en relación con los sistemas similares, ya que actualmente solo recupera 4 céntimos por cada dólar de costo operativo, mientras que los sistemas similares recuperan actualmente unos 12 céntimos (y 25 céntimos antes de COVID) en promedio.[93] El Plan Fiscal del Estado Libre Asociado de 2022 y el Plan Fiscal de la ACT de febrero de 2022 establecen una serie de reformas del transporte que habían sido recomendadas por la Junta de Supervisión en su carta del 29 de enero de 2021 conforme a la sección 205(a) de PROMESA.[94] Algunas medidas pretenden abordar las siguientes causas fundamentales de los retos a los que se enfrenta la ACT:

1) Los modos de transporte individuales tienen una propiedad solapada y fragmentada.

---

[89] De los informes de la ACT sobre presupuestado vs. real para el final del año fiscal 2021.

[90] *2020 Fatality Data Show Increased Traffic Fatalities During Pandemic,* Administración Nacional de Seguridad del Tráfico en las Carreteras, 3 de junio de 2021:https://www.nhtsa.gov/press-releases/2020-fatality-data-show-increased-traffic-fatalities-during-pandemic; *Highway Statistics 2020,* Depto. de Transporte de EE.UU. Administración Federal de Carreteras, 26 de octubre de 2021, https://www.fhwa.dot.gov/policyinformation/statistics/2020/hm64.cfm.

[91] https://realestate.usnews.com/places/rankings/best-places-to-live?src=usn_pr.

[92] *Global Traffic Scorecard,* INRIX 2021, https://static.tti.tamu.edu/tti.tamu.edu/documents/mobility-report-2019.pdf; https://inrix.com/scorecard-city/?city=San%20Juan%2C%20PR&index=163 - Los costos incluyen la pérdida de productividad, el aumento de los costos de los movimientos de carga, el aumento de los costos de operación y la disminución de la confiabilidad.

[93] Datos sobre el número de pasajeros: Informe sobre el número de usuarios del transporte público, American Public Transportation Association, Disponible en línea en: https://www.apta.com/wp-content/uploads/2018-Q4-Ridership-APTA.pdf / Farebox Recovery: National Transit Database, Disponible en línea en: https://www.transit.dot.gov/ntd/ntd-data.

[94] Carta de Natalie A. Jaresko, Junta de Supervisión y Administración Financiera para al Gobernador Pedro Rafael Pierluisi, Gobernador de Puerto Rico; José Luis Dalmau Santiago, Presidente del Senado de Puerto Rico; y Rafael Hernández Montañez, Presidente de la Cámara de Representantes de Puerto Rico (29 de enero de 2021) Carta https://drive.google.com/file/d/1p6CDJx5_NoOmLIARfYik-wg3ev_A3X6l/view.

2) La gestión del desempeño de los distintos modos de transporte es deficiente y la coordinación multimodal es escasa.

3) El sistema no aprovecha al máximo el potencial de financiamiento, dejando sin aprovechar el dinero público y privado.

*Legislación relacionada con los ingresos y la liquidez de la ACT.* Históricamente, la ACT ha recibido financiamiento de varios Ingresos Asignados Condicionalmente, entre los que se encuentran las tarifas sobre las licencias de vehículos automotores, así como los arbitrios del ELA sobre la gasolina, el petróleo, los productos derivados del petróleo y los cigarrillos. El 1 de diciembre de 2015, el Gobernador emitió la Orden Ejecutiva 2015-046 que ordenaba al Departamento de Hacienda comenzar a retener estas tasas e impuestos. Posteriormente, tras la presentación del Caso de Título III del ELA el 3 de mayo de 2017, los Ingresos Asignados Condicionalmente han sido retenidos por el ELA por numerosas razones, incluyendo la aplicación de la paralización automática bajo el Título III de PROMESA. Todos los Ingresos Asignados Condicionalmente siguen siendo retenidos por el ELA y, debido a la exitosa confirmación y perfeccionamiento del Plan del ELA, ya no serán objeto de transferencia a la ACT.

El 6 de abril de 2016, el Estado promulgó la Ley de Moratoria (como se comenta en la sección I.B.7 de esta Declaración de Divulgación). En virtud de la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas que declaraban un período de emergencia y aplicaban diversas medidas con respecto a determinadas obligaciones del Estado y varias instrumentalidades, incluyendo la ACT. Estas órdenes ejecutivas impusieron importantes restricciones al desembolso de fondos depositados en el BGF y suspendieron el desembolso de préstamos por parte del BGF. Estas órdenes ejecutivas también restringían la capacidad de la ACT de retirar los fondos depositados en el BGF y de recibir los desembolsos de los préstamos concedidos por el BGF. Las órdenes ejecutivas también ampliaron la recuperación ("clawback") de los recursos disponibles que fueron previamente asignados condicionalmente a la ACT, suspendiendo la obligación del ELA de transferir esos ingresos a la ACT. La Ley de Moratoria y las órdenes ejecutivas relacionadas, así como la aprobación de PROMESA, han tenido un efecto significativo en la liquidez de la ACT.

*La economía del ELA.* La economía del ELA entró en recesión en el cuarto trimestre del FY2006, y el PNB del ELA se ha contraído (en términos reales) casi todos los años fiscales entre 2007 y 2020, salvo por un crecimiento del PNB en el FY2012 y FY2019. El crecimiento del PNB en observado en FY2012 y FY2019 se debió principalmente al monto elevado del gasto deficitario y a los estímulos que se inyectaron a la economía del ELA durante la Gran Recesión y después de los huracanes de 2017, respectivamente. En su informe de mayo de 2018 (GAO-18-387), la Oficina de Rendición de Cuentas del Gobierno de Estados Unidos enumeró los cinco factores principales que contribuyeron a la situación económica de Puerto Rico.

- Emigración y disminución de la fuerza laboral. Puerto Rico ha experimentado una baja constante en su población y en su fuerza laboral.

- Dificultades regulatorias para hacer negocios en Puerto Rico. Esto incluye el alto costo que representa para las empresas el cumplimiento de las regulaciones de Puerto Rico, como el

proceso de permisos para nuevas empresas, y las leyes federales, como la ley del salario mínimo, que pueden ser un elemento disuasorio para el empleo en algunos sectores locales.

- Elevado costo de la importación de bienes y energía. Muchos de los bienes que utilizan las empresas en Puerto Rico son importados, lo que aumenta su costo, además de que Puerto Rico depende principalmente de productos de petróleo con alto costo para la generación de energía.

- Eliminación gradual del crédito impositivo federal, que tuvo fin en 2006. Esto afectó principalmente las operaciones de manufactura en Puerto Rico, si bien no hay un consenso con respecto a la magnitud del impacto.

- Dificultades con bancos y viviendas. Los bancos de Puerto Rico están teniendo dificultades, y muchos de ellos han desaparecido. Los precios de las viviendas han caído un 25%, desde su valor máximo en 2009.

**Déficits recurrentes de la ACT.** Al 30 de junio de 2021, el pasivo corriente de la ACT superaba su activo corriente en aproximadamente $117 millones y tenía un déficit acumulado de aproximadamente $2 mil millones. Además de la supresión de ciertos ingresos de recuperación previamente asignados a la ACT, una de las principales causas de la actual crisis fiscal de la ACT ha sido el no haber ajustado las tarifas de peaje en las carreteras de peaje operadas por la ACT desde 2005. Los aumentos de las tarifas de peaje se aplican regularmente en los estados continentales y también en las carreteras de peaje de Puerto Rico operadas por concesionarios. El precio de las tarifas ha quedado desfasado con respecto a la inflación y, por extensión, al costo de mantenimiento de las carreteras pertenecientes a la ACT. El Plan Fiscal de la ACT de mayo de 2021 y el Plan Fiscal de la ACT de febrero de 2022 incluyen medidas fiscales relacionadas con el aumento de los ingresos, que se basan principalmente en el aumento de las tarifas de peaje y la optimización de la recaudación. Además, la ACT había dependido del BGF para obtener liquidez y apoyo a la gestión fiscal. Sin embargo, cuando el BGF se disolvió, dejó a la ACT sin otra fuente de financiamiento.

**Carga de la deuda total de la ACT.** Al 30 de junio de 2021, la deuda de bonos de la ACT seguía siendo de aproximadamente $4.4 mil millones en total, excluyendo aproximadamente los $1.7 mil millones en bonos del BGF.

Desde que la ACT inició procedimientos de Título III, ha estado sujeta a las disposiciones de paralización automática de PROMESA y, como resultado, no ha realizado pagos desde julio de 2017. La deuda actual de la ACT no es sustentable y requiere un ajuste significativo en virtud de Título III, ya que sus ingresos son insuficientes para financiar sus gastos operativos, las necesidades de mejora de capital previstas y una reserva de emergencia sin créditos significativos del ELA.

**B.** **Legislación promulgada por el ELA y órdenes ejecutivas emitidas por el Gobernador para abordar la crisis fiscal y de deuda[95]**

**1.** **Ley 30-2013 ("Ley 30")**

El 25 de junio de 2013, el ELA promulgó la Ley 30, que asignó condicionalmente a la ACT la totalidad de los derechos de licencia sobre vehículos automotores que originalmente fueron retenidos por el Departamento de Hacienda. Antes de la Ley 30, solo quince dólares ($15) de cada uno de esos derechos anuales de licencia, que oscilan entre $25 y $40 para los automóviles de pasajeros y varían para otros vehículos, se asignaban condicionalmente a la ACT.

Como se describe en la Sección III.B.1(a) de esta Declaración de Divulgación, los ingresos procedentes de estos derechos de licencia sobre vehículos automotores están sujetos a la disposición de "recuperación" (clawback) de la sección 8 del Artículo VI de la Constitución de Puerto Rico.

**2.** **Ley 31-2013 ("Ley 31")**

El 25 de junio de 2013, el ELA promulgó la Ley 31 (i) por la que se incrementa la parte del arbitrio condicionalmente asignado de la ACT sobre productos de petróleo y sus derivados de $3.00 por barril a $9.25 por barril y (ii) por la que se asigna condicionalmente a la ACT $20 millones del arbitrio sobre cigarrillos del ELA cada año fiscal a la ACT.

Como se describe en la Sección III.B.1(a) de esta Declaración de Divulgación, estos ingresos están sujetos a la disposición de "recuperación" (clawback) de la Sección 8 del Artículo VI de la Constitución de Puerto Rico.

**3.** **Ley 66-2014 ("Ley 66")**

El 17 de junio de 2014, el ELA adoptó la Ley 66, conocida como la Ley de Sostenibilidad Fiscal y Operacional, que impuso múltiples medidas fiscales, entre ellas: (i) el congelamiento de las prestaciones en virtud de los contratos de negociación colectiva ("CBA") y la reducción de determinadas compensaciones no salariales; (ii) la contribución de los ahorros generados por determinadas corporaciones públicas en apoyo de determinados gastos del Fondo General; (iii) el congelamiento de los aumentos de asignaciones por fórmula a la UPR y las municipalidades; (iv) el congelamiento y reducción de las asignaciones por fórmula al Poder Judicial, la Legislatura y algunas otras entidades; (v) la reducción en los costos de transporte escolar; (vi) la reducción en los aranceles de servicios profesionales y adquiridos; (vii) el congelamiento de las tarifas de agua para las entidades gubernamentales; y (viii) la implementación de un sistema de planes de pago

---

[95] La Sección 4 de PROMESA tiene prioridad sobre la legislación promulgada por el ELA antes y después de la puesta en vigencia de PROMESA el 30 de junio de 2016 hasta el punto de ser incompatible. Además, viola la Sección 204 de PROMESA hasta el punto de que los procedimientos para revisar la legislación para controlar su compatibilidad con el plan fiscal certificado no se aplican, viola la Sección 207 de PROMESA hasta el punto de que modifica la deuda sin el consentimiento de la Junta de Supervisión, y viola la Sección 108(a)(2) de PROMESA hasta el punto de que podría obstaculizar o frustrar los fines de PROMESA tal como estos han sido determinados por la Junta de Supervisión. Al describir la legislación en esta sección de la Declaración de Divulgación, la Junta de Supervisión no renuncia a la aplicación de PROMESA a ninguna de sus partes.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                    04/30/2022 3:29 PM "" ""

para sentencias legales. Estas disposiciones caducaron el 1 de julio de 2017, pero el ELA promulgó medidas de austeridad fiscal similares mediante la Ley 3-2017, del 23 de enero de 2017 (que se comenta a continuación).

### 4.    Ley 71-2014 ("Ley 71")

Después de que las agencias de calificación bajaron el puntaje de las más grandes corporaciones públicas del ELA por debajo del grado de inversión, y dichas entidades enfrentaron limitaciones adicionales de liquidez y pérdida del acceso a los mercados de capitales, el ELA promulgó la Ley 71 el 28 de junio de 2014. Conocida como la Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico, proporcionó un proceso ordenado para permitir que ciertas corporaciones públicas, incluida la ACT, ajusten sus deudas. Debido a que el Congreso de EE. UU. excluyó a las municipalidades de Puerto Rico de obtener reparación conforme al Capítulo 9 del Código de Quiebras, el ELA promulgó la Ley 71, que llena ese vacío al crear un marco legal que permitió un proceso ordenado de reestructuración de la deuda.

En junio de 2014, ciertos tenedores de bonos de la AEEPR cuestionaron la constitucionalidad de la Ley 71 ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, que dictó sentencia a favor de los tenedores de bonos y sostuvo que el Capítulo 9 del Código de Quiebras tenía preferencia sobre la Ley 71.[96]  La sentencia del Tribunal fue confirmada por el Tribunal de Apelaciones para el Primer Circuito de EE. UU. el 6 de julio de 2015[97] y por la Corte Suprema de EE. UU. el 13 de junio de 2016.[98]

### 5.    Ley 1-2015 ("Ley 1")

El 15 de enero de 2015, el ELA promulgó la Ley 1, modificada por la Ley 29-2015, aprobada el 13 de marzo de 2015, para aumentar la alícuota impositiva de los productos de petróleo de $9.25 a $15.50 por barril de petróleo. El aumento de $6.25 por barril de la alícuota impositiva de los productos derivados del petróleo, que no se aplicó al gas oil y al diésel oil, se asignó en su totalidad a la AFI en respaldo de los pagos de amortización de la deuda de las emisiones de bonos de la AFI.

La Ley 29-2015 autorizó a la AFI a emitir bonos por hasta $2,950 millones para pagar la deuda de la ACT, que estaba compuesta por (i) $2,079 millones en líneas de crédito pendientes concedidas por el BGF y (ii) pagarés en anticipación de bonos por aproximadamente $228 millones. La Ley 29-2015 también pedía que se asignaran $3.25 adicionales por barril del impuesto a los productos derivados del petróleo a AFI para proporcionar fondos adicionales para el servicio de las emisiones de bonos de AFI, reduciendo así la participación de la ACT en el impuesto a los productos derivados del petróleo de $9.25 a $6.00 por barril. Sin embargo, debido a las condiciones económicas desesperantes a las que se enfrentan las corporaciones públicas del ELA y la consiguiente pérdida de acceso a los mercados de capitales, los esfuerzos de AFI por emitir los

---

[96]  *Franklin California Tax-Free Tr. c. Puerto Rico*, 85 F. Sup. 3d 577 (D.P.R. 6 de febrero de 2015).

[97]  *Franklin California Tax-Free Tr. c. Puerto Rico*, 805 F.3d 322 (1er Cir. 2015).

[98]  *Puerto Rico c. Franklin Cal. Tax- Free Tr.*, 579 U.S. 115 (2016).

bonos contemplados en la Ley 29-2015 para pagar la deuda de la ACT no tuvieron éxito. En consecuencia, la ACT continuó cobrando una alícuota impositiva sobre los productos derivados del petróleo de $9,25 por barril.

### 6.    Orden Ejecutiva 2015-046 ("EO 46")

El 1 de diciembre de 2015, el entonces gobernador Alejandro García Padilla firmó la OE 46 que ordenaba al Secretario del Departamento de Hacienda retener ciertos recursos disponibles del ELA a base de los estimados de ingresos revisados durante el FY2016 y la situación de liquidez deteriorada del ELA. De acuerdo con dicha orden ejecutiva, el Secretario de Hacienda retuvo los ingresos asignados condicionalmente a la ACT, la AFI, la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCCPR"), y la AMA para el pago de la amortización de la deuda de sus bonos para el FY2016. Desde el FY2016, estos ingresos están siendo retenidos por el ELA en virtud de ciertas leyes, incluyendo, entre otras (a) la Ley de Moratoria y la Ley N.º 5 (que se analiza más adelante) y (b) la paralización automática conforme al Título III de PROMESA.

### 7.    Ley 21- 2016 - La Ley de Moratoria y la creación de AAFAF (" Ley 21")

El 6 de abril de 2016, el Gobierno promulgó la Ley 21, que concedía al Gobernador la autoridad para, entre otras cosas, (i) implementar una moratoria sobre los pagos de la amortización de la deuda, (ii) derivar ciertos fondos históricamente asignados condicionalmente a entidades públicas para el pago de sus obligaciones del pago de servicios esenciales, y (iii) paralizar temporalmente remedios relacionados para los acreedores. En relación con la Ley 21, el entonces gobernador Alejandro García Padilla emitió una serie de órdenes ejecutivas, lo que incluyó órdenes para declarar una moratoria sobre el pago del servicio de la deuda por parte de diversas entidades gubernamentales.

La AAFAF también se creó en virtud de la Ley 21 con el propósito de asumir el papel del BGF como agente fiscal, asesor financiero y agente informador del ELA y sus instrumentalidades y municipios.[99]

### 8.    Orden Ejecutiva 2016-018 ("OE 18"), Orden Ejecutiva 2016-030 ("OE 30") y Orden Ejecutiva 2016-031 ("OE 31")

Conforme a la Ley 21-2016 (comentada anteriormente), el 17 de mayo de 2016, el Gobernador firmó la OE 18 y, el 30 de junio de 2016, la OE 30 y la OE 31. En conjunto, estas órdenes ejecutivas declararon al ELA y a varias de sus instrumentalidades, incluida la ACT, en estado de emergencia. En concreto, estas órdenes autorizaban a la ACT a destinar los ingresos de los peajes al financiamiento de los servicios esenciales y a suspender las transferencias al agente fiscal en virtud de la Resolución 1968-18 de 13 de junio de 1968, con sus enmiendas, y de la Resolución 1998-06 de 26 de febrero de 1998, con sus enmiendas. Además, la OE 31 suspendió la transferencia al BGF de determinados Ingresos Asignados Condicionalmente en la medida en

---

[99]  Para una discusión de la Ley 5-2017, que enmendó la Ley 21, *véase* la Sección IV.B.11 de esta Declaración de Divulgación.

que dichos ingresos fueran necesarios para que la ACT financiara sus gastos operativos y/o pagara servicios esenciales.

### 9. Ley 2-2017 ("**Ley 2**")

En enero de 2017, la Legislatura promulgó la Ley 2 que amplió el papel de la AAFAF para incluir responsabilidades adicionales relacionadas con la reestructuración de la deuda del ELA y sus corporaciones e instrumentalidades públicas y para supervisar el cumplimiento de los planes fiscales y los presupuestos de dichas entidades certificados por la Junta de Supervisión conforme a PROMESA.

Además, la Ley 2 estableció la AAFAF como la entidad del ELA responsable de llevar a cabo las funciones heredadas del BGF junto con deberes y facultades adicionales, que incluyen, entre otras cosas: (i) la supervisión del presupuesto del ELA; (ii) la presencia administrativa en todas las juntas o los comités de los que el presidente del BGF sea miembro en ese momento; (iii) la autoridad para realizar auditorías e investigaciones; y (iv) la autoridad para liberar partidas presupuestarias, nombrar administradores, redistribuir recursos humanos y cambiar procedimientos.

### 10. Ley 3-2017 ("**Ley 3**")

El 23 de enero de 2017, el ELA promulgó la Ley 3 que declaraba una crisis fiscal y económica y establecía medidas de austeridad fiscal similares a las promulgadas por la Ley 66 que expiraron el 1 de julio de 2017. La Asamblea Legislativa de Puerto Rico está estudiando un proyecto de ley que prorrogaría determinadas medidas hasta el 1 de julio de 2026.[100] La Ley 3 adoptó las siguientes medidas: (i) suspensión de los contratos de negociación colectiva; (ii) congelamiento de beneficios de compensación y empleo; (iii) reducción de los costos de transporte escolar del Departamento de Educación; (iv) implementación de limitaciones sobre las ofertas de empleo; (v) eliminación del 20% de las posiciones de empleados de confianza; (vi) limitación del traspaso de días de licencia por enfermedad y vacaciones de un año fiscal a otro; y (vii) aplicación de un sistema de plan de pago para sentencias legales. Dichas medidas pueden cancelarse con anticipación si se cumplen ciertas condiciones financieras, como un crecimiento del PNB de por lo menos 1.5%, que las obligaciones generales del ELA reciban una calificación de crédito de grado de inversión y el ELA no use financiamiento deficitario. La Ley 3 también prorrogó el arbitrio del 4% estipulado por la Ley 154 del 31 de diciembre de 2017 al 31 de diciembre de 2027.

### 11. Ley 5-2017 ("**Ley 5**")

El 29 de enero de 2017, el ELA promulgó la Ley 5, conocida como la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico de 2017, para derogar partes de la Ley 21-2016 y declarar la emergencia financiera. Si bien ciertas disposiciones de la Ley 21-2016 se derogaron, las órdenes de moratoria de la deuda emitidas conforme a la Ley 21-2016 siguen estando vigentes conforme a la Ley 5. La Ley 5 también estableció un período de emergencia, durante el cual el Gobernador puede emitir órdenes ejecutivas para designar la prioridad del uso

---

[100] Proyecto de ley del Senado 245.

de los recursos disponibles. Asimismo, se concede al Gobernador amplios poderes de sindicatura sobre las agencias gubernamentales, con el fin de rectificar la emergencia financiera.

La Ley 5 fue enmendada por la Ley 46-2017, para autorizar al Gobernador a seguir prorrogando la declaración del período de emergencia de a períodos de 6 meses adicionales, mientras exista la Junta de Supervisión. El período de emergencia se prorrogó por 6 meses hasta el 30 de junio de 2022 mediante la Orden Ejecutiva 2021-084 ("OE-84").

Esta última prórroga a través de la OE-84 es la primera desde que se enmendó la Ley 5 a través de la Ley 42-2021, que, entre otras cosas, limitó la autoridad del poder ejecutivo para emitir deuda sin una nueva legislación habilitante durante el período de emergencia. La Ley 5, enmendada por la Ley 42-2021, no limitó la autoridad de las corporaciones públicas del gobierno de Puerto Rico para emitir deuda durante el período de emergencia y no apunta a la legislación existente que le permite emitir deuda.

**12.    Ley 26-2017 ("Ley 26")**

El 29 de abril de 2017, el ELA promulgó la Ley 26, conocida como la Ley de Cumplimiento con el Plan Fiscal, para implementar una amplia gama de medidas fiscales para reducir costos en todo el ELA y sus corporaciones públicas, incluida la ACT, y apoyar el cumplimiento por parte del ELA del plan fiscal certificado por la Junta de Supervisión. Algunas de las medidas más importantes implementadas por la Ley 26 se relacionan con la estandarización de beneficios adicionales en todo el Gobierno Central y las corporaciones públicas. Las medidas adoptadas por la Ley 26 son las siguientes, entre otras: (1) reducción de los beneficios de licencia por vacaciones y enfermedad; (2) reducción del número de feriados públicos; (3) reducción del bono de Navidad de los empleados de las corporaciones públicas a $600 y condicionamiento de su elegibilidad a seis meses de servicio por año o más; (4) reemplazo del pago de horas extras para empleados públicos con tiempo compensatorio; (5) eliminación del pago en efectivo por acumulación de días de licencia por enfermedad y limitación de la liquidación por acumulación de licencia por vacaciones a sesenta (60) días; (6) anulación de cualquier disposición de un contrato de negociación colectiva que proporcione a los empleados beneficios adicionales que superen aquellos dispuestos por la Ley 26; (7) imposición de un impuesto sobre los dividendos a la Asociación de Suscripción Conjunta de Seguros; (8) ordenar a todas las corporaciones públicas e instrumentalidades que transfieran los ingresos sobrantes al Fondo General del Departamento de Hacienda; (9) establecimiento de un proceso para la venta de bienes inmuebles del gobierno; (10) reducción de la vigencia de la mayoría de las asignaciones multianuales; (11) aumento de los impuestos sobre cigarrillos y productos del tabaco; (12) reducción del financiamiento del Conservatorio de Música y la Escuela de Artes Plásticas; y (13) reducción hasta el FY2021 del monto reservado anualmente para el fondo de emergencia del ELA. La reducción de los beneficios de licencia por vacaciones y enfermedad estipulada por esta ley hizo que ACT registrara un ajuste favorable de aproximadamente $4 millones en su posición neta en FY2019.

La Ley 26 dispone que cuando la situación fiscal se haya estabilizado y la situación fiscal pública así lo permita, el Comité de Cumplimiento con el Plan Fiscal establecido por la Ley puede suspender su vigencia. El Comité se compone de tres miembros, cada uno de los cuales es designado respectivamente por el Gobernador, el Vocero de la Cámara de Representantes y el Presidente del Senado.

### 13.    Ley 109-2017 ("__Ley 109__")

La ACT había dependido históricamente del BGF para la liquidez y la gestión y el apoyo fiscal desde que suspendió su emisión de bonos en 2010. El 24 de agosto de 2017, la Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento para Puerto Rico (la "__Ley de Reestructuración del BGF__") hizo efectivo el Plan Fiscal del BGF y proporcionó una vía para la implementación del acuerdo de apoyo a la reestructuración del BGF al atender las reclamaciones del ELA y sus instrumentalidades contra el BGF. La Ley 109 creó dos entidades con fines especiales — la Autoridad de Recuperación de la Deuda del BGF y el Fideicomiso de Entidad Pública — en las que el BGF dividiría y transferiría irrevocablemente sus activos. Estas entidades fueron utilizadas para completar las transacciones en la Modificación Calificatoria del BGF, tal como fue aprobada por el Tribunal de Distrito bajo el Título VI de PROMESA. En virtud de esta Modificación Calificatoria, los tenedores de ciertas reclamaciones de bonos y depósitos intercambiaron sus reclamaciones por bonos emitidos por la Autoridad de Recuperación de la Deuda del BGF y el BGF transfirió a dicha entidad su cartera de préstamos municipales, una parte de su cartera de préstamos a entidades públicas, sus activos inmobiliarios y su efectivo libre de gravámenes. Como resultado de esta Modificación Calificatoria, los préstamos de la ACT adeudados al BGF por valor de $1.7 mil millones, más los intereses devengados de $795.6 millones fueron transferidos a la Autoridad de Recuperación de la Deuda del BGF. Además, conforme a la Ley 109, el balance de los pasivos adeudados entre el ELA y sus agentes, instrumentalidades y subsidiarias (incluyendo la ACT) y el BGF se determinaron mediante la aplicación del balance pendiente de cualquier depósito en el BGF en nombre de una Entidad Gubernamental No Municipal contra el balance pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o cualquier bono o pagaré de dicha Entidad Gubernamental No Municipal en poder de BGF a dicha fecha. En el caso de la ACT, en virtud de un acuerdo entre FGIC y el BGF que resolvía la objeción de FGIC a la Modificación Calificatoria del BGF (acuerdo de FGIC), aproximadamente $8.5 millones de los depósitos de la Autoridad mantenidos en el BGF no se aplicaron para compensar el balance de los préstamos de la Autoridad. Como resultado del ajuste anterior, se extinguieron todos los depósitos de la ACT en el BGF.

### 14.    Ley 101-2020 ("Ley __101__")

El 12 de agosto de 2020, el ELA promulgó la Ley 101, conocida como la Ley de Responsabilidad en la Emisión de Deuda de Puerto Rico, creando una nueva política de administración de la deuda (la "__Política de Administración de la Deuda__") aplicable al Gobierno de Puerto Rico, sus corporaciones públicas, incluida la ACT, y las instrumentalidades. La Política de Administración de la Deuda estableció restricciones a la emisión de deuda con garantía impositiva y a la emisión de deuda por parte de las corporaciones públicas e instrumentalidades del ELA. La Política de Administración de la Deuda se mantendrá vigente hasta que se paguen en su totalidad los nuevos bonos de obligaciones generales emitidos por el ELA en virtud del Plan del ELA confirmado conforme al Título III de PROMESA.

### 15.    Ley 9-2021 ("__Ley 9__")

El 30 de junio de 2021, el Estado aprobó la Ley 9, conocida como Ley 9 para Garantizar la Negociación Colectiva. La Ley 9, que se aplica a todas las entidades, agencias, instrumentalidades y corporaciones públicas del poder ejecutivo (excepto la Comisión Estatal de

Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel sobre el Fiscal Especial Independiente y la Oficina del Contralor Electoral), estableció lo siguiente: (1) las entidades del poder ejecutivo deben comenzar las negociaciones de los contratos de negociación colectiva con sus respectivas unidades a más tardar el 1 de julio de 2021; y (2) las cláusulas no económicas incluidas en los contratos de negociación colectiva que expiraron antes del 30 de junio de 2021, antes del 1 de julio de 2021, o las que expirarán mientras la Ley 9 esté en vigencia se extenderán hasta que se haya celebrado un nuevo contrato de negociación colectiva. Durante dicha prórroga, las partes no podrán presentar peticiones de elecciones ni celebrar elecciones de descertificación. Dado que la prórroga de un contrato de negociación colectiva queda a criterio de la unidad, si la unidad negociadora decide no prorrogar el contrato de negociación colectiva ni iniciar las negociaciones, deberá notificar dicha determinación dentro de los quince (15) días siguientes a la promulgación de la Ley 9.

### 16.  Ley 53-2021 ("Ley 53")

El 26 de octubre de 2021, el ELA promulgó la Ley 53, conocida como la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", que, entre otras cosas, autoriza condicionalmente la emisión de los nuevos bonos de obligaciones generales y los Instrumentos de Valor Contingente ("CVI") relacionados del Plan del ELA. La autorización está sujeta a que la Junta de Supervisión presente un plan de ajuste conjunto para su confirmación bajo el Título III que elimine las reducciones o modificaciones en los beneficios de pensión o retiro de los beneficiarios del Sistema de Retiro de Empleados del Gobierno ("SRE") del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro para Maestros ("SRM") y el Sistema de Retiro de la  Judicatura ("SRJ"), tales como los contemplados en el Séptimo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, de fecha 30 de julio de 2021.

El 18 de enero de 2022, el Tribunal de Título III confirmó el Plan del ELA, que proporciona una modificación mensual de los beneficios de pensión o retiro sobre los beneficios actualmente acumulados de cero dólares ($0.00) a los empleados del Sistema de Retiro de Empleados del Gobierno. Los empleados de la ACT participan en el Sistema de Retiro de Empleados.

### C.  PROMESA[101]

### 1.  Promulgación de PROMESA

El 30 de junio de 2016, el Congreso promulgó la ley PROMESA, que proporciona un marco, entre otras cosas, para que el ELA y sus instrumentalidades cubiertas, incluida la ACT, reestructuren su deuda mediante el establecimiento de:

- la Junta de Supervisión, que supervisa la reestructuración y los esfuerzos de revitalización del ELA y sus instrumentalidades cubiertas[102] mediante, entre otras: (i) la certificación de

---

[101] Esta sección resume ciertas disposiciones de PROMESA. Aunque el Deudor cree que esta descripción cubre las disposiciones materiales de PROMESA, este resumen no pretende ser completo y está sujeto, y se califica en su totalidad por referencia a, PROMESA.

[102] El 30 de septiembre de 2016, la Junta de Supervisión designó a ciertas entidades, entre ellas la ACT, como instrumentalidades cubiertas. Junta de Supervisión y Administración Financiera de Puerto Rico, Informe Anual,

los planes fiscales y los presupuestos para el ELA y sus instrumentalidades cubiertas y (ii) la representación del ELA y sus instrumentalidades cubiertas en todos los casos presentados bajo el Título III de PROMESA;

- un proceso supervisado por los tribunales, de cuasi quiebra, similar al Capítulo 9 del Código de Quiebras para permitir que el ELA y sus instrumentalidades cubiertas reestructuren su deuda conforme a un plan de ajuste; y

- un marco para la designación, supervisión e implementación de proyectos críticos de infraestructura que apuntan al crecimiento de la economía del ELA.

## 2.      Creación de la Junta de Supervisión

La Sección 101(a) de PROMESA estableció la Junta de Supervisión con el fin de proporcionar un "método para que un territorio cubierto logre la responsabilidad fiscal y acceda a los mercados de capitales". La Junta de Supervisión se compone de siete miembros con derecho al voto designados por el Presidente de Estados Unidos a partir de una lista bipartidista de nominados y un miembro *ex officio* sin derecho al voto designado por el Gobernador.[103] El 31 de agosto de 2016, el Presidente Obama designó a los siete miembros iniciales con derecho al voto de la Junta de Supervisión: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González y (7) Ana J. Matosantos. Los actuales siete miembros con derecho al voto de la Junta de Supervisión son: (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson y (7) Betty A. Rosa. El Gobernador Pedro Pierluisi Urrutia es actualmente el miembro *ex officio* sin derecho al voto en representación del ELA en la Junta de Supervisión.

Cada miembro de la Junta de Supervisión presta servicio durante un período de tres años sin ninguna clase de compensación y puede ser designado por un número ilimitado de períodos consecutivos. Cuando expira un mandato, los miembros de la Junta prestan servicios hasta que son sustituidos. El Presidente de Estados Unidos puede destituir a cualquier miembro con justa causa.

Además de sus siete miembros con derecho al voto y su miembro *ex officio* sin derecho al voto, la Junta de Supervisión también tiene un equipo ejecutivo, que incluye a: (i) un Director Ejecutivo,[104] y (ii) Jaime A. El Koury, como Asesor Legal Principal. Conforme a los estatutos de la Junta de Supervisión, el Director Ejecutivo actúa como funcionario ejecutivo principal de la

---

FY2017 (30 de julio de 2017). El 9 de mayo de 2019, la Junta de Supervisión complementó la lista de instrumentalidades cubiertas y designó 78 municipalidades como instrumentalidades cubiertas conforme a PROMESA.

[103] Para una discusión de los litigios relacionados con impugnaciones conforme a la Cláusula de Designaciones, *véase* la Sección V.F.6 de esta Declaración de Divulgación.

[104] Antes del 1 de abril de 2022, Natalie A. Jaresko ocupaba el cargo de Directora Ejecutiva y Coordinadora de Revitalización Interina. El 3 de febrero de 2022, la Junta de Supervisión anunció la renuncia de la Sra. Jaresko, con efecto a partir del 1 de abril de 2022. Comunicado de prensa, Junta de Supervisión y Administración Financiera para Puerto Rico, "Natalie Jaresko to Leave Oversight Board After Reaching Significant Debt Restructuring and Fiscal Milestones" (3 de febrero de 2022), *disponible en* https://drive.google.com/file/d/1kkEGrQrPQGyB_9FsxhGHrQo8-5gtZAZp/view. A la fecha de esta Declaración de Divulgación, no se ha anunciado ningún reemplazante.

Junta de Supervisión con poderes generales de supervisión y dirección de sus asuntos comerciales (lo que incluye la posibilidad de celebrar contratos en nombre de la Junta de Supervisión), sujeto a la supervisión y el control de la Junta de Supervisión. El Asesor Legal Principal actúa como oficial legal principal de la Junta de Supervisión. El Coordinador de Revitalización es responsable de la ejecución de los deberes estipulados en la Sección 503 de PROMESA relacionada con la identificación, priorización e implementación de proyectos de infraestructura críticos para el ELA.

Conforme a la Sección 108(a) de PROMESA, la Junta de Supervisión actúa como una entidad autónoma, de manera que ni el Gobernador ni la Legislatura pueden ejercer ningún tipo de control sobre la Junta de Supervisión y sus actividades y no pueden realizar acciones que impidan o frustren los propósitos de PROMESA. Si bien ha sido creada por una ley federal, la Junta de Supervisión no es "un departamento, una agencia, un establecimiento ni una instrumentalidad del Gobierno Federal". En lugar de ello, como se estipula en la Sección 101(c) de PROMESA (1), la Junta de Supervisión es considerada como una "entidad dentro del gobierno territorial" del ELA. La Junta de Supervisión sigue siendo una pequeña organización, con una jerarquía plana, que funciona en sus oficinas de San Juan, Puerto Rico y Nueva York, Nueva York. Uno de sus objetivos como organización fue el de aprovechar el increíble talento que hay en Puerto Rico para desarrollar la fuerza de organización mediante el reclutamiento local, reduciendo de esta manera costos y el uso de consultores externos. La abrumadora mayoría de los nuevos empleados de la Junta de Supervisión son puertorriqueños, varios de los cuales han vuelto de los EE. UU. continentales para ayudar a que Puerto Rico se recupere.

De acuerdo con la Sección 209 de PROMESA, la Junta de Supervisión seguirá existiendo hasta que la Junta certifique que: (i) el ELA y sus instrumentalidades territoriales cubiertas tienen acceso adecuado a los mercados de capitales a corto y a largo plazo a tasas de interés razonables para cumplir sus necesidades de préstamo y (ii) durante por lo menos cuatro años fiscales consecutivos: (a) el ELA y sus instrumentalidades territoriales cubiertas han desarrollado sus presupuestos de acuerdo con las normas modificadas de contabilidad en valores devengados y (b) los gastos realizados por el ELA y sus instrumentalidades territoriales cubiertas durante cada uno de estos años fiscales no superaron sus ingresos durante ese año, según se determine de acuerdo con las normas de contabilidad en valores devengados.

### 3.    Poderes y responsabilidades de la Junta de Supervisión

*Certificación de planes fiscales y presupuestos*

Uno de los pilares de PROMESA es el desarrollo, la certificación y la aplicación de planes fiscales y presupuestos para el ELA y sus instrumentalidades cubiertas, incluida la ACT. Dichos planes fiscales y presupuestos proporcionan un marco para lograr la responsabilidad fiscal y acceder a los mercados de capitales. Los planes fiscales son herramientas de planificación a corto y largo plazo, que abarcan un período de por lo menos cinco ejercicios fiscales, mientras que los presupuestos abarcan por lo menos un ejercicio fiscal. Los presupuestos deben ser coherentes con el plan fiscal que esté en vigencia en ese momento.

PROMESA contempla que la Junta de Supervisión y el gobierno electo del ELA trabajen en conjunto para adoptar un plan fiscal, pero concede a la Junta de Supervisión el poder de desarrollar y certificar su propio plan fiscal si el gobierno no le proporciona una propuesta de plan

fiscal que determine certificar. El proceso comienza con la entrega por parte de la Junta de Supervisión de un cronograma para el desarrollo, la presentación y la certificación de planes fiscales para el ELA y cualquier instrumentalidad cubierta. El Gobernador debe entonces presentar el plan fiscal propuesto de acuerdo con dicho cronograma. Después de la presentación, la Junta de Supervisión puede certificar el plan fiscal propuesto si determina que dicho plan fiscal cumple catorce (14) requisitos legales estipulados en la Sección 201(b) de PROMESA, que están diseñados para "proporcionar un método para lograr la responsabilidad fiscal y acceder a los mercados de capitales". El plan fiscal debe:

- disponer estimaciones de ingresos y gastos de acuerdo con las normas contables acordadas y basadas en (i) leyes aplicables o (ii) proyectos de ley específicos que requieran su promulgación para alcanzar las proyecciones del plan fiscal dentro de lo razonable;

- garantizar el financiamiento de los servicios públicos esenciales;

- proporcionar financiamiento adecuado para los sistemas públicos de pensión;

- tomar medidas para la eliminación de déficits estructurales;

- para los años fiscales cubiertos por un plan fiscal donde una paralización conforme al Título III o Título IV de PROMESA no es efectiva, disponer una carga de la deuda que sea sostenible;

- mejorar la gobernanza fiscal, la rendición de cuentas y los controles internos;

- permitir el logro de los objetivos fiscales;

- crear pronósticos independientes de ingresos para el período abarcado por el plan fiscal;

- incluir un análisis de sostenibilidad de la deuda;

- disponer gastos de capital e inversiones necesarios para promover el crecimiento económico;

- adoptar recomendaciones adecuadas presentadas por la Junta de Supervisión;

- incluir la información adicional que la Junta de Supervisión considere necesaria;

- asegurarse de que los activos, fondos o recursos de una instrumentalidad territorial no se presten, transfieran a o se usen de otra manera para beneficio de un territorio cubierto u otra instrumentalidad territorial cubierta de un territorio cubierto, a menos que lo permita la constitución del territorio, un plan aprobado de ajuste conforme al Título III o una Modificación Calificatoria aprobada conforme al Título VI de PROMESA; y

- respetar las relativas prioridades legales o embargos legales, según sea aplicable, de la constitución, otras leyes o acuerdos de un territorio cubierto o instrumentalidad territorial cubierta en vigencia antes de la fecha de promulgación de PROMESA.

Los planes fiscales deben garantizar el financiamiento de los servicios públicos esenciales. La Junta de Supervisión considera que "servicios esenciales" es una frase que se usa para hacer referencia, como mínimo, a servicios que, debido al poder de policía, un tribunal con jurisdicción competente podría permitir que se paguen con fondos de ingresos sobre los cuales un acreedor tiene una reclamación prioritaria o una reclamación garantizada válida e inevitable. La Junta de Supervisión considera que el uso de dichos ingresos conforme al poder de policía puede o no dar lugar a reclamaciones adicionales de los acreedores afectados, según las circunstancias. Esta Declaración de Divulgación y el Plan de la ACT no definen lo que son los "servicios esenciales" ni los "gastos esenciales". La Junta de Supervisión considera que esto se debe a varias razones, entre ellas las siguientes.[105]

El Título II de PROMESA requiere que un plan fiscal "asegure el financiamiento de los servicios públicos esenciales". Este lenguaje establece un piso mínimo de gasto, lo que significa que el plan fiscal debe financiar servicios esenciales. En el momento de la confirmación, el Tribunal de Título III estudia si aprueba un plan de ajuste. La certificación del plan fiscal, sin embargo, queda fuera de la jurisdicción sobre la materia del Tribunal de Título III conforme a la Sección 106(e) de PROMESA. La Sección 314(b)(7) de PROMESA requiere que el plan de ajuste sea coherente con el plan fiscal aplicable, pero no impone ninguna prueba del plan fiscal. Por lo tanto, los servicios esenciales no son objeto de debate.[106]

Además, el concepto de "servicios esenciales" no permite hacer una simple enumeración de qué servicios o gastos son esenciales y cuáles no, porque los servicios esenciales pueden variar mucho con el tiempo y según las circunstancias posteriores a la confirmación. Por ejemplo, si la actividad económica de la ACT fuera tan baja durante un período que la eliminación de cualquier servicio impidiera un crecimiento económico sustentable, la Junta de Supervisión podría determinar que todos esos servicios son esenciales. El fiscal certificado de la ACT abarca períodos de crecimiento y retracción, y muestra una retracción continua de la población.

Después de la certificación del plan fiscal de la ACT, la Junta de Supervisión proporcionará al Gobernador un cronograma para el desarrollo y la certificación del presupuesto. La Junta de Supervisión también debe proporcionar al Gobernador un pronóstico de ingresos para su uso en el desarrollo del presupuesto. Si la Junta de Supervisión determina que la propuesta de presupuesto para la instrumentalidad territorial cubierta presentada por el Gobernador cumple el plan fiscal aprobado, la Junta de Supervisión lo aprobará y lo certificará. Si la Junta de Supervisión determina que la propuesta de presupuesto no cumple el plan fiscal certificado, presentará una notificación de violación al Gobernador con respecto al presupuesto que incluya una descripción de las acciones correctivas necesarias y una oportunidad para corregir dichas violaciones, presentando un

---

[105] Ciertas partes alegan que los "servicios esenciales" deben identificarse específicamente.

[106] El Tribunal de Título III ha reconocido que la coherencia de un plan de ajuste y el plan fiscal aplicable queda a "exclusivo criterio" de la Junta de Supervisión. *Véase Averiguación de Hechos y Conclusiones de Derecho en relación con la confirmación del Octavo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico* ¶¶ 38, 54 [ECF Núm. 19812]; *Orden y sentencia que confirma el Octavo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico* ¶ 78 [ECF Núm. 19813].

2" = "1" "2621/33260-009 CURRENT/127656480v7                                               04/30/2022 3:29 PM" ""

presupuesto revisado que cumpla el plan fiscal certificado. El Gobernador puede presentar todos los presupuestos revisados que permita el cronograma establecido por la Junta de Supervisión. Sin embargo, si el Gobernador no presenta un presupuesto para la instrumentalidad territorial cubierta que cumpla el plan fiscal certificado dentro del plazo establecido por la Junta de Supervisión, la Junta de Supervisión debe desarrollar y presentar al Gobernador un presupuesto que cumpla el plan fiscal certificado. El Gobernador entonces presentará a la Junta de Supervisión el presupuesto que adopte para que la Junta de Supervisión pueda determinar si dicho presupuesto cumple el plan fiscal certificado. Si el presupuesto adoptado por el Gobernador cumple el plan fiscal certificado, la Junta de Supervisión lo aprobará y dicho presupuesto estará vigente a partir del primer día del año fiscal. Si la Junta de Supervisión determina que el presupuesto adoptado por el Gobernador no cumple el plan fiscal certificado, la Junta de Supervisión deberá presentar al Gobernador una notificación de violación que incluya una descripción de la acción correctiva necesaria y una oportunidad de corregir esta violación. El Gobernador puede presentar todos los presupuestos revisados que permita el cronograma establecido por la Junta de Supervisión. Sin embargo, si el Gobernador no adopta un presupuesto que cumpla el plan fiscal certificado dentro del plazo establecido por la Junta de Supervisión, la Junta de Supervisión debe desarrollar un presupuesto que cumpla el plan fiscal certificado y presentarlo al Gobernador. Dicho presupuesto se considerará aprobado por el Gobernador y estará en vigencia a partir del primer día del año fiscal.

Al final de cada trimestre fiscal, el Gobernador debe presentar a la Junta de Supervisión un informe financiero para el ELA y cada instrumentalidad territorial cubierta donde se describan los ingresos, gastos y flujos de caja reales para cada trimestre. Si la Junta de Supervisión determina que los ingresos, gastos y flujos de caja reales no son congruentes con los ingresos, gastos y flujos de caja proyectados en el presupuesto certificado para ese trimestre, la Junta de Supervisión deberá establecer una fecha límite en la cual el Gobierno debe proporcionar una explicación para esta incongruencia que la Junta de Supervisión considere razonable o el Gobierno debe implementar medidas correctivas para abordar dicha incongruencia. Si el Gobierno no ofrece una explicación razonable o no corrige la incongruencia, la Junta de Supervisión debe certificar al Presidente, el Congreso de Estados Unidos, el Gobernador y la Legislatura que el Gobierno presenta incongruencias con el presupuesto certificado y describir el monto de la incongruencia. Después de proporcionar esta certificación y determinar que el Gobierno no ha corregido la incongruencia, la Junta de Supervisión puede realizar reducciones adecuadas en los gastos no relacionados con la deuda para asegurarse de que los ingresos y gastos estén en línea con el presupuesto certificado. En el caso de una instrumentalidad territorial cubierta, la Junta de Supervisión también puede implementar congelamientos automáticos en las contrataciones y prohibir que dicha instrumentalidad celebre contratos.

Desde la promulgación de PROMESA el 30 de junio de 2016, la Junta de Supervisión ha certificado presupuestos para la ACT para los años fiscales 2018, 2019, 2020, 2021 y 2022.[107]

Con el fin de que se cumplan las obligaciones anteriores, la Junta de Supervisión tiene la autoridad para aplicar los planes fiscales y los presupuestos certificados revisando las actividades del gobierno del ELA y de sus instrumentalidades territoriales cubiertas. Como consecuencia, los

---

[107] *Véase* https://oversightboard.pr.gov/budgets-2/.

actos legislativos propuestos del ELA deben ser presentados a la Junta de Supervisión y deben estar acompañados por una estimación del impacto de la nueva ley sobre los gastos e ingresos.

Desde su creación, la Junta de Supervisión y los ex Gobernadores del ELA se han mostrado en desacuerdo en ciertas ocasiones, con respecto a si los informes del gobierno han cumplido las disposiciones de PROMESA y si ciertas órdenes ejecutivas y nuevas leyes han violado PROMESA y/o los planes fiscales y presupuestos certificados.

La Junta de Supervisión también tiene la autoridad de revisar el impacto económico sobre los planes fiscales y presupuestos certificados de cualquiera de los contratos, normas, reglamentos y órdenes del ELA y sus instrumentalidades territoriales cubiertas. Si la Junta de Supervisión determina que cualquiera de las actividades anteriores es incongruente con un plan fiscal o presupuesto certificado, la Junta de Supervisión puede tomar las medidas necesarias para garantizar que la promulgación de una nueva ley o la ejecución de un nuevo contrato no afecten de manera adversa el cumplimiento de un plan fiscal o presupuesto certificado. Además, la Junta de Supervisión puede presentar en cualquier momento al Gobernador o a la Legislatura recomendaciones de acciones que garanticen el cumplimiento de los planes fiscales o que promuevan de otra manera la estabilidad financiera y la responsabilidad administrativa en las corporaciones públicas del ELA. El ELA puede adoptar o rechazar dichas recomendaciones, con la condición de presentar un informe al Presidente de Estados Unidos y el Congreso donde se justifique el rechazo de las recomendaciones. Sin embargo, la Junta de Supervisión, en su plan fiscal certificado puede adoptar e imponer recomendaciones que el Gobernador se rehúse a adoptar.[108]

La sección 207 de PROMESA también dispone que el ELA y sus instrumentalidades territoriales cubiertas no pueden emitir ninguna deuda sin la aprobación de la Junta de Supervisión.

### *Título III de PROMESA*

Si no se logra una reestructuración consensuada, el Título III de PROMESA dispone una opción de cuasi-quiebra para el ajuste de la deuda del ELA y sus instrumentalidades cubiertas. La elegibilidad para el ELA o una instrumentalidad territorial cubierta del ELA para ser deudor conforme al Título III de PROMESA depende de que se satisfagan ciertos requisitos, como se estipula en la sección 302 de PROMESA. De conformidad con la Sección 304(b) de PROMESA, la vista para considerar una objeción a una petición de Título III no puede iniciarse hasta el 120$^{mo}$ día después de la presentación de la petición. En esa vista, el Tribunal de Título III pondrá a consideración los requisitos de la Sección 302 de que: (i) la entidad haya sido designada por la Junta de Supervisión como una instrumentalidad territorial cubierta; y (ii) la Junta de Supervisión haya emitido una certificación de reestructuración que determine que (a) se realizaron esfuerzos previos de buena fe con los acreedores para reestructurar la deuda, (b) las declaraciones financieras auditadas de la entidad estén públicamente disponibles y (c) la entidad haya adoptado previamente un plan fiscal y (iii) la entidad está dispuesta a aplicar un plan para ajustar sus deudas. La Junta de Supervisión tiene autoridad exclusiva, conforme a las secciones de PROMESA 304 y 312, para presentar una petición voluntaria para obtener protección conforme al Título III y para presentar

---

[108] Para una discusión de los litigios relacionados con las facultades de la Junta de Supervisión, *véase* la sección V.F.5 de esta Declaración de Divulgación.

un plan de ajuste para el deudor y para modificarlo. Además, la Sección 315 DE PROMESA le concede a la Junta de Supervisión el derecho de "tomar las medidas necesarias en nombre del deudor para llevar a juicio los casos del deudor", y la Junta de Supervisión "es representante del deudor" en el caso de Título III.

### *Otros poderes y responsabilidades*

Conforme a la Sección 208 de PROMESA, dentro de treinta (30) días después del final de cada año fiscal, la Junta de Supervisión debe presentar un informe anual al Presidente de Estados Unidos, el Congreso, el Gobernador y la Legislatura. El informe anual debe describir el progreso del Gobierno para lograr los objetivos de PROMESA y cómo la Junta de Supervisión ha asistido en ese progreso. Además, la Junta de Supervisión debe describir la manera precisa en que usó sus fondos durante el ejercicio fiscal. El informe anual también puede incluir las recomendaciones de la Junta de Supervisión para una acción federal futura, lo que incluye la enmienda de PROMESA o la promulgación de cualquier otra legislación, para apoyar el cumplimiento con planes fiscales certificados.

Además de las responsabilidades centrales anteriores, la Junta de Supervisión también ha recibido otros poderes significativos para asistir en el logro de sus objetivos. Estos poderes adicionales incluyen, entre otras cosas:

- realización de vistas y sesiones;

- la obtención de datos oficiales del ELA, el gobierno federal y los acreedores;

- la emisión y aplicación de citaciones legales;

- celebrar contratos;

- certificar acuerdos de reestructuración voluntarios y proteger ciertos acuerdos de reestructuración preexistentes calificatorios entre el ELA y sus acreedores;

- certificar modificaciones de la deuda bajo el Título VI de PROMESA;

- iniciar acciones civiles para hacer valer su autoridad bajo PROMESA;

- investigar las prácticas de divulgación y venta del ELA en relación con sus bonos;

- garantizar el pronto pago y administración de impuestos del ELA a través de la adopción de informes electrónicos y tecnologías de pagos y auditoría;

- analizar cualquier pensión con carencia material de fondos en el sistema de pensiones del ELA; y

- intervenir en cualquier litigio radicado contra el ELA o sus instrumentalidades cubiertas.

*Implementación de políticas de la Junta de Supervisión*

La Junta de Supervisión implementó varias iniciativas en sus esfuerzos por cumplir los objetivos de PROMESA, lo que incluye, entre otras cosas:

**(a)     Mejora de la gobernanza fiscal, rendición de cuentas, controles internos y asuntos financieros del Gobierno**

Una de las responsabilidades centrales de la Junta de Supervisión es mejorar la gobernanza fiscal, rendición de cuentas y controles internos del Gobierno. Después de la presentación de los Casos de Título III, con el apoyo del Gobierno, la Junta de Supervisión continuó identificando e implementando mejoras estructurales y de proceso para cumplir su mandato conforme a PROMESA.

La Junta de Supervisión también creó un requisito de informe de presupuestado vs. real para el Gobierno Central y las veinte principales Unidades Componentes, incluida la ACT, que ha obligado al Gobierno a agregar recursos y capacidad a sus departamentos de presupuesto y contabilidad. El requisito de informe de B2A ha permitido que el Gobierno ofrezca mayor visibilidad a las partes interesadas sobre sus patrones de gastos reales y un mecanismo de alerta temprana para advertir al Gobierno y a la Junta de Supervisión en caso de que los gastos reales se desvíen de los montos presupuestados. El informe B2A para la ACT es dado a conocer al público por el Gobierno con frecuencia trimestral.

Otros requisitos de informe implementados por la Junta de Supervisión incluyen: (i) informe público mensual de los balances de obligaciones de pensión para el Gobierno y las corporaciones públicas, (ii) informe público mensual de la nómina, número y datos de asistencia sobre los empleados públicos, (iii) informe trimestral de pronósticos de ingresos, y (iv) el texto completo de todo el Gobierno en el sitio web de la Oficina de Contralor.

**(b)     Recomendaciones**

(i)     *Recomendaciones de la Sección 205*

Conforme a la Sección 205 de PROMESA, la Junta de Supervisión puede presentar recomendaciones, en cualquier momento, al Gobernador o la Legislatura sobre las medidas que el Gobierno y sus instrumentalidades territoriales cubiertas pueden tomar para garantizar el cumplimiento del plan fiscal certificado, o para promover de otro modo la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la forma en que el Gobierno presta sus servicios. La última carta de recomendación de la Sección 205 relativa a la ACT que la Junta de Supervisión envió al Gobierno fue el 29 de enero de 2021.

La carta de la Sección 205 recomendaba al Gobierno elaborar un plan y un cronograma para integrar y mejorar los componentes de su sistema de transporte público. La recomendación se centra en la integración de las agencias, la gestión del desempeño y la maximización del financiamiento del sistema. Estas recomendaciones para un sistema de transporte unificado y eficaz están en consonancia con los objetivos de reducir la congestión del tráfico, aumentar el acceso de los ciudadanos al transporte multimodal, mejorar la gobernanza de las entidades de

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

transporte, mejorar la sustentabilidad fiscal de las agencias de transporte público y promover el crecimiento y el desarrollo económicos. El Gobierno respondió a las recomendaciones el 29 de abril de 2021 expresando su compromiso de examinar las posibilidades de implementación. Desde este compromiso, han continuado las discusiones entre la Junta de Supervisión y las entidades pertinentes (incluidas ACT, DTOP, ATI y AAFAF) sobre la aplicación de la reforma del sector del transporte. El Plan Fiscal Certificado del ELA de 2022 y el Plan Fiscal de la ACT de febrero de 2022 establecen iniciativas, como la reforma del sector del transporte, para apoyar los objetivos de esta recomendación.

(ii) <strong><em>Recomendaciones al Gobierno Federal</em></strong>

La Junta de Supervisión resumió las distintas recomendaciones al Gobierno Federal en su Informe Anual del FY2021. Las recomendaciones se centraron en el desarrollo económico, las cuestiones fiscales, Medicare y Medicaid, la participación laboral, la reforma de las prestaciones, las pequeñas empresas, las instituciones financieras y las estadísticas.

(iii) <strong><em>Medidas de la Junta de Supervisión que el ELA se ha negado a adoptar</em></strong>

El Plan Fiscal 2020 de la ACT de junio disponía un aumento del 8.5% en las tarifas de peaje para mantener el ritmo de la inflación y los crecientes costos de mantenimiento de las carreteras y los activos de transporte. Dicho aumento no se aplicó. Los planes fiscales de la ACT de mayo de 2021 y febrero de 2022 volvieron a exigir un aumento del 8.3% en las tarifas de peaje para cada año desde el FY2022 hasta el FY2024 para compensar y "ponerse al día" con la falta de aumentos desde 2005. La ACT había previsto aumentar las tarifas de peaje de las autopistas de su propiedad en enero de 2022, con la expectativa de que la recuperación de la pandemia de COVID-19 estuviera en marcha. Sin embargo, en abril de 2022, dichos aumentos no se habían aplicado.

(c) <strong>Revisión de los actos legislativos y determinadas normas, reglamentos, órdenes administrativas y ejecutivas</strong>

La Sección 204(a) de PROMESA exige que el Gobierno presente a la Junta de Supervisión todas las nuevas leyes, a más tardar siete (7) días hábiles después de que la ley esté debidamente promulgada. El Gobernador también debe presentar ciertas normas, reglamentos y órdenes ejecutivas a la Junta de Supervisión para su revisión y aprobación conforme a las Secciones 204(b)(2) y (b)(4) de PROMESA y las políticas establecidas por la Junta de Supervisión. Su único objetivo es garantizar que todas las leyes promulgadas y también cualquier norma, reglamento, orden administrativa y orden ejecutiva propuesta no tengan consecuencias negativas en ningún plan o presupuesto fiscal certificado. El Gobierno ha incumplido sistemáticamente sus obligaciones en virtud de la Sección 204(a) de presentar leyes a más tardar siete (7) días hábiles después de su promulgación. Más de 100 leyes firmadas y resoluciones conjuntas no fueron presentadas ante la Junta de Supervisión según lo exigido por PROMESA. Por ejemplo, la Junta de Supervisión envió una carta al Gobernador Vázquez instando al gobierno a retrasar la implementación de la Orden Ejecutiva 2020-10 hasta después de que la Junta de Supervisión tenga la oportunidad de revisar la orden ejecutiva y la documentación de apoyo para garantizar el

cumplimiento de la Sección 204(b) (2) de PROMESA. La Orden Ejecutiva 2020-10 eximiría al Poder Ejecutivo del ELA de cumplir los requisitos de contratación en un esfuerzo por acelerar los esfuerzos de recuperación tras los continuos terremotos.

El 3 de julio de 2019, la Junta de Supervisión ha iniciado una acción conforme a las Secciones 108(a)(2), 204(a)(5), 204(c), y 207 de PROMESA para impedir la implementación de la Ley 29 y numerosas resoluciones conjuntas, porque tales leyes son significativamente incompatibles con el plan fiscal certificado aplicable, reprogramar fondos sin la aprobación de la Junta de Supervisión, modificar la deuda sin la aprobación de la Junta de Supervisión, y/o no se presentaron debidamente a la Junta de Supervisión conforme a la Sección 204 (a) de PROMESA. Esta es la primera acción presentada conforme a la Sección 204 de PROMESA. *Véase* la Sección II.F de esta Declaración de Divulgación para obtener un resumen de dichas acciones.

Tras el inicio de dicha acción, el 25 de octubre de 2019, el Gobernador Vázquez firmó la Orden Ejecutiva 2019-057, que crea un procedimiento con el propósito expreso de cumplir la Sección 204(a) de PROMESA. El procedimiento requiere, entre otras cosas, que OGP y el Departamento de Hacienda de Puerto Rico completen y presenten a la AAFAF dentro de los siete (7) días laborables siguientes a la firma de la nueva legislación por parte del Gobernador un análisis certificado del impacto financiero y presupuestario de esa ley.

El 12 de junio de 2020, el Gobernador y la AAFAF presentaron seis (6) demandas contenciosas en las que se solicitaban sentencias declaratorias de que determinadas Leyes y las certificaciones relacionadas satisfacen los requisitos de PROMESA en virtud de las Secciones 204(a) y 108(a). *Véase* la sección II.F de esta Declaración de Divulgación para obtener un resumen de dicha acción.

(d)     **Revisión de contratos**

El 6 de noviembre de 2017 (con modificación del 30 de abril de 2021), la Junta de Supervisión estableció una política (la "Política de Revisión de Contratos"), conforme a la Sección 204(b)(2) de PROMESA, para exigir la aprobación previa de contratos por la Junta de Supervisión con un valor total de $10 millones o más celebrados por el ELA o cualquier otra instrumentalidad territorial cubierta. Los objetivos de la política son promover la competencia en el mercado y garantizar la congruencia de un contrato gubernamental con el plan fiscal y el presupuesto certificados aplicables. Por consiguiente, la Junta de Supervisión concentra su revisión en si el contrato es congruente con el plan fiscal aplicable y, en el caso de gastos en ayuda para desastres, formular observaciones con respecto al cumplimiento de los requisitos de financiamiento federal y/o reembolso.

Para que la política de contratación sea más transparente, la Junta de Supervisión publica un informe del estado de cada contrato en proceso de revisión, que incluye el nombre de la parte contratante, la fecha de presentación, la fecha de cualquier respuesta de la Junta de Supervisión de la parte contratante y una copia de todas las respuestas formales de la Junta de Supervisión. La política requiere que la entidad gubernamental contratante le presente a la Junta de Supervisión una certificación por la cual su jefe o asesor jurídico certifica que ninguna persona ha intervenido indebidamente, ha ofrecido algo de valor o ha ejercido influencia alguna en relación con la celebración del contrato. La política requiere que los contratistas presenten una certificación

similar a la Junta de Supervisión y divulguen cualquier participación de cualquier parte de su compensación con cualquier tercero. Al 20 de abril de 2022, la Junta de Supervisión ha revisado 40 contratos de la ACT por un valor total de más de $650 millones.

Además, la Junta de Supervisión incluyó en el plan fiscal del ELA un requisito para que el texto de todos los contratos gubernamentales se publique en el sitio web de la Oficina del Contralor para el 30 de septiembre de 2018, y suscribió un memorando de entendimiento con la Oficina del Contralor para promover la transparencia en la contratación estatal.

### (e)    Aprobaciones de operaciones de deuda

En diciembre de 2017, la Junta de Supervisión estableció una política conforme a la Sección 207 de PROMESA, para exigir la aprobación previa por la Junta de Supervisión de cualquier operación de deuda que sea suscrita por el ELA o cualquier otra instrumentalidad territorial cubierta. Los objetivos de esta política son promover la prudencia fiscal y garantizar que las operaciones de deuda sean congruentes con el plan fiscal certificado aplicable.

Desde el inicio de la política, la Junta de Supervisión ha aprobado una serie de transacciones de deuda para el ELA y las instrumentalidades territoriales cubiertas. Recientemente no se ha realizado ninguna aprobación de operaciones de deuda para la ACT.

### (f)    Página web de Ética de la Junta de Supervisión

El 21 de junio de 2019, la Junta de Supervisión anunció el lanzamiento de su nueva página web de Ética,[109] una herramienta de Internet para promover la transparencia y la ética en las operaciones diarias de la Junta de Supervisión. La página contiene un gran número de documentos de gobernanza de la Junta de Supervisión, los informes trimestrales de transacciones periódicas y los informes anuales de divulgación financiera de los miembros, un blog interactivo de la Asesora de Ética y otros recursos para que los visitantes conozcan las políticas y acciones sobre ética y buena gobernanza de la Junta de Supervisión. El objetivo de esta página es continuar promoviendo la importancia de la transparencia y la ética en el trabajo que la Junta de Supervisión desarrolla para las partes interesadas de los Deudores, y para proveer una herramienta interactiva para compartir documentos, novedades y recursos importantes y para mediar para la promoción de la ética y la integridad en las políticas, gestiones y vidas diarias.

### *Controversias sobre los poderes de la Junta*

Ha habido litigios sobre el alcance de las facultades de la Junta de Supervisión, incluyendo cuestiones recientes con respecto al proceso de certificación de la legislación recientemente aprobada en virtud de PROMESA.[110]  Las controversias han tenido que ver, entre otras cosas, con si la Junta de Supervisión puede imponer lo que el Gobierno considera opciones políticas y si el Gobernador y la Legislatura pueden reprogramar asignaciones presupuestarias de años anteriores

---

[109]  http://www.oversightboard.pr.gov/ethics/

[110]  Como se señaló anteriormente, la Junta de Supervisión ha enviado numerosas cartas al ELA buscando corregir las violaciones de PROMESA.

para gastar dinero que la Junta de Supervisión no ha aprobado. Estas y otras controversias se describen en la Sección II.F.5 de esta Declaración de Divulgación.

**D.    Adopción de los presupuestos y planes fiscales del año fiscal de la ACT**

*Planes fiscales.* La Junta de Supervisión se encarga de interactuar con el Gobernador con respecto al desarrollo, la presentación, la aprobación y la certificación de los planes fiscales y los presupuestos, entre ellos los de la ACT. De ahí que, ya en septiembre de 2016, la Junta de Supervisión, junto con sus economistas, asesores municipales y asesores financieros dedicaron cientos de horas a investigar y realizar sesiones de trabajo para entender la grave situación en Puerto Rico, y para investigar las diferentes formas en que los estados y los soberanos han superado circunstancias tan difíciles. La Junta de Supervisión también celebró numerosas reuniones internas y externas con funcionarios gubernamentales y los diversos grupos de acreedores. La Junta de Supervisión analizó los numerosos retos fiscales a los que se enfrentaba Puerto Rico y en unos pocos meses estaba en condiciones de formular su propio plan fiscal o evaluar el plan fiscal propuesto por el Gobierno.

La Junta de Supervisión se encarga de determinar, a su exclusivo criterio, si los planes fiscales propuestos concuerdan con la Sección 201(b) de PROMESA. Entre los objetivos de PROMESA está que el plan fiscal brinde a Puerto Rico reformas fiscales permanentes, y que promuevan el crecimiento,[111] y un método para lograr la responsabilidad fiscal y acceder a los mercados de capital.

A través de innumerables discusiones y reuniones de colaboración con la ACT y sus representantes, la Junta de Supervisión ha certificado planes fiscales para la corporación pública que han exigido a la ACT emprender varias iniciativas, que promueven la sostenibilidad fiscal de la ACT y el crecimiento económico de Puerto Rico a través del desarrollo de una red de transporte confiable y accesible con una gobernanza profesional y transparente. Entre algunas de las principales medidas fiscales del plan fiscal de la ACT que reflejan estos esfuerzos se encuentran el aumento de las tarifas de peaje y la optimización del cobro de estas en las autopistas de peaje existentes para hacer frente a los crecientes niveles de gastos de explotación y ponerse al día con la ausencia de aplicación de aumentos de peaje desde 2005, la obtención de una mayor recaudación de subvenciones discrecionales de transporte para que la ACT las utilice como fuente de financiamiento para el programa de capital de la ACT, que a su vez, optimiza el gasto en proyectos de capital a través de la priorización de proyectos, y la introducción de nuevos mecanismos de gestión de la congestión.

Los planes fiscales certificados por la Junta de Supervisión proporcionan una hoja de ruta para garantizar el éxito de la transformación de la ACT, facilitar un sistema de transporte seguro y eficiente y estimular el desarrollo económico.

---

[111] PROMESA § 701 ("Es el parecer del Congreso que cualquier solución duradera para la crisis económica y fiscal de Puerto Rico debe incluir reformas fiscales permanentes que fomenten el crecimiento, que tengan a su haber, entre otros elementos, un flujo de capital libre entre las posesiones de los Estados Unidos y el resto de los Estados Unidos").

2" = "1" "2621/33260-009 CURRENT/127656480v7                                04/30/2022 3:29 PM" ""

*Presupuestos anuales*. La Sección 202(c)(1) de PROMESA establece un proceso para la aprobación de presupuestos anuales que deben cumplir los planes fiscales certificados. Solo después de que la Junta de Supervisión haya certificado un plan fiscal, el Gobernador podrá presentar un presupuesto. En una primera instancia, la Sección 202(c)(1) de PROMESA brinda al Gobernador la oportunidad inicial de desarrollar y presentar a la Junta de Supervisión un presupuesto para el año fiscal correspondiente para el ELA, y también sus instrumentalidades, entre ellas la ACT. Luego, la Junta de Supervisión realiza una revisión detallada de las propuestas de presupuestos para garantizar que las asignaciones gubernamentales sean compatibles con los planes fiscales certificados respectivos.

La preparación de un presupuesto certificado es un proceso que dura un año, que la Junta de Supervisión ha refinado para garantizar que el presupuesto certificado contenga la transparencia y el control de gastos deseados. Como parte de ese proceso, la Junta de Supervisión instauró controles significativos sobre los gastos para restaurar la disciplina fiscal esbozando al mismo tiempo medidas específicas para promover la eficiencia y una mejor prestación de los servicios públicos.

El presupuesto de la ACT proporciona gastos detallados por concepto de gasto y por código de objeto (p. ej., salarios, horas extra, salud, arrendamientos, mantenimiento y reparaciones) para brindar mayor transparencia respecto al gasto público.

El presupuesto certificado que contiene las asignaciones para gastos para cada agencia especifica la manera en que se desembolsan los fondos mensualmente a diversas entidades gubernamentales, obliga al Departamento de Hacienda a brindar previsiones actualizadas de los ingresos netos, rescinde las asignaciones del año anterior (salvo en los casos en que estén específicamente exentas), exige que la AAFAF certifique las asignaciones no utilizadas del año anterior, suspende los derechos de la OGP, la AAFAF o del Departamento de Hacienda de reprogramar o prorrogar las asignaciones y reitera el requisito de cumplir los requisitos de presentación de informes en los planes fiscales certificados. Además, el presupuesto certificado requiere que el Gobernador presente un informe trimestral de ingresos y gastos a la Junta de Supervisión, de acuerdo con la Sección 203 de PROMESA.

1. **Desarrollo y certificación del plan fiscal de la ACT de abril de 2017**

A principios de noviembre de 2016, la Junta de Supervisión anunció que exigiría planes fiscales por separado a seis (6) de las corporaciones públicas de Puerto Rico, incluida la ACT. En ese momento, la elaboración del plan fiscal del ELA ya estaba en marcha. El 21 de febrero de 2017, la ACT presentó su propuesta de plan fiscal, de acuerdo con el plazo establecido por la Junta de Supervisión el 28 de enero de 2017.

Tras la certificación del primer plan fiscal del ELA en marzo de 2017, el Gobierno presentó el 19 de abril de 2017 una propuesta actualizada del plan fiscal de la ACT.

El 25 de abril de 2017, la Junta de Supervisión anunció que estudiaría la certificación del plan fiscal de la ACT. en su séptima reunión pública el 28 de abril de 2017. En la reunión pública, los representantes del Gobernador presentaron a la Junta de Supervisión y al público el plan fiscal final propuesto para la ACT. Tras ofrecer una oportunidad para la presentación y los comentarios del público, la Junta de Supervisión certificó el Plan Fiscal de la ACT de abril de 2017, sujeto a

seis (6) enmiendas, entre las que se incluía la necesidad de que la corporación pública abordara la sustentabilidad de la ACT por activos, y adoptara medidas más agresivas de mejora fiscal y de los ingresos del sistema de tránsito. La certificación del primer Plan Fiscal de la ACT supuso un importante avance en la transformación de la ACT. El Plan Fiscal de la ACT de abril de 2017 preveía obligar $135 millones anuales de la FHWA y $20 millones de la FTA a proyectos que cumplieran cuatro (4) objetivos clave: (1) proyectos de seguridad y protección del tránsito, (2) mejora de las infraestructuras de transporte existentes, (3) sistemas completos de carreteras y (4) mitigación de la congestión. Además, como resultado de la realidad financiera en el momento de la elaboración del Plan Fiscal de la ACT de abril de 2017, la ACT planificó la implementación de varias medidas para optimizar las operaciones con un impacto cercano a los $616 millones durante el período de diez (10) años, es decir, el catorce por ciento (14%) de la brecha financiera de entonces. Las proyecciones de referencia de la ACT dentro del Plan Fiscal de la ACT de abril de 2017 incluían unos ingresos totales de unos $6.3 mil millones, con unos $4.57 mil millones de sus ingresos operativos redirigidos al ELA, y unos gastos totales de unos $5.0 mil millones durante el período de diez (10) años. El Plan Fiscal de la ACT de abril de 2017 proponía un agresivo plan de mejoras de capital que incluía una inversión de $1.1 mil millones en proyectos tanto activos como planificados durante un período de cuatro (4) años.

La Junta de Supervisión concedió al Gobierno un mes para presentar un plan de aplicación de las enmiendas y otros quince (15) días para presentar un plan fiscal revisado en cumplimiento de las enmiendas.

## 2.  Certificación del Plan Fiscal de la ACT de 2018

El 21 de mayo de 2017, la Junta de Supervisión dictó certificaciones de reestructuración de la ACT conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para la ACT conforme a la Sección 304(a) de PROMESA ante el Tribunal de Título III, iniciando un caso bajo el Título III de PROMESA.

El 30 de junio de 2017, la Junta de Supervisión concedió al Gobierno cuarenta y cinco (45) días para presentar un plan fiscal revisado de la ACT, incorporando las enmiendas adoptadas por la Junta de Supervisión en la séptima reunión pública.

El 28 de agosto de 2017, en una carta dirigida al gobernador Ricardo Rosselló y a otros líderes legislativos, la Junta de Supervisión recomendó que se enmendara el Artículo 29 de la Ley 3 para que los poderes de destitución del Gobernador con respecto a cualquier miembro de cualquier junta u órgano rector de una corporación o instrumentalidad pública se limitaran a "con justa causa". Esto fue para asegurar el cumplimiento de los Planes Fiscales certificados para la ACT y la AEE. En la carta se indicaba además que el Plan Fiscal de la ACT de abril de 2017 exigía que los mandatos de los miembros del directorio de la ACT fueran independientes de los ciclos políticos y que la selección de los miembros del directorio de la ACT fuera independiente.

El 12 de septiembre de 2017, el gobierno de Puerto Rico depositó en la Cuenta Única del Tesoro aproximadamente $597 millones en fondos recuperados de las otras entidades de Puerto Rico durante el año fiscal 2017. Los casi $600 millones de fondos depositados en la Cuenta Única del Tesoro incluían unos $322.2 millones que se recuperaron de los bonos ACT.

El 15 de octubre de 2017, la Junta de Supervisión y la AAFAF, presentaron una moción conjunta en nombre de la ACT, entre otras entidades, solicitando una orden que aclare que los fondos federales de reparación para desastres que se están proporcionando a Puerto Rico **se utilizarían únicamente para sus fines previstos y no estarían sujetos a las reclamaciones de terceros acreedores.** El 23 de octubre de 2017, los estados financieros auditados de la ACT mostraron "dudas sustanciales" sobre la capacidad de la ACT para continuar como entidad en funcionamiento. La ACT registró una pérdida de explotación de $444.5 millones durante el FY2015, con $232.8 millones de ingresos de explotación, $228.6 millones de gastos de explotación y $448.6 millones de depreciación y amortización. Los activos de la ACT durante el FY2015 disminuyeron en un 32.5% hasta los $43.7 millones, incluyendo una disminución de $19.4 millones en efectivo y equivalentes de efectivo de diferentes depósitos en el BGF. La ACT tampoco recaudó $273.3 millones durante un período de siete meses que finalizó el 30 de junio de 2016, después de una orden del 1 de diciembre de 2015 a través de la cual el ELA recuperó los impuestos sobre la gasolina, el petróleo y el diésel que habían sido asignados a la ACT.

El 31 de octubre de 2017, la Junta de Supervisión celebró su décima reunión pública, en la que la Junta de Supervisión presentó el cronograma de revisiones del plan fiscal de las seis instrumentalidades de Puerto Rico, incluida la ACT. Dentro de las revisiones requeridas se incluyó una disminución en el alcance cubierto de los planes fiscales de diez (10) años a cinco (5) años debido a la incertidumbre en las proyecciones económicas y fiscales en el entorno posterior a los huracanes María e Irma desde que los huracanes arrasaron Puerto Rico en septiembre de 2017. El proyecto de plan fiscal de la ACT debía presentarse el 9 de febrero de 2018, y la Junta de Supervisión tenía previsto aprobar o revisar el plan fiscal de la ACT antes del 23 de febrero de 2018. Según este cronograma, el plan fiscal de la ACT se certificaría antes del 16 de marzo de 2018.

El 27 de noviembre de 2017, el entonces gobernador de Puerto Rico anunció una asignación de $8.7 millones de fondos federales desembolsados por la FHWA que permitiría a la ACT reparar los semáforos de 720 intersecciones en todo Puerto Rico, que fueron dañados casi en su totalidad por el huracán María.

El 27 de noviembre de 2017, la Junta de Supervisión anunció una sesión pública de recepción de comentarios el 30 de noviembre de 2017, en la que se solicitan comentarios del público sobre las revisiones de los planes fiscales de las seis (6) instrumentalidades, incluida la ACT, tras escuchar testimonios relacionados con la magnitud, la estructura y el cronograma de los cambios fiscales tras el huracán María.

El 18 de diciembre de 2017, el presidente del Comité de Asignaciones de la Cámara de Representantes, Rodney Frelinghuysen, presentó una legislación que proporcionaría $81 mil millones en gastos de emergencia para programas y actividades relacionadas con la asistencia por desastre para los huracanes Harvey, Irma y María, así como los incendios forestales del año calendario 2017. De los $81 mil millones, $1.4 mil millones se destinarían a reparar todos los daños sufridos por las carreteras federales y $269 millones se destinarían a ayudar a las comunidades a restaurar los sistemas de transporte masivo dañados por el huracán.

El 20 de diciembre de 2017, la Junta de Supervisión consideró una prórroga para revisar los planes fiscales del ELA y de las seis (6) instrumentalidades de Puerto Rico, incluida la ACT.

El 1 de enero de 2018, el Gobierno canceló un "adelanto" previsto del plan fiscal propuesto por el ELA. La propuesta de presentación del plan fiscal de la ACT también se retrasó. El 9 de marzo de 2018, la Junta de Supervisión confirmó la recepción de la propuesta de plan fiscal de la ACT revisado del Gobierno, que la Junta de Supervisión pretendía certificar antes del 20 de abril de 2018. Como parte del trabajo y la revisión en curso entre el Gobierno y la Junta de Supervisión, el 24 de marzo de 2018se proporcionó una propuesta revisada del plan fiscal de la ACT.

El 28 de marzo de 2018 y el 29 de marzo de 2018, la Junta de Supervisión emitió dos avisos de infracción bajo la Sección 201(c)(3)(B)(i) de PROMESA, detallando varios cambios requeridos antes de que el plan fiscal de la ACT pudiera ser certificado, como la inclusión de fondos para proyecciones estratégicas, la aclaración sobre los supuestos de referencia, la inclusión de reformas estructurales claras y la inclusión de detalles de un plan de reducción de la congestión necesario para ayudar a Puerto Rico a cumplir con los objetivos de reforma estructural del plan fiscal certificado del ELA. Una propuesta de plan fiscal revisado debía presentarse el 5 de abril de 2018.

El 5 de abril de 2018, el Gobierno presentó un plan fiscal revisado para la ACT. El plan fiscal revisado muestra un superávit total de $33 millones desde el FY2018 hasta el FY2023, en comparación con el proyecto anterior, que mostraba que la ACT estaba en equilibrio durante ese período. El plan fiscal propuesto también preveía que la ACT cerraría el FY2018 con un presupuesto equilibrado y, posteriormente, tendría un déficit de $9 millones en el FY2019 y de $10 millones en el FY2020. Sin embargo, el plan fiscal revisado también identificó una oportunidad financiera total de $88 millones para el FY2018, por encima de los $85 millones del proyecto anterior, como resultado de las seis (6) medidas fiscales clave propuestas para facilitar la transformación de la organización, aumentar los ingresos y reducir los gastos.

El 18 de abril de 2018, la Junta de Supervisión anunció que publicaría una propuesta de nuevo plan fiscal para la ACT, antes de la decimotercera reunión pública de la Junta de Supervisión el viernes 20 de abril de 2018, donde la Junta de Supervisión consideraría la certificación del nuevo plan fiscal propuesto para la ACT. Posteriormente, la Junta de Supervisión publicó una nueva propuesta de plan fiscal para la ACT, que proyectaba un superávit total de $355 millones desde el FY2018 hasta el FY2023, en comparación con una proyección de superávit de $33 millones en el proyecto anterior.

El 20 de abril de 2018, la Junta de Supervisión certificó el plan fiscal de abril de 2018 de la ACT que había sido publicado el 19 de abril de 2018.

El 29 de junio de 2018, luego de que la Legislatura no implementó la reforma laboral a través de la derogación de la Ley 80, la Junta de Supervisión volvió a certificar el Plan Fiscal de la ACT de junio de 2018, el cual incluyó algunos cambios técnicos.

### 3. Certificación del Plan Fiscal de la ACT de junio de 2019

El 1 de agosto de 2018, la Junta de Supervisión anunció que revisaría el Plan Fiscal del ELA para incorporar nueva información importante, lo que incluía disponibilidades completas de ingresos del FY2018, estimaciones revisadas de gastos de fondos de ayuda federal en caso de desastres y un ajuste a las proyecciones demográficas, entre otras cosas. El plan fiscal de la ACT vería revisiones similares.

El 17 de agosto de 2018, la Junta de Supervisión prorrogó el plazo para que la ACT presentara su plan fiscal revisado hasta el 12 de octubre de 2018. El 11 de octubre de 2018 se volvió a prorrogar el plazo de la ACT para presentar un plan fiscal revisado, a la espera de la certificación de un nuevo plan fiscal del ELA.

El 23 de octubre de 2018, la Junta de Supervisión certificó el plan fiscal del ELA, pero no anunció un nuevo plazo para la presentación del plan fiscal revisado de la ACT.

El 27 de diciembre de 2018, la Junta de Supervisión declaró que la enmienda legislativa a la Sección 23.08(c)(1) de la Ley de Vehículos y Tránsito de Puerto Rico, pondría en grave riesgo la capacidad de la ACT de cumplir con el Plan Fiscal de la ACT de junio de 2018. La ACT ha avanzado en numerosas medidas del Plan Fiscal, como la reducción de tamaño, la nueva licitación de contratos clave y la generación de ingresos complementarios. Sin embargo, el tibio avance de muchas otras medidas, en particular el aumento de los peajes, la reducción de las pensiones y la eliminación del bono de Navidad, hacen que la ACT corra el riesgo de no alcanzar los objetivos de ahorro durante el período del Plan Fiscal.

El 14 de enero de 2019, el gobernador Ricardo Rosselló anunció la selección de Rosana M. Aguilar como la nueva directora ejecutiva de la ACT.

El 11 de marzo de 2019, la Junta de Supervisión fijó el cronograma de certificación del plan fiscal de la ACT, para comenzar con la presentación de la propuesta de plan fiscal por parte de la ACT antes del 5 de abril de 2019, y la fecha objetivo de certificación para el 28 de mayo de 2019. El Gobierno presentó oportunamente una propuesta de plan fiscal 2019 para la ACT, y el 24 de abril de 2019 se ajustó la fecha prevista de certificación del plan fiscal de la ACT a mayo o junio de 2019.

El 1 de mayo de 2019, la Junta de Supervisión emitió una notificación de violación en relación con el plan fiscal de la ACT propuesto para 2019, proporcionando recomendaciones para mejorar las violaciones. En respuesta, el Gobierno presentó una versión revisada el 17 de mayo de 2019. Posteriormente, la ACT entabló amplios debates con la Junta de Supervisión y sus asesores.

El 5 de junio de 2019, la Junta de Supervisión certificó su propia versión del plan fiscal para la ACT el 5 de junio de 2019, tras una importante deliberación. El Plan Fiscal de la ACT de junio de 2019 incluyó nueva información y proyecciones financieras para mejorar la calidad del sistema de transporte de Puerto Rico, que ocupa el puesto 51 en cuanto a la calidad de las carreteras y el puesto 45 en cuanto a la congestión de las carreteras de entre 52 jurisdicciones estadounidenses. El Plan Fiscal de la ACT de junio de 2019 tenía como objetivo transformar la ACT en un gestor de contratos administrado de forma independiente para cumplir con un programa de capital de $3.1 mil millones, al tiempo que captaba $462 millones en oportunidades de ingresos y gastos. La implementación exitosa del plan fiscal permitiría a la ACT llegar a ser fiscalmente sustentable, mantener sus activos en buen estado, reducir la congestión en el sistema, asegurar la preparación para futuras catástrofes y apoyar el crecimiento económico y el desarrollo.

**4. Certificación del Plan Fiscal de la ACT de junio de 2020**

El 6 de septiembre de 2019, la Comisionado Residente Jennifer González anunció una asignación de $220.2 millones a Puerto Rico por parte de la FHWA, para trabajos de reparación relacionados con los daños inflingidos por los huracanes Irma y María. El DTOP recibiría $208.2 millones de ayuda federal para reparar la infraestructura de transporte dañada por los huracanes de 2017.

El 18 de septiembre de 2019, la ACT publicó su informe de agosto de 2019 sobre el estado de ejecución del Plan Fiscal de la ACT de junio de 2019, mostrando, entre otras cosas, avances en el despliegue de su plan de mejoras de capital y sus planes de venta de activos, pero un nivel de financiamiento federal por debajo de las previsiones durante los dos primeros meses del FY2020.

El 29 de enero de 2020, la AAFAF proporcionó un informe de estado, anunciando varios proyectos relacionados con el plan fiscal, incluyendo la reparación de carreteras debido a los terremotos. La AAFAF estimó que se necesitaban $16.2 millones en reparaciones de emergencia y $19 millones en obras permanentes para la reparación de carreteras, siendo ambas estimaciones susceptibles de aumentar.

El 15 de abril de 2020, la ACT presentó una propuesta de plan fiscal para 2020, que fue complementada el 21 de abril de 2020. El 11 de mayo de 2020, la Junta de Supervisión emitió una notificación de violación a la ACT, que incluía revisiones que la ACT debería incorporar antes de que el plan fiscal propuesto de la ACT pudiera ser certificado.

El 26 de junio de 2020, la Junta de Supervisión certificó y publicó un nuevo plan fiscal para la ACT. El Plan Fiscal de la ACT de junio de 2020 proporcionó una hoja de ruta para mejorar la calidad de vida de los ciudadanos de Puerto Rico, que se centró en la mejora de los sistemas de transporte de la isla. También exigía la creación de un consejo de administración independiente con directores experimentados y conocedores, y seis (6) medidas para mejorar los ingresos, incluyendo el aumento de la recaudación de las multas de peaje, los peajes, la introducción de la determinación de precios de la congestión, así como cuatro (4) medidas para recortar los gastos sanitarios, incluyendo la reducción de los costos de las pensiones y de la asistencia sanitaria de los empleados. Las medidas fiscales del Plan Fiscal de la ACT de junio de 2020 tenían como objetivo aumentar los ingresos de la ACT en unos $4.1 mil millones durante los próximos 30 años.

5. **Certificación del Plan Fiscal de la ACT de mayo de 2021**

El 9 de diciembre de 2020, la ACT acordó aumentar los ingresos por peaje, una iniciativa establecida en el Plan Fiscal de la ACT de junio de 2020, a partir del año calendario 2021, lo que permitiría a la ACT aumentar los ingresos.

El 10 de febrero de 2021, la Junta de Supervisión ordenó a la ACT que presentara, antes del 19 de febrero de 2021, un plan de implementación actualizado que incluyera un cronograma para reanudar el cobro de las multas de peaje antes del 15 de abril de 2021 y la aplicación de los aumentos de las tarifas de peaje antes del 1 de julio de 2021. La implementación de los aumentos de las tarifas de peaje estaba prevista para el 1 de enero de 2022, sin embargo, en abril de 2022, no se ha implementado ningún aumento. El cobro de multas de peaje se reanudó en julio de 2021. Sin embargo, en abril de 2022, no se han realizado ajustes en la política de precios de las multas (p. ej., aumentos de las multas, introducción de multas escalonadas, etc.).

El 25 de febrero de 2021, la Junta de Supervisión estableció el cronograma para desarrollar y certificar un plan fiscal de la ACT actualizado para el FY2022, con el Gobierno presentando una propuesta de plan fiscal de la ACT para el 9 de abril de 2021, y la Junta de Supervisión esperando certificar antes del 28 de mayo de 2021.

El 10 de marzo de 2021, la Junta de Supervisión inició el proceso de elaboración de un plan de ajuste de Título III para la ACT, con el objetivo de presentarlo el 31 de enero de 2022, con el fin de confirmarlo y que la ACT salga de la quiebra en algún momento de 2022.

El 18 de marzo de 2021, según el último paquete de informes de la ACT, publicado por la AAFAF, varias medidas requeridas en el Plan Fiscal de la ACT de junio de 2020 estaban retrasadas, y seguía sin estar claro cuándo se adoptarían ciertas medidas relacionadas, si es que se adoptaban. El paquete de informes de la ACT mostró que las medidas fiscales para aumentar los ingresos por tarifas y multas no se aplicaron durante la primera mitad del FY2021 y no se avanzó hacia la consecución de los objetivos del FY2021 de aumentar los ingresos por tarifas de $7.6 millones y aumentar los ingresos por multas de $7.4 millón, incluyendo $2.1 millones y $1.2 millones, respectivamente, hasta enero.

El 13 de abril de 2021, la ACT presentó un proyecto de plan fiscal para 2021, que fue complementado y revisado dos (2) días después.

El 27 de abril de 2021, la Junta de Supervisión emitió una notificación de violación para el plan fiscal propuesto por la ACT, citando una amplia gama de revisiones requeridas, incluyendo aumentos de peaje y análisis de futuras asociaciones público-privadas para las carreteras de peaje. La fecha límite para que la ACT presente un plan fiscal revisado era el 14 de mayo de 2021, con una fecha de certificación prevista para el 28 de mayo de 2021.

El 20 de mayo de 2021, la ACT publicó su informe financiero auditado correspondiente al FY2009, que incluía un tramo relativamente largo de lenguaje de entidad en funcionamiento, dadas las incertidumbres en una serie de frentes, incluyendo la aplicación del plan fiscal y los procesos de reestructuración de la deuda.

El 26 de mayo de 2021, la Junta de Supervisión anunció que celebraría su vigésimo octava reunión pública al día siguiente. El 27 de mayo de 2021, la Junta de Supervisión certificó el Plan Fiscal de la ACT de mayo de 2021, que incluía las siguientes seis medidas para formar parte de la transformación de la ACT: (1) reestructurar los activos de transporte en entidades específicas para cada modalidad (p. ej., carreteras de peaje, carreteras sin peaje, transporte masivo); (2) crear un consejo de política de transporte de gran alcance para guiar la estrategia de transporte multimodal en toda la isla; (3) desarrollar y utilizar marcos objetivos para la selección de proyectos; (4) mejorar la gestión del desempeño de los contratistas mediante la integración en los sistemas públicos, los contratos basados en el desempeño y una mejor supervisión; (5) mejorar la eficacia de la gobernanza mediante la reforma de los directorios de las entidades y, en su caso, incluir menos designaciones políticas y más expertos en la materia; y (6) maximizar la utilización de las subvenciones disponibles a través de una estrategia de subvenciones federales más completa y una mejor bancarización para atraer capital privado. El Plan Fiscal de la ACT de mayo de 2021 también incluía medidas que aumentarían los ingresos de la ACT para garantizar la sustentabilidad fiscal,

como, por ejemplo, el aumento de las tarifas, la optimización de los peajes, la modificación de los precios de las multas, el peaje bidireccional, la mejora del tránsito y las mejoras de los ingresos complementarios.

### 6. Certificación del Plan Fiscal de la ACT de febrero de 2022

El 18 de noviembre de 2021, la Junta de Supervisión anunció que había comenzado a revisar el plan fiscal de la ACT para incorporar las nuevas expectativas de financiamiento federal, las hipótesis macroeconómicas y las proyecciones de desembolso de gastos de capital, con el objetivo final de certificar un plan fiscal actualizado de la ACT para el 19 de enero de 2022. Para ello, la Junta de Supervisión exigió la presentación del plan fiscal de la ACT propuesto por el Gobierno para el 10 de diciembre de 2021.

El 9 de diciembre de 2021, la Junta de Supervisión prorrogó el plazo para la revisión del plan fiscal de la ACT, con la fecha de presentación del Gobierno prorrogada hasta el 15 de diciembre de 2021, y la fecha de certificación prevista prorrogada hasta el 4 de febrero de 2022.

El 10 de diciembre de 2021, la ACT publicó su informe financiero auditado para el FY2020, caracterizando los principales retos de la ACT como: (1) maximizar los ingresos, (2) reducir los costos operativos y (3) mejorar la liquidez. El informe financiero auditado contiene un lenguaje de entidad en funcionamiento, que destaca las incertidumbres en torno a la aplicación del plan fiscal para la ACT y los procesos de reestructuración de la deuda en curso del ELA y de la ACT, señalando que la ACT ha experimentado importantes pérdidas recurrentes de las operaciones y se enfrenta a muchos desafíos empresariales agravados por la recesión económica del ELA.

El 16 de diciembre de 2021, la ACT presentó una propuesta de borrador de su plan fiscal, que fue complementada el 17 de diciembre de 2021.

El 6 de enero de 2022, la Junta de Supervisión emitió una notificación de violación en relación con la propuesta de plan fiscal de la ACT presentada en diciembre de 2021, citando revisiones necesarias como: (1) proyecciones de referencia actualizadas que reflejan los datos reales del FY2022, (2) ajustes técnicos para garantizar la coherencia con los supuestos del plan fiscal del ELA del 21 de enero de 2022, certificado en enero de 2022, (3) cambios en el nivel general de gastos de capital para reflejar mejor las limitaciones de financiamiento y la capacidad histórica de la ACT para realizar gastos de capital, (4) puesta en marcha de medidas fiscales que permitan a la ACT tramitar los ingresos identificados en el Plan Fiscal de la ACT de mayo de 2021, y (5) un plan revisado para la Reforma del Sector del Transporte. La ACT debía presentar un plan fiscal revisado antes del 21 de enero de 2022. El 21 de enero de 2022, la ACT presentó oportunamente a la Junta de Supervisión un proyecto actualizado de su plan fiscal.

El 5 de febrero de 2022, la Junta de Supervisión emitió una notificación de violación en relación con la propuesta de plan fiscal de la ACT presentada el 21 de enero de 2022, citando revisiones necesarias como: (1) una descripción detallada de la hoja de ruta para la reforma del sector del transporte y la delimitación de los activos de peaje de la ACT mediante la creación de una nueva Oficina de Gestión de Autopistas de Peaje dentro de la ACT, (2) la inclusión de cuentas de resultados proforma para cada uno de los tipos de activos de la ACT (de peaje, sin peaje y

tránsito), y (3) ajustes para abordar plenamente todas las violaciones identificadas por la Junta de Supervisión en su notificación previa de violación de fecha 6 de enero de 2022. La ACT debía presentar un plan fiscal revisado antes del 11 de febrero de 2022.

El 11 de febrero de 2022, el Gobierno presentó oportunamente a la Junta de Supervisión una propuesta revisada de plan fiscal de la ACT.

El 22 de febrero de 2022, la Junta de Supervisión certificó y publicó el Plan Fiscal de la ACT de febrero de 2022, que permite a la ACT realizar inversiones de capital que llevarían a las carreteras de Puerto Rico a un estado de buena reparación y generarían un superávit de aproximadamente $4.8 mil millones, a través de medidas centradas en los ingresos, como aumentos de tarifas de peaje, modificaciones de los precios de las multas, mejoras en el tránsito y optimización del cobro de peajes. El Plan Fiscal de la ACT de febrero de 2022 también solicita que la ACT lleve a cabo la reforma del sector del transporte, creando una Oficina de Gestión de Autopistas de Peaje, transfiriendo los activos de tránsito a la ATI y buscando oportunidades de P3.

El 1 de abril de 2022, la ACT publicó su informe financiero auditado correspondiente al FY2021, en el que se incluía un texto sobre la situación de entidad en funcionamiento que destacaba las importantes pérdidas recurrentes de las operaciones de la ACT y señalaba el proceso de reestructuración de la deuda de la ACT para resolver los problemas de entidad en funcionamiento  El informe financiero auditado también ofrece un resumen del plan de medidas correctivas de la administración, que reitera las medidas del plan fiscal mencionadas en el párrafo anterior.

### 7. Certificación del presupuesto de la ACT del año fiscal 2018

Después de que el primer Plan Fiscal de la ACT fuera certificado por la Junta de Supervisión el 28 de abril de 2017, el Gobierno se enfrentó a una fecha límite del 30 de abril de 2017 para presentar a la Junta de Supervisión un proyecto de presupuesto para el ELA que cumpliera con el plan fiscal certificado y el informe de liquidez actualizado del ELA.

El 1 de junio de 2017, se anunció que el proyecto de presupuesto del entonces Gobernador Ricardo Rosselló para el FY2018 contenía una importante excepción para la ACT ya que incluía el aumento del presupuesto de la ACT a $538.76 millones en lugar de $408.3 millones. Las vistas sobre el presupuesto tuvieron lugar durante la semana del 15 de junio de 2017. Carlos Contreras, de DTOP, testificó sobre los diversos retos a los que se enfrentaba la ACT, entre ellos, el riesgo de perder y/o tener que reembolsar fondos federales para carreteras debido a proyectos interrumpidos o ante las dudas por las capacidades técnicas, financieras y organizativas. Si Puerto Rico pudiera competir por el dinero utilizando las fórmulas empleadas en los estados continentales, los aproximadamente $150 millones anuales que la ACT recibe de la FHA podrían alcanzar los $400 millones. El presupuesto consolidado propuesto por la ACT para el FY2018 era de $538.7 millones y el presupuesto consolidado propuesto por el DTOP para el FY2018 era de casi $98.8 millones. No se contemplan aumentos de peaje para el FY2018.

El 19 de junio de 2017, el Gobernador presentó a la Junta de Supervisión un proyecto de presupuesto revisado para la ACT para el FY2018.

El 27 de junio de 2017, la Junta de Supervisión programó su reunión pública para abordar el proyecto de presupuesto de la ACT para el 30 de junio de 2017. La orden del día incluía, entre otras cosas, un período de presentación, evaluación y recomendaciones sobre el proyecto de presupuesto para la ACT. El orden del día también contemplaba un período de comentarios públicos, debate y certificación del presupuesto de la ACT.

El 30 de junio de 2017, la Junta de Supervisión certificó el presupuesto para el FY2018 de la ACT. El importe recomendado del presupuesto consolidado era de aproximadamente $538.76 millones que incluían $22 millones de asignaciones especiales; $155 millones de fondos federales; $285.8 millones de ingresos propios de la ACT y $75.96 millones de otros ingresos. El Presupuesto certificado estaría sujeto a revisiones de conformidad en caso de que la Junta de Supervisión certifique un plan fiscal revisado de la ACT.

### 8. Certificación del presupuesto de la ACT del año fiscal 2019

El 22 de septiembre de 2017, debido a la devastación causada por el huracán María, la Junta de Supervisión anunció que aprobaría cualquier modificación de los presupuestos preaprobados, incluyendo el de la ACT, que fuera necesaria para las medidas de emergencia en respuesta a los daños causados por el huracán María, hasta un importe total de $1 mil millones.

El 12 de diciembre de 2017, la Junta de Supervisión envió una carta al Gobierno en la que esbozaba un proceso presupuestario revisado para el FY2019. En concreto, en el caso de la ACT, el Gobierno debía transmitir un listado completo del inventario de todos los fondos incluidos en el Plan Fiscal de la ACT de abril de 2017 para el 22 de diciembre de 2017, y proporcionar los ingresos propuestos para la ACT, junto con los detalles de apoyo, incluyendo todas las certificaciones pertinentes de terceros antes del 2 de marzo de 2018. En respuesta, la Junta de Supervisión enviaría al Gobernador y a las juntas directivas la previsión de ingresos para el período cubierto por todos los presupuestos aplicables, incluidos los de la ACT, para el 30 de marzo de 2018, y el Gobierno presentaría los proyectos de presupuesto a la Junta de Supervisión junto con los detalles de apoyo, incluida una conciliación detallada de los gastos presupuestados con los ingresos y los detalles de apoyo para demostrar la coherencia con los gastos reales históricos y/o las explicaciones si hay una diferencia significativa, así como los indicadores clave de rendimiento para informar después de la certificación, para el 16 de abril de 2018. La Junta de Supervisión se propuso aprobar los presupuestos del año fiscal 2019 y los proyectos de informes para cada tipo de fondo antes del 29 de junio de 2018.

El 22 de diciembre de 2017, la Junta de Supervisión estableció un nuevo cronograma del proceso presupuestario del FY2019, accediendo a la solicitud del ELA de ampliar los plazos de programación en relación con el proceso de revisión del plan fiscal. En particular, el cronograma revisado requería que el Gobierno proporcionara el proyecto de presupuesto de la ACT a la Junta de Supervisión, junto con los detalles de apoyo, antes del 11 de mayo de 2018. La fecha objetivo de certificación del presupuesto, el 29 de junio de 2018, sigue siendo la misma.

En enero de 2018, transmitió un listado completo del inventario de todos los fondos y/o entidades incluidos en el Plan Fiscal de la ACT de abril de 2017, de acuerdo con el cronograma del proceso de certificación presupuestaria establecido por la Junta de Supervisión en diciembre de 2017.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                     04/30/2022 3:29 PM" ""

El 26 de abril de 2018, la Junta de Supervisión anunció seis (6) principios rectores para el proceso de certificación del presupuesto integrado para el FY2019, que incluían lo siguiente: (1) todos los presupuestos debían cumplir su plan fiscal aplicable y estar desarrollados de acuerdo con los principios modificados de contabilidad en valores devengados; (2) la Junta de Supervisión debía proporcionar pronósticos de ingresos al Gobernador, la legislatura y las juntas directivas para usarse en el desarrollo de los presupuestos correspondientes; (3) los gastos presupuestados debían estar debidamente justificados; (4) debían acordarse plantillas de informes entre el Gobernador y la Junta de Supervisión y el Gobierno de Puerto Rico debía presentar informes conforme a estas plantillas; (5) es fundamental tener una responsabilidad clara sobre la aplicación de todos los elementos del presupuesto y la presentación de informes; y (6) todos los gastos (incluyendo los gastos de capital) del ELA y las instrumentalidades solo pueden realizarse conforme a un presupuesto certificado por la Junta de Supervisión.

El 4 de mayo de 2018, la Junta de Supervisión publicó su pronóstico de ingresos para el FY2019 para la ACT, que era congruente con el pronóstico de ingresos contenido en el Plan Fiscal de la ACT de abril de 2018.

El 4 de mayo de 2018, la Junta de Supervisión esbozó un cronograma revisado para el proceso de certificación del presupuesto de la ACT, que estableció: (i) **en o antes del 3 de junio de 2018,** la Junta de Supervisión debía aprobar el presupuesto propuesto por el Gobernador para la ACT o, de lo contrario, notificar las violaciones y describir todas las acciones correctivas necesarias. Si había infracciones y se requerían acciones correctivas, el Gobernador debía presentar un presupuesto revisado **en o antes del 18 de junio de 2018; (ii) el 29 de junio de 2018,** si el Gobernador debía haber presentado un presupuesto revisado y conforme a la Junta de Supervisión, la Junta de Supervisión debía aprobarlo y emitir una certificación de cumplimiento. Sin embargo, si el Gobernador no presentaba un presupuesto revisado y conforme a la Junta de Supervisión, la Junta de Supervisión debía presentar sus propios presupuestos conformes al Gobernador el 1 de julio de 2018; y (iii) **en cualquier momento hasta el 29 de junio de 2018**, si el Gobernador y la Junta de Supervisión certificaban que un presupuesto desarrollado conjuntamente reflejaba un consenso entre ellos, entonces dicho presupuesto serviría como el presupuesto para la respectiva instrumentalidad para el FY2019.

El 23 de junio de 2018, la Junta de Supervisión consideró que el presupuesto de la ACT presentado el 25 de mayo de 2018 no se ajustaba al plan fiscal de la ACT y, además, no cumplía con los requisitos establecidos por la Junta de Supervisión en su correspondencia con la ACT. La propuesta de presupuesto de la ACT requería revisiones sustanciales, incluyendo las relativas a la recaudación adicional de peajes, antes de poder certificar el presupuesto.

El 25 de junio de 2018, la Junta de Supervisión volvió a revisar el cronograma de certificación del presupuesto de la ACT, estableciendo el 26 de junio de 2018 como fecha límite para que el Gobernador presentara un presupuesto revisado a la Junta de Supervisión, y el 29 de junio de 2018 como fecha en la que la Junta de Supervisión aprobaría un presupuesto conforme presentado por el Gobernador o la Junta de Supervisión presentaría su propio presupuesto conforme al Gobernador.

El 30 de junio de 2018, la Junta de Supervisión certificó el presupuesto de la ACT para el FY2019 y emitió una certificación de cumplimiento en consecuencia.

**9.  Certificación del presupuesto de la ACT del año fiscal 2020**

El 14 de enero de 2019, la Junta de Supervisión observó que el Gobierno no presentó a tiempo los informes de desviación entre la cantidad presupuestada y la cantidad real de todo el año fiscal 2018 y del primer trimestre de 2019 para varias instrumentalidades. La Junta de Supervisión también señaló que los informes del segundo trimestre de 2019 sobre la cantidad presupuestada y la cantidad real, incluido el de la ACT, debían presentarse al día siguiente.

El 11 de marzo de 2019, la Junta de Supervisión estableció el cronograma para el proceso de certificación del presupuesto del FY2020 para la ACT, que incluía, entre otros, el plazo para que el Gobierno presentara un proyecto de presupuesto de la ACT para el FY2020 antes del 22 de mayo de 2019, el Gobierno presentara un proyecto de presupuesto de la ACT revisado antes del 14 de junio de 2019, si fuera necesario, y la Junta de Supervisión certificara el presupuesto del FY2020 de la ACT antes del 28 de junio de 2019.

El 7 de junio de 2019, la Junta de Supervisión prorrogó la fecha límite para que el Gobierno presentara su propuesta de presupuesto para el FY2020 para la ACT hasta el 16 de junio de 2019. La Junta de Supervisión enviaría una notificación de violación, si es necesario, antes del 19 de junio de 2019, con el Gobierno para responder con un presupuesto revisado, incluyendo las resoluciones necesarias de la junta directiva de la ACT y la documentación de apoyo, a la Junta de Supervisión antes del 26 de junio de 2019.

El 23 de junio de 2019, la Junta de Supervisión notificó al gobernador Ricardo Rosselló que el proyecto de presupuesto del FY2020 para la ACT no cumplía con el Plan Fiscal de la ACT de junio de 2019. La Junta de Supervisión fijó una fecha límite para que las violaciones se corrigieran antes del 26 de junio de 2019. La Junta de Supervisión determinó que era necesario realizar revisiones sustanciales antes de poder certificar el presupuesto de la ACT. La Junta de Supervisión destacó los principales elementos que incumplían el plan fiscal certificado para 2019 de la ACT, entre ellos: (1) ausencia de rendición de cuentas de los aumentos de peaje de la ACT; (2) gastos exagerados para las compras del Programa de Transmisión Voluntaria por parte de los empleados; (3) asignación de fondos para los bonos de Navidad; (4) asignación exagerada para las prestaciones de salud; (5) propuesta exagerada de presupuesto del programa CIP; (6) falta de inclusión de los ingresos por infracción de peaje; y (7) falta de desglose del presupuesto.

El 30 de junio de 2019, la Junta de Supervisión certificó el presupuesto para el FY2020 de la ACT. Después de una deliberación sustancial, la Junta de Supervisión determinó que el presupuesto propuesto para la ACT no cumplía con la Sección 202(c)(2) de PROMESA. En consecuencia, la Junta de Supervisión elaboró un presupuesto revisado y conforme para la ACT de acuerdo con las Secciones 202(c)(2) y 202(e)(4).

**10.  Certificación del presupuesto de la ACT del año fiscal 2021**

El 19 de agosto de 2019, la AAFAF publicó los datos financieros de la ACT correspondientes al mes de julio de 2019. El paquete de informes incluía informes financieros y de volumen de tráfico mensuales y trimestrales de la cantidad presupuestada y la cantidad real, informes de flujo de caja y balance bancario, e informes sobre medidas fiscales, programa de

inversión de capital e indicadores clave de desempeño. En julio de 2019, el primer mes del FY2020, los ingresos de la ACT procedentes de sus propias fuentes ascendieron a $12.17 millones, con lo que se incumplieron los objetivos presupuestarios por $1.869 millones, es decir, un 13.31%, mientras que el financiamiento total procedente de los gobiernos federal y del ELA y de otras fuentes ascendió a $6.811 millones, con lo que se incumplieron los objetivos presupuestarios por $1.602 millones, es decir, un 19.04%.

Entre el 6 de abril de 2020 y el 8 de abril de 2020, en el momento en que la Legislatura de Puerto Rico impulsaba numerosas medidas de respuesta a COVID-19, la Junta de Supervisión señaló resoluciones relacionadas con el ámbito fiscal por varias cuestiones, entre ellas el incumplimiento de los presupuestos y planes fiscales certificados, incluida la paralización del cobro de peajes. La Junta de Supervisión envió al menos cinco (5) cartas a la Gobernadora Wanda Vázquez y a los líderes legislativos sobre distintas resoluciones de financiamiento y/o fiscales instando a no promulgarlas. La Junta de Supervisión también señaló su reserva de derechos para anular y prohibir la aplicación de la legislación conforme a las Secciones 204, 108(a)(2) y 207 de PROMESA.

El 20 de abril de 2020, la ACT presentó una solicitud de modificación presupuestaria a la Junta de Supervisión.

El 11 de mayo de 2020, la Junta de Supervisión fijó como fecha límite el 22 de mayo de 2020 para la propuesta de presupuesto de la ACT para el año fiscal 2021. El cronograma de presupuesto requería la certificación antes del 30 de junio de 2020.

El 18 de mayo de 2020, la Junta de Supervisión propuso un presupuesto enmendado para la ACT, que incluía una nueva partida para una transferencia de $600,000 del Paquete de Apoyo a las Medidas de Emergencia por parte del ELA a la ACT para cubrir la pérdida de ingresos por el cobro de peajes resultante de la moratoria.

El 22 de mayo de 2020, la ACT presentó a tiempo una propuesta de presupuesto para el FY2021.

El 26 de junio de 2020, la Junta de Supervisión emitió el 26 de junio de 2020, la Junta de Supervisión una notificación de violación a la ACT, citando el incumplimiento del Plan Fiscal de la ACT de junio de 2020 y exigiendo nuevas revisiones.

El 30 de junio de 2020, la Junta de Supervisión certificó el presupuesto del FY2021. El total de gastos operativos dentro del presupuesto del FY2021 fue de $257 millones, con un total de gastos consolidados de $862 millones.

**11. Certificación del presupuesto de la ACT del año fiscal 2022**

El 14 de julio de 2020, la Junta de Supervisión envió cartas a la gobernadora Wanda Vásquez y a otros funcionarios del ELA en las que afirmaba que su análisis de los informes financieros del tercer trimestre del FY2020 revelaba "incoherencias materiales" y "violaciones" del presupuesto certificado del FY2020 para la ACT.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM "" ""

El 25 de febrero de 2021, la Junta de Supervisión fijó el cronograma de certificación del presupuesto de la ACT para el FY2022, comenzando con la presentación por parte del Gobierno de un proyecto de presupuesto para la ACT con documentación de apoyo detallada antes del 14 de mayo de 2021. Se esperaba que la Junta de Supervisión certificara el presupuesto de la ACT para el FY2022 para el 30 de junio de 2021.

El 28 de mayo de 2021, la Junta de Supervisión emitió una notificación de violación al Gobernador Pedro Pierluisi, donde señala que el Gobierno de Puerto Rico no presentó formalmente un presupuesto de la ACT antes de la fecha límite del 14 de mayo de 2021. Tras las subsiguientes discusiones con la ACT, la Junta de Supervisión consideró que una propuesta de modelo financiero del plan fiscal presentada a la junta el 14 de mayo de 2021 era el presupuesto propuesto por la ACT a efectos de la notificación de violación.

El 28 de mayo de 2021, la Junta de Supervisión estableció un cronograma revisado de certificación del presupuesto de la ACT y proporcionó la previsión de ingresos para su uso en la elaboración del plan de gastos de la ACT para el FY2022. Según el cronograma, el Gobierno debía presentar un presupuesto revisado y conforme de la ACT antes del 9 de junio de 2021. Si el Gobierno no presentaba un presupuesto conforme, la Junta de Supervisión certificaría su propia versión conforme a la Sección 202(e)(4) de PROMESA para el 30 de junio de 2021.

El 3 de junio de 2021, la Junta de Supervisión ordenó al Gobierno que presentara, para el 9 de junio de 2021, una propuesta de presupuesto para el FY2022 para la ACT que debe ser coherente con los ingresos y gastos previstos en el Plan Fiscal de la ACT de mayo de 2021.

El 30 de junio de 2021, la Junta de Supervisión anunció que celebraría su vigésima novena reunión pública el 1 de julio de 2021, con el fin de certificar el presupuesto de la ACT para el FY2022. El 1 de julio de 2021, la Junta de Supervisión certificó el presupuesto para el FY2022 de la ACT.

El 5 de febrero de 2022, la Junta de Supervisión fijó el cronograma de certificación del presupuesto revisado de la ACT para el año fiscal 2022, comenzando con la presentación por parte del Gobierno de un proyecto de presupuesto revisado para la ACT con documentación de apoyo detallada antes del 11 de febrero de 2022.

El 22 de febrero de 2022, la Junta de Supervisión emitió una notificación de violación en relación con la propuesta de presupuesto actualizado de la ACT para el FY2022 presentado por el Gobierno, citando revisiones necesarias como: (1) reflejo de la plena aplicación de las medidas fiscales sobre tarifas y multas en el FY2022; (2) alineación de todas las transferencias del ELA con los supuestos del plan fiscal certificado del ELA; (3) adición de fondos federales recientemente disponibles por la Ley de Infraestructura Bipartidista (BIL); (4) eliminación de los aumentos salariales no reflejados en el plan fiscal de la ACT de febrero de 2022; y (5) explicación clara de todas las partidas de gastos de capital y de operación que difieran del plan fiscal de la ACT de febrero de 2022.

El 28 de febrero de 2022, la ACT presentó a tiempo una propuesta de presupuesto para el FY2022. El 4 de marzo de 2020, la Junta de Supervisión certificó el presupuesto revisado de la

ACT del FY2022. El total de gastos operativos dentro del presupuesto del FY2022 está presupuestado en $237 millones, con un total de gastos consolidados de $612 millones.

## E.    Negociaciones con acreedores

### 1.    Negociaciones con acreedores anteriores a la promulgación de PROMESA

Durante el FY2016, el ELA presentó diversas propuestas a los tenedores y aseguradoras de bonos, intentando alcanzar un acuerdo para la reestructuración voluntaria de la deuda del ELA y la de sus corporaciones públicas.

El 1 de febrero de 2016, el ELA publicó una propuesta que buscaba el intercambio de $49.2 mil millones de deuda con garantía impositiva por $26.5 mil millones en bonos de pago obligatorio y $22.7 mil millones en bonos de pago variable (pagaderos únicamente en caso de que el ELA supere ciertas proyecciones de ingresos). La propuesta no contemplaba el pago de intereses hasta el FY2018, ni el pago de capital hasta el FY2021, la amortización de la deuda anual máxima de $1.7 mil millones a partir del FY2021 y un vencimiento final en el FY2051. Varios grupos de tenedores de bonos, especialmente aseguradoras de bonos monolínea, emitieron declaraciones después de que el ELA publicó esta propuesta donde se mostraban críticos de esta propuesta.

El 21 de junio de 2016, el ELA publicó una segunda propuesta donde se disponía una amortización de la deuda pagadero obligatoriamente incremental de $52.7 mil millones a los acreedores, en comparación con la oferta del 1 de febrero de 2016 del ELA. La propuesta contemplaba además reparación de flujo de caja durante los primeros cuatro años, pero mayores pagos de intereses en efectivo durante dicho período y agregaba una parte de intereses no en efectivo (pago en especies). La amortización de la deuda anual máximo se estipuló en $2.05 mil millones a partir del FY2031, con un vencimiento final en el FY 2071.

Las propuestas del ELA buscaban garantizar que el servicio de la deuda nunca superara un 15% de los ingresos consolidados proyectados (tal como se definieron en la presentación pública donde se explicó la propuesta) para el ELA y sus instrumentalidades con garantía impositiva. Ambas propuestas también dependían de una serie de suposiciones clave (muchas de las cuales no se encuentran bajo el control del ELA), entre ellas: (i) una tasa de participación del 100%, (ii) que el Congreso continuara con el nivel actual de financiamiento del cuidado de la salud provista a Puerto Rico conforme a la Ley de Cuidado de Salud Asequible, (iii) que el ELA prorrogara el arbitrio de la Ley 154 y el IRS siguiera permitiendo que ese impuesto se acreditara contra los impuestos federales sobre la renta de EE.UU. (junto con ninguna erosión adicional de la base tributable de la Ley 154), (iv) la implementación de todas las medidas contempladas por el Plan de Crecimiento Fiscal y Económico de fecha 9 de septiembre de 2015, y (v) que el ELA alcanzara una tasa de crecimiento nominal del dos por ciento (2%).

### 2.    Negociaciones con acreedores antes de las presentaciones de Título III

El ELA también realizó amplios esfuerzos para lograr una reestructuración consensuada con los acreedores antes de su presentación de Título III. Desde diciembre de 2016 hasta marzo de 2017, la Junta de Supervisión y el ELA realizaron más de treinta reuniones con representantes de los acreedores para obtener una reestructuración consensuada de la deuda del ELA. Además, antes

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

de la finalización de la paralización del Título IV de PROMESA, la Junta de Supervisión y el ELA se reunieron en una mediación el 13 de abril de 2017 para encontrar puntos en común y una resolución consensuada. Estos esfuerzos no tuvieron éxito.

*[El resto de la página se deja intencionalmente en blanco]*

## V.     Descripción de los Casos de Título III de los Deudores

**A.     Inicio del Caso de Título III de la ACT**

Después de las negociaciones con los integrantes del grupo de acreedores, el ELA determinó que no podía (ni veía posibilidad de) negociar una resolución extrajudicial que solucionara su situación financiera y sentara las bases para su futura recuperación económica y prosperidad, sin una renegociación de las deudas pendientes. Conforme a la Sección 405 de PROMESA, el establecimiento de la Junta de Supervisión funcionó como una paralización temporal de todas las acciones, reclamaciones y procedimientos en cualquier corte o tribunal con respecto a toda responsabilidad legal, como se define en la Sección 405(a) de PROMESA, del ELA y sus instrumentalidades territoriales, incluida la ACT. En cuanto expiró la paralización de la Sección 405 de PROMESA, se permitiría la continuación de varios juicios pendientes contra el ELA y sus instrumentalidades territoriales, y decenas de acreedores amenazaron con presentar o impulsar juicios contra el ELA y sus instrumentalidades territoriales. El 21 de mayo de 2017, la Junta de Supervisión dictó una certificación de reestructuración conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para la ACT conforme a la Sección 304(a) de PROMESA, en el Tribunal de Título III. El 29 de junio de 2017 el Tribunal registró una orden donde se concedía la administración conjunta de los casos de Título III del ELA y ACT para fines de procedimiento solamente [ECF Núm. 537].

*Designación de comités establecidos por ley.* El 15 de junio de 2017, se designaron el Comité de Acreedores y el Comité Oficial de Retirados [ECF Núm. 338, 340]. Los miembros actuales del Comité de Acreedores son (i) la Federación Americana de Maestros, (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) la Unión Internacional de Empleados de Servicio ("SEIU"), (v) Unitech Engineering, (vi) Baxter Sales and Distribution Puerto Rico Corp. y (vii) Tradewinds Energy Barceloneta, LLC [ECF Núm. 3947]. Los miembros actuales del Comité Oficial de Retirados son (i) Blanca E. Paniagua, (ii) Carmen Haydee Núñez, (iii) Juan Ortiz Curet, (iv) Lydia R. Pellot, (v) Marcos A. López Reyes, (vi) Miguel J. Fabre Ramírez, (vii) Milagros Acevedo Santiago y (viii) Rosario Pacheco Fontán [ECF Núm. 340].

*Equipo de Mediación.* El 23 de junio de 2017, el Tribunal de Título III registró la *Orden de Nombramiento de un Equipo de Mediación* [ECF Núm. 430] "en pos de lograr el objetivo de llegar a una resolución satisfactoria y consensuada de las cuestiones planteadas en estos procedimientos de ajuste de deuda". Los actuales miembros del Equipo de Mediación son los siguientes: (1) juez Barbara Houser (Tribunal de Quiebras, Distrito Norte de Texas); (2) juez Thomas Ambro (3er Circuito); (3) juez Nancy Atlas (Distrito Sur de Texas); y (4) juez Roberta Colton (Tribunal de Quiebras, Distrito Medio de Florida). La Junta de Supervisión y el Deudor están muy agradecidos a los mediadores, que son jueces federales en ejercicio y que, sin mediar compensación alguna, han trabajado de manera incansable para promover un consenso cada vez mayor y el progreso hacia un Puerto Rico revitalizado.

El Equipo de Mediación facilitó las negociaciones de acuerdos confidenciales de los asuntos y procedimientos surgidos en los Casos de Título III, que culminaron con la ejecución de varios acuerdos de apoyo al plan en relación con las condiciones de reestructuración de la deuda para cinco de los seis deudores de Título III (ELA, SRE, AEP, COFINA y ACT) y con modificaciones sustancialmente consensuadas de la calificación de Título VI para otras dos

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                    04/30/2022 3:29 PM" ""

entidades no deudoras (AFI y ADCC). Tras la confirmación satisfactoria del Plan del ELA el 18 de enero de 2022, el Tribunal de Título III dictó una orden el 19 de enero de 2022 por la que se daba por finalizado el nombramiento del Equipo de Mediación, incluyendo a cada uno de sus miembros, con efecto inmediato.[112]

**Los huracanes Irma, María y Dorian, los terremotos de enero de 2020, COVID-19, el ciclón tropical 9, la tormenta tropical Laura y el huracán Isaías, y la respuesta de la Junta de Supervisión**

*Los huracanes Irma y María.* Poco después del inicio del Caso de Título III de la ACT, en septiembre de 2017, los huracanes Irma y María azotaron Puerto Rico. Los huracanes causaron daños generalizados en todo Puerto Rico y exacerbaron los desafíos económicos que se describen anteriormente. El huracán María tocó tierra en Puerto Rico el 20 de septiembre de 2017, con vientos sostenidos de 155 millas por hora e importantes lluvias durante un período de más de 30 horas. El huracán María atravesó Puerto Rico en diagonal, ingresando por el sudeste y saliendo por la región noroeste de Puerto Rico. El huracán causó una destrucción catastrófica en Puerto Rico, dejando a Puerto Rico por completo sin energía eléctrica e inundando muchas calles y carreteras. Solo dos semanas antes del huracán María, el huracán Irma, uno de los huracanes más fuertes que se hayan registrado en el Atlántico, atravesó la costa norte de Puerto Rico.

Las carreteras y los sistemas de transporte de Puerto Rico sufrieron importantes daños tras los huracanes Irma y María. El huracán María provocó la emisión de 1,175 DDIR, que son formularios que deben presentarse a la FHWA para determinar si el suceso puede considerarse una situación de emergencia y reparación en caso de catástrofe. Varias carreteras y puentes resultaron dañados, así como múltiples estaciones del Tren Urbano, lo que hizo que las carreteras, los puentes y las estaciones quedaran inutilizados.

Al 16 de diciembre de 2021, la ACT había desembolsado aproximadamente el sesenta por ciento (60%) de las reparaciones de emergencia asociadas a los huracanes Irma y María. En el período comprendido entre el FY2022 y el FY2026, debe acelerarse la ejecución del programa de reparaciones de emergencia. Las mejoras que la ACT todavía no ha completado incluyen la instalación de un puente modular, reparaciones de aludes, limpieza de puentes, instalación de dispositivos de seguridad y otros proyectos de reconstrucción de las carreteras. Se han presentado propuestas para los primeros proyectos de reparación permanentes asociados con la señalización, la seguridad y la mejora del alumbrado.

Los huracanes tuvieron un efecto adverso en los ingresos de la ACT, que disminuyeron como resultado de la destrucción combinada de los huracanes. Los ingresos de explotación de la ACT consisten principalmente en peajes y tarifas de tren. Debido a los daños causados en el sistema de peaje, la recaudación de las tarifas de peaje se redujo considerablemente y se tuvo que suspender el cobro de las multas de peaje, que ya era un problema para la ACT, ya que el sistema de cobro preexistente presentaba múltiples deficiencias. La recaudación de las tarifas de peaje ha vuelto a los niveles anteriores a la catástrofe; sin embargo, la recaudación de las multas de peaje sigue estando retrasada. El retraso en la recaudación de las multas de peaje se debe a que las multas

---

[112] *Orden de terminación del nombramiento del equipo de mediación*, ECF Núm. 19833.

se fijaron en \$0 en los años fiscales 2020 y 2021; las multas se restablecieron en julio de 2021. La recaudación de las multas de peaje fue de aproximadamente \$20.5 millones al 31 de diciembre de 2021.[113] Además, el tráfico de pasajeros en el Tren Urbano se redujo drásticamente. El tráfico de pasajeros cayó casi un treinta por ciento (30%) después de los huracanes.[114]  El tráfico de pasajeros aún no se ha recuperado a los mismos niveles que existían antes de la destrucción por los huracanes, en parte debido a las ineficiencias operativas del sistema de tránsito de la ACT. En junio de 2021, el número de usuarios del transporte público sigue siendo un setenta y ocho (78%) inferior a los niveles anteriores al huracán, debido principalmente a la pandemia de COVID-19.

Como resultado del impacto masivo de los huracanes, el Gobierno y la Junta de Supervisión tomaron una serie de medidas para abordar la crisis.

El 21 de septiembre de 2017, la Junta de Supervisión autorizó al Gobierno a "reasignar" hasta \$1 mil millones de su presupuesto para financiamiento de emergencia para recuperarse de los efectos del huracán y para asegurarse de contar con recursos para comenzar de inmediato con la respuesta de emergencia y los esfuerzos de recuperación en espera de los fondos federales. Esto le permitió al Gobierno actuar con rapidez para reasignar (reprogramar) fondos según sea necesario, sin necesidad de obtener la aprobación de la Junta de Supervisión antes del movimiento de fondos.

En una carta dirigida a los líderes del Congreso de fecha 3 de octubre de 2017, la Junta de Supervisión solicitó ayuda federal en las siguientes áreas: maximizar la cantidad de ayuda federal, acceso a un programa de liquidez de emergencia, trato equitativo en el financiamiento del programa Medicaid y exenciones de topes y requisitos de participación locales para recibir ayuda federal.[115]

En una carta de fecha 6 de octubre de 2017 dirigida al Presidente Trump, la Junta de Supervisión reiteró el pedido de apoyo a la solicitud del entonces gobernador Rosselló y esos pedidos se describen en la carta del 3 de octubre de 2017 dirigida a los líderes del Congreso.[116]

En una carta de fecha 10 de octubre de 2017 al Secretario del Tesoro Mnuchin, la Junta de Supervisión exhortó al Departamento del Tesoro a considerar la propuesta que la Junta de

---

[113] Informe de la ACT sobre la relación entre el presupuesto y los datos reales ("B2A") del FY2022 para el mes que finalizó el 31 de diciembre de 2021.

[114]  Datos del número de pasajeros del Tren Urbano de la ACT, que comparan los 12 meses anteriores al Huracán María con los 12 meses posteriores a la reanudación del servicio del Tren Urbano.

[115] Carta de José B. Carrión, presidente, Junta de Sup. y Admin. Financiera para Puerto Rico a los líderes del Congreso de Estados Unidos, (3 de octubre de 2017), https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view.

[116] Carta de José B. Carrión, presidente, Junta de Sup. y Admin. Financiera para Puerto Rico al Presidente de los Estados Unidos, Donald Trump (6 de octubre de 2017), https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view.

Supervisión desarrolló con el Gobierno para abordar las necesidades urgentes de liquidez del ELA y sus instrumentalidades.[117]

La Junta de Supervisión colaboró con el Gobierno para proporcionar las estimaciones de liquidez a corto plazo y a mediano plazo más pesimistas en vista del déficit de ingresos que podría experimentar el ELA, y para abordar el tema de los fondos que se necesitarían para promover los esfuerzos de reconstrucción. La Junta de Supervisión mantuvo varias reuniones con el Departamento del Tesoro de Estados Unidos para discutir el acceso por parte de Puerto Rico a los Préstamos Comunitarios por Desastre para municipalidades.

La Junta de Supervisión certificó el plan de recuperación ordenado por el Congreso en la Ley de Presupuesto Bipartidista el 28 de agosto de 2018. Sin embargo, hizo dos salvedades a su certificación.  En primer lugar, la Junta de Supervisión expresó su preocupación por la falta de detalles y la elevada cantidad de fuentes de financiamiento federal estimadas en comparación con los valores del plan fiscal entonces certificado para los proyectos de Puerto Rico. En segundo lugar, la Junta de Supervisión indicó que el plan de recuperación no abordaba la supervisión de fondos federales y el proceso de recuperación. Además, la Junta de Supervisión no recibió el plan de recuperación para su consideración hasta después de que el Gobierno se lo había proporcionado al Congreso.

El 4 de octubre de 2017, para concentrarse mejor en restaurar los servicios para los residentes, que se habían visto reducidos debido a la naturaleza de la destrucción en todo Puerto Rico, la Junta de Supervisión retiró el litigio que había iniciado para hacer valer el cumplimiento por parte del Gobierno de determinadas medidas del plan fiscal certificado y pospuso la implementación de cualquier permiso o medida durante al menos un año.

Durante este período, los miembros y el personal ejecutivo de la Junta de Supervisión estuvieron activos en Washington D.C. abogando por los recursos necesarios para apoyar la recuperación de Puerto Rico, los importantes esfuerzos de reconstrucción y la liquidez necesaria para mantener los servicios. La Junta de Supervisión se unió al Gobernador para solicitar exenciones de costos, eliminación de los topes de financiamiento, mejor asistencia financiera y respuestas expeditas a pedido del Gobernador. La Junta de Supervisión participó en numerosas reuniones con miembros del Congreso, personal del Congreso, agencias federales (entre ellas la Oficina de Gerencia y Presupuesto y el Departamento del Tesoro de los EE.UU.), y decenas de reuniones informativas con periodistas, grupos de reflexión y universidades.

Los funcionarios de la Junta de Supervisión se presentaron ante varias comisiones del Congreso para prestar testimonio. El 7 de noviembre de 2017, la Sra. Natalie A. Jaresko (la entonces Directora Ejecutiva de la Junta de Supervisión) y el Sr. Noel Zamot (entonces personal ejecutivo de la Junta de Supervisión) prestaron testimonio ante la Comisión de Recursos Naturales

---

[117] Carta de José B. Carrión, presidente, Junta de Sup. y Admin. Financiera para Puerto Rico al Secretario del Tesoro Mnuchin, (10 de octubre de 2017), https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; Comunicado de prensa, Junta de Supervisión y Administración Financiera para Puerto Rico, "El Gobernador y la Junta de Supervisión y Administración Financiera le piden al Gobierno de Trump que aborde los problemas de liquidez luego del paso del huracán María", (10 de octubre de 2017), https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

de la Cámara de Representantes de EE.UU. sobre "Examinando los desafíos en la recuperación de Puerto Rico y el papel de la Junta de Supervisión y Administración Financiera". El 14 de noviembre de 2017, la Sra. Natalie A. Jaresko prestó testimonio ante la Comisión de Energía y Recursos Naturales del Senado de EE.UU. sobre "Esfuerzos de recuperación de huracanes en Puerto Rico y las Islas Vírgenes de EE.UU.".

*Tormenta tropical Dorian.* El 27 de agosto de 2019, el presidente Trump emitió una declaración de emergencia sobre la Tormenta Tropical Dorian. La declaración autorizó la categoría B de la FEMA en el marco del programa de Asistencia Pública, limitada a la asistencia federal directa para el apoyo necesario en la coordinación de los esfuerzos de ayuda en caso de desastres. El 28 de agosto de 2019, la Junta de Supervisión autorizó el uso de $260 millones de los fondos totales de la reserva de emergencia del FY2019 y el FY2020 para hacer frente a la Tormenta Tropical Dorian.

*Terremotos de enero de 2020.* El 7 de enero de 2020, Puerto Rico sufrió un terremoto de magnitud 6.4, el más fuerte y destructivo ocurrido en el Caribe en un siglo. Este terremoto provocó el cierre de segmentos de carreteras, incluyendo segmentos en dos de las principales carreteras de Puerto Rico e hizo que la isla se quedara sin electricidad durante varias horas. Según un informe del 29 de enero de 2020 publicado por el Servicio Geológico de los Estados Unidos, existe una alta probabilidad de que continúen las réplicas materiales en el transcurso de los próximos años.[118] Los terremotos de enero de 2020 y otros terremotos causaron daños significativos en viviendas y edificios y carreteras principales en la costa sur de Puerto Rico y también daños significativos en la planta de energía eléctrica Costa Sur de AEE, que habitualmente genera aproximadamente el veintiuno por ciento (21%) de la energía eléctrica de Puerto Rico.

Los terremotos de 2020 causaron una gran cantidad de daños en las regiones del sur y el suroeste de Puerto Rico. Estos terremotos provocaron el cierre de dos importantes carreteras en esas regiones: PR-52 (área de Ponce) y PR-2 (áreas de Peñuelas y Mayagüez). Las carreteras fueron reabiertas utilizando fondos de ayuda de emergencia proporcionados por la FHWA. La ACT planea comenzar las reparaciones permanentes para la rehabilitación y el reemplazo de las estructuras principales, así como los lugares donde se produjeron desprendimientos de rocas y deslizamientos de tierra.

En respuesta a estos terremotos, el presidente Trump aprobó una declaración de emergencia para los 78 municipios de categoría B, limitada a la asistencia federal directa para complementar los esfuerzos de respuesta del ELA y los gobiernos locales, a raíz de una solicitud de la gobernadora Vázquez. La Junta de Supervisión autorizó el uso de hasta $260 millones de los fondos de la Reserva de Emergencia para responder a los terremotos. El 16 de enero de 2020, el presidente Trump firmó una declaración de catástrofe grave que autorizaba los programas de asistencia individual, asistencia pública y mitigación de riesgos, habilitando una serie de ayudas federales en virtud de la Ley Stafford. Esta declaración complementa los esfuerzos de recuperación del ELA y los gobiernos locales ante las consecuencias de los continuos terremotos. La declaración (y sus posteriores modificaciones) designó a 34 municipios para recibir asistencia individual y a 14 municipios para las categorías A a G en el marco de la asistencia pública, con un porcentaje de reembolso del setenta y cinco por ciento (75%) de la parte federal y el veinticinco por ciento (25%)

---

[118] U.S. Geological Survey, Secuencia del terremoto en el suroeste de Puerto Rico, 2020 (29 de enero de 2020).

de la parte local, así como a todas las zonas que pueden recibir asistencia en el marco del Programa de Subvenciones para la Mitigación de Riesgos.

***Ciclón tropical 9.*** El 29 de julio de 2020, el presidente Trump emitió una declaración de emergencia sobre el potencial Ciclón Tropical 9. La declaración autorizó medidas de protección de emergencia (Categoría B) en el marco del programa de Asistencia Pública y se limita a la asistencia federal directa y al reembolso de la atención masiva, incluyendo la evacuación y el apoyo en materia de refugios, con un setenta y cinco por ciento (75%) de financiamiento federal.

***Tormenta tropical Laura.*** El 22 de agosto de 2019, el presidente Trump aprobó una declaración de emergencia en respuesta a la tormenta tropical Laura. La declaración autorizó medidas de protección de emergencia (Categoría B) en el marco del programa de Asistencia Pública y se limita a la asistencia federal directa conforme al programa de Asistencia Pública y al reembolso de la atención masiva, incluida la evacuación y el apoyo en materia de refugios, con un setenta y cinco por ciento (75%) de financiamiento federal.

***Huracán Isaías.*** El 9 de septiembre de 2020, el presidente Trump aprobó una declaración de catástrofe grave en respuesta al huracán Isaías. Cuatro municipios de Puerto Rico fueron designados para recibir Asistencia Individual.

***Tormenta severa e inundaciones.*** El 5 de noviembre de 2020, el presidente Trump aprobó una declaración de catástrofe grave en respuesta a una tormenta severa e inundaciones. Un municipio de Puerto Rico fue designado para recibir Asistencia Individual.

El 29 de marzo de 2022, el presidente Biden aprobó una declaración de catástrofe grave en respuesta a las graves tormentas, inundaciones y deslizamientos de tierra. Cuatro municipios de Puerto Rico fueron designados para recibir Asistencia Individual.

1.     **Fondos de ayuda federal para desastres**

(a)     **Alcance de los daños**

Hay muchos puntos de vista sobre cómo evaluar el impacto y la magnitud de los daños causados por los huracanes Irma y María, los terremotos de enero de 2020 y los acontecimientos posteriores, desde evaluar solo el daño causado a los activos fijos productivos hasta el costo de toda la reconstrucción que es necesaria para el ELA. Las siguientes fuentes proveen diversos métodos para evaluar el impacto y la magnitud de los daños causados por los huracanes Irma y María:

- El Plan Fiscal de la ACT de mayo de 2021 indicaba que su necesidad de financiamiento en respuesta a los huracanes María e Irma era de aproximadamente $836 millones y las necesidades de financiamiento relacionadas con los terremotos de 2020 eran de $26 millones.

- El plan Build Back Better ("BBB") de Puerto Rico, publicado en noviembre de 2017 calcula un costo de reconstrucción de $94.4 mil millones — esto incluye los costos relacionados con la salud y gastos de recuperación, entre otros.[119]

- "Transformación e innovación luego de la devastación" de Puerto Rico, certificado por la Junta de Supervisión en agosto de 2018, describe la perspectiva del Gobierno de Puerto Rico sobre el conjunto completo de inversiones de capital necesarias para que Puerto Rico se recupere de los huracanes Irma y María. El financiamiento total para estas casi 270 acciones, requeriría aproximadamente $139 mil millones durante los años calendario 2018-2028.[120]

- La estimación de los daños de la Administración Nacional Oceánica y Atmosférica en Puerto Rico y las Islas Vírgenes de EE.UU. debido al huracán María es de $90 mil millones, con un intervalo de confianza del 90% de +/- $25.0 mil millones, o $65.0 a $115.0 mil millones.[121]

- En diciembre de 2018, la Junta de Planificación de Puerto Rico publicó un informe que mencionaba que el impacto de la tormenta en la economía era de $43.135 mil millones,[122] cifra que incluyó los daños físicos y la interrupción de la actividad comercial (p. ej., pérdidas debido a que los sistemas habían dejado de funcionar, etc.).

- Al 20 de abril de 2022, se siguen formulando proyectos del programa de Asistencia Pública por los daños causados por los terremotos y las tormentas, con 12,083 proyectos obligados con fondos por un total de $29,247,555,533. A medida que los proyectos continúen a través del proceso de desembolso, el plan fiscal certificado se actualizará para reflejar cualquier cambio en el financiamiento total. La parte de la ACT de los proyectos y fondos comprometidos anteriormente es de 36 y $8,618,042, respectivamente.

### (b)    Ayuda federal proporcionada y esperada

El Plan Fiscal Certificado del ELA de 2022 prevé que se desembolsarán aproximadamente $84 mil millones de fondos de ayuda para desastres de fuentes federales y privadas en el esfuerzo de reconstrucción. Dicha cantidad se utilizará para una mezcla de financiamiento para particulares (por ej., reconstrucción de viviendas, gastos personales relacionados con los huracanes, como ropa y suministros), financiamiento para el sector público (por ej., reconstrucción de infraestructuras

---

[119]    Gobernador de Puerto Rico, *Build Back Better Puerto Rico* (Nov. 2017), http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[120]    Oficina Central de Recuperación, Reconstrucción y Resiliencia, *Transformación e innovación luego de la devastación: Un plan de recuperación económica y de desastres para Puerto Rico* (8 de agosto de 2017), https://pr-transformation-innovation-plan.pdf (prsciencetrust.org).

[121]    Richard J. Pasch, Andrew B. Penny, y Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane Maria* (Centro Nacional de Huracanes) (14 de febrero de 2019), https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[122]    *Véase* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, 4 de diciembre de 2018.

importantes, carreteras y escuelas) y para cubrir la parte que le corresponde al ELA del costo del financiamiento de ayuda para desastres (los destinatarios a menudo deben hacerse cargo de una parte del gasto en asistencia pública federal).[123]

Del total de $84 mil millones, se estima que $47 mil millones provienen del Fondo de Ayuda para Desastres ("DRF") de FEMA para asistencia pública, mitigación de riesgos, asignación de misiones y asistencia individual. Se estima que $7.4 mil millones provendrán de indemnizaciones de seguros privados y comerciales percibidas, y $7.7 mil millones están relacionados con otros fondos federales. El Plan Fiscal Certificado del Estado de 2022 incluye aproximadamente $20 mil millones del Programa de Subvención en Bloque para el Desarrollo Comunitario para la Recuperación ante Desastres de Puerto Rico ("CDBG- DR") / Programa de Subvención en Bloque para el Desarrollo Comunitario de Mitigación ("CDBG-MIT"). La ACT ha recibido aproximadamente $133 millones en fondos federales de ayuda de emergencia desde el FY2019 hasta el FY2021 y prevé recibir aproximadamente $243 millones en fondos totales de ayuda para desastres desde el FY2022 hasta el FY2026. Esto se compone de aproximadamente $210 millones de la FHWA y $16 millones de la FEMA, y $17 millones de la FTA a través de la Ley CARES para proyectos de construcción para reparar los daños causados en la red de carreteras de la isla. Los fondos de la FHWA y la FEMA se resumen a continuación:

- **Programa de Ayuda de Emergencia ("ER") de la FHWA.** El programa ER de la FHWA está disponible para ayudar a las agencias estatales y locales a financiar las reparaciones de las carreteras, puentes y otras infraestructuras elegibles para la ayuda federal después de un desastre natural. Los trabajos de reparación dentro del derecho de paso de las carreteras de ayuda federal suelen ser elegibles para recibir fondos de la ER, si la carretera se encuentra en un condado afectado que esté incluido en la Declaración del Gobernador o en la Declaración Presidencial. Hay dos tipos de reparaciones tras las catástrofes:

  - **Reparaciones de emergencia.** Las reparaciones de emergencia se realizan durante o justo después de una catástrofe para restablecer el tráfico esencial, minimizar el alcance de los daños o proteger las instalaciones restantes. Las reparaciones que van más allá de estos tres objetivos son reparaciones permanentes. Esto faculta a las autoridades estatales y locales de carreteras a iniciar inmediatamente las reparaciones de emergencia para restablecer el servicio de tráfico esencial y evitar más daños.

  - **Reparaciones permanentes.** Se definen como las reparaciones realizadas después de una catástrofe para restaurar la carretera a su estado anterior. El costo total del financiamiento de ER para un proyecto se limita típicamente al costo de reparación o reconstrucción de una instalación comparable que cumpla con las normas geométricas y de construcción actuales requeridas para los tipos y el volumen de tráfico que la instalación soportará durante su vida de diseño.

- **Fondos de Asistencia Pública (PA) de la FEMA para Ayuda de Emergencia.** El programa PA de la FEMA proporciona subvenciones suplementarias a los gobiernos

---

[123] La responsabilidad del financiamiento equitativo de los gastos de Puerto Rico se estimó usando datos provistos por FEMA, ajustados por categoría según sea necesario para las exenciones y excepciones.

estatales, tribales, territoriales y locales para que las comunidades puedan responder rápidamente y recuperarse de grandes desastres y emergencias. La FEMA también fomenta la protección de estas instalaciones dañadas frente a futuros sucesos, proporcionando ayuda para las medidas de mitigación de riesgos durante el proceso de recuperación. Obsérvese que la mayoría de los proyectos del fondo de ayuda de la FEMA relacionados con las carreteras se asignan al DTOP y que el dinero asignado a la ACT estaba relacionado con edificios específicos de la ACT.

- **Fondo Rotatorio de Ayuda para Desastres.** En noviembre de 2020, el Gobernador aprobó la Ley 139-2020 para crear una línea de crédito rotativo de $750 millones y autorizar al Secretario de Hacienda, en nombre del Gobierno, a proporcionar o prorrogar préstamos, líneas de crédito o adelantos a las agencias del gobierno central, corporaciones públicas, instrumentalidades y municipios para financiar proyectos de reurbanización hasta que se remitan los reembolsos de FEMA. Los municipios tienen prioridad para acceder a estos fondos, pero las empresas públicas (como ACT) y los organismos gubernamentales pueden presentar solicitudes.

  - La intención general del fondo es adelantar el financiamiento a los solicitantes con proyectos aprobados para obtener liquidez a corto plazo y acelerar la recuperación. La Junta de Supervisión colaboró con la COR3 y la AAFAF para aprobar las directrices del programa.

- **Otros fondos federales complementarios.** Se han asignado fondos federales adicionales a diversas agencias y proyectos en Puerto Rico. Este dinero se dedicará a una amplia gama de esfuerzos de recuperación, desde la reconstrucción de edificios dañados (por ej., fondos para reparar los daños en los centros Job Corps en Puerto Rico) hasta fondos para programas de salud y gestión ambiental (por ej., fondos del USDA para reparar los sistemas de agua en zonas rurales).

## 2. Respuesta a la pandemia de COVID-19

### (a) Antecedentes de la pandemia de COVID-19 e impacto económico previsto

*Antecedentes.* COVID-19 es una enfermedad viral infecciosa por la que la mayoría de las personas infectadas por el virus de COVID-19 experimentan una enfermedad respiratoria de leve a moderada y se recuperan sin necesidad de tratamiento especial. Las personas mayores y quienes padecen enfermedades subyacentes como enfermedades cardiovasculares, diabetes, enfermedades respiratorias crónicas y cáncer parecen más propensas a desarrollar enfermedades graves y, en algunos casos, a morir. Se han autorizado y recomendado tres vacunas para su uso en Estados Unidos, con dosis de refuerzo recomendadas más recientemente.

El 11 de marzo de 2020, la Organización Mundial de la Salud declaró como pandemia el brote de COVID-19, que se diseminaba rápidamente. El 21 de abril de 2022 se habían confirmado más de 504 millones de casos en todo el mundo, en más de 190 países, incluyendo los 50 estados de Estados Unidos, y había provocado más de 6.2 millones de muertes

***Impacto económico en Puerto Rico.*** Los confinamientos obligatorios en todo el ELA y las restricciones temporales han tenido un impacto crítico y adverso en toda la actividad económica del ELA. El mercado laboral fue testigo de una dislocación sin precedentes, con tasas de desempleo que alcanzaron niveles muy superiores a los de Estados Unidos y que fueron seguidas por una recuperación más lenta del empleo en el caso de Puerto Rico. Del mismo modo, la educación K-12 se enfrentó a importantes retos que han suscitado preocupación por los resultados de los estudiantes. Estos factores sugieren que la pandemia puede dejar profundas cicatrices en la economía puertorriqueña a través de múltiples canales, incluyendo una menor inversión, la erosión del capital humano y una menor productividad. El verdadero impacto cuantificable en Puerto Rico aún no se conoce del todo y, aunque se sigue de cerca, la situación aún está en curso.

***Impacto económico en la ACT.*** El inicio de COVID-19 en marzo de 2020 afectó rápida y drásticamente a las operaciones y al desempeño financiero de la ACT, ya que las cuarentenas tuvieron un gran impacto en las transacciones mensuales de autopistas de peaje, el número de pasajeros del Tren Urbano y la entrega de proyectos de capital. Las transacciones mensuales en las cuatro autopistas de peaje de la ACT, por ejemplo, se redujeron en un cuarenta y cinco por ciento (45%), pasando de un promedio de 10.3 millones por mes[124] antes de la epidemia de COVID-19 a un promedio de 5.6 millones por mes[125] durante el punto álgido de la pandemia. No obstante, en los años fiscales 2021 y 2022, se ha observado que las transacciones de peaje se aproximan a los niveles previos a COVID-19, alcanzando un promedio mensual de 9.8 millones de transacciones de peaje para el año fiscal 2021[126] y 10.7 millones de transacciones de peaje para el año fiscal 2022 hasta diciembre de 2021. Los activos de tránsito experimentaron una disminución más dramática, porque el Tren Urbano y el servicio de autobuses alimentados se cerraron por completo desde mediados de marzo hasta julio de 2020, y de nuevo en agosto y septiembre de 2020. A diferencia de las transacciones de peaje, la demanda de tránsito ha mostrado pocos signos de mejora, ya que el promedio de los ingresos mensuales del Tren Urbano se mantiene por debajo de sus niveles pre-COVID en aproximadamente el sesenta y cuatro por ciento (64%) para el FY2021 y el cincuenta y dos por ciento (52%) para la primera mitad del FY2022.[127] Además, la pandemia de COVID-19 ha provocado retrasos sustanciales en los cronogramas de los proyectos de construcción, ya que se ha producido un aumento significativo de los indicadores clave de rendimiento de la duración del proyecto, a causa de los cincuenta y seis (56) días de prórrogas requeridas por la cuarentena y los retrasos adicionales previstos.

---

[124] Promedio de transacciones mensuales para el período de seis meses desde septiembre de 2019 hasta febrero de 2020 (antes de COVID-19).

[125] Promedio de transacciones mensuales para el período de tres meses desde marzo de 2020 hasta mayo de 2020 (cuarentenas por COVID-19).

[126] Promedio de transacciones mensuales para el período de doce meses desde julio de 2020 hasta junio de 2021 (período posterior al confinamiento).

[127] Al comparar el período de seis meses que va de septiembre de 2019 a febrero de 2020 (antes de la pandemia de COVID-19) con el período de seis meses que va de enero de 2021 a junio de 2021 – el último semestre para el FY2021, que pertenecen al período posterior al confinamiento; y el período de seis meses que va de julio de 2021 a diciembre de 2021 para el FY2022, que comprende el período de seis meses más reciente.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

### (b)       Respuesta federal e impacto en Puerto Rico y el ELA

Para mitigar el impacto económico de COVID-19, el Gobierno Federal emitió una serie de proyectos de ley de estímulo de emergencia para disminuir la carga de las empresas y los individuos en los Estados Unidos.

*Proyecto de ley de emergencia 1.* El 6 de marzo de 2020, el presidente Trump firmó un proyecto de ley de gastos de $8.3 mil millones, denominado "Ley de Asignaciones Suplementarias de Preparación y Respuesta al Coronavirus", para financiar los esfuerzos de lucha contra la pandemia.

*Proyecto de ley de emergencia 2.* El 18 de marzo de 2020, el presidente Trump firmó un proyecto de ley de estímulo con más de $100 mil millones de financiamiento, llamado "Ley de Respuesta al Coronavirus Familias Primero".

*Proyectos de ley de emergencia 3 y 3.5.* El 27 de marzo de 2020, el presidente Trump firmó el proyecto de ley de estímulo de $2.2 billones, conocido como la Ley CARES. La Ley CARES se subdividió en dos divisiones, la División A titulada "Mantener a los trabajadores pagados y empleados, mejoras en el sistema de atención sanitaria y estabilización económica" (aproximadamente $1.9 billones), y la División B titulada "Asignaciones de emergencia para la respuesta sanitaria al coronavirus y operaciones de la agencia" (aproximadamente $350 mil millones). El 24 de abril de 2020, el presidente Trump firmó una ampliación de la Ley CARES, conocida como "Programa de Protección de Pago de Nómina y Ley de Mejora de la Atención Médica" (la "PPPHCEA", por sus siglas en inglés) para proporcionar fondos adicionales para testeos, hospitales e instalaciones de atención médica, y los préstamos PPP de la SBA.

El Plan Fiscal Certificado del ELA de 2022[128] incluye una estimación de la porción de estos fondos federales que se asignarán a Puerto Rico, basándose en una combinación de fuentes directas del gobierno federal y anuncios de las agencias, y, en algunos casos, basándose en una analogía histórica (por ej., la Ley de Recuperación y Reinversión de Estados Unidos de 2009). El Plan Fiscal Certificado del ELA de 2022[129] estima que Puerto Rico recibiría $18 mil millones de los $2.9 billones de estímulo federal aprobados hasta la fecha por medio de los proyectos de ley 1 a 3.5.

*Proyecto de ley de emergencia 4.* El 27 de diciembre de 2020, el presidente Trump firmó la Ley de Asignaciones Consolidadas, 2021, que combina $900 mil millones de ayuda de estímulo para la pandemia de COVID-19 en los Estados Unidos con un proyecto de ley de gastos generales de $1.4 billones para el año fiscal federal 2021. Las disposiciones de ayuda de estímulo estaban contenidas en dos divisiones, la División M, titulada "Ley de Asignaciones Suplementarias en Respuesta y Alivio al Coronavirus, 2021", y la División N, titulada "Respuesta y Alivio Adicionales al Coronavirus".

---

[128] Plan Fiscal Certificado del ELA de 2022,
https://drive.google.com/file/d/1STrf0ksj1Sqc54UkABGcjyrbIZvc_JEm/view.

[129] *Ibidem*

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

La Ley de Asignaciones Consolidadas también prorrogó el plazo en el que los estados podían gastar los $350 mil millones de los Fondos de Ayuda para el Coronavirus (CRF, por sus siglas en inglés) (creados por la Ley CARES) del 30 de diciembre de 2020 al 31 de diciembre de 2021.

De los aproximadamente $900 mil millones de ayuda de estímulo de la Ley de Asignaciones Consolidadas, se estima que Puerto Rico recibirá $7.3 mil millones, y la mayor parte de esos fondos se destinarán a particulares y empresas.

**Proyecto de ley de emergencia 5.** El 11 de marzo de 2021, el presidente Biden firmó la Ley de Plan de Rescate Estadounidense de 2021. Este proyecto de ley prevé $1.9 billones en financiamiento, cambios de programas y políticas fiscales orientados a mitigar los continuos efectos de la pandemia. Los principales componentes de esta Ley incluyen una tercera ronda de Pagos de Impacto Económico de hasta $1,400 por contribuyente elegible, la ampliación de las desgravaciones fiscales por hijo y crédito tributario por ingreso del trabajo para los puertorriqueños, la ampliación del seguro de desempleo y $350 mil millones en fondos de emergencia para los gobiernos estatales, locales, territoriales y tribales. Otros programas significativos incluyen $122.7 mil millones para la educación primaria y secundaria, $47.8 mil millones para pruebas de la COVID-19, $24 mil millones para estabilización del cuidado infantil, $21.6 mil millones para asistencia de emergencia al alquiler, $15 mil millones para financiamiento vinculado a vacunas y $28.6 mil millones para el Fondo de Revitalización de Restaurantes.

De los $1.9 billones que desembolsará el Ley de Plan de Rescate Estadounidense, se estima que a Puerto Rico le corresponderán $17.5 mil millones.

**Beneficio obtenido por la ACT de los proyectos de ley federales de emergencia.** Con respecto a los cinco (5) proyectos de ley federales de emergencia mencionados, la ACT se ha beneficiado de los créditos de emergencia de la FTA y la FHWA. Más específicamente, dentro del Proyecto de Ley de Emergencia 4, la FHWA asignó un monto de aproximadamente $35 millones al Programa de Carreteras de Puerto Rico.

### (c)   Respuestas aprobadas por la Junta de Supervisión por parte del ELA.

Además de las respuestas emitidas por el Gobierno Federal, la Junta de Supervisión aprobó una serie de medidas de emergencia, así como órdenes ejecutivas y acciones gubernamentales emitidas por la gobernadora Vázquez, para aminorar el impacto de COVID-19 en su economía, empresas y ciudadanos.

**Fondo de Reserva de Emergencia.** El 5 de marzo de 2020, la Junta de Supervisión puso a disposición una cantidad inicial de $5 millones del Fondo de Reserva de Emergencia para la prevención y preparación frente a la COVID-19.

El 13 de marzo de 2020, la Junta de Supervisión autorizó la utilización de Fondos de Reserva de Emergencia adicionales según lo necesite el Gobierno de Puerto Rico. Se autorizó el uso de aproximadamente $160 millones para los gastos de emergencia del ELA relacionados con la pandemia de COVID-19, incluyendo la preparación y detección, la sensibilización de la

población y la mejora de la capacidad del sector de la salud pública. Este fondo de Reserva de Emergencia se estableció en el Plan Fiscal Certificado del ELA de 2021.

Al 10 de enero de 2022, se han gastado $70 millones en relación con COVID-19.

***Paquete de Apoyo de Medidas de Emergencia.*** El 23 de marzo de 2020, la Junta de Supervisión concedió un apoyo presupuestario urgente en forma de un Paquete de Apoyo de Medidas de Emergencia, autorizando al Gobierno de Puerto Rico a utilizar $787 millones para enfrentar la emergencia por COVID-19. Este paquete incluye:

- $6 millones asignados a la ACT en relación con la pérdida de ingresos debida a la moratoria de los peajes; de esta asignación se han recibido $600,000;

- $237 millones en bonificaciones únicas para enfermeras públicas y privadas, técnicos, personal de servicios médicos de emergencia, oficiales correccionales y otro personal en primera línea de la lucha contra el COVID-19;

- $50 millones para inversiones en hospitales y seguridad pública, con el fin de reponer los suministros médicos e invertir en equipos durante un período de al menos dos meses;

- $160 millones en concepto de pago directo por única vez a los trabajadores autónomos y pequeñas empresas cuyos ingresos se han visto afectados por la suspensión de su trabajo e ingresos;

- $240 millones para que el Departamento de Educación apoye y permita el aprendizaje en línea mientras las escuelas están cerradas, para comprar tabletas para cada estudiante y docente, y proporcionar software y formación a los docentes y estudiantes; y

- $100 millones para los municipios, para proporcionar apoyo por la pérdida de ingresos como resultado de las medidas de emergencia aplicadas para luchar contra COVID-19.

Al 28 de enero de 2022 se habían desembolsado $662 millones.

***Órdenes ejecutivas y acciones gubernamentales.*** Desde marzo de 2020, la Gobernadora ha emitido una serie de órdenes ejecutivas en respuesta a la pandemia de COVID-19. Las órdenes ejecutivas han incluido la declaración del estado de emergencia, la activación de la Unidad Médica de la Guardia Nacional, el establecimiento y la prórroga del toque de queda, la compra de emergencia de equipos de protección personal, la cuarentena obligatoria de 14 días para los viajeros y otras restricciones de viaje, y el cierre de negocios y otras medidas de confinamiento. Las órdenes ejecutivas relativas a las restricciones de viaje, el cierre de negocios, los toques de queda y otras medidas de confinamiento han tenido un impacto negativo importante en la actividad económica de Puerto Rico.

### (d)     Otras medidas de estímulo y reparación del Gobierno

El 14 de abril de 2020, la gobernadora Vázquez convirtió en ley las Resoluciones Conjuntas 26-2020 y 27-2020, que exigen a los acreedores financieros de Puerto Rico establecer una moratoria voluntaria en los pagos a los préstamos personales, préstamos de automóviles, préstamos hipotecarios y tarjetas de crédito (de uso personal, familiar o doméstico) correspondientes a los meses de marzo a agosto de 2020. Tras la aprobación, la fecha de finalización del préstamo se prorrogará por un periodo igual al número de pagos no efectuados. El deudor podrá solicitar que

2" = "1" "2621/33260-009 CURRENT/127656480v7                                          04/30/2022 3:29 PM" ""

el importe adeudado por los pagos no efectuados se distribuya entre los pagos restantes adeudados en virtud del préstamo.

El 16 de abril de 2020, la gobernadora Vázquez promulgó la Ley Núm. 40-2020, que enmienda varias disposiciones importantes del Código de Rentas Internas de Puerto Rico de 2011, entre otras leyes especiales, como parte de las medidas tomadas para proporcionar reparación durante la pandemia de COVID-19 en curso.

El 26 de abril de 2020, la Junta de Supervisión proporcionó al ELA recomendaciones sobre las formas de utilizar los fondos recibidos en el marco del CRF creado en virtud de la Ley CARES, sugiriendo que los $2.2 mil millones se utilicen en las siguientes áreas:

- Sistema de seguimiento y evaluación: aumentar significativamente el suministro de kits de pruebas COVID-19 y adquirir redes de alta tecnología para el seguimiento de la infección;

- Infraestructura de los servicios de salud: poner en marcha un plan de almacenamiento y distribución para administrar el inventario, y racionar los suministros y equipos como el equipo de protección personal, los respiradores y las pruebas de detección de virus;

- Aprendizaje a distancia y resultados de los estudiantes: potenciar el aprendizaje a distancia para recuperar el aprendizaje perdido, y prepararse para una posible reaparición de COVID-19;

- Pequeñas empresas: formación y asesoramiento para ayudar a encarar la nueva realidad económica;

- Desempleados de larga duración: invertir en el fortalecimiento del desarrollo laboral; y

- Reembolso al ELA: una parte de los $500 millones de fondos incrementales que forman parte del Paquete de Apoyo de Medidas de Emergencia de $787 millones pueden ser gastos reembolsables en virtud de la Ley CARES.

El 15 de mayo de 2020, la gobernadora Vázquez Garced emitió la Orden Ejecutiva 2020-040, adoptando un plan de gastos para los $2.2 mil millones que Puerto Rico está recibiendo a través del CRF creado bajo la Ley CARES. Esta orden proporcionaría $990 millones a las entidades públicas y unos $811 millones al sector privado. Además, el Gobierno mantendría $440 millones en un fondo de reserva que se utilizaría en función de las necesidades futuras de Puerto Rico y del estado de la emergencia sanitaria por COVID-19.

El 3 de agosto de 2021, el gobernador Pierluisi dio a conocer su plan de gastos para los $2.47 mil millones que Puerto Rico recibió a través del Fondo de Recuperación Fiscal Estatal y Local creado bajo el ARP. Al 10 de mayo de 2022, el gasto se asignó a las siguientes categorías: desarrollo económico ($141 millones), calidad de vida ($819 millones), excelencia gubernamental ($504 millones), otros programas ($141 millones), financiamiento de la fase 2 ($67 millones) y se reservaron $573 para futuros proyectos y $225 millones para gastos administrativos. Además, al 10 de mayo de 2022, se han desembolsado aproximadamente $824 millones.

### C.  Proceso de reclamaciones y fecha límite

#### 1.  Listas de la sección 924/925

La sección 924 del Código de Quiebras exige que los deudores presenten una lista de acreedores. La sección 925 del Código de Quiebras establece que "[la] evidencia de reclamaciones se tendrá por presentada" para aquellas reclamaciones incluidas en la lista de acreedores prevista en la sección 924 del Código de Quiebras, excepto por reclamaciones "enumeradas como litigiosas, contingentes o no liquidadas". 11 U.S.C. § 925.[130]

#### 2.  Resoluciones sobre fecha límite

Conforme a la *Orden que (A) establece fechas límite y procedimientos para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 2521] (la "Orden sobre Fecha Límite Inicial") y la *Orden que (A) prorroga las fechas límite para presentar evidencias de reclamaciones y (B) aprueba la forma y el modo para su notificación* [ECF Núm. 3160] (junto con la Orden sobre la Fecha Límite Inicial, las "Órdenes sobre Fecha Límite"), el Tribunal de Título III estableció las siguientes fechas límite para presentar evidencias de reclamaciones en los Casos de Título III para la ACT:

- el 29 de junio 2018 a las 4:00 p.m., Hora Estándar del Atlántico, como fecha límite general para presentar todas las evidencias de reclamaciones (la "Fecha Límite General"), salvo por lo indicado más adelante;

- la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga el primer día hábil treinta y cinco (35) días después de la fecha de registro de la orden aplicable que rechaza un contrato a ejecutarse o un arrendamiento no vencido como fecha límite para presentar Reclamaciones emergentes del rechazo de dicho contrato a ejecutarse o arrendamiento no vencido, lo que ocurra más tarde;

- la Fecha Límite General o (b) las 4:00 p.m., Hora Estándar del Atlántico, en la fecha que caiga a los treinta y cinco (35) días de la fecha de notificación al reclamante de enmienda de la Lista de Acreedores como fecha límite para presentar Reclamaciones relacionadas con dicha enmienda a la Lista de Acreedores, lo que ocurra más tarde.

Las Órdenes sobre Fecha Límite autorizaron a las siguientes partes a presentar evidencias de reclamaciones globales en nombre de los siguientes interesados:

- Los fideicomisarios nombrados en la escritura, agentes fiscales, o cualquier otro agente similar o sus personas designadas (individualmente, un "Representante de Bonos") de cada una de las respectivas series de bonos emitidos por un deudor o no deudor (en tanto exista dicho Representante de Bonos) podrán presentar evidencias de reclamaciones contra el deudor pertinente en nombre propio y en el de todos los tenedores de reclamaciones de bonos de la respectiva serie surgidas en virtud de los

---

[130] *Véase Notificación de presentación de la lista de acreedores de la Autoridad de Carreteras y Transportación de Puerto Rico* [Caso Núm. 17-bk-3283, ECF Núm. 2163].

respectivos contratos de fideicomiso, resoluciones o documento similar relacionado con los bonos;

- Cada sindicato puede presentar evidencias de reclamaciones en nombre de sus respectivos afiliados contra el Deudor de todas las obligaciones en virtud de sus respectivos Contratos de Negociación Colectiva o leyes aplicables; y

- Cada agente en virtud de un acuerdo de crédito podrá presentar evidencias de reclamaciones aparte (cada una de ellas, una "Evidencia de Reclamación del Contrato de Crédito") contra el Deudor pertinente en nombre propio y en el de todos los acreedores en virtud de ese contrato de crédito.

### 3.    Procedimientos alternativos de resolución de disputas

El 5 de junio de 2019, la ACT y sus deudores afiliados (los "Deudores") presentaron la *Moción para el registro de una orden (A) que autorice procedimientos de resolución alternativa de disputas, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 7224], para obtener una orden que establece un procedimiento de resolución alternativa de disputas ("Procedimientos RAD") para resolver determinadas reclamaciones generales sin garantía, lo que incluye reclamaciones no liquidadas, formuladas contra la ACT (así como también otros Deudores de Título III), y aprobar un envío de correspondencia propuesto a los acreedores cuyas reclamaciones no brindaron suficiente información como para permitir que los Deudores concilien sus reclamaciones.

Para el 13 de agosto de 2019, el Tribunal de Título III aprobó el envío propuesto, y suspendió la consideración de los Procedimientos RAD y las formas de notificación supeditadas a la presentación de procedimientos propuestos y revisados y las formas de notificación compatibles con las directrices proporcionadas por el Tribunal de Título III [ECF Núm. 8453].

El 7 de enero de 2020, los Deudores presentaron su *Moción enmendada para el registro de una orden (A) que autorice procedimientos de resolución alternativa de disputas, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 9718] (la "Moción RAD enmendada").

El 1 de abril de 2020, el Tribunal de Título III emitió una orden que autoriza los procedimientos RAD enmendados (los ""Procedimientos RAD Enmendados") y aprueba formas adicionales de notificación [ECF Núm. 12576], que permitirían que el ELA, ACT, AEE, y AEP, a través de la Junta de Supervisión, y/o el Tribunal de Título III identifiquen cuáles son las reclamaciones que se resolverán a través de la RAD. Los procedimientos RAD enmendados establecen un proceso para que los Deudores y los reclamantes intenten resolver cuál es el monto de la reclamación a través de un intercambio de ofertas y contraofertas y, si no llegan a una resolución, un procedimiento simplificado de mediación. Si la reclamación continúa sin resolverse luego de estos procesos, los Procedimientos RAD Enmendados establecen además que el reclamante elija si desea resolver la reclamación utilizando uno de estos tres métodos: (1) litigio ante los tribunales del ELA (sujeto a ciertas restricciones); (2) arbitraje vinculante; o (3) litigio ante el Tribunal de Título III.

El 29 de diciembre de 2020, el Tribunal de Título III emitió una orden que modificaba los procedimientos RAD [ECF Núm. 15505]. Hasta la fecha, ACT y sus deudores afiliados han presentado veintiún notificaciones de transferencia, transfiriendo aproximadamente 946 reclamaciones a los procedimientos RAD.

### 4.     Conciliación de Reclamación de Gastos Administrativos

El 8 de octubre de 2019, los Deudores presentaron su *Moción para el registro de una orden que (A) autorice la conciliación administrativa de ciertas reclamaciones, (B) apruebe los formularios de notificación adicionales, (C) apruebe el envío de correspondencia propuesto, y (D) otorgue la reparación relacionada* [ECF Núm. 8827] (la "Moción ACR"). La Moción ACR Enmendada solicita la aprobación de los procedimientos de ACR (los ""Procedimientos ACR Enmendados") que permitirían que el ELA, ACT, AEE, y AEP, a través de la Junta de Supervisión, y/o el Tribunal de Título III determinen cuáles son las reclamaciones que se resolverán a través de ACR. Los Procedimientos ACR establecen un proceso para que el Tribunal de Título III permita determinados tipos de reclamaciones que son administrativas por naturaleza (entre ellos, reclamaciones de reembolso de impuestos, reclamaciones relacionadas con querellas sindicales, reclamaciones de empleados públicos y reclamaciones de pensión) que serán resueltas mediante los procesos administrativos existentes del ELA.

En la vista general del 30 de octubre de 2019, el Tribunal de Título III aprobó provisoriamente la Moción ACR, supeditada a la presentación de los procedimientos ACR revisados propuestos. El 12 de marzo de 2020, el Tribunal de Título III emitió una orden que aprueba la propuesta de orden revisada [ECF Núm. 12274]. Hasta la fecha, los Deudores han presentado veintitrés notificaciones de transferencia, transfiriendo 44,704 reclamaciones a los procedimientos de ACR, de las cuales 26,000 ya se han marcado como resueltas.

Como se establece en la Orden de ACR, todas las reclamaciones transferidas a ACR serán designadas como "Sujetas a Conciliación Administrativa" en el registro de reclamaciones de Título III. Las reclamaciones que se transfieran a ACR no tendrán derecho a votar sobre el Plan, pero se pagarán en su totalidad en el curso ordinario, conforme a los términos de la Orden de ACR.

### 5.     Objeciones significativas a reclamaciones presentadas hasta la fecha

A la fecha de esta Declaración de Divulgación, se han presentado aproximadamente 2,276 evidencias de reclamaciones en el Caso de Título III contra la ACT, por un total aproximado de $83 mil millones en pasivos declarados más montos por liquidar. De acuerdo con los términos de las Órdenes sobre Fecha Límite, el Deudor considera que posiblemente muchas de estas reclamaciones no necesitaban haberse presentado en absoluto, o tienen algún otro defecto, como haber sido enmendadas subsecuentemente o que sean duplicaciones de otras evidencias de reclamaciones, incluyendo las evidencias de reclamaciones presentadas contra el Deudor en nombre de determinados tenedores de bonos.

Conforme a la *Orden que (A) aprueba los procedimientos de objeción general limitada, (B) suprime el requisito de la Regla de Quiebras 3007(e)(6), y (c) otorga la reparación relacionada* [ECF Núm. 4230, 4230-1] (los "Procedimientos de Objeción Inicial"), y la *Orden que (A) aprueba los procedimientos de la objeción general enmendada, (B) suprime el requisito de la*

*Regla de Quiebras 3007(e)(6), (C), aprueba los formularios de notificación adicionales, y (D) otorga la reparación relacionada* [ECF Núm. 7440], el ELA, ACT, SRE y COFINA, a través de la Junta de Supervisión han presentado 427 objeciones generales y más de 35 objeciones individuales a las reclamaciones. Estas objeciones generales buscaban rechazar, modificar o reclasificar ciertas reclamaciones sobre la base de que carecían de información suficiente como para permitir que la Junta de Supervisión conciliara la reclamación, estaban formuladas contra el deudor incorrecto, habían sido enmendadas subsecuentemente, eran duplicaciones de otras evidencias de reclamaciones, o de otra manera declaraban montos por los cuales la entidad del deudor declarado no era responsable. Hasta la fecha, más de 1,225 reclamaciones contra la ACT han sido eliminadas, retiradas o resueltas, o se han registrado por error.

También se presentaron procesos contenciosos y objeciones significativas a reclamaciones a algunas reclamaciones de tenedores de bonos, que se describen en las Secciones V.F.1 de esta Declaración de Divulgación.

**D.     Rechazo o aceptación de arrendamientos no vencidos de bienes inmuebles no residenciales**

La ACT es parte en cientos de arrendamientos de bienes inmuebles no residenciales (los "Arrendamientos de Bienes Inmuebles") para apoyar sus operaciones. La decisión de aceptar o rechazar los Arrendamientos de Bienes Inmuebles implica la consideración de varios factores, no todos los cuales se pueden abordar de manera expedita. El 21 de julio de 2017, la ACT, junto con sus deudores afiliados de Título III, presentó una moción que solicita la aprobación de una prórroga temporal para aceptar o rechazar cualquier Arrendamiento no vencido de Bienes Inmuebles conforme a la sección 365(d)(4) del Código de Quiebras (la "Fecha límite 365(d)(4)"), que es aplicable a estos casos en virtud de la sección 301(a) de PROMESA [ECF Núm. 705]. El 10 de agosto de 2017, el Tribunal de Título III dictó una orden que prorroga la fecha límite 365(d)(4) de la ACT hasta el 18 de diciembre de 2017 [ECF Núm. 994]. Además, el 15 de noviembre de 2017, el Tribunal de Título III dictó una orden que prorrogaba la Fecha Límite 365(d)(4) de la ACT para asumir o rechazar cualquiera de los Arrendamientos de Bienes Inmuebles en los que es arrendatario y la AEP es el arrendador (los "Arrendamientos de AEP") hasta el 17 de abril de 2018 [ECF Núm. 1800].

La ACT solicitó nuevas prórrogas de la Fecha Límite 365(d)(4) con el consentimiento de los arrendadores conforme a la Sección 365(d)(4)(B)(ii) del Código de Quiebras. Para ello, la ACT, junto con sus deudores afiliados de Título III, dividió sus solicitudes de prórroga de fechas límite en (i) Arrendamientos de AEP y (ii) arrendamientos con otras entidades como arrendadoras.

i)     Arrendamientos de la AEP. El 13 de febrero de 2018, la ACT, junto con sus deudores afiliados de Título III, solicitó extender la Fecha Límite 365(d)(4) para los Arrendamientos de la AEP hasta el 25 de septiembre de 2018 inclusive, con el consentimiento de la AEP [ECF Núm. 2494]. El 28 de febrero de 2019, QTCB Noteholder Group presentó la *Reserva de derechos de QTCB Noteholder Group para una moción para el registro de una tercera orden para prorrogar el plazo para aceptar o rechazar arrendamientos no vencidos de Bienes Inmuebles no residenciales conforme a la Sección 365(d)(4) del Código de Quiebras* [ECF Núm. 2602]. Después de una vista, se concedió una orden revisada que prorroga la Fecha

Límite 365(d)(4) para Arrendamientos de AEP hasta el 27 de julio de 2018 inclusive, y que preserva expresamente los derechos de los tenedores de bonos.[131] De allí en adelante, la ACT, junto con sus deudores de Título III, con el consentimiento de la AEP, ha seguido prorrogando la Fecha Límite 365(d)(4) para Arrendamientos de AEP. La Fecha Límite 365(d)(4) actual de la ACT para Arrendamientos de AEP es el 31 de julio de 2020 [ECF Núm. 20017].

ii)  <u>Arrendamientos con otras entidades</u>. El 11 de diciembre de 2017, la ACT solicitó prorrogar la Fecha Límite 365(d)(4) para arrendamientos con otras entidades hasta (i) el 1 de enero de 2019; (ii) la fecha de expiración o vencimiento de dichos arrendamientos conforme a sus propios términos, o (iii) la fecha en la que un plan de ajuste es ratificado por la ACT, lo que ocurra primero [Caso Núm.17-03567-LTS, ECF Núm. 350]. A pesar de ponerse en contacto con cada arrendador, era improbable que la ACT pudiera recibir el consentimiento afirmativo de cada arrendador como una consecuencia directa de la destrucción generalizada y los cortes masivos de energía en la Isla de Puerto Rico luego del huracán María, lo que ha hecho que sea extremadamente difícil que las partes se comuniquen entre sí. A su vez, la ACT y sus asesores no han podido obtener el consentimiento escrito de todos los propietarios para conceder la prórroga solicitada para que la ACT acepte o rechace el Arrendamiento de Bienes Inmuebles. En consecuencia, la ACT solicitó prorrogar la Fecha Límite 365(d)(4) para los arrendamientos con otras entidades que o bien brindaron su consentimiento afirmativo o que no rechazaron expresamente dicho consentimiento. El 19 de diciembre de 2017, el Tribunal de Título III dictó una orden por la que se prorrogaba la Fecha Límite 365(d)(4) de la ACT para arrendamientos con otras entidades hasta (i) el 1 de enero de 2019; (ii) la fecha de expiración o vencimiento de dichos arrendamientos conforme a sus propios términos, o (iii) la fecha en la que un plan de ajuste es confirmado por la ACT [Caso Núm.17-03567-LTS, ECF Núm. 357]. Se preservaron los derechos de las partes cuyo consentimiento se consideró "presunto" porque el consentimiento no se denegó expresamente [Caso Núm. 17-03567-LTS, ECF Núm. 357]. Ninguna de las partes negó explícitamente su consentimiento.

El Tribunal de Título III prorrogó la Fecha Límite 365(d)(4) de la ACT para los arrendamientos con otras entidades en varias ocasiones. *Véase* ECF Núm. 4549, 4977, 5936, 9670, 15574 y 19718. La fecha límite 365(d)(4) actual para la ACT para los arrendamientos con otras entidades es (i) el 1 de enero de 2023; (ii) la fecha de expiración o vencimiento de dichos

---

[131] "Excepto por lo expresamente establecido en esta Orden, nada de lo dispuesto en la Moción o en esta Orden (a) menoscabará o modificará los derechos y las reclamaciones de AEP en virtud de o relacionados con los Arrendamientos de AEP conforme a PROMESA o una ley aplicable; ni (b) menoscabará o modificará los derechos y las reclamaciones de cualquier tenedor de bonos emitidos por AEP, ya sea directamente o como terceros beneficiarios, en virtud de o relacionado con los Arrendamientos de AEP conforme a PROMESA o una ley aplicable". *Orden que concede la moción para el registro de una tercera orden que prorroga el plazo para aceptar o rechazar arrendamientos no vencidos de Bienes Inmuebles No Residenciales según los cuales la Autoridad de Edificios Públicos de Puerto Rico es la Arrendadora conforme a la Sección 365(d)(4) del Código de Quiebras* [ECF Núm. 2689].

arrendamientos conforme a sus propios términos, o (iii) la fecha en la que un plan de ajuste es confirmado por la ACT, lo que ocurra primero [ECF Núm. 19718].

**E.     Aspectos de la paralización de Título III**

**1.     Generalidades**

En el inicio de un caso de Título III, la Sección 362(a) del Código de Quiebras, que es aplicable conforme a la Sección 301(a) de PROMESA, contempla una paralización automática de ciertas acciones por parte de terceros no deudores (la "Paralización de Título III"). El 29 de junio de 2017, el Tribunal de Título III confirmó la aplicabilidad de la Sección 362(a) del Código de Quiebras al Caso de Título III de la ACT conforme a la *Orden de acuerdo con la Sección 301(a) de PROMESA y a las Secciones 105(a), 362(a), 365 y 922 del Código de Quiebras que confirma (I) la aplicación de la paralización automática a los funcionarios, agentes y representantes del Gobierno, (II) la paralización de juicios anteriores a la petición y   (III) la aplicación de protecciones del contrato* [Caso Núm.17-bk-3283, ECF Núm. 543]. Desde la Fecha de Petición de la ACT, la ACT ha tomado medidas para preservar el importante "período de respiro" que proporciona la Paralización de Título III, abordar su condición financiera y desarrollar un plan de ajuste de manera expedita.

**2.     Protocolo de levantamiento de la paralización**

Para reducir la carga que pesa sobre el Tribunal de Título III, y para abordar eficientemente las peticiones de reparación de la Paralización de Título III en estos Casos de Título III sin precedentes, el Deudor desarrolló un protocolo por el cual las partes pueden solicitar reparación de la Paralización de Título III , y por el cual el Deudor puede resolver dichas peticiones de manera consensuada. El 17 de agosto de 2017, el Tribunal de Título III dictó una orden que implementa un protocolo para presentar mociones de reparación de la Paralización de Título III [Caso Núm.17-bk-3283, ECF Núm. 1065-1] (el "Protocolo de Levantamiento de la Paralización"). Conforme al Protocolo de Levantamiento de la Paralización, un solicitante debe (a) enviar una notificación al abogado, a la Junta de Supervisión y a AAFAF para notificarles la intención del solicitante de solicitar reparación de la Paralización de Título III al menos quince (15) días hábiles antes de presentar una moción que solicite dicha reparación, y (b) reunirse y consultar con el Deudor durante dicho período de 15 días. El 24 de octubre de 2017, se enmendó el Protocolo de Levantamiento de la Paralización (a) para permitir que el Deudor (i) suscriba estipulaciones que modifiquen o levanten la Paralización de Título III sin otra orden del Tribunal de Título III, y (ii) a su criterio, modificar o levantar la Paralización de Título III con respecto a cualquier acción civil de curso ordinario anterior a la petición contra un deudor sin la presentación de una notificación u orden del Tribunal de Título III, y (b) exigir que el Deudor presente una moción general para levantar la paralización cada sesenta (60) días, identificando cada modificación a la Paralización de Título III acordada por el Deudor durante el período pertinente y solicitando la aprobación retroactiva del Tribunal  de dichas modificaciones a la fecha de modificación pertinente [Caso Núm. 17-bk-3283, ECF Núm. 1512-1].

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

### 3.      Mociones generales de levantamiento de la paralización

Desde la implementación del Protocolo de Levantamiento de la Paralización, el ELA y sus deudores afiliados, incluyendo la ACT, han presentado veintiséis (26) mociones generales de levantamiento de la paralización, solicitando la aprobación retroactiva del Tribunal de las modificaciones a la Paralización de Título III.

### 4.      Aspectos significativos de la paralización

#### (a)      Moción de levantamiento de la paralización de la ACT[132]

El 23 de agosto de 2019, Assured y National presentaron una moción para (i) la exención de la paralización automática para permitirles ejecutar la aplicación de los ingresos de peajes y arbitrios supuestamente pignorados al pago de los bonos emitidos por la ACT, o, como alternativa, (ii) la protección adecuada de sus supuestos intereses sobre los ingresos pignorados  [Caso Núm. 17-bk-3283, ECF Núm. 8536; Caso Núm. 17-bk-3567, ECF Núm. 633].

Assured y National alegaron que aseguraban los bonos emitidos por la ACT con la garantía de los ingresos en concepto de peaje recaudados directamente por la ACT y los arbitrios recaudados en nombre de la ACT por el ELA. Los solicitantes afirmaron que tenían un derecho de retención preferencial sobre esos ingresos pignorados, que, según ellos, habían sido desviados indebidamente de la ACT al ELA. Los solicitantes afirmaron que el Tribunal de Título III debería haber levantado la paralización porque (i) los ingresos eran innecesarios para una reorganización efectiva porque el ELA  supuestamente carecía de participación patrimonial en ellos, y (ii) los solicitantes supuestamente carecían de una protección adecuada en virtud de la Sección 362(d)(1) del Código de Quiebras.

El 24 de julio de 2019, el Tribunal de Título III emitió la Orden de Paralización (como se define a continuación),[133] que suspendió la tramitación de la moción de levantamiento de la paralización.

El 19 de diciembre de 2019, el Tribunal de Título III dictó una orden provisoria de manejo de casos con respecto a ciertos temas relacionados con los bonos de ingresos [Caso Núm. 17-bk-3283, ECF Núm. 9620] (la "CMO provisoria inicial de bonos de ingresos"), que exigía que toda enmienda a la Moción de Levantamiento de la Paralización se debía presentar antes del 16 de enero de 2020.

El 16 de enero de 2020, Assured, National, Ambac y FGIC (colectivamente, los "Solicitantes") presentaron una moción enmendada de levantamiento de la paralización [Caso Núm. 17-bk-3283, ECF Núm. 10102; Caso Núm. 17-bk-3567, ECF Núm. 673] (la "Moción de levantamiento de la paralización de la ACT"), que además alegaba que el Tribunal de Título III

---

[132]  Caso Núm. 17-bk-3283, ECF Núm. 10102; Caso Núm. 17-bk-3567, ECF Núm. 673; Caso Núm. 20-1930 (1er Cir.).

[133]  Para obtener información adicional sobre la Orden de Paralización, véase la Sección V.H.1 de esta Declaración de Divulgación.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

debía levantar la suspensión automática porque, de lo contrario, se violarían los derechos al debido proceso de los Solicitantes.

El 31 de enero de 2020, el Tribunal de Título III dictó una Orden de Gestión de Casos provisoria enmendada [Caso Núm. 17-bk-3567, ECF Núm. 678] sen la que se establecían las fechas límite para los escritos de oposición y respuesta, limitados a las cuestiones de si los Solicitantes (i) tenían legitimidad para presentar la Moción de Paralización de la ACT, y (ii) tenían garantías u otros intereses de propiedad sobre los ingresos pertinentes. El 3 de febrero de 2020, la Junta de Supervisión presentó una oposición a la Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 680]. El CANA y la AAFAF presentaron acumulaciones parciales a la oposición de la Junta de Supervisión [Caso Núm. 17-bk-3567, ECF Núm. 682].

El 11 de febrero de 2020, las Partes de la ARD[134] presentaron una notificación que señala que la ARD era una parte interesada y podía participar en la Moción de Levantamiento de la Paralización de la ACT, o, como alternativa, una moción para permitir su intervención en la Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 685]. El 19 de febrero de 2020, las partes firmaron una estipulación conjunta sobre la participación de las Partes de la ARD en la Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 698-1]. El 3 de marzo de 2020, la magistrada Dein dictó una orden en la que aprobaba la estipulación conjunta y concedía parcialmente la moción de intervención de las partes de la ARD [Caso Núm. 17-bk-3567, ECF Núm. 721].

El 12 de febrero de 2020, los Solicitantes presentaron una moción de urgencia en la que se pedía el aplazamiento de la vista preliminar sobre la Moción de Levantamiento de la Paralización de la ACT hasta el 22 de abril de 2020 y la prórroga de la fecha límite para las respuestas en apoyo hasta el 6 de abril de 2020 [Caso Núm. 17-bk-3567, ECF Núm. 684]. Según los Solicitantes, este aplazamiento solicitado era necesario para disponer de tiempo para la obtención de pruebas. El 14 de febrero de 2020, el Tribunal de Título III dictó una orden que concede la moción, aplaza la vista preliminar hasta el 2 de abril de 2020, y permite que los Solicitantes obtuvieran ciertas pruebas [Caso Núm. 17-bk-3567, ECF Núm. 692].

El 24 de febrero de 2020, Ambac, Assured, National y FGIC presentaron una moción conjunta para exigir la presentación de documentos en relación con la Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 704]. Se presentaron todos los escritos procesales para la moción [Caso Núm. 17-bk-3567, ECF Núm. 716; Caso Núm. 17-bk-3283, ECF Núm. 11958]. El 5 de marzo de 2020, la magistrada Dein emitió una orden en la que concedía parcialmente la moción conjunta para exigir la presentación de documentos de los Solicitantes [Caso Núm. 17-bk-3567, ECF Núm. 723].

El 16 de marzo de 2020, las Partes de la ARD presentaron una respuesta inicial a la Moción de Levantamiento de la Paralización de la ACT y a la objeción de la Junta de Supervisión a la

---

[134] Cantor-Katz Collateral Monitor LLC, monitor de la Autoridad de Recuperación de Deuda ("ARD") del Banco Gubernamental de Fomento para Puerto Rico y AmeriNational Community Services LLC, administrador de los bonos de la ARD del BGF emitidos conforme a una modificación calificada del BGF se denominan colectivamente, las "Partes de la ARD".

Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 741].
El 23 de marzo de 2020, los Solicitantes presentaron una respuesta y una reserva de derechos [Caso
Núm. 17-bk-3567, ECF Núm. 748]. Además, el 23 de marzo de 2020, la Junta de Supervisión
presentó una contestación a la respuesta inicial de las Partes de la ARD [Caso Núm. 17-bk-3567,
ECF Núm. 749], y el CANA presentó una acumulación limitada a la contestación de la Junta de
Supervisión [Caso Núm. 17-bk-3567, ECF Núm. 749].

El 30 de abril de 2020, los Solicitantes presentaron su respuesta en apoyo de la Moción de
Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 777]. Además,
el 30 de abril de 2020, las Partes de la ARD presentaron una respuesta en apoyo de su respuesta
inicial a la Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF
Núm. 779]. El 18 de mayo de 2020, la Junta de Supervisión presentó una tríplica en oposición a la
Moción de Levantamiento de la Paralización de la ACT [Caso Núm. 17-bk-3567, ECF Núm. 807].
El 26 de mayo de 2020, los Solicitantes y las Partes de la ARD presentaron sus respuestas
respectivas a la tríplica de la Junta de Supervisión [Caso Núm. 17-bk-3567, ECF Núm. 819, 821].

El 2 de julio de 2020, el Tribunal de Título III emitió su *Opinión y Orden en relación con
la Vista Preliminar sobre la Moción de Assured Guaranty Corp., Assured Guaranty Municipal
Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation y
Financial Guaranty Insurance Company de Anulación de la Paralización Automática o, en su
defecto, Protección Adecuada (Núm. de expediente 10102)* [Caso Núm. 17-bk-3567, ECF Núm.
853] (el "Dictamen y Orden de la Moción de Levantamiento de la Paralización de la ACT"), que
sostiene que los Solicitantes no habían hecho la presentación preliminar necesaria para permitir
que la Moción de Levantamiento de la Paralización de la ACT procediera a una vista final en la
medida en que la Moción de Levantamiento de la Paralización de la ACT solicita la anulación de
la paralización o protección adecuada con respecto a gravámenes u otras participaciones
patrimoniales en los ingresos que no sean los que han depositado en los Fondos de la Resolución
(definidos en el presente, como ciertos fondos especiales con subcuentas enumeradas creadas por
la Sección 401 de cada una de las Resoluciones de Bonos). El Tribunal de Título III denegó la
Moción de Levantamiento de la Paralización de la ACT en la medida en que solicita una anulación
de la paralización o la protección adecuada con respecto a los gravámenes u otras participaciones
patrimoniales distintos de los que se han depositado en los Fondos de la Resolución. El Tribunal
de Título III también ordenó a las partes que se reunieran y deliberaran y, a más tardar el 9 de julio
de 2020, presentaran un informe conjunto sobre sus posiciones en cuanto a la naturaleza, el alcance
y la programación de los procedimientos posteriores que creían necesarios en relación con la
Moción de Levantamiento de la Paralización de la ACT, incluyendo cualquier procedimiento
relativo a la anulación de la paralización con respecto a la aseveración de los Solicitantes de las
reclamaciones no garantizadas. El Tribunal de Título III comunicó a las partes que, de no ser
necesario ningún otro procedimiento, el Tribunal de Título III dictaría una orden por la que se
daría por terminada la Moción de Levantamiento de la Paralización de la ACT, tal y como se había
denegado por las razones expuestas en el Dictamen y Orden de Levantamiento de la Paralización
de la ACT.

El 20 de julio de 2020, los Solicitantes presentaron un escrito complementario en el que
argumentaban que existía una causa para levantar la paralización a pesar de la decisión del Tribunal
de Título III sobre sus gravámenes u otras participaciones patrimoniales aseverados [Caso Núm.
17-bk-3567, ECF Núm. 880]. El 30 de julio de 2020, la Junta de Supervisión y AAFAF presentaron

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

una respuesta complementaria [Caso Núm. 17-bk-3567, ECF Núm. 898], y el CANA presentó una acumulación limitada [Caso Núm. 17-bk-3567, ECF Núm. 899]. Los Solicitantes presentaron una respuesta complementaria el 5 de agosto de 2020 [Caso Núm. 17-bk-3567, ECF Núm. 907].

El 9 de septiembre de 2020, el Tribunal de Título III emitió su *Dictamen y Orden de Memorando denegando las Mociones de Anulación de la Paralización sobre Bonos de Ingresos de la ACT y la AFI* [Caso Núm. 17-bk-3567, ECF Núm. 921] (el "Dictamen de Memorando"), que deniega la Moción de Levantamiento de la Paralización de la ACT. El Tribunal de Título III determinó que: (i) los Solicitantes no habían demostrado que la Sección 305 de PROMESA creara algún impedimento del debido proceso que proporcionara "causa" para el levantamiento de la paralización automática; (ii) no existía causa para el levantamiento de la paralización en virtud de la Sección 362(d)(1) del Código de Quiebras; y (iii) no existía causa para levantar la paralización automática en virtud de los factores de *Sonnax* (*En el caso Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2do Cir. 1990)).

El 23 de septiembre de 2020, los Solicitantes presentaron una notificación de apelación del Dictamen del Memorando del Tribunal de Título III [Caso Núm. 17-bk-3567, ECF Núm. 927], que se caratuló como Caso Núm. 20-1930. El 28 de octubre de 2020, los Solicitantes (en calidad de Apelantes) presentaron su escrito inicial donde argumentaron que la decisión del Tribunal de Título III debía ser revocada porque (i) tenían un derecho de garantía contractual sobre los arbitrios y los ingresos en concepto de peaje; (ii) la legislación de los arbitrios los convierten a ellos y a la ACT, no al ELA, en propietarios consuetudinarios de los arbitrios; y (iii) las leyes de los arbitrios imponen un gravamen legislativo sobre los arbitrios.

El 4 de diciembre de 2020, Cantor-Katz Collateral Monitor LLC presentó un escrito como "Partes contrarias a la apelación", que afirma que no adoptaron una posición sobre lo que describieron como la cuestión de la apelación (si los Solicitantes habían "demostrado una reclamación aparentemente válida sobre los ingresos en concepto de arbitrio") y manifestaron que se habían sumado a la presentación de escritos de la apelación para solicitar que cualquier decisión "se redactara de una manera que preservara" los intereses reclamados por las Partes de la ARD.

El 7 de diciembre de 2020, la Junta de Supervisión presentó su escrito de contestación, con el argumento de que el Tribunal de Título III no abusó de su poder discrecional al denegar la Moción de Levantamiento de la Paralización de la ACT sobre la base de que el Tribunal de Título III ya estaba resolviendo las reclamaciones de los Solicitantes sobre los méritos en la Acción de Impugnación de Reclamaciones del ELA-ACT que se describe más adelante en la Sección II.F.3 de esta Declaración de Divulgación. El ELA sostuvo además que la decisión del Tribunal de Título III debía ser confirmada porque, entre otras razones, (i) el lenguaje claro de las Resoluciones otorga a los Solicitantes un derecho de garantía solo sobre el dinero depositado ante el Agente Fiscal, y (ii) las leyes sobre arbitrios no otorgan a los Solicitantes la titularidad real de, o cualquier derecho de propiedad sobre, los arbitrios.

Además, el 7 de diciembre de 2020, la AAFAF y el CANA presentaron acumulaciones parciales al escrito de contestación de la Junta de Supervisión. El 21 de diciembre de 2020, los Solicitantes presentaron su escrito de contestación. El 20 de enero de 2021, los Apelantes presentaron una carta 28(j) en la que presentaban fundamentos adicionales en relación con la decisión del Tribunal de Título III que concedía una presentación de pruebas limitada en relación

con la moción de sentencia sumaria parcial de la Junta de Supervisión en la Acción de Impugnación de Reclamaciones del ELA-ACT. El 22 de enero de 2021, la Junta de Supervisión presentó una contestación a la carta 28(j) de los Solicitantes. Los alegatos orales se atendieron el 4 de febrero de 2021. El 3 de marzo de 2021, el Primer Circuito emitió un dictamen combinado para el Caso Núm. 20-1930 y en el Caso Núm. 20-1931, que confirma la denegación del Tribunal de Título III de la Moción de Levantamiento de la Paralización de la ACT. El Primer Circuito dictaminó que el Tribunal de Título III no abusó de sus poderes discrecionales al rechazar el levantamiento de la paralización automática y que levantar la paralización automática no serviría a los intereses de la economía judicial y podría interferir en el procedimiento de quiebra. El 24 de marzo de 2021, el Primer Circuito dictó su mandato.

El 11 de mayo de 2021, Assured, National y la Junta de Supervisión presentaron una moción conjunta para paralizar ciertas cuestiones relacionadas con los bonos emitidos por la ACT, la ADCC y la AFI en espera de la confirmación de los planes de ajuste del ELA y la ACT, incluyendo la Moción de Levantamiento de la Paralización de la ACT  [Caso Núm. 17-bk-3567, ECF Núm. 1016]. El 18 de mayo de 2020, las Partes de la ARD presentaron una reserva de derechos en relación con la moción conjunta [Caso Núm.17-bk-3567, ECF Núm. 1019]. Se presentaron todos los escritos procesales para la moción [Caso Núm. 17-bk-3567, ECF Núm. 1020, 1022, 1023]. El 3 de agosto de 2021, el Tribunal de Título III emitió una orden que concede la moción conjunta para paralizar ciertas cuestiones controvertidas y procesos contenciosos [Caso Núm. 17-bk-3567, ECF Núm. 1063].

El 18 de enero de 2022, el Tribunal de Título III emitió la Orden de Confirmación del ELA [Caso Núm. 17-bk-03283, ECF Núm. 19813]. El párrafo 8 de la Orden de Confirmación del ELA establece en parte que, en la Fecha de Entrada en Vigencia, en la medida en que existan, las Mociones de Levantamiento de la Paralización (incluyendo la Moción de Levantamiento de la Paralización de la ACT), serán desestimadas y/o denegadas sin derecho a nueva acción.

**(b)      Mociones de levantamiento de la paralización de las partes de la ARD[135]**

El 25 de junio de 2019, las Partes de la ARD presentaron una moción de levantamiento de la paralización automática para ejercer remedios contra las garantías reales de la ACT validadas de la ARD, entre ellos impuestos a la gasolina,  impuestos sobre el gas oil y el diésel oil, derechos de licencia y de vehículos automotores, ingresos por peaje, impuestos a los productos derivados del petróleo e impuestos a los cigarrillos [Caso Núm. 17-bk-3567, ECF Núm. 591]. Para garantizar las obligaciones contraídas con la ARD en virtud de los bonos de la ARD del BGF, las partes de la ARD alegaron que el BGF transfirió, entre otras cosas, sus activos de préstamos y bonos de la ACT y las garantías reclamadas a la ARD.

Las Partes de la ARD argumentaron que (i) el supuesto agotamiento del ELA y la ACT de las "garantías de la ACT" sin brindar una protección adecuada proporciona un motivo para levantar la paralización, y (ii) el ELA y ACT carecen de participación patrimonial o participación en las "garantías de la ACT", que son innecesarios para una reorganización efectiva.

---

[135]  Caso Núm. 17-bk-3283, ECF Núm. 7643; Caso Núm. 17-bk-3567, ECF Núm. 591, 998.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

En la alternativa, las Partes de la ARD solicitaron que el Tribunal de Título III le exija al ELA y la ACT que brinden protección adecuada mediante el pago de interés actual en préstamos y bonos de la ACT. Conforme a una estipulación entre las Partes de la ARD, AAFAF y la Junta de Supervisión[136] ,el Tribunal de Título III ordenó que el calendario de presentaciones y vistas con respecto a la moción se dividiera para considerar en primer lugar el problema de la legitimación de las Partes de la ARD para obtener la reparación solicitada en la moción [Caso Núm. 17-bk-3567, ECF Núm. 603].

El 15 de agosto de 2019, las Partes del Gobierno y las Partes de la ARD presentaron una estipulación conjunta que sometió la Moción de Levantamiento de la Paralización de la ARD a la Orden de Paralización, como se describe a continuación en la Sección II.H.1 de esta Declaración de Divulgación. El Tribunal de Título III aprobó la estipulación conjunta el 16 de agosto de 2019 [Caso Núm. 17-bk-3567, ECF Núm. 632]. Como se describe con más detalle en la Sección II.H.2, el Informe Provisional del Equipo de Mediación incluía un cronograma propuesto para el litigio de la Moción de Levantamiento de la Paralización de la ARD.

El 18 de diciembre de 2019, las Partes del Gobierno y las Partes de la ARD presentaron una estipulación conjunta enmendada con respecto a la moción de levantamiento de la paralización de las Partes de la ARD [Caso Núm. 17-bk-3567, ECF Núm. 9615], que el Tribunal de Título III aprobó mediante orden de fecha 19 de diciembre de 2019 [Caso Núm. 17-bk-3283, ECF Núm. 661]. Conforme a la estipulación conjunta enmendada y la orden, el calendario de presentaciones y vistas con respecto a la opción de levantamiento de la paralización seguirá estando dividida para determinar en primer lugar la legitimación de las Partes de la ARD para plantear la moción de paralización.

El 19 de febrero de 2020, las partes presentaron otra estipulación conjunta enmendada en la que se establecía que la Moción de Levantamiento de la Paralización de las Partes de la ARD se suspendería hasta que el Tribunal de Título III se pronunciara sobre ciertas cuestiones prioritarias de la Moción de Levantamiento de la Paralización de la ACT  [Caso Núm. 17-bk-3567, ECF Núm. 698], estipulación conjunta que el Tribunal de Título III aprobó por orden de fecha 20 de febrero de 2020 [Caso Núm. 17-bk-3567, ECF Núm. 700]. *Véase infra* la Sección V.E.4(a). En relación con esto, el 3 de marzo de 2020, el Tribunal de Título III emitió una orden que, entre otras cosas, concedía a las Partes de la ARD el derecho a participar en la Moción de Levantamiento de la Paralización de la ACT bajo ciertas condiciones [Caso Núm. 17-bk-3567, ECF Núm. 721]. Hay más información disponible sobre la Moción de Levantamiento de la Paralización de la ACT en la Sección V.E.4.(a) de esta Declaración de Divulgación.

El 25 de septiembre de 2020, las Partes del Gobierno y las Partes de la ARD presentaron otra estipulación conjunta enmendada que modificaba adicionalmente el calendario de presentación de escritos para la Moción de Levantamiento de la Paralización de las Partes de la ARD [Caso Núm. 17-bk-3567, ECF Núm. 930]. El 28 de septiembre de 2020, el Tribunal de Título III emitió una orden que aprueba la estipulación conjunta enmendada [Caso Núm. 17-bk-3567, ECF Núm. 931].

---

[136]  La Junta de Supervisión y la AAFAF se denominan colectivamente *"Partes del Gobierno."*

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                            04/30/2022 3:29 PM" ""

El 31 de marzo de 2021, las Partes de la ARD presentaron una moción enmendada de levantamiento de la paralización (la "Moción Enmendada de Levantamiento de la Paralización de la ACT")[Caso Núm. 17-bk-3567, ECF Núm. 998]. Todas las cuestiones relativas al fondo de la Moción Enmendada de Levantamiento de la Paralización de la ARD se paralizaron hasta que se resolviera la cuestión de la legitimación. El 21 de abril de 2021, las Partes del Gobierno presentaron un escrito de objeción a la Moción Enmendada de Levantamiento de la Paralización con respecto a las cuestión de la legitimación [Caso Núm. 17-bk-3567,  ECF Núm. 1009], y el CANA adhirió a la objeción [Caso Núm. 17-bk-3567, ECF Núm. 1010]. El 19 de mayo de 2021, las Partes de la ARD presentaron una respuesta a la objeción de las Partes del Gobierno [Caso Núm. 17-bk-3567, ECF Núm. 1021]. El 21 de julio de 2021, las Partes del Gobierno presentaron una respuesta en respaldo de su objeción a la moción de las Partes de la ARD de levantamiento de la paralización automática [Caso Núm. 17-bk-3567, ECF Núm. 1046].

Los argumentos orales sobre la cuestión de la legitimación en relación con la Moción de Levantamiento de la Paralización de las Partes de la ARD se presentaron en la vista general del 4 de agosto de 2021, después de la cual el Tribunal de Título III dictó una decisión oral que desestimó en parte la objeción de las Partes del Gobierno y ordenó a las partes que presentaran un informe de estado conjunto. La decisión oral del Tribunal de Título III se memorializó en una orden del 9 de agosto de 2021 [Caso Núm. 17-bk-3567, ECF Núm. 1070]. En la orden, el Tribunal de Título III desestimó la objeción de legitimación de las Partes del Gobierno en la medida en que se relacionaba con el aspecto de protección adecuada de la Moción, y aplazó la consideración de la objeción de legitimación en lo que respecta a la solicitud de reparación de la paralización automática, a la espera de aclaraciones adicionales de la naturaleza y el alcance del levantamiento de la paralización solicitada. El Tribunal de Título III ordenó a las partes que se reunieran en consulta y que presentaran un informe conjunto sobre el estado de la moción de las Partes de la ARD que solicita el levantamiento de la paralización automática.

El 13 de agosto de 2021, el Tribunal de Título III dictó una orden donde se paralizaba la Moción Enmendada de Levantamiento de la Paralización de las Partes de la ARD, y las pruebas relacionadas, en espera de "una determinación de si las Partes de la ARD tienen una participación patrimonial con respecto a los "Ingresos de la Ley 30-31" en relación con la Moción de Gastos Administrativos de las Partes de la ARD, *véase* la Sección V.F.1.(h); *AmeriNational Community Services, LLC y otros c. Ambac Assurance Corporation y otros*., Proc. Cont. Núm. 21-00068, *véase* la Sección V.F.1.(g); o cualquier objeción de las Partes de la ARD a la solicitud de la Junta de Supervisión para la confirmación de un plan de ajuste para el ELA [Caso Núm. 17-bk-3567, ECF Núm. 1075].

El 5 de noviembre de 2021, las Partes de la ARD y la Junta de Supervisión presentaron una estipulación en la que las Partes de la ARD acordaron la resolución de las disputas relacionadas con la ARD, incluyendo a Moción Enmendada de Levantamiento de la Paralización de las Partes de la ARD [Caso Núm. 17-bk-3283, ECF Núm. 19100, Anexo A]. El 12 de noviembre de 2021, las Partes de la ARD presentaron una notificación de su desistimiento, sin derecho a nueva acción, de la Moción de Levantamiento de la Paralización de las Partes de la ARD y la Moción Enmendada de Levantamiento de la Paralización de las Partes de la ARD. [Caso Núm. 17-bk-3567, ECF Núm. 1110]. El 8 de diciembre de 2021, el Tribunal de Título III dictó una orden de aceptación de la notificación de desistimiento sin derecho a una nueva acción de las Partes de la ARD [Caso Núm.17-bk-3567, ECF Núm. 1116].

(c) **Moción de levantamiento de la paralización del Municipio Autónomo de Ponce[137]**

El 4 de mayo de 2018, el Municipio Autónomo de Ponce ("MAP") presentó una moción [Caso Núm. 17-bk-3283, ECF Núm. 3019] para modificar la paralización automática para permitir que MAP haga cumplir una sentencia en una acción anterior, *Municipio de Ponce c. Autoridad de Carreteras y Transportación,* Caso Núm. AC93-0485. La sentencia anterior exigía que el ELA, la ACT y la AEE completaran determinados proyectos municipales de mejoras conforme a un acuerdo entre el ELA y MAP. El 2 de noviembre de 2018, el Tribunal de Título III denegó la petición del MAP para modificar la paralización, al sostener que ninguno de los factores de *Sonnax* pesaba a favor de conceder el levantamiento de la paralización, y por lo tanto el MAP no había demostrado justificación suficiente para el levantamiento de la paralización [Caso Núm. 17-bk-3283, ECF Núm. 4157]. El MAP apeló.

La apelación del MAP fue registrada por el Primer Circuito el 27 de diciembre de 2018, como Caso Núm. 18-2194. El MAP presentó su escrito inicial el 18 de marzo de 2019, y la Junta de Supervisión presentó un escrito en oposición el 1 de mayo de 2019. El 5 de junio de 2019, el MAP presentó su respuesta. Los alegatos orales se presentaron el 11 de septiembre de 2019. Mediante un dictamen de fecha 25 de septiembre de 2019, el Primer Circuito ratificó la decisión del Tribunal de Título III que deniega el levantamiento de la paralización y dictaminó que el derecho del MAP a un cumplimiento específico era una "reclamación" sujeta a la paralización porque los daños monetarios podían ser sustituidos por desempeño específico. El 16 de octubre de 2019, el Primer Circuito dictó su mandato.

F. **Procesos contenciosos y cuestiones controvertidas de importancia**

1. **Litigios de tenedores de bonos**

(a) ***Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 17-00125**

El 11 de mayo de 2017, Assured y FGIC (colectivamente, los "Demandantes") presentaron una demanda contra el ELA, la Junta de Supervisión, la AAFAF y varios funcionarios del ELA en su carácter oficial (colectivamente, los "Demandados") impugnando el plan fiscal de 2017 del ELA, certificado por la Junta de Supervisión el 13 de marzo de 2017 (el "Plan Fiscal del ELA de 2017"), y la Ley de Cumplimiento con el Plan Fiscal, una ley promulgada por el ELA para implementar el plan fiscal [Proc. Cont. Núm. 17-00125, ECF Núm. 1]. Los demandantes, como propietarios y aseguradores de bonos emitidos por el ELA y algunas de sus instrumentalidades (incluyendo AEP, ACT, ADCC y AFI), alegaron que los bonos emitidos por el ELA y la AEP constituían "deuda pública" bajo la Constitución de Puerto Rico y la ley del ELA y, por lo tanto, tenían derecho a la prioridad sobre todas las demás deudas y gastos del ELA de acuerdo con la Constitución de Puerto Rico. Además, los Demandantes afirmaron que los bonos emitidos por ACT, AFI y ADCC estaban garantizados por ciertas disposiciones de la ley del ELA. Según los Demandantes, el Plan Fiscal de 2017 y la Ley de Cumplimiento con el Plan Fiscal violaron PROMESA porque, entre otras cosas, no "respetaron" las "prioridades legales o los gravámenes

---

[137] Caso Núm. 17-bk-3283, ECF Núm. 3019; Caso Núm. 18-2194 (1er Cir.).

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

legales", como supuestamente exige la sección 201(b)(1)(N) de PROMESA. Por lo tanto, los demandantes solicitaron órdenes (i) que declarasen que el Plan Fiscal de 2017 y la Ley de Cumplimiento con el Plan Fiscal violaron las Secciones 201(b)(1)(N), 201(b)(1)(M), 201(b)(1)(A)(i), 101(a), 201(b), 5(10) y 5(22) de PROMESA; (ii) que declarasen la inconstitucionalidad del Plan Fiscal de 2017 y de la Ley de Cumplimiento con el Plan Fiscal porque violaban las Cláusulas sobre Contratos, Expropiaciones y Debido Proceso de la Constitución de los Estados Unidos; (iii) que impidieran a todos los Demandados "presentar o proceder a la confirmación de cualquier plan de ajuste" basado en el Plan Fiscal de 2017 o en la Ley de Cumplimiento con el Plan Fiscal; y (iv) que paralizara la confirmación de un plan de ajuste "en espera del desarrollo de un plan fiscal que cumpla con PROMESA y la Constitución de los Estados Unidos". [Proc. Cont. Núm. 17-00125, ECF Núm. 1 en 44- 45].

El 10 de julio de 2017, los Demandados presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 17-00125, ECF Núm. 27]. El 14 de agosto de 2017, los Demandantes presentaron una oposición a la moción de desestimación de los Demandados [Proc. Cont. Núm. 17-00125, ECF Núm. 54]. El 28 de agosto de 2017, los Demandados presentaron sus contestaciones en apoyo a la moción de desestimación [Proc. Cont. Núm. 17-00125, ECF Núm. 64]. El 6 de octubre de 2017, los Demandantes presentaron una notificación de desestimación voluntaria de la acción con derecho a nueva acción [Proc. Cont. Núm. 17-00125, ECF Núm. 108]. El 10 de octubre de 2017, el Tribunal de Título III dictó una orden de desestimación del caso con derecho a nueva acción y el proceso contencioso se cerró. [Proc. Cont. Núm. 17-00125, ECF Núm. 109].

### (b) *Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros, Proc. Cont. Núm. 17-00155; 17-00156; Caso Núm. 18-1165, 18-1166 (1er Cir.); Caso Núm. 19-391 (S. Ct.)*

El 3 de junio de 2017, Assured, FGIC y National (colectivamente, los "Demandantes"), cada uno de los cuales aseguran bonos emitidos por la ACT, presentaron acciones contra el ELA, la Junta de Supervisión, ACT, AAFAF y ciertos funcionarios gubernamentales individuales actuando en sus capacidades oficiales (colectivamente, los "Demandados"), que alegan que los Demandados desviaron ilícitamente lo que los Demandantes describieron como ciertos ingresos especiales de la ACT al Fondo General del ELA. Los Demandantes solicitaron remedio declaratorio e interdictal, con el argumento de que los Demandados habían violado las disposiciones sobre ingresos especiales del Código de Quiebras (Secciones 902, 922(d) y 928(a)), que eximen de la paralización automática a los ingresos especiales pignorados posteriores a la petición. Los Demandantes argumentaron que los bonos de la ACT eran bonos de ingresos especiales conforme a la Sección 902 y, en consecuencia, conforme a la Sección 922(d), la petición de Título III de la ACT no funcionaba para una paralización contra la aplicación de los ingresos especiales al reembolso de la deuda. Los Demandantes solicitaron la aplicación de estas disposiciones solicitando al Tribunal de Título III que emitiera un interdicto que ordenase a los Demandados el pago de los supuestos ingresos especiales.

El 23 de julio de 2017, los Demandantes presentaron demandas enmendadas según las cuales AAFAF indebidamente instruyó a BNYM que se abstuviera de destinar o aportar fondos depositados en las Cuentas de Reserva del Servicio de la Deuda de la ACT a los Bonos de la ACT existentes (cada uno como se define en las quejas enmendadas) [Proc. Cont. Núm. 17-00155, ECF

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

Núm. 39; Proc. Cont. Núm. 17-00156, ECF Núm. 41]. Según los Demandantes, los fondos en esas cuentas eran propiedad de los tenedores de bonos, no del Deudor.

El 28 de julio de 2017, los Demandados presentaron mociones de desestimación, con el argumento, entre otras cosas, de que (i) los Demandantes no presentaron ninguna reclamación en virtud de las Secciones 922(d) y 928(a) del Código de Quiebras porque no adujeron hechos que demostraran que tenían un derecho de garantía perfeccionado sobre los ingresos de la ACT; (ii) las Secciones 922(d) y 928(a) no exigen que los ingresos especiales pignorados, si se alegara que los hubiere, sean devueltos; (iii) los Demandantes no alegaron hechos que establezcan un gravamen ejecutable sobre los ingresos de la ACT; (iv) el Tribunal de Título III carecía de jurisdicción sobre la materia para atender la reparación solicitada en la demanda enmendada conforme a la Sección 305 de PROMESA, que limita la jurisdicción y las facultades del Tribunal de Título III; y (v) los Demandantes no presentaron ninguna reclamación con respecto a los fondos de las Cuentas de Reserva, dado que no son dueños de esas cuentas [Proc. Cont. Núm. 17-00155, ECF Núm. 46; Proc. Cont. Núm. 17-00156, ECF Núm. 48].

El 30 de enero de 2018, el Tribunal de Título III concedió las mociones de desestimación de los Demandados [Proc. Cont. Núm. 17-00155, ECF Núm. 125; Proc. Cont. Núm. 17-00156, ECF Núm. 121]. El 9 de febrero de 2018, los Demandantes presentaron notificaciones de apelación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. Las apelaciones se registraron como Caso Núm. 18-1165 y 18-1166.

El 26 de marzo de 2019, el Primer Circuito ratificó la decisión del Tribunal de Título III, al decidir que no había cometido un error al desestimar la demanda enmendada sobre la base de que ni la Sección 922(d) del Código de Quiebras ni la Sección 928(a) le dan derecho a los Demandantes a la reparación que solicitan. El Primer Circuito sostuvo que estas secciones "permiten, pero no exigen, el pago continuado mientras los procesos de quiebra continúen pendientes" y "representan la premisa de que cualquier gravamen consensual anterior a la petición garantizado por ingresos especiales sobrevivirá al período de quiebra municipal, y, en consecuencia, los municipios pueden elegir continuar pagando voluntariamente estas deudas durante el transcurso de los procesos de quiebra para no atrasarse y, de este modo, correr el riesgo de no poder obtener financiamiento en el futuro". *Assured Guar. Corp. c. Junta de Sup. y Admin. Fin.*, 919 F.3d 121, 132-33 (1er Cir. 2019). El 20 de septiembre de 2019, los Apelantes presentaron una petición de certiorari ante la Corte Suprema, que se registró como Caso Núm. 19-391. Se presentaron todos los escritos para la petición y, el 13 de enero de 2020, la Corte Suprema denegó la petición.

### (c)    *Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros, Proc. Cont. Núm. 18-00059*

El 23 de mayo de 2018, Assured Guaranty Corp. y FGIC (colectivamente, los "Demandantes") presentaron acciones contra el ELA, AAFAF, el gobernador Rosselló y algunos otros funcionarios gubernamentales individuales que actúan en sus capacidades oficiales (colectivamente, "Demandados"), que alegaban que el Plan Fiscal del ELA de abril de 2018 (el "Plan Fiscal del ELA de abril de 2018") y los actos y las órdenes relacionados violan PROMESA y la Constitución de Estados Unidos [Proc. Cont. Núm. 18-00059, ECF Núm. 1]. Los Demandantes alegaron que aseguraban bonos GO para el pago de los cuales, según ellos, tenían derecho de

prioridad de primera clase en virtud de la Constitución de Puerto Rico. Los Demandantes también aseguran bonos emitidos por ACT, ADCC y AFI que, según alegan, están asegurados por gravámenes ejecutables y perfeccionados contra ingresos especiales. Los Demandantes alegaron además que el Plan Fiscal del ELA de abril de 2018 hizo caso omiso de estas prioridades, y solicitaron una sentencia declaratoria que determine que (i) el Plan Fiscal del ELA de abril de 2018 viola (a) la Sección 201(b) de PROMESA, que define los requisitos para la aprobación de los planes fiscales, (b) la Sección 303 de PROMESA, que determina que los territorios cubiertos se reservan el derecho de controlar sus propios territorios e instrumentalidades, (c) la Sección 407 de PROMESA, que prohíbe las transferencias de bienes de cualquier instrumentalidad territorial de Puerto Rico "en violación de la ley aplicable en virtud de la cual cualquier acreedor tiene una pignoración válida, derecho de garantía o gravamen sobre dicho bien. . .", y (d) la Sección 928(a) del Código de Quiebras, que establece que los ingresos especiales adquiridos por el deudor después del inicio del caso seguirán estando sujetos a cualquier gravamen emergente de cualquier acuerdo de garantía celebrado por el deudor antes del inicio del caso; (ii) la Junta de Supervisión carecía de autoridad para certificar el Plan Fiscal del ELA de abril de 2018; (iii) el Plan Fiscal del ELA de abril de 2018 no constituye un "Plan Fiscal" en virtud de la Sección 5 de PROMESA, (iv) un plan de ajuste no se puede confirmar basándose en el Plan Fiscal del ELA de abril de 2018 y el tribunal no debe celebrar una vista de confirmación del Plan Fiscal del ELA de abril de 2018; (v) las acciones impugnadas violan las Cláusulas sobre Contratos, Expropiaciones y Debido Proceso y el Artículo I, Sección 1 de la Constitución de Estados Unidos; y (vi) las acciones impugnadas violan la Sección 303(1) de PROMESA, que se refiere a la aplicabilidad de las secciones de PROMESA a los casos, y la Sección 303(3) de PROMESA, que determina que los territorios cubiertos se reservan el derecho de controlar sus propios territorios e instrumentalidades.

Los Demandados presentaron una moción urgente para paralizar el litigio el 25 de junio de 2018, con el argumento de que las cuestiones planteadas en este proceso contencioso son sustancialmente similares a las presentadas en *Ambac Assurance Corp. c. el Estado Libre Asociado de Puerto Rico y otros*, Proc. Cont. Núm. 17-00159 (el "Litigio *Ambac* "), que estaba entonces en apelación ante el Primer Circuito[138] [Proc. Cont. Núm. 18-00059, ECF Núm. 14]. El 13 de agosto de 2018, la magistrada Dein concedió la moción para paralizar este proceso contencioso a la espera de una decisión del Primer Circuito en *Ambac*, determinando que muchas de las cuestiones en apelación en el litigio *Ambac* se superponen con las cuestiones de este caso y que la paralización solicitada no retrasa significativamente el litigio [Proc. Cont. Núm. 18-00059, ECF Núm. 23]. El 27 de agosto de 2018, los Demandantes presentaron una objeción contra la orden de la magistrada Dein y, el 18 de septiembre de 2018, los Demandados presentaron una respuesta [Proc. Cont. Núm. 18-00059, ECF Núm. 24, 28]. El 2 de noviembre de 2018, el Tribunal de Título III dictó una orden de confirmación de la paralización [Proc. Cont. Núm. 18-00059, ECF Núm. 32].

Tras la decisión del Primer Circuito que ratificaba la desestimación del Litigio *Ambac*, los Demandados presentaron una moción sin oposición para una prórroga del plazo para contestar la demanda, que el Tribunal de Título III concedió el 16 de julio de 2019 [Proc. Cont. Núm. 18-00059, ECF Núm. 33-35. Las partes se reunieron y consultaron para determinar el impacto del Litigio *Ambac* sobre este caso, y si los Demandantes tenían intención de enmendar su demanda. Las partes también consultaron sobre la posibilidad de paralizar este asunto y someterlo al

---

[138] El litigio *Ambac* y la apelación ante el Primer Circuito se analizan con más detalle en la sección V.F.1(d).

protocolo de mediación ordenado por el Tribunal de Título III en otros procesos contenciosos. El 20 de agosto de 2019, el CANA presentó una moción para intervenir en esta acción [Proc. Cont. Núm. 18-00059, ECF Núm. 38]. El 28 de agosto de 2019, las partes presentaron una moción conjunta que solicitó que el litigio fuera objeto de una Orden de Paralización, como se describe en la Sección V.H.1 de esta Declaración de Divulgación [Proc. Cont. Núm. 18-00059, ECF Núm. 41]. El 6 de septiembre de 2019, el Tribunal de Título III emitió una orden que aplica la Orden de Paralización a este procedimiento, y suspende el litigio hasta el 30 de noviembre de 2019 [Proc. Cont. Núm. 18-00059, ECF Núm. 45]. El 25 de noviembre de 2019, el Tribunal de Título III confirmó que el proceso contencioso estaba sujeto a la orden de prórroga de la paralización de determinados procesos contenciosos y cuestiones controvertidas hasta el 31 de diciembre de 2019 [Proc. Cont. Núm. 18-00059, ECF Núm. 47].

El 10 de febrero de 2020, el Equipo de Mediación presentó su Informe Enmendado, que recomendó que este litigio se mantuviera paralizado hasta que se confirme el plan de ajuste propuesto por el ELA [Caso Núm. 17-3283, ECF Núm. 10756].[139]  El 10 de marzo de 2020, el Tribunal de Título III dictó una orden para continuar con la paralización de este litigio [Proc. Cont. Núm. 18-00059, ECF Núm. 51].

El 11 de mayo de 2021, Assured, National y la Junta de Supervisión presentaron una moción conjunta para paralizar ciertas cuestiones relacionadas con los bonos emitidos por ACT, ADCC \y AFI, incluyendo este proceso contencioso, en espera de la confirmación de los planes de ajuste del ELA y ACT [Proc. Cont. Núm. 18-00059, ECF Núm. 53; Caso Núm. 17-bk-3283, ECF Núm. 16739]. El 25 de mayo de 2021, el Tribunal de Título III concedió la moción de desestimación [Proc. Cont. Núm. 18-00059, ECF Núm. 57]. El 2 de agosto de 2021, Ambac, FGIC, BNYM y la Junta de Supervisión presentaron una moción conjunta para continuar con la paralización de ciertos asuntos relacionados con los bonos emitidos por ACT, ADCC y AFI a la espera de la confirmación de los planes de ajuste del ELA y ACT que resolverían los asuntos [Proc. Cont. Núm. 18-00059, ECF Núm. 59]. El 3 de agosto de 2021, el Tribunal de Título III concedió la moción conjunta [Proc. Cont. Núm. 18-00059, ECF Núm. 60].

Tras la confirmación del Plan del ELA, el Tribunal de Título III dictó una *Orden relativa a los asuntos que pueden resolverse en relación con el Octavo Plan Enmendado Modificado tras la fecha de entrada en vigencia del Plan* [ECF Núm. 20341], en la que ordenaba a la Junta de Supervisión que presentara "una moción informativa que contenga una lista definitiva, en forma de diagrama, en la que se identifiquen las Reclamaciones actualmente aseveradas y las Reclamaciones en Disputa que serán objeto de resolución en relación con el Plan en la Fecha de Entrada en Vigencia o con posterioridad a ella". En cumplimiento de la orden del Tribunal de Título III, el 25 de marzo de 2022, la Junta de Supervisión presentó la *Moción Informativa de la Junta de Supervisión y Administración Financiera de Puerto Rico sobre la Orden de Asuntos que pueden resolverse en relación con el Octavo Plan Enmendado Modificado después de la Fecha de Entrada en Vigencia del Plan* [ECF No. 20445]. En este sentido, la Junta de Supervisión identificó el Proc. Cont. No. 18-00059 como un asunto que ha sido resuelto por el Plan, y señaló que la parte responsable de presentar cada asunto debería presentar, en la medida necesaria, una

---

[139] *Véase* la Sección V.H.2. para obtener una descripción detallada del Equipo de Mediación, el Informe Enmendado y los procedimientos relacionados.

notificación que retira o desestima dicho asunto a la luz de la confirmación del Plan. Además, la Junta de Supervisión propuso que dichas notificaciones se presentaran dentro de los treinta (30) días siguientes a su moción informativa.

      **(d)**    ***Ambac Assurance Corp. c. el Estado Libre Asociado de Puerto Rico,
Proc. Cont. Núm. 17-00159, Caso Núm. 18-1214 (1er Cir.); Caso Núm.
19-387 (S. Ct.)***

El 8 de junio de 2017, Ambac presentó una demanda contra el ELA, ACT, la Junta de Supervisión, AAFAF y ciertos funcionarios gubernamentales actuando en sus capacidades oficiales (colectivamente, los "<u>Demandados</u>"), donde se alegaba que los Demandados violaron los derechos constitucionales y legales de Ambac como aseguradora de los Bonos de Ingresos de la ACT (como se definen en la demanda [Proc. Cont. Núm. 17-00159, ECF Núm. 1]. Ambac alegó que había emitido pólizas de seguros con garantía financiera que cubren el pago de capital e intereses de aproximadamente $494 millones en valor neto a la par acumulado de los bonos de la ACT y además alegaron que poseían directamente aproximadamente $16 millones en dichos bonos. Ambac afirmó que los Bonos de la ACT estaban garantizados por gravámenes sobre (i) ingresos de instalaciones de peaje; (ii) gasolina, gasoil, petróleo crudo y otros arbitrios especiales; y (iii) arbitrios especiales que consisten en cargos por licencia de vehículos automotores (colectivamente, los "<u>Ingresos Especiales Pignorados</u>").

Ambac sostuvo que los Demandados desviaron los supuestos Ingresos Especiales Pignorados de manera tal que se les dio prioridad a las deudas subordinadas (junior) sin garantía sobre la deuda prioritaria (senior) garantizada. Estas acciones, argumentó Ambac, provocaron incumplimientos de pago innecesarios sobre los Bonos de Ingresos de la ACT. Debido a estos supuestos incumplimientos, Ambac pagó reclamaciones por un total de aproximadamente $52 millones a los tenedores de bonos.

Ambac solicitó remedio declaratorio e interdictal, donde se afirma que (i) la Ley de Moratoria y las Órdenes de Moratoria, el Plan Fiscal de la ACT y la Ley de Cumplimiento con el Plan Fiscal (cada uno como se define en la demanda), de conformidad con los cuales la ACT actuó supuestamente para desviar los Ingresos Especiales Pignorados, eran inconstitucionales, violaban la Cláusula sobre Contratos, y eran nulos; (ii) la desviación violaba las Cláusulas sobre Expropiaciones y Debido Proceso; (iii) la presunta privación del acceso de Ambac al Tribunal de Título III de las Órdenes de Moratoria era inconstitucional; y (iv) los Demandados violaron las Secciones 303 y 407 de PROMESA y las Secciones 922 y 928 del Código de Quiebras.

El 28 de julio de 2017, los Demandados presentaron una moción de desestimación de la demanda. [Proc. Cont. Núm. 17-00159, ECF Núm. 48]. Los Demandados argumentaron que el Tribunal de Título III carecía de jurisdicción para pronunciarse sobre las cuestiones planteadas en la demanda de Ambac porque (i) Ambac no tenía legitimación para presentar la demanda porque no había sufrido ningún perjuicio concreto, y (ii) no podrán determinarse todos los derechos mientras no se presente un plan de ajuste propuesto. *Id*.

El 4 de febrero de 2017, el Tribunal de Título III emitió un dictamen y una orden en la que desestimaba la demanda, al sostener que (i) Ambac tenía legitimación para presentar la demanda, pero (ii) el Tribunal carecía de jurisdicción sobre la materia con respecto al derecho de garantía

real de Ambac y dictaminó que Ambac no había presentado ninguna reclamación sobre la cual se pudiera conceder una reparación [Proc. Cont. Núm. 17-00159, ECF Núm. 156]. Ambac presentó una apelación ante el Primer Circuito, que se registró como Caso Núm. 18-1214. El 24 de junio de 2019, el Primer Circuito emitió un dictamen y una orden que confirma la decisión del Tribunal de Título III, con el argumento de que, conforme a las Secciones 106(e) y 305 de PROMESA, el Tribunal de Título III carece de autoridad para conceder el remedio declaratorio e interdictal solicitado por Ambac. El 23 de septiembre de 2019, los Apelantes presentaron una petición de *certiorari*, que se registró como Caso Núm. 19-387. El 13 de enero de 2020, una vez concluidas las presentaciones de escritos, la Corte Suprema denegó la petición.

### (e)     *Peaje Investment, LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico, Proc. Cont. Núm. 17-00151, 17-00152; Caso Núm. 17-2165, 17-2166, 17-2167 (1er Cir.)*

El 31 de mayo de 2017, Peaje Investment, LLC ("Peaje"), un tenedor de más de $64 millones en bonos 1968 emitidos por la ACT, interpuso una acción para remedio declaratorio e interdictal contra ACT, AAFAF y ciertos funcionarios gubernamentales del ELA (colectivamente, los "Demandados") con respecto a (i) la validez de su gravamen y (ii) el uso supuestamente indebido de los ingresos de peaje por parte de la ACT para financiar otras obligaciones de deuda. Peaje alegó que los ingresos de peaje de la ACT depositados en BNYM habían sido desviados de forma ilícita por la ACT para pagar otras obligaciones de deuda u otros gastos desde mayo de 2016. Además, Peaje alegó que tiene un derecho legal de retención preferencial sobre los ingresos de peaje. Según Peaje, este presunto gravamen establecido por ley protege los "ingresos especiales pignorados" sobre los bonos de las restricciones aplicadas a la paralización conforme a las Secciones 902, 922 y 928(d) del Código de Quiebras. En consecuencia, Peaje solicitó una sentencia que ordenara a los Demandados que reanudaran el depósito de los ingresos de peaje en BNYM como agente fiscal de los bonos de la ACT. Además, Peaje afirmó que la desviación ilícita de los ingresos de peaje para pagar los "gastos operativos necesarios" de la ACT viola la Cláusula sobre Expropiaciones en virtud de la Quinta Enmienda de la Constitución de los Estados Unidos. De forma alternativa, Peaje argumentó que sus gravámenes preferenciales solo pueden estar subordinados a gastos para preservar un "proyecto o sistema" que genere una garantía específica que asegure los bonos. Además, el 31 de mayo de 2017, Peaje presentó una moción para una orden de restricción temporal e interdicto preliminar para (i) que se prohíba a la ACT seguir recaudando los ingresos de peaje para otros fines que no sean el pago de bonos, y (ii) solicitar protección adecuada para sus presuntas garantías [Proc. Cont. Núm. 17-00151, ECF Núm. 2; Proc. Cont. Núm. 17-00152, ECF Núm. 2].

El Tribunal de Título III celebró una vista probatoria sobre la moción de Peaje de remedio interdictal. El Tribunal de Título III emitió una decisión que denegó la petición de remedio interdictal del Demandante basándose en que Peaje no había demostrado que (1) tiene un gravamen establecido por ley válido y (2) sufriría un daño irreparable sin un remedio interdictal [Proc. Cont. Núm. 17-00151, ECF Núm. 240; Proc. Cont. Núm. 17-00152, ECF Núm. 228]. Además, la orden concluía que, incluso si se hubiera llegado a la conclusión de que el gravamen era válido, el testimonio pericial establecía que Peaje disponía de la protección adecuada.

Inmediatamente después de la decisión, el 8 de diciembre de 2017, el Demandante presentó una notificación de apelación ante el Primer Circuito, que se registró como Caso 17- 2165,-2165,-

2166. El 8 de agosto de 2018, el Primer Circuito emitió una decisión que ratificó la conclusión de la Corte Título III con respecto a la ausencia de un gravamen establecido por ley.

Poco después de la presentación de la notificación de apelación ante el Primer Circuito, Peaje presentó una demanda enmendada ante el Tribunal de Título III que solicita (i) una declaración de que su gravamen es válido y perfeccionado y (ii) un interdicto para garantizar que la ACT reanude el depósito de los ingresos de peaje [Proc. Cont. Núm. 17-00151, ECF Núm. 246; Proc. Cont. Núm. 17-00152, ECF Núm. 234]. En su demanda enmendada, Peaje incluye referencias a los estados financieros de CANA para probar el perfeccionamiento, Peaje también amplió la afirmación contenida en su demanda original acerca de que está exenta de cualquier paralización. En la demanda enmendada, declaró que no está sujeta a las diversas medidas de emergencia adoptadas por el ELA y que no está obligada por PROMESA y la certificación del plan fiscal, que permite que el gobierno asigne fondos para saldar las obligaciones generales de deuda. La demanda enmendada de Peaje también contenía numerosas reclamaciones similares al proceso contencioso de *Ambac* que se describe anteriormente, *véase* Sección V.F.1(d).

La ACT presentó una contestación a la demanda enmendada y rechazó los hechos en que se funda la demanda [Proc. Cont. Núm. 17-00151, ECF Núm. 256; Proc. Cont. Núm. 17-00152, ECF Núm. 242]. ACT también opuso varias defensas afirmativas contra la demanda enmendada. La ACT argumentó, entre otras cosas, que los estados financieros de CANA no llevan el nombre correcto del Deudor, lo que hace que sean insuficientes para perfeccionar un derecho de garantía como cuestión de derecho. Los Demandados también cuestionaron la afirmación de Peaje acerca de que el Tribunal de Título III podría resolver ciertas reclamaciones, con el argumento de que el Tribunal de Título III carece de jurisdicción sobre la materia en virtud de las disposiciones de PROMESA que prohíben que el Tribunal de Título III revise las certificaciones del plan fiscal e impide que interfiera con los poderes políticos y gubernamentales del deudor, cualquiera de sus bienes o ingresos, o el uso y goce por parte del deudor de cualquier bien que genere ingresos. Además, ACT afirmó que la reclamación con respecto a la Cláusula sobre Expropiaciones del Demandante no es viable porque el Demandante no posee ningún derecho sobre la propiedad "reconocible".

El 26 de octubre de 2018, Peaje presentó una petición de *certiorari* ante la Corte Suprema de Estados Unidos solicitando la revisión del dictamen del Primer Circuito que confirmaba el dictamen del Tribunal de Título III, que se registró como Caso Núm. 18-560 el 30 de octubre de 2018. El 19 de febrero de 2019, la Corte Suprema de Estados Unidos denegó la petición de *certiorari*.

El 1 de julio de 2019, la magistrada Dein dictó una orden que instruye a las partes a presentar un informe de estado conjunto en o antes del 15 de septiembre de 2019 [Proc. Cont. Núm. 17-00151, ECF Núm. 292; Proc. Cont. Núm. 17-00152, ECF Núm. 279]. El 15 de septiembre de 2019, las partes presentaron un informe de estado conjunto, que informa al Tribunal de Título III que ciertas apelaciones pendientes en asuntos relacionados tenían el potencial de impactar los procedimientos posteriores en estos asuntos, y por esa razón, las partes habían acordado una paralización informal y propusieron presentar un nuevo informe de estado en noventa (90) días. *Id*. A partir de entonces, el asunto se mantuvo de manera informal y las partes presentaron una serie de informes de estado adicionales.

El 2 de agosto de 2021, la Junta de Supervisión, Ambac, FGIC, BNYM y U.S. Bank, entre otros, presentaron una moción conjunta para suspender ciertas cuestiones controvertidas y procesos contenciosos [Proc. Cont. Núm. 17-00151, ECF Núm. 322; Proc. Cont. Núm. 17-00152, ECF Núm. 308]. El 3 de agosto de 2021, el Tribunal de Título III dictó una orden por la que se concedía la moción conjunta y se paralizaba este proceso contencioso [Proc. Cont. Núm. 17-00151, ECF Núm. 323; Proc. Cont. Núm. 17-00152, ECF Núm. 309].

El 18 de enero de 2022, el Tribunal de Título III emitió la Orden de Confirmación del ELA [Caso Núm. 17-bk-03283, ECF Núm. 19813]. El párrafo 8 de la Orden de Confirmación del ELA establece en parte que, en la Fecha de Entrada en Vigencia, en la medida en que existan, las Mociones de Levantamiento de la Paralización (incluyendo el Proc. Cont. Núm. 17-00151 y 17-00152), serán desestimadas con perjuicio. Tras la confirmación del Plan del ELA, el Tribunal de Título III dictó una *Orden relativa a los asuntos que pueden resolverse en relación con el Octavo Plan Enmendado Modificado tras la fecha de entrada en vigencia del Plan* [ECF Núm. 20341], en la que ordenaba a la Junta de Supervisión que presentara "una moción informativa que contenga una lista definitiva, en forma de diagrama, en la que se identifiquen las Reclamaciones actualmente aseveradas y las Reclamaciones en Disputa que serán objeto de resolución en relación con el Plan en la Fecha de Entrada en Vigencia o con posterioridad a ella". En cumplimiento de la orden del Tribunal de Título III, el 25 de marzo de 2022, la Junta de Supervisión presentó la *Moción Informativa de la Junta de Supervisión y Administración Financiera de Puerto Rico sobre la Orden de Asuntos que pueden resolverse en relación con el Octavo Plan Enmendado Modificado después de la Fecha de Entrada en Vigencia del Plan* [ECF No. 20445]. En este sentido, la Junta de Supervisión identificó el Proc. Cont. Núm. 17-00151 y 17-00152 como asuntos que ha sido resueltos por el Plan, y señaló que la parte responsable de presentar cada asunto debería presentar, en la medida necesaria, una notificación que retira o desestima dicho asunto a la luz de la confirmación del Plan. Además, la Junta de Supervisión propuso que dichas notificaciones se presentaran dentro de los treinta (30) días siguientes a su moción informativa.

**(f)** ***Cooperativa de Ahorro y Crédito Abraham Rosa y otros c. el Estado Libre Asociado de Puerto Rico,*** **Proc. Cont. Núm. 18-00028, Caso Núm. 22-01048 (1er Cir.)**

El 22 de marzo de 2018, varias cooperativas de crédito constituidas bajo la ley de Puerto Rico presentaron un proceso contencioso contra el ELA, la Junta de Supervisión y sus miembros, COSSEC y otras instrumentalidades del ELA (entre ellas COFINA, ACT, SRE, AEE y BGF) (colectivamente, los "Demandados"), con el fin de obtener sentencias declaratorias que determinen que sus títulos de deuda de Puerto Rico no son liquidables y solicitar una indemnización monetaria por supuesto fraude en relación con la compra por parte de las cooperativas de crédito locales de instrumentos de deuda de Puerto Rico [Proc. Cont. Núm. 18-00028, ECF Núm. 1]. El 6 de agosto de 2018, la Junta de Supervisión, en nombre propio y como representante de los Deudores, solicitó la desestimación de la demanda [Proc. Cont. Núm. 18-00028, ECF Núm. 29]. También el 6 de agosto de 2018, BGF presentó una moción de desestimación por separado [Proc. Cont. Núm. 18-00028, ECF Núm. 32]. La Autoridad de Recuperación de la Deuda del BGF (la "ARD del BGF") y sus Fideicomisarios también solicitaron la desestimación de la demanda el 1 de octubre de 2018 [Proc. Cont. Núm. 18-00028, ECF Núm. 59]. Además, varias partes presentaron acumulaciones contra las mociones de desestimación o se les concedió licencia del Tribunal de Título III para

presentar acumulaciones. El 1 de abril de 2019, los Demandantes presentaron una oposición a las mociones de desestimación [Proc. Cont. Núm. 18-00028, ECF Núm. 74].

Poco después, el 16 de abril de 2019, los Demandantes presentaron una demanda enmendada, que eliminó las reclamaciones basadas en leyes de títulos valores y agregó reclamaciones por fraude, negligencia, declaración fraudulenta, violación a la Ley de Crimen Organizado de Puerto Rico y de la Cláusula sobre Expropiaciones de las Constituciones de Estados Unidos y del ELA [Proc. Cont. Núm. 18-00028, ECF Núm. 79].

El 5 de febrero de 2019, el Tribunal de Título III presentó una Orden de Confirmación enmendada que ratifica el Tercer Plan de Ajuste Enmendado de COFINA [Caso Núm. 17-bk-3284, ECF Núm. 561]. El 12 de febrero de 2019, el Tercer Plan de Ajuste Enmendado de COFINA se perfeccionó sustancialmente y entró en vigencia. Conforme al párrafo 30 de la Orden de Confirmación Enmendada, "los demandantes en ese determinado proceso contencioso ante el Tribunal de Título III, caratulado *Cooperativa de Ahorro y Crédito Abraham Rosa y otros c. el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 18-00028, tendrán derecho a proseguir el litigio contra todas las partes salvo COFINA y COFINA Reorganizada, con sujeción a todos los derechos y defensas disponibles con respecto a las reclamaciones y causas de acción declaradas en él".

El 22 de julio de 2019, los Demandados presentaron mociones para desestimar la demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 88- 91– 94, 97]. El 6 de diciembre de 2019, los Demandantes presentaron una moción de autorización para presentar una segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 116]. Se presentaron todos los escritos para la moción, y el 14 de abril de 2020, el Tribunal de Título III dictó una orden que concedió la moción de los Demandantes para permitir la presentación de una segunda demanda enmendada y establecer un cronograma de presentación de escritos [Proc. Cont. Núm. 18-00028 ECF Núm. 125].

El 16 de abril de 2020, los Demandantes presentaron su segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 126]. También el 16 de abril de 2020, el Tribunal de Título III desestimó con derecho a nueva acción las mociones de desestimación de la Junta de Supervisión, el BGF y de la ARD del BGF y las acumulaciones de CANA, AAFAF y COSSEC a las mociones [Proc. Cont. Núm. 18-00028, ECF Núm. 127]. El 20 de abril de 2020, conforme al cronograma de presentación de escritos del Tribunal de Título III, la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 128], el BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 129], y la ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 130] volvieron a presentar sus mociones para desestimar la primera demanda enmendada como mociones para desestimar la segunda demanda enmendada. También el 20 de abril, COSSEC [Proc. Cont. Núm. 18-00028, ECF Núm. 131], y CANA [Proc. Cont. Núm. 18-00028, ECF Núm. 132] presentaron acumulaciones a la moción de desestimación de la Junta de Supervisión. El 24 de abril, AAFAF presentó una acumulación a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 138].

El 1l de mayo de 2020, el Tribunal de Título III dictó una orden por la que remitía las mociones de desestimación de la segunda demanda enmendada a la magistrada Dein para un informe y recomendación [Proc. Cont. Núm. 18-00028, ECF Núm. 142]. El 21 de mayo de 2020,

la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 143], el BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 145], y la ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 146] presentaron escritos complementarios en respaldo de sus mociones de desestimación. La AAFAF presentó una acumulación a los escritos de la Junta de Supervisión y el BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 147]. El 22 de mayo de 2020, COSSEC presentó una acumulación a las mociones de desestimación de la Junta de Supervisión y la ARD del BGF junto con un escrito complementario en apoyo a su propia moción de desestimación [Proc. Cont. Núm. 18-00028, ECF Núm. 148]. También el 22 de mayo, CANA presentó una acumulación limitada al escrito complementario de la Junta de Supervisión en apoyo a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 151].

El 11 de agosto de 2020, los Demandantes presentaron una oposición a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00028, ECF Núm. 166-1]. También el 11 de agosto de 2020, los Demandantes presentaron oposiciones a las mociones de desestimación y acumulaciones asociadas del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 167], la ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 168], AAFAF [Proc. Cont. Núm. 18-00028, ECF Núm. 169], y COSSEC [Proc. Cont. Núm. 18-00028, ECF Núm. 170]. El 20 de octubre de 2020, los Demandantes presentaron una respuesta en apoyo de las mociones para desestimar la segunda demanda enmendada de los Demandantes [Proc. Cont. Núm. 18-00028, ECF Núm. 178]. La ARD del BGF también presentó una respuesta en apoyo de su moción para desestimar la segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 179]. AAFAF y el BGF presentaron una contestación en apoyo de la moción de desestimación del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 180]. COSSEC presentó una contestación en apoyo a su moción de desestimación [Proc. Cont. Núm. 18-00028, ECF Núm. 181]. El 5 de marzo de 2021, la ARD del BGF presentó una moción informativa para presentar fundamentos adicionales en relación con su contestación [Proc. Cont. Núm. 18-00028, ECF Núm. 186]. El 17 de marzo de 2021, los Demandantes presentaron un escrito de oposición a la moción informativa de la ARD del BGF [Proc. Cont. Núm. 18-00028, ECF Núm. 187].

El 27 de diciembre de 2021, el Tribunal de Título III emitió una orden (la "Orden") que concede las mociones para desestimar la segunda demanda enmendada [Proc. Cont. Núm. 18-00028, ECF Núm. 192]. La Orden desestimó todas las reclamaciones contra todos los demandados, sosteniendo que (i) todas las reclamaciones contra la Junta de Supervisión y sus miembros individuales estaban prohibidas por la Sección 105 de PROMESA, y (ii) las alegaciones de fraude de los Demandantes y la reclamación por crimen organizado asociada no cumplían con los requisitos de alegación de hechos para tales causas de acción. La Orden también (i) desestimó ciertas reclamaciones en cuanto a COFINA y el BGF como irrelevantes porque las deudas de esas entidades ya habían sido liquidadas; (ii) desestimó ciertas reclamaciones en cuanto a ACT y AEE como inmaduras porque aún no se habían presentado planes de ajuste; (iii) desestimó las reclamaciones en las que se solicitaba una excepción a la exención en lo que respecta al ELA, el SRE y la AEP porque los Demandantes no habían establecido una excepción de la exención en virtud de ninguna de las disposiciones legales citadas; (iv) consideró que varias reclamaciones en las que se alegaba la violación de determinadas leyes del Estado habían prescrito; (v) consideró que las reclamaciones de la Cláusula sobre Expropiaciones de los Demandantes no estaban maduras o eran insuficientes para demostrar que las acciones regulatorias del gobierno habían coaccionado o forzado una toma de dinero de los Demandantes; y (vi) desestimó la reclamación restante de los Demandantes por enriquecimiento ilícito porque bajo la ley de Puerto Rico, el

enriquecimiento ilícito no se aplica a conducta cubierta por una ley aplicable. El 4 de enero de 2022, el Tribunal de Título III dictó sentencia y el proceso contencioso quedó cerrado [Proc. Cont. Núm. 18-00028, ECF Núm. 193].

El 12 de enero de 2022, los Demandantes presentaron una notificación de apelación, y se registró ante el Primer Circuito en el Caso Núm. 22-1048. [Proc. Cont. Núm. 18-00028, ECF Núm. 194]. Los Demandantes presentaron su escrito inicial el 24 de marzo de 2022. El escrito de contestación de los Demandados está previsto para el 23 de mayo de 2022

### (g)   *AmeriNational Community Services, LLC, y otros. c. Ambac Assurance Corporation, y otros,* Proc. Cont. Núm. 21-00068

El 26 de junio de 2021, las Partes de la ARD presentaron una demanda contenciosa contra Assured, Ambac, FGIC, National, Peaje y BNYM, como agente fiscal para los tenedores de ciertos bonos emitidos por la ACT (colectivamente los "Demandados"). La reclamación solicita que se emitan diversas sentencias declaratorias con respecto a la validez, amplitud, antigüedad y prioridad de los supuestos derechos de las Partes de la ARD y de los Demandados con respecto a (1) ciertos ingresos establecidos por las Leyes 30-2013 y 31-2013 ("Ingresos de la Ley 30-31"), (2) los Bonos de la ACT de 1968 y los Bonos de la ACT de 1998, (3) los quince acuerdos de préstamo celebrados por el BGF y la ACT entre marzo de 2008 y enero de 2014 (con las enmiendas, enmiendas y reformulaciones, complementos u otras modificaciones, los "Acuerdos del Préstamo"), y (4) el acuerdo de cesión y garantía celebrado entre la ACT y el BGF el 28 de agosto de 2013 (con las enmiendas, complementos u otras modificaciones, el "Acuerdo de Garantía") en relación con los Acuerdos de Préstamo.

La reclamación solicita diversas declaraciones judiciales. En primer lugar, las Partes de la ARD solicitan una declaración judicial de que la ARD es la única parte con un gravamen perfeccionado válido sobre, e interés de garantía en, y derecho a cobrar los Ingresos de la Ley 30-31, incluyendo el derecho a recibir estos ingresos. En segundo lugar, las Partes de la ARD solicitan declaraciones judiciales de que los Bonos de la ACT de 1968 y los Bonos de la ACT de 1998: (i) se encuentran garantizados solamente por ingresos de bonos específicos "recibidos de hecho por la ACT y depositados de hecho en las cuentas de ingresos de bonos correspondientes"; (ii) son obligaciones de recursos limitados que deben satisfacerse únicamente con los ingresos de los bonos especificados. En tercer lugar, las partes de la ARD solicitan una declaración judicial de que ARD tiene derecho a cobrar (en relación con sus reclamaciones) de los ingresos de bonos especificados en la medida en que no se depositen en ciertas cuentas de ingresos de bonos especificadas. En cuarto lugar, las Partes de la ARD solicitan una declaración judicial de que el texto sobre subordinación que contienen los Acuerdos de Préstamo y el Acuerdo de Garantía no significa que los supuestos gravámenes o reclamaciones de cualquiera de las Partes de la ARD queden subordinados a los supuestos gravámenes o reclamaciones de los bonistas de la ACT.

Conforme a una estipulación por y entre las Partes de la ARD y los Demandados, el Tribunal de Título III ha estipulado como fecha límite el 27 de agosto de 2021 para que los Demandados respondan, contesten y/o presenten algún otro escrito como réplica a la demanda. El 28 de junio de 2021, el Tribunal de Título III emitió una orden que deriva el caso a la Magistrada Dein para manejo general previo al juicio [Proc. Cont. Núm. 21-00068, ECF Núm. 3]. El 28 de julio de 2021, la Junta de Supervisión presentó una moción de autorización para intervenir como

demandada en las Causas I, II y IV, y la AAFAF presentó una acumulación a la moción [Proc. Cont. Núm. 21-00068, ECF Núm. 26, 27]. El 2 de agosto de 2021, las Partes de la ARD presentaron una oposición a la moción de autorización para intervenir de la Junta de Supervisión [Proc. Cont. Núm. 21-00068, ECF Núm. 30]. El 11 de agosto de 2021, la magistrada Dein emitió una orden en la que concedía (i) la moción de la Junta de Supervisión para intervenir como demandada en las Causas I, II y IV y (ii) la acumulación de la AAFAF en relación con ellas [Proc Cont. Núm. 21-00068, ECF Núm. 34].

El 26 de agosto de 2021, la Junta de Supervisión, a la que se unió parcialmente la AAFAF, presentó una moción para desestimar o, alternativamente, para paralizar o desestimar las Causas I, II y IV de la demanda [Proc. Cont. Núm. 21-00068, ECF Núm. 40, 42]. Ambac, Assured, National, FGIC, BNYM y Peaje presentaron una respuesta conjunta a la demanda, una moción conjunta de desestimación de esta y ciertas reconvenciones contra las Partes de la ARD [Proc. Cont. Núm. 21-00068, ECF Núm. 43, 44].

Las Partes de la ARD presentaron una moción para paralizar la fecha límite para responder a las reconvenciones [Proc. Cont. Núm. 21-00068, ECF Núm. 57], moción que fue denegada por el Tribunal de Título III el 14 de octubre de 2021 [Proc. Cont. Núm. 21-00068, ECF Núm. 79]. El 19 de octubre de 2021, las Partes de la ARD presentaron una moción para desestimar las reconvenciones [Proc. Cont. Núm. 21-00068, ECF Núm. 80].

El 29 de octubre de 2021, el Tribunal de Título III emitió un dictamen y una orden en la que concedía a Ambac, Assured, National, FGIC, BNYM y Peaje la moción conjunta de desestimación de la demanda [Proc. Cont. Núm. 21-00068, ECF Núm. 83]. El Tribunal de Título III desestimó la Causa I basándose en que los términos claros de las Leyes 30 y 31 contemplaban específicamente el pago de bonos, lo que obliga a concluir que los tenedores de bonos pueden tener derecho a recibir los Ingresos de las Leyes 30-31. En cuanto a la Causa III, el Tribunal de Título III determinó que, en virtud de los términos del Acuerdo de Garantía, los préstamos en poder de la ARD estaban subordinados a los Bonos emitidos tanto en virtud de la Resolución de 1968 como de la Resolución de 1998. Por último, el Tribunal de Título III consideró que su razonamiento en cuanto a las Causas I y III también requería la desestimación de las Causas II y IV La Causa II fue desestimada porque los bonos eran pagaderos con los ingresos de las Leyes 30-31 (como se determinó en relación con la Causa I) y la Causa IV fue desestimada porque el Acuerdo de Garantía requería que las obligaciones de los bonos fueran satisfechas antes de que se pagaran los fondos de los préstamos en poder de la ARD (como se determinó en relación con la Causa III). A la luz de la desestimación de la Demanda en virtud de la moción conjunta de desestimación de Ambac, Assured, National, FGIC, BNYM y Peaje, el Tribunal consideró innecesario abordar los argumentos de la Junta de Supervisión, y denegó la moción de la Junta de Supervisión de desestimar las Causas I, II y IV por considerarla irrelevante. De acuerdo con la Estipulación de la ARD, la decisión del Tribunal de Título III se califica como una "Determinación de la Prioridad del Préstamo del BGF" a efectos del Plan del ELA. Estipulación de la ARD § 3.f [ECF Núm. 19100]. Para más información sobre el impacto de la Determinación de la Prioridad del Préstamo del BGF, Véase las Secciones 1.172, 1.259 y 63.2 del Plan del ELA.

El 31 de octubre de 2021, el Secretario del Tribunal dictó una sentencia por la que se desestimaba el proceso contencioso [Proc. Cont. Núm. 21-00068, ECF Núm. 84]. El 4 de noviembre de 2021, el Tribunal de Título III emitió una sentencia modificada en la que se ordenaba

al Secretario del Tribunal el cierre del proceso contencioso [Proc. Cont. Núm. 21-00068, ECF Núm. 86].

### (h) Moción de gastos administrativos de las Partes de la ARD[140]

El 15 de junio de 2021, las partes de la ARD presentaron una moción para la concesión de una reclamación de gastos administrativos (la "Moción de Gastos Administrativos de la ARD") y una notificación de vista de esta [Caso Núm. 17-bk-3283, ECF Núm. 17009, 17012]. En ella, las partes de la ARD alegaron que (1) la ARD tiene un derecho de garantía válido y perfeccionado sobre los Ingresos de las Leyes 30-31; (2) durante los procedimientos de Título III, el ELA había desviado más de $2.4 mil millones en Ingresos de las Leyes 30-31 de la ACT al ELA, y al menos $800 millones de esos ingresos eran exclusivamente para el beneficio de la ACT; y (3) la ARD no estaba adecuadamente protegida. En consecuencia, las Partes de la ARD afirmaron que tenían derecho a una reclamación de gastos administrativos de no menos de $800 millones que deben ser pagados en su totalidad, en efectivo en relación con cualquier Plan del ELA.

El 9 de septiembre de 2021, la Junta de Supervisión presentó su objeción a la Moción de Gastos Administrativos de la ARD, argumentando que (i) los derechos de garantía en cuestión ya habían sido litigadas (*véase* Proc. Cont. Núm. 21-00068, analizado anteriormente en la Sección V.F.1.(g); *véase también* Caso Núm. 17-3283, ECF Núm. 16276); (ii) las Partes de la ARD carecen de legitimación contra la ACT; y (iii) PROMESA tiene prioridad sobre la demanda [Caso Núm. 17-bk-3283, ECF Núm. 18065].

El 24 de septiembre de 2021, las Partes de la ARD presentaron su respuesta en apoyo argumentando que (i) las Partes de la ARD tenían derecho a la prioridad de los gastos administrativos en virtud del Código de Quiebras; (ii) las Partes de la ARD no estaban impedidas contractualmente para hacer valer una reclamación contra el ELA; (iii) las Partes de la ARD estaban legitimadas contra el ELA y la ACT a través de su interés propietario sobre los ingresos generados por el ELA; y (iv) PROMESA no tenía prioridad sobre la reclamación de las Partes de la ARD [Caso Núm. 17-bk-3283, ECF Núm. 18244]. El mismo día, las Partes de la ARD presentaron una moción urgente para presentar de manera confidencial ciertas partes no tachadas de un informe pericial de Lizette Martínez (el "Informe Pericial de Martínez"), que las Partes de la ARD presentaron en relación con su respuesta en apoyo de la Moción de Gastos Administrativos de la ARD [Caso Núm. 17-bk-3283, ECF Núm. 18245].

El 28 de septiembre de 2021, la Junta de Supervisión presentó una objeción probatoria al informe pericial de Martínez [Caso Núm. 17-bk-3283, ECF Núm. 18270]. El 29 de septiembre de 2021, el Tribunal de Título III concedió la moción de las Partes de la ARD para presentar de manera confidencial ciertas partes no tachadas del Informe Pericial de Martínez [Caso Núm. 17-bk-3283, ECF Núm. 18291]. El mismo día, las Partes de la ARD presentaron su respuesta de manera confidencial [Caso Núm. 17-bk-3283, ECF Núm. 18295]. Además, el mismo día, el Tribunal de Título III emitió una orden para programar una sesión informativa en relación con la objeción probatoria de la Junta de Supervisión al Informe Pericial de Martínez [Caso Núm. 17-bk-3283, ECF Núm. 18298].

---

[140] Caso Núm. 17-bk-3283, ECF Núm. 17009.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

El 7 de octubre de 2021, las Partes de la ARD presentaron una respuesta a la objeción de la Junta de Supervisión al Informe Pericial de Martínez [Caso Núm. 17-bk-3283, ECF Núm. 18429]. El 11 de octubre de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su objeción probatoria al Informe Pericial de Martínez [Caso Núm. 17-bk-3283, ECF Núm. 18452]. El 21 de octubre de 2021, el Tribunal de Título III emitió una orden que dispone el levantamiento de la confidencialidad de (i) la respuesta de las Partes de la ARD en apoyo de la Reclamación de Gastos Administrativos de la ARD y (ii) el Informe Pericial de Martínez [Caso Núm. 17-3283, ECF Núm. 18626].

El 29 de octubre de 2021, el Tribunal de Título III emitió un dictamen y una orden en la que se denegaba la Reclamación de Gastos Administrativos de la ARD [Caso Núm. 17-3283, ECF Núm. 18892]. Allí, el Tribunal de Título III sostuvo que (1) las Partes de la ARD tenían legitimidad para presentar la Moción de Gastos Administrativos de la ARD; (2) las Partes de la ARD no estaban contractualmente impedidas de tramitar la Moción de Gastos Administrativos de la ARD; (3) la ARD carece de interés propietario en los Ingresos de las Leyes 30-31 en poder del ELA; (4) no había ninguna transacción posterior a la petición que confiriera beneficios posteriores a la petición al ELA que apoyara la concesión de una reclamación de gastos administrativos para las Partes de la ARD; y (5) a la luz de las otras sentencias del Tribunal de Título III, la objeción probatoria de la Junta de Supervisión fue denegada por irrelevante.

El 5 de noviembre de 2021, las Partes de la ARD y la Junta de Supervisión presentaron la Estipulación de la ARD, en la que las partes acordaron no presentar ninguna apelación relacionada con la Moción de Gastos Administrativos de la ARD [Caso Núm. 17-bk-3283, ECF Núm. 19100, Anexo A].

### (i)    Moción de la Sección 926 de las aseguradoras monolínea[141]

El 17 de julio de 2020, Ambac, Assured, National y FGIC (los "Solicitantes de la ACT de la Sección 926"), presentaron una moción para el registro de una orden que los nombrara como cofideicomisarios en virtud de la Sección 926 del Código de Quiebras con el fin de tramitar ciertas reclamaciones de anulación conforme a las Secciones 549, 544 y 548 del Código de Quiebras en nombre de la ACT contra el ELA [Caso Núm. 17-bk-3567, ECF Núm. 871] (la "Moción de la Sección 926"). Según los Solicitantes de la ACT de la Sección 926, la ACT tenía reclamaciones de anulación contra el ELA que la Junta de Supervisión se había negado injustificadamente a tramitar, y la Junta de Supervisión tenía un conflicto de intereses irresoluble al representar simultáneamente a la ACT y al ELA en sus respectivos procedimientos de Título III. El plazo de prescripción de esas reclamaciones de anulación expiraba el 14 de agosto de 2020. Los Solicitantes de la Sección 926 de la ACT declararon además que no estaban de acuerdo con el Dictamen y la Orden de Levantamiento de la Paralización de ACT del Tribunal de Título III y presentan la Moción de la Sección 926 para preservar sus derechos conforme a la Sección 926. Además, el 17 de julio de 2020, las partes de la ARD presentaron una acumulación a la Moción de la Sección 926 [Caso Núm. 17-bk-3567, ECF Núm. 873].

Se presentaron todos los escritos procesales para la moción [Caso Núm 17-bk-3567, ECF Núm. 901, 902, 908, 909]. El 11 de agosto de 2020, el Tribunal de Título III emitió una orden

---

[141] Caso Núm. 17-bk-3283, ECF Núm. 13708; Caso Núm. 17-bk-3567, ECF Núm. 871; Caso Núm. 20-1847 (1er Cir.).

2" = "1" "2621/33260-009 CURRENT/127656480v7                                  04/30/2022 3:29 PM" ""

denegando la Moción de la Sección 926 [Caso Núm. 17-bk-3567, ECF Núm. 912]. La orden señalaba que el Tribunal de Título III tenía amplios poderes discrecionales para decidir si se debía nombrar un fideicomisario, particularmente a la luz de las preocupaciones constitucionales y de federalismo inherentes a los procedimientos de quiebra municipales, y la facultad exclusiva de la Junta de Supervisión para proponer planes de ajuste en virtud de PROMESA. El Tribunal de Título III sostuvo que la Moción de la Sección 926 se basaba en una teoría legal (que ciertos ingresos tributarios son propiedad de la ACT, y no del ELA) que la Junta de Supervisión se había negado a adoptar y que el Tribunal de Título III consideró insuficiente. El Tribunal de Título III también señaló que el Primer Circuito ya había concluido que la representación de la Junta de Supervisión de múltiples deudores no creaba un conflicto automático e irreconciliable.

El 25 de agosto de 2020, los Solicitantes de la ACT de la Sección 926 presentaron una notificación de apelación [Caso Núm. 17-bk-3567, ECF Núm. 914]. El 16 de septiembre de 2020, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 20-1847. El 30 de septiembre de 2020, los Solicitantes de la ACT de la Sección 926, en calidad de Apelantes, presentaron una moción para dejar en suspenso la apelación hasta que se decida la apelación del Dictamen de Memorando del Tribunal de Título III que deniega la Moción de Levantamiento de la Paralización de la ACT. El 13 de octubre de 2020, los Apelados presentaron una oposición a la moción de los Apelantes de mantener la apelación en suspenso y una moción cruzada para desestimar la apelación por irrelevante. Se presentaron todos los escritos procesales para las mociones. El 22 de diciembre de 2020, el Primer Circuito emitió una orden que deniega la moción de los Apelantes de dejar en suspenso la apelación. El 17 de febrero de 2021, los Apelantes presentaron su escrito inicial y las Partes de la ARD presentaron una acumulación parcial al escrito inicial de los Apelantes. El 23 de febrero de 2021, las Partes de la ARD presentaron una moción de autorización para presentar una acumulación al escrito inicial de los Apelantes. El 1 de abril de 2021, el Primer Circuito dictó una orden que rechaza la moción de las Partes de la ARD de archivar la acumulación al escrito inicial de los Apelantes. El 12 de abril de 2021, las Partes de la ARD presentaron una moción de intervención. El 19 de abril de 2021, los Apelados presentaron sus escritos de contestación. El 24 de mayo de 2021, los Apelantes presentaron su escrito de contestación. El 4 de junio de 2021, el Primer Circuito dictó una orden que concedía la moción de intervención de las Partes de la ARD. El 29 de julio de 2021, los Apelantes presentaron una moción de desestimación voluntaria de la apelación. El 30 de julio de 2021, el Primer Circuito emitió su sentencia, que ordena la desestimación de la apelación.

**(j)      *Ambac Assurance Corp. c. Autopistas Metropolitanas de Puerto Rico*,
Caso Núm. 20-cv-1094 (D.P.R.); Caso Núm. 20-1657 (1er Cir.)**

El 19 de febrero de 2020, Ambac presentó una demanda contra Autopistas Metropolitanas de Puerto Rico ("Metropistas") ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, que alega que Metropistas actuó de mala fe al acordar pagar a la ACT solo $115 millones a cambio de una prórroga de diez años de un acuerdo de concesión conforme al cual Metropistas operaba dos autopistas de Puerto Rico, PR-5 y PR-22 [Caso Núm. 20-cv-01094, ECF Núm. 1]. Ambac argumentó que Metropistas pagó mucho menos que el valor razonablemente equivalente por los derechos de explotación de la autopista. Ambac pretendía recuperar mediante la rescisión, y el enriquecimiento injusto, el valor de la concesión otorgada a Metropistas para garantizar el pago de las obligaciones adeudadas por ACT a Ambac, y una declaración de que

Ambac tiene un gravamen válido y continuado sobre determinados ingresos de peaje recaudados por Metropistas.

El 2 de marzo de 2020, Metropistas presentó una moción para reasignar el caso al Tribunal de Título III y solicitó una paralización en espera de la reasignación [Caso Núm. 20-cv-01094; Núm. 10]. El 16 de marzo de 2020, Ambac respondió oponiéndose a la moción de paralización pendiente de reasignación, pero sin oponerse a la moción de reasignación del caso [Caso Núm. 20-cv-01094; ECF Núm. 20].

El 31 de marzo de 2020, la Junta de Supervisión, en nombre del Estado y de la ACT, presentó una moción que solicita una orden que instruya a Ambac para retirar su demanda, argumentando que el litigio viola la Sección 362 del Código de Quiebras porque, entre otras cosas, (i) interfiere con los derechos de propiedad de la ACT; (ii) busca una sentencia declaratoria con respecto al gravamen de Ambac; y (iii) busca recobros sobre una reclamación contra la ACT [Caso Núm. 17-bk-3567-LTS; ECF Núm. 757]. El 1 de abril de 2020, Metropistas presentó una acumulación a la moción de la Junta de Supervisión [Caso Núm. 17-bk-3567, ECF Núm. 759].

El 18 de abril de 2020, Metropistas y Ambac presentaron una moción conjunta para prorrogar la fecha límite para responder a la demanda y para paralizar el caso en espera de la resolución de la moción de la Junta de Supervisión [Caso Núm. 20-cv-01094, ECF Núm. 21]. El 20 de abril de 2020, el juez Delgado-Hernández emitió una orden de texto que paralizaba el caso a la espera de un fallo sobre la moción de la Junta de Supervisión que peticionaba una orden que ordenara a Ambac retirar su demanda [Caso Núm. 20-cv-01094; ECF Núm. 22].

El 28 de abril de 2020, Ambac presentó una oposición a la moción de la Junta de Supervisión, argumentando que el litigio no interfería con los derechos de propiedad de la ACT y que Ambac tenía capacidad para presentar reclamaciones contra Metropistas porque, entre otras cosas, (i) ACT había abandonado las reclamaciones de la Sección 544(b) contra Metropistas; y (ii) la conducta de Ambac no violaba la paralización automática [Caso Núm. 17-bk-3282; ECF Núm. 12964]. El 27 de mayo de 2020, la Junta de Supervisión presentó una contestación [Caso Núm. 17-bk-3567; ECF Núm. 822], y el 29 de mayo de 2020, la Junta de Supervisión presentó una moción informativa en relación con su contestación [Caso Núm. 17-bk-3567; ECF Núm. 824].

El 16 de junio de 2020, el Tribunal de Título III emitió una orden que concedió la moción de la Junta de Supervisión y ordenó a Ambac que retirara su demanda [Caso Núm. 17-bk-3567, ECF Núm. 845]. El Tribunal de Título III dictaminó que la demanda violaba la paralización automática, en concreto las Secciones 362(a)(1), (3), (4) y (6) del Código de Quiebras, porque, entre otras cosas, las demandas de Ambac (i) intentaban ejercer control sobre los derechos de propiedad de la ACT, y (ii) pretendían ejecutar un gravamen contra la propiedad de la ACT [Caso Núm. 17-bk-3567; ECF Núm. 845]. El 23 de junio de 2020, y en cumplimiento de la orden del Tribunal de Título III, Ambac presentó una notificación de retiro de su demanda [Caso Núm. 20-cv-01094; ECF Núm. 23]. El 20 de julio de 2020, el juez Delgado-Hernández emitió una orden de texto en la que se concedía la notificación de desistimiento con derecho a nueva acción de Ambac, y dictaba una sentencia que cerraba el caso [Caso Núm. 20-cv-01094; ECF Núm. 24, 25].

El 30 de junio de 2020, Ambac presentó una notificación de apelación en cuanto a la orden que ordenaba a Ambac retirar su demanda [Caso Núm. 17-bk-3567; ECF Núm. 850]. El 30 de

julio de 2020, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 20-1657. El 19 de octubre de 2020, Ambac presentó su escrito inicial, argumentando que el Tribunal de Título III se había equivocado al considerar que su demanda violaba la paralización automática. El 18 de diciembre de 2020, la Junta de Supervisión presentó su escrito de contestación en la apelación, reafirmando sus argumentos de que la demanda de Ambac violaba múltiples aspectos de la paralización automática conforme a la Sección 362 del Código de Quiebras. Entre otros puntos, la Junta de Supervisión argumentó que Ambac intentó ejercer control sobre la propiedad de la ACT y trató de ejecutar un gravamen contra la propiedad de la ACT. Además, el 18 de diciembre de 2020, Metropistas presentó una acumulación al escrito de contestación de la Junta de Supervisión. El 12 de febrero de 2021, Ambac presentó su escrito de contestación. La apelación se presentó en el Primer Circuito el 8 de marzo de 2021.

El 2 de agosto de 2021, las partes presentaron una moción conjunta para paralizar el recurso en espera del perfeccionamiento de ciertas transacciones contempladas por un acuerdo de transacción celebrado entre Ambac y la Junta de Supervisión en relación con el Plan propuesto del ELA. Las partes solicitaron al Primer Circuito que paralizara el procedimiento y mantuviera el recurso en suspenso hasta que se produjeran las transacciones previstas, y propusieron presentar un informe conjunto sobre la situación si dichas transacciones no se perfeccionaban antes del 15 de enero de 2022. El 4 de agosto de 2021, el Primer Circuito concedió la moción conjunta, paralizó la apelación a la espera de un posible acuerdo y ordenó a las partes que presentaran un informe sobre la situación el 24 de enero de 2022 o antes, informando al tribunal sobre el estado del asunto. El 24 de enero de 2022, las partes presentaron un informe conjunto sobre la situación en el que informaban al Primer Circuito que (i) el Tribunal de Título III había dictado la Orden de Confirmación del Plan Conjunto el 18 de enero de 2022, y (ii) en virtud de ciertos acuerdos con las partes interesadas de la ACT, la Junta de Supervisión había indicado que se esforzaría por presentar un plan de ajuste para la ACT antes del 31 de enero de 2022, o tan pronto como fuera posible en adelante. Las partes también informaron al Primer Circuito que, si las transacciones restantes contempladas por el acuerdo de transacción no se han consumado para el 1 de mayo de 2022, las partes presentarán un informe de situación para el 15 de mayo de 2022, informando al Primer Circuito del estado del acuerdo y si solicitan una paralización adicional del procedimiento. El 25 de enero de 2022, el Primer Circuito concedió la moción conjunta, paralizó la apelación a la espera de un posible acuerdo y ordenó a las partes que presentaran un informe sobre la situación el 16 de mayo de 2022 o antes, informando al tribunal sobre el estado del asunto.

**(k)** *Ambac Assurance Corp. c. la Autoridad de Carreteras y Transportación de Puerto Rico***, Caso Núm. 16-cv-01893**

El 10 de mayo de 2016, Ambac, como aseguradora de ciertos bonos emitidos por la ACT, presentó una demanda contra la ACT ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La demanda alegaba que la ACT había incumplido sus deberes fiduciarios y contractuales al vender una parte de sus activos cuando, en virtud de la legislación de Puerto Rico, no tenía ningún control sobre el uso de los ingresos de la venta [Caso Núm.16-cv-01893, ECF Núm.1]. La demanda pedía que la incorporación a prueba de los registros financieros de la ACT, que se nombrara un síndico provisional sobre la ACT y un interdicto permanente que prohibiera a la ACT incumplir sus obligaciones fiduciarias o contractuales con los tenedores de bonos de la ACT asegurados por Ambac [Caso Núm. 16-cv-01893, ECF Núm. 1]. El 16 de mayo de 2017, Ambac presentó una demanda enmendada verificada en la que añadía al Banco de

Desarrollo Económico para Puerto Rico ("BDE") como demandado y solicitaba un interdicto preliminar que prohibiera a BDE transferir cualquier producto de la venta que estuviera a nombre de la ACT a cualquier entidad que no fuera la ACT [Caso Núm. 16-cv-01893, ECF Núm. 14]. El 25 de mayo de 2016, BDE presentó una respuesta a la demanda enmendada verificada [Caso Núm. 16-cv-01893, ECF Núm. 42].

El 25 de mayo de 2016, ACT presentó una moción de desestimación, alegando que Ambac carecía de legitimación, que no se había subrogado en los derechos de ningún tenedor de bonos de la ACT y que no había establecido la jurisdicción por diversidad [Caso Núm. 16-cv-01893, ECF Núm. 43]. El 6 de junio de 2016, Ambac presentó su oposición [Caso Núm.16-cv-01893, ECF Núm. 49]. El 14 de junio de 2016, el tribunal dictó una sentencia parcial que desestimaba con derecho a nueva acción las reclamaciones de Ambac contra el BDE, al sostener que el tribunal podía emitir órdenes que impidieran la disposición de dinero en poder del BDE y perteneciente a la ACT sin que el BDE fuera un demandado designado [Caso Núm. 16-cv-01893, ECF Núm. 54, 55].

El 1 de julio de 2016, la ACT presentó una notificación de paralización conforme a la paralización provisional impuesta por la Sección 405(b) de PROMESA [Caso Núm. 16-cv-01893, ECF Núm. 60]. El 23 de agosto de 2016, el Tribunal dictó una orden donde se paralizaba el caso [Caso Núm. 16-cv-01893, ECF Núm. 69]. El 23 de mayo de 2017, la Junta de Supervisión notificó al tribunal la presentación del Caso de Título III de la ACT y la aplicación de la paralización automática [Caso Núm. 16-cv-01893, ECF Núm. 90]. El 24 de mayo de 2017, el tribunal ordenó que el caso permaneciera paralizado hasta nueva orden judicial. [Caso Núm. 16-cv-01893, ECF Núm. 91].

**(l)** ***Peaje Investments, LLC c. Garcia-Padilla, y otros.*, Caso Núm. 16-cv-02365; Caso Núm. 16-2377 (1er Cir.)**

El 18 de julio de 2016, Peaje, alegando ser el propietario beneficiario de más de $64 millones de dólares en bonos de 1968 emitidos por la ACT y supuestamente garantizados por un gravamen sobre ciertos ingresos de peaje, presentó una moción ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico para el levantamiento de la paralización provisional impuesta automáticamente por la Sección 405 de PROMESA. La moción solicitaba el levantamiento de la paralización para presentar una acción de impugnación de lo que Peaje afirmaba que era la desviación ilegal de los ingresos de los peajes que Peaje alegaba que eran la garantía de sus bonos de la ACT, y solicitaba daños y perjuicios por la supuesta expropiación de los ingresos de los peajes de acuerdo con la Sección 407 de PROMESA [Caso Núm. 16-cv-02365, ECF Núm. 1]. El 4 de agosto de 2016, los demandados Alejandro García Padilla, Juan C. Zaragoza Gómez y Luis G. Cruz Batista (demandados en sus capacidades oficiales) presentaron una oposición a la moción [Caso Núm. 16-cv-02365, ECF Núm. 30]. El 12 de agosto de 2016, Peaje contestó a la oposición de los demandados [Caso Núm.16-cv-02365, ECF Núm. 36].

El 28 de octubre de 2016, la Junta de Supervisión presentó una moción de intervención para exponer su posición con respecto a la moción pendiente de Peaje de levantamiento de la paralización automática [Caso Núm. 16-cv-02365, ECF Núm. 67]. El 1 de noviembre de 2016, el tribunal denegó la moción de la Junta de Supervisión con derecho a nueva acción [Caso Núm. 16-cv-02365, ECF Núm. 70]. El 2 de noviembre de 2016, el tribunal denegó la petición de Peaje de

levantar la paralización. [Caso Núm. 16-cv-02365, ECF Núm. 74]. El 16 de noviembre de 2016, Peaje apeló la decisión ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, la cual fue registrada como Caso Núm. 16-2377. El 12 de enero de 2017, el Primer Circuito confirmó la denegación de la moción de Peaje y dictó su mandato. El 18 de enero de 2017, el tribunal desestimó el caso con derecho a nueva acción [Caso Núm. 16-cv-02365, ECF 86, 87].

> **(m)**    ***Assured Guaranty Corp. c. la Autoridad de Carreteras y Transportación de Puerto Rico*, Caso Núm. 16-cv-02384**

El 21 de julio de 2016, Assured presentó una moción de emergencia de levantamiento de la paralización provisional conforme a la Sección 405 de PROMESA [Caso Núm. 16-cv-02384, ECF Núm. 1]. La moción alegaba (i) que los bonos asegurados por Assured emitidos por la ACT de acuerdo con las Resoluciones de 1968 y 1998 estaban garantizados por ciertos ingresos de peaje y otros fondos; (ii) que los ingresos de peaje se desviaron indebidamente y no se utilizaron para pagar la amortización de la deuda; y (iii) que el levantamiento de la paralización era necesaria para exigir que los ingresos de los peajes se utilizaran para pagar amortización de la deuda [Caso Núm. 16-cv-02384, ECF Núm. 1].

El 17 de agosto de 2016, el ELA y algunos demandados individuales que actuaban en sus capacidades oficiales ("Demandados") presentaron una oposición a la moción de emergencia de Assured [Caso Núm. 16-cv-02384, ECF Núm. 22]. Asimismo, el 17 de agosto de 2016, los Demandados BGF y el Honorable Alberto Bacó Bagué presentaron una moción para sumarse a la oposición [Caso Núm. 16-cv-02384, ECF Núm. 24]. El 18 de agosto de 2016, el tribunal concedió la petición de acumulación [Caso Núm. 16-cv-02384, ECF Núm. 26]. El 30 de agosto de 2016, Assured contestó a la oposición [Caso Núm.16-cv-02384, ECF Núm. 30].

El 28 de octubre de 2016, la Junta de Supervisión presentó una moción para intervenir en la moción de reparación por paralización pendiente [Caso Núm. 16-cv-02384, ECF Núm. 51]. El 1 de noviembre de 2016, el tribunal denegó la moción de la Junta de Supervisión con derecho a nueva acción [Caso Núm. 16-cv-02384, ECF Núm. 55]. El 2 de noviembre de 2016, el tribunal denegó la moción de Assured de levantar la paralización [Caso Núm. 16-cv-02384, ECF Núm. 59]. El 18 de enero de 2017, el caso fue desestimado con derecho a nueva acción [Caso Núm. 16-cv-02384, ECF 68, 69].

> **(n)**    ***Peaje Investments, LLC Corp. c. la Autoridad de Carreteras y Transportación de Puerto Rico*, Caso Núm. 17-cv-01612**

El 9 de mayo de 2017, después de la expiración de la paralización automática provisional impuesta por la Sección 405 de PROMESA comentada anteriormente en *Peaje Investments, LLC c. Garcia-Padilla, y otros* [Caso Núm. 16-cv-02365], *véase* la Sección II.F.1(l), Peaje presentó una demanda verificada contra ACT para obtener remedio declaratorio e interdictal en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico [Caso Núm. 17-cv-01612, ECF Núm. 1]. La demanda alegaba que Peaje es el propietario beneficiario de más de $64 millones en bonos de 1968 emitidos por la ACT y garantizados por un gravamen sobre determinados ingresos de peaje. La demanda alegaba además que, como resultado de la supuesta desviación por parte de la ACT de los ingresos de peaje y otros fondos pignorados, el dinero que quedaba en una cuenta colateral para el pago de la amortización de la deuda de los bonos de la ACT de 1968 era

insuficiente para realizar el pago completo del capital y los intereses que vencían en julio de 2017. Según la demanda, Peaje tenía un derecho legal de retención preferencial sobre los ingresos de peaje, y la supuesta desviación ilícita de los ingresos de peaje violaba la Cláusula sobre Expropiaciones y la Quinta Enmienda de la Constitución de Estados Unidos. Además, el 9 de mayo de 2017, Peaje presentó una moción para una orden de restricción temporal y un interdicto preliminar que exigía a ACT reanudar el depósito de los ingresos de peaje de acuerdo con la interpretación de Peaje de la Resolución de 1968 [Caso Núm. 17-cv-01612, ECF Núm. 6].

El 3 de mayo de 2017, la Junta de Supervisión presentó una petición bajo el Título III de PROMESA en nombre del ELA ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico [Caso Núm. 17-bk-3283]. El 21 de mayo de 2017, la Junta de Supervisión presentó una petición bajo el Título III de PROMESA en nombre de la ACT ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico [Caso Núm. 17-bk-3567].

El 22 de mayo de 2017, la Junta de Supervisión, como representante de la ACT, presentó una moción informativa ante el tribunal en relación con la presentación por parte del ELA y la ACT de las peticiones de Título III, la incorporación de las disposiciones de paralización automática de PROMESA § 301(a) que se aplican bajo el Código de Quiebras 48 U.S.C. § 2161(a), y la paralización automática de la acción de Peaje [Caso Núm. 17-cv-01612, ECF Núm. 15]. El 23 de mayo de 2017, el tribunal aceptó la moción de la Junta de Supervisión y paralizó la acción en su totalidad a la espera de una nueva orden judicial. [Caso Núm. 17-cv-01612, ECF Núm. 16].

## 2.    Las acciones de recuperación

El 24 de julio de 2019, el Tribunal de Título III emitió la Orden de Paralización,[142] que paralizó temporalmente ciertos procesos contenciosos y cuestiones controvertidas identificados en ella, incluyendo ciertos asuntos relacionados con los bonos de ingresos emitidos por ACT, AFI y ADCC. Como parte de la paralización, el Tribunal de Título III ordenó a las partes que ingresaran a un período de mediación obligatoria, entre otras cosas, para facilitar la preparación y presentación de las órdenes de programación de vistas propuesto con respecto a ciertos procesos contenciosos y cuestiones controvertidas relacionadas con esos bonos de ingresos. El ELA, la Junta de Supervisión y ciertos acreedores se reunieron en numerosas ocasiones con el Equipo de Mediación y redactaron y presentaron órdenes de planificación propuestas sobre ciertas cuestiones prioritarias, incluyendo cuestiones relacionadas con los bonos de ingresos. El 27 de noviembre de 2019, el Equipo de Mediación presentó un *Informe y Recomendaciones Provisionales* con órdenes provisionales propuestas, incluida una orden provisional propuesta para la planificación preliminar del litigio de cuestiones relacionadas con los bonos de ingresos [Caso Núm. 17-bk-3283, ECF Núm. 9365]. El 19 de diciembre de 2019, el Tribunal de Título III presentó una Orden Provisional de Manejo de Casos para Bonos de Ingresos [Caso Núm. 17-bk-3283, ECF Núm. 9620] (la "Orden de Gestión de Casos Provisoria para Bonos de Ingresos") y estableció el 10 de enero de 2020 como fecha límite para que el Equipo de Mediación presentara un Informe Enmendado (que posteriormente se prorrogó al 10 de febrero de 2010). La Orden de Gestión de Casos Provisoria para Bonos de Ingresos se enmendó el 31 de enero de 2020 [Caso Núm. 17-bk-3283, ECF Núm. 10595]. El 10 de marzo de 2020, el Tribunal de Título III emitió otra orden de gestión de caso [Caso Núm. 17-bk-3283, ECF Núm. 12186] (con las enmiendas posteriores, la "Orden de

---

[142] Véase la sección V.H.1. para obtener una descripción más detallada de la Orden de Paralización.

Programación para Bonos de Ingresos"), que, frente a la objeción de algunos acreedores, preveía la determinación de determinadas cuestiones mediante la presentación de mociones de sentencia sumaria parcial sobre determinadas reclamaciones. Todas las partes pudieron presentar dichas mociones.

La Orden de Gestión de Casos Provisoria para Bonos de Ingresos indicaba, entre otras cosas, la presentación y el litigio preliminar de cuatro demandas contenciosas relacionadas con la evidencia de reclamaciones presentada por ciertos acreedores de bonos de ingresos y aseguradoras monolínea contra el ELA y/o la ACT con respecto a los bonos emitidos por la ACT, la AFI y la ADCC. Cada uno de estos procedimientos relacionados con los bonos emitidos por la ACT se describe a continuación.

(a)   ***Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00005**

El 16 de enero de 2020, la Junta de Supervisión presentó una acción contra Ambac, Assured, National, FGIC (colectivamente, las "Aseguradoras Monolínea"), Peaje y BNYM en carácter de fideicomisario para los tenedores de bonos emitidos por la ACT (junto con las Aseguradoras Monolínea, los "Demandados de la ACT"), donde se impugnan las evidencias de reclamaciones presentadas contra el ELA y otras reclamaciones de gravámenes formuladas por los Demandados de la ACT como aseguradoras, y/o tenedores de ciertos bonos de la ACT  (la "Acción de Impugnación de Reclamaciones del ELA-ACT") [Proc. Cont. Núm. 20-00005 ECF Núm. 1][143]. Los Demandados de la ACT presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III del ELA donde se afirma, entre otras cosas, (i) que el ELA tiene responsabilidad legal por no asignar ni transferir determinados ingresos procedentes de los impuestos sobre la gasolina y los cigarrillos y los derechos de licencia de vehículos gravados y recaudados por el ELA que históricamente fueron asignados y transferidos condicionalmente a la ACT, (ii) violaciones a las Constituciones del ELA y de Estados Unidos, y (iii) diversas teorías de ley y contractuales para que sus evidencias de reclamación sean admisibles.

La Junta de Supervisión alegaba que los Bonos de la ACT eran bonos solo cubiertos por el valor de la garantía, y que el ELA no tiene responsabilidad alguna con respecto a los Bonos de la ACT dado que no es ni emisor ni garante de los Bonos de la ACT conforme a la Ley Orgánica de la ACT y los documentos que rigen los Bonos de la ACT. La Acción de Impugnación de Reclamaciones del ELA-ACT solicitaba la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de la ACT relacionadas con los Bonos de la ACT y del ELA al sostener que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de la ACT exceptuando las de BNYM eran duplicativas de las evidencias de reclamaciones globales presentadas por BNYM, como agente fiscal, (ii) los Demandados de la ACT carecían de legitimidad para formular una reclamación en relación con los Bonos, (iii) los

---

[143] El Plan del ELA y la Orden de Confirmación del ELA se refieren colectivamente a la Acción de Impugnación de Reclamaciones del ELA-ACT y a los otros tres litigios de bonos de ingresos—(a) *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corporation, y otros*, Proc. Cont. Núm. 20-00003-LTS, (b) *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*., Proc. Cont. Núm. 20-00004-LTS, y (c) *Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00007-LTS —como las "*Acciones de Recuperación*" ("clawback").

supuestos derechos de garantía de los Demandados de la ACT se limitaban a aquellos fondos recibidos por la ACT y depositados en cuentas de depósito especificadas mantenidas por el agente fiscal, (iv) los Demandados de la ACT carecían de derechos de subrogación, reembolso o contribución, (v) la retención de los ingresos de la ACT anterior a PROMESA por parte del ELA estaba permitida por la ley del ELA, la Ley Orgánica de la ACT y los documentos que rigen los Bonos de la ACT, (vi) la retención de ingresos de la ACT por parte del ELA no constituía un incumplimiento de contrato ni extracontractual contra el ELA, (vii) PROMESA tenía prioridad sobre cualquier supuesta obligación del ELA para asignar y transferir fondos a la ACT, (viii) los Demandados de la ACT no tenían ninguna reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso o Expropiaciones de las Constituciones del ELA y de Estados Unidos, (ix) los Demandados de la ACT no tenían ningún derecho de cobro garantizado, reclamación prioritaria, derechos de garantía perfeccionados o reclamación posterior a la petición, (x) los Demandados de la ACT no tenían interés propietario sobre los ingresos de la ACT, y (xi) los Demandados de la ACT no tenían una reclamación admisible conforme a la Sección 407 de PROMESA.

El 11 de febrero de 2020, CANA presentó una moción para intervenir en la Acción de Impugnación de Reclamaciones del ELA-ACT [Proc. Cont. Núm. 20-00005, ECF Núm. 9]. El 18 de febrero de 2020, la Junta de Supervisión presentó su oposición limitada a la moción de CANA sobre la base de que la Junta de Supervisión: (i) no se oponía a que CANA intervenga con los mismos derechos de intervención limitada que CANA había aceptado (y que se le habían concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se oponía a que CANA intentara intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la Sección 1109, incluyendo el derecho a apelar las decisiones en este proceso contencioso y posiblemente bloquear la conciliación [Proc. Cont. Núm. 20-00005, ECF Núm. 16]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción de CANA [Proc. Cont. Núm. 20-00005, ECF Núm. 19]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00005, ECF Núm. 30]. El 2 de marzo de 2020, la juez Dein dictó una orden que concedía parcialmente la moción de intervención de CANA [Proc. Cont. Núm. 20-00005, ECF Núm. 37].

También el 11 de febrero de 2020, las Partes de la ARD presentaron una moción para intervenir en la Acción de Impugnación de Reclamaciones de ELA-ACT [Proc. Cont. Núm. 20-00005, ECF Núm. 11]. El 18 de febrero de 2020, la Junta de Supervisión presentó su contestación con una objeción a la moción de las Partes de la ARD [Proc. Cont. Núm. 20-00005, ECF Núm. 17]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción [Proc. Cont. Núm. 20-00005, ECF Núm. 18]. El 25 de febrero de 2020, las partes de la ARD presentaron una contestación en apoyo a su moción [Proc. Cont. Núm. 20-00005, ECF Núm. 26]. El 10 de marzo de 2020, la juez Dein dictó una orden que concedía parcialmente la moción de intervención [Proc. Cont. Núm. 20-00005, ECF Núm. 41]. El 27 de febrero de 2020, las Aseguradoras Monolínea y BNYM presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00005, ECF Núm. 34]. El 25 de febrero de 2020, la Junta de Supervisión y Peaje presentaron una moción conjunta para prorrogar la fecha límite para que Peaje contestara la demanda contenciosa [Proc. Cont. Núm. 20-00005, ECF Núm. 25]. El 26 de febrero de 2020, el Tribunal de Título III dictó una orden para conceder la moción [Proc. Cont. Núm. 20-00005, ECF Núm. 29]. El 19 de marzo de 2020, la Junta de Supervisión y Peaje presentaron una moción

conjunta para paralizar y prorrogar las fechas límite en relación con ciertas causas alegadas contra Peaje [Proc. Cont. Núm. 20-00005, ECF Núm. 45], y el Tribunal de Título III concedió la moción conjunta [Proc. Cont. Núm. 20-00005, ECF Núm. 46].

El 28 de abril de 2020, la Junta de Supervisión presentó una moción de sentencia sumaria parcial para rechazar ciertas reclamaciones descritas en su demanda [Proc. Cont. Núm. 20-00005, ECF Núm. 55]. En concreto, la Junta de Supervisión se pronunció sobre: (i) las Causas 5, 9, 10, 11, 15, 17, 18 y 22 presentadas contra Ambac; (ii) las Causas 28, 32, 33, 34, 38, 40, 41 y 45 presentadas contra Assured Guaranty Corporation; (iii) las Causas 51, 55, 56, 57, 61, 63, 64 y 68 presentadas contra Assured Guaranty Municipal Corporation; (iv) las Causas 74, 78, 79, 80, 84, 86, 87 y 91 presentadas contra National; (v) las Causas 97, 101, 102, 103, 107, 109, 110 y 114 presentadas contra FGIC; y (vi) las Causas 162, 166, 167, 168, 172, 174, 175, 183, 187, 188, 189, 193, 195, 196 y 200 alegadas contra BNYM. Además, el 28 de abril de 2020, CANA presentó una acumulación limitada a la moción de sentencia sumaria parcial de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 64]. El 16 de julio de 2020, las Aseguradoras Monolínea y las Partes de la ARD presentaron respuestas a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 94, 99]. Las Aseguradoras Monolínea también presentaron una declaración de Casey Servais, en la que se solicitaba la presentación de pruebas antes de que se resolviera la moción pendiente, de conformidad con Fed. R. Civ. P. 56(d) [Proc. Cont. Núm. 20-00005, ECF Núm. 97]. El 31 de agosto de 2020, la Junta de Supervisión presentó una respuesta en apoyo de su moción de sentencia sumaria parcial y una oposición a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria conforme a la Regla 56(d) [Proc. Cont. Núm. 20-00005, ECF Núm. 102, 103, 104, 105]. También el 31 de agosto de 2020, CANA presentó una acumulación a la moción de la Junta de Supervisión en apoyo de su moción para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 106]. El 13 de septiembre de 2020, las Partes de la ARD presentaron una tríplica en apoyo a su oposición a la moción de la Junta de Supervisión para una sentencia sumaria parcial [Proc. Cont. Núm. 20-00005, ECF Núm. 112]. También el 13 de septiembre de 2020, las Aseguradoras Monolínea presentaron una tríplica en apoyo a su oposición a la moción de sentencia sumaria parcial de la Junta de Supervisión y una contestación a la oposición de la Junta de Supervisión a la solicitud de las Aseguradoras Monolínea de paralizar o denegar la sentencia sumaria conforme a la Regla 56(d) [Proc. Cont. Núm. 20-00005, ECF Núm. 113, 114]. El 23 de septiembre de 2020 se celebró una vista sobre las mociones de sentencia sumaria.

El 20 de enero de 2021, el Tribunal de Título III emitió una *Orden sobre la presentación de pruebas en relación con las mociones del ELA de Puerto Rico, por y a través de la Junta de Administración y Supervisión Financiera, conforme a la Regla 7056 de la Ley de Quiebras, para obtener una sentencia sumaria parcial que rechace las reclamaciones* [Proc. Cont. Núm. 20-00005, ECF Núm. 129] (la "Orden de la Regla 56(d)"). La Orden de la Regla 56(d) autorizó la presentación de pruebas sobre algunos de los temas tratados en la declaración de la Regla 56(d) que los Demandados habían presentado el 26 de julio de 2020.

El Tribunal de Título III ordenó a las partes que se reunieran y deliberaran en relación con una propuesta de calendario y presentaran un informe de situación conjunto antes del 3 de febrero de 2021. De acuerdo con la Orden de la Regla 56(d), las partes se reunieron y deliberaron y presentaron un Informe de Situación Conjunto en el que exponían sus respectivas posturas respecto a la programación [Proc. Cont. Núm. 20-00005, ECF Núm. 132]. El 5 de febrero de 2021, el

Tribunal emitió su Orden de Fijación del Calendario de Presentación de Pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 133] (la "Orden de Calendario de Presentación de Pruebas"). Tras la admisión de la moción conjunta de las partes para modificar el calendario de presentación de pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 157], la Orden de Calendario de Presentación de Pruebas requiere que la presentación de pruebas autorizada en la Orden de la Regla 56(d) concluya antes del 19 de mayo de 2021, a menos que el Tribunal de Título III ordene lo contrario. La presentación de pruebas en virtud de la Orden de la Regla 56(d) comenzó el 8 de febrero de 2021 y se completó el 11 de junio de 2021, conforme a la Orden de la juez Dein [Proc. Cont. Núm. 20-00005, ECF Núm. 214].

El 2 de marzo de 2021, los Demandados de la ACT presentaron una moción de obligación de presentación de pruebas, en la que solicitaban una orden que ordenara a la Junta de Supervisión (1) ampliar el alcance de su búsqueda de documentos adicionales y (2) presentar cierta información relativa a las prácticas contables [Proc. Cont. Núm. 20-00005, ECF Núm. 136]. La moción de obligación de presentación de pruebas fue expuesta plenamente [Proc. Cont. Núm. 20-00005, ECF Núm. 141 y 144], y fue defendida el 17 de marzo de 2021. El 26 de marzo de 2021, la juez Dein dictó una orden que concedía parcialmente la moción [Proc. Cont. Núm. 20-00005, ECF Núm. 153]. El 23 de abril de 2021, la juez Dein emitió una orden para programar una sesión informativa sobre las próximas mociones de presentación de pruebas de las partes [Proc. Cont. Núm. 20-00005, ECF Núm. 179]. El 30 de abril de 2021, los Demandados de la ACT presentaron una moción para que se ordenase la presentación de pruebas, y la Junta de Supervisión y la AAFAF (las "Partes del Gobierno") plantearon una moción de orden de protección [Proc. Cont. Núm. 20-00005, ECF Núm. 185, 186]. El 3 de mayo de 2021, las Partes del Gobierno presentaron un escrito de oposición a la moción de obligación de presentación de pruebas de los Demandados del ACT [Proc. Cont. Núm. 20-00005, ECF Núm. 191]. Además, el 3 de mayo de 2021, los Demandados de la ACT presentaron una oposición a la moción de las Partes del Gobierno para una orden de protección [Proc. Cont. Núm. 20-00005, ECF Núm. 190]. El 6 de mayo de 2021, Assured y National presentaron una moción informativa comunicando al Tribunal de Título III que paralizaban su participación en las mociones de presentación de pruebas pendientes de las partes [Proc. Cont. Núm. 20-00005, ECF Núm. 193]. También el 6 de mayo de 2021, las Partes del Gobierno presentaron una respuesta en apoyo de su moción de orden de protección, y los Demandados de la ACT presentaron una respuesta en apoyo de su moción de ordenar la presentación de pruebas [Proc. Cont. Núm. 20-00005, ECF Núm. 194, 195]. El 19 de mayo de 2021, la juez Dein emitió una orden en la que denegaba la moción de los Demandados de la ACT de ordenar la presentación de pruebas y la moción de las Partes del Gobierno para una orden de protección [Proc. Cont. Núm. 20-00005, ECF Núm. 204].

El 6 de abril de 2021, la Junta de Supervisión presentó una moción de emisión de una orden que modifica la Orden de Gestión de Casos para Bonos de Ingresos para permitir a la Junta de Supervisión presentar mociones de sentencia sumaria parcial con respecto a determinadas causas [Proc Cont. Núm. 20-00005, ECF Núm. 154, 155]. El 13 de abril de 2021, Ambac, BNYM, U.S. Bank y los Acreedores del AAP de GO/AEP plantearon objeciones a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 158; Caso Núm. 17-bk-3283, ECF Núm. 16401]. También el 13 de abril de 2021, CANA presentó una respuesta en apoyo de la moción de la Junta de Supervisión, y una moción cruzada para la emisión de una orden que modifica la Orden de Gestión de Casos para Bonos de Ingresos para permitir a CANA plantear objeciones limitadas

para desestimar ciertas pruebas de la demanda [Proc. Cont. Núm. 20-00005, ECF Núm. 159]. El 14 de abril de 2021, FGIC presentó una objeción a la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 161]. El 19 de abril de 2021, Assured y National presentaron una reserva de derechos en relación con la moción de la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 169]. El 21 de abril de 2021, las Aseguradoras Monolínea y la Junta de Supervisión plantearon objeciones a la moción cruzada de CANA [Proc. Cont. Núm. 20-00005, ECF Núm. 173, 176, 177]. También el 21 de abril de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción y una respuesta a la objeción de los Acreedores del AAP de GO/AEP [Proc. Cont. Núm. 20-00005, ECF Núm. 174, 175]. El 24 de abril de 2021, CANA presentó una respuesta en apoyo de su moción cruzada [Proc. Cont. Núm. 20-00005, ECF Núm. 180]. El 5 de mayo de 2021, el Tribunal de Título III dictó una orden que rechaza la moción de la Junta de Supervisión y la moción cruzada de CANA [Proc. Cont. Núm. 20-00005, ECF Núm. 192].

El 11 de mayo de 2021, Assured, National y la Junta de Supervisión presentaron una moción conjunta para paralizar ciertas cuestiones relacionadas con los bonos emitidos por ACT, ADCC y AFI en espera de la confirmación de los planes de ajuste del ELA y ACT, incluyendo las Acciones de Impugnación de Reclamaciones de ELA-ACT. [Caso Núm. 17-bk-3283, ECF Núm. 16739]. El 18 de mayo de 2021, las Partes de la ARD presentaron una reserva de derechos en relación con la moción conjunta de Assured, National y la Junta de Supervisión para paralizar ciertas cuestiones relacionadas con los bonos emitidos por ACT, ADCC y AFI en espera de la confirmación de los planes de ajuste del ELA y ACT [Proc. Cont. Núm. 20-00005, ECF Núm. 202]. Además, el 18 de mayo de 2021, Ambac y FGIC presentaron una objeción a la moción conjunta de Assured, National y la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 203]. El 21 de mayo de 2020, Assured, National y la Junta de Supervisión presentaron una contestación en apoyo a su moción conjunta [Proc. Cont. Núm. 20-00005, ECF Núm. 205]. El 25 de mayo de 2021, el Tribunal de Título III emitió una orden que concedía la moción conjunta de Assured, National y la Junta de Supervisión [Proc. Cont. Núm. 20-00005, ECF Núm. 208]. El 2 de agosto de 2021, la Junta de Supervisión, Ambac, FGIC, BNYM y U.S. Bank presentaron una moción conjunta para paralizar ciertas cuestiones controvertidas y procesos contenciosos [Proc. Cont. Núm. 20-00005, ECF Núm. 224]. El 3 de agosto de 2021, el Tribunal de Título III dictó una orden que concede la moción conjunta de la Junta de Supervisión, Ambac, FGIC, BNYM y U.S. Bank [Proc. Cont. Núm. 20-00005, ECF Núm. 225].

El 12 de noviembre de 2021, las Partes de la ARD presentaron una notificación que retira, sin derecho a nueva acción, su moción de intervención, su oposición a la moción de la Junta de Supervisión para una sentencia sumaria parcial, y su tríplica en apoyo a su oposición a esta [Proc. Cont. Núm. 20-00005, ECF Núm. 228]. El 8 de diciembre de 2021, el Tribunal de Título III dictó una orden para conceder, sin derecho a nueva acción, la notificación de las Partes de la ARD [Proc. Cont. Núm. 20-00005, ECF Núm. 229].

El 18 de enero de 2022, el Tribunal de Título III emitió la Orden de Confirmación del ELA [Caso Núm. 17-bk-03283, ECF Núm. 19813]. El párrafo 8 de la Orden de Confirmación del ELA establece en parte que, en la Fecha de Entrada en Vigencia, incluyendo la Acción de Impugnación de Reclamaciones de ELA-ACT, serán desestimadas sin derecho a nueva acción. Como se explica con más detalle a continuación, el Proc. Cont. Núm. 20-00007 continúa pendiente.

(b)      ***Junta de* Supervisión *y* Administración *Financiera para Puerto Rico c. Ambac Assurance Corp. y otros*, Proc. Cont. Núm. 20-00007**

El 16 de enero de 2020, la Junta de Supervisión, actuando exclusivamente en carácter de representante de la ACT, y CANA[144] presentaron una acción contra Ambac, Assured, National, FGIC (colectivamente, las "Aseguradoras Monolínea"), Peaje y BNYM, como agente fiscal para bonos emitidos por la ACT (junto con las Aseguradoras Monolínea, los "Demandados de la ACT"), donde se impugnan las evidencias de reclamaciones presentadas contra la ACT y otras reclamaciones de gravámenes formuladas por los Demandados de la ACT como aseguradoras, fideicomisarios y/o tenedores de ciertos bonos emitidos por ACT [Proc. Cont. Núm. 20-00007, ECF Núm. 1] (la "Acción de Impugnación de Reclamaciones de la ACT"). Los Demandados de la ACT presentaron evidencias de reclamaciones (u otras supuestas reclamaciones de gravámenes) en el caso de Título III de la ACT donde se afirma, entre otras cosas, (i) que los Bonos de la ACT estaban garantizados por gravámenes establecidos por ley o por el derecho consuetudinario contra determinados bienes de la ACT, (ii) los Demandados de la ACT tenían participación de propiedad sobre determinados bienes de la ACT, (iii) los Demandados de la ACT tenían intereses de garantía perfeccionados con derecho de prelación de primera clase sobre los bienes de la ACT, más allá de los derechos de garantía (si los hubiera) concedidos en los documentos que rigen los Bonos de la ACT, (iv) incumplimientos de contrato y reclamaciones extracontractuales que surgen de la retención que hace el ELA de los ingresos procedentes de los impuestos sobre la gasolina y los cigarrillos y los derechos sobre licencia de vehículos gravados y recaudados por el ELA que históricamente fueron asignados y transferidos condicionalmente a la ACT, (v) violaciones a las Constituciones del ELA y de Estados Unidos, y (vi) sus participaciones de garantía seguían vinculadas a los ingresos que recibe la ACT luego de la petición.

La Acción de Impugnación de Reclamaciones de la ACT alega que las supuestas reclamaciones de Bonos de la ACT garantizados de los Demandados de la ACT se deben rechazar, excepto aquellos montos depositados y conservados en determinadas cuentas de depósito especificadas por el agente fiscal conforme a la Ley Orgánica de la ACT y los documentos que rigen los Bonos de la ACT. Además, la Acción de Impugnación de Reclamaciones de la ACT solicitaba la desestimación de todas las evidencias de reclamaciones (u otras reclamaciones de gravámenes) de los Demandados de la ACT relacionadas con los Bonos de la ACT debido a que, entre otras cosas, (i) las evidencias de reclamaciones de los Demandados de la ACT exceptuando las de BNYM eran duplicaciones de las evidencias de reclamaciones globales presentadas por BNYM, como agente fiscal, (ii) la Ley Orgánica de la ACT y los documentos que rigen los Bonos de la ACT no creaban gravámenes establecidos por ley o derecho consuetudinario, (iii) los Demandados de la ACT no tenían participación de propiedad sobre los ingresos de la ACT, (iv) los derechos de garantía frente a cualquier otro fondo no mantenido por el agente fiscal eran fondos no perfeccionados y evitables conforme a las Secciones 544 y 551 del Código de Quiebras, (v) los ingresos de la ACT no eran ingresos especiales como se define en la Sección 902(2) del Código de Quiebras, (vi) las reclamaciones por ingresos e intereses posteriores a la petición se deben rechazar conforme a las Secciones 502(b)(2) y 552 del Código de Quiebras, (vii) los Demandados

---

[144] CANA es co-demandante con respecto a ciertas reclamaciones formuladas en este proceso contencioso que son sustancialmente similares a las causas formuladas en los procesos contenciosos de impugnación de gravámenes de la ACT pendientes radicados el 20 de mayo de 2019 [Proc. Cont. Núm. 19-00362, 19-00363, 19-00364 y 19-00365], que se describen en más detalle en la sección V.F.3 de esta Declaración de Divulgación.

de la ACT no tenían una reclamación admisible en virtud de las Cláusulas sobre Contratos, Debido Proceso y Expropiaciones de las Constituciones del ELA y de Estados Unidos, (viii) los Demandados de la ACT no tenían una reclamación admisible en virtud de la Sección 407 de PROMESA, y (ix) los Demandados de la ACT no alegaban adecuadamente ninguna reclamación extracontractual contra ACT.

El 11 de febrero de 2020, el CANA presentó una moción para intervenir en esas causas en la Acción de Impugnación de Reclamaciones de la ACT en las que CANA no es codemandante [Proc. Cont. Núm. 20-00007, ECF Núm. 15]. El 18 de febrero de 2020, la Junta de Supervisión presentó su oposición limitada a la moción de CANA sobre la base de que la Junta de Supervisión: (i) no se oponía a que CANA intervenga con los mismos derechos de intervención limitada que CANA había aceptado (y que se le habían concedido) en el pasado, en al menos diez instancias anteriores a la intervención en virtud de 11 U.S.C. § 1109; y (ii) se oponía a que CANA intentara intervenir con mayores derechos que los que se conceden a CANA como coadyuvante en virtud de la Sección 1109, incluyendo el derecho a apelar las decisiones en este proceso contencioso y posiblemente bloquear la conciliación [Proc. Cont. Núm. 20-00007, ECF Núm. 20]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción de CANA [Proc. Cont. Núm. 20-00007, ECF Núm. 22]. El 26 de febrero de 2020, CANA presentó una contestación en apoyo a su moción de intervención [Proc. Cont. Núm. 20-00007, ECF Núm. 31]. El 2 de marzo de 2020, la juez Dein dictó una orden que concedía parcialmente la moción de intervención de CANA [Proc. Cont. Núm. 20-00007, ECF Núm. 39]. El 16 de marzo de 2020, CANA presentó una objeción limitada a la orden de la magistrada Dein [Proc. Cont. Núm. 20-00007, ECF Núm. 46]. El 17 de marzo de 2020, el Tribunal de Título III emitió una orden que dejaba en suspenso la objeción limitada de CANA [Proc. Cont. Núm. 20-00007, ECF Núm. 47].

También el 11 de febrero de 2020, las Partes de la ARD presentaron una moción para intervenir en la Acción de Impugnación de Reclamaciones de la ACT [Proc. Cont. Núm. 20-00007, ECF Núm. 14]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción [Proc. Cont. Núm. 20-00007, ECF Núm. 21]. El 18 de febrero de 2020, la Junta de Supervisión presentó su contestación con una objeción a la moción de las Partes de la ARD [Proc. Cont. Núm. 20-00007, ECF Núm. 23]. El 25 de febrero de 2020, las partes de la ARD presentaron una contestación en apoyo a su moción [Proc. Cont. Núm. 20-00007, ECF Núm. 28]. El 10 de marzo de 2020, la juez Dein dictó una orden que concedía parcialmente la moción de intervención [Proc. Cont. Núm. 20-00007, ECF Núm. 44]. También el 18 de febrero de 2020, las Aseguradoras Monolínea presentaron una oposición conjunta a la moción [Proc. Cont. Núm. 20-00007, ECF Núm. 21]. El 27 de febrero de 2020, las Aseguradoras Monolínea y BNYM presentaron una moción de desestimación conjunta [Proc. Cont. Núm. 20-00007, ECF Núm. 35]. Peaje presentó una acumulación a la moción [Proc. Cont. Núm. 20-00007, ECF Núm. 36]. El 28 de febrero de 2020, el Grupo Ad Hoc de Tenedores de Notas de FGIC presentó una moción de intervención [Proc. Cont. Núm. 20-00007, ECF Núm. 37]. El 7 de abril de 2020, ACT presentó una contestación a la moción de intervención del Grupo Ad Hoc de Tenedores de Notas de FGIC [Proc. Cont. Núm. 20-00007, ECF Núm. 49]. El 13 de abril de 2020, la juez Dein dictó una orden que denegaba con derecho a nueva acción la moción de intervención de las Partes de la ARD [Proc. Cont. Núm. 20-00007, ECF Núm. 50].

El 10 de marzo de 2020, el Tribunal de Título III emitió una Orden de Gestión de Casos modificada en relación con las reclamaciones de bonos de ingresos, que paralizó este proceso contencioso [Proc. Cont. Núm. 20-00007, ECF Núm. 43]. El 11 de mayo de 2021, Assured, National y la Junta de Supervisión presentaron una moción conjunta para paralizar ciertas cuestiones relacionadas con los bonos emitidos por ACT, ADCC y AFI en espera de la confirmación de los planes de ajuste del ELA y ACT incluyendo las reclamaciones de bonos de ingresos. [Caso Núm. 17-bk-3283, ECF Núm. 16739]. El 21 de mayo de 2020, Assured, National y la Junta de Supervisión presentaron contestaciones en apoyo la moción conjunta [Proc. Cont. Núm. 20-00007, ECF Núm. 67, 68]. El 25 de mayo de 2021, el Tribunal de Título III emitió una orden que concedía la moción conjunta de Assured, National y la Junta de Supervisión [Proc. Cont. Núm. 20-00007, ECF Núm. 69]. El 2 de agosto de 2021, la Junta de Supervisión, Ambac, FGIC, BNYM y U.S. Bank presentaron una moción conjunta para paralizar ciertas cuestiones controvertidas y procesos contenciosos [Proc. Cont. Núm. 20-00007, ECF Núm. 71]. El 3 de agosto de 2021, el Tribunal de Título III dictó una orden para conceder la moción conjunta [Proc. Cont. Núm. 20-00007, ECF Núm. 72].

El 14 de noviembre de 2021, las Partes de la ARD presentaron una notificación retirando, sin derecho a nueva acción, su moción de intervención, su oposición a la moción de la Junta de Supervisión para una sentencia sumaria parcial, y una tríplica en apoyo a su oposición a esta [Proc. Cont. Núm. 20-00007, ECF Núm. 75]. El 8 de diciembre de 2021, el Tribunal de Título III dictó una orden para conceder, sin derecho a nueva acción, la notificación de las Partes de la ARD [Proc. Cont. Núm. 20-00007, ECF Núm. 76].

El 18 de enero de 2022, el Tribunal de Título III emitió la Orden de Confirmación del ELA [Caso Núm. 17-bk-03283, ECF Núm. 19813]. El 14 de abril de 2022, la Junta de Supervisión presentó la *Notificación de la Junta de Supervisión y Administración Financiera para Puerto Rico sobre los asuntos resueltos en relación con el Octavo Plan Enmendado Modificado* [Caso Núm. 17-bk-03283, ECF Núm. 20562], en la que se notificaba al Tribunal y a todas las partes interesadas que, tras las discusiones informales, la Junta de Supervisión ha determinado que la Acción de Impugnación de Reclamaciones de la ACT no fue resuelta por el Plan del ELA y debe seguir pendiente.

### 3. Litigios de impugnación de gravámenes de la ACT, Proc. Cont. Núm. 19-00362 – 19-00365

El 20 de mayo de 2019, la Junta de Supervisión y CANA presentaron cuatro demandas [Proc. Cont. Núm. 19-00362, 19-00363, 19-00364 y 19-00365, ECF Núm. 1] (colectivamente, las "Impugnaciones de Gravámenes de la ACT") contra ciento cuarenta y ocho Demandados en las que se solicitaba que se declarara que los tenedores de bonos emitidos por ACT en virtud de determinadas resoluciones que autorizaban a ACT a emitir bonos no poseían derechos de garantía válidos y perfeccionados frente a ACT, excepto por los ingresos de peaje que habían sido tanto recibidos por la ACT como depositados en determinadas cuentas mantenidas en BNYM, actuando exclusivamente en carácter de agente fiscal de los tenedores de bonos emitidos por la ACT. Las impugnaciones de gravámenes de la ACT también buscan sentencias (i) que declaren que el interés de la ACT en su propiedad tiene derecho a la prioridad sobre cualquier interés que los tenedores de bonos de la ACT alegan poseer en cualquier propiedad más allá de los ingresos tanto recibidos por la ACT como depositados en el agente fiscal (si incluso hasta ese punto), (ii) que anulen

cualquier garantía prendaria que los tenedores de bonos de la ACT posean sobre dichos bienes en
virtud de las facultades de anulación del Código de Quiebras, (iii) que desestimen todas las
reclamaciones garantizadas presentadas contra la ACT por los tenedores de bonos que alegan
garantía prendaria sobre dichos bienes (iv) que determinen que PROMESA tiene prioridad sobre
cualquier derecho de la ACT o de los tenedores de bonos de la ACT tengan a recibir ciertos
impuestos o tasas históricamente asignados de forma condicional a la ACT, y (v) que declaren que
los derechos de garantía sobre los bienes de la ACT han dejado de estar vinculados a los ingresos
percibidos con posterioridad a la petición en virtud de la Sección 552(a).

El 21 de mayo de 2019, la Junta de Supervisión y CANA presentaron una moción conjunta
que peticionaba (i) prorrogar las fechas límite para notificar a los Demandados sobre estos procesos
contenciosos y (ii) paralizar los procesos contenciosos [Caso Núm. 17-bk-3567, ECF 567]. El 11
de junio de 2019, FGIC presentó una contestación, reconvenciones y reclamaciones de terceros en
las que se solicitaban remedio declaratorio e interdictal en relación con la validez de sus supuestos
gravámenes sobre determinados impuestos de la ACT [Proc. Cont. Núm. 19-00363, ECF Núm. 4].
El 13 de junio de 2019, el Tribunal de Título III concedió parcialmente la moción conjunta,
ampliando la fecha límite para notificar a los Demandados y paralizando el proceso contencioso
hasta el 1 de septiembre de 2019 [Caso Núm. 17-bk-3567, ECF Núm.567]. El 24 de julio de 2019,
el Tribunal de Título III, en virtud de la Orden de Paralización (que se describe con más detalle en
la Sección V.H.1.), paralizó las Impugnaciones de Gravámenes de la ACT hasta el 30 de
noviembre de 2019. El 10 de marzo de 2020, el Tribunal de Título III ordenó además que se
paralizaran las Impugnaciones de Gravámenes de la ACT hasta que se levantaran por otra orden
judicial o hasta la confirmación de un plan de ajuste para la ACT [Caso Núm. 17-bk-3283, ECF
Núm. 12189].

4. **Litigios varios**

(a) ***Western Surety Company, y otros c. la Autoridad de Carreteras y
Transportación de Puerto Rico*, Proc. Cont. Núm. 18-00065, Caso
Núm. 19-2026 (1er Cir.)**

El 30 de mayo de 2018, Western Surety y Continental Casualty ("Demandantes")
presentaron una acción contra la ACT y la Junta de Supervisión alegando que los Demandantes
emitieron bonos de garantía en relación con contratos de obras públicas de propiedad de la ACT y
que habían pagado reclamaciones de bonos en relación con esos proyectos [Proc. Cont. Núm. 18-
00065, ECF Núm. 1]. Los demandantes solicitaron una sentencia declaratoria de que los importes
de los contratos retenidos por la ACT en estos proyectos no eran propiedad del patrimonio de la
ACT en su caso de Título III, sino que eran propiedad de los Demandantes y debían ser pagados a
los Demandantes como resultado del derecho consuetudinario de subrogación de los Demandantes.
El 31 de mayo de 2018, el Tribunal de Título III emitió una orden que deriva el caso a la juez Dein
para manejo general previo al juicio [Proc. Cont. Núm. 18-00065, ECF Núm. 5]. Los Demandantes
presentaron una demanda enmendada el 10 de agosto de 2018 haciendo la misma reclamación
[Proc. Cont. Núm. 18-00065, ECF Núm. 12]. Los Demandados presentaron una moción de
desestimación el 14 de septiembre de 2018, argumentando que la solicitud de remedio declaratorio
de los Demandantes al margen de un plan de ajuste o de un procedimiento de objeción de
reclamaciones solo buscaba una opinión consultiva; y que la autoridad en la que se basaban los
Demandantes (citada en su demanda) para apoyar su teoría de la subrogación era inapropiada para

04/30/2022 3:29 PM" ""

los hechos de este caso [Proc. Cont. Núm. 18-00065, ECF Núm. 14]. Una vez que se presentaron los escritos, el 4 de junio de 2019, el Tribunal de Título III concedió las mociones de desestimación de los Demandados [Proc. Cont. Núm. 18-00065, ECF Núm. 21].

El 17 de junio de 2019, los Demandantes presentaron una moción de reconsideración de la orden del Tribunal de Título III que desestimaba el caso [Proc Cont. Núm. 18-00065, ECF Núm. 23], que fue denegada por el Tribunal de Título III [Proc. Cont. Núm. 18-00065, ECF Núm. 31].

El 31 de octubre de 2019, los Demandantes apelaron la denegación de reconsideración del Tribunal de Título III y la orden de concesión de la moción de desestimación ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, que registró la apelación como Caso Núm. 19-2026. El 3 de enero de 2020, los Apelantes presentaron su escrito inicial. El 13 de marzo de 2020, los Apelados presentaron sus escritos de contestación. El 29 de marzo de 2020, los Apelantes presentaron su escrito de contestación. Antes del argumento oral, el caso se resolvió, y el 20 de julio de 2020, las partes presentaron una estipulación para desestimar voluntariamente la apelación sin derecho a nueva acción, que el Primer Circuito concedió. El 21 de julio de 2020, el Primer Circuito emitió una sentencia por la que se desestimaba la apelación.

### (b) *Siemens Transportation Partnership Puerto Rico, S.E. c. la Autoridad de Carreteras y Transportación de Puerto Rico*, Proc. Cont. Núm. 18-00030

El 26 de marzo de 2018, Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens") presentó una demanda contra la ACT, la Junta de Supervisión, la AAFAF y el BGF [Proc. Cont. Núm. 18-00030, ECF Núm. 1]. En la demanda, Siemens alegó que, debido a un acuerdo alcanzado en 2010 entre Siemens y la ACT, Siemens tenía derecho a recibir los fondos depositados en una cuenta de plica tras la finalización de un proyecto de construcción que había acordado realizar en virtud del acuerdo. Siemens argumentó que había cumplido con todas sus obligaciones contractuales en virtud del acuerdo, por lo que ahora tenía derecho al pago de los fondos de la cuenta de plica. Debido a que los términos del mencionado acuerdo contenían una cláusula de confidencialidad, Siemens también presentó una moción para designar ciertas pruebas de su demanda como confidenciales [Proc. Cont. Núm. 18-00030, ECF Núm. 2]. El 28 de marzo de 2018, el Tribunal de Título III emitió una orden que deriva el caso a la juez Dein para manejo general previo al juicio [Proc. Cont. Núm. 18-00030, ECF Núm. 4]. El 29 de marzo de 2018, la juez Dein concedió la moción de Siemens para designar determinadas pruebas como confidenciales [Proc. Cont. Núm. 18-00030, ECF Núm. 6].

El 2 de mayo de 2018, Siemens presentó una moción para preservar los fondos que se mantienen en la cuenta de plica y para solicitar cualquier presentación de pruebas para las vistas que el Tribunal de Título III considere necesario [Proc. Cont. Núm. 18-00030, ECF Núm. 13]. El 16 de mayo de 2018, AAFAF y el BGF presentaron una objeción y la Junta de Supervisión presentó una respuesta separada a la moción de Siemens para preservar los fondos mantenidos en la cuenta de plica y la solicitud de presentación de pruebas en apoyo [Proc. Cont. Núm. 18-00030, ECF Núm. 17, 20]. La AAFAF, el BGF y la Junta de Supervisión argumentaron que Siemens no había formulado una reclamación que permitiera la concesión de una reparación, ya que Siemens pretendía el pago del BGF (un no deudor) a través del procedimiento de Título III. El 8 de junio de 2018, el Tribunal de Título III emitió una orden que deniega la moción de Siemens para

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

preservar los fondos mantenidos en la cuenta de plica [Proc. Cont. Núm. 18-00030, ECF Núm. 46].

El 29 de mayo de 2018, el BGF presentó una moción para desestimar la demanda, a la que se sumó la AAFAF [Proc. Cont. Núm. 18-00030, ECF Núm. 29, 31]. En su moción de desestimación, el BGF argumentó (i) que Siemens no había alegado que el BGF y ACT hubieran creado un acuerdo de cuenta de plica, y (ii) que el BGF tenía prohibido desembolsar los fondos depositados en el BGF durante el procedimiento de Título III, y que, por lo tanto, la solicitud de Siemens de desembolso de los fondos era prematura. El mismo día, la Junta de Supervisión presentó una moción de desestimación, argumentando que Siemens (i) no había presentado una reclamación contra la Junta de Supervisión o ACT, y (ii) los fondos no podían obtenerse del BGF durante el procedimiento de Título III [Proc. Cont. Núm. 18-00030, ECF Núm. 34].

El 18 de junio de 2018, Siemens presentó una respuesta general a las mociones de desestimación, argumentando (i) que había alegado hechos suficientes para establecer la existencia de una cuenta de plica, y (ii) que la cuenta de plica mantenida por el BGF era desembolsable y no estaba sujeta a las restricciones relacionadas con los procedimientos de Título III [Proc. Cont. Núm. 18-00030, ECF Núm. 49]. El 25 de junio de 2018, la Junta de Supervisión y el BGF presentaron mociones de autorización para presentar contestaciones en apoyo de sus mociones de desestimación [Proc. Cont. Núm. 18-00030, ECF Núm. 51, 52]. La AAFAF presentó una acumulación a la moción del BGF y una respuesta complementaria en apoyo de la moción de desestimación [Proc. Cont. Núm. 18-00030, ECF Núm. 54]. El 28 de junio de 2018, la juez Dein emitió órdenes en las que concedía a la Junta de Supervisión y al BGF las mociones de autorización para presentar respuestas [Proc. Cont. Núm. 18-00030, ECF Núm. 55, 56]. El mismo día, la Junta de Supervisión y el BGF presentaron sus respuestas [Proc. Cont. Núm. 18-00030, ECF Núm. 57, 58]. El 3 de julio de 2018, Siemens presentó una moción de autorización para presentar una tríplica a la respuesta del BGF, que la juez Dein concedió el 5 de julio de 2018 [Proc. Cont. Núm. 18-00030, ECF Núm. 60, 61]. El mismo día, Siemens presentó su tríplica [Proc. Cont. Núm. 18-00030, ECF Núm. 62]. El 23 de julio de 2018, las partes presentaron un informe de situación conjunto en relación con las disputas sobre la presentación de pruebas [Proc. Cont. Núm. 18-00030, ECF Núm. 66]. El 25 de julio de 2018, la juez Dein emitió una orden para que las cuestiones dentro de este procedimiento se resolvieran en relación con la propuesta de modificación calificatoria del Título VI del BGF de acuerdo con PROMESA [Proc. Cont. Núm. 18-00030, ECF Núm. 70]. La orden detallaba varios acuerdos en relación con el cronograma y la presentación de pruebas dentro del futuro procedimiento del Título VI, y paralizaba el procedimiento con derecho a nueva acción.

El 9 de noviembre de 2018, el Tribunal de Título III dictó otra orden en la que se proponía la desestimación del proceso contencioso sin derecho a nueva acción, sobre la base de la transacción de la objeción de Siemens a la Modificación Calificatoria del BGF, que también resolvía las cuestiones planteadas por este proceso contencioso. [Proc. Cont. Núm. 18-00030, ECF Núm. 74]. El 30 de noviembre de 2018, el Tribunal de Título III cerró el proceso contencioso [Proc. Cont. Núm. 18-00030, ECF Núm. 75].

 2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

5.     **Controversias sobre los poderes de la Junta de Supervisión**

(a)     *Rosselló Nevares c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, **Proc. Cont. Núm. 18-00080**

El 5 de julio de 2018, el entonces gobernador Rosselló y la AAFAF (en conjunto, el "Gobierno") presentaron una demanda [Proc. Cont. Núm. 18-00080, ECF Núm. 1] contra la Junta de Supervisión, cada miembro individual de la Junta de Supervisión y el director ejecutivo de la Junta de Supervisión, solicitando que se declare que (i)  la Junta de Supervisión carecía de autoridad para imponer iniciativas de políticas al gobierno del ELA a través de un plan fiscal y/o presupuesto, incluso el Plan Fiscal del ELA de junio de 2018 y el presupuesto del ELA para el FY2019, tal como ha sido certificado por la Junta de Supervisión el 29 de junio de 2018; (ii) los mandatos sustantivos de política contenidos en el Plan Fiscal del ELA de junio de 2018, que fueron rechazados por el Gobernador conforme a la Sección 205 de PROMESA son nulos; y (iii) los mandatos sustantivos de política contenidos en el presupuesto del FY2019 de la Junta de Supervisión exceden los poderes de la Junta de Supervisión y son nulos. Los Demandantes también solicitaron un interdicto que prohíbe a los Demandados implementar y hacer cumplir ciertas disposiciones incluidas en el Plan Fiscal del ELA de junio de 2018 que los Demandantes califican como recomendaciones.

El 12 de julio de 2018, la Junta de Supervisión presentó una moción para desestimar la demanda [Proc. Cont. Núm. 18-00080, ECF Núm. 17]. Se presentaron todos los escritos procesales para la moción de desestimación y, el 7 de agosto de 2018, el Tribunal de Título III dictó una orden que concedía y denegaba parcialmente la moción de desestimación [Proc. Cont. Núm. 18-00080, ECF Núm. 33]. El Tribunal de Título III concedió la moción para desestimar las reclamaciones del Gobierno con respecto a (i) la consolidación de las agencias y la reducción de compensaciones/congelamiento de contrataciones dado que no hay un caso o controversia propicio y (ii) reprogramación presupuestaria porque dicha reprogramación por parte del Gobierno sería incongruente con la declaración de PROMESA de que el presupuesto certificado por la Junta se encuentra plenamente vigente y, por lo tanto, tiene prioridad conforme a la Sección 4 de PROMESA. El Tribunal de Título III no desestimó las reclamaciones con respecto a las reducciones presupuestarias y medidas correctivas. En dicha sentencia, el Tribunal de Título III adoptó determinadas decisiones de fondo. Entre otras cosas, el Tribunal de Título III dictaminó que "[l]os poderes otorgados a la Junta de Supervisión por la Sección 205(b)(1)(K) de PROMESA permiten a la Junta de Supervisión establecer políticas vinculantes para el Estado Libre Asociado, a pesar del rechazo del Gobernador de las recomendaciones basadas en la Sección 205". *Nevares c. la Junta de Sup. y Admin. Financiera para Puerto Rico* (*En el caso Junta de Sup. y Admin. Financiera para P.R.*), 330 F. Sup. 3d 685, 700 (D.P.R. 2018), *conf y ratificado*, 945 F.3d 3 (1er Cir. 2019), *cert denegada,* 141 S. Ct. 241 (2020). El Tribunal de Título III también rechazó el argumento del Gobierno de que los fondos no utilizados de los presupuestos de años anteriores podrían gastarse fuera de los límites del presupuesto del año en curso, pese a la prohibición de la reprogramación no aprobada de la Sección 204(c). El Tribunal de Título III dictaminó que: "No se entiende la razón, y sería contrario a los mandatos de confiabilidad y transparencia de PROMESA, suponer que un presupuesto para un año fiscal podría ser diseñado para hacer algo menos que comprender todos los ingresos proyectados y los recursos financieros, y todos los gastos, para el año fiscal. Dado que un presupuesto certificado está plenamente vigente desde el primer día del período abarcado, los medios y las fuentes de gasto público no están necesariamente disponibles

si no se prevén en el presupuesto". *Id.* en 704. El 27 de agosto de 2018, el Tribunal de Título III emitió una opinión y una orden corregidas [Proc. Cont. Núm. 18-00080, ECF Núm. 40].

El 10 de septiembre de 2018, los demandantes presentaron una moción urgente que solicita la certificación del dictamen y la orden de apelación inmediata del Tribunal de Título III del 7 de agosto de 2018 en virtud de las Secciones 306(e)(3)-(4) de PROMESA [Proc. Cont. Núm. 18-00080, ECF Núm. 43]. El 9 de octubre de 2018, el Tribunal de Título III emitió una orden de memorando donde se certifican determinados aspectos del dictamen y la orden de apelación interlocutoria del 27 de agosto de 2018 [Proc. Cont. Núm. 18-00080, ECF Núm. 54]. La apelación se registró como Caso Núm. 18-8021. La Junta de Supervisión respondió a las reclamaciones restantes de la demanda el 2 de noviembre de 2018 [Proc. Cont. Núm. 18-00080, ECF Núm. 60].

El 20 de noviembre de 2018, el Primer Circuito dictó una sentencia, que concluye que la revisión de las cuestiones certificadas está justificada. La apelación fue registrada por el Primer Circuito el 28 de noviembre de 2018 como Caso Núm. 18-2154. Tras la presentación de información, se expuso el alegato oral el 24 de julio de 2019. El 18 de diciembre de 2019, el Primer Circuito confirmó la decisión del Tribunal de Distrito, confirmando que no hay ninguna disposición de la Sección 205 de PROMESA que "sugiera que, por el hecho de solicitar en primera instancia la conformidad del Gobernador en algún asunto, la Junta pierda de algún modo las facultades que tenga para actuar unilateralmente con respecto a la cuestión", y que la Junta de Supervisión tiene la facultad de adoptar "una recomendación rechazada si tuviera la facultad para adoptarla por sí misma". *Vázquez-Garced c. la Junta de Sup. y Admin. Financiera para Puerto Rico (En el caso Junta de Sup. y Admin. Fin. para Puerto Rico)*, 945 F.3d 3, 6-7 (1er Cir. 2019), *cert denegada,* 141 S. Ct. (2020). El Primer Circuito confirmó además la decisión del Tribunal de Título III sobre la reprogramación, señalando que "PROMESA prohíbe al Gobernador gastar fondos que no estén presupuestados independientemente de si la recomendación ha sido adoptada" e "independientemente de lo que digan las leyes territoriales". *Id.* en 8.

El Gobernador Vázquez Garced presentó una petición de certiorari el 15 de mayo de 2020, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 19-1305. El 20 de julio de 2020, la Junta de Supervisión presentó su oposición contra la petición del Gobernador. El 31 de julio de 2020, el Gobernador Vázquez Garced presentó una respuesta en apoyo de su petición. El 5 de octubre de 2020, la Corte Suprema emitió una orden denegando la petición.

El 25 de agosto de 2021, las partes presentaron una estipulación en la que desestimaban voluntariamente las reclamaciones restantes en el proceso contencioso a la luz de la decisión del Primer Circuito. [Proc. Cont. Núm. 18-00080, ECF Núm. 71]. El 26 de agosto de 2021, el Secretario del Tribunal dictó una sentencia y cerró el caso [Proc. Cont. Núm. 18-00080, ECF Núm. 72].

**(b)**      ***Rivera - Schatz y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros**, Proc. Cont. Núm. 18-00081*

El 9 de julio de 2018, los Demandantes, el Sr. Thomas Rivera-Schatz, en su carácter oficial de Presidente del Senado de Puerto Rico y en nombre del Senado de Puerto Rico, y el Sr. Carlos J. Méndez-Núñez en su carácter oficial de Presidente de la Cámara de Representantes de Puerto Rico y en nombre de la Cámara de Representantes (colectivamente, la "Legislatura"), presentaron

una demanda en la que solicitaba remedio declaratorio e interdictal contra la Junta de Supervisión y cada uno de sus miembros y su director ejecutivo únicamente su carácter oficial [Proc. Cont. Núm. 18-00081, ECF Núm. 1].

La Legislatura solicitó remedio declaratorio e interdictal, argumentando que la Junta de Supervisión "excedió sus poderes" al "tratar de forzar" a la Legislatura a aprobar un proyecto de ley que deroga retroactivamente la Ley 80 (la ley sobre despido injustificado de Puerto Rico) como condición para la aprobación del presupuesto del ELA aprobada por la Legislatura. La demanda también solicitó un interdicto que prohíba a los Demandados implementar el presupuesto 2019 de la Junta de Supervisión y que ordene a la Junta de Supervisión que certifique el presupuesto 2019 aprobado por la Legislatura el 30 de junio de 2018.

El 17 de julio de 2018, los Demandados presentaron una moción de desestimación de la demanda [Proc. Cont. Núm. 18-00081, ECF Núm. 27]. Luego de la finalización de la presentación de escritos y después de una vista el 25 de julio de 2018, el Tribunal de Título III emitió una orden que desestima la denuncia en su totalidad el 7 de agosto de 2018 [Proc. Cont. Núm. 18-00081, ECF Núm. 46]. El Tribunal de Título III sostuvo que carecía de jurisdicción para revisar las decisiones de certificación de la Junta de Supervisión, como se pedía en la demanda, ya que esa revisión estaba "directamente excluida por la Sección 106(e)". *Rivera-Schatz c. Fin. de Sup. y Admin. Financiera para Puerto Rico (En el caso Junta de Sup. y Admin. Financiera para P.R.)*, 327 F. Sup. 3d 364, 371 (D.P.R. 2018), *conf.*, 916 F.3d 98 (1er Cir. 2019). También confirmó que la Junta de Supervisión podía hacer uso de sus "facultades de manera de incentivar el asentimiento a los objetivos de política respaldados por la Junta". *Id.* en 373.

El 13 de agosto de 2018, los Demandantes presentaron una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 18-1777. El 22 de febrero de 2019, después de la presentación de escritos, el Primer Circuito confirmó la decisión del Tribunal de Título III, dictaminando, entre otras cosas, que "[e]n virtud de la disposición de prelación de PROMESA, la concesión de autoridad a la Junta en las Secciones 201 y 202 para aprobar los Planes y Presupuestos Fiscales 'prevalecerá sobre cualquier disposición general o específica de la ley territorial', incluso las disposiciones de la Constitución de Puerto Rico que son "incompatibles con [PROMESA]", y que "[c]uando la Junta certificó el Plan Fiscal y Presupuesto 2019 … [debidamente] ejerció la autoridad que se le había otorgado en virtud de PROMESA". *Méndez-Núñez c. la Junta de Sup. y Admin. Financiera para Puerto Rico (En el caso Junta de Sup. y Admin. Fin. para Puerto Rico)*, 916 F.3d 98, 116 (1er Cir. 2019). El 15 de marzo de 2019, el Primer Circuito dictó su mandato.

(c)     ***Municipio Autónomo de San Juan c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Caso núm. 19-cv-1474**

El 19 de mayo de 2019, el Municipio Autónomo de San Juan presentó una demanda contra la Junta de Supervisión en el Tribunal de Distrito para el Distrito de Puerto Rico donde se sostiene que (i) la designación de San Juan como una entidad cubierta para fines de supervisión en virtud de PROMESA por parte de la Junta de Supervisión no tiene base racional alguna, (ii) que PROMESA es inconstitucional dado que no proporciona límites suficientes a la facultad discrecional de la Junta de Supervisión y, por lo tanto, viola la doctrina de no delegación, y (iii)

que la designación no es válida porque los miembros de la Junta de Supervisión fueron designados infringiendo la Cláusula de Designaciones [Caso Núm. 19-cv-1474, ECF Núm. 1]. El 1 de julio de 2019, la Junta de Supervisión presentó una moción para transferir el caso al Tribunal de Título III [Caso Núm. 19-cv-1474, ECF Núm. 36], que el Tribunal de Distrito concedió después de la presentación de escritos [Caso Núm. 19-cv-1474, ECF Núm. 40]. El 9 de agosto de 2019, la Junta de Supervisión presentó una moción de desestimación, en la que se presentaron todos los escritos procesales [Caso Núm. 19-cv-1474, ECF Núm. 46, 51, 52]. El 5 de diciembre de 2019, el Tribunal de Título III emitió una orden que concede la moción para desestimar las causas I y II de la demanda y paralizando la causa III a la espera de la decisión de la Corte Suprema en el litigio de la Cláusula de Designaciones que se describe a continuación en la Sección V.F.1.a) [Caso Núm. 19-cv-1474, ECF Núm. 61].

El 18 de septiembre de 2020, San Juan presentó una moción para que se dicte sentencia desestimando la causa restante sin derecho a nueva acción [Caso Núm. 19-cv-1474, ECF Núm. 63]. El 21 de septiembre de 2020, el Tribunal de Título III emitió una sentencia que desestima la causa restante sin derecho a nueva acción y cerrando el caso [Caso Núm. 19-cv-1474, ECF Núm. 64].

El 25 de septiembre de 2020, San Juan presentó una notificación de apelación de la orden del Tribunal de Título III que concedía la moción de desestimación de los Demandados [Caso Núm. 19-cv-1474, ECF Núm. 65]. El 9 de octubre de 2020, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 20-1983. El 23 de noviembre de 2020, San Juan presentó su escrito inicial. El 22 de enero de 2021, la Junta de Supervisión presentó su escrito de contestación. El 27 de abril de 2021, San Juan presentó una moción de desestimación voluntaria de la apelación. El 29 de abril de 2021, el Primer Circuito dio a conocer su sentencia desestimando la apelación y su mandato.

> **(d)**     ***Junta de Supervisión y Administración Financiera para Puerto Rico c. el Sr. Vázquez Garced y otros*, Proc. Cont. Núm. 19-00393**

El 3 de julio de 2019, la Junta de Supervisión presentó una demanda contra el entonces Gobernador Rosselló y AAFAF (los "Demandados"), para impugnar la Ley 29-2019, que elimina la obligación de los municipios de reembolsar al ELA los pagos de pensiones a los jubilados municipales y de hacer pagos al plan de salud del ELA, así como 23 resoluciones conjuntas. Concretamente, la demanda alega: i) la Ley 29-2019, incluida su aprobación y aplicación, viola las Secciones 204(a), 204(c) y 207 de PROMESA; (ii) la Junta de Supervisión tiene derecho a un interdicto permanente que prohíba a los Demandados aplicar la Ley 29-2019; (iii) la Junta de Supervisión tiene derecho a un interdicto que obligue al Gobernador a presentar las certificaciones de la Sección 204(a) de PROMESA para la Ley 29-2019, las nuevas leyes y las resoluciones conjuntas no certificadas aún; (iv) la Ley 29-2019 y las resoluciones conjuntas violan la Sección 108(a) de PROMESA y no son ejecutables y no surten efecto porque menoscaban y/o frustran los propósitos de PROMESA, según lo determinado por la Junta de Supervisión; y (v) la supuesta política del Gobernador de no proporcionar las certificaciones requeridas en la Sección 204 de PROMESA viola la Sección 108(a) porque menoscaba y/o frustra los propósitos de PROMESA, según lo determinado por la Junta de Supervisión.

Los Demandados presentaron una moción de desestimación el 15 de julio de 2019 [Proc. Cont. Núm. 19-00393, ECF Núm. 17]. El 15 de agosto de 2019, después de la presentación de escritos para la moción de desestimación, el Tribunal de Título III escuchó los argumentos orales. El 22 de agosto de 2019, el Tribunal de Título III emitió un dictamen y una orden que deniega la moción de desestimación del Gobernador [Proc. Cont. Núm. 19-00393, ECF Núm. 66]. Los Demandados respondieron a la demanda el 10 de septiembre de 2019 [Proc. Cont. Núm. 19-00393, ECF Núm. 73].

El 13 de diciembre de 2019, la Junta de Supervisión presentó una moción de sentencia sumaria [Proc. Cont. Núm. 19-00393, ECF Núm. 77]. Luego de que se presentaran todos los escritos para la moción, se celebraron los argumentos orales ante el Tribunal de Título III el 5 de marzo de 2020. El 15 de abril de 2020, el Tribunal de Título III concedió la moción de la Junta de Supervisión de sentencia sumaria en cinco de los ocho cargos [Proc. Cont. Núm. 19-00393, ECF Núm. 107]. El Tribunal de Título III concedió la solicitud de la Junta de Supervisión de interdictos permanentes sobre la Ley 29 y las Resoluciones Conjuntas bajo las Secciones 204(c), 204(a) y 108(a)(2) de PROMESA, que sostienen que la Ley 29 y las Resoluciones Conjuntas efectúan reprogramaciones fuera del Plan Fiscal y el Presupuesto certificado sin la aprobación de la Junta de Supervisión, en violación de la Sección 204(c) de PROMESA, y no son ejecutables y no surten efecto. El Tribunal de Título III también sostuvo que los Demandados no cumplieron con los procedimientos requeridos por la Sección 204(a) de PROMESA con respecto a la nueva legislación y la estimación formal de los Demandados, que pretendía detallar el costo de la Ley 29, no cumplía los requisitos. El Tribunal de Título III sostuvo que la Ley 29 y las Resoluciones Conjuntas también son inválidas bajo la Sección 108(a)(2) de PROMESA, determinando que la determinación de la Junta de Supervisión de que las leyes frustran y/o perjudican los propósitos de PROMESA tiene derecho a deferencia bajo un estándar de revisión arbitrario y caprichoso. El Tribunal de Título III denegó la sentencia sumaria sobre la reclamación de la Junta de Supervisión de un interdicto permanente en cuanto a las otras leyes para las que los Demandados no habían presentado certificaciones de la Sección 204(a), basándose en la presentación de hechos por parte de los Demandados que demostraban que las certificaciones para la gran mayoría de estas leyes se habían presentado, después de la presentación de la demanda. El Tribunal de Título III también se negó a conceder una sentencia sumaria sobre la reclamación de la Junta de Supervisión de que el Gobernador tenía una política de incumplimiento de la Sección 204(a) de PROMESA, a la luz de los hechos controvertidos planteados por los Demandados con respecto a las razones del incumplimiento anterior y los esfuerzos del entonces Gobernador Vázquez Garced para mejorar el cumplimiento. Por último, el Tribunal de Título III se negó a abordar la moción de la Junta de Supervisión para la sentencia sumaria para su reclamación de la Sección 207 de PROMESA, determinando que la causa II es irrelevante porque la reparación solicitada en esa reclamación ya se concedió en las otras decisiones del Tribunal de Título III.

El 6 de mayo de 2020 y el 2 de junio de 2020, las partes presentaron mociones informativas en las que solicitaba una prórroga de la fecha de entrada en vigencia de la orden del Tribunal de Título III para permitir las negociaciones [Proc. Cont. Núm. 19-00393, ECF Núm. 109, 111]. El 17 de septiembre de 2021, el Tribunal de Título III ordenó a las partes que presentaran un informe de situación conjunto antes del 1 de octubre de 2021 informando al Tribunal de Título III del estado del litigio [Proc. Cont. Núm. 19-00393, ECF Núm. 115]. El 1 de octubre de 2021, las partes presentaron un informe de situación conjunto en el que informaban al Tribunal de Título III de que las partes estaban de acuerdo en que las reclamaciones restantes en el proceso contencioso podían

ser desestimadas y se dictaba sentencia sobre las reclamaciones sobre las que se había concedido la sentencia sumaria [Proc. Cont. Núm. 19-00393, ECF Núm. 116]. Asimismo, el 1 de octubre de 2021, las partes presentaron una estipulación por la que desestimaban voluntariamente el proceso contencioso [Proc. Cont. Núm. 19-00393, ECF Núm. 117]. El 13 de octubre de 2021, el Tribunal de Título III dictó una sentencia por la que se desestimaba el proceso contencioso y se cerraba el caso [Proc. Cont. Núm. 19-00393, ECF Núm. 119].

   (e)  ***La Liga de Ciudades de Puerto Rico c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 21-00026**

   El 14 de marzo de 2021, la Liga, una entidad sin fines de lucro que afirma tener como integrantes a alcaldes de los municipios de Puerto Rico, presentó una demanda contra la Junta de Supervisión, la AAFAF, CRIM, ASES y Luis M. Collazo Rodríguez, en su calidad de administrador del SRE (colectivamente, los "Demandados") [Proc. Cont. Núm. 21-00026, ECF Núm. 1]. La demanda alega que el CRIM, la ASES y el Sistema de Retiros están recaudando y reteniendo fondos de los municipios de Puerto Rico basándose en una interpretación incorrecta de una orden dictada por el Tribunal de Título III en una demanda anterior relativa a la Ley 29-2019 ("Ley 29") [Proc. Cont. Núm. 19-00393, ECF Núm. 1 (el "Litigio de la Ley 29"), *véase* la Sección V.F.5(d) de esta Declaración de Divulgación.

   El Litigio de la Ley 29 se inició el 3 de julio de 2019, cuando la Junta de Supervisión presentó una demanda contra el entonces gobernador Rosselló y la AAFAF, objetando la Ley 29, que eliminaba la obligación de los municipios de realizar aportaciones de atención sanitaria a la ASES y aportaciones de retiro a PayGo. [Proc. Cont. Núm. 19-00393, ECF Núm. 1]. Específicamente, la Junta de Supervisión sostuvo que la Ley 29 vulneraba las Secciones 108(a), 204(a), 204(c) y 207 de PROMESA, y solicitó un interdicto permanente. La Junta de Supervisión solicitó una sentencia sumaria, y el Tribunal de Título III aceptó la moción de sentencia sumaria de la Junta de Supervisión en cinco de las ocho causas en su Orden del 15 de abril de 2020 (la "Orden del 15 de abril"). [Proc. Cont. Núm. 19-00393, ECF Núm. 107]. El Tribunal de Título III admitió la petición de la Junta de Supervisión de un interdicto permanente contra la aplicación de la Ley 29 de conformidad con las Secciones 204(c), 204(a) y 108(a)(2) de PROMESA, declarando la Ley 29 "inejecutable y sin efecto". La Orden del 15 de abril entró en vigencia el 6 de mayo de 2020. Para obtener más detalles sobre el Litigio de la Ley 29, *véase* la Sección V.F.5.(d).

   Tras la entrada en vigencia de la Orden del 15 de abril, el CRIM retuvo fondos que, de otro modo, tendría que haber desembolsado a los municipios con el objeto de pagar a ASES y a SRE las aportaciones sanitarias y jubilatorias que, de no ser por la Ley 29, tendrían que haberse realizado durante el período anterior a la fecha de entrada en vigencia de la Orden del 15 de abril. La Liga sostiene que dichas deudas son "inexistentes", dado que la Orden del 15 de abril no es aplicable retroactivamente. En consecuencia, la Liga solicita (i) una sentencia declaratoria "que decrete que las deudas reclamadas por CRIM, ASES y [SRE]... son "inexistentes". y que las retenciones practicadas por el CRIM para pretendidamente compensar dichas deudas inexistentes son "ilegales", (ii) un interdicto "que prohíba a los Demandados recaudar a los municipios cualquiera de las sumas que la Ley 29 los eximía" de pagar antes de la fecha de entrada en vigencia de la Orden del 15 de abril, (iii) una orden que exige al CRIM el desembolso inmediato de cualquier fondo retenido para pagar las deudas relacionadas con la Ley 29, y (iv) una orden que

exige a SRE y ASES la devolución al CRIM de "todas y cada una de las sumas" percibidas para pagar las presuntas deudas.

El 14 de mayo de 2021, la Junta de Supervisión, el CRIM, y la AAFAF, ASES y el administrador del SRE, presentaron mociones de desestimación [Proc. Cont. Núm. 21-00026, ECF Núm. 14-15, 18]. El 18 de junio de 2021, La Liga presentó oposiciones a las mociones de desestimación de la Junta de Supervisión, CRIM y la AAFAF, ASES y el Administrador del SRE [Proc. Cont. Núm. 21-00026, ECF Núm. 22-23, 24]. El 14 de julio de 2021, la Junta de Supervisión, el CRIM, y la AAFAF, ASES y el Administrador del SRE, presentaron respuestas en respaldo de sus mociones de desestimación [Proc. Cont. Núm. 21-00026, ECF Núm. 27-28, 30].

El 4 de enero de 2022, el Tribunal de Título III concedió las mociones de desestimación de la Junta de Supervisión, CRIM y la AAFAF, ASES y el Administrador del SRE [Proc. Cont. Núm. 21-00026, ECF Núm. 40]. El Tribunal de Título III sostuvo que La Liga carecía de legitimación para presentar reclamaciones contra AAFAF, ASES y el Administrador del SRE en virtud de la regla 12(b)(1) de las Reglas Federales de Procedimiento Civil, porque La Liga no podía alegar de manera plausible que su perjuicio fuera atribuible a ellos o que cualquier reparación concedida contra ellos pudiera reparar el supuesto perjuicio de La Liga. El Tribunal de Título III también concedió las mociones de desestimación de la Junta de Supervisión y del CRIM, al sostener que las afirmaciones de La Liga se basaban en una interpretación errónea de la Orden del 15 de abril "de manera fatal para la Demanda" porque la Orden del 15 de abril anuló la Ley 29 *ab initio* y, por lo tanto, la Ley 29 "nunca fue efectiva para excusar las obligaciones de los municipios de pagar las contribuciones de pensiones y beneficios". El 4 de enero de 2022, el Tribunal de Título III dictó sentencia y cerró el proceso contencioso [Proc. Cont. Núm. 21-00026, ECF Núm. 41]. El 18 de enero de 2022, La Liga presentó una notificación de apelación de la orden y la sentencia del Tribunal de Título III que concedía las mociones de desestimación de los demandados [Proc. Cont. Núm. 21-00026, ECF Núm. 42].

El 4 de febrero de 2022, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 22-1062. El escrito inicial de la Liga está previsto para el 12 de mayo de 2022.

## (f) *Hernandez-Montanez c. Pierlusi*, Proc. Cont. Núm. 21-00042

El 21 de abril de 2021, el presidente de la Cámara de Representantes de Puerto Rico, actuando en nombre de la Cámara de Representantes, presentó una demanda contra el Gobernador, la AAFAF, el Presidente de la Comisión Electoral del Estado de Puerto Rico y el Secretario del Departamento de Hacienda de Puerto Rico (los "Demandados del Poder Ejecutivo") y la Junta de Supervisión (junto con los Demandados del Poder Ejecutivo, los "Demandados"), solicitando un interdicto declaratorio y remedio interdictal que prohibiera a los Demandados distribuir ciertos fondos relacionados con las elecciones [Proc. Cont. Núm. 21-00042, ECF Núm. 1].

Este caso se deriva de una disputa relativa a la Ley 167 de 2020, que convocó a una Elección Especial el 16 de mayo de 2021, con el objeto de seleccionar a una delegación de seis miembros que sería enviada a Washington, D.C. para impulsar la admisión de Puerto Rico como estado. Dado que el presupuesto certificado de Puerto Rico para el año fiscal 2020-2021 no asignaba fondos para dicha Elección Especial, el Gobernador solicitó autorización a la Junta de

Supervisión para reprogramar fondos. La Junta de Supervisión informó al Gobernador que, en atención a las singulares circunstancias del caso, la solicitud de reprogramación debía enviarse tanto a la Junta de Supervisión como a la Legislatura. En consecuencia, el Gobernador solicitó una enmienda presupuestaria para asignar fondos a la Elección Especial y presentó una propuesta de enmienda presupuestaria a la Junta de Supervisión de conformidad con la Sección 202 de la Ley PROMESA. La Junta de Supervisión determinó que la propuesta de enmienda presupuestaria del Gobernador constituía un presupuesto conforme, tal como lo exige la Sección 202(c)(1) de PROMESA, y lo envió a la Legislatura. Seguidamente, la Legislatura comunicó a la Junta de Supervisión que una propuesta de ley idéntica a la propuesta de enmienda presupuestaria de Gobernador había sido rechazada durante una vista pública de consideración final, y que no cumpliría con el proceso de enmienda presupuestaria. En consecuencia, la Junta de Supervisión emitió una resolución manifestando, entre otras cosas, que (i) el Gobernador y la Legislatura se encontraban en un punto muerto en cuanto a la asignación de fondos para cubrir los gastos de la Elección Especial (ii) la Sección 402 de PROMESA impedía a la Junta de Supervisión adoptar una interpretación de PROMESA susceptible de restringir la determinación de su estatus político de Puerto Rico; (iii) la Junta de Supervisión deseaba permitir al gobierno del ELA adoptar o no adoptar la propuesta de enmienda presupuestaria del mismo modo en que ocurriría de no existir PROMESA; y (iv) por consiguiente, el presupuesto original del ELA se mantendría en vigencia sin revisión alguna. Posteriormente, la AAFAF informó a la Junta de Supervisión que el Gobernador autorizaba el desembolso de fondos para financiar la Elección Especial.

Los Demandantes peticionaron órdenes que declarasen que las disposiciones presupuestarias de PROMESA se aplicaban a todos los gastos presupuestarios, incluyendo los relacionados con los fondos relacionados con las elecciones objetadas, y que la Sección 402 no eximía a la propuesta de reasignación de fondos de las cláusulas presupuestarias de PROMESA. Además, los Demandantes solicitaron una orden que prohibía al Gobernador y al Secretario de Hacienda supuestamente malversar y distribuir los citados fondos.

El 22 de abril de 2021, el Demandante presentó una moción para solicitar una orden de restricción temporal o un interdicto preliminar que prohíbe a los Demandados distribuir los fondos relacionados con ciertas elecciones hasta la resolución de la demanda [Proc. Cont. Núm. 21-00042, ECF Núm. 3]. El 24 de abril de 2021, el Demandante presentó una propuesta de orden de interdicto preliminar [Proc. Cont. Núm. 21-00042, ECF Núm. 6]. El 27 de abril de 2021, los Demandados presentaron escritos de oposición a la moción del Demandante [Proc. Cont. Núm. 21-00042, ECF Núm. 12, 16], y tanto el Nuevo Partido Progresista como el Comisionado Electoral presentaron una moción de intervención [Proc. Cont. Núm. 21-00042, ECF Núm. 22]. El 27 de abril de 2021, el Tribunal de Título III expidió una orden que denegó la moción de intervención [Proc. Cont. Núm. 21-00042, ECF Núm. 23]. El 28 de abril de 2021, el Demandante presentó una respuesta general en apoyo de su moción [Proc. Cont. Núm. 21-00042, ECF Núm. 26]. El 29 de abril de 2021, el Tribunal de Título III dictó una orden que rechazó la moción del Demandante de obtener una orden de restricción temporal o un interdicto preliminar [Proc. Cont. Núm. 21-00042, ECF Núm. 32].

El 4 de junio de 2021, los Demandados del Poder Ejecutivo y la Junta de Supervisión presentaron mociones para desestimar la demanda del Demandante [Proc. Cont. Núm. 21-00042, ECF Núm. 47, 49]. Después de que el Demandante solicitara varias prórrogas de su fecha límite para oponerse a las mociones de desestimación, finalmente no respondió a ellas. En consecuencia,

la Junta de Supervisión y los Demandados del Poder Ejecutivo presentaron sendos certificados de no objeción en los que solicitaban al Tribunal de Título III que concediera las mociones de desestimación como sin oposición [Proc. Cont. Núm. 21-00042, ECF Núm. 60, 61]. El 27 de agosto de 2021, el Tribunal de Título III emitió una orden que concede las mociones de desestimación de los Demandados, sosteniendo que cualquier controversia sobre la validez de las acciones de los Demandados del Poder Ejecutivo o el papel de la Junta de Supervisión en el apoyo o el financiamiento de la elección especial era irrelevante porque la elección especial se había celebrado y los fondos designados se habían gastado [Proc. Cont. Núm. 21-00042, ECF Núm. 63]. El 27 de agosto de 2021, el Tribunal de Título III dictó sentencia y cerró el proceso contencioso [Proc. Cont. Núm. 21-00042, ECF Núm. 64].

(g)    ***Junta de Supervisión y Administración Financiera para Puerto Rico c. el Sr. Vázquez Garced y otros*, Proc. Cont. Núm. 20-00078**

El 8 de junio de 2020, la Junta de Supervisión presentó una demanda contra el Gobernador y la AAFAF en la que se solicitaban interdictos y una orden judicial en relación con el hecho de que el Gobernador y la AAFAF no presentaran a la Junta de Supervisión determinados documentos e información relativos a la adquisición y negociación de contratos por parte del Gobierno del ELA para la compra de equipos de testeo de COVID-19 y otros suministros médicos [Proc. Cont. Núm. 20-00078, ECF Núm. 1]. El 23 de junio de 2020, el Gobernador y la AAFAF presentaron una moción de desestimación, argumentando que el Tribunal de Título III carecía de jurisdicción sobre la reclamación, que la Junta de Supervisión carecía de legitimación, y que la demanda no exponía una reclamación de orden de desagravio [Proc. Cont. Núm. 20-00078, ECF Núm. 11]. El 24 de julio de 2020, la Junta de Supervisión presentó una notificación de desestimación voluntaria de la acción [Proc. Cont. Núm. 20-00078, ECF Núm. 18]. El 3 de agosto de 2020 se cerró el proceso contencioso.

(h)    ***El Hon. Vázquez Garced y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085; Caso Núm. 21-1071 (1er Cir.)**

El 12 de junio de 2020, el Gobernador y la AAFAF presentaron seis demandas contenciosas en las que se solicitaban sentencias declaratorias de que las Leyes 47, 82, 90, 138, 176 y 181 y las certificaciones relacionadas de acuerdo con la sección 204(a) de PROMESA satisfacen los requisitos de PROMESA. En resumen, la Ley 47 amplía el grupo de profesionales de la salud elegibles para beneficios fiscales en virtud del Código de Incentivos de Puerto Rico, reduciendo los ingresos sin ningún ahorro de costos que los compense. La Ley 82 establece una nueva oficina dentro del DSPR para regular adicionalmente varias entidades que contratan servicios de farmacias en Puerto Rico. La Ley 82 también impide que los Administradores de Beneficios de Farmacia controlen el costo de los medicamentos recetados. La Ley 138 obliga a las compañías de seguros de salud pública, como las organizaciones de cuidados dirigidos ("MCO"), a aceptar en sus redes a todos los proveedores médicos independientemente del precio. La Ley 138 también prohíbe a las organizaciones de seguros de salud, aseguradoras y otros planes médicos que incluyan en cualquier contrato o estipulación con un proveedor de atención médica el derecho a rescindir unilateralmente el contrato. La Ley 176 aumenta la tasa de acumulación de días de licencia por enfermedad y

vacaciones para los empleados públicos. La Ley 181 prevé un aumento salarial para los bomberos que asciende a casi $3 millones al año.

El 16 de julio de 2020, el Gobierno desestimó voluntariamente la demanda contenciosa relacionada con la Ley 90 [Proc. Cont. Núm. 20-00081, ECF Núm. 5]. El 17 de julio de 2020, la Junta de Supervisión presentó respuestas y reconvenciones en relación con las cinco demandas contenciosas restantes relacionadas con las Cinco Leyes [Proc. Cont. Núm. 20-00080, ECF Núm. 5; Proc. Cont. Núm. 20-00082, ECF Núm. 5; Proc. Cont. Núm. 20-00083, ECF Núm. 6; Proc. Cont. Núm. 20-00084, ECF Núm. 5; Proc. Cont. Núm. 20-00085, ECF Núm. 5]. Las reconvenciones de la Junta de Supervisión buscaban anular y prohibir las Cinco Leyes conforme a las Secciones 204(a) y 108(a) de PROMESA, y con respecto a la Ley 82 y la Ley 181, también conforme a la Sección 204(c) de PROMESA. Específicamente, la Junta de Supervisión impugnó la Ley 47 basándose en que la ley es significativamente incompatible con el Plan Fiscal Certificado del ELA (ya que no es neutral en cuanto a los ingresos) y que la certificación del Gobernador conforme a la Sección 204(c) de PROMESA carecía de la suficiente especificidad necesaria para una estimación formal del impacto de la Ley 47 en los gastos e ingresos, como lo requiere PROMESA. La Junta de Supervisión impugnó la Ley 82 por considerar que la ley es significativamente incompatible con el Plan Fiscal Certificado del ELA y que reducirá el mercado competitivo de servicios de salud de calidad en Puerto Rico. La Junta de Supervisión impugnó la Ley 138 alegando que la ley es significativamente incompatible con el Plan Fiscal Certificado del ELA, inhibirá la capacidad de las MCO para controlar los costos de atención médica, y priva a Puerto Rico de un mercado competitivo para los servicios de salud de calidad y aumenta los costos de atención médica al eliminar los incentivos para que los médicos compitan en precio y calidad. La Junta de Supervisión impugnó la Ley 176 por considerar que la ley es significativamente incompatible con el Plan Fiscal Certificado del ELA, entre otras cosas, porque socava las medidas de ajuste contempladas en el Plan Fiscal. La Junta de Supervisión impugnó la Ley 181 alegando que la ley es significativamente incompatible con el Plan Fiscal Certificado del ELA y que el Gobernador nunca demostró a la Junta de Supervisión cómo se financiaría o podría financiarse el aumento salarial de los bomberos mediante un nuevo impuesto.

También el 17 de julio de 2020, Coopharma presentó una moción de autorización para comparecer como *amicus curiae* en nombre del Gobierno [Caso Núm. 17-bk-3283, ECF Núm. 13717]. El 20 de julio de 2020, el Tribunal de Título III emitió una orden que deniega la moción de Coopharma [Caso Núm. 17-bk-3283, ECF Núm. 13739]. El 24 de noviembre de 2020, Coopharma presentó una segunda moción de autorización para comparecer como *amicus curiae* en nombre del Gobierno [Caso Núm. 17-bk-3283, ECF Núm. 15238]. El 7 de diciembre de 2020, el Gobierno presentó una declaración en apoyo a la segunda moción de Coopharma [Proc. Cont. Núm. 20-00080, ECF Núm. 63], y la Junta de Supervisión presentó una oposición [Proc. Cont. Núm. 20-00080, ECF Núm. 65]. El 10 de diciembre de 2020, Coopharma presentó una contestación en apoyo a su segunda moción de [Proc. Cont. Núm. 20-00080, ECF Núm. 66].

El 30 de julio de 2020, la Junta de Supervisión presentó una moción para unificar los cinco procesos contenciosos restantes [Proc. Cont. Núm. 20-00080, ECF Núm. 8], y el Tribunal de Título III emitió una orden que concede la moción [Proc. Cont. Núm. 20-00080, ECF Núm. 9]. El Gobierno presentó contestaciones a las reconvenciones de la Junta de Supervisión en relación con las Cinco Leyes el 3 de agosto de 2020 [Proc. Cont. Núm. 20-00080, ECF Núm. 11; Proc. Cont.

Núm. 20-00082, ECF Núm. 9; Proc. Cont. Núm. 20-00083, ECF Núm. 10; Proc. Cont. Núm. 20-00084, ECF Núm. 10; Proc. Cont. Núm. 20-00085, ECF Núm. 9].

El 28 de septiembre de 2020, el Gobierno presentó mociones de sentencia sumaria en relación con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 12; Proc. Cont. Núm. 20-00083, ECF Núm. 13]. El 5 de octubre de 2020, la Junta de Supervisión presentó mociones de sentencia sumaria en relación con las Leyes 47, 82 y 181 [Proc. Cont. Núm. 20-00080, ECF Núm. 14, 16; Proc. Cont. Núm. 20-00084, ECF Núm. 13, 15; Proc. Cont. Núm. 20-00085, ECF Núm. 12, 13]. El 19 de octubre de 2020, la Junta de Supervisión presentó sus oposiciones a las mociones de sentencia sumaria del Gobierno y las mociones cruzadas para sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 28, 29; Proc. Cont. Núm. 20-00083, ECF Núm. 29, 30]. El 23 de octubre de 2020, el Gobierno presentó oposiciones a la moción de la Junta de Supervisión para la sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 47, 82 y 181, y solicitó una reparación en virtud de la Regla 56(d) [Proc. Cont. Núm. 20-00080, ECF Núm. 36; Proc. Cont. Núm. 20-00084, ECF Núm. 35; Proc. Cont. Núm. 20-00085, ECF Núm. 34]. El 4 de noviembre de 2020, el Gobierno presentó su contestación en apoyo a sus mociones de sentencia sumaria y su oposición a las mociones cruzadas para sentencia sumaria de la Junta de Supervisión en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 37; Proc. Cont. Núm. 20-00083, ECF Núm. 38]. El 5 de noviembre de 2020, la Junta de Supervisión presentó respuestas en apoyo a sus mociones de sentencia sumaria en relación con las Leyes 47, 82 y 181 [Proc. Cont. Núm. 20-00080, ECF Núm. 49; Proc. Cont. Núm. 20-00084, ECF Núm. 47; Proc. Cont. Núm. 20-00080, ECF Núm. 46]. El 11 de noviembre de 2020, la Junta de Supervisión presentó una respuesta en apoyo a su moción cruzada de sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 40; Proc. Cont. Núm. 20-00083, ECF Núm. 41]. El 24 de noviembre de 2020, el Tribunal de Título III celebró una vista con respecto a las mociones y las mociones cruzadas de sentencia sumaria.

El 23 de diciembre de 2020, el Tribunal de Título III dictó una orden que: (i) deniega la moción de sentencia sumaria del Gobierno en relación con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00082, ECF Núm. 52; Proc. Cont. Núm. 20-00083, ECF Núm. 53]; y (ii) concede parcialmente las mociones de la Junta de Supervisión (a) de sentencia sumaria en relación con las Leyes 47, 82 y 181, y (b) las mociones cruzadas de sentencia sumaria en relación con todas las reclamaciones y reconvenciones relacionadas con las Leyes 138 y 176 [Proc. Cont. Núm. 20-00080, ECF Núm. 72; Proc. Cont. Núm. 20-00084, ECF Núm. 61; Proc. Cont. Núm. 20-00085, ECF Núm. 60]. Con respecto a la Ley 47, el Tribunal de Título III desestimó la Causa II de la demanda de la Ley 47, que solicitaba un remedio declaratorio en relación con la Sección 108(a)(2) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención III de la Ley 47, que solicitaba interdictos que impidieran la aplicación de las leyes pertinentes en virtud de la Sección 108(a)(2) de PROMESA. El Tribunal de Título III concluyó que la determinación de la Junta de Supervisión de que la Ley 47 viola la Sección 108(a)(2) de PROMESA está respaldada por una base racional y pruebas sustanciales. Con respecto a la Ley 82, el Tribunal de Título III desestimó la Causa I de la demanda de la Ley 82, que solicitaba un remedio declaratorio en relación con la Sección 204(a) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención II de la Ley 82, que solicitaba interdictos en virtud de la Sección 104(k) de PROMESA. El Tribunal de Título III

consideró que las conclusiones de la Junta de Supervisión de que debía impedirse la aplicación de la Ley 82, ya que implicaría gastos importantes que no están claramente previstos en el plan fiscal, no son arbitrarias ni caprichosas. Con respecto a la Ley 138, el Tribunal de Título III desestimó la Causa I de la demanda de la Ley 138, que solicitaba un remedio declaratorio en relación con la Sección 204(a) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención II de la Ley 138, que solicitaba interdictos en virtud de la Sección 104(k) de PROMESA. El Tribunal de Título III razonó que las impugnaciones de la Junta de Supervisión a la Ley 138 estaban respaldadas por preocupaciones racionales dado el incumplimiento del Gobierno de las directivas de la Junta de Supervisión conforme a la Sección 204(a)(4)(A) de PROMESA para corregir las deficiencias con el Certificado de la Ley 138. Con respecto a la Ley 176, el Tribunal de Título III desestimó la Causa II de la demanda de la Ley 176, que solicitaba un remedio declaratorio en relación con la Sección 108(a)(2) de PROMESA, y concedió una sentencia sumaria sobre la Reconvención III de la Ley 176, que solicitaba interdictos que impidieran la aplicación de las leyes pertinentes en virtud de la Sección 108(a)(2) de PROMESA. El Tribunal de Título III concluyó que la determinación de la Junta de Supervisión de que la Ley 176 perjudicaría o frustraría los propósitos de PROMESA era racional y estaba respaldada por pruebas sustanciales en el expediente. Con respecto a la Ley 181, el Tribunal de Título III concedió una sentencia sumaria sobre la Reconvención IV de la Ley 181, que solicitaba un interdicto en virtud de la Sección 104(k) de PROMESA que prohibiera la aplicación de la Ley 181 en virtud de la Sección 204(c) de PROMESA. El Tribunal de Título III dictaminó que la Ley 181 violaba la Sección 204(c) de PROMESA porque creaba un déficit de ingresos que el Gobierno probablemente tendría que remediar mediante una reprogramación que no ha sido solicitada ni autorizada.

También el 23 de diciembre de 2020, el Tribunal de Título III dictó una orden en la que instruía a las partes que mostraran las causas por las que el Tribunal de Título III no debía desestimar las reclamaciones y reconvenciones restantes [Proc. Cont. Núm. 20-00080, ECF Núm. 73; Proc. Cont. Núm. 20-00082, ECF Núm. 53; Proc. Cont. Núm. 20-00083, ECF Núm. 54; Proc. Cont. Núm. 20-00084, ECF Núm. 62; Proc. Cont. Núm. 20-00085, ECF Núm. 61]. El 4 de enero de 2021, las partes presentaron una estipulación conjunta por la que se desestimaban las reclamaciones restantes con derecho a nueva acción [Proc. Cont. Núm. 20-00080, ECF Núm. 74; Proc. Cont. Núm. 20-00082, ECF Núm. 54; Proc. Cont. Núm. 20-00083, ECF Núm. 55; Proc. Cont. Núm. 20-00084, ECF Núm. 63; Proc. Cont. Núm. 20-00085 ECF Núm. 62]. El 7 de enero de 2021, el Tribunal de Título III dictó una orden de desestimación de las reclamaciones restantes con derecho a nueva acción, y el secretario del tribunal emitió una sentencia y cerró los casos relativos a las Cinco Leyes: 47, 82, 181, 176 y 138 [Proc. Cont. Núm. 20-00080, ECF Núm. 75, 76; Proc. Cont. Núm. 20-00082, ECF Núm. 55, 56; Proc. Cont. Núm. 20-00083, ECF Núm. 56, 57; Proc. Cont. Núm. 20-00084, ECF Núm. 63, 64; Proc. Cont. Núm. 20-00085, ECF Núm. 63, 64]. El 4 de febrero de 2021, las partes presentaron una moción conjunta para registrar una orden que aprobara una estipulación conjunta que modificara el interdicto en relación con la Ley 181 [Proc. Cont. Núm. 20-00084, ECF Núm. 72]. Las partes acordaron que, en la medida en que los ingresos tributarios procedentes del impuesto sobre las primas de seguros y los ingresos procedentes de las inspecciones de seguridad en las propiedades comerciales cubrieran el aumento salarial de $125 al mes para los bomberos, la Junta de Supervisión no tendría ninguna otra objeción al aumento según lo dispuesto en la Ley 181. Las partes informaron al Tribunal de Título III que el aumento salarial se haría efectivo. El 5 de febrero de 2021, el Tribunal de Título III emitió una orden que aprueba la estipulación [Proc. Cont. Núm. 20-00084, ECF Núm. 73].

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

El 21 de enero de 2021, el Gobierno presentó una notificación de apelación en relación con las órdenes del Tribunal de Título III del 23 de diciembre de 2020 sobre las mociones de sentencia sumaria [Proc. Cont. Núm. 20-00080, ECF Núm. 78; Proc. Cont. Núm. 20-00082, ECF Núm. 58; Proc. Cont. Núm. 20-00083, ECF Núm. 60; Proc. Cont. Núm. 20-00084, ECF Núm. 67; Proc. Cont. Núm. 20-00085, ECF Núm. 66]. El 27 de enero de 2021, el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito registró la apelación como Caso Núm. 21-1071 [Proc. Cont. Núm. 20-00080, ECF Núm. 81]. El 19 de abril de 2021, los Apelantes presentaron su escrito inicial. El 10 de mayo de 2021, el Presidente de la Cámara de Representantes de Puerto Rico presentó una moción de autorización para presentar un escrito *amicus* en apoyo de los Apelantes y su propuesta de escrito. El 16 de junio de 2021, el Primer Circuito emitió una orden que concede la moción del Presidente y acepta el escrito para su presentación. El 7 de julio de 2021, el Apelado presentó su escrito de contestación. El 29 de julio de 2021 los Apelantes presentaron su escrito de contestación. El 11 de agosto de 2021, el Apelado presentó su tríplica. Se presentaron los argumentos del caso el 15 de septiembre de 2021.

(i)     ***Junta de Supervisión y Administración Financiera para Puerto Rico c. el Hon. Pierluisi Urrutia. y otros*, Proc. Cont. Núm. 21-00072**

El 2 de julio de 2021, la Junta de Supervisión presentó una demanda contra el Gobernador de Puerto Rico, Pedro Pierluisi Urrutia, en su carácter oficial (el "Gobernador"); AAFAF; el Sr. José Luis Dalmau, en su carácter oficial como representante del Senado de Puerto Rico (el "Presidente del Senado "); y el Sr. Rafael Hernández Montañez, en su carácter oficial como representante de la Cámara de Representantes de Puerto Rico (el "Presidente de la Cámara") (colectivamente, los "Demandados de la Ley 7"), en el Tribunal de Título III impedir la aplicación de y anular la Ley 7-2021 [Proc. Cont. Núm. 21-00072, ECF Núm. 1]. Como se expone en la demanda, la Ley 7-2021 sustituye los sistemas de pensiones reformados del ELA por un nuevo sistema de pensiones de beneficios definidos, y ordena que el Gobierno repudie cualquier plan de ajuste que requiera reducciones de las pensiones, recortes presupuestarios o nuevas reestructuraciones de los bonos, y prohíbe el uso de cualquier recurso por parte del Gobierno para lograr y posibilitar el plan de ajuste entonces propuesto por la Junta de Supervisión. Específicamente, la demanda alega que (i) la Ley 7-2021 viola la Sección 108(a) de PROMESA porque perjudica y/o frustra los propósitos de PROMESA, según lo determinado por la Junta de Supervisión; (ii) la Ley 7-2021 viola las Secciones 204(a), 204(c) y 207 de PROMESA; (iii) la Ley 7-2021 viola la Cláusula de Supremacía de la Constitución de Estados Unidos y la Sección 4 de PROMESA; y (iv) la Junta de Supervisión tiene derecho a una orden de prohibición y anulación de la Ley 7-2021 y de cualquier medida tomada para implementar la Ley 7-2021. El 23 de julio de 2021, los Demandados de la Ley 7 presentaron respuestas a la demanda [Proc. Cont. Núm. 21-00072, ECF Núm. 13, 14, 15].

El 15 de agosto de 2021, la Junta de Supervisión presentó una moción de sentencia sumaria [Proc. Cont. Núm. 21-00072, ECF Núm. 17]. El 27 de agosto de 2021, los Demandados de la Ley 7 y el SEIU, un interventor, presentaron oposiciones a la moción de sentencia sumaria de la Junta de Supervisión [Proc. Cont. Núm. 21-00072, ECF Núm. 29, 35, 43, 44]. El 3 de septiembre de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción de sentencia sumaria [Proc. Cont. Núm. 21-00072, ECF Núm. 58]. El 9 de septiembre de 2021, la SEIU y UAW, un sindicato al que el Tribunal de Título III permitió intervenir el 27 de agosto de 2021 y que se había

unido a la oposición de SEIU, presentaron una tríplica en apoyo de su oposición a la moción de sentencia sumaria de la Junta de Supervisión [Proc. Cont. Núm. 21-00072, ECF Núm. 66]. El 10 de septiembre de 2021, el Colegio de Abogados de Puerto Rico, al que el Tribunal de Título III le había permitido intervenir el 9 de septiembre de 2021, presentó un escrito *amicus* en apoyo de la oposición de los Demandados de la Ley 7 a la moción de sentencia sumaria de la Junta de Supervisión [Proc. Cont. Núm. 21-00072, ECF Núm. 69]. Ese mismo día, el Presidente de la Cámara de Representantes presentó una tríplica en apoyo a su oposición a la moción de la Junta de Supervisión para una sentencia sumaria [Proc. Cont. Núm. 21-00072, ECF Núm. 71]. El 15 de septiembre de 2021, el Presidente del Senado presentó una tríplica en apoyo a su oposición a la moción de la Junta de Supervisión para una sentencia sumaria [Proc. Cont. Núm. 21-00072, ECF Núm. 76]. El 1 de octubre de 2021, el presidente de la Cámara presentó una moción informativa sobre la actividad legislativa relevante [Proc. Cont. Núm. 21-00072, ECF Núm. 77].

El 13 de octubre de 2021, el Tribunal de Título III emitió una orden que concedía, en parte, la moción de la Junta de Supervisión para una sentencia sumaria [Proc. Cont. Núm. 21-00072, ECF Núm. 78]. El Tribunal de Título III determinó que (i) la Junta de Supervisión estaba facultada para solicitar una reparación judicial en virtud de la Sección 204(a) de PROMESA porque la Ley 7-2021 era significativamente incompatible con el Plan Fiscal Certificado del ELA y el Gobernador no cumplió con las instrucciones de la Junta de Supervisión para corregir la incompatibilidad; y (ii) la Ley 7-2021 violó la Sección 108(a) de PROMESA al perjudicar o frustrar los propósitos de PROMESA, según determinó la Junta de Supervisión. En cuanto a las Causas IV, V y VI, el Tribunal de Título III denegó la sentencia sumaria con respecto a las reclamaciones sobre las Secciones 204(c) y 207 de PROMESA, y se negó a llegar a una conclusión sobre la cuestión de la preferencia en virtud de la Sección 4 de PROMESA y la Cláusula de Supremacía. Sobre la base de estas sentencias, el Tribunal de Título III, conforme a la Sección 204(a)(5) de PROMESA, anuló la Ley 7-2021 en su totalidad y ordenó a los Demandados de la Ley 7 que aplicaran y ejecutaran la Ley 7-2021. El Tribunal de Título III también, conforme a la Sección 108(a)(2) de PROMESA, declaró que la Sección 1.02, la Sección 5.02, el Capítulo 2, el Capítulo 3, el Capítulo 4 y la última oración de la Sección 5.01 de la Ley 7-2021 son nulos, inaplicables y sin efecto, y prohibió a los Demandados implementar o hacer cumplir esas disposiciones.

El 9 de diciembre de 2021, las partes presentaron una estipulación de desestimación voluntaria con derecho a nueva acción de las restantes causas del caso (Causas IV, V y VI). [Proc. Cont. Núm. 21-00072, ECF Núm. 79]. El 13 de diciembre de 2021, el Tribunal de Título III emitió una sentencia sobre las reclamaciones para las que concedió una sentencia sumaria y la estipulación de las partes de desestimación voluntaria con derecho a nueva acción en cuanto a las Causas IV, V y VI de la demanda [Proc. Cont. Núm. 21-00072, ECF Núm. 80], cerrando el proceso contencioso.

### (j) *R&D Master Enterprises, Inc., y otros c. la Junta de Supervisión y Administración financiera para Puerto Rico, y otros*, Caso Núm. 21-cv-1317

El 8 de julio de 2021, R&D Master Enterprises, Inc., Pro Pave Corp., Matrix Transport, Inc., José A. Rovira González, y María Magdalena Díaz Vila (colectivamente, los "Demandantes") presentaron una demanda ante el Tribunal de Distrito de los Estados Unidos para el Distrito de

Puerto Rico contra la Junta de Supervisión y Natalie Jaresko, en su capacidad oficial como Directora Ejecutiva de la Junta de Supervisión [Caso Núm. 21-cv-1317, ECF Núm. 1]. En su demanda, los Demandantes solicitan una orden que exija a la Junta de Supervisión que revise el contrato de venta de la cartera de préstamos del BDE por un valor de $384,269,047 (el "Acuerdo de Venta de Préstamos") a un inversor, PR Recovery and Development JV, LLC ("PR Recovery"), de acuerdo con su política de revisión de contratos y la Sección 204(b) de PROMESA. Los Demandantes sostienen que la supuesta omisión de la Junta de Supervisión de la revisión del Acuerdo de Venta de Préstamos viola PROMESA, las cláusulas de debido proceso y protección equitativa de la Constitución de EE.UU. y la propia política de revisión de contratos de la Junta de Supervisión.

El 27 de julio de 2021, los Demandados presentaron una moción para transferir el caso al Tribunal de Título III como un caso relacionado con el caso de Título III del ELA [Caso Núm. 21-cv-1317, ECF Núm. 8]. La Junta de Supervisión también presentó ante el Tribunal de Título III una moción informativa y una solicitud de consentimiento para transferir el caso al Tribunal de Título III [Caso Núm. 17-bk-3283, ECF Núm. 17515]. El 6 de agosto de 2021, los Demandantes presentaron una oposición a la moción de los Demandados de transferir el caso [Caso Núm. 21-cv-1317, ECF Núm. 15]. El 17 de agosto de 2021, los Demandados presentaron su respuesta [Caso Núm. 21-cv-1317, ECF Núm. 18].

El 3 de septiembre de 2021, los Demandados presentaron una moción de desestimación, argumentando que (i) los Demandantes carecen de legitimidad para presentar la demanda, (ii) sus reclamaciones han prescrito, y (iii) la demanda no establece una reclamación viable de reparación [Caso Núm. 21-cv-1317, ECF Núm. 19]. El 15 de septiembre de 2021, los Demandantes presentaron una oposición a la moción de desestimación de los Demandados [Caso Núm. 21-cv-1317, ECF Núm. 21]. El 29 de septiembre de 2021, los Demandados presentaron una respuesta en apoyo de su moción de desestimación [Caso Núm. 21-cv-1317, ECF Núm. 24].

El 25 de octubre de 2021, el juez Arias-Marxuach emitió una orden que deniega la moción de los Demandados de transferir el caso al Tribunal de Título III [Caso Núm. 21-cv-1317, ECF Núm. 25]. El 19 de noviembre de 2021, los Demandantes presentaron una moción informativa para complementar sus argumentos [Caso Núm. 21-cv-1317, ECF Núm. 26]. El 23 de noviembre de 2021, el juez Arias-Marxuach emitió una orden de texto en la que concedía la moción de permiso de los Demandantes para complementar sus argumentos [Caso Núm. 21-cv-1317, ECF Núm. 27]. El 3 de diciembre de 2021, los Demandantes presentaron una moción informativa que complementaba sus argumentos [Caso Núm. 21-cv-1317, ECF Núm. 28 en 2].

El 12 de abril de 2022, el juez Arias-Marxuach emitió una opinión y una orden en la que concedía la moción de desestimación de la Junta de Supervisión, sosteniendo que las reclamaciones de los demandantes habían prescrito. [Caso Núm. 21-cv-1317, ECF Núm. 33]. El mismo día, el juez Arias-Marxuach dictó sentencia desestimando la demanda de los Demandantes en su totalidad sin derecho a nueva acción. El 25 de abril de 2022, los Demandantes presentaron una notificación de apelación de la orden del tribunal que desestimaba la demanda. [Caso Núm. 21-cv-1317, ECF Núm. 35].

    **(k)**    ***La Junta de Supervisión y Administración Financiera para Puerto Rico c. el Hon. Pierluisi Urrutia. y otros**, Proc. Cont. No. 21-00119 (D.P.R. presentado el 20 de diciembre de 2021)*

El 20 de diciembre de 2021, la Junta de Supervisión presentó una demanda contra el Gobernador de Puerto Rico, la AAFAF, el Administrador del SRE, el Director Ejecutivo de la Junta de Retiro del Gobierno de Puerto Rico y el Director de la OGP con el fin de anular y prohibir la aplicación de la Ley 80-2020, la Ley 81-2021, la Ley 82-2020 (las "Leyes"), y la Resolución Conjunta 33 ("JR 33"), una medida que requiere que el ELA implemente, al menos parcialmente, la Ley 80-2020 [Proc. Cont. Núm. 21-00119, ECF Núm. 1]. Las leyes proponen modificar las prestaciones de jubilación de determinados empleados públicos permitiéndoles jubilarse anticipadamente y/o proporcionándoles mayores prestaciones. La Junta de Supervisión alegó que las Leyes y la JR 33 impusieron un tratamiento específico de ciertas reclamaciones de pensiones anteriores al concurso de manera incompatible con el Plan de Ajuste, lo que violó las Secciones 312 y 313 de PROMESA, y aumentó el tratamiento de ciertos reclamantes para recuperar en exceso el importe total de sus reclamaciones en violación de la Sección 301(a) de PROMESA y la Sección 1129(b) del Código de Quiebras. Además, la Junta de Supervisión alegó que: (i) cada Ley y la JR 33 violaron la Sección 207 de PROMESA al modificar la deuda sin la aprobación previa de la Junta de Supervisión, y perjudicaron y frustraron los propósitos de PROMESA, según lo determinado por la Junta de Supervisión, específicamente su propósito de lograr la responsabilidad fiscal, en violación de la Sección 108(a) de PROMESA; (ii) el Gobernador y la AAFAF no cumplieron con la Sección 204(a) de PROMESA con respecto a cada Ley; y (iii) la Ley 80 y la JR 33 reprogramaron fondos sin la certificación previa de la Junta de Supervisión, en violación de la Sección 204(c) de PROMESA.

El 27 de diciembre de 2021, la Junta de Supervisión, el Gobernador de Puerto Rico, la AAFAF y la OGP presentaron una estipulación y orden que reflejaba su resolución de la demanda de la Junta de Supervisión [Proc. Cont. Núm. 21-00119, ECF Núm. 5]. El 28 de diciembre de 2021, el Tribunal de Título III presentó la estipulación y orden [Proc. Cont. Núm. 21-00119, ECF Núm. 6]. Por efecto de la orden del Tribunal de Título III, las Leyes y la JR 33 fueron invalidadas y la demanda de la Junta de Supervisión fue desestimada sin derecho a nueva acción [Proc. Cont. Núm. 21-00119, ECF Núm. 6].

6.      **Litigio sobre la Cláusula de Designaciones**

(a)      ***Aurelius Investments, LLC y** otros c. **el Estado Libre Asociado de Puerto Rico y otros,** Casos Núm. 18-1671; 18-8014 (1er Cir.)*

El 7 de agosto de 2017, los Apelantes, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, "Aurelius"), presentaron una moción para que se desestimara la petición de Título III del ELA [Caso Núm. 17-bk-3283, ECF Núm. 913]. Aurelius alegó que la Junta de Supervisión carecía de autoridad para iniciar el Caso de Título III porque sus miembros habían sido designados en infracción de la Cláusula de Designaciones de la Constitución de los Estados Unidos, art. II, § 2, y el principio de división de poderes. En respuesta, la Junta de Supervisión argumentó que sus miembros no eran "Funcionarios de los Estados Unidos" en virtud de la Cláusula de Designaciones, y que los poderes de la Junta de Supervisión eran puramente locales, y no federales, y por lo tanto la Cláusula de Designaciones no se aplica [Caso Núm. 17-bk-3283, ECF Núm. 1622]. La Junta de Supervisión también argumentó que, incluso si sus miembros fueran funcionarios federales, la Cláusula de Designaciones no se había violado porque los miembros de la Junta ejercían autoridad en Puerto Rico, donde la Cláusula Territorial le otorga al Congreso plenos poderes. Con carácter subsidiario, la Junta de Supervisión argumentó que la

designación de sus miembros no requiere la recomendación y el consentimiento del Senado porque son "funcionarios de rango inferior".

El 13 de julio de 2018, el Tribunal de Título III denegó la moción de Aurelius para desestimar la petición de Título III del ELA [Caso Núm. 17-bk-3283, ECF Núm. 3503]. Aurelius apeló la decisión. El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de Aurelius con apelaciones similares que implican desafíos de la Cláusula de Designaciones a la Junta de Supervisión (que se discuten a continuación) presentados por la Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") y Assured Guaranty Corp.

El 15 de febrero de 2019, el Primer Circuito dictaminó que el nombramiento de los miembros de la Junta de Supervisión era inconstitucional. Sin embargo, el Primer Circuito ratificó la decisión del Tribunal de Título III de rechazar las peticiones de Título III, sosteniendo que las medidas tomadas por la Junta de Supervisión antes del fallo del Primer Circuito eran válidas bajo la doctrina de funcionario *de facto*. El Primer Circuito paralizó su fallo durante 90 días para permitir al Presidente y al Senado subsanar los nombramientos defectuosos.

La Junta de Supervisión presentó una petición de *certiorari* el 23 de abril de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1334. El 24 de abril de 2019, la Junta de Supervisión solicitó al Primer Circuito paralizar el mandato supeditado a la disposición de su petición de *certiorari*. El 6 de mayo de 2019, el Primer Circuito prorrogó la paralización del mandato por sesenta (60) días hasta el 15 de julio de 2019.

El 24 de mayo de 2019, Aurelius presentó una petición de *certiorari* para impugnar el fallo del Primer Circuito sobre los funcionarios *de facto*, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1475. CANA, que compareció como parte contraria a la apelación en el recurso ante el Primer Circuito, presentó una petición de *certiorari* el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1496. Estados Unidos presentó una petición de *certiorari* el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1514. UTIER presentó una petición de *certiorari* el 5 de junio de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm. 18-1521.

El 18 de junio de 2019, la Junta de Supervisión presentó una moción ante el Primer Circuito para que prorrogara la paralización del mandato hasta la resolución de los casos antes mencionados en la Corte Suprema. El 19 de junio de 2019, la Corte Suprema concedió todas las peticiones de *certiorari* y unificó los casos. El caso Núm. 18-1334 de la Corte Suprema de EE.UU. fue designado como caso principal. El 2 de julio de 2019, el Primer Circuito concedió la moción de la Junta de Supervisión para paralizar el mandato supeditado a la decisión sobre los méritos de la Corte Suprema.

El 25 de julio de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron escritos ante la Corte Suprema impugnando la sentencia de la Cláusula de Designaciones del Primer Circuito. El 22 de agosto de 2019, la UTIER y Aurelius presentaron sus escritos iniciales unificados, en respaldo de la sentencia del Primer Circuito sobre la Cláusula de Designaciones e impugnando su sentencia sobre la doctrina de funcionario *de facto*. Anthony Michael Sabino (profesor de derecho constitucional), Alan Mygatt Tauber (académico de derecho constitucional), Aníbal Acevedo-Vilá (ex gobernador de Puerto Rico) y las Partes de

la ARD presentaron escritos *amicus curiae*. Sabino y Acevedo-Vilá recomendaron que la Corte Suprema confirmara la decisión del Primer Circuito sobre la cuestión de la Cláusula de Designaciones, mientras que Tauber recomendó una revocación sobre esa cuestión. Las Partes de la ARD recomendaron lo mismo que Tauber y también argumentaron que la Corte Suprema debería confirmar el fallo del Primer Circuito sobre los funcionarios *de facto*. El 19 de septiembre de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron contestaciones en apoyo de sus impugnaciones a la sentencia de la Cláusula de Designaciones del Primer Circuito y en apoyo de la sentencia del Primer Circuito sobre la doctrina de los funcionarios *de facto*. La Coalición de Tenedores de Bonos Prioritarios (Senior) COFINA presentó un escrito que se limitó a apoyar el fallo del Primer Circuito sobre la doctrina de funcionario *de facto*. El 4 de octubre de 2019 y el 8 de octubre de 2019, UTIER y Aurelius presentaron sendos escritos de contestación. Los alegatos orales se presentaron el 15 de octubre de 2019.

El 1 de junio de 2020, la Corte Suprema de EE.UU. revocó la decisión del Primer Circuito del 15 de febrero de 2019. La Corte sostuvo que la Cláusula de Designaciones no se aplica al nombramiento de los miembros de la Junta de Supervisión. Dado que las responsabilidades legales de la Junta de Supervisión consisten en "deberes principalmente locales" (a saber, representar a Puerto Rico "en los procedimientos de quiebra y supervisar los aspectos de las políticas fiscales y presupuestarias de Puerto Rico") los miembros de la Junta de Supervisión no son "funcionarios de los Estados Unidos" y, por tanto, no están sujetos a la Cláusula de Designaciones. La Corte Suprema se negó a considerar la aplicación de la doctrina de funcionario *de facto* ya que sostuvo que los miembros de la Junta de Supervisión fueron nombrados válidamente. Los jueces Sotomayor y Thomas emitieron opiniones concurrentes en la sentencia. La juez Sotomayor coincidió "a regañadientes" con la sentencia, pero escribió para subrayar la autonomía de Puerto Rico. El juez Thomas coincidió en que la designación de los miembros de la Junta de Supervisión no violó la Constitución de los Estados Unidos, pero discrepó con la prueba "amorfa" de la mayoría que distingue entre las obligaciones locales y federales de un funcionario.

**(b)**     **Assured *Guaranty* Corp. y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros, Proc. Cont. Núm. 18-00087**

El 23 de julio de 2018, los Demandantes Assured Guaranty Corp. y Assured Guaranty Municipal Corp., al igual que Aurelius, presentaron una demanda donde se cuestionaba la constitucionalidad de la designación de los miembros de la Junta de Supervisión. Assured solicitó que se declarara que la designación de los miembros de la Junta de Supervisión viola la Cláusula de Designaciones y que las acciones de la Junta de Supervisión eran nulas. Assured también solicitó que se prohibiera a la Junta de Supervisión y a sus miembros con derecho al voto que realicen cualquier otra acción hasta que sus miembros fueran designados lícitamente.

El 3 de agosto de 2018, el Tribunal de Título III dictó una sentencia estipulada [Proc. Cont. Núm. 18-00087, ECF Núm. 14] para la Junta de Supervisión sobre la base de que las cuestiones planteadas en la demanda de Assured ya habían sido declaradas defectuosas por el Tribunal de Título III en el caso Aurelius. *En el caso Junta de Sup. y Admin. Financiera para P.R. 318 F. Sup.* 3d 537 (D.P.R. 2018), *conf. en parte, rev. en parte*, 915 F.3d 838 (1er Cir. 2019), *rev. y ratificado,* 140 S. Ct. 1649 (2020). Assured presentó una notificación de apelación ante el Primer Circuito,

que se registró como Caso Núm. 18-1746. Esta apelación se consolidó con la apelación de Aurelius (que se analiza anteriormente) y se resolvió por los mismos motivos.

**(c)** **UTIER c. la Autoridad de Energía Eléctrica de Puerto Rico y otros, Proc. Cont. Núm. 17-00228**

El 6 de agosto de 2017, el Demandante UTIER presentó una impugnación casi idéntica de la Cláusula de Designaciones a la designación de los miembros de la Junta que Aurelius y Assured. UTIER solicitó (i) una sentencia declaratoria que determine que PROMESA viola la Cláusula de Designaciones y que todos los actos de la Junta de Supervisión son inválidos, y (ii) una orden que prohíba que la Junta de Supervisión ejerza la autoridad que le sea concedida por PROMESA. El 10 de noviembre de 2017, UTIER modificó su demanda [Proc. Cont. Núm. 17-00228, ECF Núm. 75].

El 20 de noviembre de 2017, la Junta de Supervisión solicitó la desestimación de la demanda enmendada [Proc. Cont. Núm. 17-00228, ECF Núm. 88].

El 15 de agosto de 2018, el Tribunal de Título III concedió la moción de la Junta de Supervisión por considerar que no se había violado la Cláusula de Designaciones En *el caso Junta de Sup. y Admin. Financiera para P.R.* 318 F. Sup. 3d 537, 557

El 16 de agosto de 2018, UTIER apeló la decisión ante el Primer Circuito (que se registró como Caso Núm. 18-1787). El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de UTIER con las apelaciones presentadas por Aurelius y Assured que se analizaron anteriormente. La apelación de UTIER se resolvió de la misma manera que las apelaciones de Aurelius y Assured. *Véase* la Sección II.F.1(a) que aparece anteriormente.

**(d)** **Hernández-Montañez y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros, Proc. Cont. Núm. 18-00090**

El 25 de julio de 2018, ciertos miembros del minoritario Partido Popular Democrático que sirven en la Cámara de Representantes y el Senado de Puerto Rico presentaron una demanda donde se solicitaban sentencias declaratorias de que (i) los miembros de la Junta de Supervisión fueron designados de una manera que viola la Cláusula de Designaciones de la Constitución de EE.UU., (ii) la delegación de la autoridad ejecutiva y legislativa a la Junta de Supervisión constituye una violación de la doctrina de la división de poderes, y (iii) el uso que haga la Junta de Supervisión de sus facultades de control sobre el presupuesto para la adopción supuestamente forzosa de sus políticas preferidas constituye una "interferencia inadmisible" de la autonomía de Puerto Rico. Los Demandantes también solicitaron órdenes que prohíban que la Junta de Supervisión ejerza su autoridad en virtud de PROMESA, y que prohíban la supuesta interferencia de la Junta de Supervisión en el proceso legislativo.

El 27 de agosto de 2018, las partes presentaron un informe conjunto sobre la situación en el que los Demandantes aceptaron (1) paralizar sus reclamaciones con respecto a la Cláusula de Designaciones mientras la apelación de Aurelius con respecto a la Cláusula de Designaciones estuviera pendiente y (2) desestimar su reclamación de autonomía legislativa [Proc. Cont. Núm. 18-00090, ECF Núm. 18]. Las partes discreparon en cuanto a si la reclamación restante de los

Demandantes de que PROMESA viola la doctrina de la división de poderes debería quedar en suspenso a la espera de la resolución de la apelación de la Cláusula de Designaciones de Aurelius. El 20 de noviembre de 2018, la juez Dein dictó una orden [Proc. Cont. Núm. 18-00090, ECF Núm. 32] de paralización del caso en espera de una resolución de las apelaciones unificadas en *Aurelius Investments, LLC c. el Estado Libre Asociado de Puerto Rico*, Núm. 18-1671 y *Assured Guaranty Corp. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Núm. 18-1787 y *UTIER c. la Autoridad de Energía Eléctrica de Puerto Rico y otros*, Núm. 18-1787. Para obtener más información sobre estas apelaciones, véase la sección V.F.6 que aparece anteriormente.

El 19 de agosto de 2020, tras la decisión de la Corte Suprema en el caso Aurelius, los Demandantes solicitaron una moción de levantamiento de la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 33]. El 11 de septiembre de 2020, los Estados Unidos y la Junta de Supervisión presentaron notificaciones de que no se oponían a la moción de los Demandantes [Proc. Cont. Núm. 18-00090, ECF Núm. 35, 36]. El 14 de septiembre de 2020, el Tribunal de Título III levantó la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 37]. El 30 de noviembre de 2020, la Junta de Supervisión solicitó la desestimación de la demanda del Demandante, afirmando que no expone una reclamación de reparación. [Proc. Cont. Núm. 18-00090, ECF Núm. 45]. Además, el 30 de noviembre de 2020, Estados Unidos presentó un escrito en apoyo de la constitucionalidad de PROMESA [Proc. Cont. Núm. 18-00090, ECF Núm. 47]. El 26 de febrero de 2021, los Demandantes presentaron una oposición a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00090, ECF Núm. 52]. El 29 de marzo de 2021, la Junta de Supervisión presentó su respuesta en apoyo de su moción [Proc. Cont. Núm. 18-00090, ECF Núm. 53]. El 7 de mayo de 2021, el Tribunal de Título III dictó una orden que acepta la moción de desestimación de la Junta de Supervisión con respecto a la Causa I de la demanda [Proc. Cont. Núm. 18-00090, ECF Núm. 54]. El 14 de mayo de 2021, las partes presentaron una estipulación conjunta de desestimación sin derecho a nueva acción con respecto a la Causa III de la demanda [Proc. Cont. Núm. 18-00090, ECF Núm. 55]. El 7 de julio de 2021, los Demandantes presentaron una moción de presentación de sentencia [Proc. Cont. Núm. 18-00090, ECF Núm. 57]. El 8 de julio de 2021, el Tribunal de Título III emitió una orden que aprobó la estipulación conjunta de desestimación de las partes [Proc. Cont. Núm. 18-00090, ECF Núm. 58]. El 9 de julio de 2021, el Tribunal de Título III emitió una sentencia que desestimó el caso sin derecho a nueva acción, y el proceso contencioso se cerró [Proc. Cont. Núm. 18-00090, ECF Núm. 59]. El 25 de julio de 2021, los Demandantes presentaron una notificación de apelación en relación con la sentencia del Tribunal de Título III que desestima el caso sin derecho a nueva acción [Proc. Cont. Núm. 18-00090, ECF Núm. 60].

## G.    Investigación de la Junta de Supervisión sobre potenciales causas de acción

La Junta de Supervisión dispone de amplios poderes de investigación. Conforme a la Sección 104(o) de PROMESA, que faculta a la Junta de Supervisión para investigar las prácticas de divulgación y venta en relación con la adquisición de bonos emitidos por los Deudores, y las secciones relacionadas, la Junta de Supervisión, a través de su Comité Especial de Investigación, investigó potenciales causas de acción relacionadas con la crisis fiscal de Puerto Rico.

1.      **Informe del Investigador Independiente**

(a)      **Proceso y mandato**

El 1 de septiembre de 2017, la Junta de Supervisión, por y a través del Comité Especial de Investigación, contrató a Kobre & Kim LLP (el "Investigador Independiente") para que llevara a cabo una investigación sobre ciertos asuntos relacionados con la crisis fiscal de Puerto Rico en cumplimiento del mandato de la Junta de Supervisión conforme a PROMESA.

Específicamente, se le pidió al Investigador Independiente que investigara: (i) los factores que contribuyen a la crisis fiscal de Puerto Rico, entre ellos cambios en la economía, expansión de los compromisos de gasto y los programas de prestaciones, cambios en el financiamiento federal y la dependencia de la deuda para financiar un déficit presupuestario estructural; (ii) la deuda de Puerto Rico, el uso general de los ingresos, la relación entre la deuda y el déficit presupuestario estructural de Puerto Rico, la gama de sus instrumentos de deuda y la manera en que se comparan las prácticas de la deuda de Puerto Rico con las prácticas de deuda de los estados y las grandes jurisdicciones municipales; y (iii) las prácticas de emisión, divulgación y venta de deuda de Puerto Rico, incluida su interpretación del Límite Constitucional de la Deuda de Puerto Rico. En consulta con el Comité Especial de Investigación y el Consejero General de la Junta de Supervisión, el Investigador Independiente centró su investigación en los siguientes ámbitos específicos: BGF; Servicios Públicos de Puerto Rico; COFINA; SRE; Funciones de Elaboración de presupuestos de Puerto Rico, Presentación de informes externos y Contabilidad de Puerto Rico; cálculo del Límite Constitucional de la Deuda; las agencias de calificación crediticia; prácticas de venta de bonos relacionados con Puerto Rico; el marco de ética del gobierno de Puerto Rico; uso de swaps de tipo de interés por parte del emisor; falta de un mecanismo claro en Puerto Rico para validar los bonos relacionados con Puerto Rico antes de que se emitan; y el crédito fiscal por posesión.

Los objetivos principales de la investigación del Comité Especial de Investigación fueron: (i) identificar políticas (o falta de salvaguardias) que contribuyeron a la crisis de deuda de Puerto Rico, entre ellas factores que permitieron que Puerto Rico y algunas de sus instrumentalidades emitieran cantidades significativas de deuda sin fuentes adecuadas de reembolso; e (ii) identificar posibles recuperaciones de valor de partes culpables y determinar las cuestiones que requieren atención reglamentaria, todo ello para ayudar a la Junta de Supervisión en su misión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el acceso de Puerto Rico a los mercados de capitales.

(b)      **Procedimientos de investigación**

En mayo de 2017, la Junta de Supervisión adoptó los Procedimientos de Investigación de PROMESA para establecer el marco procesal de la investigación.[145] Los procedimientos de investigación de PROMESA autorizan a la Junta de Supervisión a iniciar una "Investigación Informal" y una "Investigación Formal" para investigar las actividades o conductas que la Junta de Supervisión tiene autoridad para investigar en virtud de PROMESA. La principal diferencia de

---

[145] Los     Procedimientos     de     Investigación     de     PROMESA     están     disponibles     en https://oversightboard.pr.gov/documents/.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                        04/30/2022 3:29 PM" ""

procedimiento entre los dos tipos de investigaciones es que la Junta de Supervisión solo está
autorizada a ordenar la tramitación de la presentación de testigos y material de investigación tras
el inicio de una Investigación Formal.[146]   El Investigador Independiente utilizó técnicas de
investigación tanto formales como informales para cumplir el mandato establecido por el Comité
Especial de Investigación.

El 18 de octubre de 2017, el Comité Especial de Investigación, en nombre de la Junta de
Supervisión, aprobó una resolución de inicio de una investigación formal con el fin de emitir
citaciones legales de investigación (la "Resolución de Citaciones Legales de Investigación").[147]
En términos generales, en virtud de la Resolución de Citaciones Legales de Investigación, una
Investigación Formal se considera iniciada con el fin de autorizar al Investigador Independiente a
emitir Citaciones Legales de Investigación[148] en determinadas circunstancias.[149]

A partir de septiembre de 2017, en el marco de la Investigación Informal, el Investigador
Independiente envió cartas a más de 90 entidades (colectivamente, las "Cartas de Conservación y
Solicitud de Documentos"). Las Cartas de Conservación y Solicitud de Documentos identificaron
diversas categorías de documentos que el Investigador Independiente consideró pertinentes para
la Investigación Informal y pidió que los destinatarios de las cartas preserven y presenten cualquier
documento de respuesta que esté en su posesión, custodia o bajo su control. Después de que se
enviaron las Cartas de Conservación y Solicitud de Documentos, el Investigador Independiente
programó y llevó a cabo conferencias con los destinatarios (la mayoría por teléfono, algunas en
persona) para reiterar las solicitudes y discutir un proceso de identificación y entrega de
documentos al Investigador Independiente.

Los testigos, en general, cooperaron con el Investigador Independiente, y el Investigador
Independiente utilizó las herramientas disponibles a través de las cartas preserven y la Investigación Informal. Esa
cooperación, que se vio facilitada por el uso del poder citatorio del Investigador Independiente
solo cuando fue necesario, permitió al Investigador Independiente completar la investigación de
manera eficiente y oportuna, en sintonía con los objetivos de PROMESA y según lo solicitado por

---

[146] Procedimientos de investigación de PROMESA, §§ 3.1(b), 3.2(b)(2). La Sección 104 de PROMESA confiere a la
Junta de Supervisión la facultad de emitir citaciones legales que "exigen la comparecencia y el testimonio de los
testigos y la presentación de libros, registros, correspondencia, memorandos, documentos, documentos,
archivos electrónicos, metadatos, cintas, y materiales de cualquier naturaleza relacionados con cualquier
asunto investigado por la Junta de Supervisión". 48 U.S.C. § 2124(f)(1).

[147] La Resolución de Citaciones Legales de Investigación está disponible en
https://oversightboard.pr.gov/documents/.

[148] Una "Citación Legal de Investigación" se define en la Sección 1.3(a)(16) de los Procedimientos de Investigación
de PROMESA y se refiere a una citación legal emitida por la Junta de Supervisión o su agente autorizado de
conformidad con la Sección 104(f)(i) de PROMESA, sustancialmente en forma de anexo adjunto a la Resolución
sobre Citaciones Legales de Investigación.

[149] Esas circunstancias se producirían cuando un testigo no hubiera cooperado voluntariamente con las solicitudes
de documentos del Investigador Independiente o un interrogatorio, cuando el testigo haya comunicado que no
puede cooperar voluntariamente con las solicitudes del Investigador Independiente, o cuando el testigo haya
respondido un interrogatorio, pero el Investigador Independiente, en consulta con el Consejero General de la
Junta de Supervisión determina que sería apropiado que el testigo ofrezca su testimonio bajo juramento.

el Comité Especial de Investigación. El Investigador Independiente fue especialmente cuidadoso de evitar la demora y el costo de litigar citaciones legales.

En el curso de la investigación, el Investigador Independiente recibió un total de aproximadamente 260,800 documentos de aproximadamente 2,740,000 páginas, de 32 partes. Esas partes incluyen, entre otras, varias entidades, instituciones financieras, agencias de calificación, asesores financieros, profesionales y reguladores de Puerto Rico.

El Investigador Independiente también obtuvo acceso directo, de solo lectura, a los archivos de custodia de correo electrónico de decenas de empleados y ex empleados del BGF a través de su representante, AAFAF.[150] En nombre del BGF, AAFAF presentó al Investigador Independiente unos 36,000 documentos de esa base de datos.

De conformidad con la Resolución sobre Citaciones Legales de Investigación, el Investigador Independiente emitió doce (12) citaciones legales de investigación (cinco de las cuales se desistieron tras la expedición sobre la base del acuerdo posterior de los beneficiarios de cooperar voluntariamente con el Investigador Independiente).[151] Sin excepción, los destinatarios de las Citaciones Legales de Investigación presentaron documentos al Investigador Independiente en respuesta a esas citaciones legales.

Desde diciembre de 2017 hasta agosto de 2018, el Investigador Independiente realizó un total de aproximadamente 120 entrevistas voluntarias a testigos, sondeando una amplia gama de temas relevantes para la investigación. Entre las personas entrevistadas se encontraban cuatro ex gobernadores de Puerto Rico, antiguos y actuales altos funcionarios del Gobierno, suscriptores de seguros, agencias de calificación crediticia, auditores, profesionales externos y asesores.

A lo largo de la investigación, el Investigador Independiente colaboró estrechamente y mantuvo consultas con CANA y el Comité de Retirados. A partir de noviembre de 2017, el Investigador Independiente mantuvo contactos periódicos con CANA y el Comité de Retirados en relación con la investigación. En concreto, además de la cooperación y la comunicación mediante llamadas y correos electrónicos cuando fuera necesario, el Investigador Independiente participó en conferencias telefónicas semanales con el abogado de CANA y del Comité de Retirados, respectivamente. Durante esas conferencias, el Investigador Independiente proporcionó información sobre los testigos que serían entrevistados en la semana siguiente, solicitó información sobre preguntas a los testigos, proporcionó asesoramiento a CANA y al Comité de Retirados con sus observaciones preliminares sobre los resultados de la investigación en ámbitos en los que

---

[150] Este acceso se obtuvo a través de la Sección 104(c)(2) de PROMESA, que establece lo siguiente: "Sin perjuicio de cualquier otra disposición legal, la Junta de Supervisión tendrá derecho a obtener copias protegidas, impresas o electrónicas, de dichos registros, documentos, información, datos o metadatos del gobierno territorial que sean necesarias para que la Junta de Supervisión pueda desempeñar sus funciones en virtud de este capítulo. A petición de la Junta de Supervisión, la Junta de Supervisión tendrá acceso directo a dichos sistemas de información, registros, documentos, información o datos que permitan a la Junta de Supervisión cumplir sus responsabilidades en virtud de la presente Ley". 48 U.S.C. § 2124(c)(2).

[151] Los destinatarios de las Citaciones Legales de Investigación (aparte de las que fueron desistidas) fueron Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp y Santander Securities LLC.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

CANA y el Comité de Retirados habían expresado interés, y también proporcionó a CANA y al Comité de Retirados acceso a los materiales proporcionados al Investigador Independiente.

### (c)     Principales conclusiones de la investigación independiente sobre la ACT

El 20 de agosto de 2018, el Investigador Independiente publicó su Informe Final de Investigación. Esta Declaración de Divulgación incluye un resumen de las principales conclusiones del Investigador Independiente relacionadas únicamente con la ACT. El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.[152]

Como se indicó en la Parte IV del Informe Final de Investigación, la investigación reveló que la ACT dependía históricamente del BGF para cubrir los gastos operativos, en particular cuando no podía acceder a los mercados de capitales. Muchos de esos préstamos fueron, según ex funcionarios del BGF, utilizados para cubrir los déficits presupuestarios de la ACT. Con respecto a la ACT en particular, el BGF evaluó y aprobó sus préstamos muy rápidamente, a veces en cuestión de horas, después de la presentación de una solicitud. Según los testigos, esto era para evitar posibles consecuencias adversas derivadas de la falta de salud fiscal de la ACT, como que la ACT hubiera tenido que cerrar el Tren Urbano si no se hubiera pagado a su operador. También hay pruebas de que, en algunos casos, el BGF puede haber aprobado solicitudes de financiamiento de la ACT a pesar de circunstancias que, si el BGF y los beneficiarios hubieran sido agentes privados, podrían haber dado lugar a una diligencia debida adicional.

La voluntad gubernamental de todos los gobiernos también afectó la toma de decisiones del BGF con respecto a la carga de la deuda de la ACT. Por ejemplo, durante el gobierno del gobernador Fortuño, el BGF aumentó la línea de crédito de la ACT a aproximadamente $2 mil millones. En ese momento, el total de los préstamos por cobrar del BGF era de aproximadamente 9 mil millones de dólares.[153] EL BGF actuó de esta manera, según un testigo, para que la ACT no tuviera que aumentar los derechos de registro de vehículos, el transporte público, los peajes, o el impuesto a la gasolina; todos los cuales habrían aumentado los costos para los votantes comunes.

Luego, a principios de 2013, el gobierno del gobernador García Padilla decidió que el BGF ya no debería apoyar a las corporaciones públicas a través de asignaciones. Al mismo tiempo, sin embargo, los testigos informaron que el Gobernador seguía reacio a aumentar las tarifas de la ACT o los impuestos conexos o no aceptaría aumentarlos tanto como la administración del BGF había recomendado.

---

[152] Puede consultarse un resumen general de todo el Informe Final de Investigación en el Resumen Ejecutivo, que está disponible en el sitio web de la Junta de Supervisión https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

[153] En cuanto al contexto, el ELA tenía un presupuesto previsto de aproximadamente $9 mil millones en 2013. *Véase* Estado Libre Asociado de P.R., *Estados financieros básicos e información suplementaria requerida: Año fiscal cerrado el 30 de junio de 2013*, 246 (30 de junio de 2014).

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

(d)      **Resumen de potenciales causas de acción pertinentes para la ACT**

En su Informe Final de Investigación, el Investigador Independiente evaluó si sus hallazgos fácticos apoyan la opinión de que cualquiera de las partes involucradas en la crisis fiscal de Puerto Rico cometió acciones que pueden ser objeto de procesos legales bajo ciertas leyes federales, estatales y locales de EE.UU. El Investigador Independiente discutió su consideración de ciertas, pero no todas, potenciales reclamaciones disponibles para Deudores de Título III (o sus patrimonios) e inversionistas, entre otros interesados, bajo la ley federal aplicable de los EE.UU. (incluso las leyes de valores y el Código de Quiebras, tal como son hechas aplicables por PROMESA), la ley en Puerto Rico, y la ley de otras jurisdicciones de EE.UU. como se indica por análisis de elección de ley. Esta discusión se llevó a cabo con los propósitos legales esbozados en PROMESA y no para ayudar a ningún litigante específico. Su resumen general de la aplicación de la ley no es asesoramiento jurídico y sus averiguaciones de hechos no constituyen pruebas admisibles en ningún litigio pendiente o futuro.

A continuación, figura un resumen de las potenciales causas de acción identificadas por el Investigador Independiente en el Informe Final de Investigación con respecto a la ACT.[154]   El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.

El Informe Final de Investigación contiene una discusión de los hallazgos de la investigación que pueden apoyar posibles reclamaciones en relación con la ACT. Los resultados se centran en la tensión derivada del doble rol del BGF como agente fiscal y prestamista de la ACT. Según el Investigador, las pruebas disponibles reflejan que el BGF, en calidad de agente fiscal, podría haber hecho más cuando se le pidió que actuara como prestamista de la ACT para aprobar nuevos préstamos. En algunos casos, el BGF puede haber aprobado las solicitudes de financiamiento de la ACT a pesar de las circunstancias que podrían o deberían haber llevado a una diligencia debida adicional. Estas pruebas, junto con una investigación más profunda, pueden permitir a las partes interesadas hacer valer ciertas reclamaciones de responsabilidad del prestamista y de incumplimiento fiduciario contra el BGF y sus correspondientes miembros del Consejo y personas de control.

(e)      **Resumen de las recomendaciones relativas a la ACT**

El Informe Final de Investigación incluye recomendaciones relativas a cada uno de los temas investigados por el Investigador Independiente. Esta Declaración de Divulgación incluye un resumen de las recomendaciones del Investigador Independiente relacionadas únicamente con la ACT. El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.

---

[154]   La discusión de las potenciales causas de acción abarca casi 100 páginas del informe final de investigación. El resumen que figura en el presente está limitado en su totalidad por el Informe Final de Investigación, que las partes deben consultar en caso de ambigüedad o conflicto.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

El Investigador Independiente recomendó que las ramas políticas de Puerto Rico evalúen medidas para separar el agente fiscal y las funciones de préstamo para el sucesor del BGF, y consideraran reformas para cada rol. El Investigador Independiente recomendó, entre otras cosas, que el nuevo agente fiscal tuviera una mejor supervisión de la ACT, y otros emisores, aconseja con acceso a los sistemas contables conjuntos e integrados y una mayor supervisión de las finanzas. El Investigador Independiente también recomendó, entre otras cosas, que la nueva entidad de crédito adoptara políticas y procedimientos, incluidas las políticas de crédito, con el marco que aplicaría un banco privado para evaluar los riesgos de su propia cartera de préstamos. En concreto, el Investigador Independiente sugirió que la entidad prestamista reevaluara trimestralmente la posibilidad de recaudación y otros riesgos asociados con el financiamiento del sector público.

## 2. Nombramiento del Comité de Reclamaciones Especiales y contratación de abogados

En los pocos días siguientes a la recepción del Informe Final de Investigación publicado, la Junta de Supervisión emitió un consentimiento unánime por escrito por el que nombraba al Comité de Reclamaciones Especiales independiente para que tramitara las reclamaciones resultantes de las conclusiones de la Investigación.[155]   A continuación, la Junta de Supervisión realizó una Solicitud de Propuestas para asesorar al comité recién constituido.

El 28 de noviembre de 2018, la Junta de Supervisión, actuando por y a través de su Comité de Reclamaciones Especiales, contrató a Brown Rudnick LLP como asesor del Comité de Reclamaciones Especiales para ayudar al Comité de Reclamaciones Especiales en la investigación, el inicio de la negociación y/o el trámite de posibles reclamaciones que puedan surgir de la conducta descrita en el Informe Final de Investigación ("Asesor de reclamaciones"). Además, en febrero de 2019, el Comité de Reclamaciones Especiales contrató a una empresa de servicios de asesoramiento financiero para que ayudara al Asesor de Reclamaciones en la investigación de potenciales reclamaciones.

En el Informe Final de Investigación no se abordaban las Acciones de Anulación[156] y no se determinaban las reclamaciones o causas concretas que el ELA y sus instrumentalidades podían

---

[155] Los actuales miembros del Comité de Reclamaciones Especiales son Andrew G. Biggs, Arthur J. González y David A. Skeel, Jr.

[156] Causas de acción derivadas de las Secciones 544, 545, 547 y 548 del Código de Quiebras. Existen esencialmente dos teorías jurídicas diferentes para estas acciones de anulación: la preferencia y la transferencia fraudulenta. Una *preferencia* es un pago en los noventa (90) días previos a la quiebra a un acreedor "preferido", es decir, alguien que recibió un pago superior a lo habitual cuando otros en situaciones similares no estaban siendo pagados debido a la insolvencia de Puerto Rico. (Para las partes con relaciones familiares con funcionarios electos, y otros con relaciones "internas" con el gobierno, el período pertinente es de un año en lugar de noventa (90) días). 11 U.S.C. § 547. En cambio, y más importante, una *transferencia fraudulenta* es un pago hecho por el cual Puerto Rico no recibió "valor razonablemente equivalente" a cambio. Si no es así, incluso si la transferencia no fue intencionalmente errónea o fraudulenta, Puerto Rico puede recuperar los fondos porque el dinero debe beneficiar por derecho a todos los acreedores y ciudadanos. 11 U.S.C. §§ 544, 548. Las preferencias y transferencias fraudulentas pueden ser "evitadas" y los fondos recuperados por Puerto Rico de los destinatarios de las transferencias; de la misma manera o como alternativa, la responsabilidad legal de anulación puede hacer

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

tener contra las personas y entidades que participaban en sus transacciones financieras. Más bien, en el Informe Final de Investigación se esbozaban los antecedentes informativos y analíticos necesarios que servirían de base para que el Comité de Reclamaciones Especiales identifique las reclamaciones judiciables que el ELA y sus instrumentalidades podrían tener en relación con la crisis financiera del ELA.

Así, inmediatamente después de su retención, el Abogado de Reclamaciones comenzó a investigar y analizar las conclusiones del Informe Final de Investigación para determinar y recomendar si había causas viables de acción que la Junta de Supervisión pudiera alegar en beneficio de los contribuyentes, sus instrumentalidades y acreedores legítimos del ELA.

### 3.    Investigación del abogado y cuestiones de prescripción

El Abogado de Reclamaciones examinó los documentos relacionados con el Informe Final de la Investigación para determinar las causas de acción que tuvieran mérito. Además, como se describe más adelante, el Comité de Reclamaciones Especiales realizó frecuentes y numerosas investigaciones a otros profesionales involucrados en los Casos de Título III, así como a posibles Demandados y otras partes para obtener informes, datos financieros, presentaciones, y otros materiales necesarios para que la Junta de Supervisión haga valer sus causas de acción. En suma, el Abogado de Reclamaciones revisó, entre otras cosas:

- el Informe Final de Investigación de 600 páginas;

- aproximadamente 100,000 documentos presentados hasta la fecha en apoyo de los hechos y el análisis jurídico que figuran en el Informe Final de Investigación;

- registros de millones de transferencias efectuadas por los Deudores de Título III, incluida la ACT, a terceros durante el período de anulación de cuatro años anterior a la fecha de la petición;

- miles de documentos que identifican a los receptores de supuestos pagos de capital e intereses sobre bonos supuestamente inválidos, mediante registros de decenas de miles de transacciones; y

---

que las reclamaciones del destinatario de las transferencias contra Puerto Rico puedan ser compensadas o denegadas. *Véase* 11 U.S.C. §§ 502, 545, 550, 553.

Las acciones de anulación son muy comunes en los grandes procedimientos de quiebra, incluidos los que afectan a entidades públicas. Permiten a los deudores garantizar que el dinero transferido a terceros en el período anterior a la quiebra se gastó de manera adecuada y justa, y si no, recuperar ese dinero en beneficio de los acreedores y los contribuyentes. Es importante señalar que las acciones de anulación de este tipo no tienen por objeto transmitir que un tercero proveedor haya cometido una infracción. Por el contrario, las acciones de anulación garantizan que ningún acreedor se vea favorecido por los pagos efectuados antes de la declaración de quiebra y que la distribución justa de los bienes de un deudor se haga de conformidad con la ley aplicable. Como con cualquier otra demanda civil, el Demandante (es decir, la Junta de Supervisión, en algunos casos junto con CANA) tiene la carga de probar cada elemento de la acción de anulación por una preponderancia de las pruebas para que el tercero vendedor sea declarado responsable y tenga que devolver el dinero al patrimonio.

" = "1" "2621/33260-009 CURRENT/127656480v7                                        04/30/2022 3:29 PM" ""

- más de 1,600 notificaciones de participación presentadas en relación con la Objeción de Reclamación Conjunta (que se definen a continuación) que identifican a los tenedores actuales de los bonos supuestamente inválidos.

La actividad de investigación de la Junta de Supervisión y el inicio de los litigios se han basado en gran medida en los plazos de prescripción aplicables. En particular, el plazo de prescripción para acciones de anulación conforme a la Sección 11 de U.S.C. 546(a)(1) expiró el 2 de mayo de 2019 para la ACT. La expiración del plazo de prescripción podría, en muchos casos, impedir que la Junta de Supervisión enjuicie muchas de las reclamaciones descritas en el presente.

La Junta de Supervisión ha adoptado una serie de medidas para proteger sus reclamaciones contra defensas por prescripción. La principal de estas es que la Junta de Supervisión inició cientos de procesos contenciosos antes de que expirara el plazo de prescripción aplicable, incluidos siete procesos contenciosos contra partes que hicieron negocios con la ACT. En algunos casos que se describen con más detalle a continuación, la Junta de Supervisión ha iniciado litigios con la intención explícita de preservar derechos, a pesar de que el enjuiciamiento de sus reclamaciones no sería una asignación óptima de recursos en el momento actual, y, en consecuencia, ha solicitado que se suspendan los litigios por el momento.

### 4.    Causas de acción contra profesionales y personal externos

La investigación de la Junta de Supervisión sugirió que de 2008 a 2014 (la emisión definitiva de bonos por el ELA hasta la fecha), numerosos profesionales externos participaron a sabiendas en emisiones de bonos que podrían haber sido ilegales, que profundizaron la insolvencia del ELA, y de sus deudores afiliados, y que resultaron en otros daños para los Deudores. En consecuencia, la Junta de Supervisión investigó y comenzó a presentar reclamaciones contra numerosas partes por hechos ilícitos relacionados con la emisión de deuda por el ELA y algunas de sus instrumentalidades y corporaciones públicas. Las partes incluyen:

- suscriptores de seguros de deudas declaradas inválidas o emitidas indebidamente;

- bufetes de abogados que asesoraron sobre transacciones de deuda;

- auditores de las finanzas del ELA; y

- contrapartes en acuerdos de swaps de tasas de interés.

Algunas de estas transacciones de deuda se describen con mayor detalle a continuación. En suma, estos "terceros demandados" prestaron servicios que en muchos casos dieron lugar a obligaciones fiduciarias de actuar en el interés superior del ELA y sus instrumentalidades. Los Terceros Demandados cobraron honorarios sustanciales al facilitar más y más transacciones de deuda, permitir que el ELA y sus instrumentalidades emitan supuestos instrumentos de deuda a pesar de la insolvencia del ELA y de las limitaciones constitucionales y legales de las emisiones de deuda.

La Junta de Supervisión presentó el Proc. Cont. Núm. 19-00280[157] contra los Terceros Demandados en nombre del ELA y sus deudores afiliados, incluyendo a ACT. La demanda de la Junta de Supervisión articula reclamaciones sobre la naturaleza de la violación del deber fiduciario y la complicidad en el incumplimiento del deber fiduciario,[158] mala praxis profesional, transferencias fraudulentas y enriquecimiento injusto. Además de presentar su demanda, la Junta de Supervisión ha negociado acuerdos de suspensión de la prescripción con varios posibles Demandados y resolverá sus reclamaciones extrajudicialmente o iniciará un litigio contra esas partes tras una investigación ulterior.

En conjunto, estas varias docenas de Terceros Demandados ganaron casi $300 millones en honorarios por servicios que supuestamente dañaron al ELA y a sus instrumentalidades. Las contrapartes de swaps recibieron otros 90 millones de dólares en concepto de comisión de terminación de swaps. Aunque la Junta de Supervisión está tratando de obtener una indemnización por daños y perjuicios por un monto por determinar, es probable que esos pagos de honorarios constituyan la indemnización mínima. En virtud de otras teorías sobre daños y perjuicios, la Junta de Supervisión puede tratar de recuperar miles de millones de dólares transferidos ilícitamente por el ELA y/o sus instrumentalidades a otras partes como resultado de las actividades ilícitas cometidas por terceros. El 24 de julio de 2019, el Tribunal emitió una orden que paraliza este litigio hasta que se confirme el Plan del ELA. El Plan del ELA y el Plan de la ACT prevén que este litigio continúe después de la confirmación.

## 5. Acciones de anulación contra proveedores

El Informe Final de Investigación se centró en transacciones de financiamiento de la deuda a gran escala y no se refería a posibles acciones de anulación relativas a los miles de millones de dólares en pagos de los Deudores de Título III a partes que presuntamente proveían bienes y servicios a los Deudores conforme a supuestos contratos (los "Pagos de Proveedores" a los "proveedores").[159] En consecuencia, el Comité de Reclamaciones Especiales comenzó a investigar los Pagos a los Proveedores para asegurarse de que esos pagos se ajustaran al derecho aplicable.

En concertación con CANA, la Junta de Supervisión obtuvo de AAFAF registros de todos los pagos a los proveedores en los cuatro años anteriores al comienzo de los respectivos casos de Título III. El Comité de Reclamaciones Especiales, en colaboración con CANA, examinó los

---

[157] *El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de sus miembros, el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Barclays Capital y otros*, 19-AP-00280 (el "Litigio de Suscriptores de Seguros").

[158] La Junta de Supervisión ha alegado que algunas partes fueron cómplices del BGF en el incumplimiento de su obligación fiduciaria hacia el ELA y sus instrumentalidades. Las reclamaciones contra el propio BGF han sido exoneradas conforme a la modificación del Título VI de PROMESA del BGF. *Véase* la Sección V.I.2 de esta Declaración de Divulgación para una breve descripción de los procedimientos de modificación del Título VI del BGF.

[159] Por "Proveedores" y "Pagos a los Proveedores" se entienden los contratistas y los pagos efectuados conforme a un contrato, respectivamente, en contraposición a los destinatarios de pagos efectuados conforme a asignaciones legislativas.

registros de millones de pagos individuales a cientos de miles de proveedores únicos, por un total de más de $12 mil millones. Tras examinar los contratos registrados y excluir a los órganos gubernamentales y las organizaciones sin fines de lucro, entre otros, la Junta de Supervisión identificó los pagos realizados por los Deudores de Título III a unos 345 proveedores por valor de más de $4 mil millones como potencialmente recobrables conforme a las teorías de anulación.[160] Como parte de este proceso, la Junta de Supervisión identificó aproximadamente $188 millones en pagos totales de la ACT a siete (7) proveedores como potencialmente recuperables.

### (a)    Acuerdos de suspensión de la prescripción y litigios

Después de concluir su examen y de identificar a las partes potencialmente responsables, la Junta de Supervisión ofreció a los proveedores la oportunidad de suspender el plazo de prescripción para la presentación de acciones de anulación del proveedor, es decir, prorrogar por acuerdo el plazo previsto para que la Junta de Supervisión presente una acción de anulación. Como tal, en las semanas previas a la respectiva prescripción, el Abogado de Reclamaciones envió a cada proveedor una carta introductoria y un acuerdo de suspensión de la prescripción que los proveedores podían firmar y devolver para evitar la presentación de una demanda y preservar los derechos de los Deudores de Título III con respecto a sus reclamaciones de anulación. No se han firmado acuerdos de suspensión de la prescripción con respecto a la ACT.

Después de excluir a las partes de los acuerdos de suspensión de la prescripción, la Junta de Supervisión presentó aproximadamente 250 acciones de anulación para recobrar aproximadamente $3 mil millones en pagos a proveedores.[161]   La Junta de Supervisión ha anunciado su preferencia por conciliar estas acciones, y las posibles reclamaciones sujetas a acuerdos de suspensión de la prescripción, conforme a un procedimiento voluntario de resolución de litigios extrajudicial que se describe en el sitio web de la notificación en los Casos de Título III y que se describe más detalladamente a continuación.

### (b)    Procedimientos informales de resolución

El 7 de junio de 2019, la Junta de Supervisión y CANA presentaron una moción general en los casos de Título III del ELA, ACT, SRE, y AEE, solicitando la aprobación de procedimientos de gestión de casos en el procedimiento de anulación interpuesto contra proveedores.[162]   La Moción de Procedimientos de Acción para los Proveedores solicitó específicamente la aprobación de los procedimientos que rigen: (i) los procedimientos y fechas límite de los litigios, (ii) la mediación voluntaria y (iii) la conciliación (los "Procedimientos de Acción para los Proveedores").

---

[160] Aproximadamente 335 de los proveedores identificados tenían contratos con el ELA, uno con SRE y el resto con la ACT. La gran mayoría de los daños reclamados, más de $4 mil millones, se refieren a supuestos contratos con el ELA.

[161] CANA se unió a algunas, pero no todas estas acciones de reintegración.

[162] *Véase Notificación de Vista de la Moción General de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación de conciliaciones*, [ECF Núm. 7325] (la "Moción de Procedimientos de Acción para los Proveedores").

El 12 de julio de 2019, el Tribunal de Título III dictó una orden de aprobación de los Procedimientos de Acción para los Proveedores, que luego se notificaron a todos los Demandados de las acciones de anulación de los proveedores junto con la citación y la demanda.[163]

Con respecto a los procedimientos de litigio y las fechas límite, los Procedimientos de Acción para los Proveedores disponen que los documentos judiciales deben presentarse de conformidad con las órdenes de gestión de casos dictadas por el Tribunal de Título III en el caso de Título III del ELA. *Véase Decimotercera Notificación Enmendada, Gestión de Casos y Procedimientos Administrativos* [ECF Núm. 13512-1]. Los procedimientos requieren además la notificación de los procedimientos y la orden de aprobación a los Demandados, y especificar formas y domicilios de notificación compatibles con las normas aplicables. Además, los Procedimientos de Acción para los Proveedores disponen la aplicación menos estricta de las fechas límite para la presentación de escritos de contestación y de disposición, la presentación de pruebas y otras presentaciones, sujeto a que se modifiquen a petición de cualquiera de las partes. Una orden análoga rige la resolución de reclamaciones sujetas a acuerdos de peaje. *Véase Orden que concede la Moción de la Junta de Supervisión y Administración Financiera para Puerto Rico, actuando por y a través de los miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para establecer procedimientos para la aprobación de transacciones* [ECF Núm. 16791] .

Estas fechas límite previstas en los Procedimientos de Acción para los Proveedores por lo general continúan todas las fechas límite de litigio. Durante el período de aplazamiento, prorrogado desde entonces por órdenes judiciales, la Junta de Supervisión y CANA han participado en un proceso de resolución informal que se describe como el "Intercambio de información" por el que la Junta de Supervisión y los proveedores actúan con diligencia adicional dentro de los parámetros especificados y luego comenzarán las negociaciones para llegar a una transacción.

Los Procedimientos de Acción para los Proveedores describen un proceso de mediación por el cual la Junta de Supervisión y cualquier Demandado(s) pueden seleccionar mediadores, programar la mediación y mantener informado al tribunal sobre el progreso de la mediación. El proceso de mediación es por sus propios términos totalmente voluntario y no vinculante y ajustable por acuerdo de las partes; los Procedimientos de Acción para los Proveedores simplemente esbozan el proceso de mediación y proporcionarían su aprobación anticipada, evitando la necesidad de que las partes soliciten la aprobación judicial de una paralización del litigio mientras la mediación esté en curso.

Desde la presentación de la Moción de Procedimientos de Acción para los Proveedores, el Comité de Reclamaciones Especiales y CANA han estado trabajando para resolver los acuerdos de suspensión de la prescripción y las acciones de anulación concertadas con los proveedores o presentadas contra ellos. Al 1 de febrero de 2022, se han desestimado aproximadamente ciento ochenta y cinco procesos contenciosos, incluidos seis (6) de los siete (7) procedimientos

---

[163] *Véase la Orden que otorga la Moción General de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación de los acuerdos,* [ECF Núm. 7941] (orden con Procedimientos de Acción para los Proveedores revisados adjuntos).

relacionados con la ACT como resultado de la participación de un proveedor-demandado en el proceso de resolución informal y/o los continuos esfuerzos del Comité de Reclamaciones Especiales para obtener documentación de las agencias del ELA que justifiquen los pagos solicitados que recibieron los proveedores antes de la petición  Del mismo modo, al 1 de febrero de 2022, aproximadamente setenta y dos acuerdos de suspensión de la prescripción con proveedores han dado lugar a que el Comité de Reclamaciones Especiales y CANA no hayan adoptado ninguna otra medida por las mismas razones.

En este momento, se han resuelto por transacción monetaria o se han identificado para su eventual transacción varias decenas de demandados en acciones de anulación y partes con acuerdos de suspensión de la prescripción debido a los intercambios de información que sugieren responsabilidad de reintegración. El Comité de Reclamaciones Especiales y CANA están preparando, celebrando y/o finalizando activamente conversaciones sobre transacciones con decenas de partes. Al 1 de febrero de 2022, el Comité de Reclamaciones Especiales y CANA también han recibido aproximadamente $7.1 millones en fondos de transacción. De manera acordada, los fondos se mantienen en depósito en cuentas de plica y se incluirán en el Fideicomiso de Acciones de Anulación, sujeto a cualquier arancel de depósito en cuenta de plica pendiente, una vez confirmado el Plan del ELA.

En noviembre de 2019, el Comité de Reclamaciones Especiales y CANA presentaron una moción para modificar los Procedimientos de Acción para los Proveedores, y el Tribunal de Título III concedió la moción, para seguir facilitando la resolución informal y extrajudicial de las acciones de anulación.[164]   La Orden de Procedimientos de Acción para los Proveedores Modificada prorrogó las fechas límite de presentación de pruebas y litigio varios meses para permitir que las partes tengan más tiempo para resolver informalmente las demandas antes de que sea necesario un litigio formal. Esas fechas límite se prorrogaron hasta 2021 mediante una serie de órdenes dictadas, entre otras cosas, a la luz de los desafíos planteados por COVID-19. *Véase*, p. ej., [ECF Núm. 16429]. En agosto de 2021, el Tribunal dictó una orden de paralización de todas las acciones de anulación para llevar a cabo el Plan del ELA y los acuerdos relacionados. [ECF Núm. 17977]. Dicha paralización sigue vigente en lo que respecta al único proceso contencioso relacionado con la ACT que queda. *Véase* Proc. Cont. Núm. 19-354 (LTS), ECF Núm. 18.

## H.    La orden de paralización y los informes del Equipo de Mediación

### 1.    La Orden de Paralización

El 24 de julio de 2019, el Tribunal de Título III emitió la Orden de Paralización [Caso Núm. 17-bk-3283, ECF Núm. 8244], por la que se paralizaban hasta el 30 de noviembre de 2019 ciertos procesos contenciosos y cuestiones controvertidas relacionados con el litigio relativo a la validez de los bonos de obligaciones generales del ELA, así como los bonos emitidos por otras entidades y garantizados por el ELA. Conforme a la Orden de Paralización, esta paralización tenía

---

[164] *Véase Orden de Concesión de Moción General para la extensión de fechas límite para otorgar la Moción General por La Junta de Supervisión y Administración Financiera para Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de gestión de casos de litigio y (II) Establecer procedimientos para la aprobación de conciliaciones,* [ECF Núm. 9476] (la "Orden de Procedimientos de Acción para los Proveedores Modificada")

por objeto "evitar el litigio fragmentario de cuestiones clave potencialmente superpuestas, y en un esfuerzo por identificar de manera eficiente las cuestiones que deben ser litigadas o resueltas de otra manera para lograr la confirmación de un plan de ajuste para el ELA (y otros deudores y potenciales deudores en los procedimientos de Título III), así como para priorizar dichas cuestiones y desarrollar enfoques eficientes para la resolución de dichas cuestiones". *Véase* Orden de Paralización en 1.

Mientras la paralización seguía pendiente, la Orden de Paralización ordenó a la Junta de Supervisión, a la AAFAF, a CANA, al Comité Oficial de Empleados Retirados y a las partes en los procesos contenciosos paralizados y las cuestiones controvertidas, según las indicaciones de la Honorable Barbara J. Houser, la Jefa del Equipo de Mediación para los procedimientos de Título III (la "Jefa del Equipo de Mediación"), que participaran en las discusiones y comunicaciones facilitadas por la Jefa del Equipo de Mediación para abordar las preocupaciones identificadas por el Tribunal de Título III en la Orden de Paralización.

## 2.    Informe provisorio y recomendación del Equipo de Mediación

El 27 de noviembre de 2019, la Jefa del Equipo de Mediación presentó su *Informe Provisorio y la Recomendación del Equipo de Mediación* [Caso Núm. 17-bk-3283, ECF Núm. 9365] (el "Informe Provisorio"). El Informe Provisorio describía dos tareas realizadas simultáneamente por el Equipo de Mediación. En primer lugar, el Equipo de Mediación abordó la programación y secuenciamiento de cuestiones identificadas en la Orden de Paralización o identificadas por las partes como cuestiones pertinentes para la ratificación del plan de ajuste para uno o más deudores de Título III. *Véase* el Informe Provisorio. En segundo lugar, el Equipo de Mediación hizo que las partes participaran en sustanciales sesiones de mediación como lo indicaba la Orden de Paralización. *Id.* en 2.

El Informe Provisorio estableció (en 4) que, debido a que un plan de ajuste enmendado podría hacer que las recomendaciones de programación del Equipo de Mediación fueran irrelevantes, el Informe Provisorio abordaba únicamente la programación de cuestiones en disputa que deberían ejecutarse en el corto plazo: la programación y secuenciación de litigios respecto de (i) la validez de ciertas series impugnadas de bonos GO y AEP, (ii) la situación de garantizada o no garantizada de reclamaciones sobre bonos GO y AEP, (iii) y los derechos contra el ELA de tenedores de "bonos de ingresos" y otras deudas emitidas por ciertas instrumentalidades de Puerto Rico. El Informe Provisorio describía que estas cuestiones están entre las más fundamentales y centrales de los casos de Título III, y recomendaba que el litigio de dichas cuestiones debería iniciarse lo antes posible. *Id.* en 5. El Informe Provisorio adjuntaba órdenes de programación propuestas para los litigios relativos a (i) los bonos GO y AEP; (ii) los bonos de ingresos emitidos por ACT, AFI y ADCC; y (iii) la moción de remedio de la paralización presentada por las Partes de la ARD.

El 6 de diciembre de 2019, numerosas partes, entre ellas la Junta de Supervisión, Ambac, National, FGIC, Assured, CANA, las Partes de la ARD y Peter C. Hein, presentaron respuestas al Informe Provisorio del Equipo de Mediación [Caso Núm. 17-bk-3283, ECF Núm. 9493, 9504, 9440, 9485, 9505, 9503, 9508]. El 11 de diciembre de 2019, el Tribunal de Título III realizó una vista para analizar el Informe Provisorio, las órdenes de programación propuestas y las objeciones de las partes y las respuestas a estas.

El 19 de diciembre de 2019, el Tribunal de Título III presentó la orden de programación propuesta para el litigio relativo a los bonos de ingresos [Caso Núm. 17-bk-3283, ECF Núm. 9620]. El Tribunal también emitió una orden que prorrogaba la duración de la paralización hasta el 31 de enero de 2020, prorrogando la fecha límite para que el Equipo de Mediación presentase un informe enmendado al 10 de enero de 2020, y programando una vista para analizar el informe emendado para el 29 de enero de 2020 [Caso Núm. 17-bk-3283, ECF Núm. 9618].

El 23 de diciembre de 2019, en respuesta a una solicitud del Equipo de Mediación, el Tribunal de Título III registró una orden por la que se prorrogaba la fecha límite anterior del 10 de enero de 2020 hasta el 10 de febrero de 2020, se aplazaba la vista sobre el informe enmendado hasta el 4 de marzo de 2020 y se prorrogaba la paralización hasta el 11 de marzo de 2020. [Caso Núm. 17-bk-3283, ECF Núm. 9639].

Numerosas partes presentaron objeciones u otras respuestas a la orden del Tribunal de Título III del 23 de diciembre de 2019, incluyendo a Assured, National, Ambac, FGIC, las Partes de la ARD y CANA. [Caso Núm. 17-bk-3283, ECF Núm. 9655, 10251, 10249, 10421 y 10424]. En la vista general del 29 de enero de 2020, el Tribunal de Título III, entre otras cosas, consideró cuestiones relacionadas con la orden de gestión de casos para litigar cuestiones relacionadas con los bonos de ingresos. Con respecto a, entre otras cosas, la Moción de Levantamiento de la Paralización de la ACT, el Tribunal de Título III dividió las cuestiones de legitimidad y estado garantizado, permitió la presentación limitada de pruebas sobre temas preliminares y programó una vista sobre las Mociones de Levantamiento de la Paralización divididas para el 5 de marzo de 2020. El 31 de enero de 2020, el Tribunal de Título III registró una Orden de Gestión de Casos provisoria enmendada para los bonos de ingresos [Caso Núm. 17-bk-3283, ECF Núm. 10595], que reflejaba las modificaciones analizadas en la vista general del 29 de enero de 2020.

### 3.     Informe enmendado y recomendación del Equipo de Mediación

#### (a)     Informe enmendado del 10 de febrero de 2020

El 10 de febrero de 2020, el Equipo de Mediación presentó su *Informe Enmendado y Recomendación del Equipo de Mediación* [Caso Núm. 17-bk-3283, ECF Núm. 10756] (el "Informe Enmendado"). El Informe Enmendado señaló que, desde la presentación del Informe Provisorio, el AAP de 2020 había sido firmado por la Junta de Supervisión y los tenedores de unos $8 mil millones en reclamaciones de bonos GO/AEP, y que esto se había notificado públicamente el 9 de febrero de 2020. Informe Enmendado en 8.

En el Informe Enmendado, el Equipo de Mediación hizo varias recomendaciones sobre los calendarios de los litigios relacionados con los bonos GO y AEP, los bonos de ingresos y los bonos SRE, así como la programación propuesta para otros litigios sujetos a la paralización. El Equipo de Mediación también propuso un calendario potencial para el período de vista previo a la Declaración de Divulgación, la vista de la Declaración de Divulgación y la vista de confirmación, *Véase id.* en 20-26.

Varias partes presentaron respuestas al Informe Enmendado del Equipo de Mediación, entre ellas Peter C. Hein, AAFAF, Ambac, Assured, National, FGIC, CANA y las Partes de la ARD. [Caso Núm. 17-bk-3283, ECF Núm. 11284, 11159, 11482, 11493, 11496, 11497, 11498 y

11495]. También el 21 de febrero de 2020, la Junta de Supervisión y las Partes del AAP presentaron declaraciones en apoyo al Informe Enmendado. [Caso Núm. 17-bk-3283, ECF Núm. 11492, 11499].

### (b) Orden Final del 10 de marzo de 2020

El Tribunal de Título III celebró una vista sobre el Informe Enmendado y las objeciones y contestaciones el 4 de marzo de 2020. El 10 de marzo de 2020, el Tribunal de Título III emitió la *Orden Final relativa a (A) el período de paralización, (B) la mediación obligatoria y (C) ciertas fechas límite relacionadas con esta*, [Caso Núm. 17-bk-3283, ECF Núm. 12189] (la "Orden Final de Paralización y Mediación"). La Orden Final de Paralización y Mediación adoptó las recomendaciones del Equipo de Mediación con ciertas modificaciones, y ordenó lo siguiente:

- El Tribunal de Título III paralizó todas las cuestiones controvertidas y los procesos contenciosos relacionados con la validez y la prioridad de las obligaciones de los GO hasta la decisión del Tribunal de Título III sobre la confirmación del *Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* [ECF Núm. 11946] (el "Plan del ELA 2020").

- El Tribunal de Título III modificó la Orden Provisional Enmendada de Bonos de Ingresos en consonancia con la propuesta de Orden Final de Programación de Bonos de Ingresos, incluyendo los cronogramas para la presentación de mociones de sentencia sumaria parcial y el tratamiento de los posibles conflictos de intereses intradeudores, las disposiciones para presentación limitada de pruebas con respecto a la Moción de Levantamiento de la Paralización de la ACT, la Moción de Levantamiento de la Paralización de AFI o la Moción de Levantamiento de la Paralización de ADCC; y una disposición que permite a las partes solicitar la certificación de las decisiones sobre las Mociones de Paralización de Bonos de Ingresos para su inmediata apelación.

El Tribunal de Título III ordenó además que, a menos que posteriormente ordenara lo contrario, las cuestiones controvertidas o los procesos contenciosos identificados en el Apéndice A de la Orden Final de Paralización y Mediación, así como las cuestiones controvertidas o los procesos contenciosos que (i) abordaran cuestiones resueltas por el Plan del ELA 2020, o (ii) abordaran cuestiones acumuladas en cualquiera de los litigios que se suspendieran a la espera de una decisión sobre la confirmación, se paralizarían a la espera de la decisión del Tribunal de Título III sobre la confirmación del Plan del ELA 2020.

## I. Reestructuraciones relacionadas de la deuda

### 1. Caso de Título III del ELA

#### (a) Antecedentes

Puerto Rico tiene una superficie de aproximadamente 3,500 millas cuadradas y una población estimada por la Oficina del Censo de Estados Unidos de aproximadamente 3.2 millones de personas al 1 de julio de 2019.

Puerto Rico quedó bajo la soberanía de los EE.UU. en virtud del Tratado de París de 1898. En 1917, conforme a la ley Jones-Shafroth, Pub. L 64-368, los ciudadanos de Puerto Rico se convirtieron en ciudadanos de los EE.UU. En 1950, el Congreso de los Estados Unidos autorizó a Puerto Rico a que aprobara su propia Constitución, la cual fue elaborada por una convención constitucional elegida por el pueblo, aprobada en un referendo especial por el pueblo de Puerto Rico, enmendada, confirmada por el Congreso de los Estados Unidos, y posteriormente aprobada por el Presidente de los Estados Unidos en 1952. La Constitución del ELA dispone la separación de poderes entre los poderes ejecutivo, legislativo y judicial del gobierno. La Legislatura se compone de un Senado y una Cámara de Representantes, cuyos miembros se eligen por períodos de cuatro años.

Desde que se aprobó la Ley PROMESA, Puerto Rico ha tenido cinco Gobernadores. El primero, Alejandro García Padilla, fue elegido Gobernador el 6 de noviembre de 2012 y juramentado para un mandato de 4 años el 2 de enero de 2013. El segundo, Ricardo A. Rosselló Nevares, fue elegido Gobernador el 8 de noviembre, 2016, y fue juramentado para un mandato de cuatro años el 2 de enero, 2017. El 24 de julio, 2019, el entonces Gobernador Rosselló anuncio su renuncia con fecha efectiva del 2 de agosto, 2019. Antes de que su renuncia fuera efectiva, el entonces Gobernador Rosselló nombró al ex-Comisionado Residente Pedro Pierluisi como Secretario de Estado, que es el primer funcionario en la línea de sucesión del Gobernador de acuerdo con la Constitución del ELA. Después de ser confirmado solamente por la Cámara de Representantes de Puerto Rico, aunque no por el Senado, el Sr. Pierluisi fue juramentado como Gobernador interino el 2 de agosto de 2019. Sin embargo, el 7 de agosto de 2019, la Corte Suprema de Puerto Rico unánimemente determinó que el Sr. Pierluisi había sido juramentado inconstitucionalmente, y el Sr. Pierluisi inmediatamente renunció. Más tarde ese mismo día, la Secretaria de Justicia de Puerto Rico, Wanda Vázquez, fue juramentada como Gobernadora conforme a la constitución del ELA para completar la gestión del Gobernador Rosselló hasta el año 2020. Pedro Pierluisi fue elegido Gobernador el 3 de noviembre de 2020 y juramentado para un mandato de cuatro años el 2 de enero de 2021.

Si bien los ciudadanos de Puerto Rico son ciudadanos de los Estados Unidos de conformidad con la Constitución de los EE.UU., los residentes de Puerto Rico no tienen representación directa en el gobierno federal. Puerto Rico no tiene electores en el Colegio Electoral que vota al presidente; sin embargo, los residentes de Puerto Rico pueden participar en las primarias para seleccionar candidatos presidenciales de EE.UU. De forma congruente con el tratamiento de todos los demás territorios de los EE.UU., bajo las reglas vigentes del Congreso de EE.UU., la representación de Puerto Rico en el Congreso se limita a un solo Comisionado Residente, el cual no tiene las facultades parlamentarias otorgadas a los demás miembros del Congreso. No se permite que el Comisionado Residente vote en el pleno de la Cámara, ni se le inscribe en el registro de los Miembros elegidos; tampoco puede votar por el Presidente de la Cámara, ni presentar ni firmar peticiones para la consideración de proyectos de Ley en el pleno. Por otra parte, las contribuciones federales, tales como los impuestos federales sobre la renta, con excepción de las contribuciones sobre la nómina (como las contribuciones de Medicare y Seguro Social) generalmente no son tributables sobre ingresos que se originan en Puerto Rico.[165]

---

[165] La información se basa en la asesoría de AAFAF (según se define a continuación) con respecto al contenido del Estado Financiero del ELA.

Como resultado de la crisis fiscal actual que afecta al ELA, el Congreso de los Estados Unidos aprobó la Ley PROMESA, que estableció la Junta de Supervisión y Administración Financiera para Puerto Rico como una entidad dentro del gobierno del ELA, con amplias facultades para ejercer controles presupuestarios y financieros sobre los asuntos fiscales del ELA y reestructurar su deuda.

**_Instrumentalidades y Corporaciones Públicas del Estado Libre Asociado._** Muchas de las funciones gubernamentales y cuasi-gubernamentales del ELA son desempeñadas por corporaciones públicas que son entidades legalmente separadas, creadas por la Legislatura, y con diversos grados de independencia del ELA. Las corporaciones públicas pueden obtener sus ingresos de las tarifas que cobran por servicios o productos, pero como se describe más abajo, muchos reciben importantes subsidios del ELA. La mayoría de las corporaciones públicas son gobernadas por juntas cuyos miembros son designados por el Gobernador con el consejo y consentimiento del Senado de Puerto Rico. Las mejoras de capital de la mayoría de las corporaciones más importantes históricamente han sido financiadas por bonos emitidos bajo acuerdos de fideicomiso o resoluciones de bonos, o acuerdos de préstamos.

Durante años, muchas corporaciones públicas y otras instrumentalidades tradicionalmente se han valido de subsidios, en forma de asignaciones del Fondo General del ELA o asignaciones de impuestos u otras rentas del ELA u otros ingresos para financiar sus operaciones. Algunas de estas instrumentalidades, incluyendo la Administración de Seguros de Salud de Puerto Rico ("ASES"), la Administración de Servicios Médicos de Puerto Rico; ATI, la Autoridad de Transporte Marítimo de Puerto Rico y las Islas Municipio, la Autoridad Metropolitana de Autobuses ("AMA"), ACT, y la Universidad de Puerto Rico ("UPR"), proveen servicios a los residentes del ELA y dependen en gran medida de dichos subsidios para financiar sus operaciones cotidianas. Otras corporaciones públicas subvencionadas le proveen servicios al Gobierno Central y otras entidades del gobierno, los cuales a su vez proveen servicios a los residentes del ELA.

Los ingresos tributarios y/o asignaciones del ELA también han sido una fuente principal del financiamiento de ciertas corporaciones públicas dedicadas a funciones fiscales y de asesoría (p. ej., la AAFAF, para el desarrollo de infraestructura (p. ej., la Autoridad para el Financiamiento de la Infraestructura ("AFI"), y la Autoridad para Alianzas Público-Privadas de Puerto Rico), transporte y logística aérea y marítima (p. ej., la Autoridad de los Puertos de Puerto Rico), y la promoción económica, turística, y cultural (por ejemplo, la Compañía de Turismo de Puerto Rico ("CTPR"), la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCC"), la Compañía de Fomento Industrial de Puerto Rico  ("PRIDCO") (principalmente con respecto al Fondo Especial para el Desarrollo Económico y el Programa Rones de Puerto Rico), y el Instituto de Cultura Puertorriqueña.

Otras corporaciones públicas, como COFINA y la Corporación para el Financiamiento Público de Puerto Rico ("CFP") han sido creadas como vehículos financieros para el ELA y han emitido deuda garantizada por el poder de imponer contribuciones (en el caso de COFINA) o asignaciones (en el caso de la CFP) como su única fuente de amortización.

Pese a las sustanciales subvenciones de apoyo del ELA, algunas de estas corporaciones públicas sufren importantes pérdidas operativas anuales y llevan montos sustanciales de cuentas por pagar. Si el Plan no logra mejorar la condición financiera del ELA, ni las reformas que la Junta

de Supervisión ha incorporado a sus presupuestos y planes fiscales certificados, es posible que no se pueda seguir sosteniendo estas operaciones al mismo nivel sin que se tomen medidas para reducir otros gastos o aumentar los ingresos.

A la Fecha de Petición del ELA, el ELA tiene aproximadamente $13.7 mil millones de deuda GO y aproximadamente $5 mil millones garantizados por su fe y crédito y su poder impositivo  Los tenedores de la deuda GO y deuda garantizada del ELA afirman que tienen (i) derecho de prelación a "todos los ingresos disponibles" del ELA, y (ii) gravámenes sobre determinadas contribuciones sobre bienes y los fondos asignados históricamente de forma condicional a determinadas instrumentalidades en conformidad con el Artículo VI, sección 8 de la Constitución del ELA. En conformidad con la Sección 8, "cuando los recursos disponibles, incluyendo el superávit, de un año fiscal no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por Ley". Los tenedores de la deuda GO y deuda garantizada del ELA afirman que hasta que todos sus intereses acumulados y capital vencido se hayan pagado en su totalidad, cualquier dinero que de otra forma sería asignado históricamente de manera condicional a la ACT y otras entidades conforme al Artículo VI, Sección 8 de la Constitución del ELA constituyen "recursos disponibles" pagaderos a dichos tenedores.

### (b)    Inicio del Caso de Título III del ELA

El 3 de mayo de 2017, la Junta de Supervisión dictó una certificación de reestructuración conforme a las Secciones 104(j) y 206 de PROMESA y presentó una petición voluntaria de reparación para el ELA conforme a la Sección 304(a) de PROMESA, iniciando el Caso de Título III de ELA.

El 29 de junio de 2017, el Tribunal de Título III registró una orden donde se concedía la administración conjunta de los casos de Título III del ELA y la ACT para fines de procedimiento solamente [ECF Núm. 537].

### (c)    Confirmación y perfeccionamiento del Plan del ELA

En mayo de 2019, la Junta de Supervisión alcanzó acuerdos con varios grupos importantes de acreedores acerca del tratamiento de sus reclamaciones, como se establece en el *Acuerdo de Apoyo al Plan*, de fecha de 31 de mayo de 2019 (el "AAP de 2019"), entre la Junta de Supervisión, y ciertos tenedores de bonos de obligaciones generales del Estado ("Bonos GO") y bonos emitidos por la AEP ("Bonos de la AEP"). El AAP de 2019 incluía la transacción y la resolución de una disputa clave sobre si los arrendamientos reclamados entre el ELA y la AEP eran verdaderos arrendamientos a efectos de la Sección 365 del Código de Quiebras o eran deudas del ELA.

El 7 de junio de 2019, la Junta de Supervisión y el Comité de Retirados celebraron un acuerdo de apoyo al plan en el que se establecía el apoyo del Comité de Retirados durante el plazo de una reestructuración acordada de las obligaciones de pensiones del ELA en virtud del Plan. Ese mismo día, el 7 de junio de 2019, la Junta de Supervisión y la AFSCME celebraron un acuerdo de apoyo al plan en relación, entre otras cosas, con el apoyo de la AFSCME a los términos de un

nuevo contrato de negociación colectiva, junto con la reestructuración de las obligaciones de pensiones de acuerdo con un plan de ajuste para el ELA.

El 27 de septiembre de 2019, la Junta de Supervisión presentó un plan de ajuste inicial [ECF Núm. 8765] (el "Plan Inicial del ELA"), que incorporaba, entre otros acuerdos, el AAP de 2019. A partir de entonces, la Junta de Supervisión continuó involucrando a las partes interesadas en negociaciones facilitadas por el Equipo de Mediación para conseguir un mayor apoyo al Plan Inicial del ELA. El 9 de febrero de 2020, la Junta de Supervisión y algunos tenedores de más de $8 mil millones en Bonos GO y Bonos de la AEP revelaron que habían llegado a un acuerdo global en principio esbozado en un Acuerdo de Apoyo al Plan (el "AAP de 2020"), que contaba con un mayor apoyo entre las partes interesadas que el AAP de 2019.

En cumplimiento del AAP de 2020, el 28 de febrero de 2020, la Junta de Supervisión presentó el *Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* [ECF Núm. 11946].

El 10 de marzo de 2020, el Tribunal de Título III dictó la *Orden de (I) programar una vista para considerar la adecuación de la información contenida en la Declaración de Divulgación, (II) de establecer el plazo para la presentación de la traducción al español de la Declaración de Divulgación, (III) establecer el plazo para la presentación de objeciones a la Declaración de Divulgación y las respuestas a esta, y (IV) de conceder la ayuda relacionada* [ECF Núm. 12187] estableciendo los días 3 y 4 de junio de 2020 como fechas para la vista para considerar la adecuación de la información contenida en la Declaración de Divulgación de 2020 y los plazos relacionados.

Sin embargo, en respuesta a la propagación de COVID-19 a nivel mundial y en todo Puerto Rico, y sus efectos sobre el pueblo y la economía de Puerto Rico, la Junta de Supervisión solicitó el aplazamiento de la vista para considerar la aprobación de la Declaración de Divulgación de 2020 y los plazos relacionados, con sujeción a los informes de estado adicionales que se proporcionarán al Tribunal de Título III [ECF Núm. 12485], que el Tribunal de Título III concedió por orden, de fecha 27 de marzo de 2020 [ECF Núm. 12549].

El 29 de octubre de 2020, el Tribunal de Título III dictó la *Orden sobre la Moción Conjunta de los Acreedores del AAP conforme a la Sección 312 de PROMESA y la Sección 105 del Código de Quiebras para imponer plazos para el Plan de Ajuste* [ECF Núm. 14987] (la "Orden de Programación del Plan"), que ordenó a la Junta de Supervisión presentar en o antes del 10 de febrero de 2021 los términos propuestos de un plan de ajuste para el ELA y una moción para la aprobación de un calendario propuesto para la presentación de un plan enmendado y una declaración de divulgación propuesta, entre otras cosas. De acuerdo con la Orden de Programación del Plan, y con la orientación del Equipo de Mediación, la Junta de Supervisión participó en (a) sesiones grupales o individuales de mediación informativa y de negociación (según lo programado por el Equipo de Mediación) o (b) sesiones informales con el ELA, las partes del AAP de 2020, las aseguradoras monolínea, el Comité Oficial de Acreedores No Asegurados, el Comité de Jubilados y varios sindicatos, todo ello diseñado para establecer un marco y un calendario para el desarrollo de una reestructuración consensuada de la deuda.

El 9 de febrero de 2021, la Junta de Supervisión anunció que, como resultado de las discusiones dirigidas por el Equipo de Mediación, la Junta de Supervisión y las partes principales

del AAP de 2020 llegaron a un acuerdo en principio sobre los términos de un plan de ajuste enmendado, sujeto a la firma de la documentación definitiva.

El 23 de febrero de 2021, la Junta de Supervisión anunció la rescisión del AAP de 2020 y la firma del Acuerdo de Apoyo al Plan, con fecha del 22 de febrero de 2021 (el "AAP de 2021"), entre la Junta de Supervisión, como representante del ELA, SRE y AEP, ciertos Bonistas GO, ciertos Bonistas de AEP, Assured Guaranty Corp. y Assured Guaranty Municipal Corp, únicamente en su calidad de aseguradores y tenedores declarados, tenedores considerados o subrogados con respecto a los Bonos GO y los Bonos de la AEP, Syncora Guarantee Inc., como titular, subrogado con respecto a o asegurador de Bonos GO y de Bonos de la AEP, y National Public Finance Guarantee Corporation, únicamente en su calidad de asegurador y tenedor declarado, tenedor considerado o subrogado con respecto a los Bonos GO y los Bonos de la AEP.

El 8 de marzo de 2021, la Junta de Supervisión presentó la *Declaración de Divulgación del Segundo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros* [ECF Núm. 15977 y 15988] y el *Segundo Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros* [ECF Núm. 15976] (el "Segundo Plan Enmendado del ELA").

El 2 de abril de 2021, la Junta de Supervisión firmó la *Estipulación Modificada y Reformulada (A) que permite las reclamaciones de los tenedores de bonos del SRE, (B) que suspende los litigios pendientes y (C) que dispone el tratamiento de las reclamaciones de los tenedores de bonos del SRE y la desestimación de los litigios pendientes de acuerdo con un plan de ajuste* (la "Estipulación del SRE") con ciertos grupos de tenedores de bonos (los "Tenedores del SRE") emitidos por el SRE (los "Bonos del SRE"). La Estipulación del SRE incorpora, entre otras cosas, el tratamiento consensuado propuesto para los Bonos del SRE.

El 12 de abril de 2021, la Junta de Supervisión llegó a un acuerdo en principio con Assured y National en relación, entre otras cosas, con el tratamiento de las reclamaciones presentadas contra el ELA derivadas de su retención de fondos históricamente asignados y transferidos de forma condicional a determinadas entidades del ELA (los "Ingresos Asignables"), que se memorializó en el AAP de la ACT/ADCC.

El 5 de mayo de 2021, la Junta de Supervisión, en calidad de representante de Título III del ELA y de la ACT, suscribió el AAP de la ACT/ADCC. El AAP de la ACT/ADCC incorpora, entre otras cosas, la propuesta de tratamiento de las reclamaciones presentadas contra el ELA en relación con su retención de los ingresos asignables, los términos de una reestructuración del endeudamiento de la ADCC y ciertos términos que se incluirán en un plan de ajuste para la ACT.

En cumplimiento del AAP de 2021, la Estipulación del SRE y el AAP de la ACT/ADCC, el 11 de mayo de 2021, el ELA presentó el *Tercer Plan de Ajuste Conjunto Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros* [ECF Núm. 16740] (el "Tercer Plan Enmendado del ELA").

El 6 de julio de 2021, la Junta de Supervisión llegó a un acuerdo en principio, sujeto a la documentación final, con la Federación Americana de Maestros, la Asociación de Maestros de Puerto Rico ("AFT") y la Asociación de Maestros de Puerto Rico-Local Sindical ("AMPR") en

relación, entre otras cosas, con el tratamiento de los beneficios del SRM según un plan de ajuste del ELA. Este acuerdo, sin embargo, estaba sujeto a la ratificación por mayoría simple de los miembros de la AMPR. En o cerca del 28 de septiembre de 2021, los miembros de AFT y AMPR votaron en contra de la ratificación de este acuerdo.

El 12 de julio de 2021, la Junta de Supervisión llegó a un acuerdo en principio, sujeto a la documentación final, con el Comité de Acreedores, en relación, entre otras cosas, con los recobros propuestos para los acreedores no garantizados generales.

El 27 de julio de 2021, la Junta de Supervisión, como representante de Título III del ELA, celebró cierto acuerdo de apoyo al plan de la AFI (el "AAP de la AFI") con ciertos tenedores de bonos emitidos por la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico ("AFI"), Ambac Assurance Corp., únicamente en su calidad de asegurador y tenedor declarado, tenedor considerado o subrogado con respecto a los bonos emitidos por la AFI ("Bonos de la AFI"), y Financial Guaranty Insurance Company, únicamente en su calidad de asegurador y tenedor declarado, tenedor considerado o subrogado con respecto a los Bonos de la AFI, que resuelve ciertos litigios entre las partes, establece los términos de los valores que se emitirán en virtud del plan de ajuste para el ELA y una reestructuración del endeudamiento de la AFI, y establece el acuerdo de las partes para apoyar los términos del plan de ajuste para el ELA en consonancia con los términos del AAP de la AFI. Ese mismo día, la Junta de Supervisión presentó el *Sexto Plan de Ajuste Conjunto Enmendado de Título III* [ECF Núm. 17516] (el "Sexto Plan Enmendado del ELA") y la declaración de divulgación asociada [ECF Núm. 17517] para, entre otras cosas, incorporar los acuerdos contenidos en el AAP de la AFI.

El 29 de julio de 2021, la Junta de Supervisión llegó a un acuerdo con el Comité de Acreedores sobre los términos del tratamiento del Plan de las reclamaciones generales sin garantía (el "Acuerdo del Comité"). El 30 de julio de 2021, la Junta de Supervisión presentó un nuevo plan de ajuste enmendado [ECF Núm. 17627 y 17628], para incorporar los términos establecidos en el Acuerdo del Comité.

La declaración de divulgación del ELA, presentada el 30 de julio de 2021, fue aprobada por el Tribunal de Título III mediante una orden emitida el 2 de agosto de 2021 [ECF Núm. 17639] (la "Orden de la Declaración de Divulgación").

El Tribunal de Título III celebró vistas para considerar la confirmación del Plan del ELA del 8 al 23 de noviembre de 2021. El 18 de enero de 2022, el Tribunal de Título III confirmó el Plan del ELA. El 15 de marzo de 2022 se produjo la Fecha de Entrada en Vigencia del ELA y se perfeccionó sustancialmente el Plan del ELA.

### (d)  Condiciones relevantes del Plan del ELA

Conforme a los términos y disposiciones del Plan del ELA, a cambio de la resolución de varios litigios sobre bonos de ingresos entre el ELA y la ACT, el litigio sobre bonos de ingresos de la ACT y la Moción de Levantamiento de la Paralización de la ACT, entre otros, los tenedores de dichas reclamaciones recibirán CVI de recuperación ("Clawback")[166] del ELA. Un instrumento

---

[166]  El Plan del ELA prevé la emisión de CVI GO además de los CVI de recuperación.

de valor contingente (CVI) es un instrumento que otorga al tenedor el derecho a recibir pagos en caso de que se cumplan ciertas condiciones.

El CVI de recuperación es un instrumento de valor contingente basado en el reparto de los posibles resultados superiores al 5.5% del IVU, en relación con las proyecciones del Plan Fiscal Certificado del ELA para 2020. Es decir, los posibles pagos estarían supeditados a que los Impuestos sobre Ventas y Uso del ELA superaran los parámetros de desempeño. El CVI de recuperación asignable a las Reclamaciones Permitidas de ELA/ACT (tal y como se define en el Plan del ELA) de acuerdo con el Plan del ELA está sujeto a un tope vitalicio de $3,697,668,995.00. A continuación, se presenta un resumen de las condiciones de los CVI de recuperación emitidos de conformidad con el Plan del ELA.

A continuación, se presenta un resumen de los condiciones del CVI, sujeto en su totalidad a los términos del Anexo J del Plan del ELA.

***Mediciones del exceso de rentabilidad.*** El CVI basado en el IVU contemplado conforme al Plan del ELA se vincula al monto del impuesto a las ventas y uso ("IVU") cobrado por el ELA en un año fiscal dado. El monto pagado al CVI basado en el IVU se basa en una línea básica que refleja la proyección del 5.5% del IVU con respecto al Plan Fiscal del ELA de 2020 para los años fiscales 2022 a 2051.[167] Por ejemplo, si, al final de un año fiscal, los cobros del 5.5% del IVU superan la línea básica (la "Línea básica del IVU", véase a continuación), el tenedor de un CVI basado en el IVU puede recibir una distribución (es decir, sobre la base de (i) un porcentaje de exceso de rentabilidad acumulado (menos pagos anteriores al CVI basado en el IVU) o (ii) el porcentaje de exceso de rentabilidad anual) conforme a los términos de la Escritura del CVI basado en el IVU. Sin embargo, si los cobros del IVU son iguales o están por debajo de la Línea Básica del IVU al final de un año fiscal, no habrá distribución a los tenedores de un CVI basado en el IVU por cuenta de ese año. Por ejemplo, la Línea Básica del IVU para 2022 es $1,282,901,069.30. Si los cobros del 5.5% del IVU para el año fiscal 2022 están por encima de ese monto, el IVU recibirá un pago basado en ciertos cálculos que se discuten a continuación.

La tabla siguiente muestra la Línea Básica del IVU. Los tenedores de CVI recibirán una proporción del monto disponible para su distribución conforme a la Escritura de los CVI.

| Línea básica del 5.5% del IVU[168] | | | |
|---|---|---|---|
| **Año fiscal** | **Monto** | **Año fiscal** | **Monto** |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |

---

[167] El Plan Fiscal del ELA de 2020 contiene proyecciones hasta el año fiscal 2049. La Línea Básica del IVU para el año fiscal 2050 y el año fiscal 2051 se calcula usando las proyecciones del año fiscal 2049 y la tasa de crecimiento promedio de los años fiscales 2045-2049. Véase también el Apéndice 5 al Anexo J al Plan del ELA.

[168] El Plan Fiscal del ELA de 2020 contiene proyecciones hasta el año fiscal 2049. La Línea Básica del IVU para el año fiscal 2050 y el año fiscal 2051 se calcula usando las proyecciones del año fiscal 2049 y la tasa de crecimiento promedio de los años fiscales 2045-2049. Véase también el Apéndice 5 al Anexo J al Plan del ELA.

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

| 2025 | 1,315,295,083.41 | | 2040 | 1,518,089,898.19 |
|------|------------------|---|------|------------------|
| 2026 | 1,345,037,783.09 | | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | | 2050 | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | | 2051 | 1,810,682,942.40 |

La medición de los cobros del 5.5% del IVU para determinar si se ha superado el parámetro acumulativo o anual (como se describe más adelante) tendrá lugar al final de cada año fiscal, desde el año fiscal 2022 hasta 2051.

### *Términos generales de los CVI basados en IVU.*

**Obligación futura contingente del ELA**. Los CVI basados en IVU representan una promesa del ELA de pagar a los tenedores de CVI basados en IVU *solo si* las condiciones que se enumeran en la Escritura de los CVI basados en IVU se producen en un año fiscal determinado. El ELA pignorará su buena fe, crédito y poder impositivo conforme a la Constitución de Puerto Rico y las leyes aplicables de Puerto Rico para el pago de los CVI basados en IVU.

**Plazo** Los CVI basados en IVU se consideran emitidos el 1 de julio de 2021. Los CVI GO tendrán un plazo de 22 años. Los CVI de recuperación ("clawback") tendrán un plazo de 30 años.

**Condición de exceso de rentabilidad y cascada** Como se describió anteriormente, los tenedores de los CVI basados en IVU recibirán una parte de los cobros de 5.5% del IVU que superen la Línea Básica correspondiente del IVU (el "Monto de Exceso de Rentabilidad"), sujeto a ciertos cálculos como se describe a continuación. De conformidad, el monto disponible para la distribución por cuenta de los CVI basados en IVU aumentará según una parte del Monto de Exceso de Rentabilidad y se reducirá según las distribuciones a los tenedores de CVI basados en IVU.

Al final de cada año fiscal, una parte del Monto de Exceso de Rentabilidad, de haberlo, puede estar disponible para su distribución a los tenedores de CVI GO, y una parte a los tenedores de CVI de recuperación, en base a una fórmula y/o una cascada de prioridad de distribuciones que determine el tamaño de la participación del Monto de Exceso de Rentabilidad para cada grupo de tenedores de CVI.

i.   Cálculo y distribución del monto del exceso de rentabilidad sujeto a cascada

El "Monto del exceso de rentabilidad sujeto a cascada" se calcula cada año fiscal como *lo que sea menor* entre (i) 50% del exceso de rentabilidad acumulativo relativo a la Línea Básica del

IVU menos los pagos hechos anteriormente por cuenta del Monto del Exceso de Rentabilidad Sujeto a Cascada a los tenedores de CVI GO y CVI de recuperación y (ii) 75% del exceso de rentabilidad anual relativo a la Línea Básica del IVU.

Los CVI GO recibirán en total los primeros $100 millones del Monto del Exceso de Rentabilidad Sujeto a Cascada en un año fiscal determinado, los CVI de recuperación recibirán en total los siguientes $11.1 millones, y los tenedores de CVI GO y CVI de recuperación compartirán el monto restante del Monto del Exceso de Rentabilidad Sujeto a Cascada en un porcentaje de 90% y 10%, respectivamente, si estuviera disponible. Por ejemplo, si el Monto del Exceso de Rentabilidad Sujeto a Cascada es de $121.1 millones en el FY2022, los tenedores de CVI GO recibirán en total $109 millones ($100 millones más 90% del resto de $10 millones, o $9 millones) y los tenedores de CVI de recuperación recibirán en total $12.1 millones ($11.1 millones más 10% del resto de $10 millones, o $1 millón). Los montos usados en este ejemplo son ilustrativos y no reflejan los pagos reales que se harán a los tenedores de CVI basados en IVU.

Al final del plazo de los CVI GO (a partir del FY2023), el 100% del Monto del Exceso de Rentabilidad Sujeto a Cascada devengará a los CVI de recuperación (a menos que los CVI GO se paguen hasta el Tope Vitalicio de los CVI GO (definido a continuación) durante o antes del FY2021, en cuyo caso, el 100% del Monto del Exceso de Rentabilidad Sujeto a Cascada devengará a los CVI de recuperación a partir del siguiente año fiscal de acuerdo con la Escritura de los CVI).

### ii. Cálculo y distribución del monto del exceso de rentabilidad no sujeto a cascada

El "Monto del Exceso de Rentabilidad no Sujeto a Cascada" será *lo que sea menor* entre (i) 40% del exceso de rentabilidad acumulativo relativo a la Línea Básica del IVU menos los pagos hechos anteriormente por cuenta del Monto del Exceso de Rentabilidad No Sujeto a Cascada a los tenedores de CVI de recuperación y (ii) 95% del Exceso de Rentabilidad anual relativo a la Línea Básica del IVU restante después de los pagos a los tenedores de CVI GO y a los tenedores de CVI de recuperación por cuenta del Monto del Exceso de Rentabilidad Sujeto a Cascada.

Además de los pagos recibidos por cuenta del Monto del Exceso de Rentabilidad Sujeto a Cascada (de haberlo, según lo anterior), los tenedores de los CVI de recuperación también recibirán una participación en el Monto del Exceso de Rentabilidad No Sujeto a Cascada, de haberlo, según la asignación del porcentaje indicada para su tipo específico de reclamación en el Apéndice 4 del Anexo J del Plan. Por ejemplo, si el Monto del Exceso de Rentabilidad No Sujeto a Cascada fuera de $56 millones, los tenedores de las Reclamaciones Permitidas de ELA/ACT recibirán, en total, 68.6% de ese monto, o aproximadamente $38 millones.

### iii. Reglas adicionales de prioridad para las Reclamaciones Permitidas de ELA/ACT

Las Reclamaciones Permitidas de ELA/ACT se encuentran además sujetas a una cascada de prioridades de distribuciones (la "Cascada de Prioridades de Distribuciones de la ACT") según el tipo de reclamación Permitida de ELA/ACT. Las Reclamaciones Permitidas de ELA/ACT componen cuatro categorías de reclamaciones: Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 y Préstamos de la ACT del BGF. Los pagos de los CVI de

recuperación asignados a las Reclamaciones Permitidas de ELA/ACT se distribuirán de la siguiente manera:

- Primeros $179,462,539 de distribuciones a las Reclamaciones de Bonos de la ACT 68,
- A continuación, $1,833,405,578 de distribuciones de Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98,
- A continuación, $207,294,178 de distribuciones de Reclamaciones de Bonos Subordinados (Sub) de la ACT 98, y
- A continuación, $1,477,506,700 de distribuciones a los Préstamos de la ACT del BGF.

Las reclamaciones a un nivel más alto deben pagarse hasta el monto especificado anteriormente en la Cascada de Prioridades de Distribuciones de la ACT antes de que las reclamaciones en el nivel siguiente puedan recibir cualquier distribución. Por ejemplo, si las distribuciones de CVI de recuperación para el FY2022 son de $68.1 millones (de (i) el Monto del Exceso de Rentabilidad Sujeto a Recuperación y (ii) el Monto del Exceso de Rentabilidad No Sujeto a Cascada), en total las Reclamaciones Permitidas de ELA/ACT recibirán 68.6% de ese monto, o aproximadamente $47 millones. En ese caso, dado que el FY2022 es el primer año en el plazo de los CVI de recuperación, la totalidad de los $47 millones se distribuirán a los tenedores de Reclamaciones de Bonos de la ACT 68. Las Reclamaciones de Bonos de la ACT 68 seguirán recibiendo distribuciones de la asignación de Reclamaciones Permitidas de ELA/ACT de los pagos de los CVI de recuperación hasta que las Reclamaciones de Bonos de la ACT 68 hayan recibido $179,462,539 en total. Una vez alcanzado ese umbral, las distribuciones a las Reclamaciones Permitidas de ELA/ACT se pagarán a las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 hasta que las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 hayan recibido $1,833,405,578 en total, y en adelante para las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 y en adelante para los Préstamos de la ACT del BGF.

**Tope vitalicio y anual sobre los pagos de los CVI GO**. Los tenedores de CVI GO están sujetos a un tope total de por vida sobre los pagos de $3,500 millones (el "<u>Tope Vitalicio de CVI GO</u>"), con un pago máximo anual de $200 millones, más cualquier monto no utilizado de años fiscales anteriores, y en todos los casos, no más de $400 millones por año. Si se alcanza el Tope Vitalicio de CVI GO en el FY2021 del plazo de los CVI GO o antes, el 100% del Monto del Exceso de Rentabilidad Sujeto a Cascada devengará a los CVI de recuperación a partir del año siguiente, sujeto a los topes anual y vitalicio aplicables a los CVI de recuperación.

**Tope vitalicio y anual sobre los pagos de los CVI de recuperación**. Los tenedores de los CVI de recuperación tendrán un tope máximo vitalicio que depende del tipo de reclamación. El tope máximo vitalicio es de $3,697,668,995 para las Reclamaciones Permitidas del ELA/ACT, $217,228,391 para las Reclamaciones Permitidas del ELA/Centro de Convenciones, $22,580,090 para la Reclamación Permitida del ELA/AMA, y $1,301,525,288 para las Reclamaciones Permitidas del ELA/Impuesto al Ron de AFI[169] (en total, $5,239,002,764). Los CVI de

---

[169] El tope vitalicio para las Reclamaciones Permitidas del ELA/ Impuesto al Ron de AFI se aplica mediante el Fideicomiso de AFI (como se define en el Anexo "F" del Acuerdo de Apoyo al Plan Vinculado a AFI) de manera tal que las distribuciones del Fideicomiso de AFI por cuenta de los CVI basados en el IVU o en el impuesto al ron se encuentran sujetos al tope vitalicio para las Reclamaciones Permitidas del ELA/Impuesto al Ron de AFI.

recuperación también están sujetos a pagos anuales máximos. En los años fiscales 1-22 del plazo de los CVI de recuperación, el pago anual máximo es de $175 millones más cualquier monto no utilizado de años anteriores, y en todos los casos, no más $350 millones. En los años fiscales 23-30 del plazo de los CVI de recuperación, el pago anual máximo es de $375 millones más cualquier monto no utilizado de años anteriores, y en todos los casos, no más de $750 millones. Los topes anual y vitalicio se aplican a los pagos recibidos por los tenedores de CVI de recuperación, en total, por cuenta del Monto del Exceso de Rentabilidad Sujeto a Cascada y el Monto del Exceso de Rentabilidad No Sujeto a Cascada.

**Estructura de amortización**. Los CVI basados en IVU son amortizables en cualquier fecha por un monto equivalente al valor actual del monto máximo de los pagos futuros sobre dicho CVI basado en IVU (es decir, ya sean CVI GO o CVI de recuperación). El valor actual se calcula aplicando una tasa de descuento sin tope para la Tasa de Hacienda + 100 puntos de base, donde la Tasa de Hacienda significa el rendimiento (o el rendimiento interpolado) del valor (o valores) comparable(s) del Tesoro de EE.UU. que tenga un vencimiento real (o vencimiento interpolado) que esté más próximo a la vida promedio restante de los pagos máximos restantes del CVI basado en IVU aplicable.

La siguiente tabla ilustra el valor actual neto de las Proyecciones del IVU del Plan Fiscal 2021 y el pago máximo para los CVI GO a varias tasas de descuento:[170]

| Hipótesis | Porcentaje de descuento | | | |
|---|---|---|---|---|
| | 5.0% | 10.0% | 15.0% | 20.0% |
| Proyecciones de IVU del Plan Fiscal de 2021 | 1,173 | 750 | 524 | 392 |
| Pago máximo | 2,296 | 1,622 | 1,218 | 959 |

**Ajuste del IVU de Línea Básica**. El IVU de Línea Básica puede ajustarse en caso de una Declaración de Desastre del Presidente de EE.UU. o cualquier otra exención implementada por el Gobierno conforme a la ley aplicable. El cálculo de cualquier ajuste será determinado por el Secretario de Hacienda y validado por un tercero independiente y se dará a conocer al público. La validación por el tercero independiente será vinculante para el gobierno y los tenedores de CVI basados en el IVU. Un acuerdo por separado documentará la metodología que el tercero independiente usará para verificar al cálculo del Secretario de Hacienda. En la medida en que el ELA reduzca el 5.5% del IVU a una tasa más baja que 5.5%, un ajuste de fórmula será acordado

---

[170]  Los pagos reales hechos por cuenta de los CVI GO pueden ser diferentes. La tabla siguiente es únicamente para fines ilustrativos y no se destina a garantizar ningún nivel de recuperación o pago por cuenta de los CVI GO.

por la Junta y los Acreedores del AAP Inicial para mantener el mismo nivel de exceso de rentabilidad que si el IVU Medido (como se define en el Plan del ELA) permaneciera en 5.5%.

**(e)** **Pago de las reclamaciones de bonos de la ACT y préstamo del ELA a la ACT**

Conforme al Plan del ELA y a la Orden de Confirmación del ELA, una vez satisfechas las Condiciones de Distribución de la ACT, la ACT está obligada a realizar una distribución provisional a los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 por un importe de $184,800,000.00 y $79,200,000.00, respectivamente, que reducirá el importe principal de dichos Bonos de la ACT 68 y Bonos Prioritarios (Senior) de la ACT 98.

En relación con dicha distribución provisional, el [_____] de 2022, la ACT y el ELA celebraron un acuerdo de préstamo, por el que el ELA acordó conceder un préstamo a ACT (el "Préstamo del ELA"), cuyos ingresos fueron utilizados por ACT para, entre otras cosas, pagar dicha distribución provisional.

El Préstamo del ELA es un préstamo a plazo de múltiples giros a la ACT por un monto de capital total de $362,000,000; que consiste en [(a) un giro inicial por un monto de capital total de $174,000,000.00 efectuado tras el cumplimiento de las Condiciones de Distribución de la ACT, (b) un segundo giro por un monto de capital total de $188,000,000.00 se efectuará tras el registro de la Fecha de Entrada en Vigencia de la ACT].

El Préstamo del ELA devenga intereses hasta su vencimiento (ya sea por aceleración o de otro modo) a un tipo anual del dos coma cinco por ciento (2,5%). Los intereses del Préstamo del ELA se calculan sobre la base de un año de 360 días que consta de doce (12) meses de 30 días y son pagaderos por el número real de días transcurridos (incluyendo el primer día, pero excluyendo el último), cada 1 de enero y 1 de julio, a partir del 1 de julio de 2023.

El capital y los intereses del Préstamo del Estado serán pagaderos de la siguiente manera:

|  | **Capital** | **Interés** | **Pagos totales del préstamo** |
|---|---|---|---|
| Total | 362,000,000.00 | 173,538,404.20 | 535,538,404.20 |
| 7/1/23 | 10,763,135.00 | 11,714,722.22 | 22,477,857.22 |
| 7/1/24 | 9,447,509.00 | 8,780,921.63 | 18,228,430.63 |
| 7/1/25 | 4,810,622.00 | 8,544,733.90 | 13,355,355.90 |
| 7/1/26 | 5,197,995.00 | 8,424,468.35 | 13,622,463.35 |
| 7/1/27 | 5,600,394.00 | 8,294,518.48 | 13,894,912.48 |
| 7/1/28 | 6,018,302.00 | 8,154,508.63 | 14,172,810.63 |
| 7/1/29 | 6,452,216.00 | 8,004,051.08 | 14,456,267.08 |
| 7/1/30 | 6,902,647.00 | 7,842,745.68 | 14,745,392.68 |
| 7/1/31 | 7,370,121.00 | 7,670,179.50 | 15,040,300.50 |
| 7/1/32 | 7,855,180.00 | 7,485,926.48 | 15,341,106.48 |
| 7/1/33 | 8,358,382.00 | 7,289,546.98 | 15,647,928.98 |

|         | Capital       | Interés      | Pagos totales del préstamo |
|---------|---------------|--------------|----------------------------|
| 7/1/34  | 8,880,300.00  | 7,080,587.43 | 15,960,887.43              |
| 7/1/35  | 9,421,525.00  | 6,858,579.93 | 16,280,104.93              |
| 7/1/36  | 9,982,665.00  | 6,623,041.80 | 16,605,706.80              |
| 7/1/37  | 10,564,346.00 | 6,373,475.18 | 16,937,821.18              |
| 7/1/38  | 11,167,211.00 | 6,109,366.53 | 17,276,577.53              |
| 7/1/39  | 11,791,923.00 | 5,830,186.25 | 17,622,109.25              |
| 7/1/40  | 12,439,163.00 | 5,535,388.18 | 17,974,551.18              |
| 7/1/41  | 13,109,633.00 | 5,224,409.10 | 18,334,042.10              |
| 7/1/42  | 13,804,055.00 | 4,896,668.28 | 18,700,723.28              |
| 7/1/43  | 14,523,171.00 | 4,551,566.90 | 19,074,737.90              |
| 7/1/44  | 15,267,745.00 | 4,188,487.63 | 19,456,232.63              |
| 7/1/45  | 16,038,563.00 | 3,806,794.00 | 19,845,357.00              |
| 7/1/46  | 16,836,434.00 | 3,405,829.93 | 20,242,263.93              |
| 7/1/47  | 17,662,190.00 | 2,984,919.08 | 20,647,109.08              |
| 7/1/48  | 18,516,687.00 | 2,543,364.33 | 21,060,051.33              |
| 7/1/49  | 19,400,805.00 | 2,080,447.15 | 21,481,252.15              |
| 7/1/50  | 20,315,451.00 | 1,595,427.03 | 21,910,878.03              |
| 7/1/51  | 21,261,555.00 | 1,087,540.75 | 22,349,095.75              |
| 7/1/52  | 22,240,075.00 | 556,001.88   | 22,796,076.88              |

En la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada emitirá al ELA la Deuda Subordinada, que tendrá un monto de capital inicial equivalente al monto del capital pendiente del Préstamo del ELA en la fecha de dicha emisión, más cualquier interés devengado y no pagado sobre él, bajo los términos de la Escritura de los Nuevos Bonos de la ACT, en lugar de pagos en efectivo para satisfacer plenamente la reclamación de gastos administrativos del ELA a cuenta del Préstamo del ELA. Tras la entrega de la Deuda Subordinada al ELA, el Préstamo del ELA y el acuerdo de préstamo se considerarán inmediatamente rescindidos y sin efecto. Véase la Sección VI.F.6 de esta Declaración de Divulgación para obtener una descripción más detallada de la Deuda Subordinada.

En caso de que no se produzca la Fecha de Entrada en Vigencia y los Nuevos Bonos de la ACT no se emitan antes del 30 de junio de 2023, la ACT Reorganizada ha acordado solicitar la aprobación del Tribunal de Título III para conceder un gravamen subordinado a favor del ELA sobre todos los ingresos de peaje, sujeto a los términos y condiciones que acuerden las partes en ese momento.

La ACT Reorganizada se ha comprometido a cumplir los siguientes pactos con respecto al Préstamo del ELA en virtud del contrato de préstamo:

1.   Deuda adicional. Mientras el Préstamo del ELA y el contrato de préstamo estén en vigencia, la ACT Reorganizada no incurrirá en ninguna deuda adicional fuera

del curso ordinario de los negocios sin la aprobación de la Junta de Supervisión mientras exista, aparte de los Nuevos Bonos de la ACT.

2. <u>Pignoración negativa</u>. La ACT Reorganizada no creará ni hará que se cree ningún gravamen o carga sobre los ingresos de peaje o cualquier producto de estos (salvo los gravámenes existentes en la fecha del Préstamo del ELA o creados tras la emisión de los Nuevos Bonos de la ACT).

3. <u>Enajenación de los Activos</u>. En caso de venta, empresa conjunta o asociación público-privada con respecto a los activos de la autopista de peaje, la ACT Reorganizada (con el consentimiento previo por escrito de la Junta de Supervisión mientras exista) podrá optar por prepagar el Préstamo del ELA en su totalidad o en parte únicamente con el producto de dicha enajenación, en cualquier momento en adelante, sin prima ni penalización.

Los casos de incumplimiento conforme a los términos del Préstamo del ELA según el contrato de préstamo son:

1. El pago del capital del Préstamo del ELA no será efectuado por la ACT Reorganizada cuando este venza y sea pagadero, ya sea al vencimiento o mediante procedimientos de amortización o de otro modo; o

2. El pago de los intereses del Préstamo del ELA no será efectuado por la ACT Reorganizada cuando estos venzan y sean pagaderos o mediante procedimientos de amortización o de otro modo; o

3. La ACT Reorganizada dejará de cumplir de manera debida y puntual cualquiera de las condiciones, acuerdos y disposiciones contenidas en el presente documento por parte de la ACT Reorganizada y dicho incumplimiento continuará durante sesenta (60) días después de que el ELA haya notificado por escrito a la ACT Reorganizada especificando dicho incumplimiento y exigiendo que se subsane, a menos que, si dicho incumplimiento es susceptible de ser subsanado pero no lo es en el plazo de sesenta (60) días, la ACT Reorganizada haya comenzado a subsanar dicho incumplimiento en el plazo de sesenta (60) días y lo haga en el plazo de noventa (90) días a partir de la fecha en que se produjo inicialmente el incumplimiento; o

4. El Tribunal de Título III desestimará el Caso de Título III con respecto a la ACT Reorganizada.

No hay derecho de aceleración con respecto al Préstamo del ELA. Si en algún momento la ACT Reorganizada no paga en su totalidad alguna cuota de intereses o el capital del Préstamo del ELA, a medida que estos venzan y sean pagaderos, los pagos del Préstamo del ELA se aplicarán (a) en primer lugar, al pago al ELA de todas las cuotas de intereses vencidas del Préstamo del ELA en el orden de vencimiento de dichos intereses y (b) en segundo lugar, al pago al ELA del capital no pagado del Préstamo del Estado que haya vencido.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                        04/30/2022 3:29 PM" ""

El Préstamo del ELA no podrá ser condonado, reducido, aplazado o compensado. Ni el contrato de préstamo ni ninguno de los derechos y obligaciones podrán ser cedidos por ninguna de las partes. Ninguna enmienda, modificación, rescisión o renuncia de cualquier disposición del contrato de préstamo, será efectiva en ningún caso a menos que sea por escrito y esté firmada por el ELA y la ACT y aprobada por la Junta de Supervisión, mientras siga existiendo, de acuerdo con la Sección 207 de PROMESA.

2.      **Caso de Título VI de BGF**

(a)      **Antecedentes**

El BGF es una corporación pública e instrumentalidad gubernamental del ELA, cuyas funciones principales son las de actuar como agente fiscal, agente pagador, asesor financiero, fuente de finanzas y depositario de fondos para el Gobierno y sus instrumentalidades, corporaciones públicas y municipios.

El 6 de abril de 2016, el ex gobernador, Alejandro García Padilla, dictó una serie de órdenes ejecutivas conforme a la Ley de Moratorias para: (i) declarar el estado de emergencia en el BGF, (ii) imponer restricciones sobre el retiro de los fondos depositados en el BGF y otros desembolsos del BGF, y (iii) implementar una moratoria sobre el pago de la amortización de la deuda sobre las notas en circulación del BGF.

(b)      **Acuerdo en apoyo a la reestructuración del BGF**

Después de muchos meses de negociaciones, el 15 de mayo de 2017, AAFAF, BGF y ciertos otros acreedores del BGF celebraron un Acuerdo en Apoyo a la Reestructuración del BGF (con sus enmiendas, modificaciones y suplementos, el "AAR de BGF") para ejecutar una reestructuración consensuada (una "Modificación Calificatoria") de ciertos otros acreedores de la deuda del BGF a través de un caso de Título VI de PROMESA. El severo daño y la devastación sufridos por Puerto Rico debido a los huracanes Irma y María hicieron necesarias ciertas modificaciones al AAR del BGF y prolongaron los plazos para el perfeccionamiento de la Modificación Calificatoria. Como resultado, el AAR del BGF tuvo seis (6) enmiendas. El 8 de mayo de 2018, la Junta de Supervisión certificó el AAR del BGF, con sus enmiendas.

(c)      **Inicio del procedimiento de Título VI**

El 10 de agosto de 2018, el BGF inició una acción conforme al Título VI de PROMESA, mediante la presentación de una petición de aprobación de la Modificación Calificatoria ante el Tribunal de Distrito de EE.UU. para el Distrito de Puerto Rico (la "Acción de Título VI"). La Acción de Título VI estaba pendiente ante la juez Swain y se le dio el número de Caso Núm. 18-cv-1561 (LTS).

(d)      **Convocatoria de votación y aprobación de la Modificación Calificatoria.**

El día anterior al inicio de la Acción de Título VI, el 9 de agosto de 2018, el BGF y AAFAF iniciaron un proceso de convocatoria de votación para aprobar o rechazar la Modificación Calificatoria. La Modificación Calificatoria fue masivamente aprobada por los acreedores del

BGF, con acreedores que representaban el 74.8% de todas las reclamaciones elegibles que participaron en la votación y acreedores que representaban el 97.4% de dichas reclamaciones participantes que votaron para aprobar la Modificación Calificatoria. Además, la Junta de Supervisión, como Supervisor Administrativo de Título VI, proporcionó todas las certificaciones necesarias, según lo dispuesto por la Sección 601 de PROMESA. El Tribunal de Distrito aprobó la Modificación Calificatoria el 7 de noviembre de 2018 [Caso Núm. 18-cv-1561, ECF Núm. 269].

### (e)    Términos de la Modificación Calificatoria

La Modificación Calificatoria entró en vigencia el 29 de noviembre de 2018 (la "Fecha de cierre"). Los términos clave de la Modificación Calificatoria son los que se describen a continuación.

### (i)    *Bonos de la Autoridad de Recuperación*

Los tenedores de los bonos públicos en circulación del BGF, depositarios netos de fondos del BGF, y ciertos reclamantes de reclamaciones contingentes y no liquidadas presentaron reclamaciones por un valor total de aproximadamente $4.23 mil millones en la Fecha de Cierre (dichas reclamaciones totales, las "Reclamaciones de los Bonos Participantes"). Los tenedores de las Reclamaciones de los Bonos Participantes, recibieron a cambio de sus reclamaciones nuevos bonos ("Bonos de la Autoridad de Recuperación") emitidos por una nueva instrumentalidad gubernamental y fideicomiso público establecidos por ley del ELA (la "Autoridad de Recuperación") creada conforme a la Ley de Reestructuración del BGF el 24 de agosto de 2017 y enmendada el 18 de julio de 2018 (la "Ley de Reestructuración del BGF"). Los tenedores de ciertas reclamaciones contingentes y no liquidadas que constituían Reclamaciones de Bonos Participantes solo recibirán los Bonos de la Autoridad de Recuperación si sus reclamaciones se materializan en el futuro.

Los siguientes son los términos principales del intercambio y los Bonos de la Autoridad de Recuperación:

- Por cada $1,000 en reclamaciones, los tenedores de las Reclamaciones de Bonos Participantes recibieron $550 de Bonos de la Autoridad de Recuperación.

- Los únicos activos de la Autoridad de Recuperación son los que el BGF transfirió a la Autoridad de Recuperación en la Fecha de Cierre (los "Bienes de Reestructuración"). Los Bienes de Reestructuración incluyen la cartera de préstamos municipales del BGF, parte de su cartera de préstamos a entidades públicas, incluidos ciertos préstamos adeudados al BGF por la ACT, ciertos bienes inmuebles, derechos de usufructo en causas de acción y efectivo. Los tenedores de Bonos de la Autoridad de Recuperación recibirán pagos de intereses y capital únicamente sobre los resultados de los Bienes de Reestructuración. No hay recurso contra el ELA o el BGF con respecto al pago de las obligaciones conforme a los Bonos de la Autoridad de Recuperación.

- Los Bonos de la Autoridad de Recuperación tienen un cupón de 7.5% y vencen en 2040. Sobre la base de las proyecciones de flujo de caja, es improbable que los

tenedores de Bonos de la Autoridad de Recuperación reciban todo el interés adeudado en efectivo o que el monto del capital de los Bonos de la Autoridad de Recuperación se pague en su totalidad.

- Conforme a la Ley de Reestructuración del BGF, al establecer el monto neto de reclamaciones o de activos, los préstamos adeudados al BGF por los municipios fueron compensados individualmente con depósitos del BGF por los mismos municipios.

### (ii) *Condiciones del intercambio*

Al mismo tiempo, y como condición del intercambio de reclamaciones para los Bonos de la Autoridad de Recuperación, las reclamaciones que el ELA y otras entidades públicas tienen contra el BGF se resolvieron conforme a la Ley de Reestructuración y la creación de un fideicomiso por separado, el Fideicomiso de Entidad Pública (el "FEP"). El objetivo principal del FEP es proporcionar cualquier distribución disponible a ciertos depositarios de corporaciones públicas, además de administrar la restauración de fondos federales depositados en BGF. Conforme a la Ley de Reestructuración del BGF, en la Fecha de Cierre el balance de los pasivos adeudados entre el ELA y sus agentes, instrumentalidades y subsidiarias (cada una de ellas una "Entidad Gubernamental No Municipal") y el BGF se determinaron mediante la aplicación del balance pendiente de cualquier depósito en el BGF en nombre de la Entidad Gubernamental No Municipal realizado individualmente contra el balance pendiente de cualquier préstamo de dicha Entidad Gubernamental No Municipal adeudado al BGF o cualquier bono o nota de dicha Entidad Gubernamental No Municipal en poder de BGF a dicha fecha. Las Entidades Gubernamentales No Municipales que tengan reclamaciones netas contra el BGF, después de dar lugar al ajuste antes mencionado, recibieron su participación prorrateada de intereses en el FEP, que se consideraron como la satisfacción plena de toda y cualquier reclamación que dicha Entidad Gubernamental No Municipal pueda tener contra el BGF. La ACT no tenía ninguna reclamación contra el BGF después del ajuste anterior conforme a la Ley de Reestructuración del BGF y, por lo tanto, la ACT no tiene interés en el FEP.

### (f) Impugnaciones al AAR del BGF y Modificación Calificatoria

Una serie de partes en diferentes oportunidades presentaron impugnaciones en litigios a diferentes aspectos del proceso de Título VI de BGF. Algunos municipios, tenedores de bonos y ciertos otros acreedores de BGF impugnaron, directa e indirectamente, la convocatoria y la Modificación Calificatoria con uno o más de los siguientes argumentos:

- los fondos comunes de los reclamantes deberían haber incluido un fondo común separado para municipios con sus propios requisitos de votación;

- sus depósitos en el BGF no constituyen "Bonos" tal como se definen en PROMESA y por lo tanto el Título VI de PROMESA no se aplica;

- algunos depósitos no eran bienes del BGF, sino que se mantenían en fideicomiso y por lo tanto pertenecían a sus respectivos depositarios;

- la venta de bonos del BGF se ofreció de manera malintencionada y bajo argumentos falsos y, por lo tanto, dichos tenedores de bonos deberían haber recibido un tratamiento diferente; y/o

- PROMESA y las acciones de la Junta de Supervisión eran inconstitucionales.

Además, CANA procuró obtener legitimidad derivativa para representar al ELA en el proceso de Título VI del BGF, lo que se denegó.

Todas estas impugnaciones fueron finalmente desestimadas, desistidas o transigidas.

### (g)     Incidente de la Modificación Calificatoria de BGF

La reestructuración del BGF contemplada en el AAR del BGF requería la aprobación de la Junta de Supervisión y una orden del Tribunal de Título III. El 12 de julio de 2017, la Junta de Supervisión autorizó al BGF a aplicar el Título VI de PROMESA, conforme a la Sección 601(e) de PROMESA. El 8 de mayo de 2018, la Junta de Supervisión certificó el AAR del BGF. La Junta de Supervisión concedió su aprobación final conforme a la Sección 601(m)(1)(B) de PROMESA el 2 de noviembre de 2018 (sujeto a la aprobación de la Modificación Calificatoria por parte del Tribunal). El 7 de noviembre de 2018, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico dictó una orden que estipulaba que los requisitos de la Sección 601(m)(1)(D) de PROMESA habían sido satisfechos. La Fecha de Cierre tuvo lugar el 29 de noviembre de 2018, cuando se firmaron todos los documentos definitivos, se transfirieron los activos del BGF a la Autoridad de Recuperación y al Fideicomiso de Entidad Pública, se cancelaron las Reclamaciones de Bonos Participantes, se exoneraron todas las reclamaciones vinculadas, la garantía provista por el ELA con respecto al total de $110 de bonos del BGF se extinguieron y se emitieron los Bonos de la Autoridad de Recuperación.

*[El resto de la página se deja intencionalmente en blanco]*

## VI.    Plan de ajuste de Título III de la ACT

### A.    Generalidades

#### 1.    Presentación del plan de ajuste

Un plan de ajuste dispone el tratamiento y el cumplimiento de las obligaciones de deuda del Deudor de Título III. Únicamente la Junta de Supervisión puede presentar un plan de ajuste, ya sea por petición o para el momento estipulado por el tribunal, y solo puede hacerlo si determina, según su exclusivo criterio, que el Plan de la ACT es coherente con el Plan Fiscal certificado aplicable.[171] La Junta de Supervisión puede modificar el Plan de la ACT en cualquier momento antes de la confirmación, siempre que el plan modificado cumpla los requisitos de Título III de PROMESA.[172]

#### 2.    Contenido de un plan de ajuste

No obstante las leyes aplicables pero no referidas a quiebras, entre otras cosas, un plan de ajuste (i) designa clases de reclamaciones (las reclamaciones en una clase deben ser "sustancialmente similares"),[173] (ii) especifica cualquier clase de reclamación que no esté afectada por el plan de ajuste y especifica el tratamiento asignado a clases de reclamaciones o intereses que están afectados, (iii) dispone el mismo tratamiento para cada reclamación de una clase particular a menos que el tenedor de una reclamación particular acepte un tratamiento menos favorable, y (iv) dispone medios adecuados para la implementación del plan de ajuste, a través de, por ejemplo, la retención de bienes por parte del deudor de Título III, la transferencia o venta de bienes a otra entidad, la satisfacción o modificación de cualquier gravamen o escritura, y la subsanación o exoneración de cualquier incumplimiento.[174]

Una clase de reclamaciones se ve afectada bajo un plan de ajuste, a menos que el plan de ajuste (i) deje sin cambios los derechos por ley o derecho consuetudinario o por contrato a los cuales dicha reclamación o interés da derecho al tenedor de dicha reclamación o dicho interés; o (ii) no obstante la ley no vinculada a Quiebras aplicable que conceda derechos al tenedor de la reclamación o interés a exigir o recibir el pago acelerado después del incumplimiento el plan de ajuste subsana el incumplimiento, reinstaura la fecha de vencimiento de la reclamación o interés, compensa al tenedor por daños incurridos como resultado de una confianza razonable por parte de dicho tenedor en dicha ley no vinculada a Quiebras aplicable y (para el incumplimiento de obligaciones no monetarias) compensa al tenedor por cualquier pérdida pecuniaria real incurrida

---

[171] PROMESA §§ 312(a)-(b), 104(j)(3).

[172] PROMESA § 313.

[173] Al determinar si las reclamaciones son "sustancialmente similares", la Junta de Supervisión debe considerar si dichas reclamaciones son garantizadas y si dichas reclamaciones tienen prioridad sobre otras reclamaciones. PROMESA § 301(e).

[174] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

por dicho tenedor y no altera de otra manera los derechos concedidos por la ley o el derecho consuetudinario o por contrato de los que goza el tenedor.[175]

### 3. Aceptación de un plan de ajuste

El tenedor de una reclamación permitida puede votar para aceptar o rechazar un plan de ajuste. PROMESA excluye específicamente de la definición de "tenedor de una reclamación o un interés" para tales fines a cualquier "Emisor" o "Instrumentalidad autorizada del Emisor del Gobierno del Territorio", tal como lo define el Título VI de PROMESA) o una corporación, fideicomiso u otra entidad legal que esté controlada por el Emisor o una Instrumentalidad Territorial Autorizada del Emisor del Gobierno del Territorio, siempre que los demás beneficiarios de dichas reclamaciones no se excluyan, y siempre que, con respecto a los Bonos Asegurados, dicho "tenedor de una reclamación o un interés" sea la aseguradora monolínea que asegura dichos bonos, en la medida en que se conceda a dicha aseguradora el derecho al voto de los Bonos Asegurados para fines de aplicar remedios o consentir a las enmiendas o modificaciones propuestas, según se dispone en los documentos aplicables.[176]

Se presume de manera concluyente que una clase que no se ve afectada conforme al plan de ajuste ha aceptado el plan, y se considera que una clase que no tiene derecho conforme al plan de ajuste a recibir o retener cualquier bien por cuenta de las reclamaciones de los tenedores no ha aceptado el plan de ajuste.[177] Una clase de reclamaciones acepta un plan de ajuste si este ha sido aceptado por acreedores que poseen por lo menos dos tercios del monto y más de la mitad del número de las reclamaciones permitidas de dicha clase (salvo las que se designan como reclamaciones que no son de buena fe de conformidad a la Sección 1126(e)) del Código de Quiebras.[178]

### 4. Solicitación de aceptaciones del plan de ajuste

Antes de solicitar aceptaciones o rechazos de los tenedores de reclamaciones, la Junta de Supervisión debe emitir, y hacer que el tribunal apruebe, una declaración de divulgación que proporcione información adecuada a los tenedores de reclamaciones e intereses con el fin de solicitar aceptaciones al Plan de la ACT.[179] El tipo de información adecuada provista debe permitir que un hipotético inversionista de la clase pertinente realice un juicio informado acerca del Plan de la ACT. La misma declaración de divulgación debe ser transmitida a cada tenedor de una reclamación de una clase particular, pero pueden transmitirse declaraciones de divulgación alternativas con diferentes montos o tipos de información a diferentes clases.[180]

---

[175] 11 U.S.C. § 1124.

[176] PROMESA § 301(c)(3).

[177] 11 U.S.C. §§ 1126(f)-(g).

[178] 11 U.S.C. § 1126(c).

[179] 11 U.S.C. §§ 1125, 1126(b).

[180] 11 U.S.C. § 1126(c).

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

**B.**     **Descripción general del plan de ajuste**

EL SIGUIENTE RESUMEN RESALTA CIERTAS DISPOSICIONES SUSTANTIVAS DEL PLAN DE LA ACT, Y NO ES, NI ESTÁ DESTINADO A SER, UNA DESCRIPCIÓN COMPLETA O UNA SUSTITUCIÓN DE UNA VERSIÓN COMPLETA DEL PLAN DE LA ACT. EL SIGUIENTE RESUMEN SE ENCUENTRA CALIFICADO EN SU TOTALIDAD POR LOS TÉRMINOS DEL PLAN DE LA ACT.

EL DEUDOR RECOMIENDA QUE TODOS LOS TENEDORES DE RECLAMACIONES LEAN ATENTAMENTE Y ESTUDIEN EL PLAN DE LA ACT AL CONSIDERAR SI VOTAN PARA ACEPTAR O RECHAZAR EL PLAN DE LA ACT, UNA COPIA DEL CUAL SE ADJUNTA A ESTA DECLARACIÓN DE DIVULGACIÓN COMO <u>ANEXO A</u>.

La Sección 1123 del Código de Quiebras, que se hace aplicable al Caso de Título III conforme a PROMESA, dispone que, salvo en el caso de reclamaciones administrativas, un plan de ajuste debe categorizar las reclamaciones contra un deudor en clases individuales. Si bien PROMESA y el Código de Quiebras conceden al Deudor una flexibilidad significativa a la hora de clasificar reclamaciones, la Sección 1122 del Código de Quiebras determina que un plan de ajuste solo puede colocar una reclamación en una clase que contenga reclamaciones que son sustancialmente similares.

El Plan de la ACT identifica 19 Clases de Reclamaciones (ciertas de las cuales abarcan numerosas series individuales de la deuda pertinente, como se estipula en el Plan de la ACT). Dichas Clases tienen en cuenta la naturaleza y prioridad diversa de las Reclamaciones contra la ACT. Las Reclamaciones Administrativas no se clasifican para los fines de votación o de recepción de distribuciones conforme al Plan de la ACT (como lo requiere la Sección 1123(a)(1) del Código de Quiebras) sino que se tratan por separado como Reclamaciones no clasificadas.

El Plan de la ACT dispone un tratamiento específico para cada Clase de Reclamaciones. Únicamente ciertos tenedores de Reclamaciones que están afectadas conforme al Plan de la ACT tienen derecho a votar y a recibir Distribuciones conforme al Plan de la ACT. *Véase* las Secciones **Error! Reference source not found.** y **Error! Reference source not found.** de esta Declaración de Divulgación para obtener un resumen de los procedimientos de votación y elección en relación con la convocatoria del Plan de la ACT.

Para los fines del Plan de la ACT, lo que incluye, entre otros, para fines de distribuciones conforme a los términos y disposiciones del Artículo XXVII del Plan de la ACT, el "tenedor" de una Reclamación es cualquier Entidad que, directa o indirectamente, tiene poder de inversión con respecto a cualquier Reclamación, lo que incluye el poder de disponer o de dirigir la disposición de dicha Reclamación. Para los fines del Artículo XXVII del Plan de la ACT y la Sección 1126 del Código de Quiebras, el "tenedor" de cualquier Reclamación de Bonos será determinado de conformidad con la Sección 301(c)(3) de PROMESA y cualquier ley o documento aplicable a dichas Reclamaciones de Bonos.

A menos que se disponga de otra manera en el Plan de la ACT o en la Orden de Confirmación de la ACT, el tratamiento de cualquier Reclamación conforme al Plan de la ACT

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

deberá satisfacer, resolver, exonerar y dar por cumplida en su totalidad dicha Reclamación, y deberá intercambiarse por dicha Reclamación. **En el momento de la confirmación, el plan será vinculante para todos los tenedores de una Reclamación, independientemente de que dichos tenedores hayan votado el Plan de la ACT o hayan votado para aceptar el Plan de la ACT.**

**C.      Acuerdo mutuo y conciliación de disputas / Reestructuración de entidades**

**1.      Resolución de litigios**

En la medida en que no se resuelvan conforme al Plan del ELA o la Orden de Confirmación del ELA, el Plan de la ACT establece los términos y condiciones para un acuerdo mutuo global y conciliación integrada de, entre otros temas, disputas que se hayan hecho valer o no con respecto a los derechos de tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 98, y Reclamaciones del ELA/ACT, incluyendo las disputas siguientes:

- Las objeciones vinculadas a la deuda[181]

- Las Acciones de Invalidez[182]

- Las Acciones de Impugnación de Gravámenes[183]

- Las disputas presentadas por ciertos tenedores de Reclamaciones de Bonos del ELA, Reclamaciones de Bonos Garantizados del ELA y Préstamos del BGF a la ACT, que hagan valer derechos a recibir ingresos históricamente asignados condicionalmente a la ACT, como corresponda, y "recuperados" por el ELA conforme a las disposiciones de la Constitución del ELA.[184]

- Disputas relacionadas con la validez, propiedad, carácter garantizado y derechos relacionados vinculados a los Préstamos del BGF a la ACT.[185]

- Las Mociones de Levantamiento de la Paralización y las Acciones de Recuperación relacionadas con las Reclamaciones del ELA/ACT[186]

**2.      Asignación de reclamaciones de bonos**

Para los fines de la confirmación y el perfeccionamiento del Plan de la ACT y las distribuciones a hacerse en virtud de este, a menos que se lo permita conforme a una orden del

---

[181] *Véase* la Sección II.B.1(b) de esta Declaración de Divulgación.

[182] *Véase* el Anexo B del Plan de la ACT para obtener una lista de las Acciones de Invalidez.

[183] *Véase* el Anexo C del Plan de la ACT para obtener una lista de las Acciones de Impugnación de Gravámenes.

[184] *Véase* la Sección V.F.2 de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[185] *Véase* la Sección V.F.1(g) y V.F.1(h) de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[186] *Véase* las Secciones V.F. de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

Tribunal de Título III, en la Fecha de Entrada en Vigencia de la ACT, entre otras Reclamaciones, se permitirán las siguientes Reclamaciones por los siguientes montos:[187]

- las Reclamaciones de Bonos de la ACT 68, las Reclamaciones de Bonos de la ACT 68 (Ambac), y las Reclamaciones de Bonos de la ACT 68 (National), se considerarán permitidas por el monto total de $831,189,105.55;

- las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National), y las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) se considerarán permitidas por el monto total de $3,129,667,976.84;

- las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98, las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC), y las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National), se considerarán permitidas por el monto total de $277,107,234.18; y

- las Reclamaciones de la ACT/BGF se considerarán permitidas por el monto total de $2,149,579,432.

### 3.  Descargos, interdictos y exculpación

Los descargos, interdictos y exculpación conforme al Artículo XL del Plan de la ACT son fundamentales para obtener el valor dispuesto en el Plan de la ACT, constituyen un componente esencial de los acuerdos mutuos alcanzados y no pueden separarse de las demás disposiciones del Plan de la ACT. Véase la Sección II.F de esta Declaración de Divulgación para obtener un resumen de los descargos contenidos en el Plan de la ACT.

### 4.  Reestructuración operativa de la ACT

En la Fecha de Entrada en Vigencia de la ACT, o a la mayor brevedad posible después de dicha fecha, incluyendo, al recibir la aprobación de la FTA, la ACT Reorganizada estará reestructurada operativamente a través de la separación de los Activos de Carreteras de los Activos de Tránsito. Los Activos de Tránsito (es decir, el Tren Urbano) y todos los ingresos por tránsito se transferirán a la ATI.

***Activos de tránsito.*** Los Activos de Tránsito se verán respaldados por los ingresos de tránsito y otros flujos de ingresos expresamente identificados y dedicados, o flujos de ingresos de la ATI o del ELA, según sea el caso, suficientes para cubrir los déficits de gastos operativos y de mantenimiento de los Activos de Tránsito y las necesidades de gastos de mejoras de capital y

---

[187]  Los montos a continuación incluyen capital e interés devengado y no pagado hasta, pero no inclusive, la Fecha de Petición de la ACT.

aprobados como adecuados para dichos fines por la FTA del Departamento de Transporte de Estados Unidos y por la Junta de Supervisión.

*Activos de carreteras.* A partir de y posteriormente a la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada retendrá los Activos de Carreteras y, a la mayor brevedad posible en adelante, dichos Activos de Carreteras pasarán a quedar operativa y financieramente divididos en Activos de Carreteras de Peaje y activos no relacionados con carreteras de peaje, con una estructura legalmente segregada y asignación de costos y gastos implementados, incluyendo, entre otros, (i) la separación interna de las funciones legales, financieras y operativas y el establecimiento de oficinas diferenciadas de administración de los Activos de Carreteras de Peaje y los activos no relacionados con carreteras de peaje, y (ii) la consolidación de todas las responsabilidades de la administración de las carreteras que no sean de peaje del Departamento de Transportación y Obras Públicas de Puerto Rico con y en la ACT Reorganizada.

*Inventario de los Activos de Carreteras.* Desde y posteriormente a la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada debe usar sus mejores esfuerzos dentro de lo razonable para inventariar todos los Activos de Carreteras disponibles e intentar proporcionar dichos inventario a la Junta de Supervisión.

## 5.     Reclamaciones de retirados

De conformidad con los términos y disposiciones de la Ley 106-2017 ("Ley 106") y el Plan del ELA, y toda y cualquier obligación del Deudor hacia ex empleados que se hayan asumido y que serán pagadas por el ELA a través de Pay-Go, donde el Deudor hace contribuciones de pago por servicio prestado al ELA de conformidad con las disposiciones de la Ley 106 y el Plan del ELA, y no se tratan de otra manera conforme al Plan de la ACT.

## D.     Disposiciones para el pago de reclamaciones de gastos administrativos

Las Reclamaciones de Gastos Administrativos y Reclamaciones Profesionales no están clasificadas y por lo tanto se excluyen de las clases estipuladas en el Artículo III del Plan de la ACT.

## 1.     Reclamaciones de gastos administrativos

En la Fecha de Entrada en Vigencia de la ACT o en la fecha en que una Reclamación de Gastos Administrativos se convierte en una reclamación permitida, lo que ocurra más tarde, el Deudor pagará en su totalidad la Reclamación de Gastos Administrativos en efectivo o satisfará de otra manera la Reclamación de Gastos Administrativos Permitida con un acuerdo entre el Deudor y el reclamante. Sin embargo, si la Reclamación de Gastos Administrativos Permitida fuera incurrida en el curso ordinario por el Deudor antes de la Fecha de Entrada en Vigencia de la ACT, la reclamación se pagará en su totalidad y será ejecutada por la ACT Reorganizada de acuerdo con los términos de cualquier acuerdo o documentos que rijan las transacciones. Con respecto al Préstamo del ELA, el reembolso de este se satisfará de acuerdo con los términos y disposiciones de la Escritura de los Nuevos Bonos de la ACT. Además, si cualquier gasto en el curso ordinario no se factura, o si no se hace una solicitud por escrito de pago, dentro de ciento cincuenta (150) días después de la Fecha de Entrada en Vigencia de la ACT, el gasto del curso

ordinario será prohibido y el tenedor de la reclamación no tendrá derecho a recibir pago por el gasto.

### 2.      Reclamaciones de compensación profesional y reembolsos

Todas las entidades a las que se les adjudican compensaciones o reembolsos recibirán el pago por el monto total permitido por el Tribunal de Título III ni bien resulte razonablemente factible en (i) la Fecha de Entrada en Vigencia de la ACT y (ii) la fecha de la Orden Final del Tribunal que permita las reclamaciones o bajo términos mutuamente acordados, lo que ocurra más tarde. Sin embargo, para calificar para el reembolso, cada profesional debe presentar una solicitud para ser compensado por los servicios profesionales prestados y los gastos cobrados dentro de los ciento veinte (120) días después de la Fecha de Entrada en Vigencia de la ACT. Los ACT Reorganizada pagará compensación por servicios profesionales y reembolso de gastos incurridos después de la Fecha de Entrada en Vigencia de la ACT en el curso ordinario y sin la necesidad de la aprobación del Tribunal de Título III.

### 3.      Costos de perfeccionamiento de la ACT

Con el fin de compensar a ciertas partes por el costo de la negociación, confirmación y perfeccionamiento del Plan de la ACT, cada Acreedor Inicial del AAP de la ACT/ADCC tendrá derecho a recibir, a más tardar diez (10) días hábiles después de la Fecha de Entrada en Vigencia de la ACT, una participación prorrateada de uno por ciento (1.00%) del monto total de las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (asegurados o no y, con respecto a Assured y National, incluyendo posiciones de los que es tenedor o ha asegurado) de dicho Acreedor Inicial del AAP de la ACT/ADCC, sin duplicación, de los que dicho Acreedor Inicial del AAP de la ACT/ADCC es tenedor o ha asegurado a las 5:00 p.m. (hora del Este) del 5 de mayo de 2021, hasta el monto total de ciento veinticinco millones de dólares ($125,000,000.00).

### 4.      Honorario de restricción de la ACT

Como contraprestación de la celebración del Acuerdo de Apoyo al Plan de la ACT/ADCC, y la conformidad con todos sus términos y condiciones, incluyendo la aceptación del "bloqueo" de sus bonos de acuerdo con los términos de este, sujeto a la presentación de la Orden de Confirmación de la ACT, donde cada Acreedor de Honorarios de Restricción de la ACT/ADCC que es tenedor de o ha asegurado Bonos de la ACT 68 o Bonos Prioritarios (Senior) de la ACT 98 (incluyendo las Monolíneas correspondientes, en la medida en que dichas Monolíneas estén autorizadas para votar por las Reclamaciones de Bonos Asegurados de la ACT correspondientes) tendrán derecho a recibir el Honorario de Restricción del AAP de la ACT en forma de una reclamación de gastos administrativos permitidos, pagaderos en efectivo, en el momento del perfeccionamiento del Plan de la ACT por un monto equivalente al Porcentaje del Honorario de Restricción de la ACT multiplicado por el monto total de las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (FGIC), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de

Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC), y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (sin duplicación y, en la medida en que dichas Reclamaciones sean aseguradas por Monolíneas, únicamente en la medida en que un Acreedor del Honorario de Restricción del AAP de la ACT/ADCC esté autorizado a votar por cualquier Reclamación de este tipo) de las que sea tenedor, o, en el caso de las Monolíneas, que sea tenedor o haya asegurado, dicho Acreedor de Honorarios de Restricción de AAP de la ACT/ADCC en el momento del vencimiento del Período del Honorario de Restricción del AAP de la ACT/ADCC.

Sin embargo, cada Acreedor de Honorarios de Restricción del AAP de la ACT/ADCC que adquiera algún Bono de la ACT 68 y/o Bonos Prioritarios (Senior) de la ACT 98 después de la Fecha Límite de la Acumulación (incluyendo (i) un tenedor de un Bono de la ACT asegurado por una Monolínea (que no sea un Bono de la ACT asegurado por una Monolínea asegurado por Assured o National, según sea el caso), en la medida en que dicho Acreedor de Honorarios de Restricción del AAP de la ACT/ADCC esté autorizado para votar por la reclamación con respecto a dicho Bono de la ACT asegurado por una Monolínea, y (ii) Assured y National, en la medida en que Assured o National, según corresponda, esté autorizado para votar por dichas Reclamaciones de Bonos Asegurados de la ACT) tendrá derecho a recibir dicho Honorario de Restricción del AAP de la ACT/ADCC equivalente al Porcentaje del Honorario de Restricción de la ACT multiplicado por el monto total de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC), y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (sin duplicación y, en la medida en que dichas reclamaciones sean aseguradas por Monolíneas, únicamente en la medida en que un Acreedor del AAP de la ACT/ADCC esté autorizado a votar por dichas reclamación) del que sea tenedor y/o esté asegurado por dicho Acreedor de Honorarios de Restricción del AAP de la ACT/ADCC al alcanzarse el Umbral del AAP atribuible a las Reclamaciones de Bonos de la ACT y la presentación de la Orden de Confirmación de la ACT, lo que ocurra primero.

Además, si un Acreedor de Honorarios de Restricción del AAP de la ACT/ADCC vende cualquier Bono de la ACT 68 o Bonos Prioritarios (Senior) de la ACT 98 por los cuales hubiera tenido derecho a recibir el Honorario de Restricción del AAP, el comprador no tendrá derecho a recibir el honorario de Restricción del AAP de la ACT por cuenta de este y dicho derecho será retenido por el vendedor.

En todas las circunstancias, la suma del total del Honorario de Restricción del AAP de la ACT más los Costos de Perfeccionamiento atribuibles a los Tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC), y Reclamaciones de Bonos Prioritarios

(Senior) de la ACT 98 (National), según sea el caso, no deberá superar los ciento veinticinco millones de dólares ($125,000,000.00).

***Honorarios adeudados ante ciertos eventos de rescisión***

El Honorario de Restricción del AAP y los Costos de Perfeccionamiento, por el monto de veinte millones de dólares ($20,000,000.00) debe pagarse, proporcionalmente, en efectivo, como reclamación de Gastos Administrativos conforme al Plan de la ACT a los Acreedores Iniciales del AAP de la ACT/ADCC a la fecha de rescisión si el Acuerdo de Apoyo al Plan de la ACT/ADCC se rescinde conforme a los términos de las Secciones 7.1(b)(iii) o (c) de este (sujeto a la extensión dispuesta en las Secciones 7.1(b) o (c) de este), o la Junta de Supervisión rescinde el Acuerdo de Apoyo al Plan de la ACT/ADCC por algún motivo que no sea:

> (i) un incumplimiento del Acuerdo de Apoyo al Plan de la ACT/ADCC por una Parte no perteneciente al Gobierno.

> (ii) la denegación de la confirmación del Plan de la ACT por el Tribunal de Título III (o si el Tribunal de Título III emite una decisión o declara su posición de que denegará la confirmación ante la falta de modificación del Plan del ELA y si dicha modificación tendría un efecto material adverso sobre la capacidad de las Partes para perfeccionar el Plan del ELA o el Plan de la ACT en términos acordes al Acuerdo de Apoyo al Plan de la ACT/ADCC, incluyendo, entre otros, términos estipulados en el Resumen de Conciliación que se anexa al presente como Anexo "J"), o

> (iv) el registro de una orden con respecto a una o más de las cuestiones estipuladas en la Sección 7.1(b)(ii) del Acuerdo de Apoyo al Plan de la ACT/ADCC.

En todas las demás circunstancias, al rescindirse el Acuerdo de Apoyo al Plan de la ACT/ADCC, incluyendo, entre otros, la rescisión del Acuerdo de Apoyo al Plan de la ACT/ADCC de acuerdo con las disposiciones de la Sección 7.1 de este, no se cobrarán Costos de Perfeccionamiento u Honorario de Restricción del AAP de la ACT/ADCC a la parte del Acuerdo de Apoyo al Plan de la ACT/ADCC que rescinde dicho acuerdo o contra la parte cuyo acuerdo se rescinde.

5.      **Sin divisibilidad**

La asignación y el pago de los Costos de Perfeccionamiento y los Honorarios de Restricción del AAP de la ACT compensan a los Acreedores de Honorarios de Restricción del AAP de la ACT/ADCC por el valor recibido y constituyen un componente esencial de los acuerdos mutuos y conciliaciones incorporados al presente y no son divisibles de los demás términos y disposiciones estipulados en el Plan de la ACT.

## E.    Clasificación y tratamiento de las reclamaciones

| Clase 1: Reclamaciones de Bonos de la ACT 68 | **Clasificación:** La Clase 1 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos de la ACT 68 que <u>no</u> son asegurados de Ambac, Assured o National.<br><br>Los Bonos de la ACT 68 incluyen lo siguiente:<br><br>{TABLE}<br><br>**Tratamiento:** En la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 recibirá su Participación Prorrateada del Recobro de Bonos de la ACT 68,[190] que consiste en (i) \$311,512,822.17 en Nuevos CIB de la ACT, (ii) \$123,543,840.05 en Nuevos CAB de la ACT, y (iii) \$211,332,685.56 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, opción que debe darse a conocer a más tardar siete días antes de la Fecha de Entrada en Vigencia de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar. |

|  | Fecha de emisión |
|---|---|
| Bonos de Ingresos de Carreteras, Serie Y | 09/04/1996 |
| Bonos de Refinanciamiento de Carreteras, Serie Z | 01/03/1996 |
| Bonos de Refinanciamiento de Ingresos de Carreteras, Serie AA-1 | 29/04/2003 |
| Bonos de Refinanciamiento de Ingresos de Carreteras, Serie AA-2 | 29/04/2003 |
| Bonos de Refinanciamiento de Ingresos de Carreteras 2005, Serie BB | 04/10/2005 |
| Bonos de Refinanciamiento de Ingresos de Carreteras 2007, Serie CC | 06/03/2007 |
| Bonos de Refinanciamiento de Ingresos de Carreteras de 2010, Serie AA-1 | 29/04/2003[188] |
| Bonos de Refinanciamiento de Ingresos de Carreteras de 2010, Serie AA-2 | 29/04/2003[189] |
| Bonos de la Serie FHA | |

---

[188] Fecha de emisión original.

[189] Fecha de emisión original.

[190] El Recobro de Bonos de la ACT 68 se comparte entre las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured) y Reclamaciones de Bonos de la ACT 68 (National).

| | |
|---|---|
| | ***Votación***: La Clase 1 está afectada por el Plan de la ACT. La Clase 1 y cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 tienen derecho a votar por la aceptación o el rechazo del Plan de la ACT. <br><br> ***Montos permitidos de reclamaciones:*** $145,642,034 <br><br> ***Recobro fijo proyectado de la ACT:*** 100% |
| **Clase 2:** <br> Reclamaciones de Bonos de la ACT 68 (Ambac) | ***Clasificación:*** La Clase 2 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos de la ACT 68 que son asegurados de Ambac. <br><br> ***Tratamiento:*** Sujeto a los términos y disposiciones de la Sección 25.4 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 (Ambac) recibirá su Participación Prorrateada del Recobro de Bonos de la ACT 68, que consiste en (i) $311,512,822.17 en Nuevos CIB de la ACT, (ii) $123,543,840.05 en Nuevos CAB de la ACT, y (iii) $211,332,685.56 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar. <br><br> ***Votación***: La Clase 2 está afectada por el Plan de la ACT. Ambac tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos de la ACT 68 (Ambac). Los tenedores beneficiarios de las Reclamaciones Permitidas de Bonos de la ACT 68 (Ambac) recibirán Efectivo por el monto equivalente al Precio de Aceleración de Ambac. <br><br> ***Montos permitidos de reclamaciones:*** $30,563,816 <br><br> ***Recobro fijo proyectado de la ACT:*** 100% |
| **Clase 3:** <br> Reclamaciones de Bonos de la ACT 68 (Assured) | ***Clasificación:*** La Clase 3 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos de la ACT 68 que son Bonos Asegurados de Assured. <br><br> ***Tratamiento:*** Sujeto a los términos y disposiciones de la Sección 25.1 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 (Assured) recibirá su Participación Prorrateada del Recobro de Bonos de la ACT 68, que consiste en (i) $311,512,822.17 en Nuevos CIB de la ACT, (ii) $123,543,840.05 en Nuevos CAB de la ACT, y (iii) $211,332,685.56 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar. |

| | |
|---|---|
| | ***Votación***: La Clase 3 está afectada por el Plan de la ACT. Assured tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos de la ACT 68 (Assured). En caso de que Assured no realice la Elección de Assured, los tenedores beneficiarios de las Reclamaciones Permitidas de Bonos de la ACT 68 (Assured) tendrán la opción de hacer una Elección de Tenedores de Bonos de Assured.<br><br>***Montos permitidos de reclamaciones:*** $567,219,573<br><br>***Recobro fijo proyectado de la ACT:*** 100% |
| **Clase 4:**<br>Reclamaciones de Bonos de la ACT 68 (National) | ***Clasificación:*** La Clase 4 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos de la ACT 68 que son asegurados de National.<br><br>***Tratamiento:*** Sujeto a los términos y disposiciones de la Sección 25.2 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 (National) recibirá su Participación Prorrateada del Recobro de Bonos de la ACT 68, que consiste en (i) $311,512,822.17 en Nuevos CIB de la ACT, (ii) $123,543,840.05 en Nuevos CAB de la ACT, y (iii) $211,332,685.56 en Nuevos CAB Convertibles de la ACT; sin embargo, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar.<br><br>***Votación***: La Clase 4 está afectada por el Plan de la ACT. National tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos de la ACT 68 (National). Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos de la ACT 68 (National) tendrán la opción de elegir recibir el Tratamiento de Conmutación de National o el Tratamiento de No Conmutación de National.<br><br>***Montos permitidos de reclamaciones:*** $87,763,682<br><br>***Recobro fijo proyectado de la ACT:*** 100% |
| **Clase 5:**<br>Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 | ***Clasificación:*** La Clase 5 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos de la ACT 98 que no son asegurados de Ambac, FGIC, Assured o National.<br><br>Los Bonos Prioritarios (Senior) de la ACT 98 incluyen lo siguiente: |

| | Fecha de emisión |
|---|---|
| Bonos de Ingresos de Transporte de 1998, Serie A | 19/03/1998 |

| | | |
|---|---|---|
| | Bonos de Ingresos de Transporte de 2002, Serie D | 07/07/2002 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2002, Serie E | 07/07/2002 |
| | Bonos de Ingresos de Transporte de 2003, Serie G | 29/04/2003 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2003, Serie H | 29/04/2003 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2004, Serie I | 20/04/2004 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2004, Serie J | 20/04/2004 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2005, Serie K | 04/10/2005 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2005, Serie L | 04/10/2005 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2007, Serie K | 06/03/2007 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2007, Serie N | 06/03/2007 |
| | Bonos de Refinanciamiento de Ingresos de Transporte 2010, Serie H | 29/04/2003[191] |

***Tratamiento:*** En la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 recibirá su Participación Prorrateada del Recobro de Bonos Prioritarios (Senior) de la ACT 98,[192] que consiste en (i) $288,487,177.83 en Nuevos CIB de la ACT, (ii) $114,412,028.08 en Nuevos CAB de la ACT, y (iii) $195,711,912.01 en Nuevos CAB Convertibles de la ACT; sin embargo, según la opción del ELA y de la ACT, opción que debe darse a conocer a más tardar siete días antes de la Fecha de Entrada en Vigencia de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar.

***Votación***: La Clase 5 está afectada por el Plan de la ACT. La Clase 5 y cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 tienen derecho a votar por la aceptación o el rechazo del Plan de la ACT.

***Montos permitidos de reclamaciones:*** $852,031,349

***Recobro fijo proyectado de la ACT:*** 22%

---

[191] Fecha de emisión original.

[192] El Recobro de Bonos Prioritarios (Senior) de la ACT 98 se comparte entre las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) y Reclamaciones de Bonos de la ACT 98 (National).

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

| Clase 6:<br><br>Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) | **Clasificación:** La Clase 6 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Prioritarios (Senior) de la ACT 98 que son asegurados de Ambac.<br><br>**Tratamiento:** Sujeto a los términos y disposiciones de la Sección 25.4 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) recibirá su Participación Prorrateada del Recobro de Bonos Prioritarios (Senior) de la ACT 98, que consiste en (i) $288,487,177.83 en Nuevos CIB de la ACT, (ii) $114,412,028.08 en Nuevos CAB de la ACT, y (iii) $195,711,912.01 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar.<br><br>**Votación**: La Clase 6 está afectada por el Plan de la ACT. Ambac tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos de la ACT 98 (Ambac). Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) tendrán la opción de elegir recibir, dentro de lo ofrecido por Ambac según su exclusivo criterio, el Tratamiento de Conmutación de Ambac o el Tratamiento de No Conmutación de Ambac.<br><br>***Montos permitidos de reclamaciones:*** $491,939,990<br><br>***Recobro fijo proyectado de la ACT:*** 22% |
| Clase 7:<br><br>Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) | **Clasificación:** La Clase 7 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Prioritarios (Senior) de la ACT 98 que son Bonos Asegurados de Assured.<br><br>**Tratamiento:** Sujeto a los términos y disposiciones de la Sección 25.1 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Assured) recibirá su Participación Prorrateada del Recobro de Bonos Prioritarios (Senior) de la ACT 98, que consiste en (i) $288,487,177.83 en Nuevos CIB de la ACT, (ii) $114,412,028.08 en Nuevos CAB de la ACT, y (iii) $195,711,912.01 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar.<br><br>**Votación**: La Clase 7 está afectada por el Plan de la ACT. Assured tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de |

2352" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

| | |
|---|---|
| | las Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Assured). En caso de que Assured no realice la Elección de Assured, los tenedores beneficiarios de las Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (Assured) tendrán la opción de hacer una Elección de Tenedores de Bonos de Assured.<br><br>***Montos permitidos de reclamaciones:*** $877,474,059<br><br>***Recobro fijo proyectado de la ACT:*** 22% |
| **Clase 8:**<br>Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) | ***Clasificación:***  La Clase 8 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Prioritarios (Senior) de la ACT 98 que son asegurados de FGIC.<br><br>***Tratamiento:***  Sujeto a los términos y disposiciones de la Sección 25.3 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) recibirá su Participación Prorrateada del Recobro de Bonos Prioritarios (Senior) de la ACT 98, que consiste en (i) $288,487,177.83 en Nuevos CIB de la ACT, (ii) $114,412,028.08 en Nuevos CAB de la ACT, y (iii) $195,711,912.01 en Nuevos CAB Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar.<br><br>***Votación***:  La Clase 8 está afectada por el Plan de la ACT. FGIC tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) que de otra manera se emitirían en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii).<br><br>***Montos permitidos de reclamaciones:*** $377,726,512<br><br>***Recobro fijo proyectado de la ACT:*** 22% |
| **Clase 9:**<br>Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) | ***Clasificación:***  La Clase 9 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Prioritarios (Senior) de la ACT 98 que son asegurados de National.<br><br>***Tratamiento:***  Sujeto a los términos y disposiciones de la Sección 25.2 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (National) recibirá su Participación Prorrateada del Recobro de Bonos Prioritarios (Senior) de la ACT 98, que consiste en (i) $288,487,177.83 en Nuevos CIB de la ACT, (ii) $114,412,028.08 en Nuevos CAB de la ACT, y (iii) $195,711,912.01 en Nuevos CAB |

|  | Convertibles de la ACT; <u>sin embargo</u>, según la opción del ELA y de la ACT, puede sustituirse el Efectivo por Nuevos Bonos de la ACT que se emitirían de otra manera en la Fecha de Entrada en Vigencia de la ACT de acuerdo con las cláusulas (i)–(iii), dólar a dólar. |
|  | *Votación*:  La Clase 9 está afectada por el Plan de la ACT. National tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos de la ACT 98 (National). Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 (National) tendrán la opción de elegir recibir el Tratamiento de Conmutación de National o el Tratamiento de No Conmutación de National. |
|  | *Montos permitidos de reclamaciones:* $530,496,068 |
|  | *Recobro fijo proyectado de la ACT:* 22% |
| **Clase 10:** Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 | *Clasificación:*  La Clase 10 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Subordinados (Sub) de la ACT 98 que <u>no</u> son asegurados de Assured, FGIC o National. |
|  | Los Bonos Prioritarios (Senior) de la ACT 98 incluyen lo siguiente: |

|  | Fecha de emisión |
|---|---|
| Bonos Subordinados de Ingresos de Transporte de 2003, Serie 1998 | 15/07/1998 |
| Bonos Subordinados de Ingresos de Transporte, Serie 2003 | 29/04/2003 |

|  | *Tratamiento:*  En la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Subordinados (Sub) de la ACT 98 recibirá su Participación Prorrateada del Recobro de Bonos Subordinados (Sub) de la ACT 98.[193] |
|  | *Votación*:  La Clase 10 está afectada por el Plan de la ACT. La Clase 10 y cada tenedor de una Reclamación Permitida de Bonos Subordinados (Sub) de la ACT 98 tienen derecho a votar por la aceptación o el rechazo del Plan de la ACT. |
|  | *Montos permitidos de reclamaciones:*  $121,457,958 |
|  | *Recobro fijo proyectado de la ACT:* N/A |

---

[193] El Recobro de Bonos Subordinados (Sub) de la ACT 98 se comparte entre las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98, Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National).

| | |
|---|---|
| **Clase 11:**<br><br>Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) | ***Clasificación:*** La Clase 11 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Subordinados (Sub) de la ACT 98 que son Bonos Asegurados de Assured.<br><br>***Tratamiento:*** Sujeto a los términos y disposiciones de la Sección 25.1 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Subordinados (Sub) de la ACT 98 (Assured) recibirá su Participación Prorrateada del Recobro de Bonos Subordinados (Sub) de la ACT 98.[194]<br><br>***Votación***: La Clase 11 está afectada por el Plan de la ACT. Assured tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (Assured). En caso de que Assured no realice la Elección de Assured, los tenedores beneficiarios de las Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (Assured) tendrán la opción de hacer una Elección de Tenedores de Bonos de Assured.<br><br>***Montos permitidos de reclamaciones:*** $51,283,015<br><br>***Recobro fijo proyectado de la ACT:*** N/A |
| **Clase 12:**<br><br>Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) | ***Clasificación:*** La Clase 12 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Subordinados (Sub) de la ACT 98 que son asegurados de FGIC.<br><br>***Tratamiento:*** Sujeto a los términos y disposiciones de la Sección 25.3 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Subordinados (Sub) de la ACT 98 (FGIC) recibirá su Participación Prorrateada del Recobro de Bonos Subordinados (Sub) de la ACT 98.[195]<br><br>***Votación***: La Clase 12 está afectada por el Plan de la ACT. FGIC tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC).<br><br>***Montos permitidos de reclamaciones:*** $65,942,129<br><br>***Recobro fijo proyectado de la ACT:*** N/A |

---

[194] El Recobro de Bonos Subordinados (Sub) de la ACT 98 se comparte entre las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98, Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) y Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National).

[195] El Recobro de Bonos Subordinados (Sub) de la ACT 98 se comparte entre las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National).

| Clase 13: | **Clasificación:** La Clase 13 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Subordinados (Sub) de la ACT 98 que son asegurados de National. |
|---|---|
| Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) | **Tratamiento:** Sujeto a los términos y disposiciones de la Sección 25.2 del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Subordinados (Sub) de la ACT 98 (National) recibirá su Participación Prorrateada del Recobro de Bonos Subordinados (Sub) de la ACT 98.[196] |
| | **Votación**: La Clase 13 está afectada por el Plan de la ACT. National tiene derecho al voto para aceptar o rechazar el Plan de la ACT por cuenta de las Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (National). Los tenedores beneficiarios de Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98 (National) tendrán la opción de elegir recibir el Tratamiento de Conmutación de National o el Tratamiento de No Conmutación de National. |
| | **Montos permitidos de reclamaciones:** $38,424,132 |
| | **Recobro fijo proyectado de la ACT:** N/A |
| **Clase 14:** | **Clasificación:** La Clase 14 consiste en todas las reclamaciones contra la ACT por cuenta de los Bonos Moscoso de la ACT, compuestos por los Bonos de Refinanciamiento de Ingresos por Instalaciones Especiales, 2003 Serie A, emitidos por la ACT conforme a un Acuerdo de Fideicomiso de fecha 1 de octubre de 2003. |
| Reclamaciones de Bonos Moscoso de la ACT | **Tratamiento:** En la Fecha de Entrada en Vigencia de la ACT, las Reclamaciones Permitidas de los Bonos Moscoso de la ACT se considerarán no afectadas y, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos Moscoso de la ACT tendrá derecho a recibir pagos de capital e intereses de acuerdo con los términos y condiciones de los Bonos Moscoso de la ACT. |
| | **Votación**: La Clase 14 no está afectada por el Plan de la ACT. Se considera que la Clase 14 y cada tenedor de una Reclamación de Bonos Moscoso de la ACT han aceptado el Plan de la ACT. |
| | **Montos permitidos de reclamaciones:** $104,215,000[197] |

---

[196] El Recobro de Bonos Subordinados (Sub) de la ACT 98 se comparte entre las Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National).

[197] Representa el monto del capital únicamente.

| | |
|---|---|
| | *Recobro fijo proyectado de la ACT:* 100% |
| **Clase 15:** Reclamaciones de Dominio Eminente / Expropiación Inversa | *Clasificación:* La Clase 15 consiste en reclamaciones emergentes de o relacionadas con una acción o proceso de expropiación iniciado en el Tribunal de Primera Instancia de acuerdo con 32 L.P.R.A. § 2905 para obtener el título de bienes inmuebles ubicados en Puerto Rico, y se ha presentado una Orden Final por un monto que supere el monto depositado por el expropiante. |

*Tratamiento:* En la Fecha de Entrada en Vigencia de la ACT:

(a) en la medida en que no se haya modificado con anterioridad, la paralización automática estipulada conforme a la Sección 362 del Código de Quiebras se considerará modificada para permitir que el tenedor de una Reclamación de Dominio Eminente / Expropiación Inversa (i) liquide dicha Reclamación de Dominio Eminente / Expropiación Inversa, y (ii) haga que el Secretario del Tribunal de Primera Instancia distribuya a dicho tenedor el monto monetario en depósito en el Tribunal de Primera Instancia con respecto a la propiedad expropiada, y

(b) sujeto a la presentación de la Orden de Confirmación de la ACT o la Averiguación de Hechos y Conclusiones de Derecho con respecto al Plan de la ACT que dispongan que dichas reclamaciones deban pagarse en su totalidad, el tenedor de una Reclamación de Dominio Eminente / Expropiación Inversa tendrá derecho a recibir 100% de dicho balance no pagado en Efectivo.

Sin embargo, si resulta exitosa la apelación de la Junta de Supervisión de la Orden de Confirmación del ELA y la Averiguación de Hechos y Conclusiones de Derecho presentadas con respecto a esta en relación con la imposibilidad de renunciar a las Reclamaciones de Dominio Eminente / Expropiación Inversa contra el ELA y si dicha Orden de Confirmación del ELA se revierte en tal medida, el tenedor de dicho balance no pagado recibirá, como contraprestación, satisfacción, descargo y canje total por ella, pagos de la ACT equivalentes a, y dentro del mismo plazo que, los pagos a hacerse a los tenedores de Reclamaciones Generales Permitidas Sin Garantía del ELA.

*Votación*: La Clase 15 está afectada por el Plan de la ACT. La Clase 15 y cada tenedor de una Reclamación Permitida de Dominio Eminente / Expropiación Inversa tienen derecho a votar por la aceptación o el rechazo del Plan de la ACT.

*Montos estimados permitidos de reclamaciones:* $83,687,663

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

|  | *Recobro fijo proyectado de la ACT:* 100% si se dispone en la Orden de Confirmación de la ACT o en las Conclusiones de Derecho con respecto al Plan de la ACT; de lo contrario, aproximadamente 19% del balance pendiente de la Reclamación Permitida después de la aplicación de cualquier depósito. |
|---|---|
| **Clase 16:** Reclamaciones Generales Sin Garantía de la ACT | *Clasificación:* La Clase 16 consiste en todas las Reclamaciones contra la ACT que no sean:<br><br>(a) una Reclamación emergente de o relacionada con los Bonos de la ACT 68, los Bonos Prioritarios (Senior) de la ACT 98, los Bonos Subordinados (Sub) de la ACT 98, los Bonos Moscoso de la ACT o los Préstamos del BGF/ACT,<br><br>(b) una Reclamación de Dominio Eminente/Expropiación Inversa,<br><br>(c) una Reclamación Subordinada de la Sección 510(b),<br><br>(d) una Reclamación Tardía,<br><br>(e) una Reclamación de Conveniencia,<br><br>(f) cualquier Reclamación que sea elegible para transferirse a o administrarse a través del proceso de ACR,<br><br>(g) la Reclamación aseverada en la Evidencia de reclamación Núm. 161091 presentada por el Concilio Nacional de Policías Inc. y cualquier otra Reclamación relacionada con el litigio caratulado <u>Frente Unido de Policías Organizados, y otros. c. Departamento de Policía de Policía de Puerto Rico</u>, Caso Núm. KAC-2007-4170,<br><br>(h) cualquier Reclamación por beneficios de retirados (incluyendo, entre otros, las partes de las Evidencia de Reclamación Núm. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 y 130091), independientemente de si dichas Reclamaciones se hacen valer a través de litigio o proceso administrativo por retirados o empleados activos, pero excluyendo las Reclamaciones por cualquier aumento de pago de pensiones que serían pagaderas antes de la adjudicación de dichas Reclamaciones (es decir, pagos atrasados de pensiones) y solo hasta el monto relacionado con pensiones no pagadas,<br><br>(i) todas las Reclamaciones contra el Deudor de cualquier Unidad Gubernamental (como se define en la Sección 101 del Código de Quiebras), incluyendo el gobierno de Estados Unidos, cualquier gobierno estatal, cualquier gobierno extranjero o municipalidad (ya sea del ELA o no), el ELA, cualquier instrumentalidad del ELA (incluyendo el BGF), ya sea aseverada directamente por dicha Unidad Gubernamental o indirectamente o por derivación por cualquier otra entidad, incluyendo, |

entre otros, las Reclamaciones del BGF aseveradas por o a través de la Autoridad de Recuperación de Deudas del BGF,

(j) cualquier Reclamación relacionada con el Acuerdo de Concesión, de fecha 20 de diciembre de 1991, entre la ACT y Autopistas de PR, LLC, con sus enmiendas y suplementos, relacionada con la operación y el mantenimiento del Puente Teodoro Moscoso, incluyendo, entre otros, la Evidencia de reclamación Núm. 52295,

(k) Reclamaciones relacionadas con el Acuerdo de Concesión de Carreteras de Peaje, de fecha 27 de junio de 2011, entre la ACT y Autopistas Metropolitanas de Puerto Rico, LLC, con sus enmiendas y suplementos, incluyendo, entre otros, la Evidencia de reclamación Núm. 35566,

(l) cualquier reclamación por deficiencia sin garantía con respecto a prioridades aseveradas y/o Reclamaciones con garantía, o

(k) cualquier otra Reclamación que, según lo determine el Tribunal de Título III no sea una Reclamación General No Garantizada de la ACT.

***Tratamiento:*** En la Fecha de Entrada en Vigencia de la ACT, sujeto a la elección de ser tratada como Reclamación de Conveniencia (Clase 19), y sujeto al Tope de Recobro de GUC de 40% excluyendo cualquier recobro neto del Fideicomiso de Acciones de Anulación por cuenta de las Acciones de Anulación, cada tenedor de una Reclamación General Permitida Sin Garantía de la ACT recibirá su participación prorrateada del Recobro de GUC de la ACT, compuesto de (a) $48,000,000.00 en Efectivo financiado por la Reserva de GUC más (b) los recobros netos, de haberlos, por el Fideicomiso de Acciones de Anulación atribuibles a las Acciones de Anulación, menos (c) el monto en Efectivo que sea necesario para cubrir el pago de las Reclamaciones de Conveniencia Permitidas (Clase 19). En caso de que las distribuciones con respecto las Reclamaciones Generales Permitidas Sin Garantía de la ACT del Recobro de GUC de la ACT equivalente al Tope del Recobro de GUC, cualquier fondo remanente de la Reserva de GUC después de que se alcance el Tope del Recobro de GUC y las distribuciones hechas o reservadas por cuenta de este, se entregarán a la ACT para fines generales.

***Reserva de GUC:*** Se creará una Reserva de GUC en o antes de la Fecha de Entrada en Vigencia de la ACT, y será mantenida por Kroll Restructuring Administration LLC (antiguamente, Prime Clerk LLC), exclusivamente para beneficio de los tenedores de Reclamaciones Generales Permitidas Sin Garantía de la ACT, conforme a un acuerdo por separado que contendrá protecciones sustancialmente similares para los tenedores de Reclamaciones Generales Sin Garantía de la ACT como el acuerdo con respecto a la Reserva de GUC que conforme al Plan del ELA

existe para tenedores de Reclamaciones Generales sin Garantía del ELA (como se definen en el Plan del ELA).

La Reserva de GUC se financiará con: (a) $24,000,000.00 en la Fecha de Entrada en Vigencia de la ACT; y (b) $24,000,000.00 en el primer aniversario de la Fecha de Entrada en Vigencia de la ACT. Los montos necesarios para satisfacer las Reclamaciones de Conveniencia Permitidas se considerarán como satisfactorios de una parte del monto a depositarse en la Reserva de GUC y como financiadas directamente al Agente Pagador y no a la Reserva de GUC. Además, en caso de que los recobros por cuenta de las Reclamaciones Generales Permitidas Sin Garantía de la ACT equivalentes al Tope de Recobro de GUC, (y) cualquier fondo (que no sea algún recobro por el Fideicomiso de Acciones de Anulación con respecto a las Acciones de Anulación) restantes en la Reserva de GUC después de alcanzar el Tope de Recobro de GUC y distribuciones hechas o reservadas por cuenta de este se entregarán a la ACT para fines generales, o (z) en la medida en que se alcance dicho Tope de Recobro de GUC antes de una obligación de financiamineto futuro, la ACT quedará liberada de dicha obligación de financiamiento futuro.

*Votación*:  La Clase 16 está afectada por el Plan de la ACT. La Clase 16 y cada tenedor de una Reclamación General Permitida Sin Garantía de la ACT tienen derecho a votar por la aceptación o el rechazo del Plan de la ACT.

***Montos estimados permitidos de reclamaciones:***  $255,972,641

***Recobro fijo proyectado de la ACT:*** 19%

***Elección a tratarse como reclamación de conveniencia (Clase 19)****:* Cualquier tenedor de una Reclamación General Sin Garantía de la ACT puede elegir (a) reducir el monto de dicha Reclamación General Sin Garantía de la ACT a $20,000.00, y (b) hacer que dicha reclamación reducida reciba el tratamiento correspondiente a la Clase 19 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dicha reclamación reducida. Cualquier tenedor de una Reclamación General Permitida Sin Garantía de la ACT puede elegir (y) reducir el monto de dicha Reclamación General Permitida Sin Garantía de la ACT al monto total de $40,000.00, y (z) hacer que dichas reclamaciones reducidas reciban el tratamiento correspondiente a la Clase 19 (Reclamaciones de Conveniencia), recibiendo un recobro proyectado del 100% de dichas reclamaciones reducidas.

Dicha elección debe hacerse en la votación y debe ser recibida por el Deudor en o antes de la Fecha de la Votación. Cualquier elección recibida

| | por el Deudor después de la Fecha de la Votación no será vinculante para el Deudor. |
|---|---|
| **Clase 17:**<br><br>Reclamaciones de la ACT/BGF | ***Clasificación:*** La Clase 17 consiste en Reclamaciones de la ACT/BGF.<br><br>***Tratamiento:*** Conforme a los términos y disposiciones de la Estipulación de la ARD, cualquier tenedor de una Reclamaciones de la ACT/BGF no recibirá distribuciones conforme al Plan de la ACT.<br><br>***Votación:*** La Clase 17 está afectada por el Plan de la ACT. Sin embargo, conforme a la Estipulación de la ARD, se considera que la Clase 17 y cada tenedor de una Reclamación Permitida de la ACT/BGF aceptan el Plan de la ACT.<br><br>***Montos estimados permitidos de reclamaciones:*** $2,149,579,432<br><br>***Recobros de la ACT:*** 0% |
| **Clase 18:**<br><br>Reclamos Subordinados de la Sección 510(b) | ***Clasificación:*** La Clase 18 consiste en todas las reclamaciones, en la medida en que se determine conforme a una Orden Final, contra la ACT o sus activos emergentes de o relacionados con (a) la rescisión de una compra o venta de un título valor existente de un Deudor o una filial de un Deudor, (b) la compra, venta o retención de dicho título valor, o (c) el reembolso, la indemnización o la contribución permitida conforme a la sección 502 del Código de Quiebras por cuenta de dicha reclamación.<br><br>***Tratamiento:*** Las Reclamaciones Permitidas Subordinadas de la Sección 510(b) no recibirán una distribución conforme al Plan de la ACT.<br><br>***Votación***: La Clase 18 está afectada por el Plan de la ACT. Se considera que la Clase 18 y cada tenedor de una Reclamación Subordinada de la Sección 510(b) han rechazado el Plan de la ACT.<br><br>***Montos estimados permitidos de reclamaciones:*** Se desconoce<br><br>***Recobros proyectados de la ACT:*** 0% |
| **Clase 19:**<br><br>Reclamaciones de conveniencia | ***Clasificación:*** La Clase 19 consiste en (a) todas las Reclamaciones Generales Permitidas Sin Garantía de la ACT por un valor igual o menor que $20,000.00, (b) reclamaciones en poder de tenedores de Reclamaciones Generales Permitidas Sin Garantía de la ACT que hayan elegido reducir el monto de dicha Reclamación General Permitida Sin Garantía de la ACT a $20,000.00. Además, la Clase 19 incluye reclamaciones de tenedores de varias Reclamaciones Generales Permitidas Sin Garantía de la ACT que hayan elegido reducir estas Reclamaciones a un monto total de $40,000.00. |

*Tratamiento:* En la Fecha de Entrada en Vigencia de la ACT (o la fecha en que la Reclamación de Conveniencia se convierta en una Reclamación Permitida), cada tenedor de una Reclamación de Conveniencia Permitida recibirá el monto total de dicha Reclamación de Conveniencia Permitida, en efectivo, sujeto al Tope de Conveniencia siguiente.

*Tope de conveniencia:* El monto total de la contraprestación a ponerse a disposición de las Reclamaciones de Conveniencia será de $2,500,000.00, y el Comité de Acreedores puede renunciar a dicho Tope de Conveniencia en o antes del inicio de la Vista de Confirmación de la ACT en ejercicio exclusivo de sus facultades discrecionales. Si se supera el Tope de Conveniencia (y si el Comité de Acreedores no renuncia a él en o antes del inicio de la Vista de Confirmación de la ACT), los tenedores de Reclamaciones Permitidas de Conveniencia recibirán una participación prorrateada del Tope de Conveniencia.

*Votación*: La Clase 19 no está afectada por el Plan de la ACT. Se considera que la Clase 19 y cada tenedor de una Reclamación de Conveniencia Permitida han aceptado el Plan de la ACT. Se considera que los tenedores de Reclamaciones que hayan elegido que su Reclamación se reduzca y se trate como una Reclamación de Conveniencia han aceptado el Plan de la ACT.

*Montos estimados permitidos de reclamaciones:* $616,519[198]

*Recobro proyectado de los Deudores:* 100%

## F.   Disposiciones con respecto a las Obligaciones Garantizadas y deudas adicionales

**LAS OBLIGACIONES GARANTIZADAS SE EMITIRÁN CONFORME A LOS TÉRMINOS Y DISPOSICIONES DE LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT. LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT CONSTITUYE PARTE DEL SUPLEMENTO DEL PLAN Y DEBE PRESENTARSE POR SEPARADO ANTE EL TRIBUNAL DE TÍTULO III LO ANTES POSIBLE (PERO EN NINGÚN CASO DESPUÉS DE LOS SIETE (7) DÍAS ANTES DE LA FECHA DE VENCIMIENTO DE LA VOTACIÓN, O EN OTRA FECHA QUE EL TRIBUNAL DE TÍTULO III DISPONGA, DE ACUERDO CON LA ORDEN DE LA DECLARACIÓN DE DIVULGACIÓN. CONFORME AL AAP DE LA ACT, LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT SERÁ CONGRUENTE CON EL AAP DE LA ACT EN TODOS LOS ASPECTOS Y DE OTRA MANERA SERÁ RAZONABLEMENTE SATISFACTORIA DE FONDO Y DE FORMA PARA CADA PARTE DEL ACUERDO DE APOYO AL PLAN DE LA ACT. LA DESCRIPCIÓN DE LOS TÉRMINOS Y DISPOSICIONES DE LAS OBLIGACIONES**

---

[198]   No tiene en cuenta los tenedores de Reclamaciones Permitidas Generales Sin Garantía de la ACT que pueden elegir reducir su Reclamación Permitida y ser tratados como una Reclamación de Conveniencia.

**GARANTIZADAS Y LOS NUEVOS BONOS DE LA ACT Y LA ESCRITURA DE LOS BONOS DE LA ACT EN ESTA SECCIÓN DE LA DECLARACIÓN DE DIVULGACIÓN REPRESENTA LA MEJOR DESCRIPCIÓN DISPONIBLE DE LOS DEUDORES A LA FECHA DEL PRESENTE, Y LOS TÉRMINOS Y DISPOSICIONES REALES DE LOS NUEVOS BONOS DE LA ACT Y LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT ESTÁN SUJETOS A CAMBIOS MATERIALES SIN NOTIFICACIÓN ADICIONAL DE LOS DEUDORES, SALVO SEGÚN SE DISPONGA EN EL SUPLEMENTO DEL PLAN. EN LA MEDIDA EN QUE HAYA ALGÚN CONFLICTO ENTRE LA DESCRIPCIÓN DE ESTA SECCIÓN DE LA DECLARACIÓN DE DIVULGACIÓN Y LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT, LA ESCRITURA DE LOS NUEVOS BONOS DE LA ACT PREVALECERÁ EN TODOS LOS ASPECTOS.**

1.      **Generalidades**

Las Obligaciones Garantizadas se emitirán conforme a los términos y disposiciones de la Escritura de los Nuevos Bonos de la ACT y se distribuirán como se estipula en el Plan de la ACT. La documentación definitiva que rige a las Obligaciones Garantizadas de modo general dispondrá los términos estipulados en este resumen, sujeto a los resultados de cualquier elección permitida por el Plan de la ACT y otros ajustes permitidos o requeridos por el Plan de la ACT. Los términos en mayúscula que se usan en el análisis de las Obligaciones Garantizadas, pero que no se definen de otra manera en el presente, tendrán los significados que se aplican a dichos términos en la Escritura de los Nuevos Bonos de la ACT.

Este resumen no pretende ser completo y se encuentra sujeto a, y calificado en su totalidad por referencia a, todas las disposiciones de las Obligaciones Garantizadas, la Escritura de los Nuevos Bonos de la ACT y el Plan de la ACT.

2.      **Los Nuevos Bonos de la ACT**

En la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada emitirá Nuevos Bonos de la ACT, consistentes en:

(i) $237,955,868.13 correspondientes al monto del capital inicial de Nuevos CAB de la ACT, con fecha de vencimiento del 1 de julio de 2032, y una tasa de interés de 5.0% anual;

(ii) $407,044,597.57 correspondientes al monto del capital inicial de Nuevos CCAB de la ACT, con fecha de vencimiento del 1 de julio de 2053, una Fecha de Conversión del 1 de julio de 2032 y una tasa de interés de 5.0% anual;

(iii) $600,000,000.00 correspondientes al monto del capital inicial de Nuevos CIB de la ACT, con fecha de vencimiento del 1 de julio de 2062, y una tasa de interés de 5.0% anual.

Los Nuevos Bonos de la ACT solo se pagarán a partir de ciertos activos, que estarán compuestos principalmente de ingresos de peaje. Véase la sección I.F.2(a) de esta Declaración de Divulgación para obtener una descripción más detallada del Patrimonio del Fideicomiso. Los Nuevos Bonos de la ACT estarán garantizados por un gravamen de primer rango sobre el Patrimonio del Fideicomiso que tiene prioridad y es superior al gravamen subordinado concedido a los tenedores de Deuda Subordinada.

Los Nuevos Bonos de la ACT tendrán la fecha de, y las tasas de interés sobre ellos devengarán a partir de, (i) el 1 de julio de 2022 o (ii) la Fecha de Entrada en Vigencia de la ACT, lo que ocurra primero. Todas las Tasas de Interés sobre los Nuevos Bonos de la ACT se calcularán en base a un año de 360 días compuesto por doce meses de 30 días y compuesto semestralmente y, con respecto a los Nuevos CIB de la ACT y los Nuevos CCAB de la ACT después de la Fecha de Conversión, se pagarán semestralmente el 1 de julio y el 1 de enero de cada año hasta su vencimiento.

**Los montos de capital, fechas de vencimiento, tasas de interés y cronogramas de pago de los Nuevos Bonos de la ACT son los que figuran en el "Resumen de las Distribuciones de Nuevos Bonos de la ACT" y en el Anexo D del Plan de la ACT.**

Toda la amortización de la deuda sobre los Nuevos Bonos de la ACT que no se pague al vencimiento, ya sea en o antes del vencimiento final programado, seguirá siendo pagadero y estando pendiente hasta que se pague en su totalidad y sea pagado. Los Nuevos Bonos de la ACT no tendrán una tasa de interés o rendimiento devengado predeterminado, según corresponda, siempre que la Tasa de Interés aplicable continúe devengando sobre toda la amortización de la deuda no pagada a la tasa regular, componiendo semestralmente, hasta que se pague o satisfaga totalmente de acuerdo con sus términos.

Los Nuevos Bonos de la ACT se emitirán como bonos totalmente registrados en denominaciones a especificarse en la Escritura de los Nuevos Bonos de la ACT.

(a)     **Patrimonio del Fideicomiso**

Los Nuevos Bonos de la ACT solo se pagarán del Patrimonio del Fideicomiso, que estará compuesto principalmente de lo siguiente:

(i)     Todo el derecho, título e interés de la ACT Reorganizada en y sobre los Ingresos Pignorados y el derecho a recibirlos, incluyendo, entre otros, cualquier dinero, ingresos, ganancias, cuentas, derechos contractuales o intangibles generales derivados de estos, (A) sujeto únicamente a la aplicación de dichos Ingresos Pignorados de acuerdo con la Escritura de los Nuevos Bonos de la ACT y (B) el gravamen prioritario y el interés de seguridad prioritario concedido por la Escritura de los Nuevos Bonos de la ACT sobre el Patrimonio del Fideicomiso para los Tenedores de Bonos, que será en todos los aspectos prioritario y superior al gravamen subordinado y el interés de seguridad subordinado concedido a la Escritura de los Nuevos Bonos de la ACT para beneficio de Tenedores de Deuda Subordinada; y

(ii)     Salvo por el Fondo de Gastos de Autoridad y el Fondo de Descuento de Arbitraje, todos los derechos, título e interés de la ACT Reorganizada sobre los fondos y cuentas creadas conforme a la Escritura de los Nuevos Bonos de la ACT y cualquier acuerdo complementario de fideicomisario y el dinero, títulos valores y otros activos en depósito con el Fideicomisario de los Nuevos Bonos de la ACT en tales fondos y cuentas creados conforme a la Escritura de los Nuevos Bonos de la ACT y el acuerdo del fideicomisario

complementario y permitido por la Ley; siempre que la prioridad con que se usen dicho dinero y títulos valores se apliquen al reembolso de las Obligaciones con Garantía serán como se especifica expresamente en la Escritura de los Nuevos Bonos de la ACT; y

(iii)    La aplicación de los ingresos de las Obligaciones con Garantía, de haberlas; y

(iv)    Periódicamente los derechos y remedios de los Tenedores de las obligaciones de la ACT Reorganizada.

*Véase* la Sección VI.F.2(b) a continuación.

"Ingresos pignorados" significa (1) los Ingresos de Peaje, (2) el derecho de la ACT Reorganizada para recibir los Ingresos de Peaje, (3) salvo para los fines del Convenio de Tarifas de Peaje de la Escritura de los Nuevos Bonos de la ACT, los ingresos derivados de o relacionados con cualquier venta o disposición de, o cualquier arreglo de concesión relacionado con la totalidad o parte de las Instalaciones de Peaje, y (4) los ingresos de inversión recibidos sobre cualquier monto retenido en el Fondo de Ingresos de Peaje, el Fondo de Amortización de la Deuda, el Fondo de Reserva Operativa, el Fondo de Renovación y Reemplazo, el Fondo de Deuda Subordinada y el Fondo de Reserva General. Los "Ingresos Pignorados" no incluirán los ingresos provenientes de concesiones, subsidios u otros pagos a la ACT Reorganizada de los Estados Unidos de América, cualquier estado, territorio, municipalidad o cualquier instrumentalidad, persona física o entidad pública o privada que no sea de la naturaleza de un Peaje.

"Ingresos de Peaje" significa (i) todos los ingresos en efectivo y pagos o créditos automatizados o eléctricos (incluyendo mediante el sistema Auto-Expreso) de todos los ingresos, tarifas, ingresos, recibos, tarifas especiales o tarifas de permisos, u otros cargos impuestos por o en nombre de la ACT Reorganizada sobre los propietarios, arrendadores, arrendatarios u operadores de vehículos automotores para la operación de o el derecho a operar esos vehículos en las carreteras PR-20, PR-52, PR-53 y PR-66 (colectivamente, las "Instalaciones de Peaje"), y multas y penalidades e intereses sobre ellas cobrados como resultado de la falta de pago de dichos montos (colectivamente, "Peajes") y (ii) los ingresos de cualquier seguro por interrupción de las actividades comerciales relacionadas con las Instalaciones de Peaje y cualquier otro seguro contra la pérdida de los Ingresos de Peaje.

**(b)    Aplicación de los Ingresos de Peaje**

Todos los Ingresos de Peaje deben depositarse con el Fideicomisario de los Nuevos Bonos de la ACT en un fondo de ingresos de peaje (el "Fondo de Ingresos de Peaje"), hasta que los Nuevos Bonos de la ACT y toda la Deuda Subordinada se pague en su totalidad o se anule de acuerdo con la Escritura de los Nuevos Bonos de la ACT.

En el primer Día Hábil de cada mes calendario, el Fideicomisario de los Nuevos Bonos de la ACT retirará los Ingresos de Peaje del Fondo de Ingresos de Peaje y transferirá y aplicará los montos siguientes en el siguiente orden de prioridad:

(i)    *En primer lugar*, a un fondo de gastos del fideicomisario por un

monto suficiente como para financiar los honorarios y gastos de la Fideicomisario de los Nuevos Bonos de la ACT, por un monto que no debe superar los $100,000.00 por año (el "Tope de Gastos del Fideicomisario");

(ii)     *En segundo lugar*, a un fondo de gastos de autoridad por un monto requerido para pagar los costos de operación, mantenimiento y administración de las Instalaciones de Peaje por los dos meses siguientes;

(iii)     *En tercer lugar*, a un fondo de amortización de la deuda (el "Fondo de Amortización de la Deuda"), cuyo monto debe asignarse a las siguientes cuentas en orden de prioridad: (x) una cuenta de intereses, por un monto equivalente a un sexto (1/6) del interés pagadero a los Nuevos Bonos de la ACT en la siguiente fecha de pago de intereses (el "Requisito de Financiamiento de Intereses"), y (y) una cuenta de capital, por un monto equivalente a un duodécimo (1/12) del capital de los Nuevos Bonos de la ACT adeudados en la siguiente fecha de pago de capital (el "Requisito de Financiamiento de Capital");

(iv)     *En cuarto lugar*, a un fondo de reserva operativa (el "Fondo de Reserva Operativa") por un monto suficiente para pagar los costos de operación, mantenimiento y administración de las Instalaciones de Peaje para el tercer y cuarto mes inmediatamente posterior a la fecha de desembolso;

(v)     *En quinto lugar*, al Fondo de Descuento de Arbitraje por el monto determinado por un funcionario autorizado de la ACT Reorganizada;

(vi)     *En sexto lugar*, a un fondo de renovación y reemplazo (el "Fondo de Renovación y Reemplazo") por un monto equivalente a un duodécimo (1/12) del requisito de renovación y reemplazo establecido en el presupuesto anual de la ACT Reorganizada;

(vii)     *En séptimo lugar*, a un fondo de deuda subordinada (el "Fondo de deuda subordinada"), por un monto equivalente a (x) interés sobre la Deuda Subordinada adeudada en la siguiente fecha sucesiva de pago de intereses, y (y) capital sobre la Deuda Subordinada adeudada en la siguiente fecha sucesiva de pago de capital;

(viii)     *En octavo lugar*, cualquier balance a un fondo de reserva general (el "Fondo de Reserva General").

A menos que haya ocurrido un evento de mora conforme a la Escritura de los Nuevos Bonos de la ACT y dicho evento continúa, los montos depositados en el Fondo de Reserva General se aplicarán al Fideicomisario de los Nuevos Bonos de la ACT según las instrucciones de la ACT Reorganizada, de la manera y con la prioridad y en los momentos que la ACT Reorganizada determine (i) a la compra o amortización de los Nuevos Bonos de la ACT, o (ii) para cualquier fin lícito relacionado con las Instalaciones de Peaje de la ACT Reorganizada.

(c)     **Pagos de capital e intereses**

Los Nuevos CAB de la ACT se canjearán anualmente a un valor acumulado, representando el monto inicial de capital más la acumulación a una Tasa de Interés de 5.0% anual, desde el 1 de julio de 2025 hasta su fecha de vencimiento establecida del 1 de julio de 2032 de acuerdo con el Anexo D del Plan.

El capital de los nuevos CCAB de la ACT se acumularán a una Tasa de Interés de 5.0% anual a partir de la fecha de emisión hasta la Fecha de Conversión, después de la cual los Nuevos CCAB de la ACT se convertirán y devengarán interés a una Tasa de Interés de 5.0% anual. Tras la conversión, los tenedores de los Nuevos CCAB de la ACT pagarán interés con frecuencia semestral y capital con frecuencia anual de acuerdo con el Anexo D del Plan.

La ACT Reorganizada pagará interés con respecto a los Nuevos CIB de la ACT a una Tasa de Interés de 5.0% anual con frecuencia semestral y el capital sobre él con frecuencia anual de acuerdo con el Anexo D del Plan.

### (d)   Opción de rescate; amortización extraordinaria

Opción de rescate

Los Nuevos CAB de la ACT no están sujetos a amortización opcional antes de la fecha de vencimiento estipulada.

Los nuevos CIB de la ACT están sujetos a amortización antes del vencimiento en o después del 1 de julio de 2032, según la elección o las instrucciones de la ACT Reorganizada, en su totalidad o en parte en cualquier Día Hábil, a un precio de amortización equivalente al monto del capital de este, más interés devengado a la fecha establecida para la amortización.

Los nuevos CCAB de la ACT están sujetos a amortización antes del vencimiento en o después del 1 de enero de 2033, según la elección o las instrucciones de la ACT Reorganizada, en su totalidad o en parte en cualquier Día Hábil, a un precio de amortización equivalente al monto del capital de este, más interés devengado a la fecha establecida para la amortización.

Si se solicita la amortización antes de la fecha de vencimiento de menos que todos los Nuevos CAB de la ACT o Nuevos CCAB de la ACT, la ACT Reorganizada seleccionará el vencimiento o los vencimientos de las series de los Nuevos CAB de la ACT o Nuevos CCAB de la ACT (según corresponda) a ser amortizados, y si no todos los Nuevos CAB de la ACT o Nuevos CCAB de la ACT se han rescatado para amortizarse dentro de una fecha de vencimiento, la Depository Trust Company, en nombre del Fideicomisario de los Nuevos Bonos de la ACT, seleccionará los Nuevos Bonos de la ACT dentro del mismo vencimiento de dichas series a ser amortizadas por medio de una lotería aleatoria.

Los Nuevos Bonos de la ACT no están sujetos a amortización antes del vencimiento a elección de los tenedores de estos.

Amortización extraordinaria

No obstante los términos y disposiciones anteriores con respecto a la opción de rescate de la ACT Reorganizada, a partir de y después de la Fecha de Entrada en Vigencia de la ACT y hasta

2" = "1" "2621/33260-009 CURRENT/127656480v7          04/30/2022 3:29 PM" ""

que los Nuevos Bonos de la ACT se hayan satisfecho en su totalidad de acuerdo con sus términos, ante una Disposición Parcial descrita en "– e) Ciertos pactos de la ACT Reorganizada relacionados con los Nuevos Bonos de la ACT", el Fideicomisario de los Nuevos Bonos de la ACT amortizarán, a un valor a la par más interés devengado o acumulado (según corresponda), la parte asignable de los Nuevos Bonos de la ACT relacionados con las Instalaciones de Peaje sujetas a la disposición.

### (e)   Ciertos pactos de la ACT Reorganizada relacionados con los Nuevos Bonos de la ACT

Los Documentos Definitivos, incluyendo la Escritura de los Nuevos Bonos de la ACT y/o la Orden de Confirmación, contendrán los términos, condiciones y pactos habituales para bonos de estructura y respaldo similares, incluyendo, entre otros, los siguientes pactos y otras disposiciones con respecto a los Nuevos Bonos de la ACT:

(i)      La ACT Reorganizada pactará para beneficio de todos los tenedores iniciales y subsiguientes de los Nuevos Bonos de la ACT que, hasta que todas las obligaciones con respecto a ellos hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos, la ACT Reorganizada no tomará medidas que (1) afectarían el gravamen de primer rango y el interés de primer rango sobre el Patrimonio del Fideicomiso, (2) afectarían el gravamen prioritario sobre el Patrimonio del Fideicomiso concedido a los tenedores de los Bonos en Circulación, que en todos los aspectos será prioritario y superior al gravamen subordinado sobre el Patrimonio del Fideicomiso concedido a los tenedores de Deuda Subordinada pendiente, (3) afectarían los depósitos mensuales al Fondo de Amortización de la Deuda, (4) limitarían o alterarían los derechos concedidos a la ACT Reorganizada de acuerdo con el Plan y la Orden de Confirmación en relación con las Obligaciones Garantizadas o (5) afectarían los derechos y remedios del Fideicomisario de los Nuevos Bonos de la ACT o el Tenedor de acuerdo con la Escritura de los Nuevos Bonos de la ACT, y en particular, los incumplimientos y remedios en virtud de esta;

(ii)      La ACT Reorganizada pactará para beneficio de todos los tenedores iniciales y posteriores de los Nuevos Bonos de la ACT para cumplir con los pactos descritos en "– 3. Mantenimiento de la exención impositiva" a continuación;

(iii)      La ACT Reorganizada pactará para beneficio de todos los tenedores iniciales y subsiguientes de los Nuevos Bonos de la ACT (el "Convenio de Tarifas") que, salvo según lo previsto en la Escritura de los Nuevos Bonos de la ACT, en todo momento cobrará y recaudará o hará que se cobren y recauden Peajes por el uso de las Instalaciones de Peaje a tarifas no inferiores a aquellas establecidas en el esquema de dichos Peajes entonces vigente y según se requiera para que los Ingresos de Peaje en cada Año Fiscal sea equivalente a por lo menos el total de (x) ciento diez por ciento (110%) del total de (I) costos de operación, mantenimiento y administración de las Instalaciones de Peaje para dicho año fiscal; (II) la Amortización anual de la deuda sobre los Nuevos Bonos de la ACT para dicho año fiscal; (III) Tope de Gastos del Fideicomisario; (IV) depósito a los

Fondos de Descuento de Arbitraje, de haberlo, para dicho año fiscal; y (V) montos que deban depositarse para la Renovación y Reemplazo para satisfacer los depósitos requeridos para dicho Año Fiscal, menos los montos entonces en depósito en ellos, y (y) cien por ciento (100%) la amortización anual de la deuda sobre la Deuda Subordinada;

(iv)    La ACT Reorganizada se comprometerá a no vender, hipotecar, arrendar o disponer o gravar de otra manera las Instalaciones de Peaje en su totalidad o en parte, siempre que (1) la ACT Reorganizada pueda (x) disponer de cualquier maquinaria, accesorios, aparatos, herramientas, instrumentos u otros bienes muebles que formen parte de las Instalaciones de Peaje si determina que dichos artículos ya no son necesarios o útiles en relación con la construcción o mantenimiento de las Instalaciones de Peaje y los ingresos de estos, y los ingresos de estos se apliquen al reemplazo de dichos artículos o se paguen al Fondo de Ingresos de Peaje y se apliquen de acuerdo con la Escritura de los Nuevos Bonos de la ACT y (y) disponer de cualquier bien inmueble o renunciar, ceder o extinguir cualquier interés sobre ellos si el Ingeniero Consultor certifica que no es necesario o no tiene ningún propósito útil en relación con el mantenimiento y operación de las Instalaciones de Peaje y los ingresos de estos, de haberlos, deben depositarse en el Fondo de Ingresos de Peaje y aplicarse de acuerdo con la Escritura de los Nuevos Bonos de la ACT y (2) la ACT Reorganizada no celebrará un acuerdo de arrendamiento, concesión a largo plazo u otro acuerdo de asociación pública-privada con respecto a cualquier bien mueble o inmueble compuesto por una parte de las Instalaciones de Peaje (una "Disposición Parcial") a menos que se entregue al Nuevo Fideicomisario de la ACT un certificado firmado por un funcionario autorizado de la ACT Reorganizada y aprobado por el Ingeniero Consultor y Consultor de Tráfico estableciendo (i) el monto de los Ingresos Netos que se habrían recaudado en el Año Fiscal recientemente completado en caso de que dicha Disposición Parcial haya ocurrido antes del primer día de dicho Año Fiscal; (ii) la amortización anual máxima de la deuda sobre las Obligaciones con Garantía que permanecen pendientes después de que tal acuerdo entre en vigencia de acuerdo con sus términos; y (iii) los porcentajes derivados de la división del monto en el ítem (i) anterior por los montos mostrados en el ítem (ii) anterior, siendo que dicho porcentaje no será menor a 120%. Los Ingresos de dicha Disposición Parcial restantes después del reembolso de los Nuevos Bonos de la ACT, tal como se describe en "– d) Opción de rescate; Amortización extraordinaria", restantes después del reembolso de (x) los Nuevos Bonos de la ACT de acuerdo con "– d) Opción de rescate; Amortización extraordinaria", y (y) cualquier otra Obligación con Garantía en la medida en que se requiera amortizar para mantener a los Nuevos Bonos de la ACT con exención impositiva que permanezcan en circulación después de dicha Disposición Parcial, la exclusión del interés sobre dichos Nuevos Bonos de la ACT con exención impositiva de ingresos brutos para fines de imposición de impuestos a la renta y (z) si no hay Nuevos Bonos de la ACT entonces en circulación, la Deuda Subordinada de acuerdo con la Escritura de los Nuevos Bonos de la ACT se depositará en el Fondo de Ingresos de Peaje y se aplicará conforme a la cascada de pagos descrita en "– b) Aplicación de Ingresos de Peaje".

(v)     La ACT Reorganizada se comprometerá a no emitir bonos adicionales garantizados por un gravamen sobre Ingresos Pignorados que garanticen los Nuevos Bonos de la ACT, salvo según se establezca con más detalle en "– 4. Deuda adicional de la ACT Reorganizada" a continuación.

**(f)     Eventos de incumplimiento**

La Escritura de los Nuevos Bonos de la ACT dispondrá los eventos de incumplimiento habituales para las transacciones de naturaleza similar, incluyendo, entre otros, la falta de pago de capital, intereses o reembolso de los Nuevos Bonos de la ACT cuando estos sean pagaderos, el incumplimiento de pactos y otras disposiciones de la Escritura de los Nuevos Bonos de la ACT por la ACT Reorganizada (sujeto a los períodos aplicables para subsanar que se estipulan en ella), la ACT Reorganizada inicia, consiente a, presenta o toma medidas similares en relación con un procedimiento de quiebra, el gravamen sobre el Patrimonio del Fideicomiso deja de estar en vigencia, entre otros.

**(g)     Derechos de aceleración**

Los Nuevos Bonos de la ACT no tendrán derechos de aceleración.

**(h)     Derecho directo de acción**

Conforme a la Escritura de los Nuevos Bonos de la ACT y sujeto a los derechos adicionales que se estipulan en esta, el Fideicomisario de los Nuevos Bonos de la ACT tendrá un derecho directo de acción para aplicar los términos de la Escritura de los Nuevos Bonos de la ACT, lo que incluye, entre otros, con respecto a los depósitos de financiamiento del Fondo de Amortización de la Deuda y para buscar remedios de ejecución específicos en caso de cualquier incumplimiento de los pactos en la Escritura de los Nuevos Bonos de la ACT. No obstante cualquier disposición en contrario en el presente, los Tenedores de un Cuarto de Interés de los Bonos en Circulación tendrá el derecho, ante la ausencia de acción por parte del Fideicomisario de los Nuevos Bonos de la ACT, para instituir cualquier acción para aplicar los términos de la Escritura de los Nuevos Bonos de la ACT.

**(i)     Prioridad de los pagos después del incumplimiento**

Después de que ocurra y continúe un evento de incumplimiento conforme a la Escritura de los Nuevos Bonos de la ACT, si en cualquier momento el dinero del Fondo de Amortización de la Deuda, el Fondo de Reserva General, el Fondo de Renovación y Reemplazo, el Fondo de Reserva de Operación y el Fondo de Deuda Subordinada no fueran suficientes para pagar el capital, la prima de amortización (de haberla), o el interés sobre los Nuevos Bonos de la ACT cuando sean pagaderos, dicho dinero deberá aplicarse de la siguiente manera:

(i)     *En primer lugar:* Al pago de montos razonables adeudados al Fideicomisario de los Nuevos Bonos de la ACT y agentes pagadores, como se dispone en la Escritura de los Nuevos Bonos de la ACT.

(ii)     *En segundo lugar:* A la ACT Reorganizada, cada mes, un monto equivalente requerido para pagar Costos de Operación, Mantenimiento y

Administración de las Instalaciones de Peaje para los dos meses siguientes, en la medida en que no se hayan pagado conforme al ítem (i) anterior;

(iii)    *En tercer lugar*, prorrateado: (A) al pago de los tenedores de bonos de los Nuevos Bonos de la ACT de todas las cuotas de interés sobre los Nuevos Bonos de la ACT entonces adeudados (incluyendo montos anteriormente adeudados pero aún no pagados) en el orden de vencimiento de las cuotas de dicho interés, y, si el monto disponible no fuera suficiente para pagar cualquier cuota en su totalidad, entonces al pago de estos proporcionalmente, de acuerdo con los montos adeudados sobre dicha cuota, a los tenedores de los Nuevos Bonos de la ACT, sin discriminación o preferencia; y (B) al pago de las personas con derecho a dicho pago del precio de capital o amortización no pagado de cualquier Nuevo Bono de la ACT que se adeude en el momento del vencimiento o por rescate para amortización en el orden de sus fechas de vencimiento y, si el monto disponible no fuera suficiente para pagar en su totalidad tales montos adeudados en cualquier fecha de vencimiento, entonces al pago de estos proporcionalmente, según el monto del precio de capital o amortización adeudados en dicha fecha, a las personas con derecho a ello, sin discriminación o preferencia;

(iv)    *En cuarto lugar*, prorrateado: (A) al pago de los tenedores de la Deuda Subordinada de todas las cuotas de interés sobre la Deuda Subordinada entonces adeudados (incluyendo montos anteriormente adeudados pero aún no pagados) en el orden de vencimiento de las cuotas de dicho interés, y, si el monto disponible no fuera suficiente para pagar cualquier cuota en su totalidad, entonces al pago de estos proporcionalmente, de acuerdo con los montos adeudados sobre dicha cuota, a los tenedores de bonos de la Deuda Subordinada, sin discriminación o preferencia; y (B) al pago de las personas con derecho a dicho pago del precio no pagado del capital o amortización de cualquier Deuda Subordinada que se adeude en el momento del vencimiento o por rescate para amortización en el orden de sus fechas de vencimiento y, si el monto disponible no fuera suficiente para pagar en su totalidad tales montos adeudados en cualquier fecha de vencimiento, entonces al pago de estos proporcionalmente, según el monto del precio de capital o amortización adeudados en dicha fecha, a las personas con derecho a ello, sin discriminación o preferencia;

**(j)    Escritura de los Nuevos Bonos de la ACT**

Las disposiciones que rigen, entre otras cosas, las enmiendas de o los suplementos a la Escritura de los Nuevos Bonos de la ACT, casos de incumplimiento, remedios, prioridad de los pagos después del incumplimiento conforme a la Escritura de los Nuevos Bonos de la ACT y la anulación conforme a la Escritura de los Nuevos Bonos de la ACT se estipulará en la Escritura de los Nuevos Bonos de la ACT. La Escritura de los Nuevos Bonos de la ACT se firmará y entregará en o antes de la Fecha de Entrada en Vigencia de la ACT.

**(k)    Derecho aplicable**

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

La Escritura de los Nuevos Bonos de la ACT y los Nuevos Bonos de la ACT emitidos en virtud de esta estarán regidos por las leyes del Estado de Nueva York, sin dar efecto a los principios de conflictos de leyes. Sin embargo, la autorización de la Escritura de los Nuevos Bonos de la ACT y la emisión de Nuevos Bonos de la ACT por la ACT Reorganizada estará regida por la ley del ELA.

### 3. Mantenimiento de la exención impositiva

Para mantener la exclusión de los ingresos brutos para fines de imposición del impuesto federal a la renta del interés sobre los Nuevos Bonos de la ACT, si dicha exclusión se concede, la ACT Reorganizada se comprometerá, bajo los términos de la Escritura de la Nueva ACT, a cumplir las disposiciones del Código de Rentas Internas de 1986 (el "Código") aplicable a los Nuevos Bonos de la ACT necesarios para mantener dicha exclusión, incluyendo, entre otros, las disposiciones del Código que prescriben el límite sobre el rendimiento y otros límites dentro de los cuales deben invertirse los ingresos de los Nuevos Bonos de la ACT, y que, bajo ciertas circunstancias, requieren el descuento de ciertas ganancias sobre tales montos al Departamento del Tesoro de Estados Unidos de América de acuerdo con la Sección 148(f) del Código.

La ACT Reorganizada se comprometerá además a no tomar medidas u omitir tomar medidas que harían que los Nuevos Bonos de la ACT pasen a ser "bonos de arbitraje" con el sentido de la Sección 148(a) del Código; ni ninguna parte de los ingresos de los Nuevos Bonos de la ACT o de cualquier otro fondo de la ACT Reorganizada se usarán directa o indirectamente para adquirir cualquier propiedad de inversión, si dicha adquisición haría que lo Nuevos Bonos de la ACT se conviertan en "bonos de arbitraje" con el sentido de la Sección 148(a) del Código.

La ACT Reorganizada no usará ninguna parte de los ingresos de los Nuevos Bonos de la ACT de una manera que haga que dichos Nuevos Bonos de la ACT pasen a ser "bonos de actividad privada" con el sentido de la Sección 141(a) del Código.

### 4. Adopción y mantenimiento de una Política de Administración de la Deuda

Durante el Período de Política de la Deuda, la ACT Reorganizada deberá mantener y cumplir una Política de Administración de la Deuda diseñada para garantizar que ciertas prácticas de emisión de deuda del pasado en la ACT no se repitan. Si bien la ACT Reorganizada debe revisar y actualizar su Política de Administración de la Deuda para reflejar los cambios en las condiciones y las normas en el mercado de bonos, la Política de Administración de la Deuda deberá, a no ser que la Junta de Supervisión apruebe lo contrario, por escrito, incluir en todo momento los siguientes principios y limitaciones:

***Préstamos solicitados a largo plazo para mejoras de capital solamente***: Para garantizar que la ACT Reorganizada obtenga y mantenga un presupuesto estructuralmente equilibrado de acuerdo con el requisito de PROMESA de que Puerto Rico recobre la responsabilidad fiscal, la deuda emitida por la ACT y después de la Fecha de Entrada en Vigencia de la ACT solo puede incurrirse para financiar Mejoras de Capital, según lo determine la ACT y lo apruebe AAFAF, y en la medida en que no se disuelva, la Junta de Supervisión, o para refinanciar la Deuda de acuerdo con los términos y disposiciones de la Sección 24.3(d) del presente. El producto de cualquier emisión de este tipo puede usarse para cubrir cualquier gasto directo o indirecto que, a criterio razonable de la ACT, sea

necesario para llevar a cabo cualquier Mejora de Capital de este tipo, incluyendo, entre otros, todo y cualquier gasto incurrido en relación con la emisión en sí misma.

*Limitación de vencimiento de 30 años sobre todos los préstamos*: Ninguna Deuda emitida por la ACT después de la Fecha de Entrada en Vigencia de la ACT puede tener una fecha de vencimiento legal final posterior a los treinta (30) años a partir de la fecha de su emisión original, y ninguna Deuda de este tipo puede ser refinanciada por ninguna Deuda mediante la prórroga de dicha fecha de vencimiento legal final más allá de dicha limitación original de treinta (30) años de la fecha de vencimiento. Sin embargo, lo anterior no se aplica a la Deuda emitida para refinanciar los Nuevos Bonos de la ACT.

*Amortización requerida del capital*: No se permite la emisión de Deuda desde y posteriormente a la Fecha de Entrada en Vigencia de la ACT a menos que su capital comience a amortizarse dentro de dos (2) años a partir de la fecha de puesta en servicio del proyecto financiado, y continúe amortizándose en cada año en que dicha Deuda ya no esté pendiente.

*Refinanciamientos permitidos solamente para ahorros de flujo de caja en cada año fiscal*: El financiamiento de la Deuda solo se permite si (i) no hay aumento en el monto del capital e interés de los bonos pagaderos en cualquier año fiscal y (ii) dicho refinanciamiento produce ahorros de valor presente positivo, después de tomar en consideración gastos de transacciones, a los niveles especificados por la ACT Reorganizada en su Política de Administración de la Deuda. Sin embargo, los refinanciamientos sin ahorros de flujo de caja en cada año fiscal se permiten si el refinanciamiento se completa en respuesta directa a un huracán, terremoto, pandemia, terrorismo u otro desastre natural y emergencias similares y la amortización de la deuda adeudada en cualquier año fiscal no aumenta más de diez por ciento (10%) y los términos del financiamiento requieren que sus términos se reembolsen en su totalidad dentro de diez (10) años.

*Amortización de la deuda del Plan Fiscal:* Cualquier Plan Fiscal de la ACT posterior a la Fecha de Entrada en Vigencia de la ACT debe incluir disposiciones para el pago, en cada año fiscal, de capital e intereses (y/o valor acumulado, según corresponda) con respecto a las Obligaciones Garantizadas, incluyendo, entre otros, pagos de fondos de amortización adeudados en dicho año fiscal.

La ACT Reorganizada puede adoptar, mantener y cumplir una Política de Administración de la Deuda que sea más restrictiva que los requisitos anteriores. La Política de Administración de la Deuda debe ser adicional a cualquier otra limitación impuesta por la ley y no se debe interpretar que ninguna disposición contenida en el presente reemplaza, enmienda o deroga cualquier restricción adicional impuesta por la Constitución del ELA.

## 5.     Deuda adicional de la ACT Reorganizada

Conforme al Plan y a la Escritura de los Nuevos Bonos de la ACT, después de la emisión de los Nuevos Bonos de la ACT, la ACT Reorganizada no podrá emitir bonos adicionales garantizados por un gravamen sobre el Patrimonio del Fideicomiso, pero la ACT Reorganizada puede emitir o incurrir en:

(i)        bonos emitidos conforme a la Escritura de los Nuevos Bonos de la ACT para refinanciar o anular (los "<u>Bonos de refinanciamiento</u>") otros bonos emitidos conforme a esta (los "<u>Bonos en Circulación</u>"), siempre que se entregue al Fideicomisario de los Nuevos Bonos de la ACT un certificado de un funcionario autorizado de la ACT Reorganizada fechado en la fecha de emisión de dichos Bonos de Refinanciamiento que demuestre que al emitir dicha serie de Bonos de Refinanciamiento, la Amortización de la Deuda anual en Bonos en Circulación en el año fiscal entonces en curso y cada año fiscal futuro inmediatamente posterior a la emisión de los Bonos de Refinanciamiento será igual o menor que la Amortización de la Deuda anual en Bonos en Circulación en el año fiscal entonces en curso y cada año fiscal futuro inmediatamente anterior a dicha emisión; y

(ii)       bonos adicionales emitidos conforme a la Escritura de los Nuevos Bonos de la ACT (los "<u>Bonos Adicionales</u>") para financiar nuevos proyectos de capital de la ACT Reorganizada relacionada con las Instalaciones de Peaje, o para refinanciar o anular las Obligaciones con Garantía pendientes, siempre que se entregue al Fideicomisario de los Nuevos Bonos de la ACT un certificado con la fecha de la emisión inicial de dichos Bonos Adicionales, firmado por un funcionario autorizado de la ACT Reorganizada y aprobado por un Ingeniero Consultor y Consultor de Tráfico (tal como dichos términos se definen en la Escritura de los Nuevos Bonos de la ACT), que estipule:

(I)        (A) el monto de los Ingresos Netos para cualquier período de doce (12) meses calendario consecutivos de los dieciocho (18) meses calendario inmediatamente anteriores a la fecha de emisión de dichos Bonos Adicionales; siempre que dicho monto se ajuste para efectivizar dicho período de doce (12) meses para cualquier aumento o disminución en las tarifas de Peaje para los cuales todas las condiciones legales de efectividad se hayan cumplido en la fecha de emisión de dichos Bonos Adicionales; (B) la Amortización anual máxima de la deuda sobre los Bonos que permanecerán en circulación después de la emisión de dichos Bonos Adicionales  (incluyendo los Bonos Adicionales a emitirse); (C) la Amortización anual máxima de la deuda sobre las Obligaciones con Garantía que permanezcan pendientes después de la emisión de dichos Bonos Adicionales (incluyendo las Obligaciones con Garantía adicionales a emitirse); (D) el porcentaje derivado de la división del monto en el ítem (A) anterior por el monto del ítem (B) anterior, siendo que dicho porcentaje no será menor al 120%; y (E) el porcentaje derivado de la división del monto en el ítem (A) anterior por el monto que figura en el ítem (C) anterior, siendo que dicho porcentaje no será inferior a 115%; y

(II)       (A) el monto de los Ingresos Netos proyectados por el Consultor de Tráfico a ser recibidos por la ACT Reorganizada durante el Año Fiscal en curso y en cada uno de los siguientes cinco Años Fiscales completos sucesivos (el "<u>Período de Prueba</u>") posteriores a la emisión de dichos Bonos Adicionales (incluyendo las Obligaciones con Garantía a emitirse);

(B) la Amortización anual de la deuda sobre los Bonos Adicionales a permanecer en circulación después de la emisión de dichos Bonos Adicionales (incluyendo los Bonos Adicionales a emitirse) durante el Período de Prueba; (C) la Amortización anual de la deuda sobre las Obligaciones con Garantía después de la emisión de dichas Obligaciones con Garantía (incluyendo las Obligaciones con Garantía a emitirse) durante el Período de Prueba; (D) los porcentajes derivados de la división del monto en el ítem (A) anterior por los montos que figuran en el ítem (B) anterior, siendo que dichos porcentajes no podrán ser inferiores a 120% en cualquier Año Fiscal dentro del Período de Prueba; y (E) los porcentajes derivados de la división del monto en el ítem (A) anterior por los montos que figuran en el ítem (C) anterior, siendo que dichos porcentajes no serán inferiores al 115% en cualquier Año Fiscal dentro del Período de Prueba.

(iii)    Deuda Subordinada adicional siempre que cumpla los términos y condiciones estipulados en la Sección VI.F.6 de esta Declaración de Divulgación.

"Amortización anual de la deuda" significa, para cualquier Año Fiscal, (i) un monto equivalente a la suma del capital adeudado sobre todos los Bonos en Circulación o Deuda Subordinada, según corresponda, en tal Año Fiscal y en la siguiente Fecha de Pago de Capital sucesivo, excluyendo el capital realmente pagado en el primer día de dicho Año Fiscal e incluyendo cualquier capital no pagado en Años Fiscales anteriores más (ii) un monto equivalente a 100% del interés adeudado y pagadero sobre todos los Bonos en Circulación o Deuda Subordinada Pendiente, según corresponda, en tal Año Fiscal y en cada 1 de julio sucesivo, excluyendo el interés realmente pagado en el primer día de dicho Año Fiscal e incluyendo cualquier interés no pagado en Años Fiscales anteriores (y, para evitar didas, interés sobre cualquier interés adeudado) calculado en base a un año de 360 días de doce (12) meses de 30 días para dicho Año Fiscal. La amortización anual de la deuda se calculará según las suposiciones estipuladas en la Escritura de los Nuevos Bonos de la ACT.

"Amortización máxima anual de la deuda" significa la Amortización máxima anual de la deuda con respecto a cualquier deuda especificada para cualquier Año Fiscal durante el plazo de dicha deuda.

"Ingresos netos" significa, para cualquier período en particular, el monto de los Ingresos de Peaje menos los costos de operación, mantenimiento y administración de los Ingresos de Peaje para dicho período.

## 6.    La Deuda Subordinada

El [_____] de 2022, la ACT y el ELA celebraron el Préstamo del ELA, cuyos ingresos fueron y serán usados por la ACT únicamente para pagar distribuciones en efectivo conforme al Acuerdo de Apoyo al Plan de la ACT/ADCC y el Plan de la ACT, al satisfacerse las Condiciones de Distribución de la ACT y al producirse la Fecha de Entrada en Vigencia del ELA. *Véase* la Sección V.I.1(e) de esta Declaración de Divulgación para obtener una descripción más detallada del Préstamo del ELA.

En la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada seguirá emitiendo al ELA una nota definitiva que constituye la Deuda Subordinada conforme al Plan de la ACT, que tendrá un monto de capital equivalente al monto de capital pendiente del Préstamo del ELA a la fecha de emisión, más cualquier interés devengado y no pagado sobre él, bajo los términos de la Escritura de los Nuevos Bonos de la ACT, en lugar de pagos en efectivo en total satisfacción de las reclamaciones de gastos administrativos del ELA por cuenta del Préstamo del ELA.

Este resumen no pretende ser completo y se encuentra sujeto a, y calificado en su totalidad por referencia a, todas las disposiciones de la Deuda Subordinada, la Escritura de los Nuevos Bonos de la ACT y el Plan.

La Deuda Subordinada se pagará únicamente de Patrimonio del Fideicomiso, sujeto al pago en cascada estipulado en la Escritura de los Nuevos Bonos de la ACT. *Véase* la Sección VI.F.2(a) de esta Declaración de Divulgación para obtener una descripción más detallada del Patrimonio del Fideicomiso y el pago en cascada antes mencionado. La Deuda Subordinada estará garantizada por un gravamen sobre el Patrimonio del Fideicomiso, que en todos los aspectos será no prioritario y subordinado al gravamen prioritario sobre el Patrimonio del Fideicomiso concedido a los Tenedores de los Nuevos Bonos de la ACT.

La Deuda Subordinada tendrá la fecha de la Fecha de Entrada en Vigencia. La Deuda Subordinada devengará interés a partir de la Fecha de Entrada en Vigencia a una Tasa de Interés de 2.5% anual, calculada sobre la base de un año de 360 días de doce meses de 30 días y compuesto y pagado semestralmente el 1 de julio y el 1 de enero de cada año hasta su vencimiento.

La tabla siguiente ilustra la Deuda Subordinada y sus pagos del fondo de amortización suponiendo que dicha Deuda Subordinada se emite en la misma fecha que el Préstamo del ELA. El monto real de capital de la Deuda Subordinada será siempre mayor que la Deuda Subordinada dado que se emite en una fecha posterior e incorpora cualquier interés devengado sobre el Préstamo del ELA hasta dicha fecha.

| Deuda subordinada | | | | |
|---|---|---|---|---|
| Pagos de capital | Pagos de tasa de interés (1) | Amortización total de la deuda | Tasa de interés | Fecha |
| 10,763,135.00 | 11,714,722.22 | 477,857.22 | 2.5% | 01/07/2023 |
| 9,447,509.00 | 8,780,921.63 | 18,228,430.63 | 2.5% | 01/07/2024 |
| 4,810,622 | 8,544,733.90 | 13,355,355.90 | 2.5% | 01/07/2025 |
| 5,197,995.00 | 8,424,468.35 | 13,622,463.35 | 2.5% | 01/07/2026 |
| 5,600,394.00 | 8,294,518.48 | 13,894,912.48 | 2.5% | 01/07/2027 |
| 6,018,302.00 | 8,154,508.63 | 14,172,810.63 | 2.5% | 01/07/2028 |
| 6,452,216.00 | 8,004,051.08 | 14,456,267.08 | 2.5% | 01/07/2029 |

| Deuda subordinada | | | | |
|---|---|---|---|---|
| Pagos de capital | Pagos de tasa de interés (1) | Amortización total de la deuda | Tasa de interés | Fecha |
| 6,902,647.00 | 7,842,745.68 | 14,745,392.68 | 2.5% | 01/07/2030 |
| 7,370,121.00 | 7,670,179.50 | 15,040,300.50 | 2.5% | 01/07/2031 |
| 7,855,180.00 | 7,485,926.48 | 15,341,106.48 | 2.5% | 01/07/2032 |
| 8,358,382.00 | 7,289,546.98 | 15,647,928.98 | 2.5% | 01/07/2033 |
| 8,880,300.00 | 7,080,587.43 | 15,960,887.43 | 2.5% | 01/07/2034 |
| 9,421,525.00 | 6,858,579.93 | 16,280,104.93 | 2.5% | 01/07/2035 |
| 9,982,665.00 | 6,623,041.80 | 16,605,706.80 | 2.5% | 01/07/2036 |
| 10,564,346.00 | 6,373,475.18 | 16,937,821.18 | 2.5% | 01/07/2037 |
| 11,167,211.00 | 6,109,366.53 | 17,276,577.53 | 2.5% | 01/07/2038 |
| 11,791,923.00 | 5,830,186.25 | 17,622,109.25 | 2.5% | 01/07/2039 |
| 12,439,163.00 | 5,535,388.18 | 17,974,551.18 | 2.5% | 01/07/2040 |
| 13,109,633.00 | 5,224,409.10 | 18,334,042.10 | 2.5% | 01/07/2041 |
| 13,804,055 .00 | 896,668 | 18,700,723.28 | 2.5% | 01/07/2042 |
| 14,523,171.00 | 4,551,566.90 | 19,074,737.90 | 2.5% | 01/07/2043 |
| 15,267,745.00 | 4,188,487.63 | 19,456,232.63 | 2.5% | 01/07/2044 |
| 16,038,563.00 | 3,806,794.00 | 19,845,357.00 | 2.5% | 01/07/2045 |
| 16,836,434.00 | 3,405,829.93 | 20,242,263.93 | 2.5% | 01/07/2046 |
| 17,662,190.00 | 2,984,919.08 | 20,647,109.08 | 2.5% | 01/07/2047 |
| 18,516,687.00 | 2,543,364.33 | 21,060,051.33 | 2.5% | 01/07/2048 |
| 19,400,805.00 | 2,080,447.15 | 21,481,252.15 | 2.5% | 01/07/2049 |
| 20,315,451.00 | 1,595,427.03 | 21,910,878.03 | 2.5% | 01/07/2050 |
| 21,261,555.00 | 1,087,540.75 | 22,349,095.75 | 2.5% | 01/07/2051 |
| 22,240,075.00 | 556,001.88 | 22,796,076.88 | 2.5% | 01/07/2052 |
| $362,000,000.00(2) | $ 173,538,404.20 | $ 535,538,404.20 | Total | |

(1) Calculada en base a un solo financiamiento en la fecha del Préstamo del ELA. El monto real será menor debido a que se producirá un segundo desembolso en la Fecha de Entrada en Vigencia.

(2) Monto de capital considerando que la Deuda Subordinada se emite en la misma fecha que el Préstamo del ELA. El monto real de capital será mayor siempre que la Deuda Subordinada se emita en una fecha posterior e incorpore cualquier interés devengado sobre el Préstamo del ELA hasta dicha fecha.

Toda la amortización de la deuda sobre la Deuda Subordinada que no se pague cuando se adeuda, ya sea en o antes del vencimiento final programado, seguirá siendo pagadero y estando pendiente hasta que se pague en su totalidad. La Deuda Subordinada no tendrá una tasa de interés predeterminada, siempre que la tasa de interés aplicable continúe devengando sobre toda la amortización de la deuda no pagada a la tasa regular, componiendo semestralmente, hasta que se pague o satisfaga totalmente de acuerdo con sus términos.

### (a)      Fondo de la deuda subordinada

Entre los fondos y las cuentas segregadas dentro de los fondos a establecerse y que constituirán una parte del Patrimonio del Fideicomiso, la Escritura de los Nuevos Bonos de la ACT dispondrá la creación y establecimiento el Fondo de la Deuda Subordinada. Los Ingresos de Peaje se depositarán en el Fondo de la Deuda Subordinada por montos y en el orden de prioridad que se describen en la Sección VI.F.2(b) en esta Declaración de Divulgación.

El Fideicomisario de los Nuevos Bonos de la ACT pagará del Fondo de la Deuda Subordinada todos los montos requeridos para dichos pagos de acuerdo con la Escritura de los Nuevos Bonos de la ACT. El dinero en el Fondo de la Deuda Subordinada que en el último día de cada Año Fiscal supere el monto entonces requerido para depositarse en él puede, según las instrucciones de la ACT Reorganizada retenerse en él o transferirse a cualquier otro fondo o cuenta establecido conforme a la Escritura de los Nuevos Bonos de la ACT; *siempre y cuando*, que si la ACT Reorganizada no ha dado instrucciones, el monto excesivo será transferido en el último día de cada Año Fiscal al Fideicomisario de los Nuevos Bonos de la ACT al Fondo de Reserva General.

### (b)      Opción de rescate

La Deuda Subordinada no está sujeta a amortización antes del vencimiento.

### (c)      Derechos de aceleración

La Deuda Subordinada no tendrá derechos de aceleración.

### 7.      Subordinación

La deuda evidenciada por toda la Deuda Subordinada (incluyendo, entre otros, la Deuda Subordinada), y cualquier gravamen o interés propietario que garantice dicha Deuda Subordinada, será inferior y subordinado en todos los aspectos y sujeta en todos los aspectos al pago previo en su totalidad de los Nuevos Bonos de la ACT y a cualquier gravamen que garantice los Nuevos Bonos de la ACT, salvo según se estipule más abajo, y el tenedor de cualquier Deuda Subordinada, ya sea en el momento de la emisión original o ante la transferencia o cesión de esta, acepta y acuerda como vinculante dicha disposición. No obstante cualquier defecto o deficiencias en, o falta de perfeccionamiento o caducidad del perfeccionamiento de, o acciones para evitarlo como un traspaso fraudulento, o de otra manera de, cualquier gravamen que garantice los Nuevos Bonos de la ACT e independientemente de cualquier procedimiento de insolvencia o liquidación, cualquier gravamen que garantice la Deuda Subordinada será subordinado en

todos los aspectos a cualquier gravamen que garantice los Nuevos Bonos de la ACT. No obstante lo anterior, los tenedores de la Deuda Subordinada tendrán derecho a recibir pagos de capital e intereses con respecto a la Deuda Subordinada y para obtener la ejecución específica de esta de acuerdo con el Acuerdo de Fideicomiso Complementario relevante.

### 8. Deuda subordinada adicional de la ACT Reorganizada

Conforme al Plan de la ACT y a la Escritura de los Nuevos Bonos de la ACT, después de la emisión de los Nuevos Bonos de la ACT, la ACT Reorganizada no podrá emitir deuda subordinada adicional garantizada por un gravamen sobre el Patrimonio del Fideicomiso, pero la ACT Reorganizada puede emitir o incurrir en:

(i) cualquier deuda subordinada emitida conforme a la Escritura de los Nuevos Bonos de la ACT para refinanciar o anular (la "Deuda Subordinada de Refinanciamiento") otra deuda subordinada emitida conforme a esta (la "Deuda Subordinada Pendiente", y, junto con los Bonos en Circulación, las "Obligaciones Garantizadas Pendientes") siempre que se entregue al Fideicomisario de los Nuevos Bonos de la ACT un certificado de un funcionario autorizado de la ACT Reorganizada la fecha de emisión de dicha Deuda Subordinada de Refinanciamiento que demuestre que al emitir dicha serie de Deuda Subordinada de Refinanciamiento, la Amortización de la Deuda anual sobre la Deuda Subordinada Pendiente en el año fiscal entonces en curso y cada año fiscal futuro inmediatamente posterior a la emisión de la Deuda Subordinada de Refinanciamiento será igual o menor que la Amortización de la Deuda anual sobre la Deuda Subordinada Pendiente en el año fiscal entonces en curso y cada año fiscal futuro inmediatamente anterior a dicha emisión.

(ii) La Deuda Subordinada que financiará los nuevos proyectos de capital de la Autoridad relacionada con las Instalaciones de Peaje, o para refinanciar o anular las Obligaciones Garantizadas Pendientes en virtud del presente, siempre que se entregue al Fideicomisario un certificado con la fecha de la emisión inicial de dicha deuda subordinada adicional, firmado por un funcionario autorizado de la Autoridad y aprobado por un Ingeniero Consultor y Consultor de Tráfico, que estipule:

i. (A) el monto de los Ingresos Netos para cualquier período de doce (12) meses calendario consecutivos de los dieciocho (18) meses calendario inmediatamente anteriores a la fecha de emisión de dicha deuda subordinada adicional; siempre que dicho monto se ajuste para efectivizar dicho período de doce (12) meses para cualquier aumento o disminución en las tarifas de Peaje para los cuales todas las condiciones legales de efectividad se hayan cumplido en la fecha de emisión de dicha deuda subordinada; (B) la Amortización anual máxima de la deuda sobre las Obligaciones Garantizadas que permanecerán Pendientes después de la emisión de dicha deuda subordinada adicional (incluyendo las Obligaciones Garantizadas a emitirse); (C) el porcentaje derivado de la división del monto en el

ítem (A) anterior por el monto del ítem (B) anterior, siendo que dicho porcentaje no será menor al 115%; y

(A) el monto de los Ingresos Netos proyectados por el Consultor de Tráfico para ser recibido por la ACT Reorganizada durante el Período de Prueba después de la emisión de dicha deuda subordinada adicional (incluyendo las Obligaciones Garantizadas a emitirse); (B) la Amortización anual de la deuda sobre las Obligaciones Garantizadas a permanecer pendientes tras la emisión de dicha deuda subordinada adicional (incluyendo Obligaciones Garantizadas a emitirse) para el Período de Prueba y (C) los porcentajes derivados de dividir el monto en el ítem (A) anterior por los montos que aparecen en el ítem (B) anterior, siendo que dichos porcentajes no serán inferiores al 115% en cualquier Año Fiscal dentro del Período de Prueba.

**G.      Disposiciones con respecto a los Bonos Asegurados de Assured, los Bonos Asegurados de National y los Bonos Asegurados de Syncora**

**1.      Tratamiento de Reclamaciones de Bonos Asegurados de Assured**

Si las Clases 3, 7, y 11 votan para aceptar el Plan de la ACT y todas las Pólizas de Seguros de Assured y acuerdos relacionados con los Bonos Asegurados de Assured están en plena vigencia, o han sido ejecutados de otra manera en su totalidad por Assured, sin pagos pendientes de Assured en mora con respecto a dichos Bonos Asegurados de Assured hasta e incluyendo la Fecha de Entrada en Vigencia de la ACT, entonces los tenedores de las Reclamaciones de Bonos Asegurados de Assured recibirán los siguientes tratamientos, que serán seleccionados por Assured antes del inicio de la Vista de la Declaración de Divulgación y como se estipula en la Notificación de Elección de Assured o el Formulario de Elección de Tenedores de Bonos de Assured, según corresponda:

(a)     ***Elección de Assured***:   Con respecto a los Bonos Asegurados de Assured identificados en el Anexo A a la Notificación de Elección de Assured, sujeto a los derechos del Agente Fiscal de la ACT, Assured recibirá la Contraprestación del Plan de Assured asignable a los tenedores de dichos Bonos Asegurados de Assured, y dichos Bonos Asegurados de Assured seleccionados por Assured serán pagados por Assured, en su totalidad en la Fecha de Entrada en Vigencia de la ACT, a un Precio de Aceleración de Assured equivalente al monto del capital pendiente de dichos Bonos Asegurados de Assured, más el interés acumulado y no pagado sobre ellos (o, en caso de cualquier bono de apreciación de capital, el monto compuesto de estos) a la fecha de pago de acuerdo con las Pólizas de Seguros de Assured que garanticen los Bonos Asegurados de Assured correspondientes. Sin embargo, Assured no tendrá la obligación de pagar el Precio de Aceleración de Assured con respecto a cualquier Bono Asegurado por Assured de propiedad de Assured por subrogación o de otra manera, y Assured recibirá en lugar de ellos la Contraprestación del Plan de Assured por cuenta de dichos Bonos Asegurados de Assured de propiedad de Assured. El pago del Precio de Aceleración aplicable con respecto a cualquier Bono Asegurado por Assured, incluyendo de acuerdo con la Elección de Assured, satisfará y exonerará todas las obligaciones de Assured en virtud de las Pólizas de Seguros de Assured con respecto a dicho Bono Asegurado de Assured.

(b)     ***Elecciones de los tenedores de Bonos Asegurados de Assured***:  Cada tenedor beneficiario de un Bono Asegurado de Assured identificado en el Anexo A del

Formulario de Elección de los Tenedores de Bonos de Assured pueden elegir una de las dos siguientes Elecciones de Tenedores de Bonos de Assured, en cada caso en términos aceptables para Assured.

Elección 1 de Tenedores de Bonos de Assured: Cada Tenedor de Bonos Asegurados de Assured que opte por la Elección 1 de Tenedores de Bonos de Assured recibirá de Assured el Precio de Aceleración de Assured aplicable en la Fecha de Entrada en Vigencia de la ACT, con plena satisfacción y exoneración de las obligaciones de Assured con respecto a dicho tenedor bajo las Pólizas de Seguros de Assured, y Assured recibirá la Contraprestación asignable a dicho tenedor conforme al Plan de la ACT; o

Elección 2 de Tenedores de Bonos de Assured: Cada Tenedor de Bonos Asegurados de Assured que opte por la Elección 2 de Tenedores de Bonos de Assured optará por un fideicomiso de custodia, un acuerdo de plica o estructura similar establecida por Assured que le proporcionará a dicho Tenedor de Bonos Asegurado por Assured un interés en (A) la Póliza de Seguro de Assured aplicable y (B) la Contraprestación del Plan de Assured aplicable de acuerdo con términos aceptables para Assured. Los intereses concedidos a un fideicomiso de custodia, acuerdo de plica o estructura similar establecida en relación con la Elección 2 de Tenedores de Bonos de Assured debe ser elegible para DTC.

Conforme a los términos y disposiciones de la Sección 25.1(c) del Plan de la ACT, el pago del capital de los Bonos Asegurados de Assured se acelerará desde y después de la Fecha de Entrada en Vigencia de la ACT, y dichos Bonos Asegurados de Assured serán pagaderos a partir y después de la Fecha de Entrada en Vigencia de la ACT al Precio de Aceleración de Assured de cien por ciento (100%) del monto de capital sobre este (o, en el caso de cualquier bono de apreciación, el monto compuesto de este) hasta la fecha de pago.

Conforme a las Pólizas de Seguros aplicables de Assured, (A) Assured puede elegir hacer cualquier pago de capital, en su totalidad o en parte, en cualquier fecha en la cual dicho pago de capital se adeuda por motivo de aceleración u otro avance de vencimientos, y (B) en el caso de cualquier Bono Asegurados de Assured elegido (o se considera que han elegido) la Elección 2 de Tenedores de Bonos de Assured, Assured retendrá el derecho de pagar el Precio de Aceleración de Assured y satisfará totalmente sus obligaciones con respecto a dichos bonos y las Pólizas de Seguros de Assured en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT con treinta (30) días de notificación previa por escrito a los tenedores pertinentes. La retención de Assured de este derecho se reflejará en la documentación correspondiente del fideicomiso de custodia o de plica. Desde y posteriormente al pago del Precio de Aceleración de Assured, incluyendo, entre otros, en (i) en la Fecha de Entrada en Vigencia de la ACT o (ii) en cualquier otra fecha de pago seleccionada por Assured, con treinta (30) días de notificación previa por escrito, interés sobre dichos Bonos Asegurados de Assured cesará de devengar y ser pagaderos. El pago del Precio de Aceleración aplicable de

Assured con respecto a cualquier Bono Asegurado de Assured de acuerdo con cualquiera de las disposiciones anteriores, incluyendo, entre otros, en la Fecha de Entrada en Vigencia de la ACT, satisfará y liberará todas las obligaciones de Assured en virtud de las Pólizas de Seguros de Assured con respecto a dicho Bono Asegurado de Assured.

En caso de que un Tenedor de Bonos de Assured elegible para hacer una Elección de Tenedores de Bonos de Assured para hacer dicha Elección de Tenedores de Bonos de Assured, se considerará que dicho Tenedor de Bonos de Assured ha elegido la Elección 2 de Tenedores de Bonos de Assured.

Los Bonos Asegurados de Assured de propiedad de Assured (por subrogación o de otra manera) no estarán sujetos a las Elecciones de los Tenedores de Bonos de Assured y Assured recibirá la Contraprestación del Plan de Assured por cuenta de dichos Bonos Asegurados de Assured.

(c)   *Aceleración de los Bonos Asegurados de Assured*. No obstante cualquier otra disposición del Plan de la ACT, en la medida en que no haya pagos en mora pendientes por Assured con respecto a los Bonos Asegurados de Assured hasta o incluyendo la Fecha de Entrada en Vigencia de la ACT, el pago del capital de los Bonos Asegurados de Assured se acelerará a partir y después de la Fecha de Entrada en Vigencia de la ACT y dichos Bonos Asegurados de Assured serán pagaderos a partir y después de la Fecha de Entrada en Vigencia de la ACT al Precio de Aceleración de Assured de cien por ciento (100%) del monto de capital sobre esto más el interés devengado sobre ellos (o, en el caso de cualquier bono de apreciación de capital, el monto compuesto de este) hasta la fecha de pago.

(d)   *Cesión de los derechos de amortización*. En la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a Assured cualquier derecho de amortización y rescate de los Bonos Asegurados de Assured y cualquier derecho relacionado tal que dichos derechos puedan ser ejercidos directa y exclusivamente por Assured como si fuera la ACT para tal fin, y cualquier monto adeudado en relación con dicha amortización será el precio de amortización aplicable o el Precio de Aceleración de Assured, el que sea menor.

(e)   *Derecho al voto*. La convocatoria a las aceptaciones y rechazos del Plan de la ACT por los tenedores de las Reclamaciones de Bonos Asegurados de Assured serán hechos por la Junta de Supervisión de acuerdo con las disposiciones de la Sección 301(c)(3) de PROMESA.

(f)   *Bonos con doble seguro*. Si se hace alguna distribución de Efectivo a los propietarios de Bonos con Doble Seguro[199] (salvo a Assured como tenedor de las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 relacionadas) conforme al párrafo 52 del decreto de la Orden de Confirmación del ELA, se considerará que dichas distribuciones de Efectivo han reducido los montos de capital de dichos Bonos con Doble Seguro a la fecha de dichas distribuciones de Efectivo y que como resultado se haya producido la reducción correspondiente en las obligaciones de FGIC

---

[199] Un Bono Asegurado de Assured que es o fue asegurado por Assured conforme a una póliza de seguros del mercado secundario y que también califica como Bono Asegurado de FGIC asegurado por FGIC conforme a una póliza de seguros del mercado primario.

conforme a las Pólizas de Seguros aplicables de FGIC y las obligaciones de Assured conforme a las Pólizas de Seguros aplicables de Assured. Si se hace alguna distribución de Efectivo por cuenta de los Bonos con Doble Seguro a Assured como tenedor de las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 relacionadas conforme al párrafo 52 del decreto de la Orden de Confirmación del ELA, se considerará que dichas distribuciones de Efectivo han reducido los montos de capital de dichos Bonos con Doble Seguro a la fecha de dichas distribuciones de Efectivo y que como resultado se ha producido la reducción correspondiente en las obligaciones de FGIC conforme a las Pólizas de Seguros aplicables de FGIC, pero no se considerará que han reducido (i) las obligaciones de Assured conforme a las Pólizas de Seguros aplicables de Assured o (ii) el monto de capital de cualquier ingreso de custodia que evidencie un interés beneficioso sobre tales Bonos con Doble Seguro y las Póliza de Seguros de Assured relacionadas.

## 2.   Tratamiento de Reclamaciones de Bonos Asegurados de National

Si las Clases 4, 9, y 13 votan para aceptar el Plan de la ACT y todas las Pólizas de Seguros de National y acuerdos relacionados con los Bonos Asegurados de National están en plena vigencia, o han sido ejecutados en su totalidad por National, sin pagos pendientes de National en mora con respecto a dichos Bonos Asegurados de National hasta e incluyendo la Fecha de Entrada en Vigencia de la ACT, entonces los tenedores de las Reclamaciones de Bonos Asegurados de National recibirán los siguientes tratamientos, que serán seleccionados por National en o antes del inicio de la Vista de la Declaración de Divulgación; y como se estipula en el Formulario de Elección de Tenedores de Bonos de National:

(a)   ***Tratamiento de conmutación de National***:   Cada tenedor de una Reclamación Permitida de Bonos Asegurados de National tendrá la opción de elegir mediante el Formulario de Elección de Tenedores de Bonos de National recibir, en la Fecha de Entrada en Vigencia de la ACT, la Contraprestación de Conmutación de National, distribuible por o siguiendo las instrucciones de National. Si se elige, (i) el tenedor de estos no tendrán otros derechos ni derechos adicionales conforme a o con respecto a la Póliza de Seguros de National o cualquier Fideicomiso de National o Cuenta de Plica de National, (ii) el tenedor de estos no recibirá ningún pago de National conforme a las Pólizas de Seguros de National por cuenta del interés devengado y no pagado sobre estas y después de la Fecha de Emisión Declarada, y en la medida en que algún interés devengado es pagado a dicho tenedor por National después de dicha fecha, dicho monto se acreditará contra el Efectivo que dicho tenedor, sus sucesores, destinatarios de transferencias o cesionarios tengan derecho de otra manera a recibir como Contraprestación de la Conmutación de National y (iii) National recibirá la Contraprestación del Plan de National distribuible por cuenta de la Reclamación Permitida de Bonos Asegurados de National.

Los Bonos Asegurados de National de un tenedor que de manera oportuna y válida elige recibir el Tratamiento de Conmutación de National o hace una elección indebida como se describe en la Sección 25.2(f) del Plan de la ACT, se considerará cancelado en la Fecha de Entrada en Vigencia de la ACT, y las obligaciones de National conforme a las Pólizas de Seguros de National aplicables será satisfecha, exonerada y liberada de manera total y definitiva.

(b)     ***Tratamiento de No Conmutación de National***:  Si un tenedor de una Reclamación Permitida de Bonos Asegurados de National de manera oportuna y válida elige en el Formulario de Elección de Tenedores de Bonos de National recibir el Tratamiento de No Conmutación de National, (i) National recibirá la Contraprestación del Plan de National distribuible por cuenta de la Reclamación Permitida de Bonos Asegurados de National, y (ii) dicho tenedor recibirá uno o más de los siguientes tratamientos, según la opción de National en o antes del inicio de la Vista de la Declaración de Divulgación, y como se detalla en el Formulario de Elección de Tenedores de Bonos de National correspondiente:

Fideicomisos de Custodia:  Dicho tenedor de una Reclamación Permitida de Bonos Asegurados de National (A) depositará, o se considerará que ha depositado, entre otras cosas, su participación prorrateada de la Contraprestación del Fideicomiso de National, los Bonos Asegurados de National asignables a dicho tenedor elector, y las Pólizas de Seguros de National relacionadas en el Fideicomiso de National aplicable, (B) se considerará que ha recibido su participación prorrateada de la Contraprestación del Fideicomiso de National y los Certificados de National como contraprestación por ellos, y (C) no tendrá ningún recurso contra National o las Pólizas de Seguros de National salvo lo previsto en los términos del Fideicomiso de National.

Cuenta de plica:  Dicho tenedor de una Reclamación Permitida de Bonos Asegurados de National depositará, o se considerará que ha depositado, entre otras cosas, la participación prorrateada de dicho tenedor de la Contraprestación de la Cuenta de Plica de National en la Cuenta de Plica de National y dicha Contraprestación de la Cuenta de Plica de National depositada se mantendrá como garantía de las obligaciones de National hacia los tenedores de los Bonos Asegurados de National cuya Contraprestación de la Cuenta de Plica de National se depositó en la Cuenta de Plica de National en virtud de las Pólizas de Seguros de National.

Pago de los importes acelerados:  National recibirá la Contraprestación del Plan de National que sería asignable de otra manera a dicho tenedor de una Reclamación Permitida de Bonos Asegurados de National y National será exonerado de manera plena y total de su obligación hacia dicho tenedor de una Reclamación Permitida de Bonos Asegurados de National pagando en la Fecha de Entrada en Vigencia de la ACT, en Efectivo, el monto de esta al Precio de Aceleración de National a la fecha de pago.

Tratamiento Alternativo:  La Junta de Supervisión y National se reservan el derecho de formular una opción de elección o implementación alternativa con respecto a los Bonos Asegurados de National que sea mutuamente aceptable para la Junta de Supervisión y National, cada una en ejercicio de su exclusivo criterio. Cualquier elección u opción de implementación alternativa debe proponerse, por escrito, antes del inicio de la Vista de la Declaración de Divulgación.

National debe hacer diferentes elecciones con respecto a diferentes CUSIP y diferentes tenedores de Bonos Asegurados de National.

Los Bonos Asegurados de National de propiedad o en posesión de National (por subrogación o de otra manera) no estarán sujetos a las elecciones de tratamiento establecidos en la Sección 25.2 del Plan de la ACT, y sujeto a los derechos del Agente Fiscal de la ACT, National recibirá la Contraprestación del Plan de National por cuenta de dichos bonos.

Además, sujeto a la provisión a los tenedores de las Reclamaciones Permitidas de Bonos Asegurados de National con las elecciones de tratamiento estipuladas en la Sección 25.2 del Plan de la ACT y al satisfacer dichas elecciones, National tendrá todo el derecho, título e interés en la Contraprestación de la ACT de National y administrará la Contraprestación de la ACT de National según su exclusivo criterio hacia y de acuerdo con todas las leyes y regulaciones aplicables.

Cualquier cálculo y/o pagos a hacerse a un tenedor beneficiario elector basado en, o en relación con, la Reclamación Permitida de Bonos Asegurados de National de dicho tenedor conforme a las opciones establecidas en la Sección 25.2 del Plan de la ACT tendrá en cuenta cualquier pago de capital y/o intereses devengados ya hechos a dicho tenedor por National conforme a los términos de las Pólizas de Seguros de National y dicho tenedor no será compensado por cualquier monto ya pagado a dicho tenedor conforme a los términos de las Pólizas de Seguros pertinentes de National.

*Aceleración de los Bonos Asegurados de National*. En la medida en que no haya pagos en mora pendientes por National con respecto a los Bonos Asegurados de National hasta e incluyendo la Fecha de Entrada en Vigencia de la ACT, el pago del capital de los Bonos Asegurados de National se acelerará a la Fecha de Entrada en Vigencia de la ACT y dichos Bonos Asegurados de National serán pagaderos a partir y después de la Fecha de Entrada en Vigencia de la ACT al Precio de Aceleración de National de cien por ciento (100%) del monto de capital sobre esto más el interés devengado sobre ellos (o, en el caso de cualquier bono de apreciación de capital, el monto compuesto de este) hasta la fecha de pago.

National tendrá el derecho a pagar el Precio de Aceleración de National con respecto a los Bonos Asegurados de National en cualquier momento, y se solicitará al tenedor de Bonos Asegurados de National y el fideicomisario o agente fiscal (según corresponda) que lo acepte en satisfacción de las obligaciones de National conforme a la Póliza de Seguros de National correspondiente con respecto a dichos bonos, y, ante dicho pago, las obligaciones de National conforme a la Póliza de Seguros aplicable de National estarán plenamente satisfechas y extintas, no obstante cualquier disposición de la Póliza de Seguros correspondiente de National u otros documentos relacionados con los Bonos Asegurados de National. Con fines de aclaración, no obstante dicha aceleración, no habrá aceleración, de haberla, de ningún pago que deba hacerse conforme a cualquier póliza de seguros de National a menos que National opte, en su exclusivo y absoluto criterio, hacer dichos pagos de manera acelerada.

*Cesión de los derechos de amortización*. En la medida en que se permita conforme a los documentos definitivos aplicables y de manera no coherente con los derechos provistos de acuerdo con la Póliza de Seguros aplicable de National, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a National todo y cualquier derecho a amortizar y rescatar los Bonos Asegurados de National y cualquier derecho relacionado de manera que dichos derechos sean ejercidos directa y exclusivamente por National como si fuera la ACT para tal fin. Cualquier

monto adeudado en relación con dicha amortización será igual al precio aplicable de amortización y al Precio de Aceleración de National, el que sea menor.

*Derecho al voto*. La convocatoria a las aceptaciones y rechazos del Plan de la ACT por los tenedores de las Reclamaciones de Bonos Asegurados de National serán hechos por la Junta de Supervisión a National. La elección de optar entre el Tratamiento de No Conmutación de National y el Tratamiento de No Conmutación de National serán hechos por los tenedores beneficiarios de los Bonos Asegurados de National en el Formulario de Elección del Tenedor de Bonos correspondiente de National. Sin embargo, el formulario del Tratamiento de No Conmutación de National será seleccionado por National.

*Elección indebida*. Si un tenedor de una Reclamación Permitida de Bonos Asegurados de National (1) no elige de manera oportuna y válida el Tratamiento de No Conmutación de National conforme a la Sección 25.2(b) del Plan de la ACT, o (2) presenta una elección por menos de todas sus Reclamaciones de Bonos Asegurados de National para una clase en particular (en cuyo caso, dicha elección será inválida y sin vigencia ni efecto), se considerará que dicho tenedor ha elegido recibir el Tratamiento de Conmutación de National estipulado en la Sección 25.2(a) del Plan de la ACT con respecto a dichas Reclamaciones de Bonos Asegurados de National, para exonerar las obligaciones de National de conformidad con las Pólizas de Seguros de National y para recibir distribuciones de acuerdo con la Sección 25.2(a) del Plan de la ACT. Además, los Bonos Asegurados de National de un tenedor de una Reclamación Permitida de Bonos Asegurados de National que no elige de manera válida recibir el Tratamiento de No Conmutación de National conforme a las cláusulas (1) o (2) anteriores se considerarán cancelados en la Fecha de Entrada en Vigencia de la ACT, y las obligaciones de National de conformidad con las Pólizas de Seguros correspondientes de National serán satisfechas y exoneradas de manera total y definitiva.

### 3. Tratamiento de Reclamaciones de Bonos Asegurados de FGIC

Si las Clases 8 y 12 votan para aceptar el Plan de la ACT y todas las Pólizas de Seguros de FGIC y los acuerdos relacionados con los Bonos Asegurados de FGIC están en plena vigencia, con las modificaciones que puedan haber recibido conforme al Plan de Rehabilitación de FGIC, no obstante cualquier otra disposición del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, entonces los tenedores de Reclamaciones de Bonos Asegurados de FGIC recibirán los tratamientos siguientes.

*Tratamiento de Reclamaciones de Bonos Asegurados de FGIC*. Cada tenedor de una Reclamación Permitida de Bonos Asegurados de FGIC (salvo aquellas de propiedad de FGIC) (A) depositarán, o se considerará que han depositado, entre otras cosas, la Participación Prorrateada de dicha Contraprestación del Plan de la FGIC, el Recobro de la Recuperación del ELA/ACT, y los Bonos Asegurados de FGIC y las Pólizas de Seguros relacionadas de FGIC asignables a dicho tenedor en el Fideicomiso de FGIC correspondiente, y (B) se considerará que han recibido la Participación Prorrateada de la Contraprestación del Plan de FGIC y los Certificados de FGIC como contraprestación de estos. Todos los derechos y remedios de conformidad con los Bonos Asegurados de FGIC depositados en un Fideicomiso de FGIC y las resoluciones legislativas aplicables relacionadas de bonos (salvo aquellas con respecto a las obligaciones de pago del ELA o sus instrumentalidades) y las Pólizas de Seguros aplicables de FGIC (únicamente en la medida en que se aplican y se relacionan con dichos Bonos Asegurados de FGIC) se preservarán y

permanecerán en plena vigencia en la medida en que sea necesario para preservar cualquier reclamación relacionada con dichos Bonos Asegurados de FGIC conforme a la Póliza de Seguros aplicable de FGIC.

Cada distribución de efectivo hecha por el Fideicomiso de FGIC a los tenedores de intereses en él se reducirán automática y simultáneamente dólar por dólar el monto del capital pendiente de los Bonos Asegurados de FGIC en posesión de dicho Fideicomiso de FGIC y resultarán en la reducción correspondiente de las obligaciones de FGIC conforme a las Pólizas de Seguros correspondientes.

***Bonos Asegurados de FGIC en posesión de FGIC.*** Con respecto a las Reclamaciones Permitidas de Bonos Asegurados de FGIC de propiedad de FGIC, en la Fecha de Entrada en Vigencia de la ACT, y sujeto a los derechos del Agente Fiscal de la ACT, FGIC tendrá derecho a recibir, en plena contraprestación, satisfacción, exoneración y canje de dichas Reclamaciones Permitidas de Bonos Asegurados de FGIC, su Participación Prorrateada de la Contraprestación del Plan de la ACT a dichas Reclamaciones Permitidas de Bonos Asegurados de FGIC.

***Bonos con doble seguro***. Los Certificados de FGIC asignables a los tenedores de Bonos con Doble Seguro se distribuirán de acuerdo con los términos y disposiciones de la Sección 25.1 del Plan de la ACT.

***Aceleración de los Bonos Asegurados de FGIC.*** El pago del capital de los Bonos Asegurados de FGIC se acelerará en la Fecha de Entrada en Vigencia de la ACT, y dichos Bonos Asegurados de FGIC serán pagaderos a partir y después de la Fecha de Entrada en Vigencia de la ACT al "precio de aceleración" de FGIC de cien por ciento (100%) del monto de capital sobre esto, más el interés devengado sobre él (o, en el caso de cualquier bono de apreciación de capital, el monto compuesto de este) hasta la fecha de pago. Sin embargo, no habrá aceleración de cualquier pago requerido a hacerse por FGIC de conformidad con la Póliza de Seguros de FGIC, a menos que FGIC opte, según su exclusivo criterio, hacer tales pagos de forma acelerada y FGIC tiene el derecho expreso de acelerar cualquier pago de este tipo conforme a la Póliza de Seguros aplicable de FGIC o los acuerdos relacionados con los Bonos Asegurados de FGIC aplicables.

***Cesión de los derechos de amortización.*** En la medida en que se permita conforme a los documentos de seguros definitivos aplicables y la Póliza de Seguros aplicable de FGIC, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a FGIC todo y cualquier derecho a amortizar y rescatar los Bonos Asegurados de FGIC y cualquier derecho relacionado de manera que dichos derechos sean ejercidos directa y exclusivamente por FGIC como si fuera la ACT para tal fin.

***Derecho al voto***. La convocatoria a las aceptaciones y rechazos del Plan de la ACT por los tenedores de las Reclamaciones de Bonos Asegurados de FGIC serán hechos por la Junta de Supervisión a FGIC.

### 4.    Tratamiento de Reclamaciones de Bonos Asegurados de Ambac

Si las Clases 2 y 6 votan para aceptar el Plan de la ACT y todas las Pólizas de Seguros de Ambac y los acuerdos relacionados con los Bonos Asegurados de Ambac se encuentran en plena

vigencia, sin pagos pendientes en mora de Ambac con respecto a dichos Bonos Asegurados de Ambac hasta e incluyendo la Fecha de Entrada en Vigencia de la ACT, los tenedores de Reclamaciones de Bonos Asegurados de Ambac recibirán el siguiente tratamiento, como se estipula en la Notificación de Elección de Ambac y en la medida en que se ofrezca por Ambac, en su exclusivo criterio, en o antes del inicio de la Vista de la Declaración de Divulgación, y Ambac puede hacer diferentes elecciones con respecto a diferentes CUSIP y diferentes Bonos Asegurados de Ambac:

(a)  ***Tratamiento de Reclamaciones de Bonos de la ACT 68 (Ambac).*** En la Fecha de Entrada en Vigencia de la ACT, o a la mayor brevedad posible en adelante, pero a más tardar el décimo (10$^{mo}$) día siguiente a la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación Permitida de Bonos de la ACT 68 (Ambac), recibirá Efectivo por un monto equivalente al Precio de Aceleración de Ambac, como plena y definitiva satisfacción y exoneración de las obligaciones de Ambac conforme a la Póliza de Seguros aplicable de Ambac, y, sujeto a los derecho del Agente Fiscal de Bonos de la ACT, Ambac recibirá la Contraprestación del Plan de Ambac que sería de otra manera asignable a dicho tenedor, sus sucesores, destinatarios de transferencias o cesionarios por cuenta de sus Reclamaciones de Bonos de la ACT 68 (Ambac). Con fines de aclaración, el Precio de Aceleración de Ambac incluirá intereses devengados y no pagados a la fecha de pago.

(b)  ***Tratamiento de Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac).*** En la Fecha de Entrada en Vigencia de la ACT, o a la mayor brevedad posible en adelante, pero a más tardar el décimo (10$^{mo}$) día siguiente a la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) recibirá uno de los siguientes tratamientos:

i.  Tratamiento de Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac): Si Ambac lo ofrece, según su exclusivo criterio, cada tenedor de una Reclamación de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) tendrá la opción de elegir en los Formularios de Elección de Tenedores de Bonos de Ambac, para recibir, en la Fecha de Entrada en Vigencia de la ACT, la Contraprestación de Conmutación de Ambac, distribuible o según las instrucciones de Ambac, y, si opta por ello, (i) dicho tenedor beneficiario no tendrá otros derechos ni derechos adicionales en virtud de o con respecto a la Póliza de Seguros aplicable de Ambac o cualquier Fideicomiso de Ambac, y (ii) sujeto a los derechos del Agente Fiscal de la ACT, Ambac recibirá la Contraprestación del Plan de Ambac que de otra manera sería asignable o distribuible a dicho tenedor. Los Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac de un tenedor que de manera válida elige recibir el Tratamiento de Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) o hace una elección indebida como se describe en la Sección 25.4(f) del Plan de la ACT, se considerará que ha cancelado, en o después de la Fecha de Entrada en Vigencia de la ACT, sus Bonos Prioritarios (Senior) de la ACT 98 Asegurados de Ambac, y las obligaciones de Ambac conforme a las Pólizas de Seguros de Ambac aplicables será satisfecha, exonerada y liberada de manera total y definitiva.

ii.  Tratamiento de No Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac): Si un tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) de manera oportuna y válida elige en un Formulario de Elección de Tenedores de Bonos de Ambac, recibir el Tratamiento de No Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), dicho tenedor de una Reclamación Permitida de Bonos Asegurados de Ambac recibirá uno o más de los siguientes tratamientos ofrecidos por Ambac, en su exclusivo criterio, y como se detalla en el Formulario de Elección de Tenedores de Bonos de Ambac:

1.  ***Fideicomisos de Custodia.***

Dicho tenedor de una Reclamación de Bonos Asegurados Prioritarios (Senior) de la ACT 98 (Ambac) depositará, o se considerará que ha depositado, en el Fideicomiso o Fideicomisos correspondiente(s) de Ambac, (A) los Bonos Asegurados de Ambac de dicho tenedor con respecto al cual se ha hecho la elección y las Pólizas de Seguros relacionadas de Ambac, (B) la Participación Prorrateada de dicho tenedor de la Contraprestación del Plan de Ambac, que consiste en (1) Efectivo, (2) el Recobro de Recuperación del ELA/ACT, que consiste en los CVI de Recuperación de la ACT y todos los pagos o cobros con respecto a dichos CVI de Recuperación de la ACT, y (3) los Nuevos Bonos de la ACT, y (C) se considerará que han recibido Certificados de Ambac como contraprestación por ellos; dichos tenedores no tendrán recurso ante Ambac o las Pólizas de Seguros correspondientes de Ambac, salvo las provistas conforme a los términos del Fideicomiso o Fideicomisos de Ambac. En caso de que los montos de distribución provisorios dispuestos en el párrafo decretal 52 de la Orden de Confirmación del ELA se hayan distribuido directamente a los tenedores de los Bonos Asegurados de Ambac antes de la Fecha de Entrada en Vigencia de la ACT, reduciendo de esa manera el monto de capital de dichos Bonos Asegurados de la ACT 98 de Ambac, dichas distribuciones provisorias de efectivo no necesitan depositarse en el Fideicomiso de Ambac.

Los términos del Fideicomiso o Fideicomisos de Ambac se estipularán en un acuerdo o acuerdos de fideicomiso que se presentarán como parte del Suplemento del Plan, pero incluirán entre otros los siguientes términos: (A) Ambac no asegurará ningún pago sobre los Certificados de Ambac, no se requerirá que pague ningún monto por mora u otro interés con respecto a los Bonos Asegurados de Ambac, y solo se requiere que pague sus obligaciones conforme a la Póliza de Seguros aplicable de Ambac según se dispone en ella y en el acuerdo de los Bonos Prioritarios (Senior) de la ACT 98 que rigen el o los Fideicomiso(s) de Ambac; (B) se considerará que Ambac es el único tenedor de los Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac en el o los Fideicomiso(s) de Ambac con respecto a la votación, enmienda, aceleración, eventos de mora, y elección e instrucción de derechos y remedios, incluyendo, entre otros, en relación con procedimientos de insolvencia durante el período en que

no haya pagos en mora pendientes de Ambac conforme a las Pólizas de Seguros correspondientes de Ambac; y (C) el acuerdo que rige el o los Fideicomiso(s) de Ambac dispondrá, entre otras cosas, que (1) todos los derechos de un tenedor de Bonos Asegurados Prioritarios (Senior) de la ACT 98 de Ambac en poder del o de los Fideicomiso(s) de Ambac (con respecto a enmiendas y consentimiento, instrucción de remedios o de otra manera) podrán ser ejercidos solo por Ambac y ningún tenedor de los Certificados de Ambac tendrá ningún derecho con respecto a los Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac (salvo según se describe de otra manera en el o los Fideicomiso(s) de Ambac), (2) Ambac puede, a su criterio, elegir instruir una distribución de un porcentaje proporcional de los Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac a tenedores individuales de Certificados de Ambac ante la exoneración de las reclamaciones de dicho tenedor sobre la Póliza de Seguros relacionada de Ambac y contra el o los Fideicomiso(s) de Ambac; dicha distribución y exoneración no dará lugar a que otro tenedor de Certificados de Ambac alegue un derecho a recibir el mismo tratamiento, y (3) Ambac puede, según su opción, elegir instruir la venta de cualquier Activo del Fideicomiso de Ambac.

Pago de los importes acelerados: Ambac recibirá la Contraprestación del Plan de Ambac que de otra manera sería asignable a los tenedores de Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98 Asegurados (Ambac) y las obligaciones de Ambac hacia dichos tenedores será exonerada total y completamente con el pago, en la Fecha de Entrada en Vigencia de la ACT, o a la mayor brevedad posible en adelante, pero en ningún caso después del décimo ($10^{mo}$) después de la Fecha de Entrada en Vigencia de la ACT, en Efectivo, al Precio de Aceleración de la ACT con respecto a este.

Tratamiento Alternativo: La Junta de Supervisión y Ambac se reservan el derecho de formular una elección u opción de implementación alternativa con respecto al Tratamiento de No Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) de los Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac que sea mutuamente aceptable para la Junta de Supervisión y Ambac, cada uno según su exclusivo criterio respectivo; siempre y cuando, que dicha elección u opción de implementación alternativa debe proponerse, por escrito, en o antes del inicio de la Vista de la Declaración de Divulgación.

(c)     ***Aceleración Declarada de los Bonos Asegurados de Ambac.*** Si no hay pagos en mora pendientes de Ambac con respecto a sus obligaciones conforme a las Pólizas de Seguros de Ambac correspondientes hasta la Fecha de Entrada en Vigencia de la ACT inclusive, los Bonos Asegurados de Ambac se considerarán acelerados e inmediatamente pagaderos a la Fecha de Entrada en Vigencia de la ACT. Ambac tendrá el derecho a pagar el Precio de Aceleración de Ambac con respecto a dichos bonos en cualquier momento, y se solicitará al tenedor de Bonos Asegurados de Ambac y al fideicomisario o agente fiscal (según corresponda) que lo acepte en satisfacción de las obligaciones de Ambac conforme a la Póliza de Seguros de

Ambac correspondiente con respecto a dichos bonos, y, ante dicho pago, las obligaciones de Ambac conforme a la Póliza de Seguros aplicable de Ambac estarán plenamente satisfechas y extintas, no obstante cualquier disposición de la Póliza de Seguros correspondiente de Ambac u otros documentos relacionados con los Bonos Asegurados de Ambac. Con fines de aclaración, no obstante dicha aceleración, no habrá aceleración, de haberla, de ningún pago que deba hacerse conforme a cualquier póliza de seguros de Ambac a menos que Ambac opte, en su exclusivo y absoluto criterio, hacer dichos pagos de manera acelerada.

(d) **_Cesión de los derechos de amortización._** En la medida en que se permita conforme a los documentos definitivos aplicables y de manera no coherente con los derechos provistos de acuerdo con la Póliza de Seguros aplicable de Ambac, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a Ambac todo y cualquier derecho a amortizar y rescatar los Bonos Asegurados de Ambac y cualquier derecho relacionado de manera que dichos derechos sean ejercidos directa y exclusivamente por Ambac como si fuera la ACT para tal fin. Cualquier monto adeudado en relación con dicha amortización será igual al precio aplicable de amortización y al Precio de Aceleración de Ambac, el que sea menor.

(e) **_Derecho al voto._** Sujeto a los términos y disposiciones de la Orden de Declaración de Divulgación, (1) la convocatoria de aceptaciones y rechazos del Plan de la ACT por tenedores de Reclamaciones de Bonos Asegurados de Ambac será hecha por la Junta de Supervisión a Ambac de acuerdo con las disposiciones de la Sección 301(c)(3) de PROMESA, el derecho aplicable y el seguro aplicable y otros documentos, y (2) en los casos en que resulte aplicable y como se describe en la Sección 25.4(b) del Plan de la ACT, la elección sería entre el Tratamiento de Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) como se estipula en la Sección 25.4(b)(i) del Plan de la ACT y el Tratamiento de No Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) como se establece en la Sección 25.4(b)(ii) del Plan de la ACT será hecha por los tenedores beneficiarios de los Bonos Prioritarios (Senior) de la ACT 98 Asegurados de Ambac. Sin embargo, la forma del Tratamiento de No Conmutación de Ambac será seleccionado por Ambac de acuerdo con los términos de la Sección 25.4(b)(ii) del Plan de la ACT.

(f) **_Elección indebida._** Si un tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (1) no elige de manera oportuna y válida el Tratamiento de Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) como se estipula en la Sección 25.4(b)(i) del Plan de la ACT o el Tratamiento de No Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) como se estipula en la Sección 25.4(b)(ii), o (2) presenta una elección por menos de todas sus Reclamaciones de Bonos Asegurados de Ambac en una clase en particular (en cuyo caso, dicha elección será nula y sin valor ni efecto), se considerará que dicho tenedor ha elegido recibir con respecto a sus Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), el Tratamiento de Conmutación de la Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) estipulado en la Sección 25.4(b)(i), de conmutar las Pólizas de Seguros correspondientes de Ambac, y de satisfacer, exonerar y liberar plena y definitivamente las obligaciones de Ambac conforme a dichas Pólizas de Seguros de Ambac, y recibirá, con respecto a sus Reclamaciones Permitidas de Bonos 98 (Ambac), el Tratamiento de Reclamación Permitida de

Bonos 68 (Ambac), de haberlo, como se estipula en la Sección 25.4(a). Además, se considera que un tenedor de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) que no elija de manera oportuna y válida recibir el Tratamiento de Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) o el Tratamiento de No Conmutación de una Reclamación Permitida de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) conforme a las cláusulas (1) o (2) anteriores que ha cancelado, en o después de la Fecha de Entrada en Vigencia de la ACT, sus Bonos Prioritarios (Senior) de la ACT 98 asegurados de Ambac, y las obligaciones de Ambac conforme a la Póliza de Seguros de Ambac aplicable será satisfecha, exonerada y liberada de manera total y definitiva.

5.      **Obligaciones el Agente Fiscal**

El Agente Fiscal de la ACT no tendrá obligaciones ni responsabilidades con respecto a ningún Bono de la ACT que se deposite en el Fideicomiso de Ambac, el Fideicomiso de Assured, el Fideicomiso de FGIC o el Fideicomiso de National desde y después de la Fecha de Entrada en Vigencia de la ACT.

**H.      Tratamiento de contratos a ejecutarse y arrendamientos no vencidos**

Todos los contratos a ejecutarse y arrendamientos de bienes inmuebles no residenciales con cualquier Deudor se tratarán de la manera siguiente:

| Categoría | Tratamiento |
|---|---|
| **Contrato a Ejecutarse o arrendamiento no vencido rechazado o asumido y cedido por un Tribunal de Título III registrados antes de la Fecha de Entrada en Vigencia de la ACT** | *Tratamiento.* No se verán afectados por el Plan de la ACT. La orden del Tribunal de Título III con respecto a dicho Contrato a Ejecutarse o arrendamiento no vencido continuará en vigencia. |
| **Contrato a Ejecutarse o arrendamiento no vencido que figura en el cronograma del suplemento del Plan** | *Tratamiento.* El Suplemento del Plan de la ACT incluirá un cronograma de contratos pendientes de ejecución y arrendamientos no vencidos que serán asumidos, o asumidos y cedidos a la Fecha de Entrada en Vigencia de la ACT. El cronograma puede enmendarse en cualquier momento antes de la Fecha de Confirmación. Conforme al Código de Quiebras, como condición de la asunción de un Contrato a Ejecutarse, el deudor debe subsanar de inmediato cualquier incumplimiento, y si hay un incumplimiento, proporcionar una garantía adecuada de que el deudor continuará actuando de conformidad con el contrato. |
|  | *Notificación y subsanación de incumplimientos.* Por lo menos veinte (20) días antes de la Vista de Confirmación de la ACT, el Deudor presentará y entregará una notificación a las partes de dichos contratos o arrendamientos. La notificación incluirá el monto a ser pagado por el Deudor para subsanar cualquier incumplimiento para cada Contrato a Ejecutarse o arrendamiento no vencido. |
|  | *Objeciones.* Cualquier parte de dicho Contrato a Ejecutarse o arrendamiento no vencido dispondrá de veinte (20) días a partir de la |

| Categoría | Tratamiento |
|-----------|-------------|
|  | fecha de notificación para presentar y notificar cualquier objeción a los montos de subsanación enumerados y a cualquier garantía adecuada de futuro cumplimiento que el deudor pueda proporcionar. Si hay objeciones radicadas, el Tribunal de Título III realizará una vista sobre la objeción. |
| **Contratos de negociación colectiva** | Salvo según lo previsto en el Artículo XXVI del Plan de la ACT, ninguno de los Contratos de Negociación Colectiva del Deudor será tratado como Contrato a Ejecutar y ninguno será asumido o rechazado ni tratado de otra manera conforme al Plan de la ACT, pero permanecerá en vigencia sujeto, en todas las instancias a la ley de Puerto Rico y la Sección 2.5 del Plan de la ACT con respecto al pago y al tratamiento en curso de reclamaciones y obligaciones de pensión y relacionadas. |
| **Contratos a Ejecutarse y Arrendamientos no Vencidos que:**<br><br>• **se hayan registrado ante la Oficina de Contralor de Puerto Rico;**<br><br>• **exentos de registro ante la Oficina de Contralor de Puerto Rico conforme a 2 L.P.R.A. § 97 y reglamentos promulgados conforme a estos;**<br><br>• **han sido aprobados por la Junta de Supervisión o autorizados por el Tribunal de Título III y no han sido específicamente designados como rechazados en el Suplemento del Plan de la ACT;**<br><br>• **son con los Estados Unidos, o cualquiera de sus agencias, departamentos o agentes o conforme a cualquier programa federal; o**<br><br>**son por y entre cualquier agencia, departamento, municipalidad, corporación pública o instrumentalidad del ELA (salvo los arrendamientos de los cuales AEP sea parte).** | *Tratamiento.* No se verán afectados por el Plan de la ACT. |
| **Todos los demás contratos a ejecutarse y arrendamientos no vencidos** | *Tratamiento.* Serán rechazados por el Deudor en la Fecha de Entrada en Vigencia de la ACT. |

| Categoría | Tratamiento |
|---|---|
|  | ***Notificación.*** Se notificará cualquier contrato a ejecutarse o arrendamiento no vencido a rechazarse a las partes de dicho contrato o arrendamiento.<br><br>***Daños debido a rechazo.*** Cualquier parte que busque presentar una reclamación por daños resultantes del rechazo de un contrato a ejecutarse o arrendamiento no vencido debe presentar una evidencia de reclamaciones en o antes de los treinta (30) días antes de (i) la Fecha de Confirmación de la ACT, o (ii) la fecha del registro de una orden por el Tribunal de Título III donde se apruebe el rechazo de dicho contrato a ejecutarse o arrendamiento no vencido, lo que ocurra más tarde.<br><br>Si una parte no presenta una evidencia de reclamaciones de daños emergentes del rechazo de un contrato a ejecutarse o arrendamiento no vencido dentro de la fecha límite anterior, dicha reclamación será prohibida para siempre y no será aplicable contra el Deudor. |

***Pólizas de Seguros***. Cada una de las pólizas de seguros del Deudor y cualquier acuerdo, documento o instrumento relacionado con ellas, se tratan como Contratos a Ejecutarse conforme al Plan de la ACT; <u>siempre que</u>, salvo dentro de lo dispuesto en el Plan de la ACT, la Orden de Confirmación de la ACT y los Documentos Definitivos, dicho tratamiento no exonerará, ni se interpretará que lo hace, a ninguna Monolínea con respecto a sus respectivas obligaciones hacia los tenedores de Reclamaciones conforme a las pólizas de seguros y el derecho aplicable y los documentos rectores con respecto a ellas.

***Obligaciones de indemnización y reembolso***  Para los fines del Plan de la ACT, (i) en la medida en que sean ejecutorias en su naturaleza, las obligaciones del Deudor, incluyendo, entre otros, las pólizas de seguros de directivos y funcionarios, de indemnizar y reembolsar a sus directivos o funcionarios que eran directivos o funcionarios, respectivamente, en o antes de la Fecha de Petición de la ACT, se considerarán asumidas a la Fecha de Entrada en Vigencia de la ACT, y (ii) las obligaciones de indemnización del Deudor emergentes de la conducta de funcionarios y directivos durante el período desde y después de la Fecha de Petición de la ACT, según sea el caso, serán Reclamaciones de Gastos Administrativos. *Véase* la Sección VI.D de esta Declaración de Divulgación para obtener un resumen de las Reclamaciones de Gastos Administrativos.

Bajo ninguna circunstancia el Deudor o la ACT Reorganizada, según sea el caso, serán responsables de cualquier obligación de indemnización, costo o gasto asociado con negligencia grave, fraude intencional o conducta dolosa de sus respectivos funcionarios o directivos.

***Disputas con respecto a contratos a ejecutarse y arrendamientos no vencidos***. Si existe una disputa con respecto a si un contrato o arrendamiento es o era a ejecutarse o no vencido en el momento de la asunción, el Deudor o la ACT Reorganizada tendrá cuarenta y cinco (45) días a partir del registro de una Orden Final que resuelva dicha disputa o altere su tratamiento de dicho contrato o arrendamiento.

## I.    Disposiciones que rigen las distribuciones

### *Tiempo y forma de las distribuciones.*

*Distribuciones a tenedores de reclamaciones*. El Agente Pagador hará las distribuciones, o hará que se hagan las distribuciones, a tenedores de las siguientes reclamaciones en la Fecha de Entrada en Vigencia de la ACT. *Véase* la Sección VI.E de la Declaración de Divulgación para conocer las distribuciones aplicables a ser hechas a tenedores de dichas reclamaciones.

- Reclamaciones Permitidas de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured) y Reclamaciones de Bonos de la ACT 68 (National).

- Reclamaciones Permitidas de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National).

- Reclamaciones Permitidas de Bonos Subordinados (Sub) de la ACT 98, Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National).

- Reclamaciones Permitidas Generales Sin Garantía de la ACT

### *Distribuciones de efectivo a tenedores de ciertas otras reclamaciones*. Las distribuciones

a tenedores de Reclamaciones de Dominio Eminente / Expropiación Inversa se harán en efectivo por el monto de dicha Reclamación Permitida dentro de los diez (10) Días Hábiles después de que se produzca una que determine la validez y el monto de la compensación justa atribuible a una Reclamación de Dominio Eminente / Expropiación Inversa, el Agente Pagador distribuirá o hará que se distribuyan. Las distribuciones a tenedores de Reclamaciones Permitidas de Gastos Administrativos y Reclamaciones Permitidas de Conveniencia se harán en efectivo ni bien resulte factible después de (i) la Fecha de Entrada en Vigencia de la ACT, o (ii) la fecha en que la reclamación se convierta en una reclamación permitida, lo que ocurra más tarde.

### *Oportunidad de los pagos*. Cualquier pago o distribución hechos dentro de los diez (10)

días laborables después de la fecha especificada en el Plan de la ACT se considerará hecho puntualmente. Cuando una distribución se adeuda en un día que no sea un día laborable, dicha distribución se hará en el siguiente día laborable, sin interés, y se considerará hecho en la fecha de vencimiento.

### *Distribuciones por el Agente Pagador*. Todas las distribuciones conforme al Plan de la

ACT serán hechas por el Agente Pagador, a menos que se especifique lo contrario. El Agente Pagador retendrá todos los bienes a ser distribuidos conforme al Plan de la ACT en fideicomiso para todas las entidades con derecho a recibir dichos bienes. El Agente Pagador no retendrá un interés económico o beneficioso sobre dichos bienes.

*Forma de pago conforme al Plan de la ACT.* Los pagos en efectivo se harán por cheque o transferencia bancaria. Sin embargo, no se hará ningún pago hasta que el monto pagadero sea igual o mayor a los diez dólares ($10.00).

*Entrega de distribuciones.* Las distribuciones y entregas a tenedores de Reclamaciones Permitidas se harán a través de The Depository Trust Company o en el domicilio del tenedor como se estipule en los Cronogramas presentados ante el Tribunal, a menos que se sustituya por el domicilio estipulado en las pruebas de la Reclamación presentada por dichos tenedores, o en el último domicilio conocido de dicho tenedor si no se presenta una evidencia de reclamación o si se ha notificado al Deudor por escrito sobre un cambio de dirección. Las distribuciones iniciales por el Agente Pagador para beneficio de los tenedores de las Reclamaciones Permitidas de Bonos de la ACT, sin embargo, se harán al fideicomisario o al agente fiscal, según corresponda, para dicha obligación de acuerdo con los documentos rectores respectivos para dichas obligaciones. El Agente Pagador puede hacer distribuciones de los Honorarios de Restricción del AAP o los Costos de Perfeccionamiento en Efectivo a una parte con derecho a ellos de una manera mutuamente acordada entre dicha parte y el Agente Pagador. El fideicomisario o agente fiscal para cada una de dichas obligaciones, por su parte, entregará la distribución a los tenedores correspondientes de la manera dispuesta en los documentos rectores aplicables.

Sin embargo, las distribuciones iniciales por el Agente Pagador para beneficio de las Reclamaciones Permitidas de Bonos de la ACT se harán al, o según las instrucciones del, Agente Fiscal de la ACT de acuerdo con los documentos rectores respectivos para dichas obligaciones. Además, el Agente Pagador puede hacer distribuciones de los Honorarios de Restricción del AAP de la ACT o los Costos de Perfeccionamiento en Efectivo a una parte con derecho a ellos de una manera mutuamente acordada entre dicha parte y el Agente Pagador. El Agente Fiscal de la ACT (o quien este designe), por su parte, entregará la distribución a los tenedores correspondientes de la manera dispuesta en los documentos rectores aplicables. Independientemente de si dichas distribuciones son hechas por el Agente Fiscal de la ACT o el Agente Pagador según las instrucciones del Agente Fiscal de la ACT, cualquier Gravamen de Cobro del Agente Fiscal de la ACT se adjuntará a dichas distribuciones de la misma manera que si dichas distribuciones fueran hechas por o a través del Agente Fiscal de la ACT. El Agente Fiscal de la ACT puede actuar según las instrucciones de distribución recibidas del Deudor o de sus agentes con respecto a la entrega de distribuciones de acuerdo con los términos y disposiciones del Artículo XXVII del Plan de la ACT, incluyendo cualquier posición contra CUSIP y posiciones de plica establecidas por el deudor o sus agentes ante The Depository Trust Company.

El Deudor, sus agentes y notificadores, y el Agente Fiscal y el Agente Pagador de la ACT no tienen obligación de reconocer ninguna transferencia de Reclamaciones de Bonos de la ACT después de la Fecha de Registro de Distribución. Los Nuevos Bonos de la ACT y los CVI de Recuperación de la ACT serán transferibles y reconocidos de acuerdo con los términos y condiciones de la Escritura de los Nuevos Bonos de la ACT y la Escritura de los CVI, respectivamente.

*Cancelación de notas, instrumentos, certificados y otros documentos.* Salvo (a) según se disponga en cualquier contrato, instrumento u otro acuerdo o documento registrado o entregado en relación con el Plan de la ACT, (b) para fines de probar un derecho a la distribución conforme al Plan de la ACT, o (c) según se disponga específicamente de otra manera en el Plan de la ACT,

la Fecha de Entrada en Vigencia de la ACT, los Bonos de la ACT y todos los instrumentos y documentos relacionados con él se considerarán automáticamente cancelados, rescindidos y sin más validez ni efecto contra el Deudor sin cualquier acto o acción adicional conforme a cualquier acuerdo, ley, regulación, orden o regla aplicables, con el Deudor y el fideicomisario, agente pagador o agente fiscal correspondiente, según sea el caso, sin obligaciones o deberes y responsabilidades en curso en virtud de estos, y las obligaciones de las partes del Deudor, conforme a los Bonos de la ACT y todos los instrumentos y documentos relacionados con estos serán exoneradas.

Sin embargo, los Bonos de la ACT y demás instrumentos y documentos relacionados continuarán en vigencia para los fines limitados a continuación:

(i)     permitir que el Agente Pagador haga cualquier distribución según se estipule en el Plan de la ACT y ejecutar todas las funciones administrativas o de otro tipo que sean necesarias con respecto a este,

(ii)    permitir a los tenedores de Reclamaciones Permitidas de Bonos de la ACT y Reclamaciones Permitidas de Bonos Asegurados de la ACT para recibir distribuciones de acuerdo con los términos y disposiciones del Plan de la ACT.

(iii)   para cualquier fideicomisario, agente, administrador de contrato o entidad similar conforme a los instrumentos y documentos relacionados con estos para ejecutar funciones necesarias, incluyendo hacer distribuciones, de acuerdo con el Plan de la ACT y tener el beneficio de todos los derechos y protecciones y otras disposiciones de dichos instrumentos y documentos, según sea aplicable, y todos los demás acuerdos relacionados,

(iv)    establecer los términos y condiciones aplicables a las partes de dichos documentos e instrumentos que no sean el Deudor, o

(v)     permitir que Assured y National ejerzan la amortización o rescate de derechos asignados a Assured y National conforme a las disposiciones de las Secciones 25.1 y 25.2 del Plan de la ACT, respectivamente, o

(vi)    según sea necesario para preservar las reclamaciones conforme a las respectivas pólizas de seguros y documentos relacionados por una Monolínea.

La Junta de Supervisión solicitará que la ACT aplique esfuerzos razonables para (1) mantener los números existentes de CUSIP para los Bonos de la ACT asegurados por Monolínea, respectivamente, y (2) tomar todas las demás medidas razonables que puedan ser necesarias para preservar y efectuar dichas Reclamaciones. Además, el Agente Fiscal de la ACT no tendrá obligaciones ni responsabilidades con respecto a ningún Bono de la ACT que se deposite en el Fideicomiso de Ambac, el Fideicomiso de Assured, el Fideicomiso de FGIC o el Fideicomiso de National desde y después de la Fecha de Entrada en Vigencia de la ACT. Dichos bonos o documentos de bonos que sigan estando en circulación no

serán la base de la aseveración de ninguna Reclamación contra el Deudor o la ACT Reorganizada, según sea el caso.

***Distribuciones no entregables/reservadas.***

*Retención de Distribuciones No Entregables por el Agente Pagador.* Si alguna distribución a cualquier tenedor se devuelve al Agente Pagador como no entregable, no se harán distribuciones adicionales a dicho tenedor mientras no se notifique al Agente Pagador, por escrito, sobre el domicilio entonces actualizado del tenedor. Las distribuciones no entregables permanecerán en poder del Agente Pagador hasta que la distribución pueda entregarse. Todas las Entidades que en definitiva reciben Efectivo no entregable no tendrán derecho a ningún interés o devengo de ningún tipo sobre ellas. El Plan de la ACT no requiere que el Agente Pagador intente localizar a ningún tenedor de una Reclamación Permitida.

*Falta de reclamación de distribuciones no entregables.* Si una distribución no puede entregarse, el Agente Pagador, en o antes de la fecha que es ciento ochenta (180) días a partir de (i) la Fecha de Entrada en Vigencia de la ACT, con respecto a todas las Reclamaciones Permitidas a la Fecha de Entrada en Vigencia de la ACT, y (ii) la fecha en la que se hace una distribución con respecto a cualquier Reclamación en Disputa que se convierta en una Reclamación Permitida después de la Fecha de Entrada en Vigencia de la ACT, presentará una lista ante el Tribunal de Título III donde figuren los nombres de las Entidades para las cuales se han hecho distribuciones en virtud el presente que no se hayan negociado o se hayan devuelto como no entregables en la fecha de estos.

Cualquier tenedor de una Reclamación Permitida en dicha lista que no se identifique y asevere sus derechos conforme al Plan de la ACT para recibir una distribución dentro de los seis (6) meses a partir de la fecha que figura allí tendrán su derecho a dicha distribución no entregable exonerada y se verán impedidos a perpetuidad de hacer valer cualquier derecho conforme al Plan de la ACT contra la ACT Reorganizada, los fideicomisarios o sus respectivos profesionales, agentes o bienes.

Cualquier Efectivo en posesión del Agente Pagador o el fideicomisario con respecto a títulos valores existentes, según sea el caso, se liberarán a la ACT Reorganizada para su uso para liberar gastos operativos de la ACT Reorganizada, y los Bonos de la ACT en posesión del Agente Pagador o fideicomisario con respecto a los títulos valores existentes se liberarán a la ACT Reorganizada para su cancelación o depósito en el tesoro de la ACT Reorganizada, según lo determine la ACT Reorganizada.

***Requisitos de retención e informe.*** Cualquier parte que emite un instrumento o hace alguna distribución conforme al Plan de la ACT debe cumplir con cualquier requisito de retención e informe impuestos por las autoridades legales o fiscales federales, estatales o locales de Estados Unidos, y todas las distribuciones conforme al Plan de la ACT estarán sujetas a tales requisitos de informe y retención e informe.

Sin embargo, cada tenedor de una Reclamación Permitida que deba recibir una distribución conforme al Plan de la ACT tendrá la única y exclusiva responsabilidad por la satisfacción y el pago de cualquier impuesto gravado sobre dicho tenedor por cualquier unidad gubernamental,

incluyendo ingresos, retenciones y otras obligaciones impositivas, por cuenta de dicha distribución. Cualquier parte que emita algún instrumento o haga cualquier distribución conforme al Plan de la ACT tiene el derecho, pero no la obligación, de no hacer una distribución hasta que dicho tenedor haya hecho arreglos satisfactorios para dicha parte emisora o desembolsadora de pago de cualquier obligación de retención y, si cualquier parte que emite un instrumento o hace alguna distribución conforme al Plan de la ACT no retiene con respecto a la distribución de dicho tenedor, y posteriormente se considera responsable por el monto de dicha retención, el tenedor reembolsará a dicha parte. El Agente Pagador puede requerir, como condición para recibir una distribución, que el tenedor complete el Formulario W-8 o el Formulario W-9 correspondiente, según sea aplicable a cada tenedor. Si el tenedor no cumple dicha solicitud dentro de un año, dicha distribución será considerada como una Distribución No Reclamada.

*Límite de tiempo para el pago en efectivo.* Los cheques emitidos por el Agente Pagador por cuenta de Reclamaciones Permitidas serán nulos si no se cobran dentro de ciento veinte días (120) desde y a partir de la fecha de emisión de estos. Las solicitudes de reemisión de cualquier cheque deben ser hechas directamente al Agente Pagador por el tenedor de la Reclamación Permitida con respecto a la cual se emitió originalmente el cheque. Cualquier reclamación relacionada con un cheque invalidado debe hacerse en o antes de (i) el primer (1er) aniversario de la Fecha de Entrada en Vigencia de la ACT o (ii) noventa (90) días después de la fecha de emisión del cheque, si el cheque representa una distribución final en virtud del presente por cuenta de dicha Reclamación, lo que ocurra después. Después de dicha fecha, todas las Reclamaciones relacionadas con cheques invalidados se desestimarán y prohibirán a perpetuidad y el Agente Pagador retendrá todo el dinero de dicho cheque para su redistribución entre los tenedores de Reclamaciones Permitidas.

*Distribuciones después de la Fecha de Entrada en Vigencia.* Las distribuciones hechas después de la Fecha de Entrada en Vigencia a los tenedores de Reclamaciones que no son Reclamaciones Permitidas en la Fecha de Entrada en Vigencia de la ACT, pero que se convierten más tarde en Reclamaciones Permitidas se considerarán hechas de acuerdo con los términos y disposiciones del Artículo XXVII del Plan de la ACT.

*Compensaciones.* El Agente Pagador puede compensar contra cualquier Reclamación Permitida y las distribuciones a hacerse conforme al Plan de la ACT por cuenta de este (antes de que cualquier distribución se haga por cuenta de dicha Reclamación por el Agente Pagador), las reclamaciones, derechos y Causas de Acción de cualquier naturaleza que el Deudor o la ACT Reorganizada pueden presentar contra el tenedor de dicha Reclamación Permitida.

Sin embargo, ni la falta de efectivización de dicha compensación ni la asignación de cualquier Reclamación constituirá una renuncia o descargo por parte del Deudor o la ACT Reorganizada de dichas reclamaciones, derechos y causas de acción que el Deudor o la ACT Reorganizada puedan poseer contra dicho tenedor.

Además, ninguna disposición del Plan de la ACT está destinada a limitar la capacidad de cualquier Acreedor para efectuar derechos de compensación o recobro preservado o permitido por las disposiciones de las Secciones 553, 555, 559, o 560 del Código de Quiebras o conforme al derecho de recobro del derecho consuetudinario y ninguna parte de la Sección 27.11 del Plan de la ACT afectará las exoneraciones e interdictos dispuestos en el Artículo XL del Plan de la ACT.

*Asignación de distribuciones del Plan entre capital e interés.* Siempre que alguna Reclamación Permitida que tenga derecho a una distribución conforme al Plan de la ACT consista en endeudamientos y otros montos (como interés devengado pero no pagado sobre ellos), dicha distribución se asignará en primer lugar, al interés devengado y no pagado a la fecha inmediatamente anterior a la Fecha de Petición de la ACT, en segundo lugar, al monto del capital de la Reclamación (según se determine para fines de impuestos federales a la renta), y luego siempre que la contraprestación supere el monto del capital de la Reclamación a otros montos. El tratamiento por parte del Deudor o la ACT Reorganizada de cualquier distribución para sus fines impositivos no será vinculante para ningún Acreedor con respecto al tratamiento de dichas distribuciones para cualquier fin regulatorio, impositivo u otros.

*Pago de honorarios y gastos del fideicomisario.* Las distribuciones a hacerse conforme al Plan de la ACT y la Orden de Confirmación del ELA a los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 por cuenta de dichas Reclamaciones se destina a incluir todos los honorarios y gastos razonables del Agente Fiscal adeudados por la ACT conforme a las resoluciones aplicables de bonos con respecto a los montos exonerados conforme al Plan de la ACT.

En la medida en que no se deduzca en relación con los pagos hechos de acuerdo con la Orden de Confirmación del ELA al satisfacerse las Condiciones de Distribución, los Honorarios y Gastos del Agente Fiscal de la ACT se deducirán de manera prorrateada de las distribuciones a los tenedores de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 por cuenta de dichas Reclamaciones, de manera tal que el costo de dichos Honorarios y Gastos del Agente Fiscal de la ACT se reparta equitativamente entre todos los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 según el monto de sus Reclamaciones.

No obstante cualquier disposición en contrario en el Plan de la ACT, la Orden de Confirmación de la ACT o las resoluciones aplicables sobre bonos, los Honorarios y Gastos del Agente Fiscal de la ACT no deberán superar los $2,360,681.02. En caso de que los montos reservados o deducidos por el Agente Fiscal de la ACT a partir de las distribuciones hechas a los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 superen los Honorarios y Gastos del Agente Fiscal de la ACT, dichos montos excesivos serán distribuidos por, o según las instrucciones de, el Agente Fiscal de la ACT de manera prorrateada a los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 en la Fecha de Entrada en Vigencia de la ACT.

Las Monolíneas correspondientes serán los tenedores de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 emergentes de los Bonos de la ACT asegurados por cualquiera de estas Monolíneas, si así fuera, de acuerdo con la Sección 301(c)(3) de PROMESA, el derecho aplicable, y el seguro rector y otros documentos aplicables a dichos Bonos de la ACT. No obstante lo anterior, (a) con respecto a cualquier Bono Prioritario (Senior) de la ACT 98 de propiedad de FGIC, el Agente Fiscal de la ACT hará la Distribución Excesiva atribuible a este, de haberlo, a FGIC, y (b) con respecto a cualquier Bono Prioritario (Senior) de la ACT 98 asegurado de FGIC, pero no de propiedad de FGIC, el Agente Fiscal de la ACT hará la Distribución Excesiva atribuible a este, de haberla, a los propietarios de dichos Bonos Prioritarios (Senior) de la ACT 98.

Salvo según lo dispuesto en la Sección 27.13 del Plan de la ACT, el Plan de la ACT no limita, ni debe interpretarse como que limita, los derechos del Agente Fiscal de la ACT a pagar dichos montos de las distribuciones hechas conforme al presente, incluyendo, entre otros, la imposición de cualquier Gravamen de Cobro.

*Propietario beneficiario.* Para todos los fines del Plan de la ACT, lo que incluye, entre otros, para fines de distribuciones conforme a los términos y disposiciones del Artículo XXVII, el "tenedor" de una Reclamación es cualquier Entidad que, directa o indirectamente, tiene poder de inversión con respecto a cualquier Reclamación, lo que incluye el poder de disponer o de dirigir la disposición de dicha Reclamación.

Sin embargo, para los fines del Artículo XXVII del Plan de la ACT y la Sección 1126 del Código de Quiebras, (a) National constituirá el "tenedor" de cualquier Reclamación de Bonos Asegurados de National y cualquier Reclamación de Bonos del ELA/ACT de National de acuerdo con la Sección 301(c)(3) de PROMESA, el derecho aplicable y el seguro rector y otros documentos aplicables a las Reclamaciones de Bonos Asegurados de National y las Reclamaciones de Bonos del ELA/ACT de National, (b) Assured constituirá el "tenedor" de cualquier Reclamación de Bonos Asegurados de Assured, cualquier Reclamación de Bonos del ELA/Centro de Convenciones de Assured, cualquier Reclamación de Bonos del ELA/ACT de Assured y cualquier Reclamación del Impuesto al Ron del ELA/AFI de Assured, de acuerdo con la Sección 301(c)(3) de PROMESA, el derecho aplicable y el seguro rector y otros documentos aplicables a las Reclamaciones de Bonos Asegurados de Assured, Reclamaciones de Bonos del ELA/Centro de Convenciones de Assured, Reclamaciones de Bonos del ELA/ACT de Assured y Reclamaciones del Impuesto al Ron del ELA/AFI de Assured, (c) Ambac constituirá el "tenedor" de cualquier Reclamación de Bonos Asegurados de Ambac, cualquier Reclamación de Bonos del ELA/Centro de Convenciones de Ambac, cualquier Reclamación de Bonos del ELA/ACT de Ambac y cualquier Reclamación del Impuesto al Ron del ELA/AFI de Ambac, de acuerdo con la Sección 301(c)(3) de PROMESA, el derecho aplicable y el seguro rector y otros documentos aplicables a las Reclamaciones de Bonos Asegurados de Ambac, Reclamaciones de Bonos del ELA/Centro de Convenciones de Ambac, Reclamaciones de Bonos del ELA/ACT de Ambac y Reclamaciones del Impuesto al Ron del ELA/AFI de Ambac, (d) FGIC constituirá el "tenedor" de cualquier Reclamación de Bonos Asegurados de FGIC, y cualquier Reclamación de Bonos del ELA/ACT de FGIC, de acuerdo con la Sección 301(c)(3) de PROMESA, el derecho aplicable y el seguro rector y otros documentos aplicables a las Reclamaciones de Bonos Asegurados de FGIC, y las Reclamaciones de Bonos del ELA/ACT de FGIC, y (e) el "tenedor" de cualquier otra Reclamación de Bonos Asegurados de la ACT se determinará de acuerdo con la Sección 301(c)(3) de PROMESA y cualquier derecho aplicable o documento rector aplicables a las Reclamaciones de Bonos Asegurados de la ACT.

*Valor de las distribuciones.* Para fines de cálculo del valor de las distribuciones hechas a tenedores de Reclamaciones Permitidas, (a) el Efectivo será valorado por el monto distribuido y (b) los Nuevos Bonos de la ACT se valorarán por el monto del capital original de estos.

*Estipulación de fondos disputados*. Si las Condiciones de Distribución de la ACT no se satisfacen antes de la Fecha de Entrada en Vigencia de la ACT,[200] en la Fecha de Entrada en Vigencia de la ACT, se considerará que las Condiciones de Distribución de la ACT se han satisfecho y los pagos y distribuciones a realizarse en relación con ellas conforme a los términos y disposiciones de la Orden de Confirmación del ELA y el Acuerdo de Apoyo al Plan de la ACT/ADCC se harán en la Fecha de Entrada en Vigencia de la ACT a los tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (FGIC), y Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National), incluyendo, entre otros, la distribución de dinero de acuerdo con la Estipulación de Fondos Disputados, sujeto a los derechos de BNYM, como agente fiscal, de hacer valer y aplicar, de manera prorrateada, todo y cualquier derecho con respecto a estos.

**J.    Enjuiciamiento y extinción de reclamaciones del Deudor**

En la Fecha de Entrada en Vigencia de la ACT, la autoridad para litigar o transigir y liquidar las Acciones de Anulación se transferirá al Fideicomiso de Acciones de Anulación, el fideicomiso creado en la Fecha de Entrada en Vigencia del ELA, en el cual se han transferido Reclamaciones y Causas de Acción del ELA, el SRE y la AEP. La Junta del Fideicomiso de Acciones de Anulación, de tres miembros, fue designada en la Fecha de Entrada en Vigencia del ELA para administrar el Fideicomiso de Acciones de Anulación. El Fideicomisario de Acciones de Anulación, Drivetrain, LLC, fue designado por la Junta del Fideicomiso de Acciones de Anulación de acuerdo con los términos y disposiciones del Acuerdo del Fideicomiso de Acciones de Anulación, de fecha 15 de marzo de 2022, por y entre el ELA, el SRE, la AEP, la Junta de Supervisión y Drivetrain, LLC.

Desde y después de la Fecha de Entrada en Vigencia de la ACT, el Fideicomisario de Acciones de Anulación tendrá el derecho y las facultades exclusivas para (a) litigar cualquiera de las Acciones de Anulación y (b) transigir y arreglar dichas Acciones de Anulación, con la aprobación del Tribunal de Título III. Los ingresos netos de dichos litigios o transacciones (una vez cubiertos todos los costos y gastos incurridos en relación con ellos) se incluirán en el Recobro de GUC de la ACT y se distribuirán a los tenedores de Reclamaciones Permitidas Generales Sin Garantía de la ACT.

**K.    Aceptación o rechazo del Plan de la ACT, efecto del rechazo por una o más Clases de Reclamaciones**

*Clases afectadas para votar*. A la Fecha de Registro de Votación o en el momento de la presentación en ATOP, según sea el caso, de una Reclamación en una Clase afectada que no se considere de otra manera que ha rechazado o aceptado el Plan de la ACT de acuerdo con el Artículo

---

[200] *Véase supra* nota **Error! Bookmark not defined.** para obtener una descripción de las Condiciones de Distribución de la ACT.

XXXIII del Plan de la ACT tendrá derecho a votar por separado para aceptar o rechazar el Plan de la ACT.

*Aceptación por una Clase de Acreedores*. Una clase afectada acepta el Plan de la ACT si (i) por lo menos dos tercios (2/3) del monto en dólares de las Reclamaciones Permitidas de dicha clase que hayan votado para aceptar el Plan de la ACT, (ii) más de la mitad (1/2) del número de las Reclamaciones Permitidas de dicha clase que hayan votado para aceptar el Plan de la ACT.

*Imposición de Plan Concursal por el Tribunal*. Si una clase de reclamaciones afectadas rechaza, o no acepta el Plan de la ACT, el Deudor puede (i) solicitar al Tribunal de Título III que confirme el Plan de la ACT de acuerdo con las disposiciones de imposición de Plan Concursal por el Tribunal del Código de Quiebras, o (ii) los Acreedores del AAP de ACT/ADCC, de acuerdo con las disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC, enmienden el Plan de la ACT. Para un resumen de las disposiciones de Imposición de Plan Concursal por el Tribunal conforme al Código de Quiebras, *véase* la Sección VII.C.1 de esta Declaración de Divulgación.

**L.     Derechos y facultades del agente pagador**

El agente pagador será ACT o una entidad o entidades designadas por la Junta de Supervisión en consulta con AAFAF en o antes de la Fecha de Entrada en Vigencia de la ACT para hacer o facilitar distribuciones de acuerdo con las disposiciones del Plan de la ACT.

*Facultades del Agente Pagador*. El Agente Pagador estará facultado para (a) tomar todas las medidas y ejecutar todos los instrumentos y documentos necesarios para aplicar el Plan de la ACT, (b) hacer distribuciones contempladas por el Plan de la ACT, (c) cumplir el Plan de la ACT y las obligaciones del Plan de la ACT, y (d) ejercer cualquier otra facultad atribuida al Agente Pagador por una orden del Tribunal de Título III, conforme al Plan de la ACT o según sea considerado por el Agente Pagador como necesario y correcto para implementar las disposiciones del Plan de la ACT.

*Honorarios y gastos incurridos a partir de y después de la Fecha de Entrada en Vigencia.* El monto de los honorarios y gastos razonables incurridos por el Agente Pagador a partir de y después de la Fecha de Entrada en Vigencia, y cualquier compensación razonable y reclamaciones de reembolso de gastos, incluyendo, entre otros, honorarios y gastos razonables de asesoramiento jurídico, incurridos por el Agente Pagador se pagarán en Efectivo sin orden adicional del Tribunal de Título III. Sin embargo, el Agente Pagador no tendrá derecho a reembolso o indemnización por parte de la ACT Reorganizada en relación con reclamaciones o causas de acción emergentes de negligencia grave o conducta ilícita dolosa del Agente Pagador.

*Exculpación*. El Agente Pagador será exculpado por todas las Entidades, incluyendo, entre otros, los tenedores de Reclamaciones y otras partes en interés, de toda y cualquier reclamación, Causas de Acción, y otras aseveraciones de responsabilidad legal emergentes del relevamiento de las facultades y deberes conferidos al Agente Pagador por el Plan de la ACT o cualquier orden del Tribunal de Título III emitida conforme a o en cumplimiento del Plan de la ACT, o el derecho aplicable, salvo por acciones u omisiones emergentes de negligencia grave o conducta ilícita dolosa del Agente Pagador. Ningún tenedor de una Reclamación u otra parte en interés puede tener o llevar adelante una reclamación o causa de acción contra el Agente Pagador por hacer pagos de

acuerdo con el Plan de la ACT o por implementar las disposiciones del Plan de la ACT, salvo por reclamaciones o causas de acción emergentes de la culpa grave o conducta ilícita dolosa del Agente Pagador.

**M.     Procedimientos de tratamiento de reclamaciones en disputa y reclamaciones sujetas a los procedimientos de ACR**

***Objeciones a reclamaciones; enjuiciamiento de reclamaciones bajo disputa.*** La ACT Reorganizada, por y a través de la Junta de Supervisión, y en consulta con AAFAF, presentarán y notificarán cualquier objeción a las reclamaciones a más tardar ciento ochenta (180) días después de la Fecha de Entrada en Vigencia, o en una fecha posterior aprobada por el Tribunal de Título III. Todas las objeciones, defensas afirmativas y reconvenciones se litigarán hasta la Orden Final. La ACT Reorganizada, por y a través de la Junta de Supervisión, y en consulta con AAFAF, tendrá la autoridad para presentar, conciliar, acordar o desistir de cualquier objeción a las reclamaciones, sin que sea necesaria la aprobación del Tribunal de Título III.

Cualquier Reclamación de Bonos de la ACT presentada por cualquier entidad por montos adeudados conforme a títulos valores existentes se considerará satisfecha, impugnada y eliminada del registro de reclamaciones en la Fecha de Entrada en Vigencia de la ACT, y después de la realización de distribuciones a los tenedores de Reclamaciones Permitidas de Bonos de la ACT, de acuerdo con las disposiciones del Plan de la ACT.

Las reclamaciones sujetas a resolución conforme a los procedimientos de resolución alternativa de disputas y la Orden de Procedimiento de resolución alternativa de disputas se abordarán de conformidad con dichos procedimientos.

Si una orden que revierte o anula la Orden de Confirmación de la ACT con respecto a las Reclamaciones de Bonos de la ACT se convierte en una Orden Final, dichas Reclamaciones de Bonos de la ACT se repondrán en el registro de reclamaciones.

Las dos (2) personas nombradas por el Comité de Acreedores para la Junta del Fideicomiso de Acciones de Anulación recibirá actualizaciones mensuales con respecto al proceso de conciliación de reclamaciones con respecto a las Reclamaciones Generales Sin Garantía de la ACT, cuyo proceso seguirá siendo administrado por la Junta de Supervisión, con la asistencia de AAFAF. Además, las dos (2) personas nombradas antes mencionadas tendrán los siguientes derechos:

(A)   revisar las objeciones a las reclamaciones y el proceso de conciliación, incluyendo los procedimientos de resolución alternativa de disputas, en lo que se relaciona con las Reclamaciones Generales Sin Garantía de la ACT y las Reclamación de Conveniencia, independientemente de la magnitud del monto de la Reclamación aseverada.

(B)   garantizar el cumplimiento de las exclusiones de las Reclamaciones Generales Sin Garantía de la ACT según se dispone en el Plan de la ACT, y

(C)   en caso de que dichas personas designadas expresen desacuerdo con cualquier conciliación de una Reclamación General Sin Garantía de la ACT, por un monto

permitido que supere los Quinientos Mil Dólares ($500,000.00), dichas personas designadas pueden buscar reparación del Tribunal de Título III para hacer que (después de demostrar que dicha conciliación no es lo más conveniente para la ACT y sus acreedores) la Junta de Supervisión o AAFAF, según sea el caso, para obtener aprobación del Tribunal de Título III para dicha conciliación de acuerdo con el estándar de aprobación conforme a la Regla de Quiebras 9019.

Dichas personas designadas y sus asesores no tendrán derecho a una compensación que supere la que se estipuló conforme al Plan del ELA y la Orden de Confirmación del ELA.

Desde y después de la Fecha de Entrada en Vigencia de la ACT, todas las Reclamaciones Tardías se considerarán denegadas, sin derecho a nueva acción, y la Junta de Supervisión instruirá a Kroll Restructuring Administration LLC, su representante designado por el tribunal, para eliminar dichas Reclamaciones Tardías del registro de reclamaciones mantenido para beneficio del Tribunal de Título III y la Junta de Supervisión notificará al tenedor de dicha Reclamación Tardía al respecto.

*Estimación de reclamaciones*. En o a partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada puede solicitar al Tribunal de Título III que estime para fines de distribución final cualquier reclamación contingente, no liquidada o en disputa, independientemente de si el Deudor había previamente objetado o solicitado la estimación de dicha reclamación.

El Tribunal de Título III retendrá la jurisdicción para considerar cualquier solicitud para estimar cualquier reclamación.

Si el Tribunal de Título III estima cualquier reclamación contingente, no liquidada o en disputa, el monto estimado será el monto permitido de dicha reclamación, o una limitación máxima de dicha reclamación, según lo determine el Tribunal de Título III. Si la estimación constituye la limitación máxima de dicha reclamación, la ACT Reorganizada puede en el futuro objetar la asignación definitiva de dicha reclamación.

*Retención de reclamaciones en disputa.* La ACT Reorganizada retendrá, en beneficio de cada tenedor de una reclamación en disputa, la distribución que dichos tenedores recibirían si la reclamación en disputa fuera permitida, hasta que se concilie la reclamación en disputa, estimada por el Tribunal de Título III, o se permita. El monto de la distribución retenida será (i) el monto liquidado estipulado en la evidencia de reclamaciones presentada relacionada con dicha reclamación en disputa, (ii) el monto de la reclamación en disputa estimada por el Tribunal de Título III como el monto máximo en el que dicha reclamación se convertirá en definitiva en una reclamación permitida, o (iii) cualquier otro monto acordado por el tenedor de dicha reclamación en disputa y la ACT Reorganizada, lo que sea menor. El recobro de cualquier tenedor de una reclamación en disputa no puede superar la cantidad que sea menor en (i), (ii) o (iii) anteriores.

En caso de que la ACT Reorganizada retenga los Nuevos Bonos de la ACT en nombre de los tenedores de reclamaciones en disputa, la ACT Reorganizada ejercerá los derechos al voto o al consentimiento con respecto a dichas obligaciones.

*Asignación de reclamaciones en disputa.* Cuando una reclamación en disputa se convierte en una reclamación permitida (en su totalidad o en parte), la ACT Reorganizada hará distribuciones

conforme al tratamiento específico de conformidad con el Plan de la ACT o el tenedor de dicha reclamación, dentro de lo que se permita esta reclamación. Dicha distribución se hará no más de noventa (90) días después de que se determine que dicha reclamación ha sido permitida.

*Sin devengado de intereses.* Ningún tenedor de una reclamación (permitida o de otro tipo) tendrá derecho a intereses devengados en o depués de la Fecha de Petición de la ACT sobre cualquier reclamación o derecho. No se devengarán ni pagarán intereses sobre cualquier reclamación en disputa con respecto al período a partir de la Fecha de Entrada en Vigencia de la ACT hasta la fecha de la distribución final, si dicha reclamación en disputa se convierte en una reclamación permitida.

*Denegación de reclamaciones.* Si (a) una entidad es responsable de entregar cualquier bien o dinero al Deudor, y (b) dicha entidad no ha entregado dicho bien o dinero al Deudor para la fecha límite correspondiente, todas las reclamaciones de dicha entidad serán denegadas.

*Potestad para enmendar la lista de acreedores.* Salvo con respecto a las Reclamaciones de Bonos de la ACT, y sujeto a las limitaciones de la Sección 31.1(b)del Plan de la ACT, el Deudor puede enmendar la Lista de Acreedores con respecto a cualquier reclamación y hacer distribuciones basadas en dicha Lista enmendada de Acreedores sin que sea necesaria la aprobación del Tribunal de Título III. Si alguna enmienda reduce el monto de una reclamación o cambia la naturaleza o la prioridad de una reclamación, el Deudor notificará al tenedor de dicha reclamación sobre la enmienda. Dicho tenedor tendrá veinte (20) días para presentar una objeción a la enmienda ante el Tribunal de Título III. Si no se presenta ninguna objeción, se harán distribuciones sobre la base de dicha Lista de Acreedores enmendada sin que sea necesaria la aprobación del Tribunal de Título III.

*Reclamaciones sujetas a procedimientos de resolución alternativa de disputas.* En la medida en que no se haya transferido a la Fecha de Entrada en Vigencia de la ACT de acuerdo con los términos y condiciones de la Orden de ACR, el Deudor transferirá reclamaciones de acuerdo con los términos y condiciones de la Orden de ACR, y tras la transferencia, todas estas reclamaciones (a) se conciliarán conforme a los procedimientos regulatorios y administrativos aplicables del Deudor, (b) se pagarán en su totalidad en el curso ordinario de negocios, y (c) salvo según se disponga en el Plan de la ACT, no se incluirán en las Reclamaciones Generales Sin Garantía de la ACT para ser cubiertas por el Recobro de GUC de la ACT o las Reclamaciones de Conveniencia.

La Junta de Supervisión puede retirar una reclamación del proceso de ACR en caso de que sea transferida indebidamente al proceso de ACR porque no calificaba de acuerdo con los términos y disposiciones de la Orden de ACR, incluyendo, entre otros, reclamaciones de bonos o reclamaciones "derivadas" relacionadas con pruebas de una acción de clase "principal" (en cuyo caso, dichas reclamaciones se transferirán a la Clase correspondiente conforme al Plan de la ACT). Las reclamaciones que son elegibles para transferirse a o administrarse a través del proceso de ACR y para las cuales no se requiera la presentación de evidencia de reclamación (independientemente de si se presentó una evidencia de reclamación) no se transferirá a la Clase 16 o la Clase 19 conforme al Plan de la ACT y se administrará a través del proceso de ACR, de acuerdo con los términos de la Orden de ACR, de acuerdo con los términos de la Orden de ACR y las subsecciones (a) y (b) de la Sección 31.7 del Plan de la ACT.

**N.**      **Condiciones suspensivas a la confirmación del Plan de la ACT**

*Condiciones suspensivas a la confirmación del Plan de la ACT.* Se deben satisfacer las siguientes condiciones antes de que el Plan de la ACT pueda confirmarse:

1.      *Certificación del Plan Fiscal***:** La Junta de Supervisión debe certificar que un Plan Fiscal de la ACT sea congruente con el Plan de la ACT, y *certificar* la presentación del Plan de la ACT (incluyendo cualquier modificación al Plan de la ACT hasta la Fecha de Confirmación de la ACT).

2.      *Órdenes requeridas***:** El Tribunal de Título III debe haber registrado órdenes que dispongan lo siguiente:

       (a)      Aprobación de que la Declaración de Divulgación contiene "información adecuada" conforme a la Sección 1125 del Código de Quiebras;

       (b)      Autorización de la convocatoria a la votación y elecciones con respecto al Plan de la ACT;

       (c)      Determinación de que todos los votos y elecciones o elecciones declaradas sean vinculantes y se haya realizado el recuento de votos de forma adecuada;

       (d)      Confirmación y aplicación de los términos y disposiciones del Plan de la ACT, incluso los descargos que se estipulan en el Artículo XL del Plan de la ACT;

       (e)      Determinación de que los acuerdos y conciliaciones estipulados en el Plan de la ACT sean adecuados, razonables y aprobados y que autoricen las transacciones contempladas en ellos;

       (f)      Determinación de que la Junta de Supervisión, el Deudor y el Plan de la ACT hayan satisfecho y cumplido todas las pruebas, estándares y cargas en relación con el Plan de la ACT;

       (g)      Aprobación de los documentos en el Suplemento del Plan de la ACT, salvo los Estatutos de la ACT Reorganizada, y determinación de que dichos documentos son válidos y vinculantes para las partes con respecto a estos; y

       (h)      Autorización para que la ACT Reorganizada firme, celebre y entregue los documentos en el Suplemento del Plan de la ACT, y que firme, implemente y ejecute todas las acciones necesarias o adecuadas para que tengan efecto las transacciones contempladas por el Plan de la ACT, y los documentos en el Suplemento del Plan de la ACT.

3.      *Forma de las órdenes:* La Orden de Confirmación de la ACT y el Plan de la ACT deben ser, de forma y de fondo, razonablemente aceptables para la Junta de Supervisión, AAFAF, el Deudor, los Acreedores del AAP de la ACT/ADCC y,

2" = "1" "2621/33260-009 CURRENT/127656480v7                  04/30/2022 3:29 PM" ""

únicamente con respecto a las disposiciones que afectan a las Clases 16 y 19, el Comité de Acreedores.

4.    ***Orden de Confirmación:*** La Orden de Confirmación de la ACT debe incluir (i) determinaciones de que todas las conciliaciones y transacciones contenidos en el Plan de la ACT deben satisfacer las normas aplicables conforme a las Secciones 365, 1123(b)(3) y 1129 del Código de Quiebras, y la Regla de Quiebras 9019 en la medida aplicable, (ii) los descargos, exculpaciones e interdictos estipulados en el Artículo XL del Plan de la ACT y (ii) las disposiciones estipuladas en la Sección 33.1(b) de este.

***Renuncia a las condiciones suspensivas a la confirmación.*** Sujeto a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Comité de la ACT, la Junta de Supervisión puede renunciar a cada una de las condiciones suspensivas en la Sección 33.1 del Plan de la ACT, en su totalidad o en parte, con el consentimiento previo por escrito del Deudor, y los Acreedores Iniciales del AAP de la ACT/ADCC, y únicamente con respecto a las disposiciones que afectan a las Clases 16 y 19, el Comité de Acreedores, cuyo consentimiento no podrá denegarse de manera no razonable. Cualquier renuncia de este tipo de una condición suspensiva puede ejecutarse en cualquier momento presentando una notificación de esta ante el Tribunal de Título III ejecutada por la Junta de Supervisión.

O.    **Condiciones suspensivas a la Fecha de Entrada en Vigencia**

***Condiciones suspensivas a la Fecha de Entrada en Vigencia.*** Se deben satisfacer las siguientes condiciones antes de que se produzca la Fecha de Entrada en Vigencia de la ACT y el perfeccionamiento sustancial del Plan de la ACT:

1.    ***Certificación del Plan Fiscal***: La Junta de Supervisión debe haber determinado que el Plan de la ACT es coherente con el Plan Fiscal del Deudor y debe haber certificado la presentación del Plan de la ACT, y cualquier modificación al Plan de la ACT hasta la Fecha de Confirmación de la ACT de acuerdo con las Secciones 104(j) y 313 de PROMESA. El Plan Fiscal de la ACT certificado a la Fecha de Entrada en Vigencia de la ACT debe incluir disposiciones para el pago de capital e interés con respecto a los Nuevos Bonos de la ACT, incluyendo, entre otros, pagos del fondo de amortización y los mecanismos y procedimientos para el pago de los CVI de Recuperación de la ACT en caso de que la Condición de Exceso de Rentabilidad se satisfaga y el pago se adeude conforme a la Escritura de los CVI de Recuperación**.**

2.    ***Registro de la orden de confirmación:*** El Tribunal de Título III debe ingresar la Orden de Confirmación de la ACT, que debe ser de forma y de fondo razonablemente aceptable para la Junta de Supervisión, los Acreedores Iniciales del AAP de la ACT/ADCC y el Comité de Acreedores y debe:

(a)    Autorizar al Deudor y a la ACT Reorganizada para ejecutar todas las acciones necesarias para celebrar, implementar y perfeccionar los contratos,

instrumentos, descargos, arrendamientos, escrituras y otros acuerdos o documentos creados en relación con el Plan de la ACT;

**(b)**  Decretar que las disposiciones de la Orden de Confirmación y el Plan de la ACT no son divisibles y son mutuamente dependientes;

**(c)**  Autorizar al Deudor y a la ACT Reorganizada, según sea el caso, a (1) hacer todas las distribuciones y emisiones requeridas por el Plan de la ACT, y (2) celebrar todos los acuerdos y transacciones que se estipulan en el Suplemento del Plan de la ACT;

**(d)**  Autorizar la implementación del Plan de la ACT de acuerdo con sus términos;

**(e)**  Determinar que la Escritura de los Nuevos Bonos de la ACT, los Nuevos Bonos de la ACT y los pactos de la ACT, incluyendo, entre otros, el Pacto de Tarifas de Peaje, para beneficio de los tenedores de los Nuevos Bonos de la ACT, según lo dispuesto en la Escritura de los Nuevos Bonos de la ACT o la Orden de Confirmación de la ACT, según corresponda, constituyen obligaciones válidas, vinculantes, legales y aplicables de la ACT Reorganizada, conforme a la ley de Puerto Rico, Nueva York y federal;

**(f)**  Determinar que la Escritura de los Nuevos Bonos de la ACT, al emitirse los Nuevos Bonos de la ACT, incluyendo, entre otros, la Deuda Subordinada emitida como refinanciamiento del Préstamo del ELA, las Obligaciones Garantizadas concede un gravamen de primer rango sobre y un interés de garantía de primer rango sobre todo el derecho, título e interés de la ACT conforme al derecho escrito y consuetudinario en el Patrimonio del Fideicomiso, a las Obligaciones Garantizadas, sujeto solo a (1) los términos y disposiciones de la Escritura de los Nuevos Bonos de la ACT que establece el Fondo de Gastos de Autoridad y el Fondo de Descuento de Arbitraje, y (2) el gravamen prioritario e interés de seguridad prioritario concedido en el Patrimonio del Fideicomiso para beneficio de los tenedores de los Nuevos Bonos de la ACT, cuyo gravamen de primer rango e interés de seguridad de primer rango será en todos los aspectos prioritario y superior al gravamen subordinado y al interés de seguridad subordinado concedido en el Patrimonio del Fideicomiso para beneficio de los tenedores de la Deuda Subordinada, en cada caso, como lo permita la Ley de Habilitación de la ACT y se considerarán automáticamente perfeccionados, a la fecha de Entrada en Vigencia de la ACT, y en todos los casos serán válidos, vinculantes, perfeccionados y aplicables desde y después de la Fecha de Entrada en Vigencia de la ACT contra todas las Entidades que tengan reclamaciones de cualquier tipo contra la ACT Reorganizada o sus activos, independientemente de si dichas Entidades han recibido notificación de dicho gravamen o interés de seguridad, sin ningún acto o acuerdo adicional de ninguna Entidad, y quedará "cerrado" y permanecerá

en plena vigencia y efecto hasta que las Obligaciones Garantizadas hayan sido pagadas o cubiertas en su totalidad de acuerdo con sus términos;

**(g)** Determinar que la Orden de Confirmación de la ACT es completa, definitiva, plena, concluyente y vinculante y no estará sujeta a ataques colaterales u otras impugnaciones en ningún tribunal u otro foro por parte de (1) el Deudor, (2) la ACT Reorganizada (3) el ELA y sus instrumentalidades, (4) cada Entidad que presente reclamos u otros derechos oponibles a la ACT, el ELA o cualquiera de sus instrumentalidades, incluyendo a cada tenedor de una reclamación de bonos y cada tenedor de un interés beneficiario (directa o indirectamente en calidad de mandante, apoderado, contraparte, subrogado, aseguradora o por otro concepto) con respecto a los bonos emitidos por el Deudor, o cualquier agencia del ELA o con respecto a cualquier fideicomisario, cualquier agente fiscal, cualquier agente de garantía y cualquier banco que reciba o mantenga fondos relacionados con esos bonos, ya sea que dicha reclamación u otros derechos de dicha Entidad se vean afectados en virtud del Plan de la ACT y, de ser afectados, sea que dicha Entidad hubiere aceptado o no el Plan de la ACT, (5) cualquier otra Entidad y (6) los herederos, sucesores y cesionarios, fideicomisarios, albaceas, administradores, funcionarios, directores, agentes, representantes, abogados, beneficiarios o tutores de las personas nombradas precedentemente.

**(h)** Disponer que el Plan Fiscal de la ACT, certificado en la Fecha de Entrada en Vigencia de la ACT, y cualquier Plan Fiscal de la ACT posterior a la Fecha de Entrada en Vigencia de la ACT incluya disposiciones para el pago en cada año fiscal del capital e intereses pagaderos sobre los Nuevos Bonos de la ACT, incluyendo, entre otros, pagos del fondo de amortización adeudados en dicho año fiscal;

**(i)** Disponer que la paralización automática en cualquier procedimiento futuro de insolvencia iniciado en nombre de la ACT (ya sea conforme al Título III de PROMESA o de otra manera) se considerará renunciado con respecto a los Ingresos Netos en manos de fondos y cuentas establecidas de acuerdo con la Escritura de los Nuevos Bonos de la ACT (salvo los Ingresos Netos en depósito en el Fondo de Descuento de Arbitraje conforme a la Escritura de los Nuevos Bonos de la ACT;

**(j)** Determinar que, conforme al Plan Fiscal de la ACT y su presupuesto correspondiente, el cumplimiento de las obligaciones de deuda a ocurrir en la Fecha de Entrada en Vigencia de la ACT es necesario para que la Junta de Supervisión certifique que los gastos no deben superar los ingresos para

el ACT según se determinen de acuerdo con los estándares de contabilidad en valores devengados modificados;

**(k)** Determinar que el Plan de la ACT es congruente con los Planes Fiscales del Deudor y satisface la Sección 314(b)(7) de PROMESA;

**(l)** Disponer que ninguna parte, Persona, o Entidad promulgará, adoptará ni implementará ninguna ley, regla, regulación o política que impida, financieramente o de otra manera, el perfeccionamiento e implementación de las transacciones contempladas en el Plan de la ACT;

**(m)** Disponer que las Partes del Gobierno, incluyendo, entre otros, la ACT y la ACT Reorganizada, de forma individual y conjunta, según corresponda, tomarán todas las medidas necesarias para perfeccionar las transacciones contempladas en el Plan de la ACT; y

**(n)** Disponer que, como contraprestación por la estructuración de pagos a hacerse a los tenedores de Reclamaciones del ELA/ACT, Reclamaciones del ELA/Centro de Convenciones, Reclamaciones del Impuesto al Ron del ELA/AFI y Reclamaciones del ELA/AMA, y de conformidad con los términos y disposiciones de la Sección 6.1(d) del Acuerdo de Apoyo al Plan de la ACT/ADCC y la Orden de Confirmación del ELA, el ELA hará pagos en la Fecha de Entrada en Vigencia de la ACT a Assured y National por los montos de Treinta y Nueve Millones Trescientos Mil Dólares ($39,300,000.00) y Diecinueve Millones Trescientos Mil Dólares ($19,300,000.00), respectivamente.

**3.** *Sin interdictos:* La *Orden* de Confirmación de la ACT no debe paralizarse en ningún aspecto.

**4.** *Autorizaciones:* Todas las (1) autorizaciones, consentimientos, aprobaciones regulatorias, decisiones o documentos, de haberlos, que sean necesarios para implementar y dar pleno vigencia y efecto al Plan de la ACT, deben haberse obtenido o promulgado o presentado y no revocado y anulado, y (2) a menos que lo permita o lo requiera PROMESA u otra autoridad similar, cualquier otra acción legislativa o de otro tipo, requerida para perfeccionar el Plan de la ACT debe haber sido completada.

**5.** *Firma de Documentos; Otras acciones:* Todas las acciones y todos los contratos, instrumentos, conciliaciones, descargos y otros acuerdos o documentos, incluyendo los Documentos Definitivos, que sean necesarios para implementar los términos y disposiciones del Plan de la ACT se ejecutan y entregan según corresponda y deben tener plena vigencia y efecto.

**6.** *Dictámenes:* Los dictámenes legales usuales y consuetudinarios sobre emisiones de un tipo similar a los Nuevos Bonos de la ACT por abogados ajenos al Deudor que abarquen cuestiones a las que no se hace referencia expresamente en la Orden de Confirmación de la ACT, razonablemente aceptables de fondo y de forma para

los Acreedores Iniciales del AAP de la ACT/ADCC, deben entregarse al fideicomisario correspondiente o a otras partes con respecto a los Documentos Definitivos y el Plan de la ACT.

7.    *Mociones de levantamiento de la paralización y acciones de recuperación*:  Los Ingresos Asignados Condicionalmente en cuestión en las Mociones de Levantamiento de la Paralización y las Acciones de Recuperación deben haber sido determinados por el Tribunal de Título III para constituir bienes del ELA.

8.    *Fecha de Entrada en Vigencia del ELA*:  La Fecha de Entrada en Vigencia del ELA ya debe haber transcurrido.

9.    *CVI de Recuperación de la ACT*:  De acuerdo con el párrafo decretal 34(f) de la Orden de Confirmación del ELA, el CVI de Recuperación de la ACT debe haber sido distribuido a los Acreedores correspondientes.

10.   *Distribución provisoria de la ACT*:  De acuerdo con el párrafo decretal 52 de la Orden de Confirmación del ELA, la ACT debe haber hecho distribuciones provisorias a tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) por los montos de Ciento Ochenta y Cuatro Millones Ochocientos Mil Dólares ($184,800,000.00) y Setenta y Nueve Millones Doscientos Mil Dólares ($79,200,000.00), respectivamente, en Efectivo.

Sin embargo, para los fines de la Sección 34.1(j) del Plan de la ACT, las Monolíneas correspondientes constituirán los tenedores de Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98, Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC), y Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) emergentes de los Bonos de la ACT asegurados o de propiedad de cualquiera de dichas Monolíneas, de haberlas, de acuerdo con la Sección 301(c)(3) de PROMESA.

***Renuncia a las condiciones suspensivas.*** Sujeto a las disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC, la Junta de Supervisión puede renunciar a cualquiera de las condiciones en la Fecha de Entrada en Vigencia de la ACT estipuladas en la Sección 34.1 del Plan de la ACT en cualquier momento sin notificación a ninguna otra parte interesada, salvo los acreedores del AAP de la ACT/ADCC, el Comité de Acreedores y las Partes del Gobierno, y sin notificación adicional a, ni acción, orden o aprobación del Tribunal de Título III, y sin acción formal salvo el procedimiento para confirmar y perfeccionar el Plan de la ACT. Sin embargo, sujeto a los términos

y disposiciones del Acuerdo del Comité de la ACT, cada una de las condiciones suspensivas en la Sección 34.1 con respecto a las disposiciones que afectan a las Clases 16 y 19 pueden ser renunciadas, en su totalidad o en parte, por la Junta de Supervisión sujeto al consentimiento previo por escrito del Comité de Acreedores, siendo que dicho consentimiento no debe ser denegado de manera no razonable.

*Efecto de que no se cumplan las condiciones en la Fecha de Entrada en Vigencia.* Si la Orden de Confirmación de la ACT es anulada por una Orden Final antes de la Fecha de Entrada en Vigencia de la ACT, el Plan de la ACT será nulo y sin valor en todos los aspectos, salvo que la orden que anule la Orden de Confirmación de la ACT disponga lo contrario.

## P.    Modificación, revocación o desistimiento del Plan de la ACT

*Modificación del Plan de la ACT.* La Junta de Supervisión puede alterar, enmendar o modificar el Plan de la ACT o los Anexos en cualquier momento antes o después de la Fecha de Confirmación de la ACT, pero antes de la Fecha de Entrada en Vigencia de la ACT.[201] Se considerará que el tenedor de una reclamación que ha aceptado el Plan de la ACT lo ha aceptado con sus alteraciones, enmiendas o modificaciones, siempre que la alteración, enmienda o modificación no cambie de manera material y adversa el tratamiento de la reclamación de dicho tenedor.

*Revocación o desistimiento del Plan de la ACT.* Sujeto a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Acuerdo del Comité de la ACT, la Junta de Supervisión puede revocar o desistir del Plan de la ACT en cualquier momento antes de la Fecha de Confirmación de la ACT.

Si se revoca o se desiste del Plan de la ACT antes de la Fecha de Confirmación de la ACT, o si el Plan de la ACT no entra en vigencia por cualquier motivo, entonces el Plan de la ACT será nulo y sin valor, y ninguna disposición del Plan de la ACT constituirá una renuncia o un descargo de dicha reclamación por parte del Deudor o cualquier otra entidad, ni perjudicará los derechos del Deudor o de cualquier otra entidad en cualquier procedimiento adicional que involucre al Deudor.

*Enmienda de los documentos del Plan.* Desde y a partir de la Fecha de Entrada en Vigencia del Plan de la ACT, el derecho a hacer cualquier enmienda, modificación o suplemento al Suplemento del Plan de la ACT, los Anexos al Suplemento del Plan de la ACT o los Anexos al Plan de la ACT estarán regidos por los términos de dicho documento.

*Sin admisión de responsabilidad.* La presentación del Plan de la ACT no está destinada a ser y no se interpretará como una admisión o evidencia en cualquier acción legal, juicio, procedimiento o disputa pendientes o posteriores con respecto a cualquier responsabilidad legal, acto ilícito u obligación de ninguna clase (lo que incluye los méritos de cualquier reclamación o defensa) por cualquier entidad con respecto a cualquiera de las cuestiones abordadas en el Plan de la ACT.

---

[201]   Cualquier alteración, enmienda o modificación de este tipo estará sujeta a los requisitos de las Secciones 104(j) y 313 de PROMESA, las Secciones 942 y 1127(d) del Código de Quiebras y los términos del Acuerdo de Apoyo al Plan de la ACT/ADCC.

El Plan de la ACT y cualquier conciliación celebrada, acto desempeñado o documento firmado en relación con el Plan de la ACT (i) no podrán ser usados como una admisión o prueba de la validez de cualquier reclamación, o cualquier afirmación hecha en cualquiera de las Acciones Relacionadas o de cualquier acto ilícito o responsabilidad legal de cualquier entidad; (ii) no podrán ser usadas como admisión o prueba de cualquier responsabilidad legal, falta u omisión de cualquier entidad en cualquier procedimiento civil, penal o administrativo en cualquier tribunal, agencia administrativa u otro tribunal; y (iii) no podrán ser usadas como admisión o prueba contra la ACT Reorganizada, el Deudor o cualquier otra persona o entidad con respecto a la validez de cualquier Reclamación.

El Plan de la ACT y cualquier conciliación celebrada, acto desempeñado o documento firmado en relación con el Plan de la ACT no serán admisibles en ningún procedimiento para ningún propósito, salvo para ejecutar los términos del Plan de la ACT o ejecutar cualquier acuerdo de este tenor. Sin embargo, una vez que el Plan de la ACT se confirme, cualquier entidad puede presentar el Plan de la ACT en cualquier acción para cualquier propósito, lo que incluye, entre otros, para apoyar una defensa o reconvención basada en los principios de cosa juzgada, impedimento de garantía, descargo, conciliación de buena fe, prohibición de sentencia o reducción o cualquier otra teoría de preclusión de reclamaciones o cuestiones o defensa similar en reconvención.

## Q.    Gobernanza corporativa y administración de la ACT Reorganizada

*Acción corporativa.* En la Fecha de Entrada en Vigencia de la ACT, todas las cuestiones conforme al Plan de la ACT que requerirían la aprobación de los directivos del Deudor o la ACT Reorganizada (lo que incluye la autorización para emitir los Nuevos Bonos de la ACT, la autorización para celebrar los Documentos Definitivos, la adopción de los Estatutos de la ACT Reorganizada, y la elección o designación de los directivos y los funcionarios de la ACT Reorganizada conforme al Plan de la ACT) serán autorizados y aprobados de acuerdo con la Escritura de los Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa y sin acción adicional por cualquier entidad conforme a cualquier otra ley, regulación orden o regla aplicable.

Las cuestiones dispuestas conforme al Plan de la ACT que involucren la estructura corporativa de la ACT Reorganizada o la acción corporativa de la ACT Reorganizada serán autorizadas y en efecto de acuerdo con la Legislación de los Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa. Después de la Fecha de Confirmación de la ACT, el Deudor ejecutará toda y cualquier acción considerada adecuada para perfeccionar las transacciones contempladas en el Plan de la ACT conforme a la Escritura de los Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa, según sea aplicable.

*Enmienda de los estatutos.* Los estatutos de la ACT Reorganizada se enmendarán a la Fecha de Entrada en Vigencia de la ACT para disponer sustancialmente como se estipula en los Estatutos de la ACT Reorganizada.

*Directivos de la ACT Reorganizada.* El Directorio de la ACT Reorganizada se designará de acuerdo con los términos y las disposiciones de la Ley de Habilitación de la ACT. Los directivos iniciales se darán a conocer antes de la Vista de Confirmación de la ACT. Si, antes de la Fecha de

Entrada en Vigencia de la ACT, las circunstancias requieren la sustitución de personas seleccionadas, el Gobernador del ELA, en consulta con la Junta de Supervisión, elegirá a un sustituto.

*Funcionarios de la ACT Reorganizada.* En la medida en que resulte aplicable, el Directorio de la ACT Reorganizada elegirá funcionarios de la ACT Reorganizada en o después de la Fecha de Entrada en Vigencia de la ACT.

**R.    Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de PROMESA**

*Efecto de la ratificación.* Ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT liberará, reemplazará, alterará o modificará de otra manera las potestades y responsabilidades de la Junta de Supervisión conforme a PROMESA o las obligaciones de la ACT Reorganizada conforme a PROMESA. A partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada deberán cumplir todos los términos y condiciones de PROMESA, lo que incluye el Título III de PROMESA.

*Función continua de la Junta de Supervisión.* Ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT exonerará ninguna de las obligaciones del Deudor conforme a PROMESA. Desde y a partir de la Fecha de Entrada en Vigencia de la ACT, la potestad y las responsabilidades de la Junta de Supervisión conforme a PROMESA continuarán y los deberes y las obligaciones del Deudor continuarán y no se verán afectados por el Plan de la ACT y el perfeccionamiento de Plan de la ACT.

*Prioridad de las leyes.* A la Fecha de Entrada en Vigencia de la ACT, y en la medida en que no se produzca incompatibilidad conforme a una orden del Tribunal de Título III, las disposiciones de las leyes del ELA que afectan al Deudor o a la ACT Reorganizada y son incompatibles con PROMESA serán incompatibles por las razones y en la medida que se establece en el Anexo "A" de la Averiguación de Hechos y Conclusiones de Derecho. Dichas leyes, normas y reglamentos incompatibles incluyen, entre otros, lo estipulado en la Sección 37.3 del Plan de la ACT. Todos los litigios en los que cualquier Parte del Gobierno sea demandada, sobre si la ley del ELA que se especifica en el Plan de la ACT es incompatible con PROMESA se desestimará, sin derecho a nueva acción, a la Fecha de Entrada en Vigencia de la ACT y las partes de dicha disputa proporcionarán a la Junta de Supervisión notificación inmediata de dicha desestimación.

Con fines de claridad, la falta de inclusión de una obligación de pago emergente de una ley válida en un plan fiscal certificado o presupuesto de la ACT no justifica la desestimación de dicha obligación en la medida en que la reclamación emergente de esta satisfaga de otra manera los requisitos de aceptación de una reclamación conforme a las disposiciones pertinentes del Código de Quiebras.

**S.    Disposiciones sobre el comité**

*Disolución del comité.* En la Fecha de Entrada en Vigencia de la ACT, se disolverá el CANA y habrá satisfecho todos sus deberes y obligaciones respectivas. El CANA será exonerado y relevado de cualquier acción o actividad realizada, o que se requiera realizar, en relación con el Caso de Título III.

Si se acepta una apelación de la Orden de Confirmación de la ACT, el CANA no se disolverá hasta que la Orden de Confirmación de la ACT se convierta en Orden Final. El CANA no se disolverá con respecto a sus deberes y obligaciones en relación con el Caso de Título III de AEE. El CANA tendrá derecho a defender solicitudes de aceptación de compensación y reembolso de gastos de sus profesionales.

En la medida en que, si la fecha inmediatamente anterior a la Fecha de Entrada en Vigencia de la ACT, el CANA fuera una parte para una cuestión controvertida o proceso contencioso en relación con el Caso de Título III, lo que incluye, las Objeciones Vinculadas a la Deuda, las Acciones de Impugnación, las Acciones de Impugnación de Gravámenes, el Litigio de la Cláusula de Designaciones, el Litigio de Uniformidad, las Acciones de Recuperación, las Mociones de Levantamiento de la Paralización y cualquier objeción a las reclamaciones, a partir de la Fecha de Entrada en Vigencia de la ACT se considerará que la ACT Reorganizada ha asumido dicha función y responsabilidad en relación con la cuestión controvertida. Al asumir, el CANA serán relevado de cualquier función, responsabilidad u obligación con respecto a la cuestión controvertida.

## T.    Retención de jurisdicción

***Retención de jurisdicción.*** El Tribunal de Título III retendrá jurisdicción exclusiva sobre cualquier cuestión emergente de PROMESA o relacionada con los Casos de Título III y el Plan de la ACT, o lo siguiente:

1. Cuestiones para permitir, no permitir, determinar, liquidar, clasificar, estimar o establecer la prioridad, situación garantizada o no garantizada o monto de cualquier reclamación no acordada o conciliada conforme al Plan de la ACT (lo que incluye cuestiones que aborden la resolución de la petición de pago de cualquier reclamación y objeciones a la situación garantizada o no garantizada, prioridad, monto o concesión de reclamaciones);

2. Cuestiones relacionadas con contratos condicionales o arrendamientos no vencidos. Esto incluye (i) la asunción o asunción y cesión de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido; (ii) cualquier obligación contractual potencial conforme a cualquier Contrato a Ejecutarse o Arrendamiento no Vencido que se asuma o se asuma y ceda; y (iii) cualquier disputa con respecto a si un contrato o arrendamiento es o fue a ejecutarse o vencido;

3. Garantizar que las distribuciones a los tenedores de reclamaciones permitidas se logren conforme a las disposiciones del Plan de la ACT y adjudiquen todas y cualquier disputa emergente de o relacionada con las distribuciones conforme al Plan de la ACT;

4. Adjudicar, decidir y resolver cualquier moción, proceso contencioso, cuestiones controvertidas o litigadas, y cualquier otra cuestión, y conceder o denegar cualquier solicitud que involucre a los Deudores o la ACT Reorganizada que pueda estar pendiente en la Fecha de Entrada en Vigencia de la ACT o que se presente después de la fecha de Entrada en Vigencia de la ACT;

5.      Decidir y resolver todas las cuestiones relacionadas con la concesión y denegación de cualquier solicitud para la concesión de compensación o reembolso de gastos a profesionales autorizados conforme a PROMESA, el Plan de la ACT o las ordenes registradas por el Tribunal de Título III;

6.      Registrar e implementar órdenes que son necesarias o adecuadas para ejecutar, implementar, perfeccionar o aplicar las disposiciones de (i) contratos, instrumentos, descargos, escrituras y otros acuerdos o documentos aprobados por la Orden Final en los Casos de Título III y (ii) el Plan de la ACT, la Orden de Confirmación de la ACT, los Documentos Definitivos y cualquier otro contrato, instrumento, títulos valores, descargos, escrituras y otros acuerdos o documentos creados en relación con el Plan de la ACT, únicamente en la medida en que dicho documento no disponga que otro tribunal tenga jurisdicción exclusiva;

7.      Resolución de casos, controversias, juicios, disputas o cualquier otra impugnación que pueda surgir en relación con el perfeccionamiento, la interpretación o la aplicación del Plan de la ACT, la Orden de Confirmación de la ACT, los Documentos Definitivos y cualquier otro contrato, instrumento, títulos valores, descargos, escrituras y otros acuerdos o documentos creados en relación con el Plan de la ACT o los derechos de cualquier entidad emergentes de, u obligaciones incurridas en relación con, el Plan de la ACT, o tales documentos, únicamente en la medida en que dicho documento no disponga que otro tribunal tenga jurisdicción exclusiva;

8.      Aprobar cualquier modificación del Plan de la ACT, la Orden de Confirmación de la ACT, o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento creado en relación con el Plan de la ACT o la Orden de Confirmación de la ACT;

9.      Subsanar cualquier defecto u omisión o conciliar cualquier incongruencia en cualquier orden, el Plan de la ACT, la Orden de Confirmación de la ACT, o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento creado en relación con el Plan de la ACT o la Orden de Confirmación de la ACT, o registrar cualquier orden en apoyo de la confirmación conforme a las secciones 945 y 1142(b) del Código de Quiebras, de una manera según sea necesario o adecuado para perfeccionar el Plan de la ACT;

10.     Adjudicar, decidir o resolver cualquier cuestión relacionada con el cumplimiento por parte del Deudor del Plan de la ACT y la Orden de Confirmación de la ACT de conformidad con la Sección 945 del Código de Quiebras;

11.     Determinar cuestiones que puedan surgir en relación con o relacionadas con el Plan de la ACT, la Orden de Confirmación de la ACT, Documentos Definitivos o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento creado en relación con el Plan de la ACT, la Declaración de Divulgación o la Orden de Confirmación de la ACT. El Tribunal de Título III solo tendrá jurisdicción en la

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                   04/30/2022 3:29 PM" ""

medida en que cualquier documento relacionado no disponga que otro tribunal o tribunales tienen jurisdicción exclusiva;

**12.** Adjudicar todas las controversias, juicios o cuestiones que puedan surgir con respecto a la validez de cualquier acción ejecutada por cualquier entidad conforme a o para promover el Plan de la ACT o la Orden de Confirmación de la ACT, incluso la emisión de Nuevos Bonos de la ACT, y registrar cualquier orden o medida que sea necesaria o apropiada en relación con dicha adjudicación;

**13.** Registrar e implementar cualquier orden según sea necesario o adecuado si la Orden de Confirmación de la ACT se modifica, paraliza, revierte, revoca o anula por cualquier motivo;

**14.** Registrar una orden o decreto final que concluya o cierre el Caso de Título III conforme a la Sección 945(b) del Código de Bancarrotas;

**15.** Resolver disputas que pueden surgir entre la Junta de Supervisión o AAFAF, según sea el caso, y los dos designados por el Comité de Acreedores a la Junta del Fideicomiso de Acciones de Anulación de acuerdo con las disposiciones de la Sección 31.1(b) del Plan de la ACT;

**16.** Aplicar y aclarar cualquier orden previamente registrada por la Tribunal de Título III en los Casos de Título III; y

**17.** Atender cualquier otra cuestión sobre la cual el Tribunal de Título III tenga jurisdicción conforme a las Secciones 305 y 306 de PROMESA.

**U.** **Disposiciones varias**

**1.** **Titularidad de los activos**

En la Fecha de Entrada en Vigencia de la ACT, la titularidad de todos los Activos y bienes del Deudor abarcados por el Plan de la ACT será investida en la ACT Reorganizada, libre de gravámenes (salvo los gravámenes concedidos conforme al Plan de la ACT y la Orden de Confirmación de la ACT).

**2.** **Liberación y descargo de reclamaciones y causas de acción**

**(a)** Todas las distribuciones y derechos permitidos conforme al Plan de la ACT serán, y se considerarán como, a cambio de y como satisfacción, transacción, exoneración y descargo de, todas las Reclamaciones y Causas de Acción contra el Deudor y la ACT Reorganizada que se hayan planteado, en su totalidad o en parte, antes de la Fecha de Entrada en Vigencia de la ACT, relacionados con el Caso de Título III, el Deudor o la ACT Reorganizada o cualquiera de sus respectivos Activos, bienes o intereses de cualquier naturaleza, incluyendo cualquier interés devengado sobre dichas Reclamaciones desde y después de la Fecha de Petición de la ACT, e independientemente de si algún bien habrá sido distribuido o retenido

conforme al Plan de la ACT por cuenta de dichas Reclamaciones o Causas de Acción; siempre que, no obstante los derechos de exculpación estipulados en la Sección 40.7 del Plan de la ACT, ninguna disposición contenida en el Plan de la ACT o la Orden de Confirmación de la ACT se destina, ni se interpretará como la concesión de un descargo de terceros no consensual de los Acreedores del AAP de la ACT/ADCC y sus respectivas Personas Relacionadas por los Acreedores del Deudor.

En la Fecha de Entrada en Vigencia de la ACT, el Deudor y la ACT Reorganizada se considerarán exonerados y eximidos de toda y cualquier Reclamación, Causas de Acción y cualquier otra deuda emergente, en su totalidad o en parte, antes de la Fecha de Entrada en Vigencia de la ACT y todas las Reclamaciones del tipo especificado en las Secciones 502(g), 502(h) o 502(i) del Código de Quiebras y la Sección 407 de PROMESA, independientemente de si (a) una evidencia de reclamación basada en la cual se presente en virtud de la Sección 501 del Código de Quiebras, (b) que se permita dicha Reclamación conforme a la Sección 502 del Código de Quiebras y la Sección 407 de PROMESA (o que se resuelva de otro modo), o (c) que el tenedor de una Reclamación basada en una deuda tal haya votado para aceptar el Plan de la ACT.

Con fines de aclaración, ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT exonerará ni prohibirá ninguna reclamación o causas de acción contra la AEE emergente de o relacionada con los bonos emitidos por AEE, incluyendo, entre otros, seguros emitidos por Monolíneas correspondientes a dichos bonos. y AEE no exonera reclamaciones o causas de acción contra ninguna Entidad que no sea el Deudor. Las reclamaciones y causas de acción contra la AEE emergentes de o relacionadas con bonos emitidos por la AEE, y los descargos contra AEE y sus activos se abordarán en el caso de Título III de la AEE, incluyendo, entre otros, cualquier plan de ajuste en dicho caso.

**(b)**    Todas las Entidades estarán impedidas de hacer valer todas y cada una de las Reclamaciones contra el Deudor y la ACT Reorganizada, y cada uno de sus respectivos Activos, bienes y derechos, remedios, Reclamaciones o Causas de Acción o pasivos de cualquier naturaleza, relacionadas con los Casos de Título III, el Deudor o la ACT Reorganizada o cualquiera de sus respectivos Activos y bienes, incluyendo cualquier interés acumulado sobre dichas Reclamaciones desde y después de la Fecha de Petición, e independientemente de que se hayan distribuido o retenido bienes conforme al Plan por cuenta de dichas Reclamaciones u otras obligaciones, demandas, sentencias, daños y perjuicios, deudas, derechos, remedios, causas de acción o pasivos.

De acuerdo con lo anterior, salvo que se disponga expresamente en el Plan de la ACT o en la Orden de Confirmación, la Orden de Confirmación de la

ACT constituirá una determinación judicial, a la Fecha de Entrada en Vigencia de la ACT, de la exoneración y descargo de todas esas Reclamaciones, Causas de Acción o deuda de o contra el Deudor y la ACT Reorganizada conforme a las Secciones 524 y 944 del Código de Quiebras, aplicable al Caso de Título III conforme a la Sección 301 de PROMESA, y dicha exoneración anulará y extinguirá cualquier sentencia obtenida contra el Deudor y la ACT Reorganizada y sus respectivos Activos, y bienes en cualquier momento, en la medida en que dicha sentencia esté relacionada con una Reclamación, deuda o pasivo que sea objeto de dicha exoneración.

A la Fecha de Entrada en Vigencia de la ACT, y como contraprestación por el valor proporcionado en virtud del Plan de la ACT, se considera que cada tenedor de una Reclamación de cualquier Clase en virtud del Plan de la ACT libera, renuncia y exonera para siempre, y liberará, renunciará y exonerará para siempre al Deudor y la ACT Reorganizada, y a sus respectivos Activos y bienes, y a todas esas Reclamaciones.

(c)     Se considerará que cada uno de los Acreedores del AAP de la ACT/ADCC y sus respectivas Personas Vinculadas, únicamente en su calidad de Acreedores del Deudor del AAP de la ACT/ADCC, (i) han renunciado a y pactado no demandar o de otro modo intentar recuperar daños y perjuicios o buscar exonerar otro tipo de reparación contra cualquiera de los Exonerados del Gobierno basada en, que se derive de o esté relacionada con las Reclamaciones Exoneradas del Gobierno o cualquiera de las Reclamaciones o Causas de Acción afirmadas o que podrían haber sido afirmadas, incluyendo, entre otros, en las Acciones de Recuperación (Clawback) y las Mociones de Levantamiento de la Paralización, y (ii) no ayudarán directa o indirectamente a ninguna persona a realizar ninguna acción con respecto a las Reclamaciones Exoneradas del Gobierno que esté prohibida por la Sección 40.2 del Plan de la ACT.

(d)     <u>Limitación de la SEC</u>. Ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT (i) impedirá que la SEC ejerza sus poderes de policía o regulatorios, o (ii) prohíba, limite, impida o demore a la SEC de iniciar o continuar sus reclamaciones, causas de acción, procedimientos o investigaciones contra una persona o entidad que no sea el deudor en cualquier foro.

(e)     <u>Limitación de Estados Unidos</u>. Ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT (i) impedirá que Estados Unidos, sus agencias, departamentos o agentes de cualquier manera releven al Deudor o a la ACT Reorganizada, según sea el caso, del cumplimiento de las leyes federales o de los territorios, y los requisitos para implementar un programa con autorización o delegación federal para la protección de la salud, la seguridad y el medio ambiente de las personas en dicho territorio, (ii) expanda el alcance de cualquier exoneración, descargo o interdicto al cual el Deudor o la ACT Reorganizada tenga derecho conforme al Título

III, y (iii) exonere, libere, prohíba o de otra manera impida (A) cualquier pasivo del Deudor o de la ACT Reorganizada a Estados Unidos que se planteen a partir o después de la Fecha de Entrada en Vigencia de la ACT, (B) cualquier pasivo hacia Estados Unidos que no sea una Reparación, (C) cualquier defensa afirmativa de cualquier derecho de compensación o recobro de Estados Unidos, el Deudor o la ACT Reorganizada, según sea el caso, y dichos derechos de compensación y recobro de dichas partes se preservan expresamente, (D) la continuación de la validez de las obligaciones de Estados Unidos, el Deudor o la ACT Reorganizada, según sea el caso, conforme a un subsidio o acuerdo de asistencia cooperativa de Estados Unidos, (E) las obligaciones del Deudor o la ACT Reorganizada conforme a las leyes federales policiales o regulatorias, incluyendo, entre otros, leyes relacionadas con el medio ambiente, salud pública o seguridad, o leyes territoriales que implementan dichas disposiciones legales federales, incluyendo, entre otros, obligaciones de cumplimiento, requisitos conforme a decretos u órdenes judiciales de consentimiento, y obligaciones de pagar punitorios administrativos, civiles, o de otro tipo asociados, y (F) cualquier pasivo hacia Estados Unidos por parte de cualquier no deudor.

Ninguna disposición del Plan de la ACT o la Orden de Confirmación de la ACT se considerará (i) como determinante del pasivo fiscal de cualquier Entidad, incluyendo, entre otros, el Deudor y la ACT Reorganizada, (ii) como vinculante para el IRS con respecto a los pasivos fiscales, situación impositiva, o declaraciones de impuestos y la retención de obligaciones de cualquier entidad, incluyendo, entre otros, el Deudor y la ACT Reorganizada, (iii) como de exoneración, satisfacción, descargo o prohibición de cualquier reclamación del IRS contra cualquier Entidad que no sea el Deudor y la ACT Reorganizada, y (iv) de concesión de la reparación hacia cualquier Entidad que el Tribunal esté impedido de conceder conforme a la Ley de Sentencia Declaratoria, 28 U.S.C. § 2201(a), o la Ley Antiinterdicto Impositivo, 26 U.S.C. § 7421(a).

**(f)**     <u>Acciones de suscriptores de seguros</u>. Ninguna disposición del Plan de la ACT, la Orden de Confirmación de la ACT o cualquier documento relacionado con el Plan de la ACT estipulado en el Suplemento del Plan de la ACT se destina, ni se debe interpretar que se destina a impedir, alterar, modificar, disminuir, prohibir, limitar, restringir, exonerar, reducir o eliminar los derechos de los demandantes y demandados, incluyendo, entre otros, las partes de las Acciones de Suscriptores de Seguros, de hacer valer sus respectivos derechos, reclamaciones, causas de acción y defensas en las Acciones de Suscriptores de Seguros, incluyendo, entre otros, cualquier Reclamación, derechos de compensación o recobro (en la medida de lo posible), de cualquier derecho de asignar responsabilidades legales o de otro tipo o de cualquier otra naturaleza para la reducción de (o el crédito contra)

cualquier sentencia en relación con las Acciones de Suscriptores de Seguros (colectivamente, los "Derechos de Defensa")

Sin embargo, para fines de aclaración, los Derechos de Defensa no pueden usarse para obtener o resultar en el pago afirmativo de dinero o de la entrega afirmativa de bienes a cualquier demandante, demandado y, en la medida en que se nombre, terceros demandados por el Deudor, la ACT Reorganizada, AEE, ELA y cualquier otra agencia o instrumentalidad del ELA en relación con una Acción de Suscriptores de Seguros.

Además, ninguna parte de las Acciones de Suscriptores de Seguros pueden hacer valer: (i) contra el Deudor o la ACT Reorganizada cualquier Reclamación o Causas de Acción con los fines de obtener un recobro monetario afirmativo que de otra manera esté prohibido o exonerado conforme a las Órdenes de Fecha Límite, el Plan de la ACT, y/o la Orden de Confirmación de la ACT y/o (ii) contra el Deudor, la ACT Reorganizada, AEE, el ELA, o cualquier otra agencia o instrumentalidad del ELA cualquier Reclamación o Reconvención con fines de obtener recobros afirmativos monetarios, incluyendo, entre otros, para indemnización, contribución, reembolso, compensación o teorías similares en la medida en que se hagan valer para obtener un recobro monetario afirmativo, siendo que dichas Reclamaciones o Reconvenciones se considerarán desestimadas, prohibidas, exoneradas o limitadas de acuerdo con los términos y disposiciones del Plan de la ACT y la Orden de Confirmación de la ACT.

Ninguna disposición del Plan de la ACT o de la Orden de Confirmación de la ACT está destinada, ni se interpretará que está destinada, a prohibir, impedir, limitar o modificar de cualquier manera la capacidad de cualquier demandado en cualquier Acción de Suscriptores de Seguros de hacer valer Derechos Defensivos con el fin de reducir, eliminar o limitar el monto del pasivo o sentencia en cualquier Acción de Suscriptores de Seguros. Las partes en las Acciones de Suscriptores de Seguros se verán permanentemente impedidas, prohibidas y restringidas de comenzar, iniciar o hacer valer, contra el Deudor, la ACT Reorganizada, AEE, el ELA o cualquier otra agencia o instrumentalidad del ELA ninguna Reclamación o Reconvención con los fines de obtener un recobro monetario afirmativo, incluyendo, entre otros, indemnizaciones, contribuciones, reembolsos, compensaciones o teorías similares, en la medida en que se hagan valer con los fines de obtener un recobro monetario afirmativo sobre la base de, emergente de o relacionado con las Acciones de Suscriptores de Seguros, independientemente de si dicha Reclamación o Reconvención es o pueda

hacerse valer en un tribunal, un arbitraje, una agencia administrativa o foro, o de cualquier otra manera.

### 3.    Interdicto sobre reclamaciones

Todas las Entidades que han ejercido, mantenido o puedan mantener Reclamaciones o cualquier otra deuda o responsabilidad legal que se exonere o libere conforme a la Sección 40.2 del Plan de la ACT, o que han ejercido, mantenido o puedan mantener Reclamaciones o cualquier otra deuda o pasivo que se exonere o libere conforme a la Sección 40.2 del Plan de la ACT se encuentran permanentemente prohibidas desde y después de la Fecha de Entrada en Vigencia de la ACT, desde:

**(a)**    el inicio o la continuación, directa o indirectamente, de cualquier manera, cualquier acción u otro procedimiento (incluyendo, entre otros, cualquier procedimiento judicial, arbitral, administrativo o de otro tipo) de cualquier tipo con cualquier Reclamación de este tipo u otra deuda o pasivo que se exonera conforme al Plan de la ACT contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes.

**(b)**    aplicar, embargar, cobrar o recobrar cualquier sentencia, laudo, decreto u orden contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra deuda o pasivo que se exonere conforme al Plan de la ACT,

**(c)**    crear, perfeccionar o aplicar cualquier gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra deuda o pasivo que se exonere conforme al Plan de la ACT, y

**(d)**    salvo en la medida en que las Secciones 553, 555, 556, 559, o 560 del Código de Quiebras o conforme al derecho de recobro del derecho consuetudinario dispongan, permitan o preserven  la aseveración de cualquier derecho de compensación, subrogación o recobro de cualquier clase contra cualquier obligación adeudada de cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes, con respecto a cualquier Reclamación de este tipo u otras deudas o pasivos que se exoneren conforme al Plan de la ACT.

Este interdicto se extenderá a todos los sucesores y cesionarios de las Partes Exoneradas y sus respectivos activos y bienes.

### 4.    Integral al Plan

Las disposiciones de descargo, interdicto, exculpación o renuncia dispuestas en el Artículo XL del Plan de la ACT es parte integral del Plan de la ACT y es esencial para su implementación. Cada una de las Partes Exoneradas pueden ejercer independientemente la aplicación de las disposiciones de descargo, interdicto y exculpación estipuladas en el Artículo XL.

5.      **Descargos de los Deudores y la ACT Reorganizada**

En la Fecha de Entrada en Vigencia de la ACT, el Deudor y la ACT Reorganizada, se considerará que el Agente Pagador y cada una de las Personas Relacionadas del Deudor y la ACT Reorganizada han renunciado, exonerado, liberado y relevado de manera irrevocable e incondicional, total, final y definitiva, a las Partes Exoneradas de toda y cualquier Reclamación o Causa de Acción que el Deudor, la ACT Reorganizada y el Agente Pagador, o cualquiera de ellos, o cualquiera que tenga una reclamación a través de ellos, en su nombre o para su beneficio, tengan o puedan tener o afirmen tener, ahora o en el futuro, contra cualquier Parte Exonerada que son Reclamaciones Exoneradas.

6.      **Interdictos relacionados con descargos**

A la Fecha de Entrada en Vigencia de la ACT, todas las entidades que hayan tenido, tengan actualmente o puedan tener una Reclamación Exonerada se verán permanentemente impedidas de las siguientes acciones con respecto a dicha Reclamación Exonerada:

(i)      iniciar, realizar o continuar de cualquier manera, ya sea directa o indirecta, cualquier juicio, acción u otro procedimiento (incluyendo, entre otros, cualquier procedimiento judicial, arbitral, administrativo o de otro tipo) en cualquier foro;

(ii)     aplicar, embargar (incluyendo, entre otros, cualquier embargo previo a la sentencia), cobrar o intentar de cualquier manera recobrar cualquier sentencia, laudo, decreto u otra orden;

(iii)    crear, perfeccionar o de cualquier manera aplicar en cualquier cuestión, directa o indirectamente, cualquier Gravamen;

(iv)     compensar, buscar reembolsos o contribuciones de o subrogación contra, o recuperar de cualquier otra manera, directa o indirecta, cualquier monto contra cualquier pasivo u obligación adeudados a cualquier Entidad exonerada conforme a la Sección 40.2 del Plan de la ACT; y

(v)      continuar de cualquier manera, en cualquier lugar de cualquier procedimiento judicial, de arbitraje o administrativo en cualquier foro, que no cumpla o no sea congruente con las disposiciones del Plan de la ACT o de la Orden de Ratificación de la ACT.

Para fines de claridad, las siguientes estipulaciones se rescindirán al presentarse la Orden de Confirmación de la ACT:

(i)      *la Cuarta Estipulación Enmendada entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico con respecto a la Suspensión de la Prescripción y Orden de Consentimiento* [Caso Núm. 173283-LTS, ECF Núm. 15854], con sus enmiendas; y

(ii) *la Cuarta Estipulación enmendada y Orden de Consentimiento entre los Deudores de Título III (salvo COFINA) y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico actuando en nombre de las Entidades Gubernamentales enumeradas en el Apéndice "B" con respecto a la Suspensión de la Prescripción* [Caso Núm. 17-3283-LTS, ECF Núm. 17394], con sus enmiendas.

## 7. Exculpación

*Partes del Gobierno*. La Junta de Supervisión, AAFAF, el Deudor y cada una de las respectivas Personas Vinculadas, actuando exclusivamente en su capacidad como tales en cualquier momento hasta la Fecha de Entrada en Vigencia de la ACT inclusive, no tendrán ni incurrirán en cualquier responsabilidad legal ante cualquier Entidad por cualquier acto ejecutado en relación con:

(a) el Caso de Título III,

(b) la formulación, preparación, difusión, implementación, ratificación o aprobación del Plan de la ACT o de cualquier acuerdo o conciliación contenido en él,

(c) la Declaración de Divulgación, o

(d) cualquier contrato, instrumento, publicación u otro acuerdo o documento dispuesto o contemplado en relación con el perfeccionamiento de la transacción establecida en el Plan de la ACT.

Sin embargo, esto no afectará la responsabilidad legal de cualquier Entidad que de lo contrario podría emerger de cualquier acto u omisión en la medida en que se determine en una Orden Final que dicho acto u omisión constituye fraude intencional o conducta ilícita dolosa. Ninguna de las disposiciones anteriores de esta Sección 88.7 ACT menoscabará el derecho de ninguna de las Partes del Gobierno, ni de los funcionarios y directivos de las Partes del Gobierno que cumplan funciones en cualquier momento hasta la Fecha de Entrada en Vigencia de la ACT, inclusive, ni de cada uno de sus profesionales respectivos de recurrir al asesoramiento de un abogado como defensa respecto de sus deberes y responsabilidades en virtud del Plan de la ACT**.**

*Acreedores del AAP de la ACT/ADCC.* Cada uno de los Acreedores de la AAP de la ACT/ADCC en su calidad de parte del Acuerdo de Apoyo al Plan de la ACT/ADCC y un Acreedor y/o Aseguradora, según corresponda, desde la Fecha de Petición de la ACT hasta la Fecha de Entrada en Vigencia de la ACT, inclusive, y cada una de las Personas Vinculadas respectivas no tendrá ninguna responsabilidad legal hacia ninguna Entidad por cualquier acto adoptado u omitido en relación con

(a) el Caso de Título III,

(b) la mediación, negociación, formación, preparación, difusión, implementación, confirmación o aprobación del Plan de la ACT o de cualquier acuerdo o conciliación contenido en él,

    **(c)**     la Declaración de Divulgación,

    **(d)**     el Acuerdo de Apoyo al Plan de la ACT/ADCC,

    **(e)**     los Documentos Definitivos, o

    **(f)**     cualquier contrato, instrumento, publicación u otro acuerdo o documento dispuesto o contemplado en relación con el perfeccionamiento de las transacciones establecidas en el Plan de la ACT.

Sin embargo, esto no afectará la responsabilidad legal de cualquier Entidad que de lo contrario podría emerger de cualquier acto u omisión en la medida en que se determine en una Orden Final que dicho acto u omisión constituye fraude intencional o conducta ilícita dolosa.

***Aseguradoras Monolínea***. Ambac, Assured, FGIC, National, y sus respectivas Personas Relacionadas no tendrán ni incurrirán en ninguna responsabilidad legal ante ninguna Entidad por ninguna medida tomada o no tomada de acuerdo con el Plan de la ACT o en relación con la formulación, preparación, diseminación, implementación, aceptación, confirmación o aprobación del Plan de la ACT, incluyendo, entre otros, en relación con el tratamiento de las Reclamaciones de Bonos Asegurados de Ambac, Reclamaciones de Bonos Asegurados de Assured, Reclamaciones de Bonos Asegurados de FGIC, o Reclamaciones de Bonos Asegurados de National, los procedimientos de votación, los procedimientos de elección y el descargo de obligaciones conforme a las Pólizas de Seguros de Ambac, Pólizas de Seguros de Assured, Pólizas de Seguros de FGIC o Pólizas de Seguros de National.

Sin embargo, los términos y disposiciones del Plan de la ACT no exonerarán ni exculparán, ni se interpretará que exoneran o exculpan, cualquier obligación de pago conforme a la Póliza de Seguros de Ambac, la Póliza de Seguros de Assured, la Póliza de Seguros de FGIC, o la Póliza de Seguros de National aplicable, a cualquier tenedor beneficiario de Bonos Asegurados de Ambac, Bonos Asegurados de Assured, Bonos Asegurados de FGIC o Bonos Asegurados de National, según corresponda, de acuerdo con sus términos únicamente en la medida en que dicho tenedor no reciba el Tratamiento de Ambac, el Tratamiento de Assured, el Tratamiento de FGIC o el Tratamiento de National, según sea aplicable (o cualquier reclamación que Ambac, Assured, FGIC, o National puedan tener contra un tenedor beneficiario de Bonos Asegurados respectivos con respecto a las obligaciones aplicables de Ambac, Assured, FGIC o National conforme a las Pólizas de Seguros de Ambac, las Pólizas de Seguros de Assured, las Pólizas de Seguros de FGIC o las Pólizas de Seguros de National, según corresponda).

***Comité de Acreedores***. Cada uno de los miembros del Comité de Acreedores, exclusivamente en su capacidad como miembro del Comité de Acreedores, y el Comité de Acreedores, desde la Fecha de Petición de la ACT hasta la Fecha de Entrada en Vigencia de la ACT inclusive, y cada una de las Personas Relacionadas del Comité de Acreedores no tendrán ni incurrirán en ninguna responsabilidad legal hacia ninguna Entidad para cualquier acción realizada u omitida en relación con el Caso de Título III, la formación, preparación, diseminación, implementación, confirmación o aprobación del Plan de la ACT o cualquier conciliación o transacción contenidas en estos, la Declaración de Divulgación de la ACT, o cualquier contrato,

instrumento, descargo u otro acuerdo o documento dispuesto o contemplado en relación con el perfeccionamiento de las transacciones estipuladas en el Plan de la ACT.

Sin embargo, no obstante la exculpación anterior, si se inicia un litigio contra un miembro del Comité de Acreedores con respecto a las acciones antes mencionadas, dicho miembro tendrá derecho a ser reembolsado por honorarios y gastos razonables de abogados incurridos e indemnizados por cualquier daño concedido, en cada caso, por la ACT conforme a una Orden Final.

Sin embargo, esto no afectará la responsabilidad legal de cualquier Entidad que de lo contrario podría emerger de cualquier acto u omisión en la medida en que se determine en una Orden Final que dicho acto u omisión constituye fraude intencional o conducta ilícita dolosa.

### 8.    Litigio relacionado con designaciones / Litigio de Uniformidad

Si se dictara una Orden Final en relación con los litigios relacionados con las designaciones posteriores al registro de una Orden de Confirmación, cualquier entidad que reciba distribuciones conforme al Plan de la ACT acepta que dicha Orden Final no anulará, afectará o modificará de manera alguna las transacciones contempladas en el Plan de la ACT y la Orden de Confirmación, incluso las exoneraciones, exculpaciones e interdictos establecidos en el Artículo XL del Plan de la ACT.

En la medida en que un demandante en el Litigio Relacionado con Designaciones o el Litigio de Uniformidad es parte del Acuerdo de Apoyo al Plan de GO/AEP, el Acuerdo de Apoyo al Plan de la ACT/ADCC, el Acuerdo de Apoyo al Plan de la AFI o la Estipulación del SRE, dentro de cinco (5) Días Hábiles de la Fecha de Entrada en Vigencia de la ACT, dicho demandante tomará todas las medidas posibles para desestimar, sin derecho a nueva acción, o, en caso de que otros demandantes sean parte de dichos litigios, retirarse de, sin derecho a nueva acción, dicho Litigio Relacionado con Designaciones o Litigio de Uniformidad, según sea el caso, incluyendo, entre otros, la presentación de notificaciones de desestimación o retiro ante el secretario del Tribunal que tenga jurisdicción sobre el litigio.

### 9.    Orden de prohibición

Dentro de los límites que se estipulan en el Plan de la ACT, todas y cada una de las Entidades quedan permanentemente inhabilitadas, prohibidas y restringidas de instituir, procesar, tramitar o litigar de cualquier manera todas y cada una de las Reclamaciones, demandas, derechos, responsabilidades o causas de acción de cualquier tipo, carácter o naturaleza, según el sistema de derecho escrito o consuetudinario, conocidas o desconocidas, directas o derivadas, afirmadas o no, contra cualquiera de las Partes Exoneradas, la confirmación y perfeccionamiento del Plan de la ACT, la negociación y perfeccionamiento del Acuerdo de Apoyo al Plan ACT/ADCC, o cualquier reclamación, acto, hecho, transacción, ocurrencia, declaración u omisión en relación con, o alegada o que podría haber sido alegada en los Casos de Título III (lo que incluye, entre otros, cualquier reclamación, demanda, derecho, responsabilidad, o causa de acción para la indemnización, contribución u otro fundamento de este tipo, según el sistema de derecho escrito o consuetudinario, costos u honorarios incurridos que surjan directa o indirectamente de los Casos de Título III o que estén relacionados con ellos de otra manera, ya sea directa o indirectamente por cualquier Persona

en beneficio directo o indirecto de cualquier Parte Exonerada que surja de o esté relacionada con las reclamaciones, actos, hechos, transacciones, eventos, declaraciones u omisiones que son, podrían haber sido o pueden ser alegados en las Acciones relacionadas o cualquier otra acción iniciada o que pueda ser iniciada por, a través de, en nombre de, o en beneficio de cualquiera de las Partes Exoneradas, ya sea que deriven de la ley federal, estatal o extranjera e independientemente de dónde se afirmen).

### 10. Sin renuncia

Las exoneraciones y las interdictos de las Secciones 40.5 y 40.6 del Plan de la ACT no limitarán, acotarán o afectarán de otro modo los derechos de la Junta de Supervisión, la AAFAF, la ACT Reorganizada, los Acreedores del AAP de la ACT/ADCC o el Fideicomiso de Acciones de Anulación de hacer valer, entablar acciones legales, conciliar o acordar los derechos, reclamaciones y otros asuntos expresamente retenidos por cualquiera de ellos.

### 11. Medida cautelar complementaria

Todas las entidades que han tenido o han hecho valer, que actualmente tienen o hacen valer, o que pueden tener o hacer valer, cualquier Reclamación Exonerada contra cualquiera de las Partes Exoneradas basada en o relacionada con los Casos de Título III, cualquier reclamación contra los Deudores, donde quiera y cuando quiera que se haga valer, en cualquier parte del mundo, basada en cualquier teoría del derecho, estará permanentemente paralizada, restringida y prohibida de iniciar cualquier acción contra cualquiera de las Partes Exoneradas con el fin de cobrar, recuperar o recibir cualquier pago con respecto a cualquier Reclamación Exonerada que surja con anterioridad a la Fecha de Entrada en Vigencia de la ACT (incluso con anterioridad a la Fecha de Petición de la ACT) incluyendo:

(a) Iniciar o continuar de cualquier manera acciones u otros procedimientos de cualquier clase con respecto a dichas Reclamaciones Exoneradas contra cualquiera de las Partes Exoneradas o los activos o los bienes de cualquier Parte Exonerada;

(b) Aplicar, embargar, cobrar o recobrar, de cualquier manera y por cualquier medio, sentencias, laudos, decretos u órdenes en contra de cualquiera de las Partes Exoneradas o los activos o los bienes de estas, con relación a dichas Reclamaciones Exoneradas;

(c) Crear, perfeccionar o ejecutar un Gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada;

(d) Salvo que se disponga expresamente en el Plan de la ACT o en la Orden de Confirmación de la ACT, hacer valer, implementar o efectuar cualquier compensación, derecho de subrogación, indemnización, contribución o recuperación de cualquier tipo contra cualquier obligación exigible a cualquiera de las Partes Exoneradas o contra los activos o bienes de

cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada; y

**(e)** Realizar cualquier acción, de cualquier manera, en cualquier lugar, que no esté de conformidad con, o que no cumpla, las disposiciones del Plan de la ACT o la Orden de Confirmación de la ACT.

Sin embargo, el cumplimiento del Deudor de los requisitos formales de la Regla de Quiebras 3016 no constituirá una admisión de que el Plan de la ACT dispone un interdicto contra conducta que no se prohíbe de otra manera conforme al Código de Quiebras.

## 12. Honorarios y gastos posteriores a la Fecha de Entrada en Vigencia

Después de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada puede contratar profesionales y pagar honorarios y gastos profesionales razonables en que incurran en relación con la implementación y perfeccionamiento del Plan de la ACT sin requerir una aprobación adicional del Tribunal de Título III. Además, sin aprobación adicional del Tribunal de Título III, la ACT Reorganizada deberá, dentro de cuarenta y cinco (45) días después de haber presentado las facturas o liquidaciones con respecto a los honorarios y gastos incurridos a la ACT Reorganizada, abonar los honorarios y reembolsar los gastos a la Junta de Supervisión y sus profesionales relacionados con la implementación y perfeccionamiento del Plan de la ACT y en relación con sus deberes y responsabilidades conforme a PROMESA y los términos y las disposiciones del Plan de la ACT.

## 13. Exención en virtud de la Ley de Valores

Conforme a la Sección 1145 del Código de Quiebras y/o la Sección 3(a)(2) de la Ley de Valores, la oferta, emisión y distribución de los Nuevos Bonos de la ACT conforme a los términos del Plan de la ACT estarán exentos de registro conforme a:

**(a)** la Ley de Valores;

**(b)** cualquier ley estatal o local que exija el registro para la oferta, emisión o distribución de valores, lo que incluye, entre otros, los requisitos de registro de la Sección 5 de la Ley de Valores; y

**(c)** cualquier otra ley estatal o federal aplicable que exija el registro y/o la entrega o calificación del prospecto antes de la oferta, emisión, distribución o venta de valores.

## 14. Divisibilidad

Sujeto a los términos y las disposiciones del Acuerdo de Apoyo al Plan de la ACT/ ADCC y el Acuerdo del Comité de la ACT, si el Tribunal de Título III determina antes de la Fecha de Confirmación que cualquiera de los términos o las disposiciones del Plan de la ACT son inválidos, nulos o no aplicables, el Tribunal de Título III puede modificar o interpretar dicho término o disposición para que sea válido o aplicable en la mayor medida posible. La modificación del Tribunal de Título III será coherente con el propósito original del término o de la disposición que

se declaran inválidos, nulos o no aplicables, y dicho término o disposición será entonces aplicable conforme a las modificaciones o interpretaciones realizadas.

Sujeto a los términos y disposiciones del Plan de Apoyo al Plan de la ACT/ADCC, si antes de la Fecha de Confirmación de la ACT la Junta de Supervisión determina que debe modificar o enmendar el Plan de la ACT, las disposiciones del Plan de la ACT aplicables a dicha modificación o enmienda se considerarán separadas y serán nulas y sin valor.

### 15. Derecho aplicable

Los derechos, los deberes y las obligaciones emergentes del Plan de la ACT se regirán por PROMESA (incluso las disposiciones del Código de Quiebras aplicables en virtud de la Sección 301 de PROMESA) y las leyes del ELA (en la medida que no sean incompatibles con PROMESA), a menos que otra ley federal sea aplicable o se indique expresamente lo contrario.

### 16. Cierre del caso

La Junta de Supervisión deberá, inmediatamente después de la administración total del Caso de Título III, presentar ante el Tribunal de Título III todos los documentos requeridos por la Regla de Quiebras 3022 y cualquier orden aplicable del Tribunal de Título III. No obstante el cierre del Caso de Título III, la Tribunal de Título III conservará la jurisdicción sobre todos los asuntos establecidos en el Artículo XXXIX del Plan de la ACT.

### 17. Discrepancias

Si hay alguna discrepancia entre la información contenida en la Declaración de Divulgación y los términos del Plan de la ACT, regirán los términos del Plan.

Si hay alguna discrepancia entre los términos del Plan de la ACT y los términos de la Orden de Confirmación de la ACT, regirán los términos de la Orden de Confirmación de la ACT y se la considerará una modificación del Plan de la ACT. Sin embargo, la Orden de Confirmación de la ACT no puede modificar los términos económicos del Plan de la ACT si no dispone del consentimiento de la Junta de Supervisión.

Si hay alguna discrepancia entre los términos del Plan de la ACT y la Escritura de los Nuevos Bonos de la ACT, los términos de la Escritura de los Nuevos Bonos de la ACT serán los que prevalezcan.

### 18. Conservación de documentos

Desde y a partir de la Fecha de Entrada en Vigencia de la ACT, los Deudores pueden conservar documentos de acuerdo con su política estándar de conservación de documentos, que puede ser alterada, enmendada, modificada o complementada por el Deudor.

### 19. Efecto vinculante inmediato

En la Fecha de Entrada en Vigencia de la ACT, los términos del Plan de la ACT y el Suplemento del Plan de la ACT se harán efectivos y ejecutables de inmediato y se considerarán

vinculantes para cualquiera y todos los titulares de Reclamaciones y sus respectivos sucesores y cesionarios, independientemente de que la Reclamación de dicho titular se vea menoscabada en virtud del Plan de la ACT o que dicho titular haya aceptado el Plan de la ACT. Las exoneraciones, exculpaciones y arreglos efectuados en virtud del Plan de la ACT serán vigentes y podrán ser aplicables por el Tribunal de Título III, a partir de y con posterioridad a la Fecha de Entrada en Vigencia de la ACT, e incluso en virtud de las disposiciones de interdictos del Plan de la ACT.

Una vez aprobadas, los acuerdos y arreglos incorporados en el Plan de la ACT, junto con el tratamiento de cualquier Reclamación Permitida asociada, no estarán sujetos a la impugnación colateral o a cualquier otra impugnación por parte de ninguna Entidad, en ningún tribunal u otro foro. Por lo tanto, toda Entidad que se oponga a los términos de cualquier acuerdo y arreglo establecido en el Plan de la ACT deberá (a) impugnar dicho acuerdo y arreglo antes de la confirmación del Plan de la ACT, y (b) demostrar que tiene un derecho apropiado para objetar y que el acuerdo y el arreglo en cuestión no cumple las normas que rigen los arreglos en virtud de la Regla de Quiebras 9019 y de otra ley aplicable.

## 20.    Documentos adicionales

En o antes de la Fecha de Entrada en Vigencia de la ACT, la Junta de Supervisión puede presentar ante el Secretario del Tribunal de Título III los acuerdos y otros documentos que sean necesarios o apropiados para hacer valer y presentar evidencia adicional sobre los términos y condiciones del Plan de la ACT. El Deudor y todos los tenedores de Reclamaciones que reciban distribuciones conforme al Plan de la ACT y todas las otras partes interesadas, podrán periódicamente preparar, ejecutar y otorgar acuerdos o documentos, y realizar otras acciones que sean necesarias o recomendables para hacer valer las disposiciones y la intención del Plan de la ACT.

## 21.    Reserva de derechos

El Plan de la ACT no tendrá validez ni vigencia a menos que el Tribunal de Título III registre la Orden de Confirmación. Ni la presentación del Plan de la ACT, cualquier declaración o disposición contenida en el Plan de la ACT, o la adopción de cualquier medida por parte del Deudor con respecto al Plan de la ACT, la Declaración de Divulgación, o el Suplemento del Plan de la ACT no se considerarán como una admisión de o una renuncia a cualquier derecho del Deudor con respecto a los titulares de Reclamaciones antes de la Fecha de Entrada en Vigencia de la ACT.

Con excepción de lo expresamente establecido en el Plan de la ACT, los derechos y facultades del gobierno de Puerto Rico conforme a la Constitución de Puerto Rico y a PROMESA, incluyendo, entre otros, en virtud de las Secciones 303 y 305 de PROMESA, quedan expresamente reservados (sujetos a cualquier limitación sobre ellos impuesta por la Constitución de Puerto Rico, la Constitución de EE. UU o PROMESA), y nada de lo estipulado en el Plan de la ACT se considerará como una renuncia a ninguno de tales derechos y facultades.

## 22.    Sucesores y cesionarios

Los derechos, los beneficios y las obligaciones de cualquier Entidad designada o a la que se haga referencia en el Plan de la ACT o la Orden de Confirmación de la ACT tendrá carácter

vinculante, y redundará en beneficio de cualquier heredero, albacea, administrador, sucesor o cesionario, Filial, funcionario, director, agente, representante, abogado, beneficiarios o custodio, si lo hubiere, de dicha Entidad.

### 23.    Plazo de las interdictos o paralizaciones

Todos los interdictos o las paralizaciones vigentes con respecto al Caso de Título III (de conformidad con las Secciones 105, 362 o 922 del Código de Quiebras, o con cualquier orden del Tribunal de Título III) y en vigencia a la Fecha de Confirmación (salvo los interdictos o las paralizaciones incluidas en el Plan de la ACT o en la Orden de Confirmación de la ACT) continuarán plenamente vigentes hasta la Fecha de Entrada en Vigencia de la ACT. Todos las interdictos o las paralizaciones incluidas en el Plan de la ACT o en la Orden de Confirmación de la ACT continuarán plenamente vigentes de conformidad con sus términos.

### 24.    Suplemento del Plan

Todos los documentos en el Suplemento del Plan de la ACT se incorporan en el Plan de la ACT y forman parte de él, como si figuraran en su totalidad en el Plan de la ACT. Al presentar el Suplemento del Plan de la ACT en la Secretaría del Tribunal de Título III, se pondrán a disposición copias de los documentos incluidos en ese suplemento a solicitud por escrito al asesor de la Junta de Supervisión, en el domicilio que se indica más arriba o se podrán descargar tales documentos de https://cases.ra.kroll.com/puertorico/ o del sitio web del Tribunal de Título III, disponible a través de PACER. A menos que el Tribunal de Título III disponga lo contrario, en la medida en que algún documento en el Suplemento del Plan de la ACT sea incompatible con los términos de alguna parte del Plan de la ACT que no constituya el Suplemento del Plan de la ACT, dicha parte del Plan de la ACT que no constituye el Suplemento del Plan de la ACT será el que prevalezca. Sin embargo, con respecto a las cuestiones regidas por la Escritura de los Nuevos Bonos de la ACT, en la medida en que cualquier disposición del Plan de la ACT sea incongruente con la Escritura de los Nuevos Bonos de la ACT, la Escritura de los Nuevos Bonos de la ACT, será la que prevalezca.

*[El resto de la página se deja intencionalmente en blanco]*

# VII.   Confirmación del plan de ajuste

## A.   Vista de confirmación

PROMESA y el Código de Quiebras requieren que el Tribunal de Título III, después de la notificación, celebre una Vista de Confirmación en la cual escuchará los argumentos en apoyo del Plan, cualquier objeción al Plan, y analizará las evidencias con respecto a si se debe confirmar el Plan. En la Vista de Confirmación, el Tribunal del Título III confirmará el Plan solo si se cumplen todos los requisitos establecidos en la Sección 314 de PROMESA.

El [_____], el Tribunal de Título III registró [_____][ECF Núm. ____] (la "Orden de Programación de Vistas"). Entre otras cosas, la Orden de Programación de Vistas prevé que la Vista de Confirmación comenzará el [_____] de 2022, [_____] (Hora Estándar del Atlántico) ante la Honorable Laura Taylor Swain, Juez de Distrito de los Estados Unidos, en el Tribunal de Título III, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 en una sala de tribunal que será determinada posteriormente o a través de una vista virtual. La Vista de Confirmación puede ser aplazada ocasionalmente por el Tribunal de Título III o por el Deudor sin notificación previa, salvo el anuncio de la fecha de reanudación que se fije en la Vista de Confirmación.

## B.   Fechas límite para objetar la confirmación

La Orden de Declaración de Divulgación establece la fecha límite para presentar objeciones a la confirmación del Plan, que será el [_____] de 2021 a las 5:00 p.m. (Hora Estándar del Atlántico). Las objeciones a la confirmación del Plan deben: (1) realizarse por escrito, en idioma inglés, e estar firmadas; (2) indicar el nombre y el domicilio de la parte que formula la objeción y la naturaleza de la Reclamación de dicha parte; (3) indicar con precisión los fundamentos y la naturaleza de cualquier objeción; y (4) ser presentadas ante el Tribunal de Título III, y notificarse al Fideicomisario de los Estados Unidos en el siguiente domicilio, para que las reciban, a más tardar, en la fecha límite correspondiente estipulada anteriormente:

- la Oficina del Fideicomisario de Estados Unidos para el Distrito de Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (ref: En el caso: Autoridad de Carreteras y Transportación de Puerto Rico);

A efectos de presentar objeciones en estos casos, el domicilio del Tribunal de Título III es: Oficina del Secretario del Tribunal de Distrito de los Estados Unidos, 150 Ave. Carlos Chardon Ste. 150, San Juan, P.R. 00918- 1767.

## C.   Requisitos para la confirmación del plan de ajuste

En la Vista de Confirmación, el Tribunal de Título III determinará si el Plan de la ACT satisface los requisitos de la Sección 314 de PROMESA. El Deudor considera que el Plan de la ACT cumplirá todos los requisitos legales aplicables de PROMESA y del Código de Quiebras. Entre los requisitos para la confirmación se encuentran que el Plan de la ACT (1) sea aceptado por los Tenedores pertinentes de las Clases de Reclamaciones afectadas o, si no fuera aceptado por ellos, que sea "justo y equitativo" y no discrimine injustamente a la clase que no lo acepte, (2) sea

"en el mejor interés" de los acreedores, (3) sea viable, y (4) cumpla con las disposiciones aplicables de PROMESA y del Código de Quiebras.

### 1,      Aceptación o imposición del plan concursal por el tribunal ("cramdown")

Un plan es aceptado por una clase de reclamaciones afectada si los tenedores de dos tercios del monto en dólares y la mayoría numérica de las reclamaciones permitidas de esa clase votan por aceptar el plan. Solo aquellos tenedores de reclamaciones que efectivamente voten por aceptar o rechazar el plan se computan a los efectos del recuento de votos. Todas las clases afectadas deben aceptar el plan para que este se confirme sin que se aplique la prueba de "imposición de Plan Concursal" (cramdown) incluida en las Secciones 1129(b)(1), (b)(2)(A) y (b)(2)(B) del Código de Quiebras.

### (a)      Imposición del plan concursal por el tribunal

PROMESA y el Código de Quiebras estipulan que el Tribunal de Título III puede confirmar un plan de ajuste que no sea aceptado por todas las clases afectadas si al menos una de ellas acepta el plan y si se cumple con las disposiciones denominadas de "cramdown" (la autoridad de tribunal de imponer un plan) establecidas en las Secciones 1129(b)(l), (b)(2)(A) y (b)(2)(B) del Código de Quiebras. El plan de ajuste puede confirmarse de acuerdo con las cláusulas correspondientes si, además de cumplir los demás requisitos de la Sección 943(b) del Código de Quiebras, (i) es "justo y equitativo" y (ii) no discrimina de manera injusta a cada clase de reclamaciones que se ve afectada en virtud del plan y que no lo han aceptado. El Deudor considera que el Plan de la ACT y el tratamiento de todas las Clases de Reclamaciones en virtud del Plan de la ACT cumplen con los siguientes requisitos para la confirmación no consensual del Plan de la ACT.

### (b)      "Justo y equitativo"

No existe certidumbre acerca del contenido exacto del requisito de que un plan sea "justo y equitativo" establecido en el Título III. Fuera del contexto del Título III, el requisito de que el plan sea "justo y equitativo" suele comprender, entre otras cosas, que, salvo que una clase de reclamaciones no garantizada disidente reciba el pago total de sus reclamaciones permitidas, ningún tenedor de reclamaciones permitidas de una clase subordinada a aquella podrá recibir o conservar bienes por cuenta de esas reclamaciones. Esto se conoce como la "regla de la prioridad absoluta". Pocas opiniones publicadas han abordado el significado del requisito de que el plan sea "justo y equitativo" en los casos del Capítulo 9. Los tribunales que han abordado este requisito en el contexto de un caso del Capítulo 9 han indicado que, debido a que no hay accionistas en los casos del Capítulo 9 (quienes, en teoría, serían menos privilegiados en cuanto a prioridad para los acreedores sin garantía generales de un deudor) la regla de la prioridad absoluta no se puede aplicar en los casos del Capítulo 9 y, por lo tanto, en dichos casos, el requisito de que el plan sea "justo y equitativo" no se debe interpretar como sinónimo de la regla de la prioridad absoluta. En cambio, los tribunales han sostenido que se entiende que, en virtud del requisito de que un plan sea "justo y equitativo" en los casos del Capítulo 9, cuando un deudor intenta obtener una confirmación no consensual de un plan de ajuste, los acreedores afectados de ese deudor recibirán, en virtud del plan de ajuste propuesto, todo lo que pueden esperar razonablemente en virtud de las circunstancias.

El Deudor considera que el Plan de la ACT es "justo y equitativo" con respecto a los Tenedores de Reclamaciones contra el Deudor ya que brinda a esos Tenedores de Reclamaciones todo aquello que pueden esperar razonablemente en virtud de las circunstancias de los Casos de Título III. La presentación del Caso de Título III se precipitó por la insostenible carga de la deuda del Deudor, una grave escasez de efectivo y el deterioro económico y la emigración que erosionaban los ingresos del Deudor. El Deudor considera que el Plan es "justo y equitativo" porque las recuperaciones del acreedor propuestas en él han sido calculadas (y, en determinados casos, negociadas) para compensar razonablemente a los Tenedores de Reclamaciones y, al mismo tiempo, permitir que el Deudor (A) evite que se repitan las dificultades financieras que dieron origen a la presentación de los Casos de Título III y (B) establezca iniciativas de reinversión que se necesitan con urgencia para garantizar la operación continua del Deudor.

(c)      Discriminación injusta

Un plan de ajuste no "discrimina injustamente" si se trata a una clase disidente de manera sustancialmente igual que a otras clases en situación similar, y si ninguna clase recibe más que aquello a lo que tiene derecho legal a recibir por sus reclamaciones. El Deudor considera que el Plan de la ACT no discrimina injustamente a ninguna de las Clases de Reclamaciones afectadas.

**SI UNA CLASE AFECTADA O MÁS DE UNA CLASE RECHAZAN EL PLAN DE LA ACT, LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE SOLICITAR AL TRIBUNAL DE TÍTULO III QUE CONFIRME EL PLAN DE CONFORMIDAD CON PROMESA Y CON LAS SECCIONES 1129(b)(1), (b)(2)(A) Y (b)(2)(B) DEL CÓDIGO DE QUIEBRAS. LA JUNTA DE SUPERVISIÓN SE HA RESERVADO EL DERECHO DE MODIFICAR EL PLAN DE LA ACT EN LA MEDIDA, SI EXISTIERA, QUE LA CONFIRMACIÓN DEL PLAN DE LA ACT EN VIRTUD DE LA SECCIÓN 314 DE PROMESA Y DE LA SECCIÓN 1129(b) DEL CÓDIGO DE QUIEBRAS NECESITE UNA MODIFICACIÓN.**

(d)      La prueba del "mejor interés de los acreedores"

Sin perjuicio de la aceptación del Plan por parte de cada Clase de Reclamaciones afectada, el Tribunal de Título III también debe determinar que el Plan de la ACT sea en el mejor interés de los acreedores conforme a la Sección 314(b)(6) de PROMESA. La prueba del "mejor interés de los acreedores" en virtud de PROMESA "exige que el tribunal considere si los remedios disponibles en virtud de las leyes excluida la ley de quiebras y la constitución del territorio darían como resultado una mayor recuperación para los acreedores que la proporcionada por dicho plan". Para decirlo de manera más sencilla, la prueba exige que el tribunal considere los recobros de todos los acreedores colectivamente, y no los recobros individuales.[202] En la mayoría de los casos, si el plan no fuera confirmado y se desestimase el caso del Título III de un deudor, se produciría una

---

[202] Esta interpretación es coherente con el enfoque adoptado por los tribunales en los casos del Capítulo 9, donde la Sección 943(b)(7) del Código de Quiebras exige que el plan sea "en el mejor interés de los acreedores", utilizando también el plural "acreedores". *Véase In el caso Ciudad de Detroit*, 524 B.R. 147, 217 (Quieb. E.D. Mich. 2014); *véase también Fondo de ingresos libres de impuestos de alto rendimiento Franklin* (*En el caso Ciudad de Stockton,* 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) ("Según estos términos, la prueba del 'mejor interés' en el capítulo 9 es colectiva y no individualizada").

carrera hacia los juzgados cuyo resultado sería que muchos acreedores se quedarían sin nada que recuperar.

Los análisis de las pruebas de mejores intereses (los "Informes de las pruebas de mejores intereses") que considera el Tribunal de Título III —es decir, los recobros que los acreedores pueden esperar de cada Deudor sobre la base de los remedios disponibles en las leyes excluida la ley de quiebras y en la Constitución del Estado Libre Asociado— sobre los que se basó el plan fiscal certificado de la ACT, se adjuntan a este documento en forma de Anexo J.[203]  El Deudor considera que el Plan de la ACT satisface la prueba de los mejores intereses de los acreedores establecida por la Sección 314(b)(6) de PROMESA.

La Junta de Supervisión certifica anualmente un nuevo plan fiscal.[204]  En consecuencia, en la medida en que sea necesario, el Deudor presentará revisiones de los informes de pruebas de mejores intereses que reflejen los datos del nuevo plan fiscal, si procede.

### (e)  Viabilidad

La Sección 314(b)(6) de PROMESA también exige que el plan de ajuste sea en el mejor interés de los acreedores y sea viable. Aunque la ley explica que el requisito de que el plan sea en el mejor interés de los acreedores significa que el tribunal debe evaluar qué es lo que recobrarían los acreedores en virtud de los remedios disponibles fuera del Título III, la ley no proporciona orientación sobre lo que se considera "viable", más allá de la palabra en sí. El Capítulo 9 del Código de Quiebras es el capítulo que está disponible para los municipios de los Estados. También impone un requisito de viabilidad en su Sección 943(b)(7) sin proporcionar mayor orientación. Los tribunales han interpretado que el requisito de viabilidad en el capítulo 9 significa que el municipio será viable, y que el plan ofrece una perspectiva de éxito razonable y es factible. El deudor debe demostrar que puede cumplir las obligaciones de su plan. A diferencia del capítulo 9, el Título III también contiene un requisito de que el Plan de Ajuste de Título III sea congruente con el plan fiscal certificado. Significativamente, conforme a la Sección 201(b)(1)(I) de PROMESA, el plan fiscal certificado debe contener un análisis de sostenibilidad de la deuda. Como consecuencia, la viabilidad del Plan de la ACT se puede determinar al menos parcialmente en función de si el plan dispone un monto de deuda continua dentro del rango del análisis de sustentabilidad de la deuda en el plan fiscal certificado.

Basándose en las proyecciones del Plan Fiscal de la ACT, la ACT Reorganizada debería poder pagar sus deudas en virtud del Plan de la ACT cuando estas estén por vencer y el ELA debería ser viable. Si fuera necesario, el Deudor actualizará el análisis cuando se certifique el nuevo plan fiscal, pero esperan que en virtud del nuevo plan fiscal, la ACT podrá pagar sus deudas en virtud del Plan de la ACT en su vencimiento.

Como consecuencia, el Deudor considera que el Plan de la ACT cumple el requisito de viabilidad de la Sección 314(b)(6) de PROMESA.

---

[203]  Los informes de las pruebas de mejores intereses se presentarán en una fecha posterior.

[204]  El Plan Fiscal de la ACT se certificó el 22 de febrero de 2022. *Véase* el Anexo D.

(f)     **Cumplimiento de las disposiciones aplicables de PROMESA y del Código de Quiebras**

Además de lo anterior, el Plan de la ACT debe cumplir con otras disposiciones aplicables de PROMESA y del Código de Quiebras, de la siguiente manera:

- El Plan de la ACT debe cumplir con las disposiciones del Código de Quiebras establecidas por la Sección 301 de PROMESA (PROMESA § 314(b)(1));

- El Plan de la ACT debe cumplir con las disposiciones del Título III de PROMESA (PROMESA § 314(b)(2));

- La ley no debe prohibir al Deudor tomar cualquier medida necesaria para ejecutar el Plan de la ACT (PROMESA § 314(b)(3));

- Salvo en la medida en que el tenedor de una reclamación específica haya acordado un tratamiento distinto por dicha reclamación, el Plan de la ACT debe establecer que, en la Fecha de Entrada en Vigencia, cada tenedor de una reclamación de alguno de los tipos descritos en la Sección 507(a)(2) del Código de Quiebras recibirá, por esa reclamación, una cantidad en efectivo igual a la admitida por dicha reclamación (PROMESA § 314(b)(4));

- Debe obtenerse cualquier aprobación legislativa, reglamentaria o electoral que sea necesaria en virtud del derecho aplicable con el fin de implementar cualquiera de las disposiciones del Plan de la ACT, o tal disposición debe estar expresamente condicionada a que se obtenga dicha aprobación (PROMESA § 314(b)(5));

- El Plan de la ACT debe ser compatible con el Plan Fiscal de la ACT certificado por la Junta de Supervisión en virtud del Título III (PROMESA § 314(b)(7));

- El Deudor, como proponente del Plan de la ACT por y a través de la Junta de Supervisión, debe haber cumplido con todas las disposiciones del Código de Quiebras (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); y

- El Plan de la ACT debe haberse propuesto de buena fe y de ninguna manera estar prohibido por la ley (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

## 2.     Alternativas a la confirmación y perfeccionamiento del Plan de la ACT

El Deudor ha evaluado varias alternativas al Plan de la ACT, incluyendo estructuras y términos alternativos del Plan de la ACT y la demora en su adopción. Si bien el Deudor ha llegado a la conclusión de que el Plan de la ACT es la mejor alternativa y que maximizará los recobros de los tenedores de Reclamaciones Permitidas contra el Deudor, si el Plan de la ACT no se confirma, el Deudor podría intentar formular y proponer un plan de ajuste distinto. El Deudor (o cualquier otra parte interesada) también podría obrar para conseguir que los casos del Título III sean desestimados de conformidad con 11 U.S.C. § 930 (incorporada en PROMESA § 301(a)).

2" = "1" "2621/33260-009 CURRENT/127656480v7                    04/30/2022 3:29 PM" ""

El Plan de la ACT se formuló tras meses de complicadas negociaciones entre varios integrantes del grupo de acreedores, incluso en relación con varias sesiones de mediación ordenadas por el Tribunal de Título III (*véase* la sección V.H de esta Declaración de Divulgación). En virtud de las circunstancias, el Deudor considera que el Plan de la ACT establece disposiciones que permitirían a los Acreedores obtener los mayores recobros lo antes posible, y que la aceptación y confirmación del Plan de la ACT son en el mejor interés del Deudor y de todos los Acreedores. El Deudor también considera que cualquier alternativa al Plan de la ACT producirá demoras innecesarias, incertidumbre, litigios y gastos, cuyo efecto neto será que los Acreedores recuperarán menos que lo que se les distribuiría en virtud del Plan de la ACT. Por lo tanto, el Deudor considera que es preferible la confirmación y el perfeccionamiento del Plan de la ACT a las posibles alternativas.

[*El resto de la página se deja intencionalmente en blanco*]

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                      04/30/2022 3:29 PM" ""

# VIII. Ciertos factores de riesgo a considerar

**AL IGUAL QUE CUALQUIER INVERSIÓN, LOS RECOBROS DE LOS NUEVOS BONOS DE LA ACT IMPLICAN RIESGOS. RECOMENDAMOS ANALIZAR CUIDADOSAMENTE LOS FACTORES DE RIESGO RELATIVOS AL PLAN DE LA ACT, Y A LOS NUEVOS BONOS DE LA ACT, ASÍ COMO EL RESTO DE LA INFORMACIÓN CONTENIDA EN, O INCORPORADA POR REFERENCIA A, ESTA DECLARACIÓN DE DIVULGACIÓN. LOS SIGUIENTES FACTORES DE RIESGO NO SON LOS ÚNICOS QUE DEBERÁ ENFRENTAR EL DEUDOR. NO TIENEN POR OBJETO SER UNA LISTA EXHAUSTIVA DE TODOS LOS RIESGOS ASOCIADOS CON EL PLAN DE LA ACT O LOS NUEVOS BONOS DE LA ACT, Y NO REFLEJAN NECESARIAMENTE LA RELATIVA IMPORTANCIA DE LOS DIVERSOS RIESGOS. LOS RIESGOS E INCERTIDUMBRES ADICIONALES ACTUALMENTE DESCONOCIDOS PARA EL DEUDOR, O QUE EL DEUDOR EN ESTE MOMENTO NO CONSIDERA SUSTANCIALES, O BIEN QUE SON APLICABLES EN GENERAL A TODAS LAS INSTRUMENTALIDADES GUBERNAMENTALES, TAMBIÉN PUEDE PERJUDICAR AL DEUDOR Y A SU CAPACIDAD DE PERFECCIONAR EL PLAN Y EFECTUAR LOS PAGOS CORRESPONDIENTES A LOS NUEVOS BONOS DE LA ACT. SE RECOMIENDA CONSIDERAR, ENTRE OTROS, LOS SIGUIENTES FACTORES DE RIESGO, ASÍ COMO REVISAR OTROS DATOS CONTENIDOS EN, O INCORPORADOS POR REFERENCIA A, ESTA DECLARACIÓN DE DIVULGACIÓN ANTES DE ADOPTAR CUALQUIER DECISIÓN RELATIVA AL PLAN DE LA ACT O A LOS NUEVOS BONOS DE LA ACT. UNO O MÁS DE LOS FACTORES AQUÍ EXPUESTOS, ASÍ COMO OTROS NO DESCRITOS EN ESTE DOCUMENTO, PODRÍAN AFECTAR A LOS RECOBROS PREVISTOS POR EL PLAN DE LA ACT O PROVOCAR UN DESCENSO DEL VALOR DE MERCADO Y DE LA LIQUIDEZ DE LOS NUEVOS BONOS DE LA ACT. NO SE PUEDE GARANTIZAR QUE OTROS FACTORES DE RIESGO NO MENCIONADOS A CONTINUACIÓN NO LLEGUEN A SER SUSTANCIALES EN EL FUTURO.**

**NI EL DEUDOR NI NINGUNA COMISIÓN DE VALORES O AUTORIDAD REGULADORA FEDERAL, ESTATAL O DEL ESTADO LIBRE ASOCIADO HAN APROBADO NI DESAPROBADO LOS NUEVOS BONOS DE LA ACT Y OTROS VALORES A EMITIR EN VIRTUD DEL PLAN DE LA ACT, NI EVALUADO LA IDONEIDAD O EXACTITUD DE ESTA DECLARACIÓN DE DIVULGACIÓN.**

## A. Riesgos relacionados con los Casos del Título III

### Es posible que el Tribunal de Título III no confirme el Plan de la ACT.

La Sección 314(b) de la Ley PROMESA y la Sección 1129 del Código de Quiebras (en sus partes incorporadas) establecen los requisitos para la confirmación de los planes de ajuste del Título III, y requiere que los Tribunales de Título III efectúen una serie de comprobaciones específicas e independientes. No se puede garantizar que el Tribunal de Título III llegue a la conclusión de que el Plan de la ACT satisface todos esos requisitos y confirme del Plan de la ACT. Si el Plan de la ACT no es confirmado, existe incertidumbre sobre qué recobros, si los hubiera, recibirán los tenedores con respecto a sus Reclamaciones en el marco de un plan de ajuste

2" = "1" "2621/33260-009 CURRENT/127656480v7                                        04/30/2022 3:29 PM" ""

alternativo u otra ley vigente en caso de que el Tribunal de Título III desestime los Casos del Título III. Para obtener información adicional, *véase* la Sección (3) de esta Declaración de Divulgación, titulada "Requisitos para la Confirmación del Plan de Ajuste".

Además, el Tribunal de Título III puede determinar que, aunque el Plan de la ACT está de acuerdo con el Plan Fiscal de la ACT y por lo tanto satisface los requisitos de la Sección 314(b)(7) de PROMESA, el Plan de la ACT no obstante no cumple uno o varios otros requisitos de confirmación estipulados en la Sección 314(b).

Las partes interesadas que tengan legitimidad tendrán la oportunidad de oponerse a la confirmación del Plan de la ACT y el Tribunal de Título III podrá admitir varias de esas objeciones.

**El Tribunal de Título III puede considerar que el Plan de la ACT es incompatible con el plan fiscal certificado correspondiente de la ACT.**

Según la Sección 314(b)(7) de PROMESA, el Plan de la ACT debe ser compatible con el Plan Fiscal de la ACT, certificado por la Junta de Supervisión. Aunque la Junta de Supervisión ha certificado, de conformidad con la Sección 104(j)(3) de PROMESA, que el Plan de la ACT es compatible con el Plan Fiscal de la ACT, la Sección 314(b) de PROMESA establece que el Tribunal de Título III determine de manera independiente si el Plan de la ACT es o no compatible con el Plan Fiscal de la ACT. Por consiguiente, no se puede garantizar que el Tribunal de Título III llegue a la conclusión de que el Plan de la ACT es compatible con el Plan Fiscal de la ACT. Para ser compatible con el plan fiscal certificado, el Plan de la ACT no puede estipular más deuda de la que los análisis de sustentabilidad de la deuda del plan fiscal certificado determinan que pueda asumir la ACT Reorganizada.

**Si algún demandante consigue enjuiciar y obtener (i) una reclamación de gastos administrativos permitida, (ii) una reclamación de prioridad permitida, (iii) una reclamación garantizada permitida, o bien (iv) una reclamación no exonerable permitida, y el Plan de la ACT no contempla pagar dicha reclamación, el Plan de la ACT no podrá ser confirmable.**

Varias partes han presentado o pueden presentar reclamaciones contra el Deudor alegando que se trata de reclamaciones de gastos administrativos, reclamaciones con prioridad, reclamaciones garantizadas o reclamaciones no exonerables y que no están contempladas para ser pagadas de acuerdo con el Plan de la ACT. Si en última instancia estas y otras reclamaciones similares son admitidas, el Plan de la ACT puede no ser confirmable sin modificaciones que cambien sustancialmente sus distribuciones propuestas.

Ciertos litigios que conciernen a dichas reclamaciones están en curso. Si este litigio no se resuelve antes de la Vista de Confirmación de la ACT, la Vista de Confirmación de la ACT y la Fecha de Entrada en Vigencia de la ACT pueden aplazarse para permitir la resolución de esas reclamaciones en disputa. Como alternativa, se puede solicitar a la Junta de Supervisión que establezca una reserva adecuada para garantizar recobros adecuados sobre las reclamaciones que se busca impugnar si la Junta de Supervisión no tiene éxito.

Si esta u otras reclamaciones similares se permiten en definitiva, o si se requiere que la Junta de Supervisión establezca una reserva adecuada con respecto a tales reclamaciones en disputa mientras no se resuelvan, el Plan de la ACT puede no ser confirmable sin enmiendas que

cambien de manera significativa sus distribuciones propuestas, pero los cambios significativos estarían sujetos a nuevos votos por los tenedores de reclamaciones afectados.

### *Es posible que el Tribunal de Título III no apruebe las transacciones y conciliaciones del Plan de la ACT.*

El Deudor considera que los significativos conciliaciones y transacciones reflejados en el Plan de la ACT son justos, equitativos y razonables. Dichas conciliaciones y transacciones son parte integral del Plan de la ACT, y aportan valor y certidumbre al Deudor y a todos los Acreedores al eliminar ciertos significativos riesgos y gastos de litigios, y establecen un marco para que el Deudor pueda salir a la mayor brevedad del Título III.

Mientras que las partes del Acuerdo de Apoyo al Plan de la ACT/ADCC incluyen tenedores de más de $700 millones en Reclamaciones de Bonos de la ACT 68 y más de $2.1 mil millones de Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 contra el Deudor, otras partes interesadas en el Caso del Título III podrían objetar dichas conciliaciones y transacciones tal y como están incorporados en el Plan de la ACT. Si las conciliaciones y transacciones del Acuerdo de Apoyo al Plan de la ACT/ADCC no son aprobadas en el Caso del Título III, el Deudor no podrá confirmar el Plan de la ACT.

Además, el Plan de la ACT puede estar condicionado a la aprobación de otras conciliaciones y transacciones resueltas en el marco del Plan de la ACT. Si las transacciones y conciliaciones contenidas en el Plan de la ACT requieren aprobación, pero no son aprobados, el Deudor puede no estar en condiciones de confirmar el Plan de la ACT.

### *La Fecha de Entrada en Vigencia de la ACT puede no producirse.*

El Artículo LXXXVI del Plan de la ACT estipula una serie de condiciones que deben satisfacerse (o dispensarse) antes de que pueda producirse la Fecha de Entrada en Vigencia de la ACT. Muchas de estas condiciones están fuera del control del Deudor. A la fecha de publicación de esta Declaración de Divulgación, no es posible garantizar que alguna o todas las condiciones para la entrada en vigencia del Plan de la ACT vayan a satisfacerse (o dispensarse). En consecuencia, incluso si el Plan de la ACT fuera confirmado por el Tribunal de Título III, no existen garantías de que el Plan de la ACT se perfeccione ni que se materialice el ajuste de las deudas del Deudor. *Véase* la Sección VI.O de esta Declaración de Divulgación, titulada "Condiciones Suspensivas a la Fecha de Entrada en Vigencia" (descripción de las condiciones para la entrada en vigencia del Plan de la ACT). Además, ciertos acuerdos contemplados en el Plan de la ACT imponen condiciones que deberán satisfacerse a la Fecha de Entrada en Vigencia de la ACT. No es posible garantizar que dichas condiciones puedan eventualmente satisfacerse o dispensarse.

### *Si el Acuerdo de Apoyo al Plan de la ACT/ADCC no se materializa, las posibilidades del Deudor de confirmar el Plan de la ACT podrán quedarse seriamente perjudicadas.*

El Acuerdo de Apoyo al Plan de la ACT/ADCC contiene una serie de eventos de rescisión que, en caso de producirse, algunas partes del Acuerdo podrán rescindirlo o retirarse. Por ejemplo, las partes acreedoras podrán rescindir el acuerdo si el Deudor retira el Plan de la ACT, la Declaración de Divulgación o la moción para el registro de una orden que apruebe la Declaración

de Divulgación, o si presenta alguna moción o escrito ante el Tribunal de Título III, en cada caso, que sea incompatible con el Acuerdo de Apoyo al Plan de la ACT/ADCC en cualquier aspecto sustancial, y dicha moción o escrito no haya sido retirada dentro de un plazo especificado. Si el Acuerdo de Apoyo al Plan no se materializa, cada una de las partes de este quedará dispensada de las obligaciones asumidas en virtud de los términos del acuerdo, incluida la obligación de votar en apoyo del Plan de la ACT. La retirada del apoyo de los acreedores al Acuerdo de Apoyo al Plan de la ACT/ADCC, o su rescisión, pueden tener sustanciales efectos perjudiciales para la capacidad del Deudor de confirmar el Plan de la ACT.

## B.      Riesgos relacionados con la ACT

*La información financiera contenida en este documento está basada en los libros y registros del Deudor y en la información de dominio público al día de la fecha o en la fecha indicada en dichos datos, según proceda. No se ha realizado ninguna auditoría ni inspección independiente de dicha información.*

La información financiera aquí contenida no ha sido, ni será, auditada (excepto en la medida en que dicha información se base en los estados financieros auditados de la ACT) ni revisada por ninguna empresa de contabilidad independiente ni por terceros de acuerdo con las normas de auditoría generalmente aceptadas, un examen de los controles internos u otros servicios de atestación o revisión de acuerdo con las normas establecidas por el Instituto Americano de Contadores Públicos Certificados o cualquier otra organización. Por ello, la información financiera contenida en este documento tiene un alcance limitado.

Aunque el Deudor considera que ha hecho todos los esfuerzos razonables para garantizar la exactitud de la información financiera aquí contenida, proporcionada en este documento, no se puede asegurar que esté libre de inexactitudes materiales ni incongruencias. Ni la Junta de Supervisión ni el Gobierno pueden garantizar la exactitud y exhaustividad de dicha información. En consecuencia, se advierte que no debe confiar indebidamente en la información financiera contenida en este documento.

*El Deudor no está obligado a actualizar las declaraciones contenidas en esta Declaración de Divulgación.*

Las declaraciones contenidas en esta Declaración de Divulgación son hechas por el Deudor a la fecha de esta, salvo que se especifique lo contrario, y la entrega de esta Declaración de Divulgación después de esa fecha no implica que no se haya producido ningún cambio en la información desde dicha fecha. El Deudor no está obligado a actualizar esta Declaración de Divulgación, salvo que así se lo ordene el Tribunal de Título III o lo requieran el Código o las Reglas de Quiebras.

*No se autoriza ninguna declaración no contenida en esta Declaración de Divulgación.*

Ni el Tribunal de Título III, ni PROMESA ni el Código de Quiebras autorizan ninguna declaración relativa o relacionada con el Deudor, el Caso del Título III o el Plan de la ACT, con la excepción de lo establecido en esta Declaración de Divulgación y cualquier otro Material de Convocatoria que acompañe a esta Declaración de Divulgación. Cualquier declaración o incentivo realizado para asegurar su aceptación o rechazo del Plan de la ACT que no esté contenido en esta

Declaración de Divulgación, o que esté incluido en ella, debe ser considerado por usted bajo su propio riesgo al tomar su decisión.

***Es posible que la Junta de Supervisión quede disuelta antes de que se cumplan plenamente las obligaciones del Plan de la ACT.***

Después de certificar que el gobierno ha cumplido con los requisitos de la Sección 209 de PROMESA, incluyendo, entre otras cosas, el desarrollo de los presupuestos de acuerdo con las normas de contabilidad en valores devengados modificadas y la certificación de que los gastos realizados por el gobierno territorial durante cada año fiscal no excedieron los ingresos, la Junta de Supervisión y los requisitos asociados para la publicación de los planes fiscales y otras medidas de transparencia fiscal se darán por terminados. Esto puede ocurrir muchos años antes de que se cumplan plenamente las obligaciones estipuladas por el Plan de la ACT.

***Cuando la Junta de Supervisión concluya su mandato, el Gobierno podrá eliminar los controles, protecciones y transparencia establecidos por la Junta de Supervisión.***

Con ciertas limitaciones constitucionales, cualquiera de las legislaturas puede cambiar leyes anteriores. No existe la seguridad de que las protecciones y sistemas de la Junta de Supervisión sean mantenidos por futuras administraciones, y el Gobierno puede objetar las medidas impuestas por la Junta de Supervisión, y continuar haciéndolo cuando la Junta de Supervisión ya no esté presente para hacer valer las reformas que ha implementado. No obstante, los convenios y obligaciones contenidos en el Plan de la ACT, la Escritura de los Nuevos Bonos de la ACT y la Legislación de los Nuevos Bonos de la ACT, incluyendo las obligaciones que repercuten en los poderes gubernamentales o políticos conforme a la Sección 305 de PROMESA, podrán ser ejecutados por partes interesadas que tengan legitimidad para hacerlo.

***Es posible que los futuros informes financieros no puedan prepararse oportunamente.***

Los estados financieros básicos auditados preparados por la ACT corresponden al FY2021. No es posible garantizar la disponibilidad de futuros estados financieros auditados ni la capacidad del Deudor para presentar los informes financieros puntualmente.

***Los eventos futuros y los resultados reales pueden diferir materialmente de cualquier estimación, proyección o declaración contenida en este documento.***

Todas las declaraciones e hipótesis contenidas en el presente documento, ya sean de carácter prospectivo o histórico, no son garantía de resultados futuros e implican ciertos riesgos, incertidumbres, estimaciones y otras hipótesis que se hacen en este documento. La situación económica y financiera de la ACT se ve afectada por diversos factores jurídicos, financieros, sociales, económicos, medioambientales, gubernamentales y políticos. Estos factores pueden ser muy complejos, pueden variar de un año fiscal a otro, y con frecuencia son el resultado de medidas tomadas o no tomadas, no solo por el Gobierno, la ACT y la Junta de Supervisión, sino también por otras terceras entidades, como el gobierno de los Estados Unidos. Nada de lo expuesto en este documento debe considerarse como una garantía expresa o implícita de hechos o eventos futuros.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

*Es posible que el Deudor no pueda aplicar con éxito la reforma propuesta por la Junta de Supervisión a través de las recomendaciones de la Sección 205(a) y el Plan Fiscal de la ACT de febrero de 2022.*

Para lograr la sostenibilidad a largo plazo, es posible que el Gobierno, la ACT y otras agencias deban emprender reformas adicionales para abordar muchos de los desafíos subyacentes que existen en el sistema de transporte actual, entre ellos: (1) la propiedad superpuesta y fragmentada de cada uno de los modos de transporte, (2) el manejo deficiente del desempeño de cada uno de los modos de transporte y la limitada coordinación multimodal, y (3) el no aprovechar al máximo el potencial de financiamiento, que reduce la inversión pública y privada disponible para la red de transporte. Estas reformas estructurales incrementales pueden ser necesarias para poder lograr la sustentabilidad a largo plazo. Muchas de estas reformas han sido propuestas por la Junta de Supervisión, pero la Junta de Supervisión no puede implementarlas sin el apoyo del Gobierno electo de Puerto Rico.

C.     Riesgos relacionados con los Nuevos Bonos de la ACT

*Los nuevos bonos de la ACT son pagaderos únicamente con el Patrimonio del Fideicomiso.*

Los Nuevos Bonos de la ACT son pagaderos únicamente con el Patrimonio del Fideicomiso y los tenedores de los Nuevos Bonos de la ACT no tendrán ningún otro recurso para el pago que no sea el Patrimonio del Fideicomiso. Los Nuevos Bonos de la ACT no son obligaciones generales de la ACT Reorganizada y se limitan al flujo de caja neto de los peajes, tal y como se detalla en esta Declaración de Divulgación, en el Plan y en la Escritura de los Nuevos Bonos de la ACT, y tampoco son una deuda o un pasivo del ELA o de cualquier otra instrumentalidad pública o subdivisión política del ELA. Los Nuevos Bonos de la ACT no están respaldados por la buena fe, el crédito y el poder impositivo del ELA, ni son pagaderos ni están garantizados por ninguna otra instrumentalidad pública o subdivisión política del ELA. Los Nuevos Bonos de la ACT no estarán asegurados ni garantizados por el Fideicomisario de los Nuevos Bonos de la ACT, por ningún otro proveedor de servicios contratado en virtud de la Escritura de los Nuevos Bonos de la ACT ni por ninguna de sus respectivas filiales, ni por ninguna otra persona. La ACT Reorganizada no tiene ninguna potestad tributaria.

*Los derechos de los tenedores de los Nuevos Bonos de la ACT son de naturaleza limitada y pueden verse afectados negativamente por cuestiones generalmente asociadas a la ejecución de los gravámenes sobre las garantías.*

Tras la declaración de incumplimiento de la Escritura de los Nuevos Bonos de la ACT, el pago de los Nuevos Bonos de la ACT no puede acelerarse. Los Nuevos Bonos de la ACT no están sujetos a amortización antes del vencimiento a elección de sus tenedores, y los tenedores no tendrán ningún recurso contra la ACT Reorganizada en caso de incumplimiento. Además, los Nuevos Bonos de la ACT no tendrán una tasa de interés o rendimiento devengado predeterminada, según corresponda.

Los derechos de garantía sobre el Patrimonio del Fideicomiso, incluidos los Ingresos Pignorados, estarán sujetos a los problemas prácticos generalmente asociados a la realización de los derechos de garantía sobre la garantía. Por ejemplo, la ejecución del derecho de garantía sobre

los Ingresos Pignorados requiere una determinación favorable del Tribunal de Título III. No existe ninguna garantía de que el Fideicomisario de los Nuevos Bonos de la ACT obtenga dicha sentencia favorable y, en consecuencia, el Fideicomisario de los Nuevos Bonos de la ACT puede no tener la capacidad de ejecutar dichos Ingresos Pignorados. Además, el gravamen de los Ingresos Pignorados puede ser anulable por el pignorante (como deudor en posesión), por el fideicomisario de quiebras, o potencialmente por otros acreedores en una futura quiebra de la ACT Reorganizada si existen o se dan ciertos hechos o circunstancias, incluyendo, entre otros, que la prenda o el perfeccionamiento permita a los tenedores de los Nuevos Bonos de la ACT recibir una mayor recuperación en un hipotético caso futuro de Título III (o Capítulo 7 o equivalentes) que si no se hubiera dado dicha prenda o perfeccionamiento. En la medida en que la concesión o el perfeccionamiento de dichos Ingresos Pignorados se evite como preferencia o de otro modo, los tenedores de los Nuevos Bonos de la ACT perderían el beneficio del derecho de garantía y podrían tener que devolver los pagos a la ACT Reorganizada.

***Es posible que los peajes no generen ingresos suficientes para realizar todos los pagos de intereses y capital de los Nuevos Bonos de la ACT.***

Los nuevos bonos de la ACT son pagaderos únicamente con el Patrimonio del Fideicomiso, cuya principal fuente de fondos serán los Peajes. Los ingresos futuros generados por los Peajes dependen en gran medida de la recaudación de las tarifas de peaje, del cobro del peaje electrónico, de las multas de aplicación y de otros ingresos, de los ingresos de las inversiones de las cuentas de amortización de la deuda y de la gestión de los gastos de explotación y mantenimiento de dichas Instalaciones de Peaje. Además, dichos ingresos dependerán de la continuidad de la explotación de las Instalaciones de Peaje. No existe ninguna garantía de que la ACT Reorganizada vaya a seguir explotando las Instalaciones de Peaje de acuerdo con sus normas actuales, ni de que no vaya a ser necesario un aumento significativo de las contribuciones para la explotación y el mantenimiento general de dichas Instalaciones de Peaje.

Las Instalaciones de Peaje también pueden ser vulnerables a un evento de fuerza mayor (por ejemplo, huracanes y otros desastres naturales, incendios, pandemias, epidemias, catástrofes provocadas por el hombre, guerras, disturbios) y otras circunstancias e incidentes imprevistos, y los daños causados por dicho evento pueden afectar negativamente al rendimiento de dichos activos hasta que se hayan subsanado dichos daños. En determinadas circunstancias, el cumplimiento del Convenio de Tarifas por parte de la ACT Reorganizada puede suspenderse si se produce un evento de fuerza mayor. Además, es posible que se construyan nuevas carreteras, que se mejoren las existentes (distintas de las Instalaciones de Peaje), que se produzcan cambios en los hábitos de los conductores o que tengan lugar otros eventos que desvíen el tráfico de las Instalaciones de Peaje.

La ocurrencia de cualquiera de los eventos mencionados puede afectar negativamente al total de los importes percibidos en concepto de Ingresos de Peaje. No puede asegurarse que las Instalaciones de Peaje generen suficientes Ingresos de Peaje para pagar los intereses y el capital de los Nuevos Bonos de la ACT.

***Es posible que los Nuevos Bonos de la ACT no coticen a su valor nominal y que su limitada liquidez no los haga atractivos para los inversionistas.***

Como consecuencia de la inquietud por las actuales circunstancias financieras de la ACT, es posible que los tenedores de los Nuevos Bonos de la ACT se encuentren con una aceptación limitada en el mercado cuando intenten venderlos, lo cual dificultará su negociación a su valor nominal o en torno a él. Es posible que, después de la Fecha de Entrada en Vigencia de la ACT, los tenedores de los Nuevos Bonos de la ACT se encuentren con que, durante un tiempo, no puedan venderlos a ningún precio. Alternativamente, los potenciales compradores podrán exigir descuentos sobre el valor nominal antes de mostrarse dispuestos a adquirir los Nuevos Bonos de la ACT. No es seguro que pueda existir algún mercado secundario para los Nuevos Bonos de la ACT. La ausencia de un mercado secundario para los Nuevos Bonos de la ACT, o la falta de liquidez en los mercados secundarios, podría limitar las posibilidades de los tenedores de bonos de revender los Nuevos Bonos de la ACT, o bien perjudicar su valor de mercado.

Los Nuevos Bonos de la ACT y las transacciones descritas en este documento estarán sujetos a las exenciones de registro previstas por la Ley de Valores de 1933, con sus correspondientes enmiendas. Los Nuevos Bonos de la ACT no han sido aprobados, ni desaprobados, por la Comisión de Bolsa y Valores de EE.UU., ninguna comisión de valores estatal o del ELA ni ninguna otra autoridad reguladora, ni ninguno de los anteriores se ha pronunciado sobre la exactitud o idoneidad de esta Declaración de Divulgación. Cualquier declaración en contrario constituye un delito penal. Por consiguiente, es posible que el mercado secundario para los Nuevos Bonos de la ACT sea limitado y que sus tenedores no puedan venderlos cuando deseen, u obtener el precio que deseen recibir por ellos, con las consiguientes pérdidas significativas.

Considerando la naturaleza única del Plan de la ACT, ciertas condiciones y resultados, incluyendo dictámenes legales, con respecto al Plan de la ACT podrán ser diferentes, en tipo y alcance, de los normalmente requeridos en transacciones de oferta de deuda municipal que se producen fuera de un proceso de reestructuración con supervisión judicial. Al adoptar sus decisiones de inversión, los inversionistas deberían considerar que ciertas acciones, procedimientos o requisitos de asesores jurídicos u otros terceros en relación con el Plan de la ACT pueden ser sustancialmente diferentes, y mucho más limitados, que los requisitos típicos.

En los últimos años, varios trastornos importantes en los mercados financieros globales han generado una significativa reducción de la liquidez de los mercados secundarios de valores. Aunque las condiciones de los mercados financieros y de los mercados secundarios han mejorado, los períodos de iliquidez pueden volver a producirse y afectar a estos últimos, perjudicando sustancialmente el valor de los Nuevos Bonos de la ACT. y limitando las posibilidades de su venta, También la preocupación por las perspectivas financieras de la ACT puede perjudicar el valor de mercado y la liquidez de los Nuevos Bonos de la ACT.

***Naturaleza limitada de las calificaciones; reducciones, suspensión o desistimiento de una calificación.***

La ACT Reorganizada, actuando según su exclusivo criterio, puede determinar la solicitud de una calificación para los Nuevos Bonos de la ACT, siempre y cuando la Escritura de los Nuevos

Bonos de la ACT no incluya un pacto por parte de la ACT Reorganizada de mantener una calificación específica con respecto a los Nuevos Bonos de la ACT en circulación.

Toda futura calificación asignada a los Nuevos Bonos de la ACT por una agencia de calificación reflejará la evaluación de dicha agencia de la probabilidad de pago de los intereses y del capital de los Nuevos Bonos GO en sus respectivas fechas de vencimiento. Una calificación de Nuevos Bonos de la ACT no es una recomendación de comprar, retener o vender los Nuevos Bonos de la ACT, y dicha calificación no abordará su comerciabilidad, su precio en el mercado ni su idoneidad para un inversionista específico. No existe garantía de que alguna calificación se mantendrá durante un determinado plazo, ni que no vaya a ser rebajada, suspendida o totalmente retirada por una agencia si, en opinión de esta, las circunstancias lo justifican, basándose en los factores prevalecientes en cada momento, incluyendo, entre otros, las perspectivas financieras de la economía de la ACT Reorganizada en opinión de la agencia. Si se produjese alguna reducción, suspensión o retirada de una calificación, esto podría perjudicar la disponibilidad de un mercado o a los precios de los Nuevos Bonos de la ACT.

***Una calificación adversa de los Nuevos Bonos de la ACT podría perjudicar su precio de mercado.***

No obstante el hecho de que inicialmente la ACT Reorganizada no podrá solicitar una calificación, una agencia de calificación podrá publicar una calificación no solicitada de los Nuevos Bonos de la ACT, empleando factores cuantitativos y cualitativos, incluyendo la solvencia financiera real o percibida de la ACT Reorganizada, las perspectivas de pago del capital y de los intereses de los Nuevos Bonos de la ACT, las repercusiones de las perspectivas financieras de la ACT y otras condiciones macroeconómicas reinantes en el ELA. Asimismo, las calificaciones reflejan las diversas metodologías e hipótesis empleadas por las agencias de calificación, que están sujetas a modificación sin previo aviso. Las medidas adoptadas por las agencias de calificación pueden incluir el inicio, el mantenimiento, la subida, la rebaja o la retirada de una calificación de la deuda de la ACT Reorganizada, o bien ponerla en perspectiva negativa para una posible rebaja futura. Dicha medida puede tomarse en cualquier momento y está fuera del control de la ACT Reorganizada. La rebaja o la retirada de cualquier calificación crediticia de la deuda de la ACT Reorganizada, incluidos los Nuevos Bonos de la ACT o la colocación de la ACT Reorganizada en una perspectiva negativa para una posible rebaja futura puede tener un efecto negativo en el valor de los Nuevos Bonos de la ACT.

***Los Nuevos Bonos de la ACT no estarán sujetos a la Ley de Escritura de Fideicomiso***s.

Los Nuevos Bonos de la ACT no se emitirán, ni se requerirá que se emitan, en virtud de una escritura calificada según la Ley de Escritura de Fideicomisos de 1939, con sus correspondientes modificaciones (la "<u>TIA</u>", por sus siglas en inglés). En consecuencia, los tenedores de los Nuevos Bonos de la ACT no estarán amparados por las protecciones previstas por la TIA con respecto a sus inversiones en los Nuevos Bonos de la ACT.

***La amortización anticipada de los Nuevos Bonos de la ACT puede perjudicar su rentabilidad.***

Los Nuevos Bonos de la ACT son amortizables total o parcialmente, antes de sus fechas de amortización previstas, en caso de enajenación de determinados activos. Además, a partir de

determinadas fechas, los Nuevos CIB de la ACT y los Nuevos CCAB de la ACT podrán ser amortizados, total o parcialmente, a elección de la ACT Reorganizada. Véase "Disposiciones con respecto a los Nuevos los Bonos de la ACT y deudas adicionales—Opción de rescate" y "—Ciertos pactos de la ACT Reorganizada relacionados con los Nuevos Bonos de la ACT". El precio de amortización que se pagará a los tenedores de los Nuevos Bonos de la ACT en caso de su amortización anticipada será igual al importe del capital más los intereses devengados hasta la fecha fijada para la amortización. La ACT Reorganizada puede optar por amortizar los nuevos CIB de la ACT y los nuevos CCAB de la ACT, o enajenar ciertos activos que den lugar a una amortización anticipada de los Nuevos Bonos de la ACT, en momentos en que las tasas de interés vigentes sean inferiores al tipo de interés pagado por los Nuevos Pagarés de la ACT. En ese caso, los tenedores de los Nuevos Bonos de la ACT no podrán reinvertir el producto de la amortización en un valor comparable a una tasa de interés efectiva tan alta como la de los Nuevos Bonos de la ACT que se amortizan.

**D.**     Riesgos relacionados con la Elección de Assured

Con respecto a los Bonos Asegurados de Assured identificados en el Anexo A de la Notificación de Elección de Assured, Assured ha optado por recibir los Nuevos Bonos de la ACT de Assured asignables a los tenedores de dichos Bonos Asegurados de Assured, y se le pagará la totalidad, tal como se describe en la Sección 75.1(a) del Plan de la ACT. Según la Elección de Assured, los tenedores de Bonos Asegurados de Assured a los que se les pague recibirán el Precio de Aceleración de Assured, que es un importe equivalente al capital pendiente más los intereses devengados y no pagados a la fecha de pago. Dicho pago satisfará y extinguirá plenamente las obligaciones asumidas por Assured en las Pólizas de Seguros de Assured con respecto a dichos Bonos Asegurados de Assured.

Los tenedores de Bonos Asegurados de Assured a quienes se les pague en el marco de la Elección de Assured puede depender de que Assured cuente con suficientes fondos para satisfacer sus obligaciones de pago. En general, dichos bonos se pagarán con el producto de la venta de Nuevos Bonos de la ACT de Assured, y Assured pagará cualquier déficit de acuerdo con las Pólizas de Seguros de Assured. No obstante, no existe certeza de que Assured dispondrá de suficientes fondos para pagar el Precio de Aceleración. Además, los tenedores de Bonos Asegurados de Assured que se paguen en el marco de la Elección de Assured no tendrán derecho a futuros pagos de intereses sobre los Bonos Asegurados de Assured, ni tendrán derechos adicionales ni participaciones en las Pólizas de Seguros de Assured, los Nuevos Bonos de la ACT de Assured.

**E.**     Riesgos relacionados con las elecciones de los tenedores de bonos de Assured

Con respecto a los Bonos Asegurados de Assured identificados en el Anexo A del Formulario de Elección de los Tenedores de Bonos de Assured, cada tenedor beneficiario de dichos Bonos Asegurados de Assured tendrá derecho a elegir una de dos opciones para el tratamiento de dichos Bonos Asegurados de Assured, como se describe en la Sección 25.1(b) del Plan de la ACT.

La Elección 1 conllevará que el tenedor de Bonos Asegurados de Assured recibirá un pago en efectivo equivalente al capital pendiente más los intereses devengados y no pagados de los Bonos Asegurados de Assured a la Fecha de Entrada en Vigencia de la ACT. Los Tenedores de

Bonos Asegurados de Assured que opten por la Elección 1 no tendrán derecho al pago de intereses adicionales sobre los Bonos Asegurados de Assured y no tendrían interés sobre la Contraprestación del Plan de Assured.

Conforme a la Elección 2, cada Tenedor de Bonos de Assured elegible que elija, o se considere que elija, la Elección 2 de Tenedores de Bonos de Assured optará por un fideicomiso de custodia (cada uno de estos fideicomisos, según corresponda, un "Fideicomiso de Custodia") o en términos sustancialmente similares a los reflejados en (i) el formulario pertinente "Términos Estándar del Contrato de Fideicomiso" incluido como anexo en el Suplemento del Plan, y (ii) el formulario pertinente "Contrato de Fideicomiso" incluido como anexo en el Suplemento del Plan (en conjunto, y tal como puedan ser modificados antes de su implementación, el "Contrato de Fideicomiso de Assured "). El Fideicomiso de Assured emitirá Unidades de Fideicomiso que proporcionarán a dicho Tenedor de Bonos de Assured una participación en (A) las Pólizas de Seguros de Assured aplicables y (B) cierta Contraprestación del Plan de Assured, de acuerdo con los términos aceptables para Assured.

De conformidad con la Sección 75.1(c) del Plan de la ACT, el pago del capital de los Bonos Asegurados de Assured se acelerará desde y a partir de la Fecha de Entrada en Vigencia de la ACT, y dichos Bonos Asegurados de Assured serán pagaderos desde y a partir de la Fecha de Entrada en Vigencia de la ACT al Precio de Aceleración de cien por ciento (100%) del monto del capital de estos, más el interés devengado sobre estos (o, en caso de los bonos de apreciación de capital, el monto compuesto de estos) a la fecha de pago. Sin limitar lo anterior, conforme a las Pólizas de Seguros aplicables de Assured, (A) Assured puede elegir, en su exclusivo y absoluto criterio, hacer cualquier pago de capital, en su totalidad o en parte, en cualquier fecha en la que dicho pago del capital se adeude por motivo de aceleración u otro avance de vencimientos, y (B) en el caso de cualquier Bono Asegurado de Assured cuyos tenedores han elegido (o se considera que han elegido) la Elección 2 de Tenedores de Bonos de Assured, Assured retendrá el derecho de pagar el Precio de Aceleración de Assured y satisfará totalmente sus obligaciones con respecto a dichos bonos y las Pólizas de Seguros de Assured en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT con treinta (30) días de notificación previa por escrito a los tenedores pertinentes. La retención de Assured de este derecho se reflejará en la documentación correspondiente del Contrato de Fideicomiso de Assured. Desde y posteriormente al pago del Precio de Aceleración de Assured, incluyendo, entre otros, en (i) en la Fecha de Entrada en Vigencia de la ACT o (ii) en cualquier otra fecha de pago seleccionada por Assured, con treinta (30) días de notificación previa por escrito, el interés sobre dichos Bonos Asegurados de Assured cesará de devengar y ser pagadero. El pago del Precio de Aceleración aplicable de Assured con respecto a cualquier Bono Asegurado de Assured de acuerdo con el Plan de la ACT, incluyendo, entre otros, en la Fecha de Entrada en Vigencia de la ACT, satisfará y liberará todas las obligaciones de Assured en virtud de las Pólizas de Seguros de Assured con respecto a dicho Bono Asegurado de Assured.

Antes de elegir, o de que se considere que han elegido, la Elección 2 de Tenedores de Bonos de Assured, los Tenedores de Bonos de Assured elegibles deben considerar cuidadosamente ciertos factores de riesgo específicamente relacionados con la Elección 2 de Tenedores de Bonos de Assured. Los factores de riesgo identificados a continuación no son los únicos riesgos relacionados con la Elección 2 de Tenedores de Bonos de Assured, y no reflejan necesariamente la importancia relativa de los distintos riesgos. Cualquiera de los factores identificados a

continuación, así como otros factores no descritos en esta Declaración de Divulgación, podrían afectar a las recuperaciones en el marco de la Elección 2 de Tenedores de Bonos de Assured, y no se puede garantizar que otros factores de riesgo no comentados en esta Declaración de Divulgación no sean importantes en el futuro. Se considerará que los Tenedores de Bonos de Assured elegibles que elijan, o se considere que elijan, la Elección 2 de Tenedores de Bonos de Assured, han asumido los riesgos relacionados, incluidos los identificados en esta Declaración de Divulgación.

Los términos en mayúsculas utilizados en el análisis de la Elección 2 de Tenedores de Bonos de Assured, pero que no se definen en esta Declaración de Divulgación, tendrán el significado que se les da en (i) el Plan de la ACT o (ii) el Contrato de Fideicomiso de Assured, según corresponda.

Assured no proporciona ningún tipo de asesoramiento fiscal a los Tenedores de Bonos de Assured, y Assured no hace ninguna declaración a los Tenedores de Bonos de Assured en relación con las consecuencias tributarias de elegir, o de que se considere que han elegido, la Elección 2 de Tenedores de Bonos de Assured, el estatus tributario del Fideicomiso de Assured o las consecuencias tributarias de poseer o enajenar Unidades de Fideicomiso. Se recomienda enfáticamente a los tenedores de EE.UU. que consulten a sus propios asesores fiscales en relación con las consecuencias tributarias de elegir, o de que se considere que han elegido, la Elección 2 de Tenedores de Bonos de Assured, el estatus tributario del Fideicomiso de Assured o las consecuencias tributarias de poseer o enajenar Unidades de Fideicomiso. En ningún caso el Fideicomisario del Fideicomiso de Assured, el Depositario o Assured serán responsables de ningún pasivo, costo o gasto del Fideicomiso de Assured o de los Tenedores de Unidades de Fideicomiso que surja de la aplicación de cualquier ley tributaria, incluyendo impuestos federales, estatales, extranjeros o locales sobre ingresos o arbitrios o cualquier otro impuesto aplicado o medido por la renta (o cualquier interés, penalidad o adición con respecto a estos o que surja de un incumplimiento de estos), excepto, en el caso del Fideicomisario, por cualquier pasivo, costo o gasto atribuible a cualquier acto u omisión del Fideicomisario en incumplimiento de sus obligaciones bajo el Contrato de Fideicomiso de Assured.

### *Riesgos relacionados con el Fideicomisario y Assured.[205]

En virtud de la Elección 2, los Tenedores de Bonos Asegurados de Assured pueden depender del Fideicomisario del Fideicomiso de Assured para ejercer los derechos de los tenedores de bonos en virtud de la Póliza de Seguros de Assured aplicable y de los Nuevos Bonos de la ACT de Assured retenidos por el Fideicomiso de Assured. Además, la inversión del tenedor dependerá (en una parte importante) de las perspectivas comerciales y financieras de Assured. En los últimos años, muchas aseguradoras de bonos se han debilitado considerablemente desde el punto de vista financiero. Además, se considerará que cualquier Tenedor de Bonos Asegurados de Assured que no haga una elección ha elegido la Elección 2.

### *El tratamiento tributario del fideicomiso de Assured es incierto.

---

[205] Los factores de riesgo de esta Sección VIII.E marcados con un asterisco (*) han sido proporcionados por Assured para su uso en esta Declaración de Divulgación, y el Deudor no hace ninguna declaración en cuanto a su presentación justa, exactitud o integridad de la información, incluyendo los documentos incorporados por referencia.

El Fideicomiso de Assured puede adoptar la posición de que es un fideicomiso otorgante a efectos tributarios federales de EE.UU. En la medida en que el Fideicomiso de Assured sea tratado como un fideicomiso otorgante, cada Tenedor de Unidades de Fideicomiso será tratado como si recibiera su(s) Unidad(es) de Fideicomiso a cambio de sus correspondientes Reclamaciones Permitidas de Bonos Asegurados de Assured y su interés en las Pólizas de Seguros de Assured, y como propietario de un interés indiviso prorrateado sobre los Activos del Fideicomiso mantenidos en el Fideicomiso de Assured, cada uno en la medida de su interés prorrateado en las Unidades de Fideicomiso. Se recomienda enfáticamente a los Tenedores de Estados Unidos que consulten a sus propios asesores fiscales en relación con el tratamiento del impuesto federal Impuesto federal sobre la renta de EE.UU. del Fideicomiso de Assured.

En la medida en que los Tenedores de Unidades de Fideicomiso sean tratados como propietarios de su participación prorrateada de los Activos del Fideicomiso bajo un fideicomiso otorgante, serán tratados como si hubieran recibido distribuciones bajo el Plan de la ACT directamente y como propietarios de su participación prorrateada de los Activos del Fideicomiso, incluyendo cualquier Nuevo Bono de la ACT mantenido como Activo del Fideicomiso. Se espera que los intereses de una parte de dichos Nuevos Bonos de la ACT queden excluidos de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU. (dichos interés, el "Interés Exento de Impuestos del Fideicomiso de Assured"). No se puede asegurar que los Intereses Exentos de Impuestos del Fideicomiso de Assured, en la medida en que estén generalmente excluidos de los ingresos brutos a efectos del impuesto sobre la renta federal, mantengan dicha exclusión con respecto a los Tenedores de Unidades del Fideicomiso. No se ha solicitado, ni se solicitará, un dictamen de un abogado o una resolución del IRS respecto de si los pagos de los Intereses Exentos de Impuestos del Fideicomiso de Assured que se transfieran a los Tenedores de Unidades del Fideicomiso mantendrán su exclusión de los ingresos brutos a efectos del impuesto federal sobre la renta. Se recomienda enfáticamente a los Tenedores de EE.UU. que consulten a sus propios asesores fiscales en relación con el tratamiento del impuesto federal sobre la renta de EE.UU. de los Intereses Exentos de Impuestos del Fideicomiso de Assured.

Es posible que el IRS pueda afirmar, y que un tribunal así lo considere, que el Fideicomiso de Assured está correctamente caracterizado de una manera distinta a la de un fideicomiso otorgante a efectos del impuesto federal sobre la renta de EE.UU. Dichas caracterizaciones alternativas (principalmente, el tratamiento de las Unidades de Fideicomiso como deuda gravable de Assured o el tratamiento del Fideicomiso de Assured como sujeto al impuesto a nivel corporativo) podrían resultar en consecuencias tributarias diferentes (y materialmente adversas) para el Fideicomiso de Assured y los Tenedores de Unidades de Fideicomiso (incluyendo el tratamiento de todos los ingresos recibidos con respecto a las Unidades de Fideicomiso como ingresos totalmente gravables o posiblemente la imposición de un impuesto corporativo al Fideicomiso de Assured, reduciendo así las distribuciones a los Tenedores de Unidades de Fideicomiso).

El Fideicomiso de Assured no ha solicitado ni solicitará una resolución del IRS o un dictamen de un abogado con respecto a su condición de fideicomiso otorgante, la naturaleza de las Unidades de Fideicomiso emitidas por el Fideicomiso de Assured, o el carácter, el momento o la exención de ingresos gravables de cualquier ingreso generado por cualquier activo mantenido por el Fideicomiso de Assured. En consecuencia, no se puede asegurar que el Fideicomiso de Assured sea tratado como un fideicomiso otorgante, que las Unidades de Fideicomiso sean tratadas como

intereses en dicho fideicomiso o que cualquiera de los Activos del Fideicomiso sea tratado como generador de ingresos exentos de impuestos o del momento de dichos ingresos.

Se recomienda enfáticamente a los Tenedores de EE.UU. que consulten a sus propios asesores fiscales en relación con la clasificación del impuesto federal sobre la renta de EE.UU. del Fideicomiso de Assured y de las Unidades de Fideicomiso (en particular, las consecuencias fiscales asociadas en caso de que el Fideicomiso de Assured no sea clasificado como un fideicomiso otorgante (de manera que las Unidades de Fideicomiso sean tratadas como deuda tributable de Assured o el Fideicomiso de Assured sea tratado como sujeto al impuesto a la renta a nivel corporativo) para los fines del impuesto federal sobre la renta de EE.UU.), así como el carácter, el momento o la exención de los ingresos imponibles de cualquier ingreso generado por cualquier activo mantenido por el Fideicomiso de Assured.

### *Riesgos relacionados con la tributación de la propiedad y la venta o enajenación de las Unidades de Fideicomiso.*

En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de los Nuevos Bonos de la ACT en circulación u otros Activos del Fideicomiso, incluyendo las correspondientes Pólizas de Seguros de Assured, tendrá derecho a los pagos atribuibles a dichos Activos del Fideicomiso. En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de los Nuevos Bonos de la ACT, véase "—Tributación de los Nuevos Bonos de la ACT" en esta Declaración de Divulgación para un análisis de las consecuencias del impuesto federal sobre la renta de EE.UU. de ser propietario de dichos Nuevos Bonos de la ACT. En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de las Pólizas de Seguros de Assured, la tributación de las cantidades recibidas por el Fideicomiso de Assured y transferidas a los Tenedores de la Unidad de Fideicomiso con respecto a los pagos de las Pólizas de Seguros de Assured es incierta con el potencial de consecuencias materialmente adversas para los Tenedores de la Unidad de Fideicomiso. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de los pagos en virtud de las Pólizas de Seguros de Assured y la posibilidad de que se produzcan consecuencias tributarias adversas importantes para los Tenedores de Unidades de Fideicomiso.

Conforme a la Sección 25.1(c) del Plan de la ACT, las Pólizas de Seguros de Assured aplicables y el Contrato de Fideicomiso de Assured retendrá el derecho a pagar el Precio de Aceleración de Assured al Fideicomiso de Assured y a satisfacer plenamente sus obligaciones con respecto a los Bonos Heredados de Assured mantenidos por el Fideicomiso de Assured y las Pólizas de Seguros de Assured relacionadas en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT, previa notificación con treinta (30) días de antelación a los tenedores correspondientes y al Fideicomiso de Assured. En la medida en que Assured ejerza esta opción, el Fideicomiso de Assured se rescindirá y los Tenedores de Unidades de Fideicomiso recibirán únicamente su participación prorrateada del Precio de Aceleración de Assured. Como se discutió anteriormente con respecto a los pagos de las Pólizas de Seguros de Assured en general, la tributación de la recepción del Precio de Aceleración de Assured por el Fideicomiso de Assured y su distribución a los Tenedores de Unidades de Fideicomiso es incierta con la posibilidad de consecuencias materialmente adversas para los Tenedores de Unidades de Fideicomiso. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de la recepción del Precio de Aceleración de Assured por parte del

Fideicomiso de Assured y la posibilidad de que se produzcan consecuencias tributarias adversas importantes para los Tenedores de Unidades de Fideicomiso.

Ciertos aspectos del tratamiento del Impuesto federal sobre la renta de EE.UU. de la propiedad y la enajenación de una Unidad de Fideicomiso son inciertos. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con la propiedad, venta y enajenación de las Unidades de Fideicomiso en sus circunstancias individuales.

***Riesgos de prepago y reinversión, incluyendo los relacionados con la Opción de Anticipo de Assured***.

Inmediatamente después de su recepción por el Fideicomisario del Fideicomiso de Assured, y con sujeción a las deducciones previstas en el Contrato de Fideicomiso de Assured, el Fideicomisario deberá distribuir, en forma de transferencia prorrateada, a los Tenedores de Unidades de Fideicomiso, todos los ingresos del Fideicomiso de Assured. Cada una de estas Distribuciones efectuadas en o antes de la Fecha de Vencimiento a los Tenedores de Unidades de Fideicomiso dará lugar a una reducción simultánea dólar por dólar (i) en el caso de los Bonos de Interés Corriente correspondientes, en primer lugar, de los intereses devengados y no pagados de dichos Bonos de Interés Corriente y, en segundo lugar, del importe de capital pendiente de pago o, (ii) en el caso de los Bonos de Apreciación de Capital correspondientes, del Importe Compuesto de dichos Bonos de Apreciación de Capital, en cualquiera de los casos, a la fecha de dicha Distribución y por un importe igual a dicha Distribución.

Esta rápida transferencia de los ingresos del Fideicomiso de Assured, y la consiguiente reducción simultánea de los intereses devengados y no pagados, del capital y/o del Importe Compuesto de los Bonos Heredados de Assured, puede dar lugar a que los Tenedores de Unidades de Fideicomiso reciban pagos a cuenta de dichos intereses, capital o Importe Compuesto antes de las Fechas de Pago de Intereses Programadas Originales, las Fechas de Pago de Capital Programadas Originales y/o la Fecha de Vencimiento de los Bonos Heredados

De conformidad con la Opción de Anticipo de Assured, y de acuerdo con las Pólizas de Seguros de Assured y las Secciones 25.1(c) y/o 25.1(d) del Plan de la ACT, Assured también tendrá la opción de satisfacer sus obligaciones de pago con respecto a cualquier CUSIP de Bonos Heredados de Assured mediante el pago del Precio de Aceleración de Assured aplicable o del precio de amortización en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT, previa notificación con 30 días de antelación a los tenedores correspondientes y al Fideicomiso de Assured. El pago del Precio de Aceleración de Assured o del precio de amortización aplicable con respecto a cualquiera de los Bonos Heredados de Assured satisfará y exonerará todas las obligaciones de Assured en virtud de la Póliza de Seguros de Assured aplicable con respecto al CUSIP de dichos Bonos Heredados de Assured .

Como resultado de dicho(s) pago(s) anticipado(s) de intereses, capital o Monto Compuesto, incluso en virtud de la Opción de Anticipo de Assured, los Tenedores de Unidades de Fideicomiso pueden necesitar reinvertir los fondos a una tasa de interés inferior a la prevista en los Bonos Heredados de Assured. Cualquier riesgo de reinversión será asumido exclusivamente por los Tenedores de Unidades de Fideicomiso.

Assured no proporciona ningún tipo de asesoramiento fiscal a los Tenedores de Bonos de Assured, y Assured no hace ninguna declaración a los Tenedores de Bonos de Assured en relación con las consecuencias tributarias de elegir cualquier Elección del Tenedor de Bonos de Assured o de recibir el Precio de Aceleración de Assured. Se recomienda a los Tenedores de EE.UU. que elijan alguna Elección de Bonos Asegurados que consulten a sus propios asesores fiscales sobre el tratamiento tributario de dicha elección y la recepción del Precio de Aceleración de Assured.

**F.**     Riesgos relacionados con la Elección del Tratamiento de Conmutación de National

Cada tenedor de una Reclamación de Bonos Asegurados de National permitida tendrá la opción de elegir en el Formulario de Elección del Tenedor de Bonos de National para recibir, en la Fecha de Entrada en Vigencia de la ACT, la Contraprestación de la Conmutación de National distribuible por o bajo la dirección de National, y, si se elige, (i) el tenedor de estos no tendrán otros derechos ni derechos adicionales conforme a o con respecto a la Póliza de Seguros de National o cualquier Fideicomiso de National o Cuenta de Plica de National, (ii) el tenedor de estos no recibirá ningún pago de National conforme a las Pólizas de Seguros de National por cuenta del interés devengado y no pagado sobre estas y después de la Fecha de Emisión Declarada, y en la medida en que algún interés devengado es pagado a dicho tenedor por National después de dicha fecha, dicho monto se acreditará contra el Efectivo que dicho tenedor, sus sucesores, destinatarios de transferencias o cesionarios tengan derecho de otra manera a recibir como Contraprestación de la Conmutación de National y (iii) National recibirá la Contraprestación del Plan de National distribuible por cuenta de la Reclamación Permitida de Bonos Asegurados de National. National se reserva a su exclusivo criterio la selección de la forma de Contraprestación de la Conmutación de National a distribuir de conformidad con el Tratamiento de Conmutación de National. En el momento de dicha elección, estos Tenedores sabrán cómo se tratarán sus reclamaciones.

**G.**     Riesgos relacionados con el tratamiento de no conmutación de National

Cada tenedor de una Reclamación Permitida de Bonos Asegurados de National podrá optar por no recibir el Tratamiento de Conmutación de National. En el momento de dicha elección, estos Tenedores sabrán cómo se tratarán sus reclamaciones.

National tendrá derecho a elegir entre los tratamientos descritos en la Sección 75.2(b) del Plan de la ACT, que incluyen fideicomisos de custodia, cuentas de plica, o pagos en efectivo de importes acelerados. En caso de que un tenedor de una Reclamación Permitida de Bonos Asegurados de National de manera oportuna y válida elige en el Formulario de Elección de Tenedores de Bonos de National recibir el Tratamiento de No Conmutación de Nacional, (i) National recibirá la Contraprestación del Plan de National distribuible por cuenta de la Reclamación Permitida de Bonos Asegurados de National, y (ii) dicho tenedor recibirá uno o más de los tratamientos descritos en la Sección 25.2(b) del Plan de la ACT, a elección de National, elección que será ejercida por National al inicio de la Vista de la Declaración de Divulgación o antes, y como se detalla en el Formulario de Elección de Tenedores de Bonos de National correspondiente.

En la medida en que National opte por fideicomisos de custodia (cada uno de estos fideicomisos, según corresponda, un "Fideicomiso de National") en términos sustancialmente similares a los reflejados en (i) el formulario pertinente "Términos Estándar del Contrato de Fideicomiso" incluido como anexo en el Suplemento del Plan si es elegido por National como la

forma de Tratamiento de No Conmutación de National, y (ii) el correspondiente formulario "Contrato de Fideicomiso" incluido como anexo en el Suplemento del Plan si es elegido por National como la forma de Tratamiento de No Conmutación de National (en conjunto, y tal como puedan ser modificados antes de su aplicación, el "Contrato de Fideicomiso de National"), los Tenedores que reciban dicho tratamiento (i) depositarán, o se considerará que han depositado, entre otras cosas, la Participación Prorrateada de dicho Tenedor de la Contraprestación del Fideicomiso de National, los Bonos Asegurados de National asignables a dicho Tenedor elector, y las Pólizas de Seguros de National relacionadas en el Fideicomiso de National aplicable, (ii) se considerará que han recibido su Participación Prorrateada de la Contraprestación del Fideicomiso de National y los Certificados de National como contraprestación, y (iii) no podrán recurrir a National o a las Pólizas de Seguros de National, salvo lo previsto en los términos del Fideicomiso de National.

En la medida en que National elija una cuenta de plica, los tenedores que reciban dicho tratamiento depositarán, o se considerará que han depositado, entre otras cosas, la participación prorrateada de dicho tenedor de la Contraprestación de la Cuenta de Plica de National en la Cuenta de Plica de National y dicha Contraprestación de la Cuenta de Plica de National depositada se mantendrá como garantía de las obligaciones de National hacia los tenedores de los Bonos Asegurados de National cuya Contraprestación de la Cuenta de Plica de National se depositó en la Cuenta de Plica de National en virtud de las Pólizas de Seguros de National.

En la medida en que National opte por pagos en efectivo, National será exonerado de manera plena y total de su obligación hacia dicho tenedor de una Reclamación Permitida de Bonos Asegurados de National pagando en la Fecha de Entrada en Vigencia de la ACT, en Efectivo, el monto de esta al Precio de Aceleración de National a la fecha de pago.

Además, National y la Junta de Supervisión podrán formular una opción de elección o implementación no identificada en el Plan de la ACT con respecto a los Bonos Asegurados de National antes del comienzo de la vista de la Declaración de Divulgación.

Todo tenedor de una Reclamación Permitida de Bonos Asegurados de National que no opte de manera oportuna y válida por recibir el Tratamiento de no Conmutación de National, o que presente una elección por menos de todas sus Reclamaciones de Bonos Asegurados de National, se considerará que dicho Tenedor ha optado por recibir el Tratamiento de Conmutación de National.

**H.** Riesgos relacionados con hacer u omitir hacer una elección de conmutación de National

El Plan de la ACT ofrece a los tenedores de Reclamaciones Permitidas de Bonos Asegurados de National la opción de elegir un Tratamiento de Conmutación o de No Conmutación de National Los Bonos Asegurados de National de un tenedor de una Reclamación Permitida de Bonos Asegurados de National que no elige de manera válida recibir el Tratamiento de No Conmutación de National se considerarán cancelados en la Fecha de Entrada en Vigencia de la ACT, y las obligaciones de National de conformidad con las Pólizas de Seguros correspondientes de National serán satisfechas y exoneradas de manera total y definitiva.

La capacidad de un tenedor de no conmutación de Reclamaciones de la Clase 4, Clase 9 y Clase 13 para recuperar por cuenta de sus Reclamaciones Permitidas de Bonos Asegurados de National está sujeta al riesgo de cobro asociado con National. Los tenedores de Reclamaciones de

Clase 4, Clase 9 y Clase 13 deberían investigar la condición financiera de National antes de determinar si desean optar por recibir el Tratamiento de Conmutación de National conforme al Plan de la ACT. En el futuro podrían producirse eventos que podrían dar lugar a riesgos de pago u otros riesgos de contraparte con respecto a National. Dichos riesgos se vincularían a los Certificados de National y el Deudor no garantiza que cualquier tenedor podrá hacer efectivo cualquier nivel de recobro de National.

**I.**      Riesgos relacionados con los Certificados de National

El tenedor de una Reclamación Permitida de Bonos Asegurados de National que opte por no recibir el Tratamiento de Conmutación de National podrá, a criterio de National, ser considerado como receptor de su Participación Prorrateada en la Contraprestación del Fideicomiso de National, y Certificados de National como contraprestación por el depósito de tal Participación Prorrateada del tenedor en la Contraprestación del Fideicomiso de National, los Bonos Asegurados de National asignables a dicho tenedor y las Pólizas de Seguros de National relacionadas en el Fideicomiso de National correspondiente y no tendrán recurso ante National o las Pólizas de Seguros de National aparte de los provistos por los términos del Fideicomiso de National. Los términos en mayúsculas utilizados en el análisis de los Certificados de National, pero que no se definen en esta Declaración de Divulgación, tendrán el significado que se les da en (i) el Plan de la ACT o (ii) el Contrato de Fideicomiso de Assured, según corresponda.

Los tenedores que reciban Certificados de National estarán expuestos a riesgos adicionales, incluyendo, entre otros, los siguientes:[206]

- No se espera que los Certificados de National sean líquidos. Los Certificados de National y las Unidades de Fideicomiso no serán negociables y no habrá mercado para los Certificados de National o las Unidades de Fideicomiso;

- Cada distribución de los Certificados de National reducirá las obligaciones correspondientes de National estipuladas en las Pólizas de Seguros de National. No obstante cualquier impuesto que deba pagar un tenedor de los Certificados de National a cuenta de distribuciones del Fideicomiso de National, el monto bruto de la distribución asignable a dicho tenedor (sin ninguna reducción por los impuestos que deba pagar) reducirá las obligaciones de National de conformidad con la Póliza de Seguros de National;

- Conforme a la Sección 25.2(c) del Plan de la ACT y el Contrato de Fideicomiso de National, National retendrá el derecho de pagar el Precio de Aceleración de National al Fideicomiso de National y satisfacer plenamente sus obligaciones con respecto a los Bonos Heredados de National mantenidos por el Fideicomiso de National y las Pólizas de Seguros de National relacionadas en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT, previa notificación con 30 días de antelación a los tenedores correspondientes y al Fideicomiso de National. En la medida en que National ejerza esta opción, el Fideicomiso de National se rescindirá y los Tenedores de Unidades de Fideicomiso recibirán únicamente su participación prorrateada del Precio de Aceleración de National. La tributación de la recepción del Precio de Aceleración de National por el Fideicomiso de National y su distribución a los Tenedores de Unidades de Fideicomiso es incierta con la posibilidad de consecuencias materialmente

---

[206] Los factores de riesgo que figuran a continuación han sido proporcionados por National para su uso en esta Declaración de Divulgación, y el Deudor no hace ninguna declaración en cuanto a su presentación justa, exactitud o integridad de la información, incluyendo los documentos incorporados por referencia.

adversas para los Tenedores de Unidades de Fideicomiso. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de la recepción del Precio de Aceleración de National por parte del Fideicomiso de National y la posibilidad de que se produzcan consecuencias tributarias adversas importantes para los Tenedores de Unidades de Fideicomiso;

- Inmediatamente después de su recepción por el Fideicomisario del Fideicomiso de National, y con sujeción a las deducciones previstas en el Contrato de Fideicomiso de National, el Fideicomisario deberá distribuir, en forma de transferencia prorrateada, a los Tenedores de Unidades de Fideicomiso, todos los ingresos del Fideicomiso de National. Cada una de estas Distribuciones efectuadas en la Fecha de Vencimiento o con anterioridad a esta a los Tenedores de Unidades de Fideicomiso dará lugar a una reducción simultánea dólar por dólar, en primer lugar, de los intereses devengados y no pagados y, en segundo lugar, del importe de capital pendiente de pago o de los Bonos Heredados de National del Tenedor, a la fecha de dicha Distribución y por un importe igual a dicha Distribución. Esta rápida transferencia de los ingresos del Fideicomiso de National, y la consiguiente reducción simultánea de los intereses devengados y no pagados, y del monto del capital de, los Bonos Heredados de National, puede dar lugar a que los Tenedores de Unidades de Fideicomiso reciban pagos a cuenta de dichos intereses, capital o Importe Compuesto antes de las Fechas de Pago de Intereses Programadas Originales, las Fechas de Pago de Capital Programadas Originales y/o la Fecha de Vencimiento de los Bonos Heredados. De conformidad con la Opción de Anticipo de National, y de acuerdo con las Secciones 25.2(c) y/o 25.2(d) del Plan de la ACT, National también tendrá la opción de satisfacer sus obligaciones de pago con respecto a cualquier CUSIP de Bonos Heredados de National mediante el pago del Precio de Aceleración de National aplicable o del precio de amortización en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT, previa notificación con 30 días de antelación a los tenedores correspondientes y al Fideicomiso de National. El pago del Precio de Aceleración de National o del precio de amortización aplicable con respecto a cualquier CUSIP de los Bonos Heredados de National satisfará y exonerará todas las obligaciones de National en virtud de la Póliza de Seguros de National aplicable con respecto al CUSIP de dichos Bonos Heredados de National. Como resultado de dicho(s) pago(s) anticipado(s) de intereses y capital, incluso en virtud de la Opción de Anticipo de National, los Tenedores de Unidades de Fideicomiso pueden necesitar reinvertir los fondos a una tasa de interés inferior a la prevista en los Bonos Heredados de National. Cualquier riesgo de reinversión será asumido exclusivamente por los Tenedores de Unidades de Fideicomiso. National no proporciona ningún tipo de asesoramiento fiscal a los Tenedores de Bonos Asegurados de National, y National no hace ninguna declaración a los Tenedores de Bonos Asegurados de National en relación con las consecuencias tributarias de elegir cualquier elección del tenedor de bonos de National o de recibir el Precio de Aceleración de National. Se recomienda a los Tenedores de EE.UU. que elijan cualquier elección de tenedores de bonos de National que consulten a sus propios asesores fiscales sobre el tratamiento tributario de dicha elección y la recepción del Precio de Aceleración de National;

- Ciertos aspectos del tratamiento del impuesto federal sobre la renta de EE.UU. de la propiedad de una Unidad de Fideicomiso son inciertos;

- En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de los Nuevos Bonos de la ACT en circulación u otros Activos del Fideicomiso, incluyendo las correspondientes Pólizas de Seguros de National, tendrá derecho a los pagos atribuibles a dichos Activos del Fideicomiso. En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de los Nuevos Bonos de la ACT, véase "—Tributación de los Nuevos Bonos de la

ACT" en esta Declaración de Divulgación para un análisis de las consecuencias del impuesto federal sobre la renta de EE.UU. de ser propietario de dichos Nuevos Bonos de la ACT. En la medida en que cada Tenedor de la Unidad de Fideicomiso sea tratado como propietario de su participación prorrateada de las Pólizas de Seguros de National, la tributación de las cantidades recibidas por el Fideicomiso de National y transferidas a los Tenedores de la Unidad de Fideicomiso con respecto a los pagos de las Pólizas de Seguros de National es incierta,  con el potencial de consecuencias materialmente adversas para los Tenedores de la Unidad de Fideicomiso. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de los pagos en virtud de las Pólizas de Seguros de National y la posibilidad de que se produzcan consecuencias tributarias adversas importantes para los Tenedores de Unidades de Fideicomiso;

- Salvo lo previsto en la Póliza de Seguros de National aplicable, los tenedores de los Certificados de National no tendrán ningún recurso contra el fideicomisario de los Certificados de National, National o cualquiera de sus Personas Vinculadas. Además, los tenedores no tendrán ningún recurso contra dichas personas o sus activos para los pagos de los Certificados de National, salvo lo establecido en la Póliza de Seguros de National aplicable y en el contrato de fideicomiso. Los Certificados de National serán obligaciones del Fideicomiso de National. Salvo lo dispuesto en la Póliza de Seguros de National aplicable o en el contrato de fideicomiso, las distribuciones respecto de los Certificados de National solo se harán con cargo a los activos del Fideicomiso de National.

- Si National experimentase dificultades financieras en el futuro, es posible que no pueda abonar los pagos correspondientes a las Pólizas de Seguros de National depositadas como activos del fideicomiso para beneficio de los fideicomisos. Además, en el futuro podrían producirse eventos que podrían dar lugar a riesgos de pago u otros riesgos de contraparte con respecto a National. Dichos riesgos se vincularían al Fideicomiso de National y la Junta de Supervisión no garantiza que cualquier tenedor podrá hacer efectivo cualquier recobro concreto de National. El valor de los Certificados de National dependerá en parte de las perspectivas comerciales y financieras de National. Los tenedores de los Certificados de National deberían, además de evaluar la capacidad de la ACT Reorganizada para cumplir con sus obligaciones bajo los Bonos Asegurados de National, evaluar también la capacidad de National para cumplir con sus obligaciones en virtud de las Pólizas de Seguro de National.

**J.**     Riesgos relacionados con la Cuenta de Plica de National

Al tenedor de una Reclamación Permitida de Bonos Asegurados de National que opte por no recibir el Tratamiento de Conmutación de National podrá requerírsele, a criterio de National, que deposite, o que se considere que ha depositado, entre otras cosas, la participación prorrateada de dicho tenedor de la Contraprestación de la Cuenta de Plica de National en la Cuenta de Plica de National y dicha Contraprestación de la Cuenta de Plica de National depositada se mantendrá como garantía de las obligaciones de National hacia los tenedores de los Bonos Asegurados de National cuya Contraprestación de la Cuenta de Plica de National se depositó en la Cuenta de Plica de National en virtud de las Pólizas de Seguros de National.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                                04/30/2022 3:29 PM" ""

**K.    Riesgos relativos a las proyecciones de ingresos y gastos del Plan Fiscal de la ACT**

El Plan Fiscal de la ACT[207] con sus correspondientes proyecciones financieras subyacentes, es el resultado de años de sesiones de trabajo, diálogo, participación de las partes interesadas, investigación y análisis en profundidad (así como de la colaboración entre la Junta de Supervisión y el Gobierno del ELA, que generó una amplia base de datos para sustentar las actuales tendencias macroeconómicas y las previsiones de ingresos y gastos presentadas. Sin embargo, todo esto se fundamenta en una serie de hipótesis y factores que están sujetos a riesgos externos e internos susceptibles de repercutir sustancialmente en los resultados previstos. Para reconocer tales riesgos, a continuación, se exponen los factores que podrían afectar a las proyecciones macroeconómicas y financieras a treinta (30) años contenidas en el Plan Fiscal de la ACT.

Las citadas proyecciones financieras contienen declaraciones prospectivas. Algunas de estas declaraciones se basan en eventos futuros, resultados futuros de operaciones o futura evolución financiera. En algunos casos, el uso del potencial o de vocabulario como "puede", "podría", "pudiera", "debería", "pretende", "prevé", "planifica", "objetivos", "proyecta"; "pronostica", "cree", "estima", "predice", "potencial", "continuar", así como los negativos de estas palabras u otra terminología semejante suelen identificar las declaraciones prospectivas.

Estas declaraciones a futuro están basadas en hipótesis, son inciertas e involucran sustanciales riesgos conocidos y desconocidos, incertidumbres y otros factores susceptibles de hacer que los resultados reales, así como la actividad o evolución de la economía y la capacidad de recaudación tributaria de Puerto Rico sean sustancialmente diferentes de cualquier resultado, niveles de actividad o rentabilidad futuros, explícitos o implícitos en dichas declaraciones prospectivas.

No es posible garantizar resultados, niveles de actividad ni rentabilidades futuras. No se debe depositar una confianza excesiva en estas declaraciones prospectivas, que solo se refieren a la fecha en que se hicieron. No hay intención de actualizar ninguna de estas declaraciones ilustrativas y prospectivas para que reflejen los resultados reales, eventos o circunstancias posteriores o para que reflejen eventos imprevistos.

Las suposiciones en las que se basa esta información financiera son necesariamente subjetivas. No se puede garantizar que estas suposiciones sean correctas en la actualidad o que sigan siendo correctas o precisas en el futuro. En consecuencia, no se puede garantizar que esta información refleje plena o correctamente las relaciones entre los factores económicos tratados en esta información financiera. No se declara ni se garantiza que las proyecciones carezcan de defectos lógicos o mecánicos, aunque se ha hecho todo lo posible por diseñar y elaborar la información financiera para demostrar las operaciones financieras previstas y los resultados financieros basados en las suposiciones expuestas. Además de las limitaciones inherentes a cualquier pronóstico, las proyecciones también están sujetas a las incertidumbres adicionales asociadas a la preparación de proyecciones sobre el impacto de la pandemia de COVID-19 durante el transcurso de la pandemia y en el contexto de la evolución de la respuesta de salud pública.

---

[207] El Plan Fiscal de la ACT se certificó el 22 de febrero de 2022. *Véase* el <u>Anexo D</u>.

***El modelo del Plan Fiscal de la ACT se basa en datos históricos para proyectar el PNB y la inflación, y no toma en cuenta posibles trastornos externos.***

El modelo del Plan Fiscal de la ACT está basado en datos históricos sobre una serie de variables económicas importantes (por ej., los precios del crudo y de los alimentos, la brecha de producción, el crecimiento de capital y las transferencias federales netas) para proyectar el PNB y la inflación, y toma en cuenta tanto los efectos de los huracanes María e Irma, los terremotos de 2020 y la pandemia de COVID-19 como los fondos de ayuda en caso de desastres y otros fondos de estímulo federales que se prevé que recibirá Puerto Rico. No toma en cuenta posibles perturbaciones externas futuras, como crisis económicas y no económicas imprevistas, desastres naturales u otros cambios en la actividad económica mundial (o local) que no están previstos actualmente. Un ejemplo de perturbación no económica es el ciberataque sufrido por el sistema de autopistas AutoExpreso. Debido a este ciberataque, los usuarios de AutoExpreso no han podido realizar pagos, lo que ha repercutido negativamente en la recaudación de las tarifas y multas de peaje. Las perturbaciones económicas externas pueden afectar a otras variables importantes, como los precios del combustible, que a su vez pueden tener un impacto negativo en el uso de las autopistas de peaje, dada la evidencia de que los aumentos de los precios del combustible pueden conducir a un cambio hacia modos alternativos de transporte (por ej., el tránsito) y rutas alternativas (por ej., a través de carreteras sin peaje). Dado que las proyecciones futuras se basan en resultados históricos, si el crecimiento económico (o la inflación) de Estados Unidos o Puerto Rico fueran sustancialmente mayores o menores de lo previsto, ello podría afectar significativamente las posteriores proyecciones del PNB y de la inflación del Plan Fiscal de la ACT y, por consiguiente, la exactitud de las proyecciones de ingresos y gastos. Por otra parte, el retraso o la ineficacia de la aplicación de las reformas estructurales en materia de mano de obra, energía, facilidad para hacer negocios y educación —que actualmente se supone que impulsan un crecimiento del PNB del 0.9% — podría afectar al crecimiento del PNB y, en consecuencia, a los resultados generales de los ingresos.

El pronóstico del volumen de peaje de referencia de la ACT, que incluye el aumento anual del tráfico de peaje y los ingresos correspondientes, antes de cualquier aumento del precio del peaje, se basa en el pronóstico del PNB del ELA. Por otra parte, existe un riesgo importante de que el PNB real difiera del proyectado, ya que la exactitud de las proyecciones del PNB se ve afectada significativamente por la subestimación o sobreestimación del crecimiento económico. La inexactitud de las proyecciones del PNB hará que la relación entre el PNB y el volumen de las autopistas de peaje sea menos confiable que antes. Además, los ingresos de peaje de referencia suponen que la recaudación de tarifas de peaje se mantendrá en su nivel actual. Esta suposición también podría resultar errónea si, por ejemplo, la tecnología de cobro de peajes es inviable durante cualquier período, como han demostrado los desastres naturales que han interferido previamente con la capacidad de la ACT para cobrar las tarifas de peaje. Por lo tanto, el crecimiento del PNB y el rendimiento general de los ingresos de la ACT pueden verse afectados de forma significativa.

***El modelo del Plan Fiscal de la ACT no incorpora importantes variaciones demográficas que en este momento no son evidentes.***

Las proyecciones de población del Plan Fiscal de la ACT están basadas en las previsiones de futuro crecimiento económico y en diversos factores demográficos, como las tasas de fertilidad y mortalidad y la emigración neta, derivadas de los datos más recientes (a la fecha de certificación)

de CDC, Estadísticas de la Oficina de Transportes y la Oficina del Censo de EE.UU., entre otros. Las variaciones demográficas importantes que en este momento no son evidentes (como, por ej., cambios notables en las tasas de fertilidad, la pirámide de población y los patrones migratorios) podrían alterar significativamente las estimaciones sobre las que se basó el modelo del Plan Fiscal de la ACT. Dado que la población constituye un factor determinante para las proyecciones macroeconómicas generales (por ej., el PNB en Puerto Rico), que a su vez influyen en las proyecciones de las partidas de ingresos y gastos (por ej., los volúmenes de tráfico, el número de usuarios del transporte público, los costos de la mano de obra), los cambios en las proyecciones de población afectarían la precisión del superávit proyectado.

***El plan fiscal de la ACT utiliza los datos y las políticas actuales para proyectar la magnitud y el desembolso de los fondos federales destinados a la ayuda para desastres y discrecional, otras fuentes de financiamiento relacionadas y otros programas federales importantes.***

Históricamente, la ACT ha sufrido las consecuencias de la falta de un proceso claro para la ejecución de programas de inversión de capital. Las proyecciones del Plan Fiscal de la ACT de febrero de 2022 se fundamentan en la implementación eficiente y oportuna de la recepción y desembolso de fondos federales y privados de ayuda para desastres, así como de fondos discrecionales, y de otras fuentes de financiamiento similares. Esta confianza supone que los procesos de los gobiernos federal y local para solicitar y desembolsar fondos se acelerarán durante y después del FY2022 y que las estimaciones federales más recientes en cuanto a la magnitud de los fondos y del desembolso son exactas. La exactitud de los fondos de financiamiento federal es un factor clave para los ingresos en el modelo operativo. Las proyecciones también se basan en la legislación actual y las políticas federales que rigen el uso de estos fondos. Si cambian los niveles de eficiencia o los procesos generales del gobierno local o federal, o si se producen cambios en las asignaciones o en las políticas de gobierno (es decir, cambios realizados por el Congreso, FEMA, HUD, USDA u otras agencias federales), podría haber impactos directos en la exactitud de las proyecciones de ingresos y gastos, dado que los fondos de ayuda para desastres afectan a las estimaciones de crecimiento del PNB (que a su vez repercuten en las proyecciones de población), así como a las estimaciones relativas a la participación de los gobiernos locales en los costos. Además, las proyecciones dependen del estatus de concesionario de la ACT, que le permite recibir fondos adicionales del gobierno federal, y cualquier interrupción del estatus de concesionario de la ACT perjudicaría aún más la situación fiscal de la ACT.

También existe un riesgo para el nivel de fondos federales que recibe la ACT, que se basa en su capacidad para cumplir con los requisitos y directrices federales. Por ejemplo, si la ACT no cumple, supervisa o informa sobre los requisitos federales de desempeño, como los requisitos de la FHWA de "lograr o hacer un progreso significativo hacia la consecución de los objetivos establecidos en el Programa Nacional de Desempeño de las Carreteras", puede haber implicaciones para el nivel y las limitaciones de los fondos federales. El Plan Fiscal de la ACT de febrero de 2022 parte de la base de la coherencia histórica reciente del cumplimiento de estos requisitos por parte de la ACT.

Sin la recepción y el desembolso oportunos de los fondos, la ACT correrá el riesgo de no poder mantener su actual red de transporte y seguirá estando atrasada con respecto a los estándares nacionales de calidad, seguridad y confiabilidad. Los fondos proporcionados a la ACT se utilizan para proyectos de infraestructura de transporte, cuyo objetivo es hacer que las carreteras de Puerto

Rico sean más seguras y los sistemas de tránsito de Puerto Rico más confiables. Sin estos fondos, estos proyectos quedarán incompletos y pueden dar lugar a que menos residentes de Puerto Rico utilicen los sistemas de tránsito de Puerto Rico, así como las carreteras de Puerto Rico, lo que provocará una disminución de los ingresos totales de la ACT debido a la falta de recaudación de peajes y multas, así como de las tasas de tránsito. Hasta la fecha, el número de usuarios de transporte público ha disminuido considerablemente y sigue deprimido en relación con los niveles anteriores a la pandemia. Un mayor descenso del número de usuarios y/o un aumento inesperado de los costos de explotación supondrían un riesgo para la situación fiscal general de la ACT. Por lo tanto, los cambios en el financiamiento eficiente y confiable tendrán un impacto negativo en la implementación exitosa de las medidas señaladas en el Plan Fiscal de la ACT de febrero de 2022.

***Un cambio en la relación entre el ELA y la ACT puede afectar a la exactitud de las proyecciones del plan fiscal de la ACT.***

Debido al papel de la ACT en la entrega de proyectos de infraestructura de transporte en todo Puerto Rico y en el mantenimiento de las carreteras de Puerto Rico, la ACT ha dependido históricamente de la transferencia anual de fondos del ELA, como se discute en el Plan Fiscal de la ACT de febrero de 2022. Antes de la promulgación de la Orden Ejecutiva 2015-046, la ACT recibía asignaciones de ingresos procedentes del impuesto sobre los cigarrillos, el impuesto sobre la gasolina, el impuesto sobre el gasoil y el impuesto sobre el petróleo, además de las tarifas sobre licencia de vehículos recaudadas por el ELA. Después de que el ELA comenzara a retener estos ingresos en virtud de la Orden Ejecutiva 2015-046, para garantizar que la ACT tuviera suficientes recursos para financiar los gastos de mantenimiento y de capital necesarios para mantener operativo el sistema de transporte de Puerto Rico, el ELA comenzó a realizar dos nuevas asignaciones principales a la ACT: (1) una asignación para gastos de capital destinada a ayudar a la ACT a avanzar en sus prioridades de infraestructura; y (b) una transferencia general destinada a ser utilizada por la ACT únicamente para financiar los costos asociados a los activos no relacionados con el peaje. Durante el período comprendido entre los años fiscales 2022 y 2051, el Plan Fiscal Certificado del ELA 2022 incluye una asignación de operación anual promedio de aproximadamente $109 millones y una asignación de capital promedio de aproximadamente $67 por año. Si esta relación cambiara, o si estos importes de fondos anuales cambiaran con respecto a las proyecciones, la posición fiscal de la ACT se enfrentaría a un riesgo significativo.

***El plan fiscal de la ACT supone la aplicación del aumento de las tarifas de peaje.***

Las proyecciones del Plan Fiscal de la ACT de febrero de 2022 tienen en cuenta la aplicación de los aumentos de las tarifas de peaje. Los aumentos programados de las tarifas de peaje, previstos en el Plan Fiscal de la ACT de febrero de 2022, son el factor más importante del impacto fiscal global. Sin embargo, la aplicación de los aumentos de las tarifas de peaje sigue siendo políticamente incierta, y las tarifas de peaje de cuatro (4) de las autopistas de peaje operadas por la ACT se han mantenido planas durante dieciséis (16) años, sin ningún ajuste desde 2005. Además, dado que los aumentos de peaje contemplados en el Plan Fiscal de la ACT de febrero de 2022 están vinculados a la inflación, las fluctuaciones de esta acabarán afectando a los ingresos de peaje.

Por lo tanto, si no se aplican los aumentos de las tarifas de peaje en consonancia con la inflación y el Plan Fiscal de la ACT de febrero de 2022, los ingresos previstos en el Plan Fiscal de

la ACT de febrero de 2022 podrían verse afectados de forma significativa, ya que las tarifas de peaje son una de las cinco fuentes principales de ingresos de explotación de la ACT. Si las tarifas de peaje no se aplican de forma adecuada y eficaz, los ingresos de la ACT podrían diferir sustancialmente de los previstos en el Plan Fiscal de la ACT de febrero de 2022.

***El plan fiscal de la ACT asume la optimización de las multas y el cobro de peajes.***

Para alcanzar con éxito los objetivos fiscales contenidos en el Plan Fiscal de la ACT de febrero de 2022 y garantizar que las operaciones de la ACT estén suficientemente financiadas, el Plan Fiscal de la ACT de febrero de 2022 prevé unas tasas de multas de peaje que se ajusten a la inflación. El aumento de los precios de las multas de peaje para que sean compatibles con la inflación coincidiría tanto con los aumentos programados de las tarifas de peaje como con la Ley Federal de Ajuste de Sanciones Civiles de 2015. Además, se espera que la optimización del cobro de peajes mediante la instalación de nuevos sistemas de peaje y la ampliación del peaje de flujo libre ("ORT"), prevista en el Plan Fiscal de la ACT de febrero de 2022, aumente también los ingresos por peajes.

Las estimaciones para la aplicación de las multas de peaje y la optimización de la recaudación se basan necesariamente en hipótesis sobre los futuros índices de recaudación y los importes de las multas, que en última instancia podrían resultar incorrectos y afectar significativamente a las previsiones del Plan Fiscal de la ACT de febrero de 2022. Además, el Gobierno del ELA tomó la decisión política de no cobrar las multas de peaje de 2018 a 2020, pero podrían aplicarse cambios políticos similares en el futuro, lo que supondría un grave riesgo para esta fuente de ingresos fundamental para la ACT.

***El plan fiscal de la ACT asume que las medidas de eficiencia de la agencia se implementan para lograr ahorros sin afectar negativamente a la prestación de los servicios gubernamentales.***

Las medidas de gasto suponen que, en general, se conseguirán los objetivos de ahorro mediante reformas que mejoren la eficiencia gubernamental, manteniendo un nivel de servicios acorde con las necesidades de la población y que faciliten el crecimiento económico. No obstante, si dicho ahorro se consigue mediante simples recortes u onerosos programas de compras, aumentaría el riesgo de que no se logren eficiencias y de que el menor nivel de gastos comprometa la prestación de servicios del Gobierno, repercutiendo negativamente en la sostenibilidad económica y en los niveles de pobreza.

***El Plan Fiscal de la ACT parte del supuesto de una implementación eficaz y puntual de medidas relativas a los ingresos y gastos.***

Las proyecciones del Plan Fiscal de la ACT de febrero de 2022 se basan en una implementación eficaz y puntual de medidas relativas a los diversas ingresos y gastos. Esto supone que cualquier cambio posterior cambio o desviación de las metas y objetivos del Plan Fiscal de la ACT de febrero de 2022 se ajustará a la neutralidad de los ingresos y a los límites de gasto generales contemplados en el Plan Fiscal de la ACT de febrero de 2022 y los Presupuestos certificados pertinentes  Para garantizar la implementación efectiva y la credibilidad de los objetivos y las proyecciones del Plan Fiscal de la ACT de febrero de 2022, la Junta de Supervisión exige al Gobierno que presente informes periódicos de los resultados financieros y de los progresos de la

implementación. Además, la Junta de Supervisión ha desarrollado en su sitio web un mecanismo de seguimiento, que incrementará la transparencia y reforzará la rendición de cuentas de las iniciativas del Gobierno en cuanto a los hitos y logros del Plan Fiscal de la ACT de febrero de 2022. Las demoras o desviaciones de los objetivos, hitos e información de las medidas de ingresos y gastos especificados en el Plan Fiscal de la ACT de 2022 pueden alterar sustancialmente las proyecciones del Plan Fiscal de la ACT de febrero de 2022.

***El plan fiscal de la ACT parte de la base de que el Gobierno cooperará plenamente en la aplicación de todas las reformas estructurales y de tránsito y otras medidas fiscales.***

El plan fiscal de la ACT incorpora una serie de reformas necesarias para que Puerto Rico se acerque a una realidad en la que la ACT proporcione unas distancias de viaje entre la casa y el trabajo más predecibles, una mayor seguridad y confiabilidad de las carreteras, unos sistemas de transporte público mejorados, un aire más limpio, una reducción del tiempo de tránsito y un sistema de transporte público más eficaz y eficiente en Puerto Rico en general. El plan fiscal de la ACT incluye reformas agresivas destinadas a apoyar una transformación más amplia de la ACT, como la reestructuración de los activos de transporte en entidades específicas de cada modo (por ej., carreteras de peaje, carreteras sin peaje y transporte público), el desarrollo de marcos más objetivos para la selección de políticas, la creación de una junta de política general para guiar las estrategias de transporte multimodal en todo Puerto Rico, entre otros. En la actualidad, la ACT se financia mediante una combinación de ingresos propios, fondos federales y fondos del ELA (que incluyen tanto una asignación de capital como una asignación de operación). Las transferencias operativas y de capital del ELA están destinadas a ser utilizadas por la ACT únicamente para financiar los costos asociados a los activos no relacionados con el peaje y no están disponibles para ser utilizadas para ningún otro propósito. El plan fiscal de la ACT parte de la base de que las asignaciones de operación y de capital del ELA se transferirán a la ACT exclusivamente para financiar los costos de los activos no relacionados con el peaje una vez que se haya completado la reestructuración de los activos de transporte. En consonancia con la visión de la transformación más amplia de la ACT, el financiamiento futuro está ligado a los niveles estimados necesarios para operar las carreteras sin peaje y los activos de tránsito respectivamente, ya que las carreteras de peaje pueden financiar sus propios gastos. Sin embargo, estas reformas deben adoptarse junto con las medidas fiscales establecidas para aumentar los ingresos y restablecer los resultados de la entrega de capital para la ACT.

***El modelo del Plan Fiscal de la ACT está basado en los datos históricos reportados por la ACT, muchos de los cuales no han sido auditados ni revisados de manera independiente.***

El modelo del Plan Fiscal de la ACT está basado en la aportación de datos históricos macroeconómicos, de ingresos y de datos aportados por la ACT. En el pasado, el Gobierno ha tenido dificultades para comunicar datos completos y exactos, y gran parte de la información financiera facilitada por el Gobierno nunca ha sido auditada ni revisada por una empresa de contabilidad independiente o por terceros. Todas las incongruencias o inexactitudes de los datos pueden tener un impacto sobre las proyecciones basadas en ellos.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                    04/30/2022 3:29 PM" ""

***El modelo del plan fiscal de la ACT está basado en datos e información actuales para proyectar las necesidades y repercusiones de las necesidades del programa de mejoras de capital.***

Las proyecciones del plan fiscal de la ACT incorporan gastos de capital basados en la evaluación actual y futura de las necesidades del programa de mejoras de capital. Es posible que los planes de gastos de capital tengan que ser revisados periódicamente debido a varios factores, incluyendo, entre otros, cambios en la política legislativa y en las actividades del sector público, necesidad de acelerar o aplazar mejoras planificadas, interacción con otras agencias gubernamentales, instrumentalidades, municipios, inversionistas privados, fuentes de financiamiento y otros factores macroeconómicos. La necesidad de cuantificar o aumentar la reforma estructural relativa a las infraestructuras públicas también puede afectar a las proyecciones de gastos de capital del Plan Fiscal de la ACT de febrero de 2022. Las variaciones de estas proyecciones de gastos, así como cualquier desviación de las repercusiones proyectadas de esas mejoras de capital también podrían repercutir en la puntualidad y cumplimiento de otras proyecciones financieras interdependientes del cumplimiento efectivo y de la existencia de un marco y de infraestructuras subyacentes.

***El plan fiscal de la ACT no prevé cambios importantes en el clima político actual en Puerto Rico o en Estados Unidos con posterioridad a esta certificación.***

Las políticas y proyecciones financieras del plan fiscal de la ACT están impulsadas por el compromiso del Poder Ejecutivo y por las políticas legislativas de EE.UU. y de Puerto Rico existentes en el momento de la certificación del Plan Fiscal de la ACT de febrero de 2022. Gran parte de las proyecciones financieras están estrechamente vinculadas con la disponibilidad de fondos federales y con el compromiso político local. El plan fiscal de la ACT no toma en cuenta futuros cambios en el entorno político, como los de; gobierno puertorriqueño, la orientación legislativa y reglamentaria de Puerto Rico, como tampoco la organización y estructura de la prestación de servicios en las entidades gubernamentales a nivel del ELA y municipal, las asignaciones federales, políticas de financiamiento y exenciones tributarias federales, o el estado de las relaciones de Puerto Rico con el gobierno federal.

***El plan fiscal de la ACT se basa en las disposiciones prescritas por la ley actual, modificadas por las medidas propuestas. Los futuros cambios en la política de pensiones podrían afectar significativamente los costos proyectados.***

El plan fiscal de la ACT prevé los beneficios adeudados a los particulares basándose en las disposiciones actualmente vigentes, modificadas por las medidas propuestas, así como de conformidad con el plan fiscal del ELA y el Plan del ELA. En la medida en que el Gobierno promulgue leyes que modifiquen estas disposiciones y que no se determinen de otro modo como incompatibles o nulas y sin valor, los costos proyectados de PayGo cambiarán, lo que en última instancia afectará las proyecciones del plan fiscal de la ACT.

El Gobierno ha mostrado su propensión a querer modificar los beneficios de las pensiones a través de una serie de leyes a lo largo de los dos últimos años. Entre ellas se encuentran, entre otras, la Ley 80-2020 (que prevé una ventana de retiro incentivado), la Ley 81-2020 (que prevé la mejora de los beneficios para los empleados de alto riesgo) y la Ley 82-2020 (que prevé la conversión adicional de las licencias por enfermedad en la fórmula de las pensiones para los

2" = "1" "2621/33260-009 CURRENT/127656480v7                                   04/30/2022 3:29 PM" ""

maestros). Además, a principios de 2021 se introdujeron varias leyes adicionales para modificar adicionalmente los beneficios de las pensiones. El 9 de junio de 2021, el Gobernador promulgó la Ley 7-2021 , que pretendía dictar unilateralmente los términos del plan del ELA, incluyendo las obligaciones de deuda previas a la petición, eliminar todas las reformas a las pensiones contempladas por el plan fiscal del ELA junto con reformas esenciales implementadas conforme a la Ley 106, restablecer todos los sistemas públicos de pensión tal como existían antes de la Ley 106 y consolidar la fuente de financiamiento para estas obligaciones de beneficios insustentables en un sistema de pensiones financiados por fideicomisos.

Aunque la Junta de Supervisión y el Gobierno resolvieron las disputas relativas a la Ley 80-2020, la Ley 81-2020 y la Ley 82-2020 conforme con la *Estipulación y Orden que resuelve la demanda de la Junta de Supervisión de fecha 20 de diciembre de 2021 relativa a las Leyes 80-2020, 81-2020 y 82-2020 y la Resolución Conjunta 33-2021* [ECF Núm. 6 en Proc. Cont. Núm. 21-00119], que establecía que dichas Leyes serían invalidadas, a la fecha de promulgación aplicable, por ser significativamente incompatibles con el plan fiscal certificado del ELA, el Gobierno puede, no obstante, tomar medidas para cambiar la futura política de pensiones.

***Las actuales asociaciones P3 pueden concluir, lo que obligaría a la ACT a incurrir en y pagar costos imprevistos.***

Actualmente, la ACT opera bajo dos contratos de concesión: (i) el Contrato de Concesión de Autopistas de Peaje con Metropistas para el derecho de explotación de las Autopistas PR-5 y PR-22 y (ii) el Contrato de Concesión de Servicios de Puentes con Autopistas para el diseño, la construcción, la operación y el mantenimiento del Puente Teodoro Moscoso. Ambos acuerdos pueden ser rescindidos a exclusivo criterio de los Concesionarios y/o si no se cumplen ciertas condiciones de desempeño. Si se rescindieran estos contratos, la ACT estaría obligada a asumir ciertas obligaciones de pago del capital y los intereses de los bonos en circulación, así como a pagar otras compensaciones.

## L.   Riesgos relacionados con la recaudación de ingresos que respaldan el pago de los Nuevos Bonos de la ACT

Los esfuerzos de recaudación de los ingresos de peaje en Puerto Rico se llevan a cabo mediante la operación de métodos de cobro de peaje electrónico, que consisten en comisiones pagadas al operador de peaje. El plan fiscal de la ACT pretende mejorar la recaudación de los ingresos de los peajes mediante la mejora y ampliación de la recaudación de peajes sin el uso de cabinas de peaje a través de ORT (por ej., peaje totalmente electrónico, peaje sin efectivo o peaje de flujo libre, así como la instalación de nuevos sistemas de peaje, para mejorar la eficiencia de la ACT en la recaudación de las tarifas de peaje). Además, el Plan Fiscal de la ACT de febrero de 2022 prevé la aplicación de aumentos de tarifas de peaje, lo que incrementa directamente las tasas de cobro de peaje.

El pago de los Nuevos Bonos de la ACT estará respaldado por una pignoración del Patrimonio del Fideicomiso, que incluye los ingresos generados directamente por el cobro de peajes electrónicos. Véase la Sección (87) de esta Declaración de Divulgación para obtener una descripción más detallada del Patrimonio del Fideicomiso. Cualquier reducción de los recursos de

cobro de peajes o cualquier falla en el sistema de cobro electrónico de peajes disminuiría la capacidad de la ACT para cotizar y recaudar los ingresos de los peajes para financiar el pago de los Nuevos Bonos de la ACT. Además, la aplicación de los aumentos de las tarifas de peaje sigue siendo políticamente incierta porque no ha habido ningún aumento de las tarifas de peaje en Puerto Rico desde 2005, lo que hace que la ACT corra el riesgo de carecer de fondos suficientes para solventar el pago de los Nuevos Bonos de la ACT

***Los desastres naturales y los cortes de electricidad pueden afectar a la capacidad del gobierno para recaudar los ingresos de peaje.***

Puerto Rico está situado en una región que sufre frecuentes huracanes, tormentas tropicales y otros fenómenos meteorológicos. Estos fenómenos meteorológicos y otros desastres naturales, como los terremotos, han causado importantes daños en las carreteras de Puerto Rico y han afectado gravemente al funcionamiento del sistema de peaje electrónico de Puerto Rico. El cobro de las multas de peaje se suspendió debido al impacto adverso de los desastres naturales en el sistema de cobro de peaje electrónico. Sin embargo, el cobro de peaje se ha reanudado posteriormente, pero sigue estando por debajo de los niveles previstos debido al retraso en la aplicación del plan de optimización del cobro de peaje. En 2020, el operador provisional del sistema de peaje electrónico estimó que hasta un 20% de los conductores no pagaban las tarifas de peaje. Es posible que los fenómenos meteorológicos y otros desastres naturales, como terremotos, aludes o la subida del nivel del mar, interfieran con la capacidad de recaudación de los ingresos previstos en el Plan Fiscal de la ACT de febrero de 2022 y provoquen nuevas perturbaciones en la recaudación de las tarifas y las multas de peaje.

***Brote de la pandemia de COVID-19.***

El impacto que la pandemia de COVID-19 está causando y causará en el comercio, los mercados financieros y Puerto Rico, así como la naturaleza de sus repercusiones, seguramente evolucionará en el transcurso de los próximos años. El Gobierno ha experimentado reducciones de las fuentes de ingresos. La información contenida en esta Declaración de Divulgación describe las repercusiones actuales que la pandemia de COVID-19 y sus consecuencias han tenido para las finanzas y actividades del país, y describe algunas de las medidas de respuesta adoptadas por Puerto Rico. No es posible predecir la duración ni el alcance de la emergencia sanitaria de COVID-19, ni la magnitud de su impacto en Puerto Rico, ni la economía regional o la recaudación de impuestos. El brote de COVID-19 está en curso y su naturaleza dinámica provoca incertidumbre, como por ejemplo (i) la propagación geográfica del virus; (ii) la gravedad de la enfermedad; (iii) la duración del brote; (iv) las medidas que las autoridades pueden adoptar para contener o mitigar la pandemia; (v) el desarrollo y distribución de terapias médicas y vacunas; (vi) restricciones de movilidad adicionales o cambiantes; (vii) el impacto de la pandemia en la economía local o global o, en general, en el sector aeronáutico; (viii) probabilidades, y en qué medida, de que Puerto Rico pueda ordenar medidas de salud pública adicionales; y (ix) consecuencia de la pandemia y acciones de respuesta emprendidas en materia de recaudación de impuestos, gastos y situación financiera. Es más que probable que las restricciones y limitaciones vinculadas con COVID-19 continúen y/o se exacerben, al igual que los trastornos de las economías y mercados financieros nacionales y globales, al menos a corto y medio plazo, y que la recuperación puede ser prolongada. Pueden producirse epidemias o pandemias locales adicionales, y hacerlo con mayor frecuencia considerando las tendencias de globalización.

## M.    Factores de riesgo relacionados con futuras acciones judiciales

*Los Nuevos Bonos de la ACT se emiten en relación con el Plan de la ACT que está sujeto a confirmación de acuerdo con el Título III de PROMESA, que solo se ha utilizado para la reestructuración financiera en otros dos casos.*

El Plan de la ACT se efectúa de conformidad con el Título III de PROMESA. PROMESA es una nueva legislación federal aprobada en 2016, y un plan de ajuste conforme al Título III solo ha sido confirmado por un tribunal en otras dos ocasiones, con respecto al ELA (confirmado el 18 de enero de 2022) y COFINA (confirmado el 4 de febrero de 2019). En consecuencia, existen incertidumbres sobre la confirmación y el perfeccionamiento de un plan de ajuste conforme al Título III de PROMESA. Por ejemplo, no queda claro en qué medida una orden del Tribunal de Título III que confirme el Plan de la ACT podrá ser apelada, o su entrada en vigencia aplazada. Mientras que los tribunales posiblemente recurran a precedentes existentes de los capítulos 9 y 11 del Código de Quiebras, no existen garantías de que vayan a hacerlo o que no consideren otros factores a la hora de interpretar las disposiciones de PROMESA. Estas incertidumbres pueden afectar, entre otras cosas, a la percepción del mercado y, por tanto, al valor de negociación de los Nuevos Bonos de la ACT.

Además, existe incertidumbre en cuanto al perfeccionamiento de un plan de ajuste conforme al Título III de PROMESA, por cuanto no hay experiencia judicial relativa a la interpretación de un plan de ajuste confirmado en virtud del Título III de PROMESA. Las interpretaciones judiciales de un plan de ajuste confirmado en virtud del Título III de PROMESA, incluyendo las vinculadas a su perfeccionamiento satisfactorio, podrían afectar al valor de los Nuevos Bonos de la ACT emitidos en virtud del Plan de la ACT.

*La Ley PROMESA está sujeta a objeciones en cuanto a su constitucionalidad.*

Por ejemplo, ciertas partes han cuestionado la constitucionalidad de PROMESA, sobre la base de que la designación de los miembros de la Junta de Supervisión viola la Cláusula de Designaciones y el principio de división de poderes de la Constitución de EE.UU. porque los miembros no fueron designados por el Presidente con la recomendación y el consentimiento del Senado de EE.UU. Estas partes pretenden que se desestime el Caso de Título III del ELA, y han solicitado una sentencia declaratoria que manifieste que PROMESA viola la Cláusula de Designaciones y que todos los actos de la Junta de Supervisión hasta la fecha carecen de validez. Estas partes también solicitan que se prohíba a la Junta de Supervisión ejercer cualquier autoridad que le sea concedida por PROMESA. El Tribunal de Título III emitió una opinión y una orden que sostiene que no existe ningún defecto de constitucionalidad en el método de designación [ECF Núm. 3503]. Las partes que objetan la Ley PROMESA apelaron ante el Primer Circuito, que revocó la decisión del Tribunal de Título III y sostuvo que el método de designación fue defectuoso. La Corte Suprema de EE.UU. concedió el certiorari sobre esta cuestión, y los alegatos orales se presentaron el 15 de octubre de 2019. El 1 de junio de 2020, la Corte Suprema revocó la decisión del Primer Circuito, sosteniendo que la Cláusula de Designaciones no se aplica a las designaciones de los miembros de la Junta de Supervisión. Para obtener información adicional, *véase* la Sección **V.F.6.** de esta Declaración de divulgación, titulada "Litigio sobre la Cláusula de Designaciones".

*La ACT puede ser objeto de futuras reclamaciones y acciones legales.*

La ACT puede estar sujeta a varias reclamaciones y acciones legales derivadas del curso ordinario de sus actividades después de la Fecha de Entrada en Vigencia de la ACT. El Deudor no puede predecir la naturaleza y el alcance de dichas reclamaciones y acciones, y no puede garantizar que la resolución final de estas no vaya a tener efectos perjudiciales para el Deudor después de salir del procedimiento del Título III.

*La aplicación de los derechos en virtud de los Nuevos Bonos de la ACT, la Escritura de los Nuevos Bonos de la ACT y la Legislación de los Nuevos Bonos de la ACT, puede verse limitada en la medida en que la ACT Reorganizada esté sujeta a un caso posterior en virtud del Título III de PROMESA.*

Los tenedores de los Nuevos Bonos de la ACT pueden ser incapaces de hacer valer sus derechos en virtud de los Nuevos Bonos de la ACT, la Escritura de los Nuevos Bonos de la ACT y la Legislación de los Nuevos Bonos de la ACT en la medida en que la ACT Reorganizada está sujeta a un caso posterior en virtud del Título III de PROMESA como resultado de la aplicación de la paralización automática de la ejecución de los remedios que se haría efectiva tras la presentación de la petición del Título III.

*Ciertas condiciones de cierre y documentación a entregar de cierre con respecto al Plan de la ACT pueden diferir en tipo y alcance de los descritos en este documento.*

Ciertas condiciones de cierre y documentación a entregar de cierre con respecto al Plan de la ACT pueden diferir en tipo y alcance de los descritos en este documento si el Tribunal de Título III emite una Orden de Confirmación diferente a la esperada.

**N.    Factores de riesgo relacionados con el tratamiento tributario de los Nuevos Bonos de la ACT**

*La proporción de los Nuevos Bonos de la ACT que estarán exentos de impuestos a efectos del impuesto federal sobre la renta de EE.UU. es incierta.*

Se espera que los Nuevos Bonos de la ACT se emitan como Nuevos Bonos de la ACT exentos de impuestos (como se define en "Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU."). Sin embargo, si se determina que los Nuevos Bonos de la ACT, o una parte de ellos, no están exentos de impuestos, serán tratados como Nuevos Bonos de la ACT tributables (como se definen en esta Declaración de Divulgación en "Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU."). La ACT Reorganizada se compromete, en virtud del Plan de la ACT, a que, hasta que todas las obligaciones al respecto hayan sido pagadas o se hayan satisfecho en su totalidad de acuerdo con sus términos, hará y llevará a cabo todos los actos y gestiones permitidas por ley y razonablemente necesarias o deseables para garantizar que los intereses pagados a los tenedores de cualquier Nuevo Bono de la ACT con exención impositiva serán y seguirán siendo excluibles de los ingresos brutos para fines del impuesto federal sobre la renta. Sin embargo, el estatus tributario de los Nuevos Bonos de la ACT todavía no ha sido determinado a la fecha de esta Declaración de Divulgación, incluyendo (i) si parte del interés de los Nuevos Bonos de la ACT tendrán o no derecho a ser excluidos a efectos de los ingresos brutos del impuesto federal sobre la renta de EE.UU., o bien (ii) si se

determina que dichos intereses, o una parte de ellos, no pueden ser excluidos, la relación de la cuantía total de todos los Nuevos Bonos de la ACT tributables que se emitirán en la Fecha de Entrada en Vigencia de la ACT y la cuantía total de todos los Nuevos Bonos de la ACT. Véase "*Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.")— Tenedores de EE.UU.—Tratamiento fiscal de Reclamaciones permitidas— Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (Clase 9)—Tributación de los Nuevos Bonos de la ACT.*"

***La manera en que se calcularán los intereses devengados con respecto a los Nuevos Bonos de la ACT a efectos del impuesto federal sobre la renta de EE.UU. es incierta***

Los Deudores no pretenden dar a los Nuevos Bonos de la ACT el tratamiento de "instrumentos de deuda de pago contingente" a efectos del Reglamento del Tesoro vigente (como se define en "Consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU."). No obstante, la autoridad para el tratamiento de los Nuevos Bonos de la ACT es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acera del tratamiento de los Nuevos Bonos de la ACT en calidad de instrumentos de deuda de pago contingente, incluyendo las limitaciones que pudiesen aplicarse a la cuantía de los intereses exentos de impuestos de los Nuevos Bonos de la ACT que podrán excluirse de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU. Véase "*Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.")—Tenedores de EE.UU.—Tratamiento fiscal de Reclamaciones permitidas— Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (Clase 9)—Tributación de los Nuevos Bonos de la ACT.*"

***Es posible que, en algunos años, se exija a los Tenedores de EE.UU. declarar sus ingresos superiores al dinero en efectivo que hayan percibido en esos años, lo cual supondría "ingresos fantasma" para propósitos tributarios de Estados Unidos.***

Aunque se espera que los Nuevos Bonos de la ACT se emitan como Nuevos Bonos de la ACT exentos de impuestos (como se definen en "Ciertas consideraciones materiales a efectos a efectos del Impuesto federal sobre la renta de EE.UU."), en la medida en que se determine que los Nuevos Bonos de la ACT, o una parte de ellos, no están exentos de impuestos, serán tratados como Nuevos Bonos de la ACT tributables (como se definen en "Ciertas consideraciones materiales a efectos a efectos del Impuesto federal sobre la renta de EE.UU."). Si a efectos del Impuesto federal

sobre la renta de EE.UU., los Nuevos Bonos de la ACT tributables se emiten con más de un importe *de minimis* de descuento original de emisión, generalmente, el 0.25% del precio de amortización estipulado al vencimiento, multiplicado por el número de años enteros hasta el vencimiento, entonces un Tenedor de EE.UU. de dichos bonos deberá incluir el descuento de emisión original en sus ingresos cuando lo devengue (independientemente del método habitual de contabilización tributaria del tenedor) utilizando un método de rentabilidad constante de conformidad con las reglas de devengo. Si en algún año los devengos de intereses superasen los pagos de efectivo en concepto de los Nuevos Bonos de la ACT tributables, un Tenedor de EE.UU. habrá percibido ese año una "renta fantasma", es decir, ingresos tributables por encima del efectivo recibido, que podría ser sustancial.

En caso de venta u otra enajenación tributable de un Nuevo Bono de la ACT con el descuento de mercado devengado, un Tenedor de EE.UU. deberá declararlo como ingreso ordinario (en lugar de plusvalía de capital) en función del descuento de mercado devengado, salvo que previamente haya optado por incluir el descuento de mercado del ingreso en el momento de devengarlo. Véase "*Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.")—Tenedores de EE.UU.—Tratamiento fiscal de Reclamaciones permitidas— Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (Clase 9)—Tributación de los Nuevos Bonos de la ACT.*"

TODOS LOS TENEDORES SUJETOS A LA TRIBUTACIÓN ESTADOUNIDENSE DEBERÍAN LEER LA EXPLICACIÓN DE LAS CONSECUENCIAS, A EFECTO DEL IMPUESTO FEDERAL SOBRE LA RENTA DE EE.UU., DE LA COMPRA, POSESIÓN Y ENAJENACIÓN DE LOS NUEVOS BONOS DE LA ACT CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, BAJO EL ENCABEZADO "CONSIDERACIONES MATERIALES A EFECTOS DEL IMPUESTO FEDERAL SOBRE LA RENTA DE EE.UU.".

[*El resto de la página se deja intencionalmente en blanco*]

2" = "1" "2621/33260-009 CURRENT/127656480v7                                      04/30/2022 3:29 PM" ""

## IX.     Consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.

### A.     Generalidades

A continuación, se presenta una descripción general de ciertas consecuencias materiales del Plan de la ACT a efectos del Impuesto federal sobre la renta de EE.UU. para los tenedores de ciertas Reclamaciones. Esta descripción está basada en el Código de Rentas Internas de 1986, con sus correspondientes modificaciones (el "IRC", por sus siglas en inglés), los reglamentos (incluyendo los temporales y propuestos) promulgados conforme al IRC (el "Reglamento del Tesoro"), las sentencias judiciales y decisiones administrativas, tal y como estén vigentes en la fecha de esta Declaración de Divulgación, y sujetos a cambios, posiblemente con efectos retroactivos. Los cambios de cualquiera de estas potestades o de su interpretación podría hacer que algunas, o todas, las consecuencias tributarias del Plan a efectos del Impuesto federal sobre la renta de EE.UU. resulten sustancialmente distintas de las aquí descritas.

Las consecuencias tributarias del Plan a efectos del Impuesto federal sobre la renta de EE.UU. son complejas, y pueden variar en función de la Clase de la Reclamación de un tenedor. A la fecha de esta Declaración de Divulgación, no se ha solicitado al Servicio de Rentas Internas ("IRS", por sus siglas en inglés) ninguna opinión acerca de algún aspecto del Plan de la ACT; no se ha solicitado ninguna opinión a los abogados de los Deudores sobre las consecuencias fiscales del Plan de la ACT, salvo las específicamente aquí expuestas, y esta Declaración de Divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos de la tributación federal estadounidense que pudiera ser relevante para los tenedores de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial preocupación para determinados tipos de contribuyentes (por ej., compañías de inversiones reguladas, fondos de inversión inmobiliaria, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de retiro y otras sujetas a tributación diferida, tenedores que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificados, asociaciones u otras entidades interpuestas a efectos tributarios federales estadounidenses, personas cuyas divisas funcionales para fines fiscales no sean el dólar estadounidense, intermediarios de valores o de divisas, intermediarios que ajustan sus títulos al mercado, personas sujetas al impuesto mínimo alternativo, personas perceptoras de beneficios del Seguro Social o del Sistema de Retiro para Ferroviarios, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción no aborda otros impuestos federales de los impuestos sobre la renta, ni se aplica a las personas que adquieran Nuevos Bonos de la ACT en el mercado secundario. Además, la descripción no contempla las consecuencias tributarias relativas a otros impuestos estatales, territoriales (incluido Puerto Rico), locales o no estadounidenses (incluyendo los impuestos patrimoniales o a las donaciones). Por último, este documento no aborda las consecuencias a efectos del Impuesto federal sobre la renta de Estados Unidos para los titulares de reclamaciones que se considere que han rechazado el Plan de la ACT.

Por estos motivos, esta descripción no sustituye a una detenida planificación tributaria ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada tenedor de

una Reclamación. Los tenedores de Reclamaciones deberían consultar a sus propios asesores fiscales acerca de las consecuencias tributarias de los impuestos federales, estatales, territoriales (Puerto Rico incluido), locales y no estadounidenses del Plan de la ACT.

**Esta sección no aborda las consecuencias fiscales del Plan de la ACT en Puerto Rico para los titulares residentes de buena fe del Estado Libre Asociado ni para otros que pudieran estar sujetos a impuestos, sobre una base bruta o neta, del Estado Libre Asociado. Recomendamos a estas personas consultar la sección "Consideraciones materiales a efectos del Impuesto sobre la renta de Puerto Rico", más adelante.**

**B.      Tenedores de EE.UU.**

**1.      Definición de Tenedor de EE.UU.**

Salvo que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores de EE.UU. Tal como se utiliza aquí, por "Tenedor de EE.UU." se entenderá a un tenedor beneficiario de Bonos de la ACT ("Valores Existentes") a la Fecha de Vigencia del Plan de la ACT, a efectos del Impuesto federal sobre la renta de EE.UU.:

- un particular que es ciudadano o residente de los Estados Unidos;

- una corporación u otra entidad sujeta a impuestos federales sobre ingresos de EE.UU., constituida u organizada en, o de acuerdo con, las leyes de los Estados Unidos, cualquiera de sus estados o el Distrito de Columbia;

- una sucesión, cuyos ingresos están sujetos al Impuesto federal sobre la renta de EE.UU., independientemente de su procedencia; o bien

- un fideicomiso, si un tribunal de los Estados Unidos puede ejercitar su competencia sobre su administración y una o más personas estadounidenses tienen la facultad de controlar todas sus decisiones sustanciales, o bien si el fideicomiso tiene en vigencia una elección válida, de conformidad con el reglamento del Tesoro de EE.UU., para ser tratado como persona estadounidense.

Si una asociación u otra entidad o instrumento jurídico que paga impuestos como asociación a efectos del Impuesto federal sobre la renta de EE.UU. es tenedor de Valores Existentes, el tratamiento fiscal de un socio de dicha asociación dependerá en general de la situación del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad tenedores de Valores Existentes que consulten a sus asesores fiscales.

El término "Tenedor de EE.UU." no incluye a personas físicas ni jurídicas de Puerto Rico, cada una de ellas definida a continuación, bajo "Personas Físicas de Puerto Rico y Personas Jurídicas de Puerto Rico". Las personas físicas y jurídicas de Puerto Rico deberían consultar las consecuencias fiscales del Plan de la ACT a efectos del Impuesto federal sobre la renta de EE.UU. que se explican en "Personas físicas y jurídicas de Puerto Rico".

Un Tenedor de EE.UU. que sea tenedor de Reclamaciones Permitidas de más de una Clase podría tener consecuencias tributarias diferentes para cada clase de Reclamaciones Permitidas. Los

Tenedores de EE.UU. deberían consultar cuidadosamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones permitidas de las que fueran tenedores y los Tenedores estadounidenses de más de una Clase de Reclamaciones permitidas deberían consultar a sus propios asesores fiscales acerca de la potencial interacción de las consecuencias para el Impuesto federal sobre la renta de EE.UU. de cada una de las Reclamaciones permitidas de las que pudiera ser tenedor.

En general, a ciertos Tenedores de EE.UU. que utilizan el método contable en valores devengados a efectos del Impuesto federal sobre la renta se les exigirá que reconozcan determinadas cantidades como parte de los ingresos percibidos en concepto de las Reclamaciones permitidas no más tarde del momento en que estas aparezcan reflejadas en sus estados financieros. Dichos Tenedores de EE.UU. deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan de la ACT a efectos tributarios en EE.UU., en función de sus circunstancias personales.

2.   **Tratamiento fiscal de Reclamaciones permitidas**

(a)   **Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) (Clase 9)**

Se prevé que, conforme al Plan de la ACT, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos de la ACT 68; (ii) Reclamaciones de Bonos de la ACT 68 (Ambac); (iii) Reclamaciones de Bonos de la ACT 68 (Assured); (iv) Reclamaciones de Bonos de la ACT 68 (National); (v) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98; (vi) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac); (vii) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured); (viii) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC); y (ix) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (National) será tratado como si canjeara los Bonos de la ACT de los Tenedores de EE.UU. sujetos a estas Clases de Reclamaciones permitidas por Nuevos Bonos de la ACT y Efectivo, a efectos del Impuesto federal sobre la renta de EE.UU. Los Deudores pretenden declarar la transacción de manera congruente con su tratamiento por el IRS, y en el resto de esta exposición se parte del supuesto de que cada Tenedor de EE.UU. seguirá el tratamiento previsto.

(i)   *Tratamiento fiscal del canje*

La oferta de Bonos de la ACT por Nuevos Bonos de la ACT y efectivo, según corresponda, prevista por el Plan de la ACT será considerada un canje, de conformidad con la Sección 1001 del IRC. Un Tenedor de EE.UU. declarará resultados por una cantidad equivalente a la diferencia entre (i) la suma de cualquier efectivo percibido (salvo el atribuible a intereses devengados pero no

pagados en concepto de los Bonos de la ACT) más el "precio de emisión" a efectos del Impuesto federal sobre la renta de EE.UU. (que se determinará de la manera descrita a continuación bajo el epígrafe "—Precio de emisión") en concepto de cualesquiera Nuevos Bonos de la ACT, y (ii) la base tributable ajustada del Tenedor de EE.UU. sobre los Bonos de la ACT así ofrecidos (base tributable ajustada calculada como se describe más adelante). En general, y con sujeción a lo expuesto en "—Descuento de mercado", todo beneficio o pérdida que un Tenedor de EE.UU. declare en concepto del canje de los Bonos de la ACT por los Nuevos Bonos de la ACT y Efectivo, según proceda, conforme al canje, se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de mantenimiento de Bonos de la ACT del Tenedor de EE.UU. es superior a un año. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU. no corporativos se gravan a tasas preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones.

El período de mantenimiento por parte de un Tenedor de EE.UU. de cualesquiera Nuevos Bonos de la ACT comenzará a contabilizarse al día siguiente del canje. En general, la base tributaria de los Nuevos Bonos de la ACT recibidos en el canje por el Tenedor de EE.UU. será equivalente al precio de emisión de los Nuevos Bonos de la ACT (que se determinará como se explica más adelante en el epígrafe "—Precio de emisión") en la fecha del canje.

(ii) *Tratamiento fiscal de la percepción de efectivo*

(1) **Efectivo**

Está previsto que, a efectos del Impuesto federal sobre la renta de EE.UU., el efectivo se trate como pago por los Bonos de la ACT, salvo el efectivo percibido atribuible a los intereses devengados y no pagados. El Plan de la ACT prevé que, en la medida de lo posible, las distribuciones al tenedor de una Reclamación se aplicarán en primer lugar a los intereses devengados pero no pagados a la fecha inmediatamente anterior a la Fecha de Petición de la ACT; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos del Impuesto federal sobre la renta de EE.UU.) y, a continuación, en la medida en que la contraprestación supere el monto del capital de la Reclamación, a aquellas otras cantidades (como intereses devengados pero no pagados distintos de los descritos en las cláusulas precedentes). La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la asignación de contraprestación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del Impuesto federal sobre la renta de EE.UU. Congruentes con dicha asignación en el marco del Plan de la ACT, en general el Reglamento del Tesoro considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados pero no pagados. Aunque se cree que la notificación de las distribuciones a un Tenedor de EE.UU. de conformidad con Plan de la ACT es congruente con la legislación vigente y las intenciones de los legisladores, no existen garantías de que el IRS vaya a respetarlas en lo que respecta a los pagos por los Bonos de la ACT. Recomendamos a los Tenedores de EE.UU. consultar a sus asesores fiscales para determinar la caracterización correcta de los pagos percibidos.

Con sujeción a lo tratado en el apartado precedente, si parte del efectivo percibido fuera atribuible a los intereses devengados e impagos de los Bonos de la ACT, el tratamiento de ese Efectivo abonado a un Tenedor de EE.UU. dependerá de si dichos intereses por su reclamación

devengados pero no pagados están o no exentos de pago a efectos del Impuesto federal sobre la renta de EE.UU. En general, un Tenedor de EE.UU. que anteriormente no hubiera estado obligado a incluir en sus ingresos tributables los intereses devengados pero no pagados de una Reclamación no exentos de impuestos posiblemente deba declarar el efectivo percibido como ingreso por intereses a efectos del Impuesto federal sobre la renta de EE.UU. en caso de recibir una distribución de tales intereses. Un Tenedor de EE.UU. que anteriormente estuviera obligado a incluir en los ingresos tributables intereses devengados pero no pagados de una Reclamación no exenta de impuestos tendrá derecho a que se le reconozca una pérdida deducible, en la medida en que dichos intereses no sean satisfechos de conformidad con el Plan de la ACT. Sin embargo, el Tenedor de EE.UU. de una Reclamación exenta de impuestos no tendrá derecho a deducir las pérdidas por intereses no pagados si nunca antes había incluido dichos intereses en sus ingresos brutos en EE.UU. Por otra parte, un Tenedor de EE.UU. que perciba una distribución de intereses devengados pero no pagados en concepto de una Reclamación exenta de impuestos no tendrá que incluir esa cantidad como ingresos financieros a efectos del Impuesto federal sobre la renta de EE.UU. por percibir dicha distribución en concepto de intereses. Aunque en general los Tenedores de EE.UU. no estarán obligados a incluir las mencionadas sumas en el cálculo de su ingreso tributable en EE.UU., lo más probable es que tengan que declararlas al IRS.

En el caso de los Bonos de la ACT que sean bonos de apreciación de capital, en los cuales el devengo del descuento de emisión original está tratado como intereses, el monto de dicho devengo podría haber incrementado la base tributable de un tenedor de bonos, aumentando de esa forma la inversión de un tenedor en dicho bono de apreciación de capital. En general, tal aumento de la base tributable se considera un incremento del monto del capital del bono de apreciación de capital. Los Tenedores de Reclamaciones de EE.UU. que hayan devengado dichos intereses deberían consultar a sus asesores fiscales acerca del tratamiento tributario de las distribuciones previstas por el Plan de la ACT y sobre las deducciones de los impuestos devengados pero no pagados a efectos del Impuesto federal sobre la renta.

(2) **Costos de perfeccionamiento y Derechos de restricción del AAP de la ACT**

El tratamiento del Impuesto federal sobre la renta de EE.UU. de los Costos de Perfeccionamiento y de los Honorarios de Restricción del AAP de la ATC no queda claro. Se cree que es adecuado tratar el pago de los Costos de Perfeccionamiento y los Derechos de Restricción del AAP de la ACT como un costo separado que debería declararse como ingreso ordinario, en lugar de una cantidad percibida de conformidad con los Bonos de la ACT. En general, dicho ingreso ordinario no estaría exento de impuestos a efectos del Impuesto federal sobre la renta de EE.UU., independientemente de si los Bonos de la ACT subyacentes estuvieran exentos de impuestos para fines del Impuesto federal sobre la renta de EE.UU. No obstante, es posible que los Costos de Perfeccionamiento y los Derechos de Restricción del AAP pudiesen ser en cambio tratados de la misma manera que se ha descrito en "Efectivo". Estos derechos también podrían ser considerados contraprestaciones adicionales pagadas a los tenedores que deberían tenerse en cuenta a la hora de calcular los beneficios o pérdidas de un tenedor. Se recomienda a los Tenedores de EE.UU. consultar a sus propios asesores fiscales sobre el tratamiento del Impuesto federal sobre la renta de EE.UU. de los Costos de Perfeccionamiento y los Derechos de Restricción del AAP de la ACT.

(iii)     *Descuento de mercado*

Si un Tenedor de EE.UU. adquirió los Bonos de la ACT por menos del "precio de emisión ajustado" de los Bonos de la ACT, y la diferencia entre el costo para dicho Tenedor y el "precio de emisión ajustado" excediera de un umbral de *minimis* (equivalente al 0.25% de la suma del total de los pagos pendientes a abonar por el instrumento de deuda, excluyendo los intereses declarados cualificados, multiplicado por el número de años completos hasta el vencimiento), en general dicha diferencia será tratada como "descuento de mercado".

En general, toda ganancia declarada en el canje será tratada como ingreso ordinario en la medida de cualquier descuento de mercado no devengado no incluido en el ingreso ordinario con respecto a los Bonos de la ACT. Si se reconociera el beneficio en virtud del canje de los Bonos de la ACT por Nuevos Bonos de la ACT, el Tenedor de EE.UU. deberá incluir como ingreso ordinario todo beneficio que, de otra manera, hubiera sido tratado como plusvalía de capital derivada del descuento de mercado devengado por los Bonos de la ACT, salvo que dicho Tenedor de EE.UU. previamente hubiera optado por incluir el descuento de mercado en el ingreso en el momento de devengarlo. Véase más adelante, bajo el epígrafe "—Tributación de los Nuevos Bonos de la ACT—Venta, retiro y otras enajenaciones de los Nuevos Bonos de la ACT", una exposición más detallada acerca de la opción de incluir el descuento de mercado en el ingreso en el momento de su devengo. Recomendamos a los Tenedores de EE.UU. consultar a sus propios asesores fiscales acerca del tratamiento tributario del descuento de mercado derivado del canje, incluyendo la interacción entre el descuento de mercado, el descuento de emisión original ("OID", por sus siglas en inglés) y las normas de primas de adquisición.

(iv)     *Tributación de los Nuevos Bonos de la ACT*

Se espera que los Nuevos Bonos de la ACT se emitan como bonos cuyos intereses estarán excluidos del ingreso bruto para fines del Impuesto federal sobre la renta de EE.UU. (los "Nuevos Bonos de la ACT exentos de impuestos") y el resto de este análisis asume que así será. No obstante, si se determina que dichos intereses no pueden excluirse de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU., los Nuevos Bonos de la ACT, o una parte de ellos, se emitirán como bonos cuyos intereses no están excluidos de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU. (los "Nuevos Bonos de la ACT Tributables"). El estatus tributario de los Nuevos Bonos de la ACT todavía no ha sido determinado a la fecha de esta Declaración de Divulgación, incluyendo (i) si parte de los Nuevos Bonos de la ACT tendrán o no derecho a ser excluidos de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU., o bien (ii) si los Nuevos Bonos de la ACT, o una parte de ellos, no pueden ser excluidos, la relación de la cuantía total de todos los Nuevos Bonos de la ACT tributables que se emitirán en la Fecha de Vigencia de la ACT y la cuantía total de todos los Nuevos Bonos de la ACT.

(1)     **Precio de emisión**

Se prevé que el precio de emisión de los Nuevos Bonos de la ACT sea equivalente a su valor justo de mercado a la fecha de su canje. Esta determinación está basada en las conclusiones de los Deudores de que tanto los Bonos de la ACT como los Nuevos Bonos de la ACT deberían ser tratados como "cotizados en Bolsa", con el significado de este concepto según las Reglas del Tesoro. El valor justo de mercado de los Nuevos Bonos de la ACT se determinará según el "precio

de cotización" de dichos bonos en la fecha del canje o en torno a ella. No existen directrices específicas sobre cómo determinar el precio de cotización en un determinado momento. Sin embargo, las Reglas del Tesoro pertinentes sugieren que un contribuyente podrá utilizar un método razonable y aplicado de manera congruente para determinar el justo valor de mercado si existe más de un precio de venta o precio cotizado. La determinación de los Deudores de que los Bonos de la ACT y los Nuevos Bonos de la ACT "coticen en Bolsa" será vinculante para todos los tenedores, salvo que alguno exprese su posición en sentido contrario en la manera requerida por las Reglas del Tesoro. La normativa en materia de determinación del precio de emisión es compleja, y los Tenedores de EE.UU. deberían consultar a sus propios asesores fiscales acerca de la determinación del precio de compra de los Nuevos Bonos de la ACT a efectos del Impuesto federal sobre la renta de EE.UU.

(2)   <strong>Intereses, incluyendo el OID</strong>

La normativa del Impuesto federal sobre la renta de EE.UU. empleada para determinar qué fondos son tratados como intereses es compleja. Se recomienda a los Tenedores de EE.UU. consultar a sus propios asesores fiscales acerca de los importes que serán tratados como intereses a efectos del Impuesto federal sobre la renta de EE.UU. en función de sus circunstancias individuales.

i.   <strong>Nuevos Bonos de la ACT exentos de impuestos</strong>

El IRC impone ciertos requisitos que deben satisfacerse tras la emisión y entrega de los Nuevos Bonos de la ACT exentos de impuestos, con el objeto de que los intereses que generen estén, y sigan estando, excluidos de los ingresos brutos para los fines del Impuesto federal sobre la renta de EE.UU., conforme a la Sección 103 del IRC. El incumplimiento de dichos requisitos podría conllevar que los intereses de los Nuevos Bonos de la ACT exentos de impuestos queden incluidos en el ingreso bruto a efectos del Impuesto federal sobre la renta de EE.UU. con retroactividad a la fecha de emisión de los Nuevos Bonos de la ACT exentos de impuestos. Cuando los Nuevos Bonos de la ACT exentos de impuestos se emitan en la Fecha de Entrada en Vigencia, la ACT Reorganizada, con arreglo a los Documentos Definitivos, incluyendo la Legislación de los Nuevos Bonos de la ACT, se compromete a hacer todo lo posible que la ley permita y que fuera razonablemente necesario o deseable para garantizar que los intereses pagados a los tenedores de Nuevos Bonos de la ACT exentos de impuestos estén, y sigan estando excluidos, del ingreso bruto para fines del Impuesto federal sobre la renta de EE.UU., conforme a la Sección 103 del IRC. Se pretende que los intereses de los Nuevos Bonos de la ACT que se emitan en virtud del plan de ajuste estén exentos de impuestos federales en la máxima medida permitida por el IRC. Sin embargo, como se ha indicado anteriormente, el estatus tributario de los Nuevos Bonos de la ACT todavía no se ha determinado a la fecha de esta Declaración de Divulgación. Para determinar el importe máximo de los Nuevos Bonos de la ACT que pueden estar exentos de impuestos federales en virtud del IRC, el Abogado especializado en Bonos de la Sección 103 debe completar la diligencia debida en relación con el uso de los ingresos de los bonos existentes, entre otras cuestiones. Este proceso de diligencia tardará algún tiempo en completarse.

Además, se buscará una resolución u otra orientación del IRS en relación con la asignación de los ingresos de los Nuevos Bonos de la ACT entre los fines elegibles para el financiamiento exento de impuestos y los fines no elegibles para el financiamiento exento de impuestos con el fin

de maximizar el monto de los Nuevos Bonos de la ACT que pueden ser emitidos como exentos de impuestos federales bajo el IRC.[208]  Todavía no se ha presentado una solicitud de resolución al IRS, pero se espera que la orientación del IRS se obtenga antes de la Fecha de Entrada en Vigencia. No se puede asegurar que se obtenga una orientación favorable del IRS ni el momento en que se produzca. Si no se recibe una resolución, el importe de los Nuevos Bonos de la ACT que estará exento de impuestos federales será menor que si se hubiera recibido una resolución y se basará en el porcentaje de los bonos existentes que se utilizaron para fines que eran y siguen siendo elegibles para la exención de impuestos según lo determinado por el Abogado especializado en Bonos de la Sección 103 después de una aplicación prorrateada de otras contraprestaciones recibidas por los tenedores. Para que el Abogado especializado en Bonos de la Sección 103 opine que cualquiera de los Nuevos Bonos de la ACT está exento de impuestos, es necesario que se determine que esas obligaciones son válidas y vinculantes para el ELA en virtud de la legislación promulgada por el ELA o de otro modo.

Los montos asignables a los intereses devengados antes de la emisión de los Nuevos Bonos de la ACT exentos de impuestos no serán tratados como intereses exentos de impuestos de conformidad con la Sección 103 del IRC.

ii.    **OID**

El importe del OID de los Nuevos Bonos de la ACT, si lo hay, será equivalente al excedente de la suma de todo el capital y de los pagos de intereses declarados (salvo el interés declarado calificado) de dichos Nuevos Bonos de la ACT (tomando inicialmente en cuenta el calendario de pagos descrito más adelante) sobre el precio de emisión (determinado de la manera descrita previamente bajo el epígrafe "—Precio de emisión") de los citados Nuevos Bonos de la ACT. En cuanto a los Nuevos Bonos de la ACT exentos de impuestos, el importe del OID se excluye del ingreso bruto a efectos tributarios federales estadounidense en la misma medida que se prevé que se excluyan los intereses de los Nuevos Bonos de la ACT exentos de impuestos. Los devengos del OID se calculan de la misma manera antes descrita para los Nuevos Bonos de la ACT tributables, aunque dichos devengos se sumarán a la base tributable del Tenedor de los Nuevos Bonos de la ACT exentos de impuestos. Es posible que el devengo del OID se considere como un incremento de la cantidad del ingreso exento de impuestos a efectos de determinar varias otras consecuencias fiscales de poseer Nuevos Bonos de la ACT exentos de impuestos aunque no se produzca el pago en efectivo correspondiente. Los Tenedores de los Nuevos Bonos de la ACT exentos de impuestos con OID deberían consultar a sus asesores fiscales con respecto a las consecuencias tributarias de poseer dichos instrumentos.

Las normas relativas al OID son complejas, y las anteriormente descritas pueden no aplicarse en todos los casos. Si se aplicase otra normativa, los Tenedores de EE.UU. que reciban los Nuevos Bonos de la ACT podrían ser tratados de manera diferente de la descrita anteriormente. Los Tenedores de EE.UU. que reciban Nuevos Bonos de la ACT deberían consultar a sus asesores

---

[208] Para evitar dudas, los Nuevos Bonos de la ACT no tendrán ingresos. Será necesario llevar a cabo la debida diligencia en cuanto al uso de los ingresos de los bonos existentes de la ACT, y si dichos ingresos se utilizaron de acuerdo con la legislación fiscal aplicable.

fiscales acerca de la potencial aplicación del OID y de la normativa tributaria federal de EE.UU. a los Nuevos Bonos de la ACT.

Esta Declaración de Divulgación parte del supuesto de que los Nuevos Bonos de la ACT no serán considerados instrumentos de deuda de pago contingente de conformidad con la definición del Reglamento del Tesoro aplicable. No obstante, la autoridad para el tratamiento de los Nuevos Bonos de la ACT es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acera del tratamiento de los Nuevos Bonos de la ACT en calidad de instrumentos de deuda de pago contingente, incluyendo las limitaciones que pudiesen aplicarse a la cuantía de los intereses exentos de impuestos de los Nuevos Bonos de la ACT exentos de impuestos que podrán excluirse de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU.

### iii.    Prima de adquisición

Un Nuevo Bono de la ACT será tratado como adquirido con una prima de adquisición si la base inicial del Tenedor de EE.UU. en el Nuevo Bono de la ACT es (a) igual o menor que la suma de todos los importes a pagar en concepto del Nuevo Bono de la ACT (salvo los pagos de los intereses declarados calificados), y (b) mayor que el precio de emisión ajustado de dicho bono a efectos Impuesto federal sobre la renta de EE.UU. Si el Nuevo Bono de la ACT exento de impuestos se hubiera adquirido con una prima de adquisición, el Tenedor de EE.UU. reduciría la base tributable del Nuevo Bono de la ACT exento de impuestos durante cada período de devengo utilizando el mismo método descrito anteriormente para los Nuevos Bonos de la ACT tributables. Como alternativa para reducir la base tributable del Nuevo Bono de la ACT exento de impuestos, el Tenedor de EE.UU. podrá optar por calcular los devengos del OID aplicando el método de rentabilidad constante descrito anteriormente. No obstante, si opta por ello, su decisión también se aplicará a todos los demás bonos que obren en su poder al comienzo del año fiscal en el cual se aplique su elección, así como a todos los bonos que adquiera a partir de ese momento. Normalmente, esta elección no podrá ser revocada. Los Tenedores de EE.UU. que adquieran Nuevos Bonos de la ACT con prima de adquisición deberían consultar a sus asesores fiscales acerca de las consecuencias de dicha elección en función de sus circunstancias personales.

### iv.    Nuevos Bonos de la ACT tributables

Si, en contra de las expectativas, los Nuevos Bonos de la ACT se emiten como Nuevos Bonos de la ACT Tributables, los pagos o devengos de "intereses declarados calificados" (según se define más adelante) sobre los Nuevos Bonos de la ACT Tributables (o una parte relevante de ellos) serán tributables a dicho Tenedor de EE.UU. en calidad de ingresos financieros ordinarios en el momento de percibirlos o devengarlos, de acuerdo con el método habitual de contabilización del Tenedor de EE.UU. a efectos del Impuesto federal sobre la renta de EE.UU. En general, el concepto "intereses declarados calificados" significa aquellos intereses declarados que se pagarán incondicionalmente en efectivo o en especie (salvo instrumentos de deuda del emisor) al menos anualmente durante el plazo de dicho instrumento, a una tasa fija de interés simple o, con sujeción a ciertas condiciones, sobre la base de uno o más índices de intereses. Está previsto que, en general, los pagos de los intereses pactados sobre los Nuevos Bonos de la ACT se consideren intereses pactados calificados a estos efectos.

- **OID**

Según lo dispuesto anteriormente, el importe del OID de los Nuevos Bonos de la ACT, si lo hay, será equivalente al excedente de la suma de todo el capital y de los pagos de intereses declarados (salvo el interés declarado calificado) de dichos Nuevos Bonos de la ACT (tomando inicialmente en cuenta el calendario de pagos descrito más adelante) sobre el precio de emisión (determinado de la manera descrita previamente bajo el epígrafe "—Precio de emisión") de los citados Nuevos Bonos de la ACT. Los Nuevos Bonos de la ACT tributables devengarán OID solamente si el precio de emisión de los Nuevos Bonos de la ACT, según proceda, fuera menor que el importe del capital en más de la cantidad *de minimis*. El OID se considerará *de minimis* si es menos del 0.25% del precio de amortización pactado al vencimiento multiplicado por el número de años enteros restante hasta el vencimiento de tales Nuevos Bonos de la ACT Tributables. Los Tenedores de EE.UU., tanto si fuera en efectivo o aplicando el método contable de devengo a efectos tributarios federales estadounidense, deberán incluir el OID de los Nuevos Bonos de la ACT tributables en los ingresos brutos como ingreso ordinario al devengo, sobre una base de rendimiento constante hasta el vencimiento, independientemente de si la cantidad atribuible a dicho OID se percibe en ese momento o no. Sin embargo, los Nuevos Bonos de la ACT Tributables pueden estar sujetos a las normas de prima de adquisición (descritas más adelante bajo el epígrafe "—Prima de adquisición"), lo cual podría reducir la cantidad de OID incluible en el ingreso bruto.

En el caso de los Nuevos Bonos de la ACT tributables, la cantidad del OID susceptible de inclusión en el ingreso bruto por un Tenedor de EE.UU. en cualquier año fiscal es, en general, la suma de los tramos diarios de OID con respecto a un Nuevo Bono de la ACT tributable por cada día de ese año fiscal o parte de ese año en que el Tenedor de EE.UU. mantenga el Nuevo Bono de la ACT tributable. El tramo diario se determina asignando a cada día de un período de devengo una parte prorrateada del OID asignable a dicho período. El período de devengo de un Nuevo Bono de la ACT tributable podrá tener cualquier duración durante el plazo, y podrá variar en el plazo del Nuevo Bono de la ACT siempre y cuando cada período de devengo no sea superior a un año, y cada pago programado de capital o de intereses se produzca el primer o el último día de un período de devengo. El importe del OID asignable a cualquier período de devengo, con sujeción a los posibles ajustes descritos más adelante, será una cantidad equivalente al producto del precio de emisión ajustado del Nuevo Bono de la ACT tributable al principio del período de devengo y su rendimiento al vencimiento (menos los pagos de los intereses declarados calificados asignables a dicho período). El rendimiento hasta el vencimiento de los Nuevos Bonos de la ACT tributables es la tasa de descuento que, cuando se utiliza para calcular el valor actual (a la fecha de emisión) del total de pagos de capital e intereses sobre los Nuevos Bonos de la ACT tributables genera una cantidad equivalente al precio de emisión de dichos bonos. El importe del OID asignable al período de devengo final es la diferencia entre el importe a pagar al vencimiento (salvo el pago de los intereses declarados calificados) y el precio de emisión ajustado al principio del último período de devengo. El precio de emisión ajustado de un Nuevo Bono de la ACT tributable al principio de cualquier período de devengo es equivalente a su precio de emisión, incrementado por el OID devengado en cada período de devengo anterior, y reducido por los pagos efectuados sobre el Nuevo Bono de la ACT tributable, según proceda, durante los períodos de devengo anteriores (excepto los pagos de los intereses declarados calificados).

**(b)   Prima de adquisición**

Según lo dispuesto anteriormente, un Nuevo Bono de la ACT será tratado como adquirido con una prima de adquisición si la base inicial del Tenedor de EE.UU. en el Nuevo Bono de la ACT es (a) igual o menor que la suma de todos los importes a pagar en concepto del Nuevo Bono de la ACT (salvo los pagos de los intereses declarados calificados), y (b) mayor que el precio de emisión ajustado de dicho bono a efectos del Impuesto federal sobre la renta de EE.UU. Si un Nuevo Bono de la ACT tributable fue adquirido con una prima de adquisición, en general un Tenedor de EE.UU. podría reducir el importe del OID que, de otro modo, se incluiría en el ingreso de cada período de devengo en una cantidad equivalente a (i) el monto del OID que de otro modo se incluiría en el ingreso, multiplicado por (ii) una fracción cuyo numerador es el excedente de la base tributable ajustada del Nuevo Bono de la ACT tributable inmediatamente después de su adquisición por el Tenedor de EE.UU. sobre el precio de emisión ajustado de dicho bono y cuyo denominador es el excedente de la suma de todos los importes a pagar sobre el Nuevo Bono de la ACT tributable tras la fecha de compra, salvo los pagos de los intereses declarados calificados, sobre el precio de emisión ajustado de dicho bono. Como alternativa para reducir el importe del OID que, de otro modo, se incluiría en el ingreso durante un período de devengo, el Tenedor de EE.UU. podrá optar por calcular los devengos del OID aplicando el método de rentabilidad constante descrito anteriormente. No obstante, si opta por ello, su decisión también se aplicará a todos los demás bonos que obren en su poder al comienzo del año fiscal en el cual se aplique su elección, así como a todos los bonos que adquiera a partir de ese momento. Normalmente, esta elección no podrá ser revocada. Los Tenedores de EE.UU. que adquieran Nuevos Bonos de la ACT con prima de adquisición deberían consultar a sus asesores fiscales acerca de las consecuencias de dicha elección en función de sus circunstancias personales.

(3)     **Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT**

Un Tenedor de EE.UU. declarará un beneficio o pérdida tributable sobre la venta, canje, retirada (incluyendo recuperación) u otra enajenación tributable de un Nuevo Bono de la ACT equivalente a la diferencia, en su caso, de (i) el importe materializado por dicha enajenación (salvo el efectivo percibido atribuible a intereses devengados pero no pagados), y (ii) la base tributable ajustada de dicho Nuevo Bono de la ACT. La base tributable ajustada de un Tenedor de EE.UU. sobre un Nuevo Bono de la ACT será generalmente equivalente a la base tributable de dicho Tenedor sobre el citado Nuevo Bono de la ACT en la fecha en que el Tenedor de EE.UU. haya adquirido ese instrumento, incrementada en cualquier OID previamente adquirido por él, y disminuida en la cantidad de los pagos de efectivo (salvo los pagos de los intereses pactados) previamente percibidos en concepto de aquel Nuevo Bono de la ACT por ese Tenedor de EE.UU. Recomendamos a estos consultar con sus asesores fiscales sobre la base tributable de sus Nuevos Bonos de la ACT en la fecha de adquisición.

Con sujeción a lo expuesto más adelante sobre el descuento de mercado, en general todo beneficio o pérdida que un Tenedor de EE.UU. declare por la venta u otra enajenación tributable de un Nuevo Bono de la ACT constituirá una plusvalía o una minusvalía de capital a largo plazo si dicho Tenedor mantiene el Nuevo Bono de la ACT durante más de un año. El período de mantenimiento por parte de un Tenedor de EE.UU. de cualesquiera Nuevos Bonos de la ACT recibidos en virtud del canje comenzará a contabilizarse al día siguiente del canje. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU. no corporativos se gravan a tasas preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones. En el

momento de la enajenación tributable de los Nuevos Bonos de la ACT, un Tenedor de EE.UU. deberá declararlos como ingreso ordinario (en lugar de plusvalía de capital) en función del descuento de mercado devengado, salvo que previamente haya optado por incluir el descuento de mercado del ingreso en el momento de devengarlo. Un Tenedor de EE.UU. podrá optar por incluir el descuento de mercado en el ingreso en el momento de devengarlo, en cuyo caso dicha renta será tratada como ingresos financieros ordinarios en el momento de declararlos, incrementando de este modo su base en los Nuevos Bonos de la ACT por el monto del descuento de mercado declarado. Dicha elección se realiza incluyendo el descuento de mercado en el ingreso en una declaración de impuestos federales sobre la renta presentada puntualmente, y adjuntando una declaración que señala la opción elegida.

Si se opta por esa elección, esta se aplicará a todos los bonos con descuento de mercado adquiridos por el Tenedor de EE.UU. durante el año en que hizo esa elección, y en todos los años siguientes.

**(b)** **Tenedores de Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Clase 10), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) (Clase 11), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) (Clase 12) y Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) (Clase 13)**

Se prevé que, conforme al Plan de la ACT, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98; (ii) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured); (iii) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC); y (iv) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) tendrá derecho a recibir, como contraprestación, satisfacción, exoneración y canje total de las Reclamaciones de dicho tenedor que son objeto de estas Clases de Reclamaciones Permitidas, la parte prorrateada de dicho titular de Recobro de Bonos Subordinados de la ACT 98. En la medida en que dichos importes estén disponibles, se considerará que dichos tenedores han canjeado los Bonos de la ACT de dicho Tenedor de EE.UU. que son objeto de estas Clases de Reclamaciones Permitidas por Dinero en Efectivo a efectos del Impuesto federal sobre la renta de EE.UU.

(i)   *Tratamiento fiscal del canje*

Se espera que, en la medida en que cualquiera de los Tenedores de EE.UU. mencionados anteriormente reciba su participación prorrateada de Efectivo en virtud del Plan de la ACT, las consecuencias del impuesto federal sobre los ingresos de EE.UU. para dicho Tenedor de EE.UU. sean las descritas anteriormente bajo el epígrafe "*Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT  98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT  98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT  98 (FGIC) (Clase 8), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98  (National) (Clase 9)—Tratamiento fiscal de la percepción de efectivo*".

(c) **Tenedores de Reclamaciones de Bonos Moscoso de la ACT (Clase 14), Tenedores de Reclamaciones de Dominio Eminente/Expropiación Inversa (Clase 15), Reclamaciones Generales Sin Garantía de la ACT (Clase 16), y Reclamaciones de Conveniencia (Clase 19)**

Se prevé que, conforme al Plan de la ACT, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonos Moscoso de la ACT, (ii) Reclamaciones de Dominio Eminente/Expropiación Inversa; (iii) Reclamaciones Generales Sin Garantía de la ACT; y (iv) Reclamaciones de Conveniencia se considerará que recibe una distribución como contraprestación, satisfacción, exoneración y canje total de las Reclamaciones de dicho tenedor que son objeto de estas Clases de Reclamaciones Permitidas. Las consecuencias de la recepción de dicha distribución variarán en función de las circunstancias individuales de los Tenedores de EE.UU. Los tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de la recepción de dicha distribución en sus circunstancias individuales.

(d) **Tenedores de Reclamaciones de la ACT/BGF (Clase 17) y Tenedores de Reclamaciones Subordinadas de la Sección 510(b) (Clase 18)**

Se prevé que, conforme al Plan de la ACT, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de la ACT/BGF y (ii) Reclamaciones Subordinadas de la Sección 510(b) no recibirán una distribución conforme al Plan de la ACT. Se considerará que cada Tenedor de EE.UU. de Reclamaciones de la ACT/BGF ha aceptado el Plan de la ACT. Se considerará que cada Tenedor de EE.UU. de las Reclamaciones Subordinadas de la Sección 510(b) ha rechazado el Plan de la ACT con respecto a dichas Reclamaciones Subordinadas de la Sección 510(b). Los Tenedores de EE.UU. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de aceptación o rechazo del Plan de la ACT.

3. **Deducción por deudas incobrables y/o títulos valores sin valor**

Un Tenedor de EE.UU. que, en virtud del Plan de la ACT, percibiera con respecto a una Reclamación Permitida una cantidad inferior a la base tributable de dicho Tenedor en concepto de tal Reclamación, tendrá derecho, en el año de la percepción (o en un año fiscal anterior o posterior) a practicar una deducción por deudas incobrables o por títulos valores sin valor. Las normas que rigen el carácter, la oportunidad y el importe de las deducciones por incobrables o por títulos valores sin valor ponen considerable énfasis en las realidades y circunstancias del Tenedor de EE.UU., del deudor y del instrumento con respecto al cual se aplica la deducción. Los Tenedores de EE.UU. de Reclamaciones permitidas deberían consultar a sus asesores fiscales con respecto a las posibilidades de practicar tales deducciones y en qué año.

4. **Impuesto de Medicare**

Si, en contra de las expectativas, los Nuevos Bonos de la ACT se emiten como Nuevos Bonos de la ACT Tributables, entonces, un Tenedor de EE.UU. de Nuevos Bonos de la ACT tributables que sea persona natural, sucesión o fideicomiso no incluido en una clase especial de fideicomisos exenta de dicho impuesto, está sujeto al recargo por Medicare del 3.8% sobre la menor de las siguientes cantidades (1) los "ingresos de inversión netos" del Tenedor de EE.UU. (o "el ingreso de inversión neto no distribuido" en el caso de una sucesión o fideicomiso)

correspondiente al año fiscal tributable, lo cual incluye, entre otros, intereses (incluyendo el descuento de emisión original) sobre la deuda y las plusvalías de la venta u otra enajenación tributable de deuda, y (2) el excedente del ingreso bruto ajustado modificado del Tenedor de EE.UU. (o del ingreso bruto ajustado en el caso de una sucesión o fideicomiso) del año fiscal tributable por encima de determinado umbral (que, en el caso de las personas físicas se sitúa entre los $125,000 y los $250,000, en función de las circunstancias individuales). Un Tenedor de EE.UU. que sea persona natural, sucesión o fideicomiso debería consultar a su asesor fiscal acerca de la aplicabilidad del recargo de Medicare a sus ingresos y beneficios con respecto a los canjes y titularidad de los Nuevos Bonos de la ACT.

### 5. Declaración de información y retención adicional de impuestos

En general, la declaración de información se aplicará a (i) los pagos en concepto del canje; (ii) los pagos de capital, intereses y OID, en su caso, en concepto de los Nuevos Bonos de la ACT; y (iii) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos de la ACT.

Además, es posible que sea de aplicación la retención adicional de impuestos a los pagos si dicho Tenedor de EE.UU. (a) omite aportar un número de identificación de contribuyente correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una notificación del IRS que indica que no ha declarado todos los intereses y dividendos que deben reflejarse en las declaraciones de impuestos federales estadounidenses, o bien (d) omite certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de identificación de contribuyente correcto y que el IRS no le ha notificado que está sujeto a la retención adicional de impuestos. La solicitud de exención puede solicitarse aportando un Formulario W-9 del IRS debidamente completado (o el formulario que lo sustituya).

La retención adicional de impuestos no es un impuesto adicional. En general, un Tenedor de EE.UU. podrá obtener un reintegro de las cantidades retenidas de conformidad con la normativa específica, que exceda de su responsabilidad tributaria federal mediante la presentación puntual de una solicitud de reintegro ante el IRS.

Ciertos Tenedores de EE.UU. no están sujetos en ciertos casos la obligación de presentar información y de retención adicional de impuesto, siempre y cuando se identifiquen debidamente como exentos. Los Tenedores de EE.UU. deberían consultar a sus asesores fiscales si cumplen estos requisitos de exención y cuáles son los procedimientos para obtenerla.

### C. Personas naturales y jurídicas de Puerto Rico

### 1. Definición de personas naturales y jurídicas de Puerto Rico

Tal como se utiliza aquí, por "persona natural de Puerto Rico" se entenderá al tenedor beneficiario de una Reclamación de Bonos o un Nuevo Bono de la ACT que sea un particular y residente de buena fe del Estado Libre Asociado, conforme a la definición de la Sección 937 del IRC y de las Reglas del Tesoro, durante la totalidad del año fiscal que incluya a la Fecha de Entrada en Vigencia de la ACT. Tal como se utiliza aquí, por "persona jurídica de Puerto Rico" se entenderá al tenedor beneficiario de una Reclamación de Bonos o de un Nuevo Bono de la ACT. que sea una corporación constituida de conformidad con las leyes del Estado Libre Asociado

La siguiente exposición incluye solo algunas consecuencias tributarias federales estadounidenses del Plan de la ACT para personas naturales y jurídicas de Puerto Rico. No obstante, no incluye consideraciones tributarias no estadounidenses (incluyendo las de Puerto Rico). Recomendamos a toda persona natural o jurídica de Puerto Rico consultar en la sección "Consideraciones materiales a efectos del impuesto sobre la renta de Puerto Rico" las consecuencias tributarias del Plan de la ACT en Puerto Rico.

Las normas que rigen las consecuencias tributarias federales estadounidenses para las personas naturales y jurídicas de Puerto Rico son complejas. Recomendamos a las personas naturales y jurídicas de Puerto Rico que consulten a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales, locales y extranjeras del perfeccionamiento del Plan de la ACT en función de sus circunstancias particulares.

### 2.    Tratamiento fiscal del canje

En general, una persona natural de Puerto Rico no estará sujeta al Impuesto federal sobre la renta de EE.UU. con respecto a los beneficios materializados por el canje de una Reclamación Permitida en virtud del Plan de la ACT. En general, una persona jurídica de Puerto Rico no estará sujeta al Impuesto federal sobre la renta de EE.UU. con respecto a los beneficios materializados por el canje de una Reclamación Permitida en virtud del Plan de la ACT, salvo que dichos beneficios estén efectivamente relacionados con las actividades comerciales o los negocios de la persona jurídica de Puerto Rico en Estados Unidos, en cuyo caso los beneficios estarán sujetos a gravamen de la misma manera que el ingreso correspondiente como se describe más adelante en el epígrafe "—*Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT*".

### 3.    Tributación de los Nuevos Bonos de la ACT

### (a)    Tratamiento de los intereses

En general, los pagos de intereses en concepto de un Nuevo Bono de la ACT, incluyendo el OID, a una persona natural o jurídica de Puerto Rico no están sujetos a impuestos federales sobre la renta de EE.UU., salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que esta ha realizado actividades comerciales o hecho negocios en EE.UU., y dicho ingreso esté efectivamente relacionado con dichas actividades.

Si, al contrario de lo que se espera, los Nuevos Bonos de la ACT se emiten como Nuevos Bonos de la ACT Tributables, y se considera que una corporación de Puerto Rico se dedica a actividades comerciales o hace negocios en Estados Unidos, y los intereses (incluyendo el OID) de los Nuevos Bonos de la ACT tributables están "efectivamente conectados" con dichas actividades o negocios, la corporación de Puerto Rico estará sujeta al Impuesto federal sobre la renta de EE.UU. en concepto de dichos intereses (incluyendo el OID), normalmente sobre una base de los ingresos netos, de la misma manera que si fuera un Tenedor de EE.UU. Además, una corporación de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

**(b)      Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT**

La ganancia obtenida por la venta, retiro u otra enajenación de un Nuevo Bono de la ACT por una persona natural o jurídica de Puerto Rico generalmente no están sujetos a impuestos federales sobre la renta de EE.UU. salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que la persona jurídica de Puerto Rico ha realizado actividades comerciales o hecho negocios en EE.UU. y dicho ingreso esté efectivamente relacionado con dichas actividades.

Si se considera que una corporación de Puerto Rico se dedica a una actividad comercial o empresarial en EE.UU. y la ganancia obtenida por la venta, retiro u otra enajenación de un Nuevo Bono de la ACT por la corporación de Puerto Rico están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, la corporación de Puerto Rico estará sujeta al Impuesto federal sobre la renta de EE.UU. por esa ganancia sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un Tenedor de EE.UU. Además, una corporación de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

**No existe certeza acerca de las consecuencias tributarias del Plan para personas naturales y jurídicas de Puerto Rico. Las personas naturales de Puerto Rico y las personas jurídicas de Puerto Rico deben consultar a sus asesores fiscales en relación con las consecuencias fiscales específicas de las transacciones contempladas en el Plan de la ACT.**

**4.      Declaración de información y retención adicional de impuestos**

En general, la declaración de información se aplicará a (i) los pagos en concepto del canje; (ii) los pagos de capital, intereses y OID, en su caso, en concepto de los Nuevos Bonos de la ACT; y (iii) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos de la ACT.

En general, una persona natural de Puerto Rico no estará sujeta a retenciones adicionales de impuestos con respecto a los pagos derivados de los Nuevos Bonos de la ACT si presenta el Formulario W-9 del IRS debidamente completado (o un documento de sustitución adecuado), salvo si dicha persona natural de Puerto Rico (a) omite aportar un número de identificación de contribuyente correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una notificación del IRS que indica que no ha declarado todos los intereses y dividendos que deben reflejarse en las declaraciones de impuestos federales estadounidenses, o bien (d) omite certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de identificación de contribuyente correcto y que el IRS no le ha notificado al Tenedor de EE.UU. que el Tenedor de EE.UU. está sujeto a la retención adicional de impuestos.

En general, una persona jurídica de Puerto Rico no estará sujeta a retención adicional de impuestos con respecto a los pagos del canje, capital e intereses y OID, en su caso, vinculados a los Nuevos Bonos de la ACT, siempre y cuando haya presentado un Formulario W-8BEN-E del IRS debidamente completado (u otro formulario pertinente), manifestando que no es una persona estadounidense tal como lo define el IRC (o si satisface ciertos requisitos de pruebas documentales para demostrar que no lo es). La declaración de información y, según las circunstancias, la retención adicional de impuestos será de aplicación al producto de la venta u otra enajenación de los Nuevos Bonos de la ACT realizada dentro de EE.UU. o a través de ciertos intermediarios

financieros relacionados con EE.UU., salvo que la persona natural de Puerto Rico manifieste, bajo pena de perjurio, que no es una persona de EE.UU. (y que el pagador no sepa, o tuviera motivos para saber, que dicha persona jurídica de Puerto Rico es una persona de EE.UU.), o bien que pueda demostrar una exención.

La retención adicional de impuestos no es un impuesto adicional. En general, una persona natural o jurídica de Puerto Rico, según proceda, podrá obtener un reintegro de las cantidades retenidas de conformidad con la normativa específica, que exceda de su responsabilidad tributaria federal mediante la presentación puntual de una solicitud de reintegro ante el IRS.

Ciertas personas naturales y jurídicas de Puerto Rico no están sujetas a las obligaciones de declaración y retención adicional de impuestos en circunstancias específicas, siempre y cuando pueda establecer debidamente que están exentas. Recomendamos a las personas naturales y jurídicas de Puerto Rico que consulten a sus asesores fiscales sobre si están exentos de las obligaciones de retención adicional de impuestos y sobre los o procedimientos para obtener dicha exención.

**D.      Tenedores no estadounidenses**

**1.      Definición de Tenedor no estadounidense**

Salvo que se indique algo distinto, lo siguiente se aplica exclusivamente a Tenedores no estadounidenses. Tal como se utiliza aquí, por "Tenedor no estadounidense" se entenderá al tenedor beneficiario de Títulos Valores Existentes que no sea (i) Tenedor de EE.UU., o bien (ii) una asociación u otra entidad considerada como tal o bajo tratamiento fiscal simplificado a efectos del Impuesto federal sobre la renta de EE.UU., o bien (iii) una persona natural o jurídica de Puerto Rico.

La siguiente exposición incluye solo algunas consecuencias tributarias federales estadounidenses del Plan de la ACT para Tenedores no estadounidenses. No obstante, no incluye consideraciones tributarias no estadounidenses. Las normas que rigen las consecuencias tributarias federales estadounidenses para Tenedores no estadounidenses son complejas. Los Tenedores no estadounidenses deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales y locales del Plan de la ACT, en EE.UU. y en el extranjero, en función de sus circunstancias personales.

**2.      Tratamiento del canje**

En general, un Tenedor no estadounidense no estará sujeto a los impuestos federales sobre la renta de EE.UU., con respecto a los beneficios obtenidos por el canje en el marco de una Reclamación Permitida en virtud del Plan, salvo que (i) dicho beneficio esté efectivamente relacionado con el hecho de que el Tenedor no estadounidense realice actividades comerciales o haga negocios en los Estados Unidos (y, si fuera de aplicación un tratado para evitar la doble imposición, dicho beneficio sea atribuible a un establecimiento permanente o a una base fija en los Estados Unidos del Tenedor no estadounidense), en cuyo caso estará sujeto al impuesto de la misma manera que los ingresos efectivamente conectados, como se describe a continuación, para los Nuevos Bonos de la ACT, bajo el epígrafe "—Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT", o bien (ii) si ese Tenedor no estadounidense es una persona natural extranjera

no residente que mantiene los Nuevos Bonos de la ACT como activos de capital y está presente en Estados Unidos durante más de ciento ochenta y tres (183) días del año fiscal del canje, y dichos beneficios se derivan de fuentes de dentro de los Estados Unidos.

3. **Tributación de los Nuevos Bonos de la ACT**

    (a)     *Tratamiento de los intereses*

En general, los pagos de intereses de los Nuevos Bonos de la ACT, incluyendo el OID, a un Tenedor no estadounidense, que se consideran fuente de ingresos extranjera a efectos tributarios federales de EE.UU., no están sujetos al impuesto federal sobre la renta de EE.UU. toda vez que se considere que el Tenedor no estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente conectados a las citadas actividades o negocios en EE.UU.

Si, al contrario de lo que se espera, los Nuevos Bonos de la ACT se emiten como Nuevos Bonos de la ACT Tributables, y se considera que un Tenedor no estadounidense se dedica a una actividad comercial o empresarial en Estados Unidos, y los intereses (incluyendo el OID) de los Nuevos Bonos de la ACT están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, el Tenedor no estadounidense estará sujeto al impuesto federal sobre los ingresos de EE.UU. en concepto de dichos intereses (incluyendo el OID), sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un Tenedor de EE.UU. a menos que un tratado de impuesto sobre los ingresos aplicable disponga lo contrario. Además, si el Tenedor no estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de sucursales con respecto al ingreso efectivamente conectado, a menos que un tratado de doble imposición permita reducir el porcentaje.

    (b)     *Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT*

En general, los beneficios materializados por la venta, retiro u otra enajenación de Nuevos Bonos de la ACT por un Tenedor no estadounidense no estarán sujetos a impuestos federales sobre la renta de EE.UU., toda vez que se considere que el Tenedor no estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente conectados a las citadas actividades o negocios.

Si se considera que un Tenedor no estadounidense se dedica a actividades comerciales o hace negocios en los Estados Unidos y que los beneficios obtenidos por la venta, retiro u otra enajenación de los Nuevos Bonos de la ACT de los Tenedores no estadounidenses están "efectivamente relacionados" con la realización de esa actividad comercial o empresarial, el Tenedor no estadounidense estará sujeto al impuesto federal sobre la renta de EE.UU. por esos beneficios sobre la base de los ingresos netos, generalmente de la misma manera que si fuera un Tenedor de EE.UU., salvo si algún tratado de doble imposición estipule algo distinto. Además, si el Tenedor no estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de sucursales con respecto al ingreso efectivamente conectado, a menos que un tratado de doble imposición permita reducir el porcentaje.

No existen certidumbres acerca de las consecuencias tributarias del Plan de la ACT para Tenedores no estadounidenses. Los Tenedores no estadounidenses deben consultar a sus asesores

fiscales en relación con las consecuencias fiscales específicas de las transacciones contempladas en el Plan de la ACT.

4.    **FATCA (Ley de Cumplimiento Tributario de Cuentas en el Extranjero)**

Conforme a FATCA, en general las instituciones financieras extranjeras (concepto que incluye a la mayoría de fondos de cobertura, fondos de capital privado, fondos de inversión, vehículos de titulización y otros vehículos de inversión), así como ciertas otras entidades extranjeras deben cumplir obligaciones de declaración con respecto a sus Tenedores de cuentas e inversionistas de EE.UU., o bien practicar retenciones impositivas a los pagos de fuentes estadounidenses que se les abonan (tanto si son Tenedores beneficiarios como intermediarios de terceros). En general, la institución financiera u otra entidad extranjera que no cumpla las obligaciones de declaración de la FATCA estarán sujetas a retenciones con respecto a cualesquiera "pagos sujetos a retención". Para tales efectos, por "pagos sujetos a retención" se entenderán todos los pagos fijos o determinables, anuales o periódicos de ingresos, beneficios y ciertos "pagos subrogados extranjeros" procedentes de fuentes estadounidenses. En general, las retenciones estipuladas por la FATCA no se aplicarán a los pagos de intereses (incluyendo el OID) de los Nuevos Bonos de la ACT porque normalmente se tratará de ingresos generados en el extranjero. Las instituciones financieras extranjeras presentadas en jurisdicciones con las que existen acuerdos intergubernamentales con EE.UU. en relación con la FATCA pueden estar sujetas a una normativa diferente. Los Tenedores deberían consultar a sus asesores fiscales si la FATCA se aplica a sus circunstancias específicas.

*[El resto de la página se deja intencionalmente en blanco]*

## X.  Consideraciones materiales a efectos del impuesto sobre la renta de Puerto Rico

## A.  Generalidades

A continuación, se presenta una descripción general de ciertas consecuencias materiales del Plan de la ACT a efectos del impuesto sobre la renta de Puerto Rico. Esta descripción está basada en el Código de Rentas Internas de Puerto Rico de 2011, con sus correspondientes enmiendas (el "Código de P. R."), en la normativa aprobada de conformidad con el Código de P.R., en los pronunciamientos administrativos y en las sentencias judiciales en vigencia a la fecha de esta Declaración de Divulgación, todo lo cual está sujeto a modificaciones, posiblemente con efectos retroactivos (colectivamente, la "Legislación tributaria vigente de P.R."). Los cambios de la Legislación tributaria vigente de P.R. o de su interpretación podría hacer que algunas de las consecuencias tributarias del Plan de la ACT a efectos del Impuesto sobre la renta de Puerto Rico resulten sustancialmente distintas de las aquí descritas.

Las consecuencias del Plan a efectos del impuesto sobre la renta de Puerto Rico son complejas. A la fecha de esta Declaración de Divulgación, no se ha solicitado formalmente ninguna resolución al Departamento de Hacienda de Puerto Rico (el "Departamento de Hacienda de P.R."); no se ha solicitado ninguna opinión a los abogados de los Deudores sobre las consecuencias fiscales del Plan de la ACT, salvo las específicamente aquí expuestas, y esta Declaración de divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos de la tributación federal de Puerto Rico que pudiera ser relevante para los Tenedores de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial preocupación para determinados tipos de contribuyentes (por ej., compañías de inversiones reguladas, fondos de inversión inmobiliaria, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de retiro y otras sujetas a tributación diferida, tenedores que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificado, asociaciones u otras entidades interpuestas a efectos tributarios de Puerto Rico, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción parte del supuesto de que el Tenedor posee Bonos de la ACT y Nuevos Bonos de la ACT solamente como "activos de capital", tal como se definen en la Sección 1034.01(a)(1) del Código de P.R. La descripción no aborda más impuestos puertorriqueños distintos de los del ELA que gravan los ingresos, ni se aplica a ninguna persona que adquiera Nuevos Bonos de la ACT en el mercado secundario. Por último, este documento no aborda las consecuencias a efectos del impuesto sobre la renta de Puerto Rico para los Tenedores de Reclamaciones que se considere que han rechazado el Plan.

Por estos motivos, esta descripción no sustituye a una planificación tributaria detallada ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada Tenedor de una Reclamación. Los Tenedores de Reclamaciones deberían consultar a sus propios asesores fiscales acerca de las consecuencias tributarias del Plan de la ACT en Puerto Rico.

**B.      Tenedores de P.R.**

**1.      Definición de Tenedor de P.R.**

Salvo que se indique algo distinto, la siguiente explicación es aplicable solamente a Tenedores de P.R. Tal como se utiliza aquí, por "Tenedor de P.R." se entenderá al tenedor beneficiario de Bonos de la ACT a la Fecha de Entrada en Vigencia del Plan de la ACT a efectos del impuesto sobre la renta de Puerto Rico:

- Una persona natural que durante todo el año fiscal sea residente de buena fe de Puerto Rico para propósitos de la Sección 933 del Código de Rentas Internas de 1986 de EE.UU., con sus correspondientes modificaciones (como lo determina la Sección 937(a) de este), y residente de Puerto Rico para propósitos del Código de P.R.;

- una sociedad u otra entidad constituida con arreglo a las leyes de Puerto Rico con tratamiento de corporación para propósitos tributarios de Puerto Rico, excluyendo las corporaciones u otros tipos de entidades sujetas a transparencia fiscal u otro tratamiento fiscal especial de acuerdo con el Código de P.R.;

- una sucesión, cuyos ingresos están sujetos al Impuesto federal sobre la renta de Puerto Rico independientemente de su procedencia; o bien

- un fideicomiso (salvo un fideicomiso comercial), todos cuyos beneficiarios sean personas naturales residentes de Puerto Rico, como ya se ha descrito.

Si una asociación u otra entidad o instrumento jurídico que paga impuestos como asociación a efectos del Impuesto federal sobre la renta de EE.UU. es tenedor de Bonos de la ACT, el tratamiento fiscal de un socio de dicha asociación dependerá en general de la situación del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad tenedores de Bonos de la ACT que consulten a sus asesores fiscales.

Un Tenedor de P.R. que sea tenedor de Reclamaciones Permitidas de más de una Clase podría tener en Puerto Rico consecuencias tributarias diferentes para cada Clase de Reclamaciones Permitidas. Los Tenedores de P.R. deberían leer atentamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones Permitidas de las que fueran tenedores y los Tenedores de P.R, de más de una Clase de Reclamaciones Permitidas deberían consultar a sus asesores fiscales acerca de la potencial interacción de las potenciales interacciones de consecuencias tributarias puertorriqueñas de cada una de las Reclamaciones Permitidas de las que dicho tenedor de P.R. pudiera ser tenedor.

**2.      Tratamiento fiscal de Reclamaciones permitidas**

**(a)      Tenedores de Reclamaciones de Bonos de la ACT 98 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac)**

**(Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8) y Reclamaciones de Bonos de la ACT 98 (National) (Clase 9)**

El Deudor prevé que, en virtud del Plan, cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de Bonos de la ACT 68; (ii) Reclamaciones de Bonos de la ACT 68 (Ambac); (iii) Reclamaciones de Bonos de la ACT 68 (Assured); (iv) Reclamaciones de Bonos de la ACT 68 (National); (v) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98; (vi) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac); (vii) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured); (viii) Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC); y (ix) Reclamaciones de Bonos de la ACT 98 (National) será tratado como si cambiara los Bonos de la ACT de los Tenedores de P.R. sujetos a estas Clases de Reclamaciones Permitidas por Nuevos Bonos de la ACT que consisten en los Nuevos CIB de la ACT, los Nuevos CAB de la ACT y los Nuevos CAB Convertibles de la ACT) y Efectivo.

(i)    *Tratamiento fiscal del canje*

El Deudor espera que, y tiene la intención de adoptar la posición de que, el canje de un tramo de los Bonos de la ACT por los Nuevos Bonos de la ACT y el Efectivo en virtud del Plan de la ACT se considerará un canje tributable en virtud del Código de P.R. Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente a la diferencia entre el importe materializado en el canje y la base tributable ajustada del Tenedor de P.R. en concepto de los Bonos de la ACT. a la fecha del canje. El importe materializado al canjear los Bonos de la ACT será equivalente al valor de mercado de cada Nuevo Bono de la ACT más el Efectivo percibido (salvo cualquier tramo atribuible a intereses devengados y no pagados). Véase en la siguiente exposición lo relativo a los pagos en efectivo en concepto de Costos de Perfeccionamiento y los Honorarios de Restricción del AAP de la ACT.

Las ganancias o pérdidas por el canje de Bonos de la ACT por Nuevos Bonos de la ACT se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de mantenimiento de Bonos de la ACT del Tenedor de P.R. es superior a un año. Las plusvalías de capital a largo plazo declaradas por Tenedores de P.R. que sean personas naturales, sucesiones y fideicomisos podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, el 15% (o bien, un máximo del 24% si fuera aplicable el impuesto básico alternativo). Las plusvalías de capital a largo plazo de Tenedores de P.R. que tributen como personas jurídicas podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, del 20%.

Los Tenedores de P.R. podrán deducir las minusvalías de capital sufridas en el canje de los Bonos de la ACT por Nuevos Bonos de la ACT de las plusvalías de capital obtenidas durante el año, y los Tenedores de P.R. no corporativos podrán deducir los excedentes netos de minusvalías de hasta $1,000 de los ingresos ordinarios. Estas minusvalías podrán pasarse a cuenta nueva como pérdidas a corto plazo durante siete años tributables, y aplicarse a la compensación de hasta el 90% de las plusvalías de capital generadas durante dichos años.

En la medida en que alguna contraprestación (por ejemplo, Nuevos Bonos de la ACT o tramos de estos, más pagos de efectivo) percibida por algún Tenedor de P.R. al canjear los Bonos

de la ACT sea atribuible a intereses devengados y no pagados de dichos bonos, el monto de dicha contraprestación se considerará ingreso de capital exento a efectos tributarios puertorriqueños. En tal caso, el tramo asignado a los intereses devengados y no pagados reducirá el importe materializado por el Tenedor de P.R. para calcular el resultado del canje.

El Plan de la ACT prevé que, en la medida de lo posible, las distribuciones al tenedor de una Reclamación se aplicarán en primer lugar a los intereses devengados pero no pagados a la fecha inmediatamente anterior a la Fecha de Petición de la ACT; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos tributarios federales) y, a continuación, en la medida en que la contraprestación supere al capital de la Reclamación, a aquellas otras cantidades distintas de las descritas en las cláusulas precedentes. La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la asignación de contraprestación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del Impuesto federal sobre la renta de EE.UU. Congruentes con dicha asignación en el marco del Plan de la ACT, en general el Reglamento del Tesoro considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados pero no pagados. No existe ninguna ley tributaria de P.R. específica vigente que considere cómo deben aplicarse los pagos en nuestra situación. Aunque el Deudor pretende asignar las distribuciones a un Tenedor de P.R. de conformidad con el Plan de la ACT, y considera que ello es compatible con la legislación vigente y las intenciones de los legisladores, no existen garantías de que el Departamento de Hacienda de Puerto Rico vaya a respetarlas en lo que respecta a los pagos por los Bonos de la ACT.

Los Tenedores de P.R. deberían consultar a sus asesores fiscales acerca del tratamiento fiscal de las distribuciones percibidas de conformidad con el Plan.

(ii)     *Tributación de los Nuevos Bonos de la ACT*

*Intereses de los Nuevos Bonos de la ACT*. Los intereses pagados a, o devengados por, los Tenedores de P.R. en concepto de los Nuevos Bonos de la ACT no estarán sujetos al impuesto sobre la renta de Puerto Rico, incluyendo el impuesto básico alternativo. La plusvalía de capital de los Nuevos Bonos de la ACT a pagar en el vencimiento por encima de su precio de emisión inicial, si la hubiese, no estará sujeta al impuesto sobre la renta de Puerto Rico, incluyendo el impuesto básico alternativo.

La titularidad de los Nuevos Bonos de la ACT podría conllevar que un tramo de los intereses pagados a, o devengados por, un Tenedor de P.R., así como otros gastos incurridos por el Tenedor de P.R. y atribuibles a los intereses sobre los Nuevos Bonos de la ACT, no fueran permitidos como deducciones a efectos tributarios de Puerto Rico.

*Venta, canje o retiro de los Nuevos Bonos de la ACT*. Las ganancias o pérdidas por la venta o el canje de Nuevos Bonos de la ACT se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de retención de los Nuevos Bonos de la ACT del Tenedor de P.R. es superior a un año. Las plusvalías de capital a largo plazo declaradas por Tenedores de P.R. que sean personas naturales, sucesiones y fideicomisos podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, el 15% (o bien, un máximo del 24% si fuera aplicable el impuesto básico

alternativo). Las plusvalías de capital a largo plazo de Tenedores de P.R. que tributen como personas jurídicas podrán estar sujetas a la tasa máxima de impuestos de Puerto Rico, del 20%.

Los Tenedores de P.R. podrán deducir las minusvalías de capital sufridas en la venta o el canje de los Nuevos Bonos de la ACT de las plusvalías de capital obtenidas durante el año fiscal, y los Tenedores de P.R. no corporativos podrán deducir los excedentes netos de minusvalías de hasta $1,000 de los ingresos ordinarios. Estas minusvalías podrán pasarse a cuenta nueva como pérdidas a corto plazo durante siete años tributables, y aplicarse a la compensación de hasta el 90% de las plusvalías de capital generadas durante dichos años.

(b)     **Tenedores de Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Clase 10), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured) (Clase 11), Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC) (Clase 12) y Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) (Clase 13)**

El Deudor prevé que, en virtud del Plan, cada Tenedor de P.R. de cualquiera de las siguientes:: (i) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98; (ii) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (Assured); (iii) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (FGIC); y (iv) Reclamaciones de Bonos Subordinados (Sub) de la ACT 98 (National) tendrá derecho a recibir, como contraprestación, satisfacción, exoneración y canje total de las Reclamaciones de dicho tenedor que son objeto de estas Clases de Reclamaciones Permitidas, la participación prorrateada de dicho titular de Recobro de Bonos Subordinados de la ACT 98. En la medida en que dichas cantidades estén disponibles, se considerará que dichos tenedores han canjeado los Bonos de la ACT de dicho Tenedor de P.R. que son objeto de estas Clases de Reclamaciones Permitidas por Efectivo a efectos tributarios de Puerto Rico.

Se espera que, en la medida en que cualquiera de los Tenedores de P.R. mencionados anteriormente reciba su participación prorrateada de Efectivo en virtud del Plan de la ACT, las consecuencias del impuesto sobre la renta para dicho Tenedor de P.R. serán las descritas anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos de la ACT 68 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8) y Reclamaciones de Bonos de la ACT 98 (National) (Clase 9) —Tratamiento fiscal del canje*".

Por consiguiente, un Tenedor de P.R. declarará un resultado equivalente a la diferencia entre el importe materializado (excepto la parte del Efectivo atribuible a los intereses devengados y no pagados) y la base tributaria ajustada del Tenedor de P.R. en concepto de los Bonos de la ACT. a la fecha del canje.

(c)     **Tenedores de Reclamaciones de Bonos Moscoso de la ACT (Clase 14), Reclamaciones de Dominio Eminente/Expropiación Inversa (Clase 15),**

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

**Reclamaciones Generales Sin Garantía de la ACT (Clase 16), y Reclamaciones de Conveniencia (Clase 19)**

El Deudor prevé que, en virtud del Plan, cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de Bonos Moscoso de la ACT, (ii) Reclamaciones de Dominio Eminente/Expropiación Inversa; (iii) Reclamaciones Generales Sin Garantía de la ACT; y (iv) Reclamaciones de Conveniencia tendrá derecho a recibir una distribución como contraprestación, satisfacción, exoneración y canje total de las Reclamaciones de dicho tenedor que son objeto de estas Clases de Reclamaciones Permitidas. Las consecuencias de la recepción de dicha distribución variarán en función de las circunstancias individuales de los Tenedores de P.R. y de la naturaleza de los activos que se distribuyan. Los Tenedores de P.R. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de la recepción de dicha distribución en sus circunstancias individuales.

(d) **Reclamaciones de la ACT/BGF (Clase 17) y Reclamaciones Subordinadas de la Sección 510(b) (Clase 18)**

Se prevé que, conforme al Plan de la ACT, cada Tenedor de P.R. de cualquiera de las siguientes: (i) Reclamaciones de la ACT/BGF y (ii) Reclamaciones Subordinadas de la Sección 510(b) no recibirán una distribución conforme al Plan de la ACT. Se considerará que cada Tenedor de P.R. de Reclamaciones de la ACT/BGF ha aceptado el Plan de la ACT. Se considerará que cada Tenedor de P.R. de las Reclamaciones Subordinadas de la Sección 510(b) ha rechazado el Plan de la ACT con respecto a dichas Reclamaciones Subordinadas de la Sección 510(b). Los Tenedores de P.R. deberían consultar a sus propios asesores fiscales en relación con las consecuencias tributarias de aceptación o rechazo del Plan de la ACT.

3. **Tratamiento fiscal de Costos de Perfeccionamiento y Honorarios de Restricción del AAP de la ACT**

Ciertos Tenedores de Reclamaciones podrán percibir pagos en efectivo de los Costos de Perfeccionamiento y/o de los Honorarios de Restricción del AAP de la ACT. El tratamiento tributario de Puerto Rico de los pagos en efectivo de los Costos de Perfeccionamiento y de los Honorarios de Restricción del AAP de la ACT no queda claro. El Deudor pretende tratar la percepción de los Costos de Perfeccionamiento y los Honorarios de Restricción del AAP de la ACT de manera similar a la adoptada a efectos tributarios federales de EE.UU.; por lo que su pago puede ser tratado como una tasa separada imponible como ingreso ordinario. Sin embargo, el pago de los Costos de Perfeccionamiento y Honorarios de Restricción del AAP de la ACT puede ser tratado como parte del importe materializado por un Tenedor de P.R. en el canje y estar sujeto al impuesto sobre la renta de Puerto Rico descrito anteriormente bajo el epígrafe "—*Tenedores de Reclamaciones de Bonos de la ACT 68 (Clase 1), Reclamaciones de Bonos de la ACT 68 (Ambac) (Clase 2), Reclamaciones de Bonos de la ACT 68 (Assured) (Clase 3), Reclamaciones de Bonos de la ACT 68 (National) (Clase 4), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Clase 5), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Ambac) (Clase 6), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (Assured) (Clase 7), Reclamaciones de Bonos Prioritarios (Senior) de la ACT 98 (FGIC) (Clase 8) y Reclamaciones de Bonos de la ACT 98 (National) (Clase 9)—Tratamiento fiscal del canje*".

Los Tenedores de P.R. deberían consultar a sus asesores fiscales acerca del tratamiento fiscal de las distribuciones percibidas de conformidad con el Plan, incluido el Efectivo cobrado en concepto de Costos de Perfeccionamiento y Honorarios de Restricción del AAP de la ACT.

## C.  Tenedores no de P.R.

### 1.      Definición de Tenedor no de P.R.

Salvo que se indique algo distinto, la siguiente explicación se aplica exclusivamente a Tenedores no de P.R. Tal como se utiliza aquí, por "Tenedor no de P.R" se entenderá al tenedor beneficiario de Bonos de la ACT, o Nuevos Bonos de la ACT que no sea (i) Tenedor de P.R., o bien (ii) una asociación u otra entidad considerada como tal o bajo tratamiento fiscal simplificado a efectos tributarios de Puerto Rico.

Si una asociación u otra entidad o instrumento jurídico que paga impuestos como asociación a efectos del impuesto sobre la renta de Puerto Rico es tenedor de Bonos de la ACT, o Nuevos Bonos de la ACT, el tratamiento tributario de Puerto Rico de un socio de dicha asociación dependerá en general de la situación del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad que consulten a sus asesores fiscales.

La siguiente descripción incluye solo algunas consecuencias tributarias puertorriqueñas del Plan para Tenedores no de P.R. La descripción no incluye ninguna consideración tributaria no puertorriqueña. Tenedores no de P.R. deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan, en Puerto Rico y en el extranjero, en función de sus circunstancias personales.

### 2.      Tratamiento fiscal del canje

Un Tenedor no de P.R: que no realice actividades económicas ni haga negocios en Puerto Rico no estaría sujeto al impuesto sobre la renta de Puerto Rico con respecto a cualquier beneficio materializado por el canje de una Reclamación permitida en virtud del Plan, incluyendo aquellas cuantías asignadas a intereses devengados y no pagados. Por otra parte, los Tenedores no de P.R. que sean corporaciones (o estén tratados como tales por el Código de P.R.) y extranjeros no residentes dedicados a actividades comerciales o que hagan negocios en Puerto Rico, estarán sujetos a los impuestos sobre la renta de P.R. igual que un Tenedor de P.R., en concepto de cualquier beneficio relacionado con sus actividades o negocios en Puerto Rico.

### 3.      Tributación de los Nuevos Bonos de la ACT

#### (a) Tratamiento de los intereses

Los intereses pagados a, o devengados por, a un Tenedor no de P.R. en concepto de un Nuevo Bono de la ACT no estarán sujetos al impuesto sobre la renta de Puerto Rico, incluyendo el impuesto básico alternativo. La plusvalía de capital del Nuevo Bono de la ACT a pagar en el vencimiento por encima de su precio de emisión inicial, si la hubiese, no estará sujeta al impuesto sobre la renta de Puerto Rico, incluyendo el impuesto básico alternativo.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                              04/30/2022 3:29 PM" ""

Es posible que, a efectos tributarios de Puerto Rico, no se admitan las deducciones de un Tenedor no de P.R. que se dedique a actividades comerciales o haga negocios en Puerto Rico, relacionadas con los intereses pagados o devengados y otros gastos incurridos atribuibles a los citados Nuevos Bonos de la ACT.

### (b) Venta, retiro u otras enajenaciones de Nuevos Bonos de la ACT

Los beneficios materializados en concepto de la venta, retiro u otras enajenaciones de un Nuevo Bono de la ACT por un Tenedor no de P.R. que no se dedique a actividades comerciales ni haga negocios en Puerto Rico no estarán sujetos al impuesto sobre la renta de Puerto Rico, sea mediante retenciones o de otras maneras. Por otra parte, los Tenedores no de P.R. que sean corporaciones (o estén tratados como tales por el Código de P.R.) y extranjeros no residentes dedicados a actividades comerciales o hagan negocios en Puerto Rico estarán sujetos a los impuestos sobre la renta de Puerto Rico si dichos beneficios están efectivamente conectados con dichas actividades o negocios en Puerto Rico del mismo modo que un Tenedor de P.R. Además, una corporación puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente conectados.

*[El resto de la página se deja intencionalmente en blanco]*

## XI.    Aplicabilidad de ciertas leyes federales y estatales de títulos valores

A.    **Nuevos Bonos de la ACT**

1.    **Registro de títulos valores**

En general, los títulos valores emitidos por la ACT Reorganizada, como los Nuevos Bonos de la ACT, están exentos de los requisitos de registro de la Ley de Valores conforme a la Sección 3(a)(2) de la Ley de Valores.

Además de las exenciones provistas a entidades gubernamentales como la ACT Reorganizada conforme a la Ley de Valores, la Sección 1145(a) (1) del Código de Quiebras, aplicable a los Casos de Título III conforme a la Sección 301 de PROMESA, dispone una exención de los requisitos de registro de la Ley de Valores; y de los requisitos emergentes de las leyes de títulos valores de los estados para la oferta o venta conforme a un plan de ajuste de títulos valores del deudor, una filial del deudor que participe en un plan de ajuste conjunto con el deudor o un sucesor del deudor. Dado que las obligaciones de la ACT están exentas del registro conforme a la ley de títulos valores generalmente aplicable, esta excepción no es relevante para los títulos valores de la ACT Reorganizada aunque las disposiciones de la Sección 1145 del Código de Quiebras que suspenden la operación de las leyes de títulos valores pueden no estar disponibles para los "suscriptores de seguros" dentro del significado del Código de Quiebras. El Código de Quiebras dispone que ciertos acreedores, denominados "suscriptores de seguros", dentro del significado del Código de Quiebras, no pueden revender dichos títulos valores sin registrarse conforme a la Ley de Valores o conforme a una exención a esta. Los Acreedores de los Deudores que creen que cumplen la definición de "suscriptores de seguros" tal como se definen en el Código de Quiebras deben consultar a asesores calificados con respecto a sus obligaciones conforme a las leyes federales y estatales pertinentes sobre títulos valores.

Al igual que la exención de registro dispuesta por la ACT Reorganizada conforme a la Sección 3(a)(2) de la Ley de Valores, las leyes de títulos valores generalmente aplicables proporcionan una exención de la calificación de ciertas escrituras de fideicomiso presentadas por entidades gubernamentales. Por lo tanto, cada escritura de fideicomiso, orden, resolución y otras acciones por escrito de la ACT o de la ACT Reorganizada relacionadas con los Nuevos Bonos de la ACT estarán exentas de la calificación conforme a la Sección 304(a)(4) de la TIA.

Las leyes de títulos valores generalmente disponen exenciones de registro para las transferencias subsiguientes por un propietario de buena fe por cuenta del propietario y transferencias subsiguientes a inversionistas institucionales o acreditados. En general se espera que dichas exenciones estén disponibles para transferencias subsiguientes de los Nuevos Bonos de la ACT.

2.    **Divulgación de mercado**

(a)    **Oferta y venta iniciales**

Aunque se los exceptúa del registro, los títulos valores emitidos por la ACT Reorganizada están sujetos a las disposiciones antifraude de las leyes federales de títulos valores. Las Secciones 10(b) y 17(a) de la Ley de Intercambio de Títulos Valores de 1934 (la "Ley de Intercambio") y la

Regla 10b-5 promulgada por la SEC conforme a la Ley de Intercambio generalmente prohíben el fraude en la compraventa de títulos valores. Por lo tanto, cada venta ofrecida públicamente de las obligaciones de una entidad pública generalmente se ven acompañadas por un documento de oferta denominado "Declaración Oficial", que divulga información de importancia con respecto al emisor y los títulos valores que se venden, para que los inversionistas puedan tomar una decisión informada sobre sus inversiones, con respecto a la venta de los títulos valores ofertados. La Sección 1125(d) del Código de Quiebras, que fue adoptada por PROMESA, dispone que la adecuación de cualquier divulgación a los acreedores e inversionistas hipotéticos típicos de los tenedores de Reclamaciones en este caso no está sujeta a los principios de cualquier otra ley, regla o reglamento no relacionados con quiebras aplicables de otra manera, lo que incluye las leyes federales de títulos valores. En lugar de ello, la Sección 1125(b) del Código de Quiebras, que fue adoptado por PROMESA, regula las divulgaciones al exigir que se proporcione información adecuada a las diversas clases de acreedores de los Deudores y a los inversionistas hipotéticos sobre las obligaciones de los Deudores a través de una declaración de divulgación como la presente Declaración de Divulgación.

(b)     **Continuación de la divulgación**

Los títulos valores ofrecidos públicamente de la ACT Reorganizada generalmente están sujetos a los requisitos de la Regla 15c2-12 conforme a la Ley de Intercambio (la "Regla") a menos que dichos títulos valores cumplan ciertas exenciones dispuestas en la Regla. Entre otros requisitos, la Regla exige que los suscriptores de seguros que participen en una oferta obtengan un acuerdo que imponga ciertos requisitos permanentes de divulgación al mercado ante la emisión de títulos valores municipales, como los de la ACT Reorganizada.

La entrega de los Nuevos Bonos de la ACT conforme al Plan no está cubierta por la Regla porque se propone que los Nuevos Bonos de la ACT se emitan a cambio de la Reclamación de un tenedor de reclamaciones sin que participe un suscriptor de seguros, tal como este se define en la Regla.

*[El resto de la página se deja intencionalmente en blanco]*

2" = "1" "2621/33260-009 CURRENT/127656480v7                                                04/30/2022 3:29 PM" ""

## XII.   Información y proyecciones financieras

**A.   Información financiera histórica**

**(a)   Declaraciones financieras de la ACT**

De acuerdo con la Regla 15c2-12 de la SEC y en relación con sus emisiones de bonos, la ACT se ha comprometido a presentar dentro de los trescientos cinco (305) días posteriores al final de cada año fiscal, con MSRB a través de EMMA, información financiera y datos operativos fundamentales para el año fiscal precedente, incluyendo: (1) declaraciones financieras auditadas y (2) un Informe sobre Información Financiera y Datos Operativos (el "Informe de la ACT"), que proporciona información financiera y datos operativos sobre ingresos, gastos, operaciones financieras y deuda que generalmente se encuentran en las Declaraciones Oficiales preparadas en relación con sus emisiones de bonos.

Los estados financieros básicos auditados más recientes preparados por la ACT corresponden al FY2021. Estos estados financieros fueron presentados por la ACT con MSRB a través de EMMA el 1 de abril de 2022. El Informe de la ACT más reciente se publicó el 29 de abril de 2021, y presenta información financiera no auditada al 30 de junio de 2020.

Los estados financieros para el FY2021 fueron auditados por Crowe Puerto Rico, PSC. El informe de los auditores expone opiniones calificadas[209] porque, entre otras razones, el ELA no ha dado a conocer el Informe de Gastos de Pensión del Plan Definido de Beneficios de Pensión del ELA de la Junta de Normas Contables Gubernamentales ("GASB", por sus siglas en inglés) para el año que termina el 30 de junio de 2021. Por lo tanto, todos los montos relacionados con pensiones que se incluyen en los estados financieros están obsoletos y pueden tener un efecto significativo en la posición financiera y los resultados de las operaciones de la ACT. Sin embargo, al 1 de julio de 2020, la ACT ha replanteado su déficit neto, por cuenta de su participación proporcional de los pasivos de pensión del SRE conforme a la Declaración de GASB Núm. 73 – "Informe contable y financiero para pensiones y activos relacionados que no están dentro del ámbito de la Declaración de GASB Núm. 68, y enmiendas a ciertas disposiciones de la Declaración de GASB Núm. 67 y 68". Se omite la información sobre pensiones que debe divulgarse conforme a los principios contables generalmente aceptados de EE. UU. ("GAAP", por sus siglas en inglés). Sin embargo, los auditores indicaron que su opinión sobre estados financieros básicos no se ve afectada por esta información faltante.

**Presentación tardía de informes financieros.** Aunque la ACT ha presentado todos los informes y estados financieros que se deben presentar en los años anteriores, algunas de estas presentaciones se hicieron una vez transcurrida la fecha límite de presentación de la ACT, que normalmente es el 1 de mayo.

El siguiente es un breve resumen de las demoras en las presentaciones con respecto a los estados financieros auditados para FY2016 en adelante.

---

[209]   Una opinión calificada es una declaración emitida después de completarse una auditoría, que sugiere que la información provista es de alcance limitado.

2" = "1" "2621/33260-009 CURRENT/127656480v7                                        04/30/2022 3:29 PM" ""

***Año fiscal 2020.*** El 29 de abril de 2021, la ACT notificó que sus estados financieros auditados no se presentarían para la fecha límite del 1 de mayo de 2021. Los estados financieros auditados para FY2020 se presentaron el 10 de diciembre de 2021.

***Año fiscal 2019.*** El 29 de abril de 2020, la ACT notificó que sus estados financieros auditados no se presentarían para la fecha límite del 30 de abril de 2020. Los estados financieros auditados para FY2019 se presentaron el 19 de mayo de 2021.

***Año fiscal 2018.*** Los estados financieros auditados para FY2018 se presentaron a tiempo, el 30 de abril de 2019.

***Año fiscal 2017.*** El 30 de abril de 2018, la ACT notificó que sus estados financieros auditados no se presentarían para la fecha límite del 1 de mayo de 2018. Los estados financieros auditados para FY2017 se presentaron el 9 de abril de 2019.

***Año fiscal 2016.*** El 1 de mayo de 2017, la ACT notificó que sus estados financieros auditados para FY2016 no se presentarían para la fecha límite del 1 de mayo de 2017. Los estados financieros auditados para FY2016 se presentaron el 7 de mayo de 2018.

**B.      Plan fiscal y proyecciones de la ACT**

Se adjunta a esta Declaración de Divulgación como <u>Anexo D</u> una copia del Plan Fiscal de la ACT, certificado por la Junta de Supervisión el 22 de febrero de 2022. El Plan Fiscal de la ACT presenta detalles sobre las operaciones proyectadas de la ACT conforme al Plan de la ACT, sujeto a las suposiciones y calificaciones estipuladas en el Plan Fiscal de la ACT certificado.

Es importante resaltar que las proyecciones que se describen en el Plan Fiscal de la ACT pueden diferir del desempeño real y dependen en gran medida de suposiciones significativas con respecto a las condiciones económicas y financieras futuras de la ACT, que se ven afectadas por diversos factores legales, financieros, sociales, económicos, ambientales, gubernamentales y políticos. Estos factores pueden ser muy complejos, pueden variar de un año fiscal al siguiente y con frecuencia son el resultado de medidas tomadas o no tomadas, no solo por el Gobierno, la Junta de Supervisión y otras entidades externas, como el gobierno de Estados Unidos.

Las proyecciones financieras incluidas en el Plan Fiscal de la ACT suponen la implementación exitosa del Plan de la ACT. Las proyecciones financieras que se incluyen en el Plan Fiscal de la ACT deben revisarse en conjunción con las suposiciones, notas y calificaciones incluidas en el Plan Fiscal de la ACT, y las suposiciones, calificaciones y explicaciones estipuladas en esta Declaración de Divulgación, incluyendo las secciones tituladas "Descripción general de la ACT", "Plan de ajuste del Título III de la ACT", "Ciertos factores de riesgo a considerar", "Ciertas consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.", "Ciertas consideraciones materiales a efectos del impuesto sobre la renta de Puerto Rico" y "Aplicabilidad de ciertas leyes federales y estatales de títulos valores".

El Plan Fiscal de la ACT no constituye una auditoría realizada de acuerdo con las normas de auditoría generalmente aceptadas, un examen de los controles internos u otras certificaciones o servicios de revisión de acuerdo con las normas establecidas por el Instituto Estadounidense de Contadores Públicos Certificados o cualquier otra organización. De conformidad, la Junta de

Supervisión no puede expresar una opinión ni otra forma de garantía sobre los estados financieros o cualquier otra información financiera o de otro tipo o los controles internos de la ACT, y la información contenida en ellos.

El Plan Fiscal de la ACT no es un plan de ajuste de Título III. No especifica clases de reclamaciones y tratamientos. No exonera deudas ni extingue gravámenes. Al decidir si votar para aceptar o rechazar el Plan de la ACT, los tenedores de Reclamaciones deben tomar sus propias decisiones con respecto a la razonabilidad de las suposiciones y la confiabilidad de las proyecciones financieras y deben consultar a sus propios asesores.

[*El resto de la página se deja intencionalmente en blanco*]

### XIII.   <u>Información adicional</u>

Cualquier declaración en esta Declaración de Declaración de Divulgación con respecto a las disposiciones de cualquier documento no están necesariamente completas, y en cada caso se hace referencia a dicho documento para consultar el texto completo de este. Ciertos documentos que se describen o a los que se hace referencia en esta Declaración de Divulgación no se han adjuntado como Anexos debido a que no resulta práctico proporcionar copias de esos documentos a todos los destinatarios de esta Declaración de Divulgación. Todos los Anexos al Plan de la ACT se presentarán ante el Tribunal de Título III y pueden consultarse gratuitamente en el Sitio Web de Documentos en <u>https://cases.ra.kroll.com/puertorico/</u> antes de la Fecha Límite de Votación. También se pueden obtener copias gratuitas del Plan de la ACT poniéndose en contacto con el Agente de Convocatoria, Kroll Restructuring Administration LLC, llamando al (844) 822-9231 (llamada gratuita para EE.UU. y Puerto Rico) o (646) 486-7944 (para llamadas internacionales), de 10:00 a.m. a 7:00 p.m. (Hora Estándar del Atlántico) (se atiende también en español), o enviando un mensaje a puertoricoballots@ra.kroll.com y colocando en el asunto "HTA Plan of Adjustment Exhibits". Tenga en cuenta que Prime Clerk LLC no está autorizado a proporcionar asesoramiento jurídico y no lo hará.

### XIV.   <u>Conclusión</u>

La Junta de Supervisión y el Deudor consideran que el Plan de la ACT defiende los intereses de todos los acreedores y recomienda a los Tenedores de Reclamaciones Afectadas con derecho a votar sobre el Plan de la ACT que voten para aceptar el Plan de la ACT y demuestren su aceptación mediante la devolución oportuna de sus Papeletas marcadas para aceptar el Plan de la ACT antes de la Fecha Límite de Votación.

2" = "1" "2621/33260-009 CURRENT/127656480v7                     04/30/2022 3:29 PM" ""

# **ANEXO A**

PLAN DE LA ACT

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*: | PROMESA |
| | Título III |
| LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO | N.º 17 BK 3283-LTS |
| como representante de | (Administrado en conjunto) |
| EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, y otros, | |
| Deudores. | |
| *In re*: | PROMESA |
| | Título III |
| LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO | N.º 17 BK 3567-LTS |
| como representante de | |
| LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO, | |
| Deudor. | |

**PLAN MODIFICADO DE AJUSTE DE TÍTULO III DE LA
AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**

**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, Nueva York 10036
Teléfono: (212) 969-3000
Fax: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Teléfono: (787) 764-8181
Fax: (787) 753-8944

*Abogados para la Junta de Supervisión y Administración Financiera
como representante del deudor en su Caso de Título III*

Fechado:  16 de mayo de 2022

# ÍNDICE

**Página**

## SECCIÓN I

### DEFINICIONES

1.1     AAFAF ..............................................................................................1
1.2     Orden de la ACR..............................................................................1
1.3     Ley 106 ............................................................................................1
1.4     Fecha Límite de Reclamación Administrativa ...................................1
1.5     Reclamación de Gastos Administrativos ...........................................1
1.6     Orden de la ADR ..............................................................................2
1.7     Procedimientos de ADR ....................................................................2
1.8     Empresa asociada..............................................................................2
1.9     AFICA ...............................................................................................2
1.10    Permitida ...........................................................................................2
1.11    Reclamación Permitida .....................................................................2
1.12    Ambac ...............................................................................................2
1.13    Precio de Aceleración de Ambac ......................................................3
1.14    Acción de Ambac..............................................................................3
1.15    Elecciones de Tenedores de Bonos de Ambac ..................................3
1.16    Formularios de Elección de Tenedores de Bonos de Ambac ............3
1.17    Formulario de Notificación para Tenedores de Bonos de Ambac .....3
1.18    Certificados de Ambac ......................................................................3
1.19    Contraprestación por Conmutación de Ambac ..................................3
1.20    Tratamiento por Conmutación de Ambac ..........................................3
1.21    Reclamaciones de Bonos de la ACT/ELA de Ambac ........................3
1.22    Elección de Ambac ...........................................................................3
1.23    Notificación de Elección de Ambac ..................................................3
1.24    Reclamación de Bonos Asegurados de Ambac ..................................4
1.25    Tenedor de Bonos Asegurados de Ambac .........................................4
1.26    Bonos Asegurados de Ambac ...........................................................4
1.27    Pólizas de Seguros de Ambac ...........................................................4
1.28    Tratamiento por No Conmutación de Ambac ....................................4
1.29    Contraprestación por el Plan de Ambac ............................................4
1.30    Tratamiento de Ambac ......................................................................4
1.31    Fideicomiso de Ambac ......................................................................4
1.32    Activos del Fideicomiso de Ambac ...................................................4
1.33    Litigio Relacionado a Designaciones.................................................4
1.34    Activos ..............................................................................................5
1.35    Assured .............................................................................................5
1.36    Precio de Aceleración de Assured .....................................................5
1.37    Elecciones de los Bonistas de Assured .............................................5
1.38    Formulario de Elecciones de los Tenedores de Bonos de Assured ....5
1.39    Reclamaciones de Bonos de la ACT/ELA de Assured .......................5

i

1.40    Elección de Assured ...................................................................................5
1.41    Notificación de Elección de Assured ........................................................5
1.42    Pólizas de Seguros de Assured ..................................................................5
1.43    Reclamación de Bonos Asegurados de Assured ........................................5
1.44    Bonista Asegurado de Assured ..................................................................6
1.45    Bonos Asegurados de Assured ..................................................................6
1.46    Nuevos Bonos de la ACT de Assured ........................................................6
1.47    Contraprestación del Plan de Assured ......................................................6
1.48    Tratamiento de Assured .............................................................................6
1.49    Fideicomiso de Assured .............................................................................6
1.50    Acciones de Anulación ..............................................................................6
1.51    Fideicomiso de Acciones de Anulación .....................................................7
1.52    Contrato de Fideicomiso de Acciones de Anulación .................................7
1.53    Junta del Fideicomiso de Acciones de Anulación .....................................7
1.54    Fideicomisario de Acciones de Anulación ................................................7
1.55    Fecha de Elección ......................................................................................7
1.56    Papeleta/Formulario de Elección ..............................................................7
1.57    Código de Quiebras ...................................................................................7
1.58    Reglamento sobre Quiebras .......................................................................7
1.59    Fecha Límite ..............................................................................................7
1.60    Órdenes de Fecha Límite ...........................................................................8
1.61    Día Hábil ...................................................................................................8
1.62    Mejoras Capitales ......................................................................................8
1.63    Efectivo .....................................................................................................8
1.64    Causas de Acción ......................................................................................8
1.65    ADCC ........................................................................................................8
1.66    Derecho de preferencia de honorarios profesionales ................................8
1.67    Reclamación ..............................................................................................9
1.68    Clase ..........................................................................................................9
1.69    Acciones de Recuperación .........................................................................9
1.70    Contrato de Emisión de CVI de Recuperación ..........................................9
1.71    CVI de Recuperación .................................................................................9
1.72    COFINA .....................................................................................................9
1.73    Estado Libre Asociado ...............................................................................9
1.74    Orden de Confirmación del ELA ...............................................................9
1.75    Constitución del ELA ...............................................................................10
1.76    Fecha de Entrada en Vigencia del ELA ...................................................10
1.77    Préstamo del ELA ....................................................................................10
1.78    Legislatura del ELA .................................................................................10
1.79    Plan del ELA ............................................................................................10
1.80    Costos de Perfeccionamiento ...................................................................10
1.81    Tope de Conveniencia ..............................................................................10
1.82    Reclamación de Conveniencia .................................................................10
1.83    Fecha de conversión .................................................................................11
1.84    Acreedor ...................................................................................................11
1.85    Comité de Acreedores ..............................................................................11

1.86    CUSIP ....................................................................................................11
1.87    Documentos del Fideicomiso de custodia ..........................................................11
1.88    CVI ......................................................................................................11
1.89    Contrato de Emisión de CVI ..........................................................................11
1.90    Legislación de CVI .....................................................................................11
1.91    Reclamación del Centro de Convenciones/ELA ....................................................11
1.92    Reclamación de la ACT/ELA ..........................................................................11
1.93    Recuperación de Recuperación de la ACT/ELA ...................................................12
1.94    Reclamación de la AMA/ELA ..........................................................................12
1.95    Reclamación de Impuesto de Ron de la AFI/ELA .................................................12
1.96    Deuda ...................................................................................................12
1.97    Deudor ..................................................................................................12
1.98    Política de Gestión de la Deuda ......................................................................12
1.99    Período de la Política de Deuda ......................................................................12
1.100   Objeciones Relacionadas con Deuda ................................................................12
1.101   Fondo de Amortización de la Deuda ................................................................13
1.102   Fecha de Emisión Estimada ..........................................................................13
1.103   Documentos Definitivos ..............................................................................13
1.104   No Permitidas ..........................................................................................14
1.105   Agente Pagador ........................................................................................14
1.106   Declaración de Divulgación ..........................................................................14
1.107   Vista de Declaración de Divulgación ................................................................14
1.108   Orden de Declaración de Divulgación ..............................................................14
1.109   Reclamación Controvertida ...........................................................................14
1.110   Estipulación de Fondos en Disputa .................................................................14
1.111   Fecha de Registro de Distribución ..................................................................15
1.112   Estipulación de la DRA ...............................................................................15
1.113   Bonos Asegurados de Doble Garantía ..............................................................15
1.114   Reclamación de Expropiación/Expropiación Inversa .............................................15
1.115   Procedimiento de Expropiación ......................................................................15
1.116   Entidad ..................................................................................................15
1.117   SRE ......................................................................................................15
1.118   Contrato a Ejecutarse .................................................................................15
1.119   FGIC .....................................................................................................15
1.120   Acción de FGIC ........................................................................................16
1.121   Certificados de FGIC ..................................................................................16
1.122   Reclamaciones de Bonos de la ACT/ELA de FGIC ...............................................16
1.123   Acuerdos de Cuenta de Plica de FGIC .............................................................16
1.124   Reclamación de Bonos Asegurados por FGIC .....................................................16
1.125   Bonos Asegurados por FGIC .........................................................................16
1.126   Pólizas de Seguros de FGIC .........................................................................16
1.127   Contraprestación del Plan de FGIC .................................................................16
1.128   Plan de Rehabilitación de FGIC .....................................................................16
1.129   Tratamiento de FGIC ..................................................................................17
1.130   Fideicomiso del FGIC ..................................................................................17
1.131   Orden Final .............................................................................................17

2" = "1" "125859215v13" ""

1.132   Plan Fiscal ................................................................................................17
1.133   Año Fiscal .................................................................................................17
1.134   BGF .........................................................................................................17
1.135   Préstamos a la ACT/BGF..........................................................................17
1.136   Determinación de la Prioridad de Préstamos del BGF ...............................17
1.137   CVI de OG ................................................................................................18
1.138   Organización Gubernamental ....................................................................18
1.139   Partes del Gobierno ...................................................................................18
1.140   Reclamaciones Eximidas por el Gobierno ..................................................18
1.141   Partes Eximidas del Gobierno....................................................................18
1.142   Tope de Recuperación de GUC ..................................................................19
1.143   Reserva de GUC ........................................................................................19
1.144   Activos de Carretera ..................................................................................19
1.145   ACT...........................................................................................................19
1.146   Reclamación de Bonos de la ACT 68..........................................................19
1.147   Reclamación de Bonos de la ACT 68 (Ambac)............................................19
1.148   Reclamación de Bonos de la ACT 68 (Assured)..........................................19
1.149   Reclamación de Bonos de la ACT 68 (National)..........................................19
1.150   Recuperación de Bonos de la ACT 68 .........................................................19
1.151   Bonos de la ACT 68....................................................................................20
1.152   Bonos de la ACT 98....................................................................................20
1.153   Reclamación de Bonos de la ACT 98 Principales ........................................20
1.154   Reclamación de Bonos de la ACT 98 Principales (Ambac) ..........................20
1.155   Reclamación de Bonos de la ACT 98 Principales (Assured) ........................20
1.156   Reclamación de Bonos de la ACT 98 Principales (FGIC) ............................20
1.157   Reclamación de Bonos de la ACT 98 Principales (National)........................21
1.158   Recuperación de Bonos de la ACT 98 Principales .......................................21
1.159   Bonos de la ACT 98 Principales ..................................................................21
1.160   Reclamación de Bonos de la ACT 98 Subordinados .....................................22
1.161   Reclamación de Bonos de la ACT 98 Subordinados (Assured) .....................22
1.162   Reclamación de Bonos de la ACT 98 Subordinados (FGIC) ........................22
1.163   Reclamación de Bonos de la ACT 98 Subordinados (National)....................22
1.164   Recuperación de Bonos de la ACT 98 Subordinados ....................................22
1.165   Bonos de la ACT 98 Subordinados ..............................................................22
1.166   Reclamaciones de Bonos de la ACT ............................................................22
1.167   Bonos de la ACT .........................................................................................22
1.168   Contrato Complementario de la ACT/ADCC ...............................................22
1.169   Acuerdo de Litisconsorcio de la ACT/ADCC ..............................................22
1.170   Fecha límite del Litisconsorcio de la ACT/ADCC .......................................22
1.171   Acreedores de Litisconsorcio de la ACT/ADCC ..........................................23
1.172   Acuerdo de Apoyo al Plan de la ACT/ADCC ...............................................23
1.173   Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC ........................23
1.174   Acreedores con Tasa de Restricción del Acuerdo de Apoyo al Plan de la
        ACT/ADCC .................................................................................................23
1.175   Período de Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC .........23
1.176   Obtención del Umbral del Acuerdo de Apoyo al Plan de la ACT/ADCC........................23

2" = "1" "125859215v13" ""

1.177  CVI de Recuperación de la ACT ..............................................................24
1.178  Recuperación de Recuperación de la ACT ...............................................24
1.179  Contrato del Comité de la ACT ...............................................................24
1.180  Fecha de Confirmación de la ACT ..........................................................24
1.181  Vista de Confirmación de la ACT ............................................................24
1.182  Orden de Confirmación de HTA...............................................................24
1.183  Condiciones de Distribución de la ACT ...................................................24
1.184  Fecha de Entrada en Vigencia de la ACT ................................................24
1.185  Ley para Crear la ACT.............................................................................25
1.186  Agente fiscal de la ACT...........................................................................25
1.187  Plan Fiscal de la ACT ..............................................................................25
1.188  Reclamación de la ACT/BGF ..................................................................25
1.189  Reclamación sin Garantía General de la ACT ..........................................25
1.190  Recuperación de GUC de la ACT .............................................................26
1.191  Reclamación de Bonos de Moscoso de la ACT ........................................26
1.192  Bonos de Moscoso de la ACT ..................................................................26
1.193  Fecha de Petición de la ACT ....................................................................26
1.194  Plan de la ACT ........................................................................................26
1.195  Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT ...............26
1.196  Porcentaje de la Tasa de Restricción de la ACT .......................................26
1.197  Caso de Título III de la ACT ....................................................................26
1.198  Acreedores Iniciales del Acuerdo de Apoyo al Plan de la ACT/ADCC............27
1.199  Reclamación de Bonos de la ACT Asegurados ........................................27
1.200  Acciones de Invalidez ..............................................................................27
1.201  IRC .........................................................................................................27
1.202  SII ...........................................................................................................27
1.203  Reclamación de Radicación Tardía ..........................................................27
1.204  Gravamen ................................................................................................27
1.205  Acciones de Impugnación de Gravamen ..................................................27
1.206  Mociones de levantamiento de la paralización .........................................27
1.207  Lista de Acreedores..................................................................................28
1.208  Normas de Quiebra Locales......................................................................28
1.209  AMA .......................................................................................................28
1.210  AFM ........................................................................................................28
1.211  Monolíneas ..............................................................................................28
1.212  National ...................................................................................................28
1.213  Acción de National ..................................................................................28
1.214  Precio de Aceleración de National ...........................................................28
1.215  Formulario de Elección de Tenedores de Bonos de National ....................28
1.216  Certificados de National ..........................................................................28
1.217  Contraprestación por Conmutación de National .......................................28
1.218  Tratamiento de Conmutación de National .................................................29
1.219  Reclamaciones de Bonos de la ACT/ELA de National .............................29
1.220  Cuenta de Plica de National .....................................................................29
1.221  Contraprestación de Cuenta de Plica de National.....................................29
1.222  Contraprestación de la ACT de National ..................................................29

1.223   Pólizas de Seguro de National ....................................................................29
1.224   Reclamaciones de Bonos Asegurados de National .....................................29
1.225   Bonos Asegurados de National ...................................................................29
1.226   Tratamiento de No Conmutación de National .............................................29
1.227   Contraprestación del Plan de National ........................................................29
1.228   Tratamiento de National ..............................................................................29
1.229   Fideicomiso de National ..............................................................................30
1.230   Contraprestación del Fideicomiso de National ...........................................30
1.231   Nuevos Bonos de la ACT .............................................................................30
1.232   Contrato de Emisión de Nuevos Bonos de la ACT ......................................30
1.233   Fideicomisario de Nuevos Bonos de la ACT ...............................................30
1.234   Nuevos CAB de la ACT ...............................................................................30
1.235   Nuevos CIB de la ACT .................................................................................30
1.236   Nuevos CAB convertibles de la ACT ...........................................................30
1.237   Pendiente .....................................................................................................30
1.238   Junta de Supervisión ...................................................................................31
1.239   Disposición Parcial ......................................................................................31
1.240   PayGo ...........................................................................................................31
1.241   AEP ...............................................................................................................31
1.242   Persona .........................................................................................................31
1.243   CFP ...............................................................................................................31
1.244   Complemento del Plan .................................................................................31
1.245   Ingresos Pignorados .....................................................................................31
1.246   AAA ...............................................................................................................31
1.247   AEE ...............................................................................................................31
1.248   PRIDCO .......................................................................................................32
1.249   AFI ................................................................................................................32
1.250   ATI ................................................................................................................32
1.251   Profesional ...................................................................................................32
1.252   Reclamación Profesional .............................................................................32
1.253   PROMESA ....................................................................................................32
1.254   Participación a Prorrata ...............................................................................32
1.255   Personas Relacionadas .................................................................................32
1.256   Reclamaciones Eximidas .............................................................................32
1.257   Partes Eximidas ...........................................................................................33
1.258   Partes que Eximen........................................................................................33
1.259   Estado Libre Asociado Reorganizado .........................................................33
1.260   ACT Reorganizada .......................................................................................34
1.261   Estatutos de la ACT Reorganizada ..............................................................34
1.262   Acción de SCC .............................................................................................34
1.263   SEC ...............................................................................................................34
1.264   Asesor Jurídico de Bonos del Artículo 103 .................................................34
1.265   Reclamación Subordinada al Artículo 510(b)..............................................34
1.266   Obligaciones Garantizadas ..........................................................................34
1.267   Ley de Valores .............................................................................................34
1.268   Cuenta del SIB .............................................................................................34

2" = "1" "125859215v13" ""

1.269   Agente del Solicitante ...............................................................................34
1.270   Endeudamiento Subordinado ....................................................................34
1.271   Título III ...................................................................................................34
1.272   Caso de Titulo III .....................................................................................34
1.273   Tribunal del Título III ...............................................................................34
1.274   Instalaciones de Peaje ...............................................................................34
1.275   Convenio de Tarifas de Peaje ...................................................................35
1.276   Recibos de Peaje .......................................................................................35
1.277   Fondo de Recibo de Peaje .........................................................................35
1.278   Peajes ........................................................................................................35
1.279   Activos de Tránsito ...................................................................................35
1.280   Documentación del Fideicomiso ...............................................................35
1.281   Bienes del Fideicomiso .............................................................................35
1.282   Distribución no Reclamada .......................................................................36
1.283   Acciones de la aseguradora .......................................................................36
1.284   Arrendamiento en curso .............................................................................36
1.285   Litigio de Uniformidad ..............................................................................36
1.286   UPR ...........................................................................................................36
1.287   Fecha de Registro de Votación ..................................................................36
1.288   Otras Definiciones ....................................................................................36
1.289   Normas de Interpretación ..........................................................................37

## SECCIÓN II

### CONCILIACIÓN Y RESOLUCIÓN DE DISPUTAS/REESTRUCTURACIÓN DE ENTIDADES/RECLAMACIONES DE PENSIONADOS

2.1   Resolución de Litigios ...............................................................................37
2.2   Admisión de Reclamaciones de Bonos .......................................................38
2.3   Exenciones, Medidas Cautelares y Exculpaciones .....................................38
2.4   Reestructuración operativa de la ACT ........................................................38
2.5   Reclamaciones de Pensionados ..................................................................39

## SECCIÓN III

### DISPOSICIONES PARA EL PAGO DE RECLAMACIONES DE GASTOS ADMINISTRATIVOS

3.1   Reclamaciones de Gastos Administrativos ..................................................39
3.2   Reclamaciones de Reembolso y Compensación Profesional ........................39
3.3   Costos de Perfeccionamiento de la ACT .....................................................40
3.4   Tasa de Restricción de la ACT ...................................................................40
3.5   No Independencia .......................................................................................41

2" = "1" "125859215v13" ""

## SECCIÓN IV

## CLASIFICACIÓN DE RECLAMACIONES

4.1 Las reclamaciones se clasifican de la manera siguiente ....................................................42

## SECCIÓN V

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (CLASE 1)

5.1 Tratamiento de Reclamaciones de Bonos de la ACT 68 ....................................................43

## SECCIÓN VI

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (AMBAC) (CLASE 2)

6.1 Tratamiento de Reclamaciones de Bonos de la ACT 68 (Ambac) ...................................43

## SECCIÓN VII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (ASSURED) (CLASE 3)

7.1 Tratamiento de Reclamaciones de Bonos de la ACT 68 (Assured)...................................43

## SECCIÓN VIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (NATIONAL) (CLASE 4)

8.1 Tratamiento de Reclamaciones de Bonos de la ACT 68 (National).................................43

## SECCIÓN IX

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (CLASE 5)

9.1 Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales.................................44

## SECCIÓN X

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (AMBAC) (CLASE 6)

10.1 Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (Ambac) ................44

2" = "1" "125859215v13" ""

## SECCIÓN XI

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (ASSURED) (CLASE 7)

11.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (Assured)................44

## SECCIÓN XII

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (FGIC) (CLASE 8)

12.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (FGIC)....................44

## SECCIÓN XIII

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (NATIONAL) (CLASE 9)

13.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (National) ...............45

## SECCIÓN XIV

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (CLASE 10)

14.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados ...........................45

## SECCIÓN XV

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (ASSURED) (CLASE 11)

15.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados (Assured)............45

## SECCIÓN XVI

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (FGIC) (CLASE 12)

16.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC)...............45

## SECCIÓN XVII

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (NATIONAL) (CLASE 13)

17.1   Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados (National)...........46

2" = "1" "125859215v13" ""

# SECCIÓN XVIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE MOSCOSO DE LA ACT (CLASE 14)

18.1   Tratamiento de Reclamaciones de Bonos de Mocoso de la ACT.......................................46

# SECCIÓN XIX

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES EXPROPIACIÓN/EXPROPIACIÓN INVERSA (CLASE 15)

19.1   Tratamiento de Reclamaciones de Expropiación/Expropiación Inversa ..........................46

# SECCIÓN XX

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES SIN GARANTÍA GENERALES DE LA ACT (CLASE 16)

20.1   Tratamiento de Reclamaciones sin Garantía Generales de la ACT .................................47
20.2   Limitación de Recuperación .........................................................................................47
20.3   Reserva de GUC .........................................................................................................48

# SECCIÓN XXI

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE LA ACT/BGF (CLASE 17)

21.1   Tratamiento de Reclamaciones de la ACT/BGF ...........................................................48

# SECCIÓN XXII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES SUBORDINADAS DEL ARTÍCULO 510(b) (CLASE 18)

22.1   Tratamiento de Reclamaciones Subordinadas del Artículo 510(b) ..................................48

# SECCIÓN XXIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE CONVENIENCIA (CLASE 19)

23.1   Tratamiento de Reclamaciones de Conveniencia ...........................................................48

# SECCIÓN XXIV

## DISPOSICIONES RELATIVAS A OBLIGACIONES GARANTIZADAS Y ENDEUDAMIENTO ADICIONAL

24.1   Emisión y Distribución de los Nuevos Bonos de la ACT.................................................49
24.2   Tratamiento Exento de Impuestos de  los Nuevos Bonos de la ACT ...............................53

24.3    Adopción y mantenimiento de una Política de Gestión de la Deuda................................53

## SECCIÓN XXV

## DISPOSICIONES CON RESPECTO A LOS BONOS ASEGURADOS DE ASSURED, LOS BONOS ASEGURADOS DE NATIONAL, LOS BONOS ASEGURADOS DE AMBAC Y LOS BONOS ASEGURADOS DE FGIC

25.1    Tratamiento de Reclamaciones de Bonos Asegurados por Assured..................................54
25.2    Tratamiento de Reclamaciones de Bonos Asegurados por National................................57
25.3    Tratamiento de Reclamaciones de Bonos Asegurados de FGIC......................................60
25.4    Tratamiento de Reclamaciones de Bonos Asegurados de Ambac....................................61
25.5    Obligaciones del Agente Fiscal ....................................................................................65

## SECCIÓN XXVI

## TRATAMIENTO DE CONTRATOS A EJECUTARSE Y CONTRATOS DE ARRENDAMIENTO EN CURSO

26.1    Rechazo o Asunción de Contratos a Ejecutarse o Contratos de Arrendamiento en Curso Restantes.......................................................................................................65
26.2    Aprobación del Rechazo o Asunción de Contratos a Ejecutarse o Contratos de Arrendamiento en Curso ..............................................................................................66
26.3    Carácter incluyente.......................................................................................................66
26.4    Corrección de Incumplimientos....................................................................................66
26.5    Pólizas de seguros ........................................................................................................67
26.6    Reclamaciones por Daños debido a Rechazo ...............................................................67
26.7    Obligaciones de Indemnización y Reembolso ..............................................................67
26.8    Inexistencia de Fecha de Entrada en Vigencia de la ACT............................................67
26.9    Reserva de Derechos.....................................................................................................67
26.10   Contrato de Negociación Colectiva ..............................................................................68

## SECCIÓN XXVII

## DISPOSICIONES QUE RIGEN LAS DISTRIBUCIONES

27.1    Tiempo y Manera de Distribución .................................................................................68
27.2    Puntualidad de los Pagos ..............................................................................................69
27.3    Distribuciones por parte del Agente Pagador ...............................................................69
27.4    Forma de Pago conforme al Plan de la ACT .................................................................69
27.5    Entrega de Distribuciones.............................................................................................69
27.6    Cancelación de Pagarés, Instrumentos, Certificados y Otros documentos......................70
27.7    Distribuciones no Entregables/Reservadas ...................................................................71
27.8    Requisitos de Retención y Presentación de Informes ...................................................72
27.9    Tiempo Límite para Pagos en Efectivo.........................................................................72
27.10   Distribuciones después de la Fecha de Entrada en Vigencia de la ACT .........................72
27.11   Compensaciones ...........................................................................................................72
27.12   Asignación de Distribución del Plan entre Capital e Intereses ......................................73

27.13   Pago de Honorarios y Gastos del Fideicomisario ...............................................73
27.14   Beneficiario Efectivo ........................................................................................74
27.15   Valor de Distribuciones ....................................................................................74
27.16   Estipulación de Fondos en Disputa ...................................................................74

## SECCIÓN XXVIII

### SEGUIMIENTO Y EXTINCIÓN DE RECLAMACIONES DEL DEUDOR

28.1   Seguimiento de Reclamaciones ...........................................................................75

## SECCIÓN XXIX

### ACEPTACIÓN O RECHAZO DEL PLAN DE LA ACT; EFECTOS DEL RECHAZO POR PARTE DE UNA O MÁS CLASES DE RECLAMACIONES

29.1   Clases Afectadas que Votan................................................................................75
29.2   Aceptación por Clase de Acreedores ..................................................................75
29.3   Imposición de Plan Concursal por el Tribunal ...................................................75

## SECCIÓN XXX

### DERECHOS Y FACULTADS DEL AGENTE PAGADOR

30.1   Exculpación........................................................................................................75
30.2   Facultades del Agente Pagador ..........................................................................76
30.3   Honorarios y Gastos incurridos a partir de la Fecha de Entrada en Vigencia de la ACT....................................................................................................................76

## SECCIÓN XXXI

### PROCEDIMIENTOS PARA EL TRATAMIENTO DE RECLAMACIONES CONTROVERTIDAS Y RECLAMACIONES SUJETAS A PROCEDIMIENTOS DE LA ACR

31.1   Objeciones a Reclamaciones; Seguimiento de Reclamaciones Controvertidas ...............76
31.2   Estimación de Reclamaciones.............................................................................77
31.3   Pagos y Distribuciones de Reclamaciones Controvertidas.................................78
31.4   Facultad para modificar Listas de Acreedores...................................................78
31.5   No Devengamiento de Intereses .........................................................................78
31.6   Denegación de Reclamaciones ...........................................................................79
31.7   Reclamaciones Sujetas a Procedimientos de la ACR ........................................79

## SECCIÓN XXXII

### IDENTIFICACIÓN DE RECLAMACIONES AFECTADAS POR EL PLAN DE LA ACT Y NO AFECTADAS POR EL PLAN DE LA ACT

32.1   Clases Afectadas ................................................................................................79
32.2   Clases de la ACT no Afectadas ..........................................................................80

# SECCIÓN XXXIII

## CONDICIONES PRECEDENTES A LA CONFIRMACIÓN DEL PLAN

33.1  Condiciones Precedentes a la Confirmación del Plan de la ACT .....................80
33.2  Renuncia a las Condiciones Precedentes a la Confirmación ...........................81

# SECCIÓN XXXIV

## CONDICIONES PRECEDENTES A LA FECHA DE ENTRADA EN VIGENCIA DE LA ACT

34.1  Condiciones precedentes a la Fecha de Entrada en Vigencia de la ACT ..........................81
34.2  Renuncia a las Condiciones Precedentes ...........................................85
34.3  Efecto de la no ocurrencia de las Condiciones a la Fecha de Entrada en Vigencia de la ACT ...............................................................85

# SECCIÓN XXXV

## MODIFICACIÓN, REVOCACIÓN O RETIRO DEL PLAN DE LA ACT

35.1  Modificación del Plan de la ACT ....................................................85
35.2  Revocación o Desistimiento ..........................................................85
35.3  Modificación de los Documentos del Plan ........................................86
35.4  No Admisión de Responsabilidad...................................................86

# SECCIÓN XXXVI

## GOBERNANZA CORPORTAIVA Y GESTIÓN DE LA ACT REORGANIZADA

36.1  Acción Corporativa.....................................................................87
36.2  Modificación de Estatutos.............................................................87
36.3  Directores de la ACT Reorganizada ...............................................87
36.4  Funcionarios de la ACT Reorganizada ...........................................88

# SECCIÓN XXXVII

## DISPOSICIONES RELATIVAS A LA JUNTA DE SUPERVISIÓN Y EL CUMPLIMIENTO DE PROMESA

37.1  Efecto de la Confirmación ...........................................................88
37.2  Función permanente de la Junta de Supervisión...............................88
37.3  Invalidez de Leyes ......................................................................88

# SECCIÓN XXXVIII

## DISPOSICIONES RELATIVAS AL COMITÉ DE ACREEDORES

38.1  Disolución del Comité de Acreedores .............................................89

2" = "1" "125859215v13" ""

# SECCIÓN XXXIX

# CONSERVACIÓN DE JURISDICCIÓN

39.1    Conservación de Jurisdicción ............................................................89

# SECCIÓN XL

# DISPOSICIONES VARIAS

40.1    Titularidad de los Activos........................................................................91
40.2    Extinción y Descargo de Reclamaciones y Causas de Acción .................92
40.3    Interdictos sobre Reclamaciones...............................................................95
40.4    Integral para el Plan de la ACT.................................................................95
40.5    Exenciones por parte del Deudor y la ACT Reorganizada.......................95
40.6    Medida Cautelar con respecto a las Exenciones ......................................95
40.7    Exculpación...............................................................................................96
40.8    Litigio Relacionado a Designaciones/Litigio de Uniformidad .................98
40.9    Orden de Exclusión...................................................................................98
40.10   Sin Renuncia..............................................................................................98
40.11   Medida Cautelar Complementaria.............................................................99
40.12   Gastos y Honorarios posteriores a la Vigencia ........................................99
40.13   Exención de la Ley de Valores................................................................100
40.14   Independencia..........................................................................................100
40.15   Ley Aplicable...........................................................................................100
40.16   Cierre de Caso.........................................................................................100
40.17   Títulos de secciones ...............................................................................100
40.18   Incongruencias.........................................................................................101
40.19   Conservación de documentos..................................................................101
40.20   Efecto Vinculante Inmediato ..................................................................101
40.21   Documentos Adicionales .........................................................................101
40.22   Reserva de Derechos................................................................................101
40.23   Sucesores y Cesionarios..........................................................................102
40.24   Notificaciones..........................................................................................102
40.25   Duración de los Interdictos o Paralizaciones ..........................................104
40.26   Totalidad del acuerdo,.............................................................................104
40.27   Complemento del Plan.............................................................................104

2" = "1" "125859215v13" ""

La Junta de Supervisión y Administración Financiera para Puerto Rico, como representante de la Autoridad de Carreteras y Transportación de Puerto Rico conforme al Artículo 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico*, por el presente propone el siguiente plan de ajuste.

## SECCIÓN I

## DEFINICIONES

Tal como se usa en el Plan de la ACT, los siguientes términos tienen los significados respectivos establecidos a continuación y son aplicables tanto a la forma singular como plural de los términos que se definen:

1.1 **AAFAF:**  la Autoridad de Asesoría Financiera y Agencia Fiscal, una empresa pública e instrumentalidad del Estado Libre Asociado, cuyo nombre en inglés es Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.2 **Orden de la ACR:**  la Orden específica (A) que autoriza la conciliación administrativa de reclamaciones, (B) que aprueba formas adicionales de notificaciones y (C) que otorga medidas relacionadas con fecha 12 de marzo de 2020 [Caso n.º 17-3283-LTS, ECF [gestión electrónica de casos] n.º 12274].

1.3 **Ley 106:**  Ley n.º 106 de 23 de agosto de 2017, por la que se creó el sistema de pensiones «PayGo» y se estableció un sistema de retiro de aportaciones definidas para sustituir el plan de beneficio de jubilación, conforme a la Ley n.º 12 de 19 de octubre de 1954, y sus modificaciones, Ley n.º 3 de 4 de abril de 2013, y sus modificaciones, y la Ley n.º 160 de 24 de diciembre de 2013, y sus modificaciones.

1.4 **Fecha Límite de Reclamación Administrativa:** a menos que el Tribunal del Título III ordene lo contrario, la fecha establecida por el Tribunal del Título III y establecida en la Orden de Confirmación de la ACT como el último día para radicar la evidencia de Reclamaciones de Gastos Administrativos; dicha fecha no será posterior a noventa (90) días después de la Fecha de Entrada en Vigencia de la ACT, después de dicha fecha, cualquier Reclamación de Gastos Administrativos para la cual no se haya radicado evidencia se considerará excluida para siempre y el Deudor y la ACT Reorganizada no tendrán obligación alguna con respecto a estas; disponiéndose, sin embargo, que no se requiera radicar evidencia de Reclamación de Gastos Administrativos si tal Reclamación de Gastos Administrativos (a) se incurrió (i) conforme a una orden del Tribunal del Título III o (ii) con la autorización por escrito de las Partes del Gobierno relevantes que otorga tal Reclamación de Gastos Administrativos de manera expresa, (b) es una Reclamación Profesional, (c) es una Reclamación intergubernamental, (d) es una Reclamación de Gastos Administrativos del IRS por el pago de impuestos incurridos por el Deudor durante el período desde y después de la fecha de Petición de la ACT, o (e) es objeto de una moción pendiente que busca la concesión de un gasto administrativo conforme al Artículo 503(b) del Código de Quiebras a partir de la entrada de la Orden de Confirmación de la ACT.

1

1.5 **Reclamación de Gastos Administrativos:** una Reclamación contra el Deudor o sus Activos que constituye un costo o gasto administrativo del Caso de Título III presentado o autorizado a ser presentado, en o antes de la Fecha Límite de Reclamación Administrativa, conforme a los artículos 503(b) y 507(a)(2) del Código de Quiebras que surge durante el período hasta la Fecha de Entrada en Vigencia de la ACT inclusive y que cumple de otro modo con la legislación de Puerto Rico aplicable, lo que incluye, de manera no taxativa, sujeto a la Fecha de Entrada en Vigencia de la ACT y salvo conforme al Artículo 3.5 del presente, los Costos de Perfeccionamiento y las Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT.

1.6 **Orden de la ADR:** la Orden específica (A) que autoriza procedimientos de resolución alternativa de litigios, (B) que aprueba formas adicionales de notificaciones, (C) que aprueba envíos propuestos y (D) que otorga medidas relacionadas, con fecha 1 de abril de 2020 [Caso n.º 17-3283-LTS, ECF [gestión electrónica de casos] n.º 12576].

1.7 **Procedimientos de la ADR:** los procedimientos de resolución alternativa de litigios autorizados conforme a la Orden de la ADR.

1.8 **Empresa asociada:** con respecto a cualquier Entidad especificada, cualquier otra Entidad que, directa o indirectamente, mediante uno o más intermediarios, controle, sea controlada o esté sujeta al control regular de tal Entidad.

1.9 **AFICA:** Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental.

1.10 **Permitida:** con respecto a cualquier Reclamación contra la ACT, tal Reclamación o parte de esta (a) de la cual se radicó evidencia en o antes de la Fecha Límite aplicable o (b) si no se radicó evidencia de Reclamación de manera oportuna, la cual se haya enumerado (o se enumere de aquí en adelante) por parte del Deudor en la Lista de Acreedores y no se enumera posteriormente como «controvertida», «condicional» o «no determinada» o (c) permitida conforme a (i) el artículo 502(h) del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA, (ii) los términos del Plan de la ACT o (iii) una Orden Final, disponiéndose, sin embargo, que, con respecto a cualquier Reclamación descrita en la cláusula (a) o (b) que precede, tal Reclamación se considerará Permitida solo si, y en la medida en que, no se haya interpuesto ninguna objeción a su admisión, ni acción para subordinar de manera equitativa o limitar de otro modo la recuperación con respecto a esta, dentro del plazo de prescripción aplicable establecido en el Plan de la ACT, el Código de Quiebras, las Normas de Quiebras o una Orden Final, o respecto a la cual se interpone una objeción y tal Reclamación se permitió en su totalidad o en parte mediante una Orden Final. A los efectos de determinar el monto de una «Reclamación Permitida» con respecto a las distribuciones dentro de una Clase, se deducirá de esta un monto igual al monto de cualquier descuento sobre el valor de la emisión original no devengado a la fecha inmediatamente anterior a la Fecha de Petición de la ACT y cualquier Reclamación que el Deudor pueda tener contra un tenedor de esta, en la medida en que tal Reclamación se pueda compensar conforme a la legislación de quiebra y no quiebra aplicable. Sin perjuicio de cualquier disposición que indique lo contrario en el presente (x) las Reclamaciones permitidas únicamente con el fin de votar para aceptar o rechazar el Plan de la

2

ACT conforme a una orden del Tribunal del Título III no se considerará como «Permitida» según el presente a menos que se especifique lo contrario en el presente o por orden del Tribunal del Título III, (y) para cualquier fin conforme al Plan de la ACT, «Permitida» no incluirá intereses, sanciones ni cargos por mora que surjan de o se relacionen con el período desde y posterior a la Fecha de Petición de la ACT y (z) «Permitida» no incluirá ninguna Reclamación sujeta a desaprobación conforme al artículo 502(d) del Código de Quiebras.

1.11 **Reclamación Permitida:** una reclamación, en la medida en que es Permitida o se permite.

1.12 **Ambac:** Ambac Assurance Corporation o su sucesor o delegado.

1.13 **Precio de Aceleración de Ambac:** con respecto a cualquier Bono Asegurado de Ambac, una cantidad igual al capital pendiente de dicho Bono Asegurado de Ambac <u>más</u> los intereses devengados y pendientes de pago a partir de la fecha del pago; <u>disponiéndose, sin embargo,</u> que dicha cantidad se ajustará para tener en cuenta cualquier pago del capital y/o intereses devengados a el tenedor de dicho Bono Asegurado de Ambac a cuenta de las Pólizas de Seguro de Ambac antes del pago de una Reclamación de Bono Asegurado de Ambac Permitida aplicable de acuerdo con los términos y disposiciones del Artículo 25.4 del presente.

1.14 **Acción de Ambac:** el litigio se denominó <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., *et al*.,</u> actualmente pendiente en el Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil n.º SJ2020CV01505.

1.15 **Elecciones de Tenedores de Bonos de Ambac:** en su conjunto, las elecciones que se proporcionaron a los tenedores de Bonos Asegurados de Ambac de acuerdo con los términos y disposiciones del Artículo 25.4 del presente y establecidos en el Formulario de Elección de Tenedores de Bonos de Ambac.

1.16 **Formularios de Elección de Tenedores de Bonos de Ambac:** la «Notificación de Elección a los Tenedores de Reclamaciones de Bonos de la ACT 98 Principales Asegurados de Ambac» adjunta como Anexo 5(a) a la Orden de Declaración de Divulgación.

1.17 **Formulario de Notificación para Tenedores de Bonos de Ambac:** la «Notificación a los Tenedores de Reclamaciones de Bonos de la ACT 68 Asegurados de Ambac» adjunta como Anexo 4(e) a la Orden de Declaración de Divulgación.

1.18 **Certificados de Ambac:** los certificados o unidades a ser emitidos por el Fideicomiso de Ambac a los tenedores beneficiarios de Bonos de la ACT que eligen tratamiento conforme a los términos y disposiciones del Artículo 25.4 del presente y cuyos Bonos de la ACT se depositan en el Fideicomiso de Ambac.

1.19 **Contraprestación por Conmutación de Ambac:** una combinación de algunos o todos los siguientes elementos seleccionados a criterio exclusivo de Ambac en o antes del comienzo de la Vista de Declaración de Divulgación: (a) una parte o la totalidad de la Participación a Prorrata en la Contraprestación del Plan de Ambac del tenedor; (b) un porcentaje,

3

que se determinará a criterio exclusivo de Ambac, de los Costos de Perfeccionamiento y/o de las Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT que se pueda asignar a Ambac de conformidad con los términos y disposiciones de la Sección III del presente; y (c) Efectivo en una cantidad a ser determinada por Ambac a su criterio exclusivo.

1.20 **Tratamiento por Conmutación de Ambac:** el tratamiento establecido en el Artículo 25.4(b)(i) del presente.

1.21 **Reclamaciones de Bonos de la ACT/ELA de Ambac:** en su conjunto, las Reclamaciones de la ACT/ELA que surjan de los bonos de la ACT Asegurados de Ambac.

1.22 **Elección de Ambac:** los derechos de Ambac, tal como se establecen en el Artículo 25.4 del presente, para seleccionar la forma de Tratamiento de Ambac.

1.23 **Notificación de Elección de Ambac:** la «Notificación de Elección de Ambac» adjunta como Anexos 4(e) y 5(a) a la Orden de Declaración de Divulgación.

1.24 **Reclamaciones de Bonos Asegurados de Ambac:** en su conjunto, las Reclamaciones contra la ACT que surjan de los Bonos Asegurados de Ambac, incluidas las Reclamaciones de Bonos de la ACT 68 (Ambac) y Bonos de la ACT 98 Principales (Ambac).

1.25 **Tenedor de Bonos Asegurados de Ambac:** el tenedor beneficiario de un Bono Asegurado de Ambac.

1.26 **Bonos Asegurados de Ambac:** en su conjunto, los Bonos de la ACT que han sido asegurados por Ambac o son de otra manera propiedad (por subrogación o de otra manera) de Ambac, lo que incluye, sin limitación, conforme a una póliza de seguro de mercado secundario.

1.27 **Pólizas de Seguros de Ambac:** las pólizas de seguro existentes emitidas por Ambac (o un predecesor en su interés) relativas a los Bonos Asegurados de Ambac, junto con todos y cada uno de los acuerdos y demás documentos relacionados con estos.

1.28 **Tratamiento por No Conmutación de Ambac:** el tratamiento establecido en el Artículo 25.4(b)(ii) del presente.

1.29 **Contraprestación por el Plan de Ambac:** la contraprestación asignable o distribuible a los tenedores de Reclamaciones de Bonos Asegurados de Ambac Permitidas y la Recuperación de la ACT/ELA asignable a los tenedores de Reclamaciones de la ACT/ELA de Ambac Permitidas.

1.30 **Tratamiento de Ambac:** el tratamiento de las Reclamaciones de Bonos Asegurados de Ambac establecido en el Artículo 25.4 del presente que comprende el Tratamiento de Conmutación de Ambac y el Tratamiento de No Conmutación de Ambac.

1.31 **Fideicomiso de Ambac:** con respecto a cada clase de los Bonos Asegurados de Ambac, un fideicomiso separado o un acuerdo de custodia que será formado, en o antes de la

4

Fecha de Entrada en Vigencia de la ACT, por la ACT, por cuenta exclusiva de Ambac y en beneficio de los tenedores beneficiarios de tales Bonos Asegurados de Ambac.

1.32 **Activos del Fideicomiso de Ambac:** en su conjunto, los activos que se depositarán en el Fideicomiso de Ambac, que consisten en (a) los Bonos Asegurados de Ambac, (b) la Contraprestación por el Plan de Ambac y (c) las Pólizas de Seguros de Ambac.

1.33 **Litigio Relacionado con Designaciones:** en su conjunto, los litigios denominados (a) Pinto Lugo, et al. v. United States, Caso n.º 21-1283 (apelación del procedimiento contencioso n.º 18-00041-LTS), actualmente en trámite en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Caso n.º 19-2243 (apelación del procedimiento contencioso n.º 18-00066), actualmente pendiente en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (c) Hernandez-Montañez, et al. v. The Financial Oversight & Management Board for Puerto Rico, procedimiento contencioso n.º 18-00090, actualmente en trámite en el Tribunal del Título III, y (d) cualquier otro litigio que pueda estar actualmente en trámite o que pueda iniciarse durante el período desde y después de la fecha del presente hasta e inclusive la Fecha de Entrada en Vigencia de la ACT, en donde las reclamaciones o Causas de Acción congruentes con o similares a las presentadas o que podrían haber sido presentadas en los litigios mencionados anteriormente han sido presentadas.

1.34 **Activos:** en su conjunto, (i) todos los «bienes» del Deudor, lo que incluye, de manera no taxativa, los bienes que figuran en los libros contables y registros y la Orden de Confirmación del Deudor a la Fecha de Entrada en Vigencia de la ACT y (ii) todas las Causas de Acción, y cualquier ganancia ulterior de estos, que se hayan iniciado o puedan iniciarse por parte del Deudor u otro representante autorizado en beneficio del Deudor y sus Acreedores, a menos que se modifique o se exima conforme al Plan de la ACT o una Orden Final, lo que incluye, de manera no taxativa, cualquier Acción de Anulación.

1.35 **Assured:** Assured Guaranty Corp. y Assured Guaranty Municipal Corp., junto con sus respectivos sucesores o designados.

1.36 **Precio de Aceleración de Assured:** un precio igual a un capital pendiente de un Bono Asegurado de Assured más el interés devengado e impagado de este, o, en el caso de bonos de apreciación de capital, el monto compuesto de este, en cada caso, a la fecha del pago.

1.37 **Elecciones de Tenedores de Bonos de Assured:** en su conjunto, las elecciones proporcionadas a los Tenedores de Bonos Asegurados de Assured de conformidad con el Artículo 25.1(b) del presente en caso de que Assured no ejerza la Elección Asegurada.

1.38 **Formulario de Elecciones de los Tenedores de Bonos de Assured:** la «Notificación de Elección para Determinados Tenedores de Bonos con respecto a las Clases 3, 7 y 11» adjunta como Anexo 5(b) a la Orden de Declaración de Divulgación.

1.39 **Reclamaciones de Bonos de la ACT/ELA de Assured:** en su conjunto, las Reclamaciones de la ACT/ELA que surgen de Bonos de la ACT asegurados por Assured, lo que incluye conforme a una póliza de seguro de mercado secundario.

**Elección de Assured:** los derechos de Assured, tal como se establecen en el Artículo 25.1 del presente, para recibir los Nuevos Bonos de la ACT de Assured asignables a los tenedores de Bonos Asegurados de Assured, y para hacer que todos o cualquier parte de los Bonos Asegurados de Assured seleccionados por Assured sean pagados por Assured, en su totalidad, en la Fecha de Entrada en Vigencia de la ACT, a un Precio de Aceleración de Assured igual al capital pendiente de dichos Bonos Asegurados de Assured más los intereses devengados e impagos (o, en el caso de cualquier bono de apreciación del capital, el importe calculado de estos) a partir de la fecha de pago de conformidad con las Pólizas de Seguro de Assured que aseguran los Bonos Asegurados de Assured.

1.41 **Notificación de Elección de Assured:** la «Notificación de Elección de Assured», una copia de la cual se adjunta como Anexo 5(c) a la Orden de Declaración de Divulgación.

1.42 **Pólizas de Seguros de Assured:** las pólizas de seguro existentes emitidas por Assured relativas a los Bonos Asegurados de Assured, junto con todos y cada uno de los acuerdos y demás documentos relacionados con estos.

1.43 **Reclamación de Bonos Asegurados de Assured:** una Reclamación contra la ACT que surge de un Bono Asegurado de Assured, que incluye cualquier Reclamación de Bonos de la ACT 68 (Assured), Reclamación de Bonos de la ACT 98 Principales (Assured) y Reclamación de Bonos de la ACT 98 Subordinados (Assured).

1.44 **Tenedor de Bonos Asegurados de Assured:** el tenedor beneficiario de un Bono Asegurado de Assured.

1.45 **Bonos Asegurados de Assured:** en su conjunto, los Bonos de la ACT que han sido asegurados o son de otra manera propiedad (por subrogación o de otra manera) de Assured, lo que incluye, de forma no taxativa, conforme a una póliza de seguro de mercado secundario; disponiéndose, sin embargo, que, para evitar dudas, los «Bonos Asegurados de Assured» incluyan los bonos identificados en el Anexo «A» de la Notificación de Elección de Assured y el Anexo «A» del Formulario de Elecciones de Tenedores de Bonos de Assured.

1.46 **Nuevos Bonos de la ACT de Assured:** los nuevos Bonos de la ACT asignables a los tenedores de Reclamaciones de Bonos Asegurados de Assured.

1.47 **Contraprestación del Plan de Assured:** la contraprestación asignable o distribuible a los tenedores de las Reclamaciones de Bonos Asegurados de Assured Permitidas, que consiste en (a) en el caso de los Bonos Asegurados de Assured que son Bonos de la ACT 68 o Bonos de la ACT 98 Principales, pero no Bonos Asegurados de Doble Garantía, (i) Nuevos Bonos de la ACT y/o (ii) en caso de una elección por el ELA y/o la ACT para sustituir el Efectivo por la emisión de Nuevos Bonos de la ACT en la Fecha de Entrada en Vigencia del a ACT, Efectivo resultante de tal elección por el ELA y/o la ACT para sustituir Efectivo por los Nuevos Bonos de

6

la ACT en la Fecha de Entrada en Vigencia de la ACT, (b) en el caso de los Bonos Asegurados de Doble Garantía, certificados de FGIC, y (c) en el caso de los Bonos Asegurados de Assured que sean Bonos de la ACT 98 Subordinados, sujetos a los términos y disposiciones del Plan del ELA y la Orden de Confirmación del ELA, cualquier Recuperación de Bonos de la ACT 98 Subordinados asignable a las Reclamaciones de Bonos de la ACT 98 Subordinados (Assured) relacionadas; *disponiéndose, sin embargo*, que, para evitar dudas, ningún Efectivo, valores u otra contraprestación que Assured tenga derecho a recibir de conformidad con la Sección LXIII del Plan del ELA o el párrafo 52 de la Orden de Confirmación del ELA constituya una Contraprestación del Plan de Assured.

1.48 **Tratamiento de Assured:** el tratamiento de las Reclamaciones de Bonos Asegurados de Assured establecido en el Artículo 25.1 del presente.

1.49 **Fideicomiso de Assured**: un fideicomiso de custodia, arreglo de cuenta de plica o estructura similar establecida de conformidad con el Artículo 25.1(b)(ii) del Plan de la ACT.

1.50 **Acciones de Anulación:** las acciones de anulación, recuperación y subordinación identificadas en el Anexo «A» del presente, conforme a las modificaciones o alteraciones que puedan hacerse al Anexo «A» hasta la Fecha de Entrada en Vigencia de la ACT inclusive, contra cualquier Entidad que haya sido interpuesta por o en nombre del Deudor contra una Entidad en virtud de los artículos 510, 544, 545, 547, 548, 549, 550, 551, 552 y 553 del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA, o una ley aplicable con excepción de la Ley de Quiebras, (b) otras acciones que hayan sido interpuestas por o en nombre del Deudor que solicita recuperaciones afirmativas, y cuyas acciones se exponen en el Anexo «A» en el presente, conforme a las modificaciones o alteraciones que puedan hacerse al Anexo «A» hasta la Fecha de Entrada en Vigencia de la ACT inclusive, y (c) todos las Causas de Acción similares que actualmente están sujetas a acuerdos de paralización con la ACT; *disponiéndose, sin embargo*, que bajo ninguna circunstancia las «Acciones de Anulación» incluirán, (x) cualquier Reclamación o Causa de Acción contra cualquier Entidad relacionada con las Reclamaciones de Bonos de la ACT, (y) cualquier Reclamación o Causa de Acción relacionada con la Cuarta Estipulación Modificada Entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico en relación con la Paralización de las Normas de Prescripción y la Orden de Consentimiento [Caso n.º 17-3283-LTS, ECF n.º 15854], y sus modificaciones, que expiraron al ingresar la Orden de Confirmación de la ELA, o (z) cualquier Reclamación o Causa de Acción relacionada con la Cuarta Orden de Estipulación y Consentimiento Modificada entre Deudores del Título III (que no sean COFINA) y la Agencia Fiscal y Autoridad Asesora Financiera de Puerto Rico Actuando en Nombre de las Entidades Gubernamentales Enumeradas en el Apéndice «B» en relación con la Paralización de las Normas de Prescripción [Caso n.º 17-3283-LTS, ECF n.º 17394], y sus modificaciones, que expiraron con la entrada de la Orden de Confirmación del ELA.

1.51 **Fideicomiso de Acciones de Anulación:** el fideicomiso creado en la Fecha de Entrada en Vigencia del ELA en la cual se han transferido Reclamaciones y Causas de Acción del ELA, el SRE y la AEP, y al cual en la Fecha de Entrada en Vigencia de la ACT será transferido la autoridad para litigar o comprometer y resolver las Acciones de Anulación.

1.52 **Contrato de Fideicomiso de Acciones de Anulación:** los Acuerdos de Fideicomiso de Acciones de Anulación, con fecha 15 de marzo de 2022, por y entre el SRE, el ELA, la AEP, la Junta de Supervisión y Drivetrain, LLC.

1.53 **Junta del Fideicomiso de Acciones de Anulación:** los tres (3) miembros de la junta nombrados a partir de la Fecha de Entrada en Vigencia del ELA para gobernar el Fideicomiso de Acciones de Anulación.

1.54 **Fideicomisario de Acciones de Anulación:** Drivetrain LLC, el fideicomisario nombrado por la Junta de Fideicomiso de Acciones de Anulación conforme a los términos y disposiciones del Contrato de Fideicomiso de Acciones de Anulación.

1.55 **Fecha de Elección:** la o las fechas límite establecidas por el Tribunal del Título III y establecidas en la Orden de Declaración de Divulgación para la presentación de Papeletas/Formularios de Elección y la elección de tratamientos alternativos conforme a los términos y disposiciones del Plan de la ACT.

1.56 **Papeleta/Formulario de Elección:** la papeleta y formulario de elección, cuyo formulario será aprobado por el Tribunal del Título III, distribuido a cada tenedor o asegurador, según corresponda, de una Reclamación afectada con derecho a voto o que de otro modo haga una elección con respecto al Plan de la ACT, en cuyo formulario se indique, entre otras cosas, (a) la aceptación o rechazo del Plan de la ACT y/o (b), en la medida que proceda, una elección de distribución y tratamiento que pueda ser necesaria conforme a las disposiciones del Plan de la ACT.

1.57 **Código de Quiebras:** la Ley de Reforma de Quiebras de 1978, y sus modificaciones, en la medida codificada en el Título 11 del Código de los Estados Unidos y aplicable al Caso de Título III.

1.58 **Reglamento sobre Quiebras:** las Reglas Federales de Procedimiento de Quiebra, tal como fueron promulgadas por el Tribunal Supremo de los Estados Unidos conforme al artículo 2075 del Título 28 del Código de los Estados Unidos, según su versión modificada y aplicable al Caso de Título III.

1.59 **Fecha Límite:** la fecha establecida por el Tribunal del Título III antes de la cual deben radicarse las evidencias de la Reclamación contra el Deudor, conforme a (a) las Órdenes de Fecha Límite, (b) una Orden Final del Tribunal del Título III o (c) el Plan de la ACT.

1.60 **Órdenes de Fecha Límite:** las órdenes del Tribunal del Título III que establecen las fechas límite para la radicación de evidencias de Reclamaciones contra el Deudor o sus Activos, lo que incluye, de manera no taxativa, esa determinada (a) Orden (A) que establece fechas límites y procedimientos para radicar evidencia de Reclamaciones y (B) aprueba el modo y forma de notificación de estas [Caso n.º 17-3283-LTS, EFC n.º 2521], y (b) la Orden (A) que establece la extensión de fechas límite para radicar evidencias de Reclamaciones y (B) aprueba el modo y forma de notificación de estas [Caso n.º 17-3283-LTS, ECF n.º 3160].

8

1.61 **Día Hábil:** un día que no sea sábado, domingo o cualquier otro día en el cual la ley o una orden ejecutiva determine que las instituciones comerciales bancarias de Nueva York, Nueva York y San Juan, Puerto Rico cierren.

1.62 **Mejoras Capitales:** cualquier proyecto o proyectos (a) financiados, o que se propone sean financiados, en su totalidad o en parte, mediante dinero público, para construir, reconstruir, restaurar, rehabilitar o comprar cualquier equipamiento, bienes o instalaciones de la ACT, lo que incluye, de manera no taxativa, edificios, infraestructura, sistemas de tecnología de la información u otro equipamiento financiado en una base que no se repite necesariamente y que se utiliza como activo público o para el beneficio público, o (b) financiados, o que se propone sean financiados, en su totalidad o en parte, mediante la emisión de bonos de actividad privada u otros instrumentos similares.

1.63 **Efectivo:** la moneda de curso legal de los Estados Unidos, lo que incluye, de manera no taxativa, depósitos bancarios, cheques con fondos suficientes y sus equivalentes legales.

1.64 **Causas de Acción:** toda reclamación, acción, causa de acción, derecho de pago, derechos de acción, demanda, deuda, cuota, suma de dinero, cuenta, consideración, bono, factura, especialidad, pacto, contrato, controversia, acuerdo, promesa, variación, transgresión, daño y perjuicio, sentencia, acción jurídica, derecho de compensación, reclamación de terceros, reclamación de subrogación, reclamación de contribuciones, reclamación de reembolso, reclamación de indemnización, reconvención y reclamación contra parte (lo que incluye, de manera no taxativa, toda reclamación por incumplimiento de deberes fiduciarios, negligencia, mala praxis, incumplimiento de contrato, complicidad, fraude, inducción, evasión, recuperación, subordinación y toda Acción de Anulación) que esté pendiente o pueda presentarse contra cualquier Entidad que surja en o antes de la Fecha de Entrada en Vigencia de la ACT, en base al derecho o la equidad, lo que incluye, de manera no taxativa, conforme al Código de Quiebras, conocido, desconocido, sometido a sentencia, no sometido a sentencia, saldado, no saldado, estipulado, condicional, vencido, no vencido, objeto de controversia o no, con garantía o sin garantía y ya sea presentada o presentable de manera directa o derivada, en derecho, equidad o de otra forma y ya sea presentada o no presentada a la Fecha de Entrada en Vigencia de la ACT.

1.65 **ADCC:** la Autoridad del Distrito del Centro de Convenciones de Puerto Rico.

1.66 **Derecho de preferencia de honorarios profesionales:** un gravamen o derecho de prioridad de pago al Agente Fiscal de la ACT pueda tener derecho conforme a una resolución aplicable, Contrato de Fideicomiso, u otro documento o instrumento contra las distribuciones que se realizarán conforme a los términos y disposiciones del Plan de la ACT para el pago de una compensación, indemnización, honorarios, gastos y desembolsos razonables efectuados antes o después de la Entrada en Vigencia de la ACT.

1.67 **Reclamación:** cualquier derecho a pago o cumplimiento, ya sea si tal derecho es sometido a sentencia o no, saldado, no saldado, estipulado, condicional, vencido, no vencido, objeto de controversia o no, legal, equitativo, con garantía o sin garantía, conocido o desconocido, presentado o no presentado; o cualquier derecho de acción jurídica conforme al sistema de *equity* para el incumplimiento o ejecución del cumplimiento, sea o no tal derecho de

9

acción jurídica conforme al sistema de *equity* sometido a sentencia o no, estipulado, condicional, vencido, no vencido, objeto de controversia o no, con garantía o sin garantía, y toda deuda, demanda, daño y perjuicio, derecho, acción jurídica, pérdida, responsabilidad, obligación, sentencia, acción, Causa de Acción, intimación o reclamación de cualquier tipo o naturaleza, en derecho, en el sistema de *equity* o de algún otro modo.

1.68 **Clase:** una categoría de Reclamaciones establecida en la Sección IV del Plan de la ACT.

1.69 **Acciones de Recuperación:** en su conjunto, los litigios denominados (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, *et al.*, procedimiento contencioso n.º 20-00005-LTS, actualmente pendiente en el Tribunal de Título III, (b) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, *et al.*, procedimiento contencioso n.º 20-00004-LTS, actualmente pendiente en el Tribunal de Título III, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, *et al.*, procedimiento contencioso n.º 20-00003-LTS, actualmente pendiente en el Tribunal de Título III y (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, *et al.*, procedimiento contencioso n.º 20-00007-LTS, actualmente pendiente en el Tribunal del Título III.

1.70 **Contrato de Emisión de CVI de Recuperación:** el contrato celebrado y otorgado en la Fecha de Entrada en Vigencia del ELA conforme al cual el ELA emitirá los CVI de Recuperación y que incluye todos los términos y disposiciones relacionados con estos, y las enmiendas, complementos o modificaciones ocasionales que se realicen de conformidad con sus términos y condiciones.

1.71 **CVI de Recuperación:** en su conjunto, los valores de obligación general, el pago por el cual el Estado Libre Asociado ha prometido su plena fe, crédito y poder impositivo conforme al Artículo VI de la Constitución del Estado Libre Asociado y la ley aplicable de Puerto Rico, emitida en la Fecha de Entrada en Vigencia del ELA por el ELA conforme a los términos y condiciones del Suplemento «2» del Anexo «J» del Plan del ELA, lo que incluye, sin limitación, según su implementación de conformidad con la Orden de Confirmación del ELA, el Contrato de Emisión de CVI de Recuperación y la Legislación de CVI.

1.72 **COFINA:** la Corporación del Fondo de Interés Apremiante de Puerto Rico.

1.73 **Estado Libre Asociado:** el Estado Libre Asociado de Puerto Rico

1.74 **Orden de Confirmación del ELA:** la Orden y Sentencia que Confirma la Octava Modificación del Plan de Ajuste en Conjunto de Título III Modificado del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico, fechadas el 18 de enero de 2022 (Caso n.º 17-03283-LTS, ECF n.º 19813).

1.75 **Constitución del ELA:** la Constitución del Estado Libre Asociado de Puerto Rico

1.76 **Fecha de Entrada en Vigencia del ELA:** el 15 de marzo de 2022, fecha en que el Plan del ELA fue consumado sustancialmente de conformidad con sus términos y las disposiciones del Plan del ELA y la Orden de Confirmación del ELA.

1.77 **Préstamo del ELA:** el préstamo extendido por el ELA a la ACT en el capital original hasta trescientos sesenta y dos millones de dólares ($362,000,000.00) en relación con, entre otras cosas, las obligaciones de la ACT en virtud del Acuerdo de Apoyo al Plan de la ACT/ADCC, la Orden de Confirmación del ELA y la Estipulación de la DRA.

1.78 **Legislatura del ELA:** la Asamblea Legislativa de Puerto Rico.

1.79 **Plan del ELA:** la Octava Modificación del Plan de Ajuste de Título III Modificado del Estado Libre Asociado de Puerto Rico, *et al*., de fecha 14 de enero de 2022 [Caso n.º 17-3283-LTS, ECF. n.º 19784].

1.8 **Costos de Perfeccionamiento:** en su conjunto, el monto a pagar establecido en el Artículo 3.3 del presente, en Efectivo, a la Fecha de Entrada en Vigencia de la ACT, o tan pronto como sea posible después de esta, pero en ningún caso más de diez (10) días hábiles después de la Fecha de Entrada en Vigencia, a los Acreedores de Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales correspondientes conforme a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC, la Sección III del presente y la Orden de Confirmación de la ACT.

1.81 **Tope de Conveniencia:** dos millones quinientos mil dólares ($2,500,000.00), el monto total de contraprestación que se pondrá a disposición de los tenedores de Reclamaciones de Conveniencia Permitidas, a menos que se renuncie a dicha limitación de alguna otra manera por el Comité de Acreedores en o antes del comienzo de la Vista de Confirmación de la ACT.

1.82 **Reclamación de Conveniencia:** una Reclamación sin Garantía General de la ACT Permitida (a) que sea igual o inferior a veinte mil dólares ($20,000.00) o (b) cuyo tenedor, a opción de dicho tenedor, ha elegido reducir el monto de dicha Reclamación sin Garantía Generales de la ACT Permitida a veinte mil dólares ($20,000.00) de conformidad con los términos y disposiciones establecidos en el Artículo 20.1(b) del presente; disponiéndose, sin embargo, que, a pesar de lo anterior, un tenedor de varias Reclamaciones sin Garantía General de la ACT Permitidas que sean superiores a cuarenta mil dólares ($40,000.00) en conjunto puede elegir reducir todas dichas Reclamaciones a una cantidad acumulada de cuarenta mil dólares ($40,000.00); y, disponiéndose, además, que el monto total de contraprestación que se pondrá a disposición de las Reclamaciones de Conveniencia será de dos millones quinientos mil dólares ($2,500,000.00), que el Comité de Acreedores puede renunciar al Tope de Conveniencia en o antes del comienzo de la Vista de Confirmación de la ACT a su criterio exclusivo y absoluto; y disponiéndose, además, que, en el caso de que se exceda el Tope de Conveniencia y que el Comité de Acreedores no renuncie a este en o antes del comienzo de la Vista de Confirmación de la ACT, los tenedores de Reclamaciones de Conveniencia Permitida recibirán una Participación a Prorrata del Tope de Conveniencia.

1.83 **Fecha de conversión:** la fecha final de capitalización para el período de acumulación asociado con los Nuevos CAB [bonos de apreciación de capital] Convertibles de la ACT en que los Nuevos CAB Convertibles de la ACT comenzarán a devengarse y pagar intereses semestrales.

1.84 **Acreedor:** una Entidad con una Reclamación contra el Deudor o cualquiera de los Activos del Deudor, conforme al artículo 102(2) del Código de Quiebras, contra cualquier otro bien del Deudor, lo que incluye, de manera no taxativa, una Reclamación contra el Deudor de un tipo especificado en el artículo 502(g), 502(h) o 502(i) del Código de Quiebras, en cada caso, únicamente en la calidad de tal Entidad como tal.

1.85 **Comité de Acreedores:** el comité estatutario de los tenedores de reclamaciones sin garantía nombrado en el Caso de Título III de la ACT.

1.86 **CUSIP:** los códigos numéricos de nueve dígitos o alfanuméricos de nueve dígitos de los procedimientos del Comité de Identificación de Valores Uniforme.

1.87 **Documentos del Fideicomiso de custodia:** en su conjunto, los contratos de fideicomiso y otros documentos e instrumentos relacionados con los fideicomisos de custodia que se crearán a partir de la Fecha de Entrada en Vigencia de la ACT y en relación con los Bonos de la ACT asegurados por una Monolínea, si corresponde, y las distribuciones que se realizarán conforme al Plan de la ACT, donde los Contratos de Fideicomiso tendrán forma y sustancia razonablemente satisfactoria para la Junta de Supervisión y las Monolíneas respectivas.

1.88 **CVI:**  En su conjunto, CVI de OG y los CVI de Recuperación.

1.89 **Contrato de Emisión de CVI:** en su conjunto, el Contrato de Emisión de CVI de OG y el Contrato de Emisión de CVI de Recuperación.

1.90 **Legislación de CVI:** Ley n.º 53 del 26 de octubre de 2021, conocida como la «Ley para poner fin a la quiebra de Puerto Rico».

1.91 **Reclamación del Centro de Convenciones/ELA:** la Reclamación contra el ELA que surge o está relacionado con la retención del ELA de determinados fondos históricamente transferidos a la ADCC conforme a las disposiciones de la Constitución del ELA, cualquier estatuto, regulación u orden ejecutiva, lo que incluye reclamaciones con respecto a los derechos u obligaciones que surgen de (a) el Artículo 8 de la Sección VI de la Constitución del ELA, artículo 2271v de 13 L.P.R.A., artículo 104(c) de 23 L.P.R.A. y los Boletines Administrativos del Estado Libre Asociado de Puerto Rico n.º OE-2015-46, OE-2016-14 y OE-2016-31 y (b) el endeudamiento emitido por la ADCC conforme a ese determinado Contrato de Fideicomiso con fecha 24 de marzo de 2006, entre la ADCC y JPMorgan Chase Bank, N.A., como fideicomisario.

1.92 **Reclamación de la ACT/ELA:** la Reclamación contra el ELA derivada o relacionada con la retención del ELA de determinados fondos históricamente transferidos a la ACT conforme a las disposiciones de la Constitución del ELA, cualquier estatuto, regulación u orden ejecutiva, lo que incluye, sin limitación, reclamaciones ratificadas a causa de los

Préstamos de la ACT de BGF y reclamaciones con respecto a los derechos u obligaciones que surgen de (a) el Artículo 8 de la Sección VI de la Constitución del ELA, artículo 2021 de 9 L.P.R.A., artículo 31751 (a)(3)(C) de 13 L.P.R.A., artículo 104(c) de 23 L.P.R.A. y los Boletines Administrativos del Estado Libre Asociado de Puerto Rico n.º OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30 y OE-2016-31 y (b) el endeudamiento emitido por la ACT conforme a esa determinada (i) Resolución n.º 68-18, adoptada el 13 de junio de 1968 y (ii) Resolución n.º 98-06, adoptada el 26 de febrero de 1998.

1.93 **Recuperación de Recuperación de la ACT/ELA:** la recuperación total por parte de los tenedores o aseguradores de las Reclamaciones de la ACT/ELA Permitidas, que consiste en el sesenta y ocho por ciento y seis décimos (68.6%) de los CVI de Recuperación, tal como se presenta en el Suplemento 4 del Anexo «J» del Plan del ELA.

1.94 **Reclamación de la AMA/ELA:** la Reclamación contra el ELA que surge de o en relación con la retención del ELA de determinados fondos históricamente transferidos a la AMA con respecto a los derechos u obligaciones que surgen conforme a las disposiciones de la Constitución del ELA, cualquier estatuto, regulación u orden ejecutiva.

1.95 **Reclamación de Impuesto de Ron de la AFI/ELA:** la Reclamación contra el ELA que surge de o se relaciona con la retención del ELA de determinados fondos históricamente transferidos a la AFI conforme a las disposiciones de la Constitución del ELA, cualquier estatuto, regulación u orden ejecutiva, lo que incluye Reclamaciones con respecto a los derechos u obligaciones que surgen de (a) el Artículo 8 de la Sección VI de la Constitución del ELA, artículo 1914 de 3L.P.R.A. y los Boletines Administrativos del Estado Libre Asociado de Puerto Rico n.º OE-2015-46, OE-2016-27 y OE-2016-30 y (b) el endeudamiento emitido por la AFI conforme a ese determinado Contrato de Fideicomiso con fecha 1 de octubre de 1988, entre la AFI y U.S. Bank Trust National Association, como fideicomisario sucesor.

1.96 **Deuda:** en su conjunto, bonos, pagarés, préstamos y otras evidencias de endeudamiento por dinero prestado; disponiéndose, sin embargo, que la «Deuda» no incluya las Obligaciones Garantizadas.

1.97 **Deudor:** ACT.

1.98 **Política de Gestión de la Deuda:** la política desarrollada por la ACT, y aprobada por la Junta de Supervisión, relativa a la emisión de endeudamiento por la ACT Reorganizada, tal como se describe más detalladamente en el Artículo 24.3 del presente.

1.99 **Período de la Política de Deuda:** el período que comienza el primer (1.er) día calendario inmediatamente después de la Fecha de Entrada en Vigencia de la ACT y que finaliza el primer (1.er) día calendario en el cual no hay más Nuevos Bonos de ACT pendientes o la refinanciación de estos.

1.100 **Objeciones Relacionadas con Deuda:** en su conjunto, esa determina (a) Objeción de (I) la Junta de Supervisión y Administración Financiera, actuando mediante su Comité Especial de Reclamaciones y (II) Comité Oficial de Acreedores sin Garantía, conforme al

13

Artículo 502 del Código de Quiebras y la Norma de Quiebras 3007, a Reclamaciones radicadas o presentadas por Tenedores de determinados Bonos de Obligaciones Generales del ELA, con fecha 14 de enero de 2019 [Caso n.º 17-3283-LTS, EFC n.º 4784], (b) Objeción del Comité Oficial de Acreedores sin Garantía, conforme al Artículo 502 del Código de Quiebras y la Norma de Quiebras 3007, las Reclamaciones radicadas o presentadas por Tenedores de determinados Bonos de Obligaciones Generales del ELA 2011, con fecha 21 de mayo de 2019 [Caso n.º 17-3283-LTS, EFC n.º 7057], (c) Objeción Global del Comité Oficial de Acreedores sin Garantía, conforme al Artículo 502 del Código de Quiebras y la Norma de Quiebras 3007, a Reclamaciones radicadas o presentadas contra el ELA por Tenedores de determinados Bonos de la Autoridad de Edificios Públicos de Puerto Rico, con fecha 18 de julio de 2019 [Caso n.º 17-3283-LTS, EFC n.º 8141], (d) Objeción Global de la Coalición de Deuda Constitucional Legítima, conforme al Artículo 502 del Código de Quiebras y la Norma de Quiebras 3007, a Reclamaciones radicadas o presentadas por Tenedores de determinados Bonos emitidos o garantizados por el ELA, con fecha 8 de enero de 2020 [Caso n.º 17-3283-LTS, ECF. n.º 9730], (e) Objeción Global del Comité Oficial de Acreedores sin Garantía a las Bases del límite de deuda constitucional (I) Reclamación del Banco Gubernamental de Fomento para Puerto Rico [Reclamación número 29485] con base en determinadas notificaciones emitidas por el ELA y en la garantía del ELA de determinados bonos emitidos por Port of Americas Authority, (II) Reclamación de ScotiaBank de Puerto Rico [Reclamación número 47658] en base a pagaré con plena fe y crédito emitido por la Administración de Servicios Generales de Puerto Rico y (III) Reclamaciones radicadas o presentadas contra el ELA en base a la Garantía del ELA de determinados Pagarés emitidos por la Autoridad de Infraestructura de Puerto Rico, con fecha 8 de enero de 2020 [Caso n.º 17-3283-LTS, EFC n.º 9735], únicamente según se relaciona las Reclamaciones de Bonos de la ACT y las Reclamaciones de Bonos de Garantía del ELA, (f) Objeción Global del Comité Oficial de Acreedores sin Garantía, conforme al Artículo 502 del Código de Quiebras y la Norma de Quiebras 3007, a Reclamaciones radicadas o presentadas contra el ELA por Tenedores de Bonos de Obligaciones Generales que alegan prioridad sobre otros acreedores sin garantía del ELA, con fecha 3 de febrero de 2020 [Caso n.º 17-3283-LTS, EFC n.º 10638], (g) Objeción del Comité Oficial de Acreedores sin Garantía para Reclamar al Banco de Desarrollo del Gobierno de Puerto Rico contra el Estado Libre Asociado de Puerto Rico (Reclamación n.º 29.485) [Caso n.º 17-3283-LTS, ECF n.º 8000], únicamente en lo que se refiere a las Reclamaciones de Bonos de la ACT y las Reclamaciones de Bonos de Garantía de la ACT, y (h) cualquier otro (i) litigio o acción, lo que incluye, de manera no taxativa, litigios o acciones iniciados para recuperar capital y/o interés con respecto a los Bonos de OG, los Bonos de la AEP y/o las notas de bonos anticipados de la AFI y (ii) cualquier otra objeción o litisconsorcio a estas o cualquier otra objeción o litisconsorcio a estas o cualquier otra objeción o notificación de participación que apoye las medidas solicitadas en tales objeciones radicadas con respecto a la misma forma y conteos de las medidas solicitadas que impugna, entre otras cosas, la validez y derechos relacionados de los Bonos de OG, Bonos de la AEP, BAN de la AFI, las Reclamaciones de Bonos del ELA, las Reclamaciones de Bonos de Garantía del ELA y las Reclamaciones de Bonos de la AEP.

1.101 **Fondo de Amortización de la Deuda:** el fondo a ser creado conforme a los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT y el Artículo 24.1

del presente en relación con el depósito de montos necesarios para satisfacer los pagos de capital e intereses a cuenta de los Nuevos Bonos de la ACT.

1.102 **Fecha de Emisión Estimada:** lo que ocurra antes entre (a) 1 de julio de 2022 y (b) la Fecha de Entrada en Vigencia de la ACT.

1.103 **Documentos Definitivos:** en su conjunto, los documentos definitivos y acuerdos contemplados por el Plan, lo que incluye, de manera no taxativa, (a) el Plan de la ACT (lo que incluye cualquier cambio, modificación y complemento de este) y cualquier documentación o acuerdos relacionados a este, (b) la Declaración de Divulgación, la Orden de Declaración de Divulgación, la Orden de Confirmación de la ACT y los escritos procesales que respaldan su ingreso, (c) el Contrato de Emisión de Nuevos Bonos de la ACT y documentos o acuerdos relacionados con este, (d) la forma de los bonos para los Nuevos Bonos de la ACT, y (e) cada otro documento que compondrá el Complemento del Plan, en todos los casos, cuya forma y sustancia deberá ser aceptada por la Junta de Supervisión a su criterio exclusivo y absoluto y aceptada de forma razonable por la AAFAF y las Monolíneas y, en el caso de las cláusulas (a) y (b), aceptada de forma razonable por el Comité de Acreedores.

1.104 **No Permitidas:** con respecto a cualquier Reclamación contra el Deudor, una Reclamación o cualquier parte de esta que no sea Permitida y (a) que no sean permitidas por una Orden Final, (b) es cero, condicional, objeto de controversia o no y con respecto a la cual no se haya radicado evidencia de reclamaciones o solicitud de pago de una Reclamación de Gastos Administrativos de manera oportuna o que no se consideró radicada de manera oportuna con el Tribunal del Título III, (c) se ha retirado por acuerdo del Deudor aplicable y el tenedor de esta o (d) se ha retirado por el tenedor de esta.

1.105 **Agente Pagador:** tal Entidad o Entidades designadas por la Junta de Supervisión, luego de consultar con la AAFAF en o antes de la Fecha de Entrada en Vigencia de la ACT para realizar o facilitar las distribuciones conforme con las disposiciones del Plan de la ACT.

1.106 **Declaración de Divulgación:** la declaración de divulgación con respecto al Plan de la ACT y aprobada por el Tribunal del Título III conforme al artículo 1125 del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA.

1.107 **Vista de Declaración de Divulgación:** la vista celebrada por el Tribunal del Título III para considerar la adecuación de la información contenida en la Declaración de Divulgación conforme al artículo 1125 del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA.

1.108 **Orden de Declaración de Divulgación:** la orden de Tribunal del Título III (a) que aprueba la Declaración de Divulgación considerando que contiene la información adecuada conforme a las disposiciones del artículo 1125 del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA y (b) que autoriza, entre otras cosas, la forma y manera de solicitud de (a) aceptaciones y rechazos del Plan y (II) elecciones, si corresponde, de las distribuciones según el presente, cuyo orden será en forma y sustancia razonablemente

15

satisfactoria para los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales y cada una de las Partes del Gobierno.

1.109 **Reclamación Controvertida:** una Reclamación contra el Deudor o sus Activos, en la medida en que la admisión de tal Reclamación se someta a una objeción oportuna o solicitud de valoración conforme al Plan de la ACT, el Código de Quiebras, las Normas de Quiebras o la Orden de Confirmación de la ACT, o se dispute de otro modo por parte del Deudor conforme a la ley aplicable, y cuya objeción, solicitud de valoración o disputa no se ha retirado, sin perjuicio, o determinada por una Orden Final.

1.110 **Estipulación de Fondos en Disputa:** determinada Estipulación Enmendada y Reformulada y la Orden Acordada Respecto a los Fondos en Disputa en las Cuentas del Servicio de Bonos de la ACT, Cuentas de Amortización y Cuentas de Reserva, fechadas el 11 de marzo de 2022, entre (a) el ELA y la ACT, por y a través de la Junta de Supervisión, y (b) el Bank of New York Mellon, en su calidad de agente fiscal, y aprobado en virtud de una resolución del Tribunal del Título III, con fecha 16 de marzo de 2022 (Caso n.º 17-03283 LTS, EFC n.º 20366).

1.111 **Fecha de Registro de Distribución:** la Fecha de Votación o cualquier otra fecha que pueda establecerse mediante otra orden del Tribunal del Título III, lo que incluye la Orden de Confirmación; *disponiéndose, sin embargo*, que la «Fecha de Registro de Distribución» no se aplique a ningún valor público que recibirá distribución conforme al Plan de la ACT mediante The Depository Trust Company.

1.112 **Estipulación de la DRA:** determinada Estipulación en Relación con las Disputas Relacionadas con la DRA, fechada el 5 de noviembre de 2021, por y entre la Junta de Supervisión, como representante del ELA y la ACT, Cantor-Katz Collateral Monitor LLC, y AmeriNational Community Services, LLC, y ratificada en virtud de una resolución del Tribunal de Título III, con fecha 8 de noviembre de 2021 [Caso n.º 17-3283-LTS, ECF n.º 19124].

1.113 **Bonos Asegurados de Doble Garantía:** un Bono Asegurado de Assured que está o fue asegurado por Assured conforme a una póliza de seguro de mercado secundario y que también califica como un Bono Asegurado de FGIC asegurado por FGIC de acuerdo a una póliza de seguro de mercado primario.

1.114 **Reclamación de Expropiación/Expropiación Inversa:** una Reclamación derivada o relacionada con (a) un Procedimiento de Expropiación y una Orden Final ingresaron en este por un monto superior al monto depositado por la autoridad de expropiación de conformidad con los términos y disposiciones de 32 L.P.R.A., artículo 2907, lo que incluye, sin limitación, los intereses devengados con respecto a este o (b) una expropiación inversa declarada de los bienes causada por una asunción de propiedad para uso público por el deudor sin el debido proceso legal y sin haber recibido una compensación justa, lo que incluye, sin limitación, mediante la imposición de restricciones de desarrollo o limitaciones de uso.

1.115 **Procedimiento de Expropiación:** una acción o procedimiento de condena iniciado por la ACT o por una agencia o entidad del esta ante el Tribunal de Primera Instancia de

16

conformidad con los términos y disposiciones de 32 L.P.R.A., artículo 2905, para obtener el título de bienes inmuebles ubicados en Puerto Rico.

1.116 **Entidad:** una persona, una sociedad, una sociedad colectiva, una sociedad limitada, una sociedad de responsabilidad limitada, una asociación de responsabilidad limitada, una asociación, una sociedad por acciones, una empresa conjunta, un patrimonio, un fideicomiso, una organización no constituida, una unidad gubernamental o cualquier subdivisión de esta, lo que incluye, de manera no taxativa, la oficina del Fideicomisario de los Estados Unidos, o cualquier otra entidad.

1.117 **SRE:** el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico.

1.118 **Contrato a Ejecutarse:** un contrato del cual el Deudor es parte y que está sujeto a asunción, asunción y transferencia o rechazo conforme al artículo 365 del Código de Quiebras, salvo según se establezca en el Artículo 311 de PROMESA.

1.119 **FGIC:** Financial Guaranty Insurance Company o su sucesor o delegado.

1.120 **Acción de FGIC:** el litigio denominado <u>Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., <i>et al.</i></u>, actualmente pendiente en el Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil n.º SJ2020CV06383.

1.121 **Certificados de FGIC:** con respecto a cada Fideicomiso de FGIC, los certificados o recibos que emitirá dicho Fideicomiso de FGIC a los tenedores beneficiarios de los Bonos Asegurados de FGIC que se depositen en el Fideicomiso de FGIC.

1.122 **Reclamaciones de Bonos de la ACT/ELA de FGIC:** en su conjunto, las Reclamaciones de Bonos de la ACT/ELA que surgen de Bonos de la ACT asegurados por FGIC, lo que incluye conforme a una póliza de seguro de mercado secundario.

1.123 **Acuerdos de Cuenta de Plica de FGIC:** aquellas (i) Reclamaciones de Bonos de la ACT/ELA de FGIC de Acuerdo de Cuenta de Plica derivadas de Bonos de la ACT 98 Principales, fechadas al [15] de marzo de 2022, por y entre el ELA, FGIC, como agente de cuenta de plica de estas, y FGIC, como asegurador de Bonos de la ACT 98 Principales Asegurados por FGIC (tal como se define en dicho acuerdo de cuenta de plica), y (ii) Reclamaciones de Bonos de la ACT/ELA de FGIC de Acuerdo de Cuenta de Plica derivadas de Bonos de la ACT 98 Subordinados, fechadas al [15] de marzo de 2022, por y entre el ELA, FGIC, como agente de cuenta de plica de estas, y FGIC, como asegurador de Bonos de la ACT 98 Subordinados Asegurados por FGIC (tal como se define en dicho acuerdo de cuenta de plica), según el cual se establecieron cuentas de plica en beneficio de los tenedores beneficiarios de Reclamaciones de Bonos de la ACT/ELA de FGIC para mantener las respectivas acciones asignables de dichos tenedores de la Recuperación de Recuperación de la ACT/ELA (incluidos los pagos recibidos al respecto y los ingresos netos de cualquier venta de estos) en cuenta de plica pendiente de la Fecha de Entrada en Vigencia de la ACT, y de la cual dicha Recuperación

17

de Recuperación de la ACT/ELA, en forma proporcional, se distribuirá a FGIC o se depositará en el Fideicomiso de FGIC aplicable según lo previsto en dichos acuerdos de cuenta de plica.

1.124 **Reclamación de Bonos Asegurados de FGIC:** en su conjunto, las Reclamaciones contra la ACT derivadas de los Bonos Asegurados de FGIC, incluidas las Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC).

1.125 **Bonos Asegurados de FGIC:** en su conjunto, los Bonos de la ACT que han sido asegurados por FGIC, lo que incluye, sin limitación, conforme a una póliza de seguro de mercado secundario.

1.126 **Pólizas de Seguros de FGIC:** las pólizas de seguro existentes emitidas por FGIC (o un predecesor en su interés) relativas a los Bonos Asegurados por FGIC, junto con todos y cada uno de los acuerdos y demás documentos relacionados con estos, en cada caso, según las modificaciones que pudieran haber sido realizadas por el Plan de Rehabilitación de FGIC.

1.127 **Contraprestación del Plan de FGIC:** la contraprestación asignable o distribuible a los tenedores de las Reclamaciones del Bonos Asegurados de Assured Permitidas.

1.128 **Plan de Rehabilitación de FGIC:** el primer Plan de Rehabilitación enmendado para la FGIC, fechado el 4 de junio de 2013, junto con todos los documentos adjuntos y los documentos contenidos en el complemento del plan, en cada con sus enmiendas, revisiones, complementos o modificaciones ocasionales de otro modo.

1.129 **Tratamiento de FGIC:** el tratamiento de las Reclamaciones de Bonos Asegurados de FGIC establecido en el Artículo 25.3 del presente.

1.130 **Fideicomiso de FGIC:** con respecto a cada Bono Asegurado de FGIC, los fideicomisos que se pueden formar, en o antes de la Fecha de Entrada en Vigencia, la ACT, cuyo costo y gasto exclusivo, incluidos, sin limitación, la formación y mantenimiento de estos (incluidos los honorarios y gastos del fideicomisario), serán satisfechos a partir de los activos de los respectivos fideicomisos y en beneficio de los tenedores beneficiarios de los Bonos Asegurados de FGIC que están depositados en cada fideicomiso y FGIC, cuyos términos se establecerán en el Complemento del Plan.

1.131 **Orden Final:** una orden o sentencia de un tribunal de jurisdicción competente que se ingresó en el expediente llevado por el actuario de tal tribunal y que no se ha revocado, anulado o paralizado y con respecto a la cual (a) ha caducado el período de apelación, petición de revisión o petición de nuevo proceso, presentación de nuevos alegatos o nueva vista y con respecto al cual no se encuentre pendiente ninguna apelación, petición de revisión, procedimientos de remisión u otros procesos para solicitar un nuevo proceso, presentar de nuevos alegatos o nueva vista o (b) de haberse presentado una apelación, mandamiento de revisión, nuevo proceso, presentación de nuevos alegatos o nueva vista, (i) tal orden o sentencia se habrá ratificado, revertido o remitido en parte o en su totalidad, sin procesos adicionales en remisión, por el tribunal de máxima instancia ante la cual se apeló, se haya negado la revisión o

18

se hayan negado un nuevo proceso, la presentación de nuevos alegatos o nueva vista o que no resultó en modificaciones a tal orden y (ii) el período para realizar cualquier apelación, petición de revisión, nuevo proceso, presentación de nuevos alegatos o nueva vista adicionales haya caducado; *disponiéndose, sin embargo,* que, la posibilidad de que una moción conforme a la Norma 60 de las Normas Federales de Procedimientos Civiles, o cualquier norma análoga conforme a las Normas de Quiebra o las Normas de Quiebras Locales, pueda radicarse con respecto a tal orden no impedirá que tal orden sea una Orden Final, salvo según dispongan las Normas Federales de Procedimiento de Apelación, las Normas de Quiebra o las Normas de Quiebra Locales.

1.132 **Plan Fiscal:** un «Plan Fiscal» según se define en el Artículo 5(10) de PROMESA.

1.133 **Año Fiscal:** un año fiscal de la ACT, que comienza el 1 de julio y finaliza el 30 de julio del siguiente año calendario.

1.134 **BGF:** el Banco Gubernamental de Fomento para Puerto Rico.

1.135 **Préstamos a la ACT/BGF:** en su conjunto, los préstamos, si los hubiera, hechos a la ACT por el BGF y ahora en poder de la Autoridad de Recuperación de la Deuda del BGF conforme a la Modificación Calificativa consumada bajo el Título VI de PROMESA, pero excluyendo expresamente de los «Préstamos a la ACT del BGF» cualquier Bono de la ACT.

1.136 **Determinación de la Prioridad de Préstamos del BGF:** la determinación, realizada en el Caso del Título III del Estado Libre Asociado y en el Caso del Título III de la ACT, (a) en relación con los derechos relativos de recuperación y prioridad de pago de los Bonos de la ACT 68 y los Bonos de la ACT 98 a los derechos del BGF con respecto a los Préstamos a la ACT del BGF, y/o (b) que la Autoridad de Recuperación de la Deuda del Banco Gubernamental de Fomento no posee una reclamación o derecho permisible de recuperación con respecto al CVI de la Recuperación de la ACT basada en tales Préstamos a la ACT del BGF, tal como se establece en esa opinión y orden por la que se concede la moción de los demandados de desestimar la demanda, fechada el 29 de octubre de 2021, del Tribunal de Título III, ingresada en AmeriNational Community Services, LLC, *et al.* v Ambac Assurance Corporation, *et al.*, procedimiento contencioso n.º 21-00068-LTS [ECF n.º 83].

1.137 **CVI de OG:** en su conjunto, los valores de obligación general emitidos a la Fecha de Entrada en Vigencia del ELA por el ELA de conformidad con los términos y disposiciones del Suplemento «1» del Anexo «J» al Plan del ELA, la Orden de Confirmación del ELA, el Contrato de Emisión de CVI de OG y la Legislación de CVI.

1.138 **Organización Gubernamental:** cualquier agencia, departamento, oficina, empresa pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Gobierno de Puerto Rico.

1.139 **Partes del Gobierno:** en su conjunto, (a) la Junta de Supervisión, en su calidad de representante del Deudor de conformidad con el Artículo 315(b) de PROMESA, (b) los comités y subcomités de la Junta de Supervisión, incluidos, sin limitación, el Comité de Reclamaciones

19

Especiales de la Junta de Supervisión, (c) el Deudor y (d) la AAFAF; disponiéndose, sin embargo, que, sin perjuicio de lo anterior, para evitar dudas, las «Partes del Gobierno» no incluirán al ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE únicamente con respecto a cualquier reclamación o bonos emitidos por dichas Entidades.

1.140 **Reclamaciones Eximidas por el Gobierno:** en su conjunto, toda Reclamación, intimación, obligación o Causa de Acción de todo tipo, índole o naturaleza, en derecho o equidad, conocida o desconocida, presentada o no presentada, que cualquier Persona o cualquiera que reclame mediante esta, en su nombre o en su beneficio tenga, pueda tener o afirme tener, ahora o en el futuro, contra cualquier Parte Eximida del Gobierno derivado, relacionado o conectado con el Deudor, Reclamaciones (lo que incluye, de manera no taxativa, Reclamaciones derivadas o relacionadas con los Bonos de la ACT), las Objeciones Relacionadas con Deuda, las Acciones de Impugnación de Gravamen, y que surgen antes de la Fecha de Entrada en Vigencia de la ACT; disponiéndose, sin embargo, que las «Reclamaciones Eximidas por el Gobierno» no incluirán ningún derecho, privilegio, Reclamación, intimación, obligación o Causa de Acción de ningún tipo, índole o naturaleza (a) contra (i) el Deudor (o su sucesor, incluida la ACT Reorganizada), el ELA, SRE, AEP o COFINA que surjan o estén relacionadas con las obligaciones del Deudor, del ELA, SRE, AEP  y COFINA, según corresponda, conforme al Plan de la ACT o los valores que se emitirán conforme al Plan de la ACT o que se hayan emitido de conformidad con el Plan de COFINA o el Plan del ELA, o (ii) una Parte Eximida del Gobierno no relacionada con el Deudor o las Reclamaciones eximidas conforme a los términos y disposiciones del Plan de la ACT, (b) que surjan o estén relacionadas con cualquier acto u omisión que constituya fraude intencional o conducta dolosa intencional o (c) que surjan o estén relacionadas con reclamaciones o bonos emitidos, o contratos o arrendamientos celebrados por el ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE.

1.141 **Partes Eximidas del Gobierno:** en su conjunto, las Partes del Gobierno y el Deudor, lo que incluye toda instrumentalidad, municipalidad, empresa pública y agencia pública del ELA junto con los miembros de sus juntas, directores, mandantes, representantes, funcionarios, empleados, asesores y profesionales respectivos, lo que incluye, de manera no taxativa, todo asesor y profesional contratado por las Partes del Gobierno en relación con el Caso de Título III en su calidad como tales; disponiéndose, sin embargo, que, sin perjuicio de lo que antecede, «Partes Eximidas del Gobierno» no incluirá al ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE solamente con respecto a cualquier Reclamación contra o bonos emitidos por tales Entidades.

1.142 **Tope de Recuperación de GUC:** cuarenta por ciento (40%); disponiéndose, sin embargo, que, a efectos de cálculo, cualquier recuperación neta por el Fideicomiso de Acciones de Anulación a causa de las Acciones de Anulación no cuente para alcanzar el tope del cuarenta por ciento (40%).

1.143 **Reserva de GUC:** la reserva que se creará en o antes de la Fecha de Entrada en Vigencia de la ACT, y que estará en manos de Kroll Restructuring Administration LLC

20

(anteriormente, Prime Clerk LLC), exclusivamente en beneficio de los tenedores de las Reclamaciones sin Garantía Generales de la ACT Permitidas, de conformidad con un acuerdo separado que contendrá protecciones sustancialmente similares para los tenedores de Reclamaciones sin Garantía Generales de la ACT como el acuerdo con respecto a la Reserva de GUC conforme al Plan del ELA tiene para los tenedores de Reclamaciones sin Garantía Generales del ELA (como se define en el Plan del ELA).

1.144 **Activos de Carretera:** en su conjunto, los Activos de Peaje y las carreteras sin peaje en Puerto Rico, manejadas, operadas o mantenidas por la ACT.

1.145 **ACT:** la Autoridad de Carreteras y Transportación de Puerto Rico.

1.146 **Reclamación de Bonos de la ACT 68:** una Reclamación contra la ACT a causa de Bonos de la ACT 68, que no sea una Reclamación de Bonos de la ACT 68 (Ambac), una Reclamación de Bonos de la ACT 68 (Assured) o una Reclamación de Bonos de la ACT 68 (National).

1.147 **Reclamación de Bonos de la ACT 68 (Ambac):** una reclamación contra la ACT a causa de un Bono de la ACT 68 que es un Bono Asegurado de Ambac.

1.148 **Reclamación de Bonos de la ACT 68 (Assured):** una reclamación contra la ACT a causa de un Bono de la ACT 68 que es un Bono Asegurado de Assured.

1.149 **Reclamación de Bonos de la ACT 68 (National):** una reclamación contra la ACT a causa de un Bono de la ACT 68 que es un Bono Asegurado de National.

1.150 **Recuperación de Bonos de la ACT 68:** la recuperación total por parte de los tenedores de Reclamaciones de Bonos de la ACT 68 Permitidas, Reclamaciones de Bonos de la ACT 68 Permitidas (Ambac), Reclamaciones de Bonos de la ACT 68 Permitidas (Assured) y Reclamaciones de Bonos de la ACT 68 Permitidas (National), a causa de dichas Reclamaciones, que consiste en (a) trescientos once millones quinientos doce mil ochocientos veintidós dólares y diecisiete centavos ($311,512,822.17) en el capital original de Nuevos CIB [bonos de interés actual] de la ACT, (b) ciento veintitrés millones quinientos cuarenta y tres mil ochocientos cuarenta dólares y cinco centavos ($123,543,840.05) en el capital original de nuevos CAB de la ACT, y (c) doscientos once millones trescientos treinta y dos mil seiscientos ochenta y cinco dólares y cincuenta y seis centavos ($211,332,685.56) en el capital original de nuevos CAB convertibles de la ACT; disponiéndose, sin embargo, que, a la elección del ELA y la ACT, cuya elección se divulgará a más tardar siete (7) días antes de la Fecha de Entrada en Vigencia de la ACT, a su criterio conjunto y absoluto, el ELA o la ACT, según el caso, puede sustituir el efectivo por los Nuevos Bonos de la ACT que de otro modo se emitirán en la Fecha de Entrada en Vigencia de la ACT conforme a las cláusulas (a)-(c) anteriores, sobre una base de dólar por dólar.

1.151 **Bonos de la ACT 68:** en su conjunto, los siguientes bonos emitidos por la ACT conforme a la Resolución n.º 68-18, adoptada el 13 de junio de 1968, según se haya modificado y complementado después de la fecha: (a) los Bonos de Ingresos de Carreteras, Serie Y, emitidos

21

por la ACT en el capital original de ochocientos noventa millones doscientos treinta y cinco mil dólares ($890,235,000,00), (b) los Bonos de Refinanciamiento de Carreteras, Serie Z, emitidos por la ACT en el capital original de ciento ochenta y cinco millones cuarenta mil dólares ($185,040,000.00), (c) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2003, Serie AA-1, emitidos por la ACT en el capital original de ciento ochenta y ocho millones trescientos noventa y cinco mil dólares ($188,395,000.00), (d) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2003, Serie AA-2, emitidos por la ACT en el capital original de sesenta y cinco millones doscientos setenta y cinco mil dólares ($65,275,000.00), (e) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2005, Serie BB, emitidos por la ACT en el capital original de ciento un millones seiscientos veinticinco mil dólares ($101,625,000.00), (f) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2007, Serie CC, emitidos por la ACT en el capital original de cuatrocientos treinta y un millones novecientos cincuenta y cinco mil seiscientos nueve dólares y cinco centavos ($431,955,609.05), (g) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2010, Serie AA-1, emitidos por la ACT en el capital original de ciento ochenta y ocho millones trescientos noventa y cinco mil dólares ($188,395,000.00), (h) los Bonos de Refinanciamiento de Ingresos de Carreteras de 2010, Serie AA-2, emitidos por la ACT en el capital original de sesenta y cinco millones doscientos setenta y cinco mil dólares ($65,275,000.00), y (i) los Bonos Serie FHA emitidos por la ACT en el capital original de novecientos cuarenta y cinco mil dólares ($945,000.00).

1.152 **Bonos de la ACT 98:** en su conjunto, los Bonos de la ACT 98 Principales y los Bonos de la ACT 98 Subordinados.

1.153 **Reclamación de Bonos de la ACT 98 Principales:** una Reclamación contra la ACT a causa de Bonos de la ACT 98 Principales, que no sea una Reclamación de Bonos de la ACT 98 Principales (Ambac), una Reclamación de Bonos de la ACT 98 Principales (Assured), Reclamación de Bonos de la ACT 98 Principales (FGIC) o una Reclamación de Bonos de la ACT 98 Principales (National).

1.154 **Reclamación de Bonos de la ACT 98 Principales (Ambac):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Principal que es un Bono Asegurado de Ambac.

1.155 **Reclamación de Bonos de la ACT 98 Principales (Assured):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Principal que es un Bono Asegurado de Assured.

1.156 **Reclamación de Bonos de la ACT 98 Principales (FGIC):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Principal que es un Bono Asegurado de FGIC.

1.157 **Reclamación de Bonos de la ACT 98 Principales (National):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Principal que es un Bono Asegurado de National.

1.158 **Recuperación de Bonos de la ACT 98 Principales:** la recuperación total por parte de los tenedores de Reclamaciones de Bonos de la ACT 98 Principales Permitidas, Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac), Reclamaciones de

Bonos de la ACT 98 Principales Permitidas (Assured), Reclamaciones de Bonos de la ACT 98 Principales Permitidas (FGIC) y Reclamaciones de Bonos de la ACT 98 Principales Permitidas (National), a causa de dichas Reclamaciones, que consiste en (a) doscientos ochenta y ocho millones cuatrocientos ochenta y siete mil dólares y ochenta y tres centavos ($288,487,177.83) en el capital original de nuevos CIB de la ACT, (b) ciento catorce millones cuatrocientos doce mil veintiocho dólares y ocho centavos ($114,412,028.08) en el capital original de nuevos CAB de la ACT, y (c) ciento noventa y cinco millones setecientos once mil novecientos doce dólares y un centavo ($195,711,912.01) en el capital original de nuevos CAB convertibles de la ACT; disponiéndose, sin embargo, que, a la elección del ELA y la ACT, cuya elección se divulgará a más tardar siete (7) días antes de la Fecha de Entrada en Vigencia de la ACT, a su criterio conjunto y absoluto, el ELA o la ACT, según el caso, puede sustituir el efectivo por los Nuevos Bonos de la ACT que de otro modo se emitirán en la Fecha de Entrada en Vigencia de la ACT conforme a las cláusulas (a)-(c) anteriores, sobre una base de dólar por dólar.

    1.159 **Bonos de la ACT 98 Principales:** en su conjunto, los siguientes bonos emitidos por la ACT conforme a la Resolución n.º 98-06, adoptada el 26 de febrero de 1998: (a) los Bonos de Ingresos de Transporte de 1998, Serie A, emitidos por la ACT en el capital original de mil ciento veintinueve millones seiscientos cuarenta y tres mil setecientos cuarenta dólares ($1,129,643,740.00), (b) los Bonos de Ingresos de Transporte de 2002, Serie D, Emitido por la ACT en el capital original de setecientos millones ochocientos cincuenta y cinco mil dólares ($700,855,000.00), (c) los Bonos de Refinanciamiento de Ingresos de Transporte de 2002, Serie E, emitidos por la ACT en el capital original de doscientos ochenta y cuatro millones cuatrocientos cinco mil dólares ($284,405,000.00), (d) los Bonos de Ingresos de Transporte de 2003, Serie G, emitidos por la ACT en el capital original de quinientos sesenta y tres millones seiscientos cincuenta mil dólares ($563,650,000), (e) los Bonos de Refinanciamiento de Ingresos de Transporte de 2003, Serie H, emitidos por la ACT en el capital original de setenta y dos millones treinta y cinco mil dólares ($72,035,000.00), (f) los Bonos de Refinanciamiento de Ingresos de Transporte de 2004, Serie I, emitidos por la ACT en el capital original de ochenta y dos millones trescientos cuarenta mil dólares ($82,340,000.00), (g) los Bonos de Refinanciamiento de Ingresos de Transporte de 2004, Serie J, emitidos por la ACT en el capital original de cuatrocientos cinco millones novecientos ochenta y cinco mil dólares ($405,985,000.00), (h) los Bonos de Refinanciamiento de Ingresos de Transporte de 2005, Serie K, emitidos por la ACT en el capital original de ochocientos millones de dólares ($800,000,000.00), (i) los Bonos de Refinanciamiento de Ingresos de Transporte de 2005, Serie L, emitidos por la ACT en el capital original de quinientos noventa y ocho millones doscientos ochenta y cinco mil dólares ($598,285,000.00), (j) los Bonos de Refinanciamiento de Ingresos de Transporte de 2007, Serie M, emitidos por la ACT en el capital original de doscientos cincuenta millones de dólares ($250,000,000.00), (k) los Bonos de Refinanciamiento de Ingresos de Transporte de 2007, Serie N, emitidos por la ACT en el capital original de mil quinientos dos millones novecientos cuatro mil novecientos cincuenta y tres dólares y noventa y cinco centavos ($1,502,904,953.95), y (l) los Bonos de Refinanciamiento de Ingresos de Transporte de 2010, Serie H, emitidos por la ACT en el capital original de cuarenta y cuatro millones doscientos setenta y cinco mil dólares ($44,275,000.00).

2" = "1" "125859215v13" ""

1.160 **Reclamación de Bonos de la ACT 98 Subordinados:** una Reclamación contra la ACT a causa de Bonos de la ACT 98 Subordinados, que no sea una Reclamación de Bonos de la ACT 98 Subordinados (Assured), una Reclamación de Bonos de la ACT 98 Subordinados (FGIC) o una Reclamación de Bonos de la ACT 98 Subordinados (National).

1.161 **Reclamación de Bonos de la ACT 98 Subordinados (Assured):** una reclamación contra la ACT a causa de un Bono la ACT 98 Subordinado que es un Bono Asegurado de Assured.

1.162 **Reclamación de Bonos de la ACT 98 Subordinados (FGIC):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Subordinado que es un Bono Asegurado de FGIC.

1.163 **Reclamación de Bonos de la ACT 98 Subordinados (National):** una reclamación contra la ACT a causa de un Bono de la ACT 98 Subordinado que es un Bono Asegurado de National.

1.164 **Recuperación de Bonos de la ACT 98 Subordinados:** la recuperación total por parte de los tenedores de Reclamaciones de Bonos de la ACT 98 Subordinados Permitidas, Reclamaciones de Bonos de la ACT 98 Subordinados Permitidas (Assured), Reclamaciones de Bonos de la ACT 98 Subordinados Permitidas (FGIC) y Reclamaciones de Bonos de la ACT 98 Subordinados Permitidas (National).

1.165 **Bonos de la ACT 98 Subordinados:** en su conjunto, los siguientes bonos subordinados emitidos por la ACT conforme a la Resolución 98-06, adoptada el 26 de febrero de 1998, según se haya modificado y complementado después de la fecha: (a) los Bonos de Ingresos de Transporte Subordinados, Serie 1998, emitidos por la ACT en el capital original de setenta y cinco millones cincuenta mil dólares ($75,050,000.00), y (b) los Bonos de Ingresos de Transporte Subordinados, Serie 2003, emitidos por la ACT en el capital original de trescientos veinte millones quinientos cuarenta y cinco mil dólares ($320,545,000.00).

1.166 **Reclamaciones de Bonos de la ACT:** en su conjunto, una Reclamación contra la ACT por Bonos de la ACT 68, Bonos de la ACT 98 Principales y Bonos de la ACT 98 Subordinados.

1.167 **Bonos de la ACT:** en su conjunto, los Bonos de la ACT 68, los Bonos de la 98 Principales y los Bonos de la ACT 98 Subordinados.

1.168 **Contrato Complementario de la ACT/ADCC:** ese Contrato Complementario específico adjunto como Anexo «I» al Acuerdo de Apoyo al Plan de la ACT/ADCC conforme al cual determinados tenedores de Bonos de la ACT y Bonos de la ADCC se convierten en Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC.

1.169 **Acuerdo de Litisconsorcio de la ACT/ADCC:** ese Acuerdo de Litisconsorcio específico adjunto como Anexo «H» al Acuerdo de Apoyo al Plan de la ACT/ADCC conforme

24

al cual determinados tenedores de Bonos de la ACT y Bonos de la ADCC se convierten en Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC.

1.170 **Fecha límite del Litisconsorcio de la ACT/ADCC:** con respecto a (a) las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos de la ACT 68 (Ambac), 17 de mayo de 2021, a las 11:59 p.m. (horario de verano del este) y (b) Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac) y Reclamaciones de Bonos de la ACT 98 Principales (FGIC), 15 de julio de 2021, a las 11:59 p.m. (horario de verano del este) o, en cualquier caso, la fecha y hora posteriores que puedan ser solicitadas por Assured y National, pero en ningún caso posterior al comienzo de la audiencia para considerar la confirmación del Plan de la ACT.

1.171 **Acreedores de Litisconsorcio de la ACT/ADCC:** en su conjunto, aquellas entidades que poseen Bonos de la ACT o Bonos de la ADCC que celebraron y otorgaron el Contrato de Litisconsorcio de la ACT/ADCC o el Contrato Complementario de la ACT/ADCC antes de la Fecha Límite del Litisconsorcio de la ACT/ADCC.

1.172 **Acuerdo de Apoyo al Plan de la ACT/ADCC:** ese determinado Acuerdo de Apoyo al Plan de la ACT/ADCC, con fecha 5 de mayo de 2021, entre la Junta de Supervisión y los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC, según se modifique, complemente o cambie ocasionalmente conforme a sus términos.

1.173 **Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC:** en su conjunto, las partes del Acuerdo de Apoyo al Plan de la ACT/ADCC, que no sean la Junta de Supervisión.

1.174 **Acreedores con Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC:** en su conjunto, los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales y los Acreedores de Acumulación de la ACT/ADCC que celebraron el Acuerdo de Apoyo al Plan de la ACT/ADCC, el Acuerdo de Litisconsorcio la ACT/ADCC o el Acuerdo Complementario de la ACT/ADCC antes de la expiración del Período de Tarifa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC ; disponiéndose, sin embargo, que, sin perjuicio del contenido en el presente en contrario, todas las entidades que celebren un Acuerdo de Acumulación de la ACT/ADCC o un Acuerdo Complementario de la ACT/ADCC en la fecha en que se alcance la Obtención del Umbral del Acuerdo de Apoyo al Plan de la ACT/ADCC se considerarán Acreedores de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC; y, disponiéndose, además,, que, en todas las circunstancias, las Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT no estarán disponibles para los tenedores de Reclamaciones de Bonos de la ACT 98 Subordinados, Reclamaciones de Bonos de la ACT 98 Subordinados (Assured), Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC) o Reclamaciones de Bonos de la ACT 98 Subordinados (National) en su calidad de tales, y tales tenedores en tal capacidad no serán considerados Acreedores de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC con respecto a tales Bonos de la ACT 98 Subordinados.

1.175 **Período de Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC:** el período desde el 5 de mayo de 2021 hasta (a) la Obtención del Umbral del

25

Acuerdo de Apoyo al Plan de la ACT/ADCC o (b) la Fecha Límite del Litisconsorcio de la ACT/ADCC pertinente inclusive, el que ocurra antes.

1.176 **Obtención del Umbral del Acuerdo de Apoyo al Plan de la ACT/ADCC:** la fecha en la que los Acreedores con Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC posean o tengan la debida responsabilidad y autoridad de gestión de inversiones para fondos o cuentas que poseen o, con respecto a Assured y National, posean o aseguren y estén autorizados a votar conforme al Artículo 301(c)(3) de PROMESA, los documentos de seguro definitivos y la ley aplicable, (a) con respecto a los Bonos de la ACT 68, ochenta y cinco por ciento (85%) del monto total de las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured) y Reclamaciones de Bonos de la ACT 68 (National), incluido el capital principal e interés a partir de la Fecha de Petición de la ACT, (b) con respecto a los Bonos de la ACT 98 Principales, sesenta y siete por ciento (67%) del monto total de las Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured), Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la ACT 98 Principales (National), incluido el capital principal y los intereses a partir de la Fecha de Petición de la ACT, y (c) con respecto a los Bonos de la ADCC, setenta por ciento (70%) del monto total de las Reclamaciones de Bonos de la ADCC, y en cada caso, sin duplicación y en la medida en que tales reclamaciones estén aseguradas, en la medida en que un acreedor del Acuerdo de Apoyo al Plan de la ACT/ADCC esté autorizado a votar cualquier reclamación conforme al Artículo 301(c)(3) de PROMESA, los documentos de seguro definitivos y la ley aplicable.

1.177 **CVI de Recuperación de la ACT:** el CVI emitido a causa de las Reclamaciones de la ACT/ELA Permitidas de conformidad con los términos y disposiciones del Plan del ELA.

1.178 **Recuperación de Recuperación del ELA:** la recuperación total por parte de los tenedores de Reclamaciones de la ACT/ELA Permitidas, que consiste en CVI de Recuperación de la ACT distribuido a los tenedores de tales Reclamaciones de conformidad con el Plan del ELA y sujeto a la Cascada de Pago Anual, según se define en el Anexo «J» del Plan del ELA.

1.179 **Contrato del Comité de la ACT:** la carta contrato, con fecha 9 de mayo de 2022, entre el Comité de Acreedores y la Junta de Supervisión.

1.180 **Fecha de Confirmación de la ACT:** la fecha en la cual el Actuario del Tribunal del Título III registra la Orden de Confirmación de la ACT en el expediente.

1.181 **Vista de Confirmación de la ACT:** la vista llevada a cabo por el Tribunal del Título III conforme al artículo 1128(a) del Código de Quiebras y el Artículo 314 de PROMESA para considerar la confirmación del Plan de la ACT, según se paralice o continúe la vista ocasionalmente.

1.182 **Orden de Confirmación de la ACT:** la orden del Tribunal del Título III que confirma el Plan de la ACT conforme al Artículo 314 de PROMESA y el artículo 1129 del

26

Código de Quiebras, aplicable para los Casos de Título III de la ACT conforme al Artículo 301 de PROMESA.

1.183 **Condiciones de Distribución de la ACT:** en su conjunto, (a) la Fecha de Entrada en Vigencia del ELA habrá ocurrido, (b) la documentación del Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de Bonos Nuevos de la ACT, la Documentación del Fideicomiso (si la hubiera), y los Documentos del Fideicomiso de Custodia (solo si se relacionan con Assured y National) habrán sido acordados por la Junta de Supervisión, Assured y National, (c) los tenedores o aseguradores con derecho a votar con respecto a Bonos de la ACT 68, que tengan o aseguren, según el caso, por lo menos sesenta y siete por ciento (67%) del capital pendiente de Bonos de la ACT 68, habrán celebrado el Acuerdo de Apoyo del Plan de la ACT/ADCC (o un Acuerdo de Litisconsorcio de la ACT/ADCC o un Contrato Complementario de la ACT/ADCC con respecto a este), y (d) tenedores o aseguradores con derecho a voto con respecto a los Bonos de la ACT 98 Principales, que tengan o aseguren, según sea el caso, al menos sesenta y siete (67%) del capital pendiente de Bonos de la ACT 98 Principales deberán haber celebrado el Acuerdo de Apoyo al Plan de la ACT/ADCC (o un Acuerdo de Litisconsorcio o un Contrato Complementario con respecto a este); disponiéndose, sin embargo, al momento de la entrada de una Orden Final con respecto a la Orden de Confirmación de la ACT, se consideren satisfechas las condiciones establecidas en los subapartados (c) y (d) anteriores.

1.184 **Fecha de Entrada en Vigencia de la ACT:** el primer (1er) día hábil en el que (i) se hayan cumplido o renunciado a todas las condiciones precedentes a la confirmación del Plan de la ACT especificadas en el Artículo 34.1 del Plan, conforme al Artículo 34.2 del Plan de la ACT y (ii) se hayan cumplido o renunciado a todas las condiciones precedentes al perfeccionamiento sustancial del Plan de la ACT y a la Fecha de Entrada en Vigencia de la ACT especificadas en el Artículo 35.1 del Plan de la ACT conforme al Artículo 35.2 del Plan de la ACT.

1.185 **Ley para Crear la ACT:** Ley n.º 74 de 23 de junio de 1965, conocida como «Ley de la Autoridad de Carreteras y Transportación de Puerto Rico».

1.186 **Agente Fiscal de la ACT:** el Bank of New York Mellon, únicamente en su calidad de agente fiscal con respecto a los Bonos de la ACT.

1.187 **Plan Fiscal de la ACT:** un plan fiscal para el Deudor o la ACT Reorganizada.

1.188 **Reclamación de la ACT/BGF:** una Reclamación en contra de la ACT con respecto a préstamos concedidos por el BGF a la ACT, distinta de una Reclamación de Bonos de la ACT 68, Reclamación de Bonos de la ACT 68 (Ambac), Reclamación de Bonos de la ACT 68 (Assured), Reclamación de Bonos de la ACT 68 (National), Reclamación de Bonos de la ACT 98 Principales, Reclamación de Bonos de la ACT 98 Principales (Ambac), Reclamación de Bonos de la ACT 98 Principales (Assured), Reclamación de Bonos de la ACT 98 Principales (FGIC), Reclamación de Bonos de la ACT 98 Principales (National) o Reclamación de Bonos de la ACT 98 Subordinados (National).

27

1.189 **Reclamación sin Garantía General de la ACT:** una reclamación contra la ACT; disponiéndose, sin embargo, que, en todas las circunstancias, «Reclamación sin Garantía General de la ACT» no incluirá (a) una Reclamación derivada o relacionada con los Bonos de la ACT 68, los Bonos de la ACT 98 Principales, los Bonos de la ACT 98 Subordinados, los Bonos de la ACT de Moscoso o los Préstamos a la ACT/BFG, (b) una Reclamación de Expropiación/Expropiación Inversa, (c) una Reclamación subordinada del Artículo 510(b), (d) una Reclamación de Radicación Tardía, (e) una Reclamación de Conveniencia, (f) cualquier Reclamación que sea elegible para ser transferida o administrada a través del proceso ACR, (g) la Reclamación presentada en Evidencia de Reclamación n.º 161091 presentada por el Concilio Nacional de Políticas Inc. y cualquier otra reclamación relacionada con el litigio denominado <u>Frente Unido de Policías Organizados, *et al.* v. Puerto Rico Police Department</u>, Caso n.º KAC-2007-4170, (h) cualquier Reclamación por prestaciones de jubilación (incluidas, sin limitación, las partes de las Evidencia de Reclamación n.º 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 y 130091), independientemente de si tales Reclamaciones son radicadas por jubilados o empleados activos, independientemente de si dichas Reclamaciones se radican a través de litigios o procedimientos administrativos, pero excluyendo las Reclamaciones por cualquier aumento de pagos de pensiones que serían pagaderos antes de la adjudicación de tales Reclamaciones (<u>es decir</u>, «pago de atraso» de la pensión) y solamente hasta el monto relacionado con las pensiones impagas, (i) todas las reclamaciones contra el Deudor por cualquier Unidad Gubernamental (como se define en el Artículo 101 del Código de Quiebras), incluido el gobierno de los Estados Unidos, cualquier gobierno estatal, gobierno extranjero, cualquier municipio (ya sea del ELA o de otro modo), el ELA, cualquier instrumentalidad del ELA (incluido el BGF), ya sea radicada directamente por dicha Unidad Gubernamental o indirectamente o derivativamente por cualquier otra Entidad, incluida, sin limitación, cualquier Reclamación del BGF radicada por o a través de la Autoridad de Recuperación de Deuda del BGF, (j) cualquier reclamación relacionada con el Acuerdo de Concesión, fechado al 20 de diciembre de 1991, entre la ACT y Autopistas de PR, LLC, en su forma enmendada y complementada, relativa a la operación y mantenimiento del puente Teodoro Moscoso, lo que incluye, sin limitación, la evidencia de la reclamación n.º 52295, (k) cualquier reclamación relacionada con el Acuerdo de Concesión de Peaje Vial, fechado el 27 de junio de 2011, entre la ACT y Autopistas Metropolitanas de Puerto Rico, LLC, en su forma enmendada y complementada, que incluye, sin limitación, la evidencia de la reclamación n.º 35566, (l) cualquier reclamación de deficiencia sin garantía con respecto a la prioridad reclamada y/o las Reclamaciones con garantía, o (m) tal otra Reclamación que el Tribunal del Título III determine que no es una Reclamación sin Garantía General de la ACT.

1.190 **Recuperación de GUC de la ACT:** el monto equivalente a (a) cuarenta y ocho millones de dólares ($48,000,000.00), que se financiará de conformidad con los términos y disposiciones del Artículo 20.3 del presente, <u>más</u> (b) las recuperaciones netas, si las hubiere, por el Fideicomiso de Acciones de Anulación imputables a las Acciones de Anulación, <u>menos</u> (c) el monto en Efectivo necesario para satisfacer el pago de las Reclamaciones de Conveniencia Permitidas de conformidad con los términos y disposiciones de la Sección XXIII del presente.

1.191 **Reclamación de Bonos de Moscoso de la ACT:** una reclamación contra la ACT por los Bonos de Moscoso de la ACT.

28

1.192 **Bonos de Moscoso de la ACT:** en su conjunto, el Bono de Reembolso de Ingresos de Instalaciones Especiales, 2003 Serie A, emitido por la ACT en el capital original de ciento cincuenta y tres millones doscientos veintidós mil doscientos setenta dólares y cinco centavos ($153,222,270.45) conforme a los términos y disposiciones de ese Contrato de Fideicomiso, con fecha de 1 de octubre de 2003, entre la ACT y Banco Popular de Puerto Rico, como Fideicomisario en el cual, a partir de la Fecha de Petición de la ACT, donde en el monto total pendiente principal de $141,875,411.00.

1.193 **Fecha de Petición de la ACT:** 21 de mayo de 2017.

1.194 **Plan de la ACT:** este Plan Modificado de Ajuste de la Autoridad de Carreteras y Transportación de Puerto Rico de Título III, lo que incluye, de manera no taxativa, los anexos y suplementos adjuntos al presente, según se modifiquen, complementen o cambien ocasionalmente conforme a las disposiciones de PROMESA, el Código de Quiebras y los términos del presente.

1.195 **Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT:** en su conjunto, las tasas a ser pagadas, en Efectivo, en la Fecha de Entrada en Vigencia de la ACT, conforme a los términos y disposiciones del Acuerdo de Apoyo del Plan de la ACT/ADCC, Sección 3.4 del presente, y la Orden de Confirmación de la ACT, cuyas tasas, en total, no excederán de ciento veinticinco millones de dólares ($125,000,000.00) menos el monto que pueda ser pagadero a cuenta de los Costos de Perfeccionamiento.

1.196 **Porcentaje de la Tasa de Restricción de la ACT:** el porcentaje igual a (a) ciento veinticinco millones de dólares ($125,000,000.00) menos los montos que pueden ser pagaderos por concepto de Costos de Perfeccionamiento, dividido entre (b) la cantidad total de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured), Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la ACT 98 Principales (National) en poder o, en el caso de una Monolínea, ya sea en poder o asegurado, y está autorizado a votar conforme al Artículo 301(c)(3) de PROMESA, documentos que rigen y la ley aplicable, por Acreedores de Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC.

1.197 **Caso de Título III de la ACT:** el caso de Título III bajo PROMESA pendiente en el Tribunal del Título III, bajo el epígrafe *In re* Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Caso n.º 17-3567-LTS (D.P.R.).

1.198 **Acreedores Iniciales del Acuerdo de Apoyo al Plan de la ACT/ADCC:** en su conjunto, las partes del Acuerdo de Apoyo al Plan de la ACT/ADCC, que no sean la Junta de Supervisión al 5 de mayo de 2021.

29

1.199 **Reclamación de Bonos de la ACT Asegurados:** en su conjunto, las Reclamaciones de Bonos de la ACT, los pagos de intereses y capital de estos asegurados por una Monolínea, lo que incluye, sin limitación, conforme a una póliza de seguro de mercado secundario.

1.200 **Acciones de Invalidez:** en su conjunto, los procedimientos contenciosos que impugnan la validez de determinados Bonos de OG, Bonos de la AEP y notas de bonos anticipados de la AFI enumerados en el Anexo «B» del presente.

1.201 **IRC:** el Código Tributario Interno de los Estados Unidos de 1986 y sus ocasionales modificaciones.

1.202 **SII:** el Servicio de Impuestos Internos, una agencia del Departamento del Tesoro de los Estados Unidos.

1.203 **Reclamación de Radicación Tardía:** una evidencia de reclamaciones presentada en el caso de Título III de la ACT desde y después del comienzo de la Vista de Declaración de Divulgación.

1.204 **Gravamen:** cualquier cargo contra o interés en bienes para garantizar el pago de una deuda o el cumplimiento de una obligación.

1.205 **Acciones de Impugnación de Gravamen:** en su conjunto, los procedimientos contenciosos enumerados en el Anexo «C» adjunto al presente.

1.206 **Mociones de levantamiento de la paralización:** en su conjunto, los litigios denominados (a) Assured Guaranty Corp., *et al*. v. Junta de Supervisión Financiera y Administración para Puerto Rico, presentado en el Caso de Título III de la ACT [Expediente n.º 673], (b) Ambac Assurance Corporation, *et al*. v. The Financial Oversight and Management Board, presentado en el caso de Título III del ELA [Expediente n.º 10104], (c) Ambac Assurance Corporation, *et al*. v. The Financial Oversight and Management Board, presentado en el caso de Título III del ELA [Expediente n.º 10602], (d) AmeriNational Community Services, LLC, *et al*. v. The Financial Oversight Management Board of Puerto Rico, presentado en el Caso de Título III [Expediente n.º 591], (e) Assured Guaranty Corp., *et al*. v. Commonwealth of Puerto Rico, *et al*., Caso n.º 20-1930, actualmente pendiente ante el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos, (f) Ambac Assurance Corporation, *et al*. v. Commonwealth of Puerto Rico, *et al*., Caso n.º 2-1931, actualmente pendiente ante el Tribunal de Apelaciones del Primer Circuito de los Estados Unidos, (g) Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, *et al*., procedimiento contencioso n.º 17-00152-LTS, presentado en el Caso de Título III de la ACT [Expediente n.º 1], en su forma enmendada, y (h) cualquier moción o procedimiento contencioso que pretenda levantar la paralización automática prevista conforme al Artículo 362 y 922 del Código de Quiebras (en la medida aplicable) con respecto a los ingresos similares a los en cuestión en las Mociones de Levantamiento de la Paralización mencionadas anteriormente.

30

1.207 **Lista de Acreedores:** la lista de Acreedores (junto con todos los resúmenes, notas y listas) adjunto como Anexo A de la *Notificación de Presentación de Lista de Acreedores para la Autoridad de Carreteras y Transportación de Puerto Rico* presentada en el Caso de Título III [Caso n.º 17-3283-LTS, ECF n.º 10708], conforme a los artículos 924 y 925 del Código de Quiebras, y las posibles enmiendas, replanteamientos, complementos o modificaciones de otro modo realizadas a dichas listas, resúmenes, notas o enumeraciones por el Deudor.

1.208 **Normas de Quiebra Locales:** las Normas de Quiebra Locales del Tribunal de Quiebras de los Estados Unidos para el Distrito de Puerto Rico y, en la medida que sea aplicable al Caso de Título III; las Normas del Tribunal del Distrito para el Distrito de Puerto Rico y todas sus modificaciones ocasionales.

1.209 **AMA:** Autoridad Metropolitana de Autobuses de Puerto Rico.

1.210 **AFM:** Agencia de Financiamiento Municipal de Puerto Rico.

1.211 **Monolíneas:** en su conjunto, Ambac, Assured, FGIC y National, como aseguradoras de Bonos de la ACT, u otras Reclamaciones o valores emitidos por el Deudor, según corresponda.

1.212 **National:** National Public Finance Guarantee Corporation.

1.213 **Acción de National:** el litigio se denominó National Public Finance Guarantee Corp., *et al*. v. UBS Financial Services, Inc., *et al*., actualmente pendiente en el Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil n.º SJ2019CV07932.

1.214 **Precio de Aceleración de National:** con respecto a cualquier Bono Asegurado de National, un precio igual a un capital pendiente de un Bono Asegurado de National más el interés acumulado e impagado de este (o, en el caso de bonos de apreciación de capital, el monto compuesto de este) a la fecha del pago.

1.215 **Formulario de Elección de Tenedores de Bonos de National:** la «Notificación de Elección para Determinados Tenedores de Bonos con respecto a las Clases 4, 9 y 13» adjunto como Anexo 5(d) a la Orden de Declaración de Divulgación.

1.216 **Certificados de National:** con respecto a cada Fideicomiso de National que se forme para el beneficio de los Beneficiarios de Bonos Asegurados de National, el certificado o recibo que expida dicho Fideicomiso de National a los Beneficiarios de tales Bonos Asegurados de National que se depositen en el Fideicomiso de National.

1.217 **Contraprestación por Conmutación de National:** una combinación de algunos o todos los siguientes elementos, que serán seleccionados por National al criterio exclusivo de National en o antes del comienzo de la Vista de Declaración de Divulgación: (i) una parte o la totalidad de la Participación a Prorrata en la Contraprestación del Plan de National del tenedor; (ii) un porcentaje, que se determinará a criterio exclusivo de National, de los Costos de Perfeccionamiento y/o de las Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT que

31

se pueda distribuir a National de conformidad con los términos y disposiciones de la Sección III del presente; y (iii) Efectivo en una cantidad a ser determinada por National a su criterio exclusivo.

1.218 **Tratamiento de Conmutación de National:** el tratamiento establecido en el Artículo 25.2(a) del presente.

1.219 **Reclamaciones de Bonos de la ACT/ELA de National:** en su conjunto, las Reclamaciones de la ACT/ELA que surgen de Bonos de la ACT asegurados por National, lo que incluye, sin limitación, conforme a una póliza de seguro de mercado secundario.

1.220 **Cuenta de Plica de National:** una única cuenta de plica que puede ser formada, en o antes de la Fecha de Entrada en Vigencia de la ACT, por la ACT, para beneficio de los tenedores beneficiarios de Bonos Asegurados de National cuya Contraprestación de Cuenta de Plica de National se deposite en ella, cuyos términos se establecerán en el Complemento del Plan.

1.221 **Contraprestación de Cuenta de Plica de National:** algunos o todos los Nuevos Bonos de la ACT distribuibles a causa de las Reclamaciones de Bonos Asegurados de National Permitidas y cualquier otra contraprestación que pueda ser seleccionada por National, a criterio exclusivo y absoluto de National, en o antes del comienzo de la Vista de Declaración de Divulgación.

1.222 **Contraprestación de la ACT de National:** la contraprestación distribuible de conformidad con el Plan del ELA, la Orden de Confirmación del ELA, el Plan de la ACT y la Orden de Confirmación de la ACT a causa de las Reclamaciones de Bonos Asegurados de National Permitidas y las Reclamaciones de Bonos de la ACT/ELA de National Permitidas, que consiste en (a) el Efectivo y los Nuevos Bonos de la ACT distribuibles a cuenta de las Reclamaciones de Bonos Asegurados de National Permitidas , y (b) el CVI de Recuperación de la ACT distribuible a cuenta de las Reclamaciones de Bonos de la ACT/ELA de National Permitidas.

1.223 **Pólizas de Seguros de National:** las pólizas de seguros existentes, incluidas las pólizas de seguros de mercado secundario, emitidas inicialmente por (a) MBIA Insurance Corporation y posteriormente renovadas a National o (b) FGIC y posteriormente renovadas a National, y relacionadas con los Bonos Asegurados de National, junto con todos y cada uno de los acuerdos y otros documentos relacionados con estos.

1.224 **Reclamaciones de Bonos Asegurados de National:** en su conjunto, las Reclamaciones contra la ACT derivadas de los Bonos Asegurados de National, incluidas cualesquiera Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98 Principales (National) y Reclamaciones de Bonos de la ACT 98 Subordinados (National).

1.225 **Bonos Asegurados de National:** en su conjunto, los Bonos de la ACT que han sido asegurados o son de otra manera propiedad (por subrogación o de otra manera) de National, lo que incluye, sin limitación, conforme a una póliza de seguro de mercado secundario.

1.226 **Tratamiento de No Conmutación de National:** el tratamiento establecido en el Artículo 25.2(b) del presente.

1.227 **Contraprestación del Plan de National:** la contraprestación distribuible a causa de las Reclamaciones del Bonos Asegurados de National Permitidas.

1.228 **Tratamiento de National:** con respecto a cada Clase de Reclamaciones de Bonos Asegurados de National, el tratamiento establecido en el Artículo 25.2 del presente.

1.229 **Fideicomiso de National:** los fideicomisos que puede formar, en o antes de la Fecha de Entrada en Vigencia de la ACT, la ACT, cuyo costo y gasto exclusivo, incluidos, sin limitación, la formación y mantenimiento de los fideicomisos (incluidos los honorarios y gastos del fideicomisario), serán satisfechos a partir de los activos del Fideicomiso de National, y en beneficio de los tenedores beneficiarios de tales Bonos Asegurados de National, cuyos términos se establecerán en el Complemento del Plan.

1.230 **Contraprestación del Fideicomiso de National:** algunos o todos los Nuevos Bonos de la ACT distribuibles a causa de las Reclamaciones de Bonos Asegurados de National Permitidas y cualquier otra contraprestación que pueda ser seleccionada por National, a criterio exclusivo y absoluto de National, en o antes del comienzo de la Vista de Declaración de Divulgación.

1.231 **Nuevos Bonos de la ACT:** en su conjunto, los bonos que la ACT Reorganizada emitirá a la Fecha de Entrada en Vigencia de la ACT conforme a los términos y condiciones del Plan de la ACT, la Orden de Confirmación de la ACT y el Contrato de Emisión de Bonos Nuevos de la ACT, incluido, sin limitación, cualquier bono de reembolso que pueda emitirse conforme al Contrato de Emisión de Bonos Nuevos de la ACT, el reembolso de los cuales se respaldará con una prenda de los Ingresos Pignorados.

1.232 **Contrato de Emisión de Nuevos Bonos de la ACT:** el contrato de emisión o resolución a celebrarse y otorgarse en la Fecha de Entrada en Vigencia de la ACT conforme a lo cual la ACT Reorganizada emitirá los Obligaciones Garantizadas y que incluye todos los términos y disposiciones relacionados a estos, según se modifique, complemente o cambie ocasionalmente conforme a sus términos y condiciones, donde el contrato de emisión o resolución deberá ser razonablemente satisfactorio para Monolíneas.

1.233 **Fideicomisario de Nuevos Bonos de la ACT:** el fideicomisario designado conforme a los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT.

1.234 **Nuevos CAB de la ACT:** en su conjunto, la serie de bonos de apreciación de capital, que acumulan intereses a una tasa de cinco por ciento (5.0%) anual, que se emitirán

33

conforme al Plan de la ACT como componentes de Nuevos Bonos de la ACT y que se distribuirán conforme a los términos y disposiciones del Plan de la ACT.

1.235 **Nuevos CIB de la ACT:** en su conjunto, la serie de bonos de interés actual, que acumulan intereses a una tasa de cinco por ciento (5%) anual, que se emitirán conforme al Plan de la ACT como componentes de Nuevos Bonos de la ACT y que se distribuirán conforme a los términos y disposiciones del Plan de la ACT.

1.236 **Nuevos CAB convertibles de la ACT:** en su conjunto, la serie de bonos de apreciación de capital convertibles, que acumulan intereses a una tasa de cinco por ciento (5.0%) anual, que se emitirán conforme al Plan de la ACT como componentes de Nuevos Bonos de la ACT y que se distribuirán conforme a los términos y disposiciones del Plan de la ACT.

1.237 **Pendiente:** deuda que (i) no se ha pagado en su totalidad conforme a sus términos o (ii) no se ha anulado legalmente conforme a los requisitos de anulación establecidos en los documentos de emisión definitiva aplicables.

1.238 **Junta de Supervisión:** la Junta de Supervisión y Administración Financiera para Puerto Rico establecida conforme al Artículo 101 de PROMESA, como representante del Deudor en el Caso de Título III conforme al Artículo 315(b) de PROMESA.

1.239 **Disposición Parcial:** un contrato de arrendamiento, concesión a largo plazo u otro acuerdo de asociación público-privada con respecto a cualquier bien mueble o inmueble que comprende una parte de las Instalaciones de Peaje.

1.240 **PayGo:** el sistema de pensión prepaga creado conforme a la Ley 106 de 2017.

1.241 **AEP:** la Autoridad de Edificios Públicos de Puerto Rico.

1.242 **Persona:** una persona física, una sociedad colectiva, una sociedad limitada, una sociedad, una sociedad de responsabilidad limitada, una asociación de responsabilidad limitada, una cooperativa, un fideicomiso, una organización no constituida, una asociación, una sociedad por acciones, una empresa conjunta, un patrimonio, un gobierno o una agencia o subdivisión política de este, o cualquier otra forma de persona jurídica.

1.242 **CFP:** la Corporación para el Financiamiento Público de Puerto Rico.

1.244 **Complemento del Plan:** un volumen separado, para ser presentado ante el Actuario del Tribunal del Título III, que incluye, entre otros documentos, el Contrato de Emisión de Nuevos Bonos de la ACT, formas de los Nuevos Bonos de la ACT, y los Estatutos de la ACT Reorganizada, que serán en forma y sustancia razonablemente satisfactorios para la AAFAF y las Monolíneas, y, únicamente con respecto a las disposiciones que afectan a las Clases 16 y 19, el Comité de Acreedores. El Complemento del Plan (que contiene versiones en borrador o finales de los documentos que anteceden) se radicará con el Actuario del Tribunal del Título III en cuanto sea posible (pero en ningún caso más de siete (7) días) antes de la Fecha de Elección, o en la fecha que establezca el Tribunal del Título III. El Complemento del Plan se considerará

34

incorporado al Plan de la ACT y parte de este como si estuviese contenido en el presente en su totalidad.

1.245 **Ingresos Pignorados:** en su conjunto, (a) los Recibos de Peaje, (b) los derechos de la ACT Reorganizada para recibir los Recibos de Peaje, (c) salvo para fines del Convenio de Tarifas de Peaje establecido en el Contrato de Emisión de Nuevos Bonos de la ACT, los ingresos derivados de o relacionados con cualquier venta o enajenación de, o cualquier acuerdo de concesión relacionado con, todo o parte de las Instalaciones de Peaje, y (d) los ingresos de inversión recibidos sobre cualquier monto mantenido el Fondo de Recibos de Peaje, el Fondo de Amortización de la deuda, el Fondo de Reserva Operativo, los Fondos de Renovación y Reemplazo, el Fondo de Endeudamiento Subordinado y el Fondo de Reserva General, cada uno como se define en el Contrato de Emisión de Nuevos Bonos de la ACT; disponiéndose, sin embargo que, en todas las circunstancias, los «Ingresos Pignorados» no incluirán los ingresos de ningún obsequio, subvención u otros pagos a la ACT Reorganizada de los Estados Unidos de América, cualquier estado, territorio, municipalidad o cualquier instrumento público o privado, individuo o entidad que no estén en la naturaleza de un Peaje.

1.246 **AAA:** la Autoridad de Acueductos y Alcantarillados de Puerto Rico.

1.247 **AEE:** la Autoridad de Energía Eléctrica de Puerto Rico.

1.248 **PRIDCO:** Compañía de Fomento Industrial de Puerto Rico.

1.249 **AFI:** la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico.

1.250 **ATI:** la Autoridad de Tránsito Integrado de Puerto Rico.

1.251 **Profesional:** una Entidad (a) a compensar por servicios proporcionados antes o en la Fecha de Entrada en Vigencia de la ACT conforme a los Artículos 316 y 317 de PROMESA y (i) empleada en el Caso de Título III por las Partes del Gobierno (a criterio exclusivo de las Partes del Gobierno); (iii) empleada en el Caso de Título III por la Junta de Supervisión (a criterio exclusivo de la Junta de Supervisión); o (iii) un comité nombrado conforme al artículo 1103 del Código de Quiebras o (b) para la cual se Concedió compensación y reembolso por parte del Tribunal del Título III conforme al artículo 503(b)(4) del Código de Quiebras.

1.252 **Reclamación Profesional:** una Reclamación de un Profesional que procura, por parte del Tribunal del Título III, un laudo de compensación por los servicios realizados o el reembolso de los gastos realizados hasta la Fecha de Confirmación de la ACT inclusive conforme a los Artículos 316 y 317 de PROMESA.

1.253 **PROMESA:** la Ley de Supervisión, Gestión y Estabilidad Económica de Puerto Rico, Pub. L. n.º 114-187, 130 Stat. 549 (2016), Artículo 2101 del Título 48 del U.S.C. y siguientes, y sus enmiendas o modificaciones.

1.254 **Participación a Prorrata:** con respecto a las Reclamaciones Permitidas contra el Deudor, (a) la proporción de una Reclamación Permitida con respecto a la suma de todas las

Reclamaciones Permitidas dentro de tal Clase, tomando en cuenta, y reduciendo considerando, el interés no vencido sobre este a la Fecha de Petición de la ACT, con respecto a los bonos individuales dentro de tal Clase y (b) entre más de una Clase, la proporción que reciben de las Reclamaciones Permitidas dentro de tal Clase de Reclamaciones en contraprestación con respecto a la suma de contraprestaciones recibidas por todas las Reclamaciones dentro de las Clases aplicables.

1.255 **Personas Relacionadas:** con respecto a cualquier Entidad (lo que incluye, para evitar dudas, el ELA, las Partes del Gobierno y el Comité de Acreedores), sus predecesores, sucesores y cesionarios (de pleno derecho o de otra forma) y sus empleados, gerentes, oficiales designados o electos, directores, funcionarios, directivos, mandantes, miembros, accionistas (sean sus participaciones directas o indirectas), socios, asesores financieros, abogados, contadores, consultores, agentes y profesionales (lo que incluye, de manera no taxativa, todo Profesional contratado por el Deudor, AAFAF y el Comité de Acreedores) actuales o pasados u otros representantes, apoderados o gestores de inversión de tal Entidad o sus Empresas asociadas actuales y pasadas respectivas, cada uno actuando en tal calidad, y cualquier Entidad que realice una reclamación mediante cualquier de ellos (lo que incluye sus funcionarios, directores, gerentes, accionistas, socios, empleados, miembros y profesionales respectivos), cada uno en su calidad respectiva; disponiéndose, sin embargo, que «Personas Relacionadas» no se pretende que incluya ni se interprete como que incluye al ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE.

1.256 **Reclamaciones Eximidas:** en su conjunto, (a) con respecto a las Entidades que son parte en el Acuerdo de Apoyo al Plan de la ACT/ADCC, las Reclamaciones y Causas de Acción que se relevan en el presente y de conformidad con el Acuerdo de Apoyo al Plan de la ACT/ADCC, (b) Reclamaciones y Causas de Acción que surgen, están relacionadas o podrían haber sido radicadas contra el Deudor o sus Activos en el Caso de Título III, (c) Reclamaciones y Causas de Acción que hayan sido o podrían haber sido radicadas por el Deudor (con respecto a los relevos otorgados por el Deudor) y por los Acreedores o las Partes del Gobierno en relación con las Reclamaciones que tengan contra las Partes Eximidas (con respecto a los relevos otorgados por las Partes Eximidas), (d) Reclamaciones y Causas de Acción relacionadas con la Cuarta Estipulación Modificada entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico en relación con la Paralización de las Normas de Prescripción y la Orden de Consentimiento [Caso n.° 17-3283-LTS, ECF n.° 15854], y sus modificaciones, y Reclamaciones y Causas de Acción relacionadas con la Cuarta Estipulación Modificada y  Orden de Consentimiento entre Deudores del Título III (distintos de COFINA) y la Agencia Fiscal y la Autoridad Asesora Financiera de Puerto Rico actuando en nombre de las Entidades Gubernamentales enumeradas en el Apéndice «B» en relación con la Paralización de las Normas de Prescripción [Caso n.º 17-3283-LTS, ECF n.º 17394], y sus modificaciones, y (e) Reclamaciones que de otra manera se deriven o se relacionen con el Caso de Título III, el Plan de la ACT, el Acuerdo de Apoyo al Plan de la ACT/ADCC, el Acuerdo del Comité de la ACT y los compromisos establecidos en el presente, que incluyen, sin limitación, en relación con cualquiera de las Partes del Gobierno, y sus respectivas subsidiarias, activos, pasivos, operaciones o bienes; disponiéndose, sin embargo, que «Reclamaciones Eximidas» no tenga por objeto incluir, ni tendrá el efecto de incluir, Reclamaciones o Causas de Acción no relacionadas

36

con el Deudor o Reclamaciones o Causas de Acción por negligencia grave, conducta dolosa deliberada o fraude intencional alegado, o que podrían haberse ratificado, ya sea que de forma contractual o extracontractual; y, disponiéndose, además, que «Reclamaciones Eximidas» no tenga por objeto eximir, ni tendrá el efecto de eximir, a ninguna Entidad en su calidad de demandada en ninguna Acción de Anulación, incluida una parte en un acuerdo de limitación con el ELA y/o SRE relacionado con dicha Causa de Acción; y, disponiéndose, además, que las «Reclamaciones Eximidas» no estén destinadas a eximir, ni tendrán el efecto de eximir, a ninguna parte del cumplimiento de sus obligaciones de acuerdo con la Orden de Confirmación de la ACT o el Plan de la ACT, lo que incluye, sin limitación, cumplimiento de las obligaciones derivadas o relacionadas con los Nuevos Bonos de la ACT, los Nuevos Bonos de OG, los CVI de Recuperación de ACT o bajo cualquier póliza de seguro o documentos relacionados emitidos por una Monolínea; y disponiéndose, además, que las «Reclamaciones Eximidas» no incluyan reclamaciones contra el ELA, AFICA, ADCC, COFINA, SRE, AMA, AFM, AEP, CFP, AAA, PRIDCO, AFI, UPR y AEE.

1.257 **Partes Eximidas:** en su conjunto, únicamente en la medida prevista en el Plan de la ACT, (a) las Partes del Gobierno, (b) los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC, (c) el Comité de Acreedores, y (d) con respecto a las cláusulas anteriores (a) a (c), cada una de sus respectivas Personas Relacionadas.

1.258 **Partes que Eximen:** en su conjunto, únicamente en la medida prevista en el Plan de la ACT, (a) todos los tenedores de Reclamaciones contra el Deudor o sus Activos; (b) las Afiliadas actuales y anteriores de dichos tenedores y (c) con respecto a las cláusulas anteriores (a) y (b), cada una de las Personas Relacionadas actuales y anteriores de cada una de esas Entidades.

1.259 **Estado Libre Asociado Reorganizado:** el Estado Libre Asociado, a partir de la Fecha de Entrada en Vigencia del ELA.

1.260 **ACT Reorganizada:** el Deudor, a partir de la Fecha de Entrada en Vigencia de la ACT.

1.261 **Estatutos de la ACT Reorganizada:** los estatutos de la ACT Reorganizada, en la medida aplicable, a partir de la Fecha de Entrada en Vigencia de la ACT.

1.262 **Acción de SCC:** el litigio denominado Special Claims Committee v. Barclays Capital, et al., procedimiento contencioso n.º 19-00280-LTS, actualmente pendiente en el Tribunal del Título III.

1.263 **SEC:** la Comisión de Bolsa y Valores de los Estados Unidos.

1.264 **Asesor Jurídico de Bonos del Artículo 103:** con respecto a la ACT o la ACT Reorganizada, según el caso, el abogado que presta servicios con respecto al Artículo 103 del IRC.

1.265 **Reclamación Subordinada al Artículo 510(b):** toda Reclamación, en la medida determinada conforme a una Orden Final, contra el Deudor o sus Activos derivados o relacionados con: (a) la rescisión de una compra o venta de un valor existente del Deudor o de una Empresa asociada al Deudor, (b) la compra, venta o retención de dicho valor o (c) el reembolso, la indemnización o la contribución permitida conforme al artículo 502 del Código de Quiebras a causa de dicho crédito.

1.266 **Obligaciones Garantizadas**: en su conjunto, los Nuevos Bonos de la ACT y la Endeudamiento Subordinado.

1.267 **Ley de Valores:** la Ley de Valores de 1933, artículos 77a-77aa del título 15 del U.S.C., y sus modificaciones, o cualquier ley federal, estatal o local similar.

1.268 **Cuenta del SIB:** la cuenta del Banco de Infraestructura del Estado [SIB, por sus siglas en inglés] establecida y contabilizada como garantía para el reembolso de las Reclamaciones de la ACT 98 Subordinadas (National).

1.269 **Agente del Solicitante:** Kroll Restructuring Administration LLC (anteriormente, Prime Clerk LLC), el agente para reclamaciones, votaciones y solicitante contratado por el Deudor en el Caso de Título III por orden del Tribunal del Título III.

1.270 **Endeudamiento Subordinado:** en su conjunto, el endeudamiento subordinado que se emitirá al ELA conforme al Contrato de Emisión de Nuevos Bonos de la ACT o un complemento de este y como refinanciación de las obligaciones de la ACT en virtud del Préstamo del ELA, con intereses a una tasa de dos y medio por ciento (2.5%) anual, una fecha de vencimiento del 1 de julio de 2052, y otras disposiciones de pago salientes establecidas en el Anexo «E» del presente.

1.271 **Título III:** Título III de PROMESA.

1.272 **Caso de Titulo III:** el Caso de Título III de la ACT

1.273 **Tribunal del Título III:** el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico o cualquier otro tribunal que tenga jurisdicción sobre los Casos de Título III.

1.274 **Instalaciones de Peaje:** en su conjunto, autopistas de peaje PR-20, PR-52, PR-53 y PR-66.

1.275 **Convenio de Tarifas de Peaje:** el convenio de tarifas de peaje mencionado en el Artículo 24.1(i) del presente, como se establece en el presente y sus revisiones conforme a los términos y disposiciones de la Contrato de Emisión de Nuevos Bonos de la ACT.

1.276 **Recibos de Peaje:** en su conjunto, (a) todos los recibos de Efectivo y pagos automáticos o eléctricos o créditos de los Peajes (lo que incluye por medio del sistema "Auto-Expresso"), y (b) el producto de cualquier seguro de interrupción de negocio relacionado con las

38

Instalaciones de Peaje y de cualquier otro seguro que asegure contra la pérdida de los Recibos de Peaje.

1.277 **Fondo de Recibo de Peaje:** el fondo designado, creado y establecido conforme al Artículo 5.01 del Contrato de Emisión de Nuevos Bonos de la ACT para mantener los Recibos de Peaje pendientes de solicitud y distribución conforme a los términos y condiciones del Contrato de Emisión de Nuevos Bonos de la ACT.

1.278 **Peajes:** en su conjunto, peajes, tarifas, ingresos, recibos, honorarios especiales u honorarios por permisos, u otros cargos impuestos por o en nombre de la ACT Reorganizada a los propietarios, arrendadores, arrendatarios u operadores de vehículos de motor para la operación o el derecho de operar esos vehículos en las Instalaciones de Peaje, y multas y penalidades e intereses recaudados como resultado de la falta de pago de tal monto.

1.279 **Activos de Tránsito:** Tren Urbano.

1.280 **Documentación del Fideicomiso:** en su conjunto, la documentación requerida, si es necesaria, para establecer y mantener el fideicomiso en el que, con respecto a la ACT; se depositará el CVI de Recuperación de la ACT pendiente y que proporcionará la distribución de este a los tenedores de Reclamaciones de la ACT/ELA Permitidas (incluidas las Monolíneas aplicables) conforme a los términos del Acuerdo de Apoyo al Plan de la ACT/ADCC, donde la documentación en todos los casos será acordada por la Junta de Supervisión y las Monolíneas aplicables.

1.281 **Bienes del Fideicomiso:** en su conjunto, y sin limitar las disposiciones establecidas en la el Contrato de Emisión de Nuevos Bonos de la ACT, (a) todo derecho, título e interés de la ACT reorganizada en y a los Ingresos Pignorados, y el derecho a recibirlos, lo que incluye, sin limitación, cualquier dinero, ingreso, cuenta, derecho contractual o intangible genera derivado de estos, i) sujetos únicamente a la aplicación de los ingresos prometidos de conformidad con los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT, y (ii) el gravamen principal y la garantía prendaria principal concedidos por el Contrato de Emisión de Bonos de la ACT en beneficio de los tenedores de Nuevos Bonos de la ACT, que en todos los aspectos serán principales y superiores al gravamen subordinado y la garantía prendaria subordinada otorgados por el Contrato de Emisión de Nuevos Bonos de la ACT en beneficio de los tenedores de Endeudamiento Subordinado, y (b) salvo por el Fondo de Gastos de la Autoridad y el Fondo de Garantía Arbitral, todos los derechos, títulos e intereses de la ACT reorganizada en los fondos y cuentas creados de conformidad con el Contrato de Emisión de Nuevos Bonos de la ACT y cualquier Contrato de Fideicomiso complementario y los dineros, valores y otros activos en depósito con el Fideicomisario de Nuevos Bonos de la ACT en tales fondos y cuentas creados de conformidad con el Contrato de Emisión de Nuevos Bonos de la ACT y cualquier Contrato de Fideicomiso complementario permitido por la Ley para Crear la ACT; disponiéndose, sin embargo, que la prioridad en la que se apliquen dichos dineros y valores al reembolso de las Obligaciones Garantizadas sea la especificada expresamente en Contrato de Emisión de Nuevos Bonos de la ACT.

1.282 **Distribución no Reclamada:** toda distribución a un Acreedor que (a) no haya aceptado una distribución determinada o, en el caso de las distribuciones efectuadas mediante control, no haya negociado dicho control, (b) no haya notificado al Deudor de la intención de aceptar una distribución determinada, (c) no haya respondido a las solicitudes de información del Deudor necesarias para facilitar una distribución determinada o (d) haya adoptado cualquier otra medida necesaria para facilitar dicha distribución.

1.283 **Acciones de la aseguradora:** en su conjunto, la Acción de Ambac, la Acción de FGIC, la Acción de National y la Acción de SCC, o cualquier acción que se interpuso en el futuro en cualquier tribunal, agencia o tribunal estatal, federal o del ELA contra cualquiera de los demandados mencionados en tales litigios referentes o relacionados con endeudamiento o bonos emitidos por la ACT, AEE, ELA o cualquier otra agencia o instrumentalidad del ELA.

1.284 **Arrendamiento en curso:** un arrendamiento de bienes inmuebles no residenciales en los que el Deudor sea parte que esté sujeto a asunción, asunción y transferencia o rechazo conforme al artículo 365 del Código de Quiebras, salvo según se establezca en el Artículo 311 de PROMESA.

1.285 **Litigio de Uniformidad:** en su conjunto, (a) el litigio llamado Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, *et al*., procedimiento contencioso n.º 20-00068-LTS, actualmente pendiente en el Tribunal del Título III, y (b) cualquier otro litigio que pueda estar actualmente pendiente o que pueda iniciarse durante el período desde y después de la fecha del presente hasta e inclusive la Fecha de Entrada en Vigencia de la ACT, en donde las reclamaciones o causa de acción congruentes con o similares a las presentadas o que podrían haber sido presentadas en el litigio mencionado anteriormente han sido presentadas.

1.286 **UPR:** Universidad de Puerto Rico.

1.287 **Fecha de Registro de Votación**: las fechas establecidas por el Tribunal del Título III con respecto a un derecho a votar para aceptar o rechazar el Plan de la ACT y establecidas en la Orden de Declaración de Divulgación; disponiéndose, sin embargo, que la «Fecha del Registro de Votación» no se aplique a los valores cotizados en bolsa, las reclamaciones con respecto a las cuales se votará a través de la Plataforma de Oferta de Licitación Automatizada de Depository Trust Company, conocida como «ATOP», donde el tenedor de los valores en el momento de la licitación (en lugar de una fecha determinada) se considera el tenedor con derecho a voto.

1.288 **Otras definiciones:** a menos que el contexto exija otra cosa, todo término en mayúsculas utilizado y no definido en este o en otro lugar del Plan de la ACT que se define en PROMESA o en el Código de Quiebras tendrá, si se define en PROMESA, el significado asignado a dicho término en PROMESA o, si no se define en PROMESA, pero se define en el Código de la Quiebras, tendrá el significado atribuido al mismo en el Código de Quiebras. A menos que se especifique de otro modo, (a) toda referencia a artículos, programas o anexos que figuran en el Plan de la ACT se refieren al artículo, sección, programa o anexo correspondiente del Plan de la ACT, según se modifique, renuncie o cambie ocasionalmente y (b) toda referencia a dólares se refiere a la moneda de curso legal de los Estados Unidos de América. Las palabras

40

«en el presente», «del presente», «según el presente» y otras expresiones de relevancia similar se refieren al Plan de la ACT en su conjunto y no a un artículo, inciso o cláusula particular contenida en el Plan de la ACT. Al calcular cualquier plazo prescrito o permitido por el Plan de la ACT, a menos que se disponga expresamente otra cosa, se aplicarán las disposiciones de la Norma de Quiebras 9006(a).

1.289 **Normas de Interpretación:** a los fines del Plan de la ACT, (a) a menos que se especifique de otro modo, cualquier especificación en el presente a un contrato, contrato de arrendamiento, instrumento, contrato de emisión, acuerdo u otro acuerdo o documento que tenga una forma específica o términos y condiciones específicos significa que tal documento tendrá sustancialmente tal forma o tales términos y condiciones, (b) a menos que se especifique de otro modo, cualquier referencia en el presente a una definición, un documento, programa o anexo existente, significará tal documento, programa o anexo en su estado, según se modifique, cambie o complemente, lo que incluye, de manera no taxativa, actualizaciones para cumplir con los Documentos Definitivos, (c) a menos que se especifique de otro modo, toda referencia en el presente a distribuciones realizadas en un «monto» se calcularán usando el capital de cualquier bono emitido en la Fecha de Entrada en Vigencia de la ACT conforme al Plan de la ACT más el monto, en su caso, de Efectivo distribuido de tal manera, (d) a menos que se especifique de otro modo, toda referencia en el presente a «Secciones» y «Artículos» son referencias a Secciones y Artículos, respectivamente, del presente, (e) los epígrafes y títulos de las Secciones y Artículos se insertan por conveniencia para simplificar su referencia y no se pretende que sean parte ni afecten la interpretación del Plan, (f) a menos que se especifique de otro modo en el presente, se aplicarán las normas de interpretación establecidas en el artículo 102 del Código de Quiebras, (g) a menos que se especifique de otro modo, las referencias a los números de expediente de los documentos radicados en el Caso de Título III son referencias a los números de expediente del sistema CM/ECF del Tribunal del Título III, (h) los términos «incluye» y «que incluye» y variaciones de estos no se considerarán términos taxativos y se considerará como acompañados por los términos «de manera no taxativa» e (i) cualquier disposición inmaterial que proporcione validez puede ser interpretada por la Junta de Supervisión de manera coherente con el propósito e intención generales del Plan de la ACT sin notificación o acción adición o acción, orden o aprobación del Tribunal del Título III ni cualquier otra Entidad.

## SECCIÓN II

## CONCILIACIÓN Y RESOLUCIÓN DE DISPUTAS/REESTRUCTURACIÓN DE ENTIDADES/RECLAMACIONES DE PENSIONADOS

2.1 **Resolución de Litigios:** en la medida en que no se resuelva de conformidad con el Plan del ELA o la Orden de Confirmación del ELA, el Plan de la ACT establece los términos y condiciones para un compromiso global y una transacción integrada, entre otras cuestiones, de las disputas ratificadas y no ratificadas relativas a los derechos de los tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 98 y Reclamaciones de la ACT/ELA, incluidas las disputas (a) establecidas en las Objeciones Relacionadas con la Deuda, (b) establecidas en las Acciones de Invalidez, (c) establecidas en las Acciones de Impugnación de Gravamen, (d) planteadas por ciertos tenedores de Reclamaciones de Bonos del

41

ELA, Reclamaciones de Bonos de Garantía del ELA y préstamos de la ACT del BGF que ratifican derechos para recibir ingresos históricamente asignados de manera condicional al ACT, según corresponda, y «recuperados» por el ELA conforme a las disposiciones de la Constitución del ELA, (e) en relación con la validez, la prioridad, el estado garantizado y los derechos conexos de los Préstamos de la ACT de BGF, y (f) establecidas en las Mociones de Levantamiento de la Paralización y las Acciones de Recuperación relacionadas con las Reclamaciones de la ACT/ELA.

2.2 **Admisión de Reclamaciones de Bonos:** con el fin de confirmación y perfeccionamiento del Plan de la ACT y las distribuciones a ser hechas de conformidad con el presente, a menos que se permita lo contrario en virtud de una orden del Tribunal de Título III, en la Fecha de Entrada en Vigencia de la ACT, entre otras Reclamaciones, (a) las Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured) y Reclamaciones de Bonos de la ACT 68 (National) se considerarán permitidas en el monto total de $831,189,105.55, (b) las Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured), Reclamaciones de Bonos de la ACT 98 Principales (National) y Reclamaciones de Bonos de la ACT 98 Subordinadas (FGIC) se considerarán permitidas en el monto total $3,129,667.976.84, (c) Reclamaciones por Bonos de la ACT 98 Subordinadas, Reclamaciones de Bonos de la ACT 98 Subordinadas (Assured), Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC) y Reclamaciones de Bonos de la ACT 98 Subordinadas (National) se considerarán permitidas en el monto total de $277,107,234.18, y (d) las Reclamaciones de la ACT/BGF se considerarán permitidas en el monto total de $2,149,579,432.

2.3 **Exenciones, Medidas Cautelares y Exculpaciones:** las exenciones, medidas cautelares y exculpaciones previstas en la Sección XL del presente son esenciales para obtener el valor que se indica según el presente y constituyen un componente esencial de las conciliaciones alcanzadas y no pueden separarse de las demás disposiciones del presente Plan de la ACT.

2.4 **Reestructuración operativa de la ACT:** en o tan pronto como sea posible después de la Fecha de Entrada en Vigencia de la ACT, lo que incluye, sin limitación, tras la aprobación de la Administración Federal de Tránsito del Departamento de Transporte de los Estados Unidos, la ACT Reorganizada será reestructurada operativamente mediante la separación de los Activos de Carretera de los Activos de Tránsito, donde tales Activos del Tránsito y todos los Ingresos del Tránsito se transfieren a la ATI.

(a) **Activos de Tránsito.** Los Activos de Tránsito serán respaldados por los Ingresos de Tránsito y por cualquier otro flujo de ingresos dedicado expresamente identificado, o las corrientes de ingresos de la ATI o del ELA, según el caso, suficientes para cubrir los déficits de gastos operacionales y de mantenimiento de los Activos de Tránsito y las necesidades de gastos de mejoras de capital y aprobadas como adecuadas para tales fines por la Administración Federal de Tránsito del Departamento de Transporte de los Estados Unidos y la Junta de Supervisión.

(b)      **Activos de Carretera**.  Desde y después de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada conservará los Activos de Carretera y, tan pronto como sea posible a partir de entonces, dichos Activos de Carretera se separarán operativa y financieramente entre Activos de Peaje Vial y Activos que no son de Peaje Vial, con una estructura de «Anillo cercado» y asignación de costos y gastos implementados, lo que incluye, sin limitación, (i) la separación interna de las funciones legales, financieras y operativas y el establecimiento de oficinas de gestión de Activos de Peaje Vial y activos de carreteras sin peaje separadas, y (ii) la consolidación de todas las responsabilidades de gestión de carreteras sin peaje del Departamento de Transportación y Obras Públicas de Puerto Rico con y en la ACT Reorganizada.

(c)      **Inventario de los Activos de Carretera**.  A partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada utilizará sus mejores esfuerzos razonables para hacer un inventario de todos los Activos de Carretera disponibles y proporcionar dicho inventario a la Junta de Supervisión.

2.5 **Reclamaciones de Pensionados:** de conformidad con los términos y disposiciones de la Ley 106 y el Plan del ELA, se han asumido todas y cada una de las obligaciones del Deudor con los ex empleados y serán pagadas por el ELA mediante Pay-Go, donde el Deudor que hace aportaciones «prepagos» al ELA de conformidad con las disposiciones de la Ley 106 y el Plan del ELA, y que no son tratadas de otra manera de conformidad con el Plan de la ACT.

## SECCIÓN III

## DISPOSICIONES PARA EL PAGO DE RECLAMACIONES DE GASTOS ADMINISTRATIVOS

Conforme al artículo 1123(a)(1) del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301(a) de PROMESA, las Reclamaciones de Gastos Administrativos y las Reclamaciones Profesionales no se han clasificado, por lo que quedan excluidas de las Clases de Reclamaciones establecidas en la Sección IV del Plan de la ACT.

3.1 **Reclamaciones de Gastos Administrativos:** en la posterior de (a) la Fecha de Entrada en Vigencia de la ACT y (b) la fecha en que una Reclamación de Gastos Administrativos se torne una Reclamación Permitida, la ACT Reorganizada deberá (i) pagar a cada tenedor de una Reclamación de Gastos Administrativos Permitida, en Efectivo, el monto total de tal Reclamación de Gastos Administrativos o (ii) satisfacer y cumplir tal Reclamación de Gastos Administrativos Concedida conforme a los términos que no sean más favorables para el demandante que lo que se acuerde entre el tenedor de esta y la ACT Reorganizada; disponiéndose, sin embargo, que las Reclamaciones de Gastos Administrativos Permitidas que representan el endeudamiento padecido en el ejercicio habitual a la Fecha de Entrada en Vigencia de la ACT por parte del Deudor deberá ser pagada en su totalidad por parte de la ACT Reorganizada conforme a los términos y sujeto a las condiciones de cualquier acuerdo aplicable, inversión que evidencie u otro documento relacionado a tales transacciones, lo que incluye, sin limitación, todas las obligaciones de la ACT y la ACT Reorganizada con respecto al pago del

43

Préstamo del ELA; y disponiéndose, además, que, con respecto al Préstamo del ELA, el reembolso de este se realizará de conformidad con los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT; y disponiéndose, además, que, si tal gasto de ejercicio normal no se factura o no se realiza una solicitud por escrito para su pago en los ciento cincuenta (150) días posteriores a la Fecha de Entrada en Vigencia de la ACT, tal gasto de ejercicio normal se excluirá y el tenedor de este no tendrá derecho a ni recibirá una distribución conforme al Plan de la ACT.

3.2 **Reclamaciones de Reembolso y Compensación Profesional:** todas las Entidades a las que se haya concedido una compensación, lo que incluye, de manera no taxativa, en la mayor medida prevista en las respectivas cartas de compromiso o en instrumentos o acuerdos similares, o el reembolso de gastos por el Tribunal del Título III, incluidos, sin limitación, expertos que hayan prestado servicios al Deudor durante el Caso de Título III, se abonarán íntegramente, en Efectivo, en los montos permitidos por el Tribunal del Título III (a) tan pronto como sea razonablemente posible después de que se produzca lo posterior de (i) la Fecha de Entrada en Vigencia de la ACT y (ii) la fecha en que se considere que la orden del Tribunal del Título III que concede tales Reclamaciones es una Orden Final, o (b) en otros términos que no sean más favorables para el demandante que los que se establezcan de común acuerdo entre tal demandante y las Partes del Gobierno; disponiéndose, sin embargo, que, salvo lo dispuesto en el presente, cada Profesional, incluidos, sin limitación, expertos que hayan prestado servicios al Deudor durante el Caso de Título III, debe radicar su solicitud de indemnización definitiva de compensación por servicios profesionales prestados y reembolso de gastos a la fecha ciento veinte (120) días después de la Fecha de Entrada en Vigencia de la ACT, o antes de esa fecha. La ACT Reorganizada pagará una compensación por los servicios profesionales prestados y el reembolso de los gastos efectuados después de la Fecha de Entrada en Vigencia en el ejercicio habitual y sin necesidad de la aprobación del Tribunal del Título III.

3.3 **Costos de Perfeccionamiento de la ACT:** sin perjuicio del contenido en el Plan de la ACT en contrario, para compensar a ciertas partes por el costo de negociación, confirmación y perfeccionamiento del Plan de la ACT, cada Acreedor del Acuerdo de Apoyo al Plan de la ACT/ADCC Inicial tendrá derecho a recibir en la Fecha de Entrada en Vigencia de la ACT, o tan pronto como sea posible, pero en ningún caso más tarde de diez (10) Días Hábiles después de la Fecha de Entrada en Vigencia de la ACT, una participación a prorrata en Efectivo, en forma de una Reclamación de Gasto Administrativo Permitida, en un monto igual al uno por ciento (1.00%), truncada a dos puntos decimales, del monto total de las Reclamaciones de Bonos de la ACT 68 del Acreedor del Acuerdo de Apoyo al Plan de la ACT/ADCC Inicial, Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Assured) y Reclamaciones de Bonos de la ACT 98 Principales (National) (aseguradas o no y, con respecto a cada uno de Assured y National, lo que incluye, las posiciones que tiene o ha asegurado), sin duplicación, en poder y/o asegurado por tal Acreedor del Acuerdo de Apoyo al Plan de la ACT/ADCC Inicial a las 5:00 p.m. (EST) del 5 de mayo de 2021, en un monto total no mayor de ciento veinticinco millones de dólares ($125,000,000.00).

44

3.4 **Tasa de Restricción de la ACT:** a cambio de celebrar el Acuerdo de Apoyo al Plan de la ACT/ADCC, y de aceptar todos sus términos y condiciones, incluido el acuerdo de "bloquear" sus bonos de acuerdo con los términos de este, sujeto a la entrada de la Orden de Confirmación de la ACT, cada Acreedor Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC que tenga o asegure Bonos de la ACT 68 o Bonos de la ACT 98 Principales (que incluyen Monolíneas aplicables, en la medida en que dichas Monolíneas estén autorizadas a votar las reclamaciones de Bonos de ACT Asegurados aplicables de acuerdo con el Artículo 301(c)(3) de PROMESA, los documentos de seguro definitivos y la ley aplicable) tendrá derecho a recibir la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT en forma de una reclamación de gastos administrativos permitida, pagadera en efectivo, al momento del perfeccionamiento del Plan de la ACT en un monto igual al porcentaje de la Tasa de Restricción de la ACT multiplicado por el monto total de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured), Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la ACT 98 Principales (National) (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por Monolíneas, únicamente en la medida en que un Acreedor de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC esté autorizado a votar cualquier Reclamación de conformidad con el Artículo 301(c)(3) de PROMESA, los documentos de seguro definitivos y la ley aplicable) en poder o, en el caso de las Monolíneas en poder o aseguradas, por el Acreedor de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC a partir de la expiración del Período de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC; disponiéndose, sin embargo, que cada Acreedor de Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC que adquiera cualquier Bono de la ACT 68 y/o Bono de la ACT 98 Principal después de la Fecha Límite del Litisconsorcio (incluido (i) un titular de un Bono de la ACT asegurados con Monolíneas (excepto un Bono de la ACT asegurado con Monolíneas asegurados por Assured o National, según el caso) en la medida en que dicho Acreedor de Tasa de Restricción de Acuerdo de Apoyo al Plan de la ACT/ADCC esté autorizado a votar la reclamación con respecto a dicho Bono de la ACT asegurado con Monolíneas, conforme al Artículo 301(c)(3) de PROMESA, los documentos de seguro definitivos y la ley aplicable, y (ii) Assured y National, en la medida en que Assured o National, según corresponda, esté autorizado a votar dichas Reclamaciones de Bonos de la ACT Asegurados conforme al Artículo 301(c)(3) de PROMESA, los documentos de seguros definitivos y la ley aplicable) tendrán derecho a recibir tal Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT igual al Porcentaje de Tasa de Restricción de la ACT multiplicado por el monto total de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured), Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la ACT 98 Principales (National) (sin duplicación y, en la medida en que tales reclamaciones estén aseguradas con Monolíneas, únicamente en la medida en que un Acreedor del Acuerdo de Apoyo al Plan de la ACT/ADCC esté autorizado a votar cualquier reclamación conforme al Artículo 301(c)(3) de PROMESA, los

45

documentos de seguro definitivos y la ley aplicable) en poder y/o asegurados de tal Acreedor de Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC a la fecha de que se produzca la Obtención del Umbral de la ACT atribuible a las Reclamaciones de Bonos de la ACT y la entrada de la Orden de Confirmación de la ACT, lo que ocurra primero; y disponiéndose, además, que, si un Acreedor de Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT/ADCC vende cualesquiera Bonos de la ACT 68 o Bonos de la ACT 98 Principales por los que hubiera tenido derecho a recibir la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT, la parte compradora no tendrá derecho a recibir la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT por su cuenta y dicho derecho permanecerá con la parte vendedora; y disponiéndose, además, que, en todas las circunstancias, el monto de la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT total más los Costos de Perfeccionamiento atribuibles a los tenedores de las reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la ACT 98, Reclamaciones de Bonos de la ACT 98 (Assured) o Reclamaciones de Bonos de la ACT 98 Principales (National), según el caso, no excederán de ciento veinticinco millones de dólares ($125,000,000.00); y, disponiéndose, además, en caso de que el Acuerdo de Apoyo al Plan de la ACT/ADCC se rescinda de conformidad con los términos de los Artículos 7.1(b)(iii) o (c) del este (sujeto a la extensión prevista en los Artículos 7.1(b) o (c) de este) o la Junta de Supervisión rescinda el Acuerdo de Apoyo al Plan de la ACT/ADCC por cualquier otra razón que no sea (i) un incumplimiento del Acuerdo de Apoyo al Plan de la ACT/ADCC por parte de una Parte no Gubernamental, (ii) la negación de la confirmación del Plan de la ACT por parte del Tribunal del Título III (o el Tribunal de Título III emite una decisión o declara su posición de que negará la confirmación sin modificación del Plan del ELA o del Plan de la ACT, y tal modificación tendría un efecto adverso material en la capacidad de las Partes para consumar el Plan del ELA o el Plan de la ACT en términos congruentes con el Acuerdo de Apoyo al Plan de la ACT/ADCC, lo que incluye, de forma no taxativa, los términos establecidos en el Resumen de la Transacción adjunto al presente como Anexo «J»), o (iii) la entrada de una orden con respecto a uno o más de los asuntos establecidos en el Artículo 7.1(b)(ii) del Acuerdo de Apoyo al Plan de la ACT/ADCC, la Tasa de Restricción y Costos de Perfeccionamiento totales del Acuerdo de Apoyo al Plan de la ACT, por el monto de veinte millones de dólares ($20,000,000.00) se pagarán, proporcionalmente, en Efectivo, como una reclamación de gastos administrativos conforme al Plan de la ACT a los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales a la fecha de rescisión; y, disponiéndose, además, que, en todas las demás circunstancias, al rescindirse el Acuerdo de Apoyo del Plan de la ACT/ADCC, lo que incluye, sin limitación, la rescisión del Acuerdo de Apoyo del Plan de la ACT/ADCC de acuerdo con otras disposiciones del Artículo 7.1 de este, no se deberá pagar ningún Costo de Perfeccionamiento ni Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT a la parte del Acuerdo de Apoyo al Plan de la ACT/ADCC que rescinda dicho acuerdo o contra la parte en que se rescinda dicho acuerdo.

3.5 **No Independencia**: la asignación y el pago de los Costos de Perfeccionamiento y de las Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT, tal como se establecen en la presente Sección III, compensan a los Acreedores de la Tasas de Restricción de la ACT/ADCC por el valor recibido y constituyen un componente esencial de las conciliaciones y resoluciones

que se enuncian en el presente y no pueden separarse de los demás términos y disposiciones
establecidos en el presente.

## SECCIÓN IV

## CLASIFICACIÓN DE RECLAMACIONES

4.1 **Las reclamaciones se clasifican de la manera siguiente**:

| | | |
|---|---|---|
| (a) | **Clase 1** | Reclamaciones de Bonos de la ACT 68 |
| (b) | **Clase 2** | Reclamaciones de Bonos de la ACT 68 (Ambac) |
| (c) | **Clase 3** | Reclamaciones de Bonos de la ACT 68 (Assured) |
| (d) | **Clase 4** | Reclamaciones de Bonos de la ACT 68 (National) |
| (e) | **Clase 5** | Reclamaciones de Bonos de la ACT 98 Principales |
| (f) | **Clase 6** | Reclamaciones de Bonos de la ACT 98 Principales (Ambac) |
| (g) | **Clase 7** | Reclamaciones de Bonos de la ACT 98 Principales (Assured) |
| (h) | **Clase 8** | Reclamaciones de Bonos de la ACT 98 Principales (FGIC) |
| (i) | **Clase 9** | Reclamaciones de Bonos de la ACT 98 Principales (National) |
| (j) | **Clase 10** | Reclamaciones de Bonos de la ACT 98 Subordinados |
| (k) | **Clase 11** | Reclamaciones de Bonos de la ACT 98 Subordinados (Assured) |
| (l) | **Clase 12** | Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC) |
| (m) | **Clase 13** | Reclamaciones de Bonos de la ACT 98 Subordinados (National) |
| (n) | **Clase 14** | Reclamaciones de Bonos de Moscoso de la ACT |
| (o) | **Clase 15** | Reclamaciones de Expropiación/Expropiación Inversa |
| (p) | **Clase 16** | Reclamaciones sin Garantía Generales de la ACT |
| (q) | **Clase 17** | Reclamaciones de la ACT/BGF |
| (r) | **Clase 18** | Reclamaciones Subordinada al Artículo 510(b) |
| (s) | **Clase 19** | Reclamaciones de Conveniencia |

2" = "1" "125859215v13" ""

# SECCIÓN V

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (CLASE 1)

5.1 **Tratamiento de Reclamaciones de Bonos de la ACT 68:** en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 68 Permitida de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 68 de tal tenedor.

# SECCIÓN VI

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (AMBAC) (CLASE 2)

6.1 **Tratamiento de Reclamaciones de Bonos de la ACT 68 (Ambac):** sujeto a los términos y disposiciones del Artículo 25.4 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida (Ambac) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 68 Permitida (Ambac) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 68 de tal tenedor.

# SECCIÓN VII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (ASSURED) (CLASE 3)

7.1 **Tratamiento de Reclamaciones de Bonos de la ACT 68 (Assured):** sujeto a los términos y disposiciones del Artículo 25.1 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida (Assured) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 68 Permitida (Assured) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 68 de tal tenedor.

# SECCIÓN VIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 68 (NATIONAL) (CLASE 4)

8.1 **Tratamiento de Reclamaciones de Bonos de la ACT 68 (National):** sujeto a los términos y disposiciones del Artículo 25.2 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida (National) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 68 Permitida (National) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 68 de tal tenedor.

48

## SECCIÓN IX

### DISPOSICIONES PARA EL TRATAMIENTO DE
### RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (CLASE 5)

9.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales:** en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de Reclamaciones de Bonos de la ACT 98 Principales Permitida tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Principales Permitida de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 de tal tenedor.

## SECCIÓN X

### DISPOSICIONES PARA EL TRATAMIENTO DE
### RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (AMBAC) (CLASE 6)

10.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (Ambac):** sujeto a los términos y disposiciones del Artículo 25.4 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Principales de tal tenedor.

## SECCIÓN XI

### DISPOSICIONES PARA EL TRATAMIENTO DE
### RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (ASSURED) (CLASE 7)

11.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (Assured):** sujeto a los términos y disposiciones del Artículo 25.1 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Assured) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Principales Permitida (Assured) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Principales de tal tenedor.

## SECCIÓN XII

### DISPOSICIONES PARA EL TRATAMIENTO DE
### RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (FGIC) (CLASE 8)

12.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (FGIC):** sujeto a los términos y disposiciones del Artículo 25.3 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (FGIC) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e

49

intercambio de la Reclamación de Bonos de la ACT 98 Principales Permitida (FGIC) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Principales de tal tenedor.

## SECCIÓN XIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 PRINCIPALES (NATIONAL) (CLASE 9)

13.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (National):** sujeto a los términos y disposiciones del Artículo 25.2 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (National) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Principales Permitida (National) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Principales de tal tenedor.

## SECCIÓN XIV

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (CLASE 10)

14.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados:** en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Subordinados Permitida tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Subordinados Permitida de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Subordinados de tal tenedor.

## SECCIÓN XV

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (ASSURED) (CLASE 11)

15.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados (Assured):** sujeto a los términos y disposiciones del Artículo 25.1 del presente, en la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Subordinados Permitida (Assured) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Subordinados Permitida (Assured) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Subordinados de tal tenedor.

**SECCIÓN XVI**

**DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (FGIC) (CLASE 12)**

16.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados (FGIC):**
sujeto a los términos y disposiciones del Artículo 25.3 del presente, en la Fecha de Entrada en
Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Subordinados
Permitida (FGIC) tendrá derecho a recibir en plena contraprestación, satisfacción, liberación e
intercambio de la Reclamación de Bonos de la ACT 98 Subordinados Permitida (FGIC) de tal
tenedor, la Participación a Prorrata de la Recuperación de Bonos de la ACT 98 Subordinados de
tal tenedor.

**SECCIÓN XVII**

**DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE BONOS DE LA ACT 98 SUBORDINADOS (NATIONAL)
(CLASE 13)**

17.1 **Tratamiento de Reclamaciones de Bonos de la ACT 98 Subordinados
(National):** sujeto a los términos y disposiciones del Artículo 25.2 del presente, en la Fecha de
Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98
Subordinados Permitida (National) tendrá derecho a recibir (a) en plena contraprestación,
satisfacción, liberación e intercambio de la Reclamación de Bonos de la ACT 98 Subordinados
Permitida (National) de tal tenedor, la Participación a Prorrata de la Recuperación de Bonos de la
ACT 98 Subordinados de tal tenedor, y (b) liberar cualquier interés o Gravamen sobre la Cuenta
del SIB.

**SECCIÓN XVIII**

**DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE BONOS DE MOSCOSO DE LA ACT (CLASE 14)**

18.1 **Tratamiento de Reclamaciones de Bonos de Mocoso de la ACT:** en la Fecha de
Entrada en Vigencia de la ACT, se considerará que las Reclamaciones de Bonos de Moscoso de
la ACT Permitidas no se ven afectadas, lo que incluye, sin limitación, la subsanación de todos
los incumplimientos monetarios, si los hubiere, con respecto a estas y, en la Fecha de Entrada en
Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de Moscoso de la ACT
Permitida, en contraprestación, satisfacción, liberación e intercambio total de dicha Reclamación
de Bonos de Moscoso de la ACT Permitida, tendrá derecho a recibir pagos de capital e intereses
de acuerdo con los términos y condiciones de los Bonos de Moscoso de la ACT.

51

## SECCIÓN XIX

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES EXPROPIACIÓN/EXPROPIACIÓN INVERSA (CLASE 15)

19.1 **Tratamiento de Reclamaciones de Expropiación/Expropiación Inversa**: a partir de la Fecha de Entrada en Vigencia de la ACT, (a) en la medida en que no se haya modificado antes de esta, la paralización automática existente conforme al artículo 362 del Código de Quiebras se considerará modificada para permitirle al tenedor de una Reclamación de Expropiación/Expropiación Inversa (i) liquidar dicha Reclamación de Expropiación/Expropiación Inversa en el Procedimiento de Expropiación del tenedor y (ii) hacer que el Actuario del Tribunal de Primera Instancia distribuya a dicho tenedor el monto de dinero depositado en el Tribunal de Primera Instancia con respecto a la propiedad expropiada, y (b) sujeto a la entrada de la Orden de Confirmación de la ACT o a las Conclusiones de Hechos y Conclusiones de Ley con respecto al Plan de la ACT que proporciona que tales reclamaciones deben ser pagadas en su totalidad en la medida en que sean Reclamaciones Permitidas por una compensación justa, cuando cada orden se convierta en una Orden Final, y cuando se produzca otra Orden Final que determine la validez y el monto de la compensación justa atribuible a una Reclamación de Expropiación/Expropiación Inversa, el tenedor de una Reclamación de Expropiación/Expropiación Inversa Permitida tendrá derecho a recibir, en contraprestación, satisfacción, liberación, e intercambio total del saldo impagado de tal tenedor de su Reclamación de Expropiación/Expropiación Inversa Permitida, en Efectivo, cien por ciento (100%) de dicho saldo impago; disponiéndose, sin embargo, que, en caso de que la apelación de la Junta de Supervisión de la Orden de Confirmación del ELA y las Conclusiones de Hechos y las Conclusiones de Ley formuladas con respecto a esta en relación con las Reclamaciones de Expropiación/Expropiación Inversa Permitidas contra el ELA no descargables tenga éxito y esa Orden de Confirmación del ELA se invierta en tal medida, el tenedor de dicho saldo impago de Reclamaciones de Expropiación/Expropiación Inversa Permitidas tendrá derecho a recibir, en contraprestación, satisfacción, liberación e intercambio total de estas, pagos de la ACT iguales a, y en el mismo plazo que, los pagos a ser realizados a los tenedores de Reclamaciones sin Garantía Generales de la ACT Permitidas conforme a los términos y disposiciones de los Artículos 20.1, 20.2 y 20.3 del presente.

## SECCIÓN XX

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES SIN GARANTÍA GENERALES DE LA ACT (CLASE 16)

20.1 **Tratamiento de Reclamaciones sin Garantía Generales de la ACT:**

(a) Tratamiento de Reclamaciones sin Garantía Generales de la ACT. Sujeto a la elección establecido en el Artículo 20.1(b) del presente, en la Fecha de Entrada en Vigencia de la ACT; cada tenedor de una Reclamación de Bonos sin Garantía Generales de la ACT Permitida tendrá derecho a recibir, en plena consideración, satisfacción, liberación e intercambio de la Reclamación de Bonos sin Garantía Generales de la ACT Permitida de tal tenedor, la

52

Participación a Prorrata de tal tenedor de la Recuperación de GUC de la ACT hasta el Tope de Recuperación de GUC.

(b)   <u>Elección a tratarse como una Reclamación de Conveniencia</u>. Sin perjuicio de las disposiciones del Artículo 20.1(a) del Plan de la ACT, todo tenedor de una Reclamación sin Garantía General de la ACT Permitida, que no sea Reclamación sin Garantía General de la ACT que sea un componente de una Reclamación sin Garantía General mayor, cuyas partes puedan estar en poder de dicho tenedor o de cualquier otro tenedor de una Reclamación Permitida, cuya Reclamación sin Garantía General de la ACT Permitida sea superior a veinte mil dólares ($ 20,000.00), y que opte por reducir el monto de esa Reclamación sin Garantía General de la ACT Permitida a veinte mil dólares ($ 20,000.00) y (ii) múltiples Reclamaciones sin Garantía Generales de la ACT Permitidas que sean superiores a cuarenta mil dólares ($40,000.00) en total y que elija reducir el monto total de tales Reclamaciones sin Garantía Generales de la ACT Permitidas a cuarenta mil dólares ($ 40.000.00), a elección de ese titular, tendrá derecho a recibir, sobre la base de tal Reclamación sin Garantía General de la ACT Permitida en su forma reducida, distribuciones conforma al Artículo 23.1 del presente. Esa elección debe realizarse por Papeleta y ser recibida por la Junta de Supervisión en o antes de la Fecha de Votación. Toda elección realizada después de la Fecha de Votación no será vinculante para la ACT, a menos que la Junta de Supervisión renuncie expresamente, por escrito, a la Fecha de Votación; <u>disponiéndose, sin embargo</u>, que bajo ninguna circunstancia la Junta de Supervisión pueda renunciar a ella en la Fecha de Entrada en Vigencia de la ACT o después de esta.

20.2 **Limitación de Recuperación:** Sin perjuicio de todo lo contenido en el presente en contrario, en el caso de que las distribuciones con respecto a las Reclamaciones sin Garantía Generales la ACT Permitidas de la Recuperación de GUC de la ACT igualen el Tope de Recuperación de GUC, sin consideración de ninguna recuperación neta por parte de la Fideicomiso de Acciones a Anulación con respecto a las Acciones a Anulación, cualquier fondo que quede en la Reserva de GUC después de la consecución del Tope de Recuperación de GUC y las distribuciones realizadas o reservadas a cuenta del este se devolverá a la ACT con fines generales.

20.3 **Reserva de GUC:** la Reserva de GUC será financiada de la siguiente manera: (a) veinticuatro millones de dólares ($24,000,000.00) en la Fecha de Entrada en Vigencia de la ACT; y (b) veinticuatro millones de dólares ($24,000,000.00) en el primer (1.$^{er}$) aniversario de la Fecha de Entrada en Vigencia de la ACT; <u>disponiéndose, sin embargo</u>, que se considere que los montos necesarios para satisfacer las Reclamaciones de Conveniencia Permitidas satisfacen una parte del monto que se depositará en la Reserva de GUC y se financie directamente al Agente Pagador y no a la Reserva de GUC; y, <u>disponiéndose, además</u>, que, de conformidad con las disposiciones del Artículo 20.2 del presente documento, en el caso de que las recuperaciones a cuenta de las Reclamaciones no Reclamadas de la ACT Generales Permitidas de la Recuperación de GUC igualen el Tope de Recuperación de GUC, (y) cualquier fondo (que no sea cualquier recuperación por parte del Fideicomiso de Acciones a Anulación con respecto a las Acciones a Anulación) que permanezca en la Reserva de GUC después de la consecución del Tope de Recuperación de GUC y las distribuciones realizadas o reservadas a causa de las estas se volcaran a la ACT para fines generales, o (z) en la medida en que dicho Tope de Recuperación

de GUC se alcance antes de una obligación de financiación futura, la ACT se liberará de dicha obligación de financiación futura.

## SECCIÓN XXI

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE LA ACT/BGF (CLASE 17)

21.1 **Tratamiento de Reclamaciones de la ACT/BGF:** conforme a los términos y disposiciones de la Estipulación de DRA, las Reclamaciones de la ACT/BGF permitidas no recibirán una distribución conforme al Plan de la ACT y se considerará que cada titular de una Reclamación de la ACT/BGF Permitida ha aceptado el Plan de la ACT.

## SECCIÓN XXII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES SUBORDINADAS DEL ARTÍCULO 510(b) (CLASE 18)

22.1 **Tratamiento de Reclamaciones Subordinadas del Artículo 510(b):** las Reclamaciones Subordinadas del Artículo 510(b) no recibirán una distribución conforme al Plan de la ACT y se considerará que cada tenedor de una Reclamación Subordinada del Artículo 510(b) Permitida ha rechazado el Plan de la ACT con respecto a tal Reclamación Subordinada del Artículo 510(b).

## SECCIÓN XXIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE CONVENIENCIA (CLASE 19)

23.1 **Tratamiento de Reclamaciones de Conveniencia:** a más tardar en la Fecha de Entrada en Vigencia de la ACT y en la fecha en que dicha Reclamación de Conveniencia Permitida pase a ser una Reclamación Permitida, o tan pronto como sea factible después de esto, el Agente Pagador pagará a cada tenedor de una Reclamación de Conveniencia Permitida, en Efectivo, la cantidad total de dicha Reclamación de Conveniencia Permitida, en plena satisfacción, resolución, liberación y extinción, y a cambio de dicha Reclamación de Conveniencia Permitida.

## SECCIÓN XXIV

## DISPOSICIONES RELATIVAS A OBLIGACIONES GARANTIZADAS Y ENDEUDAMIENTO ADICIONAL

24.1 **Emisión y Distribución de los Nuevos Bonos de la ACT:** en la Fecha Entrada en Vigencia de la ACT, la ACT Reorganizada emitirá las Obligaciones Garantizadas, en denominaciones mínimas de un dólar ($1.00) e incrementos de un dólar ($1.00) a partir de entonces, que consisten en Nuevos CIB de la ACT, Nuevos CAB de la ACT, Nuevos CAB

54

Convertibles de la ACT, y Adeudamiento Subordinado, tal como se describe más particularmente en el presente y en el Contrato de Emisión de Nuevos Bonos de la ACT. Los vencimientos, tasas de interés y programas de amortización para las Obligaciones Garantizadas se adjuntan como Anexos «D» y «E». Toda la amortización de la deuda en las Obligaciones Garantizadas que no se pague en el momento de su vencimiento, ya sea al vencimiento final previsto o antes de su vencimiento final, permanecerá pendiente hasta que se haya pagado íntegramente y se abonará. Se devengarán intereses por la amortización de la deuda atrasada a tipo de interés ordinario (tasa de acumulación para CAB), calculado semestralmente, hasta que se paguen o satisfagan íntegramente las Obligaciones Garantizadas correspondientes conforme a sus términos. El interés sobre las Obligaciones Garantizadas se calculará sobre una base de 30/360. En la medida en que las Partes del Gobierno, cada una actuando a su criterio exclusivo y absoluto, determinen solicitar las calificaciones de los Nuevos Bonos de la ACT, las Partes del Gobierno utilizarán sus mejores esfuerzos comercialmente razonables para obtener las calificaciones de los Nuevos Bonos de la ACT, incluida la pronta respuesta de buena fe a solicitudes documentales u otras solicitudes, tan pronto como sea razonablemente posible, según lo determinado exclusivamente por las Partes del Gobierno. Una vez que las Partes del Gobierno determinen a qué agencias de calificación han de solicitar calificaciones, las Partes del Gobierno realizarán sus esfuerzos comercialmente razonables para obtener las mejores calificaciones posibles. Sin perjuicio de lo dispuesto en el Plan en sentido contrario, en la medida en que se expidan Nuevos Bonos de la ACT imponibles, tales Nuevos Bonos de la ACT se distribuirán como participación a prorrata a receptores de Nuevos Bonos de la ACT.

(a) **Nuevos CIB de la ACT:** sin perjuicio a cualquier ajuste previsto en el presente, los Nuevos CIB de la ACT tendrán el capital original, tipo de interés, la fecha de vencimiento y la condición imponible que se indica a continuación: seiscientos millones de dólares ($600,000,000.00), cinco por ciento (5.0%), 1 de julio de 2062, y exento de impuestos. Los nuevos CIB de la ACT no implicarán ninguna tasa de interés por incumplimiento; disponiéndose, sin embargo, ese interés continúe acumulándose en toda amortización de la deuda atrasada, a la tasa de acumulación regular, calculado semestralmente, hasta que sea pagado o satisfecho en su totalidad de acuerdo con sus términos.

(b) **Nuevos CAB de la ACT:** sin perjuicio a cualquier ajuste previsto en el presente, los Nuevos CAB de la ACT tendrán el capital original, rendimiento de la acumulación, la fecha de vencimiento y la condición imponible que se indica a continuación: doscientos treinta y siete millones novecientos cincuenta y cinco mil ochocientos sesenta y ocho dólares y trece centavos ($237,955,868.13), cinco por ciento (5.0%), 1 de julio de 2032, y exentos de impuestos. Los nuevos CAB de la ACT no implicarán ninguna tasa de interés por incumplimiento; disponiéndose, sin embargo, ese interés continúe acumulándose en toda amortización de la deuda atrasada, a la tasa de acumulación regular, calculado semestralmente, hasta que sea pagado o satisfecho en su totalidad de acuerdo con sus términos.

(c) **Nuevos CAB convertibles de la ACT:** sin perjuicio a cualquier ajuste previsto en el presente, los Nuevos CAB Convertibles de la ACT tendrán el capital original, rendimiento de la acumulación, la fecha de vencimiento y la condición imponible que se indica a continuación: cuatrocientos siete millones cuarenta y cuatro mil quinientos noventa y siete

55

dólares y cincuenta y siete centavos ($407,044,597.57), cinco por ciento (5.0%), 1 de julio de 2053, una fecha de conversión del 1 de julio de 2032, y exentos de impuestos. Los nuevos CAB Convertibles de la ACT no implicarán ninguna tasa de interés por incumplimiento; disponiéndose, sin embargo, ese interés continúe acumulándose en toda amortización de la deuda atrasada, a la tasa de acumulación regular, calculado semestralmente, hasta que sea pagado o satisfecho en su totalidad de acuerdo con sus términos.

(d)    **Endeudamiento Subordinado:** sujeto a los ajustes proporcionados en el presente, el Endeudamiento Subordinado tendrá el capital original, el tipo de interés y la fecha de vencimiento de la siguiente manera: el capital principal pendiente del Préstamo del ELA a partir de la Fecha de Entrada en Vigencia de la ACT, más todos los intereses devengados e impagos sobre el Préstamo del ELA a partir de la Fecha de Entrada en Vigencia de la ACT, dos y medio por ciento (2,5%), y 1 de julio de 2052.

(e)    **Fecha de Emisión Estimada:** sin perjuicio de cuando sea la Fecha de Entrada en Vigencia de la ACT, el interés sobre los Nuevos Bonos de OG comenzará a devengarse o acumularse, según corresponda, el 1 de julio de 2022 y (ii) la Fecha de Entrada en Vigencia de la ACT, lo que ocurra primero, fecha que se designará como la fecha «a partir de la cual se calcula el interés» de los Nuevos Bonos de la ACT.

(f)    **Disposiciones de Redención/Amortización Voluntaria:** los Nuevos Bonos de la ACT serán redimibles, total o parcialmente, en cualquier orden de vencimiento, a su valor nominal más los intereses devengados sobre este, con notificación por escrito con treinta (30) días de anticipación, según se indica a continuación:

**Nuevos CIB de la ACT:**

2062 CIBS: redimibles a su valor nominal en y después del 7/1/32

**Nuevos CAB de la ACT:**

2032 CABS: no redimibles

**Nuevos CAB convertibles de la ACT:**

2053 CCABS: redimibles a su valor nominal en y después del 1/1/33

(g)    **Disposiciones de Redención extraordinaria:** sin perjuicio de los términos y disposiciones del Artículo 24.1(d) del presente, a partir de la Fecha de Entrada en Vigencia de la ACT y hasta que los Nuevos Bonos de la ACT se hayan satisfecho en su totalidad de acuerdo con sus términos, (i) tras una disposición completa de las Instalaciones de Peaje, el Fideicomisario de Nuevos Bonos de la ACT deberá amortizar los Nuevos Bonos de la ACT, a su valor nominal, más el interés acumulado en estos, y (ii) tras una Disposición Parcial, el Fideicomisario de Nuevos Bonos de la ACT deberá amortizar, a su valor nominal, más interés acumulado en estos, la parte asignable de Nuevos Bonos de la ACT relacionados con las Instalaciones de Peaje sujeto a dicha Disposición Parcial; disponiéndose, sin embargo, que, en el

56

caso de que tal amortización sea solamente para una parte de los Nuevos Bonos de la ACT, tal amortización se hará de una manera para preservar el estatus prevaleciente exento de impuestos de los Nuevos Bonos de la ACT. La ACT Reorganizada no ingresará una Disposición Parcial a menos que se emita al Fideicomisario de Nuevos Bonos de la ACT un certificado de la ACT Reorganizada, y aprobado por el consultor de tráfico, un certificado que establezca (i) el monto de Ingresos Netos, como se define en el Contrato de Emisión de Nuevos Bonos de la ACT, que se habría recolectado en el último año fiscal completado si dicha Disposición Parcial se hubiera producido antes del primer día de dicho año fiscal, (ii) la amortización de la deuda anual máxima en las Obligaciones Garantizadas que permanecerán pendientes después de que dicho acuerdo entre en vigencia de acuerdo con sus términos, y (iii) los porcentajes derivados al dividir el importe de la cláusula (i) anterior entre los importes indicados en la cláusula (ii) anterior, cuyo porcentaje no será inferior al ciento veinte por ciento (120%).

(h)     **Pignoración de Bienes del Fideicomiso:** a partir de la Fecha de Entrada en Vigencia de la ACT, hasta que las obligaciones garantizadas hayan sido pagadas o satisfechas en su totalidad de acuerdo con sus términos, el Fideicomisario de Nuevos Bonos de la ACT, en nombre de los tenedores de Obligaciones Garantizadas, tendrá un gravamen de primer rango válido y perfeccionado sobre la garantía prendaria de primer rango en los Bienes del Fideicomiso, sujeto únicamente a (i) los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT por el que se establece el Fondo de Gastos de la Autoridad y el Fondo de Garantía Arbitral, y (ii) el gravamen principal y la garantía prendaria principal concedidos sobre los Bienes del Fideicomiso en beneficio de los tenedores de Nuevos Bonos de la ACT, que en todos los aspectos será principal y superior con respecto al gravamen subordinado y a la garantía prendaria subordinada concedidos sobre los Bienes del Fideicomiso en beneficio de los tenedores de Endeudamiento Subordinado.

(i)     **Depósitos Mensuales de Recibos de Peaje:** en el primer (1.er) Día Hábil de cada mes calendario, el Fideicomisario de Nuevos Bonos de la ACT retirará los Recibos de Peajes del Fondo de Recibos de Peajes y los transferirá y aplicará de acuerdo con los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT. Sin limitar de modo alguno lo anterior, en la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada depositará en el Fondo de Recibo de Peaje los montos adicionales que sean necesarios para compensar los Nuevos Bonos de la ACT emitidos a la Fecha de Emisión Estimada.

(j)     **Pactos Adicionales para Nuevos Bonos de la ACT:** en la Fecha de Entrada en Vigencia de la ACT, el Contrato de Emisión de Nuevos Bonos de la ACT contendrá términos, condiciones y convenios consuetudinarios para bonos estructurados y respaldados de forma similar, y dichas condiciones y convenios se considerarán incorporados en el presente como si se establecieran en su totalidad.

(k)     **Derechos de Aceleración:** los Nuevos Bonos de la ACT no tendrán derechos de aceleración.

(l)     **Pacto de no Afectación:** de conformidad con el Contrato de Emisión de Nuevos Bonos de la ACT, y/o la Orden de Confirmación de la ACT, la ACT Reorganizada

57

convendrá, se comprometerá y acordará, para el beneficio de todos los tenedores iniciales y subsiguientes de Nuevos Bonos de la ACT, (i) hacer cumplir el pacto del ELA establecido en el artículo 2019 de la Ley para Crear la ACT de que el ELA no limitará ni restringirá los derechos o el poder conferidos a la ACT o a la ACT Reorganizada, según sea el caso, en virtud de la Ley para Crear la ACT hasta que todos los Nuevos Bonos de la ACT, junto con todos los intereses de estos, se satisfagan y se descarguen plenamente y (ii) no realizará ninguna acción que (A) afecte el gravamen de primer rango y la garantía prendaria de primer rango sobre los Bienes del Fideicomiso, (B) afecte los intereses de garantía prendaria principal y gravamen principal sobre los Bienes del Fideicomiso concedido a los tenedores de nuevos Bonos de la ACT, que en todos los aspectos será principal y superior al gravamen subordinado y a la garantía prendaria subordinada sobre los Bienes del Fideicomiso otorgado a los tenedores de Endeudamiento Subordinado pendiente, (C) afecte o prevenga los depósitos mensuales de Recibos de Peajes como se establece en la subsección (i) del presente Artículo 24.1, (D) no limitará ni alterará los derechos conferidos a la ACT Reorganizada de acuerdo con el Plan de la ACT y la Orden de Confirmación de la ACT para cumplir los términos de cualquier acuerdo con los tenedores de los Nuevos Bonos de la ACT o, (E) afecte los derechos y recursos del Fideicomisario de Nuevos Bonos de la ACT conforme al Contrato de Emisión de Nuevos Bonos de la ACT, lo que incluye, sin limitación, los incumplimientos y recursos conforme a este.

(m)   **Perfección Automática de Gravamen en Bienes del Fideicomiso**: el gravamen de primer rango sobre los Bienes del Fideicomiso establecido de conformidad con el Contrato de Emisión de Nuevos Bonos de la ACT se considerará automáticamente perfeccionado a partir de la Fecha de Entrada en Vigencia de la ACT.

(n)   **Derecho Directo de Acción**: conforme al Contrato de Emisión de Nuevos Bonos de la ACT, y sujeto a los derechos adicionales que se estipulan en este, el Fideicomisario de los Nuevos Bonos de e la ACT tendrá derecho directo de acción para hacer cumplir los términos del Contrato de Emisión de Nuevos Bonos de la ACT, lo que incluye, de manera no taxativa, con respecto a la financiación de depósitos realizados de conformidad con este y que busquen el cumplimiento específico y otros recursos disponibles para cualquier incumplimiento de los pactos del Contrato de Emisión de Nuevos Bonos de la ACT.

(o)   **Planes Fiscales de la ACT**: los Planes Fiscales de la ACT certificados en o después de la Fecha de Entrada en Vigencia de la ACT deberán proporcionar las medidas necesarias para cumplir con las obligaciones contempladas conforme a este Plan de la ACT, los Nuevos Bonos de la ACT y el Contrato de Emisión de Nuevos Bonos de la ACT.

(p)   **Sello o leyenda**: los Nuevos Bonos de la ACT llevarán un sello o leyenda similar que indique que el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico ha determinado que tales Nuevos Bonos de la ACT son válidos, legalmente vinculantes y exigibles conforme a la Orden de Confirmación de la ACT.

(q)   **Conservación de Jurisdicción**: el Tribunal del Título III conservará la jurisdicción para hacer cumplir el Plan de la ACT, los Nuevos Bonos de la ACT, y el Nuevo Contrato de Emisión de Bonos de la ACT, lo que incluye, sin limitación, el Convenio de Tarifas

58

de Peaje o, en el caso de que el Tribunal de Título III rechace tal conservación de jurisdicción o el Caso de Título III de la ACT haya sido cerrado de acuerdo con los términos y disposiciones de PROMESA, se designa al Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico para hacer cumplir este Plan de la ACT, los Nuevos Bonos de la ACT y el Contrato de Emisión de Nuevos Bonos de la ACT, lo que incluye, sin limitación, el Convenio de Tarifas de Peaje.

(r) **Legislación Aplicable:** el Contrato de Emisión de Nuevos Bonos de la ACT y los Nuevos Bonos de la ACT emitidos conforme a este se regirán por las leyes del Estado de Nueva York, sin dar efecto a principios de conflictos de ley; disponiéndose, sin embargo, que, a pesar de la aplicación de las leyes del Estado de Nueva York para regir el Contrato de Emisión de Nuevos Bonos de la ACT y los Nuevos Bonos de la ACT, la autorización relativa a la emisión de los Nuevos Bonos de la ACT está prevista por las leyes del Estado Libre Asociado.

24.2 **Tratamiento Exento de Impuestos de los Nuevos Bonos de la ACT:** en el caso de que las Partes del Gobierno obtengan una determinación del SII o una opinión del Asesor Jurídico de Bonos del Artículo 103 (colectivamente, una «Determinación») de que todos los Nuevos Bonos de la ACT que se emitirán en la Fecha de Entrada en Vigencia de la ACT están exentos de impuestos, los tenedores de cualquier Reclamación que reciban Nuevos Bonos de la ACT de conformidad con el Plan de la ACT recibirán el beneficio de tal determinación en la forma de Nuevos Bonos de la ACT exentos de impuestos emitidos de conformidad con el Plan de la ACT con cupones para todos los vencimientos iguales a los cupones de los Nuevos Bonos de la ACT exentos de impuestos establecidos en el Anexo «D» del presente; disponiéndose, sin embargo, que, en caso de que la determinación se obtenga con posterioridad a la Fecha de Entrada en Vigencia de la ACT, se invitará a los tenedores de los Nuevos Bonos de la ACT imponibles afectados por dicha determinación (los «Bonos Invitados») a intercambiar dichos bonos por bonos convertidos (La «Oferta de Intercambio») y, sujeto a la aplicación de todos los gastos razonables incurridos por las Partes del Gobierno en relación con dicha Oferta de Intercambio, la tasa de interés de los bonos convertidos será la mismo que el interés de los Bonos Invitados del mismo tipo, tasa de interés, serie y vencimiento; y disponiéndose, además, que dichos bonos convertidos vayan acompañados de la opinión favorable del Asesor Jurídico de Bonos del Artículo 103 de que el interés, distinto de los intereses devengados antes de la emisión, sobre dichos bonos convertidos, y sobre los Bonos Invitados intercambiados por dichos bonos convertidos a partir de la fecha original de entrega de dichos Bonos Invitados intercambiados de este modo, se excluye, en opinión de dicho asesor jurídico, de los ingresos brutos para fines del impuesto federal sobre la renta y de los impuestos sobre la renta de los Estados Unidos, el estado, el ELA y locales; y, disponiéndose, además, que, en el caso de que no se obtenga ninguna de las determinaciones anteriores, los pactos para buscar tales determinaciones se rescindirán (1) el 15 de junio de 2022, (2) tras la notificación del SII al ELA de que el SII no puede emitir una carta en respuesta a consulta favorable, contrato de cierre u otro tipo de determinación del SII con respecto a los asuntos abordados en la presente subsección, y (3) la modificación del Contrato de Emisión de Nuevos Bonos de la ACT después de recibir una determinación favorable y perfeccionamiento de una Oferta de Intercambio, lo que ocurra primero.

24.3 **Adopción y mantenimiento de una Política de Gestión de la Deuda:** durante el Período de Política de la Deuda, la ACT Reorganizada mantendrá y cumplirá una Política de Gestión de la Deuda diseñada para asegurar que no se repitan ciertas prácticas pasadas de emisión de Deuda de la ACT. Si bien la ACT Reorganizada puede revisar y actualizar su Política de Gestión de la Deuda para reflejar la evolución de las condiciones y normas del mercado de bonos, la Política de Gestión de la Deuda, a menos que la Junta de Supervisión apruebe otra cosa por escrito, incluirá en todo momento los siguientes principios y limitaciones:

(a) **Préstamo a largo plazo solo para Mejoras Capitales:** para asegurar que la ACT Reorganizada logre y mantenga un presupuesto estructuralmente equilibrado que sea compatible con el requisito de PROMESA de que Puerto Rico vuelva a asumir responsabilidad fiscal, la Deuda emitida por la ACT después de la Fecha de Entrada en Vigencia la ACT solamente podrá incurrirse para financiar Mejoras Capitales, según lo determine la ACT y de los lo apruebe la AAFAF y, en la medida que no se haya rescindido, la Junta de Supervisión, o para refinanciar Deuda conforme a los términos y disposiciones del Artículo 24.3(d) del presente. Los ingresos derivados de tal emisión de este tipo podrán utilizarse para cubrir todos los gastos directos e indirectos que, a criterio razonable de la ACT, sean necesarios para llevar a cabo dichas Mejoras Capitales, lo que incluye, de manera no taxativa, todo gasto incurrido en relación con la misma emisión.

(b) **Limitación de Vencimiento de 30 años en todos los Prestamos:** ninguna Deuda emitida por la ACT después de la Fecha de Entrada en Vigencia de la ACT puede tener un vencimiento legal final después de treinta (30) años a partir de la fecha de su emisión original, y ninguna Deuda puede ser refinanciada por ninguna Deuda que extienda dicha fecha de vencimiento final legal más allá de tal límite original de fecha de vencimiento de treinta (30) años; disponiéndose, sin embargo, que lo anterior no se aplique a la Deuda emitida para refinanciar Nuevos Bonos de la ACT.

(c) **Amortización de Principal Requerida:** ninguna deuda emitida desde y después de la Fecha de Entrada en Vigencia de la ACT puede ser emitida a menos que su capital comience a amortizarse dentro de dos (2) años a partir de la fecha de puesta en servicio del proyecto que se está financiando, y se continúa amortizando en cada año hasta que dicha deuda ya no esté pendiente.

(d) **Refinanciamiento Permitido únicamente para los Ahorros de Flujo de Activos en cada Año Fiscal:** el refinanciamiento de la Deuda solo se permite si (i) no se incrementa el monto del capital e intereses del bono pagaderos en cualquier año fiscal y (ii) la refinanciación produce ahorros de valor actual positivos después de tener en cuenta los gastos de transacción en los niveles especificados por la ACT Reorganizada en su Política de Gestión de la Deuda; disponiéndose, sin embargo, que las refinanciaciones sin ahorros de flujo de activos en cada año fiscal estén permitidas si la refinanciación se completa en respuesta directa a un huracán, terremoto, pandemia, terrorismo u otro desastre natural y emergencias similares y la amortización de la deuda debido en cualquier año fiscal futuro no aumenta en más del diez por ciento (10%) y la financiación se requiere en sus términos que se reembolse en su totalidad en un plazo de diez (10) años.

(e)      **Amortización de la Deuda del Plan Fiscal:** cualquier Plan Fiscal posterior a la Fecha de Entrada en Vigencia de la ACT incluirá disposiciones para el pago, en cada año fiscal, de capital e interés (y/o valor acumulado, según corresponda) con respecto a las Obligaciones Garantizadas, lo que incluye, sin limitación, los pagos de fondos de amortización debidos en tal año fiscal.

Sin perjuicio de lo anterior, nada de lo dispuesto en el presente prohibirá a la ACT Reorganizada adoptar, mantener y cumplir una Política de Gestión de la Deuda que sea más restrictiva que los requisitos establecidos anteriormente. La Política de Gestión de la Deuda se sumará a cualquier otra limitación impuesta por ley y nada de lo contenido en el presente se interpretará como que sustituye, modifica o deroga cualquier restricción adicional impuesta por la Constitución del ELA.

## SECCIÓN XXV

### DISPOSICIONES CON RESPECTO A LOS BONOS ASEGURADOS DE ASSURED, LOS BONOS ASEGURADOS DE NATIONAL, LOS BONOS ASEGURADOS DE AMBAC Y LOS BONOS ASEGURADOS DE FGIC

25.1 **Tratamiento de Reclamaciones de Bonos Asegurados de Assured:** en el caso de que Clases 3, 7 y 11 voten para aceptar el Plan de la ACT conforme a las disposiciones del Artículo 1126 del Código de Quiebras y todas las Pólizas de seguros de Assured y los acuerdos relacionados con los Bonos Asegurados por Assured estén en plena vigencia o efecto, o hayan sido realizados completamente de otro modo por Assured, sin pagos pendientes por Assured con respecto a dichos Bonos Asegurados por Assured hasta la Fecha de Entrada en Vigencia de la ACT inclusive, entonces, sin perjuicio de cualquier otra disposición del Plan de la ACT, los tenedores de Reclamaciones de Bonos Asegurados de Assured recibirán los siguientes tratamientos, que serán seleccionados por Assured a su total y absoluto criterio antes del comienzo de la Vista de Declaración de Divulgación y tal como se establece en la Notificación de Elección de Assured o en el Formulario de Elecciones de Tenedores de Bonos de Assured, según corresponda:

(a)      **Elección de Assured:** con respecto a los Bonos Asegurados de Assured identificados en el Anexo «A» a la Notificación de Elección de Assured, sujeto a los derechos del Agente Fiscal de la ACT, Assured recibirá la Contraprestación del Plan de Assured asignable a los tenedores de dichos Bonos Asegurados de Assured, y tales Bonos Asegurados de Assured seleccionados por Assured serán pagados por Assured, en su totalidad, en la Fecha de Entrada en Vigencia de la ACT, a un Precio de Aceleración de Assured igual al capital pendiente de dichos Bonos Asegurados de Assured más los intereses devengados e impagos (o, en el caso de cualquier bono de apreciación del capital, el importe calculado de estos) a partir de la fecha de pago de conformidad con las Pólizas de Seguros de Assured que aseguran los Bonos Asegurados de Assured relevantes; disponiéndose, sin embargo, que, para evitar dudas, no se exija a Assured que se pague a sí misma ningún Precio de Aceleración de Assured con respecto a los Bonos Asegurados de Assured, por subrogación o de otro modo, y Assured recibirá la Contraprestación del Plan de Assured a causa de tales Bonos Asegurados de Assured. El pago del Precio de

61

Aceleración de Assured aplicable con respecto a cualquier Bono Asegurado de Asegurada, incluso de conformidad con la Elección de Assured, satisfará y cumplirá todas las obligaciones de Assured conforme a las Pólizas de Seguros de Assured con respecto a dicho Bono Asegurado de Assured.

(b)        **Elección de Tenedores de Bonos de Assured:** cada tenedor beneficiario de un Bono Asegurado de Assured identificado en el Anexo «A» del Formulario de Elecciones para Tenedores de Bonos de Assured puede elegir una de las siguientes dos elecciones para Tenedores de Bonos de Assured, en cada caso en condiciones aceptables para Assured; disponiéndose, sin embargo, que, en el caso de que un Tenedor de Bonos de Assured con derecho a realizar una Elección de Tenedores de Bonos de Assured no pueda realizar tal Elección de Tenedores de Bonos de Assured, se considerará que dicho Tenedor de Bonos Asegurados de Assured ha elegido la Elección 2 de Tenedores de Bonos de Assured; y, disponiéndose, además, que, para evitar dudas, los Bonos Asegurados de Assured propiedad de Assured (por subrogación o de otra forma) no serán sometidos a Elecciones de Tenedores de Bonos de Assured establecida en el presente Artículo 25.1(b), y Assured recibirá la Contraprestación del Plan de Assured debida a dichos Bonos Asegurados de Assured:

(i)        **Elección de los Bonistas de Assured 1:** cada Tenedor de Bonos Asegurados de Assured que elija la Elección 1 de Tenedores de Bonos de Assured recibirá de Assured el Precio de Aceleración de Assured aplicable en la Fecha de Entrada en Vigencia de la ACT, en plena satisfacción y cumplimiento de las obligaciones de Assured con respecto a dicho tenedor en virtud de las Pólizas de Seguros de Assured aplicables, y Assured recibirá la Contraprestación del Plan de Assured asignable a dicho tenedor en virtud del Plan de la ACT; o

(ii)        **Elección de los Bonistas de Assured 2:** cada Tenedor de Bonos Asegurados de Assured que elija la Elección 2 de Tenedores de Bonos de Assured optará por un fideicomiso de custodia, un arreglo de cuenta de plica o estructura similar establecida por Assured que proporcionará a dicho Tenedor de Bonos Asegurados de Assured un interés en (A) la Póliza de Seguros de Assured aplicable y (B) la Contraprestación del Plan de Assured aplicable de acuerdo con los términos aceptables para Assured. Los intereses concedidos en un fideicomiso de custodia, arreglo de cuenta de plica o estructura similar establecida en conexión con la Elección 2 de Tenedores de Bonos de Assured deben ser elegibles para DTC.

Conforme a los términos y disposiciones del Artículo 25.1(c) del presente, el pago del capital principal de los Bonos Asegurados de Assured se acelerará a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta, y dichos Bonos Asegurados de Assured vencerán y serán pagaderos a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta al Precio de Aceleración de Assured de cien por ciento (100%) del capital de estos más los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el monto acumulado de estos) hasta la fecha de pago. Sin pretender limitar lo que antecede, de conformidad con las Pólizas de Seguros de Assured aplicables, (A) Assured podrá elegir, a su criterio exclusivo y absoluto, realizar cualquier pago de capital, total o parcialmente, en cualquier fecha en la que dicho pago de capital venza por motivos de aceleración u otro adelanto del vencimiento, y (B) en el caso de cualesquiera Bonos Asegurados de Assured cuyos tenedores hayan elegido (o se

considere que han elegido) la Elección 2 de Tenedores de bonos de Assured, Assured conservará el derecho de pagar el Precio de Aceleración de Assured y cumplir plenamente con sus obligaciones con respecto a tales bonos y las Pólizas de Seguros de Assured aplicables en cualquier momento después de la Fecha de Entrada en Vigencia de la ACT tras Notificación previa a treinta (30) días por escrito a los tenedores relevantes. La conservación de este derecho por parte de Assured se reflejará en la documentación aplicable de fideicomiso de custodia aplicable o de cuenta de plica. A partir y después del pago del Precio de Aceleración de Assured, incluido sin limitación, en (i) la Fecha de Entrada en Vigencia de la ACT o (ii) otra fecha de pago seleccionada por Assured, tras Notificación previa treinta (30) días por escrito, los intereses sobre tales Bonos Asegurados dejarán de acumularse y ser pagaderos. El pago del Precio de Aceleración de Assured aplicable con respecto a cualquier Bono Asegurado de Assured de conformidad con cualquiera de las disposiciones anteriores, lo que incluye, sin limitación, en la Fecha de Entrada en Vigencia de la ACT, satisfará y cumplirá todas las obligaciones de Assured conforme a las Pólizas de Seguros de Assured con respecto a dicho Bono Asegurado de Assured.

(c) **Aceleración de los Bonos Asegurados de Assured:** sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida en que no haya pagos pendientes por Assured con respecto a los Bonos Asegurados de Assured hasta la Fecha de Entrada en Vigencia de la ACT inclusive, el pago del capital principal de los Bonos Asegurados de Assured se acelerará a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta, y dichos Bonos Asegurados de Assured vencerán y serán pagaderos a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta al Precio de Aceleración de Assured de cien por ciento (100%) del capital de estos más los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el monto acumulado de estos) hasta la fecha de pago.

(d) **Cesión de Derechos de Amortización:** sin perjuicio de cualquier otra disposición del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a Assured cualquier derecho a canjear y redimir los Bonos Asegurados de Assured y cualquier derecho relacionado, de forma que dichos derechos puedan ser ejercidos directa y exclusivamente por Assured como si fuera la ACT para tal fin, y cualquier monto debido en relación con dicha amortización será igual al menor del precio de amortización aplicable y el Precio de Aceleración de Assured.

(e) **Derecho a Voto:** sujeto a los términos y disposiciones de la Orden de Declaración de Divulgación, la solicitud de aceptaciones y rechazos al Plan de la ACT por parte de los tenedores de Reclamaciones de Bonos Asegurados de Assured será hecha por el Consejo de Supervisión a Assured de acuerdo con lo dispuesto en el Artículo 301(c)(3) de PROMESA

(f) **Bonos Asegurados de Doble Garantía:** en el caso de que se realice alguna distribución de Efectivo a los tenedores de Bonos Asegurados de Doble Garantía (en lugar de a Assured como tenedor de las Reclamaciones de Bonos de la ACT 98 Principales relacionadas) conforme al párrafo 52 de la Orden de Confirmación del ELA, se considerará que dichas distribuciones en Efectivo han reducido los capitales principales de dichos Bonos Asegurados de Doble Garantía a partir de la fecha de dichas distribuciones en Efectivo y que han dado lugar a una reducción correspondiente de las obligaciones de FGIC en virtud de las Pólizas

63

de Seguros de FGIC aplicables y de las obligaciones de Assured en virtud de las Pólizas de Seguros de Assured aplicables. En el caso de que se realice alguna distribución de Efectivo a causa de Bonos Asegurados de Doble Garantía a Assured como tenedor de las Reclamaciones de Bonos de la ACT 98 Principales relacionadas conforme al párrafo 52 de la Orden de Confirmación del ELA, se considerará que dichas distribuciones en Efectivo han reducido los capitales principales de dichos Bonos Asegurados de Doble Garantía a partir de la fecha de dichas distribuciones en Efectivo y que han dado lugar a una reducción correspondiente de las obligaciones de FGIC en virtud de las Pólizas de Seguros de FGIC aplicables, sin embargo, se considerará que no ha reducido (i) las obligaciones de Assured en virtud de las Pólizas de Seguro de Assured aplicables o (ii) el capital de cualquier recibo de custodia que evidencie un interés beneficioso en tales Bonos Asegurados de Doble Garantía y las Pólizas de Seguros aseguradas relacionadas.

25.2 <u>Tratamiento de Reclamaciones de Bonos Asegurados de National</u>: en el caso de que Clases 4, 9 y 13 voten para aceptar el Plan de la ACT conforme al Artículo 1126 del Código de Quiebras y todas las Pólizas de seguros de National y los acuerdos relacionados con los Bonos Asegurados por National estén en plena vigencia y efecto, o hayan sido realizados completamente de otro modo por National, sin pagos pendientes por National con respecto a dichos Bonos Asegurados por National hasta la Fecha de Entrada en Vigencia de la ACT inclusive, entonces, sin perjuicio de cualquier otra disposición del Plan de la ACT, en la Fecha de Entrada en Vigencia de la ACT, los tenedores de Reclamaciones de Bonos Asegurados de National Permitidas recibirán los siguientes tratamientos, que serán seleccionados por National a su total y absoluto criterio en o antes del comienzo de la Vista de Declaración de Divulgación y establecidos en el Formulario de Elección de Tenedores de Bonos de National; <u>disponiéndose, sin embargo</u>, que, para evitar dudas, los Bonos Asegurados de National en propiedad o retenidos por National (por subrogación o de otro modo) no estén sujetos a las elecciones de tratamiento establecidas en el presente Artículo 25.2 y, sujeto a los derechos del Agente Fiscal de la ACT, National recibirá la Contraprestación del Plan de National a causa de tales bonos; y, <u>disponiéndose, además</u>, que, sujeto a proporcionar a los tenedores de las Reclamaciones de Bonos Asegurados de National Permitidas el tratamiento de las elecciones establecido en el presente Artículo 25.2 y que satisfagan todas dichas elecciones, National tendrá todo el derecho, título e interés sobre la Contraprestación de la ACT de National y gestionará la contraprestación de la ACT de National a su criterio exclusivo y absoluto, sujeto a y de acuerdo con todas las leyes y regulaciones aplicables; y, <u>disponiéndose, además</u>, que cualquier cálculo y/o pago que se realicen a un tenedor que haga una elección basándose en, o en relación con, la Reclamación de Bonos Asegurados de National Permitida de dicho tenedor de conformidad con las opciones establecidas en el presente Artículo 25.2 tendrá en cuenta cualquier pago de capital y/o interés acumulado ya efectuado a dicho tenedor por National de conformidad con los términos de las Pólizas de Seguros de National pertinentes, y dicho tenedor no será compensado por ningún monto ya pagado a dicho tenedor de conformidad con los términos de las Pólizas de Seguros de National pertinentes:

(a) <u>Tratamiento de Conmutación de National:</u> cada tenedor de una Reclamación de Bonos Asegurados de National Permitida tendrá la opción de elegir en el Formulario de Elección de Tenedores de bonos de National para recibir, en la Fecha de Entrada

en Vigencia de la ACT, la Contraprestación de Conmutación de National, distribuible por o bajo la dirección de National, y, si lo elige, (i) el tenedor de esta no tendrá otros derechos o derechos adicionales en virtud o con respecto a la Póliza de Seguros de National aplicable o a cualquier Fideicomiso de National o Cuenta de Plica de National, ii) el tenedor de esta no recibirá ningún pago de National en virtud de las Pólizas de Seguros de National a causa de intereses devengados e impagos en y después de la Fecha de Emisión Considerada, y en la medida en que National pague a dicho tenedor cualquier interés acumulado después de dicha fecha, dicho monto se acreditará en contra del Efectivo que dicho tenedor, sus sucesores o cesionarios tengan derecho a recibir de otro modo como Contraprestación de Conmutación de National, y (iii) National recibirá la Contraprestación del Plan de National distribuible a causa de la Reclamación de Bonos Asegurados de National Permitida aplicable. Los Bonos Asegurados de National de un tenedor que oportuna y válidamente elija recibir el Tratamiento de Conmutación de National o realice una elección indebida como se describe en el Artículo 25.2(f) del presente, se considerarán cancelados en la Fecha de Entrada en Vigencia de la ACT, y las obligaciones de National en virtud de las Pólizas de Seguros de National aplicables se satisfarán, liberarán y descargarán finalmente y en su totalidad.

(b)     **Tratamiento de No Conmutación de National:** en el caso de que el tenedor de una Reclamación de Bonos Asegurados de National Permitida elija oportuna y válidamente en el Formulario de Elección de Tenedores de Bonos de National recibir el Tratamiento de no Conmutación de National de conformidad con las disposiciones de los Artículos 25.2(b) y (f) del presente, (i) National recibirá la Contraprestación del Plan de National distribuible a causa de la Reclamación de Bonos Asegurados de National Permitida aplicable, y (ii) dicho tenedor recibirá uno o más de los siguientes tratamientos, a elección de National, cuya elección será ejercida por National en o antes del comienzo de la Vista de Declaración de Divulgación, y como se detalla en el Formulario de Elección de Tenedores de Bonos de National aplicable:

(i)     **Fideicomisos de Custodia:** dicho tenedor de una Reclamación de Bonos Asegurados de National Permitida (A) depositará, o se considerará que ha depositado, entre otras cosas, la Participación a Prorrata de la Contraprestación del Fideicomiso de National del tenedor, los Bonos Asegurados de National asignables a dicho tenedor que hace una elección, y las correspondientes Pólizas de Seguros de National en el Fideicomiso National aplicable (B) se considerará que han recibido su Participación a Prorrata de la Contraprestación del Fideicomiso de National y Certificados de National en contraprestación de estas, y (C) no tiene ningún recurso contra National o las Pólizas de Seguros de National que no sea de conformidad con los términos del Fideicomiso de National.

(ii)     **Cuenta de Plica:** el tenedor de una Reclamación de Bonos Asegurados de National Permitida depositará, o se considerará que ha depositado, entre otras cosas, la Participación a Prorrata del tenedor en la Contraprestación de Cuenta de Plica de National en la Cuenta de Plica de National y dicha Contraprestación de Cuenta de Plica de National se tendrá como garantía de las obligaciones de National con los tenedores de los Bonos Asegurados de National cuya Contraprestación de Cuenta de Plica de National se depositó en la Cuenta de Plica de National conforme a la Pólizas de Seguros de National.

65

(iii)    **Pago de montos acelerados:** National recibirá la Contraprestación del Plan de National que de otra manera sería asignable a dicho tenedor de una Reclamación de Bonos Asegurados de National Permitida y National deberá cumplir total y completamente su obligación con dicho tenedor de una Reclamación de Bonos Asegurados de National Permitida al pagar en la Fecha de Entrada en Vigencia de la ACT, en Efectivo, el monto de esta al Precio de Aceleración de National a partir de la fecha de pago.

(iv)    **Tratamiento Alternativo:** la Junta de Supervisión y National se reservan el derecho de formular una elección alternativa u opción de implementación con respecto a los Bonos Asegurados de National que sea mutuamente aceptable para la Junta de Supervisión y National, cada una a su criterio exclusivo; <u>disponiéndose, sin embargo</u>, que cualquier elección alternativa u opción de implementación debe ser propuesta, por escrito, antes del comienzo de la Vista de Declaración de Divulgación.

Sin perjuicio de lo anterior, y para evitar dudas, National puede realizar diferentes elecciones, con respecto a diferentes CUSIP y diferentes tenedores de Bonos Asegurados de National.

(c)    **Aceleración de los Bonos Asegurados de National:** sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida en que no haya pagos pendientes por National con respecto a los Bonos Asegurados por National hasta la Fecha de Entrada en Vigencia de la ACT inclusive, el pago del capital principal de los Bonos Asegurados por National se acelerará a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta, y dichos Bonos Asegurados por National vencerán y serán pagaderos a partir de la Fecha de Entrada en Vigencia de la ACT y después de esta al Precio de Aceleración de National de cien por ciento (100%) del capital de estos más los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el monto acumulado de estos) hasta la fecha de pago. National tendrá derecho a pagar el Precio de Aceleración de National con respecto a los Bonos Asegurados de National en cualquier momento, y el tenedor de Bonos Asegurados de National y el fideicomisario o agente fiscal (según proceda) deberá aceptarlos en cumplimiento de las obligaciones de National en virtud de la Póliza de Seguros de National aplicable con respecto a dichos bonos y, tras dicho pago, las obligaciones de National en virtud de la Póliza de Seguros de National aplicable se cumplirán y extinguirán plenamente, a pesar de cualquier disposición de la Póliza de Seguros de National aplicable u otros documentos relacionados con los Bonos Asegurados de National. Para evitar dudas, a pesar de tal aceleración, no habrá aceleración de ningún pago que se requiera que se haga conforme a cualquier Póliza de Seguros de National a menos que National elija, a su criterio exclusivo y absoluto, hacer tal pago sobre una base acelerada.

(d)    **Cesión de Derechos de Amortización:** sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida en que lo permitan los documentos definitivos aplicables y no sean incompatibles con los derechos establecidos de conformidad con la Póliza de Seguros de National aplicable, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a National todos y cada uno de los derechos para amortizar y redimir los Bonos Asegurados de National y cualquier derecho relacionado de manera que tales derechos puedan ser ejercidos directa y exclusivamente por National como si fuera la ACT para tal fin.

2" = "1" "125859215v13" ""

Cualquier monto adeudado en relación con dicha amortización será igual al menor del precio de amortización aplicable y del Precio de Aceleración de National.

(e)  **Derecho a Voto:** sujeto a los términos y disposiciones de la Orden de Declaración de Divulgación, (a) la solicitud de aceptaciones y rechazos al Plan de la ACT por parte de los tenedores de Reclamaciones de Bonos Asegurados de National será hecha por el Consejo de Supervisión a National de acuerdo con lo dispuesto en el Artículo 301(c)(3) de PROMESA, la legislación aplicable y los documentos que rigen, y (b) la elección para elegir entre el Tratamiento de Conmutación de Nacional según lo establecido en el Artículo 25.2(a) del presente y el Tratamiento de No Conmutación de Nacional según lo establecido en el Artículo 25.2(b) del presente será realizada por los tenedores beneficiarios de Bonos Asegurados de National en el Formulario de Elección de Tenedores de Bonos de National aplicable; disponiéndose, sin embargo, que la forma del Tratamiento de no Conmutación de National sea seleccionada por National de conformidad con el Artículo 25.2(b) del presente.

(f)  **Elección Indebida:** si un tenedor de una Reclamación de Bonos Asegurados de National Permitida (1) no elige oportuna y válidamente el Tratamiento de no Conmutación de National de conformidad con el Artículo 25.2(b) del presente, o (2) presenta una elección por menos de todas sus Reclamaciones de Bonos Asegurados de National en una clase particular (en cuyo caso, dicha elección será nula y no tendrá fuerza ni efecto alguno), se considerará que dicho tenedor ha elegido recibir el Tratamiento de Conmutación de National establecido en el Artículo 25.2(a) del presente con respecto a dichas Reclamaciones de Bonos Asegurados de National, para conmutar las Pólizas de Seguros de National aplicables, liberar y descargar las obligaciones de National en virtud de dichas Pólizas de Seguros de National, y recibir distribuciones de conformidad el Artículo 25.2(a) del presente. Además, los Bonos Asegurados de National de un tenedor de una Reclamación de Bonos Asegurados de National Permitida que no elija válidamente recibir el Tratamiento de no Conmutación de National de conformidad con las cláusulas (1) o (2) anteriores se considerarán cancelados en la Fecha de Entrada en Vigencia de la ACT, y las obligaciones de National en virtud de las Pólizas de Seguros de National aplicables se satisfarán, liberarán y descargarán finalmente y en su totalidad.

25.3 **Tratamiento de Reclamaciones de Bonos Asegurados de FGIC**: en caso de que las Clases 8 y 12 voten para aceptar el Plan de la ACT de acuerdo con las disposiciones del artículo 1126 del Código de Quiebras, y todas las Pólizas de Seguros de FGIC y los acuerdos relacionados con los Bonos Asegurados de FGIC estén en plena vigencia y efecto, y sus posibles modificaciones de conformidad con el Plan de Rehabilitación de FGIC, entonces, sin perjuicio de cualquier otra disposición del Plan de la ACT, en la Fecha de entrada en Vigencia de la ACT, los tenedores de Reclamaciones de Bonos Asegurados de FGIC recibirán los siguientes tratamientos:

(a)  **Tratamiento de Reclamaciones de Bonos Asegurados de FGIC**: cada tenedor de una Reclamación de Bonos Asegurados de FGIC Permitida (salvo lo dispuesto en el Artículo 25.3(b) del presente) deberá (A) depositar, o se considerará que ha depositado, entre otras cosas, la Participación a Prorrata de la Contraprestación del Plan de FGIC, su participación proporcional de la Recuperación de Recuperación de la ACT/ELA, y los Bonos Asegurados de

67

FGIC y las Pólizas de Seguro de FGIC relacionadas asignables a dicho tenedor en el Fideicomiso de FGIC aplicable, y (B) se considerará que ha recibido su Participación a Prorrata de la Contraprestación del Plan de FGIC y los Certificados de FGIC en contraprestación de estas. Todos los derechos y recursos conforme a y de acuerdo con los Bonos Asegurados de FGIC depositados en un Fideicomiso de FGIC y las resoluciones de bonos legislativos relacionados aplicables (salvo con respecto a las obligaciones de pago del ELA o sus instrumentalidades) y las Pólizas de Seguros de FGIC aplicables (únicamente en la medida en que se apliquen y se refieran a tales Bonos Asegurados de FGIC) se conservarán y permanecerán en plena vigencia y efecto únicamente en la medida necesaria para preservar cualquier reclamación relativa a dichos Bonos Asegurados de FGIC en virtud de la Póliza de Seguros de FGIC aplicable. Para evitar dudas, cada distribución de efectivo realizada por un Fideicomiso de FGIC a los tenedores de intereses en este reducirá automática y simultáneamente en una base de dólar por dólar el capital pendiente de los Bonos Asegurados del FGIC que se encuentren en dicho Fideicomiso de FGIC y dará lugar a una reducción correspondiente de las obligaciones de FGIC en virtud de las Pólizas de Seguros de FGIC aplicables.

(b)      **Reclamaciones de Bonos Asegurados de FGIC propiedad de FGIC**: con respecto a todas las Reclamaciones de Bonos Asegurados de FGIC Permitidas propiedad de FGIC, en la Fecha de Entrada en Vigencia de la ACT, y sujeto a los derechos del Agente Fiscal de la ACT, FGIC tendrá derecho a recibir, en plena contraprestación, satisfacción, liberación e intercambio de dichas Reclamaciones de Bonos Asegurados de FGIC Permitidas, su Participación a Prorrata de la Contraprestación del Plan FGIC asignable a dichas Reclamaciones de Bonos Asegurados de FGIC Permitidas.

(c)      **Bonos Asegurados de Doble Garantía**: los certificados de FGIC asignables a los tenedores de Bonos Asegurados de Doble Garantía se distribuirán de conformidad con los términos y disposiciones del Artículo 25.1 del presente.

(d)      **Aceleración de los Bonos Asegurados de FGIC**: sin perjuicio de cualquier otra disposición del Plan de la ACT o de los Bonos Asegurados de FGIC, el pago del capital de los Bonos Asegurados de FGIC se acelerará a partir de la Fecha de Entrada en Vigencia de la ACT, y los Bonos Asegurados de FGIC vencerán y serán pagaderos a partir de la Fecha de Entrada en Vigencia de la ACT a un «precio de aceleración» del cien por ciento (100%) del capital de estos más los intereses devengados (o, en el caso de un bono de apreciación de capital, el monto acumulado de estos) hasta la fecha de pago; disponiéndose, sin embargo, que, para evitar dudas, a pesar de dicha aceleración, no se producirá ninguna aceleración de ningún pago requerido por FGIC en virtud de una Póliza de Seguros de FGIC, a menos que FGIC elija, a su criterio exclusivo y absoluto, realizar dichos pagos sobre una base acelerada y FGIC tiene el derecho expreso de acelerar dichos pagos en virtud de la Póliza de Seguros de FGIC aplicable o de los acuerdos relacionados con los Bonos Asegurados de FGIC aplicables.

(e)      **Cesión de Derechos de Amortización**: sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida permitida conforme a la Fecha de Entrada en Vigencia de la ACT, de conformidad con los documentos de seguro definitivos aplicables y la

68

Póliza de Seguros de FGIC aplicables, se considerará que la ACT ha cedido a FGIC todos y cada uno de los derechos para amortizar y redimir los Bonos Asegurados de FGIC y cualquier derecho relacionado, de manera que tales derechos puedan ser ejercidos directa y exclusivamente por FGIC como si fuera la ACT para tal fin.

(f) **Derecho a Voto:** sujeto a los términos y disposiciones de la Orden de Declaración de Divulgación, la solicitud de aceptaciones y rechazos al Plan de la ACT por parte de los tenedores de Reclamaciones de Bonos Asegurados de FGIC será hecha por el Consejo de Supervisión a FGIC de acuerdo con lo dispuesto en el Artículo 301(c)(3) de PROMESA, la legislación aplicable, documentos de seguros que rigen y otros documentos.

25.4 **Tratamiento de Reclamaciones de Bonos Asegurados de Ambac:** en el caso de que Clases 2 y 6 voten para aceptar el Plan de la ACT conforme al Artículo 1126 del Código de Quiebras y todas las Pólizas de seguros de Ambac y los acuerdos relacionados con los Bonos Asegurados por Ambac estén en plena vigencia y efecto, sin pagos pendientes por Ambac con respecto a dichos Bonos Asegurados por Ambac hasta la Fecha de Entrada en Vigencia de la ACT inclusive, entonces, sin perjuicio de cualquier otra disposición del Plan, en la Fecha de Entrada en Vigencia de la ACT, los titulares de Reclamaciones de Bonos Asegurados por Ambac recibirán el siguientes tratamiento, según se proporciona en la Notificación de Elección de Ambac y en la medida ofrecida por Ambac, a su total y absoluto criterio en o antes del comienzo de la Audiencia de Declaración de Divulgación; disponiéndose, sin embargo, que, sin perjuicio de lo siguiente, Ambac pueda hacer elecciones diferentes con respecto a los diferentes CUSIP y diferentes Bonos Asegurados Ambac:

(a) **Tratamiento de Reclamaciones de Bonos de la ACT 68 (Ambac):** en la Fecha de Entrada en Vigencia de la ACT, o tan pronto como sea razonablemente posible a partir de entonces, pero en ningún caso después del décimo (10.º) día siguiente a la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida (Ambac) recibirá en Efectivo el monto igual al Precio de Aceleración de Ambac, para la satisfacción, liberación y descargo total y final de las obligaciones de Ambac bajo la Póliza de Seguro Ambac aplicable, y sujeto a los derechos del Agente Fiscal de la ACT, Ambac recibirá la Contraprestación del Plan de Ambac que de otra manera sería asignable a dicho tenedor, sus sucesores o cesionarios a causa de sus Reclamaciones de Bonos de la ACT 68 (Ambac). Para evitar dudas, el Precio de Aceleración de Ambac incluirá los intereses devengados e impagos a partir de la fecha de pago.

(b) **Tratamiento de Reclamaciones de Bonos de la ACT 98 Principales (Ambac):** en la Fecha de Entrada en Vigencia de la ACT, o tan pronto como sea razonablemente posible a partir de entonces, pero en ningún caso después del décimo (10.º) día siguiente a la Fecha de Entrada en Vigencia de la ACT, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) recibirá uno de los siguientes tratamientos:

(i) **Tratamiento de Conmutación de Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac):** en la medida en que Ambac ofrezca, a su criterio exclusivo y absoluto, cada tenedor de una Reclamación de Bonos de la ACT 98 Principales

Permitida (Ambac) tendrá la opción de elegir en los Formularios de Elección de Tenedores de Bonos de Ambac recibir, en la Fecha de Entrada en Vigencia de la ACT, la Contraprestación de Conmutación de Ambac, distribuible por o bajo la dirección de Ambac y, si lo elige, (i) dicho beneficiario no tendrá ningún otro o más derechos conforme a o con respecto a la Póliza de Seguros de Ambac aplicable o cualquier Fideicomiso de Ambac, y (ii) sujeto a los derechos del Agente Fiscal de la ACT, Ambac recibirá la Contraprestación del Plan de Ambac que de otra manera sería asignable o distribuible a dicho tenedor. Los Bonos de la ACT 98 Principales Asegurados de Ambac de un tenedor que elija válidamente recibir el Tratamiento de Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac), o realiza una elección indebida como se describe en el Artículo 25.4(f) del presente, se considerará, en o después de la Fecha de Entrada en Vigencia de la ACT, sus Bonos de la ACT 98 Principales Asegurados de Ambac han sido cancelados, y las obligaciones de Ambac conforme a la Póliza de Seguros de Ambac aplicable se satisfarán, liberarán y descargarán finalmente y en su totalidad.

(ii)     **Tratamiento de no Conmutación de Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac):** en el caso de que el tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) elija oportuna y válidamente en el Formulario de Elección de Tenedores de Bonos de Ambac recibir el Tratamiento de no Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac), el tenedor de una Reclamación de Bonos Asegurados de Ambac Permitida recibirá uno o más de los siguientes tratamientos ofrecidos por Ambac, a su criterio exclusivo y absoluto, y según se detalla en el Formulario de Elección de Tenedores de Bonos de Ambac aplicable:

(1)     **Fideicomisos de Custodia:**

(i)     El tenedor de una Reclamación de Bonos Asegurados de la ACT 98 Principales Permitida (Ambac) depositará, o se considerará que ha depositado, en los Fideicomisos de Ambac aplicables, (A) los Bonos Asegurados de Ambac del tenedor con respecto a los cuales se ha realizado la elección y las Pólizas de Seguros de Ambac relacionadas, (B) la Participación a Prorrata del tenedor de la Contraprestación del Plan de Ambac, que consiste en (1) Efectivo, (2) la Recuperación de Recuperación de la ACT/ELA, que consiste en CVI de Recuperación de la ACT y todos los pagos o cobranzas correspondientes a dicho CVI de Recuperación de la ACT, y (3) los Nuevos Bonos de la ACT, y (C) se considerará que ha recibido los Certificados de Ambac en Contraprestación a esta; dichos tenedores no tendrán recurso contra Ambac o las Pólizas de Seguros de Ambac aplicables, que no sea de conformidad con los términos del Fideicomiso de Ambac. En caso de que los montos de distribución provisionales proporcionados en el párrafo 52 de la Orden de Confirmación del ELA se hayan distribuido directamente a los tenedores de Bonos Asegurados de Ambac antes de la Fecha de Entrada en Vigencia de la ACT, reduciendo así el capital de tales Bonos de la ACT 98 Principales Asegurados de Ambac, tales distribuciones provisionales en efectivo no necesitan ser depositadas en el Fideicomiso de Ambac.

(ii)     Los términos del Fideicomiso de Ambac se establecerán en un contrato de fideicomiso o contratos de fideicomiso que se presentarán como parte del

70

Complemento del Plan, pero que incluirán los siguientes términos, sin limitación: (A) Ambac no asegurará ningún pago en los Certificados de Ambac, no se le exigirá pagar ningún incumplimiento u otros intereses con respecto a los Bonos Asegurados de Ambac, y solamente está obligada a pagar sus obligaciones en virtud de la Póliza de Seguros de Ambac aplicable, tal como se establece en esta y en el acuerdo de la ACT 98 Principal que rige los Fideicomisos de Ambac; (B) Ambac se considerará el único tenedor de los Bonos de la ACT 98 Principales Asegurados de Ambac en el Fideicomiso de Ambac con respecto a la votación, modificación, aceleración, eventos de incumplimiento y elección y dirección de los derechos y recursos, lo que incluye, sin limitación, en relación con los procedimientos de insolvencia durante el período en que no haya incumplimientos de pago pendientes por parte de Ambac en virtud de las Pólizas de Seguros de Ambac aplicables; y (C) el acuerdo que rige el Fideicomiso de Ambac establecerá, entre otras cosas, que (1) todos los derechos de un tenedor de los Bonos Asegurados de la ACT 98 Principales de Ambac en poder del Fideicomiso de Ambac (ya sea en cuanto a modificaciones y consentimientos, dirección de los recursos o de otra manera) podrán ser ejercidos únicamente por Ambac y ningún tenedor de los Certificados de Ambac tendrá ningún derecho con respecto a los Bonos de la ACT 98 Principales Asegurados de Ambac (excepto los descritos en contrario en los Fideicomisos de Ambac), (2) Ambac podrá, a su elección, Elegir dirigir una distribución de un porcentaje proporcional de los Bonos Senior de Ambac Asegurados la ACT 98 subyacentes a los tenedores individuales de Certificados de Ambac al momento de la liberación de las reclamaciones de dichos tenedores sobre la Póliza de Seguros de Ambac relacionada y contra el Fideicomiso de Ambac; dicha distribución y liberación no dará lugar a que ningún otro tenedor de Certificados de Ambac reivindique el derecho a recibir el mismo tratamiento, y (3) Ambac podrá, a su elección, decidir dirigir la venta de cualquier Activo del Fideicomiso de Ambac.

(1)     **Pago de montos acelerados:** Ambac recibirá la Contraprestación del Plan de Ambac que de otra manera sería asignable a los tenedores de Reclamaciones de Bonos de la ACT 98 Principales Asegurados Permitidas (Ambac) y las obligaciones de Ambac con dichos tenedores serán cumplidas total y completamente al momento del pago, en la Fecha de Entrada en Vigencia de la ACT, o tan pronto como sea factible a partir de entonces, pero en ningún caso después del décimo (10.º) día siguiente a la Fecha de Entrada en Vigencia de la ACT, en Efectivo, del Precio de Aceleración de Ambac con respecto a estas.

(2)     **Tratamiento Alternativo:** la Junta de Supervisión y Ambac se reservan el derecho de formular una elección alternativa u opción de implementación con respecto al Tratamiento de no Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) de los Bonos de la ACT 98 Principales Asegurados que sea mutuamente aceptable para la Junta de Supervisión y Ambac, cada una a su criterio exclusivo; disponiéndose, sin embargo, que cualquier elección alternativa u opción de implementación debe ser propuesta, por escrito, en o antes del comienzo de la Vista de Declaración de Divulgación.

(c)     **Aceleración Considerada de los Bonos Asegurados de Ambac:** sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida en que no haya incumplimientos de pago pendientes por parte de Ambac con respecto a sus obligaciones en virtud de las Pólizas de Seguros de Ambac aplicables hasta e incluida la Fecha de Entrada en Vigencia de la ACT, los Bonos Asegurados de Ambac se considerarán acelerados e

71

inmediatamente vencidos y pagaderos a partir de la Fecha de Entrada en Vigencia de la ACT. Ambac tendrá derecho a pagar el Precio de Aceleración de Ambac con respecto a tales bonos en cualquier momento, y el tenedor de Bonos Asegurados de Ambac y el fideicomisario o agente fiscal (según proceda) deberá aceptarlos en cumplimiento de las obligaciones de Ambac en virtud de la Póliza de Seguros de Ambac aplicable con respecto a dichos bonos y, tras dicho pago, las obligaciones de Ambac en virtud de la Póliza de Seguros de Ambac aplicable se cumplirán y extinguirán plenamente, a pesar de cualquier disposición de la Póliza de Seguros de Ambac aplicable u otros documentos relacionados con los Bonos Asegurados de Ambac. Para evitar dudas, a pesar de tal aceleración, no habrá aceleración de ningún pago que se requiera que se haga conforme a cualquier Póliza de Seguros de Ambac a menos que Ambac elija, a su criterio exclusivo y absoluto, hacer tal pago sobre una base acelerada.

(d)  **Cesión de Derechos de Amortización**: sin perjuicio de cualquier otra disposición del Plan de la ACT, en la medida en que lo permitan los documentos definitivos aplicables y no sean incompatibles con los derechos establecidos de conformidad con la Póliza de Seguros de Ambac aplicable, en la Fecha de Entrada en Vigencia de la ACT, se considerará que la ACT ha cedido a Ambac todos y cada uno de los derechos para amortizar y redimir los Bonos Asegurados de Ambac y cualquier derecho relacionado de manera que tales derechos puedan ser ejercidos directa y exclusivamente por Ambac como si fuera la ACT para tal fin. Cualquier monto adeudado en relación con dicha amortización será igual al menor del precio de amortización aplicable y del Precio de Aceleración de Ambac.

(e)  **Derecho a Voto**: sujeto a los términos y disposiciones de la Orden de Declaración de Divulgación, la solicitud de aceptaciones y rechazos al Plan de la ACT por parte de los tenedores de Reclamaciones de Bonos Asegurados de Ambac será hecha por el Consejo de Supervisión a Ambac de acuerdo con lo dispuesto en el Artículo 301(c)(3) de PROMESA, la legislación aplicable, documentos de seguros que rigen y otros documentos, y (2) cuando proceda y como se describe en el Artículo 25.4(b) del presente, la elección para elegir entre el Tratamiento de Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac), según se establece en el Artículo 25.4(b)(i) del presente, y el Tratamiento de no Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac), según se establece en el Artículo 25.4(b)(ii) del presente, será realizada por los tenedores beneficiarios de Bonos de la ACT 98 Principales Asegurados de Ambac; disponiéndose, sin embargo, que la forma del Tratamiento de no Conmutación de Ambac sea seleccionada por Ambac de conformidad con los términos y disposiciones del Artículo 25.4(b)(ii) del presente.

(f)  **Elección Indebida**: si el tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) (1) no elige oportuna y válidamente el Tratamiento de Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) establecido en el Artículo 25.4(b)(i) del presente o el Tratamiento de no Conmutación permitido de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) según lo establecido en el Artículo 25.4(b)(ii) del presente, o (2) presenta una elección por menos de la totalidad de sus Reclamaciones de Bonos Asegurados de Ambac en una clase determinada (en cuyo caso, dicha elección será nula y sin fuerza ni efecto), se considerará que dicho tenedor ha elegido recibir con respecto a sus Reclamaciones de Bonos de la ACT 98 Principales (Ambac), el

72

Tratamiento de Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) establecido en el Artículo 25.4(b)(i) del presente, conmutar las Pólizas de Seguros de Ambac aplicables, y satisfacer, liberar y descargar finalmente y en su totalidad las obligaciones de Ambac conforme a tales Pólizas de Seguros de Ambac, y recibirá, con respecto a sus Reclamaciones de Bonos de la ACT 68 (Ambac), el Tratamiento de Reclamaciones de Bonos de la ACT 68 Permitidas (Ambac), si lo hubiere, como se establece en el Artículo 25.4(a) del presente. Además, un tenedor de una Reclamación de Bonos de la ACT 98 Principales Permitida (Ambac) que no elija válidamente recibir el Tratamiento de Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) o el Tratamiento de no Conmutación de Reclamaciones de Bonos de la ACT 98 Principales Permitidas (Ambac) de conformidad con las cláusulas (1) o (2) anteriores se considerará que, en o después de la Fecha de Entrada en Vigencia de la ACT, sus Bonos de la ACT 98 Principales Asegurados de Ambac han sido cancelados, y la obligación de Ambac conforme a la Póliza de Seguros de Ambac aplicable se satisfará, liberará y descargará finalmente y en su totalidad.

25.5 **Obligaciones del Agente Fiscal**: sin perjuicio del contenido en el Plan de la ACT en contrario, lo que incluye, sin limitación, los términos y disposiciones de la presente Sección XXV, el Agente Fiscal de la ACT no tendrá deberes ni responsabilidades con respecto a cualesquiera Bonos de la ACT que se depositen en cualquiera del Fideicomiso de Ambac, el Fideicomiso de Assured, el Fideicomiso de FGIC o el Fideicomiso de National a partir de la Fecha de Entrada en Vigencia de la ACT.

## SECCIÓN XXVI

## TRATAMIENTO DE CONTRATOS A EJECUTARSE Y CONTRATOS DE ARRENDAMIENTO EN CURSO

26.1 **Rechazo o Asunción de Contratos a Ejecutarse o Contratos de Arrendamiento en Curso Restantes**: de conformidad con los artículos 365(b)(2) del Código de Quiebras, aplicables al Caso del Título III conforme al Artículo 301 de PROMESA, y sujeto a las disposiciones de los Artículos 26.5 y 26.7 del presente, todos los Contratos a Futuro y Arrendamientos no Vencidos que existan entre el Deudor y cualquier Entidad, y que no hayan vencido por sus propios términos en o antes de la Fecha de Entrada en Vigencia de la ACT, se considerarán rechazados por el Deudor a partir de la Fecha de Entrada en Vigencia de la ACT, salvo en el caso de cualquier Contrato de a Futuro y Arrendamiento no Vencido (a) que se haya asumido y cedido o rechazado de conformidad con una orden del Tribunal del Título III ingresada antes de la Fecha de Entrada en Vigencia de la ACT, (b) que se designe específicamente como un contrato o contrato de arrendamiento para ser asumido o asumido y cedido en los anexos del Complemento del Plan, (c) que se haya registrado en la Oficina del Contralor de Puerto Rico, (d) que se haya exento de registro en Oficina del Contralor de Puerto Rico conforme al artículo 97 de 2 L.P.R.A. y los reglamentos promulgados de conformidad con este, (e) haya sido aprobado por la Junta de Supervisión o autorizado por el Tribunal del Título III, a menos que se designe específicamente un contrato para ser rechazado en el Complemento del Plan, (f) con los Estados Unidos, o cualquiera de sus agencias, departamentos o agentes, o de conformidad con cualquier programa federal, o (g) por o entre cualquier agencia, departamento,

73

2" = "1" "125859215v13" ""

municipio, corporación pública o instrumentalidades del ELA (excepto los arrendamientos en los que la AEP sea parte); _disponiéndose, sin embargo,_ que el Deudor se reserva el derecho, en o antes de la Fecha de Entrada en Vigencia de la ACT, a modificar dichos anexos para eliminar cualquier Contrato da Futuro y Arrendamiento no Vencido de este, o añadir cualquier Contrato a Futuro y Arrendamiento no Vencido a este, en cuyo caso se considerará que dichos Contratos a Futuro Arrendamientos no Vencidos, según sea el caso, fueron rechazados, asumidos o asumidos y cedidos a partir de la Fecha de Entrada en Vigencia de la ACT. El Deudor (y) notificará cualquier Contrato a Ejecutarse y Contrato de Arrendamiento en Curso que deba asumirse o asumirse y cederse a través de la aplicación del presente Artículo 26.1, al incluir una lista de tales contratos y contratos de arrendamientos en el Complemento del Plan y (z) notificará cualquier Contrato a Ejecutarse y Contrato de Arrendamiento en Curso a rechazar mediante la aplicación del presente Artículo 26.1, mediante una notificación por separado a las contrapartes pertinentes de dichos acuerdos. En la medida en que se introduzcan modificaciones a dichas listas, el Deudor notificará a las partes del Contrato a Ejecutarse y Contrato de Arrendamiento en Curso afectados por estas, cualquier modificación de esa índole. La inclusión de un documento en los programas del Suplemento del Plan o en cualquier notificación separada no constituirá una admisión por parte del Deudor de que tal documento es un Contrato a Ejecutarse y Contrato de Arrendamiento en Curso o de que el Deudor tenga responsabilidad alguna en virtud de ello.

26.2 **Aprobación del Rechazo o Asunción de Contratos a Ejecutarse o Contratos de Arrendamiento en Curso**: el ingreso de la Orden de Confirmación de la ACT por parte del Tribunal del Título III constituirá la aprobación, conforme a los artículos 365(a) y 1123(b)(2) del Código de Quiebras, del rechazo, asunción o la asunción y la cesión, según el caso, de un Contrato a Ejecutarse y un Contrato de Arrendamiento en Curso conforme al Artículo 26.1 del Plan de la ACT.

26.3 **Carácter incluyente**: a menos que se especifique lo contrario en los programas del Complemento del Plan, cada Contrato a Ejecutarse y Contrato de Arrendamiento en Curso enumerado o que se enumerará en estos incluirá todas las modificaciones, cambios, ampliaciones, replanteamientos u otros acuerdos celebrados directa o indirectamente por cualquier acuerdo, instrumento u otro documento que de alguna manera afecte a dicho Contrato a Ejecutarse y Contrato de Arrendamiento en Curso, sin tener en cuenta si dicho acuerdo, instrumento u otro documento está incluido en dicho programa.

26.4 **Corrección de Incumplimientos**: salvo en la medida en que la parte no deudora o las partes en un Contrato a Ejecutarse y Contrato de Arrendamiento en Curso hayan acordado un tratamiento diferente a asumirse o asumirse y cederse conforme al Artículo 26.1 del Plan de la ACT, el Deudor deberá, conforme a la disposiciones del artículo 1123(a)(5)(G) y 1123(b)(2) del Código de Quiebras y de conformidad con los requisitos del artículo 365 del Código de Quiebras, en un plazo mínimo de veinte (20) días antes de la Vista de Confirmación de la ACT, radicar ante el Tribunal del Título III y entregar por correo de servicios prioritarios a cada parte no Deudora de dichos Contratos a Ejecutarse y Contratos de Arrendamiento en Curso a asumir conforme al Artículo 26.1 del Plan de la ACT, una notificación convocatoria, en la que se enumerará el monto de corrección para cada contrato a ejecutarse o contrato de arrendamiento en curso a asumir o asumir y ceder. Las partes en tales Contratos a Ejecutarse y Contratos de

74

Arrendamiento en Curso dispondrán de veinte (20) días a partir de la fecha de entrega de dicha notificación para radicar y entregar cualquier objeción a los montos de corrección enumerados por el Deudor. En caso de que se presenten objeciones, el Tribunal del Título III celebrará una vista en una fecha establecida por el Tribunal del Título III. Sin perjuicio de lo dispuesto en los términos y disposiciones del Artículo 26.1 del Plan de la ACT, el Deudor conservará su derecho a rechazar cualquiera de sus Contratos a Ejecutarse y Contratos de Arrendamiento en Curso que estén sujetos a una controversia sobre los montos necesarios para corregir cualquier incumplimiento hasta la Fecha de Entrada en Vigencia de la ACT.

26.5 **Pólizas de Seguros**: sujeto a los términos y disposiciones del Artículo 26.7, cada una de las pólizas de seguros del Deudor y cualquier acuerdo, documento o instrumento relacionado con estas se considerarán Contratos a Ejecutarse según el Plan; disponiéndose, sin embargo, que, salvo en la medida proporcionada en el presente, la Orden de Confirmación de la ACT y los Documentos Definitivos, tal tratamiento no podrá liberar ni eximir ninguna Monolínea con respecto a sus respectivas obligaciones con respecto a los tenedores de Reclamaciones conforme a las pólizas de seguros y la ley aplicable y los documentos que rijan con respecto a ellos, ni se interpretará de tal forma.

26.6 **Reclamaciones por Daños debido a Rechazo**: si el rechazo de un Contrato a Ejecutarse y Contrato de Arrendamiento en Curso por parte del Deudor según el presente da lugar a daños y perjuicios a la o las otras partes en dicho contrato o contrato de arrendamiento, toda reclamación por tales daños y perjuicios, si hasta ahora no ha quedado demostrada por una evidencia de Reclamación radicada, será excluida para siempre y no será ejecutable contra el Deudor, ni sus bienes o agentes, sucesores o causahabientes, lo que incluye, de manera no taxativa, la ACT Reorganizada, a menos que se radique una evidencia de Reclamación ante el Tribunal del Título III y se comunique a los abogados de la Junta de Supervisión y la ACT Reorganizada, según el caso, treinta (30) o más días después de la última de (i) la Fecha de Confirmación de la ACT y (ii) la fecha de ingreso de una orden por parte del Tribunal del Título III que autoriza el rechazo de un Contrato a Ejecutarse y Contrato de Arrendamiento en Curso en particular.

26.7 **Obligaciones de Indemnización y Reembolso**: a los efectos del Plan de la ACT, (i) en la medida en que sean de carácter ejecutorio, las obligaciones del Deudor, lo que incluye, de manera no taxativa, las pólizas de seguro de directores y funcionarios, de indemnizar y reembolsar a sus directores o funcionarios que fueran directores o funcionarios, respectivamente, en o antes de la Fecha de Petición de la ACT, se considerarán asumidas a partir de la Fecha de Entrada en Vigencia de la ACT y (ii) las obligaciones de indemnización del Deudor que surgen de la conducta de funcionarios y directores durante el período desde la Fecha de Petición de la ACT, serán Reclamaciones de Gastos Administrativos; disponiéndose, sin embargo, que, bajo ninguna circunstancia, el Deudor o la ACT Reorganizada, según el caso, sean responsables de cualquier obligación de indemnización, costo o gasto asociado a la negligencia grave, el fraude intencional o la conducta dolosa intencional de sus respectivos funcionarios o directores.

26.8 **Inexistencia de Fecha de Entrada en Vigencia de la ACT**: en caso de que no se produzca la Fecha de Entrada en Vigencia de la ACT, el Tribunal del Título III conservará la

75

jurisdicción con respecto a toda solicitud de prórroga de la fecha límite para asumir o rechazar Contratos a Ejecutarse y Contratos de Arrendamiento en Curso conforme al artículo 365(d)(4) del Código de Quiebras, a menos que tal o tales plazos hayan vencido.

26.9 **Reserva de Derechos**: nada de lo dispuesto en el Plan de la ACT o en el Complemento del Plan constituirá una admisión por parte del Deudor, la ACT Reorganizada o de cualquier otra parte de que dicho contrato o contrato de arrendamiento es, de hecho, un Contrato a Ejecutarse o Contrato de Arrendamiento en Curso o que el Deudor tiene responsabilidad alguna en virtud de estos. Si existe una controversia con respecto a si un contrato o contrato de arrendamiento es o fue ejecutorio o no había vencido al momento de la asunción, el Deudor o ACT Reorganizada dispondrán de cuarenta a cinco (45) días después del ingreso de una Orden Final que resuelva dicha controversia para alterar su tratamiento de tal contrato o contrato de arrendamiento.

26.10 **Contrato de Negociación Colectiva**: salvo conforme a la Sección XXVI del presente, ninguno de los contratos de negociación colectiva del Deudor será tratado como Contrato a Ejecutarse y ninguno será asumido, rechazado o tratado de otro modo conforme al Plan, pero permanecerá en efecto sujeto, en todos los casos, a la legislación de Puerto Rico y al Artículo 2.5 del presente relativo al pago y tratamiento continuo de pensiones y reclamaciones y obligaciones relacionadas.

## SECCIÓN XXVII

## DISPOSICIONES QUE RIGEN LAS DISTRIBUCIONES

27.1 **Tiempo y Manera de Distribución**: a menos que se disponga de otro modo en el presente, las distribuciones previstas en el Plan de la ACT se realizarán a cada tenedor de una Reclamación Permitida de la siguiente manera:

(a) **Distribución a Tenedores de Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68 (Assured) y Reclamaciones de Bonos de la ACT 68 (National):** salvo que se disponga lo contrario en el presente, en la Fecha de Entrada en Vigencia de la ACT, el Agente Pagador distribuirá, o hará que se distribuya, a cada tenedor de una Reclamación de Bonos de la ACT 68 Permitida, una Reclamación de Bonos de la ACT 68 Permitida (Ambac), una Reclamación de Bonos de la ACT 68 Permitida (Assured) o una Reclamación de Bonos de la ACT 68 Permitida (National), y en cada caso congruente con los términos establecidos en el presente, la Participación a Prorrata del tenedor, si la hubiera, de la Recuperación de Bonos de la ACT 68, la Tasa de Restricción de la ACT y los Costos de Perfeccionamiento de la ACT, si corresponde.

(b) **Distribución a Tenedores de Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured) y Reclamaciones de Bonos de la ACT 98 Principales (National):** salvo que se disponga lo contrario en el presente, en la Fecha de Entrada en Vigencia de la ACT, el Agente Pagador distribuirá, o hará que se distribuya, a cada tenedor de una Reclamación de Bonos de la ACT 98 Permitida, una Reclamación de Bonos de la ACT 98

76

Principales Permitida (Ambac), una Reclamación de Bonos de la ACT 98 Principales Permitida (Assured), una Reclamación de Bonos de la ACT 98 Principales Permitida (FGIC) o una Reclamación de Bonos de la ACT Principales Permitida (National), la Participación a Prorrata del tenedor, si la hubiera, de (i) la Recuperación de Bonos de la ACT 98 Principales, (ii) la Tasa de Restricción del Acuerdo de Apoyo al Plan de la ACT y (iii) los Costos de Perfeccionamiento de la ACT, en cada caso, en la medida aplicable.

(c)     **Distribución a Tenedores de Reclamaciones de Bonos de la ACT 98 Subordinados, Reclamaciones de Bonos de la ACT 98 Subordinados (Assured), Reclamaciones de Bonos de la ACT 98 Subordinados (FGOC) y Reclamaciones de Bonos de la ACT 98 Subordinados (National):** salvo que se disponga lo contrario en el presente, en la Fecha de Entrada en Vigencia de la ACT, el Agente Pagador distribuirá, o hará que se distribuya, a cada tenedor de una Reclamación de Bonos de la ACT 98 Subordinados Permitida, una Reclamación de Bonos de la ACT 98 Subordinados Permitida (Assured), una Reclamación de Bonos de la ACT 98 Subordinados Permitida (FGIC) o una Reclamación de Bonos de la ACT 98 Subordinados Permitida (National), la Participación a Prorrata del tenedor en la Recuperación de Bonos de la ACT 98 Subordinados.

(d)     **Distribuciones con respecto a Reclamaciones sin Garantía Generales de la ACT:** salvo que se disponga lo contrario en el presente, en la Fecha de Entrada en Vigencia de la ACT, el Agente Pagador distribuirá, o hará que se distribuya, a cada tenedor de una Reclamación sin Garantía General de la ACT Permitida, la Participación a Prorrata del tenedor, si la hubiere, de la Recuperación de GUC de la ACT.

(e)     **Distribuciones con respecto a las Reclamaciones de Expropiación/Expropiación Inversa:** salvo que se disponga lo contrario en el presente, en un plazo de diez (10) Días Hábiles a partir de la aparición de una Orden Final que determine la validez y el monto de compensación justa atribuible a una Reclamación de Expropiación/Expropiación Inversa, el Agente Pagador distribuirá, o hará que se distribuya, a cada tenedor de una Reclamaciones de Expropiación/Expropiación Inversa Permitida, Efectivo en el monto de dicha Reclamación Permitida.

(f)     **Distribución de Efectivo a los Tenedores de Reclamaciones de Gastos Administrativos Permitidas:** salvo que se disponga de otro modo en el presente, o tan pronto como sea posible después de la fecha posterior de (i) la Fecha de Entrada en Vigencia de la ACT y ii) la fecha en que tal Reclamación se convierta en una Reclamación Permitida, el Agente Pagador distribuirá, o dispondrá que se distribuya, a cada tenedor de una Reclamación de Gastos Administrativos Permitida, Efectivo en el monto de tal Reclamación Permitida.

(g)     **Distribución de Efectivo a los Tenedores de Reclamaciones de Conveniencia Permitidas:** salvo que se disponga de otro modo en el presente, o tan pronto como sea posible después de la fecha posterior de (i) la Fecha de Entrada en Vigencia y ii) la fecha en que tal Reclamación se convierta en una Reclamación Permitida, el Agente Pagador distribuirá, o dispondrá que se distribuya, a cada tenedor de una Reclamación, Efectivo en el monto de tal Reclamación de Conveniencia Permitida.

27.2 **Puntualidad de los Pagos**: cualquier pago o distribución que deba efectuarse conforme al Plan se considerará oportuna si se realiza dentro de los diez (10) Días Hábiles siguientes a la fecha establecida en el Plan de la ACT. Cuando la distribución que deba efectuarse según el presente Plan deba realizarse en un día que no sea un Día Hábil, dicha distribución se efectuará, sin intereses, en el Día Hábil inmediatamente posterior, pero se considerará que se ha efectuado en la fecha de vencimiento, lo que incluye, de manera no taxativa, considerar que las distribuciones efectuadas conforme al Artículo 27.1 del presente se han realizado en la Fecha de Entrada en Vigencia de la ACT.

27.3 **Distribuciones por parte del Agente Pagador**: a menos que se disponga otra cosa en el presente o en la Orden de Confirmación de la ACT, todas las distribuciones conforme al Plan de la ACT serán realizadas por el Agente Pagador. Se considerará que el Agente Pagador posee todos los bienes que se distribuirán según el presente en fideicomiso a las Entidades facultadas para recibirlos. El Agente Pagador no tendrá ningún interés económico o de usufructo sobre tales bienes.

27.4 **Forma de Pago conforme al Plan de la ACT**: a menos que la Entidad que reciba un pago acuerde otra cosa, cualquier pago en Efectivo que deba efectuar el Agente Pagador se efectuará, según decida quien efectúa el pago, mediante cheque de banco nacional o mediante transferencia bancaria desde un banco nacional; disponiéndose, sin embargo, que no se haga ningún pago de Efectivo a un tenedor de una Reclamación Permitida hasta el momento, si es que sucede, en que el monto pagadero es igual o mayor que diez dólares ($ 10.00).

27.5 **Entrega de Distribuciones**: sujeto a las disposiciones de la Norma 9010 de la Normas de Quiebras, y salvo según se dispone en la Orden de Confirmación de la ACT o el presente, la distribuciones y entregas a tenedores de Reclamaciones Permitidas se realizarán mediante The Depository Trust Company o en el domicilio de cada tenedor según se establece en los Programas radicados con el Tribunal, a menos que lo sustituyan por los domicilios establecidos en las evidencias de Reclamación radicadas por tales tenedores, o en el último domicilio conocido de tal tenedor si no se radica evidencia de Reclamación o si notificó por escrito al Deudor de un cambio de domicilio; disponiéndose, sin embargo, que las distribuciones iniciales por parte del Agente Pagador con respecto a las Reclamaciones de Bonos de la ACT Permitidas se realizarán a, o a la dirección del, Agente Fiscal de la ACT conforme a los documentos que rigen tales obligaciones; y disponiéndose, además, que el Agente Pagador puede realizar distribuciones de Tasas de Restricción del Acuerdo de Apoyo al Plan de la ACT y Costos de Perfeccionamiento en Efectivo a una parte que tenga derecho a estos de una forma de mutuo acuerdo entre tal parte y el Agente Pagador. El Agente Fiscal de la ACT (o la persona designada por el Agente Fiscal de la ACT) entregará, a su vez, la distribución a los tenedores aplicables en la forma prevista en los documentos aplicables que las rijan. Independientemente de si dichas distribuciones son realizadas por el Agente Fiscal de la ACT o por el Agente Pagador bajo la dirección del Agente Fiscal de la ACT, cualquier Gravamen de Carga del Agente Fiscal de la ACT se adjuntará a dichas distribuciones de la misma manera que si dichas distribuciones fueran hechas por o a través del Agente Fiscal de la ACT. El Agente Fiscal de la ACT podrá basarse en las instrucciones de distribución recibidas del Deudor o de sus agentes con respecto a la entrega de distribuciones de acuerdo con los términos y disposiciones de la

78

presente Sección XXVII, incluidas las posiciones contra CUSIP y las posiciones de cuenta de plica establecidas por el deudor o sus agentes con Depository Trust Company. El Deudor, sus agentes y administradores, el Agente Fiscal de la ACT y el Agente Pagador no estarán obligados a reconocer ninguna transferencia de Reclamación de Bonos de la ACT después de la Fecha de Registro de Distribución; disponiéndose, sin embargo, que los Nuevos Bonos de la ACT y los CVI de Recuperación de la ACT sean transferibles y reconocidos si se realizan conforme a los términos y condiciones del Contrato de Emisión de Nuevos Bonos de la ACT y el Contrato de Emisión de CVI, respectivamente.

27.6 **Cancelación de Pagarés, Instrumentos, Certificados y Otros documentos**: salvo (a) según se disponga en cualquier contrato, instrumento u otro acuerdo o documento celebrado u otorgado con relación al Plan de la ACT, (b) para fines de probar el derecho de distribución conforme al Plan de la ACT o (c) según se disponga de otro modo específicamente en el Plan de la ACT (lo que incluye cualquier rechazo de Contratos a Ejecutarse o Contratos de Arrendamiento en Curso conforme al Artículo 26.1 del presente), en la Fecha de Entrada en Vigencia de la ACT, los Bonos de la ACT y todo instrumento y documento relacionado con estos se considerará automáticamente cancelado, rescindido y sin validez ni vigencia alguna contra el Deudor sin acto o acción adicional conforme a cualquier acuerdo, ley, regulación, orden o norma aplicable, y el Deudor y el fideicomisario aplicable, el agente pagador o agente fiscal, no tendrán obligaciones ni deberes y responsabilidades continuas según estos y las obligaciones de las partes del Deudor, conforme a los Bonos de la ACT y todo instrumento y documento relacionado con estos se relevarán; disponiéndose, sin embargo, que, sin perjuicio de lo dispuesto en el presente al contrario, los Bonos de la ACT y tales instrumentos y documentos relacionados seguirán siendo válidos únicamente (i) para permitir que el Agente Pagador realice las distribuciones establecidas en el Plan de la ACT y realice toda otra función administrativa u otra con respecto a este, (ii) para permitir que los tenedores de Reclamaciones de Bonos de la ACT Permitidas y Reclamaciones de Bonos de la ACT Asegurados Permitidas reciban distribuciones conforme a los términos y disposiciones del Plan de la ACT, (iii) para que cualquier fideicomisario, agente, administrador de contratos o entidad similar de todo instrumento y documento relacionado a esto, realice la funciones necesarias, lo que incluye realizar distribuciones, conforme al Plan de la ACT, y para tener el beneficio de todos los derechos y protecciones y otras disposiciones de tales instrumentos y documentos, según corresponda, y todo otro acuerdo relacionado, (iv) para establecer los términos y condiciones aplicables a las partes de tales documentos e instrumentos que no sean el Deudor, (v) para permitir que Assured y National ejerzan los derechos de amortización o redención cedidos a Assured y National conforme a las disposiciones de los Artículos 25.1 y 25.2 del presente, o (vi) según sea necesario para conservar cualquier reclamación en las pólizas de seguros respectivos y documentos relacionados emitidos por una Monolínea y la Junta de Supervisión solicitará que la ACT realice los esfuerzos razonables para (1) mantener los números de CUSIP existentes para los Bonos de la ACT asegurados por Monolínea y (2) tomar las medidas razonables necesarias para preservar y dar plena vigencia y efecto a tales Reclamaciones; y, disponiéndose, sin embargo, que, sin perjuicio de lo anterior o del contenido en el Plan de la ACT en contrario, el Agente Fiscal de la ACT no tendrá deberes ni responsabilidades con respecto a cualesquiera Bonos de la ACT que se depositen en cualquiera del Fideicomiso de Ambac, el Fideicomiso de Assured, el Fideicomiso de FGIC o el Fideicomiso de National a partir de la Fecha de Entrada en Vigencia de la ACT.

79

Sin perjuicio de lo que antecede, y salvo disposición expresa en contrario en el Plan de la ACT, tales bonos o documentos de bonos que queden pendientes no constituirán la base para la afirmación de ninguna Reclamación contra el Deudor o ACT Reorganizada, según el caso.

27.7 **Distribuciones no Entregables/Reservadas**:

(a) **Retención de Distribuciones no Entregables por parte del Agente Pagador:** si cualquier distribución a cualquier tenedor es devuelta al Agente Pagador como no entregable, no se hará ninguna otra distribución a dicho tenedor a menos y hasta que se notifique por escrito al Agente Pagador de la dirección actual de tal tenedor. Sujeto a los términos y disposición del Artículo 32.7(b) del presente, las distribuciones no entregables permanecerán en posesión del Agente Pagador hasta el momento en que una distribución se torne entregable. Todas las Entidades que, en última instancia, reciban Efectivo que no sea entregable no tendrán derecho a ningún interés u otros montos devengados sobre ellos de ningún tipo. Nada de lo dispuesto en el Plan de la ACT requerirá que el Agente Pagador intente localizar a cualquier tenedor de una Reclamación Permitida.

(b) **Falta de Reclamar Distribuciones no Entregables**: si (i) el Agente Pagador envía un cheque a un tenedor con respecto a las distribuciones y tal cheque no se hace efectivo en un plazo de ciento veinte (120) días después de la fecha en que se expidió dicho cheque o (ii) cualquier otra forma de distribución a un tenedor es de otro modo imposible de entregar, el Agente Pagador (o su agente debidamente autorizado) deberá, en antes de la fecha ciento ochenta (180) días posterior a (i) la Fecha de Entrada en Vigencia de la ACT, con respecto a todas las Reclamaciones Permitidas a partir de la Fecha de Entrada en Vigencia de la ACT, (ii) la fecha en que se haga una distribución con respecto a cualquier Reclamación Controvertida que se convierta en Reclamación Permitida después de la Fecha de Entrada en Vigencia de la ACT, radicar una lista en el Tribunal del Título III en la que se indiquen los nombres de las Entidades para las cuales se hayan efectuado distribuciones según el presente que no se hayan hecho efectivas o que hayan sido devueltas como no entregables en la fecha de su entrega. Cualquier tenedor de una Reclamación Permitida en tal lista que no se identifique y haga valer sus derechos conforme al Plan de la ACT para recibir una distribución dentro de los seis (6) meses posteriores a la fecha establecida en la lista se le finiquitará el derecho a tal distribución no entregable y quedará excluido para siempre de hacer valer cualquier derecho conforme al Plan de la ACT contra la ACT Reorganizada, los fideicomisarios o sus profesionales, agentes o bienes correspondientes y todo (1) Efectivo en posesión del Agente Pagador o el fideicomisario con respecto a valores existentes, según el caso, se liberará a Deudores Reorganizados para su uso en la liquidación de gastos de operación de la ACT Reorganizada y (2) los Bonos de la ACT en posesión del Agente Pagador o fideicomisario con respecto a los valores existentes se liberarán a la ACT Reorganizada para cancelación o depósito en el tesoro de la ACT Reorganizada, según determine la ACT Reorganizada a su criterio exclusivo y absoluto.

27.8 **Requisitos de Retención y Presentación de Informes**: cualquier parte que emita cualquier instrumento o realice cualquier distribución según el Plan de la ACT deberá cumplir con todos los requisitos aplicables de retención y presentación de informes impuestos por cualquier ley fiscal o autoridad fiscal federal, estatal o local de los Estados Unidos, y todas las

distribuciones según el Plan de la ACT estarán sujetas a tales requisitos de retención o presentación de informes. Sin perjuicio de lo anterior, cada tenedor de una Reclamación Permitida que vaya a recibir una distribución según el Plan de la ACT tendrá la responsabilidad única y exclusiva de satisfacción y pago de los impuestos exigidos a ese tenedor por cualquier unidad gubernamental, lo que incluye los impuestos de rentas, retención y otras obligaciones fiscales, a causa de tal distribución. Cualquier parte que emita cualquier instrumento o haga cualquier distribución según el Plan de la ACT tiene derecho, pero no la obligación, a no hacer una distribución hasta que tal tenedor haya tomado las disposiciones satisfactorias para dicha parte emisora o pagadora para el pago de tales obligaciones de retención de impuestos y, si cualquier de las partes que emite cualquier instrumento o realiza cualquier distribución según el Plan de la ACT no realiza las retenciones con respecto a la distribución de tal tenedor, y más tarde es considerada responsable por el monto de dicha retención, el tenedor reembolsará a dicha parte. El Agente Pagador podrá exigir, como condición para la recepción de una distribución, que el tenedor complete el Formulario W-8 o el Formulario W-9 correspondiente, según sea aplicable a cada tenedor. Si el tenedor no cumple dicha solicitud en el plazo de un año, dicha distribución se considerará una Distribución no Reclamada.

27.9 **Tiempo Límite para Pagos en Efectivo**: los cheques expedidos por el Agente Pagador a causa de las Reclamaciones Permitidas serán nulos si no se hacen efectivos en un plazo de ciento veinte (120) días a partir de la fecha de emisión de estos. El tenedor de la Reclamación Permitida con respecto a la cual se expidió inicialmente dicho cheque presentará directamente las solicitudes de reexpedición de cualquier cheque al Agente Pagador. Toda reclamación con respecto a tal cheque anulado se efectuará en o antes del posterior del (i) primer (1.ᵉʳ) aniversario de la Fecha de Entrada en Vigencia de la ACT o (ii) noventa (90) días después de la fecha de emisión de dicho cheque, si dicho cheque representa una distribución final según el presente a causa de dicha Reclamación. Después de tal fecha, todas las Reclamaciones con respecto a los cheques anulados deberán finiquitarse y quedar excluidas para siempre y el Agente Pagador conservará todos los fondos relacionados con estas con el único fin de redistribuirlos a los tenedores de Reclamaciones Permitidas conforme a los términos y disposiciones del presente.

27.10 **Distribuciones después de la Fecha de Entrada en Vigencia de la ACT**: se considerará que las distribuciones efectuadas después de la Fecha de Entrada en Vigencia de la ACT a tenedores de Reclamaciones que no son Reclamaciones Permitidas a la Fecha de Entrada en Vigencia de la ACT, pero que posteriormente pasan a ser Reclamaciones Permitidas, se han realizado conforme a los términos y disposiciones de la Sección XXVII del Plan de la ACT.

27.11 **Compensaciones**: salvo que se disponga de otro modo en el Plan de la ACT o en la Orden de Confirmación, el Agente Pagador puede, conforme a la legislación de quiebras o que no sea de quiebras, compensar contra cualquier Reclamación Permitida y las distribuciones a realizar conforme al Plan de la ACT a causa de estas (antes de que se realice ninguna distribución a causa de tal Reclamación por parte del Agente Pagador), las reclamaciones, derechos y Causas de Acción de cualquier naturaleza que el Deudor o la ACT Reorganizada puedan tener contra el tenedor de tal Reclamación Permitida, disponiéndose, sin embargo, que ni la falta de realizar tal compensación ni la asignación de ninguna Reclamación según el presente constituirá una renuncia o descargo por parte del Deudor o la ACT Reorganizada de tales

81

reclamaciones, derechos y Causas de Acción que el Deudor o la ACT Reorganizada puedan poseer contra tal tenedor, y *disponiéndose, además*, que nada en el contenido del presente pretende limitar la capacidad de cualquier Acreedor de dar plena vigencia y efecto a derechos de compensación o recuperación conservados o permitidos por las disposiciones de los artículos 553, 555, 559 o 560 del Código de Quiebras o conforme a al derecho consuetudinario de recuperación; y *disponiéndose, además*, que nada de lo contenido en el presente Artículo 27.11 afectará los descargos y medidas cautelares dispuestas en la Sección XL del Plan.

27.12 **Asignación de Distribución del Plan entre Capital e Intereses**: a menos que se especifique de otro modo en el presente, en la medida en que cualquier Reclamación Permitida con derecho a una distribución según el Plan de la ACT consista en endeudamiento y otros montos (tal como intereses devengados pero impagos sobre estos), dicha distribución se asignará en primer lugar, a los intereses devengados e impagos a partir de la fecha inmediatamente anterior a la Fecha de Petición de la ACT, en segundo lugar, al capital de la Reclamación (según se determine a efectos del impuesto federal a la renta) y luego, en la medida en que la contraprestación exceda el capital de la Reclamación, a esos otros montos; *disponiéndose, sin embargo*, que el tratamiento por parte del Deudor y la ACT Reorganizada de cualquier distribución para sus fines fiscales no sea vinculante para ningún Acreedor en cuanto al tratamiento de tales distribuciones con fines reglamentarios, fiscales o de otro tipo.

27.13 **Pago de Honorarios y Gastos del Fideicomisario**: las distribuciones a ser realizadas conforme al Plan de la ACT y el Plan de Confirmación del ELA para los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos de la ACT 98 Principales a causa de tales Reclamaciones se pretende que se incluyan todos y cada uno de los honorarios y gastos razonables del Agente Fiscal de la ACT debidos y adeudados por la ACT de conformidad con las resoluciones de bonos aplicables con respecto a las montos descargadas de conformidad con el Plan de la ACT (las «los honorarios y gastos del Agente Fiscal de la ACT»). En la medida en que no se deduzca en relación con los pagos realizados de conformidad con la Orden de Confirmación del ELA, en cumplimiento de las Condiciones de Distribución, los Honorarios y Gastos del Agente Fiscal de la ACT se deducirán a prorrata de las distribuciones a los tenedores de Reclamaciones de Bonos de la ACT 68 y de Reclamaciones de Bonos de la ACT 98 Principales a causa de dichas reclamaciones, de tal forma que el costo de los Honorarios y Gastos del Agente Fiscal de la ACT sea compartido por igual por todos los tenedores de las Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos de la ACT 98 Principales basándose en el monto de sus reclamaciones; *disponiéndose, sin embargo*, que, sin perjuicio de cualquier cosa en el Plan de la ACT, la Orden de Confirmación de la ACT, o las resoluciones de bonos aplicables en contrario, los Honorarios y Gastos del Agente Fiscal de la ACT no excederán los $2,360,681.02. En el caso de que los montos reservados o deducidos por el Agente Fiscal de la ACT de las distribuciones que se realizarán a los tenedores de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos de la ACT 98 Principales excedan los Honorarios y Gastos del Agente Fiscal de la ACT, dichos montos excesivos serán distribuidos por, o bajo la dirección de, el Agente Fiscal de la ACT a prorrata de los tenedores de las Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos de la ACT 98 Principales en la Fecha de Entrada en Vigencia de la ACT (la «Distribución en Exceso»). A efectos del presente Artículo 27.13, las Monolíneas aplicables constituirán los tenedores de las Reclamaciones de

Bonos de la ACT 68 y de las Reclamaciones de Bonos de la ACT 98 Principales derivadas de los
Bonos de la ACT asegurados por cualquiera de estas Monolíneas, si las hubiere, de conformidad
con el Artículo 301(c)(3) de PROMESA, ley aplicable, y los seguros aplicables y otros
documentos aplicables a dichos Bonos de la ACT; disponiéndose, sin embargo, que, sin perjuicio
de lo anterior, (a) con respecto a cualesquiera Bonos de la ACT 98 Principales propiedad de
FGIC, el Agente Fiscal de la ACT atribuirá la Distribución en Exceso a FGIC, si la hubiere, y (b)
con respecto a cualesquiera Bonos de la ACT 98 Principales Asegurados de FGIC, pero no en
propiedad de FGIC, el Agente Fiscal de la ACT hará que la Distribución en Exceso sea atribuible
a los propietarios de tales Bonos de la ACT 98 Principales. Salvo que se disponga lo contrario en
el presente Artículo 27.13, el Plan de la ACT no limita, ni se interpretará como que limita, los
derechos del Agente Fiscal de la ACT al pago de tales montos de las distribuciones que se
realizarán en virtud del presente, lo que incluye, sin limitación, la imposición de cualquier
Gravamen de Carga.

27.14 **Beneficiario Efectivo**: a todos los efectos del Plan de la ACT, lo que incluye, de
manera no taxativa, a los efectos de las distribuciones conforme a los términos y disposiciones de
la presente Sección XXVII, se entenderá por «tenedor» de una Reclamación cualquier Entidad
que, directa o indirectamente, tenga poder de inversión respecto de cualquier Reclamación, lo
que incluye la facultad de enajenar o dirigir la enajenación de tal Reclamación; disponiéndose,
sin embargo, que a los efectos de la Sección XXVII del presente y del artículo 1126 del Código
de Quiebras, (a) National constituirá el «tenedor» de cualquier Reclamación de Bonos
Asegurados de National y cualquier Reclamación de Bonos de la ACT/ELA conforme al
Artículo 301(c)(3) de PROMESA, la legislación aplicable y otros documentos que rijan
aplicables a las Reclamaciones de Bonos Asegurados de National y las Reclamaciones de Bonos
de la ACT/ELA, (b) Assured constituirá el "tenedor" de cualquier Reclamación de Bonos
Asegurados por Assured, cualquier Reclamación de Bonos de la ACT/ELA de Assured,
cualquier Reclamación de Bonos de la ACT/ELA de Assured y cualquier Reclamación de
Impuesto de Ron de la AFI/ELA de Assured conforme a la Sección 301(c)(3) de PROMESA, la
ley aplicable, documentos de seguros que rijan y otros documentos aplicables a las
Reclamaciones de Bonos Asegurados de Assured, Reclamaciones  de Bonos de la ACT/ELA de
Assured, Reclamaciones de Bonos de la ACT/ELA de Assured y Reclamaciones de Impuesto al
Ron de la AFI/ELA de Assured, (c) Ambac constituirá el "tenedor" de cualquier Reclamación de
Bonos Asegurados por Ambac, cualquier Reclamación de Bonos de la ACT/ELA de Ambac,
cualquier Reclamación de Bonos de la ACT/ELA de Ambac y cualquier Reclamación de
Impuesto de Ron de la AFI/ELA de Ambac conforme a la Sección 301(c)(3) de PROMESA, la
ley aplicable, documentos de seguros que rijan y otros documentos aplicables a las
Reclamaciones de Bonos Asegurados de Ambac, Reclamaciones  de Bonos de la ACT/ELA de
Ambac, Reclamaciones de Bonos de la ACT/ELA de Ambac y Reclamaciones de Impuesto al
Ron de la AFI/ELA de Ambac, (d) FGIC constituirá el "tenedor" de cualquier Reclamación de
Bonos Asegurados de FGIC y cualquier Reclamación de Bonos de la ACT/ELA de FGIC
conforme a la Sección 301(c)(3) de PROMESA, la ley aplicable y documentos de seguros que
rijan y otros documentos aplicables a las Reclamaciones de Bonos Asegurados de FGIC y las
Reclamaciones de Bonos de la ACT/ELA de FGIC, y (e) el "tenedor" de cualquier otra
Reclamación de Bonos de la ACT Asegurados se determinará de conformidad con el Artículo

83

301(c)(3) de PROMESA, la ley aplicable y los documentos que rijan dicha Reclamación de
Bonos de la ACT Asegurados.

27.15 **Valor de Distribuciones**: a efectos del cálculo del valor de las distribuciones
efectuadas a tenedores de Reclamaciones Permitidas, (a) el Efectivo se valorará en el monto
distribuido y (b) los Nuevos Bonos la ACT se valorarán en su capital original.

27.16 **Estipulación de Fondos en Disputa**: en caso de que las condiciones de
distribución no se cumplan antes de la Fecha de Entrada en Vigencia de la ACT, en la Fecha de
Entrada en Vigencia de la ACT, las Condiciones de distribución se considerarán satisfechas y los
pagos y distribuciones que se realicen en relación con estas de conformidad con los términos y
disposiciones de la Orden de Confirmación del ELA y el Acuerdo de Apoyo al Plan de la
ACT/ADCC se realizarán en la Fecha de Entrada en Vigencia de la ACT para los tenedores de
Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac),
Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68
(National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la
ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured),
Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la
ACT 98 Principales (National), incluida, sin limitación, la distribución del dinero de
conformidad con la Estipulación de Fondos en Disputa, sujeta a los derechos del Bank of New
York Mellon, como agente fiscal, de hacer valer y aplicar, a prorrata, todos y cada uno de sus
derechos con respecto a estas.

## SECCIÓN XXVIII

## SEGUIMIENTO Y EXTINCIÓN DE RECLAMACIONES DEL DEUDOR

28.1 **Seguimiento de Reclamaciones**: salvo como se haya resuelto y liberado en el
presente, a partir de la Fecha de Entrada en Vigencia de la ACT, el Fideicomisario de Acciones
de Anulación tendrá el derecho y la facultad exclusivos de (a) litigar todas las Acciones de
Anulación y (b) conciliar y resolver tales Acciones de Anulación, previa aprobación del Tribunal
del Título III. Los ingresos netos de cualquier litigio o transacción (después de satisfacer todos
los costos y gastos incurridos en relación con este) se incluirán en la Recuperación de GUC de la
ACT y se distribuirán a los tenedores de Reclamaciones sin Garantía Generales de la ACT
Permitidas.

## SECCIÓN XXIX

## ACEPTACIÓN O RECHAZO DEL PLAN DE LA ACT; EFECTOS DEL RECHAZO POR PARTE DE UNA O MÁS CLASES DE RECLAMACIONES

29.1 **Clases Afectadas a Votar**: cada tenedor de una Reclamación, a la Fecha de
Registro de Votación o al momento de realizar una licitación en ATOP, según corresponda, de
una Reclamación de una Clase afectada que no se considere que haya rechazado o aceptado el
Plan de la ACT conforme a la Sección XXXII del Plan de la ACT de otro modo tendrá derecho a
votar por separado para aceptar o rechazar el Plan de la ACT.

84

29.2 **Aceptación por Clase de Acreedores**: se considerará que una Clase afectada de tenedores de Reclamaciones habrá aceptado el Plan de la ACT si el Plan de la ACT es aceptado por al menos dos tercios (2/3) en monto en dólares y más de la mitad (1/2) en cantidad de Reclamaciones Permitidas de tal clase que hayan votado para aceptar o rechazar del Plan de la ACT.

29.3 **Imposición de Plan Concursal por el Tribunal**: en el caso en que cualquier Clase afectada de Reclamaciones no acepte, o se considere que rechaza, el Plan de la ACT conforme al artículo 1129(a) del Código de Quiebras, el Deudor se reserva el derecho a (i) solicitar que el Tribunal de Quiebras confirme el Plan de la ACT conforme al artículo 1129(b) del Código de Quiebras o (ii) sujeto al consentimiento de los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC, conforme a las disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC, modificar el Plan de la ACT.

## SECCIÓN XXX

## DERECHOS Y FACULTADS DEL AGENTE PAGADOR

30.1 **Exculpación**: a partir de la Fecha de Entrada en Vigencia de la ACT, el Agente Pagador será exculpado por todas las Entidades, lo que incluye, de manera no taxativa, los tenedores de Reclamaciones y otras partes interesadas, de toda reclamación, Causa de Acción y otros alegatos de responsabilidad derivados del cumplimiento de las facultades y obligaciones que le confieren al Agente Pagador el Plan de la ACT o cualquier orden del Tribunal del Título III que se haya dictado conforme al Plan de la ACT o en cumplimiento de este, o de la ley aplicable, excepto en el caso de acciones o falta de acción derivados de negligencia grave o de mala conducta intencional de tal Agente Pagador. Ningún tenedor de una Reclamación u otra parte interesada tendrá o iniciará ninguna reclamación o causa de acción contra el Agente Pagador porque este realice pagos conforme al Plan de la ACT o implemente las disposiciones del Plan de la ACT, excepto por reclamaciones o causas de acción que surjan de la negligencia grave o conducta dolosa deliberada del Agente Pagador.

30.2 **Facultades del Agente Pagador**: salvo que se disponga de otro modo según el presente, el Agente Pagador estará facultado para (a) adoptar todas las medidas y ejecutar todos los instrumentos y documentos necesarios para llevar a cabo el Plan de la ACT, (b) hacer las distribuciones contempladas en el Plan de la ACT, (c) cumplir con el Plan de la ACT y las obligaciones que este impone; y (d) ejercer las demás facultades que se confieran al Agente Pagador conforme a una orden del Tribunal del Título III, conforme al Plan de la ACT, o que el Agente Pagador considere necesario y adecuado para implementar las disposiciones del Plan de la ACT.

30.3 **Honorarios y Gastos incurridos a partir de la Fecha de Entrada en Vigencia de la ACT**: salvo que el Tribunal del Título III disponga de otro modo, el monto de los honorarios y gastos razonables en que incurra el Agente Pagador a partir de la Fecha de Entrada en Vigencia de la ACT, y cualquier reclamación razonable de compensación y reembolso de gastos, lo que incluye, de manera no taxativa, honorarios y gastos razonables de abogado, en que incurra el

Agente Pagador, se abonarán en Efectivo sin órdenes adicionales por parte del Tribunal del Título III; disponiéndose, sin embargo, que el Agente Pagador no tenga derecho a reembolso o indemnización por parte de la ACT Reorganizada en relación con reclamaciones o causas de acción que surjan de la negligencia grave o conducta dolosa deliberada del Agente Pagador.

## SECCIÓN XXXI

## PROCEDIMIENTOS PARA EL TRATAMIENTO DE RECLAMACIONES CONTROVERTIDAS Y RECLAMACIONES SUJETAS A PROCEDIMIENTOS DE LA ACR

31.1 **Objeciones a Reclamaciones; Seguimiento de Reclamaciones Controvertidas**:

(a)     Salvo en lo que respecta a las Reclamaciones Permitidas, y sujeto a los términos y condiciones de los Procedimientos de ADR y la Orden de ADR, la ACT Reorganizada, a través de la Junta de Supervisión, y en consulta con la AAFAF, objetarán y asumirán toda objeción pendiente radicada por el Deudor a la admisión de Reclamaciones radicadas ante el Tribunal del Título III con respecto a las cuales dispute la responsabilidad, prioridad o monto, lo que incluye, de manera no taxativa, las objeciones a Reclamaciones que se hayan cedido y la afirmación de la doctrina de subordinación equitativa con respecto a estas. Todas las objeciones, defensas afirmativas y contrademandas serán litigadas hasta obtener una Orden Final; disponiéndose, sin embargo, que la ACT Reorganizada, a través de la Junta de Supervisión, y en consulta con la AAFAF, estarán facultadas para radicar, resolver, conciliar o retirar toda objeción a Reclamaciones, sin necesidad de aprobación por parte del Tribunal del Título III. A menos que el Tribunal del Título III disponga otra cosa, en la medida en que no sea ya objeto de objeciones por parte del Deudor, la ACT Reorganizada radicará y presentará todas las objeciones a Reclamaciones lo antes posible, pero, en cada caso, a más tardar ciento ochenta (180) días después de la Fecha de Entrada en Vigencia de la ACT o en una fecha posterior que pueda aprobar el Tribunal del Título III. Tras la realización de distribuciones a los tenedores de Reclamaciones de Bonos de la ACT Permitidas de conformidad con las disposiciones del presente, cualquier Reclamación de Bonos de la ACT presentada por cualquier Entidad, por montos adeudados en virtud de valores existentes, se considerará satisfecha y eliminada y la Junta de Supervisión instruirá a Kroll Restructuring Administration LLC (anteriormente Prime Clerk LLC), su representante designado por el tribunal, para eliminar tales Reclamaciones de Bonos de la ACT del registro de reclamaciones mantenido para el beneficio del Tribunal del Título III; disponiéndose, sin embargo, que, en el caso de que un pedido que invierta o anule la Orden de Confirmación de la ACT con respecto a las Reclamaciones de Bonos de la ACT se convierta en una Orden Final, dichas Reclamaciones de Bonos de la ACT se restablecerán en el registro de reclamaciones.

(b)     Los dos (2) miembros designados por el Comité de Acreedores para la Junta de Fideicomiso de Acciones de Anulación (i) recibirán actualizaciones mensuales del proceso de conciliación de reclamaciones con respecto a las Reclamaciones sin garantía Generales de la ACT, cuyo proceso continuará siendo administrado por la Junta de Supervisión, con la asistencia de la AAFAF, (ii) tendrán derecho a (A) revisar las objeciones a las

86

reclamaciones y el proceso de conciliación, incluidos los Procedimientos de ADR, en lo que respecta a las Reclamaciones sin Garantía Generales de la ACT y a las Reclamaciones de Conveniencia, independientemente del tamaño de la Reclamación ratificada, (B) garantizar el cumplimiento de las exclusiones de las Reclamaciones sin Garantía Generales de la ACT, tal como se establece en el Plan de la ACT, y (C) en caso de que dichas personas no estén de acuerdo con cualquier liquidación de una Reclamación sin Garantía General de la ACT, por un monto permitido superior a quinientos mil dólares ($500,000.00), tales personas designadas pueden solicitar ayuda al Tribunal del Título III para hacer (al demostrar que tal transacción no es en el mejor interés de la ACT y sus acreedores) que la Junta de Supervisión o AAFAF, según el caso, obtenga la aprobación del Tribunal del Título III para cualquier transacción de conformidad con la norma de aprobación de conformidad con la Regla de Quiebras 9019. Tales personas designadas y sus asesores no tendrán derecho a una indemnización superior a la proporcionada de conformidad con el Plan del ELA y la Orden de Confirmación del ELA.

(c)  A partir de la Fecha de Entrada en Vigencia de la ACT, todas las Reclamaciones de Radicación Tardía se considerarán denegadas, con prejuicio, y la Junta de Supervisión instruirá a Kroll Restructuring Administration LLC (anteriormente Prime Clerk LLC), su representante designado por el tribunal, para eliminar tales Reclamaciones de Radicación Tardía del registro de reclamaciones mantenido para el beneficio del Tribunal de Título III y la Junta de Supervisión hará que se le notifique al tenedor de dicha Reclamación de Radicación Tardía.

31.2 **Estimación de Reclamaciones**: salvo en lo que respecta a las Reclamaciones Permitidas, en la Fecha de Entrada en Vigencia de la ACT y después de esta, y a menos que una orden del Tribunal del Título III lo límite de otro modo, lo que incluye, de manera no taxativa, la Orden de la ACR y la Orden de ADR, la ACT Reorganizada, a través de la Junta de Supervisión, podrán en cualquier momento pedir a el Tribunal del Título III que calcule a efectos de distribución final cualquier Reclamación contingente, por liquidar o Controvertida conforme al artículo 502(c) del Código de Quiebras, independientemente de si el Deudor se opuso previamente a dicha Reclamación o trató de estimarla, y el Tribunal del Título III retendrá la jurisdicción para considerar cualquier solicitud de estimación de cualquier Reclamación durante el litigio con respecto a cualquier objeción a cualquier Reclamación, lo que incluye, de manera no taxativa, durante la pendencia de cualquier apelación con respecto a tal objeción. A menos que se disponga otra cosa en una orden del Tribunal del Título III, en caso de que el Tribunal del Título III estimase cualquier reclamación contingente, por liquidar o Controvertida, el monto estimado constituirá el monto permitido de dicha Reclamación o una limitación máxima de dicha Reclamación, según determine el Tribunal del Título III; disponiéndose, sin embargo, que, si la estimación constituye la limitación máxima de dicha Reclamación, la ACT Reorganizada, a través de la Junta de Supervisión, podrá optar por iniciar procedimientos suplementarios para objetar a cualquier admisión definitiva de tal Reclamación; y, disponiéndose, además, que lo que antecede no pretende limitar los derechos concedidos por el artículo 502(j) del Código de Quiebras. Todos los procedimientos de objeción, estimación y resolución de Reclamaciones antes mencionados son acumulativos y no se excluyen necesariamente entre sí.

31.3 **Pagos y Distribuciones de Reclamaciones Controvertidas**:

(a)     **Retención de las Reclamaciones Controvertidas:** a partir de la Fecha de Entrada en Vigencia de la ACT y hasta el momento que cada Reclamación Controvertida se haya conciliado y resuelto, estimada por el Tribunal del Título III en un monto que constituye el monto permitido, o Permitida o No Permitida mediante Orden Final del Tribunal del Título III, la ACT Reorganizada retendrá, a beneficio de cada tenedor de una Reclamación Controvertida, las distribuciones que se hubiesen realizado a tal tenedor si fuese una Reclamación Permitida en un monto igual o menor que (i) el monto liquidado establecido en la evidencia radicada de la Reclamación con respecto a tal Reclamación Controvertida, (ii) el monto en que el Tribunal del Título III debe estimar las Reclamaciones Controvertidas conforme al artículo 502 del Código de Quiebras constituye y representa el monto máximo por el cual tal Reclamación se pueda convertir finalmente en una Reclamación Permitida y (iii) tal otro monto pueda acordarse por el tenedor de tal Reclamación Controvertida y la ACT Reorganizada; disponiéndose, sin embargo, que la recuperación por parte de cualquier tenedor de una Reclamación Controvertida no excederá el menor de (i), (ii) y (iii) que preceden. En la medida en que la ACT Reorganizada conserve cualquier Nuevo Bono de la ACT en nombre de tenedores de Reclamaciones Controvertidas, hasta que dichos Nuevos Bonos de la ACT se distribuyan, la ACT Reorganizada ejercerá sus derechos de voto o consentimiento con respecto a dichas obligaciones.

(b)     **Admisión de Reclamaciones Controvertidas:** en el momento en que una Reclamación Controvertida se convierta, total o parcialmente, en una Reclamación Permitida, la ACT Reorganizada distribuirá al tenedor de esta las distribuciones, si las hubiere, a las que tal tenedor tenga derecho según el Plan de la ACT, junto con cualesquiera ganancias que se hayan acumulado al respecto (el neto de cualquier gasto, lo que incluye impuestos, correspondientes), pero solamente en la medida en que esas ganancias sean atribuibles al monto de la Reclamación Permitida. Tal distribución, en su caso, se hará tan pronto como sea posible después de la fecha en que la orden o sentencia del Tribunal del Título III que permite tal Reclamación Controvertida se convierta en una Orden Final, pero en ningún caso más de noventa (90) días después de esta.

31.4 **Facultad para modificar Listas de Acreedores**: salvo en lo que se refiere a las Reclamaciones de Bonos de la ACT y sujeto a las limitaciones en el Artículo 31.1(b) del presente, el Deudor estará facultado para modificar la Lista de Acreedores con respecto a cualquier Reclamación y para efectuar distribuciones basadas en tal Lista de Acreedores modificada sin aprobación por parte del Tribunal del Título III. Si tal modificación a la Lista de Acreedores reduce el monto de una Reclamación o cambia la naturaleza o prioridad de una Reclamación, el Deudor notificará al tenedor de tal Reclamación de tal modificación y tal tenedor dispondrán de veinte (20) días para presentar una objeción a tal modificación ante el Tribunal del Título III. Si no se presenta tal objeción, el Agente Pagador podrá proceder con las distribuciones en base a tal Lista de Acreedores modificada sin aprobación por parte del Tribunal del Título III.

31.5 **No Devengamiento de Intereses**: a menos que se disponga de otro modo en el presente o por orden del Tribunal del Título III, los intereses posteriores a la petición con respecto a Reclamaciones, Permitidas o de otro modo, no se devengarán ni pagarán, y ningún tenedor de una Reclamación, Permitida o de otro modo, tendrá derecho a intereses devengados en o después de la Fecha de Petición de la ACT sobre cualquier Reclamación o derecho.

Además, y sin limitar lo anterior, no se devengarán ni se pagarán intereses sobre ninguna reclamación controvertida con respecto al período comprendido entre la Fecha de Entrada en Vigencia de la ACT y la fecha en que se realice una distribución final a causa de tal Reclamación Controvertida, siempre y cuando dicha Reclamación Controvertida se convierta en una Reclamación Permitida.

31.6 **Denegación de Reclamaciones**: se denegarán todas la Reclamaciones de cualquier Entidad a la que el Deudor solicite bienes conforme a los artículos 550 o 553 del Código de Quiebras o el Deudor alegue sea cesionaria de una transferencia evitable conforme a los artículos 544, 545, 547, 548 o 549 del Código de Quiebras si: a) la entidad, por una parte, y el Deudor, por otra parte, acuerdan o el Tribunal del Título III haya determinado mediante Orden Final que dicha Entidad o cesionario está obligado a entregar cualquier bien o fondos en virtud de cualquiera de los artículos antes mencionados del Código de Quiebras y (b) tal Entidad o cesionario no ha entregado esos bienes en la fecha establecida en tal acuerdo u Orden Final.

31.7 **Reclamaciones Sujetas a Procedimientos de la ACR**: en la medida en que aún no se haya transferido a partir de la Fecha de Entrada en Vigencia de la ACT de conformidad con los términos y condiciones de la Orden de la ACR, el Deudor o la ACT Reorganizada, según el caso, transferirán las Reclamaciones de conformidad con los términos y condiciones de la Orden de la ACR y, tras la transferencia, todas esas Reclamaciones (a) se conciliarán conforme a los procedimientos reglamentarios y administrativos aplicables del Deudor y la ACT Reorganizada, según el caso, (b) se pagarán íntegramente en el curso de operaciones comerciales normales, y (c) excepto como se proporciona de otra manera en el Plan de la ACT, no se incluirán en las Reclamaciones sin Garantía Generales de la ACT para ser satisfechas a partir de las Reclamaciones de Conveniencia o Recuperación de GUC de la ACT. Sin perjuicio de lo anterior, (y) la Junta de Supervisión puede retirar una reclamación del proceso de la ACR en caso de que se transfiriera indebidamente al proceso de la ACR porque no reúne los requisitos de conformidad con los términos y disposiciones de la Orden de la ACR, lo que incluye, sin limitación, reclamaciones de bonos o reclamaciones «hijas» relacionadas con evidencias de reclamación de una acción de clase «madre» (en cuyo caso, dichas reclamaciones pueden transferirse a la Clase apropiada según el Plan de la ACT) y (z) reclamaciones que son aptas para ser transferidas o administradas a través del proceso de la ACR y para las que no se requiere presentar ninguna evidencia de reclamaciones (independientemente de si se presentó o no una evidencia de reclamaciones) no se transferirán a la Clase 16 o Clase 19 conforme al Plan de la ACT y se administrarán a través del proceso de la ACR, conforme a los términos de la Orden de la ACR y las subsecciones (a) y (b) del Artículo 31.7.

## SECCIÓN XXXII

## IDENTIFICACIÓN DE RECLAMACIONES AFECTADAS POR EL PLAN DE LA ACT Y NO AFECTADAS POR EL PLAN DE LA ACT

32.1 **Clases Afectadas**: las Reclamaciones de las Clases 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16 y 17 se ven afectadas y reciben distribuciones conforme al Plan de la ACT, por lo que tienen derecho a votar para aceptar o rechazar el Plan de la ACT; _disponiéndose, sin_

embargo, que, en base las elecciones realizadas en la Papeleta/Formulario de Elección, se considere que la Clase 19 ha aceptado el Plan de la ACT. Las Reclamaciones de la Clase 18 se ven afectadas y no reciben una distribución conforme al Plan de la ACT y, por lo tanto, se considera que la Clase 18 ha rechazado el Plan de la ACT.

32.2 **Clases de la ACT no Afectadas**: las Reclamaciones de las Clases 14 y 19 no se ven afectadas conforme al Plan de la ACT y se considera que han aceptado el Plan de la ACT y no tienen derecho a votar para aceptar o rechazar el Plan de la ACT.

## SECCIÓN XXXIII

## CONDICIONES PRECEDENTES A LA CONFIRMACIÓN DEL PLAN DE LA ACT

33.1 **Condiciones Precedentes a la Confirmación del Plan de la ACT**: la confirmación del Plan de la ACT está sujeta a la satisfacción de las siguientes condiciones precedentes:

(a)      **Certificación del Plan Fiscal:** la Junta de Supervisión deberá haber certificado un Plan Fiscal de la ACT coherente con el Plan de la ACT y haber certificado la presentación del Plan de la ACT, así como cualquier modificación del Plan de la ACT hasta la Fecha de Confirmación de la ACT, conforme a los Artículos 104(j) y 313 de PROMESA.

(b)      **Órdenes Requeridas:** el Actuario del Tribunal del Título III deberá haber ingresado una orden u órdenes (lo que incluye, de manera no taxativa, la Orden de Declaración de Divulgación y la Orden de Confirmación de la ACT) que prevean lo siguiente:

(i)      Aprobar la Declaración de Divulgación en el sentido de que contiene «información adecuada» conforme al artículo 1125 del Código de Quiebras;

(ii)      Autorizar la solicitud de votos y elecciones con respecto al Plan de la ACT;

(iii)      Determinar que todos los votos y elecciones o las elecciones consideradas sean vinculantes y hayan sido debidamente tabulados;

(iv)      Confirmar y dar efecto a los términos y disposiciones del Plan de la ACT, lo que incluye las liberaciones establecidas en la Sección XL del Plan de la ACT;

(v)      Determinar que las conciliaciones y resoluciones establecidas en el Plan de la ACT son apropiadas, razonables y aprobadas y que autorizan las transacciones previstas en este;

(vi)      Determinar que todas las pruebas, normas y cargas aplicables con respecto al Plan de la ACT han sido debidamente satisfechas y cumplidas por la Junta de Supervisión, el Deudor y el Plan de la ACT;

(vii)   Aprobar los documentos en el Complemento del Plan, que no sean de los estatutos de la ACT Reorganizada, y determinar que tales documentos son válidos y vinculantes para las partes con respecto a estos; y

(viii)   Autorizar a la ACT Reorganizada a ejecutar, ingresar y otorgar los documentos en el Complemento del Plan, así como a ejecutar, implementar y tomar todas las medidas que sean necesarias o apropiadas de otro modo para dar efecto a las transacciones contempladas en el Plan de la ACT, así como a los documentos del Complemento del Plan.

(c)   **Forma de las Órdenes:** la Orden de Confirmación de la ACT y el Plan de la ACT son cada uno en forma y sustancia razonablemente aceptables para la Junta de Supervisión, AAFAF, el Deudor, los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC y, únicamente con respecto a las disposiciones que afectan a las Clases 16 y 19, el Comité de Acreedores.

(d)   **Orden de Confirmación de la ACT:** la Orden de Confirmación de la ACT incluye (i) determinaciones de que todas las resoluciones y conciliaciones contenidas en el Plan de la ACT cumplen las normas aplicables según los artículos 365, 1123(b)(3) y 1129 del Código de Quiebras y la Norma de Quiebras 9019, en la medida en que sea aplicable, (ii) las liberaciones, exculpaciones y medidas cautelares establecidas en la Sección XL del Plan de la ACT y (iii) las disposiciones aplicables establecidas en el Artículo 33.1(b) del presente.

33.2 **Renuncia a las Condiciones Precedentes a la Confirmación**: sujeto a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Acuerdo del Comité de la ACT y en la medida en que sea factible y legalmente permisible, cada una de las condiciones precedentes en el Artículo 33.1 del presente podrá ser renunciada, en su totalidad o en parte, por la Junta de Supervisión, sujeto al consentimiento previo por escrito del Deudor, y los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales, y únicamente con respecto a las disposiciones que afectan a las Clases 16 y 19, el Comité de Acreedores, cuyo consentimiento no retendrá de forma injustificada. Toda renuncia a una condición precedente podrá efectuarse en cualquier momento mediante la presentación de una notificación ante el Tribunal del Título III ejecutado por la Junta de Supervisión.

## SECCIÓN XXXIV

## CONDICIONES PRECEDENTES A LA FECHA DE ENTRADA EN VIGENCIA DE LA ACT

34.1 **Condiciones precedentes a la Fecha de Entrada en Vigencia de la ACT**: la Fecha de Entrada en Vigencia de la ACT y el perfeccionamiento sustancial del Plan de la ACT están sujetas a la satisfacción de las siguientes condiciones precedentes:

(a)   **Certificación del Plan Fiscal:** la Junta de Supervisión deberá haber determinado que el Plan de la ACT es coherente con el Plan Fiscal del Deudor y haber certificado la presentación del Plan de la ACT, así como cualquier modificación del Plan de la ACT hasta la Fecha de Confirmación de la ACT, conforme a los Artículos 104(j) y 313 de

91

PROMESA. El Plan Fiscal de la ACT certificado a partir de la Fecha de Entrada en Vigencia de la ACT incluirá disposiciones para el pago del capital e intereses con respecto a los Nuevos Bonos de la ACT, lo que incluye, sin limitación, pagos de fondos de amortización y los mecanismos y procedimientos para el pago de CVI de Recuperación de la ACT en caso de que se cumpla la Condición de Rentabilidad y se deba el pago conforme al Contrato de Emisión de CVI de Recuperación.

(b) **Ingreso de la Orden de Confirmación de la ACT:** el Actuario del Tribunal del Título III deberá haber ingresado la Orden de Confirmación de la ACT conforme al Artículo 314 de PROMESA y el artículo 1129 del Código de Quiebras, aplicables al Caso de Titulo III conforme al Artículo 301 de PROMESA, que tendrán la forma y sustancia razonablemente aceptables para la Junta de Supervisión, los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales y el Comité de Acreedores, y la Orden de Confirmación de la ACT dispondrá lo siguiente:

(i) Autorizar al Deudor y a la ACT Reorganizada, según el caso, a tomar todas las medidas necesarias para celebrar, implementar y perfeccionar los contratos, instrumentos, liberaciones, contratos de arrendamientos y otros acuerdos o documentos creados en relación con el Plan de la ACT;

(ii) Decretar que las disposiciones de la Orden de Confirmación de la ACT y del Plan de la ACT no son divisibles y son mutuamente dependientes;

(iii) Autorizar al Deudor y a la ACT Reorganizada, según el caso, a (1) realizar todas las distribuciones y emisiones que se requieran según el Plan y (2) celebrar cualquier acuerdo y transacción, según se establece en el Complemento del Plan;

(iv) Autorizar la implementación del Plan de la ACT conforme a sus términos;

(v) Determinar que el Contrato de Emisión de Nuevos Bonos de la ACT, los Nuevos Bonos de la ACT y los convenios por la ACT, que incluyen, sin limitación, el Convenio de Tarifas de Peaje, para el beneficio de los tenedores de los Nuevos Bonos de la ACT, como se proporciona en el Contrato de Emisión de Nuevos Bonos de la ACT, o la Orden de Confirmación de la ACT, según corresponda, constituyen obligaciones válidas, vinculantes, legales y exigibles de la ACT reorganizada conforme a la ley federal, de Puerto Rico y de Nueva York;

(vi) Determinar que el Contrato de Emisión de Nuevos Bonos de la ACT, tras la emisión de las Obligaciones Garantizadas, lo que incluye, sin limitación, el Endeudamiento Subordinado emitido como refinanciamiento del préstamo del ELA, otorga un gravamen de primer rango y una garantía prendaria de primer rango sobre todo el derecho legal y equitativo, título e interés sobre los Bienes del Fideicomiso de las Obligaciones Garantizadas de la ACT reorganizada, sujeto únicamente a (1) los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT por el que se establece el Fondo de Gastos de la Autoridad y el Fondo de Garantía Arbitral, y (2) el gravamen principal y la garantía prendaria principal

92

sobre los Bienes del Fideicomiso en beneficio de los tenedores de Nuevos Bonos de la ACT, cuyo gravamen de primer rango y garantía prendaria de primer rango serán en todos los aspectos principales y superiores al gravamen subordinado y la garantía prendaria subordinada concedidos sobre los Bienes del Fideicomiso en beneficio de los tenedores de Endeudamiento Subordinado, en cada caso, según lo permitido por la Ley para Crear la ACT, y se considerarán automáticamente perfeccionados a partir de la Fecha de Entrada en Vigencia de la ACT y en cualquier caso serán válidos, vinculantes, perfeccionados y exigibles contra todas las Entidades que tengan reclamaciones de cualquier tipo en forma extracontractual, contractual o de otro tipo contra la ACT Reorganizada o sus activos, independientemente de si dichas Entidades tienen notificación de dicho gravamen o garantía prendaria, sin ningún acto o acuerdo adicional por parte de ninguna Entidad, y se "cerrará" y permanecerá en plena vigencia hasta que las Obligaciones Garantizadas se hayan pagado o satisfecho en su totalidad de conformidad con sus términos;

(vii)    Determinar que la Orden de Confirmación de la ACT es completa, definitiva, concluyente y vinculante y no estará sujeta a impugnación de garantías ni otra impugnación en ningún tribuna u otro foro por parte del (1) Deudor, (2) la ACT Reorganizada, (3) el ELA y sus instrumentalidades, (4) cada Entidad que hace valer reclamaciones u otros derechos contra la ACT, el ELA u otra instrumentalidad del ELA, lo que incluye cada tenedor de una reclamación e bonos y cada tenedor de un interés económico (directa o indirectamente, como mandante, agente, contraparte, subrogatario, asegurador u otro) con respecto a bonos emitidos por el Deudor o cualquier agencia del ELA o con respecto a cualquier fideicomisario, cualquier agente de garantías, cualquier fideicomisario de contrato de emisión, cualquier agente fiscal y cualquier banco que recibe o mantiene fondos relacionados con tales bonos, esté o no tal reclamación u otros derechos de tal Entidad afectados conforme al Plan de la ACT y, si están afectados, si la Entidad aceptó o no el Plan de la ACT, (5) cualquier otra Entidad y (6) cada uno de los herederos, sucesores, causahabientes, fideicomisarios, albaceas, administradores, funcionarios, directores, agentes, representantes, abogados, beneficiario o tutores de cada uno de los que antecede.

(viii)    Proporcionar que el Plan Fiscal de la ACT, certificado a partir de la Fecha de Entrada en Vigencia de la ACT, y cualquier Plan Fiscal de la ACT posterior a la Fecha de Entrada en Vigencia de la ACT incluya disposiciones para el pago en cada año fiscal del capital e interés pagaderos en los Nuevos Bonos de la ACT, lo que incluye, sin limitación, los pagos de fondos de amortización que se deben en tal año fiscal;

(ix)    Disponer que la paralización automática en cualquier procedimiento de insolvencia futuro que se inicie en nombre de la ACT (ya sea en virtud del Título III de PROMESA o de otro modo) se considera renunciada con respecto de los Ingresos Netos mantenidos en los fondos y cuentas establecidos de conformidad con el Contrato de Emisión de Nuevos Bonos de la ACT (que no sean los Ingresos Netos depositados en el Fondo de Garantía Arbitral establecido conforme al Contrato de Emisión de Nuevos Bonos de la ACT);

(x)    Determinar que, de forma congruente con el Plan Fiscal de la ACT y presupuesto correspondiente, para que la extinción de la deuda ocurra a la Fecha de Entrada en

93

Vigencia es necesario que la Junta de Supervisión certifique que los gastos no superan los ingresos de la ACT, según se determine de conforme a las normas de contabilidad de valores devengados modificadas.

(xi)     Determinar que el Plan de la ACT es coherente con los Planes Fiscales del Deudor y que satisface el Artículo 314(b)(7) de PROMESA;

(xii)    Disponiéndose que ninguna parte, Persona o Entidad promulgará, adoptará o implementará ninguna ley, regla, regulación o política que impida, financieramente o de otra manera, el perfeccionamiento e implementación de las transacciones contempladas por el Plan de la ACT;

(xiii)   Disponiéndose que, las Partes del Gobierno, lo que incluye, de forma no taxativa, la ACT y la ACT Reorganizada, individual y conjuntamente, según corresponda, realicen todas y cada una de las acciones necesarias para perfeccionar las transacciones contempladas por el Plan; y

(xiv)    disponiéndose que, como contraprestación por la estructuración de los pagos a los tenedores de Reclamaciones de la ACT/ELA, reclamaciones del Centro de Convenciones/ELA, Reclamaciones de Impuesto al Ron de la AFI/ELA y Reclamaciones de la AMA/ELA y conforme a los términos y disposiciones del Artículo 6.1(d) del Acuerdo de Apoyo al Plan de la ACT/ADCC y la Orden de Confirmación del ELA, el ELA hará pagos en la Fecha de Entrada en Vigencia de la ACT a Assured y National en los montos de treinta y nueve millones trescientos mil dólares ($39,300,000.00) y diecinueve millones trescientos mil dólares ($19,300,000.00), respectivamente.

(c)     **Sin Medida Cautelar:** la Orden de Confirmación de la ACT no se paralizará en ningún caso.

(d)     **Autorizaciones:** toda (1) autorización, consentimiento, aprobación regulatoria, resolución o documento, si los hubiere, que sean necesarios para implementar y dar plena vigencia y efecto al Plan de la ACT han sido obtenidos o promulgados o ingresados y no revocados o revertidos y (2) salvo en la medida expresamente estipulada en el presente y no incompatible con ninguna otra disposición del Plan de la ACT, a menos que PROMESA o una autoridad similar lo permitan o exijan de otro modo, el cumplimiento de cualquier otra acción legislativa u otra acción gubernamental necesaria para consumar el Plan de la ACT.

(e)     **Otorgamiento de Documentos; otras Acciones:** todas las acciones y todos los contratos, instrumentos, acuerdos, liberaciones y otros acuerdos o documentos, incluidos los Documentos Definitivas, necesarios para implementar los términos y disposiciones del Plan de la ACT se realizan o celebran y entregan, según corresponda, y están en plena vigencia y efecto.

(f)     **Dictámenes:** se han emitido al fideicomisario correspondiente o a otras partes con respecto a los Documentos Definitivos y el Plan de la ACT dictámenes jurídicos habituales y consuetudinarios para emisiones similares a los Nuevos Bonos de la ACT por un

94

asesor externo del Deudor sobre cuestiones no abordadas expresamente en la Orden de
Confirmación de la ACT, en forma y en sustancia razonablemente aceptables para los
Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC Iniciales.

(g)   **Mociones de Levantamiento de la Paralización y Acciones de**
**Recuperación:** los fondos de recuperación en cuestión en las Mociones de Levantamiento de la
Paralización y las Acciones de Recuperación han sido determinados por el Tribunal del Título III
para constituir propiedad del ELA.

(h)   **Fecha de Entrada en Vigencia del ELA:** la Fecha de Entrada en
Vigencia del ELA habrá ocurrido.

(i)   **CVI de Recuperación de la ACT:** de conformidad con el párrafo
directivo 34(f) de la Orden de Confirmación de la ELA, CVI de Recuperación de la ACT se
habrá distribuido a los Acreedores aplicables.

(j)   **Distribución Provisional de la ACT:** de conformidad con el párrafo 52
de la Orden de Confirmación del ELA, incluida, sin limitación, la satisfacción de las condiciones
establecidas en esta, la ACT habrá efectuado distribuciones provisionales a los tenedores de
Reclamaciones de Bonos de la ACT 68, Reclamaciones de Bonos de la ACT 68 (Ambac),
Reclamaciones de Bonos de la ACT 68 (Assured), Reclamaciones de Bonos de la ACT 68
(National), Reclamaciones de Bonos de la ACT 98 Principales, Reclamaciones de Bonos de la
ACT 98 Principales (Ambac), Reclamaciones de Bonos de la ACT 98 Principales (Assured),
Reclamaciones de Bonos de la ACT 98 Principales (FGIC) y Reclamaciones de Bonos de la
ACT 98 Principales (National) en los montos de ciento ochenta y cuatro millones ochocientos
mil dólares ($184,800,000.00) y setenta y nueve millones doscientos mil dólares
($79,200,000.00), respectivamente, en Efectivo; disponiéndose, sin embargo, que, a los efectos
del presente Artículo 34.1(j), las Monolíneas aplicables constituirán los tenedores de
Reclamaciones de Bonos de la ACT 68 (Ambac), Reclamaciones de Bonos de la ACT 68
(Assured), Reclamaciones de Bonos de la ACT 68 (National), Reclamaciones de Bonos de la
ACT 98, Reclamaciones de Bonos de la ACT 98 Principales (Ambac), Reclamaciones de Bonos
de la ACT 98 Principales (Assured) y Reclamaciones de Bonos de la ACT 98 Principales
(National) derivadas de los Bonos de la ACT asegurados o propiedad de cualquiera de tales
Monolíneas, si los hubiera, de conformidad con el Artículo 301(c)(3) de PROMESA; y,
disponiéndose, además, que, a pesar de lo anterior, (i) con respecto a cualesquiera
Reclamaciones de Efectivo; disponiéndose Bonos de la ACT 98 Principales (FGIC) derivadas de
Bonos de la ACT 98 Principales (o derechos de pago relacionados) propiedad de FGIC, la ACT
habrá hecho dicha distribución a FGIC, y (ii) con respecto a cualquier Reclamación de Bonos de
la ACT 98 Principales (FGIC) que surja de Bonos de la ACT 98 Principales asegurados, pero no
propiedad de FGIC, la ACT habrá hecho dicha distribución provisional a los tenedores
beneficiarios de tales Bonos de la ACT 98 Principales.

34.2 **Renuncia a las Condiciones Precedentes:** sujeto a las disposiciones del Acuerdo
de Apoyo al Plan de la ACT/ADCC, la Junta de Supervisión puede renunciar a cualquiera de las
condiciones de la Fecha de Entrada en Vigencia de la ACT establecidas en el Artículo 34.1 del

95

presente en cualquier momento sin notificación previa a cualquier otra parte interesada, excepto a los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC, el Comité de Acreedores y las Partes del Gobierno, y sin ninguna notificación o acción, orden o aprobación adicional del Tribunal del Título III, y sin ninguna acción formal que no sea el procedimiento para confirmar y consumar el Plan de la ACT; disponiéndose, sin embargo, que, sujeto a los términos y disposiciones del Acuerdo del Comité de la ACT, cada una de las condiciones precedentes en el Artículo 34.1 del presente con respecto a las disposiciones que afectan a las Clases 16 y 19 pueda ser renunciada, en su totalidad o en parte, por la Junta de Supervisión sujeto al consentimiento previo por escrito del Comité de Acreedores, que no se retendrá de forma injustificada.

34.3 **Efecto de la no ocurrencia de las Condiciones a la Fecha de Entrada en Vigencia de la ACT**: si antes de la Fecha de Entrada en Vigencia de la ACT, la Orden de Confirmación de la ACT es anulada conforme a una Orden Final, entonces, salvo lo dispuesto en una Orden Final que anule la Orden de Confirmación de la ACT, el Plan de la ACT será nulo en todos los aspectos, y nada de lo que figure en el Plan de la ACT o Declaración de Divulgación: (a) constituirá una renuncia o liberación de cualquier Reclamación, o Causa de Acción, (b) perjudicará de cualquier manera los derechos del Deudor, la Junta de Supervisión, el Comité de Acreedores o cualquier otra Entidad o (c) constituirá una admisión, reconocimiento, oferta o compromiso de cualquier tipo por parte del Deudor, la Junta de Supervisión, el Comité de Acreedores o cualquier otra Entidad.

## SECCIÓN XXXV

## MODIFICACIÓN, REVOCACIÓN O RETIRO DEL PLAN DE LA ACT

35.1 **Modificación del Plan de la ACT**: sujeto a (a) los Artículos 104(j) y 313 de PROMESA y los artículos 942 y 1127(d) del Código de Quiebras, aplicables al Caso de Título III conforme al Artículo 301 de PROMESA y (b) los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Acuerdo del Comité de la ACT, la Junta de Supervisión podrá alterar, modificar o cambiar el Plan de la ACT o los Anexos en cualquier momento antes o después de la Fecha de Confirmación de la ACT, pero antes de la Fecha de Entrada en Vigencia de la ACT. Se considerará que un tenedor de una Reclamación que ha aceptado el Plan de la ACT ha aceptado el Plan de la ACT según se altere, modifique o cambie, siempre que la alteración, modificación o cambio propuesto no modifique de manera significativa y negativa el tratamiento de la Reclamación de tal Tenedor.

35.2 **Revocación o Retiro**:

(a) Sujeto a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Acuerdo del Comité de la ACT, la Junta de Supervisión podrá revocar o retirar el Plan de la ACT antes de la Fecha de Confirmación de la ACT.

(b) Si el Plan de la ACT se revoca o retira antes de la Fecha de Confirmación de la ACT, o si el Plan de la ACT no entra en vigencia por cualquier motivo, entonces el Plan de la ACT se considerará nulo. En tal caso, nada de lo dispuesto en el presente se considerará como una renuncia o liberación de cualquier reclamación por parte del Deudor o de cualquier otra

96

Entidad, o que perjudique de ninguna manera los derechos del Deudor o de cualquier otra
Entidad en cualquier otro procedimiento que afecte al Deudor.

35.3 **Modificación de los Documentos del Plan**: a partir de la Fecha de Entrada en
Vigencia de la ACT, la autoridad para modificar, cambiar o complementar el Complemento del
Plan, los Anexos al Complemento del Plan y los Anexos del Plan de la ACT, así como cualquier
documento adjunto a cualquiera de los anteriores, será la prevista en tal Complemento del Plan,
Anexo al Complemento del Plan o Anexo al Plan de la ACT y sus respectivos adjuntos, según el
caso.

35.4 **No Admisión de Responsabilidad:**

(a)    La presentación del presente Plan de la ACT no pretende ser, ni se
interpretará como, una admisión o prueba en cualquier demanda, acción, procedimiento o
controversia pendiente o posterior de cualquier responsabilidad, infracción u obligación alguna
(lo que incluye los fundamentos de cualquier reclamación o defensa) por parte de cualquier
Entidad con respecto a cualquiera de los asuntos abordados en el presente Plan de la ACT.

(b)    Ninguna parte del presente Plan de la ACT (lo que incluye, de manera no
taxativa, los Anexo adjuntos al presente), ni ninguna resolución concertada, hecho realizado o
documento otorgado en relación con el presente Plan de la ACT: (i) es o puede considerarse que
es o puede utilizarse como admisión o prueba de la validez de cualquier reclamación, o de
cualquier acusación formulada en cualquiera de las Acciones Conexas o de cualquier infracción
o responsabilidad de cualquier Entidad, (ii) es o puede considerarse que es o puede utilizarse
como admisión o prueba de cualquier responsabilidad, culpa u omisión de cualquier Entidad en
cualquier procedimiento civil, penal o administrativo en cualquier tribunal, organismo
administrativo u otro tribunal (iii) es o puede considerarse que es o puede utilizarse como
admisión o prueba contra la ACT Reorganizada, el Deudor o cualquier otra Entidad con respecto
a la validez de cualquier Reclamación. Ninguna parte del presente Plan de la ACT o cualquier
resolución concertada, hecho realizado o documento otorgado en relación con el presente Plan
de la ACT será admisible en ningún procedimiento para ningún fin, salvo para llevar a cabo los
términos del presente Plan de la ACT o para hacer cumplir cualquier acuerdo de este tipo, y
salvo que, una vez confirmado, cualquier Entidad podrá presentar este Plan de la ACT en
cualquier acción con cualquier propósito, lo que incluye, de manera no taxativa, para respaldar
una defensa o contrademanda en base los principios de *res judicata,* doctrina de actos propios
colateral, liberación, resolución de buena fe, inadmisión o reducción de sentencia o cualquier
otra teoría de la preclusión de reclamación o preclusión de asunto o defensa de contrademanda
similar.

## SECCIÓN XXXVI

## GOBERNANZA CORPORTAIVA Y GESTIÓN
## DE LA ACT REORGANIZADA

36.1 **Acción Corporativa**: en la Fecha de Entrada en Vigencia de la ACT, se autorizarán
y aprobarán en todo sentido, todos los asuntos previstos en el Plan de la ACT que de otro modo

97

requerirían la aprobación de los directores del Deudor o la ACT Reorganizada, lo que incluye, de manera no taxativa, en la medida en que proceda, la autorización para expedir o disponer que se expidan los Nuevos Bonos de la ACT, la autorización para incluir en los Documentos Definitivos, la adopción de los Estatutos de la ACT Reorganizada, y la elección o designación, según el caso, de directores y funcionarios de la ACT Reorganizada conforme al Plan de la ACT, según proceda, conforme al Contrato de Emisión de Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa, según proceda, y sin ninguna medida adicional por parte de ninguna Entidad según cualquier otra ley, reglamento, orden o norma aplicable. Se considerará que los otros asuntos previstos en el Plan de la ACT que impliquen la estructura corporativa de la ACT Reorganizada o la acción corporativa por parte de la ACT Reorganizada, según proceda, habrán ocurrido, estarán autorizados y estarán en vigencia conforme a el Contrato de Emisión de Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa, según proceda, y sin exigir la adopción de nuevas medidas por parte de ninguna Entidad según cualquier otra ley, reglamento, orden o norma aplicable. Sin limitar lo anterior, a partir de la Fecha de Confirmación de la ACT, el Deudor y la ACT Reorganizada tomarán todas medidas que se consideren apropiadas para consumar las transacciones contempladas en el presente conforme a el Contrato de Emisión de Nuevos Bonos de la ACT y los nuevos documentos de gobernanza corporativa, según proceda.

36.2 **Modificación de Estatutos:** los estatutos de la ACT Reorganizada se modificarán a partir de la Fecha de Entrada en Vigencia de la ACT para disponer sustancialmente según se establece en los Estatutos de la ACT Reorganizada.

36.3 **Directores de la ACT Reorganizada:** en la Fecha de Entrada en Vigencia de la ACT, y conforme a los términos y disposiciones del Artículo 36.2 del presente, los Estatutos de la ACT Reorganizada deberán disponer que la junta directiva de la ACT Reorganizada se designe conforme a los términos y disposiciones de la Ley para Crear la ACT. Los directores iniciales serán divulgados antes de la Vista de Confirmación de la ACT. En el caso de que, durante el período desde la Audiencia de Confirmación de la ACT hasta e incluida la Fecha de Entrada en Vigencia de la ACT, las circunstancias requieran la sustitución de una (1) o más personas seleccionadas para servir en la junta directiva de la ACT Reorganizada, el Gobernador del ELA, al consultar con la Junta de Supervisión, elegirá un sustituto congruente con las normas de independencia y calificación establecidas anteriormente y el Deudor presentará una notificación de ello ante el Tribunal del Título III y, a los efectos del Artículo 1129 del Código de Quiebras, cualquier persona de reemplazo, designada conforme a los requisitos de la oración inmediatamente anterior, se considerará que ha sido seleccionada y divulgada antes de la Vista de Confirmación de la ACT. Los documentos de gobierno corporativo modificados de la ACT Reorganizada deberán proporcionar que todos los miembros de la junta poseen un deber fiduciario para la ACT Reorganizada conforme a la ley de Puerto Rico y su Constitución.

36.4 **Funcionarios de la ACT Reorganizada**: en la medida en que proceda, la junta directiva de la ACT Reorganizada elegirá a los funcionarios de la ACT Reorganizada a partir de la Fecha de Entrada en Vigencia de la ACT.

98

## SECCIÓN XXXVII

### DISPOSICIONES RELATIVAS A LA JUNTA DE SUPERVISIÓN Y EL CUMPLIMIENTO DE PROMESA

37.1 **Efecto de la Confirmación**: nada de lo dispuesto en el presente Plan de la ACT ni en la Orden de Confirmación de la ACT extinguirá, sustituirá, alterará o modificará de otro modo las facultades y responsabilidades de la Junta de Supervisión conforme a PROMESA ni las obligaciones de la ACT Reorganizada según PROMESA. A partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada seguirá teniendo todas sus obligaciones conforme a PROMESA, lo que incluye, de manera no taxativa, los términos y condiciones de los Títulos I y II de esta.

37.2 **Función permanente de la Junta de Supervisión**: nada de lo dispuesto en el Plan de la ACT ni en la Orden de Confirmación de la ACT extinguirá ninguna de las obligaciones del Deudor según PROMESA y, a partir de la Fecha de Entrada en Vigencia de la ACT, continuarán las facultades y responsabilidades de la Junta de Supervisión según PROMESA, y las funciones y obligaciones del Deudor continuarán y no se verán afectadas por el Plan de la ACT y su perfeccionamiento.

37.3 **Preferencia de Leyes**: a partir de la Fecha de entrada en Vigencia de la ACT, y en la medida en que no tenga preferencia previamente de conformidad con una orden del Tribunal del Título III, las disposiciones de las leyes del ELA que afecten al Deudor o la ACT Reorganizada y sean incompatibles con PROMESA serán prioritarias por las razones y en la medida en que se expone en el Anexo «A» a las Conclusiones de los Hechos y las Conclusiones de la Ley, tales leyes, reglas y reglamentos de preferencia incluyen, sin limitación, (a) de conformidad con el Artículo 4 de PROMESA, todas las leyes, reglas y las regulaciones (o tales porciones de estas) del Estado Libre Asociado de Puerto Rico en la medida en que den lugar a obligaciones del Deudor que son descargadas por el Plan de la ACT y la Orden de Confirmación de la ACT conforme a PROMESA, y tal descargo prevalecerá sobre cualquier disposición general o específica de las leyes, reglas y regulaciones territoriales, y (b) leyes promulgadas antes del 30 de junio de 2016, en la medida en que prevean transferencias u otras apropiaciones después de la promulgación de PROMESA, incluidas las transferencias del Deudor o la ACT Reorganizada al ELA o cualquier agencia o instrumentalidad, ya sea para permitir que dicha agencia o instrumentalidad pague o satisfaga el endeudamiento o para cualquier otro fin, serán de preferencia en la medida en que sea incompatible con el cumplimiento por parte del Plan de la ACT de las obligaciones del Deudor y todas estas leyes no serán aplicables en la medida en que sean incompatibles con el cumplimiento por parte del Plan de la ACT de las obligaciones del Deudor o cualquiera de las transacciones contempladas por el Plan de la ACT. Sin limitar en modo alguno lo anterior, (y) las leyes del ELA no preferentes debido a PROMESA que afectan al Deudor incluyen, de manera no taxativa, las enumeradas en el Anexo «F» del presente por razones y en la medida establecida en el Anexo «A» de las Conclusiones de Hechos y las Conclusiones de Ley, y (z) todo litigio en el que cualquier Parte del Gobierno sea el demandado, sobre si la legislación del ELA enumerada en el Anexo «F» del presente es considerada no preferente frente a PROMESA será desestimada, con perjuicio, a partir de la Fecha de Entrada en

99

Vigencia de la ACT, y las partes de esta deberán notificar sin demora a la Junta de Supervisión de dicha desestimación. Para evitar dudas, la no inclusión de una obligación de pago derivada de una ley válida en un Plan Fiscal certificado o en un presupuesto de la ACT no es una base para el desaprobar dicha obligación en la medida en que la reclamación derivada de esta satisfaga de otra manera los requisitos de admisión de una reclamación en virtud de las disposiciones pertinentes del Código de Quiebras.

## SECCIÓN XXXVIII

## DISPOSICIONES RELATIVAS AL COMITÉ DE ACREEDORES

38.1 **Disolución del Comité de Acreedores**: en la Fecha de Entrada en Vigencia de la ACT, el Comité de Acreedores (a) se disolverá y se considerará que ha cumplido con todos sus deberes y obligaciones respectivos, y (b) se eximirá y liberará de cualquier acción o actividad realizada o que deba realizarse en relación con el Caso de Título III; disponiéndose, sin embargo, que, (x) en caso de que se realice una apelación a la Orden de Confirmación de la ACT, el Comité de Acreedores no se disolverá hasta que la Orden de Confirmación de la ACT se convierta en Orden Final, (y) el Comité de Acreedores no se disolverá con respecto a sus deberes y obligaciones en relación con el Caso de Título III de la AEE, y (z) el Comité de Acreedores tendrá derecho a defender las solicitudes de admisión de indemnización y reembolso de los gastos de sus respectivos profesionales. En la medida en que, a la fecha inmediatamente anterior a la Fecha de Entrada en Vigencia de la ACT, el Comité de Acreedores fuera parte en un asunto impugnado o procedimiento contencioso en relación con el Caso de Título III, lo que incluye, de manera no taxativa, las Objeciones Relacionadas con Deuda, las Acciones de Invalidez, las Acciones de Impugnación de Gravamen, el Litigio de la Cláusula de Designaciones, el Litigio de Uniformidad, las Acciones de Recuperación, las Mociones de Levantamiento de la Paralización y cualquier objeción a reclamar, a partir de la Fecha de Entrada en Vigencia de la ACT y en la medida en que aún no sea parte en ella, se considerará que la ACT Reorganizada habrá asumido tal función y responsabilidad en cuanto a tal asunto impugnado y, conforme a tal asunción, el Comité de Acreedores quedará exento de cualquier función, responsabilidad u obligación al respecto.

## SECCIÓN XXXIX

## CONSERVACIÓN DE JURISDICCIÓN

39.1 **Conservación de Jurisdicción**: el Tribunal del Título III conservará y tendrá jurisdicción exclusiva sobre cualquier asunto que surja en el marco de PROMESA, derivado o relacionado con los Caso de Titulo III y el Plan de la ACT o que esté relacionado lo siguiente:

(a)     permitir, denegar, determinar, liquidar, clasificar, estimar o establecer la prioridad, la situación de garantía o no garantía, o el monto de cualquier Reclamación no controvertida o resuelta por el presente, lo que incluye, de manera no taxativa, la resolución de toda solicitud de pago de cualquier Reclamación y la resolución de toda objeción a la situación

100

de garantía o no garantía, prioridad, monto o admisión de Reclamaciones no controvertidas o resueltas por el presente;

(b)      resolver cualquier asunto relacionado con Contratos A Ejecutarse o Contratos de Arrendamiento en Curso, lo que incluye, de manera no taxativa, (a) la asunción o asunción y cesión de cualquier Contrato A Ejecutarse o Contrato de Arrendamiento en Curso en el que sean parte el Deudor o respecto de los cuales el Deudor pueda ser responsables y dar vista, determinar y, en caso necesario, liquidar, cualquier Reclamación derivada de estos, lo que incluye conforme al artículo 365 del Código de Quiebras, (b) cualquier obligación contractual potencial en virtud de cualquier Contrato A Ejecutarse o Contrato de Arrendamiento en Curso que se asume y asuma y ceda y c) cualquier controversia con respecto a si un contrato o contrato de arrendamiento es o era condicional o ha caducado;

(c)      velar por que las distribuciones a los tenedores de Reclamaciones Permitidas se lleven a cabo conforme a las disposiciones del Plan de la ACT y resolver todas las controversias derivadas o relacionadas con las distribuciones en el marco del Plan de la ACT;

(d)      resolver, decidir o solucionar toda moción, procedimiento contencioso, cuestiones impugnadas o litigadas, y cualquier otro asunto, y conceder o denegar cualquier solicitud relativas al Deudor o ACT Reorganizada que puedan estar pendientes en la Fecha de Entrada en Vigencia o que se presenten posteriormente;

(e)      decidir y resolver todos los asuntos relacionados con la concesión y denegación, total o parcial, de las solicitudes de compensación o reembolso de gastos a los Profesionales autorizados conforme a PROMESA, el Plan de la ACT o las órdenes dictadas por el Tribunal del Título III;

(f)      ingresar e implementar las órdenes que sean necesarias o apropiadas para celebrar, implementar, perfeccionar o hacer cumplir las disposiciones de (i) contratos, instrumentos, liberaciones, contratos de emisión y otros acuerdos o documentos aprobados mediante una Orden Final en el Caso de Título III, únicamente en la medida en que dicho documento no disponga que otro tribunal o tribunales tengan jurisdicción exclusiva, y (ii) el Plan de la ACT, la Orden de Confirmación la ACT, los Documentos Definitivos y cualquier otro contrato, instrumento, valores, liberaciones, obligaciones y otros acuerdos o documentos creados en relación con el Plan de la ACT, únicamente en la medida en que dicho documento no disponga que otro tribunal o tribunales tengan jurisdicción exclusiva;

(g)      resolver todo caso, demanda, controversia u otras impugnaciones de cualquier tipo que puedan surgir en relación con la consumación, interpretación o ejecución del Plan de la ACT, la Orden de Confirmación de la ACT, los Documentos Definitivos o cualquier otro contrato, instrumento, valor, liberación u otro acuerdo o documento que se celebre u otorgue conforme al Plan de la ACT o los derechos de cualquier Entidad derivados u obligaciones contraídas en relación con el Plan de la ACT o tales documentos, únicamente en la medida en que dicho documento no disponga que otro tribunal o tribunales tenga jurisdicción exclusiva;

(h)      aprobar cualquier modificación del Plan de la ACT o aprobar cualquier modificación de la Orden de Confirmación de la ACT o cualquier contrato, instrumento, valor, liberación u otro acuerdo o documento creado en relación con el Plan de la ACT o la Orden de Confirmación de la ACT, o remediar cualquier defecto u omisión o conciliar cualquier inconsistencia en cualquier orden, el Plan de la ACT, la Orden de Confirmación de la ACT o cualquier contrato, instrumento, valor, liberación u otro acuerdo o documento creado en relación con el Plan de la ACT o la Orden de Confirmación de la ACT, o introducir cualquier orden en apoyo de la confirmación de conforme a los artículos 945 y 1142(b) del Código de Quiebras, de la manera que sea necesaria o apropiada para consumar el Plan de la ACT;

(i)      resolver, decidir o solucionar cualquier asunto relacionado con el cumplimiento por parte del Deudor del Plan de la ACT y la Orden de Confirmación de la ACT de conformidad con el artículo 945 del Código de Quiebras;

(j)      determinar cualesquiera otros asuntos que puedan surgir en relación o en conexión el Plan de la ACT, la Declaración de Divulgación, la Orden de Confirmación de la ACT o cualquier contrato, instrumento, garantía, liberación u otro acuerdo o documento creado, celebrado u otorgado en relación con el Plan de la ACT, la Declaración de Divulgación o la Orden de Confirmación de la ACT, en cada caso, únicamente en la medida en que dicho documento no prevea que otro tribunal o tribunales tengan jurisdicción exclusiva;

(k)      incluir e implementar otras órdenes, o adoptar las demás medidas que sean necesarias o apropiadas para hacer cumplir o restringir la injerencia de cualquier entidad en el perfeccionamiento o ejecución del Plan de la ACT o la Orden de Confirmación de la ACT, lo que incluye, de manera no taxativa, las disposiciones de los Artículos 40.2 y 40.3 del presente;

(l)      adjudicar todas y cada una de las controversias, demandas o asuntos que puedan surgir con respecto a la validez de cualquier acción realizada por cualquier Entidad conforme a o en cumplimiento del Plan de la ACT o la Orden de Confirmación la ACT, lo que incluye, sin limitación, la emisión de los Nuevos Bonos de la ACT e ingresar cualquier orden o medida necesaria o apropiada en relación con dicha adjudicación;

(m)      incluir e implementar las órdenes que sean necesarias o apropiadas si la Orden de Confirmación de la ACT es modificada, paralizada, revertida, revocada o anulada por cualquier motivo;

(n)      incluir una orden o un decreto definitivo que concluyan o cierren el Caso de Título III conforme al artículo 945(b) del Código de Quiebras;

(o)      resolver las disputas que puedan surgir entre la Junta de Supervisión o la AAFAF, según el caso, y los dos (2) miembros nombrados del Comité de Acreedores a la Junta de Fideicomiso de Acciones de Anulación conforme a las disposiciones del Artículo 31.1(b) del Plan de la ACT;

(p)      hacer cumplir y aclarar toda orden dictada anteriormente por el Tribunal del Título III en el Caso de Título III; y

(q)      dar vista a cualquier otro asunto sobre el que el Tribunal del Título III tenga jurisdicción según los Artículos 305 y 306 de PROMESA.

## SECCIÓN XL

## DISPOSICIONES VARIAS

40.1 **Título de los Activos**: salvo según se dispone en la Orden de Confirmación de la ACT, en la Fecha de Entrada en Vigencia de la ACT, la titularidad de todos los Activos y bienes del Deudor incluidos en el Plan de la ACT se otorgarán a la ACT Reorganizada, libres de todo Gravamen, lo que incluye, sin limitación cualquier Gravamen sobre o garantía prendaria en la Cuenta de SIB, pero que excluye expresamente Gravámenes concedidos conforme al Plan de la ACT y la Orden de Confirmación de la ACT:

40.2 **Extinción y Descargo de Reclamaciones y Causas de Acción:**

(a)      Salvo lo expresamente dispuesto en el Plan de la ACT o en la Orden de Confirmación de la ACT, todas las distribuciones y derechos otorgados bajo el Plan de la ACT serán, y se considerarán, a cambio de y por la completa satisfacción de la liquidación, la descarga y la liberación de todas las Reclamaciones o causas de Acción contra el Deudor y la ACT Reorganizada que surgieron, total o parcialmente, antes de la Fecha de Entrada en Vigencia de la ACT, en relación con el Caso de Título III, el Deudor o la ACT Reorganizada o cualquiera de sus respectivos activos, bienes o intereses de cualquier naturaleza, lo que incluye cualquier interés acumulado en tales Reclamaciones desde y después de la Fecha de Petición de la ACT, y sin importar si cualquier propiedad ha sido distribuida o retenida conforme al Plan de la ACT a causa de tales Reclamaciones o Causas de Acción; disponiéndose, sin embargo, que, sin perjuicio de los derechos de exculpación establecidos en el Artículo 40.7 del presente, no se pretende que nada contenido en el Plan de la ACT o en la Orden de Confirmación la ACT sea, ni se interpretará como, una concesión de una liberación de terceros no consensuada de los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC y sus respectivas Personas Relacionadas por parte de Acreedores del Deudor. En la Fecha de Entrada en Vigencia de la ACT, toda reclamación, causa de acción y cualquier otra deuda que surja se considerará extinguida y descargada, total o parcialmente, antes de la Fecha de Entrada en Vigencia de la ACT contra el Deudor y la ACT Reorganizada, y Reclamaciones del tipo especificado en los artículos 502(g), 502(h) o 502(i) del Código de la Quiebra y el Artículo 407 de PROMESA, independientemente de que (a) se radique o no una evidencia de reclamación en base a tal Reclamación, o se considere radicada virtud del artículo 501 del Código de Quiebras, (b) tal Reclamación es permitida de conformidad con el artículo 502 del Código de Quiebras y el artículo 407 de PROMESA (o se resuelve de otro modo), o (c) el tenedor de una Reclamación basada en tal deuda votó a favor del Plan de la ACT. Para evitar dudas, nada de lo contenido en el presente o en la Orden de Confirmación de la ACT liberará, descargará o exigirá en cualquier reclamación o causa de acción contra la AEE derivada o relacionada con bonos emitidos por la AEE, incluido, sin limitación, el seguro emitido por Monolíneas correspondiente a estos, y la AEE no expedirá ninguna reclamación ni causa de acción contra ninguna entidad que no sea el Deudor. Las Reclamaciones y causas de acción contra la AEE derivadas o relacionadas con los

103

bonos emitidos por la AEE y los descargos contra la AEE y sus activos se abordarán en el Caso de Título III de la AEE, incluido, sin limitación, cualquier plan de ajuste de este.

(b)     Excepto en la medida expresamente proporcionada en el Plan de la ACT y la Orden de Confirmación  de la ACT, se impedirá a todas las Entidades de presentar toda Reclamación contra el Deudor y la ACT Reorganizada, y cada uno de sus respectivos Activos, bienes y derechos, recursos, Reclamaciones o Causas de Acción o responsabilidades de cualquier naturaleza, en relación con los Casos de Título III, el Deudor o la ACT Reorganizada o cualquiera de sus respectivos Activos y bienes, lo que incluye los intereses devengados sobre tales Reclamaciones a partir de una Fecha de Petición de la ACT, e independientemente de que se hayan distribuido o retenido bienes conforme al Plan de la ACT a causa de tales Reclamaciones u otras obligaciones, demandas, sentencias, daños y perjuicios, deudas, derechos, recursos, causas de acción o responsabilidades. De acuerdo con lo anterior, salvo según se dispone expresamente en el Plan de la ACT o en la Orden de Confirmación de la ACT, la Orden de Confirmación de la ACT constituirá una determinación judicial, a partir de la Fecha de Entrada en Vigencia de la ACT, de la extinción y descarga de todas esas Reclamaciones, Causas de Acción o deudas de o contra el Deudor y la ACT Reorganizada conforme a los artículos 524 y 944 del Código de Quiebras, aplicables al Caso del Título III conforme al Artículo 301 de PROMESA, y tal extinción anulará y extinguirá toda sentencia obtenida contra el Deudor o la ACT Reorganizada y sus respectivos Activos y bienes, en cualquier momento, en la medida en que tal sentencia se relacione con una Reclamación extinguida, deuda o responsabilidad. A la Fecha de Entrada en Vigencia de la ACT, y en contraprestación al valor previsto en el Plan de la ACT, cada tenedor de una Reclamación de cualquier Clase en virtud del presente Plan de la ACT habrá y por el presente se considerará que extinguirá y descarará para siempre al Deudor y a la ACT Reorganizada, y sus respectivos Activos y bienes y todas esas Reclamaciones.

(c)     Sin perjuicio de cualquier otra disposición del presente Artículo 40.2, conforme a las disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC, se considerará que cada uno de los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC y sus respectivas Personas Relacionadas, únicamente en su calidad de Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC del Deudor, (i) han liberado y pactado no demandar, o tratar de obtener de otro modo indemnización por daños y perjuicios o solicitar cualquier otro tipo de medida contra cualquiera de las Partes Eximidas del Gobierno en base a las Reclamaciones derivadas o relacionadas con las Reclamaciones Eximidas por el Gobierno o cualquier de las Reclamaciones o Causas de Acción presentadas o que pudiesen haberse presentado, lo que incluye, sin limitación, en las Acciones de Recuperación y en las Mociones de Levantamiento de la Paralización, y (ii) no ayuden directa o indirectamente a ninguna persona a adoptar ninguna medida con respecto a las Reclamaciones Eximidas por el Gobierno que esté prohibida por el presente Artículo 40.2.

(d)     Limitación del SEC. Sin perjuicio del contenido en el presente o en la Orden de Confirmación de la ACT en contrario, ninguna disposición (i) le impedirá al SEC hacer cumplir sus facultades policiales o reglamentarias, ni (ii) exigirá, limitará, alterará ni retrasará a la SEC de iniciar o continuar cualquier reclamación, causa de acción, procedimiento o investigación contra cualquier persona no deudora o entidad no deudora en cualquier foro.

(e)     Limitación de los Estados Unidos. Sin perjuicio del contenido en el presente o en la Orden de Confirmación de la ACT en contrario, ninguna disposición (i) perjudicará a los Estados Unidos, sus agencias, departamentos o agentes ni, de modo alguno, eximirá al Deudor o la ACT Reorganizada, según el caso, del cumplimiento de las leyes federales o las leyes y requisitos territoriales que implementen un programa federal autorizado o delegado federal que proteja la salud, la seguridad y el medioambiente de las personas en dicho territorio, (ii) ampliará el alcance de cualquier descarga, liberación o requisito judicial al que el Deudor o la ACT Reorganizada tenga derecho conforme al Título III, ni (iii) descargará, liberará, exigirá ni de otro modo prohibirá (A) cualquier responsabilidad del Deudor o la ACT Reorganizada para los Estados Unidos que surja de y después de la Fecha de Entrada en Vigencia de la ACT, (B) cualquier responsabilidad hacia los Estados Unidos que no sea una reclamación, (C) cualquier defensa afirmativa o cualquier derecho de compensación o recobro de los Estados Unidos, del Deudor o de la ACT Reorganizada, según sea el caso, y dichos derechos de compensación y recobro de tales partes se preserven expresamente, (D) la validez continua de las obligaciones de los Estados Unidos, el Deudor o la ACT Reorganizada, según el caso, en virtud de cualquier acuerdo de subvención o asistencia cooperativa de los Estados Unidos, (E) las obligaciones del Deudor o de la ACT Reorganizada que surjan en virtud de las leyes federales de policía o regulatorias, incluidas, entre otras, las leyes relativas al medio ambiente, la salud o la seguridad pública, o leyes territoriales que implementen tales disposiciones legales federales, incluidas, de forma no taxativa, obligaciones de cumplimiento, requisitos bajo decretos de consentimiento u órdenes judiciales, y obligaciones de pagar las sanciones administrativas, civiles u otras sanciones asociadas, y (F) cualquier responsabilidad con los Estados Unidos por parte de cualquier no deudor. Sin limitar lo anterior, nada contenido en el presente o en la Orden de Confirmación la ACT se considerará (i) que determina la responsabilidad impositiva de cualquier Entidad, incluido, de forma no taxativa, el Deudor y la ACT Reorganizada, (ii) que es vinculante con el SII con respecto a las obligaciones fiscales federales, estado fiscal u obligaciones de declaración y retención de impuestos de cualquier Entidad, incluido, de forma no taxativa, el Deudor y la ACT Reorganizada, (iii) que libera, satisface, descarga o exige la recopilación de cualquier reclamación del SII contra cualquier Entidad que no sea el Deudor y la ACT Reorganizada, y (iv) que concede cualquier medida a cualquier Entidad que el Tribunal tenga prohibido conceder, Ley de Sentencia Declaratoria, Artículo 2201(a) del Título 28 del U.S.C. o la Ley contra la Intervención Fiscal, Artículo 7421(a) del Título 26 del U.S.C.

(f)     Acciones de la aseguradora. Sin perjuicio del contenido en el presente o en la Orden de Confirmación de la ACT en contrario, lo que incluye, sin limitación, los Artículos 40.2, 40.3 y 40.11 del Plan de la ACT, excepto lo que pueda excluirse de conformidad con las disposiciones de PROMESA, nada en el Plan de la ACT, la Orden de Confirmación de la ACT o cualquier documento relacionado con el Plan de la ACT establecido en el Complemento del Plan tiene por objeto, ni se interpretará como que tiene por objeto, deteriorar, alterar, modificar, disminuir, prohibir, restringir, exigir, liberar, reducir, eliminar o limitar los derechos de los demandantes y demandados, lo que incluye, sin limitación, las partes en las acciones del asegurador, de afirmar sus respectivos derechos, reclamaciones, causas de acción y defensas en las Acciones de la Aseguradora, lo que incluye, de forma no taxativa, cualquier Reclamación, defensa, Causa de Acción y derecho de compensación o reembolso (en la medida de lo posible), o cualquier derecho a asignar responsabilidad o cualquier otra base para la reducción (o crédito

105

en contra) de cualquier sentencia en relación con las Acciones de la Asegurador (en su conjunto, los «Derechos Defensivos»); disponiéndose, sin embargo, que, para evitar dudas, en ningún caso se utilizarán Derechos Defensivos para obtener o provocar el pago afirmativo de dinero o la entrega afirmativa de bienes a cualquier demandante, demandado y, en la medida indicada, tercero demandado por el Deudor, ACT Reorganizada, la AEE, el ELA o cualquier otra agencia o instrumentalidad del ELA en relación con una Acción de la Aseguradora; y, disponiéndose, además, que a ninguna parte en las Acciones de la Aseguradora, lo que incluye, sin limitación, demandantes, demandados y, en la medida en que se nombren a los acusados de terceros, se le permitirá ratificar: (i) contra el Deudor o la ACT Reorganizada cualquier Reclamación o Causa de Acción para los fines de obtener una recuperación monetaria afirmativa que, de otra forma, está bloqueada o saldada según las Órdenes de Fecha Límite, el Plan de la ACT y/o la Orden de Confirmación de la ACT; y/o (ii) contra el Deudor, la ACT Reorganizada, la AEE, el ELA o cualquier otra agencia o instrumentalidad del ELA cualquier Reclamación o contrarreclamación para los fines para obtener una recuperación monetaria afirmativa, lo que incluye, de forma no taxativa, para indemnización, contribución, reembolso, compensación o teorías similares, hasta la medida reivindicada para los fines de obtener una recuperación monetaria afirmativa, cuyas Reclamaciones o contrarreclamaciones se considerarán denegadas, bloqueadas, como una exención y extinguidas de acuerdo con los términos y disposiciones del Plan de la ACT y la Orden de Confirmación de la ACT; y disponiéndose, además, que no se pretenda ni se interprete que nada en el presente o en la Orden de Confirmación de la ACT prohíbe, impide, bloquea, modifica o limita de forma alguna la capacidad de cualquier defendido en cualquier Acción de la Aseguradora para reivindicar los Derechos de Defensa con el fin de reducir, eliminar o limitar el monto de cualquier responsabilidad o dictamen en cualquier Acción de la Aseguradora. A las partes de las Acciones de la Aseguradora se encontrarán permanentemente bloqueadas, ordenadas y restringidas de comenzar, llevar a juicio o reivindicar, contra el Deudor, la ACT Reorganizada, la AEE, el ELA o cualquier otra agencia o instrumentalidad del ELA cualquier Reclamación o contrarreclamación para los fines de obtener una recuperación monetaria afirmativa, que incluye, de forma no taxativa, indemnización, contribución, reembolso, compensación o teorías similares, hasta la medida reivindicada para los fines de obtener una recuperación monetaria afirmativa en función de, que se originan de o se relacionan con las Acciones de la Aseguradora, ya sea que dichas Reclamaciones o contrarreclamaciones sean o puedan ser reivindicadas o no en un tribunal, un tribunal de arbitraje, una agencia administrativa o un foro o en cualquier otra forma.

40.3 **Medidas Cautelares sobre Reclamaciones**: salvo que se disponga de manera expresa de otro modo en el Plan de la ACT, la Orden de Confirmación de la ACT o tal otra Orden Final del Tribunal del Título III que sea aplicable, todas las Entidades que hayan mantenido o mantengan Reclamaciones o cualquier otra deuda o responsabilidad que se extinga o exima conforme al Artículo 40.2 del presente o que hayan mantenido, mantengan o puedan mantener Reclamaciones o cualquier otra deuda o responsabilidad que se extinga o exima conforme al Artículo 40.2 del presente tienen permanentemente prohibido, a partir de la Fecha de Entrada en Vigencia de la ACT, (a) comenzar o continuar, directo indirectamente, de cualquier forma, cualquier acción u otro procedimiento (lo que incluye, de manera no taxativa, cualquier procedimiento judicial, de arbitraje, administrativo u otro) de cualquier tipo en tal Reclamación u otra deuda o responsabilidad que se extinga conforme al Plan de la ACT contra cualquier de las

Partes Eximidas o cualquiera de sus activos o bienes correspondientes, (b) la ejecución, laudo, cobro o recuperación de cualquier forma o por cualquier medio de cualquier sentencia, adjudicación, decreto u otra orden contra cualquier de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes a causa de cualquier Reclamación u otra deuda o responsabilidad extinta conforme al Plan de la ACT, (c) crear, perfeccionar o hacer cumplir cualquier gravamen de cualquier tipo contra cualquiera de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes a causa de cualquier Reclamación u otra deuda o responsabilidad extinta conforme al Plan de la ACT y (d) salvo en la medida dispuesta, permitida o ponderada en los artículos 553, 555, 556, 559, o 560 del Código de Quiebras o conforme al derecho consuetudinario de recuperación, haciendo valer cualquier derecho a compensación, subrogación o recuperación de cualquier tipo con respecto a cualquier obligación debida por cualquiera de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes a causa de cualquier Reclamación u otra deuda o responsabilidad extinta conforme al Plan de la ACT. Tal medida cautelar se extenderá a todos los sucesores y causahabientes de las Partes Eximidas y sus respectivos activos y bienes.

40.4 **Integral para el Plan de la ACT**: cada una de las disposiciones relativas a la extinción, medidas cautelares, exculpación y exención previstas en la presente Sección XL es una parte integral del Plan de la ACT y es esencial para su implementación. Cada una de las Partes Eximidas tendrá derecho a solicitar de manera independiente la ejecución de las disposiciones de extinción, medidas cautelares y exención establecidas en la presente Sección XL.

40.5 **Exenciones por parte del Deudor y la ACT Reorganizada**: salvo que se indique expresamente lo contrario en el plan de la ACT o en la Orden de Confirmación de la ACT, en la Fecha de Entrada en Vigencia de la ACT y por una contraprestación satisfactoria y valiosa, cada uno del Deudor y la ACT Reorganizada, el Agente Pagador y cada una de las Personas Relacionadas de la ACT Reorganizada y del Deudor se considerará que han renunciado, liberado, exonerado y descargado de forma irrevocable e incondicional, y por el presente lo hacen, a las Partes Eximidas de todas y cada una de las Reclamaciones o Causas de Acción que el Deudor, la ACT Reorganizada y el Agente Pagador, o cualquiera de ellos, o cualquier persona que reclame a través de ellos, en su nombre o en beneficio de ellos, tenga o puede tener o pretender tener, ahora o en el futuro, contra cualquier Parte Eximida que sean Reclamaciones Eximidas.

40.6 **Medida Cautelar con respecto a las Exenciones**: a partir de la Fecha de Entrada en Vigencia de la ACT, todas las Entidades que mantengan, hayan mantenido o puedan mantener una Reclamación Eximida que haya sido eximida conforme al Artículo 40.2 del Plan de la ACT, están y estarán paralizadas, restringidas, prohibidas y excluidas permanentemente, para siempre y por completo  de adoptar cualquiera de las siguientes medidas, directa o indirectamente, derivadas o de otra índole, a causa o en base al del objeto de tales Reclamaciones Eximidas extintas: (i) iniciar, conducir o continuar de cualquier manera, directa o indirectamente, cualquier demanda, acción u otro procedimiento (lo que incluye, de manera no taxativa, cualquier procedimiento judicial, de arbitraje, administrativo o de otro tipo) en cualquier foro, (ii) ejecutar, embargar (lo que incluye, de manera no taxativa, cualquier embargo previo), recaudar, o de

107

cualquier manera tratar de recuperar cualquier sentencia, laudo, decreto u otra orden, (iii) crear, perfeccionar o de cualquier manera ejecutar en cualquier asunto, directa o indirectamente, cualquier Gravamen, (iv) compensar o procurar reembolsos o contribuciones de o subrogación contra, o reembolsar de cualquier manera, directa o indirectamente, cualquier monto contra cualquier responsabilidad u obligación debida a cualquier Entidad eximida en virtud del Artículo 40.2 del presente y (v) iniciar o continuar de cualquier manera, en cualquier lugar o cualquier procedimiento judicial, de arbitraje o administrativo en cualquier foro, que no cumpla o no sea incompatible con las disposiciones del Plan de la ACT o la Orden de Confirmación de la ACT. Para evitar dudas, las siguientes disposiciones se rescindirán al ingreso de la orden de confirmación de la ACT: (i) la Cuarta Estipulación Modificada entre el Estado Libre Asociado de Puerto Rico y la Autoridad de Carreteras y Transportación de Puerto Rico en relación con la Paralización de las Normas de Prescripción y la Orden de Consentimiento [Caso n.° 173283-LTS, ECF n.° 15854], y sus modificaciones; y (ii) la Cuarta Estipulación Modificada y la Orden de Consentimiento entre Deudores del Título III (distintos de COFINA) y la Agencia Fiscal y la Autoridad Asesora Financiera de Puerto Rico actuando en nombre de las Entidades Gubernamentales enumeradas en el Apéndice «B» en relación con la Paralización de las Normas de Prescripción [Caso n.º 17-3283-LTS, ECF n.º 17394], y sus modificaciones.

40.7 **Exculpación:**

(a) **Partes del Gobierno:** la Junta de Supervisión, la AAFAF, el Deudor y cada una de sus respectivas Personas Relacionadas, actuando únicamente en su calidad de tal en cualquier momento y hasta la Fecha de Entrada en Vigencia de la ACT inclusive, no tendrán ni incurrirán en responsabilidad alguna ante ninguna Entidad por ninguna acción realizada u omitida en relación con el Caso de Título III, la formulación, preparación, difusión, implementación, confirmación o aprobación del Plan de la ACT o cualquier conciliación o resolución contenida en él, la Declaración de Divulgación, o cualquier contrato, instrumento, descargo u otro acuerdo o documento previsto o contemplado en relación con el perfeccionamiento de las transacciones establecidas en el Plan de la ACT; disponiéndose, sin embargo, que las disposiciones anteriores del presente Artículo 40.7 no afectarán a la responsabilidad de ninguna Entidad que de otro modo resultaría de tal acción u omisión en la medida en que se determine mediante Orden Final que dicha acción u omisión constituye fraude intencional o mala conducta intencional. Nada de lo dispuesto en las disposiciones anteriores del presente Artículo 40.7 menoscabará el derecho de cualquiera de las Partes del Gobierno y de los funcionarios y directores que cumplen funciones en estos en cualquier momento y hasta la Fecha de Entrada en Vigencia de la ACT, así como de cada uno de sus respectivos profesionales, a recurrir al asesoramiento de un abogado como defensa con respecto a sus funciones y responsabilidades en virtud del Plan de la ACT.

(b) **Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC:** cada uno de los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC únicamente en su calidad de partes del Acuerdo de Apoyo al Plan de la ACT/ADCC y un acreedor y/o asegurador, según corresponda, desde la Fecha de Petición de la ACT y hasta la Fecha de Entrada en Vigencia de la ACT inclusive y cada una de sus Personas Relacionadas correspondientes no tendrán ni incurrirán en responsabilidad alguna ante ninguna Entidad por ninguna acción realizada u

108

omitida en relación con el Caso de Título III, la mediación, negociación, formación, preparación, difusión, implementación, confirmación o aprobación del Plan de la ACT o cualquier conciliación o resolución contenida en él, la Declaración de Divulgación, el Acuerdo de Apoyo al Plan de la ACT/ADCC, los Documentos Definitivos o cualquier otro contrato, instrumento, descargo u otro acuerdo o documento previsto o contemplado en relación con el perfeccionamiento de las transacciones establecidas en el Plan de la ACT; disponiéndose, sin embargo, que las disposiciones anteriores del presente Artículo 40.7(b) no afectarán a la responsabilidad de ninguna Entidad que de otro modo resultaría de tal acción u omisión en la medida en que se determine mediante Orden Final que dicha acción u omisión constituye fraude intencional o mala conducta intencional.

(c)     **Aseguradoras Monolíneas:** Ambac, Assured, FGIC, National y sus respectivas Personas Relacionadas no tendrán ni incurrirán en responsabilidad alguna con ninguna Entidad por cualquier acto realizado u omitido congruente con el Plan de la ACT o en conexión con la formulación, preparación, difusión, implementación, aceptación, confirmación o aprobación del Plan de la ACT, lo que incluye, sin limitación, en relación con el tratamiento de las Reclamaciones Bonos Asegurados de Ambac, Reclamaciones Bonos Asegurados de Assured, Reclamaciones Bonos Asegurados de FGIC o Reclamaciones Bonos Asegurados de National, los procedimientos de votación, los procedimientos de elección, y cualquier exención de obligaciones conforme las Pólizas de Seguros de Ambac, Pólizas de Seguros de Assured, Pólizas de Seguros de FGIC o Pólizas de Seguros de National aplicables, disponiéndose, sin embargo, que, a pesar del contenido en el presente en contrario, los términos y provisiones del Plan de la ACT no liberarán o exculparan, ni se interpretará que lo hacen, ninguna obligación de pago conforme a la Póliza de Seguros de Ambac, Póliza de Seguros de Assured, Póliza de Seguros de FGIC o Póliza de Seguros de National, a cualquier tenedor beneficiario de los Bonos Asegurados de Ambac, Bonos Asegurados de Assured, Bonos Asegurados de FGIC o Bonos Asegurados de National, según corresponda, de acuerdo con sus términos únicamente en la medida en que dicho tenedor no reciba el Tratamiento de Ambac, Tratamiento de Assured, Tratamiento de FGIC o el Tratamiento de National, según corresponda (o cualquier reclamación que Ambac, Assured, FGIC o National, pueda tener contra un tenedor beneficiario de los respectivos bonos asegurados con respecto a las obligaciones aplicables de Ambac, Assured, FGIC o National conforme a las Pólizas de Seguros de Ambac, Pólizas de seguros de Assured, Pólizas de Seguros de FGIC o Pólizas de Seguros de National, según corresponda).

(d)     **Comité de Acreedores:** cada uno de los miembros del Comité de Acreedores, únicamente en su calidad de miembro del Comité de Acreedores, y del Comité de Acreedores, a partir la Fecha de Petición de la ACT hasta la Fecha de Entrada en Vigencia de la ACT inclusive y cada una de las Personas Relacionadas del Comité de Acreedores no tendrá o incurrirá en responsabilidad alguna con ninguna Entidad por cualquier acto realizado u omitido en relación con el Caso del Título III, la formación, difusión, implementación, confirmación o aprobación del Plan de la ACT o cualquier compromiso o acuerdo contenido en el presente, la Declaración de Divulgación de la ACT, o cualquier contrato, instrumento, liberación u otro acuerdo o documento previsto o contemplado en relación con el perfeccionamiento de las transacciones establecidas en el Plan de la ACT; disponiéndose, sin embargo, que, sin perjuicio de la exculpación anterior, en el caso en que esa litigación comience

contra un miembro del Comité de Acreedores con respecto a las acciones anteriores, dicho miembro debe tener el derecho de recibir un reembolso por los honorarios de abogados y gastos razonables incurridos y de ser indemnizado por cualquier daño sufrido, en cada caso, por la ACT conforme a una Orden Final; y disponiéndose, además, que, las disposiciones anteriores del presente Artículo 40.7(d) no afectarán a la responsabilidad de ninguna Entidad que de otra manera resultaría de cualquier acto u omisión en la medida en que se determine en una Orden Final que dicho acto u omisión ha constituido fraude intencional o conducta dolosa intencional.

40.8 **Litigio Relacionado a Designaciones/Litigio de Uniformidad**: sin perjuicio de lo contenido en el presente en contrario, en el caso de que se introduzca una Orden Final en relación con el Litigio Relacionado con los Nombramientos o el Litigio de Uniformidad posterior a la entrada de la Orden de Confirmación de la ACT, en contraprestación de las distribuciones realizadas, a realizar, o que se considera que se realizan conforme a los términos y disposiciones del Plan de la ACT y los documentos e instrumentos relacionados con este, todos los Acreedores u otras Entidades que reciban, o se considere que han recibido, distribuciones de conformidad con el Plan de la ACT o como resultado de este, consiente y aceptan que tal Orden Final no revertirá, afectará o modificará de manera alguna las transacciones contempladas en el Plan de la ACT y la Orden de Confirmación de la ACT, lo que incluye, sin limitación, las liberaciones, exculpaciones y medidas cautelares proporcionadas conforme a la Sección XL del Plan de la ACT; disponiéndose, sin embargo, que, en la medida en que un demandante en el Litigio Relacionado con Nombramientos o el Litigio de Uniformidad sea parte en cualquiera del Acuerdo de Apoyo al Plan de OG/AEP, el Acuerdo de Apoyo al Plan de la ACT/ADCC, el Acuerdo de Apoyo al Plan de la AFI o la Estipulación de SRE, dentro de los cinco (5) Días Hábiles siguientes a la Fecha de Entrada en Vigencia de la ACT, el demandante realizará todas y cada una de las medidas necesarias para desestimar, con perjuicio o, en el caso de que otros demandantes sean parte en tales litigios, retirarse, con prejuicio, de tale Litigio Relacionado con Nombramientos o Litigio de Uniformidad, según sea el caso, lo que incluye, sin limitación, la presentación de notificaciones de desestimación o retiro con el actuario del tribunal que tenga jurisdicción sobre estos.

40.9 **Orden de Exclusión**: en la medida limitada establecida en el Plan de la ACT, todas las Entidades tienen permanentemente prohibido, excluido o restringido la institución, seguimiento, procura miento o litigio de cualquier modo sobre toda Reclamación, intimación, derecho, responsabilidad o causa de acción de cualquier tipo, índole o naturaleza, en derecho o equidad, conocida o desconocida, directa o derivada, presentada o no, contra cualquiera de Partes Eximidas, en base, con relación, derivado o en conexión a cualquiera de las Reclamaciones Eximidas, confirmación y perfeccionamiento del Plan de la ACT, la negociación y perfeccionamiento del Acuerdo de Apoyo al Plan de la ACT/ADCC, o cualquier reclamación, acción, hecho, transacción, incidencia, declaración u omisión relacionada con o supuesta o que se podría haber supuesto en el Caso de Título III, lo que incluye, de manera no taxativa, cualquier reclamación, intimación, derecho, responsabilidad o causa de acción para indemnizar, contribuir u otra base en derecho o equidad para daños y perjuicios, costos o tasas incurridas que surjan directa o indirectamente de o se relacionen de otro modo con el Caso de Título III, ya sea directa o indirectamente por parte de cualquier Persona en beneficio directo o indirecto de la Parte Eximida derivado o relacionado a las reclamaciones, acciones, hechos, transacciones,

110

incidencias u omisiones que son, podrían haber sido o podrían ser supuestas en las acciones relacionadas o cualquier otra acción presentada o que pueda presentarse por, mediante, en nombre de en beneficio de cualquiera de las Partes Eximidas (ya sea que surge de una ley extranjera, federal o estatal e independientemente de dónde se presente).

40.10 **Sin Renuncia**: sin perjuicio de cualquier disposición que indique lo contrario en los Artículos 40.5 y 46.6 del presente, las descargas y medidas cautelares establecidas en esos artículos no limitarán, reducirán ni afectarán de ningún otro modo los derechos de la Junta de Supervisión, la AAFAF, la ACT Reorganizada, los Acreedores del Acuerdo de Apoyo al Plan de la ACT/ADCC o el Fideicomiso de Acciones de Anulación para hacer cumplir, demandar, resolver o conciliar los derechos, reclamaciones y otros asuntos expresamente retenidos por cualquiera de ellos, ni se considerará que lo hagan.

40.11 **Medida Cautelar Complementaria**: sin perjuicio de cualquier disposición del presente, salvo en la medida limitada prevista en el Plan de la ACT, todas las Entidades, lo que incluye las Entidades que actúen en su nombre, que en la actualidad posean o presenten, hayan poseído o presenten, o puedan poseer o presentar, cualquier Reclamación Eximida contra cualquiera de las Partes Eximida en base a, atribuible a derivado o relacionado con el Caso de Título III o cualquier Reclamación contra el Deudor, cuando sea y dondequiera que surja o se presente, ya sea en los Estados Unidos o en cualquier otro lugar del mundo, ya sea en forma contractual, extracontractual, de garantía, estatuto o cualquier otra teoría de derecho, equidad o de otra índole será y se considerará paralizada, restringida y prohibida en cuanto a la adopción de cualquier medida contra cualquiera de las Partes Eximidas con el fin de recaudar, recuperar o recibir directa o indirectamente cualquier pago o recuperación con respecto a cualquier Reclamación Eximida que surja antes de la Fecha de Entrada en Vigencia de la ACT (lo que incluye antes de la Fecha de Petición de la ACT), lo que incluye, de manera no taxativa:

(a)      Iniciar o continuar de cualquier manera cualquier acción u otro procedimiento de cualquier tipo con respecto a cualquier Reclamación Eximida contra cualquiera de las Partes Eximidas o los activos o bienes de cualquier Parte Eximida;

(b)      Ejecutar, adjuntar, recaudar o recuperar, por cualquier medio o forma, cualquier sentencia, laudo, decreto u orden contra cualquiera de las Partes Eximidas o los activos o bienes de cualquier Parte Eximida con respecto a cualquier Reclamación Eximida;

(c)      Crear, perfeccionar o hacer cumplir cualquier Gravamen de cualquier tipo contra cualquiera de las Partes Eximidas o los activos o bienes de cualquier Parte Eximida con respecto a cualquier Reclamación Eximida;

(d)      A menos que se disponga expresamente otra cosa en el Plan de la ACT o en la Orden de Confirmación de la ACT, presentar, implementar o hacer efectiva cualquier compensación, derecho de subrogación, indemnización, contribución o reembolso de cualquier tipo contra cualquier obligación debida a cualquiera de las Partes Eximidas o contra los bienes de cualquier Parte Eximida respecto de cualquier Reclamación Eximida; y

111

(e)     Tomar cualquier acción, de cualquier forma, en cualquier lugar, que no se ajuste o cumpla con las disposiciones del Plan de la ACT o la Orden de Confirmación de la ACT, disponiéndose, sin embargo, que el cumplimiento por parte del Deudor de los requisitos formales de la Norma de Quiebras 3016 no constituirá una admisión de que el Plan de la ACT proporciona ninguna medida cautelar contra una conducta no prohibida de otro modo en virtud del Código de Quiebras.

40.12 **Casos y Honorarios posteriores a la Fecha de Entrada en Vigencia**: a partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada contratará, en el ejercicio habitual de la actividad y sin necesidad de aprobación por parte del Tribunal del Título III, profesionales y pagará los honorarios y gastos profesionales razonables incurridos por la ACT Reorganizada en relación con la implementación y perfeccionamiento del Plan de la ACT sin aprobación adicional por parte del Tribunal del Título III. Sin limitar lo anterior, a partir de la Fecha de Entrada en Vigencia de la ACT, la ACT Reorganizada deberá, en el ejercicio habitual de la actividad y sin necesidad de aprobación por parte del Tribunal del Título III, pero en ningún caso más tarde de cuarenta y cinco (45) días a partir de la presentación de facturas o declaraciones con respecto a la incurrencia de honorarios y gastos a la ACT Reorganizada, pagar los honorarios razonables y documentados y reembolsar los gastos de la Junta de Supervisión y de sus profesionales relacionados con la implementación y perfeccionamiento del Plan de la ACT y en relación con sus funciones y responsabilidades conforme a PROMESA y los términos y disposiciones del Plan de la ACT.

40.13 **Exención de la Ley de Valores**: conforme al artículo 1145 del Código de Quiebras y/o al Artículo 3(a)(2) de la Ley de Valores, la oferta, emisión y distribución de los Nuevos Bonos de la ACT conforme a los términos del presente estarán exentas del registro en virtud de la Ley de Valores y cualquier ley estatal o local que exija el registro para la oferta, emisión o distribución de valores, lo que incluye, de manera no taxativa, los requisitos de registro del Artículo 5 de la Ley de Valores y cualquier otra ley estatal o federal aplicable que exija el registro y/o la entrega o calificación de prospecto antes de la oferta, emisión, distribución o venta de valores.

40.14 **Independencia**: sujeto a los términos y disposiciones del Acuerdo de Apoyo al Plan de la ACT/ADCC y el Acuerdo del Comité de la ACT, si, antes de la Fecha de Confirmación de la ACT, el Tribunal del Título III considera que (a) cualquier término o disposición del Plan de la ACT es inválido, nulo o inaplicable, el Tribunal del Título III tendrá la facultad de alterar e interpretar tal término o disposición para que sea válido o exigible en la mayor medida posible, de conformidad con el propósito original del término o disposición que se considere inválida, nula o inaplicable, y tal término o disposición será aplicable en su forma alterada o interpretada, o (b) la Junta de Supervisión determina la modificación o enmienda el Plan de la ACT, las provisiones del Plan de la ACT aplicables a estas se considerarán separadas y no tendrán vigencia ni efecto.

40.15 **Ley Aplicable:** salvo en la medida en que sea aplicable otra ley federal, o en la medida en que un anexo del presente o cualquier documento que se concierte en relación con el presente disponga otra cosa, los derechos, deberes y obligaciones que surgen del presente Plan de

la ACT se regirán por y se interpretarán y harán cumplir conforme a PROMESA (lo que incluye las disposiciones del Código de Quiebras aplicables en virtud del Artículo 301 de PROMESA) y, en la medida en que no sean incompatibles con ellas, las leyes del Estado Libre Asociado de Puerto Rico que dan efecto a los principios de conflictos de leyes.

40.16 **Cierre de Caso**: la Junta de Supervisión, inmediatamente después de la plena administración del Casos de Titulo III, radicará ante el Tribunal del Título III todos los documentos exigidos por la Norma de Quiebras 3022 y cualquier orden aplicable del Tribunal del Título III. Sin perjuicio del cierre del Caso de Título III, el Tribunal del Título III conservará la jurisdicción de todas las cuestiones establecidas en la Sección XXXIX del Plan de la ACT.

40.17 **Títulos de artículos**: los títulos de los artículos contenidos en el presente Plan de la ACT son solamente para referencia y no afectarán de ningún modo el significado o interpretación del Plan de la ACT.

40.18 **Inconsistencias**: en la medida en que haya incongruencias entre (a) la información contenida en la Declaración de Divulgación y los términos y disposiciones del Plan de la ACT, regirán los términos y disposiciones contenidos en el presente, (b) los términos y disposiciones del Plan de la ACT y los términos y disposiciones de la Orden de Confirmación de la ACT, regirán los términos y disposiciones de la Orden de Confirmación de la ACT y se considerarán una modificación del Plan de la ACT, (c) los términos y disposiciones del Plan de la ACT y el Contrato de Emisión de Nuevos Bonos de la ACT, regirán los términos y disposiciones del Contrato de Emisión de Nuevos Bonos de la ACT; disponiéndose, sin embargo, que bajo ninguna circunstancia la Orden de Confirmación de la ACT modifique los términos económicos establecidos en el presente documento sin el consentimiento de la Junta de Supervisión.

40.19 **Conservación de documentos**: a partir de la Fecha de Entrada en Vigencia de la ACT, el Deudor podrá mantener documentos conforme a la política estándar de conservación de documentos, y las alteraciones, enmiendas, modificaciones o complementos de estos realizados por el Deudor.

40.20 **Efecto Vinculante Inmediato**: conforme al artículo 944(a) del Código de Quiebras, aplicable al Caso de Título III conforme al Artículo 301 de PROMESA, y sin perjuicio de las Normas de Quiebras 3020(e), 6004(h) o 7062 o de otro modo, al producirse la Fecha de Entrada en Vigencia de la ACT, los términos del Plan de la ACT y del Complemento del Plan serán inmediatamente efectivos y ejecutables y se considerarán vinculantes para todos los tenedores de Reclamaciones y sus respectivos sucesores y causahabientes, independientemente de que la Reclamación de dicho tenedor se vea afectada en virtud del Plan de la ACT y de que dicho tenedor haya aceptado o no el Plan de la ACT. Las descargas, exculpaciones y resoluciones efectuados en virtud del Plan de la ACT serán operativos y estarán sujetos a ejecución por el Tribunal del Título III, a partir de la Fecha de Entrada en Vigencia de la ACT, lo que incluye conforme a las disposiciones cautelares del Plan de la ACT. Una vez aprobadas, las conciliaciones y resoluciones incorporadas en el Plan de la ACT, junto con el tratamiento de cualquier Reclamación Permitida asociada, no serán objeto de impugnación de garantías u otra impugnación por parte de ninguna Entidad en ningún tribunal u otro foro. Como tal, toda Entidad

113

que se oponga a los términos de cualquier conciliación y resolución establecidas en el Plan de la ACT debe (a) impugnar dicha conciliación y resolución antes de la confirmación del Plan de la ACT y (b) demostrar la legitimidad adecuada para objetar y que la conciliación y resolución de que se trate no cumplen las normas que rigen resoluciones en virtud de la Norma de Quiebras 9019 y otras leyes aplicables.

40.21 **Documentos Adicionales**: en la Fecha de Entrada en Vigencia de la ACT o antes de esta, la Junta de Supervisión podrá radicar ante un Actuario del Tribunal del Título III los acuerdos y otros documentos que sean necesarios o apropiados para poner en práctica y aportar más anexos de los términos y condiciones del Plan de la ACT. El Deudor y todos los tenedores de Reclamaciones que reciban distribuciones conforme al Plan de la ACT y todas las demás partes interesadas, ocasionalmente, podrán preparar, celebrar y otorgar cualquier acuerdo o documento y adoptar cualquier otra medida que sea necesaria o aconsejable para poner en práctica las disposiciones y la intención del Plan de la ACT.

40.22 **Reserva de Derechos**: salvo lo dispuesto expresamente en el presente, el Plan de la ACT no tendrá validez ni vigencia a menos que el Tribunal del Título III dicte la Orden de Confirmación de la ACT. Ninguna radicación del Plan de la ACT, ninguna declaración o disposición contenida en el Plan de la ACT, ni la adopción de ninguna medida por parte del Deudor con respecto al Plan de la ACT, la Declaración de Divulgación, o el Complemento del Plan será o se considerará como una admisión o renuncia a ningún derecho del Deudor con respecto a los tenedores de Reclamaciones antes de la Fecha de Entrada en Vigencia de la ACT. Salvo lo dispuesto expresamente en el presente, los derechos y facultades del gobierno de Puerto Rico en virtud de la Constitución del ELA y PROMESA, lo que incluye, de manera no taxativa, en virtud de los Artículos 303 y 305 de PROMESA, están expresamente reservados (sujetos a cualquier limitación al respecto impuesta por la Constitución del ELA, la Constitución de los Estados Unidos o PROMESA), y nada de lo dispuesto en el presente se considerará una renuncia a ninguno de tales derechos y facultades.

40.23 **Sucesores y Causahabientes**: salvo que se disponga expresamente de otro modo en el Plan de la ACT, los derechos, beneficios y obligaciones de cualquier Entidad nombrada o mencionada en el Plan de la ACT o la Orden de Confirmación de la ACT serán vinculantes para cualquier heredero, albacea, administrador, sucesor o causahabiente, Empresa asociada, funcionario, director, agente, representante, abogado, beneficiarios o tutor, en su caso, de cada entidad y será para beneficio de estos.

40.24 **Notificaciones**: todas las notificaciones, solicitudes, intimaciones u otros documentos exigidos por el Plan de la ACT o la Orden de Confirmación de la ACT que deban notificarse o entregarse a la Junta de Supervisión, al Deudor o a la AAFAF para que surtan efecto se harán por escrito, lo que incluye mediante transmisión por fax y, a menos que se disponga expresamente de otro modo en el presente, se considerará que se han entregado o realizado debidamente en el momento de la entrega efectiva o, en caso de notificación por transmisión o fax, cuando se reciban y confirmen telefónicamente, dirigidas de la siguiente manera:

114

En caso de ser para la Junta de Supervisión, a:

Junta de Supervisión y Administración Financiera de Puerto Rico
268 Muñoz Rivera Ave, Suite 1107
San Juan, PR 00918-1813
A la atención de: Director Ejecutivo

– con copia a –

PROSKAUER ROSE LLP
Eleven Times Square
Nueva York, NY 10036
A la atención de: Martin J. Bienenstock, Esq.
    Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

– y –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
A la atención de: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

Si al Deudor, a:

Autoridad de Carreteras y Transportación de Puerto Rico
c/o Agencia Fiscal y Autoridad de Asesoría Financiera
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
A la atención de: Oficina del Director Ejecutivo

– con copia a –

PROSKAUER ROSE LLP
Eleven Times Square
Nueva York, NY 10036
A la atención de: Martin J. Bienenstock, Esq.
    Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

– y –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800

115

San Juan, PR 00918-1813
A la atención de: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

– y –

O'MELVENY & MYERS LLP
Seven Times Square
Nueva York, NY 10036
A la atención de: John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

Si a la AAFAF, a:          La Autoridad de Asesoría Financiera y Agencia Fiscal
                           Roberto Sánchez Vilella (Minillas) Government Center
                           De Diego Ave. Stop 22
                           San Juan, Puerto Rico 00907

– con copia a –

O'MELVENY & MYERS LLP
Seven Times Square
Nueva York, NY 10036
A la atención de: John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

40.25 **Duración de las Medidas Cautelares o Paralizaciones**: a menos que se disponga de otro modo en el presente o en la Orden de Confirmación de la ACT, todos las medidas cautelares o paralizaciones en vigencia en el Caso de Título III (conforme a los artículos 105, 362 o 922 del Código de Quiebras o cualquier orden del Tribunal del Título III) y que existen a la Fecha de Confirmación de la ACT (lo que excluye cualquier medida cautelar o paralización contenida en el Plan de la ACT o en la Orden de Confirmación de la ACT) permanecerán en plena vigencia hasta la Fecha de Entrada en Vigencia de la ACT. Todas las medidas cautelares o paralizaciones contenidas en el Plan de la ACT o en la Orden de Confirmación de la ACT permanecerán en plena vigencia conforme a sus condiciones.

40.26 **Acuerdo completo**: salvo que se indique de otro modo, el Plan de la ACT sustituye a todas las negociaciones, promesas, pactos, acuerdos, entendimientos y representaciones anteriores y contemporáneas sobre tales temas, todos los cuales se han fusionado e integrado al Plan de la ACT.

116

40.27 **Complemento del Plan**: todos los documentos incluidos en el Complemento del Plan se incorporan al Plan de la ACT y forman parte de él, como si se establecieran íntegramente en el Plan de la ACT. Una vez radicado el Complemento del Plan ante el Actuario del Tribunal del Título III, se distribuirán copias de los documentos que en él figuran, previa solicitud por escrito al abogado de la Junta de Supervisión en el domicilio que precede o descargando esos documentos de https://cases.primeclerk.com/ puertorico/ o del sitio web del Tribunal del Título III, disponible a través de PACER. A menos que el Tribunal del Título III ordene otra cosa, en la medida en que cualquier documento del Complemento del Plan sea incompatible con los términos de cualquier parte del Plan de la ACT que no constituya el Complemento del Plan, prevalecerá la parte del Plan de la ACT que no constituya el Complemento del Plan; disponiéndose, sin embargo, que, en lo que respecta a los asuntos regidos por el Contrato de Emisión de Nuevos Bonos de la ACT, en la medida en que cualquier disposición del Plan de la ACT sea incompatible con el Contrato Emisión de Nuevos Bonos de la ACT, prevalecerá el Contrato de Emisión de Nuevos Bonos de la ACT.

Fechado:      San Juan, Puerto Rico
          __ de mayo de 2022

LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓNDE PUERTO RICO, a través de la Junta de Supervisión y Administración Financiera para Puerto Rico como su representante

Firmado:              /s/ David A. Skeel Jr.
        Nombre:  David A. Skeel Jr.
        Nombre:  Presidente

# ANEXO A

PROGRAMA DE ACCIONES DE ANULACIÓN

2" = "1" "125859215v13" ""

Proveedores adversarios restantes

| Nombre del proveedor | Tipo de proveedor | Procedimiento del adversario n.º |
|---|---|---|
| GILA LLC | Adversario | 19-00354 |

2" = "1" "125859215v13" ""

## **ANEXO B**

PROGRAMA DE ACCIONES DE INVALIDEZ

**Acciones de Invalidez**

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, procedimiento contencioso n.º 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, procedimiento contencioso n.º 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., procedimiento contencioso n.º 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E, procedimiento contencioso n.º 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, procedimiento contencioso n.º 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, procedimiento contencioso n.º 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, procedimiento contencioso n.º 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, procedimiento contencioso n.º 19-00288

2" = "1" "125859215v13" ""

# **ANEXO C**

PROGRAMA DE ACCIONES DE IMPUGNACIÓN DE GRAVAMEN

2" = "1" "125859215v13" ""

## Acciones de Impugnación de Gravamen

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., procedimiento contencioso n.º 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, procedimiento contencioso n.º 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, procedimiento contencioso n.º 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, procedimiento contencioso n.º 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, procedimiento contencioso n.º 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, procedimiento contencioso n.º 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., procedimiento contencioso n.º 19-00297

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, procedimiento contencioso n.º 19-00362

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ambac Assurance Corporation, procedimiento contencioso n.º 19-00363

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, *et al.*, and the Official Committee of Unsecured Creditors of All Title III  Debtors (Other Than COFINA) v. Davidson Kempner Capital Management LP, procedimiento  contencioso n.º 19-00364

2" = "1" "125859215v13" ""

<u>The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board of Puerto Rico and the</u>
<u>Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v.</u>
<u>Banco Popular de Puerto Rico</u>, procedimiento contencioso n.º 19-00365

2" = "1" "125859215v13" ""

# ANEXO D

PROGRAMA DE FLUJO DE ACTIVOS DE LOS NUEVOS BONOS DE LA ACT

ANEXO: D

Anexo: Programa de Flujo de Activos de Nuevos Bonos de la ACT:

| Año Fiscal (7/1) | Vencimiento | Principal | Intereses 5.000% | Amortización de la Deuda |
|---|---|---|---|---|
| | | | Nuevos CIB de la ACT | |
| Total | | 600,000,000.00 | 1,085,949,250.00 | 1,685,949,250.00 |
| 2023 | 1 de julio de 2023 | - | 30,000,000.00 | 30,000,000.00 |
| 2024 | 1 de julio de 2024 | - | 30,000,000.00 | 30,000,000.00 |
| 2025 | 1 de julio de 2025 | - | 30,000,000.00 | 30,000,000.00 |
| 2026 | 1 de julio de 2026 | - | 30,000,000.00 | 30,000,000.00 |
| 2027 | 1 de julio de 2027 | - | 30,000,000.00 | 30,000,000.00 |
| 2028 | 1 de julio de 2028 | - | 30,000,000.00 | 30,000,000.00 |
| 2029 | 1 de julio de 2029 | - | 30,000,000.00 | 30,000,000.00 |
| 2030 | 1 de julio de 2030 | - | 30,000,000.00 | 30,000,000.00 |
| 2031 | 1 de julio de 2031 | | 30,000,000.00 | 30,000,000.00 |
| 2032 | 1 de julio de 2032 | - | 30,000,000.00 | 30,000,000.00 |
| 2033 | 1 de julio de 2033 | - | 30,000,000.00 | 30,000,000.00 |
| 2034 | 1 de julio de 2034 | - | 30,000,000.00 | 30,000,000.00 |
| 2035 | 1 de julio de 2035 | - | 30,000,000.00 | 30,000,000.00 |
| 2036 | 1 de julio de 2036 | - | 30,000,000.00 | 30,000,000.00 |
| 2037 | 1 de julio de 2037 | - | 30,000,000.00 | 30,000,000.00 |
| 2038 | 1 de julio de 2038 | - | 30,000,000.00 | 30,000,000.00 |
| 2039 | 1 de julio de 2039 | - | 30,000,000.00 | 30,000,000.00 |
| 2040 | 1 de julio de 2040 | - | 30,000,000.00 | 30,000,000.00 |
| 2041 | 1 de julio de 2041 | - | 30,000,000.00 | 30,000,000.00 |
| 2042 | 1 de julio de 2042 | - | 30,000,000.00 | 30,000,000.00 |
| 2043 | 1 de julio de 2043 | - | 30,000,000.00 | 30,000,000.00 |
| 2044 | 1 de julio de 2044 | - | 30,000,000.00 | 30,000,000.00 |
| 2045 | 1 de julio de 2045 | - | 30,000,000.00 | 30,000,000.00 |

| 2046 | 1 de julio de 2046 | - | 30,000,000.00 | 30,000,000.00 |
| 2047 | 1 de julio de 2047 | - | 30,000,000.00 | 30,000,000.00 |
| 2048 | 1 de julio de 2048 | - | 30,000,000.00 | 30,000,000.00 |
| 2049 | 1 de julio de 2049 | - | 30,000,000.00 | 30,000,000.00 |
| 2050 | 1 de julio de 1950 | - | 30,000,000.00 | 30,000,000.00 |
| 2051 | 1 de julio de 1951 | - | 30,000,000.00 | 30,000,000.00 |
| 2052 | 1 de julio de 1952 | - | 30,000,000.00 | 30,000,000.00 |
| 2053 | 1 de julio de 1953 | 14,190,000.00 | 30,000,000.00 | 44,190,000.00 |
| 2054 | 1 de julio de 1954 | 53,125,000.00 | 29,290,500.00 | 82,415,500.00 |
| 2055 | 1 de julio de 1955 | 55,785,000.00 | 26,634,250.00 | 82,419,250.00 |
| 2056 | 1 de julio de 1956 | 58,575,000.00 | 23,845,000.00 | 82,420,000.00 |
| 2057 | 1 de julio de 1957 | 61,500,000.00 | 20,916,250.00 | 82,416,250.00 |
| 2058 | 1 de julio de 1958 | 64,575,000.00 | 17,841,250.00 | 82,416,250.00 |
| 2059 | 1 de julio de 1959 | 67,805,000.00 | 14,612,500.00 | 82,417,500.00 |
| 2060 | 1 de julio de 1960 | 71,195,000.00 | 11,222,250.00 | 82,417,250.00 |
| 2061 | 1 de julio de 1961 | 74,755,000.00 | 7,662,500.00 | 82,417,500.00 |
| 2062 | 1 de julio de 1962 | 78,495,000.00 | 3,924,750.00 | 82,419,750.00 |

*La Fecha de Emisión Considerada es el 1 de julio de 2022

| Año Fiscal (7/1) | Vencimiento | Nuevos CAB de la ACT | | |
| --- | --- | --- | --- | --- |
| | | Principal Inicial | Valor acumulado en cada Fecha de amortización (2) | Valor de vencimiento (3) |
| Total | | 237,955,868.13 | 334,856,647.24 | 389,919,000.00 |
| 2023 | 1 de julio de 2023 | - | - | - |
| 2024 | 1 de julio de 2024 | - | - | - |
| 2025 | 1 de julio de 2025 | 25,289,588.80 | 29,327,916.80 | 41,440,000.00 |
| 2026 | 1 de julio de 2026 | 22,310,860.93 | 27,183,444.45 | 36,559,000.00 |
| 2027 | 1 de julio de 2027 | 25,083,317.54 | 32,108,471.38 | 41,102,000.00 |
| 2028 | 1 de julio de 2028 | 28,817,559.67 | 38,756,163.54 | 47,221,000.00 |

| | | | | |
|---|---|---|---|---|
| 2029 | 1 de julio de 2029 | 35,543,345.34 | 50,221,494.18 | 58,242,000.00 |
| 2030 | 1 de julio de 2030 | 35,310,832.47 | 52,419,172.95 | 57,861,000.00 |
| 2031 | 1 de julio de 2031 | 33,610,009.98 | 52,419,983.94 | 55,074,000.00 |
| 2032(1) | 1 de julio de 2032 | 31,990,353.40 | 52,420,000.00 | 52,420,000.00 |

(1) Vencimiento declarado; no una amortización de fondo de amortización

(2) Es igual al monto inicial del capital más el interés acumulado a cada fecha de la amortización del fondo del amortización

(3) Es igual al valor total acumulado que sería representado por la porción de los bonos redimidos si se mantienen al vencimiento

*La Fecha de Emisión Considerada es el 1de julio de 2022

| Año Fiscal (7/1) | Vencimiento | Nuevos CCAB de la ACT | | | |
|---|---|---|---|---|---|
| | | (a) Principal Inicial | (a) Valor de Vencimiento | (b) Interés CCAB (2) | (c = a + b) Amortización de la Deuda CCAB |
| Total | | 407,044,597.57 | 666,991,000.00 | 419,638,900.00 | 1,086,629,900.00 |
| 2023 | 1 de julio de 2023 | - | - | - | - |
| 2024 | 1 de julio de 2024 | - | - | - | - |
| 2025 | 1 de julio de 2025 | - | - | - | - |
| 2026 | 1 de julio de 2026 | - | - | - | - |
| 2027 | 1 de julio de 2027 | - | - | - | - |
| 2028 | 1 de julio de 2028 | - | - | - | - |
| 2029 | 1 de julio de 2029 | - | - | - | - |
| 2030 | 1 de julio de 2030 | | | | |
| 2031 | 1 de julio de 2031 | - | - | - | - |
| 2032 | 1 de julio de 2032 | - | - | - | - |
| 2033 | 1 de julio de 2033 | 11,637,848.90 | 19,070,000.00 | 33,349,550.00 | 52,419,550.00 |
| 2034 | 1 de julio de 2034 | 12,220,046.48 | 20,024,000.00 | 32,396,050.00 | 52,420,050.00 |
| 2035 | 1 de julio de 2035 | 12,830,926.75 | 21,025,000.00 | 31,394,850.00 | 52,419,850.00 |
| 2036 | 1 de julio de 2036 | 13,472,320.52 | 22,076,000.00 | 30,343,600.00 | 52,419,600.00 |
| 2037 | 1 de julio de 2037 | 14,146,058.60 | 23,180,000.00 | 29,239,800.00 | 52,419,800.00 |
| 2038 | 1 de julio de 2038 | 14,853,361.53 | 24,339,000.00 | 28,080,800.00 | 52,419,800.00 |
| 2039 | 1 de julio de 2039 | 15,596,060.12 | 25,556,000.00 | 26,863,850.00 | 52,419,850.00 |
| 2040 | 1 de julio de 2040 | 16,375,985.18 | 26,834,000.00 | 25,586,050.00 | 52,420,050.00 |
| 2041 | 1 de julio de 2041 | 17,194,967.52 | 28,176,000.00 | 24,244,350.00 | 52,420,350.00 |
| 2042 | 1 de julio de 2042 | 18,054,837.95 | 29,585,000.00 | 22,835,550.00 | 52,420,550.00 |
| 2043 | 1 de julio de 2043 | 18,957,427.28 | 31,064,000.00 | 21,356,300.00 | 52,420,300.00 |
| 2044 | 1 de julio de 2044 | 19,905,176.59 | 32,617,000.00 | 19,803,100.00 | 52,420,100.00 |
| 2045 | 1 de julio de 2045 | 20,900,526.96 | 34,248,000.00 | 18,172,250.00 | 52,420,250.00 |
| 2046 | 1 de julio de 2046 | 21,945,309.20 | 35,960,000.00 | 16,459,850.00 | 52,419,850.00 |
| 2047 | 1 de julio de 2047 | 23,042,574.66 | 37,758,000.00 | 14,661,850.00 | 52,419,850.00 |

| 2048 | 1 de julio de 2048 | 24,194,764.42 | 39,646,000.00 | 12,773,950.00 | 52,419,950.00 |
| 2049 | 1 de julio de 2049 | 25,404,319.56 | 41,628,000.00 | 10,791,650.00 | 52,419,650.00 |
| 2050 | 1 de julio de 1950 | 26,674,901.70 | 43,710,000.00 | 8,710,250.00 | 52,420,250.00 |
| 2051 | 1 de julio de 1951 | 28,008,341.65 | 45,895,000.00 | 6,524,750.00 | 52,419,750.00 |
| 2052 | 1 de julio de 1952 | 29,408,911.30 | 48,190,000.00 | 4,230,000.00 | 52,420,000.00 |
| 2053(1) | 1 de julio de 1953 | 22,219,930.70 | 36,410,000.00 | 1,820,500.00 | 38,230,500.00 |

(1) Vencimiento declarado; no una amortización de fondo de amortización
(2) La nueva fecha de conversión de CCAB de la ACT es 1de julio de 2032
*La Fecha de Emisión Considerada es el 1 de julio de 2022

2" = "1" "125859215v13" ""

Flujos de activos de la amortización de la deuda acumulados

| Año Fiscal (7/1) | Vencimiento | Amortización de la Deuda CIB | Valor acumulado en cada Fecha de amortización CAB | Amortización de la Deuda CCAB | Total Amortización de la Deuda |
|---|---|---|---|---|---|
| Total | | 1,685,949,250.00 | 334,856,647.24 | 1,086,629,900.00 | 3,107,435,797.24 |
| 2023 | 1 de julio de 2023 | 30,000,000.00 | - | - | 30,000,000.00 |
| 2024 | 1 de julio de 2024 | 30,000,000.00 | - | - | 30,000,000.00 |
| 2025 | 1 de julio de 2025 | 30,000,000.00 | 29,327,916.80 | - | 59,327,916.80 |
| 2026 | 1 de julio de 2026 | 30,000,000.00 | 27,183,444.45 | - | 57,183,444.45 |
| 2027 | 1 de julio de 2027 | 30,000,000.00 | 32,108,471.38 | - | 62,108,471.38 |
| 2028 | 1 de julio de 2028 | 30,000,000.00 | 38,756,163.54 | - | 68,756,163.54 |
| 2029 | 1 de julio de 2029 | 30,000,000.00 | 50,221,494.18 | - | 80,221,494.18 |
| 2030 | 1 de julio de 2030 | 30,000,000.00 | 52,419,172.95 | - | 82,419,172.95 |
| 2031 | 1 de julio de 2031 | 30,000,000.00 | 52,419,983.94 | - | 82,419,983.94 |
| 2032 | 1 de julio de 2032 | 30,000,000.00 | 52,420,000.00 | - | 82,420,000.00 |
| 2033 | 1 de julio de 2033 | 30,000,000.00 | - | 52,419,550.00 | 82,419,550.00 |
| 2034 | 1 de julio de 2034 | 30,000,000.00 | - | 52,420,050.00 | 82,420,050.00 |
| 2035 | 1 de julio de 2035 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2036 | 1 de julio de 2036 | 30,000,000.00 | - | 52,419,600.00 | 82,419,600.00 |
| 2037 | 1 de julio de 2037 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2038 | 1 de julio de 2038 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2039 | 1 de julio de 2039 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2040 | 1 de julio de 2040 | 30,000,000.00 | - | 52,420,050.00 | 82,420,050.00 |
| 2041 | 1 de julio de 2041 | 30,000,000.00 | - | 52,420,350.00 | 82,420,350.00 |
| 2042 | 1 de julio de 2042 | 30,000,000.00 | - | 52,420,550.00 | 82,420,550.00 |
| 2043 | 1 de julio de 2043 | 30,000,000.00 | - | 52,420,300.00 | 82,420,300.00 |
| 2044 | 1 de julio de 2044 | 30,000,000.00 | - | 52,420,100.00 | 82,420,100.00 |
| 2045 | 1 de julio de 2045 | 30,000,000.00 | - | 52,420,250.00 | 82,420,250.00 |
| 2046 | 1 de julio de 2046 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2047 | 1 de julio de 2047 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2048 | 1 de julio de 2048 | 30,000,000.00 | - | 52,419,950.00 | 82,419,950.00 |
| 2049 | 1 de julio de 2049 | 30,000,000.00 | - | 52,419,650.00 | 82,419,650.00 |
| 2050 | 1 de julio de 1950 | 30,000,000.00 | - | 52,420,250.00 | 82,420,250.00 |
| 2051 | 1 de julio de 1951 | 30,000,000.00 | - | 52,419,750.00 | 82,419,750.00 |
| 2052 | 1 de julio de 1952 | 30,000,000.00 | - | 52,420,000.00 | 82,420,000.00 |
| 2053 | 1 de julio de 1953 | 44,190,000.00 | - | 38,230,500.00 | 82,420,500.00 |
| 2054 | 1 de julio de 1954 | 82,415,500.00 | - | - | 82,415,500.00 |
| 2055 | 1 de julio de 1955 | 82,419,250.00 | - | - | 82,419,250.00 |
| 2056 | 1 de julio de 1956 | 82,420,000.00 | - | - | 82,420,000.00 |
| 2057 | 1 de julio de 1957 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2058 | 1 de julio de 1958 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2059 | 1 de julio de 1959 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2060 | 1 de julio de 1960 | 82,417,250.00 | - | - | 82,417,250.00 |
| 2061 | 1 de julio de 1961 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2062 | 1 de julio de 1962 | 82,419,750.00 | - | - | 82,419,750.00 |

2" = "1" "125859215v13" ""

# **ANEXO E**

CONDICIONES DE PAGO DE ENDEUDAMIENTO SUBORDINADO

|  | Principal | Intereses | Pagos de préstamos acum. |
|---|---|---|---|
| Total | 362,000,000.00 | 173,538,404.20 | 535,538,404.20 |
| 1 de julio de 2023 | 10,763,135.00 | 11,714,722.22 | 22,477,857.22 |
| 1 de julio de 2024 | 9,447,509.00 | 8,780,921.63 | 18,228,430.63 |
| 1 de julio de 2025 | 4,810,622.00 | 8,544,733.90 | 13,355,355.90 |
| 1 de julio de 2026 | 5,197,995.00 | 8,424,468.35 | 13,622,463.35 |
| 1 de julio de 2027 | 5,600,394.00 | 8,294,518.48 | 13,894,912.48 |
| 1 de julio de 2028 | 6,018,302.00 | 8,154,508.63 | 14,172,810.63 |
| 1 de julio de 2029 | 6,452,216.00 | 8,004,051.08 | 14,456,267.08 |
| 1 de julio de 2030 | 6,902,647.00 | 7,842,745.68 | 14,745,392.68 |
| 1 de julio de 2031 | 7,370,121.00 | 7,670,179.50 | 15,040,300.50 |
| 1 de julio de 2032 | 7,855,180.00 | 7,485,926.48 | 15,341,106.48 |
| 1 de julio de 2033 | 8,358,382.00 | 7,289,546.98 | 15,647,928.98 |
| 1 de julio de 2034 | 8,880,300.00 | 7,080,587.43 | 15,960,887.43 |
| 1 de julio de 2035 | 9,421,525.00 | 6,858,579.93 | 16,280,104.93 |
| 1 de julio de 2036 | 9,982,665.00 | 6,623,041.80 | 16,605,706.80 |
| 1 de julio de 2037 | 10,564,346.00 | 6,373,475.18 | 16,937,821.18 |
| 1 de julio de 2038 | 11,167,211.00 | 6,109,366.53 | 17,276,577.53 |
| 1 de julio de 2039 | 11,791,923.00 | 5,830,186.25 | 17,622,109.25 |
| 1 de julio de 2040 | 12,439,163.00 | 5,535,388.18 | 17,974,551.18 |
| 1 de julio de 2041 | 13,109,633.00 | 5,224,409.10 | 18,334,042.10 |
| 1 de julio de 2042 | 13,804,055.00 | 4,896,668.28 | 18,700,723.28 |
| 1 de julio de 2043 | 14,523,171.00 | 4,551,566.90 | 19,074,737.90 |
| 1 de julio de 2044 | 15,267,745.00 | 4,188,487.63 | 19,456,232.63 |
| 1 de julio de 2045 | 16,038,563.00 | 3,806,794.00 | 19,845,357.00 |
| 1 de julio de 2046 | 16,836,434.00 | 3,405,829.93 | 20,242,263.93 |
| 1 de julio de 2047 | 17,662,190.00 | 2,984,919.08 | 20,647,109.08 |
| 1 de julio de 2048 | 18,516,687.00 | 2,543,364.33 | 21,060,051.33 |
| 1 de julio de 2049 | 19,400,805.00 | 2,080,447.15 | 21,481,252.15 |
| 1 de julio de 1950 | 20,315,451.00 | 1,595,427.03 | 21,910,878.03 |

| | | | |
|---|---|---|---|
| 1 de julio de 1951 | 21,261,555.00 | 1,087,540.75 | 22,349,095.75 |
| 1 de julio de 1952 | 22,240,075.00 | 556,001.88 | 22,796,076.88 |

## **ANEXO F**

PROGRAMA DE ESTATUTOS SUBORDINADOS A PREFERENCIA

**Lista de los Estatuto Principales sobre los que PROMESA tiene preferencia**[1]

I. **Estatutos de créditos gravados y buena fe del ELA**
   A. Bonos de Obligaciones Generales
      1. Ley 2 aprobada el 10 de octubre de 1985.
      2. Ley 1 aprobada el 26 de junio de 1987 y sus modificaciones.
      3. Ley 34 aprobada el 4 de marzo de 2014.
      4. Ley 79 aprobada el 1 de junio de 2011.
      5. Ley 243 aprobada el 9 de agosto de 2008.
      6. Ley 43 aprobada el 1 de agosto de 2005 y sus modificaciones.
      7. Ley 216 aprobada el 19 de agosto de 2004.
      8. Ley 100 aprobada el 12 de julio de 2002 y sus modificaciones.
      9. Ley 161 aprobada el 5 de julio de 2003.
      10. Ley 149 aprobada el 9 de agosto de 2002 y sus modificaciones.
      11. Resolución conjunta n.º 57 aprobada el 12 de julio de 1993.
      12. Ley 54 aprobada el 6 de julio de 2001.
      13. Ley 118 aprobada el 13 de julio de 2000.
      14. Ley 153 aprobada el 16 de julio de 1999.
      15. Ley 219 aprobada el 9 de agosto de 1998.
      16. Ley 81 aprobada el 14 de agosto de 1997.
      17. Ley 119 aprobada el 9 de agosto de 1995.
      18. Ley 46 aprobada el 28 de julio de 1994.
      19. Ley 39 aprobada el 13 de mayo de 1976 y sus modificaciones.
      20. Ley 83 aprobada el 30 de agosto de 1991.[2]

   B. Préstamos de Obligaciones Generales
      1. Préstamo de Helicóptero a Policía de la ASG - Resolución Conjunta n.º 99-2013 aprobada el 9 de diciembre de 2013.
      2. Prestamos del BGF al ELA
         1. Resolución conjunta n.º 104 aprobada el 13 de diciembre de 2013. [Línea de crédito de $ 15 millones para el Distrito Capital de la Legislatura.]
         2. Resolución conjunta n.º 96 aprobada el 27 de noviembre de 2013. [Línea de crédito de $ 30 millones.]

   C. Garantía del ELA - Bonos de la Autoridad de Edificios Públicos
      1. Ley 17 aprobada el 11 de abril de 1968 y sus modificaciones.

   D. Garantía del ELA - APLA

---

[1] Cualquier estatuto que disponga una asignación no incluida en el presupuesto certificado por la JSAF no tiene preferencia.

[2] Para evitar dudas, las disposiciones del estatuto relativas a la recaudación de impuestos no tienen preferencia.

        1.        Ley 409 aprobada el 22 de septiembre de 2004.

E.  Garantía del ELA - Notas de bonos anticipados de la AFI
     1.        Ley 1 aprobada el 1 de enero de 2015.

F.  [Garantía del ELA - AAA
     1.        Ley 45 aprobada el 28 de julio de 1994.]

## II.  Estatutos que asignan ingresos del ELA

A.  ACT
     1.        Ley 9 aprobada el 12 de agosto de 1982; artículo 2021 de 9 L.P.R.A. [tasas de licencia de automotores]
     2.        artículo 31751(a)(1) de 13 L.P.R.A. [productos de petróleo, diesel y gasoil.]
     3.        artículo 31751(a)(3) de 13 L.P.R.A. [impuesto a los cigarrillos]

B.  AFI
     1.        Ley 44 aprobada el 21 de junio de 1988 y sus modificaciones; artículo 1914 de 3 L.P.R.A. [impuesto al consumo de ron]

C.  Notas de Bonos Anticipados de la AFI
     1.        Ley 1 aprobada el 1 de enero de 2015; artículo 31751a(a) de 13 L.P.R.A. [productos de petróleo]

D.  AMA
     1.        artículo 31751(a)(4) de 13 L.P.R.A. [impuesto a los cigarrillos]

E.  ATI
     1.        artículo 31751(a)(5) de 13 L.P.R.A. [impuesto a los cigarrillos]

F.  ADCC
     1.        artículo 2271v(a) de 13 L.P.R.A. [impuesto a habitaciones de hotel]

G.  Ley 147 promulgada el 18 de junio de 1980 y sus modificaciones
     1.        artículo 104 de 23 L.P.R.A.[3] [asignación judicial]

H.  UPR
     1.        artículo 621-1 de 18 L.P.R.A.[4]

I.  Ley 83 aprobada el 30 de agosto de 1991 y sus modificaciones[5]
     1.        Artículos 5002, 5004, 5006, 5815 de 21 L.P.R.A..[6]

J.  Ley 221 aprobada el 15 de mayo de 1948 y sus modificaciones

---

[3] En el Año Fiscal 2019, las asignaciones en virtud del artículo 104 de 23 L.P.R.A. llegarían a más de $ 250 millones, si no se hace valer la preferencia.

[4] En el Año Fiscal 2019, las asignaciones en virtud del artículo 621-1 de 18 L.P.R.A. llegarían a más de $ 750 millones, si no se hace valer la preferencia.

[5] Para evitar dudas, las disposiciones del estatuto relativas a la recaudación de impuestos no tienen preferencia.

[6] En el Año Fiscal 2019, las asignaciones en virtud de los artículos 5002 y 5004 de 21 L.P.R.A. llegarían a más de $ 100 millones, si no se hace valer la preferencia. En el Año Fiscal 2019, las asignaciones en virtud de los artículos 5006 y 5815 de 21 L.P.R.A. llegarían a más de $ 200 millones, si no se hace valer la preferencia.

      1.      artículo 74(d) de 15 L.P.R.A.[7]

K. Ley 18 aprobada el 24 de enero de 2014 y sus modificaciones
      1.      artículo 6742 de 21 L.P.R.A.[8]

L. Ley 41 aprobada el 22 de julio de 2011 y sus modificaciones
      1.      artículo 8105 de 12 L.P.R.A.

## III. Estatutos del SRM y el SRJ

A. Ley 106 aprobada el 23 de agosto de 2017
B. Ley 160 aprobada el 24 de diciembre de 2013
C. Ley 91 del 24 de marzo de 2004
D. Ley 12 aprobada el 19 de octubre de 1954
E. Ley 162 aprobada el 24 de diciembre de 2013

## IV. Sección VI de la Constitución de Puerto Rico

A. Si los derechos previstos en la Sección VI, Artículos 6 y 8 de la Constitución de Puerto Rico a los bonos de Obligación general y los bonos garantizados por el ELA o el endeudamiento reestructurado de conformidad con el Plan son Prioritarios por PROMESA, se liquidan por el tratamiento de dichos bonos y endeudamiento conforme a las disposiciones del Plan. Nada en el Plan afecta o determina si la Sección VI, Artículos 6 y 8 de la Constitución de Puerto Rico es prioritaria para cualquier propósito futuro.

---

[7] En el Año Fiscal 2019, las asignaciones en virtud del artículo 74(d) de 15 L.P.R.A. llegarían a más de $ 250 millones, si no se hace valer la preferencia.

[8] En el Año Fiscal 2019, las asignaciones en virtud del artículo 6742 de 21 L.P.R.A. llegarían a más de $ 120 millones, si no se hace valer la preferencia.

2" = "1" "125859215v13" ""

**<u>ANEXO B</u>**

ACUERDO DE APOYO AL PLAN VINCULADO A LA ACT/ADCC

COPIA DE SUSCRIPCIÓN

## ACUERDO DE APOYO AL PLAN VINCULADO A LA ACT/ADCC

ACUERDO DE APOYO AL PLAN VINCULADO A LA ACT/ADCC, de fecha 5 de mayo de 2021, entre (a) la Junta de Supervisión y Administración Financiera para Puerto Rico (la "**Junta de Supervisión**"), en calidad de representante del Estado Libre Asociado de Puerto Rico (el "**Estado Libre Asociado**" o el "**ELA**"), y la Autoridad de Carreteras y Transportación ("**ACT**") de Puerto Rico, (b) ciertos tenedores de Reclamaciones de Bonos de la ACT, como se definen a continuación, que pueden incluir a los asesores o administradores que asesoran o administran a un tenedor de Reclamaciones de Bonos de la ACT en nombre de dicho tenedor, tal como se indica en el Anexo "A" del presente, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias realizadas de acuerdo con los términos del presente, los "**Tenedores de la ACT**"), (c) ciertos tenedores de Reclamaciones de Bonos de la ADCC, como se definen a continuación, que pueden incluir a los asesores o administradores que asesoran o administran a un tenedor de Reclamaciones de Bonos de la ADCC en nombre de dicho tenedor, tal como se indica en el Anexo "B" del presente, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias realizadas de acuerdo con los términos del presente, los "**Tenedores de la ADCC**"), (d) Assured Guaranty Corp. y Assured Guaranty Municipal Corp., exclusivamente en su calidad de aseguradores y tenedores declarados, tenedores potenciales o subrogados con respecto a los Bonos de la ACT y de la ADCC, cada uno como se definen a continuación, ("**Assured**"), y (e) National Public Finance Guarantee Corporation, exclusivamente en su calidad de aseguradores y tenedores declarados, tenedores potenciales o subrogados con respecto a los Bonos de la ACT ("**National**" y, colectivamente con los Tenedores de la ACT, los Tenedores de la ADCC y Assured, los "**Acreedores del AAP Iniciales**" ). Los signatarios del presente documento se denominarán colectivamente en adelante "**Partes**" o individualmente "**Parte**". Los términos en mayúsculas utilizados en este documento que no estén definidos de otra manera tendrán los significados que se establecen a continuación o en el Plan (según se define más adelante), según corresponda.

### ANTECEDENTES

A.     En virtud de la autoridad concedida conforme a la Ley Núm. 74-1965, certificada como 9 L.P.R.A. §§2001-2035, con sus correspondientes enmiendas, la ACT fue creada para, entre otras cosas, la construcción, la operación y el mantenimiento del sistema de transporte del ELA.

B.     De acuerdo con (a) la Resolución Núm. 68-18, adoptada el 13 de junio de 1968 con sus enmiendas y complementos posteriores, la ACT emitió una serie de bonos (colectivamente, los "**Bonos de la ACT 68**"), como se indica en el Anexo "C" del presente, y (b) la Resolución 98-06, adoptada el 26 de febrero de 1998 con sus enmiendas y complementos posteriores, la ACT emitió (i) una serie de bonos que figuran en el Anexo "D" del presente (colectivamente, los "**Bonos prioritarios de la ACT 98**"), y (ii) una serie de bonos subordinados como se indica en el Anexo "E" del presente documento (colectivamente, los "**Bonos subordinados de la ACT 98**" y, junto con los Bonos de la ACT 68 y los Bonos prioritarios de la ACT 98, los "**Bonos de la ACT**").

C.     En virtud de la autoridad conferida por la ley 351 del 2 de septiembre de 2000, se creó la Autoridad del Distrito del Centro de Convenciones ("**ADCC**") de Puerto Rico, con el propósito, entre otros, de planificar, desarrollar y operar un centro de convenciones en San Juan, Puerto Rico.

123408529v3

COPIA DE SUSCRIPCIÓN

D.     De acuerdo con los términos de cierto Contrato de Fideicomiso, de fecha 24 de marzo de 2006, entre la ADCC y JP Morgan Chase Bank, N.A., como fideicomisario, con sus enmiendas y complementos periódicos, la ADCC emitió la serie de bonos (colectivamente, los "**Bonos de la ADCC**"), que figura en el Anexo "F" del presente, por el monto del capital original de Cuatrocientos Sesenta y Ocho Millones Ochocientos Mil Dólares ($468,800,000.00).

E.     En relación con la emisión de ciertos Bonos de la ACT y Bonos de la ADCC, Assured y National emitieron ciertas pólizas de seguro y la ACT y la ADCC y celebraron contratos de seguro con respecto a estas.

F.     El 30 de junio de 2016, la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico fue aprobada por el Presidente de los Estados Unidos (P.L. 114-187) ("**PROMESA**").

G.     PROMESA creó la Junta de Supervisión y confirió a la Junta de Supervisión ciertos poderes sobre las finanzas y el proceso de reestructuración con respecto a, entre otros, el Estado Libre Asociado y sus instrumentalidades, todo ello según lo dispuesto en PROMESA.

H.     A tenor con la Ley 2-2017, la Autoridad de Asesoría Financiera y Agencia Fiscal ("**AAFAF**") de Puerto Rico fue designada como agente y asesora del Gobierno del Estado Libre Asociado de Puerto Rico (el "**Gobierno**"), y se le otorgó autoridad con respecto a la reestructuración de cualquier endeudamiento emitido por el ELA y cualquiera de sus entidades gubernamentales.

I.     El 3 de mayo de 2017 (la "**Fecha de Petición del ELA**"), la Junta de Supervisión presentó una petición del Título III en nombre del Estado Libre Asociado (el "**Procedimiento de PROMESA del ELA**") ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "**Tribunal del Título III**").

J.     El 21 de mayo de 2017 (la "**Fecha de Petición de la ACT**"), la Junta de Supervisión presentó una petición del Título III en nombre de la ACT (el "**Procedimiento de PROMESA de la ACT**") ante el Tribunal del Título III.

K.     La Junta de Supervisión es el representante del ELA y de la ACT en el Procedimiento de PROMESA del ELA y en el Procedimiento de PROMESA de la ACT, respectivamente, a tenor con la Sección 315(b) de PROMESA.

L.     El 22 de febrero de 2021, las Partes, entre otras, firmaron un Acuerdo de Apoyo al Plan ("**AAP del ELA**"), en relación con la reestructuración de los Bonos GO y los Bonos de la AEP, cada uno de los cuales se define a continuación, acuerdo que continúa sujeto a ciertas condiciones, incluyendo, entre otras, la confirmación y perfeccionamiento de un plan de ajuste en el Procedimiento de PROMESA del ELA.

M.     El 8 de marzo de 2021, el Estado Libre Asociado, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico presentaron cierto Segundo Plan de Ajuste Conjunto Enmendado del Título III del Estado Libre Asociado de Puerto Rico, y otros (el "**Segundo Plan Enmendado**") [Leg. Núm. 15976], ante el Tribunal del Título III, y una declaración de divulgación correspondiente (la "**Declaración de Divulgación 2021**").

N.     A tenor con las Secciones 7.1(g) y (h) del AAP del ELA, Assured y National tenían cada uno el

123408529v3

derecho de rescindir el AAP del ELA en lo que respecta a ellos mismos en o antes del 31 de marzo de 2021 a las 5:00 p.m. (hora del Este). Por acuerdo, la Junta de Supervisión amplió dicha fecha límite hasta el 20 de abril de 2021, inclusive, a las 17:00 horas (hora del Este).

O.    Con la colaboración del equipo de mediación designado por el Tribunal del Título III, las Partes han entablado negociaciones de buena fe y bajo condiciones de mercado, incluyendo, entre otros, los términos de una propuesta de reestructuración de los Bonos de la ADCC y los Bonos de la ACT y las reclamaciones contra el ELA, la ACT y la ADCC derivadas de los Bonos de la ADCC y los Bonos de la ACT o relacionadas con ellos, que se implementarán de la manera establecida en (a) el Tercer Plan de Ajuste Conjunto Enmendado del Título III del Estado Libre Asociado de Puerto Rico, y otros, con sus correspondientes enmiendas, modificaciones o suplementos (el "**Plan**"), que será compatible con los términos y disposiciones del presente Acuerdo, incluyendo, entre otros, el Anexo "J" del presente, cuyo formulario se presentará ante el Tribunal del Título III tan pronto como sea posible tras la fecha del presente y, tras su presentación, modificará y sustituirá el Segundo Plan Enmendado, y (b) el plan de ajuste presentado en el Procedimiento de PROMESA de la ACT, plan de ajuste que la Junta de Supervisión y la ACT se esforzarán por presentar a más tardar el 31 de enero de 2022 y solicitar su confirmación; disponiéndose, sin embargo, que la falta de presentación y/o confirmación de dicho plan de ajuste en las fechas indicadas anteriormente no dará lugar a un derecho de rescisión del presente Acuerdo ni a un remedio con respecto a dicha falta.

P.    La Junta de Supervisión da su consentimiento a la suscripción y entrega de este Acuerdo por parte del ELA y la ACT, así como al cumplimiento y ejercicio por parte del ELA y la ACT de sus respectivos derechos en virtud de este Acuerdo, incluyendo, entre otros, el derecho a rescindir este Acuerdo y el derecho a dar su consentimiento a cualquier renuncia o modificación, en cada caso, de acuerdo con los términos y condiciones establecidos en el presente.

POR TODO LO ANTEDICHO, las Partes, en contraprestación por los compromisos, pactos y acuerdos descritos en el presente y por otras contraprestaciones válidas y onerosas, reconocidas por cada una de ellas como satisfactorias y adecuadas, y con la intención de estar legalmente obligadas, acuerdan mutuamente lo siguiente:

ARTÍCULO I

DEFINICIONES:

Sección 1.1    Antecedentes. Los antecedentes mencionados se incorporan por referencia y forman parte explícita de este Acuerdo.

Sección 1.2    Definiciones. Las siguientes definiciones se aplicarán y formarán parte del presente Acuerdo y de todos sus anexos y apéndices.

"*IVU del 5.5%*" significará los ingresos y recaudaciones presentes y futuros generados por la parte del Impuesto sobre las Ventas y el Uso que corresponde a una alícuota impositiva del cinco y medio por ciento (5.5%).

"*Acuerdo*" significa el presente Acuerdo de Apoyo al Plan de la ACT/ADCC, así como cada uno de sus anexos, incluidos, entre otros, con su presentación, el Plan y el Plan de la ACT, en la medida en que

3

cada uno de ellos pueda ser enmendado, complementado o modificado de otro modo de conformidad con los términos del presente o del documento que corresponda.

*"Litigio relacionado con las Designaciones"* significará, colectivamente, el litigio denominado (a) Rene Pinto Lugo, y otros c. el Gobierno de los Estados Unidos de América y otros, Proc. Cont. Núm. 18-041-LTS, actualmente pendiente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (b) Hermandad de Empleados del Fondo del Seguro del Estado, Inc., y otros c. el Gobierno de los Estados Unidos de América y otros, Caso Núm. 19-2243, actualmente pendiente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (c) Hon. Rafael Hernández-Montañez, y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico, Proc. Cont. Núm. 18-090-LTS, actualmente pendiente en el Tribunal del Título III, y (d) cualquier otro litigio que pueda estar actualmente pendiente o que pueda interponerse durante el período comprendido desde y a partir de la fecha del presente hasta la Fecha de Vigencia de la ACT, inclusive, en el que se hayan presentado reclamaciones o causas de acción compatibles con o similares a las que se presentaron, o podrían haberse presentado, en los litigios mencionados anteriormente.

*"Bonos de la ACT de Assured"* significa, colectivamente, los Bonos Asegurados por Assured que son Bonos de la ACT.

*"Bonos Asegurados por Assured"* significa, colectivamente, los Bonos de la ACT y los Bonos de la ADCC que están asegurados por Assured.

*"Código de Quiebras"* significa el Título 11 del Código de los Estados Unidos, con sus correspondientes enmiendas, §§101, y ss.

*"Reglas de Quiebra "* significa las Reglas Federales de Procedimiento de Quiebra.

*"Día Hábil"* significa un día que no sea un sábado, un domingo o cualquier otro día en el que los bancos comerciales de Nueva York, Nueva York, estén obligados o autorizados a cerrar por ley o por orden ejecutiva.

*"Reclamaciones de Bonos de la ADCC"* significa, colectivamente, las reclamaciones contra la ADCC derivadas de los Bonos de la ADCC o relacionadas con ellos, que se calcularán, para los fines del Plan, como el monto de capital pendiente de los Bonos de la ADCC más los intereses devengados, pero no pagados, hasta la Fecha de Petición del ELA, no inclusive.

*"Costos de Perfeccionamiento de la ADCC"* significa, colectivamente, un monto a pagar en contraprestación por los honorarios y gastos incurridos por un Acreedor del AAP Inicial en relación con la negociación y suscripción de este Acuerdo y la tramitación de la aprobación de la Declaración de Divulgación y la confirmación del Plan, calculados como un monto igual al uno por ciento (1.00%), truncado a dos decimales, de las Reclamaciones de Bonos de la ADCC de dicho Acreedor del AAP Inicial, pagadero como una reclamación de gastos administrativos en la Fecha de Vigencia del ELA, por un monto no mayor que Quince Millones de Dólares ($15,000,000.00).

*"Fecha de presentación de la ADCC"* significa la fecha en la que (a) la Junta de Supervisión presente (i) una petición del Título III en nombre de la ADCC ante el Tribunal del Título III o (ii) una solicitud ante

el Tribunal del Título III para aprobar una modificación calificatoria conforme al Título VI de PROMESA en nombre de la ADCC, o (b) la ADCC comience un intercambio u oferta extrajudicial para los Bonos de la ADCC.

"*Procedimiento de PROMESA de la ADCC*" significará (a) el caso de Título III iniciado por la Junta de Supervisión en nombre de la ADCC ante el Tribunal del Título III o, en el caso de que Assured proponga a la Junta de Supervisión una modificación de los Bonos de la ADCC en virtud del Título VI de PROMESA, la solicitud de aprobación de una modificación calificatoria presentada por la Junta de Supervisión en nombre de la ADCC o (b) la ADCC inicie un intercambio u oferta extrajudicial de los Bonos de la ADCC.

"*Porcentaje de Honorario de Restricción de la ADCC*" significa el porcentaje igual a (a) Quince Millones de Dólares ($15,000,000.00) menos el monto que pueda ser pagado a cuenta de los Costos de Perfeccionamiento de la ADCC dividido por (b) el monto total de las Reclamaciones de Bonos de la ADCC mantenidas, o en el caso de Assured, mantenidas o aseguradas y con derecho al voto de acuerdo con la Sección 301(c)(3) de PROMESA, los documentos rectores y la ley aplicable, por los Acreedores de los Honorarios de Restricción del AAP.

"*Acciones de Recuperación*" significa, colectivamente, el litigio caratulado (a) Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corporation, y otros, Proc. Cont. Núm. 20-00005-LTS, actualmente pendiente en el Tribunal del Título III, (b) Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corporation, y otros, Proc. Cont. Núm. 20- 00004-LTS, actualmente pendiente en el Tribunal del Título III, (c) Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corporation, y otros, Proc. Cont. Núm. 20- 00003-LTS, actualmente pendiente en el Tribunal del Título III, (d) Junta de Supervisión y Administración Financiera para Puerto Rico c. Ambac Assurance Corporation, y otros, Proc. Cont. Núm. 20- 00007-LTS, actualmente pendiente en el Tribunal del Título III.

"*Honorarios de Estructuración de Recuperación*" significa, colectivamente, los importes establecidos en la Sección 6.1(d) del presente, que se pagarán, en efectivo, en la Fecha de Vigencia de la ACT o tan pronto como sea posible a partir de entonces de acuerdo con los términos del Plan de la ACT, pero en ningún caso más de diez (10) Días Hábiles después de dicha fecha, a Assured y National de acuerdo con los términos y disposiciones de este Acuerdo y el Plan de la ACT, incluyendo, entre otros, el Artículo VI del presente.

"*COFINA*" significa la Corporación del Fondo de Interés Apremiante de Puerto Rico.

"*Tope Global*" tendrá el significado que se le atribuye en la Ley de Responsabilidad de la Deuda.

"*Orden de Confirmación*" significa la orden del Tribunal del Título III que confirme el Plan de conformidad con la Sección 314 de PROMESA y la Sección 1129 del Código de Quiebras que se aplique en los Procedimientos de PROMESA de conformidad con la Sección 301 de PROMESA, orden que deberá ser razonablemente satisfactoria para cada una de las Partes en su forma y fondo.

"*Costos de Perfeccionamiento*" significa, colectivamente, los importes establecidos en la Sección 6.1(a) del presente que se pagarán, en efectivo, en la Fecha de Vigencia del ELA y en la Fecha de Vigencia

de la ACT, incluidos los Costos de Perfeccionamiento de la ADCC o los Costos de Perfeccionamiento de la ACT, respectivamente, según sea el caso, o tan pronto como sea posible a partir de entonces de acuerdo con los términos del Plan y del Plan de la ACT, según sea el caso, pero en ningún caso más de diez (10) Días Hábiles después de dicha fecha, a los Acreedores del AAP Iniciales de acuerdo con los términos y disposiciones de este Acuerdo, del Plan y del Plan de la ACT, incluyendo, entre otros, el Artículo VI del presente.

*"Prestatarios Cubiertos"* significa, colectivamente, el ELA, la ACT y, a partir de la Fecha de Presentación de la ADCC, la ADCC.

*"CUSIP"* significa el código numérico o alfanumérico de nueve dígitos del Comité de Procedimientos Uniformes de Identificación de Valores que, a efectos de este Acuerdo, identifica la serie de Bonos de la ACT y Bonos de la ADCC para facilitar la compensación y la liquidación de las operaciones.

**"Documentos del Fideicomiso de Custodia"** significa, colectivamente, los acuerdos de fideicomiso y otros documentos e instrumentos que acompañan a los fideicomisos de custodia que se crearán a partir de la Fecha de Vigencia de la ACT y que se relacionan con los Bonos Asegurados de Assured, los Bonos Asegurados de National y las distribuciones que se harán de acuerdo con el Plan de la ACT, del Plan o, en la medida en que sea necesario, una modificación calificada para los Bonos de la ADCC de acuerdo con el Título VI de PROMESA.

*"CVI"* significa, colectivamente, los valores, para cuyo pago estará respaldado por la buena fe, el crédito y el poder impositivo del ELA a tenor con el Artículo VI de la Constitución de Puerto Rico, que serán emitidos en la Fecha de Vigencia del ELA por el ELA de conformidad con los términos y condiciones de este Acuerdo, el Plan, la Orden de Confirmación, el Contrato de Emisión de los CVI y la Legislación sobre CVI.

*"Contrato de Emisión de CVI"* significa el contrato de emisión que se suscribirá y entregará en o antes de la Fecha de Vigencia del ELA, a tenor con el cual ELA emitirá los CVI, e incluirá todos los términos y disposiciones en relación con ellos, con sus enmiendas, complementos o modificaciones periódicos de acuerdo con sus términos y condiciones.

*"Legislación sobre CVI"* significa la legislación que se aprobará en o antes de la Fecha de Vigencia del ELA, y que autoriza ciertas transacciones contempladas en el presente Acuerdo y en el Plan y coherentes con estos, incluyendo, entre otros, la legislación que autoriza la emisión de los CVI, que puede formar parte de la legislación sobre los Nuevos Bonos GO.

*"Reserva de Pago de CVI"* significa, en la medida en que los pagos sean adeudados a los titulares y aseguradores de Reclamaciones de Bonos Prioritarios de la ACT 98 y/o Reclamaciones de Bonos Subordinados de la ACT 98 de acuerdo con los términos y disposiciones del Plan, el Contrato de Emisión de los CVI y la sección de la Cascada de Distribución Prioritaria de CVI de Recuperación (*Clawback*) de la ACT del Resumen de Transacción que se adjunta al presente como Anexo "J", a la espera de una Orden Definitiva con respecto a la Determinación de la Prioridad del Préstamo del BGF, el efectivo pagadero de los CVI de Recuperación (*Clawback*) de la ACT a ser mantenido en reserva por el agente pagador de los CVI o el fideicomisario, según sea el caso, a tenor con los términos de la Documentación del Fideicomiso

123408529v3

y el Contrato de Emisión de los CVI por un importe igual a la diferencia (a) del importe en efectivo que se adeudaría a los tenedores y aseguradores de Reclamaciones de Bonos Prioritarios de la ACT 98 y Reclamaciones de Bonos Subordinados de la ACT 98 en la medida en que el pago con respecto a los Préstamos del BGF para la ACT esté subordinado al pago con respecto a los Bonos de la ACT 98 <u>menos</u> (b) el importe en efectivo que se adeudaría a los tenedores y aseguradores de Reclamaciones de Bonos Prioritarios de la ACT 98 y Reclamaciones de Bonos Subordinados de la ACT 98 en la medida en que el pago con respecto a los Préstamos del BGF para la ACT esté en igualdad de condiciones (*pari passu)* con respecto al pago a cuenta de los Bonos de la ACT 98.

*"Fecha de Vigencia del ELA "* significa la fecha en la que las transacciones contempladas por el Plan y autorizadas por el Tribunal del Título III a tenor con la Orden de Confirmación se hayan perfeccionado sustancialmente, pero, bajo todas las circunstancias, será la fecha no posterior al décimo (10mo) día calendario siguiente a la fecha en la que todas las condiciones para la eficacia del Plan se hayan cumplido o se haya renunciado a ellas de conformidad con sus términos.

*"Objeciones Relacionadas con la Deuda"* significa, colectivamente que determinada (a) Objeción Global de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, a través de su Comité Especial de Reclamaciones, y (II) el Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o sostenidas por tenedores de ciertos Bonos de Obligación General del Estado Libre Asociado de Puerto Rico, del 14 de enero de 2019 [Leg. Núm. 4784], (b) Objeción Global del Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o sostenidas por tenedores de ciertos Bonos de Obligación General del Estado Libre Asociado de 2011, del 21 de mayo de 2019 [Leg. Núm. 7057], (c) Objeción Global del Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o sostenidas contra el Estado Libre Asociado por tenedores de ciertos Bonos de la Autoridad de Edificios Públicos de Puerto Rico, del 18 de julio de 2019 [Leg. Núm. 8141], (d) Objeción Global de la Coalición de Deuda Constitucional Legítima, a tenor con la Sección 502 del Código de Quiebras y la Regla de Quiebras 3007, a las reclamaciones presentadas o sostenidas por Tenedores de Ciertos Bonos Emitidos o Garantizados por el ELA, del 8 de enero de 2020 [Leg. Núm. 9731], (e) Objeción Global del Comité Oficial de Acreedores No Asegurados por motivos del Límite Constitucional de la Deuda a (I) la Reclamación del Banco Nacional de Fomento para Puerto Rico [Número de Reclamación 29485] en base a ciertos Pagarés emitidos por el ELA y ciertas Garantías del ELA sobre ciertos bonos emitidos por la Autoridad del Puerto de las Américas, (II) Reclamación de ScotiaBank de Puerto Rico [Número de Reclamación 47658] basada en la Nota de Plena Fe y Crédito emitida por la Administración de Servicios Generales de Puerto Rico, y (III) Reclamaciones presentadas o sostenidas contra el ELA sobre la base de la garantía del ELA de ciertos Pagarés emitidos por la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, del 8 de enero de 2020 (Leg. Núm. 9735], exclusivamente en lo relativo a los BAN de la AFI, (f) Objeción Global del Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla 3007 de Quiebras, a las Reclamaciones presentadas o sostenidas contra el Estado Libre Asociado por tenedores de Bonos de Obligación General que alegan prioridad sobre otros Acreedores No Asegurados del Estado Libre Asociado, del 3 de febrero de 2020 [Leg. Núm. 10638], y (g) cualquier otra objeción o acumulación a estas, u otras objeciones que pudieran presentarse de la misma forma y causas de remedio solicitando que

objeten, entre otras cosas, la validez y los derechos relacionados de los Bonos GO 2011, los Bonos GO 2012, los Bonos GO 2014, los Bonos de la AEP y/o los BAN de la AFI.

*"Ley de Responsabilidad de la Deuda"* significa la Ley Núm. 101-2020, con las enmiendas, modificaciones o complementos necesarios para establecer, entre otras cosas, un Tope Global que se ajuste a los términos y disposiciones del Plan y el AAP del ELA.

*"Fecha de Emisión Considerada"* significa una de las siguientes fechas, la que ocurra primero: (a) 1 de julio de 2022 y (b) la Fecha de Vigencia de la ACT.

*"Documentos Definitivos"* significa, colectivamente, los documentos, incluyendo, entre otros, cualquier acuerdo, instrumento, apéndice o anexo relacionado, que sean necesarios o deseables para implementar, o de otra manera se relacionen con, los términos y las disposiciones establecidos en el presente, en el Resumen de Transacción, el Plan (incluyendo cualquier enmienda, modificación y suplemento de este), la Declaración de Divulgación, la Orden de Declaración de Divulgación, la Orden de Confirmación, y las resoluciones de bonos, con sus modificaciones o derogaciones y sustituciones, cada una de las cuales con términos y condiciones compatibles con este Acuerdo, el Resumen de Transacción y PROMESA, en todos los aspectos y, por lo demás, razonablemente satisfactorios en forma y fondo para cada una de las Partes del AAP del ELA.

*"Declaración de Divulgación"* significa la declaración de divulgación presentada con respecto al Plan ante el Tribunal del Título III por la Junta de Supervisión en los Procedimientos de PROMESA de conformidad con la sección 1125 del Código de Quiebras que se aplique en los Procedimientos de PROMESA de conformidad con la Sección 301 de PROMESA, declaración de divulgación que deberá ser razonablemente satisfactoria para cada una de las Partes en forma y fondo.

*"Orden de Declaración de Divulgación"* significa la orden del Tribunal del Título III (a) que aprueba la forma de la Declaración de Divulgación y la adecuación de la información contenida en ella de acuerdo con la sección 1125 del Código de Quiebras, hecha aplicable en los Procedimientos de PROMESA de acuerdo con la Sección 301 de PROMESA, y (b) que autoriza, entre otras cosas, la forma y el modo de solicitar (i) aceptaciones y rechazos al Plan, y (ii) opciones, si procede, de distribuciones en virtud de este, orden que deberá ser en forma y fondo razonablemente satisfactoria para cada una de las Partes.

*"Condiciones de Distribución"* significa, colectivamente, (a) la Fecha de Vigencia del ELA, (b) la documentación del Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de los Nuevos Bonos de la ACT, la Documentación del Fideicomiso (si la hubiera) y los Documentos del Fideicomiso de Custodia habrán sido acordados por la Junta de Supervisión, Assured y National, (c) los tenedores de los Bonos de la ACT 68, o los aseguradores con derecho a voto con respecto a estos, que posean o aseguren, según el caso, al menos el sesenta y siete por ciento (67%) del monto de capital pendiente de los Bonos de la ACT 68 habrán suscrito el presente Acuerdo o un Acuerdo de Acumulación o un Acuerdo de Anexión con respecto al presente, (d) los tenedores de los Bonos Prioritarios de la ACT, o los aseguradores con derecho a voto con respecto a estos, que posean o aseguren, según el caso, al menos el sesenta y siete por ciento (67%) del monto de capital pendiente de los Bonos Prioritarios de la ACT 98 habrán suscrito el presente Acuerdo o un Acuerdo de Acumulación o un Acuerdo de Anexación con respecto al presente; disponiéndose, sin embargo, que una vez que se dicte una Orden Definitiva con

respecto a la Orden de Confirmación de la ACT, se considerarán satisfechas las condiciones establecidas en las subsecciones (c) y (d).

*"EMMA"* significa el sitio web de Acceso Electrónico al Mercado Municipal de la Junta de Regulación de los Títulos Municipales.

*"Monto Nominal"* significa, únicamente a efectos del Artículo II del presente y de las hojas de firmas que se adjuntan, (a) con respecto a los Bonos de la ACT de interés corriente, asegurados o no asegurados, el monto de capital en circulación de dichos Bonos de la ACT a la fecha de este Acuerdo, (b) con respecto a los Bonos de la ADCC, el monto de capital en circulación de dichos Bonos de la ADCC a la fecha de este Acuerdo, y (c) con respecto a los Bonos de la ACT de apreciación de capital, asegurados y no asegurados, el valor acumulado de dichos Bonos de la ACT durante el período que transcurre hasta la Fecha de Petición de la ACT, no inclusive.

*"Orden Definitiva"* significa una orden o sentencia de un tribunal de jurisdicción competente que ha sido registrada en el expediente mantenido por el secretario de dicho tribunal y que no ha sido revocada, anulada o paralizada y en la que (a) haya expirado el plazo para apelar, presentar la solicitud de elevación a un tribunal superior o solicitud de un nuevo juicio, una nueva argumentación o una nueva vista, y respecto de la cual no esté pendiente ninguna apelación, petición de elevación a un tribunal superior, procedimiento de devolución u otro procedimiento para un nuevo juicio, una nueva presentación de argumentos o una nueva vista, o (b) si se ha solicitado un recurso de apelación, una petición de elevación a un tribunal superior, un nuevo juicio o una nueva vista, (i) que dicha orden o sentencia haya sido confirmada o revocada en parte o en su totalidad, sin que se haya procedido a su devolución, por el tribunal superior al que se apeló, que se haya denegado la petición de elevación a un tribunal superior, o que se haya denegado un nuevo juicio, una nueva presentación de argumentos o una nueva vista, o que no haya dado lugar a ninguna modificación de dicha orden, y (ii) el plazo para interponer cualquier otro recurso de apelación, petición de elevación a un tribunal superior o solicitud de un nuevo juicio, nueva argumentación o nueva vista haya expirado; disponiéndose, sin embargo, que la posibilidad de que se presente una moción en virtud de la Regla 60 de las Reglas Federales de Procedimiento Civil, o cualquier regla análoga en virtud de las Reglas de Quiebra, en relación con dicha orden, no impedirá que dicha orden sea una Orden Definitiva, salvo lo dispuesto en las Reglas Federales de Procedimiento de Apelación, las Reglas de Quiebra o las Reglas de Quiebra locales aplicables.

*"Plan Fiscal "* significa un "Plan Fiscal" tal como se define en la Sección 5(10) de PROMESA.

*"Año Fiscal"* significa el año fiscal del ELA que comienza el 1 de julio y concluye el 30 de junio del siguiente año calendario.

*"Préstamos del BGF para la ACT"* significa, colectivamente, los préstamos, si los hubiera, concedidos a la ACT por el Banco Gubernamental de Fomento y que ahora están en manos de la Autoridad para la Recuperación de la Deuda del Banco Gubernamental de Fomento de conformidad con la modificación calificatoria perfeccionada en virtud del Título VI de PROMESA, pero excluyendo expresamente de los "Préstamos del BGF para la ACT" cualquier Bono de la ACT.

*"Determinación de la prioridad de los préstamos del BGF"* significa la determinación, ya sea en el

9

COPIA DE SUSCRIPCIÓN

Procedimiento de PROMESA del ELA o el Procedimiento de PROMESA de la ACT, (a) con respecto a los derechos relativos de recuperación y prioridad de pago de los Bonos de la ACT 68 y los Bonos de la ACT 98 con respecto a los derechos del Banco Gubernamental de Fomento en relación con los Préstamos del BGF para la ACT y/o (b) que la Recuperación de la Deuda del Banco Gubernamental de Fomento no posee una reclamación admisible o un derecho de recuperación con respecto al CVI de Recuperación (*Clawback*) de la ACT en base a dichos Préstamos del BGF para la ACT.

"*Fondo General*" significa el fondo operativo principal del Gobierno.

"*Partes del Gobierno*" significa, colectivamente, la Junta de Supervisión, la AAFAF, el ELA, el SRE, la AEP, la ACT y la ADCC.

"*Reclamaciones Exoneradas del Gobierno*" significa, colectivamente, todas y cada una de las reclamaciones, demandas, derechos, responsabilidades o causas de acción de cualquier tipo, carácter o naturaleza, por ley o por derecho consuetudinario, conocidas o desconocidas, ya sean declaradas o no, que cualquiera de las Partes, o cualquier persona que reclame a través de ellas, en su nombre o en su beneficio, tenga o pueda tener o reclame tener, ahora o en el futuro, contra cualquier Parte Exonerada del Gobierno emergente de, relacionada con, o en conexión con la ACT, los Bonos de la ACT, las Reclamaciones de Bonos de la ACT, la ADCC, los Bonos de la ADCC, las Reclamaciones de Bonos de la ADCC,  y que se presenten antes de la Fecha de Vigencia del ELA o la Fecha de Vigencia de la ACT, según sea el caso; disponiéndose, sin embargo, que las "Reclamaciones Exoneradas por el Gobierno" no incluirán ningún derecho, privilegio, reclamación, demanda, responsabilidad o causa de acción de cualquier tipo, carácter o naturaleza (a) contra (i) el ELA, la ADCC o la ACT, que se deriven o estén relacionados con el Plan o el Plan de la ACT, los valores que se emitan en virtud del Plan o el Plan de la ACT, o (ii) una Parte del Gobierno no relacionada con los Bonos de la ACT, las Reclamaciones de Bonos de la ACT, los Bonos de la ADCC o las Reclamaciones de Bonos de la ADCC,  o (b) que se deriven de o estén relacionados con cualquier acto u omisión que constituya fraude intencional o conducta dolosa; y, disponiéndose además que, para evitar dudas, las "Reclamaciones Exoneradas del Gobierno" incluyen todas las Reclamaciones Exoneradas del Gobierno a tenor con el AAP del ELA.

"*Partes Exoneradas del Gobierno*" significa las Partes del Gobierno, junto con sus respectivos miembros actuales o anteriores de la junta directiva, directores, jefes, comités especiales, agentes, funcionarios, empleados, asesores y profesionales, en cada caso, en sus capacidades como tales, incluidos, entre otros, todos y cada uno de los asesores y profesionales contratados por las Partes del Gobierno en relación con los Procedimientos de PROMESA, en sus respectivas capacidades como tales.

"*Reclamaciones de Bonos de la ACT*" significa, colectivamente, las Reclamaciones de Bonos de la ACT 68, las Reclamaciones de Bonos Prioritarios de la ACT 98 y las Reclamaciones de Bonos Subordinados de la ACT 98.

"*Reclamaciones de Bonos 68*" significa, colectivamente, las reclamaciones contra la ACT derivadas de los Bonos de la ACT 68 o relacionadas con ellos, que se calcularán, a efectos de la distribución a tenor con el Plan y el Plan de la ACT, como el monto de capital en circulación de los Bonos de la ACT 68 más los intereses devengados, pero no pagados, como se establece en el Resumen de Transacción.

123408529v3

COPIA DE SUSCRIPCIÓN

"**Bonos de la ACT 98**" significa, colectivamente, los Bonos Prioritarios de la ACT 98 y los Bonos Subordinados de la ACT 98.

"**Reclamaciones de Bonos Prioritarios de la ACT 98**" significa, colectivamente, las reclamaciones contra la ACT derivadas de los Bonos Prioritarios de la ACT 98 o relacionadas con ellos, que se calcularán, a efectos de la distribución a tenor con el Plan y el Plan de la ACT, como el monto de capital en circulación de los Bonos Prioritarios de la ACT 98 más los intereses devengados, pero no pagados, hasta la Fecha de Petición de la ACT, no inclusive.

"**Reclamaciones de Bonos Subordinados de la ACT 98**" significa, colectivamente, las reclamaciones contra la ACT derivadas de los Bonos Subordinados de la ACT 98 o relacionadas con ellos, que se calcularán, a efectos de la distribución a tenor con el Plan y el Plan de la ACT, como el monto de capital en circulación de los Bonos Subordinados de la ACT 98 más los intereses devengados, pero no pagados, hasta la Fecha de Petición de la ACT, no inclusive.

"**CVI de Recuperación de la ACT**" significa los CVI que se emitirán a cuenta de las Reclamaciones Admitidas de ELA/ACT de acuerdo con los términos y disposiciones del Plan, el Contrato de Emisión de los CVI, este Acuerdo y el Resumen de Transacción que se adjunta como Anexo "J".

"**Orden de Confirmación de la ACT**" significa la orden del Tribunal del Título III que confirme el Plan de la ACT de conformidad con la Sección 314 de PROMESA y la Sección 1129 del Código de Quiebras que se aplique en los Procedimientos de PROMESA de conformidad con la Sección 301 de PROMESA, orden que deberá ser razonablemente satisfactoria para cada una de las Partes.

"**Costos de Perfeccionamiento de la ACT**" significa, colectivamente, un monto a pagar en contraprestación por los honorarios y gastos incurridos por un Acreedor del AAP Inicial en relación con la negociación y suscripción de este Acuerdo y la tramitación de la aprobación de la Declaración de Divulgación de la ACT y la confirmación del Plan de la ACT, calculado por un monto igual al uno por ciento (1.00%), truncado a dos decimales, de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios de la ACT 98 de dicho Acreedor del AAP Inicial, pagadero como una reclamación de gastos administrativos en la Fecha de Vigencia de la ACT, por un monto no superior a Ciento Veinticinco Millones de Dólares ($125,000,000.00).

"**Documentos Definitivos de la ACT**" significa, colectivamente, los documentos, incluyendo, entre otros, cualquier acuerdo (incluido el Contrato de Emisión de Nuevos Bonos de la ACT), instrumento, anexo o apéndice relacionados, que sean necesarios o deseables para implementar, o de otra manera se relacionen con, los términos y disposiciones establecidos en el presente, en el Resumen de Transacción, el Plan de la ACT (incluyendo cualquier enmienda, modificación y suplemento de este), la Declaración de Divulgación de la ACT, la Orden de Declaración de Divulgación de la ACT, la Orden de Confirmación de la ACT, y las resoluciones de bonos, con sus modificaciones o derogaciones y sustituciones, cada una de las cuales tiene términos y condiciones compatibles con este Acuerdo, el Resumen de Transacción y PROMESA, en todos los aspectos y, por lo demás, son razonablemente satisfactorios en forma y fondo para la Junta de Supervisión, Assured y National.

"**Declaración de Divulgación de la ACT**" significa la declaración de divulgación presentada con

11

respecto al Plan de la ACT ante el Tribunal del Título III por la Junta de Supervisión en los Procedimientos de PROMESA de la ACT de conformidad con la Sección 1125 del Código de Quiebras que se aplique en los Procedimientos de PROMESA de conformidad con la Sección 301 de PROMESA, declaración de divulgación que deberá ser razonablemente satisfactoria para la Junta de Supervisión, Assured y National en forma y fondo.

*"Orden de Declaración de Divulgación de la ACT"* significa la orden del Tribunal del Título III (a) que aprueba la forma de la Declaración de Divulgación de la ACT y la adecuación de la información contenida en ella de acuerdo con la Sección 1125 del Código de Quiebras, hecha aplicable en los Procedimientos de PROMESA de acuerdo con la Sección 301 de PROMESA, y (b) autorizando, entre otras cosas, la forma y el modo de solicitar (i) aceptaciones y rechazos al Plan de la ACT, y (ii) opciones, si procede, de distribuciones en virtud de este, orden que deberá ser en forma y fondo razonablemente satisfactoria para la Junta de Supervisión, Assured y National.

*"Fecha de Vigencia de la ACT"* significa la fecha en la que las transacciones contempladas por el Plan de la ACT y autorizadas por el Tribunal del Título III a tenor con la Orden de Confirmación de la ACT se hayan perfeccionado sustancialmente, pero, bajo todas las circunstancias, será la fecha no posterior al décimo (10mo) día calendario siguiente a la fecha en la que todas las condiciones para la eficacia del Plan de la ACT se hayan cumplido o se haya renunciado a ellas de conformidad con sus términos.

*"Plan de la ACT"* significa un plan de ajuste que será presentado por la Junta de Supervisión, como representante de la ACT en el procedimiento de PROMESA de la ACT, que deberá ser en forma y fondo razonablemente satisfactorio para Assured y National, y compatible a los términos del Resumen de Transacción que se adjunta como Anexo "J".

*"Suplemento del Plan de la ACT"* significa el volumen de documentos, acuerdos e instrumentos, incluyendo, entre otros, los Documentos Definitivos de la ACT, que se presentarán ante el Tribunal del Título III en relación con el Plan de la ACT y el perfeccionamiento de las transacciones contempladas en este, y cada uno de los cuales será en forma y fondo razonablemente satisfactorio para la Junta de Supervisión, Assured y National.

*"Porcentaje de Honorario de Restricción de la ACT"* significa el porcentaje igual a (a) Ciento Veinticinco Millones de Dólares ($125,000,000.00) menos el monto que pueda ser pagado a cuenta de los Costos de Perfeccionamiento de la ACT dividido por (b) el monto total de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios de la ACT 98 mantenidas, o en el caso de Assured y National, mantenidas o aseguradas y con derecho al voto de acuerdo con la Sección 301(c)(3) de PROMESA, los documentos rectores y la ley aplicable, por los Acreedores de los Honorarios de Restricción del AAP.

*"Reclamaciones de Bonos Asegurados"* significa, colectivamente, las Reclamaciones de Bonos Asegurados de la ADCC y las Reclamaciones de Bonos Asegurados de la ACT.

*"Reclamaciones de Bonos Asegurados de la ADCC"* significa, colectivamente, aquellas Reclamaciones de Bonos de la ADCC, cuyos pagos de capital e intereses han sido asegurados por una Aseguradora Monolínea, incluso en virtud de pólizas del mercado secundario.

COPIA DE SUSCRIPCIÓN

"**Reclamaciones de Bonos Asegurados de la ACT**" significa, colectivamente, aquellas Reclamaciones de Bonos de la ACT, cuyos pagos de capital e intereses han sido asegurados por una Aseguradora Monolínea, incluso en virtud de pólizas del mercado secundario.

"**Acciones de Invalidez**" significa, colectivamente, los litigios que figuran en el Anexo "G" del presente.

"**IRC**" significa el Código de Rentas Internas de 1986, con sus modificaciones periódicas.

"**Acreedores de Acumulación**" significa, colectivamente, aquellas entidades tenedoras de Bonos de la ACT o Bonos de la ADCC que suscriban y entreguen el Acuerdo de Acumulación o el Acuerdo de Anexación, cuyos formularios se adjuntan como Anexos "H" e "I", respectivamente, antes de la Fecha Límite de la Acumulación.

"**Fecha Límite de la Acumulación**" significa, con respecto a (a) las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos de la ADCC, el 17 de mayo de 2021, a las 11:59 p.m. (horario de verano del Este), y (b) las Reclamaciones de Bonos Prioritarios de la ACT 98, el 15 de julio de 2021, a las 11:59 p.m. (horario de verano del Este), o en cualquier caso, la fecha y hora posteriores que puedan solicitar Assured y National, pero en ningún caso después del comienzo de la vista para considerar la confirmación del Plan.

"**Mociones de Levantamiento de la Paralización**" significa, colectivamente el litigio caratulado (a) Assured Guaranty Corp., y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico, presentado en el caso de Título III de la ACT [Leg. Núm. 673], (b) Ambac Assurance Corporation, y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico, presentado en el Procedimiento de PROMESA del ELA [Leg. Núm. 10104], (c) Ambac Assurance Corporation, y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico, presentado en el Procedimiento de PROMESA del ELA [Leg. Núm. 10602], (d) AmeriNational Community Services, LLC, y otros c. la Junta de Supervisión y Administración Financiera para Puerto Rico, presentado en el caso de Título III de ACT [Leg. Núm. 591], (e) Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros., Caso Núm. 20-1930, actualmente pendiente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (f) Ambac Assurance Corporation y otros c. el Estado Libre Asociado de Puerto Rico y otros, Caso Núm. 20-1931, actualmente pendiente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (g) Peaje Investments LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros, Proc. Cont. Núm. 17-00151-LTS, presentado en el caso de Título III de ACT [Leg. No. 1], con sus correspondientes enmiendas, (h) Peaje Investments LLC c. la Autoridad de Carreteras y Transportación de Puerto Rico y otros, Proc. Cont. Núm. 17-00152-LTS, presentado en el caso de Título III de ACT [Leg. No. 1], con sus correspondientes enmiendas, y (i) cualquier moción o procedimiento contencioso que pretenda levantar la paralización automática prevista de conformidad con las secciones 362 y 922 del Código de Quiebras (en la medida en que sea aplicable) con respecto a ingresos similares a los que están en cuestión en las Mociones de Levantamiento de la Paralización mencionadas anteriormente.

"**IVU Medido**" significa el IVU del 5.5%, menos los fondos de CINE de Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00) como se establece en el Resumen de Transacción que se adjunta como Anexo "J".

123408529v3

COPIA DE SUSCRIPCIÓN

"*Aseguradoras Monolínea*" significa Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company y National Public Finance Guarantee Corporation, como aseguradoras de Bonos de la ADCC y Bonos de la ACT, según proceda.

"*Bonos Asegurados por National*" significa, colectivamente, los Bonos de la ACT que están asegurados por National.

"*Nuevos Bonos de la ACT*" significa, colectivamente, los bonos tal y como se describen más detalladamente en el Resumen de Transacción que se adjunta como Anexo "J", a emitirse en la Fecha de Vigencia de la ACT por la ACT de acuerdo con los términos y condiciones del Plan de la ACT, la Orden de Confirmación de la ACT y el Contrato de Emisión de los Nuevos Bonos de la ACT, incluyendo, entre otros, cualquier bono de refinanciamiento que pueda ser emitido de acuerdo con el Contrato de Emisión de los Nuevos Bonos de la ACT.

"*Contrato de Emisión de los Nuevos Bonos de la ACT*" significa el contrato de emisión o resolución que se suscribirá y entregará en la Fecha de Vigencia de la ACT, a tenor con el cual la ACT emitirá los Nuevos Bonos de la ACT, e incluye todos los términos y disposiciones en relación con esto, con sus enmiendas, complementos o modificaciones periódicos, de conformidad con sus términos y condiciones.

"*Condición de superación del rendimiento*" significa la cantidad en la que el IVU Medido supera la Métrica de Superación del Rendimiento, como se define en el Resumen de Transacción que se adjunta como Anexo "J", en cualquier Año Fiscal.

"*Suplemento del Plan*" significa los volúmenes de documentos, acuerdos e instrumentos, incluyendo, entre otros, los Documentos Definitivos, que se presentarán ante el Tribunal del Título III en relación con el Plan y el perfeccionamiento de las transacciones contempladas en él, y cada uno de los cuales será razonablemente satisfactorio para cada una de las Partes en forma y fondo.

"*PRIFA*" significa la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico.

"*Procedimientos de PROMESA*" significa, colectivamente, el Procedimiento de PROMESA del ELA, el Procedimiento de PROMESA de la ACT y el Procedimiento de PROMESA de la ADCC.

"*Acreedores del AAP*" significa, colectivamente, (a) los Acreedores del AAP Iniciales y (b) aquellas entidades tenedoras de Bonos de la ACT o Bonos de la ADCC que suscriban y entreguen el Acuerdo de Acumulación o el Acuerdo de Anexación, cuyos formularios se adjuntan como Anexos "H" e "I" respectivamente, de conformidad con los términos y disposiciones de este Acuerdo.

"*Honorarios de Restricción del AAP*" significa, colectivamente, los honorarios a pagar de acuerdo con las Secciones 6.1(b) y (c) del presente, el Plan, el Plan de la ACT, la Orden de Confirmación y la Orden de Confirmación de la ACT, que, en conjunto, no excederán los Ciento Cuarenta Millones  de Dólares ($140,000,000.00) menos el monto que pueda ser pagado a cuenta de los Costos de Perfeccionamiento de la ADCC y los Costos de Perfeccionamiento de la ACT.

"*Acreedores del Honorario de Restricción del AAP*" significa, colectivamente, los Acreedores del AAP Iniciales y los Acreedores de la Acumulación que suscriban el presente Acuerdo, el Acuerdo de

14

COPIA DE SUSCRIPCIÓN

Acumulación o el Acuerdo de Anexación antes de la expiración del Período del Honorario de Restricción del AAP; disponiéndose, sin embargo, que no obstante cualquier disposición del presente en contrario, todas las entidades que suscriban un Acuerdo de Acumulación o un Acuerdo de Anexación en la Fecha del Umbral del AAP se considerarán Acreedores del Honorario de Restricción del AAP; y disponiéndose además que, en todas las circunstancias, los Honorarios de Restricción del AAP no estarán disponibles para los tenedores de Reclamaciones de Bonos Subordinados de la ACT 98 en su calidad de tales y dichos tenedores en tal calidad no serán considerados Acreedores de los Honorarios de Restricción del AAP con respecto a dichos Bonos Subordinados de la ACT 98.

"Período del Honorario de Restricción del AAP" significa el período comprendido hasta la fecha del presente inclusive y (a) la Fecha del Umbral del AAP y (b) la Fecha Límite de la Acumulación, la que ocurra primero.

"Fecha del Umbral del AAP" significa la fecha en la que los Acreedores de Honorarios de Restricción del AAP poseen o tienen la debida responsabilidad y autoridad de administración de las inversiones de los fondos o cuentas que mantienen o, con respecto a Assured y National, mantienen o aseguran y están autorizados a votar de acuerdo con la Sección 301(c)(3) de PROMESA, los documentos de seguro definitivos y la legislación aplicable, (a) con respecto a los Bonos de la ACT 68, el ochenta y cinco por ciento (85%) del monto total de las Reclamaciones de Bonos de la ACT 68, incluidos el capital y los intereses a la Fecha de Petición de la ACT, (b) con respecto a los Bonos Prioritarios de la ACT 98, sesenta y siete por ciento (67%) del monto total de las Reclamaciones de Bonos de la ACT 98, incluidos el capital y los intereses en la Fecha de Petición de la ACT, y (c) con respecto a los Bonos de la ADCC, setenta por ciento (70%) del monto total de las Reclamaciones de Bonos de la ADCC y, en cada caso, sin duplicación, si dichas Reclamaciones son Reclamaciones de Bonos Asegurados, en la medida en que un Acreedor del AAP esté autorizado a votar cualquier reclamación de este tipo de acuerdo con la Sección 301(c)(3) de PROMESA, los documentos de seguro definitivos y la legislación aplicable.

"Creador de Mercado Calificado" significa una entidad que (x) se presenta ante el mercado como capacitada, en el curso ordinario de sus operaciones, a comprar y a vender a los clientes valores de deuda como los Bonos de la ACT o los Bonos de la ADCC, o a tomar con los clientes posiciones largas y cortas en valores de deuda como los Bonos de la ACT o los Bonos de la ADCC, en su calidad de agente o creador de mercado de dichos Bonos; (y) se dedique de hecho y con regularidad a la creación de un mercado para los valores de deuda; y (z) si realiza transacciones con respecto a los Bonos de la ACT o los Bonos de la ADCC, esté registrado ante la Comisión de Valores y ante la autoridad que regula las instituciones financieras.

"Impuesto sobre Ventas" o "IVU" significa los Impuestos sobre Ventas y Uso, incluyendo cualquier impuesto sobre ventas y uso sustitutivo o similar, que imponga el Gobierno de Puerto Rico conforme a las Secciones 4020.01 y 4020.02 del Subcapítulo D de la Ley 1-2011, y sus enmiendas y conocido como Código de Rentas Internas para un Nuevo Puerto Rico.

"Moción de la Sección 926" significa el litigio derivado de (a) la Moción Urgente para la Orden Temporal y la Moción para el Nombramiento de un Fideicomisario en virtud de 11 U.S.C. §926 de Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company y National Public Finance Guarantee Corporation, de fecha 17 de julio de 2020,

123408529v3

presentado en el caso de Título III de ACT [Leg. Núm. 871] y el Procedimiento de PROMESA del ELA
[Leg. Núm. 13708], (b) Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y
otros., Caso Núm. 20-1847, actualmente pendiente ante el Tribunal de Apelaciones de los Estados Unidos
para el Primer Circuito, (c) cualquier otra moción o procedimiento contencioso pendiente a la fecha del
presente documento, en el que se solicite el nombramiento de un fideicomisario para ACT de conformidad
con 11 U.S.C. §926, y (d) todas las reclamaciones y causas de acción afirmadas en la Demanda Propuesta,
tal y como se define en la Moción de la Sección 926 y se adjunta a esta como Anexo "C".

   *"Resumen de Transacción"* significa el resumen de los términos económicos clave que se incluirán en
el Plan y en el Plan de la ACT, como se establece en el Anexo "J" adjunto.

   *"Impuesto Medido Sustitutivo"* significa, la totalidad o una parte de un impuesto de aplicación general
en todo el ELA que, a través de un cambio en la ley, se designe o apruebe en plena sustitución del IVU
Medido o que de otro modo constituya una medida similar o comparable de la actividad económica dentro
del ELA, en cada caso de acuerdo con los términos de la Legislación de CVI y del Contrato de Emisión de
los CVI.

   *"Documentación del Fideicomiso"* significa, colectivamente, la documentación requerida, si es
necesario, para establecer y mantener el fideicomiso en el que se depositará el CVI de Recuperación de
ACT a la espera de que se distribuya a los titulares de Reclamaciones del ELA/ACT (incluyendo las
Aseguradoras Monolínea) a tenor con los términos de este Acuerdo.

   *"Litigio de Uniformidad"* significa, colectivamente, (a) el litigio caratulado <u>Ambac Assurance
Corporation c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros</u>., Proc. Cont.
Núm. 20-00068-LTS, actualmente pendiente en el Tribunal del Título III, y (b) cualquier otro litigio que
pueda estar actualmente pendiente o que pueda iniciarse durante el período comprendido desde y a partir
de la fecha del presente documento e incluyendo la Fecha de Vigencia de la ACT en el que se hayan hecho
valer reclamaciones o causas de acción compatibles con las que se han hecho valer en los litigios
mencionados anteriormente, o similares a ellas.

   Sección 1.3   <u>Otros términos.</u> Hay otros términos que pueden definirse en otras partes de este
Acuerdo y, a menos que se indique lo contrario, tendrán el significado que se utilice en la totalidad del
Acuerdo. Tal y como se utiliza en el presente Acuerdo, toda referencia a cualquier ley federal, estatal, local
o extranjera, incluyendo cualquier ley aplicable, se considerará que también se refiere a dicha ley en su
versión enmendada y a todas las normas y reglamentos aprobados en virtud de ella, a menos que el
contexto estipule otra cosa. Se considerará que las palabras "incluyen", "incluye" e "incluyendo" van
seguidas de la expresión "entre otros". Los pronombres de género masculino, femenino o neutro se
interpretarán de forma que incluyan cualquier otro género, y las palabras en singular se interpretarán de
forma que incluyan el plural y viceversa, a menos que el contexto estipule otra cosa. Las palabras "este
Acuerdo", "en el presente", "del presente", "por el presente", "en virtud del presente", y palabras de
significado similar se refieren a este Acuerdo en su conjunto y no a ninguna subdivisión en particular, a
menos que se indique expresamente dicha limitación,

   Sección 1.4   <u>Interpretaciones.</u> Las Partes han participado conjuntamente en la negociación y
redacción del presente Acuerdo. En caso de que se presente alguna ambigüedad o dudas respecto de su

123408529v3

intención o interpretación, el presente Acuerdo se interpretará como si hubiera sido redactado conjuntamente por las Partes, y no se aplicará ninguna presunción o carga de la prueba que favorezca o perjudique a ninguna de las Partes debido a la autoría de cualquier disposición del presente Acuerdo.

Sección 1.5        Anexos. Cada uno de los anexos, apéndices, hojas de firmas y suplementos adjuntos se incorporan expresamente al presente y forman parte de él, y todas las referencias al presente Acuerdo incluirán dichos anexos, apéndices y suplementos.

## ARTÍCULO II

## DISPOSICIONES GENERALES

Sección 2.1        AAP del ELA. No obstante cualquier disposición del presente Acuerdo en contrario, los términos y condiciones del AAP del ELA permanecen en plena vigencia, incluyendo, entre otros, las protecciones legales con respecto a los CVI, la Legislación de los CVI y el Contrato de Emisión de los CVI que se establecen en la Sección 4.9(b) del AAP del ELA, y no se pretende, ni se interpretará que ninguno de los términos establecidos en el presente los enmiende o modifique. Sin perjuicio de lo anterior, los acuerdos, términos y condiciones establecidos en el presente, incluyendo, entre otros, los anexos al presente, tienen por objeto complementar los términos y condiciones del AAP del ELA en beneficio de los titulares de Reclamaciones de Bonos de la ADCC y Reclamaciones de Bonos de la ACT.

Sección 2.2        Información financiera. La Junta de Supervisión reconoce y acepta que (a) la información financiera que figura en las hojas de firmas que se adjuntan a este Acuerdo y los números CUSIP de los Bonos de la ACT, y los Bonos de la ADCC, proporcionados por las Partes a tenor con la Sección 2.3 del presente está protegida por derechos de propiedad, es secreta y confidencial, y (b) a menos que el Tribunal del Título III ordene lo contrario, no deberá revelarse a ningún tercero y se hará todo lo posible dentro de lo razonable para proteger el carácter confidencial de dicha información financiera y de los números CUSIP, incluyendo, entre otros, en las presentaciones que se realicen ante el Tribunal del Título III o en cualquier otra divulgación pública.

Sección 2.3        Información de CUSIP. A menos que la información entonces actual haya sido proporcionada previamente a la Junta de Supervisión, dentro de los dos (2) Días Hábiles siguientes a la fecha del presente, cada Acreedor del AAP Inicial proporcionará a la Junta de Supervisión, por escrito, el Monto Nominal y los números CUSIP de cada uno de los Bonos de la ACT y de los Bonos de la ADCC, si los hubiera, que dicha Parte posea, asegure o sobre los cuales tenga la debida responsabilidad y autoridad de administración de las inversiones de los fondos o cuentas que posean dichos Bonos de la ACT y los Bonos de la ADCC, según sea el caso. Además, dentro de los cinco (5) Días Hábiles de cada mes calendario o a petición de la Junta de Supervisión, solicitud que se realizará con una frecuencia no superior a la mensual a partir de la fecha del presente, cada Acreedor del AAP proporcionará a la Junta de Supervisión, por escrito, el Monto Nominal y los números CUSIP de cada uno de los Bonos de la ACT y de los Bonos de la ADCC, si los hubiera, que dicha Parte en ese momento posea, asegure o sobre los cuales tenga la debida responsabilidad y autoridad de administración de las inversiones de los fondos o cuentas que posean dichos Bonos de la ACT y los Bonos de la ADCC, según sea el caso.

Sección 2.4        Partes adicionales. Dentro de los dos (2) Días Hábiles a partir de la fecha del

presente, la Junta de Supervisión solicitará a la AAFAF que proporcione, a través de la pronta publicación en EMMA, una notificación relativa a la suscripción y entrega del presente Acuerdo y la oportunidad de que todas las entidades que posean y/o aseguren Bonos de la ACT y Bonos de la ADCC, con un monto nominal, en cada caso, superior a Un Millón de Dólares ($1,000,000.00), suscriban y entreguen a los abogados de la Junta de Supervisión el formulario del Acuerdo de Acumulación que se adjunta como Anexo "H", y se conviertan en parte del presente de acuerdo con los términos y condiciones establecidos en el presente y en el Acuerdo de Acumulación.

## ARTÍCULO III

### DECLARACIONES Y GARANTÍAS

Sección 3.1     Declaraciones y Garantías de la Junta de Supervisión. La Junta de Supervisión por el presente declara y garantiza que: (a) está debidamente constituida de acuerdo con los términos y disposiciones de PROMESA con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para suscribir este Acuerdo y perfeccionar las transacciones contempladas en el presente; (b) cuenta con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por ella y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) salvo en lo que respecta al Litigio Relacionado con las Designaciones y al Litigio de Uniformidad, no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra ella, o, según su conocimiento, inminente contra ella, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.2     Declaraciones y Garantías del ELA. El ELA, a través de su representante del Título III, la Junta de Supervisión, por el presente declara y garantiza que, sujeto a la emisión de una orden del Tribunal del Título III: (a) está debidamente constituido y es legalmente existente en virtud de las leyes de la jurisdicción donde se ha constituido, cumple con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para llevar a cabo la actividad a la que se dedica, para poseer las propiedades que posee, para suscribir este Acuerdo y para perfeccionar las transacciones contempladas en el presente: (b) tiene plenas facultades y autoridad para suscribir y entregar y cumplir sus obligaciones en virtud de este Acuerdo, y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por él y (ii) no violan sus documentos organizativos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra él, o, según su conocimiento, inminente contra él, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.3     Declaraciones y Garantías de la ACT. La ACT, a través de su representante del Título III, la Junta de Supervisión, por el presente declara y garantiza que, sujeto a la emisión de una orden del Tribunal del Título III: (a) está debidamente constituida y su existencia es válida de acuerdo con las

COPIA DE SUSCRIPCIÓN

leyes de la jurisdicción donde se constituye con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para desarrollar la actividad a la que se dedica y para poseer las propiedades que posee, suscribir este Acuerdo y perfeccionar las transacciones contempladas en el presente; (b) cuenta con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por ella y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra ella, o, según su conocimiento, inminente contra ella, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.4      <u>Declaraciones y Garantías de la ADCC.</u> La ADCC, por el presente declara y garantiza que, sujeto a la emisión de una orden del Tribunal del Título III: (a) está debidamente constituida y su existencia es válida de acuerdo con las leyes de la jurisdicción donde se constituye con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para desarrollar la actividad a la que se dedica y para poseer las propiedades que posee, suscribir este Acuerdo y perfeccionar las transacciones contempladas en el presente; (b) cuenta con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por ella y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra ella, o, según su conocimiento, inminente contra ella, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.5      <u>Declaraciones y Garantías de los Tenedores de la ACT.</u> Cada uno de los Tenedores de la ACT, por separado y no conjuntamente, por el presente declara y garantiza en su propio nombre que, en la fecha del presente documento: (a) está debidamente constituido y es legalmente existente y que opera de plena conformidad con las leyes de la jurisdicción donde se ha constituido, cumple con todos los requisitos, y ha obtenido el consentimiento, la aprobación, el poder y la autoridad para llevar a cabo la actividad a la que se dedica, para poseer las propiedades que posee, para ejecutar este Acuerdo y para consumar las transacciones contempladas en el presente; (b) cuenta con todos los requisitos, el poder y la autoridad para ejecutar y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la ejecución, entrega y cumplimiento del presente, y los instrumentos y documentos que debe ejecutar en relación con el presente (i) han sido debida y válidamente autorizados por él y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o proceso contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra él, o, según su conocimiento, inminente contra él, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud del presente, y; (d) posee o tiene la debida responsabilidad y autoridad de administración de las inversiones de los fondos o cuentas que poseen los Bonos de la ACT por un valor

123408529v3

nominal no inferior al que figura en las hojas de firmas adjuntas a este Acuerdo en la fecha del presente, que tendría derecho a votar en relación con la solicitud de aceptaciones y rechazos al Plan, salvo potencialmente con respecto a las Reclamaciones de Bonos Asegurados de la ACT, y que, en la fecha del presente, con sujeción a cualquier gravamen o carga permitida por la Sección 4.5(a), no ha vendido, transferido, pignorado, hipotecado o cedido dichos Bonos de la ACT o cualquier derecho de voto, consentimiento o instrucción relacionado con dichos Bonos de la ACT a ninguna persona o entidad, que pudiera impedir o afectar adversamente de algún modo al cumplimiento de sus obligaciones contenidas en el presente Acuerdo por parte de dichos Tenedores de ACT en el momento en que se requiera el cumplimiento de dichas obligaciones; disponiéndose, sin embargo, que cada una de las Partes reconoce que cada Reclamación de Bonos Asegurados de la ACT será votada de acuerdo con la Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia.

Sección 3.6    Declaraciones y Garantías de los Tenedores de la ADCC.  Cada uno de los Tenedores de la ADCC, por separado y no conjuntamente, por el presente declara y garantiza en su nombre que, en la fecha del presente documento: (a) está debidamente constituido y es legalmente existente y que opera de plena conformidad con las leyes de la jurisdicción donde se ha constituido, cumple con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para llevar a cabo la actividad a la que se dedica, para poseer las propiedades que posee, para suscribir este Acuerdo y para perfeccionar las transacciones contempladas en él; (b) cuenta con todas las facultades y la autoridad necesarias para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por él y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o proceso contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra él, o, según su conocimiento, inminente contra él, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud del presente, y; (d) posee o tiene la debida responsabilidad y autoridad de administración de las inversiones de los fondos o cuentas que poseen los Bonos de la ADCC por un valor nominal no inferior al que figura en las hojas de firmas adjuntas a este Acuerdo en la fecha de este, que tendría derecho a votar en relación con la solicitud de aceptaciones y rechazos al Plan, salvo potencialmente con respecto a las Reclamaciones de Bonos Asegurados de la ADCC, y que, a la fecha del presente documento, con sujeción a cualquier gravamen o carga permitida por la Sección 4.6(a), no ha vendido, transferido, pignorado, hipotecado ni cedido dichos Bonos de la ADCC o cualquier derecho de voto, consentimiento o instrucción relacionado con dichos Bonos de la ADCC a ninguna persona o entidad, que pudiera impedir o afectar adversamente de algún modo al cumplimiento de las obligaciones de tales Tenedores de la ADCC contenidas en el presente Acuerdo en el momento en que se requiera el cumplimiento de dichas obligaciones; disponiéndose, sin embargo, que cada una de las Partes reconoce que cada Reclamación de Bonos Asegurados de la ADCC será votada de acuerdo con la Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia.

Sección 3.7    Declaraciones y Garantías de Assured. Assured por el presente declara y garantiza que, a la fecha del presente documento: (a) está debidamente constituido y su existencia es válida de

20

acuerdo con las leyes de la jurisdicción donde se constituye con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para desarrollar la actividad a la que se dedica y para poseer las propiedades que posee, suscribir este Acuerdo y perfeccionar las transacciones contempladas en el presente; (b) cuenta con todas las facultades y la autoridad necesarios para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por él y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra él, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.8     Declaraciones y Garantías de National. National por el presente declara y garantiza que, a la fecha del presente documento: (a) está debidamente constituido y su existencia es válida de acuerdo con las leyes de la jurisdicción donde se constituye con todo el consentimiento, la aprobación, las facultades y la autoridad necesarios para desarrollar la actividad a la que se dedica y para poseer las propiedades que posee, suscribir este Acuerdo y perfeccionar las transacciones contempladas en el presente; (b) cuenta con todas las facultades y la autoridad necesarios para suscribir y entregar y cumplir sus obligaciones en virtud del presente Acuerdo y la suscripción, entrega y cumplimiento del presente, y los instrumentos y documentos que debe suscribir en relación con el presente (i) han sido debida y válidamente autorizados por él y (ii) no violan sus documentos constitutivos o cualquier acuerdo material que le sea específicamente aplicable o cualquier ley, norma o reglamento por el que deba regirse; y (c) no hay ningún procedimiento, litigio o procedimiento contencioso ante ningún tribunal, árbitro u organismo administrativo o gubernamental pendiente contra él, que pudiera afectar adversamente a su capacidad para celebrar este Acuerdo o para cumplir sus obligaciones en virtud de este.

Sección 3.9     Declaraciones de las Partes en el presente Acuerdo. Cada una de las Partes, por separado y no conjuntamente, declara y reconoce que: (a) al suscribir el presente Acuerdo, no se basa, ni se ha basado, en ninguna declaración realizada por cualquier otra Parte o por cualquiera de los representantes, agentes o abogados de dicha Parte, en relación con el objeto, la materia o el efecto del presente Acuerdo o de cualquier otro modo, que no sea el establecido en el presente Acuerdo; (b) al suscribir el presente Acuerdo, se ha basado enteramente en su propio criterio, convicciones e intereses y en el asesoramiento de sus abogados, y que ha tenido un plazo razonable para analizar los términos del presente Acuerdo antes de suscribirlo; y (c) ha leído el presente Acuerdo y que comprende plenamente y acepta voluntariamente todas las disposiciones contenidas en él. Ninguna disposición del presente limitará o modificará de otro modo cualquier conmutación u otro acuerdo o instrumento separado celebrado por uno o más Tenedores de la ACT o Tenedores de la ADCC, por una parte, y una Aseguradora Monolínea, por otra, ni impedirá que dichas partes celebren voluntariamente cualquier conmutación o acuerdo o instrumento separado similar en o a partir de la fecha del presente documento.

## ARTÍCULO II

## PACTOS

Sección 4.1     Pactos de la Junta de Supervisión. La Junta de Supervisión tomará, y hará que el

ELA, la ACT y, tras el inicio del Procedimiento de PROMESA de la ADCC, la ADCC, tomen todas las medidas necesarias para obtener, y no tomarán, ni alentarán a ninguna otra persona a tomar, ninguna medida que impida o se espere razonablemente que impida u obstaculice, la presentación del Plan, del Plan de la ACT, la Declaración de Divulgación y la Declaración de Divulgación de la ACT, la aprobación de la Declaración de Divulgación y la Declaración de Divulgación de la ACT y el registro de la Orden de Confirmación y la Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos y los Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de Divulgación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos y los Documentos Definitivos de la ACT sean compatibles con los términos del presente y del Plan y del Plan de la ACT, incluyendo, entre otros, que las Partes hayan actuado de buena fe en relación con la negociación de los términos del presente y del Plan; disponiéndose, sin embargo, que en el caso de que Assured (incluyendo, según sea el caso, conjuntamente con otros tenedores o aseguradoras de Reclamaciones de Bonos de la ADCC) proponga a la Junta de Supervisión una modificación de los Bonos de la ADCC de acuerdo con el Título VI de PROMESA, la Junta de Supervisión considerará dicha propuesta, en la medida en que sea compatible con los términos establecidos en el Resumen de Transacción que se adjunta al presente como Anexo "J", y tomará la decisión que considere apropiada. Dichas acciones incluirán, entre otras, (a) iniciar el Procedimiento de PROMESA de la ADCC, (b) presentar el Plan y la Declaración de Divulgación, de manera compatible en forma y fondo con este Acuerdo y razonablemente aceptable para las Partes, ante el Tribunal del Título III, y solicitar que el Tribunal del Título III establezca fechas de vista para la consideración expedita de la Declaración de Divulgación y el Plan, (c) procesar, de manera oportuna y apropiada, la aprobación de la Declaración de Divulgación y la Declaración de Divulgación de la ACT y la confirmación del Plan y el Plan de la ACT en vistas de conformidad con las órdenes aplicables dictadas en los Procedimientos de PROMESA, (d) abstenerse de iniciar directa o indirectamente (o continuar con el proceso) cualquier acción o procedimiento o hacer valer cualquier reclamación u objeción contra cualquiera de los Acreedores del AAP Iniciales (o sus respectivos fideicomisarios, agentes fiscales o agentes de pago) en relación con los Bonos de la ACT o los Bonos de la ADCC, según sea el caso, y hacer todos los esfuerzos razonables para evitar que cualquier otra persona o entidad (privada o gubernamental) inicie directa o indirectamente (o continúe con el proceso) cualquier acción o procedimiento o haga valer cualquier reclamación u objeción, (e) abstenerse de iniciar directa o indirectamente (o continuar con el proceso) o adoptar cualquier posición legal en cualquier acción o procedimiento, incluyendo, entre otros, hacer valer cualquier reclamación u objeción, que sea incompatible con las concesiones y transacciones descritas en el presente o establecidas en el Plan o el Plan de la ACT; disponiéndose, sin embargo, que nada de lo anterior tiene por objeto aplicarse a, ni se interpretará de modo que se aplique a, cualquier medida tomada o que se vaya a tomar con respecto a las reclamaciones u objeciones con respecto a las recuperaciones (*clawbacks*) u otras reclamaciones, en cada caso, planteadas por los tenedores o aseguradoras de los Bonos de la ADCC o los Bonos de la ACT que no sean parte de este Acuerdo, incluyendo, entre otros, la práctica de las mociones, la obtención de pruebas, la presentación de memorandos, la presentación de argumentos orales y el juicio, (f) al menos cuatro (4) días antes de dicha presentación, entregar a los abogados de Assured y National copias de la Declaración de Divulgación, la Declaración de Divulgación de la ACT, el Plan, el Plan de la ACT, el Suplemento del Plan, el Suplemento del Plan de la ACT, la Orden de Confirmación, la Orden de Confirmación de la ACT, los demás

Documentos Definitivos y los Documentos Definitivos de la ACT y todos los demás documentos
relacionados con cualquiera de los anteriores, (g) en caso de que una de las partes (i) presente una
notificación de apelación del registro de la Orden de Confirmación o de la Orden de Confirmación de la
ACT y (ii) solicite una paralización en espera de la apelación en relación con esta, haciendo todos los
esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre otros, la solicitud de
una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes de cualquier retraso
causado por cualquier apelación o petición de revisión de la Orden de Confirmación o de la Orden de
Confirmación de la ACT, (h) hacer todos los esfuerzos razonables para proporcionar, y hacer que la ACT
proporcione, a Assured y a National (y a sus respectivos asesores, según proceda) la información
razonablemente solicitada para facilitar, implementar, perfeccionar o hacer efectivo de otra manera el Plan
de la ACT y la reestructuración de la ACT, e (i) utilizar sus mejores esfuerzos razonables y negociar de
buena fe con Assured y National el Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de
Emisión de los Nuevos Bonos de la ACT, la Documentación del Fideicomiso y los Documentos del
Fideicomiso de Custodia, en un esfuerzo por concluir la documentación de estos antes de la Fecha de
Vigencia del ELA. Además de lo anterior, la Junta de Supervisión, como representante de la ACT en el
Procedimiento de PROMESA de la ACT, (w) una vez satisfechas las Condiciones de Distribución, de
acuerdo con los términos y disposiciones de la Sección 6.1(d) del presente, tomará las medidas necesarias
para hacer que el ELA realice pagos a Assured y National, en efectivo, por un importe de Treinta y Nueve
Millones Trescientos Mil Dólares ($39,300,000.00), y Diecinueve Millones Trescientos Mil Dólares
($19,300,000.00) respectivamente, como contraprestación de la estructuración de los pagos a realizarse a
los tenedores de las Reclamaciones del ELA/ACT, Reclamaciones del ELA/Centro de Convenciones,
Reclamaciones del ELA/Impuesto al Ron de AFI y Reclamaciones del ELA/AMA de acuerdo con el Plan,
(x) adoptará y hará que la ACT adopte todas las medidas necesarias para presentar, o hacer que se presente,
el Plan de la ACT en consonancia con los términos establecidos en el Anexo "J" adjunto al presente, y
realizará todos los esfuerzos razonables para lograr su confirmación por el Tribunal del Título III, (y) una
vez cumplidas las Condiciones de Distribución, tomará las medidas necesarias para que la ACT realice los
pagos, en efectivo, de Ciento Ochenta y Cuatro Millones Ochocientos Mil Dólares ($184,800,000.00) a los
tenedores de Reclamaciones de Bonos de la ACT 68 y Setenta y Nueve Millones Doscientos Mil Dólares
($79,200,000.00) a los tenedores de Reclamaciones de Bonos Prioritarios ACT 98, y (z) una vez cumplidas
las Condiciones de Distribución, tomará, y hará que el ELA tome, las medidas necesarias para distribuir los
CVI de Recuperación de la ACT a los tenedores de las Reclamaciones del ELA/ACT permitidas
(incluyendo las Aseguradoras Monolínea) y para realizar los pagos a cuenta de estas de acuerdo con los
términos del Plan, el Contrato de Emisión de los CVI y la sección de la Cascada de Distribución Prioritaria
de los CVI de Recuperación de la ACT del Resumen de Transacción que se adjunta al presente y al Anexo
"J"; disponiéndose, sin embargo, que, hasta la recepción de la Determinación de la Prioridad del Préstamo
del BGF, (i) los pagos en efectivo asignables a los Bonos de la ACT 98 estén sujetos a la Reserva de Pagos
de CVI, y (ii) los CVI de Recuperación de la ACT que de otro modo serían asignables a los tenedores de
Reclamaciones Permitidas del ELA/ACT relativas a los Préstamos del BGF para la ACT no se distribuirán
a los tenedores de Préstamos del BGF para la ACT; y disponiéndose, además, que una vez recibida la
Determinación de la Prioridad de los Préstamos del BGF, los fondos de la Reserva de Pagos de CVI y
cualquier CVI de Recuperación de la ACT no distribuido se entreguen a los tenedores de Bonos de la ACT
y Préstamos del BGF para la ACT, según sea el caso, sobre la base de (i) entre los tenedores de los Bonos
de la ACT 98 y los tenedores de los Préstamos del BGF para la ACT, los términos de dicha Determinación

de la Prioridad de los Préstamos del BGF, (ii) entre los tenedores de los Bonos de la ACT 68 y los
tenedores de los Bonos de la ACT 98, la sección de la Cascada de Distribución Prioritaria de CVI de
Recuperación de la ACT del Resumen de Transacción que se adjunta al presente como Anexo "J".

Sección 4.2        Pactos del ELA. El ELA tomará todas las medidas necesarias para obtener, y no
tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pueda, o se espere
razonablemente que pueda, obstaculizar o impedir la presentación del Plan, el Plan de la ACT, la
Declaración de Divulgación y la Declaración de Divulgación de la ACT, la aprobación de la Declaración
de Divulgación y la Declaración de Divulgación de la ACT, y el registro de la Orden de Confirmación y la
Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan
y del Plan de la ACT, incluyendo, entre otros, la suscripción y entrega de los Documentos Definitivos y los
Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de
Divulgación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y
administración) y los demás Documentos Definitivos y los Documentos Definitivos de la ACT sean
compatibles con los términos del presente y del Plan y del Plan de la ACT, incluyendo, entre otros, que las
Partes han actuado de buena fe en relación con la negociación de los términos del presente y del Plan.
Dichas medidas incluirán, entre otras, las siguientes: (a) la aprobación de manera oportuna y adecuada de
la Declaración de Divulgación y la Declaración de Divulgación de la ACT y la confirmación del Plan y del
Plan de la ACT en las vistas de conformidad con las órdenes aplicables dictadas en el Procedimiento de
PROMESA, (b) proporcionar a la Junta de Supervisión la información financiera que se le solicite
razonablemente y que sea necesaria para llevar a cabo el Procedimiento de PROMESA del ELA y el
Procedimiento de PROMESA de la ACT, (c) de abstenerse de iniciar directa o indirectamente (o continuar
con el proceso) cualquier acción o procedimiento o hacer valer cualquier reclamación u objeción contra
cualquiera de los Acreedores del AAP Iniciales (o sus respectivos fideicomisarios, agentes fiscales o
agentes de pago) en relación con los Bonos de la ACT o los Bonos de la ADCC, según sea el caso, y hacer
todos los esfuerzos razonables para evitar que cualquier otra persona o entidad (privada o gubernamental)
inicie directa o indirectamente (o continúe con el proceso) cualquier acción o procedimiento o haga valer
cualquier reclamación u objeción, (d) abstenerse de iniciar directa o indirectamente (o continuar con el
proceso) o adoptar cualquier posición legal en cualquier acción o procedimiento, incluyendo, entre otros,
hacer valer cualquier reclamación u objeción, que sea incompatible con las concesiones y transacciones
descritas en el presente o establecidas en el Plan o el Plan de la ACT; disponiéndose, sin embargo, que
nada de lo anterior tiene por objeto aplicarse a, ni se interpretará de modo que se aplique a, cualquier
medida tomada o que se vaya a tomar con respecto a las reclamaciones u objeciones con respecto a las
recuperaciones (clawbacks) u otras reclamaciones, en cada caso, planteadas por los tenedores o
aseguradoras de los Bonos de la ADCC o los Bonos de la ACT que no sean parte de este Acuerdo,
incluyendo, entre otros, la práctica de las mociones, la obtención de pruebas, la presentación de
memorandos, la presentación de argumentos orales y el juicio, (e) en caso de que una de las partes (i)
presente una notificación de apelación del registro de la Orden de Confirmación o de la Orden de
Confirmación de la ACT y (ii) solicite una paralización en espera de la apelación en relación con esta,
haciendo todos los esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre
otros, la solicitud de una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes
de cualquier retraso causado por cualquier apelación o petición de revisión de la Orden de Confirmación o
de la Orden de Confirmación de la ACT, y (f) hacer todos los esfuerzos razonables para proporcionar, y

123408529v3

hacer que la ACT proporcione, a Assured y a National (y a sus respectivos asesores, según proceda) la información razonablemente solicitada para facilitar, implementar, perfeccionar o hacer efectivo de otra manera el Plan de la ACT y la reestructuración de la ACT. Además de lo anterior, una vez satisfechas las Condiciones de Distribución, (y) de acuerdo con los términos y disposiciones de la Sección 6.1(d) del presente documento, el ELA tomará las medidas necesarias para realizar los pagos en la fecha de Vigencia del ELA, en efectivo, a Assured y National, por un importe de Treinta y Nueve Millones  Trescientos Mil Dólares ($39,300,000.00), y Diecinueve Millones Trescientos Mil Dólares ($19,300,000.00) respectivamente, como contraprestación de la estructuración de los pagos a realizarse a los tenedores de las Reclamaciones del ELA/ACT,  Reclamaciones del ELA/Centro de Convenciones, Reclamaciones del ELA/Impuesto al Ron de AFI y Reclamaciones del ELA/AMA  de acuerdo con el Plan, y (z) el ELA tomará las medidas necesarias para distribuir los CVI de Recuperación de la ACT a los tenedores de las Reclamaciones del ELA/ACT permitidas (incluyendo las Aseguradoras Monolínea) y para realizar los pagos a cuenta de estas de acuerdo con los términos del Plan, el Contrato de Emisión de los CVI y la sección de la Cascada de Distribución Prioritaria de los CVI de Recuperación de la ACT del Resumen de Transacción que se adjunta al presente y al Anexo "J"; disponiéndose, sin embargo, que, hasta la recepción de la Determinación de la Prioridad del Préstamo del BGF, (i) los pagos en efectivo asignables a los Bonos de la ACT 98 estén sujetos a la Reserva de Pagos de CVI, y (ii) los CVI de Recuperación de la ACT que de otro modo serían asignables a los tenedores de Reclamaciones Permitidas del ELA/ACT  relativas a los Préstamos del BGF para la ACT no se distribuirán a los tenedores de Préstamos del BGF para la ACT; y disponiéndose, además, que una vez recibida la Determinación de la Prioridad de los Préstamos del BGF, los fondos de la Reserva de Pagos de CVI y cualquier CVI de Recuperación de la ACT no distribuido se entreguen a los tenedores de Bonos de la ACT y Préstamos del BGF para la ACT, según sea el caso, sobre la base de (i) entre los tenedores de los Bonos de la ACT 98 y los tenedores de los Préstamos del BGF para la ACT, los términos de dicha Determinación de la Prioridad de los Préstamos del BGF, (ii) entre los tenedores de los Bonos de la ACT 68 y los tenedores de los Bonos de la ACT 98, la sección de la Cascada de Distribución Prioritaria de CVI de Recuperación de la ACT del Resumen de Transacción que se adjunta al presente como Anexo "J".

Sección 4.3        Pactos de la ACT. La ACT tomará todas las medidas necesarias para obtener, y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pueda, o se espere razonablemente que pueda, obstaculizar o impedir la presentación del Plan, el Plan de la ACT, la Declaración de Divulgación y la Declaración de Divulgación de la ACT, la aprobación de la Declaración de Divulgación y la Declaración de Divulgación de la ACT, y el registro de la Orden de Confirmación y la Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos y los Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de Divulgación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos y los Documentos Definitivos de la ACT sean compatibles con los términos del presente y del Plan y del Plan de la ACT, incluyendo, entre otros, que las Partes han actuado de buena fe en relación con la negociación de los términos del presente y del Plan. Dichas medidas incluirán, entre otras, las siguientes: (a) la aprobación de manera oportuna y adecuada de la Declaración de Divulgación y la Declaración de Divulgación de la ACT y la confirmación del Plan y del Plan de la ACT en las vistas de conformidad con las órdenes aplicables dictadas en el Procedimiento de

123408529v3

PROMESA, (b) proporcionar a la Junta de Supervisión la información financiera que se le solicite
razonablemente y que sea necesaria para llevar a cabo el Procedimiento de PROMESA de la ACT, (c) de
abstenerse de iniciar directa o indirectamente (o continuar con el proceso) cualquier acción o
procedimiento o hacer valer cualquier reclamación u objeción contra Assured, National, cualquier Tenedor
de la ACT, o cualquier Tenedor de la ADCC, en relación con los Bonos de la ACT y los Bonos de la
ADCC, (o sus respectivos fideicomisarios, agentes fiscales o agentes de pago), según sea el caso, y hacer
todos los esfuerzos razonables para evitar que cualquier otra persona o entidad (privada o gubernamental)
inicie directa o indirectamente (o continúe con el proceso) cualquier acción o procedimiento o haga valer
cualquier reclamación u objeción, (d) abstenerse de iniciar directa o indirectamente (o continuar con el
proceso) o adoptar cualquier posición legal en cualquier acción o procedimiento, incluyendo, entre otros,
hacer valer cualquier reclamación u objeción, que sea incompatible con las concesiones y transacciones
descritas en el presente o establecidas en el Plan o el Plan de la ACT; disponiéndose, sin embargo, que
nada de lo anterior tiene por objeto aplicarse a, ni se interpretará de modo que se aplique a, cualquier
medida tomada o que se vaya a tomar con respecto a las reclamaciones u objeciones con respecto a las
recuperaciones (*clawbacks*) u otras reclamaciones, en cada caso, planteadas por los tenedores o
aseguradoras de los Bonos de la ADCC o los Bonos de la ACT que no sean parte de este Acuerdo,
incluyendo, entre otros, la práctica de las mociones, la obtención de pruebas, la presentación de
memorandos, la presentación de argumentos orales y el juicio, y (e) hacer todos los esfuerzos razonables
para proporcionar a Assured y a National (y a sus respectivos asesores, según proceda) la información
razonablemente solicitada para facilitar, implementar, perfeccionar o hacer efectivo de otra manera el Plan
de la ACT y la reestructuración de la ACT. Además de lo anterior, la ACT deberá (y) presentar el Plan de
la ACT de acuerdo con los términos establecidos en el Anexo "J" adjunto y la Declaración de Divulgación
de la ACT y realizar todos los esfuerzos razonables para lograr la confirmación de estos por parte del
Tribunal del Título III de la forma más expedita y práctica posible y (z) una vez satisfechas las
Condiciones de Distribución, tomar las medidas necesarias para realizar los pagos, en efectivo, de Ciento
Ochenta y Cuatro Millones Ochocientos Mil Dólares ($184,800,000.00) a los tenedores de Reclamaciones
de Bonos de la ACT 68 y Setenta y Nueve Millones Doscientos Mil Dólares ($79,200,000.00) a los
tenedores de Reclamaciones de Bonos Prioritarios ACT 98.

　　　　Sección 4.4　　　　Pactos de la ADCC. La ADCC tomará todas las medidas necesarias para obtener,
y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pueda, o se espere
razonablemente que pueda, obstaculizar o impedir la presentación del Plan y la Declaración de
Divulgación, la aprobación de la Declaración de Divulgación y el registro de la Orden de Confirmación y
el perfeccionamiento, la implementación y la administración del Plan, incluyendo la suscripción y entrega
de los Documentos Definitivos, siempre que la Declaración de Divulgación, el Plan (y su
perfeccionamiento, implementación y administración) y los demás Documentos Definitivos sean
compatibles con los términos del presente y del Plan, incluyendo, entre otros, que las Partes han actuado de
buena fe en relación con la negociación de los términos del presente y del Plan; disponiéndose, sin
embargo, que en el caso de que Assured (incluyendo, según sea el caso, conjuntamente con otros tenedores
o aseguradoras de Reclamaciones de Bonos de la ADCC) proponga a la Junta de Supervisión una
modificación de los Bonos de la ADCC de acuerdo con el Título VI de PROMESA, incluyendo como
alternativa a la inclusión de ADCC en el Plan como deudor bajo el Título III de PROMESA, si es aprobada
y autorizada por la Junta de Supervisión, la ADCC hará todos los esfuerzos razonables y tomará las

26

medidas necesarias para obtener la aprobación de dicha modificación calificatoria de acuerdo con los términos establecidos en el Anexo "J" adjunto al presente. Dichas medidas incluirán, entre otras, las siguientes: (a) la aprobación de manera oportuna y adecuada de la Declaración de Divulgación y la confirmación del Plan en las vistas de conformidad con las órdenes aplicables dictadas en el Procedimiento de PROMESA, (b) proporcionar a la Junta de Supervisión la información financiera que se le solicite razonablemente y que sea necesaria para llevar a cabo el Procedimiento de PROMESA de la ADCC, (c) abstenerse de iniciar directa o indirectamente (o continuar con el proceso) cualquier acción o procedimiento o hacer valer cualquier reclamación u objeción contra cualquier Acreedor Inicial del AAP (o sus respectivos fideicomisarios, agentes fiscales o agentes de pago), en relación con los Bonos de la ACT o los Bonos de la ADCC, según sea el caso, y hacer todos los esfuerzos razonables para evitar que cualquier otra persona o entidad (privada o gubernamental) inicie directa o indirectamente (o continúe con el proceso) cualquier acción o procedimiento o haga valer cualquier reclamación u objeción, (d) abstenerse de iniciar directa o indirectamente (o continuar con el proceso) o adoptar cualquier posición legal en cualquier acción o procedimiento, incluyendo, entre otros, hacer valer cualquier reclamación u objeción, que sea incompatible con las concesiones y transacciones descritas en el presente o establecidas en el Plan; disponiéndose, sin embargo, que nada de lo anterior tiene por objeto aplicarse a, ni se interpretará de modo que se aplique a, cualquier medida tomada o que se vaya a tomar con respecto a las reclamaciones u objeciones con respecto a las recuperaciones (*clawbacks*) u otras reclamaciones, en cada caso, planteadas por los tenedores o aseguradoras de los Bonos de la ADCC o los Bonos de la ACT que no sean parte de este Acuerdo, incluyendo, entre otros, la práctica de las mociones, la obtención de pruebas, la presentación de memorandos, la presentación de argumentos orales y el juicio.

Sección 4.5        Pactos de los Tenedores de la ACT. Sujeto a los términos y condiciones del presente documento, cada uno de los Tenedores de la ACT, por separado y no conjuntamente, se compromete y acuerda lo siguiente:

(a) Ninguno de los Tenedores de la ACT venderá, transferirá, pignorará, hipotecará ni cederá, salvo en la medida en que se requiera de conformidad con la Sección 301(c)(3) de PROMESA, los documentos de seguro definitivos y la legislación aplicable con respecto a un bono asegurado por una Aseguradora Monolínea) (una "**Transferencia**") ninguna de las Reclamaciones de Bonos de la ACT, ni ningún derecho de voto, consentimiento o instrucción o participaciones u otros intereses en ellos (colectivamente, los "**Intereses de la ACT**") durante el período comprendido entre la fecha del presente documento y (i) la Fecha de Vigencia de la ACT y (ii) la extinción del presente Acuerdo de conformidad con las disposiciones de la Sección 7.1 del presente, lo que ocurra primero, inclusive; disponiéndose, sin embargo, que, no obstante lo anterior, cada uno de los Tenedores de la ACT podrá transferir cualquier Interés de la ACT a (1) otro Acreedor del AAP o (2) en caso de que el adquirente no sea un Acreedor del AAP en el momento de la Transferencia, dicho adquirente suscriba y entregue, dentro de los cinco (5) días calendario siguientes a la suscripción de esta, a los abogados de la Junta de Supervisión y de la AAFAF, el Acuerdo de Acumulación que se adjunta como Anexo "G" (un "**Adquirente Calificado**"), en virtud del cual (y) dicho Adquirente Calificado (i) asumirá todos los derechos y obligaciones del transferente de acuerdo con los términos y condiciones de este Acuerdo y (ii) dicho Adquirente Calificado se considerará entonces un Acreedor del AAP a todos los efectos del presente, incluyendo, entre otros, con respecto a los Bonos adicionales de la ACT que posea dicho Adquirente Calificado en el momento en que se adhiera al presente Acuerdo, y asumirá todos los derechos y obligaciones en virtud del presente (salvo el derecho a recibir los Costos de

Perfeccionamiento) y (z) en o después de la fecha de entrada en vigencia de la Transferencia, se considerará que dicho Tenedor de la ACT ha renunciado a sus derechos (salvo el derecho a recibir los Costos de Perfeccionamiento), y será liberado de sus obligaciones (salvo las establecidas en la Sección 4.5(c) del presente) en o después de la fecha de entrada en vigencia de la Transferencia en virtud de este Acuerdo únicamente en la medida de dichos derechos transferidos; y disponiéndose, además, que, en la medida en que una Transferencia infrinja las disposiciones de esta Sección 4.5(a), será nula *ab initio* y las Reclamaciones de Bonos de la ACT aplicables y el Tenedor de la ACT que intente dicha Transferencia seguirán estando sujetos a los términos de este Acuerdo; y disponiéndose, además, que ninguna disposición del presente tiene por objeto, ni debe interpretarse como, un impedimento para que cualquiera de los Tenedores de la ACT adquiera Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC adicionales; disponiéndose, sin embargo, que cualquier Reclamación de Bonos de la ACT y Reclamación de Bonos de la ADCC que se adquieran en o a partir de la fecha del presente se considerará automática e inmediatamente después de su adquisición por parte de un Tenedor de la ACT sujeta a todos los términos y disposiciones del presente Acuerdo; y disponiéndose además, que las disposiciones de esta Sección 4.5(a) no se aplicarán al otorgamiento de cualquier derecho de retención o embargo a favor de un banco o corredor que tenga la custodia de valores en el curso ordinario de su actividad y cuyo derecho de retención o embargo quede extinguido al momento de la Transferencia de dichos valores. No obstante lo anterior, ninguna disposición del presente documento restringirá o prohibirá a ninguna de las partes la adopción de cualquier medida exigida por la Ley de Valores de 1933, con sus enmiendas, la Ley de Intercambio de Valores de 1934, con sus enmiendas, cualquier norma o reglamento promulgado en virtud de ellas, o por cualquier otra ley o reglamento aplicable.

(b) Ninguno de los Tenedores de la ACT podrá, salvo lo dispuesto expresamente en el presente, (i) presentar reclamaciones o pruebas de reclamación adicionales, de cualquier tipo, ante el Tribunal del Título III contra el ELA (incluyendo las reclamaciones garantizadas, no garantizadas, administrativas o de contribución sustancial), a cuenta de cualquiera de los Bonos de la ACT o Reclamaciones de Bonos de la ACT o siempre que el hecho de no presentar ninguna evidencia de reclamación adicional como resultado de sus obligaciones en virtud de esta cláusula (i) no perjudique, ni se considere una limitación, a las participaciones totales de dichos Tenedores de la ACT de Reclamaciones de Bonos de la ACT, (ii) excepto según lo permitido por la Sección 4.5(d) a continuación, únicamente con respecto a las Aseguradoras Monolínea, presentar cualquier reclamación adicional, iniciar o promover cualquier litigio, procedimiento, acción o asunto pendiente o adicional a causa de sus Bonos de la ACT o Reclamaciones de Bonos de la ACT (y cada uno de dichos Tenedores de la ACT está de acuerdo con dichos litigios, procedimientos, acciones o asuntos pendientes) o reclamar daños u otro tipo de remedio contra cualquiera de las Partes Exoneradas del Gobierno en base a, emergente de o relacionado con las Reclamaciones Exoneradas del Gobierno, o (iii) ayudar a cualquier persona a tomar cualquier medida con respecto a las Reclamaciones Exoneradas del Gobierno que esté prohibida por esta Sección 4.5(b); disponiéndose, sin embargo, que, en la medida en que sea compatible con sus obligaciones en virtud del presente, el Tenedor de la ACT podrá modificar una prueba de reclamación únicamente para cambiar el nombre, el domicilio o información similar del reclamante.

(c) Cada uno de los Tenedores de la ACT, únicamente en su calidad de tenedor de Bonos de la ACT o de Reclamaciones de Bonos de la ACT, por separado y no conjuntamente, (i) apoyará y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pudiera, o se esperara razonablemente que

pudiera, infringir o ser incompatible con los términos del presente, u obstaculizar o impedir la presentación del Plan o del Plan de la ACT, la administración de los Procedimientos de PROMESA, la aprobación de la Declaración de Divulgación o la Declaración de Divulgación de la ACT y el registro de la Orden de Confirmación o la Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos y los Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de Divulgación de la ACT, la Orden de Confirmación, la Orden de Confirmación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos y Documentos Definitivos de la ACT sean compatibles con los términos del presente, el Plan y el Plan de la ACT, (ii) de acuerdo con las disposiciones de la Sección 5.1 del presente documento, (A) no consentirá ni votará a favor de ninguna modificación del Plan o del Plan de la ACT, a menos que dicha modificación sea propuesta o apoyada por la Junta de Supervisión, la AAFAF, el ELA, la ACT y la ADCC y se haya realizado de acuerdo con las disposiciones de la Sección 8.1 del presente, y (B) no votará ni apoyará ningún plan de ajuste de la ACT o del ELA que no haya sido propuesto o apoyado por la Junta de Supervisión, la AAFAF, el ELA y la ACT, siempre y cuando ninguna de las Partes del Gobierno haya incumplido sustancialmente sus obligaciones establecidas en este Acuerdo; disponiéndose, sin embargo, que cada una de las Partes reconoce que cada Reclamación de Bonos Asegurados de la ACT se votará de acuerdo con la Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia, y (iii) en caso de que una de las partes (A) presente una notificación de apelación del registro de la Orden de Confirmación o de la Orden de Confirmación de la ACT y (B) solicite una paralización en espera de la apelación en relación con esta, usar todos los esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre otros, la solicitud de una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes de cualquier retraso causado por cualquier apelación o petición de revisión de la Orden de Confirmación o de la Orden de Confirmación de la ACT.

(d) Sujeto a los términos establecidos en el presente, no se podrá limitar ni prohibir que los Tenedores de la ACT (i) tomen cualquier medida que dicho Tenedor de la ACT considere necesaria o apropiada para preservar, proteger o defender cualquiera de sus derechos en virtud de este Acuerdo, el Plan, o los otros Documentos Definitivos, (ii) emprendan cualquier acción para defenderse de las reclamaciones y causas de acción afirmadas en las Objeciones Relacionadas con la Deuda, las Acciones de Invalidez o las Acciones de Impugnación de Gravámenes, en la medida en que dichos litigios no estén paralizados, o contra las reclamaciones y causas de acción afirmadas en cualquier otro litigio que no estén paralizadas, (iii) hagan valer cualquier reclamación o causa de acción contra cualquier Parte que incumpla este Acuerdo, o (iv) tomen cualquier medida que dicho tenedor considere necesaria o apropiada contra una Aseguradora Monolínea para preservar, proteger o defender cualquiera de sus derechos bajo cualquier póliza de seguro emitida por una Aseguradora Monolínea con respecto a cualquier bono asegurado por una Aseguradora Monolínea. Sin limitar en modo alguno lo anterior, en la medida en que el Plan, el Plan de la ACT, los Documentos Definitivos y los Documentos Definitivos de la ACT sean compatibles con este Acuerdo y sus anexos, ninguno de los Tenedores de la ACT tomará ninguna medida para oponerse a la confirmación del Plan o del Plan de la ACT, según sea el caso, con respecto a los Prestatarios Cubiertos, incluyendo, entre otros, la votación para rechazar el Plan o el Plan de la ACT con respecto a cualquier otra reclamación que se presente contra el ELA o la ACT (con respecto a un bono asegurado por una Aseguradora Monolínea, que

no sea un Bono Asegurado por Assured o un Bono Asegurado por National, en la medida en que dicho Tenedor de la ACT esté autorizado a votar dicha reclamación de acuerdo con la Sección 301(c)(3) de PROMESA, cualquier documento de seguro definitivo y la ley aplicable); disponiéndose, sin embargo, que nada de lo dispuesto en el presente Acuerdo limitará o prohibirá a un Tenedor de la ACT emprender cualquier acción, o hacer valer cualquier reclamación o causa de acción, en relación con cualquier asunto relativo a las Aseguradoras Monolínea y con respecto a cualquier bono asegurado por una Aseguradora Monolínea (incluyendo, entre otros, la votación de reclamaciones, la subrogación o la aceleración, la conmutación o cualquier otro acto necesario para mantener los beneficios de la póliza de seguro aplicable de una Aseguradora Monolínea).

Sección 4.6        Pactos de los Tenedores de la ADCC. Sujeto a los términos y condiciones del presente documento, cada uno de los Tenedores de la ADCC, por separado y no conjuntamente, se compromete y acuerda lo siguiente:

(a)        Ninguno de los Tenedores de la ADCC transferirá ninguna de las Reclamaciones de Bonos de la ADCC, ni ningún derecho de voto, consentimiento o instrucción o participaciones u otros intereses en ellos (colectivamente, los "**Intereses de la ADCC**") durante el período comprendido entre la fecha del presente documento y (i) la Fecha de Vigencia del ELA y (ii) la extinción del presente Acuerdo de conformidad con las disposiciones de la Sección 7.1 del presente, lo que ocurra primero, inclusive; disponiéndose, sin embargo, que, no obstante lo anterior, cada uno de los Tenedores de la ADCC podrá transferir cualquier Interés de la ADCC a (1) otro Acreedor del AAP o (2) un Adquirente Calificado, en virtud del cual (y) dicho Adquirente Calificado (i) asumirá todos los derechos y obligaciones del transferente de acuerdo con los términos y condiciones de este Acuerdo y (ii) dicho Adquirente Calificado se considerará entonces un Acreedor del AAP a todos los efectos del presente, incluyendo, entre otros, con respecto a los Bonos adicionales de la ADCC que posea dicho Adquirente Calificado en el momento en que se adhiera al presente Acuerdo, y asumirá todos los derechos y obligaciones en virtud del presente (salvo el derecho a recibir los Costos de Perfeccionamiento) y (z) en o después de la fecha de entrada en vigencia de la Transferencia, se considerará que dicho Tenedor de la ADCC ha renunciado a sus derechos (salvo el derecho a recibir los Costos de Perfeccionamiento), y será liberado de sus obligaciones (salvo las establecidas en la Sección 4.6(c) del presente) en o después de la fecha de entrada en vigencia de la Transferencia en virtud de este Acuerdo únicamente en la medida de dichos derechos transferidos; y disponiéndose, además, que, en la medida en que una Transferencia infrinja las disposiciones de esta Sección 4.6(a), será nula *ab initio* y las Reclamaciones de Bonos de la ADCC aplicables y el Tenedor de la ADCC que intente dicha Transferencia seguirán estando sujetos a los términos de este Acuerdo; y disponiéndose, además, que ninguna disposición del presente tiene por objeto, ni debe interpretarse como, un impedimento para que cualquiera de los Tenedores de la ACT adquiera Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC adicionales; disponiéndose, sin embargo, que cualquier Reclamación de Bonos de la ACT y Reclamación de Bonos de la ADCC que se adquieran en o a partir de la fecha del presente se considerará automática e inmediatamente después de su adquisición por parte de un Tenedor de la ACT sujeta a todos los términos y disposiciones del presente Acuerdo; y disponiéndose además, que las disposiciones de esta Sección 4.6(a) no se aplicarán al otorgamiento de cualquier derecho de retención o embargo a favor de un banco o corredor que tenga la custodia de valores en el curso ordinario de su actividad y cuyo derecho de retención o embargo quede extinguido al momento de la Transferencia de dichos valores. No obstante lo anterior, ninguna disposición del presente documento restringirá o prohibirá a

30

ninguna de las partes la adopción de cualquier medida exigida por la Ley de Valores de 1933, con sus enmiendas, la Ley de Intercambio de Valores de 1934, con sus enmiendas, cualquier norma o reglamento promulgado en virtud de ellas, o por cualquier otra ley o reglamento aplicable.

(b)        Ninguno de los Tenedores de la ADCC podrá, salvo lo dispuesto expresamente en el presente, (i) presentar reclamaciones o pruebas de reclamación adicionales, de cualquier tipo, ante el Tribunal del Título III contra el ELA (incluyendo las reclamaciones garantizadas, no garantizadas, administrativas o de contribución sustancial), a cuenta de cualquiera de los Bonos de la ADCC o Reclamaciones de Bonos de la ADCC o siempre que el hecho de no presentar ninguna evidencia de reclamación adicional como resultado de sus obligaciones en virtud de esta cláusula (i) no perjudique, ni se considere una limitación, a las participaciones totales de dichos Tenedores de la ADCC de Reclamaciones de Bonos de la ADCC, (ii) excepto de acuerdo con cualquier orden de fecha de limitación de reclamaciones presentada en el Procedimiento de PROMESA de la ADCC, o según lo permitido por la Sección 4.6(d) a continuación, únicamente con respecto a las Aseguradoras Monolínea, presentar cualquier reclamación adicional, iniciar o promover cualquier litigio, procedimiento, acción o asunto pendiente o adicional a causa de sus Bonos de la ADCC o Reclamaciones de Bonos de la ADCC (y cada uno de dichos Tenedores de la ADCC está de acuerdo con dichos litigios, procedimientos, acciones o asuntos pendientes) o reclamar daños u otro tipo de remedio contra cualquiera de las Partes Exoneradas del Gobierno, en base a, emergentes de o relacionados con las Reclamaciones Exoneradas del Gobierno, o (iii) ayudar a cualquier persona a tomar cualquier medida con respecto a las Reclamaciones Exoneradas del Gobierno que esté prohibida por esta Sección 4.6(b); disponiéndose, sin embargo, que, en la medida en que sea compatible con sus obligaciones en virtud del presente, el Tenedor de la ADCC podrá modificar una prueba de reclamación únicamente para cambiar el nombre, el domicilio o información similar del reclamante.

(c)        Cada uno de los Tenedores de la ADCC, únicamente en su calidad de tenedor de Bonos de la ADCC o de Reclamaciones de Bonos de la ADCC, por separado y no conjuntamente, (i) apoyará y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pudiera, o se esperara razonablemente que pudiera, infringir o ser incompatible con los términos del presente o en el Plan, u obstaculizar o impedir la presentación del Plan, la administración de los Procedimientos de PROMESA, la aprobación de la Declaración de Divulgación y el registro de la Orden de Confirmación y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos, siempre que la Declaración de Divulgación, la Orden de Confirmación y el Plan (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos sean compatibles con los términos del presente, (ii) de acuerdo con las disposiciones de la Sección 5.1 del presente documento, (A) no consentirá ni votará a favor de ninguna modificación del Plan, a menos que dicha modificación sea propuesta o apoyada por la Junta de Supervisión, la AAFAF, el ELA, la ACT y la ADCC y se haya realizado de acuerdo con las disposiciones de la Sección 8.1 del presente, y (B) no votará ni apoyará ningún plan de ajuste de la ADCC o del ELA que no haya sido propuesto o apoyado por la Junta de Supervisión, la AAFAF, el ELA y la ADCC, siempre y cuando ninguna de las Partes del Gobierno haya incumplido sustancialmente sus obligaciones establecidas en este Acuerdo; disponiéndose, sin embargo, que cada una de las Partes reconoce que cada Reclamación de Bonos Asegurados de la ADCC se votará de acuerdo con la Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia, y (iii) en caso de que una de las partes (A) presente una notificación de apelación del registro de la Orden de Confirmación

y (B) solicite una paralización en espera de la apelación en relación con esta, usar todos los esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre otros, la solicitud de una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes de cualquier retraso causado por cualquier apelación o petición de revisión de la Orden de Confirmación.

(d)        Sujeto a los términos establecidos en el presente, no se podrá limitar ni prohibir que los Tenedores de la ADCC (i) tomen cualquier medida que dicho Tenedor de la ADCC considere necesaria o apropiada para preservar, proteger o defender cualquiera de sus derechos en virtud de este Acuerdo, el Plan o los otros Documentos Definitivos, (ii) emprendan cualquier acción para defenderse de las reclamaciones y causas de acción afirmadas en las Objeciones Relacionadas con la Deuda, las Acciones de Invalidez o las Acciones de Impugnación de Gravámenes, en la medida en que dichos litigios no estén paralizados, o contra las reclamaciones y causas de acción afirmadas en cualquier otro litigio que no estén paralizadas, (iii) hagan valer cualquier reclamación o causa de acción contra cualquier Parte que incumpla este Acuerdo, o (iv) tomen cualquier medida que dicho tenedor considere necesaria o apropiada contra una Aseguradora Monolínea para preservar, proteger o defender cualquiera de sus derechos bajo cualquier póliza de seguro emitida por una Aseguradora Monolínea con respecto a cualquier bono asegurado por una Aseguradora Monolínea. Sin limitar en modo alguno lo anterior, en la medida en que el Plan y los Documentos Definitivos sean compatibles con este Acuerdo y sus anexos, ninguno de los Tenedores de la ADCC tomará ninguna medida para oponerse a la confirmación del Plan con respecto a los Prestatarios Cubiertos, incluyendo, entre otros, la votación para rechazar el Plan con respecto a cualquier otra reclamación que se presente contra el ELA o la ADCC (con respecto a un bono asegurado por una Aseguradora Monolínea, que no sea un Bono Asegurado por Assured o un Bono Asegurado por National, en la medida en que dicho Tenedor de la ADCC esté autorizado a votar dicha reclamación de acuerdo con la Sección 301(c)(3) de PROMESA, cualquier documento de seguro definitivo y la ley aplicable); disponiéndose, sin embargo, que nada de lo dispuesto en el presente Acuerdo limitará o prohibirá a un Tenedor de la ADCC emprender cualquier acción, o hacer valer cualquier reclamación o causa de acción, en relación con cualquier asunto relativo a las Aseguradoras Monolínea y con respecto a cualquier bono asegurado por una Aseguradora Monolínea (incluyendo, entre otros, la votación de reclamaciones, la subrogación o la aceleración, la conmutación o cualquier otro acto necesario para mantener los beneficios de la póliza de seguro aplicable de una Aseguradora Monolínea).

Sección 4.7        Pactos de Assured. Por el presente, Assured se compromete y acuerda lo siguiente:

(a)  Assured no podrá, salvo lo dispuesto expresamente en el presente o de conformidad con cualquier orden del Tribunal del Título III relativa a la presentación de pruebas de reclamación en un Procedimiento de PROMESA de la ADCC, (i) presentar reclamaciones o evidencias de reclamación adicionales, de cualquier tipo, ante el Tribunal del Título III contra el ELA, la ACT o la ADCC (incluidas las reclamaciones garantizadas, no garantizadas, administrativas o de contribución sustancial), a cuenta de cualquiera de los Bonos Asegurados de Assured, o cualquier Reclamación de Bonos de la ACT o Reclamación de Bonos de la ADCC, siempre que el hecho de no presentar ninguna evidencia de reclamación adicional como resultado de sus obligaciones en virtud de esta cláusula (i) no perjudique, ni se considere una limitación, a las participaciones totales de Assured de Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC, (ii) al registrarse una orden de paralización del litigio, únicamente con respecto a Assured, en el Procedimiento de PROMESA del ELA, el Procedimiento de PROMESA de la ACT y el Procedimiento de

123408529v3

PROMESA de la ADCC en el que Assured sea demandante, demandado o recurrido, presentar cualquier reclamación adicional, iniciar o procesar cualquier litigio, procedimiento, acción o asunto pendiente o adicional por cuenta de cualquier Bono Asegurado de Assured o cualquiera de sus Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC en el Procedimiento de PROMESA del ELA, el Procedimiento de PROMESA de la ACT y el Procedimiento de PROMESA de la ADCC (y Assured acepta paralizar todos esos litigios, procedimientos, acciones o asuntos pendientes) o buscar recuperar daños u otro tipo de remedio contra cualquiera de las Partes Exoneradas del Gobierno en base a, emergente de o relacionado con las Reclamaciones Exoneradas del Gobierno o cualquiera de las reclamaciones o causas de acción establecidas o que se puedan haber establecido en las Acciones de Recuperación (*Clawback*) y las Mociones de Levantamiento de la Paralización, o (iii) ayudar, directa o indirectamente, a cualquier persona a tomar cualquier medida con respecto a las Reclamaciones Exoneradas del Gobierno que esté prohibida por esta Sección 4.7(a). Sin perjuicio de lo anterior, en el plazo de cuatro (4) Días Hábiles a partir de la fecha del presente, (A) Assured y la Junta de Supervisión presentarán mociones urgentes conjuntas, en forma razonablemente aceptable para Assured y la Junta de Supervisión, para paralizar las Acciones de Recuperación (*Clawback*), las Mociones de Levantamiento de la Paralización, la Moción de la Sección 926 en lo que respecta a Assured, y el litigio caratulado Assured Guaranty Corp. y otros c. el Estado Libre Asociado de Puerto Rico y otros, Proc. Cont. Núm. 18-00059- LTS, actualmente pendiente en el Tribunal del Título III (el "**Procedimiento Contencioso**"), y (B) Assured tomará, o hará que se tomen, todas las medidas necesarias, incluyendo, entre otros, la notificación de estas a todas las partes afectadas, para provocar la paralización de la presentación de pruebas propuesta únicamente por Assured en relación con las Acciones de Recuperación (*Clawback*) y las Mociones de Levantamiento de la Paralización, incluyendo, entre otros, todas las citaciones, avisos de declaración, solicitudes de presentación de documentos, y cualquier acumulación por parte de Assured a los pedidos de presentación de pruebas presentadas de acuerdo con la Regla de Quiebras 2004.

(b) Assured (i) apoyará y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pudiera, o se esperara razonablemente que pudiera, infringir o ser incompatible con los términos del presente, u obstaculizar o impedir la presentación del Plan o del Plan de la ACT, la administración de los Procedimientos de PROMESA, la aprobación de la Declaración de Divulgación o la Declaración de Divulgación de la ACT y el registro de la Orden de Confirmación o la Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos y los Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de Divulgación de la ACT, la Orden de Confirmación, la Orden de Confirmación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos y Documentos Definitivos de la ACT sean compatibles con los términos del presente, (ii) de acuerdo con las disposiciones de la Sección 5.1 del presente documento, (A) no consentirá ni votará a favor de ninguna modificación del Plan o del Plan de la ACT, a menos que dicha modificación sea propuesta o apoyada por la Junta de Supervisión, y que sea por otro lado compatible con las disposiciones del presente, y (B) no votará ni apoyará ningún plan de ajuste que no haya sido propuesto o apoyado por la Junta de Supervisión, siempre y cuando ninguna de las Partes del Gobierno haya incumplido sustancialmente sus obligaciones establecidas en este Acuerdo; disponiéndose, sin embargo, que Assured reconoce que cada Reclamación de Bonos Asegurados de la ACT y Reclamación de Bonos Asegurados de la ADCC aseguradas por Assured se votará de acuerdo con la

123408529v3

Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia, y (iii) en caso de que una de las partes (A) presente una notificación de apelación del registro de la Orden de Confirmación o de la Orden de Confirmación de la ACT y (B) solicite una paralización en espera de la apelación en relación con esta, usar todos los esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre otros, la solicitud de una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes de cualquier retraso causado por cualquier apelación o petición de revisión de la Orden de Confirmación o de la Orden de Confirmación de la ACT y (iv) aplicar esfuerzos razonables y negociar de buena fe con la Junta de Supervisión y National el Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de los Nuevos Bonos de la ACT, la Documentación del Fideicomiso y los Documentos del Fideicomiso de Custodia, en un esfuerzo para concluir la documentación de estos antes de la Fecha de Entrada en Vigencia del ELA.

(c) Sujeto a los términos establecidos en el presente documento, incluyendo, entre otros, la paralización del litigio como se requiere de acuerdo con la Sección 4.7(a) del presente, Assured no estará limitada ni se le prohibirá (i) adoptar las medidas que considere necesarias o apropiadas para preservar, proteger o defender cualquiera de sus derechos en virtud del presente Acuerdo, el Plan, el Plan de la ACT, los demás Documentos Definitivos, o los demás Documentos Definitivos de la ACT, o (ii) hacer valer cualquier reclamación o causa de acción contra cualquier Parte que incumpla el presente Acuerdo; disponiéndose, sin embargo, que lo anterior no impida a Assured participar en cualquier acción o procedimiento relativo a la Determinación de la Prioridad del Préstamo del BGF.

Sección 4.8     Pactos de National. Por el presente, National se compromete y acuerda lo siguiente:

(a) National no podrá, salvo lo dispuesto expresamente en el presente, (i) presentar reclamaciones o evidencias de reclamación adicionales, de cualquier tipo, ante el Tribunal del Título III contra el ELA, la ACT o la ADCC (incluidas las reclamaciones garantizadas, no garantizadas, administrativas o de contribución sustancial), a cuenta de cualquiera de los Bonos Asegurados de National, o cualquier Reclamación de Bonos de la ACT o Reclamación de Bonos de la ADCC, siempre que el hecho de no presentar ninguna evidencia de reclamación adicional como resultado de sus obligaciones en virtud de esta cláusula (i) no perjudique, ni se considere una limitación, a las participaciones totales de National de Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC, (ii) presentar cualquier reclamación adicional, iniciar o procesar cualquier litigio, procedimiento, acción o asunto pendiente o adicional por cuenta de cualquier Bono Asegurado de National o cualquiera de sus Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC en el Procedimiento de PROMESA del ELA, el Procedimiento de PROMESA de la ACT y el Procedimiento de PROMESA de la ADCC (y National acepta paralizar todos esos litigios, procedimientos, acciones o asuntos pendientes) o buscar recuperar daños u otro tipo de remedio contra cualquiera de las Partes Exoneradas del Gobierno en base a, emergente de o relacionado con las Reclamaciones Exoneradas del Gobierno o cualquiera de las reclamaciones o causas de acción establecidas o que se puedan haber establecido en las Acciones de Recuperación (*Clawback*) y las Mociones de Levantamiento de la Paralización, o (iii) ayudar, directa o indirectamente, a cualquier persona a tomar cualquier medida con respecto a las Reclamaciones Exoneradas del Gobierno que esté prohibida por esta Sección 4.8(a). Sin perjuicio de lo anterior, en el plazo de cuatro (4) Días Hábiles a partir de la fecha del presente, (A) National y la Junta de Supervisión presentarán mociones urgentes conjuntas, en forma

razonablemente aceptable para National y la Junta de Supervisión, para paralizar las Acciones de Recuperación (*Clawback*), las Mociones de Levantamiento de la Paralización, la Moción de la Sección 926 en lo que respecta a National, y (B) National tomará, o hará que se tomen, todas las medidas necesarias, incluyendo, entre otros, la notificación de estas a todas las partes afectadas, para provocar la paralización de la presentación de pruebas propuesta únicamente por National en relación con las Acciones de Recuperación (*Clawback*) y las Mociones de Levantamiento de la Paralización, incluyendo, entre otros, todas las citaciones, avisos de declaración, solicitudes de presentación de documentos, y cualquier acumulación por parte de National a los pedidos de presentación de pruebas presentadas de acuerdo con la Regla de Quiebras 2004.

(b)  National (i) apoyará y no tomará, ni alentará a ninguna otra persona a que tome, ninguna medida que pudiera, o se esperara razonablemente que pudiera, infringir o ser incompatible con los términos del presente, u obstaculizar o impedir la presentación del Plan o del Plan de la ACT, la administración de los Procedimientos de PROMESA, la aprobación de la Declaración de Divulgación o la Declaración de Divulgación de la ACT y el registro de la Orden de Confirmación o la Orden de Confirmación de la ACT y el perfeccionamiento, la implementación y la administración del Plan y del Plan de la ACT, incluyendo la suscripción y entrega de los Documentos Definitivos y los Documentos Definitivos de la ACT, siempre que la Declaración de Divulgación, la Declaración de Divulgación de la ACT, la Orden de Confirmación, la Orden de Confirmación de la ACT, el Plan y el Plan de la ACT (y su perfeccionamiento, implementación y administración) y los demás Documentos Definitivos y Documentos Definitivos de la ACT sean compatibles con los términos del presente, (ii) de acuerdo con las disposiciones de la Sección 5.1 del presente documento, (A) no consentirá ni votará a favor de ninguna modificación del Plan o del Plan de la ACT, a menos que dicha modificación sea propuesta o apoyada por la Junta de Supervisión, y que sea por otro lado compatible con las disposiciones del presente, y (B) no votará ni apoyará ningún plan de ajuste que no haya sido propuesto o apoyado por la Junta de Supervisión, siempre y cuando ninguna de las Partes del Gobierno haya incumplido sustancialmente sus obligaciones establecidas en este Acuerdo; disponiéndose, sin embargo, que National reconoce que cada Reclamación de Bonos Asegurados de la ACT asegurada por National se votará de acuerdo con la Sección 301(c)(3) de PROMESA y con cualquier otra ley y documentos rectores aplicables, mientras este Acuerdo siga en vigencia, y (iii) en caso de que una de las partes (A) presente una notificación de apelación del registro de la Orden de Confirmación o de la Orden de Confirmación de la ACT y solicite una paralización en espera de la apelación en relación con esta, usar todos los esfuerzos razonables para oponerse a dicha solicitud de paralización, incluyendo, entre otros, la solicitud de una fianza de apelación por un monto proporcional a las posibles pérdidas resultantes de cualquier retraso causado por cualquier apelación o petición de revisión de la Orden de Confirmación o de la Orden de Confirmación de la ACT y (iv) aplicar esfuerzos razonables y negociar de buena fe con la Junta de Supervisión y National el Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de los Nuevos Bonos de la ACT, la Documentación del Fideicomiso y los Documentos del Fideicomiso de Custodia, en un esfuerzo para concluir la documentación de estos antes de la Fecha de Entrada en Vigencia del ELA.

(c)  Sujeto a los términos establecidos en el presente documento, incluyendo, entre otros, la paralización del litigio como se requiere de acuerdo con la Sección 4.8(a) del presente, National no estará limitada ni se le prohibirá (i) adoptar las medidas que considere necesarias o apropiadas para preservar, proteger o defender cualquiera de sus derechos en virtud del presente Acuerdo, el Plan, el Plan de la ACT, los demás

COPIA DE SUSCRIPCIÓN

Documentos Definitivos, o los demás Documentos Definitivos de la ACT, o (ii) hacer valer cualquier reclamación o causa de acción contra cualquier Parte que incumpla el presente Acuerdo; disponiéndose, sin embargo, que lo anterior no impida a National participar en cualquier acción o procedimiento relativo a la Determinación de la Prioridad del Préstamo del BGF.

Sección 4.9        Pactos de las Partes. Sujeto a los términos y condiciones del presente, cada una de las Partes, por separado y no conjuntamente, se compromete y acuerda lo siguiente:

(a) Coordinación. Las Partes se coordinarán y harán sus mejores esfuerzos razonables para obtener el consentimiento y la acumulación de la AAFAF antes de perfeccionar las transacciones contempladas en el presente. Todas las declaraciones, garantías, pactos u otras obligaciones de la AAFAF contempladas en el presente no serán vigentes hasta que una persona autorizada por dicha entidad haya firmado el presente.

(b) Protecciones legales y de otro tipo. El Plan, la Orden de Confirmación, el Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de los Nuevos Bonos de la ACT, los Documentos Definitivos de la ACT, la Legislación de los CVI, la Ley de Responsabilidad de la Deuda y el Contrato de Emisión de los CVI, en la medida en que sean aplicables, de la manera que acuerden la Junta de Supervisión, Assured y National, incluirán las siguientes protecciones legales:

(i)        Para el pago de los CVI, el Estado Libre Asociado pignorará su plena fe, crédito y poder impositivo de conformidad con la Constitución de Puerto Rico y la legislación aplicable de Puerto Rico;

(ii)        Conforme al Contrato de Emisión de los Nuevos Bonos de la ACT, el Fideicomisario de los Nuevos Bonos de la ACT tendrá un derecho directo de acción para hacer cumplir el Contrato de Emisión de los Nuevos Bonos de la ACT, incluyendo (A) con respecto a los Nuevos Bonos de la ACT y el Contrato de Emisión de los Nuevos Bonos de la ACT, una pignoración de ingresos netos con respecto a la recaudación de peajes, (B) solicitar el cumplimiento específico como remedio para cualquier incumplimiento de los pactos en el Contrato de Emisión de los Nuevos Bonos de la ACT, y (C) a partir del inicio de estos, la paralización automática en cualquier procedimiento de insolvencia futuro iniciado en nombre de la ACT (ya sea en virtud del Título III de PROMESA o de otro modo) se considerará anulada con respecto a los ingresos de peaje, netos de los gastos de explotación de solo peaje y de los gastos de capital enumerados en la carretera de peaje; disponiéndose, sin embargo, que, en caso de incumplimiento del Contrato de Emisión de los Nuevos Bonos de la ACT, y, en ausencia de acción por parte del fideicomisario de los Nuevos Bonos de la ACT, los tenedores de no menos del veinticinco por ciento (25%) del monto de capital en circulación de los Nuevos Bonos de la ACT tendrán derecho a entablar una demanda, acción, un escrito *mandamus* o cualquier otro procedimiento en virtud de los principios de la ley o el derecho consuetudinario, o para proteger o hacer cumplir cualquier derecho o remedio en virtud del Contrato de Emisión de los Nuevos Bonos de la ACT;

(iii)        Conforme al Contrato de Emisión de CVI, el Fideicomisario de CVI tendrá un derecho directo de acción para aplicar el Contrato de Emisión de CVI, lo que incluye solicitar el cumplimiento específico como remedio para cualquier incumplimiento de los pactos en el Contrato de Emisión de CVI; disponiéndose, sin embargo, que, en caso de incumplimiento del Contrato de Emisión de CVI, como se describe en este y, en ausencia de acción por parte del fideicomisario del CVI, los tenedores de no menos del veinticinco por ciento (25%) del monto de capital en circulación de los CVI tendrán derecho a entablar

36

una demanda, acción, un escrito *mandamus* o cualquier otro procedimiento en virtud de la ley o el derecho consuetudinario, o para proteger o hacer cumplir cualquier derecho o remedio en virtud del Contrato de Emisión de CVI.

(iv)    El Plan Fiscal de la ACT certificado en la Fecha de Vigencia de la ACT, y cualquier Plan Fiscal de la ACT posterior a la Vigencia de la ACT, incluirá disposiciones para el pago en cada Año Fiscal del capital y los intereses sobre los Nuevos Bonos de la ACT, incluyendo, entre otros, los pagos del fondo de amortización que deban realizarse en dicho Año Fiscal;

(v)    El Plan Fiscal del ELA, certificado en la Fecha de Vigencia, y cualquier Plan Fiscal posterior a la Fecha de Vigencia, incluirá disposiciones para el pago en cada Año Fiscal, en la medida en que la Condición de Superación del Rendimiento quede cumplida en el Año Fiscal anterior, cualquier monto que deba pagarse con respecto a los CVI de conformidad con los términos del Contrato de Emisión de CVI;

(vi)    Los nuevos bonos de la ACT estarán garantizados por un derecho de retención preferencial sobre los peajes recaudados por la ACT o en su nombre y otros ingresos/recursos disponibles de la ACT, así como el derecho a recibir lo anterior, sujeto a los gastos de explotación y de capital necesarios de las carreteras de peaje especificados en el Contrato de Emisión de los Nuevos Bonos de la ACT (los "**Ingresos Netos**");

(vii)    El Plan de la ACT, la Orden de Confirmación de ACT y el Contrato de Emisión de los Nuevos Bonos de la ACT establecerán un pacto que fija una prueba de bonos adicionales de 1.20x de los Ingresos Netos.

(viii)    El Plan de la ACT y la Orden de Confirmación de la ACT establecerán un pacto de tasas que requiera un coeficiente de cobertura de 1.10x de los Ingresos Netos, por lo que, a efectos del cálculo del coeficiente de cobertura, los Ingresos Netos podrán incluir el efectivo no comprometido según lo previsto en el Contrato de Emisión de los Nuevos Bonos de la ACT;

(ix)    Los Planes Fiscales de la ACT certificados en la Fecha de Vigencia de la ACT o con posterioridad a esta, el Plan de la ACT y la Orden de Confirmación de la ACT, establecerán las medidas necesarias para el servicio de las obligaciones contempladas en este Acuerdo, los Nuevos Bonos de la ACT y el Contrato de Emisión de los Nuevos Bonos de la ACT;

(x)    La Orden de Confirmación de la ACT dispondrá la retención de la jurisdicción por parte del Tribunal del Título III o, en caso de que el Tribunal del Título III rechace dicha retención de jurisdicción o los Procedimientos de PROMESA hayan sido cerrados de acuerdo con los términos y disposiciones de PROMESA, la designación del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, para hacer cumplir los términos de los Planes Fiscales certificados y las obligaciones contempladas en virtud de este Acuerdo, los Nuevos Bonos de la ACT y el Contrato de Emisión de los Nuevos Bonos de la ACT;

(xi)    Los Nuevos Bonos de la ACT, incluidos, entre otros, cualesquiera Nuevos Bonos de la ACT emitidos de conformidad con los términos y disposiciones de la Sección 4.9(c) del presente y, en la medida en que sea posible, los CVI, portarán un sello o una leyenda similar a los efectos de que el Tribunal

de Distrito de los Estados Unidos para el Distrito de Puerto Rico ha determinado que dichos bonos y títulos son válidos, legalmente vinculantes y exigibles a tenor con la Orden de Confirmación o la Orden de Confirmación de la ACT, según sea el caso;

(xii)    Los compromisos y transacciones establecidos en este Acuerdo y consignados en el Plan, la Orden de Confirmación, el Plan de la ACT y la Orden de Confirmación de la ACT no serán vinculantes para ninguna de las Partes (incluido cualquier sucesor de la Junta de Supervisión) en un procedimiento futuro (u otro procedimiento de insolvencia) presentado conforme al Título III con respecto a la prioridad de los CVI de conformidad con PROMESA, la Constitución de Puerto Rico u otra legislación aplicable;

(xiii)   Para el beneficio de todos los tenedores iniciales y futuros de los Nuevos Bonos de la ACT, el ELA asumirá el compromiso de no limitar o restringir los derechos o facultades conferidos a la ACT hasta que todas las obligaciones con respecto a los Nuevos Bonos de la ACT, junto con todos los intereses devengados por ellos, hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos;

(xiv)   Para el beneficio de los tenedores iniciales y futuros de los CVI, el ELA asumirá el compromiso de que, hasta que todas las obligaciones con respecto a dichos bonos hayan sido totalmente pagadas o satisfechas de otra manera de conformidad con sus términos, el ELA no: (a) tomará ninguna medida que afecte los derechos y remedios de los tenedores de los CVI; (b) limitará ni restringirá los derechos o facultades de los funcionarios correspondientes del ELA para cumplir los términos de cualquier acuerdo celebrado con los tenedores de los CVI; ni (c) limitará la capacidad de los tenedores de los CVI de dar seguimiento al rendimiento del IVU Medido; disponiéndose, sin embargo, que lo anterior no impedirá que el ELA ejerza su facultad, mediante un cambio de ley, de eliminar el IVU Medido, o sustituir el IVU Medido por un Impuesto Medido Sustitutivo, cada uno de conformidad con el Contrato de Emisión de CVI, que protegerá a los tenedores de los CVI de una eliminación o sustitución que reduzca la probabilidad de que se satisfagan las Condiciones de Superación del Rendimiento; y disponiéndose, además, que el Contrato de Emisión de CVI incluirá un mecanismo para la divulgación pública por parte del ELA de (x) los importes del IVU Medido, (y) los cobros del IVU, y (z) el cálculo de cualquier conciliación o reducción del IVU de referencia, según se define y refleja en el Resumen de Transacción adjunto al presente como Anexo "J".

(xv)    La Orden de Confirmación de la ACT incluirá una determinación de que, para los fines de la Sección 209 de PROMESA, el cumplimiento de las obligaciones de deuda a ocurrir en la Fecha de Vigencia de la ACT es necesario para que la Junta de Supervisión certifique que los gastos no superen los ingresos para la ACT según se determinen de acuerdo con los estándares de contabilidad en valores devengados modificados;

(xvi)   El Contrato de Emisión de los Nuevos Bonos de la ACT, los Nuevos Bonos de la ACT y los CVI se regirán por la legislación de Nueva York;

(xvii)  La Orden de Confirmación es completa, definitiva, plena, concluyente y vinculante para, y no estará sujeta a ataques colaterales u otras impugnaciones en ningún tribunal u otro foro por parte de (1) el ELA, (2) la ACT, (3) cada persona o entidad que afirme tener reclamaciones u otros derechos oponibles al ELA, la ACT, COFINA o cualquiera de sus respectivas instrumentalidades o agencias, incluyendo una participación (directa o indirectamente en calidad de mandante, agente, contraparte, subrogado, aseguradora o por otro concepto) en los bonos emitidos por el ELA o cualquiera de sus otras instrumentalidades; o con

respecto a cualquier fideicomisario, cualquier agente colateral, cualquier fideicomisario designado por el contrato de emisión, cualquier agente fiscal y cualquier banco que reciba o mantenga fondos relacionados con esos bonos, ya sea que dicha reclamación u otros derechos de dicha persona o entidad se vean afectados en virtud del Plan y, de ser afectados, independientemente de que dicha persona o entidad hubiere aceptado o no el Plan, (4) cualquier otra persona y (5) los herederos, sucesores, cesionarios, albaceas, administradores, funcionarios, directores, agentes, representantes, abogados, beneficiarios o tutores de las personas nombradas precedentemente.

(xviii) La Orden de Confirmación de la ACT es completa, definitiva, plena, concluyente y vinculante para, y no estará sujeta a ataques colaterales u otras impugnaciones en ningún tribunal u otro foro por parte de (1) el ELA, (2) la ACT, (3) cada persona o entidad que afirme tener reclamaciones u otros derechos oponibles al ELA, la ACT, COFINA o cualquiera de sus respectivas instrumentalidades o agencias, incluyendo una participación (directa o indirectamente en calidad de mandante, agente, contraparte, subrogado, aseguradora o por otro concepto) en los bonos emitidos por el ELA o cualquiera de sus otras instrumentalidades; o con respecto a cualquier fideicomisario, cualquier agente colateral, cualquier fideicomisario designado por el contrato de emisión, cualquier agente fiscal y cualquier banco que reciba o mantenga fondos relacionados con esos bonos, ya sea que dicha reclamación u otros derechos de dicha persona o entidad se vean afectados en virtud del Plan de la ACT y, de ser afectados, independientemente de que dicha persona o entidad hubiere aceptado o no el Plan de la ACT, (4) cualquier otra persona y (5) los herederos, sucesores, cesionarios, albaceas, administradores, funcionarios, directores, agentes, representantes, abogados, beneficiarios o tutores de las personas nombradas precedentemente.

(xix)   El Plan incluirá una disposición que establezca que el CVI de Recuperación (*Clawback*) de la ACT que se emita y cualquier distribución en virtud de este se mantendrá en una reserva o fideicomiso, cuya forma y fondo serán razonablemente aceptables para Assured y National, hasta la fecha en que se cumplan las Condiciones de Distribución, inclusive y, en caso de que la Junta de Supervisión, Assured y/o National rescindan el presente Acuerdo, el CVI de Recuperación (*Clawback*) de la ACT y cualquier distribución a cuenta de este se liberará de dicha reserva o fideicomiso, según sea el caso, y se distribuirá a los acreedores de acuerdo con los términos establecidos en el Anexo "J" adjunto al presente.

(xx)   La Orden de Confirmación dispondrá que, en contraprestación por los acuerdos establecidos en el presente, y una vez satisfechas las Condiciones de Distribución, la ACT realizará una distribución provisional a los titulares de Reclamaciones de Bonos de la ACT 68 y Reclamaciones de Bonos Prioritarios de la ACT 98 por un importe de Ciento Ochenta y Cuatro Millones Ochocientos Mil Dólares ($184,800,000.00) y Setenta y Nueve Millones Doscientos Mil Dólares ($79,200,000.00), respectivamente, en efectivo, cuyas distribuciones reducirán el monto de capital de dichos Bonos de la ACT 68 y Bonos Prioritarios de la ACT 98, respectivamente, y las correspondientes Reclamaciones de Bonos de la ACT`;

(xxi)   La Orden de Confirmación dispondrá que, como contraprestación por la estructuración de los pagos que se efectuarán a los titulares de Reclamaciones del ELA/ACT, Reclamaciones del ELA/Centro de Convenciones, Reclamaciones Fiscales del ELA/AFI y Reclamaciones del ELA/AMA, una vez satisfechas las Condiciones de Distribución, y de conformidad con los términos y disposiciones de la Sección 6.1(d) del presente, el ELA efectuará pagos a Assured y National por montos de Treinta y Nueve Millones Trescientos Mil Dólares ($39,300,000.00) y Diecinueve Millones Trescientos Mil Dólares

39

($19,300,000.00), respectivamente;

(xxii) El Plan y el Contrato de Emisión de CVI incluirán disposiciones que establezcan que, una vez satisfechas las Condiciones de Distribución, los CVI de Recuperación (*Clawback*) de la ACT se distribuirán a los tenedores de Reclamaciones del ELA/ACT permitidas (incluso las Aseguradoras Monolínea) y los pagos a cuenta de estas se realizarán de acuerdo con los términos del Plan, el Contrato de Emisión de CVI y la sección de la Cascada de Distribución Prioritaria de CVI de Recuperación (*Clawback*) de la ACT del Resumen de Transacción que se adjunta al presente como Anexo "J"; *disponiéndose, sin embargo*, que, hasta la recepción de la Determinación de la Prioridad del Préstamo del BGF, (i) los pagos en efectivo asignables a los Bonos de la ACT 98 estén sujetos a la Reserva de Pagos de CVI, y (ii) los CVI de Recuperación (*Clawback*) de la ACT que de otro modo serían asignables a los tenedores de Reclamaciones Permitidas del ELA/ACT relativas a los Préstamos del BGF para la ACT no se distribuirán a los tenedores de Préstamos del BGF para la ACT; y *disponiéndose, además*, que una vez recibida la Determinación de la Prioridad de los Préstamos del BGF, los fondos de la Reserva de Pagos de CVI y cualquier CVI de Recuperación de la ACT no distribuido se entreguen a los tenedores de Bonos de la ACT y Préstamos del BGF para la ACT, según sea el caso, sobre la base de (i) entre los tenedores de los Bonos de la ACT 98 y los tenedores de los Préstamos del BGF para la ACT, los términos de dicha Determinación de la Prioridad de los Préstamos del BGF, (ii) entre los tenedores de los Bonos de la ACT 68 y los tenedores de los Bonos de la ACT 98, la sección de la Cascada de Distribución Prioritaria de CVI de Recuperación de la ACT del Resumen de Transacción que se adjunta al presente como Anexo "J"; y

(xxiii) El Plan y el Contrato de Emisión de CVI dispondrán que cualquier modificación de la Cascada de Distribución Prioritaria de CVI de Recuperación de la ACT solo requerirá el consentimiento de la Junta de Supervisión y de los Acreedores del AAP Iniciales, siempre que dichas modificaciones no sean materialmente adversas para los titulares de Reclamaciones Permitidas de Bonos de la ACT.

(c) <u>Tratamiento no Tributable de los Nuevos Bonos de la ACT</u>. La Junta de Supervisión y la ACT realizarán todos los esfuerzos razonables para que el pago del capital y los intereses de los Nuevos Bonos de la ACT se consideren exentos de impuestos a efectos de las leyes locales y/o territoriales aplicables y del impuesto federal sobre los ingresos.

Sección 4.10     <u>Creador de Mercado Calificado</u>. No obstante cualquier disposición de este Artículo IV en contrario, (a) un Acreedor del AAP puede Transferir cualquier Interés de la ACT o Interés de la ADCC a un Creador de Mercado Calificado que actúe como tal, sin requerir que dicho Creador de Mercado Calificado sea o se convierta en un Acreedor del AAP; *disponiéndose, sin embargo*, que en caso de que un Creador de Mercado Calificado adquiera dichos Intereses de la ACT, Intereses de la ADCC, en o antes del 27 de abril de 2021, dicho Creador de Mercado Calificado podrá retener dichos Intereses de la ACT, o Intereses de la ADCC, según sea el caso, por un período de ciento veinte (120) días después de la adquisición de dichos Intereses de la ACT o Intereses de la ADCC, según sea el caso; y (b) en la medida en que un Acreedor del AAP actúe en calidad de Creador de Mercado Calificado, podrá transferir los Intereses de la ACT o los Intereses de la ADCC que el Creador de Mercado Calificado adquiera de un tenedor de los Intereses de la ACT o de los Intereses de la ADCC que no sea un Acreedor del AAP, sin necesidad de que el adquirente sea o se convierta en un Acreedor del AAP. Un Creador de Mercado Calificado podrá, con el consentimiento de las Partes del Gobierno, que no se negará de manera no razonable, adherirse a este

Acuerdo únicamente en nombre de una mesa de negociación específica.

Sección 4.11       Litigios relacionados con las Designaciones/Litigios de Uniformidad. Salvo por lo establecido de otra manera en el presente, o a menos que se exija otra cosa para cumplir una orden de un tribunal con jurisdicción competente que no haya sido anulada, revocada o paralizada, una Parte que participe en calidad de demandante en un Litigio relacionado con las Designaciones o el Litigio de Uniformidad no podrá seguir participando en dicho litigio, sino que, en todas las circunstancias, dicha Parte por el presente se compromete y acepta (a) cumplir todas las demás responsabilidades y obligaciones que se establecen en este Acuerdo, incluyendo, entre otras, las demás responsabilidades y obligaciones que se establecen en los Artículos IV y V del presente, y (b) independientemente de la determinación y la emisión de una Orden Definitiva en el marco del Litigio relacionado con las Designaciones o el Litigio de Uniformidad, sea que dicha determinación y Orden Definitiva se dicten antes de que el Tribunal del Título III considere la aprobación o confirmación del Plan o del Plan de la ACT, según sea el caso, o después de que se dicte la Orden de Confirmación o la Orden de Confirmación de la ACT, dicha Parte (i) no argumentará ni aducirá que dicha determinación y Orden Definitiva anula, afecta o de otras formas modifica las transacciones contempladas en el presente y en el Plan o el Plan de la ACT, según proceda, y (ii) en caso de que dicha determinación y Orden Definitiva ocurra antes de la aprobación o confirmación del Plan o del Plan de la ACT, según sea el caso, dicha parte solicitará por escrito que la Junta de Supervisión, según sea modificada, reconstituida o redesignada, (1) exija el cumplimiento de los términos y condiciones de este Acuerdo y del Plan y del Plan de la ACT, y (2) procure sin demora que el Tribunal del Título III confirme el Plan y el Plan de la ACT. Sin perjuicio de lo anterior, durante el período (i) previo a la Fecha de Vigencia del ELA, cualquier Parte que participe en calidad de demandante en un Litigio relacionado con las Designaciones o el Litigio de Uniformidad no tendrá ninguna obligación en virtud del presente de informar al tribunal que esté considerando dicho litigio sobre la suscripción y tramitación de este Acuerdo, y (ii) a partir de la Fecha de Vigencia del ELA, cualquier Parte involucrada en el Litigio relacionado con las Designaciones o el Litigio de Uniformidad buscará la desestimación definitiva de dicho litigio sin derecho a nueva acción.

Sección 4.12       Derecho al voto. Cada una de las Partes reconoce que, a efectos de este Acuerdo, y de cualquier Plan o Plan de la ACT solicitado de acuerdo con las disposiciones de este Acuerdo, y mientras este Acuerdo siga vigente y no sea rescindido de otro modo por Assured y National en lo que respecta a ellos mismos, (a) Assured y National tendrán derecho a votar para aceptar o rechazar el Plan o el Plan de la ACT, según sea el caso, en la medida prevista por los términos y disposiciones de la Sección 301(c)(3) de PROMESA y cualquier otra ley aplicable y documentos rectores a cuenta de los Bonos de la ACT y los Bonos de la ADCC existentes que aseguren, y (b) no se opondrá al derecho de Assured o National a votar para aceptar o rechazar el Plan o el Plan de la ACT, según sea el caso, de acuerdo con la subsección (a) anterior. Para evitar dudas, si el presente Acuerdo deja de estar vigente, todas las Partes del presente se reservan el derecho a solicitar una determinación por parte del Tribunal del Título III con respecto a los derechos de Assured, National y sus respectivos tenedores de bonos asegurados a votar para aceptar o rechazar cualquier Plan o el Plan de la ACT, según sea el caso.

COPIA DE SUSCRIPCIÓN

ARTÍCULO V

PLAN Y APOYO AL PLAN

Sección 5.1  Compromiso de apoyo al Plan. A partir de la fecha del presente, siempre y cuando (a) el presente Acuerdo no haya sido rescindido y (b) ni la Declaración de Divulgación, ni la Declaración de Divulgación de la ACT, ni el Plan, ni el Plan de la ACT ni ninguno de los Documentos Definitivos y los Documentos Definitivos de la ACT propuestos hayan sido presentados, enmendados o modificados de una manera que vaya en contra de lo dispuesto en el presente Acuerdo:

(a)  Plan del ELA: cada uno de los Acreedores del AAP (en la medida en que continúe siendo una Parte) (i) apoyará (A) la aprobación de la Declaración de Divulgación de conformidad con la Sección 1125 del Código de Quiebras, (B) la confirmación del Plan de conformidad con la Sección 314 de PROMESA y la sección 1129 del Código de Quiebras, y (C) a menos que el Tribunal del Título III disponga otra cosa, previa moción presentada por las Partes del Gobierno, una paralización de todos los procedimientos y determinaciones vinculados con las Acciones de Invalidez, las Acciones de Impugnación de Gravámenes, las Objeciones relacionadas con la Deuda, las Acciones de Recuperación, las Mociones de Levantamiento de la Paralización, la Moción de la Sección 926 y el Procedimiento Contencioso, hasta una fecha no anterior a la Fecha de Vigencia, únicamente en lo que respecta a Assured y National; disponiéndose, sin embargo, que un Acreedor del AAP únicamente estará obligado a apoyar el Plan con respecto a las Reclamaciones de los Bonos de la ACT y las Reclamaciones de los Bonos de la ADCC que tenga en su poder y bajo su control, o, en el caso de Assured o National, que posean o aseguren y tengan derecho a voto de acuerdo con los términos de la Sección 301(c)(3) de PROMESA y de cualquier otra ley y documentos rectores aplicables; y disponiéndose además que ninguna disposición del presente limitará o prohibirá a ningún Acreedor del AAP adoptar ninguna medida, o presentar ninguna reclamación o causa de acción, que se vincule con cualquier asunto relacionado exclusivamente con las Aseguradoras Monolínea, ni prohibirá a Assured y National tomar cualquier medida, o hacer valer cualquier reclamación o causa de acción, en relación con cualquier asunto relacionado únicamente con los tenedores de Reclamaciones de Bonos Asegurados de la ACT o Reclamaciones de Bonos Asegurados de la ADCC que estén asegurados por Assured o National, según el caso (lo que incluye, entre otros, la votación de reclamaciones, subrogaciones, aceleraciones, conmutaciones o cualquier otro acto necesario para mantener los beneficios y los derechos que otorgue la póliza de seguro de la Aseguradora Monolínea que corresponda), y (D) la paralización de cualquier acumulación por parte de Assured o de National a las solicitudes de presentación de pruebas notificadas en virtud de la Regla de Quiebras 2004, (ii) tras recibir la Declaración de Divulgación u otros materiales de solicitud con respecto al Plan, en la máxima medida permitida por la ley, votará oportunamente, o dispondrá que se vote, para aceptar el Plan en su capacidad como Tenedor de la ACT, Tenedor de la ADCC o asegurador de Reclamaciones de Bonos Asegurados de la ACT o Reclamaciones de Bonos Asegurados de la ADCC, según corresponda, con derechos de aceptación en virtud de la Orden de la Declaración de Divulgación, según el caso; disponiéndose, sin embargo, que los Acreedores del AAP solamente estarán obligados a votar, o disponer que se vote, para aceptar el Plan con respecto a las Reclamaciones de Bonos de la ACT y las Reclamaciones de Bonos de la ADCC que dicho Acreedor del AAP tenga en su poder o controle o, en el caso de Assured o National, que Assured o

123408529v3

National posean o aseguren y tengan derecho a votar de acuerdo con los términos de la Sección 301(c)(3) de PROMESA y de cualquier otra ley y documentos rectores aplicables, (iii) no cambiará ni anulará (ni dispondrá que se cambie o se anule) ninguno de tales votos, (iv) no dará su consentimiento a, ni votará por, ninguna modificación del Plan, a menos que dicha modificación (Y) no sea perjudicial para los Tenedores de la ACT, los Tenedores de la ADCC, Assured y National, y (Z) no contradiga los términos establecidos en el presente y en el Plan, y (v) no votará ni apoyará ningún plan de ajuste de la ACT o del ELA que no haya sido propuesto o no esté respaldado por las Partes del Gobierno, siempre y cuando ninguna de las Partes del Gobierno haya incurrido en un incumplimiento material de este Acuerdo; disponiéndose, sin embargo, que cada una de las Partes reconoce que cada Reclamación de Bonos Asegurados de la ACT y cada reclamación de Bonos Asegurados de la ADCC se votará de conformidad con los términos de la Sección 301(c)(3) de PROMESA y cualquier otra ley y documento rector que sea de aplicación mientras este Acuerdo siga vigente.

(b) Plan de la ACT: cada uno de los Acreedores del AAP (en la medida en que continúe siendo una Parte) (i) apoyará (A) la aprobación de la Declaración de Divulgación de la ACT de conformidad con la Sección 1125 del Código de Quiebras, (B) la confirmación del Plan de la ACT de conformidad con la Sección 314 de PROMESA y la Sección 1129 del Código de Quiebras, y (C) a menos que el Tribunal del Título III disponga otra cosa, previa moción presentada por las Partes del Gobierno, una paralización de todos los procedimientos y determinaciones vinculados con las Acciones de Invalidez, las Acciones de Impugnación de Gravámenes, las Objeciones relacionadas con la Deuda, las Acciones de Recuperación, las Mociones de Levantamiento de la Paralización, la Moción de la Sección 926 y el Procedimiento Contencioso, hasta una fecha no anterior a la Fecha de Vigencia de la ACT, únicamente en lo que respecta a Assured y National; disponiéndose, sin embargo, que un Acreedor del AAP únicamente estará obligado a apoyar el Plan de la ACT con respecto a las Reclamaciones de los Bonos de la ACT que dicho Acreedor del AAP tenga en su poder y bajo su control, o, en el caso de Assured o National, que posean o aseguren y tengan derecho a voto de acuerdo con los términos de la Sección 301(c)(3) de PROMESA y de cualquier otra ley y documentos rectores aplicables; y disponiéndose, además, que ninguna disposición del presente limitará o prohibirá a ningún Acreedor del AAP adoptar ninguna medida, o presentar ninguna reclamación o causa de acción, que se vincule con cualquier asunto relacionado exclusivamente con las Aseguradoras Monolínea, ni prohibirá a Assured y National tomar cualquier medida, o hacer valer cualquier reclamación o causa de acción, en relación con cualquier asunto relacionado únicamente con los tenedores de Reclamaciones de Bonos Asegurados de la ACT que estén asegurados por Assured o National, según el caso (lo que incluye, entre otros, la votación de reclamaciones, subrogaciones, aceleraciones, conmutaciones o cualquier otro acto necesario para mantener los beneficios y los derechos que otorgue la póliza de seguro de la Aseguradora Monolínea que corresponda), y (D) la paralización de cualquier acumulación por parte de Assured o de National a las solicitudes de presentación de pruebas notificadas en virtud de la Regla de Quiebras 2004, (ii) tras recibir la Declaración de Divulgación de la ACT u otros materiales de solicitud con respecto al Plan, en la máxima medida permitida por la ley, votará oportunamente, o dispondrá que se vote, para aceptar el Plan de la ACT en su capacidad como Tenedor de la ACT, o asegurador de Reclamaciones de Bonos Asegurados de la ACT con derechos de aceptación en virtud de la Orden de la Declaración de Divulgación de la ACT, según el caso; disponiéndose, sin embargo, que los Acreedores del AAP solamente estarán obligados a votar, o disponer que se vote, para aceptar el Plan de la ACT con respecto a las Reclamaciones de Bonos de la ACT que dicho Acreedor del

43

COPIA DE SUSCRIPCIÓN

AAP tenga en su poder o controle, o, en el caso de Assured o National, que Assured o National posean o
aseguren y tengan derecho a votar de acuerdo con los términos de la Sección 301(c)(3) de PROMESA y de
cualquier otra ley y documentos rectores aplicables, (iii) no cambiará ni anulará (ni dispondrá que se
cambie o se anule) ninguno de tales votos, (iv) no dará su consentimiento a, ni votará por, ninguna
modificación del Plan de la ACT, a menos que dicha modificación (Y) no sea perjudicial para los
Tenedores de la ACT, Assured y National, y (Z) no contradiga los términos establecidos en el presente y en
el Plan, y (v) no votará ni apoyará ningún plan de ajuste de la ACT que no haya sido propuesto o no esté
respaldado por las Partes del Gobierno, siempre y cuando ninguna de las Partes del Gobierno haya
incurrido en un incumplimiento material de este Acuerdo; disponiéndose, sin embargo, que cada una de las
Partes reconoce que cada Reclamación de Bonos Asegurados de la ACT se votará de conformidad con los
términos de la Sección 301(c)(3) de PROMESA y cualquier otra ley y documento rector que sea de
aplicación mientras este Acuerdo siga vigente.

Sección 5.2 <u>Solicitud en relación con los Planes.</u> Sin perjuicio de ninguna disposición en contrario en
el presente Artículo V o en alguna otra sección de este Acuerdo, este Acuerdo no es, ni se interpretará
como tal, una solicitud de aceptación del Plan o del Plan de la ACT, según sea el caso. Cada una de las
Partes, por separado y no conjuntamente, reconoce y acepta que (a) no se solicitarán votos sobre el Plan y
el Plan de la ACT, según proceda, hasta que el Tribunal del Título III haya aprobado la declaración de
divulgación y los materiales de propuestas relacionados y las partes que tengan derecho a recibirlos los
hayan recibido, y (b) este Acuerdo no constituye una oferta para emitir o vender títulos a ninguna persona o
entidad, ni la solicitud de una oferta para adquirir o comprar títulos en una jurisdicción donde dicha oferta
o propuesta sería ilícita. SIN PERJUICIO DE LO ANTERIOR, NINGUNA DISPOSICIÓN DEL
PRESENTE OBLIGARÁ A NINGUNA DE LAS PARTES A REALIZAR NINGUNA ACCIÓN
PROHIBIDA POR PROMESA, LA LEY DE VALORES DE 1933, CON SUS ENMIENDAS, LA LEY
DE INTERCAMBIO DE VALORES DE 1934, CON SUS ENMIENDAS, CUALQUIER NORMA O
REGLAMENTO APROBADO EN VIRTUD DE ESTAS, O POR CUALQUIER OTRA LEY O
REGLAMENTO APLICABLE O POR CUALQUIER ORDEN O INSTRUCCIÓN DE CUALQUIER
TRIBUNAL O CUALQUIER AUTORIDAD GUBERNAMENTAL ESTATAL O FEDERAL.

Sección 5.3 <u>Fideicomisos de custodia/Aceleración/Conmutación del seguro.</u> Con sujeción a (a) los
términos y disposiciones establecidos en el Artículo VII del presente, incluyendo, entre otros, la rescisión
de este Acuerdo por parte de Assured y/o National, y (b) todas las pólizas de seguro y los acuerdos
relacionados con los Bonos Asegurados de Assured y los Bonos Asegurados de National que estén
plenamente vigentes, sin incumplimientos de pago por parte de Assured o National con respecto a dichos
Bonos Asegurados de Assured y los Bonos Asegurados de National, respectivamente, hasta la Fecha de
Vigencia del ELA o la Fecha de Vigencia de la ACT, según sea el caso, inclusive, (i) el Plan contendrá una
disposición que establezca que (A) el pago del capital de los Bonos GO, los Bonos AEP y los Bonos de la
ADCC asegurados por Assured se acelere a partir de la Fecha de Vigencia del ELA, (B) los Bonos GO, los
Bonos AEP y los Bonos de la ADCC asegurados por Assured son pagaderos a partir de la Fecha de
Vigencia del ELA a un "precio de aceleración" del cien por cien (100%) del monto de capital de estos <u>más</u>
los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el importe compuesto
de estos) hasta la fecha de pago, (C) el pago del capital de los Bonos GO y de los Bonos AEP asegurados
por National se acelera a partir de la Fecha de Vigencia del ELA, y (D) los Bonos GO y los Bonos AEP
asegurados por National son pagaderos a partir de la Fecha de Vigencia del ELA a un "precio de

44

aceleración" del cien por cien (100%) del monto de capital de estos más los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el importe compuesto de estos) hasta la fecha de pago, (ii) el Plan de la ACT contendrá una disposición que establezca que (A) el pago del capital de los Bonos de la ACT asegurados por Assured se acelere a partir de la Fecha de Vigencia de la ACT, (B) los Bonos de la ACT asegurados por Assured son pagaderos a partir de la Fecha de Vigencia de la ACT a un "precio de aceleración" del cien por cien (100%) del monto de capital de estos más los intereses devengados (o, en el caso de los bonos de apreciación de capital, el importe compuesto de estos) hasta la fecha de pago, (C) el pago del capital de los Bonos de la ACT asegurados por National se acelera a partir de la Fecha de Vigencia de la ACT, y (D) los Bonos de la ACT asegurados por National son pagaderos a partir de la Fecha de Vigencia de la ACT a un "precio de aceleración" del cien por cien (100%) del monto de capital de estos más los intereses devengados (o, en el caso de cualquier bono de apreciación de capital, el importe compuesto de los mismos) hasta la fecha de pago, y (iii) el Plan y el Plan de la ACT incluirán, según proceda, disposiciones relativas a (A) la implementación de fideicomisos de custodia en relación con las distribuciones que se harán a los tenedores de Bonos Asegurados de Assured y Bonos Asegurados de National, y (B) una propuesta a los tenedores aplicables de Bonos Asegurados de Assured y Bonos Asegurados de National, en relación con la resolución de las reclamaciones de dichos tenedores con respecto a las pólizas de seguro aplicables, cuyas disposiciones serán razonablemente satisfactorias de forma y de fondo para la Junta de Supervisión y, en la medida aplicable, para Assured y National. Dichas propuestas podrán adoptar la forma de una o varias operaciones de conmutación; disponiéndose, sin embargo, que ningún tenedor de Bonos Asegurados de Assured y Bonos Asegurados de National estará obligado a aceptar ninguna de dichas propuestas de conmutación de las respectivas pólizas de emisión.

## ARTÍCULO VI

## COSTOS DE PERFECCIONAMIENTO Y HONORARIOS DE RESTRICCIÓN

Sección 6.1   Costos de Perfeccionamiento y Honorario de Restricción del AAP. Con sujeción a los términos y condiciones del presente y del Plan y del Plan de la ACT, los Costos de Perfeccionamiento y los Honorario de Restricción del AAP, cada uno de los cuales devengará por completo en la fecha del presente o en la fecha de suscripción del Acuerdo de Acumulación para los Acreedores del AAP Iniciales o los Acreedores de Acumulación, según el caso, se pagarán en la Fecha de Vigencia del ELA o la Fecha de Vigencia de la ACT, de conformidad con los términos y condiciones establecidos en el Plan, la Orden de Confirmación, el Plan de la ACT y la Orden de Confirmación de la ACT.

(a)   Costos de perfeccionamiento. En contraprestación por los honorarios y los gastos en que los Acreedores del AAP Iniciales incurran en relación con (i) las Reclamaciones de Bonos de la ADCC, la negociación y suscripción de este Acuerdo y la obtención de la aprobación de la Declaración de Divulgación y la confirmación del Plan, y (ii) las Reclamaciones de Bonos de la ACT, la negociación y suscripción de este Acuerdo y la tramitación y confirmación del Plan de la ACT y la aprobación de la Declaración de Divulgación de la ACT con respecto a este, cada Acreedor Inicial del AAP tendrá derecho a recibir en la Fecha de Vigencia del ELA o en la Fecha de Vigencia de la ACT, según sea el caso, en la forma de una reclamación autorizada por gastos administrativos, en función de sus respectivas posiciones (aseguradas o no y, con respecto a Assured y National, incluidas las posiciones que posean o hayan asegurado), a las 5:00 p.m. (horario de verano del Este) de la fecha del presente, una porción prorrateada en

efectivo de los Costos de Perfeccionamiento de la ACT y los Costos de Perfeccionamiento de la ADCC, según proceda.

(b) <u>Honorario de restricción de la ACT</u>. A cambio de la suscripción de este Acuerdo, y de conformidad con todos sus términos y condiciones, incluyendo la aceptación de un "bloqueo" de sus bonos de acuerdo con los términos del presente Acuerdo, sujeto al registro de la Orden de Confirmación de la ACT, cada Acreedor de los Honorarios de Restricción del AAP que sean tenedores o aseguradores de los Bonos de la ACT 68 o de los Bonos Prioritarios de la ACT 98 (incluyendo a Assured y National, en la medida en que Assured o National, según proceda, esté autorizado a votar por tales Reclamaciones Aseguradas de la ACT de acuerdo con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable) tendrán derecho a recibir el Honorario de Restricción de la ACT bajo la forma de una reclamación permitida de gastos administrativos, pagadera en efectivo, en el momento del perfeccionamiento del Plan de la ACT por un monto equivalente al Porcentaje del Honorario de Restricción de la ACT multiplicado por el monto global de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios de la ACT 98 (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por Aseguradoras Monolínea, únicamente si dicho Acreedor del Honorario de Restricción del AAP está autorizado a votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable), mantenidos o, en el caso de Assured o National mantenidos o asegurados, por el Acreedor del Honorario de Restricción del AAP cuando expire el Período del Honorario de Restricción del AAP; <u>disponiéndose, sin embargo</u>, que cada Acreedor del Honorario de Restricción del AAP que adquiera cualquier Bono de la ACT 68 y/o Bonos Prioritarios de la ACT 98 después de la Fecha Límite de la Acumulación (incluyendo (i) un tenedor de un Bono de la ACT asegurado por una Aseguradora Monolínea (salvo un bono de la ACT Asegurado por una Aseguradora Monolínea asegurado por Assured o National, según sea el caso), en la medida en que dicho Acreedor del Honorario de Restricción del AAP esté autorizado para votar por la reclamación con respecto a dicho Bono de la ACT asegurado por una Aseguradora Monolínea de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable y (ii) Assured y National, en la medida en que Assured o National, según corresponda, estén autorizados a votar por dichas Reclamaciones de Bonos Asegurados de la ACT en virtud de la sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable), tendrá derecho a recibir un Honorario de Restricción de AAP equivalente al Porcentaje del Honorario de Restricción multiplicado por el monto global de las Reclamaciones de Bonos de la ACT 68 y las Reclamaciones de Bonos Prioritarios de la ACT 98 (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por Aseguradoras Monolínea, únicamente si dicho Acreedor del AAP está autorizado a votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable) en poder de tal Acreedor del Honorario de Restricción del AAP en la Fecha de Umbral del AAP atribuible a las Reclamaciones de Bonos de la ACT y el registro de la orden de confirmación, lo que ocurra primero; y <u>disponiéndose además</u>, que, si un Acreedor del Honorario de Restricción del AAP vende cualquiera de los Bonos de la ACT 68 o Bonos Prioritarios de la ACT 98 por los que habría tenido derecho a recibir el Honorario de Restricción del AAP, la parte compradora no tendrá derecho a recibir el Honorario de Restricción del AAP por motivo de dicha venta y tal derecho permanecerá con la parte vendedora; y <u>disponiéndose además</u>, que en todas las circunstancias la suma del total del Honorario de Restricción del AAP <u>más</u> los Costos de Perfeccionamiento atribuibles a las Reclamaciones de Bonos de la ACT 68 o

Reclamaciones de Bonos Prioritarios de la ACT 98 de un Tenedor de la ACT, según sea el caso, no excederá la cifra de Ciento Veinticinco Millones de Dólares ($125,000,000.00); y disponiéndose además, que en caso de que este Acuerdo sea rescindido de conformidad con los términos de las Secciones 7.1(b)(iii) o (c) del presente (de conformidad con la extensión que establecen las Secciones 7.1(b) o (c) del presente), o si la Junta de Supervisión rescinde este Acuerdo por cualquier motivo que no sea (i) un incumplimiento de este Acuerdo por parte de una parte no gubernamental, (ii) que el Tribunal del Título III deniegue la confirmación del Plan de la ACT (o el Tribunal del Título III emita una decisión o manifieste su posición de que denegará la confirmación si no se modifica el Plan o el Plan de la ACT, y dicha modificación habría tenido un efecto material adverso sobre la capacidad de las Partes para perfeccionar el Plan o el Plan de la ACT en términos compatibles con este Acuerdo, incluyendo, entre otros, los términos establecidos en el Resumen de Transacción que se adjunta al presente como Anexo "J"), (iii) la Legislación de CVI y la Ley de Responsabilidad de la Deuda no se aprueban antes del inicio de la vista para considerar la confirmación del Plan, o (iv) se dicta una orden con respecto a uno o más de los asuntos establecidos en la Sección 7.1(b)(ii) del presente, la suma global del Honorario de Restricción del AAP y los Costos de Perfeccionamiento por un importe de Veinte Millones de Dólares ($20,000,000.00) se pagarán de manera prorrateada y en efectivo con reclamación de gastos administrativos de conformidad con un plan de ajuste para la ACT a los Acreedores del AAP Iniciales en la fecha de rescisión; y disponiéndose, además, que en toda otra circunstancia, al momento de la rescisión del Acuerdo, incluyendo, entre otros, la rescisión del Acuerdo de conformidad con otras disposiciones de la Sección 7.1 del presente, no deberá pagarse ningún Costo de Perfeccionamiento u Honorario de Restricción del AAP a la Parte de este Acuerdo que lo rescinda o contra la Parte de este Acuerdo con respecto a la cual se rescinda este Acuerdo.

(c) Honorario de restricción de la ADCC. A cambio de la suscripción de este Acuerdo, y de conformidad con todos sus términos y condiciones, incluyendo la aceptación de un "bloqueo" de sus bonos de acuerdo con los términos del presente Acuerdo, sujeto al registro de la Orden de Confirmación, cada Acreedor de los Honorarios de Restricción del AAP que sean tenedores o aseguradores de Bonos de la ADCC (incluyendo (i) un tenedor de un Bono de la ADCC asegurado por una Aseguradora Monolínea (salvo un bono de la ADCC Asegurado por una Aseguradora Monolínea asegurado por Assured o National, según sea el caso), en la medida en que dicho Acreedor del Honorario de Restricción del AAP esté autorizado para votar por la reclamación con respecto a dicho Bono de la ADCC asegurado por una Aseguradora Monolínea de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable y (ii) Assured y National, en la medida en que Assured o National, según corresponda, estén autorizados a votar por dichas Reclamaciones de Bonos Asegurados de la ADCC en virtud de la sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable), tendrá derecho a recibir un Honorario de Restricción de AAP en forma de una reclamación permitida de gastos administrativos, pagadera en efectivo, en el momento del perfeccionamiento del Plan por un monto equivalente al Porcentaje del Honorario de Restricción de la ADCC multiplicado por el monto global de las Reclamaciones de Bonos de la ADCC (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por Aseguradoras Monolínea, únicamente si dicho Acreedor del Honorario de Restricción del AAP está autorizado a votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable) mantenidos, o en el caso de Assured o National mantenidos y asegurados por tal Acreedor del Honorario de Restricción del AAP en el momento de la expiración del Período del Honorario de Restricción del AAP; disponiéndose, sin embargo, que cada

47

Acreedor del Honorario de Restricción del AAP que adquiera cualquier Bono de la ADCC después de la Fecha Límite de la Acumulación (incluyendo (i) un tenedor de un Bono de la ADCC asegurado por una Aseguradora Monolínea (salvo un bono de la ADCC Asegurado por una Aseguradora Monolínea asegurado por Assured o National, según sea el caso), en la medida en que dicho Acreedor del Honorario de Restricción del AAP esté autorizado para votar por la reclamación con respecto a dicho Bono de la ADCC asegurado por una Aseguradora Monolínea de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable, y (ii) Assured y National, en la medida en que Assured o National, según corresponda, estén autorizados a votar por dichas Reclamaciones de Bonos Asegurados de la ADCC en virtud de la sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable), tendrá derecho a recibir un Honorario de Restricción del AAP equivalente al Porcentaje del Honorario de Restricción de la ADCC multiplicado por el monto global de las Reclamaciones de Bonos de la ADCC (sin duplicación y, en la medida en que dichas reclamaciones estén aseguradas por Aseguradoras Monolínea, únicamente si dicho Acreedor del AAP está autorizado a votar dicha reclamación de conformidad con la Sección 301(c)(3) de PROMESA, los documentos definitivos de seguro y la ley aplicable) en poder del tal Acreedor del Honorario de Restricción del AAP en la Fecha de Umbral del AAP y el registro de la orden de confirmación, lo que ocurra primero; y disponiéndose además, que, si un Acreedor del Honorario de Restricción del AAP vende cualquiera de los Bonos de la ADCC por los que habría tenido derecho a recibir el Honorario de Restricción del AAP, la parte compradora no tendrá derecho a recibir el Honorario de Restricción del AAP por motivo de dicha venta y tal derecho permanecerá con la parte vendedora; y disponiéndose además, que en todas las circunstancias la suma del total del Honorario de Restricción del AAP más los Costos de Perfeccionamiento atribuibles a las Reclamaciones de Bonos de la ADCC de un Tenedor de la ADCC, no excederá la cifra de Quince Millones de Dólares ($15,000,000.00); y disponiéndose además, que en caso de que este Acuerdo sea rescindido de conformidad con los términos de las Sección 7.1 del presente, no se pagarán Costos de Perfeccionamiento o el Honorario de Restricción del AAP adeudados a un Tenedor de la ADCC o Assured con respecto a dichas reclamaciones de Bonos de la ADCC.

   (d) Honorarios de Estructuración de Recuperación. A cambio de la suscripción de este Acuerdo, tras acordar regirse por todos sus términos y condiciones, y estructurar los pagos que se deben realizar de conformidad con el Resumen de Transacción que se adjunta al presente como Anexo "J", con sujeción a la emisión de la Orden de Confirmación de la ACT, en la Fecha de Vigencia de la ACT, Assured y National tendrán derecho a recibir, y el ELA deberá pagar, en efectivo, a Assured y National un importe de Treinta y Nueve Millones  Trescientos Mil Dólares ($39,300,000.00) y Diecinueve Millones Trescientos Mil Dólares ($19,300,000.00), respectivamente. En caso de que el presente Acuerdo sea rescindido por Assured o por National de conformidad con lo dispuesto en el Artículo VII del presente, dicha Parte no tendrá derecho al pago de un Honorario de Estructuración de Recuperación.

## ARTÍCULO VII

## RESCISIÓN

Sección 7.1  Rescisión del Acuerdo

(a)  El presente Acuerdo puede ser rescindido por cualquier Acreedor del AAP, únicamente en lo que respecta a sí mismo, a su exclusivo criterio y mediante notificación por escrito a las otras Partes, en caso de que (i) la Junta de Supervisión incumpla cualquiera de los pactos respectivos que figuran en el Artículo IV del presente o cualquiera de los compromisos del presente Acuerdo (salvo la falta de acuerdo por parte de la Junta de Supervisión con Assured y National con respecto al Plan de la ACT, la Orden de Confirmación de la ACT, el Contrato de Emisión de los Nuevos Bonos de la ACT, la Documentación del Fideicomiso y los Documentos del Fideicomiso de Custodia anteriores a la Fecha de Entrada en Vigencia del ELA, siempre que la Junta de Supervisión haya realizado los mejores esfuerzos razonables y haya negociado de buena fe de manera oportuna con Assured y National), si dicho incumplimiento tiene o habría tenido un impacto económico o legal adverso sobre dicho Acreedor del AAP, incluyendo un impacto económico adverso sobre el tratamiento recibido por dicho Acreedor del AAP conforme al Plan o al Plan de la ACT (incluyendo cualquier transacción aplicable conforme al Plan o el Plan de la ACT o cambios en las protecciones legales estipuladas en la Sección 4.9(b) del presente), o cambios en los flujos de caja de los Nuevos Bonos de la ACT a los que se hace referencia en los anexos del Plan de la ACT, los términos y la estructura de los CVI establecidos en el Plan o a la definición o el cálculo de los Costos de Perfeccionamiento o los Honorarios de Restricción del AAP que tendrían un impacto económico o legal adverso sobre dicho Acreedor del AAP, (ii) la Junta de Supervisión presenta una moción o escrito ante el Tribunal del Título III, en cada caso, que sea incompatible con el presente Acuerdo, incluyendo el Plan y el Plan de la ACT en cualquier aspecto económico o legal adverso (incluyendo el tratamiento conforme al Plan o al Plan de la ACT, o cualquier transacción aplicable conforme al Plan o al Plan de la ACT, o cambio en los flujos de caja para los Nuevos Bonos de la ACT a los que se hace referencia en los anexos del Plan de la ACT, los términos y la estructura de los CVI estipulados en el Plan, o en la definición o el cálculo de los Costos de Perfeccionamiento o los Honorarios de Restricción del AAP) antes de (y) cinco (5) Días Hábiles después de que la Junta de Supervisión reciba notificación por escrito de otra Parte (de acuerdo con las disposiciones de notificación que se estipulan en la Sección 8.11 del presente) de que dicha moción o escrito es incompatible con este Acuerdo en tal aspecto económico o legal adverso y (z) la presentación de una orden del Tribunal del Título III que apruebe dicha moción o escrito, lo que ocurra primero, (iii) la presentación de una Orden Definitiva en los Procedimientos de PROMESA ha tenido un efecto adverso material sobre la compatibilidad del Plan o el Plan de la ACT, (iv) la Legislación de los CVI y la Ley de Responsabilidad de la Deuda no se aprueban antes del comienzo de la vista para analizar la confirmación del Plan, (v) el AAP del ELA se ha rescindido con respecto a todas las Partes del presente, (vi) la ACT no realiza los pagos dispuestos en la Sección 4.9(b)(xxi) del presente, o (viii) el ELA no realiza el pago dispuesto en la Sección 4.9(b)(xxi) del presente.

(b)  El presente Acuerdo puede ser rescindido en cualquier momento antes de la Fecha de Entrada en Vigencia de la ACT con respecto a todas las Partes del presente por la Junta de Supervisión, o por una acción conjunta de Assured y National en caso de que (i) cualquier otra Parte haya incumplido cualquiera de sus respectivos pactos estipulados en el Artículo IV del presente o cualquiera de sus otros compromisos del presente Acuerdo, y dicho incumplimiento tiene un efecto material adverso sobre la conformidad del Plan o del Plan de la ACT, según sea el caso (tal como lo determinen de manera conjunta las Partes del Gobierno, Assured y National), (ii) se presenta una orden del tribunal, y dicha orden no es revertida o resuelta consensualmente de otra manera de forma satisfactoria para las Partes del Gobierno, y dicha orden a la luz de la totalidad de las circunstancias tiene un efecto adverso material sobre la conformidad del Plan

o hace que el Perfeccionamiento del Plan resulte impracticable; _disponiéndose, sin embargo_, que, en caso de que el tratamiento a aplicarse con respecto a las Reclamaciones de los Bonos de la ADCC haga que el Plan no pueda confirmarse, la Junta de Supervisión puede eliminar la ADCC y el tratamiento de las Reclamaciones de Bonos de la ADCC del Plan, siempre que la Junta de Supervisión y Assured hayan acordado una metodología alternativa para proporcionar el mismo tratamiento económico contemplado por las Reclamaciones de los Bonos de la ADCC en este Acuerdo y el Resumen de Transacción adjunto al presente como Anexo "J" y dicha acción no dará lugar a un derecho de rescisión de este Acuerdo con respecto a ninguna de las Partes, (iii) el AAP del ELA se ha rescindido con respecto a todas las partes de este, (iv) el Tribunal del Título III u otro tribunal con jurisdicción competente presenta una Orden Definitiva que deniegue la confirmación del Plan, (v) la situación económica del ELA sufre un cambio material adverso que, a la luz de la totalidad de las circunstancias, hace que la confirmación del Plan no sea posible o que el perfeccionamiento del Plan sea impracticable, (vi) la Ley de Responsabilidad de la Deuda, tal como se la ha aprobado, no contiene el Tope Global, tal como se estipuló en el Plan, (vii) la Legislación de los CVI y la Ley de Responsabilidad de la Deuda no se aprueban antes del comienzo de la vista realizada para analizar la confirmación del Plan; _disponiéndose, sin embargo_, que el derecho de la Junta de Supervisión de rescindir el presente Acuerdo conforme a la subsección (vii) no podrá ejercerse antes del 31 de diciembre de 2021, o (viii) un tribunal de jurisdicción competente emite una decisión, sentencia u orden que hace que el perfeccionamiento del Plan resulte ilegal, o que lo impida o prohíba de otra manera, y que dicha decisión, sentencia u orden no se anule o revierta dentro de sesenta (60) días calendario después de su emisión, y no se vea sujeta a una paralización.

(c)   Sin limitación de los derechos de Assured y National conforme a cualquier otra disposición del presente Acuerdo, Assured y National, indistintamente, pueden, a su exclusivo criterio, rescindir este Acuerdo con respecto a sí mismos si (i) la Junta de Supervisión (A) modifica cualquiera de las disposiciones del Plan o del Plan de la ACT y si dicha modificación tiene un impacto económico o legal adverso sobre el tratamiento concedido a cualquier Tenedor de la ACT, Tenedor de la ADCC, Assured o National, según corresponda, sobre el Plan o el Plan de la ACT, (B) presenta un plan de ajuste en el Procedimiento de PROMESA del ELA que sea económicamente incompatible con el tratamiento que se estipula en el Plan (incluyendo, entre otros, cualquier modificación de las protecciones legales estipuladas en la Sección 4.9(b) del presente; _disponiéndose, sin embargo_, que, en caso de que el tratamiento a aplicarse con respecto a las Reclamaciones de los Bonos de la ADCC haga que el Plan no pueda confirmarse, la Junta de Supervisión puede eliminar la ADCC y el tratamiento de las Reclamaciones de Bonos de la ADCC del Plan, siempre que la Junta de Supervisión y Assured hayan acordado una metodología alternativa para proporcionar el mismo tratamiento económico contemplado por las Reclamaciones de los Bonos de la ADCC en este Acuerdo y el Resumen de Transacción anexado al presente como Anexo "J" y dicha acción no dará lugar a un derecho de rescisión de este Acuerdo por Assured o National, o (C) presenta el Plan de la ACT y dicho plan de ajuste y las características de diseño de los valores de los Nuevos Bonos de la ACT no fueran compatibles con el tratamiento estipulado en el Anexo "J" del presente), en cada caso, sin el consentimiento de Assured y National; y _disponiéndose, además_, que para evitar dudas, Assured y National no tendrán derecho a rescindir el presente Acuerdo con el argumento de que el Plan de la ACT no ha sido presentado o confirmado por el Tribunal del Título III para una fecha determinada.

(d)   La paralización automática conforme a las Secciones 362 y 922 del Código de Quiebras, aplicable

COPIA DE SUSCRIPCIÓN

a los Procedimientos de PROMESA conforme a la Sección 301 de PROMESA, no representarán una prohibición para que cualquiera de las Partes tome las medidas necesarias para efectuar la rescisión del presente Acuerdo a tenor con y de acuerdo con los términos del presente.

(e)  El presente Acuerdo se rescindirá automáticamente con respecto a toda las Partes una vez que se produzca la Fecha de Entrada en Vigencia de la ACT, salvo con respecto a cualquier acción de las Partes que según se disponga expresamente en el presente deba ocurrir antes de la Fecha de Entrada en Vigencia de la ACT, disponiéndose, sin embargo, que para todos los fines de esta Sección 7.1, el tratamiento a darse a todas las clases de reclamaciones que no sean las descritas en el Anexo "J" del presente no constituya un impacto económico o legal adverso sobre cualquier Acreedor del AAP; y disponiéndose, además, que, en caso de que Assured o National rescinda este Acuerdo únicamente con respecto a sí mismo, ni Assured ni National pueden objetar la confirmación del Plan y el Plan de la ACT, ni oponerse de otra manera a cualquier moción o aplicación sobre la base del pago de los Costos de Perfeccionamiento o los Honorarios de Restricción del AAP dispuestos por el Artículo VI del presente, el Plan y el Plan de la ACT.

Sección 7.2  Efectos de la rescisión. Salvo si se dispone lo contrario en el presente, en caso de la rescisión de este Acuerdo con respecto a cualquiera de las Partes, (a) el presente Acuerdo será nulo y sin valor y se considerará que no tiene vigencia ni efecto, sin que medie responsabilidad alguna de dicha Parte o cualquiera de sus entidades vinculadas (o cualquiera de sus respectivos directores, funcionarios, empleados, consultores, contratistas, clientes asesores, agentes, asesores legales o financieros u otros representantes de dicha Parte o sus entidades vinculadas), (b) dicha Parte no tendrá obligaciones hacia ninguna otra Parte emergentes de, y no tendrá otros derechos, beneficios o privilegios de acuerdo con, el presente Acuerdo (incluyendo, entre otros, cualquier derecho a los Costos de Perfeccionamiento o el Honorario de Restricción del AAP, salvo según se disponga de acuerdo con las disposiciones del Plan y el Plan de la ACT), salvo por las obligaciones y/o las disposiciones que se estipulan en las Secciones 2.1, 6.1(b), 7.1, 7.3, 8.3, 8.4, 8.8, 8.13 y 8.15 del presente y esta cláusula (b) de la Sección 7.2, siendo que dichas disposiciones están destinadas a conservar su validez después de la extinción o rescisión del presente Acuerdo y continuarán teniendo plena vigencia y efecto de acuerdo con los términos del presente; disponiéndose, sin embargo, que cualquier responsabilidad de una de las Partes a causa del incumplimiento de los términos del presente Acuerdo ocurrido antes de la fecha de dicha rescisión o extinción continúe después de dicha rescisión o extinción, y (c) dicha Parte tendrá todos los derechos y remedios que hubiera tenido, y tendrá derecho a tomar todas las medidas que hubiera tenido derecho a tomar en caso de no haber celebrado este Acuerdo, y no se considerará que hay renuncia a ninguno de estos derechos a tenor de una reclamación basada en los principios de prescripción liberatoria o de actos propios, y las Partes acuerdan renunciar, y no invocar como defensa, las leyes de prescripción aplicables para cualquier reclamación, litigio, procedimiento, acción o cuestión contra otra Parte impedidos por este Acuerdo como si dichas leyes de prescripción se hubieran suspendido durante el período en que este Acuerdo fue vinculante para la Parte que presente una tal reclamación, litigio, procedimiento, acción o cuestión; disponiéndose, sin embargo, que en ningún caso dicha rescisión relevará a dicha Parte de la responsabilidad por su incumplimiento o falta de ejecución de sus obligaciones en virtud del presente antes de la fecha de dicha rescisión o extinción; y disponiéndose además que a menos que el Tribunal del Título III ordene lo contrario, al recibir notificación a dicha Parte que rescinde, todos los consentimientos, papeletas de voto y votos dados por dicha Parte antes de dicha extinción o rescisión se considerarán, para todos los fines, automáticamente nulas y sin valor ab initio, y no serán consideradas ni usadas de ninguna manera por las Partes en relación

51

con el Plan, el Plan de la ACT, el presente Acuerdo o de otra manera; y _disponiéndose además_ que la rescisión de este Acuerdo no tendrá efecto algunos sobre los derechos concedidos conforme al AAP del ELA o cualquier derecho o beneficio relacionado emergente del Plan. Salvo en relación con una disputa que involucre el incumplimiento de este Acuerdo o la interpretación de los términos de este en el momento de la rescisión, (y) ni este Acuerdo ni ninguno de los términos o disposiciones que se estipulan en el presente será admisible en ninguna disputa, litigio, procedimiento o controversia entre las Partes, y ninguna disposición del presente constituirá ni se interpretará como una admisión de cualquiera de las Partes con respecto a cualquier tema, entendiéndose que las declaraciones y resoluciones que se incorporan en el presente fueron el resultado de negociaciones y concesiones de las posiciones respectivas de las Partes, y (z) ninguna de las Partes procurará usar este Acuerdo como prueba ni admitirá este Acuerdo ni ninguna parte de este como prueba contra ninguna de las otras Partes del presente.

Sección 7.3  _Obligaciones posteriores a la Fecha de Entrada en Vigencia._ Además de las obligaciones y disposiciones que figuran en la Sección 7.2(b) del presente, que continuarán siendo válidas después de la extinción del presente, las obligaciones y/o disposiciones que se estipulan en las Secciones 4.1(e), 4.1(f), 4.2(d) y 4.2(e) conservarán su validez después de la extinción automática de este Acuerdo a tenor con la Sección 7.1(e) del presente.

ARTÍCULO VIII

DISPOSICIONES VARIAS

Sección 8.1  _Enmiendas._ El presente Acuerdo no podrá ser modificado, enmendado ni suplementado, salvo mediante acuerdo por escrito firmado por las Partes del Gobierno que son Partes del presente, Assured y National; _disponiéndose, sin embargo_, que cualquier modificación, enmienda o suplemento que tenga un impacto económico o legal adverso sobre un Acreedor del AAP, incluyendo el cambio del tratamiento concedido a dicho Acreedor del AAP conforme al Plan (incluyendo cualquier transacción aplicable conforme al Plan) o el cambio de los flujos de caja o protecciones legales propuestas para los Nuevos Bonos GO o CVI o la definición o cálculo de los Costos de Perfeccionamiento, o el Honorario de Restricción del AAP de una manera que tendría un impacto económico adverso para dicho Acreedor del AAP, debe ser acordado por escrito por cada uno de los Acreedores del AAP iniciales. No obstante lo anterior y los términos y disposiciones de las Secciones 4.5(a) y 4.6(a) del presente, y sin el consentimiento o la aprobación de Assured y National, a partir de y después de la fecha del presente hasta la Fecha Límite de la Acumulación, la Junta de Supervisión puede buscar partes adicionales para que sean signatarias del presente con sujeción a todos los términos del presente, incluyendo, entre otros, los términos y condiciones estipulados en los apéndices, anexos y suplementos del presente; _disponiéndose, sin embargo_, que, no obstante las disposiciones de la presente Sección 8.1, a menos que una modificación, enmienda o suplemento tenga un impacto económico o legal adverso sobre un Acreedor del AAP, la Junta de Supervisión puede enmendar o modificar de otra manera los términos del presente sin el consentimiento de dichas partes adicionales, siempre que se obtenga el consentimiento previo por escrito de Assured y National; y, _disponiéndose además_ que tales partes adicionales deben firmar y entregar a los abogados de la Junta de Supervisión el formulario del Acuerdo de Anexación que se adjunta al presente como Anexo "I"; y, _disponiéndose además_ que bajo ninguna circunstancia se podrán modificar, enmendar ni suplementar las disposiciones de la Sección 6.1(a) sin el consentimiento expreso por escrito de los Acreedores del AAP

52

Iniciales a la fecha de este Acuerdo.

Sección 8.2 <u>Naciones más favorecidas.</u> No obstante cualquier disposición en sentido contrario del presente, en caso de que la Junta de Supervisión celebre cualquier acuerdo que disponga (o que el Plan o el Plan de la ACT dispongan) la transacción o el tratamiento del Plan o del Plan de la ACT que sea más favorable económicamente (a) para cualquier Reclamación de Bonos de la ADCC, o Reclamación del ELA/Centro de Convenciones (para evitar dudas, se incluyen las Reclamaciones de Bonos Asegurados de la ADCC o las Reclamaciones Aseguradas del ELA/Centro de Convenciones) que el tratamiento estipulado en el Resumen de Transacción para cualquier otra Reclamación de Bonos de la ADCC o Reclamación del ELA/Centro de Convenciones, entonces el tratamiento estipulado en el Resumen de Transacción será modificado para igualar el provisto para dicha Reclamación de Bonos de la ADCC o Reclamación del ELA/Centro de Convenciones, (b) para cualquier Reclamación de Bonos de la ACT o Reclamación del ELA/ACT (para evitar dudas, se incluyen las Reclamaciones de Bonos Asegurados de la ACT o las Reclamaciones Aseguradas del ELA/ACT), que el tratamiento estipulado en el Resumen de Transacción para cualquier otra Reclamación de Bonos de la ACT o Reclamación del ELA/ACT, entonces el tratamiento estipulado en el Resumen de Transacción será modificado para igualar el provisto para dicha Reclamación de Bonos de la ACT o Reclamación del ELA/ACT, (c) para cualquier Reclamación emergente de o relacionada con la deuda emitida por la AFI conforme al Acuerdo de Fideicomiso de fecha 1 de octubre de 1988, entre la AFI y U.S. Bank Trust National Association, como fideicomisario sucesor, con sus enmiendas (las "**Reclamaciones de Bonos de la AFI**"), o una Reclamación de Impuesto al Ron del ELA/AFI (para evitar dudas, se incluyen las Reclamaciones Aseguradas de Bonos de la AFI o las Reclamaciones Aseguradas de Impuesto al Ron del ELA/AFI), que el tratamiento estipulado en el Resumen de Transacción para cualquier otra Reclamación de Bonos de la AFI o Reclamación de Impuesto al Ron del ELA/AFI, entonces el tratamiento estipulado en el Resumen de Transacción será modificado para igualar el provisto para dicha Reclamación de Bonos de la AFI o Reclamación de Impuesto al Ron del ELA/AFI, o (d) para cualquier Aseguradora Monolínea, o tenedor de una Reclamación de Bonos Asegurados o una Reclamación de Bonos Asegurados de la AFI que el tratamiento dispuesto en el presente y estipulado en el Resumen de Transacción o conforme al Plan o el Plan de la ACT para Assured, National, o cualquier tenedor de Reclamaciones de Bonos Asegurados o Reclamación de Bonos Asegurados de la AFI asegurados por Assured o National, entonces el tratamiento provisto a Assured, National y los tenedores de Reclamaciones de Bonos Asegurados de la ACT, Reclamaciones de Bonos Asegurados de la ADCC o Reclamaciones de Bonos Asegurados de la AFI asegurados por Assured o National, según sea el caso, se modificarán para igualar dicho mejor tratamiento; <u>disponiéndose, sin embargo</u>, que el tratamiento de las "Reclamaciones de conveniencia" consuetudinarias, tal como se definen en el Plan, deberán estar exentas de esta disposición; y, <u>disponiéndose además</u>, que el pago de cualquier prima pagada a una Aseguradora Monolínea en relación con la provisión de seguro con respecto a la refinanciación de cualquier Nuevo Bono de la ACT estará exenta de esta disposición; y disponiéndose además, que (y) el tratamiento más favorable económicamente de las Reclamaciones de Bonos de la ADCC, Reclamaciones del ELA/Centro de Convenciones, Reclamaciones de Bonos de la ACT, Reclamaciones del ELA/ACT, Reclamaciones de Bonos de la AFI, y/o Reclamaciones de Impuesto al Ron del ELA/AFI requeridos por una Orden Definitiva emergente de una determinación por litigio (pero excluyendo una orden que apruebe una transacción, a tenor con la Regla de Quiebras 9019 o de otro modo) del Tribunal de Título III o cualquier otro tribunal de jurisdicción competente, y (z) cualquier reclamación emergente de o relacionada

con los BAN de la AFI, como se definen en el AAP del ELA, estarán exentos de esta disposición.

Sección 8.3   Sin admisión de responsabilidad.

(a)   La suscripción de este Acuerdo no está destinada a ser y no se interpretará como una admisión o prueba en cualquier acción legal, juicio, procedimiento o disputa de ninguna responsabilidad legal, acto ilícito u obligación de ninguna clase (lo que incluye los méritos de cualquier reclamación o defensa) por cualquier Parte hacia cualquier otra Parte o cualquier otra Persona con respecto a cualquiera de las cuestiones abordadas en este Acuerdo.

(b)   Ninguna parte de este Acuerdo (incluyendo, entre otros, sus Antecedentes y Anexos), la transacción de cualquier acto ejecutado o instrumento suscrito a tenor con o para la ejecución de este Acuerdo o la transacción: (i) es ni puede considerarse como ni usarse como una admisión o prueba de la validez de cualquier reclamación o cualquier alegato hecho en las Objeciones Relacionadas con la Deuda, las Acciones de Invalidez, las Mociones de Levantamiento de la Paralización, la Moción de la Sección 926, las Acciones de Recuperación, las Acciones de Impugnación de Gravámenes o de cualquier ilícito o responsabilidad de ninguna de las Partes; (ii) es o puede considerarse que es o puede usarse como una admisión o prueba de cualquier responsabilidad, incumplimiento u omisión de cualquiera de las Partes en cualquier procedimiento civil, penal o administrativo en cualquier tribunal, entidad administrativa u otro tribunal; o (iii) es o puede considerarse que es o puede usarse como una admisión o prueba contra el ELA, la ACT o la ADCC con respecto a la validez de cualquiera de las Reclamaciones de Bonos de la ADCC, o las Reclamaciones de Bonos de la ACT. Ninguna disposición de este Acuerdo, la transacción o cualquier acto ejecutado o documento suscrito a tenor con o para la ejecución de este Acuerdo o la transacción será admisible en ningún procedimiento para ningún fin, salvo para aplicar los términos del Acuerdo.

Sección 8.4   Negociaciones de buena fe. Las Partes reconocen y aceptan que cada una de las Partes del presente se encuentra representada por abogados, y que cada parte ha recibido asesoramiento legal independiente con respecto a la conveniencia de celebrar este Acuerdo; que las negociaciones relacionadas con este Acuerdo se llevaron a cabo regularmente y bajo condiciones de mercado; que este Acuerdo ha sido celebrado y suscrito por cada Parte de su libre y espontánea voluntad; y que cada Parte conoce todos los hechos pertinentes y sus derechos en relación con estos, y que no han recibido influencias o persuasiones indebidas para celebrar esta transacción como resultado de cualquier acto o acción de cualquiera de las partes o un empleado, agente, abogado o representante de cualquiera de las partes de este Acuerdo. Las Partes además aceptan que han celebrado este Acuerdo como resultado de su intención de evitar los gastos e inconvenientes adicionales que se producirían como resultado de litigios y otras disputas, y para acordar mutuamente de manera permanente y transigir en las reclamaciones entre las Partes mediante la celebración del presente Acuerdo. Las Partes reconocen y acuerdan además que, en relación con los Procedimientos de PROMESA y la negociación y perfeccionamiento de este Acuerdo, incluyendo, entre otros, el Plan y el Plan de la ACT, las Partes, en todo momento, han actuado (a) de buena fe y (b) únicamente en su nombre y no en nombre ni representación de otros acreedores, tenedores de bonos u otras partes interesadas.

Sección 8.5   Tercero beneficiario. Salvo los fondos y/o cuentas que son tenedoras de Bonos de la ACT o Bonos de la ADCC, y cuyos asesores o administradores son Partes del presente, y Assured y National, ninguna disposición de este Acuerdo, ya sea expresa o implícita, está destinada a conferir o conceder, ni se

interpretará como que confiere o concede, o que otorga, a cualquier persona (incluyendo, entre otros, cualquier Aseguradora Monolínea salvo Assured y National), aparte de las Partes del Presente y sus respectivos sucesores y cesionarios, ningún derecho, remedio o reclamación en virtud de o por motivo de este Acuerdo o cualquier pacto, condición o estipulación de estos; y que los pactos, estipulaciones y convenios que contiene este Acuerdo son y serán para beneficio único y exclusivo de las Partes del presente y sus respectivos sucesores y cesionarios.

Sección 8.6   Derecho aplicable; retención de jurisdicción; notificación de proceso. El presente Acuerdo estará regido por y se interpretará de acuerdo con las leyes internas del estado de Nueva York y la ley federal aplicable, sin que se apliquen los principios de conflictos de leyes que requerirían la aplicación de la ley de cualquier otra jurisdicción. Mediante la suscripción y entrega de este Acuerdo, cada una de las Partes por el presente acepta de manera irrevocable e incondicional en su nombre que cualquier acción legal, juicio o procedimiento entre cualquiera o todos los anteriores con respecto a cualquier cuestión en virtud de, o emergente de, o relacionada con este Acuerdo o para el reconocimiento o aplicación de cualquier sentencia dictada en cualquier acción legal, juicio o procedimiento se presentará ante el Tribunal del Título III únicamente para ese fin, y al suscribir y entregar este Acuerdo, cada una por el presente acepta y se somete a la jurisdicción de dicho tribunal, de manera general e incondicional, con respecto a dicha acción legal, juicio o procedimiento, sujeto a los derechos de cada Parte a tenor con el derecho aplicable. En caso de que se inicie cualquier acción legal, juicio o procedimiento de este tipo, cada una de las Partes por el presente (a) acepta y consiente que las notificaciones del proceso pueden hacerse, y la jurisdicción personal sobre cualquiera de las Partes del presente en cualquier acción legal, juicio o procedimiento de este tipo puede obtenerse, mediante la entrega de una copia de la citación, demanda y otros escritos requeridos para iniciar dicha acción legal, juicio o procedimiento a la Parte en cuestión en el domicilio de dicha Parte tal como este figura en la Sección 8.11 del presente, a menos que dicha Parte haya designado otro domicilio en una notificación entregada a las demás Partes de acuerdo con la Sección 8.11 del presente y (b) renuncia dentro del máximo límite permitido por el derecho aplicable a cualquier derecho que pueda tener a un juicio por jurados en cualquier procedimiento legal directa o indirectamente emergente de este Acuerdo y las declaraciones, pactos y otras obligaciones estipuladas en el presente.

Sección 8.7   Títulos. Los títulos de las secciones, párrafos y subsecciones del presente Acuerdo se insertan por motivos de conveniencia únicamente y no forman parte de este Acuerdo, ni modifican de ninguna manera los términos o disposiciones de este Acuerdo ni afectan su interpretación.

Sección 8.8   Acuerdo vinculante; sucesores y cesionarios. Este Acuerdo está destinado a, y estará vigente y será vinculante únicamente después de la suscripción y entrega de este Acuerdo por las Partes que figuran en las hojas de firmas del presente. Este Acuerdo está destinado a, y se considerará que será vinculante y redundará en beneficio de las Partes y sus respectivos sucesores, cesionarios, administradores, constituyentes y representantes. Los acuerdos, declaraciones, pactos y obligaciones de las Partes conforme al presente Acuerdo no son conjuntos sino separados en todos los aspectos, y ninguna de las Partes será responsable del cumplimiento o incumplimiento de este Acuerdo por otra de las Partes. Si cualquier disposición de este Acuerdo, o la aplicación de dicha disposición a cualquier persona o entidad o circunstancia, fuera considerada inválida o inaplicable, en su totalidad o en parte, dicha invalidez o inaplicabilidad solo se referirá a dicha disposición o parte de ella y la parte restante de dicha disposición del presente y del presente Acuerdo conservarán plenamente su vigencia y efecto siempre que la sustancia

legal y económica de las transacciones contempladas en el presente o en el Plan o el Plan de la ACT no afecten adversamente de manera sustancial a cualquiera de las Partes. Ante tal determinación de invalidez, las Partes negociarán de buena fe para modificar este Acuerdo, de modo que cumpla con la intención original de las Partes en el mayor grado posible, de una manera razonablemente aceptable, para que las transacciones contempladas en el presente se perfeccionen tal como se previó originalmente en el mayor grado posible. No obstante lo anterior, a menos que las Partes acuerden lo contrario, las disposiciones del presente con respecto al pago de los Costos de Perfeccionamiento y los Honorarios de Restricción del AAP son partes integrales de este Acuerdo y no pueden separarse.

Sección 8.9   Totalidad del Acuerdo. El Acuerdo, incluyendo, entre otros, el Plan y el Plan de la ACT, constituye la totalidad del acuerdo entre las Partes con respecto al tema del presente y el Plan y el Plan de la ACT, y reemplaza a todas las negociaciones, declaraciones, compromisos o garantías (orales o de otro tipo) hechas anteriormente por cualquiera de las Partes con respecto al tema del presente. Ninguna de las Partes ha celebrado este Acuerdo sobre la base de una declaración, compromiso o garantía (oral o de otro tipo) hecha anteriormente por cualquiera de las demás Partes, salvo aquellas que se incluyen expresamente en el presente Acuerdo.

Sección 8.10 Ejemplares. El presente Acuerdo puede suscribirse en uno o más ejemplares, cada uno de los cuales se considerará como una copia original del presente Acuerdo y todos los cuales, en conjunto, constituirán el mismo Acuerdo. Las copias de ejemplares firmados transmitidos por telecopia u otro servicio de transmisión electrónica se considerarán ejemplares originales firmados, siempre que se acuse recibo del envío de dichos ejemplares.

Sección 8.11 Notificaciones. Todas las demandas, notificaciones, solicitudes, consentimientos y demás comunicaciones en virtud del presente se harán por escrito y se considerarán como debidamente entregadas (i) cuando se entreguen en persona mediante mensajero o servicio de courier, (ii) en el momento de la recepción en sí (establecida mediante acuse de recibo o de otra manera) durante los horarios laborables normales, o en el primer día hábil en adelante si se transmiten electrónicamente (por correo electrónico), mediante facsímil o telecopiadora, con acuse de recibo, o (iii) tres (3) Días Hábiles después de ser depositadas en el correo, por correo certificado o registrado, con franqueo prepagado y acuse de recibo solicitado, a los siguientes domicilios, o a los domicilios indicados en el futuro por escrito, a las siguientes Partes:

    (a)        Si se dirigen a la Junta de Supervisión, al ELA, la ADCC o
                    la ACT, a:

                    PROSKAUER ROSE LLP
                    Eleven Times Square New York, NY 10036
                    Attn: Martin J. Bienenstock, Esq.
                    Correo electrónico: mbienenstock@proskauer.com
                    Brian S. Rosen, Esq.
                    Correo electrónico: brosen@proskauer.com
                    Facsímil: 212-969-2900

COPIA DE SUSCRIPCIÓN

(b)        Si se dirige a la AAFAF, a:

O'MELVENY & MEYERS LLP
Seven Times Square New York, NY 10036
Attn: John Rapisardi, Esq.
Email: jrapisardi@omm.com
Maria J. DiConza, Esq.
Correo electrónico: mdiconza@omm.com
Facsímil: 212-326-2061

(c)        Si se dirige a Assured, a:

CADWALADER, WICKERSHAM & TAFT
200 Liberty Street
New York, NY 10281
Attn: Mark Ellenberg, Esq.

Correo electrónico: mark.ellenberg@cwt.com

Casey Servais, Esq.

Correo electrónico: casey.servais@cwt.com

(d)         Si se dirige a National, a:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Andrew Wilkinson, Esq.
Correo electrónico: Andrew.wilkinson@weil.com
Attn: Kelly Di Blasi, Esq.
Correo electrónico: Kelly.diblasi@weil.com
Kirsten Erichsen, Esq.
Correo electrónico: Kirsten.erichsen@weil.com

Sección 8.12 Sin renuncia a remedios. Salvo según se disponga expresamente en el presente Acuerdo, ninguna disposición del presente está destinada, ni se interpretará de ninguna manera, como una renuncia, límite, disminución o restricción de cualquier derecho o capacidad de las Partes para proteger y preservar cada uno de sus derechos, remedios e intereses, contractuales o de otro tipo, en virtud de las Resoluciones sobre Bonos, el Título III o cualquier otra disposición de PROMESA o cualquier otra ley o reglamento.

57

COPIA DE SUSCRIPCIÓN

Sección 8.13 Obligaciones separadas, no conjuntas. Los acuerdos, declaraciones, pactos y otras obligaciones de las Partes que se estipulan en este Acuerdo son, en todos los aspectos, separadas y no conjuntas.

Sección 8.14 Remedios acumulativos. Todos los derechos, facultades y remedios dispuestos de acuerdo con los términos y disposiciones del presente Acuerdo y disponibles de otra manera con respecto a este conforme al derecho escrito o consuetudinario serán acumulativos y no alternativos, y el ejercicio de cualquier derecho, facultad o remedio por cualquiera de las Partes no impedirá el ejercicio contemporáneo o posterior de cualquier otro derecho, facultad o remedio de este tipo por cualquiera de las Partes.

Sección 8.15 Ejecución específica. Cada una de las Partes acepta y entiende que los daños monetarios no constituyen un remedio suficiente en caso de cualquier incumplimiento de este Acuerdo por cualquiera de las Partes, y cada una de las Partes que no incumpla el Acuerdo tendrá derecho a la ejecución específica y a interdictos u otros remedios consuetudinarios como remedio por cualquier incumplimiento de este Acuerdo, incluyendo, entre otros, una orden del Tribunal del Título III u otro tribunal de jurisdicción competente que requiera que cualquiera de las Partes cumpla de inmediato sus obligaciones en virtud del presente. No obstante cualquier disposición en contrario del presente Acuerdo, la ejecución específica y los interdictos y otros remedios similares y el derecho a rescindir este Acuerdo de conformidad con los términos y disposiciones de este será el único y exclusivo remedio para cualquier incumplimiento de este Acuerdo por cualquiera de las Partes (o cualquier otra persona) y ninguna de las Partes (ni ninguna otra persona) tendrá derecho a daños monetarios por cualquier incumplimiento de cualquier disposición del presente Acuerdo; disponiéndose, sin embargo, que en caso de rescisión del Acuerdo conforme a los términos y disposiciones de la Sección 7.1 del presente, el único remedio (salvo la aplicación de las disposiciones de este Acuerdo que conserven su validez después de su extinción) será el pago de los honorarios estipulados en la Sección 6.1(b) del presente, según sea aplicable.

Sección 8.16 Garantías adicionales. Cada una de las Partes del presente acepta firmar y entregar, o hacer que se firme y se entregue, los instrumentos, y tomar las medidas que las demás Partes soliciten dentro de lo razonable con el fin de dar pleno vigor y efecto a la intención y los fines, y ejecutar los términos, de este Acuerdo.

123408529v3

**EN FE DE LO CUAL**, las Partes del presente han hecho que se firme el presente Acuerdo en la fecha antes establecida.

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO**

Por:   /firma/ Natalie A. Jaresko
Nombre:  Natalie A. Jaresko
Cargo :   Directora Ejecutiva

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Por: la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico

Por:   /firma/ Natalie A. Jaresko
Nombre:  Natalie A. Jaresko
Cargo :   Directora Ejecutiva

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**

Por: la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante de la Autoridad de Carreteras y Transportación de Puerto Rico

Por:   /firma/ Natalie A. Jaresko
Nombre:  Natalie A. Jaresko
Cargo :   Directora Ejecutiva

123408529v3

**ASSURED GUARANTY CORP. y ASSURED GUARANTY MUNICIPAL CORP.**

Por:   /firma/ Russell B. Brewer II

Nombre: Russell B. Brewer II

Cargo:  Director de Vigilancia


Aseguradora del Monto del Capital en Bonos de la ACT: ███████████


Aseguradora del Monto del Capital en Bonos de la ADCC: ███████████

60

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

Por:   /firma/ Adam Bergonzi

Nombre:   Adam Bergonzi

Cargo:   Director de Riesgos

Aseguradora del Monto Nominal en Bonos de la ACT: ████████████

Aseguradora del Monto Nominal en Bonos de la ADCC: ████████████

61

**DAVIDSON KEMPNER CAPITAL MANAGEMENT LP, en nombre de ciertos de sus fondos de inversiones afiliados o entidades afiliadas**

Por:   /firma/ Suzanne K. Gibbons
Nombre:   Suzanne K. Gibbons
Cargo:      Miembro de la Gerencia

Tenedor del Monto Nominal en Bonos de la ACT:   ███████

Tenedor del Monto Nominal en Bonos de la ADCC:   ███████

**WHITEHAVEN  CREDIT OPPORTUNITIES  MASTER  FUND, LTD.**

Por:   /firma/ Scott Richman

Nombre:  Scott Richman

Cargo:  Socio Gerente y Director de Información

Tenedor del Monto Nominal en Bonos de la ACT:   ███████████

Tenedor del Monto Nominal en Bonos de la ADCC:   ███████████

## ANEXO A

### LISTA DE BONISTAS DE LA ACT

Davidson Kempner Capital Management LP, en nombre de ciertos de sus fondos de inversiones afiliados o entidades afiliadas

Whitehaven Credit Opportunities Fund, Ltd.

## **ANEXO B**

LISTA DE BONISTAS DE LA ADCC

Ninguno

123408529v3

## **ANEXO C**

CALENDARIO DE BONOS DE LA ACT 68

66

CALENDARIO DE BONOS DE LA ACT 68

| CUSIP | Serie | Vencimiento | Emisión |
|-------|-------|-------------|---------|
| 745181M79 | SERIE Z | 01/07/2018 | 01/03/1996 |
| 745181NF0 | SERIE Y | 01/07/2021 | 09/04/1996 |
| 745181N60 | SERIE AA | 01/07/2017 | 29/04/2003 |
| 745181N78 | SERIE AA | 01/07/2018 | 29/04/2003 |
| 745181N86 | SERIE AA | 01/07/2019 | 29/04/2003 |
| 745181N94 | SERIE AA | 01/07/2020 | 29/04/2003 |
| 745181XN2 | SERIE AA | 01/07/2021 | 29/04/2003 |
| 745181XQ5 | SERIE AA | 01/07/2023 | 29/04/2003 |
| 745181XR3 | SERIE AA | 01/07/2028 | 29/04/2003 |
| 745181XS1 | SERIE AA | 01/07/2035 | 29/04/2003 |
| 745181ZJ9 | SERIE BB | 01/07/2017 | 04/10/2005 |
| 745181ZK6 | SERIE BB | 01/07/2018 | 04/10/2005 |
| 745181P35 | SERIE BB | 01/07/2022 | 04/10/2005 |
| 745181B22 | SERIE CC | 01/07/2021 | 06/03/2007 |
| 745181B48 | SERIE CC | 01/07/2023 | 06/03/2007 |
| 745181B55 | SERIE CC | 01/07/2024 | 06/03/2007 |
| 745181B63 | SERIE CC | 01/07/2025 | 06/03/2007 |
| 745181B71 | SERIE CC | 01/07/2026 | 06/03/2007 |
| 745181B89 | SERIE CC | 01/07/2027 | 06/03/2007 |
| 745181B97 | SERIE CC | 01/07/2028 | 06/03/2007 |
| 745181C21 | SERIE CC | 01/07/2029 | 06/03/2007 |
| 745181C39 | SERIE CC | 01/07/2030 | 06/03/2007 |
| 745181C47 | SERIE CC | 01/07/2031 | 06/03/2007 |
| 745181C54 | SERIE CC | 01/07/2032 | 06/03/2007 |
| 745181C62 | SERIE CC | 01/07/2033 | 06/03/2007 |
| 745181C70 | SERIE CC | 01/07/2034 | 06/03/2007 |
| 745181C88 | SERIE CC | 01/07/2036 | 06/03/2007 |
| 745181K97 | RECOMERCIALIZACIÓN DE LA SERIE AA | 01/07/2035 | 29/04/2003 |
| 745181N52 | RECOMERCIALIZACIÓN DE LA SERIE AA | 01/07/2026 | 29/04/2003 |

67

## **ANEXO D**

CALENDARIO DE BONOS DE LA ACT 98

## CALENDARIO DE BONOS 98 DE LA ACT

| CUSIP | Serie | Vencimiento | Emisión |
|---|---|---|---|
| 745190AU2 | SERIE A | 01/07/2017 | 19/03/1998 |
| 745190AV0 | SERIE A | 01/07/2018 | 19/03/1998 |
| 7451903T3 | SERIE A | 01/07/2028 | 15/02/1998 |
| 745190Y77 | SERIE A | 01/07/2028 | 27/05/2008 |
| 745190AY4 | SERIE A | 01/07/2038 | 15/02/1998 |
| 745190Z92 | SERIE A | 01/07/2038 | 15/02/1998 |
| 745190HC5 | SERIE E | 01/07/2017 | 07/02/2002 |
| 745190HD3 | SERIE E | 01/07/2018 | 07/02/2002 |
| 745190HE1 | SERIE E | 01/07/2019 | 07/02/2002 |
| 745190HF8 | SERIE E | 01/07/2020 | 07/02/2002 |
| 745190HG6 | SERIE E | 01/07/2021 | 07/02/2002 |
| 745190HH4 | SERIE E | 01/07/2022 | 07/02/2002 |
| 745190HJ0 | SERIE E | 01/07/2023 | 07/02/2002 |
| 745190HK7 | SERIE E | 01/07/2024 | 07/02/2002 |
| 745190J41 | SERIE D | 01/07/2027 | 07/02/2002 |
| 7451902B3 | SERIE D | 01/07/2032 | 07/02/2002 |
| 7451902Q0 | SERIE G | 01/07/2019 | 29/04/2003 |
| 7451902R8 | SERIE G | 01/07/2020 | 29/04/2003 |
| 745190KC1 | SERIE G | 01/07/2022 | 29/04/2003 |
| 745190KD9 | SERIE G | 01/07/2023 | 29/04/2003 |
| 745190K56 | SERIE G | 01/07/2028 | 29/04/2003 |
| 7451902S6 | SERIE G | 01/07/2033 | 29/04/2003 |
| 7451902T4 | SERIE G | 01/07/2042 | 29/04/2003 |
| 7451902W7 | SERIE H | 01/07/2018 | 29/04/2003 |
| 745190KX5 | SERIE H | 01/07/2019 | 29/04/2003 |
| 745190KY3 | SERIE H | 01/07/2020 | 29/04/2003 |
| 745190KZ0 | SERIE H | 01/07/2021 | 29/04/2003 |
| 745190LA4 | SERIE H | 01/07/2022 | 29/04/2003 |
| 745190LB2 | SERIE H | 01/07/2023 | 29/04/2003 |
| 745190L22 | SERIE H | 01/07/2028 | 29/04/2003 |
| 7451902X5 | SERIE H | 01/07/2035 | 29/04/2003 |
| 745190PF9 | SERIE I | 01/07/2017 | 20/04/2004 |
| 745190PG7 | SERIE I | 01/07/2018 | 20/04/2004 |
| 745190PH5 | SERIE I | 01/07/2019 | 20/04/2004 |
| 745190PJ1 | SERIE I | 01/07/2020 | 20/04/2004 |
| 745190PK8 | SERIE I | 01/07/2021 | 20/04/2004 |
| 7451902Z0 | SERIE I | 01/07/2022 | 20/04/2004 |
| 745190PM4 | SERIE I | 01/07/2023 | 20/04/2004 |
| 745190PN2 | SERIE I | 01/07/2024 | 20/04/2004 |
| 745190PP7 | SERIE I | 01/07/2025 | 20/04/2004 |
| 745190PQ5 | SERIE I | 01/07/2026 | 20/04/2004 |
| 7451903K2 | SERIE J | 01/07/2017 | 20/04/2004 |
| 7451903L0 | SERIE J | 01/07/2018 | 20/04/2004 |
| 745190QH4 | SERIE J | 01/07/2019 | 20/04/2004 |
| 7451903M8 | SERIE J | 01/07/2020 | 20/04/2004 |
| 7451903N6 | SERIE J | 01/07/2021 | 20/04/2004 |
| 745190QM3 | SERIE J | 01/07/2022 | 20/04/2004 |

| CUSIP | Serie | Vencimiento | Emisión |
|-------|-------|-------------|---------|
| 745190QP6 | SERIE J | 01/07/2023 | 20/04/2004 |
| 745190QR2 | SERIE J | 01/07/2024 | 20/04/2004 |
| 7451903P1 | SERIE J | 01/07/2029 | 20/04/2004 |
| 745190TC2 | SERIE K | 01/07/2017 | 04/10/2005 |
| 745190TD0 | SERIE K | 01/07/2018 | 04/10/2005 |
| 745190TE8 | SERIE K | 01/07/2019 | 04/10/2005 |
| 745190TF5 | SERIE K | 01/07/2020 | 04/10/2005 |
| 745190TG3 | SERIE K | 01/07/2020 | 04/10/2005 |
| 745190TH1 | SERIE K | 01/07/2021 | 04/10/2005 |
| 745190TJ7 | SERIE K | 01/07/2022 | 04/10/2005 |
| 745190TK4 | SERIE K | 01/07/2023 | 04/10/2005 |
| 745190TL2 | SERIE K | 01/07/2024 | 04/10/2005 |
| 745190TM0 | SERIE K | 01/07/2025 | 04/10/2005 |
| 745190TN8 | SERIE K | 01/07/2025 | 04/10/2005 |
| 745190TP3 | SERIE K | 01/07/2026 | 04/10/2005 |
| 745190TQ1 | SERIE K | 01/07/2027 | 04/10/2005 |
| 745190TR9 | SERIE K | 01/07/2030 | 04/10/2005 |
| 745190TS7 | SERIE K | 01/07/2035 | 04/10/2005 |
| 745190UC0 | SERIE L | 01/07/2017 | 04/10/2005 |
| 745190UD8 | SERIE L | 01/07/2018 | 04/10/2005 |
| 745190UE6 | SERIE L | 01/07/2019 | 04/10/2005 |
| 745190UF3 | SERIE L | 01/07/2020 | 04/10/2005 |
| 745190UG1 | SERIE L | 01/07/2021 | 04/10/2005 |
| 745190UH9 | SERIE L | 01/07/2022 | 04/10/2005 |
| 745190UJ5 | SERIE L | 01/07/2023 | 04/10/2005 |
| 745190UK2 | SERIE L | 01/07/2024 | 04/10/2005 |
| 745190UL0 | SERIE L | 01/07/2025 | 04/10/2005 |
| 745190UM8 | SERIE L | 01/07/2030 | 04/10/2005 |
| 745190UP1 | SERIE L | 01/07/2035 | 04/10/2005 |
| 745190UN6 | SERIE L | 01/07/2035 | 04/10/2005 |
| 745190UQ9 | SERIE L | 01/07/2038 | 04/10/2005 |
| 745190UR7 | SERIE L | 01/07/2041 | 04/10/2005 |
| 745190YB8 | SERIE M | 01/07/2017 | 06/03/2007 |
| 745190YC6 | SERIE M | 01/07/2018 | 06/03/2007 |
| 745190YD4 | SERIE M | 01/07/2018 | 06/03/2007 |
| 745190YE2 | SERIE M | 01/07/2019 | 06/03/2007 |
| 745190YF9 | SERIE M | 01/07/2020 | 06/03/2007 |
| 745190YG7 | SERIE M | 01/07/2020 | 06/03/2007 |
| 745190YH5 | SERIE M | 01/07/2021 | 06/03/2007 |
| 745190YJ1 | SERIE M | 01/07/2022 | 06/03/2007 |
| 745190YK8 | SERIE M | 01/07/2022 | 06/03/2007 |
| 745190YL6 | SERIE M | 01/07/2023 | 06/03/2007 |
| 745190YM4 | SERIE M | 01/07/2023 | 06/03/2007 |
| 745190YN2 | SERIE M | 01/07/2024 | 06/03/2007 |
| 745190YP7 | SERIE M | 01/07/2024 | 06/03/2007 |
| 745190YQ5 | SERIE M | 01/07/2025 | 06/03/2007 |
| 745190YR3 | SERIE M | 01/07/2025 | 06/03/2007 |
| 745190YS1 | SERIE M | 01/07/2026 | 06/03/2007 |
| 745190YT9 | SERIE M | 01/07/2026 | 06/03/2007 |

123408529v3

| CUSIP | Serie | Vencimiento | Emisión |
|-------|-------|-------------|---------|
| 745190YU6 | SERIE M | 01/07/2027 | 06/03/2007 |
| 745190YV4 | SERIE M | 01/07/2027 | 06/03/2007 |
| 745190YW2 | SERIE M | 01/07/2032 | 06/03/2007 |
| 745190YY8 | SERIE M | 01/07/2037 | 06/03/2007 |
| 745190YX0 | SERIE M | 01/07/2037 | 06/03/2007 |
| 7451903D8 | SERIE M | 01/07/2046 | 06/03/2007 |
| 745190ZA9 | SERIE N | 01/07/2019 | 06/03/2007 |
| 745190ZB7 | SERIE N | 01/07/2020 | 06/03/2007 |
| 745190ZC5 | SERIE N | 01/07/2021 | 06/03/2007 |
| 745190ZD3 | SERIE N | 01/07/2022 | 06/03/2007 |
| 745190ZE1 | SERIE N | 01/07/2023 | 06/03/2007 |
| 745190ZF8 | SERIE N | 01/07/2024 | 06/03/2007 |
| 745190ZG6 | SERIE N | 01/07/2025 | 06/03/2007 |
| 745190ZH4 | SERIE N | 01/07/2026 | 06/03/2007 |
| 745190ZJ0 | SERIE N | 01/07/2027 | 06/03/2007 |
| 745190ZK7 | SERIE N | 01/07/2028 | 06/03/2007 |
| 745190ZL5 | SERIE N | 01/07/2029 | 06/03/2007 |
| 745190ZM3 | SERIE N | 01/07/2030 | 06/03/2007 |
| 745190ZN1 | SERIE N | 01/07/2031 | 06/03/2007 |
| 745190ZP6 | SERIE N | 01/07/2032 | 06/03/2007 |
| 745190ZQ4 | SERIE N | 01/07/2033 | 06/03/2007 |
| 745190ZR2 | SERIE N | 01/07/2034 | 06/03/2007 |
| 745190ZS0 | SERIE N | 01/07/2036 | 06/03/2007 |
| 745190ZT8 | SERIE N | 01/07/2039 | 06/03/2007 |
| 745190ZU5 | SERIE N | 01/07/2041 | 06/03/2007 |
| 745190ZV3 | SERIE N | 01/07/2045 | 06/03/2007 |
| 7451903V8 | RECOMERCIALIZACIÓN DE LA SERIE H | 01/07/2032 | 29/04/2003 |

71

## **ANEXO E**

CALENDARIO DE BONOS SUBORDINADOS DE LA ACT 98

123408529v3

CALENDARIO DE BONOS SUBORDINADOS DE LA ACT 98

| CUSIP | Serie | Vencimiento | Emisión |
|---|---|---|---|
| 745190CN6 | SERIE 1998 | 01/07/2018 | 15/07/1998 |
| 745190CP1 | SERIE 1998 | 01/07/2022 | 15/07/1998 |
| 745190CQ9 | SERIE 1998 | 01/07/2028 | 15/07/1998 |
| 745190MF2 | SERIE 2003 SUBORDINADOS | 01/07/2017 | 29/04/2003 |
| 745190MG0 | SERIE 2003 SUBORDINADOS | 01/07/2017 | 29/04/2003 |
| 745190MH8 | SERIE 2003 SUBORDINADOS | 01/07/2018 | 29/04/2003 |
| 745190MJ4 | SERIE 2003 SUBORDINADOS | 01/07/2018 | 29/04/2003 |
| 745190MK1 | SERIE 2003 SUBORDINADOS | 01/07/2019 | 29/04/2003 |
| 745190ML9 | SERIE 2003 SUBORDINADOS | 01/07/2019 | 29/04/2003 |
| 745190MM7 | SERIE 2003 SUBORDINADOS | 01/07/2020 | 29/04/2003 |
| 745190MN5 | SERIE 2003 SUBORDINADOS | 01/07/2021 | 29/04/2003 |
| 745190MP0 | SERIE 2003 SUBORDINADOS | 01/07/2022 | 29/04/2003 |
| 745190MQ8 | SERIE 2003 SUBORDINADOS | 01/07/2022 | 29/04/2003 |
| 745190MR6 | SERIE 2003 SUBORDINADOS | 01/07/2023 | 29/04/2003 |
| 745190MS4 | SERIE 2003 SUBORDINADOS | 01/07/2028 | 29/04/2003 |

123408529v3

## **ANEXO F**

CALENDARIO DE BONOS DE LA ADCC

CALENDARIO DE BONOS DE LA ADCC

| CUSIP | Serie | Vencimiento | Emisión |
|---|---|---|---|
| 745266AP1 | SERIE 2006 | 01/07/2017 | 24/03/2006 |
| 745266AQ9 | SERIE 2006 | 01/07/2018 | 24/03/2006 |
| 745266AR7 | SERIE 2006 | 01/07/2019 | 24/03/2006 |
| 745266AS5 | SERIE 2006 | 01/07/2020 | 24/03/2006 |
| 745266AT3 | SERIE 2006 | 01/07/2021 | 24/03/2006 |
| 745266AU0 | SERIE 2006 | 01/07/2021 | 24/03/2006 |
| 745266AV8 | SERIE 2006 | 01/07/2022 | 24/03/2006 |
| 745266AW6 | SERIE 2006 | 01/07/2023 | 24/03/2006 |
| 745266AX4 | SERIE 2006 | 01/07/2024 | 24/03/2006 |
| 745266AY2 | SERIE 2006 | 01/07/2025 | 24/03/2006 |
| 745266AZ9 | SERIE 2006 | 01/07/2026 | 24/03/2006 |
| 745266BA3 | SERIE 2006 | 01/07/2026 | 24/03/2006 |
| 745266BB1 | SERIE 2006 | 01/07/2027 | 24/03/2006 |
| 745266BC9 | SERIE 2006 | 01/07/2031 | 24/03/2006 |
| 745266BD7 | SERIE 2006 | 01/07/2036 | 24/03/2006 |

123408529v3

## **ANEXO G**

LISTA DE ACCIONES DE INVALIDEZ

123408529v3

## ACCIONES DE INVALIDEZ

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Jefferies LLC, Proc. Cont. Núm. 19-00281

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. BNY Mellon/POP Sec, Proc. Cont. Núm. 19-00282

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. First Southwest Co., Proc. Cont. Núm. 19-00283

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Demandados 1E-59E, Proc. Cont. Núm. 19-00284

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Demandados 1A-100A, Proc. Cont. Núm. 19-00285

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Demandados 1B-100B, Proc. Cont. Núm. 19-00286

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Demandados 1C-53C, Proc. Cont. Núm. 19-00287

El Comité de Reclamaciones Especiales de la Junta de Supervisión y Administración Financiera para Puerto Rico y el Comité Oficial de Acreedores No Asegurados del Estado Libre Asociado de Puerto Rico c. Demandados 1D-73D, Proc. Cont. Núm. 19-00288

## ANEXO H

FORMULARIO DE ACUERDO DE ACUMULACIÓN

## FORMULARIO DE ACUERDO DE ACUMULACIÓN

ACUERDO DE ACUMULACIÓN AL ACUERDO DE APOYO AL PLAN VINCULADO A LA ACT/ADCC (con sus modificaciones periódicas, el "**AAP**" con sus enmiendas, suplementos y otros), de fecha 5 de mayo de 2021, por y entre (a) la Junta de Supervisión y Administración Financiera para Puerto Rico (la "**Junta de Supervisión**"), como representante del Estado Libre Asociado de Puerto Rico (el "**Estado Libre Asociado**" o el "**ELA**"), la Autoridad de Carreteras y Transportación (la "**ACT**") de Puerto Rico, y (b) los tenedores de Reclamaciones de Bonos de la ACT, tal como se definen en el AAP, que pueden incluir a los asesores o administradores que prestan asesoramiento o administran a un tenedor de Reclamaciones de Bonos de la ACT en nombre de dichos tenedores tal como se estipulan en el Anexo "A" del AAP, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias hechas de acuerdo con los términos del presente, los "**Tenedores de la ACT**"), (c) los tenedores de Reclamaciones de Bonos de la ADCC, tal como se definen en el AAP, que pueden incluir a los asesores o administradores que prestan asesoramiento o administran a un tenedor de Reclamaciones de Bonos de la ADCC en nombre de dichos tenedores tal como se estipulan en el Anexo "B" del AAP, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias hechas de acuerdo con los términos del presente, los "**Tenedores de la ADCC**"), y (d) Assured Guaranty Corp. y Assured Guaranty Municipal Corp., exclusivamente en sus capacidades como aseguradores, y tenedores afirmados, considerados o subrogados con respecto a los Bonos de la ACT y los Bonos de la ADCC ("**Assured**"), (e) National Public Finance Guarantee Corporation, exclusivamente en sus capacidades como aseguradores, y tenedores afirmados, considerados o subrogados con respecto a los Bonos de la ACT ("**National**" y, colectivamente con los Tenedores de la ACT, los Tenedores de la ADCC, y Assured, los "**Acreedores del AAP iniciales**"), y (f) los demás Acreedores de la ACT que periódicamente sean partes de estos, es suscrito y presentado por los _____ (los "**Acreedores del AAP en la acumulación**") al _____ de 2021. Los términos con mayúsculas que se usan en este documento, pero cuya definición no se estipula en él, tendrán el significado que se les atribuye en el AAP.

     1      Acuerdo de vinculación. El Acreedor del AAP en la Acumulación por el presente acepta como vinculantes todos los términos y disposiciones que figuran en el AAP. El Acreedor del AAP en la Acumulación se considerará en lo sucesivo un "Acreedor del AAP", una "Parte", un "Tenedor de la ACT" (si es tenedor de Reclamaciones de Bonos de la ACT) y un "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) para todos los fines en virtud del AAP, incluyendo, entre otros y para evitar dudas, con respecto a cualquier Reclamación de Bonos de la ACT y ADCC que posea el Acreedor del AAP en la Acumulación a la fecha de este Acuerdo de Acumulación (salvo cualquier Reclamación de Bonos de la ACT, y cualquier Reclamación de Bonos de la ADCC en capacidad de Creador de Mercado Calificado).

     2      Declaraciones y garantías y pactos. Con respecto al monto de capital total de cualquier Reclamación de Bonos de la ACT y cualquier Reclamación de Bonos de la ADCC (sin duplicación) que posea el Acreedor del AAP en la Acumulación, incluyendo, entre otros, el perfeccionamiento de cualquier Transferencia pendiente de cualquier Reclamación de Bonos de la ACT y cualquier Reclamación de Bonos de la ADCC al Acreedor del AAP en la Acumulación, el Acreedor del AAP en la Acumulación por el presente (a) realiza, a la fecha del presente, las declaraciones y garantías del "Tenedor de la ACT" (si es tenedor de Reclamaciones de Bonos de la ACT) establecidas en la Sección 3.5 del AAP y del "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) establecidas en la Sección 3.6 del AAP

y (b) se compromete a y acuerda cumplir todos los pactos del "Tenedor de la ACT" (si es tenedor de Reclamaciones de Bonos de la ACT) establecidos en la Sección 4.5 del AAP y del "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) establecidos en la Sección 4.6 del AAP, hacia cada una de las demás Partes del AAP.

3        Derecho aplicable. La Sección 8.5 del AAP se incorpora por referencia al presente como si el presente la contuviera en su totalidad, salvo que cualquier referencia al "Acuerdo" o el "AAP" se reemplazará por referencias al Acuerdo de Acumulación.

4        Notificación de Acumulación. El Acreedor del AAP en la Acumulación acuerda proporcionar una copia del Acuerdo de Acumulación a la Junta de Supervisión y a la AAFAF de acuerdo con la Sección 4.5 del AAP (si es tenedor de Reclamaciones de Bonos de la ACT), Sección 4.6 del AAP (si es tenedor de Reclamaciones de Bonos de la ADCC), y las disposiciones de notificación estipuladas en la Sección 8.11 del AAP.

5        Adquisición de Bonos no vinculados al AAP. Si el Acreedor del AAP en la Acumulación (a) a la fecha del presente, es tenedor de Reclamaciones de Bonos de la ACT o de Reclamaciones de Bonos de la ADCC que no estén sujetos al AAP y/o a partir de y después de la fecha del presente adquiere Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC además de las Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC adquiridas a tenor con el presente Acuerdo de Acumulación, el Acreedor del AAP en la Acumulación deberá, dentro de los cinco (5) días calendario de la fecha del presente o, en caso de que se trate de Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC adquiridas con posterioridad, a partir de la fecha de dicha adquisición posterior, entregar a los abogados de la Junta de Supervisión información financiera requerida de acuerdo con las disposiciones de la Sección 2.2 del AAP con respecto a dichas Reclamaciones de Bonos de la ACT o Reclamaciones de Bonos de la ADCC.

EN FE DE LO CUAL, el Acreedor del AAP en la Acumulación ha hecho que se firme el presente Acuerdo de Acumulación en la fecha antes establecida.

[NOMBRE DEL ADQUIRENTE CALIFICADO]

Por: _____

        Nombre:

        Cargo:

Tenedor del Monto Nominal en Bonos de la ACT:
Tenedor del Monto Nominal en Bonos de la ADCC:

## **ANEXO I**

FORMULARIO DE ACUERDO DE ANEXACIÓN

123408529v3

## FORMULARIO DE ACUERDO DE ANEXACIÓN

ACUERDO DE ANEXACIÓN AL ACUERDO DE APOYO AL PLAN VINCULADO A LA ACT/ADCC (con sus modificaciones periódicas, el "**AAP**" con sus enmiendas, suplementos y otros), de fecha 5 de mayo de 2021, por y entre (a) la Junta de Supervisión y Administración Financiera para Puerto Rico (la "**Junta de Supervisión**"), como representante del Estado Libre Asociado de Puerto Rico (el "**Estado Libre Asociado**" o el "**ELA**"), la Autoridad de Carreteras y Transportación (la "**ACT**") de Puerto Rico, y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (la "**ADCC**") (b) los tenedores de Reclamaciones de Bonos de la ACT, tal como se definen en el AAP, que pueden incluir a los asesores o administradores que prestan asesoramiento o administran a un tenedor de Reclamaciones de Bonos de la ACT en nombre de tales tenedores tal como se estipula en el Anexo "A" del AAP, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias hechas de acuerdo con los términos del presente, los "**Tenedores de la ACT**"), (c) los tenedores de Reclamaciones de Bonos de la ADCC, tal como se definen en el AAP, que pueden incluir a los asesores o administradores que prestan asesoramiento o administran a un tenedor de Reclamaciones de Bonos de la ADCC en nombre de tales tenedores tal como se estipulan en el Anexo "B" del AAP, (junto con sus respectivos sucesores y cesionarios con respecto a las transferencias hechas de acuerdo con los términos del presente, los "**Tenedores de la ADCC3**"), y (d) Assured Guaranty Corp. y Assured Guaranty Municipal Corp., exclusivamente en sus capacidades como aseguradores, y tenedores afirmados, considerados o subrogados con respecto a los Bonos de la ACT y los Bonos de la ADCC ("**Assured**"), (e) National Public Finance Guarantee Corporation, exclusivamente en sus capacidades como aseguradores, y tenedores afirmados, considerados o subrogados con respecto a los Bonos de la ACT ("**National**" y, colectivamente con los Tenedores GO, los Tenedores de la ADCC, y Assured, los "**Acreedores iniciales del AAP**"), y (f) los demás Acreedores del AAP que periódicamente sean partes del estos, es suscrito y presentado por los _____ (el "**Acreedor del AAP en la Anexación**") al _____ de 2021. Los términos con mayúsculas que se usan en este documento, pero cuya definición no se estipula en él, tendrán el significado que se les atribuye en el AAP.

     1     Acuerdo de vinculación. El Acreedor del AAP en la Anexación por el presente acepta como vinculantes todos los términos y disposiciones que figuran en el AAP. El Acreedor del AAP en la Anexación se considerará en lo sucesivo un "Acreedor del AAP", una "Parte", un "Tenedor de la ACT" (si es tenedor de Reclamaciones de Bonos de la ACT) y un "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) para todos los fines en virtud del AAP, incluyendo, entre otros y para evitar dudas, con respecto a cualquier Reclamación de Bonos de la ACT y cualquier Reclamación de Bonos de la ADCC que posea el Acreedor del AAP en la Anexación a la fecha de este Acuerdo de Anexación (salvo cualquier Reclamación de Bonos de la ACT, y cualquier Reclamación de Bonos de la ADCC en capacidad de Creador de Mercado Calificado).

     2     Declaraciones y garantías y pactos. Con respecto al monto de capital total de cualquier Reclamación de Bonos de la ACT y cualquier Reclamación de Bonos de la ADCC (sin duplicación) que posea el Acreedor del AAP en la Anexación, el Acreedor del AAP en la Anexación por el presente (a) realiza, a la fecha del presente, las declaraciones y garantías del "Tenedor de la ACT" (si es tenedor de Reclamaciones de Bonos de la ACT) establecidas en la Sección 3.5 del AAP y del "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) establecidas en la Sección 3.6 del AAP y (b) se compromete y acuerda cumplir todos los pactos del "Tenedor de la ACT" (si es tenedor de Reclamaciones

de Bonos de la ACT) establecidas en la Sección 4.5 del AAP y del "Tenedor de la ADCC" (si es tenedor de Reclamaciones de Bonos de la ADCC) establecidas en la Sección 4.6 del AAP, hacia cada una de las demás Partes del AAP.

3        Derecho aplicable. La Sección 8.5 del AAP se incorpora por referencia al presente como si el presente la contuviera en su totalidad, salvo que cualquier referencia al "Acuerdo" o el "AAP" se reemplazará por referencias al Acuerdo de Anexación.

4        Notificación de Anexación. El Acreedor del AAP en la Anexación acepta proporcionar una copia del presente Acuerdo de Anexación a los abogados de la Junta de Supervisión y de acuerdo con las disposiciones de notificación estipuladas en la Sección 8.11 del AAP; disponiéndose, sin embargo, que salvo con respecto a los abogados de la Junta de Supervisión, el Acreedor del AAP en la Anexación puede tachar el monto nominal de los Bonos de la ACT y los Bonos de la ADCC que se indican a continuación.

5        Rechazo del Acuerdo de Anexación. No obstante la suscripción y entrega del presente Acuerdo de Anexación a los abogados de la Junta de Supervisión, la Junta de Supervisión puede, en ejercicio de su exclusivo criterio, determinar no aceptar este Acuerdo de Anexación y, en tal caso, (a) la Junta de Supervisión deberá proporcionar notificación por escrito de dicha determinación al Acreedor del AAP en la Anexación dentro de los quince (15) Días Hábiles después de haber recibido el Acuerdo de Anexación y (b) el Acreedor del AAP en la Anexación no tendrá derechos ni titularidad a tenor con el AAP, incluyendo, entre otros, derechos a recibir un Honorario de Restricción del AAP.

EN FE DE LO CUAL, el Acreedor del AAP en la Anexación ha hecho que se firme el presente Acuerdo de Anexación en la fecha antes establecida.


[NOMBRE DEL ACREEDOR DEL AAP EN LA ANEXACIÓN]


Por: _____

        Nombre: _____

        Cargo: _____

        Domicilio: _____

                _____

                _____

Tenedor del Monto Nominal en Bonos de la ACT:
Tenedor del Monto Nominal en Bonos de la ADCC:

123408529v3

## **ANEXO J**

ACUERDO DE TRANSACCIÓN

**RESUMEN DE LOS TÉRMINOS ECONÓMICOS:**

| TÉRMINO | DESCRIPCIÓN |
|---|---|
| **1) Contraprestación de la ACT** | |
| **a) Efectivo** | |
| **i) Monto** | ▪ $184,800,000 distribuidos a los Tenedores de Bonos de la ACT 68 y $79,200,000 distribuidos a los tenedores de Reclamaciones de Bonos Prioritarios de la ACT 98 (en su totalidad, el "Efectivo de la ACT") una vez que se hayan cumplido las Condiciones de Distribución (tal como se definen en el AAP de la ACT) |
| **b) Deuda** | |
| **i) Nuevos Bonos de la ACT** | ▪ Bonos de Interés Corriente de la ACT ("CIB de la ACT")<br>▪ Bonos de Apreciación de Capital de la ACT ("CAB de la ACT")<br>▪ Bonos Convertibles de Apreciación de Capital de la ACT ("CAB Convertibles de la ACT") |
| **ii) Valor a la par** | ▪ $1,245,000,000, asignados según se especifica en el Anexo 2 de este documento |
| **iii) Plazo hasta el vencimiento** | ▪ Hasta 40 años |
| **iv) Tasa de interés** | ▪ Tasa de interés promedio de 5.0% |
| **v) Fecha considerada de emisión** | ▪ Los nuevos Bonos de la ACT empiezan a acumular interés (i) el 1 de julio de 2022 o (ii) la Fecha de Entrada en Vigencia de la ACT, lo que ocurra primero |
| **vi) Opción de compra** | ▪ CIB de la ACT y CAB de la ACT:<br>  ○ Opción de compra a 10 años a la par<br>▪ CAB Convertibles de la ACT:<br>  ○ Fecha de conversión de 10 años o menos<br>  ○ Opción de compra a la par a partir de (i) 7 años después de la fecha de conversión y (ii) 10.5 años después de la emisión, lo que ocurra antes |
| **vii) Efectivo para intercambio de bonos** | ▪ El ELA / la ACT retienen la capacidad de sustituir efectivo en lugar de nuevos Bonos de la ACT en la Fecha de Entrada en Vigencia de la ACT |
| **viii) Asociación público-privada** | ▪ Alternativa a la estructuración de los bonos de ingresos a través de la asociación público-privada u opción de canje de todos o parte de los bonos de ingresos a la par a partir de los ingresos de una asociación público-privada vinculada a las carreteras con peaje. |

| TÉRMINO | DESCRIPCIÓN |
|---|---|
|  | Cualquier canje de este tipo debe hacerse de manera tal que se preserve la exención impositiva de los Nuevos Bonos de la ACT |
| **2) ADCC** |  |
| **a) Efectivo** | ▪ $97,000,000 |
| **3) CVI de recuperación** | ▪ Los CVI de recuperación deben estructurarse de manera coherente con los CVI en el AAP del ELA y según se explica con más detalle en el Plan de Ajuste <br> ▪ Los CVI de recuperación a las Reclamaciones Permitidas del ELA/ACT deben distribuirse una vez que se hayan producido las Condiciones de Distribución (definidas más arriba) |
| **a) Métrica de superación del rendimiento** | ▪ Ver Anexo 1 |
| **b) IVU Medido** | ▪ Como se define en el AAP |
| **c) Punto de intervención** | ▪ 100% de 5.5% de las proyecciones del Plan Fiscal del IVU del ELA según se incluyen en el Anexo 1 (el "IVU de referencia") |
| **d) Estructura de los CVI de recuperación** | ▪ El ELA pignorará su fe, crédito y poder impositivo en virtud de la Constitución de Puerto Rico y la legislación aplicable de Puerto Rico para el pago de los CVI de recuperación <br> ▪ Disposiciones de valores como se describe en el AAP del ELA, Sección 4.10 (b) |
| **e) Fecha de medición** | ▪ Medido al final de cada Año Fiscal, a partir de 2022 <br> ▪ El pago y la mecánica de medición a determinarse |
| **f) Tope hipotético / vitalicio de los CVI de recuperación** | ▪ ACT: $3,697,668,995 <br> ▪ ADCC: $217,228,391 |
| **g) Plazo de los CVI de recuperación** | ▪ 30 años (Año Fiscal 2051) <br> ▪ Fecha de emisión estimada de 1 de julio de 2021 |
| **h) Pago anual máximo de los CVI de recuperación** | ▪ Pago Anual Máximo de los CVI de recuperación aplicable a los pagos totales a los CVI de recuperación (es decir, tanto sujetos a cascada como no sujetos a cascada) <br> ▪ Años 1-22: pago anual máximo de $175 millones más cualquier monto no utilizado de años anteriores, sujeto a un tope en cualquier año de dos veces |

123408529v3

| TÉRMINO | DESCRIPCIÓN |
|---|---|
| | el tope anual aplicable (es decir, $350 millones) (el "Pago anual máximo de los CVI del período inicial") |
| | ▪ Años 23-30: pago anual máximo de $375 millones más cualquier monto no utilizado de años anteriores, sujeto a un tope en cualquier año de dos veces el tope anual aplicable (es decir, $750 millones) (el "Pago anual máximo de los CVI Post-GO/AAP") |
| | ▪ En la medida en que se alcance el Tope Vitalicio de los CVI GO (es decir, el total de $3,500 millones pagados a CVI GO) en el año 21 o anterior, el Pago Anual Máximo de los CVI Post-GO/AAP para los CVI de recuperación empezaría a aplicarse en el año siguiente |
| | ▪ En la medida en que cualquier monto no utilizado de años anteriores permanezca al final del plazo de 30 años, el ELA no adeudará ningún monto adicional a los CVI de recuperación |
| **i) Estructura de opción de compra para los CVI de recuperación** | ▪ Opción de compra ejercitable por un valor total equivalente al monto máximo de pagos futuros presentes valuados a una tasa de descuento sin tope de la Tasa del Tesoro + 100 puntos base, donde la Tasa del Tesoro significa el rendimiento (o rendimiento interpolado) de un valor o valores comparables del Tesoro de EE.UU. que tengan un vencimiento real (o vencimiento interpolado) que esté más cerca de la duración promedio restante de los pagos máximos restantes del CVI de recuperación |
| **j) Conciliación del IVU** | ▪ Como se describe en el Apéndice I del AAP del ELA |
| **k) Reducción del IVU de referencia** | ▪ Como se describe en el Apéndice I del AAP del ELA |
| **l) CVI sujeto a cascada** | |
| **i) Condición de superación del rendimiento sujeto a cascada** | ▪ Anualmente, el valor menor entre (el "Monto de superación del rendimiento sujeto a cascada"): <br><br> o (i) 50% de superación del rendimiento acumulativa por encima de la Métrica de Superación del Rendimiento, a partir del 1 de julio de 2021, menos los pagos hechos anteriormente a CVI GO y CVI de recuperación a partir del Monto de Superación del Rendimiento Sujeto a Cascada <br><br> o (ii) 75% de superación del rendimiento anual |

123408529v3

| TÉRMINO | DESCRIPCIÓN |
|---|---|
| ii) Sujeta a pagos anuales en cascada | ▪ Años 1-22: a partir del Monto de Superación del Rendimiento Sujeto a Cascada, pago anual en cascada de la manera siguiente:<br>  ○ (a) Primeros $100,000,000 a los CVI GO<br>  ○ (b) $11,111,111 siguientes a los CVI de recuperación<br>  ○ (c) Reparto prorrateado en adelante del 90% a los CVI GO y 10% a los CVI de Recuperación, sujeto a cualquier tope aplicable<br>▪ Años 23-30: 100% del Monto de Superación del Rendimiento Sujeto a Cascada a los CVI de recuperación, sujeto a cualquier tope aplicable |
| m) CVI no sujeta a cascada | |
| i) Condición de superación del rendimiento no sujeto a cascada | ▪ Anualmente, el valor menor entre (el "Monto de superación del rendimiento no sujeto a cascada"):<br>  ○ (i) 40% de superación del rendimiento acumulativa por encima de la Métrica de Superación del Rendimiento, a partir del 1 de julio de 2021, menos los pagos hechos anteriormente a los CVI de recuperación a partir del Monto de Superación del Rendimiento No Sujeto a Cascada<br>  ○ (ii) 95% de superación del rendimiento anual (combinado con montos Sujetos a Cascada) |
| ii) No sujeto a pagos anuales en cascada | ▪ 100% del Monto de Superación del Rendimiento No Sujeto a Cascada, sujeto a cualquier tope aplicable |
| n) Destinatarios de los CVI de recuperación | ▪ La asignación de la ACT de los CVI de recuperación será no menor que el 68.6%, como se especifica en el Apéndice 3 del presente documento |
| o) Cascada de distribución prioritaria de los CVI de recuperación de la ACT | ▪ En primer lugar, pagos de los CVI de recuperación, de haberlos, a las Reclamaciones de Bonos de la ACT 68 hasta $179,462,539<br>▪ En segundo lugar, pagos de los CVI de recuperación, de haberlos, a las Reclamaciones de Bonos Prioritarios de la ACT 98 hasta $1,833,405,578<br>▪ En tercer lugar, pagos de los CVI de recuperación, de haberlos, a las Reclamaciones de Bonos Subordinados de la ACT 98 hasta $207,294,178<br>▪ En cuarto lugar, después de pagar los montos permitidos anteriores en su totalidad, los pagos restantes de los CVI de recuperación, de haberlos al Préstamo a la ARD del BCF de la ACT hasta $1,477,506,700<br>▪ Cascada implementada hasta el límite máximo permitido contra el ELA y sujeto a la determinación judicial |

**APÉNDICE 1: BASE DE REFERENCIA DEL 5.5% DEL IVU[1]**
*($ USD)*

**5.5% IVU de referencia**

| Año Fiscal | Monto | | Año Fiscal | Monto |
|---|---|---|---|---|
| 2022 | $1,282,901,069.30 | | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | | 2050[1] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | | 2051[1] | 1,810,682,942.40 |

---

1 El Plan Fiscal de mayo de 2020 contiene proyecciones hasta el Año Fiscal 2049. Valores de referencia calculados para los Años Fiscales 2050 y 2051 utilizando proyecciones del Año Fiscal 2049 y la tasa de crecimiento promedio de los Años Fiscales 2045-2049.

123408529v3

**APÉNDICE 2: RESUMEN DE ASIGNACIÓN DE NUEVOS BONOS DE LA ACT**

| Reclamación | Asignación de Nuevos Bonos de la ACT ($) |
|---|---|
| Reclamaciones de Bonos de la ACT 68 | $646,389,106 |
| Reclamaciones de Bonos Prioritarios de la ACT 98 | $598,610,894 |

123408529v3

**APÉNDICE 3: RESUMEN DE ASIGNACIÓN MÍNIMA DE CVI DE RECUPERACIÓN**

| Reclamación | Mínimo % de asignación a los CVI de recuperación |
|---|---|
| Reclamaciones de Bonos del ELA/ACT Permitidas | 68.6% |

## **ANEXO C**

Estipulación vinculada a las controversias relacionadas con la ARD

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**
**PARA EL DISTRITO DE PUERTO RICO**

| | |
|---|---|
| En el asunto de:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>    como representante de<br><br>EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,<br><br>                    Deudores.[1] | PROMESA<br>Título III<br><br>Núm. 17 BK 3283-LTS<br><br>(Administrado conjuntamente) |

## ESTIPULACIÓN VINCULADA A LAS CONTROVERSIAS RELACIONADAS CON LA ARD

Por la presente, la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), en su calidad de representante única de (i) el Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado, o ELA"), (ii) la Autoridad de Edificios Públicos de Puerto Rico ("AEP"), (iii) el Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico ("SRE") y (iv) la Autoridad de Carreteras y Transportación de Puerto Rico ("ACT"), de conformidad con la Sección 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA")[2],

---

[1] Los Deudores de estos Casos del Título III, conjuntamente con los números de casos del Título III de los respectivos Deudores y los cuatro (4) últimos dígitos del número de identificación tributaria federal de cada Deudor, según proceda, son (i) el Estado Libre Asociado de Puerto Rico (Caso de quiebra núm. 17-BK-3283-LTS) (cuatro últimos dígitos del número de identificación tributaria federal: 3481); (ii) Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de quiebra núm. 17-BK-3284-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 8474); (iii) Autoridad de Carreteras y Transportación de Puerto Rico ("ACT") (Caso de quiebra núm. 17-BK-3567-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3808); (iv) Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de quiebra núm. 17-BK-3566-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 9686); (v) Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") (Caso de quiebra núm. 17-BK-4780-LTS) (Caso de quiebra núm. 17-BK-4780-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3747); y (vi) Autoridad de Edificios Públicos de Puerto Rico ("AEP") (Caso de quiebra núm. 19-BK-5523-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3801) (los números de casos del Título III están enumerados como números de Casos de quiebra debido a las limitaciones del software).

[2] PROMESA está codificada en 48 U.S.C. §§2101–2241.

126714213v4

AmeriNational Community Services, LLC (el "Recaudador"), en calidad de recaudador de la Autoridad de Recuperación de la Deuda ("ARD") del BGF, y Cantor-Katz Collateral Monitor LLC, una sociedad de responsabilidad limitada de Delaware, en calidad de supervisora de la garantía de Wilmington Trust, N.A. (la "Supervisora de la garantía", y conjuntamente con el Recaudador, las "Partes de la ARD")[3], a través de sus respectivos asesores jurídicos y representantes autorizados, estipulan y convienen lo que a continuación se expone:

## CONSIDERANDOS

### Creación de la ARD

A.     El 5 de noviembre de 2018, la Junta de Supervisión certificó una modificación calificada (la "MC del BGF") para el Banco Gubernamental de Fomento ("BGF"), de conformidad con el Título VI de la Ley PROMESA.  El 7 de noviembre de 2018, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal") aprobó la MC del BGF.

B.     La ARD es un fideicomiso público estatutario e instrumentalidad gubernamental del Estado Libre Asociado de Puerto Rico, creada mediante la *Ley para la Reestructuración de la Deuda del Banco Gubernamental de Fomento de Puerto Rico*, Ley 109-2017, con el objeto de que surta efecto lo dispuesto en la MC del BGF.  Leyes de P.R. 7, § 3171.

C.     De conformidad con un Acuerdo marco de transferencia, de fecha 29 de noviembre de 2018 (el "Acuerdo de Transferencia"), formalizado entre la ARD y el BGF, este último transfirió prácticamente todos sus activos a la ARD y, entre otras cosas, los derechos legales, la titularidad y las participaciones del BGF, en:

      a.   veintitrés (23) pagarés emitidos por la ACT a favor del BGF (los "Pagarés de la ACT");

      b.   un capital total original de $200,000,000 en concepto de Bonos de ingresos de la ACT (Serie A), emitidos por la ACT en virtud de la Resolución Núm. 98-06 (los "Bonos Senior 98 de la ACT");

---

[3]     Cada una de ellas —el Estado Libre Asociado, la AEP, el SRE, la ACT, el Recaudador y la Supervisora de la garantía es una "Parte" y, conjuntamente, son las "Partes".

126714213v4

c. la prenda del BGF sobre determinados ingresos incrementales implementados mediante la Ley Núm. 30-2013 y la Ley Núm. 31-2013;

d. ciertos créditos a la AEP por un capital total de $137,414,149.15;

e. ciertos créditos al Estado Libre Asociado;

f. ciertos créditos (los "Créditos de la ADCC") a la Autoridad del Distrito del Centro de Convenciones de Puerto Rico ("ADCC");

g. ciertos créditos (los "Créditos al CRIM") al Centro de Recaudación de Ingresos Municipales ("CRIM")

h. ciertos créditos (los "Créditos al BDE") al Banco para el Desarrollo Económico ("BDE");

i. ciertas transacciones de recompra (las "Recompras a la AFV") con la Autoridad para el Financiamiento de la Vivienda de Puerto Rico (la "AFV");

j. ciertos créditos (los "Créditos a la APPR") a la Autoridad de los Puertos de Puerto Rico ("APPR");

k. en la medida en que no hayan sido identificados en los puntos precedentes, ciertos Préstamos retenidos por el BGF, identificados en el Apéndice 8 del Acuerdo de Transferencia (los "Préstamos retenidos por el BGF").

**Inicio de los Casos del Título III y del Procedimiento del Título VI**

D.      El 3 de mayo de 2017, la Junta de Supervisión presentó ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal del Título III") una petición voluntaria de quiebra en nombre del Estado Libre Asociado, de conformidad con la Sección 304(a) de la Ley PROMESA, con lo cual se inició un proceso al amparo del Título III de dicha Ley (el "Caso del Título III del Estado Libre Asociado").

E.      El 21 de mayo de 2017 (la "Fecha de petición de ACT/SRE"), la Junta de Supervisión presentó ante el Tribunal del Título III sendas peticiones voluntarias de quiebra en nombre de la ACT y del SRE, de conformidad con la Sección 304(a) de la Ley PROMESA, con lo cual se iniciaron procesos al amparo del Título III de dicha Ley (el "Caso de Título III de la ACT" y el "Caso de Título III del SRE", respectivamente).

F.      El 27 de septiembre de 2019 (la "Fecha de petición de AEP"), la Junta de Supervisión presentó ante el Tribunal del Título III una petición voluntaria de quiebra en nombre de la AEP, de

conformidad con la Sección 304(a) de la Ley PROMESA, con lo cual se inició el proceso al amparo del Título III de dicha Ley (el "Caso de Título III de la AEP" y, conjuntamente con el Caso del Título III del Estado Libre Asociado, el Caso del Título III del SRE y el Caso del Título III de la ACT, los "Casos del Título III").

       G.     A tenor de la Sección 315(b) de la Ley PROMESA, la Junta de Supervisión es la representante exclusiva del Estado Libre Asociado, de la ACT, del SRE y de la AEP en los Casos del Título III.

       H.     El 27 de agosto de 2021, la Junta de Supervisión, en calidad de Supervisor administrativo de la ADCC de conformidad con la Sección 601(a)(1) de la Ley PROMESA, certificó una modificación calificada (la "MC de la ADCC") en nombre de la ADCC, que proponía una modificación calificada para reestructurar solamente una parte de la deuda emitida por la ADCC (los "Bonos de la ADCC"). El 8 de octubre de 2021, la Junta de Supervisión inició una acción en nombre de la ADCC, de conformidad con el Título VI de la Ley PROMESA, el Caso Núm. 21-01493 (el "Caso del Título VI de la ADCC"), con el objeto de conseguir la aprobación de la MC de la ADCC. Para el 8 de noviembre de 2021 se ha señalado una vista con el objeto de aprobar la MC de la ADCC. Las Partes reconocen que la MC de la ADCC afecta solamente a los Bonos de la ADCC y no a ninguna de las reclamaciones que la ARD podría plantear contra la ADCC, incluyendo, entre otros, los Créditos a la ADCC.

**El Plan de ajuste**

       I.     El 30 de julio de 2021, la Junta de Supervisión presentó la *Séptima enmienda al Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros*, [ECF Núm. 17627] (la "Séptima enmienda al Plan") y la correspondiente *Declaración de divulgación de la Séptima enmienda al Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros* [ECF Núm. 17628].

       J.     El 2 de agosto de 2021, el Tribunal dictó (i) la *Orden para (I) aprobar la Declaración de divulgación, (II) establecer una Fecha de registro de votación, (III) aprobar la Notificación de la Vista de confirmación y el calendario de confirmación, (IV) aprobar los paquetes de convocatoria y los*

procedimientos de distribución, (V) aprobar los formularios de Papeletas y los procedimientos de votación y elección, (VI) aprobar la Notificación de Miembro sin derecho a voto, (VII) establecer las Fechas límite de votación, elección y confirmación, y (VIII) aprobar los procedimientos de recuento de votos [ECF Núm. 17639] (la "Orden de Procedimientos de convocatoria"), que estableció un calendario y los procedimientos relativos a la convocatoria de votos de los acreedores a favor o en contra de la Séptima enmienda al Plan, y señalando el inicio de la vista para considerar la confirmación de la misma para el 8 de noviembre de 2021 (la "Vista de Confirmación").

K.      En relación con la convocatoria de votos para aceptar o rechazar la Séptima enmienda al Plan, la ARD votó por rechazarla en relación con sus reclamaciones alegadas de las Clases 12, 14, 40 y 59 del Séptimo Plan enmendado (Papeletas Núm.   21060, 21098, 21255, 21283, 21790 y 21296) (en conjunto, los "Votos de la ARD").

L.      El 19 de octubre de 2021, las Partes de la ARD presentaron la *Objeción de las Partes de la ARD a la Séptima enmienda del Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros [Exp. Núm.   17627]* (la "Objeción de la ARD").

M.      El 22 de octubre de 2021, las Partes de la ARD presentaron la *Objeción de las Partes de la ARD a la Propuesta de Orden y Sentencia confirmando la Séptima enmienda del Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros* (la "Objeción a la Orden de Confirmación de la ARD" que, conjuntamente con la Objeción de la ARD, se entenderán como "las Objeciones a la Confirmación").   Las Partes de la ARD han presentado alegaciones adicionales para fundamentar la oposición a la confirmación de la Séptima enmienda al Plan por parte de la ARD y las Partes de la ARD.

N.      El 3 de noviembre de 2021, la Junta de Supervisión presentó la *Octava enmienda al Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico y otros* [ECF Núm.   19053] (el "Plan").[4]   Tal como se estipula en la Sección 2.2 del Plan, a efectos de confirmación y consumación del

---

[4] Todos los términos en mayúsculas utilizados pero no definidos en este documento tendrán los significados atribuidos a los mismos en el Plan.

Plan y de las distribuciones contempladas en el mismo, salvo que se disponga algo distinto a tenor de una orden del Tribunal del Título III, (1) las Reclamaciones de Bonos ELA 2012 y las Reclamaciones de Bonos ELA 2012 (Assured) se considerarán admitidas por un importe total de $2,934,427,459.40, y (2) las Reclamaciones de ELA/ACT se considerarán admitidas por un importe total de $6,377,335,459.34. La ARD manifiesta ser titular de Reclamaciones de Bonos ELA 2012 por un importe de $63,215,037.71. La ARD manifiesta ser titular de una Reclamación de AEP/ARD garantizada y una Reclamación de AEP/ARD no garantizada por importes de $66,222,028.00 y $134,357,497.00, respectivamente.  La ARD alega tener derecho a una parte de la recuperación asociada con las Reclamaciones de AEP/ARD, tal y como se estipula en la Jerarquía de prioridades de distribución de los IVC de Recuperación (Clawback) a las Reclamaciones admitidas del ELA/ACT, incluidos en el Anexo "J" del Plan.

**Disputas relacionadas con la ARD**

O.     Las Partes de la ARD han iniciado y/o participado en, actuaciones, alegaciones y objeciones relacionados con, entre otros, los siguientes (en conjunto, las "Controversias relacionadas con la ARD"):

(i)     **Moción de Levantamiento de paralización de la ARD**.  Pleitos derivados de (a) *la Moción y Escrito de alegaciones de las Partes de la ARD en apoyo de su Moción de medidas cautelares contra la suspensión automática o, en su defecto, para ordenar el pago de la protección adecuada* [ECF Núm. 7643], (b) *la Enmienda a la Moción y Escrito de alegaciones de las Partes de la ARD en apoyo de su Solicitud de Protección adecuada o medidas cautelares contra la suspensión automática* [ECF Núm. 16276], y (c) cualesquiera otras mociones o disputas pendientes a la fecha de hoy relacionadas con las citadas mociones.

(ii)    **Moción de gastos administrativos**.  Pleitos derivados de (a) *la Moción de las Partes de la ARD para la admisión de una Reclamación de gastos administrativos* [ECF Núm. 17009], y (b) cualesquiera otras mociones o disputas pendientes a la fecha de hoy relacionadas con la moción citada.

(iii)   **Procedimiento contencioso de la ARD**.  El pleito caratulado(a) *AmeriNational Community Services, LLC y otros contra Ambac Assurance Corporation, y otros*, Proc. abr. Núm. 21-00068, y (b) cualesquiera otras mociones y contenciosos pendientes a la fecha relacionados con la actuación citada.

(iv)    **Procedimiento contencioso de la AEP**.  El pleito caratulado (a) *Autoridad de Edificios Públicos de Puerto Rico contra AmeriNational Community Services, LLC y otros*, Proc. abr. Núm. 21-00100, (el "Contencioso de la AEP") y (b) cualesquiera

otras mociones y contenciosos pendientes a la fecha relacionados con la actuación citada.

(v) **Moción conforme a la Sección 926**. Pleitos derivados de (a) la *Moción urgente para una Orden provisional, y Moción para el nombramiento de un Fideicomisario, a tenor de 11 U.S.C. §926, para Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company y National Public Finance Guarantee Corporation*, de fecha 17 de julio de 2020, presentada en el Caso del Título III de la ACT [ECF Núm. 871] y el Caso del Título III del Estado Libre Asociado [ECF Núm. 13708], (b) *Assured Guaranty Corp. y otros contra el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 20-1847, y (c) cualesquiera otras mociones y contenciosos pendientes a la fecha solicitando el nombramiento de un fideicomisario para la ACT, de conformidad con 11 U.S.C. §926.

(vi) **Mociones de levantamiento de paralización**. El pleito caratulado (a) *Assured Guaranty Corp. y otros contra la Junta de Supervisión y Administración Financiera de Puerto Rico*, presentado en el Caso del Título III de la ACT [ECF Núm. 673], (b) *Ambac Assurance Corporation y otros contra la Junta de Supervisión y Administración Financiera de Puerto Rico*, presentado en el Caso del Título III del Estado Libre Asociado [ECF Núm. 10104], (c) *Ambac Assurance Corporation y otros contra la Junta de Supervisión y Administración Financiera de Puerto Rico*, presentado en el Caso del Título III del Estado Libre Asociado [ECF Núm. 10602], (d) *AmeriNational Community Services, LLC y otros contra la Junta de Supervisión y Administración Financiera de Puerto Rico*, presentado en el Caso del Título III de la ACT [ECF Núm. 591], (e) *Assured Guaranty Corp y otros contra el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 20-1930, actualmente pendiente en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (f) *Ambac Assurance Corporation otros contra el Estado Libre Asociado de Puerto Rico y otros*, Caso Núm. 20-1931, actualmente pendiente en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, (g) *Peaje Investments LLC contra la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. abr. Núm. 17-00151-LTS, presentado en el Caso del Título III de la ACT [ECF Núm. 1], con sus correspondientes enmiendas, (h) *Peaje Investments LLC contra la Autoridad de Carreteras y Transportación de Puerto Rico y otros*, Proc. abr. Núm. 17-00152-LTS, presentado en el Caso del Título III de la ACT [ECF Núm. 1], con sus correspondientes enmiendas, y (i) cualesquiera mociones o contenciosos solicitando el levantamiento de la suspensión automática decretada de acuerdo con las Secciones 362 y 922 del Código de Quiebras (en la medida en que procediese) con respecto a ingresos similares a los disputados en las citadas Mociones de levantamiento de paralización.

(vii) **Objeciones relativas a la deuda**. Pleitos derivados de (a) *Objeción global de (I) la Junta de Supervisión y Administración Financiera para Puerto Rico, a través de su Comité Especial de Reclamaciones, y (II) el Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o alegadas por tenedores de ciertos Bonos de Obligación General del Estado Libre Asociado de Puerto Rico*, de fecha 14 de enero de 2019 [ECF No. 4784], (b) *Objeción global del Comité Oficial de Acreedores No Asegurados, , a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las reclamaciones presentadas o alegadas por*

*tenedores de ciertos Bonos de Obligación General 2011 del Estado Libre Asociado de Puerto Rico*, de fecha 21 de mayo de 2019 [ECF No. 7057], (c) *Objeción global del Comité Oficial de Acreedores No Asegurados , a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, contra el Estado Libre Asociado por tenedores de Bonos de la Autoridad de Edificios Públicos de Puerto Rico*, de fecha 18 de julio de 2019 [ECF No. 8141], (d) *Objeción global de la Coalición de Deuda Constitucional Legítima, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las Reclamaciones presentadas o incoadas por tenedores de ciertos Bonos emitidos o garantizados por el Estado Libre Asociado*, de fecha 8 de enero de 2020 [ECF No. 9731], (e) *Objeción global del Comité Oficial de Acreedores No Asegurados, a tenor de la Sección 502 del Código de Quiebras y de la Regla de Quiebras 3007, a las Reclamaciones presentadas o incoadas contra el Estado Libre Asociado por tenedores de Bonos de Obligación General que alegan prioridad sobre otros acreedores no asegurados del Estado Libre Asociado*, de fecha 3 de febrero de 2020 [ECF No. 10638], y (g) cualesquiera otras objeciones o adhesiones a las mismas, u otras objeciones, que pudieran presentarse por cuenta de otras solicitudes de medidas cautelares, oponiéndose, entre otras cosas, a la validez y a los correspondientes derechos de los de los Bonos GO 2011, los Bonos GO 2012 y los Bonos GO 2014.

(viii) **Acciones de recuperación**.  El pleito caratulado (a) *Junta de Supervisión y Administración Financiera de Puerto Rico contra Ambac Assurance Corporation y otros*, Proc. abr. Núm.  20-00005-LTS, actualmente pendiente de decisión en el Tribunal del Título III (b) *Junta de Supervisión y Administración Financiera de Puerto Rico contra Ambac Assurance Corporation y otros*, Proc. abr. Núm. 20-00007-LTS, actualmente pendiente de decisión en el Tribunal del Título III.

(ix) **Pleitos de uniformidad**.  El pleito caratulado (a) *Ambac Assurance Corporation contra la Junta de Supervisión y Administración Financiera de Puerto Rico y otros*, Proc. abr. Núm.  20-00068-LTS, actualmente pendiente de decisión en el Tribunal del Título III, y (b) todos aquellos pleitos que pudiesen actualmente estar pendientes de decisión o que pudiesen haberse iniciado durante período desde y después de la fecha del mismo, incluyendo la Fecha de vigencia de la ACT, si se trataran de reclamaciones o causas de acción congruentes con, o similares a, las alegadas o que pudiesen alegarse en los pleitos referenciados.

P.      El 29 de octubre de 2021, el Tribunal del Título III explicó (a) el *Dictamen y Orden rechazando la Moción de las Partes de la ARD para la admisión de una Reclamación de gastos administrativos* [ECF Núm.  18892] (el "Dictamen sobre Gastos administrativos") en el Caso del Título III de Estado Libre Asociado, y (b) el *Dictamen y Orden aceptando la Moción de desestimación de la Reclamación de los Demandados* [Caso Núm.  21-00068, ECF Núm.  83] (la "Orden desestimando la Demanda contenciosa de la ARD").

**POR CONSIGUIENTE**, de conformidad con lo antedicho, por la presente las Partes convienen lo que a continuación se expone:

126714213v4

**ACUERDO**

1.    <u>Votos de la ARD</u>.  A la mayor brevedad después de la formalización de esta Estipulación, las Partes de la ARD notificarán al Agente de votación de los deudores, Prime Clerk LLC, su determinación de cambiar los Votos de la ARD y cualesquiera otros votos emitidos en relación a la Séptima enmienda al Plan, de "Rechazo" a "Acepto", incluyendo, entre otros y en la medida en que fuera necesario, e interponiendo un recurso ante el Tribunal del Título III para que modifique los Votos de la ARD y cualesquiera otros votos emitidos en relación con la Séptima enmienda al Plan, de conformidad con la Regla 3018(a) de las Reglas Federales de Procedimientos de Quiebra.

2.    <u>Retirada de las Objeciones a la Confirmación</u>.  A la mayor brevedad después de la formalización de esta Estipulación, las Partes de la ARD retirarán las Objeciones a la Confirmación y adoptarán todas y cada una de las medidas razonablemente necesarias para efectuar dicha retirada, incluyendo, entre otros, la retirada de (i) todos los testigos, incluyendo todos sus testimonios por escrito registrados, ofrecidos por las Partes de la ARD en la Vista de Confirmación, (ii) todas las pruebas y demás evidencias que las Partes de la ARD hubieran solicitado que se admitiera como tales en la Vista de Confirmación, (iii) todas las solicitudes de examinar o de otro modo obtener testimonios de testigos en la Vista de Confirmación, y (iv) cualesquiera mociones presentadas por las Partes de la ARD relacionadas con cualquier cuestión vinculada con la Vista de Confirmación.

3.    <u>Acuerdos del Plan</u>.  A partir de la fecha de hoy, y siempre y cuando esta Estipulación no haya quedado rescindida, las Partes convienen lo que a continuación se expone:

     a.    En la medida en que fuera necesaria una convocatoria adicional en relación con el Plan (o cualquier otro plan de ajuste registrado con posterioridad al Plan), el Recaudador, en nombre y representación de la ARD, votará a favor de la aceptación del Plan (o de cualquier otro plan de ajuste registrado con posterioridad al Plan que, en forma y contenido, sea congruente con el Plan y de ningún modo sea económica o materialmente peor que los términos y condiciones de esta Estipulación o del Plan);

     b.    El ARD y las Partes del ARD aceptan no apoyar, ni contribuir en modo alguno a que otra persona apoye, la adopción de medidas que pudiesen, o fueran razonablemente susceptibles de, vulnerar o ser incongruentes con los términos y condiciones aquí pactados, ni impedirán u obstaculizarán la presentación de un plan de ajuste ulterior que sea congruente con el Plan y de ningún modo sea económica o materialmente peor que los términos y condiciones de esta Estipulación o del Plan, la administración del Plan (o

126714213v4

cualquier otro plan de ajuste presentado con posterioridad al Plan que, en forma y contenido, sea congruente con el Plan y de ningún modo sea económica o materialmente peor que los términos y condiciones de esta Estipulación o del Plan) y la materialización de la Fecha de vigencia; aunque siempre en el bien entendido de que dicha documentación sea congruente con los términos y condiciones aquí pactados;

c.  La Junta de Supervisión revisará a la mayor brevedad las Reclamaciones de AEP/ARD garantizadas y las Reclamaciones de AEP/ARD no garantizadas y, en caso de que la Junta de Supervisión no estuviera de acuerdo con las cuantías de las reclamaciones alegadas, (1) la Junta de Supervisión lo notificará a las Partes de la ARD como más tardar el 1 de diciembre de 2021, (2) las Partes se reunirán y resolverán cualquier desacuerdo relativo a los importes, y (3) en la medida en que las Partes no llegaran a un acuerdo en relación con las cuantías, la Junta de Supervisión presentará una objeción a las mismas, como más tardar el 31 de diciembre de 2021, y solicitará al Tribunal del Título III que considere a la mayor brevedad la objeción así planteada;

d.  En la medida en que se admitan las Reclamaciones de AEP/ARD garantizadas y las Reclamaciones de AEP/ARD no garantizadas, la ARD recibirá el tratamiento y las recuperaciones previstos en los Artículos XVI y XVIII del Plan, respectivamente (o las disposiciones correspondientes en cualquier plan de ajuste presentado con posterior al Plan Plan);

e.  En la Fecha de vigencia, las Reclamaciones de Bonos ELA 2012 en posesión de la ARD se considerarán admitidas por una cuantía global de $63,215,037.71, representada por el Crédito Núm.  20001721500100347 por un importe de $24,305,448.72, y el Crédito Núm.  20001721500100356 por una cuantía de $38,909,588.99; y

f.  La Orden desestimando la Demanda contenciosa de la ARD, incluyendo, entre otros, que los Créditos del BGF a la ACT están subordinados a los Bonos 68 de la ACT, y que, a efectos del Plan, los Bonos 98 de la ACT están sujetos a la "Determinación de prioridad de Créditos del BGF".

4.  Caso del Título VI de la ADCC.  A partir de la fecha, y siempre y cuando esta Estipulación no quede rescindida, cada una de las Partes del ARD acepta no oponerse ni contribuir en modo alguno a que otra persona apoye, la adopción de medidas que pudiesen, o fueran razonablemente susceptibles de, vulnerar, o ser incongruentes con, los términos y condiciones aquí pactados, ni impedir u obstaculizar la aprobación de la MC de la ADCC del Caso del Título VI de la ADCC, el dictado de una orden que apruebe la MC de la ADCC y la consumación de la MC de la ADCC.  En la medida en que fuera necesario que a las Partes del ARD se les cursara alguna notificación en relación con el Caso del Título VI de la ADCC, la ARD y las Partes de la ARD renuncian a que se les curse la misma.

5.  Desestimación/Retirada de las Controversias relacionadas con la ARD.  Las Partes de la ARD aceptan, y se comprometen a hacerlo en un plazo de cinco (5) Días laborables a partir del día de la

126714213v4

fecha, a retirar y/o hacer desestimar, sin perjuicio en cada caso, las Controversias relacionadas con la ARD y cualesquiera otros pleitos o disputas entre las Partes de la ARD y los Deudores del Título III, así como a adoptar todas aquellas otras medidas razonablemente necesarias para materializar dicha retirada/desestimación, sin perjuicio en cada caso.  Las Partes de la ARD acuerdan, y se comprometen a, no plantear ninguna apelación con respecto a las Controversias relacionadas con la ARD, incluyendo, entre otras, el Dictamen sobre Gastos administrativos y la Orden desestimando la Demanda contenciosa de la ARD.  En un plazo de cinco (5) Días laborables a contar desde la Fecha de vigencia, la Junta de Supervisión dispondrá que la Demanda contra la AEP quede desestimada, sin perjuicio.

6.      <u>Exculpación de las Partes del ARD</u>.  La Junta de Supervisión deberá incluir en la Orden de Confirmación (y en cualquier plan de ajuste que se presente con posterioridad al Plan) y en el Plan de la ACT (y en cualquier plan de ajuste que se presente con posterioridad al Plan de la ACT) el texto estableciendo la exculpación de las Partes de la ARD, la ARD y sus respectivos profesionales y asesores, de manera sustancialmente similar a la exculpación otorgada a determinadas a parte a tenor de la Sección 92.7 del Plan.

7.      <u>Acuerdos del Plan de la ACT</u>.  A partir de la fecha de hoy, y siempre y cuando esta Estipulación no haya quedado rescindida, las Partes convienen lo que a continuación se expone:

a.      la ARD y las Partes de la ARD apoyarán la aprobación de la declaración de divulgación (la "<u>Declaración de divulgación de la ACT</u>") que, con respecto al Plan de la ACT, la Junta de Supervisión presentará ante el Tribunal del Título III en el Caso Título III de la ACT, de conformidad con la Sección 1125 del Código de Quiebras, declaración que, en forma y contenido, será congruente con la presente Estipulación y en ningún caso económica o materialmente peor que los términos y condiciones de la misma, y razonablemente aceptable para las Partes de la ARD;

b.      La ARD y las Partes de la ARD apoyarán la confirmación del Plan de la ACT que presentará la Junta de Supervisión, como representante de la ACT en el Caso del Título III de la ACT, en forma y contenido congruente con esta Estipulación, y de ningún modo económica o materialmente peor que los términos y condiciones de la misma o del Plan, y razonablemente aceptable para las Partes de la ARD, de conformidad con la Sección 314 de la Ley PROMESA y la Sección 1129 del Código de Quiebras;

c. Tras ser convocado a tenor de lo dispuesto en la Ley PROMESA, el Recaudador, en nombre y representación de la ARD, votará por la aceptación del Plan de la ACT (o cualquier otro plan de ajuste presentado con posterioridad al mismo que sea congruente con, y en ningún caso económica o materialmente peor que, los términos y condiciones de esta Estipulación;

d. El ARD y las Partes del ARD aceptan no apoyar, ni contribuir en modo alguno a que otra persona apoye, la adopción de medidas que pudiesen, o fueran razonablemente susceptibles de, vulnerar o ser incongruentes con los términos y condiciones aquí pactados, ni impedirán u obstaculizarán la presentación de un plan de ajuste ulterior que sea congruente con el Plan de la ACT y de ningún modo sea económica o materialmente peor que los términos y condiciones de esta Estipulación o del Plan de la ACT, la administración del Plan de la ACT (o cualquier otro plan de ajuste presentado con posterioridad al mismo que, en forma y contenido, sea congruente con el Plan de la ACT y de ningún modo sea económica o materialmente peor que los términos y condiciones de esta Estipulación) y la materialización de la Fecha de vigencia (tal como se define en el Plan de la ACT; aunque siempre en el bien entendido de que dicha documentación sea congruente con los términos y condiciones aquí pactados; y

e. Tras producirse la Fecha de vigencia del Plan de la ACT, las Reclamaciones de Bonos Senior 98 de la ACT, Reclamaciones de Bonos Senior 98 de la ACT (Ambac), Reclamaciones de Bonos Senior 98 de la ACT (Assured), Reclamaciones de Bonos Senior 98 de la ACT (National) y las Reclamaciones de Bonos Senior 98 de la ACT (FGIC), cada una de ellas definida en el Plan de la ACT, serán admitidas por un importe total de $3,129,667,976.84, y la titularidad de la ARD de $200,000,000.00 de capital de los Bonos Senior 98 de la ACT será reconocida y considerada incluida en dicho importe.

8. <u>Compromiso para negociar ulteriores reestructuraciones</u>.  La Junta de Supervisión hará

todos los esfuerzos razonables, o intervendrá ante la entidad pertinente, para:

a. <u>Créditos al CRIM</u>.  Emprenderá negociaciones de buena fe con el CRIM, las Partes de la ARD y la Autoridad de Asesoría Financiera y Agencia Fiscal ("<u>AAFAF</u>") de Puerto Rico para formalizar un acuerdo relativo a la reestructuración y/o conciliación con los Créditos del CRIM como más tarde el 31 de diciembre de 2021.

b. <u>Créditos al BDE</u>.  Emprenderá negociaciones de buena fe con el BDE, las Partes del ARD y la AAFAF para formalizar un acuerdo relativo a la reestructuración y/o conciliación de los Créditos al BDE como más tarde el 31 de diciembre de 2021.

c. <u>Recompras a la AFV</u>.  Emprenderá negociaciones de buena fe con la AFV, las Partes de la ARD y la AAFAF para elaborar, como más tarde el 31 de enero de 2022, una propuesta relativa a la reestructuración y/o conciliación de las Recompras a la AFV.  Las Partes convienen que el período durante el cual la AFV deberá responder a la demanda

presentada en el pleito caratulado <u>Autoridad de Recuperación de la Deuda del Banco Gubernamental de Fomento para Puerto Rico, representada por su Administrador de Activos AmeriNational Community Services, LLC contra la Autoridad para el Financiamiento de la vivienda de Puerto Rico</u>, presentado el 3 de noviembre de 2021, en la actualidad pendiente de decisión del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, se prorrogará hasta el 15 de febrero de 2022, inclusive, para dar a las Partes tiempo suficiente para intentar resolver sus diferencias sobre el particular.

d.   <u>Créditos a la APPR</u>.   Negociará de buena fe con la Autoridad de los Puertos de Puerto Rico (APPR), las Partes de la ARD y la AAFAF la reestructuración y/o conciliación de los Créditos a la APPR.

e.   <u>Préstamos retenidos por el BGF</u>.   Establecerá de buena fe un calendario con la AAFAF, las Partes de la ARD y las entidades oficiales pertinentes para la reestructuración y/o conciliación de los Préstamos retenidos por el BGF, esforzándose por negociar la resolución de los mismos en un plazo de doce (12) meses a contar desde la Fecha de vigencia.

9.   <u>Posteriores transferencias</u>.  Las Partes de la ARD aceptan abstenerse de vender, transferir, prendar, hipotecar o ceder sus Bonos Senior 98 o Pagarés de la ACT, así como votar, consentir, ordenar o mantener participaciones u otros intereses en estas actividades "Transferencia"). No obstante cualquier disposición en sentido contrario aquí contenida, las Partes dela ARD podrán efectuar una Transferencia a (1) otra Parte de esta Estipulación, o bien (2), en caso de que el beneficiario de la transferencia no fuera una Parte en el momento de la Transferencia, dicho beneficiario acepta formalizar y otorgar, en un plazo de tres (3) días naturales desde la ejecución de la misma y siguiendo las instrucciones de la Junta de Supervisión, el acuerdo de litisconsorcio adjunto a este documento como **Anexo A** (un "<u>Beneficiario de transferencia cualificado</u>"), de conformidad con el cual (y) dicho Beneficiario de transferencia cualificado (i) asumirá todos los derechos y obligaciones del mandante de la transferencia a tenor de los términos y condiciones de la presente Estipulación, y (ii) dicho Beneficiario de transferencia cualificado pasará entonces a ser considerado una Parte a todos los efectos, incluyendo, entre otros, con respecto a cualesquiera Bonos Senior 98 y Pagarés de la ACT adicionales poseídos por el Beneficiario de la transferencia en el momento de incorporarse a esta Estipulación, asumiendo asimismo todos los derechos y obligaciones aquí pactados (salvo el de recibir la Comisión de restricción), y (z) a partir de la Fecha de vigencia de la Transferencia, se considerará que el mandante de la Transferencia ha renunciado a sus

derechos (salvo el de percibir los Derechos de restricción); y siempre en el bien entendido además que, en la medida en que la Transferencia vulnere las disposiciones de esta Sección, será nula y sin efecto *ab initio*, y los Bonos Senior 98 y Pagarés de la ACT, así como la Parte que intente dicha Transferencia, seguirán estando sujetos a los términos y condiciones de la presente estipulación. Asimismo, en el bien entendido de que nada de lo aquí contenido tiene por objeto, ni se interpretará tal, impedir que cualquiera de las Partes adquiera Bonos Senior 98 y Pagarés de la ACT adicionales, entendiéndose que aquellos Bonos Senior 98 y Pagarés de la ACT adquiridos a partir de la fecha de este documento se considerarán, automática e inmediatamente tras la adquisición por alguna de las Partes, sujetos a todos los términos y disposiciones de esta Estipulación.  No obstante lo antedicho, nada de lo aquí contenido tendrá como consecuencia restringir o prohibir a cualquiera de las partes adoptar alguna medida requerida por la Ley de Valores 1933, con sus correspondientes enmiendas, la Ley del Mercado de Valores de 1934, con sus correspondientes enmiendas, cualquier norma o reglamento promulgado de conformidad con ellas, o cualquier otra ley o normativa vigentes.  No obstante lo expuesto, una Parte podrá transferir Bonos Senior 98 o Pagarés de la ACT (o intereses sobre los mismos) a un Creador de mercado cualificado (como se define a continuación), actuando en calidad de tal, sin el requisito de que sea o tenga que ser parte de esta Estipulación si sucesivamente transfiere dichos Bonos Senior 98 o Pagarés de la ACT (o intereses sobre los mismos) a un beneficiario que sea parte de esta Estipulación o a un beneficiario que formalice y otorgue un Acuerdo de Litisconsorcio de conformidad con la Estipulación, antes o en el momento de la Transferencia propuesta. En la medida de que alguna parte de esta Estipulación actúe en calidad de Creador de mercado cualificado, podrá transferir cualesquiera Bonos Senior 98 o Pagarés de la ACT (o intereses sobre los mismos) que adquiera a un tenedor de dichos instrumentos (o intereses sobre los mismos) que no sea Parte de esta Estipulación sin el requisito de que el beneficiario de la Transferencia sea o devenga Parte de la misma. Un Creador de mercado cualificado podrá, con la autorización de la Junta de Supervisión —que no se denegará sin causas justificadas— incorporarse a esta Estipulación exclusivamente en nombre de una mesa de contratación específica.  No obstante lo antedicho, nada de lo aquí contenido sustituye cualquiera de las restricciones en la capacidad de la ARD y de las Partes de la

14

ARD para vender, transferir y transmitir los Bonos Senior 98 o los Pagarés de la ACT (o cualquier otra Propiedad de reestructuración, tal y como se define en el Acuerdo de Transferencia, estipuladas en los acuerdos operativos que implementan la Modificación calificadora del BGF).

10.   Creador de mercado cualificado.  Por "Creador de mercado cualificado" se entenderá a una entidad que: (x) se mantiene fuera del mercado disponible, en el transcurso ordinario de sus actividades, para comprar de sus clientes y vender a sus clientes títulos de deuda, como los Bonos Senior 98 o los Pagarés de la ACT, o contratar con clientes posiciones largas y cortas con dichos títulos, en su calidad de intermediario o creador de mercado de los mismos; (y) actúa de hecho en el negocio de abrir mercados de instrumentos de deuda; y (z) si realiza transacciones con los Bonos Senior 98 o los Pagarés de la ACT, estas quedan registradas en la SEC y en las autoridades reguladoras de instituciones financieras.

11.   Condiciones de distribución de la ACT.  Una vez satisfechas las Condiciones de distribución de la ACT, la ARD tendrá derecho a recibir su parte de la Recuperación (Clawback) de ELA/ACT, tal y como se estipula en la Jerarquía de prioridades de distribución de los IVC de Recuperación (Clawback) a las Reclamaciones admitidas del ELA/ACT, incluidos en el Anexo "J" del Plan.

12.   Comisión de restricción.  Como contrapartida por los acuerdos aquí estipulados, incluyendo el acuerdo para "bloquear" sus Bonos Senior 98 y Pagarés de la ACT, la ARD tendrá derecho a percibir, en la Fecha de vigencia del Plan de la ACT, o en cuanto resulten razonablemente viable con posterioridad de conformidad con los términos del Plan de la ACT, aunque como más tardar diez (10) Días laborables a contar de dicha fecha y en forma de una reclamación admitida de gastos administrativos, la suma de quince millones de dólares ($15,000,000.00), en efectivo, de la ACT (la "Comisión de restricción"); aunque siempre en el bien entendido de que, si esta Estipulación queda rescindida a tenor del apartado 16(b), la ARD no tendrá derecho a percibir esta comisión.

13.   Derecho de modificación del Plan.  Siempre y cuando esta Estipulación no quede rescindida y se mantenga en pleno vigor y efecto, la Junta de Supervisión, a su exclusiva y absoluta

15

discreción podrá presentar cualquier plan de ajuste ulterior (incluyendo, entre otros, documentación relacionada, como el Plan fiscal del ELA y complementos del plan) para enmendarlo, así como cualquier plan de ajuste ulterior para el Estado Libre Asociado o la ACT; aunque siempre en el bien entendido de que dicho plan contendrá cláusulas congruentes con las descritas en esta Estipulación, y que nada de lo contenido en el mismo será incongruente con dichas cláusulas; en el bien entendido asimismo de que la Junta de Supervisión no podrá enmendar dicho plan de modo alguno que disminuya los derechos y privilegios de la ARD conformes a esta Estipulación y al Plan.

14.     No es oferta de emisión o venta de valores.  Cada una de las Partes, conjunta y no solidariamente, reconoce y acepta que esta Estipulación no constituye una oferta de emisión o venta de valores a ninguna persona física o jurídica, ni la solicitud de ofertas de adquisición o compra de títulos en ninguna jurisdicción donde dicha oferta o solicitud sería ilícita. NO OBSTANTE LO ANTEDICHO, NADA DE LO AQUÍ CONTENIDO REQUERIRÁ QUE NINGUNA DE LAS PARTES ADOPTE NINGUNA MEDIDA PROHIBIDA POR LA LEY PROMESA, LA LEY DE VALORES DE 1933, CON SUS CORRESPONDIENTES ENMIENDAS, LA LEY DEL MERCADO DE VALORES DE 1934, CON SUS CORRESPONDIENTES ENMIENDAS, O LAS NORMAS O REGLAMENTOS PROMULGADOS EN VIRTUD DE LAS MISMAS, O POR CUALQUIER OTRA LEY O REGLAMENTE VIGENTE, U ÓRDENES O INSTRUCCIONES DE CUALQUIER TRIBUNAL O AUTORIDAD GUBERNAMENTAL ESTATAL O FEDERAL.

15.     Obligación de defensa.  La Junta de Supervisión está obligada a defender cualquier objeción a esta Estipulación.

16.     Rescisión.  Esta Estipulación quedará rescindida, tras lo cual quedará nula y sin efecto y se considerará como tal, al producirse cualquiera de las siguientes incidencias: (a) por las Partes de la ARD, en caso de que la Junta de Supervisión vulnerara cualquiera de los términos y condiciones materiales de esta Estipulación, incluyendo la presentación de un plan de ajuste de la ACT de manera incongruente con los términos y condiciones aquí pactados; (b) por la Junta de Supervisión, en caso de que cualquiera de las Partes de la ARD vulnerara materialmente los términos y cláusulas de esta

16

Estipulación; o bien (c) por la Junta de Supervisión o las Partes de la ARD si el Tribunal del Título III

rechazara confirmar el Plan o el Plan de la ACT (o cualquier plan de ajuste presentado a posterioridad del

Plan de la ACT) y la Junta de Supervisión omite presentar un Plan enmendado o un Plan de la ACT

enmendado (en cada caso, congruente con, y de ningún modo económica o materialmente peor que los

términos de, esta Estipulación) en un plazo de treinta (30) días naturales a contar desde el citado rechazo.

      17.   <u>Cumplimiento específico</u>.  Las Partes entienden y convienen que las indemnizaciones

monetarias serían una subsanación insuficiente por cualquier vulneración de esta Estipulación por

cualquiera de las Partes, y que la Parte no incumplidora tendrá derecho a medidas de cumplimiento

específico, cautelares y otros recursos de amparo como subsanación de cualquier vulneración, sin

necesidad de demostrar la inadecuación de indemnizaciones monetarias como remedio.  Las medidas de

cumplimiento específico, cautelares y otros recursos de amparo, así como el derecho de rescindir esta

Estipulación de conformidad con los términos y condiciones de la misma, será el único y exclusivo

recurso por cualquier incumplimiento de esta Estipulación por cualquiera de las Partes.

      18.   <u>Garantías adicionales</u>.  Cada una de las Partes signatarias acepta formalizar y otorgar, u

ocuparse de que se formalicen y otorguen, aquellos instrumentos, y se adopten aquellas medidas, que las

otras Partes pudiesen solicitar justificadamente con el objeto de materializar las intenciones y propósitos,

y hacer cumplir los términos y condiciones, de esta Estipulación.

<u>Cláusulas diversas</u>

      19.   Las decisiones del Tribunal relativas a la aplicabilidad de las Restricciones de activos a

las Partes de la ARD incluidas en la *Orden relativa a la Objeción de las Partes del Gobierno a la

legitimación de las Partes de la ARD de solicitar medidas cautelares contra la suspensión automática o,

alternativamente, ordenar el pago de protección adecuada en relación con las Restricciones de activos

de la ARD* [ECF no 17725] y el Dictamen sobre Gastos administrativos serán vinculantes para las Partes.

      20.   Las Partes, a través de sus respectivos letrados, manifiestan y garantizan que están

debidamente autorizadas para formalizar esta Estipulación y quedar vinculadas por la misma.

17

126714213v4

21.     Los acuerdos, compromisos, convenios y obligaciones asumidos por las Partes en virtud de esta Estipulación son exclusivamente individuales y no solidarios en todos sus aspectos, y ninguna de ellas será responsable por el cumplimiento o vulneración de esta Estipulación por parte de la otra.

22.     La formalización de esta Estipulación no tiene por objeto ser, ni se interpretará de ese modo, una admisión o prueba en cualquier litigio, acción, procedimiento o diferencia pendiente, de responsabilidad, negligencia u obligación ninguna (incluyendo en lo que respecta a los méritos de cualquier demanda o defensa) por alguna de las Partes frente a la otra o a cualquier otra persona con respecto a cualesquiera de los asuntos abordados en esta Estipulación.  Nada de lo contenido en esta Estipulación (incluyendo sus considerandos y anexos), como tampoco las negociaciones o cualesquiera otros actos realizados o documentos formalizados de conformidad con, o en cumplimiento de esta Estipulación o los acuerdos alcanzados, será admisible en ningún procedimiento ni para ningún propósito, salvo para hacer valer los términos y condiciones de la presente Estipulación.

23.     Este Tribunal mantendrá la competencia de oír y determinar todos los asuntos derivados de, o relacionados con, la implementación, interpretación o validez de esta Estipulación.

24.     La presenta Estipulación se regirá por las leyes del estado de Nueva York.

25.     Esta Estipulación podrá formalizarse en varias copias, cada una de las cuales podrá transmitirse por fax o correo electrónico, y cada una de las cuales se considerará un original, aunque el conjunto de todas ellas constituirá un único instrumento.

126714213v4

26.     A efectos de disipar cualquier duda, esta Estipulación no afectará a ninguna de las reclamaciones de las Partes del ARD, salvo a aquellas pertinentes a los Deudores y a la ACT.

Fecha: noviembre 5, 2021

[<em>sigue página de firmas</em>]

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Por: Junta de Supervisión y Administración Financiera de Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico

Por: */s/ Brian S. Rosen* _____
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera de Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico*

**EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO**

Por: Junta de Supervisión y Administración Financiera de Puerto Rico, como representante del Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico

Por: */s/ Brian S. Rosen* _____
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera de Puerto Rico, como representante del Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico*

126714213v4

**LA AUTORIDAD DE EDIFICIOS
PÚBLICOS DE PUERTO RICO**

Por: Junta de Supervisión y Administración
Financiera de Puerto Rico, como representante
de la Autoridad de Edificios Públicos de Puerto
Rico

Por: */s/ Brian S. Rosen*                          
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y
Administración Financiera de Puerto Rico,
como representante de la Autoridad de Edificios
Públicos de Puerto Rico*

**LA AUTORIDAD DE CARRETERAS Y
TRANSPORTACIÓN DE PUERTO RICO**

Por: Junta de Supervisión y Administración
Financiera de Puerto Rico, como representante
de la Autoridad de Carreteras y Transportación
de Puerto Rico

Por: */s/ Brian S. Rosen*                          
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y
Administración Financiera de Puerto Rico,
como representante de la Autoridad de
Carreteras y Transportación de Puerto Rico*

126714213v4

**LA AUTORIDAD DE RECUPERACIÓN DE LA DEUDA DEL BGF**

Por:  AmeriNational Community Services, LLC, como recaudador de la Autoridad de Recuperación de la Deuda del BGF

Por: */s/ Arturo J. García-Solá*
Arturo J. García-Solá
**MCCONNELL VALDÉS LLC**
270 Avenida Muñoz Rivera, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00918-4225
Teléfono: 787-250-5632
Fax: 787-759-9225

*Abogados de AmeriNational Community Services, LLC, como recaudador de la Autoridad de Recuperación de la Deuda del BGF*

22

126714213v4

**LA AUTORIDAD DE RECUPERACIÓN DE LA DEUDA DEL BGF**

Por: Cantor-Katz Collateral Monitor LLC, como Supervisora de la garantía de la Autoridad de Recuperación de la Deuda de BGF


Por: */s/ Douglas S. Mintz*
Douglas S. Mintz
**SCHULTE ROTH & ZABEL LLP**
901 Fifteenth Street, NW, Suite 800
Washington, D.C. 20005
Teléfono: (202) 729-7470
Fax: (202) 730-4520

- y -

Douglas Koff (admitido pro hac vice)
Abbey Walsh (admitido pro hac vice)
Peter J. Amend (admitido pro hac vice)
919 Third Avenue
Nueva York, N.Y. 10022
Tel: 212-756-2000
Fax: 212-593-5955

*Abogados de Cantor-Katz Collateral Monitor LLC, como Supervisora de la garantía de la Autoridad de Recuperación de la Deuda de BGF*

126714213v4

# **ANEXO E**

Presupuesto fiscal de la ACT, 2022



**FINANCIAL OVERSIGHT & MANAGEMENT BOARD
FOR PUERTO RICO**

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**POR CORREO ELECTRÓNICO**

4 de marzo de 2022

Honorable Pedro R. Pierluisi Urrutia,
Gobernador
Estado Libre Asociado de Puerto Rico

Estimado Gobernador Pierluisi Urrutia:

De conformidad con virtud de la Resolución (copia de la cual se adjunta al presente en forma de Anexo A (la "Resolución") adoptada por la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión") y con la Sección 202(e)(4) de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA"), por la presente la Junta de Supervisión presenta al Gobernador este certificado de cumplimiento, manifestando que el presupuesto fiscal revisado para el año 2022 de la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico, identificado como Anexo 1 del presente documento y preparado por la Junta de Supervisión a tenor de la Sección 202(c)(2), es un presupuesto compatible tal y como lo establece la Resolución.

La Junta de Supervisión pretende colaborar con el Estado Libre Asociado y con la ACT cumplir los requisitos y alcanzar los objetivos de la Ley PROMESA para beneficio del pueblo de Puerto Rico.

Atentamente,

*David Skeel*

David A. Skeel

Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

Honorable Pierluisi Urrutia
4 de marzo de 2022
Página 2 de 2

CC:     Sra. Natalia A. Jaresko
        Hon. Omar Marrero Díaz
        Sr. Edwin González Montalvo
        Junta de Directores de la ACT

**ANEXO I**

**ANEXO I**: PRESUPUESTO CERTIFICADO REVISADO PARA EL AÑO FISCAL 2022 DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO

ANEXO I

## ANEXO I – PRESUPUESTO DE INGRESOS

### AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO

**Sección I. –** Descripción general del Presupuesto

|  | Presupuesto AF 22 (miles de $) |
|---|---:|
| Ingresos por peajes y multas | 185,236 |
| Ingresos del transporte público | 4,973 |
| Fondos operativos de la FTA | 20,000 |
| Otros ingresos de explotación | 10,270 |
| **Total de ingresos de explotación** | **220,479** |
| Fondos para inversiones de capital del ELA | 143,020 |
| Fondos para inversiones de capital federales | 263,049 |
| **Total ingresos de capital** | **406,069** |
| **Total ingresos consolidados** | **626,548** |
| Costos salariales y de pensiones | 57,867 |
| Costos de administración y mantenimiento de peajes de carreteras | 45,235 |
| Costos del Tren Urbano y del Autobús Rápido | 82,587 |
| Otros costos de explotación | 51,247 |
| **Total de costos de explotación** | **236,936** |
| Costos del Programa federal de construcción de carreteras | 157,043 |
| Costos de construcción de carreteras no federales | 72,677 |
| Costos del programa de reparaciones de emergencia | 36,497 |
| Costos del programa de construcción de transporte público | 53,506 |
| Otros costos de capital[1] | 49,693 |
| **Total inversiones de capital** | **369,415** |
| Depósitos de reserva | 6,000 |
| **Total depósitos de reserva** | **6,000** |
| **Total gastos consolidados** | **612,351** |
| **Balance** | **14,197** |

[1] 'Salarios de construcción y beneficios afines' y "Otros gastos del programa de construcción" han sido reclasificados como Inversiones de capital y se incluyen dentro de dicha partida

### ANEXO I

**TOTAL INGRESOS POR PEAJES Y MULTAS**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Ingresos por peajes a las tarifas actuales | 138,554 |
| Ingresos por peajes por incremento de las tarifas | 4,584 |
| Ingresos por peajes de los carriles de peaje dinámicos (DTL) | 5,500 |
| Ingresos por peajes de tarifas bidireccionales | 166 |
| **Total de ingresos por peajes** | **148,804** |
| Total de ingresos por multas de peaje a las tarifas actuales | 33,870 |
| Total de ingresos por multas de peaje a tarifas estratificadas | 2,562 |
| **Total de ingresos por multas de peaje** | **36,432** |
| **Total de ingresos por peajes y multas** | **185,236** |

**INGRESOS DEL TRANSPORTE PÚBLICO**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Ingresos por tarifas del Tren Urbano | 4,297 |
| Ingresos por tarifas del Autobús rápido | 676 |
| **Total ingresos del transporte público** | **4,973** |

**FONDOS OPERATIVOS DE LA FTA**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Fondos operativos de la FTA | 20,000 |
| **Total Fondos operativos de la FTA** | **20,000** |

**OTROS INGRESOS DE EXPLOTACIÓN**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Otros ingresos de explotación | 10,270 |
| **Total Otros ingresos de explotación** | **10,270** |

**FONDOS DE INVERSIONES DE CAPITAL DEL ESTADO LIBRE ASOCIADO ("ELA")**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Asignación de inversiones de capital del ELA | 53,020 |
| Fondos de reinversiones de capital del Estado | 90,000 |
| **Total fondos de inversiones de capital del ELA** | **143,020** |

### ANEXO I

**FONDOS DE INVERSIONES DE CAPITAL FEDERALES**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Fondos regulares de la FHWA | 157,044 |
| Fondos para carreteras de "IIJA" de la FHWA | - |
| Fondos para puentes de "IIJA" de la FHWA | - |
| **Total fondos de la FHWA (no de emergencia)** | **157,044** |
| Fondos de emergencia de la FHWA | 33,673 |
| Fondos de emergencia de la FEMA | 1,619 |
| Fondos de emergencia de la CARES | 17,607 |
| **Total fondos de emergencia federales** | **52,899** |
| Fondos regulares de la FTA | 51,506 |
| Fondos de "IIJA" de la FTA | 1,600 |
| **Total fondos federales para transporte público** | **53,106** |
| **Total Fondos para inversiones de capital federales** | **263,049** |

**COSTOS SALARIALES Y DE PENSIONES**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Salarios principales – excepto construcción | 10,670 |
| Costos sanitarios – excepto construcción | 3,086 |
| Bonificación de Navidad – excepto construcción | 181 |
| Costos de jubilaciones anticipadas – excepto construcción | 6,737 |
| Otros costos laborales – excepto construcción | 1,434 |
| **Total salarios no de construcción y beneficios afines** | **22,108** |
| Aportaciones a pensiones | 35,759 |
| Costos administrativos | - |
| **Total de costos de pensiones** | **35,759** |
| **Total de costos salariales y de pensiones** | **57,867** |

**COSTOS DE ADMINISTRACIÓN Y MANTENIMIENTO DE PEAJES DE CARRETERAS**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Comisiones de cobro de peajes electrónicos variables | 20,646 |
| Costos de electricidad de carreteras | 4,000 |
| Otros costos de administración y mantenimiento de peajes de carreteras | 20,589 |
| **Total de costos de administración y mantenimiento de peajes de carreteras** | **45,235** |

### ANEXO I

## COSTOS DEL TREN URBANO Y EL AUTOBÚS RÁPIDO

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Tarifa básica del contrato de explotación del Tren Urbano | 48,603 |
| Otros costos del contrato de explotación del Tren Urbano | 3,620 |
| Costos de seguros del Tren Urbano | 8,500 |
| Costos de electricidad del Tren Urbano | 9,129 |
| Otros costos regulares del Tren Urbano | 68 |
| Costos especiales por la COVID-19 | 1,100 |
| **Total de costos del Tren Urbano** | **71,020** |
| Tarifa básica del contrato de explotación del Autobús Rápido | 8,847 |
| Otros costos del contrato de explotación del Autobús Rápido | 1,357 |
| Costos de circulación del Autobús Rápido | 1,074 |
| Costos especiales por la COVID-19 | 698 |
| **Total de costos del Autobús Rápido** | **11,976** |
| **Total de costos del tren urbano y del Autobús Rápido** | **82,996** |

## OTROS COSTOS DE EXPLOTACIÓN

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Pagos operativos de derecho de paso | 7,905 |
| Honorarios de servicios profesionales (no del Título III) | 7,276 |
| Honorarios de servicios profesionales del Título III | 12,508 |
| Equipo de administración del fondo discrecional | 150 |
| Equipo de administración de ingresos complementarios | 200 |
| Costos de electricidad | 918 |
| Costos de suministro de agua | 500 |
| Otros costos de explotación | 21,791 |
| **Total Otros costos de explotación** | **51,247** |

## COSTOS DEL PROGRAMA FEDERAL DE CONSTRUCCIÓN DE CARRETERAS

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Costos directos de construcción regular de carreteras federales | 132,291 |
| **Total de costos directos de construcción de carreteras federales** | **132,291** |
| Costos indirectos de planificación y cumplimiento federales | 24,752 |
| **Total de costos indirectos de construcción de carreteras federales** | **24,752** |
| **Total de costos del Programa federal de construcción de carreteras** | **157,043** |

## ANEXO I

**COSTOS DEL PROGRAMA DE CONSTRUCCIÓN DE CARRETERAS NO FEDERALES**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Costos directos de proyectos de Abriendo Caminos - Fase III | 26,511 |
| Costos directos de otros programas de construcción de carreteras no federales | 4,224 |
| Costos de construcción locales | 9,500 |
| **Total de costos directos de construcción de carreteras no federales** | **40,235** |
| Costos indirectos de los proyectos Abriendo Caminos – Fase III | 3,030 |
| Costos indirectos vinculados a proyectos financiados no federales | 21,799 |
| Costos indirectos estatales de CDBG-DR/MIT | 5,513 |
| Pagos de capital de derechos de paso | 2,100 |
| **Total de costos indirectos de construcción de carreteras no federales** | **32,442** |
| **Total Programas de construcción de carreteras no federales** | **72,677** |

**COSTOS DEL PROGRAMA DE REPARACIONES DE EMERGENCIA**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Costos de reparaciones de emergencia financiados por la FHWA | 33,673 |
| Costos de reparaciones de emergencia financiados por la FEMA | 1,619 |
| Costos de reparaciones de emergencia locales | 1,204 |
| **Total de costos del programa de reparaciones de emergencia** | **36,497** |

**COSTOS DE PROGRAMAS DE CONSTRUCCIÓN DE TRANSPORTE PÚBLICO**

|  | Presupuesto AF 22 (miles de $) |
|---|---|
| Costos de construcción de transporte público | 53,506 |
| **Total de costos del programa de construcción de transporte público** | **53,506** |

**ANEXO I**

**OTROS COSTOS DE CAPITAL**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Salarios principales – construcción | 17,869 |
| Costos sanitarios – construcción | 5,125 |
| Bonificación de Navidad – construcción | 349 |
| Costos de jubilaciones anticipadas – construcción | - |
| Otros costos laborales - construcción | 4,270 |
| **Total salarios de construcción y beneficios afines** | **27,613** |
| Costos de optimización de peajes | 18,047 |
| **Total de costos de optimización de peajes** | **19,827** |
| Otros costos de programas de construcción | 4,033 |
| **Total otros costos de programas de construcción** | **4,033** |
| **Total otros costos de capital** | **48,973** |

**DEPÓSITOS DE RESERVA**

| | Presupuesto AF 22 (miles de $) |
|---|---|
| Depósitos de reserva para costos de litigios imprevistos no vinculados al Título III | 6,000 |
| **Total depósitos de reserva** | **6,000** |

**ANEXO I**

**ANEXO I – PRESUPUESTO DE INGRESOS**
*(cont.)*

**EJECUCIÓN DEL PRESUPUESTO
REVISADO PARA EL AF 22 DE LA
AUTORIDAD DE CARRETERAS Y
TRANSPORTACIÓN DE PUERTO RICO**

**Sección II –** Se dan por concluidas todas las asignaciones y gastos autorizados en cualquier año fiscal anterior, y no se desembolsarán fondos públicos para cubrir dichas autorizaciones de gastos, salvo: (1) gastos de ejecución de mejoras de capital contabilizadas y registradas en los libros; (2) inversiones de capital y gastos en equipos con ciclos de suministro que se extienden más allá del final del año fiscal que se hayan contabilizado y registrado y en los libros; (3) el tramo de otros gastos autorizados en el Presupuesto certificado de la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico del año fiscal 2021; y (4) el tramo de asignaciones autorizadas para el año fiscal 2021 que haya sido gravado hasta el 30 de junio de dicho año fiscal. Las restricciones de gastos autorizados en cualquier año fiscal precedente no serán de aplicación a: (i) programas financiados total o parcialmente con fondos federales; (ii) órdenes del Tribunal de Distrito de Estados Unidos competente para todos los asuntos vinculados con el Título III de la Ley PROMESA; y
(iii) asuntos pertinentes a cualquier decreto de consentimiento o medida cautelar, o una orden administrativa o conciliación formalizada con una agencia federal, en el caso de los programas federales.

**Sección III** – Los fondos asignados a la partida presupuestaria para "Depósitos de reserva para costos de litigios imprevistos no vinculados al Título III" de la Sección 1 se mantendrán en una cuenta que devengue intereses (separada de otras cuentas que actualmente utilice la ACT para sus operaciones cotidianas). El Director Ejecutivo efectuará depósitos mensuales (equivalentes a 1/12ª parte de la cuantía total) para aportar fondos a la cuenta, tal y como se establece en la Sección 1, hasta alcanzar los totales aquí estipulados. Todo gasto o uso de los fondos de la cuenta de reserva solamente podrá realizarse en respuesta a circunstancias que estén fuera del control de la ACT y que conlleve que el organismo no cumpla objetivos de ingresos y/o exceda de los objetivos de gasto. Para dichos gastos será necesaria una autorización previa, expresa y por escrito, de la Junta de Supervisión.

**Sección IV** – Los fondos depositados en la cuenta "Depósitos de reserva para emergencias y eventos imprevistos" (Sección I del Presupuesto de la ACT para el AF 2022) se mantendrán en una cuenta que devengue intereses (separada de otras cuentas que actualmente utilice la ACT para sus operaciones cotidianas). Todo gasto o uso de los fondos de esta cuenta de reserva solamente podrá realizarse en respuesta a circunstancias que estén fuera del control de la ACT y que conlleve que el organismo no cumpla objetivos de ingresos y/o exceda de los objetivos de gasto. Para dichos gastos será necesaria una autorización previa, expresa y por escrito, de la Junta de Supervisión.

**Sección V** – No obstante cualquier otra manifestación, la ACT no podrá utilizar ninguna de las asignaciones presupuestarias no utilizadas de algún año fiscal anterior para financiar gastos del año fiscal en curso, salvo que la Junta de Supervisión lo haya autorizado, expresamente y por escrito, después del 30 de junio de 2021.

**Sección VI** – Las asignaciones aprobadas en este presupuesto solamente podrán reprogramarse con la autorización previa, explícita y por escrito, de la Junta de Supervisión. A efectos de disipar cualquier duda, esta prohibición incluye cualquier reprogramación de cualquier cuantía, partida o gasto previstos en este presupuesto, independientemente de si se trata de una reprogramación intragencias como si no. Las reprogramaciones, también denominadas reasignaciones, podrán aplicarse a conceptos y/u objetos de gasto no explícitamente incluidas en la resolución del presupuesto certificado del

## ANEXO I

AF 2022, siempre y cuando dichas solicitudes se presenten por escrito a, y sean aprobadas por, la Junta de Supervisión.

**Sección VII** – Según estipula la Sección 203 de la Ley PROMESA, la ACT deberá presentar a la Junta de Supervisión, como más tardar 15 días después del último día de cada mes del AF 2022, un informe de evolución de la ejecución del presupuesto, conjuntamente con una explicación de las variaciones relevantes, tal como se estipula en el Plan fiscal certificado. La Junta de Supervisión podrá determinar facilitar a la ACT una plantilla para elaborar dichos informes, en cuyo caso los informes trimestrales de evolución de la ejecución del presupuesto elaborados por la ACT se presentarán de una manera compatible con dicha plantilla.

**Sección VIII** - La Junta de Supervisión se reserva el derecho de, a su absoluta discreción, cursar una notificación al Gobernador, de conformidad con la Sección 202(a) de PROMESA, estableciendo un calendario para la revisión del presupuesto de la ACT.

**Sección IX** – Conjuntamente con los informes requeridos en estas secciones, deberá incluirse un certificado de la Junta de Supervisión que manifieste (1) que no se han utilizado partidas presupuestarias no autorizadas de ningún año fiscal anterior (salvo aquellas estipuladas por las excepciones aquí mencionadas) para cubrir ningún gasto, salvo si ha sido expresamente autorizado por escrito por la Junta de Supervisión.

**Sección X** – El Presupuesto de la ACT para el AF 2022, con sus correspondientes revisiones, entrará en vigor el 4 de marzo de 2022.

## **ANEXO F**

Lista de bonos

| | Fecha de emisión | Importe emitido | Rango de tipos de interés | Fecha de vencimiento final | Saldo a Fecha de petición de la ACT |
|---|---|---|---|---|---|
| Bonos de Ingresos de Carreteras – Serie Y | 4/09/96 | $890,235,000 | 6.25 | 7/01/21 | $67,300,000 |
| Bonos de Refinanciamiento de Ingresos de Carreteras – Serie Z | 3/01/96 | $185,040,000 | 6.00 – 6.25 | 7/01/18 | $19,775,000 |
| Bonos de Refinanciamiento de Ingresos de Carreteras – Serie AA | 4/29/03 | $717,365,000 | 4.50 – 5.50 | 7/01/35 | $74,695,000 |
| Bonos de Refinanciamiento de Ingresos de Carreteras – Serie AA (Recomercialización) | 4/29/03 | $253,670,000 | 4.95 – 5.30 | 7/01/35 | $176,050,000 |
| Bonos de Refinanciamiento de Ingresos de Carreteras – Serie BB | 10/04/05 | $101,625,000 | 5.25 | 7/01/22 | $63,070,000 |
| Bonos de Refinanciamiento de Ingresos de Carreteras – Serie CC | 3/06/07 | $431,955,609 | 4.46 – 5.50 | 7/01/36 | $414,188,123 |
| Bonos de Ingresos de Transporte – Serie A | 3/19/98 | $1,129,643,740 | 4.75 – 12.00 | 7/01/38 | $244,523,613 |
| Bonos de Ingresos de Transporte – Serie D | 7/07/02 | $700,855,000 | 5.00 | 7/01/32 | $141,315,000 |
| Bonos de Refinanciamiento de Ingresos de Transporte – Serie E | 7/07/02 | $284,405,000 | 5.50 – 5.75 | 7/01/24 | $155,620,000 |
| Bonos de Ingresos de Transporte – Serie G | 4/29/03 | $563,650,000 | 5.00 – 5.25 | 7/01/42 | $163,090,000 |
| Bonos de Refinanciamiento de Ingresos de Transporte – Serie H | 4/29/03 | $72,035,000 | 4.00 – 5.00 | 7/01/35 | $9,875,000 |
| Bonos de Refinanciamiento de Ingresos de Transporte – Serie H (Recomercialización) | 4/29/03 | $44,275,000 | 5.45 | 7/01/32 | $12,720,000 |
| Bonos de Refinanciamiento de Ingresos de Transporte – Serie I | 4/20/04 | $82,340,000 | 3.90 – 5.00 | 7/01/26 | $76,935,000 |
| Bonos de Ingresos de Transporte – Serie J | 4/20/04 | $405,895,000 | 4.63 – 5.00 | 7/01/29 | $79,725,000 |
| Bonos de Ingresos de Transporte – Serie K | 10/04/05 | $800,000,000 | 4.30 – 5.00 | 7/01/35 | $235,800,000 |
| Bonos de Ingresos de Transporte – Serie L | 10/04/05 | $598,285,000 | 3.88 – 5.25 | 7/01/41 | $542,195,000 |
| Bonos de Ingresos de Transporte – Serie M | 3/06/07 | $250,000,000 | 4.00 – 5.00 | 7/01/46 | $227,860,000 |

| | Fecha de emisión | Importe emitido | Rango de tipos de interés | Fecha de vencimiento final | Saldo a Fecha de petición de la ACT |
|---|---|---|---|---|---|
| Bonos de Refinanciamiento de Ingresos de Transporte – Serie N | 3/06/07 | $1,502,904,943 | 0.72 – 5.50 | 7/01/45 | $1,021,729,944 |
| Bonos Subordinados de Ingresos de Transporte – Serie 1998 | 7/15/98 | $75,050,000 | 5.00 – 5.25 | 7/01/28 | $51,985,000 |
| Bonos Subordinados de Ingresos de Transporte – Serie 2003 | 4/29/03 | $320,545,000 | 2.30 – 5.75 | 7/01/28 | $215,960,000 |
| Bonos de Refinanciamiento de Instalaciones especiales, Serie A 2003 (Puente Teodoro Moscoso) | 10/30/03 | $153,222,270.45 | 0.375 – 6.15 | 7/01/27 | $141,858,218.15[1] |

---

[1]  Esta cuantía representa el valor nominal más el valor capitalizado de los bonos de apreciación de capital. Los Bonos de Refinanciamiento de Instalaciones especiales, Serie A 2003 (Puente Teodoro Moscoso) han continuado pagando el servicio de la deuda normalmente desde la Fecha de petición de la ACT.

**ANEXO G**

Lista de las cuentas bancarias y saldos de las cuentas bancarias de la ACT, y categorización de restricciones preliminares a 31 de diciembre de 2021

**ACT:**

| Número de cuenta | Número de cuenta | Saldo al 31/12/2021 ($) | Categorización |
|---|---|---|---|
| **Irrestricta** | | | |
| 66/BSA-69-3768 | First Bank | $85,179,137.03 | Irrestricta |
| 66/BNY-16-5538 | Bank of New York Mellon | $34,202,538.01 | Irrestricta |
| 66/BSA-01-2473 | First Bank | $24,551,576.87 | Irrestricta |
| 66/BNY-20-5566 | Bank of New York Mellon | $16,785,475.27 | Irrestricta |
| 66/BNY-30-1811 | Bank of New York Mellon | $13,873,798.39 | Irrestricta |
| 66/BCP-14-5116 | Banco Popular | $13,002,018.11 | Irrestricta |
| 66/BNY-05-5484 | Bank of New York Mellon | $12,827,089.44 | Irrestricta |
| 66/BCP-12-1520 | Banco Popular | $9,510,355.29 | Irrestricta |
| 66/BNY-14-5532 | Bank of New York Mellon | $7,242,300.63 | Irrestricta |
| 66/BDE-01-bers[1] | Banco de Desarrollo Económico (BDE) | $5,948,490.44 | Irrestricta |
| 66/ORI-03-9874 | Oriental Bank | $3,416,628.92 | Irrestricta |
| 66/BNY-01-5475 | Bank of New York Mellon | $2,498,911.71 | Irrestricta |
| 66/BNY-09-5522 | Bank of New York Mellon | $1,066,161.06 | Irrestricta |
| 66/BNY-47-5471 | Bank of New York Mellon | $1,030,095.18 | Irrestricta |
| 66/BNY-11-5526 | Bank of New York Mellon | $790,330.21 | Irrestricta |
| 66/BCP-15-5353 | Banco Popular | $514,482.23 | Irrestricta |
| 66/BCP-13-5078 | Banco Popular | $343,931.91 | Irrestricta |
| 66/BNY-58-6813 | Bank of New York Mellon | $1,183.08 | Irrestricta |
| 66/BNY-19-5565 | Bank of New York Mellon | $674.92 | Irrestricta |
| 66/BNY-12-5529 | Bank of New York Mellon | $638.01 | Irrestricta |
| 66/BNY-23-5652 | Bank of New York Mellon | $590.03 | Irrestricta |
| 66/BNY-49-5474 | Bank of New York Mellon | $444.75 | Irrestricta |

[1] Las cuentas bancarias del Banco de Desarrollo Económico (BDE) no tienen asignado un identificador numérico.  En su lugar, hay una sola cuenta bancaria por agencia que dispone una cuenta en el BDE, y las transacciones y estados de cuenta se identifican por nombre del titular de la cuenta y dirección postal.

| Número de cuenta | Número de cuenta | Saldo al 31/12/2021 ($) | Categorización |
|---|---|---|---|
| 66/BNY-46-5469 | Bank of New York Mellon | $193.86 | Irrestricta |
| 66/BNY-06-5488 | Bank of New York Mellon | $27.29 | Irrestricta |
| 66/BNY-13-5530 | Bank of New York Mellon | $13.46 | Irrestricta |
| 66/BNY-38-4911 | Bank of New York Mellon | $3.08 | Irrestricta |
| 66/BNY-59-6814 | Bank of New York Mellon | $0.88 | Irrestricta |
| 66/BNY-48-5473 | Bank of New York Mellon | $0.25 | Irrestricta |
| 66/BNY-02-5478 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-03-5479 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-04-5482 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-07-5515 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-08-5520 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-10-5524 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-15-5537 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-17-5541 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-18-5564 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-25-1793 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-27-1804 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-28-1805 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-29-1806 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-31-4035 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-40-4914 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-42-4924 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-50-4910 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-51-4915 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-52-4916 | Bank of New York Mellon | $0.00 | Irrestricta |
| 66/BNY-53-4917 | Bank of New York Mellon | $0.00 | Irrestricta |
| **Total Irrestrictas** | | **$ 232,787,090.31** | |
| | | | |
| **Fondos/Leyes Federales** | | | |

| Número de cuenta | Número de cuenta | Saldo al 31/12/2021 ($) | Categorización |
|---|---|---|---|
| 66/BCP-17-0510 | Banco Popular | $7,403,704.50 | **Restrictas: Fondos Federales** – fondos aportados por el Departamento de Transportes de EE.UU. para proyectos de construcción regidos por leyes o reglamentos federales |
| **Total Fondos/Leyes Federales** | | **$7,403,704.50** | |
| | | | |
| **Fondos de terceros** | | | |
| 66/BCP-21-6411 | Banco Popular         $23,712,235.70 | $23,712,235.70 | **Restrictas: Fondos de terceros** – peajes prepagados antes de la distribución de los ingresos devengados por peajes |
| **Total Fondos de terceros** | | **$23,712,235.70** | |
| | | | |
| **No concluyente** | | | |
| 66/BCP-18-5210 | Banco Popular | $6,438,057.61 | No concluyente |
| **Total Inconcluyente** | | **$6,438,057.61** | |
| | | | |
| **No revisadas – Menos de $2M** | | | |
| x6671 | Banco Popular | $867,138.20 | No revisada[2] |
| x2489 | Oriental Bank | $157,501.98 | No revisada |
| x6672 | Oriental Bank | $67,965.72 | No revisada |
| x0303 | Banco Popular | $5,000.00 | No revisada |
| x6438 | Banco Popular | $5,000.00 | No revisada |
| x1795 | Bank of New York Mellon | $2,098.99 | No revisada |

[2] En general, las cuentas con un saldo inferior a los $2 millones no son sometidas a revisiones de evaluación de restricción.  En algunos casos, si la revisión de cuentas con un saldo de $2 millones o más indican que una cuenta con saldo inferior pueden estar sujetas a restricciones legales similares en materia de uso de los fondos, dichas cuentas también fueron revisadas a pesar de su bajo saldo.  Al 31 de diciembre de 2021, las cuentas cuya situación de restricción fue revisada representaban aproximadamente $270.3 millones, de un total de $271.4 millones; es decir, el 99.6% de los fondos mantenidos en cuentas de la ACT.  Las cuentas que no han sido revisadas en función del umbral de sus cuantías se presentan en casillas grises.

| Número de cuenta | Número de cuenta | Saldo al 31/12/2021 ($) | Categorización |
|---|---|---:|---|
| x5656 | Bank of New York Mellon | $1,220.27 | No revisada |
| x7726 | First Bank | $541.48 | No revisada |
| x0693 | Bank of New York Mellon | $127.02 | No revisada |
| x5574 | Bank of New York Mellon | $78.82 | No revisada |
| x4042 | Bank of New York Mellon | $66.11 | No revisada |
| x4912 | Bank of New York Mellon | $15.19 | No revisada |
| x7474 | Bank of New York Mellon | $0.30 | No revisada |
| x5567 | Bank of New York Mellon | $0.02 | No revisada |
| x0026 | Bank of New York Mellon | $0.02 | No revisada |
| x0220 | Banco Popular | $0.01 | No revisada |
| x0025 | Bank of New York Mellon | $0.01 | No revisada |
| x0028 | Bank of New York Mellon | $0.00 | No revisada |
| x0186 | Bank of New York Mellon | $0.00 | No revisada |
| x0268 | Bank of New York Mellon | $0.00 | No revisada |
| x4919 | Bank of New York Mellon | $0.00 | No revisada |
| x4921 | Bank of New York Mellon | $0.00 | No revisada |
| x9574 | Oriental Bank | $0.00 | No revisada |
| **Total No revisadas – Menos de $2M** | | **$1,106,754.14** | |
| | | | |
| **TOTAL FONDOS** | | **$271,447,842.26** | |

## **ANEXO H**

Últimos Estados Financieros auditados de la Autoridad de Carreteras y Transportación de Puerto Rico

GOBIERNO DE PUERTO RICO
AUTORIDAD DE ASESORÍA FINANCIERA Y AGENCIA FISCAL DE PUERTO RICO

## Portada de la información sobre el mercado secundario municipal
## Junta Reguladora de los Valores Municipales (MSRB)
## Sistema electrónico de acceso al mercado municipal (EMMA)

**ESTA PRESENTACIÓN SE RELACIONA CON LA EMISIÓN DE BONOS ÚNICOS:**

Nombre de la emisión de bonos exactamente como aparece en la portada de la Declaración Oficial:

_____

_____

Números CUSIP* de nueve dígitos, si están disponibles, a los que se refiere la información:

_____

_____

**ESTA PRESENTACIÓN SE REFIERE A TODOS O VARIOS VALORES EMITIDOS POR EL EMISOR, O A TODOS O VARIOS VALORES DE UN ACREEDOR ESPECÍFICO:**

Nombre del emisor: <u>Autoridad de Carreteras y Transportación de Puerto Rico ("ACTPR")</u>

Nombre de otra persona obligada (si corresponde):  _____

Número(s) CUSIP de seis dígitos:  <u>745181, 745190, 745185 (Puente Teodoro Moscoso)</u>

**TIPO DE INFORMACIÓN PROVISTA:**

A.  ☐ Informe sobre Información Financiera y Datos Operativos anual de conformidad con la Regla 15c2-12

   Período fiscal cubierto: _____

B.  ☒ Estados Financieros auditados o CAFR de conformidad con la Regla 15c2-12

   Período fiscal cubierto:  <u>2020-21</u>

C.  ☐ Aviso de no presentación de la información financiera anual requerida: _____

Declaro que estoy autorizado por el emisor, el obligado o su agente para distribuir esta información públicamente.

<u>/s/Julian M. Bayne Hernández</u>
Julian M. Bayne Hernández
Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico,
   como agente fiscal de la ACTPR

   Fecha: 1 de abril de 2022

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 I PO Box 42001, San Juan, PR 00940-2001

® 787.722.2525          contact@aafaf.pr.gov          aafaf.pr.gov

**AUTORIDAD DE CARRETERAS Y
TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estados Financieros con informe del auditor independiente

e

información complementaria requerida

Año Fiscal Finalizado el 30 de junio de 2021

<u>**ÍNDICE**</u>

<u>Página</u>

**INFORME DE AUDITORES INDEPENDIENTES**……………………………………………1

Debate y análisis de la gerencia (no auditado)……………………….………………………4

Estados financieros auditados:

Estado de déficit neto……………………….……………………………………………...11

Estados condensados de ingresos, gastos y cambios en el déficit neto…………………….....14

Estado de flujos de efectivo……………………….…………………………………………21

Notas a los estados financieros……………………….……………………………………………23

Información complementaria requerida:

Esquema de cambios en el pasivo de los beneficios totales posempleo distintos de las pensiones (Plan OPEB) de la Autoridad y ratios relacionados (sin auditar)……………………….…..............................................................................75

Esquema de los cambios en el pasivo de los beneficios totales posempleo del ELA, aparte de las pensiones (Plan SRE MIPC OPEB) y ratios relacionados (sin auditar)……...............................................................................76



**Crowe PR PSC**
100 Carr 165, Suite 410
Guaynabo, PR 00968-8051

+1 (787)625-1800
www.crowe.pr

## INFORME DE AUDITORES INDEPENDIENTES

A la Junta de Directores de la
Autoridad de Carreteras y Transportación de Puerto Rico
(una unidad componente del Estado Libre Asociado de Puerto Rico)

**Informe sobre los estados financieros**

Auditamos los Estados Financieros adjuntos de la Autoridad de Carreteras y Transportación de Puerto Rico (en lo sucesivo, la "Autoridad") (una unidad componente del Estado Libre Asociado de Puerto Rico), al 30 de junio de 2021 y para el año fiscal finalizado en esa fecha, así como las notas relacionadas a los estados financieros que, en conjunto comprenden los estados financieros básicos de la Autoridad, según se indica en el índice.

*Responsabilidad de la gerencia sobre los estados financieros*

La gerencia es responsable de la elaboración y la presentación fiel de estos estados financieros de acuerdo con los principios contables generalmente aceptados en los Estados Unidos de América; esto incluye el diseño, la aplicación y el mantenimiento del control interno pertinente para la elaboración y la presentación fiel de estados financieros libres de errores materiales, ya sea por fraude o por error.

*Responsabilidad del auditor*

Nuestra responsabilidad es la de expresar un dictamen sobre estos estados financieros en función de nuestra auditoría. Realizamos nuestra auditoría de conformidad con las normas de auditoría generalmente aceptadas en los Estados Unidos de América y con las normas aplicables a las auditorías financieras contenidas en los *Estándares de Auditoría Gubernamental*, emitidos por el Contralor General de los Estados Unidos. Dichas normas exigen que planifiquemos y ejecutemos la auditoría con el fin de obtener una seguridad razonable sobre si los estados financieros están libres de desviaciones materiales.

Una auditoría implica ejecutar procedimientos para obtener evidencia de auditoría acerca de los montos y las revelaciones en los estados financieros. Los procedimientos seleccionados dependen del criterio del auditor, incluida la evaluación de los riesgos de errores materiales en los estados financieros, ya sea por fraude o por error. Al efectuar esas evaluaciones de riesgos, el auditor considera el control interno existente en la entidad, en lo que sea relevante para la preparación y la presentación razonable de los estados financieros, a fin de diseñar procedimientos de auditoría que sean apropiados en las circunstancias, pero no con el propósito de expresar una opinión sobre la eficacia del control interno de la entidad. En consecuencia, no expresamos tal opinión. Una auditoría también implica evaluar lo apropiado de las políticas contables utilizadas y la razonabilidad de las estimaciones contables significativos realizadas por la gerencia, así como evaluar la presentación de los estados financieros tomados en su conjunto.

Creemos que las pruebas de auditoría que obtuvimos son suficientes y adecuadas para fundamentar nuestro dictamen de auditoría.

*Fundamento para el dictamen calificado*

Como se comenta en la Nota 15 de los estados financieros básicos, el Estado Libre Asociado de Puerto Rico no publicó el Informe de Gastos de Pensiones GASB 73 del Plan de Pensiones de Beneficios Definidos del ELA para el año finalizado el 30 de junio de 2021. Por consiguiente, todos los importes relacionados con las pensiones incluidos en los

estados financieros están desfasados, lo que puede tener un efecto significativo en la situación financiera y los resultados de las operaciones de la Autoridad. Además, se omitió la información sobre las pensiones que los principios de contabilidad generalmente aceptados en Estados Unidos exigen que se revele.

Como se comenta en la Nota 16 de los estados financieros básicos, el Estado Libre Asociado de Puerto Rico no publicó el informe GASB 75 de Otros Beneficios Posempleo (OPEB) del Beneficio de Contribución al Plan de Seguro Médico (SER MIPC) para el año finalizado el 30 de junio de 2021. En consecuencia, la parte proporcional de la Autoridad del pasivo total de OPEB de SER MIPC, los flujos de salida y entrada de recursos diferidos y los gastos relacionados, tal y como se registran en los estados financieros, están desfasados, y esto puede tener un efecto significativo en la posición financiera y los resultados de las operaciones de la Autoridad.

### Dictamen calificado

En nuestra opinión, excepto por los efectos de los asuntos descritos anteriormente en el párrafo de *Fundamentos para el dictamen calificado*, los estados financieros mencionados anteriormente presentan de manera fiel, en todos los aspectos materiales, la posición financiera de la Autoridad al 30 de junio de 2021, y los cambios en la posición financiera y sus flujos de efectivo para el año finalizado en esa fecha de acuerdo con los principios de contabilidad generalmente aceptados de los Estados Unidos.

### Capacidad de continuar como empresa en funcionamiento

Los estados financieros adjuntos se elaboraron asumiendo que la Autoridad continuará como empresa en funcionamiento. Como se comenta en las Notas 3 y 4 de los estados financieros básicos, el 21 de mayo de 2017, la Junta de Supervisión y Administración Financiera para Puerto Rico (la Junta de Supervisión), a petición del Gobernador, inició un caso para la Autoridad mediante la presentación de una petición de remedio en virtud del Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico, Sección 2101 y siguientes del Título 48 del Código de Estados Unidos (USC) (PROMESA) en el Tribunal de Distrito de los Estados Unidos de Puerto Rico. Posteriormente, el 5 de mayo de 2021, la Autoridad ejecutó el Acuerdo de Apoyo al Plan (PSA) de la ACT/CCDA para liquidar todos los bonos y obligaciones de deuda en circulación con el Banco Gubernamental de Fomento (BGF), a cambio de la emisión de nuevos bonos por parte de la Autoridad, de instrumentos de valor contingente por parte del ELA y de ciertas contraprestaciones en efectivo por adelantado. Este acuerdo se hizo parte del Plan de Ajuste del ELA con fecha del 18 de enero de 2022. Sin embargo, la Autoridad sigue negociando su propio Plan de Ajuste de la Deuda para su aprobación final por el Tribunal del Título III.

Por lo tanto, hasta que el Plan de Ajuste de la Deuda de la Autoridad no sea ratificado por el Tribunal del Título III, sigue habiendo dudas sustanciales sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento. Los planes de la gerencia en relación con estos asuntos se describen en la Nota 4 de los estados financieros. Los estados financieros no incluyen ningún ajuste que pueda derivarse del resultado de esta incertidumbre.

### Replanteamiento de los estados financieros del período anterior

Como se comentó en la Nota 22 de los estados financieros, al 1 de julio de 2020, el déficit neto de la Autoridad se replanteó para reconocer la parte proporcional de la Autoridad del pasivo de pensiones del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico (SRE) de conformidad con la Declaración N.º 73, *Junta de Normas de Contabilidad Gubernamental (GASB), Contabilidad e Información Financiera para Pensiones y Activos Relacionados que no están dentro del alcance de la Declaración 68 de GASB, y Enmiendas a Ciertas Disposiciones de las Declaraciones 67 y 68 de GASB*, cuya información no estaba disponible cuando se emitieron los estados financieros del 30 de junio de 2020. Además, al 1 de julio de 2020, el déficit neto de la Autoridad se replanteó para reconocer la parte proporcional de la Autoridad del pasivo de OPEB del SRE MIPC según la Declaración gubernamental la GASB N.º 75, *Contabilidad e información financiera sobre beneficios posempleo distintos de las pensiones*, como consecuencia de un malentendido de los hechos disponibles a dicha fecha. Nuestra opinión no se ha modificado con respecto a este asunto.

### Información complementaria requerida

Los principios contables generalmente aceptados en los Estados Unidos de América exigen que se presenten los comentarios y el análisis de la gerencia, el esquema de cambios en el pasivo de los beneficios totales posempleo de la Autoridad distintas de las pensiones (Plan OPEB) y las ratios correspondientes, y el esquema de cambios en el pasivo de los beneficios totales posempleo del ELA distintos de las pensiones (Plan OPEB del SRE MIPC) y las ratios correspondientes para complementar los estados financieros básicos.

**Información complementaria requerida (continuación)**

Tal información, aunque no forma parte de los estados financieros básicos, es requerida por la Junta de Normas de Contabilidad del Gobierno, que considera que es una parte fundamental de la información financiera para ubicar los estados financieros básicos en un contexto operativo, económico o histórico apropiado. Aplicamos ciertos procedimientos limitados a la información complementaria requerida de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América, que han consistido en preguntar a la gerencia sobre los métodos de preparación de la información y en comparar la información para comprobar su coherencia con las respuestas de la gerencia a nuestras preguntas, los estados financieros básicos y otros conocimientos que hemos obtenido durante nuestra auditoría de los estados financieros básicos. No expresamos una opinión ni brindamos ninguna garantía sobre la información porque los procedimientos limitados no nos brindan evidencia suficiente para expresar una opinión o brindar alguna garantía.

La gerencia omitió la información complementaria requerida por la norma de la GASB N.º 73 que los principios contables generalmente aceptados en los Estados Unidos de América exigen que se presente para complementar los estados financieros básicos. Esta información que falta, aunque no forma parte de los estados financieros básicos, es requerida por la Junta de Normas de Contabilidad Gubernamental, que la considera una parte esencial de la información financiera para situar los estados financieros básicos en un contexto operativo, económico o histórico adecuado. Nuestro dictamen sobre los estados financieros básicos no se ve afectado por esta información faltante.

30 de marzo de 2022

El original de este informe lleva el sello E482989          *Crowe PR PS*

.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

Los siguientes comentarios y análisis del desempeño financiero, y la actividad de la Autoridad de Carreteras y Transportación de Puerto Rico (la Autoridad) proporcionan una introducción y comprensión de los estados financieros básicos de la Autoridad para los años fiscales finalizados el 30 de junio de 2021 y 2020. Este análisis fue elaborado por la gerencia y debe leerse junto con los estados financieros y sus notas, que siguen a esta sección.

**Estados financieros**

Los estados financieros básicos proporcionan información sobre las actividades de la Autoridad. Los estados financieros se confeccionan de acuerdo con los principios contables generalmente aceptados en los EE. UU. (GAAP) promulgados por la GASB, excepto en los siguientes casos:

Como se comenta en la Nota 15 de los estados financieros básicos, el Estado Libre Asociado de Puerto Rico no publicó el Informe de Gastos de Pensiones de la GASB 73 del Plan de Pensiones para el año finalizado el 30 de junio de 2021. Por consiguiente, todos los importes relacionados con las pensiones incluidos en los estados financieros están desfasados, lo que puede tener un efecto significativo en la situación financiera y los resultados de las operaciones de la Autoridad. Además, se omitió la información sobre pensiones que debe divulgarse según los GAAP. Por lo tanto, toda la información financiera histórica presentada en el Análisis de la Gerencia debe leerse teniendo en cuenta los posibles efectos de esta desviación.

Como se comenta en la Nota 16 de los estados financieros básicos, el Estado Libre Asociado de Puerto Rico no publicó el informe de la GASB 75 de Otros Beneficios Posteriores al Empleo del Beneficio de Contribución al Plan de Seguro Médico para el año finalizado el 30 de junio de 2021. En consecuencia, $15.9 millones relacionados con el beneficio del plan de salud proporcionado por las Contribuciones al Plan de Seguro Médico del Sistema de Retiro de los Empleados, incluidos en los estados financieros, son obsoletos, y esto puede tener un efecto significativo en la posición financiera y los resultados de las operaciones de la Autoridad.

Como se explica en la Nota 22, la Autoridad replanteó el saldo de principio de año del déficit neto, para contabilizar la obligación total de pensiones al 30 de junio de 2020, y el gasto relacionado con el año finalizado en ese momento de conformidad con la Declaración de la GASB 73, cuya información no había sido publicada por el Estado Libre Asociado de Puerto Rico cuando se publicaron los estados financieros de la Autoridad para 2020. La Autoridad replanteó el saldo del déficit neto de principios de año para contabilizar su parte proporcional del pasivo total de OPEB relacionado con el beneficio del plan de salud proporcionado por las Contribuciones al Plan de Seguro Médico del Sistema de Retiro de los Empleados, de acuerdo con la Declaración N.º 75 de GASB sobre *Contabilidad e Información Financiera de los Beneficios Posteriores al Empleo Distintos de las Pensiones*, que no se había reconocido anteriormente.

También alertamos a los lectores de que, desde el 2017, la Autoridad está operando de conformidad con el Título III: Proceso de Reestructuración en Corte, de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA). Este asunto plantea dudas sustanciales sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento. Como se explica en las notas 4 y 24, la Autoridad formó parte del Plan de Ajuste del ELA que redujo significativamente los bonos a pagar y las obligaciones del Banco Gubernamental de Fomento (BGF) a aproximadamente $1,245 millones; una reducción de alrededor de $6,600 millones. Suponiendo que el Plan de Ajuste de la Autoridad se apruebe durante 2022, estas cuestiones deberían permitir una oportunidad razonable de continuar como empresa en funcionamiento. La Autoridad elaboró sus estados financieros asumiendo que la Autoridad continuará como empresa en funcionamiento. Los estados financieros no incluyen ningún ajuste que pueda derivarse del resultado de esta incertidumbre.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

**Aspectos financieros destacados**

El déficit neto de la Autoridad al 30 de junio de 2021 ascendía a $694.7 millones, frente al déficit neto de $394.3 millones al 30 de junio de 2020, tal y como se replanteó. El déficit neto aumentó en $300.4 millones después de las subvenciones de capital durante el año fiscal finalizado el 30 de junio de 2021, en comparación con un aumento de $646.7 millones durante el año fiscal finalizado el 30 de junio de 2020, tal y como se replanteó. Este cambio se debe principalmente a un aumento de los ingresos de explotación de $23.6 millones, un aumento de $17.5 millones en los gastos de operación, una disminución de los intereses de los bonos y de las obligaciones de la Autoridad de Recuperación de la Deuda del BGF (DRA BGF) (antes conocida como BGF) de $36.1 millones, un aumento de $206.1 millones de las transferencias de explotación del ELA y un aumento de las transferencias y subvenciones de capital de $112.1 millones durante el año fiscal finalizado el 30 de junio de 2021.

Los activos de capital netos de la Autoridad, incluidos los activos en virtud de los Acuerdos de Concesión de Servicios (como se definen más adelante), ascendían a $8,856.5 millones al 30 de junio de 2021, frente a los $9,096.3 millones al 30 de junio de 2020. Los activos fijos netos disminuyeron un 2.7 % al 30 de junio de 2021, en comparación con el saldo al 30 de junio de 2020.

El importe total del pasivo no corriente de la Autoridad era de $8,741.7 millones al 30 de junio de 2021, frente a los $8,557 millones al 30 de junio de 2020 (replanteado), que consistía principalmente en bonos a pagar, la obligación de la Autoridad de Recuperación de la Deuda del BGF, los intereses devengados, las reclamaciones legales devengadas, los planes de incentivos por cese voluntario y los pasivos netos por pensiones de la Autoridad. Una parte importante de los pasivos fue paralizada en virtud del Título III de PROMESA y está en proceso de reestructuración a través de los procedimientos del Título III. El 5 de mayo de 2021, la Autoridad ejecutó el Acuerdo de Apoyo al Plan de la Autoridad de Carreteras y Transportación/Autoridad del Distrito del Centro de Convenciones (PSA de la ACT/CCDA) para intercambiar los bonos en circulación, junto con la Obligación de la Autoridad de Recuperación de la Deuda del BGF (revelada en la Nota 14), por una combinación de bonos que serán emitidos por la Autoridad, bonos de valor contingente que serán emitidos por el ELA y ciertas contraprestaciones en efectivo que se pagarán en el momento del intercambio. El Acuerdo, si finalmente es confirmado por el Tribunal del Título III, como se espera, reducirá las obligaciones de la Autoridad a $1,245 millones a pagar en cuarenta años, al 5 %. Esto representa un descargo estimado de la deuda de aproximadamente $6,600 millones.

**Resumen de los estados financieros básicos**

Los estados financieros básicos consisten en: (1) estado de déficit neto, (2) estado de ingresos, gastos y cambios en el déficit neto, (3) estado de flujos de efectivo y (4) notas a los estados financieros. Los estados financieros básicos se elaboran según la contabilidad basada en valores devengados, lo que significa que todos los gastos se registran cuando se incurre en ellos y todos los ingresos se reconocen cuando se obtienen, de acuerdo con GAAP.

**Estado del déficit neto**

El estado de déficit neto informa todos los recursos financieros y de capital de la Autoridad. El estado se presenta en el formato en el que los activos más las salidas de recursos diferidas son iguales a los pasivos más las entradas de recursos diferidas más el déficit neto. Los activos y pasivos se presentan por orden de liquidez y se clasifican en corrientes (convertibles en efectivo o pagaderos en un año) y no corrientes. El objetivo del estado del déficit neto es mostrar una imagen de la liquidez y la salud financiera de la Autoridad al final del año.

El déficit neto de la Autoridad se informa en las siguientes categorías:

**Inversión neta en activos de capital**: este componente del déficit neto consiste en todos los activos de capital, netos de la depreciación acumulada, menos los saldos pendientes de cualquier bono, pagaré u otros préstamos atribuibles a la adquisición, construcción o mejora de dichos activos.

**Restringido para la amortización de la deuda:** este componente del déficit neto se utiliza para contabilizar los activos restringidos para el pago del monto del capital y los intereses de los bonos a pagar. Sin embargo, desde que la Autoridad

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

presentó la petición de remedio en virtud del Título III de PROMESA, toda la amortización de la deuda de los bonos, excepto la relacionada con la concesión del Puente Teodoro Moscoso, ha sido paralizada. Por lo tanto, los activos no se separan para la amortización de la deuda. Además, los fondos conservados por el Bank of New York Mellon (en lo sucesivo, el "Fideicomisario") ya no están disponibles para tales fines.

**Restringido para construcción**: este componente del déficit neto consiste en activos restringidos con el propósito específico de pagar proyectos de construcción. Esta restricción la imponen los garantes y contribuyentes, así como los bonistas a través de convenios de deuda.

**Déficit no restringido:** este componente consiste en el déficit neto que no se ajusta a la definición de inversión neta en activos de capital ni está restringido para la amortización de la deuda o la construcción.

**Estado de ingresos, gastos y cambios en el déficit neto**

El estado de ingresos, gastos y cambios en el déficit neto incluye: (i) ingresos operativos, que consisten en tarifas de peaje, otros ingresos operativos, acuerdos de concesión y otros gastos operativos, como los costos operativos de las autopistas de peaje, el sistema de transporte, los gastos administrativos y la depreciación de los activos de capital; e (ii) ingresos y gastos "no operativos", como las transferencias operativas del ELA, los ingresos por intereses e inversiones, los gastos por intereses y otros. El estado también incluye las contribuciones de capital y los pagos recibidos del ELA y las subvenciones del gobierno federal. El eje del estado de ingresos, gastos y cambios en el déficit neto es la variación del déficit neto (enfoque de medición de los recursos económicos). Es similar a los ingresos o pérdidas netos, y muestra los resultados de las operaciones de la Autoridad durante todo el período de operación.

**Estado de flujos de efectivo**

El estado de flujos de efectivo revela el efectivo neto proporcionado o utilizado por las actividades de operación, las actividades de financiamiento no relacionadas con el capital, el capital y las actividades de financiamiento relacionadas y de las actividades de inversión. Este estado también refleja la salud financiera de la Autoridad en el sentido de que los flujos de caja corrientes son suficientes para pagar el pasivo corriente.

**Notas a los estados financieros**

Las notas a los estados financieros son parte integrante de los estados financieros básicos y describen las políticas contables significativas, las transacciones con partes relacionadas, los depósitos e inversiones, los activos de capital, los bonos a pagar, los pasivos a largo plazo, los planes de retiro, los compromisos y las contingencias, la empresa en funcionamiento y PROMESA. Se recomienda al lector que lea las notas junto con el debate y el análisis de la gerencia y los estados financieros.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

**Análisis financiero de la Autoridad**

*Estado de déficit neto condensado*

La siguiente tabla refleja el déficit neto condensado de la Autoridad al 30 de junio de 2021 y 2020:

| | 2021[1] | 2020 (replanteado) |
|---|---|---|
| **Activos** | | |
| Activos corrientes | $ 89,537,218 | $ 35,335,074 |
| Activos restringidos | 316,905,109 | 249,296,172 |
| Activos de capital, neto | 8,660,384,135 | 8,898,393,339 |
| Autopistas y puentes en régimen de concesión, neto | 196,198,857 | 197,896,107 |
| Activos totales | 9,263,025,319 | 9,380,920,692 |
| Salidas de recursos diferidas | 64,376,495 | 132,970,094 |
| Total de activos y salidas de recursos diferidas | $9,327,401,814 | $9,513,890,786 |
| **Pasivos** | | |
| Pasivos corrientes | $ 206,324,794 | $ 251,305,802 |
| Pasivos no corrientes | 8,741,740,083 | 8,556,983,498 |
| Total de pasivos | 8,948,064,877 | 8,808,289,300 |
| Entradas diferidas de recursos | 1,074,080,424 | 1,099,973,422 |
| Total de pasivos y entradas diferidas de recursos | 10,022,145,301 | 9,908,262,722 |
| **Déficit neto** | | |
| Inversión neta en activos de capital | 1,521,179,877 | 1,759,491,091 |
| Restringido a la amortización de la deuda | - | - |
| Restringido a construcciones | 119,621,153 | 132,436,565 |
| No restringido | (2,335,544,517) | (2,286,299,592) |
| Déficit neto total | (694,743,487) | (394,371,936) |
| Total de pasivos, entrada de recursos diferida y déficit neto | $9,327,401,814 | $9,513,890,786 |

[1] El Estado de Déficit Neto de 2021 carece de cualquier ajuste relacionado con los efectos de las transacciones de pensiones no registradas para el año finalizado el 30 de junio de 2021, y las transacciones de OPEB del ELA para el año finalizado el 30 de junio de 2021.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

El activo corriente aumentó aproximadamente un 153.4 %, hasta los $89.5 millones durante el año fiscal finalizado el 30 de junio de 2021. El aumento neto del activo corriente de $54.2 millones se debió principalmente a un aumento del efectivo y los equivalentes de efectivo, en aproximadamente $7.4 millones, y a un aumento de las cuentas por cobrar al ELA en aproximadamente $46.2 millones. El efectivo y los equivalentes de efectivo aumentaron en aproximadamente $7.4 millones, principalmente debido a los mayores ingresos por peaje recibidos durante el año fiscal finalizado el 30 de junio de 2021. Este aumento se debe principalmente a la normalización de las operaciones privadas y gubernamentales tras el impacto del cierre provocado por el virus de la pandemia de COVID-19.

Los activos restringidos aumentaron aproximadamente un 27.1 %, hasta los $316.9 millones durante el año fiscal finalizado el 30 de junio de 2021. El efectivo y los equivalentes de efectivo y las inversiones con el fideicomisario aumentaron en aproximadamente $47.8 millones durante el año fiscal finalizado el 30 de junio de 2021. Este aumento se debe principalmente al uso de los fondos de gastos de capital (CAPEX) y del programa "Abriendo Caminos" en alrededor de $42.9 millones, compensado, por un aumento de $85.2 millones principalmente debido a una cuenta de depósito de reserva creada para pagar obligaciones de servicios públicos, otras emergencias e imprevistos según lo requerido por la Junta de Supervisión y Administración Federal (JSAF) y el Plan Fiscal. Además, las inversiones tuvieron unos ingresos por intereses de aproximadamente $3.2 millones y las cuentas por cobrar al gobierno federal de los EE. UU. relacionadas con los fondos de la Administración Federal de Carreteras (FHWA) aumentaron un 40.1 % hasta aproximadamente $68.9 millones. No hubo ingresos pignorados depositados en el fideicomisario durante los años fiscales 2021 y 2020. Todos los demás activos restringidos se mantuvieron en línea con el año fiscal anterior.

Durante el año fiscal finalizado el 30 de junio de 2021, los activos de capital disminuyeron un 2.67 % hasta aproximadamente $8,660.4 millones, en comparación con el año fiscal 2020. La disminución se debió principalmente al resultado neto de un aumento agregado de las construcciones en curso, carreteras, puentes y equipos, y vehículos de alrededor de $236.7 millones, netos de gastos de depreciación de aproximadamente $476.4 millones para el año fiscal finalizado el 30 de junio de 2021.

Durante el año fiscal finalizado el 30 de junio de 2021, las autopistas y los puentes en virtud de los Acuerdos de Concesión de Servicios (tal como se definen a continuación) disminuyeron un 0.87 % hasta aproximadamente $196.2 millones, en comparación con el año fiscal 2020. Este descenso se debe a los gastos de depreciación de alrededor de $1.6 millones relacionados con el Puente Teodoro Moscoso. Obsérvese que no se amortizan otros activos en virtud de acuerdos de concesión de servicios, ya que los acuerdos de concesión de servicios exigen que el concesionario devuelva los activos a la Autoridad en su estado original o mejorado.

Las salidas de recursos diferidas disminuyeron hasta aproximadamente $64.4 millones durante el presente año fiscal. Esto representa una disminución del 51.6 %, que se debe principalmente a la cancelación de las salidas diferidas relacionadas con las pérdidas diferidas por reembolsos anticipados durante 2021.

Durante el ejercicio fiscal finalizado el 30 de junio de 2021, el pasivo corriente se redujo un 17.9 % hasta aproximadamente $206.3 millones, en comparación con el año fiscal 2020. Los principales cambios en el pasivo corriente son los siguientes:

Las cuentas a pagar y los pasivos devengados, incluidas las vacaciones, aumentaron un 2.1 % hasta aproximadamente $144.0 millones durante el año fiscal finalizado el 30 de junio de 2021, en comparación con el año fiscal anterior.

Los ingresos diferidos se redujeron en 34.6 millones de dólares debido a las subvenciones estatales recibidas y concedidas para la reparación y el mantenimiento de carreteras y puentes durante el presente año fiscal.

La parte corriente de los bonos a pagar se redujo un 41.1 % hasta aproximadamente $13.2 millones durante el año fiscal finalizado el 30 de junio de 2021, en comparación con el año fiscal anterior. La parte corriente de los bonos a pagar está

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

relacionada con los bonos a pagar del Puente Teodoro Moscoso. La disminución se debe principalmente a la reducción de los importes del monto principal de los bonos a pagar para el año fiscal 2022, en comparación con los importes que vencían durante el año fiscal 2021.

Durante el año fiscal finalizado el 30 de junio de 2021, el pasivo no corriente aumentó un 2.2 % hasta aproximadamente $8,741.7 millones, en comparación con el año fiscal de 2020. El aumento del pasivo no corriente de aproximadamente $184.8 millones durante el año fiscal actual fue el efecto neto de: un aumento de los intereses devengados por pagar sobre los bonos a pagar y la obligación de la Autoridad de Recuperación de la Deuda del BGF en un 15.7 % hasta aproximadamente $1,790.9 millones durante el año fiscal finalizado el 30 de junio de 2021 en comparación con el año fiscal anterior; y una disminución de los bonos a pagar de aproximadamente $11.5 millones; una disminución de $25.2 millones en las cuentas a pagar y una disminución de $3.8 millones en las obligaciones del plan de incentivos por vacaciones y cese voluntario.

Las reclamaciones legales no relacionadas con la expropiación y los costos relacionados disminuyeron un 6.09 % hasta aproximadamente $19.8 millones durante el año fiscal finalizado el 30 de junio de 2021, en comparación con el período del año anterior. Las reclamaciones legales relacionadas con la expropiación de propiedades disminuyeron un 25.76 % hasta aproximadamente 46.5 millones de dólares. El valor de las reclamaciones legales se registró en función del asesoramiento de los abogados internos y externos.

Las entradas de recursos diferidas durante el año fiscal finalizado el 30 de junio de 2021 disminuyeron un 2.4 % a $1,074.1 millones, en comparación con el año fiscal 2020. La disminución de $25.8 millones se debe principalmente al efecto de la amortización a las entradas de recursos diferidas sobre los acuerdos de concesión.

Durante el año fiscal finalizado el 30 de junio de 2021, el déficit neto de la Autoridad se incrementó en un 76.1 % hasta los $694.7 millones, en comparación con el año fiscal 2020. La disminución se debió a una pérdida de aproximadamente $300.4 millones después de las subvenciones de capital durante el actual año fiscal 2021. La mayor parte del déficit neto de la Autoridad fue su inversión en activos de capital netos de la deuda pendiente relacionada utilizada para adquirir dichos activos de capital.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

**Estados condensados de ingresos, gastos y cambios en el déficit neto**

La siguiente tabla refleja un resumen condensado de los ingresos, gastos y cambios en el déficit neto para los años fiscales finalizados el 30 de junio de 2021 y 2020:

| | 2021 [2] | 2020 (replanteado y reclasificado) |
|---|---|---|
| Ingresos operativos: | | |
| Tarifas de peaje | $ 151,557,243 | $ 124,272,241 |
| Otros ingresos operativos | 7,582,389 | 12,525,486 |
| Acuerdos de concesión | 41,164,686 | 39,945,626 |
| Total de ingresos operativos | 200,304,318 | 176,743,353 |
| | | |
| Total de gastos operativos | 349,411,742 | 331,955,446 |
| Amortización y depreciación | 476,415,023 | 471,936,881 |
| | | |
| Pérdida operativa | (625,522,447) | (627,148,974) |
| | | |
| Ingresos (gastos) no operativos: | | |
| Transferencias operativas del Estado Libre Asociado de Puerto Rico | 206,136,000 | - |
| Subvenciones operativas del Gobierno Federal de los Estados Unidos | 16,565,090 | 24,310,201 |
| Ingresos por inversiones | 3,891,951 | 5,213,185 |
| Intereses de los bonos y de las obligaciones de la Autoridad para la Recuperación de la Deuda del BGF | (302,106,535) | (338,226,720) |
| Otros gastos no operativos | (558,124) | 49,838 |
| Total de ingresos no operativos/(gastos) | (76,071,618) | (308,653,496) |
| | | |
| Pérdidas antes de las contribuciones de capital | (701,594,065) | (935,802,470) |
| Subvenciones de capital (federales y del ELA) | 401,222,514 | 289,140,974 |
| Variación del déficit neto | (300,371,551) | (646,661,496) |
| Posición neta (déficit) al principio del año, incluidos ($7,996,728), replanteamiento en 2020 | (394,371,936) | 252,289,560 |
| | | |
| Déficit neto al final del año | $(694,743,487) | $(394,371,936) |

Los ingresos operativos, que consisten en tarifas de peaje, acuerdos de concesión y otros ingresos operativos, aumentaron un 13.3 % hasta los $200.3 millones durante el año fiscal finalizado el 30 de junio de 2021, en comparación con el año fiscal 2020. Este aumento es el efecto neto de lo siguiente:

    a.   El aumento de las tarifas de peaje de $27.2 millones se debe principalmente a la reapertura de las operaciones

---

[2] Consulte la nota 1 de la página 7

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

gubernamentales y comerciales tras el impacto de los mandatos de cierre como consecuencia del virus de la pandemia de COVID-19.

b.   La disminución de otros ingresos operativos de aproximadamente $4.9 millones durante el presente año fiscal está relacionada con la disminución de las tarifas de los trenes debido al menor tráfico atribuible al impacto de las restricciones por la COVID-19 en escuelas y universidades, y al aumento del trabajo a distancia en entidades privadas y gubernamentales.

c.   El aumento de los ingresos por concesiones de aproximadamente $1.2 millones durante el presente año fiscal está relacionado con el aumento de los ingresos por concesiones de servicios de puentes por el importe del capital y los intereses de los bonos realizados por Autopistas de Puerto Rico (Autopistas).

Los gastos operativos aumentaron un 5.2 % hasta aproximadamente 349.4 millones de dólares durante el año fiscal finalizado el 30 de junio de 2021, en comparación con el año fiscal 2020. El aumento de los gastos operativos de aproximadamente $17.5 millones durante el presente año fiscal fue el efecto agregado de: 1) el efecto neto de un aumento en los salarios y beneficios relacionados de aproximadamente $3.4 millones; 2) una disminución en la parte proporcional del informe de gastos de pensiones GASB 73 del Plan de Pensiones para el año finalizado el 30 de junio de 2020 por aproximadamente $7.9 millones registrados como un ajuste del período anterior en el año fiscal 2021; 3) un aumento en la administración de autopistas de peaje de aproximadamente $4.7 millones debido al aumento de las reparaciones y el mantenimiento de las autopistas y al aumento de las tarifas mensuales del operador externo de las autopistas; 4) un aumento de los gastos de operación y mantenimiento de los trenes de aproximadamente $1 millón; 5) un aumento del sistema de transporte integrado de aproximadamente $1.4 millones; 6) un aumento de las reparaciones y el mantenimiento de las carreteras y los puentes de aproximadamente $3.2 millones; y 7) una disminución de los servicios jurídicos y profesionales de aproximadamente $9.1 millones relacionados con la aplicación del Plan Fiscal y los servicios jurídicos del Título III.

Las transferencias operativas del ELA aumentaron en aproximadamente $206.1 millones en comparación con el año fiscal finalizado el 30 de junio de 2020 como consecuencia de un aumento en las cantidades asignadas por el ELA.

El 30 de noviembre de 2015, el Gobernador emitió la Orden Ejecutiva 2015-046, que ordenó al Departamento de Hacienda que retuviera, entre otras cosas, ciertos impuestos sobre la gasolina, el aceite, el gasóleo y el petróleo que el ELA había asignado previamente de forma condicional a la Autoridad. Estos ingresos fueron retenidos por el ELA para el pago de servicios gubernamentales fundamentales. Dicha asignación condicional de los impuestos sobre la gasolina, el aceite, el gasóleo y el petróleo a la Autoridad ya no se realizará, ya que el Plan de Ajuste del ELA (definido más adelante) establece que las leyes que autorizaban dichas asignaciones quedaron anuladas y la asignación condicional se eliminó.

Los ingresos por inversiones disminuyeron en aproximadamente $1.3 millones durante el año fiscal finalizado el 30 de junio de 2021, como consecuencia de la disminución de tasas de interés en los saldos de efectivo. Además, los gastos de intereses sobre bonos y obligaciones de la Autoridad para la Recuperación de la Deuda del BGF disminuyeron en aproximadamente $36.1 millones durante el año fiscal finalizado el 30 de junio de 2021, principalmente debido a la disminución de los intereses a pagar relacionados con el saldo pendiente de la obligación de la Autoridad para la Recuperación de la Deuda del BGF.

Otros ingresos no operativos se mantuvieron en línea con el año fiscal anterior.

La Autoridad también recibió subvenciones de capital y operativas del gobierno federal de los Estados Unidos. Las subvenciones de capital solo pueden utilizarse para la construcción, las grandes mejoras y la conservación de carreteras y puentes, mientras que las subvenciones operativas se utilizan para financiar la reparación y el mantenimiento de carreteras y puentes, y otros gastos operativos de otros sistemas de transporte de masas. Dichas subvenciones de capital y operativas ascendieron a aproximadamente $234.2 y $222.6 millones de dólares durante el año fiscal finalizado el 30 de junio de 2021 y 2020, respectivamente.

***ACTIVOS DE CAPITAL Y ADMINISTRACIÓN DE LA DEUDA***

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

**Activos de capital**

Al 30 de junio de 2021, la Autoridad tenía aproximadamente $8,660.4 millones en activos de capital, netos de depreciación acumulada, lo que representa una disminución de $238.0 millones, en comparación con el año anterior. Los activos de capital consisten en carreteras, puentes, sistema de transporte masivo, equipo de transporte, edificios, terrenos, construcciones en curso y carreteras y puentes en virtud de acuerdos de concesión.

Desde finales del año fiscal 2005, la Autoridad opera el sistema de transporte ferroviario masivo para el área metropolitana de San Juan conocido como "Tren Urbano". La Autoridad incurrió originalmente en unos $2,420 millones en costos relacionados con el Tren Urbano, de los cuales $685.7 millones se pagaron con fondos federales. El Tren Urbano de San Juan consta de unos 17 km de vías que van de San Juan a Bayamón. Los servicios de mantenimiento se financian parcialmente con subvenciones operativas de la Administración Federal de Tránsito (FTA). El total de las subvenciones de explotación recibidas de la FTA utilizadas para los servicios de mantenimiento y otros programas ascendió a aproximadamente $16.5 millones durante el año fiscal finalizado el 30 de junio de 2021. A partir del 1 de julio de 2017, la Autoridad celebró un nuevo contrato con ACI-Herzog para la operación y el mantenimiento del Tren Urbano. Este acuerdo vence el 30 de junio de 2032, con una opción de prórroga por dos períodos adicionales no inferiores a 5 años, siempre que la duración total no supere los 25 años. El costo total anual de operación y mantenimiento, para el año fiscal finalizado el 30 de junio de 2021, fue de aproximadamente $47.3 millones de dólares.

El 22 de septiembre de 2011, la Autoridad celebró un acuerdo de concesión de servicios de autopistas de peaje con Metropistas (el Acuerdo de Concesión de Servicios de Autopistas de Peaje), en el que la Autoridad concedió a Metropistas el derecho a financiar, operar y mantener las autopistas PR-22 y PR-5 durante un período de 40 años. Durante el plazo de 40 años, Metropistas tendrá derecho a cobrar y recaudar los peajes impuestos en estas autopistas, como se describe con más detalle en la Nota 11 de los estados financieros básicos. El 19 de abril de 2016, la Autoridad celebró una modificación del Acuerdo de Concesión de Servicios de Autopistas de Peaje para ampliar el plazo original por diez años más y crear cinco puntos de peaje bidireccionales en las autopistas PR-5 y PR-22.

El 20 de diciembre de 1992, la Autoridad y Autopistas celebraron un acuerdo de concesión de servicios (con las modificaciones de 1992, 2004 y 2009, el Acuerdo de Concesión de Servicios de Puentes, y junto con el Acuerdo de Concesión de Servicios de Autopistas, los Acuerdos de Concesión de Servicios) para el diseño, la construcción, la operación y el mantenimiento del Puente Teodoro Moscoso, un puente de peaje que cruza la Laguna San José entre los municipios de San Juan y Carolina. Autopistas diseñó y construyó el Puente Teodoro Moscoso, que comenzó a funcionar el 23 de febrero de 1994, como se describe con más detalle en la Nota 11 de los estados financieros básicos. El 9 de septiembre de 2009, el acuerdo se modificó para ampliar su plazo a 50 años (2044).

**Administración de la deuda**

Al 30 de junio de 2021, el capital total de los bonos en circulación de la Autoridad (neto de primas y descuentos no amortizados) ascendía a aproximadamente $4,372.6 millones, más los intereses devengados de $890.7 millones. Además, en la misma fecha, el capital agregado de las líneas de crédito vencidas que se adeudaban al DRA BGF era de $1,733.7 millones, más los intereses devengados de $900.3 millones. El pago de estas obligaciones se ha paralizado en el procedimiento del Título III de PROMESA. Estas obligaciones deben ser resueltas en los términos establecidos en esa cierta *Estipulación en conexión con las disputas relacionadas con el DRA* [ECF N.º 19100], que establece que dichas obligaciones se descargan a cambio de ciertos Instrumentos de Valor Contingente (CVI) subordinados emitidos de conformidad con el Plan de Ajuste del ELA y el pago de ciertos honorarios y gastos.

Como se comenta más adelante, al presentar la solicitud de exención en 2017 en virtud del Título III de PROMESA, se paralizaron todos los pagos de la deuda, excepto cierta deuda que actualmente está siendo liquidada por un tercero (Bonos Teodoro Moscoso). Para el año fiscal finalizado el 30 de junio de 2021, la Autoridad dejó de pagar el capital y los intereses de la amortización de la deuda por un valor de $351.8 millones.

***HECHOS CONOCIDOS EN LA ACTUALIDAD***

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Debate y análisis de la gerencia (no auditado) (continuación)

Para los años fiscales finalizados el 30 de junio de 2021 y 2020

**Evento de la pandemia de COVID-19**

Desde que China alertó por primera vez a la Organización Mundial de la Salud (en lo sucesivo, la "OMS") de casos similares a los de la gripe en Wuhan el 31 de diciembre de 2019, la comunidad mundial está experimentando una crisis sanitaria sin precedentes causada por un nuevo coronavirus conocido como "COVID-19", que puede causar varios síntomas graves, como fiebre, tos, dificultad para respirar e incluso la muerte en casos extremos. El 15 de marzo de 2020, la entonces gobernadora Wanda Vázquez Garced firmó la Orden Ejecutiva N.º E-2020- 023, que ordenaba el cierre de todos los negocios no esenciales en Puerto Rico. A partir de entonces, y hasta la fecha de emisión de estos estados financieros, se han emitido nuevas órdenes ejecutivas, incluidas las del actual gobernador Pedro Pierluisi. En la Autoridad, el cierre sustancial de las operaciones estuvo vigente durante menos de dos meses. A partir de entonces, se iniciaron los trabajos de construcción y mantenimiento, ya que los contratistas reprogramaron las obras en curso, y los empleados administrativos comenzaron a trabajar en un horario híbrido hasta el 24 de mayo de 2021, fecha en la que todos los empleados debían volver a su puesto de trabajo a tiempo completo, con la prueba de la vacunación con ciertas excepciones. A la fecha de emisión de estos estados financieros, ha disminuido notablemente el número de personas que se infectan o requieren hospitalización. Sin embargo, el efecto a largo plazo de la pandemia sigue siendo difícil de predecir.

**Plan fiscal de la Autoridad y acuerdos de principio**

El 22 de febrero de 2022, la Junta de Supervisión certificó una versión modificada del plan fiscal para el año fiscal 2022 de la Autoridad que se aprobó inicialmente el 27 de mayo de 2021. El plan fiscal modificado para el año fiscal 2022 incorpora elementos del Plan de Ajuste del ELA, que fue confirmado el 18 de enero de 2022 y entró en vigencia el 15 de marzo de 2022.

El 12 de abril de 2021, el ELA y otras unidades componentes, incluida la Autoridad, presentaron un Acuerdo de Principios (AP) ante la Junta Reguladora de Valores Municipales. Las partes del AP de la Autoridad revelaron acuerdos tentativos alcanzados con los bonistas de la Autoridad, que si se materializan, generarán una disminución significativa de las obligaciones de la Autoridad. El 5 de mayo de 2021, la Junta de Supervisión (como representante del deudor del ELA y de la Autoridad en sus respectivos casos del Título III) y algunos de los acreedores y aseguradores de la Autoridad celebraron el PSA de la ACT/CCDA, que establecía los términos clave para la resolución de las reclamaciones de los acreedores contra la Autoridad en virtud del Plan de Ajuste del ELA y del Plan de Ajuste de la ACT.

### *CONTACTO CON LA ADMINISTRACIÓN FINANCIERA DE LA AUTORIDAD*

Este informe financiero está diseñado para proporcionar a nuestros bonistas, y a otras partes interesadas, una visión general de las finanzas de la Autoridad y para demostrar la responsabilidad de la Autoridad por el dinero que recibe. Si tiene alguna pregunta o necesita información financiera adicional, póngase en contacto con la Autoridad de Carreteras y Transportación de Puerto Rico, Área de Finanzas, Código postal 42007, San Juan, Puerto Rico 00940-2007.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estado del déficit neto

30 de junio de 2021

| | |
|---|---:|
| Activos | |
| Activos corrientes: | |
| Efectivo | $    18,400,049 |
| Cuentas por cobrar, netas | 7,090,078 |
| Deudas con el Estado Libre Asociado de Puerto Rico, netas | 59,067,000 |
| Gastos pagados por adelantado y otros activos | 4,980,091 |
| Total de activos corrientes | 89,537,218 |
| | |
| Activos restringidos: | |
| Efectivo y equivalentes de efectivo | 158,169,219 |
| Inversiones con fideicomisario | 89,801,845 |
| Cuentas por cobrar gobierno federal de los EE. UU. | 68,934,045 |
| Total de activos restringidos | 316,905,109 |
| | |
| Otros activos no corrientes: | |
| Activos de capital, neto | 8,660,384,135 |
| Autopistas y puentes en régimen de concesión, neto | 196,198,857 |
| Total de otros activos no corrientes | 8,856,582,992 |
| Activos totales | 9,263,025,319 |
| | |
| Salidas diferidas de recursos: | |
| Pensión relacionada | 64,249,240 |
| Otros beneficios posempleo distintos de las pensiones | 127,255 |
| Total de salidas diferidas, netas | 64,376,495 |
| | |
| Total de activos y salidas de recursos diferidas | $ 9,327,401,814 |

Continuación.

-14-

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estado del déficit neto (continuación)

30 de junio de 2021

| | |
|---|---:|
| Pasivos | |
| Pasivos corrientes: | |
| Cuentas por pagar | $ 57,707,664 |
| Pasivos devengados y otros pasivos | 9,763,594 |
| Subcontratistas de cuentas a pagar | 76,586,137 |
| Ingresos diferidos | 48,955,971 |
| Parte corriente de las reclamaciones judiciales acumuladas | 76,428 |
| Parte corriente de las obligaciones a pagar, Teodoro Moscoso | 13,235,000 |
| Total de pasivos corrientes | 206,324,794 |
| Pasivos no corrientes: | |
| Bonos a pagar | 4,372,581,416 |
| Bonos a pagar, Teodoro Moscoso, neto | 76,305,479 |
| Intereses devengados de bonos a pagar | 890,679,364 |
| Obligación de la Autoridad de Recuperación de la Deuda del BGF | 1,733,697,499 |
| Intereses devengados de la obligación de la Autoridad de Recuperación de la Deuda del BGF | 900,306,912 |
| Vacaciones acumuladas, netas | 2,918,261 |
| Pasivo del plan de incentivos por cese voluntario, neto | 25,864,412 |
| Total del pasivo por pensiones | 615,651,428 |
| Otros beneficios posempleo distintos de las pensiones | 18,387,663 |
| Cuentas por pagar | 8,764,467 |
| Pasivos devengados y otros pasivos | 4,021,368 |
| Subcontratistas de cuentas a pagar | 26,327,475 |
| Demandas judiciales acumuladas | 66,234,339 |
| Total de pasivos no corrientes | 8,741,740,083 |
| Total de pasivos | 8,948,064,877 |
| Entradas diferidas de recursos: | |
| Acuerdo de concesión de servicios | 1,036,670,106 |
| Otros beneficios posempleo distintos de las pensiones | 621,700 |
| Pensión relacionada | 36,788,618 |
| Total de entradas diferidas de recursos | 1,074,080,424 |
| Déficit neto: | |
| Inversión neta en activos de capital | |
| Restringido a la amortización de la deuda | 1,521,179,877 |
| Restringido para la construcción | - |
| | 119,621,153 |
| Déficit | (2,335,544,517) |
| Déficit neto total | (694,743,487) |
| Total de pasivos, entrada de recursos diferida y déficit neto | $9,327,401,814 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estado de ingresos, gastos y cambios en el déficit neto

30 de junio de 2021

| | |
|---|---:|
| **Ingresos operativos:** | |
| Tarifas de peaje | $ 151,557,243 |
| Otros ingresos operativos | 7,582,389 |
| Acuerdos de concesión | 41,164,686 |
| Total de ingresos operativos | 200,304,318 |
| | |
| **Gastos operativos:** | |
| Sueldos y beneficios relacionados | |
| Pensiones pagadas (PayGo) | 14,023,571 |
| Otros beneficios posempleo | 35,037,526 |
| Administración y mantenimiento de autopistas de peaje | 56,387 |
| Costos operativos y mantenimiento del tren | 51,939,540 |
| Sistema de transporte integrado | 47,308,557 |
| Reparación y mantenimiento de carreteras y puentes | 9,513,372 |
| Servicios públicos | 146,662,403 |
| Seguro | 8,681,257 |
| Otros | 11,978,095 |
| Total de gastos operativos | 24,211,034 |
| Pérdida operativa antes de depreciación y amortización | 349,411,742 |
| Amortización y depreciación | (149,107,424) |
| Pérdida operativa | 476,415,023 |
| | (625,522,447) |
| **Ingresos (gastos) no operativos:** | |
| Transferencias operativas del Estado Libre Asociado de Puerto Rico | |
| Subvenciones operativas del Gobierno Federal de los Estados Unidos | 206,136,000 |
| Intereses de los bonos y de la obligación de recuperación de la deuda del BGF | 16,565,090 |
| Ingresos por inversiones | (302,106,535) |
| Variación neta del valor razonable de las inversiones | 3,846,495 |
| Otros | 45,456 |
| Total de ingresos (gastos) no operativos, netos | (558,124) |
| Pérdidas antes de las contribuciones de capital | (76,071,618) |
| Subvenciones de capital: | (701,594,065) |
| Gobierno federal de los EE. UU. | |
| ELA | 217,697,633 |
| Total de subvenciones de capital | 183,524,881 |
| Variación del déficit neto | 401,222,514 |
| Déficit neto al principio del año | |
| Ajuste del período anterior | (300,371,551) |
| Déficit neto al final del año | (386,375,208) |
| | (7,996,728) |
| | $(694,743,487) |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estado de flujos de efectivo

30 de junio de 2021

| | |
|---|---:|
| ACTIVIDADES OPERATIVAS: | |
| Recibo de peajes y tarifas de tren | $ 165,910,309 |
| Recepción de otras fuentes | (38,423,563) |
| Pagos a empleados, PayGo y beneficios relacionados | (53,802,467) |
| Pagos a proveedores por bienes y servicios | (335,764,043) |
| Efectivo neto utilizado en actividades operativas | (262,079,764) |
| | |
| ACTIVIDADES DE FINANCIAMIENTO NO RELACIONADAS CON EL CAPITAL: | |
| Subvenciones de operación recibidas | 26,963,754 |
| Transferencias operativas del Estado Libre Asociado de Puerto Rico | 130,805,000 |
| Efectivo neto procedente de actividades de financiamiento no relacionadas con el capital | 157,768,754 |
| ACTIVIDADES DE CAPITAL Y FINANCIAMIENTO RELACIONADAS: | |
| Subvenciones de capital recibidas | 446,416,084 |
| Adquisición y construcción de bienes de capital Pago de bonos Puente Teodoro Moscoso | (275,358,378) |
| | (12,760,000) |
| Intereses pagados Puente Teodoro Moscoso | (2,628,990) |
| Flujos de caja netos procedentes de actividades de capital y de financiamiento relacionadas | 155,668,716 |
| ACTIVIDADES DE INVERSIÓN: | |
| Compra de inversiones | (3,228,151) |
| Inversiones e ingresos por intereses recibidos | 3,846,495 |
| Efectivo neto procedente de actividades de inversión | 618,344 |
| | |
| AUMENTO NETO DE EFECTIVO Y EQUIVALENTES DE EFECTIVO | 51,976,050 |
| | |
| EFECTIVO Y EQUIVALENTES DE EFECTIVO AL PRINCIPIO DEL AÑO | 124,593,218 |
| | |
| EFECTIVO Y EQUIVALENTES DE EFECTIVO AL FINAL DEL AÑO | $ 176,569,268 |

Continuación.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Estado de flujos de efectivo (continuación)

30 de junio de 2021

CONCILIACIÓN CON EL EFECTIVO Y LOS EQUIVALENTES DE EFECTIVO PRESENTADOS EN EL
ESTADO DE POSICIÓN NETA:

| | | |
|---|---|---|
| Efectivo | $ | 18,400,049 |
| Efectivo y equivalentes de efectivo - restringido | | 158,169,219 |
| Total | $ | 176,569,268 |

CONCILIACIÓN DE LA PÉRDIDA OPERATIVA CON EL FLUJO DE CAJA
NETO UTILIZADO EN LAS ACTIVIDADES OPERATIVAS:

| | |
|---|---|
| Pérdida operativa | $(625,522,447) |
| Ajustes para conciliar las pérdidas operativas con los flujos de caja netos utilizados en las actividades operativas: | |
| Amortización y depreciación | 476,415,023 |
| Ingresos del acuerdo de concesión | (41,164,686) |
| Otros ingresos no operativos | (558,123) |
| Variación neta de los activos y pasivos operativos: | |
| Cuentas por cobrar | (46,483,753) |
| Gastos pagados por adelantado y otros activos | (338,907) |
| Otros beneficios posempleo | 104,374 |
| Salidas de recursos diferidas relacionadas con las pensiones | (10,535) |
| Cuentas por pagar | 741,941 |
| Pasivo acumulado | (18,916,713) |
| Demandas judiciales acumuladas | (1,282,416) |
| Vacaciones acumuladas | (237,503) |
| Pasivo del plan de incentivos voluntarios acumulados | (4,708,717) |
| Entradas de recursos diferidas relacionadas con las pensiones | (117,302) |
| Flujos de caja netos utilizados en actividades de explotación | $(262,079,764) |

INFORMACIÓN COMPLEMENTARIA SOBRE LOS FLUJOS DE CAJA:

Transacción no monetaria:

Intereses de los bonos y de las obligaciones de recuperación de la deuda del BGF,
incluida la amortización

| | |
|---|---|
| relacionada con las pérdidas diferidas por reembolsos anticipados | $ 299,541,545 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros

Año finalizado el 30 de junio de 2021

## 1. ORGANIZACIÓN

La Autoridad es una corporación pública y unidad componente del Estado Libre Asociado de Puerto Rico (el ELA) creada por la Ley N.º 74 del 23 de junio de 1965, con sus modificaciones (en lo sucesivo, la "Ley N.º 74-1965"), para diseñar, construir y administrar carreteras de peaje, autopistas y otras instalaciones para la movilidad de individuos, vehículos y embarcaciones, y para la planificación, la promoción y la viabilidad de sistemas de transporte masivo. Como unidad componente, la Autoridad está incluida en los estados financieros básicos del ELA.

La Autoridad está exenta del pago de impuestos sobre sus ingresos y propiedades. La Autoridad está gobernada por una junta de directores de siete miembros facultados para aprobar, modificar y revocar los reglamentos necesarios para el desempeño de sus funciones y para controlar el presupuesto de capital y operativo de la Autoridad. Con la promulgación de PROMESA el 30 de junio de 2016, ciertas acciones corporativas también pueden requerir la aprobación de la Junta de Supervisión y Administración Financiera para Puerto Rico (la Junta de Supervisión). Además, la promulgación de la Ley N.º 2-2017, Ley de la Agencia Fiscal y la Autoridad de Asesoría Financiera de Puerto Rico, amplió las facultades y la autoridad de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (en lo sucesivo, la "AAFAF"), para que la AAFAF tenga la responsabilidad de negociar, reestructurar y llegar a acuerdos con los acreedores sobre toda o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del ELA, incluida la Autoridad.

Además, como se comenta en las Notas 3 y 4 de los estados financieros básicos, el 21 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador, inició un caso de Título III para la Autoridad mediante la presentación de una petición de alivio en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. Los casos del Título III de PROMESA están presididos por la juez de distrito estadounidense Laura Taylor Swain. La Autoridad opera actualmente como deudor en dicho caso del Título III.

Los estados financieros básicos que se presentan en este documento se refieren únicamente a la situación financiera y los resultados de las operaciones de la Autoridad y no pretenden presentar la situación financiera del ELA ni los resultados de sus operaciones o flujos de efectivo.

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS

### Enfoque de medición y bases de contabilidad

Las políticas contables de la Autoridad se ajustan a los principios contables generalmente aceptados (GAAP) en los Estados Unidos de América, tal y como se promulgan en los pronunciamientos de la Junta de Normas Contables Gubernamentales (GASB).

Las operaciones de la Autoridad se contabilizan como un fondos de propiedad exclusiva (fondo empresarial) utilizando el enfoque de medición del flujo de recursos económicos y la base de la contabilidad basada en valores devengados. Con este enfoque de medición, todos los activos y las salidas de recursos diferidos, así como todos los pasivos y las entradas de recursos diferidos asociados a las operaciones de la Autoridad se incluyen en el estado de déficit neto. Los ingresos se reconocen en el período en que se obtienen, y los gastos se reconocen en el período en que se producen.

La Autoridad contabiliza sus operaciones y financiamiento de manera similar a las empresas privadas. La intención es que los costos de proporcionar bienes o servicios al público en general de forma continuada se financien o recuperen principalmente a través de las tasas de los usuarios. Dichas cuentas y estos estados financieros básicos fueron preparados sobre la base de que la Autoridad continuará como una empresa en funcionamiento y como una entidad gubernamental legalmente separada y una unidad componente del ELA. Consulte la Nota 4 a los estados financieros básicos.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

**Efectivo y equivalentes de efectivo**

La Autoridad considera como efectivo y equivalentes de efectivo todas las inversiones de gran liquidez con vencimiento original de tres meses o menos desde la fecha de compra. Sin embargo, en el caso de los activos restringidos, los equivalentes de efectivo se presentarán como inversiones.

**Cuentas por cobrar**

Las cuentas por cobrar consisten en cantidades adeudadas por el ELA, lo que incluye transferencias operativas del ELA no remitidas, cantidades adeudadas por programas federales, agencias gubernamentales, corporaciones públicas, municipios del ELA y otros. Los importes con un retraso significativo se incluyen en la provisión para cuentas de dudoso cobro. Las cuentas por cobrar se presentan netas de las provisiones estimadas para cuentas incobrables, que se determinan sobre la base de la experiencia de cobro anterior y las condiciones económicas actuales, entre otros factores.

**Inversiones**

La Autoridad declara las inversiones en el estado de déficit neto por su valor razonable y los ingresos de las inversiones, incluidas las variaciones del valor razonable de dichas inversiones, que se contabilizan como ingresos/(gastos) no operativos en el estado de ingresos, gastos y cambios en el déficit neto. Los valores razonables se determinaron utilizando valores de mercado cotizados o ajustados al 30 de junio de 2021.

**Provisión para cuentas de dudoso cobro**

La provisión para cuentas de dudoso cobro es una cantidad que la gerencia considera adecuada para absorber las posibles pérdidas de las cuentas por cobrar existentes que puedan resultar incobrables, sobre la base de las evaluaciones de la capacidad de cobro de las cuentas por cobrar y en la experiencia de pérdidas crediticias anteriores. Debido a las incertidumbres inherentes al proceso de estimación, la estimación de la gerencia sobre las pérdidas crediticias inherentes a las cuentas por cobrar existentes y la correspondiente provisión puede cambiar en el futuro.

**Activos de capital**

**Base de costo**: los bienes de capital se registran al costo histórico o al valor de adquisición de los bienes donados. El costo de los bienes y equipos incluye los costos de los activos de infraestructura (derechos de paso, subestructuras de puentes, autopistas y puentes), instalaciones de peaje, equipos y otros costos relacionados (incluido el *software*), edificios y mobiliario. Las subestructuras de las carreteras y los puentes incluyen la subbase de la carretera, la nivelación, la limpieza del terreno, los terraplenes y otros costos relacionados. Los costos de los activos de infraestructura incluyen los costos de construcción, los honorarios de diseño e ingeniería y los gastos administrativos y generales asociados al proyecto.

**Política de capitalización**: los activos de capital de infraestructura (carreteras, puentes, autopistas, equipos de transporte, etc.) son definidos por la Autoridad como activos con un costo inicial e individual de más de $500,000 y una vida útil estimada de más de un año. La Autoridad define otros activos de capital, como equipos, vehículos, etc., como activos con un costo inicial individual superior a $1,000 y una vida útil estimada de más de dos años.

Los costos de adquisición de activos de capital adicionales, que sustituyen a los activos existentes, amplían su vida útil o mejoran la capacidad del activo de capital, se capitalizan.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

Los costos de mantenimiento y reparaciones normales, que no aumentan el valor de los activos ni prolongan sustancialmente su vida útil, se contabilizan como gastos en el momento en que se producen.

**Depreciación de bienes de capital**: la depreciación se realiza por el método lineal a lo largo de una vida útil estimada de 40 años para las nuevas carreteras, autopistas y ensanchamientos de carreteras, de 50 a 59 años para los nuevos puentes y sistemas de transporte (incluidos los equipos e instalaciones de transporte), de 20 años para las mejoras de los puentes, de 15 años para la repavimentación de las autopistas y de 10 años para los equipos, vehículos y repavimentación de las carreteras que no son autopistas.

**Deterioro de activos de capital**: la Autoridad evalúa los eventos prominentes o los cambios en las circunstancias que afectan a los activos de capital para determinar si se ha producido el deterioro de un activo de capital. Tales eventos o cambios en circunstancias que pueden ser indicativos de deterioro incluyen evidencia de daño físico, promulgación o aprobación de leyes o reglamentaciones u otros cambios en factores ambientales, cambios tecnológicos o evidencia de obsolescencia, cambios en la manera o duración del uso de un activo de capital y detención en la construcción, entre otros.

La Autoridad evaluó sus activos de capital y determinó que no había un deterioro significativo al 30 de junio de 2021.

**Acuerdos de concesión de servicios**

La Autoridad celebró acuerdos de concesión de servicios en virtud de los cuales transfirió la administración y la operación de determinados activos de infraestructura a organizaciones privadas a cambio de tarifas de concesión. Los importes cobrados por adelantado se contabilizan como entradas de recursos diferidas y se amortizan en los ingresos de la concesión de forma sistemática y racional a lo largo de la duración de los acuerdos. Los activos siguen siendo propiedad de la Autoridad y, por lo tanto, figuran en los estados financieros básicos de la Autoridad. Las mejoras realizadas por Metropistas en los activos transferidos son capitalizadas por la Autoridad. Consulte la Nota 11 para obtener información adicional sobre los acuerdos de concesión de servicios vigentes al 30 de junio de 2021.

**Reclamaciones y sentencias**

El importe estimado del pasivo por reclamaciones y sentencias se registra en el estado de déficit neto adjunto sobre la base de la evaluación de la Autoridad de la probabilidad de un resultado desfavorable en el litigio de dichas reclamaciones y sentencias. La Autoridad consulta con los asesores jurídicos al determinar si se espera un resultado desfavorable. Debido a las incertidumbres inherentes al proceso de estimación, la estimación de la gerencia del pasivo por reclamaciones y sentencias puede cambiar en el futuro. En la Nota 19, se ofrece información adicional sobre la situación de los principales litigios de la Autoridad a la fecha de los presentes estados financieros básicos.

**Ausencias compensadas**

Las ausencias compensadas incluyen el tiempo libre remunerado que se pone a disposición de los empleados en relación con las vacaciones y las bajas por enfermedad. El pasivo por ausencias compensadas se informa en el estado de déficit neto. El pasivo por ausencias compensadas se contabiliza en los estados financieros solo cuando se debe el pago. El pasivo por ausencias compensadas registrado en el estado de déficit neto adjunto se limita a las vacaciones atribuibles a los servicios ya prestados y que no dependen de un acontecimiento específico.

El 29 de abril de 2017, el Gobernador promulgó la Ley N.º 26 de 2017 "Ley para el Cumplimiento del Plan Fiscal", que, entre otras cuestiones, modificó la fórmula de acumulación de vacaciones y licencias por enfermedad para todos los empleados gubernamentales. A través de la Ley, se estableció que, a partir del 1 de mayo de 2017, todos los empleados públicos tendrán derecho a acumular las vacaciones a razón de un día y cuarto por cada mes de

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2.   RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

servicio. Además, se eliminó el pago de la licencia por enfermedad cuando el empleado renuncia o en el momento de la separación. Los empleados nuevos acumulan las vacaciones con carácter retroactivo después de los tres primeros meses de trabajo.

Además se informó de que, a partir de la vigencia de esta Ley, ningún empleado público, sindicalizado o no, que trabaje para el ELA en cualquiera de sus agencias, instrumentalidades o corporaciones públicas, tendrá derecho a recibir el pago por la liquidación de días en exceso de la licencia máxima permitida.

**Pensiones**

Desde el 1 de julio de 2017, la obligación de pensiones del Sistema de Retiro de los Empleados (SRE) se transfirió a un fideicomiso de pensiones no financiado, en el que las obligaciones de pensiones se financian sobre la base del pago. En esa fecha, los empleados activos dejaron de contribuir al SRE y los nuevos empleados tampoco se afiliarán. El cambio de financiamiento dio lugar a la modificación del principio contable de GASB 68 Contabilidad e información financiera sobre pensiones a GASB; *GASB 73, Contabilización e información financiera sobre pensiones y activos relacionados que no están dentro del ámbito de aplicación de la Declaración 68 de la GASB; y modificaciones de determinadas disposiciones de las Declaraciones 67 y 68 de la GASB.* En virtud del Plan de Ajuste del ELA y de la Orden de Confirmación del ELA (cada una de ellas definida y comentada más adelante), se creó un Fideicomiso de Reserva de Pensiones para financiar los futuros pasivos de pensiones del SRE con una contribución de financiamiento inicial del ELA de 5 millones de dólares en la Fecha de Entrada en Vigencia del ELA para financiar los costos y los gastos administrativos iniciales de la Junta de Reserva de Pensiones. También se realizarán contribuciones anuales adicionales del ELA al Fideicomiso de Reserva de Pensiones en cantidades que se determinarán cada año fiscal de acuerdo con los términos del Plan de Ajuste del ELA. El Plan de Ajuste del ELA y la Orden de Confirmación del ELA también impiden que el ELA aplique la legislación existente o promulgue una legislación nueva dentro de los 10 años siguientes a la Fecha de Entrada en Vigencia del ELA que crearía o aumentaría cualquier pago u obligación de pensión de beneficio definido a los jubilados actuales o futuros sin la aprobación previa del Tribunal del Título III.

Para medir el pasivo total por pensiones, las salidas de recursos diferidas y las entradas de recursos diferidas relacionadas con las pensiones, y los gastos por pensiones, la información sobre el pasivo total por pensiones del SRE, y los cambios en el pasivo total por pensiones se han determinado sobre la misma base que la informada por el SRE. A tal efecto, los pagos de beneficios (incluidos los reembolsos de las contribuciones de los empleados) se reconocen cuando son debidos y a pagar de acuerdo con las condiciones de los beneficios. Consulte la Nota 15.

**Beneficios posempleo distintos de las pensiones**

La Autoridad contabiliza los beneficios posempleo distintos de las pensiones de acuerdo con la Declaración de la GASB N.º 75, *Contabilidad e información financiera sobre beneficios posempleo distintos de las pensiones.* Los gastos de otros beneficios posempleo distintos de las pensiones (OPEB) se reconocen y revelan utilizando la contabilidad basada en valores devengados. La Autoridad reconoce el pasivo total de OPEB, ya que el programa de OPEB de la Autoridad se financia sobre la base de pagos periódicos. Los cambios en el pasivo total de OPEB durante el período se registran como gasto de OPEB, o como entradas o salidas diferidas de recursos, según la naturaleza del cambio; el reconocimiento se produce en el período en que se incurre en el gasto de OPEB, las entradas o salidas diferidas, según corresponda. Los cambios en el pasivo total de OPEB que se registran como entradas o salidas diferidas de recursos que surgen de los cambios en las hipótesis actuariales u otros datos y de las diferencias entre la experiencia esperada y la real se amortizan a lo largo de la media de la vida de servicio restante de todos los participantes, incluidos los jubilados, y se registran como un componente de los gastos de OPEB, comenzando por el período en el que surgieron.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

### Beneficios por cese voluntario

La Autoridad contabiliza las indemnizaciones por cese voluntario de acuerdo con la Declaración N.º 47 de la GASB, *Contabilización de las indemnizaciones por cese*. De conformidad con las disposiciones de la Declaración N.º 47 de la GASB, en los estados financieros elaborados con la contabilidad basada en valores devengados, los patrones deben reconocer un pasivo y gasto por beneficios de cese voluntario (por ejemplo, incentivos de retiro anticipado) cuando se acepta la oferta y se puede estimar el monto.

### Salidas/entradas diferidas de recursos

Además de los activos, el estado del déficit neto presenta una sección separada para las salidas de recursos. Este elemento de los estados financieros separados representa un consumo de déficit neto que se aplica a un período futuro y no se reconocerá como una salida de recursos (gastos) hasta entonces. La Autoridad tiene dos partidas que cumplen los requisitos para informar en esta categoría: (i) la diferencia entre la experiencia esperada y la real, debido a cambios en las hipótesis y en la contribución del patrono al plan de pensiones con posterioridad a la fecha de medición de pasivos netos por pensiones, y (ii) la diferencia entre la experiencia real y la esperada en relación con la obligación de OPEB.

Además del pasivo, el estado del déficit neto presenta una sección separada para las entradas de recursos diferidas. Este elemento de los estados financieros separados representa una adquisición de déficit neto que se aplica a un período futuro y no se reconocerá como una entrada de recursos (ingresos) hasta ese momento. La Autoridad tiene dos partidas que cumplen los requisitos para informar en esta categoría: (i) los importes diferidos de los acuerdos de concesión de servicios; y (ii) la diferencia entre la experiencia esperada y la real, los cambios en las hipótesis y la contribución del patrono al plan de pensiones posterior a la fecha de medición del pasivo total por pensiones.

Los flujos de entrada y salida de recursos diferidos relacionados con las pensiones se derivan de las diferencias entre la experiencia prevista y la real, o de los cambios en las hipótesis u otros datos. Estos importes se difieren y se incluyen en los gastos de pensiones de forma sistemática y racional a lo largo de un período igual a la media de la vida útil restante prevista de todos los empleados que reciben beneficios a través del plan de pensiones (empleados activos y empleados inactivos). Las entradas diferidas de recursos relacionadas con el acuerdo de concesión de servicios ascendieron a $1,036.7 millones. Estos importes se amortizan a lo largo de los 50 años de duración del acuerdo. Las entradas de recursos diferidas también incluyen importes relacionados con las pensiones de $36.8 millones y $621.7 mil relacionados con los importes de OPEB. Las salidas diferidas de recursos incluyen importes relacionados con las pensiones de $64.2 millones y $127.3 mil relacionados con los importes de OPEB.

### Primas (descuentos) y costos de emisión de bonos

Los costos de emisión de bonos se contabilizan como gastos durante el año en el que se producen.

Los descuentos y las primas de los bonos se amortizan a lo largo de la duración de la deuda correspondiente utilizando el método de la tasa de interés efectiva. Los bonos a pagar se presentan netos de los descuentos y primas aplicables.

La amortización relacionada con las primas (descuentos) de los bonos fue de aproximadamente $12.9 millones para el año fiscal finalizado el 30 de junio de 2021 y se incluye como un componente de los gastos por intereses en los estados adjuntos de ingresos, gastos y cambios en el déficit neto.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

**Refinanciamiento de la deuda**

En años anteriores, la Autoridad canceló algunos bonos relacionados con la emisión de los acuerdos de concesión, como se explica en la Nota 11.

Al 30 de junio de 2021, los saldos pendientes de los bonos cancelados por la Autoridad son los siguientes:

|  |  |
|---|---|
| Serie BB | $22,180,000 |
| Serie AA | 1,580,000 |
| Serie CC (CABS) | 1,300,000 $ |
| Total | 25,060,000 |

La gerencia cree que las nuevas emisiones de bonos, como consecuencia de esta cancelación, se liquidarán de conformidad con el PSA de la ACT/CCDA. Sin embargo, esto está sujeto a la aprobación final del Tribunal del Título III.

**Gastos de intereses**

Tras la presentación del Título III en virtud de PROMESA, la Autoridad sigue contabilizando los intereses de todas las obligaciones que devengan intereses. El importe final de los intereses, si los hay, que se pagarán en el futuro depende de la resolución del caso del Título III de la Autoridad. Sin embargo, el 5 de mayo de 2021, la Autoridad celebró el PSA de la ACT/CCDA (aún sujeto a la aprobación del Tribunal del Título III en la fecha de emisión de los estados financieros). Sobre la base del PSA formalizado, la gerencia cree que es más probable que el total de los intereses a pagar sea liquidado, y, en consecuencia, la Autoridad dejó de devengar intereses en dicha fecha. Además, las salidas diferidas relacionadas con la pérdida por reembolso anticipado se imputaron a las operaciones (dentro de los gastos de intereses) durante el año en curso, ya que la gerencia cree que es más probable que el tribunal del Título III apruebe el PSA de la ACT/CCDA y, en consecuencia, descargue todos los bonos en circulación a pagar, incluidos los bonos emitidos como parte de la transacción de cancelación de reembolso anticipado.

**Déficit neto**

El déficit neto se clasifica en los siguientes cuatro componentes en el estado de déficit neto adjunto:

**Inversión neta en activos de capital**: este componente del déficit neto consiste en los activos de capital, netos de la depreciación acumulada, menos los saldos pendientes de cualquier bono, pagaré u otros préstamos atribuibles a la adquisición, construcción o mejora de dichos activos. Las salidas diferidas de recursos y las entradas diferidas de recursos que son atribuibles a la adquisición, construcción o mejora de esos activos o deuda relacionada también deben incluirse en este componente de déficit neto. Si al final del año fiscal existen ingresos de deuda o entradas de recursos diferidos significativos no gastados, la parte de la deuda o de las entradas de recursos diferidos atribuibles al importe no gastado no se incluyen en el cálculo de la inversión neta en bienes de capital. En cambio, esa parte de la deuda o de las entradas de recursos diferidas se incluye en el mismo componente de déficit neto (restringido o no restringido) que el importe no gastado.

**Restringido para la amortización de la deuda:** este componente del déficit neto consiste en activos restringidos para el pago del capital y los intereses relacionados con los bonos a pagar. Esta restricción la imponen los bonistas a través de convenios de deuda.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

**Restringido para la construcción**: este componente del déficit neto consiste en activos restringidos con el propósito específico de financiar proyectos de construcción. Esta restricción la imponen los garantes y contribuyentes, así como los bonistas a través de convenios de deuda.

**Déficit no restringido**: el déficit neto no restringido consiste en el importe neto de los activos, las salidas de recursos diferidas, los pasivos y las entradas de recursos diferidas que no se incluyen en la determinación de las inversiones netas en activos de capital o el componente restringido del déficit neto. Al 30 de junio de 2021, la Autoridad tenía un déficit acumulado de aproximadamente $2,335.5 millones. Consulte la Nota 4 para obtener más información sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento.

### Reconocimiento de ingresos

La Autoridad distingue los ingresos y gastos operativos de las partidas no operativas. Los ingresos asociados a los peajes y a los billetes de tren se registran como ingresos operativos cuando se obtienen sobre la base de los informes de actividad facilitados por los operadores de peajes y trenes, respectivamente.

Los gastos relacionados con la administración y el mantenimiento de las autopistas de peaje y el sistema de transporte, la reparación y el mantenimiento de carreteras y puentes, y los gastos administrativos se registran como gastos de explotación. Todos los demás ingresos y gastos se consideran no operativos.

Los ingresos no operativos consisten principalmente en transferencias operativas asignadas a la Autoridad por el ELA y el gobierno federal de los Estados Unidos para financiar las operaciones de la Autoridad en proyectos de capital.

Los ingresos diferidos están relacionados con el "Programa Estatal de Modernización de Carreteras" (PEMOC) y "Abriendo Caminos" para la reparación y el mantenimiento de carreteras y puentes que se reconocen siguiendo los requisitos legales y contractuales aplicables. Básicamente, los ingresos se reconocen en función de los gastos registrados. Esto ocurre cuando los gastos se realizan para el propósito específico del proyecto. Los ingresos restantes de dichas subvenciones se presentan como efectivo restringido en el Estado de Déficit Neto.

### Subvenciones de capital y de operación

Las subvenciones de capital y de operación son fondos asignados por los gobiernos federal y local, incluidas la Administración Federal de Carreteras (FHWA), la Administración Federal de Tránsito (FTA) y el ELA a la Autoridad para la construcción de proyectos de capital específicos o la reparación y el mantenimiento de infraestructuras. Estas se contabilizan como subvenciones de capital y de explotación, tal y como exige la Declaración N.º 33 de la GASB, *Contabilización e información financiera de las transacciones sin contraprestación*.

### Uso de estimaciones

La elaboración de los estados financieros de conformidad con los GAAP requiere que la gerencia realice estimaciones e hipótesis que afectan a (i) los importes declarados de los activos y pasivos; (ii) la divulgación de los activos y pasivos contingentes en la fecha de los estados financieros y (iii) los importes declarados de los ingresos y gastos durante el período. Los resultados reales pueden diferir de estas estimaciones.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

**Financiamiento del riesgo**

La Autoridad cuenta con un seguro comercial para cubrir siniestros, robos, reclamaciones y otras pérdidas. Las pólizas de seguro actuales no fueron canceladas ni rescindidas. La Autoridad no liquidó ninguna reclamación por encima de la cobertura de su seguro para el año fiscal finalizado el 30 de junio de 2021.

**Nuevos pronunciamientos contables**

La GASB emitió las siguientes declaraciones:

- La Declaración N.º 87 de la GASB, *Arrendamientos* (Declaración N.º 87 de la GASB), que entra en vigencia para los períodos que comiencen después del 15 de junio de 2021, según la Declaración N.º 95 de la GASB, establece un enfoque único para la contabilización y la información de los arrendamientos por parte de los gobiernos estatales y locales. La Declaración N.º 87 de la GASB se basa en el principio de que los arrendamientos son financiamientos del derecho a utilizar un activo subyacente. La Declaración N.º 87 de la GASB proporciona orientación para los contratos de arrendamiento de activos no financieros, incluidos los vehículos, el equipo pesado y los edificios, pero excluye las transacciones sin intercambio, incluidos los activos donados y los arrendamientos de activos intangibles (como las patentes y las licencias de *software*). La Declaración N.º 87 de la GASB establece excepciones al enfoque único para los arrendamientos a corto plazo, las compras financieras, los arrendamientos de activos que son inversiones y determinados arrendamientos regulados. La Declaración N.º 87 de la GASB también aborda la contabilización de las rescisiones y modificaciones de los contratos de arrendamiento, las transacciones de venta y retroarrendamiento, los componentes no relacionados con el arrendamiento incluidos en los contratos de arrendamiento (como los acuerdos de servicios) y los arrendamientos con partes vinculadas.

  En virtud de esta declaración, una administración arrendataria debe reconocer un pasivo por arrendamiento y un activo intangible que representa el derecho del arrendatario a usar el activo arrendado. El pasivo debe ser el valor actual de los pagos cubiertos por el contrato, y su valor debe reducirse a medida que se realicen los pagos durante el plazo del arrendamiento. El activo debe ser igual a la medición inicial del pasivo. Un arrendatario también informará lo siguiente en sus estados financieros:

  (1) el gasto de amortización por el uso del activo de arrendamiento (similar a la depreciación) a lo largo del plazo del arrendamiento o de la vida útil del activo subyacente, lo que sea menor;
  (2) los gastos de intereses sobre el pasivo del arrendamiento; y
  (3) notas de información sobre el arrendamiento, incluida una descripción general del acuerdo de arrendamiento, el importe de los activos de arrendamiento reconocidos y un calendario de los futuros pagos de arrendamiento que se deben realizar.

  De acuerdo con esta declaración, un gobierno arrendador debe reconocer un arrendamiento por cobrar y una entrada de recursos diferida. El arrendador seguirá informando del activo arrendado en sus estados financieros. Un arrendador también informará lo siguiente en sus estados financieros:

  (1) los ingresos por arrendamiento, reconocidos sistemáticamente a lo largo de la duración del arrendamiento, que se corresponden con la reducción de la entrada diferida;
  (2) los ingresos por intereses del crédito; y
  (3) notas de información sobre el arrendamiento, incluida una descripción general del acuerdo de arrendamiento y el importe total de las entradas de recursos reconocidas por los arrendamientos.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

- La Declaración N.º 91 de la GASB, *Obligaciones de deuda conducida* (Declaración N.º 91 de la GASB), que entra en vigencia para los períodos que comienzan después del 15 de diciembre de 2021, según la Declaración N.º 95 de la GASB, proporciona un método único para que los emisores gubernamentales informen sobre las obligaciones de deuda conducida y los compromisos relacionados. La Declaración N.º 91 de la GASB aborda la variación en la práctica: aclarando lo que es una obligación de deuda conducida; eliminando la opción de que los emisores gubernamentales reconozcan las obligaciones de deuda conducida, y proporciona así un único método de información; ampliando la definición de las obligaciones de deuda conducida para incluir aquellas para las que los emisores gubernamentales adquieren compromisos adicionales relacionados, como garantías o promesas de obligaciones morales, o acuerdan voluntariamente realizar pagos para la amortización de la deuda o solicitan una asignación para tales pagos, si es necesario; aclarar la forma en que los emisores públicos deben contabilizar e informar sobre los compromisos que se extienden o proporcionan voluntariamente, así como los acuerdos asociados a las obligaciones de deuda conducida, que, a menudo, se caracterizan en la práctica como arrendamientos, pero que no son arrendamientos a efectos de información financiera; y mejorar la información de las notas. Aunque los emisores gubernamentales ya no informarán de las obligaciones de deuda conducida como pasivos, es posible que tengan que reconocer un pasivo relacionado con los compromisos que asumen o proporcionan voluntariamente asociados a esa deuda conducida. La Declaración N.º 91 de la GASB requiere que un emisor gubernamental reconozca un pasivo si los factores cualitativos indican que es más probable que no que admita uno o más pagos de la amortización de la deuda para una obligación de deuda conducida.

- La Declaración N.º 92 de la GASB, *Omnibus 2020* (Declaración de la GASB N.º 92), aumenta la comparabilidad de la información contable y financiera y mejora la coherencia de la literatura autorizada abordando cuestiones de práctica que se han identificado durante la implementación y la aplicación de determinadas Declaraciones de la GASB. Esta Declaración aborda diversos temas e incluye disposiciones específicas sobre lo siguiente: la fecha de entrada en vigencia de la Declaración de la GASB N.º 87, *Arrendamientos*, y la Guía de Implementación n.º 2019-3, *Arrendamientos*, para los informes financieros intermedios; la presentación de informes sobre las transferencias de activos entre un patrono del gobierno primario y un plan de pensiones de beneficios definidos de una unidad componente o un plan de otros beneficios posteriores al empleo (OPEB) de beneficios definidos; la aplicabilidad de las Declaraciones de la GASB N.º 73, *Contabilización e información financiera sobre pensiones y activos afines que no están dentro del ámbito de aplicación de la Declaración 68 de la GASB, y modificaciones de algunas disposiciones de las Declaraciones 67 y 68 de la GASB*, en su versión modificada, y la Declaración N.º 74 de la GASB, *Información financiera sobre planes de beneficios posempleo distintos de los planes de pensiones*, en su versión modificada, a la información sobre los activos acumulados para los beneficios posempleo; la aplicabilidad de determinados requisitos de la Declaración N.º 84 de la GASB, *Actividades fiduciarias*, a los acuerdos de beneficios posempleo; la valoración de los pasivos (y los activos, en su caso) relacionados con las obligaciones de retiro de activos (ARO) en una adquisición gubernamental; la información por parte de las agrupaciones de riesgo de las entidades públicas de los importes que son recuperables de los reaseguradores o aseguradores en exceso; la referencia a las mediciones no recurrentes del valor razonable de los activos o pasivos en la literatura autorizada; y la terminología utilizada para referirse a los instrumentos derivados.

Los requisitos de la Declaración N.º 92 de la GASB entran en vigencia de la siguiente manera: los requisitos relacionados con la fecha de entrada en vigencia de la Declaración N.º 87 de la GASB y la Guía de Implementación 2019-3, relativa a las recuperaciones de reaseguros, y la terminología utilizada para referirse a los instrumentos derivados entran en vigencia en el momento de su emisión; los requisitos

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2.  RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

relacionados con las transferencias de activos entre entidades y los relacionados con la aplicabilidad de las Declaraciones N.º 73 y N.º 74 son efectivos para los años fiscales que comiencen después del 15 de junio de 2021; los requisitos relacionados con la aplicación de la Declaración N.º 84 de la GASB a los acuerdos de beneficios posempleo y los relacionados con las mediciones no recurrentes del valor razonable de los activos o pasivos son efectivos para los períodos de información que comiencen después del 15 de junio de 2021; los requisitos relacionados con la medición de los pasivos (y los activos, en su caso) asociados a las ARO en una adquisición gubernamental son efectivos para las adquisiciones gubernamentales que se produzcan en los períodos de información que comiencen después del 15 de junio de 2021.

- Declaración N.º 96 de la GASB, *Acuerdos de tecnología de la información basados en la suscripción*. Esta Declaración proporciona orientación sobre la contabilidad y la información financiera de los acuerdos de tecnología de la información basados en la suscripción (SBITA) para los usuarios finales de la administración pública (gobiernos). Esta declaración (1) define un SBITA; (2) establece que un SBITA da lugar a un activo de suscripción por derecho de uso (un activo intangible) y a un pasivo de suscripción correspondiente; (3) proporciona los criterios de capitalización para los desembolsos distintos de los pagos de suscripción, incluidos los costos de implementación de un SBITA; y (4) exige la divulgación de notas relativas a un SBITA. En la medida en que sea pertinente, las normas para los SBITA se basan en los estándares establecidos en la Declaración N.º 87, *Arrendamientos*, en su versión modificada. Los requisitos de esta Declaración son efectivos para los años fiscales que comiencen después del 15 de junio de 2022 y todos los períodos de informe posteriores. Se anima a presentar la solicitud antes, pero no es obligatorio.

- Declaración N.º 97 de la GASB, *Ciertos criterios de las unidades componentes, y Contabilidad e información financiera para los planes de compensación diferida de la Sección 457 del Código de Rentas Internas* (una modificación de las Declaraciones N.º 14 y N.º 84 de la GASB, y una sustitución de la Declaración N.º 32 de la GASB). Los objetivos principales de esta Declaración son (1) aumentar la coherencia y la comparabilidad en relación con la información de las unidades componentes fiduciarias en circunstancias en las que una unidad componente potencial no tiene una junta de administración y el gobierno primario desempeña las funciones que normalmente realizaría una junta de administración; (2) mitigar los costos asociados a la presentación de información sobre determinados planes de pensiones de contribuciones definidas, planes de beneficios posempleo (OPEB) de contribuciones definidas y planes de contribuciones a los empleados distintos de los planes de pensiones o los planes OPEB (otros planes de beneficios para los empleados) como unidades componentes fiduciarias en los estados financieros de los fondos fiduciarios; y (3) mejorar la pertinencia, la coherencia y la comparabilidad de la información contable y financiera de los planes de compensación diferida de la Sección 457 del Código de Rentas Internas (IRC) (planes de la Sección 457) que cumplen la definición de plan de pensiones y de los beneficios proporcionados a través de dichos planes.

  Los requisitos de esta Declaración que (1) eximen a los gobiernos primarios que desempeñan las funciones que típicamente realiza una junta de administración de tratar la ausencia de una junta de administración igual que el nombramiento de una mayoría de votos de una junta de administración para determinar si son responsables financieramente de los planes de pensiones de aportaciones definidas, planes OPEB de aportaciones definidas u otros planes de beneficios a los empleados y (2) limitan la aplicabilidad del criterio de la carga financiera del párrafo 7 de la Declaración N.º 84 a los planes de pensiones de beneficios definidos y a los planes OPEB de beneficios definidos que se administran a través de fideicomisos que cumplen los criterios del párrafo 3 de la Declaración N.º 67 o del párrafo 3 de la Declaración N.º 74, respectivamente, son efectivos de inmediato.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 2. RESUMEN DE POLÍTICAS CONTABLES SIGNIFICATIVAS (continuación)

Los requisitos de esta Declaración que están relacionados con los informes contables y financieros para los planes de la Sección 457 son efectivos para los años fiscales que comienzan después del 15 de junio de 2021. A los fines de determinar si un gobierno primario es responsable financieramente de una posible unidad componente, los requisitos de esta Declaración que establecen que para todos los demás acuerdos la ausencia de una junta directiva sea tratada de la misma manera que el nombramiento de una mayoría de votos de una junta directiva si el gobierno primario realizara las funciones que normalmente realizaría una junta directiva son efectivos para los períodos de información que comienzan después del 15 de junio de 2021. Se fomenta y permite la aplicación anticipada de estos requisitos en virtud de los requisitos especificados en esta Declaración.

Declaración N.º 98 de la GASB, *El informe financiero completo anual*. Esta declaración establece el término "informe financiero completo anual" y su sigla en inglés "ACFR". Este nuevo término y su sigla sustituyen a los casos de informe financiero completo anual y su sigla en los principios contables generalmente aceptados para los gobiernos estatales y locales.

Esta Declaración se elaboró en respuesta a las preocupaciones planteadas por las partes interesadas de que la pronunciación común del acrónimo en inglés de *informe financiero completo anual* suena como un insulto racial profundamente objetable. La introducción del nuevo término en esta Declaración se basa en el compromiso de promover la inclusión. Los requisitos de esta Declaración son efectivos para los años fiscales que finalizan después del 15 de diciembre de 2021.

## 3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA

El ELA y muchas de sus unidades componentes, incluida la Autoridad, sufrieron una crisis económica y fiscal que provocó, entre otras cuestiones, la puesta en marcha de medidas financieras dirigidas a restablecer la estabilidad fiscal y financiera, entre las que se incluyen, varias leyes del ELA y federales que se han aprobado en los últimos años. El 30 de junio de 2016, el Congreso de los Estados Unidos promulgó PROMESA para abordar estos problemas. Posteriormente, el ELA y otras entidades gubernamentales, incluidas la Autoridad, la Corporación para el Financiamiento del Impuesto a las Ventas de Puerto Rico (COFINA), el Sistema de Retiro de Empleados (SRE), la Autoridad de Energía Eléctrica de Puerto Rico (AEE) y la Autoridad de Edificios Públicos (AEP) iniciaron procedimientos en virtud del Título III de PROMESA, y el Banco Gubernamental de Fomento para Puerto Rico (BGF), la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (PRIFA) y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (ADCCPR) iniciaron procedimientos en virtud del Título VI de PROMESA, cada uno a petición del Gobernador, para reestructurar o ajustar su deuda existente. La legislación más relevante federal y del ELA promulgada para hacer frente a la crisis fiscal e iniciar la recuperación económica es la siguiente:

**Medidas fiscales antes de PROMESA**

*(i) Retención por parte del gobierno de los ingresos tributarios asignados condicionalmente a ciertas corporaciones públicas y disposiciones de prioridad de pago*

El 1 de diciembre de 2015, el Gobernador firmó la Orden Ejecutiva N.º 46 que ordenaba al Secretario del Departamento de Hacienda (DOT) retener ciertos recursos disponibles del ELA sobre la base de las estimaciones revisadas de ingresos para el año fiscal 2016 y a la deteriorada situación de liquidez del ELA. De acuerdo con dicha orden ejecutiva, el Secretario del DOT retuvo los ingresos asignados condicionalmente a la Autoridad, la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (PRIFA), la Autoridad del Distrito del Centro de Convenciones de Puerto Rico (ADCCPR) y la Autoridad Metropolitana de Autobuses de Puerto Rico (PRMBA) para el pago de la amortización de la deuda de sus

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

bonos durante el año fiscal 2016. Desde el año fiscal 2016, dichos ingresos son retenidos por el ELA en virtud de ciertas leyes, incluidas, entre otras: (a) la Ley de Moratoria y la Ley N.º 5 (que se comenta más adelante); y (b) la paralización automática en virtud del Título III de PROMESA. El litigio relativo a la asignación condicional de los impuestos sobre la gasolina, el aceite, el gasóleo y el petróleo a la Autoridad se resolvió de acuerdo con los términos del Plan de Ajuste del ELA. Dichas asignaciones ya no se realizarán, dado que las leyes que las autorizaban fueron anuladas por el Plan de Ajuste del ELA y las asignaciones fueron eliminadas.

(ii) *Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico, Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico y órdenes ejecutivas relacionadas*

El 6 de abril de 2016, el ELA promulgó la Ley N.º 21 de 2016, conocida como la Ley de Moratoria de Emergencia y Rehabilitación Financiera de Puerto Rico (con sus modificaciones, la Ley de Moratoria). En virtud de la Ley de Moratoria, el Gobernador emitió una serie de órdenes ejecutivas y declaró un período de emergencia, una moratoria y varias otras medidas con respecto a ciertas obligaciones del ELA y varios de sus instrumentalidades. De conformidad con estas órdenes ejecutivas, ciertas entidades del ELA: (i) no hicieron pagos de amortización de la deuda; (ii) hicieron pagos de amortización de la deuda con fondos en depósito con los fideicomisarios de sus bonos; o (iii) no recibieron ni transfirieron ciertos ingresos. Dichas órdenes ejecutivas también impusieron restricciones significativas al desembolso de los fondos depositados en el BGF y paralizaron el desembolso de préstamos por el BGF.

**3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)**

La implementación de la Ley de Moratoria y sus órdenes ejecutivas relacionadas es el objeto del litigio en curso, como se analiza en la Nota 19. Tras la promulgación de PROMESA el 30 de junio de 2016, se aplicó la Paralización del Título IV (que se comenta más adelante) para paralizar este litigio hasta su vencimiento el 1 de mayo de 2017. Desde el inicio del caso del Título III del ELA el 3 de mayo de 2017, la paralización automática en virtud del Título III de PROMESA se aplicó para continuar la paralización de este litigio y evitar la amortización de la deuda a los bonistas. Este litigio se resolvió en virtud del Plan de Ajuste del ELA, que entró en vigencia el 15 de marzo de 2022.

**Resumen de PROMESA**

En términos generales, PROMESA busca proporcionar al ELA disciplina fiscal y económica a través de, entre otras cuestiones: (i) el establecimiento de la Junta de Supervisión, cuyas responsabilidades incluyen la certificación de los planes fiscales y los presupuestos para el ELA y sus entidades relacionadas; (ii) una paralización temporal de todas las demandas de los acreedores en virtud del Título IV de PROMESA; y (iii) dos métodos alternativos para ajustar la deuda insostenible: (a) un proceso de modificación voluntaria de la deuda en virtud del Título VI de PROMESA, que establece un proceso de reestructuración de la deuda en gran medida extrajudicial a través del cual las modificaciones de la deuda financiera pueden ser aceptadas por una supermayoría de los acreedores; y (b) un procedimiento de cuasiquiebra en virtud del Título III de PROMESA, que establece un proceso de reestructuración judicial de la deuda basado sustancialmente en las disposiciones incorporadas del Título 11 del Código de los Estados Unidos (Código de Quiebras de los Estados Unidos). Cada uno de estos elementos se divide entre los siete títulos de PROMESA, como se describe brevemente a continuación.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

**Título I. Establecimiento de la Junta de Supervisión y Asuntos Administrativos**

Tras la promulgación de PROMESA, se creó la Junta de Supervisión para el ELA. Consulte PROMESA § 101(b).

Tras la promulgación de PROMESA, se estableció la Junta de Supervisión para Puerto Rico. Como se indica en PROMESA, "el propósito de la Junta de Supervisión es proporcionar un método para que un territorio cubierto logre la responsabilidad fiscal y el acceso a los mercados de capital". El 31 de agosto de 2016, el Presidente de los Estados Unidos anunció el nombramiento de los miembros de la Junta de Supervisión. Cada miembro de la Junta de Supervisión debe tener "conocimiento y experiencia en finanzas, mercados de bonos municipales, administración, leyes, u organización u operación de negocios o gobierno". La Junta de Supervisión fue "creada como una entidad dentro del gobierno territorial para el cual fue establecida" y no es expresamente una entidad del gobierno federal, pero también fue establecida para actuar de forma independiente al gobierno del ELA, de manera que ni el Gobernador ni la Legislatura pueden "(1) ejercer ningún control, supervisión, vigilancia o revisión respecto de la Junta de Supervisión o sus actividades; ni (2) promulgar, implementar o hacer cumplir cualquier estatuto, resolución, política o norma que perjudique o anule los propósitos de [PROMESA], según lo determine la Junta de Supervisión".

**Título II. Plan fiscal y proceso de certificación presupuestaria y cumplimiento**

El Título II establece los requisitos para proponer y certificar planes y presupuestos fiscales para el ELA y sus instrumentalidades. "Cada plan fiscal sirve como piedra angular para las reformas estructurales que la Junta de Supervisión considera necesarias para garantizar que el territorio, o la instrumentalidad, se encaminen hacia la responsabilidad fiscal y el acceso a los mercados de capitales".

Solo después de que la Junta de Supervisión haya certificado un plan fiscal, el Gobernador puede presentar a la Legislatura un presupuesto del año fiscal del ELA y presupuestos del año fiscal para ciertas instrumentalidades del ELA (según lo aprobado por la Junta de Supervisión).

3. **LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)**

En cumplimiento de los deberes anteriores, PROMESA contiene una disposición que otorga facultades a la Junta de Supervisión para supervisar el cumplimiento de los planes y presupuestos fiscales certificados y emprender ciertas acciones, incluidas las reducciones de gastos y la presentación de acciones recomendadas al Gobernador que promuevan el cumplimiento presupuestario. Consulte el texto de PROMESA para obtener una descripción completa de las facultades de la Junta de Supervisión relacionadas con el plan fiscal y el cumplimiento presupuestario.

**Título III. Proceso de restructuración en el tribunal**

El Título III de PROMESA establece un proceso judicial para la reestructuración de las deudas de Puerto Rico y otros territorios de los Estados Unidos que sigue el modelo del proceso del Capítulo 9 del Código de Quiebras de los Estados Unidos.

La Junta de Supervisión es la única facultada para presentar una petición voluntaria en busca de protección en virtud del Título III de PROMESA, sujeto a los requisitos previos establecidos de este.

En un caso del Título III, la Junta de Supervisión actúa como representante del deudor y está autorizada a adoptar las medidas necesarias para procesar el caso del Título III. Inmediatamente después de radicar la petición del Título III, la sección 362 del Código de Quiebras (que se incorpora a los casos del Título III en virtud de PROMESA) se aplica para paralizar automáticamente todos los litigios contra el deudor (la Paralización del Título III). Un caso del Título III culmina en la confirmación de un plan de ajuste de las deudas del deudor. La

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

Junta de Supervisión tiene la autoridad exclusiva de presentar y modificar un plan de ajuste antes de la confirmación.

**Título IV. Paralización temporal de litigios, informes gubernamentales y otras disposiciones misceláneas**

El Título IV de PROMESA contiene varias disposiciones misceláneas, que incluyen una paralización temporal de litigios relacionados con "Reclamaciones de Pasivos", alivio de ciertas leyes salariales y por hora, el establecimiento de un Grupo de Trabajo del Congreso sobre crecimiento económico en Puerto Rico (el Grupo de Trabajo), el requisito de que la Oficina del Contralor General de los Estados Unidos presente dos informes al Congreso sobre los niveles de deuda pública de los territorios estadounidenses y la expansión del programa HUBZone de pequeñas empresas del gobierno federal en Puerto Rico.

De conformidad con la sección 405 de PROMESA, la promulgación de PROMESA impuso de forma inmediata y automática una paralización temporal (la Paralización del Título IV) desde el 30 de junio de 2016 (la fecha de promulgación de PROMESA) hasta el 15 de febrero de 2017 de todos los litigios de "Reclamaciones de Pasivos" iniciados contra el ELA de Puerto Rico y sus instrumentalidades después del 18 de diciembre de 2015. Una "Reclamación de Pasivos" se define como cualquier derecho de pago o recurso equitativo por incumplimiento relacionado con "un bono, préstamo, carta de crédito, otro título de préstamo, obligación de seguro u otro endeudamiento financiero por dinero prestado, incluidos los derechos, las titularidades o las obligaciones, ya sea que dichos derechos, titularidades u obligaciones surjan de un contrato, de un estatuto o de cualquier otra fuente de derecho relacionada [con ellos]" para los cuales el ELA o una de sus instrumentalidades fue el emisor, el obligado o el garante, y dichos pasivos se incurrieron antes del 30 de junio de 2016. La Paralización del Título IV estaba sujeta a una extensión de 75 días por la Junta de Supervisión o una extensión de 60 días por el Tribunal de Distrito de los Estados Unidos. El 28 de enero de 2017, la Junta de Supervisión prorrogó la paralización del Título IV por 75 días hasta el 1 de mayo de 2017, momento en el que finalizó la paralización del Título IV.

El Título IV de PROMESA también requirió varios informes del gobierno federal. En primer lugar, PROMESA estableció el Grupo de Trabajo dentro de la rama legislativa del gobierno federal de los Estados Unidos. El Grupo de Trabajo presentó su informe al Congreso el 20 de diciembre de 2016.

En segundo lugar, PROMESA requirió que el Contralor General de los Estados Unidos, a través de la Oficina de Rendición de Cuentas del Gobierno (GAO), presentara un informe a la Cámara y al Senado antes del 30 de diciembre de 2017, en relación con lo siguiente: (i) las condiciones que

**3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)**

llevaron al nivel actual de deuda de Puerto Rico; (ii) cómo las acciones del gobierno mejoraron o deterioraron su condición financiera; y (iii) recomendaciones sobre nuevas acciones o políticas fiscales que el ELA podría adoptar. La GAO publicó este informe el 9 de mayo de 2018.

En tercer lugar, PROMESA requirió que el Contralor General de los EE. UU., a través de la GAO, presentara al Congreso, antes del 30 de junio de 2017, un informe sobre la deuda pública de los territorios de los EE. UU. Además de su informe inicial, la GAO debe presentar al Congreso informes actualizados sobre la deuda pública al menos una vez cada dos años. La GAO publicó su informe inicial el 2 de octubre de 2017. El 30 de junio de 2021, la GAO publicó su último informe semestral sobre la deuda pública de los territorios estadounidenses.

**Título V. Revitalización de la infraestructura**

El Título V de PROMESA establece el puesto de Coordinador de Revitalización bajo la Junta de Supervisión y proporciona un marco para la revitalización de la infraestructura a través de un proceso de autorización acelerado para "proyectos críticos" según lo identificado por el Coordinador de Revitalización.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

**Título VI. Proceso de modificación de la deuda consensuado y extrajudicial**

El Título VI de PROMESA establece un proceso extrajudicial para modificar las deudas de Puerto Rico. Según la sección 601 (d) de PROMESA, la Junta de Supervisión está autorizada a establecer "grupos" de bonos emitidos por cada emisor relacionado con el gobierno de Puerto Rico en función de las prioridades relativas. Después de establecer los grupos, el emisor del gobierno o cualquier bonista o grupo de tenedores de bonos pueden proponer una modificación a una o más series de bonos del emisor del gobierno. Si existe un acuerdo voluntario, la Junta de Supervisión debe emitir una certificación y ejecutar una serie de procesos adicionales para calificar la modificación.

Finalmente, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico debe emitir una orden para aprobar la Modificación Calificante y otorgar al emisor todos los bienes libres de cargas y gravámenes con respecto a cualquier bono.

**Título VII. Espíritu del congreso**

El Título VII de PROMESA establece el espíritu del Congreso de que "cualquier solución duradera para la crisis fiscal y económica de Puerto Rico debe incluir reformas fiscales permanentes y favorables al crecimiento que incluyan, entre otros elementos, un flujo libre de capital entre los territorios de los Estados Unidos y el resto de los Estados Unidos".

**Legislación de Puerto Rico y otras medidas fiscales**

La Ley N.º 2-2017, la Ley de la Autoridad Fiscal y de Asesoramiento Financiero de Puerto Rico, se promulgó para ampliar las facultades y la autoridad de la AAFAF (como se estableció inicialmente en virtud de la Ley de Moratoria) para que esta tenga la responsabilidad exclusiva de negociar, reestructurar y llegar a acuerdos con los acreedores sobre la totalidad o parte de la deuda pública o cualquier otra deuda emitida por cualquier entidad del ELA. La AAFAF también es responsable de los esfuerzos de colaboración, comunicación y cooperación entre el ELA y la Junta de Supervisión en virtud de PROMESA. Además, la Ley N.º 2-2017 estableció a la AAFAF como la entidad del ELA responsable de llevar a cabo las funciones heredadas del BGF junto con deberes y facultades adicionales, que incluyen, entre otras actividades: (i) la supervisión del presupuesto del ELA; (ii) la presencia administrativa en todas las juntas o comités de los que el presidente del BGF fuera miembro en ese momento; (iii) la autoridad para realizar auditorías e investigaciones; y (iv) la autoridad para congelar partidas presupuestarias, nombrar administradores, redistribuir recursos humanos y modificar procedimientos.

**3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)**

La Ley N.º 3-2017, la Ley de Gestión de Crisis Fiscal, se promulgó para extender la mayoría de las medidas fiscales que se habían adoptado en virtud de la Ley N.º 66-2014 hasta el 1 de julio de 2021, incluida una extensión de 10 años del arbitrio sobre las adquisiciones de corporaciones extranjeras en virtud de la Ley N.º 154-2010.

La Ley N.º 5-2017, la Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico, le permitió al ELA segregar fondos que, con el tiempo, se utilizarían para financiar el pago de la deuda pública. La Ley N.º 5-2017 establece que el Gobernador puede pagar la amortización de la deuda siempre que el ELA pueda continuar financiando servicios esenciales, como la salud, la seguridad y el bienestar de la gente de Puerto Rico, incluido el suministro de su educación y asistencia a sus residentes. La Ley N.º 5-2017 continuó la declaración del ELA en estado de emergencia y aumentó las facultades del Gobernador para administrar las finanzas del ELA. El período de emergencia en virtud de la Ley N.º 5-2017 finalizaba el 1 de mayo de 2017 para coincidir con el vencimiento de la paralización del Título IV (tal como se explicó anteriormente), a menos que se extienda por tres meses adicionales por orden ejecutiva. El 30 de abril de 2017, el Gobernador emitió la orden ejecutiva OE-2017-031, que prorrogó el período de emergencia de la Ley N.º 5-2017 hasta el 1 de agosto de 2017. El 19 de julio de 2017,

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

la Legislatura promulgó la Ley N.º 46-2017, que extendió aún más el período de emergencia de la Ley N.º 5-2017 hasta el 31 de diciembre de 2017. La Ley N.º 46-2017 permitió al Gobernador firmar órdenes ejecutivas para extender el período de emergencia por períodos sucesivos de seis meses, siempre que la Junta de Supervisión permanezca activa para Puerto Rico en virtud de PROMESA. El 27 de junio de 2019, el Gobernador emitió la orden ejecutiva OE-2019-030, que extendió el período de emergencia hasta el 31 de diciembre de 2019. El 31 de diciembre de 2019, el Gobernador emitió la orden ejecutiva OE-2019-066, que extendió el período de emergencia hasta el 30 de junio de 2021.

La Ley N.º 106-2017, la Ley para Garantizar el Pago a Nuestros Pensionistas y Establecer un Nuevo Plan de Contribuciones Definidas para los Empleados Públicos, reformó las pensiones del ELA reemplazando las juntas de gobierno de los Sistemas de Retiro con una sola Junta de Retiro del Estado Libre Asociado de Puerto Rico (Junta de Retiro) y estableció una "Cuenta para el Pago de las Pensiones Acumuladas" para implementar un método PayGo mediante el que el ELA pague los beneficios de pensiones a los jubilados del gobierno de forma móvil. La Ley N.º 106-2017 creó el marco legal para que el ELA pueda realizar los pagos a los pensionados a través del sistema PayGo.

La Ley N.º 109-2017, la Ley de Reestructuración de la Deuda del Banco Gubernamental de Fomento para Puerto Rico (la Ley de Reestructuración del BGF), hizo efectivo el Plan Fiscal del BGF y proveyó un camino para la implementación del RSA del BGF al atender las reclamaciones del ELA y sus instrumentalidades contra el BGF. La Ley N.º 109-2017 creó dos entidades de propósito especial, la Autoridad de Recuperación de la Deuda del BGF y el Fideicomiso de Entidades Públicas, en el que el BGF dividiría y transferiría irrevocablemente sus activos. Como se analiza a continuación, estas entidades se utilizaron para completar transacciones en la Modificación de Calificación del BGF, según lo aprobado por el Tribunal de Distrito en virtud del Título VI de PROMESA.

La Ley N.º 241-2018, la Ley de la Corporación del Fondo de Interés Apremiante de Puerto Rico, modificó y reformuló la Ley N.º 91-2006 para establecer el marco legal para la reestructuración de los bonos emitidos y en circulación de COFINA mediante, entre otras cuestiones, autorizar la emisión de nuevos bonos de COFINA necesarios para completar las transacciones contempladas en el Plan de Ajuste de COFINA.

La Ley N.º 29-2019, la Ley para la Reducción de Cargas Administrativas de los Municipios, atendió la crisis fiscal profunda y la escasez de liquidez de los municipios de Puerto Rico al eximirlos de sus obligaciones de hacer pagos de PayGo al ELA y otros pagos a la Administración de Seguros de Salud de Puerto Rico (PRHIA) en virtud de la Ley 106-2017. La Junta de Supervisión impugnó la aplicación y el cumplimiento de la Ley 29-2019. El 15 de abril de 2020, el Tribunal del Título III dictó una orden en la que declaraba que la Ley 29-2019 es inaplicable y prohibía de forma permanente que el ELA la aplicara o la hiciera cumplir,

**3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADA CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)**

con efecto a partir del 6 mayo de 2020. La Junta de Supervisión y otras entidades gubernamentales han implementado otras medidas para abordar los temas planteados en la Ley 29-2019.

**Casos del Título III de PROMESA**

*Caso del Título III del ELA*

El 3 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador, inició un caso de Título III para el ELA mediante la presentación de una petición de remedio en virtud del Título III de PROMESA en el Tribunal del Título III.

El 3 de noviembre de 2021, la Junta de Supervisión presentó su *Plan de Ajuste Conjunto Modificado del Título III del Estado Libre Asociado de Puerto Rico, et al.* [ECF N.º 19053] (el Octavo Plan Modificado), que revisó el

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

Séptimo Plan Modificado para eliminar, entre otras cuestiones, sus disposiciones de modificación de los beneficios mensuales. La vista para considerar la confirmación del Octavo Plan Modificado comenzó el 8 de noviembre de 2021 y concluyó el 23 de noviembre de 2021. La versión final modificada del Octavo Plan Modificado se presentó el 14 de enero de 2022 [ECF N.º 19813-1] (el Plan de Ajuste del ELA).

El 18 de enero de 2022, el Tribunal del Título III presentó sus conclusiones de hecho y de derecho en relación con el Plan de Ajuste del ELA [ECF N.º 19812] (las Conclusiones de Hecho) y una orden de confirmación del Plan de Ajuste del ELA [ECF N.º 19813] (la Orden de Confirmación del ELA). El 15 de marzo de 2022, la Junta de Supervisión cumplió o renunció a las condiciones previas a la fecha de entrada en vigencia del Plan de Ajuste del ELA, y el plan entró en vigencia. En consecuencia, el Plan de Ajuste del ELA fue confirmado y se encuentra en vigencia a la fecha del presente documento.

Para obtener más información, consulte la Nota 24 y las versiones finales del Plan de Ajuste del ELA, las Conclusiones de Hecho y la Orden de Confirmación del ELA, que están disponibles en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

### *El caso del Título III de la Autoridad*

El 21 de mayo de 2017, la Junta de Supervisión, a petición del Gobernador, inició un caso de Título III para la Autoridad mediante la presentación de una petición de remedio en virtud del Título III de PROMESA en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. El plazo en el que todos los acreedores debían presentar sus evidencias de reclamación contra la Autoridad era el 29 de junio de 2018. Se presentaron aproximadamente 2,290 reclamaciones contra la Autoridad por un importe total de aproximadamente $83,100 millones. De esta cantidad, alrededor de 1,255 reclamaciones en el monto agregado total declarado de aproximadamente $6,800 millones han sido desestimadas o eliminados por una orden de objeción general emitida por el Tribunal del Título III. En consecuencia, quedan pendientes alrededor de 870 reclamaciones por un importe total de aproximadamente $76,200 millones (sin incluir las reclamaciones pendientes de impugnación, marcadas para futura impugnación, o transferidas o en espera de ser transferidas a la Conciliación Administrativa de Reclamaciones). La validez de estas reclamaciones restantes aún no se ha determinado y dichas reclamaciones siguen estando sujetas al proceso de conciliación de reclamaciones.

El 5 de mayo de 2021, la Junta de Supervisión celebró el PSA de la ACT/CCDA con los aseguradores monolínea que le habían acordado para resolver ciertas reclamaciones contra el ELA en relación con los bonos emitidos por la Autoridad y la Autoridad del Distrito del Centro de Convenciones (ACT), así como las reclamaciones contra dichos emisores. Los términos del PSA de la ACT/CCDA se incorporaron al Plan de Ajuste del ELA. El PSA de la ACT/CCDA también establece que la Autoridad debe presentar su propio plan de ajuste (el Plan de Ajuste de la ACT) (de conformidad con las disposiciones económicas del PSA de la ACT/CCDA) que permitiría a la Autoridad salir de su procedimiento del

### 3. LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO (PROMESA) Y OTRA LEGISLACIÓN RELACIONADAS CON LA REESTRUCTURACIÓN DE LA DEUDA (continuación)

Título III. La Junta de Supervisión actualmente está preparando el Plan de Ajuste de la ACT, que se espera que se presente con prontitud, para que el Plan de Ajuste de la ACT se confirme y entre en vigencia a finales del año calendario 2022. Consulte la Nota 24.

Tras el inicio del caso del Título III de la Autoridad, se presentaron numerosas mociones y procedimientos contenciosos, tanto por parte de la Autoridad como en su contra, en relación con los derechos de los acreedores sobre los activos de la Autoridad. El resultado de estos procedimientos y su impacto en cualquier plan de ajuste para la Autoridad no puede determinarse en este momento. Para obtener una descripción detallada de estas contingencias legales, consulte la Nota 19.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 4. EMPRESA EN FUNCIONAMIENTO

El análisis de los siguientes párrafos sobre los riesgos financieros y de liquidez de la Autoridad proporciona los antecedentes y el apoyo necesarios para que la gerencia evalúe si existen dudas sustanciales sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento durante los 12 meses posteriores a la fecha de estos estados financieros básicos o durante un período más largo si se conoce actualmente información que pueda plantear dudas sustanciales poco después.

Las medidas que se exponen a continuación deberían permitir a la Autoridad continuar como empresa en funcionamiento. Sin embargo, hasta que el Plan de Acuerdo de la Deuda de la Autoridad no sea confirmado por el Tribunal, sigue existiendo una incertidumbre razonable sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento, de acuerdo con la Declaración N.º 56 de la GASB, *Codificación de la Guía de Contabilidad e información financiera contenida en las Declaraciones de Normas de Auditoría*.

Los estados financieros básicos adjuntos se redactaron asumiendo que la Autoridad continuará como empresa en funcionamiento y, por lo tanto, solo asume la liquidación de los activos y pasivos en el curso normal de las operaciones de la Autoridad y no incluye los ajustes que podrían ser necesarios si la Autoridad no puede continuar como empresa en funcionamiento.

**Resumen del déficit financiero**

En 2015, la Autoridad experimentaba importantes pérdidas recurrentes en sus operaciones, debido, entre otras cuestiones, a que el ELA retenía una cantidad significativa de ingresos asignados en virtud de un proceso de recuperación que comenzó en ese año. A partir de entonces, la Autoridad incumplió el pago de miles de millones de dólares en bonos en circulación, líneas de crédito caducadas y otras obligaciones. En consecuencia, el 21 de mayo de 2017 (la Fecha de Petición), la Junta de Supervisión, a petición del Gobernador, presentó una petición de remedio para la Autoridad en virtud del Título III de PROMESA.

**Plan de corrección de la gerencia**

El 22 de febrero de 2022, la Junta de Supervisión certificó un plan fiscal revisado para la Autoridad hasta el año fiscal 2051 que se centra en: (i) el programa de infraestructuras; (ii) el memorando de entendimiento con sus organismos federales de subvención, orientado a renovar la capacidad de ejecución de proyectos y programas de la Autoridad; (iii) las iniciativas fiscales y la transformación organizativa; y (iv) la sostenibilidad de la deuda, que refleja las proyecciones económicas actualizadas como consecuencia de los efectos de la pandemia de COVID-19 y los términos aprobados en el marco del Plan de Ajuste del ELA. Para obtener más información sobre el plan fiscal, consulte la Nota 24.

## 4. EMPRESA EN FUNCIONAMIENTO (continuación)

Además, la Autoridad está trabajando activamente para presentar su Plan de Ajuste de sus obligaciones, antes del 30 de junio de 2022, para obtener una aprobación y certificación final del Tribunal antes del final del año calendario 2022. Como parte de este proceso, el 5 de mayo de 2021, la Autoridad ejecutó el PSA de la ACT/CCDA. En virtud de este acuerdo, prácticamente la totalidad de los bonos a pagar y las obligaciones contraídas con la Autoridad para la Reestructuración de la Deuda del BGF, incluidos los intereses devengados, se canjearán por 1) $1,245 millones en nuevos documentos a pagar que emitirá la Autoridad, con un interés del 5 %, y pagaderos en 40 años; 2) bonos de valor contingente con un tope vitalicio de $3,697,668,995 y pagaderos con cargo al Impuesto sobre Ventas y Uso, por encima de determinados importes de referencia, en su caso; y pagos en efectivo por valor de $389 millones, incluidos determinados costos de perfeccionamiento por el valor de $125 millones. Además, como se indica en la Nota 7, la Autoridad utilizará determinadas inversiones que servirán para compensar los pagos iniciales de efectivo. En relación con el reembolso de estos nuevos bonos que emitirá la Autoridad, esta está evaluando alternativas para entrar en asociaciones público-privadas (PPP) para las autopistas de peaje que no están actualmente con una PPP. Lo obtenido de los futuros acuerdos de privatización que se alcancen se utilizará para

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

costear el saldo pendiente de los nuevos bonos que se emitan. Sin embargo, la negociación del pasivo y la privatización de las restantes autopistas de peaje siguen estando sujetas a la aprobación del Tribunal del Título III.

El Plan de Ajuste del ELA fue aprobado por el Tribunal del Título III el 18 de enero de 2022. Por lo tanto, el Plan entró en vigencia a partir del 15 de marzo de 2022, y el ELA fue liberado del procedimiento de quiebra del Título III, sujeto a la resolución de ciertas reclamaciones pendientes. De este modo, el ELA tendrá la oportunidad de cumplir sus obligaciones a medida que vayan venciendo en un futuro previsible. En consecuencia, el ELA podrá proporcionar apoyo financiero a la Autoridad, que, en el Plan Fiscal Certificado de la Autoridad hasta 2051, se proyectan en un promedio de $100,000,000 anuales, pero esto podría aumentar si la Autoridad no tiene éxito en la privatización de las carreteras de peaje restantes, como se comentó anteriormente.

5.  **EFECTIVO**

El efectivo al 30 de junio de 2021 estaba compuesto por:

| | |
|---|---|
| Dinero en efectivo en los bancos | $   18,400,049 |

El efectivo y los equivalentes de efectivo incluyen certificados de depósito en bancos comerciales locales. Los certificados de depósito en el Banco de Desarrollo Económico (EDB) por un importe total agregado de $5.9 millones al 30 de junio de 2021 se autorizaron en su totalidad en años anteriores, como se describe con más detalle en la Nota 9 de los estados financieros básicos.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 6. CUENTAS POR COBRAR, NETAS

Las cuentas por cobrar al 30 de junio de 2021 consistían en lo siguiente:

*Créditos operativos*

| | | |
|---|---|---:|
| Gobierno, agencias y otros | $ | 57,274,345 |
| Alquileres por cobrar | | 5,571,481 |
| Reparaciones de carreteras recuperables de los usuarios | | 1,571,646 |
| Agente de custodia de peaje | | 4,924,968 |
| Otros | | 5,878,940 |
| Total | | 75,221,380 |
| Menos la provisión para cuentas de cobro dudoso | | (68,131,302) |
| Cuentas por cobrar, netas | $ | 7,090,078 |

*Cantidades adeudadas por entidades gubernamentales de Puerto Rico*

Las cuentas por cobrar a entidades gubernamentales consisten en cargos realizados a diversas agencias gubernamentales, corporaciones públicas y municipios del ELA. La mayoría de estos importes están muy atrasados y se incluyen en la provisión para cuentas de cobro dudoso al 30 de junio de 2021, excepto los saldos corrientes adeudados por el ELA, que ascienden a $59.1 millones, de los que $39.1 millones se cobraron a la fecha de emisión de los estados financieros.

## 7. EFECTIVO RESTRINGIDO, EQUIVALENTES DE EFECTIVO E INVERSIONES CON FIDEICOMISARIO

El efectivo restringido, los equivalentes de efectivo y las inversiones con fideicomisario al 30 de junio de 2021 consistían en lo siguiente:

| | |
|---|---:|
| Dinero en efectivo en los bancos | $ 158,169,219 |
| | |
| Inversiones con fideicomisario: | |
| Fondos de inversión y fondos del mercado monetario | $ 58,912,668 |
| Contratos de inversión garantizados, FSA Capital Management Services | 7,903,918 |
| Valores del gobierno de los EE. UU. | 9,820,274 |
| Bonos corporativos | 13,164,985 |
| Total | $ 89,801,845 |

El efectivo restringido en bancos incluye $85.2 millones destinados por la JSAF a determinados gastos operativos, $60.1 millones destinados por el ELA de Puerto Rico a gastos de capital y $12.9 millones en otro tipo de efectivo restringido.

Como parte del PSA de la ACT/CCDA, tal y como se explica con más detalle en las notas 4 y 24, estas inversiones se utilizarán para compensar parte de un pago inicial previsto a los acreedores del PSA, incluido un pago adicional por los costos de perfeccionamiento relacionados con la negociación y la ejecución del PSA de la ACT/CCDA.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 8. MEDICIONES DEL VALOR RAZONABLE

La Autoridad sigue la declaración N.º 72 de la GASB, *Medición y aplicación del valor razonable*. La Autoridad clasifica sus mediciones del valor razonable dentro de la jerarquía del valor razonable establecida por los GAAP. La Declaración N.º 72 de la GASB establece el marco para la medición del valor razonable. Este marco proporciona una jerarquía de valor razonable que prioriza los datos de las técnicas de valoración utilizadas para medir el valor razonable. La jerarquía da la máxima prioridad a los precios de mercado cotizados no ajustados en mercados activos para activos o pasivos idénticos (mediciones de nivel 1) y la menor prioridad a los datos no observables (mediciones de nivel 3). A continuación, se describen los tres niveles de la jerarquía del valor razonable:

**Nivel 1.** Los datos de la metodología de valoración son precios cotizados no ajustados para activos o pasivos idénticos en mercados activos a los que la Autoridad puede acceder.

**Nivel 2.** Los datos de la metodología de valoración incluyen precios de mercado cotizados ajustados para activos o pasivos similares en mercados activos; precios cotizados ajustados para activos idénticos o similares en mercados activos; datos distintos de los precios cotizados que son observables para el activo o el pasivo; o datos que se derivan principalmente de datos de mercado observables o se corroboran por correlación u otros medios. Si el activo o el pasivo tiene un plazo determinado (contractual), el dato de Nivel 2 debe ser observable durante todo el plazo del activo o del pasivo.

Para las inversiones clasificadas en el Nivel 2 de la jerarquía del valor razonable, los depositarios de la Autoridad suelen utilizar un modelo relacional multidimensional. Los datos de sus modelos de fijación de precios se basan en datos de mercado observables en mercados activos. Los datos de los modelos de fijación de precios suelen ser los puntos de referencia de rendimientos, las operaciones notificadas, las cotizaciones de los corredores de bolsa, los diferenciales de los emisores y los puntos de referencia de los valores, entre otros.

**Nivel 3.** Los datos de la metodología de valoración son inobservables y significativos para la medición del valor razonable.

El nivel del activo dentro de la jerarquía se basa en el nivel más bajo de información significativa para la valoración del valor razonable. Las técnicas de valoración utilizadas deben maximizar el uso de datos observables y minimizar el uso de datos no observables. La determinación de lo que es observable requiere el criterio de la gerencia de la Autoridad. La gerencia de la Autoridad considera que los datos observables son datos de mercado que están fácilmente disponibles, se distribuyen o actualizan de manera regular, son fiables y verificables, no están protegidos por derechos de propiedad y son proporcionados por múltiples fuentes independientes que participan de forma activa en el mercado correspondiente. La clasificación de una inversión dentro de la jerarquía se basa en la observabilidad relativa de los datos para la medición del valor razonable y no corresponde necesariamente al riesgo percibido por la gerencia para esa inversión. La Autoridad tiene las siguientes mediciones recurrentes del valor razonable a 30 de junio de 2021:

|  | Nivel 1 | Nivel 2 | Nivel 3 | Total |
|---|---|---|---|---|
| Valores de deuda: |  |  |  |  |
| Obligaciones del gobierno de los EE. UU. | $ | $ 9,820,274 | $ | $ 9,820,274 |
| Bonos corporativos | - | 13,164,985 | - | 13,164,985 |
| Socios mutuos | 37,486,083 | - | - | 37,486,083 |
| Total | $37,486,083 | $22,985,259 | $ | 60,471,342 |
| Inversiones valoradas al valor neto de los activos o costo amortizado: |  |  |  |  |
| Fondos del mercado monetario |  |  |  | 21,426,585 |
| Contrato de inversión garantizado |  |  |  | 7,903,918 |
| Total de inversiones |  |  |  | $ 89,801,845 |

La Autoridad no tiene ninguna inversión que se valore utilizando datos de Nivel 3.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 9.  DEPÓSITOS E INVERSIONES

La Autoridad está restringida por ley a depositar fondos solo en instituciones financieras aprobadas por el DOT, y dichos depósitos deben mantenerse en cuentas separadas a nombre de la Autoridad.

**Riesgo de crédito de custodia: Depósitos**

En el caso de los depósitos, el riesgo de crédito de custodia es el riesgo de que, en caso de quiebra del banco, los depósitos de la Autoridad no sean recuperables. De acuerdo con la legislación del ELA, los fondos públicos depositados en bancos comerciales deben estar totalmente garantizados por la cantidad depositada en exceso del seguro federal de depósito.

Todo el dinero depositado en el Fideicomisario o en cualquier otra institución depositaria en virtud del presente documento que supere la cantidad garantizada por la Corporación Federal de Seguros de Depósitos u otra agencia federal está continuamente garantizado mediante su depósito en un banco o compañía fiduciaria aprobada por la Autoridad y por el Fideicomisario como custodio, o, si la ley le permite en ese momento, apartando bajo control del departamento fiduciario del banco que mantiene dicho depósito, como valores de garantía, Obligaciones Gubernamentales u otros valores negociables. Al 30 de junio de 2021, los depósitos de la Autoridad mantenidos en bancos comerciales son los siguientes:

| | No restringido | | Restringido | |
|---|---|---|---|---|
| | Saldo en libros | Saldo bancario | Saldo en libros | Saldo bancario |
| Bancos comerciales | $  18,400,049 | $ 20,335,817 | $ 158,169,219 | $ 158,130,716 |

**Pérdida por riesgo de crédito de custodia en el Banco de Desarrollo Económico (EDB)**

La Autoridad tiene certificados de depósito en el EDB por un importe total de aproximadamente $5.9 millones a 30 de junio de 2021. La gerencia considera que el EDB se enfrenta a riesgos e incertidumbres significativos, y que actualmente carece de liquidez suficiente para hacer frente a sus obligaciones cuando estas venzan. En consecuencia, todos los certificados de depósito mantenidos en el EDB estaban plenamente autorizados a partir del 30 de junio de 2021.

**Riesgo de crédito de custodia: Inversiones**

En el caso de una inversión, el riesgo de crédito de custodia es el riesgo de que, en caso de quiebra de la contraparte, la Autoridad no pueda recuperar el valor de su inversión o de los valores de garantía que están en posesión de un tercero. La Autoridad invierte en inversiones de primera calidad con una calificación mínima de Aa1 (Moody's) o AA+ (S&P). Además, las inversiones en fondos de amortización de bonos se limitan a obligaciones directas del gobierno federal de los Estados Unidos, u obligaciones garantizadas incondicionalmente por el gobierno federal de los Estados Unidos, o depósitos a plazo fijo que devengan intereses, u otros acuerdos similares, según lo dispuesto en las Resoluciones de Bonos.

**Riesgo de tasa de interés**

El riesgo de tasa de interés es el riesgo de que los cambios en las tasas de interés afecten negativamente al valor razonable de una inversión. En general, cuanto más largo sea el vencimiento de una inversión, mayor será la sensibilidad de su valor razonable a las variaciones de las tasas de interés del mercado.

Los vencimientos de las inversiones en el fideicomisario al 30 de junio de 2021 eran los siguientes:

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 9. DEPÓSITOS E INVERSIONES (continuación)

| | Menos de un año | De uno a cinco años | De cinco a diez años | Total |
|---|---|---|---|---|
| Fondos mutuos | $ 37,486,083 | $ | $ | $ 37,486,083 |
| Bonos corporativos | 13,164,985 | - | - | 13,164,985 |
| Fondos del mercado monetario | 21,426,585 | | - | 21,426,585 |
| Obligaciones del gobierno de los EE. UU. | 2,980,274 | 6,840,000 | - | 9,820,274 |
| Contrato de inversión garantizado | - | - | 7,903,918 | 7,903,918 |
| Total | $ 75,057,927 | $ 6,840,000 | $ 7,903,918 | $ 89,801,845 |

## 10. ACTIVOS DE CAPITAL, NETO

El siguiente esquema resume los activos de capital, sobre una base neta, mantenidos por la Autoridad al 30 de junio de 2021:

| | Saldo al 30 de junio de 2020 | Incrementos | Disminuciones | Saldo al 30 de junio de 2021 |
|---|---|---|---|---|
| **Activos no amortizados** | | | | |
| Tierra | $ 1,933,484,316 | $ 18,936,842 | $ (2,805,023) | $ 1,949,616,135 |
| Construcción en progreso | 584,078,989 | 239,943,244 | (306,446,744) | 517,575,489 |
| Total de activos no amortizados | 2,517,563,305 | 258,880,086 | (309,251,767) | 2,467,191,624 |
| | | | | |
| **Activos amortizados** | | | | |
| Sistema de transporte | 2,419,375,826 | - | - | 2,419,375,826 |
| Carreteras | 13,221,331,014 | 259,047,589 | (583,266) | 13,479,795,337 |
| Puentes | 3,591,941,533 | 28,491,438 | - | 3,620,432,971 |
| Vehículos de equipamiento y otros | 123,076,002 | 124,489 | - | 123,200,491 |
| Total | 19,355,724,375 | 287,663,516 | (583,266) | 19,642,804,625 |
| Menos depreciación acumulada | (12,974,894,341) | (474,717,773) | - | (13,449,612,114) |
| Total de activos amortizados | 6,380,830,034 | (187,054,257) | (583,266) | 6,193,192,511 |
| Total de activos de capital, neto | $ 8,898,393,339 | $ 71,825,829 | $ (309,835,033) | $ 8,660,384,135 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 11. CARRETERAS Y PUENTES EN VIRTUD DE ACUERDOS DE CONCESIÓN DE SERVICIOS

Las carreteras y puentes en virtud de Acuerdos de Concesión de Servicios al 30 de junio de 2021 se resumen de la siguiente manera:

| | Saldo del 30 de junio de 2020 | Incrementos | Disminuciones | Saldo del 30 de junio 30,2021 |
|---|---|---|---|---|
| Autopistas de peaje (PR 5 y PR 22) | $ 310,362,533 $ | - $ | - | $ 310,362,533 |
| Mejoras en la concesión de autopistas con peaje | 51,173,315 | - | - | 51,173,315 |
| Puente Teodoro Moscoso | 109,500,000 | - | - | 109,500,000 |
| Total | 471,035,848 | - | - | 471,035,848 |
| Menos depreciación acumulada | (273,139,741) | (1,697,250) | - | (274,836,991) |
| Total | $ 197,896,107 $ | (1,697,250) $ | - | $ 196,198,857 |

### Acuerdo de Concesión de Servicios de Autopistas de Peaje (PR-5 y PR-22)

El 22 de septiembre de 2011, la Autoridad celebró el Acuerdo de Concesión de Servicios de Autopistas de Peaje con Metropistas, en el que la Autoridad concedió el derecho de explotación de las autopistas PR-5 y PR-22 (las Autopistas de Peaje) por un período de 40 años. Durante el plazo de 40 años, Metropistas tendrá derecho a cobrar y recaudar los peajes impuestos en las autopistas de peaje.

La Autoridad recibió un pago inicial del canon de concesión de $1,136 millones, de los cuales aproximadamente $873.1 millones se utilizaron para amortizar o cancelar los bonos emitidos y en circulación asociados a las autopistas de peaje.

La Autoridad registró una entrada de recursos diferida procedente del Acuerdo de Concesión de Servicios de Autopistas de Peaje de $1,136 millones que se amortiza y se reconoce como ingreso a lo largo de los 40 años de vigencia del acuerdo. Las autopistas de peaje (activos de capital) seguirán figurando en el estado de déficit neto como una partida separada como autopistas y puentes en virtud de acuerdos de concesión de servicios. Al 30 de junio de 2021, el importe total agregado de los bienes de capital de las autopistas era de aproximadamente $141.9 millones, netos de la depreciación acumulada. La amortización de las autopistas de peaje se paralizó el 22 de septiembre de 2011, hasta la finalización del Acuerdo de Concesión de Servicios de Autopistas de Peaje, ya que el acuerdo exige a Metropistas que devuelva las autopistas a la Autoridad en su estado original o mejorado.

El 19 de abril de 2016, la Autoridad suscribió una modificación del Acuerdo de Concesión de Servicios de Autopistas de Peaje para ampliar el plazo original por 10 años más y crear cinco puntos de peaje bidireccionales en las autopistas. La Autoridad recibió un pago por adelantado del canon de concesión de $100 millones que se utilizó para pagar $18.2 millones de la deuda actual de la Autoridad y se transfirieron $79.8 millones al ELA en el año fiscal 2016. Además, en junio de 2017, la Autoridad recibió un pago adicional de $15 millones de manera simultánea al inicio del sistema bidireccional descrito anteriormente.

Durante el año fiscal finalizado el 30 de junio de 2021, la Autoridad no capitalizó las mejoras realizadas por Metropistas en las autopistas de peaje.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 11. AUTOPISTAS Y PUENTES CON ACUERDOS DE CONCESIÓN DE SERVICIOS (continuación)

### Acuerdo de concesión de servicios de puente

El 20 de diciembre de 1992, la Autoridad y Autopistas celebraron el Acuerdo de Concesión de Servicios del Puente para el diseño, la construcción, la operación y el mantenimiento del Puente Teodoro Moscoso, un puente de peaje que cruza la Laguna San José entre los municipios de San Juan y Carolina. Autopistas diseñó y construyó el Puente y comenzó a operar el Puente Teodoro Moscoso el 23 de febrero de 1994 (fecha de valoración). El plazo inicial de este acuerdo era de 35 años y finalizaba el 3 de abril de 2027. El 9 de septiembre de 2009, el acuerdo se modificó para ampliar su plazo a 50 años (2044).

A partir de la aplicación de la norma N.º 60 de la GASB, *Contabilidad e información financiera de los acuerdos de concesión de servicios,* el 30 de junio de 2013, la Autoridad reconoció el puente Teodoro Moscoso a su valor razonable, equivalente a lo que la Autoridad podría haber pagado por la construcción del Puente Teodoro Moscoso (costo de reposición) a la fecha de valuación. El costo de reposición se determinó en $109.5 millones amortizados a lo largo de una vida útil estimada de 59 años. El saldo del activo relacionado con el puente Teodoro Moscoso se ajustó para reconocer los primeros 17 años de operaciones y la amortización restante se amortizará en 42 años. La amortización del Puente Teodoro Moscoso se debe a que, en opinión de la gerencia, el Acuerdo de Concesión de Servicios de Puentes no obliga a Autopistas a devolver el Puente Teodoro Moscoso en su estado original. Al 30 de junio de 2021, el valor neto contable del puente Teodoro Moscoso era de $54.3 millones.

El Acuerdo de Concesión de Servicios del Puente, en su versión modificada, obliga a Autopistas a pagar el 5 % de los ingresos anuales por peaje a la Autoridad hasta el 22 de febrero de 2027, y luego el 61.5 % de dichos ingresos desde el 23 de febrero de 2027 hasta el final del acuerdo. Durante el año fiscal finalizado el 30 de junio de 2021, Autopistas pagó a la Autoridad aproximadamente $1.9 millones relacionados con los ingresos de peaje.

El 22 de octubre de 2003, la Autoridad emitió bonos a plazo y bonos de apreciación de capital por un importe total de aproximadamente $153.2 millones (los Bonos de 2003). El producto de estos bonos se utilizó para reembolsar, por adelantado, los bonos emitidos previamente en 1992 para financiar la construcción del Puente Teodoro Moscoso. La actividad de los bonos durante el año fiscal finalizado el 30 de junio de 2021, tal como se registra en los estados financieros adjuntos, es la siguiente:

| | Saldo al 30 de junio de 2020 | | Incrementos/ Acreditaciones | | Pagos/ amortización | | Saldo al 30 de junio de 2021 |
|---|---|---|---|---|---|---|---|
| Bonos a plazo | $ | 57,700,000 | $ | - | $ | (12,760,000) | $ | 44,940,000 |
| Bonos de apreciación de capital | | 42,035,489 | | 2,564,990 | | - | | 44,600,479 |
| **Total** | $ | 99,735,489 | $ | 2,564,990 | $ | (12,760,000) | $ | 89,540,479 |

Según los términos del Acuerdo de Concesión del Servicio de Puentes, Autopistas es responsable del pago de la amortización de la deuda de los bonos, a menos que el acuerdo se rescinda como se especifica en el Acuerdo de Concesión del Servicio de Puentes. Dado que los bonos están siendo pagados por Autopistas, la Autoridad registra los ingresos de la concesión por el importe del capital y los intereses pagados por Autopistas de manera anual hasta su transacción. Por tanto, la Autoridad registró ingresos por concesiones por un importe total agregado de $15.3 millones durante el año fiscal finalizado el 30 de junio de 2021, que representan los pagos del capital y de los intereses de los bonos realizados por Autopistas.

En determinadas circunstancias, como si no se alcanzan los ingresos mínimos de peaje, el Acuerdo de Concesión de Servicios del Puente puede rescindirse, y la Autoridad estará obligada a asumir todas las obligaciones de Autopistas de pagar el monto del capital y los intereses de los bonos en circulación que, de conformidad con el Acuerdo de

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 11.  AUTOPISTAS Y PUENTES CON ACUERDOS DE CONCESIÓN DE SERVICIOS (continuación)

Préstamo, se pagarán con los ingresos netos del uso y la operación del Puente Teodoro Moscoso. Aunque Autopistas actualmente tiene la capacidad de rescindir el Acuerdo de Concesión de Servicios del Puente y hacer que la Autoridad asuma sus obligaciones, la Autoridad no ha recibido dicha notificación y, en la actualidad, no espera que el Acuerdo de Concesión de Servicios del Puente se rescinda.

Las entradas diferidas de recursos por un importe total de aproximadamente $1,036.7 millones, al 30 de junio de 2021, estaban relacionadas con el Acuerdo de Concesión de Autopistas de Peaje. Las entradas diferidas relacionadas con el Acuerdo de Concesión de Autopistas reducen significativamente el déficit neto de la inversión neta en activos de capital en $1,036.7 millones al 30 de junio de 2021.

## 12.  BONOS A PAGAR

Como se explica en las notas 4 y 24 de los estados financieros básicos, a la fecha de emisión de estos estados financieros, la Autoridad sigue bajo protección de alivio y la amortización de la deuda de sus series de bonos continúa paralizada. Sin embargo, el 5 de mayo de 2021, la Autoridad formalizó el PSA de la ACT/CCDA para intercambiar los bonos en circulación, junto con la Obligación de la Autoridad para la Recuperación de la Deuda del BGF (revelada en la Nota 14), por una combinación de bonos que emitirá la Autoridad, bonos de valor contingente que emitirá el ELA y ciertas contraprestaciones en efectivo que se pagarán en el momento del intercambio. El Acuerdo, si finalmente es confirmado por el Tribunal del Título III, como se espera, reducirá las obligaciones de la Autoridad a $1,245 millones a pagar en cuarenta años, al 5 %.

En la actualidad, se espera que los bonos comiencen a amortizarse durante el año fiscal 2022-2023. Por lo tanto, no se requiere una presentación de la parte corriente. A la fecha de emisión de estos estados financieros, no se han elaborado tablas de amortización. Si la Autoridad puede privatizar las autopistas de peaje no privatizadas anteriormente, los ingresos de la privatización se utilizarán para costear estos pasivos. En caso de que la Autoridad no pueda privatizar las autopistas de peaje, sobre la base de las proyecciones del Plan Fiscal Certificado aprobado por la Autoridad, esta podría carecer de recursos suficientes para liquidar estos bonos a su vencimiento sin apoyo financiero adicional del ELA. Por lo tanto, la información histórica de los bonos, tal y como se presenta en esta nota, es sustancialmente obsoleta, y solo debe leerse con fines informativos.

Las Resoluciones de Bonos autorizaron históricamente a la Autoridad a emitir bonos de renta para recaudar fondos para la construcción y los costos relacionados con las instalaciones de transporte. Al 30 de junio de 2021, los bonos en circulación en virtud de las Resoluciones de Bonos, eran los siguientes:

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 12.  BONOS A PAGAR (continuación)

**RESOLUCIÓN 1968-18**

| | |
|---|---:|
| Bonos en serie, con vencimiento hasta 2034, con intereses que oscilan entre el 3.30 % y el | $ 396,389,997 |
| 6.50 % Bonos a plazo, con vencimiento hasta 2039, con intereses que oscilan entre el 4 % y el | 393,095,000 |
| 6 % Bonos de apreciación de capital, con vencimiento hasta 2026, con intereses | |
| entre el 4.36 % y el 4.58 %. | 32,079,630 |
| Total de la Resolución 68-18 | 821,564,627 |

**RESOLUCIÓN 1998-06**

| | |
|---|---:|
| Bonos a plazo, con vencimiento hasta 2037 y un interés que oscila entre el 2.25 % y 5.75 %. | 1,186,895,000 |
| Bonos a plazo, con vencimiento hasta 2046 y un interés que oscila entre el 2.25 % y 5.75 %. | 1,842,045,000 |
| Bonos de tasa variable en poder de la Autoridad de Recuperación de la Deuda del BGF | 200,000,000 |
| Bonos de apreciación de capital, con vencimiento hasta 2026 y un interés que oscila entre el 4.47 % y 5.08 %. | 81,264,404 |
| Bonos a tasa de interés LIBOR con vencimiento hasta 2045 | 700,000 |
| Bonos de interés basados en el Índice de Precios al Consumidor con vencimiento hasta 2028 | 57,965,000 |
| Total de la Resolución 1998-06 | 3,368,869,404 |
| | |
| Total de bonos en circulación | 4,190,434,031 |
| Añadir la prima neta no amortizada | 182,147,385 |
| Bonos netos a pagar | $ 4,372,581,416 |

En el caso de los bonos de tasa de interés variable incluidos anteriormente, las necesidades de amortización de la deuda se calcularon suponiendo que las tasas de interés actuales permanecen inalteradas durante el resto de su duración. Como las tasas varían, los pagos de intereses de los bonos a tasa variable también lo harán.

La asignación condicional de los impuestos sobre la gasolina, el aceite, el gasóleo y el petróleo a la Autoridad para el reembolso de los Bonos ya no se realizará, dado que las leyes que autorizaban dichas asignaciones fueron anuladas por el Plan de Ajuste del ELA y dicha asignación condicional se eliminó.

Los bonos de tasa variable devengan intereses a una tasa de interés anual (que no debe superar la tasa máxima legal) determinada por el agente remarcador en la fecha de determinación de la tasa. Esta tasa será, a criterio del agente remarcador en las condiciones actuales del mercado, la tasa que daría lugar a la venta de los bonos de interés variable en circulación a un precio igual al precio de compra tal como se define en la oferta de bonos. La tasa efectiva de estos bonos era del 12 % al 30 de junio de 2021.

Los Bonos LIBOR de la Serie N devengan intereses a partir de su fecha de entrega a una tasa anual para cada período igual a (a) el 67 % de la tasa LIBOR a tres meses para dicho período más (b) un diferencial anual igual al 0.53 %. En

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 12. BONOS A PAGAR (continuación)

cada caso, la tasa de interés basada en LIBOR no puede superar la tasa máxima permitida por la legislación de Puerto Rico (actualmente el 12 %). La tasa efectiva de estos bonos era del 1.64 % al 30 de junio de 2021.

Los intereses de los Bonos con Índice de Precios al Consumidor (IPC) debían pagarse el primer día hábil de cada mes a partir del 2 de julio de 2007. La tasa del IPC, que se reajustará mensualmente, es un tipo de interés basado en las variaciones del IPC y no puede superar la tasa máxima permitida por la ley de Puerto Rico (en la actualidad el 12 %). La tasa efectiva de estos bonos era del 3.17 % al 30 de junio de 2021.

Los bonos a pagar de la Autoridad están sujetos a las normas de arbitraje emitidas por el Servicio de Rentas Internas de los Estados Unidos de América, que exigen el pago de un reembolso al gobierno federal de los Estados Unidos del exceso de ganancias de las inversiones sobre los ingresos de la deuda exenta de impuestos si el rendimiento de esas ganancias supera el rendimiento efectivo de la deuda exenta de impuestos correspondiente emitida. Las ganancias excedentes deben reembolsarse cada cinco años o al vencimiento de la deuda, lo que ocurra primero. Los cálculos de arbitraje no generaron pasivos al 30 de junio de 2021.

La actividad de la deuda a largo plazo para el año fiscal finalizado el 30 de junio de 2021 fue la siguiente:

| | Saldo a 30 de junio 2020 | Incrementos/ Acreditaciones | Pagos/ Amortización | Saldo a 30 de junio 2021 | Con vencimiento en un año |
|---|---|---|---|---|---|
| Bonos en serie | | | | | |
| Resolución 1968-18 | $ 396,389,997 | $ - | $ - | $ 396,389,997 | $ - |
| Resolución 1998-06 | 1,186,895,000 | - | - | 1,186,895,000 | - |
| Total | 1,583,284,997 | - | - | 1,583,284,997 | - |
| Bonos a plazo | | | | | |
| Resolución 1968-18 | 393,095,000 | - | - | 393,095,000 | - |
| Resolución 1998-06 | 1,842,045,000 | - | - | 1,842,045,000 | - |
| Total | 2235,140,000 | - | - | 2,235,140,000 | - |
| Bonos a tasa variable | | | | | |
| Resolución 1998-06 | 200,000,000 | - | - | 200,000,000 | - |
| Bonos de interés basados en el IPC | | | | | |
| Resolución 1998-06 | 57,965,000 | - | - | 57,965,000 | - |
| Bonos de tasa de interés basada en LIBOR | | | | | |
| Resolución 1998-06 | 700,000 | - | - | 700,000 | - |
| Bonos de apreciación de capital | | | | | - |
| Resolución 1968-18 | 30,662,498 | 1,417,132 | - | 32,079,630 | |
| Resolución 1998-06 | 81,264,404 | - | - | 81,264,404 | |
| Total | 111,926,902 | 1,417,132 | - | 113,344,034 | - |
| Total antes de la prima de los bonos | 4,189,016,899 | 1,417,132 | - | 4,190,434,031 | - |
| Añadir la amortización neta de las primas de los bonos | 195,092,776 | - | (12,945,391) | 182,147,385 | |
| Total de bonos en circulación sujetos a compromiso | $ 4,384,109,675 | $ 1,417,132 | $ (12,945,391) | $ 4,372,581,416 | $ - |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 12. BONOS A PAGAR (continuación)

Los bonos en circulación al 30 de junio de 2021, requieren pagos futuros de capital e intereses de la siguiente manera:

| Años fiscales que comienzan el 1 de julio | Capital | Intereses | Total |
|---|---|---|---|
| 2022 (incluidos los importes atrasados) | $ 671,244,401 | $ 1,007,800,449 | $ 1,679,044,850 |
| 2023 | 153,750,000 | 193,636,083 | 347,386,083 |
| 2024 | 150,079,058 | 185,774,044 | 335,853,102 |
| 2025 | 157,021,525 | 178,396,853 | 335,418,378 |
| 2026 | 164,290,890 | 170,637,788 | 334,928,678 |
| 2027-2031 | 878,093,157 | 731,402,818 | 1,609,495,975 |
| 2032-2036 | 1,036,960,000 | 498,357,239 | 1,535,317,239 |
| 2037-2041 | 843,560,000 | 225,418,987 | 1,068,978,987 |
| 2042-2046 | 121,560,000 | 50,443,998 | 172,003,998 |
| 2047 | 13,875,000 | 693,750 | 14,568,750 |
| Total | $ 4,190,434,031 | $ 3,242,562,009 | $ 7,432,996,040 |

**Incumplimiento de bonos**

Tras la presentación de la exención en virtud del Título III de PROMESA, como se explica en la Nota 3, hasta el 30 de junio de 2021, la Autoridad paralizó toda la amortización de la deuda, excepto los bonos Teodoro Moscoso. Sin embargo, los pagos de los bonos cubiertos por el seguro monolínea pueden haber sido pagados por dichos aseguradores.

| Año fiscal finalizado el 30 de junio de | Total de impagos pendientes | Pagos subrogados de la compañía de seguros monolínea | Total de impagos no subrogados por el seguro |
|---|---|---|---|
| **2017** | | | |
| Capital | $ 3,110,000 | $ 3,110,000 | $ |
| Intereses | 2,509,625 | 245,125 | 2,264,500 |
| **2018** | | | |
| Capital | 122,885,000 | 107,805,000 | 15,080,000 |
| Intereses | 247,524,261 | 112,581,380 | 134,942,881 |
| **2019** | | | |
| Capital | 128,035,000 | 112,235,000 | 15,800,000 |
| Intereses | 242,089,354 | 119,320,846 | 122,768,508 |
| **2020** | | | |
| Capital | 127,101,793 | 72,745,000 | 54,356,793 |
| Intereses | 241,459,632 | 113,186,409 | 128,273,223 |
| **2021** | | | |
| Capital | 130,568,151 | 58,260,000 | 72,308,151 |
| Intereses | 220,195,929 | 90,567,163 | 129,628,766 |
| **Total** | $ 1,465,478,745 | $ 790,055,923 | $ 675,422,822 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 12. BONOS A PAGAR (continuación)

Las necesidades de amortización de la deuda no pagadas a las que se refiere el párrafo anterior están aseguradas por diferentes compañías de seguros; Ambac Assurance Corporation ("AMBAC"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Insurance ("ASSURED"), MBIA Inc. ("MBIA"), AAC Insurance Group ("AAC") y CDC IXIS Financial Guaranty North America, Inc. ("CIFG N/A"). Ambac, Assured, MBIA y AAC cubrieron su parte del servicio de la deuda de las series de bonos cubiertas por sus correspondientes pólizas de seguro. FGIC estuvo sujeta a un Plan de Rehabilitación y ha ido pagando sus correspondientes porciones sobre la base de un porcentaje establecido de la amortización de la deuda que osciló entre el 25 % en el año fiscal 2017 y el 38.5 % hasta el 13 de octubre de 2019. Desde el 13 de octubre de 2019, el porcentaje de cobertura de la amortización de la deuda es del 43.5 %. Sin embargo, la cantidad pagada por FGIC no se revela completamente al fideicomisario de la Autoridad. Aunque estas compañías de seguros han estado pagando el capital y los intereses de dichos bonos, estos pagos no constituyen una reducción de la deuda de la Autoridad. Tras los pagos de las compañías de seguros, estas se convierten en propietarias de las Obligaciones de Bonos cedidas y se subrogan plenamente en todos los Derechos de los Bonistas a los pagos.

## 13. BONOS A PAGAR: TEODORO MOSCOSO

El 22 de octubre de 2003, la Autoridad emitió bonos a plazo y bonos de apreciación de capital por un importe total de aproximadamente $153.2 millones (los Bonos de 2003). El producto de estos bonos se utilizó para reembolsar, por adelantado, los bonos emitidos previamente en 1992 para financiar la construcción del Puente Teodoro Moscoso.

Los bonos en circulación en virtud de las Resoluciones de Bonos al 30 de junio de 2021 son los siguientes:

| | |
|---|---:|
| Bonos a plazo, con vencimiento hasta 2027 y un interés que oscila entre el 5.55 % y el 5.85 %. | $ 44,940,000 |
| Bonos de apreciación de capital, con vencimiento hasta 2026 y un interés que oscila entre el 5.90 % y el 6.15 %. | 44,600,479 |
| Total de bonos Teodoro Moscoso | 89,540,479 |
| Menos: porción actual | 13,235,000 |
| Porción a largo plazo | $ 76,305,479 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

### 13. BONOS A PAGAR: TEODORO MOSCOSO (continuación)

**Vencimiento de la deuda**

El siguiente esquema se presentó de acuerdo con los términos originales de los bonos a pagar. Los bonos en circulación al 30 de junio de 2021, requieren pagos futuros de capital e intereses de la siguiente manera:

| Años fiscales finalizados el 30 de junio. | Capital | Intereses | Total |
|---|---|---|---|
| 2022 | $ 13,235,000 | $ 2,458,170 | $ 15,693,170 |
| 2023 | 12,954,501 | 2,170,644 | 15,125,145 |
| 2024 | 13,264,770 | 1,776,938 | 15,041,708 |
| 2025 | 14,989,438 | 1,294,606 | 16,284,044 |
| 2026 | 16,779,138 | 690,008 | 17,469,146 |
| 2027-2028 | 18,317,632 | 410,962 | 18,728,594 |
| Total | $ 89,540,479 | $ 8,801,328 | $ 98,341,807 |

En la actualidad, Autopistas está pagando los intereses y el capital previstos para estos bonos de conformidad con el acuerdo de concesión de servicios. Consulte la Nota 11.

### 14. DEUDA CON LA AUTORIDAD DE RECUPERACIÓN DE LA DEUDAS DEL BGF

La Autoridad tenía varias líneas de crédito no garantizadas con el BGF, que fueron transferidas a la Autoridad de Recuperación de la Deuda del BGF, el 29 de noviembre de 2018, de conformidad con las Modificaciones Calificadoras del BGF de ciertas Líneas de crédito no revolventes que devengan intereses a tasas variables más un margen de 150 puntos básicos o un piso de 6 % ($1,232.9 computados a Diario/360 y $500.8 millones computados a 30/360). El importe total pendiente era de aproximadamente $1,733.7 millones al 30 de junio de 2021, más los intereses devengados y no pagados de $900.3 millones.

El 5 de mayo de 2021, la Autoridad ejecutó el PSA de la ACT/CCDA, que en esencia, incluirá la transacción de esta obligación, como parte del intercambio de bonos a pagar con los bonistas.

### 15. PLAN DE RETIRO

Antes del 1 de julio de 2017, la Autoridad era un patrono participante en los planes de retiro administrados por el Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico (SRE).

Sin embargo, el 30 de septiembre de 2016, el SRE fue designado por la Junta de Supervisión como una Instrumentalidad Territorial Cubierta e virtud de PROMESA. El 21 de mayo de 2017, la Junta de Supervisión presentó una petición de remedio en virtud del Título III de PROMESA para el SRE en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, e inició un caso de Título III para el SRE. El 15 de junio de 2017, el Fideicomisario de los Estados Unidos nombró un Comité Oficial de Empleados Jubilados en los casos del Título III del ELA. El 18 de enero de 2022, el Tribunal del Título III confirmó el Plan de Ajuste del ELA, que incluye la reestructuración de las deudas pendientes del SRE y otras obligaciones financieras. El Plan de Ajuste del ELA entró en vigencia el 15 de marzo de 2022.

En virtud del Plan de Ajuste del ELA y de la Orden de Confirmación del ELA, se creó un Fideicomiso de Reserva de Pensiones para financiar los futuros pasivos de pensiones del SRE con una contribución de financiamiento inicial del ELA de $5 millones en la Fecha de Entrada en Vigencia del ELA para financiar los costos y gastos administrativos iniciales de la Junta de Reserva de Pensiones. También se realizarán contribuciones anuales adicionales del ELA al Fideicomiso de Reserva de Pensiones en cantidades que se determinarán cada año fiscal de acuerdo con los términos del Plan de Ajuste del ELA. El Plan de Ajuste del ELA y la

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 15. PLAN DE RETIRO (continuación)

Orden de Confirmación del ELA también impiden que el ELA aplique la legislación existente o promulgue nueva legislación dentro de los 10 años siguientes a la Fecha de Entrada en Vigencia del ELA que crearía o aumentaría cualquier pago u obligación de pensión de beneficio definido a los jubilados actuales o futuros sin la aprobación previa del Tribunal del Título III.

### Reforma de las pensiones PayGo

El 27 de junio de 2017, el DOT emitió la Carta Circular N.º 1300-46-17 para transmitir a las agencias del gobierno central, las corporaciones públicas y los municipios los nuevos procedimientos de implementación para adoptar, a partir del 1 de julio de 2017, un nuevo sistema de "pago por uso" (PayGo), en el que el SRE y los otros sistemas de retiro del ELA dejaron de recibir las contribuciones patronales o de los participantes del plan y ya no administran las contribuciones en nombre de los participantes. Desde el año fiscal 2018, se eliminaron las contribuciones patronales, las ordenadas por leyes especiales y la aportación uniforme adicional.

El 23 de agosto de 2017, el Gobernador firmó la Ley N.º 106 de 2017, conocida como la *Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Contribuciones Definidas para los Funcionarios Públicos* (Ley 106-2017), que proporciona el marco legal para que el ELA implemente el sistema PayGo a partir del 1 de julio de 2017. En el marco del sistema PayGo, el Fondo General del ELA efectúa los pagos directos de las pensiones a los pensionistas y luego recibe el reembolso de esos pagos por parte de los patronos participantes aplicables, incluida la Autoridad. Los porcentajes de asignación del ELA se basan en la relación entre los pagos de beneficios reales de cada entidad participante y el total de los pagos de beneficios agregados realizados por todas las entidades participantes para el año que finaliza en la fecha de medición. Se asignaron aproximadamente $2,000 millones para estos fines en cada uno de los presupuestos del ELA para el año fiscal 2019. El Plan de Ajuste del ELA conserva todos los beneficios de pensiones acumulados para los jubilados y empleados actuales del SRE, el Sistema de Retiro de Maestros (TRS) y el Sistema de Retiro de la Judicatura (JRS).

La Ley 106-2017, entre otras cuestiones, modificó la Ley 447 con respecto a la gobernanza, el financiamiento y los beneficios del SRE para los miembros activos del programa real y los nuevos miembros contratados. En virtud de la Ley 106-2017, se eliminó la Junta de Fideicomisarios del SRE y se creó una nueva junta de retiro (la Junta de Retiro), que actualmente se encarga de gobernar todos los Sistemas de Retiro del ELA.

La Ley 106-2017 puso fin a los programas de pensiones previamente existentes para los participantes del SRE a partir del 30 de junio de 2017 y creó un nuevo plan de contribuciones definidas (el Nuevo Plan de Contribuciones Definidas) para los miembros activos existentes y los nuevos empleados contratados a partir del 1 de julio de 2017. Este plan es similar a un 401(k) y está gestionado por una entidad privada. Los beneficios futuros no serán pagados por el SRE. En el marco del Nuevo Plan de Contribuciones Definidas, los miembros de los programas anteriores y los nuevos empleados públicos contratados a partir del 1 de julio de 2017 se inscribirán en el Nuevo Programa de Contribuciones Definidas. A partir del 22 de junio de 2020, el saldo acumulado en las cuentas de los programas de pensiones anteriores se transferirá a las cuentas individuales de los miembros en el Nuevo Plan de Contribuciones Definidas.

La Ley 106-2017 también ordenó la paralización de los programas de préstamos del SRE y ordenó la fusión de las estructuras administrativas de los sistemas de retiro del ELA. A discreción de la Junta de Retiro, la administración de los beneficios del nuevo Plan de Contribuciones Definidas puede ser gestionada por un proveedor de servicios externo. Además, la Ley 106-2017 derogó la Ley de Retiro Anticipado Voluntario, Ley N 211 de 2015, al tiempo que creó incentivos, oportunidades y un programa de recualificación para los trabajadores públicos.

### Descripción del plan antes del 1 de julio de 2017

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

Este resumen de las disposiciones del plan de pensiones del SRE pretende describir las características fundamentales del plan antes de la promulgación de la Ley 106-2017. Cabe señalar que todos los requisitos de elegibilidad y los montos de los beneficios se

## 15. PLAN DE RETIRO (continuación)

determinarán en estricta conformidad con la ley y los reglamentos aplicables, y estos beneficios no fueron cambiados ni modificados con la promulgación de la Ley 106-2017.

Para los empleados que se afiliaron al SRE antes del 1 de julio de 2013, el SRE funcionaba con las siguientes tres estructuras de beneficios:

- Ley N.º 447 de 15 de mayo de 1951 (Ley N.º 447), con entrada en vigencia el 1 de enero de 1952 para los miembros contratados hasta el 31 de marzo de 1990;

- Ley N.º 1 de 16 de febrero de 1990 (Ley N.º 1), para los miembros contratados a partir del 1 de abril de 1990 y hasta el 31 de diciembre de 1999;

- Ley N.º 305 del 24 de septiembre de 1999 (Ley N.º 305), que modificó la Ley N.º 447 y la Ley N.º 1, para miembros contratados desde el 1 de enero de 2000 hasta el 3 de junio de 2013.

Los empleados de la Ley N.º 447 y de la Ley N.º 1 participaban en un plan de beneficios definidos con participación en los costos de múltiples patronos (el Programa de Beneficios Definidos). Los miembros de la Ley 305 participaban en un programa de pensiones conocido como Programa del Sistema 2000, un plan híbrido de contribuciones definidas. Con el Programa del Sistema 2000, los beneficios a la edad de retiro no estaban garantizados por el ELA y estaban sujetos al saldo total acumulado en la cuenta del miembro.

Posteriormente, en virtud de la Ley N.º 3 de 2013, que entró en vigencia el 1 de julio de 2013, el Estado creó un plan híbrido en el que el empleado dejaba de devengar beneficios por cuenta ajena y al retirarse recibiría una renta vitalicia a partir de los beneficios definidos acumulados hasta esa fecha, más las contribuciones realizadas por el empleado a partir de entonces, ajustadas por los rendimientos de las inversiones y las fluctuaciones del mercado. También se hicieron otros cargos al Plan. Tras la promulgación de la Ley N.º 3, el ELA dejó de contribuir una parte proporcional en nombre del trabajador, y, en cambio, las contribuciones patronales se redirigieron al pago de las pensiones acumuladas. La Ley N.º 3 de 2013 (Ley N.º 3) modificó las disposiciones de las diferentes estructuras de beneficios del SRE. La Ley N.º 3 trasladó a todos los participantes (empleados) del Programa de Beneficios Definidos y del Programa del Sistema 2000 a un nuevo plan híbrido de contribuciones definidas (el Programa Híbrido Contributivo). Todos los empleados regulares contratados por primera vez a partir del 1 de julio de 2013 y los antiguos empleados que participaron en el Programa de Beneficios Definidos y en el Programa del Sistema 2000, y que fueron recontratados a partir del 1 de julio de 2013, se convierten en miembros del Programa Híbrido Contributivo como condición para su empleo. Los beneficios de la Ley N.º 3 se extinguieron con la promulgación de la Ley. N.º 106-2017.

**Pasivos por pensiones, gastos por pensiones y salidas diferidas de recursos y entradas diferidas de recursos relacionadas con las pensiones**

El informe de gastos de pensiones GASB 73 del ELA para el año terminado el 30 de junio de 2021 no estaba disponible cuando la Autoridad publicó estos estados financieros. En consecuencia, el pasivo total por pensiones, las salidas/entradas diferidas de recursos y el gasto por pensiones GASB 73, tal y como se registran en estos estados financieros, difieren de los importes reales. Estas diferencias pueden ser importantes para los estados financieros básicos. Además, no se divulga la información sobre el total de las pensiones que exigen los principios contables generalmente aceptados en los Estados Unidos.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

La cantidad total pagada por la Autoridad con el sistema PayGo durante el año fiscal finalizado el 30 de junio de 2021 ascendió a $35 millones, lo que representa el 100 % de las contribuciones requeridas por la ley.

### 15.  PLAN DE RETIRO (continuación)

**Información fiduciaria del plan de pensiones**

Puede obtener información adicional sobre el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico para el año fiscal finalizado el 30 de junio de 2019 del Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico, Código postal 42003, San Juan PR 00940-2003.

### 16.  OTROS BENEFICIOS POSEMPLEO DISTINTOS DE LAS PENSIONES (OPEB)

La Autoridad participa en dos planes OPEB. Un plan está patrocinado por el ELA y el otro por la Autoridad:

| Total del pasivo de OPEB | | |
|---|---|---|
| Pasivo de OPEB - Autoridad (fecha de presentación de informes 30 de junio de 2021) | $ | 2,450,802 |
| Pasivo de OPEB - ELA (Fecha de presentación de informes 30 de junio de 2020) | | 15,936,861 |
| Total del pasivo de OPEB | $ | 18,387,663 |

### OPEB patrocinado por el ELA

La Autoridad participa en el plan OPEB del ELA para los participantes jubilados del Sistema de Retiro de Empleados (SRE MIPC). El Plan se gestiona con arreglo a un sistema de pago por uso (pay-as-you-go).

El SRE MIPC es un plan OPEB de beneficios definidos (distintos de las pensiones) de múltiples patronos, sin financiamiento, patrocinado por el ELA. Este SRE MIPC se creó en virtud de la Ley N.º 95-1963. Los beneficios de atención médica se ofrecen a través de compañías de seguros, cuyas primas son pagadas por el miembro jubilado y el ELA aporta una parte correspondiente. El SRE MIPC cubre prácticamente a todos los empleados a tiempo completo del ELA, de algunos municipios y de las unidades componentes del ELA. Para el SRE MIPC, los empleados del ELA y de la Autoridad se convirtieron en miembros del plan en la fecha de su contratación. Los miembros del plan eran elegibles para beneficios al alcanzar la edad de retiro para los beneficios de pensión correspondientes.

El SRE MIPC cubre un pago de hasta $100 por mes al plan de seguro médico elegible seleccionado por cada miembro, siempre que el miembro se haya jubilado antes del 1 de julio de 2013, (Ley N.º 483, modificada por la Ley N.º 3). El SRE MIPC está financiado por el ELA a través de asignaciones legislativas. Sin embargo, el ELA reclama mensualmente a cada patrono el reembolso del importe correspondiente a los pagos de OPEB efectuados por el ELA en relación con los jubilados asociados a cada patrono. Los créditos legislativos se consideran estimaciones de los pagos que debe realizar el SRE MIPC. No se exige ninguna contribución a los miembros del plan durante el empleo activo. Los jubilados contribuyen el importe de la prima del seguro de atención médica que no está cubierto por la contribución del ELA.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

### Métodos y supuestos actuariales

El pasivo total de OPEB del SRE MIPC al 30 de junio de 2019 se determinó mediante una valoración actuarial al 30 de junio de 2017, que se trasladó al 30 de junio de 2018. La valoración actuarial utilizó los siguientes supuestos actuariales aplicados a todos los períodos del período de medición:

| | |
|---|---|
| Inflación | No se aplica |
| Índice de bonos municipales | 3.5 %, según Bond Buyer General Obligation 20-Bond Municipal Bond Index |
| Aumento de la compensación | 3 % por año. No se prevé ningún aumento de la compensación hasta el 1 de julio de 2021 como consecuencia de la Ley N.º 3-2017 y de la economía general actual. |
| Mortalidad | Mortalidad antes del retiro: |

Para los empleados generales no cubiertos por la Ley N.º 127, las tasas de mortalidad de los empleados del RP-2014 para hombres y mujeres ajustadas para reflejar la escala de mejora de la mortalidad MP-2018 a partir del año base 2006 y proyectadas hacia adelante utilizando la MP-2018 sobre una base generacional. Para los miembros cubiertos por la Ley N.º 127, las tasas de mortalidad de los empleados del RP-2014 con ajustes de operario para hombres y mujeres ajustados para reflejar la escala de mejora de la mortalidad MP-2018 a partir del año base 2006 y proyectados hacia adelante utilizando MP-2018 en base generacional. Como tablas generacionales, se reflejan las mejoras de mortalidad tanto antes como después de la fecha de medición.

Se supone que el 100 % de los fallecimientos en servicio activo son ocupacionales para los miembros cubiertos por la Ley N.º 127.

Mortalidad de miembros sanos después del retiro:

Las tasas, que varían según el sexo, se suponen para los jubilados y beneficiarios sanos sobre la base de un estudio de la experiencia del plan de 2007 a 2012 y de las expectativas actualizadas sobre la mejora de la mortalidad en el futuro. Las tasas base de 2010 equivalen al 92 % de las tasas de la Tabla de Mortalidad UP-1994 para los hombres y al 95 % de las tasas de la Tabla de Mortalidad UP-1994 para las mujeres, ambas proyectadas de 1994 a 2010 utilizando la Escala AA. Las tasas básicas se proyectan mediante la Escala de Mejora de la Mortalidad MP-2018 sobre una base generacional. Como tabla generacional, se reflejan las mejoras de mortalidad tanto antes como después de la fecha de medición.

Mortalidad de miembros con discapacidad después del retiro:

Las tasas que varían según el sexo se suponen para los jubilados con discapacidades sobre la base de un estudio de la experiencia del plan de 2007 a 2012 y de las expectativas actualizadas sobre la futura mejora de la mortalidad. Las tasas base de 2010 equivalen al 105 % de las tasas de la Tabla de Mortalidad UP- 1994 para los hombres y al 115 % de las tasas de la Tabla de Mortalidad UP-1994 para las mujeres. Las tasas básicas se proyectan mediante la Escala de Mejora de la Mortalidad MP-2018 sobre una base generacional. Como tabla generacional, se reflejan las mejoras de mortalidad tanto antes como después de la fecha de medición.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16.  OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

La mayoría de las demás hipótesis demográficas utilizadas en la valoración del 30 de junio de 2019 se basaron en los resultados de un estudio actuarial de la experiencia de 2009 utilizando datos al 30 de junio de 2003, al 30 de junio de 2005 y al 30 de junio de 2007.

La tasa de descuento para el 30 de junio de 2019 y 2018 fue del 3.5 % y del 3.87 %, respectivamente. Esto representa la tasa de retorno de los bonos municipales elegida por el ELA. La fuente es el Bond Buyer GO 20-Bond Municipal Bond Index, que incluye bonos municipales de obligación general exentos de impuestos con una calificación media de AA/Aa o superior.

Las valoraciones actuariales de un plan en curso implican estimaciones del valor neto de los importes declarados e hipótesis sobre la probabilidad de que se produzcan acontecimientos en un futuro lejano, incluidos, por ejemplo, supuestos sobre el empleo y la mortalidad futuros. Los cálculos se basan en los tipos de beneficios proporcionados según los términos del plan sustantivo en el momento de cada valoración y en el patrón de reparto de costos entre el patrono y el miembro del plan en el momento de cada valoración. Las proyecciones de los beneficios a efectos de información financiera no incorporan explícitamente los posibles efectos de las limitaciones legales o contractuales del financiamiento sobre el modelo de reparto de costos entre el patrono y los miembros del plan en el futuro.

Los supuestos actuariales se revisan periódicamente para reflejar mejor la experiencia real y la prevista. Debido al cambio en la fecha de recopilación del censo al comienzo del año fiscal en lugar de al final del año fiscal, la ganancia/pérdida demográfica durante el año se limita a la diferencia entre los pagos de beneficios reales y previstos, que surgen de las diferencias en la rescisión y actividad de retiro y mortalidad frente a las expectativas.

**Proporción de la Autoridad en el pasivo total de OPEB del SRE MIPC**

La parte proporcional de la Autoridad del pasivo total de OPEB del SRE MIPC y el porcentaje de la proporción del pasivo total agregado de OPEB del SRE asignado a la Autoridad al 30 de junio de 2019 (fecha de medición) fue de aproximadamente $15.94 millones y 1.91 %, respectivamente. Como el SRE MIPC es un plan de múltiples patronos y los beneficios no están financiados por un fideicomiso de OPEB, la Declaración N.º 75 de la GASB se aplica a la OPEB proporcionada a los propios empleados de cada patrono participante. El Estado Libre Asociado de Puerto Rico y sus unidades componentes se consideran un solo patrono. Otros empresarios también participan en el SRE MIPC. Debido a que algunos patronos que son unidades componentes del ELA, como la Autoridad, preparan estados financieros individuales, se determina una parte proporcional o gasto de OPEB para estos patronos. La Declaración N.º 75 de la GASB exige que dicha parte proporcional sea coherente con la forma en que se determinan los importes que se pagan a medida que se devengan los beneficios. La parte proporcional en cada fecha de medición se basa en la relación entre los pagos de beneficios reales de cada organismo y unidad componente y el total de pagos de beneficios reales efectuados durante el año que finaliza en la fecha de medición.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

### Sensibilidad del pasivo total de OPEB del SRE MIPC a las variaciones del tipo de descuento

En la siguiente tabla, se presenta la parte proporcional del pasivo de OPEB del SRE MIPC al 30 de junio de 2020 (fecha de medición: 30 de junio de 2019) para el SRE calculado utilizando la tasa de descuento del 3.5 %, así como cuál sería la parte proporcional del pasivo de OPEB de la empresa si se calcula utilizando una tasa de descuento de un punto porcentual menos (2.5 %) o un punto porcentual más (4.5 %) que la tasa actual:

|  | Disminución del 1 % (2.5 %) | Supuesto actual (3.5 %) | Incremento del 1 % (4.5 %) |
|---|---|---|---|
| Total del pasivo de OPEB | $ 17,465,992 | $ 15,936,861 | $ 14,636,302 |

### Salidas diferidas de recursos y entradas diferidas de recursos

Los ajustes de OPEB reconocidos por la Autoridad para el año finalizado el 30 de junio de 2020 (fecha de presentación), relacionados con el SRE MIPC, ascendieron a aproximadamente $83,000. Dado que todos los participantes están inactivos, no hay salidas ni entradas diferidas de recursos, ya que cualquier cambio en los supuestos actuariales, las ganancias y pérdidas económicas o demográficas y los cambios en la parte proporcional se reconocen inmediatamente durante el año de medición. Sin embargo, solamente se reconoció un flujo de salida diferido por el importe de los pagos de beneficios realizados por la Autoridad con posterioridad a la fecha de medición. Puede encontrar información adicional sobre el Plan OPEB MIPC del Estado Libre Asociado de Puerto Rico para Participantes Jubilados del SRE en sus Anexos independientes de Asignaciones del Patrono y Anexos de Montos OPEB por Patrono para los años finalizados el 30 de junio de 2018 y 2017, una copia de los cuales se puede obtener del Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico, Código postal 42004, San Juan PR 00940-2004.

### Año de notificación del pasivo OPEB del SRE MIPC

El informe de gastos GASB 75 del ELA correspondiente al año finalizado el 30 de junio de 2021 no estaba disponible cuando la Autoridad publicó estos estados financieros. En consecuencia, el total del pasivo OPEB del SRE MIPC, los flujos de salida/entrada de recursos diferidos y el gasto GASB 75, registrados en estos estados financieros, son diferentes de los importes reales. Estas diferencias pueden ser importantes para los estados financieros básicos.

### Plan de beneficios de salud de la Autoridad

### Descripción del programa y la membresía

La Autoridad acordó proporcionar cobertura de seguro médico, farmacéutico, odontológico y oftalmológico a los jubilados elegibles, sus cónyuges y dependientes, durante un período de un año después del retiro para los empleados del sindicato y durante el resto del año calendario del retiro para los empleados de la gerencia, como un plan de beneficios definidos de un solo patrono para otros beneficios posteriores al empleo (el Plan OPEB).

El Plan OPEB puede ser modificado por acción de la Autoridad sujeto a los acuerdos de negociación colectiva y de empleo aplicables. El Plan OPEB no emite un informe financiero independiente porque no hay activos legalmente segregados con el único fin de pagar los beneficios del Plan OPEB.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

Las obligaciones del Patrono del miembro del Plan OPEB se establecen por acción de la Autoridad de conformidad con los acuerdos de negociación colectiva y de empleo aplicables. Los porcentajes de cotización exigidos al patrono y a los afiliados varían en función del acuerdo aplicable.

Todos los empleados con más de 20 años de servicio prestado en la Autoridad tienen derecho a OPEB cuando alcanzan la edad de retiro.

Para más detalles sobre la edad de retiro, consulte la Nota 15. La obligación finaliza en caso de fallecimiento antes del retiro y en caso de invalidez total o permanente antes del retiro. La obligación también finaliza en caso de fallecimiento tras el retiro.

### Política de financiamiento

En la actualidad, la Autoridad contribuye al Plan OPEB una cantidad de dinero suficiente para satisfacer las obligaciones actuales sobre la base de un sistema de pago por uso. Los costos de administración del Plan OPEB los paga la Autoridad.

No se acumulan activos en un fideicomiso que cumpla los criterios del párrafo 4 de la Declaración n.º 75 de la GASB para el pago de estos beneficios.

### Membresía

Al 30 de junio de 2021, fecha de la valoración actuarial más reciente, los miembros del Plan OPEB eran los siguientes:

| Descripción | Número |
|---|---|
| Empleados o beneficiarios no activos que reciban beneficios actualmente | 1 |
| Miembros no activos con derecho a beneficios pero que todavía no los reciben | - |
| Empleados activos | 838 |
| Total de miembros | 839 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

### 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

**Supuestos actuariales**

El pasivo total de OPEB se determinó mediante una valoración actuarial al 30 de junio de 2021 utilizando los siguientes supuestos actuariales clave y otros datos:

| | |
|---|---|
| Inflación | 2.4 % |
| Aumentos de sueldo | N/C |
| Tasa del índice de bonos municipales en la fecha de medición | 2.66 % |
| Tasa de rendimiento esperada a largo plazo | 2.66 % |
| Tasa de tendencia de los costos sanitarios | 5.6 % disminuye a 4.7 %. |

**Tabla de mortalidad**

Las tasas de mortalidad se basaron en la Tabla de mortalidad ponderada por cantidades de jubilados generales de la PUB-2010, proyectada generacionalmente utilizando la escala MP-2020 para los retiros del servicio. Para el período posterior al retiro por invalidez, se utilizó la Tabla de mortalidad ponderada por cantidades de la PUB-2010, proyectada generacionalmente con la escala MP-2020.

**Cambios en los supuestos actuariales**

Desde la fecha de medición anterior, el tipo de descuento ha disminuido del 2.79 % al 2.66 %. Las tasas de mortalidad fueron actualizadas a la Tabla de mortalidad general ponderada por cantidad de jubilados PUB-2010, proyectada generacionalmente utilizando la escala MP-2020 para los retiros del servicio. Para el período posterior al retiro por invalidez se utilizó la Tabla de mortalidad general de jubilados por invalidez PUB-2010, proyectada generacionalmente utilizando la escala MP-2020.

**Cambios en las condiciones de los beneficios**

No hubo ningún cambio en las condiciones de los beneficios que afectara la medición del pasivo total de OPEB desde la fecha de medición anterior. No hay pagos de beneficios atribuibles a la compra de contratos de seguros asignados.

**Sensibilidad del pasivo total del Plan OPEB a los cambios en la tasa de descuento y en la tendencia de la asistencia sanitaria**

A continuación, se presenta el pasivo total de OPEB calculado utilizando la tasa de descuento del 2.66 %, así como lo que sería si se calculara utilizando una tasa de descuento un punto porcentual más bajo o un punto porcentual más alto que la tasa actual:

| | Disminución del 1 % (1.66 %) | Supuesto actual (2.66 %) | Incremento del 1 % (3.66 %) |
|---|---|---|---|
| Total del pasivo de OPEB | $ 2,710,302 | $ 2,214,240 | |
| | $ 2,450,802 | | |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

Del mismo modo, el siguiente gráfico presenta el pasivo total de OPEB calculado utilizando las tasas de tendencia de los costos de atención sanitaria, así como lo que sería si se calculara utilizando una tasa de costos de atención sanitaria de un punto porcentual menos o un punto porcentual más que la tasa actual:

|  | Disminución del 1 % (del 4.6 % al 3.7 %) | Supuesto actual (5.6 % que disminuye a 4.7 %) | Incremento del 1 % (6.6 % que disminuye a 5.7 %) |
|---|---|---|---|
| Total del pasivo de OPEB | $ 2,255,139 | $ 2,450,802 | $2,681,353 |

### Costo anual del Plan OPEB y pasivo del Plan OPEB

El pasivo total del Plan OPEB al 30 de junio de 2021 (fecha del informe) se basa en una valoración actuarial realizada a la Fecha de Valoración, 30 de junio de 2020. El pasivo total previsto del Plan OPEB se determina al 30 de junio de 2020 utilizando técnicas estándares de *roll forward*. El cálculo del *roll forward* comienza con el pasivo total del Plan OPEB a la Fecha de Medición anterior, 30 de junio de 2019, agrega el Costo Normal anual (también llamado "Costo de Servicio"), agrega el interés a la Tasa de Descuento para el año y luego resta los pagos de beneficios esperados para el año. La diferencia entre este pasivo total esperado del Plan OPEB y el pasivo total real del Plan OPEB en la Fecha de Medición, antes de reflejar cualquier cambio en los supuestos, se refleja como una ganancia o pérdida por experiencia para el año. La diferencia entre el pasivo total real del Plan OPEB en la Fecha de Medición antes y después de reflejar cualquier cambio de hipótesis se refleja como una ganancia o pérdida por cambio de hipótesis para el año.

La siguiente tabla ilustra los componentes del costo del Plan OPEB para el año terminado el 30 de junio de 2021:

| | |
|---|---|
| **Pasivo total de OPEB al 30 de junio de 2020 (fecha de valoración)** | $ 2,346,428 |
| **Cambios para el año:** | |
| Costo del servicio al final del año | 85,610 |
| Intereses del pasivo OPEB y flujos de caja | 64,351 |
| Cambio en las condiciones de los beneficios | - |
| Diferencias entre la experiencia prevista y real | 2,213 |
| Cambios en los supuestos u otros datos | 32,050 |
| Pagos de beneficios | (79,850) |
| **Cambios netos** | 104,374 |
| **Pasivo total de OPEB al 30 de junio de 2021 (fecha de valoración)** | $ 2,450,802 |

Para el año terminado el 30 de junio de 2021, la Autoridad reconoció un gasto del Plan OPEB de aproximadamente $56,387 dólares.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

Dado que ciertas partidas de gastos se reconocen a lo largo de períodos cerrados cada año, las partes diferidas de estas partidas deben ser objeto de un seguimiento anual. Si los importes aumentarán los gastos del Pan OPEB, se etiquetan como salidas diferidas de recursos. Si sirven para reducir el gasto de OPEB, se etiquetan como entradas diferidas de recursos. El reconocimiento de estos importes se realiza en dólares, sin incluir intereses en los importes diferidos. Las ganancias/pérdidas por experiencia y el impacto de los cambios en las hipótesis actuariales u otros datos, si los hay, se reconocen a lo largo de la vida media de servicio restante esperada de los miembros activos e inactivos del Plan al principio del período de medición.

La siguiente tabla proporciona un resumen de las salidas diferidas de recursos y las entradas diferidas de recursos al 30 de junio de 2021:

**Salidas diferidas de recursos y entradas diferidas de recursos de OPEB**

| Descripción | Salidas diferidas de recursos | Entradas diferidas de recursos |
|---|---|---|
| Diferencia entre la experiencia esperada y la real | 1,918 | $ 621,700 |
| Cambios en los supuestos u otros datos | 125,337 | |
| Total | 127,255 | $ 621,700 |

La aplicación de la norma GASB N.º 75 requiere determinar las salidas de recursos diferidas y las entradas de recursos diferidas para poder amortizarlas y reconocerlas en el gasto anual del Plan OPEB.

La siguiente tabla ilustra los componentes del costo del Plan OPEB para el año terminado el 30 de junio de 2021:

| | |
|---|---|
| Gasto de OPEB: | |
| Costo del servicio al final del año | $ 85,610 |
| Intereses sobre el pasivo total de OPEB | 64,351 |
| Parte de la diferencia del período actual entre la experiencia esperada y la real en el pasivo total de OPEB | 295 |
| Cambio en el supuesto | 4,273 |
| Reconocimiento de las salidas de recursos diferidas iniciales como gasto de OPEB | 19,160 |
| Reconocimiento de las entradas de recursos diferidas iniciales como gasto de OPEB | (117,302) |
| Gasto de OPEB | $ 56,387 |

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 16. OTROS BENEFICIOS POSEMPLEO DISTINTOS A LAS PENSIONES (OPEB) (continuación)

Los importes informados como salidas diferidas de recursos y entradas diferidas de recursos relacionados con los beneficios del Plan OPEB se reconocerán en el Gasto del Plan OPEB de la siguiente manera:

| Años fiscales finalizados el 30 de junio: | Salidas diferidas de recursos | Entradas diferidas de recursos | Aumento/(disminución) de gastos de OPEB |
|---|---|---|---|
| 2022 | $ 23,728 | $ 117,302 | $ (93,574) |
| 2023 | 23,728 | 117,302 | (93,574) |
| 2024 | 23,728 | 117,302 | (93,574) |
| 2025 | 23,728 | 117,302 | (93,574) |
| 2026 | 22,135 | 117,302 | (95,167) |
| Posteriormente | 10,208 | 35,190 | (24,982) |
| Total | $ 127,255 | $ 621,700 | $ (494,445) |

**Métodos y supuestos actuariales**

El método de costo actuarial utilizado para medir el pasivo total del Plan OPEB al 30 de junio de 2021 fue el método de costo normal individual a la edad de entrada.

## 17. BENEFICIOS POR CESE VOLUNTARIO

El 2 de julio de 2010, el ELA promulgó la Ley N.º 70, que estableció un programa que proporciona beneficios para el retiro anticipado o incentivos económicos para la terminación voluntaria del empleo a los empleados elegibles, según como se define. El programa estaba disponible para los empleados que cumplían los requisitos y que habían completado entre 15 y 29 años de servicios acreditados y proporcionaba beneficios mensuales que oscilaban entre el 37.5 % y el 50 % del salario mensual de cada empleado hasta que este cumpliera los requisitos de edad y 30 años de servicio acreditado en el Sistema de Retiro. El Plan Pay-Go del SRE (anteriormente SRE) es el responsable del pago de los beneficios. Los empleados tenían hasta el 31 de diciembre de 2012 para elegir participar en este programa. Al 30 de junio de 2021, el pasivo total pendiente de la Autoridad en virtud de este programa era de aproximadamente $22.6 millones, descontados al 1.85 %.

El 28 de diciembre de 2015, el ELA promulgó la Ley N.º 211 de 2015 (Ley N.º 211), conocida como Ley de Retiro Anticipado Voluntario. La Ley N.º 211 permitía a los empleados activos elegibles participar en un programa de retiro voluntario si habían sido contratados antes de abril de 1990 y habían acumulado un mínimo de 20 años de servicio. El programa voluntario, que se adoptó inicialmente durante el año fiscal finalizado el 30 de junio de 2017, proporcionaba a los participantes elegibles el 60 % de su compensación media, determinada a partir del 31 de diciembre de 2015, hasta que el empleado cumpliera los sesenta años. Al 30 de junio de 2021, el saldo pendiente de la Ley N.º 211 ascendía a $9.3 millones. El pasivo de este programa se descontó al 1.5 %.

El ajuste agregado por los cambios en la tasa de descuento en virtud de la Ley N.º 70 y la Ley N.º 211 durante el año fiscal finalizado el 30 de junio de 2021 dio lugar a una pérdida de $2.3 millones.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 18. TRANSACCIONES CON PARTES RELACIONADAS

Durante el año fiscal finalizado el 30 de junio de 2021, los gastos de operación incluyeron aproximadamente $8.1 millones de cargos de la Autoridad de Energía Eléctrica de Puerto Rico (AEE), una unidad componente del ELA. Además, la Autoridad tiene una deuda pendiente de pago a la AEE por concepto de cargos de electricidad que asciende a aproximadamente $7.9 millones. Asimismo, durante el año finalizado el 30 de junio de 2021, la Autoridad recibió de la AEP, una unidad componente del ELA, cargos por el alquiler de edificios por un valor aproximado de $1 millón. Durante el año que finalizó el 30 de junio de 2021, la Autoridad realizó los pagos del alquiler cada mes según lo requerido.

Al 30 de junio de 2021, la Autoridad tenía un importe adeudado por el ELA de aproximadamente $59.1 millones, de los cuales $39.1 millones se habían cobrado a la fecha de emisión de los estados financieros. El importe adeudado por el ELA se refiere a las transferencias de asignaciones de CAPEX realizadas a la Autoridad.

Como se comenta en la Nota 14, el saldo de las líneas de crédito del BGF, ya extinguidas, fue asumido por el DRA del BGF. Al 30 de junio de 2021, la Autoridad tiene un saldo pendiente con el DRA del BGF de aproximadamente $1,733.7 millones más $900.3 millones de intereses devengados.

Los bonos a pagar incluyen $200 millones de dólares de bonos a tasa variable, adquiridos por el BGF (como se conocía anteriormente) de un tercero el 19 de mayo de 2014, y posteriormente asumidos por el DRA del BGF.

Durante el año finalizado el 30 de junio de 2021, la Autoridad utilizó la subvención de capital del ELA de aproximadamente $183.5 millones para el mantenimiento de reparaciones y la repavimentación de ciertas carreteras y puentes.

Al 30 de junio de 2021, la Autoridad tenía montos adeudados a otras entidades gubernamentales por concepto de arrendamientos operativos, servicios públicos y otros acuerdos por un monto aproximado de $26.4 millones, los cuales se incluyen en cuentas a pagar y pasivos acumulados en el estado de déficit neto adjunto.

## 19. COMPROMISOS Y PASIVOS CONTINGENTES

**Compromisos de construcción**

Al 30 de junio de 2021, la Autoridad tenía compromisos de aproximadamente $248.6 millones de dólares relacionados con contratos de construcción.

**Compromisos de arrendamiento**

La Autoridad tiene varios contratos de arrendamiento operativo de oficinas con la AEP. Estos contratos de arrendamiento finalizaron en los años fiscales 2003 y 2004, y la Autoridad sigue utilizando las instalaciones mes a mes. Durante el año fiscal finalizado el 30 de junio de 2021, el importe total de los gastos de alquiler registrados por la Autoridad en estos contratos fue de aproximadamente $1 millón.

**Contingencias legales**

1. Litigios clave pendientes presentados antes del inicio de los casos del Título III relacionados con la Autoridad

La Autoridad es la parte demandada o codemandada en varios juicios por supuestos daños en casos relacionados principalmente con proyectos de construcción. En virtud de los acuerdos de construcción, los contratistas están obligados a contratar un seguro de responsabilidad civil adecuado y a eximir a la Autoridad de las demandas presentadas por daños y perjuicios relacionados con la construcción de los proyectos.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 19. COMPROMISOS Y PASIVOS CONTINGENTES (CONTINUACIÓN)

2. *Ambac Assurance Corporation c. Autoridad de Carreteras y Transportación de Puerto Rico*, Caso N.º 16-cv-1893 (D.P.R.)

Ambac presentó dos demandas contra la Autoridad alegando (i) incumplimientos de los deberes fiduciarios, y (ii) incumplimientos de las obligaciones contractuales. El 16 de mayo de 2016, el demandante presentó una demanda modificada. El 1 de julio de 2016, la Autoridad presentó una moción de paralización del procedimiento, que el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el Tribunal de Distrito) concedió el 23 de agosto de 2016. El 23 de mayo de 2017, el Departamento de Justicia de Puerto Rico presentó una notificación de paralización en virtud del Título III de PROMESA. El 24 de mayo de 2017, el Tribunal de Distrito dictó una orden confirmando la paralización. A la fecha de emisión de los estados financieros, no se ha producido ninguna otra actividad en el expediente.

3. *Scotiabank de Puerto Rico, et. al. c. Garcia-Padilla, et. al.*, Caso N.º 16-cv-2736 (D.P.R.)

Los demandantes presentaron una demanda contra varias partes del gobierno, incluida la Autoridad, alegando que la Ley de Moratoria y las órdenes ejecutivas emitidas en virtud de la Ley de Moratoria violan PROMESA, la Constitución de los Estados Unidos y la Constitución de Puerto Rico. El 10 de septiembre de 2016, los demandantes presentaron su demanda modificada. El 11 de noviembre de 2016, los demandados presentaron una moción de paralización del procedimiento. El 16 de diciembre de 2016, los demandados presentaron una moción de desestimación. El 31 de enero de 2017, los demandantes presentaron una oposición a la moción de los demandados. Esa moción está pendiente. El 16 de mayo de 2017, el Departamento de Justicia de Puerto Rico presentó una notificación de paralización en virtud del Título III de PROMESA. El 17 de mayo de 2017, el Tribunal de Distrito dictó una orden confirmando la paralización. A la fecha de emisión de los estados financieros, no se ha producido ninguna otra actividad en el expediente.

4. *Peaje Investments LLC c. Autoridad de Carreteras y Transportación de Puerto Rico*, Caso N.º 17-cv-01612 (D.P.R. 9 de mayo de 2017)

El 9 de mayo de 2017, Peaje Investments LLC presentó una demanda de sentencia de remedio declaratorio e interdictal en la que impugnaba el uso de los ingresos totales del peaje por parte de la Autoridad. El 22 de mayo de 2017, la Junta de Supervisión presentó una notificación de paralización en virtud del Título III de PROMESA, que el Tribunal concedió el 23 de mayo de 2017. A la fecha de emisión de los estados financieros, no se ha producido ninguna otra actividad en el expediente.

**Principales acciones civiles presentadas contra la Autoridad o en relación con ella después del inicio del caso del Título III**

1. Las siguientes acciones civiles se resolvieron de acuerdo con el Plan de Ajuste del ELA:
   a. Peaje Investments LLC c. Autoridad de Carreteras y Transportación de Puerto rico, *et. al.*, Caso N.º 17-151-LTS
   b. Moción de paralización del bonista de la Autoridad, Caso N.º 17-3283-LTS (D.P.R. 16 enero de 2020).
   c. The Fin. Oversight & Mgmnt. Bd. Para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico c. Ambac Assurance Corp. *et al.*, Proc. Con. N.º 20-00005-LTS (D.P.R. 16 de enero de 2020)
   d. The Fin. Oversight & Mgmnt. Bd. para Puerto Rico, como representante de la Autoridad de Carreteras y Transportación de Puerto Rico, *et al.* c. Ambac Assurance Corp., *el. al.*, Proc. Con. N.º 20- 00007-LTS (D.P.R. 16 de enero de 2020)
   e. Moción de las aseguradoras monolínea para el nombramiento de cofideicomisarios para llevar a cabo acciones de evasión, Caso N.º 17-3283-LTS (D.P.R. 17 de julio de 2020)

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

    f.  Petición de conformidad con los artículos 105(a) y 362 del Código de Quiebras para que se ordene a Ambac Assurance Corporation que retire la demanda, Caso N.º 17-3283-LTS (D.P.R. 31 de marzo de 2020)

## 19. COMPROMISOS Y PASIVOS CONTINGENTES (CONTINUACIÓN)

    2.  Reclamaciones del Título III

El plazo en el que todos los acreedores debían presentar sus evidencias de reclamación contra la Autoridad de conformidad con su caso del Título III era el 29 de junio de 2018. Se presentaron aproximadamente 2,290 reclamaciones contra la Autoridad por un importe total de aproximadamente $83,100 millones. De esta cantidad, alrededor de 1,255 reclamaciones en el monto agregado total declarado de aproximadamente $6,800 millones han sido desestimadas o eliminadas por una orden de objeción general emitida por el Tribunal del Título III. En consecuencia, quedan pendientes alrededor de 870 reclamaciones por un importe total de aproximadamente $76,200 millones (sin incluir las reclamaciones pendientes de impugnación, marcadas para futura impugnación, o transferidas o en espera de ser transferidas a la Conciliación Administrativa de Reclamaciones). La validez de estas reclamaciones restantes aún no se ha determinado y dichas reclamaciones siguen estando sujetas al proceso de conciliación de reclamaciones.

**Resumen de pasivos contingentes**

Al 30 de junio de 2021, la Autoridad, sobre la base del asesoramiento jurídico, registraba un pasivo de aproximadamente $66.3 millones para las pérdidas probables de esas reclamaciones que no están totalmente cubiertas por el seguro. La responsabilidad legal pendiente se compone de $19.7 millones en casos legales relacionados con proyectos de construcción y otros asuntos operativos y $46.5 millones relacionados con la expropiación y los costos relacionados. Sin embargo, debido al proceso de estimación, el importe acumulado puede cambiar a corto plazo. La mayoría de estas pérdidas pueden tratarse como reclamaciones no garantizadas en el caso del Título III de la Autoridad. Otras reclamaciones contra la Autoridad están relacionadas principalmente con el impago de los bonos de la Autoridad y otras obligaciones a largo plazo que se registran en su totalidad en los estados financieros de la Autoridad, incluidos los intereses devengados. Se espera que estos pasivos se negocien en el marco de la reorganización de la Autoridad en virtud del Título III de PROMESA, por lo que no es necesaria ningún otro devengamiento.

La Autoridad también está demandada en otros juicios presentados por diferentes contratistas por supuesto incumplimiento de contratos. Estos contratistas de la Autoridad alegan, entre otras cuestiones, reclamaciones administrativas de construcción, como consecuencia de las órdenes ejecutivas del Gobernador de Puerto Rico que decretaron un cierre del gobierno de marzo a mayo de 2020. Los contratistas enviaron notificaciones para reclamar daños contractuales, en particular, la ampliación de los gastos generales. Sobre la base del asesoramiento de sus abogados, la Autoridad considera que estas alegaciones carecen de todo fundamento y defenderá enérgicamente su posición. Por consiguiente, en los estados financieros básicos, no se registró ninguna provisión para pérdidas, si existieren.

**Programas de asistencia federal**

La Autoridad participa en varios programas federales de asistencia financiera. Estos programas están sujetos a auditorías de acuerdo con las disposiciones del Título 2 del Código de Reglamentos Federales Parte 200, Requisitos Administrativos Uniformes, Principios de Costo y Requisitos de Auditoría para las Concesiones Federales, o a auditorías de cumplimiento por parte de los organismos otorgantes.

El 31 de marzo de 2014, la FHWA aprobó $756.4 millones en créditos de peaje que pueden aplicarse a la parte no

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

federal de los proyectos de tránsito. Estos créditos de peaje estarán disponibles hasta que se utilicen. Desde su creación, solo se reclamaron $166 millones en créditos de peaje, y había un saldo pendiente de $590.3 millones para futuros proyectos con ayuda federal al 30 de junio de 2021. La Unidad Presupuestaria de la Autoridad actualiza el saldo de los créditos de peaje en función de la aprobación de la FHWA. Durante el año terminado el 30 de junio de 2021, la Autoridad utilizó $20.6 millones de dólares en créditos de peaje.

20. **EXPLOTACIÓN Y MANTENIMIENTO DEL TREN URBANO Y OTROS SISTEMAS DE TRANSPORTE**

A partir del 1 de julio de 2017, la Autoridad celebró un nuevo contrato con ACI-Herzog para la operación y el mantenimiento del Tren Urbano. Este contrato vence el 30 de junio de 2032, con una opción de prórroga por dos períodos adicionales no inferiores a 5 años, siempre que la duración total no supere los 25 años. El costo total anual de operación y mantenimiento, para el año fiscal finalizado el 30 de junio de 2021, fue de aproximadamente $51.5 millones, incluida la cuota base del contrato. La Autoridad se compromete a pagar las tasas básicas durante el resto de la vida del acuerdo.

La Autoridad contrató a First Transit of Puerto Rico, Inc. (First Transit) para operar el servicio conocido como Metrobus I, que consta de dos rutas expresas (Metrobus Ruta I) y Metrobus-Expreso, que prestan servicio entre la Universidad de Puerto Rico y el Viejo San Juan. El servicio se presta los siete días de la semana con 24 autobuses propiedad de First Transit. El acuerdo de servicio existente con First Transit finalizó el 30 de junio de 2015, pero se prorrogó hasta el 30 de junio de 2022. El importe total de los gastos de este contrato fue de $7.5 millones para el año fiscal finalizado el 30 de junio de 2021.

21. **OTROS INGRESOS OPERATIVOS**

En el año finalizado el 30 de junio de 2021, otros ingresos operativos incluyen lo siguiente:

| | | |
|---|---:|---:|
| Ingresos de Teodoro Moscoso | $ | 1,886,596 |
| Ingresos por arrendamiento | | 1,503,917 |
| Ingresos por peaje electrónico y venta de etiquetas | | 1,419,760 |
| Ingresos del tren urbano | | 1,117,165 |
| Tasa de impacto | | 851,868 |
| Tarifas del Metrobus | | 200,351 |
| Otros | | 602,732 |
| Total | $ | 7,582,389 |

22. **REPLANTEAMIENTO DEL DÉFICIT NETO DEL AÑO ANTERIOR**

**Gasto en pensiones**

El 22 de enero de 2022, se emitió el informe de gastos de pensiones del SRE según la Declaración N.º 73 de la GASB para el período de presentación de informes del 30 de junio de 2020, fecha que fue posterior a la emisión de los estados financieros de 2020 por parte de la Autoridad. En consecuencia, la Autoridad registró un ajuste de $7.9 millones al déficit neto inicial al 1 de julio de 2020 para reconocer las transacciones de pensiones para el año finalizado el 30 de junio de 2020.

22. **REPLANTEAMIENTO DEL DÉFICIT NETO DEL AÑO ANTERIOR (continuación)**

**Otros beneficios posempleo (OPEB)**

La Autoridad ajustó su pasivo de OPEB para reconocer la parte proporcional de la Autoridad del beneficio del

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

plan de salud proporcionado por el SRE MIPC en virtud de la Declaración N.º 75 de la GASB que no había sido reconocida previamente.

El déficit neto inicial de la Autoridad se modificó de la siguiente manera:

| | |
|---|---:|
| Déficit neto, al principio del año fiscal, tal y como se informó anteriormente | $(386,375,208) |
| Ajustes del período anterior: | |
| Total del pasivo por pensiones según la Declaración N.º 73 de la GASB | 7,940,133 |
| Total de otros beneficios posempleo de la Declaración N.º 75 de la GASB | (15,936,861) |
| Total de ajustes del período anterior | (7,996,728) |
| Déficit neto al inicio del año fiscal, replanteado | $(394,371,936) |

## 23. PANDEMIA DE COVID-19

Desde que China alertó por primera vez a la Organización Mundial de la Salud ("OMS") de casos similares a los de la gripe en Wuhan el 31 de diciembre de 2019, la comunidad mundial está experimentando una crisis sanitaria sin precedentes causada por un nuevo coronavirus conocido como "COVID-19", que puede causar varios síntomas graves, como fiebre, tos, dificultad para respirar e incluso la muerte en casos extremos. El 15 de marzo de 2020, la entonces gobernadora Wanda Vázquez Garced firmó la Orden Ejecutiva N.º OE-2020-023, que ordenaba el cierre de todos los negocios no esenciales en Puerto Rico. Posteriormente, hasta la fecha de emisión de estos estados financieros, se han publicado nuevas órdenes ejecutivas. Con respecto a la Autoridad, el cierre sustancial de las operaciones se mantuvo durante menos de dos meses. A partir de entonces, se iniciaron los trabajos de construcción y mantenimiento, ya que los contratistas reprogramaron las obras en curso, y los empleados administrativos comenzaron a trabajar en un horario híbrido hasta el 24 de mayo de 2021, fecha en la que todos los empleados debían volver a su puesto de trabajo a tiempo completo, con la prueba de la vacunación con ciertas excepciones. En toda la isla, siguen existiendo restricciones limitadas en los lugares públicos, mientras que la vacunación ya ha alcanzado a más del 70 % de la población elegible. A la fecha de emisión de estos estados financieros, ha disminuido notablemente el número de personas que se infectan o requieren hospitalización. Sin embargo, el efecto a largo plazo de la pandemia sigue siendo difícil de predecir.

## 24. EVENTOS POSTERIORES

La Autoridad evaluó los eventos posteriores hasta el 30 de marzo de 2022, fecha en la que los estados financieros estaban listos para su publicación. La gerencia de la Autoridad entiende que no se produjeron otros acontecimientos importantes con posterioridad al 30 de junio de 2021 que requieran ser revelados en los estados financieros, excepto los que se mencionan a continuación. La Autoridad determinó que estos hechos son hechos posteriores no ajustados. Por lo tanto, el déficit financiero y los resultados de las operaciones al 30 de junio de 2021 no se ajustaron para reflejar su impacto.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 24. EVENTOS POSTERIORES (continuación)

### Impago de bonos

Sin los impuestos y otros ingresos asignados condicionalmente por el ELA, como se explica en la Nota 4, la Autoridad no ha podido realizar los pagos programados de sus bonos en circulación, como se explica a continuación:

| Año fiscal finalizado el 30 de junio de | Total de impagos pendientes | | Pagos subrogados de la compañía de seguros monolínea | | Total de impagos no subrogados por el seguro |
|---|---|---|---|---|---|
| **2022** | | | | | |
| Capital | $ | 145,493,895 | $ | 50,820,000 | $ | 94,673,895 |
| Intereses | | 181,882,019 | | 86,707,190 | | 95,174,829 |
| **Total** | $ | 327,375,914 | $ | 137,527,190 | $ | 189,848,724 |

### Situación de los fondos federales de ayuda para catástrofes

El ELA sigue coordinando los esfuerzos de ayuda y financiamiento para hacer frente a las catástrofes naturales que han afectado a Puerto Rico en los últimos años, incluida la recuperación continua tras los huracanes Irma y María, y los terremotos que impactaron (y siguen impactando) la parte sur y suroeste de Puerto Rico. A partir del 24 de marzo de 2022, el Congreso de los Estados Unidos asignó aproximadamente $78,500 millones a Puerto Rico para los esfuerzos de socorro y recuperación de catástrofes. De esta cantidad, aproximadamente $65,700 millones fueron comprometidos por las agencias federales para su distribución y $22,900 millones se desembolsaron. De las cantidades obligadas y desembolsadas, la Agencia Federal de Gestión de Emergencias (FEMA) aprobó unos $37,600 millones y desembolsó unos $14,900 millones de las cantidades totales detalladas anteriormente. El uso de estos fondos está detallado por el ELA en el sitio web de COR3 y se puede acceder a él: https:\\recovery.pr\en.

### Fondos federales depositados en el BGF

La Autoridad se dio cuenta de que algunos de los fondos de la Autoridad que se deterioraron debido a la insolvencia del BGF eran, en realidad, fondos federales. La reestructuración del BGF en virtud del Título VI se estructuró específicamente para no perjudicar a los fondos federales. Además, la Orden de Confirmación, tal y como fue emitida por el tribunal, compensa que dichos fondos no fueron perjudicados, por lo que la confirmación no debería haber sido considerada legalmente como no aplicable a estos fondos federales y, en consecuencia, deberían ser restaurados. La Autoridad, con el apoyo de FHWA, está buscando activamente la restitución de estos depósitos por parte del ELA. Los importes del financiamiento federal que hay que restituir ascienden a unos $16 millones. El reconocimiento de esta ganancia contingente se reconocerá cuando se realice.

### Confirmación del Plan de Ajuste del ELA

El 30 de julio de 2021, la Junta de Supervisión (como representante del ELA, el SRE y la AEP en sus respectivos casos de Título III) presentó su Séptimo Plan de Ajuste Conjunto Modificado del Título III del Estado Libre Asociado de Puerto Rico, et al. [ECF N.º 17629] (el Séptimo Plan Modificado) y una declaración de divulgación corregida relacionada con él [ECF N.º 17628] (la Séptima Declaración de Divulgación Modificada).

El 3 de noviembre de 2021, la Junta de Supervisión presentó su Plan de Ajuste Conjunto Modificado del Título III del Estado Libre Asociado de Puerto Rico, et al. (ECF N.º 19053) (el Octavo Plan Modificado), que revisó el Séptimo Plan Modificado para eliminar las disposiciones de recorte de la pensión mensual, entre otras cuestiones.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 24. EVENTOS POSTERIORES (continuación)

La vista para considerar la confirmación del Octavo Plan Modificado comenzó el 8 de noviembre de 2021 y concluyó el 23 de noviembre de 2021. La versión final modificada del Octavo Plan Modificado se presentó el 14 de enero de 2022 [ECF N.º 19813-1] (el Plan de Ajuste del ELA).

El 18 de enero de 2022, el Tribunal del Título III presentó sus conclusiones de hecho y de derecho en relación con el Plan de Ajuste del ELA [ECF N.º 19812] (las Conclusiones de Hecho) y una orden de confirmación del Plan de Ajuste del ELA [ECF N.º 19813] (la Orden de Confirmación del ELA). El 15 de marzo de 2022 (la Fecha de Entrada en Vigencia), la Junta de Supervisión cumplió o renunció a las condiciones previas a la Fecha de Entrada en Vigencia del Plan de Ajuste del ELA, y el plan entró en vigencia. En consecuencia, el Plan de Ajuste del ELA fue confirmado y se encuentra en vigencia a la fecha del presente documento.

A partir de la Fecha de Entrada en Vigencia, el Plan de Ajuste del ELA redujo la deuda total del ELA de unos $34,300 millones de deuda anterior al concurso a solo unos $7,400 millones, lo que representa una reducción total de la deuda del 78 %. Esta reducción de la deuda también reducirá la amortización máxima anual de la deuda del ELA (incluido COFINA) de aproximadamente $4,200 millones a $1,150 millones, lo que representa una reducción total de la amortización de la deuda del 73 %. También a partir de la Fecha de Entrada en Vigencia, todos los bonos de obligación general del ELA, los bonos del SRE y los bonos de la AEP fueron liquidados, y todas las obligaciones y garantías del ELA, del SRE y de la AEP relacionadas con ellos fueron liquidadas. Además, todas las leyes del ELA que exigían la transferencia de fondos del ELA a otras entidades se consideran anuladas, y el ELA no tiene obligación de transferir cantidades adicionales de conformidad con esas leyes. Es importante que la ejecución del Plan de Ajuste del ELA ofrezca a Puerto Rico la oportunidad de acceder a los mercados de crédito y desarrollar presupuestos anuales equilibrados.

Un componente fundamental del Plan de Ajuste del ELA es la emisión posterior a la Fecha de Entrada en Vigencia de nuevos bonos de obligación general (los nuevos bonos GO) y de instrumentos de valor contingente (CVI) que proporcionan recuperaciones a los bonistas GO y AEP, así como a los titulares de reclamaciones de devolución contra el ELA, incluidos los bonistas de la Autoridad y el DRA del BGF.

Los gobiernos municipales suelen emitir deuda amortizable, es decir, deuda con vencimientos de capital programados regularmente a lo largo de una duración que varía generalmente entre 20 y 40 años. Los nuevos bonos públicos del ELA tendrán un vencimiento de 25 años e incluirán tanto bonos de apreciación de capital (CAB) como bonos de interés corriente (CIB). Todos los CAB y CIB tendrán bonos a plazo con pagos obligatorios del fondo de amortización. Con ello, se pretende optimizar el efectivo disponible para pagar la amortización de la deuda, ya que el mercado municipal tiene una curva de rendimiento, y los bonos no tienen un precio acorde con la vida media, como ocurre en otros mercados, porque inversores específicos pueden comprar bonos en diferentes partes de la curva de vencimiento, incluidos inversores individuales, empresas y fondos de inversión.

Los nuevos bonos GO se emitieron por un capital original agregado de aproximadamente $7,400 millones, compuesto por aproximadamente (i) $6,600 millones de nuevos GO CIB, (ii) $442.5 millones de nuevos GO CAB con una tasa de interés del 5.375 %, y (iii) $288.2 millones de nuevos GO CAB con una tasa de interés del 5 %. Tienen 11 fechas de vencimiento diferentes y estarán garantizados por (a) un gravamen estatutario de primer rango, (b) una prenda de las cantidades depositadas en el Fondo de Amortización de la Deuda, y (c) una prenda de la plena fe, el crédito y el poder impositivo del ELA de acuerdo con el Artículo VI, Sección 2 de la Constitución del ELA y la legislación aplicable de Puerto Rico. Los nuevos bonos GO están fechados y devengarán intereses a partir del 15 de marzo de 2022, que es la fecha en que entra en vigencia el Plan de Ajuste del ELA.

El Plan de Ajuste del ELA también prevé la emisión de CVI, un instrumento que da a su titular el derecho a recibir pagos en caso de que se cumplan determinados factores desencadenantes. El Plan de Ajuste del ELA establece puntos de referencia de rendimiento basados en los ingresos y permite a los titulares de los CVI recibir pagos a cuenta solo si se superan los puntos de referencia. Los CVI emitidos en el marco del Octavo

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 24. EVENTOS POSTERIORES (continuación)

Plan Modificado se basan en la recaudación por exceso de rendimiento del impuesto sobre ventas y uso (IVU) del 5.5 % del ELA, y algunos CVI también están sujetos a la recaudación por exceso de rendimiento del impuesto sobre el ron. Los CVI representan una promesa condicional por parte del ELA de pagar a los titulares del CVI solo si se superan las bases imponibles del IVU o del ron en un año fiscal determinado. La métrica de superación se medirá al final de cada año fiscal (es decir, el 30 de junio) a partir del año fiscal 2022 y se basa en las líneas de base del IVU y de la recaudación de impuestos sobre el ron para los años fiscales 2022 a 2043, tal y como se establece en el plan fiscal para el ELA certificado por la Junta, con fecha del 27 de mayo de 2020. Al igual que sucede con los Nuevos Bonos GO, el ELA comprometió su plena fe, crédito y poder impositivo en virtud de la Constitución de Puerto Rico y la ley aplicable de Puerto Rico para el pago de los CVI. Los CVI se considerarán emitidos el 1 de julio de 2021.

Los CVI también se dividen en dos categorías: (i) CVI GO y (ii) CVI Clawback. Los CVI GO se asignarán a varias reclamaciones de los bonistas del GO y los CVI Clawback se asignarán a las reclamaciones relacionadas con los bonos de la Autoridad, CCDA, AFI y MBA. Los CVI GO tienen una duración de 22 años. Los CVI Clawback tienen una duración de 30 años. Los CVI GO están sujetos a un límite vitalicio de $3,500 millones, con pagos anuales máximos de $200 millones de dólares, más las cantidades no utilizadas de años anteriores con el fin de que los pagos anuales acumulados no superen los $400 millones. Asimismo, los CVI Clawback están sujetos a un límite total de $5,200 millones durante toda su vida, distribuidos entre los diferentes tipos de reclamaciones de bonos, con pagos anuales máximos de (i) $175 millones más cualquier cantidad no utilizada de años anteriores, sin exceder los pagos anuales acumulados de $350 millones, para los años fiscales 1-22 del plazo de 30 años; y (ii) $375 millones más cualquier cantidad no utilizada de años anteriores, sin exceder los pagos anuales acumulados de $750 millones, para los años fiscales 23-30 del plazo de 30 años. Los CVI también aplican una cascada de pagos anuales en la que los primeros $100 millones se pagarán a los CVI GO y los siguientes $11,111,111 se pagarán a los CVI Clawback.

El Plan de Ajuste del ELA clasifica las reclamaciones en 69 clases, cada una de las cuales recibe las siguientes recuperaciones agregadas:

- Varias categorías de créditos de bonos del ELA (Clases 15-50): Recuperación del 73 % compuesta por efectivo, nuevos bonos GO y CVI GO.

- Diversas categorías de reclamaciones de bonos AEP (Clases 1-12, 14): 79 % de recuperación en efectivo, además de los Nuevos Bonos GO y los CVI GO que los bonistas AEP reciben a cuenta de sus Reclamaciones de Garantía CW.

- Diversas categorías de reclamaciones de acreedores (Clases 59-63): Recuperación del 23 % compuesta de CVI Clawback.

- Reclamaciones de bonos SRE (Clase 65): Recuperación del 16 % compuesta por efectivo y participaciones en la Cartera de Capital Privado del SRE.

- Varias categorías de créditos generales no garantizados (Clases 13, 58 y 66): 21 % de recuperación en efectivo.

- Otras reclamaciones misceláneas (Clases 52-57, 64, 67-69): 26 % de recuperación en efectivo.

El Plan de Ajuste del ELA preserva todos los beneficios de pensión acumulados para los empleados públicos activos y jubilados de la Clase 51. Sin embargo, los participantes en el JRS y el TRS estarán sujetos a la congelación de los beneficios y a la eliminación de cualquier ajuste por el costo de vida previamente autorizado en los planes de pensiones del JRS y el TRS.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del Estado Libre Asociado de Puerto Rico)

Notas a los estados financieros (continuación)

Año finalizado el 30 de junio de 2021

## 24. EVENTOS POSTERIORES (continuación)

Para obtener más información, consulte las versiones finales del Plan de Ajuste del ELA, las Conclusiones de Hecho y la Orden de Confirmación, que están disponibles en https://cases.primeclerk.com/puertorico/Home-DocketInfo.

**Acuerdo de Apoyo al Plan de la ACT/CCDA y propuesta de Plan de Ajuste de la ACT**

El 5 de mayo de 2021, la Junta de Supervisión, como representante del ELA y de la Autoridad en sus casos del Título III, celebró el PSA de la ACT/CCDA con ciertos titulares de más de $2,000 millones en reclamaciones contra la Autoridad, incluido más del 85 % de los Bonos ACT 1968 y casi el 50 % de los Bonos Senior ACT 1998, entre los que se incluyen, inversores municipales tradicionales y aseguradoras de bonos monolínea Assured Guaranty Corp. y National Public Finance Guarantee Corporation, sobre el marco del Plan de Ajuste del ELA y un Plan de Ajuste de la ACT para resolver, entre otras cuestiones, las "reclamaciones de recuperación" contra el ELA y la emisión de ciertos instrumentos de valor contingente basados en el potencial rendimiento superior del 5.5 % del Impuesto sobre Ventas y Uso de Puerto Rico en relación con las proyecciones del plan fiscal certificado del ELA, como se explica más adelante en el PSA de la ACT/CCDA. En la fecha de emisión de estos estados financieros, se seguían introduciendo cambios en el PSA. El último cambio está fechado el 30 de julio de 2021.

El PSA de la ACT/CCDA y el Plan de Ajuste del ELA establecen, entre otras cuestiones, que en un plazo de 10 días hábiles tras el cumplimiento de determinadas "condiciones de distribución de la ACT", incluido el Acuerdo sobre los términos del Plan de Ajuste de la ACT, la Autoridad debe realizar pagos en efectivo por un importe total de $264 millones a los bonistas de la ACT, como se indica a continuación: (i) $184.8 millones a los titulares de los Bonos ACT 68; y (ii) $79.2 millones a los titulares de los Bonos Senior ACT 98. Además, el PSA de la ACT/CCDA exige que la Autoridad pague a determinadas partes acreedoras una tasa de restricción de la ACT a cambio de su ejecución del PSA de la ACT/CCDA por un importe no superior a $125 millones, menos los Costos de Perfeccionamiento (según se definen en el PSA de la ACT/CCDA). El Plan de Ajuste de la ACT aún no se ha presentado y sigue sujeto a la confirmación del Tribunal.

El 22 de febrero de 2022, la Junta de Supervisión certificó su plan fiscal para la Autoridad, que establece que el Estado proporcionará a la Autoridad un préstamo único para el año fiscal 2022 por un importe de $314 millones para implementar las obligaciones de pago en efectivo de la Autoridad e virtud del Plan de Ajuste del ELA y los pagos adicionales de conformidad con el PSA de la ACT/CCDA que se implementarán como parte del Plan de Ajuste de la ACT. La Autoridad también utilizará los fondos en poder del fideicomisario para esos fines, según sea necesario. La Junta de Supervisión también certificó un Presupuesto General de Gastos del Gobierno de Puerto Rico para el Año Fiscal 2022 modificado el 21 de febrero de 2022 que, entre otras cuestiones, autorizó al Secretario de Hacienda a hacer uno o más préstamos a la Autoridad para satisfacer las obligaciones de pago de la Autoridad en virtud del Plan de Ajuste del ELA y la Orden de Confirmación del ELA. A la fecha de este documento, la Junta de Supervisión, el ELA y la Autoridad están negociando los términos de un préstamo de $314 millones del ELA a la Autoridad para las obligaciones de pago en efectivo de la Autoridad en virtud del Plan de Ajuste del ELA y el Plan de Ajuste de la ACT. Además, la Junta está negociando y ultimando los términos de un Plan de Ajuste de la ACT que aún no se ha presentado ante el Tribunal del Título III, pero que se espera que se presente pronto para que pueda ser confirmado antes de que finalice el año calendario 2022.

**INFORMACIÓN COMPLEMENTARIA REQUERIDA**

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del ELA de Puerto Rico)

Esquema de cambios en el pasivo de los beneficios totales posempleo distintos de las pensiones (Plan OPEB) de la Autoridad y ratios relacionados (sin auditar)

30 de junio de 2021

| Pasivo total de OPEB (fecha de presentación) | 2021 | 2020 | 2019 |
|---|---|---|---|
| Costo del servicio al final del año | $ 85,610 | $ 117,660 | $ 114,893 |
| Intereses | 64,351 | 90,625 | 91,351 |
| Diferencias entre la experiencia prevista y real | 2,213 | (856,304) | - |
| Cambios en los supuestos | 32,050 | 81,655 | 62,199 |
| Pagos de beneficios | (79,850) | (256,598) | (35,231) |
| **Cambio neto en el pasivo total de OPEB** | 104,374 | (822,962) | 233,212 |
| **Total del pasivo de OPEB: al inicio** | 2,346,428 | 3,169,390 | 2,936,178 |
| **Total del pasivo OPEB: al cierre** | $ 2,450,802 | $ 2,346,428 | $ 3,169,390 |
| **Nómina de empleados cubiertos** | $27,658,668 | $29,432,004 | $39,777,324 |
| **Pasivo total de OPEB como porcentaje de la nómina de empleados cubierta** | 8.86 % | 7.97 % | 7.97 % |

**Nota al esquema:**

El pasivo total de OPEB de la Autoridad a 30 de junio de 2021 se midió el 30 de junio de 2019 (fecha de medición), mediante una valoración actuarial a esa fecha para el período de informe 30 de junio de 2021.

Este esquema está destinado a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

**AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO**
(Una unidad componente del ELA de Puerto Rico)

Esquema de los cambios en el pasivo de los beneficios totales posempleo del ELA, aparte de las pensiones (Plan SRE MIPC OPEB) y ratios relacionados (sin auditar) (en miles de dólares)
30 de junio de 2021

**Pasivo total de OPEB (fecha de presentación)**

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| | | (en miles de dólares) | |
| Costo del servicio al final del año | $ | $ | $ |
| Intereses | 36,210 | 36,770 | 37,891 |
| Efecto de las ganancias o (pérdidas) económicas/demográficas | 6,082 | (18,937) | (13,832) |
| Efecto de los cambios de hipótesis o de los beneficios | 26,337 | (28,381) | (240,535) |
| Pagos de beneficios | (80,341) | (81,511) | (90,417) |
| **Cambio neto en el pasivo total de OPEB** | (11,712) | (92,059) | (306,893) |
| **Total del pasivo de OPEB: al inicio** | 975,433 | 1,067,492 | 1,374,385 |
| **Total del pasivo OPEB: al cierre** | $ 963,721 | $ 975,433 | $ 1,067,492 |
| **Nómina de empleados cubiertos** | N/C | N/C | N/C |
| **Pasivo total de OPEB como porcentaje de la nómina de empleados cubierta** | N/C | N/C | N/C |

**Nota al esquema:**

El pasivo total de OPEB del ELA al 30 de junio de 2020 se midió el 30 de junio de 2018 (fecha de la medición), mediante una valoración actuarial a esa fecha para el período del informe 30 de junio de 2020.

El esquema está destinado a mostrar información durante diez años. Se mostrarán años adicionales a medida que estén disponibles.

**Anexo I**

GRÁFICOS REPRESENTATIVOS DE LAS DISTRIBUCIONES DE RECUPERACIÓN DE BONOS

***Los siguientes gráficos se facilitan exclusivamente a efectos representativos, y no tienen por objeto garantizar ningún grado de recuperación o distribución. Las distribuciones a cuenta de una Reclamación autorizada están sujetas, en todos sus aspectos, a los términos y condiciones del Plan de la ACT.***

**Ejemplo representativo de una reclamación por importe de $100,000 de la categoría de recuperación de bonos**
**"Reclamaciones de Bonos subordinados 98 de la ACT"**

*RESUMEN DE CONTRAPARTIDA*

*Tenencias hipotéticas*

| | |
|---|---|
| Categoría de recuperación de bonos | Reclamaciones de Bonos 68 de la ACT Clases 1 a 4 $100,000 $831,189,106 |
| Clases incluidas en la categoría de recuperación de bonos | |
| Importe de la reclamación del tenedor representativo⁶* | |
| Total de reclamaciones de la categoría de recuperación de bonos | |

*Recuperación en efectivo y como contrapartida de bonos*

| | Contrapartida de la categoría de recuperación de bonos | Tenedor representativo⁶* |
|---|---|---|
| Efectivo | $184,800,000.00 | $22,233.20 |
| Bonos de interés corriente | 311,512,822.17 | 37,477.00 |
| Bonos de apreciación de capital (BAC) (Capital inicial) | 123,543,840.05 | 14,863.13 |
| Bonos convertibles de apreciación de capital (BCAC) (Capital inicial) | 211,332,685.56 | 25,425.07 |
| *Total Efectivo y contrapartida de bonos* | *$831,189,347.78* | *$99,998.39* |
| IVC (tope vitalicio) | 179,462,539.00 | 21,591.00 |

*Bonos recibidos*

| | Bonos de interés corriente | | | | BAC y BCAC | | | |
|---|---|---|---|---|---|---|---|---|
| Vencimiento final | Tipo | Capital | Estatus tributario | Rentabilidad | Tipo al contado | Capital inicial | Intereses devengados | Valor devengado al canje |
| 7/1/2032 | | | | 5.000% | | 14,863.13 | 6,052.59 | 20,916 |
| 7/1/2053 | | | | 5.000% | 5.000% | 25,425.07 | 16,236.91 | 41,661.98 |
| 7/1/2062 | 5.000% | 37,477.00 | Exención fiscal | | | | | |

*Flujos de efectivo²*

| | Bonos de interés corriente | | BAC | | BCAC | | | |
|---|---|---|---|---|---|---|---|---|
| | Exención fiscal | | Capital | Intereses | Capital | Intereses | Intereses | Total |
| Vencimiento | Capital | Intereses al contado | inicial | devengados | inicial | devengados | de efectivo | Flujo de efectivo |
| Efectivo | | | | | | | | $22,233.20 |
| 7/1/2023 | - | 1,873.85 | - | - | | | | 1,873.85 |
| 7/1/2024 | - | 1,873.85 | - | - | | | | 1,873.85 |
| 7/1/2025 | - | 1,873.85 | 1,579.63 | 252.24 | - | - | - | 3,705.72 |
| 7/1/2026 | - | 1,873.85 | 1,393.57 | 304.35 | - | - | - | 3,571.77 |
| 7/1/2027 | - | 1,873.85 | 1,566.75 | 438.80 | - | - | - | 3,879.40 |
| 7/1/2028 | - | 1,873.85 | 1,799.90 | 620.79 | - | - | - | 4,294.63 |
| 7/1/2029 | - | 1,873.85 | 2,220.10 | 916.82 | - | - | - | 5,010.77 |
| 7/1/2030 | - | 1,873.85 | 2,205.57 | 1,068.62 | - | - | - | 5,148.09 |
| 7/1/2031 | - | 1,873.85 | 2,099.34 | 1,174.90 | - | - | - | 5,148.09 |
| 7/1/2032 | - | 1,873.85 | 1,998.18 | 1,276.07 | | - | - | 5,148.10 |
| 7/1/2033 | - | 1,873.85 | - | - | 726.93 | 464.23 | 2,083.10 | 5,148.11 |
| 7/1/2034 | - | 1,873.85 | - | - | 763.30 | 487.45 | 2,023.54 | 5,148.14 |
| 7/1/2035 | - | 1,873.85 | - | - | 801.45 | 511.83 | 1,961.00 | 5,148.13 |
| 7/1/2036 | - | 1,873.85 | - | - | 841.52 | 537.40 | 1,895.34 | 5,148.11 |
| 7/1/2037 | - | 1,873.85 | - | - | 883.60 | 564.28 | 1,826.39 | 5,148.12 |
| 7/1/2038 | - | 1,873.85 | - | - | 927.78 | 592.50 | 1,754.00 | 5,148.13 |
| 7/1/2039 | - | 1,873.85 | - | - | 974.17 | 622.12 | 1,677.99 | 5,148.13 |
| 7/1/2040 | - | 1,873.85 | - | - | 1,022.89 | 653.23 | 1,598.17 | 5,148.14 |
| 7/1/2041 | - | 1,873.85 | - | - | 1,074.04 | 685.91 | 1,514.37 | 5,148.17 |
| 7/1/2042 | - | 1,873.85 | - | - | 1,127.75 | 720.21 | 1,426.37 | 5,148.18 |
| 7/1/2043 | - | 1,873.85 | - | - | 1,184.13 | 756.21 | 1,333.97 | 5,148.16 |
| 7/1/2044 | - | 1,873.85 | - | - | 1,243.33 | 794.01 | 1,236.95 | 5,148.14 |
| 7/1/2045 | - | 1,873.85 | - | - | 1,305.50 | 833.72 | 1,135.09 | 5,148.16 |
| 7/1/2046 | - | 1,873.85 | - | - | 1,370.76 | 875.40 | 1,028.12 | 5,148.13 |
| 7/1/2047 | - | 1,873.85 | - | - | 1,439.30 | 919.16 | 915.82 | 5,148.13 |
| 7/1/2048 | - | 1,873.85 | - | - | 1,511.27 | 965.12 | 797.89 | 5,148.13 |
| 7/1/2049 | - | 1,873.85 | - | - | 1,586.82 | 1,013.37 | 674.07 | 5,148.11 |
| 7/1/2050 | - | 1,873.85 | - | - | 1,666.18 | 1,064.06 | 544.06 | 5,148.15 |
| 7/1/2051 | - | 1,873.85 | - | - | 1,749.47 | 1,117.25 | 407.55 | 5,148.12 |
| 7/1/2052 | - | 1,873.85 | - | - | 1,836.97 | 1,173.10 | 264.22 | 5,148.14 |
| 7/1/2053 | 886.33 | 1,873.85 | - | - | 1,387.91 | 886.35 | 113.71 | 5,148.15 |
| 7/1/2054 | 3,318.28 | 1,829.53 | - | - | - | - | - | 5,147.81 |
| 7/1/2055 | 3,484.42 | 1,663.62 | - | - | - | - | - | 5,148.04 |
| 7/1/2056 | 3,658.69 | 1,489.40 | - | - | - | - | - | 5,148.09 |
| 7/1/2057 | 3,841.39 | 1,306.47 | - | - | - | - | - | 5,147.86 |
| 7/1/2058 | 4,033.46 | 1,114.40 | - | - | - | - | - | 5,147.86 |
| 7/1/2059 | 4,235.21 | 912.73 | - | - | - | - | - | 5,147.94 |
| 7/1/2060 | 4,446.96 | 700.97 | - | - | - | - | - | 5,147.93 |
| 7/1/2061 | 4,669.32 | 478.62 | - | - | - | - | - | 5,147.94 |
| 7/1/2062 | 4,902.94 | 245.15 | - | - | - | - | - | 5,148.09 |
| *Total* | *$37,477.00* | *$67,830.24* | *$14,863.13* | *$6,052.59* | *$25,425.07* | *$16,236.91* | *$26,211.73* | *$216,329.86* |

Nota: las distribuciones se presentan exclusivamente a título representativo y no toman en cuenta los valores nominales de los pagos de los fondos de reserva.
(1) Refleja la recuperación de un tenedor representativo de una reclamación de $100,000 en la categoría de recuperación de bonos.
(2) Los flujos de efectivo no incluyen potenciales pagos a cuenta de IVC de Recuperación.

**Ejemplo representativo de una reclamación por importe de $100,000 de la categoría de recuperación de bonos
"Reclamaciones de Bonos preferentes 98 de la ACT**

*RESUMEN DE CONTRAPARTIDA*

*Tenencias hipotéticas*

| | |
|---|---|
| Categoría de recuperación de bonos | Reclamaciones de Bonos preferentes 98 de la ACT Clases 5 a 9 $100,000 |
| Clases incluidas en la categoría de recuperación de bonos | $3,129,667,977 |
| Importe de la reclamación del tenedor representativo[2]* | |
| Total de reclamaciones de la categoría de recuperación de bonos | |

*Recuperación en efectivo y como contrapartida de bonos*

| | Contrapartida de la categoría de recuperación de bonos | Tenedor representativo[2]* |
|---|---|---|
| Efectivo | $79,200,000.00 | $2,530.61 |
| Bonos de interés corriente | 288,487,177.83 | 9,217.00 |
| Bonos de apreciación de capital (BAC) (Capital inicial) | 114,412,028.08 | 3,655.52 |
| Bonos convertibles de apreciación de capital (BCAC) (Capital inicial) | 195,711,912.01 | 6,253.44 |
| *Total Efectivo y contrapartida de bonos* | *$677,811,117.92* | *$21,656.56* |
| IVC (tope vitalicio) | 1,833,405,578.00 | 58,581.00 |

*Bonos recibidos*

| | Bonos de interés corriente | | | | BAC y BCAC | | | |
|---|---|---|---|---|---|---|---|---|
| Vencimiento final | Tipo | Capital | Estatus tributario | Rentabilidad | Tipo al contado | Capital inicial | Intereses devengados | Valor devengado al canje |
| 7/1/2032 | | | | 5.000% | | 3,655.52 | 1,488.61 | 5,144 |
| 7/1/2053 | | | | 5.000% | 5.000% | 6,253.44 | 3,993.56 | 10,247.00 |
| 7/1/2062 | 5.000% | 9,217.00 | Exención fiscal | | | | | |

*Flujos de efectivo[2]*

| | Bonos de interés corriente | | BAC | | BCAC | | | Total |
|---|---|---|---|---|---|---|---|---|
| | Exención fiscal | | Capital | Intereses | Capital | Intereses | Intereses | |
| Vencimiento | Capital | Intereses al contado | inicial | devengados | inicial | devengados | de efectivo | Flujo de efectivo |
| Efectivo | | | | | | | | $2,530.61 |
| 7/1/2023 | - | 460.85 | - | - | | | | 460.85 |
| 7/1/2024 | - | 460.85 | - | - | | | | 460.85 |
| 7/1/2025 | - | 460.85 | 388.50 | 62.04 | | | | 911.39 |
| 7/1/2026 | - | 460.85 | 342.74 | 74.86 | | | | 878.45 |
| 7/1/2027 | - | 460.85 | 385.33 | 107.93 | | | | 954.11 |
| 7/1/2028 | - | 460.85 | 442.70 | 152.68 | | | | 1,056.23 |
| 7/1/2029 | - | 460.85 | 546.02 | 225.49 | | | | 1,232.36 |
| 7/1/2030 | - | 460.85 | 542.45 | 262.82 | | | | 1,266.12 |
| 7/1/2031 | - | 460.85 | 516.32 | 288.96 | | | | 1,266.13 |
| 7/1/2032 | - | 460.85 | 491.46 | 313.83 | | | | 1,266.14 |
| 7/1/2033 | - | 460.85 | - | - | 178.79 | 114.18 | 512.35 | 1,266.17 |
| 7/1/2034 | - | 460.85 | - | - | 187.74 | 119.89 | 497.70 | 1,266.18 |
| 7/1/2035 | - | 460.85 | - | - | 197.12 | 125.89 | 482.32 | 1,266.18 |
| 7/1/2036 | - | 460.85 | - | - | 206.98 | 132.17 | 466.17 | 1,266.17 |
| 7/1/2037 | - | 460.85 | - | - | 217.33 | 138.78 | 449.21 | 1,266.17 |
| 7/1/2038 | - | 460.85 | - | - | 228.19 | 145.73 | 431.41 | 1,266.18 |
| 7/1/2039 | - | 460.85 | - | - | 239.60 | 153.02 | 412.71 | 1,266.18 |
| 7/1/2040 | - | 460.85 | - | - | 251.58 | 160.67 | 393.08 | 1,266.18 |
| 7/1/2041 | - | 460.85 | - | - | 264.17 | 168.70 | 372.47 | 1,266.19 |
| 7/1/2042 | - | 460.85 | - | - | 277.38 | 177.14 | 350.82 | 1,266.19 |
| 7/1/2043 | - | 460.85 | - | - | 291.24 | 186.00 | 328.10 | 1,266.19 |
| 7/1/2044 | - | 460.85 | - | - | 305.80 | 195.30 | 304.24 | 1,266.19 |
| 7/1/2045 | - | 460.85 | - | - | 321.10 | 205.05 | 279.18 | 1,266.18 |
| 7/1/2046 | - | 460.85 | - | - | 337.15 | 215.30 | 252.87 | 1,266.17 |
| 7/1/2047 | - | 460.85 | - | - | 354.00 | 226.08 | 225.25 | 1,266.18 |
| 7/1/2048 | - | 460.85 | - | - | 371.70 | 237.38 | 196.25 | 1,266.18 |
| 7/1/2049 | - | 460.85 | - | - | 390.29 | 249.24 | 165.79 | 1,266.17 |
| 7/1/2050 | - | 460.85 | - | - | 409.81 | 261.71 | 133.82 | 1,266.19 |
| 7/1/2051 | - | 460.85 | - | - | 430.29 | 274.80 | 100.24 | 1,266.18 |
| 7/1/2052 | - | 460.85 | - | - | 451.81 | 288.53 | 64.99 | 1,266.18 |
| 7/1/2053 | 217.98 | 460.85 | - | - | 341.37 | 218.00 | 27.97 | 1,266.17 |
| 7/1/2054 | 816.09 | 449.95 | - | - | - | - | - | 1,266.04 |
| 7/1/2055 | 856.95 | 409.15 | - | - | - | - | - | 1,266.10 |
| 7/1/2056 | 899.81 | 366.30 | - | - | - | - | - | 1,266.11 |
| 7/1/2057 | 944.74 | 321.31 | - | - | - | - | - | 1,266.05 |
| 7/1/2058 | 991.98 | 274.07 | - | - | - | - | - | 1,266.05 |
| 7/1/2059 | 1,041.60 | 224.47 | - | - | - | - | - | 1,266.07 |
| 7/1/2060 | 1,093.67 | 172.39 | - | - | - | - | - | 1,266.06 |
| 7/1/2061 | 1,148.36 | 117.71 | - | - | - | - | - | 1,266.07 |
| 7/1/2062 | 1,205.82 | 60.29 | - | - | - | - | - | 1,266.11 |
| *Total* | *$9,217.00* | *$16,681.99* | *$3,655.52* | *$1,488.61* | *$6,253.44* | *$3,993.56* | *$6,446.93* | *$50,267.65* |

Nota: las distribuciones se presentan exclusivamente a título representativo y no toman en cuenta los valores nominales de los pagos de los fondos de reserva.
(1) Refleja la recuperación de un tenedor representativo de una reclamación de $100,000 en la categoría de recuperación de bonos.
(2) Los flujos de efectivo no incluyen potenciales pagos a cuenta de IVC de Recuperación.

**Ejemplo representativo de una reclamación por importe de $100,000 de la categoría de recuperación de bonos**
**"Reclamaciones de Bonos subordinados 98 de la ACT"**

_RESUMEN DE CONTRAPARTIDA_

_Tenencias hipotéticas_

| | |
|---|---|
| Categoría de recuperación de bonos | |
| Clases incluidas en la categoría de recuperación de bonos | Reclamaciones de Bonos subordinados 98 de la ACT |
| Importe de la reclamación del tenedor representativo[1] | 10 a 13 |
| Total de reclamaciones de la categoría de recuperación de bonos | $100,000 |
| | $277,107,234 |

_Recuperación en efectivo y como contrapartida de bonos_

| | Contrapartida de la categoría de recuperación de bonos representativa | |
|---|---|---|
| | Categoría | Tenedor^ |
| Efectivo | $- | $- |
| Bonos de interés corriente | - | - |
| Bonos de apreciación de capital (BAC) (Capital inicial) | | |
| Bonos convertibles de apreciación de capital (BCAC) (Capital inicial) | -- | -- |
| **Total Efectivo y contrapartida de bonos** | $- | $ |
| IVC (tope vitalicio) | 207,294,178.00 | 74,806.00 |

_Bonos recibidos_

| | Bonos de interés corriente | | | | | BAC y BCAC | | |
|---|---|---|---|---|---|---|---|---|
| Vencimiento final | Tipo | Capital | Estatus tributario | Rentabilidad | Tipo al contado | Capital inicial | Intereses devengados | Valor devengado al canje |
| 7/1/2032 | | | | 5.000% | | - | - | - |
| 7/1/2053 | | | | 5.000% | 5.000% | - | - | - |
| 7/1/2062 | 5.000% | - | Exención fiscal | | | | | |

_Flujos de efectivo[2]_

| | Bonos de interés corriente | | BAC | | BCAC | | | |
|---|---|---|---|---|---|---|---|---|
| | Exención fiscal | | Capital | Intereses | Capital | Intereses | Intereses | Total |
| Vencimiento | Capital | Intereses al contado | inicial | devengados | inicial | devengados | en efectivo | Flujo de efectivo |
| Efectivo | | | | | | | | $- |
| 7/1/2023 | - | - | - | - | - | - | - | - |
| 7/1/2024 | - | - | - | - | - | - | - | - |
| 7/1/2025 | - | - | - | - | - | - | - | - |
| 7/1/2026 | - | - | - | - | - | - | - | - |
| 7/1/2027 | - | - | - | - | - | - | - | - |
| 7/1/2028 | - | - | - | - | - | - | - | - |
| 7/1/2029 | - | - | - | - | - | - | - | - |
| 7/1/2030 | - | - | - | - | - | - | - | - |
| 7/1/2031 | - | - | - | - | - | - | - | - |
| 7/1/2032 | - | - | - | - | - | - | - | - |
| 7/1/2033 | - | - | - | - | - | - | - | - |
| 7/1/2034 | - | - | - | - | - | - | - | - |
| 7/1/2035 | - | - | - | - | - | - | - | - |
| 7/1/2036 | - | - | - | - | - | - | - | - |
| 7/1/2037 | - | - | - | - | - | - | - | - |
| 7/1/2038 | - | - | - | - | - | - | - | - |
| 7/1/2039 | - | - | - | - | - | - | - | - |
| 7/1/2040 | - | - | - | - | - | - | - | - |
| 7/1/2041 | - | - | - | - | - | - | - | - |
| 7/1/2042 | - | - | - | - | - | - | - | - |
| 7/1/2043 | - | - | - | - | - | - | - | - |
| 7/1/2044 | - | - | - | - | - | - | - | - |
| 7/1/2045 | - | - | - | - | - | - | - | - |
| 7/1/2046 | - | - | - | - | - | - | - | - |
| 7/1/2047 | - | - | - | - | - | - | - | - |
| 7/1/2048 | - | - | - | - | - | - | - | - |
| 7/1/2049 | - | - | - | - | - | - | - | - |
| 7/1/2050 | - | - | - | - | - | - | - | - |
| 7/1/2051 | - | - | - | - | - | - | - | - |
| 7/1/2052 | - | - | - | - | - | - | - | - |
| 7/1/2053 | - | - | - | - | - | - | - | - |
| 7/1/2054 | - | - | - | - | - | - | - | - |
| 7/1/2055 | - | - | - | - | - | - | - | - |
| 7/1/2056 | - | - | - | - | - | - | - | - |
| 7/1/2057 | - | - | - | - | - | - | - | - |
| 7/1/2058 | - | - | - | - | - | - | - | - |
| 7/1/2059 | - | - | - | - | - | - | - | - |
| 7/1/2060 | - | - | - | - | - | - | - | - |
| 7/1/2061 | - | - | - | - | - | - | - | - |
| 7/1/2062 | - | - | - | - | - | - | - | - |
| **Total** | $- | $- | $- | $- | $- | $- | $- | $- |

Nota: las distribuciones se presentan exclusivamente a título representativo y no toman en cuenta los valores nominales de los pagos de los fondos de reserva.
(1) Refleja la recuperación de un tenedor representativo de una reclamación de $100,000 en la categoría de recuperación de bonos.
(2) Los flujos de efectivo no incluyen potenciales pagos a cuenta de IVC de Recuperación.