# **EXHIBIT J**

Best Interests Test Report

*Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the Puerto Rico Highways and Transportation Authority ("HTA")*

This analysis assesses the recoveries available to creditors of HTA on the basis of available remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA,[1] a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which requires the court to consider whether available remedies under non-bankruptcy law and the constitution of the territory would result in greater recoveries for the creditors than provided by the plan." This analysis provides an estimated range of recoveries available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment for HTA is confirmed, and the Title III case for HTA is dismissed.

The analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC,[2] legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. The legal assumptions are included in Appendix 1 of this document. FOMB's financial advisors provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt, estimates of cash balances, and other financial data. McKinsey & Company also relied on data published by or directly provided by HTA and the Government of Puerto Rico and their respective advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all the legal and financial information and assumptions provided by Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, and the Government of Puerto Rico, HTA, and their respective advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, the Government of Puerto Rico, HTA, and their respective advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in the analysis are inherently subject to business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to or potentially realized by creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in the analysis, and actual results may vary materially from those shown herein. McKinsey & Company does, however, represent that the recovery range identified herein is its best estimate of such recoveries based on the information provided to it.

---

[1] *PROMESA* means the Puerto Rico Oversight, Management and Economic Stability Act.
[2] Proskauer Rose LLP and O'Neill & Borges LLC are sometimes referred to as "FOMB's legal advisors" in this analysis.

1

**OVERALL METHODOLOGY**

Following guidance provided by FOMB's legal advisors, the analysis assumes the PROMESA Title III case for HTA is dismissed and PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement terminates, and the FOMB remains in place and will continue to certify HTA Fiscal Plans, and enforce implementation of budgets, subject to any debt enforcement in excess of the budget the Puerto Rico courts would order. The analysis further assumes creditors would pursue legal action against HTA to recover the amounts they claim they are owed.

This analysis is based on the revenue and expenditure projections as contained in the 2022 HTA Certified Fiscal Plan. The analysis relies on three components to calculate potential recoveries available to HTA creditors: (1) the Resource Envelope (defined below) available to satisfy HTA creditor obligations; (2) outstanding creditor obligations; and (3) priorities for the distribution of the Resource Envelope to service HTA's obligations.

The "Effective Date" of the analysis is June 30, 2022. The percentage recovery is calculated as the present value of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the HTA Title III petition date of May 21, 2017 (the "Petition Date"). Based on guidance from the FOMB's financial advisors, the analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments.

This document consists of two sections. The first section provides an overview of HTA's resources available for debt service and outstanding creditor obligations. The second section outlines the distribution of available resources across all HTA's financial obligations and estimates the range of recoveries available to HTA creditors under different scenarios.

**I. RESOURCE ENVELOPE AND OUTSTANDING CREDITOR OBLIGATIONS**

**1) Resource Envelope**

The total amount of resources available to pay creditor claims constitutes HTA's resource envelope (the "Resource Envelope"). The Resource Envelope is the sum of (A) starting cash available for debt service and (B) surplus generated by HTA over FY23–51 (see details below).

**A. Starting cash available for debt service:** Based on guidance from FOMB's legal and financial advisors, the starting cash available for debt service as of the Effective Date of the analysis is defined as: Cash in HTA's Bondholder Reserve Accounts (defined below) plus any excess of HTA's Unrestricted Cash (defined below) over HTA's recommended minimum cash balance.

The balances for these types of cash are projected as follows:

- **Cash in HTA's Bondholder Reserve Accounts**: The "Bondholder Reserve Accounts" are the funds held at the Bank of New York Mellon as a collateral for HTA bondholders under resolutions No. 68-18 ("1968 Resolution") and No. 98-06 ("1998 Resolution"). Based on data provided by FOMB's legal and financial advisors, the Bondholder Reserve Accounts are assumed to have no value as of the Effective Date of this analysis, as any such funds in those accounts are paid to HTA Bondholders pursuant to that certain *Second Amended and Restated Stipulation and Agreed Order Regarding the*

*Disputed Funds in the HTA Bond Service Accounts, Redemption Accounts and Reserve Accounts* [Case No. 17-bk-3567-LTS, ECF No. 1187] (the "Stipulation").

