**<u>EXHIBIT B</u>**

HTA/CCDA PSA

## HTA/CCDA RELATED PLAN SUPPORT AGREEMENT

HTA/CCDA RELATED PLAN SUPPORT AGREEMENT, dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and Puerto Rico Highways and Transportation Authority ("**HTA**"), (b) certain holders of HTA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holder as set forth on Exhibit "A" hereto, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) certain holders of CCDA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holder as set forth on Exhibit "B" hereto (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA Holders**"), (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined below ("**Assured**"), and (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively with the HTA Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**"). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or in the Plan (as defined below), as applicable.

## RECITALS

A.      Pursuant to the authority granted pursuant to Act No. 74-1965, certified as 9 L.P.R.A. §§2001-2035, as amended, HTA was created for the purpose of, among other things, the construction, operation, and maintenance of the Commonwealth's transportation system.

B.      In accordance with (a) Resolution No. 68-18, adopted June 13, 1968 and as amended and supplemented thereafter, HTA issued a series of bonds (collectively, the "**HTA 68 Bonds**"), as set forth on Exhibit "C" hereto, and (b) Resolution 98-06, adopted February 26, 1998 and as amended and supplemented thereafter, HTA issued (i) a series of bonds as set forth on Exhibit "D" hereto (collectively, the "**HTA 98 Senior Bonds**"), and (ii) a series of subordinate bonds as set forth on Exhibit "E" hereto (collectively, the "**HTA 98 Sub Bonds**" and, together with the HTA 68 Bonds and the HTA 98 Senior Bonds, the "**HTA Bonds**").

C.      Pursuant the authority of Act 351 of September 2, 2000, the Puerto Rico Convention Center District Authority ("**CCDA**") was created for the purpose of, among other things, planning, developing and operating a convention center in San Juan, Puerto Rico.

D.      In accordance with the terms of that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JP Morgan Chase Bank, N.A., as trustee, as amended and supplemented from time to time, CCDA issued the series of bonds (collectively, the "**CCDA Bonds**"), as set forth on Exhibit "F" hereto, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00).

123408529v3

**EXECUTION COPY**

E.      In connection with the issuance of certain of the HTA Bonds and CCDA Bonds, Assured and National issued certain insurance policies and the HTA and CCDA entered into insurance agreements with respect thereto.

F.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

G.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to, among others, the Commonwealth and its instrumentalities, all as provided for in PROMESA.

H.      Pursuant to Act 2-2017, Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") was appointed as the agent of, and advisor to, the Government of the Commonwealth of Puerto Rico (the "**Government**"), and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth.

I.      On May 3, 2017 (the "**Commonwealth Petition Date**"), the Oversight Board filed a Title III petition on behalf of the Commonwealth (the "**Commonwealth PROMESA Proceeding**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

J.      On May 21, 2017 (the "**HTA Petition Date**"), the Oversight Board filed a Title III petition on behalf of HTA (the "**HTA PROMESA Proceeding**") in the Title III Court.

K.      The Oversight Board is the representative of the Commonwealth and HTA in the Commonwealth PROMESA Proceeding and the HTA PROMESA Proceeding, respectively, pursuant to Section 315(b) of PROMESA.

L.      On February 22, 2021, the Parties, among others, executed a Plan Support Agreement (the "**CW PSA**"), regarding the restructuring of GO Bonds and PBA Bonds, each as defined below, which agreement remains subject to certain conditions, including, without limitation, confirmation and consummation of a plan of adjustment in the Commonwealth PROMESA Proceeding.

M.      On March 8, 2021, the Commonwealth, the Employee Retirement System of the Government of the Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority filed that certain Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "**Second Amended Plan**") [Dkt. No. 15976], in the Title III Court, and a corresponding disclosure statement (the "**2021 Disclosure Statement**").

N.      Pursuant to Sections 7.1(g) and (h) of the CW PSA, Assured and National each had the right to terminate the CW PSA as to themselves on or before March 31, 2021 at 5:00pm (ET). By agreement, the Oversight Board extended such deadline up to and including April 20, 2021 at 5:00pm (ET).

O.      With the assistance of the Title III Court-appointed mediation team, the Parties have engaged in good faith, arm's-length negotiations, including, without limitation, regarding the terms of a proposed restructuring of the CCDA Bonds and the HTA Bonds and claims against the Commonwealth, HTA, and CCDA arising from or related to the CCDA Bonds and the HTA Bonds to be implemented in a manner as set forth in a (a) Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., as it may be amended, modified or supplemented (the "**Plan**"), which Plan shall be consistent with the terms and provisions of this Agreement, including, without limitation, Exhibit "J" hereto, the form of which shall be filed with the Title III Court as soon as practicable following the date hereof and, upon filing thereof, shall amend and supersede the Second Amended Plan, and (b) plan of adjustment filed in the HTA PROMESA Proceeding, which plan of adjustment the Oversight Board and HTA shall endeavor to file no later than January 31, 2022 and seek confirmation thereof; provided, however, that failure to file and/or confirm such plan of adjustment by the dates set forth above shall not give rise to a right of termination of this Agreement or a remedy with respect thereto.

P.      The Oversight Board consents to the execution and delivery of this Agreement by the Commonwealth and HTA and to the Commonwealth's and HTA's performance and exercise of their respective rights under this Agreement, including, without limitation, the right to terminate this Agreement and right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1      Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2      Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**5.5% SUT**" shall mean the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

"**Agreement**" shall mean this HTA/CCDA Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, upon filing, the Plan and the HTA Plan, as each may be amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof.

"**Appointments Related Litigation**" shall mean, collectively, the litigation styled (a) Rene Pinto Lugo, et al. v. The Government of the United States of America, et al., Adv. Pro. No. 18-041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b)

EXECUTION COPY

Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the
United States of America, et al., Case No. 19-2243, currently pending in the United States Court
of Appeals for the First Circuit, (c) Hon. Rafael Hernandez-Montanez, et al. v. The Financial
Oversight and Management Board of Puerto Rico, Adv. Pro. No. 18-090-LTS, currently pending
in the Title III Court, and (d) such other litigation as may be currently pending or as may be
commenced during the period from and after the date hereof up to and including the HTA
Effective Date wherein claims or causes of action consistent with or similar to those asserted or
which could have been asserted in the above-referenced litigations have been asserted.

"*Assured HTA Bonds*" shall mean, collectively, the Assured Insured Bonds that are
HTA Bonds.

"*Assured Insured Bonds*" shall mean, collectively, the HTA Bonds and the CCDA
Bonds that are insured by Assured.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code, as amended, §§101,
et seq.

"*Bankruptcy Rules*" shall mean the Federal Rules of Bankruptcy Procedure.

"*Business Day*" shall mean a day other than a Saturday, a Sunday, or any other day on
which commercial banks in New York, New York are required or authorized to close by law or
executive order.

"*CCDA Bond Claims*" shall mean, collectively, the claims against CCDA arising from or
relating to the CCDA Bonds, which shall be calculated, for the purposes of the Plan, as the
outstanding principal amount of the CCDA Bonds plus accrued, but unpaid, interest up to, but
not including, the Commonwealth Petition Date.

"*CCDA Consummation Costs*" shall mean, collectively, an amount to be paid in
consideration for fees and expenses incurred by an Initial PSA Creditor in connection with the
negotiation and execution of this Agreement and the prosecution of approval of the Disclosure
Statement and confirmation of the Plan, calculated in an amount equal to one percent (1.00%),
truncated to two decimal points, of such Initial PSA Creditor's CCDA Bond Claims, payable as
an administrative expense claim on the CW Effective Date, in an amount not greater than Fifteen
Million Dollars ($15,000,000.00).

"*CCDA Filing Date*" shall mean the date upon which (a) the Oversight Board files (i) a
Title III petition on behalf of CCDA in the Title III Court or (ii) an application in the Title III
Court to approve a qualifying modification under Title VI of PROMESA on behalf of CCDA, or
(b) CCDA commences an out-of-court exchange or offering for the CCDA Bonds.

"*CCDA PROMESA Proceeding*" shall mean (a) the Title III case commenced by the
Oversight Board on behalf of CCDA in the Title III Court or, in the event that Assured proposes
to the Oversight Board a modification of the CCDA Bonds under Title VI of PROMESA, the
application to approve a qualifying modification filed by the Oversight Board on behalf of
CCDA or (b) CCDA commences an out-of-court exchange or offering for the CCDA Bonds.

123408529v3

"*CCDA Restriction Fee Percentage*" shall mean, the percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) <u>minus</u> such amount as may be payable on account of CCDA Consummation Costs <u>divided</u> by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by PSA Restriction Fee Creditors.

"*Clawback Actions*" shall mean, collectively, the litigation styled (a) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

"*Clawback Structuring Fees*" shall mean, collectively, the amounts set forth in Section 6.1(d) hereof to be paid, in cash, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, to Assured and National in accordance with the terms and provisions of this Agreement and the HTA Plan, including, without limitation, Article VI hereof.

"*COFINA*" shall mean the Puerto Rico Sales Tax Financing Corporation.

"*Comprehensive Cap*" shall have the meaning ascribed thereto in the Debt Responsibility Act.

"*Confirmation Order*" shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

"*Consummation Costs*" shall mean, collectively, the amounts set forth in Section 6.1(a) hereof to be paid, in cash, on the CW Effective Date or the HTA Effective Date, including CCDA Consummation Costs or HTA Consummation Costs, respectively, as the case may be, or as soon as practicable thereafter in accordance with the terms of the Plan and the HTA Plan, as the case may be, but in no event later than ten (10) Business Days following such date, to the Initial PSA Creditors in accordance with the terms and provisions of this Agreement, the Plan and the HTA Plan, as applicable, including, without limitation, Article VI hereof.

"*Covered Borrowers*" shall mean, collectively, the Commonwealth, HTA and, as of the CCDA Filing Date, CCDA.

"*CUSIP*" shall mean the Committee on Uniform Securities Identification Procedures nine-digit numeric or nine-digit character alphanumeric code which, for purposes of this Agreement, identifies the series of HTA Bonds and CCDA Bonds for the purposes of facilitating clearing and settlement of trades.

EXECUTION COPY

"*Custodial Trust Documents*" shall mean, collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the HTA Effective Date and relating to the Assured Insured Bonds, National Insured Bonds and the distributions to be made in accordance with the HTA Plan, the Plan or, to the extent necessary, a qualifying modification for the CCDA Bonds in accordance with Title VI of PROMESA.

"*CVIs*" shall mean, collectively, the securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution, to be issued on the CW Effective Date by the Commonwealth in accordance with the terms and conditions of this Agreement, the Plan, the Confirmation Order, the CVI Indenture, and the CVI Legislation.

"*CVI Indenture*" shall mean the indenture to be executed and delivered on or prior to the CW Effective Date pursuant to which the Commonwealth shall issue the CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

"*CVI Legislation*" shall mean the legislation to be enacted on or prior to the CW Effective Date authorizing certain transactions contemplated by, and consistent with, this Agreement and the Plan, including, without limitation, legislation authorizing the issuance of the CVIs, which may be part of the New GO Bonds Legislation.

"*CVI Payment Reserve*" shall mean, to the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the terms and provisions of the Plan, the CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI to be held in reserve by the CVI paying agent or the trustee, as the case may be, pursuant to the terms of the Trust Documentation and the CVI Indenture in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

"*CW Effective Date*" shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

"*Debt Related Objections*" shall mean, collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Dkt. No. 4784], (b)

123408529v3

**EXECUTION COPY**

Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Dkt. No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Dkt. No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Dkt. No. 9731], (e) Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of the Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Dkt. No. 9735], solely as it relates to the PRIFA BANs, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Dkt. No. 10638], and (g) any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, and/or the PRIFA BANs.

*"**Debt Responsibility Act**"* shall mean Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms and provisions of the Plan and the CW PSA.

*"**Deemed Issuance Date**"* shall mean the earlier to occur of (a) July 1, 2022 and (b) the HTA Effective Date.

*"**Definitive Documents**"* shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the Plan (including any amendments, modifications and supplements thereto), the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to each party to the CW PSA.

*"**Disclosure Statement**"* shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the PROMESA Proceedings in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

123408529v3

***"Disclosure Statement Order"*** shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

***"Distribution Conditions"*** shall mean, collectively, (a) the CW Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed this Agreement or a Joinder Agreement or an Annex Agreement with respect hereto, (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed this Agreement or a Joinder Agreement or an Annex Agreement with respect hereto; provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) shall be deemed satisfied.

***"EMMA"*** shall mean the website of the Municipal Securities Rulemaking Boards Electronic Municipal Market Access.

***"Face Amount"*** shall mean, solely for purposes of Article II hereof and the signature pages affixed hereto, (a) with respect to current interest HTA Bonds, insured or uninsured, the outstanding principal amount of such HTA Bonds as of the date of this Agreement, (b) with respect to CCDA Bonds, the outstanding principal amount of such CCDA Bonds as of the date of this Agreement, and (c) with respect to capital appreciation HTA Bonds, insured and uninsured, the accreted value of such HTA Bonds during the period up to, but not including, the HTA Petition Date.

***"Final Order"*** shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed or reversed in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not

123408529v3

prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

*"Fiscal Plan"* shall mean a "Fiscal Plan" as defined by Section 5(10) of PROMESA.

*"Fiscal Year"* shall mean a fiscal year of the Commonwealth commencing on July 1st and concluding on June 30th of the following calendar year.

*"GDB HTA Loans"* shall mean, collectively, the loans, if any, made to HTA by the Government Development Bank and now held by the Government Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

*"GDB Loan Priority Determination"* shall mean the determination, in either the Commonwealth PROMESA Proceeding or the HTA PROMESA Proceeding, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of the Government Development Bank with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

*"General Fund"* shall mean the Government's primary operating fund.

*"Government Parties"* shall mean, collectively, the Oversight Board, AAFAF, the Commonwealth, ERS, PBA, HTA and CCDA.

*"Government Released Claims"* shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with HTA, the HTA Bonds, the HTA Bond Claims, CCDA, the CCDA Bonds, the CCDA Bond Claims, and arising prior to the CW Effective Date or the HTA Effective Date, as the case may be; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) the Commonwealth, CCDA or HTA arising from or relating to the Plan or the HTA Plan, the securities to be issued pursuant to the Plan or the HTA Plan, or (ii) a Government Party unrelated to the HTA Bonds, the HTA Bond Claims, the CCDA Bonds, or the CCDA Bond Claims, or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct; and, provided, further, that, for the avoidance of doubt, "Government Released Claims" includes all Government Released Claims pursuant to the CW PSA.

