# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) PROMESA |
| | ) Title III |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) No. 17 BK 3283-LTS |
| | ) |
| as representative of | ) (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, | ) |
| *et al.* | ) |
| | ) |
| Debtors. | ) |
| | ) |
| In re: | ) |
| | ) PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) |
| | ) No. 17 BK 4780-LTS |
| as representative of | ) |
| PUERTO RICO ELECTRIC POWER | ) |
| AUTHORITY ("PREPA") | ) |
| | ) |
| Debtor.[1] | ) **Re: 17-BK-04780-LTS, ECF No.** |
| | ) **2841** |
| | ) |

## JOINT OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, PUERTO RICO ELECTRIC POWER AUTHORITY, AND PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY TO COBRA ACQUISITIONS LLC'S MOTION FOR STAY RELIEF

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT...................................................................................1
OBJECTION..............................................................................................................5

    I.     FEMA's Pending Review Weighs in Favor of the Continued Stay......................6

         A.    Material Progress Has Been Made and Is Expected ...................................6

         B.    FEMA's Review is Critical to Determining Liability ..............................10

         C.    Cobra's Position on PREPA's Review of Invoices is Misguided..............12

    II.    The Criminal Dispositions Weigh In Favor of a Continued Stay ..........................14

    III.   The Balance of Harms Weighs Decidedly In Favor of Maintaining the Stay........17

CONCLUSION.........................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Arthur Young & Co. v. Vega III*,
    136 D.P.R. 157 (1994) ...............................................................................................16

*Banco Popular v. Sucn. Talavera*,
    174 D.P.R. 686 (2008) ...............................................................................................16

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    No. 17-bk-4780, 2022 WL 1401506 (D.P.R. May 4, 2022) ....................................11

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
    385 F.3d 72 (1st Cir. 2004) .........................................................................................5

*Punta Lima, LLC v. Punta Lima Dev. Co.*,
    440 F. Supp. 3d 130 (D.P.R. 2020) ..........................................................................16

*Ramírez Anglada v. Club Cala de Palmas*,
    23 P.R. Offic. Trans. 311 (1989) ..............................................................................16

*United States v. Sandoval*,
    6 F.4th 63 (1st Cir. 2021), *cert. denied sub nom. Larios v. United States*, 142
    S. Ct. 801, 211 L. Ed. 2d 499 (2022), *and cert. denied sub nom. Guzman v.*
    *United States*, 142 S. Ct. 801, 211 L. Ed. 2d 499 (2022), *and cert. denied sub*
    *nom. Martinez v. United States*, 142 S. Ct. 802, 211 L. Ed. 2d 499 (2022) ..........14

STATUTES

13 L.P.R.A. § 30255 ........................................................................................................13

11 U.S.C. § 503(b) ...........................................................................................................11

41 U.S.C. § 7105(e)(1)(B) ..................................................................................................7

42 U.S.C. § 5189a(d)(1) .....................................................................................................7

PROMESA § 305...........................................................................................................4, 18

OTHER AUTHORITIES

Restatement (second) of Agency § 403 ...........................................................................16

U.S. Civilian Board of Contract Appeals, *FEMA Arbitrations under 42 U.S.C.*
    *5189a(d)*, https://www.cbca.gov/howto/rules/public-assistance-
    eligibility.html#rule611 ...............................................................................................8

United States Sentencing Guidelines § 1B1.3 ................................................................................14

To the Honorable United States District Judge Laura T. Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as Title III representative of the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor")

pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*

("PROMESA"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF,"

and together with PREPA and the Oversight Board, the "Government Parties"), respectfully submit

this objection to *Cobra Acquisitions LLC's Motion to Lift Stay Order* [ECF No. 2841; Case No 17-

03283, ECF No. 21145][2] ("Motion").[3]   In support of this Objection, the Government Parties

respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.      It is now beyond dispute that while Cobra was under contract to perform

restoration services for PREPA, Cobra's then-CEO bribed a FEMA official to obtain more PREPA

work for Cobra in violation of the PREPA-Cobra contract.  From the start of these proceedings,

Cobra has consistently tried to downplay the relevance of this criminal conduct and related

proceedings.  Nowhere in its original Administrative Expense Motion, for example, did Cobra

even mention the existence of the criminal indictments that had been delivered merely weeks

before.  Cobra asserts this criminal matter was irrelevant to its Administrative Expense Motion and

it has been "vindicated" by the recent guilty plea, and felony conviction, of its former CEO, and

continues to argue the criminal conduct has nothing to do with the contracts at issue.  This

development, Cobra argues, warrants lifting the litigation stay with respect to its Administrative

---

[2] Docket numbers refer to Case No. 17-4780 unless otherwise noted.

[3] Terms that are capitalized but not defined herein have the meanings ascribed in the Motion.

Expense Motion.  Simultaneously, Cobra concedes the FEMA review is incomplete, and says that is irrelevant too.