- **Unrestricted Cash:** HTA holds funds that do not have legal restrictions on their use (the "Unrestricted Cash"). Specifically, Unrestricted Cash does not include: (a) funds held on behalf of third parties in custodial or trust accounts;[3] (b) funds whose use is restricted by a secured interest or court orders; and (c) earmarked funds received from the federal government for specific purposes and/or restricted by federal law or regulation. Based on data provided by FOMB's financial advisors and liquidity projections provided by HTA, Unrestricted Cash is projected to be $113 million as of the Effective Date of the analysis.
- **Minimum cash balance:** This analysis contemplates HTA will maintain a minimum cash balance to meet its working capital needs. We understand an analysis of the advisable amount of minimum cash HTA should retain is in progress by FOMB's advisors but has not yet been completed. Based on guidance from FOMB's advisors, this analysis assumes, on a preliminary basis, that the amount of the recommended minimum cash balance will be in excess of the amount of available Unrestricted Cash as of the Effective Date of this analysis.

As of the Effective Date of the analysis, Unrestricted Cash is expected to be less than the recommended minimum cash balance. Therefore, no Unrestricted Cash is expected to be available for debt service as of the Effective Date of the analysis.

**B. Surplus generated by HTA**:

HTA's annual surplus is a function of revenues less expenses. HTA revenues include:

- Toll fare and fine revenues from roads specified in the 1968 Resolution and 1998 Resolution ("four pledged toll roads")[4]
- Operating revenues from other sources (*e.g.*, revenue shares from other toll roads,[5] fares from Tren Urbano and its feeder buses for as long as Tren Urbano is operated by HTA, ancillary revenues from activities such as property rentals, truck weighing and toll tag sales)
- Appropriations and grants from the Commonwealth, the Federal Highways Administration, the Federal Emergency Management Agency, and the Federal Transit Administration

HTA expenses include:

- Payroll, including salaries, retirement costs and related benefits
- Transit costs, which includes costs generated by transit assets, such as Tren Urbano (passenger train system) and feeder bus system
- Operating Right of Way ("ROW") costs and litigation reserve deposits
- Toll highway administration costs and other operating expenses[6]
- Hard[7] and soft[8] highway construction costs to maintain the existing road system

---

[3] Includes but is not limited to prepaid toll revenue collected but not yet earned by HTA

[4] Four pledged toll roads are: PR-20, PR-52, PR-53 and PR-66

[5] Other toll roads include: PR-5, PR-22 (incl. Dynamic Toll Lanes), PR-17, PR-199

[6] Other operating expenses include professional fees, rents, administrative costs, and others

[7] Costs associated with physical construction

[8] Costs associated with activities that do not involve physical construction

- Transit capital expenditures to maintain the existing transit system
- Other capital expenditures, such as emergency repair costs, toll optimization costs, local construction costs, capital ROW costs, and other construction program expenses[9]

For all the items above, this analysis uses projections from the 2022 HTA Certified Fiscal Plan, although certain projections are modified to reflect the dismissal of HTA's Title III case and the lack of a Plan of Adjustment ("PoA") for HTA. Based on guidance from FOMB's legal advisors, the FOMB is assumed to continue to exist because the requirements for its dissolution as defined by PROMESA would not be met if the Title III case is dismissed, and HTA would continue to incur professional fees through FY32 related to ongoing litigation and stakeholder engagement. As outlined in Appendix 1, relative to the amounts identified in the 2022 HTA Certified Fiscal Plan, legal professional fees are assumed to be 20% higher in FY23 and continue at that level, growing in line with inflation through FY32. Non-legal professional fees related to ongoing litigation and stakeholder engagement are assumed to decrease by 50% relative to the amount identified in the 2022 HTA Certified Fiscal Plan in FY23 and continue at that level, growing in line with inflation through FY32.

To establish an estimated likely surplus range, this analysis also takes into account a number of risks resulting from financial instability and political uncertainty (*e.g.*, challenges in the enactment of new legislation in the aftermath of HTA Title III case dismissal, elimination of fare increases, etc.) that may impact implementation of fiscal measures in the Fiscal Plan, if a PoA is not confirmed.