*"Government Releasees"* shall mean the Government Parties, together with their respective current or former board members, directors, principals, special committees, agents, officers, employees, advisors and professionals, in each case, in their capacities as such, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the PROMESA Proceedings, in their respective capacities as such.

"*HTA Bond Claims*" shall mean, collectively, the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, and the HTA 98 Sub Bond Claims.

"*HTA 68 Bond Claims*" shall mean, collectively, the claims against HTA arising from or relating to the HTA 68 Bonds, which shall be calculated, for purposes of distribution pursuant to the Plan and the HTA Plan, as the outstanding principal amount of the HTA 68 Bonds, plus accrued, but unpaid, interest as set forth in the Settlement Summary.

"*HTA 98 Bonds*" shall mean, collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

"*HTA 98 Senior Bond Claims*" shall mean, collectively, the claims against HTA arising from or relating to the HTA 98 Senior Bonds, which shall be calculated for purposes of distribution pursuant to the Plan and the HTA Plan as the outstanding principal amount of the HTA 98 Senior Bonds, plus accrued, but unpaid, interest up to, but not including, the HTA Petition Date.

"*HTA 98 Sub Bond Claims*" shall mean, collectively, the claims against HTA arising from or relating to the HTA 98 Sub Bonds, which shall be calculated for purposes of distribution pursuant to the Plan and the HTA Plan as the outstanding principal amount of the HTA 98 Sub Bonds, plus accrued, but unpaid, interest up to, but not including, the HTA Petition Date.

"*HTA Clawback CVI*" shall mean the CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, this Agreement and the Settlement Summary annexed hereto as Exhibit "J".

"*HTA Confirmation Order*" shall mean, the order of the Title III Count confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA proceedings in accordance with Section 301 of PROMESA, which order shall be reasonably satisfactory to each Party.

"*HTA Consummation Costs*" shall mean, collectively, an amount to be paid in consideration for fees and expense incurred by an Initial PSA Creditor in connection with the negotiation and execution of this Agreement and the prosecution and approval of the HTA Disclosure Statement and confirmation of the HTA Plan, calculated in an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial PSA Creditor's HTA 68 Bond Claims and HTA 98 Senior Bond Claims, payable as an administrative expense claim on the HTA Effective Date, in an amount not greater than One Hundred Twenty-Five Million Dollars ($125,000,000.00).

"*HTA Definitive Documents*" shall mean, collectively, the documents, including, without limitation, any related agreements (including the New HTA Bond Indenture), instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the HTA Plan (including any amendments, modifications and supplements thereto), the HTA Disclosure Statement, the HTA Disclosure Statement Order, the HTA Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent

with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

*"HTA Disclosure Statement"* shall mean, the disclosure statement to be filed with respect to the HTA Plan with the Title III Court by the Oversight Board in the HTA PROMESA Proceeding in accordance with Section 1125 of the Bankruptcy Code made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably acceptable to the Oversight Board, Assured and National.

*"HTA Disclosure Statement Order"* shall mean the order of the Title III Court (a) approving the form of HTA Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the HTA Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

*"HTA Effective Date"* shall mean, the date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

*"HTA Plan"* shall mean a plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA PROMESA proceeding, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed hereto as Exhibit "J".

*"HTA Plan Supplement"* shall mean the volume of documents, agreements, and instruments, including, without limitation, the HTA Definitive Documents, which shall be filed with the Title III Court in connection with the HTA Plan and consummation of the transactions contemplated herein, and each of which shall be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

*"HTA Restriction Fee Percentage"* shall mean the percentage equal to (a) One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amounts as may be payable on account of HTA Consummation Costs divided by (b) the aggregate amount of HTA 68 Bond Claims and the HTA 98 Senior Bond Claims held or, in the case of Assured and National, either held or insured and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by PSA Restriction Fee Creditors.

*"Insured Bond Claims"* shall mean, collectively, the Insured CCDA Bond Claims and the Insured HTA Bond Claims.

*"Insured CCDA Bond Claims"* shall mean, collectively, those CCDA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including pursuant to secondary market policies.

EXECUTION COPY

*"**Insured HTA Bond Claims**"* shall mean, collectively, those HTA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including pursuant to secondary market policies.

*"**Invalidity Actions**"* shall mean, collectively, those litigations set forth on Exhibit "G" hereto.

*"**IRC**"* shall mean the Internal Revenue Code of 1986, as amended from time to time.

*"**Joinder Creditors**"* shall mean, collectively, those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "H" and "I", respectively, prior to the Joinder Deadline.

*"**Joinder Deadline**"* shall mean, with respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

*"**Lift Stay Motions**"* shall mean, collectively the litigation styled (a) Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 673], (b) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 591], (e) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) Ambac Assurance Corporation, et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1931, currently pending in the United States Court of Appeals for the First Circuit, (g) Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al., Adv. Pro. No. 17-00151-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, (h) Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al., Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with sections 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

*"**Measured SUT**"* shall mean the 5.5% SUT, less CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) as set forth in the Settlement Summary annexed hereto as Exhibit "J".

*"**Monolines**"* shall mean Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation, as insurers of CCDA Bonds and HTA Bonds, as applicable.

*"National Insured Bonds"* shall mean, collectively, the HTA Bonds that are insured by National.

*"New HTA Bonds"* shall mean, collectively, the bonds, as more fully described in the Settlement Summary annexed hereto as Exhibit "J", to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

*"New HTA Bonds Indenture"* shall mean the indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

*"Outperformance Condition"* shall mean the amount that the Measured SUT exceeds the Outperformance Metric, as defined in the Settlement Summary annexed hereto as Exhibit "J", in any Fiscal Year.

*"Plan Supplement"* shall mean the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties.

*"PRIFA"* shall mean The Puerto Rico Infrastructure Financing Authority.

*"PROMESA Proceedings"* shall mean, collectively, the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding

*"PSA Creditors"* shall mean, collectively, (a) the Initial PSA Creditors and (b) those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "H" and "I", respectively, in accordance with the terms and provisions of this Agreement.

*"PSA Restriction Fees"* shall mean, collectively, the fees payable in accordance with Sections 6.1(b) and (c) hereof, the Plan, the HTA Plan, the Confirmation Order and the HTA Confirmation Order, which fees, in the aggregate, shall not exceed One Hundred Forty Million Dollars ($140,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs and HTA Consummation Costs.

*"PSA Restriction Fee Creditors"* shall mean, collectively, the Initial PSA Creditors and the Joinder Creditors that execute this Agreement, the Joinder Agreement, or the Annex Agreement prior to the expiration of the PSA Restriction Fee Period; provided, however, that notwithstanding anything contained herein to the contrary, all entities executing a Joinder Agreement or an Annex Agreement on the date the PSA Threshold Attainment is reached shall be considered PSA Restriction Fee Creditors; and, provided, further, that, under all circumstances, PSA Restriction Fees shall not be available to holders of HTA 98 Sub Bond

Claims in their capacity as such and such holders in such capacity shall not be considered PSA Restriction Fee Creditors with respect to such HTA 98 Sub Bonds.

*"PSA Restriction Fee Period"* shall mean the period from the date hereof up to and including the earlier to occur of (a) the PSA Threshold Attainment and (b) the Joinder Deadline.

*"PSA Threshold Attainment"* shall mean the date on which PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent (85%) of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are Insured Bond Claims, to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the HTA Bonds or the CCDA Bonds or enter with customers into long and short positions in debt securities such as the HTA Bonds or the CCDA Bonds, in its capacity as a dealer or market marker in such HTA Bonds or CCDA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to HTA Bonds or CCDA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Sales Tax" or "SUT"* shall mean the sales and use taxes, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

*"Section 926 Motion"* shall mean, the litigation arising from (a) the Urgent Motion for Bridge Order, and Motion for Appointment of Trustee Under 11 U.S.C. §926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation, dated July 17, 2020, filed in the HTA Title III Case [Dkt. No. 871] and the Commonwealth PROMESA Proceeding [Dkt. No. 13708], (b) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1847, currently pending in the United States Court of Appeals for the First Circuit, (c) any other motion or adversary proceeding pending as of the date hereof seeking appointment of a trustee for HTA in accordance with 11 U.S.C. §926, and (d) all claims and causes of action asserted in the Proposed Complaint, as defined in the Section 926 Motion and annexed thereto as Exhibit "C".

*"Settlement Summary"* shall mean the summary of the key economic terms to be included in the Plan and the HTA Plan as set forth in Exhibit "J" annexed hereto.

*"Substitute Measured Tax"* shall mean, all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

*"Trust Documentation"* shall mean, collectively, the documentation required, if necessary, to establish and maintain the trust into which the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of CW/HTA Claims (including the Monolines) pursuant to the terms of this Agreement.

*"Uniformity Litigation"* shall mean, collectively, (a) the litigation styled Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al., Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

Section 1.3    Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited,

Section 1.4    Interpretations.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5    Exhibits.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

123408529v3

EXECUTION  COPY

## ARTICLE II

## GENERAL PROVISIONS

Section 2.1    CW PSA.  Notwithstanding  anything  contained  in this Agreement to the
contrary,  the terms and conditions  of the CW PSA remain in full force and effect, including,
without  limitation,  the legal protections  with respect to the CVIs, the CVI Legislation  and the
CVI Indenture set forth in Section 4.9(b) of the CW PSA, and are not intended,  nor shall they be
construed to be, amended or modified  by any of the terms set forth herein.  Without  limiting  the
foregoing,  the agreements, terms and conditions  set forth herein,  including,  without limitation,
the exhibits  annexed hereto, are intended to supplement the terms and conditions  of the CW PSA
for the benefit  of holders  of CCDA Bond Claims and HTA Bond Claims.

Section 2.2    Financial  Information.  The Oversight Board acknowledges and agrees
that (a) the financial information  set forth on signature pages affixed to this Agreement and the
CUSIP numbers for the HTA Bonds, and the CCDA Bonds, provided by the Parties pursuant to
Section 2.3 hereof are proprietary,  privileged,  and confidential,  and (b) unless otherwise ordered
by the Title III Court, shall not disclose to any third party and shall otherwise use its reasonable
best efforts to protect the confidential  nature of such financial information  and CUSIP numbers,
including,  without  limitation,  in filings  to be made in the Title III Court or any other public
release.

Section 2.3    CUSIP Information.  Unless the then-current information  has previously
been provided to the Oversight Board, within  two (2) Business Days after the date hereof, each
Initial  PSA Creditor shall provide the Oversight Board, in writing,  the Face Amount and CUSIP
numbers for each of the HTA Bonds and the CCDA Bonds, if any, such Party owns, insures or
has due investment  management responsibility  and authority for funds or accounts which own
such HTA Bonds and the CCDA Bonds, as the case may be. In addition,  within  five (5)
Business Days of each calendar month or upon the request of the Oversight Board, which request
shall be made no more frequently  than monthly  from and after the date hereof, each PSA
Creditor shall provide the Oversight Board, in writing,  the Face Amount and CUSIP numbers for
each of the HTA Bonds and the CCDA Bonds, if any, such Party then owns, insures or has due
investment  management responsibility  and authority for funds or accounts which own such HTA
Bonds and the CCDA Bonds, as the case may be.

Section 2.4    Additional  Parties.  Within  two (2) Business Days from the date hereof,
the Oversight Board shall request that AAFAF provide,  through the prompt issuance on EMMA,
a notice regarding the execution and delivery of this Agreement and the opportunity  for all
entities holding  and/or insuring  HTA Bonds and CCDA Bonds, having  a Face Amount, in each
case, in excess of One Million  Dollars ($1,000,000.00),  to execute and deliver  to counsel to the
Oversight Board, the form of Joinder Agreement annexed hereto as Exhibit  "H", and to become
a party hereto in accordance with the terms and conditions  set forth herein and in the Joinder
Agreement.

123408529v3

EXECUTION  COPY

<u>ARTICLE III</u>

<u>REPRESENTATIONS AND WARRANTIES</u>

Section 3.1      <u>Representations  and Warranties of the Oversight  Board.</u>  The Oversight
Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and
provisions  of PROMESA with all requisite  consent, approval,  power and authority to execute
this Agreement and to consummate the transactions  contemplated hereby; (b) it has full requisite,
consent, approval, power and authority to execute and deliver  and to perform its obligations
under this Agreement and the execution,  delivery and performance hereof, and the instruments
and documents required to be executed by it in connection  herewith (i) have been duly  and
validly  authorized by it and (ii) are not in contravention of its organizational  documents  or any
material  agreements specifically  applicable  to it or any law, rules or regulations  applicable  to it;
and (c) except with respect to the Appointments  Related Litigation  and the Uniformity
Litigation,  no proceeding, litigation  or adversary proceeding before any court, arbitrator or
administrative  or governmental  body is pending  against it, or to its knowledge has been
threatened against it, which would adversely affect its ability  to enter into this  Agreement or to
perform its obligations  hereunder.

Section 3.2      <u>Representations  and Warranties of the Commonwealth.</u>   The
Commonwealth,  through  its Title III representative,  the Oversight  Board, hereby represents and
warrants that, subject to entry of an order of the Title  III Court: (a) it is duly organized  and
validly  existing  under the laws of the jurisdiction  of its organization  with all requisite,  consent,
approval,  power and authority to carry on the business  in which  it is engaged, to own the
properties  it owns, to execute this Agreement and to consummate the transactions contemplated
hereby: (b) it has full requisite  power and authority  to execute and deliver  and to perform its
obligations  under this Agreement, and the execution,  delivery and performance hereof, and the
instruments  and documents required to be executed by it in connection  herewith (i) have been
duly and validly  authorized by it and (ii) are not in contravention of its organizational  documents
or any material agreements specifically  applicable  to it, or any law, rules or regulations
applicable  to it; and (c) no proceeding,  litigation  or adversary proceeding before any court,
arbitrator or administrative  or governmental  body is pending  against it, or to its knowledge has
been threatened against it, which would adversely affect its ability  to enter into this  Agreement
or to perform its obligations  hereunder.