2.     Cobra's arguments fail.  First, the criminal proceedings are not yet completed: the prosecution may introduce at sentencing (scheduled for August 17, 2022) additional "relevant conduct" of additional criminal acts in which the individual defendants engaged in relation to contracting with PREPA.  Second, the facts to which the former CEO stipulated in connection with his guilty plea by themselves show unequivocally he, while under a "duty of complete loyalty"[4] to PREPA, engaged in disloyal and self-serving conduct to procure work from PREPA by bribing a FEMA official.  At the same time Cobra was negotiating the Second Contract (executed May 26, 2018), its CEO was bribing FEMA for additional work from PREPA.  *See* Plea and Forfeiture Agreement, Mot. Ex. B at 13-14 (in exchange for things of value, official acts being performed April 2018 through October 2018).  And, as illustrated by FEMA's placing of a hold on further disbursement of funds in 2020 because of the criminal indictments, FEMA may still consider the criminal pleas as well as any additional developments in the Criminal Matter relevant to its ongoing review of the Cobra contracts.

3.     Moreover, contrary to Cobra's assertions, the ongoing FEMA Analysis remains a valid independent basis for the stay to continue.  FEMA is determining whether amounts Cobra billed were validly charged under the PREPA contracts; if they were not, Cobra's administrative claims against PREPA would not be allowable.  For example, FEMA has completed its analysis of the First Contract, initially de-obligating approximately $47 million of Cobra's charges as improper under the First Contract.  Importantly, these charges had already been paid by PREPA and reimbursed by FEMA, thus PREPA would have had to repay this amount to FEMA as a result

---

[4] First Contract Art. 21.

of this de-obligation.   PREPA, in collaboration with Cobra, appealed this decision, recently resulting in the re-obligation of approximately $24.4 million of that amount in a recently-issued appeal decision.  The appeal decision still concluded, however, the remaining $22 million was not eligible for FEMA reimbursement because those charges were not payable to Cobra under the terms of the First Contract.  PREPA intends to request arbitration of this part of the decision before the Civilian Board of Contract Appeals ("CBCA"), an Article I legislative court with a panel of expert administrative law judges whose primary job is interpreting federal government contracts, and which will analyze the applicable First Contract provisions and issue a decision expected by the end of the year.  Thus, a legislative court whose main function is to resolve contractual disputes with the Federal Government will decide whether $22 million was properly charged by Cobra under the First Contract.  If the CBCA determines these charges were not payable under the terms of the First Contract, the result will be a material contract defense against Cobra's asserted administrative claim, as Cobra will have been overpaid and PREPA will be entitled to recovery or setoff of this amount.  On the other hand, if the CBCA determines these charges were payable under the terms of the First Contract, FEMA's reimbursement of this amount to PREPA will stand. The interest of judicial economy therefore favors letting this review of the First Contract conclude as it will inform potential defenses of PREPA in this dispute.

4.     The same holds true for the remaining amounts under the Second Contract currently under FEMA review.  There are two FEMA Project Worksheets (PW) that capture the costs invoiced by Cobra to PREPA under the Second Contract.  PREPA understands FEMA is expected to issue a Determination Memorandum (DM) soon on one PW and by the end of the year on the other.  Allowing FEMA's analysis and any resulting administrative appellate process to conclude will be more efficient and beneficial to both parties than litigating Cobra's claims here.  First,

FEMA may determine the majority of the costs under the Second Contract are eligible for reimbursement and obligate funding.  Litigating these costs at the same time FEMA conducts its analysis may lead to inconsistent results, or worse, FEMA could determine that a dispute exists as to whether the costs are payable under the contract and choose to pause its analysis until the litigation is resolved, thus slowing the availability of federal funding.  Second, even if FEMA determines some of the costs under the Second Contract are ineligible for reimbursement, the issues in any litigation would be significantly narrowed by FEMA's partial approval of costs.  And, as to any denied costs, FEMA's determination would give rise to additional contract defenses against PREPA's obligations under the Second Contract.

5.      Finally, while Cobra again asserts prejudice due to non-payment, the Court has already determined Cobra is unlikely to suffer prejudice because PREPA cannot be required to pay or reserve for Cobra's claim under PROMESA section 305, at least until the effective date of a Title III plan of adjustment.  Cobra's attempt to invoke PREPA's cash position to show a change in circumstances is also unpersuasive.  The $40.4 million that Cobra has identified in a PREPA bank account is not "earmarked" for Cobra as Cobra asserts, but rather represents FEMA funds received by PREPA to reimburse it for costs PREPA has long since paid Cobra out of pocket with respect to the First Contract.  PREPA has no legal or factual obligation to leave these funds in this account or to pay them to Cobra.  It can freely move these funds to its operating account or use them for other purposes.  They are not "Cobra's" funds.  Moreover, the additional $24.4 million approved by FEMA most recently represents confirmation of the validity of FEMA's prior

4

reimbursement to PREPA of money already paid to Cobra under the First Contract.[5]  This decision will not result in the release of any funds by FEMA to PREPA.

6.      For the reasons set forth herein, Cobra has therefore not identified a material change in circumstances that justifies lifting the stay.