The higher end of the likely surplus range assumes the following adjustments with respect to fiscal measures in the 2022 HTA Certified Fiscal Plan:

- Non-implementation of measures that would require legislative authorization, such as changes in the HTA Board of Directors and fine price modifications (inflation-based increases, tiered fines), due to challenges in the enactment of new legislation in the aftermath of Title III case dismissal
- Elimination of fare increases that would catch up with historical inflation in FY22–24

The lower end of the likely surplus range additionally assumes the following adjustments with respect to fiscal measures (in addition to the adjustments described above):

- Non-implementation of ancillary revenue improvements and transit enhancements, which would require coordinated actions across various stakeholders
- Lack of Tren Urbano contract reassessments and healthcare cost reductions, which would generate surplus for debt service if they occurred
- Elimination of any fare increases above any increases needed to cover deficits before debt service in the later years of the HTA Certified Fiscal Plan

After accounting for these adjustments, the resulting range for cumulative HTA surplus over FY23–51 is estimated to be $667 million to $3,610 million, of which $650 to $3,570 million is from HTA's four pledged toll roads and $17 to $40 million is from other sources.

---

[9] Other construction program expenses include security costs, equipment rentals, travel costs

4

**2) Outstanding obligations**

This analysis considers the following classes of claims and associated balances based on information provided by FOMB's legal and financial advisors:

- **HTA Bonds:**[10] As of the Petition Date, the total amount of principal and interest owed was $4,159 million and $79 million, respectively. Based on guidance from FOMB's legal and financial advisors, owed principal is expected to decrease to $3,897 million as of the Effective Date of the analysis as a result of contemplated payments to HTA bondholders pursuant to the Stipulation. Interest is projected to be $1,253 million as of the Effective Date of the analysis, which includes accrued and unpaid interest from the Petition Date through the Effective Date in the amount of $1,174 million.
- **Government Development Bank (GDB) loans:** As of the Petition Date, the total amount of principal and interest owed to GDB was $1,734 million and $416 million, respectively. Based on guidance from FOMB's legal and financial advisors, owed principal is projected to stay the same and owed interest is projected to be $948 million as of the Effective Date of the analysis, which includes accrued and unpaid interest from the Petition Date through the Effective Date in the amount of $532 million.
- **Unsecured Claims:** As described in Appendix 1, there are three categories of unsecured claims as of the Effective Date of the analysis. Total unsecured claims of $513 million comprised of $256 million in HTA general unsecured claims, $84 million in eminent domain/inverse condemnation claims, and $173 million with respect to a loan from the Commonwealth to HTA.

The analysis excludes bonds issued to finance the construction of the Teodoro Moscoso Bridge. Those bonds are paid directly by the concessionaire and are neither currently in default nor anticipated to be in default in the future.

## II. DISTRIBUTION OF AVAILABLE RESOURCES ACROSS OUTSTANDING OBLIGATIONS

The distribution of resources available to pay creditor obligations follows a distribution waterfall (described below), and leads to a range of recoveries where the higher end is driven by the higher end surplus assumptions and the lower end is driven by the lower end surplus assumptions, as described above. This section provides (1) an estimated likely range of recoveries, as well as (2) estimated creditor recoveries under alternative scenarios based on the litigation risks described in Appendix 1.

**1) Estimated likely range of recoveries**

The estimated likely range of recoveries is calculated based on the cumulative HTA surplus range and legal assumptions outlined in Appendix 1 (including the Main Assumptions where applicable). Specifically, it is assumed HTA Bondholders do not have a validly perfected security interest in revenues earned by HTA's four pledged toll roads. In the absence of a validly perfected security interest in such toll fare and fine revenues, operating and capital expenses would be paid before HTA Bondholder debt is serviced.

Funds available for debt service:

---

[10] Including 1968 bonds, 1998 bonds, subordinated 1998 bonds, and subordinated 2003 bonds

5

- **Cumulative HTA surplus from the four pledged toll roads over FY23–51:** $650 million to $3,570 million – *after payment of all operating and capital expenses*
- **Cumulative HTA surplus from other sources[11] over FY23–51:** $17 million to $40 million – *after payment of all operating and capital expenses*

Funds available for debt service would be distributed in the order of priority outlined in Appendix 1 (*see Exhibit 1 below for more details*). For the claims considered in this analysis, obligations with the same level of priority would receive a pro rata allocation of resources in a given year up to the amount owed in that year. However, total recovery as a percent of outstanding debt may differ between debt with the same level of priority but different maturity schedules.