Section 3.3      <u>Representations  and Warranties of HTA.</u>  HTA, through  its Title  III
representative,  the Oversight  Board, hereby represents and warrants that, subject to entry of an
order of the Title  III Court: (a) it is duly organized  and validly  existing  under the laws of the
jurisdiction  of its organization  with all requisite,  consent, approval,  power and authority to carry
on the business  in which  it is engaged, to own the properties  it owns, to execute this Agreement
and to consummate the transactions  contemplated hereby; (b) it has full requisite  power and
authority to execute and deliver  and to perform its obligations  under this Agreement, and the
execution,  delivery and performance hereof, and the instruments  and documents required to be
executed by it in connection  herewith (i) have been duly and validly  authorized by it and (ii) are
not in contravention  of its organizational  documents  or any material  agreements specifically
applicable  to it, or any law, rules or regulations  applicable  to it; and (c) no proceeding, litigation

123408529v3

or adversary proceeding  before any court, arbitrator or administrative  or governmental body is pending  against it, or to its knowledge has been threatened against it, which would adversely affect its ability  to enter into this Agreement or to perform its obligations  hereunder.

Section 3.4      Representations  and Warranties of CCDA.  CCDA hereby represents and warrants that, subject to entry of an order of the Title  III Court: (a) it is duly organized  and validly  existing  under the laws of the jurisdiction  of its organization  with all requisite, consent, approval,  power and authority  to carry on the business in which  it is engaged, to own the properties  it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite  power and authority  to execute and deliver and to perform its obligations  under this Agreement, and the execution, delivery and performance hereof, and the instruments  and documents  required  to be executed by it in connection  herewith (i) have been duly and validly  authorized  by it and (ii) are not in contravention  of its organizational  documents or any material agreements specifically  applicable  to it, or any law, rules or regulations applicable  to it; and (c) no proceeding, litigation  or adversary proceeding before any court, arbitrator or administrative  or governmental body is pending  against it, or to its knowledge has been threatened against it, which would adversely affect its ability  to enter into this Agreement or to perform its obligations  hereunder.

Section 3.5      Representations  and Warranties of the HTA Holders.  Each of the HTA Holders, severally and not jointly,  hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized,  validly  existing and in good standing  under the laws of the jurisdiction  of its organization  with all requisite consent, approval,  power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority  to execute and deliver and to perform its obligations  under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly  authorized  by it and (ii) are not in contravention  of its organizational  documents or any material agreements specifically  applicable to it, or any law, rules or regulations  applicable  to it; (c) no proceeding, litigation  or adversary proceeding before any court, arbitrator or administrative  or governmental body is pending  against it, or to its knowledge  has been threatened against it, which would adversely affect its ability  to enter into this Agreement or to perform its obligations  hereunder; and (d) it owns or has due investment management responsibility  and authority for funds or accounts which own the HTA Bonds of no less than the Face Amounts set forth on the signature pages affixed to this Agreement as of the date hereof, which  it would be entitled to vote in connection with the solicitation  of acceptances and rejections to the Plan, other than potentially with respect to the Insured HTA Bond Claims, and that, as of the date hereof, subject to any liens or encumbrances permitted by Section 4.5(a), it has not sold, transferred, pledged, hypothecated or assigned such HTA Bonds or any voting, consent or direction  rights related to such HTA Bonds to any person or entity, that would prevent or adversely affect in any way such HTA Holders' performance of its obligations  contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Parties acknowledges that each Insured HTA Bonds Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable  law and governing  documents, so long as this Agreement remains in effect.

EXECUTION COPY

Section 3.6     Representations and Warranties of the CCDA Holders.   Each of the CCDA Holders, severally and not jointly, hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the CCDA Bonds of no less than the Face Amounts set forth on the signature pages affixed to this Agreement as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than potentially with respect to the Insured CCDA Bond Claims, and that, as of the date hereof, subject to any liens or encumbrances permitted by Section 4.6(a), it has not sold, transferred, pledged, hypothecated or assigned such CCDA Bonds or any voting, consent or direction rights related to such CCDA Bonds to any person or entity, that would prevent or adversely affect in any way such CCDA Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Parties acknowledges that each Insured CCDA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

Section 3.7     Representations and Warranties of Assured.   Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.8     Representations and Warranties of National.   National hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated

19

hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9    Representations of the Parties to this Agreement.  Each Party, severally and not jointly, represents and acknowledges that: (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as stated in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein. Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more HTA Holders or CCDA Holders, on the one hand, and a Monoline, on the other hand, or prevent any such parties from voluntarily entering into any commutation or similar separate agreement or instrument from and after the date hereof.

## ARTICLE IV

## COVENANTS

Section 4.1    Covenants of the Oversight Board.  The Oversight Board shall take, and cause the Commonwealth, HTA and following, the commencement of the CCDA PROMESA Proceeding, CCDA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan, and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; provided, however, that, in the event that Assured (including, as the case may be, jointly with other holders or insurers of CCDA Bond Claims) proposes to the Oversight Board a modification of the CCDA Bonds in accordance with Title VI of PROMESA, the Oversight Board shall consider such proposal, to the extent consistent with the terms set forth in the Settlement Summary annexed hereto as Exhibit "J", and make such determination as it deems appropriate. Such actions shall include, but not be limited

to, (a) commencing the CCDA PROMESA Proceeding, (b) filing the Plan and Disclosure Statement, in form and substance consistent with this Agreement and reasonably acceptable to the Parties, with the Title III Court, and requesting that the Title III Court establish hearing dates for the expeditious consideration of the Disclosure Statement and the Plan, (c) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (d) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditors (or their respective trustees, fiscal agents, or paying agents) relating to the HTA Bonds or the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (e) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan or the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "Clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds or HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, (f) at least four (4) days prior to such filing, delivering to counsel for each of Assured, and National copies of the Disclosure Statement, the HTA Disclosure Statement, the Plan, the HTA Plan, the Plan Supplement, the HTA Plan Supplement, the Confirmation Order, the HTA Confirmation Order, the other Definitive Documents and the HTA Definitive Documents and all other documents related to any of the foregoing, (g) in the event that a party (i) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, (h) using its reasonable best efforts to provide, and cause HTA to provide, to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA, and (i) using its reasonable best efforts and negotiate in good faith with Assured and National the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date. In addition to the foregoing, the Oversight Board, as representative of HTA in the HTA PROMESA Proceeding, (w) upon satisfaction of the Distribution Conditions, in accordance with the terms and provisions of Section 6.1(d) hereof, shall take such action as may be necessary to cause the Commonwealth to make payments to Assured and National, in cash, in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00), and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00) respectively, in consideration of the structuring of payments to be made to holders of CW/HTA Claims, CW Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims in accordance with the Plan, (x) shall take and cause HTA to take all actions necessary to file, or cause the filing of, the HTA

**EXECUTION COPY**

Plan consistent with the terms set forth on Exhibit "J" annexed hereto, and shall use its reasonable best efforts to achieve confirmation thereof by the Title III Court, (y) upon satisfaction of the Distribution Conditions, shall take such action as may be necessary to cause HTA to make payments, in cash, of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) to holders of the HTA 68 Bond Claims and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00) to holders of HTA 98 Senior Bond Claims, and (z) upon satisfaction of the Distribution Conditions, shall take, and cause the Commonwealth to take, such actions as are necessary to distribute the HTA Clawback CVI to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms of the Plan, the CVI Indenture, and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto and Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J".

Section 4.2    Covenants of the Commonwealth. The Commonwealth shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement, and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order and the consummation, implementation and administration of the Plan and the HTA Plan, including, without limitation, the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan, and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the Commonwealth PROMESA Proceeding and the HTA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the HTA Bonds and the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any

22

action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan or the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, (e) in the event that a party (i) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (f) using its reasonable best efforts to provide, and cause HTA to provide, to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA. In addition to the foregoing, upon satisfaction of the Distribution Conditions, (y) in accordance with the terms and provisions of Section 6.1(d) hereof, the Commonwealth shall take such action as is necessary to make payments on the CW Effective Date, in cash, to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively, in consideration of the structuring of payments to be made to holders of CW/HTA Claims, CW Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims in accordance with the Plan, and (z) the Commonwealth shall take such actions as are necessary to distribute the HTA Clawback CVI to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms of the Plan, the CVI Indenture, and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J".

Section 4.3    Covenants of HTA. HTA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement, and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan and the HTA Plan (and their consummation, implementation and administration) and the other

23

Definitive Documents and the HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the HTA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against Assured, National, any HTA Holder, or any CCDA Holder, relating to the HTA Bonds and the CCDA Bonds, (or their respective trustees, fiscal agents or paying agents), as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan and the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and the HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, and (e) using its reasonable best efforts to provide to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA. In addition to the foregoing, HTA shall (y) file the HTA Plan consistent with the terms set forth on Exhibit "J" annexed hereto and the HTA Disclosure Statement and use its reasonable best efforts to achieve confirmation thereof by the Title III Court as expeditiously and practicable as possible and (z) upon satisfaction of the Distribution Conditions, take such action as is necessary to make payments, in cash, of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) to holders of HTA 68 Bond Claims and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00) to holders of HTA 98 Senior Bond Claims.

Section 4.4 Covenants of CCDA. CCDA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; provided, however, that, in the event that Assured (including, as the case may be, jointly with other holders or insurers of CCDA Bond Claims) proposes to the Oversight Board a modification of the CCDA Bonds in accordance with Title VI of PROMESA, including as an alternative to inclusion of CCDA in the Plan as a debtor under Title III of PROMESA, if approved and authorized by the

123408529v3

Oversight Board, CCDA shall use its reasonable best efforts and take such actions as necessary to obtain approval of such qualifying modification consistent with the terms set forth on Exhibit "J" annexed hereto. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the CCDA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the HTA Bonds or the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection and (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and the HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial.

Section 4.5    Covenants of the HTA Holders. Subject to the terms and conditions hereof, each of the HTA Holders, severally and not jointly, hereby covenants and agrees as follows:

(a)    None of the HTA Holders shall sell, transfer, pledge, hypothecate or assign (except as may be required in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law with respect to a Monoline-insured bond) (a "**Transfer**") any of the HTA Bond Claims, or any voting, consent, or direction rights or participations or other interests therein (collectively, the "**HTA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) the HTA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.1 hereof; provided, however, that, notwithstanding the foregoing, each of the HTA Holders may transfer any HTA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of Transfer, such transferee that executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF, the Joinder Agreement attached hereto as Exhibit "G" (a "**Qualified Transferee**"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein, including, without limitation, with respect to any additional HTA Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder (other than the right to receive the Consummation Costs) and (z) on or after the effective date of the Transfer, such HTA Holder shall be deemed to have relinquished its rights (other than the right to receive the Consummation Costs), and be released from its obligations (other than as set forth in Section 4.5(c) hereof) on or after the effective date of the Transfer under this Agreement

solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void *ab initio* and the applicable HTA Bond Claims and the HTA Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the HTA Holders from acquiring additional HTA Bond Claims or CCDA Bond Claims; provided, however, that any such HTA Bond Claims and CCDA Bond Claims acquired from and after the date hereof shall automatically and immediately upon acquisition by an HTA Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)      None of the HTA Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth (including secured, unsecured, administrative or substantial contribution claims), on account of any HTA Bonds or HTA Bond Claims or provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such HTA Holders' aggregate holdings of HTA Bond Claims, (ii) except as permitted by Section 4.5(d) below solely with respect to the Monolines, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of its HTA Bonds or HTA Bond Claims (and each such HTA Holder agrees to such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims, or (iii) aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b); provided, however, that, to the extent consistent with its obligations hereunder, a HTA Holder may amend a proof of claim solely to change the claimant's name, address or similar information.

(c)      Each of the HTA Holders, solely in its capacity as holder of HTA Bonds or HTA Bond Claims, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan or the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement or the HTA Disclosure Statement, and the entry of the Confirmation Order or the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that such Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order, the HTA Confirmation Order, the Plan and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, the Plan and the HTA Plan, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by

the Oversight Board, AAFAF, the Commonwealth, HTA and CCDA and was made in accordance with the provisions of Section 8.1 hereof, and (B) not vote for or support any HTA or Commonwealth plan of adjustment not proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and HTA, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, and (iii) in the event that a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order, and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order.

(d)     Subject to the terms set forth herein, none of the HTA Holders shall be limited or prohibited from (i) taking any action that any such HTA Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents, (ii) taking any action to defend itself against the claims and causes of action asserted in the Debt Related Objections, the Invalidity Actions or the Lien Challenge Actions, to the extent such litigation is not otherwise stayed, or against the claims and causes of action asserted in any other litigation that is not stayed, (iii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iv) taking any action such holder shall deem necessary or appropriate as against a Monoline to preserve, protect or defend any of its rights under any policy of insurance issued by a Monoline with respect to any Monoline-insured bond. Without in any way limiting the foregoing, to the extent the Plan, the HTA Plan the Definitive Documents, and the HTA Definitive Documents are consistent with this Agreement and the exhibits hereto, none of the HTA Holders shall take any action to oppose confirmation of the Plan or the HTA Plan, as the case may be, with respect to the Covered Borrowers, including, without limitation, voting to reject the Plan or the HTA Plan with respect to any other claims held against the Commonwealth or HTA (with respect to a Monoline-insured bond, other than an Assured Insured Bond or a National Insured Bond, to the extent such HTA Holder is authorized to vote such claim in accordance with Section 301(c)(3) of PROMESA, any definitive insurance documents and applicable law); provided, however, that nothing in this Agreement shall limit or prohibit a HTA Holder from taking any action, or asserting any claims or causes of action, in connection with any matter relating to the Monolines and with respect to any Monoline-insured bond (including, without limitation, voting of claims, subrogation or acceleration, commutation or any other act necessary to maintain the benefits of the applicable Monoline insurance policy).

Section 4.6     Covenants of CCDA Holders. Subject to the terms and conditions hereof, each of the CCDA Holders, severally and not jointly, hereby covenants and agrees as follows:

(a)     None of the CCDA Holders shall Transfer any of the CCDA Bond Claims, or any voting, consent or direction rights or participations or other interests therein (collectively, the "**CCDA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) the CW Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.1 hereof; provided, however, that, notwithstanding the foregoing, each of the CCDA Holders may transfer any CCDA Interests to (1) another PSA Creditor or (2)

123408529v3

a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein, including, without limitation, with respect to any additional CCDA Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder (other than the right to receive the Consummation Costs) and (z) on or after the effective date of the Transfer, such CCDA Holder shall be deemed to have relinquished its rights (other than the right to receive the Consummation Costs), and be released from its obligations (other than as set forth in Sections 4.6(c) hereof) on or after the effective date of the Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void *ab initio* and the applicable CCDA Bond Claims and the CCDA Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the CCDA Holders from acquiring additional HTA Bond Claims or CCDA Bond Claims; provided, however, that any such CCDA Bond Claims or HTA Bond Claims, acquired from and after the date hereof shall automatically and immediately upon acquisition by a CCDA Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)  None of the CCDA Holders shall, except as expressly provided for herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth (including secured, unsecured, administrative or substantial contribution claims), on account of any CCDA Bonds or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such CCDA Holders' aggregate holdings of CCDA Bond Claims, (ii) except in accordance with any claims bar date order entered in the CCDA PROMESA Proceeding, or as permitted by Section 4.6(d) below solely with respect to the Monolines, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of its CCDA Bonds or CCDA Bond Claims (and each such CCDA Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims, or (iii) aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b); provided, however, that, to the extent consistent with its obligations hereunder, a CCDA Holder may amend a proof of claim solely to change the claimant's name, address or similar information.