## OBJECTION

7.      As this Court has recognized, a "motion for reconsideration of a previous order is an extraordinary remedy that must be used sparingly because of interest in finality and conservation of scarce judicial resources." *Order Denying Caribbean Airport Facilities, Inc.'s Motion for Reconsideration*, Case No. 17-Bk-3283-LTS, ECF No. 1045 at 1 (D.P.R. Aug. 16, 2017) (quoting *In re Pabon Rodriguez*, 233 B.R. 212, 220 (Bankr. D.P.R. 1999), *aff'd*, 2000 WL 35916017 (B.A.P. 1st Cir. 2000), *aff'd*, 17 F. App'x 5 (1st Cir. 2001)). To justify the Court reconsidering its prior order, "[t]he movant 'must either clearly establish a manifest error of law or must present newly discovered evidence.'" *Id.* at 2 (quoting *Cherena v. Coors Brewing Co.*, 20 F. Supp. 2d 282, 287 (D.P.R. 1998)). The Motion fails to provide a change in circumstances warranting modification of the stay.

8.      In addition, all relevant factors set forth in *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004), weigh strongly in favor of maintaining the stay applicable to the Administrative Expense Motion.  Specifically, the primary relevant factors are (a) the "hardship to [PREPA]," (b) the interests of Cobra in "proceeding expeditiously" and the prejudice of delay, and (c) the convenience of the courts.  *Id.*

---

[5] Cobra has already been paid $893 million out of $945 million it charged under the First Contract, and PREPA has likewise been reimbursed this amount.  The remaining unpaid balance under the First Contract represents tax "gross-up" obligations that remain under review by PREPA and Cobra.

I.      **FEMA's Pending Review Weighs in Favor of the Continued Stay**

9.      In considering Cobra's request, "the Court must evaluate all aspects of the current factual and procedural landscape." *Memorandum Order Denying Cobra Acquisitions LLC's Urgent Motion to Modify the Stay Order and Allow the Undisputed Tax Claims* [ECF No. 2004] (the "Tax Claims Order") at 10.  Considered in this light, entry of guilty pleas in the criminal trial does not justify modification of the Stay Orders.

10.      Since the Stay Order was entered, the Court has consistently identified the FEMA Analysis, independent of the criminal proceedings, as a primary basis for the stay.  *See* Stay Order at 2 ("[C]oncurrent litigation of both matters presents the potential for duplication of effort by the parties and courts, inefficiencies in discovery, and inconsistent rulings. FEMA's ongoing analysis of Cobra's contracts with PREPA similarly weighs in favor of a stay.").

A.      **Material Progress Has Been Made and Is Expected**

11.      At present, the FEMA Analysis is complete with respect to the First Contract[6] and completion of the Second Contract should occur in a matter of months.  As shown below, Cobra's "no end in sight" allegation is simply contrived hyperbole.  On July 23, 2021, in collaboration with Cobra, PREPA timely filed an administrative appeal to FEMA Region 2 of FEMA's ineligibility determination under the First Contract.  The appeal requested FEMA to approve the full amount disallowed and to schedule meetings with PREPA necessary to complete FEMA's review in a timely manner.  On May 31, 2022, FEMA Region 2 issued its appeal decision, approving PREPA's appeal in part and denying it in part.  FEMA found that staffing costs of $24,439,810.49 are eligible and will amend PW 251 (the PW associated with the First Contract) to obligate this additional

---

[6] FEMA deferred decision on the tax gross-up payable under the contract to project closeout, and indicated that it needed PREPA to provide specific documentation establishing the amount of taxes paid in excess of 8.5% that were payable under the gross-up provision.

funding.[7]   However, FEMA upheld denial of two categories of costs as not supported by the contract: (a) $21,451,272.51 attributable to the difference between (i) the full amount of the "Daily Minimum Amount Due" charged by Cobra during the initial mobilization period based on the provision of 250 linemen, and (ii) a prorated adjustment based on the actual number of Cobra personnel on the ground, which FEMA determined was reasonable and consistent with the contract; and (b) $133,800 of apartment monthly rental costs FEMA determined to be duplicative of lodging costs.   FEMA determined that these costs were not allowed under the terms of the First Contract.

12.     For this approximately $22 million denied on appeal by FEMA Region 2, PREPA intends to submit a request for arbitration to the CBCA.[8]   The CBCA is an Article I court established under the Contract Disputes Act of 1978 as an independent tribunal to hear and decide contract disputes between government contractors and executive agencies of the United States. 41 U.S.C. § 7105(e)(1)(B).   The Disaster Recovery Reform Act of 2018 amended the Robert T. Stafford Disaster Relief and Emergency Assistance Act to allow an applicant for FEMA funding to request arbitration before the CBCA to dispute eligibility of FEMA disaster assistance and the decision of the CBCA "shall be binding."   42 U.S.C. § 5189a(d)(1).   PREPA's Request for Arbitration is due to be filed by July 30, 2022.   The CBCA has its own set of rules for FEMA arbitrations, which requires an initial conference to be held within 14 days after the Clerk dockets the arbitration request (usually within one business day of filing); a hearing to be held within 60

---

[7] PREPA had already paid Cobra for these costs and had received reimbursement from FEMA for those payments before FEMA denied and deobligated them.  FEMA's re-obligation means PREPA will not have to return the funds previously disbursed to it.  FEMA's approval of this $24 million also allows FEMA to approve associated tax gross-up amounts and thus will help resolve that aspect of Cobra's claim against PREPA.