**Exhibit 1: Distribution waterfall[12]**



1 Including 1968 bonds, 1998 bonds, Subordinated 1998 bonds, and Subordinated 2003 bonds
2 Including Non-toll roads and Transit

Aggregate recoveries (*i.e.*, total recoveries for all creditors assuming HTA's Title III case is dismissed and all claims were enforced under non-bankruptcy law) would be $648 million to $1,789 million.[13] This would represent an implied aggregate recovery rate of 10% to 27%.[14] Recoveries would differ between different debt classes. Exhibit 2 shows the estimated likely range of recoveries for each class of claims.

---

[11] Including non-toll (*e.g.*, electronic toll device sales and truck weighing, property sales and rentals, etc.) and transit (*e.g.*, Tren Urbano, Metrobus)

[12] Following legal guidance outlined in Appendix 1

[13] The amount refers to the present value (as of the Effective Date) of future debt payments using an annual 5% discount rate

[14] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

6

**Exhibit 2: Estimated likely range of recoveries**

Estimated likely range of recoveries available to creditors by debt class

Present value of total payments in USD million, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **HTA Bonds** | 612<br>14% | 1,688<br>40% |
| **GDB claims** | 15<br>1% | 32<br>1% |
| **Unsecured claims** | 21<br>6% | 70<br>20% |
| **Total** | 648<br>10% | 1,789<br>27% |

**2) Alternative Scenarios based on litigation risks identified in Appendix 1**

**A. Alternative Scenario 1:** On the basis of the litigation risks presented in Appendix 1, Alternative Scenario 1 assumes HTA Bondholders have a validly perfected security interest in all toll fares and fines from HTA's four pledged toll roads. Under the 1968 Resolution and 1998 Resolution, HTA Bondholders have a gross pledge over the toll revenues of these roads, meaning HTA is contractually required to service its bond debt obligations before using these revenues to pay any operating or capital expenses of HTA. However, Alternative Scenario 1 also assumes a court would enable HTA to use toll revenues to cover HTA operating and capital expenses before debt service to the extent necessary to prevent an interruption in vital public services.

Therefore, in this scenario, funds available to satisfy creditor obligations would be distributed in the following order outlined in Exhibit 3 (*see Appendix 1 for more details*).

**Exhibit 3: Distribution waterfall considered in Alternative Scenario 1**



1 Including 1968 bonds, 1998 bonds, Subordinated 1998 bonds, and Subordinated 2003 bonds
2 Including Non-toll roads and Transit

7

Under Alternative Scenario 1, the estimated aggregate range of recoveries is between 10% and 27%.[15] Exhibit 5 shows the estimated likely range of recoveries for each class of claims.

**B. Alternative Scenarios 2 and 3:** Alternative Scenarios 2 and 3 also assume HTA Bondholders have a validly perfected security interest in toll revenues from HTA's four pledged toll roads as specified in the 1968 Resolution and 1998 Resolution. However, these scenarios assume a court would enforce the contractual gross pledge of HTA Bondholders over toll revenues from these roads and would not permit HTA to use these revenues to cover its expenses before servicing its debt. Although there are conceivably a number of potential outcomes, this analysis offers two possible scenarios.

Under Alternative Scenarios 2 and 3, the funds available for debt service would be:

- **Cumulative HTA surplus from the four pledged toll roads over FY23–51:** $5,051 million to $5,258 million – *before payment of operating and capital expenses*
- **Cumulative HTA surplus from other sources over FY23–51:** $0 to $40 million *after payment of all operating and capital expenses*

Therefore, funds available to satisfy creditor obligations under Alternative Scenarios 2 and 3 would be distributed in the following order outlined in Exhibit 4 (*see Appendix 1 for more details*).



Under Alternative Scenarios 2 and 3, HTA would not have enough funds after debt service to cover its operating and capital expenses. The analysis also assumes HTA would be unlikely to further increase any revenues or decrease any costs within these scenarios. For example, the analysis recognizes HTA may have limited incentives to roll out any type of fare increases if the majority or all of the toll fares were to be exclusively dedicated to debt service rather than HTA's own costs. Thus, the analysis assumes no implementation of fare increases under Alternative Scenarios 2 and 3.