(c)  Each of the CCDA Holders, solely in its capacity as holder of CCDA Bonds and CCDA Bond Claims, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to,

breach or be inconsistent with the terms herein or in the Plan, or impede or preclude, the filing of the Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF, the Commonwealth, HTA and CCDA and was made in accordance with the provisions of Section 8.1 hereof, and (B) not vote for or support any CCDA or Commonwealth plan of adjustment not proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and CCDA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that each of the Parties acknowledges that each Insured CCDA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, and (iii) in the event that a party (A) files a notice of appeal from the entry of the Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order.

(d)     Subject to the terms set forth herein, none of the CCDA Holders shall be limited or prohibited from (i) taking any action that any such CCDA Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents, (ii) taking any action to defend itself against claims or causes of action asserted in the Debt Related Objections, the Invalidity Actions or the Lien Challenge Actions, to the extent such litigation is not otherwise stayed, or against the claims and causes of action asserted in any other litigation that is not stayed, (iii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iv) taking any action such holder shall deem necessary or appropriate as against a Monoline to preserve, protect or defend any of its rights under any policy of insurance issued by a Monoline with respect to any Monoline-insured bond. Without in any way limiting the foregoing, to the extent the Plan and the Definitive Documents are consistent with this Agreement and the exhibits hereto, none of the CCDA Holders shall take any action to oppose confirmation of the Plan with respect to the Covered Borrowers, including, without limitation, voting to reject the Plan with respect to any other claims held against the Commonwealth or CCDA (with respect to a Monoline-insured bond, other than an Assured Insured Bond or a National Insured Bond, to the extent such CCDA Holder is authorized to vote such claim in accordance with Section 301(c)(3) of PROMESA, any definitive insurance documents and applicable law); provided, however, that nothing in this Agreement shall limit or prohibit a CCDA Holder from taking any action, or asserting any claims or causes of action, in connection with any matter relating to the Monolines and with respect to any Monoline-insured bond (including, without limitation, voting of claims, subrogation or acceleration, commutation or any other act necessary to maintain the benefits of the applicable Monoline insurance policy).

**EXECUTION COPY**

Section 4.7     <u>Covenants of Assured</u>.  Assured hereby covenants and agrees as follows:

(a)     Assured shall not, except as expressly provided herein or in accordance with any order of the Title III Court regarding the filing of proofs of claim in a CCDA PROMESA Proceeding, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA or CCDA (including secured, unsecured, administrative or substantial contribution claims) on account of any Assured Insured Bonds, or any HTA Bond Claims or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings of HTA Bond Claims or CCDA Bond Claims, (ii) upon entry of a stay of litigation, solely with respect to Assured, in the Commonwealth PROMESA Proceeding, the HTA Proceeding, and the CCDA Proceeding in which Assured is a plaintiff, defendant or respondent, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any Assured Insured Bonds or any of its HTA Bond Claims or CCDA Bond Claims in the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding (and Assured agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(a). Without limiting the foregoing, within four (4) Business Days from the date hereof, (A) Assured and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to Assured and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions, the Section 926 Motion as to Assured, and that certain litigation styled <u>Assured Guaranty Corp., et al. v. The Commonwealth of Puerto Rico, et al.</u>, Adv. Pro. No. 18-00059-LTS, currently pending in the Title III Court (the "**Adversary**"), and (B) Assured shall take, or cause to be taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by Assured in connection with the Clawback Actions and the Lift Stay Motions, including, without limitation, all such subpoenae, deposition notices, requests for production of documents, and any joinders by Assured to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)     Assured shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan and the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement and the HTA Disclosure Statement, the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order the HTA Confirmation Order, the Plan and the HTA Plan (and their consummation, implementation and administration) and the Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by the Oversight Board, and otherwise

123408529v3

consistent with the terms herein, and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that Assured acknowledges that each Insured HTA Bond Claim and Insured CCDA Bond Claim insured by Assured shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (iv) use its reasonable best efforts and negotiate in good faith with the Oversight Board and National the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date.

(c)     Subject to the terms set forth herein, including ,without limitation, the stay of litigation as required in accordance with Section 4.7(a) hereof, Assured shall not be limited or prohibited from (i) taking such action that Assured shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the HTA Plan, the other Definitive Documents, or the other HTA Definitive Documents, or (ii) asserting any claims or causes of action against any Party that breaches this Agreement; provided, however, that the foregoing shall not preclude Assured from participating in any action or proceeding regarding the GDB Loan Priority Determination.

Section 4.8     Covenants of National.  National hereby covenants and agrees as follows:

(a)     National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA or CCDA (including secured, unsecured, administrative or substantial contribution claims) on account of any National Insured Bonds, or any HTA Bond Claims or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of HTA Bond Claims or CCDA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any National Insured Bonds or any of its HTA Bond Claims or CCDA Bond Claims in the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.8(a). Without limiting the foregoing, within four (4) Business Days from the date hereof, (A) National and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to National and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions and the Section 926 Motion as to National, and (B) National shall take, or cause to be

taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by National in connection with the Clawback Actions and the Lift Stay Motions, including, without limitation, the withdrawal of all subpoenas, deposition notices, requests for production of documents, and any joinders by National to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)     National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan and the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement and the HTA Disclosure Statement, the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order, the HTA Confirmation Order, the Plan and the HTA Plan (and its consummation, implementation and administration) and the Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by the Oversight Board, and otherwise consistent with the terms herein and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that National acknowledges that each Insured HTA Bond Claim insured by National shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (iv) use its reasonable best efforts and negotiate in good faith with the Oversight Board and Assured the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date.

(c)     Subject to the terms set forth herein, including, without limitation, the stay of litigation as required in accordance with Section 4.8(a) hereof, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the HTA Plan, the other Definitive Documents or the HTA Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement; provided, however, that the foregoing shall not preclude National from participating in any action or proceeding regarding the GDB Loan Priority Determination.

Section 4.9     Covenants of the Parties. Subject to the terms and conditions hereof, each of the Parties, severally and not jointly, hereby covenants and agrees as follows:

EXECUTION COPY

(a)     Coordination.  The Parties shall coordinate and use their reasonable best efforts to obtain the consent and joinder of AAFAF prior to consummation of the transactions contemplated herein.  Any representations, warranties, covenants, or other obligations of AAFAF contemplated herein shall not be effective until an authorized signature for such entity has been affixed hereto.

(b)     Legal and Other Protections.  The Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the HTA Definitive Documents, the CVI Legislation, the Debt Responsibility Act, and the CVI Indenture, to the extent applicable, in a manner to be agreed to by the Oversight Board, Assured and National, shall include the following legal protections:

(i)     For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law;

(ii)     Pursuant to the New HTA Bonds Indenture, the New HTA Bonds trustee shall have a direct right of action to enforce the New HTA Bonds Indenture, including (A) with respect to the New HTA Bonds and the New HTA Bonds Indenture, a net revenue pledge with respect to the collection of tolls, (B) seeking specific performance as a remedy for any breach of covenants in the New HTA Bonds Indenture, and (C) as of the commencement thereof, the automatic stay in any future insolvency proceeding commenced on behalf of HTA (whether under Title III of PROMESA or otherwise) would be deemed waived with respect to toll revenues, net of toll-only operating expenses and toll road enumerated capital expenditures; provided, however, that, upon an event of default under the New HTA Bonds Indenture, and, in the absence of action by the New HTA Bonds trustee, holders of not less than twenty-five percent (25%) in principal amount of the New HTA Bonds then outstanding shall be entitled to institute any suit, action, mandamus or other proceeding in equity or at law, or for the protection or enforcement of any right or remedy under the New HTA Bonds Indenture;

(iii)     Pursuant to the CVI Indenture, the CVI trustee shall have a direct right of action to enforce the CVI Indenture, including seeking specific performance as a remedy for any breach of covenants in the CVI Indenture; provided, however, that, upon an event of default pursuant to the CVI Indenture, as described therein, and, the absence of action by the CVI trustee, holders of not less than twenty-five percent (25%) in principal amount of the CVIs then outstanding shall be entitled to institute any suit, action, mandamus or other proceeding in equity or at law, or for the protection or enforcement of any right or remedy pursuant to the CVI Indenture;

(iv)     The HTA Fiscal Plan certified as of the HTA Effective Date, and any post-HTA Effective Date HTA Fiscal Plan will include provisions for the payment in each Fiscal Year of principal and interest of New HTA Bonds, including, without limitation, sinking fund payments due in such Fiscal Year;

(v)     The Fiscal Plan for the Commonwealth certified as of the Effective Date, and any Post-Effective Date Fiscal Plan will include provisions for the payment in each Fiscal Year to the extent that the Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

33

(vi)     The New HTA Bonds shall be secured by a first-priority lien on tolls collected by or on behalf of HTA and certain other HTA available revenues/ resources, and the right to receive the foregoing, subject to necessary operating and capital expenses of the toll roads specified in the New HTA Bonds Indenture (the "**Net Revenues**");

(vii)     The HTA Plan, the HTA Confirmation Order and the New HTA Bonds Indenture shall provide for a covenant setting forth an additional bonds test of 1.20x from Net Revenues;

(viii)     The HTA Plan and the HTA Confirmation Order shall provide for a rate covenant requiring a 1.10x coverage ratio of Net Revenues, whereby, for purposes of calculating the coverage ratio, Net Revenues may include unencumbered cash as provided in the New HTA Bonds Indenture;

(ix)     HTA Fiscal Plans certified on or after the HTA Effective Date, the HTA Plan and the HTA Confirmation Order shall provide for the measures necessary to service the obligations contemplated pursuant to this Agreement, the New HTA Bonds and the New HTA Bonds Indenture;

(x)     The HTA Confirmation Order shall provide for the retention of jurisdiction by the Title III Court, or, in the event the Title III Court declines such retention of jurisdiction or the PROMESA Proceedings have been closed in accordance with the terms and provisions of PROMESA, designation of the United States District Court for the District of Puerto Rico, to enforce the terms of the certified Fiscal Plans and the obligations contemplated pursuant to this Agreement, the New HTA Bonds and the New HTA Bonds Indenture;

(xi)     The New HTA Bonds, including, without limitation, any New HTA Bonds issued in accordance with the terms and provisions of Section 4.9(c) hereof, and, to the extent feasible, the CVIs shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such bonds and securities are valid, legally binding and enforceable pursuant to the Confirmation Order or the HTA Confirmation Order, as the case may be;

(xii)     The compromises and settlements embodied in this Agreement and set forth in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order shall not be binding on any Party (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding with respect to the priority of the CVIs under PROMESA, the Puerto Rico Constitution or other applicable law;

(xiii)     The Commonwealth shall covenant for the benefit of all initial and subsequent holders of New HTA Bonds that the Commonwealth will not limit or restrict the rights or powers vested in HTA until all obligations with respect to the New HTA Bonds, together with all interest accrued thereon, have been paid or satisfied in full in accordance with their terms;

(xiv)     The Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Commonwealth will not: (a) take any

action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Commonwealth of (x) the amounts of the Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in the Settlement Summary annexed hereto as Exhibit "J";

(xv)   The HTA Confirmation Order shall include a determination that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the HTA Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA as determined in accordance with modified accrual accounting standards;

(xvi)   The New HTA Bonds Indenture, the New HTA Bonds, and the CVIs shall be governed by New York law;

(xvii)   The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) HTA, (3) each person or entity asserting claims or other rights against the Commonwealth, HTA, COFINA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan and, if impaired, whether or not such person or entity accepted the Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(xviii)   The HTA Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) HTA, (3) each person or entity asserting claims or other rights against the Commonwealth, HTA, COFINA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the HTA Plan and, if impaired, whether or not such person or entity accepted the HTA Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

EXECUTION COPY

(xix)    The Plan shall include a provision that the HTA Clawback CVI to be issued and any distributions thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the Distribution Conditions are satisfied, and, in the event that this Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust, as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto;

(xx)    The Confirmation Order shall provide that, in consideration for the agreements set forth herein, and upon satisfaction of the Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xxi)    The Confirmation Order shall provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) hereof, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xxii)    The Plan and the CVI Indenture shall include provisions that provide that, upon satisfaction of the Distribution Conditions, the HTA Clawback CVI shall be distributed to the holders of Allowed CW/HTA Claims (including the Monolines) and payments on account thereof shall be in accordance with the terms of the Plan, the CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; and

(xxiii)    The Plan and the CVI Indenture shall provide that any modifications to the HTA Clawback CVI Priority Distribution Waterfall shall only require consent of the Oversight Board and the Initial PSA Creditors, provided that such modifications are not materially adverse to the holders of Allowed HTA Bonds Claims.

123408529v3

(c)     Tax-Exempt Treatment of the New HTA Bonds.  The Oversight Board and the HTA shall use their reasonable best efforts to cause the payment of principal and interest with respect to the New HTA Bonds to be treated as tax-exempt for applicable local tax and/or territorial laws and federal income tax purposes.

Section 4.10   Qualified Marketmaker. Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any HTA Interests or CCDA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided, however, that, in the event that a Qualified Marketmaker acquires such HTA Interests, CCDA Interests, on or before April 27, 2021, such Qualified Marketmaker may retain such HTA Interests, or CCDA Interests, as the case may be, for a period of one hundred twenty (120) days following such Qualified Marketmaker's acquisition of such HTA Interests or CCDA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any HTA Interests or CCDA Interests that the Qualified Marketmaker acquires from a holder of the HTA Interests or CCDA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.  A Qualified Marketmaker may, with the consent of the Government Parties, which consent shall not be unreasonably withheld, join this Agreement solely on behalf of a specific trading desk.