[8] The FEMA dispute resolution process allows an applicant for disaster assistance to appeal any adverse decision regarding eligibility or funding to the relevant FEMA Regional office.  Upon issuance of a decision denying any part of the appeal, an applicant may submit a second appeal to FEMA Headquarters or, if the disputed amount is at least $500,000, a Request for Arbitration to the Civilian Board of Contract Appeals.

days of the initial conference; and for the CBCA panel that hears the case to issue a decision within 60 days of the close of the case (usually the same day as the hearing or after closing briefs are submitted, if requested by the panel).[9]  The CBCA typically adheres strictly to these rules and is reluctant to extend these timelines (and when it does, the extension is the minimum length required to accommodate schedules or special circumstances).  Thus, PREPA expects to have a final, binding decision regarding the eligibility of all remaining denied costs under the First Contract by the end of the calendar year.

13.     In sum, the CBCA, a legislative court whose main function is to resolve contractual disputes with the Federal Government, will decide a contract interpretation issue worth approximately $22 million pursuant to the First Contract.  The outcome will determine whether Cobra received overpayments under the First Contract, and thus whether PREPA has setoff rights or other defenses against Cobra's claims.  Accordingly, Cobra's contention that the convenience of the courts is no longer a relevant concern (Mot. ¶ 32) should be rejected.  Multiple courts should not be considering the same questions under the same contract involving the same parties.

14.     With respect to the Second Contract, FEMA initially created PW 466 and obligated $250 million thereunder to reimburse costs under the Second Contract at a 100% federal cost share. The cost share was later reduced to 90% for costs incurred after August 16, 2018 (with a 10% match requirement to be paid by PREPA).  As a result, to avoid obligating costs at two different cost shares under one PW, FEMA advised it would reduce the obligation under PW 466 to only those costs incurred subject to 100% federal cost share period and create a new PW 49831 for the costs incurred subject to the 90% cost share period (after August 16, 2018).

---

[9]  U.S. Civilian Board of Contract Appeals, *FEMA Arbitrations under 42 U.S.C. 5189a(d)*, https://www.cbca.gov/howto/rules/public-assistance-eligibility.html#rule611 (last visited June 13, 2022).

15.     PREPA is informed that FEMA has prepared a draft DM as to PW 466, and therefore PREPA anticipates FEMA will issue a DM for this PW in the near future.  As to Project No. 49831, all indications are that the project is progressing.  PREPA has received eleven requests for information from FEMA for this project and responded to all of them.  PREPA has been orally advised by FEMA it anticipates completing its review and issuing a DM on this Project No. 49831 by the end of the calendar year.  PREPA understands that both projects are undergoing FEMA's Environmental and Historic Preservation review and as part of that process FEMA is waiting on determinations from the U.S. Army Corps of Engineers regarding permitting.

16.     It is undisputed that FEMA's analysis concerning the First Contract was a comprehensive review of expenses contemplated in the Administrative Expense Motion.  FEMA's administrative process has shown it provides for an investigation into Cobra's expenses and whether they were incurred in accordance with the contract, a cost analysis with the issuance of a DM, and an avenue for administrative appeal of any adverse finding, including before an independent tribunal of federal government contract experts.  If FEMA determines the costs were not properly incurred under PREPA's contract, PREPA would have a meritorious defense to Cobra's administrative claim, contrary to Cobra's contention to the contrary.  FEMA's conclusions on both contracts, subject to PREPA's appeal rights, discussed previously in detail,[10] will help to inform the parties as to the validity and reasonableness of Cobra's invoices, and thus its right to

---

[10] *See e.g.*, *Status Report Pursuant to December 9, 2020 Order Setting Deadline for Further Status Report Regarding Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [ECF No. 2509] at 5-6; *Opposition of the Oversight Board, AAFAF, and PREPA to Cobra Acquisitions LLC's Motion to Lift the Stay Order* [ECF No. 2507]; *Joint Informative Motion Pursuant to Order of October 17, 2019 regarding Cobra Acquisition LLC's Motion for Allowance and Payment of Administrative Expense Claims* [Case No. 17-3283, ECF No. 10307] at 9–11, 13–14; *Opposition of the Oversight Board, AAFAF, and PREPA to Cobra Acquisition LLC's Urgent Motion to Modify the Stay Order and Allow the Undisputed Tax Claims* [ECF No. 1959]; *Joint Status Report Pursuant to June 14, 2021 Order Adjourning Cobra Acquisitions LLC's Motion to Lift Stay Order* [ECF No. 2563] at Parts II.a., III.a., V.a.

payment under the contracts, without the need for costly discovery and litigation. This pillar supporting continuance of the stay remains solid as ever.