---

[15] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

The 1968 Resolution and 1998 Resolution indicate that HTA has entered into an agreement with the Secretary of Public Works pursuant to which the Secretary of Public Works agreed to use general funds of the Commonwealth "which are made available to him" to pay for the maintenance, reparation, and operation of all traffic facilities financed by HTA. Therefore, the 1968 Resolution and 1998 Resolution do not imply an independent legal obligation for the Commonwealth to finance HTA's operating and capital costs.

Hence, the analysis assumes two alternative scenarios for the treatment of HTA's costs:

- **Alternative Scenario 2**: The Commonwealth agrees to fund all deficits not associated with the four pledged toll roads to support Puerto Rico's transport system. The Commonwealth also agrees to fund toll road capital expenditures, excluding the four pledged toll roads, to prevent the deterioration of conditions on major roads of the island. HTA Bondholders allow funds to be spent on operating costs of the four pledged toll roads, to ensure the continued operation of toll plazas and sustain recoveries over time (thus voluntarily reducing their short-term recoveries), but do not cover any capital expenses.
- **Alternative Scenario 3**: The Commonwealth agrees to fund all deficits not associated with the four pledged toll roads but does not agree to fund toll road capital expenditures. HTA Bondholders allow funds to be spent on both operating and capital expenses of the four pledged toll roads, to ensure the continued operation of toll plazas and sustain recoveries over time, thus voluntarily reducing their short-term recoveries.

Overall, the creditor recoveries under Alternative Scenario 2 would range from $1,712 million to $1,796 million,[16] which would represent an implied aggregate recovery rate of 25% to 27%.[17] Creditor recoveries under Alternative Scenario 3 would range from $988 million to $1,883 million, which would represent an implied aggregate recovery rate of 15% to 28%.

Recoveries would differ between different debt classes. Exhibit 5 shows the estimated likely range of recoveries for each class of claims for all the Alternative Scenarios 1–3.

---

[16] The amount refers to the present value (as of the Effective Date) of future debt payments using an annual 5% discount rate

[17] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

9

**Range of recoveries available to creditors by debt class,**
Present value of total payments in USD million, % recovery

|  | Alternative Scenario 1 | | Alternative Scenario 2 | | Alternative Scenario 3 | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Low end of range | High end of range | Low end of range | High end of range | Low end of range | High end of range |
| HTA Bonds | 631 | 1,754 | 1,712 | 1,796 | 971 | 1,847 |
|  | 15% | 41% | 40% | 42% | 23% | 44% |
| GDB claims | 15 | 32 | 0 | 0 | 15 | 32 |
|  | 1% | 1% | 0% | 0% | 1% | 1% |
| Unsecured claims | 2 | 4 | 0 | 0 | 2 | 4 |
|  | 1% | 1% | 0% | 0% | 1% | 1% |
| Total | 648 | 1,789 | 1,712 | 1,796 | 988 | 1,883 |
|  | 10% | 27% | 25% | 27% | 15% | 28% |

10

# HTA Title III Plan

## Best Interests Test Analysis – Assumptions

|   | Question | Assumption |
|---|---|---|
| 1. | To which assets and revenues will the HTA 1968 Bonds and HTA 1998 Bonds be entitled to recover from? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: The Allocable Revenue statutes pursuant to which the Commonwealth transferred collections of certain fees and taxes are preempted by PROMESA; accordingly, the HTA 1968 Bonds and HTA 1998 Bonds shall not be entitled to recover therefrom. ECF No. 19813 (the "Confirmation Order"), Exhibit K (preempting Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]; 13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]; and 13 L.P.R.A. § 31751(a)(3). [cigarette tax]); *see also* Confirmation Order, Exhibit K, n.9 ("Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted."); Confirmation Order, Article LXXXIX, ¶ 89.3 ("Preemption of Laws" – generally approving preemption of provisions of Commonwealth laws inconsistent with PROMESA).<br><br>Outside of Title III, holders of the HTA 1968 Bonds and 1998 Bonds will be entitled to recover from the funds on deposit in the Bond Revenue Fund, Bond Reserve Fund, Debt Service Fund, Bond Sinking Fund, and Bond Redemption Fund Sinking Fund (the "Bond Sinking Funds") held by the fiscal agent, in which they have a security interest.<br><br>Additionally, while the Bondholders are contractually entitled to have certain toll and fine revenues specified in the Resolution deposited in the Bond Sinking Funds, they will share *pari passu* with other unsecured creditors to those revenues, including the GDB/HTA Loans, whose claims are included in the ratable calculations, but whose ratable recoveries will be allocated to the Bondholders until such bonds are paid in full (see assumption in row 2). The HTA 1968 Bonds and HTA 1998 Bonds ratable recoveries will be from only those revenues to which they are contractually entitled.<br><br>**BASIS**: The Bondholders have validly perfected security interests in the accounts specified by the HTA Bond resolutions, which accounts are for the benefit of the HTA 1968 Bonds and HTA 1998 Bonds, as so designated. Additionally, the Bondholders still have a contractual right to compel HTA to deposit the toll and fine revenues specified in the Resolution in the Bond Sinking Funds independent of whether their security interest |