Section 4.11   Appointments Related Litigation/Uniformity Litigation.  Except as expressly provided below, or unless otherwise required to comply with an order of a court of competent jurisdiction that has not been vacated, reversed, or otherwise stayed, no Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall take further action in connection with such litigation but, under all circumstances, such Party hereby covenants and agrees (a) to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation or the Uniformity Litigation, with such determination and Final Order being entered either prior to consideration of approval of, or confirmation of, the Plan or the HTA Plan, as the case may be, by the Title III Court or subsequent to entry of the Confirmation Order or the HTA Confirmation Order, as applicable, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein and in the Plan or the HTA Plan as the case may be, and (ii) in the event that such determination and Final Order occurs prior to approval of, or confirmation of, the Plan or the HTA Plan, as the case may be, such Party shall urge and request, in writing, that the Oversight Board, as it may be modified, reconstructed or reappointed, (1) enforce the terms and conditions of this Agreement and the Plan and the HTA Plan, and (2) promptly seek confirmation of the Plan and the HTA Plan by the Title III Court. Notwithstanding the foregoing, during the period (i) prior to the CW Effective Date, a Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall be under no obligation hereunder to inform a court considering such litigation of the execution and pendency of this Agreement, and (ii) from and after the CW Effective Date, any Party to the Appointments Related Litigation or the Uniformity Litigation shall seek the dismissal, with prejudice, of such litigation.

**EXECUTION COPY**

Section 4.12   <u>Right to Vote</u>. Each Party acknowledges that, for purposes of this Agreement, and any Plan or HTA Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect and is not otherwise terminated by Assured and National as to themselves, (a) Assured and National shall have the right to vote to accept or reject the Plan or the HTA Plan, as the case may be, to the extent provided by the terms and provisions of Section 301(c)(3) of PROMESA and such other applicable law and governing documents on account of any existing HTA Bonds and CCDA Bonds that it insures, and (b) it shall not object to Assured's or National's right to vote to accept or reject the Plan or the HTA Plan, as the case may be, in accordance with subsection (a) above. For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Assured's, National's and their respective insured bondholders' rights to vote to accept or reject any Plan or the HTA Plan, as the case may be.

<u>ARTICLE V</u>

<u>PLAN AND PLAN SUPPORT</u>

Section 5.1   <u>Plan Support Commitment.</u>   From and after the date hereof, provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the HTA Disclosure Statement, the Plan, the HTA Plan or any of the proposed Definitive Documents and the HTA Definitive Documents have been filed, amended or modified in a manner inconsistent with the provisions of this Agreement:

(a)   <u>Commonwealth Plan</u>: Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion and the Adversary, through a date no earlier than the CW Effective Date, solely with respect to Assured and National; <u>provided</u>, <u>however</u>, that a PSA Creditor shall only be required to support the Plan with respect to those HTA Bond Claims and CCDA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that they either hold or insure and are entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents; and, <u>provided</u>, <u>further</u>, that, nothing herein shall limit or prohibit any PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Assured and National from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured HTA Bond Claims or Insured CCDA Bond Claims that are insured by Assured or National, as the case may be (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable Monoline insurance policy), and (D) a stay of any joinders by Assured or National to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely

123408529v3

vote, or cause to be voted, to accept the Plan in its capacity as an HTA Holder, a CCDA Holder or insurer of Insured HTA Bond Claims or Insured CCDA Bond Claims, as applicable, with rights of acceptance in accordance with the Disclosure Statement Order, each as the case may be; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the Plan with respect to those HTA Bond Claims and CCDA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that Assured or National either holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the Plan unless such modification is (Y) not adverse to the HTA Holders, CCDA Holders, Assured and National, and (Z) not inconsistent with the terms provided herein and the Plan, and (v) not vote for or support any HTA or Commonwealth plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim and Insured CCDA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

(b)    HTA Plan: Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the HTA Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, and (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion and the Adversary, through a date no earlier than the HTA Effective Date, solely with respect to Assured and National; provided, however, that a PSA Creditor shall only be required to support the HTA Plan with respect to those HTA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that they either hold or insure and are entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents; and, provided, further, that, nothing herein shall limit or prohibit any PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Assured and National from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured HTA Bond Claims that are insured by Assured or National, as the case may be (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable Monoline insurance policy), and (D) a stay of any joinders by Assured or National to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the HTA Disclosure Statement and/or other solicitation materials in respect of the HTA Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the HTA Plan in its capacity as a HTA Holder, or insurer of Insured HTA Bond Claims with rights of acceptance in accordance with the HTA Disclosure Statement Order, each as the case may be; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the HTA Plan with respect to those HTA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that Assured or National either holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such

other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the HTA Plan unless such modification is (Y) not adverse to the HTA Holders, Assured and National, and (Z) not inconsistent with the terms provided herein and the Plan, and (v) not vote for or support any HTA plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

Section 5.2    Solicitation Required in Connection with Plans. Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan or the HTA Plan, as the case may be. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan and the HTA Plan, as applicable, will not be solicited until the Title III Court has approved the disclosure statement and related solicitation materials, and such disclosure statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

Section 5.3    Custodial Trusts/Acceleration/Commutation of Insurance. Subject to (a) the terms and provisions set forth in Article VII hereof, including, without limitation, the termination of this Agreement by Assured and/or National, and (b) all insurance policies and related agreements relating to Assured Insured Bonds and National Insured Bonds being in full force and effect, with no outstanding payment defaults by Assured or National with respect to such Assured Insured Bonds and National Insured Bonds, respectively, up to and including the CW Effective Date or the HTA Effective Date, as the case may be, (i) the Plan shall contain a provision providing that (A) the payment of the principal of the GO Bonds, PBA Bonds, and CCDA Bonds insured by Assured is accelerated as of the CW Effective Date, (B) the GO Bonds, PBA Bonds, and CCDA Bonds insured by Assured are payable from and after the CW Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, (C) the payment of the principal of the GO Bonds and PBA Bonds insured by National is accelerated as of the CW Effective Date, and (D) the GO Bonds and PBA Bonds insured by National are payable from and after the CW Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, (ii) the HTA Plan shall contain a provision providing that (A) the payment of the principal of the HTA Bonds insured by Assured is accelerated as of the HTA Effective Date, (B) the HTA Bonds insured by Assured are payable from and after the

HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment, (C) the payment of the principal of the HTA Bonds insured by National is accelerated as of the HTA Effective Date, and (D) the HTA Bonds insured by National are payable from and after the HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, and (iii) the Plan and the HTA Plan shall include provisions relating to, as applicable (A) the implementation of custodial trusts in connection with distributions to be made to the holders of Assured Insured Bonds and National Insured Bonds, and (B) a proposal to the applicable holders of Assured Insured Bonds and National Insured Bonds regarding the resolution of such holders' claims in respect of applicable policies of insurance, which provisions shall be in the form and substance satisfactory to the Oversight Board and, to the extent applicable, Assured and National. Such proposals may take the form of one or more commutation transactions; provided, however, that no holder of Assured Insured Bonds or National Insured Bonds shall be required to accept any such proposal to commute the respective policies of issuance.

## ARTICLE VI

## CONSUMMATION COSTS & RESTRICTION FEES

Section 6.1    Consummation Costs and PSA Restriction Fees. Subject to the terms and conditions herein and in the Plan and the HTA Plan, the Consummation Costs and the PSA Restriction Fees, each of which shall be fully earned as of the date hereof or the date of execution of a Joinder Agreement for Initial PSA Creditors or Joinder Creditors, as the case may be, shall be paid on the CW Effective Date or the HTA Effective Date, as the case may be, in accordance with the terms and conditions set forth in the Plan, the Confirmation Order, the HTA Plan, and the HTA Confirmation Order.

(a)    Consummation Costs. In consideration for the fees and expenses incurred by Initial PSA Creditors in connection with (i) with respect to the CCDA Bond Claims, the negotiation and execution of this Agreement and the prosecution of approval of the Disclosure Statement and confirmation of the Plan and (ii) with respect to HTA Bond Claims, the negotiation and execution of this Agreement and the prosecution and confirmation of the HTA Plan and approval of the HTA Disclosure Statement with respect thereto, each Initial PSA Creditor shall be entitled to receive on the CW Effective Date or the HTA Effective Date, as the case may be, in the form of an allowed administrative expense claim, based upon its respective positions (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured) as of 5:00 p.m. (EDT) on the date hereof, a pro rata share of the HTA Consummation Costs and the CCDA Consummation Costs, as applicable.

(b)    HTA Restriction Fee. In exchange for executing this Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of this Agreement, subject to the entry of the HTA Confirmation Order, each PSA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds (including Assured and National, to the extent Assured or National, as applicable, is authorized to vote such

Insured HTA Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the HTA Plan in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims and HTA 98 Senior Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period; provided, however, that each PSA Restriction Fee Creditor who acquires any HTA 68 Bonds and/or HTA 98 Senior Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured HTA Bond (other than a Monoline-insured HTA Bond insured by Assured or National, as the case may be), to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured HTA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such PSA Restriction Fee equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims and HTA 98 Senior Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the HTA Bond Claims and the entry of the confirmation order; and, provided, further, that, if a PSA Restriction Fee Creditor sells any HTA 68 Bonds or HTA 98 Senior Bonds for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate PSA Restriction Fee plus the Consummation Costs attributable to an HTA Holder's HTA 68 Bond Claims or HTA 98 Senior Bond Claims, as the case may be, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00); and, provided, further, that, in the event this Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) hereof (subject to the extension provided for in Sections 7.1(b) or (c) hereof), or the Oversight Board terminates this Agreement for any reason other than (i) a breach of this Agreement by a non-Government Party, (ii) the denial of confirmation of the HTA Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan or the HTA Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Plan or the HTA Plan on terms consistent with this Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed hereto as Exhibit "J"), (iii) the CVI Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) hereof, the aggregate PSA Restriction Fee and Consummation Costs, in the amount of Twenty Million Dollars ($20,000,000.00) shall be paid, ratably, in cash, as an administrative expense claim under a plan of adjustment for HTA to the Initial PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances,

upon termination of this Agreement, including, without limitation, termination of this Agreement in accordance with other provisions of Section 7.1 hereof, no Consummation Costs or PSA Restriction Fee shall be due and payable to the Party to this Agreement terminating this Agreement or against the Party to this Agreement as to which this Agreement is terminated.

(c)     <u>CCDA Restriction Fee</u>. In exchange for executing this Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of this Agreement, subject to the entry of the Confirmation Order, each PSA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be) to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period; <u>provided</u>, <u>however</u>, that each PSA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be), to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such PSA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment and the entry of the Confirmation Order; and, <u>provided</u>, <u>further</u>, that, if a PSA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, <u>provided</u>, <u>further</u>, that, in all circumstances, the sum of the aggregate PSA Restriction Fee <u>plus</u> the Consummation Costs attributable to a CCDA Holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, <u>provided</u>, <u>further</u>, that, in the event this Agreement is terminated pursuant to the terms of Section 7.1 hereof, no Consummation Costs or PSA Restriction Fee shall be due and payable to a CCDA Holder or Assured with respect to CCDA Bond Claims.

EXECUTION  COPY

(d)      Clawback Structuring Fees.  In exchange for executing this Agreement, agreeing to all of its terms and conditions,  and structuring the payments to be made in accordance with the Settlement Summary annexed hereto as Exhibit  "J", subject to the entry of the HTA Confirmation  Order, on the HTA Effective Date, Assured and National shall be entitled to receive, and the Commonwealth  shall pay, in cash, to Assured and National the amounts of Thirty-Nine Million  Three Hundred Thousand Dollars ($39,300,000.00)  and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00),  respectively.   In the event that this Agreement is terminated by either Assured or National in accordance with the provisions  of Article VII hereof, such Party shall  not be entitled to the payment of a Clawback Structuring  Fee.

## ARTICLE VII

## TERMINATION

Section 7.1      Termination  of Agreement.

(a)      This Agreement may be terminated by any PSA Creditor, solely  as to itself,  at its sole option and discretion and upon written notice to the other Parties, in the event that (i) the Oversight Board fails to comply  with any of its respective covenants in Article IV hereof or any of its undertakings  in this Agreement (except for the failure of the Oversight Board to agree with Assured and National with respect to the HTA Plan, the HTA Confirmation  Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents prior to the CW Effective Date provided  that the Oversight Board used its reasonable best efforts and negotiated  in good faith in a timely  manner in connection therewith), if such failure to comply has or would have an adverse economic or legal impact on such PSA Creditor, including  an adverse economic impact in the treatment afforded to such PSA Creditor under the Plan or the HTA Plan (including  any applicable  settlement under the Plan or the HTA Plan or changes to the legal protections set forth in Section 4.9(b) hereof), or change in the cash flows for the New HTA Bonds referenced in exhibits  to the HTA Plan, the terms and structure of the CVIs set forth in the Plan, or to the definition  or calculation of Consummation  Costs or PSA Restriction Fees that would have an adverse economic or legal impact on such PSA Creditor, (ii) the Oversight Board files any motion  or pleading with the Title III Court, in each case, that is inconsistent  with this Agreement, including  the Plan and the HTA Plan in any adverse economic or legal respect (including  treatment under the Plan or the HTA Plan, or any applicable  settlement under the Plan or the HTA Plan, or change in the cash flows for the New HTA Bonds  referenced in the exhibits to the HTA Plan, the terms and structure of the CVIs set forth in the Plan, or to the definition  or calculation of Consummation  Costs or PSA Restriction Fees) before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions  set forth in Section 8.11 hereof) that such motion  or pleading is inconsistent  with this Agreement in such adverse economic or legal respect and (z) entry of an order of the Title III Court approving  such motion  or pleading, (iii) the entry of a Final Order in the PROMESA Proceedings has a material adverse effect on the confirmability  of the Plan or the HTA Plan, (iv) the CVI Legislation  and the Debt Responsibility  Act are not enacted prior to the commencement of the hearing to consider confirmation  of the Plan, (v) the CW PSA has been terminated as to all parties thereto, (vi) HTA fails to make the payments

44

provided for in Section 4.9(b)(xx) hereof, or (viii) the Commonwealth fails to make the payment provided for in Section 4.9(b)(xxi) hereof.