17.      Cobra's assertion there is "no end in sight"[11] on the FEMA Analysis is inaccurate. With respect to the First Contract, FEMA has issued a decision on PREPA's appeal of the DM,[12] and with respect to the portion that PREPA has determined to submit to arbitration before the CBCA, PREPA reasonably expects a decision by the end of the calendar year based on the CBCA's procedural rules for FEMA arbitrations. While PREPA understands that delays have occurred with respect to FEMA's analysis (no doubt exacerbated by the criminal proceedings), PREPA does not have control over FEMA's internal workings. For its part, PREPA, with Cobra's assistance, has promptly complied with information requests from FEMA. Moreover, PREPA understands the completion of FEMA's and CBCA's processes will have reasonable target dates. Accordingly, good cause exists to continue the stay to allow the FEMA process to conclude. *See, e.g.*, January 29, 2020, *Omnibus Hearing Transcript* [Case No. 17-3283, ECF No. 10594], 61:12-20 ("Given that there is . . . a target date for a report from FEMA [with respect to the First Contract]. . . , the current stay on this administrative expense claim is continued.").

### B.      FEMA's Review is Critical to Determining Liability

18.      In addition to narrowing the issues and saving the parties time and effort in discovery, FEMA's independent review of the Second Contract is critical for determining whether Cobra's costs complied with regulatory cost principles and with the contract. To the extent they did not, such costs are not owed under the Second Contract. *See* Second Contract Art. 53.H. ("All

---

[11] *See* Mot. ¶ 3.

[12] With respect to the First Contract, on May 25, 2021, FEMA issued a Determination Memorandum, finding, among other things: (a) $46.7 million invoiced by Cobra was not payable and (b) at closeout PREPA will need to provide documentation on the Tax Gross-Up, and FEMA will not reimburse the portion of Tax Gross-Up attributable to the $46.7 million disallowance.

costs incurred by [Cobra] in performance of this Contract must be in accord with the cost principles of 2 C.F.R. pt. 200, Subpart [E.] PREPA shall not be required to make payments to the Contractor for costs which are found to be contrary to the cost principles 2 C.F.R. pt. 200, Subpart E.").

19.     Cobra nevertheless asserts FEMA's conclusions will not alter PREPA's liability. Mot. ¶ 38.  The FEMA Analysis, however, is relevant both to PREPA's contractual liability and to allowance of the claim under Bankruptcy Code section 503(b).  FEMA spent two years conducting a "reasonable cost analysis" with respect to costs it initially rejected under the First Contract, and found that the costs were reasonable, but that $22 million of the costs invoiced were not payable under the contract and hence should not have been reimbursed under FEMA's reading of the contract.  The question under both the FEMA Analysis and a court's evaluation of Cobra's claims are therefore the same, since for claims to be "actual" and "necessary" under the Bankruptcy Code, they must at a minimum be costs which were required to be paid under the contract.[13]  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-bk-4780, 2022 WL 1401506, at *4 (D.P.R. May 4, 2022) ("Motion for administrative expense treatment fails because [movant] has not demonstrated that it has a contractual right to reimbursement of the Expenses . . . .").

20.     Contrary to Cobra's suggestion that the "Contracts relieve PREPA of liability only if federal funding is not available due to Cobra's 'sole fault,'"[14] there are other conditions that could relieve PREPA of certain obligations under the contracts—for example, if the costs were incurred outside the scope of the contract or (with respect to interest) whether the delay in payment was Cobra's fault due to delays associated with the adjudication of its former CEO's now-admitted

---

[13] Note that this $22 million amount rejected by FEMA is not part of Cobra's asserted claim, as it has already been paid to Cobra by PREPA.  Nonetheless, rejection or de-obligation of charges under the Second Contract, which are part of the claim, as non-compliant with the terms of the Second Contract will be relevant to allowance of the claims under section 503(b).

[14] Mot. ¶ 42.

criminal conduct.  Indeed, FEMA was so concerned about the criminal charges that on March 28,

2020, it directed COR3 to cease making payments of FEMA funds in its control to PREPA for

Cobra costs, thus preventing PREPA from having the cash needed to pay Cobra.  It is possible

FEMA may consider the criminal proceedings in its determinations.

### C.    Cobra's Position on PREPA's Review of Invoices is Misguided

21.    Cobra takes issue with PREPA's review of several categories of invoices (*see* Mot.

¶¶ 40-41), but PREPA is working to ensure all approved invoices are validated and entered into

PREPA's accounts payable system, so that when FEMA funds become available they can be

promptly paid to Cobra, as appropriate.  With respect to amounts due for safety and training

exercises, waste disposal, and maintenance work under the Second Contract, PREPA again submits

ultimate resolution is most efficient by allowing FEMA's review and interpretation of the

applicable contract provisions to conclude.  Contrary to Cobra's assertion (*see id.* ¶ 41), concurrent

litigation imposes obvious burdens on PREPA to litigate simultaneously in multiple fora and

unnecessarily poses the potential for arguably divergent outcomes between two tribunals.