| | Question | Assumption |
|---|---|---|
| | | attaches thereto. However, such contractual right is an unsecured obligation of HTA *pari passu* to the rights of all other creditors of HTA with respect to HTA's payment obligations. Further, the bonds will recover only from those revenues to which they have a contractual entitlement.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: The HTA 1968 Bonds have priority with respect to toll and fine revenues pledged under the 1968 Resolution, and the HTA 1998 Bonds have priority with respect to toll and fine revenues pledged under the 1998 Resolution.<br><br>**BASIS**: A court may find that the Bondholders have a security interest in the toll and fine revenues collected by HTA in addition the funds deposited in bank accounts held by Bank of New York Mellon. |
| 2. | What is the priority of payments with respect to each of the various revenue sources for holders of HTA debt? | **ASSUMPTION**: Under the bond documents, bondholders can only recover from revenues pledged to them, which includes revenues from toll roads managed by HTA and fines pledged under the 1968 Resolution and 1998 Resolution. Other sources of revenues, to the extent unrestricted (such as certain federal funds, Commonwealth appropriations, and revenues from concession toll roads such as the Metropistas Toll Roads and the Teodoro Moscoso Bridge) are available to all creditors other than the HTA Bondholders, whose claims are nonrecourse.<br><br>**HTA 1968 Bonds**<br>The HTA 1968 Bonds have priority with respect to the toll and fine revenues pledged under the 1968 Resolution.<br><br>Debt service on the 1968 HTA Bonds and the funding of the Reserve Account pursuant to the 1968 Resolution must be satisfied (*i.e.*, an amount equal to the lesser of (x) the maximum annual principal and interest payment on the 1968 HTA Bonds and (y) 10% of the original principal amount of each series of bonds outstanding) before any payments are made on the 1998 Bonds. The HTA 1968 Bonds may not be accelerated.<br><br>**HTA 1998 Bonds** |

| | Question | Assumption |
|---|---|---|
| | | The HTA 1998 Bonds will receive (i) excess revenues pledged under the 1968 Resolution provided the HTA 1968 Bonds have been paid all amounts due to date, and (ii) revenues from toll roads managed by HTA pledged to the holders of HTA 1998 Bonds (and not pledged to holders of HTA 1968 Bonds). The HTA 1998 Bonds may not be accelerated.<br><br>**GDB/HTA Loans (held by the DRA Parties)**<br>In accordance with the Title III Court's determination that the GDB/HTA Loans are subordinated to the HTA Bondholders, such loans will receive the excess revenues pledged under the 1968 Resolution and 1998 Resolution, only after the HTA 1998 Bonds and HTA 1998 Bonds are paid in full. The GDB/HTA Loans' ratable share of toll roads and fines are instead allocated to the HTA Bondholders, until such bondholders are paid in full.<br><br>The GDB/HTA Loans may also recover from the general revenues or other resources of HTA, which are not available to HTA Bondholders.<br><br>**Teodoro Moscoso Bridge Bonds**<br>Revenues generated by the Teodoro Moscoso Bridge are pledged to pay the Teodoro Moscoso bonds. In any given year, the revenues from this bridge are first used to pay all expenses incurred by the bridge, including payments to Autopistas for monthly expenses. Then, Teodoro Moscoso bondholders are paid with any remaining surplus. Finally, any remaining resources are transferred to HTA and are available for HTA's general use.<br><br>**BASIS**: The underlying debt documents set forth the respective rights of the various HTA debtholders, which rights are summarized above. |
| 3. | Should interest on debt that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**: Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>　　i. **Interest on HTA debt during stay:** Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during the automatic stay, unless the underlying contract provides for |