(b)     This Agreement may be terminated at any time prior to the HTA Effective Date as to all Parties hereto by the Oversight Board, or by joint action of Assured and National in the event that (i) any other Party has failed to comply with any of its respective covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, and such non-compliance has a material adverse effect on confirmability of either the Plan or the HTA Plan, as the case may be (as determined jointly by the Government Parties, Assured and National), (ii) a court order shall be entered, and such order shall not be reversed or otherwise consensually resolved in a manner satisfactory to the Government Parties, and such order in the light of the totality of circumstances, has a material adverse effect on the confirmability of the Plan or renders consummation of the Plan impracticable; provided, however, that, in the event that the treatment to be provided with respect to CCDA Bond Claims renders the Plan unconfirmable, the Oversight Board may delete CCDA and the treatment of CCDA Bond Claims from the Plan, so long as the Oversight Board and Assured have agreed upon an alternative methodology to provide the same economic treatment contemplated for the CCDA Bond Claims in this Agreement and the Settlement Summary annexed hereto as Exhibit "J", and such action shall not give rise to a right of termination of this Agreement as to any Party, (iii) the CW PSA has been terminated as to all parties thereto, (iv) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, (v) the economic situation of the Commonwealth suffers a material adverse change which, in light of the totality of the circumstances, renders the confirmation of the Plan not feasible or consummation of the Plan impracticable, (vi) the Debt Responsibility Act, as enacted, does not contain the Comprehensive Cap, as set forth in the Plan, (vii) the CVI Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan; provided, however, that the Oversight Board's right to terminate this Agreement pursuant to the subsection (vii) may not be exercised earlier than December 31, 2021, or (viii) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment, or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay.

(c)     Without limiting the rights of Assured and National under any other provision in this Agreement, each of Assured and National may, in its sole discretion, terminate this Agreement as to itself if (i) the Oversight Board (A) modifies any of the provisions in the Plan or the HTA Plan and any such modification adversely economically or legally impacts the treatment afforded any HTA Holder, CCDA Holder, Assured or National, as applicable, in the Plan or the HTA Plan, (B) files a plan of adjustment in the Commonwealth PROMESA Proceeding that is economically inconsistent with the treatment set forth in the Plan (including, without limitation, any modifications to the legal protections set forth in Section 4.9(b) hereof; provided, however, that, in the event that the treatment to be provided with respect to CCDA Bond Claims renders the Plan unconfirmable, the Oversight Board may delete CCDA and the treatment of CCDA Bond Claims from the Plan, so long as the Oversight Board and Assured have agreed upon an alternative methodology to provide the same economic treatment contemplated for the CCDA Bond Claims in this Agreement and the Settlement Summary annexed hereto as Exhibit "J", and such action shall not give rise to a right of termination of this

Agreement by Assured or National,  or (C) files the HTA Plan and such plan of adjustment and
the securities  design features of the New HTA Bonds are inconsistent  with the treatment set forth
in Exhibit  "J" hereto), in each case, without  the consent of Assured and National;  and, <u>provided</u>,
<u>further</u>, that, for the avoidance of doubt, Assured and National  shall not have the right to
terminate this Agreement on the basis that the HTA Plan is not filed or confirmed  by the Title  III
Court by a date certain.

(d)       The automatic  stay under Sections 362 and 922 of the Bankruptcy Code, made
applicable  to the PROMESA Proceedings  pursuant to Section 301 of PROMESA, shall not
prohibit  a Party from taking any action necessary to effectuate the termination  of this Agreement
pursuant to and in accordance with the terms hereof.

(e)       This Agreement shall automatically  terminate as to all Parties upon the
occurrence of the HTA Effective Date except with respect to any actions of the Parties that are
expressly set forth herein to occur after the HTA Effective Date.

<u>provided</u>,  <u>however</u>, that, for all purposes of this Section 7.1, the treatment to be afforded to all
classes of claims other than those described in Exhibit  "J" hereto shall not constitute an adverse
economic or legal impact on any PSA Creditor; and, <u>provided</u>,  <u>further</u>, that, in the event that
either Assured or National terminates this Agreement solely as to itself, neither Assured nor
National may object to confirmation  of the Plan and the HTA Plan or otherwise oppose any
motion or application  on the basis of the payment of Consummation  Costs or the PSA
Restriction Fees provided by Article VI hereof, the Plan and the HTA Plan.

Section 7.2      <u>Effect of Termination.</u>   Except as otherwise provided  herein, in the event
of the termination  of this Agreement as to any Party, (a) this Agreement shall become null and
void and be deemed of no force and effect, with no liability  on the part of such Party or any of its
affiliates (or of any of their respective directors, officers, employees, consultants, contractors,
advisory clients, agents, legal and financial advisors or other representatives of such Party or its
affiliates), (b) such Party shall not have any obligations  to any other Party arising out of, and
shall have no further rights, benefits or privileges  under, this Agreement (including,  without
limitation,  any rights to Consummation  Costs or the PSA Restriction Fee, except as provided in
accordance with the provisions  of the Plan and the HTA Plan), except for the obligations  and/or
provisions  set forth in Sections 2.1, 6.1(b), 7.1, 7.3, 8.3, 8.4, 8.8, 8.13 and 8.15 hereof and this
clause (b) of Section 7.2, which provisions  are intended to survive the expiration  or termination
of this Agreement and shall continue in full force and effect in accordance with the terms hereof;
<u>provided</u>,  <u>however,</u> that any liability  of a Party for failure to comply with the terms of this
Agreement prior to the date of such expiration  or termination  shall survive such expiration  or
termination,  and (c) such Party shall have all the rights and remedies that it would have had, and
be entitled to take all actions that it would have been entitled to take, had it not entered into this
Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel,
and the Parties agree to waive, and not raise as a defense, the applicable  statute of limitations  for
any claim, litigation,  proceeding, action or matter against another Party barred by this Agreement
as though such statute of limitations  had been tolled during such time that this Agreement was
binding  on the Party then asserting such claim, litigation,  proceeding, action, or matter; <u>provided</u>,
<u>however,</u> that in no event shall any such termination  relieve such Party from liability  for its
breach or non-performance of its obligations  hereunder prior to the date of such expiration  or

termination; and, _provided_, _further,_ that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void _ab initio,_ and shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, the HTA Plan, this Agreement or otherwise; and, _provided_, _further,_ that, termination of this Agreement shall have no effect on any rights provided pursuant to the CW PSA or any related right or entitlement in accordance with the Plan. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

Section 7.3     Post-Effective Date Obligations.   In addition to the surviving obligations and provisions listed in Section 7.2(b) hereof, the obligations and/or provisions set forth in Sections 4.1(e), 4.1(f), 4.2(d), and 4.2(e) shall survive the automatic termination of this Agreement pursuant to Section 7.1(e) hereof.

ARTICLE VIII

MISCELLANEOUS

Section 8.1     Amendments.   This Agreement, may not be modified, amended, or supplemented except by a written agreement executed by the Government Parties that are Parties hereto, Assured and National; _provided_, _however_, that any modification, amendment, or supplement that has an adverse economic or legal impact on a PSA Creditor, including by changing the treatment afforded to such PSA Creditor under the Plan (including any applicable settlement under the Plan) or changing the cash flows or proposed legal protections for the New GO Bonds or CVIs or definition or calculation of Consummation Costs, or PSA Restriction Fee in a way that would have an adverse economic impact on such PSA Creditor, must be agreed to in writing by each of the Initial PSA Creditors. Notwithstanding the foregoing and the terms and provisions of Sections 4.5(a) and 4.6(a) hereof, and without the consent or approval of Assured and National, from and after the date hereof until the Joinder Deadline, the Oversight Board may solicit additional parties to become signatories hereto subject to all of the terms herein, including, without limitation, the terms and conditions set forth in the exhibits, annexes and schedules hereto; _provided_, _however_, that, notwithstanding the provisions of this Section 8.1, unless a modification, amendment or supplement has an adverse economic or legal impact on a PSA Creditor, the Oversight Board may amend or otherwise modify the terms herein without the consent of such additional parties provided that the prior written consent of Assured and National is obtained; and, _provided_, _further,_ that each additional party must execute and deliver to counsel to the Oversight Board the form of Annex Agreement attached hereto as Exhibit "I"; and, _provided_, _further,_ that, under no circumstances may the provisions of Section 6.1(a) be modified, amended, or supplemented without the express written consent of the Initial PSA Creditors as of the date of this Agreement.

47

Section 8.2    Most Favored Nations.  Notwithstanding anything contained herein to the contrary, in the event that the Oversight Board enters into any agreements which provide (or the Plan or the HTA Plan does provide) for the settlement or Plan or HTA Plan treatment that is more economically favorable (a) to any CCDA Bond Claim or CW/Convention Center Claim (for the avoidance of doubt, including, Insured CCDA Bond Claims or insured CW/Convention Center Claims) than the treatment set forth in the Settlement Summary for any other CCDA Bond Claims or CW/Convention Center Claims, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such CCDA Bond Claim or CW/Convention Center Claim, (b) to any HTA Bond Claim or CW/HTA Claim (for the avoidance of doubt, including, Insured HTA Bond Claims or insured CW/HTA Claims), than the treatment set forth in the Settlement Summary for any other HTA Bond Claim or CW/HTA Claim, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such HTA Bond Claim or CW/HTA Claim, (c) to any claim arising from or relating to the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee, as amended (the "**PRIFA Bond Claims**"), or CW/PRIFA Rum Tax Claim (for the avoidance of doubt, including insured PRIFA Bond Claims or insured CW/PRIFA Rum Tax Claims), than the treatment set forth in the Settlement Summary for any other PRIFA Bond Claim or CW/PRIFA Rum Tax Claim, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such PRIFA Bond Claim or CW/PRIFA Rum Tax Claim, or (d) to any Monoline, or holder of an Insured Bond Claim or insured PRIFA Bond Claim than the treatment provided hereunder and set forth in the Settlement Summary or under the Plan or the HTA Plan to Assured, National, or any holder of Insured Bond Claims or PRIFA Bond Claims insured by Assured or National, then the treatment provided to Assured, National and holders of Insured HTA Bond Claims, Insured CCDA Bond Claims or PRIFA Bond Claims insured by Assured or National, as the case may be, shall be modified to be equal to such enhanced treatment; provided, however, that treatment of customary "Convenience Claims", as defined in the Plan, shall be exempt from this provision; and, provided, further, that the payment of any premium paid to a Monoline in connection with providing insurance with respect to the refunding of any New HTA Bonds shall be exempt from this provision; and provided, further, that (y) more economically favorable treatment of CCDA Bond Claims, CW/Convention Center Claims, HTA Bond Claims, CW/HTA Claims, PRIFA Bond Claims, and/or CW/PRIFA Rum Tax Claims required by a Final Order resulting from a determination by litigation (but excluding an order approving a settlement, pursuant to Bankruptcy Rule 9019 or otherwise) of the Title III Court or such other court of competent jurisdiction, and (z) any claim arising from or relating to the PRIFA BANs, as defined in the CW PSA, shall be exempt from this provision.

Section 8.3    No Admission of Liability.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance

123408529v3

of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Debt Related Objections, the Invalidity Actions, the Lift Stay Motions, the Section 926 Motion, the Clawback Actions, the Lien Challenge Actions, or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against the Commonwealth, HTA or CCDA with respect to the validity of any of the CCDA Bond Claims, or HTA Bond Claims. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 8.4    Good Faith Negotiations.    The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; and each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement. The Parties further acknowledge and agree that, in connection with the PROMESA Proceedings and the negotiation and consummation of this Agreement, including, without limitation, the Plan and the HTA Plan, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 8.5    Third Party Beneficiary.    Other than funds and/or accounts which are holders of the HTA Bonds or CCDA Bonds, and whose advisors or managers are Parties hereto, and Assured and National, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any person (including, without limitation, any Monoline other than Assured and National) other than the Parties hereto, and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or

enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

    Section 8.7    Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

    Section 8.8    Binding Agreement; Successors and Assigns.  This Agreement is intended to, and shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Plan or the HTA Plan are not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.  Notwithstanding the foregoing, unless otherwise agreed to by the Parties, provisions herein providing payment of the Consummation Costs and PSA Restriction Fees are integral parts of this Agreement and cannot be severed.

    Section 8.9    Entire Agreement.  This Agreement, including, without limitation, the Plan and the HTA Plan, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Plan and the HTA Plan, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

**EXECUTION COPY**

      Section 8.10    <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

      Section 8.11    <u>Notices.</u>  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

      (a)      If to the Oversight Board, the Commonwealth, CCDA or HTA, to:

      PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

      (b)      If to AAFAF, to:

      O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
Email: jrapisardi@omm.com
Maria J. DiConza, Esq.
Email: mdiconza@omm.com
Facsimile: 212-326-2061

      (c)      If to Assured, to:

      CADWALADER, WICKERSHAM & TAFT
200 Liberty Street
New York, NY 10281
Attn: Mark Ellenberg, Esq.

**EXECUTION COPY**

Email: mark.ellenberg@cwt.com
Casey Servais, Esq.
Email: casey.servais@cwt.com

(d)        If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Andrew Wilkinson, Esq.
Email: Andrew.wilkinson@weil.com
Attn: Kelly Di Blasi, Esq.
Email: Kelly.diblasi@weil.com
Kirsten Erichsen, Esq.
Email: Kirsten.erichsen@weil.com

Section 8.12    Non-Waiver of Remedies. Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 8.13    Several, Not, Joint Obligations. The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

Section 8.14    Remedies Cumulative. All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 8.15    Specific Performance. Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other similar relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement; provided, however, that, in the event the Agreement is terminated in accordance with the terms and provisions of Section 7.1 hereof, the sole remedy

52

(other than to enforce provisions  of this Agreement that survive  termination  hereof) shall be the payment of the fees set forth in Section 6.1(b) hereof, as applicable.

Section 8.16   <u>Further Assurances.</u>  Each of the Parties hereto agrees to execute and deliver,  or to cause to be executed and delivered,  such instruments,  and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

**THE COMMONWEALTH OF PUERTO RICO**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

**THE PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Highways and Transportation Authority

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

123408529v3

**ASSURED GUARANTY CORP. and ASSURED GUARANTY MUNICIPAL CORP.**

By:  /s/ Russell B. Brewer II
Name: Russell B. Brewer II
Title: Chief Surveillance  Office


Insurer of Principal Amount of HTA Bonds: ███████████

Insurer of Principal Amount of CCDA Bonds: ███████████

55

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By:  /s/ Adam Bergonzi

Name:  Adam Bergonzi

Title:  Chief Risk Officer

Insurer of Face Amount of HTA Bonds: ███████████

Insurer of Face Amount of CCDA Bonds: ███████████

56

**DAVIDSON KEMPNER CAPITAL MANAGEMENT LP, on behalf of certain of its affiliated investment funds or affiliated entities**

By:   /s/ Suzanne K. Gibbons

Name:   Suzanne K. Gibbons

Title:    Managing Member

Holder of Face Amount of HTA Bonds: ███████████

Holder of Face Amount of CCDA Bonds: ██████████

57

**WHITEHAVEN CREDIT OPPORTUNITIES MASTER FUND, LTD.**

By:    /s/ Scott Richman
Name:   Scott Richman
Title:   Managing Partner and CIO

Holder of Face Amount of HTA Bonds: ████████

Holder of Face Amount of CCDA Bonds: ████████

## EXHIBIT A

LIST OF HTA HOLDERS

Davidson Kempner Capital Management LP, on behalf of certain of its affiliated investment funds or affiliated entities

Whitehaven Credit Opportunities Fund, Ltd.

## **EXHIBIT B**

LIST OF CCDA HOLDERS

None

# **EXHIBIT C**

SCHEDULE OF HTA 68 BONDS

## SCHEDULE OF HTA 68 BONDS

| CUSIP | Series | Maturity | Issuance |
|---|---|---|---|
| 745181M79 | SERIES Z | 7/1/18 | 3/1/96 |
| 745181NF0 | SERIES Y | 7/1/21 | 4/9/96 |
| 745181N60 | SERIES AA | 7/1/17 | 4/29/03 |
| 745181N78 | SERIES AA | 7/1/18 | 4/29/03 |
| 745181N86 | SERIES AA | 7/1/19 | 4/29/03 |
| 745181N94 | SERIES AA | 7/1/20 | 4/29/03 |
| 745181XN2 | SERIES AA | 7/1/21 | 4/29/03 |
| 745181XQ5 | SERIES AA | 7/1/23 | 4/29/03 |
| 745181XR3 | SERIES AA | 7/1/28 | 4/29/03 |
| 745181XS1 | SERIES AA | 7/1/35 | 4/29/03 |
| 745181ZJ9 | SERIES BB | 7/1/17 | 10/4/05 |
| 745181ZK6 | SERIES BB | 7/1/18 | 10/4/05 |
| 745181P35 | SERIES BB | 7/1/22 | 10/4/05 |
| 745181B22 | SERIES CC | 7/1/21 | 3/6/07 |
| 745181B48 | SERIES CC | 7/1/23 | 3/6/07 |
| 745181B55 | SERIES CC | 7/1/24 | 3/6/07 |
| 745181B63 | SERIES CC | 7/1/25 | 3/6/07 |
| 745181B71 | SERIES CC | 7/1/26 | 3/6/07 |
| 745181B89 | SERIES CC | 7/1/27 | 3/6/07 |
| 745181B97 | SERIES CC | 7/1/28 | 3/6/07 |
| 745181C21 | SERIES CC | 7/1/29 | 3/6/07 |
| 745181C39 | SERIES CC | 7/1/30 | 3/6/07 |
| 745181C47 | SERIES CC | 7/1/31 | 3/6/07 |
| 745181C54 | SERIES CC | 7/1/32 | 3/6/07 |
| 745181C62 | SERIES CC | 7/1/33 | 3/6/07 |
| 745181C70 | SERIES CC | 7/1/34 | 3/6/07 |
| 745181C88 | SERIES CC | 7/1/36 | 3/6/07 |
| 745181K97 | SERIES AA REMARKETING | 7/1/35 | 4/29/03 |
| 745181N52 | SERIES AA REMARKETING | 7/1/26 | 4/29/03 |

123408529v3

# **EXHIBIT D**

SCHEDULE OF HTA 98 BONDS

## SCHEDULE OF HTA 98 BONDS

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745190AU2 | SERIES A | 7/1/17 | 3/19/98 |
| 745190AV0 | SERIES A | 7/1/18 | 3/19/98 |
| 7451903T3 | SERIES A | 7/1/28 | 2/15/98 |
| 745190Y77 | SERIES A | 7/1/28 | 5/27/08 |
| 745190AY4 | SERIES A | 7/1/38 | 2/15/98 |
| 745190Z92 | SERIES A | 7/1/38 | 2/15/98 |
| 745190HC5 | SERIES E | 7/1/17 | 2/7/02 |
| 745190HD3 | SERIES E | 7/1/18 | 2/7/02 |
| 745190HE1 | SERIES E | 7/1/19 | 2/7/02 |
| 745190HF8 | SERIES E | 7/1/20 | 2/7/02 |
| 745190HG6 | SERIES E | 7/1/21 | 2/7/02 |
| 745190HH4 | SERIES E | 7/1/22 | 2/7/02 |
| 745190HJ0 | SERIES E | 7/1/23 | 2/7/02 |
| 745190HK7 | SERIES E | 7/1/24 | 2/7/02 |
| 745190J41 | SERIES D | 7/1/27 | 2/7/02 |
| 7451902B3 | SERIES D | 7/1/32 | 2/7/02 |
| 7451902Q0 | SERIES G | 7/1/19 | 4/29/03 |
| 7451902R8 | SERIES G | 7/1/20 | 4/29/03 |
| 745190KC1 | SERIES G | 7/1/22 | 4/29/03 |
| 745190KD9 | SERIES G | 7/1/23 | 4/29/03 |
| 745190K56 | SERIES G | 7/1/28 | 4/29/03 |
| 7451902S6 | SERIES G | 7/1/33 | 4/29/03 |
| 7451902T4 | SERIES G | 7/1/42 | 4/29/03 |
| 7451902W7 | SERIES H | 7/1/18 | 4/29/03 |
| 745190KX5 | SERIES H | 7/1/19 | 4/29/03 |
| 745190KY3 | SERIES H | 7/1/20 | 4/29/03 |
| 745190KZ0 | SERIES H | 7/1/21 | 4/29/03 |
| 745190LA4 | SERIES H | 7/1/22 | 4/29/03 |
| 745190LB2 | SERIES H | 7/1/23 | 4/29/03 |
| 745190L22 | SERIES H | 7/1/28 | 4/29/03 |
| 7451902X5 | SERIES H | 7/1/35 | 4/29/03 |
| 745190PF9 | SERIES I | 7/1/17 | 4/20/04 |
| 745190PG7 | SERIES I | 7/1/18 | 4/20/04 |
| 745190PH5 | SERIES I | 7/1/19 | 4/20/04 |
| 745190PJ1 | SERIES I | 7/1/20 | 4/20/04 |
| 745190PK8 | SERIES I | 7/1/21 | 4/20/04 |
| 7451902Z0 | SERIES I | 7/1/22 | 4/20/04 |
| 745190PM4 | SERIES I | 7/1/23 | 4/20/04 |
| 745190PN2 | SERIES I | 7/1/24 | 4/20/04 |
| 745190PP7 | SERIES I | 7/1/25 | 4/20/04 |
| 745190PQ5 | SERIES I | 7/1/26 | 4/20/04 |
| 7451903K2 | SERIES J | 7/1/17 | 4/20/04 |
| 7451903L0 | SERIES J | 7/1/18 | 4/20/04 |
| 745190QH4 | SERIES J | 7/1/19 | 4/20/04 |
| 7451903M8 | SERIES J | 7/1/20 | 4/20/04 |
| 7451903N6 | SERIES J | 7/1/21 | 4/20/04 |
| 745190QM3 | SERIES J | 7/1/22 | 4/20/04 |

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745190QP6 | SERIES J | 7/1/23 | 4/20/04 |
| 745190QR2 | SERIES J | 7/1/24 | 4/20/04 |
| 7451903P1 | SERIES J | 7/1/29 | 4/20/04 |
| 745190TC2 | SERIES K | 7/1/17 | 10/4/05 |
| 745190TD0 | SERIES K | 7/1/18 | 10/4/05 |
| 745190TE8 | SERIES K | 7/1/19 | 10/4/05 |
| 745190TF5 | SERIES K | 7/1/20 | 10/4/05 |
| 745190TG3 | SERIES K | 7/1/20 | 10/4/05 |
| 745190TH1 | SERIES K | 7/1/21 | 10/4/05 |
| 745190TJ7 | SERIES K | 7/1/22 | 10/4/05 |
| 745190TK4 | SERIES K | 7/1/23 | 10/4/05 |
| 745190TL2 | SERIES K | 7/1/24 | 10/4/05 |
| 745190TM0 | SERIES K | 7/1/25 | 10/4/05 |
| 745190TN8 | SERIES K | 7/1/25 | 10/4/05 |
| 745190TP3 | SERIES K | 7/1/26 | 10/4/05 |
| 745190TQ1 | SERIES K | 7/1/27 | 10/4/05 |
| 745190TR9 | SERIES K | 7/1/30 | 10/4/05 |
| 745190TS7 | SERIES K | 7/1/35 | 10/4/05 |
| 745190UC0 | SERIES L | 7/1/17 | 10/4/05 |
| 745190UD8 | SERIES L | 7/1/18 | 10/4/05 |
| 745190UE6 | SERIES L | 7/1/19 | 10/4/05 |
| 745190UF3 | SERIES L | 7/1/20 | 10/4/05 |
| 745190UG1 | SERIES L | 7/1/21 | 10/4/05 |
| 745190UH9 | SERIES L | 7/1/22 | 10/4/05 |
| 745190UJ5 | SERIES L | 7/1/23 | 10/4/05 |
| 745190UK2 | SERIES L | 7/1/24 | 10/4/05 |
| 745190UL0 | SERIES L | 7/1/25 | 10/4/05 |
| 745190UM8 | SERIES L | 7/1/30 | 10/4/05 |
| 745190UP1 | SERIES L | 7/1/35 | 10/4/05 |
| 745190UN6 | SERIES L | 7/1/35 | 10/4/05 |
| 745190UQ9 | SERIES L | 7/1/38 | 10/4/05 |
| 745190UR7 | SERIES L | 7/1/41 | 10/4/05 |
| 745190YB8 | SERIES M | 7/1/17 | 3/6/07 |
| 745190YC6 | SERIES M | 7/1/18 | 3/6/07 |
| 745190YD4 | SERIES M | 7/1/18 | 3/6/07 |
| 745190YE2 | SERIES M | 7/1/19 | 3/6/07 |
| 745190YF9 | SERIES M | 7/1/20 | 3/6/07 |
| 745190YG7 | SERIES M | 7/1/20 | 3/6/07 |
| 745190YH5 | SERIES M | 7/1/21 | 3/6/07 |
| 745190YJ1 | SERIES M | 7/1/22 | 3/6/07 |
| 745190YK8 | SERIES M | 7/1/22 | 3/6/07 |
| 745190YL6 | SERIES M | 7/1/23 | 3/6/07 |
| 745190YM4 | SERIES M | 7/1/23 | 3/6/07 |
| 745190YN2 | SERIES M | 7/1/24 | 3/6/07 |
| 745190YP7 | SERIES M | 7/1/24 | 3/6/07 |
| 745190YQ5 | SERIES M | 7/1/25 | 3/6/07 |
| 745190YR3 | SERIES M | 7/1/25 | 3/6/07 |
| 745190YS1 | SERIES M | 7/1/26 | 3/6/07 |
| 745190YT9 | SERIES M | 7/1/26 | 3/6/07 |

123408529v3

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745190YU6 | SERIES M | 7/1/27 | 3/6/07 |
| 745190YV4 | SERIES M | 7/1/27 | 3/6/07 |
| 745190YW2 | SERIES M | 7/1/32 | 3/6/07 |
| 745190YY8 | SERIES M | 7/1/37 | 3/6/07 |
| 745190YX0 | SERIES M | 7/1/37 | 3/6/07 |
| 7451903D8 | SERIES M | 7/1/46 | 3/6/07 |
| 745190ZA9 | SERIES N | 7/1/19 | 3/6/07 |
| 745190ZB7 | SERIES N | 7/1/20 | 3/6/07 |
| 745190ZC5 | SERIES N | 7/1/21 | 3/6/07 |
| 745190ZD3 | SERIES N | 7/1/22 | 3/6/07 |
| 745190ZE1 | SERIES N | 7/1/23 | 3/6/07 |
| 745190ZF8 | SERIES N | 7/1/24 | 3/6/07 |
| 745190ZG6 | SERIES N | 7/1/25 | 3/6/07 |
| 745190ZH4 | SERIES N | 7/1/26 | 3/6/07 |
| 745190ZJ0 | SERIES N | 7/1/27 | 3/6/07 |
| 745190ZK7 | SERIES N | 7/1/28 | 3/6/07 |
| 745190ZL5 | SERIES N | 7/1/29 | 3/6/07 |
| 745190ZM3 | SERIES N | 7/1/30 | 3/6/07 |
| 745190ZN1 | SERIES N | 7/1/31 | 3/6/07 |
| 745190ZP6 | SERIES N | 7/1/32 | 3/6/07 |
| 745190ZQ4 | SERIES N | 7/1/33 | 3/6/07 |
| 745190ZR2 | SERIES N | 7/1/34 | 3/6/07 |
| 745190ZS0 | SERIES N | 7/1/36 | 3/6/07 |
| 745190ZT8 | SERIES N | 7/1/39 | 3/6/07 |
| 745190ZU5 | SERIES N | 7/1/41 | 3/6/07 |
| 745190ZV3 | SERIES N | 7/1/45 | 3/6/07 |
| 7451903V8 | SERIES H REMARKETING | 7/1/32 | 4/29/03 |

123408529v3

# **EXHIBIT E**

SCHEDULE OF HTA 98 SUB BONDS

## SCHEDULE OF HTA 98 SUB BONDS

| CUSIP | Series | Maturity | Issuance |
|---|---|---|---|
| 745190CN6 | SERIES 1998 | 7/1/18 | 7/15/98 |
| 745190CP1 | SERIES 1998 | 7/1/22 | 7/15/98 |
| 745190CQ9 | SERIES 1998 | 7/1/28 | 7/15/98 |
| 745190MF2 | SERIES 2003 SUBORDINATE | 7/1/17 | 4/29/03 |
| 745190MG0 | SERIES 2003 SUBORDINATE | 7/1/17 | 4/29/03 |
| 745190MH8 | SERIES 2003 SUBORDINATE | 7/1/18 | 4/29/03 |
| 745190MJ4 | SERIES 2003 SUBORDINATE | 7/1/18 | 4/29/03 |
| 745190MK1 | SERIES 2003 SUBORDINATE | 7/1/19 | 4/29/03 |
| 745190ML9 | SERIES 2003 SUBORDINATE | 7/1/19 | 4/29/03 |
| 745190MM7 | SERIES 2003 SUBORDINATE | 7/1/20 | 4/29/03 |
| 745190MN5 | SERIES 2003 SUBORDINATE | 7/1/21 | 4/29/03 |
| 745190MP0 | SERIES 2003 SUBORDINATE | 7/1/22 | 4/29/03 |
| 745190MQ8 | SERIES 2003 SUBORDINATE | 7/1/22 | 4/29/03 |
| 745190MR6 | SERIES 2003 SUBORDINATE | 7/1/23 | 4/29/03 |
| 745190MS4 | SERIES 2003 SUBORDINATE | 7/1/28 | 4/29/03 |

123408529v3

## **EXHIBIT F**

SCHEDULE OF CCDA BONDS

123408529v3

## SCHEDULE OF CCDA BONDS

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745266AP1 | SERIES 2006 | 7/1/17 | 3/24/06 |
| 745266AQ9 | SERIES 2006 | 7/1/18 | 3/24/06 |
| 745266AR7 | SERIES 2006 | 7/1/19 | 3/24/06 |
| 745266AS5 | SERIES 2006 | 7/1/20 | 3/24/06 |
| 745266AT3 | SERIES 2006 | 7/1/21 | 3/24/06 |
| 745266AU0 | SERIES 2006 | 7/1/21 | 3/24/06 |
| 745266AV8 | SERIES 2006 | 7/1/22 | 3/24/06 |
| 745266AW6 | SERIES 2006 | 7/1/23 | 3/24/06 |
| 745266AX4 | SERIES 2006 | 7/1/24 | 3/24/06 |
| 745266AY2 | SERIES 2006 | 7/1/25 | 3/24/06 |
| 745266AZ9 | SERIES 2006 | 7/1/26 | 3/24/06 |
| 745266BA3 | SERIES 2006 | 7/1/26 | 3/24/06 |
| 745266BB1 | SERIES 2006 | 7/1/27 | 3/24/06 |
| 745266BC9 | SERIES 2006 | 7/1/31 | 3/24/06 |
| 745266BD7 | SERIES 2006 | 7/1/36 | 3/24/06 |

**<u>EXHIBIT G</u>**

LIST OF INVALIDITY ACTIONS

123408529v3

## INVALIDITY ACTIONS

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

## **EXHIBIT H**

FORM OF JOINDER AGREEMENT

## FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE HTA/CCDA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), the Puerto Rico Highways and Transportation Authority ("**HTA**"), and (b) holders of HTA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) holders of CCDA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holders as set forth on Exhibit "B" to the PSA (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA Holders**"), and (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds ("**Assured**"), (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively with the HTA Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**") and (f) the other PSA Creditors from time to time party thereto, is executed and delivered by _____ (the "**Joining PSA Creditors**") as of _____ 2021. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

1.    <u>Agreement to be Bound</u>.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA. The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "HTA Holder" (if it holds HTA Bond Claims) and a "CCDA Holder" (if it holds CCDA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any HTA Bond Claims and CCDA Bond Claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any HTA Bond Claims, and CCDA Bond Claims held in a Qualified Marketmaker capacity).

2.    <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of any HTA Bond Claims and CCDA Bond Claims (without duplication) held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of any HTA Bond Claims, and CCDA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 3.5 of the PSA and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 3.6 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 4.5 of the PSA, and a " CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 4.6 of the PSA, to each of the other Parties to the PSA.

3.    <u>Governing Law</u>. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

4.    <u>Notice of Joinder</u>. The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.5 of the PSA (if it holds HTA Bond Claims), Section 4.6 of the PSA (if it holds CCDA Bond Claims), and the notice provisions set forth in Section 8.11 of the PSA.

5.    <u>Acquisition of Non-PSA Bonds</u>. To the extent that the Joining PSA Creditor (a) as of the date hereof, holds HTA Bond Claims or CCDA Bond Claims not subject to the PSA and/or (b) from and after the date hereof, acquires HTA Bond Claims or CCDA Bond Claims in addition to those HTA Bond Claims or CCDA Bond Claims acquired pursuant to this Joinder Agreement, the Joining PSA Creditor shall, within five (5) calendar days of the date hereof or, to the extent of after-acquired HTA Bond Claims or CCDA Bond Claims, from the date of such subsequent acquisition, deliver to counsel for the Oversight Board, financial information required in accordance with the provisions of Section 2.2 of the PSA with respect to such HTA Bond Claims and CCDA Bond Claims.

IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.

[NAME OF QUALIFIED TRANSFEREE]

By: _____
     Name:
     Title:

Holder of Face Amount of HTA Bonds:

Holder of Face Amount of CCDA Bonds:

## **EXHIBIT I**

FORM OF ANNEX AGREEMENT

123408529v3

# FORM OF ANNEX AGREEMENT

ANNEX AGREEMENT TO THE HTA/CCDA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), Puerto Rico Public Highways and Transportation Authority ("**HTA**"), and Convention Center District Authority of Puerto Rico ("**CCDA**"), (b) holders of HTA Bond Claims each as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) holders of CCDA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holders as set forth on Exhibit "B" to the PSA (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA3 Holders**"), (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds ("**Assured**"), and (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively, with the GO Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**"), and (f) the other PSA Creditors from time to time party thereto, is executed and delivered by _____(the "**Annex PSA Creditor**") as of _____ 2021.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

       1.      <u>Agreement to be Bound</u>.  The Annex PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Annex PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "HTA Holder" (if it holds HTA Bond Claims) and a "CCDA Holder" (if it holds CCDA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any HTA Bond Claims and CCDA Bond Claims held by the Annex PSA Creditor as of the date of this Annex Agreement (other than any HTA Bond Claims and CCDA Bond Claims held in a Qualified Marketmaker capacity).

       2.      <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of any HTA Bond Claims and CCDA Bond Claims (without duplication) held by the Annex PSA Creditor, the Annex PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 3.5 of the PSA and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 3.6 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 4.5 of the PSA, and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 4.6 of the PSA, to each of the other Parties to the PSA.

3.      Governing Law. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Annex Agreement.

4.      Notice of Annex.  The Annex PSA Creditor agrees to provide a copy of this Annex Agreement to counsel to the Oversight Board and in accordance with the notice provisions set forth in Section 8.11 of the PSA; provided, however, that, except with respect to counsel to the Oversight Board, the Annex PSA Creditor may delete the face amount of HTA Bonds and CCDA Bonds set forth below.

5.      Rejection of Annex Agreement.  Notwithstanding the execution and delivery of this Annex Agreement to counsel to the Oversight Board, the Oversight Board may, in its sole and absolute discretion, determine not to accept such Annex Agreement and, in such event, (a) the Oversight Board shall provide written notice of such determination to the Annex PSA Creditor within fifteen (15) Business Days of receipt of the Annex Agreement and (b) the Annex PSA Creditor shall have no rights or entitlements pursuant to the PSA including, without limitation, rights to receive a PSA Restriction Fee.

IN WITNESS WHEREOF, the Annex PSA Creditor has caused this Annex Agreement to be executed as of the date set forth above.

[NAME OF ANNEX PSA CREDITOR]

By: _____
        Name: _____
        Title:   _____
        Address: _____
                    _____
                    _____

Holder of Face Amount of HTA Bonds:

Holder of Face Amount of CCDA Bonds:

# **EXHIBIT J**

SETTLEMENT SUMMARY

123408529v3

**SUMMARY OF KEY ECONOMIC TERMS:**

| TERM | DESCRIPTION |
|---|---|
| **1) HTA Consideration** | |
| **a) Cash** | |
| **i)  Amount** | ▪ $184,800,000 distributed to holders of HTA 68 Bond Claims and $79,200,000 distributed to holders of HTA 98 Senior Bond Claims (in aggregate, "HTA Cash") once the Distribution Conditions (as defined in the HTA PSA) have been met |
| **b) Debt** | |
| **i)  New HTA Bonds** | ▪ HTA Current Interest Bonds ("HTA CIBs")<br>▪ HTA Capital Appreciation Bonds ("HTA CABs")<br>▪ HTA Convertible Capital Appreciation Bonds ("HTA Convertible CABs") |
| **ii) Par Amount** | ▪ $1,245,000,000, allocated as specified within Annex 2 of this document |
| **iii) Tenor** | ▪ Up to 40 years |
| **iv) Interest Rate** | ▪ Average interest rate of 5.0% |
| **v)  Deemed Issuance Date** | ▪ New HTA Bonds to begin accruing interest on the earlier of (i) July 1, 2022 and (ii) the HTA Effective Date |
| **vi) Call Option** | ▪ HTA CIBs and HTA CABs<br>   o Callable in 10 years at par<br>▪ HTA Convertible CABs:<br>   o Conversion date of 10 years or less<br>   o Callable at par commencing on the earlier of (i) 7 years after conversion date and (ii) 10.5 years after issuance |
| **vii) Cash for Bond Exchange** | ▪ Commonwealth / HTA retain the ability to substitute cash instead of New HTA Bonds at the HTA Effective Date |
| **viii)  Public-Private Partnership** | ▪ Alternative to revenue bond structuring via public-private partnership or option to redeem all or a portion of the revenue bonds at par from proceeds of a public-private partnership with respect to the toll roads. Any such redemption |

| TERM | DESCRIPTION |
|---|---|
| | shall be done in a manner so as to preserve the tax exemption of the New HTA Bonds |
| **2) CCDA** | |
|    **a) Cash** | ▪ $97,000,000 |
| **3) Clawback CVI** | ▪ Clawback CVI to be structured consistent with CVI in the CW PSA and further elaborated in the Plan of Adjustment<br>▪ Clawback CVI to Allowed CW/HTA Claims to be distributed once Distribution Conditions (as defined above) have occurred |
|    **a) Outperformance Metric** | ▪ See Annex 1 |
|    **b) Measured SUT** | ▪ As defined in PSA |
|    **c) Attachment Point** | ▪ 100% of 5.5% SUT CW Fiscal Plan projections as included in Annex 1 (the "Baseline SUT") |
|    **d) Structure of Clawback CVI** | ▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the Clawback CVI<br>▪ Security provisions as described in CW PSA Section 4.10 (b) |
|    **e) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
|    **f) Clawback CVI Notional / Lifetime Cap** | ▪ HTA: $3,697,668,995<br>▪ CCDA: $217,228,391 |
|    **g) Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
|    **h) Clawback CVI Maximum Annual Payment** | ▪ Clawback CVI Maximum Annual Payment applicable to aggregate payments to Clawback CVI (i.e., both Subject to Waterfall and Not Subject to Waterfall)<br>▪ Years 1-22: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the |

123408529v3

| TERM | DESCRIPTION |
|---|---|
| | applicable annual cap (i.e., $350 million) (the "Initial Period CVI Maximum Annual Payment")<br>▪ <u>Years 23-30</u>: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) (the "Post-GO/PBA CVI Maximum Annual Payment")<br>▪ To the extent that the GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the Post-GO/PBA CVI Maximum Annual Payment for the Clawback CVI would begin to apply in the following year<br>▪ To the extent any unused amounts from previous years remain at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI |
| **i)  Call Structure for Clawback CVI** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| **j)  SUT True-Up** | ▪ As described in CW PSA Exhibit I |
| **k)  Baseline SUT Reduction** | ▪ As described in CW PSA Exhibit I |
| **l)  CVI Subject to Waterfall** | |
| **i)  Subject to Waterfall Outperformance Condition** | ▪ On an annual basis, the lesser of (the "Subject to Waterfall Outperformance Amount"):<br>  o (i) 50% of cumulative outperformance above the Outperformance Metric, starting on July 1, 2021, less payments previously made to GO CVI and Clawback CVI from Subject to Waterfall Outperformance Amount<br>  o (ii) 75% of annual outperformance |

123408529v3

| TERM | DESCRIPTION |
|---|---|
| **ii)  Subject to Waterfall Annual Payments** | ▪ <u>Years 1-22</u>: From the Subject to Waterfall Outperformance Amount, annual payment waterfall as follows:<br>  ○ (a) First $100,000,000  to GO CVI<br>  ○ (b) Next $11,111,111  to Clawback CVI<br>  ○ (c) Pro rata sharing thereafter of 90% to GO CVI and 10% to Clawback CVI, subject to any applicable  caps<br>▪ <u>Years 23-30</u>: 100% of the Subject to Waterfall Outperformance Amount to Clawback CVI, subject to any applicable  caps |
| **m) CVI Not Subject to Waterfall** | |
| **i)  Not Subject to Waterfall Outperformance Condition** | ▪ On an annual basis, the lesser of (the "Not Subject to Waterfall Outperformance Amount"):<br>  ○ (i) 40% of cumulative  outperformance above the Outperformance Metric, starting on July 1, 2021, less payments  previously  made to Clawback CVI from Not Subject to Waterfall Outperformance Amount<br>  ○ (ii) 95% of annual outperformance (combined with amounts Subject to Waterfall) |
| **ii)  Not Subject to Waterfall Annual Payments** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable  caps |
| **n)  Clawback CVI Recipients** | ▪ HTA allocation of the Clawback CVI will be no less than 68.6%, as specified within Annex 3 of this document |
| **o)  HTA Clawback CVI Priority Distribution Waterfall** | ▪ <u>First</u>, Clawback CVI payments, if any, to the HTA 68 Bond Claims  up to $179,462,539<br>▪ <u>Second</u>, Clawback CVI payments, if any, to HTA 98 Senior Bond Claims  up to $1,833,405,578<br>▪ <u>Third</u>, Clawback CVI payments, if any, to HTA 98 Sub Bond Claims  up to $207,294,178<br>▪ <u>Fourth</u>, after paying the permitted amounts above in full, remaining Clawback CVI payments, if any, to the HTA GDB DRA Loan up to $1,477,506,700<br>▪ Waterfall implemented  to the maximum extent allowable  against the Commonwealth  and subject to judicial  determination |

## ANNEX 1: 5.5% SUT BASELINE[1]

*($ USD)*

| | 5.5% SUT Baseline | | |
|---|---|---|---|
| **Fiscal Year** | **Amount** | **Fiscal Year** | **Amount** |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | 2050[1] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | 2051[1] | 1,810,682,942.40 |

---

[1] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

123408529v3

**ANNEX 2: NEW HTA BONDS ALLOCATION SUMMARY**

| Claim | New HTA Bonds Allocation ($) |
|---|---|
| HTA 68 Bond Claims | $646,389,106 |
| HTA 98 Senior Bond Claims | $598,610,894 |

123408529v3

**ANNEX 3: CLAWBACK CVI MINIMUM ALLOCATION SUMMARY**

| Claim | Minimum Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims | 68.6% |

123408529v3