22.    Cobra is incorrect in stating it has no visibility into the FEMA process or expected

resolution.  PREPA's counsel and Cobra's counsel have regular meetings to update Cobra's

counsel on the FEMA process.  PREPA and Cobra have engaged in a collaborative process of

reconciling approximately $159.5 million in invoices issued pursuant to the Second Contract with

representatives of PREPA and Cobra holding bi-weekly meetings (with a brief hiatus during the

holiday months and due to significant PREPA employee turnover as a result of the LUMA Energy

transaction) to review remaining discrepancies regarding Cobra's invoices.  Now, with all invoices

having been submitted to FEMA, Cobra and PREPA counsel's engagement remains ongoing

through videoconferences, written correspondences, and telephone calls.  The parties are working

to find common ground on the calculation of the proper amount of tax gross-up payable under the contract and to address FEMA inquiries and related issues.

23.     Cobra is also incorrect in stating there is no more information that PREPA needs to review that Cobra has not already supplied.  PREPA retained the services of a tax advisor to evaluate the documentation supporting Cobra's tax gross-up invoices with respect to the First Contract,[15] and render an opinion on the amounts invoiced whereby Cobra's parent entity can obtain a foreign tax credit.  After the parties entered into a non-disclosure agreement, Cobra agreed to provide certain tax-related documents for the tax advisor's evaluation and did so in September 2021.  On November 17, 2021, the tax advisor requested missing and additional information from Cobra so that the evaluation could be completed, including Cobra's audited financial statements for the relevant periods, which are required for the tax determination under Puerto Rico law. 13 L.P.R.A. § 30255.  Certain of that information still has not been provided.  Cobra's accountants and PREPA's tax advisor are scheduled to meet during the week of June 13 to see if they can come to an understanding on this issue.

24.     For the reasons discussed above, FEMA's final conclusions on both contracts will help (a) narrow the issues without costs of litigation, and (b) determine, if FEMA is not required to reimburse a claimed costs under regulatory cost principles, whether PREPA is contractually obligated to pay those costs.  Accordingly, the costs and time to PREPA of duplicative litigation and discovery weigh heavily in favor of continuing the stay.

---

[15] FEMA noted in the Determination Memorandum (DM) regarding the First Contract that Cobra had invoiced PREPA $76,717,644.43 for Cobra's payments of taxes on revenue earned from the First Contract pursuant to a "tax gross-up" provision, in which PREPA agreed to cover any tax payments by Cobra to any governmental authority of Puerto Rico in excess of 8.5% of the amounts invoiced by Cobra under the contract.

13

## II.     The Criminal Dispositions Weigh In Favor of a Continued Stay

25.     Cobra states the Criminal Matter is "now resolved."  Mot. at 2.  While guilty pleas have been entered, at sentencing the prosecution may introduce evidence of additional misconduct outside the stipulated facts.  FEMA may in turn rely on this evidence in concluding its review processes.  Section 1B1.3 of the United States Sentencing Guidelines permits the sentencing judge to consider in sentencing the "relevant conduct," or "all acts and omissions" that actually occurred in connection with an offense. U.S.S.G. § 1B1.3.  Accordingly, "relevant conduct" may result in the sentencing judge increasing a defendant's sentencing based on misconduct to which the defendant did not explicitly plead.  *Id.*  Further, where there are multiple participants involved in a criminal act—as there were here—the standard definition of relevant conduct expands to include co-conspirator liability, even in the absence of a conspiracy conviction or charge.  *Id.*  The government need prove the "relevant conduct" only by a preponderance of evidence standard, rather than the higher standard of beyond-reasonable-doubt.  *United States v. Sandoval*, 6 F.4th 63 (1st Cir. 2021), *cert. denied sub nom. Larios v. United States*, 142 S. Ct. 801, 211 L. Ed. 2d 499 (2022), *and cert. denied sub nom. Guzman v. United States*, 142 S. Ct. 801, 211 L. Ed. 2d 499 (2022), *and cert. denied sub nom. Martinez v. United States*, 142 S. Ct. 802, 211 L. Ed. 2d 499 (2022).  Accordingly, it is possible the criminal proceedings may produce additional facts pertinent to the Contracts.

26.     Moreover, the guilty pleas themselves may be relevant to PREPA's liability under the Cobra contracts.  They show it is now beyond dispute that while Cobra was under contract to perform restoration services for PREPA, Cobra's then-CEO bribed a FEMA official to obtain more PREPA work for Cobra.  Cobra has attempted to downplay this criminal conduct since the start of this dispute, arguing this criminal matter was irrelevant to its Administrative Expense Motion.

Cobra now asserts its position has been "vindicated" by the recent guilty plea, and felony conviction, of its former CEO. But at the same time Cobra was negotiating the Second Contract (executed May 26, 2018), its CEO was bribing FEMA for additional work from PREPA. *See* Plea and Forfeiture Agreement, Motion Ex. B at 13-4 (in exchange for things of value, official acts being performed April 2018 through October 2018). The facts set forth in the Guilty Pleas alone might give rise to additional contract defenses against Cobra's claims, particularly if they result in rejection of any remaining charges by FEMA. It is also not impossible, as Cobra implies, that other improper conduct occurred. Indeed, the Guilty Pleas do not state, and thus do not prove, that no additional facts supporting criminality exist; they are, after all, a set of agreed-upon facts resulting from an extensive negotiation. Cobra's conclusion that the Guilty Pleas are of no import is incorrect.

27.    As the Court is aware, in Article 21 of the First Contract, Cobra expressly "acknowledge[d] that in executing the services pursuant to Contract it has a duty of complete loyalty towards PREPA . . . ." First Contract Art. 21. Importantly, Article 21(2) states that any violation of this "duty of complete loyalty" by "**any of the partners, directors, or employees** of [Cobra] . . . shall constitute a violation" of Article 21. *Id.* (emphasis added). If, in bribing FEMA while it was performing under the First Contract and negotiating the Second Contract, Ellison violated Cobra's "duty of complete loyalty" to PREPA, Cobra is liable to PREPA under the express terms of the contract. Under Puerto Rico law, PREPA would be entitled to—at the very least—

damages for a violation of this duty,[16] and possibly may be entitled to disgorgement of all profits obtained from the Cobra Contracts.[17]

28.     In addition, Cobra may have breached the duty of good faith and fair dealing implied in the two contracts, by bribing FEMA officials to obtain more work for Cobra, and thus jeopardizing FEMA reimbursement, which reimbursement was a material benefit of the Contracts for PREPA.  Puerto Rico law implies into contracts the covenant of good faith and fair dealing.  *See Punta Lima, LLC v. Punta Lima Dev. Co.*, 440 F. Supp. 3d 130, 154 (D.P.R. 2020) (citing P.R. Laws Ann. tit. 31, § 3375).  "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."  *Id.* (quoting *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 108 (1st Cir. 2001) (quoting Restatement (Second) of Contracts § 205a (1981)).[18]  Here, Cobra knew FEMA reimbursement was a critical benefit for PREPA.  *See, e.g.*, First Contract Art. 7 ("no changes shall be made to the scope of the Services that would render the costs incurred in the performance of this Contract unallowable or not allocable under, or outside the scope or not reasonable for the completion of, Federal grant awards from the Federal Emergency Management Agency"); *id.* Art.

---

[16] *Ramírez Anglada v. Club Cala de Palmas*, 23 P.R. Offic. Trans. 311 (1989) (explaining that parties can obtain damages for breach of contractual terms, as well as termination for breach of an "essential obligation").

[17] *See, e.g.*, RESTATEMENT (SECOND) OF AGENCY § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.").

[18] See also, *Banco Popular v. Sucn. Talavera*, 174 D.P.R. 686 (2008), in which the Puerto Rico Supreme Court modified a 25-year-long contract after determining the original consideration for the contract was unreasonable in the light of recent events and used the principle of equity and good faith to moderate the terms in such a manner that it would be equitable for the parties.  It also indicated that, although contracts must be performed in accordance with the agreement between the parties, there are events that change the foundation on which the parties rested at the time of the execution of the contract; in these cases, there are major justifications that arise from the general principles of law that allow the modification or extinction of the contract.  *Id.* at 696.  Furthermore, in *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157 (1994), the Puerto Rico Supreme Court established that the exigency of an honest and faithful conduct between the parties is a guiding principle of all legal activities and is based on the mutual loyalty during the negotiations and the true and faithful performance of the covenants since that the principle of good faith is the source of special obligations that are required in each case, in keeping with the nature of the legal relation and the end pursued by the parties through the contract.

29 ("The Contractor acknowledges that starting on October 25, 2017, FEMA financial assistance

will be used to fund this Contract.").   Yet, the CEO's self-serving behavior jeopardized this benefit

contrary to the Contracts.  As the Court has recognized, PREPA is entitled to make its contractual

arguments and to build a case that costs were not "actual, necessary costs and expenses of

preserving" PREPA.  *See* Tax Claims Order at 10.

## III.   The Balance of Harms Weighs Decidedly In Favor of Maintaining the Stay

29.   From the start of these proceedings, the Court has consistently held Cobra is

unlikely to be prejudiced by delay in litigation because PREPA cannot be required to pay or reserve

for Cobra's claim until the effective date of a plan of adjustment.  *See* Stay Order at 2-3 (citing 48

U.S.C. §§ 2165, 2174); *Order Denying Cobra Acquisitions LLC's Motion to Lift the Stay Order*

[ECF No. 2590] at 5 (explaining feasibility of a potential plan need not be established before

confirmation and can be accomplished by establishing a reserve for Cobra's claim at that time).

Nothing has changed in this respect.

30.   Cobra therefore turns to PREPA's finances to establish that harm to PREPA by

lifting of the stay is exaggerated and that a material change in circumstances warranting lifting of

the stay has occurred.  Cobra asserts (a) there is no indication from PREPA that it intends to pay

Cobra the amount allowed by FEMA in its recent ruling on appeal regarding the First Contract,

and (b) PREPA has $40.4 million in funds earmarked for Cobra.  These statements are inaccurate.

*To be clear*: PREPA has paid Cobra approximately $893 million, which is less than PREPA has

received from FEMA.  Although PREPA is not required under PROMESA to remit funds prior to

a plan effective date, PREPA intends to pay Cobra any funds received from FEMA for payment of

unpaid invoices, consistent with applicable law.[19]  The $24 million approved by the FEMA appeal

---

[19] First, FEMA Region 2 (the entity issuing the appeal decision) would be expected to direct the Joint Recovery Office
to obligate the amounts approved, thus transferring them to a federal "Smartlink" account to which COR3, the recipient

decision, however, has already been paid to Cobra and the obligation will not result in a disbursement by COR3 to PREPA, but instead will reverse a debt owed by PREPA to COR3 that was created by FEMA's deobligation of the funds when it issued the DM that PREPA appealed. Cobra understandably wants PREPA to transfer available funds to Cobra as soon as possible, but lifting the stay will do nothing to achieve this.

31.     Second, Cobra's contention that $40.4 million identified by Cobra in a PREPA bank account is "earmarked"[20] for Cobra is incorrect.  This account primarily consists of funds obligated by FEMA for reimbursement of costs long since paid to Cobra by PREPA out of pocket—not for payment of any unpaid Cobra invoices.  PREPA is not restricted from moving the money in this account to other accounts for operating purposes.

32.     Finally, Cobra has not established any benefit it would receive through the allowance of its claim by this Court, when PROMESA bars orders directing payment from PREPA funds.  PROMESA § 305.  There is a good reason for PREPA's refusal to pay Cobra.  While the Government Parties agree postpetition vendors with valid claims should be paid in full and timely, none of PREPA's other vendors' principals have been found guilty of bribes with respect to their contracts with PREPA.

33.     PREPA reasonably believes the FEMA process will shed light on the allowability of Cobra's claim and will be concluded prior to PREPA's emergence from Title III, which is the earliest point when allowed administrative claims must be paid.  Cobra will therefore likely suffer no harm in allowing the FEMA process to conclude without litigating its claims in this Court.

---

of all FEMA PA grant funding, has access.  (This obligation, due to its size, will in turn be routed through FEMA HQ and the OMB, although PREPA does not anticipate this will generate a roadblock to obligation.)  PREPA can and will promptly submit to COR3 a request for reimbursement of the amount, if any, so obligated.  COR3 will review the request for reimbursement, and after its approval it will then provide the funds to PREPA allowing payment of those funds to Cobra.

[20] Mot. ¶ 33.

34.     In sum, the Court should deny the Motion for largely the same reasons the Court denied Cobra's motion for allowance of the Tax Gross-Up.  The balance of harms weighs in favor of maintaining the stay.  Once again, the only urgency identified is Cobra's financial situation; Cobra has not "identified any interest of PREPA that is served by undergoing the transaction costs of discovery and litigation of aspects of the dispute prior to resolution of the criminal case and the FEMA Investigation."  Tax Claims Order at 11.

## **CONCLUSION**

35.     For the foregoing reasons, the Government Parties respectfully request the Court deny the Motion.

*[Remainder of page intentionally left blank]*

San Juan, Puerto Rico
June 14, 2022

Respectfully submitted,

**O'NEILL & BORGES LLC**

By: /s/  *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
Email: hermann.bauer@oneillborges.com

**PROSKAUER ROSE LLP**

By: /s/  *Paul V. Possinger*
Martin J. Bienenstock*
Paul V. Possinger*
Ehud Barak*
Eleven Times Square New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: mbienenstock@proskauer.com
ppossinger@proskauer.com
ebarak@proskauer.com
* admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board as representative of the
Puerto Rico Electric Power Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C.**

By: /s/ *Katiuska Bolaños*
Katiuska Bolaños
kbolanos@diazvaz.com
USDC-PR 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918
Tel. (787) 395-7133
Fax. (787) 497-9664

*Co-Attorneys for Puerto Rico Electric Power
Authority*

**MARINI PIETRANTONI MUÑIZ LLC**

By: /s/  *Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Email: lmarini@mpmlawpr.com
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2171
Fax: (787) 936-7494

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory Authority*

**O'MELVENY & MYERS LLP**

By: /s/ *Maria J. DiConza*
John J. Rapisardi*
Maria J. DiConza*
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrapisardi@omm.com
mdiconza@omm.com

20

-and-

Peter Friedman*
1625 Eye Street, NW
Washington, D.C. 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414
pfriedman@omm.com

-and-

Elizabeth L. McKeen*
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel:  (949) 823-6900
Fax:  (949) 823-6994
emckeen@omm.com

* admitted pro hac vice

*Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory
Authority and Puerto Rico Electric Power
Authority*