3

| | Question | Assumption |
|---|---|---|
| | | default interest, in which case the latter should be used. The HTA bond and loan documents do not provide for default interest or interest on interest.<br><br>ii. **Interest on unsecured claims during stay:** Assume no interest accrues on debt having no interest rate.<br><br>iii. **Interest on unpaid debt:** Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2022 (provided by Citi).<br><br>iv. **Interest on interest:** No. Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties, although there is no statutory provision for interest on interest. However, the HTA Bonds do not provide for interest on overdue interest. |
| 4. | If all other resources available to HTA are insufficient to maintain HTA's solvency, may HTA use toll and fine revenues to pay operating expenditures and capital expenditures before debt service? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: Yes. HTA will be permitted to use toll and fine revenues to cover necessary operating expenses and capital expenses of HTA, both toll and non-toll related, prior to payment of debt service.<br><br>**BASIS**: In accordance with the Puerto Rico Supreme Court's opinion in *Librotex, Inc.*, et al. v. *Aqueduct and Sewer Authority of Puerto Rico*, et al., (Case No. CE-94-395, July 14, 1995), a court may approve the use of tolls and fine revenues to pay operating expenses and capital expenses. *Librotex* holds that a judgment creditor cannot get an attachment of revenues if to do so would "result in the interruption" of a vital public service  Accordingly, if, without maintaining the entire transportation system, HTA's operations could be materially harmed, including the success of toll roads, non-toll roads, and the Tren Urbano, a court is likely to find the public interest overrides any contractual obligations to the contrary.<br><br>**ASSUMPTION 2 [LITIGATION RISK]**: No. Commonwealth courts may find that, if the Bondholders have a perfected security interest in toll and fine revenues, such revenues may not be used to pay operating expenses and capital expenses before debt |

4

| | Question | Assumption |
|---|---|---|
| | | service is paid in full. If necessary, the Commonwealth could pay all necessary operating expenses of HTA which HTA is not otherwise able to pay itself.<br><br>**BASIS**: The Resolutions for the 1968 HTA Bonds and the 1998 HTA Bonds provide the Bondholders have a gross pledge of the toll revenues, which provides debt service is paid prior to operating expenses and capital expenses. |
| 5. | Are eminent domain claims for just compensation senior to, or *pari passu* with, general unsecured claims? | **ASSUMPTION**: Eminent domain claims are *pari passu* with general unsecured claims.<br><br>**BASIS**: Eminent domain claims, even if not dischargeable in Title III, have rights no payment priority over unsecured claims. |
| 6. | Will HTA have restricted cash accounts not available for debt service? What minimum cash balance must HTA retain for operating expenses and capital expenses? | **ASSUMPTION**: Yes. HTA will retain minimum cash balances for operating expenses and capital expenses.<br><br>**BASIS**: To maintain the safe operation and maintenance of HTA, HTA will be required to maintain minimum liquidity for both operating expenses and capital expenses. |

**DEBT STACK**[1]

2. **Operating Cost**
   - Projected $18,988 million in annual expenses over FY23–51, per the 2022 HTA Fiscal Plan.

3. **Adjustments from Fiscal Plan**
   - HTA's legal fees are expected to increase by 20% in FY23 and grow in line with inflation from FY24 through FY32, assuming extensive litigation needs without Title III protections or a plan of adjustment. Non-legal professional fees fall by 50% once the Title III case is dismissed, and grow by inflation through FY32.  All professional fees for the creditors committee are assumed to be zero after the effective date of this analysis (June 30, 2022).

4. **HTA Debt as of Effective Date of the HTA BIT Analysis**
   - HTA Bond Claims: $3,897 million in principal and $1,253 million in interest
   - GDB HTA Loans (held by the DRA Parties):  $1,734 million in principal and $948 million in interest

5. **Other unsecured claims**
   - $255,972,641 (excluding eminent domain claims)
   - $83,687,663 in eminent domain claims
   - $173 million CW/HTA loan (no acceleration; payable according to the amortization schedule)

---

[1] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein.