# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>              Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>              Debtor. | PROMESA<br>Title III<br><br>No. 17 BK-3567-LTS |

## NOTICE OF FILING OF THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY AND CORRESPONDING DISCLOSURE STATEMENT

**PLEASE TAKE NOTICE** that, on May 2, 2022, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Puerto Rico Highways and Transportation Authority ("HTA" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

filed the *Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1164][3] (the "HTA Plan") and corresponding *Disclosure Statement for the Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority* [ECF No. 1165] (the "HTA Disclosure Statement").

      **PLEASE TAKE FURTHER NOTICE** that, on May 16, 2022, the Debtor filed (i) the *Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1177] (the "Amended HTA Plan"), and (ii) the *Disclosure Statement for the Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority*. [ECF No. 1178] (the "Amended HTA Disclosure Statement").

      **PLEASE TAKE FURTHER NOTICE** that, on June 7, 2022, the Debtor filed (i) the *Second Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1202] (the "Second Amended HTA Plan"), which reflects certain comments received from various parties in interest, and (ii) the *Disclosure Statement for the Second Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority*. [ECF No. 1203] (the "Second Amended HTA Disclosure Statement").

      **PLEASE TAKE FURTHER NOTICE** that, on June 17, 2022, the Debtor filed (i) the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [ECF No. 1240] (the "Third Amended HTA Plan") and (ii) the *Disclosure Statement for the Third Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority*. [ECF No. 1241] (the "Third Amended HTA Disclosure Statement").

---

[3] Unless otherwise stated, all ECF Nos. shall refer to the docket in Case No. 17-3567.

**PLEASE TAKE FURTHER NOTICE** that a redline comparison showing the changes from the Second Amended HTA Plan to the Third Amended HTA Plan is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a redline comparison showing the changes from the Second Amended HTA Disclosure Statement to the Third Amended HTA Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.ra.kroll.com/puertorico/ or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: June 17, 2022
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

## **EXHIBIT A**

HTA Plan Redline

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>et al.,<br><br>      Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY,<br><br>      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

**~~SECOND~~THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board*

*as Representative for the Debtor in Its Title III Case*

Dated: June ~~7,~~17, 2022

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

### ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | AAFAF | 1 |
| 1.2 | ACR Order | 1 |
| 1.3 | Act 106 | 1 |
| 1.4 | Administrative Claim Bar Date | 1 |
| 1.5 | Administrative Expense Claim | 1 |
| 1.6 | ADR Order | 2 |
| 1.7 | ADR Procedures | 2 |
| 1.8 | Affiliate | 2 |
| 1.9 | AFICA | 2 |
| 1.10 | Allowed | 2 |
| 1.11 | Allowed Claim | 2 |
| 1.12 | Ambac | 2 |
| 1.13 | Ambac Acceleration Price | 3 |
| 1.14 | Ambac Action | 3 |
| 1.15 | Ambac Bondholder Elections | 3 |
| 1.16 | Ambac Bondholder Election Forms | 3 |
| 1.17 | Ambac Bondholder Notice Form | 3 |
| 1.18 | Ambac Certificates | 3 |
| 1.19 | Ambac Commutation Consideration | 3 |
| 1.20 | Ambac Commutation Treatment | 3 |
| 1.21 | Ambac CW/HTA Bond Claims | 3 |

i

1.22   Ambac Election .............................................................................. 3

1.23   Ambac Election Notice ..................................................................... 3

1.24   Ambac Insured Bond Claims .............................................................. 4

1.25   Ambac Insured Bondholder ................................................................ 4

1.26   Ambac Insured Bonds ....................................................................... 4

1.27   Ambac Insurance Policies .................................................................. 4

1.28   Ambac Non-Commutation Treatment .................................................... 4

1.29   Ambac Plan Consideration ................................................................. 4

1.30   Ambac Treatment ............................................................................ 4

1.31   Ambac Trust ................................................................................... 4

1.32   Ambac Trust Assets ......................................................................... 4

1.33   Appointments Related Litigation ......................................................... 4

1.34   Assets ........................................................................................... 5

1.35   Assured ......................................................................................... 5

1.36   Assured Acceleration Price ................................................................ 5

1.37   Assured Bondholder Elections ............................................................ 5

1.38   Assured Bondholder Elections Form ..................................................... 5

1.39   Assured CW/HTA Bond Claims ........................................................... 5

1.40   Assured Election ............................................................................. 5

1.41   Assured Election Notice .................................................................... 5

1.42   Assured Insurance Policies ................................................................ 5

1.43   Assured Insured Bond Claim .............................................................. 5

1.44   Assured Insured Bondholder .............................................................. 6

1.45   Assured Insured Bonds ..................................................................... 6

1.46   Assured New HTA Bonds ................................................................... 6

1.47   Assured Plan Consideration .................................................................. 6

1.48   Assured Treatment ............................................................................... 6

1.49   Assured Trust ...................................................................................... 6

1.50   Avoidance Actions ............................................................................... 6

1.51   Avoidance Actions Trust ....................................................................... 7

1.52   Avoidance Actions Trust Agreement ....................................................... 7

1.53   Avoidance Actions Trust Board .............................................................. 7

1.54   Avoidance Actions Trustee .................................................................... 7

1.55   Ballot Date ........................................................................................ 7

1.56   Ballot/Election Form ............................................................................ 7

1.57   Bankruptcy Code ................................................................................. 7

1.58   Bankruptcy Rules ................................................................................ 7

1.59   Bar Date ............................................................................................ 7

1.60   Bar Date Orders .................................................................................. 8

1.61   Business Day ...................................................................................... 8

1.62   Capital Improvements .......................................................................... 8

1.63   Cash ................................................................................................. 8

1.64   Causes of Action ................................................................................. 8

1.65   CCDA ................................................................................................ 8

1.66   Charging Lien ..................................................................................... 8

1.67   Claim ................................................................................................ 8

1.68   Class ................................................................................................. 9

1.69   Clawback Actions ................................................................................ 9

1.70   Clawback CVI Indenture ....................................................................... 9

1.71   Clawback CVIs .................................................................................... 9

| 1.72 | COFINA | 9 |
| 1.73 | Commonwealth | 9 |
| 1.74 | Commonwealth Confirmation Order | 9 |
| 1.75 | Commonwealth Constitution | 9 |
| 1.76 | Commonwealth Effective Date | 10 |
| 1.77 | Commonwealth Loan | 10 |
| 1.78 | Commonwealth Legislature | 10 |
| 1.79 | Commonwealth Plan | 10 |
| 1.80 | Consummation Costs | 10 |
| 1.81 | Convenience Cap | 10 |
| 1.82 | Convenience Claim | 10 |
| 1.83 | Conversion Date | 10 |
| 1.84 | Creditor | 11 |
| 1.85 | Creditors' Committee | 11 |
| 1.86 | CUSIP | 11 |
| 1.87 | Custodial Trust Documents | 11 |
| 1.88 | CVIs | 11 |
| 1.89 | CVI Indenture | 11 |
| 1.90 | CVI Legislation | 11 |
| 1.91 | CW/Convention Center Claim | 11 |
| 1.92 | CW/HTA Claim | 11 |
| 1.93 | CW/HTA Clawback Recovery | 12 |
| 1.94 | CW/MBA Claim | 12 |
| 1.95 | CW/PRIFA Rum Tax Claim | 12 |
| 1.96 | Debt | 12 |

1.97    Debtor ........................................................................................................... 12

1.98    Debt Management Policy .............................................................................. 12

1.99    Debt Policy Period ....................................................................................... 12

1.100   Debt Related Objections ............................................................................... 12

1.101   Debt Service Fund ........................................................................................ 13

1.102   Deemed Issuance Date .................................................................................. 13

1.103   Definitive Documents ................................................................................... 13

1.104   Disallowed .................................................................................................... 13

1.105   Disbursing Agent .......................................................................................... 14

1.106   Disclosure Statement .................................................................................... 14

1.107   Disclosure Statement Hearing ...................................................................... 14

1.108   Disclosure Statement Order .......................................................................... 14

1.109   Disputed Claim ............................................................................................. 14

1.110   Disputed Funds Stipulation .......................................................................... 14

1.111   Distribution Record Date .............................................................................. 14

1.112   DRA ............................................................................................................. 15

1.113   DRA Parties ................................................................................................. 15

1.114   DRA Restriction Fee .................................................................................... 15

1.115   DRA Stipulation ........................................................................................... 15

1.116   Dual-Insured Bond ....................................................................................... 15

1.117   Eminent Domain/Inverse Condemnation Claim ........................................... 15

1.118   Eminent Domain Proceeding ........................................................................ 15

1.119   Entity ........................................................................................................... 15

1.120   ERS .............................................................................................................. 15

1.121   Executory Contract ...................................................................................... 16

1.122   Federal Claims .................................................................................................... 16

1.123   FGIC ...................................................................................................................... 16

1.124   FGIC Action .......................................................................................................... 16

1.125   FGIC Certificates .................................................................................................. 16

1.126   FGIC CW/HTA Bond Claims ............................................................................... 16

1.127   FGIC Escrow Account Agreements ...................................................................... 16

1.128   FGIC Insured Bond Claims ................................................................................... 16

1.129   FGIC Insured Bonds ............................................................................................. 16

1.130   FGIC Insurance Policies ....................................................................................... 16

1.131   FGIC Plan Consideration ...................................................................................... 17

1.132   FGIC Rehabilitation Plan ...................................................................................... 17

1.133   FGIC Treatment .................................................................................................... 17

1.134   FGIC Trust ............................................................................................................ 17

1.135   Final Order ............................................................................................................ 17

1.136   ~~Fiscal Plan~~Findings of fact and Conclusions of Law ........................................ 17

1.137   ~~FY~~Fiscal Plan .................................................................................................... 17

1.138   ~~GDB~~ .................................................................................................... ~~17~~FY 18

1.139   GDB ...................................................................................................................... 18

1.140   GDB/HTA Loans .................................................................................................. 18

~~1.140~~1.141                          GDB Loan Priority Determination          18

~~1.141~~1.142                                              GO CVIs          18

~~1.142~~  ~~Government Entity~~ .......................................................................... ~~18~~

1.143   Government ~~Parties~~Entity .................................................................................... 18

1.144   Government ~~Released Claims~~Parties ..................................................................... 18

1.145   Government Released Claims ................................................................................ 18

1.146   Government Releasees ....................................................................... 19

1.1461.147 .............................................................. GUC Recovery Cap   19

1.1471.148 .................................................................. GUC Reserve   19

1.1481.149 .................................................................. Highway Assets   19

1.149   HTA ..................................................................................... 19

1.150   HTA 68 Bond Claim ............................................................... 19

1.151   HTA 68 Bond Claim (Ambac) ................................................. 19

1.152   HTA 68 Bond Claim (AssuredAmbac) ..................................... 19

1.153   HTA 68 Bond Claim (NationalAssured) .................................. 20

1.154   HTA 68 Bond RecoveryClaim (National) ................................ 20

1.155   HTA 68 BondsBond Recovery ............................................... 20

1.156   HTA 9868 Bonds .................................................................... 20

1.157   HTA 98 Senior Bond ClaimBonds .......................................... 20

1.158   HTA 98 Senior Bond Claim (Ambac) ...................................... 21

1.159   HTA 98 Senior Bond Claim (AssuredAmbac) .......................... 21

1.160   HTA 98 Senior Bond Claim (FGICAssured) ............................ 21

1.161   HTA 98 Senior Bond Claim (NationalFGIC) ........................... 21

1.162   HTA 98 Senior Bond RecoveryClaim (National) ...................... 21

1.163   HTA 98 Senior BondsBond Recovery ..................................... 21

1.164   HTA 98 Sub Bond Claim ................................. 22Senior Bonds 21

1.165   HTA 98 Sub Bond Claim (Assured) ........................................ 22

1.166   HTA 98 Sub Bond Claim (FGICAssured) ................................ 22

1.167   HTA 98 Sub Bond Claim (NationalFGIC) ............................... 22

1.168   HTA 98 Sub Bond RecoveryClaim (National) .......................... 22

1.169   HTA 98 Sub BondsBond Recovery ......................................... 22

1.170   HTA Bond Claims98 Sub Bonds ......................................................... 22

1.171   HTA BondsBond Claims ..................................................................... 22

1.172   HTA Bonds .......................................................................................... 23

1.173   HTA/CCDA Annex Agreement ........................................................... 23

1.173   HTA/CCDA Joinder Agreement .......................................................... 23

1.174   HTA/CCDA Joinder DeadlineAgreement ............................................ 23

1.175   HTA/CCDA Joinder CreditorsDeadline ............................................... 23

1.176   HTA/CCDA Joinder Creditors .............................................................. 23

1.177   HTA/CCDA Plan Support Agreement ................................................... 23

1.177   HTA/CCDA PSA Creditors ................................................................... 23

1.178   HTA/CCDA PSA Restriction Fee Creditors .......................................... 23

1.179   HTA/CCDA PSA Restriction Fee PeriodCreditors ............................... 23

1.180   HTA/CCDA PSA Restriction Fee Period ............................................... 23

1.181   HTA/CCDA PSA Threshold Attainment ............................................... 23

1.181   HTA Clawback CVI ............................................................................... 24

1.182   HTA Clawback RecoveryCVI ............................................................... 24

1.183   HTA Clawback Recovery ...................................................................... 24

1.184   HTA Committee Agreement .................................................................. 24

1.184   HTA Confirmation Date ........................................................................ 24

1.185   HTA Confirmation HearingDate ........................................................... 24

1.186   HTA Confirmation OrderHearing .......................................................... 24

1.187   HTA Confirmation Order ....................................................................... 24

1.188   HTA Distribution Conditions ................................................................. 24

1.1881.189                                                    HTA Effective Date      25

1.1891.190                                                    HTA Enabling Act       25

1.190   HTA Fiscal Agent ............................................................................... 25

1.191   HTA Fiscal Plan Agent ....................................................................... 25

1.192   HTA/GDB Claim Fiscal Plan ............................................................. 25

1.193   HTA/GDB Claim ................................................................................. 25

1.194   HTA General Unsecured Claim .......................................................... 25

1.194 1.195                                                      HTA GUC Recovery     26

1.195   HTA Moscoso Bond Claim .................................................................. 26

1.196   HTA Moscoso Bonds Bond Claim ....................................................... 26

1.197   HTA Moscoso Bonds ........................................................................... 26

1.198   HTA Petition Date .............................................................................. 26

1.198   HTA Plan ............................................................................................ 26

1.199   HTA Plan ............................................................................................ 26

1.200   HTA PSA Restriction Fees ................................................................. 26

1.200 1.201                                                      HTA Restriction Fee Percentage     26

1.201   HTA Title III Case ............................................................................. 27

1.202   HTA Title III Case ............................................................................. 27

1.203   Initial HTA/CCDA PSA Creditors ..................................................... 27

1.203   Insured HTA Bond Claim ................................................................... 27

1.204   Insured HTA Bond Claim ................................................................... 27

1.205   Invalidity Actions .............................................................................. 27

1.205   IRC ...................................................................................................... 27

1.206   IRS IRC ............................................................................................... 27

1.207   IRS ....................................................................................................... 27

1.208   Late-Filed Claim ................................................................................ 27

1.208   Lien ..................................................................................................... 27

1.209   Lien .................................................................................................... 27

1.210   Lien Challenge Actions ..................................................................... 27

1.210 1.211 ......................................................................... Lift Stay Motions   27

1.211 1.212 ........................................................................... List of Creditors   28

1.212 1.213 ................................................................. Local Bankruptcy Rules   28

1.213   MBA .............................................................................................. 28

1.214   MFA MBA ...................................................................................... 28

1.215   Monolines MFA ............................................................................. 28

1.216   National Monolines ........................................................................ 28

1.217   National Action .............................................................................. 28

1.218   National Acceleration Price Action ............................................... 28

1.219   National Acceleration Price ........................................................... 28

1.220   National Bondholder Election Form ............................................. 28

1.220   National Certificates ...................................................................... 28

1.221   National Commutation Consideration ............................. 29 Certificates 28

1.222   National Commutation Treatment Consideration ......................... 29

1.223   National Commutation Treatment .................................................. 29

1.224   National CW/HTA Bond Claims .................................................... 29

1.224 1.225 ................................................................ National Election Notice   29

1.225   National Escrow Account ............................................................... 29

1.226   National Escrow Consideration Account ....................................... 29

1.227   National HTA Escrow Consideration ............................................ 29

1.228   National HTA Consideration ......................................................... 29

1.229   National Insurance Policies ........................................................... 29

1.229   National Insured Bond Claims ....................................................... 29

1.230   National Insured ~~Bonds~~Bond Claims .......................................................... 30

1.231   National Insured Bonds .......................................................................................... 30

1.232   National Non-Commutation Treatment ................................................................ 30

~~1.232   National Plan Consideration~~ .......................................................................... ~~30~~

1.233   National ~~Treatment~~Plan Consideration ............................................................ 30

1.234   National ~~Trust~~Treatment .................................................................................... 30

1.235   National Trust ~~Consideration~~ ............................................................................ 30

1.236   ~~New HTA Bonds~~National Trust Consideration .............................................. 30

1.237   New HTA Bonds ~~Indenture~~ .............................................................................. 30

1.238   New HTA Bonds ~~Trustee~~Indenture .................................................................. 30

1.239   New HTA ~~CABs~~Bonds Trustee ........................................................................ 30

1.240   New HTA ~~CIBs~~CABs .......................................................................................... 30

1.241   New HTA CIBs ...................................................................................................... 31

1.242   New HTA Convertible CABs ................................................................................ 31

~~1.242~~1.243 .................................................................................. Outstanding   31

~~1.243~~1.244 .................................................................................. Oversight Board   31

~~1.244~~1.245 .................................................................................. Partial Disposition   31

~~1.245~~1.246 .................................................................................. PayGo   31

~~1.246   PBA~~ .................................................................................................................. ~~31~~

1.247   PBA ........................................................................................................................ 31

1.248   Person .................................................................................................................... 31

~~1.248   PFC~~ .................................................................................................................... ~~31~~

1.249   PFC ........................................................................................................................ 31

1.250   Plan Supplement .................................................................................................. 31

~~1.250~~1.251 .................................................................................. Pledged Revenues   ~~31~~32

1.251 1.252 .................................................................................................................. PRASA      32

1.252 1.253 .................................................................................................................. PREPA      32

1.253 1.254 .................................................................................................................. PRIDCO     32

1.254   PRIFA .................................................................................................................... 32

1.255   PRITA PRIFA ......................................................................................................... 32

1.256   Professional PRITA ................................................................................................ 32

1.257   Professional Claim ................................................................................................. 32

1.258   Professional Claim ................................................................................................. 32

1.259   PROMESA ............................................................................................................. 32

1.259 1.260 .............................................................................................. Pro Rata Share   32

1.260 1.261 .......................................................................................... Related Persons   32

1.261   Released Claims ..................................................................................................... 33

1.262   Released Parties ......................................................................... 34 Claims 33

1.263   Released Parties ..................................................................................................... 34

1.264   Releasing Parties ................................................................................................... 34

1.264   Reorganized Commonwealth .............................................................................. 34

1.265   Reorganized HTA Commonwealth ..................................................................... 34

1.266   Reorganized HTA .................................................................................................. 34

1.267   Reorganized HTA By-Laws .................................................................................. 34

1.267 1.268 .................................................................................................. SCC Action    34

1.268   SEC ......................................................................................................................... 34

1.269   SEC ......................................................................................................................... 34

1.270   Section 103 Bond Counsel ................................................................................... 34

1.270 1.271 .............................................................. Section 510(b) Subordinated Claim   34

1.271 1.272 ...................................................................................... Secured Obligations   34

xii

1.272 1.273 .................................................... Securities Act ............ 34

1.273 1.274 .................................................... SIB Account ............ 34

1.274 1.275 .................................................... Solicitation Agent ............ 34 35

1.275 1.276 .................................................... Subordinated Indebtedness ............ 35

1.276  Syncora .................................................... 35

1.277  Syncora Acceleration Price .................................................... 35

1.278  Title III Syncora Acceleration Price .................................................... 35

1.279  Title III Case .................................................... 35

1.280  Title III Case .................................................... 35

1.281  Title III Court .................................................... 35

1.281 1.282 .................................................... Toll Facilities ............ 35

1.282 1.283 .................................................... Toll Rate Covenant ............ 35

1.283  Toll Receipts .................................................... 35

1.284  Toll Receipts .................................................... 35

1.285  Toll Receipt Fund .................................................... 35

1.285 1.286 .................................................... Tolls ............ 35

1.286 1.287 .................................................... Transit Assets ............ 35 36

1.287 1.288 .................................................... Trust Documentation ............ 36

1.288 1.289 .................................................... Trust Estate ............ 36

1.289 1.290 .................................................... Unclaimed Distribution ............ 36

1.290 1.291 .................................................... Underwriter Actions ............ 36

1.291 1.292 .................................................... Unexpired Lease ............ 36

1.292 1.293 .................................................... Uniformity Litigation ............ 36

1.293  UPR .................................................... 37

1.294  UPR .................................................... 37

1.295   Voting Record Date ............................................................................... 37

1.2951.296   Other Definitions   37

1.2961.297   Rules of Interpretation   37

## ARTICLE II

### COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES/RETIREE CLAIMS

2.1   Litigation Resolution ............................................................................ 38

2.2   Allowance of Bond Claims .................................................................... 38

2.3   Releases, Injunctions and Exculpation ................................................. 38

2.4   HTA Operational Restructuring ............................................................ 38

2.5   Retiree Claims ...................................................................................... 39

## ARTICLE III

### PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

3.1   Administrative Expense Claims ............................................................ 39

3.2   Professional Compensation and Reimbursement Claims ...................... 40

3.3   HTA Consummation Costs .................................................................... 40

3.4   HTA Restriction Fee ............................................................................. 41

3.5   DRA Restriction Fee ............................................................................ 42

3.6   Non-Severability .................................................................................. 42

## ARTICLE IV

### CLASSIFICATION OF CLAIMS

4.1   Claims are classified as follows .......................................................... 42

## ARTICLE V

### PROVISIONS FOR TREATMENT OF HTA 68 BOND CLAIMS (CLASS 1)

5.1   Treatment of HTA 68 Bond Claims ...................................................... 43

## ARTICLE VI

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (AMBAC) (CLASS 2)

6.1   Treatment of HTA 68 Bond Claims (Ambac) ................................................ 44

## ARTICLE VII

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (ASSURED) (CLASS 3)

7.1   Treatment of HTA 68 Bond Claims (Assured) .............................................. 44

## ARTICLE VIII

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (NATIONAL) (CLASS 4)

8.1   Treatment of HTA 68 Bond Claims (National) ............................................. 44

## ARTICLE IX

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (CLASS 5)

9.1   Treatment of HTA 98 Senior Bond Claims ................................................... 44

## ARTICLE X

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (AMBAC) (CLASS 6)

10.1   Treatment of HTA 98 Senior Bond Claims (Ambac) .................................. 45

## ARTICLE XI

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (ASSURED) (CLASS 7)

11.1   Treatment of HTA 98 Senior Bond Claims (Assured) ................................ 45

## ARTICLE XII

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (FGIC) (CLASS 8)

12.1   Treatment of HTA 98 Senior Bond Claims (FGIC) .................................... 45

## ARTICLE XIII

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (NATIONAL) (CLASS 9)

13.1   Treatment of HTA 98 Senior Bond Claims (National) .................................... 45

## ARTICLE XIV

### PROVISIONS FOR TREATMENT OF HTA
### 98 SUB BOND CLAIMS (CLASS 10)

14.1   Treatment of HTA 98 Sub Bond Claims .................................... 46

## ARTICLE XV

### PROVISIONS FOR TREATMENT OF HTA
### 98 SUB BOND CLAIMS (ASSURED) (CLASS 11)

15.1   Treatment of HTA 98 Sub Bond Claims (Assured) .................................... 46

## ARTICLE XVI

### PROVISIONS FOR TREATMENT OF HTA
### 98 SUB BOND CLAIMS (FGIC) (CLASS 12)

16.1   Treatment of HTA 98 Sub Bond Claims (FGIC) .................................... 46

## ARTICLE XVII

### PROVISIONS FOR TREATMENT OF HTA
### 98 SUB BOND CLAIMS (NATIONAL) (CLASS 13)

17.1   Treatment of HTA 98 Sub Bond Claims (National) .................................... 46

## ARTICLE XVIII

### PROVISIONS FOR TREATMENT OF HTA
### MOSCOSO BOND CLAIMS (CLASS 14)

18.1   Treatment of HTA Moscoso Bond Claims .................................... 47

## ARTICLE XIX

### PROVISIONS FOR TREATMENT EMINENT
### DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 15)

19.1   Treatment of Eminent Domain/Inverse Condemnation Claims .................................... 47

# ARTICLE XX

## PROVISIONS FOR TREATMENT OF HTA
## GENERAL UNSECURED CLAIMS (CLASS 16)

20.1   Treatment of HTA General Unsecured Claims ............................................... 48

20.2   Limitation on Recovery ............................................................................. 48

20.3   GUC Reserve ........................................................................................... 48

# ARTICLE XXI

## PROVISIONS FOR TREATMENT OF
## HTA/GDB CLAIMS (CLASS 17)

21.1   Treatment of HTA/GDB Claims ................................................................. 49

# ARTICLE XXII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 18)

22.1   Treatment of Section 510(b) Subordinated Claims ...................................... 49

# ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 19)

23.1   Treatment of Convenience Claims .............................................................. 49

# ARTICLE XXIV

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 20)

24.1   Treatment of Federal Claims ..................................................................... 49

# ARTICLE XXV

## PROVISIONS REGARDING SECURED OBLIGATIONS
## AND ADDITIONAL INDEBTEDNESS

25.1   Issuance and Distribution of the New HTA Bonds ...................................... 50

25.2   Tax-Exempt Treatment of the New HTA Bonds ......................................... 54

25.3   Adoption and Maintenance of a Debt Management Policy .......................... 54

## ARTICLE XXVI

### PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

26.1    Treatment of Assured Insured Bond Claims ................................................... 55

26.2    Treatment of National Insured Bond Claims ................................................. 58

26.3    Treatment of FGIC Insured Bond Claims ..................................................... 61

26.4    Treatment of Ambac Insured Bond Claims .................................................. 63

26.5    Fiscal Agent Obligations ............................................................................... 66

## ARTICLE XXVII

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

27.1    Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases ............................................................................................................. 67

27.2    Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases ............................................................................................................. 67

27.3    Inclusiveness .................................................................................................. 67

27.4    Cure of Defaults ............................................................................................. 68

27.5    Insurance Policies .......................................................................................... 68

27.6    Rejection Damage Claims ............................................................................. 68

27.7    Indemnification and Reimbursement Obligations ........................................ 68

27.8    Nonoccurrence of HTA Effective Date ........................................................ 69

27.9    Reservation of Rights .................................................................................... 69

27.10   Collective Bargaining Agreements ............................................................... 69

## ARTICLE XXVIII

### PROVISIONS GOVERNING DISTRIBUTIONS

28.1    Time and Manner of Distribution .................................................................. 69

28.2    Timeliness of Payments ................................................................................. 70

28.3    Distributions by the Disbursing Agent ......................................................... 70

28.4    Manner of Payment under the HTA Plan ................................................. 71

28.5    Delivery of Distributions ....................................................................... 71

28.6    Cancellation of Notes, Instruments, Certificates, and Other Documents ...... 71

28.7    Undeliverable/Reserved Distributions ..................................................... 72

28.8    Withholding and Reporting Requirements ................................................ 73

28.9    Time Bar to Cash Payments ................................................................... 73

28.10   Distributions After HTA Effective Date ................................................... 74

28.11   Setoffs ............................................................................................... 74

28.12   Allocation of Plan Distributions Between Principal and Interest .................. 74

28.13   Payment of Trustee Fees and Expenses ................................................... 74

28.14   Beneficial Owner ................................................................................. 75

28.15   Value of Distributions ........................................................................... 76

28.16   Disputed Funds Stipulation .................................................................... 76

## ARTICLE XXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTOR

29.1    Prosecution of Claims ........................................................................... 76

## ARTICLE XXX

## ACCEPTANCE OR REJECTION OF THE HTA PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

30.1    Impaired Classes to Vote ....................................................................... 77

30.2    Acceptance by Class of Creditors ........................................................... 77

30.3    Cramdown ........................................................................................... 77

## ARTICLE XXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

31.1    Exculpation ......................................................................................... 77

31.2    Powers of the Disbursing Agent ............................................................. 77

31.3   Fees and Expenses Incurred From and After the HTA Effective Date ................... 78

## ARTICLE XXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
## AND CLAIMS SUBJECT TO ACR PROCEDURES

32.1   Objections to Claims; Prosecution of Disputed Claims ................................... 78

32.2   Estimation of Claims .................................................................................... 79

32.3   Payments and Distributions on Disputed Claims ......................................... 79

32.4   Authority to Amend Lists of Creditors ....................................................... 80

32.5   Non-Accrual of Interest ............................................................................... 80

32.6   Disallowance of Claims ............................................................................... 80

32.7   Claims Subject to ACR Procedures ............................................................. 81

## ARTICLE XXXIII

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE HTA PLAN
## AND NOT IMPAIRED BY THE HTA PLAN

33.1   Impaired Classes .......................................................................................... 81

33.2   Unimpaired HTA Classes ............................................................................. 81

## ARTICLE XXXIV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE HTA PLAN

34.1   Conditions Precedent to Confirmation of the HTA Plan ............................... 81

34.2   Waiver of Conditions Precedent to Confirmation ......................................... 83

## ARTICLE XXXV

## CONDITIONS PRECEDENT TO THE HTA EFFECTIVE DATE

35.1   Conditions Precedent to the HTA Effective Date ......................................... 83

35.2   Waiver of Conditions Precedent .................................................................. 86

35.3   Effect of Non-Occurrence of Conditions to HTA Effective Date ................. 87

# ARTICLE XXXVI

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE HTA PLAN

36.1  Modification of HTA Plan .................................................................. 87

36.2  Revocation or Withdrawal ................................................................. 87

36.3  Amendment of Plan Documents ......................................................... 87

36.4  No Admission of Liability .................................................................. 88

# ARTICLE XXXVII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED HTA

37.1  Corporate Action ............................................................................... 88

37.2  Amendment of By-Laws ..................................................................... 89

37.3  Directors of Reorganized HTA ........................................................... 89

37.4  Officers of Reorganized HTA ............................................................. 89

# ARTICLE XXXVIII

## PROVISIONS REGARDING OVERSIGHT BOARD AND
## COMPLIANCE WITH PROMESA

38.1  Effect of Confirmation ....................................................................... 89

38.2  Ongoing Role of the Oversight Board ................................................ 89

38.3  Preemption of Laws ........................................................................... 89

# ARTICLE XXXIX

## PROVISIONS REGARDING CREDITORS' COMMITTEE

39.1  Dissolution of Creditors' Committee .................................................. 90

# ARTICLE XL

## RETENTION OF JURISDICTION

40.1  Retention of Jurisdiction .................................................................... 91

## ARTICLE XLI

## MISCELLANEOUS PROVISIONS

41.1    Title to Assets ............................................................................................. 93

41.2    Discharge and Release of Claims and Causes of Action ............................ 93

41.3    Injunction on Claims .................................................................................. 96

41.4    Integral to HTA Plan .................................................................................. 97

41.5    Releases by the Debtor and Reorganized HTA .......................................... 97

41.6    Injunction Related to Releases ................................................................... 97

41.7    Exculpation ................................................................................................ 98

41.8    Appointments Related Litigation/Uniformity Litigation ........................... 99

41.9    Bar Order ................................................................................................... 100

41.10   No Waiver .................................................................................................. 100

41.11   Supplemental Injunction ............................................................................ 100

41.12   Post-Effective Date Fees and Expenses ..................................................... 101

41.13   Securities Act Exemption ........................................................................... 102

41.14   Severability ................................................................................................ 102

41.15   Governing Law ........................................................................................... 102

41.16   Closing Case ............................................................................................... 102

41.17   Section Headings ........................................................................................ 102

41.18   Inconsistencies ........................................................................................... 102

41.19   Document Retention ................................................................................... 103

41.20   Immediate Binding Effect ........................................................................... 103

41.21   Additional Documents ................................................................................ 103

41.22   Reservation of Rights ................................................................................. 103

41.23   Successors and Assigns ............................................................................... 104

41.24   Notices ................................................................................................ 104

41.25   Term of Injunctions or Stays ............................................................... 105

41.26   Entire Agreement ............................................................................... 106

41.27   Plan Supplement ................................................................................ 106

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Puerto Rico Highways and Transportation Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following plan of adjustment.

**ARTICLE I**

**DEFINITIONS**

As used in the HTA Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1     **AAFAF:**  Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.2     **ACR Order:**  That certain Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief, dated March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.3     **Act 106:**  Act No. 106 of August 23, 2017, which created the pay-as-you-go pension system known as "PayGo" and established a defined contribution retirement system to replace the retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act No. 3 of April 4, 2013, as amended, and Act No. 160 of December 24, 2013, as amended.

1.4     **Administrative Claim Bar Date:**  Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the HTA Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the HTA Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtor and Reorganized HTA shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by the Debtor during the period from and after the HTA Petition Date, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of the entry of the HTA Confirmation Order.

1.5     **Administrative Expense Claim:**  A Claim against the Debtor or its Assets constituting a cost or expense of administration of the Title III Case asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the HTA Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the HTA Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and HTA PSA Restriction Fees.

1.6    **ADR Order:**  That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.7    **ADR Procedures:**  The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.8    **Affiliate:**  With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.9    **AFICA:**  Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority.

1.10    **Allowed:**  With respect to any Claim against HTA, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtor in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the HTA Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the HTA Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the HTA Petition Date and any Claim that the Debtor may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law.  Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the HTA Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the HTA Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the HTA Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.11    **Allowed Claim:**  A Claim, to the extent it is or has become Allowed.

1.12    **Ambac:**  Ambac Assurance Corporation or its successor or designee.

1.13    **Ambac Acceleration Price:**  With respect to any Ambac Insured Bond, an amount equal to the outstanding principal amount of such Ambac Insured Bond plus the accrued and unpaid interest thereon as of the date of payment; provided, however, that such amount shall be adjusted to account for any payment of principal and/or accrued interest made to the holder of such Ambac Insured Bond on account of the Ambac Insurance Policies prior to the payment of

2

an applicable Allowed Ambac Insured Bond Claim in accordance with the terms and provisions of Section 26.4 hereof.

1.14    **Ambac Action:**  The litigation styled <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV01505.

1.15    **Ambac Bondholder Elections:**  Collectively, the elections provided to Ambac Insured Bond holders in accordance with the terms and provisions of Section 26.4 hereof and set forth in the Ambac Bondholder Election Form.

1.16    **Ambac Bondholder Election Forms:**  The "Election Notice to Holders of Ambac Insured HTA 98 Senior Bond Claims" attached as Schedule 5(a) to the Disclosure Statement Order.

1.17    **Ambac Bondholder Notice Form:**  The "Notice to Holders of Ambac Insured HTA 68 Bond Claims" attached as Schedule 4(e) to the Disclosure Statement Order.

1.18    **Ambac Certificates:**  The certificate(s) or unit(s) to be issued by the Ambac Trust to beneficial holders of HTA Bonds electing treatment pursuant to the terms and provisions of Section 26.4 hereof and which HTA Bonds are deposited into the Ambac Trust.

1.19    **Ambac Commutation Consideration:**  A combination of some or all of the following selected at Ambac's sole discretion at or prior to the commencement of the Disclosure Statement Hearing: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage, to be determined at Ambac's sole discretion, of the Consummation Costs and/or the HTA PSA Restriction Fee allocable to Ambac in accordance with the terms and provisions of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.20    **Ambac Commutation Treatment:**  The treatment set forth in Section 25.4(b)(i) hereof.

1.21    **Ambac CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.22    **Ambac Election:**  Ambac's rights, as set forth in Section 26.4 hereof, to select the form of Ambac Treatment.

1.23    **Ambac Election Notice:**  The "Ambac Election Notice" attached as Schedules 4(e) and 5(a) to the Disclosure Statement Order.

1.24    **Ambac Insured Bond Claims:**  Collectively, the Claims against HTA arising from the Ambac Insured Bonds, including, any HTA 68 Bond Claims (Ambac) and HTA 98 Senior Bond Claims (Ambac).

1.25    **Ambac Insured Bondholder:**  The beneficial holder of an Ambac Insured Bond.

1.26    **Ambac Insured Bonds:**  Collectively, the HTA Bonds that have been insured by Ambac or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.27    **Ambac Insurance Policies:**  The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.28    **Ambac Non-Commutation Treatment:**  The treatment set forth in Section 26.4(b)(ii) hereof.

1.29    **Ambac Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims and the CW/HTA Recovery allocable to holders of the Allowed Ambac CW/HTA Claims.

1.30    **Ambac Treatment:**  The treatment of Ambac Insured Bond Claims set forth in Section 26.4 hereof comprised of the Ambac Commutation Treatment and the Ambac Non-Commutation Treatment.

1.31    **Ambac Trust:**  With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the HTA Effective Date, by HTA, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.32    **Ambac Trust Assets:**  Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) the Ambac Plan Consideration, and (c) the Ambac Insurance Policies.

1.33    **Appointments Related Litigation:**  Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States, Case No. 21-1283 (appealed from Adv. Proc. No. 18-00041-LTS), currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montañez, et al. v. The Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.34    **Assets:**  Collectively, (i) all "property" of the Debtor, including, without limitation, such property as it may be reflected on the Debtor's books and records and the HTA Confirmation Order as of the HTA Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtor or other authorized representative for the benefit of the Debtor and its Creditors, unless modified or released pursuant to the HTA Plan or a Final Order, including, without limitation, any Avoidance Action.

1.35   **Assured:**  Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.36   **Assured Acceleration Price:**  A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof, in each case, as of the date of payment.

1.37   **Assured Bondholder Elections:**  Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 26.1(b) hereof in the event Assured does not exercise the Assured Election.

1.38   **Assured Bondholder Elections Form:**  The "Election Notice for Certain Assured Insured Bondholders with Claims in Classes 3 and 7" attached as Schedule 5(b) to the Disclosure Statement Order.

1.39   **Assured CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.40   **Assured Election:**  Assured's rights, as set forth in Section 26.1 hereof, to receive the Assured New HTA Bonds allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid by Assured, in full, on the HTA Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.41   **Assured Election Notice:**  The "Assured Election Notice", a copy of which is attached as Schedule 5(c) to the Disclosure Statement Order.

1.42   **Assured Insurance Policies:**  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.43   **Assured Insured Bond Claim:**  A Claim against HTA arising from an Assured Insured Bond, including any HTA 68 Bond Claims (Assured), HTA 98 Senior Bond Claims (Assured), and HTA 98 Sub Bond Claims (Assured).

1.44   **Assured Insured Bondholder:**  The beneficial holder of an Assured Insured Bond.

1.45   **Assured Insured Bonds:**  Collectively, the HTA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

5

1.46   **Assured New HTA Bonds:**  The New HTA Bonds allocable to holders of Assured Insured Bond Claims.

1.47   **Assured Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Assured Insured Bond Claims, consisting of (a) in the case of Assured Insured Bonds that are HTA 68 Bonds or HTA 98 Senior Bonds, but not Dual-Insured Bonds, (i) New HTA Bonds and/or (ii) in the event of an election by the Commonwealth and/or HTA to substitute Cash for the issuance of New HTA Bonds on the HTA Effective Date, Cash resulting from such election by the Commonwealth and/or HTA to substitute Cash for the New HTA Bonds on the HTA Effective Date, (b) in the case of Dual-Insured Bonds, FGIC Certificates, and (c) in the case of Assured Insured Bonds that are HTA 98 Sub Bonds, subject to the terms and provisions of the Commonwealth Plan and the Commonwealth Confirmation Order, any HTA 98 Sub Bond Recovery allocable to the related HTA 98 Sub Bond Claims (Assured); provided, however, that, for the avoidance of doubt, no Cash, securities, or other consideration that Assured is entitled to receive pursuant to Article LXIII of the Commonwealth Plan or decretal paragraph 52 of the Commonwealth Confirmation Order shall constitute Assured Plan Consideration.

1.48   **Assured Treatment:**  The treatment of Assured Insured Bond Claims set forth in Section 25.1 26.1 hereof.

1.49   **Assured Trust**:  A custodial trust, escrow arrangement or similar structure established pursuant to Section 26.1(b)(ii) of the HTA Plan.

1.50   **Avoidance Actions:**  The avoidance, recovery, subordination actions identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the HTA Effective Date, against any Entity that have been brought by or on behalf of the Debtor against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or on behalf of the Debtor seeking affirmative recoveries, and which actions are set forth on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the HTA Effective Date, and (c) all similar Causes of Action that are currently subject to tolling agreements with HTA; provided, however, that under no circumstances shall "Avoidance Actions" include, (x) any Claim or Cause of Action against any Entity relating to HTA Bond Claims, (y) any Claim or Cause of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, which terminated upon entry of the Commonwealth Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, which terminated upon entry of the Commonwealth Confirmation Order.

1.51   **Avoidance Actions Trust:**  The trust created on the Commonwealth Effective Date into which have been transferred Claims and Causes of Action of the Commonwealth, ERS,

6

and PBA, and into which on the HTA Effective Date shall be transferred the authority to litigate or compromise and settle the Avoidance Actions.

1.52    **Avoidance Actions Trust Agreement:**  That certain Avoidance Actions Trust Agreement, dated as of March 15, 2022, by and among the Commonwealth ERS, PBA, the Oversight Board and Drivetrain, LLC.

1.53    **Avoidance Actions Trust Board:**  The three (3) member board appointed as of the Commonwealth Effective Date to govern the Avoidance Actions Trust.

1.54    **Avoidance Actions Trustee:**  Drivertrain LLC, the trustee appointed by the Avoidance Actions Trust Board in accordance with the terms and provisions of the Avoidance Actions Trust Agreement.

1.55    **Ballot Date:**  The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the HTA Plan.

1.56    **Ballot/Election Form:**  The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the HTA Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the HTA Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the HTA Plan.

1.57    **Bankruptcy Code:**  The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Case.

1.58    **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as amended and as applicable to the Title III Case.

1.59    **Bar Date:**  The date established by the Title III Court by which proofs of Claim against the Debtor must have been filed pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the HTA Plan.

1.60    **Bar Date Orders:**  The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtor or its Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], and (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof  [Case No. 17-3283-LTS, ECF No. 3160].

1.61    **Business Day:**  A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

1.62   **Capital Improvements**:  Any project or projects (a) funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities of HTA, including, without limitation, buildings, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit, or (b) financed or proposed to be financed, in whole or in part, through the issuance of private activity bonds or other similar instruments.

1.63   **Cash**:  Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.64   **Causes of Action**:  All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the HTA Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the HTA Effective Date.

1.65   **CCDA**:  Puerto Rico Convention Center District Authority.

1.66   **Charging Lien**:  A lien or right to priority of payment to which the HTA Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the HTA Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the HTA Effective Date.

1.67   **Claim**:  Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.68   **Class**:  A category of Claims set forth in Article IV of the HTA Plan.

1.69   **Clawback Actions**:  Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and

Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

1.70    **Clawback CVI Indenture:**  The indenture executed and delivered on the Commonwealth Effective Date pursuant to which the Commonwealth issued the Clawback CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.71    **Clawback CVIs:**  Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law issued on the Commonwealth Effective Date by the Commonwealth in accordance with the terms and conditions of Annex "2" to Exhibit "J" to the Commonwealth Plan, including, without limitation, as implemented in accordance with the Commonwealth Confirmation Order, the Clawback CVI Indenture and the CVI Legislation.

1.72    **COFINA:**  Puerto Rico Sales Tax Financing Corporation.

1.73    **Commonwealth:**  The Commonwealth of Puerto Rico.

1.74    **Commonwealth Confirmation Order:**  The Order and Judgment Confirming Modified Eight Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority, dated January 18, 2022 (Case No. 17-03283-LTS, ECF No. 19813).

1.75    **Commonwealth Constitution:**  The Constitution of the Commonwealth of Puerto Rico.

1.76    **Commonwealth Effective Date:**  March 15, 2022, the date on which the Commonwealth Plan was substantially consummated in accordance with its terms and the provisions of the Commonwealth Plan and the Commonwealth Confirmation Order.

1.77    **Commonwealth Loan:**  The loan extended by the Commonwealth to HTA in the original principal amount up to Three Hundred Sixty-Two Million Dollars ($362,000,000.00) in connection with, among other things, HTA's obligations pursuant to the HTA/CCDA Plan Support Agreement, the Commonwealth Confirmation Order, and the DRA Stipulation.

1.78    **Commonwealth Legislature:**  The Legislative Assembly of Puerto Rico.

1.79    **Commonwealth Plan:**  That certain Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated January 14, 2022 [Case No. 17-3283-LTS, ECF. No 19784].

1.80     **Consummation Costs:**  Collectively, the amount set forth in Section 3.3 hereof to be paid, in Cash, on the HTA Effective Date, or as soon thereafter as practicable, but in no event later than ten (10) Business Days following HTA Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement, Article III hereof, and the HTA Confirmation Order.

1.81     **Convenience Cap:**  Two Million Five Hundred Thousand Dollars ($2,500,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims, unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing.

1.82     **Convenience Claim:**  An Allowed HTA General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed HTA General Unsecured Claim to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 20.1(b) hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed HTA General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) in the aggregate, may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing in its sole and absolute discretion; and, provided, further, that, in the event the Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.83     **Conversion Date:**  The final compounding date for the accretion period associated with the New HTA Convertible CABs at which time the New HTA Convertible CABs shall begin to accrue and pay interest on a semi-annual basis.

1.84     **Creditor:**  Any Entity holding a Claim against the Debtor or any of the Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtor, including, without limitation, a Claim against the Debtor of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.85     **Creditors' Committee:**  The statutory committee of unsecured claimholders appointed in the HTA Title III Case.

1.86     **CUSIP:**  The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.87     **Custodial Trust Documents:**  Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the HTA Effective Date and relating to the HTA Bonds insured by a Monoline, if applicable, and the distributions to

be made in accordance with the HTA Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board and the respective Monolines.

1.88    **CVIs:**  Collectively, GO CVIs and the Clawback CVIs.

1.89    **CVI Indenture:**  Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.90    **CVI Legislation:**  Act No. 53 of October 26, 2021, known as the "Law to End the Bankruptcy of Puerto Rico".

1.91    **CW/Convention Center Claim:**  The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.92    **CW/HTA Claim:**  The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

1.93    **CW/HTA Clawback Recovery:**  The aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" to the Commonwealth Plan.

1.94    **CW/MBA Claim:**  The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

1.95    **CW/PRIFA Rum Tax Claim:**  The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b)

the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

    1.96    **Debt:**  Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money; provided, however, that "Debt" shall not include the Secured Obligations.

    1.97    **Debtor:**  HTA.

    1.98    **Debt Management Policy:**  The policy developed by HTA, and approved by the Oversight Board, relating to the issuance of indebtedness by Reorganized HTA, as more fully described in Section 24.3 hereof.

    1.99    **Debt Policy Period:**  The period commencing on the first (1st) calendar day immediately following the HTA Effective Date and ending on the first (1st) calendar day on which no New HTA Bonds or refinancing thereof remain outstanding.

    1.100    **Debt Related Objections:**  Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No. 10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without

limitation, litigations or actions commenced to recover principal and/or interest with respect to the GO Bonds, the PBA Bonds and/or PRIFA BANs, and (ii) any other objections or joinders to these or other such objections or joinders to these or such other objections or notices of participation that support the relief requested in such objections filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond Claims, and the PBA Bond Claims.

 1.101 **Debt Service Fund:** The fund to be created in accordance with the terms and provisions of the New HTA Bonds Indenture and Section 25.1 hereof in connection with the deposit of amounts necessary to satisfy the payments of principal and interest on account of the New HTA Bonds.

 1.102 **Deemed Issuance Date:** The earlier to occur of (a) July 1, 2022 and (b) the HTA Effective Date.

 1.103 **Definitive Documents:** Collectively, the definitive documents and agreements contemplated by the HTA Plan, including, without limitation, (a) the HTA Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the HTA Confirmation Order, and pleadings in support of entry thereof, (c) the New HTA Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New HTA Bonds, and (e) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF and the Monolines, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors' Committee.

 1.104 **Disallowed:** With respect to any Claim against the Debtor, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or undisputed and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the holder thereof.

 1.105 **Disbursing Agent:** Such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the HTA Effective Date to make or to facilitate distributions in accordance with the provisions of the HTA Plan.

 1.106 **Disclosure Statement:** The disclosure statement relating to the HTA Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

 1.107 **Disclosure Statement Hearing:** The hearing held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.108 **Disclosure Statement Order:** The order of the Title III Court (a) approving the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the HTA Plan, and (ii) elections, if applicable, of distributions hereunder, which order shall be in form and substance reasonably satisfactory to the Initial HTA/CCDA PSA Creditors and each of the Government Parties.

1.109 **Disputed Claim:** A Claim against the Debtor or its Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the HTA Plan, the Bankruptcy Code, the Bankruptcy Rules, or the HTA Confirmation Order, or is otherwise disputed by the Debtor in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.110 **Disputed Funds Stipulation:** That certain Amended and Restated Stipulation and Agreed Order Regarding the Disputed Funds in the HTA Bond Service Accounts, Redemption Accounts and Reserve Accounts, dated March 11, 2022, between (a) the Commonwealth and HTA, by and through the Oversight Board, and (b) The Bank of New York Mellon, in its capacity as fiscal agent, and approved pursuant to an order of the Title III Court, dated March 16, 2022 (Case No. 17-03283 LTS, ECF No. 20366).

1.111 **Distribution Record Date:** The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the HTA Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the HTA Plan through The Depository Trust Company.

1.112 **DRA:** The GDB Debt Recovery Authority.

1.113 **DRA Parties:** Collectively, AmeriNational Community Services LLC, in its capacity as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC, in its capacity as collateral monitor for Wilmington Trust N.A. in connection with the bonds issued by DRA pursuant to the Government Development Bank for Puerto Rico Debt Restructuring Act, Act No. 109-2017 (as amended), and the Qualifying Modification for GDB approved in accordance with the terms and provisions of Title VI of PROMESA.

1.114 **DRA Restriction Fee:** The fee to be paid, in Cash, on the HTA Effective Date, in accordance with the terms and provisions of the DRA Stipulation, Section 3.5 hereof, and the HTA Confirmation Order, in the amount of Fifteen Million Dollars ($15,000,000.00).

1.115 **DRA Stipulation:** That certain Stipulation in Connection With DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Commonwealth and HTA, Cantor-Katz Collateral Monitor LLC, and AmeriNational Community Services, LLC, and affirmed pursuant to an order, dated November 8, 2021 of the Title III Court [Case No. 17-3283-LTS, ECF No. 19124].

1.116   **Dual-Insured Bond:**  An Assured Insured Bond that is or was insured by Assured pursuant to a secondary market insurance policy and that also qualifies as an FGIC Insured Bond insured by FGIC pursuant to a primary market insurance policy.

1.117   **Eminent Domain/Inverse Condemnation Claim:**  A Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use by the Debtor without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

1.118   **Eminent Domain Proceeding:**  A condemnation action or proceeding commenced by HTA or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A. §2905 to obtain title to real property located on Puerto Rico.

1.119   **Entity:**  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.120   **ERS:**  Employee Retirement System of the Government of the Commonwealth of Puerto Rico.

1.121   **Executory Contract:**  A contract to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.122   **Federal Claims:**  Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security, and the United States Department of Labor.

1.123   **FGIC:**  Financial Guaranty Insurance Company or its successor or designee.

1.124   **FGIC Action:**  The litigation styled Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al., currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.125   **FGIC Certificates:**  With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

1.126  **FGIC CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.127  **FGIC Escrow Account Agreements:**  Those certain (i) Escrow Account Agreement FGIC CW/HTA Bond Claims Arising from HTA 98 Senior Bonds, dated as of March 15, 2022, by and among the Commonwealth, FGIC, as escrow agent thereunder, and FGIC, as the bond insurer of the FGIC Insured HTA 98 Senior Bonds (as defined in such escrow account agreement), and (ii) Escrow Account Agreement FGIC CW/HTA Bond Claims arising from HTA 98 Sub Bonds, dated as of March 15, 2022, by and among the Commonwealth, FGIC, as escrow agent thereunder, and FGIC, as the bond insurer of the FGIC Insured HTA 98 Sub Bonds (as defined in such escrow account agreement), pursuant to which escrow accounts were established for the benefit of the beneficial holders of FGIC CW/HTA Bond Claims to hold such holders' respective allocable shares of the CW/HTA Clawback Recovery (including any payments received thereon and the net proceeds from any sales thereof) in escrow pending the HTA Effective Date, and from which such CW/HTA Clawback Recovery shall, on a proportionate basis, be distributed to FGIC or deposited into the applicable FGIC Trust as provided in such escrow account agreements.

1.128  **FGIC Insured Bond Claims:**  Collectively, the Claims against HTA arising from the FGIC Insured Bonds, including, any HTA 98 Senior Bond Claims (FGIC) and HTA 98 Sub Bond Claims (FGIC).

1.129  **FGIC Insured Bonds:**  Collectively, the HTA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.130  **FGIC Insurance Policies:**  The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.131  **FGIC Plan Consideration:**  The consideration allocable or distributable to holders of Allowed FGIC Insured Bond Claims.

1.132  **FGIC Rehabilitation Plan:**  The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.133  **FGIC Treatment:**  The treatment of FGIC Insured Bond Claims set forth in Section 26.3 hereof.

1.134  **FGIC Trust:**  With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the HTA Effective Date, by HTA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.135   **Final Order:**  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.136   **Findings of fact and Conclusions of Law:**  The findings of fact and conclusions of law of the Title III Court entered in the Title III Case in connection with confirmation of the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA.

1.137   ~~1.136~~ **Fiscal Plan:**  A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.138   ~~1.137~~ **FY:**  A fiscal year of HTA, commencing on July 1st and concluding on June 30th of the following calendar year.

1.139   ~~1.138~~ **GDB:**  The Government Development Bank for Puerto Rico.

1.140   ~~1.139~~ **GDB/HTA Loans:**  Collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the Qualifying Modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.141   ~~1.140~~ **GDB Loan Priority Determination:**  The determination, rendered in the Commonwealth Title III Case and the HTA Title III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the DRA, including, without limitation, its predecessors and successors in interest, does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans, as set forth in that certain Opinion and Order Granting Defendants' Motion to Dismiss the Complaint, dated October 29, 2021, of the Title III Court entered in AmeriNational Community Services, LLC, et al. v Ambac Assurance Corporation, et al., Adv. Pro. No. 21-00068-LTS [ECF No 83].

1.142   ~~1.141~~ **GO CVIs:**  Collectively, the general obligation securities issued on the Commonwealth Effective Date by the Commonwealth in accordance with the terms and

provisions of Annex "1" to Exhibit "J" to the Commonwealth Plan, the Commonwealth Confirmation Order, the GO CVI Indenture and the CVI Legislation.

1.143   1.142  **Government Entity:**  Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.144   1.143  **Government Parties:**  Collectively, (a) the Oversight Board, as the representative of the Debtor in accordance with Section 315(b) of PROMESA, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtor, and (d) AAFAF; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.145   1.144  **Government Released Claims:**  Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtor, Claims (including, without limitation, Claims arising from or relating to the HTA Bonds), the Debt Related Objections, the Lien Challenge Actions, and arising prior to the HTA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtor (or its successor, including Reorganized HTA), the Commonwealth, ERS, PBA or COFINA arising from or relating to the Debtor's, the Commonwealth's, ERS's, PBA's and COFINA's obligations, as applicable, pursuant to the HTA Plan or the securities to be issued pursuant to the HTA Plan or that were issued pursuant to the COFINA Plan or the Commonwealth Plan, or (ii) a Government Releasee unrelated to the Debtor or the Claims discharged pursuant to the terms and provisions of the HTA Plan, (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA.

1.146   1.145  **Government Releasees:**  Collectively, the Government Parties and the Debtor, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

18

1.147   1.146 **GUC Recovery Cap:**  Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust on account of the Avoidance Actions shall not count towards attaining the forty percent (40%) cap.

1.148   1.147 **GUC Reserve:**  The reserve to be created on or prior to the HTA Effective Date, and held by Kroll Restructuring Administration LLC (formerly, Prime Clerk LLC), solely for the benefit of holders of Allowed HTA General Unsecured Claims, pursuant to a separate agreement that will contain substantially similar protections for holders of HTA General Unsecured Claims as the agreement with respect to the GUC Reserve under the Commonwealth Plan has for holders of CW General Unsecured Claims (as defined in the Commonwealth Plan).

1.149   1.148 **Highway Assets:**  Collectively, the Toll Road Assets and the toll-free roads on Puerto Rico, managed, operated or maintained by HTA.

1.150   1.149 **HTA:**  Puerto Rico Highways and Transportation Authority.

1.151   1.150 **HTA 68 Bond Claim:**  A Claim against HTA on account of HTA 68 Bonds, other than an HTA 68 Bond Claim (Ambac), an HTA 68 Bond Claim (Assured) or an HTA 68 Bond Claim (National).

1.152   1.151 **HTA 68 Bond Claim (Ambac):**  A Claim against HTA on account of an HTA 68 Bond that is an Ambac Insured Bond.

1.153   1.152 **HTA 68 Bond Claim (Assured):**  A Claim against HTA on account of an HTA 68 Bond that is an Assured Insured Bond.

1.154   1.153 **HTA 68 Bond Claim (National):**  A Claim against HTA on account of an HTA 68 Bond that is a National Insured Bond.

1.155   1.154 **HTA 68 Bond Recovery:**  The aggregate recovery by holders of Allowed HTA 68 Bond Claims, Allowed HTA 68 Bond Claims (Ambac), Allowed HTA 68 Bond Claims (Assured), and Allowed HTA 68 Bond Claims (National), on account of any such Claims, consisting of (a) Three Hundred Eleven Million Five Hundred Twelve Thousand Eight Hundred Twenty-Two Dollars and Seventeen Cents ($311,512,822.17) in original principal amount of New HTA CIBs, (b) One Hundred Twenty-Three Million Five Hundred Forty-Three Thousand Eight Hundred Forty Dollars and Five Cents ($123,543,840.05) in original principal amount of New HTA CABs, and (c) Two Hundred Eleven Million Three Hundred Thirty-Two Thousand Six Hundred Eighty-Five Dollars and Fifty-Six Cents ($211,332,685.56) in original principal amount of New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, which election shall be disclosed no later than seven (7) days prior to the HTA  Effective Date, in their joint and absolute discretion, the Commonwealth or HTA, as the case may be, may substitute Cash for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (a)-(c) above, on a dollar-for-dollar basis.

1.156   1.155 **HTA 68 Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight

Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (h) the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

1.157   1.156 **HTA 98 Bonds**:  Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

1.158   1.157 **HTA 98 Senior Bond Claim:**  A Claim against HTA on account of HTA 98 Senior Bonds, other than an HTA 98 Senior Bond Claim (Ambac), an HTA 98 Senior Bond Claim (Assured), an HTA 98 Senior Bond Claim (FGIC) or an HTA 98 Senior Bond Claim (National).

1.159   1.158 **HTA 98 Senior Bond Claim (Ambac):**  A Claim against HTA on account of HTA 98 Senior Bond that is an Ambac Insured Bond.

1.160   1.159 **HTA 98 Senior Bond Claim (Assured):**  A Claim against HTA on account of HTA 98 Senior Bond that is an Assured Insured Bond.

1.161   1.160 **HTA 98 Senior Bond Claim (FGIC):**  A Claim against HTA on account of an HTA 98 Senior Bond that is a FGIC Insured Bond.

1.162   1.161 **HTA 98 Senior Bond Claim (National):**  A Claim against HTA on account of an HTA 98 Senior Bond that is a National Insured Bond.

1.163   1.162 **HTA 98 Senior Bond Recovery:**  The aggregate recovery by holders of Allowed HTA 98 Senior Bond Claims, Allowed HTA 98 Senior Bond Claims (Ambac), Allowed HTA 98 Senior Bond Claims (Assured), Allowed HTA 98 Senior Bond Claims (FGIC), and Allowed HTA 98 Senior Bond Claims (National) on account of any such Claims, consisting of (a) Two Hundred Eighty-Eight Million Four Hundred Eighty-Seven Thousand One Hundred Seventy-Seven Dollars and Eighty-Three Cents ($288,487,177.83) in original principal amount of New HTA CIBs, (b) One Hundred Fourteen Million Four Hundred Twelve Thousand Twenty-Eight Dollars and Eight Cents ($114,412,028.08) in original principal amount of New

HTA CABs, and (c) One Hundred Ninety-Five Million Seven Hundred Eleven Thousand Nine Hundred Twelve Dollars and One Cent ($195,711,912.01) in original principal amount of the New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, which election shall be disclosed no later than seven (7) days prior to the HTA Effective Date, in their joint and absolute discretion, the Commonwealth or HTA, as the case may be, may substitute Cash for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (a)-(c) above, on a dollar-for-dollar basis.

1.164   1.163  **HTA 98 Senior Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars ($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars ($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G, issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty Thousand Dollars ($82,340,000.00), (g) the 2004 Transportation Revenue Refunding Bonds, Series J, issued by HTA in the original principal amount of Four Hundred Five Million Nine Hundred Eighty-Five Thousand Dollars ($405,985,000.00), (h) the 2005 Transportation Revenue Refunding Bonds, Series K, issued by HTA in the original principal amount of Eight Hundred Million Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series L, issued by HTA in the original principal amount of Five Hundred Ninety-Eight Million Two Hundred Eighty-Five Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue Refunding Bonds, Series M, issued by HTA in the original principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original principal amount of One Billion Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95), and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Forty-Four Million Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.165   1.164  **HTA 98 Sub Bond Claim:**  A Claim against HTA on account of HTA 98 Sub Bonds, other than an HTA 98 Sub Bond Claim (Assured), an HTA 98 Sub Bond Claim (FGIC), or an HTA 98 Sub Bond Claim (National).

1.166   1.165  **HTA 98 Sub Bond Claim (Assured):**  A Claim against HTA on account of an HTA 98 Sub Bond that is an Assured Insured Bond.

1.167   1.166  **HTA 98 Sub Bond Claim (FGIC):**  A Claim against HTA on account of an HTA 98 Sub Bond that is a FGIC Insured Bond.

1.168 1.167 **HTA 98 Sub Bond Claim (National):** A Claim against HTA on account of an HTA 98 Sub Bond that is a National Insured Bond.

1.169 1.168 **HTA 98 Sub Bond Recovery:** The aggregate recovery by holders of Allowed HTA 98 Sub Bond Claims, Allowed HTA 98 Sub Bond Claims (Assured), Allowed HTA 98 Sub Bond Claims (FGIC), and Allowed HTA 98 Sub Bond Claims (National).

1.170 1.169 **HTA 98 Sub Bonds:** Collectively, the following subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million Fifty Thousand Dollars ($75,050,000.00), and (b) the Subordinated Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.171 1.170 **HTA Bond Claims:** Collectively, a Claim against HTA on account of HTA 68 Bonds, HTA 98 Senior Bonds, and HTA 98 Sub Bonds.

1.172 1.171 **HTA Bonds:** Collectively, the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.173 1.172 **HTA/CCDA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds became HTA/CCDA PSA Creditors.

1.174 1.173 **HTA/CCDA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds became HTA/CCDA PSA Creditors.

1.175 1.174 **HTA/CCDA Joinder Deadline:** With respect to (a) HTA 68 Bond Claims and HTA 68 Bond Claims (Ambac), May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), and HTA 98 Senior Bond Claims (FGIC), July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the HTA Plan.

1.176 1.175 **HTA/CCDA Joinder Creditors:** Collectively, those entities holding HTA Bonds or CCDA Bonds that executed and delivered either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement prior to the HTA/CCDA Joinder Deadline.

1.177 1.176 **HTA/CCDA Plan Support Agreement:** That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.178 1.177 **HTA/CCDA PSA Creditors:** Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.179   1.178 **HTA/CCDA PSA Restriction Fee Creditors**:  Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors that executed the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement, or the HTA/CCDA Annex Agreement prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that, notwithstanding anything contained herein to the contrary, all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA PSA Threshold Attainment is reached shall be considered HTA/CCDA PSA Restriction Fee Creditors; and, provided, further, that, under all circumstances, HTA PSA Restriction Fees shall not be available to holders of HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), or HTA 98 Sub Bond Claims (National) in their capacity as such, and such holders in such capacity shall not be considered HTA/CCDA PSA Restriction Fee Creditors with respect to such HTA 98 Sub Bonds.

1.180   1.179 **HTA/CCDA PSA Restriction Fee Period**:  The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.181   1.180 **HTA/CCDA PSA Threshold Attainment**:  The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent (85%) of the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National), inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National), inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.182   1.181 **HTA Clawback CVI**:  The CVI issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Commonwealth Plan.

1.183   1.182 **HTA Clawback Recovery**:  The aggregate recovery by holders of Allowed CW/HTA Claims, consisting of HTA Clawback CVIs distributed to holders of such Claims pursuant to the Commonwealth Plan and subject to the Annual Payment Waterfall, as defined in Exhibit "J" of the Commonwealth Plan. .

1.184   1.183 **HTA Committee Agreement**:  That certain letter agreement, dated May 9, 2022, between the Creditors' Committee and the Oversight Board.

1.185   1.184 **HTA Confirmation Date**:  The date on which the Clerk of the Title III Court enters the HTA Confirmation Order on the docket.

1.186 ~~1.185~~ **HTA Confirmation Hearing:** The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the HTA Plan, as such hearing may be adjourned or continued from time to time.

1.187 ~~1.186~~ **HTA Confirmation Order:** The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.188 ~~1.187~~ **HTA Distribution Conditions:** Collectively, (a) the Commonwealth Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.189 ~~1.188~~ **HTA Effective Date:** The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the HTA Plan specified in Section 35.1 of the HTA Plan shall have been satisfied or waived, as provided in Section 35.2 of the HTA Plan, and (ii) all the conditions precedent to the substantial consummation of the HTA Plan and occurrence of the HTA Effective Date specified in Section 36.1 of the HTA Plan shall have been satisfied or waived as provided in Section 36.2 of the HTA Plan.

1.190 ~~1.189~~ **HTA Enabling Act:** Act No. 74 of June 23, 1965, known as the "Puerto Rico Highway and Transportation Authority Act".

1.191 ~~1.190~~ **HTA Fiscal Agent:** The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.192 ~~1.191~~ **HTA Fiscal Plan:** A Fiscal Plan for the Debtor or Reorganized HTA.

1.193 ~~1.192~~ **HTA/GDB Claim:** A Claim against HTA with respect to loans extended by GDB to HTA, other than an HTA 68 Bond Claim, HTA 68 Bond Claim (Ambac), HTA 68 Bond Claim (Assured), HTA 68 Bond Claim (National), HTA 98 Senior Bond Claim, HTA 98 Senior Bond Claim (Ambac), HTA 98 Senior Bond Claim (Assured), HTA 98 Senior Bond Claim (FGIC), HTA 98 Senior Bond Claim (National), or HTA 98 Sub Bond Claim (National).

1.194 ~~1.193~~ **HTA General Unsecured Claim:** A Claim against HTA; provided, however, that, under all circumstances, "HTA General Unsecured Claim" shall not include (a) a

Claim arising from or related to the HTA 68 Bonds, the HTA 98 Senior Bonds, the HTA 98 Sub Bonds, the HTA Moscoso Bonds or the GDB/HTA Loans, (b) an Eminent Domain/Inverse Condemnation Claim, (c) a Section 510(b) Subordinated Claim, (d) a Late-Filed Claim, (e) a Convenience Claim, (f) any Claim that is eligible to be transferred into or administered through the ACR process, (g) the Claim asserted in Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any other Claims related to the litigation styled <u>Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department</u>, Case No. KAC-2007-4170, (h) any Claims for retiree benefits (including, without limitation, those portions of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless of whether such Claims are asserted by retirees or active employees and regardless of whether of such Claims are asserted through litigation or administrative proceedings, but excluding Claims for any increased pension payments that would have been payable prior to adjudication of such Claims (<u>i.e.</u>, pension "back pay") and only up to the amount related to unpaid pensions, (i) all Claims against the Debtor by any Governmental Unit (as defined in section 101 of the Bankruptcy Code), including the United States government, any State government, foreign government, any municipality (whether of the Commonwealth or otherwise), the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted directly by such Governmental Unit or indirectly or derivatively by any other Entity, including, without limitation, any Claims by the GDB asserted by or through the DRA, (j) any Claims related to the Concession Agreement, dated as of December 20, 1991, between HTA and Autopistas de PR, LLC, as amended and supplemented, relating to the operation and maintenance of the Teodoro Moscoso Budge, including, without limitation, Proof of Claim No. 52295, (k) any Claims related to the Toll Road Concession Agreement, dated as of June 27, 2011, between the HTA and Autopistas Metropolitanas de Puerto Rico, LLC, as amended and supplemented, including without limitation, Proof of Claim No. 35566, (l) any unsecured deficiency claims with respect to asserted priority and/or secured Claims, or (m) such other Claim determined by the Title III Court not to be an HTA General Unsecured Claim.

1.195  1.194 **HTA GUC Recovery:**  The amount equal to (a) Forty-Eight Million Dollars ($48,000,000.00), to be funded in accordance with the terms and provisions of Section 20.3 hereof, <u>plus</u> (b) the net recoveries, if any, by the Avoidance Actions Trust attributable to the Avoidance Actions, <u>minus</u> (c) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims in accordance with the terms and provisions of Article XXIII hereof.

1.196  1.195 **HTA Moscoso Bond Claim:**  A Claim against HTA on account of the HTA Moscoso Bonds.

1.197  1.196 **HTA Moscoso Bonds:**  Collectively, the Special Facility Revenue Refunding Bond, 2003 Series A, issued by HTA in the original principal amount of One Hundred Fifty-Three Million Two Hundred Twenty-Two Thousand Two Hundred Seventy dollars and Forty-Five Cents ($153,222,270,45) in accordance with the terms and provisions of that certain Trust Agreement, dated as of October 1, 2003, between HTA and Banco Popular de Puerto Rico, as Trustee in which, as of the HTA Petition Date, where in the aggregate outstanding principal amount of $141,875411.00.

1.198  1.197 **HTA Petition Date:**  May 21, 2017.

1.199   ~~1.198~~ **HTA Plan:**  This ~~Second~~Third Amended Title III Plan of Adjustment of Puerto Rico Highways and Transportation Authority, including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.200   ~~1.199~~ **HTA PSA Restriction Fees:**  Collectively, the fees to be paid, in Cash, on the HTA Effective Date, in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement, Section 3.4 hereof, and the HTA Confirmation Order, which fees, in the aggregate, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amount as may be payable on account of Consummation Costs.

1.201   ~~1.200~~ **HTA Restriction Fee Percentage:**  The percentage equal to (a) One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amounts as may be payable on account of Consummation Costs, divided by (b) the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) held or, in the case of a Monoline, either held or insured and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents, and applicable law, by HTA/CCDA PSA Restriction Fee Creditors.

1.202   ~~1.201~~ **HTA Title III Case:**  The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Case No. 17-3567-LTS (D.P.R.).

1.203   ~~1.202~~ **Initial HTA/CCDA PSA Creditors:**  Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board, as of May 5, 2021.

1.204   ~~1.203~~ **Insured HTA Bond Claim:**  Collectively, the HTA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.205   ~~1.204~~ **Invalidity Actions:**  Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "B" hereto.

1.206   ~~1.205~~ **IRC:**  The United States Internal Revenue Code of 1986, as amended from time to time.

1.207   ~~1.206~~ **IRS:**  The Internal Revenue Service, an agency of the United States Department of Treasury.

1.208   ~~1.207~~ **Late-Filed Claim:**  A proof of claim filed in the HTA Title III Case from and after the commencement of the Disclosure Statement Hearing.

1.209   ~~1.208~~ **Lien:**  Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.210   ~~1.209~~ **Lien Challenge Actions:**  Collectively, the adversary proceedings listed on Exhibit "C" hereto.

1.211   ~~1.210~~ **Lift Stay Motions:**  Collectively, the litigation styled (a) _Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico_, filed in the HTA Title III Case [Dkt. No. 673], (b) _Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board_, filed in the Commonwealth's Title III case [Dkt. No. 10104], (c) _Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board_, filed in the Commonwealth's Title III case [Dkt. No. 10602], (d) _AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico_, filed in the Title III Case [Dkt. No. 591], (e) _Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al._, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) _Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al._, Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit, (g) _Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al._, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (h) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

1.212   ~~1.211~~ **List of Creditors:**  The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the _Notice of Filing of Creditor List for the Puerto Rico Highways and Transportation Authority_ filed in the Title III Case [Case No. 17-3283-LTS, ECF No. 10708], pursuant to sections 924 and 925 of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be amended, restated, supplemented or otherwise modified by the Debtor.

1.213   ~~1.212~~ **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.214   ~~1.213~~ **MBA:**  Puerto Rico Metropolitan Bus Authority.

1.215   ~~1.214~~ **MFA:**  Puerto Rico Municipal Finance Agency.

1.216   ~~1.215~~ **Monolines:**  Collectively, Ambac, Assured, FGIC, and National, as insurers of HTA Bonds, or other Claims or securities issued by the Debtor, as applicable.

1.217   ~~1.216~~ **National:**  National Public Finance Guarantee Corporation.

1.218   ~~1.217~~ **National Action:**  The litigation styled _National Public Finance Guarantee Corp., et al. v. UBS Financial Services, Inc., et al._, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.219   ~~1.218~~ **National Acceleration Price:**  With respect to any National Insured Bond, a price equal to the outstanding principal amount of a National Insured Bond plus the accrued

27

and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

1.220   1.219 **National Bondholder Election Form:** Collectively or individually, as the case may be, the "Form of Election Notice for Holders of Claims in Class 4" and the "Form of Election Notice for the Holders of Claims in Class 9", copies of which are attached as Schedules 5(d) and 5(e), respectively, to the Disclosure Statement Order.

1.221   1.220 **National Certificates:** With respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

1.222   1.221 **National Commutation Consideration:** A combination of some or all of the following, to be selected by National at National's sole discretion at or prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the Consummation Costs and/or the HTA PSA Restriction Fee distributable to National in accordance with the terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

1.223   1.222 **National Commutation Treatment:** The treatment set forth in Section 26.2(a) hereof.

1.224   1.223 **National CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by National, including, without limitation, pursuant to a secondary market insurance policy.

1.225   1.224 **National Election Notice:** The "Notice of Non-Voting Status for Holders of HTA 98 Sub Bond Claims (National)", a copy of which is attached as Schedule 4(f) to the Disclosure Statement Order.

1.226   1.225 **National Escrow Account:** A single escrow account that may be formed, on or prior to the HTA Effective Date, by HTA, for the benefit of the beneficial holders of National Insured Bonds whose National Escrow Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.227   1.226 **National Escrow Consideration:** Some or all of the New HTA Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing.

1.228   1.227 **National HTA Consideration:** The consideration distributable pursuant to the Commonwealth Plan, the Commonwealth Confirmation Order, the HTA Plan and the HTA Confirmation Order on account of Allowed National Insured Bond Claims and Allowed National CW/HTA Bond Claims, consisting of (a) the Cash and New HTA Bonds distributable on account

of Allowed National Insured Bond Claims, and (b) the HTA Clawback CVI distributable on account of Allowed National CW/HTA Bond Claims.

1.229   1.228 **National Insurance Policies:**  The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.230   1.229 **National Insured Bond Claims:**  Collectively, the Claims against HTA arising from the National Insured Bonds, including any HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims (National), and HTA 98 Sub Bond Claims (National).

1.231   1.230 **National Insured Bonds:**  Collectively, the HTA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.232   1.231 **National Non-Commutation Treatment:**  The treatment set forth in Section 26.2(b) hereof.

1.233   1.232 **National Plan Consideration:**  The consideration distributable on account of Allowed National Insured Bond Claims.

1.234   1.233 **National Treatment:**  With respect to each Class of National Insured Bond Claims, the treatment set forth in Section 26.2 hereof.

1.235   1.234 **National Trust:**  The trust(s) which may be formed, on or prior to the HTA Effective Date, by HTA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.236   1.235 **National Trust Consideration:**  Some or all of the New HTA Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing.

1.237   1.236 **New HTA Bonds:**  Collectively, the bonds to be issued on the HTA Effective Date by Reorganized HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture, the repayment of which shall be supported by a pledge of the Pledged Revenues.

1.238   1.237 **New HTA Bonds Indenture:**  The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which Reorganized HTA shall issue the Secured Obligations, and including all of the terms and provisions in connection therewith, as it

29

may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to the Monolines.

1.239 ~~1.238~~ **New HTA Bonds Trustee:** The trustee appointed in accordance with the terms and provisions of the New HTA Bonds Indenture.

1.240 ~~1.239~~ **New HTA CABs:** Collectively, the series of capital appreciation bonds, accreting interest at the rate of five percent (5.0%) per annum, to be issued pursuant to the HTA Plan as components of New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.241 ~~1.240~~ **New HTA CIBs:** Collectively, the series of current interest bonds, accruing interest at the rate of five percent (5%) per annum, to be issued pursuant to the HTA Plan as components of the New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.242 ~~1.241~~ **New HTA Convertible CABs:** Collectively, the series of convertible capital appreciation bonds, accreting interest at the rate of five percent (5.0%) per annum, to be issued pursuant to the HTA Plan as components of the New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.243 ~~1.242~~ **Outstanding:** Debt that (i) has not been paid in full in accordance with its terms, or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.244 ~~1.243~~ **Oversight Board:** The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtor's representative in the Title III Case pursuant to Section 315(b) of PROMESA.

1.245 ~~1.244~~ **Partial Disposition:** A lease, long-term concession or other public-private partnership arrangement with respect to any real restate or personal property comprising a portion of the Toll Facilities.

1.246 ~~1.245~~ **PayGo:** The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.247 ~~1.246~~ **PBA:** Puerto Rico Public Buildings Authority.

1.248 ~~1.247~~ **Person:** An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.249 ~~1.248~~ **PFC:** Puerto Rico Public Finance Corporation.

1.250 ~~1.249~~ **Plan Supplement:** A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, the New HTA Bonds Indenture, forms of the

New HTA Bonds, and Reorganized HTA By-Laws, which shall be in form and substance reasonably satisfactory to AAFAF, and the Monolines, and, solely with respect to the provisions affecting Classes 16 and 19, the Creditors' Committee.  The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes.  The Plan Supplement shall be deemed incorporated into and part of the HTA Plan as if set forth herein in full.

1.251   1.250 **Pledged Revenues:**  Collectively, (a) the Toll Receipts, (b) the rights of Reorganized HTA to receive the Toll Receipts, (c) except for purposes of the Toll Rate Covenant set forth in the New HTA Bonds Indenture, the proceeds derived from or related to any sale or disposition of, or any concession arrangement relating to, all or any part of the Toll Facilities, and (d) investment income received on any amounts held in the Toll Receipts Fund, the Debt Service Fund, the Operating Reserve Fund, the Renewal and Replacement Funds, the Subordinated Indebtedness Fund and the General Reserve Fund, each as defined in the New HTA Bonds Indenture; provided, however, that, under all circumstances, "Pledged Revenues" shall not include the proceeds of any gifts, grants, or other payments to Reorganized HTA from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity that are not in the nature of a Toll.

1.252   1.251 **PRASA:**  Puerto Rico Aqueduct and Sewer Authority.

1.253   1.252 **PREPA:**  Puerto Rico Electric Power Authority.

1.254   1.253 **PRIDCO:**  Puerto Rico Industrial Development Company.

1.255   1.254 **PRIFA:**  Puerto Rico Infrastructure Financing Authority.

1.256   1.255 **PRITA:**  Puerto Rico Integrated Transit Authority.

1.257   1.256 **Professional:**  An Entity (a) to be compensated for services rendered prior to or on the HTA Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Case by the Government Parties (in the Government Parties' sole discretion); (ii) employed in the Title III Case by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.258   1.257 **Professional Claim:**  A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the HTA Confirmation Date under Sections 316 and 317 of PROMESA.

1.259   1.258 **PROMESA:**  The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.260   1.259 **Pro Rata Share:**  With respect to Allowed Claims against the Debtor (a) the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class, taking into account, and reducing for, unmatured interest thereon as of the HTA Petition Date with respect to individual bonds within such Class, and (b) among more than one Class, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.261   1.260 **Related Persons:**  With respect to any Entity (including for the avoidance of doubt, the Commonwealth, the Government Parties, and the Creditors' Committee), its predecessors, successors and assigns (whether by operation of law or otherwise) and their respective current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and professionals (including, without limitation, any and all Professionals retained by the Debtor, AAFAF, and the Creditors' Committee), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), each in its respective capacity as such; provided, however, that "Related Persons" is not intended, nor shall it be construed, to include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

1.262   1.261 **Released Claims:**  Collectively, (a) with respect to those Entities party to the HTA/CCDA Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the HTA/CCDA Plan Support Agreement, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtor or its Assets in the Title III Case, (c) Claims and Causes of Action that have been or could have been asserted by the Debtor (with respect to releases given by the Debtor) and by Creditors or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, (e) with respect to those Entities party to the DRA Stipulation, Claims and Causes of Action released hereunder and in accordance with the DRA Stipulation, and (f) Claims that otherwise arise from or relate to the Title III Case, the HTA Plan, the HTA/CCDA Plan Support Agreement, the HTA Committee Agreement, and the compromises set forth herein, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtor or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort; and,

provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the HTA Confirmation Order or the HTA Plan, including, without limitation, performance of obligations arising from or related to New HTA Bonds, New GO Bonds, the HTA Clawback CVIs or under any policy of insurance or related documents issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims against the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

1.263   1.262 **Released Parties:** Collectively, solely to the extent provided in the HTA Plan, (a) the Government Parties, (b) the HTA/CCDA PSA Creditors, (c) the Creditors' Committee, (d) the DRA and the DRA Parties, and (e) with respect to the foregoing clauses (a) through (d), each of their respective Related Persons.

1.264   1.263 **Releasing Parties:** Collectively, solely to the extent provided in the HTA Plan, (a) all holders of Claims against the Debtor or its Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

1.265   1.264 **Reorganized Commonwealth:** The Commonwealth, from and after the Commonwealth Effective Date.

1.266   1.265 **Reorganized HTA:** The Debtor, from and after the HTA Effective Date.

1.267   1.266 **Reorganized HTA By-Laws:** The by-laws of Reorganized HTA, to the extent applicable, from and after the HTA Effective Date.

1.268   1.267 **SCC Action:** The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.269   1.268 **SEC:** The United States Securities and Exchange Commission.

1.270   1.269 **Section 103 Bond Counsel:** With respect to HTA or Reorganized HTA, as the case may be, counsel providing services with respect to Section 103 of the IRC.

1.271   1.270 **Section 510(b) Subordinated Claim:** Any Claim, to the extent determined pursuant to a Final Order, against the Debtor or its Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of the Debtor or an Affiliate of the Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.272   1.271 **Secured Obligations**: Collectively, the New HTA Bonds and the Subordinated Indebtedness.

1.273   1.272 **Securities Act:** The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.274   1.273 **SIB Account:**  The State Infrastructure Bank account established and posted as security for the repayment of HTA 98 Sub Bond Claims (National).

1.275   1.274 **Solicitation Agent:**  Kroll Restructuring Administration LLC (formerly, Prime Clerk LLC), the claims, balloting, and solicitation agent retained by the Debtor in the Title III Case by Title III Court order.

1.276   1.275 **Subordinated Indebtedness:**  Collectively, the subordinated indebtedness to be issued to the Commonwealth pursuant to the New HTA Bonds Indenture or a supplement thereto and as a refinancing of HTA's obligations pursuant to the Commonwealth Loan, bearing interest at the rate of two and one-half percent (2.5%) per annum, a maturity date of July 1, 2052, and such other salient payment provisions as set forth on Exhibit "E" annexed hereto.

1.277   1.276 **Syncora:**  Syncora Guarantee Inc., together with its predecessors, successors, or designees.

1.278   1.277 **Syncora Acceleration Price:**  With respect to an HTA 98 Senior Bond bearing CUSIP number 745190AY4, and the principal and interest payments of which have been insured by Syncora, a price equal to the outstanding principal amount of such HTA 98 Senior Bond plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

1.279   1.278 **Title III:**  Title III of PROMESA.

1.280   1.279 **Title III Case:**  The HTA Title III Case.

1.281   1.280 **Title III Court:**  The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.282   1.281 **Toll Facilities:**  Collectively, PR-20, PR-52, PR-53 and PR-66 toll highways.

1.283   1.282 **Toll Rate Covenant:**  The toll rate covenant referred to in Section 24.1(i) hereof, as set forth herein and as may be revised in accordance with the terms and provisions of the New HTA Bonds Indenture.

1.284   1.283 **Toll Receipts:**  Collectively, (a) all Cash receipts and automated or electric payments or credits from Tolls (including by way of the "Auto-Expresso" system), and (b) the proceeds of any business interruption insurance relating to the Toll Facilities and of any other insurance which insures against the loss of Toll Receipts.

1.285   1.284 **Toll Receipt Fund:**  The fund designated, created and established pursuant to Section 5.01 of the New HTA Bonds Indenture to hold the Toll Receipts pending application and distribution in accordance with the terms and conditions of the New HTA Bonds Indenture.

1.286   1.285 **Tolls:**  Collectively, tolls, fares, incomes, receipts, special fees or permit fees, or other charges imposed by or on behalf of Reorganized HTA on the owners, lessors, lessees or operators of motor vehicles for the operation of or the right to operate those vehicles

34

on the Toll Facilities, and fines and penalties and interest thereon collected as a result of a failure to pay any such amount.

1.287   ~~1.286~~ **Transit Assets:** Tren Urbano.

1.288   ~~1.287~~ **Trust Documentation:** Collectively, the documentation required, if necessary, to establish and maintain the trust into which with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

1.289   ~~1.288~~ **Trust Estate:** Collectively, and without limiting the provisions set forth in the New HTA Bonds Indenture, (a) all right, title, and interest of Reorganized HTA in and to the Pledged Revenues, and the right to receive the same, including, without limitation, any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, (i) subject only to the application of Pledged Revenues in accordance with the terms and provisions of the New HTA Bonds Indenture, and (ii) the senior lien and senior security interest granted by the New HTA Bonds Indenture for the benefit of holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and the subordinate security interest granted by the New HTA Bonds Indenture for the benefit of holders of Subordinated Indebtedness, and (b) except for the Authority Expense Fund and the Arbitrage Rebate Fund, all of Reorganized HTA's right, title and interest in the funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement and the moneys, securities, and other assets on deposit with the New HTA Bonds Trustee in such funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement permitted by the HTA Enabling Act; provided, however, that the priority in which such moneys and securities are applied to the repayment of the Secured Obligations shall be as expressly specified in the New HTA Bonds Indenture.

1.290   ~~1.289~~ **Unclaimed Distribution:** Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtor of an intent to accept a particular distribution, (c) responded to the Debtor's requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.291   ~~1.290~~ **Underwriter Actions:** Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action, or any action brought in the future in any state, federal or Commonwealth court, agency or tribunal against any of the defendants named in such litigations concerning or relating to indebtedness or bonds issued by HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth.

1.292   ~~1.291~~ **Unexpired Lease:** A lease of nonresidential real property to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.293 ~~1.292~~ **Uniformity Litigation:** Collectively, (a) the litigation styled <u>Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.</u>, Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.294 ~~1.293~~ **UPR:** Universidad de Puerto Rico.

1.295 ~~1.294~~ **Voting Record Date**: The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the HTA Plan and set forth in the Disclosure Statement Order; provided, however, that the "Voting Record Date" shall not apply to the publicly traded securities, the claims with respect to which will be voted through the Depository Trust Company's Automated Tender Offer Platform, known as "ATOP", where the holder of the securities at the time of tender (as opposed to a date certain) is deemed to be the holder entitled to vote.

1.296 ~~1.295~~ **Other Definitions:** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the HTA Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, shall have the meaning ascribed thereto in the Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the HTA Plan are to the respective section in, article of, or schedule or exhibit to, the HTA Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the HTA Plan as a whole and not to any particular section, subsection, or clause contained in the HTA Plan. In computing any period prescribed or allowed by the HTA Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.297 ~~1.296~~ **Rules of Interpretation:** For purposes of the HTA Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents, (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the HTA Effective Date pursuant to the HTA Plan plus the amount, if any, of Cash so distributed, (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the HTA Plan, (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Case are references to

the docket numbers under the Title III Court's CM/ECF system, (h) the words "include" and
"including," and variations thereof, shall not be deemed to be terms of limitation, and shall be
deemed to be followed by the words "without limitation", and (i) any immaterial effectuating
provisions may be interpreted by the Oversight Board in such a manner consistent with the
overall purpose and intent of the HTA Plan all without further notice to or action, order, or
approval of the Title III Court or any other Entity.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES/RETIREE CLAIMS

2.1 **Litigation Resolution:** To the extent not resolved pursuant to the
Commonwealth Plan or the Commonwealth Confirmation Order, the HTA Plan sets forth the
terms and conditions for a global compromise and integrated settlement of, among other issues,
asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims, HTA
98 Bond Claims, and CW/HTA Claims, including the disputes (a) set forth in the Debt Related
Objections, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d)
raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA
Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as
applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the
Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights
attendant to the GDB HTA Loans, and (f) set forth in the Lift Stay Motions and the Clawback
Actions relating to the CW/HTA Claims.

2.2 **Allowance of Bond Claims:** For purposes of confirmation and consummation of
the HTA Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an
order of the Title III Court, on the HTA Effective Date, among other Claims, (a) the HTA 68
Bond Claims, the HTA 68 Bond Claims (Ambac), the HTA 68 Bond Claims (Assured), and the
HTA 68 Bond Claims (National), shall be deemed allowed in the aggregate amount of
$831,189,105.55, (b) the HTA 98 Senior Bond Claims, the HTA 98 Senior Bond Claims
(Ambac), the HTA 98 Senior Bond Claims (Assured), the HTA 98 Senior Bond Claims
(National), and the HTA 98 Senior Bond Claims (FGIC), including, without limitation, Claims
arising from HTA 98 Senior Bonds held by the DRA, shall be deemed allowed in the aggregate
amount of $3,129,667,976.84, (c) the HTA 98 Sub Bond Claims, the HTA 98 Sub Bond Claims
(Assured), the HTA 98 Sub Bond Claims (FGIC), and the HTA 98 Sub Bond Claims (National)
shall be deemed allowed in the aggregate amount of $277,107,234.18, and (d) the HTA/GDB
Claims shall be deemed allowed in the aggregate amount of $2,149,579,432.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and
exculpation provided in Article XLI herein are integral to obtaining the value provided hereunder
and constitute an essential component of the compromises reached and are not severable from the
other provisions of this HTA Plan.

2.4 **HTA Operational Restructuring:** On or as soon as practicable following the
HTA Effective Date, including, without limitation, upon approval of the United States
Department of Transportation Federal Transit Administration, Reorganized HTA shall be

operationally restructured through the separation of the Highway Assets from the Transit Assets, with such Transit Assets and all Transit Revenues being transferred to PRITA.

      (a)    **Transit Assets**. The Transit Assets shall be supported by the Transit Revenues and by such other expressly identified, dedicated revenue stream, or revenue streams of PRITA or the Commonwealth, as the case may be, sufficient to cover the Transit Assets' operational and maintenance expense deficits and capital improvement expenditure needs and approved as adequate for such purposes by the United States Department of Transportation Federal Transit Administration and the Oversight Board.

      (b)    **Highway Assets**. From and after the HTA Effective Date, Reorganized HTA shall retain the Highway Assets and, as soon as practicable thereafter, such Highway Assets shall be operationally and financially separated between Toll Road Assets and non-toll road assets, with a "Ring-Fenced" structure and allocation of cost and expenses implemented, including, without limitation, (i) the internal separation of legal, financial and operational functions and the establishment of separate Toll Road Assets and non-toll road assets management offices, and (ii) the consolidation of all non-toll-road management responsibilities of the Puerto Rico Department of Transportation and Public Works with and into Reorganized HTA.

      (c)    **Inventory of Highway Assets**. From and after the HTA Effective Date, Reorganized HTA shall use its reasonable best efforts to inventory all available Highway Assets and provide such inventory to the Oversight Board.

    2.5    **Retiree Claims:** In accordance with the terms and provisions of Act 106 and the Commonwealth Plan, any and all obligations of the Debtor to former employees have been assumed and will be paid by the Commonwealth through Pay-Go, with the Debtor making "pay-as-you-go" contributions to the Commonwealth consistent with the provisions of Act 106 and the Commonwealth Plan, and are not otherwise treated pursuant to the HTA Plan.

## ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

    In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the HTA Plan.

    3.1    **Administrative Expense Claims:** On the later to occur of (a) the HTA Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized HTA shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized HTA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the HTA Effective Date by the

Debtor shall be paid in full and performed by Reorganized HTA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions, including, without limitation, all obligations of HTA and Reorganized HTA with respect to payment of the Commonwealth Loan; and, provided, further, that, with respect to the Commonwealth Loan, the repayment thereof shall be satisfied in accordance with the terms and provisions of the New HTA Bonds Indenture; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the HTA Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the HTA Plan.

3.2 **Professional Compensation and Reimbursement Claims:**  All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court, including, without limitation, experts who provided services to the Debtor during the Title III Case, shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the HTA Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional, including, without limitation, experts who provided services to the Debtor during the Title III Case, must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the HTA Effective Date.  Reorganized HTA shall pay compensation for professional services extended and reimbursement of expenses incurred after the HTA Effective Date in the ordinary course and without the need for Title III Court approval.

3.3 **HTA Consummation Costs:**  Notwithstanding anything contained in the HTA Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA Plan, each Initial HTA/CCDA PSA Creditor shall be entitled to receive on the HTA Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the HTA Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one percent (1.00%), truncated to two decimal points, of the aggregate amount of such Initial HTA/CCDA PSA Creditor's HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured) and HTA 98 Senior Bond Claims (National) (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial HTA/CCDA PSA Creditor as of 5:00 p.m. (EST) on May 5, 2021, in an aggregate amount not greater than One Hundred Twenty-Five Million Dollars ($125,000,000.00).

3.4 **HTA Restriction Fee:**  In exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms thereof, subject to the entry of the HTA Confirmation Order, each HTA/CCDA PSA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds (including the applicable Monolines, to the extent such Monolines are

authorized to vote the applicable Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the HTA PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the HTA Plan in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Restriction Fee Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of the Monolines held or insured, by such HTA/CCDA PSA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that each HTA/CCDA PSA Restriction Fee Creditor who acquires any HTA 68 Bonds and/or HTA 98 Senior Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured HTA Bond (other than a Monoline-insured HTA Bond insured by Assured or National, as the case may be), to the extent such HTA/CCDA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured HTA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such HTA PSA Restriction Fee equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held and/or insured by such HTA/CCDA PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the HTA Bond Claims and the entry of the HTA Confirmation Order; and, provided, further, that, if an HTA/CCDA PSA Restriction Fee Creditor sells any HTA 68 Bonds or HTA 98 Senior Bonds for which it would have been entitled to receive the HTA PSA Restriction Fee, the purchasing party shall not be entitled to receive the HTA PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate HTA PSA Restriction Fee plus the Consummation Costs attributable to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured), or HTA 98 Senior Bond Claims (National), as the case may be, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) thereof (subject to the extension provided for in Sections 7.1(b) or (c) thereof), or the Oversight Board terminates the HTA/CCDA Plan Support Agreement for any reason other than (i) a breach of the HTA/CCDA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the HTA Plan by the Title III Court (or the Title III Court renders a decision or states its

position that it will deny confirmation absent modification of the Commonwealth Plan or the HTA Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Commonwealth Plan or the HTA Plan on terms consistent with the HTA/CCDA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "J"), or (iii) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the HTA/CCDA Plan Support Agreement, the aggregate HTA PSA Restriction Fee and Consummation Costs, in the amount of Twenty Million Dollars ($20,000,000.00) shall be paid, ratably, in cash, as an administrative expense claim under the HTA Plan to the Initial HTA/CCDA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the HTA/CCDA Plan Support Agreement, including, without limitation, termination of the HTA/CCDA Plan Support Agreement in accordance with other provisions of Section 7.1 thereof, no Consummation Costs or HTA PSA Restriction Fee shall be due and payable to the party to HTA/CCDA Plan Support Agreement terminating such agreement or against the party such agreement is terminated.

3.5     **DRA Restriction Fee**:  In exchange for executing the DRA Stipulation, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its HTA 98 Senior Bonds and the HTA/GDB Claims in accordance with the terms thereof, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms hereof, but in no event later than ten (10) Business Days following the HTA Effective Date, DRA shall be entitled to receive the DRA Restriction Fee.

3.6     **Non-Severability**:  The allowance and payment of the Consummation Costs and HTA PSA Restriction Fees as set forth in this Article III compensate the HTA/CCDA Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1     **Claims are classified as follows:**

| | | |
|---|---|---|
| (a) | **Class 1:** | HTA 68 Bond Claims |
| (b) | **Class 2:** | HTA 68 Bond Claims (Ambac) |
| (c) | **Class 3:** | HTA 68 Bond Claims (Assured) |
| (d) | **Class 4:** | HTA 68 Bond Claims (National) |
| (e) | **Class 5:** | HTA 98 Senior Bond Claims |
| (f) | **Class 6:** | HTA 98 Senior Bond Claims (Ambac) |
| (g) | **Class 7:** | HTA 98 Senior Bond Claims (Assured) |

41

(h)   **Class 8:**      HTA 98 Senior Bond Claims (FGIC)

(i)   **Class 9:**      HTA 98 Senior Bond Claims (National)

(j)   **Class 10:**     HTA 98 Sub Bond Claims

(k)   **Class 11:**     HTA 98 Sub Bond Claims (Assured)

(l)   **Class 12:**     HTA 98 Sub Bond Claims (FGIC)

(m)   **Class 13:**     HTA 98 Sub Bond Claims (National)

(n)   **Class 14:**     HTA Moscoso Bond Claims

(o)   **Class 15:**     Eminent Domain/Inverse Condemnation Claims

(p)   **Class 16:**     HTA General Unsecured Claims

(q)   **Class 17:**     HTA/GDB Claims

(r)   **Class 18:**     Section 510(b) Subordinated Claims

(s)   **Class 19:**     Convenience Claims

(t)   **Class 20:**     Federal Claims

## ARTICLE V

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (CLASS 1)

5.1   **Treatment of HTA 68 Bond Claims:**  On the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim, such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VI

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (AMBAC) (CLASS 2)

6.1   **Treatment of HTA 68 Bond Claims (Ambac):**  Subject to the terms and provisions of Section 26.4 hereof, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (Ambac), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VII

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (ASSURED) (CLASS 3)

7.1    **Treatment of HTA 68 Bond Claims (Assured):**  Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (Assured), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VIII

### PROVISIONS FOR TREATMENT OF HTA
### 68 BOND CLAIMS (NATIONAL) (CLASS 4)

8.1    **Treatment of HTA 68 Bond Claims (National):**  Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (National), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE IX

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (CLASS 5)

9.1    **Treatment of HTA 98 Senior Bond Claims:**  On the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claims shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim, such holder's Pro Rata Share of HTA 98 Bond Recovery.

## ARTICLE X

### PROVISIONS FOR TREATMENT OF HTA
### 98 SENIOR BOND CLAIMS (AMBAC) (CLASS 6)

10.1    **Treatment of HTA 98 Senior Bond Claims (Ambac):**  Subject to the terms and provisions of Section 26.4 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (Ambac), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

## ARTICLE XI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (ASSURED) (CLASS 7)

11.1   **Treatment of HTA 98 Senior Bond Claims (Assured):**  Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (Assured), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

## ARTICLE XII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (FGIC) (CLASS 8)

12.1   **Treatment of HTA 98 Senior Bond Claims (FGIC):**  Subject to the terms and provision of Section 26.3 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (FGIC) shall be entitled to receive, in full consideration satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (FGIC), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

## ARTICLE XIII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (NATIONAL) (CLASS 9)

13.1   **Treatment of HTA 98 Senior Bond Claims (National):**  Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

## ARTICLE XIV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (CLASS 10)

14.1   **Treatment of HTA 98 Sub Bond Claims:**  On the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed HTA 98 Sub Bond Claim, such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

## ARTICLE XV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (ASSURED) (CLASS 11)

15.1   **Treatment of HTA 98 Sub Bond Claims (Assured):**  Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (Assured), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

## ARTICLE XVI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (FGIC) (CLASS 12)

16.1   **Treatment of HTA 98 Sub Bond Claims (FGIC):**  Subject to the terms and provisions of Section 26.3 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (FGIC), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

## ARTICLE XVII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (NATIONAL) (CLASS 13)

17.1   **Treatment of HTA 98 Sub Bond Claims (National):**  Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (National) shall (a) be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery, and (b) release any interest in or Lien upon the SIB Account.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF HTA
## MOSCOSO BOND CLAIMS (CLASS 14)

18.1   **Treatment of HTA Moscoso Bond Claims:**  On the HTA Effective Date, Allowed HTA Moscoso Bond Claims shall be deemed unimpaired, including, without limitation, the curing of all monetary defaults, if any, with respect thereto and, on the HTA Effective Date, each holder of an Allowed HTA Moscoso Bond Claim, in full consideration, satisfaction, release, and exchange of such Allowed HTA Moscoso Bond Claim, shall be entitled to receive payments of principal and interest in accordance with the terms and conditions of the HTA Moscoso Bonds.

## ARTICLE XIX

## PROVISIONS FOR TREATMENT EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 15)

19.1   **Treatment of Eminent Domain/Inverse Condemnation Claims:**  From and after the HTA Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and (b) subject to the entry of the HTA Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the HTA Plan providing such claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such unpaid balance; provided, however, that, in the event that the Oversight Board's appeal of the Commonwealth Confirmation Order and the Findings of Fact and Conclusions of Law entered with respect thereto relating to the non-dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth is successful and such Commonwealth Confirmation Order is reversed to such extent, the holder of such unpaid balance of an Allowed Eminent Domain/Inverse Condemnation Claims shall be entitled to receive, in full consideration, satisfaction, release and exchange therefor, payments from HTA equal to, and on the same timeframe as, the payments to be made to holders of Allowed HTA General Unsecured Claims pursuant to the terms and provisions of Sections 20.1, 20.2 and 20.3 hereof.

## ARTICLE XX

## PROVISIONS FOR TREATMENT OF HTA
## GENERAL UNSECURED  CLAIMS (CLASS 16)

20.1   **Treatment of HTA General Unsecured Claims:**

(a)   Treatment of HTA General Unsecured Claims.  Subject to the election set forth in Section 20.1(b) hereof, on the HTA Effective Date, each holder of an Allowed HTA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA General Unsecured Claim, such holder's Pro Rata Share of the HTA GUC Recovery up to the GUC Recovery Cap.

(b)   Election to be Treated as a Convenience Claim.  Notwithstanding the provisions of Section 20.1(a) of the HTA Plan, any holder of (i) an Allowed HTA General Unsecured Claim, other than a HTA General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other holder of an

Allowed Claim, whose Allowed HTA General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed HTA General Unsecured Claim to Twenty Thousand Dollars ($20,000.00) and (ii) multiple Allowed HTA General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) in the aggregate, and who elects to reduce the aggregate amount of such Allowed HTA General Unsecured Claims to Forty Thousand Dollars ($40.000.00) shall, at such holder's option, be entitled to receive, based on such Allowed HTA General Unsecured Claim as so reduced, distributions pursuant to Section 23.1 hereof.  Such election must be made on the Ballot and be received by the Oversight Board on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon HTA unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that, under no circumstances may such waiver by the Oversight Board occur on or after the HTA Effective Date.

20.2    **Limitation on Recovery:**  Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed HTA General Unsecured Claims from the HTA GUC Recovery equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust with respect to the Avoidance Actions, any funds remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes.

20.3    **GUC Reserve:**  The GUC Reserve shall be funded as follows: (a) Twenty-Four Million Dollars ($24,000,000.00) on the HTA Effective Date; and (b) Twenty-Four Million Dollars ($24,000,000.00) on the first (1st) anniversary of the HTA Effective Date; provided, however, that amounts necessary to satisfy Allowed Convenience Claims shall be deemed to satisfy a portion of the amount to be deposited into the GUC Reserve and be funded directly to the Disbursing Agent and not into the GUC Reserve; and, provided, further, that, in accordance with the provisions of Section 20.2 hereof, in the event recoveries on account of Allowed HTA General Unclaimed Claims from the HTA GUC Recovery equal the GUC Recovery Cap, (y) any funds (other than any recoveries by the Avoidance Actions Trust with respect to the Avoidance Actions) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes, or (z) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, HTA shall be relieved of such future funding obligation.

## ARTICLE XXI

## PROVISIONS FOR TREATMENT OF
## HTA/GDB CLAIMS (CLASS 17)

21.1    **Treatment of HTA/GDB Claims:**  Pursuant to the terms and provisions of the DRA Stipulation, Allowed HTA/GDB Claims shall not receive a distribution pursuant to the HTA Plan and each holder of an Allowed HTA/GDB Claim shall be deemed to have accepted the HTA Plan.

## ARTICLE XXII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 18)

22.1   **Treatment of Section 510(b) Subordinated Claims:**  Section 510(b)
Subordinated Claims shall not receive a distribution pursuant to the HTA Plan and each holder of
an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the HTA Plan
with respect to such Section 510(b) Subordinated Claims.

## ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 19)

23.1   **Treatment of Convenience Claims:**  On the later of the HTA Effective Date and
the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is
practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in
Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement,
release, and discharge of, and in exchange for such Allowed Convenience Claim.

## ARTICLE XXIV

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 20)

24.1   **Treatment of Federal Claims**:  On the later to occur of (a) the HTA Effective
Date and (b) the date on which a Federal Claim shall become an Allowed Claim, Reorganized
HTA shall (i) in its sole and absolute discretion, and in full consideration, satisfaction, release
and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim,
in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed
Federal Claim in accordance with the terms and conditions of such documents evidencing such
Allowed Federal Claims, or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full
amount of such Allowed Federal Claim in forty (40) equal amount installments, with such
payments commencing on the third (3rd) anniversary of the HTA Effective Date and continuing
on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such
terms as Reorganized HTA and the holder of any such Allowed Federal Claim shall agree.

## ARTICLE XXV

## PROVISIONS REGARDING SECURED OBLIGATIONS
## AND ADDITIONAL INDEBTEDNESS

25.1   **Issuance and Distribution of the New HTA Bonds:**  On the HTA Effective
Date, Reorganized HTA shall issue the Secured Obligations, in minimum denominations of One
Dollar ($1.00) and increments of One Dollar ($1.00) thereafter, consisting of New HTA CIBs,
New HTA CABs, New HTA Convertible CABs, and Subordinated Indebtedness, as more

particularly described herein and in the New HTA Bonds Indenture.  The maturities, interest rates and amortization schedules for the Secured Obligations are annexed hereto as Exhibits "D" and "E".  All debt service on the Secured Obligations which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate for CABs), compounding semiannually, until the applicable Secured Obligations are paid or satisfied in full in accordance with their terms.  Interest on the Secured Obligations shall be calculated on a 30/360 basis.  To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New HTA Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New HTA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties.  After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings. Notwithstanding anything contained in the HTA Plan to the contrary, to the extent that taxable New HTA Bonds are issued, such New HTA Bonds shall be distributed pro rata to recipients of New HTA Bonds.

(a)     **New HTA CIBs:**  Subject to any adjustments provided for herein, the New HTA CIBs shall have the original principal amount, coupon, maturity date and taxable status as follows: Six Hundred Million Dollars ($600,000,000.00), five percent (5.0%), July 1, 2062, and tax exempt.  New HTA CIBs shall not carry any default rate of interest; provided, however, that interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(b)     **New HTA CABs:**  Subject to any adjustments provided for herein, the New HTA CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: Two Hundred Thirty-Seven Million Nine Hundred Fifty-Five Thousand Eight Hundred Sixty-Eight Dollars and Thirteen Cents ($237,955,868.13), five percent (5.0%), July 1, 2032, and tax-exempt.  New HTA CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(c)     **New HTA Convertible CABs:**  Subject to any adjustments provided for herein, the New HTA Convertible CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: Four Hundred Seven Million Forty-Four Thousand Five Hundred Ninety-Seven Dollars and Fifty-Seven Cents ($407,044,597.57), five percent (5.0%), July 1, 2053, a Conversion Date of July 1, 2032, and tax-exempt.  New HTA Convertible CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(d)     **Subordinated Indebtedness:**  Subject to any adjustments provided herein, the Subordinated Indebtedness shall have the original principal amount, coupon and maturity date as follows: the outstanding principal amount of the Commonwealth Loan as of the

HTA Effective Date, plus all accrued and unpaid interest on the Commonwealth Loan as of the HTA Effective Date, two and one-half percent (2.5%), and July 1, 2052.

(e) **Deemed Issuance Date:** Notwithstanding the timing of the HTA Effective Date, interest on the New HTA Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2022, and (ii) the HTA Effective Date, which date shall be designated as the "dated date" of the New HTA Bonds.

(f) **Call Provisions/Optional Redemption:** The New HTA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

**New HTA CIBs:**

2062 CIBS:   Callable at par on and after 7/1/32

**New HTA CABs:**

2032 CABS:   Non-Callable

**New HTA Convertible CABs:**

2053 CCABS:   Callable at par on and after 1/1/33

(g) **Extraordinary Call Provisions:** Notwithstanding the terms and provisions of Section 25.1(d) hereof, from and after the HTA Effective Date and until the New HTA Bonds have been satisfied in full in accordance with their terms, (i) upon a full disposition of the Toll Facilities, the New HTA Bonds Trustee shall redeem the New HTA Bonds, at par, plus accrued or accreted interest thereon, and (ii) upon a Partial Disposition, the New HTA Bonds Trustee shall redeem, at par, plus accrued or accredited interest thereon, the allocable portion of New HTA Bonds related to the Toll Facilities subject to such Partial Disposition; provided, however, that, in the event that such redemption is for only a portion of the New HTA Bonds, such redemption shall be done in a manner to preserve the prevailing tax-exempt status of the New HTA Bonds.  Reorganized HTA will not enter into a Partial Disposition unless there is delivered to the New HTA Bonds Trustee a certificate of Reorganized HTA, and approved by the traffic consultant, a certificate setting forth (i) the amount of Net Receipts, as defined in the New HTA Bonds Indenture, that would have been collected in the most recently completed FY had such Partial Disposition occurred prior to the first day of such FY, (ii) maximum annual debt service on the Secured Obligations that will remain outstanding after such agreement becomes effective in accordance with its terms, and (iii) the percentages derived by derived by dividing the amount in clause (i) above by the amounts shown in clause (ii) above, which percentage shall not be less than one hundred twenty percent (120%).

(h) **Pledge of Trust Estate:** From and after the HTA Effective Date, until the Secured Obligations have been paid or satisfied in full in accordance with their terms, the New HTA Bonds Trustee, on behalf of the holders of Secured Obligations, shall have a valid and perfected first-priority lien on and first-priority security interest in the Trust Estate, subject only

to (i) the terms and provisions of the New HTA Bonds Indenture establishing the Authority Expense Fund and the Arbitrage Rebate Fund, and (ii) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted in Trust Estate for the benefit of holders of Subordinated Indebtedness.

(i)     **Monthly Deposits of Toll Receipts:**  On the first (1st) Business Day of each calendar month, the New HTA Bonds Trustee shall withdraw the Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts in accordance with the terms and provisions of the New HTA Bonds Indenture.  Without in any way limiting the foregoing, on the HTA Effective Date, Reorganized HTA shall deposit into the Toll Receipt Fund such additional amounts as may be necessary to account for the New HTA Bonds being issued as of the Deemed Issuance Date.

(j)     **Additional Covenants for New HTA Bonds:**  On the HTA Effective Date, the New HTA Bonds Indenture will contain customary terms, conditions and covenants for similarly structured and supported bonds, and such conditions and covenants shall be deemed incorporated herein as though set forth in full.

(k)     **Rights of Acceleration:**  The New HTA Bonds shall not have rights of acceleration.

(l)     **Non-Impairment Covenant:**  Pursuant to the New HTA Bonds Indenture, and/or the HTA Confirmation Order, Reorganized HTA shall covenant, pledge to, and agree, for the benefit of all initial and subsequent holders of New HTA Bonds, (i) to enforce the covenant of the Commonwealth set forth in § 2019 of the HTA Enabling Act that the Commonwealth will not limit or restrict the rights or power vested in HTA or Reorganized HTA, as the case may be, under the HTA Enabling Act until all New HTA Bonds, together with all interest thereon, are fully met and discharged and (ii) to take no action that would (A) impair the first-priority lien on and first-priority security interest in the Trust Estate, (B) impair the senior lien and senior security interest on the Trust Estate granted to the holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest on the Trust Estate granted to the holders of outstanding Subordinated Indebtedness, (C) impair or prevent the monthly deposits of Toll Receipts as set forth in subsection (i) of this Section 25.1, (D) limit or alter the rights vested in Reorganized HTA in accordance with the HTA Plan and the HTA Confirmation Order to fulfill the terms of any agreements with the holders of the New HTA Bonds or, (E) impair the rights and remedies of the New HTA Bonds Trustee or holders of the New HTA Bonds under the New HTA Bonds Indenture, including, without limitation, the defaults and remedies thereunder.

(m)     **Automatic Perfection of Lien on Trust Estate:**  The first-priority lien on the Trust Estate established pursuant to the New HTA Bonds Indenture shall be deemed automatically perfected as of the HTA Effective Date.

(n)     **Direct Right of Action:**  Pursuant to the New HTA Bonds Indenture, and subject to such additional rights as provided therein, the New HTA Bonds Trustee shall have a direct right of action to enforce the terms of the New HTA Bonds Indenture, including, without

limitation, with respect to funding deposits made in accordance therewith and seeking specific performance and other available remedies for any breach of covenants in the New HTA Bonds Indenture.

(o)  **HTA Fiscal Plans:**  HTA Fiscal Plans certified on or after the HTA Effective Date shall provide for the measures necessary to service the obligations contemplated pursuant to this HTA Plan, the New HTA Bonds, and the New HTA Bonds Indenture.

(p)  **Stamp or Legend:**  The New HTA Bonds shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such New HTA Bonds are valid, legally binding and enforceable pursuant to the HTA Confirmation Order.

(q)  **Retention of Jurisdiction:**  The Title III Court shall retain jurisdiction to enforce the HTA Plan, the New HTA Bonds, and the New HTA Bonds Indenture, including, without limitation, the Toll Rate Covenant, or, in the event the Title III Court declines such retention of jurisdiction or the HTA Title III Case has been closed in accordance with the terms and provisions of PROMESA, the United States District Court for the District of Puerto Rico is hereby designated to enforce this HTA Plan, the New HTA Bonds and the New HTA Bonds Indenture, including, without limitation, the Toll Rate Covenant.

(r)  **Governing Law:**  The New HTA Bonds Indenture and the New HTA Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the New HTA Bonds Indenture and the New HTA Bonds, the authorization regarding the issuance of the New HTA Bonds is provided by the laws of the Commonwealth.

25.2  **Tax-Exempt Treatment of the New HTA Bonds:**  In the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Determination") that all of the New HTA Bonds to be issued on the HTA Effective Date are tax-exempt, the holders of any Claims receiving New HTA Bonds pursuant to the HTA Plan shall receive the benefit of such Determination in the form of tax-exempt New HTA Bonds issued pursuant to the HTA Plan with coupons for all maturities equal to the coupons on the tax-exempt New HTA Bonds set forth on Exhibit "D" hereto; provided, however, that, in the event that the Determination is obtained subsequent to the HTA Effective Date, then the holders of the taxable New HTA Bonds affected by such Determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; and, provided, further, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and, provided, further, that, in the event that neither

of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) June 15, 2022, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New HTA Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

25.3    **Adoption and Maintenance of a Debt Management Policy**:  During the Debt

Policy Period, Reorganized HTA shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of HTA are not repeated. While Reorganized HTA may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a)    **Long-Term Borrowing for Capital Improvements Only**: To ensure Reorganized HTA achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Debt issued by HTA after the HTA Effective Date may only be incurred to finance Capital Improvements, as determined by HTA and approved by AAFAF, and, to the extent not terminated, the Oversight Board, or to refinance Debt in accordance with the terms and provisions of Section 25.3(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in HTA's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b)    **30-Year Maturity Limitation on All Borrowings**:  No Debt issued by HTA after the HTA Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to Debt issued to refinance New HTA Bonds.

(c)    **Required Principal Amortization**:  No Debt issued from and after the HTA Effective Date may be issued unless its principal commences to amortize within two (2) years from the placed-in-service date of the project being financed, and continues amortizing in each and every year until such Debt is no longer outstanding.

(d)    **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year**:  Refinancings of Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by Reorganized HTA in its Debt Management Policy; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

(e)      **Fiscal Plan Debt Service:** Any post-HTA Effective Date HTA Fiscal Plan shall include provisions for the payment, in each FY of principal and interest (and/or accreted value, as applicable) with respect to the Secured Obligations, including, without limitation, sinking fund payments due in such FY.

Notwithstanding the foregoing, nothing contained herein shall prohibit Reorganized HTA from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE XXVI

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

26.1      **Treatment of Assured Insured Bond Claims:**  In the event that Classes 3, 7, and 11 vote to accept the HTA Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force or effect, or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other provision of the HTA Plan, holders of Assured Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Assured, in its sole and absolute discretion, prior to the commencement of the Disclosure Statement Hearing and as set forth in the Assured Election Notice or the Assured Bondholder Elections Form, as applicable:

(a)      **Assured Election:**  With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, subject to the rights of the HTA Fiscal Agent, Assured shall receive the Assured Plan Consideration allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid by Assured, in full, on the HTA Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)      **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to

make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2; and, provided, further, that, for the avoidance of doubt, Assured Insured Bonds owned by Assured (by subrogation or otherwise) shall not be subject to the Assured Bondholder Elections set forth in this Section 26.1(b), and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds:

(i)     **Assured Bondholder Election 1**:  Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Assured Acceleration Price on the HTA Effective Date, in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Assured Plan Consideration allocable to such holder under the HTA Plan; or

(ii)     **Assured Bondholder Election 2**:  Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) the applicable Assured Plan Consideration in accordance with terms acceptable to Assured.  The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 26.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' prior written notice to the relevant holders.  Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation.  From and after payment of the Assured Acceleration Price, including without limitation, on (i) the HTA Effective Date or (ii) such other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above, including, without limitation, on the HTA Effective Date, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(c)     **Acceleration of Assured Insured Bonds**:  Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by

Assured with respect to Assured Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d) **Assignment of Redemption Rights:**  Notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, HTA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were HTA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

(e) **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the HTA Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA

(f) **Dual-Insured Bonds:**  In the event any distributions of Cash are made to owners of Dual-Insured Bonds (rather than to Assured as the holder of the related HTA 98 Senior Bond Claims) pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions shall be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies and Assured's obligations under the applicable Assured Insurance Policies.  In the event any distributions of Cash are made on account of Dual-Insured Bonds to Assured as the holder of the related HTA 98 Senior Bond Claims pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions shall be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies, but shall be deemed not to have reduced (i) Assured's obligations under the applicable Assured Insurance Policies or (ii) the principal amount of any custody receipt evidencing a beneficial interest in such Dual-Insured Bonds and related Assured Insurance Policies.

26.2 **Treatment of National Insured Bond Claims:**  In the event that Classes 4, 9 and 13 vote to accept the HTA Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, holders of Allowed National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing and be set forth on the National Bondholder Election Form or the National Election Notice, as applicable; provided, however, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Section

26.2 and, subject to the rights of the HTA Fiscal Agent, National shall receive the National Plan Consideration on account of such bonds; and, provided, further, that, subject to providing holders of Allowed National Insured Bond Claims with the treatment or elections set forth in this Section 26.2 and satisfying all such treatment or elections, National shall have all right, title and interest in the National HTA Consideration and shall manage the National HTA Consideration in its sole and absolute discretion subject to and in accordance with all applicable laws and regulations; and, provided, further, that any calculations and/or payments to be made to a holder based on, or in relation to, such holder's Allowed National Insured Bond Claim pursuant to the options set forth in this Section 26.2 will take into account any payments of principal and/or accrued interest already made to such holder by National pursuant to the terms of the relevant National Insurance Policies, and such holder shall not be compensated for any amounts already paid to such holder pursuant to the terms of the relevant National Insurance Policies:

(a)     **National Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National):**  Each holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall have the option to elect on the National Bondholder Election Form to receive, on the HTA Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital ~~application~~appreciation bonds, the accreted value on and after, the Deemed Issuance Date, and to the extent any accrued or accreted interest is paid to such holder by National after such date, such amount shall be credited against the Cash such holder, their successors, transferees or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim.  The National Insured Bonds of a holder that timely and validly elects to receive the National Commutation Treatment or makes an improper election as described in Section 26.2(g) hereof, shall be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

(b)     **National Non-Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National):**  In the event that a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment in accordance with the provisions of Sections 26.2(b) and (g) hereof, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such holder shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing, and as detailed in the applicable National Bondholder Election Form:

(i)     **Custodial Trusts:**  Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National

Trust Consideration, the National Insured Bonds allocable to such electing holder, and the related National Insurance Policies into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

(ii)    **Escrow:**  Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii)    **Payment of Accelerated Amounts:**  National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed National HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the HTA Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

(iv)    **Alternative Treatment:**  The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, with respect to different CUSIPs and different holders of National Insured Bonds.

(c)    **Acceleration of National Insured Bonds:**  Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the HTA Effective Date, and such National Insured Bonds shall be due and payable from and after the HTA Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  National shall have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the holder of the National Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable National Insurance Policy or other documents related to the National Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any

58

National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

(d)    **Treatment of HTA 98 Sub Bond Claims (National):**  On the HTA Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth (10th) Business Day following the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (National) shall receive Cash in an amount equal to the National Acceleration Price, in full and final satisfaction, release, and discharge of National's obligations under the applicable National Insurance Policy, and National shall receive the National Plan Consideration that would be otherwise distributable to such holder, its successors, transferees, or assigns on account of its HTA 98 Sub Bond Claim (National).

(e)    **Assignment of Redemption Rights:**  Notwithstanding any other provision of the HTA Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the HTA Effective Date, HTA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were HTA for such purpose.  Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(f)    **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the HTA Plan by holders of National Insured Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment as set forth in Section 26.2(a) hereof and the National Non-Commutation Treatment as set forth in Section 26.2(b) hereof shall be made by the beneficial holders of the applicable National Insured Bonds on the applicable National Bondholder Election Form; provided, however, that the form of the National  Non-Commutation Treatment shall be selected by National in accordance with Section 26.2(b) hereof.

(g)    **Improper Election:**  If a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) (1) fails to timely and validly elect the National Non-Commutation Treatment pursuant to Section 26.2(b) hereof, or (2) submits an election for less than all of its National Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in Section 26.2(a) hereof with respect to such National Insured Bond Claims, to commute the applicable National Insurance Policies, to release and discharge National's obligations under such National Insurance Policies, and to receive distributions in accordance with Section 26.2(a) hereof.  In addition, the National Insured Bonds of a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) that does not validly elect to receive the National Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

26.3    **Treatment of FGIC Insured Bond Claims**:  In the event that Classes 8 and 12 vote to accept the HTA Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, holders of FGIC Insured Bond Claims shall receive the following treatments:

(a)    **FGIC Insured Bond Claims Treatment**:  Each holder of an Allowed FGIC Insured Bond Claim (except as provided in Section 26.3(b) hereof) shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration, its proportionate share of the CW/HTA Clawback Recovery, and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor.  All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy.  For the avoidance of doubt, each distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies.

(b)    **FGIC Insured Bond Claims Owned By FGIC**:  With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the HTA Effective Date, and subject to the rights of the HTA Fiscal Agent, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, its Pro Rata Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c)    **Dual-Insured Bonds**:  FGIC Certificates allocable to holders of Dual-Insured Bonds shall be distributed in accordance with the terms and provisions of Section 26.1 hereof.

(d)    **Acceleration of FGIC Insured Bonds**:  Notwithstanding any other provision of the HTA Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the HTA Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)      **Assignment of Redemption Rights:**  Notwithstanding any other
provision of the HTA Plan, to the extent permitted pursuant to applicable definitive insurance
documents and the applicable FGIC Insurance Policy, on the HTA Effective Date, HTA shall be
deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds
and any related rights such that such rights may be exercised directly and exclusively by FGIC as
if it were HTA for such purpose.

(f)      **Entitlement to Vote:**  Subject to the terms and provisions of the
Disclosure Statement Order, the solicitation of acceptances and rejections to the HTA Plan by
holders of FGIC Insured Bond Claims shall be made by the Oversight Board to FGIC in
accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and
governing insurance and other documents.

26.4     **Treatment of Ambac Insured Bond Claims**:  In the event that Classes 2 and 6
vote to accept the HTA Plan in accordance with section 1126 of the Bankruptcy Code, and all
Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full
force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac
Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other
provision of the HTA Plan, on the HTA Effective Date, holders of Ambac Insured Bond Claims
shall receive the following treatment, as provided in the Ambac Election Notice and to the extent
offered by Ambac, in its sole and absolute discretion, at or prior to the commencement of the
Disclosure Statement Hearing; provided, however, that, notwithstanding the following, Ambac
may make different elections with respect to different CUSIPs and different Ambac Insured
Bonds:

(a)      **Treatment of HTA 68 Bond Claims (Ambac)**:  On the HTA Effective
Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth (10th) day
following the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac)
shall receive Cash in the amount equal to the Ambac Acceleration Price, in full and final
satisfaction, release, and discharge of Ambac's obligations under the applicable Ambac Insurance
Policy, and, subject to the rights of the HTA Fiscal Agent, Ambac shall receive the Ambac Plan
Consideration that would be otherwise allocable to such holder, its successors, transferees or
assigns on account of its HTA 68 Bond Claims (Ambac).  For the avoidance of doubt, the Ambac
Acceleration Price will include accrued and unpaid interest as of the date of payment.

(b)      **Treatment of HTA 98 Senior Bond Claims (Ambac):**  On the HTA
Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth
(10th) day following the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond
Claim (Ambac) shall receive one of the following treatments:

(i)      **Allowed HTA 98 Senior Bond Claim (Ambac) Commutation
Treatment:**  To the extent offered by Ambac, in its sole and absolute discretion, each holder of
an Allowed HTA 98 Senior Bond Claim (Ambac) shall have the option to elect on the Ambac
Bondholder Election Forms, to receive, on the HTA Effective Date, the Ambac Commutation
Consideration, distributable by or at the direction of Ambac, and, if elected, (i) such beneficial
holder shall have no other or further rights under or with respect to the applicable Ambac
Insurance Policy or any Ambac Trust(s), and (ii) subject to the rights of the HTA Fiscal Agent,

61

Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder. The Ambac Insured HTA 98 Senior Bonds of a holder that validly elects to receive the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment, or makes an improper election as described in Section 26.4(f) hereof, shall be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and Ambac's obligations under the applicable Ambac Insurance Policy shall be fully and finally satisfied, released, and discharged.

(ii)      **Allowed HTA 98 Senior Bond Claim (Ambac)
Non-Commutation Treatment:** In the event that a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) timely and validly elects on the Ambac Bondholder Election Form, to receive the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment, such holder of an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments offered by Ambac, in its sole and absolute discretion, and as detailed in the applicable Ambac Bondholder Election Form:

(1)      **Custodial Trusts:**

(i)      Such holder of an Allowed HTA 98 Senior Insured Bond Claim (Ambac) shall deposit, or be deemed to have deposited, into the applicable Ambac Trust(s), (A) such holder's Ambac Insured Bonds with respect to which the election has been made and the related Ambac Insurance Policies, (B) such holder's Pro Rata Share of the Ambac Plan Consideration, consisting of (1) Cash, (2) the CW/HTA Clawback Recovery, consisting of the HTA Clawback CVIs and all payments on or collections in respect of such HTA Clawback CVIs, and (3) the New HTA Bonds, and (C) shall be deemed to have received Ambac Certificates in consideration therefor; such holders shall have no recourse to Ambac or the applicable Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s). In the event the interim distribution amounts provided for in decretal paragraph 52 of the Commonwealth Confirmation Order have been distributed directly to holders of Ambac Insured Bonds prior to the HTA Effective Date, thereby reducing the principal amount of such Ambac Insured HTA 98 Senior Bonds, such interim cash distributions need not be deposited into the Ambac Trust(s).

(ii)      The terms of the Ambac Trust(s) shall be set forth in a trust agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall include the following terms, without limitation: (A) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement HTA 98 Senior governing the Ambac Trust(s); (B) Ambac shall be deemed the sole holder of the Ambac Insured HTA 98 Senior Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings during the period that there are no outstanding payment defaults by Ambac under the applicable Ambac Insurance Policies; and (C) the agreement governing the Ambac Trust(s) will provide, among other things, that (1) all rights of a holder of Ambac HTA 98 Senior Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the

62

Ambac Insured HTA 98 Senior Bonds (other than as otherwise described in the Ambac Trust(s)), (2) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured HTA 98 Senior Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment, and (3) Ambac may, at its option, elect to direct the sale of any Ambac Trust Assets.

(1) **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to the holders of Allowed HTA 98 Senior Insured Bond Claims (Ambac) and Ambac's obligations to such holders shall be fully and completely discharged upon the payment, on the HTA Effective Date, or as soon as practicable thereafter, but in no event later than the tenth (10th) day following the HTA Effective Date, in Cash, of the Ambac Acceleration Price with respect thereto.

(2) **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Allowed HTA 98 Senior Bond Claim (Ambac) Non Commutation Treatment of the Ambac Insured HTA 98 Senior Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, at or prior to the commencement of the Disclosure Statement Hearing.

(c) **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to its obligations under the applicable Ambac Insurance Policies up to and including the HTA Effective Date, the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the HTA Effective Date. Ambac shall have the right to pay the Ambac Acceleration Price with respect to such bonds at any time, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the HTA Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the HTA Effective Date, HTA shall be deemed to have assigned to Ambac any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were HTA for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

(e)     **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, (1) the solicitation of acceptances and rejections of the HTA Plan by holders of Ambac Insured Bond Claims shall be made by the Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (2) where applicable and as described in Section 26.4(b) hereof, the election to choose between the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment as set forth in Section 26.4(b)(i) hereof and the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii) hereof shall be made by the beneficial holders of Ambac Insured HTA 98 Senior Bonds; provided, however, that the form of the Ambac Non-Commutation Treatment shall be selected by Ambac in accordance with the terms and provisions of Section 26.4(b)(ii) hereof.

(f)     **Improper Election:**  If a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) (1) fails to timely and validly elect either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i) hereof or the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii) hereof, or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive with respect to its HTA 98 Senior Bond Claims (Ambac), the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i) hereof, to commute the applicable Ambac Insurance Policies, and to fully and finally satisfy, release and discharge Ambac's obligations under such Ambac Insurance Policies, and shall receive, with respect to its HTA 68 Bond Claims (Ambac), the Allowed 68 Bond Claim (Ambac) Treatment, if any, as set forth in Section 26.4(a) hereof.  In addition, a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) that does not validly elect to receive either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment or the Allowed HTA 98 Senior Bond (Ambac) Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and Ambac's obligation under the applicable Ambac Insurance Policy shall be fully and finally satisfied released and discharged.

26.5   **Fiscal Agent Obligations**

:  Notwithstanding anything contained in the HTA Plan to the contrary, including, without limitation, the terms and provisions of this Article XXVI, the HTA Fiscal Agent shall have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date.

## ARTICLE XXVII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

27.1   **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**:  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 27.5 and 27.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtor and any

Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtor reserves the right, on or prior to the HTA Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date. The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 27.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 27.1, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that the Debtor have any liability thereunder.

27.2 **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**: Entry of the HTA Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 27.1 of the HTA Plan.

27.3 **Inclusiveness**: Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

27.4 **Cure of Defaults**: Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 27.1 of the HTA Plan, the Debtor shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the HTA Confirmation Hearing, file with the Title III Court and serve by first class mail

on each non- Debtor party to such Executory Contracts and Unexpired Leases to be assumed pursuant to Section 27.1 of the HTA Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned.  The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor.  If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court.  Notwithstanding the terms and provisions of Section 27.1 of the HTA Plan, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the HTA Effective Date.

27.5   **Insurance Policies**:  Subject to the terms and provisions of Section 27.7 hereof, each of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the HTA Plan; provided, however, that, except to the extent provided herein, the HTA Confirmation Order and the Definitive Documents, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

27.6   **Rejection Damage Claims**:  If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, including, without limitation, Reorganized HTA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized HTA, as the case may be, on or before thirty (30) days after the later to occur of (i) the HTA Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

27.7   **Indemnification and Reimbursement Obligations**:  For purposes of the HTA Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the HTA Petition Date, shall be deemed assumed as of the HTA Effective Date, and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the HTA Petition Date, as the case may be, shall be Administrative Expense Claims; provided, however, that, under no circumstances shall the Debtor or Reorganized HTA, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

27.8   **Nonoccurrence of HTA Effective Date**:  In the event that the HTA Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

27.9   **Reservation of Rights**:  Nothing contained in the HTA Plan or the Plan Supplement shall constitute an admission by the Debtor, Reorganized HTA or any other party

that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized HTA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

27.10   **Collective Bargaining Agreements**:  Except as provided in Article XXVII hereof, none of the Debtor's collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the HTA Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Section 2.5 hereof regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE XXVIII

## PROVISIONS GOVERNING DISTRIBUTIONS

28.1   **Time and Manner of Distribution**:  Except as otherwise provided herein, distributions under the HTA Plan shall be made to each holder of an Allowed Claim as follows:

(a)   **Distributions to Holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National):** Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 68 Bond Claim, an Allowed HTA 68 Bond Claim (Ambac), an Allowed HTA 68 Bond Claim (Assured), or an Allowed HTA 68 Bond Claim (National), and in each case consistent with the terms hereof, such holder's Pro Rata Share, if any, of the HTA 68 Bond Recovery, the HTA Restriction Fee, and HTA Consummation Costs, if applicable.

(b)   **Distributions to Holders of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National):**  Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 98 Bond Claim, an Allowed HTA 98 Senior Bond Claim (Ambac), an Allowed HTA 98 Senior Bond Claim (Assured), an Allowed HTA 98 Senior Bond Claim (FGIC), or an Allowed HTA 98 Senior Bond Claim (National), such holder's Pro Rata Share, if any, of (i) HTA 98 Senior Bond Recovery, (ii) the HTA PSA Restriction Fee, and (iii) HTA Consummation Costs, in each case, to the extent applicable.

(c)   **Distributions to Holders of HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National):**  Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 98 Sub Bond Claim, an Allowed HTA 98 Sub Bond Claim (Assured), an Allowed HTA 98 Sub Bond Claim (FGIC), or an Allowed HTA 98 Sub Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

(d)      **Distributions with Respect to HTA General Unsecured Claims:**
Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall
distribute, or cause to be distributed, to each holder of an Allowed HTA General Unsecured
Claim such holder's Pro Rata Share, if any, of the HTA GUC Recovery.

(e)      **Distributions with Respect to Eminent Domain/Inverse Condemnation**
**Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the
occurrence of a Final Order determining the validity and amount of just compensation
attributable to an Eminent Domain/Inverse Condemnation Claim, the Disbursing Agent shall
distribute, or cause to be distributed, to each holder of an Allowed Eminent Domain/Inverse
Condemnation Claim, Cash in the amount of such Allowed Claim.

(f)      **Distribution of Cash to Holders of Allowed Administrative Expense**
**Claims:**  Except as otherwise provided herein, on or as soon as practicable after the later of (i)
the HTA Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the
Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed
Administrative Expense Claim, Cash in the amount of such Allowed Claim.

(g)      **Distribution of Cash to Holders of Allowed Convenience Claims:**
Except as otherwise provided herein, on or as soon as practicable after the later of (i) the HTA
Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing
Agent shall distribute, or cause to be distributed, to each holder of an Allowed  Claim, Cash in
the amount of such Allowed Convenience Claim.

28.2    **Timeliness of Payments**:  Any payment or distribution to be made pursuant to the
HTA Plan shall be deemed to be timely made if made within ten (10) Business Days after the
date specified in the HTA Plan.  Whenever any distribution to be made under this HTA Plan
shall be due on a day other than a Business Day, such distribution shall instead be made, without
interest, on the immediately succeeding Business Day, but shall be deemed to have been made on
the date due, including, without limitation, deeming distributions made pursuant to Section 28.1
hereof to have been made on the HTA Effective Date.

28.3    **Distributions by the Disbursing Agent**:  Except as otherwise provided herein or
in the HTA Confirmation Order, all distributions under the HTA Plan shall be made by the
Disbursing Agent.  The Disbursing Agent shall be deemed to hold all property to be distributed
hereunder in trust for the Entities entitled to receive the same.  The Disbursing Agent shall not
hold an economic or beneficial interest in such property.

28.4    **Manner of Payment under the HTA Plan**:  Unless the Entity receiving a
payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be
made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a
domestic bank; provided, however, that no Cash payment shall be made to a holder of an
Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than
Ten Dollars ($10.00).

28.5    **Delivery of Distributions**:  Subject to the provisions of Rule 9010 of the
Bankruptcy Rules, and except as provided in the HTA Confirmation Order or herein,

distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent on account of Allowed HTA Bond Claims shall be made to, or at the direction of, the HTA Fiscal Agent in accordance with the respective governing documents for such obligations; and, provided, further, that the Disbursing Agent may make distributions of HTA PSA Restriction Fees, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The HTA Fiscal Agent (or the HTA Fiscal Agent's designee) shall, in turn, deliver the distribution to the applicable holders in the manner provided for in the applicable governing documents. Regardless of whether such distributions are made by the HTA Fiscal Agent or the Disbursing Agent at the direction of the HTA Fiscal Agent, any Charging Lien of the HTA Fiscal Agent shall attach to such distributions in the same manner as if such distributions were made by or through the HTA Fiscal Agent. The HTA Fiscal Agent may rely upon the distribution instructions received from the Debtor or its agents with respect to delivery of distributions in accordance with the terms and provisions of this Article XXVII, including any contra-CUSIP positions and escrow positions set up by the debtor or its agents with the Depository Trust Company. The Debtor, its agents and servicers, the HTA Fiscal Agent, and the Disbursing Agent shall have no obligation to recognize any transfer of HTA Bond Claims after the Distribution Record Date; provided, however, that the New HTA Bonds and the HTA Clawback CVIs will be transferable and recognized in accordance with the terms and conditions of the New HTA Bonds Indenture and the CVI Indenture, respectively.

28.6 **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the HTA Plan, (b) for purposes of evidencing a right to distribution under the HTA Plan, or (c) as specifically provided otherwise in the HTA Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 27.1 hereof), on the HTA Effective Date, the HTA Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtor and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtor, under the HTA Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the HTA Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the HTA Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed HTA Bond Claims and Allowed Insured HTA Bond Claims to receive distributions in accordance with the terms and provisions of the HTA Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the HTA Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements,

69

(iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 26.1 and 26.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that HTA use its reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured HTA Bonds, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims; and, provided, further, that, notwithstanding the foregoing or anything else contained in the HTA Plan to the contrary, the HTA Fiscal Agent shall have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date.  Notwithstanding the foregoing, and except as otherwise expressly provided in the HTA Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized HTA, as the case may be.

28.7    **Undeliverable/Reserved Distributions**:

(a)    **Holding of Undeliverable Distributions by the Disbursing Agent**:  If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address.  Subject to the terms and provision of Section 32.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind.  Nothing contained in the HTA Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b)    **Failure to Claim Undeliverable Distributions**:  If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the HTA Effective Date, with respect to all Allowed Claims as of the HTA Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the HTA Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the HTA Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the HTA Plan, against Reorganized HTA, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized HTA for use to discharge operating expenses of Reorganized HTA, and (2) the HTA Bonds in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized HTA for cancellation or deposit into the treasury of Reorganized HTA, as determined by Reorganized HTA in its sole and absolute discretion.

28.8 **Withholding and Reporting Requirements**:  Any party issuing any instrument or making any distribution under the HTA Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the HTA Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the HTA Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the HTA Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the HTA Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

28.9 **Time Bar to Cash Payments**:  Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the HTA Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

28.10 **Distributions After HTA Effective Date**:  Distributions made after the HTA Effective Date to holders of Claims that are not Allowed Claims as of the HTA Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XXVIII of the HTA Plan.

28.11 **Setoffs**:  Except as otherwise provided in the HTA Plan or in the HTA Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the HTA Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtor or Reorganized HTA may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized HTA of any such claims, rights, and Causes of Action that the Debtor or Reorganized HTA may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

71

recoupment; and, provided, further, that nothing in this Section 28.11 shall affect the releases and injunctions provided in Article XLI of the HTA Plan.

28.12    **Allocation of Plan Distributions Between Principal and Interest**:  Unless otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under the HTA Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately preceding the HTA Petition Date, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; provided, however, that the Debtor or Reorganized HTA's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

28.13    **Payment of Trustee Fees and Expenses**:  The distributions to be made pursuant to the HTA Plan and the Commonwealth Confirmation Order to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on account of such Claims are intended to be inclusive of any and all of the HTA Fiscal Agent's reasonable fees and expenses due and owing by HTA pursuant to the applicable bond resolutions with respect to amounts discharged pursuant to the HTA Plan (the "HTA Fiscal Agent's Fees and Expenses").  To the extent not deducted in connection with payments made in accordance with the Commonwealth Confirmation Order upon satisfaction of the Distribution Conditions, the HTA Fiscal Agent's Fees and Expenses shall be deducted on a pro rata basis from distributions to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on account of such Claims, such that the cost of such HTA Fiscal Agent's Fees and Expenses is shared equally by all holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims based on the amount of their Claims; provided, however, that, notwithstanding anything in the HTA Plan, the HTA Confirmation Order, or the applicable bond resolutions to the contrary, the HTA Fiscal Agent's Fees and Expenses shall not exceed $2,360,681.02.  In the event amounts reserved or deducted by the HTA Fiscal Agent from the distributions to be made to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims exceed the HTA Fiscal Agent's Fees and Expenses, such excess amounts shall be distributed by, or at the direction of, the HTA Fiscal Agent on a pro rata basis to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on the HTA Effective Date (the "Excess Distribution").  For purposes of this Section 28.13, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims and the HTA 98 Senior Bond Claims arising from the HTA Bonds which are insured by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA, applicable law, and governing insurance and other documents applicable to such HTA Bonds; provided, however, that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to FGIC, and (b) with respect to any HTA 98 Senior Bonds insured by FGIC, but not owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to the owners of such HTA 98 Senior Bonds.  Except as otherwise provided in this Section 28.13, the HTA Plan does not, nor shall it be construed to, limit the rights of the HTA Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

28.14    **Beneficial Owner**:  For all purposes of the HTA Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article

XXVIII, the "holder" of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; provided, however, that, for purposes of Article XXVIII hereof and section 1126 of the Bankruptcy Code, (a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the "holder" of any FGIC Insured Bond Claims and any FGIC CW/HTA Bond Claims, in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/HTA Bond Claims,  (e) Syncora shall constitute the "holder" of any HTA Bond Claims and CW/HTA Bond Claims arising from or related to HTA 98 Senior Bonds bearing CUSIP number 745190AY4, and the principal and interest payments of which have been insured by Syncora in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to such Claims; provided, however, that, solely to the extent permitted by governing insurance and other documents, on the HTA Effective Date, Syncora shall pay the beneficial owners of such HTA 98 Senior Bonds the Syncora Acceleration Price; and, provided, further, that Syncora shall indemnify and hold the Oversight Board, the Commonwealth, HTA, and Reorganized HTA harmless from any and all claims, liabilities, damages, and causes of action arising from or related to the acceleration of such HTA 98 Senior Bonds and the payment of the Syncora Acceleration Price, and (f) the "holder" of any other Insured HTA Bond Claims shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured HTA Bond Claims.

28.15  **Value of Distributions**:  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New HTA Bonds shall be valued at the original principal amount thereof.

28.16  **Disputed Funds Stipulation**:  In the event that the Distribution Conditions are not satisfied prior to the HTA Effective Date, on the HTA Effective Date, the Distribution Conditions shall be deemed satisfied and payments and distributions to be made in connection therewith pursuant to the terms and provisions of the Commonwealth Confirmation Order and the HTA/CCDA Plan Support Agreement shall be made on the HTA Effective Date to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims

(Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National), including, without limitation, the distribution of monies in accordance with the Disputed Funds Stipulation, subject to the rights of The Bank of New York Mellon, as fiscal agent, to assert and apply, on a pro rata basis, any and all of its rights with respect thereto.

## ARTICLE XXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTOR

29.1   **Prosecution of Claims**:  Except as settled and released herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be included in the HTA GUC Recovery and be distributed to holders of Allowed HTA General Unsecured Claims.

## ARTICLE XXX

## ACCEPTANCE OR REJECTION OF THE HTA PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

30.1   **Impaired Classes to Vote**:  Each holder of a Claim, as of the Voting Record Date or at the time of tender into ATOP, as the case may be, in an impaired Class not otherwise deemed to have rejected or accepted the HTA Plan in accordance with Article XXXIII of the HTA Plan shall be entitled to vote separately to accept or reject the HTA Plan.

30.2   **Acceptance by Class of Creditors**:  An impaired Class of holders of Claims shall have accepted the HTA Plan if the HTA Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the HTA Plan.

30.3   **Cramdown**:  In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the HTA Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to (i) request that the Bankruptcy Court confirm the HTA Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the HTA/CCDA PSA Creditors, in accordance with the provisions of the HTA/CCDA Plan Support Agreement, amend the HTA Plan.

## ARTICLE XXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

31.1   **Exculpation**:  From and after the HTA Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of

the discharge of the powers and duties conferred upon such Disbursing Agent by the HTA Plan
or any order of the Title III Court entered pursuant to or in furtherance of the HTA Plan, or
applicable law, except for actions or omissions to act arising out of the gross negligence or
willful misconduct of such Disbursing Agent.  No holder of a Claim or other party in interest
shall have or pursue any claim or cause of action against the Disbursing Agent for making
payments in accordance with the HTA Plan or for implementing the provisions of the HTA Plan,
except for claims or causes of action arising from the gross negligence or willful misconduct of
the Disbursing Agent.

31.2   **Powers of the Disbursing Agent**:  Except as may be provided otherwise
hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all
instruments and documents necessary to effectuate the HTA Plan, (b) make distributions
contemplated by the HTA Plan, (c) comply with the HTA Plan and the obligations thereunder,
and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of
the Title III Court, pursuant to the HTA Plan, or as deemed by the Disbursing Agent to be
necessary and proper to implement the provisions of the HTA Plan.

31.3   **Fees and Expenses Incurred From and After the HTA Effective Date**:  Except
as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses
incurred by the Disbursing Agent from and after the HTA Effective Date and any reasonable
compensation and expense reimbursement claims, including, without limitation, reasonable fees
and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further
order of the Title III Court; provided, however, that the Disbursing Agent shall not be entitled to
reimbursement or indemnification by Reorganized HTA related to claims or causes of action
arising from the gross negligence or willful misconduct of the Disbursing Agent.

## ARTICLE XXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
## AND CLAIMS SUBJECT TO ACR PROCEDURES

32.1   **Objections to Claims; Prosecution of Disputed Claims**:

(a)   Except with respect to Allowed Claims, and subject to the terms and
conditions of the ADR Procedures and the ADR Order, Reorganized HTA, by and through the
Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending
objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with
respect to which it disputes liability, priority or amount, including, without limitation, objections
to Claims that have been assigned and the assertion of the doctrine of equitable subordination
with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to
Final Order; provided, however, that Reorganized HTA, by and through the Oversight Board, and
in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any
objections to Claims, without approval of the Title III Court.  Unless otherwise ordered by the
Title III Court, to the extent not already objected to by the Debtor, Reorganized HTA shall file
and serve all objections to Claims as soon as practicable, but, in each instance, not later than one
hundred eighty (180) days following the HTA Effective Date or such later date as may be
approved by the Title III Court.  Following the making of distributions to holders of Allowed

HTA Bond Claims in accordance with the provisions hereof, any HTA Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Kroll Restructuring Administration LLC (formerly Prime Clerk LLC), its court-appointed representative, to remove such HTA Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event that an order reversing or vacating the HTA Confirmation Order with respect to HTA Bond Claims becomes a Final Order, such HTA Bond Claims shall be reinstated on the claims registry.

(b)     The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process with respect to HTA General Unsecured Claims, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to HTA General Unsecured Claims and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from HTA General Unsecured Claims as provided in the HTA Plan, and (C) in the event that such appointees  disagree with any settlement of an HTA General Unsecured Claim, for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of HTA and its creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.  Such appointees and their advisors shall not be entitled to compensation in excess to that provided pursuant to the Commonwealth Plan and the Commonwealth Confirmation Order.

(c)     From and after the HTA Effective Date, all Late-Filed Claims shall be deemed denied, with prejudice, and the Oversight Board shall instruct Kroll Restructuring Administration LLC (formerly Prime Clerk LLC), its court-appointed representative, to remove such Late-Filed Claims from the claims registry maintained for the benefit of the Title III Court and the Oversight Board shall cause a notice with respect thereto to be served upon the holder of such Late-Filed Claim.

32.2   **Estimation of Claims**:  Except with respect to Allowed Claims, on and after the HTA Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized HTA, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized HTA, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the

Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

32.3 **Payments and Distributions on Disputed Claims**:

(a) **Disputed Claims Holdback:**  From and after the HTA Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized HTA shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized HTA; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.  To the extent that Reorganized HTA retains any New HTA Bonds on behalf of Disputed Claims holders, until such New HTA Bonds are distributed, Reorganized HTA shall exercise voting or consent rights with respect to such obligations.

(b) **Allowance of Disputed Claims:**  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the HTA Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.

32.4 **Authority to Amend Lists of Creditors**:  Except with respect to HTA Bond Claims, and subject to the limitations in Section 32.1(b) hereof, the Debtor shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court.  If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

32.5 **Non-Accrual of Interest**:  Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the HTA Petition Date, on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any disputed claim with respect to the period from the HTA Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

32.6    **Disallowance of Claims**:  All Claims of any Entity from which property is sought by the Debtor under sections 550, or 553 of the Bankruptcy Code or that the Debtor alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtor, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

32.7    **Claims Subject to ACR Procedures**:  To the extent not already transferred as of the HTA Effective Date in accordance with the terms and conditions of the ACR Order, the Debtor or Reorganized HTA, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtor and Reorganized HTA, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the HTA Plan, shall not be included in HTA General Unsecured Claims to be satisfied from the HTA GUC Recovery or Convenience Claims. Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the HTA Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 16 or Class 19 under the HTA Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 32.7.

## ARTICLE XXXIII

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE HTA PLAN
## AND NOT IMPAIRED BY THE HTA PLAN

33.1    **Impaired Classes**:  The Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 20 are impaired and receiving distributions pursuant to the HTA Plan, and are therefore entitled to vote to accept or reject the HTA Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Class 19 is deemed to have accepted the HTA Plan.  The Claims in Class 18 are impaired and not receiving a distribution pursuant to the HTA Plan and, therefore, Class 18 is deemed to have rejected the HTA Plan.

33.2    **Unimpaired HTA Classes**:  Claims in Class 14 and 19 are unimpaired pursuant to the HTA Plan, are deemed to have accepted the HTA Plan and are not entitled to vote to accept or reject the HTA Plan.

## ARTICLE XXXIV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE HTA PLAN

34.1     **Conditions Precedent to Confirmation of the HTA Plan**:  Confirmation of the HTA Plan is subject to satisfaction of the following conditions precedent:

(a)     **Fiscal Plan Certification:**  The Oversight Board shall have certified an HTA Fiscal Plan consistent with the HTA Plan and shall have certified the submission of the HTA Plan, and any modifications to the HTA Plan through the HTA Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b)     **Required Orders:**  The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the HTA Confirmation Order) providing for the following:

(i)     Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     Authorizing the solicitation of votes and elections with respect to the HTA Plan;

(iii)     Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)     Confirming and giving effect to the terms and provisions of the HTA Plan, including the releases set forth in Article XLI of the HTA Plan;

(v)     Determining that the compromises and settlements set forth in the HTA Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

(vi)     Determining that all applicable tests, standards and burdens in connection with the HTA Plan have been duly satisfied and met by the Oversight Board, the Debtor and the HTA Plan;

(vii)     Approving the documents in the Plan Supplement, other than the Reorganized HTA By-Laws, and determining that such documents are valid and binding on parties with respect thereto; and

(viii)     Authorizing Reorganized HTA to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the HTA Plan, and the documents in the Plan Supplement.

(c)     **Form of Orders:**  The HTA Confirmation Order and the HTA Plan are each in form and substance reasonably acceptable to the Oversight Board, AAFAF, the Debtor,

the HTA/CCDA PSA Creditors and, solely with respect to provisions affecting Classes 16 and 19, the Creditors' Committee.

(d)      **HTA Confirmation Order:**  The HTA Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the HTA Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XLI of the HTA Plan and (iii) the applicable provisions set forth in Section 34.1(b) hereof.

34.2    **Waiver of Conditions Precedent to Confirmation**:  Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 34.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtor, and the Initial HTA/CCDA PSA Creditors, and solely with respect to the provisions affecting Classes 16 and 19, the Creditors' Committee, which consent shall not be unreasonably withheld.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

## ARTICLE XXXV

## CONDITIONS PRECEDENT TO THE HTA EFFECTIVE DATE

35.1    **Conditions Precedent to the HTA Effective Date**:  The occurrence of the HTA Effective Date and the substantial consummation of the HTA Plan are subject to satisfaction of the following conditions precedent:

(a)      **Fiscal Plan Certification:**  The Oversight Board shall have determined that the HTA Plan is consistent with the Debtor's Fiscal Plan and shall have certified the submission of the HTA Plan, and any modifications to the HTA Plan through the HTA Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.  The HTA Fiscal Plan certified as of the HTA Effective Date shall include provisions for the payment of principal and interest with respect to the New HTA Bonds and the Subordinated Indebtedness, including, without limitation, sinking fund payments.

(b)      **Entry of the HTA Confirmation Order:**  The Clerk of the Title III Court shall have entered the HTA Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial HTA/CCDA PSA Creditors, and the Creditors' Committee and the HTA Confirmation Order shall provide for the following:

(i)      Authorize the Debtor and Reorganized HTA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the HTA Plan;

(ii)     Decree that the provisions of the HTA Confirmation Order and the HTA Plan are nonseverable and mutually dependent;

(iii)     Authorize the Debtor and Reorganized HTA, as the case may be, to (1) make all distributions and issuances as required under the HTA Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)     Authorize the implementation of the HTA Plan in accordance with its terms;

(v)     Determine the New HTA Bonds Indenture, the New HTA Bonds, the Subordinated Indebtedness, and the covenants by Reorganized HTA, including, without limitation, the Toll Rate Covenant, for the benefit of the holders of the New HTA Bonds and the Subordinated Indebtedness, as provided in the New HTA Bonds Indenture, or the HTA Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of Reorganized HTA under Puerto Rico, New York and federal law;

(vi)     Determine that the New HTA Bonds Indenture, upon issuance of the Secured Obligations, including, without limitation, the Subordinated Indebtedness issued as a refinancing of the Commonwealth Loan, grants a first priority lien on and first priority security interest on all of Reorganized HTA's legal and equitable right, title and interest in the Trust Estate to the Secured Obligations, subject only to (1) the terms and provisions of the New HTA Bonds Indenture establishing the Authority Expense Fund and the Arbitrage Rebate Fund, and (2) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which first-priority lien and first-priority security interest shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of holders of Subordinated Indebtedness, in each case, as permitted by the HTA Enabling Act, and shall be deemed automatically perfected as of the HTA Effective Date and shall in any event be valid, binding, perfected, and enforceable against all Entities having claims of any kind in tort, contract or otherwise against Reorganized HTA or its assets, irrespective of whether such Entities have notice of such lien or security interest, without any further act or agreement by any Entity, and will be "closed" and shall remain in full force and effect until the Secured Obligations have been paid or satisfied in full in accordance with their terms;

(vii)     Determine the HTA Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtor, (2) Reorganized HTA, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against HTA, the Commonwealth, or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtor or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the HTA Plan and, if impaired, whether or not such Entity accepted the HTA Plan, (5) any other Entity, and (6) each of the

foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(viii)   Provide that the HTA Fiscal Plan, certified as of the HTA Effective Date, and any post-HTA Effective Date HTA Fiscal Plan include provisions for the payment in each FY of principal and interest payable on the New HTA Bonds and the Subordinated Indebtedness, including, without limitation, any sinking fund payments which may become due in such FY;

(ix)   Provide that the automatic stay in any future insolvency proceeding commenced on behalf of HTA (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to Net Receipts held in the funds and accounts established in accordance with the New HTA Bonds Indenture (other than the Net Receipts on deposit in the Arbitrage Rebate Fund established pursuant to the New HTA Bonds Indenture;

(x)   Determine that, consistent with the HTA Fiscal Plan and corresponding budget, the discharge of debt to occur as of the HTA Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA as determined in accordance with modified accrual accounting standards;

(xi)   Determine that the HTA Plan is consistent with the Debtor's Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xii)   Provide that no party, Person or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the HTA Plan;

(xiii)   Provide that the Government Parties, including, without limitation, HTA and Reorganized HTA, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the HTA Plan; and

(xiv)   Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement and the Commonwealth Confirmation Order, the Commonwealth shall make payments on the HTA Effective Date to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

(c)   **No Injunction:**  The HTA Confirmation Order shall not be stayed in any respect.

(d)   **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the HTA Plan, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and not inconsistent with any other provision of the HTA Plan, unless

otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the HTA Plan.

(e) **Execution of Documents; Other Actions:** All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the HTA Plan are effected or executed and delivered, as applicable, and are in full force and effect.

(f) **Opinions:** Usual and customary legal opinions for issuances of the type similar to the New HTA Bonds by outside counsel to the Debtor covering matters not expressly addressed in the HTA Confirmation Order, in form and substance reasonably acceptable to the Initial HTA/CCDA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the HTA Plan.

(g) **Lift Stay Motions and Clawback Actions:** The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

(h) **Commonwealth Effective Date:** The Commonwealth Effective Date shall have occurred.

(i) **HTA Clawback CVI:** In accordance with the decretal paragraph 34(f) of the Commonwealth Confirmation Order, the HTA Clawback CVI shall have been distributed to the applicable Creditors.

(j) **HTA Interim Distribution:** In accordance with decretal paragraph 52 of the Commonwealth Confirmation Order, including, without limitation, the satisfaction of conditions set forth therein, HTA shall have made interim distributions to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC) and HTA 98 Senior Bond Claims (National) in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash; provided, however, that, for purposes of this Section 34.1(j), the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), and HTA 98 Senior Bond Claims (National) arising from the HTA Bonds insured or owned by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA; and, provided, further, that, notwithstanding the foregoing, (i) with respect to any HTA 98 Senior Bond Claims (FGIC) arising from HTA 98 Senior Bonds (or related payment rights) owned by FGIC, HTA shall have made such distribution to FGIC, and (ii) with respect to any HTA 98 Senior Bond Claims (FGIC) arising from HTA 98 Senior Bonds insured, but not owned, by FGIC, HTA shall have made such interim distribution to the beneficial owners of such HTA 98 Senior Bonds.

35.2   **Waiver of Conditions Precedent**: Subject to the provisions of the HTA/CCDA Plan Support Agreement, the Oversight Board may waive any of the conditions to the HTA

Effective Date set forth in Section 35.1 hereof at any time without any notice to any other parties in interest, other than the HTA/CCDA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the HTA Plan; provided, however, that, subject to the terms and provisions of the HTA Committee Agreement, each of the conditions precedent in Section 35.1 hereof with respect to the provisions affecting Classes 16 and 19, may be waived, in whole or in part, by the Oversight Board subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

35.3   **Effect of Non-Occurrence of Conditions to HTA Effective Date**:  If prior to the HTA Effective Date, the HTA Confirmation Order is vacated pursuant to a Final Order, then, except as provided in a Final Order vacating the HTA Confirmation Order, the HTA Plan will be null and void in all respects, and nothing contained in the HTA Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtor, the Oversight Board, the Creditors' Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor, the Oversight Board, the Creditor's Committee, or any other Entity.

## ARTICLE XXXVI

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE HTA PLAN

36.1   **Modification of HTA Plan**:  Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, the Oversight Board may alter, amend or modify the HTA Plan or the Exhibits at any time prior to or after the HTA Confirmation Date but prior to the HTA Effective Date.  A holder of a Claim that has accepted the HTA Plan shall be deemed to have accepted the HTA Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

36.2   **Revocation or Withdrawal**:

(a)   Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, the HTA Plan may be revoked or withdrawn prior to the HTA Confirmation Date by the Oversight Board.

(b)   If the HTA Plan is revoked or withdrawn prior to the HTA Confirmation Date, or if the HTA Plan does not become effective for any reason whatsoever, then the HTA Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any other Entity in any further proceeding involving the Debtor.

36.3     **Amendment of Plan Documents**:  From and after the HTA Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the HTA Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the HTA Plan and their respective attachments, as the case may be.

36.4     **No Admission of Liability:**

(a)     The submission of this HTA Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this HTA Plan.

(b)     None of this HTA Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this HTA Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized HTA, the Debtor, or any other Entity with respect to the validity of any Claim.  None of this HTA Plan or any settlement entered, act performed or document executed in connection with this HTA Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this HTA Plan or enforce any such agreement, and except that, once confirmed, any Entity may file this HTA Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE XXXVII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED HTA

37.1     **Corporate Action**:  On the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New HTA Bonds Indenture, and the

new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the HTA Confirmation Date, the Debtor and Reorganized HTA shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable.

37.2 **Amendment of By-Laws:** The by-laws of Reorganized HTA shall be amended as of the HTA Effective Date to provide substantially as set forth in Reorganized HTA By-Laws.

37.3 **Directors of Reorganized HTA:** On the HTA Effective Date, and pursuant to the terms and provisions of Section 36.2 hereof, the Reorganized HTA By-Laws shall provide that the board of directors of Reorganized HTA shall be appointed consistent with the terms and provisions of the HTA Enabling Act. The initial directors shall be disclosed prior to the HTA Confirmation Hearing. In the event that, during the period from the HTA Confirmation Hearing up to and including the HTA Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the board of directors of Reorganized HTA, the Governor of the Commonwealth, upon consultation with the Oversight Board, shall choose a substitute consistent with the independence and qualification standards set forth above and the Debtor shall file a notice thereof with the Title III Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the HTA Confirmation Hearing. The Reorganized HTA amended corporate governance documents shall provide that all board members shall owe a fiduciary duty to Reorganized HTA as consistent with Puerto Rico law and its Constitution.

37.4 **Officers of Reorganized HTA**: To the extent applicable, the board of directors of Reorganized HTA shall elect officers of Reorganized HTA as of or after the HTA Effective Date.

## ARTICLE XXXVIII

## PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

38.1 **Effect of Confirmation**: Nothing in this HTA Plan or the HTA Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of Reorganized HTA under PROMESA. From and after the HTA Effective Date, Reorganized HTA shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

38.2 **Ongoing Role of the Oversight Board**: Nothing in the HTA Plan or the HTA Confirmation Order shall discharge any or all obligations of the Debtor under PROMESA and, from and after the HTA Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtor's duties and obligations shall continue and be unaffected by the HTA Plan and the consummation thereof.

38.3    **Preemption of Laws**:  As of the HTA Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws that affect the Debtor or Reorganized HTA and are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, such preempted laws, rules and regulations include, without limitation, (a) pursuant to Section 4 of PROMESA, all laws, rules, and regulations (or such portions thereof) of the Commonwealth of Puerto Rico to the extent they give rise to obligations of the Debtor discharged by the HTA Plan and the HTA Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, and (b) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Debtor or Reorganized HTA to the Commonwealth or any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the HTA Plan's discharge of the Debtor's obligations and all such laws shall not be enforceable to the extent they are inconsistent with the HTA Plan's discharge of the Debtor's obligations or any of the transactions contemplated by the HTA Plan. Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by PROMESA that affect the Debtor include, without limitation, those listed on Exhibit "F" hereto for the reasons and to the extent set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, and (z) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "F" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the HTA Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified Fiscal Plan or HTA budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

# ARTICLE XXXIX

# PROVISIONS REGARDING CREDITORS' COMMITTEE

39.1    **Dissolution of Creditors' Committee**:  On the HTA Effective Date, the Creditors' Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Case; provided, however, that (x) in the event that an appeal of the HTA Confirmation Order is taken, the Creditors' Committee shall not be dissolved until the HTA Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with PREPA's Title III case, and (z) the Creditors' Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals. To the extent that, as of the date immediately prior to the HTA Effective Date, the Creditors' Committee was a party to a contested matter or adversary proceeding in connection with the Title III Case, including, without limitation, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the HTA

Effective Date and to the extent not already a party thereto, Reorganized HTA shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon such assumption, the Creditors' Committee shall be relieved of any role, responsibility or obligation with respect thereto.

## ARTICLE XL

## RETENTION OF JURISDICTION

40.1 **Retention of Jurisdiction**: The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Case and the HTA Plan, or that relates to the following:

(a) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b) to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c) to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the HTA Plan and adjudicate any and all disputes arising from or relating to distributions under the HTA Plan;

(d) to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor or Reorganized HTA that may be pending on the HTA Effective Date or brought thereafter;

(e) to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the HTA Plan or orders entered by the Title III Court;

(f) to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (i) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction, and (ii) the HTA Plan, the HTA Confirmation Order, the Definitive

Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the HTA Plan, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(g)    to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the HTA Plan, the HTA Confirmation Order, the Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the HTA Plan or any Entity's rights arising from or obligations incurred in connection with the HTA Plan or such documents, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(h)    to approve any modification of the HTA Plan or approve any modification of the HTA Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the HTA Plan, the HTA Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the HTA Plan;

(i)    to adjudicate, decide or resolve any matters relating to the Debtor's compliance with the HTA Plan and the HTA Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)    to determine any other matters that may arise in connection with or relate to the HTA Plan, the Disclosure Statement, the HTA Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the HTA Plan, the Disclosure Statement or the HTA Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)    to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the HTA Plan or the HTA Confirmation Order, including, without limitation, the provisions of Sections 41.2 and 41.3 hereof;

(l)    to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the HTA Plan or HTA Confirmation Order, including, without limitation, issuance of the New HTA Bonds and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m)    to enter and implement such orders as are necessary or appropriate if the HTA Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)      to enter an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

(o)      to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board in accordance with the provisions of Section 32.1(b) of the HTA Plan;

(p)      to enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

(q)      to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XLI

## MISCELLANEOUS PROVISIONS

41.1   **Title to Assets**:  Except as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order.

41.2   **Discharge and Release of Claims and Causes of Action**:

(a)      Except as expressly provided in the HTA Plan or the HTA Confirmation Order, all distributions and rights afforded under the HTA Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtor and Reorganized HTA that arose, in whole or in part, prior to the HTA Effective Date, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 41.7 hereof, nothing contained in the HTA Plan or the HTA Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third party release of the HTA/CCDA PSA Creditors and their respective Related Persons by Creditors of the Debtor.  Upon the HTA Effective Date, the Debtor and Reorganized HTA shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the HTA Effective Date, and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the HTA Plan.  For the avoidance of doubt, nothing contained herein or in the HTA Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation,

Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity. Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)  Except as expressly provided in the HTA Plan or the HTA Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtor and Reorganized HTA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets and property, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities. In accordance with the foregoing, except as expressly provided in the HTA Plan or the HTA Confirmation Order, the HTA Confirmation Order shall constitute a judicial determination, as of the HTA Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtor and Reorganized HTA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized HTA and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the HTA Effective Date, and in consideration for the value provided under the HTA Plan, each holder of a Claim in any Class under this HTA Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtor and Reorganized HTA, and their respective Assets and property and all such Claims.

(c)  Notwithstanding any other provisions of this Section 41.2, in accordance with the provisions of the HTA/CCDA Plan Support Agreement, each of the HTA/CCDA PSA Creditors and their respective Related Persons, solely in their capacity as HTA/CCDA PSA Creditors of the Debtor, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 41.2.

(d)  SEC Limitation. Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)  United States Limitation. Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtor or Reorganized HTA, as

91

the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtor or Reorganized HTA are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtor or Reorganized HTA to the United States arising from and after the HTA Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtor or Reorganized HTA, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtor or Reorganized HTA, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtor's or Reorganized HTA's obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor.  Without limiting the foregoing, nothing contained herein or in the HTA Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtor and Reorganized HTA, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any entity, including, but not limited to, the Debtor and Reorganized HTA, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtor and Reorganized HTA, and (iv) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)     _Underwriter Actions._  Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, including, without limitation, Sections 41.2, 41.3 and 41.11 of the HTA Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the HTA Plan, the HTA Confirmation Order or any HTA Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "_Defensive Rights_"); _provided_, _however_, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth in connection with an Underwriter Action; and, _provided_, _further_, that no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named third-party defendants, shall be permitted to assert: (i) against the Debtor or Reorganized HTA any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the HTA Plan, and/or the HTA

92

Confirmation Order; and/or (ii) against the Debtor, Reorganized HTA, PREPA, the
Commonwealth, or any other agency or instrumentality of the Commonwealth any Claims or
counterclaims for purposes of obtaining an affirmative monetary recovery, including, without
limitation, for indemnification, contribution, reimbursement, set-off or similar theories, to the
extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or
counterclaims shall be deemed disallowed, barred, released and discharged in accordance with
the terms and provision of the HTA Plan and the HTA Confirmation Order; and, provided,
further, that nothing herein or in the HTA Confirmation Order is intended, nor shall it be
construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in
any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or
limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the
Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,
prosecuting, or asserting, against the Debtor, Reorganized HTA, PREPA, the Commonwealth, or
any other agency or instrumentality of the Commonwealth any Claims or counterclaims for
purposes of obtaining an affirmative monetary recovery, including, without limitation,
indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted
for purposes of obtaining an affirmative monetary recovery based upon, arising from or related to
the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a
court, an arbitration, an administrative agency or forum, or in any other manner.

    41.3    **Injunction on Claims**:  Except as otherwise expressly provided in the HTA Plan,
the HTA Confirmation Order or such other Final Order of the Title III Court that may be
applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that
is discharged or released pursuant to Section 41.2 hereof or who have held, hold or may hold
Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 hereof
are permanently enjoined, from and after the HTA Effective Date, from (a) commencing or
continuing, directly or indirectly, in any manner, any action or other proceeding (including,
without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any
such Claim or other debt or liability that is discharged pursuant to the HTA Plan against any of
the Released Parties or any of their respective assets or property, (b) the enforcement, attachment,
collection or recovery by any manner or means of any judgment, award, decree or order against
any of the Released Parties or any of their respective assets or property on account of any Claim
or other debt or liability that is discharged pursuant to the HTA Plan, (c) creating, perfecting, or
enforcing any encumbrance of any kind against any of the Released Parties or any of their
respective assets or property on account of any Claim or other debt or liability that is discharged
pursuant to the HTA Plan, and (d) except to the extent provided, permitted or preserved by
sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right
of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any
obligation due from any of the Released Parties or any of their respective assets or property, with
respect to any such Claim or other debt or liability that is discharged pursuant to the HTA Plan.
Such injunction shall extend to all successors and assigns of the Released Parties and their
respective assets and property.

    41.4    **Integral to HTA Plan**:  Each of the discharge, injunction, exculpation and release
provisions provided in this Article XLI is an integral part of the HTA Plan and is essential to its

implementation.  Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XLI.

41.5    **Releases by the Debtor and Reorganized HTA**:  Except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, on the HTA Effective Date, and for good and valuable consideration, each of the Debtor and Reorganized HTA, the Disbursing Agent and each of the Debtor's and Reorganized HTA's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtor, Reorganized HTA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

41.6    **Injunction Related to Releases**:  As of the HTA Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 41.2 of the HTA Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 41.2 hereof; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the HTA Plan or the HTA Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of the HTA Confirmation Order: (i) the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transpiration Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and (ii) the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended.

41.7    **Exculpation**:

(a)    **Government Parties**:  The Oversight Board, AAFAF, the Debtor, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the HTA Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection

with the consummation of the transactions set forth in the HTA Plan; provided, however, that the foregoing provisions of this Section 41.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in the foregoing provisions of this Section 41.7 shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the HTA Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the HTA Plan.

(b)     **HTA/CCDA PSA Creditors:**  Each of the HTA/CCDA PSA Creditors solely in its capacity as a party to HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the HTA Petition Date up to and including the HTA Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan; provided, however, that the foregoing provisions of this Section 41.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)     **Monoline Insurers:**  Ambac, Assured, FGIC, National, and their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the HTA Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, or National Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, or National Insurance Policies provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the HTA Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, or National Insurance Policy, to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds or National Insured Bonds, as applicable, in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, or National Treatment, as applicable (or any claims that Ambac, Assured, FGIC, or National, may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, or National's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies or National Insurance Policies, as applicable).

(d)     **Creditors' Committee:**  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the HTA Petition Date up to and including the HTA Effective Date and each of

the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained herein, the HTA Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by HTA pursuant to a Final Order; and provided, further, that, the foregoing provisions of this Section 41.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)      **The DRA Parties**:  Each of the DRA and the DRA Parties, from the HTA Petition Date up to and including the HTA Effective Date, and each of the DRA Parties' respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, the DRA Stipulation, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan; provided, however, that, the foregoing provisions of this Section 41.7(e) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

41.8     **Appointments Related Litigation/Uniformity Litigation**:  Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the HTA Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the HTA Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the HTA Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the HTA Plan and the HTA Confirmation Order, including, without limitation, the releases, exculpations and injunctions provided pursuant to Article XLI of the HTA Plan; provided, however, that, to the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement or the ERS Stipulation, within five (5) Business Days of the HTA Effective Date, such plaintiff shall take any and all action to dismiss, with prejudice, or, in the event other plaintiffs are party to such

litigations, withdraw from, with prejudice, such Appointments Related Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

41.9    **Bar Order**:  To the limited extent provided in the HTA Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the HTA Plan, the negotiation and consummation of the HTA/CCDA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Case, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Case, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

41.10    **No Waiver**:  Notwithstanding anything to the contrary contained in Sections 41.5 and 41.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized HTA, the HTA/CCDA PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

41.11    **Supplemental Injunction**:  Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the HTA Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Case or any Claim against the Debtor, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the HTA Effective Date (including prior to the HTA Petition Date), including, but not limited to:

(a)    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

97

(b)      Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)      Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)      Except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the HTA Plan or the HTA Confirmation Order, provided, however, that the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the HTA Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

41.12   **Post-Effective Date Fees and Expenses**:  From and after the HTA Effective Date, Reorganized HTA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized HTA related to implementation and consummation of the HTA Plan without further approval from the Title III Court.  Without limiting the foregoing, from and after the HTA Effective Date, Reorganized HTA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to Reorganized HTA, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the HTA Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the HTA Plan.

41.13   **Securities Act Exemption**:  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New HTA Bonds pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

41.14   **Severability**:  Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, if, prior to the HTA Confirmation Date, (a) any term or provision of the HTA Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the

original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the HTA Plan, the HTA Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

41.15   **Governing Law:**  Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this HTA Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

41.16   **Closing Case**:  The Oversight Board shall, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Case, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XL of the HTA Plan.

41.17   **Section Headings**:  The section headings contained in this HTA Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the HTA Plan.

41.18   **Inconsistencies**:  To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the HTA Plan, the terms and provisions contained herein shall govern, (b) the terms and provisions of the HTA Plan and the terms and provisions of the HTA Confirmation Order, the terms and provisions of the HTA Confirmation Order shall govern and be deemed a modification of the HTA Plan, and (c) the terms and provisions of the HTA Plan and the New HTA Bonds Indenture, the terms and provisions of the New HTA Bonds Indenture shall govern; provided, however, that under no circumstances shall the HTA Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

41.19   **Document Retention**:  From and after the HTA Effective Date, the Debtor may maintain documents in accordance with standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtor.

41.20   **Immediate Binding Effect**:  Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the HTA Effective Date, the terms of the HTA Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the HTA Plan and whether or not such holder has accepted the HTA Plan.  The releases, exculpations, and settlements effected under the HTA Plan shall be operative, and subject to enforcement by the Title III Court, from and after the HTA Effective Date, including pursuant to the injunctive provisions of the HTA Plan.  Once approved, the compromises and settlements

embodied in the HTA Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the HTA Plan must (a) challenge such compromise and settlement prior to confirmation of the HTA Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

41.21   **Additional Documents**:  On or before the HTA Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the HTA Plan.  The Debtor and all holders of Claims receiving distributions pursuant to the HTA Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the HTA Plan.

41.22   **Reservation of Rights**:  Except as expressly set forth herein, the HTA Plan shall have no force or effect unless the Title III Court shall enter the HTA Confirmation Order.  None of the filing of the HTA Plan, any statement or provision contained in the HTA Plan, or the taking of any action by the Debtor with respect to the HTA Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims prior to the HTA Effective Date.  Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

41.23   **Successors and Assigns**:  Except as expressly provided otherwise in the HTA Plan, the rights, benefits, and obligations of any Entity named or referred to in the HTA Plan or the HTA Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

41.24   **Notices**:  All notices, requests to, demands or other document(s) required by the HTA Plan or the HTA Confirmation Order to be served on or delivered to the Oversight Board, the Debtor or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:        Financial Oversight and Management Board for Puerto Rico
                                      268 Muñoz Rivera Ave, Suite 1107
                                      San Juan, PR 00918-1813
                                      Attn:  Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

If to the Debtor, to:              Puerto Rico Highways and Transportation Authority
                                   c/o Fiscal Agency and Financial Advisory Authority
                                   Roberto Sánchez Vilella (Minillas) Government Center
                                   De Diego Ave. Stop 22
                                   San Juan, Puerto Rico 00907
                                   Attn: Office of the Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

– and –

O'MELVENY & MYERS LLP

101

Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

If to AAFAF, to:          Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

                – with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

41.25   **Term of Injunctions or Stays**:  Unless otherwise provided herein or in the HTA Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the HTA Confirmation Date (excluding any injunctions or stays contained in the HTA Plan or the HTA Confirmation Order) shall remain in full force and effect until the HTA Effective Date.  All injunctions or stays contained in the HTA Plan or the HTA Confirmation Order shall remain in full force and effect in accordance with their terms.

41.26   **Entire Agreement**:  Except as otherwise indicated, the HTA Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the HTA Plan.

41.27   **Plan Supplement**:  All documents included in the Plan Supplement are incorporated into and are a part of the HTA Plan as if set forth in full in the HTA Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://cases.primeclerk.com/ puertorico/ or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the HTA Plan that does not constitute the Plan Supplement, such part of the HTA Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New HTA Bonds Indenture to the extent that any

102

provisions of the HTA Plan are inconsistent with the New HTA Bonds Indenture the New HTA Bonds Indenture shall control.

Dated: San Juan, Puerto Rico
      June 7,17, 2022

                                    PUERTO RICO HIGHWAYS AND
                                    TRANSPORTATION AUTHORITY, by and
                                    through the Financial Oversight and Management
                                    Board for Puerto Rico as its representative

                                    By:  /s/ David A. Skeel Jr.         
                                          Name:  David A. Skeel Jr.
                                          Title:  Chairman

# EXHIBIT A

SCHEDULE OF AVOIDANCE ACTIONS

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| GILA LLC | Adversary | 19-00354 |

## EXHIBIT B

SCHEDULE OF INVALIDITY ACTIONS

**Invalidity Actions**

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

# **EXHIBIT C**

SCHEDULE OF LIEN CHALLENGE ACTIONS

**Lien Challenge Actions**

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., Adv. Proc. No. 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, Adv. Proc. No. 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, Adv. Proc. No. 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, Adv. Proc. No. 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, Adv. Proc. No. 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., Adv. Proc. No. 19-00297

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00362

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ambac Assurance Corporation, Adv. Proc. No. 19-00363

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III  Debtors (Other Than COFINA) v. Davidson Kempner Capital Management LP, Adv. Proc. No. 19-00364

The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board of Puerto Rico and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v.

<u>Banco Popular de Puerto Rico</u>, Adv. Proc. No. 19-00365

# EXHIBIT D

SCHEDULE OF CASH FLOW OF NEW HTA BONDS

EXHIBIT: D

Exhibit: Schedule of Cash Flow of New HTA Bonds:

| Fiscal Year (7/1) | Maturity | Principal | Interest 5.000% | Debt Service |
|---|---|---|---|---|
| | | | New HTA CIBs | |
| Total | | 600,000,000.00 | 1,085,949,250.00 | 1,685,949,250.00 |
| 2023 | 7/1/23 | - | 30,000,000.00 | 30,000,000.00 |
| 2024 | 7/1/24 | - | 30,000,000.00 | 30,000,000.00 |
| 2025 | 7/1/25 | - | 30,000,000.00 | 30,000,000.00 |
| 2026 | 7/1/26 | - | 30,000,000.00 | 30,000,000.00 |
| 2027 | 7/1/27 | - | 30,000,000.00 | 30,000,000.00 |
| 2028 | 7/1/28 | - | 30,000,000.00 | 30,000,000.00 |
| 2029 | 7/1/29 | - | 30,000,000.00 | 30,000,000.00 |
| 2030 | 7/1/30 | - | 30,000,000.00 | 30,000,000.00 |
| 2031 | 7/1/31 | - | 30,000,000.00 | 30,000,000.00 |
| 2032 | 7/1/32 | - | 30,000,000.00 | 30,000,000.00 |
| 2033 | 7/1/33 | - | 30,000,000.00 | 30,000,000.00 |
| 2034 | 7/1/34 | - | 30,000,000.00 | 30,000,000.00 |
| 2035 | 7/1/35 | - | 30,000,000.00 | 30,000,000.00 |
| 2036 | 7/1/36 | - | 30,000,000.00 | 30,000,000.00 |
| 2037 | 7/1/37 | - | 30,000,000.00 | 30,000,000.00 |
| 2038 | 7/1/38 | - | 30,000,000.00 | 30,000,000.00 |
| 2039 | 7/1/39 | - | 30,000,000.00 | 30,000,000.00 |
| 2040 | 7/1/40 | - | 30,000,000.00 | 30,000,000.00 |
| 2041 | 7/1/41 | - | 30,000,000.00 | 30,000,000.00 |
| 2042 | 7/1/42 | - | 30,000,000.00 | 30,000,000.00 |
| 2043 | 7/1/43 | - | 30,000,000.00 | 30,000,000.00 |
| 2044 | 7/1/44 | - | 30,000,000.00 | 30,000,000.00 |
| 2045 | 7/1/45 | - | 30,000,000.00 | 30,000,000.00 |
| 2046 | 7/1/46 | - | 30,000,000.00 | 30,000,000.00 |
| 2047 | 7/1/47 | - | 30,000,000.00 | 30,000,000.00 |
| 2048 | 7/1/48 | - | 30,000,000.00 | 30,000,000.00 |
| 2049 | 7/1/49 | - | 30,000,000.00 | 30,000,000.00 |
| 2050 | 7/1/50 | - | 30,000,000.00 | 30,000,000.00 |
| 2051 | 7/1/51 | - | 30,000,000.00 | 30,000,000.00 |
| 2052 | 7/1/52 | - | 30,000,000.00 | 30,000,000.00 |
| 2053 | 7/1/53 | 14,190,000.00 | 30,000,000.00 | 44,190,000.00 |
| 2054 | 7/1/54 | 53,125,000.00 | 29,290,500.00 | 82,415,500.00 |
| 2055 | 7/1/55 | 55,785,000.00 | 26,634,250.00 | 82,419,250.00 |
| 2056 | 7/1/56 | 58,575,000.00 | 23,845,000.00 | 82,420,000.00 |
| 2057 | 7/1/57 | 61,500,000.00 | 20,916,250.00 | 82,416,250.00 |
| 2058 | 7/1/58 | 64,575,000.00 | 17,841,250.00 | 82,416,250.00 |
| 2059 | 7/1/59 | 67,805,000.00 | 14,612,500.00 | 82,417,500.00 |
| 2060 | 7/1/60 | 71,195,000.00 | 11,222,250.00 | 82,417,250.00 |
| 2061 | 7/1/61 | 74,755,000.00 | 7,662,500.00 | 82,417,500.00 |

| 2062 | 7/1/62 | 78,495,000.00 | 3,924,750.00 | 82,419,750.00 |

*Deemed Issuance Date is 7/1/2022

| Fiscal Year (7/1) | Maturity | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|---|
| | | | New HTA CABs | |
| Total | | 237,955,868.13 | 334,856,647.24 | 389,919,000.00 |
| 2023 | 7/1/23 | - | - | - |
| 2024 | 7/1/24 | - | - | - |
| 2025 | 7/1/25 | 25,289,588.80 | 29,327,916.80 | 41,440,000.00 |
| 2026 | 7/1/26 | 22,310,860.93 | 27,183,444.45 | 36,559,000.00 |
| 2027 | 7/1/27 | 25,083,317.54 | 32,108,471.38 | 41,102,000.00 |
| 2028 | 7/1/28 | 28,817,559.67 | 38,756,163.54 | 47,221,000.00 |
| 2029 | 7/1/29 | 35,543,345.34 | 50,221,494.18 | 58,242,000.00 |
| 2030 | 7/1/30 | 35,310,832.47 | 52,419,172.95 | 57,861,000.00 |
| 2031 | 7/1/31 | 33,610,009.98 | 52,419,983.94 | 55,074,000.00 |
| 2032(1) | 7/1/32 | 31,990,353.40 | 52,420,000.00 | 52,420,000.00 |

(1) Stated maturity; not a sinking fund redemption

(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date

(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity

*Deemed Issuance Date is 7/1/2022

| Fiscal Year (7/1) | Maturity | New HTA CCABs | | | |
| | | Initial Principal | (a) Maturity Value | (b) CCAB Interest (2) | (c = a + b) CCAB Debt Service |
|---|---|---|---|---|---|
| Total | | 407,044,597.57 | 666,991,000.00 | 419,638,900.00 | 1,086,629,900.00 |
| 2023 | 7/1/23 | - | - | - | - |
| 2024 | 7/1/24 | - | - | - | - |
| 2025 | 7/1/25 | - | - | - | - |
| 2026 | 7/1/26 | - | - | - | - |
| 2027 | 7/1/27 | - | - | - | - |
| 2028 | 7/1/28 | - | - | - | - |
| 2029 | 7/1/29 | - | - | - | - |
| 2030 | 7/1/30 | - | - | - | - |
| 2031 | 7/1/31 | - | - | - | - |
| 2032 | 7/1/32 | - | - | - | - |
| 2033 | 7/1/33 | 11,637,848.90 | 19,070,000.00 | 33,349,550.00 | 52,419,550.00 |
| 2034 | 7/1/34 | 12,220,046.48 | 20,024,000.00 | 32,396,050.00 | 52,420,050.00 |
| 2035 | 7/1/35 | 12,830,926.75 | 21,025,000.00 | 31,394,850.00 | 52,419,850.00 |
| 2036 | 7/1/36 | 13,472,320.52 | 22,076,000.00 | 30,343,600.00 | 52,419,600.00 |
| 2037 | 7/1/37 | 14,146,058.60 | 23,180,000.00 | 29,239,800.00 | 52,419,800.00 |
| 2038 | 7/1/38 | 14,853,361.53 | 24,339,000.00 | 28,080,800.00 | 52,419,800.00 |
| 2039 | 7/1/39 | 15,596,060.12 | 25,556,000.00 | 26,863,850.00 | 52,419,850.00 |
| 2040 | 7/1/40 | 16,375,985.18 | 26,834,000.00 | 25,586,050.00 | 52,420,050.00 |
| 2041 | 7/1/41 | 17,194,967.52 | 28,176,000.00 | 24,244,350.00 | 52,420,350.00 |
| 2042 | 7/1/42 | 18,054,837.95 | 29,585,000.00 | 22,835,550.00 | 52,420,550.00 |
| 2043 | 7/1/43 | 18,957,427.28 | 31,064,000.00 | 21,356,300.00 | 52,420,300.00 |
| 2044 | 7/1/44 | 19,905,176.59 | 32,617,000.00 | 19,803,100.00 | 52,420,100.00 |
| 2045 | 7/1/45 | 20,900,526.96 | 34,248,000.00 | 18,172,250.00 | 52,420,250.00 |
| 2046 | 7/1/46 | 21,945,309.20 | 35,960,000.00 | 16,459,850.00 | 52,419,850.00 |
| 2047 | 7/1/47 | 23,042,574.66 | 37,758,000.00 | 14,661,850.00 | 52,419,850.00 |
| 2048 | 7/1/48 | 24,194,764.42 | 39,646,000.00 | 12,773,950.00 | 52,419,950.00 |
| 2049 | 7/1/49 | 25,404,319.56 | 41,628,000.00 | 10,791,650.00 | 52,419,650.00 |
| 2050 | 7/1/50 | 26,674,901.70 | 43,710,000.00 | 8,710,250.00 | 52,420,250.00 |
| 2051 | 7/1/51 | 28,008,341.65 | 45,895,000.00 | 6,524,750.00 | 52,419,750.00 |
| 2052 | 7/1/52 | 29,408,911.30 | 48,190,000.00 | 4,230,000.00 | 52,420,000.00 |
| 2053(1) | 7/1/53 | 22,219,930.70 | 36,410,000.00 | 1,820,500.00 | 38,230,500.00 |

(1) Stated maturity; not a sinking fund redemption

(2) New HTA CCAB conversion date is 7/1/2032

*Deemed Issuance Date is 7/1/2022

Aggregate Debt Service Cash Flows

| Fiscal Year (7/1) | Maturity | CIB Debt Service | CAB Accreted Value at each Redemption Date | CCAB Debt Service | Total Debt Service |
|---|---|---|---|---|---|
| Total | | 1,685,949,250.00 | 334,856,647.24 | 1,086,629,900.00 | 3,107,435,797.24 |
| 2023 | 7/1/23 | 30,000,000.00 | - | - | 30,000,000.00 |
| 2024 | 7/1/24 | 30,000,000.00 | | - | 30,000,000.00 |
| 2025 | 7/1/25 | 30,000,000.00 | 29,327,916.80 | - | 59,327,916.80 |
| 2026 | 7/1/26 | 30,000,000.00 | 27,183,444.45 | - | 57,183,444.45 |
| 2027 | 7/1/27 | 30,000,000.00 | 32,108,471.38 | | 62,108,471.38 |
| 2028 | 7/1/28 | 30,000,000.00 | 38,756,163.54 | - | 68,756,163.54 |
| 2029 | 7/1/29 | 30,000,000.00 | 50,221,494.18 | | 80,221,494.18 |
| 2030 | 7/1/30 | 30,000,000.00 | 52,419,172.95 | - | 82,419,172.95 |
| 2031 | 7/1/31 | 30,000,000.00 | 52,419,983.94 | - | 82,419,983.94 |
| 2032 | 7/1/32 | 30,000,000.00 | 52,420,000.00 | | 82,420,000.00 |
| 2033 | 7/1/33 | 30,000,000.00 | - | 52,419,550.00 | 82,419,550.00 |
| 2034 | 7/1/34 | 30,000,000.00 | | 52,420,050.00 | 82,420,050.00 |
| 2035 | 7/1/35 | 30,000,000.00 | | 52,419,850.00 | 82,419,850.00 |
| 2036 | 7/1/36 | 30,000,000.00 | - | 52,419,600.00 | 82,419,600.00 |
| 2037 | 7/1/37 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2038 | 7/1/38 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2039 | 7/1/39 | 30,000,000.00 | | 52,419,850.00 | 82,419,850.00 |
| 2040 | 7/1/40 | 30,000,000.00 | | 52,420,050.00 | 82,420,050.00 |
| 2041 | 7/1/41 | 30,000,000.00 | | 52,420,350.00 | 82,420,350.00 |
| 2042 | 7/1/42 | 30,000,000.00 | | 52,420,550.00 | 82,420,550.00 |
| 2043 | 7/1/43 | 30,000,000.00 | - | 52,420,300.00 | 82,420,300.00 |
| 2044 | 7/1/44 | 30,000,000.00 | | 52,420,100.00 | 82,420,100.00 |
| 2045 | 7/1/45 | 30,000,000.00 | | 52,420,250.00 | 82,420,250.00 |
| 2046 | 7/1/46 | 30,000,000.00 | | 52,419,850.00 | 82,419,850.00 |
| 2047 | 7/1/47 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2048 | 7/1/48 | 30,000,000.00 | - | 52,419,950.00 | 82,419,950.00 |
| 2049 | 7/1/49 | 30,000,000.00 | | 52,419,650.00 | 82,419,650.00 |
| 2050 | 7/1/50 | 30,000,000.00 | - | 52,420,250.00 | 82,420,250.00 |
| 2051 | 7/1/51 | 30,000,000.00 | - | 52,419,750.00 | 82,419,750.00 |
| 2052 | 7/1/52 | 30,000,000.00 | - | 52,420,000.00 | 82,420,000.00 |
| 2053 | 7/1/53 | 44,190,000.00 | - | 38,230,500.00 | 82,420,500.00 |
| 2054 | 7/1/54 | 82,415,500.00 | - | - | 82,415,500.00 |
| 2055 | 7/1/55 | 82,419,250.00 | - | - | 82,419,250.00 |
| 2056 | 7/1/56 | 82,420,000.00 | - | - | 82,420,000.00 |
| 2057 | 7/1/57 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2058 | 7/1/58 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2059 | 7/1/59 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2060 | 7/1/60 | 82,417,250.00 | - | - | 82,417,250.00 |
| 2061 | 7/1/61 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2062 | 7/1/62 | 82,419,750.00 | - | - | 82,419,750.00 |

# **EXHIBIT E**

SUBORDINATED INDEBTEDNESS PAYMENT TERMS

|  | Principal | Interest | Agg. Loan Payments |
|---|---|---|---|
| Total | 362,000,000.00 | 173,538,404.20 | 535,538,404.20 |
| 7/1/23 | 10,763,135.00 | 11,714,722.22 | 22,477,857.22 |
| 7/1/24 | 9,447,509.00 | 8,780,921.63 | 18,228,430.63 |
| 7/1/25 | 4,810,622.00 | 8,544,733.90 | 13,355,355.90 |
| 7/1/26 | 5,197,995.00 | 8,424,468.35 | 13,622,463.35 |
| 7/1/27 | 5,600,394.00 | 8,294,518.48 | 13,894,912.48 |
| 7/1/28 | 6,018,302.00 | 8,154,508.63 | 14,172,810.63 |
| 7/1/29 | 6,452,216.00 | 8,004,051.08 | 14,456,267.08 |
| 7/1/30 | 6,902,647.00 | 7,842,745.68 | 14,745,392.68 |
| 7/1/31 | 7,370,121.00 | 7,670,179.50 | 15,040,300.50 |
| 7/1/32 | 7,855,180.00 | 7,485,926.48 | 15,341,106.48 |
| 7/1/33 | 8,358,382.00 | 7,289,546.98 | 15,647,928.98 |
| 7/1/34 | 8,880,300.00 | 7,080,587.43 | 15,960,887.43 |
| 7/1/35 | 9,421,525.00 | 6,858,579.93 | 16,280,104.93 |
| 7/1/36 | 9,982,665.00 | 6,623,041.80 | 16,605,706.80 |
| 7/1/37 | 10,564,346.00 | 6,373,475.18 | 16,937,821.18 |
| 7/1/38 | 11,167,211.00 | 6,109,366.53 | 17,276,577.53 |
| 7/1/39 | 11,791,923.00 | 5,830,186.25 | 17,622,109.25 |
| 7/1/40 | 12,439,163.00 | 5,535,388.18 | 17,974,551.18 |
| 7/1/41 | 13,109,633.00 | 5,224,409.10 | 18,334,042.10 |
| 7/1/42 | 13,804,055.00 | 4,896,668.28 | 18,700,723.28 |
| 7/1/43 | 14,523,171.00 | 4,551,566.90 | 19,074,737.90 |
| 7/1/44 | 15,267,745.00 | 4,188,487.63 | 19,456,232.63 |
| 7/1/45 | 16,038,563.00 | 3,806,794.00 | 19,845,357.00 |
| 7/1/46 | 16,836,434.00 | 3,405,829.93 | 20,242,263.93 |
| 7/1/47 | 17,662,190.00 | 2,984,919.08 | 20,647,109.08 |
| 7/1/48 | 18,516,687.00 | 2,543,364.33 | 21,060,051.33 |
| 7/1/49 | 19,400,805.00 | 2,080,447.15 | 21,481,252.15 |
| 7/1/50 | 20,315,451.00 | 1,595,427.03 | 21,910,878.03 |
| 7/1/51 | 21,261,555.00 | 1,087,540.75 | 22,349,095.75 |
| 7/1/52 | 22,240,075.00 | 556,001.88 | 22,796,076.88 |

**EXHIBIT F**

SCHEDULE OF PREEMPTED STATUTES

I.   ~~Commonwealth good faith and credit pledge statutes~~Puerto Rico Highway and Transportation Authority Act

~~A.  General Obligation Bonds~~
~~1.   Act 2 approved October 10, 1985.~~
~~2.   Act 1 approved June 26, 1987, as amended.~~
~~3.   Act 34 approved March 4, 2014.~~
~~4.   Act 79 approved June 1, 2011.~~
~~5.   Act 243 approved August 9, 2008.~~
~~6.   Act 43 approved August 1, 2005, as amended.~~
~~7.   Act 216 approved August 19, 2004.~~
~~8.   Act 100 approved July 12, 2002, as amended.~~
~~9.   Act 161 approved July 5, 2003.~~
~~10. Act 149 approved August 9, 2002, as amended.~~
~~11. Joint Resolution No. 57 approved July 12, 1993.~~
~~12. Act 54 approved July 6, 2001.~~
~~13. Act 118 approved July 13, 2000.~~
~~14. Act 153 approved July 16, 1999.~~
~~15. Act 219 approved August 9, 1998.~~
~~16. Act 81 approved August 14, 1997.~~
~~17. Act 119 approved August 9, 1995.~~
~~18. Act 46 approved July 28, 1994.~~
~~19. Act 39 approved May 13, 1976, as amended.~~
~~20. Act 83 approved August 30, 1991.[2]~~

~~B.  General Obligation Loans~~
~~1.   GSA Police Helicopters Loan—Joint Resolution No. 99-2013 approved December 9, 2013.~~
~~2.   GDB Loans to the Commonwealth~~
~~1.   Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]~~
~~2.   Joint Resolution No. 96 approved November 27, 2013. [$30 million line of credit].~~

~~C.  Commonwealth Guaranty—Public Buildings Authority Bonds~~
1.   Act ~~17 approved April 11, 1968, as amended.~~74, approved on June 23, 1965:

---

~~[2] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.~~

2

D.  Commonwealth Guaranty – APLA
  1.  Act 409 approved September 22, 2004.

E.  Commonwealth Guaranty – PRIFA BANs
  1.  Act 1 approved January 1, 2015.

F.  [Commonwealth Guaranty – PRASA
  1.  Act 45 approved July 28, 1994.]

**II.  Statutes appropriating Commonwealth revenues**
  A.  HTA
    1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]
  a.  9 L.P.R.A. §§ 2004(f), (h), (j), (l), (m), (n), (q)

  b.  9 L.P.R.A. § 2004a(3)

  c.  [9 L.P.R.A. § 2006]

  d.  9 L.P.R.A. § 2008

  e.  [9 L.P.R.A. § 2010]

  f.  9 L.P.R.A. §§ 2012(a), (b), (d), (e), (g) (h)

  g.  9 L.P.R.A. §§ 2013(a), (b)

  h.  9 L.P.R.A. § 2019

  i.  9 L.P.R.A. § 2020

2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]Act 1, approved on January 15, 2015:

    3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
  B.  PRIFA
    1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
  C.  PRIFA BANs
    1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
  D.  MBA
    1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]

~~E.   PRITA~~
  ~~1.        13 L.P.R.A. § 31751(a)(5). [cigarette tax]~~
~~F.   CCDA~~
  ~~1.        13 L.P.R.A. § 2271v(a). [hotel room tax]~~
~~G.   Act 147 enacted June 18, 1980, as amended~~
  ~~1.        23 L.P.R.A. § 104.[3] [judiciary appropriation]~~
~~H.   UPR~~
  ~~1.        18 L.P.R.A. § 621-1.[4]~~
~~I.   Act 83 approved August 30, 1991, as amended[5]~~
  ~~1.        21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[6]~~

a.   9 L.P.R.A. § 2024

b.   9 L.P.R.A. §§ 2026(b), (c), (d)(first paragraph), (d)(1), (d)(2), (d)(6), (d)(7),
(d)(12), (d)(15)

c.   9 L.P.R.A. § 2027

d.   9 L.P.R.A. § 2030

e.   9 L.P.R.A. § 2032

f.   9 L.P.R.A. § 2035


II.   ~~J. Act 221 approved May 15, 1948, as amended~~**Uniform Rate Revision and
Modification Act**

  ~~1.        15 L.P.R.A. § 74(d).[7]~~
~~K.   Act 18 approved January 24, 2014, as amended~~
  ~~1.        21 L.P.R.A. § 6742.[8]~~
~~L.   Act 41 approved July 22, 2011, as amended~~
1.   ~~12 L.P.R.A. §8105~~Act 21, approved on May 31, 1985:

---

~~[3] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.~~
~~[4] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.~~
~~[5] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.~~
~~[6] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted.  In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.~~
~~[7] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.~~
~~[8] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.~~

III. TRS and JRS Statutes
  A.  Act 106 approved August 23, 2017
  B.  Act 160 approved December 24, 2013
  C.  Act 91 of March 24, 2004
  D.  Act 12 approved October 19, 1954
  E.  Act 162 approved December 24, 2013


IV. Article VI of the Puerto Rico Constitution
  A.  Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico
      Constitution to General Obligation bonds and Commonwealth-guaranteed bonds
      or indebtedness restructured pursuant to the Plan are Preempted by PROMESA is
      settled by the treatment of such bonds and indebtedness pursuant to the provisions
      of the Plan.  Nothing in the Plan affects or determines whether Article VI,
      Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future
      purpose.

  a.  27 L.P.R.A. § 261a

  b.  27 L.P.R.A. § 261b

  c.  27 L.P.R.A. § 261c

  d.  27 L.P.R.A. § 261d

# **EXHIBIT B**

HTA Disclosure Statement Redline

**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>                  Debtor. | PROMESA<br>Title III<br><br>No. 17 BK-3567-LTS<br><br>This disclosure statement relates only to HTA, and has been filed in lead Case No. 17 BK-3283-LTS and 17 BK-3567-LTS (HTA) |

**DISCLOSURE STATEMENT FOR THE**
**~~SECOND~~THIRD AMENDED TITLE III PLAN OF ADJUSTMENT**
**FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813 |

*Attorneys for the Financial Oversight and Management Board for Puerto Rico*
*as Representative for the Puerto Rico Highways and Transportation Authority*

Dated: June ~~7,~~17, 2022

---

For inquiries regarding this Disclosure Statement, contact the Solicitation Agent, Kroll Restructuring Administration LLC ("Kroll"):
**Telephone** (available 10:00 a.m. to 7:00 p.m. AST):  (844) 822-9231 (toll free for U.S. and Puerto Rico)
                                         (646) 486-7944 (for international callers)
**Email**: puertoricoballots@ra.kroll.com (reference "HTA Plan of Adjustment" in the subject line)
Please note that Kroll is not authorized to provide, and will not provide, legal advice.

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN OF ADJUSTMENT. VOTES MAY NOT BE SOLICITED UNTIL THE TITLE III COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

NO OTHER INFORMATION HAS BEEN JUDICIALLY APPROVED.

THE OVERSIGHT BOARD, AS HTA'S SOLE REPRESENTATIVE IN ITS TITLE III CASE PURSUANT TO PROMESA SECTION 315(b), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE HTA PLAN OR THE DEBTOR, OR THE VALUE OF THE DEBTOR'S PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER.[2] HOLDERS OF CLAIMS SHOULD UNDERSTAND THAT ANY INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF, OR OBTAIN AN ELECTION TO SETTLE CERTAIN CLAIMS PURSUANT TO, THE HTA PLAN HAVE NOT BEEN APPROVED BY THE TITLE III COURT. FURTHER, HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION DISTRIBUTED VIA SOCIAL MEDIA, INCLUDING, BUT NOT LIMITED TO, FACEBOOK, TWITTER, AND INSTAGRAM.

THE HTA PLAN IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AMONG THE OVERSIGHT BOARD (AS THE SOLE REPRESENTATIVE OF THE DEBTOR IN ITS TITLE III CASE), PARTIES TO THE PLAN SUPPORT AGREEMENTS (COLLECTIVELY, THE "SUPPORTING PARTIES"), AND OTHER PARTIES. THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES BELIEVE THE HTA PLAN REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF THE DEBTOR AND, THEREFORE, CONFIRMATION OF THE HTA PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES RECOMMEND THAT YOU VOTE TO ACCEPT THE HTA PLAN.

FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT WAS DRAFTED BY THE OVERSIGHT BOARD, AND SOME OF THE STATEMENTS HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS OR THE GOVERNMENT, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF THE DEBTOR AND CREDITORS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS

---

[2] Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the HTA Plan.

**DISCLOSURE STATEMENT ARE THE VIEWS OF THE OVERSIGHT BOARD AND THE DEBTOR ONLY, AND MAY NOT BE ATTRIBUTED TO ANY OF THE SUPPORTING PARTIES OR ANY OTHER PARTY.**

[*Remainder of Page Left Intentionally Blank*]

2

**IMPORTANT INFORMATION**

**OVERSIGHT BOARD AUTHORITY**. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT ("PROMESA") PROVIDES THAT THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "OVERSIGHT BOARD") MAY TAKE ANY ACTION NECESSARY TO PROSECUTE A CASE UNDER TITLE III OF PROMESA OF A DEBTOR, INCLUDING FILING A TITLE III PETITION, SUBMITTING A PLAN OF ADJUSTMENT FOR A DEBTOR, AND OTHERWISE GENERALLY SUBMITTING FILINGS IN RELATION TO THE TITLE III CASE. PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF A DEBTOR. PROMESA REQUIRES THAT THE PLAN OF ADJUSTMENT FOR A TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT.

**PURPOSE OF DISCLOSURE STATEMENT**. THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE ~~SECOND~~THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY (THE "HTA PLAN"). THE FUNCTION OF A DISCLOSURE STATEMENT IS TO PROVIDE A HYPOTHETICAL INVESTOR TYPICAL OF THE CLAIMHOLDERS IN THE CASE INFORMATION REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND CONDITIONS OF ITS BOOKS AND RECORDS TO ENABLE THE HYPOTHETICAL INVESTOR TO MAKE AN INFORMED JUDGMENT TO ACCEPT OR TO REJECT THE HTA PLAN.

**DEBTOR**. THIS DISCLOSURE STATEMENT ACCOMPANIES THE ~~SECOND~~THIRD AMENDED TITLE III PLAN OF ADJUSTMENT FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA" OR THE "DEBTOR").

**SOURCE OF DATA**. THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DOCUMENT. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF THE DEBTOR.

THE UNITED STATES GOVERNMENT CREATED THE OVERSIGHT BOARD ON JUNE 30, 2016. THE PRESIDENT OF THE UNITED STATES (THEN PRESIDENT BARACK OBAMA) APPOINTED THE OVERSIGHT BOARD'S SEVEN VOTING MEMBERS ON AUGUST 31, 2016. AT ITS INCEPTION, THE OVERSIGHT BOARD HAD NO INFORMATION OR DATABASE OF ITS OWN, BUT HAD THE LEGAL RIGHT TO PROCURE INFORMATION AND DATA FROM THE COMMONWEALTH AND ITS INSTRUMENTALITIES.

**ORIGIN OF FINANCIAL INFORMATION.** ALL FINANCIAL INFORMATION IN THIS DOCUMENT IS BASED ON DATA THE OVERSIGHT BOARD HAS EITHER RECEIVED FROM HTA AND THE COMMONWEALTH, OR THAT IS PUBLICLY AVAILABLE. AS OF THE DATE OF THIS DISCLOSURE STATEMENT, THE MOST RECENT PUBLISHED AUDITED FINANCIAL STATEMENTS FOR HTA IS FOR THE 2021 FISCAL YEAR ("FY"). ACCORDINGLY, WHILE THE OVERSIGHT BOARD HAS USED ITS BEST EFFORTS TO PROCURE ACCURATE AND COMPLETE INFORMATION, IT IS LIMITED TO USING HTA'S AND THE COMMONWEALTH'S SYSTEMS AND DATA AS ITS SOURCES AND CANNOT INDEPENDENTLY VOUCH FOR THE CORRECTNESS OF SUCH DATA. THIS DISCLOSURE STATEMENT AND THE ECONOMIC AND FINANCIAL INFORMATION PROVIDED HEREIN HAVE NOT BEEN APPROVED BY HTA'S FISCAL AGENT, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY ("AAFAF").[3]

**COURT REVIEW.** THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO (THE "TITLE III COURT") HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b)[4] AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON, OR ELECTION OF THE FORM OF DISTRIBUTION TO BE RECEIVED UNDER, THE HTA PLAN. THE TITLE III COURT HAS NOT, HOWEVER, DETERMINED THE CORRECTNESS OR COMPLETENESS OF ANY INFORMATION HEREIN.

**VOTE AFTER CONSIDERING RISK FACTORS.** ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE HTA PLAN, OR MAKE AN ELECTION, ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT, AND THE ATTACHED HTA PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE HTA PLAN OR MAKING AN ELECTION. SEE SECTION VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

**FORWARD LOOKING STATEMENTS.** THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "SHOULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE

---

[3]   The Government of Puerto Rico, and its agencies and instrumentalities (including AAFAF), have not independently verified or approved the information contained or the statements made in this Disclosure Statement.

[4]   All provisions of Title 11 of the United States Code (the "Bankruptcy Code") referenced herein are made applicable to these Title III cases by PROMESA section 301(a).

4

STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE HTA PLAN, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND THE DEBTOR'S FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES.   WHILE THESE STATEMENTS REPRESENT THE DEBTOR'S CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE DEBTOR BELIEVES THESE JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND THE DEBTOR'S ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE HTA PLAN, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED.   THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW.   ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTOR CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM THE DEBTOR'S EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION VIII, "CERTAIN RISK FACTORS TO BE CONSIDERED."   THE DEBTOR URGES HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

**FACTS CAN CHANGE.**   THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED.   HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH IN THIS DOCUMENT ARE UNCHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE.   EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON, OR MAKE AN ELECTION WITH RESPECT TO, THE HTA PLAN MUST RELY ON ITS OWN EVALUATION OF THE DEBTOR AND ITS OWN ANALYSIS OF THE TERMS OF THE HTA PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT, OR MAKE AN ELECTION PURSUANT TO, THE HTA PLAN.

**PLAN SUPPLEMENT.**  A PLAN SUPPLEMENT CONTAINING DRAFT OR FINAL VERSIONS OF PRIMARY DOCUMENTS REQUIRED TO CONSUMMATE

THE TRANSACTIONS CONTEMPLATED BY THE HTA PLAN WILL BE FILED WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE,[5] OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES.  THE PLAN SUPPLEMENT SHALL BE DEEMED INCORPORATED INTO AND PART OF THE HTA PLAN AS IF SET FORTH THEREIN IN FULL.

**DISCLOSURE STATEMENT IS SOLELY FOR VOTING AND/OR ELECTIONS.**  THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT, OR ELECT THE FORM OF DISTRIBUTION PURSUANT TO, THE HTA PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE.  THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE HTA PLAN.

**JUDICIAL APPROVAL DOES NOT MEAN ALL FACTS ARE CORRECT.**  THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.[6]  FURTHER, THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE TITLE III COURT'S DETERMINATION THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AND DOES NOT MEAN THE COURT WILL CONFIRM THE HTA PLAN.  THE TITLE III COURT HAS SCHEDULED A HEARING ~~BEGINNING ON [_____], 2022~~ON AUGUST 17 TO 18, 2022 AT 9:30 A.M. (ATLANTIC STANDARD TIME) TO CONSIDER CONFIRMATION OF THE HTA PLAN UNDER PROMESA AND THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO THE TITLE III ~~CASES~~CASE PURSUANT TO PROMESA SECTIONS 301 AND 314.

**NO GOVERNMENTAL APPROVAL.**  NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS

---

[5]   The "Voting Deadline" is defined as ~~[_____]~~5:00 p.m. (Atlantic Standard Time) on ~~[_____]~~July 27, 2022, unless such time is extended.

[6]   For the avoidance of doubt, the use of the term "clawback" in this Disclosure Statement shall not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver in current or future litigation regarding monies historically conditionally appropriated by the Commonwealth to certain Commonwealth instrumentalities.

CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

UNREGISTERED SECURITIES.  NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE HTA PLAN WILL HAVE BEEN REGISTERED WITH THE SECURITIES & EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

CONSEQUENCES OF HOLDING SECURITIES ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT.  THE DEBTOR RECOMMENDS POTENTIAL RECIPIENTS OF NEW HTA BONDS TO BE ISSUED PURSUANT TO THE HTA PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

TAX CONSIDERATIONS.  THE TAX CONSEQUENCES OF THE HTA PLAN TO HOLDERS OF CLAIMS ARE COMPLEX, AND DEPEND IN PART ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE HTA PLAN IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

PLAN OF ADJUSTMENT CONTROLS OVER THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE HTA PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO THE DEBTOR.  THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE.  NO OTHER PARTY, INCLUDING ANY PARTY TO A PLAN SUPPORT AGREEMENT, MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN.  IF THERE IS ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE HTA PLAN OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE HTA PLAN, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

PLAN OF ADJUSTMENT MAY BE AMENDED.  THE OVERSIGHT BOARD RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE HTA

**PLAN AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENTS, THE HTA PLAN, AND PROMESA TITLE III.**

## Table of Contents

| | | | Page |
|---|---|---|---|
| I. | Preface | | 1 |
| II. | Introduction | | 17 |
| | A. | PROMESA Title III Plan of Adjustment: An Overview | 19 |
| | B. | Summary of Key Components of the HTA Plan of Adjustment | 20 |
| | C. | Holders of Claims Entitled to Vote on the Plan of Adjustment | 34 |
| | D. | Solicitation and Voting Procedures | 36 |
| | E. | Confirmation Hearing and Deadline for Objections to Confirmation | 36 |
| | F. | Summary of Release, Exculpation, and Injunction Provisions Contained in the HTA Plan | 37 |
| III. | Overview of HTA | | 43 |
| | A. | General Information | 43 |
| | B. | HTA's Financial Obligations as of HTA Petition Date | 45 |
| | C. | HTA's Revenue Regime | 48 |
| | D. | HTA's Cash Management System | 54 |
| | E. | HTA Cash Accounts | 57 |
| IV. | Significant Events Leading to Commencement of HTA's Title III Case | | 65 |
| | A. | The Commonwealth and HTA's Steady Operational and Financial Decline | 65 |
| | B. | Legislation Enacted by the Commonwealth and Executive Orders Issued by the Governor to Address the Fiscal and Debt Crisis | 68 |
| | C. | PROMESA | 74 |
| | D. | Adoption of HTA Fiscal Year Budgets and Fiscal Plan | 85 |
| | E. | Negotiations with Creditors | 99 |
| V. | Overview of the Debtor's Title III Cases | | 101 |
| | A. | Commencement of HTA's Title III Case | 101 |
| | B. | Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes, COVID-19, Tropical Cyclone 9, Tropical Storm Laura, and Hurricane Isaias, and the Oversight Board's Response | 102 |
| | C. | Claims Process and Bar Date | 113 |
| | D. | Rejection or Assumption of Unexpired Leases of Nonresidential Property | 116 |
| | E. | Title III Stay Matters | 117 |

ix

| | | | |
|---|---|---|---|
| | F. | Significant Adversary Proceedings and Contested Matters | 124 |
| | G. | Oversight Board's Investigation of Potential Causes of Action | 169 |
| | H. | The Stay Order and Mediation Team Reports | 180 |
| | I. | Related Debt Restructurings | 182 |
| VI. | | HTA Title III Plan of Adjustment | 200 |
| | A. | General | 200 |
| | B. | Overview of the Plan of Adjustment | 201 |
| | C. | Compromise and Settlement of Disputes / Restructuring of Entities | 202 |
| | D. | Provisions for Payment of Administrative Expense Claims | 205 |
| | E. | Classification and Treatment of Claims | 208 |
| | F. | Provisions Regarding the Secured Obligations and Additional Indebtedness | 221 |
| | G. | Provisions Regarding Assured Insured Bonds, National Insured Bonds, Ambac Insured Bonds, and FGIC Insured Bonds | 237 |
| | H. | Treatment of Executory Contracts and Unexpired Leases | 249 |
| | I. | Provisions Governing Distributions | 252 |
| | J. | Prosecution and Extinguishment of Claims Held by the Debtor | 259 |
| | K. | Acceptance or Rejection of the HTA Plan, Effect of Rejection by One or More Classes of Claims | 259 |
| | L. | Rights and Powers of Disbursing Agent | 259 |
| | M. | Procedures for Treatment of Disputed Claims and Claims Subject to ACR Procedures | 260 |
| | N. | Conditions Precedent to Confirmation of the HTA Plan | 263 |
| | O. | Conditions Precedent to the HTA Effective Date | 264 |
| | P. | Modification, Revocation, or Withdrawal of the HTA Plan | 268 |
| | Q. | Corporate Governance and Management of Reorganized HTA | 269 |
| | R. | Provisions Regarding Oversight Board and Compliance with PROMESA | 270 |
| | S. | Provisions Regarding Creditors' Committee | 270 |
| | T. | Retention of Jurisdiction | 271 |
| | U. | Miscellaneous Provisions | 273 |
| VII. | | Confirmation of the Plan of Adjustment | 287 |
| | A. | Confirmation Hearing | 287 |
| | B. | Deadlines to Object to Confirmation | 287 |

| | | | |
|---|---|---|---|
| | C. | Requirements for Confirmation of the Plan of Adjustment | 287 |
| VIII. | | Certain Risk Factors to Be Considered | 292 |
| | A. | Risks Related to the Title III Cases | 292 |
| | B. | Risks Related to HTA | 295 |
| | C. | Risks Related to New HTA Bonds | 297 |
| | D. | Risks Related to Assured Election | 300 |
| | E. | Risks Related to the Assured Bondholder Elections | 300 |
| | F. | Risks Related to the Election of National Commutation Treatment | 305 |
| | G. | Risks Related to the National Non-Commutation Treatment | 305 |
| | H. | Risks Related to Making or Declining to Make the National Commutation Election | 306 |
| | I. | Risks Related to the National Certificates | 307 |
| | J. | Risks Related to the National Escrow Account | 309 |
| | K. | Risks Related to Revenues and Expenses in the HTA Fiscal Plan | 309 |
| | L. | Risks Related to Collection of Revenues Supporting Payment of New HTA Bonds | 316 |
| | M. | Risk Factors Related to Future Judicial Actions | 317 |
| | N. | Risk Factors Related to Tax Treatment of New HTA Bonds | 319 |
| IX. | | Certain Material United States Federal Income Tax Considerations | 321 |
| | A. | General | 321 |
| | B. | U.S. Holders | 322 |
| | C. | Puerto Rico Individuals and Puerto Rico Corporations | 333 |
| | D. | Non-U.S. Holders | 335 |
| X. | | Certain Material Puerto Rico Income Tax Considerations | 338 |
| | A. | General | 338 |
| | B. | P.R. Holders | 338 |
| | C. | Non-P.R. Holders | 343 |
| XI. | | Applicability of Certain Federal and State Securities Laws | 345 |
| | A. | New HTA Bonds | 345 |
| XII. | | Financial Information and Projections | 347 |
| | A. | Historical Financial Reporting | 347 |
| | B. | HTA Fiscal Plan and Projections | 348 |
| XIII. | | Additional Information | 350 |

XIV.   Conclusion ............................................................................................................ 350

**Table of Exhibits**

**Exhibit A** – ~~Second~~Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority (the "HTA Plan")

**Exhibit B** – Plan Support Agreement, dated as of May 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation (the "HTA/CCDA PSA")

**Exhibit C** – Stipulation in Connection with DRA Related Disputes, dated November 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Highways and Transportation Authority, AmeriNational Community Services, LLC, and Cantor-Katz Collateral Monitor LLC

**Exhibit D** – Certified Puerto Rico Highways and Transportation Authority Fiscal Plan

**Exhibit E** – Certified Puerto Rico Highways and Transportation Authority Budget

**Exhibit F** – Schedule of HTA Bonds

**Exhibit G** – List of Puerto Rico Highways and Transportation Authority's Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2021

**Exhibit H** – Latest Audited Financial Statements for Puerto Rico Highways and Transportation Authority

**Exhibit I** – Illustrative Charts of Bond Recovery Distributions

**Exhibit J** – Best Interests Test Report

2" = "1" "2621/33260-009 CURRENT/127656480v7
04/30/2022 3:29 PM" ""

THE FOLLOWING STATEMENTS IN THESE SECTIONS I AND II ARE
QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION
CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE
HTA PLAN, AND THE EXHIBITS TO EACH.

## I.    Preface[7]

*The Commonwealth and HTA's Economic Decline.*   Over the last several decades, a multitude of factors contributed to the steep economic downturn of the Commonwealth of Puerto Rico (the "Commonwealth"), including a contracting economy, population decline, and changes in tax status and available credits under the U.S. tax code.  From the early 2000's through 2016, Puerto Rico's public debt rose rapidly—in part from borrowing to cover deficits, including to pay debt service—and the outlook for Puerto Rico's economy continued declining.

By 2016, Puerto Rico was "in the midst of a fiscal crisis."[8]  The Commonwealth was "being crushed under the weight of a public debt that [was] larger" than its gross national product ("GNP"), "it ha[d] started to default on its debt obligations," and it had lost access to external financing.[9]  The Commonwealth had over $120 billion in combined debt and unfunded pension liabilities.  Even worse, these calamitous financial circumstances threatened a humanitarian crisis for the over 3 million U.S. citizens living on the island of Puerto Rico.  As the United States Secretary of the Treasury observed, the Commonwealth's ability to provide "basic healthcare, legal, and education services" was in serious doubt.[10]

The Puerto Rico Highways and Transportation Authority ("HTA") is a public corporation and covered territorial instrumentality of the Commonwealth created in 1965 under Act No. 74 of June 23, 1965 (known as the "Puerto Rico Highway and Transportation Authority Act") to design, construct, and administer Puerto Rico's toll roads.  HTA is also responsible for the construction of roads, highways, and related transportation facilities in Puerto Rico.  HTA's powers and duties are executed by its Executive Director and Board of Directors in coordination with the Secretary of Puerto Rico's Department of Transportation and Public Works ("DTOP", by its Spanish acronym).  HTA is a key stakeholder in Puerto Rico's transportation sector, due to HTA's management, operation, and maintenance over a majority of the Commonwealth's transportation system.  As such, HTA has critical influence in determining the current and future state of the transportation sector of Puerto Rico.

The Commonwealth's negative fiscal and economic outlook directly impacted HTA.  As a government instrumentality of the Commonwealth, HTA has historically received significant fiscal financial support from the Commonwealth due to HTA's role in the construction of roads,

---

[7]   Capitalized terms used not otherwise defined have the meaning given to such term in the HTA Plan (as defined below).

[8]   *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 136 S. Ct. 1938, 1942 (2016).

[9]   *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016); H.R. Rep. No. 114-602, at 40 (2016).

[10]   Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives (Jan. 15, 2016),
https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

highways, and related transportation projects and systems in Puerto Rico. HTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and fiscal emergency. This has resulted in a lack of HTA's ability to provide Puerto Rico citizens with effective transportation services, with Puerto Rico's roads and highways continuing to lag behind national standards for quality, safety, and reliability due to significant lack of funding.

As further described in this Disclosure Statement, HTA issued various series of bonds to continue its highway construction program and refinance its obligations. However, in 2010, it stopped issuing bonds, relying instead on the Government Development Bank ("GDB") for liquidity and fiscal management support. The entity repeatedly drew on its lines of credit with GDB to fund its operational, working capital, and construction needs as well as ongoing deficits. Between 2008 and 2012, HTA borrowed over $2 billion dollars from GDB to finance various infrastructure projects and other related operational expenses. The outstanding balance of these credit lines as of June 30, 2015, amounted to $1.8 billion, which subsequently expired in January 2016 and have remained in default. As of June 30, 2021, the outstanding principal of these credit lines due to the Debt Recovery Authority (the successor-in-interest to these loans following GDB's restructuring pursuant to PROMESA Title VI) amounted to approximately $1.7 billion, plus accrued interest of $0.9 billion.

On December 1, 2015, the Governor also issued Executive Order 2015-046 which directed the Puerto Rico Department of Treasury to retain certain conditionally appropriated revenues (collectively, the "Conditionally Appropriated Revenues") from HTA, including motor vehicle license fees as well as Commonwealth excise taxes on gasoline, oil, petroleum products, and cigarettes. The Government subsequently enacted legislation including the Moratorium Act (Act 21-2016, as amended) and the Puerto Rico Fiscal Responsibility and Financial Emergency Act (Act 5-2017, as amended), and a series of related executive orders, which among other things, suspended the obligation of the Commonwealth to transfer the Conditionally Appropriated Revenues to HTA.

**Enactment of PROMESA.** On June 30, 2016, the President signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*, to work toward a remedy to the ongoing fiscal and humanitarian crisis in Puerto Rico. The goal of PROMESA is to meet Puerto Rico's immediate need to provide its citizens effective services, to formulate a debt restructuring, and to implement fiscal reform leading to a sustainable economy, fiscal responsibility, and market access.

**Main Components of PROMESA.** PROMESA establishes two primary mechanisms for restoring fiscal responsibility. First, Titles I, II, IV, and V of PROMESA create the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and provide it powers and duties governing the review and certification of multi-year fiscal plans, annual budgets, and infrastructure revitalization, and fast-tracking key infrastructure projects. Second, Titles III and VI of PROMESA provide for debt restructurings, similar to bankruptcy cases and out-of-court restructurings, respectively, for Puerto Rico and its instrumentalities.[11] By incorporating many provisions of Title 11 of the United States Code (the "Bankruptcy Code") into Title III of

---

[11]   48 U.S.C. § 2161.

PROMESA, which provides for restructurings similar to restructurings under chapters 9 and 11 of the Bankruptcy Code, the statute also protects the debtors from creditor debt-enforcement actions[12] that otherwise could extract billions of dollars from the Commonwealth and inflict irreparable damage on Puerto Rico's economy. The statute includes unique attributes, such as an automatic stay triggered once the bill was signed into law. The Oversight Board is the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a plan of adjustment. PROMESA Title VI provides an alternate, out-of-court restructuring process conditioned on voting thresholds.

*Historic Problems Leading to Oversight Board.* To overcome decades of severe economic decline, operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing,[13] PROMESA established an independent entity within Puerto Rico's government—the Oversight Board.[14] The Oversight Board is "an entity within the territorial government," rather than a "department, agency, establishment, or instrumentality of the Federal Government."[15] The Oversight Board is statutorily charged with restoring to the Commonwealth fiscal responsibility and market access.[16] To achieve success in carrying out its statutory mission, the Oversight Board is granted authority to oversee the restructuring of the Commonwealth's and its instrumentalities' debt and to require fiscal reforms. Elements of this authority have been challenged,[17] but have been confirmed by the United States District Court for the District of Puerto Rico (the "Title III Court"), the United States Court of Appeals for the First Circuit (the "First Circuit"), and the United States Supreme Court (the "Supreme Court").[18]

*Oversight Board's Initial Actions to Fulfill PROMESA's Mandate.* On August 31, 2016, President Obama appointed the seven voting members of the Oversight Board, who under PROMESA serve with no compensation, but are entitled to reimbursement of reasonable and necessary expenses incurred by reason of their service.[19] When appointed, the Oversight Board had no staff, no office, and no data. It commenced assembling the facilities and expertise it needed to carry out its statutory functions.

On September 30, 2016, the Oversight Board (i) announced a process for the development, submission, approval, and certification of fiscal plans for the Commonwealth and for covered territorial instrumentalities, including HTA, (ii) designated an initial group of 63 entities as covered entities under PROMESA,[20] (iii) requested a significant amount of financial and budgetary information from the Governor as a first step to develop improvements to the Government's fiscal governance, accountability, internal controls, and financial affairs, and (iv)

---

[12]  11 U.S.C. § 362(a) (incorporated into the Title III case by 48 U.S.C. § 2161(a)).

[13]  PROMESA § 405(m)(1).

[14]  48 U.S.C. § 2121(b)(1).

[15]  *Id.* § 2121(c); *see also* 48 U.S.C. § 2194(i)(2) (defining the term "Government of Puerto Rico" to include the Oversight Board for purposes of that section); 48 U.S.C. § 2127(b) (providing that the Oversight Board is funded exclusively by the territorial government of Puerto Rico).

[16]  PROMESA § 101(a).

[17]  The summaries of court filings in this Disclosure Statement are fully qualified by the corresponding publicly filed documents.

[18]  For summaries of relevant litigation challenging the Oversight Board's powers, *see* Section V.F.5 of this Disclosure Statement.

[19]  PROMESA § 101(g).

[20]  On May 9, 2019, the Oversight Board also designated 78 municipalities as covered entities.

began the critical projects process authorized under Title V of PROMESA by developing selection criteria and processes for expediting certain critical energy and infrastructure projects. Furthermore, the Oversight Board commenced meetings with representatives of multiple groups of creditors, including HTA bondholders and insurers, and many others.

***Commencement of Commonwealth and HTA Title III Cases.***  When PROMESA was enacted, it imposed a temporary automatic stay protecting the Commonwealth and its instrumentalities from creditor actions to enforce debt against them until May 1, 2017.[21]  Upon the expiration of the PROMESA stay, the Oversight Board commenced Title III cases for the Commonwealth on May 3, 2017, for the Puerto Rico Sales Tax Financing Corporation ("COFINA") on May 5, 2017, and for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") and Puerto Rico Electric Power Authority ("PREPA") on July 2, 2017.  On September 27, 2019, the Oversight Board also commenced a Title III case for the Puerto Rico Public Buildings Authority ("PBA").

Similarly, with HTA, after the Oversight Board engaged in extensive discussions and deliberations with HTA, the Oversight Board determined a voluntary petition under Title III for HTA should be filed because it was both in the best interests of HTA's creditors, and necessary and appropriate to protect the residents of Puerto Rico.  On May 21, 2017, the Oversight Board issued restructuring certifications for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA.  The commencement of Title III cases triggered the automatic stay pursuant to Bankruptcy Code section 362, thereby providing those entities continued protection from enforcement actions for the duration of their Title III cases.[22]

Between June 1, 2017 and October 9, 2019, the Title III Court entered certain orders that collectively granted the joint administration of the Title III cases for the Commonwealth, COFINA, HTA, ERS, PREPA, and PBA (collectively, the "Joint Administration Orders").[23]

***A New Landscape – Hurricanes Irma and Maria.***  In September 2017, the difficulty of improving Puerto Rico's financial status worsened as Puerto Rico was devastated by Hurricanes Irma and Maria.  The hurricanes destroyed much of Puerto Rico's infrastructure and upended the daily lives of all Puerto Ricans and the work of the Oversight Board.

Immediately after the hurricanes struck, the Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses.  Through several meetings, letters, Congressional testimony, and other interactions with the Federal Government and authorities in Puerto Rico, the Oversight Board actively advocated for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity.

---

[21]   PROMESA §§ 5(11), 405(b).  The PROMESA stay was initially set to expire on February 15, 2017 but the Oversight Board extended the stay by seventy-five (75) days as permitted under PROMESA section 405(d)(1)(B).

[22]   PROMESA § 301(a).

[23]   Case No. 17-3283, ECF Nos. 242, 537, 1417, and 8829.  ECF numbers cited in the Disclosure Statement refer to Lead Case No. 17-03283 (the Commonwealth Title III Case) except as otherwise indicated.

Hurricanes Irma and Maria tore through Puerto Rico's transportation infrastructure, leaving Puerto Rico's highways and other transportation systems with unprecedented damage. As a result of the substantial amount of damage, Puerto Rico was required to submit 1,175 Detailed Damage Inspection Reports ("DDIRs").  DDIRs are forms which are required to be submitted to the FWHA for evaluation of whether an event qualifies as an emergency relief disaster, estimates for those qualified as disaster damages, and an outline of the scope of the proposed work for restoration.

In addition to the damage to HTA's transportation systems infrastructure, HTA's operating revenues also declined as a direct result of the hurricanes' combined destruction. HTA's operating revenues consist primarily of toll fares, toll fines and transit fares.  Due to the hurricanes' effects on HTA's tolling system, Puerto Rico was forced to suspend fine collection, which was already a pre-existing problem for Puerto Rico due to pre-existing collection system deficiencies.  During FY2021-FY2022, toll fare receipts returned to pre-disaster levels, however toll fine receipts were still lagging behind pre-disaster levels due to fines being set to $0 in FY2020 and FY2021 and not being restored until FY2022 (July 2021).  Through the first half of FY2022 (December 2021), HTA collected $20.5 million in toll fines, which is significantly more than the budget for that period ($8.1 million).  This positive increase was driven by higher than expected violation rates as well as higher collection rates after fines were restored.  Ridership traffic on Tren Urbano fell by almost 30% after the hurricanes[24] and has yet to recover to pre-hurricane ridership levels.  As of June 2021, Tren Urbano ridership was still 78% below pre-hurricane levels, mainly attributable to the COVID-19 pandemic.

As of December 16, 2021, approximately sixty percent (60%) of the emergency funds for repairs related to Hurricanes Irma and Maria have been disbursed.  Over FY2022-FY2026, the delivery of the emergency repairs program must be accelerated.  The improvements that have not yet been completed by HTA include a modular bridge installation, landslide repairs, bridge scouring repairs, safety device installation, and other highway reconstruction projects.  Proposals have been submitted for the first permanent repair projects associated with signage, safety, and lighting improvements.

***Earthquakes and Aftershocks.***  On January 7, 2020, an earthquake with a magnitude of 6.4 caused significant damage throughout Puerto Rico's south and southwestern region, prompting the closure of segments of roads, including short segments of two major roads: PR-52 (km 106 in Ponce), PR-2 (km 218 at Peñuelas and km 153.9 at Mayaguez).  This earthquake came after a series of earthquakes starting in December 2019.   As a result, the Federal Government classified several municipalities as major disaster areas.[25]   In response to these earthquakes, the Oversight Board authorized the use of Emergency Reserve Funds, setting aside $260 million in reserves.  Additionally, President Trump signed a major disaster declaration authorizing Individual Assistance and Public Assistance for impacted Municipalities and Hazard Mitigation Commonwealth-wide, enabling a range of federal assistance under the Stafford Act.

---

[24]   HTA Tren Urbano Ridership Data, comparing 12 months before Hurricane Maria with 12 months after Tren Urbano operation was restored.

[25]   The municipalities of Ponce, Guanica, Guayanilla, Yauco, Utuado, Penuelas, Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San German, San Sebastian, and Villalba were declared as major disaster areas as a result of the January 7, 2020 earthquakes.

The declaration authorizes disaster assistance funding to supplement Commonwealth and local government recovery efforts in the aftermath of the earthquakes.

***COVID-19 Impact and Response.***  On March 11, 2020, the World Health Organization declared the Coronavirus Disease 2019 ("COVlD-19") a global pandemic.  As a result of the health threat and to contain the virus spread across Puerto Rico, then-Governor Vázquez-Garced issued an executive order on March 12, 2020, declaring a state of emergency in Puerto Rico to concentrate all efforts and implement necessary measures to safeguard the health, well-being, and public safety of the citizens of Puerto Rico.  As a result of the lock-down protections put in place to contain the virus, HTA's operations and financial performance drastically declined.  The lock down protections had a direct, negative affect on HTA's monthly toll transactions, vehicle traffic, and capital project delivery.

HTA experienced a major decline in toll transactions due to the COVID-19 pandemic, which ultimately resulted in a decrease in HTA's revenue because HTA's operating revenues consist primarily of toll fares, toll fines, and transit fares.  HTA's four toll roads experienced a forty-five percent (45%) decline in the number of monthly toll transactions, dropping from 10.3 million per month[26] on average in toll transactions prior to COVID-19, to an average of 5.6 million per month[27] during the height of the pandemic.  Nonetheless, during FY2021 and FY2022, monthly toll transactions have hovered around pre-COVID levels, reaching a monthly average of 9.8 million toll transactions for FY2021[28] and an average of 10.7 million toll transactions recorded for FY2022 through December 2021.

Unlike toll transactions, transit demand has shown few signs of improvement, as the average monthly Tren Urbano revenues remain below their pre-COVID levels at approximately sixty-four percent (64%) for FY2021 and fifty two percent (52%) for the first half of FY2022.[29] Stagnant transit demand has been exacerbated by operational inefficiencies in HTA's transit system (*e.g.*, nonoperational turnstiles, outdated IT systems) that have led to reduced public accessibility and attractiveness of facilities, and a lower quality of service.

The COVID-19 pandemic has also caused significant delays in construction project schedules, leaving HTA unable to achieve its target Key Performance Indicator ("KPI") for project duration.  As of March 31, 2020, HTA complied with the KPI target set by HTA's Memorandum of Understanding ("MOU")  with the Federal Highway Administration ("FHWA").[30]  However, as a result of the COVID-19 pandemic, the projected duration on the

---

[26]   Average monthly transactions for the six-month period from September 2019 through February 2020 (prior to COVID-19).

[27]   Average monthly transactions for the three-month period from March 2020 through May 2020 (COVID-19 shutdowns).

[28]   Average monthly transactions for the twelve-month period from July 2020 through June 2021 (post-lockdown period).

[29]   When comparing the six-month period from September 2019 through February 2020 (*i.e.*, a period prior to the C OVID-19 pandemic) against the six-month period from January 2021 through June 2021 – the last six months for FY2021 (*i.e.*, the post-lockdown period) and the six-month period from July 2021 through December 2021 for FY2022 (*i.e.*, the most recent six-month period).

[30]   KPIs as established within HTA's MOU with the FHWA set the target for change in duration (program level) to be acceptable at less than 25%.  As of March 31, 2020, post-María repair projects presented a 22.8% increase in project duration.

post-hurricane repair projects has been noted to increase to 64.3%,[31] which does not meet the "on-time" delivery target set forth in HTA's MOU with the FHWA. The significant increase is largely attributable to fifty-six days of lockdown, which required protective measures and labor limitations on contracts and resulted in extensions and projected additional delays.

To help combat the economic effects of the COVID-19 lockdown procedures, the Governor's executive order authorized the Commonwealth's Secretary of the Treasury and the Director of the Office of Management and Budget of the Commonwealth ("OMB") to set up a special budget, from any available funds, including the Emergency Reserve, to cover all necessary costs for the containment of COVID-19 throughout Puerto Rico and sharing information with municipalities.

Federal and local government funds were provided to individuals, families, businesses, nonprofits, and other organizations across the United States, including Puerto Rico. On March 3, 2020, the Oversight Board made an initial $5 million of Emergency Reserve Funds available to the Government to contain and mitigate COVID-19. On March 13, 2020, the Oversight Board made the remainder of the $260 million of Emergency Reserve Funds available to respond to the pandemic. On March 23, 2020, the Government and the Oversight Board agreed to provide $787 million in financial support (Emergency Measures Support Package) to those on the front line of the COVID-19 pandemic and those most affected by the emergency measures that have resulted. HTA attempted to mitigate the effects of COVID-19 on HTA's own transit operations by implementing standard operating procedures ("SOP's") during the lockdown. HTA established procedures for payment to critical contractors, suppliers, and consultants working with HTA and on HTA roadways during the lockdown, and upon the resumption of construction and other field operations. HTA prioritized payment for already completed work to mitigate lasting economic effects and to provide contractors more financial security and stability during the lockdown. HTA created SOP's to maintain compliance with protocols and alignment of resources to manage the federal reimbursement process remotely. HTA also implemented remote procedures for documentation required when partial field operations resume, including requests for information, change orders, and extra work orders. HTA also authorized the utilization of accepting electronic documents instead of only accepting signed, physical copies.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act, Public Law No. 116-136 (the "CARES Act"), was signed into law by President Donald J. Trump. The CARES Act created the Coronavirus Relief Fund ("CRF"), which provided $150 billion in general assistance for domestic governments. $2.2 billion of relief was directed to Puerto Rico via the CRF. The deadline for spending CRF funds was initially December 30, 2020, but was extended through December 31, 2021, by the Consolidated Appropriations Act, 2021, Public Law No. 116-260, which was signed into law on December 27, 2020. In addition to the extension, the Act also combines $900 billion in stimulus relief for the COVID-19 pandemic in the United States with a $1.4 trillion omnibus spending bill for the 2021 federal fiscal year. Of the approximately $900 billion of stimulus relief, Puerto Rico is estimated to receive $7 billion. On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021 ("ARP"). ARP provides $1.9 trillion nationally in funding, program changes and tax policies aimed at mitigating the continuing effects of the pandemic. ARP provided a further $350 billion

---

[31]   As reported in HTA's B2A reporting for the month ended June 30, 2021.

in aid to state and local governments, of which Puerto Rico (including municipalities) is to receive $4 billion.

With regard to the above emergency federal acts, HTA has benefited from the emergency appropriations from the Federal Transit Administration ("FTA") and the FHWA. More specifically, within the Consolidated Appropriations Act of 2021, the FHWA appropriated an amount of approximately $35 million to the Puerto Rico Highway Program.

*New Federal Funding.* On November 11, 2021 President Biden signed into law the $1.2 trillion Infrastructure Investment and Jobs Act (the "IIJA") which had a dual purpose of (1) providing funding extensions and increases for FY2022 through FY2026 for many Fixing America's Surface Transportation Act (the "FAST Act") programs and (2) creating new funding programs and appropriations addressing surface transportation, aviation, water, climate and broadband. The IIJA provides over $550 billion in new spending over five years. HTA will benefit from increases to existing federal funding sources (like the Puerto Rico Highway Program) and new programs, like the Bridge Replacement, Rehabilitation, Preservation, Protection, and Construction Program. Puerto Rico is eligible to receive approximately $2.5 billion in formula grants between FY2022 and FY2026 and is eligible to compete for a share of approximately $380 billion in discretionary programs. HTA specifically is expected to be eligible for up to $300-400 million in incremental formula funding from IIJA across FY2022-2026 (highway, transit, and bridges—assuming HTA were to expand its capital program such that capital expenditures equaled available formula funding).

*First HTA Certified Fiscal Plan.* To fulfill its mission of achieving fiscal responsibility and market access, since 2016, the Oversight Board has worked closely with AAFAF, HTA, and its advisors, to develop and implement fiscal plans and budgets for HTA consistent with the requirements of PROMESA. The Oversight Board, alongside its advisors, spent hundreds of hours in research and working sessions understanding HTA's current situation, including HTA's interactions with the Commonwealth and the Federal Government. The Oversight Board also analyzed potential opportunities to improve HTA's financial and operating performance, informed by best practices, external data sources, and internal data sources provided by HTA.

In November 2016, the Oversight Board announced HTA would be required to develop and certify its own fiscal plan. The Government submitted its first proposed fiscal plan for HTA on February 21, 2017. After incorporating additional revisions and public commentary, the Oversight Board certified the first HTA fiscal plan on April 28, 2017 (the "April 2017 HTA Fiscal Plan"). The certified HTA fiscal plan was based on the Government's proposed fiscal plan with six amendments added by the Oversight Board. Subsequent fiscal plans have been certified annually for HTA and are described in more detail below.

*New Fiscal Plans.* Following Hurricanes Irma and Maria in September 2017, the Oversight Board sought to re-certify the April 2017 HTA Fiscal Plan to account for the fundamental effects of the hurricanes on Puerto Rico. On April 20, 2018, the Oversight Board voted to certify the HTA fiscal plan (the "April 2018 HTA Fiscal Plan"), which was to provide a roadmap for transforming the highway and transit infrastructure systems all across Puerto Rico to catalyze economic growth and combat the effects of the hurricane destruction. The revised HTA fiscal plan projected a total six (6)-year post-measures surplus of $355 million, based on several

changes, including updated pre-measures financial information, toll increases, and personnel cost reductions on a level consistent with the rest of the Commonwealth.

In June 2018, the Oversight Board announced that the April 2018 HTA Fiscal Plan would be revised (the "June 2018 HTA Fiscal Plan") with technical changes to be in line with the adjustments to the Commonwealth's June 2018 fiscal plan certification, following the Legislature's failure to repeal Law 80.  Updates made to the June 2018 HTA Fiscal Plan during the re-certification process were largely merely technical in nature.

On June 5, 2019, the Oversight Board certified the fiscal plan for HTA (the "June 2019 HTA Fiscal Plan"), which included new information and financial projections to improve the quality of Puerto Rico's highway and transit systems.  The June 2019 HTA Fiscal Plan recognized HTA's accomplishments in the implementation of measures from previous certified fiscal plans to begin the transformation of HTA, while providing for new roadmaps for certain measures and updated projected milestones consistent with HTA's recovery process from Hurricane Maria.  However, the June 2019 HTA Fiscal Plan also emphasized the need for dramatic transformation and cautioned that a significant gap still remains between HTA's current performance and the fiscal plan goals.

On June 26, 2020, the Oversight Board certified a new fiscal plan for HTA to reflect the substantial impacts of the 2020 earthquakes and COVID-19 pandemic on Puerto Rico's highway infrastructure (the "June 2020 HTA Fiscal Plan").  The June 2020 HTA Fiscal Plan supported a total transformation of Puerto Rico's transportation system to provide for a more productive, competitive, and resilient economic future for Puerto Rico's transportation system.

On May 27, 2021, the Oversight Board certified the new fiscal plan for HTA (the "May 2021 HTA Fiscal Plan").  The May 2021 HTA Fiscal Plan reflected new macroeconomic, policy and technological developments, while accounting for the impacts of COVID-19 on Puerto Rico's transportation system.  The May 2021 HTA Fiscal Plan highlighted three key issues, which are the root causes of the challenges currently facing the transportation sector: (1) individual modes of transportation have overlapping and fragmented ownership; (2) there is poor performance management within individual modes of transportation and little multi-modal coordination; and (3) the system is not maximizing funding potential, leaving public and private dollars on the table.  The May 2021 HTA Fiscal Plan introduced the Transportation Sector Reform, which lays out key initiatives to address the underperformance of Puerto Rico's transportation sector. The Transportation Sector Reform arises from a series of recommendations proposed by the Oversight Board in the Section 205 letter addressed to the Government on January 29, 2021.  While implementation of the Transportation Sector Reform requires the support of all the existing transportation entities on the Island, it calls for HTA, as a key stakeholder in Puerto Rico's transportation sector, to play a lead role in executing the necessary measures to enable the reform.  The Transportation Sector Reform intends to reorganize transportation assets to improve overall efficiency and performance of transportation systems in Puerto Rico through measures that promote long-term sustainability.  The fiscal measures described in the May 2021 HTA Fiscal Plan are critical to HTA's long-term financial success and embody the need for HTA to optimize expenses, generate revenues, and support the transportation network for long term fiscal sustainability.  If properly and fully implemented, the fiscal measures included in the May 2021 HTA Fiscal Plan have the ability to generate $5.6

billion in impact from FY2022-FY2051, taking HTA's $2.8 billion baseline deficit to a $2.8 billion post-measures surplus. Revenue enhancements, primarily from toll fares and toll fine adjustments, are expected to drive most of the $5.6 billion in increased revenues and cost savings over the thirty (30) year period, generating approximately $4.7 billion. Cost savings would contribute approximately $1.0 billion and enhancing toll fares and fines through price increases and performance improvement accounts for $4.0 billion of the $5.6 billion.

On February 22, 2022, the Oversight Board certified the new fiscal plan for HTA (the "February 2022 HTA Fiscal Plan"). The February 2022 HTA Fiscal Plan recommends HTA to pursue the Transportation Sector Reform, transferring ownership of Tren Urbano to the Puerto Rico Integrated Transit Authority ("PRITA"), setting up a dedicated Toll Road Management Office, and pursuing a Public-Private Partnership ("P3") to access new sources of capital funding. The February 2022 HTA Fiscal Plan also outlines fiscal measures that generate revenues and optimize expenses. Revenue generation measures include inflation-based increases on fares and fines,[32] new electronic systems for toll collection, and transit enhancements that would enable Tren Urbano to achieve a farebox recovery of eighteen percent (18%) by FY2026. Expense optimization measures include the re-assessment of Tren Urbano contracts and the reduction of healthcare expenses. These measures would generate approximately $6.0 billion of positive impact from FY2022-FY2051, taking HTA's approximately $1.2 billion baseline deficit to an approximately $4.8 billion surplus and enabling HTA to execute capital improvements of approximately $11.6 billion that would bring the roads of Puerto Rico to a State of Good Repair.[33]

***Election of Governor Pierluisi.*** On November 3, 2020, Pedro Pierluisi was elected Governor of Puerto Rico. Governor Pierluisi was sworn into office for a four-year term on January 2, 2021.

***Related Restructurings.*** Throughout the course of the Title III cases, the Oversight Board has led debt restructuring negotiations with the view that consensual negotiations are often better than contested resolutions. To that end, the Oversight Board and the Government made significant progress with COFINA's stakeholders regarding a gating issue over whether certain sales and use taxes ("SUT") were property of the Commonwealth or COFINA. These negotiations led to a consensual allocation of SUT revenues and ultimately the successful confirmation of a plan of adjustment for COFINA on February 5, 2019, reducing COFINA's debt from approximately $17 billion to $12 billion. With the SUT issue settled, the Commonwealth was one step closer to restructuring its debt in that it knew which SUT revenues it could use.

---

[32]   For FY2022 to FY2024, the February 2022 HTA Fiscal Plan calls for annual fare increases of 8.3%. From FY2025 onwards, annual increases adjust to the Consumer Price Index ("CPI") plus 1.5%, in line with the existing concessionaire agreements in Puerto Rico.

[33]   Per the Puerto Rico Transportation Asset Management Program ("TAMP"), the FHWA allows each agency to define a "State of Good Repair." HTA defines the state of good repair for pavements as having, within a 25-year period, no more than five percent (5%) of interstate pavements in poor condition and no more than twenty percent (20%) of the non-interstate pavements in poor condition. Poor condition is defined as pavement being rated as poor in two of the following four categories: roughness, cracking, rutting, and faulting. 2028 Puerto Rico Transportation Asset Management Program (TAMP), at 103, *available at*
https://act.dtop.pr.gov/wp-content/uploads/2019/10/2028-PRTAMP-Final-Revised-Document-8-Oct-20191.pdf.

This eliminated uncertainty over billions of dollars claimed by both the Commonwealth and COFINA.

Following resolution of this issue, the Oversight Board refocused its efforts on generating substantial consensus and support for a framework for a plan of adjustment for the Commonwealth. In pursuit of this goal, the Oversight Board engaged in mediation sessions and negotiations directed by and under the auspices of the court-appointed mediation team led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas. These mediation sessions culminated in the execution of certain creditor plan support agreements that ultimately led to the Oversight Board filing the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-3283, ECF No. 19367] (the "Commonwealth Plan") and the related disclosure statement. The Commonwealth Plan was confirmed by the Title III Court on January 18, 2022, which provided for, among other things, the settlement and compromise of disputes against the Commonwealth relating to the Conditionally Appropriated Revenues and the issuance of certain Clawback CVIs in connection with such settlement and compromise. On March 15, 2022, the effective date of the Commonwealth Plan occurred, and such plan was substantially consummated.

Further, in November 2018, the Government and the Oversight Board completed a restructuring of GDB pursuant to Title VI of PROMESA (the "GDB Qualifying Modification"). The GDB had more than $4 billion in legacy bond debt and approximately $8 billion in total liabilities. These claims were resolved with the issuance of $2.6 billion in new bonds under PROMESA's Title VI procedure. Those bonds are mainly secured by the cash flow from loans GDB previously made to Puerto Rico municipalities and other GDB assets. The policy goals of the Oversight Board and the Government in the GDB restructuring were to ensure that these new bonds are payable solely from legacy GDB assets, without recourse to any future general government appropriations from the Commonwealth, and to cushion the financial effect of the GDB restructuring on the many Puerto Rico municipalities who also were creditors of GDB.

In addition, the Oversight Board has obtained court approval of two additional restructurings through qualifying modifications under Title VI of PROMESA upon agreements with the majority of bond debt creditors of (i) the Puerto Rico Infrastructure Financing Authority, and (ii) the Convention Center District Authority.

***Reasons for Disagreements.*** While the Oversight Board took on the challenges identified by Congress in PROMESA accrued from prior decades, exacerbated by Hurricanes Irma and Maria, the ongoing earthquakes, and the current COVID-19 pandemic, various creditors, stakeholders, and, at times, the Government, disagreed with the Oversight Board's reforms and sought to challenge the Oversight Board's exercise of its authority and mandate pursuant to PROMESA to bring the Commonwealth and its covered instrumentalities to economic stability and access to capital markets. Disagreement also has arisen as a result of the Oversight Board's decision to include toll rate increases in the certified fiscal plan which have not been adjusted since 2005, to enhance HTA revenues. During the HTA Title III Case, the Oversight Board sought to raise toll rates, but then-Governor Ricardo Rosselló Nevares would not implement the required reforms. Some of the disputes arose out of differing interpretations of PROMESA, the Commonwealth Constitution, bond resolutions, and other contracts and

applicable laws.  For the most part, reasonable people could differ, and they did differ and brought their disputes to court.

**Litigation Affecting the Debt Restructurings.**  In a Title III case under PROMESA, the plan of adjustment is required to be consistent with the debtor's certified fiscal plan.[34]  In turn the fiscal plan must contain, among other things, a debt sustainability analysis.[35]  Creditors who believed the Commonwealth's certified fiscal plan contained a debt sustainability analysis showing the Commonwealth could issue less new debt to pay creditors' claims than the creditors believed was sustainable, sued and sought to enjoin the Oversight Board from proposing any plan of adjustment consistent with the Commonwealth's certified fiscal plan.  Some creditors also asked to nullify the Commonwealth's certified fiscal plan, and to compel turnovers of billions of dollars of revenues.  *See* section V.F.5 of this Disclosure Statement for a summary of litigation against the Oversight Board.

PROMESA expressly provides "[t]here shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter."[36]  No creditor procured any injunction against the Oversight Board, and creditors' claims for turnovers of revenues were either dismissed for lack of jurisdiction or denied on the merits.  Specifically, the trial and appellate courts ruled Bankruptcy Code section 922(d) does not require application of pledged special revenues, to special revenue debt during the Title III Cases, and the U.S. Supreme Court denied two petitions for *certiorari* requesting further review.[37]

**Background Leading to the HTA/CCDA Plan Support Agreement.**  The negotiations culminating in the filing of the HTA Plan arose in the context of broad negotiations regarding the Commonwealth and certain of its other debtor instrumentalities.  Throughout the HTA Title III Case, the Oversight Board, with the assistance of the Meditation Team,[38] conducted in-depth negotiations with various groups of Commonwealth and HTA creditors.

On February 9, 2021, working toward a Court-imposed deadline to file a joint plan of adjustment for the Commonwealth, PBA, and ERS, and as a result of months of negotiations, mediations and informal discussions, the Oversight Board, as representative of the Commonwealth, reached an agreement in principle with certain Commonwealth and PBA bondholders on the terms of a plan of adjustment for the Commonwealth and PBA.  On February 22, 2021, the agreement was memorialized in the plan support agreement (the "GO/PBA PSA") with holders of in excess of $11.7 billion of Commonwealth and PBA bond claims, including certain traditional municipal investors and monoline bond insurers Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"), Syncora Guarantee Inc. ("Syncora"), and National Public Finance Guarantee Corp. ("National"), in their limited capacities as agreed in the GO/PBA PSA.  The GO/PBA PSA resolved outstanding disputes with

---

[34]   PROMESA § 314(b)(7).

[35]   PROMESA § 201(b)(1)(I).

[36]   PROMESA § 106(e).

[37]   *Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121 (1st Cir. 2019), *cert. denied*, No. 19-391, 140 S. Ct. 855 (2020).

[38]   The "Mediation Team" is the mediation team led by Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team Leader") as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

holders of GO Bonds and PBA Bonds, including, but not limited to, disputes concerning the bonds' validity, priority and asserted secured status.[39]   Shortly after, on March 8, 2021, the Oversight Board filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* ("Second Amended CW Plan")[40] and associated disclosure statement,[41] which reflected the settlements achieved in the GO/PBA PSA.

The Second Amended CW Plan also provided for treatment of claims against the Commonwealth by holders and insurers of HTA, the Puerto Rico Convention Center District Authority ("CCDA") and Puerto Rico Infrastructure Finance Authority ("PRIFA") bonds arising from or related to the Commonwealth's retention of certain funds historically appropriated and transferred to HTA, CCDA and PRIFA, respectively (the "Revenue Bond Claims").  However, at the time of the filing of the Second Amended CW Plan, no specific agreement had been reached with those claim holders, and significant litigation concerning Revenue Bond Claims against the Commonwealth remained pending between the Oversight Board, as representative of the Commonwealth, on the one hand, and the Monolines (among others), on the other hand, concerning, among other things, alleged property, security interest, trust, or other equitable ownership interests in those certain revenues retained by the Commonwealth.

Following the filing of the Second Amended CW Plan and execution of the GO/PBA PSA in February 2021, negotiations occurred regarding the possibility of achieving a consensual resolution of the treatment of the Revenue Bond Claims and restructuring of the HTA Bonds and CCDA Bonds that could involve the Monolines and others.

***Entry into the HTA/CCDA Plan Support Agreement.***  The Oversight Board and the Monolines (through their respective advisors and directly with one another) engaged in formal mediation sessions as well as informal discussions, seeking to resolve any claims arising from or related to the funds historically appropriated and transferred to HTA and CCDA by the Commonwealth, including claims of a property or other interest in those revenues, regardless of whether the revenues were actually transferred by the Commonwealth to HTA and CCDA, respectively.

As a result of these negotiations, on May 5, 2021, the Oversight Board, as representative of the Commonwealth and HTA, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims (both as defined in the HTA/CCDA Plan Support Agreement), Assured and National entered into the HTA/CCDA Plan Support Agreement.  The HTA/CCDA Plan Support Agreement was signed by holders of claims in excess of $2 billion of claims regarding the HTA Bonds, including more than 85% of HTA 1968 Bonds, nearly 50% of HTA 1998 Senior Bonds, and nearly 40% of holders of claims regarding CCDA Bonds.  Among other things, the HTA/CCDA Plan Support Agreement provided the framework to resolve the Revenue Bond Claims against the Commonwealth.

***Further Support for HTA/CCDA Plan Support Agreement***.  Following entry into the HTA/CCDA Plan Support Agreement, negotiations undertaken with the assistance and guidance of the Mediation Team between the Oversight Board, on behalf of the Commonwealth, and

---

[39]   ECF No. 18791-6.
[40]   ECF No. 15976.
[41]   ECF No. 15977.

certain Monolines—Ambac Assurance Corporation ("Ambac") and Financial Guaranty Insurance Company ("FGIC") (neither of which had joined the HTA/CCDA Plan Support Agreement at that time)—continued concerning a possible consensual restructuring of PRIFA Bonds and claims against the Commonwealth arising from or related to the PRIFA Bonds.  Over the course of several weeks, there were numerous mediation sessions and informal discussions between representatives of the Oversight Board, Ambac and FGIC, and their respective advisors.

During the course of the negotiations, Ambac and FGIC executed joinders to the HTA/CCDA Plan Support Agreement, subject to the right to terminate the HTA/CCDA Plan Support Agreement, solely as to themselves, on or prior to July 26, 2021.  Meanwhile, negotiations continued among the parties concerning claims related to proceeds of rum tax revenues covered over by the United States government to the Commonwealth and then historically transferred to PRIFA by the Commonwealth, but that had been retained by the Commonwealth in recent years.  As a result of these negotiations, on July 27, 2021, the Oversight Board, as representative of the Commonwealth, certain holders of PRIFA Bond Claims, including Ambac and FGIC (in the limited capacities agreed in the PRIFA Plan Support Agreement), entered into the PRIFA Plan Support Agreement.[42]  As part of that agreement, Ambac and FGIC also agreed to be bound to the terms of the HTA/CCDA Plan Support Agreement, without any further right to terminate.[43]

The joinders of Ambac and FGIC to the HTA/CCDA Plan Support Agreement and the execution of the PRIFA Plan Support Agreement resolved the remaining Revenue Bond Claims litigation against the Commonwealth as it concerned the Monolines.

As of the filing of this Disclosure Statement, the HTA/CCDA Plan Support Agreement has the support of (i) $384 million of CCDA claims (100%), (ii) over $700 million of the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National), (over 85%), and (iii) over $2.1 billion of the aggregate amount of HTA 98 Senior Bond Claims, , HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (over 67%, based on the EMMA filing dated July 16, 2021).

***Background Leading to the DRA Stipulation.***  On November 7, 2018, the United States District Court for the District of Puerto Rico approved the GDB Qualifying Modification.  To give effect to the GDB Qualifying Modification, the Commonwealth created, pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act 109-2017 (the "GDB Restructuring Act"), the GDB Debt Recovery Authority ("DRA")—a statutory public trust and public governmental instrumentality of the Commonwealth.[44]

Pursuant to a Master Transfer Agreement, dated as of November 29, 2018 (the "Transfer Agreement"), between DRA and GDB, GDB transferred substantially all of its assets to DRA, including, among other things, GDB's legal rights, title, and interest in twenty-three promissory

---

[42]   ECF No. 18791-8.
[43]   ECF No. 18791-7, 18791-8.
[44]   7 P.R. Laws Ann. § 3171.

notes issued by HTA in favor of GDB (the "HTA Notes") and $200,000,000 in aggregate original principal amount of HTA Senior 98 Bonds.

AmeriNational Community Services, LLC (as servicer for DRA), and Cantor-Katz Collateral Monitor LLC (a Delaware limited liability company and as collateral monitor for Wilmington Trust, N.A.) (collectively, the "DRA Parties") commenced actions, filed pleadings, and participated in connection with numerous actions related to the Commonwealth's and HTA's Title III cases (collectively, the "DRA-Related Disputes"), including, among others:[45] (1) DRA Parties' lift stay motions, (2) administrative expense motion, (3) DRA adversary proceeding, (4) PBA adversary proceeding, (5) Section 926 motion, (6) other parties' lift stay motions, (7) Debt Related Objections, (8) Clawback Actions, and (9) Uniformity Litigation.

*Entry into DRA Stipulation.*  On November 5, 2021, the DRA Parties and the Oversight Board entered into a stipulation (the "DRA Stipulation") [ECF No. 19100], in which the parties agreed to settle and compromise the DRA-Related Disputes and for the DRA Parties to support the HTA Plan and related solicitation processes, and vote to accept the HTA Plan, among other things.

*Entry into the HTA Committee Agreement.* On May 9, 2022, the Oversight Board and the Creditors' Committee entered into that certain letter agreement, dated May 9, 2022 (the "HTA Committee Agreement"), which provided for the terms of a global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the HTA GUC Recovery from $25 million to $48 million.  Pursuant to the HTA Committee Agreement, the Creditors' Committee agreed to support the HTA Plan incorporating such global settlement.

[*Remainder of Page Left Intentionally Blank*]

---

[45]  *See* Section II.B.1(b) of this Disclosure Statement for a list of the DRA-Related Disputes.

## II.    Introduction

***Commencement of Title III Case.***   On May 3, 2017 (the "Commonwealth Petition Date"), the Oversight Board issued a restructuring certification for the Commonwealth pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "Commonwealth Title III Case").

On May 21, 2017 (the "HTA Petition Date"), the Oversight Board issued a restructuring certification for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "HTA Title III Case").   The Commonwealth Title III Case and the HTA Title III Case are jointly administered for administrative purposes under Lead Case No. 17-3283-LTS.   Pursuant to PROMESA section 315, the Oversight Board is the sole representative of the Commonwealth and HTA in their Title III cases.

***Certification of HTA Plan.***   On June ~~7,~~17, 2022, pursuant to PROMESA section 104(j), the Oversight Board certified the submission of the ~~*Second*~~*Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority*, dated June ~~7,~~17, 2022 (the "HTA Plan").   On June ~~7,~~17, 2022, the Debtor filed (a) the HTA Plan [ECF No. ____], and (b) this disclosure statement [ECF No. _____] (the "Disclosure Statement").[46]

***Disclosure Statement Schedule.***   On [_____], 2022, the Title III Court entered the *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. ____] approving the Disclosure Statement (the "Disclosure Statement Order").   **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE HTA PLAN.   THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE HTA PLAN AT THE CONFIRMATION HEARING SCHEDULED ~~TO BEGIN [____], 2022~~ON AUGUST 17 TO 18, 2022 AT 9:30 A.M. (ATLANTIC STANDARD TIME).**

The Confirmation Hearing may be adjourned or continued from time to time.   Therefore, parties in interest should check the online docket at https://cases.ra.kroll.com/puertorico/ to confirm the latest scheduled date and time of the Confirmation Hearing.

The Title III Court has set the following schedule in connection with the confirmation proceedings:

---

[46]   References to the docket are to Lead Case No. 17-BK-3283-LTS, unless otherwise specified.

- **[~~   ~~],July 27, 2022 at 5:00 p.m. (AST):**
  - Voting and election deadline~~;~~
  - ~~[   ], 2022:~~ Deadline to file objections to confirmation of the HTA Plan~~;~~, and proposed confirmation order
- **August 15, 2022 at 5:00 p.m. (AST):** Deadline to file objections to proposed findings of fact and conclusions of law
- **[~~   ~~],August 17-18, 2022 at 9:30 a.m. (AST):** Confirmation hearing.

The Debtor is furnishing this Disclosure Statement as the proponent of the HTA Plan pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject, and elections of the form of distributions pursuant to, the HTA Plan, as it may be amended or supplemented from time to time in accordance with PROMESA Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to PROMESA section 310.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the HTA Plan, HTA's operations, its financial condition, including financial projections, as well as other related matters, including the treatment of holders of Claims against HTA.  This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and election procedures, and the confirmation process.

*Ballot and Election Forms.*  A ballot for the acceptance or rejection of the HTA Plan (a "Ballot") and/or a notice of election pursuant to the HTA Plan (an "Election Notice") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes entitled to vote to accept or reject the HTA Plan, elect to settle certain claims pursuant to the HTA Plan, and/or elect the form of distributions pursuant to the HTA Plan.  The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the HTA Plan.  The Election Notice includes information regarding the election deadline and detailed instructions to elect the form of distributions pursuant to the HTA Plan.  Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice.  These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes.  No solicitation of votes on the HTA Plan may be made except pursuant to this Disclosure Statement, as it may be amended, the Disclosure Statement Order, and Bankruptcy Code section 1125.

*Exhibits to Disclosure Statement.*  This Disclosure Statement includes the following exhibits and supplements:

**Exhibit A** – ~~Second~~Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority (the "HTA Plan")

**Exhibit B** – Plan Support Agreement, dated as of May 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation

Authority, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation (the "<u>HTA/CCDA PSA</u>")

**Exhibit C** – Stipulation in Connection with DRA Related Disputes, dated November 5, 2021, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Highways and Transportation Authority, AmeriNational Community Services, LLC, and Cantor-Katz Collateral Monitor LLC

**Exhibit D** – Certified Puerto Rico Highways and Transportation Authority Fiscal Plan

**Exhibit E** – Certified Puerto Rico Highways and Transportation Authority Budget

**Exhibit F** – Schedule of HTA Bonds

**Exhibit G** – List of Puerto Rico Highways and Transportation Authority's Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2021

**Exhibit H** – Latest Audited Financial Statements for Puerto Rico Highways and Transportation Authority

**Exhibit I** – Illustrative Charts of Bond Recovery Distributions

**Exhibit J** – Best Interests Test Report

To the extent any inconsistencies exist between this Disclosure Statement, any of the Plan Support Agreements (and any exhibit or term sheet attached thereto), and the HTA Plan, the terms and provisions of the HTA Plan will govern.

## A.    PROMESA Title III Plan of Adjustment: An Overview

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of a debtor.  Except as provided in PROMESA, the plan of adjustment or the confirmation order, confirmation of a plan of adjustment discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified in the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both PROMESA section 314(b) and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."  Among other things, PROMESA section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the applicable provisions of the Bankruptcy Code, (ii) all the required legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have been

obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.

While the Debtor believes all classes of Claims should vote to accept the HTA Plan, the HTA Plan may be confirmed without acceptance by all classes. Bankruptcy Code section 1129(b)(1) provides that, if all the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than acceptance by all classes (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponents, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the plan of adjustment.

**B.      Summary of Key Components of the HTA Plan of Adjustment**

Except for Administrative Claims and Professional Claims, which are not classified and do not vote on the HTA Plan, all Claims that existed on the HTA Petition Date are divided into classes under the HTA Plan. Under the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. Under section 301(e) of PROMESA, in determining whether claims are "substantially similar" to one another, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims. The following table shows the classes of claims against the Debtor, the approximate estimated claim amount, and approximates the percentage of fixed recovery proposed to be paid to the claims in each class. The amount a creditor may actually recover could vary materially from the estimates below.

| Claim | Class | Estimated Claim Amount | Appx. Fixed Recovery from the Debtor (%) | Form of Fixed Consideration |
|---|---|---|---|---|
| HTA 68 Bond Claims | 1 | 145,642,034 | 100% | New HTA Bonds / Cash |
| HTA 68 Bond Claims (Ambac) | 2 | 30,563,816 | 100% | New HTA Bonds / Cash |
| HTA 68 Bond Claims (Assured) | 3 | 567,219,573 | 100% | New HTA Bonds / Cash |
| HTA 68 Bond Claims (National) | 4 | 87,763,682 | 100% | New HTA Bonds / Cash |
| HTA 98 Senior Bond Claims | 5 | 852,031,349 | 22% | New HTA Bonds / Cash |
| HTA 98 Senior Bond Claims (Ambac) | 6 | 491,939,990 | 22% | New HTA Bonds / Cash |
| HTA 98 Senior Bond Claims (Assured) | 7 | 865,236,581 | 22% | New HTA Bonds / Cash |
| HTA 98 Senior Bond Claims (FGIC) | 8 | 389,963,990 | 22% | New HTA Bonds / Cash |

19

| Claim | Class | Estimated Claim Amount | Appx. Fixed Recovery from the Debtor (%) | Form of Fixed Consideration |
|---|---|---|---|---|
| HTA 98 Senior Bond Claims (National) | 9 | 530,496,068 | 22% | New HTA Bonds / Cash |
| HTA 98 Sub Bond Claims | 10 | 121,457,958 | * | N/A |
| HTA 98 Sub Bond Claims (Assured) | 11 | 51,283,015 | * | N/A |
| HTA 98 Sub Bond Claims (FGIC) | 12 | 65,942,129 | * | N/A |
| HTA 98 Sub Bond Claims (National) | 13 | 38,424,132 | * | N/A |
| HTA Moscoso Bond Claims | 14 | 104,215,000[47] | 100% | [48] |
| Eminent Domain/Inverse Condemnation Claims | 15 | 83,687,663 | [49] | Cash |
| HTA General Unsecured Claims | 16 | 255,972,641 | 19% | Cash |
| HTA/GDB Claims | 17 | 2,149,579,432 | 0% | N/A |
| Section 510(b) Subordinated Claims | 18 | Unknown | 0% | N/A |
| Convenience Claims | 19 | 616,519[50] | 100% | Cash |
| Federal Claims | 20 | 20,788,696.48 | 100% | Cash |

\*     \*     \*     \*     \*

The Debtor believes the HTA Plan's contemplated restructuring is feasible and in the best interests of the Debtor's creditors. If confirmation of the HTA Plan were to be denied, the Debtor's options would be either for the Oversight Board to propose an alternate Title III plan of adjustment after re-engaging and re-negotiating with creditors or for the Title III Case to be dismissed, in which event the automatic stay would be terminated and multi-party, multifaceted litigation would ensue (including litigation commenced by bondholders and other parties against HTA and its officials), as holders of claims compete for the limited resources available to pay those claims.

---

[47]   Represents principal amount only.

\*   Holders of HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National) will receive recoveries through the Clawback CVIs on account of CW/HTA Claims against the Commonwealth pursuant to the Commonwealth Plan.

[48]   Unimpaired pursuant to the HTA Plan and will receive payments of principal and interest in accordance with the terms and conditions of the HTA Moscoso Bonds. Values for claim represent current outstanding principal.

[49]   The balance of any claim after application of any applicable monies on deposit with the Court of First Instance will be paid in full, in cash. However, if the Oversight Board's appeal of the Commonwealth Confirmation Order and the Findings of Fact and Conclusions of Law relating to the non-dischargeability of eminent domain/inverse condemnation claims is successful, such claim will receive similar treatment as holders of HTA General Unsecured Claims in Class 16.

[50]   Does not account for holders of Allowed HTA General Unsecured Claim that may elect to reduce their Allowed Claim and be treated as a Convenience Claim.

The following overview summarizes certain key components of the HTA Plan.  The overview is qualified in its entirety by the full text of the HTA Plan.

## 1. Implementation of Plan Support Agreements in the Plan of Adjustment

### (a) Plan Support Agreement with Certain Holders of HTA Bond Claims and CCDA Bond Claims

On May 5, 2021, the Oversight Board, as representative of the Commonwealth and HTA in their Title III Cases, announced that, following extensive discussions, it had entered into the HTA/CCDA Plan Support Agreement (attached hereto as Exhibit B) with certain holders of in excess of $2 billion of claims against HTA, including more than 85% of HTA 1968 Bonds, nearly 50% of HTA 1998 Senior Bonds, and nearly 40% of CCDA Bonds, which include traditional municipal investors and monoline bond insurers Assured and National, on the framework of plans of adjustment that proposes, among other things, to resolve asserted "clawback claims" against the Commonwealth and the issuance of certain contingent value instruments based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax relative to projections in the 2020 certified fiscal plan for the Commonwealth, as explained more fully in Exhibit I to the HTA/CCDA Plan Support Agreement.

During the course of the negotiations, Ambac and FGIC executed joinders to the HTA/CCDA Plan Support Agreement, subject to the right to terminate the HTA/CCDA Plan Support Agreement, solely as to themselves, on or prior to July 26, 2021.  The joinders of Ambac and FGIC to the HTA/CCDA Plan Support Agreement and the execution of the PRIFA Plan Support Agreement resolved the remaining Revenue Bond Claims litigation against the Commonwealth as it concerned the Monolines.

As of the filing of this Disclosure Statement, the HTA/CCDA Plan Support Agreement has the support of (i) $384 million of CCDA claims (100%), (ii) over $700 million of HTA 68 claims (over 85%), and (iii) over $2.1 billion of HTA 98 Senior Bond Claims (over 67%, based on an EMMA filing dated July 16, 2021).

*Settlement of Outstanding Disputes Relating to "Clawback Claims*."  In exchange for the consideration to be provided in the Commonwealth Plan and HTA Plan, the following disputes in connection with the "clawback claims" as they relate to Assured and National were compromised and settled pursuant to the confirmation of the Commonwealth Plan:

- **Clawback Actions**:

    o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00005-LTS,

    o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00004-LTS,

    o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00003-LTS, and

  o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00007-LTS.

- **Lift Stay Motions:**

  o *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico*, filed in the HTA Title III Case [ECF No. 673],

  o *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [ECF No. 10104],

  o *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [ECF No. 10602],

  o *AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico*, filed in the HTA Title III Case [ECF No. 591],

  o *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit,

  o *Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.*, Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit,

  o *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [ECF No. 1], and

  o any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

  **(b)**  **Stipulation with DRA Parties**

  ***Background Leading to the DRA Stipulation.*** On November 7, 2018, the United States District Court for the District of Puerto Rico approved the GDB Qualifying Modification.  To give effect to the GDB Qualifying Modification, the Commonwealth created, pursuant to the GDB Restructuring Act, the DRA—a statutory public trust and public governmental instrumentality of the Commonwealth.[51]

---

[51] 7 P.R. Laws Ann. § 3171.

Pursuant to the Transfer Agreement, dated November 29, 2018, between DRA and GDB, GDB transferred substantially all of its assets to DRA, including, among other things, GDB's legal rights, title, and interest in the HTA Notes and $200,000,000 in aggregate original principal amount of HTA Senior 98 Bonds.

The DRA Parties commenced certain actions, filed pleadings, and participated in connection with numerous actions related to the Commonwealth's and HTA's Title III cases, including, among others: including the following:

- **DRA Lift Stay Motions:**

  o *The DRA Parties' Motion and Memorandum of Law in Support of Their Motion for Relief From the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [ECF No. 7643]

  o *The DRA Parties' Amended Motion and Memorandum of Law in Support of Their Request for Adequate Protection or Relief From the Automatic Stay* [ECF No. 16276]

- **Administrative Expense Motion:**

  o *The DRA Parties' Motion for Allowance of an Administrative Expense Claim* [ECF No. 17009]

- **DRA Adversary Proceeding:**

  o *AmeriNational Community Services, LLC, et al. v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 21-00068

- **PBA Adversary Proceeding:**

  o *Puerto Rico Public Buildings Authority v. AmeriNational Community Services, LLC, et al.*, Adv. Proc. No. 21-00100

- **Section 926 Motion:**

  o *Urgent Motion for Bridge Order, and Motion for Appointment of Trustee Under 11 U.S.C. §926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation*, dated July 17, 2020 [ECF No. 871 in Case No. 17-3567; ECF No. 13708 in Case No. 17-3283],

  o *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1847

- **Other Parties' Lift Stay Motions:**

  o *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico* [ECF No. 673 in Case No. 17-3567]

  o *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [ECF No. 10104]

  o *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board* [ECF No. 10602]

  o *AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico*, filed in the HTA Title III Case [ECF No. 591 in Case No. 17-3567]

  o *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit

  o *Ambac Assurance Corporation, et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1931, currently pending in the United States Court of Appeals for the First Circuit

  o *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Proc. No. 17-00151- LTS

  o *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Proc. No. 17-00152-LTS

- **Debt Related Objections:**

  o *Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, dated January 14, 2019 [ECF No. 4784]

  o *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds*, dated May 21, 2019 [ECF No. 7057]

  o *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain*

24

*Puerto Rico Public Buildings Authority Bonds*, dated July 18, 2019 [ECF No. 8141],

o *Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth*, dated January 8, 2020 [ECF No. 9731]

o *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors*, dated February 3, 2020 [ECF No. 10638]

- **Clawback Actions:**

  o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Prco. No. 20-00005-LTS

  o *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00007-LTS

- **Uniformity Litigation:**

  o *Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Proc. No. 20-00068-LTS

***Entry into DRA Stipulation.*** On November 5, 2021, the DRA Parties and the Oversight Board entered into the DRA Stipulation, which provided, among other things:

i)   DRA Parties would support the Commonwealth Plan and HTA Plan and related solicitation processes;

ii)  DRA Parties would vote to accept the HTA Plan;

iii) DRA Parties would withdraw and/or dismiss with prejudice, as applicable, each of the DRA-Related Disputes; and

iv)  in consideration for the agreements set forth in the DRA Stipulation, including the agreement to "lock-up" its HTA Senior 98 Bonds and the HTA/GDB Claims, DRA would be entitled to receive a $15 million restriction fee in the form of an allowed administrative expense claim.

(c)   **Agreement with the Creditors' Committee**

On May 9, 2022, the Oversight Board and the Creditors' Committee entered into the HTA Committee Agreement, which provided for the terms of a global settlement regarding the treatment of HTA General Unsecured Claims, including, among other things, the increase of the

HTA GUC Recovery from $25 million to $48 million. Pursuant to the HTA Committee Agreement, the Creditors' Committee agreed to support the HTA Plan incorporating such global settlement.

### 2.      Holders of Allowed Claims Permitted to Make Elections

Pursuant to the Disclosure Statement Order and the HTA Plan, certain holders of Claims are entitled to make an election regarding the distribution they will receive under the HTA Plan. Below is an overview of the distribution elections and limitations on voting applicable to certain holders of Claims.

*Assured Bond Claims – Distribution Elections and Voting*. If you are a beneficial holder of an Assured Insured Bond identified on Exhibit A to the Assured Bondholder Elections Form, you may elect on your Election Form to receive in full satisfaction, release, and exchange of your Allowed Assured Insured Bond Claim and rights under the applicable Assured Insurance Policy, Assured Bondholder Election 1 or Assured Bondholder Election 2, each as described in section VI.G.1(b) of this Disclosure Statement below.

Beneficial holders of Allowed Assured Insured Bond Claims arising from bonds insured by Assured will not be entitled to vote to accept or reject the HTA Plan. Assured is entitled to vote on account of Allowed Assured Insured Bond Claims arising from bonds insured by Assured under the HTA Plan in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

*National Insured Bond Claims—Distribution Election and Voting*. If you are a beneficial holder of Allowed HTA 68 Bond Claims (National) or Allowed HTA 98 Senior Bond Claims (National), you may elect on your Election Form to receive in full satisfaction, release, and exchange of your Allowed National Insured Bond Claim and rights under the applicable National Insurance Policy, (1) the National Commutation Treatment or (2) the National Non-Commutation Treatment. If you are a beneficial holder of Allowed HTA 98 Sub Bond Claims (National), you will receive in full and final satisfaction, release, and discharge of National's obligations under the applicable National Insurance Policy, Cash in an amount equal to the National Acceleration Price.

Holders of Allowed National Insured Bond Claims will not be entitled to vote to accept or reject the HTA Plan. National is entitled to vote on account of Allowed National Insured Bond Claims under the HTA Plan on behalf of beneficial holders thereof in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

*Ambac Insured Bond Claims—Distribution Election and Voting*. If you are a beneficial holder of Allowed HTA 68 Bond Claims (Ambac), you will receive in full and final satisfaction, release, and discharge of Ambac's obligations under the applicable Ambac Insurance Policy, cash in the amount equal to the Ambac Acceleration Price. Beneficial holders of Allowed HTA 68 Bond Claims (Ambac) will not be entitled to vote to accept or reject the HTA Plan, and Ambac is entitled to vote on account of such Claims under the HTA Plan on behalf of

beneficial holders thereof in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

If you are a beneficial holder of an Allowed HTA 98 Senior Bond Claims (Ambac), to the extent offered by Ambac, you may elect on your Election Form to receive in full satisfaction, release, and exchange of your Allowed HTA 98 Senior Bond Claims (Ambac) and rights under the applicable Ambac Insurance Policy, (1) the Ambac Commutation Treatment or (2) the Ambac Non-Commutation Treatment.

Holders of HTA 98 Senior Bond Claims (Ambac) will not be entitled to vote to accept or reject the HTA Plan. Ambac is entitled to vote on account of HTA 98 Senior Bond Claims (Ambac) under the HTA Plan on behalf of beneficial holders thereof in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

***FGIC Insured Bond Claims—Voting.*** If you are a beneficial holder of Allowed HTA 98 Senior Bond Claims (FGIC) or Allowed HTA 98 Sub Bond Claims (FGIC), pursuant to Section 26.3 of the HTA Plan, the insurance policies underlying FGIC Insured Bond Claims will be maintained in a FGIC Trust. Beneficial holders of Allowed HTA 98 Senior Bond Claims (FGIC) and Allowed HTA 98 Sub Bond Claims (FGIC) will not be entitled to vote to accept or reject the HTA Plan, and FGIC is entitled to vote on account of such Claims under the HTA Plan on behalf of beneficial holders thereof in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE HTA EFFECTIVE DATE OF THE HTA PLAN. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

***Convenience Claim Election.*** Holders of Allowed HTA General Unsecured Claim (Class 16) may elect to:

(a) reduce the amount of such holder's Allowed Claim to $20,000.00 and receive payment in full in cash of such reduced claim pursuant to the treatment of Convenience Claims in Class 19; and

(b) accept the HTA Plan as a holder of a Claim in Class 19.

Holders of multiple Allowed HTA General Unsecured Claims may elect to:

(a) reduce the amount of such multiple claims to an aggregate amount of $40,000.00 and receive payment in full in cash of such reduced aggregate claim pursuant to the treatment of Convenience Claims in Class 19; and

(b) accept the HTA Plan as a holder of a Claim in Class 19.

*Convenience Cap:* The aggregate amount of consideration to be made available to Convenience Claims will be $2,500,000.00, which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing in its sole and absolute discretion. If the Convenience Cap is exceeded (and not otherwise waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing), holders of Allowed Convenience Claims will receive a Pro Rata Share of the Convenience Cap.

3.     **Overview of New HTA Bonds to be Issued on the HTA Effective Date**

On the HTA Effective Date, Reorganized HTA will issue the New HTA Bonds, consisting of:

(i) $237,955,868.13 in initial principal amount of capital appreciation bonds, Series 2022B ("New HTA CABs"), with a maturity date of July 1, 2032, and an Interest Rate of 5.0% per annum;

(ii) $407,044,597.57 in initial principal amount of convertible capital appreciation bonds, Series 2022C ("New HTA CCABs"), with a maturity date of July 1, 2053, a Conversion Date of July 1, 2032 and an Interest Rate of 5.0% per annum;

(iii) $600,000,000.00 in initial principal amount of current interest bonds, Series 2022A ("New HTA CIBs"), with a maturity date of July 1, 2062, and an Interest Rate of 5.0% per annum.

The New HTA Bonds will be paid solely from certain assets (the "Trust Estate"), which will be comprised primarily of Toll Receipts. *See* Section VI.F.2(a) of this Disclosure Statement for a more detailed description of the Trust Estate. The New HTA Bonds will be secured by a first-priority lien on the Trust Estate.

The New HTA Bonds will be dated as of, and Interest Rates thereon shall accrue or accrete from, the earlier of (i) July 1, 2022 and (ii) the HTA Effective Date. New HTA Bonds shall not carry any default rate of interest or accretion yield, as applicable; provided, however, that the applicable Interest Rate shall continue to accrue or accrete on all overdue debt service, at the regular rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

The maturities, interest rates, and amortization schedules for the New HTA Bonds are included in Section II.B.3(a) of this Disclosure Statement below and as Exhibit D to the Plan.

Further, on the HTA Effective Date, Reorganized HTA shall also issue the Subordinated Indebtedness in an initial principal amount equal to the outstanding principal amount of the Commonwealth Loan at the date of such issuance, plus any accrued and unpaid interest thereon, under the terms of the New HTA Bonds Indenture. The Subordinated Indebtedness will be secured by a lien on the Trust Estate, which lien shall in all respects be junior and subordinated to the senior lien granted to the holders of New HTA Bonds. *See* Section VI.F.6 of this Disclosure Statement for a more detailed description of the Subordinated Indebtedness.

### (a)      Summary of New HTA Bond Distributions

Municipal governments issue amortizing debt—*i.e.*, debt with principal maturities due on a regularly scheduled basis over a duration that varies generally between 20 and 40 years.   The New HTA Bonds will include (i) New HTA CIBs that will mature over 40 years, (ii) New HTA CABs that will mature over 10 years and (iii) New HTA CCABs that will mature over 36 years. All of the New HTA CABs, New HTA CCABs and New HTA CIBs are represented by term bonds with mandatory sinking fund payments. This is intended to optimize cash available to pay debt service since the municipal market has a yield curve, and bonds are not priced to the average life as is the case in other markets, because specific investors may purchase bonds in differing parts of the maturity curve, including individual investors, corporations and mutual funds.

Existing bondholders owned outstanding bonds with differing maturities.  However, such holders' Claims as treated in the HTA Plan are not distinguished based upon existing maturity. Thus, each existing holder will receive a pro-rata portion of all New HTA Bonds to be issued listed below, allocated based upon the distribution provided to the applicable Class and such holder's Claim, which is intended to provide all bondholders similar recoveries and distributions of the New HTA Bonds per Class.  The New HTA Bonds will be issued in $1.00 denominations with each bond delivered being rounded downwards to the nearest dollar.   The $1.00 denomination for the New HTA Bonds will be allocated based upon the Maturity Value of each respective term bond.  You should consult your own tax advisor concerning the U.S. Federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of receiving the distribution of securities below.

The New HTA Bonds will be issued pursuant to the New HTA Bonds Indenture and will be distributed as set forth in the HTA Plan.

Illustrative charts of the distributions to be made to each Class of bond claims pursuant to the HTA Plan are attached to this Disclosure Statement as Exhibit I.

For purposes of this Disclosure Statement, all references to "Interest Rate" refer to (i) with respect to the HTA CABs and the New HTA CCABs until the Conversion Date (as defined below), the accretion rate set forth in the New HTA Bonds Indenture, (ii) with respect to the New HTA CCABs after the Conversion Date and the New HTA CIBs, the interest rate set forth in the New HTA Bonds Indenture, and (iii) with respect to the Subordinated Indebtedness, the interest rate set forth in the New HTA Bonds Indenture.

Below is a table illustrating the New HTA CIBs to be distributed pursuant to the Plan and their sinking fund payments.

| New HTA CIBs | | | | |
|---|---|---|---|---|
| Principal Payments | Interest Rate Payments | Total Debt Service | Interest Rate | Date |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2023 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2024 |

| New HTA CIBs | | | | |
| Principal Payments | Interest Rate Payments | Total Debt Service | Interest Rate | Date |
|---|---|---|---|---|
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2025 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2026 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2027 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2028 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2029 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2030 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2031 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2032 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2033 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2034 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2035 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2036 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2037 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2038 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2039 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2040 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2041 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2042 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2043 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2044 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2045 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2046 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2047 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2048 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2049 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2050 |

| New HTA CIBs | | | | |
|---|---|---|---|---|
| **Principal Payments** | **Interest Rate Payments** | **Total Debt Service** | **Interest Rate** | **Date** |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2051 |
| - | $30,000,000.00 | $30,000,000.00 | 5.000% | 7/1/2052 |
| $14,190,000.00 | $30,000,000.00 | $ 44,190,000.00 | 5.000% | 7/1/2053 |
| $53,125,000.00 | $29,290,500.00 | $ 82,415,500.00 | 5.000% | 7/1/2054 |
| $55,785,000.00 | $26,634,250.00 | $ 82,419,250.00 | 5.000% | 7/1/2055 |
| $58,575,000.00 | $23,845,000.00 | $ 82,420,000.00 | 5.000% | 7/1/2056 |
| $61,500,000.00 | $20,916,250.00 | $ 82,420,000.00 | 5.000% | 7/1/2057 |
| $64,575,000.00 | $17,841,250.00 | $ 82,416,250.00 | 5.000% | 7/1/2058 |
| $67,805,000.00 | $14,612,500.00 | $ 82,417,500.00 | 5.000% | 7/1/2059 |
| $71,195,000.00 | $11,222,250.00 | $ 82,417,250.00 | 5.000% | 7/1/2060 |
| $74,755,000.00 | $7,662,500.00 | $ 82,417,500.00 | 5.000% | 7/1/2061 |
| $78,495,000.00 | $3,924,750.00 | $ 82,419,750.00 | 5.000% | 7/1/2062 |
| **$600,000,000.00** | **$1,085,949,250.00** | **$1,685,949,250.00** | Total | |

Below is a table illustrating the New HTA CABs to be distributed pursuant to the Plan and their sinking fund payments.

| New HTA CABs | | | | |
|---|---|---|---|---|
| **Initial Principal** | **Accreted Value at each Redemption Date (1)** | **Maturity Value (2)** | **Interest Rate** | **Date** |
| $25,289,588.80 | $29,327,916.80 | $41,440,000.00 | 5.000% | 7/1/2025 |
| $22,310,860.93 | $27,183,444.45 | $36,559,000.00 | 5.000% | 7/1/2026 |
| $25,083,317.54 | $32,108,471.38 | $41,102,000.00 | 5.000% | 7/1/2027 |
| $28,817,559.67 | $38,756,163.54 | $47,221,000.00 | 5.000% | 7/1/2028 |
| $35,543,345.34 | $50,221,494.18 | $58,242,000.00 | 5.000% | 7/1/2029 |
| $35,310,832.47 | $52,419,172.95 | $57,861,000.00 | 5.000% | 7/1/2030 |
| $33,610,009.98 | $52,419,983.94 | $55,074,000.00 | 5.000% | 7/1/2031 |

| New HTA CABs | | | | |
|---|---|---|---|---|
| **Initial Principal** | **Accreted Value at each Redemption Date (1)** | **Maturity Value (2)** | **Interest Rate** | **Date** |
| $31,990,353.40 | $52,420,000.00 | $52,420,000.00 | 5.000% | 7/1/2032 (3) |
| **$237,955,868.13** | **$334,856,647.24** | **$389,919,000.00** | **Total** | |

(1) Equals the initial principal amount plus Interest Rate for each sinking fund payment date.
(2) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.
(3) Stated maturity; not a sinking fund payment.

Below is a table illustrating the New HTA CCABs (post-Conversion Date) to be distributed pursuant to the Plan and their sinking fund payments.  The New HTA CCABs accrete at an Interest Rate of 5.0% per annum from the issuance date until the final compounding date of July 1, 2032 (the "Conversion Date").

| New HTA CCABs | | | | |
|---|---|---|---|---|
| **Initial Principal** | **Maturity Value** | **Interest Rate Payments** | **Interest Rate** | **Date** |
| $11,637,848.90 | $  19,070,000.00 | 33,349,550.00 | 5.000% | 7/1/2033 |
| $12,220,046.48 | $  20,024,000.00 | 32,396,050.00 | 5.000% | 7/1/2034 |
| $12,830,926.75 | $  21,025,000.00 | 31,394,850.00 | 5.000% | 7/1/2035 |
| $13,472,320.52 | $  22,076,000.00 | 30,343,600.00 | 5.000% | 7/1/2036 |
| $14,146,058.60 | $  23,180,000.00 | 29,239,800.00 | 5.000% | 7/1/2037 |
| $14,853,361.53 | $  24,339,000.00 | 28,080,800.00 | 5.000% | 7/1/2038 |
| $15,596,060.12 | $  25,556,000.00 | 26,863,850.00 | 5.000% | 7/1/2039 |
| $16,375,985.18 | $  26,834,000.00 | 25,586,050.00 | 5.000% | 7/1/2040 |
| $17,194,967.52 | $  28,176,000.00 | 24,244,350.00 | 5.000% | 7/1/2041 |
| $18,054,837.95 | $  29,585,000.00 | 22,835,550.00 | 5.000% | 7/1/2042 |
| $18,957,427.28 | $  31,064,000.00 | 21,356,300.00 | 5.000% | 7/1/2043 |
| $19,905,176.59 | $  32,617,000.00 | 19,803,100.00 | 5.000% | 7/1/2044 |
| $20,900,526.96 | $  34,248,000.00 | 18,172,250.00 | 5.000% | 7/1/2045 |
| $21,945,309.20 | $  35,960,000.00 | 16,459,850.00 | 5.000% | 7/1/2046 |
| $23,042,574.66 | $  37,758,000.00 | 14,661,850.00 | 5.000% | 7/1/2047 |
| $24,194,764.42 | $  39,646,000.00 | 12,773,950.00 | 5.000% | 7/1/2048 |

32

| New HTA CCABs | | | | |
|---|---|---|---|---|
| Initial Principal | Maturity Value | Interest Rate Payments | Interest Rate | Date |
| $25,404,319.56 | $ 41,628,000.00 | 10,791,650.00 | 5.000% | 7/1/2049 |
| $26,674,901.70 | $ 43,710,000.00 | 8,710,250.00 | 5.000% | 7/1/2050 |
| $28,008,341.65 | $ 45,895,000.00 | 6,524,750.00 | 5.000% | 7/1/2051 |
| $29,408,911.30 | $ 48,190,000.00 | 4,230,000.00 | 5.000% | 7/1/2052 |
| $22,219,930.70 | $36,410,000.00 | 1,820,500.00 | 5.000% | 7/1/2053(1) |
| $407,044,597.57 | $666,991,000.00 | $419,638,900.00 | Total | |

(1) Stated maturity; not a sinking fund redemption.

## C.    Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims that are impaired and are not deemed to have automatically accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment.  Classes of claims in which the holders of claims are unimpaired under the HTA Plan are deemed to have accepted the HTA Plan and are not entitled to vote to accept or reject the HTA Plan.  Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote.

Holders of Allowed HTA Moscoso Bond Claims (Class 14) shall be deemed unimpaired and holders of Allowed Convenience Claims (Class 19) are being paid in full in Cash, and will not have the right to vote.

Holders of Allowed Claims in the Class 18 (Section 510(b) Subordinated Claims) will not receive a distribution pursuant to the Plan and shall be deemed to have rejected the HTA Plan and are not entitled to vote.

Holders of ACR-eligible claims will not have the right to vote.

Below is a summary of the forms that will be delivered to members of Classes of Claims (a) entitled to vote to accept or reject the HTA Plan, (b) entitled to make a distribution election, and (c) not entitled to vote to accept or reject the HTA Plan:

| Claim | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| HTA 68 Bond Claims | 1 | X | - | - |
| HTA 68 Bond Claims (Ambac) | 2 | * | - | X |
| HTA 68 Bond Claims (Assured) | 3 | * | X | - |
| HTA 68 Bond Claims (National) | 4 | * | X | - |

| Claim | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| HTA 98 Senior Bond Claims | 5 | X | - | - |
| HTA 98 Senior Bond Claims (Ambac) | 6 | * | X | - |
| HTA 98 Senior Bond Claims (Assured) | 7 | * | X | - |
| HTA 98 Senior Bond Claims (FGIC) | 8 | * | - | X |
| HTA 98 Senior Bond Claims (National) | 9 | * | X | - |
| HTA 98 Sub Bond Claims | 10 | X | - | - |
| HTA 98 Sub Bond Claims (Assured) | 11 | * | - | X |
| HTA 98 Sub Bond Claims (FGIC) | 12 | * | - | X |
| HTA 98 Sub Bond Claims (National) | 13 | * | - | X |
| HTA Moscoso Bond Claims | 14 | - | - | X |
| Eminent Domain/Inverse Condemnation Claims | 15 | X | - | - |
| HTA General Unsecured Claims | 16 | X | - | - |
| HTA/GDB Claims | 17 | X | - | - |
| Section 510(b) Subordinated Claims | 18 | - | - | X |
| Convenience Claims | 19 | - | - | X |
| Federal Claims | 20 | X | - | - |

* Beneficial holders of the following Claims will not be entitled to vote to accept or reject the HTA Plan:

| Claim | Class |
|---|---|
| HTA 68 Bond Claims (Ambac) | 2 |
| HTA 68 Bond Claims (Assured) | 3 |
| HTA 68 Bond Claims (National) | 4 |
| HTA 98 Senior Bond Claims (Ambac) | 6 |
| HTA 98 Senior Bond Claims (Assured) | 7 |
| HTA 98 Senior Bond Claims (FGIC) | 8 |
| HTA 98 Senior Bond Claims (National) | 9 |
| HTA 98 Sub Bond Claims (Assured) | 11 |
| HTA 98 Sub Bond Claims (FGIC) | 12 |
| HTA 98 Sub Bond Claims (National) | 13 |

Instead, Ambac, Assured, FGIC, and National are entitled to vote on account of such claims, as applicable, under the HTA Plan on behalf of beneficial holders thereof in accordance with section 301(c)(3) of PROMESA and other applicable law and governing documents.

*     *     *     *     *

34

Bankruptcy Code section 1126 defines "acceptance" of a plan of adjustment by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted to accept or reject the HTA Plan.  Thus, acceptance of the HTA Plan by Claims in each Class entitled to vote on the HTA Plan will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the HTA Plan.  A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in the Classes in the chart above that are eligible to vote exercise their right to vote to accept or reject the HTA Plan.  **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE HTA PLAN, YOU MAY BE BOUND BY THE HTA PLAN IF IT IS CONFIRMED BY THE TITLE III COURT.**  The amount and number of votes required for acceptance or rejection of the HTA Plan by a Class are computed on the basis of Claims actually voting to accept or reject the HTA Plan. There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to PROMESA section 301(a), permits the confirmation of the plan of adjustment under certain conditions, notwithstanding the rejection of the plan of adjustment by one or more other impaired classes of claims.  Under that section, a plan of adjustment may be confirmed by a court if the plan of adjustment does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  *See* section VII.C of this Disclosure Statement for more information.

The Debtor's determination as to whether to request confirmation of the HTA Plan pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

D.     **Solicitation and Voting Procedures**

On May 2, 2022, the Debtor filed the *Motion of the Puerto Rico Highways and Transportation Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. ~~——~~20654] (the "Disclosure Statement Approval Motion"), seeking an order from the Title III Court (i) approving the adequacy of the information contained in the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the HTA Plan, (iii) approving the Confirmation Hearing Notice (as defined therein) and confirmation schedule, (iv) approving the proposed contents of the Solicitation Package (as defined therein) and procedures for distribution thereof, (v) approving the forms of Ballots, and establishing

solicitation, voting, distribution election, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status (as defined therein), (vii) fixing the Voting Deadline (as defined therein), Election Deadline (as defined therein), and confirmation deadlines, and (viii) approving procedures for tabulating creditor votes.  On [_____], 2022, the Title III Court entered the Disclosure Statement Order.

For more information regarding the solicitation and voting procedures surrounding the Plan, *see* the Disclosure Statement Order.

### E.    Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtor has satisfied the confirmation requirements of PROMESA section 314 and the incorporated subsections of Bankruptcy Code section 1129 ~~to begin on [_____].~~for **August 17-18,** 2022 at ~~_____~~ **9:30** a.m./~~p.m.~~ **(Atlantic Standard Time)** before the Honorable Laura Taylor Swain, United States District Judge designated by Chief Justice John Roberts of the U.S. Supreme Court to preside over the HTA Title III Case, Clemente Ruiz Nazario U.S. Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom or via virtual hearing to be later determined.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has (i) established a Voting Deadline and Election Deadline of no later than **5:00 p.m. (Atlantic Standard Time) on** ~~[_____],~~**July 27,** 2022, and (ii) ordered that objections, if any, to confirmation of the HTA Plan be filed and served on or before ~~[_____], 2022 at~~ **5:00 p.m. (Atlantic Standard Time)**~~.~~ **on July 27, 2022.**

### F.    Summary of Release, Exculpation, and Injunction Provisions Contained in the HTA Plan

*The HTA Plan provides for certain releases of claims and causes of action.  If the HTA Plan is confirmed, it will be binding on you whether or not you vote.  You will have no right to demand the Debtor pay you the full, original amounts owed to you, except as provided in the HTA Plan. You will only have the rights to the treatment provided to your Claim pursuant to the HTA Plan. **BELOW IS A SUMMARY OF THE RELEASES CONTAINED IN THE HTA PLAN, WHICH SUMMARY IS QUALIFIED ENTIRELY BY THE TERMS OF THE HTA PLAN.  PLEASE REVIEW IT CAREFULLY TOGETHER WITH ARTICLE XLI OF THE HTA PLAN.***

**Discharge; Release of Claims and Causes of Action**:[52]

| Releasing Party | Released Party | Scope of Release / Discharge |
|---|---|---|
| All holders of Claims in any Class under the HTA Plan. | • HTA<br>• Reorganized HTA | • All Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the HTA Effective Date, including those relating to: |

---

[52]    *See* HTA Plan § 41.2(a), (b), (c).

| Releasing Party | Released Party | Scope of Release / Discharge |
|---|---|---|
| | | ○ the Title III Case, <br> ○ the Debtor or Reorganized HTA or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date. <br> • Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407. |
| HTA/CCDA PSA Creditors and their respective Related Persons, solely as HTA/CCDA PSA Creditors of HTA. | • Oversight Board <br> • Committees and subcommittee of the Oversight Board <br> • HTA <br> • AAFAF <br> • All instrumentalities, municipalities, public corporations and public agencies of the Commonwealth <br> • The current or former board members, directors, principals, agents, officers, employees, advisors and professionals of the entities above. | • All Claims or Causes of Action arising prior to the HTA Effective Date relating to the Debtor, Claims (including, relating to the HTA Bonds), the Debt Related Objections, and the Lien Challenge Actions. <br><br> Does not include: <br> • Claims or Causes of Action: <br> ○ against the Debtor (or its successor, including Reorganized HTA), the Commonwealth, ERS, PBA or COFINA relating to the Debtor's, the Commonwealth's, and COFINA's obligations pursuant to the HTA Plan or the securities to be issued pursuant to the HTA Plan or that were issued pursuant to the COFINA Plan or the Commonwealth Plan. <br> ○ against a Government Releasee unrelated to the Debtors or the Claims discharged pursuant to the HTA Plan. <br> ○ related to any act or omission that constitutes intentional fraud or willful misconduct. <br> ○ related to claims or bonds issued, or contracts or leases entered into, by the Commonwealth, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA. |

## Debtor Releases:[53]

| Releasing Party | Released Party | Scope of Release |
|---|---|---|
| • HTA <br> • Reorganized HTA <br> • Disbursing Agent <br> • HTA's and Reorganized HTA's | • Oversight Board <br> • Committees and subcommittee of the Oversight Board[54] | • With respect to parties to the HTA/CCDA Plan Support Agreement: <br> ○ Claims and Causes of Action released under the HTA Plan and in accordance with the |

[53]  See HTA Plan § 41.5.
[54]  Includes the Special Claims Committee of the Oversight Board.

| Releasing Party | Released Party | Scope of Release |
|---|---|---|
| Related Persons | • HTA<br>• AAFAF<br>• HTA/CCDA PSA Creditors<br>• The DRA<br>• The DRA Parties<br>• Creditors' Committee<br>• Related Persons[55] of the parties above. | HTA/CCDA Plan Support Agreement.<br>• Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtor or its Assets in the Title III Case.<br>• Claims and Causes of Action that have been or could have been asserted by the Debtor.<br>• Claims and Causes of Action related to:<br>  ○ the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* [Case No. 17-3283-LTS, ECF No. 15854] (as amended), and<br>  ○ the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations* [Case No. 17-3283-LTS, ECF No. 17394], as amended.<br>• With respect to parties to the DRA Stipulation:<br>  ○ Claims and Causes of Action released under the HTA Plan and in accordance with the DRA Stipulation.<br>• Claims that otherwise arise from or relate to the Title III Case, the HTA Plan, the HTA/CCDA Plan Support Agreement, the HTA Committee Agreement, and the compromises set forth in the HTA Plan. |
| | | <u>Specific Exclusions from Releases</u>:<br>• Claims or Causes of Action unrelated to the Debtor.<br>• Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud.<br>• any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action.<br>• Any party from the performance of its obligations |

---

[55]   "<u>Related Persons</u>" means, with respect to any Entity (including for the avoidance of doubt, the Commonwealth, the Government Parties, and the Creditors' Committee), its predecessors, successors and assigns (whether by operation of law or otherwise) and their respective current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and professionals (including, without limitation, any and all Professionals retained by the Debtor, AAFAF, and the Creditors' Committee), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), each in its respective capacity as such; <u>provided</u>, <u>however</u>, that "Related Persons" is not intended, nor shall it be construed, to include the Commonwealth, AFICA, CCDA, COFINA, ERS MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA

| Releasing Party | Released Party | Scope of Release |
|---|---|---|
| | | in accordance with the HTA Confirmation Order or the HTA Plan. <br> • Claims or Causes of Action against Commonwealth, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA. |

## Exculpations:[56]

| Exculpating Party | Exculpated Party | Scope of Exculpation |
|---|---|---|
| All entities. | Government Parties:[57] <br> • Oversight Board <br> • AAFAF <br> • HTA | • Any act or omission in connection with: <br> ○ the Title III Case. <br> ○ the HTA Plan or any related compromises or settlements. <br> ○ the Disclosure Statement. <br> ○ any document provided for or contemplated in connection with the consummation of the HTA Plan. <br> • Does not include acts or omissions that constitute intentional fraud or willful misconduct. |
| All entities. | PSA Creditors:[58] <br> • Each of the HTA/CCDA PSA Creditors[59] | • Any act or omission in connection with: <br> ○ the Title III Case. <br> ○ the HTA Plan or any related compromises or settlements. <br> ○ the Disclosure Statement. <br> ○ the HTA/CCDA Plan Support Agreement. <br> ○ the Definitive Documents. <br> ○ any document provided for or contemplated in connection with the consummation of the HTA Plan. <br> • Does not include acts or omissions that constitute intentional fraud or willful misconduct. |
| All entities. | Monoline Insurers:[60] <br> • Ambac <br> • Assured <br> • FGIC <br> • National | • Any act or omission in connection with the HTA Plan.[61] <br> • Does not include: <br> ○ the applicable insurer's payment obligation to any beneficial holder of the applicable insured bonds under the terms of the applicable insurance policy, to the extent such holder fails to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, or |

---

[56]  *See* HTA Plan § 41.7.

[57]  Includes each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date.

[58]  Includes each of their respective Related Persons.

[59]  Solely in its capacity as a party to the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the HTA Petition Date up to and including the HTA Effective Date.

[60]  Includes each of their respective Related Persons.

[61]  Includes in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond claims, National Insured Bond claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, or National Insurance Policies.

| Exculpating Party | Exculpated Party | Scope of Exculpation |
|---|---|---|
| | | National Treatment, as applicable.<br>o any claims that the applicable insurer may have against a beneficial holder of respective insured bonds with respect to the applicable insurer's obligations under the applicable insurance policy. |
| All entities. | • Each member of the Creditors' Committee (solely in its capacity as a member of the Creditors' Committee)<br>• The Creditors' Committee | • Any act or omission in connection with:<br>o the Title III Case.<br>o the HTA Plan or any related compromises or settlements.<br>o the Disclosure Statement.<br>o any document provided for or contemplated in connection with the consummation of the HTA Plan.<br>• Does <u>not</u> include acts or omissions that constitute intentional fraud or willful misconduct. |
| All entities. | The DRA[62]<br>The DRA Parties:[63]<br>• AmeriNational Community Services LLC, in its capacity as servicer for the DRA<br>• Cantor-Katz Collateral Monitor LLC, in its capacity as collateral monitor for Wilmington Trust N.A. in connection with the bonds issued by DRA pursuant to the Government Development Bank for Puerto Rico Debt Restructuring Act, Act No. 109-2017 (as amended), and the Qualifying Modification for GDB approved in accordance with the terms and provisions of Title VI of PROMESA | • Any act or omission in connection with:<br>o the Title III Case.<br>o the HTA Plan or any related compromises or settlements.<br>o the Disclosure Statement.<br>o the DRA Stipulation<br>o any document provided for or contemplated in connection with the consummation of the HTA Plan.<br>• Does <u>not</u> include acts or omissions that constitute intentional fraud or willful misconduct. |

## Releases in Connection with Appointments Related Litigation/Uniformity Litigation:[64]

---

[62] Includes its respective predecessors, successors and assigns (whether by operation of law or otherwise), and its respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of it, in each case, solely to the extent acting in such capacity.

[63] Includes each of their respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity.

[64] *See* HTA Plan § 41.8.

| Releasing Party | Released Party | Scope of Release |
|---|---|---|
| • All Creditors.<br>• All entities receiving, or deemed to have received, distributions under the HTA Plan. | • All parties receiving releases and exculpations pursuant to the HTA Plan. | • A final order in connection with the Appointments Related Litigation or the Uniformity Litigation will not in any way modify the transactions contemplated in the HTA Plan and the HTA Confirmation Order, including, the releases, exculpations and injunctions provided in the HTA Plan. |

**Plan Injunctions:**[65]

| Parties Enjoined | Scope of Injunction |
|---|---|
| • All entities, including entities acting on their behalf. | • Enjoined from instituting, prosecuting, pursuing or litigating in any manner against any of the Released Parties claims relating to:<br>  ○ the discharged claims.<br>  ○ the Released Claims (see scope of releases above).<br>  ○ confirmation and consummation of the HTA Plan.<br>  ○ the negotiation and consummation of the HTA/CCDA Plan Support Agreement.<br>  ○ any act or omission in connection with or alleged or that could have been alleged in the Title III Case.<br><br>• Includes the following actions:<br>  ○ Commencing or continuing any proceeding with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party.<br>  ○ Enforcing, attaching, collecting or recovering any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any Released Claim.<br>  ○ Creating, perfecting or enforcing any Lien against any Released Parties or the assets or property of any Released Party with respect to any Released Claim.<br>  ○ Asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any Released Claim. |

[*Remainder of Page Left Intentionally Blank*]

---

[65] *See* HTA Plan §§ 41.3, 41.9, 41.11.

### III.    Overview of HTA

**A.    General Information**

**1.    The Puerto Rico Highways and Transportation Authority (HTA)**

HTA is a public corporation and component unit of the Commonwealth created by Act No. 74 of June 23, 1965, as amended ("Act No. 74-1965"), to design, construct and administer toll roads, highways, and other facilities for the mobility of individuals, vehicles, and vessels, and for the planning, promotion, and feasibility of mass transportation systems. As such, HTA has critical influence in determining the current and future state of the transportation sector of Puerto Rico. HTA plans and manages the construction of all major projects relating to Puerto Rico's transportation system, which includes the undertaking of major repairs and maintenance of toll highways and other roads in accordance with the DTOP's overall transportation policies. HTA was afforded broad powers under Act No. 74-1965 to carry out its responsibilities, including, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes, and other obligations.

HTA is a separate entity from DTOP for purposes of financing and constructing Puerto Rico's transportation system. The powers and duties of HTA are executed by the Board of Directors in coordination with the Secretary of DTOP, appointed by the Governor. The HTA Executive Director reports to the HTA's Board of Directors.

As established by Act No. 74-1965, HTA has a seven-member Board of Directors which is composed of four ex-officio members, which include the Secretary of DTOP, the President of the Puerto Rico Planning Board, the Executive Director of the Fiscal Agency, and Financial Advisory Authority, and the Treasury Secretary. The other three remaining positions are intended to be filled by industry professionals, however, they are currently vacant. Ex-officio board members serve terms of unlimited duration, while industry professionals are to serve a limited term of up to four (4) years. The HTA Board of Directors guides HTA's overall strategy and aids in priority-setting. In January 2021, Edwin E. Gonzalez-Montalvo, PhD was designated by the HTA Board of Directors to serve as Executive Director of HTA. The February 2022 HTA Fiscal Plan outlines a series of organizational fiscal measures, which includes the recruitment of a new Board of Directors. This measure specifies that the Board will still be composed of seven members but outlines that four of those members should be independent and private positions. The measure also outlines that six-year terms should be implemented to avoid disruptions related to the political cycle.

In 1990, via the enactment of Act 4 of August 24, 1990, HTA was authorized to enter into contracts with private operators for the construction, operation, and maintenance of new highways, bridges, avenues, and other traffic installations. In this capacity, HTA completed a P3 under U.S. jurisdiction via the completion of the Teodoro Moscoso Bridge in 1994.

In 1991, via the enactment of Act 1-1991, the old Highway Authority became HTA, an integrated transportation authority and the principal promoter and developer of transportation in Puerto Rico. Originally, HTA was created to manage the toll network. However, HTA has grown to manage the highway network, Tren Urbano transit system, and feeder bus system. Today, HTA both constructs new roads and maintains its existing networks of toll and non-toll roads and also supports other public entities (*e.g.*, municipalities) with the management of federal construction grants and the delivery of capital projects.

HTA classifies its highways and roads within the following categories: (i) primary, (ii) primary urban, (iii) secondary, (iv) tertiary, (v) and local roads. There is an overlap between DTOP and HTA as asset ownership is fragmented for non-toll roads between the agencies, which has resulted in a backlog of maintenance projects due to the mix of private revenue streams with public funds. As of FY2020, the Commonwealth had approximately 4,647 miles of highways and 12,740 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the most important inter-regional traffic routes and include (i) the Luis A. Ferré ("PR-52"), De Diego ("PR-22"), PR-53, Eastern Corridor ("PR-66"), PR-5, and Martínez Nadal ("PR-20") toll highways, (ii) 233 miles of primary urban system highways, (iii) 959 miles of secondary system highways serving the needs of intra-regional and inter-municipal traffic, (iv) 3,064 miles of tertiary highways, and (v) 12,740 miles of local as well as intra-municipal traffic.

HTA owns tolling facilities on four major roads on the island (PR-20, PR-52, PR-53, and PR-66). As of February 2022, two toll roads (PR-5 and PR-22) are managed and operated by Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas") under a concession agreement entered into in September 2011, as part of a P3 transaction. The Transportation Sector Reform includes advancing a future-toll road concession as Puerto Rico Public-Private Partnerships Authority ("P3A") evaluates the viability of a potential concession agreement of the remaining toll roads.

In addition to road management, HTA also operates transit assets, including Tren Urbano, San Juan's heavy rail system, and its associated feeder buses. Completed in 2004, Tren Urbano is the Caribbean's first urban rapid transit system. It consists of a single line of 10.7 miles with sixteen stations from Bayamón to Sagrado Corazón in downtown San Juan. Most of the system is elevated with a 1.1-mile tunnel section in the Río Piedras district.

HTA is one of three agencies that manage the operation of public transportation assets in the San Juan metropolitan area. PRITA operates the main bus network of the San Juan metropolitan area, and the Maritime Transport Authority operates the ferry between Old San Juan and Cataño.

The management of multiple transportation assets and lack of asset-class specific ownership and responsibility contribute to lack of integration and coordinated planning by mode across Puerto Rico. HTA's mandate beyond the toll road management, creates potential overlap with other transportation agencies, one of the root cause drivers of lagging performance outcomes of the system that must be addressed through broad transportation sector reform.

Moreover, HTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and fiscal emergency. As a result, HTA has been unable to provide Puerto Rico citizens with effective transit related services. HTA continues to lag behind national standards for quality, safety, and reliability due to a significant lack of funding.

## B.    HTA's Financial Obligations as of HTA Petition Date

### 1.    Bond Resolutions and Outstanding Bonds

#### (a)    HTA Debt

HTA issued multiple series of bonds (the "HTA Bonds") pursuant to certain bond resolutions, including: (i) Resolution No. 98-06, adopted on February 26, 1998 (the "1998 Bond Resolution") and (ii) Resolution No. 68-18, adopted on June 13, 1968 (the "1968 Bond Resolution", and together with the 1998 Bond Resolution, the "HTA Bond Resolutions"), as supplemented by separate resolutions authorizing the issuance of each series of bonds.

*The HTA Bond Resolutions*. HTA issued bonds pursuant to the 1968 Bond Resolution (the "1968 Resolution Bonds") for the purpose of continuing its highway construction program and paying outstanding notes pursuant to a line of credit extended in connection with such highways program. The 1968 Resolution Bonds are purportedly[66] secured by, and payable from, pledged tax and fee revenue including (1) the gross receipts of the $0.16 per gallon excise tax on gasoline; (2) the gross receipt of the $0.04 per gallon excise tax on gas oil and diesel oil; (3) the gross receipts of the $15 increase in annual motor vehicle license fees; (4) toll revenues on facilities financed with the proceeds of bonds issued under the 1968 Bond Resolution; and (5) investment earnings on deposits to the credit of funds and accounts established under the 1968 Bond Resolution, except for the Construction Fund established thereunder.

Additional bonds were later issued under the 1998 Resolution (the "1998 Resolution Bonds"). The 1998 Resolution Bonds are purportedly secured by, and payable from, (1) up to $120 million per fiscal year of the excise tax on petroleum products; (2) toll revenues other than tolls on facilities financed with the proceeds of bonds issued under the 1968 Bond Resolution; (3) revenues pledged under the 1968 Bond Resolution that remain after payment or provision for payment of debt service and required reserves on the bonds issued under the 1968 Bond Resolution; and (4) investment earnings on deposit to the credit of funds and accounts established under the 1998 Bond Resolution. The 1998 Bond Resolution provides for both senior and subordinated 1998 Resolution Bonds.

Each series of the HTA Bonds was issued pursuant to a supplemental resolution providing for its issuance and the terms of such series, in each case adopted by HTA. Under the HTA Resolutions, Bank of New York Mellon ("BNYM") acts as fiscal agent for the HTA Bonds.

---

[66] The security for such bonds has been subject to challenge. *See* section V.F.1 of this Disclosure Statement for more information.

The tax revenues and license fees purportedly pledged in connection with the 1968 and 1998 Resolution Bonds are subject to the "clawback" provision in section 8 of Article VI of the Constitution of Puerto Rico. Toll revenues allegedly pledged in connection with the 1968 and 1998 Resolution Bonds, however, are not subject to "clawback."

Separately, the Commonwealth also allocated to HTA taxes from vehicle license fees, cigarette excise taxes and excess petroleum products excise taxes that are not pledged or appropriated to any bonds but are pledged to the repayment of GDB lines of credit.[67] These are also subject to the "clawback" provision in section 8 of Article VI of the Constitution of Puerto Rico.

Pursuant to the Commonwealth Plan, disputes regarding the "clawback" of revenues allegedly pledged in connection with the 1968 and 1998 Resolution Bonds have been settled and compromised with respect to claims against the Commonwealth.

**HTA's Teodoro Moscoso Bridge Special Facility Revenue Refunding Bonds.** HTA and Autopistas de Puerto Rico y Compañía, S.E. ("Autopistas") are parties to a Concession Agreement dated as of December 20, 1991, pursuant to which Autopistas constructed and is entitled to operate the Teodoro Moscoso Bridge, a toll bridge spanning the San José Lagoon, which opened for traffic in February of 1994. To pay for a portion of the costs related to the construction of the bridge, HTA issued its revenue bonds and loaned the proceeds thereof to Autopistas (the "Bridge Bonds" and together with the 1968 Resolution Bonds and 1998 Resolution Bonds, the "Existing HTA Bonds"). Under the loan agreement with Autopistas, Autopistas agreed to repay the loan solely from the revenues generated by the bridge (net of the bridge's operating and maintenance expenses). Under the HTA trust agreement pursuant to which the Bridge Bonds were issued, such net revenues are pledged to secure the payment of the Bridge Bonds. The Concession Agreement is scheduled to terminate on February 24, 2044. However, Autopistas has the option to terminate the Concession Agreement if bridge traffic is below certain levels specified in the Concession Agreement. Although Autopistas may have the ability to terminate the Teodoro Moscoso Bridge Concession Agreement, according to the FY2021 audited financial statements issued on April 1, 2022 HTA has not received a termination notice and did not expect the Concession Agreement to be terminated. However, if Autopistas exercises its right to terminate the Concession Agreement, HTA would be obligated to assume the obligation to pay the Bridge Bonds, and would be required to issue bonds thereunder in exchange for the Bridge Bonds. If HTA cannot issue bonds under its 1998 Resolution because it does not meet the additional bonds test, the Bridge Bonds would continue to be payable from available bridge net toll revenues and from any other revenues available to HTA after payment of debt service on its senior and subordinated bonds.

**Outstanding Bonds and Other Obligations.**[68] The outstanding HTA Bonds[69] were issued between 1996 and 2007, bearing interest rates between 2.25% and 6.50%, and maturing between July 1, 2018 and July 1, 2046. As of the HTA Petition Date, HTA had approximately

---

[67] Such lines of credit were transferred to the Recovery Authority following the closing of the GDB Title VI proceeding.

**[68]** Amounts of outstanding bonds are based on the information published in the Commonwealth of Puerto Rico Basic Financial Statements and Required Supplementary Information of June 30, 2018.

[69] A list of HTA's outstanding HTA Bonds is provided in Exhibit F to this Disclosure Statement.

$4.3 billion in aggregate principal amount of bonds outstanding under the HTA Bond Resolutions, bearing interest rates between 3.12% and 6.25%.  Approximately $1.46 billion of the outstanding HTA Bonds are insured by Assured, approximately $640 million are insured by National, approximately $430 million are insured by FGIC, approximately $6 million are insured by Syncora, and approximately $515 million are insured by Ambac.  A schedule of outstanding HTA Bonds is attached as Exhibit F. Pursuant to the HTA Enabling Act and the HTA Bond Resolutions, the HTA Bonds are payable from the Conditionally Appropriated Revenues.[70]

Pursuant to executive orders issued under the Moratorium Act enacted by the Commonwealth in May 2016, the then Governor suspended HTA's obligation to transfer pledged funds to the trustee of the 1968 and 1998 Resolution Bonds and ordered the suspension of the Commonwealth's obligation to transfer tax revenues allocated to HTA.[71]  The fiscal agent of the 1968 and 1998 Resolution Bonds paid interest and principal on such bonds (except subordinate bonds issued under the 1998 resolution) on July 1, 2016 using available funds, including debt service reserves.  In the case of the subordinated bonds issued under the 1998 resolution, the debt service reserves were held at GDB and were not available to pay such bonds as a result of the limitations on withdrawal of deposits imposed by the executive orders issued under the Moratorium Act.[72]

As of June 30, 2020, HTA had outstanding approximately $1.7 billion aggregate principal amounts of loans from the GDB (the "HTA Loans"), which were transferred to the Debt Recovery Authority for the Government Development Bank pursuant to the GDB Qualifying Modification.  For a summary of the GDB Qualifying Modification, see Section V.I.2 of this Disclosure Statement.  All HTA Loans have matured and bear interest as a variable rate equal to the U.S. Prime Rate plus 150 basis points, subject to a floor of 6% and a legal cap of 12%.  The HTA Loans were payable primarily from the revenues allocated by the Commonwealth to HTA by Act No. 30-2013 and Act No. 31-2013 (collectively, the "Act 30-31 Revenues").

The Act 30-31 Revenues consist of (i) revenues from the increase in the Commonwealth's petroleum products excise tax introduced by Act No. 31-2013, (ii) the portion of the motor vehicle license fees in excess of the $15 pledged for the payment of certain of HTA's outstanding public bonds, and (iii) $20 million of the Commonwealth's cigarette excise tax each fiscal year.  As described in Section III.B.1(a) of this Disclosure Statement, the Act 30-31 Revenues purportedly pledged in connection with the HTA Loans are subject to the "clawback" provision in section 8 of Article VI of the Constitution of Puerto Rico.

***Litigations Related to HTA Bonds and Other Obligations.***  Summaries of certain litigation relating to the HTA Bonds and other obligations of HTA are available in section V.F of this Disclosure Statement.

---

[70]  9 L.P.R.A. § 2004(l).

[71]  The HTA Resolutions do not provide for the acceleration of the maturities of the Bonds upon default.

[72]  The Moratorium Act was amended by the Commonwealth in January 2017 by Act 5-2017, declaring a financial emergency and allowing the Governor to issue executive orders designating priority for use of available resources and granting the Governor broad receivership powers over government agencies.  For further discussion of Act 5-2017, *see* section IV.B.11 of this Disclosure Statement.

### C.  HTA's Revenue Regime[73]

Revenue is generated at HTA from two primary categories: (1) operating revenue, which consists primarily of toll fares, toll fines, transit fares, and concession agreements; and (2) non-operating revenue, which consists primarily of federal and Commonwealth transfers and grants for both operational and capital purposes.  Prior to December 1, 2015, HTA received several Conditionally Appropriated Revenues, including gasoline taxes, diesel taxes, petroleum product taxes, cigarette taxes, and motor vehicle license fees.  Since the issuance of Executive Order 2015-046, however, the Department of Treasury has retained these taxes.  These Conditionally Appropriated Revenues are commonly referred to as "clawback funds."

For FY2021, HTA reported revenue totaling approximately $824 million.  For FY2020, HTA reported revenue totaling approximately $490 million in total revenues (see Table 1 below).

**Table 1: Historical HTA Revenue FY2018 to FY2021**

| | Revenues[74] | | | |
|---|---|---|---|---|
| ($ *thousands*) | **FY2018** | **FY2019** | **FY2020** | **FY2021** |
| **Operating Revenue** | | | | |
| Toll and train fares | $115,783 | $142,293 | $129,279 | $152,674 |
| Other operating income | 5,941 | 18,245 | 7,518 | 6,465 |
| Electronic toll fines and label sales | 54,204 | 14,282 | - | - |
| Concession agreements | 34,140 | 34,426 | 39,946 | 41,165 |
| **Operating Revenue Subtotal** | **210,068** | **209,246** | **176,743** | **200,304** |
| **Non-Operating Revenue** | | | | |
| Operating transfers from the Commonwealth of Puerto Rico [75] | 117,088 | 97,300 | | 206,136 |
| Capital Grant - Commonwealth | 159,000 | 61,397 | 90,851 | 183,525 |
| Operating grants from U.S. Federal Government | 20,602 | 31,828 | 24,310 | 16,565 |
| Capital Grant - Federal Government | 92,313 | 164,101 | 198,290 | 217,698 |
| **Non-Operating Revenue Subtotal** | **389,003** | **354,626** | **313,451** | **623,924** |
| **Total Revenue** | 599,071 | 563,872 | 490,195 | 824,228 |

### 1.  HTA Revenue Sources

### (a)  Operating Revenues

HTA has four primary sources of operating revenues: (1) toll and train fares; (2) other operating income; (3) electronic toll fines and label sales; and (4) concession agreements.

---

[73]  This section is not intended to exhaustively describe all of HTA's revenues, but rather provides an overview of certain of the HTA's most significant sources of revenue.

[74]  These amounts represent audited revenue reported by HTA in its annual audited financial statements for fiscal years ended 2018, 2019, 2020, and 2021.

[75]  Consists of Commonwealth funds to fund HTA's operating expenditures associated with non-toll assets.  In FY2021, the amount also includes $115.5 million as a one-time reserve to fund HTA's outstanding utility obligations due to PREPA and PRASA, unforeseen non-Title III litigation expenses, and unforeseen operational emergency events.

*Toll and Train Fares*.  Toll and train fare revenue total approximately $153 million and contributes to the majority of HTA's current operating revenues (approximately seventy-six percent (76%) of FY2021 operating revenue).  HTA currently operates four toll roads, PR-20, PR-52, PR-53, and PR-66.  The toll fares on all four HTA-operated toll roads have not increased since 2005.

Tren Urbano, San Juan's heavy rail metro train system, collects fares from their ridership. Total transit collections have consistently fallen short of initial projections. Tren Urbano was initially projected to attain a monthly ridership of approximately 3.4 million passengers per month by 2010; however, it currently has a ridership of only approximately 0.22 million[76] passengers per month. Additionally, Tren Urbano's transit farebox recovery ratio (the share of expenses covered by fare revenues) is currently down to four percent (4%) from seventeen percent (17%) in 2017,[77] compared to twelve percent (12%) for peer U.S. systems. A 2018 assessment after Hurricanes Irma and María found that more than fifty percent (50%) of the Tren Urbano's turnstiles (barriers) were not operational; twenty percent (20%) of the ticket vending machines had defects; the software is outdated; and the system is not payment card industry-compliant, which prevents users from purchasing tickets with debit and credit cards.

*Other operating income.* In FY2021, HTA recorded approximately $6 million in other operating income, which accounts for three percent (3%) of FY2021 operating revenue.  Other operating income consists of: (i) Teodoro Moscoso revenues, which is approximately five percent (5%) of fares collected by Autopistas and remitted to HTA on an annual basis, (ii) rent and lease income, (iii) truck weighting, (iv) Metrobus fare fees, and (v) other non-toll transit-based revenue.

*Electronic toll fines and label sales.* Toll fine revenue is based on toll operation-related violations (a $15 flat fine pursuant to Act 220-2018).  For example, fines are imposed on drivers who pass through toll plazas without a transponder or balance in their account and do not pay the appropriate toll fare within five (5) days of the date of their respective violation.  Toll fine forgiveness legislation passed in September 2018 delayed electronic toll fine collections through July 2021.  HTA resumed toll fine collections in July 2021.  Historically, HTA collected approximately sixty percent (60%) of all fines imposed.  From July 2021 through December 2021, HTA collected $20.5 million in toll fines, which is significantly higher than the budgeted amount of $8.1 million for that period.  This increase is driven by high violation rates, as well as higher collection rates after fines were restored.  Label sales relate to income recorded for sales of transponders and toll tags for AutoExpreso.

*Concession agreements.* HTA maintains two toll road concession agreements.  In 1992, HTA entered into a Bridge Service Concession Agreement with Autopistas for the design, construction, operation, and maintenance of the Teodoro Moscoso Bridge, a toll bridge that crosses the San Jose Lagoon between the municipalities of San Juan and Carolina.  Pursuant to the agreement, Autopistas pays five percent (5%) of the annual toll revenue to HTA through 2027 and then 61.5% from February 23, 2027 through the end of the agreement.  Additionally,

---

[76]   Average for the period July 2021 to January 2022.

[77]   Reflects farebox revenue ratio ("FRR") of FY2022 (as of December 2021); FY2021 FRR is closer to 2% due to shutdown periods in 2020.

under the terms of the agreement, Autopistas is responsible for the debt service payment on term and capital appreciation bonds used to finance the construction of the bridge. Because these bonds are being paid by Autopistas, HTA will record concession revenue for the amount of principal and interest paid by Autopistas annually until settlement.

On September 22, 2011, HTA entered into a Toll Road Concession Agreement with Metropistas in which Metropistas was granted the right to operate the PR-5 and PR-22 highways for a period of 40 years. As part of the agreement, Metropistas received the right to charge and collect tolls imposed on the toll roads in exchange for an upfront concession fee payment of approximately $1.13 billion, for which HTA recorded the payments as a deferred inflow of resources that is being amortized and recognized as revenue over the 40-year term of the agreement. Metropistas operates roads with a Consumer Price Index ("CPI") plus additional 1.5% schedule of annual increases and has increased fares every year since 2014.

Given the success of utilizing this concession to improve road quality and financial sustainability, on April 19, 2016, HTA entered into an amendment of the Toll Road Services Concession Agreement to extend the original term of the contract with Metropistas for an additional 10 years and to create five bidirectional tolling points on the toll roads in exchange for an upfront concession fee payment of $100 million. Most recently, in June 2017, HTA received an additional $15 million payment concurrently with the commencement of the bidirectional system previously described. In addition to raising funds, Metropistas has demonstrated success with quality improvements based on improved metrics for road conditions. As of 2019, ninety-nine percent (99%) of PR-22's pavement is in "good" or "fair" condition, compared to eighty-three percent (83%) for Puerto Rico's interstate system as a whole.

HTA also has a contract with the Municipality of Guaynabo to collect the toll revenues of the municipal toll road through the AutoExpreso operator for a fee.

***COVID-19 impact on HTA operating revenues.*** The onset of the COVID-19 pandemic in March 2020 quickly and dramatically impacted HTA's operations and financial performance. Monthly transactions on HTA's four toll roads, for instance, declined forty-five percent (45%) from a pre-COVID-19 average of 10.3 million per month[78] to an average of 5.6 million per month[79] during the height of the pandemic. Nonetheless, in FY2021 and FY2022, toll transactions have hovered around pre-COVID-19 levels, reaching a monthly average of 9.8 million toll transactions for FY2021[80] and 10.7 million toll transactions for FY2022 (starting July 2021) through December 2021. Transit assets experienced a more dramatic decrease in revenues, because Tren Urbano and feeder bus service was entirely shut down from mid-March 2020 until July 2020, and again in August and September 2020. Unlike toll transactions, transit demand has shown few signs of improvement, as the average monthly Tren Urbano revenues remain below its pre-COVID levels at approximately sixty-four percent (64%) for FY2021 and fifty two

---

[78]   Average monthly transactions for the six-month period from September 2019 through February 2020 (prior to COVID-19).

[79]   Average monthly transactions for the three-month period from March 2020 through May 2020 (COVID-19 shutdowns).

[80]   Average monthly transactions for the twelve-month period from July 2020 through June 2021 (post-lockdown period).

percent (52%) for the first half of FY2022.[81] Stagnant transit demand has been exacerbated by operational inefficiencies in HTA's transit system (*e.g.*, nonoperational turnstiles, outdated IT systems) that have led to reduced public accessibility and attractiveness of facilities, and a lower quality of service.

### (b)    Non-Operating capital contributions and revenues

HTA has historically received non-operating capital contributions and revenues from two sources: (1) the Federal government, and (2) appropriations from the Commonwealth government's primary operating fund (the "General Fund") budget.

***Operating transfers and capital grants from the Commonwealth.***  In late 2015, the sitting Governor issued Executive Order 2015-046, which directed the Treasury Department to retain certain Conditionally Appropriated Revenues from HTA, including motor vehicle license fees, as well as Commonwealth excise taxes on gasoline, oil, petroleum products, and cigarettes. To ensure HTA maintained enough resources to fund necessary maintenance and capital expenditures ("CapEx") to keep Puerto Rico's transportation system operational, the Commonwealth subsequently started making two new appropriations: (1) a CapEx appropriation designed to help HTA advance its infrastructure priorities; and (2) a general operating transfer intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes.  In line with the certified 2021 and 2022 fiscal plans for both HTA and the Commonwealth, the amount of the transfer from the Commonwealth varies in an amount that ties to the estimated level of funding required to support HTA's non-toll roads and transit assets, cover their operational expenses, and address their capital needs.  In FY2021, this funding level was based on projections of the May 2021 HTA Fiscal Plan, assuming full and successful implementation of the fiscal measures.

A one-time reserve for HTA was funded in FY2021 with a total balance of approximately $115.5 million.  This reserve was intended to be used to pay for outstanding utility obligations due to PREPA and PRASA (approximately $40 million), unforeseen non-Title III litigation expenses (approximately $9 million), and unforeseen operational emergency events (approximately $67 million).  HTA cannot access this reserve without prior written authorization from the Oversight Board.  The reserve is managed in a separate account and not utilized for HTA's CapEx program.  There is no intent to replenish this reserve going forward.  Starting FY2021 through January 2022, HTA disbursed approximately $30.4 million from this one-time reserve (99.7% of which related to outstanding utility obligations due to PREPA and PRASA), resulting in an ending balance of approximately $85 million.

Going forward, all General Fund appropriations to HTA will be tied to the estimated level of investment required to maintain the non-tolled roads and transit assets, as the toll roads will fully fund their own operating and capital expenses and toll revenues will not be available to finance non-toll operations.  The level of funding is based on the estimated apportionment of costs and revenues between asset classes and is subject to further refinement, particularly as

---

[81]    When comparing the six-month period from September 2019 through February 2020 (*i.e.*, a period prior to the C OVID-19 pandemic) against the six-month period from January 2021 through June 2021 – the last six months for FY2021 (*i.e.*, the post-lockdown period) and the six-month period from July 2021 through December 2021 for FY2022 (*i.e.*, the most recent six-month period).

capital project plans are finalized.  Over FY2022-FY2051, the 2022 Commonwealth Certified Fiscal Plan forecasts the General Fund appropriation to HTA to average approximately $109 million per year, plus an additional $67 million average per year in CapEx appropriations.  The Commonwealth transfers CapEx appropriations each year to HTA to allow for sufficient funding for HTA's Capital Improvement Program, which is intended to start in FY2023.

Additionally, pursuant to the Commonwealth Plan, subject to the satisfaction of certain conditions, HTA shall make cash payments of $184.8 million to holders of the HTA 68 Bonds Claims and $79.2 million to holders of the HTA 98 Senior Bond Claims.  HTA shall also make a cash payment of $125 million for consummation costs in consideration of fees and expenses incurred by an Initial PSA Creditor and cover $15 million to the DRA Parties in accordance with the DRA Stipulation.  From the total owed by HTA of $404 million, the Commonwealth will provide a one-time loan to HTA for FY2022 in the amount of $362 million in addition to the above-referenced annual operating and capital appropriations to ensure HTA's liquidity upon implementation of the Commonwealth Plan.  The 2022 Commonwealth Certified Fiscal Plan assumes a 30-year subordinated loan repayment for illustrative purposes.

***Infrastructure Investment and Jobs Act (IIJA)***.  On November 11, 2021, President Biden signed into law the $1.2 trillion IIJA which had a dual purpose of (1) providing funding extensions and increases for FY2022 through FY2026 for many FAST Act programs and (2) creating new funding programs and appropriations addressing surface transportation, aviation, water, climate and broadband.  The IIJA provides over $550 billion in new spending over five years.  Among other initiatives, IIJA aims to repair and rebuild roads and bridges with a focus on climate change mitigation, resilience, equity, and safety for all users and improve transportation options and reduce greenhouse emissions through a large investment in public transit.  HTA will benefit from increases to existing federal formula funding sources (like the Puerto Rico Highway Program) and new programs, like the Bridge Replacement, Rehabilitation, Preservation, Protection, and Construction Program, as well as have the ability to compete for multiple discretionary programs such as Infrastructure for Rebuilding America.  Puerto Rico is estimated to be eligible to receive approximately $2.5 billion[82] in formula funding between FY2022 and FY2026 from the IIJA.  HTA is expected to be eligible for up to approximately $300-$400 million in incremental formula funding from IIJA across FY2022-FY2026 (highway, transit, and bridges – assuming HTA were to expand its capital program such that capital expenditures equaled available formula funding).  More broadly, Puerto Rico could compete for a share of approximately $380 billion in discretionary programs.

***Operating and capital grants from the U.S. Federal Government.***  HTA receives capital and operating grants from the federal government.  Capital grants may only be used for construction, major improvements, preservations of highways and bridges while operating grants are used to finance repair and maintenance for roads and bridges and other operating expenses of other mass transportation systems.  For example, HTA receives an annual allocation from the FHWA for construction, major improvements, and the preservation of highways and bridges. Historically, these funds could not be used for other operating purposes; however, pursuant to the newly enacted IIJA, a portion of the formula funds to be provided by FHWA to HTA will allow for maintenance work.  HTA also receives operating grants from the FTA for maintenance

---

[82]   This figure includes both renewal of baseline funding and incremental new funding.

services of Tren Urbano. In addition to normal course contributions, HTA also expects to receive ad hoc funding until at least FY2026 from FHWA and the Federal Emergency Management Agency ("FEMA") emergency funds; and non-regular Capital FTA funds.

### (c)     Conditionally Appropriated Revenues

Historically, HTA also received funding from several Conditionally Appropriated Revenues, including motor vehicle license fees as well as Commonwealth excise taxes on gasoline, oil, petroleum products, and cigarettes. On December 1, 2015, the Governor issued Executive Order 2015-046 which directed the Department of the Treasury to start retaining these fees and taxes. Subsequently, following the filing of the Commonwealth's Title III case on May 3, 2017, the Conditionally Appropriated Revenues were retained by the Commonwealth for numerous reasons, including application of the automatic stay under Title III of PROMESA. Since the consummation of the Commonwealth Plan, on March 15, 2022, such revenues are no longer be subject to transfer to HTA in the future.

*Excise Tax on Gasoline.* The Puerto Rico Internal Revenue Code currently imposes a $0.16 per gallon tax on gasoline. Prior to the enactment of Executive Order 2015-046, the entire amount collected under this tax was transferred to HTA on a conditionally appropriated basis. In FY2021, the General Fund collected approximately $126 million in gasoline excise tax collections.

*Excise Tax on Diesel.* The Puerto Rico Internal Revenue Code currently imposes a $0.04 per gallon tax on gas oil and diesel oil. In FY2021, the General Fund collected approximately $13 million from the excise tax on diesel fuels.

*Excise Tax on Petroleum Products and its Derivatives ("crudita").* The gross excise tax on petroleum products and its derivatives is currently $15.50 per barrel ($6.25 of which does not apply to diesel products). Starting on June 25, 2013, Puerto Rico increased the conditionally appropriated portion of the excise tax that HTA received on petroleum products from $3.00 per barrel to $9.25 per barrel and also started transferring to HTA the portion of motor vehicle license fee proceeds that was originally retained by the Department of Treasury. The other $6.25 was historically sent on a conditionally allocable basis to the Puerto Rico Infrastructure Financing Authority. This tax is subject to adjustment based on consumption and inflation every four years. In FY2021, the General Fund collected approximately $343 million from the crudita tax.

*Tobacco Products Excise Tax.* Section 3020.05 of the Puerto Rico Internal Revenue Code imposes an excise tax on cigarettes. The tax has increased multiple times in the past decade and is currently $25.50 per hundred cigarettes. The 2011 Puerto Rico Internal Revenue Code also imposes a tax on cigars, rolling tobacco, chewing tobacco, powdered tobacco (snuff), electronic cigarettes, vaporizers, and other products derived from tobacco.

The 2011 Puerto Rico Internal Revenue Code provides that the Secretary of Treasury shall deposit the collections resulting from the tobacco products excise taxes directly to the Commonwealth General Fund. Act 26-2017 amended the 2011 Puerto Rico Internal Revenue Code's provision regarding the assignment of funds to direct the deposit of all funds collected to

the General Fund rather than distribute a portion of the funds among the School of Fine Arts (33%), the Conservatory of Music (33%) and Musical Arts Corporation (34%).

Prior to the enactment of Executive Order 2015-046, a portion of the proceeds from the tobacco products excise tax, approximately $20 million, was conditionally appropriated to HTA. In FY2021, the General Fund collected approximately $55 million from the tobacco products excise tax.

*Motor Vehicle License Fee.*  Under Act 22-2000, as amended, known as the Vehicle and Traffic Law of Puerto Rico, the Commonwealth imposes annual license fees on various classes of motor vehicles.  Act 22-2000 repealed Act 141-1960, as amended, known as the Puerto Rico Vehicle and Traffic Law, which previously governed motor vehicle license fees.  The current license fees range from $25 to $40 for passenger cars and vary for other vehicles.  Prior to the enactment of Executive Order 2015-046, fifteen dollars ($15) of each such annual license fee was conditionally appropriated to HTA to be used as a source of revenue.  Additionally, Act 30-2013 conditionally assigned the remaining twenty-five dollars ($25) of each such annual license fee to HTA.  In FY2021, the General Fund collected approximately $103 million from motor vehicle license fees.

### D.    HTA's Cash Management System

### (a) HTA Bank Accounts Flow of Funds

*Toll Revenue*.  Toll revenues collected at the point of sale, including all prepayments made into AutoExpreso accounts through automatic electronic funds replenishment, are deposited in Banco Popular de Puerto Rico ("BPPR") sweep escrow accounts #0303 and #6438. These funds are then transferred to BPPR consolidated escrow account #6411 daily.  As of the December 31, 2021 (the "December 2021 Measurement Date"), account #6411 had a balance of approximately $23.7 million.  Accounts #0303 and #6438 each had a balance of $5,000, as required by the escrow agreement.  Toll revenues belonging to HTA, calculated weekly based on the toll traffic report, are distributed from the consolidated escrow account #6411 to BPPR account #5116, which had a balance of approximately $13.0 million as of December 2021 Measurement Date.  If any toll funds are incorrectly transferred to HTA from the BPPR consolidated escrow account #6411, these funds are transferred back to the sweep escrow account (BPPR account #0303).

Funds may be transferred from account #5116 to various accounts, including (1) BPPR accounts #5078 and #5353, from which payroll is disbursed and, collectively, had a balance of approximately $0.9 million as of the December 2021 Measurement Date; (2) Oriental Bank account #9874 (main operating account) from which operating expenses are disbursed and had a balance of approximately $3.4 million as of the December 2021 Measurement Date; (3) restricted BPPR account #0510, to which the state share of federal programs is transferred to and had a balance of approximately $7.4 million as of the December 2021 Measurement Date; and (4) BPPR account #5210, which had a balance of $6.4 million as of the December 2021 Measurement Date relating to restricted toll funds set aside for specific capital projects, in accordance with Act 91-2013.  Additional funds are not currently being transferred to BPPR account #5210.

The flow of funds is illustrated below:



***Toll Fine Revenue.***  Toll fine revenues are collected in BPPR account #1520 and are disbursed for operating expenses, including paying for the services of third-party operators.  As of the December 2021 Measurement Date, BPPR account #1520 had a balance of approximately $9.5 million.  The flow of funds is illustrated below:



***Commonwealth Transfers to HTA.***  Transfers from the Commonwealth to HTA, including General Fund appropriations and Abriendo Caminos funds, are deposited in Oriental Bank account #2489, which had a balance of $0.2 million of the December 2021 Measurement Date, and are then transferred to HTA's main operating account (Oriental Bank account #9874). Certain CapEx reimbursement funds from the Commonwealth are transferred directly to the main operating account.

HTA segregates certain funds for specific purposes from the main operating account into three separate accounts.  Funds for state CapEx projects are kept in First Bank account #2473, which had a balance of approximately $24.6 million as of the December 2021 Measurement Date.  Funds for the Abriendo Caminos projects are kept in First Bank account #7726, which had a minimal balance as of the December 2021 Measurement Date.  Finally, funds for the operating expense reserve are kept in First Bank account #3768, which had a balance of approximately $85.2 million on the December 2021 Measurement Date.  Funds from the operating expense reserve are used to pay for emergency and unforeseen events, outstanding utility obligations, and any unforeseen non-Title III litigation costs.  HTA cannot access this reserve without prior and written authorization from the Oversight Board.  There is currently no intent to replenish this reserve going forward, although HTA will continue to utilize the funds as necessary and permitted by the Oversight Board.  The funds from these segregated accounts may be transferred back into the operating account (#9874) as needed when HTA needs to pay for these specific projects or expenses.  Additionally, funds for operating expenses are transferred to a pass-through account (Oriental Bank account #9574) to pay operating expenses.

The flow of funds is illustrated below:



***FTA Funds.***  FTA grants are collected in Oriental Bank account #6672, which had a balance of approximately $0.1 million as of the December 2021 Measurement Date.  Depending on the project, funds may be passed through to municipalities to reimburse for qualified projects or transferred to Oriental Bank account #9874, the main operating account.  The flow of funds is illustrated below:



***FHWA Funds.***  FHWA funds are collected in BPPR account #0510, which had a balance of approximately $7.4 million as of the December 2021 Measurement Date.  HTA maintains a backup BPPR account #0220, which had a zero balance as of the December 2021 Measurement Date.  Funds from these two accounts are disbursed for federal construction projects.  The flow of funds is illustrated below:



***FEMA Funds.***  FEMA funds related to Hurricanes Irma and Maria are received by the Central Office for Recovery, Reconstruction and Resiliency ("COR3").  COR3 is responsible for depositing these funds to BPPR account #6671, which had a balance of approximately $0.9 million as of the December 2021 Measurement Date.  The flow of funds is illustrated below:



### E.   HTA Cash Accounts

The list of the Debtor's bank accounts, balances as of December 31, 2021, and preliminary restriction categorizations is attached hereto as Exhibit G.  The list is based on the most current information available to the Oversight Board's professionals and the Oversight Board's legal analysis and judgment regarding restriction categorizations are based on such information.

#### 1.   Independent Forensic Analysis Team's Report

On January 31, 2018, the Oversight Board, acting by and through the Special Investigation Committee (the "Special Investigation Committee"),[83] tasked an Independent Forensic Analysis Team (the "IFAT"), through the retention of Duff and Phelps, LLC ("D&P"), to conduct an investigation into bank accounts of government entities, including the entities covered by the Commonwealth fiscal plan, UPR, HTA, ERS, and PREPA.  The scope of the assignment included (i) an inventory of cash, cash equivalents, and investments of the Puerto Rico Government, (ii) analysis of the sources and intended uses of these funds, and (iii) any documented legal restrictions on these funds.

The principal goal of the IFAT was the publication of a report that described the processes employed, results obtained, and an opinion from the IFAT on whether or not procedures performed validate, among other things, the HTA bank and investment accounts identified, and account balances disclosed.  The investigation was dependent on the assumption that HTA, among others, would voluntarily provide the Oversight Board with specific financial information.  The design of the investigation was tailored to collect and develop information as to whether the bank accounts identified by HTA, among others, contained restricted funds, the quantities, and the nature of restricted funds.

#### (a) Investigation Procedures

For purposes of the report, the IFAT identified a measurement date of June 30, 2018 (the "June 2018 Measurement Date").  The investigation included three components: (i) an information gathering process; (ii) an inquiry and data collecting process; and (iii) an analytical and reporting process.

---

[83]   The Special Investigation Committee of the Oversight Board was at the time comprised of Members Ana J. Matosantos, David A. Skeel, and Judge Arthur J. Gonzalez (Ret.)., and was charged with pursuing investigations pursuant to the authority granted to the Oversight Board by PROMESA Section 104(o) and such other authority vested in the Oversight Board under PROMESA.

*Information Gathering.*   Gathering information was a sequenced process.   A master database was created of government entities, including HTA, and their respective bank accounts as of the June 2018 Measurement Date.   The information was primarily received from the Puerto Rico Department of Treasury, AAFAF, and publicly available government information.

*Inquiry and Data Collecting Process.*   Once the master database was created, each government entity that was identified, including HTA, was contacted using a standardized format.   The government entities were contacted to obtain the relevant bank account information and authorization from the government entities to allow the financial institutions that maintained the government entities' bank accounts to provide information directly to the IFAT.

*Analytical and Reporting Process.*   The final step was contacting the financial institutions identified to confirm and verify the self-reported information from the government entities, including HTA.

### (b) Additional Steps Suggested in the IFAT's Report

The IFAT issued its report on March 12, 2019.   The IFAT report suggested additional tasks and activities to more fully develop information referred to in the report, which included updating the June 2018 Measurement Date to a more current measurement date, in consideration of the possibility that amounts may have materially changed between these dates.   The changes to balances as of the new Measurement Dates, as well as additional procedures to reconcile balances and categorize restrictions, are addressed below.

### 2.   Ongoing Analysis of Bank Accounts

Following the release of the IFAT report, the Oversight Board, with assistance from its advisors other than Duff & Phelps, continued to expand upon the IFAT investigation and perform analyses of the cash accounts of the Commonwealth and its instrumentalities, including HTA, on a periodic basis, most recently as of December 31, 2021 or the December 2021 Measurement Date.

As described below, the Oversight Board's ongoing analyses of HTA accounts included the collection, processing, and review of documents provided by financial institutions, agencies, and other government entities.   Collection of documents included account statements (including bank statements, brokerage statements, certificates of deposit or balance confirmation letters, depending on type of account and availability of information), restriction information (including contracts, and federal and local legislation) and signatory information.   In addition, this information was obtained via email, phone, in-person meetings, and through accounting and legal review.

### (a) Summary of Procedures Performed

The Oversight Board focused on, among other things, (i) confirming the population of bank accounts and establishing their balances, and (ii) assessing, based on available information and legal analysis, the amount of any restricted funds within those accounts.

The Oversight Board leveraged and enhanced the procedures noted in the IFAT report to rollforward the balances, most recently to the December 2021 Measurement Date.  Specifically, in addition to obtaining balance information for a set population of accounts through requests to the governmental entities, the Oversight Board's procedures included obtaining credentials for access to online account platforms for each entity, including HTA, for a majority of the bank account balances.  The online account access allows for the rolling forward of balances and identification of the population of accounts at each financial institution for each governmental entity, including HTA.  Requests for financial information were also sent to governmental entities and financial institutions in cases where online access was not available.  Further procedures were performed to align financial institution data with information provided by governmental entities to reconcile differences.

Concurrently, the Oversight Board requested documentation regarding any governmental entity's self-reported restriction classification.  Further procedures were performed to continuously support the governmental entities in providing the documentation for legal due diligence review.  For HTA, the vast majority (98%) of the value of the account balances was concentrated in 15 of the 74 accounts.  The Oversight Board's legal advisors performed legal due diligence on these 15 accounts, all of which had balances in excess of $2.0 million, to obtain over 95% coverage of the total cash held in HTA accounts as of the December 2021 Measurement Date.  The remaining 59 accounts contained $4.9 million and equated to 2% of the total cash balance in HTA accounts as of the December 2021 Measurement Date.

     (i)     ***Identifying the Population of Bank Accounts and Establishing Their Balances:***

The Oversight Board sent letters requesting account balances as of the December 2021 Measurement Date to financial institutions ("<u>FIs</u>") for HTA's accounts.  The letters were sent in conjunction with a list of known accounts held by HTA at the respective FIs and requested that the FIs submit the following to the Oversight Board:

- bank or brokerage statements for any cash and/or investment balances for accounts held by the FIs relating to HTA, or online access for the Oversight Board to obtain the relevant data for each account;

- a list of signatories with authority over each account;

- information pertaining to any known liens, encumbrances, or third-party claims; and

- details for any additional accounts held by HTA that were not included within the IFAT report.

Simultaneously, letters were sent to HTA requesting the following information for a list of identified accounts:

- bank or brokerage statements for any cash and/or investment balances for accounts held by HTA, or a completed consent form granting online access to obtain the relevant data for each account from a FI;

- the status of each account, such as open, closed, suspended, etc.;

- a list of signatories with authority over each account;

- details for any other HTA accounts (*i.e.*, any not identified on the list of accounts sent to HTA); and

- whether the funds in each account should be categorized as restricted, unrestricted, or pooled (as further discussed below).[84]

(ii) *Determining Whether Accounts and Balances Include Legally Restricted Funds:*

As noted, requests sent to governmental entities, including HTA, included a request for the entity to classify its accounts as restricted, unrestricted, or pooled.  To help guide them, the entities were provided with descriptions of various restricted and unrestricted account designations.  If an account was viewed as restricted by the governmental entity, the governmental entity, including HTA, was requested to select the applicable category of restriction and provide to the Oversight Board supporting documentation for the claimed restriction, including information about the sources and uses of funds.  If an account was viewed as unrestricted by the governmental entity, the governmental entity, including HTA, was requested to provide the sources and uses of funds for the accounts.

A thorough examination of the documents provided by the governmental entities, including HTA, was performed by the Oversight Board's legal advisors to investigate and assess asserted legal restrictions, which included:

- reviewing documentation gathered as part of the IFAT report;

- reviewing documents obtained since the IFAT report regarding account classifications; and

- working with other parties, such as the Puerto Rico Department of Treasury and AAFAF, to obtain and review additional documentation relevant to the legal restriction classifications of HTA bank accounts.

---

[84]   Pooled accounts contain both restricted and unrestricted funds.

The accounts were then classified in the following categories based on the above-described account information review and legal analyses (the preliminary designation for each account above the review threshold of $2.0 million as of the December 2021 Measurement Date is provided in Exhibit G):

- **Unreviewed Accounts**: Except as noted in footnote 83, accounts with a balance below $2.0 million as of the December 2021 Measurement Date have been designated as "Unreviewed" in Exhibit G.[85]

- **Restricted Federal Funds/Law**: Funds received from the federal government, and/or restricted by federal law or regulation, for specific uses (*e.g.*, grants or support funds from the U.S. Department of Transportation regarding roads and transportation system projects). Such cash could be recouped by the federal government if not used as designated.

- **Restricted Third Party Funds**: Funds belonging to and held on behalf of third parties (*e.g.*, prepaid toll revenue collected but not yet earned by HTA).

- **Inconclusive**: Accounts for which the legal team thus far has insufficient information to determine whether the funds are legally restricted.

- **Unrestricted Funds**: Funds that are not subject to legal restrictions and can be used to pay creditors under a plan of adjustment.[86]

(b)     **Summary of Preliminary Findings[87]**

While the Oversight Board's analysis is ongoing, preliminary investigation shows HTA maintains approximately $271.4 million as of the December 2021 Measurement Date across 74 accounts held by HTA at various FIs. The list of such accounts is attached as Exhibit G, and a summary is set forth directly below:

---

[85]   Thirty-seven (37) accounts under $2 million were also reviewed and categorized as unrestricted. Those accounts, totaling $3.7 million, include 35 accounts (totaling $2.9 million) held at Bank of New York Mellon, the fiscal agent for HTA bonds.

[86]   A one-time reserve for HTA was funded in FY21 with a total balance of approximately $115.5 million. This reserve was intended to be used to pay for outstanding utility obligations due to PREPA and PRASA, Title III litigation expenses, and unforeseen operational emergency events. The reserve is managed in a separate account and not utilized for HTA's capital expenditure program. There is no intent to replenish this reserve going forward, although HTA will continue to utilize the funds as permitted. The balance of this reserve fund as of December 31, 2021, was approximately $85 million and is considered unrestricted for the purposes of legal due diligence analysis.

[87]   The information included herein is as of the date of this Disclosure Statement and should be considered preliminary and subject to material change. Amounts included throughout this Disclosure Statement with respect to the Debtor's cash accounts are subject to modification based on the receipt of additional information and review by legal counsel.

| Agency | No. of Accts. | 12/31/2021 Balance | Unreviewed | Restricted | Inconclusive[88] | Unrestricted[89] |
|---|---|---|---|---|---|---|
| HTA | 74 | $ 271,447,842 | $ 1,106,754 | $ 31,115,940 | $ 6,438,058 | $ 232,787,090 |

Legal due diligence review for restriction classification was performed for $270.3 million out of the $271.4 million in balances for the December 2021 Measurement Date. The remaining accounts totaling approximately $1.1 million were not reviewed for restriction designations due to the size of individual balances. Each of the balances for those accounts were below $2.0 million as of the December 2021 Measurement Date and has been classified as unreviewed. Legal due diligence is continuing; however, out of the $270.3 million account balances analyzed, approximately $31.1 million were classified as restricted, and $232.8 million were classified as unrestricted. An additional $6.4 million in account balances were categorized as inconclusive pending the receipt of further documentation.

Of the $232.8 million balance classified as unrestricted, (i) $85.2 million is related specifically to emergency reserve funding provided by the Commonwealth for specific uses and requires authorization from the Oversight Board prior to spending and (ii) $90.3 million set aside for plan-related payments. Additionally, an ample amount of the remaining balance must be maintained for general working capital purposes as well as planned capital expenditures. Based on the above, a one-time $362 million loan from the Commonwealth to HTA will be provided to facilitate plan-related cash payments and ensure adequate liquidity.

### (c) Updates to Information Referenced in the IFAT Report

The following provides a summary highlighting the areas of progress made since the June 2018 Measurement Date:

- Since the June 2018 Measurement Date, six (6) new HTA accounts totaling approximately $85.2 million were identified and supported by financial documents. These six accounts were identified based on information provided by governmental entities and FIs.

- Since the June 2018 Measurement Date, twenty-three (23) HTA accounts that were included within the IFAT report were identified as being closed accounts, duplicate accounts, or non-existent accounts and this was confirmed by the FIs or governmental entities. The IFAT report included 13 accounts with reported balances totaling $1,305 that were deemed as duplicate and one account with a reported balance of approximately $6.0 million that was closed prior to the June 2018 Measurement Date.

---

[88]   The $6.4 million Inconclusive balance is comprised of one account with insufficient documentation to determine whether it is subject to legal restriction governing the use of the funds.

[89]   Of the $232.8 million unrestricted balance, $90.3 million is held at Bank of New York Mellon, the fiscal agent for HTA bonds.

**(d) Continuation of Tasks and Activities Referenced in the IFAT Report**

The IFAT report suggested nine (9) additional tasks and activities to more fully develop the relevant information.  The Oversight Board has adopted the suggestions and continued procedures to enhance the information subsequent to the release of the IFAT report.  Accordingly, the following provides an update, specific to HTA, on the nine suggestions:

- The Oversight Board continued and updated its procedures to review and update account balances and legal restriction classifications, most recently as of the December 2021 Measurement Date.

- The Oversight Board updated its procedures to review accounts for legal restriction classifications across the population of accounts for HTA that would result in a review of more than 95% of combined total account balances.

- The procedures to review and update account balances and legal restriction classifications included gathering additional documents for all governmental entities, which were used to update and enhance financial and legal due diligence procedures.  Specifically, HTA and the respective FIs were contacted regarding accounts and were asked to provide further information regarding closed or suspended accounts, as well as potential duplicate, non-existent, or new accounts.  Follow-up calls and meetings were scheduled to clarify and ask questions about the information provided.

- Additional analytical procedures were performed for the review of legal restriction classifications, including obtaining HTA's descriptions of the various legal restriction categories asserted by HTA and reviewing sources and uses of funds for accounts.

- Updated procedures were applied to obtain appropriate supporting documentation from HTA to inform the legal team's assessment of account designations.

- Updated procedures were applied to identify federal funds within HTA's accounts.  The procedures included obtaining information from the Puerto Rico Department of Treasury, AAFAF, and HTA.

62

- Discrepancies noted between the IFAT report findings and information subsequently obtained from agencies, including HTA, and FIs were reconciled through additional procedures, such as obtaining direct confirmation from FIs and clarifying current status of a bank account. Similarly, discrepancies noted between the IFAT report findings and information obtained from AAFAF, as further discussed below, were reconciled through additional procedures, such as identifying and reconciling the differences between the scope and time period covered by the IFAT report and those of the information reported by AAFAF. Currently, the unreconciled differences between the HTA balances reported by AAFAF and the HTA balances reported by FIs are less than five percent (5%) of the total balance as of the December 2021 Measurement Date.

**(e) Status of Review**

As of the December 2021 Measurement Date, HTA holds 74 accounts across five FIs, for all of which the Oversight Board has received supporting documentation of balances. HTA also provided online bank account access via the FIs for $155.8 million held in 70 out of 74 bank accounts (approximately 95% of accounts and 57% of balances in the total population). Bank account statements for the remaining $115.7 million held in four out of 74 bank accounts (approximately 5% of the total population) are obtained directly from the FIs and from HTA due to limitations in online bank account access.

The balances reported above as of the December 2021 Measurement Date for HTA have been substantively reconciled to the AAFAF Bank Account Balances Report as of December 31, 2021 ("AAFAF Report").[90]

The list of the Debtor's bank accounts, balances as of the December 2021 Measurement Date, and preliminary legal restriction categorizations is attached hereto as Exhibit G. The information presented in Exhibit G includes accounts where balances have been confirmed with FI information as of the December 2021 Measurement Date. The Oversight Board and its advisors are continuing to analyze the legal restriction assessments for the accounts, and any determinations provided in Exhibit G are preliminary and, in all respects, subject to change based on new and additional information as it becomes available. The Oversight Board will update this Disclosure Statement to a new measurement date as warranted until it is approved by the Court.

*[Remainder of Page Left Intentionally Blank]*

---

[90] *Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of December 30, 2021* published by AAFAF on January 31, 2022.

IV.    **Significant Events Leading to Commencement of HTA's Title III Case**

A.    **The Commonwealth and HTA's Steady Operational and Financial Decline**

*The Commonwealth.*  The Commonwealth and certain of its public corporations are in the midst of a profound fiscal crisis.  Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses, and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues.  This is mainly due to years of economic recession, recurring budget deficits, the financing of recurrent expenses with long-term debt, and the failure to adequately fund legacy obligations such as pensions.  The Commonwealth's economic situation was later exacerbated by the devastation caused by the hurricanes in 2017, the earthquakes in 2020, and the COVID-19 pandemic.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring cases under Title III of PROMESA.

*HTA.*  HTA has experienced significant recurrent losses from operations and faces many business challenges that have been exacerbated by the Commonwealth's economic recession.  Its principal challenges, some of which are interrelated, are in executing: (1) maximization of revenues; (2) reductions in operating costs and (3) improving liquidity.

In 2010, HTA stopped issuing bonds and instead relied upon the GDB for liquidity and fiscal management support.  HTA repeatedly drew on its lines of credit with the GDB to fund its operational, working capital, and construction needs as well as ongoing deficits.  According to Kobre & Kim LLP, an independent investigator retained by the Oversight Board to investigate certain matters relating to Puerto Rico's fiscal crisis, the GDB evaluated and approved HTA's loan requests very quickly, at times within hours, after a request was submitted.  This practice was reportedly needed to avoid potential adverse consequences stemming from HTA's lack of fiscal health, such as HTA having to shut down the Tren Urbano if its operator had not been paid.  Gubernatorial policy changes across administrations also affected GDB's decision-making with respect to HTA's debt load.  For example, during Governor Fortuño's administration, GDB increased HTA's line of credit to approximately $2 billion.  At the time, the total of GDB's loans receivable was already approximately $9 billion.  GDB did this reportedly so that HTA would not have to raise vehicle registration fees, public transportation fees, tolls, or the gasoline tax; all of which would have increased costs for ordinary voters.

Puerto Rico's current transportation system continues to lag behind national standards for quality, safety, and reliability.  Only 13%[91] of Puerto Rico's highways are in good condition, compared to a median of 84% in the U.S., while fatality rates are approximately 43% higher than

---

[91]    From PRHTA Budget-to-Actuals reporting for FY21 end of fiscal year.

the U.S. median (in 2020: 1.96 fatalities per 100 VMT versus 1.37 US median).[92]  In addition, the absence of a reliable transit system drives increased traffic congestion, as residents lack an alternative to private vehicle transportation.  Among U.S. cities, San Juan has the seventh-longest average commute at 31.2 minutes.[93]  Drivers lose 58 hours each year to traffic congestion at a cost of $1,150 per driver and $400 million to the city.[94]  Meanwhile, the main public transportation alternative, Tren Urbano, has one of the lowest ridership among transit systems in North America, with approximately 5 million annual riders prior to the start of the COVID-19 pandemic, below Miami's Metrorail (19 million), Cleveland's RTA (6 million), Baltimore's SubwayLink (8 million) and Philadelphia's PATCO Speedline (11 million).  Tren Urbano also has one of the worst financial performances relative to peer systems, currently recovering only 4 cents on every dollar of operational cost, while its peers currently recover approximately 12 cents (and 25 cents prior to COVID) on average.[95]  The 2022 Certified Commonwealth Fiscal Plan and the February 2022 HTA Fiscal Plan lay out a series of transportation reforms that had been recommended by the Oversight Board in their January 29, 2021 letter pursuant to PROMESA section 205(a).[96]  Certain measures aim to address the below root causes of the challenges facing HTA:

1)  Individual modes of transportation have overlapping and fragmented ownership.

2)  There is poor performance management within individual modes of transportation and little multi-modal coordination.

3)  The system is not maximizing funding potential, leaving public and private dollars untapped.

***Legislation related to HTA revenue and liquidity.***  Historically, HTA received funding from several Conditionally Appropriated Revenues, including motor vehicle license fees as well as Commonwealth excise taxes on gasoline, oil, petroleum products, and cigarettes.  On December 1, 2015, the Governor issued Executive Order 2015-046 which directed the Department of the Treasury to start retaining these fees and taxes.  Subsequently, following the filing of the Commonwealth's Title III case on May 3, 2017, Conditionally Appropriated Revenues have been retained by the Commonwealth for numerous reasons, including application

---

[92]  *2020 Fatality Data Show Increased Traffic Fatalities During Pandemic,* National Highway Traffic Safety Administration, June 3, 2021:https://www.nhtsa.gov/press-releases/2020-fatality-data-show-increased-traffic-fatalities-during-pandemic; *Highway Statistics 2020,* U.S. Dep't of Transp. Fed Highway Admin., Oct. 26, 2021, https://www.fhwa.dot.gov/policyinformation/statistics/2020/hm64.cfm.

[93]  https://realestate.usnews.com/places/rankings/best-places-to-live?src=usn_pr.

[94]  *Global Traffic Scorecard,* INRIX 2021, https://static.tti.tamu.edu/tti.tamu.edu/documents/mobility-report-2019.pdf; https://inrix.com/scorecard-city/?city=San%20Juan%2C%20PR&index=163 - Costs include lost productivity, increased freight movements costs, higher operating costs and decreased reliability.

[95]  Ridership Data: Public Transportation Ridership Report, American Public Transportation Association, Found online at: https://www.apta.com/wp-content/uploads/2018-Q4-Ridership-APTA.pdf / Farebox Recovery: National Transit Database, Found online at: https://www.transit.dot.gov/ntd/ntd-data.

[96]  Letter from Natalie A. Jaresko, Fin. Oversight and Mgmt. Bd. for P.R. to Governor Pedro Rafael Pierluisi, Governor of Puerto Rico; Jose Luis Dalmau Santiago, President of the Senate of Puerto Rico; & Rafael Hernandez Montanez, President of the House of Reps. of Puerto Rico (Jan. 29, 2021) Letter https://drive.google.com/file/d/1p6CDJx5_NoOmLIARfYik-wg3ev_A3X6l/view.

of the automatic stay under Title III of PROMESA. All of the Conditionally Appropriated Revenues continue to be retained by the Commonwealth, and, due to the successful confirmation and consummation of the Commonwealth Plan, will no longer be subject to transfer to the HTA.

On April 6, 2016, the Commonwealth issued the Moratorium Act (as discussed in section IV.B.7 of this Disclosure Statement). Pursuant to the Moratorium Act, the Governor issued a series of executive orders which declared an emergency period and implemented various measures with respect to certain obligations of the Commonwealth and several instrumentalities, including the HTA. These executive orders placed significant restrictions on the disbursement of funds deposited at GDB and suspended the disbursement of loans by GDB. These executive orders also restricted HTA's ability to withdraw any funds held on deposit at GDB and to receive any disbursements on loans granted by GDB. The executive orders also extended the "clawback" of available resources that were previously conditionally appropriated to HTA by suspending the obligation of the Commonwealth to transfer those revenues to HTA. The Moratorium Act and related executive orders as well as the enactment of PROMESA have all had a significant effect on HTA's liquidity.

***The Commonwealth's Economy.*** The Commonwealth's economy entered a recession in the fourth quarter of FY2006, and the Commonwealth's GNP has contracted (in real terms) nearly every FY between 2007 and 2020, except for GNP growth in FY2012 and FY2019. The GNP growth seen in FY2012 and FY2019 were mainly due to the large amount of deficit spending and stimuli injected into the Commonwealth's economy during the Great Recession and post 2017 hurricanes, respectively. In its May 2018 report (GAO-18-387), the U.S. Government Accountability Office listed the following five main factors that contributed to Puerto Rico's economic condition:

- Outmigration and diminishing labor force. Puerto Rico has experienced a steady decline in its population and labor force.

- Regulatory challenges in doing business in Puerto Rico. These include the high cost to businesses in complying with Puerto Rico regulations, such as the permitting process for new business, and federal laws such as the minimum wage law that may be a deterrent to employment in some local sectors.

- High cost of importing goods and energy. Many of the goods used by businesses in Puerto Rico are imported, which increases their cost and Puerto Rico relies mainly on high-cost petroleum products for its energy generation.

- Phase-out of the federal tax credit that concluded in 2006. This affected mostly manufacturing operations in Puerto Rico, although there is no consensus as to the magnitude of the impact.

- Banking and housing struggles. Puerto Rico banks have struggled, and several have disappeared. Housing prices have fallen by 25% since its peak in 2009.

***HTA Recurring Deficits.*** As of June 30, 2021, HTA's current liabilities exceeded its current assets by approximately $117 million and had an accumulated deficit of approximately

$2 billion.  In addition to removal of certain "clawback" revenues previously allocated to HTA, one of the principal causes of the HTA's current fiscal crisis has been not adjusting toll fares on HTA-operated toll roads since 2005.  Toll fare increases are regularly implemented in the mainland states and also on Puerto Rico toll roads operated by concessionaries.  Fare pricing has fallen out of step with inflation and, by extension, the cost of maintaining HTA-owned roads. The May 2021 HTA Fiscal Plan and the February 2022 HTA Fiscal Plan include fiscal measures related to revenue increases which are primarily driven by toll fare increases and collection optimization.  Furthermore, HTA had been dependent upon GDB for liquidity and fiscal management support.  However, when GDB dissolved, it left HTA with no other source of financing.

*Aggregate Debt Burden of HTA.*  As of June 30, 2021, HTA's bond debt still amounted to approximately $4.4 billion overall, excluding approximately the $1.7 billion in GDB bonds.

Since HTA entered Title III proceedings, it has been subject to the automatic stay provisions of PROMESA and as a result has not made payments since July 2017.  HTA's existing debt is not sustainable and requires a significant adjustment under Title III as its revenues are insufficient to fund its operating expenses, projected capital improvement needs, and an emergency reserve without significant appropriations from the Commonwealth.

## B. Legislation Enacted by the Commonwealth and Executive Orders Issued by the Governor to Address the Fiscal and Debt Crisis[97]

### 1. Act 30-2013 ("Act 30")

On June 25, 2013, the Commonwealth enacted Act 30 which conditionally appropriated to HTA the entirety of all motor vehicle license fees that were originally retained by the Department of Treasury.  Prior to Act 30, only fifteen dollars ($15) of each such annual license fee, which ranges from $25 to $40 for passenger cars and vary for other vehicles, was conditionally appropriated to HTA.

As described in Section III.B.1(a) of this Disclosure Statement, the revenue from these motor vehicle license fees is subject to the "clawback" provision in section 8 of Article VI of the Constitution of Puerto Rico.

### 2. Act 31-2013 ("Act 31")

On June 25, 2013, the Commonwealth enacted Act 31 (i) increasing HTA's conditionally appropriated portion of the excise tax on petroleum products and its derivatives from $3.00 per

---

[97]   Legislation enacted by the Commonwealth before and after the effectiveness of PROMESA on June 30, 2016 is preempted by section 4 of PROMESA to the extent it is inconsistent.  Additionally, it violates PROMESA section 204 to the extent the procedures for vetting the legislation for consistency with the certified fiscal plan are not followed, it violates PROMESA section 207 to the extent it modifies debt without Oversight Board consent, and it violates PROMESA section 108(a)(2) to the extent it would impair or defeat the purposes of PROMESA as determined by the Oversight Board.  By describing the legislation in this section of the Disclosure Statement, the Oversight Board is not waiving the application of PROMESA to any portion of it.

barrel to $9.25 barrel and (ii) conditionally appropriating up to $20 million of the Commonwealth's cigarette excise tax each fiscal year to HTA.

As described in Section III.B.1(a) of this Disclosure Statement, these revenues are subject to the "clawback" provision in section 8 of Article VI of the Constitution of Puerto Rico.

### 3. Act 66-2014 ("Act 66")

On June 17, 2014, the Commonwealth adopted Act 66, known as the Fiscal and Operational Sustainability Act, which imposed multiple fiscal measures, including: (i) the freezing of benefits under collective bargaining agreement or agreements ("CBAs") and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to UPR and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislature and certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates for governmental entities; and (viii) the implementation of a payment plan system for legal judgments.  These provisions expired as of July 1, 2017, but similar fiscal austerity measures were enacted by the Commonwealth through Act 3-2017, dated January 23, 2017 (discussed below).

### 4. Act 71-2014 ("Act 71")

After the rating agencies downgraded the Commonwealth's largest public corporations below investment grade and such entities were facing further liquidity constraints and a loss of access to the capital markets, the Commonwealth enacted Act 71 on June 28, 2014.  Known as the Puerto Rico Debt Enforcement and Recovery Act, it provided an orderly process to allow certain public corporations, including HTA, to adjust their debts.  Because the U.S. Congress excluded Puerto Rico's municipalities from seeking relief under chapter 9 of the Bankruptcy Code, the Commonwealth enacted Act 71 to fill that void by creating a legal framework that afforded an orderly debt restructuring process.

In June 2014, certain PREPA bondholders challenged the constitutionality of Act 71 before the U.S. District Court for the District of Puerto Rico, which ruled in favor of bondholders and held that Act 71 was preempted by chapter 9 of the Bankruptcy Code.[98]  The Court's holding was upheld by the First Circuit on July 6, 2015[99] and the Supreme Court on June 13, 2016.[100]

### 5. Act 1-2015 ("Act 1")

On January 15, 2015, the Commonwealth enacted Act 1, as amended by Act 29-2015, approved March 13, 2015, to increase the petroleum products tax rate from $9.25 to $15.50 per petroleum barrel.  The $6.25 per barrel increase in the petroleum products tax rate, which did not apply to diesel oil, was assigned in its entirety to the PRIFA to support debt service payments of PRIFA's bond issues.

---

[98]   *Franklin California Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R. Feb. 6, 2015).

[99]   *Franklin California Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322 (1st Cir. 2015).

[100]   *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115 (2016).

Act 29-2015 authorized PRIFA to issue bonds of up to $2,950 million in order to pay HTA's debt which was comprised of (i) $2,079 million in outstanding lines of credit granted by GDB and (ii) bond anticipation notes of approximately $228 million. Act 29-2015 also called for an additional $3.25 per barrel of the petroleum products tax to be assigned to PRIFA in order to provide additional funds to service PRIFA's bonds issues, thereby reducing HTA's share of the petroleum products tax from $9.25 to $6.00 per barrel. However, due to the dire economic conditions facing the Commonwealth's public corporations and the resultant loss of access to capital markets, PRIFA's efforts to issue the bonds contemplated by Act 29-2015 to pay HTA's debt were unsuccessful. Consequently, HTA continued to collect a petroleum products tax rate of $9.25 per barrel.

### 6.  Executive Order 2015-046 ("EO 46")

On December 1, 2015, then-Governor Alejandro García Padilla signed EO 46 which ordered the Secretary of Department of Treasury to retain certain available resources of the Commonwealth based on revised revenue estimates for FY2016 and Commonwealth's deteriorating liquidity situation. Pursuant to such executive order, Secretary of the Treasury retained revenues conditionally appropriated to HTA, PRIFA, the Puerto Rico Convention Center District Authority ("PRCCDA"), and MBA for the payment of debt service on their bonds for the FY2016. Since FY2016, such revenues are being retained by the Commonwealth pursuant to certain laws, including but not limited to (a) the Moratorium Act and Act No. 5 (discussed below) and (b) the automatic stay under Title III of PROMESA.

### 7.  Act 21-2016 - The Moratorium Act and Creation of AAFAF ("Act 21")

On April 6, 2016, the Government enacted Act 21, which granted the Governor the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain monies historically conditionally appropriated to public entities for the payment of their obligations to the payment of essential services, and (iii) temporarily stay related creditor remedies. In connection with Act 21, then-Governor Alejandro García Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities.

AAFAF was also created under Act 21 for the purpose of assuming GDB's role as fiscal agent, financial advisor, and reporting agent to the Commonwealth and its instrumentalities and municipalities.[101]

### 8.  Executive Order 2016-018 ("EO 18"), Executive Order 2016-030 ("EO 30") and Executive Order 2016-031 ("EO 31")

Pursuant to Act 21-2016 (discussed above), on May 17, 2016, the Governor signed EO 18 and, on June 30, 2016, EO 30 and EO 31. Collectively, these executive orders declared the Commonwealth and several of its instrumentalities, including HTA, to be in a state of emergency. Specifically, these orders authorized HTA to apply toll revenues to fund essential services and suspend transfers to the fiscal agent under Resolution 1968-18 dated June 13, 1968, as amended, and Resolution 1998-06 dated February 26, 1998, as amended. In addition, EO 31

---

[101]  For a discussion of Act 5-2017, which amended Act 21, *see* section IV.B.11 of this Disclosure Statement.

suspended the transfer of certain Conditionally Appropriated Revenues to the GDB to the extent that those revenues were needed by HTA to finance its operational expenses and/or pay for essential services.

### 9.      Act 2-2017 ("Act 2")

In January 2017, the Legislature enacted Act 2 which expanded AAFAF's role to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its public corporations and instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities certified by the Oversight Board pursuant to PROMESA.

In addition, Act 2 established AAFAF as the Commonwealth entity responsible for carrying out the roles inherited from the GDB along with additional duties and powers, which include, among other things: (i) oversight of the Commonwealth budget; (ii) an administrative presence on every board or committee where the GDB president was a member at that time; (iii) authority to conduct audits and investigations; and (iv) authority to free budgetary items, appoint trustees, redistribute human resources, and change procedures.

### 10.     Act 3-2017 ("Act 3")

On January 23, 2017, the Commonwealth enacted Act 3 declaring a fiscal and economic crisis and establishing fiscal austerity measures similar to those enacted by Act 66 that expired on July 1, 2017.  The Puerto Rico Legislative Assembly is considering a bill which would extend particular measures until July 1, 2026.[102] Act 3 adopted the following measures: (i) suspension of CBAs; (ii) freezing of compensation and employment benefits; (iii) reduction in the Department of Education's school transportation costs; (iv) implementing limitations on job openings; (v) eliminating 20% of trust employee positions; (vi) limiting the carryover of sick and vacations days between fiscal years; and (vii) application of a payment plan system for legal judgments. Such measures may be terminated earlier if certain financial conditions are met, such as GNP growth of at least 1.5%, Commonwealth general obligations receive an investment grade credit rating, and no deficit financing is used by the Commonwealth.  Act 3 also extended the 4% excise tax imposed by Act 154 from December 31, 2017 until December 31, 2027.

### 11.     Act 5-2017 ("Act 5")

On January 29, 2017, the Commonwealth enacted Act 5, known as the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017, to repeal parts of Act 21-2016 and declare a financial emergency.  Although certain provisions of Act 21-2016 were repealed, the debt moratorium orders issued under Act 21-2016 continue in effect pursuant to Act 5.  Act 5 also established an emergency period, during which the Governor may issue executive orders designating the priority for the use of available resources.  The Governor was also granted broad receivership powers over government agencies in order to rectify the financial emergency.

Act 5 was amended by Act 46-2017 to authorize the Governor to continue extending the emergency period declaration by additional 6-month periods as long as the Oversight Board

---

[102]    Senate Bill 245.

exists. The emergency period was extended for 6 months through June 30, 2022 via Executive Order 2021-084 ("EO-84").

This latest extension via EO-84 is the first since Act 5 was amended via Act 42-2021 which, among other things, limited the executive branch's authority to issue debt without new enabling legislation during the emergency period. Act 5, as amended by Act 42-2021, did not limit the authority of the Puerto Rico government's public corporations to issue debt during the emergency period and does not target the existing statutes that enable them to issue debt.

## 12.   Act 26-2017 ("Act 26")

On April 29, 2017, the Commonwealth enacted Act 26, known as the Fiscal Plan Compliance Act, to implement a broad array of fiscal measures to reduce costs across the Commonwealth and its public corporations, including HTA, and support the Commonwealth's compliance with the fiscal plan certified by the Oversight Board. Some of the most important measures implemented by Act 26 relate to the standardization of fringe benefits across the Central Government and public corporations. The measures adopted by Act 26 among other things: (1) reduced vacation and sick leave benefits; (2) reduced the number of public holidays; (3) reduced the Christmas bonus of employees of public corporations to $600 and conditioned its eligibility to six months of service per year or more; (4) replaced overtime pay for public employees with compensatory time; (5) eliminated the cash-out payment for sick day accruals and capped the liquidation for vacation leave accruals to sixty (60) days; (6) nullified any provision of a CBA that provided public employees fringe benefits in excess of those set forth in Act 26; (7) imposed a special dividend tax on the Joint Underwriting Association; (8) ordered all public corporations and instrumentalities to transfer surplus revenues to the Treasury Department's General Fund; (9) established a process for selling real properties of the government; (10) shortened the effectiveness of most multiyear appropriations; (11) increased taxes on cigarettes and tobacco products; (12) reduced funding for the Conservatory of Music and the School of Plastic Arts; and (13) reduced until FY2021 the annual set aside for the Commonwealth's emergency fund. The reduction of vacation and sick leave benefits stipulated by this act resulted in HTA recording an approximately $4 million favorable adjustment to its net position in FY2019.

Act 26 provides that when the fiscal situation has stabilized and the condition of the public fiscal situation so permits, the Fiscal Plan Compliance Committee established by the Act may suspend its effectiveness. The Committee is composed of three members, with the Governor, the Speaker of the House of Representatives, and the President of the Senate each appointing one member.

## 13.   Act 109-2017 ("Act 109")

The HTA had historically been dependent on the GDB for liquidity and fiscal management and support since discontinuing their issuance of bonds in 2010. On August 24, 2017, the Government Development Bank for Puerto Rico Debt Restructuring Act (the "GDB Restructuring Act"), effectuated the GDB Fiscal Plan and provided a path for the implementation of the GDB restructuring support agreement by addressing the claims of the Commonwealth and its instrumentalities against GDB. Act 109 created two special purpose entities – the GDB Debt

Recovery Authority and the Public Entity Trust – into which the GDB would divide and irrevocably transfer its assets. These entities were utilized to complete the transactions in the GDB's Qualifying Modification, as approved by the District Court under Title VI of PROMESA. Under this Qualifying Modification, holders of certain bond and deposit claims exchanged their claims for bonds issued by the GDB Debt Recovery Authority and the GDB transferred to such entity its municipal loan portfolio, a portion of its public entity loan portfolio, its real estate assets, and its unencumbered cash. As a result of this Qualifying Modification, HTA loans owed to GDB in the amount of $1.7 billion, plus accrued interest of $795.6 million were transferred to the GDB Debt Recovery Authority. Additionally, pursuant Act 109, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities, and affiliates (including HTA) and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or any bond or note of such Non-Municipal Government Entity held by GDB as of such date. In HTA's case, pursuant to an agreement between the FGIC and GDB setline FGIC's objection to the GDB Qualifying Modification (FGIC settlement), approximately $8.5 million of the Authority's deposits held at GDB were not applied to offset the balance of the Authority's loans. As a result of the foregoing adjustment, all the HTA's deposits at GDB were extinguished.

### 14.    Act 101-2020 ("__Act 101__")

On August 12, 2020, the Commonwealth enacted Act 101, known as the Puerto Rico Debt Responsibility Act, creating a new debt management policy (the "__Debt Management Policy__") applicable to the Government of Puerto Rico, its public corporations, including HTA, and instrumentalities. The Debt Management Policy established restrictions on the issuance of tax-supported debt and debt issuance by the Commonwealth's public corporations and instrumentalities. The Debt Management Policy is to remain in effect until the new general obligation bonds issued by the Commonwealth pursuant to the Commonwealth Plan confirmed pursuant to Title III of PROMESA are paid in full.

### 15.    Act 9-2021 ("__Act 9__")

On June 30, 2021, the Commonwealth adopted Act 9, known as the Act to Guarantee Collective Bargaining. Act 9, which applies to all executive branch entities, agencies, instrumentalities and public corporations (except for the State Elections Commission, the Office of Government Ethics, Office of the Independent Prosecutor, and the Office of the Electoral Comptroller), established the following: (1) executive branch entities must begin collective bargaining negotiations with their respective units no later than July 1, 2021; and (2) the non-economic clauses included in collective bargaining agreements that expired before June 30, 2021, before July 1, 2021, or those that will expire while Act 9 is in effect will be extended until a new CBA has been reached. During said extension, parties will be precluded from filing petitions for elections and from celebrating decertification elections. Since the extension of the CBA lies in the unit's discretion, if the bargaining unit decides not to extend the CBA nor begin negotiations, it must notify said determination within fifteen (15) days since the enactment of Act 9.

16.        **Act 53-2021 ("Act 53")**

On October 26, 2021, the Commonwealth enacted Act 53, known as the "Law to End the Bankruptcy of Puerto Rico", which, among other things, conditionally authorizes the issuance of the new general obligation bonds and related Contingent Value Instruments ("CVIs") of the Commonwealth Plan.  The authorization is subject to the Oversight Board filing a joint plan of adjustment for confirmation under Title III that eliminates reductions or modifications in pension or retirement benefits of beneficiaries of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), Teachers Retirement System ("TRS") and Judiciary Retirement System ("JRS"), such as those contemplated in the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, dated July 30, 2021.

On January 18, 2022, the Title III Court confirmed the Commonwealth Plan, which provides a monthly pension or retirement benefits modification on currently accrued benefits of zero dollars ($0.00) to employees in the Government's Employees Retirement System.  HTA employees participate in the Employees Retirement System.

C.        **PROMESA**[103]

1.        **Enactment of PROMESA**

On June 30, 2016, Congress enacted PROMESA, which provides a framework, among other things, for the Commonwealth and its covered territorial instrumentalities, including HTA, to restructure their indebtedness by establishing:

- the Oversight Board, which provides oversight of the Commonwealth and its covered instrumentalities'[104] restructuring and revitalization efforts by, among other things: (i) certifying fiscal plans and budgets for the Commonwealth and its covered instrumentalities and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA;

- a court-supervised, quasi-bankruptcy process similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment; and

- a framework for the designation, oversight, and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy.

---

[103]    This section summarizes certain provisions of PROMESA.  Although the Debtor believes that this description covers the material provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

[104]    On September 30, 2016, the Oversight Board designated certain entities, including HTA, as covered instrumentalities.  Fin. Oversight & Mgm.t Bd. for P. R., Annual Report, FY2017 (July 30, 2017).  On May 9, 2019, the Oversight Board supplemented the list of covered instrumentalities and designated 78 municipalities as covered instrumentalities under PROMESA.

## 2.      Creation of the Oversight Board

PROMESA section 101(a) established the Oversight Board for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  The Oversight Board consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by the Governor.[105]  On August 31, 2016, President Obama appointed the Oversight Board's initial seven voting members: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González and (7) Ana J. Matosantos.  The current seven voting members of the Oversight Board are: (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson, and (7) Betty A. Rosa.  Governor Pedro Pierluisi Urrutia is currently the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms.  When a term expires, Board members serve until replaced.  The President of the United States may remove any member for cause.

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has an executive team, which includes: (i) an Executive Director,[106] and (ii) Jaime A. El Koury, as General Counsel.  Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board.  The General Counsel acts as the chief legal officer of the Oversight Board.  The Revitalization Coordinator is responsible for executing the duties prescribed under PROMESA section 503 relating to the identification, prioritization, and implementation of critical infrastructure projects for the Commonwealth.

In accordance with PROMESA section 108(a), the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislature may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the purposes of PROMESA.  Although created by federal statute, the Oversight Board is not a "department, agency, establishment, or instrumentality of the Federal Government."  Instead, as set forth in PROMESA section 101(c)(1), the Oversight Board is deemed "an entity within the territorial government" of the Commonwealth.  The Oversight Board remains a small organization, with a flat hierarchy, and operates from offices located in San Juan, Puerto Rico and New York, New York.  One of its organizational goals has been to take advantage of the incredible talent in Puerto Rico to build organizational strength through local recruiting, thereby

---

[105]   For a discussion of litigation related to challenges under the Appointments Clause, *see* section V.F.6 of this Disclosure Statement.

[106]   Prior to April 1, 2022, Natalie A. Jaresko served as Executed Director and Interim Revitalization Coordinator.  On February 3, 2022, the Oversight Board announced Ms. Jaresko's resignation, effective April 1, 2022.  Press Release, Fin. Oversight and Mgmt. Bd. for P.R., "Natalie Jaresko to Leave Oversight Board After Reaching Significant Debt Restructuring and Fiscal Milestones," (Feb. 3, 2022), *available at* https://drive.google.com/file/d/1kkEGrQrPQGyB_9FsxhGHrQo8-5gtZAZp/view.  As of the date of this Disclosure Statement, no replacement has been announced.

reducing costs and the use of third-party consultants. The overwhelming majority of the Oversight Board's new hires are Puerto Ricans, several of whom have returned from the U.S. mainland to help Puerto Rico recover.

In accordance with PROMESA section 209, the Oversight Board will continue in existence until the Oversight Board certifies that: (i) the Commonwealth and its covered territorial instrumentalities has adequate access to the short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs and (ii) for at least four consecutive fiscal years: (a) the Commonwealth and its covered territorial instrumentalities has developed its budgets in accordance with modified accrual accounting standards and (b) the expenditures made by the Commonwealth and its covered territorial instrumentalities during each such fiscal year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards.

### 3.    The Oversight Board's Powers and Responsibilities

*Certification of Fiscal Plans and Budgets*

One of the cornerstones of PROMESA is the development, certification, and enforcement of fiscal plans and budgets for the Commonwealth and its covered territorial instrumentalities, including HTA. Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets. Fiscal plans are short-term and long-term planning tools, covering a period of at least five fiscal years, while budgets cover at least one fiscal year. Budgets must be consistent with the fiscal plan then in effect.

PROMESA contemplates the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the government does not provide it with a proposed fiscal plan it determines to certify. The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and certification of fiscal plans for the Commonwealth and any covered instrumentality. The Governor is required to submit the proposed fiscal plan in accordance with such schedule. Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets fourteen (14) statutory requirements set forth in PROMESA section 201(b), which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets." The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for fiscal years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability, and internal controls;

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

- ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

Fiscal plans must ensure the funding of essential public services. The Oversight Board takes the view that "essential services" is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim. The Oversight Board takes the view that use of such revenues pursuant to the police power may or may not give rise to additional claims of the affected creditors, depending on the circumstances. This Disclosure Statement and the HTA Plan do not define "essential services" or "essential expenses." The Oversight Board takes the view that this is for several reasons, including the following reasons.[107]

Title II of PROMESA requires that a fiscal plan "ensure the funding of essential public services." This language sets a minimum floor on spending, meaning that the fiscal plan must fund essential services. At confirmation, the Title III Court considers whether to approve a plan of adjustment. The fiscal plan's certification, however, is outside the subject matter jurisdiction of the Title III Court pursuant to PROMESA section 106(e). PROMESA section 314(b)(7)

---

[107] Certain parties assert that "essential services" must be specifically identified.

requires that a plan of adjustment be consistent with the applicable fiscal plan, but imposes no testing of the fiscal plan.  Therefore, essential services are not in issue.[108]

Furthermore, the concept of "essential services" is not conducive to simple listings of which services or expenses are essential, and which are not, because essential services may vary greatly over time and depending on circumstances post-confirmation.  For instance, if HTA economic activity were so low during a period that elimination of any services would prevent sustainable economic growth then the Oversight Board might determine that all such services were essential.  HTA's certified fiscal covers periods of growth and shrinkage, and shows continued population shrinkage.

After certification of the HTA fiscal plan, the Oversight Board will provide to the Governor a schedule for the development and certification of the budget.  The Oversight Board must also provide to the Governor a revenue forecast for use in developing the budget.  If the Oversight Board determines the proposed covered territorial instrumentality budget submitted by the Governor is compliant with the approved fiscal plan, the Oversight Board will approve and certify it.  If the Oversight Board determines the proposed budget is not compliant with the certified fiscal plan, it will provide a notice of violation to the Governor regarding the budget that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the certified fiscal plan.  The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Governor fails to submit a covered territorial instrumentality budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor a budget that complies with the certified fiscal plan.  The Governor will then submit to the Oversight Board the budget it adopts so that the Oversight Board can determine whether such budget complies with the certified fiscal plan.  If the budget adopted by the Governor complies with the certified fiscal plan, the Oversight Board will approve it and such budget shall be in effect on the first day of the fiscal year.  If the Oversight Board determines that the budget adopted by the Governor does not comply with the certified fiscal plan, the Oversight Board will provide to the Governor a notice of violation that includes a description of the necessary corrective action and an opportunity to correct such violation.  The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Governor fails to adopt a budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop a budget that complies with the certified fiscal plan and submit it to the Governor.  Such budget shall be deemed to be approved by the Governor and will be in effect on the first day of the fiscal year.

---

[108]   The Title III Court has acknowledged the consistency of a plan of adjustment and the applicable fiscal plan is in the "sole discretion" of the Oversight Board.  *See Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* ¶¶ 38, 54 [ECF No. 19812]; *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* ¶ 78 [ECF No. 19813].

At the end of each fiscal quarter, the Governor must submit to the Oversight Board a financial report for the Commonwealth and each covered territorial instrumentality describing actual revenues, expenditures, and cash flows for such quarter. If the Oversight Board determines that actual revenues, expenditures, and cash flows are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Government must provide an explanation for the inconsistency that the Oversight Board finds reasonable, or the Government must implement corrective actions to address such inconsistency. If the Government fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislature that the Government is inconsistent with the applicable certified budget and describe the nature and amount of the inconsistency. After providing such certification and determining that the Government has failed to correct the inconsistency, the Oversight Board can make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in line with the certified budget. In the case of a covered territorial instrumentality, the Oversight Board can also institute automatic hiring freezes and prohibit such instrumentality from entering into any contract.

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for the HTA for FY2018, FY2019, FY2020, FY2021, and FY2022.[109]

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the certified fiscal plans and budgets by reviewing the activities of the government of the Commonwealth and its covered territorial instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues.

Since its creation, the Oversight Board and the Commonwealth's former Governors disagreed on certain occasions as to whether government reporting complied with PROMESA and whether certain executive orders and newly enacted laws violated PROMESA and/or certified fiscal plans and budgets.

The Oversight Board also has the authority to review any of the contracts, rules, regulations, and orders of the Commonwealth and its covered territorial instrumentalities for their economic impact on the certified fiscal plans and budgets. If the Oversight Board determines any of the foregoing activities are inconsistent with a certified fiscal plan or budget, the Oversight Board may take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the certified fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislature recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations. The Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for

---

[109] *See* https://oversightboard.pr.gov/budgets-2/.

rejecting any recommendations.  The Oversight Board, however, can in its certified fiscal plan adopt and impose recommendations the Governor declines to adopt.[110]

PROMESA section 207 also provides the Commonwealth and its covered territorial instrumentalities may not issue any debt without the approval of the Oversight Board.

### Title III of PROMESA

If a consensual restructuring is not accomplished, Title III of PROMESA provides a quasi-bankruptcy option for the adjustment of the indebtedness of the Commonwealth and its covered territorial instrumentalities.  Eligibility for the Commonwealth or a covered territorial instrumentality to be a debtor under Title III of PROMESA is conditioned on satisfaction of certain requirements, as set forth in PROMESA section 302.  Pursuant to PROMESA section 304(b), the hearing to consider an objection to a Title III petition cannot commence until the 120th day after the petition is filed.  At that hearing, the Title III Court will consider section 302's requirements that: (i) the entity has been designated by the Oversight Board as a covered territorial instrumentality; and (ii) the Oversight Board has issued a restructuring certification determining that (a) prior good-faith efforts were made with creditors to restructure the debt, (b) the entity's audited financial statements are publicly available, (c) the entity previously adopted a fiscal plan and (iii) the entity desires to effect a plan to adjust its debts. The Oversight Board has exclusive authority, under PROMESA sections 304 and 312, to file a voluntary petition seeking protection under Title III and to file a plan of adjustment for the debtor and make modifications thereto.  Furthermore, PROMESA section 315 grants the Oversight Board the right to "take any action necessary on behalf of the debtor to prosecute the cases of the debtor," and the Oversight Board "is the representative of the debtor" in the Title III case.

### Other Powers and Responsibilities

Pursuant to PROMESA section 208, within thirty (30) days after the end of each fiscal year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor, and the Legislature.  The annual report must describe the Government's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress.  In addition, the Oversight Board must describe the precise manner in which it used its funds during the fiscal year.  The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives.  These additional powers include, among other things:

- holding hearings and sessions;

- obtaining official data from the Commonwealth, the federal government and creditors;

---

[110]    For a discussion of litigation related to the Oversight Board's powers, *see* section V.F.5 of this Disclosure Statement.

- issuing and enforcing subpoenas;

- entering into contracts;

- certifying voluntary restructuring agreements and protecting certain qualifying pre-existing restructuring agreements between the Commonwealth and its creditors;

- certifying debt modifications under Title VI of PROMESA;

- initiating civil actions to enforce its authority under PROMESA;

- investigating the Commonwealth's disclosure and selling practices related to its bonds;

- ensuring the prompt payment and administration of Commonwealth taxes through the adoption of electronic reporting, payment and auditing technologies;

- analyzing any materially underfunded pensions in the Commonwealth's pension system; and

- intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

### *Implementation of Oversight Board Policies*

The Oversight Board implemented various initiatives in its efforts to meet the objectives of PROMESA, including, among other things:

### (a)    Improving the Government's Fiscal Governance, Accountability, Internal Controls, and Financial Affairs

One of the Oversight Board's core responsibilities is to improve the Government's fiscal governance, accountability, and internal controls.  Following the commencement of the Title III Cases, the Oversight Board, with the support of the Government, continued to identify and implement structural and process improvements to fulfill its mandate pursuant to PROMESA.

The Oversight Board created a budget-to-actuals reporting requirement for the Central Government and the top twenty Component Units, including HTA, which has required the Government to add additional resources and capacity to its budgeting and accounting departments.  The B2A reporting requirement has enabled the Government to provide greater visibility to stakeholders into its actual spending patterns and an early warning mechanism to alert the Government and the Oversight Board if actual spending deviates from budgeted amounts.  The B2A report for HTA is publicly reported by the Government on a quarterly basis.

Other reporting requirements implemented by the Oversight Board include: (i) monthly public reporting of pension obligation balances for the Government and public corporations, (ii) monthly public reporting of public employee payroll, headcount, and attendance data, (iii)

quarterly reporting of revenue forecasts, and (iv) the full text of all Government contracts are on the Comptroller's website.

### (b)     Recommendations

#### (i)     *Section 205 Recommendations*

Pursuant to PROMESA section 205, the Oversight Board may, at any time, submit recommendations to the Governor or the Legislature on actions the Government and its covered territorial instrumentalities may take to ensure compliance with the certified fiscal plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the Government and its covered territorial instrumentalities.  The last Section 205 Recommendation Letter pertaining to HTA that the Oversight Board sent to the Government was on January 29, 2021.

The Section 205 letter recommended that the Government develop a plan and timeline to integrate and improve components of its public transportation system.  The recommendation focuses on agency integration, performance management, and system funding maximization. These recommendations for a unified, well-performing transportation system are aligned with the goals of reducing traffic congestion, increasing citizens' access to multimodal transportation, improving governance of transportation entities, improving fiscal sustainability of public transportation agencies, and promoting economic growth and development.  The Government responded to the recommendations on April 29, 2021 expressing its commitment to examine paths of implementation.  Since this commitment, discussions between the Oversight Board and the relevant entities (including HTA, DTOP, PRITA and AAFAF) have continued regarding the implementation of the transportation sector reform.  The Commonwealth 2022 Certified Fiscal Plan and the February 2022 HTA Fiscal Plan both laid out initiatives, such as, Transportation Sector Reform to support the goals of this recommendation.

#### (ii)     *Recommendations to the Federal Government*

The Oversight Board summarized the various recommendations to the Federal Government in its FY2021 Annual Report.  The recommendations focused on economic development, tax issues, Medicare and Medicaid, labor participation, benefits reform, small business, financial institutions and statistics.

#### (iii)     *Oversight Board Measures that the Commonwealth has declined to adopt*

The June HTA 2020 Fiscal Plan called for an 8.5% increase in toll fares to keep pace with inflation and the rising costs of maintaining roads and transportation assets.  Such increase was not implemented.  The May 2021 and February 2022 HTA Fiscal Plans again called for an 8.3% increase in toll fares for each year from FY2022 to FY2024 to compensate for and "catch up" with the lack of increase since 2005.  HTA had planned to increase toll fares for HTA-owned toll

roads in January of 2022, on the expectation that the COVID-19 pandemic recovery would be underway.  However, as of April 2022, such increases had not been implemented.

### (c)   Review of Legislative Acts and Certain Rules, Regulations, Administrative, and Executive Orders

PROMESA section 204(a) requires that the Government submit to the Oversight Board all new laws, no later than seven (7) business days after the law is duly enacted.  The Governor must also submit certain rules, regulations, and executive orders to the Oversight Board for review and approval pursuant to sections 204(b)(2) and (b)(4) of PROMESA and policies established by the Oversight Board.  The singular objective is to assure that all enacted acts as well as any proposed rule, regulation, administrative order, and executive order will have no adverse impact on any certified fiscal plans or budgets.  The Government has consistently failed to comply with its obligations under section 204(a) to send acts no later than seven (7) business days after enactment.  Over 100 signed acts and joint resolutions were not submitted to the Oversight Board as required by PROMESA.  For example, the Oversight Board sent a letter to Governor Vázquez urging the government to delay implementing Executive Order 2020-10 until after the Oversight Board had the opportunity to review the executive order and supporting documentation to ensure compliance with PROMESA section 204(b)(2).  Executive Order 2020-10 would exempt the Commonwealth executive branch from having to follow contracting requirements in an effort to accelerate recovery efforts following the continued earthquakes.

On July 3, 2019, the Oversight Board commenced an action under PROMESA sections 108(a)(2), 204(a)(5), 204(c), and 207 to prevent the implementation of Act 29 and numerous joint resolutions, because such laws are significantly inconsistent with the applicable certified fiscal plan, reprogram funds without Oversight Board approval, modify debt without Oversight Board approval, and/or otherwise were not properly submitted to the Oversight Board pursuant to PROMESA section 204(a).  This is the first action filed under PROMESA section 204.  *See* Section V.F of this Disclosure Statement for a summary of such actions.

Following the commencement of such action, on October 25, 2019, Governor Vázquez signed Executive Order 2019-057, which creates a procedure for the express purpose of complying with PROMESA section 204(a).  The procedure requires, among other things, the OMB and the Puerto Rico Department of Treasury to complete and submit to AAFAF within seven (7) business days of the Governor's signing new legislation a certified analysis of the financial and budgetary impact of that law.

On June 12, 2020, the Governor and AAFAF filed six (6) adversary complaints seeking declaratory judgments that certain Acts and the related certifications satisfy PROMESA's requirements under sections 204(a) and 108(a).  *See* section V.F of this Disclosure Statement for a summary of such action.

### (d)   Contract Review

On November 6, 2017 (as modified on April 30, 2021), the Oversight Board established a policy (the "Contract Review Policy"), pursuant to PROMESA section 204(b)(2), to require prior Oversight Board approval of contracts with an aggregate value of $10 million or more that would

be entered into by the Commonwealth or any covered territorial instrumentality.  The policy's objectives are to promote market competition and ensure a government contract's consistency with the applicable certified fiscal plan and certified budget.  Accordingly, the Oversight Board focuses its review on whether the contract is consistent with the applicable fiscal plan and in the case of disaster aid spending, provide observations regarding the compliance with federal funding and/or reimbursement requirements.

In order to make the contracting policy more transparent, the Oversight Board publishes a status report of each contract under review, including the name of the contracting party, the date of submission, the date of any response from the Oversight Board or from the contracting party, and a copy of all the Oversight Board's formal responses.  The policy requires that the government contracting entity submit to the Oversight Board a certification whereby its head or general counsel certifies that no person has unduly intervened, offered anything of value, or wielded any influence in connection with the execution of the contract.  The policy requires that contractors submit a similar certification to the Oversight Board and disclose any sharing of any portion of its compensation with any third party.  As of April 20, 2022, the Oversight Board has reviewed 40 HTA contracts for a total aggregate value of over $650 million.

Moreover, the Oversight Board included in the Commonwealth fiscal plan a requirement for the text of all government contracts to be made public on the Office of the Comptroller's website by September 30, 2018, and executed a memorandum of agreement with the Office of the Comptroller to promote transparency in government contracting.

### (e)    Debt Transaction Approvals

In December 2017, the Oversight Board established a policy pursuant to PROMESA section 207 to require prior Oversight Board approval of any debt transaction to be entered into by the Commonwealth or any covered territorial instrumentality.  The objectives of this policy are to promote fiscal prudence and ensure that the debt transactions are consistent with the applicable certified fiscal plan.

Since the inception of the policy the Oversight Board approved a variety of debt transactions for the Commonwealth and covered territorial instrumentalities.  There have been no recent debt transaction approvals for HTA.

### (f)    Oversight Board Ethics Website

On June 21, 2019, the Oversight Board announced the launching of its new Ethics Website,[111] an internet-based tool to promote transparency and ethics in the Oversight Board's day-to-day operations.  The site contains scores of Oversight Board governance documents, members' quarterly periodic transaction reports and annual financial disclosure reports, an interactive Ethics Advisor Blog, and other resources to guide visitors through the Oversight Board's ethics and good governance policies and actions.  The goal of this site is to continue to promote the importance of transparency and ethics in the work that the Oversight Board does for the Debtors' stakeholders, and to provide an interactive tool to share important documents,

---

[111]    http://www.oversightboard.pr.gov/ethics/

developments, resources, and mediate to promote ethics and integrity in everyday life, business, and policy.

### Controversies over Board's Powers

There has been litigation over the scope of the Oversight Board's powers, including recent issues with respect to the certification process of newly passed legislation under PROMESA.[112]   The controversies have involved, among other things, whether the Oversight Board can impose what the Government considers policy choices and whether the Governor and Legislature can reprogram budget appropriations from prior years so as to spend money the Oversight Board has not approved.   These and certain other controversies are described in Section V.F.5 of this Disclosure Statement.

## D.   Adoption of HTA Fiscal Year Budgets and Fiscal Plan

*Fiscal Plans.*   The Oversight Board is tasked with interacting with the Government for the development, submission, approval, and certification of fiscal plans and budgets, including for HTA.   Thus, starting as early as September 2016, the Oversight Board, alongside its economists, municipal consultants, and financial advisors spent hundreds of hours researching and hosting working sessions to understand the dire situation in Puerto Rico, and to research various ways in which states and sovereigns have exited such dire circumstances.   The Oversight Board also held numerous internal and external meetings with the Government officials and the various creditor groups.   The Oversight Board analyzed the many fiscal challenges that Puerto Rico faced and within only a few months, the Oversight Board was in a position to formulate its own fiscal plan or evaluate the Government's proposed fiscal plan.

The Oversight Board is tasked with determining in its sole discretion whether proposed fiscal plans comport with PROMESA section 201(b).   Among PROMESA's goals is that the fiscal plan provides Puerto Rico with permanent, pro-growth fiscal reforms,[113] and a method to achieve fiscal responsibility and access to the capital markets.

Through countless collaborative discussions and meetings with HTA and its representatives, the Oversight Board has certified fiscal plans for the public corporation that have required HTA to undertake various initiatives, which promote the fiscal sustainability of HTA and economic growth of Puerto Rico through the development of a reliable and accessible transportation network with professional and transparent governance.   Amongst some of the key fiscal measures in HTA's fiscal plan that reflecting these efforts are toll fare increases and the optimization of toll fare collection on existing toll roads to meet increasing operating expenditure levels and to catch-up with the absence of implementation of toll increases since 2005, securing a greater collection of transportation discretionary grants for HTA to use as a funding source for

---

[112]   As noted above, the Oversight Board has sent numerous letters to the Commonwealth seeking to rectify violations of PROMESA.

[113]   PROMESA § 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

HTA's capital program, which in turn, optimizes, capital project spending through project prioritization, and introducing new congestion management mechanisms.

The fiscal plans certified by the Oversight Board provide a roadmap to ensure a successful transformation of HTA, to facilitate a safe and efficient transportation system, and to spur economic development.

*Annual Budgets*.  PROMESA section 202(c)(1) sets forth a process for the approval of annual budgets that must comply with the certified fiscal plans.  Only after the Oversight Board has certified a fiscal plan may the Governor submit a budget.  In the first instance, PROMESA section 202(c)(1) provides the Governor with the initial opportunity to develop and submit to the Oversight Board a budget for the applicable fiscal year for the Commonwealth, as well as its instrumentalities, including HTA.  The Oversight Board then conducts a detailed review of the proposed budgets to ensure that governmental appropriations are consistent with their respective certified fiscal plans.

The preparation of a certified budget is a year-long process that the Oversight Board has refined to ensure that the certified budget contains the desired transparency and spending controls.  As part of that process, the Oversight Board put in place significant controls on spending to restore fiscal discipline while outlining specific measures to promote efficiency and improved delivery of government services.

HTA's budget provides detailed spending by concept of spend and by object code (*e.g.*, salaries, overtime, healthcare, leases, maintenance & repairs) to provide greater government spending transparency.

The certified budget that contains the spending appropriations for each agency specifies the manner in which funds are disbursed on a monthly basis to various governmental entities, obligate the Department of Treasury to provide updated net revenue forecasts, rescind prior year appropriations (except where specifically exempted), requires AAFAF to certify unused appropriations of the prior year, suspending OMB's, AAFAF's, or the Department of Treasury's rights to reprogram or extend appropriations, and reiterates the requirement to comply with reporting requirements in the certified fiscal plans.  In addition, the certified budget requires that the Governor provide to the Oversight Board a quarterly report of revenue and expenditures consistent with PROMESA section 203.

## 1.  Development and Certification of the April 2017 HTA Fiscal Plan

In early November 2016, the Oversight Board announced it would require separate fiscal plans from six (6) of Puerto Rico's public corporations, including HTA. At the time, the Commonwealth fiscal plan development was already in progress.  On February 21, 2017, HTA submitted its proposed fiscal plan, in accordance with the deadline set by the Oversight Board on January 28, 2017.

After the first Commonwealth fiscal plan was certified in March 2017, the Government submitted an updated proposed HTA fiscal plan on April 19, 2017.

On April 25, 2017, the Oversight Board announced it would consider the certification of the HTA fiscal plan at its seventh public meeting on April 28, 2017.  At the public meeting, the Governor's representatives presented the final proposed fiscal plan for HTA to the Oversight Board and the public.  After providing an opportunity for presentation and public comment, the Oversight Board certified the April 2017 HTA Fiscal Plan subject to six (6) amendments, which included the need for the public corporation to address the sustainability of the HTA by asset, and to adopt more aggressive fiscal and revenue enhancement measures of the transit system. The certification of the first HTA Fiscal Plan marked an important advancement in the transformation of HTA.  The April 2017 HTA Fiscal Plan provided to obligate $135 million annually from FHWA and $20 million from the FTA projects that met four (4) key objectives: (1) transit security and safety projects, (2) improvement of existing transportation infrastructure, (3) complete highway systems, and (4) congestion mitigation.  Further, as a result of the financial reality at the time of the development of the April 2017 HTA Fiscal Plan, HTA planned to implement several measures to optimize operations with an impact nearly $616 million during the ten (10) year period, or fourteen percent (14%) of the then financial gap.  The HTA baseline projections within the April 2017 HTA Fiscal Plan included total revenues of about $6.3 billion, with about $4.57 billion of its operating revenues redirected to the Commonwealth, and total expenses of about $5.0 billion during the ten (10) year period.  The April 2017 HTA Fiscal Plan proposed an aggressive capital improvement plan which included a $1.1 billion investment in both active and planned projects over a four (4) year period.

The Oversight Board provided the Government a month to submit a plan to implement the amendments and an additional fifteen (15) days to submit a revised fiscal plan in compliance with the amendments.

## 2.  The 2018 HTA Fiscal Plan Certifications

On May 21, 2017, the Oversight Board issued restructuring certifications for HTA pursuant to PROMESA sections 104(j) and 206, and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA.

On June 30, 2017, the Oversight Board provided the Government forty-five (45) days to submit a revised HTA fiscal plan, incorporating amendments adopted by the Oversight Board in the seventh public meeting.

On August 28, 2017, in a letter to Governor Ricardo Rosselló and other legislative leaders, the Oversight Board recommended Article 29 of Act 3 be amended so the Governor's removal powers with respect to any member of any board or governing body of a public corporation or instrumentality be limited to "for cause."  This was to ensure compliance with the certified Fiscal Plans for HTA and PREPA.  The letter further stated the April 2017 HTA Fiscal Plan required the terms of HTA board members to be independent of political cycles and the HTA board member selection to be independent.

On September 12, 2017, the Puerto Rico government deposited approximately $597 million in funds clawed back from the other Puerto Rico entities during fiscal year 2017 into the

Treasury Single Account.  The nearly $600 million in funds deposited in the TSA included around $322.2 million that was clawed back from HTA bonds.

On October 15, 2017, the Oversight Board and AAFAF, filed a joint motion on behalf of HTA, among other entities, seeking an order clarifying that the federal disaster relief funds being provided to Puerto Rico would be used solely for their intended purposes and not be subject to third-party creditor claims.  On October 23, 2017, HTA's audited financial statements showed "substantial doubt" regarding HTA's ability to continue as a going concern.  HTA reported a $444.5 million operating loss during FY2015 on $232.8 million of operating revenue, $228.6 million operating expenses and $448.6 million in depreciation and amortization.  HTA's assets during fiscal 2015 decreased by 32.5% to $43.7 million, including a $19.4 million decrease in cash and cash equivalents from different deposits at GDB.  HTA also did not collect $273.3 million during a seven-month period ending June 30, 2016, after a December 1, 2015 order through which the Commonwealth clawed back gasoline, oil, diesel and petroleum taxes that had been allocated to the HTA.

On October 31, 2017, the Oversight Board held its tenth public meeting, where the Oversight Board presented the timeline for fiscal plan revisions for Puerto Rico's six instrumentalities, including HTA.  Included within the required revisions was a decrease in the covered scope of the fiscal plans from ten (10) years to five (5) years due to the uncertainty in economic and fiscal projections in the post-Hurricanes Maria and Irma environment since the hurricanes hit in September 2017.  The draft fiscal plan for HTA was due February 9, 2018, and the Oversight Board slated to approve or revise HTA's fiscal plan by February 23, 2018.  Under this schedule, HTA's fiscal plan would be certified by March 16, 2018.

On November 27, 2017, the then Puerto Rico Governor announced an $8.7 million allocation of federal funds disbursed by FHWA that would enable HTA to repair traffic lights at 720 intersections across Puerto Rico, which were almost all damaged by Hurricane Maria.

On November 27, 2017, the Oversight Board announced a public listening session on November 30, 2017, seeking public comment on revisions to the six (6) instrumentalities' fiscal plans, including HTA's, after hearing testimony relating to the magnitude, structure, and timing of fiscal changes in the aftermath of Hurricane Maria.

On December 18, 2017, the House Appropriations Chairman, Rodney Frelinghuysen, introduced legislation that would provide $81 billion in emergency spending for programs and activities related to disaster assistance for Hurricanes Harvey, Irma and Maria, as well as calendar year 2017 wildfires.  $1.4 billion of the $81 billion would be used to address all damages to federal highways and $269 million would be provided to help communities restore hurricane-damaged mass transit systems.

On December 20, 2017, the Oversight Board considered an extension to revise the fiscal plans of the Commonwealth and of the six (6) instrumentalities of Puerto Rico, including HTA.

On January 1, 2018, the Government canceled a planned "preview" of the Commonwealth proposed fiscal plan.  The proposed HTA fiscal plan submission was also

pushed back.  On March 9, 2018, the Oversight Board confirmed receipt of the Government's revised HTA fiscal plan proposal, which the Oversight Board aimed to certify by April 20, 2018. As part of ongoing work and review between the Government and the Oversight Board, a revised HTA fiscal plan proposal was provided on March 24, 2018.

On March 28, 2018 and March 29, 2018, the Oversight Board issued two notices of violation under PROMESA section 201(c)(3)(B)(i), detailing several changes required before the HTA fiscal plan could be certified, such as the inclusion of funding for strategic projections, clarification on the baseline assumptions, inclusion of clear structural reforms, and inclusion of details of a congestion reduction plan necessary to help Puerto Rico meet the structural reform targets of the Commonwealth's certified fiscal plan. A proposed revised fiscal plan was due April 5, 2018.

On April 5, 2018, the Government submitted a revised fiscal plan for HTA.  The revised fiscal plan showed a total $33 million surplus from FY2018 through FY2023 compared with the previous draft, which showed HTA breaking even during that time frame.  The proposed fiscal plan also projected HTA would close FY2018 with a balanced budget and subsequently run a $9 million deficit in FY2019 and a $10 million deficit in FY2020.  However, the revised fiscal plan also identified a total financial opportunity of $88 million for FY2018, up from $85 million in the prior draft, resulting from the six (6) key fiscal measures proposed to facilitate organizational transformation, enhance revenue, and reduce expenditures.

On April 18, 2018, the Oversight Board announced it would publish a proposed new fiscal plan for HTA, prior to the Oversight Board's thirteenth public meeting on Friday, April 20, 2018, where the Oversight Board would consider certification of the new proposed HTA fiscal plan.  Subsequently, the Oversight Board published a new proposed fiscal plan for HTA, projecting a total $355 million surplus from FY2018 through FY2023, as compared to a $33 million surplus projection in the previous draft.

On April 20, 2018, the Oversight Board certified the April 2018 HTA fiscal plan that had been published on April 19, 2018.

On June 29, 2018, after the Legislature failed to implement labor reform through repeal of Law 80, the Oversight Board re-certified the June 2018 HTA Fiscal Plan, which included some technical changes.

### 3.   The June 2019 HTA Fiscal Plan Certification

On August 1, 2018, the Oversight Board announced it would revise the Commonwealth's fiscal plan to incorporate material new information including, full FY2018 revenue actuals, revised federal disaster spending estimates, and an adjustment to demographic projections, among other things.  The HTA fiscal plan would see similar revisions.

On August 17, 2018, the Oversight Board extended the deadline for HTA to submit its revised fiscal plan until October 12, 2018.  On October 11, 2018, HTA's deadline to submit a

revised fiscal plan was again extended, pending certification of a new Commonwealth fiscal plan.

On October 23, 2018, the Oversight Board certified the Commonwealth fiscal plan, but did not announce a new deadline for submission of HTA's revised fiscal plan.

On December 27, 2018, the Oversight Board stated the legislative amendment to Section 23.08(c)(1) of the Vehicle and Traffic Law of Puerto Rico, would put HTA's ability to comply with the June 2018 HTA Fiscal Plan at serious risk.  HTA had made progress on numerous Fiscal Plan measures, including rightsizing, re-bidding key contracts, and generating ancillary revenues.  However, the tepid progress of many other measures, particularly toll increases, pension reduction, and elimination of the Christmas bonus, put HTA at risk of missing the savings targets over the Fiscal Plan period.

On January 14, 2019, Governor Ricardo Rosselló announced the selection of Rosana M. Aguilar as the new HTA executive director.

On March 11, 2019, the Oversight Board set the HTA fiscal plan certification schedule, to begin with the HTA's submission of proposed fiscal plan by April 5, 2019, and the target date of certification by May 28, 2019.  The Government timely submitted a proposed 2019 fiscal plan for HTA, and on April 24, 2019, the expected certification date of the HTA fiscal plan was adjusted to May or June of 2019.

On May 1, 2019, the Oversight Board issued a notice of violation regarding the proposed 2019 HTA fiscal plan, providing recommendations to ameliorate the violations.  In response, the Government submitted a revised version on May 17, 2019.  Subsequently, HTA engaged in extensive discussions with the Oversight Board and its advisors.

On June 5, 2019, the Oversight Board certified its own version of the fiscal plan for HTA on June 5, 2019, after substantial deliberation.  The June 2019 HTA Fiscal Plan included new information and financial projections to improve the quality of Puerto Rico's transport system, which is ranked 51st for quality of roads and ranked 45th for the congestion of roads out of 52 US jurisdictions.  The June 2019 HTA Fiscal Plan aimed to transform HTA into an independently governed contract manager to deliver on a $3.1 billion capital program while capturing $462 million in revenue and expense opportunities.  Successful implementation of the fiscal plan would allow HTA to become fiscally sustainable, maintain its assets in a state of good repair, reduce congestion in the system, ensure preparedness for future disasters, and support economic growth and development.

### 4.  The June 2020 HTA Fiscal Plan Certification

On September 6, 2019, Resident Commissioner Jennifer González announced a $220.2 million allocation to Puerto Rico from the FHWA, for repair work related to damage inflicted by Hurricanes Irma and Maria. DTOP would receive $208.2 million of federal aid to repair transportation infrastructure damaged by the 2017 hurricanes.

On September 18, 2019, HTA published its August 2019 report on the status of the June 2019 HTA Fiscal Plan implementation, showing, among other things, progress in deploying its capital improvements plan and its asset sales plans, but a federal funding level below projections during the first two months of FY2020.

On January 29, 2020, AAFAF provided a status report, announcing several fiscal-plan related projects, including roadway repairs due to the earthquakes.  AAFAF estimated $16.2 million was needed in emergency repairs and $19 million was needed in permanent works for road repairs, with both estimates subject to increase.

On April 15, 2020, HTA submitted a proposed 2020 fiscal plan for HTA, which was further supplemented on April 21, 2020.  On May 11, 2020, the Oversight Board issued a notice of violation to HTA, which included revisions HTA would need to incorporate before the proposed HTA fiscal plan could be certified.

On June 26, 2020, the Oversight Board certified and published a new fiscal plan for HTA. The June 2020 HTA Fiscal Plan provided a roadmap to a better quality of life for Puerto Rico citizens, which was focused on improving the island's transportation systems.  It also required establishment of an independent board with experienced and knowledgeable directors, and six (6) measures to improve revenue, including, increases in toll fare collections, tolls, introduction of congestion pricing, as well as four (4) measures to cut heath expenses, including reducing pension and employee healthcare costs.  The fiscal measures in the June 2020 HTA Fiscal Plan were aimed at increasing HTA revenue by about $4.1 billion over the next 30 years.

## 5. The May 2021 HTA Fiscal Plan Certification

On December 9, 2020, HTA agreed to increase toll revenue, an initiative set forth in the June 2020 HTA Fiscal Plan, starting in calendar year 2021, which would allow HTA to increase revenues.

On February 10, 2021, the Oversight Board directed HTA to submit by February 19, 2021, an updated implementation plan that included a timeline for restarting the collection of toll fines by April 15, 2021 and the implementation of toll fare increases by July 1, 2021.  The implementation of toll fare increases was expected to occur by January 1, 2022, however, as of April 2022, no increase has been implemented.  Toll fine collection recommenced in July 2021. However, as of April 2022, no adjustments have been made to the pricing policy of fines (*e.g.*, fine increases, introduction of tiered fines, etc.).

On February 25, 2021, the Oversight Board established the schedule to develop and certify an updated HTA fiscal plan for FY2022, with the Government to submit a proposed HTA fiscal plan by April 9, 2021, and the Oversight Board to expect to certify by May 28, 2021.

On March 10, 2021, the Oversight Board began the process of working on a Title III plan of adjustment for HTA, with a filing goal of January 31, 2022, aiming for confirmation and HTA's exit from bankruptcy sometime in 2022.

On March 18, 2021, according to the latest HTA reporting package, posted by AAFAF, various measures required in the June 2020 HTA Fiscal Plan were behind schedule, and it remained unclear when certain related steps would be taken, if at all.  The HTA reporting package showed fiscal measures to increase fare revenue and fine revenue were not implemented during the first half of FY2021 and there was no progress made towards achieving FY2021 targets for increased fare revenue of $7.6 million and increased fine revenue of $7.4 million, including $2.1 million and $1.2 million, respectively, through January.

On April 13, 2021, HTA submitted a draft 2021 fiscal plan, which was further supplemented and revised two (2) days later.

On April 27, 2021, the Oversight Board issued a notice of violation for the proposed HTA fiscal plan, citing a wide range of required revisions, including toll increases and analyses of future public-private partnerships for toll roads.  HTA's deadline to submit a revised fiscal plan was May 14, 2021, with a target certification date of May 28, 2021.

On May 20, 2021, HTA posted its audited financial report for FY2019, which included a relatively long stretch of going-concern language given uncertainties on a range of fronts, including fiscal plan implementation and debt restructuring processes.

On May 26, 2021, the Oversight Board announced to hold its twenty-eighth public meeting the next day.  On May 27, 2021, the Oversight Board certified the May 2021 HTA Fiscal Plan, which included the following six measures to be part of the HTA transformation: (1) restructure transportation assets into mode-specific entities (*e.g.*, toll roads, non-toll roads, mass transit); (2) create an overreaching transportation policy board to guide multi-modal transportation strategy across the island; (3) develop and use objective frameworks for project selection; (4) improve performance management of contractors through integration in public systems, performance-based contracts, and better supervision; (5) enhance effectiveness of governance by reforming entity boards of directors, and, where relevant, include fewer political appointees and more subject-matter experts; and (6) maximize utilization of available grants through a more comprehensive federal grants strategy and improved bankability to attract private capital. The May 2021 HTA Fiscal Plan also included measures that would enhance HTA's revenues to ensure fiscal sustainability, such as, fare increases, toll optimization, fine price modifications, bi-directional tolling, transit enhancements, and ancillary revenue improvements.

### 6.  The February 2022 HTA Fiscal Plan Certification

On November 18, 2021, the Oversight Board announced it began revising HTA's fiscal plan to incorporate new federal funding expectations, macroeconomic assumptions, and CapEx disbursement projections, with an ultimate goal to certify an updated HTA fiscal plan by January 19, 2022.  To do so, the Oversight Board required the submission of the Government's proposed HTA fiscal plan by December 10, 2021.

On December 9, 2021, the Oversight Board extended the timeline for the revision of the HTA fiscal plan, with the Government's submission date extended to December 15, 2021, and the target certification date extended to February 4, 2022.

On December 10, 2021, HTA posted its audited financial report for FY2020, characterizing HTA's principal challenges as: (1) maximizing revenue, (2) reducing operating costs, and (3) improving liquidity. The audited financial report contains going-concern language, which outlines uncertainties around fiscal plan implementation for HTA and the ongoing Commonwealth and HTA debt restructuring processes, noting that HTA has experienced significant recurring losses from operations and faces many business challenges exacerbated by the Commonwealth's economic recession.

On December 16, 2021, HTA submitted a proposed draft of its fiscal plan, which was further supplemented on December 17, 2021.

On January 6, 2022, the Oversight Board issued a notice of violation regarding the proposed HTA fiscal plan submitted in December 2021, citing revisions required such as: (1) updated baseline projections that reflect FY2022 actuals, (2) technical adjustments to ensure consistency with the assumptions in the January 21, 2022 Commonwealth fiscal plan certified in January 2022, (3) changes to the overall level of CapEx to better reflect HTA's funding constraints and historical capacity to deliver CapEx, (4) rollout of fiscal measures that would enable HTA to pursue the revenue identified in the May 2021 HTA Fiscal Plan, and (5) a revised plan for Transportation Sector Reform. HTA was required to submit a revised fiscal plan by January 21, 2022. On January 21, 2022, HTA timely submitted to the Oversight Board an updated draft of its fiscal plan.

On February 5, 2022, the Oversight Board issued a notice of violation regarding the revised proposed HTA fiscal plan submitted on January 21, 2022, citing revisions required such as: (1) a detailed description of the implementation roadmap for Transportation Sector Reform and ringfencing of HTA's toll assets through the creation of new Toll Road Management Office within HTA, (2) inclusion of proforma profit and loss statements for each of HTA's asset types (toll, non-toll, and transit), and (3) adjustments to fully address all violations identified by the Oversight Board in its prior notice of violation dated January 6, 2022. HTA was required to submit a revised fiscal plan by February 11, 2022.

On February 11, 2022, the Government submitted to the Oversight Board a revised proposed HTA fiscal plan.

On February 22, 2022, the Oversight Board certified and published the February 2022 HTA Fiscal Plan, which enables HTA to deliver capital investments that would bring the roads of Puerto Rico to a State of Good Repair and generate a surplus of approximately $4.8 billion, through revenue-focusing measures, such as toll fare increases, fine price modifications, transit enhancements and toll collection optimization. The February 2022 HTA Fiscal Plan also calls for HTA to pursue Transportation Sector Reform, by setting up a Toll Road Management Office, transferring over transit assets to PRITA, and pursuing P3 opportunities.

On April 1, 2022, HTA posted its audited financial report for FY2021, which included going concern language highlighting HTA's significant recurring losses from operations and noting HTA's debt restructuring process to address the going concern issues. The audited

financial report also provides a summary of management's remediation plan, which reiterates fiscal plan measures referenced in the above paragraph.

### 7. Fiscal Year 2018 HTA Budget Certification

After the first HTA Fiscal Plan was certified by the Oversight Board on April 28, 2017, the Government faced an April 30, 2017 deadline to submit a proposed budget for the Commonwealth to the Oversight Board that complied with the Commonwealth's certified fiscal plan and updated liquidity report.

On June 1, 2017, it was announced the then-Governor Ricardo Rosselló's proposed budget for FY2018 contained a significant exception for HTA because it included HTA's budget rising to $538.76 million from $408.3 million. Budget hearings took place during the week of June 15, 2017. Carlos Contreras of DTOP, testified on the various challenges HTA faced, including, the risk of losing and/or having to reimburse federal highway funds due to discontinued projects or concerns over technical, financial and organizational capabilities. If Puerto Rico could compete for money utilizing the formulas used in the mainland states, the roughly $150 million per year that HTA receives from FHA could reach $400 million. HTA's proposed consolidated budget for FY2018 was $538.7 million and DTOP's proposed consolidated budget for FY2018 was nearly $98.8 million. No toll hikes were contemplated for FY2018.

On June 19, 2017, the Governor submitted to the Oversight Board a revised proposed budget for HTA for FY2018.

On June 27, 2017, the Oversight Board scheduled its public meeting to address the HTA proposed budget for June 30, 2017. The agenda included, among other things, a period for presentation, assessment, and recommendations on the proposed budget for HTA. The agenda also contemplated a period for public comment, discussion and certification of HTA's budget.

On June 30, 2017, the Oversight Board, certified the proposed FY2018 budget for HTA. The recommended amount of the consolidated budget was roughly $538.76 million, which included $22 million from special assignments; $155 million from federal funds; $285.8 million from HTA's own income and revenue and $75.96 million of other income and revenues. The certified Budget would be subject to conforming revisions should the Oversight Board certify a revised HTA fiscal plan.

### 8. Fiscal Year 2019 HTA Budget Certification

On September 22, 2017, due to the devastation caused by Hurricane Maria, the Oversight Board announced it would approve any modifications to the pre-approved budgets, including HTA's budget, that were necessary for emergency measures in response to the damage caused by Hurricane Maria, up to an aggregate amount of $1 billion.

On December 12, 2017, the Oversight Board sent a letter to the Government outlining a revised budget process for FY2019. Specifically, for HTA, the Government needed to transmit a

complete inventory listing of all funds included in the April 2017 HTA Fiscal Plan by December 22, 2017, and provide proposed revenues for HTA, along with supporting details, including all relevant third-party certifications by March 2, 2018.  In response, the Oversight Board would send the Governor and boards of directors the forecast of revenues for the period covered by all applicable budgets, including HTA's, by March 30, 2018, and the Government would submit proposed budgets to the Oversight Board along with supporting detail, including a detailed reconciliation of budgeted expenses to revenues and supporting detail to evidence consistency with historical actual expenditures and/or explanations if there is a significant difference, as well as key performance indicators for reporting post-certification, by April 16, 2018.  The Oversight Board aimed to approve the fiscal 2019 budgets and the reporting blueprints for each fund type by June 29, 2018.

On December 22, 2017, the Oversight Board established a new FY2019 budget process schedule, granting the Commonwealth's request for an extension of the scheduling deadlines in connection with the fiscal plan revision process.  Notably, the revised schedule required the Government to provide the proposed HTA budget to the Oversight Board along with supporting detail, by May 11, 2018.  The target budget certification date of June 29, 2018 remained the same.

In January 2018, the Government transmitted a complete inventory listing of all funds and/or entities included in the April 2017 HTA Fiscal Plan, in accordance with the budget certification process schedule set by the Oversight Board in December 2017.

On April 26, 2018, the Oversight Board announced six (6) guiding principles for the FY2019 integrated budget certification process which included the following: (1) all budgets must be compliant with their applicable fiscal plan and developed in accordance with modified accrual accounting standards; (2) revenue forecasts will be provided by the Oversight Board to the Governor, legislature, and boards of directors for use in developing relevant budgets; (3) budgeted expenses must be properly justified; (4) reporting blueprint templates must be agreed to by the Governor and the Oversight Board, and the Puerto Rico government must comply with reporting pursuant to these templates; (5) clear responsibility for enforcement of all elements of the budget and reporting is critical; and (6) all expenditures (including capital expenditures) of the Commonwealth and instrumentalities can be made only pursuant to a budget certified by the Oversight Board.

On May 4, 2018, the Oversight Board posted its FY2019 revenue forecast for HTA, which was consistent with the revenue forecast contained in the April 2018 HTA Fiscal Plan.

On May 4, 2018, The Oversight Board outlined a revised timeline for the HTA budget certification process, which set out: (i) on or before June 3, 2018, the Oversight Board was to approve the Governor's proposed budget for HTA or otherwise provide notification of violations and describe all necessary corrective actions.  If there were violations and required corrective actions, the Governor was to submit a revised budget on or before June 18, 2018; (ii) on June 29, 2018, if the Governor was to have submitted a revised, compliant budget to the Oversight Board, the Oversight Board was to approve it and issue a compliance certification.  However, if the Governor failed to submit a revised, compliant budget to the Oversight Board, the Oversight

94

Board was to submit its own compliant budgets to the Governor on July 1, 2018; and (iii) anytime through June 29, 2018, if the Governor and the Oversight Board each certified that a jointly developed budget reflects a consensus among them, then such budget shall serve as the budget for the respective instrumentality for FY2019.

On June 23, 2018, the Oversight Board found HTA's budget submitted on May 25, 2018 was not compliant with the HTA fiscal plan, and, further, did not meet the requirements set forth by the Oversight Board in its correspondence with HTA. HTA's proposed budget required substantial revisions, including those surrounding additional toll proceeds, before the budget could be certified.

On June 25, 2018, the Oversight Board again revised the HTA budget certification timeline, setting June 26, 2018 as the deadline for the Governor was to submit a revised budget to the Oversight Board, and June 29, 2018 as the date by which the Oversight Board would approve a compliant budget submitted by the Governor or the Oversight Board would submit its own compliant budget to the Governor.

On June 30, 2018, the Oversight Board certified HTA's FY2019 budget and issued a compliance certification accordingly.

### 9. Fiscal Year 2020 HTA Budget Certification

On January 14, 2019, the Oversight Board noted the Government failed to timely submit fiscal full-year 2018 and first quarter 2019 budget-to-actual variance reports for a number of instrumentalities. The Oversight Board also noted the second quarter 2019 budget-to-actual reports, including that for HTA, were due the next day.

On March 11, 2019, the Oversight Board set the timeline for the FY2020 budget certification process for HTA, which included, among others, the deadline for the Government to submit a draft FY2020 HTA budget by May 22, 2019, the Government to submit revised draft HTA budget by June 14, 2019, if necessary, and the Oversight Board to certify HTA's FY2020 budget by June 28, 2019.

On June 7, 2019, the Oversight Board extended the deadline for the Government to submit its proposed FY2020 budget for HTA to June 16, 2019. The Oversight Board would send a notice of violation, if needed, by June 19, 2019, with the Government to respond with a revised budget, including the necessary resolutions from HTA's governing board and supporting documentation, to the Oversight Board by June 26, 2019.

On June 23, 2019, the Oversight Board notified Governor Ricardo Rosselló that the proposed FY2020 budget for HTA was not compliant with the June 2019 HTA Fiscal Plan. The Oversight Board set a deadline for the violations to be corrected by June 26, 2019. The Oversight Board found substantial revisions were required before the HTA budget could be certified. The Oversight Board highlighted major items that were noncompliant with the certified 2019 fiscal plan for HTA, including: (1) no accountability of HTA toll increases; (2) overstated expenses for employee Voluntary Transmission Program buyouts; (3) allocated

funding for Christmas bonuses; (4) overstated appropriation for health benefits; (5) overstated proposed CIP program budget; (6) failure to include toll violation revenue; and (7) lack of budget itemization.

On June 30, 2019, the Oversight Board certified the FY2020 budget for HTA.  After substantial deliberation, the Oversight Board determined that the proposed budget for HTA did not comply with Section 202(c)(2) of PROMESA.  As a result, the Oversight Board developed a revised, compliant budget for HTA pursuant to Sections 202(c)(2) and 202(e)(4).

### 10. Fiscal Year 2021 HTA Budget Certification

On August 19, 2019, AAFAF published financial data of HTA for the month of July 2019.  The reporting package included budget-to-actual monthly and quarterly financial and traffic volume reports, cash flow and bank balance reports, and reports on fiscal measures, capital investment program and key performance indicators.  For July 2019, the first month of FY2020, HTA's revenue from its own sources totaled $12.17 million, which missed budget targets by $1.869 million, or 13.31%, while total funding from the federal and Commonwealth governments and other sources totaled $6.811 million, which missed budget targets by $1.602 million, or 19.04%.

Between April 6, 2020 and April 8, 2020, as the Puerto Rico Legislature pushed through numerous COVID-19 response measures, the Oversight Board flagged fiscal-related resolutions for several issue, including noncompliance with the certified budgets and fiscal plans, including the halt of toll collections.  The Oversight Board issued at least five (5) letters to Governor Wanda Vázquez and legislative leaders on separate funding and/or fiscal resolutions urging against their enactment.  The Oversight Board also noted its reservation of rights to nullify and enjoin enforcement of legislation pursuant to PROMESA sections 204,108(a)(2) and 207.

On April 20, 2020, HTA submitted a budget amendment request to the Oversight Board.

On May 11, 2020, the Oversight Board set a deadline of May 22, 2020 for HTA's proposed budget for FY2021.  The budget schedule required certification by June 30, 2020.

On May 18, 2020, the Oversight Board proposed an amended budget for HTA, which included a new line item for a $600,000 transfer from the Emergency Measures Support Package by the Commonwealth to HTA to cover the lost revenues from toll collections resulting from the moratorium.

On May 22, 2020, HTA timely submitted a proposed FY2021 budget.

On June 26, 2020, the Oversight Board issued a notice of violation to HTA, citing noncompliance with the June 2020 HTA Fiscal Plan and requiring further revisions.

On June 30, 2020, the Oversight Board certified the FY2021 budget.  The total operating expenses within the FY2021 budget were $257 million, with total consolidated expenses of $862 million.

### 11. Fiscal Year 2022 HTA Budget Certification

On July 14, 2020, the Oversight Board sent letters to Governor Wanda Vasquez and other Commonwealth officials stating that its analysis of the FY2020 third-quarter financial reports revealed "material inconsistencies" in and "violations" of the FY2020 certified Budget for HTA.

On February 25, 2021, the Oversight Board set the certification schedule for HTA's FY2022 budget, starting with the Government's submission of a proposed budget for HTA with detailed support documentation by May 14, 2021. The Oversight Board was expected to certify the HTA FY2022 budget by June 30, 2021.

On May 28, 2021, the Oversight Board issued a notice violation to Governor Pedro Pierluisi, noting that the Puerto Rico Government did not formally submit an HTA budget by the May 14, 2021 deadline. After subsequent discussions with HTA, the Oversight Board deemed a proposed fiscal plan financial model submitted to the board on May 14, 2021 as HTA's proposed budget for purposes of the notice violation.

On May 28, 2021, the Oversight Board established a revised HTA budget certification schedule and provided the forecast of revenue for use in developing the FY2022 spending plan for HTA. According to the schedule, the Government was required to submit a revised compliant HTA budget by June 9, 2021. If the government did not submit a compliant budget, the Oversight Board would certify its own version pursuant to section 202(e)(4) of PROMESA by June 30, 2021.

On June 3, 2021, the Oversight Board directed the Government to submit, by June 9, 2021, a proposed FY2022 budget for HTA that is to be consistent with revenue and expenditures projected in the May 2021 HTA Fiscal Plan.

On June 30, 2021, the Oversight Board announced it would hold its twenty-ninth public meeting on July 1, 2021, seeking to certify HTA's FY2022 budget. On July 1, 2021, the Oversight Board certified the FY2022 budget for HTA.

On February 5, 2022, the Oversight Board set the certification schedule for HTA's revised fiscal year 2022 budget, starting with the Government's submission of a revised proposed budget for HTA with detailed support documentation by February 11, 2022.

On February 22, 2022, the Oversight Board issued a notice of violation regarding the proposed updated HTA FY2022 budget submitted by the Government, citing revisions required such as: (1) reflection of full fare and fine fiscal measure implementation in FY2022; (2) alignment of all Commonwealth transfers with the certified Commonwealth fiscal plan assumptions; (3) addition of federal funds made newly available by the Bipartisan Infrastructure Law (BIL); (4) elimination of salary increases not reflected in the February 2022 HTA Fiscal Plan; and (5) provision of clear explanation for all capital and operating expense line-items diverging from the February 2022 HTA Fiscal Plan.

On February 28, 2022, HTA timely submitted a proposed revised FY2022 budget. On March 4, 2022, the Oversight Board certified the revised HTA FY2022 budget. The total operating expenses within FY2022 are budgeted to be $237 million, with total consolidated expenses of $612 million.

## E.  Negotiations with Creditors

### 1.  Negotiations with Creditors Prior to the Enactment of PROMESA

During FY2016, the Commonwealth presented various proposals to bondholders and bond insurers seeking to reach an agreement for a voluntary restructuring of the debt of the Commonwealth and that of its public corporations.

On February 1, 2016, the Commonwealth published a proposal that sought to exchange $49.2 billion of tax-supported debt into $26.5 billion of mandatorily payable bonds and $22.7 billion in variable payment bonds (payable only in the event the Commonwealth outperformed certain revenue projections). The proposal contemplated no interest payments until FY2018, no principal payments until FY2021, maximum annual debt service of $1.7 billion starting FY2021 and a final maturity in FY2051. Several bondholder groups, particularly monoline bond insurers, issued statements after the Commonwealth published its proposal that were critical of such proposal.

On June 21, 2016, the Commonwealth published a second proposal that provided an incremental $52.7 billion of mandatorily payable debt service to creditors as compared to the Commonwealth's February 1, 2016 offer. The proposal continued to contemplate cash flow relief during the first four years but increased cash interest payments during such period and added a non-cash interest portion (payable-in-kind). Maximum annual debt service was set at $2.05 billion starting in FY2031, with a final maturity in FY2071.

The Commonwealth's proposals sought to ensure that debt service would never exceed 15% of projected consolidated revenues (as defined in the public presentation explaining the proposal) for the Commonwealth and its tax supported instrumentalities. Both proposals were also predicated upon a number of key assumptions (many of which are not under the control of the Commonwealth), including: (i) a 100% participation rate, (ii) Congress continuing the current level of health care funding provided to Puerto Rico under the Affordable Care Act, (iii) the Commonwealth extending the Act 154 excise tax and the IRS continuing to allow such tax to be creditable against U.S. federal income taxes (along with no further erosion of the Act 154 tax base), (iv) the implementation of all the measures contemplated by the Fiscal and Economic Growth Plan dated September 9, 2015, and (v) the Commonwealth achieving a two percent (2%) nominal growth rate.

### 2.  Negotiations with Creditors Prior to Title III Filings

The Commonwealth also made extensive efforts to reach a consensual restructuring with creditors prior to its Title III filing. From December 2016 through March 2017, the Oversight Board and the Commonwealth held more than thirty meetings with creditor representatives to seek a consensual restructuring of the Commonwealth's debt. In addition, prior to the

termination of the PROMESA Title IV stay, the Oversight Board and the Commonwealth convened mediation on April 13, 2017, to find common ground and a consensual resolution. Those efforts were unsuccessful.

[*Remainder of Page Left Intentionally Blank*]

## V.   Overview of the Debtor's Title III Cases

### A.   Commencement of HTA's Title III Case

After negotiations with its creditor constituencies, the Commonwealth determined it was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation and lay a foundation for economic recovery and prosperity going forward without a renegotiation of outstanding debts.  Pursuant to PROMESA section 405, the establishment of the Oversight Board operated as a temporary stay of all actions, claims, and proceedings in any court or tribunal with respect to any liability, as defined in PROMESA section 405(a), of the Commonwealth and its territorial instrumentalities, including HTA.  As soon as the PROMESA section 405 stay expired, numerous pending lawsuits against the Commonwealth and its territorial instrumentalities would be allowed to continue, and dozens of creditors threatened to file or pursue lawsuits against the Commonwealth and its territorial instrumentalities.  On May 21, 2017, the Oversight Board issued a restructuring certification for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) in the Title III Court.  On June 29, 2017, the Court entered an order granting the joint administration of the Title III cases of the Commonwealth and HTA for procedural purposes only [ECF No. 537].

*Appointment of Statutory Committees.*  On June 15, 2017, the Creditors' Committee and the Retiree Committee were appointed [ECF Nos. 338, 340].  The current members of the Creditors' Committee are (i) The American Federation of Teachers, (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) Service Employees International Union ("SEIU"), (v) Unitech Engineering, (vi) Baxter Sales and Distribution Puerto Rico Corp., and (vii) Tradewinds Energy Barceloneta, LLC [ECF No. 3947].  The current members of the Retiree Committee are (i) Blanca E. Paniagua, (ii) Carmen Haydee Núñez, (iii) Juan Ortiz Curet, (iv) Lydia R. Pellot, (v) Marcos A. López Reyes, (vi) Miguel J. Fabre Ramírez, (vii) Milagros Acevedo Santiago, and (viii) Rosario Pacheco Fontán [ECF No. 340].

*Mediation Team.*  On June 23, 2017, the Title III Court entered the *Order Appointing Mediation Team* [ECF No. 430] "to further the goal of the successful, consensual resolution of the issues raised in these debt adjustment proceedings."  The members of the Mediation Team included: (1) Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); and (4) Judge Roberta Colton (Bankr. M.D. Fla.).  The Oversight Board and the Debtor owe their utmost gratitude to the mediators who are each sitting federal judges and who, without compensation, have tirelessly and indefatigably worked successfully to promote increasing consensus and progress towards a revitalized Puerto Rico.

The Mediation Team facilitated confidential settlement negotiations of matters and proceedings arising in the Title III Cases, culminating in the execution of various plan support agreements regarding debt restructuring terms for five of the six Title III debtors (the Commonwealth, ERS, PBA, COFINA, and HTA) and substantially consensual Title VI qualifying modifications for two other non-debtor entities (PRIFA and CCDA).  Following the successful confirmation of the Commonwealth Plan on January 18, 2022, the Title III Court

entered an order on January 19, 2022 terminating the appointment of the Mediation Team, including each of its members, with immediate effect.[114]

**B.      Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes, COVID-19, Tropical Cyclone 9, Tropical Storm Laura, and Hurricane Isaias, and the Oversight Board's Response**

***Hurricanes Irma and Maria.***    Shortly after the commencement of the HTA Title III Case, in September 2017, Hurricanes Irma and Maria struck Puerto Rico.  The hurricanes caused widespread damage throughout Puerto Rico and exacerbated the economic challenges described above.  Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period.  Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of Puerto Rico.  The hurricane caused catastrophic destruction in Puerto Rico, leaving Puerto Rico completely without power and flooding many streets and roads.  Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast.

Puerto Rico's highways and transportation systems suffered significant damage following Hurricanes Irma and Maria.  Hurricane Maria prompted the issuance of 1,175 DDIRs which are forms required to be submitted to the FHWA to determine if the event qualifies as an emergency relief disaster.  Several roads and bridges were damaged as were multiple stations of Tren Urbano rendering the roads, bridges, and stations inoperable.

As of December 16, 2021, HTA had disbursed approximately sixty percent (60%) of the emergency repairs associated with Hurricanes Irma and Maria.  Over FY2022-FY2026, the delivery of the emergency repairs program must be accelerated.  The improvements that have not yet been completed by HTA include a modular bridge installation, landslide repairs, bridge scouring repairs, safety device installation, and other highway reconstruction projects.  Proposals have been submitted for the first permanent repair projects associated with signage, safety, and lighting improvements.

The hurricanes had an adverse effect on HTA's revenue, which declined as a result of the hurricanes' combined destruction.  HTA's operating revenues consist primarily of toll and train fares.  Due to the damage caused on the tolling system, toll fare receipts dropped significantly, and toll fine collection was forced to be suspended, which was already a problem for HTA as the pre-existing collection system had multiple deficiencies.  Toll fare receipts have returned to pre-disaster levels; however, toll fine receipts are still lagging.  The lag in toll fine receipts is due to fines being set to $0 in FY2020 and FY2021, the fines were restored in July 2021.  Toll fine receipts were approximately $20.5 million as of December 31, 2021.[115]  Additionally, ridership traffic on Tren Urbano declined drastically.  Ridership traffic fell by almost thirty percent (30%) after the hurricanes.[116]  Ridership traffic has yet to recover to the same levels that existed prior to the hurricane destruction in part because of operational inefficiencies in HTA's transit system.

---

[114]   *Order Terminating Appointment of Mediation Team*, ECF No. 19833.
[115]   HTA's FY2022 budget to actuals ("B2A") reporting for the month ended December 31, 2021.
[116]   HTA Tren Urbano Ridership Data, comparing 12 months before Hurricane Maria with 12 months after Tren Urbano operation was restored.

As of June 2021, transit ridership is still seventy-eight percent (78%) below pre-hurricane levels, mainly attributable to the COVID-19 pandemic.

As a result of the massive impact of the hurricanes, the Government and the Oversight Board undertook a series of actions to address the crisis.

On September 21, 2017, the Oversight Board authorized the Government to "reallocate" up to $1 billion of its budget for emergency funding to recover from the hurricane's effects and to ensure it had resources to begin immediate emergency response and recovery efforts in anticipation of federal funds.   This enabled the Government to act quickly to reapportion (reprogram) funds as needed, without seeking the Oversight Board's approval prior to movement of funds.

In a letter to Congressional Leadership dated October 3, 2017, the Oversight Board sought federal support in the following areas: maximizing the amount of federal assistance, access to an emergency liquidity program, parity treatment for Medicaid funding, and waivers of caps and local share requirements for federal assistance.[117]

In an October 6, 2017 letter to President Trump, the Oversight Board reiterated the request to support then-Governor Rosselló's request and those requests outlined in the October 3, 2017 letter to the Congressional leadership.[118]

In an October 10, 2017 letter to Treasury Secretary Mnuchin, the Oversight Board urged the Department of the Treasury to consider a proposal that the Oversight Board developed with the Government to address the pressing liquidity needs of the Commonwealth and its instrumentalities.[119]

The Oversight Board collaborated with the Government to provide short term and medium- term worst-case liquidity estimates, considering revenue shortfalls that the Commonwealth could experience, and to address funds needed to advance rebuilding efforts. The Oversight Board held several meetings with the U.S. Treasury to discuss Puerto Rico's access to Community Disaster Loans for municipalities.

The Oversight Board certified the recovery plan directed by Congress in the Bipartisan Budget Act on August 28, 2018.  However, it provided two caveats to its certification.  First, the Oversight Board expressed concern regarding the lack of detail and high amount of estimated Federal funding sources compared to values in the then-certified fiscal plan for Puerto Rico projects.  Second, the Oversight Board indicated that the recovery plan did not address oversight

---

[117]   Letter from José B. Carrión, Chair, Fin. Oversight & Mgmt. Bd. for P.R. to United States Congressional Leaders, (Oct. 3, 2017), https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view.

[118]   Letter from José B. Carrión, Chair, Fin. Oversight & Mgmt. Bd. for P.R. to United States President Trump-, (Oct. 6, 2017), https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view.

[119]   Letter from Jose B. Carrión, Chair, Fin. Oversight & Mgmt. Bd. for P.R. to Treasury Secretary Mnuchin, (Oct. 10, 2017), https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; Press Release, Fin. Oversight and Mgmt. Bd. for P.R., "The Governor and the Financial Oversight and Management Board Each Ask the Trump Administration to Address Liquidity Issues Following Hurricane Maria," (Oct. 10, 2017), https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

of federal funds and the recovery process.  Moreover, the Oversight Board did not receive the recovery plan for consideration until after the Government had provided it to Congress.

On October 4, 2017, to better focus on restoring services to residents, which were diminished due to the destruction across Puerto Rico, the Oversight Board withdrew the litigation it had initiated to enforce the Government's compliance with certain measures in the certified fiscal plan and postponed the implementation of any furlough measures for at least a year.

During this period, members and executive staff of the Oversight Board were active in Washington D.C. advocating for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity to maintain services.  The Oversight Board joined the Governor in requesting cost-sharing waivers, lifting funding caps, increased financial assistance, and expedited responses to the Governor's requests.   The Oversight Board participated in numerous meetings, with members of Congress, Congressional staff, federal agencies (including The Office of Management and Budget, U.S. Treasury), and dozens of informational meetings with reporters, think-tanks, and universities.

Oversight Board officials appeared before several Congressional committees to testify.  On November 7, 2017, Ms. Natalie A. Jaresko (then-Executive Director of the Oversight Board) and Mr. Noel Zamot (then-Executive Staff of the Oversight Board) testified before the U.S. House of Representatives' Committee on Natural Resources "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board."   On November 14, 2017, Ms. Natalie A. Jaresko testified before the U.S. Senate's Committee on Energy and Natural Resources "Hurricane Recovery Efforts in Puerto Rico and the U.S. Virgin Islands."

***Tropical Storm Dorian.***   On August 27, 2019, President Trump issued an emergency declaration to address Tropical Storm Dorian.  The declaration authorized FEMA Category B under the Public Assistance program limited to direct federal assistance for the needed support in coordinating disaster relief efforts.  On August 28, 2019, the Oversight Board authorized the use of $260 million in aggregate emergency reserve funds from FY2019 and FY2020 to address Tropical Storm Dorian.

***January 2020 Earthquakes.***   On January 7, 2020, Puerto Rico experienced a 6.4 magnitude earthquake, the Caribbean's strongest and most destructive earthquake in a century.  This earthquake prompted the closure of segments of roads, including segments on two of Puerto Rico's major roadways and resulted in the island losing power for several hours.  According to a January 29, 2020 report published by the United States Geological Survey, there is a high likelihood of continued, material aftershocks over the course of the next several years.[120]   The January 2020 earthquakes and others have caused significant damage to homes, buildings, and major roadways on Puerto Rico's southern coast as well as significant damage to PREPA's Costa Sur power plant, which would typically provide approximately twenty-one percent (21%) of Puerto Rico's power.

The 2020 earthquakes caused a significant amount of damage throughout Puerto Rico's south and southwestern regions.  These earthquakes resulted in the closure of two major roads in

---

[120]  U.S. Geological Survey, 2020 Southwest Puerto Rico Earthquake Sequence (Jan. 29, 2020).

103

those regions: PR-52 (Ponce area) and PR-2 (Peñuelas and Mayaguez areas). The roads were re-opened using emergency relief funds provided by the FHWA. HTA plans to begin permanent repairs for major structure rehabilitation and replacement as well as sites where rockfall and landslides were experienced.

In response to these earthquakes, President Trump approved an emergency declaration for all 78 municipalities for Category B, limited to direct federal assistance to supplement the Commonwealth and local government response efforts, following a request from Governor Vazquez. The Oversight Board authorized the use up to $260 million in Emergency Reserve funds to respond to the earthquakes. On January 16, 2020, President Trump signed a major disaster declaration authorizing Individual Assistance, Public Assistance, and Hazard Mitigation programs, enabling a range of federal assistance under the Stafford Act. The declaration supplements Commonwealth and local government recovery efforts in the aftermath of the continued earthquakes. The declaration (and later amendments to the same) designated 34 municipalities for Individual Assistance and 14 municipalities for Category A through G under Public Assistance at a reimbursement rate of seventy-five percent (75%) federal and twenty-five percent (25%) local share and all areas eligible for assistance under the Hazard Mitigation Grant Program.

*Tropical Cyclone 9.* On July 29, 2020, President Trump issued an emergency declaration to address the potential Tropical Cyclone 9. The declaration authorized emergency protection measures (Category B) under the Public Assistance program and is limited to direct federal assistance and reimbursement for mass care, including evacuation and shelter support, at seventy-five percent (75%) federal funding.

*Tropical Storm Laura.* On August 22, 2019, President Trump approved an emergency declaration in response to Tropical Storm Laura. The declaration authorized emergency protection measures (Category B) under the Public Assistance program and is limited to direct federal assistance under the Public Assistance program and reimbursement for mass care, including evacuation and shelter support, at seventy-five percent (75%) federal funding.

*Hurricane Isaias.* On September 9, 2020, President Trump approved a major disaster declaration in response to Hurricane Isaias. Four Puerto Rico municipalities were designated for Individual Assistance.

*Severe Storm and Flooding.* On November 5, 2020, President Trump approved a major disaster declaration in response to a severe storm and flooding. One Puerto Rico municipality was designated for Individual Assistance.

On March 29, 2022, President Biden approved a major disaster declaration in response to severe storms, flooding, and landslides. Five Puerto Rico municipalities were designated for Individual Assistance.

1.     **Federal Disaster Assistance Funding**

(a)     **Extent of Damage**

There are multiple views on how to measure the impact and extent of damage caused by Hurricanes Irma and Maria, the earthquakes in January of 2020, and subsequent events—ranging from assessing only the damage to productive capital assets, to the cost of all rebuilding needed for the Commonwealth.   The following sources provide various methods of measuring Hurricanes Irma's and Maria's impact and extent of damage:

- The May 2021 HTA Fiscal Plan indicated its funding need in response to Hurricanes Maria and Irma as approximately $836 million and funding needs related to the 2020 earthquakes as $26 million.

- Puerto Rico's Build Back Better ("BBB") plan, published in November 2017 estimates rebuilding cost at $94.4 billion—this includes costs related to healthcare, resiliency spend, among others.[121]

- Puerto Rico's "Transformation and Innovation in the Wake of the Devastation," certified by the Oversight Board in August 2018, outlines the Government of Puerto Rico's perspective on the full set of capital investments needed for Puerto Rico to recover from Hurricanes Irma and Maria.   Fully funding these roughly 270 actions would require approximately $139 billion over calendar years 2018 to 2028.[122]

- The National Oceanic and Atmospheric Administration's estimate of damage in Puerto Rico and the U.S. Virgin Islands due to Hurricane Maria is $90 billion, with a 90% confidence range of +/- $25.0 billion, or $65.0 to $115.0 billion.[123]

- In December 2018, the Puerto Rico Planning Board issued a report citing that the storm's impact on the economy was $43.135 billion,[124] with this figure including included both physical damage and business interruption (*e.g.*, losses due to systems going down, etc.).

- As of April 20, 2022, projects under the Public Assistance program are still being formulated from damages caused by the earthquakes and storms, with 12,083 obligated projects with funds totaling $29,247,555,533.   As projects continue through the disbursement process, the certified fiscal plan will be updated to reflect any changes in total funding.   The HTA portion of the above obligated projects and funds is 36 and $8,618,042, respectively.

---

[121] Governor of Puerto Rico, *Build Back Better Puerto Rico* (Nov. 2017), http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[122]   Central Office for Recovery, Reconstruction and Resiliency, *Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico* (Aug. 8, 2017), https://pr-transformation-innovation-plan.pdf (prsciencetrust.org).

[123]   Richard J. Pasch, Andrew B. Penny, & Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane Maria* (National Hurricane Ctr.) (Feb. 14, 2019), https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf .

[124]   *See* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, Dec. 4, 2018.

**(b)      Federal Aid Provided and To Be Expected**

The 2022 Commonwealth Certified Fiscal Plan projects that approximately $84 billion of disaster relief funding in total from federal and private sources will be disbursed in the reconstruction effort.  Such amount will be used for a mix of funding for individuals (*e.g.*, reconstruction of houses, personal expenditures related to the hurricanes, such as clothing and supplies), funding for the public (*e.g.*, reconstruction of major infrastructure, roads, and schools), and to cover part of the Commonwealth's share of the cost of disaster relief funding (recipients often must match some portion of federal public assistance spend).[125]

Of the total $84 billion, $47 billion is estimated to come from FEMA's Disaster Relief Fund ("DRF") for public assistance, hazard mitigation, mission assignments, and individual assistance.  An estimated $7.4 billion will come from private and business insurance payouts, and $7.7 billion is related to other federal funding.  The 2022 Commonwealth Certified Fiscal Plan includes approximately $20 billion from the Community Development Block Grant Disaster Recovery Program ("CDBG- DR") / Community Development Block Grant Mitigation Program ("CDBG-MIT").  HTA has received approximately $133 million in federal emergency relief funding from FY2019 to FY2021 and anticipates receiving approximately $243 million in total disaster relief funding from FY2022 through FY2026.  This is comprised of approximately $210 million from the FHWA and $16 million from FEMA, and $17 million from FTA via the CARES Act for construction projects to repair damages caused in the island's highway network. FHWA and FEMA funds are further summarized below:

- **FHWA Emergency Relief ("ER") Program.**  The FHWA ER program is available to help state and local agencies fund repairs to Federal-aid eligible roads, bridges, and other infrastructure after a natural disaster.  The repair work within the right-of-way of Federal-aid highways is usually eligible to receive ER funds, if the roadway is in an affected county that is included in the Governor's Declaration or Presidential Declaration. There are two types of repairs following disasters:

  - **Emergency Repairs.**  Emergency repairs are made during or right after a disaster to restore essential traffic, to minimize the extent of damage, or to protect the remaining facilities.  Repairs that go beyond these three objectives are permanent repairs.  This empowers state and local highway authorities to immediately begin emergency repairs to restore essential traffic service and to prevent further damage.

  - **Permanent Repairs.**  Defined as repairs undertaken after the occurrence of a disaster to restore the highway to its pre-disaster condition.  The total cost of ER funding for a project is typically limited to the cost of repair or reconstruction of a comparable facility that meets the current geometric and construction standards required for the types of and volume of traffic that the facility will carry over its design life.

---

[125]   Puerto Rico's cost-match responsibility was estimated using FEMA-provided data, adjusted by category as necessary for waivers and exceptions.

- **FEMA Emergency Relief Public Assistance (PA) Funds.** FEMA's PA program provides supplemental grants to state, tribal, territorial, and local governments so that communities can quickly respond to and recover from major disasters and emergencies. FEMA also encourages protection for these damaged facilities from future events by providing assistance for hazard mitigation measures during the recovery process. Note that a majority of highway related FEMA relief fund projects are allocated to DTOP and that the money allocated to HTA was related to HTA specific buildings.

- **Disaster Aid Revolving Fund.** In November 2020, the Governor enacted Act 139-2020 to create a $750 million revolving credit facility and authorize the Treasury Secretary, on behalf of the Government, to provide or extend loans, credit facilities or advances to central government agencies, public corporations, instrumentalities, and municipalities to fund redevelopment projects until FEMA reimbursements are remitted. Municipalities have priority in accessing these funds, but public corporations (such as HTA) and government agencies may apply.

  - The overall intent of the fund is to advance funding to applicants with approved projects for short-term liquidity and accelerate recovery. The Oversight Board worked with COR3 and AAFAF to approve the program guidance.

- **Other supplemental federal funding.** Additional federal funding has been allocated to various agencies and projects in Puerto Rico. This money is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (*e.g.*, funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (*e.g.*, USDA funding to repair water systems in rural areas).

## 2. COVID-19 Pandemic Response

### (a) COVID-19 Pandemic Background and Anticipated Economic Impact

*Background.* COVID-19 is an infectious viral disease whereby most people infected with the COVID-19 virus experience mild to moderate respiratory illness and recover without requiring special treatment. The elderly, and those with underlying medical conditions like cardiovascular disease, diabetes, chronic respiratory disease, and cancer appear more likely to develop serious illness and, in some cases, die. Three vaccines have been authorized and recommended for use in the United States with booster doses more recently recommended.

On March 11, 2020, the World Health Organization declared the rapidly spreading COVID-19 outbreak a pandemic. As of April 21, 2022, there have been over 504 million confirmed cases worldwide detected in over 190 countries, including all 50 States of the United States and has resulted in over 6.2 million deaths.

*Economic Impact to Puerto Rico.* The mandatory Commonwealth-wide shut-downs and temporary restrictions have critically and adversely impacted all economic activity of the Commonwealth. The labor market witnessed an unprecedented dislocation, with unemployment rates reaching levels much higher than in the U.S. and followed by a slower job recovery in the case of Puerto Rico. Similarly, K-12 education faced significant challenges that have raised

concerns over student outcomes.  These factors suggest the pandemic may leave deep scars in the Puerto Rican economy through multiple channels, including lower investment, erosion of human capital, and lower productivity.  The true quantifiable impact to Puerto Rico is not yet completely known, and although closely monitored, the situation is still ongoing.

***Economic Impact to HTA.***   The onset of COVID-19 in March 2020 quickly and dramatically affected HTA's operations and financial performance as lockdowns had a large impact on monthly toll road transactions, Tren Urbano ridership, and capital project delivery.  Monthly transactions on HTA's four toll roads, for instance, declined forty-five percent (45%) from a pre-COVID-19 average of 10.3 million per month[126] to an average of 5.6 million per month[127] during the height of the pandemic.   Nonetheless, in FY2021 and FY2022, toll transactions have been noted to approximate pre-COVID-19 levels, reaching a monthly average of 9.8 million toll transactions for 2021[128] and 10.7 million toll transactions for FY2022 through December 2021.  Transit assets experienced a more dramatic decrease, given Tren Urbano and feeder bus service was entirely shut down from mid-March until July 2020, and again in August and September 2020.   Unlike toll transactions, transit demand has shown few signs of improvement, as the average monthly Tren Urbano revenues remain below their pre-COVID levels at approximately sixty-four percent (64%) for FY2021 and fifty-two percent (52%) for the first half of FY2022[129].  Additionally, the COVID-19 pandemic has caused substantial delays in construction project schedules as there has been a significant increase in project duration KPIs, which was driven by fifty-six (56) days of lockdown-required extensions and projected additional delays.

### (b)       Federal Response and Impact on Puerto Rico and the Commonwealth

In order to mitigate the economic impact of COVID-19, the federal government issued a series of emergency stimulus bills to lessen the burden on businesses and individuals in the United States.

***Emergency Bill 1.***   On March 6, 2020, President Trump signed an $8.3 billion spending bill, called the "Coronavirus Preparedness and Response Supplemental Appropriations Act," to fund efforts to fight the pandemic.

***Emergency Bill 2.***   On March 18, 2020, President Trump signed a stimulus-relief bill, the "Families First Coronavirus Response Act," with over $100 billion in funding.

***Emergency Bills 3 and 3.5.***   On March 27, 2020, President Trump signed the $2.2 trillion stimulus-relief bill, known as the CARES Act.  The CARES Act was divided into two divisions,

---

[126]   Average monthly transactions for the six-month period from September 2019 through February 2020 (prior to COVID-19).

[127]   Average monthly transactions for the three-month period from March 2020 through May 2020 (COVID-19 shut downs).

[128]   Average monthly transactions for the twelve-month period from July 2020 through June 2021 (post-lockdown period).

[129]   When comparing the six- month period from September 2019 through February 2020 (prior to the COVID-19 pandemic) against the six-month period from January 2021 through June 2021 – the last six months for FY2021, which pertain to the post-lockdown period; and the six-month period from July 2021 through December 2021 for FY2022, which comprises the most recent six-month period.

Division A titled "Keeping Workers Paid and Employed, Health Care System Enhancements, and Economic Stabilization" (approximately $1.9 trillion), and Division B titled "Emergency Appropriations for Coronavirus Health Response and Agency Operations" (approximately $350 billion). On April 24, 2020, President Trump signed an expansion to the CARES Act, known as the "Paycheck Protection Program and Health Care Enhancement Act" (the "PPPHCEA") to provide additional money for testing, hospital and healthcare facilities, and SBA PPP loans.

The 2022 Commonwealth Certified Fiscal Plan[130] includes an estimate of what portion of these federal funds will be allocated to Puerto Rico, relying on a combination of direct federal government sources and agency announcements, and, in some cases, based on historical analogy (*e.g.*, the American Recovery and Reconstruction Act of 2009). The 2022 Commonwealth Certified Fiscal Plan[131] estimates that Puerto Rico would receive approximately $18 billion of the $2.9 trillion in federal stimulus bills 1 through 3.5.

***Emergency Bill 4.*** On December 27, 2020, President Trump signed into law the Consolidated Appropriations Act, 2021, which combines $900 billion in stimulus relief for the COVID-19 pandemic in the United States with a $1.4 trillion omnibus spending bill for the 2021 federal fiscal year. The stimulus relief provisions were contained within two divisions, Division M titled "Coronavirus Response and Relief Supplemental Appropriations Act, 2021," and Division N titled "Additional Coronavirus Response and Relief."

The Consolidated Appropriations Act also extended the deadline within which states could spend the $350 billion of CRFs (created by the CARES Act) from December 30, 2020 to December 31, 2021.

Of the approximately $900 billion of stimulus relief in the Consolidated Appropriations Act, it is estimated that Puerto Rico will receive $7.3 billion, with the majority of that funding supporting individuals and businesses.

***Emergency Bill 5.*** On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021. The bill provides $1.9 trillion in funding, program changes and tax policies aimed at mitigating the continuing effects of the pandemic. Major components of the Act include a third round of Economic Impact Payments of up to $1,400 per eligible taxpayer, expansion of the Child Tax Credit and Earned Income Tax Credit for Puerto Ricans, extension of unemployment insurance, and $350 billion in emergency funding for state, local, territorial, and tribal governments. Other significant programs include $122.7 billion to K-12 education, $47.8 billion for COVID-19 testing, $24 billion Child Care Stabilization funding, $21.6 billion for emergency rental assistance, $15 billion for vaccine related funding, and a $28.6 billion Restaurant Revitalization Fund.

Of the $1.9 trillion to be disbursed pursuant to the American Rescue Plan, it is estimated that Puerto Rico will be allocated $17.5 billion.

---

[130] Certified 2022 Commonwealth Fiscal Plan,
https://drive.google.com/file/d/1STrf0ksj1Sqc54UkABGcjyrbIZvc_JEm/view.
[131] *Id.*

*HTA Benefit of Above Federal Emergency Bills.*  With regard to the above five (5) emergency federal bills, HTA has benefited from the emergency appropriations from the FTA and FHWA. More specifically, within Emergency Bill 4, the FHWA appropriated an amount of approximately $35 million to the Puerto Rico Highway Program.

### (c) Oversight Board Approved Responses by the Commonwealth

In addition to the responses issued by the Federal Government, the Oversight Board approved a series of emergency measures, as well as executive orders and government actions issued by Governor Vázquez, to lessen the impact of COVID-19 on Puerto Rico's economy, businesses and citizens.

*Emergency Reserve Fund.*  On March 5, 2020, the Oversight Board made available an initial $5 million from the Emergency Reserve fund for COVID-19 prevention and preparedness.

On March 13, 2020, the Oversight Board authorized the utilization of additional Emergency Reserve Funds as needed by the Government of Puerto Rico.  Approximately $160 million was authorized to be used for Commonwealth emergency expenses related to the COVID-19 pandemic, including preparedness and detection, public awareness, and improving the public healthcare sector's capacity.  This Emergency Reserve fund was established in the 2021 Commonwealth Certified Fiscal Plan.

As of January 10, 2022, $70 million has been expensed in relation to COVID-19.

*Emergency Measures Support Package.*  On March 23, 2020, the Oversight Board granted urgent budgetary support in the form of an Emergency Measures Support Package, authorizing the Government of Puerto Rico to use $787 million to fight the COVID-19 emergency.  This package includes:

- $6 million allocated to HTA relating to a loss of revenue due to the moratorium on tolls; of this allocation $600,000 has been received;

- $237 million in one-time bonuses for public and private nurses, technicians, emergency medical services personnel, correction officers, and other staff in the front lines of the fight against COVID-19;

- $50 million for investments in hospitals and public safety, to restock medical supplies and invest in equipment for a period of at least two months;

- $160 million in one-time direct payment to self-employed individuals and small businesses whose incomes have been affected by the disruption of their work and income;

- $240 million for the Department of Education to support and enable online learning while schools are closed, to buy tablets for every student and teacher, and provide teachers and students with software and training; and

- $100 million for municipalities, providing support for lost revenues as a result of the emergency measures implemented to fight COVID-19.

As of January 28, 2022, $662 million was disbursed.

***Executive Orders and Government Actions.***  Since March 2020, the Governor has issued a series of executive orders in response to the COVID-19 pandemic.  The executive orders have included the declaration of a state of emergency, activation of the National Guard Medical Unit, establishment and extension of a curfew, emergency purchase of personal protection equipment, mandatory 14-day quarantine for travelers and other travel restrictions, and the closure of businesses and other lockdown measures.  The executive orders concerning travel restrictions, business closures, curfews and other lockdown measures have had a material negative impact on economic activity in Puerto Rico.

### (d)    Other Government Stimulus and Relief Actions

On April 14, 2020, Governor Vázquez signed into law Joint Resolutions 26-2020 and 27-2020, requiring financial creditors in Puerto Rico to establish a voluntary moratorium on payments to personal loans, auto loans, mortgage loans, and credit cards (for personal, family, or domestic use) corresponding to the months of March through August 2020.  Upon approval, the date of termination of the loan will be extended for a period equal to the number of payments not made.  The debtor may request that the amount due for the missed payments be distributed among the remaining payments due under the loan.

On April 16, 2020, the Governor Vázquez signed into law Act No. 40-2020, which amends several important provisions of the Puerto Rico Internal Revenue Code of 2011, among other special laws, as part of the measures taken to provide relief during the ongoing COVID-19 pandemic.

On April 26, 2020, the Oversight Board provided the Commonwealth with recommendations on ways to deploy funding received under the CRF created under the CARES Act, suggesting the $2.2 billion be used on the following areas:

- Monitoring and Assessment System: significantly increase the supply of COVID-19 test kits and purchase high-tech networks for tracking infection;
- Health Service Infrastructure: put in place a storage and distribution plan to manage inventory, and ration supplies and equipment like personal protective equipment, ventilators and virus detection tests;
- Distance Learning and Student Outcomes: enhance distance learning to recuperate lost learning, and to prepare for a possible reemergence of COVID-19;
- Small Businesses: training and coaching to help navigate the new economic reality;
- Long Term Unemployed: invest in strengthening work development; and
- Reimbursement to the Commonwealth: a portion of the $500 million in incremental funds that are a part of the $787 million Emergency Measures Support Package may be reimbursable expenses under the CARES Act.

On May 15, 2020, Governor Vázquez issued Executive Order 2020-040, adopting a spending plan for the $2.2 billion Puerto Rico is receiving through the CRF created under the CARES Act.  This order would provide $990 million to public entities, and roughly $811 million to the private sector.  Furthermore, the Government would hold $440 million in a reserve fund to be used based on Puerto Rico's future needs and the status of the COVID-19 health emergency.

On August 3, 2021, Governor Pierluisi released his spending plan for the $2.47 billion Puerto Rico received through the State and Local Fiscal Recovery Fund created under the ARP. As of May 10, 2022, the spending was allocated to the following categories: economic development ($141 million), quality of life ($819 million), government excellence ($504 million), other programs ($141 million), phase 2 funding ($67 million) and set aside $573 million for future projects and $225 million for administrative expenses.  Additionally, as of May 10, 2022, approximately $824 million has been disbursed.

## C.    Claims Process and Bar Date

### 1.    Section 924/925 Lists

Bankruptcy Code section 924 requires debtors to file a list of creditors.  Bankruptcy Code section 925 provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by Bankruptcy Code section 924 except as to claims that are "listed as disputed, contingent, or unliquidated."  11 U.S.C. § 925.[132]

### 2.    Bar Date Orders

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order") and *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the HTA Title III Case:

- June 29, 2018 at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is thirty-five (35) days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is thirty-five (35) days after the date that a notice of an amendment to the List of Creditors is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

---

[132]   *See Notice of Filing of Creditor List for the Puerto Rico Highways and Transportation Authority* [Case No. 17-bk-3283, ECF No. 2163].

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents;

- Each union may file a separate master proof of claim on behalf of its respective constituents against the Debtor on account of all obligations due under their respective CBAs or applicable statutes; and

- Each agent under any credit agreement may file a separate master proof of claim (each, a "Credit Agreement Master Proof of Claim") against the applicable Debtor on behalf of itself and all lenders under such credit agreement.

### 3.      Alternative Dispute Resolution Procedures

On June 5, 2019, HTA and its affiliated debtors (the "Debtors") filed the *Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 7224], seeking an order establishing an alternative dispute resolution procedure ("ADR Procedures") for resolving certain general unsecured claims, including unliquidated litigation claims, asserted against HTA (as well as other Title III debtors), and approving a proposed mailing to creditors whose claims did not provide sufficient information to enable the Debtor to reconcile its claims.

By order dated August 13, 2019, the Title III Court approved the proposed mailing, and adjourned consideration of the ADR Procedures and forms of notice pending the submission of revised proposed procedures and forms of notice consistent with the guidance provided by the Title III Court [ECF No. 8453].

On January 7, 2020, the Debtors filed their *Amended Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 9718] (the "Amended ADR Motion").

On April 1, 2020, the Title III Court entered an order authorizing amended ADR procedures (the "Amended ADR Procedures") and approving additional forms of notice [ECF No. 12576], which allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to identify claims that will be resolved through ADR. The Amended ADR Procedures establish a process for the Debtors and the claimants to attempt to resolve the amount of the claim through an exchange of offers and counteroffers, and if no resolution is reached, a streamlined mediation procedure.  If the claim remains unresolved following these processes, the Amended ADR Procedures further provide for the claimant to

elect whether to resolve their claim using one of three methods: (1) litigation before the Commonwealth's courts (subject to certain restrictions); (2) binding arbitration; or (3) litigation before the Title III Court.

On December 29, 2020, the Title III Court entered an order amending the ADR procedures [ECF No. 15505]. To date, HTA and its affiliated debtors have filed twenty-one notices of transfer, transferring approximately 946 claims into the ADR procedures.

### 4. Administrative Claims Reconciliation

On October 8, 2019, the Debtors filed their *Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8827] (the "ACR Motion"). The ACR Motion seeks approval of ACR procedures (the "ACR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to determine which claims will be resolved through ACR. The ACR Procedures establish a process for the Title III Court to permit certain types of claims which are administrative in nature—including tax refund claims, union grievance claims, public employee claims, and pension claims—to be resolved by the Commonwealth's existing administrative processes.

At the October 30, 2019 omnibus hearing, the Title III Court provisionally approved the ACR Motion, pending the submission of revised proposed ACR Procedures. On March 12, 2020, the Title III Court issued an order approving the revised proposed order [ECF No. 12274]. To date, the Debtors have filed twenty-three notices of transfer, transferring approximately 44,704 claims into the ACR procedures, of which over 26,000 have already been marked as resolved.

As set forth in the ACR Order, all claims transferred into ACR will be designated as "Subject to Administrative Reconciliation" on the Title III claims registry. Claims that are transferred into ACR will not be entitled to vote on the Plan, but will be paid in full in the ordinary course, pursuant to the terms of the ACR Order.

### 5. Significant Claim Objections Filed to Date

As of the date of this Disclosure Statement, approximately 2,276 proofs of claim have been filed in the Title III Case against HTA, totaling approximately $83 billion in asserted liabilities plus unliquidated amounts. In accordance with the terms of the Bar Date Orders, the Debtor believes that many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended or duplicative of other proofs of claim, including master proofs of claim filed against the Debtor on behalf of certain bondholders.

Pursuant to the *Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (c) Granting Related Relief* [ECF Nos. 4230, 4230-1] (the "Initial Objection Procedures"), and the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), (C), Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440],

the Commonwealth, HTA, ERS, and COFINA, through the Oversight Board have filed 427 omnibus objections and over 35 individual objections to claims. Those omnibus objections sought to disallow, modify, or reclassify certain claims on the bases that they lacked sufficient information to permit the Oversight Board to reconcile the claim, were asserted against the incorrect debtor, were subsequently amended, were duplicative of other proofs of claim, or, otherwise asserted amounts for which the asserted debtor entity are not liable. To date, over 1,255 claims against HTA have been expunged, withdrawn, or resolved, or were docketed in error.

Significant adversary proceedings and objections were also filed to certain bondholder claims, and are described in Sections V.F.1 of this Disclosure Statement.

### D.  Rejection or Assumption of Unexpired Leases of Nonresidential Property

HTA is party to various nonresidential real estate leases (the "Real Estate Leases") to support its operations. The decision to assume or reject the Real Property Leases involves the consideration of various factors, not all of which can be addressed expeditiously. On July 21, 2017, HTA, along with its affiliated Title III debtors, filed a motion seeking approval of an extension of time to assume or reject any unexpired Real Estate Leases pursuant to Bankruptcy Code section 365(d)(4) (the "365(d)(4) Deadline"), made applicable to these cases by PROMESA section 301(a) [ECF No. 705]. On August 10, 2017, the Title III Court entered an order extending HTA's 365(d)(4) Deadline to December 18, 2017 [ECF No. 994]. Additionally, on November 15, 2017, the Title III Court entered an order extending HTA's 365(d)(4) Deadline to assume or reject any of the Real Property Leases where it is a lessee and PBA is the lessor (the "PBA Leases") to April 17, 2018 [ECF No. 1800].

HTA sought further extensions of the 365(d)(4) Deadline with the lessors' consent pursuant to Bankruptcy Code section 365(d)(4)(B)(ii). For that purpose, HTA, along with other Title III debtors, bifurcated its deadline extensions requests into (i) PBA Leases and (ii) leases with other entities as lessors.

> i)  PBA Leases.  On February 13, 2018, HTA, along with its affiliated Title III debtors, sought to extend the 365(d)(4) Deadline for PBA Leases through and including September 25, 2018, with PBA's consent [ECF No. 2494]. On February 28, 2019, the QTCB Noteholder Group filed its *Reservation of Rights of the QTCB Noteholder Group to Motion for Entry of Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Bankruptcy Code Section 365(d)(4)* [ECF No. 2602]. After a hearing, a revised order was granted extending the 365(d)(4) Deadline for PBA Leases through and including July 27, 2018, and it expressly preserved bondholders'

rights.[133]  Thereafter, HTA, along with other Title III debtors, with PBA's consent, has been further extending the 365(d)(4) Deadline for PBA Leases.  HTA's current 365(d)(4) Deadline for PBA Leases is July 31, 2022 [ECF No. 20017].

ii) <u>Leases with Other Entities</u>.  On December 11, 2017, HTA sought to extend the 365(d)(4) Deadline for leases with other entities until the earlier of (i) January 1, 2019, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for HTA [Case No. 17-03567-LTS, ECF No. 350].  Despite contacting each lessor, it was unlikely HTA could receive affirmative consent from each lessor as a direct consequence of the widespread destruction and mass power outages on the island of Puerto Rico following Hurricane Maria that has made it extremely difficult for parties to communicate with each other.  In turn, HTA and its advisors had been unable to obtain written consent of all their landlords to grant the requested extension of time for HTA to assume or reject Real Property Leases.  Accordingly, HTA sought to extend the 365(d)(4) Deadline for leases with other entities that either provided affirmative consent or did not expressly decline such consent.  On December 19, 2017, the Title III Court entered an order extending HTA's 365(d)(4) Deadline for leases with other entities to the earlier of (i) January 1, 2019, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for HTA [Case No. 17-03567-LTS, ECF No. 357].  The rights of parties whose consent was "deemed" because consent was not expressly denied were preserved [Case No. 17-03567-LTS, ECF No. 357].  No party expressly denied consent.

HTA's 365(d)(4) Deadline for leases with other entities has been extended by the Title III Court on multiple additional occasions.  *See* ECF Nos. 4549, 4977, 5936, 9670, 15574, and 19718.  HTA's current 365(d)(4) Deadline for leases with other entities is the earlier of (i) January 1, 2023, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment for HTA becomes effective [ECF No. 19718].

## E.     Title III Stay Matters

### 1.      Generally

Upon commencement of a Title III case, Bankruptcy Code section 362(a), made applicable by PROMESA section 301(a), provides for an automatic stay of certain actions by non-debtor third parties (the "<u>Title III Stay</u>").  On June 29, 2017, the Title III Court confirmed the applicability of Bankruptcy Code section 362(a) to the HTA Title III case pursuant to the *Order*

---

[133]  "Except as expressly stated in this Order, nothing in the Motion or this Order shall (a) impair or modify the rights and claims of PBA under or related to the PBA Leases under PROMESA or applicable law; nor (b) impair or modify the rights or claims of any holders of bonds issued by PBA, either directly or as third party beneficiaries, under or related to the PBA Leases under PROMESA or applicable law." *Order Granting Motion for Entry of A Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Under Which the Puerto Rico Public Buildings Authority is the Lessor Pursuant to Bankruptcy Code Sections 365(d)(4)*, [ECF No. 2689].

*Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections* [Case No. 17-bk-3283, ECF No. 543].  Since the HTA Petition Date, HTA has taken steps to preserve the important "breathing spell" the Title III Stay provides, address its financial condition, and expeditiously develop a plan of adjustment.

### 2.        Lift Stay Protocol

In order to reduce the burden on the Title III Court, and to efficiently address requests for relief from the Title III Stay in these unprecedented Title III Cases, the Debtor developed a protocol by which parties may request relief from the Title III Stay, and by which the Debtor may consensually resolve such requests.  On August 17, 2017, the Title III Court entered an order implementing a protocol for filing motions for relief from the Title III Stay [Case No. 17-bk-3283, ECF No. 1065-1] (the "Lift Stay Protocol").  Under the Lift Stay Protocol, a movant is required to (a) send notice to counsel to the Oversight Board and AAFAF to advise them of movant's intent to seek relief from the Title III Stay at least fifteen (15) business days prior to filing a motion seeking such relief, and (b) meet and confer with the Debtor during such 15-day period.  On October 24, 2017, the Lift Stay Protocol was amended (a) to allow the Debtor (i) to enter into stipulations modifying or lifting the Title III Stay without further order of the Title III Court, and (ii) in their discretion, to modify or lift the Title III Stay with respect to any prepetition ordinary course civil action against a debtor without the filing of a notice or order of the Title III Court; and (b) to require the Debtor to file an omnibus lift stay motion every sixty (60) days, identifying each modification to the Title III Stay agreed to by the Debtor during the relevant period and seeking retroactive court approval of such modifications as of the relevant modification date [Case No. 17-bk-3283, ECF No. 1512-1].

### 3.        Omnibus Lift Stay Motions

Since the implementation of the Lift Stay Protocol, the Commonwealth and its affiliated debtors, including HTA, have filed twenty-~~six~~seven (~~26~~27) omnibus lift stay motions, seeking retroactive court approval of modifications to the Title III Stay.

### 4.        Significant Stay Matters

### (a)        HTA Lift Stay Motion[134]

On August 23, 2019, Assured and National filed a motion for (i) relief from the automatic stay to allow them to enforce the application of allegedly pledged toll and excise tax revenues to the payment of bonds issued by HTA, or, in the alternative, (ii) adequate protection of their alleged interests in the pledged revenues [Case No. 17-bk-3283, ECF No. 8536; Case No. 17-bk-3567, ECF No. 633].

Assured and National alleged they insured bonds issued by HTA secured by toll revenues collected directly by HTA and excise taxes collected on behalf of HTA by the Commonwealth. Movants contended they had a first priority lien on these pledged revenues, which they claimed

---

[134]  Case No. 17-bk-3283, ECF No. 10102; Case No. 17-bk-3567, ECF No. 673; Case No. 20-1930 (1st Cir.).

had been improperly diverted from HTA to the Commonwealth. Movants asserted the Title III Court should have lifted the stay because (i) the revenues were unnecessary to an effective reorganization because the Commonwealth allegedly lacked a property interest in them, and (ii) Movants allegedly lacked adequate protection under Bankruptcy Code section 362(d)(1).

On July 24, 2019, the Title III Court issued the Stay Order (as defined below),[135] which stayed prosecution of the lift stay motion.

On December 19, 2019, the Title III Court entered an interim case management order regarding certain issues related to revenue bonds [Case No. 17-bk-3283, ECF No. 9620] (the "Initial Interim Revenue Bonds CMO"), which required that any amendments to the lift stay motion be filed by January 16, 2020.

On January 16, 2020, Assured, National, Ambac, and FGIC (collectively, "Movants") filed an amended lift stay motion [Case No. 17-bk-3283, ECF No. 10102; Case No. 17-bk-3567, ECF No. 673] (the "HTA Lift Stay Motion"), which further alleged the Title III Court should lift the automatic stay because otherwise Movants' due process rights would be violated.

On January 31, 2020, the Title III Court entered an Amended Interim Case Management Order [Case No. 17-bk-3567, ECF No. 678] setting deadlines for opposition and reply briefs limited to issues of whether Movants (i) had standing to bring the HTA Lift Stay Motion, and (ii) have security or other property interests in the relevant revenues. On February 3, 2020, the Oversight Board filed an opposition to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 680]. The UCC and AAFAF filed partial joinders to the Oversight Board's opposition [Case No. 17-bk-3567, ECF Nos. 681, 682].

On February 11, 2020, the DRA Parties[136] filed a notice that the DRA was a party in interest and could participate in the HTA Lift Stay Motion, or in the alternative, a motion to permit their intervention in the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 685]. On February 19, 2020, the parties entered into a joint stipulation regarding the DRA Parties' participation in the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 698-1]. On March 3, 2020, Magistrate Judge Dein issued an order approving the joint stipulation and partially granting the DRA Parties' motion to intervene [Case No. 17-bk-3567, ECF No. 721].

On February 12, 2020, Movants filed an urgent motion seeking to adjourn the preliminary hearing on the HTA Lift Stay Motion until April 22, 2020 and to extend the deadline for replies in support until April 6, 2020 [Case No. 17-bk-3567, ECF No. 684]. According to Movants, the requested adjournment was necessary to permit time to obtain discovery. On February 14, 2020, the Title III Court entered an order granting the motion, adjourning the preliminary hearing until April 2, 2020, and allowing for certain discovery by Movants to occur [Case No. 17-bk-3567, ECF No. 692].

---

[135]  For additional information regarding the Stay Order, please refer to Section V.H.1 of this Disclosure Statement.

[136]  Cantor-Katz Collateral Monitor LLC, monitor for the Government Development Bank Debt Recovery Authority ("DRA"), and AmeriNational Community Services LLC, servicer for the GDB DRA bonds issued pursuant to the GDB Qualifying Modification are collectively referred to as the "DRA Parties."

On February 24, 2020, Ambac, Assured, National, and FGIC filed a joint motion to compel the production of documents in connection with the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 704]. The motion was fully briefed [Case No. 17-bk-3567, ECF No. 716; Case No. 17-bk-3283, ECF No. 11958]. On March 5, 2020, Magistrate Judge Dein issued an order partially granting Movants' joint motion to compel [Case No. 17-bk-3567, ECF No. 723].

On March 16, 2020, the DRA Parties filed an opening response to the HTA Lift Stay Motion and to the Oversight Board's objection to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 741]. On March 23, 2020, Movants filed a response and reservation of rights [Case No. 17-bk-3567, ECF No. 748]. Also, on March 23, 2020, the Oversight Board filed a response to the DRA Parties' opening response [Case No. 17-bk-3567, ECF No. 749], and the UCC filed a limited joinder to the Oversight Board's response [Case No. 17-bk-3567, ECF No. 749].

On April 30, 2020, Movants filed a reply in support of the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 777]. Also, on April 30, 2020, the DRA Parties filed a reply in support of their opening response to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 779]. On May 18, 2020, the Oversight Board filed a sur-reply in opposition to the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 807]. On May 26, 2020, Movants and the DRA Parties filed their respective responses to the Oversight Board's sur-reply [Case No. 17-bk-3567, ECF Nos. 819, 821].

On July 2, 2020, the Title III Court issued its *Opinion and Order in Connection with Preliminary Hearing Regarding Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from Automatic Stay, or, in the Alternative, Adequate Protection (Docket Entry No. 10102)* [Case No. 17-bk-3567, ECF No. 853] (the "HTA Lift Stay Opinion and Order"), holding Movants had not made the preliminary showing necessary to allow the HTA Lift Stay Motion to proceed to a final hearing to the extent that the HTA Lift Stay Motion seeks stay relief or adequate protection with respect to liens or other property interests in revenues other than those that have been deposited in the Resolution Funds (defined therein, as certain special funds with enumerated sub-accounts created by Section 401 of each of the Bond Resolutions). The Title III Court denied the HTA Lift Stay Motion to the extent it sought stay relief or adequate protection with respect to liens or other property interests in revenues other than those that have been deposited in the Resolution Funds. The Title III Court further directed the parties to meet and confer and, no later than July 9, 2020, file a joint report as to their positions on the nature, scope and scheduling of further proceedings they believed were necessary in connection with the HTA Lift Stay Motion, including any proceedings concerning stay relief with respect to the Movants' assertion of unsecured claims. The Title III Court advised the parties that if no further proceedings were necessary, the Title III Court would enter an order terminating the HTA Lift Stay Motion as denied for the reasons stated in the HTA Lift Stay Opinion and Order.

On July 20, 2020, the Movants filed a supplemental brief arguing that cause existed to lift the stay notwithstanding the Title III Court's ruling on their asserted liens and property interests [Case No. 17-bk-3567, ECF No. 880]. On July 30, 2020, the Oversight Board and AAFAF filed a supplemental response [Case No. 17-bk-3567, ECF No. 898], and the UCC filed a limited

joinder [Case No. 17-bk-3567, ECF No. 899].  Movants filed a supplemental reply on August 5, 2020 [Case No. 17-bk-3567, ECF No. 907].

On September 9, 2020, the Title III Court issued its *Memorandum Opinion and Order Denying HTA and PRIFA Revenue Bond Stay Relief Motions* [Case No. 17-bk-3567, ECF No. 921] (the "Memorandum Opinion") denying the HTA Lift Stay Motion.  The Title III Court found: (i) Movants had failed to establish that PROMESA section 305 created any due process impediment that provided "cause" for relief from the automatic stay; (ii) cause did not exist for stay relief under section 362(d)(1) of the Bankruptcy Code; and (iii) cause did not exist to lift the automatic stay under the *Sonnax* factors (*In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990)).

On September 23, 2020, Movants filed a notice of appeal of the Title III Court's Memorandum Opinion [Case No. 17-bk-3567, ECF No. 927], which was docketed as Case No. 20-1930.  On October 28, 2020, Movants-Appellants filed their opening brief arguing the Title III Court's decision should be reversed because (i) they have a contractual security interest in the excise taxes and toll revenues; (ii) the excise tax statutes make them and HTA, not the Commonwealth, equitable owners of the excise taxes; and (iii) the excise tax statutes impose a statutory lien on the excise taxes.

On December 4, 2020, Cantor-Katz Collateral Monitor LLC filed a brief as "Appellees", asserting they did not take a position on what they described as the issue on appeal—whether Movants had "demonstrated a colorable claim to the excise tax revenues"—and represented they had joined in the briefing on appeal to request that any decision "be written in a way that preserves" the DRA Parties' claimed interests.

On December 7, 2020, the Oversight Board filed its answering brief, arguing the Title III Court did not abuse its discretion in denying the HTA Lift Stay Motion because the Title III Court already was adjudicating Movants' claims on the merits in the Commonwealth-HTA Claim Challenge Action described below in section V.F.3 of this Disclosure Statement.  The Commonwealth further argued the Title III Court's decision should be affirmed because, among other reasons, (i) the plain language of the Resolutions granted Movants a security interest only in moneys deposited with the Fiscal Agent, and (ii) the excise tax statutes did not give Movants beneficial ownership of, or any property rights in, the excise taxes.

Also, on December 7, 2020, AAFAF and the UCC filed partial joinders to the Oversight Board's response brief.  On December 21, 2020, Movants filed their reply brief.  On January 20, 2021, Appellants filed a 28(j) letter submitting supplemental authority regarding the Title III Court's ruling granting limited discovery in connection with the Oversight Board's motion for partial summary judgment in the Commonwealth-HTA Claim Challenge Action.  On January 22, 2021, the Oversight Board filed a response to Movants' 28(j) letter.  Oral argument was heard on February 4, 2021.  On March 3, 2021, the First Circuit issued a combined opinion in Case No. 20-1930 and in Case No. 20-1931, affirming the Title III Court's denial of the HTA Lift Stay Motion.  The First Circuit held that the Title III Court did not abuse its discretion in denying relief from the automatic stay, and that lifting the automatic stay would not serve the interests of judicial economy and would interfere with the bankruptcy proceedings.  On March 24, 2021, the First Circuit issued its mandate.

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 1016].  On May 18, 2021, the DRA Parties filed a reservation of rights in connection with the joint motion [Case No. 17-bk-3567, ECF No. 1019].  The motion was fully briefed [Case No. 17-bk-3567, ECF Nos. 1020, 1022, 1023].  On August 3, 2021, the Title III Court issued an order granting the joint motion to stay certain contested matters and adversary proceedings [Case No. 17-bk-3567, ECF No. 1063].

On January 18, 2022, the Title III Court issued the Commonwealth Confirmation Order [Case No. 17-bk-03283, ECF No. 19813].  Paragraph 8 of the Commonwealth Confirmation Order states in part that, on the Effective Date, to the extent extant, the Lift Stay Motions (including the HTA Lift Stay Motion), shall be dismissed and/or denied with prejudice.

### (b)    The DRA Parties' Lift-Stay Motions[137]

On June 25, 2019, the DRA Parties filed a motion for relief from the automatic stay to exercise remedies against DRA's asserted HTA collateral, including gasoline taxes, gas oil and diesel oil taxes, motor vehicle and license fees, toll revenues, petroleum products taxes and cigarette taxes [Case No. 17-bk-3567, ECF No. 591].  To secure obligations to DRA pursuant to the GDB DRA bonds, the DRA Parties asserted GDB transferred, among other things, certain HTA loans, bond assets, and claimed collateral to DRA.

The DRA Parties argued that (i) the Commonwealth and HTA's alleged depletion of the "HTA collateral" without providing adequate protection provided cause to lift the stay, and (ii) the Commonwealth and HTA lacked any property interest or equity in the "HTA collateral," which they claimed are unnecessary for an effective reorganization.

In the alternative, the DRA Parties requested the Title III Court require the Commonwealth and HTA to provide adequate protection by paying current interest under the HTA loans and bonds.  Pursuant to a stipulation among the DRA Parties, AAFAF, and the Oversight Board[138], the Title III Court ordered that the briefing and hearing schedule regarding the motion be bifurcated to first consider the issue of the DRA Parties' standing to seek the relief requested in the motion [Case No. 17-bk-3567, ECF No. 603].

On August 15, 2019, the Government Parties and the DRA Parties filed a joint stipulation making the DRA Lift Stay Motion subject to the Stay Order, as described in section V.H.1 of this Disclosure Statement.  The Title III Court approved the joint stipulation on August 16, 2019 [Case No. 17-bk-3567, ECF No. 632].  As described in more detail in section V.H.2, the Mediation Team's Interim Report included a proposed schedule for litigation of the DRA Lift Stay Motion.

On December 18, 2019, the Government Parties and the DRA Parties filed an amended joint stipulation regarding the DRA Parties' motion for relief from the stay [Case No. 17-bk-3567, ECF No. 9615], which the Title III Court approved by order dated December 19,

---

[137]  Case No. 17-bk-3283, ECF No. 7643; Case No. 17-bk-3567, ECF Nos. 591, 998.

[138]  The Oversight Board and AAFAF are collectively referred to as the "*Government Parties*."

2019 [Case No. 17-bk-3283, ECF No. 661].  Pursuant to the amended joint stipulation and order, the briefing and hearing schedule regarding the lift stay motion continued to be bifurcated to first determine the DRA Parties' standing to bring the stay motion.

On February 19, 2020, the parties filed a further amended joint stipulation providing the DRA Parties' Lift Stay motion would be stayed until the Title III Court ruled on certain gating issues in the HTA Lift Stay Motion [Case No. 17-bk-3567, ECF No. 698], which joint stipulation the Title III Court approved by order dated February 20, 2020 [Case No. 17-bk-3567, ECF No. 700].  *See infra* section V.E.4(a). Relatedly, on March 3, 2020, the Title III Court issued an order, which, *inter alia*, granted the DRA Parties the right to participate in the HTA Lift Stay motion under certain conditions [Case No. 17-bk-3567, ECF No. 721].  Further information regarding the HTA Lift Stay motion is available in section V.E.4(a) of this Disclosure Statement.

On September 25, 2020, the Government Parties and the DRA Parties filed another amended joint stipulation further amending the briefing schedule for the DRA Parties' Lift Stay Motion [Case No. 17-bk-3567, ECF No. 930].  On September 28, 2020, the Title III Court issued an order approving the amended joint stipulation [Case No. 17-bk-3567, ECF No. 931].

On March 31, 2021, the DRA Parties filed an amended lift stay motion (the "DRA Parties' Amended Lift Stay Motion") [Case No. 17-bk-3567, ECF No. 998].  All issues concerning the merits of the DRA Parties' Amended Lift Stay Motion were stayed pending resolution of the standing issue.  The Government Parties filed an objection to the DRA Parties' Amended Lift Stay Motion, solely with respect to the standing issue, on April 21, 2021 [Case No. 17-bk-3567, ECF No. 1009], and the UCC filed a joinder to the objection [Case No. 17-bk-3567, ECF No. 1010].  On May 19, 2021, the DRA Parties filed a response to the Government Parties' objection [Case No. 17-bk-3567, ECF No. 1021].  On July 21, 2021, the Government Parties filed a reply in support of their objection to the DRA Parties' motion for relief from the automatic stay [Case No. 17-bk-3567, ECF No. 1046].

Oral argument on the standing issue regarding the DRA Parties' Amended Lift Stay Motion was presented at the August 4, 2021 omnibus hearing, after which the Title III Court issued an oral decision overruling in part the Government Parties' objection and ordering the parties to file a joint status report.  The Title III Court's oral decision was memorialized in an order dated August 9, 2021 [Case No. 17-bk-3567, ECF No. 1070].  In the order, the Title III Court overruled the Government Parties' standing objection insofar as it related to the adequate protection aspect of the Motion, and deferred consideration of the standing objection as it related to the request for relief from the automatic stay, pending further clarification of the nature and scope of the stay relief sought.  The Title III Court directed the parties to meet and confer and file a joint status report regarding the DRA Parties' motion requesting relief from the automatic stay.

On August 13, 2021, the Title III Court issued an order staying the DRA Parties' Amended Lift Stay Motion, and related discovery, pending "a determination of whether the DRA Parties hold an interest in property with respect to the Act 30-31 Revenues" in connection with the DRA Parties' Administrative Expense Motion, *see* section V.F.1.(h); *AmeriNational Community Services, LLC, et al. v. Ambac Assurance Corporation, et al*., Adv. Proc. No. 21-00068, *see* section V.F.1.(g); or any objection by the DRA Parties to the Oversight Board's

request for confirmation of a plan of adjustment for the Commonwealth [Case No. 17-bk-3567, ECF No. 1075].

On November 5, 2021, the DRA Parties and the Oversight Board filed a stipulation in which the DRA Parties agreed to resolution of the DRA-related disputes, including the DRA Parties' Amended Lift Stay Motion [Case No. 17-bk-3283, ECF No. 19100, Ex. A].   On November 12, 2021, the DRA Parties filed a notice withdrawing, with prejudice, the DRA Parties' Lift Stay Motion and the DRA Parties' Amended Lift Stay Motion.   [Case No. 17-bk-3567, ECF No. 1110].  On December 8, 2021, the Title III Court issued an order granting the DRA Parties' notice of withdrawal with prejudice [Case No. 17-bk-3567, ECF No. 1116].

### (c)    Autonomous Municipality of Ponce Lift-Stay Motion[139]

On May 4, 2018, the Autonomous Municipality of Ponce ("AMP") filed a motion [Case No. 17-bk-3283, ECF No. 3019] to modify the automatic stay to allow AMP to enforce a judgment in a previous action, *Municipio de Ponce v. Autoridad de Carreteras y Transportación*, Case No. AC93-0485.  The former judgment required the Commonwealth, HTA, and PREPA to complete certain municipal improvement projects pursuant to an agreement between the Commonwealth and AMP.  On November 2, 2018, the Title III Court denied AMP's request to modify the stay, holding that none of the *Sonnax* factors weighed in favor of granting relief from the stay, and thus AMP had failed to demonstrate cause for stay relief [Case No. 17-bk-3283, ECF No. 4157].  AMP appealed.

AMP's appeal was docketed by the First Circuit on December 27, 2018, as Case No. 18-2194.  AMP filed its opening brief on March 18, 2019, and the Oversight Board filed a brief in opposition on May 1, 2019.  On June 5, 2019, AMP filed its reply.  Oral argument took place on September 11, 2019.  By opinion dated September 25, 2019, the First Circuit affirmed the Title III Court's decision denying stay relief and ruled that AMP's right to specific performance was a "claim" subject to the stay because money damages could be substituted for specific performance.  On October 16, 2019, the First Circuit issued its mandate.

## F.    Significant Adversary Proceedings and Contested Matters

### 1.    Bondholder Litigation

#### (a)    *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00125

On May 11, 2017, Assured and FGIC (collectively, "Plaintiffs") filed a complaint against the Commonwealth, the Oversight Board, AAFAF, and several Commonwealth officials in their official capacity (collectively, the "Defendants") challenging the Commonwealth's 2017 fiscal plan, as certified by the Oversight Board on March 13, 2017 (the "2017 Commonwealth Fiscal Plan"), and the Fiscal Plan Compliance Act, a law enacted by the Commonwealth to effectuate the fiscal plan [Adv. Proc. No. 17-00125, ECF No. 1].  Plaintiffs, as owners and insurers of bonds issued by the Commonwealth and certain of its instrumentalities (including PBA, HTA, CCDA, and PRIFA), alleged that bonds issued by the Commonwealth and PBA constituted

---

[139]   Case No. 17-bk-3283, ECF No. 3019; Case No. 18-2194 (1st Cir.).

"public debt" under the Puerto Rico Constitution and Commonwealth law and were thus entitled to priority over all other debts and expenses of the Commonwealth pursuant to the Puerto Rico Constitution.  Further, Plaintiffs contended that bonds issued by HTA, PRIFA, and CCDA were secured by certain provisions of Commonwealth law.  According to Plaintiffs, the 2017 Fiscal Plan and the Fiscal Plan Compliance Act violated PROMESA because, among other things, they did not "respect" "lawful priorities or lawful liens," as PROMESA section 201(b)(1)(N) purportedly requires.  Plaintiffs therefore sought orders (i) declaring the 2017 Fiscal Plan and the Fiscal Plan Compliance Act violated PROMESA sections 201(b)(1)(N), 201(b)(1)(M), 201(b)(1)(A)(i), 101(a), 201(b), 5(10), and 5(22); (ii) declaring the 2017 Fiscal Plan and the Fiscal Plan Compliance Act unconstitutional because they violated the Contracts, Takings, and Due Process Clauses of the U.S. Constitution; (iii) enjoining all Defendants from "presenting or proceeding with confirmation of any plan of adjustment" based upon the 2017 Fiscal Plan or the Fiscal Plan Compliance Act; and (iv) staying the confirmation of a plan of adjustment "pending development of a fiscal plan compliant with PROMESA and the U.S. Constitution."  [Adv. Proc. No. 17-00125, ECF No. 1, at 44-45].

On July 10, 2017, Defendants filed a joint motion to dismiss [Adv. Proc. No. 17-00125, ECF No. 27].  On August 14, 2017, Plaintiffs filed their opposition to Defendants' motion to dismiss [Adv. Proc. No. 17-00125, ECF No. 54].  On August 28, 2017, Defendants filed their reply in support of the motion to dismiss [Adv. Proc. No. 17-00125, ECF No. 64].  On October 6, 2017, Plaintiffs filed a notice of voluntary dismissal without prejudice [Adv. Proc. No. 17-00125, ECF No. 108].  On October 10, 2017, the Title III Court entered an order dismissing the case without prejudice and closing the adversary proceeding.  [Adv. Proc. No. 17-00125, ECF No. 109].

### (b) *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00155; 17-00156; Case Nos. 18-1165, 18-1166 (1st Cir.); Case No. 19-391 (S. Ct.)

On June 3, 2017, Assured, FGIC, and National (collectively, "Plaintiffs"), each of which insure bonds issued by HTA, filed actions against the Commonwealth, the Oversight Board, HTA, AAFAF, and certain individual government officials acting in their official capacities (collectively, "Defendants"), alleging Defendants illegally diverted to the Commonwealth's General Fund certain monies Plaintiffs claimed were HTA special revenues.  Plaintiffs sought declaratory and injunctive relief, asserting Defendants violated the special revenue provisions of the Bankruptcy Code (sections 902, 922(d), and 928(a)), which exempt pledged post-petition special revenues from the automatic stay.  Plaintiffs alleged the HTA bonds were special revenue bonds pursuant to section 902 and, accordingly, pursuant to section 922(d), HTA's Title III petition did not operate as a stay against the application of special revenues to the repayment of debt.  Plaintiffs sought to enforce these provisions by requesting the Title III Court issue an injunction ordering Defendants to pay the alleged special revenues.

On July 23, 2017, Plaintiffs filed amended complaints adding allegations that AAFAF improperly directed BNYM to refrain from applying or delivering funds held in HTA's Debt Service Reserve Accounts to the Existing HTA Bonds (each as defined in the amended complaints) [Adv. Proc. No. 17-00155, ECF No. 39; Adv. Proc. No. 17-00156, ECF No. 41].

According to Plaintiffs, the funds in those accounts were property of the bondholders, not the Debtor.

On July 28, 2017, Defendants filed motions to dismiss, arguing, among other things, (i) Plaintiffs failed to state a claim under sections 922(d) and 928(a) of the Bankruptcy Code because they did not allege facts showing they had a perfected security interest in HTA's revenues; (ii) sections 922(d) and 928(a) do not require the pledged special revenues, if any were alleged, be turned over; (iii) Plaintiffs did not allege facts establishing an enforceable lien on HTA revenues; (iv) the Title III Court lacked subject matter jurisdiction over the relief requested in the amended complaint pursuant to PROMESA section 305, which limits the jurisdiction and the powers of the Title III Court; and (v) Plaintiffs did not state a claim to the funds in the Reserve Accounts, as they do not own those accounts [Adv. Proc. No. 17-00155, ECF No. 46; Adv. Proc. No. 17-00156, ECF No. 48].

On January 30, 2018, the Title III Court granted Defendants' motions to dismiss [Adv. Proc. No. 17-00155, ECF No. 125; Adv. Proc. No. 17-00156, ECF No. 121]. On February 9, 2018, Plaintiffs filed notices of appeal to the United States Court of Appeals for the First Circuit. The appeals were docketed as Case Nos. 18-1165 and 18-1166.

On March 26, 2019, the First Circuit affirmed the Title III Court's decision, finding that it did not err when it dismissed the amended complaint because neither Bankruptcy Code section 922(d) nor section 928(a) entitle Plaintiffs to the relief they sought. The First Circuit held these sections "permit, but do not require, continued payment during the pendency of the bankruptcy proceedings" and "stand for the premise that any consensual prepetition lien secured by special revenues will survive the period of municipal bankruptcy, and, accordingly, municipalities can elect to voluntarily continue payment on these debts during the course of the bankruptcy proceedings so as to not fall behind and thus be at risk of being unable to secure financing in the future." *Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd.*, 919 F.3d 121, 132-33 (1st Cir. 2019). On September 20, 2019, Appellants filed a petition for a writ of certiorari with the Supreme Court, which was docketed as Case No. 19-391. The petition was fully briefed and, on January 13, 2020, denied by the Supreme Court.

(c)   ***Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.,***
***Adv. Proc. No. 18-00059***

On May 23, 2018, Assured and FGIC (collectively, "Plaintiffs") filed an action against the Commonwealth, AAFAF, Governor Rosselló, and certain other individual government officials acting in their official capacities (collectively, "Defendants"), alleging the fiscal plan certified by the Oversight Board in April 2018 (the "April 2018 Commonwealth Fiscal Plan") and related acts and orders violated PROMESA and the U.S. Constitution [Adv. Proc. No. 18-00059, ECF No. 1]. Plaintiffs alleged they insured GO bonds, which they claimed were entitled to first priority payment under the Puerto Rico Constitution. Plaintiffs alleged they also insured bonds issued by HTA, CCDA, and PRIFA, which they alleged were secured by enforceable and perfected liens against special revenues. Plaintiffs further alleged the April 2018 Commonwealth Fiscal Plan disregarded these priorities, and requested declaratory judgments that (i) the April 2018 Commonwealth Fiscal Plan violated (a) PROMESA section 201(b), which delineates the requirements for the approval of fiscal plans, (b) PROMESA section 303, which

reserves the rights of covered territories to control their own instrumentalities and territories,  (c) PROMESA section 407, which prohibits transfers of property of any territorial instrumentality of Puerto Rico "in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on . . .", and (d) Bankruptcy Code § 928(a), which states that special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case; (ii) the Oversight Board lacked the authority to certify the April 2018 Commonwealth Fiscal Plan; (iii) the April 2018 Commonwealth Fiscal Plan did not constitute a "Fiscal Plan" under PROMESA section 5, (iv) a plan of adjustment could not be confirmed based on the April 2018 Commonwealth Fiscal Plan and the court should not hold a confirmation hearing on the April 2018 Commonwealth Fiscal Plan; (v) the challenged actions violated the Contracts, Takings, and Due Process Clauses and Article I, Section 1 of the United States Constitution; and (vi) the challenged actions violated PROMESA section 303(1), which concerns applicability of the sections of PROMESA applicable to cases, and PROMESA section 303(3), which reserves the rights of covered territories to control their own instrumentalities and territories.

Defendants filed an urgent motion to stay the litigation on June 25, 2018, arguing the issues raised in the adversary proceeding were substantially similar to those raised in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00159 (the "*Ambac Litigation*"), which was then on appeal to the First Circuit[140] [Adv. Proc. No. 18-00059, ECF No. 14].  On August 13, 2018, Magistrate Judge Dein granted the motion to stay the adversary proceeding pending a decision from the First Circuit in *Ambac*, determining that many of the questions on appeal in the *Ambac* Litigation overlapped with the issues in this case and that the requested stay would not significantly delay litigation [Adv. Proc. No. 18-00059, ECF No. 23]. On August 27, 2018, Plaintiffs filed an objection to Magistrate Judge Dein's order, and on September 18, 2018, Defendants filed a response [Adv. Proc. No. 18-00059, ECF Nos. 24, 28]. On November 2, 2018, the Title III Court entered an order affirming the stay [Adv. Proc. No. 18-00059, ECF No. 32].

Following the First Circuit's decision affirming the dismissal of the *Ambac* Litigation, Defendants filed an unopposed motion for an extension of time to respond to the complaint, which the Title III Court granted on July 16, 2019 [Adv. Proc. No. 18-00059, ECF No. 33, 35]. The parties met and conferred to determine the impact of the *Ambac* Litigation on this case, and whether Plaintiffs intended to amend their complaint.  The parties also conferred about the possibility of staying this matter and having it placed into the mediation protocol ordered by the Title III Court in other adversary proceedings.  On August 20, 2019, the UCC filed a motion to intervene in this action [Adv. Proc. No. 18-00059, ECF No. 38].  On August 28, 2019, the parties filed a joint motion requesting that the litigation be subject to the Stay Order, as described in section V.H.1. of this Disclosure Statement [Adv. Proc. No. 18-00059, ECF No. 41].  On September 6, 2019, the Title III Court issued an order applying the Stay Order to this proceeding, and staying the litigation until November 30, 2019 [Adv. Proc. No. 18-00059, ECF No. 45].  On November 25, 2019, the Title III Court confirmed the adversary proceeding was subject to the order extending the stay of certain adversary proceedings and contested matters through December 31, 2019 [Adv. Proc. No. 18-00059, ECF No. 47].

---

[140]   The *Ambac* Litigation and the appeal to the First Circuit are discussed in greater detail in section V.F.1(d).

On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation remain stayed pending the confirmation of the Commonwealth's proposed plan of adjustment [Case No. 17-3283, ECF No. 10756].[141]   On March 10, 2020, the Title III Court issued an order continuing the stay of this litigation [Adv. Proc. No. 18-00059, ECF No. 51].

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA, including this adversary proceeding, pending confirmation of the Commonwealth and HTA plans of adjustment [Adv. Proc. No. 18-00059, ECF No. 53; Case No. 17-bk-3283, ECF No. 16739].  On May 25, 2021, the Title III Court granted the joint motion [Adv. Proc. No. 18-00059, ECF No. 57].  On August 2, 2021, Ambac, FGIC, BNYM, and the Oversight Board filed a joint motion to continue the stay of certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment which would resolve the matters [Adv. Proc. No. 18-00059, ECF No. 59].  On August 3, 2021, the Title III Court granted the joint motion [Adv. Proc. No. 18-00059, ECF No. 60].

Following confirmation of the Commonwealth Plan, the Title III Court entered an *Order Regarding Matters that May Be Resolved in Connection with the Modified Eighth Amended Plan Following the Plan's Effective Date* [ECF No. 20341], directing the Oversight Board to file "an informative motion containing a definitive list, in the form of a chart, identifying the currently asserted Claims and Disputed Claims that will be subject to resolution in connection with the Plan on or after the Effective Date."  In compliance with the Title III Court's order, on March 25, 2022, the Oversight Board filed the *Informative Motion of the Financial Oversight and Management Board for Puerto Rico Regarding Order Regarding Matters that May Be Resolved in Connection with the Modified Eighth Amended Plan Following the Plan's Effective Date* [ECF No. 20445].  Therein, the Oversight Board identified Adv. Proc. No. 18-00059 as a matter that has been resolved by the Plan, and noted that the party responsible for filing each matter should file, to the extent necessary, a notice withdrawing or dismissing such matter in light of the Plan's confirmation.  Further, the Oversight Board proposed that such notices be filed within thirty (30) days of its informative motion.

### (d)     *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00159, Case No. 18-1214 (1st Cir.); Case No. 19-387 (S. Ct.)

On June 8, 2017, Ambac filed a complaint against the Commonwealth, HTA, the Oversight Board, AAFAF, and certain government officials acting in their official capacities (collectively, the "Defendants"), claiming Defendants violated Ambac's constitutional and statutory rights as insurer of the HTA Revenue Bonds (as defined in the complaint) [Adv. Proc. No. 17-00159, ECF No. 1].  Ambac alleged it had issued financial guaranty insurance policies covering payment of principal and interest on approximately $494 million in net par accreted value of HTA's bonds and claimed further to directly own approximately $16 million in such bonds.  Ambac asserted the HTA Bonds were secured by liens on (i) revenues from toll facilities;

---

[141]    *See* section V.H.2. for a detailed description of the Mediation Team, the Amended Report, and related proceedings.

(ii) gasoline, diesel, crude oil and other special excise taxes; and (iii) special excise taxes consisting of motor vehicle license fees (collectively, the "Pledged Special Revenues").

Ambac claimed Defendants diverted the alleged Pledged Special Revenues in such a way that junior unsecured debts were prioritized over senior secured debt. These actions, Ambac alleged, caused unnecessary payment defaults on the HTA Revenue Bonds. Due to these alleged defaults, Ambac paid claims totaling approximately $52 million to bondholders.

Ambac sought declaratory and injunctive relief, claiming (i) the Moratorium Legislation and Moratorium Orders, the HTA Fiscal Plan, and the Fiscal Plan Compliance Act (each as defined in the complaint), which HTA allegedly acted pursuant to in order to divert the Pledged Special Revenues, were unconstitutional, violated the Contracts Clause, and were null; (ii) the diversion violated the Takings and Due Process Clauses; (iii) the Moratorium Orders' alleged deprivation of Ambac's access to the Title III Court was unconstitutional; and (iv) Defendants violated sections 303 and 407 of PROMESA and sections 922 and 928 of the Bankruptcy Code.

On July 28, 2017, Defendants filed a motion to dismiss the complaint. [Adv. Proc. No. 17-00159, ECF No. 48]. Defendants argued the Title III Court lacked jurisdiction to decide the issues raised in Ambac's complaint because (i) Ambac had no standing to file the complaint because it had not suffered any concrete injury, and (ii) any and all rights will not be determined until the filing of a proposed plan of adjustment. Id.

On February 4, 2017, the Title III Court issued an opinion and order dismissing the complaint, holding (i) Ambac had standing to file the complaint, but (ii) the Title III Court lacked subject matter jurisdiction regarding Ambac's lien interest and otherwise ruled that Ambac failed to state a claim upon which relief could be granted [Adv. Proc. No. 17-00159, ECF No. 156]. Ambac filed an appeal with the First Circuit, which was docketed as Case No. 18-1214. On June 24, 2019, the First Circuit issued an opinion and order affirming the Title III Court's decision, holding that, pursuant to PROMESA sections 106(e) and 305, the Title III Court lacks the authority to grant the declaratory and injunctive relief that Ambac seeks. On September 23, 2019, Appellants filed a petition for a writ of *certiorari*, which was docketed as Case No. 19-387. On January 13, 2020, after briefing had concluded, the Supreme Court denied the petition.

       **(e)**     ***Peaje Investments LLC v. Puerto Rico Highways and Transportation Authority*, Adv. Proc. Nos. 17-00151, 17-00152; Case Nos. 17-2165, 17-2166, 17-2167 (1st Cir.)**

On May 31, 2017, Peaje Investments, LLC ("Peaje"), a holder of over $64 million in 1968 bonds issued by HTA, brought an action for declaratory and injunctive relief against HTA, AAFAF, and certain Commonwealth officials (collectively, "Defendants") regarding (i) the validity of its lien and (ii) HTA's allegedly improper use of toll revenues to fund other obligations. Peaje alleged that HTA toll revenues deposited with BNYM had been wrongfully diverted by HTA to pay other debt obligations or other expenses since May 2016. Further, Peaje alleged that it has a first priority statutory lien on the toll revenues. According to Peaje, this purported statutory lien protects "pledged special revenues" on the bonds from stay restrictions pursuant to sections 902, 922 and 928(d) of the Bankruptcy Code. Accordingly, Peaje sought a judgment ordering the Defendants to resume depositing toll revenues with BNYM, as fiscal

agent for HTA bonds.  Moreover, Peaje asserted the wrongful diversion of the toll revenues to pay "necessary operating expenses" of HTA violates the Takings Clause and the Fifth Amendment of the U.S. Constitution.  Alternatively, Peaje argued its priority liens can only be subordinated to expenses to preserve a "project or system" that generates specific collateral securing the bonds.  Also, on May 31, 2017, Peaje filed a motion for a temporary restraining order and preliminary injunction to (i) enjoin HTA from continuing to utilize the toll revenues for purposes other than paying the bonds, and (ii) seek adequate protection for its purported collateral [Adv. Proc. No. 17-00151, ECF No. 2; Adv. Proc. No. 17-00152, ECF No. 2].

The Title III Court held an evidentiary hearing on Peaje's motion for preliminary injunctive relief.  The Title III Court issued an order denying Peaje's request for injunctive relief on the basis that Peaje failed to demonstrate (i) it has a valid statutory lien and (ii) it would suffer irreparable harm absent injunctive relief [Adv. Proc. No. 17-00151, ECF No. 240; Adv. Proc. No. 17-00152, ECF No. 228].  Further, the order concluded that even if the lien were found to have been valid, expert testimony established Peaje was adequately protected.

Immediately after the ruling, on December 8, 2017, Plaintiff filed a notice of appeal to the First Circuit, which was docketed as Case Nos. 17-2165, 17-2166, and 17-2167.  On August 8, 2018, the First Circuit entered a ruling affirming the Title III Court's conclusion regarding the absence of a statutory lien.

Shortly after filing the notice of appeal to the First Circuit, Peaje filed an amended complaint in the Title III Court seeking (i) a declaration that its lien is valid and perfected, and (ii) an injunction ensuring that HTA resumes depositing the toll revenues [Adv. Proc. No. 17-00151, ECF No. 246; Adv. Proc. No. 17-00152, ECF No. 234].  In its amended complaint, Peaje included references to UCC financing statements to evidence perfection.  Peaje also expanded upon its assertion in its original complaint that it is exempt from any stay.  It declared in the amended complaint that it is not bound by various emergency measures enacted by the Commonwealth, and not bound by PROMESA and the certification of the fiscal plan, which allow the government to appropriate funds to service general debt obligations.  Peaje's amended complaint also contained numerous claims resembling the *Ambac* adversary proceeding described above, *see* section V.F.1.(d).

HTA filed an answer to the amended complaint and denied the material allegations [Adv. Proc. No. 17-00151, ECF No. 256; Adv. Proc. No. 17-00152, ECF No. 242].  HTA also asserted various affirmative defenses to the amended complaint.  HTA argued, among other things, the UCC financing statements do not bear the correct name of the Debtor, rendering them insufficient to perfect a security interest as a matter of law.  The Defendants also challenged Peaje's assertion that the Title III Court could adjudicate certain claims, arguing the Title III Court lacks subject matter jurisdiction under provisions of PROMESA that prohibit the Title III Court from reviewing fiscal plan certifications and preclude interference with political or governmental powers of the debtor, any of its property or revenue, or the use and enjoyment by the debtor of any income-producing property.  Moreover, HTA asserted that the Plaintiff's Takings Clause claim is not viable because the Plaintiff possesses no "cognizable" property right.

On October 26, 2018, Peaje filed a petition for a writ of *certiorari* with the U.S. Supreme Court seeking review of the First Circuit's opinion affirming the Title III Court's opinion, which

was docketed October 30, 2018 as Case No. 18-560.  On February 19, 2019, the U.S. Supreme Court denied the petition for a writ of *certiorari*.

On July 1, 2019, Magistrate Judge Dein entered an order directing the parties to file a joint status report on or before September 15, 2019 [Adv. Proc. No. 17-00151, ECF No. 292; Adv. Proc. No. 17-00152, ECF No. 279].  On September 15, 2019, the parties filed a joint status report, informing the Title III Court that certain pending appeals in related matters had the potential to impact further proceedings in these matters, and for that reason, the parties had agreed to an informal stay and proposed filing a further status report in ninety (90) days.  *Id*. Thereafter, the matter remained stayed informally and the parties filed a series of further status reports.

On August 2, 2021, the Oversight Board, Ambac, FGIC, BNYM, and U.S. Bank, among others, filed a joint motion to stay certain contested matters and adversary proceedings [Adv. Proc. No. 17-00151, ECF No. 322; Adv. Proc. No. 17-00152, ECF No. 308].  On August 3, 2021, the Title III Court issued an order granting the joint motion and staying this adversary proceeding [Adv. Proc. No. 17-00151, ECF No. 323; Adv. Proc. No. 17-00152, ECF No. 309].

On January 18, 2022, the Title III Court issued the Commonwealth Confirmation Order [Case No. 17-bk-03283, ECF No. 19813].  Paragraph 8 of the Commonwealth Confirmation Order states in part that, on the Effective Date, to the extent extant, the Lift Stay Motions (including Adv. Proc. Nos. 17-00151 and 17-00152), shall be dismissed with prejudice. Following confirmation of the Commonwealth Plan, the Title III Court entered an *Order Regarding Matters that May Be Resolved in Connection with the Modified Eighth Amended Plan Following the Plan's Effective Date* [ECF No. 20341], directing the Oversight Board to file "an informative motion containing a definitive list, in the form of a chart, identifying the currently asserted Claims and Disputed Claims that will be subject to resolution in connection with the Plan on or after the Effective Date."  In compliance with the Title III Court's order, on March 25, 2022, the Oversight Board filed the *Informative Motion of the Financial Oversight and Management Board for Puerto Rico Regarding Order Regarding Matters that May Be Resolved in Connection with the Modified Eighth Amended Plan Following the Plan's Effective Date* [ECF No. 20445].  Therein, the Oversight Board identified Adv. Proc. No. 17-00151 and 17-00152 as matters that have been resolved by the Plan, and noted that the party responsible for filing each matter should file, to the extent necessary, a notice withdrawing or dismissing such matter in light of the Plan's confirmation.  Further, the Oversight Board proposed that such notices be filed within thirty (30) days of its informative motion.

On March 10, 2022, the Oversight Board filed a motion for entry of an order directing the Fiscal Agent to disburse disputed funds in the HTA bond service accounts, redemption accounts and reserve accounts [Adv. Proc. No. 17-00151, ECF Nos. 327, 329; Adv. Proc. No. 17-00152, ECF Nos. 313, 315].  The motion was fully briefed [Adv. Proc. No. 17-00151, ECF Nos. 330, 331, 332, 334, 335; Adv. Proc. No. 17-00152, ECF Nos. 316, 317, 318, 320, 321; Case No. 17-bk-3283, ECF No. 20927].

On May 10, 2022, the Oversight Board filed notices of voluntary dismissal, seeking dismissal of all claims against the Commonwealth Adv. Proc. Nos. 17-00151 and 17-00152 [Adv. Proc. No. 17-00151, ECF No. 340; Adv. Proc. No. 17-00152, ECF No. 326].  On May 23,

2022, the Title III Court issued orders dismissing solely the claims against the Commonwealth [Adv. Proc. No. 17-00151, ECF No. 342; Case No. 17-00152, ECF No. 328].

      **(f)**      ***Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 18-00028, Case No. 22-01048 (1st Cir.)**

On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board and its members, COSSEC, and certain other Commonwealth instrumentalities (including COFINA, HTA, ERS, PREPA, and GDB) (collectively, the "Defendants"), seeking declaratory judgments that their Puerto Rico debt holdings are not dischargeable and seeking monetary damages for alleged fraud in connection with the credit unions' purchase of Puerto Rico debt instruments [Adv. Proc. No. 18-00028, ECF No. 1]. On August 6, 2018, the Oversight Board, for itself and as representative of the Debtors, moved to dismiss the complaint [Adv. Proc. No. 18-00028, ECF No. 29]. Also on August 6, 2018, GDB filed a separate motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 32]. The GDB Debt Recovery Authority (the "GDB DRA") and its Trustees also moved to dismiss the complaint on October 1, 2018 [Adv. Proc. No. 18-00028, ECF No. 59]. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Title III Court to file joinders. On April 1, 2019, Plaintiffs filed their opposition to the motions to dismiss [Adv. Proc. No. 18-00028, ECF No. 74].

Shortly thereafter, on April 16, 2019, Plaintiffs filed an amended complaint, which eliminated claims premised on securities law and added claims for fraud, negligence, misrepresentation, violation of the Puerto Rico Organized Crime Law, and violation of the Takings Clause of the U.S. and Commonwealth Constitutions [Adv. Proc. No. 18-00028, ECF No. 79].

On February 5, 2019, the Title III Court issued an Amended Confirmation Order confirming COFINA's Third Amended Plan of Adjustment [Case No. 17-bk-3284, ECF No. 561]. On February 12, 2019, COFINA's Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to paragraph 30 of the Amended Confirmation Order, "the plaintiffs in that certain adversary proceeding before the Title III Court, captioned *Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 18-00028, shall be entitled to continue pursuit of such litigation against all parties other than COFINA and Reorganized COFINA, subject to all available rights and defenses with respect to claims and causes of action asserted therein."

On July 22, 2019, Defendants filed motions to dismiss the amended complaint and associated joinders to the motions to dismiss [Adv. Proc. No. 18-00028, ECF Nos. 88, 91–94, 97]. On December 6, 2019, Plaintiffs filed a motion for leave to file a second amended complaint [Adv. Proc. No. 18-00028, ECF No. 116]. The motion was fully briefed, and on April 14, 2020, the Title III Court issued an order granting Plaintiffs' motion for leave to file a second amended complaint and setting a briefing schedule [Adv. Proc. No. 18-00028, ECF No. 125].

On April 16, 2020, Plaintiffs filed their second amended complaint [Adv. Proc. No. 18-00028, ECF No. 126]. Also on April 16, 2020, the Title III Court dismissed without

prejudice the Oversight Board's, GDB's, and GDB DRA's motions to dismiss and the UCC's, AAFAF's, and COSSEC's joinders to the motions [Adv. Proc. No. 18-00028, ECF No. 127]. On April 20, 2020, as per the Title III Court's briefing schedule, the Oversight Board [Adv. Proc. No. 18-00028, ECF No. 128], GDB [Adv. Proc. No. 18-00028, ECF No. 129], and the GDB DRA [Adv. Proc. No. 18-00028, ECF No. 130] refiled their motions to dismiss the first amended complaint as motions to dismiss the second amended complaint. Also on April 20, 2020, COSSEC [Adv. Proc. No. 18-00028, ECF No. 131] and the UCC [Adv. Proc. No. 18-00028, ECF No. 132] filed joinders to the Oversight Board's motion to dismiss. On April 24, 2020, AAFAF filed a joinder to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 138].

On May 11, 2020, the Title III Court issued an order referring the motions to dismiss the second amended complaint to Magistrate Judge Dein for a report and recommendation [Adv. Proc. No. 18-00028, ECF No. 142]. On May 21, 2020, the Oversight Board [Adv. Proc. No. 18-00028, ECF No. 143], GDB [Adv. Proc. No. 18-00028, ECF No. 145] and GDB DRA [Adv. Proc. No. 18-00028, ECF No. 146] filed supplemental briefs in support of their motions to dismiss. AAFAF filed a joinder to the Oversight Board's and GDB's briefs [Adv. Proc. No. 18-00028, ECF No. 147]. On May 22, 2020, COSSEC filed a joinder to the Oversight Board's and GDB DRA's motions to dismiss together with a supplemental brief in support of its own motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 148]. Also on May 22, 2020, the UCC filed a limited joinder to the Oversight Board's supplemental brief in support of the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 151].

On August 11, 2020, Plaintiffs filed an opposition to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 166-1]. Also on August 11, 2020, Plaintiffs filed oppositions to GDB's [Adv. Proc. No. 18-00028, ECF No. 167], GDB DRA's [Adv. Proc. No. 18-00028, ECF No. 168], AAFAF's [Adv. Proc. No. 18-00028, ECF No. 169], and COSSEC's [Adv. Proc. No. 18-00028, ECF No. 170] motions to dismiss and associated joinders. On October 20, 2020, Defendants filed a reply in support of the motions to dismiss Plaintiffs' second amended complaint [Adv. Proc. No. 18-00028, ECF No. 178]. The GDB DRA also filed a reply in support of its motion to dismiss Plaintiffs' second amended complaint [Adv. Proc. No. 18-00028, ECF No. 179]. AAFAF and the GDB filed a reply in support of the GDB's motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 180]. COSSEC also filed a reply in support of its motion to dismiss [Adv. Proc. No. 18-00028, ECF No. 181]. On March 5, 2021, the GDB DRA filed an informative motion submitting supplemental authority in connection with its reply [Adv. Proc. No. 18-00028, ECF No. 186]. On March 17, 2021, Plaintiffs filed an opposition to the GDB DRA's informative motion [Adv. Proc. No. 18-00028, ECF No. 187].

On December 27, 2021, the Title III Court issued an order (the "Order") granting the motions to dismiss the second amended complaint [Adv. Proc. No. 18-00028, ECF No. 192]. The Order dismissed all claims against all defendants, holding that (i) all claims against the Oversight Board and its individual members were barred by section 105 of PROMESA, and (ii) Plaintiffs' fraud allegations and associated racketeering claim failed to meet the requisite heightened pleading requirements for such causes of action. The Order also (i) dismissed certain claims as to COFINA and GDB as moot because those entities' debts had already been discharged; (ii) dismissed certain claims as to HTA and PREPA as unripe because no plans of

132

adjustment had yet been filed; (iii) dismissed claims requesting exception to discharge as to the Commonwealth, ERS, and PBA because Plaintiffs had not established an exemption from discharge under any cited statutory provision; (iv) held several claims alleging violations of particular Commonwealth statutes to be barred by applicable statutes of limitations; (v) held Plaintiffs' Takings Clause claims to be either unripe or insufficient to show that the government's regulatory actions had coerced or forced a taking of Plaintiffs' money; and (vi) dismissed Plaintiffs' remaining claim for unjust enrichment because under Puerto Rico law, unjust enrichment is not available for conduct covered by an applicable statute.  On January 4, 2022, the Title III Court entered its judgment, and the adversary proceeding was closed [Adv. Proc. No. 18-00028, ECF No. 193].

On January 12, 2022, Plaintiffs filed a notice of appeal, and it was docketed at the First Circuit at Case No. 22-1048.  [Adv. Proc. No. 18-00028, ECF No. 194]. Plaintiffs filed their opening brief on March 24, 2022.  On May 23, 2022, Defendants' filed their answering briefs. Plaintiffs' reply brief is currently due on May 23, July 1, 2022.

(g)     *AmeriNational Community Services, LLC, et al. v. Ambac Assurance Corporation, et al.*, **Adv. Proc. No. 21-00068**

On June 26, 2021, the DRA Parties filed an adversary complaint against Assured, Ambac, FGIC, National, Peaje, and BNYM as fiscal agent for holders of certain bonds issued by HTA (collectively the "Defendants").  The complaint requested entry of various declaratory judgments regarding the validity, extent, seniority and priority of the DRA Parties' and the Defendants' alleged rights with respect to (1) certain revenues collected pursuant to Acts 30-2013 and 31-2013 ("Act 30-31 Revenues"), (2) the 1968 HTA Bonds and 1998 HTA Bonds, (3) fifteen loan agreements entered into by GDB and HTA between March 2008 and January 2014 (as amended, amended and restated, supplemented or otherwise modified, the "Loan Agreements"), and (4) the assignment and security agreement executed by and between HTA and GDB on August 28, 2013 (as amended, supplemented or otherwise modified, the "Security Agreement") in connection with the Loan Agreements.

The complaint requested several judicial declarations.  First, the DRA Parties requested a judicial declaration that the DRA was the only party with a valid, perfected lien on and security interest in, and right to collect from, the Act 30-31 Revenues, including the right to receive such revenues.  Second, the DRA Parties requested judicial declarations that the 1968 HTA Bonds and the 1998 HTA Bonds were: (i) secured only by specified bond revenues "actually received by HTA and actually deposited in applicable bond revenue accounts"; and (ii) limited recourse obligations to be satisfied solely from the specified bond revenues.  Third, the DRA Parties requested a judicial declaration that the DRA had the right to collect (in connection with its claims) from the specified bond revenues to the extent they were not deposited in the certain specified bond revenue accounts.  Fourth, the DRA Parties requested a judicial declaration that the subordination language contained in the Loan Agreements and the Security Agreement did not cause any of the DRA Parties' alleged liens or claims to be subordinated to the HTA bondholders' alleged liens or claims.

Pursuant to a stipulation by and among the DRA Parties and Defendants, the Title III Court set an August 27, 2021 deadline for Defendants to respond, answer, and/or otherwise plead

to the complaint.  On June 28, 2021, the Title III Court issued an order referring the case to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 21-00068, ECF No. 3]. On July 28, 2021, the Oversight Board filed a motion for leave to intervene as a defendant in Counts I, II and IV, and AAFAF filed a joinder to the motion [Adv. Proc. No. 21-00068, ECF Nos. 26, 27].  On August 2, 2021, the DRA Parties filed an opposition to the Oversight Board's motion for leave to intervene [Adv. Proc. No. 21-00068, ECF No. 30].  On August 11, 2021, Magistrate Judge Dein issued an order granting (i) the Oversight Board's motion for leave to intervene as a defendant in Counts I, II and IV and (ii) AAFAF's joinder in connection with the same [Adv. Proc. No. 21-00068, ECF No. 34].

On August 26, 2021, the Oversight Board, partially joined by AAFAF, filed a motion to dismiss or, alternatively, to stay or terminate Counts I, II and IV of the complaint [Adv. Proc. No. 21-00068, ECF Nos. 40, 42].  Ambac, Assured, National, FGIC, BNYM and Peaje filed a joint answer to the complaint, a joint motion to dismiss the same, and certain counterclaims against the DRA Parties [Adv. Proc. No. 21-00068, ECF Nos. 43, 44].

The DRA Parties filed a motion to stay the deadline for responding to the counterclaims [Adv. Proc. No. 21-00068, ECF No. 57], which motion was denied by the Title III Court on October 14, 2021 [Adv. Proc. No. 21-00068, ECF No. 79].  On October 19, 2021, the DRA Parties filed a motion to dismiss the counterclaims [Adv. Proc. No. 21-00068, ECF No. 80].

On October 29, 2021, the Title III Court issued an opinion and order granting Ambac, Assured, National, FGIC, BNYM and Peaje's joint motion to dismiss the complaint [Adv. Proc. No. 21-00068, ECF No. 83].  The Title III Court dismissed Count I on grounds that the plain terms of Acts 30 and 31 specifically contemplated bond payments, compelling the conclusion that holders of bonds may have a right to receive Acts 30-31 Revenues.  As to Count III, the Title III Court found that under the terms of the Security Agreement, the loans held by the DRA were subordinated to Bonds issued under both the 1968 Resolution and 1998 Resolution.  Finally, the Title III Court found that its reasoning as to Counts I and III also required dismissal of Counts II and IV.  Count II was dismissed because the bonds were payable from Acts 30-31 Revenues (as found in relation to Count I) and Count IV was dismissed because the Security Agreement required Bond obligations be satisfied before any funds are paid toward the loans held by the DRA (as found in relation to Count III).  In light of the dismissal of the Complaint pursuant to the joint motion to dismiss by Ambac, Assured, National, FGIC, BNYM and Peaje, the Court deemed it unnecessary to address the arguments of the Oversight Board, and denied the Oversight Board's motion to dismiss Counts I, II and IV as moot.  Pursuant to the DRA Stipulation, the Title III Court's decision qualifies as a "GDB Loan Priority Determination" for purposes of the Commonwealth Plan.  DRA Stipulation § 3.f [ECF No. 19100].  For more information on the impact of the GDB Loan Priority Determination, see sections 1.172, 1.259, and 63.2 of the Commonwealth Plan.

On October 31, 2021, the Court Clerk issued a judgment dismissing the adversary proceeding [Adv. Proc. No. 21-00068, ECF No. 84].  On November 4, 2021, the Title III Court issued an amended judgment directing the Court Clerk to close the adversary proceeding [Adv. Proc. No. 21-00068, ECF No. 86].

**(h)      DRA Parties' Administrative Expense Motion**[142]

On June 15, 2021, the DRA Parties filed a motion for allowance of an administrative expense claim (the "DRA Administrative Expense Motion") and a notice of hearing thereof [Case No. 17-bk-3283, ECF Nos. 17009, 17012]. Therein, the DRA Parties alleged that (1) the DRA has a valid, perfected security interest in the Act 30-31 Revenues; (2) during the Title III proceedings the Commonwealth had diverted over $2.4 billion in Acts 30-31 Revenues from HTA to the Commonwealth, and at least $800 million of those revenues were exclusively for the benefit of HTA; and (3) the DRA was not adequately protected. Accordingly, the DRA Parties contended that they were entitled to an administrative expense claim of no less than $800 million that must be paid in full, in cash in connection with any Commonwealth Plan.

On September 9, 2021, the Oversight Board filed its objection to the DRA Administrative Expense Motion, arguing that (i) the security interests at issue had already been litigated (*see* Adv. Proc. No. 21-00068, discussed above in section V.F.1.(g); *see also* Case No. 17-3283, ECF No. 16276); (ii) the DRA Parties lack standing against the HTA; and (iii) the claim is preempted by PROMESA [Case No. 17-bk-3283, ECF No. 18065].

On September 24, 2021, the DRA Parties filed their reply in support arguing that (i) the DRA Parties were entitled to administrative expense priority under the Bankruptcy Code; (ii) the DRA Parties were not contractually barred from asserting a claim against the Commonwealth; (iii) the DRA Parties had standing against the Commonwealth and the HTA through its ownership interest in revenues generated by the Commonwealth; and (iv) the DRA Parties' claim was not preempted by PROMESA [Case No. 17-bk-3283, ECF No. 18244]. On the same day, the DRA Parties filed an urgent motion to file under seal certain un-redacted portions of an expert report by Lizette Martinez (the "Martinez Expert Report"), which the DRA Parties submitted in connection with their reply in support of the DRA Administrative Expense Motion [Case No. 17-bk-3283, ECF No. 18245].

On September 28, 2021, the Oversight Board filed an evidentiary objection to the Martinez Expert Report [Case No. 17-bk-3283, ECF No. 18270]. On September 29, 2021, the Title III Court granted the DRA Parties' motion to file under seal certain un-redacted portions of the Martinez Expert Report [Case No. 17-bk-3283, ECF No. 18291]. On the same day, the DRA Parties filed their reply under seal [Case No. 17-bk-3283, ECF No. 18295]. Also, on the same day, the Title III Court issued an order scheduling briefing in connection with the Oversight Board's evidentiary objection to the Martinez Expert Report [Case No. 17-bk-3283, ECF No. 18298].

On October 7, 2021, the DRA Parties filed a response to the Oversight Board's objection to the Martinez Expert Report [Case No. 17-bk-3283, ECF Nos. 18429]. On October 11, 2021, the Oversight Board filed a reply in support of its evidentiary objection to the Martinez Expert Report [Case No. 17-bk-3283, ECF No. 18452]. On October 21, 2021, the Title III Court issued an order directing the unsealing of (i) the DRA Parties' reply in support of the DRA Administrative Expense Claim and (ii) the Martinez Expert Report [Case No. 17-3283, ECF No. 18626].

---

[142] Case No. 17-bk-3283, ECF No. 17009.

On October 29, 2021, the Title III Court issued an opinion and order denying the DRA Administrative Expense Claim [Case No. 17-3283, ECF No. 18892].  Therein, the Title III Court held that (1) the DRA Parties had standing to pursue the DRA Administrative Expense Motion; (2) the DRA Parties were not contractually barred from pursuing the DRA Administrative Expense Motion; (3) the DRA lacks a property interest in the Act 30-31 Revenues held by the Commonwealth; (4) there was no post-petition transaction conferring post-petition benefits on the Commonwealth that would support allowance of an administrative expense claim for the DRA Parties; and (5) in light of the Title III Court's other rulings, the Oversight Board's evidentiary objection was denied as moot.

On November 5, 2021, the DRA Parties and the Oversight Board filed the DRA Stipulation, in which the parties agreed not to pursue any appeals related to the DRA Administrative Expense Motion [Case No. 17-bk-3283, ECF No. 19100, Ex. A].

(i)     **Monolines' Section 926 Motion[143]**

On July 17, 2020, Ambac, Assured, National, and FGIC (the "Section 926 HTA Movants"), filed a motion for entry of an order appointing themselves as co-trustees under section 926 of the Bankruptcy Code in order to pursue certain avoidance claims pursuant to Bankruptcy Code sections 549, 544, and 548 on behalf of HTA against the Commonwealth [Case No. 17-bk-3567, ECF No. 871] (the "Section 926 Motion").  According to the Section 926 HTA Movants, HTA had avoidance claims against the Commonwealth that the Oversight Board had unjustifiably refused to pursue, and the Oversight Board had an unresolvable conflict of interest by simultaneously representing both HTA and the Commonwealth in their respective Title III proceedings.  The statute of limitations for those avoidance claims was set to expire on August 14, 2020.  The Section 926 HTA Movants further stated that they disagreed with the Title III Court's HTA Lift Stay Opinion and Order and submit the Section 926 Motion to preserve their rights pursuant to section 926.  Also, on July 17, 2020, the DRA Parties filed a joinder to the Section 926 Motion [Case No. 17-bk-3567, ECF No. 873].

The motion was fully briefed [Case No. 17-bk-3567, ECF Nos. 901, 902, 908, 909].  On August 11, 2020, the Title III Court issued an order denying the Section 926 Motion [Case No. 17-bk-3567, ECF No. 912].  The order noted the Title III Court had wide discretion to decide whether a trustee should be appointed, particularly in light of the constitutional and federalism concerns inherent in municipal bankruptcy proceedings, and the Oversight Board's sole authority to propose plans of adjustment under PROMESA.  The Title III Court held the Section 926 Motion was based on a legal theory—that certain tax revenues are owned by HTA, and not the Commonwealth—the Oversight Board had declined to adopt and the Title III Court found lacking.  The Title III Court also noted the First Circuit had already concluded the Oversight Board's representation of multiple debtors did not create an automatic, irreconcilable conflict.

On August 25, 2020, the Section 926 HTA Movants filed a notice of appeal [Case No. 17-bk-3567, ECF No. 914].  On September 16, 2020, the United States Court of Appeals for the First Circuit docketed the appeal as Case No. 20-1847.  On September 30, 2020, Section 926 HTA Movants, as Appellants, filed a motion to hold the appeal in abeyance pending a decision

---

[143] Case No. 17-bk-3283, ECF No. 13708; Case No. 17-bk-3567, ECF No. 871; Case No. 20-1847 (1st Cir.).

on the appeal of the Title III Court's Memorandum Opinion denying the HTA Lift Stay Motion. On October 13, 2020, Appellees filed an opposition to Appellants' motion to hold the appeal in abeyance and a cross-motion to dismiss the appeal as moot. The motions were fully briefed. On December 22, 2020, the First Circuit issued an order denying Appellants' motion to hold the appeal in abeyance. On February 17, 2021, Appellants filed their opening brief and the DRA Parties filed a partial joinder to Appellants' opening brief. On February 23, 2021, the DRA Parties filed a motion for leave to file a joinder to Appellants' opening brief. On April 1, 2021, the First Circuit issued an order denying the DRA Parties' motion for leave to file a joinder to Appellants' opening brief. On April 12, 2021, the DRA Parties filed a motion to intervene. On April 19, 2021, Appellees filed their answering briefs. On May 24, 2021, Appellants filed their reply brief. On June 4, 2021, the First Circuit entered an order granting the DRA Parties' motion to intervene. On July 29, 2021, Appellants filed a motion to voluntarily dismiss the appeal. On July 30, 2021, the First Circuit issued its judgment ordering the appeal be dismissed.

> **(j)**    ***Ambac Assurance Corp. v. Autopistas Metropolitanas de Puerto Rico***,
> **Case No. 20-cv-1094 (D.P.R.); Case No. 20-1657 (1st Cir.)**

On February 19, 2020, Ambac filed a complaint against Autopistas Metropolitanas de Puerto Rico ("Metropistas") in the United States District Court for the District of Puerto Rico, alleging Metropistas acted in bad faith by agreeing to pay HTA only $115 million in exchange for a ten-year extension to a concession agreement pursuant to which Metropistas operated two Puerto Rico highways, PR-5 and PR-22 [Case No. 20-cv-01094, ECF No. 1]. Ambac claimed Metropistas paid far less than the reasonably equivalent value for the rights to operate the highway. Ambac sought to reclaim, through rescission and unjust enrichment, the value of the concession granted to Metropistas to secure the payment of obligations owed by HTA to Ambac, and a declaration that Ambac has a valid, continuing lien on certain toll revenues collected by Metropistas.

On March 2, 2020, Metropistas filed a motion to reassign the case to the Title III Court and sought a stay pending reassignment [Case No. 20-cv-01094, No. 10]. On March 16, 2020, Ambac responded by opposing the motion to stay pending reassignment, but not the motion to reassign the case [Case No. 20-cv-01094, ECF No. 20].

On March 31, 2020, the Oversight Board, on behalf of the Commonwealth and HTA, filed a motion seeking an order directing Ambac to withdraw its complaint, arguing the litigation violated Bankruptcy Code section 362 because, among other things, it (i) interfered with HTA's property rights; (ii) sought a declaratory judgment with respect to Ambac's lien; and (iii) sought to recover on a claim against HTA [Case No. 17-bk-3567, ECF No. 757]. On April 1, 2020, Metropistas filed a joinder in the Oversight Board's motion [Case No. 17-bk-3567, ECF No. 759].

On April 18, 2020, Metropistas and Ambac filed a joint motion to extend the deadline to respond to the complaint and to stay the case pending resolution of the Oversight Board's motion [Case No. 20-cv-01094, ECF No. 21]. On April 20, 2020, Judge Delgado-Hernández issued a text-only order staying the case pending a ruling on the Oversight Board's motion seeking an order directing Ambac to withdraw its complaint [Case No. 20-cv-01094, ECF No. 22].

On April 28, 2020, Ambac filed an opposition to the Oversight Board's motion, arguing the litigation did not interfere with HTA's property rights and that Ambac had standing to pursue claims against Metropistas because, among other things, (i) HTA had abandoned Section 544(b) claims against Metropistas; and (ii) Ambac's conduct did not violate the automatic stay [Case No. 17-bk-3282, ECF No. 12964]. On May 27, 2020, the Oversight Board filed a reply [Case No. 17-bk-3567, ECF No. 822], and on May 29, 2020, the Oversight Board filed an informative motion in connection with its reply [Case No. 17-bk-3567, ECF No. 824].

On June 16, 2020, the Title III Court issued an order granting the Oversight Board's motion and directed Ambac to withdraw its complaint [Case No. 17-bk-3567, ECF No. 845]. The Title III Court held the complaint violated the automatic stay—specifically Bankruptcy Code sections 362(a)(1), (3), (4) and (6)—because, among other things, Ambac's claims (i) attempted to exercise control over HTA's property rights, and (ii) sought to enforce a lien against property of HTA [Case No. 17-bk-3567, ECF No. 845]. On June 23, 2020, and pursuant to the Title III Court's order, Ambac filed a notice of withdrawal of its complaint [Case No. 20-cv-01094, ECF No. 23]. On July 20, 2020, Judge Delgado-Hernández issued a text-only order granting Ambac's notice of withdrawal without prejudice, and entered a judgment closing the case [Case No. 20-cv-01094, ECF Nos. 24, 25].

On June 30, 2020, Ambac filed a notice of appeal from the order directing Ambac to withdraw its complaint [Case No. 17-bk-3567, ECF No. 850]. On July 30, 2020, the appeal was docketed by the United States Court of Appeals for the First Circuit as Case No. 20-1657. On October 19, 2020, Ambac filed its opening brief, arguing that the Title III Court had erred in finding that its complaint violated the automatic stay. On December 18, 2020, the Oversight Board filed its answering brief in the appeal, reasserting its arguments that Ambac's complaint violated multiple aspects of the automatic stay pursuant to Bankruptcy Code section 362. Among other points, the Oversight Board argued Ambac attempted to exercise control over HTA's property and sought to enforce a lien against HTA's property. Also, on December 18, 2020, Metropistas filed a joinder to the Oversight Board's answering brief. On February 12, 2021, Ambac filed its reply brief. The appeal was argued to the First Circuit on March 8, 2021.

On August 2, 2021, the parties filed a joint motion to stay the appeal pending consummation of certain transactions contemplated by a settlement agreement entered into between Ambac and the Oversight Board in connection with the proposed Commonwealth Plan. The parties asked the First Circuit to stay proceedings and hold the appeal in abeyance until the occurrence of the contemplated transactions, and proposed to file a joint status report if those transactions were not consummated by January 15, 2022. On August 4, 2021, the First Circuit granted the joint motion, stayed the appeal pending possible settlement and directed the parties to file a status report on or before January 24, 2022 advising the court of the status of the matter. On January 24, 2022, the parties filed a joint status report informing the First Circuit that (i) the Title III Court had entered the Joint Plan Confirmation Order on January 18, 2022, and (ii) pursuant to certain agreements with HTA's stakeholders, the Oversight Board had indicated it would endeavor to file a plan of adjustment for HTA by January 31, 2022, or as soon as practicable thereafter. The parties further advised the First Circuit that, if the remaining transactions contemplated by the settlement agreement have not been consummated by May 1, 2022, the parties will file a status report by May 15, 2022, apprising the First Circuit of the status

of the settlement and whether they request an additional stay of the proceedings.  On January 25, 2022, the First Circuit granted the joint motion, stayed the appeal pending possible settlement and directed the parties to file a status report on or before May 16, 2022 advising the court of the status of the matter.  On May 12, 2022, the parties filed a joint status report.  On May 13, 2022, the First Circuit issued an order further staying the appeal and directed the parties to file a status report on before November 9, 2022.

**(k)      *Ambac Assurance Corp. v. Puerto Rico Highways and Transportation Authority*, Case No. 16-cv-01893**

On May 10, 2016, Ambac, as an insurer of certain bonds issued by HTA, filed a complaint against HTA in the United States District Court for the District of Puerto Rico.  The complaint alleged that HTA had breached its fiduciary and contractual duties by selling a portion of its assets when, under Puerto Rico law, it had no control over the use of the proceeds from the sale [Case No. 16-cv-01893, ECF No. 1].  The complaint sought discovery regarding HTA's financial records, appointment of a provisional receiver over HTA, and a permanent injunction prohibiting HTA from committing breaches of its fiduciary or contractual duties to holders of HTA bonds insured by Ambac [Case No. 16-cv-01893, ECF No. 1].  On May 16, 2017, Ambac filed a verified amended complaint adding the Economic Development Bank for Puerto Rico ("EDB") as a defendant and requesting a preliminary injunction enjoining EDB from transferring any proceeds of the sale held in HTA's name to any entity other than HTA [Case No. 16-cv-01893, ECF No. 14].  On May 25, 2016, EDB filed an answer to the verified amended complaint [Case No. 16-cv-01893, ECF No. 42].

On May 25, 2016, HTA filed a motion to dismiss, contending Ambac lacked standing, had not been subrogated to the rights of any holders of HTA bonds, and failed to establish diversity jurisdiction [Case No. 16-cv-01893, ECF No. 43].  On June 6, 2016, Ambac submitted its opposition [Case No. 16-cv-01893, ECF No. 49].  On June 14, 2016, the court entered a partial judgment dismissing without prejudice Ambac's claims against EDB, holding that the court could issue orders preventing the disposition of money held by EDB and belonging to HTA without EDB as a named defendant [Case No. 16-cv-01893, ECF Nos. 54, 55].

On July 1, 2016, the HTA filed a notice of stay pursuant to the interim stay imposed by PROMESA section 405(b) [Case No. 16-cv-01893, ECF No. 60].  On August 23, 2016, the court entered an order staying the case [Case No. 16-cv-01893, ECF No. 69].  On May 23, 2017, the Oversight Board notified the court of the filing of HTA's Title III Case and application of the automatic stay [Case No. 16-cv-01893, ECF No. 90].  On May 24, 2017, the court ordered that the case remain stayed until further court order.  [Case No. 16-cv-01893, ECF No. 91].

**(l)      *Peaje Investments, LLC v. Garcia-Padilla, et al.*, Case No. 16-cv-02365; Case No. 16-2377 (1st Cir.)**

On July 18, 2016, Peaje, claiming to be the beneficial owner of over $64 million in 1968 bonds issued by HTA and allegedly secured by a lien on certain toll revenues, filed a motion in the United States District Court for the District of Puerto Rico for relief from the interim stay automatically imposed by PROMESA section 405.  The motion sought stay relief to pursue an action  challenging what Peaje contended was the unlawful diversion of  toll revenues Peaje

alleged were collateral for its HTA bonds, and seeking damages for the alleged expropriation of the toll revenues pursuant to PROMESA section 407 [Case No. 16-cv-02365, ECF No. 1].  On August 4, 2016, Respondents Alejandro García Padilla, Juan C. Zaragoza Gómez, and Luis G. Cruz Batista (sued in their official capacities) filed an opposition to the motion [Case No. 16-cv-02365, ECF No. 30].  On August 12, 2016, Peaje replied to Respondents' opposition [Case No. 16-cv-02365, ECF No. 36].

On October 28, 2016, the Oversight Board filed a motion to intervene to state its position regarding Peaje's pending motion for relief from the automatic stay [Case No. 16-cv-02365, ECF No. 67].  On November 1, 2016, the court denied the Oversight Board's motion without prejudice [Case No. 16-cv-02365, ECF No. 70].  On November 2, 2016, the court denied Peaje's motion to lift the stay.  [Case No. 16-cv-02365, ECF No. 74].  On November 16, 2016, Peaje appealed the decision to the United States Court of Appeals for the First Circuit, which was docketed as Case No. 16-2377.  On January 12, 2017, the First Circuit affirmed the denial of Peaje's motion and issued its mandate.  On January 18, 2017, the court dismissed the case without prejudice [Case No. 16-cv-02365, ECF Nos. 86, 87].

 **(m)** ***Assured Guaranty Corp. v. Puerto Rico Highways and Transportation Authority*, Case No. 16-cv-02384**

On July 21, 2016, Assured filed an emergency motion for relief from the interim stay pursuant to PROMESA section 405 [Case No. 16-cv-02384, ECF No. 1].  The motion alleged (i) Assured insured bonds issued by HTA pursuant to the 1968 and 1998 Resolutions secured by certain toll revenues and other funds; (ii) the toll revenues were improperly diverted and not used to pay debt service; and (iii) stay relief was necessary to pursue an action requiring that the roll revenues be used to pay debt service [Case No. 16-cv-02384, ECF No. 1].

On August 17, 2016, the Commonwealth and certain individual defendants acting in their official capacities ("Respondents") filed an opposition to Assured's emergency motion [Case No. 16-cv-02384, ECF No. 22].  Also, on August 17, 2016, Respondents the GDB and Hon. Alberto Bacó Bagué filed a motion to join the opposition [Case No. 16-cv-02384, ECF No. 24].  On August 18, 2016, the court granted the motion for joinder [Case No. 16-cv-02384, ECF No. 26].  On August 30, 2016, Assured replied to the opposition [Case No. 16-cv-02384, ECF No. 30].

On October 28, 2016, the Oversight Board filed a motion to intervene in the pending motion for stay relief [Case No. 16-cv-02384, ECF No. 51].  On November 1, 2016, the court denied the Oversight Board's motion without prejudice [Case No. 16-cv-02384, ECF No. 55].  On November 2, 2016, the court denied Assured's motion to lift the stay [Case No. 16-cv-02384, ECF No. 59].  On January 18, 2017, the case was dismissed without prejudice [Case No. 16-cv-02384, ECF Nos. 68, 69].

 **(n)** ***Peaje Investments, LLC v. Puerto Rico Highways and Transportation Authority*, Case No. 17-cv-01612**

On May 9, 2017, after expiration of the interim automatic stay imposed by PROMESA section 405 discussed above in *Peaje Investments, LLC v. Garcia-Padilla, et al.* [Case No. 16-cv-02365], *see* section V.F.1(l), Peaje filed a verified complaint against HTA for declaratory

judgment and injunctive relief in the United States District Court for the District of Puerto Rico [Case No. 17-cv-01612, ECF No. 1]. The complaint alleged Peaje is the beneficial owner of over $64 million in 1968 bonds issued by HTA and secured by a lien on certain toll revenues. The complaint further alleged that, as a result of HTA's purported diversion of toll revenues and other pledged funds, the monies remaining in a collateral account for the payment of debt service on HTA 1968 bonds were insufficient to make the entire payment of principal and interest due in July 2017. According to the complaint, Peaje held a first priority gross lien on the toll revenues, and the alleged wrongful diversion of toll revenues violated the Takings Clause and the Fifth Amendment of the U.S. Constitution. Also, on May 9, 2017, Peaje filed a motion for a temporary restraining order and preliminary injunction requiring HTA to resume depositing toll revenues in accordance with Peaje's interpretation of the 1968 Resolution [Case No. 17-cv-01612, ECF No. 6].

On May 3, 2017, the Oversight Board filed a petition under Title III of PROMESA on behalf of the Commonwealth with the United States District Court for the District of Puerto Rico [Case No. 17-bk-3283]. On May 21, 2017, the Oversight Board filed a petition under Title III of PROMESA on behalf of HTA with the United States District Court for the District of Puerto Rico [Case No. 17-bk-3567].

On May 22, 2017, the Oversight Board, as representative of HTA, filed an informative motion with the court regarding the filing by the Commonwealth and HTA of Title III petitions, PROMESA § 301(a)'s incorporation of the automatic-stay provisions that apply under Bankruptcy Code 48 U.S.C. § 2161(a), and the automatic stay of Peaje's action [Case No. 17-cv-01612, ECF No. 15]. On May 23, 2017, the court granted the Oversight Board's motion and stayed the action in its entirety pending further court order.— [Case No. 17-cv-01612, ECF No. 16].

## 2.    The Clawback Actions

On July 24, 2019, the Title III Court issued the Stay Order,[144] which temporarily stayed certain adversary proceedings and contested matters identified therein, including certain matters related to revenue bonds issued by HTA, PRIFA and CCDA. As part of the stay, the Title III Court ordered the parties to enter into a period of mandatory mediation to, among other things, facilitate the preparation and filing of proposed scheduling orders with respect to certain adversary proceedings and contested matters relating to those revenue bonds. The Commonwealth, the Oversight Board, and certain creditors met extensively with the Mediation Team and drafted and submitted proposed scheduling orders regarding certain "gating issues," including issues related to the revenue bonds. On November 27, 2019, the Mediation Team filed an *Interim Report and Recommendation* with proposed interim orders, including a proposed interim order for the preliminary scheduling of the litigation of issues related to the revenue bonds [Case No. 17-bk-3283, ECF No. 9365]. On December 19, 2019, the Title III Court entered an Interim Case Management Order for Revenue Bonds [Case No. 17-bk-3283, ECF No. 9620] (the "Revenue Bond Interim CMO") and set a January 10, 2020 deadline for the Mediation Team to file an Amended Report (which was subsequently extended to February 10, 2020). The Revenue Bond Interim CMO was amended on January 31, 2020 [Case No. 17-bk-3283, ECF No.

---

[144] See section V.H.1. for a more detailed description of the Stay Order.

10595].  On March 10, 2020, the Title III Court issued another case management order [Case No. 17-bk-3283, ECF No. 12186] (as subsequently amended, the "Revenue Bond Scheduling Order"), which, over the objection of certain creditors, provided for the determination of certain issues through the filing of partial summary judgment motions on certain claims.  All sides were permitted to file such motions.

The Revenue Bond Interim CMO directed, among other things, the filing and preliminary litigation of four adversary complaints relating to proofs of claim filed by certain revenue bond creditors and monoline insurers against the Commonwealth and/or HTA with respect to revenue bonds issued by HTA, PRIFA and CCDA.  Two of those proceedings related to bonds issued by HTA are described below.

(a)      *Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00005

On January 16, 2020, the Oversight Board filed an action against Ambac, Assured, National, FGIC (collectively, the "Monolines"), Peaje, and BNYM in its capacity as trustee for holders of bonds issued by HTA (together with the Monolines, the "HTA Defendants"), challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the HTA Defendants as insurers and/or holders of HTA Bonds (the "Commonwealth-HTA Claim Challenge Action") [Adv. Proc. No. 20-00005, ECF No. 1][145].  The HTA Defendants filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III case asserting, among other things, (i) the Commonwealth had liability for not appropriating and transferring certain revenues from gasoline and cigarette taxes and vehicle license fees levied and collected by the Commonwealth which were historically conditionally appropriated and transferred to HTA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contended the HTA Bonds were non-recourse, and the Commonwealth had no liability with respect to the HTA Bonds as it was neither an issuer nor a guarantor of the HTA Bonds pursuant to the HTA Enabling Act and documents governing the HTA Bonds.  The Commonwealth-HTA Claim Challenge Action sought disallowance of all HTA Defendants' proofs of claim (or other claims of liens) related to the HTA Bonds as against the Commonwealth on the grounds that, among other things, (i) the HTA Defendants' proofs of claim other than BNYM's were duplicative of the master proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Defendants lacked standing to assert a claim against the Commonwealth as to the Bonds, (iii) the HTA Defendants' purported security interests were limited to those funds received by HTA and deposited in specified deposit accounts held by the fiscal agent, (iv) the HTA Defendants lacked subrogation, reimbursement, or contribution rights, (v) the pre-PROMESA retention of HTA revenues by the Commonwealth was permitted by

---

[145]   The Commonwealth Plan and the Commonwealth Confirmation Order collectively refer to the Commonwealth-HTA Claim Challenge Action and the other three revenue bond litigations—(a) *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00003-LTS, (b) *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00004-LTS, and (c) *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 20-00007-LTS —as the "*Clawback Actions*."

Commonwealth law, the HTA Enabling Act and the documents governing the HTA Bonds, (vi) the Commonwealth's retention of HTA revenues was neither a breach of contract nor a tort by the Commonwealth, (vii) any purported Commonwealth obligation to appropriate and transfer funds to HTA was preempted by PROMESA, (viii) the HTA Defendants did not have an allowable claim under the Contract, Due Process, or Takings Clauses of the Commonwealth and U.S. Constitutions, (ix) the HTA Defendants did not have a secured claim, a priority claim, a perfected security interest, or a claim for post-petition revenues, (x) the HTA Defendants did not have an ownership interest in any HTA revenues, and (xi) the HTA Defendants did not have an allowable claim under PROMESA section 407.

On February 11, 2020, the UCC moved to intervene in the Commonwealth-HTA Claim Challenge Action [Adv. Proc. No. 20-00005, ECF No. 9]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) did not oppose the UCC intervening with the same limited intervention rights the UCC had agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objected to the UCC's attempt to intervene with greater rights than were afforded to the UCC as intervenors under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00005, ECF No. 16]. Also on February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No. 20-00005, ECF No. 19]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00005, ECF No. 30]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the UCC's motion to intervene [Adv. Proc. No. 20-00005, ECF No. 37].

Also, on February 11, 2020, the DRA Parties moved to intervene in the Commonwealth-HTA Claim Challenge Action [Adv. Proc. No. 20-00005, ECF No. 11]. On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00005, ECF No. 17]. Also, on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00005, ECF No. 18]. On February 25, 2020, the DRA Parties filed a reply in support of their motion [Adv. Proc. No. 20-00005, ECF No. 26]. On March 10, 2020, Magistrate Judge Dein issued an order partially granting the motion to intervene [Adv. Proc. No. 20-00005, ECF No. 41]. On February 27, 2020, the Monolines and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00005, ECF No. 34]. On February 25, 2020, the Oversight Board and Peaje filed a joint motion to extend the deadline for Peaje to respond to the adversary complaint [Adv. Proc. No. 20-00005, ECF No. 25]. On February 26, 2020, the Title III Court issued an order granting the motion [Adv. Proc. No. 20-00005, ECF No. 29]. On March 19, 2020, the Oversight Board and Peaje filed a joint motion to stay and extend the deadlines in connection with certain counts alleged against Peaje [Adv. Proc. No. 20-00005, ECF No. 45], and the Title III Court granted the joint motion [Adv. Proc. No. 20-00005, ECF No. 46].

On April 28, 2020, the Oversight Board filed a motion for partial summary judgment to disallow certain claims described in its complaint [Adv. Proc. No. 20-00005, ECF No. 55]. Specifically, the Oversight Board moved on: (i) Counts 5, 9, 10, 11, 15, 17, 18, and 22 alleged against Ambac; (ii) Counts 28, 32, 33, 34, 38, 40, 41, and 45 alleged against Assured Guaranty Corporation; (iii) Counts 51, 55, 56, 57, 61, 63, 64, and 68 alleged against Assured Guaranty Municipal Corporation; (iv) Counts 74, 78, 79, 80, 84, 86, 87, and 91 alleged against National;

(v) Counts 97, 101, 102, 103, 107, 109, 110, and 114 alleged against FGIC; and (vi) Counts 162, 166, 167, 168, 172, 174, 175, 183, 187, 188, 189, 193, 195, 196, and 200 alleged against BNYM. Also, on April 28, 2020, the UCC filed a limited joinder to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF No. 64]. On July 16, 2020, the Monolines and the DRA Parties filed responses to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF Nos. 94, 99]. The Monolines also filed a declaration of Casey Servais, which sought discovery prior to a ruling on the pending motion, pursuant to Fed. R. Civ. P. 56(d) [Adv. Proc. No. 20-00005, ECF No. 97]. On August 31, 2020, the Oversight Board filed a reply in support of its motion for partial summary judgment and an opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00005, ECF Nos. 102, 103, 104, 105]. Also, on August 31, 2020, the UCC filed a joinder to the Oversight Board's reply in support of its motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF Nos. 106]. On September 13, 2020, the DRA Parties filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment [Adv. Proc. No. 20-00005, ECF No. 112]. Also on September 13, 2020, the Monolines filed a sur-reply in support of their opposition to the Oversight Board's motion for partial summary judgment and a response to the Oversight Board's opposition to the Monolines' request to stay or deny summary judgment pursuant to Rule 56(d) [Adv. Proc. No. 20-00005, ECF Nos. 113, 114]. A hearing on the motions for summary judgment was held on September 23, 2020.

On January 20, 2021, the Title III Court issued the *Order Regarding Discovery in Connection with Motions of the Commonwealth of Puerto Rico, by and through the Financial Oversight and Management Board, Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims* [Adv. Proc. No. 20-00005, ECF No. 129] (the "Rule 56(d) Order"). The Rule 56(d) Order authorized discovery into certain of the topics addressed in the Rule 56(d) declaration Defendants had submitted on July 26, 2020.

The Title III Court ordered the parties to meet-and-confer regarding a proposed schedule and file a joint status report by February 3, 2021. Consistent with the Rule 56(d) Order, the parties met and conferred and filed a Joint Status Report setting forth their respective positions regarding scheduling [Adv. Proc. No. 20-00005, ECF No. 132]. On February 5, 2021, the Title III Court issued an order setting the discovery schedule [Adv. Proc. No. 20-00005, ECF No. 133] (the "Discovery Schedule Order"). Following the grant of the parties' joint motion to modify the discovery schedule [Adv. Proc. 20-00005, ECF No. 157], the Discovery Schedule Order required discovery authorized in the Rule 56(d) Order be completed by May 19, 2021, unless otherwise ordered by the Title III Court. Discovery under the Rule 56(d) Order commenced on February 8, 2021 and was completed on June 11, 2021 pursuant to Magistrate Judge Dein's order [Adv. Proc. No. 20-00005, ECF No. 214].

On March 2, 2021, the HTA Defendants filed a motion to compel, which sought an order directing the Oversight Board to (1) expand the scope of their search for additional documents and (2) produce certain information regarding accounting practices [Adv. Proc. No. 20-00005, ECF No. 136]. The motion to compel was fully briefed [Adv. Proc. No. 20-00005, ECF Nos. 141, 144], and was argued on March 17, 2021. On March 26, 2021, Magistrate Judge Dein issued an order partially granting the motion [Adv. Proc. No. 20-00005, ECF No. 153]. On April 23, 2021, Magistrate Judge Dein issued an order scheduling briefing on the parties' forthcoming

discovery motions [Adv. Proc. No. 20-00005, ECF No. 179]. On April 30, 2021, the HTA Defendants filed a motion to compel and the Oversight Board and AAFAF (the "Government Parties") filed a motion for a protective order [Adv. Proc. No. 20-00005, ECF Nos. 185, 186]. On May 3, 2021, the Government Parties filed an opposition to the HTA Defendants' motion to compel [Adv. Proc. No. 20-00005, ECF No. 191]. Also, on May 3, 2021, the HTA Defendants filed an opposition to the Government Parties' motion for a protective order [Adv. Proc. No. 20-00005, ECF No. 190]. On May 6, 2021, Assured and National filed an informative motion informing the Title III Court they were suspending their participation in the parties' pending discovery motions [Adv. Proc. No. 20-00005, ECF No. 193]. Also, on May 6, 2021, the Government Parties filed a reply in support of their motion for a protective order, and the HTA Defendants filed a reply in support of their motion to compel [Adv. Proc. No. 20-00005, ECF Nos. 194, 195]. On May 19, 2021, Magistrate Judge Dein issued an order denying the HTA Defendants' motion to compel and the Government Parties' motion for a protective order [Adv. Proc. No. 20-00005, ECF No. 204].

On April 6, 2021, the Oversight Board filed a motion for entry of an order amending the Revenue Bond Scheduling Order to allow the Oversight Board to file partial summary judgment motions regarding certain additional counts [Adv. Proc. No. 20-00005, ECF Nos. 154, 155]. On April 13, 2021, Ambac, BNYM, U.S. Bank, and the GO/PBA PSA Creditors filed objections to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 158; Case No. 17-bk-3283, ECF No. 16401]. Also, on April 13, 2021, the UCC filed a response in support of the Oversight Board's motion and a cross-motion for entry of an order further amending the Revenue Bond Scheduling Order to allow the UCC to file limited objections to disallow certain proofs of claim [Adv. Proc. No. 20-00005, ECF No. 159]. On April 14, 2021, FGIC filed an objection to the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 161]. On April 19, 2021, Assured and National filed a reservation of rights in connection with the Oversight Board's motion [Adv. Proc. No. 20-00005, ECF No. 169]. On April 21, 2021, the Monolines and the Oversight Board filed objections to the UCC's cross motion [Adv. Proc. No. 20-00005, ECF Nos. 173, 176, 177]. Also, on April 21, 2021, the Oversight Board filed a reply in support of its motion and a response to the GO/PBA PSA Creditors' objection [Adv. Proc. No. 20-00005, ECF Nos. 174, 175]. On April 24, 2021, the UCC filed a reply in support of its cross-motion [Adv. Proc. No. 20-00005, ECF No. 180]. On May 5, 2021, the Title III Court issued an order denying the Oversight Board's motion and the UCC's cross motion [Adv. Proc. No. 20-00005, ECF No. 192].

On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the Commonwealth-HTA Claim Challenge Actions. [Case No. 17-bk-3283, ECF No. 16739]. On May 18, 2021, the DRA Parties filed a reservation of rights in connection with Assured, National, and the Oversight Board's joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment [Adv. Proc. No. 20-00005, ECF No. 202]. Also, on May 18, 2021, Ambac and FGIC filed an objection to Assured, National, and the Oversight Board's joint motion [Adv. Proc. No. 20-00005, ECF No. 203]. On May 21, 2021, Assured, National, and the Oversight Board filed a reply in support of their joint motion [Adv. Proc. No. 20-00005, ECF No. 205]. On May 25, 2021, the Title III

Court issued an order granting Assured, National, and the Oversight Board's joint motion [Adv. Proc. No. 20-00005, ECF No. 208]. On August 2, 2021, the Oversight Board, Ambac, FGIC, BNYM, and U.S. Bank filed a joint motion to stay certain contested matters and adversary proceedings [Adv. Proc. No. 20-00005, ECF No. 224]. On August 3, 2021, the Title III Court issued an order granting the Oversight Board, Ambac, FGIC, BNYM and U.S. Bank's joint motion [Adv. Proc. No. 20-00005, ECF No. 225].

On November 12, 2021, the DRA Parties filed a notice withdrawing, with prejudice, their motion to intervene, opposition to the Oversight Board's motion for partial summary judgment, and sur-reply in support of their opposition thereto [Adv. Proc. No. 20-00005, ECF No. 228]. On December 8, 2021, the Title III Court issued an order granting with prejudice the DRA Parties' notice [Adv. Proc. No. 20-00005, ECF No. 229].

On January 18, 2022, the Title III Court issued the Commonwealth Confirmation Order [Case No. 17-bk-03283, ECF No. 19813]. Paragraph 8 of the Commonwealth Confirmation Order states in part that, on the Effective Date, including the Commonwealth-HTA Claim Challenge Action, shall be dismissed with prejudice. As discussed in further detail below, Adv. Proc. No. 20-00007 remains pending.

### (b) *Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00007

On January 16, 2020, the Oversight Board, acting in its capacity as representative of HTA, and the UCC[146] filed an action against Ambac, Assured, National, FGIC (collectively, the "Monolines"), Peaje, and BNYM as fiscal agent for bonds issued by HTA (together with the Monolines, the "HTA Defendants"), challenging the proofs of claim filed against HTA and other lien claims asserted by the HTA Defendants as insurers, trustees, and/or holders of bonds issued by HTA [Adv. Proc. No. 20-00007, ECF No. 1] (the "HTA Claim Challenge Action"). The HTA Defendants filed proofs of claim (or alleged other claims of liens) in the HTA Title III case asserting, among other things, (i) the HTA Bonds were secured by statutory or equitable liens against certain of HTA's property, (ii) HTA Defendants held ownership interests in certain of HTA's property, (iii) HTA Defendants had first priority, perfected security interests against HTA's property extending beyond the security interests (if any) granted in the documents governing the HTA Bonds, (iv) breaches of contract and tort claims arising from the Commonwealth's retention of revenues from gasoline and cigarette taxes and vehicle license fees levied and collected by the Commonwealth which were historically conditionally appropriated and transferred to HTA, (v) violations of the Commonwealth and U.S. Constitutions, and (vi) their security interests continued to attach to revenues received by HTA post-petition.

The HTA Claim Challenge Action alleged the HTA Defendants' purported secured HTA Bond claims should be disallowed except as to those amounts deposited and held in certain specified deposit accounts by the fiscal agent pursuant to the HTA Enabling Act and documents governing the HTA Bonds. In addition, the HTA Claim Challenge Action sought disallowance

---

[146] The UCC is co-plaintiff with respect to certain claims asserted in this adversary proceeding that are substantially similar to the counts asserted in the prior pending HTA lien challenge adversary proceedings filed on May 20, 2019 [Adv. Proc. Nos. 19-00362, 19-00363, 19-00364, and 19-00365], which are further described in section V.F.3 of this Disclosure Statement.

of all HTA Defendants' proofs of claim (or other claims of liens) related to the HTA Bonds on the grounds that, among other things, (i) the HTA Defendants' proofs of claim other than BNYM's were duplicative of the master proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Enabling Act and documents governing the HTA Bonds did not create statutory or equitable liens, (iii) the HTA Defendants did not have an ownership interest in any HTA revenues, (iv) security interests against any other funds not held by the fiscal agent were unperfected and avoidable pursuant to Bankruptcy Code sections 544 and 551, (v) HTA's revenues were not special revenues as defined in Bankruptcy Code section 902(2), (vi) claims for post-petition revenues and interest must be disallowed pursuant to Bankruptcy Code sections 502(b)(2) and 552, (vii) the HTA Defendants did not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (viii) the HTA Defendants did not have an allowable claim under PROMESA section 407, and (ix) the HTA Defendants did not properly allege any tort claims against HTA.

On February 11, 2020, the UCC moved to intervene in those counts in the HTA Claim Challenge Action in which the UCC was not a co-plaintiff [Adv. Proc. No. 20-00007, ECF No. 15]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) did not oppose the UCC intervening with the same limited intervention rights the UCC had agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objected to the UCC's attempt to intervene with greater rights than were afforded to the UCC as intervenors under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00007, ECF No. 20]. Also, on February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No. 20-00007, ECF No. 22]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00007, ECF No. 31]. On March 2, 2020, Magistrate Judge Dein issued an order partially granting the UCC's motion to intervene [Adv. Proc. No. 20-00007, ECF No. 39]. On March 16, 2020, the UCC filed a limited objection to Magistrate Judge Dein's order [Adv. Proc. No. 20-00007, ECF No. 46]. On March 17, 2020, the Title III Court issued an order holding in abeyance the UCC's limited objection [Adv. Proc. No. 20-00007, ECF No. 47].

Also, on February 11, 2020, the DRA Parties moved to intervene in the HTA Claim Challenge Action [Adv. Proc. No. 20-00007, ECF No. 14]. Also on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00007, ECF No. 21]. On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00007, ECF No. 23]. On February 25, 2020, the DRA Parties filed a reply in support of their motion [Adv. Proc. No. 20-00007, ECF No. 28]. On March 10, 2020, Magistrate Judge Dein issued an order partially granting the motion to intervene [Adv. Proc. No. 20-00007, ECF No. 44]. Also, on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00007, ECF No. 21]. On February 27, 2020, the Monolines and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00007, ECF No. 35]. Peaje filed a joinder to the motion [Adv. Proc. No. 20-00007, ECF No. 36]. On February 28, 2020, the Ad Hoc Group of FGIC Noteholders filed a motion to intervene [Adv. Proc. No. 20-00007, ECF No. 37]. On April 7, 2020, HTA filed a response to the Ad Hoc Group of FGIC Noteholders' motion to intervene [Adv. Proc. No. 20-00007, ECF No. 49]. On April 13, 2020, Magistrate Judge Dein issued an

order denying without prejudice the DRA Parties' motion to intervene [Adv. Proc. No. 20-00007, ECF No. 50].

On March 10, 2020, the Title III Court issued an amended Case Management Order in connection with the revenue bond complaints, which stayed this adversary proceeding [Adv. Proc. No. 20-00007, ECF No. 43]. On May 11, 2021, Assured, National, and the Oversight Board filed a joint motion to stay certain matters relating to bonds issued by HTA, CCDA, and PRIFA pending confirmation of the Commonwealth and HTA plans of adjustment, including the revenue bonds complaints. [Case No. 17-bk-3283, ECF No. 16739]. On May 21, 2021, Assured, National, and the Oversight Board filed replies in support of the joint motion [Adv. Proc. No. 20-00007, ECF Nos. 67, 68]. On May 25, 2021, the Title III Court issued an order granting Assured, National, and the Oversight Board's joint motion [Adv. Proc. No. 20-00007, ECF No. 69]. On August 2, 2021, the Oversight Board, Ambac, FGIC, BNYM and U.S. Bank filed a joint motion to stay certain contested matters and adversary proceedings [Adv. Proc. No. 20-00007, ECF No. 71]. On August 3, 2021, the Title III Court issued an order granting the joint motion [Adv. Proc. No. 20-00007, ECF No. 72].

On November 14, 2021, the DRA Parties filed a notice withdrawing, with prejudice, its motion to intervene, opposition to the Oversight Board's motion for partial summary judgment, and sur-reply in support of its opposition [Adv. Proc. No. 20-00007, ECF No. 75]. On December 8, 2021, the Title III Court issued an order granting with prejudice the DRA Parties' notice [Adv. Proc. No. 20-00007, ECF No. 76].

On January 18, 2022, the Title III Court issued the Commonwealth Confirmation Order [Case No. 17-bk-03283, ECF No. 19813]. On April 14, 2022, the Oversight Board filed the *Notice of the Financial Oversight and Management Board for Puerto Rico Regarding Matters Resolved in Connection with the Modified Eighth Amended Plan* [Case No. 17-bk-03283, ECF No. 20562], which notified the Court and all parties in interest that, following informal discussions, the Oversight Board has determined that the HTA Claim Challenge Action was not resolved by the Commonwealth Plan and should remain pending.

### 3.   HTA Lien Challenge Litigations, Adv. Proc. Nos. 19-00362 – 19-00365

On May 20, 2019, the Oversight Board and the UCC filed four complaints [Adv. Proc. Nos. 19-00362, 19-00363, 19-00364, and 19-00365, ECF No. 1] (collectively, the "HTA Lien Challenges") against one hundred forty-eight Defendants seeking declarations that holders of bonds issued by HTA pursuant to certain resolutions authorizing HTA to issue bonds do not possess valid, perfected security interests against HTA, except for toll revenues that have been both received by HTA and deposited in certain accounts held at BNYM, in its capacity as fiscal agent for holders of bonds issued by HTA. The HTA Lien Challenges also seek judgments (i) declaring HTA's interest in its property is entitled to priority over any interests HTA bondholders allege they possess in any property beyond revenues both received by HTA and deposited with the fiscal agent (if even to that extent), (ii) avoiding any security interests HTA bondholders are held to possess in such property pursuant to the Bankruptcy Code's avoidance powers, (iii) disallowing all secured claims filed against HTA by bondholders alleging security interests on such property, (iv) determining that any right HTA or HTA bondholders have to receive certain taxes or fees historically conditionally appropriated to HTA has been preempted by PROMESA,

148

and (v) declaring that any security interests in HTA's property ceased attaching to revenues received post-petition by virtue of section 552(a).

On May 21, 2019, the Oversight Board and the UCC filed a joint motion seeking to (i) extend the deadlines to serve the Defendants in these adversary proceedings and (ii) stay the adversary proceedings [Case No. 17-bk-3567, ECF No. 567]. On June 11, 2019, FGIC filed an answer, counterclaims, and third-party claims seeking declaratory and injunctive relief regarding the validity of their alleged liens over certain HTA taxes [Adv. Proc. No. 19-00363, ECF No. 4]. On June 13, 2019, the Title III Court partially granted the joint motion, extending the deadline to serve the Defendants and staying the adversary proceedings until September 1, 2019 [Case No. 17-bk-3567, ECF No. 567]. On July 24, 2019, the Title III Court, pursuant to the Stay Order (described in further detail in section V.H.1.), stayed the HTA Lien Challenges through November 30, 2019. On March 10, 2020, the Title III Court further ordered that the HTA Lien Challenges be stayed until lifted by further court order or until the confirmation of a plan of adjustment for HTA [Case No. 17-bk-3283, ECF No. 12189].

### 4. Miscellaneous Litigation

#### (a) *Western Surety Company, at al. v. Puerto Rico Highways and Transportation Authority*, Adv. Proc. No. 18-00065, Case No. 19-2026 (1st Cir.)

On May 30, 2018, Western Surety and Continental Casualty ("Plaintiffs") filed an action against HTA and the Oversight Board alleging Plaintiffs issued surety bonds in relation to public works contracts owned by HTA and that they had paid bond claims in relation to those projects [Adv. Proc. No. 18-00065, ECF No. 1]. Plaintiffs sought a declaratory judgment that contract amounts retained by HTA on these projects were not property of HTA's estate in its Title III case, but were instead property of Plaintiffs and must be paid to Plaintiffs as a result of Plaintiffs' equitable right of subrogation. On May 31, 2018, the Title III Court issued an order referring the case to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 18-00065, ECF No. 5]. Plaintiffs filed an amended complaint on August 10, 2018 making the same claim [Adv. Proc. No. 18-00065, ECF No. 12]. Defendants filed a motion to dismiss on September 14, 2018, arguing that Plaintiffs' request for declaratory relief outside a plan of adjustment or claims objection proceeding sought only an advisory opinion; and the authority on which Plaintiffs relied (cited in their complaint) to support their subrogation theory was inapposite to the facts of this case [Adv. Proc. No. 18-00065, ECF No. 14]. After full briefing, on June 4, 2019, the Title III Court granted Defendants' motion to dismiss [Adv. Proc. No. 18-00065, ECF No. 21].

On June 17, 2019, Plaintiffs filed a motion for reconsideration of the Title III Court's order dismissing the case [Adv. Proc. No. 18-00065, ECF No. 23], which the Title III Court denied [Adv. Proc. No. 18-00065, ECF No. 31].

On October 31, 2019, Plaintiffs appealed the Title III Court's denial of reconsideration and order granting the motion to dismiss to the United States Court of Appeals for the First Circuit which docketed the appeal as Case No. 19-2026. On January 3, 2020, Appellants filed their opening brief. On March 13, 2020, Appellees filed their answering brief. On March 29, 2020, Appellants filed their reply brief. Prior to oral argument, the case was settled, and on July

20, 2020, the parties filed a stipulation to voluntarily dismiss the appeal with prejudice, which the First Circuit granted.  On July 21, 2020, the First Circuit issued a judgment dismissing the appeal.

**(b)** *Siemens Transportation Partnership Puerto Rico, S.E. v. Puerto Rico Highways and Transportation Authority*, **Adv. Proc. No. 18-00030**

On March 26, 2018, Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens") filed a complaint against HTA, the Oversight Board, AAFAF, and GDB [Adv. Proc. No. 18-00030, ECF No. 1].  In the complaint, Siemens alleged that, due to a settlement reached in 2010 between Siemens and HTA, Siemens was entitled to receive funds held in an escrow account upon completion of a construction project it had agreed to undertake pursuant to the settlement.  Siemens argued that it fulfilled all its contractual obligations pursuant to the settlement, and thus was now entitled to payment of the funds from the escrow account.  Because the terms of the aforementioned settlement contained a confidentiality clause, Siemens also filed a motion to seal certain exhibits to its complaint [Adv. Proc. No. 18-00030, ECF No. 2].  On March 28, 2018, the Title III Court issued an order referring the case to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 18-00030, ECF No. 4].  On March 29, 2018, Magistrate Judge Dein granted Siemens' motion to seal select exhibits [Adv. Proc. No. 18-00030, ECF No. 6].

On May 2, 2018, Siemens filed a motion to preserve the funds held in escrow and to request any discovery for hearings deemed necessary by the Title III Court [Adv. Proc. No. 18-00030, ECF No. 13].  On May 16, 2018, AAFAF and the GDB filed an objection and the Oversight Board filed a separate response to Siemens' motion to preserve funds held in escrow and request for discovery in aid [Adv. Proc. No. 18-00030, ECF Nos. 17, 20].  AAFAF, the GDB, and the Oversight Board argued that Siemens failed to state a claim upon which relief can be granted, on the basis that Siemens sought payment from GDB—a non-debtor—by way of Title III proceedings.  On June 8, 2018, the Title III Court issued an order denying Siemens' motion to preserve funds held in escrow [Adv. Proc. No. 18-00030, ECF No. 46].

On May 29, 2018, GDB filed a motion to dismiss the complaint, which was joined by AAFAF [Adv. Proc. No. 18-00030, ECF Nos. 29, 31].  In its motion to dismiss, GDB argued (i) Siemens failed to allege that GDB and HTA created an escrow agreement, and (ii) GDB was prohibited from disbursing any funds in deposit at GDB during the Title III proceedings, and accordingly, Siemens' request for disbursement of the funds was premature.  On the same day, the Oversight Board filed a motion to dismiss, arguing that Siemens (i) failed to state a claim against the Oversight Board or HTA, and (ii) the funds could not be obtained from GDB during the Title III proceedings [Adv. Proc. No. 18-00030, ECF No. 34].

On June 18, 2018, Siemens filed an omnibus reply to the motions to dismiss, arguing (i) it had pled sufficient facts to establish the existence of an escrow account, and (ii) the escrow account held by GDB was disbursable and not subject to the restrictions related to the Title III proceedings [Adv. Proc. No. 18-00030, ECF No. 49].  On June 25, 2018, the Oversight Board and GDB filed motions for leave to file replies in support of their motions to dismiss [Adv. Proc. No. 18-00030, ECF Nos. 51, 52].  AAFAF filed a joinder to GDB's motion and a supplemental reply in support of the motion to dismiss [Adv. Proc. No. 18-00030, ECF No. 54].  On June 28,

2018, Magistrate Judge Dein issued orders granting the Oversight Board and GDB's motions for leave to file replies [Adv. Proc. No. 18-00030, ECF Nos. 55, 56]. On the same day, the Oversight Board and GDB filed their replies [Adv. Proc. No. 18-00030, ECF Nos. 57, 58]. On July 3, 2018, Siemens filed a motion for leave to file a sur-reply to GDB's reply, which Magistrate Judge Dein granted on July 5, 2018 [Adv. Proc. No. 18-00030, ECF Nos. 60, 61]. On the same day, Siemens filed its sur-reply [Adv. Proc. No. 18-00030, ECF No. 62]. On July 23, 2018, the parties filed a joint status report regarding discovery disputes [Adv. Proc. No. 18-00030, ECF No. 66]. On July 25, 2018, Magistrate Judge Dein issued an order that the issues within this proceeding would be resolved in connection with GDB's proposed Title VI qualifying modification pursuant to PROMESA [Adv. Proc. No. 18-00030, ECF No. 70]. The order detailed several agreements with regards to timeline and discovery within the future Title VI proceeding, and stayed the proceeding without prejudice.

On November 9, 2018, the Title III Court issued another order proposing the dismissal of the adversary proceeding with prejudice, on the basis of the settlement of Siemens' objection to the GDB Qualifying Modification, which also resolved the issues raised by this adversary proceeding. [Adv. Proc. No. 18-00030, ECF No. 74]. On November 30, 2018, the Title III Court closed the adversary proceeding [Adv. Proc. No. 18-00030, ECF No. 75].

### 5. Controversies Over Oversight Board's Powers

#### (a) *Rosselló Nevares v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 18-00080

On July 5, 2018, then-Governor Ricardo Rosselló and AAFAF (together, the "Government") filed a complaint [Adv. Proc. No. 18-00080, ECF No. 1] against the Oversight Board, each individual Oversight Board member, and the Oversight Board's executive director, seeking declarations that (i) the Oversight Board lacked the authority to impose policy initiatives on the Commonwealth Government through a fiscal plan and/or budget, including the June 2018 Commonwealth Fiscal Plan and the Commonwealth budget for FY2019, as certified by the Oversight Board on June 29, 2018; (ii) the substantive policy mandates contained in the June 2018 Commonwealth Fiscal Plan, that were rejected by the Governor pursuant to PROMESA section 205, were null and void; and (iii) the substantive policy mandates contained in the Oversight Board's FY2019 budget exceeded the Oversight Board's powers and were null and void. Plaintiffs also sought an injunction prohibiting Defendants from implementing and enforcing certain provisions included in the June 2018 Commonwealth Fiscal Plan that Plaintiffs characterized as recommendations.

On July 12, 2018, the Oversight Board filed a motion to dismiss the complaint [Adv. Proc. No. 18-00080, ECF No. 17]. The motion to dismiss was fully briefed and, on August 7, 2018, the Title III Court entered an order granting in part and denying in part the motion to dismiss [Adv. Proc. No. 18-00080, ECF No. 33]. The Title III Court granted the motion to dismiss the Government's claims regarding (i) agency consolidation and compensation reductions/hiring freezes because there was not a ripe case or controversy, and (ii) budgetary reprogramming because such reprogramming by the Government would be inconsistent with PROMESA's declaration that the budget certified by the Oversight Board was in full force and effect, and therefore preempted by section 4 of PROMESA. The Title III Court did not dismiss

151

claims regarding automatic budget reductions and corrective measures.  In so ruling, the Title III Court made certain substantive decisions.  Among other things, the Title III Court ruled that "[t]he power bestowed on the Oversight Board by Section 201(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations." *Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.* (*In re Fin. Oversight & Mgmt. Bd. for P.R.*), 330 F. Supp. 3d 685, 700 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019), *cert denied,* 141 S. Ct. 241 (2020).  The Title III Court rejected the Government's argument that unspent funds from prior-year budgets could be spent outside of the strictures of the current year's budget, despite section 204(c)'s prohibition on unapproved reprogramming.  The Title III Court ruled: "It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year.  Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget." *Id.* at 704.  On August 27, 2018, the Title III Court entered a corrected opinion and order [Adv. Proc. No. 18-00080, ECF No. 40].

On September 10, 2018, Plaintiffs filed an urgent motion requesting certification of the Title III Court's August 7, 2018 opinion and order for immediate appeal under PROMESA sections 306(e)(3)-(4) [Adv. Proc. No. 18-00080, ECF No. 43].  On October 9, 2018, the Title III Court entered a memorandum order certifying certain aspects of the August 27, 2018 opinion and order for interlocutory appeal [Adv. Proc. No. 18-00080, ECF No. 54].  The appeal was docketed as Case No. 18-8021.  The Oversight Board answered the complaint's remaining claims on November 2, 2018 [Adv. Proc. No. 18-00080, ECF No. 60].

On November 20, 2018, the First Circuit entered a judgment, concluding that review of the certified issues was warranted.  The appeal was docketed by the First Circuit on November 28, 2018 as Case No. 18-2154.  Following briefing, oral argument was held on July 24, 2019.  On December 18, 2019, the First Circuit affirmed the Title III Court decision, confirming there is nothing in PROMESA section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board had the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 6-7 (1st Cir. 2019), *cert. denied,* 141 S. Ct. (2020).  The First Circuit further affirmed the Title III Court's ruling on reprogramming, noting "PROMESA prohibits the Governor from spending any funds that are not budgeted regardless of whether the recommendation had been adopted" and "regardless of what any territorial laws say." *Id.* at 8.

Governor Vázquez Garced filed a petition for a writ of certiorari on May 15, 2020, which was docketed as U.S. Supreme Court Case No. 19-1305.  On July 20, 2020, the Oversight Board filed its opposition to the Governor's petition.  On July 31, 2020, Governor Vázquez Garced filed a reply in support of her petition.  On October 5, 2020, the Supreme Court issued an order denying the petition.

On August 25, 2021, the parties filed a stipulation voluntarily dismissing the remaining claims in the adversary proceeding in light of the First Circuit's decision. [Adv. Proc. No. 18-00080, ECF No. 71]. On August 26, 2021, the court clerk issued a judgment and closed the case [Adv. Proc. No. 18-00080, ECF No. 72].

**(b)** ***Rivera-Schatz et al v. The Financial Oversight and Management Board for Puerto Rico et al.***, **Adv. Proc. No. 18-00081**

On July 9, 2018, Plaintiffs, Hon. Thomas Rivera-Schatz, in his official capacity as President of the Senate of Puerto Rico and on behalf of the Senate of Puerto Rico, and Hon. Carlos J. Méndez-Núñez, in his official capacity as Speaker of the House of Representatives of Puerto Rico and on behalf of the House of Representatives (collectively, the "Legislature"), filed a complaint seeking declaratory and injunctive relief against the Oversight Board, and each of its members and its executive director solely in their official capacities [Adv. Proc. No. 18-00081, ECF No. 1].

The Legislature sought declaratory and injunctive relief, arguing the Oversight Board "overreached its powers" by "trying to force" the Legislature to pass a bill retroactively repealing Law 80 (Puerto Rico's wrongful dismissal act) as a condition for the Oversight Board's certification of the Legislature's approved Commonwealth budget. The complaint also sought an injunction prohibiting Defendants from implementing the Oversight Board's 2019 budget and directing the Oversight Board to certify the 2019 budget approved by the Legislature on June 30, 2018.

On July 17, 2018, Defendants filed a motion to dismiss the complaint [Adv. Proc. No. 18-00081, ECF No. 27]. Following the completion of briefing and after a hearing on July 25, 2018, the Title III Court issued an order dismissing the complaint in its entirety on August 7, 2018 [Adv. Proc. No. 18-00081, ECF No. 46]. The Title III Court held that it lacked jurisdiction to review the Oversight Board's certification decisions, as sought by the complaint, as such review is "directly precluded by Section 106(e)." *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 364, 371 (D.P.R. 2018), *aff'd*, 916 F.3d 98 (1st Cir. 2019). It also affirmed that the Oversight Board may use its "powers in a manner designed to incentivize assent to the policy goals supported by the Board." *Id.* at 373.

On August 13, 2018, Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-1777. On February 22, 2019, following briefing, the First Circuit affirmed the Title III Court's decision, ruling, among other things, that "[u]nder PROMESA's preemption provision, the grants of authority to the Board at sections 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA],'" and that "[w]hen the Board certified the 2019 Fiscal Plan and Budget … it [properly] exercised authority granted to it under PROMESA." *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019). On March 15, 2019, the First Circuit issued its mandate.

**(c)**    ***Autonomous Municipality of San Juan v. The Financial Oversight &
Management Board for Puerto Rico, et al.*, Case No. 19-cv-1474**

On May 19, 2019, the Municipality of San Juan filed a complaint against the Oversight
Board in the District Court for the District of Puerto Rico alleging that (i) the Oversight Board's
designation of San Juan as a covered entity for purposes of oversight under PROMESA was
without a rational basis; (ii) PROMESA was unconstitutional because it did not provide
sufficient bounds to the Oversight Board's discretion and therefore violated the non-delegation
doctrine; and (iii) the designation was invalid because the Oversight Board's members were
appointed in violation of the Appointments Clause [Case No. 19-cv-1474, ECF No. 1].   On July
1, 2019, the Oversight Board filed a motion to transfer the case to the Title III Court [Case No.
19-cv-1474, ECF No. 36], which the District Court granted after briefing [Case No. 19-cv-1474,
ECF No. 40].   On August 9, 2019, the Oversight Board filed a motion to dismiss, which was
fully briefed [Case No. 19-cv-1474, ECF No. 46, 51, 52].   On December 5, 2019, the Title III
Court issued an order granting the motion to dismiss counts I and II of the complaint and staying
count III pending the Supreme Court's decision in the Appointments Clause litigation described
in Section V.F.6. of this Disclosure Statement [Case No. 19-cv-1474, ECF No. 61].

On September 18, 2020, San Juan filed a motion for entry of judgment dismissing the
remaining count with prejudice [Case No. 19-cv-1474, ECF No. 63].   On September 21, 2020,
the Title III Court issued a judgment dismissing the remaining count with prejudice and closing
the case [Case No. 19-cv-1474, ECF No. 64].

On September 25, 2020, San Juan filed a notice of appeal of the Title III Court's order
granting Defendants' motion to dismiss [Case No. 19-cv-1474, ECF No. 65].   On October 9,
2020, the appeal was docketed by the United States Court of Appeals for the First Circuit as Case
No. 20-1983.   On November 23, 2020, San Juan filed its opening brief.   On January 22, 2021, the
Oversight Board filed its answering brief.   On April 27, 2021, San Juan filed a motion to
voluntarily dismiss the appeal.   On April 29, 2021, the First Circuit issued its judgment
dismissing the appeal and its mandate.

**(d)**    ***The Financial Oversight & Management Board for Puerto Rico v. Hon.
Vázquez Garced, et al.*, Adv. Proc. No. 19-00393**

On July 3, 2019, the Oversight Board filed a complaint against then-Governor Rosselló
and AAFAF (the "Defendants") challenging Act 29-2019, which eliminates the obligation of
municipalities to reimburse the Commonwealth for pension payments to municipality retirees
and make payments to the Commonwealth's health plan, as well as 23 joint resolutions.
Specifically, the complaint alleged that (i) Act 29-2019, including its enactment and
enforcement, violated PROMESA sections 204(a), 204(c), and 207; (ii) the Oversight Board was
entitled to a permanent injunction prohibiting Defendants from implementing Act 29-2019; (iii)
the Oversight Board was entitled to an injunction compelling the Governor to submit PROMESA
section 204(a) certifications for Act 29-2019, as well as the other newly enacted laws and joint
resolutions that had not yet been so certified; (iv) Act 29-2019 and the joint resolutions violated
PROMESA section 108(a) and were not enforceable and were of no effect because they impaired
and/or defeated the purposes of PROMESA, as determined by the Oversight Board; and (v) the
Governor's alleged policy of not providing certifications for newly passed legislation as required

under PROMESA section 204 violated PROMESA section 108(a) because it impaired and/or defeated the purposes of PROMESA, as determined by the Oversight Board.

Defendants filed a motion to dismiss on July 15, 2019 [Adv. Proc. No. 19-00393, ECF No. 17]. On August 15, 2019, after the motion to dismiss was fully briefed, the Title III Court heard oral argument. On August 22, 2019, the Title III Court issued an order and opinion denying the Governor's motion to dismiss [Adv. Proc. No. 19-00393, ECF No. 66]. Defendants answered the complaint on September 10, 2019 [Adv. Proc. No. 19-00393, ECF No. 73].

On December 13, 2019, the Oversight Board filed a motion for summary judgment [Adv. Proc. No. 19-00393, ECF No. 77]. After the motion was fully briefed, oral argument was held before the Title III Court on March 5, 2020. On April 15, 2020, the Title III Court granted the Oversight Board's motion for summary judgment on five of the eight counts [Adv. Proc. No. 19-00393, ECF No. 107]. The Title III Court granted the Oversight Board's request for permanent injunctions on Law 29 and the joint resolutions under PROMESA sections 204(c), 204(a), and 108(a)(2), holding that Law 29 and the joint resolutions effectuate reprogrammings outside of the Fiscal Plan and certified budget without Oversight Board approval, in violation of PROMESA section 204(c), and were unenforceable and of no effect. The Title III Court also held Defendants did not comply with the procedures required by PROMESA section 204(a) with regard to new legislation and Defendants' formal estimate, purporting to detail the cost of Law 29, was facially noncompliant. The Title III Court held Law 29 and the joint resolutions were also invalid pursuant to PROMESA section 108(a)(2), finding that the Oversight Board's determination that the laws defeated and/or impaired the purposes of PROMESA is entitled to deference under an arbitrary and capricious standard of review. The Title III Court denied summary judgment on the Oversight Board's claim for a permanent injunction as to the other laws for which Defendants had not submitted 204(a) certifications based on Defendants' submission of facts showing certifications for the vast majority of these laws had, after the filing of the lawsuit, been submitted. The Title III Court also declined to grant summary judgment on the Oversight Board's claim that the Governor had a policy of noncompliance with PROMESA section 204(a), in light of the disputed facts raised by Defendants regarding the reasons for past non-compliance and then-Governor Vázquez Garced's efforts to improve compliance. Lastly, the Title III Court declined to address the Oversight Board's motion for summary judgment for its PROMESA section 207 claim, finding count II to be moot because the relief requested in that claim was already granted in the Title III Court's other rulings.

On May 6, 2020 and June 2, 2020, the parties filed informative motions requesting an extension of the effective date of the Title III Court's order to allow for negotiations [Adv. Proc. No. 19-00393, ECF Nos. 109, 111]. On September 17, 2021, the Title III Court ordered the parties to file a joint status report by October 1, 2021 informing the Title III Court of the status of the litigation [Adv. Proc. No. 19-00393, ECF No. 115]. On October 1, 2021, the parties filed a joint status report informing the Title III Court that the parties agreed the remaining claims in the adversary proceeding could be dismissed and judgment entered on the claims upon which summary judgment was granted [Adv. Proc. No. 19-00393, ECF No. 116]. Also, on October 1, 2021, the parties filed a stipulation voluntarily dismissing the adversary proceeding [Adv. Proc. No. 19-00393, ECF No. 117]. On October 13, 2021, the Title III Court issued a judgment

dismissing the adversary proceeding and closing the case [Adv. Proc. No. 19-00393, ECF No. 119].

> **(e)**     ***La Liga de Ciudades de Puerto Rico v. The Financial Oversight and Management Board for Puerto Rico, et. al.*, Adv. Proc. No. 21-00026**

On March 14, 2021, La Liga, a non-profit corporation claiming to have as members mayors of Puerto Rico's municipalities, filed a complaint against the Oversight Board, AAFAF, CRIM, ASES, and Luis M. Collazo Rodríguez, in his capacity as administrator of ERS (collectively, "Defendants") [Adv. Proc. No. 21-00026, ECF No. 1]. The complaint alleges that CRIM, ASES, and the Retirement System are collecting and withholding money from Puerto Rico's municipalities based on an incorrect interpretation of an order entered by the Title III Court in earlier litigation regarding Law 29-2019 ("Law 29"), Adv. Proc. No. 19-00393, ECF No. 1 (the "Law 29 Litigation"), *see* section V.F.5(d) of this Disclosure Statement.

The Law 29 Litigation commenced on July 3, 2019, when the Oversight Board filed a complaint against then-Governor Rosselló and AAFAF, challenging Law 29, which eliminated the municipalities' obligations to make health care contributions to ASES and retirement contributions to PayGo. [Adv. Proc. No. 19-00393, ECF No. 1]. Specifically, the Oversight Board alleged Law 29 violated PROMESA sections 108(a), 204(a), 204(c), and 207, and sought a permanent injunction. The Oversight Board moved for summary judgment, and the Title III Court granted the Oversight Board's motion for summary judgment on five of the eight counts in its April 15, 2020 Order (the "April 15 Order"). [Adv. Proc. No. 19-00393, ECF No. 107]. The Title III Court granted the Oversight Board's request for a permanent injunction against the implementation of Law 29 pursuant to PROMESA section 204(c), 204(a), and 108(a)(2), declaring Law 29 "unenforceable and of no effect." The April 15 Order went into effect on May 6, 2020. For more details regarding the Law 29 Litigation, *see* section V.F.5.(d).

After the April 15 Order went into effect, CRIM held back funds that otherwise would have been disbursed to the municipalities in order to pay ASES and ERS the health care and retirement contributions that, but for Law 29, would have been made during the period prior to the effective date of the April 15 Order. La Liga contends those debts are "inexistent," because the April 15 Order does not apply retroactively. Accordingly, La Liga seeks (i) a declaratory judgment "decreeing that the debts claimed by CRIM, ASES and [ERS] … are "inexistent" and that the withholdings made by CRIM to purportedly offset those inexistent debts are "illegal", (ii) an injunction "prohibiting Defendants from collecting from the [m]unicipalities any of the monies that Law 29 exempted them" from paying prior to the effective date of the April 15 Order, (iii) an order requiring CRIM to immediately disburse any funds withheld to pay for the Law 29-related debts, and (iv) an order requiring ERS and ASES to return to CRIM "any and all monies" received to pay the purported debts.

On May 14, 2021, the Oversight Board, CRIM, and AAFAF, ASES, and ERS Administrator filed motions to dismiss [Adv. Proc. No. 21-00026, ECF Nos. 14, 15, 18]. On June 18, 2021, La Liga filed oppositions to the Oversight Board, CRIM, and AAFAF, ASES, and ERS Administrator's motions to dismiss [Adv. Proc. No. 21-00026, ECF Nos. 22, 23, 24]. On July 14, 2021, the Oversight Board, CRIM, and the AAFAF, ASES, and ERS Administrator filed replies in support of their motions to dismiss [Adv. Proc. No. 21-00026, ECF Nos. 27, 28, 30].

On January 4, 2022, the Title III Court granted the Oversight Board's, CRIM's, and AAFAF, ASES, and ERS Administrator's motions to dismiss [Adv. Proc. No. 21-00026, ECF No. 40]. The Title III Court held that La Liga lacked standing to assert claims against AAFAF, ASES, and ERS Administrator under rule 12(b)(1) of the Federal Rules of Civil Procedure because La Liga could not plausibly allege that its injury was traceable to them or that any relief granted against them could redress La Liga's alleged injury. The Title III Court also granted the Oversight Board's and CRIM's motions to dismiss, holding that La Liga's allegations rested on a misreading of the April 15 Order "in a manner fatal to the Complaint" because the April 15 Order nullified Law 29 *ab initio* and thus Law 29 "was never effective to excuse the municipalities' obligations to pay pension and benefit contributions." On January 4, 2022, the Title III Court issued its judgment and closed the adversary proceeding [Adv. Proc. No. 21-00026, ECF No. 41]. On January 18, 2022, La Liga filed a notice of appeal of the Title III Court's order and judgment granting Defendants' motions to dismiss [Adv. Proc. No. 21-00026, ECF No. 42].

On February 4, 2022, the United States Court of Appeals for the First Circuit docketed the appeal as Case No. 22-1062. La Liga's opening brief is currently due on ~~May 12,~~ July 15, 2022.

### (f)    *Hernandez-Montanez v. Pierlusi*, Adv. Proc. No. 21-00042

On April 21, 2021, the Speaker of the Puerto Rico House of Representatives, acting on behalf of the Puerto Rico House of Representatives, filed a complaint against the Governor, AAFAF, the President of the Puerto Rico State Elections Commission, and the Secretary of the Puerto Rico Treasury Department (the "Executive Defendants") and the Oversight Board (together with the Executive Defendants, the "Defendants"), seeking declaratory and injunctive relief prohibiting Defendants from distributing certain election-related funds [Adv. Proc. No. 21-00042, ECF No. 1].

This case arose out of a dispute regarding Act 167 of 2020, which called for a Special Election on May 16, 2021 to select a six-member delegation to be sent to Washington, D.C. in order to press for Puerto Rico's admission as a state. Because Puerto Rico's certified budget for the 2020-2021 fiscal year did not allocate funds for this Special Election, the Governor sought authorization from the Oversight Board to reprogram funds. The Oversight Board informed the Governor that, in the unique circumstances presented here, the reprogramming request must be submitted to both the Oversight Board and the Legislature. Subsequently, the Governor requested a budget amendment to appropriate funds for the Special Election and submitted a proposed amended budget to the Oversight Board pursuant to PROMESA section 202. The Oversight Board determined the Governor's proposed amended budget was a compliant budget, as required by PROMESA section 202(c)(1), and submitted it to the Legislature. Thereafter, the Legislature informed the Oversight Board that a bill identical to the Governor's proposed amended budget was defeated during a markup session vote and that it would not comply with the budget amendment process. As a result, the Oversight Board issued a resolution stating, among other things, that (i) the Governor and the Legislature were at an impasse concerning the appropriation of funds to cover the cost of the Special Election; (ii) PROMESA section 402 constrained the Oversight Board from adopting an interpretation of PROMESA that might restrict Puerto Rico's determination of its political status; (iii) the Oversight Board desired to

allow the Commonwealth government to adopt or not to adopt the proposed amended budget the same as would occur absent PROMESA; and (iv) therefore, the original Commonwealth budget would remain in effect without revision.  Thereafter, AAFAF informed the Oversight Board that the Governor authorized the disbursement of funds to fund the Special Election.

Plaintiff sought orders declaring that PROMESA's budgetary provisions apply to all budgetary expenditures, including those relating to contested election-related funds, and that section 402 did not exempt the proposed reallocation of funds from PROMESA's budgetary provisions.  Plaintiff also sought an order enjoining the Governor and Secretary of the Treasury from allegedly misappropriating and distributing those funds.

On April 22, 2021, Plaintiff filed a motion seeking a temporary restraining order or preliminary injunction prohibiting Defendants from distributing certain election-related funds pending resolution of the complaint [Adv. Proc. No. 21-00042, ECF No. 3].  On April 24, 2021, Plaintiff filed a proposed preliminary injunction order [Adv. Proc. No. 21-00042, ECF No. 6].  On April 27, 2021, Defendants filed oppositions to Plaintiff's motion [Adv. Proc. No. 21-00042, ECF Nos. 12, 16], and the New Progressive Party and its Electoral Commissioner filed a motion to intervene [Adv. Proc. No. 21-00042, ECF No. 22].  On April 27, 2021, the Title III Court issued an order denying the motion to intervene [Adv. Proc. No. 21-00042, ECF No. 23].  On April 28, 2021, Plaintiff filed an omnibus reply in support of its motion [Adv. Proc. No. 21-00042, ECF No. 26].  On April 29, 2021, the Title III Court issued an order denying Plaintiff's motion seeking a temporary restraining order or preliminary injunction [Adv. Proc. No. 21-00042, ECF No. 32].

On June 4, 2021, the Executive Defendants and the Oversight Board filed motions to dismiss Plaintiff's complaint [Adv. Proc. No. 21-00042, ECF Nos. 47, 49].  After Plaintiff requested several extensions of its deadline to oppose the motions to dismiss, Plaintiff ultimately failed to respond to the motions to dismiss.  Accordingly, the Oversight Board and the Executive Defendants each filed certificates of no objection requesting the Title III Court grant the motions to dismiss as unopposed [Adv. Proc. No. 21-00042, ECF Nos. 60, 61].  On August 27, 2021, the Title III Court issued an order granting Defendants' motions to dismiss, holding that any controversy over the validity of the actions of the Executive Defendants or the Oversight Board's role in supporting or funding the special election was moot because the special election had been held and the designated funds spent [Adv. Proc. No. 21-00042, ECF No. 63].  On August 27, 2021, the Title III Court issued its judgment and closed the adversary proceeding [Adv. Proc. No. 21-00042, ECF No. 64].

(g)    **The Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.**, Adv. Proc. No. 20-00078

On June 8, 2020, the Oversight Board filed a complaint against the Governor and AAFAF seeking injunctive relief and a writ of mandamus in connection with the Governor and AAFAF's failure to produce to the Oversight Board certain documents and information regarding the Commonwealth Government's procurement and negotiation of contracts to purchase COVID-19 testing equipment and other medical supplies [Adv. Proc. No. 20-00078, ECF No. 1].  On June 23, 2020, the Governor and AAFAF filed a motion to dismiss, arguing the Title III Court lacked jurisdiction over the claim, the Oversight Board lacked standing, and the complaint failed to state

158

a claim for mandamus relief [Adv. Proc. No. 20-00078, ECF No. 11].  On July 24, 2020, the Oversight Board filed a notice of voluntary dismissal of the action [Adv. Proc. No. 20-00078, ECF No. 18].  On August 3, 2020, the adversary proceeding was closed.

**(h)**   ***Hon. Vázquez Garced, et al. v. The Financial Oversight & Management Board for Puerto Rico***, **Adv. Proc. Nos. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085; Case No. 21-1071 (1st Cir.)**

On June 12, 2020, the Governor and AAFAF filed six adversary complaints seeking declaratory judgments that Acts 47, 82, 90, 138, 176, and 181 and the related certifications pursuant to PROMESA section 204(a) satisfy PROMESA's requirements.  In short, Act 47 expands the group of health professionals eligible for tax benefits under the Puerto Rico Incentives Code, reducing revenues without any offsetting cost savings.  Act 82 establishes a new office within the PRDH to further regulate various entities that contract services from pharmacies in Puerto Rico.  Act 82 also prevents Pharmacy Benefit Managers from controlling the cost of prescription medications.  Act 138 forces public health insurance companies such as managed care organization ("MCOs") to accept into their networks all medical providers regardless of price.  Act 138 also bars health-insurance organizations, insurers, and other medical plans from including in any contract or stipulation with a healthcare provider a right to unilaterally terminate the contract.  Act 176 increases the accrual rate for vacation days and sick days for public employees.  Act 181 provides for a salary increase to firefighters amounting to almost $3 million per year.

On July 16, 2020, the Government voluntarily dismissed the adversary complaint related to Act 90 [Adv. Proc. No. 20-00081, ECF No. 5].  On July 17, 2020, the Oversight Board filed answers and counterclaims in connection with the five remaining adversary complaints related to the Five Acts [Adv. Proc. No. 20-00080, ECF No. 5; Adv. Proc. No. 20-00082, ECF No. 5; Adv. Proc. No. 20-00083, ECF No. 6; Adv. Proc. No. 20-00084, ECF No. 5; Adv. Proc. No. 20-00085, ECF No. 5].  The Oversight Board's counterclaims sought to nullify and enjoin the Five Acts pursuant to PROMESA sections 204(a) and 108(a), and with respect to Act 82 and Act 181, pursuant to PROMESA section 204(c) as well.  Specifically, the Oversight Board challenged Act 47 on the grounds that the law is significantly inconsistent with the Commonwealth Certified Fiscal Plan (as it is not revenue neutral) and the Governor's certification pursuant to PROMESA section 204(a) lacked sufficient specificity needed for a formal estimate of Act 47's impact on expenditures and revenues, as PROMESA requires.  The Oversight Board challenged Act 82 on the grounds that the law is significantly inconsistent with the Commonwealth Certified Fiscal Plan and will reduce the competitive market for quality healthcare services in Puerto Rico.  The Oversight Board challenged Act 138 on the grounds that the law is significantly inconsistent with the Commonwealth Certified Fiscal Plan, will inhibit MCOs' ability to control healthcare costs, and deprives Puerto Rico of a competitive market for quality healthcare services and increases healthcare costs by eliminating incentives for doctors to compete on price and quality.  The Oversight Board challenged Act 176 on the grounds that the law is significantly inconsistent with the Commonwealth Certified Fiscal Plan, among other things, undermining right-sizing measures contemplated in the Commonwealth Certified Fiscal Plan.  The Oversight Board challenged Act 181 on the grounds that the law is significantly inconsistent with the Commonwealth Certified

Fiscal Plan and the Governor never demonstrated to the Oversight Board how the salary increase for firefighters would or could be funded through a new tax.

Also, on July 17, 2020, Coopharma filed a motion for leave to appear as amicus on behalf of the Government [Case No. 17-bk-3283, ECF No. 13717]. On July 20, 2020, the Title III Court issued an order denying Coopharma's motion [Case No. 17-bk-3283, ECF No. 13739]. On November 24, 2020, Coopharma filed a second motion for leave to appear as amicus on behalf of the Government [Case No. 17-bk-3283, ECF No. 15238]. On December 7, 2020, the Government filed a statement in support of Coopharma's second motion [Adv. Proc. No. 20-00080, ECF No. 63], and the Oversight Board filed an opposition [Adv. Proc. No. 20-00080, ECF No. 65]. On December 10, 2020, Coopharma filed a reply in support of its second motion [Adv. Proc. No. 20-00080, ECF No. 66].

On July 30, 2020, the Oversight Board filed a motion to consolidate the five remaining adversary proceedings [Adv. Proc. No. 20-00080, ECF No. 8], and the Title III Court issued an order granting the motion [Adv. Proc. No. 20-00080, ECF No. 9]. The Government filed answers to the Oversight Board's counterclaims in connection with the Five Acts on August 3, 2020 [Adv. Proc. No. 20-00080, ECF No. 11; Adv. Proc. No. 20-00082, ECF No. 9; Adv. Proc. No. 20-00083, ECF No. 10; Adv. Proc. No. 20-00084, ECF No. 10; Adv. Proc. No. 20-00085, ECF No. 9].

On September 28, 2020, the Government filed motions for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 12; Adv. Proc. No. 20-00083, ECF No. 13]. On October 5, 2020, the Oversight Board filed motions for summary judgment in connection with Acts 47, 82, and 181 [Adv. Proc. No. 20-00080, ECF Nos. 14, 16; Adv. Proc. No. 20-00084, ECF Nos. 13, 15; Adv. Proc. No. 20-00085, ECF Nos. 12, 13]. On October 19, 2020, the Oversight Board filed its oppositions to the Government's motions for summary judgment and cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF Nos. 28, 29; Adv. Proc. No. 20-00083, ECF Nos. 29, 30]. On October 23, 2020, the Government filed oppositions to the Oversight Board's motion for summary judgment in connection with all claims and counterclaims related to Acts 47, 82, and 181 and moved for relief pursuant to Rule 56(d) [Adv. Proc. No. 20-00080, ECF No. 36; Adv. Proc. No. 20-00084, ECF No. 35; Adv. Proc. No. 20-00085, ECF No. 34]. On November 4, 2020, the Government filed its reply in further support of its motions for summary judgment and opposition to the Oversight Board's cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 37; Adv. Proc. No. 20-00083, ECF No. 38]. On November 5, 2020, the Oversight Board filed replies in support of its motions for summary judgment in connection with Acts 47, 82, and 181 [Adv. Proc. No. 20-00080, ECF No. 49; Adv. Proc. No. 20-00084, ECF No. 47; Adv. Proc. No. 20-00080, ECF No. 46]. On November 11, 2020, the Oversight Board filed a reply in support of its cross-motion for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 40; Adv. Proc. No. 20-00083, ECF No. 41]. On November 24, 2020, the Title III Court held a hearing regarding the motions and cross-motions for summary judgment.

On December 23, 2020, the Title III Court issued an order: (i) denying the Government's motion for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 52; Adv. Proc. 20-00083, ECF No. 53]; and (ii) partially granting both the Oversight Board's (a) motions for summary judgment in connection with Acts 47, 82, and 181, and (b) cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00080, ECF No. 72; Adv. Proc. No. 20-00084, ECF No. 61; Adv. Proc. No. 20-00085, ECF No. 60].  With respect to Act 47, the Title III Court dismissed Count II of the Act 47 Complaint, which sought declaratory relief concerning PROMESA section 108(a)(2), and granted summary judgment on Act 47 Counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA section 108(a)(2).  The Title III Court concluded that the Oversight Board's determination that Act 47 violates PROMESA section 108(a)(2) is supported by a rational basis and substantial evidence.  With respect to Act 82, the Title III Court dismissed Count I of the Act 82 Complaint, which sought declaratory relief concerning PROMESA section 204(a), and granted summary judgment on Act 82 Counterclaim II, which sought injunctions under PROMESA section 104(k).  The Title III Court found the Oversight Board's conclusions that the implementation of Act 82 should be prevented as it would involve significant expenditures that are not clearly provided for in the fiscal plan are neither arbitrary nor capricious.  With respect to Act 138, the Title III Court dismissed Count I of the Act 138 Complaint, which sought declaratory relief concerning PROMESA section 204(a), and granted summary judgment on Act 138 Counterclaim II, which sought injunctions under PROMESA section 104(k).  The Title III Court reasoned that the Oversight Board's challenges to Act 138 were supported by rational concerns given the Government's failure to comply with the Oversight Board's directives under PROMESA section 204(a)(4)(A) to correct deficiencies with the Act 138 Certificate.  With respect to Act 176, the Title III Court dismissed Count II of the Act 176 Complaint, which sought declaratory relief concerning PROMESA section 108(a)(2), and granted summary judgment on Act 176 Counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA section 108(a)(2).  The Title III Court concluded that the Oversight Board's determination that Act 176 will impair or defeat PROMESA's purposes was rational and supported by substantial evidence on the record.  With respect to Act 181, the Title III Court granted summary judgment on Act 181 Counterclaim IV, which sought an injunction under PROMESA section 104(k) barring implementation of Act 181 under PROMESA section 204(c).  The Title III Court ruled that Act 181 violates PROMESA section 204(c) because it creates a revenue deficiency that the Government would likely need to remedy through reprogramming that has neither been requested nor authorized.

Also, on December 23, 2020, the Title III Court issued an order directing the parties to show cause why the Title III Court should not dismiss the remaining claims and counterclaims [Adv. Proc. No. 20-00080, ECF No. 73; Adv. Proc. No. 20-00082, ECF No. 53; Adv. Proc. No. 20-00083, ECF No. 54; Adv. Proc. No. 20-00084, ECF No. 62; Adv. Proc. No. 20-00085, ECF No. 61].  On January 4, 2021, the parties filed a joint stipulation dismissing the remaining claims without prejudice [Adv. Proc. No. 20-00080, ECF No. 74; Adv. Proc. No. 20-00082, ECF No. 54; Adv. Proc. No. 20-00083, ECF No. 55; Adv. Proc. No. 20-00084, ECF No. 63; Adv. Proc. No. 20- 00085, ECF No. 62].  On January 7, 2021, the Title III Court issued an order dismissing the remaining claims without prejudice, and the court clerk issued judgment and closed the cases relating to all Five Acts: 47, 82, 181, 176, and 138 [Adv. Proc. No. 20-00080, ECF Nos. 75, 76; Adv. Proc. No. 20-00082, ECF Nos. 55, 56; Adv. Proc. No. 20-00083, ECF Nos. 56, 57; Adv.

Proc. No. 20-00084, ECF Nos. 63, 64; Adv. Proc. No. 20-00085, ECF Nos. 63, 64]. On February 4, 2021, the parties filed a joint motion for entry of an order approving a joint stipulation modifying the injunction regarding Act 181 [Adv. Proc. No. 20-00084, ECF No. 72]. The parties agreed to the extent tax revenues from tax on insurance premiums and revenues from safety inspections on commercial properties covered the salary increase of $125 per month for the firefighters, the Oversight Board would have no further objection to the increase as provided by Act 181. The parties informed the Title III Court that the pay increase would be put into effect. On February 5, 2021, the Title III Court issued an order approving the stipulation [Adv. Proc. No. 20-00084, ECF No. 73].

On January 21, 2021, the Government filed a notice of appeal in connection with the Title III Court's December 23, 2020 orders on the summary judgment motions [Adv. Proc. No. 20-00080, ECF No. 78; Adv. Proc. No. 20-00082, ECF No. 58; Adv. Proc. No. 20-00083, ECF No. 60; Adv. Proc. No. 20-00084, ECF No. 67; Adv. Proc. No. 20-00085, ECF No. 66]. On January 27, 2021, the appeal was docketed by the United States Court of Appeals for the First Circuit as Case No. 21-1071 [Adv. Proc. No. 20-00080, ECF No. 81]. On April 19, 2021, Appellants filed their opening brief. On May 10, 2021, the Speaker of the Puerto Rico House of Representatives filed a motion for leave to file an amicus brief in support of Appellants and his proposed brief. On June 16, 2021, the First Circuit issued an order granting the Speaker's motion and accepting the brief for filing. On July 7, 2021, Appellee filed its answering brief. On July 29, 2021 Appellants filed their reply brief. On August 11, 2021, Appellee filed its sur-reply brief. The case was argued on September 15, 2021.

### (i) *The Financial Oversight and Management Board for Puerto Rico v. Hon. Pierluisi Urrutia, et al.*, Adv. Proc. No. 21-00072

On July 2, 2021, the Oversight Board filed a lawsuit against Governor Pedro Pierluisi Urrutia in his official capacity (the "Governor"); AAFAF; the Honorable José Luis Dalmau, in his official capacity as a representative of the Puerto Rico Senate (the "Senate President"); and the Honorable Rafael Hernández Montañez, in his official capacity as a representative of the Puerto Rico House of Representatives (the "House Speaker") (collectively, the "Act 7 Defendants"), in the Title III Court to enjoin the enforcement and to nullify Act 7-2021 [Adv. Proc. No. 21-00072, ECF No. 1]. As set forth in the complaint, Act 7-2021 sought to replace the Commonwealth's reformed pension systems with a new, defined-benefit pension system, mandated that the Government repudiate any plan of adjustment that required pension reductions, budget cuts, or further bond restructurings, and prohibited the use of any resources by the Government to achieve and enable the Oversight Board's then-proposed plan of adjustment. The complaint alleged that (i) Act 7-2021 violated PROMESA section 108(a) because it impaired and/or defeated the purposes of PROMESA, as determined by the Oversight Board; (ii) Act 7-2021 violated PROMESA sections 204(a), 204(c), and 207; (iii) Act 7-2021 violated the Supremacy Clause of the U.S. Constitution and PROMESA section 4; and (iv) the Oversight Board was entitled to an order enjoining and nullifying Act 7-2021 and any actions taken to implement Act 7-2021. On July 23, 2021, the Act 7 Defendants filed answers to the complaint [Adv. Proc. No. 21-00072, ECF Nos. 13, 14, 15].

On August 15, 2021, the Oversight Board filed a motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 17].  On August 27, 2021, the Act 7 Defendants and SEIU, an intervenor, filed oppositions to the Oversight Board's motion for summary judgment [Adv. Proc. No. 21-00072, ECF Nos. 29, 35, 43, 44].  On September 3, 2021, the Oversight Board filed a reply in support of its motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 58].  On September 9, 2021, SEIU and UAW, a union permitted to intervene by the Title III Court on August 27, 2021 and which had joined in SEIU's opposition, filed a sur-reply in support of their opposition to the Oversight Board's motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 66].  On September 10, 2021, the Puerto Rico Bar Association, which had been permitted to intervene by the Title III Court on September 9, 2021, filed an amicus brief in support of the Act 7 Defendants' opposition to the Oversight Board's summary judgment motion [Adv. Proc. No. 21-00072, ECF No. 69].  That same day, the House Speaker filed a sur-reply in support of his opposition to the Oversight Board's motion for summary judgement [Adv. Proc. No. 21-00072, ECF No. 71].  On September 15, 2021, the Senate President filed a sur-reply in support of his opposition to the Oversight Board's motion of summary judgement [Adv. Proc. No. 21-00072, ECF No. 76].  On October 1, 2021, the House Speaker filed an informative motion regarding relevant legislative activity [Adv. Proc. No. 21-00072, ECF No. 77].

On October 13, 2021, the Title III Court issued an order granting, in part, the Oversight Board's motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 78].  The Title III Court found that (i) the Oversight Board had authority to seek judicial relief under PROMESA section 204(a) because Act 7-2021 was significantly inconsistent with the Commonwealth Certified Fiscal Plan and the Governor failed to comply with the Oversight Board's directions to correct the inconsistency; and (ii) Act 7-2021 violated PROMESA section 108(a) by impairing or defeating the purposes of PROMESA, as determined by the Oversight Board.  As to Counts IV, V, and VI, the Title III Court denied summary judgment with respect to the claims on PROMESA sections 204(c) and 207, and declined to reach a conclusion on the question of preemption under PROMESA section 4 and the Supremacy Clause.  Based on these rulings, the Title III Court, pursuant to PROMESA section 204(a)(5), nullified the entirety of Act 7-2021 and enjoined the Act 7 Defendants from implementing and enforcing Act 7-2021.  The Title III Court also, pursuant to PROMESA section 108(a)(2), declared section 1.02, section 5.02, Chapter 2, Chapter 3, Chapter 4, and the last sentence of section 5.01 of Act 7-2021 to be nullified, unenforceable, and of no effect, and enjoined Defendants from implementing or enforcing those provisions.

On December 9, 2021, the parties filed a stipulation of voluntary dismissal without prejudice as to the remaining counts in the case (Counts IV, V, and VI).  [Adv. Proc. No. 21-00072, ECF No. 79].  On December 13, 2021, the Title III Court issued a judgment on the claims for which it granted summary judgment and the parties' stipulation of voluntary dismissal without prejudice as to Counts IV, V, and VI of the complaint [Adv. Proc. No. 21-00072, ECF No. 80], closing the adversary proceeding.

**(j)**   ***R&D Master Enterprises, Inc., et al. v. The Financial Management and Oversight Board for P.R., et al.*, Case No. 21-cv-1317**

On July 8, 2021, R&D Master Enterprises, Inc., Pro Pave Corp., Matrix Transport, Inc., José A. Rovira González, and Maria Magdalena Díaz Vila (collectively, the "Plaintiffs") filed a complaint in the United States District Court for the District of Puerto Rico against the Oversight Board and Natalie Jaresko, in her official capacity as Executive Director of the Oversight Board [Case No. 21-cv-1317, ECF No. 1]. In their complaint, Plaintiffs seek an order requiring the Oversight Board to review the EDB's contract selling a $384,269,047 loan portfolio (the "Loan Sale Agreement") to an investor, PR Recovery and Development JV, LLC ("PR Recovery"), pursuant to its contracts review policy and PROMESA section 204(b). Plaintiffs contend the Oversight Board's alleged failure to review the Loan Sale Agreement violates PROMESA, the U.S. Constitution's Due Process and Equal Protection Clauses, and the Oversight Board's own contracts review policy.

On July 27, 2021, Defendants filed a motion to transfer the case to the Title III Court as a case related to the Commonwealth Title III case [Case No. 21-cv-1317, ECF No. 8]. The Oversight Board also filed with the Title III Court an informative motion and a request for consent to transfer the case to the Title III Court [Case No. 17-bk-3283, ECF No. 17515]. On August 6, 2021, Plaintiffs filed an opposition to Defendants' motion to transfer the case [Case No. 21-cv-1317, ECF No. 15]. On August 17, 2021, Defendants filed their reply [Case No. 21-cv-1317, ECF No. 18].

On September 3, 2021, Defendants filed a motion to dismiss, arguing that (i) Plaintiffs lack standing to bring the suit, (ii) their claims are time-barred, and (iii) the complaint fails to state a viable claim for relief [Case No. 21-cv-1317, ECF No. 19]. On September 15, 2021, Plaintiffs filed an opposition to Defendants' motion to dismiss [Case No. 21-cv-1317, ECF No. 21]. On September 29, 2021, Defendants filed a reply in support of their motion to dismiss [Case No. 21-cv-1317, ECF No. 24].

On October 25, 2021, Judge Arias-Marxuach issued an order denying the Defendants' motion to transfer the case to the Title III Court [Case No. 21-cv-1317, ECF No. 25]. On November 19, 2021, Plaintiffs filed an informative motion for leave to supplement their arguments [Case No. 21-cv-1317, ECF No. 26]. On November 23, 2021, Judge Arias-Marxuach issued a text-only order granting Plaintiffs' motion for leave to supplement their arguments [Case No. 21-cv-1317, ECF No. 27]. On December 3, 2021, Plaintiffs filed an informative motion supplementing their arguments [Case No. 21-cv-1317, ECF No. 28 at 2].

On April 12, 2022, Judge Arias-Marxuach entered an opinion and order granting the Oversight Board's motion to dismiss, holding that Plaintiffs' claims were time-barred. [Case No. 21-cv-1317, ECF No. 33]. On the same day, Judge Arias-Marxuach entered judgment dismissing Plaintiffs' complaint in its entirety with prejudice. On April 25, 2022, Plaintiffs filed a notice of appeal of the court's order dismissing the complaint. [Case No. 21-cv-1317, ECF No. 35].

On May 24, 2022, the United States Court of Appeals for the First Circuit docketed the appeal as Case No. 22-1342. Plaintiffs' opening brief is currently due on June 27, 2022.

**(k)** ***The Financial Oversight and Management Board for Puerto Rico v. Hon. Pierluisi Urrutia, et al., Adv. Proc. No. 21-00119 (D.P.R. filed December 20, 2021)***

On December 20, 2021, the Oversight Board filed a complaint against the Governor of Puerto Rico, AAFAF, the ERS Administrator, the Executive Director of the Government of Puerto Rico Retirement Board, and the OMB Director seeking to nullify and enjoin enforcement of Act 80-2020, Act 81-2021, Act 82-2020 (the "Acts"), and Joint Resolution 33 ("JR 33"), a measure requiring the Commonwealth to implement, at least partially, Act 80-2020 [Adv. Proc. No. 21-00119, ECF No. 1].   The Acts proposed to modify certain government employees' pension benefits by permitting them to retire early and/or providing enhanced benefits.   The Oversight Board alleged that the Acts and JR 33 imposed a specified treatment of certain prepetition pension claims in a manner inconsistent with the Plan of Adjustment, which violated PROMESA sections 312 and 313, and increased the treatment of certain claimants to recover in excess of the full amount of their claims in violation of PROMESA section 301(a) and Bankruptcy Code section 1129(b).   In addition, the Oversight Board alleged that: (i) each Act and JR 33 violated PROMESA section 207 by modifying debt without prior Oversight Board approval, and impaired and defeated the purposes of PROMESA, as determined by the Oversight Board, specifically its purpose of achieving fiscal responsibility, in violation of PROMESA section 108(a); (ii) the Governor and AAFAF failed to comply with PROMESA section 204(a) with respect to each Act; and (iii) Act 80 and JR 33 reprogrammed funds without prior Oversight Board certification, in violation of PROMESA section 204(c).

On December 27, 2021, the Oversight Board, the Governor of Puerto Rico, AAFAF and the OMB filed a stipulation and order reflecting their resolution of the Oversight Board's complaint [Adv. Proc. No. 21-00119, ECF No. 5].   On December 28, 2021, the Title III Court entered the stipulation and order [Adv. Proc. No. 21-00119, ECF No. 6].   By effect of the Title III Court's order, the Acts and JR 33 were invalidated and the Oversight Board's complaint was dismissed with prejudice [Adv. Proc. No. 21-00119, ECF No. 6].

On February 16, 2022, the Oversight Board, the Governor of Puerto Rico, and AAFAF filed a joint motion (i) to inform the Title III Court that the parties had reached agreements concerning Act 81 and Act 82, as contemplated in the stipulation and order resolving the Oversight Board's complaint; and (ii) to extend the deadline for the parties to satisfy their respective obligations under the Title III Court's order in connection with Act 80 [Adv. Proc. 21-00119, ECF No. 8].   On June 11, 2022, the Oversight Board, the Governor of Puerto Rico, and AAFAF filed a joint motion to further extend the deadline in the Title III Court's order to enable the parties to complete their respective analyses and engage in a bilateral discussion to explore the possibility of reaching consensus on or before July 14, 2022 [Adv. Proc. No. 21-00119, ECF No. 10].

6.    **Appointments Clause Litigation**

(a)    **Aurelius Investments, LLC, et al. v. Commonwealth of Puerto Rico, et al., Case Nos. 18-1671; 18-8014 (1st Cir.)**

On August 7, 2017, Appellants Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius") moved to dismiss the Commonwealth's Title III petition [Case No. 17-bk-3283, ECF No. 913].   Aurelius alleged that the Oversight Board lacked authority to initiate the Title III case because its members were appointed in violation of the Appointments Clause of the United States Constitution, U.S. Const. art. II, § 2,

and the principle of separation of powers.  In response, the Oversight Board argued that its members were not "Officers of the United States" under the Appointments Clause, and that the Oversight Board's powers were purely local, not federal, and thus the Appointments Clause did not apply [Case No. 17-bk-3283, ECF No. 1622].  The Oversight Board also argued that even if its members were federal officers, the Appointments Clause was not violated because Board members exercised authority in Puerto Rico, where the Territories Clause endows Congress with plenary powers.  In the alternative, the Oversight Board argued that the appointment of its members did not require advice and consent of the Senate because they were "inferior officers."

On July 13, 2018, the Title III Court denied Aurelius' motion to dismiss the Commonwealth's Title III petition [Case No. 17-bk-3283, ECF No. 3503].  Aurelius appealed. On September 7, 2018, the First Circuit consolidated the Aurelius appeal with similar appeals involving Appointments Clause challenges to the Oversight Board (discussed below) brought by Union de Trabajadores de la Industria Electrica y Riego ("UTIER") and Assured Guaranty Corp.

On February 15, 2019, the First Circuit ruled that the appointment of the Oversight Board's members was unconstitutional.  However, the First Circuit affirmed the Title III Court's decision declining to dismiss the Title III petitions, holding that actions taken by the Oversight Board prior to the First Circuit's ruling were valid under the *de facto* officer doctrine.  The First Circuit stayed its ruling for 90 days to allow the President and the Senate to cure the defective appointments.

The Oversight Board filed a petition for a writ of certiorari on April 23, 2019, which was docketed as U.S. Supreme Court Case No. 18-1334.  On April 24, 2019, the Oversight Board moved with the First Circuit to stay the mandate pending the disposition of its petition for certiorari.  On May 6, 2019, the First Circuit extended the stay of the mandate by sixty (60) days until July 15, 2019.

On May 24, 2019, Aurelius filed a petition for a writ of certiorari challenging the First Circuit's *de facto* officer ruling, which was docketed as U.S. Supreme Court Case No. 18-1475. The UCC, which appeared as an appellee in the appeal at the First Circuit, filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1496.  The United States filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1514.  UTIER filed a petition for a writ of certiorari on June 5, 2019, which was docketed as U.S. Supreme Court Case No. 18-1521.

On June 18, 2019, the Oversight Board moved the First Circuit to extend the stay of the mandate until resolution of the above cases by the Supreme Court.  On June 19, 2019, the Supreme Court granted all of the petitions for certiorari and consolidated the cases.  U.S. Supreme Court Case No. 18-1334 was designated as the lead case.  On July 2, 2019, the First Circuit granted the Oversight Board's motion to stay the mandate pending a merits decision by the Supreme Court.

On July 25, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed briefs at the Supreme Court challenging the First Circuit's Appointments Clause ruling.  On August 22, 2019, UTIER and Aurelius filed their consolidated opening briefs, supporting the First Circuit's ruling on the Appointments Clause and challenging

its ruling on the *de facto* officer doctrine. Amicus briefs were filed by Anthony Michael Sabino (a constitutional law professor), Alan Mygatt Tauber (a constitutional law scholar), Aníbal Acevedo-Vilá (a former Governor of Puerto Rico), and the DRA Parties. Sabino and Acevedo-Vilá recommended that the Supreme Court affirm the First Circuit's decision on the Appointments Clause issue, while Tauber recommended a reversal on that issue. The DRA Parties recommended the same as Tauber and also argued that the Supreme Court should affirm the First Circuit's *de facto* officer ruling. On September 19, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed replies in support of their challenges to the First Circuit's Appointments Clause ruling and supporting the First Circuit's ruling on the *de facto* officer doctrine. The COFINA Senior Bondholders' Coalition filed a brief that was limited to supporting the First Circuit's ruling on the *de facto* officer doctrine. On October 4, 2019, and October 8, 2019, UTIER and Aurelius filed reply briefs. Oral argument was held on October 15, 2019.

On June 1, 2020, the United States Supreme Court reversed the First Circuit's February 15, 2019 decision. The court held that the Appointments Clause does not apply to the appointment of the Oversight Board's members. Because the Oversight Board's statutory responsibilities consist of "primarily local duties"—namely, representing Puerto Rico "in bankruptcy proceedings and supervising aspects of Puerto Rico's fiscal and budgetary policies"—the Oversight Board's members are not "Officers of the United States" and thus not subject to the Appointments Clause. The Supreme Court declined to consider the application of the *de facto* officer doctrine since it held that the Oversight Board's members were validly appointed. Justices Sotomayor and Thomas issued opinions concurring in the judgment. Justice Sotomayor "reluctantly" concurred in the judgment but wrote to underscore the autonomy of Puerto Rico. Justice Thomas concurred that the appointment of the members of the Oversight Board did not violate the U.S. Constitution but took issue with the majority's "amorphous" test distinguishing between an officer's local and federal duties.

### (b)   Assured Guaranty Corp., et al. v. Financial Oversight and Management Board for Puerto Rico, et al., Adv. Proc. No. 18-00087

On July 23, 2018, Plaintiffs Assured Guaranty Corp. and Assured Guaranty Municipal Corp., like Aurelius, filed a complaint challenging the constitutionality of the appointment of the Oversight Board's members. Assured sought declarations that the appointment of the Oversight Board's members violated the Appointments Clause and that the Oversight Board's actions were null and void. Assured also sought to enjoin the Oversight Board and its voting members from taking any further action until its members were lawfully appointed.

On August 3, 2018, the Title III Court issued a stipulated judgment [Adv. Proc. No. 18-00087, ECF No. 14] for the Oversight Board on the ground that the claims raised in Assured's complaint had already been found defective by the Title III Court in the Aurelius matter. *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 318 F. Supp. 3d 537 (D.P.R. 2018), *aff'd in part, rev'd in part,* 915 F.3d 838 (1st Cir. 2019), *rev'd and remanded,* 140 S. Ct. 1649 (2020). Assured filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-1746. That appeal was consolidated with the Aurelius appeal (discussed above) and was resolved on the same grounds.

(c)    **UTIER v. Puerto Rico Electric Power Authority, et al., Adv. Proc. No. 17-00228**

On August 6, 2017, Plaintiff UTIER brought a nearly identical Appointments Clause challenge to the appointment of the Board's members as Aurelius and Assured.  UTIER sought (i) declaratory judgments that PROMESA violated the Appointments Clause and all of the Oversight Board's acts to date were invalid, and (ii) an order enjoining the Oversight Board from exercising any authority granted to it by PROMESA.  On November 10, 2017, UTIER amended its complaint [Adv. Proc. No. 17-00228, ECF No. 75].

On November 20, 2017, the Oversight Board moved to dismiss the amended complaint [Adv. Proc. No. 17-00228, ECF No. 88].

On August 15, 2018, the Title III Court granted the Oversight Board's motion on the ground that there was no violation of the Appointments Clause.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 318 F. Supp. 3d at 557.

On August 16, 2018, UTIER appealed to the First Circuit (docketed as Case No. 18-1787).  On September 7, 2018, the First Circuit consolidated the UTIER appeal with the appeals brought by Aurelius and Assured discussed above.  UTIER's appeal was resolved in the same manner as the Aurelius and Assured appeals.  *See* section V.F.1(a) above.

(d)    **Hernandez-Montañez, et al. v. Financial Oversight & Management Board for Puerto Rico, et al., Adv. Proc. No. 18-00090**

On July 25, 2018, certain members of the minority Popular Democratic Party serving in the Puerto Rico House of Representatives and Senate filed a complaint seeking declaratory judgments that (i) the Oversight Board's members were appointed in a manner that violates the Appointments Clause of the U.S. Constitution, (ii) the delegation of executive and legislative authority to the Oversight Board is a violation of the separation of powers doctrine, and (iii)  the Oversight Board's use of its budgetary powers to allegedly encourage adoption of its preferred policies constitutes "impermissible interference" with the autonomy of Puerto Rico's legislature. Plaintiffs also sought orders enjoining the Oversight Board from exercising its authority under PROMESA and enjoining the Oversight Board from supposedly interfering with the legislative process.

On August 27, 2018, the parties filed a joint status report in which Plaintiffs agreed (1) to stay their Appointments Clause claim while Aurelius's Appointments Clause appeal was pending and (2) dismiss their legislative autonomy claim [Adv. Proc. No. 18-00090, ECF No. 18].  The parties disagreed as to whether Plaintiffs' remaining claim that PROMESA violates the separation-of-powers doctrine should be stayed pending resolution of the Aurelius Appointments Clause appeal.  On November 20, 2018, Magistrate Judge Dein entered an order [Adv. Proc. No. 18-00090, ECF No. 32] staying the case pending resolution of the consolidated appeals in *Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, No. 18-1671, *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico*, No. 18-1746, and *UTIER v. Puerto Rico Electric Power Authority*, et al., No. 18-1787.  For more information on those appeals, see section V.F.6 above.

On August 19, 2020, after the Supreme Court's decision in Aurelius, Plaintiffs moved to lift the stay [Adv. Proc. No. 18-00090, ECF No. 33]. On September 11, 2020, the United States and the Oversight Board filed notices of non-opposition to Plaintiffs' motion [Adv. Proc. No. 18-00090, ECF Nos. 35, 36]. On September 14, 2020, the Title III Court lifted the stay [Adv. Proc. No. 18-00090, ECF No. 37]. On November 30, 2020, the Oversight Board moved to dismiss Plaintiff's complaint, asserting that it fails to state a claim for relief [Adv. Proc. No. 18-00090, ECF No. 45]. Also, on November 30, 2020, the United States filed a brief in support of the constitutionality of PROMESA [Adv. Proc. No. 18-00090, ECF No. 47]. On February 26, 2021, Plaintiffs filed an opposition to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00090, ECF No. 52]. On March 29, 2021, the Oversight Board filed its reply in support of its motion [Adv. Proc. No. 18-00090, ECF No. 53]. On May 7, 2021, the Title III Court issued an order granting the Oversight Board's motion to dismiss, as to Count I of the complaint [Adv. Proc. No. 18-00090, ECF No. 54]. On May 14, 2021, the parties filed a joint stipulation of dismissal with prejudice as to Count III of the complaint [Adv. Proc. No. 18-00090, ECF No. 55]. On July 7, 2021, Plaintiffs filed a motion for entry of judgment [Adv. Proc. No. 18-00090, ECF No. 57]. On July 8, 2021, the Title III Court issued an order approving the parties' joint stipulation of dismissal [Adv. Proc. No. 18-00090, ECF No. 58]. On July 9, 2021, the Title III Court issued a judgment dismissing the case with prejudice, and the adversary proceeding was closed [Adv. Proc. No. 18-00090, ECF No. 59]. On July 25, 2021, Plaintiffs filed a notice of appeal in connection with the Title III Court's judgment dismissing the case with prejudice [Adv. Proc. No. 18-00090, ECF No. 60].

On August 2, 2021, the United States Court of Appeals for the First Circuit docketed the appeal as Case No. 21-1581. On October 11, 2021, all Plaintiffs except for the Speaker of the Puerto Rico House of Representatives ("House Speaker") filed a notice of partial voluntary dismissal. On May 13, 2022, the First Circuit issued an order dismissing the appeal as to all Plaintiffs except the House Speaker and Pedro Garcia-Figueroa. On May 24, 2022, Pedro Garcia-Figueroa filed a notice of voluntary dismissal. On May 27, 2022, the First Circuit issued an order dismissing the appeal as to Pedro Garcia-Figueroa. The House Speaker's opening brief is currently due on June 22, 2022.

## G.    Oversight Board's Investigation of Potential Causes of Action

The Oversight Board is vested with broad investigative powers. Pursuant to PROMESA section 104(o), which empowers the Oversight Board to investigate the disclosure and selling practices in connection with the purchase of bonds issued by the Debtors, and related sections, the Oversight Board, through its Special Investigation Committee, pursued an investigation into potential causes of actions related to Puerto Rico's fiscal crisis.

### 1.    Independent Investigator Report

#### (a)    Process and Mandate

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP (the "Independent Investigator") to conduct an investigation into certain matters relating to Puerto Rico's fiscal crisis in furtherance of the Oversight Board's mandate pursuant to PROMESA.

Specifically, the Independent Investigator was asked to investigate: (i) the factors contributing to Puerto Rico's fiscal crisis, including changes in the economy, expansion of spending commitments and entitlement programs, changes in the federal funding it receives, and reliance on debt to finance a structural budget deficit; (ii) Puerto Rico's debt, the general use of proceeds, the relationship between the debt and Puerto Rico's structural budget deficit, the range of its debt instruments, and how Puerto Rico's debt practices compare to the debt practices of states and large municipal jurisdictions; and (iii) Puerto Rico's debt issuance, disclosure, and selling practices, including its interpretation of Puerto Rico's Constitutional Debt Limit.  In consultation with the Special Investigation Committee and the Oversight Board's General Counsel, the Independent Investigator focused its inquiry on the following specific areas: GDB; Puerto Rico's Public Utilities; COFINA; ERS; Puerto Rico's Budgeting, External Reporting, and Accounting Functions; calculation of the Constitutional Debt Limit; the credit rating agencies; selling practices for Puerto Rico-related Bonds; Puerto Rico's government ethics framework; issuers' use of interest rate swaps; Puerto Rico's lack of a clear mechanism for validating Puerto Rico-related bonds before they issue; and the possession tax credit.

The Special Investigation Committee's principal goals for the investigation were: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted Puerto Rico and certain of its instrumentalities to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's access to the capital markets.

### (b)    Investigation Procedures

In May 2017, the Oversight Board adopted the PROMESA Investigative Procedures to establish the procedural framework for the investigation.[147]   Those PROMESA Investigative Procedures authorize the Oversight Board to commence an "Informal Investigation" and a "Formal Investigation" to probe activities or conduct for which the Oversight Board has authority to investigate under PROMESA.   The key procedural difference between the two types of investigations is that the Oversight Board is only authorized to issue process to compel testimony and production of investigative materials upon the commencement of a Formal Investigation.[148] The Independent Investigator used both formal and informal investigative techniques to achieve the mandate set out by the Special Investigation Committee.

On October 18, 2017, the Special Investigation Committee, acting on behalf of the Oversight Board, approved a Resolution Initiating Formal Investigation for Purpose of Issuing Investigative Subpoenas (the "Investigative Subpoenas Resolution").[149]   In general terms, under the Investigative Subpoenas Resolution, a Formal Investigation is deemed initiated for the

---

[147]   The PROMESA Investigative Procedures are available at https://oversightboard.pr.gov/documents/.

[148]   PROMESA Investigative Procedures, §§ 3.1(b), 3.2(b)(2).  Section 104 of PROMESA vests the Oversight Board with the power to issue subpoenas "requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board." 48 U.S.C. § 2124(f)(1).

[149]   The Investigative Subpoenas Resolution is available at https://oversightboard.pr.gov/documents/.

purpose of authorizing the Independent Investigator to issue Investigative Subpoenas[150] in certain circumstances.[151]

Starting in September 2017, in furtherance of the Informal Investigation, the Independent Investigator delivered letters to more than 90 entities (collectively, the "Document Preservation and Request Letters"). The Document Preservation and Request Letters identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients of the letters preserve and produce any responsive documents in their possession, custody, or control. After the Document Preservation and Request Letters were sent, the Independent Investigator scheduled and conducted conferences with the recipients (most by phone, some in person) to reiterate the requests and discuss a process for identification and delivery of documents to the Independent Investigator.

Witnesses, in the main, cooperated with the Independent Investigator, and the Independent Investigator used the tools available through the Informal Investigation. That cooperation—facilitated by the Independent Investigator's use of its subpoena power only as needed—enabled the Independent Investigator to complete the investigation in an efficient and timely manner, consistent with the objectives of PROMESA and as requested by the Special Investigation Committee. The Independent Investigator was especially mindful of avoiding the delay and cost of litigating subpoenas.

Over the course of the investigation, the Independent Investigator received a total of approximately 260,800 documents consisting of approximately 2,740,000 pages, from 32 parties. Those parties include, among others, a number of Puerto Rico entities, financial institutions, rating agencies, financial advisors, professionals, and regulators.

The Independent Investigator also secured direct, read-only access to the email custodial files of dozens of employees and former employees of GDB through its representative, AAFAF.[152] On behalf of GDB, AAFAF produced to the Independent Investigator approximately 36,000 documents from that database.

Pursuant to the Investigative Subpoenas Resolution, the Independent Investigator issued twelve (12) Investigative Subpoenas (five of which were withdrawn after issuance based on the

---

[150] An "Investigative Subpoena" is defined in section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution.

[151] Those circumstances would occur where a witness has not voluntarily cooperated with the Independent Investigator's requests for documents or an interview, where the witness has communicated that it cannot voluntarily cooperate with the Independent Investigator's requests, or where the witness has provided an interview but the Independent Investigator, in consultation with the Oversight Board's General Counsel, determines that it would be appropriate to have the witness testify under oath.

[152] That access was obtained through PROMESA section 104(c)(2), which provides as follows: "Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this chapter. At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this Act." 48 U.S.C. § 2124(c)(2).

recipient's subsequent agreement to voluntarily cooperate with the Independent Investigator).[153] Without exception, the recipients of the Investigative Subpoenas produced documents to the Independent Investigator in response to those subpoenas.

From December 2017 to August 2018, the Independent Investigator conducted a total of approximately 120 voluntary witness interviews, probing a wide range of topics relevant to the investigation. The individuals interviewed included four former governors of Puerto Rico, former and current senior government officers, underwriters, credit rating agencies, auditors, outside professionals and advisors.

Throughout the investigation, the Independent Investigator engaged in robust cooperation and consultation with the UCC and Retiree Committee. Beginning in November 2017, the Independent Investigator regularly engaged with both the UCC and Retiree Committee regarding the investigation. Specifically, in addition to cooperation and communication by calls and e-mails when needed, the Independent Investigator participated in weekly telephone conferences with counsel for the UCC and Retiree Committee respectively. During those conferences, the Independent Investigator provided information regarding witnesses to be interviewed in the coming week, solicited input on questions to ask of witnesses, provided counsel to the UCC and Retiree Committee with its preliminary observations regarding the results of the investigation in areas in which the UCC and Retiree Committee had expressed interest, and also facilitated the UCC and Retiree Committee's access to materials that were provided to the Independent Investigator.

(c)     **Major Findings from the Independent Investigation Regarding HTA**

On August 20, 2018, the Independent Investigator published its Final Investigative Report. This Disclosure Statement includes a summary of the Independent Investigator's primary findings relating only to HTA. The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.[154]

As discussed in Part IV of the Final Investigative Report, the investigation revealed that HTA historically relied on GDB to step in to cover operational expenses, particularly when it was unable to access the capital markets. Many of those loans were, according to former GDB officials, used to cover HTA's budget deficits. With regard to HTA in particular, GDB evaluated and approved its loans very quickly, at times within hours, after a request was submitted. According to witnesses, this was to avoid potential adverse consequences stemming from HTA's lack of fiscal health, such as HTA having to shut down the Tren Urbano if its operator had not been paid. There is also evidence that, in certain instances, GDB may have approved financing requests by HTA notwithstanding circumstances that, if GDB and the recipients had been private actors, might have led to additional due diligence.

---

[153]  The recipients of Investigative Subpoenas (apart from those that were withdrawn) were Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp, and Santander Securities LLC.

[154]   A comprehensive overview of the entire Final Investigative Report is available in the Executive Summary, available at the Oversight Board's website at https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

Gubernatorial will across administrations also affected GDB's decision-making with respect to HTA's debt load. For example, during Governor Fortuño's administration, GDB increased HTA's line of credit to approximately $2 billion. At the time, the total of GDB's loans receivable was approximately $9 billion.[155] GDB did this, according to one witness, so that HTA would not have to raise vehicle registration fees, public transportation fees, tolls, or the gasoline tax; all of which would have increased costs for ordinary voters.

Then, by early 2013, Governor García Padilla's administration decided that GDB should no longer support the public corporations through appropriations. At the same time, however, witnesses reported that the Governor remained reluctant to raise HTA's fares or related taxes—or would not agree to increase them as much as GDB management recommended.

### (d)  Summary of Potential Causes of Action as Relevant to HTA

In its Final Investigative Report, the Independent Investigator evaluated whether its factual findings support the view that any of the parties involved in Puerto Rico's fiscal crisis committed conduct that is actionable under certain U.S. federal, state, and local laws. The Independent Investigator discussed its consideration of certain, but not all, potential claims available to Title III Debtors (or their estates) and investors, among other stakeholders, under applicable U.S. federal law (including securities laws and the Bankruptcy Code, as made applicable by PROMESA), the law in Puerto Rico, and the law of other U.S. jurisdictions as indicated by choice of law analyses. This discussion was undertaken for the statutory purposes outlined in PROMESA and not for reliance by any specific litigant. Its overview of and application of the law is not legal advice and its factual findings do not constitute admissible evidence in any pending or future litigation.

Set forth below is a summary of potential causes of action identified by the Independent Investigator in the Final Investigative Report with respect to HTA.[156] The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

The Final Investigative Report contains discussion of the investigative findings that may support potential claims in connection with HTA. The findings focus on the tension arising out of GDB's dual roles as both fiscal agent for and lender to HTA. According to the Investigator, available evidence reflects that, GDB as a fiscal agent could have done more when approached in its separate capacity as lender to HTA for the purpose of approving new loans. And in certain instances, GDB may have approved financing requests by HTA notwithstanding circumstances that might or should have led to additional due diligence. This evidence, together with further investigation, may allow relevant stakeholders to assert certain lender liability and fiduciary breach claims against GDB and its relevant Board members and control persons.

---

[155]  For context, the Commonwealth had a projected budget of approximately $9 billion in 2013. *See* Commonwealth of P.R., *Basic Financial Statements and Required Supplementary Information: Year ended June 30, 2013*, 246 (June 30, 2014).

[156]  The discussion of potential causes of action spans nearly 100 pages of the Final Investigative Report. The summary herein is qualified in its entirety by the Final Investigative Report, which parties should reference in the event of any ambiguity or conflict.

### (e)  Summary of Recommendations Related to HTA

The Final Investigative Report includes recommendations related to each of the topics investigated by the Independent Investigator.  This Disclosure Statement includes a summary of the Independent Investigator's recommendations relating only to HTA.  The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

The Independent Investigator recommended that Puerto Rico's political branches should evaluate measures to separate the fiscal agent and lending functions for GDB's successor, and consider reforms for each role.  The Independent Investigator recommended, among others, that the new fiscal agent have improved oversight of HTA, and other issuers, it advises with access to the joint and integrated accounting systems and enhanced monitoring of finances.  The Independent Investigator also recommended, among others, that the new lending entity adopt policies and procedures, including credit policies, with the framework that a private bank would apply to evaluate risks to its own loan portfolio.  Specifically, the Independent Investigator suggested the lending entity re-evaluate at quarterly intervals the collectability and other risks associated with existing public-sector financing.

### 2.  Appointment of Special Claims Committee and Retention of Counsel

Within a few days of receiving the published Final Investigative Report, the Oversight Board executed a unanimous written consent appointing the independent Special Claims Committee to pursue claims resulting from the findings of the Investigation.[157]  The Oversight Board then issued a Request for Proposal for counsel to the newly formed committee.

On November 28, 2018, the Oversight Board, acting by and through its Special Claims Committee, retained Brown Rudnick LLP as counsel to the Special Claims Committee to assist the Special Claims Committee in the investigation, initiation of negotiation, and/or prosecution of potential claims that might arise from conduct described in the Final Investigative Report ("Claims Counsel").  Additionally, in February 2019, the Special Claims Committee retained a financial advisory services firm to assist Claims Counsel in its investigation of potential claims.

---

[157]  The current members of the Special Claims Committee are Andrew G. Biggs, Arthur J. González, and David A. Skeel, Jr.

The Final Investigative Report did not address Avoidance Actions[158]

and did not identify specific claims or causes of action the Commonwealth and its instrumentalities might hold against individuals and entities involved in their financial transactions.  Rather, the Final Investigative Report outlined the necessary informative and analytical background which would serve as a springboard for the Special Claims Committee to identify actionable claims that the Commonwealth and its instrumentalities might hold relating to the Commonwealth's financial crisis.

Thus, immediately after its retention, Claims Counsel began investigating and analyzing the conclusions in the Final Investigative Report to determine and recommend whether there were viable causes of action that the Oversight Board could assert for the benefit of the Commonwealth's taxpayers, its instrumentalities, and legitimate creditors.

### 3.      Counsel Investigation and Statute of Limitations Concerns

Claims Counsel examined the documents related to the Final Investigative Report to assist it in identifying meritorious causes of action.  Furthermore, and as described additionally below, the Special Claims Committee made frequent and numerous inquiries to other professionals involved in the Title III Cases, as well as potential Defendants and other parties in order to obtain reports, financial data, presentations, and other materials necessary for the Oversight Board to assert its causes of action.  In sum, Claims Counsel reviewed, among other things:

- the 600-page Final Investigative Report;

- approximately 100,000 documents provided to date that support the facts and legal analysis contained in the Final Investigative Report;

---

[158]   Causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code.  There are essentially two different legal theories for these avoidance actions: preference and fraudulent transfer.  A *preference* is a payment in the ninety (90) days prior to the bankruptcy to a "preferred" creditor, *i.e.*, someone who got paid more than usual when others in similar situations were not being paid due to Puerto Rico's insolvency.  (For parties with family relationships to elected officials, and others with "insider" relationships to the government, the relevant period is one year, not ninety (90) days.)  11 U.S.C. § 547.  A *fraudulent transfer* is, most importantly, a payment made for which Puerto Rico did not receive "reasonably equivalent value" in exchange. If not, even if the transfer was not intentionally wrongful or fraudulent, Puerto Rico can recover the funds because the money rightfully should benefit all creditors and citizens.  11 U.S.C. §§ 544, 548.  Preferences and fraudulent transfers can be "avoided" and funds recovered by Puerto Rico from the transferees; likewise or in the alternative, the avoidance liability may cause the transferee's claims against Puerto Rico may be set off or disallowed.  *See* 11 U.S.C. §§ 502, 545, 550, 553.⬜
Avoidance actions are very common in large bankruptcy proceedings, including those involving government entities.  They allow debtors to ensure that money transferred to third parties in the period before bankruptcy was appropriately and fairly spent, and if not, recover that money for the benefit of creditors and taxpayers. Importantly, avoidance actions of this type do not intend to convey that a third party vendor committed any wrongdoing.  Rather, avoidance actions ensure no one creditor is favored by payments made prior to the bankruptcy filing and that a fair distribution of a debtor's assets is made in accordance with applicable law.  As with any other civil lawsuit, the Plaintiff (*i.e.*, the Oversight Board, in some cases along with the UCC) has the burden to prove each element of the avoidance action by a preponderance of the evidence in order for the third party vendor to be found liable to and have to return the money to the estate.

175

- records of millions of transfers by the various Title III debtors, including HTA, to third parties during the four-year avoidance period prior to the applicable petition date;

- thousands of documents identifying recipients of purported principal and interest payments on allegedly invalid bonds, through records of tens of thousands of transactions; and

- over 1,600 notices of participation filed in connection with the Joint Claim Objection (defined below) evidencing current holders of the allegedly invalid bonds.

The Oversight Board's investigative activity and commencement of litigation has been largely driven by applicable statutes of limitations. Most notably, the statute of limitations for avoidance actions pursuant to 11 U.S.C. section 546(a)(1) expired on May 20, 2019 for HTA. The expiration of the statute of limitations could, in many instances, preclude the Oversight Board's ability to prosecute many of the claims described herein.

The Oversight Board has taken a number of measures to protect its claims against statute of limitations defenses. Foremost among these, the Oversight Board commenced hundreds of adversary proceedings prior to the expiration of the applicable statute of limitations, including seven adversary proceedings against parties that conducted business with HTA. In some cases described in greater detail below, the Oversight Board has commenced litigation with the explicit intention of preserving rights, notwithstanding that prosecution of its claims would not be an optimal resource allocation at the present time, and has accordingly requested that the litigation itself be stayed for the time being.

### 4.  Causes of Action Against Third-Party Professionals and Personnel

The Oversight Board's investigation suggested that from 2008 through 2014 (the final issuance of bonds by the Commonwealth to date), numerous third-party professionals knowingly participated in bond issuances that may have been unlawful, that deepened the insolvency of the Commonwealth, and its affiliated Debtors, and that resulted in other harm to the Debtors. Accordingly, the Oversight Board investigated and commenced pursing claims against numerous parties for wrongful acts in relation to debt issuances by the Commonwealth and certain of its instrumentalities and public corporations. The parties include:

- underwriters of alleged invalid or wrongfully issued debt;

- law firms that advised on debt transactions;

- auditors of the Commonwealth's finances; and

- counterparties to interest rate swap agreements.

Some of these debt transactions are described in greater detail below. In sum, these "Third-Party Defendants" provided services that in many cases gave rise to fiduciary obligations to act in the best interests of the Commonwealth and its instrumentalities. The Third-Party

Defendants collected substantial fees by facilitating more and more debt transactions, enabling the Commonwealth and its instrumentalities to issue purported debt instruments notwithstanding the Commonwealth's insolvency and the constitutional and statutory limitations on debt issuances.

The Oversight Board filed Adv. Proc. No. 19-00280[159] against the Third-Party Defendants on behalf of the Commonwealth and its affiliated Debtors, including HTA. The Oversight Board's complaint articulates claims in the nature of breach of fiduciary duty and aiding and abetting a breach of fiduciary duty,[160] professional malpractice, fraudulent transfer, and unjust enrichment.  In addition to filing its complaint, the Oversight Board has negotiated tolling agreements with a number of potential Defendants and will either settle its claims out of court or commence litigation against such parties following further investigation.

Together, these several dozen Third-Party Defendants earned nearly $300 million in fees for services that allegedly damaged the Commonwealth and its instrumentalities.  The swap counterparties received an additional $90 million in swap termination fees. Although the Oversight Board is pursuing damages in an amount to be determined, these fee payments are likely the minimum recovery to be sought.  Under various other damages theories, the Oversight Board may seek to recover billions of dollars unlawfully transferred by the Commonwealth and/or its instrumentalities to other parties as a result of the Third-Party Defendants' malfeasance.  On July 24, 2019, the Court entered an order staying this litigation pending confirmation of the Commonwealth Plan.  The Commonwealth Plan and the HTA Plan provide for this litigation to continue after confirmation.

### 5.    Avoidance Actions Against Vendors

The Final Investigative Report focused on large-scale debt financing transactions and did not concern potential avoidance actions relating to the billions of dollars in payments by the Title III Debtors to parties who purported to provide goods and services to Debtors the pursuant to purported contracts (the "Vendor Payments" to "vendors").[161]  Accordingly, the Special Claims Committee began investigating the Vendor Payments to ensure that such payments complied with applicable law.

In concert with the UCC, the Oversight Board obtained from AAFAF records of all payments to vendors within the four years prior to commencement of the respective Title III cases.  The Special Claims Committee, in collaboration with the UCC, reviewed records of millions of individual payments to hundreds of thousands of unique vendors, totaling over $12 billion.  After reviewing the contracts on file and excluding government bodies and non-profit organizations, among others, the Oversight Board identified over $4 billion in payments by the

---

[159]  *The Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico, acting by and through Its Members, The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Barclays Capital, et al.*, 19-AP-00280 (the "Underwriter Litigation").

[160]  The Oversight Board has alleged that certain parties aided and abetted GDB in GDB's breach of its fiduciary duty to the Commonwealth and its instrumentalities.  Claims against GDB itself have been released pursuant to GDB's PROMESA Title VI modification.  *See* section V.I.2 of this Disclosure Statement for a brief description of the GDB Title VI modification proceedings.

[161]  "Vendors" and "Vendor Payments" refers to contractors and payments made pursuant to contract, respectively, as opposed to transferees of payments made pursuant to legislative appropriation.

Title III Debtors to approximately 345 vendors as potentially recoverable under avoidance theories.[162]  As part of this process, the Oversight Board identified approximately $188 million in aggregate payments from HTA to seven (7) vendors as potentially recoverable.

### (a)    Tolling Agreements and Litigation

After concluding its review and identifying potentially liable parties, the Oversight Board provided the vendors an opportunity to toll the statute of limitations for filing the vendor avoidance actions, *i.e.*, extend by agreement the time provided for the Oversight Board to file an avoidance action.  As such, in the weeks prior to the respective statute of limitations expirations, Claims Counsel sent to each vendor a cover letter and tolling agreement which the vendors could sign and return in order to avoid the filing of a complaint and preserving the Title III Debtors' rights with respect to its avoidance claims.  No tolling agreements were executed with respect to HTA.

After excluding the parties to tolling agreements, the Oversight Board filed approximately 250 vendor avoidance actions seeking to recover approximately $3 billion in payments to vendors.[163]  The Oversight Board has announced its preference to settle these actions, and the potential claims subject to tolling agreements, pursuant to a voluntary out-of-court dispute resolution procedure that is outlined on the notice website in the Title III Cases and described more fully below.

### (b)    Informal Resolution Procedures

On June 7, 2019, the Oversight Board and the UCC filed an omnibus motion in the Title III cases of the Commonwealth, HTA, ERS, and PREPA, requesting approval of case management procedures in the avoidance proceedings brought against vendors.[164]  The Vendor Action Procedures Motion specifically requested approval of procedures governing (i) litigation procedures and deadlines, (ii) voluntary mediation, and (iii) settlement (the "Vendor Action Procedures").  On July 12, 2019, the Title III Court entered an order approving the Vendor Action Procedures, which were then served on all Defendants to the vendor avoidance actions along with the summons and complaint.[165]

With respect to the litigation procedures and deadlines, the Vendor Action Procedures provide that court documents must be filed in accordance with the case management orders entered by the Title III Court in the Commonwealth Title III case.  *See Thirteenth Amended*

---

[162]   Approximately 335 of the vendors identified contracted with the Commonwealth, one with ERS, and the remainder with HTA.  The vast majority of the damages sought, over $4 billion, relate to purported contracts with the Commonwealth.

[163]   The UCC joined in some, but not all of these avoidance actions.

[164]   *See Notice of Hearing Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [ECF No. 7325] (the "Vendor Action Procedures Motion").

[165]   *See Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [ECF No. 7941] (order with attached, revised Vendor Action Procedures).

*Notice, Case Management and Administrative Procedures* [ECF No. 13512-1].  The procedures further require service of the procedures and order approving them upon any Defendants, and specify manners and addresses of service consistent with applicable rules.  Additionally, the Vendor Action Procedures provide for relaxation of deadlines for responsive and dispositive pleadings, discovery, and other filings, subject to alteration by request of any party.  An analogous order governs resolution of claims subject to tolling agreements.  *See Order Granting Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to Establish Procedures for the Approval of Settlements* [ECF No. 16791].

These deadlines provided in the Vendor Action Procedures generally continue all litigation deadlines.  During the continuance period, since extended by court orders, the Oversight Board and UCC have engaged in an informal resolution process described as the "Information Exchange," whereby the Oversight Board and vendors conduct additional diligence within specified parameters and thereafter commence settlement negotiations.

The Vendor Action Procedures outline a mediation process whereby the Oversight Board and any Defendant(s) may select mediators, schedule mediation, and advise the court of mediation progress.  The mediation process is by its own terms fully voluntary and non-binding and adjustable by agreement of the parties; the Vendor Action Procedures merely outline the mediation process and would provide advance approval thereof, obviating the need for parties to seek court approval of a litigation stay during the pendency of the mediation.

Since the filing of the Vendor Action Procedures Motion, the Special Claims Committee and the UCC have been working to resolve the tolling agreements and avoidance actions entered into with or filed against vendors.  As of February 1, 2022, approximately one hundred eighty-five adversary proceedings, including six (6) of the seven (7) HTA related-proceedings have been dismissed as a result of a vendor-defendant's participation in the informal resolution process and/or continuing efforts by the Special Claims Committee to obtain documents from Commonwealth agencies to substantiate the prepetition payments received by the vendors.  Likewise, as of February 1, 2022, approximately seventy-two tolling agreements with vendors have resulted in no further action from the Special Claims Committee and the UCC for the same reasons.

As of this time, several dozen avoidance action defendants and tolled parties have been resolved by monetary settlement or flagged for potential settlement due to information exchanges suggesting avoidance liability.  The Special Claims Committee and the UCC are actively preparing, conducting and/or finalizing settlement discussions with dozens of parties.  As of February 1, 2022, the Special Claims Committee and the UCC have taken receipt of approximately $7.1 million in settlement funds.  By agreement, the funds are held in escrow and shall be vested in the Avoidance Actions Trust, subject to any outstanding escrow fees, following confirmation of the Commonwealth Plan.

In November, 2019, the Special Claims Committee and the UCC filed a motion to modify the Vendor Action Procedures, and the Title III Court granted the motion, to continue facilitating

the informal, out-of-court resolution of the avoidance actions.[166]  The Modified Vendor Action Procedures Order extended the discovery and litigation deadlines several months to allow the parties more time to informally resolve the lawsuits before formal litigation is necessary.  Those deadlines were further extended into 2021 by a series of orders entered in light of, among other things, challenges posed by COVID-19.  *See, e.g.* [ECF No. 16429].  In August of 2021, the Court entered an order staying all of the avoidance actions to effectuate the Commonwealth Plan and related agreements.  [ECF No. 17977].  That stay remains in effect as to the sole remaining HTA-related adversary proceeding.  *See* Adv. Pro. No. 19-354 (LTS), ECF No. 18.

## H.    The Stay Order and Mediation Team Reports

### 1.    The Stay Order

On July 24, 2019, the Title III Court issued the Stay Order [Case No. 17-bk-3283, ECF No. 8244], staying through November 30, 2019 certain adversary proceedings and contested matters relating to litigation concerning the validity of the Commonwealth's general obligation bonds, as well as bonds issued by other entities and guaranteed by the Commonwealth.  Pursuant to the Stay Order, this stay was intended "to avoid piecemeal litigation of potentially overlapping key issues, and in an effort to identify efficiently the issues that must be litigated or otherwise resolved to achieve confirmation of a plan of adjustment for the Commonwealth (and other debtors and potential debtors in Title III proceedings), as well as to prioritize such issues and develop efficient approaches to the resolution of such issues."  *See* Stay Order at 1.

During the pendency of the stay, the Stay Order directed the Oversight Board, AAFAF, the UCC, the Official Committee of Retired Employees and the parties in the stayed adversary proceedings and contested matters, as directed by the Honorable Barbara J. Houser, the Mediation Team Leader for the Title III proceedings (the "Mediation Team Leader"), to participate in discussions and communications facilitated by the Mediation Team Leader to address the concerns identified by the Title III Court in the Stay Order.

### 2.    Interim Report and Recommendation of the Mediation Team

On November 27, 2019, the Mediation Team Leader filed the *Interim Report and Recommendation of the Mediation Team* [Case No. 17-bk-3283, ECF No. 9365] (the "Interim Report").  The Interim Report described two tasks concurrently performed by the Mediation Team.  First, the Mediation Team addressed the scheduling and sequencing of issues identified in the Stay Order or identified by the parties as issues relevant to confirmation of the plan of adjustment for one or more of the Title III debtors.  *See* Interim Report.  Second, the Mediation Team engaged the parties in substantive mediation sessions as directed by the Stay Order.  *Id.* at 2.

---

[166]    *See Order Granting Omnibus Motion To Extend Deadlines In Order Granting Omnibus Motion By The Financial Oversight And Management Board For Puerto Rico, Acting By And Through The Members Of The Special Claims Committee And The Official Committee Of Unsecured Creditors To (I) Establish Litigation Case Management Procedures And (II) Establish Procedures For Approval Of Settlements,* [ECF No. 9476] (the "Modified Vendor Action Procedures Order").

The Interim Report stated (at 4) that, because an amended plan of adjustment might render any scheduling recommendations by the Mediation Team moot, the Interim Report addressed only the scheduling of disputed issues that should proceed in the near-term: scheduling and sequencing of litigation concerning (i) the validity of certain challenged series of GO and PBA bonds, (ii) the secured or unsecured status of claims on GO and PBA bonds, (iii) and the rights, as against the Commonwealth, of holders of "revenue bonds" and other debt issued by certain Puerto Rico instrumentalities. The Interim Report described these issues as among the most fundamental and pivotal issues in the Title III cases, and recommended litigation on these issues commence as soon as practicable. *Id.* at 5. The Interim Report attached proposed scheduling orders for litigation concerning (i) GO and PBA bonds; (ii) revenue bonds issued by HTA, PRIFA, and CCDA; and (iii) the motion for relief from stay filed by the DRA Parties.

On December 6, 2019, numerous parties, including the Oversight Board, Ambac, National, FGIC, Assured, the UCC, the DRA Parties, and Peter C. Hein, filed responses to the Mediation Team's Interim Report [Case No. 17-bk-3283, ECF Nos. 9493, 9504, 9440, 9485, 9505, 9503, 9508]. On December 11, 2019, the Title III Court held a hearing to consider the Interim Report, the proposed scheduling orders, and the parties' objections and responses thereto.

On December 19, 2019, the Title III Court entered the proposed scheduling order for litigation concerning the revenue bonds [Case No. 17-bk-3283, ECF No. 9620]. The Title III Court also issued an order extending the duration of the stay to January to January 31, 2020, extending the deadline for the Mediation Team to file an amended report to January 10, 2020, and setting a hearing to consider the amended report for January 29, 2020 [Case No. 17-bk-3283, ECF No. 9618].

On December 23, 2019, in response to a request by the Mediation Team, the Title III Court entered an order extending the January 10, 2020 deadline for the amended report by one month to February 10, 2020, adjourning the hearing on the amended report to March 4, 2020, and extending the stay to March 11, 2020. [Case No. 17-bk-3283, ECF No. 9639].

Numerous parties filed objections or other responses to the Title III Court's December 23, 2019 order, including Assured, National, Ambac, FGIC, the DRA Parties, and the UCC. [Case No. 17-bk-3283, ECF Nos. 9655, 10251, 10249, 10421, and 10424]. At the January 29, 2020 omnibus hearing, the Title III Court, among other things, considered issues relating to the case management order for litigating issues related to revenue bonds. With respect to, among other things, the HTA Lift Stay Motion, the Title III Court bifurcated the issues of standing and secured status, permitted limited discovery on preliminary issues, and scheduled a hearing on the bifurcated Lift Stay Motions for March 5, 2020. On January 31, 2020, the Title III Court entered an amended interim case management order for revenue bonds [Case No. 17-bk-3283, ECF No. 10595], reflecting the modifications discussed at the January 29, 2020 omnibus hearing.

### 3.   Amended Report and Recommendation of the Mediation Team

#### (a)   February 10, 2020 Amended Report

On February 10, 2020, the Mediation Team filed its *Amended Report and Recommendation of the Mediation Team* [Case No. 17-bk-3283, ECF No. 10756] (the "Amended

Report"). The Amended Report noted that since the filing of the Interim Report, the 2020 PSA was signed by the Oversight Board and the holders of approximately $8 billion in claims of GO/PBA bonds, notice of which was made publicly available on February 9, 2020. Amended Report at 8.

In the Amended Report, the Mediation Team made several recommendations regarding the schedules for litigating issues related to the GO and PBA Bonds, the revenue bonds, and the ERS bonds, as well as proposed scheduling for other litigations subject to the stay. The Mediation Team also set out a potential schedule for the pre-disclosure statement hearing period, the disclosure statement hearing, and the confirmation hearing, *see id.* at 20-26.

Several parties filed responses to the Mediation Team's Amended Report, including Peter C. Hein, AAFAF, Ambac, Assured, National, FGIC, the UCC, and the DRA Parties. [Case No. 17-bk-3283, ECF Nos. 11284, 11159, 11482, 11493, 11496, 11497, 11498, and 11495]. Also, on February 21, 2020, the Oversight Board and the parties to the 2020 PSA filed statements in support of the Amended Report. [Case No. 17-bk-3283, ECF Nos. 11492, 11499].

### (b) March 10, 2020 Final Order

The Title III Court held a hearing regarding the Amended Report and the objections and responses on March 4, 2020. On March 10, 2020, the Title III Court issued the *Final Order Regarding (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto* [Case No. 17-bk-3283, ECF No. 12189] (the "Final Stay and Mediation Order"). The Final Stay and Mediation Order adopted the recommendations of the Mediation Team with certain modifications, and ordered as follows:

- The Title III Court stayed any contested matters and adversary proceedings relating to the validity and priority of GO obligations pending the Title III Court's decision regarding confirmation of the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11946] (the "2020 Commonwealth Plan").

- The Title III Court modified the Amended Interim Revenue Bonds Order consistent with the proposed Final Revenue Bonds Scheduling Order, including schedules for filing partial summary judgment motions and addressing potential intra-debtor conflicts of interest, provisions for limited discovery regarding the HTA Lift Stay Motion, the PRIFA Lift Stay Motion, or the CCDA Lift Stay Motion; and a provision permitting parties to seek certification of decisions on the Revenue Bond Lift Stay Motions for immediate appeal.

The Title III Court further ordered that, unless it subsequently ordered otherwise, contested matters or adversary proceedings identified in Appendix A to the Final Stay and Mediation Order, as well as any contested matters or adversary proceedings that either (i) addressed issues settled by the 2020 Commonwealth Plan, or (ii) addressed issues joined by any of the litigations that were stayed pending a decision on confirmation, would be stayed pending the Title III Court's decision whether to confirm the 2020 Commonwealth Plan.

## I.      Related Debt Restructurings

### 1.      Commonwealth Title III Case

#### (a)      Background

Puerto Rico has an area of approximately 3,500 square miles and a population estimated by the U.S. Census Bureau of approximately 3.2 million as of July 1, 2019.

Puerto Rico came under U.S. sovereignty pursuant to the Treaty of Paris of 1898. In 1917, pursuant to the Jones-Shafroth Act, Pub. L. 64-368, citizens of Puerto Rico became citizens of the U.S. In 1950, the U.S. Congress authorized Puerto Rico to approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, approved by the U.S. Congress, and subsequently approved by the President of the U.S. in 1952. The Commonwealth Constitution provides for the separation of powers between the executive, legislative and judicial branches of government. The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

Since the enactment of PROMESA, Puerto Rico has had five Governors. The first, Alejandro García-Padilla, was elected Governor on November 6, 2012, and was sworn into office for a four-year term on January 2, 2013. The second, Ricardo A. Rosselló Nevares, was elected Governor on November 8, 2016 and was sworn into office for a four-year term on January 2, 2017. On July 24, 2019, then-Governor Rosselló announced his resignation effective as of August 2, 2019. Before his resignation became effective, then-Governor Rosselló appointed former resident commissioner Pedro Pierluisi as Secretary of State, which is the first official in the line of succession to Governor under the Commonwealth Constitution. Despite being confirmed by only the Puerto Rico House of Representatives, but not the Senate, Mr. Pierluisi was sworn in as acting Governor on August 2, 2019. But on August 7, 2019, the Puerto Rico Supreme Court unanimously determined that Mr. Pierluisi was unconstitutionally sworn into office as Governor and Mr. Pierluisi promptly resigned. Later that same day, the Secretary of Justice of Puerto Rico, Wanda Vázquez, was sworn in as Governor pursuant to the Commonwealth Constitution to complete former Governor Rosselló's term through 2020. Pedro Pierluisi was elected Governor on November 3, 2020, and was sworn into office for a four-year term on January 2, 2021

While the people of Puerto Rico are citizens of the United States under the U.S. Constitution, the residents of Puerto Rico have no direct representation in the federal government. Puerto Rico has no electors in the Electoral College to vote for president; however, Puerto Rican residents can participate in U.S. presidential nominating primaries. Consistent with the treatment for all U.S. territories, under current U.S. Congressional rules, Puerto Rico's representation in Congress is limited to a single resident commissioner who does not possess the same parliamentary rights afforded to other members of Congress. The resident commissioner is not permitted to vote on the House floor, is not recorded on the Clerk's roll of Members-elect, and may not vote for Speaker or file or sign discharge petitions. In addition, federal taxes, such

as individual income taxes, except payroll taxes such as Social Security and Medicare taxes, are generally not levied on Puerto Rico source income.[167]

As a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board as an entity within the Commonwealth government with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs and to restructure its debt.

***The Commonwealth's Public Corporations and Instrumentalities.***   In the Commonwealth, many governmental and quasi-governmental functions are performed by legally separate public corporations created by the Legislature with varying degrees of independence from the Commonwealth.  Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the Commonwealth.   Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Puerto Rico Senate.  Capital improvements of most of the larger public corporations have been financed historically by bonds issued under trust agreements or bond resolutions or by loan agreements.

Through the years, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the General Fund of the Commonwealth or appropriations of Commonwealth taxes or other revenues, to fund their operations.   Certain of these instrumentalities, including the Puerto Rico Health Insurance Administration ("ASES"), the Puerto Rico Medical Services Administration, PRITA, the Puerto Rico and Island Municipalities Maritime Transport Authority, the Metropolitan Bus Authority ("MBA"), HTA, and the University of Puerto Rico ("UPR"), provide services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day-to-day operations.  Other subsidized public corporations provide services to the Central Government and other government entities, which in turn provide services to the Commonwealth residents.

Commonwealth appropriations and/or tax revenues have also been used as a principal source of funding for certain public corporations dedicated to fiscal and advisory functions (*e.g.*, AAFAF, infrastructure development (*e.g.*, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), and the Puerto Rico Public Private Partnerships Authority), air and maritime transportation and logistics (*e.g.*, the Puerto Rico Ports Authority), and economic, tourism and cultural promotion (*e.g.*, the Puerto Rico Tourism Company ("PRTC"), the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Industrial Development Company ("PRIDCO") (primarily with respect to the Special Fund for Economic Development and the Rums of Puerto Rico Program), and the Institute of Puerto Rican Culture).

Other public corporations, such as COFINA and the Puerto Rico Public Finance Corporation ("PFC"), have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

---

[167]   The information is based on AAFAF's (as defined below) advice as to the contents of the upcoming Commonwealth Financial Statement.

Notwithstanding the Commonwealth's substantial grants of support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable. If the Commonwealth's financial condition is not improved by the Plan and the reforms the Oversight Board has built into its certified fiscal plans and budgets, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues.

As of the Commonwealth Petition Date, the Commonwealth had approximately $13.7 billion of GO debt and approximately $5 billion of debt guaranteed by its good faith, credit, and taxing power. The holders of the GO debt and the Commonwealth guaranteed debt claim they have (i) a first priority right to all "available revenues" of the Commonwealth, and (ii) liens against certain property taxes and the funds historically conditionally appropriated to certain instrumentalities subject to Article VI, section 8 of the Commonwealth Constitution. Under section 8, when "available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Holders of the GO debt and Commonwealth guaranteed debt have asserted that until all their accrued interest and matured principal is paid in full, the monies otherwise historically conditionally appropriated to HTA and other entities subject to Article VI, section 8 of the Commonwealth Constitution constitute "available revenues" payable to those holders.

### (b)   Commencement of the Commonwealth Title III Case

On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing the Commonwealth Title III Case.

On June 29, 2017, the Title III Court entered an order granting the joint administration of the Title III cases of the Commonwealth and HTA for procedural purposes only [ECF No. 537].

### (c)   Confirmation and Consummation of the Commonwealth Plan

In May 2019, the Oversight Board reached agreements with several major groups of claimholders on the treatments of their claims, as set forth in that certain *Plan Support Agreement*, dated as of May 31, 2019 (the "2019 PSA"), among the Oversight Board, and certain holders of Commonwealth general obligation bonds ("GO Bonds") and bonds issued by PBA ("PBA Bonds"). The 2019 PSA included the compromise and settlement of a key dispute concerning whether claimed leases between the Commonwealth and PBA were true leases for purposes of Bankruptcy Code section 365 or were debts of the Commonwealth.

On June 7, 2019, the Oversight Board and the Retiree Committee entered into a plan support agreement providing for the Retiree Committee's support for the term of an agreed-upon restructuring of the Commonwealth's pension obligations pursuant to the Plan. That same day, on June 7, 2019, the Oversight Board and AFSCME entered into a plan support agreement

regarding, among other things, the AFSCME's support for the terms of a new collective bargaining agreement, along with the restructuring of pension obligations pursuant to a plan of adjustment for the Commonwealth.

On September 27, 2019, the Oversight Board filed an initial plan of adjustment [ECF No. 8765] (the "Initial Commonwealth Plan"), which embodied, among other agreements, the 2019 PSA. Thereafter, the Oversight Board continued to engage stakeholders in negotiations facilitated by the Mediation Team to build greater support for the Initial Commonwealth Plan. On February 9, 2020, the Oversight Board and certain holders of in excess of $8 billion in GO Bonds and PBA Bonds disclosed they had reached a global settlement in principle outlined in a Plan Support Agreement (the "2020 PSA"), which agreement had greater support among stakeholders than the 2019 PSA.

In furtherance of the 2020 PSA, on February 28, 2020, the Oversight Board filed the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11946].

On March 10, 2020, the Title III Court entered the *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [ECF No. 12187] establishing June 3–4, 2020 as the dates for the hearing to consider the adequacy of the information contained in the 2020 Disclosure Statement and related deadlines.

However, in response to the spread of COVID-19 throughout Puerto Rico and the rest of the world, and its effects on the people and economy of Puerto Rico, the Oversight Board sought to adjourn the hearing to consider approval of the 2020 Disclosure Statement and related deadlines, subject to further status reports to be provided to the Title III Court [ECF No. 12485], which the Title III Court granted by order, dated March 27, 2020 [ECF No. 12549].

On October 29, 2020, the Title III Court entered the *Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14987] (the "Plan Scheduling Order"), which directed the Oversight Board to file on or before February 10, 2021 the proposed terms of a plan of adjustment for the Commonwealth and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things. In accordance with the Plan Scheduling Order, and with the guidance of the Mediation Team, the Oversight Board participated in (a) group or individual informational and negotiation mediation sessions (as and when scheduled by the Mediation Team) or (b) informal sessions with the Commonwealth, the parties to the 2020 PSA, the monoline insurers, the Official Committee of Unsecured Creditors, the Retiree Committee, and various unions, all designed to establish a framework and timeline for the development for a consensual debt restructuring.

On February 9, 2021, the Oversight Board announced that, as a result of discussions led by the Mediation Team, the Oversight Board and the principal parties to the 2020 PSA reached an agreement in principle regarding the terms of an amended plan of adjustment, subject to the execution of definitive documentation.

On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Plan Support Agreement, dated as of February 22, 2021 (the "2021 PSA"), among the Oversight Board, as representative of the Commonwealth, ERS, and PBA, certain holders of GO Bonds, certain holders of PBA Bonds, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, Syncora Guarantee Inc., as holder of, subrogee with respect to, or insurer of GO Bonds and PBA Bonds, and National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds.

On March 8, 2021, the Oversight Board filed the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF Nos. 15977 and 15988] and the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 15976] (the "Second Amended Commonwealth Plan").

On April 2, 2021, the Oversight Board entered into the *Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment* (the "ERS Stipulation") with certain groups of holders of bonds (the "ERS Bondholders") issued by ERS (the "ERS Bonds"). The ERS Stipulation incorporates, among other things, the proposed consensual treatment for ERS Bonds.

On April 12, 2021, the Oversight Board entered into an agreement in principle with Assured and National regarding, among other things, the treatment of claims asserted against the Commonwealth arising from its retention of funds historically conditionally appropriated and transferred to certain Commonwealth instrumentalities (the "Allocable Revenues"), which was memorialized in the HTA/CCDA PSA.

On May 5, 2021, the Oversight Board, as Title III representative of the Commonwealth and HTA, entered into the HTA/CCDA PSA. The HTA/CCDA PSA incorporates, among other things, the proposed treatment of claims asserted against the Commonwealth related to its retention of Allocable Revenues, the terms of a restructuring of the indebtedness of CCDA, and certain terms to be included in a plan of adjustment for HTA.

In furtherance of the 2021 PSA, ERS Stipulation, and the HTA/CCDA PSA, on May 11, 2021, the Commonwealth filed the *Third Amended Title III Joint Plan Of Adjustment Of The Commonwealth of Puerto Rico, et al.* [ECF No. 16740] (the "Third Amended Commonwealth Plan").

On July 6, 2021, the Oversight Board reached an agreement in principle, subject to final documentation, with the American Federation of Teachers, the Asociacion de Maestros de Puerto Rico ("AFT"), and the Asociacion de Maestros de Puerto Rico-Local Sindical ("AMPR") regarding, among other things, the treatment of TRS benefits pursuant to a Commonwealth plan of adjustment.  This agreement, however, was subject to ratification by simple majority vote of AMPR's members.  On or around September 28, 2021, the members of AFT and AMPR voted against ratifying this agreement.

On July 12, 2021, the Oversight Board reached an agreement in principle, subject to final documentation, with the Creditors' Committee, regarding, among other things, proposed recoveries for general unsecured creditors.

On July 27, 2021, the Oversight Board, as Title III representative of the Commonwealth, entered into that certain PRIFA plan support agreement (the "PRIFA PSA") with certain holders of bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA"), Ambac Assurance Corp., solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to bonds issued by PRIFA ("PRIFA Bonds"), and Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds, which resolves certain litigation among the parties, set forth the terms of securities to be issued pursuant to the plan of adjustment for the Commonwealth and a restructuring of the indebtedness of PRIFA, and sets forth the agreement of the parties to support the terms of the plan of adjustment for the Commonwealth consistent with the terms of the PRIFA PSA.  That same day the Oversight Board filed the *Sixth Amended Title III Joint Plan of Adjustment* [ECF No. 17516] (the "Sixth Amended Commonwealth Plan") and associated disclosure statement [ECF No. 17517] to, among other things, incorporate the settlements contained in the PRIFA PSA.

On July 29, 2021, the Oversight Board reached an agreement with the Creditors' Committee on the terms of the Plan's treatment of general unsecured claims (the "Committee Agreement").  On July 30, 2021, the Oversight Board filed a further amended plan of adjustment [ECF Nos. 17627 and 17628], to incorporate the terms set forth in the Committee Agreement.

The Commonwealth's disclosure statement filed on July 30, 2021 was approved by the Title III Court by order entered on August 2, 2021 [ECF No. 17639] (the "Disclosure Statement Order").

The Title III Court held hearings to consider confirmation of the Commonwealth Plan on November 8 to 23, 2021.  On January 18, 2022, the Title III Court confirmed the Commonwealth Plan.  On March 15, 2022, the Commonwealth Effective Date occurred and the Commonwealth Plan was substantially consummated.

### (d)    Relevant Terms of Commonwealth Plan

Pursuant to the terms and provisions of the Commonwealth Plan, in exchange for the settlement of various Commonwealth-HTA revenue bond litigation, the HTA revenue bond litigation, and HTA Lift Stay Motion, among others, holders of such claims will receive

188

Clawback CVIs[168] from the Commonwealth.   A contingent value instrument (CVI) is an instrument that gives a holder the right to receive payments in the event that certain triggers are met.

The Clawback CVI is a contingent value instrument based on sharing the potential outperformance of the 5.5% SUT, relative to projections in the Commonwealth's 2020 Certified Fiscal Plan.  That is, potential payments would be contingent upon the Commonwealth's Sales and Use Taxes exceeding performance metrics.  The Clawback CVI allocable to Allowed CW/HTA Claims (as defined in the Commonwealth Plan) pursuant to the Commonwealth Plan is subject to a lifetime cap of $3,697,668,995.00.   Below is a summary of the terms of the Clawback CVIs issued pursuant to the Commonwealth Plan.

The following is a summary of the terms of the CVI, subject entirely to the terms in Exhibit J of the Commonwealth Plan.

***Outperformance Metrics.***  The SUT-based CVI contemplated under the Commonwealth Plan is tied to the quantum of sales and use tax ("SUT") collected by the Commonwealth in a given fiscal year.  The amount that is paid to the SUT-based CVI is based on a baseline amount that reflects the 5.5% SUT projection from the 2020 CW Fiscal Plan for FY2022 to FY2051.[169] For example, if, at the end of a fiscal year, 5.5% SUT collections are in excess of the baseline (the "SUT Baseline", see below) the holder of an SUT-based CVI may receive a distribution (*i.e.*, on the basis of a (i) percentage of cumulative outperformance (less previous payments to the SUT-based CVI) or (ii) percentage of annual outperformance) under the terms of the SUT-based CVI Indenture.  If, however, SUT collections are at or below the SUT Baseline at the end of a fiscal year, there will be no distribution to the holders of an SUT-based CVI on account of that year.  For example, the SUT Baseline for 2022 is $1,282,901,069.30.  If 5.5% SUT collections for FY2022 are above that amount, the CVI will receive a payment based on certain calculations discussed below.

Below is a chart that depicts the SUT Baseline.  Holders of CVIs will receive a proportion of the amount available for distribution under the CVI Indenture.

---

[168]  The Commonwealth Plan provides for the issuance of GO CVIs in addition to the Clawback CVIs.
[169]   The 2020 CW Fiscal Plan contains projections through FY2049.  The SUT Baseline for FY2050 and FY2051 is calculated using FY2049 projections and the average growth rate from FY2045 to FY2049.  Also see Annex 5 of Exhibit J to the Commonwealth Plan.

| 5.5% SUT Baseline[170] | | | | |
|---|---|---|---|---|
| Fiscal Year | Amount | | Fiscal Year | Amount |
| 2022 | $1,282,901,069.30 | | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | | 2050 | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | | 2051 | 1,810,682,942.40 |

Measuring the 5.5% SUT collections to determine whether the cumulative or annual benchmark has been exceeded (as discussed below) will take place at the end of each fiscal year, from FY2022 until FY2051.

### General Terms of SUT-Based CVIs.

**Contingent Future Obligation of the Commonwealth**.  The SUT-based CVIs represent a promise by the Commonwealth to pay SUT-based CVI holders *only if* the conditions enumerated in the SUT-based CVI Indenture occur in a given fiscal year.  The Commonwealth will pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the SUT-Based CVIs.

**Term**.  The SUT-based CVIs are deemed issued on July 1, 2021.  The GO CVIs will have a 22-year term.  The Clawback CVIs will have a 30-year term.

**Outperformance Condition and Waterfall**.  As described above, holders of SUT-based CVIs will receive a portion of the 5.5% SUT collections that exceed the corresponding SUT Baseline (the "Outperformance Amount"), subject to certain calculations as described below.  Accordingly, the amount available for distribution on account of SUT-based CVIs will increase

---

[170]   The 2020 CW Fiscal Plan contains projections through FY2049.  The SUT Baseline for FY2050 and FY2051 is calculated using FY2049 projections and the average growth rate from FY2045 to FY2049.  Also see Annex 5 of Exhibit J to the Commonwealth Plan.

by a portion of the Outperformance Amount and reduced by distributions to holders of SUT-based CVIs.

At the end of each fiscal year, a portion of the Outperformance Amount, if any, may be available for distribution to holders of GO CVIs, and a portion to holders of Clawback CVIs based on a formula and/or a priority waterfall of distributions that determines the size of the share of Outperformance Amount for each group of holders of CVIs.

i.      Calculation and Distribution of the Subject to Waterfall Outperformance Amount

The "Subject to Waterfall Outperformance Amount" is calculated each fiscal year as the *lesser* of (i) 50% of cumulative outperformance relative to the SUT Baseline less payments previously made on account of the Subject to Waterfall Outperformance Amount to holders of GO CVIs and holders of Clawback CVIs and (ii) 75% of annual outperformance relative to the SUT Baseline.

GO CVIs in aggregate will receive the first $100 million of the Subject to Waterfall Outperformance Amount in a given fiscal year, Clawback CVIs in aggregate will receive the next $11.1 million, and GO CVI holders and Clawback CVI holders will share the remaining amount of Subject to Waterfall Outperformance Amount 90% and 10%, respectively, if any available. For example, if the Subject to Waterfall Outperformance Amount is $121.1 million in FY2022, holders of GO CVIs in aggregate will receive $109 million ($100 million plus 90% of the $10 million remainder, or $9 million) and holders of Clawback CVIs in aggregate will receive $12.1 million ($11.1 million plus 10% of the $10 million remainder, or $1 million).  Amounts used within example are illustrative and do not reflect actual payments to be made to holders of SUT-based CVIs.

After the end of the GO CVI term (starting in FY2023), 100% of the Subject to Waterfall Outperformance Amount will accrue to the Clawback CVI (unless the GO CVI is paid up to GO CVI Lifetime Cap (defined below) during or prior to FY2021, in which case 100% of the Subject to Waterfall Amount will accrue to the Clawback CVI beginning in the following fiscal year in accordance with the CVI Indenture).

ii.      Calculation and Distribution of the Not Subject to Waterfall Outperformance Amount

The Not Subject to Waterfall Outperformance Amount will be the *lesser* of (i) 40% of cumulative outperformance relative to the SUT Baseline less payments previously made on account of the Not Subject to Waterfall Outperformance Amount to holders of Clawback CVIs and (ii) 95% of annual outperformance relative to the SUT Baseline that remains after payments to holders of GO CVIs and to holders of Clawback CVIs on account of the Subject to Waterfall Outperformance Amount.

In addition to payments received on account of the Subject to Waterfall Outperformance Amount (if any, per above), holders of Clawback CVIs will also receive a share of the Not Subject to Waterfall Outperformance Amount, if any, according to the percentage allocation

listed for their particular claim type in Annex 4 of Exhibit J of the Commonwealth Plan.  For example, if the Not Subject to Waterfall Outperformance amount is $56 million, holders of Allowed CW/HTA Claims, in aggregate, will receive 68.6% of that amount, or approximately $38 million.

     iii.     <u>Additional Priority Rules for Allowed CW/HTA Claims</u>

Allowed CW/HTA Claims are further subject to a priority waterfall of distributions (the "<u>HTA Priority Distribution Waterfall</u>") depending on the type of Allowed CW/HTA claim held.  Allowed CW/HTA Claims pursuant to the Commonwealth Plan comprise four categories of claims: HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims, and GDB HTA Loans.  Clawback CVI payments allocated to Allowed CW/HTA Claims will be distributed as follows:

- First $179,462,539 of distributions to the HTA 68 Bond Claims,

- Next $1,833,405,578 of distributions to HTA 98 Senior Bond Claims,

- Next $207,294,178 of distributions to HTA 98 Sub Bond Claims, and

- Next $1,477,506,700 of distributions to the GDB HTA Loans.

Claims at a higher level must be paid up to the amount specified above in the HTA Priority Distribution Waterfall before claims at the next level can receive any distribution.  For example, if aggregate Clawback CVI distributions for FY2022 are $68.1 million (from both (i) the Subject to Clawback Outperformance Amount and (ii) the Not Subject to Waterfall Outperformance Amount), Allowed CW/HTA Claims in aggregate will receive 68.6% of this amount, or approximately $47 million.  In this case, as FY2022 is the first year in the Clawback CVI term, the entire $47 million would be distributed to HTA 68 Bond Claims holders.  HTA 68 Bond Claims would continue to receive distributions from the Allowed CW/HTA Claims' allocation of Clawback CVI payments until HTA 68 Bond Claims have received $179,462,539 in total.  After that threshold is reached, distributions to Allowed CW/HTA Claims will be paid to HTA 98 Senior Bond Claims until HTA 98 Senior Bond Claims have received $1,833,405,578 in total, and thereafter for HTA 98 Sub Bond Claims and thereafter for GDB HTA Loans.

**Lifetime and Annual Cap on GO CVI Payments**.  Holders of GO CVIs are subject to a total lifetime cap on payments of $3,500 million ("<u>GO CVI Lifetime Cap</u>"), with a maximum annual payment of $200 million plus any unused amounts from previous fiscal years, and in all cases no more than $400 million per year.  If the GO CVI Lifetime Cap is reached in fiscal year 21 of the GO CVI term or before, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Clawback CVI beginning in the following year, subject to applicable Clawback CVI annual and lifetime caps.

**Lifetime and Annual Cap on Clawback CVI Payments**.  Holders of Clawback CVIs will have a maximum lifetime cap depending on the type of claim held.  The maximum lifetime cap is $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed

CW/Convention Center Claims, $22,580,090 for the Allowed CW/MBA Claim, and $1,301,525,288 for Allowed CW/PRIFA Rum Tax Claims[171] (in total, $5,239,002,764). Clawback CVIs are also subject to maximum annual payments. In fiscal years 1-22 of the Clawback CVI term, the maximum annual payment is $175 million plus any unused amounts from previous years, and in all cases no more than $350 million. In fiscal years 23-30 of the Clawback CVI term, the maximum annual payment is $375 million plus any unused amounts from previous years, and in all cases no more than $750 million. The annual and lifetime caps apply to payments received by holders of Clawback CVIs, in aggregate, on account of the Subject to Waterfall Outperformance Amount and the Not Subject to Waterfall Outperformance Amount.

**Call Structure**. The SUT-based CVIs are callable on any date at an amount equal to the present value of the maximum amount of future payments for such SUT-based CVI (*i.e.*, whether GO CVI or Clawback CVI). The present value is calculated by using an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the applicable SUT-based CVI.

The following chart illustrates the net present value of the 2021 Fiscal Plan SUT Projections and the maximum payment for GO CVIs at various discount rates:[172]

| Assumption | Discount Rate | | | |
|---|---|---|---|---|
| | 5.0% | 10.0% | 15.0% | 20.0% |
| 2021 Fiscal Plan SUT Projections | 1,173 | 750 | 524 | 392 |
| Maximum Payment | 2,296 | 1,622 | 1,218 | 959 |

---

[171]  Lifetime cap for Allowed CW/PRIFA Rum Tax Claims is applied via PRIFA Trust (as defined in Exhibit "F" to the PRIFA Related Plan Support Agreement) such that distributions from PRIFA Trust on account of either SUT-based or rum tax-based CVIs are subject to the lifetime cap for Allowed CW/PRIFA Rum Tax Claims.

[172]  Actual payments made on account of the GO CVIs may differ. The chart below is intended for illustrative purposes only and is <u>not</u> intended to guarantee any level of recovery or payment on account of the GO CVIs.

**Baseline SUT Adjustment**.  The Baseline SUT may be adjusted in the event of a U.S. Presidential Declaration of Disaster or any other exemption implemented by the Government under applicable law.  The calculation of any adjustment will be determined by the Treasury Secretary and validated by an independent third party and will be publicly disclosed.  Validation by the independent third party will be binding on both the Government and holders of SUT-based CVIs.  A separate agreement will document the methodology the independent third party will use to verify the Treasury Secretary's calculation.  To the extent the Commonwealth reduces the 5.5% SUT to a lower rate than 5.5%, a formulaic adjustment will be agreed upon by the Board and Initial PSA Creditors to maintain the same amount of outperformance had the Measured SUT (as defined in the Commonwealth Plan) remained at 5.5%.

### (e)    Payment of HTA Bond Claims, and Commonwealth Loan to HTA

Pursuant to the Commonwealth Plan and the Commonwealth Confirmation Order, upon satisfaction of the HTA Distribution Conditions, HTA is required to make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of $184,800,000.00 and $79,200,000.00, respectively, which shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds.

In connection with such interim distribution, on [      ], 2022, HTA and the Commonwealth entered will enter into a loan agreement, whereby the Commonwealth agreed will agree to provide a loan to HTA (the "Commonwealth Loan"), proceeds of which were will be used by HTA to, among other things, pay such interim distribution.

The Commonwealth Loan is a multi-draw term loan to HTA in the aggregate principal amount of $362,000,000; consisting of [(a) an initial draw in the principal amount of $174,000,000.00 made upon satisfaction of the HTA Distribution Conditions, (b) a second draw in the principal amount of $188,000,000.00 shall be made upon entry of the HTA Effective Date.]

The Commonwealth Loan accrues interest until the maturity thereof (whether by acceleration or otherwise) at a rate per annum of two point five percent (2.5%).  Interest on the Commonwealth Loan is computed on the basis of a 360-day year consisting of twelve (12) 30-day months and is payable for the actual number of days elapsed (including the first day but excluding the last day), on each January 1 and July 1, commencing July 1, 2023.

The principal and interest of the Commonwealth Loan shall be payable as follows:

|        | Principal      | Interest       | Agg. Loan Payments |
|--------|----------------|----------------|--------------------|
| Total  | 362,000,000.00 | 173,538,404.20 | 535,538,404.20     |
| 7/1/23 | 10,763,135.00  | 11,714,722.22  | 22,477,857.22      |
| 7/1/24 | 9,447,509.00   | 8,780,921.63   | 18,228,430.63      |
| 7/1/25 | 4,810,622.00   | 8,544,733.90   | 13,355,355.90      |
| 7/1/26 | 5,197,995.00   | 8,424,468.35   | 13,622,463.35      |
| 7/1/27 | 5,600,394.00   | 8,294,518.48   | 13,894,912.48      |
| 7/1/28 | 6,018,302.00   | 8,154,508.63   | 14,172,810.63      |

194

|  | Principal | Interest | Agg. Loan Payments |
|---|---|---|---|
| 7/1/29 | 6,452,216.00 | 8,004,051.08 | 14,456,267.08 |
| 7/1/30 | 6,902,647.00 | 7,842,745.68 | 14,745,392.68 |
| 7/1/31 | 7,370,121.00 | 7,670,179.50 | 15,040,300.50 |
| 7/1/32 | 7,855,180.00 | 7,485,926.48 | 15,341,106.48 |
| 7/1/33 | 8,358,382.00 | 7,289,546.98 | 15,647,928.98 |
| 7/1/34 | 8,880,300.00 | 7,080,587.43 | 15,960,887.43 |
| 7/1/35 | 9,421,525.00 | 6,858,579.93 | 16,280,104.93 |
| 7/1/36 | 9,982,665.00 | 6,623,041.80 | 16,605,706.80 |
| 7/1/37 | 10,564,346.00 | 6,373,475.18 | 16,937,821.18 |
| 7/1/38 | 11,167,211.00 | 6,109,366.53 | 17,276,577.53 |
| 7/1/39 | 11,791,923.00 | 5,830,186.25 | 17,622,109.25 |
| 7/1/40 | 12,439,163.00 | 5,535,388.18 | 17,974,551.18 |
| 7/1/41 | 13,109,633.00 | 5,224,409.10 | 18,334,042.10 |
| 7/1/42 | 13,804,055.00 | 4,896,668.28 | 18,700,723.28 |
| 7/1/43 | 14,523,171.00 | 4,551,566.90 | 19,074,737.90 |
| 7/1/44 | 15,267,745.00 | 4,188,487.63 | 19,456,232.63 |
| 7/1/45 | 16,038,563.00 | 3,806,794.00 | 19,845,357.00 |
| 7/1/46 | 16,836,434.00 | 3,405,829.93 | 20,242,263.93 |
| 7/1/47 | 17,662,190.00 | 2,984,919.08 | 20,647,109.08 |
| 7/1/48 | 18,516,687.00 | 2,543,364.33 | 21,060,051.33 |
| 7/1/49 | 19,400,805.00 | 2,080,447.15 | 21,481,252.15 |
| 7/1/50 | 20,315,451.00 | 1,595,427.03 | 21,910,878.03 |
| 7/1/51 | 21,261,555.00 | 1,087,540.75 | 22,349,095.75 |
| 7/1/52 | 22,240,075.00 | 556,001.88 | 22,796,076.88 |

On the HTA Effective Date, Reorganized HTA shall issue to the Commonwealth the Subordinated Indebtedness, which shall have a principal amount equal to the outstanding principal amount of the Commonwealth Loan at the date of issuance, plus any accrued and unpaid interest thereon, under the terms of the New HTA Bonds Indenture, in lieu of cash payments in full satisfaction of the Commonwealth's administrative expense claim on account of the Commonwealth Loan.   Upon the delivery of the Subordinated Indebtedness to the Commonwealth, the Commonwealth Loan and the loan agreement shall be deemed immediately terminated and no longer in effect.  See Section VI.F.6 of this Disclosure Statement for a more detailed description of the Subordinated Indebtedness.

In the event the Effective Date does not occur and the New HTA Bonds are not issued on or prior to June 30, 2023, the HTA has agreed to seek approval from the Title III Court to grant a subordinate lien in favor of the Commonwealth on all toll revenues, subject to terms and conditions to be agreed upon by the parties at such time.

The HTA has undertaking the following covenants in respect of the Commonwealth Loan under the loan agreement:

1.  <u>Additional Indebtedness</u>.  So long as the Commonwealth Loan and the loan agreement are in effect, HTA shall not incur any additional indebtedness outside the ordinary course of business without approval of the Oversight Board while it is in existence, other than the New HTA Bonds.

2.  <u>Negative Pledge</u>.  HTA shall not create or cause to be created any lien or charge on the toll revenues or any proceeds thereon (other than any liens existing as of the date of the Commonwealth Loan or created upon the issuance of the New HTA Bonds).

3.  <u>Asset Disposition</u>.  In the event of a sale, joint venture, or public-private partnership with respect to toll road assets, HTA (with the prior written consent of the Oversight Board while it is in existence) may elect to prepay the Commonwealth Loan in whole or in part solely with the proceeds of such disposition, at any time thereafter, without premium or penalty.

The events of default pursuant to the terms of the Commonwealth Loan pursuant to the loan agreement are:

1.  Payment of the principal of the Commonwealth Loan shall not be made by HTA when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

2.  Payment of interest on the Commonwealth Loan shall not be made by HTA when the same shall become due and payable; or

3.  HTA shall default in the due and punctual performance of any of the conditions, agreements and provisions contained herein on the part of HTA to be performed and such default shall continue for sixty (60) days after written notice specifying such default and requiring same to be remedied shall have been given to HTA by the Commonwealth, unless, if such default is capable of being cured but is not capable of being cured within sixty (60) days, HTA has commenced to cure such default within sixty (60) days and does cure such default within ninety (90) days of the date the default initially occurred; or

4.  The Title III Case in respect of HTA shall be dismissed by the Title III Court.

There is no right of acceleration with respect to the Commonwealth Loan.  If at any time HTA fails to pay in whole any installment of interest or principal of the Commonwealth Loan, as the same shall become due and payable, the Commonwealth Loan payments shall be applied (a) first, to the payment to the Commonwealth of all installments of interest due on the Commonwealth Loan in the order of maturity of such interest and (b) second, to the payment to the Commonwealth of the unpaid principal of the Commonwealth Loan which shall have become due.

The Commonwealth Loan may not be forgiven, reduced, postponed or offset.  Neither the loan agreement nor any of the rights and obligations may be assigned by any of the parties.  No amendment, modification, termination or waiver of any provision of the loan agreement, shall in any event be effective unless the same shall be in writing and signed by the Commonwealth and HTA and approved by the Oversight Board, while still in existence, pursuant to PROMESA Section 207.

### 2. GDB Title VI Case

#### (a) Background

The GDB is a public corporation and governmental instrumentality of the Commonwealth, whose principal functions were to act as fiscal agent, paying agent, financial advisor, financing source and depositary of funds for the Government and its instrumentalities, public corporations, and municipalities.

On April 6, 2016, the former Governor, Alejandro Garcia Padilla, issued a number of executive orders under the Moratorium Act to: (i) declare a state of emergency at GDB, (ii) impose restrictions on the withdrawal of funds deposited with GDB and of other disbursements by GDB, and (iii) implement a moratorium on the payment of debt service on GDB's outstanding notes.

#### (b) GDB Restructuring Support Agreement

After many months of negotiations, on May 15, 2017, AAFAF, GDB and certain other creditors of GDB entered into a GDB Restructuring Support Agreement (as amended, modified, or supplemented, the "GDB RSA") to effectuate a consensual restructuring (a "Qualifying Modification") of certain other creditors of GDB's indebtedness through a Title VI case under PROMESA.  The severe damage and devastation inflicted on Puerto Rico by Hurricanes Irma and Maria necessitated certain modifications to the GDB RSA and pushed back the timeframe for consummating the Qualifying Modification. As a result, the GDB RSA underwent six (6) amendments.  On May 8, 2018, the Oversight Board certified the GDB RSA, as amended.

#### (c) Commencement of Title VI Proceeding

On August 10, 2018, GDB commenced an action under Title VI of PROMESA by filing an application seeking approval of the Qualifying Modification with the U.S. District Court for the District of Puerto Rico (the "Title VI Action").  The Title VI Action was pending before Judge Swain and captioned Case No. 18-cv-1561 (LTS).

#### (d) Solicitation of Votes and Approval of the Qualifying Modification.

The day prior to commencing the Title VI Action, on August 9, 2018, GDB and AAFAF launched a solicitation of votes to approve or reject the Qualifying Modification.  The Qualifying Modification was overwhelmingly approved by GDB's creditors, with creditors representing 74.8% of all eligible claims participating in the vote and creditors representing 97.4% of such participating claims voting to approve the Qualifying Modification.  In addition, the Oversight

Board, as the Administrative Supervisor in Title VI, provided all necessary certifications, as required by PROMESA section 601.  The District Court approved the Qualifying Modification on November 7, 2018 [Case No. 18-cv-1561, ECF No. 269].

### (e)    Terms of the Qualifying Modification

The Qualifying Modification became effective as of November 29, 2018 (the "Closing Date").  The key terms of the Qualifying Modification are described below.

### (i)    *Recovery Authority Bonds*

Holders of outstanding GDB public bonds, net depositors of funds at GDB, and certain claimants of contingent and unliquidated claims held claims totaling approximately $4.23 billion as of the Closing Date (such aggregate claims, the "Participating Bond Claims").  Holders of Participating Bond Claims received on the Closing Date in exchange for their claims new bonds ("Recovery Authority Bonds") issued by a newly formed statutory public trust and government instrumentality of the Commonwealth (the "Recovery Authority") created pursuant to the GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018 (the "GDB Restructuring Act").  Holders of certain claimants of contingent and unliquidated claims that constituted Participating Bond Claims will only receive the Recovery Authority Bonds if their claims materialize in the future.

The following are the principal terms of the exchange and the Recovery Authority Bonds:

- For every $1,000 of claims, holders of Participating Bond Claims received $550 of Recovery Authority Bonds.

- The Recovery Authority's only assets are those GDB transferred to the Recovery Authority on the Closing Date (the "Restructuring Property").  The Restructuring Property includes GDB's municipal loan portfolio, a portion of its public entity loan portfolio, including certain loans owed to GDB by HTA, certain real estate property, beneficial interests in causes of action and cash.  Holders of Recovery Authority Bonds will receive interest and principal payments solely from the proceeds of the Restructuring Property.  There is no recourse against the Commonwealth or GDB with respect to the payment obligations under the Recovery Authority Bonds.

- The Recovery Authority Bonds have a coupon of 7.5% and mature in 2040.  Based on cash flow projections, it is unlikely that holders of Recovery Authority Bonds will receive all interest due in cash or that the principal amount of the Recovery Authority Bonds will be paid in full.

- Pursuant to the GDB Restructuring Act, in establishing the net amount of claims or of assets, loans owed to GDB by municipalities, were set off on a one-for-one basis with deposits with GDB by the same municipalities.

(ii)     *Conditions of Exchange*

Concurrently with, and as a condition to, the exchange of claims for the Recovery Authority Bonds, the claims the Commonwealth and other public entities had against GDB were resolved pursuant to the terms of the GDB Restructuring Act and the creation of a separate trust—the Public Entity Trust (the "PET").  The primary purpose of the PET is to provide any available distribution to certain public corporation depositors, as well as administer the restoration of federal funds deposited at GDB.  Pursuant to the GDB Restructuring Act, on the Closing Date, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates (each a "Non-Municipal Government Entity") and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name on a one-for-one basis against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date.  Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment, received their pro rata share of interests in the PET, which were deemed to be full satisfaction of any and all claims such Non-Municipal Government Entity may have against GDB.  HTA did not have any claim against GDB after the foregoing adjustment pursuant to the GDB Restructuring Act, and thus HTA does not have any interest in the PET.

### (f)     Challenges to the GDB RSA and Qualifying Modification

A number of parties at different times presented litigation challenges to various aspects of the GDB Title VI process.  Some municipalities, bondholders and certain other creditors of GDB, challenged, directly and indirectly, the solicitation and the Qualifying Modification alleging one or more of the following:

- the pools of claimants should have included a separate pool for municipalities with its own voting requirements;

- their deposits with GDB did not constitute "Bonds" as defined in PROMESA and therefore Title VI of PROMESA did not apply;

- some deposits were not the property of GDB but instead were held in trust and therefore belonged to the respective depositors;

- the sale of GDB bonds were offered maliciously and under false pretenses and therefore such bondholders should have been treated differently; and/or

- PROMESA and the actions of the Oversight Board were unconstitutional.

In addition, the UCC sought derivative standing to represent the Commonwealth in the GDB Title VI process, which was denied.

All these challenges were ultimately dismissed, withdrawn, or settled.

### (g)        Occurrence of the GDB Qualifying Modification

The GDB restructuring contemplated by the GDB RSA required the approval of the Oversight Board and an order from the Title III Court.  On July 12, 2017, the Oversight Board authorized GDB to avail itself of Title VI of PROMESA, pursuant to PROMESA section 601(e).  On May 8, 2018, the Oversight Board certified the GDB RSA.  The Oversight Board gave its final approval pursuant to PROMESA section 601(m)(1)(B) on November 2, 2018 (subject to approval of the Qualifying Modification by the Court).  On November 7, 2018, the United States District Court for the District of Puerto Rico issued an order that the requirements of PROMESA section 601(m)(1)(D) had been satisfied.  The Closing Date took place on November 29, 2018, on which date all definitive documents were executed, the GDB assets were transferred to the Recovery Authority and the Public Entity Trust, the Participating Bond Claims were cancelled, all related claims were released, the guarantee provided by the Commonwealth in respect of an aggregate of $110 million of GDB bonds was extinguished, and the Recovery Authority Bonds were issued.

[*Remainder of Page Left Intentionally Blank*]

## VI.    HTA Title III Plan of Adjustment

### A.    General

#### 1.    Filing of a Plan of Adjustment

A plan of adjustment provides for the treatment and discharge of the debts of the Title III Debtor.  Only the Oversight Board may file a plan of adjustment, either with the petition or by the time set by the court, and it may only do so if it determines, in its sole discretion, that the HTA Plan is consistent with the applicable certified fiscal plan.[173]  The Oversight Board may modify the HTA Plan at any time before confirmation, provided that the modified plan meets the requirements of PROMESA Title III.[174]

#### 2.    Contents of a Plan of Adjustment

Notwithstanding otherwise applicable nonbankruptcy law, among other things, a plan of adjustment (i) designates classes of claims (claims in a class must be "substantially similar"),[175] (ii) specifies any classes of claims that are not impaired under the plan of adjustment and specifies the treatment accorded to classes of claims or interests that are impaired, (iii) provides the same treatment for each claim of a particular class unless the holder of a particular claim agrees to less favorable treatment, and (iv) provides adequate means for the plan of adjustment's implementation through, for example the retention of property by the Title III debtor, the transfer or sale of property to another entity, the satisfaction or modification of any lien or indenture, and the curing or waiving of any default.[176]

A class of claims is impaired under a plan of adjustment, unless the plan of adjustment either (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such a claim or interest; or (ii) notwithstanding applicable nonbankruptcy law that entitles the holder of the claim or interest to demand or receive accelerated payment after default the plan of adjustment cures the default, reinstates the maturity of the claim or interest, compensates the holder for damages incurred as a result of any reasonable reliance by such holder on such applicable nonbankruptcy law and (for failures to perform nonmonetary obligations) compensates the holder for any actual pecuniary loss incurred by such holder, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder.[177]

#### 3.    Acceptance of a Plan of Adjustment

The holder of an allowed claim may vote to accept or reject a plan of adjustment. PROMESA specifically excludes from the definition of "holder of a claim or interest" for such purpose any "Issuer" or "Authorized Instrumentality of the Territory Government Issuer" (as

---

[173]   PROMESA §§ 312(a)-(b), 104(j)(3).

[174]   PROMESA § 313.

[175]   In determining whether claims are "substantially similar," the Oversight Board is to consider whether such claims are secured and whether such claims have priority over other claims.  PROMESA § 301(e).

[176]   11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[177]   11 U.S.C. § 1124.

defined in PROMESA Title VI) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the other beneficiaries of such claims are not excluded, and provided that with respect to insured bonds, such "holder of a claim or interest" will be the monoline insurer insuring such bonds to the extent such insurer is granted the right to vote insured bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents.[178]

A class that is not impaired under the plan of adjustment is conclusively presumed to accept the plan, and a class that is not entitled under the plan of adjustment to receive or retain any property on account of the holders' claims is deemed not to have accepted the plan of adjustment.[179]  A class of claims accepts a plan of adjustment if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class (other than those designated as not in good faith under Bankruptcy Code section 1126(e)).[180]

### 4.    Solicitation of Acceptances of Plan of Adjustment

Prior to soliciting acceptances or rejections from the holders of claims, the Oversight Board is required to issue, and have the court approve, a disclosure statement providing adequate information to holders of claims and interests in order to solicit acceptances for the HTA Plan.[181] The type of adequate information provided should enable a hypothetical investor of the relevant class to make an informed judgment about the HTA Plan.  The same disclosure statement must be transmitted to each holder of a claim of a particular class, but alternate disclosure statements differing in the amount or kind of information provided may be transmitted to different classes.[182]

## B.    Overview of the Plan of Adjustment

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE HTA PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE HTA PLAN.  THE SUMMARY BELOW IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE HTA PLAN.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE HTA PLAN IN CONSIDERING WHETHER TO VOTE TO ACCEPT OR REJECT THE HTA PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS UNDERLINE EXHIBIT A.

Bankruptcy Code section 1123, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims

---

[178]  PROMESA § 301(c)(3).
[179]  11 U.S.C. §§ 1126(f)-(g).
[180]  11 U.S.C. § 1126(c).
[181]  11 U.S.C. §§ 1125, 1126(b).
[182]  11 U.S.C. § 1126(c).

against a debtor into individual classes.  Although PROMESA and the Bankruptcy Code give the Debtor significant flexibility in classifying claims, Bankruptcy Code section 1122 dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The HTA Plan identifies ~~19~~20 Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth in the HTA Plan).  These Classes take into account the differing nature and priority of Claims against HTA.  Administrative Claims are not classified for purposes of voting or receiving distributions under the HTA Plan (as is required by Bankruptcy Code section 1123(a)(1)) but are treated separately as unclassified Claims.

The HTA Plan provides specific treatment for each Class of Claims.  Only certain holders of Claims that are impaired under the HTA Plan are entitled to vote and receive distributions under the HTA Plan. *See* Sections II.C and II.D of this Disclosure Statement for a summary of the voting and election procedures in connection with the solicitation for the HTA Plan.

For all purposes of the HTA Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article XXVIII of the HTA Plan, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim.  For purposes of Article XXVIII of the HTA Plan and section 1126 of the Bankruptcy Code, the "holder" of any Bond Claims will be determined in accordance with section 301(c)(3) of PROMESA and any law or governing documents applicable to such Bond Claims.

Unless otherwise provided in the HTA Plan or the HTA Confirmation Order, the treatment of any Claim under the HTA Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.  **Upon confirmation, the HTA Plan will be binding on all holders of a Claim regardless of whether such holders voted on the HTA Plan or voted to accept the HTA Plan.**

## C.    Compromise and Settlement of Disputes / Restructuring of Entities

### 1.    Litigation Resolution

To the extent not resolved pursuant to the Commonwealth Plan or the Commonwealth Confirmation Order, the HTA Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims, HTA 98 Bond Claims, and CW/HTA Claims, including the following disputes:

- The Debt Related Objections[183]

- The Invalidity Actions[184]

---

[183]   *See* section II.B.1(b) of this Disclosure Statement.
[184]   *See* Exhibit B to the HTA Plan for a list of the Invalidity Actions.

- The Lien Challenge Actions[185]

- Disputes raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution[186]

- Disputes relating to the validity, propriety, secured status and related rights attendant to the GDB HTA Loans[187]

- The Lift Stay Motions and the Clawback Actions relating to the CW/HTA Claims[188]

## 2.      Allowance of Bond Claims

For purposes of confirmation and consummation of the HTA Plan and distributions to be made thereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the HTA Effective Date, among other Claims, the following Claims will be allowed in the following amounts:[189]

- the HTA 68 Bond Claims, the HTA 68 Bond Claims (Ambac), the HTA 68 Bond Claims (Assured), and the HTA 68 Bond Claims (National), shall be deemed allowed in the aggregate amount of $831,189,105.55;

- the HTA 98 Senior Bond Claims, the HTA 98 Senior Bond Claims (Ambac), the HTA 98 Senior Bond Claims (Assured), the HTA 98 Senior Bond Claims (National), and the HTA 98 Senior Bond Claims (FGIC), including, without limitation, HTA 98 Senior Bonds held by the DRA, shall be deemed allowed in the aggregate amount of $3,129,667,976.84;

- the HTA 98 Sub Bond Claims, the HTA 98 Sub Bond Claims (Assured), the HTA 98 Sub Bond Claims (FGIC), and the HTA 98 Sub Bond Claims (National) shall be deemed allowed in the aggregate amount of $277,107,234.18; and

- the HTA/GDB Claims shall be deemed allowed in the aggregate amount of $2,149,579,432.

## 3.      Releases, Injunctions and Exculpation

The releases, injunctions and exculpation provided in Article XLI of the HTA Plan are integral to obtaining the value provided under the HTA Plan and constitute an essential component of the compromises reached and are not severable from the other provisions of the

---

[185]    *See* Exhibit C to the HTA Plan for a list of the Lien Challenge Actions.

[186]  *See* section V.F.2 of this Disclosure Statement for a summary of such disputes.

[187]  *See* section V.F.1(g) and V.F.1(h) of this Disclosure Statement for a summary of such disputes.

[188]  *See* sections V.F. of this Disclosure Statement for a summary of such disputes.

[189]    Amounts below include principal and accrued and unpaid interest up to, but not including, the HTA Petition Date.

HTA Plan.  See section II.F of this Disclosure Statement for a summary of the releases contained in the HTA Plan.

### 4. HTA Operational Restructuring

On or as soon as practicable following the HTA Effective Date, including, upon approval of the FTA, Reorganized HTA will be operationally restructured through the separation of the Highway Assets from the Transit Assets.  Transit Assets (*i.e.*, Tren Urbano) and all transit revenues will be transferred to PRITA.

*Transit Assets.*  The Transit Assets will be supported by the transit revenues and by such other expressly identified, dedicated revenue stream, or revenue streams of PRITA or the Commonwealth, as the case may be, sufficient to cover the Transit Assets' operational and maintenance expense deficits and capital improvement expenditure needs and approved as adequate for such purposes by the United States Department of Transportation FTA and the Oversight Board.

*Highway Assets.*  From and after the HTA Effective Date, Reorganized HTA will retain the Highway Assets and, as soon as practicable thereafter, such Highway Assets will be operationally and financially separated between Toll Road Assets and non-toll road assets, with a "Ring-Fenced" structure and allocation of cost and expenses implemented, including, without limitation, (i) the internal separation of legal, financial and operational functions and the establishment of separate Toll Road Assets and non-toll road assets management offices and (ii) the consolidation of all non-toll-road management responsibilities of the Puerto Rico Department of Transportation and Public Works with and into Reorganized HTA.

*Inventory of Highway Assets.*  From and after the HTA Effective Date, Reorganized HTA must use its reasonable best efforts to inventory all available Highway Assets and provide such inventory to the Oversight Board.

### 5. Retiree Claims

In accordance with the terms and provisions of Act 106-2017 ("Act 106") and the Commonwealth Plan, any and all obligations of the Debtor to former employees have been assumed and will be paid by the Commonwealth through Pay-Go, with the Debtor making "pay-as-you-go" contributions to the Commonwealth consistent with the provisions of Act 106 and the Commonwealth Plan, and are not otherwise treated pursuant to the HTA Plan.

### D. Provisions for Payment of Administrative Expense Claims

Administrative Expense Claims and Professional Claims are not classified and therefore are excluded from the classes outlined in Article III of the HTA Plan.

### 1. Administrative Expense Claims

On the later of the HTA Effective Date or the date on which an Administrative Expense Claim becomes an allowed claim, the Debtor will pay in full the Administrative Expense Claim

in cash, or otherwise satisfy the Allowed Administrative Expense Claim in accordance with any agreement between the Debtor and claimant. However, if the Allowed Administrative Expense Claim was incurred in the ordinary course by the Debtor before the HTA Effective Date, the claim will be paid in full and performed by Reorganized HTA in accordance with the terms of any agreement or documents governing the transactions. With respect to the Commonwealth Loan, the repayment thereof will be satisfied in accordance with the terms and provisions of the New HTA Bonds Indenture. Furthermore, if any ordinary course expense is not billed, or a written request for payment is not made, within one hundred and fifty (150) days after the HTA Effective Date, the ordinary course expense will be barred and the holder of the claim will not be entitled to receive payment for the expense.

### 2.    Professional Compensation and Reimbursement Claims

All entities awarded compensation or reimbursement will be paid in full in the amount allowed by the Title III Court as soon as reasonably practicable on the later of (i) the HTA Effective Date and (ii) the date of the Final Order from the Court allowing the claims or upon mutually agreed upon terms. However, to qualify for repayment, each professional must file an application to be compensated for the professional services rendered and expenses charged within one hundred twenty (120) days after the HTA Effective Date. Reorganized HTA will compensate for professional services and reimburse expenses incurred after the HTA Effective Date in the ordinary course and without the need for Title III Court approval.

### 3.    HTA Consummation Costs

In order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA Plan, each Initial HTA/CCDA PSA Creditor will be entitled to receive, no later than ten (10) business days after the HTA Effective Date, a pro rata cash share of one percent (1.00%), of the aggregate amount of such Initial HTA/CCDA PSA Creditor's HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured) and HTA 98 Senior Bond Claims (National) (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial HTA/CCDA PSA Creditor as of 5:00 p.m. (EST) on May 5, 2021, up to an aggregate amount of One Hundred Twenty-Five Million Dollars ($125,000,000.00).

### 4.    HTA Restriction Fee

In exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms thereof, subject to the entry of the HTA Confirmation Order, each HTA/CCDA PSA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds (including the applicable Monolines, to the extent such Monolines are authorized to vote the applicable Insured HTA Bond Claims) shall be entitled to receive the HTA PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the HTA Plan in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond

Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Restriction Fee Creditor is authorized to vote any such Claim) held or, in the case of the Monolines held or insured, by such HTA/CCDA PSA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period.

However, each HTA/CCDA PSA Restriction Fee Creditor who acquires any HTA 68 Bonds and/or HTA 98 Senior Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured HTA Bond (other than a Monoline-insured HTA Bond insured by Assured or National, as the case may be), to the extent such HTA/CCDA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured HTA Bond, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured HTA Bond Claims) will be entitled to receive such HTA CCDA/PSA Restriction Fee equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National)  (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim) held and/or insured by such HTA/CCDA PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the HTA Bond Claims and the entry of the HTA Confirmation Order.

Furthermore, if an HTA/CCDA PSA Restriction Fee Creditor sells any HTA 68 Bonds or HTA 98 Senior Bonds for which it would have been entitled to receive the HTA PSA Restriction Fee, the purchasing party will not be entitled to receive the HTA PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party.

In all circumstances, the sum of the aggregate HTA PSA Restriction Fee plus the Consummation Costs attributable to Holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National), as the case may be, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00).

### *Fees Due upon Certain Termination Events*

The aggregate HTA PSA Restriction Fee and Consummation Costs, in the amount of Twenty Million Dollars ($20,000,000.00) must be paid, ratably, in cash, as an administrative expense claim under the HTA Plan to the Initial HTA/CCDA PSA Creditors as of the date of termination if the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) thereof (subject to the extension provided for in Sections 7.1(b) or (c) thereof), or the Oversight Board terminates the HTA/CCDA Plan Support Agreement for any reason other than:

(i) a breach of the HTA/CCDA Plan Support Agreement by a non-Government Party,

(ii) the denial of confirmation of the HTA Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Commonwealth Plan or the HTA Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Commonwealth Plan or the HTA Plan on terms consistent with the HTA/CCDA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "J"), or

(iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the HTA/CCDA Plan Support Agreement.

In all other circumstances, upon termination of the HTA/CCDA Plan Support Agreement, including, without limitation, termination of the HTA/CCDA Plan Support Agreement in accordance with other provisions of Section 7.1 thereof, no Consummation Costs or HTA PSA Restriction Fee will be due and payable to the party to HTA/CCDA Plan Support Agreement terminating such agreement or against the party such agreement is terminated.

### 5.    DRA Restriction Fee

In exchange for executing the DRA Stipulation, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its HTA 98 Senior Bonds and the HTA/GDB Claims in accordance with the terms and provisions set forth in the DRA Stipulation, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms and provisions set forth in the DRA Stipulation, HTA Plan, and HTA Confirmation Order, but in no event later than ten (10) Business Days following the HTA Effective Date, DRA shall be entitled to receive the DRA Restriction Fee, payable in cash, in the amount of Fifteen Million Dollars ($15,000,000.00).

### 6.    Non-Severability

The allowance and payment of the Consummation Costs and HTA PSA Restriction Fees compensate the HTA/CCDA Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth in the HTA Plan.

### E.    Classification and Treatment of Claims

| Class 1: HTA 68 Bond Claims | **Classification:** Class 1 consists of all claims against HTA on account of HTA 68 Bonds that are <u>not</u> insured by Ambac, Assured, or National. |
| --- | --- |
| | The HTA 68 Bonds include the following: |

| | Issue Date |
| --- | --- |
| Highway Revenue Bonds, Series Y | 4/09/96 |

| | |
|---|---|
| Highway Refunding Bonds, Series Z | 3/01/96 |
| 2003 Highway Revenue Refunding Bonds, Series AA-1 | 4/29/03 |
| 2003 Highway Revenue Refunding Bonds, Series AA-2 | 4/29/03 |
| 2005 Highway Revenue Refunding Bonds, Series BB | 10/04/05 |
| 2007 Highway Revenue Refunding Bonds, Series CC | 3/06/07 |
| 2010 Highway Revenue Refunding Bonds, Series AA-1 | 4/29/03[190] |
| 2010 Highway Revenue Refunding Bonds, Series AA-2 | 4/29/03[191] |
| Series FHA Bonds | |

***Treatment:***   On the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim will receive its Pro Rata Share of the HTA 68 Bond Recovery,[192] consisting of (i) $311,512,822.17 in New HTA CIBs, (ii) $123,543,840.05 in New HTA CABs, and (iii) $211,332,685.56 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, which election must be disclosed no later than seven days prior to the HTA Effective Date, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.

***Voting***:   Class 1 is Impaired by the HTA Plan.   Class 1 and each holder of an Allowed HTA 68 Bond Claim are entitled to vote to accept or reject the HTA Plan.

***Allowed Amount of Claims:*** $145,642,034

***Projected Fixed Recovery from HTA:*** 100%

**Class 2:**

HTA 68 Bond Claims (Ambac)

***Classification:***   Class 2 consists of all claims against HTA on account of HTA 68 Bonds that are insured by Ambac.

***Treatment:***   Subject to the terms and provisions of Section 26.4 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac) will receive its Pro Rata Share of the HTA 68 Bond Recovery, consisting of (i) $311,512,822.17 in New HTA CIBs, (ii) $123,543,840.05 in New HTA CABs, and (iii) $211,332,685.56 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.

***Voting***:   Class 2 is Impaired by the HTA Plan.   Ambac is entitled to vote

---

[190] Original issue date.

[191] Original issue date.

[192] The HTA 68 Bond Recovery is shared among the HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National).

| | |
|---|---|
| | to accept or reject the HTA Plan on account of Allowed HTA 68 Bond Claims (Ambac). Beneficial holders of Allowed HTA 68 Bond Claims (Ambac) will receive Cash in the amount equal to the Ambac Acceleration Price.<br><br>***Allowed Amount of Claims:*** $30,563,816<br><br>***Projected Fixed Recovery from HTA:*** 100% |
| **Class 3:**<br>HTA 68 Bond Claims (Assured) | ***Classification:*** Class 3 consists of all claims against HTA on account of HTA 68 Bonds that are Assured Insured Bonds.<br><br>***Treatment:*** Subject to the terms and provisions of Section 26.1 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Assured) will receive its Pro Rata Share of the HTA 68 Bond Recovery, consisting of (i) $311,512,822.17 in New HTA CIBs, (ii) $123,543,840.05 in New HTA CABs, and (iii) $211,332,685.56 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>***Voting***: Class 3 is Impaired by the HTA Plan. Assured is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 68 Bond Claims (Assured). In the event Assured does not make the Assured Election, beneficial holders of Allowed HTA 68 Bond Claims (Assured) will have the option to make an Assured Bondholder Election.<br><br>***Allowed Amount of Claims:*** $567,219,573<br><br>***Projected Fixed Recovery from HTA:*** 100% |
| **Class 4:**<br>HTA 68 Bond Claims (National) | ***Classification:*** Class 4 consists of all claims against HTA on account of HTA 68 Bonds that are insured by National.<br><br>***Treatment:*** Subject to the terms and provisions of Section 26.2 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (National) will receive its Pro Rata Share of the HTA 68 Bond Recovery, consisting of (i) $311,512,822.17 in New HTA CIBs, (ii) $123,543,840.05 in New HTA CABs, and (iii) $211,332,685.56 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>***Voting***: Class 4 is Impaired by the HTA Plan. National is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 68 |

| | |
|---|---|
| | Bond Claims (National).  Beneficial holders of Allowed HTA 68 Bond Claims (National) will have the option to elect to receive the National Commutation Treatment or National Non-Commutation Treatment.<br><br>***Allowed Amount of Claims:*** $87,763,682<br><br>***Projected Fixed Recovery from HTA:*** 100% |
| **Class 5:**<br>HTA 98 Senior Bond Claims | ***Classification:***  Class 5 consists of all claims against HTA on account of HTA 98 Senior Bonds that are <u>not</u> insured by Ambac, Assured, FGIC, or National.<br><br>The HTA 98 Senior Bonds include the following:<br><br><table><tr><td></td><td>Issue Date</td></tr><tr><td>1998 Transportation Revenue Bonds, Series A</td><td>3/19/98</td></tr><tr><td>2002 Transportation Revenue Bonds, Series D</td><td>7/07/02</td></tr><tr><td>2002 Transportation Revenue Refunding Bonds, Series E</td><td>7/07/02</td></tr><tr><td>2003 Transportation Revenue Bonds, Series G</td><td>4/29/03</td></tr><tr><td>2003 Transportation Revenue Refunding Bonds, Series H</td><td>4/29/03</td></tr><tr><td>2004 Transportation Revenue Refunding Bonds, Series I</td><td>4/20/04</td></tr><tr><td>2004 Transportation Revenue Refunding Bonds, Series J</td><td>4/20/04</td></tr><tr><td>2005 Transportation Revenue Refunding Bonds, Series K</td><td>10/04/05</td></tr><tr><td>2005 Transportation Revenue Refunding Bonds, Series L</td><td>10/04/05</td></tr><tr><td>2007 Transportation Revenue Refunding Bonds, Series M</td><td>3/06/07</td></tr><tr><td>2007 Transportation Revenue Refunding Bonds, Series N</td><td>3/06/07</td></tr><tr><td>2010 Transportation Revenue Refunding Bonds, Series H</td><td>4/29/03[193]</td></tr></table><br>***Treatment:***   On the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim will receive its Pro Rata Share of the HTA 98 Senior Bond Recovery,[194] consisting of  (i) $288,487,177.83 in New HTA CIBs, (ii) $114,412,028.08 in New HTA CABs, and (iii) $195,711,912.01 in New HTA Convertible CABs; <u>provided</u>, <u>however</u>, at the election of the Commonwealth and HTA, which election must be disclosed no later than seven days prior to the HTA Effective date, Cash may be substituted for the New HTA Bonds, which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>***Voting***:  Class 5 is Impaired by the HTA Plan.  Class 5 and each holder of an Allowed HTA 98 Senior Bond Claim are entitled to vote to accept |

---

[193]   Original issue date.
[194]   The HTA 98 Senior Bond Recovery is shared among the HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National).

| | or reject the HTA Plan. |
| | *Allowed Amount of Claims:* $852,031,349 |
| | *Projected Fixed Recovery from HTA:* 22% |
| **Class 6:**<br><br>HTA 98 Senior Bond Claims (Ambac) | ***Classification:***  Class 6 consists of all claims against HTA on account of HTA 98 Senior Bonds that are insured by Ambac.<br><br>***Treatment:***  Subject to the terms and provisions of Section 26.4 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) will receive its Pro Rata Share of the HTA 98 Senior Bond Recovery, consisting of (i) $288,487,177.83 in New HTA CIBs, (ii) $114,412,028.08 in New HTA CABs, and (iii) $195,711,912.01 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), ), on a dollar-for-dollar basis.<br><br>*Voting*:  Class 6 is Impaired by the HTA Plan.  Ambac is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Senior Bond Claims (Ambac).  Beneficial holders of Allowed HTA 98 Senior Bond Claims (Ambac) will have the option to elect to receive, to the extent offered by Ambac in its sole and absolute discretion, the Ambac Commutation Treatment or Ambac Non-Commutation Treatment.<br><br>*Allowed Amount of Claims:* $491,939,990<br><br>*Projected Fixed Recovery from HTA:* 22% |
| **Class 7:**<br><br>HTA 98 Senior Bond Claims (Assured) | ***Classification:***  Class 7 consists of all claims against HTA on account of HTA 98 Senior Bonds that are Assured Insured Bonds.<br><br>***Treatment:***  Subject to the terms and provisions of Section 26.1 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Assured) will receive its Pro Rata Share of the HTA 98 Senior Bond Recovery, consisting of (i) $288,487,177.83 in New HTA CIBs, (ii) $114,412,028.08 in New HTA CABs, and (iii) $195,711,912.01 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>*Voting*:  Class 7 is Impaired by the HTA Plan.  Assured is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Senior |

| | |
|---|---|
| | Bond Claims (Assured).  In the event Assured does not make the Assured Election, beneficial holders of Allowed HTA 98 Senior Bond Claims (Assured) will have the option to make an Assured Bondholder Election.<br><br>***Allowed Amount of Claims:*** $865,236,581<br><br>***Projected Fixed Recovery from HTA:*** 22% |
| **Class 8:**<br>HTA 98 Senior Bond Claims (FGIC) | ***Classification:***  Class 8 consists of all claims against HTA on account of HTA 98 Senior Bonds that are insured by FGIC.<br><br>***Treatment:***  Subject to the terms and provisions of Section 26.3 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (FGIC) will receive its Pro Rata Share of the HTA 98 Senior Bond Recovery, consisting of (i) $288,487,177.83 in New HTA CIBs, (ii) $114,412,028.08 in New HTA CABs, and (iii) $195,711,912.01 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds, which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>***Voting***:  Class 8 is Impaired by the HTA Plan.  FGIC is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Senior Bond Claims (FGIC) which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii).<br><br>***Allowed Amount of Claims:*** $389,963,990<br><br>***Projected Fixed Recovery from HTA:*** 22% |
| **Class 9:**<br>HTA 98 Senior Bond Claims (National) | ***Classification:***  Class 9 consists of all claims against HTA on account of HTA 98 Senior Bonds that are insured by National.<br><br>***Treatment:***  Subject to the terms and provisions of Section 26.2 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (National) will receive its Pro Rata Share of the HTA 98 Senior Bond Recovery, consisting of (i) $288,487,177.83 in New HTA CIBs, (ii) $114,412,028.08 in New HTA CABs, and (iii) $195,711,912.01 in New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, Cash may be substituted for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (i)–(iii), on a dollar-for-dollar basis.<br><br>***Voting***:  Class 9 is Impaired by the HTA Plan.  National is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 |

213

| | Senior Bond Claims (National).  Beneficial holders of Allowed HTA 98 Senior Bond Claims (National) will have the option to elect to receive the National Commutation Treatment or National Non-Commutation Treatment. |
| --- | --- |
| | ***Allowed Amount of Claims:*** $530,496,068 |
| | ***Projected Fixed Recovery from HTA:*** 22% |
| **Class 10:**<br><br>HTA 98 Sub Bond Claims | ***Classification:***  Class 10 consists of all claims against HTA on account of HTA 98 Sub Bonds that are <u>not</u> insured by Assured, FGIC, or National, and. |
| | The HTA 98 Sub Bonds include the following: |
| | <table><tr><td></td><td>**Issue Date**</td></tr><tr><td>Subordinated Transportation Revenue Bonds, Series 1998</td><td>7/15/98</td></tr><tr><td>Subordinated Transportation Revenue Bonds, Series 2003</td><td>4/29/03</td></tr></table> |
| | ***Treatment:***  On the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim will receive its Pro Rata Share of the HTA 98 Sub Bond Recovery.[195] |
| | ***Voting:***  Class 10 is Impaired by the HTA Plan.  Class 10 and each holder of an Allowed HTA 98 Sub Bond Claim are entitled to vote to accept or reject the HTA Plan. |
| | ***Allowed Amount of Claims:*** $121,457,958 |
| | ***Projected Fixed Recovery from HTA:*** N/A |
| **Class 11:**<br><br>HTA 98 Sub Bond Claims (Assured) | ***Classification:***  Class 11 consists of all claims against HTA on account of HTA 98 Sub Bonds that are Assured Insured Bonds. |
| | ***Treatment:***  Subject to the terms and provisions of Section 26.1 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (Assured) will receive its Pro Rata Share of the HTA 98 Sub Bond Recovery.[196] |
| | ***Voting***:  Class 11 is Impaired by the HTA Plan.  Assured is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Sub Bond Claims (Assured).  In the event Assured does not make the Assured Election, beneficial holders of Allowed HTA 98 Sub Bond |

---

[195] The HTA 98 Sub Bond Recovery is shared among the HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National).

[196] The HTA 98 Sub Bond Recovery is shared among the HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National).

| | |
|---|---|
| | Claims (Assured) will have the option to make an Assured Bondholder Election. |
| | ***Allowed Amount of Claims:*** $51,283,015 |
| | ***Projected Fixed Recovery from HTA:*** N/A |
| **Class 12:** <br> HTA 98 Sub Bond Claims (FGIC) | ***Classification:***  Class 12 consists of all claims against HTA on account of HTA 98 Sub Bonds that are insured by FGIC. <br><br> ***Treatment:***  Subject to the terms and provisions of Section 26.3 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (FGIC) will receive its Pro Rata Share of the HTA 98 Sub Bond Recovery.[197] <br><br> ***Voting***:  Class 12 is Impaired by the HTA Plan.  FGIC is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Sub Bond Claims (FGIC). <br><br> ***Allowed Amount of Claims:***  $65,942,129 <br><br> ***Projected Fixed Recovery from HTA:*** N/A |
| **Class 13:** <br> HTA 98 Sub Bond Claims (National) | ***Classification:***  Class 13 consists of all claims against HTA on account of HTA 98 Sub Bonds that are insured by National. <br><br> ***Treatment:***  Subject to the terms and provisions of Section 26.2 of the HTA Plan, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (National) will receive its Pro Rata Share of the HTA 98 Sub Bond Recovery.[198] <br><br> ***Voting***:  Class 13 is Impaired by the HTA Plan.  National is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA 98 Sub Bond Claims (National).  Beneficial holders of Allowed HTA 98 Sub Bond Claims (National) will receive Cash in an amount equal to the National Acceleration Price. <br><br> ***Allowed Amount of Claims:***  $38,424,132 <br><br> ***Projected Fixed Recovery from HTA:*** N/A |
| **Class 14:** <br> HTA Moscoso | ***Classification:***  Class 14 consists of all claims against HTA on account of HTA Moscoso Bonds, consisting of the Special Facility Revenue Refunding Bonds, 2003 Series A, issued by HTA pursuant to that certain |

---

[197]   The HTA 98 Sub Bond Recovery is shared among the HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National).

[198]   The HTA 98 Sub Bond Recovery is shared among the HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National).

| Bond Claims | Trust Agreement, dated as of October 1, 2003. |
|---|---|
| | **Treatment:**  On the HTA Effective Date, allowed HTA Moscoso Bond Claims will be deemed unimpaired and, on the HTA Effective Date, each holder of an Allowed HTA Moscoso Bond Claim will be entitled to receive payments of principal and interest in accordance with the terms and conditions of the HTA Moscoso Bonds. |
| | **Voting**:  Class 14 is Unimpaired by the HTA Plan.  Class 14 and each holder of an HTA Moscoso Bond Claim is deemed to accept the HTA Plan. |
| | **Allowed Amount of Claims:** $104,215,000[199] |
| | **Projected Fixed Recovery from HTA:** 100% |
| **Class 15:**<br><br>Eminent Domain/Inverse Condemnation Claims | **Classification:**  Class 15 consists of claims arising form or related to a condemnation action or proceeding commenced  in the Court of First Instance in accordance with 32 L.P.R.A. § 2905 to obtain title to real property located in Puerto Rico, and a Final Order has been entered for an amount in excess of the amount deposited by the condemnor. |
| | **Treatment:**  On the HTA Effective Date, |
| | (a) to the extent not previously modified, the automatic stay pursuant to section 362 of the Bankruptcy Code will be deemed modified to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim, and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and |
| | (b) subject to entry of the HTA Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the HTA Plan providing such claims must be paid in full, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive 100% of such unpaid balance in Cash. |
| | If, however, the Oversight Board's appeal of the Commonwealth Confirmation Order and the Findings of Fact and Conclusions of Law entered with respect thereto relating to the  non-dischargeability of Eminent  Domain/Inverse  Condemnation  Claims  against  the Commonwealth is successful and such Commonwealth Confirmation Order is reversed to such extent, the holder of such unpaid balance will receive, in full consideration, satisfaction, release and exchange therefor, payments  from  HTA  equal  to,  and  on  the  same  timeframe  as,  the |

---

[199]   Represents principal amount only.

| | |
|---|---|
| | payments to be made to holders of Allowed HTA General Unsecured Claims.<br><br>*Voting*:  Class 15 is Impaired by the HTA Plan.  Class 15 and each holder of an Allowed Eminent Domain/Inverse Condemnation Claim are entitled to vote to accept or reject the HTA Plan.<br><br>***Estimated Amount of Claims:***  $83,687,663<br><br>***Projected Fixed Recovery from HTA:*** 100% if provided in the HTA Confirmation Order or the conclusions of law in respect of the HTA Plan;  otherwise, approximately 19% of the outstanding balance of the Allowed Claim after application of any deposit. |
| **Class 16:**<br><br>HTA General Unsecured Claims | *Classification:*  Class 16 consists of all Claims against HTA other than:<br><br>(a) a Claim arising from or related to the HTA 68 Bonds, the HTA 98 Senior Bonds, the HTA 98 Sub Bonds, the HTA Moscoso Bonds or the GDB/HTA Loans,<br><br>(b) an Eminent Domain/Inverse Condemnation Claim,<br><br>(c) a section 510(b) Subordinated Claim,<br><br>(d) a Late-Filed Claim,<br><br>(e) a Convenience Claim,<br><br>(f) any Claim that is eligible to be transferred into or administered through the ACR process,<br><br>(g) the Claim asserted in Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any other Claims related to the litigation styled <u>Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department</u>, Case No. KAC-2007-4170,<br><br>(h) any Claims for retiree benefits (including, without limitation, those portions of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless of whether such Claims are asserted by retirees or active employees and regardless of whether of such Claims are asserted through litigation or administrative proceedings, but excluding Claims for any increased pension payments that would have been payable prior to adjudication of such Claims (*i.e.*, pension "back pay") and only up to the amount related to unpaid pensions,<br><br>(i) all Claims against the Debtor by any Governmental Unit (as defined in section 101 of the Bankruptcy Code), including the United States |

government, any State government, foreign government, any municipality (whether of the Commonwealth or otherwise), the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted directly by such Governmental Unit or indirectly or derivatively by any other entity, including, without limitation, any Claims by the GDB asserted by or through the DRA,

(j) any Claims related to the Concession Agreement, dated as of December 20, 1991, between HTA and Autopistas de PR, LLC, as amended and supplemented, relating to the operation and maintenance of the Teodoro Moscoso Budge, including, without limitation, Proof of Claim No. 52295,

(k) any Claims related to the Toll Road Concession Agreement, dated as of June 27, 2011, between the HTA and Autopistas Metropolitanas de Puerto Rico, LLC, as amended and supplemented, including without limitation, Proof of Claim No. 35566,

(l) any unsecured deficiency claims with respect to asserted priority and/or secured Claims, or

(m) such other Claim determined by the Title III Court not to be an HTA General Unsecured Claim.

***Treatment:***   On the HTA Effective Date, subject to the election to be treated as a Convenience Claim (Class 19), and subject to the GUC Recovery Cap of 40% excluding any net recoveries by the Avoidance Actions Trust on account of Avoidance Actions, each holder of an Allowed HTA General Unsecured Claim will receive its Pro Rata Share of the HTA GUC Recovery, comprised of (a) $48,000,000.00 in Cash funded by the GUC Reserve plus (b) the net recoveries, if any, by the Avoidance Actions Trust attributable to the Avoidance Actions, minus (c) such amount of Cash as necessary to satisfy payment of Allowed Convenience Claims (Class 19).   In the event that distributions with respect to Allowed HTA General Unsecured Claims from the HTA GUC Recovery equal the GUC Recovery Cap, any funds remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes.

***GUC Reserve:***   A GUC Reserve will be created on or prior to the HTA Effective Date, and held by Kroll Restructuring Administration LLC (formerly, Prime Clerk LLC), solely for the benefit of holders of Allowed HTA General Unsecured Claims, pursuant to a separate agreement that will contain substantially similar protections for holders of HTA General Unsecured Claims as the agreement with respect to the GUC Reserve under the Commonwealth Plan has for holders of CW General Unsecured

| | |
|---|---|
| | Claims (as defined in the Commonwealth Plan).<br><br>The GUC Reserve will be funded with: (a) $24,000,000.00 on the HTA Effective Date; and (b) $24,000,000.00 on the first anniversary of the HTA Effective Date. The amounts necessary to satisfy Allowed Convenience Claims will be deemed to satisfy a portion of the amount to be deposited into the GUC Reserve and be funded directly to the Disbursing Agent and not into the GUC Reserve. In addition, in the event recoveries on account of Allowed HTA General Unclaimed Claims from the HTA GUC Recovery equal the GUC Recovery Cap, (y) any funds (other than any recoveries by the Avoidance Actions Trust with respect to the Avoidance Actions) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes, or (z) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, HTA shall be relieved of such future funding obligation.<br><br>*Voting*: Class 16 is Impaired by the HTA Plan. Class 16 and each holder of an Allowed HTA General Unsecured Claim are entitled to vote to accept or reject the HTA Plan.<br><br>*Estimated Amount of Claims:* $255,972,641<br><br>*Projected Fixed Recovery from HTA:* 19%<br><br>*Election to be Treated as Convenience Claim (Class 19)*: Any holder of an Allowed HTA General Unsecured Claim may elect to (a) reduce the amount of such Allowed HTA General Unsecured Claim to $20,000.00, and (b) have such reduced claim be treated pursuant to Class 19 (Convenience Claims), receiving a projected recovery of 100% of such reduced claim. Any holder of multiple Allowed HTA General Unsecured Claims may elect to (y) reduce the amount of such multiple Allowed HTA General Unsecured Claims to an aggregate amount of $40,000.00, and (z) have such reduced claims be treated pursuant to Class 19 (Convenience Claims), receiving a projected recovery of 100% of such reduced claims.<br><br>Such election must be made on the ballot and receive by the Debtor on or prior to the Ballot Date. Any election received on the Debtor after the Ballot Date will not be binding on the Debtor. |
| **Class 17:**<br><br>HTA/GDB Claims | *Classification:* Class 17 consists of the claims against HTA with respect |

| | |
|---|---|
| | to loans extended by GDB to HTA.[200]<br><br>***Treatment:***   Pursuant to the terms and provisions of the DRA Stipulation, any holder of an Allowed HTA/GDB Claim will receive no distribution pursuant to the HTA Plan.<br><br>***Voting:***  Class 17 is Impaired by the HTA Plan.  However, pursuant to the DRA Stipulation, Class 17 and each holder of an Allowed HTA/GDB Claim are deemed to accept the HTA Plan.<br><br>***Estimated Amount of Claims:***  $2,149,579,432<br><br>***Recovery from HTA:*** 0% |
| **Class 18:**<br><br>Section 510(b) Subordinated Claims | ***Classification:***  Class 18 consists of all claims, to the extent determined pursuant to a Final Order, against HTA or its assets arising from or relating to (a) rescission of a purchase or sale of an existing security of the Debtor or an affiliate of the Debtor, (b) purchase, sale, or retention of such a security, or (c) reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such claim.<br><br>***Treatment:***   Allowed section 510(b) Subordinated Claims will not receive a distribution pursuant to the HTA Plan.<br><br>***Voting***:   Class 18 is Impaired by the HTA Plan.  Class 18 and each holder of a section 510(b) Subordinated Claim are deemed to have rejected the HTA Plan.<br><br>***Estimated Amount of Claims:***  Unknown<br><br>***Projected Recovery from HTA:***  0% |
| **Class 19:**<br><br>Convenience Claims | ***Classification:***   Class 19 consists of (a) all Allowed HTA General Unsecured Claims that are equal to or less than $20,000.00, and (b) claims held by holders of Allowed HTA General Unsecured Claims that have elected to reduce the amount of such Allowed HTA General Unsecured Claim to $20,000.00.  In addition, Class 19 includes claims by holders of multiple Allowed HTA General Unsecured Claims that have elected to reduce all such Claims to an aggregate amount of $40,000.00.<br><br>***Treatment:***  On the HTA Effective Date (or the date the Convenience Claim becomes an Allowed Claim), each holder of an Allowed Convenience Claim will receive the full amount of such Allowed |

[200] Does not include an HTA 68 Bond Claim, HTA 68 Bond Claim (Ambac), HTA 68 Bond Claim (Assured), HTA 68 Bond Claim (National), HTA 98 Senior Bond Claim, HTA 98 Senior Bond Claim (Ambac), HTA 98 Senior Bond Claim (Assured), HTA 98 Senior Bond Claim (FGIC), HTA 98 Senior Bond Claim (National), or HTA 98 Sub Bond Claim (National).

| | Convenience Claim, in cash, subject to the Convenience Cap below. |
|---|---|
| | **Convenience Cap:** The aggregate amount of consideration to be made available to Convenience Claims will be $2,500,000.00, which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing in its sole and absolute discretion.  If the Convenience Cap is exceeded (and not otherwise waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing), holders of Allowed Convenience Claims will receive a Pro Rata Share of the Convenience Cap.<br><br>**Voting:**  Class 19 is unimpaired by the HTA Plan.  Class 19 and each holder of an Allowed Convenience Claim are deemed to have accepted the HTA Plan.  Holders of Claims that have elected to have their Claim reduced and be treated as a Convenience Claim are deemed to accept the HTA Plan.<br><br>**Estimated Allowed Amount of Claims:**  $616,519[201]<br><br>**Projected Recovery from HTA:**  100% |
| **Class 20:**<br>Federal Claims | **Classification:**  Class 20 consists of any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.<br><br>**Treatment:**  On the later to occur of (a) the HTA Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, Reorganized HTA shall (i) in its sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims, or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the HTA Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as Reorganized HTA and the holder of any such Allowed Federal Claim shall agree.<br><br>**Voting:**  Class 20 is Impaired by the HTA Plan.  Class 20 and each |

---

[201]   Does not account for holders of Allowed HTA General Unsecured Claim that may elect to reduce their Allowed Claim and be treated as a Convenience Claim.

|  | holder of an Allowed Federal Claim are entitled to vote to accept or reject the HTA Plan. *Estimated Amount of Claims*: $20,788,696.48 *Projected Fixed Recovery from HTA:* 100% |
|---|---|

## F.        Provisions Regarding the Secured Obligations and Additional Indebtedness

**THE SECURED OBLIGATIONS WILL BE ISSUED PURSUANT TO THE TERMS AND PROVISIONS OF THE NEW HTA BONDS INDENTURE.   THE NEW HTA BONDS INDENTURE CONSTITUTES PART OF THE PLAN SUPPLEMENT AND WILL BE FILED SEPARATELY WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.   PURSUANT TO THE HTA PSA, THE NEW HTA BONDS INDENTURE WILL BE CONSISTENT WITH THE HTA PSA IN ALL RESPECTS AND OTHERWISE BE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO EACH PARTY TO THE HTA PSA. THE DESCRIPTION OF THE TERMS AND PROVISIONS OF THE SECURED OBLIGATIONSAND THE NEW HTA BONDS INDENTURE IN THIS SECTION OF THE DISCLOSURE STATEMENT REPRESENTS THE DEBTORS' BEST AVAILABLE DESCRIPTION AS OF THE DATE HEREOF, AND THE ACTUAL TERMS AND PROVISIONS OF THE SECURED OBLIGATIONS AND THE NEW HTA BONDS INDENTURE ARE SUBJECT TO MATERIAL CHANGE WITHOUT FURTHER NOTICE BY THE DEBTORS EXCEPT AS PROVIDED IN THE PLAN SUPPLEMENT. TO THE EXTENT THERE IS ANY CONFLICT BETWEEN THE DESCRIPTION IN THIS SECTION OF THE DISCLOSURE STATEMENT AND THE NEW HTA BONDS INDENTURE, THE NEW HTA BONDS INDENTURE GOVERNS IN ALL RESPECTS.**

### 1.        General

The Secured Obligations will be issued pursuant to the terms and provisions of the New HTA Bonds Indenture and will be distributed as set forth in the HTA Plan.   The definitive documentation governing the Secured Obligations generally shall provide for the terms set forth in this summary, subject to the results of any election permitted by the HTA Plan and other adjustments permitted or required by the HTA Plan. Capitalized terms used in the discussion of the Secured Obligations but not otherwise defined herein shall have the meanings applied to such terms in the New HTA Bonds Indenture.

This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the Secured Obligations, the New HTA Bonds Indenture and the HTA Plan.

### 2.        The New HTA Bonds

On the HTA Effective Date, Reorganized HTA shall issue the New HTA Bonds, consisting of:

(i) $237,955,868.13 in initial principal amount of New HTA CABs, with a maturity date of July 1, 2032, and an Interest Rate of 5.0% per annum;

(ii) $407,044,597.57 in initial principal amount of New HTA CCABs, with a maturity date of July 1, 2053, a Conversion Date of July 1, 2032 and an Interest Rate of 5.0% per annum;

(iii) $600,000,000.00 in initial principal amount of New HTA CIBs, with a maturity date of July 1, 2062, and an Interest Rate of 5.0% per annum.

The New HTA Bonds will be paid solely from certain assets, which will be comprised primarily of Toll Receipts.  See Section VI.F.2(a) of this Disclosure Statement for a more detailed description of the Trust Estate.  The New HTA Bonds will be secured by a first-priority lien on the Trust Estate that is senior and superior to the subordinated lien granted to the holders of Subordinated Indebtedness.

The New HTA Bonds will be dated as of, and Interest Rates thereon shall accrue or accrete from, the earlier of (i) July 1, 2022 and (ii) the HTA Effective Date.  All Interest Rates on the New HTA Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months and compounded semi-annually and, with respect to the New HTA CIBs and the New HTA CCABs after the Conversion Date, will be paid semi-annually on July 1 and January 1 of each year until maturity.

**The principal amounts, maturities, Interest Rates, and payment schedules for the New HTA Bonds are as shown in "Summary of New HTA Bonds Distributions" above and in Exhibit D to the HTA Plan.**

All debt service on the New HTA Bonds that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid.  New HTA Bonds shall not carry any default rate of interest or accretion yield, as applicable; provided, however, that the applicable Interest Rate shall continue to accrue or accrete on all overdue debt service, at the regular rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

The New HTA Bonds will be issued as fully registered bonds in denominations to be specified in the New HTA Bonds Indenture.

(a)    **Trust Estate**

The New HTA Bonds will be paid solely from the Trust Estate, which will be comprised of the following:

(i)    All right, title and interest of Reorganized HTA in and to the Pledged Revenues and the right to receive the same, including, without limitation, any moneys, income, revenues, accounts, contract rights or general

intangibles derived therefrom, (A) subject only to the application of such Pledged Revenues in accordance with the New HTA Bonds Indenture and (B) the senior lien and senior security interest granted by the New HTA Bonds Indenture in the Trust Estate for the Holders of Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted by the New HTA Bonds Indenture in the Trust Estate for the benefit of Holders of Subordinated Indebtedness; and

(ii)     Except for the Authority Expense Fund and the Arbitrage Rebate Fund, all of the Reorganized HTA's right, title and interest in the funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement and the money, securities and other assets on deposit with the New HTA Bonds Trustee in such funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement and permitted by the Act; provided, however, that the priority in which such money and securities are applied to the repayment of the Secured Obligations shall be as expressly specified in the New HTA Bonds Indenture; and

(iii)    Application of proceeds of Secured Obligations, if any; and

(iv)    The rights and remedies of the Holders from time to time of the Reorganized HTA's obligations.

*See* Section VI.F.2(b) below.

"Pledged Revenues" means (1) the Toll Receipts, (2) the right of Reorganized HTA to receive the Toll Receipts, (3) except for purposes of the Toll Rate Covenant of the New HTA Bonds Indenture, the proceeds derived from or related to any sale or disposition of, or any concession arrangement relating to all or any part of the Toll Facilities, and (4) investment income received on any amounts held in the Toll Receipts Fund, the Debt Service Fund, the Operating Reserve Fund, the Renewal and Replacement Fund, the Subordinated Indebtedness Fund and the General Reserve Fund. "Pledged Revenues" shall not include the procees of any gifts, grants, or other payments to Reorganized HTA from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity that are not in the nature of a Toll.

"Toll Receipts" means (i) all cash receipts and automated or electric payments or credits (including by way of the Auto-Expresso system) from any tolls, fares, incomes, receipts, special fees or permit fees, or other charges imposed by or on behalf of Reorganized HTA on the owners, lessors, lessees or operators of motor vehicles for the operation of or the right to operate those vehicles on PR-20, PR-52, PR-53 and PR-66 (collectively, the "Toll Facilities"), and fines and penalties and interest thereon collected as a result of a failure to pay any such amount (collectively, "Tolls") and (ii) the proceeds of any business interruption insurance relating to the Toll Facilities and of any other insurance which insures against loss of Toll Receipts.

**(b)     Application of Toll Receipts**

224

All Toll Receipts must be deposited with the New HTA Bonds Trustee in a toll receipts fund (the "Toll Receipts Fund"), until all New HTA Bonds and all Subordinated Indebtedness are fully paid or defeased in accordance with the New HTA Bonds Indenture.

On the first Business Day of each calendar month, the New HTA Bonds Trustee shall withdraw the Toll Receipts from the Toll Receipts Fund and transfer and apply such amounts as follows and in the following order of priority:

(i)    *First*, to a trustee expense fund in an amount sufficient to fund the New HTA Bonds Trustee fees and expenses at an amount not to exceed $100,000.00 per year (the "Trustee Expenses Cap");

(ii)    *Second*, to an authority expense fund in an amount required to pay costs of operation, maintenance and administration of the Toll Facilities for the two following months;

(iii)    *Third*, to a debt service fund (the "Debt Service Fund"), which amounts shall be allocated to the following accounts in order of priority: (x) an interest account, in an amount equal to one-sixth (1/6) of the interest payable to the New HTA Bonds on the next interest payment date (the "Interest Funding Requirement"), and (y) a principal account, in an amount equal to one-twelfth (1/12) of the principal of the New HTA Bonds due on the next principal payment date (the "Principal Funding Requirement");

(iv)    *Fourth*, to an operating reserve fund (the "Operating Reserve Fund") in an amount sufficient to pay costs of operation, maintenance and administration of the Toll Facilities for the third and fourth months immediately succeeding the disbursement date;

(v)    *Fifth*, to the Arbitrage Rebate Fund in the amount determined by an authorized officer of Reorganized HTA;

(vi)    *Sixth*, to a renewal and replacement fund (the "Renewal and Replacement Fund") in an amount equal to one-twelfth (1/12) of the renewal and replacement requirement set forth in the annual budget of Reorganized HTA;

(vii)    *Seventh*, to a subordinated indebtedness fund (the "Subordinated Indebtedness Fund"), in an amount equal to (x) interest on Subordinated Indebtedness due on the next succeeding interest payment date, and (y) principal on Subordinated Indebtedness due on the next succeeding principal payment date;

(viii)    *Eighth*, any remaining balances to a general reserve fund (the "General Reserve Fund").

Unless an event of default pursuant to the New HTA Bonds Indenture has occurred and is continuing, amounts deposited in the General Reserve Fund shall be applied by the New HTA Bonds Trustee at the direction of the Reorganized HTA, in such manner, in such priority, and at such times as Reorganized HTA shall determine (i) to the purchase or redemption of New HTA Bonds, or (ii) for any Toll Facility-related lawful purpose of Reorganized HTA.

### (c)   Principal and Interest Payments

The New HTA CABs will be redeemed annually at an accreted value, representing the initial principal amount plus accretion at an Interest Rate of 5.0% per annum, starting on July 1, 2025 and ending on its stated maturity of July 1, 2032 in accordance with Exhibit D to the Plan.

The principal on the New HTA CCABs shall accrete at an Interest Rate of 5.0% per annum from the issuance date until the Conversion Date, after which the New HTA CCABs shall be converted and shall accrue interest at an Interest Rate of 5.0% per annum. Upon conversion, the holders of the New HTA CCABs will be paid interest on a semi-annual basis and principal on an annual basis in accordance with Exhibit D to the Plan.

Reorganized HTA shall pay interest with respect to the New HTA CIBs at an Interest Rate of 5.0% per annum on a semi-annual basis and the principal thereon on an annual basis in accordance with Exhibit D to the Plan.

### (d)   Call Option; Extraordinary Redemption

Call Option

The New HTA CABs are not subject to optional redemption prior to stated maturity.

The New HTA CIBs are subject to redemption prior to maturity on and after July 1, 2032, at the election or direction of Reorganized HTA, in whole or in part on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

The New HTA CCABs are subject to redemption prior to maturity on and after January 1, 2033, at the election or direction of Reorganized HTA, in whole or in part on any Business Day at a redemption price equal to the principal amount thereof, plus accrued interest to the dated fixed for redemption.

If less than all the New HTA CABs or New HTA CCABs are called for redemption prior to maturity, Reorganized HTA will select the maturity or maturities of such series of the New HTA CABs or New HTA CCABs to be redeemed (as applicable), and, if less than all the of the New HTA CABs or New HTA CCABs within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New HTA Bonds Trustee, will select the New HTA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

The New HTA Bonds are not subject to redemption prior to maturity at the election of the holders thereof.

Extraordinary Redemption

Notwithstanding the terms and provisions above with respect to the Reorganized HTA call option, from and after the HTA Effective Date and until the New HTA Bonds have been satisfied in full in accordance with their terms, upon a Partial Disposition described in "– e) Certain Covenants of Reorganized HTA Relating to the New HTA Bonds", the New HTA Bonds Trustee shall redeem, at par, plus accrued or accreted Interest (as applicable), the allocable portion of New HTA Bonds related to the Toll Facilities subject to the disposition.

**(e)     Certain Covenants of Reorganized HTA Relating to the New HTA Bonds**

The Definitive Documents, including the New HTA Bonds Indenture and/or the Confirmation Order, will contain customary terms, conditions and covenants for similarly structured and supported bonds, including, without limitation, the following covenants and other provisions with respect to New HTA Bonds:

(i)     Reorganized HTA will covenant for the benefit of all initial and subsequent holders of New HTA Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, Reorganized HTA will take no action that would (1) impair the first-priority lien and first-priority security interest on the Trust Estate, (2) impair the senior lien on the Trust Estate granted to the holders of Outstanding Bonds, which shall in all respects be senior and superior to the subordinate lien on the Trust Estate granted to the holders of outstanding Subordinated Indebtedness, (3) impair the monthly deposits to the Debt Service Fund, (4) limit or alter the rights vested in Reorganized HTA in accordance with the Plan and the Confirmation Order in connection with the Secured Obligations or (5) impair the rights and remedies of the New HTA Bonds Trustee or the Holder under the New HTA Bonds Indenture and, in particular the defaults and remedies thereunder;

(ii)     Reorganized HTA will covenant for the benefit of all initial and subsequent holders of New HTA Bonds to comply with the covenants described in "– 3. Maintenance of Tax-Exemption" below;

(iii)     Reorganized HTA will covenant for the benefit of all initial and subsequent holders of New HTA Bonds (the "Rate Covenant") that, except as provided in the New HTA Bonds Indenture, it will at all times charge and collect or cause to be charged and collected Tolls for the use of the Toll Facilities at rates not less than those set forth in the schedule of such Tolls then in effect and as shall be required in order that Toll Receipts in each Fiscal Year shall equal at least the aggregate of (x) one hundred and ten percent (110%) of the aggregate of (I) costs of operation, maintenance and administration of the Toll Facilities for such fiscal year; (II) Annual Debt Service on New HTA Bonds for such fiscal year; (III) Trustee Expenses Cap; (IV) deposit to Arbitrage Rebate Funds, if any, for such fiscal year; and (V) amounts required to be deposited in the Renewal and Replacement Fund in order to satisfy the required

227

deposits for such Fiscal Year, less amounts then on deposit therein, and (y) one hundred percent (100%) the Annual Debt Service on Subordinated Indebtedness;

(iv) Reorganized HTA will covenant not to sell, mortgage, lease or otherwise dispose of or encumber the Toll Facilities in part or in full, provided that (1) the Reorganized HTA may (x) dispose of any machinery, fixtures, apparatus, tools, instruments or other movable property that are part of the Toll Facilities if it determines such articles are no longer needed or no longer useful in connection with the construction or maintenance and maintenance of the Toll Facilities and proceeds thereof are applied to the replacement of such articles or are paid to the Toll Receipts Fund and applied in accordance with the New HTA Bonds Indenture and (y) dispose of any real property or release, relinquish or extinguish any interest therein as the Consulting Engineer certifies is not needed or serves no useful purpose in connection with the maintenance and operation of the Toll Facilities, and the proceeds thereof, if any, are required to be deposited in the Toll Receipts Fund and applied in accordance with the New HTA Bonds Indenture, and (2) the Reorganized HTA will not enter into a lease, long-term concession or other public-private partnership arrangement with respect to any real estate or personal property comprising a portion of the Toll Facilities (a "Partial Disposition") unless there is delivered to the New HTA Trustee a certificate signed by an authorized officer of the Reorganized HTA and approved by the Consulting Engineer and Traffic Consultant setting forth (i) the amount of Net Receipts that would have been collected in the most recently completed Fiscal Year had such Partial Disposition occurred prior to the first day of such Fiscal Year; (ii) Maximum Annual Debt Service on the Secured Obligations that will remain outstanding after such agreement become effective in accordance with its terms; and (iii) the percentages derived by dividing the amount in item (i) above by the amounts shown in item (ii) above, which percentage shall not be less than 120%. Proceeds from such Partial Disposition remaining after the repayment of New HTA Bonds, as described in "– d) Call Option; Extraordinary Redemption", remaining after the repayment of (x) New HTA Bonds in accordance with "– d) Call Option; Extraordinary Redemption", (y) any other Secured Obligations to the extent required to be redeemed in order to maintain for the tax-exempt New HTA Bonds that will remain outstanding after such Partial Disposition, the exclusion of interest on such tax-exempt New HTA Bonds from gross income for purposes of federal income taxation and (z) if no New HTA Bonds are then outstanding, Subordinated Indebtedness in accordance with the New HTA Bonds Indenture, shall be deposited in the Toll Receipts Fund and applied pursuant to the payment waterfall described in "– b) Application of Toll Receipts" above.

(v) Reorganized HTA will covenant not to issue any additional bonds secured by a lien on Pledged Revenues securing the New HTA Bonds, except as further detailed in "– 4. Additional Indebtedness of Reorganized HTA" below.

### (f)    Events of Default

The New HTA Bonds Indenture shall provide for events of default customary to transactions of similar nature, including, but not limited to, failure to pay the principal, interest or repayment amount of the New HTA Bonds when such become due and payable, breach of covenants and other provisions of the New HTA Bonds Indenture by the Reorganized HTA (subject to applicable cure periods set forth therein), the Reorganized HTA commences, consents, files or takes similar actions in connection with a bankruptcy proceeding, the lien on the Trust Estate ceases to be in full force and effect, among others.

### (g)    Rights of Acceleration

The New HTA Bonds shall not have rights of acceleration.

### (h)    Direct Right of Action

Pursuant to the New HTA Bonds Indenture, and subject to such additional rights as provided therein, the New HTA Bonds Trustee shall have a direct right of action to enforce the terms of the New HTA Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance remedies for any breach of covenants in the New HTA Bonds Indenture.  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right, in the absence of action by the New HTA Bonds Trustee, to institute any action to enforce the terms of the New HTA Bonds Indenture.

### (i)    Priority of Payments after Default

Following the occurrence and continuance of an event of default pursuant to the New HTA Bonds Indenture, if at any time the moneys in the Debt Service Fund, the General Reserve Fund, the Renewal and Replacement Fund, the Operating Reserve Fund and the Subordinated Indebtedness Fund shall not be sufficient to pay the principal of, the redemption premium (if any), or the interest on the New HTA Bonds as the same are then due and payable, such money shall be applied, as follows:

(i)    *First*:  To the payment of reasonable amounts due to the New HTA Bonds Trustee and paying agents, as provided in the New HTA Bonds Indenture.

(ii)    *Second*:  To the Reorganized HTA, in each month, an amount equal required to pay Costs of Operation, Maintenance and Administration of the Toll Facilities for the next succeeding two months, to the extent not paid pursuant to item (i) above;

(iii)    *Third*, pro rata: (A) to the payment to the bondholders of the New HTA Bonds of all installments of interest on the New HTA Bonds then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be

sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the bondholders of the New HTA Bonds, without any discrimination or preference; and (B) to the payment to the persons entitled thereto of the unpaid principal or redemption price of any New HTA Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of principal or redemption price due on such date, to the persons entitled thereto, without any discrimination or preference

(iv)    *Fourth*, pro rata: (A) to the payment to the holders of Subordinated Indebtedness of all installments of interest on the Subordinated Indebtedness then due (including amounts previously due but not yet paid) in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the holders of Subordinated Indebtedness without any discrimination or preference; and (B) to the payment to the persons entitled thereto of the unpaid principal or redemption price of any Subordinated Indebtedness which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any such due date, then to the payment thereof ratably, according to the amount of principal or redemption price due on such date, to the persons entitled thereto, without any discrimination or preference

**(j)    New HTA Bonds Indenture**

Provisions governing, among other things, amendments of or supplements to the New HTA Bonds Indenture, events of default, remedies, priority of payments after default under the New HTA Bonds Indenture, and defeasance under the New HTA Bonds Indenture will be set forth in the New HTA Bonds Indenture.  The New HTA Bonds Indenture will be executed and delivered on or prior to the HTA Effective Date.

**(k)    Governing Law**

The New HTA Bonds Indenture and the New HTA Bonds issued thereunder will be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.  However, the authorization of the New HTA Bonds Indenture and the issuance of the New HTA Bonds by Reorganized HTA will be governed by the law of the Commonwealth.

**3.    Maintenance of Tax-Exemption**

In order to maintain the exclusion from gross income for purposes of federal income taxation of interest on the New HTA Bonds, if such an exclusion is granted, Reorganized HTA will covenant, under the terms of the New HTA Indenture, to comply with the provisions of the Internal Revenue Code of 1986 (the "Code") applicable to the New HTA Bonds necessary to

maintain such exclusion, including without limitation the provisions of the Code which prescribe yield and other limits within which proceeds of the New HTA Bonds are to be invested, and which, in certain circumstances, require the rebate of certain earnings on such amounts to the Department of the Treasury of the United States of America in accordance with Section 148(f) of the Code.

Reorganized HTA will further covenant not to take any action or fail to take any action which would cause the New HTA Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code; nor shall any part of the proceeds of New HTA Bonds or any other funds of Reorganized HTA be used directly or indirectly to acquire any investment property the acquisition of which would cause any New HTA Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code.

Reorganized HTA shall not use any part of the proceeds of the New HTA Bonds in a manner which would cause such New HTA Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Code.

**4.     Adoption and Maintenance of a Debt Management Policy**

During the Debt Policy Period, Reorganized HTA shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of HTA are not repeated. While Reorganized HTA may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

*Long-Term Borrowing for Capital Improvements Only*: To ensure Reorganized HTA achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Debt issued by HTA after the HTA Effective Date may only be incurred to finance Capital Improvements, as determined by HTA and approved by AAFAF, and, to the extent not terminated, the Oversight Board, or to refinance Debt in accordance with the terms and provisions of Section 25.3(d) of the HTA Plan. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in HTA's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

*30-Year Maturity Limitation on All Borrowings*: No Debt issued by HTA after the HTA Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation. However, the foregoing shall not apply to Debt issued to refinance New HTA Bonds.

*Required Principal Amortization*: No Debt issued from and after the HTA Effective Date may be issued unless its principal commences to amortize within two (2) years from the placed-in-service date of the project being financed, and continues amortizing in each and every year until such Debt is no longer outstanding.

*Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year*: Refinancings of Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by Reorganized HTA in its Debt Management Policy.  However, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

*Fiscal Plan Debt Service:* Any post-HTA Effective Date HTA Fiscal Plan shall include provisions for the payment, in each FY of principal and interest (and/or accreted value, as applicable) with respect to the Secured Obligations, including, without limitation, sinking fund payments due in such FY.

Reorganized HTA may adopt, maintain, and comply with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## 5.    Additional Indebtedness of Reorganized HTA

Pursuant to the Plan and the New HTA Bonds Indenture, following the issuance of the New HTA Bonds, Reorganized HTA may not issue any additional bonds secured by a lien on the Trust Estate, except that Reorganized HTA may issue or incur:

(i)    any bonds issued pursuant to the New HTA Bonds Indenture to refund, refinance or defease (the "Refunding Bonds") other bonds issued pursuant thereto (the "Outstanding Bonds"), provided that there is delivered to the New HTA Bonds Trustee a certificate of an authorized officer of Reorganized HTA dated the date of issuance of such Refunding Bonds demonstrating that upon the issuance of such series of Refunding Bonds, the Annual Debt Service on Outstanding Bonds in the then-current and each future fiscal year immediately after the issuance of the Refunding Bonds shall be equal to or less than the Annual Debt Service on Outstanding Bonds in the then-current and each future fiscal year immediately prior to such issuance; and

(ii)    additional bonds issued pursuant to the New HTA Bonds Indenture (the "Additional Bonds") to fund new capital projects of Reorganized HTA relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations outstanding, provided that  there is delivered to the New HTA Bonds Trustee a certificate dated the date of initial issuance of such Additional Bonds, signed by an authorized officer of Reorganized HTA and approved by

the Consulting Engineer and Traffic Consultant (as such terms are defined in the New HTA Bonds Indenture), setting forth:

(I)    (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such Additional Bonds; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such Additional Bonds; (B) the Maximum Annual Debt Service on the Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued); (C) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such Additional Bonds (including the additional Secured Obligations to be issued); (D) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 120%; and (E) the percentage derived by dividing the amount in item (A) above by the amount shown in item (C) above, which percentage shall not be less than 115%; and

(II)    (A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Reorganized HTA during the current Fiscal Year and each of the next succeeding five full Fiscal Years (the "Testing Period") following the issuance of such Additional Bonds (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Additional Bonds to remain Outstanding after the issuance of such Additional Bonds (including the Additional Bonds to be issued) for the Testing Period; (C) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional Secured Obligations (including the Secured Obligations to be issued) for the Testing Period; (D) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 120% in any Fiscal Year within the Testing Period; and (E) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (C) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

(iii)    additional Subordinated Indebtedness provided it complies with the terms and conditions set forth in Section VI.F.6 of this Disclosure Statement.

"Annual Debt Service" means, for any Fiscal Year, (i) an amount equal to the sum of the principal due on all Outstanding Bonds or Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding Principal Payment Date, excluding principal actually paid on the first day of such Fiscal Year and including any principal unpaid in prior Fiscal Years plus (ii) an amount equal to 100% of the interest due and payable on all Outstanding Bonds or

233

Outstanding Subordinated Indebtedness, as applicable, in such Fiscal Year and on the next succeeding July 1, excluding interest actually paid on the first day of such Fiscal Year and including any interest unpaid in prior Fiscal Years (and, for the avoidance of doubt, interest on any overdue interest) calculated based on a 360-day year consisting of twelve (12) 30-day months for such Fiscal Year.  The Annual Debt Service shall be calculated subject to the assumptions set forth in the New HTA Bonds Indenture.

"Maximum Annual Debt Service" means the maximum Annual Debt Service with respect to any specified indebtedness for any Fiscal Year during the term of such indebtedness.

"Net Receipts" means, for any particular period, the amount of Toll Receipts less the costs of operation, maintenance and administration of the Toll Facilities for such period.

6.      The Subordinated Indebtedness

On [        ], 2022, HTA and the Commonwealth enteredare anticipated to enter into the Commonwealth Loan, the proceeds of which were and shall be used by HTA solely to pay cash distributions pursuant to the HTA/CCDA Plan Support Agreement and the HTA Plan, upon satisfaction of the HTA Distribution Conditions and the occurrence of the Commonwealth Effective Date.  *See* Section V.I.1(e) of this Disclosure Statement for a more detailed description of the Commonwealth Loan.

On the HTA Effective Date, Reorganized HTA shall issue to the Commonwealth a definitive note constituting the Subordinated Indebtedness pursuant to the HTA Plan, which shall have a principal amount equal to the outstanding principal amount of the Commonwealth Loan at the date of issuance, plus any accrued and unpaid interest thereon, under the terms of the New HTA Bonds Indenture, in lieu of cash payments in full satisfaction of the Commonwealth's administrative expense claim on account of the Commonwealth Loan.

This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the Subordinated Indebtedness, the New HTA Bonds Indenture and the Plan.

The Subordinated Indebtedness will be paid solely from the Trust Estate, subject to the payment waterfall provided in the New HTA Bonds Indenture.  *See* Section VI.F.2(a) of this Disclosure Statement for a more detailed description of the Trust Estate and the abovementioned payment waterfall.  The Subordinated Indebtedness will be secured by a lien on the Trust Estate, which lien shall in all respects be junior and subordinate to the senior lien on the Trust Estate granted to the Holders of the New HTA Bonds.

The Subordinated Indebtedness will be dated as of the Effective Date. The Subordinated Indebtedness will accrue interest from the Effective Date at an Interest Rate of 2.5% per annum, computed on the basis of a 360-day year consisting of twelve 30-day months and compounded and paid semi-annually on July 1 and January 1 of each year until maturity.

Below is a table illustrating the Subordinated Indebtedness and its sinking fund payments assuming that such Subordinated Indebtedness is issued on the same date as the Commonwealth

234

Loan.  Actual principal amount of the Subordinated Indebtedness will be higher given that the Subordinated Indebtedness will be issued on a subsequent date and will incorporate any interest accrued on the Commonwealth Loan until such date.

| Subordinated Indebtedness | | | | |
|---|---|---|---|---|
| Principal Payments | Interest Rate Payments (1) | Total Debt Service | Interest Rate | Date |
| 10,763,135.00 | 11,714,722.22 | 22,477,857.22 | 2.5% | 7/1/2023 |
| 9,447,509.00 | 8,780,921.63 | 18,228,430.63 | 2.5% | 7/1/2024 |
| 4,810,622.00 | 8,544,733.90 | 13,355,355.90 | 2.5% | 7/1/2025 |
| 5,197,995.00 | 8,424,468.35 | 13,622,463.35 | 2.5% | 7/1/2026 |
| 5,600,394.00 | 8,294,518.48 | 13,894,912.48 | 2.5% | 7/1/2027 |
| 6,018,302.00 | 8,154,508.63 | 14,172,810.63 | 2.5% | 7/1/2028 |
| 6,452,216.00 | 8,004,051.08 | 14,456,267.08 | 2.5% | 7/1/2029 |
| 6,902,647.00 | 7,842,745.68 | 14,745,392.68 | 2.5% | 7/1/2030 |
| 7,370,121.00 | 7,670,179.50 | 15,040,300.50 | 2.5% | 7/1/2031 |
| 7,855,180.00 | 7,485,926.48 | 15,341,106.48 | 2.5% | 7/1/2032 |
| 8,358,382.00 | 7,289,546.98 | 15,647,928.98 | 2.5% | 7/1/2033 |
| 8,880,300.00 | 7,080,587.43 | 15,960,887.43 | 2.5% | 7/1/2034 |
| 9,421,525.00 | 6,858,579.93 | 16,280,104.93 | 2.5% | 7/1/2035 |
| 9,982,665.00 | 6,623,041.80 | 16,605,706.80 | 2.5% | 7/1/2036 |
| 10,564,346.00 | 6,373,475.18 | 16,937,821.18 | 2.5% | 7/1/2037 |
| 11,167,211.00 | 6,109,366.53 | 17,276,577.53 | 2.5% | 7/1/2038 |
| 11,791,923.00 | 5,830,186.25 | 17,622,109.25 | 2.5% | 7/1/2039 |
| 12,439,163.00 | 5,535,388.18 | 17,974,551.18 | 2.5% | 7/1/2040 |
| 13,109,633.00 | 5,224,409.10 | 18,334,042.10 | 2.5% | 7/1/2041 |
| 13,804,055.00 | 4,896,668.28 | 18,700,723.28 | 2.5% | 7/1/2042 |
| 14,523,171.00 | 4,551,566.90 | 19,074,737.90 | 2.5% | 7/1/2043 |
| 15,267,745.00 | 4,188,487.63 | 19,456,232.63 | 2.5% | 7/1/2044 |
| 16,038,563.00 | 3,806,794.00 | 19,845,357.00 | 2.5% | 7/1/2045 |

| Subordinated Indebtedness | | | | |
|---|---|---|---|---|
| Principal Payments | Interest Rate Payments (1) | Total Debt Service | Interest Rate | Date |
| 16,836,434.00 | 3,405,829.93 | 20,242,263.93 | 2.5% | 7/1/2046 |
| 17,662,190.00 | 2,984,919.08 | 20,647,109.08 | 2.5% | 7/1/2047 |
| 18,516,687.00 | 2,543,364.33 | 21,060,051.33 | 2.5% | 7/1/2048 |
| 19,400,805.00 | 2,080,447.15 | 21,481,252.15 | 2.5% | 7/1/2049 |
| 20,315,451.00 | 1,595,427.03 | 21,910,878.03 | 2.5% | 7/1/2050 |
| 21,261,555.00 | 1,087,540.75 | 22,349,095.75 | 2.5% | 7/1/2051 |
| 22,240,075.00 | 556,001.88 | 22,796,076.88 | 2.5% | 7/1/2052 |
| **$362,000,000.00 (2)** | **$173,538,404.20** | **$535,538,404.20** | **Total** | |

(1) Calculated based on a single funding on the date of the Commonwealth Loan. Actual amount will be lower given a second disbursement will occur on the Effective Date.

(2) Principal amount considering the Subordinated Indebtedness is issued on the same date as the Commonwealth Loan. Actual principal amount will be higher given that the Subordinated Indebtedness will be issued on a subsequent date and will incorporate any interest accrued on the Commonwealth Loan until such date.

All debt service on the Subordinated Indebtedness that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full. The Subordinated Indebtedness shall not carry any default rate of interest; provided, however, that the Interest Rate shall continue to accrue on all overdue debt service, at the regular rate, compounding semi-annually, until paid or satisfied in full in accordance with its terms.

### (a)    Subordinated Indebtedness Fund

Among the funds and separate accounts within funds to be established and that will constitute a portion of the Trust Estate, the New HTA Bonds Indenture will provide for the creation and establishment of the Subordinated Indebtedness Fund. Toll Receipts shall be deposited in the Subordinated Indebtedness Fund in amounts and order of priority described in Section VI.F.2(b) of this Disclosure Statement.

The New HTA Bonds Trustee shall pay out of the Subordinated Indebtedness Fund all amounts required for such payments in accordance with the New HTA Bonds Indenture. Money in the Subordinated Indebtedness Fund that on the last day of each Fiscal Year is in excess of the amount then required to be deposited therein may at the direction of Reorganized HTA either be retained therein or transferred to any other fund or account established pursuant to the New HTA Bonds Indenture; *provided, however*, that if no direction has been given by Reorganized HTA, the excess on the last day of each Fiscal Year shall be transferred by the New HTA Bonds Trustee to the General Reserve Fund.

### (b)    Call Option

The Subordinated Indebtedness is not subject to redemption prior to maturity.

### (c)    Rights of Acceleration

The Subordinated Indebtedness shall not have rights of acceleration.

### 7.    Subordination

The indebtedness evidenced by all Subordinated Indebtedness (including, but not limited to the Subordinated Indebtedness), and any liens or property interests securing such Subordinated Indebtedness, shall be junior, inferior, and subordinate in all respects to and subject in all respects to the prior payment in full of the the New HTA Bonds and to any liens securing the New HTA Bonds, except as set forth below, and the holder of any Subordinated Indebtedness whether upon original issue or upon transfer or assignment thereof accepts and agrees to be bound by such provision.  Notwithstanding any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, any liens securing the New HTA Bonds, and regardless of any insolvency or liquidation proceeding, any liens securing the Subordinated Indebtedness shall be junior and subordinate in all respects to any liens securing the New HTA Bonds. Notwithstanding the foregoing, holders of Subordinated Indebtedness shall be entitled to receive payments of principal and interest with respect to the Subordinated Indebtedness and to seek specific performance thereof in accordance with the relevant Supplemental Trust Agreement.

### 8.    Additional Subordinated Indebtedness of Reorganized HTA

Pursuant to the HTA Plan and the New HTA Bonds Indenture, following the issuance of the New HTA Bonds, Reorganized HTA may not issue any additional subordinated debt secured by a lien on the Trust Estate, except that Reorganized HTA may issue or incur:

(i)    any subordinated indebtedness issued pursuant to the New HTA Bonds Indenture to refund, refinance or defease (the "Refunding Subordinated Indebtedness") other subordinated indebtedness issued pursuant thereto (the "Outstanding Subordinated Indebtedness" and, together with the Outstanding Bonds, the "Outstanding Secured Obligations"), to the New HTA Bonds Trustee a certificate of an authorized officer of Reorganized HTA dated the date of issuance of such Refunding Subordinated Indebtedness demonstrating that upon the issuance of such Series of Refunding Subordinated Indebtedness, the Annual Debt Service on Outstanding Subordinated Indebtedness in the then-current and each future FY immediately after the issuance of the Refunding Subordinated Indebtedness shall be equal to or less than the Annual Debt Service due on Outstanding Subordinated Indebtedness in the then-current and each future FY immediately prior to such issuance

(ii)    Subordinated indebtedness to fund new capital projects of the Authority relating to the Toll Facilities, or to refund, refinance or defease Secured Obligations Outstanding hereunder, provided that there is delivered to the Trustee a certificate dated the date of initial issuance of such additional

subordinated indebtedness, signed by an Authorized Officer of the Authority and approved by the Consulting Engineer and Traffic Consultant, setting forth:

    i.     (A) the amount of the Net Receipts for any twelve (12) consecutive calendar months out of the eighteen (18) calendar months immediately preceding the date of issuance of such additional subordinated indebtedness; provided that such amount shall be adjusted to give effect for such twelve (12) month period to any increases or decreases in Toll rates for which all legal conditions to effectiveness have been met on the date of issuance of such subordinated indebtedness; (B) the Maximum Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional subordinated indebtedness (including Secured Obligations to be issued); and (C) the percentage derived by dividing the amount in item (A) above by the amount shown in item (B) above, which percentage shall not be less than 115%; and

(A) the amount of Net Receipts projected by the Traffic Consultant to be received by the Reorganized HTA during the Testing Period following the issuance of such additional subordinated indebtedness (including the Secured Obligations to be issued); (B) the Annual Debt Service on the Secured Obligations to remain Outstanding after the issuance of such additional subordinated indebtedness (including Secured Obligations to be issued) for the Testing Period and (C) the percentages derived by dividing the amount in item (A) above by the amounts shown in item (B) above, which percentages shall not be less than 115% in any Fiscal Year within the Testing Period.

## G.    Provisions Regarding Assured Insured Bonds, National Insured Bonds, Ambac Insured Bonds, and FGIC Insured Bonds

### 1.    Treatment of Assured Insured Bond Claims

If Classes 3, 7, and 11 vote to accept the HTA Plan and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force or effect, or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the HTA Effective Date, then holders of Assured Insured Bond Claims will receive the following treatments, which will be selected by Assured prior to the commencement of the Disclosure Statement Hearing and as set forth in the Assured Election Notice or the Assured Bondholder Elections Form, as applicable:

    (a)    ***Assured Election***:  With respect to the Assured Insured Bonds identified on Exhibit A to the Assured Election Notice, subject to the rights of the HTA Fiscal Agent, Assured will receive the Assured Plan Consideration allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid by Assured, in full, on the HTA Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded

amount thereof) as of the date of payment in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds.  However, Assured will not be required to pay itself any Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured by subrogation or otherwise, and Assured shall instead receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election, will satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)     ***Assured Insured Bondholder Elections***:   Each beneficial holder of an Assured Insured Bond identified on Exhibit A to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured.

> Assured Bondholder Election 1: Each Assured Insured Bondholder who elects Assured Bondholder Election 1 will receive from Assured the applicable Assured Acceleration Price on the HTA Effective Date, in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured will receive the Assured Plan Consideration allocable to such holder under the HTA Plan; or

> Assured Bondholder Election 2: Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) the applicable Assured Plan Consideration in accordance with terms acceptable to Assured.  The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

> Pursuant to the terms and provisions of section 26.1(c) of the HTA Plan, the payment of the principal of the Assured Insured Bonds will be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds will be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

> Pursuant to the applicable Assured Insurance Policies, (A) Assured may elect to make any principal payment, in whole or in part, on

239

any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' prior written notice to the relevant holders.  Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation.  From and after payment of the Assured Acceleration Price, including without limitation, on (i) the HTA Effective Date or (ii) such other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds will cease to accrue and be payable.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above, including without limitation, on the HTA Effective Date, will satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

In the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder will be deemed to have elected Assured Bondholder Election 2.

Assured Insured Bonds owned by Assured (by subrogation or otherwise) will not be subject to the Assured Bondholder Elections and Assured will receive the Assured Plan Consideration on account of such Assured Insured Bonds.

(c) **_Acceleration of Assured Insured Bonds_**.  Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the Assured Insured Bonds will be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds will be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d) **_Assignment of Redemption Rights_**.  On the HTA Effective Date, HTA will be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were HTA for such

purpose, and any amounts due in connection with such redemption will be either the applicable redemption price or the Assured Acceleration Price, whichever is less.

(e) ***Entitlement to Vote***.  The solicitation of acceptances and rejections to the HTA Plan by holders of Assured Insured Bond Claims will be made by the Oversight Board to Assured in accordance with the provisions of section 301(c)(3) of PROMESA.

(f) ***Dual-Insured Bonds***.  If any distributions of Cash are made to owners of Dual-Insured Bonds[202] (rather than to Assured as the holder of the related HTA 98 Senior Bond Claims) pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions will be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies and Assured's obligations under the applicable Assured Insurance Policies.  If any distributions of Cash are made on account of Dual-Insured Bonds to Assured as the holder of the related HTA 98 Senior Bond Claims pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions shall be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies, but shall be deemed not to have reduced (i) Assured's obligations under the applicable Assured Insurance Policies or (ii) the principal amount of any custody receipt evidencing a beneficial interest in such Dual-Insured Bonds and related Assured Insurance Policies.

## 2.   Treatment of National Insured Bond Claims

If Classes 4, 9 and 13 vote to accept the HTA Plan and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the HTA Effective Date, then, on the HTA Effective Date, holders of Allowed National Insured Bond Claims will receive the following treatments selected by National at or before the commencement of the Disclosure Statement Hearing and be set forth on the National Bondholder Election Form or the National Election Notice, as applicable:

(a) ***National Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National)***:  Each holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) will have the option to elect on the National Bondholder Election

---

[202] An Assured Insured Bond that is or was insured by Assured pursuant to a secondary market insurance policy and that also qualifies as an FGIC Insured Bond insured by FGIC pursuant to a primary market insurance policy.

Form to receive, on the HTA Effective Date, the National Commutation Consideration, distributable by or at the direction of National. If elected, (i) the holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital ~~application~~appreciation bonds, the accreted value on and after, the Deemed Issuance Date, and to the extent any accrued or accreted interest is paid to such holder by National after such date, such amount shall be credited against the Cash such holder, their successors, transferees or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim.

The National Insured Bonds of a holder that timely and validly elects to receive the National Commutation Treatment or makes an improper election as described in Section 26.2(g) of the HTA Plan, will be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies will be fully and finally satisfied, released, and discharged.

(b)    ***National Non-Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National):*** If a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such holder shall receive one or more of the following treatments, at National's election at or before the commencement of the Disclosure Statement Hearing and as detailed in the applicable National Bondholder Election Form:

Custodial Trusts: Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing holder, and the related National Insurance Policies into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

242

Escrow:  Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

Payment of Accelerated Amounts:  National will receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) and National will fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the HTA Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

Alternative Treatment:  The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion.  Any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

National may make different elections with respect to different CUSIPs and different holders of National Insured Bonds.

(c)  ***Treatment of HTA 98 Sub Bond Claims (National)***:  On the HTA Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the 10th Business Day following the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (National) shall receive Cash in an amount equal to the National Acceleration Price, in full and final satisfaction, release, and discharge of National's obligations under the applicable National Insurance Policy, and National shall receive the National Plan Consideration that would be otherwise distributable to such holder, its successors, transferees, or assigns on account of its HTA 98 Sub Bond Claim (National).

National Insured Bonds owned or held by National (by subrogation or otherwise) will not be subject to the treatment elections set forth in Section 26.2 of the HTA Plan, and, subject to the rights of the HTA Fiscal Agent, National will receive the National Plan Consideration on account of such bonds.

In addition, subject to providing holders of Allowed National Insured Bond Claims with the treatment or elections set forth in Section 26.2 of the HTA Plan and satisfying all such treatment or elections, National shall have all right, title and interest in the National HTA Consideration and shall manage the National HTA Consideration in its sole and absolute discretion subject to and in accordance with all applicable laws and regulations.

Any calculations and/or payments to be made to a holder based on, or in relation to, such holder's Allowed National Insured Bond Claim pursuant to the options set forth in HTA Plan Section 26.2 will take into account any payments of principal and/or accrued interest already made to such holder by National pursuant to the terms of the relevant National Insurance Policies, and such holder shall not be compensated for any amounts already paid to such holder pursuant to the terms of the relevant National Insurance Policies.

***Acceleration of National Insured Bonds***.   To the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the National Insured Bonds will be accelerated as of the HTA Effective Date, and such National Insured Bonds will be due and payable from and after the HTA Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

National will have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the holder of the National Insured Bonds and the trustee or fiscal agent (as applicable) will be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy will be fully satisfied and extinguished, notwithstanding any provision of the applicable National Insurance Policy or other documents related to the National Insured Bonds.   For the sake of clarity, notwithstanding such acceleration, there will be no acceleration of any payment required to be made under any National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

***Assignment of Redemption Rights***.   To the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the HTA Effective Date, HTA will be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were HTA for such purpose.   Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

***Entitlement to Vote***.   The solicitation of acceptances and rejections to the HTA Plan by holders of National Insured Bond Claims will be made by the Oversight Board to National.   The election to choose between the National Commutation Treatment and the National Non-Commutation Treatment will be made by the beneficial holders of the applicable National Insured Bonds on the applicable National Bondholder Election Form.   However, the form of the National Non-Commutation Treatment will be selected by National.

*Improper Election.*  If a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) (1) fails to timely and validly elect the National Non-Commutation Treatment pursuant to Section 26.2(b) of the HTA Plan, or (2) submits an election for less than all of its National Insured Bond Claims in a particular class (in which case, such election will be void and of no force or effect), such holder will be deemed to have elected to receive the National Commutation Treatment set forth in Section 26.2(a) of the HTA Plan with respect to such National Insured Bond Claims, to commute the applicable National Insurance Policies, to release and discharge National's obligations under such National Insurance Policies, and to receive distributions in accordance with Section 26.2(a) of the HTA Plan.  In addition, the National Insured Bonds of a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) that does not validly elect to receive the National Non-Commutation Treatment pursuant to clauses (1) or (2) above will be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies will be fully and finally satisfied, released, and discharged.

### 3. Treatment of FGIC Insured Bond Claims

If Classes 8 and 12 vote to accept the HTA Plan and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, then holders of FGIC Insured Bond Claims will receive the treatments below.

*FGIC Insured Bond Claims Treatment*.  Each holder of an Allowed FGIC Insured Bond Claim (except those owned by FGIC) will (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration, the CW/HTA Clawback Recovery, and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor.  All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy.

Each distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable Insurance Policies.

*FGIC Insured Bonds Held By FGIC.*  With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the HTA Effective Date, and subject to the rights of the HTA Fiscal Agent, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange

of such Allowed FGIC Insured Bond Claims, its Pro Rata Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

*Dual-Insured Bonds*.  FGIC Certificates allocable to holders of Dual-Insured Bonds shall be distributed in accordance with the terms and provisions of Section 26.1 of the HTA Plan.

*Acceleration of FGIC Insured Bonds*.  The payment of the principal of the FGIC Insured Bonds shall be accelerated as of the HTA Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.  However, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

*Assignment of Redemption Rights*.  To the extent permitted pursuant to applicable definitive insurance documents and the applicable FGIC Insurance Policy, on the HTA Effective Date, HTA shall be deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by FGIC as if it were HTA for such purpose.

*Entitlement to Vote*.  The solicitation of acceptances and rejections to the HTA Plan by holders of FGIC Insured Bond Claims shall be made by the Oversight Board to FGIC.

**4.      Treatment of Ambac Insured Bond Claims**

If Classes 2 and 6 vote to accept the HTA Plan and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the HTA Effective Date, then on the HTA Effective Date holders of Ambac Insured Bond Claims will receive the following treatment, as provided in the Ambac Election Notice and to the extent offered by Ambac, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing, and Ambac may make different elections with respect to different CUSIPs and different Ambac Insured Bonds:

(a)    *Treatment of HTA 68 Bond Claims (Ambac)*.  On the HTA Effective Date, or as soon as reasonably practicable thereafter, but no later than the tenth (10th) day following the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac) will receive Cash in the amount equal to the Ambac Acceleration Price, in full and final satisfaction, release, and discharge of Ambac's obligations under the applicable Ambac Insurance Policy, and, subject to the rights of the HTA Fiscal Agent, Ambac will receive the Ambac Plan Consideration that would be otherwise allocable to such holder, its successors, transferees or assigns on account of its HTA 68

Bond Claims (Ambac).  For the sake of clarity, the Ambac Acceleration Price will include accrued and unpaid interest as of the date of payment.

(b)   ***Treatment of HTA 98 Senior Bond Claims (Ambac).***  On the HTA Effective Date, or as soon as reasonably practicable thereafter, but no later than the tenth (10th) day following the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) will receive one of the following treatments:

  i.   Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment:  If offered by Ambac, in its sole and absolute discretion, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) will have the option to elect on the Ambac Bondholder Election Forms, to receive, on the HTA Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) such beneficial holder will have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s), and (ii) subject to the rights of the HTA Fiscal Agent, Ambac will receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder.  The Ambac Insured HTA 98 Senior Bonds of a holder that validly elects to receive the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment, or makes an improper election as described in Section 26.4(f) of the HTA Plan, will be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and Ambac's obligations under the applicable Ambac Insurance Policy will be fully and finally satisfied, released, and discharged.

  ii.   Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment:  If a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) timely and validly elects on the Ambac Bondholder Election Form, to receive the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment, such holder of an Allowed Ambac Insured Bond Claim will receive one or more of the following treatments offered by Ambac, in its sole and absolute discretion, and as detailed in the applicable Ambac Bondholder Election Form:

      1.   ***Custodial Trusts.***

        Such holder of an Allowed HTA 98 Senior Insured Bond Claim (Ambac) will deposit, or be deemed to have deposited, into the applicable Ambac Trust(s), (A) such holder's Ambac Insured Bonds with respect to which the election has been made and the related Ambac Insurance Policies, (B) such holder's Pro Rata Share of the Ambac Plan Consideration, consisting of (1) Cash, (2) the CW/HTA Clawback Recovery, consisting of the

247

HTA Clawback CVIs and all payments on or collections in respect of such HTA Clawback CVIs, and (3) the New HTA Bonds, and (C) will be deemed to have received Ambac Certificates in consideration therefor; such holders shall have no recourse to Ambac or the applicable Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s). In the event the interim distribution amounts provided for in decretal paragraph 52 of the Commonwealth Confirmation Order have been distributed directly to holders of Ambac Insured Bonds prior to the HTA Effective Date, thereby reducing the principal amount of such Ambac Insured HTA 98 Senior Bonds, such interim cash distributions need not be deposited into the Ambac Trust(s).

The terms of the Ambac Trust(s) will be set forth in a trust agreement or trust agreements which will be filed as part of the Plan Supplement, but will include the following terms, without limitation: (A) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement HTA 98 Senior governing the Ambac Trust(s); (B) Ambac shall be deemed the sole holder of the Ambac Insured HTA 98 Senior Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings during the period that there are no outstanding payment defaults by Ambac under the applicable Ambac Insurance Policies; and (C) the agreement governing the Ambac Trust(s) will provide, among other things, that (1) all rights of a holder of Ambac HTA 98 Senior Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the Ambac Insured HTA 98 Senior Bonds (other than as otherwise described in the Ambac Trust(s)), (2) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured HTA 98 Senior Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same

248

treatment, and (3) Ambac may, at its option, elect to direct the sale of any Ambac Trust Assets.

<u>Payment of Accelerated Amounts</u>:   Ambac will receive the Ambac Plan Consideration that would be otherwise allocable to the holders of Allowed HTA 98 Senior Insured Bond Claims (Ambac) and Ambac's obligations to such holders shall be fully and completely discharged upon the payment, on the HTA Effective Date, or as soon as practicable thereafter, but in no event later than the tenth (10th) day following the HTA Effective Date, in Cash, of the Ambac Acceleration Price with respect thereto.

<u>Alternative Treatment:</u>   The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Allowed HTA 98 Senior Bond Claim (Ambac) Non Commutation Treatment of the Ambac Insured HTA 98 Senior Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; <u>provided</u>, <u>however</u>, that any such alternative election or implementation option must be proposed, in writing, at or prior to the commencement of the Disclosure Statement Hearing.

(c)   ***Deemed Acceleration of Ambac Insured Bonds.***  If there are no outstanding payment defaults by Ambac with respect to its obligations under the applicable Ambac Insurance Policies up to and including the HTA Effective Date, the Ambac Insured Bonds will be deemed accelerated and immediately due and payable as of the HTA Effective Date.  Ambac will have the right to pay the Ambac Acceleration Price with respect to such bonds at any time, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) will be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy will be fully satisfied and extinguished, notwithstanding any provision of the applicable Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.  For the sake of clarity, notwithstanding such acceleration, there will be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

(d)   ***Assignment of Redemption Rights.***  If permitted by applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the HTA Effective Date, HTA will be deemed to have assigned to Ambac any and all rights to redeem and

call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were HTA for such purpose.  Any amounts due in connection with any such redemption will be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

(e)  **_Entitlement to Vote._**  Subject to the terms and provisions of the Disclosure Statement Order, (1) the solicitation of acceptances and rejections of the HTA Plan by holders of Ambac Insured Bond Claims will be made by the Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (2) where applicable and as described in Section 26.4(b) of the HTA Plan, the election to choose between the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment as set forth in Section 26.4(b)(i) of the HTA Plan and the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii) of the HTA Plan will be made by the beneficial holders of Ambac Insured HTA 98 Senior Bonds. However, the form of the Ambac Non-Commutation Treatment will be selected by Ambac in accordance with the terms and provisions of Section 26.4(b)(ii) of the HTA Plan.

(f)  **_Improper Election._**  If a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) (1) fails to timely and validly elect either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i) of the HTA Plan or the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii), or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election will be void and of no force or effect), such holder will be deemed to have elected to receive with respect to its HTA 98 Senior Bond Claims (Ambac), the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i), to commute the applicable Ambac Insurance Policies, and to fully and finally satisfy, release and discharge Ambac's obligations under such Ambac Insurance Policies, and will receive, with respect to its HTA 68 Bond Claims (Ambac), the Allowed 68 Bond Claim (Ambac) Treatment, if any, as set forth in Section 26.4(a).  In addition, a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) that does not validly elect to receive either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment or the Allowed HTA 98 Senior Bond (Ambac) Non-Commutation Treatment pursuant to clauses (1) or (2) above will be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and Ambac's obligation under the applicable Ambac Insurance Policy will be fully and finally satisfied released and discharged.

5.      **Fiscal Agent Obligations**

The HTA Fiscal Agent will have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date.

## H.      Treatment of Executory Contracts and Unexpired Leases

All executory contracts and leases of nonresidential real property with the Debtor will be treated as follows:

| Category | Treatment |
|---|---|
| **Executory Contract or Unexpired Lease Rejected or Assumed and Assigned by an Order of the Title III Court Entered Before the HTA Effective Date** | *Treatment.* Will be unaffected by the HTA Plan. The order of Title III Court with respect to such executory contract or unexpired lease will continue to govern. |
| **Executory Contract or Unexpired Lease Listed in Schedule to Plan Supplement** | *Treatment.* The HTA Plan Supplement will include a schedule of executory contracts and unexpired leases that will be assumed, or assumed and assigned as of the HTA Effective Date. The scheduled may be amended at any time before the Confirmation Date. Pursuant to the Bankruptcy Code, as a condition of assumption of an executory contract, the debtor must promptly cure any defaults, and if there is a default, provide adequate assurance that the debtor will continue to perform under the contract.<br><br>*Notice and Cure of Defaults.* At least twenty (20) days before the HTA Confirmation Hearing, the Debtor will file and serve a notice to parties to such contracts or leases. The notice will include the amount to be paid by the Debtor to cure any default for each executory contract or unexpired lease.<br><br>*Objections.* Any party to such executory contract or unexpired lease will have twenty (20) days from the date of service of the notice to file and serve any objection to the cure amounts listed and to any proposed adequate assurance of future performance the debtor may provide. If there are any objections filed, the Title III Court will hold a hearing on the objection. |
| **Collective Bargaining Agreements** | Except as provided in Article XXVII of the HTA Plan, none of the Debtor's collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the HTA Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Section 2.5 of the HTA Plan regarding the payment and ongoing treatment of pension and related claims and obligations. |
| **Executory Contracts and Unexpired Leases that:**<br><br>•   **have been registered with the** | *Treatment.* Will be unaffected by the HTA Plan. |

| Category | Treatment |
|---|---|
| **Office of the Comptroller of Puerto Rico;**<br><br>• **have been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto;**<br><br>• **have been approved by the Oversight Board or authorized by the Title III Court and have not been specifically designated as rejected in the HTA Plan Supplement;**<br><br>• **are with the United States, or any of its agencies, departments or agents or pursuant to any federal program; or**<br><br>**are by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party).** | |
| **All Other Executory Contracts and Unexpired Leases** | ***Treatment.*** Will be rejected by the Debtor as of the HTA Effective Date.<br><br>***Notice.*** Notice of any executory contract or unexpired lease to be rejected will be served on parties to such contract or lease.<br><br>***Rejection Damages.*** Any party seeking to assert a claim for damages resulting from the rejection of an executory contract or unexpired lease must file a proof of claim on or before thirty (30) days after (i) the HTA Confirmation Date, or (ii) the date of the entry of an order by the Title III Court approving the rejection of such executory contract or unexpired lease, whichever is later.<br><br>If a party fails to file a proof of claim for damages resulting from the rejection of an executory contract or unexpired lease within the deadline above, such claim will be forever barred and unenforceable against the Debtor. |

    ***Insurance Policies.*** Each of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the HTA Plan; provided, however, that, except to the extent provided in the HTA Plan, the HTA Confirmation Order and the Definitive Documents, such treatment shall not, and shall not be

construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

*Indemnification and Reimbursement Obligations*.  For purposes of the HTA Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the HTA Petition Date, shall be deemed assumed as of the HTA Effective Date, and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the HTA Petition Date, as the case may be, shall be Administrative Expense Claims. *See* section VI.D of this Disclosure Statement for a summary of the treatment of Administrative Expense Claims.

Under no circumstances shall the Debtor or Reorganized HTA, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

*Disputes Regarding Executory Contracts and Unexpired Leases*.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized HTA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## I.      Provisions Governing Distributions

*Time and Manner of Distributions.*

*Distributions to Holders of Claims*.  The Disbursing Agent will make distributions, or cause distribution to be made, to holders of the following claims on the HTA Effective Date.  *See* section VI.E of the Disclosure Statement for the applicable distributions to be made to holders of such claims.

- Allowed HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National).

- Allowed HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National).

- Allowed HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National).

- Allowed HTA General Unsecured Claims

*Distributions of Cash to Holders of Certain Other Claims*.  Distributions to holders of Allowed Eminent Domain/Inverse Condemnation Claim will be made in cash in the amount of such Allowed Claim within ten (10) Business Days following the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent

Domain/Inverse Condemnation Claim, the Disbursing Agent shall distribute, or cause to be distributed. Distributions to holders of Allowed Administrative Expense Claims and Allowed Convenience Claims will be made in cash as soon as practicable after the later of (i) the HTA Effective Date, or (ii) the date on which the claim becomes an allowed claim.

*Timeliness of Payments.* Any payment or distribution made within ten (10) business days after the date specified in the HTA Plan will be considered timely made. When a distribution is due on a day other than a business day, such distribution will be made on the next business day, without interest, and will be considered to have been made on the date due.

*Distributions by the Disbursing Agent.* All distributions under the HTA Plan will be made by the Disbursing Agent, unless otherwise specified. The Disbursing Agent will hold all property to be distributed under the HTA Plan in trust for all entities entitled to receive such property. The Disbursing Agent will not hold an economic or beneficial interest in such property.

*Manner of Payment under the HTA Plan.* Cash payments will be made by either check or wire transfer. However, no cash payment will be made until the amount payable is equal to or greater than ten dollars ($10.00).

*Delivery of Distributions.* Distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address.

However, initial distributions by the Disbursing Agent on account of Allowed HTA Bond Claims will be made to, or at the direction of, the HTA Fiscal Agent in accordance with the respective governing documents for such obligations. Furthermore the Disbursing Agent may make distributions of HTA PSA Restriction Fees, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The HTA Fiscal Agent (or the HTA Fiscal Agent's designee) will, in turn, deliver the distribution to the applicable holders in the manner provided for in the applicable governing documents. Regardless of whether such distributions are made by the HTA Fiscal Agent or the Disbursing Agent at the direction of the HTA Fiscal Agent, any Charging Lien of the HTA Fiscal Agent will attach to such distributions in the same manner as if such distributions were made by or through the HTA Fiscal Agent. The HTA Fiscal Agent may rely upon the distribution instructions received from the Debtor or its agents with respect to delivery of distributions in accordance with the terms and provisions of Article XXVIII of the HTA Plan, including any contra-CUSIP positions and escrow positions set up by the debtor or its agents with the Depository Trust Company.

The Debtor, its agents and servicers, the HTA Fiscal Agent, and the Disbursing Agent shall have no obligation to recognize any transfer of HTA Bond Claims after the Distribution Record Date. The New HTA Bonds and the HTA Clawback CVIs will be transferable and recognized in accordance with the terms and conditions of the New HTA Bonds Indenture and the CVI Indenture, respectively.

***Cancellation of Notes, Instruments, Certificates, and Other Documents.***  Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the HTA Plan, (b) for purposes of evidencing a right to distribution under the HTA Plan, or (c) as specifically provided otherwise in the HTA Plan, on the HTA Effective Date, the HTA Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtor and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtor, under the HTA Bonds and all instruments and documents related thereto shall be discharged.

However, the HTA Bonds and such other instruments and documents shall continue in effect for the limited purposes below:

    (i)    to allow the Disbursing Agent to make any distributions as set forth in the HTA Plan and to perform such other necessary administrative or other functions with respect thereto,

    (ii)    to allow holders of Allowed HTA Bond Claims and Allowed Insured HTA Bond Claims to receive distributions in accordance with the terms and provisions of the HTA Plan,

    (iii)    for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the HTA Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements,

    (iv)    to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor,

    (v)    to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 26.1 and 26.2 of the HTA Plan, respectively, or

    (vi)    as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline.

The Oversight Board will request that HTA use its reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured HTA Bonds, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.  In addition, the HTA Fiscal Agent will have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date.  Such bonds or bond documents that remain

outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized HTA, as the case may be.

**Undeliverable/Reserved Distributions.**

*Holding of Undeliverable Distributions by the Disbursing Agent.* If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution will be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions will remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving previously undeliverable Cash will not be entitled to any interest or other accruals thereon of any kind. The HTA Plan does not require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

*Failure to Claim Undeliverable Distributions.* If a distribution is undeliverable, the Disbursing Agent will, on or prior to the date that is one hundred eighty (180) days from (i) the HTA Effective Date, with respect to all Allowed Claims as of the HTA Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the HTA Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.

Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the HTA Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the HTA Plan, against Reorganized HTA, the trustees, or their respective professionals, agents, or property.

Any Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized HTA for use to discharge operating expenses of Reorganized HTA, and the HTA Bonds in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized HTA for cancellation or deposit into the treasury of Reorganized HTA, as determined by Reorganized HTA.

**Withholding and Reporting Requirements.** Any party issuing any instrument or making any distribution under the HTA Plan must comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the HTA Plan will be subject to any such withholding or reporting requirements.

However, each holder of an Allowed Claim that is to receive a distribution under the HTA Plan will have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the HTA Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing

party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the HTA Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

*Time Bar to Cash Payments.*  Checks issued by the Disbursing Agent on account of Allowed Claims will be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check will be made on or before the later of (i) the first (1st) anniversary of the HTA Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks will be discharged and forever barred and the Disbursing Agent will retain all monies related thereto for redistribution to holders of Allowed Claims.

*Distributions After Effective Date.*  Distributions made after the HTA Effective Date to holders of Claims that are not Allowed Claims as of the HTA Effective Date, but which later become Allowed Claims, will be deemed to have been made in accordance with the terms and provisions of Article XXVIII of the HTA Plan.

*Setoffs.*  The Disbursing Agent may set off against any Allowed Claim and the distributions to be made pursuant to the HTA Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtor or Reorganized HTA may hold against the holder of such Allowed Claim.

However, neither the failure to effect such a setoff nor the allowance of any Claim will constitute a waiver or release by the Debtor or Reorganized HTA of any such claims, rights, and Causes of Action that the Debtor or Reorganized HTA may possess against such holder.

Furthermore, nothing in the HTA Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment and, nothing in HTA Plan Section 28.11 shall affect the releases and injunctions provided in Article XLI of the HTA Plan.

*Allocation of Plan Distributions Between Principal and Interest.*  To the extent that any Allowed Claim entitled to a distribution under the HTA Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately preceding the HTA Petition Date, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts. The Debtor or Reorganized HTA's treatment of any distributions for its tax purposes will not be

binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

*Payment of Trustee Fees and Expenses.* The distributions to be made pursuant to the HTA Plan and the Commonwealth Confirmation Order to holders of HTA 68 Bonds Claims and HTA 98 Senior Bond Claims on account of such Claims are intended to be inclusive of any and all of the HTA Fiscal Agent's reasonable fees and expenses due and owing by HTA pursuant to the applicable bond resolutions with respect to amounts discharged pursuant to the HTA Plan.

To the extent not deducted in connection with payments made in accordance with the Commonwealth Confirmation Order upon satisfaction of the Distribution Conditions, the HTA Fiscal Agent's Fees and Expenses shall be deducted on a pro rata basis from distributions to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on account of such Claims, such that the cost of such HTA Fiscal Agent's Fees and Expenses is shared equally by all holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims based on the amount of their Claims.

Notwithstanding anything in the HTA Plan, the HTA Confirmation Order, or the applicable bond resolutions to the contrary, the HTA Fiscal Agent's Fees and Expenses shall not exceed $2,360,681.02. In the event amounts reserved or deducted by the HTA Fiscal Agent from the distributions to be made to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims exceed the HTA Fiscal Agent's Fees and Expenses, such excess amounts shall be distributed by, or at the direction of, the HTA Fiscal Agent on a pro rata basis to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on the HTA Effective Date.

The applicable Monolines shall constitute the holders of the HTA 68 Bond Claims and the HTA 98 Senior Bond Claims arising from the HTA Bonds which are insured by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA, applicable law, and governing insurance and other documents applicable to such HTA Bonds. Notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to FGIC, and (b) with respect to any HTA 98 Senior Bonds insured by FGIC, but not owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to the owners of such HTA 98 Senior Bonds.

Except as provided in Section 28.13 of the HTA Plan, the HTA Plan does not, and will not be construed to, limit the rights of the HTA Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

*Beneficial Owner.* For all purposes of the HTA Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article XXVIII, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim.

However, for purposes of Article XXVIII of the HTA Plan and section 1126 of the Bankruptcy Code:

(a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims,

(b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and the Assured CW/PRIFA Rum Tax Claims,

(c) Ambac shall constitute the "holder" of any Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims,

(d) FGIC shall constitute the "holder" of any FGIC Insured Bond Claims and any FGIC CW/HTA Bond Claims, in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/HTA Bond Claims,

(e) Syncora shall constitute the "holder" of any HTA Bond Claims and CW/HTA Bond Claims arising from or related to HTA 98 Senior Bonds bearing CUSIP number 745190AY4, and the principal and interest payments of which have been insured by Syncora in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to such Claims.  However, (i) solely to the extent permitted by governing insurance and other documents, on the HTA Effective Date, Syncora shall pay the beneficial owners of such HTA 98 Senior Bonds the Syncora Acceleration Price,[203] and (ii) Syncora shall indemnify and hold the Oversight Board, the Commonwealth, HTA, and Reorganized HTA harmless from any and all claims, liabilities, damages, and causes of action arising from or related to the acceleration of such HTA 98 Senior Bonds and the payment of the Syncora Acceleration Price,

(f) the "holder" of any other Insured HTA Bond Claims shall be determined in accordance with section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured HTA Bond Claims.

***Value of Distributions***.  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New HTA Bonds shall be valued at the original principal amount thereof.

---

[203] The "Syncora Acceleration Price" consists of the principal and interest payments of which have been insured by Syncora, a price equal to the outstanding principal amount of such HTA 98 Senior Bond plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

*Disputed Funds Stipulation*.  If the HTA Distribution Conditions are not satisfied before the HTA Effective Date,[204] on the HTA Effective Date, the HTA Distribution Conditions will be deemed satisfied and payments and distributions to be made in connection therewith pursuant to the terms and provisions of the Commonwealth Confirmation Order and the HTA/CCDA Plan Support Agreement will be made on the HTA Effective Date to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National), including, without limitation, the distribution of monies in accordance with the Disputed Funds Stipulation, subject to the rights of BNYM, as fiscal agent, to assert and apply, on a pro rata basis, any and all of its rights with respect thereto.

## J.      Prosecution and Extinguishment of Claims Held by the Debtor

On the HTA Effective Date, the authority to litigate or compromise and settle the Avoidance Actions will be transferred to the Avoidance Actions Trust, the trust created on the Commonwealth Effective Date into which have been transferred Claims and Causes of Action of the Commonwealth, ERS, and PBA. The three-member board, the Avoidance Actions Trust Board was appointed as of the Commonwealth Effective Date to govern the Avoidance Actions Trust.  The Avoidance Actions Trustee, Drivetrain, LLC, was appointed by the Avoidance Actions Trust Board in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, dated as of March 15, 2022, by and among the Commonwealth, ERS, PBA, the Oversight Board and Drivetrain, LLC.

From and after the HTA Effective Date, the Avoidance Actions Trustee will have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) will be included in the HTA GUC Recovery and be distributed to holders of Allowed HTA General Unsecured Claims.

## K.      Acceptance or Rejection of the HTA Plan, Effect of Rejection by One or More Classes of Claims

*Impaired Classes to Vote.*  As of the Voting Record Date or at the time of tender into ATOP, as the case may be, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the HTA Plan in accordance with Article XXXIII of the HTA Plan shall be entitled to vote separately to accept or reject the HTA Plan.

*Acceptance by Class of Creditors*.  An impaired class accepts the HTA Plan if (i) at least two-thirds (2/3) in dollar amount of the Allowed Claims of such class who have voted accept the HTA Plan, and (ii) more than one-half (1/2) in the number of the Allowed Claims of such class that have voted accept the HTA Plan.

*Cramdown*.  If any impaired class of claims reject, or fail to accept, the HTA Plan, the Debtor may (i) request the Title III Court to confirm the HTA Plan in accordance with the

---

[204] *See supra* note V.I.1(d) for a description of the HTA Distribution Conditions.

"cramdown" provisions of the Bankruptcy Code, or (ii) HTA/CCDA PSA Creditors, in accordance with the provisions of the HTA/CCDA Plan Support Agreement, amend the HTA Plan.  For a summary of the "cramdown" provisions under the Bankruptcy Code, *see* section VII.C.1 of this Disclosure Statement.

## L.     Rights and Powers of Disbursing Agent

The disbursing agent will be HTA or another entity/ies designated by the Oversight Board, upon consultation with AAFAF, on or prior to the HTA Effective Date to make or to facilitate distributions in accordance with the provisions of the HTA Plan.

*Powers of the Disbursing Agent*.  The Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the HTA Plan, (b) make distributions contemplated by the HTA Plan, (c) comply with the HTA Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the HTA Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the HTA Plan.

*Fees and Expenses Incurred From and After the Effective Date.*  The amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the HTA Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.  However, the Disbursing Agent shall not be entitled to reimbursement or indemnification by Reorganized HTA related to claims or causes of action arising from the gross negligence or willful misconduct of the Disbursing Agent.

*Exculpation*.  The Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the HTA Plan or any order of the Title III Court entered pursuant to or in furtherance of the HTA Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent.  No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the HTA Plan or for implementing the provisions of the HTA Plan, except for claims or causes of action arising from the gross negligence or willful misconduct of the Disbursing Agent.

## M.     Procedures for Treatment of Disputed Claims and Claims Subject to ACR Procedures

*Objections to Claims; Prosecution of Disputed Claims.*  Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, will file and serve any objections to claims no later than one hundred and eighty (180) days following the HTA Effective Date, or such later date as approved by the Title III Court.  All objections, affirmative defenses, and counterclaims will be litigated to final order.  Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, will have the authority to file, settle, compromise, or withdraw any objections to claims, without approval of the Title III Court.

Any HTA Bond Claim filed by any entity for amounts due under existing securities will be deemed satisfied, expunged, and removed from the claims registry on the HTA Effective Date, and following the making of distributions to holders of Allowed HTA Bond Claims in accordance with the provisions of the HTA Plan.

Claims subject to resolution pursuant to the ADR Procedures and ADR Procedures Order will continue to be addressed under such procedures.

If an order reversing or vacating the HTA Confirmation Order with respect to HTA Bond Claims becomes a Final Order, such HTA Bond Claims will be reinstated on the claims registry.

The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board will receive monthly updates to the claims reconciliation process with respect to HTA General Unsecured Claims, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF.  In addition, the aforementioned two (2) appointees will have the following rights:

(A)     review the claims objections and reconciliation process, including the ADR Procedures, as it relates to HTA General Unsecured Claims and Convenience Claims, regardless of the size of the asserted Claim amount,

(B)     ensure compliance with the exclusions from HTA General Unsecured Claims as provided in the HTA Plan, and

(C)     in the event that such appointees disagree with any settlement of an HTA General Unsecured Claim, for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of HTA and its creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.

Such appointees and their advisors will not be entitled to compensation in excess to that provided pursuant to the Commonwealth Plan and the Commonwealth Confirmation Order.

From and after the HTA Effective Date, all Late-Filed Claims will be deemed denied, with prejudice, and the Oversight Board will instruct Kroll Restructuring Administration LLC, its court-appointed representative, to remove such Late-Filed Claims from the claims registry maintained for the benefit of the Title III Court and the Oversight Board will cause a notice with respect thereto to be served upon the holder of such Late-Filed Claim.

***Estimation of Claims***.  On and after the HTA Effective Date, Reorganized HTA may request the Title III Court to estimate for final distribution purposes any contingent, unliquidated, or disputed claim, regardless of whether the Debtor previously objected to or sought to estimate such claim.

The Title III Court will retain jurisdiction to consider any request to estimate any claim.

If the Title III Court estimates any contingent, unliquidated, or disputed claim, the estimated amount will be either the allowed amount of such claim, or a maximum limitation on such claim, as determined by the Title III Court.  If the estimate constitutes the maximum limitation on such claim, Reorganized HTA may in the future object to the ultimate allowance of such claim.

**Disputed Claims Holdback.**  Reorganized HTA will hold, for the benefit of each holder of a disputed claim, the distribution such holders would receive if the disputed claim were allowed, until the disputed claim is settled, estimated by the Title III Court, or allowed.  The amount of the distribution held back will be the lesser of (i) the liquidated amount stated in the filed proof of claim relating to such disputed claim, (ii) the amount of the disputed claim estimated by the Title III Court as the maximum amount in which such claim may ultimately become an allowed claim, or (iii) such other amount agreed upon by the holder of such disputed claim and Reorganized HTA.  The recovery of any holder of a disputed claim cannot exceed the lesser of (i), (ii), or (iii) above.

To the extent that Reorganized HTA retains any New HTA Bonds on behalf of disputed claims holders, Reorganized HTA shall exercise voting or consent rights with respect to such obligations.

**Allowance of Disputed Claims.**  When a disputed claim becomes an allowed claim (in whole or in part), Reorganized HTA will make distributions pursuant to the treatment specific under the HTA Plan to the holder of such claim, to the extent the claim is allowed.  Such distribution will be made no more than ninety (90) days after such claim is determined to be allowed.

**Non-Accrual of Interest.**  No holder of a claim (allowed or otherwise) will be entitled to interest accruing on or after the HTA Petition Date on any claim or right.  Interest will not accrue or be paid on any disputed claim with respect to the period from the HTA Effective Date to the date a final distribution, if such disputed claim becomes an allowed claim.

**Disallowance of Claims.**  If (a) an entity is liable to turn over any property or monies to the Debtor, and (b) such entity has failed to turn over such property or monies to the Debtor by the applicable deadline, all claims of such entity will be disallowed.

**Authority to Amend List of Creditors.**  Except with respect to HTA Bond Claims, and subject to the limitations of Section 32.1(b) of the HTA Plan, the Debtor may amend the List of Creditors with respect to any claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any amendment reduces the amount of a claim or changes the nature or priority of a claim, the Debtor will provide the holder of such claim with notice of the amendment.  Such holder will have twenty (20) days to file an objection to the amendment with the Title III Court.  If no objection is filed, distributions will be made based on such amended List of Creditors without approval of the Title III Court.

**Claims Subject to ACR Procedures**.  To the extent not already transferred as of the HTA Effective Date in accordance with the terms and conditions of the ACR Order, the Debtor will transfer claims in accordance with the terms and conditions of the ACR Order, and, upon

transfer, all such claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtor, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the HTA Plan, shall not be included in HTA General Unsecured Claims to be satisfied from the HTA GUC Recovery or Convenience Claims.

The Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the HTA Plan). Claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 16 or Class 19 under the HTA Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of Section 32.7 of the HTA Plan.

## N.     Conditions Precedent to Confirmation of the HTA Plan

*Conditions Precedent to Confirmation of the HTA Plan.*  The following conditions must be satisfied before the HTA Plan may be confirmed:

1.     *Fiscal Plan Certification*:  The Oversight Board must certify that a HTA Fiscal Plan is consistent with the HTA Plan, and certify the submission of the HTA Plan (including any modification to the HTA Plan through the HTA Confirmation Date).

2.     *Required Orders*:  The Title III Court must have entered orders providing for the following:

(a)     Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(b)     Authorizing the solicitation of votes and elections with respect to the HTA Plan;

(c)     Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(d)     Confirming and giving effect to the terms and provisions of the HTA Plan, including the releases set forth in Article XLI of the HTA Plan;

(e)     Determining that the compromises and settlements set forth in the HTA Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

    **(f)**      Determining that all applicable tests, standards and burdens in connection with the HTA Plan have been duly satisfied and met by the Oversight Board, the Debtor and the HTA Plan;

    **(g)**      Approving the documents in the HTA Plan Supplement, other than the Reorganized HTA By-Laws, and determining that such documents are valid and binding on parties with respect thereto; and

    **(h)**      Authorizing Reorganized HTA to execute, enter into, and deliver the documents in the HTA Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the HTA Plan, and the documents in the HTA Plan Supplement.

**3.**    *Form of Orders*: The HTA Confirmation Order and the HTA Plan must each be in form and substance reasonably acceptable to the Oversight Board, AAFAF, the Debtor, the HTA/CCDA PSA Creditors and, solely with respect to provisions affecting Classes 16 and 19, the Creditors' Committee.

**4.**    *Confirmation Order*: The HTA Confirmation Order must include (i) determinations that all of the settlements and compromises contained in the HTA Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XLI of the HTA Plan and (iii) the applicable provisions set forth in section 34.1(b) thereof.

    *Waiver of Conditions Precedent to Confirmation*. Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, each of the conditions precedent in HTA Plan Section 34.1 may be waived, in whole or in part, by the Oversight Board, with the prior written consent of the Debtor, and the Initial HTA/CCDA PSA Creditors, and solely with respect to the provisions affecting Classes 16 and 19, the Creditors' Committee, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

**O.**    **Conditions Precedent to the HTA Effective Date**

    *Conditions Precedent to the HTA Effective Date.* The following conditions must be satisfied before the occurrence of the HTA Effective Date and the substantial consummation of the HTA Plan:

**1.**    *Fiscal Plan Certification*: The Oversight Board must have determined that the HTA Plan is consistent with the Debtor's Fiscal Plan and must have certified the submission of the HTA Plan, and any modifications to the HTA Plan through the HTA Confirmation Date, in accordance with sections 104(j) and 313 of PROMESA. The HTA Fiscal Plan certified as of the HTA Effective Date must include provisions for the payment of principal and interest with respect to the

New HTA Bonds and the Subordinated Indebtedness, including, without limitation, sinking fund payments.

**2.**     ***Entry of the HTA Confirmation Order*:**  The Title III Court must enter the HTA Confirmation Order, which must be in form and substance reasonably acceptable to the Oversight Board, the Initial HTA/CCDA PSA Creditors, and the Creditors' Committee and must:

**(a)**     Authorize the Debtor and Reorganized HTA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the HTA Plan;

**(b)**     Decree that the provisions of the HTA Confirmation Order and the HTA Plan are nonseverable and mutually dependent;

**(c)**     Authorize the Debtor and Reorganized HTA, as the case may be, to (1) make all distributions and issuances as required under the HTA Plan and (2) enter into any agreements and transactions, as set forth in the HTA Plan Supplement;

**(d)**     Authorize the implementation of the HTA Plan in accordance with its terms;

**(e)**     Determine the New HTA Bonds Indenture, the New HTA Bonds, the Subordinated Indebtedness, and the covenants by Reorganized HTA, including, without limitation, the Toll Rate Covenant, for the benefit of the holders of the New HTA Bonds and the Subordinated Indebtedness, as provided in the New HTA Bonds Indenture, or the HTA Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations ~~ofReorganized~~of Reorganized HTA under Puerto Rico, New York and federal law;

**(f)**     Determine that the New HTA Bonds Indenture, upon issuance of the Secured Obligations, including, without limitation, the Subordinated Indebtedness issued as a refinancing of the Commonwealth Loan, grants a first priority lien on and first priority security interest on all of Reorganized HTA's legal and equitable right, title and interest in the Trust Estate to the Secured Obligations, subject only to (1) the terms and provisions of the New HTA Bonds Indenture establishing the Authority Expense Fund and the Arbitrage Rebate Fund, and (2) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which first-priority lien and first-priority security interest will in all respects be senior and superior to the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of holders of Subordinated Indebtedness, in each case, as permitted by the HTA Enabling Act, and shall be deemed automatically perfected as of the

266

HTA Effective Date and shall in any event be valid, binding, perfected, and enforceable against all Entities having claims of any kind against Reorganized HTA or its assets, irrespective of whether such Entities have notice of such lien or security interest, without any further act or agreement by any Entity, and will be "closed" and will remain in full force and effect until the Securd Obligations have been paid or satisfied in full in accordance with their terms;

**(g)**   Determine the HTA Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtor, (2) Reorganized HTA, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against HTA, the Commonwealth, or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtor or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the HTA Plan and, if impaired, whether or not such Entity accepted the HTA Plan, (5) any other Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

**(h)**   Provide that the HTA Fiscal Plan, certified as of the HTA Effective Date, and any post-HTA Effective Date HTA Fiscal Plan include provisions for the payment in each FY of principal and interest payable on the New HTA Bonds and the Subordinated Indebtedness, including, without limitation, any sinking fund payments which may become due in such FY;

**(i)**   Provide that the automatic stay in any future insolvency proceeding commenced on behalf of HTA (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to Net Receipts held in the funds and accounts established in accordance with the New HTA Bonds Indenture (other than the Net Receipts on deposit in the Arbitrage Rebate Fund established pursuant to the New HTA Bonds Indenture;

**(j)**   Determine that, consistent with the HTA Fiscal Plan and corresponding budget, the discharge of debt to occur as of the HTA Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA as determined in accordance with modified accrual accounting standards;

**(k)**   Determine that the HTA Plan is consistent with the Debtor's Fiscal Plans and satisfies section 314(b)(7) of PROMESA;

**(l)**   Provide that no party, Person, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the HTA Plan;

**(m)**   Provide that the Government Parties, including, without limitation, HTA and Reorganized HTA, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the HTA Plan; and

**(n)**   Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA Plan Support Agreement and the Commonwealth Confirmation Order, the Commonwealth shall make payments on the HTA Effective Date to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively**.**

**3.**   *No Injunction*:  The HTA Confirmation Order must not be stayed in any respect.

**4.**   *Authorizations:*  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the HTA Plan, must have been obtained or enacted or entered and not revoked or reversed, and (2) unless otherwise permitted or required by PROMESA or similar authority, any other required legislative or other governmental action required to consummate the HTA Plan must have been completed**.**

**5.**   *Execution of Documents; Other Actions:*   All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents necessary to implement the terms and provisions of the HTA Plan must be effected or executed and delivered, as applicable, and must be in full force and effect.

**6.**   *Opinions:*  Usual and customary legal opinions for issuances of the type similar to the New HTA Bonds by outside counsel to the Debtor covering matters not expressly addressed in the HTA Confirmation Order, in form and substance reasonably acceptable to the Initial HTA/CCDA PSA Creditors, must have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the HTA Plan.

**7.**   *Lift Stay Motions and Clawback Actions*:   The Conditionally Appropriated Revenues at issue in the Lift Stay Motions and the Clawback Actions must have been determined by the Title III Court to constitute property of the Commonwealth.

8.    *Commonwealth Effective Date*:   The Commonwealth Effective Date must have occurred.

9.    *HTA Clawback CVI*:   In accordance with the decretal paragraph 34(f) of the Commonwealth Confirmation Order, the HTA Clawback CVI must have been distributed to the applicable Creditors.

10.   *HTA Interim Distribution*:   In accordance with decretal paragraph 52 of the Commonwealth Confirmation Order, HTA must have made interim distributions to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC) and HTA 98 Senior Bond Claims (National)  in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash.

However, for purposes of Section 35.1(j) of the HTA Plan, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) arising from the HTA Bonds insured or owned by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA.

***Waiver of Conditions Precedent.***  Subject to the provisions of the HTA/CCDA Plan Support Agreement, the Oversight Board may waive any of the conditions to the HTA Effective Date set forth in HTA Plan Section 35.1 at any time without any notice to any other parties in interest, other than the HTA/CCDA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the HTA Plan.  However, subject to the terms and provisions of the HTA Committee Agreement, each of the conditions precedent in Section 35.1 with respect to the provisions affecting Classes 16 and 19 may be waived, in whole or in part, by the Oversight Board subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

***Effect of Non-Occurrence of Conditions to Effective Date.***  If the HTA Confirmation Order is vacated by a final order before the HTA Effective Date, the HTA Plan will be null and void in all respects, unless the order vacating the HTA Confirmation Order provides otherwise.

## P.   Modification, Revocation, or Withdrawal of the HTA Plan

***Modification of the HTA Plan.***  The Oversight Board may alter, amend, or modify the HTA Plan or Exhibits at any time prior to or after the HTA Confirmation Date, but before the

HTA Effective Date.[205]  A holder of a claim that has accepted the HTA Plan will be deemed to have accepted the HTA Plan as altered, amended, or modified so long as the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the claim of such holder.

*Revocation or Withdrawal of the HTA Plan.*  Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, the Oversight Board may revoke or withdraw the HTA Plan at any time before the HTA Confirmation Date.

If the HTA Plan is revoked or withdrawn prior to the HTA Confirmation Date, or if the HTA Plan does not become effective for any reason whatsoever, then the HTA Plan will be null and void, and nothing in the HTA Plan will constitute a waiver or release of any claim by the Debtor or any other entity, or prejudice the rights of the Debtor or any other entity in any further proceeding involving the Debtor.

*Amendment of Plan Documents.*  From and after the HTA Effective Date, the right to make any amendment, modification, or supplement to the HTA Plan Supplement, Exhibits to the HTA Plan Supplement, or Exhibits to the HTA Plan will be governed by the terms of such document.

*No Admission of Liability.*  The submission of the HTA Plan is not intended to be and will not be construed as an admission or evidence in any pending or subsequent suit, action, proceeding or dispute regarding any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any entity with respect to any of the matters addressed in the HTA Plan.

The HTA Plan and any settlement entered, act performed, or document executed in connection with the HTA Plan (i) may not be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any entity; (ii) may not be used as an admission or evidence of any liability, fault or omission of any entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; and (iii) may not be used as an admission or evidence against Reorganized HTA, the Debtor, or any other person or entity with respect to the validity of any Claim.

The HTA Plan and any settlement entered, act performed, or document executed in connection with the HTA Plan will not be admissible in any proceeding for any purposes, except to carry out the terms of the HTA Plan or enforce any such agreement.  However, once the HTA Plan is confirmed, any entity may file the HTA Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

---

[205]   Any such alteration, amendment, or modification is subject to the requirements of sections 104(j) and 313 of PROMESA, Bankruptcy Code sections 942 and 1127(d), and the terms of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement.

**Q.**     **Corporate Governance and Management of Reorganized HTA**

*Corporate Action.*  On the HTA Effective Date, all matters under the HTA Plan that would require approval of the directors of the Debtor (including the authorization to issue the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment of directors and officers of Reorganized HTA pursuant to the HTA Plan) will be authorized and approved in accordance with the New HTA Bonds Indenture, and the new corporate governance documents and without further action by any entity under any other applicable law, regulation, order, or rule.

Matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA will be authorized and in effect in accordance with the New HTA Bonds Indenture and the new corporate governance documents.  After the HTA Confirmation Date, the Debtor will take any and all actions deemed appropriate in order to consummate the transactions contemplated in the HTA Plan in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable.

*Amendment of By-Laws.*  The by-laws of Reorganized HTA shall be amended as of the HTA Effective Date to provide substantially as set forth in Reorganized HTA By-Laws.

*Directors of Reorganized HTA.*  The board of directors of Reorganized HTA shall be appointed consistent with the terms and provisions of the HTA Enabling Act.  The initial directors will be disclosed prior to the HTA Confirmation Hearing.  If, prior to the HTA Effective Date, circumstances require substitution persons selected, the Governor of the Commonwealth, upon consultation with the Oversight Board, will choose a substitute.

*Officers of Reorganized HTA.*  To the extent applicable, the board of directors of Reorganized HTA will elect officers of Reorganized HTA as of or after the HTA Effective Date.

**R.**     **Provisions Regarding Oversight Board and Compliance with PROMESA**

*Effect of Confirmation.*  Nothing in the HTA Plan or the HTA Confirmation Order will discharge, substitute, alter, or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of Reorganized HTA under PROMESA.  Beginning on the HTA Effective Date, Reorganized HTA will be required to comply with all of the terms and conditions of PROMESA, including Title III of PROMESA.

*Ongoing Role of the Oversight Board.*  Nothing in the HTA Plan or the HTA Confirmation Order will discharge any or all obligations of the Debtor under PROMESA.  From and after the HTA Effective Date, the Oversight Board's powers and responsibilities under PROMESA will continue and the Debtor's duties and obligations will continue and be unaffected by the HTA Plan and the consummation of the HTA Plan.

*Preemption of Laws.*  As of the HTA Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws that affect the Debtor or Reorganized HTA and are inconsistent with PROMESA will be preempted for the reasons, and to the extent, set forth in Exhibit "A" to the Findings of Fact and

Conclusions of Law. Such preempted laws, rules and regulations include, without limitation, those set forth in Section 38.3 of the HTA Plan.  All litigation in which any Government Party is a defendant, over whether Commonwealth law specified in the HTA Plan is preempted by PROMESA shall be dismissed, with prejudice, as of the HTA Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.

For the sake of clarity, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or HTA budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

**S.      Provisions Regarding Creditors' Committee**

***Dissolution of Creditors' Committee.***   On the HTA Effective Date, the Creditors' Committee will be dissolved and will have satisfied all of its respective duties and obligations. The Creditors' Committee will be released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Case.

If an appeal of the HTA Confirmation Order is taken, the Creditors' Committee will not be dissolved until the HTA Confirmation Order becomes a Final Order.  The Creditors' Committee will not be dissolved with respect to its duties and obligations in connection with the PREPA Title III case.  The UCC will be entitled to defend applications for allowance of compensation and reimbursement of expenses of its professionals.

To the extent that, as of the date immediately prior to the HTA Effective Date, the Creditors' Committee was a party to a contested matter or adversary proceeding in connection with the Title III Case, including, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any claim objection, beginning on the HTA Effective Date, Reorganized HTA will be deemed to have assumed such role and responsibility in connection with the contested matter.  Upon assumption, the Creditors' Committee will be relieved of any role, responsibility or obligation with respect to the contested matter.

**T.      Retention of Jurisdiction**

***Retention of Jurisdiction.***   The Title III Court will retain exclusive jurisdiction over any matter arising under PROMESA or related to the Title III Case and the HTA Plan, or the following:

1.      Matters to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any claim not compromised or settled pursuant to the HTA Plan (including matters addressing the resolution of request for payment of any claim and objections to the secured or unsecured status, priority, amount, or allowance of claims);

2.      Matters related to Executory Contracts or Unexpired Leases.  This includes (i) the assumption or assumption and assignment of any Executory Contract or

Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

3.   Ensuring that distributions to holders of allowed claims are accomplished under the provisions of the HTA Plan and adjudicating any and all disputes arising from or relating to distributions under the HTA Plan;

4.   Adjudicating, deciding, or resolving any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor or Reorganized HTA that may be pending on the HTA Effective Date or brought after the HTA Effective Date;

5.   Deciding and resolving all matters related to the granting and denying any applications for allowance of compensation or reimbursement of expenses to professionals authorized under PROMESA, the HTA Plan, or orders entered by the Title III Court;

6.   Entering and implementing orders that are either necessary or appropriate to execute, implement, consummate, or enforce the provisions of (i) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (ii) the HTA Plan, the HTA Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the HTA Plan, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

7.   Resolving cases, controversies, suits, disputes or any other challenges that may arise in connection with the consummation, interpretation or enforcement of the HTA Plan, the HTA Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the HTA Plan or any entity's rights arising from or obligations incurred in connection with the HTA Plan or such documents, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

8.   Approving  any modification of the HTA Plan, the HTA Confirmation Order, or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order;

9.   Remedying any defect or omission or reconciling any inconsistency in any order, the HTA Plan, the HTA Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order, or entering any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in a manner as may be necessary or appropriate to consummate the HTA Plan;

10.     Adjudicating, deciding, or resolving any matters relating to the Debtor's compliance with the HTA Plan and the HTA Confirmation Order consistent with section 945 of the Bankruptcy Code;

11.     Determining matters that may arise in connection with or relate to the HTA Plan, the Disclosure Statement, the HTA Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the HTA Plan, the Disclosure Statement or the HTA Confirmation Order.  The Title III Court will only have jurisdiction to the extent that any related document does not provide for another court or courts to have exclusive jurisdiction;

12.     Adjudicating all controversies, suits or issues that may arise regarding the validity of any actions taken by any entity pursuant to or in furtherance of the HTA Plan or HTA Confirmation Order, including issuance of the New HTA Bonds, and entering any necessary or appropriate orders or relief in connection with such adjudication;

13.     Entering and implementing any orders as are necessary or appropriate if the HTA Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Entering an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

15.     Resolving disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two Creditors' Committee appointees to the Avoidance Actions Trust Board in accordance with the provisions of Section 32.1(b) of the HTA Plan;

16.     Enforcing and clarifying any orders previously entered by the Title III Court in the Title III Case; and

17.     Hearing any other matter over which the Title III Court has jurisdiction under sections 305 and 306 of PROMESA.

## U.     Miscellaneous Provisions

### 1.     Title to Assets

On the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan will vest in Reorganized HTA, free and clear of all Liens (except the Liens granted pursuant to the HTA Plan and the HTA Confirmation Order).

### 2.     Discharge and Release of Claims and Causes of Action

(a)     All distributions and rights afforded under the HTA Plan will be, and will be deemed to be, in exchange for, and in complete satisfaction, settlement,

274

discharge and release of, all Claims or Causes of Action against the Debtor and Reorganized HTA that arose, in whole or in part, prior to the HTA Effective Date, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 41.7 of the HTA Plan, nothing contained in the HTA Plan or the HTA Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third party release of the HTA/CCDA PSA Creditors and their respective Related Persons by Creditors of the Debtor.

Upon the HTA Effective Date, the Debtor and Reorganized HTA will be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the HTA Effective Date, and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the HTA Plan.

For the sake of clarity, nothing in the HTA Plan or in the HTA Confirmation Order will release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

**(b)**   All Entities will be precluded from asserting any and all Claims against the Debtor and Reorganized HTA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets and property, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.

275

In accordance with the foregoing, except as expressly provided in the HTA Plan or the HTA Confirmation Order, the HTA Confirmation Order will constitute a judicial determination, as of the HTA Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtor and Reorganized HTA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge will void and extinguish any judgment obtained against the Debtor or Reorganized HTA and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.

As of the HTA Effective Date, and in consideration for the value provided under the HTA Plan, each holder of a Claim in any Class under the HTA Plan will be deemed to release and forever waive and discharge as against the Debtor and Reorganized HTA, and their respective Assets and property and all such Claims.

**(c)**  Each of the HTA/CCDA PSA Creditors and their respective Related Persons, solely in their capacity as HTA/CCDA PSA Creditors of the Debtor, will (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releases based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by Section 41.2 of the HTA Plan.

**(d)**  <u>SEC Limitation</u>.  Nothing in the HTA Plan or HTA Confirmation Order will (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

**(e)**  <u>United States Limitation</u>.  Nothing in the HTA Plan or HTA Confirmation Order will (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtor or Reorganized HTA, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtor or Reorganized HTA are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtor or Reorganized HTA to the United States arising from and after the HTA Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the

United States, the Debtor or Reorganized HTA, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtor or Reorganized HTA, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtor's or Reorganized HTA's obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor.

Nothing in the HTA Plan or HTA Confirmation Order will be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtor and Reorganized HTA, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any entity, including, but not limited to, the Debtor and Reorganized HTA, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtor and Reorganized HTA, and (iv) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

**(f)**    Underwriter Actions.  Nothing in the HTA Plan, the HTA Confirmation Order or any HTA Plan-related document set forth in the HTA Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive Rights").

However, for the sake of clarity, Defensive Rights may not be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth in connection with an Underwriter Action.

Furthermore, no party in the Underwriter Actions may assert: (i) against the Debtor or Reorganized HTA any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is

277

barred or discharged pursuant to the Bar Date Orders, the HTA Plan, and/or the HTA Confirmation Order; and/or (ii) against the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provision of the HTA Plan and the HTA Confirmation Order.

Nothing in the HTA Plan or HTA Confirmation Order is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the Underwriter Actions will be permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting, against the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

**3.     Injunction on Claims**

All Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 of the HTA Plan or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 of the HTA Plan are permanently enjoined, from and after the HTA Effective Date, from:

**(a)**     commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the HTA Plan against any of the Released Parties or any of their respective assets or property,

**(b)**     the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the HTA Plan,

    **(c)**      creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the HTA Plan, and

    **(d)**      except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the HTA Plan.

Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

### 4.  Integral to HTA Plan

The discharge, injunction, exculpation and release provisions provided in Article XLI of the HTA Plan is an integral part of the HTA Plan and is essential to its implementation. Each of the Released Parties may independently seek the enforcement of the discharge, injunction and release provisions set forth in Article XLI.

### 5.  Releases by the Debtor and Reorganized HTA

On the HTA Effective Date each of the Debtor and Reorganized HTA, the Disbursing Agent and each of the Debtor's and Reorganized HTA's Related Persons will be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted, and discharged the Released Parties from any and all Claims or Causes of Action that the Debtor, Reorganized HTA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

### 6.  Injunction Related to Releases

As of the HTA Effective Date, all Entities that hold, have held, or may hold a Released Claim will be permanently barred from the following actions regarding such Released Claim:

    (i)      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum;

    (ii)      enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order;

(iii)    creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien;

(iv)    setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 41.2 of the HTA Plan; and

(v)    commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the HTA Plan or the HTA Confirmation Order.

For the sake of clarity, the following stipulations will terminate upon the entry of the HTA Confirmation Order:

(i)    the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transpiration Authority Regarding the Tolling of Statute of Limitations and Consent Order* [Case No. 173283-LTS, ECF No. 15854], as amended; and

(ii)    the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations* [Case No. 17-3283-LTS, ECF No. 17394], as amended.

## 7.    Exculpation

***Government Parties***. The Oversight Board, AAFAF, the Debtor, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the HTA Effective Date, will not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with:

(a)    the Title III Case,

(b)    the formulation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein,

(c)    the Disclosure Statement, or

(d)    any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan.

However, this will not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to

have constituted intentional fraud or willful misconduct.  Nothing in the provisions of Section 41.7 of the HTA Plan will prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the HTA Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the HTA Plan**.**

**HTA/CCDA PSA Creditors.**  Each of the HTA/CCDA PSA Creditors solely in its capacity as a party to HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the HTA Petition Date up to and including the HTA Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with

**(a)** the Title III Case,

**(b)** mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein,

**(c)** the Disclosure Statement,

**(d)** the HTA/CCDA Plan Support Agreement,

**(e)** the Definitive Documents, or

**(f)** any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan.

However, the foregoing provisions will not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

**Monoline Insurers**.  Ambac, Assured, FGIC, National, and their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the HTA Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, or National Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, or National Insurance Policies.

However, the terms and provisions of the HTA Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, or National Insurance Policy, to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds or National Insured Bonds, as applicable, in accordance with its terms solely to the extent of any failure of

such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, or National Treatment, as applicable (or any claims that Ambac, Assured, FGIC, or National, may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, or National's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies or National Insurance Policies, as applicable).

*Creditors' Committee*.  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the HTA Petition Date up to and including the HTA Effective Date and each of the Creditors' Committee's Related Persons will not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the HTA Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan.

However, notwithstanding the foregoing exculpation, if litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member will be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by HTA pursuant to a Final Order.

In addition, the foregoing provisions will not affect the liability of any entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

*The DRA Parties*.  Each of the DRA and the DRA Parties, from the HTA Petition Date up to and including the HTA Effective Date, and each of the DRA Parties' respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, the DRA Stipulation, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan.

However, the foregoing provisions will not affect the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

## 8. Appointments Related Litigation / Uniformity Litigation

If a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the HTA Confirmation Order, any entity receiving distributions pursuant to the HTA Plan agrees that such Final Order will not in any way reverse,

affect, or modify the transactions contemplated in the HTA Plan and the HTA Confirmation Order, including the releases, exculpations, and injunctions provided in Article XLI of the HTA Plan.

To the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement or the ERS Stipulation, within five (5) Business Days of the HTA Effective Date, such plaintiff must take any and all action to dismiss, with prejudice, or, in the event other plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

### 9.    Bar Order

To the extent provided in the HTA Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the HTA Plan, the negotiation and consummation of the HTA/CCDA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Case (including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Case, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties, whether arising under federal, state or foreign law, and regardless of where asserted).

### 10.    No Waiver

The releases and injunctions set forth in contained in Sections 41.5 and 41.6 of the HTA Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized HTA, the HTA/CCDA PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

### 11.    Supplemental Injunction

All entities who have held or asserted, currently hold or assert, or may hold or assert, any Released Claims against any of the Released Parties based upon or relating to the Title III Case, any claim against the Debtor, whenever and wherever asserted, anywhere in the world, sounding in any theory of law, will be permanently stayed, restrained and enjoined from taking any action

against any of the Released Parties for the purpose of collecting, recovering or receiving any payment with respect to any Released Claims arising prior to the HTA Effective Date (including prior to the HTA Petition Date), including:

**(a)** Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

**(b)** Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

**(c)** Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

**(d)** Except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

**(e)** Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the HTA Plan or the HTA Confirmation Order.

However, the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 will not constitute an admission that the HTA Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code**.**

### 12.    Post-Effective Date Fees and Expenses

From and after the HTA Effective Date, Reorganized HTA may retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized HTA related to implementation and consummation of the HTA Plan without further approval from the Title III Court.   In addition, without further Title III Court approval Reorganized HTA may, within forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to Reorganized HTA, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the HTA Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the HTA Plan.

13.     **Securities Act Exemption**

Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New HTA Bonds pursuant to the terms of the HTA Plan shall be exempt from registration under:

(a)     the Securities Act;

(b)     any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of section 5 of the Securities Act; and

(c)     any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

14.     **Severability**

Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, if the Title III Court determines before the HTA Confirmation Date that any term or provision of the HTA Plan is invalid, void, or unenforceable, the Title III Court may alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable. The Title III Court's alteration will be consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement, if before the HTA Confirmation Date the Oversight Board determines to modify or amend the HTA Plan, the HTA Plan provisions applicable to such modification or amendment will be deemed severed and to be of no force or effect.

15.     **Governing Law**

The rights, duties, and obligations arising under the HTA Plan shall be governed by PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and the laws of the Commonwealth (to the extent not inconsistent with PROMESA), unless other federal law is applicable or expressly provided otherwise.

16.     **Closing Case**

The Oversight Board must, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Case, the Title III Court will retain jurisdiction of all of the matters set forth in Article XL of the HTA Plan.

17.     **Inconsistencies**

If there is any inconsistency between the information contained in the Disclosure Statement and the terms of the HTA Plan, the terms of the HTA Plan will govern.

If there is any inconsistency between the terms of the HTA Plan and the terms of the HTA Confirmation Order, the terms of the HTA Confirmation Order will govern and be considered a modification of the HTA Plan.  However, the HTA Confirmation Order may not modify the economic terms of the HTA Plan absent consent of the Oversight Board.

If there is any inconsistency between the terms of the HTA Plan and the New HTA Bonds Indenture, the terms of the New HTA Bonds Indenture will govern.

18.     **Document Retention**

From and after the HTA Effective Date, the Debtor may maintain documents in accordance with standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtor.

19.     **Immediate Binding Effect**

On the HTA Effective Date, the terms of the HTA Plan and the HTA Plan Supplement will be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the HTA Plan and whether or not such holder has accepted the HTA Plan.  The releases, exculpations, and settlements effected under the HTA Plan will be operative, and subject to enforcement by the Title III Court, from and after the HTA Effective Date, including pursuant to the injunctive provisions of the HTA Plan.

Once approved, the compromises and settlements embodied in the HTA Plan, along with the treatment of any associated Allowed Claims, may not be collaterally attacked or otherwise challenged by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the HTA Plan must (a) challenge such compromise and settlement prior to confirmation of the HTA Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

20.     **Additional Documents**

On or before the HTA Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the HTA Plan.  The Debtor and all holders of Claims receiving distributions pursuant to the HTA Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the HTA Plan.

### 21.        Reservation of Rights

The HTA Plan shall have no force or effect unless the Title III Court enters the HTA Confirmation Order.  None of the filing of the HTA Plan, any statement or provision contained in the HTA Plan, nor the taking of any action by the Debtor with respect to the HTA Plan, the Disclosure Statement, or the HTA Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims prior to the HTA Effective Date.

Except as expressly set forth in the HTA Plan, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing in the HTA Plan shall be deemed a waiver of any such rights and powers.

### 22.        Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the HTA Plan or the HTA Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 23.        Term of Injunctions or Stays

All injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the HTA Plan or the HTA Confirmation Order) will remain in full force and effect until the HTA Effective Date.  All injunctions or stays contained in the HTA Plan or the HTA Confirmation Order will remain in full force and effect in accordance with their terms.

### 24.        Plan Supplement

All documents included in the HTA Plan Supplement are incorporated into and are a part of the HTA Plan as if set forth in full in the HTA Plan.  Upon the filing of the HTA Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel or by downloading such documents from https://cases.ra.kroll.com/puertorico/ or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the HTA Plan Supplement is inconsistent with the terms of any part of the HTA Plan that does not constitute the HTA Plan Supplement, such part of the HTA Plan that does not constitute the HTA Plan Supplement shall control.  However, with respect to matters governed by the New HTA Bonds Indenture to the extent that any provisions of the HTA Plan are inconsistent with the New HTA Bonds Indenture, the New HTA Bonds Indenture will control.

[*Remainder of Page Left Intentionally Blank*]

## VII.   Confirmation of the Plan of Adjustment

### A.   Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan, any objections to the Plan, and consider evidence with respect to whether the Plan should be confirmed.  At the Confirmation Hearing, the Title III Court will confirm the Plan only if all of the requirements of PROMESA section 314 described below are met.

On [_____], the Title III Court entered the [_____]*Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. ___] (the "Scheduling Order").  Among other things, the Scheduling Order provides that the Confirmation Hearing will beginoccur on [_____],August 17-18, 2022, [_____]at 9:30 a.m. (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined, or via virtual hearing.  The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.   Deadlines to Object to Confirmation

The Disclosure Statement Order establishes the objection deadline to confirmation of the Plan as [_____],July 27, 2022 at 5:00 p.m. (Atlantic Standard Time).  Objections to confirmation of the Plan must: (1) be in writing, in English, and signed; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the U.S. Trustee at the address below so that they are received no later than the applicable deadline set forth above:

- the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: The Puerto Rico Highways and Transportation Authority).

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court, Clerk's Office, 150 Ave. Carlos Chardon Ste. 150, San Juan, P.R. 00918-1767.

### C.   Requirements for Confirmation of the Plan of Adjustment

At the Confirmation Hearing, the Title III Court will determine whether the HTA Plan satisfies the requirements of PROMESA section 314.  The Debtor believes that the HTA Plan will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code. Among the requirements for confirmation are that the HTA Plan (1) is accepted by the requisite

Holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of creditors, (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

### 1.      Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan.  Only those holders of claims who actually vote to accept or reject the plan count in the tabulation.  The impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

#### (a)      Cramdown

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied.  The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan. The Debtor believes that the HTA Plan and the treatment of all Classes of Claims under the HTA Plan satisfy the following requirements for nonconsensual confirmation of the HTA Plan.

#### (b)      "Fair and Equitable"

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims.  This is known as the "absolute priority rule."  Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases.  Courts that have addressed this requirement in context of a chapter 9 case have indicated that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a debtor's general unsecured creditors), the absolute priority rule cannot be applied in chapter 9 cases and, thus, in such cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule.  Instead, courts have held that the requirement that the "fair and equitable" requirement in chapter 9 is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive all that they can reasonably expect under the circumstances.

The Debtor believes that the HTA Plan is "fair and equitable" with respect to Holders of Claims against the Debtor because it provides such Holders of Claims with all they reasonably can expect under the circumstances of the HTA Title III Case.  The commencement of the HTA

Title III Case was precipitated by the Debtor's untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtor's revenues. The Debtor believes that the Plan is "fair and equitable" because the creditor recoveries proposed therein have been calculated – and, in certain cases, negotiated – to reasonably compensate Holders of Claims while enabling the Debtor to (A) avoid a recurrence of the financial difficulties that led to the commencement of the HTA Title III Case and (B) institute desperately-needed reinvestment initiatives to ensure the Debtor's continued operation.

### (c)      Unfair Discrimination

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The Debtor does not believe that the HTA Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE HTA PLAN BY ONE OR MORE IMPAIRED CLASSES, THE OVERSIGHT BOARD RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE HTA PLAN IN ACCORDANCE WITH PROMESA AND SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE OVERSIGHT BOARD HAS RESERVED THE RIGHT TO MODIFY THE HTA PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE HTA PLAN UNDER SECTION 314 OF PROMESA AND SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### (d)      The "Best Interests of Creditors" Test

Notwithstanding acceptance of the HTA Plan by each impaired Class of Claims, the Title III Court also must determine that the HTA Plan is in the best interests of creditors pursuant to PROMESA section 314(b)(6). The "best interests of creditors" test under PROMESA "shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." The plain language of the test requires the court to consider the recoveries to all creditors collectively, not individual recoveries.[206] The failure of plan confirmation and dismissal of a debtor's title III case, in most instances, would result in a race to the courthouse that would leave many creditors with no recovery at all.

The best interests test analysis (the "Best Interests Test Report") the Title III Court considers—*i.e.*, of recoveries creditors of the Debtor could expect based on available remedies under the non-bankruptcy laws and the Commonwealth Constitution—that were based on the certified HTA fiscal plan are attached hereto as Exhibit J. The Debtor believes that the HTA Plan satisfies the best interests of creditors test set forth in PROMESA section 314(b)(6).

---

[206]   This interpretation is consistent with the approach taken by courts in chapter 9 cases, where Bankruptcy Code section 943(b)(7) requires the plan to be "in the best interests of creditors," similarly using the plural "creditors." *See In re City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014); *see also Franklin High Yield Tax-Free Income Fund* (*In re City of Stockton*, 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) ("By its terms, the 'best interests' test in chapter 9 is collective rather than individualized.").

The Oversight Board annually certifies a new fiscal plan.[207]    Accordingly, to the extent necessary, the Debtor will submit a revised best interests test report reflecting new fiscal plan data, if applicable.

### (e)    Feasibility

PROMESA section 314(b)(6) requires that a plan of adjustment be in the best interests of creditors and feasible.    While the statute explains the best interests of creditors requirement means the court shall consider what creditors would recover pursuant to available remedies outside Title III, the statute does not provide guidance as to what is meant by "feasible," beyond the word itself.    Chapter 9 of the Bankruptcy Code is the chapter available to municipalities of the States.    It also imposes a feasibility requirement in its section 943(b)(7) without providing further guidance.    Courts have interpreted the feasibility requirement in chapter 9 to mean the municipality will be viable, and the plan offers a reasonable prospect of success and is workable. The debtor must show it can satisfy the obligations in its plan.    Unlike chapter 9, Title III also contains a requirement that the Title III Plan of Adjustment be consistent with the certified fiscal plan.    Significantly, pursuant to PROMESA section 201(b)(1)(I), the certified fiscal plan must contain a debt sustainability analysis.    Accordingly, the feasibility of the HTA Plan is at least partially determinable by whether the plan provides for an amount of ongoing debt within the range of the debt sustainability analysis in the certified fiscal plan.

Based on the projections in the HTA Fiscal Plan, Reorganized HTA should be able to pay its debts under the HTA Plan when they come due and HTA should be viable.    If needed, the Debtor will update the analysis if a new fiscal plan is certified, but expect that under a new fiscal plan, HTA will be able to pay its debts under the HTA Plan when they come due.

Accordingly, the Debtor believes that the HTA Plan meets the feasibility requirement of PROMESA section 314(b)(6).

### (f)    Compliance with Applicable Provisions of PROMESA and the Bankruptcy Code

In addition to the foregoing, the HTA Plan must comply with other applicable provisions of PROMESA and the Bankruptcy Code, as follows:

- The HTA Plan must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301 (PROMESA § 314(b)(1));

- The HTA Plan must comply with the provisions of PROMESA Title III (PROMESA § 314(b)(2));

- The Debtor must not be prohibited by law from taking any action necessary to carry out the HTA Plan (PROMESA § 314(b)(3));

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the HTA Plan must provide that on the HTA Effective Date

---

[207]    The HTA Fiscal Plan was certified on February 22, 2022.    *See* Exhibit D.

each holder of a claim of a kind specified in 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA § 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the HTA Plan must be obtained, or such provision must be expressly conditioned on such approval (PROMESA § 314(b)(5));

- The HTA Plan must be consistent with the HTA Fiscal Plan certified by the Oversight Board under Title III (PROMESA § 314(b)(7));

- The Debtor, as the proponent of the HTA Plan by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); and

- The HTA Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

### 2. Alternatives to Confirmation and Consummation of the HTA Plan

The Debtor has evaluated numerous alternatives to the HTA Plan, including alternative structures and terms of the HTA Plan and delaying the adoption thereof. While the Debtor has concluded that the HTA Plan is the best alternative and will maximize recoveries by holders of Allowed Claims against the Debtor, if the HTA Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan of adjustment. The Debtor (or another party in interest) may also move to dismiss the HTA Title III Case pursuant to 11 U.S.C. § 930 (as incorporated by PROMESA § 301(a)).

The HTA Plan was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Title III Court (*see* section V.H of this Disclosure Statement). Under the circumstances, the Debtor believes that the HTA Plan provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the HTA Plan are in the best interests of the Debtor and all Creditors. The Debtor further believes that any alternative to the HTA Plan would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the HTA Plan. The Debtor, therefore, believes that confirmation and consummation of the HTA Plan is preferable to potential alternatives.

*[Remainder of Page Left Intentionally Blank]*

## VIII.   Certain Risk Factors to Be Considered

**AS WITH ANY INVESTMENT, RECOVERIES ON THE NEW HTA BONDS INVOLVE RISKS.  YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE HTA PLAN, AND THE NEW HTA BONDS, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT.  THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS THE DEBTOR FACES, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE HTA PLAN OR THE NEW HTA BONDS, AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS.  ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DOES NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT THE DEBTOR AND THE DEBTOR'S ABILITY TO CONSUMMATE THE HTA PLAN AND MAKE PAYMENTS ON THE NEW HTA BONDS.  YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE HTA PLAN OR THE NEW HTA BONDS.  ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE HTA PLAN OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE NEW HTA BONDS.  THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.**

**NEITHER THE DEBTOR NOR ANY FEDERAL, STATE, OR COMMONWEALTH SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE NEW HTA BONDS AND OTHER SECURITIES TO BE ISSUED PURSUANT TO THE HTA PLAN OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.**

**A.      Risks Related to the Title III ~~Cases~~Case**

***The Title III Court may not confirm the HTA Plan.***

PROMESA section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings.  There can be no assurance that the Title III Court will find that the HTA Plan meets all of these requirements and confirm the HTA Plan.  If the HTA Plan is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismisses the Title III ~~Cases~~Case.  For additional information, *see* section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."

Furthermore, the Title III Court may find that, although the HTA Plan is consistent with the HTA Fiscal Plan and therefore satisfies Section 314(b)(7) of PROMESA, the HTA Plan nonetheless fails to meet one or several other confirmation requirements set forth in Section 314(b).

Interested parties who have standing will have an opportunity to object to confirmation of the HTA Plan and the Title III Court may sustain any number of such objections.

***The Title III Court may not find the HTA Plan is consistent with the applicable certified fiscal plan for HTA.***

Under PROMESA section 314(b)(7), the HTA Plan must be consistent with the HTA Fiscal Plan, certified by the Oversight Board. Although the Oversight Board has certified under PROMESA section 104(j)(3) that the HTA Plan is consistent with the HTA Fiscal Plan, PROMESA section 314(b) requires that the Title III Court make an independent determination as to whether the HTA Plan is consistent with the HTA Fiscal Plan. Therefore, there can be no assurance that the Title III Court will find that the HTA Plan is consistent with the HTA Fiscal Plan. To be consistent with the certified fiscal plan, the HTA Plan cannot provide for more debt than the certified fiscal plan's debt sustainability analyses determine should be sustained by Reorganized HTA.

***If any claimant is successful in prosecuting and obtaining an allowed (i) administrative expense claim, (ii) priority claim, (iii) secured claim, or (iv) non-dischargeable claim, and any such claim is not contemplated to be paid pursuant to the HTA Plan, the HTA Plan may not be confirmable.***

Various parties (including, without limitation, the Velazquez Group (as defined below))[208]

have asserted or may assert claims against the Debtor that they assert may be administrative expense claims, priority claims, secured claims, or non-dischargeable and that are not contemplated to be paid pursuant to the HTA Plan. If such and other similar claims are

---

[208]   Plaintiffs (the "Velazquez Group") in the case captioned *Vazquez Velazquez, et al. v. Puerto Rico Highways and Transportation Authority, et al.*, Case No. 21-1739 (the "Velazquez Litigation"), pending in the U.S. Court of Appeals for the First Circuit, have asserted that their claims arising from such litigation are non-dischargeable.

The Velazquez Group consist of current and former employees of HTA. In the Velazquez Litigation, the Velazquez Group asserts under 42 U.S.C. § 1983 that HTA violated the Takings Clause of the Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Contract Clause, and various provisions of Puerto Rico law in connection with the elimination of certain additional compensation pursuant to Regulation 02-017, entitled "Compensation Program for Management of Construction Projects."

On August 9, 2021, the district court issued an opinion and order dismissing the Velazquez Group's federal constitutional claims with prejudice and thereafter entered judgment against the Velazquez Group. In light of the dismissal of the federal constitutional claims, the district court also declined to exercise supplemental jurisdiction over the Velazquez Group's claims under Puerto Rico law. *Id.* at 27. On September 3, 2021, the Velazquez Group appealed such decision to the First Circuit.

ultimately allowed, the HTA Plan may not be confirmable without amendments that may materially change its proposed distributions.

Certain litigation concerning such claims is continuing.  If this litigation is not resolved prior to the HTA Confirmation Hearing, the HTA Confirmation Hearing and HTA Effective Date may be delayed to allow for resolution of these disputed claims.  Alternatively, the Oversight Board may be required to establish an appropriate reserve to ensure adequate recoveries on the claims sought to be disallowed if the Oversight Board is unsuccessful.

If such and other similar claims are ultimately allowed, or if the Oversight Board is required to establish an appropriate reserve in respect of such disputed claims pending their resolution, the HTA Plan may not be confirmable without amendments that may materially change its proposed distributions, but material changes would be subject to new votes by the affected claimholders.

***The Title III Court may not approve the settlements and compromises in the HTA Plan.***

The Debtor believes the significant compromises and settlements reflected in the HTA Plan are fair, equitable, and reasonable.  Such compromises and settlements are an integral part of the HTA Plan, and they provide value and certainty for the Debtor and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for the Debtor to emerge from Title III expeditiously.

While parties to the HTA/CCDA Plan Support Agreement include holders of over $700 million of HTA 68 Bond Claims and over $2.1 billion of HTA 98 Senior Bond Claims against the Debtor, other parties in interest in the Title III Case may object to those compromises and settlements, as incorporated in the HTA Plan.  If the compromises and settlements in the HTA/CCDA Plan Support Agreement are not approved in the Title III Case, the Debtor may not be able to confirm the HTA Plan.

The HTA Plan may also be contingent on the approval of other settlements and compromises resolved pursuant to the HTA Plan.  If the settlements and compromises contained in the HTA Plan require approval, but are not approved, the Debtor may not be able to confirm the HTA Plan.

***The HTA Effective Date may not occur.***

Article XXXV of the HTA Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the HTA Effective Date.  Many of the conditions are outside of the control of the Debtor.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the HTA Plan will be satisfied (or waived).  Accordingly, even if the HTA Plan is confirmed by the Title III Court, there can be no assurance that the HTA Plan will be consummated and the adjustment of the Debtor's debts completed.  *See* section VI.O of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" (description of the conditions to the effectiveness of the HTA Plan).  In addition, certain agreements contemplated in the HTA Plan impose conditions that must be satisfied as of

the HTA Effective Date.  There can be no assurance that such conditions will be timely satisfied or waived.

***If the HTA/CCDA Plan Support Agreement is terminated, the ability of the Debtor to confirm the HTA Plan may be materially and adversely affected.***

The HTA/CCDA Plan Support Agreement contains a number of termination events, upon the occurrence of which certain parties to the agreement may terminate or withdraw from such agreement.  For instance, creditor parties may terminate the agreement if the Debtor withdraws the HTA Plan, the Disclosure Statement, or the motion seeking entry of an order approving the Disclosure Statement, or file any motion or pleading with the Title III Court, in each case, that is inconsistent with the HTA/CCDA Plan Support Agreement in any material respect and such motion or pleading has not been withdrawn within a specified period of time.  If the HTA/CCDA Plan Support Agreement is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the agreement, including the obligation to vote in support of the HTA Plan.  The withdrawal of support by creditors from, or the termination of, the HTA/CCDA Plan Support Agreement may have a material adverse effect on the Debtor's ability to confirm the HTA Plan.

## B.    Risks Related to HTA

***The financial information contained herein is based upon the Debtor's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.***

The financial information contained herein has not been, and will not be, audited (except to the extent such information based upon HTA's audited financial statements) or reviewed by any independent accounting firm or third party in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization.  As such, the financial information contained herein is limited in scope.

Although the Debtor believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies.  Neither the Oversight Board nor the Government can vouch for the accuracy and completeness of such information.  As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

***The Debtor has no duty to update the statements contained in this Disclosure Statement.***

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since

that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

***No representations outside this Disclosure Statement are authorized.***

No representations concerning or related to the Debtor, the Title III Case, or the HTA Plan are authorized by the Title III Court, PROMESA, or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the HTA Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

***The Oversight Board will terminate before HTA Plan obligations are fully satisfied.***

After certifying the government has met the requirements under Section 209 of PROMESA, including, among other things, the development of budgets in accordance with modified accrual accounting standards and certification that expenditures made by the territorial government during each fiscal year did not exceed the revenues, the Oversight Board and associated requirements for the publication of fiscal plans and other fiscal transparency measures will be terminated.  This may occur many years before the obligations under the HTA Plan are fully satisfied.

***When the Oversight Board terminates, the Government can eliminate controls, protections, and transparency the Oversight Board has created.***

Subject to certain constitutional limitations, every legislature can change prior laws.  There is no assurance the Oversight Board's protections and systems will be continued by subsequent administrations, and the Government may object to measures the Oversight Board imposes and may continue to do so once the Oversight Board is no longer present to enforce the reforms it has imposed.  However, covenants and obligations in the HTA Plan, the New HTA Bond Indenture, and the New HTA Bonds Legislation, inclusive of obligations impacting governmental or political powers pursuant to PROMESA section 305, may be enforced by parties in interest having standing to do so.

***Financial reporting going forward may not be completed on a timely basis.***

The most recent basic audited financial statements prepared by HTA are for FY2021.  No guaranty can be made as to the availability of future audited financial statements or the Debtor's ability to provide financial reporting on a timely basis.

***Future events and actual results may differ materially from any estimates, projections, or statements contained herein.***

Any statements and assumptions contained herein, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates, and other assumptions made in this document.  The economic and financial condition of HTA is affected by various legal, financial, social, economic, environmental, governmental and political

factors.  These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Government, HTA, and the Oversight Board, but also by other third-party entities such as the government of the United States.  Nothing in this document should be considered as an express or implied warranty of facts or future events.

### *The Debtor may be unable to successfully implement proposed reform by the Oversight Board via Section 205(a) recommendations and the February 2022 HTA Fiscal Plan.*

To achieve long-term sustainability, the Government, HTA, and other agencies may be required to take additional reforms to address many of the underlying challenges that exist with the current transportation system, including: (1) the overlapping and fragmented ownership of the individual modes of transportation, (2) the poor performance management within individual modes of transportation and limited multi-modal coordination, and (3) not maximizing the funding potential, which reduces the public and private investment available for the transportation network. These incremental structural reforms may be required to be able to achieve long-term sustainability.  Many of these reforms have been proposed by the Oversight Board, but the Oversight Board cannot implement them without the support of Puerto Rico's elected Government.

### C.    Risks Related to New HTA Bonds

### *The New HTA Bonds are payable solely from the Trust Estate.*

The New HTA Bonds are payable solely from the Trust Estate and the holders of the New HTA Bonds will have no recourse for payment other than from the Trust Estate.  The New HTA Bonds are not general obligations of Reorganized HTA and are limited to the net cash flow from Tolls as detailed in this Disclosure Statement, the Plan and the New HTA Bonds Indenture and also are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's other public instrumentalities or political subdivisions.  The New HTA Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by any of the Commonwealth's other public instrumentalities or political subdivisions.  The New HTA Bonds will not be insured or guaranteed by the New HTA Bonds Trustee, any other service provider engaged pursuant to the New HTA Bonds Indenture or any of their respective affiliates, or any other person.  Reorganized HTA does not have any taxing authority.

### *The rights of the holders of the New HTA Bonds are limited in nature and may be adversely affected by issues generally associated with the enforcement of liens on collateral.*

Upon any declaration of default under the New HTA Bonds Indenture, the payment of the New HTA Bonds cannot be accelerated.  The New HTA Bonds are not subject to redemption prior to maturity at the election of the holders thereof, and the holders shall have no recourse against Reorganized HTA upon an event of default.  Further, New HTA Bonds shall not carry any default rate of interest or accretion yield, as applicable.

The security interests in the Trust Estate, including the Pledged Revenues, will be subject to practical problems generally associated with the realization of security interests in collateral. For example, the enforcement of the security interest in the Pledged Revenues requires a

favorable determination from the Title III Court.  There is no assurance that the New HTA Bonds Trustee will obtain such favorable judgment and, accordingly, the New HTA Bonds Trustee may not have the ability to foreclose upon such Pledged Revenues.  Further, the lien of Pledged Revenues may be avoidable by the pledgor (as debtor in possession), by its trustee in bankruptcy, or potentially by other creditors in a future bankruptcy of Reorganized HTA if certain events or circumstances exist or occur, including, among others the pledge or perfection permits the holders of New HTA Bonds to receive a greater recovery in a hypothetical future Title III (or Chapter 7 or equivalents) case than if such pledge or perfection had not been given.  To the extent that the grant or perfection of such Pledged Revenues is avoided as a preference or otherwise, the holders of the New HTA Bonds would lose the benefit of the security interest and could have to return payments to Reorganized HTA.

***The Tolls may not generate sufficient revenue to make all payments of interest and principal on the New HTA Bonds.***

The New HTA Bonds are payable solely from the Trust Estate, whose main source of funds will be the Tolls.  The future revenue generated by the Tolls is highly dependent on the realization of toll fares, electronic toll collection, enforcement fines and other income, investment income from debt service accounts and the management of operational and maintenance expenses in respect of such Toll Facilities.  Further, such revenue will depend on the continued operation of the Toll Facilities.  There is no assurance that Reorganized HTA will continue to operate the Toll Facilities in accordance with their current standards, or that a significant increase in contributions to the general operation and maintenance of such Toll Facilities will not be required.

The Toll Facilities may also be vulnerable to a *force majeure* event (e.g. hurricanes and other natural disasters, fires, pandemics, epidemics, man-made disasters, war, riots) and other unforeseen circumstances and incidents, and the damage caused by such an event may adversely affect the performance of such assets until such damage has been remedied.  In certain circumstances, compliance by Reorganized HTA with the Rate Covenant may be suspended upon the occurrence of a force majeure event.  In addition, new roads may be constructed, existing roads (other than the Toll Facilities) may be improved, changes to driver habits may occur or other events may take place, redirecting traffic from the Toll Facilities.

The occurrence of any of the abovementioned events may materially adversely affect the total amounts received as Toll Receipts.  No assurance can be made that Toll Facilities will generate sufficient Toll Receipts to pay interest on and principal of the New HTA Bonds.

***The New HTA Bonds may not trade at par and limited liquidity may make the New HTA Bonds less attractive to investors.***

As a result of concerns with the HTA's current financial circumstances, holders of the New HTA Bonds may encounter limited market acceptance upon any attempt to sell the New HTA Bonds, making sales at or near par potentially difficult.  Holders of the New HTA Bonds after the HTA Effective Date may not be able to sell such bonds for any price for some time.  Alternatively, potential purchasers may demand discounts to the par amount of such bonds before a potential purchaser would be willing to purchase the New HTA Bonds.  There can be no

assurance that a secondary market will exist for any New HTA Bonds. The absence of a secondary market for the New HTA Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any New HTA Bonds or adversely affect the market value of the New HTA Bonds.

The New HTA Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The New HTA Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the New HTA Bonds may be limited, and bondholders may not be able to sell the New HTA Bonds when they want to do so or obtain the price that they wish to receive for the New HTA Bonds, and, as a result, could suffer significant losses.

Given the unique nature of the HTA Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the HTA Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the HTA Plan will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the New HTA Bonds and limiting bondholders' ability to sell the New HTA Bonds. Concerns with the HTA's financial outlook may also adversely affect the market value and liquidity of the New HTA Bonds.

### *Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating.*

Reorganized HTA acting in its sole and absolute discretion may determine to apply for ratings on the New HTA Bonds, provided that the New HTA Bonds Indenture will not include a covenant by Reorganized HTA to maintain a specific rating with respect to outstanding New HTA Bonds.

Any future rating assigned to the New HTA Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the New HTA Bonds on their respective maturity dates. Any rating of the New HTA Bonds is not a recommendation to purchase, hold or sell such New HTA Bonds and such rating will not address the marketability of such New HTA Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for

Reorganized HTA.  Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the New HTA Bonds.

### *An adverse rating of the New HTA Bonds could adversely affect the market price of the New HTA Bonds.*

Notwithstanding that Reorganized HTA may not initially solicit a rating, a rating agency may issue an unsolicited rating on the New HTA Bonds, employing quantitative and qualitative factors, including Reorganized HTA's actual or perceived financial strength, the prospects for payment of principal and interest on the New HTA Bonds, the impact of the HTA's financial outlook, and other macroeconomic conditions in the Commonwealth.  Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice.  Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of Reorganized HTA's indebtedness or placing Reorganized HTA on negative outlook for possible future downgrading.  Such action may be taken at any time and is beyond Reorganized HTA's control.  The downgrade or withdrawal of any credit rating of Reorganized HTA's indebtedness, including the New HTA Bonds, or placing Reorganized HTA on negative outlook for possible future downgrading may have a negative effect on the value of the New HTA Bonds.

### *The New HTA Bonds will not be subject to the Trust Indenture Act*.

The New HTA Bonds will not be required to be and will not be issued under an indenture qualified under the Trust Indenture Act of 1939, as amended (the "TIA").  Accordingly, holders of the New HTA Bonds will not have the benefit of the protections of the TIA with respect to their investment in the New HTA Bonds.

### *Early redemption of the New HTA Bonds may materially adversely affect the return on the New HTA Bonds.*

The New HTA Bonds are redeemable in whole or in part, prior to their scheduled redemption dates, upon the disposition of certain assets.  In addition, following certain dates, the New HTA CIBs and New HTA CCABs may be redeemed, in whole or in part, at the option of the Reorganized HTA.  See "Provisions Regarding the New HTA Bonds and Additional Indebtedness—Call Option" and "—Certain Covenants of Reorganized HTA Relating to the New HTA Bonds." The redemption price to be paid to holders of New HTA Bonds upon such an early redemption thereof will be equal to the principal amount thereof plus accrued interest thereon to the date fixed for redemption.  Reorganized HTA may choose to redeem the New HTA CIBs and New HTA CCABs, or dispose of certain assets resulting in an early redemption of New HTA Bonds, at times when prevailing interest rates are lower than the Interest Rate paid on the New HTA Notes.  In this circumstance, holders of such New HTA Bonds may not be able to reinvest the redemption proceeds in a comparable security at an effective interest rate as high as that of the New HTA Bonds being redeemed.

**D.     Risks Related to Assured Election**

With respect to the Assured Insured Bonds identified on Exhibit A to the Assured Election Notice, Assured has elected to receive the Assured New HTA Bonds allocable to holders of such Assured Insured Bonds, which will be paid in full as described in Section 26.1(a) of the HTA Plan.  Under the Assured Election, holders of the Assured Insured Bonds that are repaid will receive the Assured Acceleration Price, which is an amount equal to the outstanding principal plus accrued and unpaid interest as of the date of payment.  Such payment will satisfy and discharge in full Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bonds.

Holders of the Assured Insured Bonds that are paid under the Assured Election may be dependent on Assured to have sufficient cash to satisfy its payment obligations.  Such bonds generally will be paid with proceeds from the sale of Assured New HTA Bonds, and Assured will pay any deficiency in accordance with the Assured Insurance Policies.  However, there is no certainty that Assured will have sufficient funds to pay the Acceleration Price.  Moreover, holders of the Assured Insured Bonds that are paid under the Assured Election will not be entitled to any further interest payments on the Assured Insured Bonds, will have no further rights to or interest in the Assured Insurance Policies or the Assured New HTA Bonds.

**E.     Risks Related to the Assured Bondholder Elections**

With respect to the Assured Insured Bonds identified on Exhibit A to the Assured Bondholder Elections Form, each beneficial holder of such Assured Insured Bonds is entitled to make one of two elections for treatment of such Assured Insured Bonds, as described in Section 26.1(b) of the HTA Plan.

Election 1 would provide the Assured Insured Bondholder a cash payment equal to the outstanding principal plus accrued and unpaid interest of such holder's Assured Insured Bonds as of the HTA Effective Date.  Assured Insured Bondholders that opt for Election 1 would not be entitled to any further interest payments on the Assured Insured Bonds and would have no interest in the Assured Plan Consideration.

Pursuant to Election 2, each eligible Assured Insured Bondholder who elects, or is deemed to elect, Assured Bondholder Election 2 will opt into a custodial trust (each such trust, as applicable, an "Assured Trust") on terms substantially similar to those reflected in (i) the relevant form "Standard Terms of Trust Agreement" included as an exhibit to the Plan Supplement, and (ii) the relevant form "Trust Agreement" included as an exhibit in the Plan Supplement (together, and as they may be modified prior to implementation, the "Assured Trust Agreement").  The Assured Trust will issue Trust Units that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policies and (B) certain Assured Plan Consideration, in accordance with terms acceptable to Assured.

Under Section 26.1(c) of the HTA Plan, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued

interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' prior written notice to the relevant holders.  Assured's retention of this right will be reflected in the applicable Assured Trust Agreement.  From and after payment of the Assured Acceleration Price, including without limitation, on (i) the HTA Effective Date or (ii) such other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with the HTA Plan, including, without limitation, on the HTA Effective Date, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

Before electing, or being deemed to elect, Assured Bondholder Election 2, eligible Assured Insured Bondholders should carefully consider certain risk factors specifically related to Assured Bondholder Election 2. The risk factors identified below are not the only risks related to Assured Bondholder Election 2, and do not necessarily reflect the relative importance of various risks. Any one or more of the factors identified below, and other factors not described in this Disclosure Statement, could affect recoveries under Assured Bondholder Election 2, and there can be no assurance that other risk factors not discussed in this Disclosure Statement will not become material in the future. Eligible Assured Insured Bondholders who elect, or are deemed to elect, Assured Bondholder Election 2, will be deemed to have assumed the related risks, including those identified in this Disclosure Statement.

Capitalized terms used in the discussion of Assured Bondholder Election 2 below, but not defined in this Disclosure Statement, shall have the meanings given to them in (i) the HTA Plan or (ii) the Assured Trust Agreement, as applicable.

Assured is not providing any tax advice to Assured Insured Bondholders, and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. In no event shall the Trustee for the Assured Trust, the Depositor, or Assured be liable for any liabilities, costs or expenses of the Assured Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under the Assured Trust Agreement.

***Risks Related to the Trustee and Assured.***[208][209]

Under Election 2, the Assured Insured Bondholders may be dependent on the Trustee for the Assured Trust to exercise the bondholders' rights under the applicable Assured Insurance Policy and any Assured New HTA Bonds held by the Assured Trust. Additionally, the holder's investment will depend (in a significant part) on the business and financial prospects of Assured. In recent years, many bond insurers have become significantly weaker from a financial perspective. Moreover, any Assured Insured Bondholder that fails to make an election will be deemed to have chosen Election 2.

***\*Tax Treatment of the Assured Trust is Uncertain.***

The Assured Trust may take the position that it is a grantor trust for U.S. federal income tax purposes. To the extent the Assured Trust is treated as a grantor trust, each Trust Unit Holder will be treated as receiving its Trust Unit(s) in exchange of its relevant Allowed Assured Insured Bond Claims and its interest in the Assured Insurance Policies, and as owning a pro rata undivided interest in the Trust Assets held in the Assured Trust, each to the extent of its pro rata interest in the Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust.

To the extent Trust Unit Holders are treated as owning their pro rata share of the Trust Assets under a grantor trust, they will be treated as if they had received distributions under the HTA Plan directly and as owners of their pro-rated portion of the Trust Assets, including any New HTA Bonds held as Trust Assets. Interest on a portion of any such New HTA Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "Assured Trust Tax-Exempt Interest"). There can be no assurance that the Assured Trust Tax-Exempt Interest, to the extent it is generally excluded from gross income for federal income tax purposes, will retain such exclusion in respect of the Trust Unit Holders. No opinion of counsel or IRS ruling has been, or will be, requested regarding whether any payments of Assured Trust Tax-Exempt Interest that are passed through to the Trust Unit Holders will retain their exclusion from gross income for federal income tax purposes. U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust Tax-Exempt Interest.

It is possible that the IRS may assert, and a court may so hold, that the Assured Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterizations (principally, treating the Trust Units as taxable debt of Assured or treating the Assured Trust as subject to corporate level tax) could result in different (and materially adverse) tax consequences to the Assured Trust and the Trust Unit Holders (including treating all income received with respect to the Trust Units as fully taxable income or possibly imposing a corporate tax on the Assured Trust, thereby reducing distributions to Trust Unit Holders).

The Assured Trust has not sought and will not seek either a ruling from the IRS or an opinion of counsel with respect to its status as a grantor trust, the nature of the Trust Units issued

---

[208][209] The risk factors in this Section VIII.E marked with an asterisk (*) have been furnished by Assured for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated by reference.

by the Assured Trust, or the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust. As a result, there can be no assurance that the Assured Trust will be treated as a grantor trust, that the Trust Units will be treated as interests in such trust or that any of the Trust Assets will be treated as producing tax-exempt income or the timing of such income.

U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax classification of the Assured Trust and the Trust Units (particularly the associated tax consequences in case the Assured Trust is not classified as a grantor trust (such that the Trust Units are treated as taxable debt of Assured or the Assured Trust is treated as subject to corporate level tax) for U.S. federal income tax purposes), as well as the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.

***Risks Related to Taxation of Ownership and Sale or Disposition of the Trust Units.***

To the extent that each Trust Unit Holder is treated as owning its pro rata share of any applicable outstanding New HTA Bonds or other Trust Assets, including the related Assured Insurance Policies, it will be entitled to payments attributable to such Trust Assets. To the extent that each Trust Unit Holder is treated as owning its pro rata share of any New HTA Bonds, see "—Taxation of New HTA Bonds" in this Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning such New HTA Bonds. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the Assured Insurance Policies, the taxation of amounts received by the Assured Trust and passed through to the Trust Unit Holders in respect of payments on the Assured Insurance Policies is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of payments under the Assured Insurance Policies and the possibility of material adverse tax consequences to the Trust Unit Holders.

Pursuant to Section 26.1(c) of the HTA Plan, the applicable Assured Insurance Policies and the Assured Trust Agreement, Assured will retain the right to pay the Assured Acceleration Price to the Assured Trust and fully satisfy its obligations with respect to the Assured Legacy Bonds held by the Assured Trust and the related Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' notice to the relevant holders and the Assured Trust. To the extent that Assured exercises this option, the Assured Trust will terminate and the Trust Unit Holders will receive only their pro-rata share of the Assured Acceleration Price. As discussed above in respect to payments on the Assured Insurance Policies generally, the taxation of the receipt of the Assured Acceleration Price by the Assured Trust and its distribution to the Trust Unit Holders is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the receipt of the Assured Acceleration Price by the Assured Trust and the possibility of material adverse tax consequences to the Trust Unit Holders.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a Trust Unit are uncertain. U.S. Holders are strongly urged to consult their tax advisors regarding the ownership, sale and disposition of the Trust Units in their individual circumstances.

***Prepayment and Reinvestment Risks, Including Related to the Assured Advancement Option***.

Promptly following receipt thereof by the Trustee for the Assured Trust, and subject to any deductions provided for in the Assured Trust Agreement, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Assured Trust. Each such Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.

This prompt "pass-through" of Assured Trust income, and the resulting simultaneous reduction of the accrued and unpaid interest on, principal amount of, and/or Compounded Amount of the Assured Legacy Bonds may result in Trust Unit Holders receiving payments on account of such interest, principal, or Compounded Amount prior to the applicable Original Scheduled Interest Payment Dates, Original Scheduled Principal Payment Dates, and/or Maturity Date of the Assured Legacy Bonds.

Pursuant to the Assured Advancement Option, and in accordance with the Assured Insurance Policies and Section(s) 26.1(c) and/or 26.1(d) of the HTA Plan, Assured will also have the option to satisfy its payment obligations with respect to any Assured Legacy Bonds CUSIP by paying the applicable Assured Acceleration Price or redemption price at any time after the HTA Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. Payment of the applicable Assured Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Legacy Bonds CUSIP.

As a result of any such prepayment(s) of interest, principal, or Compounded Amount, including pursuant to the Assured Advancement Option, Trust Unit Holders may need to reinvest funds at a lower interest rate than that provided for under the Assured Legacy Bonds. Any reinvestment risk will be borne exclusively by the Trust Unit Holders.

Assured is not providing any tax advice to Assured Insured Bondholders and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing any Assured Bondholder Election or receiving the Assured Acceleration Price. U.S. Holders that elect any Assured Bondholder Election are strongly urged to consult their own tax advisors regarding the tax treatment of such election and the receipt of the Assured Acceleration Price.

## F.    Risks Related to the Election of National Commutation Treatment

Each holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall have the option to elect on the National Bondholder Election Form to receive, on the HTA Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the holder thereof will have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the holder thereof will not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after the

Deemed Issuance Date, and to the extent any accrued interest is paid to such holder by National after such date, such amount will be credited against the Cash such holder, their successors, transferees or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National will receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim.  National retains the sole discretion to select the form of National Commutation Consideration to be distributed under the National Commutation Treatment.  At the time of election, such holders will know how their claims will be treated.

## G.    Risks Related to the National Non-Commutation Treatment

Each holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) may elect not to receive the National Commutation Treatment.  At the time of such election, such holders will know how their claims will be treated.

National is entitled to elect from the treatments described in Section 26.2(b) of the HTA Plan, which include custodial trusts, escrow accounts, or cash payments of accelerated amounts. In the event that a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment, (i) National will receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such holder will receive one or more of the treatments described in Section 26.2(b) of the HTA Plan, at National's election, which election will be exercised by National at or prior to the commencement of the Disclosure Statement Hearing, and as detailed in the applicable National Bondholder Election Form.

To the extent that National elects a custodial trust (each such trust, as applicable, a "National Trust") on terms substantially similar those reflected in (i) the relevant form "Standard Terms to Trust Agreement" included as an exhibit in the Plan Supplement if elected by National as the form of National Non-Commutation Treatment, and (ii) the relevant form "Trust Agreement" included as an exhibit in the Plan Supplement if elected by National as the form of National Non-Commutation Treatment (together, and as they may be modified prior to implementation, the "National Trust Agreement"), holders receiving such treatment will (i) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing holder, and the related National Insurance Policies into the applicable National Trust, (ii) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (iii) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

To the extent that National elects an escrow account, holders receiving such treatment will deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration will be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

To the extent that National elects cash payments, National will fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the HTA Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

In addition, National and the Oversight Board may formulate an alternative election or implementation option not identified in the HTA Plan with respect to the National Insured Bonds prior to commencement of the Disclosure Statement Hearing.

Any holder of an Allowed National Insured Bond Claim that does not timely and validly elect to receive the National Non-Commutation Treatment, or submits an election for less than all of its National Insured Bond Claims, will be deemed to have elected to receive the National Commutaiton Treatment.

## H.   Risks Related to Making or Declining to Make the National Commutation Election

The HTA Plan provides holders of Allowed HTA 68 Bond ~~Claim~~Claims (National) or Allowed HTA 98 Senior Bond ~~Claim~~Claims (National) with an option to choose the National Commutation Treatment or National Non-Commutation Treatment.  The National Insured Bonds of a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) that does not validly elect to receive the National Non-Commutation Treatment will be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies will be fully and finally satisfied, released, and discharged.

The ability of a non-commuting holder of Claims in Classes 4 and 9 to recover on account of its Allowed National Insured Bond Claims is subject to the collection risk associated with National.  The holders of Claims in Classes 4 and 9 should investigate the financial condition of National prior to determining whether to elect to receive the National Commutation Treatment under the HTA Plan.  Future events could occur that could give rise to payment or other counterparty risks with respect to National.  Such risks would attach to the National Certificates and the Debtor can make no guarantee that any holder would be able to realize any particular level of recovery from National.

## I.   Risks Related to the National Certificates

A holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) ~~aim~~ that elects not to receive the National Commutation Treatment may, at National's election, be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration for the deposit of such holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such holder, and the related National Insurance Policies into the applicable National Trust and will have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.  Capitalized terms used in the discussion of the National Certificates below, but not defined in this Disclosure Statement, shall have the meanings given to them in (i) the HTA Plan or (ii) the National Trust Agreement, as applicable.

309

Holders that receive National Certificates will be subject to additional risks including, but not limited to, the following:~~209~~210

- The National Certificates and Trust Units will not be liquid. The National Certificates and Trust Units will not be tradeable and there will be no market for the National Certificates or Trust Units;

- Each distribution on the National Certificates will reduce the related obligation of National under the National Insurance Policies. Notwithstanding any tax that is payable by a holder of the National Certificates on account of distributions from the National Trust, the gross  amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder) will reduce National's obligations under the National Insurance Policy;

- Pursuant to Section 26.2(c) of the HTA Plan and the National Trust Agreement, National will retain the right to pay the National Acceleration Price to the National Trust and fully satisfy its obligations with respect to the National Legacy Bonds held by the National Trust and the related National Insurance Policies at any time after the HTA Effective Date upon 30 days' notice to the relevant holders and the National Trust. To the extent that National exercises this option, the National Trust will terminate and the Trust Unit Holders will receive only their pro-rata share of the National Acceleration Price. The taxation of the receipt of the National Acceleration Price by the National Trust and its distribution to the Trust Unit Holders is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the receipt of the National Acceleration Price by the National Trust and the possibility of material adverse tax consequences to the Trust Unit Holders;

- Promptly following receipt thereof by the Trustee for the National Trust, and subject to any deductions provided for in the National Trust Agreement, the Trustee will be required to and will distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the National Trust. Each such Distribution made on or prior to the Maturity Date to Trust Unit Holders will result in a deemed simultaneous dollar-for-dollar reduction, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, the Holder's National Legacy Bonds, as of the date of such Distribution and in an amount equal to such Distribution. This prompt "pass-through" of National Trust income, and the resulting simultaneous reduction of the accrued and unpaid interest on, and principal amount of, the National Legacy Bonds may result in Trust Unit Holders receiving payments on account of such interest and principal prior to the applicable Original Scheduled Interest Payment Dates, Original Scheduled Principal Payment Dates, and/or Maturity Date of the National Legacy Bonds. Pursuant to the National Advancement Option, and in accordance with Section(s) 26.2(c) and/or 26.2(~~d~~c) of the HTA Plan, National will also have the option to satisfy its payment obligations with respect to any

---

~~209~~210   The risk factors below have been furnished by National for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated by reference.

National Legacy Bonds CUSIP by paying the applicable National Acceleration Price or redemption price at any time after the HTA Effective Date upon 30 days' notice to the relevant holders and the National Trust.  Payment of the applicable National Acceleration Price or redemption price with respect to any National Legacy Bonds CUSIP will satisfy and discharge all of National's obligations under the applicable National Insurance Policy with respect to such National Legacy Bonds CUSIP.  As a result of any such prepayment(s) of interest and principal, including pursuant to the National Advancement Option, Trust Unit Holders may need to reinvest funds at a lower interest rate than that provided for under the National Legacy Bonds.  Any reinvestment risk will be borne exclusively by the Trust Unit Holders.  National is not providing any tax advice to National Insured Bondholders and National makes no representations to National Insured Bondholders regarding the tax consequences of electing any National bondholder election or receiving the National Acceleration Price.  U.S. Holders that elect any National bondholder election are strongly urged to consult their own tax advisors regarding the tax treatment of such election and the receipt of the National Acceleration Price;

- Certain aspects of the U.S. federal income tax treatment of owning a Trust Unit are uncertain;

- To the extent that each Trust Unit Holder is treated as owning its pro rata share of any applicable outstanding New HTA Bonds or other Trust Assets, including the related National Insurance Policies, it will be entitled to payments attributable to such Trust Assets.  To the extent that each Trust Unit Holder is treated as owning its pro rata share of any New HTA Bonds, see "—Taxation of New HTA Bonds" in this Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning such New HTA Bonds.  To the extent that each Trust Unit Holder is treated as owning its pro rata share of the National Insurance Policies, the taxation of amounts received by the National Trust and passed through to the Trust Unit Holders in respect of payments on the National Insurance Policies is uncertain with the potential for materially adverse consequences to Trust Unit Holders.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of payments under the National Insurance Policies and the possibility of material adverse tax consequences to the Trust Unit Holders;

- Except as provided under the applicable National Insurance Policy, holders of the National Certificates will have no recourse to the trustee of the National Certificates, National, or any their Related Persons.  Moreover, holders will have no recourse against such persons or their assets for payments on the National Certificates, except as set forth in the applicable National Insurance Policy and the trust agreement.  The National Certificates will be obligations of the National Trust.  Except as provided into the applicable National Insurance Policy or the trust agreement, the distributions in respect of the National Certificates will only be made out of the National Trust assets;

- If National experiences financial difficulties of its own in the future, it may not be able to make payments on the National Insurance Policies deposited as trust assets for the benefit of the trusts.  In addition, future events could occur that could give rise to payment or

other counter party risks with respect to National.  Such risks would attach to the National Trust and the Oversight Board can make no guarantee that any holder would be able to realize any particular recovery from National.  The value of the National Certificates will be dependent in part on the business and financial prospects of National.  Holders of National Certificates should, in addition to evaluating the ability of Reorganized HTA to fulfill its obligations under the National Insured Bonds, also evaluate the ability of National to fulfill its obligations under the National Insurance Policies.

**J.      Risks Related to the National Escrow Account**

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, be required to deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration will be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

**K.      Risks Related to Payment of National Acceleration Price**

With respect to Allowed HTA 98 Sub Bond Claims (National), National has elected to receive the National Plan Consideration allocable to holders of such National Insured Bonds, which will be paid in full as described in Section 26.2(d) of the HTA Plan.  Holders of the National Insured Bonds that are repaid will receive the National Acceleration Price, which is an amount equal to the outstanding principal plus accrued and unpaid interest (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.  Such payment will satisfy and discharge in full National's obligations under the National Insurance Policies with respect to such National Insured Bonds.

Holders of the National Insured Bonds that are paid the National Acceleration Price may be dependent on National to have sufficient cash to satisfy its payment obligations.  There is no certainty that National will have sufficient funds to pay the National Acceleration Price.  Moreover, holders of the National Insured Bonds that are paid the National Acceleration Price will not be entitled to any further interest payments on the National Insured Bonds, and will have no further rights to or interest in the National Insurance Policies or the National Plan Consideration.

**L.      Risks Related to Revenues and Expenses in the HTA Fiscal Plan**

The HTA Fiscal Plan[210][211] and its underlying financial projections are the result of several years of working sessions, dialogue, stakeholder engagement, research and in-depth analysis, as well as Oversight Board and the Commonwealth Government collaboration, that created a deep and rich fact base to underpin the presented macroeconomic trends and revenue and expenditure forecasts.  However, the aforementioned have been built upon a set of assumptions and factors that are subject to external and internal risks that could materially impact the expected outcomes.

---

[210][211]  The HTA Fiscal Plan was certified on February 22, 2022.  *See* Exhibit D.

To recognize such risks, the following sections outline those factors that could affect the macroeconomic and thirty (30) year financial projections contained in the HTA Fiscal Plan.

The aforementioned financial projections contain forward looking statements. Certain of these statements relate to anticipated future events, future results of operations or future financial performance. In some cases, the words "may," "might," "will," "should," "intends," "expects," "plans," "goals," "projects," "forecasts," "anticipates," "believes," "estimates," "predicts," "potential," or "continue" or the negative of these terms or other comparable terminology are generally intended to identify forward-looking statements.

These forward-looking statements are based on material assumptions, are uncertain and involve substantial known and unknown risks, uncertainties and other factors which may cause the actual results, and levels of activity or performance of the Puerto Rican economy and tax collection to be materially different from any future results, levels of activity or performance expressed or implied by these forward-looking statements.

There can be no guaranty as to future results, levels of activity or performance. Undue reliance should not be placed on these forward-looking statements, which speak only as of the date that they were made. There is no intention to update any of these illustrative, forward-looking, statements to conform these statements to reflect actual results, later events or circumstances or to reflect the occurrence of unanticipated events.

The assumptions underlying this financial information are necessarily subjective. There can be no assurance that these assumptions are currently correct or that they will remain correct or accurate in the future. Accordingly, there can be no guaranty that this information fully or correctly demonstrates the relationships among the economic factors comprised by this financial information. There are no representations or warranties that the projections are without flaws in logic or mechanics, although best efforts to design and build the financial information to demonstrate forecasted financial operations and financial performance based on the stated assumptions were undertaken. In addition to the typical limitations of any forecast, the projections also are subject to the additional uncertainties associated with preparing projections regarding the impact of the COVID-19 pandemic during the course of the pandemic and in the context of the evolving public health response.

***The HTA fiscal plan model relies on historical data to project GNP and inflation and does not take into account potential external shocks.***

The HTA Fiscal Plan model relies on historical data on a key set of economic variables (*e.g.*, oil prices, food prices, output gap, capital growth, net federal transfers) to project GNP and inflation—and layers on the effects of Hurricanes Maria and Irma, the 2020 earthquakes, and the COVID-19 pandemic, as well as the resulting disaster relief and other federal stimulus funding projected to be received by Puerto Rico. It does not take into account potential future external shocks such as unforeseen economic and non-economic crises, natural disasters, or other changes in global (or local) economic activity that are not currently projected. One example of a non-economic shock is the cyberattack experienced by the AutoExpreso toll road system. Due to this cyberattack, AutoExpreso users have been unable to make payments, which has negatively impacted toll fare and toll fine collection. Economic external shocks may impact other important

variables, such as fuel prices, which in turn may negatively impact toll road usage given the evidence that increases in fuel prices may lead to a shift to alternative modes of transporation (*e.g.*, transit) and alternative routes (*e.g.* via non-toll roads). Because future projections take into account past performance, if economic growth (or inflation) for the United States or Puerto Rico is materially higher or lower than projected, that could significantly affect the accuracy of the subsequent GNP and inflation projections in the HTA Fiscal Plan and thus the accuracy of the revenue and expense projections.    Additionally, delayed or ineffective implementation of structural reforms on labor, energy, ease of doing business and education—which are currently assumed to drive a GNP growth uptick of 0.9%—could impact GNP growth and in consequence, overall revenue performance.

HTA's baseline toll volume forecast, which includes the yearly increase in toll traffic and related revenues, before any toll price increases, is based on the Commonwealth's GNP forecast. Relatedly, there is a significant risk in the future that actual GNP will differ from projected GNP, since the accuracy of the GNP projections is significantly affected by the underestimated or overestimated projection of economic growth.  The inaccuracy of GNP projections will cause the link between GNP and toll road volume to be less reliable than it has been previously. Additionally, baseline toll revenue assumes that toll fare collection will remain at its current level.  This assumption could also prove wrong if, for example, toll collection technology is unworkable for any period of time, as demonstrated by the natural disasters that have previously interfered with HTA's ability to collect toll fares.  Therefore, GNP growth and HTA's overall revenue performance can be significantly impacted.

***The HTA fiscal plan model does not incorporate major demographic shifts not currently apparent.***

Population projections in the HTA fiscal plan model are driven by projected future economic growth, as well as several demographic factors—such as projected fertility and mortality rates and net outmigration—based on the most recent available data (as of the certification date) from the CDC, Bureau of Transportation Statistics, and U.S. Census Bureau, among others.  Major demographic shifts not currently apparent (*e.g.*, major changes in fertility rates, age-mix of the population, migration patterns) could significantly change the accuracy of population estimates underlying the HTA fiscal plan model.  Since population serves as an input for overall macroeconomic projections (*e.g.*, GNP in Puerto Rico), which in turn drive projections for revenue and expense items (*e.g.*, traffic volumes, transit ridership, labor costs), changes in population projections would impact the accuracy of the projected surplus.

***The HTA fiscal plan uses current data and policies to project the magnitude and roll out of federal funds for disaster and discretionary relief, other related sources of funding, and other major federal programs.***

Historically, HTA has suffered as a result of a lack of a clear process for delivering capital programs.  The projections in the February 2022 HTA Fiscal Plan rely on the efficient and timely implementation of receipt and disbursement of federal and private disaster relief funds, as well as discretionary funds, and other similar sources of funding.  This reliance assumes both federal and local government processes to apply for and disburse funds will speed up during and after FY2022 and that the latest federal estimates in terms of overall magnitude of funding and

roll out are accurate.  The accuracy of federal funding amounts is a key driver of revenue in the operating model.  The projections are also built on current legislation and federal policies governing the use of these funds.  If overall local or federal government efficiency levels or processes change, or there are changes to the appropriations or governing policies (*i.e.*, changes made by Congress, FEMA, HUD, USDA, or other federal agencies), there could be direct impacts on the accuracy of revenue and expenditure projections given disaster relief funds impact GNP growth estimates (which then impact population projections) as well as estimates regarding local government cost share.  Furthermore, the projections depend on HTA's grantee status, which enables HTA to receive additional federal government funds, and any disruption to HTA's grantee status would further harm HTA's fiscal situation.

There is also a risk to the level of federal funding that HTA receives, which is based on its ability to comply with federal requirements and guidelines.  For example, if HTA fails to meet, monitor, or report on federal performance requirements, such as FHWA's requirements to "achieve or make significant progress toward the achievement of targets set under the National Highway Performance Program," there can be implications to the level and limitations of federal funding.  The February 2022 HTA Fiscal Plan assumes recent historical consistency of HTA compliance with these requirements.

Without the timely receipt and disbursement of funding, HTA will risk failing to maintain its current transportation network and will continue to lag behind national standards for quality, safety, and reliability.  The funding provided to HTA is utilized for transportation infrastructure projects, which aim to make Puerto Rico's roadways safer and Puerto Rico's transit systems more reliable.  Without such funding, these projects will remain incomplete and may result in fewer Puerto Rico residents utilizing Puerto Rico's transit systems, as well as Puerto Rico roadways, leading to a decrease in HTA's total revenues due to lack of toll and fine collection, and transit fees.  To date, transit ridership has declined significantly and remains depressed relative to pre-pandemic levels.  Further declines in transit ridership and/or unexpected increases in operating costs would present risks to HTA's overall fiscal situation.  Therefore, changes in efficient and reliable funding will negatively impact successful implementation of the measures outlined in the February 2022 HTA Fiscal Plan.

***A change in the relationship between the Commonwealth and HTA may affect the accuracy of the HTA's fiscal plan projections.***

Due to HTA's role delivering transportation infrastructure projects across Puerto Rico and maintaining Puerto Rico's roadways, HTA has historically depended on the annual transfer of funds from the Commonwealth, as discussed in the February 2022 HTA Fiscal Plan.  Prior to the enactment of Executive Order 2015-046, HTA received appropriations of revenues from the cigarette tax, gasoline tax, diesel tax, petroleum tax, in addition to vehicle license fees collected by the Commonwealth.  After the Commonwealth began retaining these revenues pursuant to Executive Order 2015-046, to ensure HTA had enough resources to fund necessary maintenance and capital expenditures to keep Puerto Rico's transportation system operational, the Commonwealth started making two new, main appropriations to HTA: (a) a capital expenditure appropriation, designed to help HTA advance its infrastructure priorities; and (b) a general transfer, intended to be used by HTA solely to fund costs associated to non-toll assets. Over

FY2022 through FY2051, the 2022 Commonwealth Certified Fiscal Plan includes an average annual operating appropriation of approximately $109 million and an average capital appropriation of approximately $67 million per year. If this relationship were to change, or these annual funding amounts were to change from projections, HTA's fiscal position would face significant risk.

***The HTA fiscal plan assumes toll fare increase implementation.***

The February 2022 HTA Fiscal Plan projections account for the implementation of toll fare increases. Scheduled toll fare increases, as provided for in the February 2022 HTA Fiscal Plan, are the single most important driver to overall fiscal impact. However, the implementation of toll fare increases remains politically uncertain, and toll fares for four (4) of HTA's-operated toll roads have remained flat for sixteen (16) years, with no adjustment since 2005. Furthermore, because the toll increases contemplated by the February 2022 HTA Fiscal Plan are linked to inflation, fluctuations in inflation will ultimately affect toll revenues.

Failure to implement toll fare increases in alignment with inflation and the February 2022 HTA Fiscal Plan could therefore significantly impact revenues projected by the February 2022 HTA Fiscal Plan, with toll fares being one of five primary sources of HTA's operating revenues. If the toll fares are not properly and effectively implemented, HTA revenues could differ materially from those projected in the February 2022 HTA Fiscal Plan.

***The HTA fiscal plan assumes toll fine and toll collection optimization.***

To successfully reach the fiscal targets contained in the February 2022 HTA Fiscal Plan and ensure HTA's operations are sufficiently funded, the February 2022 HTA Fiscal Plan provides for toll fine rates that are aligned with inflation. Increasing toll fine prices to be consistent with inflation would coincide with both the scheduled toll fare increases and the Federal Civil Penalties Adjustment Act of 2015. Furthermore, the optimization of toll collection through the installment of new tolling systems and expanded Open Road Tolling ("ORT"), provided for in the February 2022 HTA Fiscal Plan, is also expected to increase toll revenues.

The estimates for the implementation of toll fines and collection optimization necessarily rely on assumptions about future rates of collection and fine amounts, which ultimately could prove to be incorrect and significantly affect the projections in the February 2022 HTA Fiscal Plan. Furthermore, the Commonwealth Government made a policy decision not to collect toll fines from 2018 to 2020, but similar policy changes could be implemented in the future, which would pose a serious risk to this core revenue stream for HTA.

***The HTA fiscal plan assumes agency efficiency measures are implemented to achieve savings without adversely impacting the delivery of government services.***

Expense measures assume that savings will generally be achieved through reforms that improve government efficiency while maintaining a level of services commensurate with the needs of the population and facilitate economic growth. However, if such savings are captured via simple attrition or expensive buy-out programs, there would be increased risk that efficiencies are not achieved and that the lower level of expenditures compromise the

government's delivery of services, adversely impacting economic sustainability and poverty levels.

***The HTA fiscal plan assumes effective and timely implementation of revenue and expense measures.***

The February 2022 HTA Fiscal Plan projections rely on the effective and timely implementation of various revenue and expense measures. This assumes that any subsequent policy changes or departures from the February 2022 HTA Fiscal Plan targets and objectives will adhere to the revenue-neutrality and overall spending limits contemplated by the February 2022 HTA Fiscal Plan and related certified Budgets. In order to assure effective implementation and credibility to the February 2022 HTA Fiscal Plan objective and projections, the Oversight Board requires the Government to provide periodic reports on financial performance and implementation progress. The Oversight Board has also developed a monitoring mechanism on its website, which can provide further transparency and accountability to the public on the Government's efforts relating to the February 2022 HTA Fiscal Plan milestones and achievements. Delays or departures from the revenue and expense measure targets, milestones, and reporting specified in the February 2022 HTA Fiscal Plan could materially alter the February 2022 HTA Fiscal Plan projections.

***The HTA fiscal plan assumes the government will cooperate fully on the implementation of all structural and transit reforms and other fiscal measures.***

The HTA fiscal plan incorporates a number of reforms that are required to enable Puerto Rico to move closer to a reality where HTA will provide more predictable commutes, improved road safety and reliability, enhanced public transit systems, cleaner air, reduction in transit time and a more effective and efficient public transportation system in Puerto Rico overall. The HTA fiscal plan includes aggressive reforms intended to support a broader transformation of HTA such as, restructuring the transportation assets into mode-specific entities (e.g. toll roads, non-toll roads, and mass transit), developing more objective frameworks for policy selection, creating an overarching policy board to guide multi-modal transportation strategies across Puerto Rico, among others. HTA is currently funded through a combination of own revenues, federal funds, and Commonwealth funds (including both a capital appropriation and an operating appropriation). The Commonwealth operating and capital transfers are intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes. The HTA fiscal plan assumes the Commonwealth operating and capital appropriations will be transferred to HTA soley to fund non-toll asset costs after the restructuring of transportation assets is completed. Aligned with the vision of the broader transformation of HTA, future funding is tied to the estimated levels needed to operate the non-toll roads and transit assets respectively, as the toll roads can fund its own expenses. However, these reforms need to be adopted in tandem with the fiscal measures laid out to increase revenue and restore capital delivery outcomes for HTA.

***The HTA fiscal plan model is based on historical data reported by HTA, much of which has not been audited or independently reviewed.***

The HTA fiscal plan model is based on the input of historical macroeconomic, revenue and expense data reported by the HTA.  The Government has faced challenges in the past in reporting complete and accurate data, and much of the financial information provided by the Government has not been audited or reviewed by any independent accounting firm or third party. Any material inaccuracies or inconsistencies in the data could impact the accuracy of projections based on that data.

***The HTA fiscal plan model is based on current data and information to project capital improvement program needs and impact.***

The HTA fiscal plan projections incorporate capital expenditure based on current and projected future assessment of capital improvement program needs.  The capital expenditure plans may need to be revised periodically due to various factors including, but not limited to, changes in legislative policy, changes in public sector operations, need for acceleration or deferrals of planned improvements, interaction with other governmental agencies, instrumentalities, municipalities, and private investors and financing sources, and other macroeconomic factors. Needs for quantification or increase in structural reform relating to public infrastructure may also impact the capital expenditure projections in the February 2022 HTA Fiscal Plan.  Changes in these expenditure projections as well as any deviations from the projected impact of such capital improvements could also impact the timing and achievement of other financial projections that are inter-dependent on effective accomplishment and existence of underlying framework and infrastructure.

***The HTA fiscal plan does not assume major changes in the current political climate in Puerto Rico or the United States subsequent to its certification.***

The HTA fiscal plan policies and financial projections are driven by the executive commitment and legislative policies in the United States and Puerto Rico political climate which existed at the time of the February 2022 HTA Fiscal Plan certification.  Much of the financial projections are closely tied to federal funding availability and local political commitment.  The HTA fiscal plan does not take into account future changes in the political environment – such as those from the Puerto Rican administration, Puerto Rican legislative and regulatory direction, organization and structure of service delivery across governmental entities at the Commonwealth and municipal levels, federal appropriations and funding policies, federal tax exemptions, or Puerto Rico's statehood or relationship with the federal government.

***The HTA fiscal plan is modeled on provisions prescribed by current law as modified by proposed measures.  Future changes in pension policy could significantly impact projected costs.***

The HTA fiscal plan projects benefits owed to individuals based on the provisions currently in law as modified by the proposed measures, as well as in accordance with the Commonwealth fiscal plan and the Commonwealth Plan.  To the extent that the Government enacts laws modifying these provisions and are not otherwise determined to be preempted or null

and void, the projected PayGo costs will change, which will ultimately affect the projections in the HTA fiscal plan.

The Government has shown a propensity to desire modifying the pension benefits payable through a series of laws through the last two years.  These include, but are not limited to, Act 80-2020 (providing an incentivized retirement window), Act 81-2020 (providing enhanced benefits to high risk employees), and Act 82-2020 (providing additional sick leave conversion in the pension formula for teachers).  Furthermore, additional legislation was introduced in early 2021 to further modify pension benefits.  On June 9, 2021, the Governor signed Act 7-2021 into law, which purported to unilaterally dictate the terms of the Commonwealth Plan including the treatment of pre-petition debt obligations, eliminate all pension reforms contemplated by the Commonwealth fiscal plan along with essential reforms implemented under Act 106, reinstate all public pension systems as they existed prior to Act 106, and consolidate the source of funding of these unsustainable benefit obligations into one new trust-funded pension system.

Although the Oversight Board and the Government resolved the disputes regarding Act 80-2020, Act 81-2020, and Act 82-2020 pursuant to that certain *Stipulation and Order Resolving Oversight Board Complaint Dated December 20, 2021 Concerning Acts 80-2020, 81-2020, and 82-2020 and Joint Resolution 33-2021* [ECF No. 6 in Adv. Proc. No. 21-00119], which provided that such Acts shall be invalidated, as of the applicable enactment date, as significantly inconsistent with the Commonwealth's certified fiscal plan, the Government may nonetheless take actions to change future pension policy.

***The current P3 partnerships may be terminated, which would require HTA to incur and pay unforeseen costs.***

Currently, HTA operates under two concession agreements: (i) the Toll Road Concession Agreement with Metropistas for the right to operate PR-5 and PR-22 Highways and (ii) the Bridge Service Concession Agreement with Autopistas for the design, construction, operation, and maintenance of the Teodoro Moscoso Bridge.  Both agreements may be terminated upon the sole discretion of the Concessionaires and/or if certain performance conditions are not met.  If these agreements were terminated, HTA would be obligated to assume certain obligations to pay principal and interest on bonds outstanding as well as pay certain other compensation.

## M.    Risks Related to Collection of Revenues Supporting Payment of New HTA Bonds

Collection efforts of toll revenues in Puerto Rico are accomplished through the operation of electronic toll collection methods, which consist of commissions paid to the toll operator.  The HTA fiscal plan seeks to enhance toll revenue collection through improving and expanding the collection of tolls without the use of toll booths through ORT (*e.g.*, all-electronic tolling, cashless tolling, or free-flow tolling, as well as installing new tolling systems, to improve HTA's efficiency in collecting toll fares.  Further, the February 2022 HTA Fiscal Plan provides for implementation of toll fare increases, which directly increases toll collection rates.

The payment of New HTA Bonds will be supported by a pledge of the Trust Estate, which includes revenues generated directly from electronic toll collection. See Section VI.F.2(a)

of this Disclosure Statement for a more detailed description of the Trust Estate. Any reductions to the toll collection resources or any failure of a workable electronic toll collection system would diminish HTA's ability to assess and collect toll revenues to support the payment of New HTA Bonds. Further, the implementation of toll fare increases remains politically uncertain because there has not been any increases in toll fares in Puerto Rico since 2005, which causes HTA to run the risk of a lack of sufficient funds to support the payment of the New HTA bonds.

### *Natural disasters and electricity distruptions may impact the ability of the government to collect toll revenue.*

Puerto Rico is located in a region that experiences frequent hurricanes, tropical storms and other weather events. Such weather events and other natural disasters, such as earthquakes, have caused significant damage to Puerto Rico's highways, and severely adversely affected the functioning of Puerto Rico's electronic tolling system. Toll fine collection was suspended due to the adverse impact the natural disasters had on the electronic toll collection system. However, toll collection has subsequently resumed but still remains below anticipated levels due to the delay in the implementation of the plan to optimize toll collection. In 2020, the interim operator of the electronic toll system estimated as many as 20% of drivers did not pay toll fares. It is possible that weather events and other natural disasters, such as earthquakes, mudslides, or rising sea levels, could disrupt the ability to collect revenues as forecast in the February 2022 HTA Fiscal Plan and could lead to further disruptions in toll fare and toll fine collection.

### *Outbreak of Disease; COVID-19.*

The impact that the COVID-19 pandemic is having and will have on commerce, financial markets and Puerto Rico, and the nature of the impact is likely to evolve over the next several years. The Government has experienced reductions in its revenue sources. The information contained in this Disclosure Statement describe current impacts that the COVID-19 pandemic and related orders have had on Puerto Rico's finances and operations, and describe some of the actions that Puerto Rico is taking in response. Neither the duration and extent of the COVID-19 public health emergency, nor the magnitude of the impact on Puerto Rico, on regional economy or on collection of tax receipts can be predicted. The COVID-19 outbreak is ongoing, and its dynamic nature leads to uncertainties, including (i) the geographic spread of the virus; (ii) the severity of the disease; (iii) the duration of the outbreak; (iv) actions that governmental authorities may take to contain or mitigate the outbreak; (v) the development and distribution of medical therapeutics and vaccinations; (vi) additional or changed travel restrictions; (vii) the impact of the outbreak on the local or global economy, or on the aviation sector generally; (viii) whether and to what extent the Puerto Rico may order additional public health measures; and (ix) the impact of the outbreak and actions taken in response to the outbreak to the collection of tax receipts, expenses and financial condition. It should be assumed that the restrictions and limitations instituted related to COVID-19 may continue, that the current upheaval to the national and global economies and financial markets may continue and/or be exacerbated, at least over the near term, and that the recovery may be prolonged. Additional local epidemics or pandemics may occur and may occur with greater frequency given trends in globalization.

### N.    Risk Factors Related to Future Judicial Actions

***The New HTA Bonds are being issued in connection with the HTA Plan that is subject to confirmation pursuant to PROMESA Title III, which has only been utilized for financial restructuring in two other instances.***

The HTA Plan is effected pursuant to PROMESA Title III.  PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III has only been confirmed by a court in two other instances—with respect to the Commonwealth (confirmed on January 18, 2022) and COFINA (confirmed on February 4, 2019).  As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III.  For example, it is uncertain to what extent an order of the Title III Court confirming the HTA Plan can be appealed or its effectiveness delayed.  While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA.  Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the New HTA Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is no judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III.  Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the New HTA Bonds issued under the HTA Plan.

***PROMESA is subject to challenges regarding its constitutionality.***

For example, certain parties have challenged the constitutionality of PROMESA on the grounds that appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the U.S. Senate. These parties sought to dismiss the Commonwealth Title III Case and to obtain declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid.  These parties also seek to enjoin the Oversight Board from exercising any authority granted to it by PROMESA.  The Title III Court entered an opinion and order holding that there is no constitutional defect in the method of appointment [ECF No. 3503]. The parties challenging PROMESA appealed to the First Circuit, which reversed the Title III Court and held that the method of appointment was defective.  Certiorari was granted by the United States Supreme Court on this issue, and oral argument took place on October 15, 2019. On June 1, 2020, the Supreme Court reversed the First Circuit's decision, holding that the Appointments Clause does not apply to the appointments of the Oversight Board's members.  For additional information, *see* section V.F.6 of this Disclosure Statement, entitled "Appointments Clause Litigation."

***HTA may be subject to future claims and legal actions.***

HTA may be subject to various claims and legal actions arising in the ordinary course of its activities that arise after the HTA Effective Date.  The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Debtor after its emergence from Title III.

***The enforcement of rights under the New HTA Bonds, the New HTA Bonds Indenture, and the New HTA Bonds Legislation, may be limited to the extent Reorganized HTA is subject to a subsequent case under Title III of PROMESA.***

The holders of New HTA Bonds may be unable to enforce rights under the New HTA Bonds, New HTA Bonds Indenture, and New HTA Bonds Legislation to the extent Reorganized HTA is subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition.

***Certain closing conditions and closing deliverables with respect to the HTA Plan may differ in type and scope from those described herein.***

Certain closing conditions and closing deliverables with respect to the HTA Plan may differ in type and scope from those described herein if the Title III Court enters a Confirmation Order that is different than expected.

**O.      Risk Factors Related to Tax Treatment of New HTA Bonds**

***The proportion of New HTA Bonds that will be tax-exempt for U.S. federal income tax purposes is uncertain.***

The New HTA Bonds are expected to be issued as Tax-Exempt New HTA Bonds (as defined in "Certain Material United States Federal Income Tax Considerations").  However, if the New HTA Bonds, or a portion thereof, are determined not to be tax-exempt, they will be treated as Taxable New HTA Bonds (as defined in this Disclosure Statement in "Certain Material United States Federal Income Tax Considerations").  Reorganized HTA covenants under the HTA Plan that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, it will do and perform all acts and things permitted by law and reasonably necessary to assure that interest paid to the holders of any Tax-Exempt New HTA Bonds shall be and remain excludable from gross income for federal income tax purposes. However, the tax status of the New HTA Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the interest on the New HTA Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) if such interest, or a portion thereof, is determined to not eligible to be excluded, the ratio of the aggregate amount of all Taxable New HTA Bonds to be issued on the HTA Effective Date to the total aggregate amount of all New HTA Bonds. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims*

*(Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims
(Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims
(Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), HTA 98 Senior Bond Claims
(National) (Class 9)—Taxation of New HTA Bonds.*"

**The manner in which interest accruals should be calculated with respect to the New HTA Bonds for U.S. federal income tax purposes is uncertain.**

The Debtors do not intend to treat the New HTA Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations (as defined in "Certain Material United States Federal Income Tax Considerations"). However, there is limited authority as to the treatment of the New HTA Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New HTA Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the New HTA Bonds that may be excluded from gross income for U.S. federal income tax purposes. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), HTA 98 Senior Bond Claims (National) (Class 9—Taxation of New HTA Bonds.*"

**U.S. Holders may be required to report income in certain years in excess of the amount of cash received by such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.**

While the New HTA Bonds are expected to be issued as Tax-Exempt New HTA Bonds (as defined in "Certain Material United States Federal Income Tax Considerations"), to the extent the New HTA Bonds, or a portion thereof, are determined not to be tax-exempt, they will be treated as Taxable New HTA Bonds (as defined in "Certain Material United States Federal Income Tax Considerations"). If, for U.S. federal income tax purposes, the Taxable New HTA Bonds are issued with more than a *de minimis* amount of original issue discount, generally, 0.25% of the stated redemption price at maturity multiplied by the number of complete years to maturity, then a U.S. Holder of such bonds must include original issue discount in income as it accrues (regardless of the holder's regular method of tax accounting) using a constant yield method under the accrual rules for original issue discount. If interest accruals exceed the cash payments on the Taxable New HTA Bonds in any year, a U.S. Holder will have "phantom income" in that year, *i.e.*, taxable income in excess of the cash received, which may be substantial.

In the event of a sale or other taxable disposition of a New HTA Bond with accrued market discount, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured)*

323

*(Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), HTA 98 Senior Bond Claims (National) (Class 9)—Taxation of New HTA Bonds."*

ALL HOLDERS SUBJECT TO UNITED STATES TAXATION SHOULD READ THE DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NEW HTA BONDS THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."

[*Remainder of Page Left Intentionally Blank*]

## IX.    Certain Material United States Federal Income Tax Considerations

### A.    General

A general description of certain material U.S. federal income tax consequences of the HTA Plan to holders of certain Claims is provided below.  This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations (including temporary and proposed regulations) promulgated under the IRC (the "Treasury Regulations"), judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect.  Changes in any of these authorities or in their interpretation could cause some, or all, of the U.S. federal income tax consequences of the HTA Plan to differ materially from the consequences described below.

The U.S. federal income tax consequences of the HTA Plan are complex and may vary based on the Class of Claims held by a holder.  As of the date of this Disclosure Statement, no ruling has been requested from the Internal Revenue Service (the "IRS") as to any aspect of the HTA Plan; no opinion has been requested from the Debtors' counsel concerning any tax consequence of the HTA Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New HTA Bonds in the secondary market.  Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences).  Finally, this discussion does not address the treatment of holders of Federal Claims (Class 20), nor does it address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the HTA Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim.  Holders of Claims are urged to consult with their own tax advisors regarding the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the HTA Plan.

**The Puerto Rico tax consequences of the HTA Plan to holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net**

325

basis by the Commonwealth are not discussed in this section. Such holders should review the section "Certain Material Puerto Rico Income Tax Considerations" below.

**B.     U.S. Holders**

**1.     Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "U.S. Holder" means a beneficial owner of HTA Bonds ("Existing Securities") on the Effective Date of the HTA Plan that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

The term "U.S. Holder" does not include a Puerto Rico Individual or a Puerto Rico Corporation, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should review the certain U.S. federal income tax consequences of the HTA Plan discussed under "— Puerto Rico Individuals and Puerto Rico Corporations."

A U.S. Holder who holds Allowed Claims of more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims. U.S. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial

statements of such U.S. Holders.  Such U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of the HTA Plan in their individual circumstances.

      **2.**      **Tax Treatment of Allowed Claims**

          **(a)**      **Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), HTA 98 Senior Bond Claims (National) (Class 9)**

It is expected that, pursuant to the HTA Plan, each U.S. Holder of any of the following: (i) HTA 68 Bond Claims; (ii) HTA 68 Bond Claims (Ambac); (iii) HTA 68 Bond Claims (Assured); (iv) HTA 68 Bond Claims (National); (v) HTA 98 Senior Bond Claims; (vi) HTA 98 Senior Bond Claims (Ambac); (vii) HTA 98 Senior Bond Claims (Assured); (viii) HTA 98 Senior Bond Claims (FGIC); and (ix) HTA 98 Senior Bond Claims (National) will be treated as exchanging such U.S. Holder's HTA Bonds that are the subject of these Classes of Allowed Claims for New HTA Bonds and Cash for U.S. federal income tax purposes.  The Debtors intend to report the transaction consistently with this treatment to the IRS, and the remainder of this discussion assumes the expected treatment will be followed by each U.S. Holder.

          (i)      *Tax Treatment of Exchange*

The tender of the HTA Bonds for the New HTA Bonds and Cash, as applicable, pursuant to the HTA Plan will be considered an exchange under Section 1001 of the IRC.  A U.S. Holder will recognize gain or loss in an amount equal the difference between (i) the sum of any Cash received (other than Cash received attributable to accrued but unpaid interest on the HTA Bonds) plus the "issue price" for U.S. federal income tax purposes (determined in the manner described below under "—Issue Price") for any New HTA Bonds and (ii) the U.S. Holder's adjusted tax basis in the HTA Bonds that were tendered therefore (such adjusted tax basis calculated as described below).  Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the HTA Bonds for the New HTA Bonds and Cash, as applicable, pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the HTA Bonds surrendered is more than one year, long-term capital gain or loss.  Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.

A U.S. Holder's holding period for any New HTA Bonds received will begin the day after the exchange.  A U.S. Holder's tax basis in the New HTA Bonds received in the exchange will generally be equal to the issue price of the New HTA Bonds (determined in the manner described below under "—Issue Price") on the date of the exchange.

(ii)   ***Tax Treatment of Receipt of Cash***

(1)   **Cash**

Cash is expected to be treated as a payment on the HTA Bonds for U.S. federal income tax purposes, other than Cash received that is attributable to accrued but unpaid interest.  The HTA Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the HTA Petition Date, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses).  Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes.  Consistent with such allocation under the HTA Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest.  While it is believed that the reporting of distributions to a U.S. Holder in accordance with the HTA Plan is consistent with applicable law and congressional intent, there can be no assurance that the IRS will respect those allocations with respect to payment on the HTA Bonds.  U.S. Holders should consult their tax advisors to determine the appropriate characterization of payments received.

Subject to the discussion in the previous paragraph, if any of the Cash received is attributable to accrued but unpaid interest on the HTA Bonds, the treatment of such Cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes.  In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of Cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest.  A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss, to the extent that such interest is not satisfied under the HTA Plan.  However, a U.S Holder of a tax-exempt Claim will not be entitled to recognize a deductible loss with respect to any unpaid interest if such U.S. Holder never included such unpaid interest in U.S. gross income.  Additionally, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest.  Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For HTA Bonds that are capital appreciation bonds, where the accrual of the original issue discount is treated as tax exempt interest, the amount of such accrual would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in such capital appreciation bond.  Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond.  U.S. Holders of Claims on which such interest has accrued are urged to consult their own tax advisors regarding the tax treatment of distributions

under the HTA Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

           (2)     **Consummation Costs, HTA PSA Restriction Fee, and DRA Restriction Fee**

The U.S. federal income tax treatment of the Consummation Costs, the HTA PSA Restriction Fees, and the DRA Restriction Fee is unclear.  It is believed that it is appropriate to treat the payment of the Consummation Costs, the HTA PSA Restriction Fees, and the DRA Restriction Fee as a separate fee that would be reported as ordinary income, rather than an amount paid under the HTA Bonds, and such ordinary income generally would not be tax-exempt regardless of whether the underlying HTA Bonds were tax-exempt for U.S. federal income tax purposes.  It is possible, however, that the Consummation Costs, the HTA PSA Restriction Fees, and the DRA Restriction Fee could instead be treated in the same manner as discussed above under "Cash."  These fees may also be treated as additional consideration paid to holders that would be taken into account in calculating a holder's gain or loss.  U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Consummation Costs, the HTA PSA Restriction Fees, and the DRA Restriction Fee.

           (iii)     ***Market Discount***

If a U.S. Holder acquired the HTA Bonds for less than the "adjusted issue price" of the HTA Bonds and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

Any gain recognized on the exchange will generally be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the HTA Bonds.  To the extent gain is recognized pursuant to the exchange of HTA Bonds for New HTA Bonds, a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the HTA Bonds, unless the U.S. Holder previously elected to include the market discount in income as it accrued.  See below "—Taxation of New HTA Bonds—Sale, Retirement or Other Disposition of New HTA Bonds" for a further discussion regarding the election to include market discount in income as it accrues.  U.S. Holders should consult their own tax advisors regarding the tax treatment of market discount pursuant to the exchange, including the interaction of the market discount, original issue discount ("OID") and acquisition premium rules.

           (iv)     ***Taxation of New HTA Bonds***

The New HTA Bonds are expected to be issued as bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt New HTA Bonds") and the remainder of this discussion assumes this will be the case.  However, if such interest is determined to not be eligible to be excluded from gross income for U.S. federal income tax purposes, the New HTA Bonds, or a portion thereof, will be issued as bonds the

interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable New HTA Bonds").  The tax status of the New HTA Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the New HTA Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) if the New HTA Bonds, or a portion thereof, are not eligible to be so excluded, the ratio of the aggregate amount of all Taxable New HTA Bonds to be issued on the HTA Effective Date to the total aggregate amount of all New HTA Bonds.

### (1)  Issue Price

It is expected that the issue price of the New HTA Bonds should equal the fair market value of the New HTA Bonds on the date of the exchange.  This determination is based on the Debtors' conclusion that the HTA Bonds as well as the New HTA Bonds should be treated as "publicly traded" within the meaning of the applicable Treasury Regulations.  The fair market value of the New HTA Bonds will be determined by the "trading price" of such Bonds on or about the date of the exchange.  There is no specific guidance on how to determine the trading price as of a specific time; however, related Treasury Regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price.  The Debtors' determination that the HTA Bonds and the New HTA Bonds are "publicly traded" will be binding on all holders, unless a holder discloses its contrary position in the manner required by applicable Treasury Regulations.  The rules regarding the determination of issue price are complex, and U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New HTA Bonds for U.S. federal income tax purposes.

### (2)  Interest Including OID

The U.S. federal income tax rules used to determine what amounts are treated as interest are complex.  U.S. Holders are urged to consult their own tax advisors regarding what amounts will be treated as interest for U.S. federal income tax purposes in their individual circumstances.

### i.  Tax-Exempt New HTA Bonds

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt New HTA Bonds for interest thereon to be and remain excluded from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC.  Noncompliance with such requirements could cause the interest on the Tax-Exempt New HTA Bonds to be included in gross income for U.S. federal income tax purposes retroactive to the date of issue of the Tax-Exempt New HTA Bonds.  When the Tax-Exempt New HTA Bonds are issued on the Effective Date, Reorganized HTA will, pursuant to the Definitive Documents, including the New HTA Bonds Legislation, covenant to do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any Tax-Exempt New HTA Bonds shall be and remain excludable from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC.  Interest on the New HTA Bonds to be issued under the plan of adjustment is intended to be exempt from federal taxes to the maximum extent permitted under the IRC.  However, as noted above, the tax status of the New HTA Bonds has not been determined as of the date of this Disclosure Statement.  In order to

determine the maximum amount of New HTA Bonds that can be exempt from federal taxes under the IRC, due diligence regarding the use of proceeds of the existing bonds must be completed by Section 103 Bond Counsel, among other matters. This diligence process will take some time to complete.

In addition, a ruling or other guidance from the IRS regarding the allocation of proceeds of the New HTA Bonds between purposes eligible for tax-exempt financing and purposes not eligible for tax-exempt financing will be sought in order to maximize the amount of New HTA Bonds that can be issued as exempt from federal taxes under the IRC.[211][212] A ruling request has not yet been submitted to the IRS, but it is expected that the guidance from the IRS will be obtained before the Effective Date. No assurance can be given that favorable guidance will be obtained from the IRS or the timing of such guidance. If a ruling is not received, the amount of New HTA Bonds that will be exempt from federal taxes will be less than if a ruling had been received and will be based on the percentage of existing bonds that were used for purposes that were and continue to be eligible for tax-exemption as determined by Section 103 Bond Counsel after a pro rata application of other consideration received by holders. In order for Section 103 Bond Counsel to opine that any of the New HTA Bonds are tax-exempt, it is necessary that those obligations are determined to be valid and binding legal obligations of the Commonwealth under legislation enacted by the Commonwealth or otherwise.

Amounts allocable to pre-issuance accrued interest on the Tax-Exempt New HTA Bonds will not be treated as tax-exempt interest under Section 103 of the IRC.

### ii. **OID**

The amount of OID on the New HTA Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (other than qualified stated interest) provided by such New HTA Bonds (initially taking into account the payment schedule as described below) over the issue price (determined in the manner described above under "—Issue Price") of such New HTA Bonds. For Tax-Exempt New HTA Bonds, the amount of OID is excluded from gross income for U.S. federal income tax purposes to the same extent as interest on the Tax-Exempt New HTA Bonds is so expected to be excluded. The OID accruals are computed in the same manner as described above for Taxable New HTA Bonds, but such accruals will be added to the holder's tax basis for the Tax-Exempt New HTA Bonds. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Tax-Exempt New HTA Bonds even though there will not be a corresponding cash payment. Owners of the Tax-Exempt New HTA Bonds with OID are urged to consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt New HTA Bonds.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the New HTA Bonds could be treated differently than described above. U.S. Holders receiving the New HTA Bonds should consult

---

[211][212] For the avoidance of doubt, the New HTA Bonds will not have proceeds. Due diligence will need to be conducted as to the use of proceeds of the HTA's existing bonds, and whether such proceeds were used in accordance with applicable tax law.

their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the New HTA Bonds.

This disclosure assumes that the New HTA Bonds will not be considered contingent payment debt instruments within the meaning of the applicable Treasury Regulations. However, there is limited authority as to the treatment of the New HTA Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New HTA Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New HTA Bonds that may be excluded from gross income for U.S. federal income tax purposes.

### iii.   **Acquisition Premium**

A New HTA Bond would be treated as acquired with acquisition premium if the U.S. Holder's initial basis in the New HTA Bond is (a) less than or equal to the sum of all amounts payable on the New HTA Bond (other than payments of qualified stated interest) and (b) greater than such bond's adjusted issue price for U.S. federal income tax purposes. If a Tax-Exempt New HTA Bond were acquired with acquisition premium, a U.S. Holder will reduce the Tax-Exempt New HTA Bond's tax basis during each accrual period using the same method described above for a Taxable New HTA Bond. As an alternative to reducing the tax basis of the Tax-Exempt New HTA Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above; provided, however, that if a U.S. Holder chooses to make such election, the election shall also apply with respect to all other bonds held by such U.S. Holder at the beginning of the taxable year to which the election applies and to any bonds thereafter acquired, and such election generally may not be revoked. U.S. Holders who acquire New HTA Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

### iv.   **Taxable New HTA Bonds**

If contrary to the expectations, New HTA Bonds are issued as Taxable New HTA Bonds, then payments or accruals of "qualified stated interest" (as defined below) on such Taxable New HTA Bonds (or the relevant portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices. Stated interest payments on the New HTA Bonds generally are expected to be qualified stated interest for this purpose.

### (a)   **OID**

As provided above, the amount of OID on the New HTA Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (other than qualified stated interest) provided by such New HTA Bonds (initially taking into account the payment schedule

as described below) over the issue price (determined in the manner described above under
"—Issue Price") of such New HTA Bonds. Taxable New HTA Bonds would bear OID only if
the issue price of the Taxable New HTA Bonds, as applicable, is less than its principal amount by
more than a de minimis amount. OID will be considered de minimis if it is less than 0.25% of
the stated redemption price at maturity multiplied by the number of remaining complete years to
maturity of such Taxable New HTA Bonds. U.S. Holders, whether on the cash or accrual
method of accounting for U.S. federal income tax purposes, must include the OID on Taxable
New HTA Bonds in gross income as ordinary income as it accrues on a constant yield to maturity
basis, regardless of whether cash attributable to such OID is received at such time. However, the
Taxable New HTA Bonds may be subject to the acquisition premium rules (described below
under "—Acquisition Premium"), which could reduce the amount of OID includible in gross
income.

For Taxable New HTA Bonds, the amount of OID includible in gross income by a U.S. Holder in
any taxable year generally is the sum of the daily portions of OID with respect to a Taxable New
HTA Bond for each day during such taxable year or portion of such taxable year on which the
U.S. Holder holds the Taxable New HTA Bond. The daily portion is determined by allocating to
each day in any accrual period a pro rata portion of the OID allocable to that accrual period. The
accrual period for a Taxable New HTA Bond may be of any length and may vary in length over
the term of the Taxable New HTA Bond provided that each accrual period is no longer than one
year and each scheduled payment of principal or interest occurs on either the first day or the final
day of an accrual period. The amount of OID allocable to any accrual period, subject to the
possible adjustments described below, will be an amount equal to the product of the Taxable
New HTA Bond's adjusted issue price at the beginning of the accrual period and its yield to
maturity (less payments of qualified stated interest allocable to that period). The yield to
maturity of the Taxable New HTA Bonds is the discount rate that, when used in computing the
present value (as of the issue date) of all principal and interest payments to be made on the
Taxable New HTA Bonds produces an amount equal to the issue price of such Taxable New
HTA Bonds. The amount of OID allocable to the final accrual period is the difference between
the amount payable at maturity (other than a payment of qualified stated interest) and the
adjusted issue price at the beginning of the final accrual period. The adjusted issue price of a
Taxable New HTA Bond at the beginning of any accrual period is equal to its issue price,
increased by the accrued OID for each prior accrual period and reduced by any payments made
on the Taxable New HTA Bond, as applicable, during the prior accrual periods (other than
payments of qualified stated interest).

**(b)   Acquisition Premium**

As provided above, a New HTA Bond would be treated as acquired with acquisition premium if
the U.S. Holder's initial basis in the New HTA Bond is (a) less than or equal to the sum of all
amounts payable on the New HTA Bond (other than payments of qualified stated interest) and (b)
greater than such bond's adjusted issue price for U.S. federal income tax purposes. If a Taxable
New HTA Bond was acquired with acquisition premium, a U.S. Holder generally would reduce
the amount of OID that otherwise would be included in income for each accrual period by an
amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a
fraction, the numerator of which is the excess of the adjusted tax basis of the Taxable New HTA

Bond immediately after its acquisition by the U.S. Holder over the adjusted issue price of the Taxable New HTA Bond and the denominator of which is the excess of the sum of all amounts payable on the Taxable New HTA Bond after the purchase date, other than payments of qualified stated interest, over the Taxable New HTA Bond's adjusted issue price.  As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above; provided, however, that if a U.S. Holder chooses to make such election, the election shall also apply with respect to all other bonds held by such U.S. Holder at the beginning of the taxable year to which the election applies and to any bonds thereafter acquired, and such election generally may not be revoked.  U.S. Holders who acquire New HTA Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

(3)     **Sale, Retirement or Other Disposition of New HTA Bonds**

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a New HTA Bond equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of such New HTA Bond.  A U.S. Holder's adjusted tax basis in a New HTA Bond will generally equal such U.S. Holder's tax basis on such New HTA Bond on the date the U.S. Holder acquired such New HTA Bond, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any Cash payments (other than payments of qualified stated interest) previously received on such New HTA Bond by the U.S. Holder.  U.S. Holders should consult with their own tax advisors as to the tax basis of their New HTA Bonds on the date of acquisition.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a New HTA Bond should generally constitute capital gain or loss and will be long-term capital gain or loss if such holder's holding period in the New HTA Bond is greater than one year.  A U.S. Holder's holding period in New HTA Bonds received pursuant to the exchange will begin the day after the exchange.  Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.  Upon a taxable disposition of the New HTA Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued.  A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized and the U.S. Holder would increase its basis in the New HTA Bonds by the amount of the market discount recognized.  Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

334

**(b)** **Holders of HTA 98 Sub Bond Claims (Class 10), HTA 98 Sub Bond Claims (Assured) (Class 11), HTA 98 Sub Bond Claims (FGIC) (Class 12), and HTA 98 Sub Bond Claims (National) (Class 13)**

It is expected that pursuant to the HTA Plan, each U.S. Holder of any of the following: (i) HTA 98 Sub Bond Claims; (ii) HTA 98 Sub Bond Claims (Assured); (iii) HTA 98 Sub Bond Claims (FGIC); and (iv) HTA 98 Sub Bond Claims (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims, such holder's pro rata share of the HTA 98 Sub Bond Recovery. To the extent such amounts are available, such holders will be be treated as exchanging such U.S. Holder's HTA Bonds that are the subject of these Classes of Allowed Claims for Cash for U.S. federal income tax purposes.

**(i)** ***Tax Treatment of Exchange***

It is expected that, to the extent that any of the above-mentioned U.S. Holders receives its pro rata share of Cash under the HTA Plan, the U.S. federal income tax consequences to such U.S. Holder should be as described above under "*—Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), HTA 98 Senior Bond Claims (National) (Class 9)—Tax Treatment of Receipt of Cash.*"

**(c)** **Holders of HTA Moscoso Bond Claims (Class 14), Holders of Eminent Domain/Inverse Condemnation Claims (Class 15), HTA General Unsecured Claims (Class 16), and Convenience Claims (Class 19)**

It is expected that pursuant to the HTA Plan, each U.S. Holder of any of the following: (i) HTA Moscoso Bond Claims, (ii) Eminent Domain/Inverse Condemnation Claims; (iii) HTA General Unsecured Claims; and (iv) Convenience Claims will be treated as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims. The consequences of the receipt of such distribution will vary depending on the U.S. Holders individual circumstances. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution in their individual circumstances.

**(d)** **Holders of HTA/GDB Claims (Class 17) and Holders of Section 510(b) Subordinated Claims (Class 18)**

It is expected that pursuant to the HTA Plan, each U.S. Holder of any of the following: (i) HTA/GDB Claims and (ii) Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the HTA Plan. Each U.S. Holder of HTA/GDB Claims shall be deemed to have accepted the HTA Plan. Each U.S. Holder of Section 510(b) Subordinated Claims shall be deemed to have rejected the HTA Plan with respect to such Section 510(b) Subordinated Claims. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of accepting or rejecting the HTA Plan.

### 3.      Bad Debt and/or Worthless Securities Deduction

A U.S. Holder who, under the HTA Plan, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction or a worthless securities deduction. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  U.S. Holders of Allowed Claims should consult their tax advisors with respect to their ability to take such a deduction and as to what taxable year.

### 4.      Medicare Tax

If contrary to the expectations, New HTA Bonds are issued as Taxable New HTA Bonds, then, a U.S. Holder of Taxable New HTA Bonds that is an individual, estate or trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year, which includes, among other items, interest (including original issue discount) on debt and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances).  A U.S. Holder that is an individual, estate or trust should consult its own tax advisors regarding the applicability of the Medicare surtax to its income and gains in respect of its exchanges and their ownership of the New HTA Bonds.

### 5.      Information Reporting and Backup Withholding

Information reporting will generally apply to (i) payments in respect of the exchange; (ii) payments of principal and interest and OID, if any, on the New HTA Bonds; and (iii) payments of proceeds of the sale or other disposition of the New HTA Bonds.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.  The application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

Backup withholding is not an additional tax.  A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding in some cases, provided they properly identify themselves as exempt. U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

## C.   Puerto Rico Individuals and Puerto Rico Corporations

### 1.   Definition of Puerto Rico Individuals and Puerto Rico Corporations

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Bond Claim or a New HTA Bond that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the IRC and the Treasury Regulations for the entire taxable year that includes the HTA Effective Date. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Bond Claim or a New HTA Bond that is a corporation organized under the laws of the Commonwealth.

The following discussion includes only certain U.S. federal income tax consequences of the HTA Plan to Puerto Rico Individuals and Puerto Rico Corporations. The discussion does not include any non-U.S. (including Puerto Rico) tax considerations. A Puerto Rico Individual or a Puerto Rico Corporation should review the Section "Certain Material Puerto Rico Income Tax Considerations" below for the Puerto Rico tax consequences of the HTA Plan.

The rules governing the U.S. federal income tax consequences to Puerto Rico Individuals and Puerto Rico Corporations are complex. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the consummation of the HTA Plan in their own circumstances.

### 2.   Tax Treatment of Exchange

A Puerto Rico Individual generally will not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the HTA Plan. A Puerto Rico Corporation generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the HTA Plan, unless such gain is effectively connected with such Puerto Rico Corporation's conduct of a trade or business in the United States, in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—*Sale, Retirement or Other Disposition of New HTA Bonds.*"

### 3.   Taxation of New HTA Bonds

#### (a)   Treatment of Interest

Payments of interest on a New HTA Bond, including OID, to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a

337

trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If contrary to the expectations, New HTA Bonds are issued as Taxable New HTA Bonds, and a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New HTA Bonds is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder.  In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

### (b)     Sale, Retirement or Other Disposition of New HTA Bonds

Gain realized upon a sale, retirement or other disposition of a New HTA Bond by a Puerto Rico Individual or a Puerto Rico Corporation generally would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New HTA Bond by the Puerto Rico Corporation is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder.  In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

**Certain tax consequences of the HTA Plan to Puerto Rico Individuals and Puerto Rico Corporations are uncertain.  Puerto Rico Individuals and Puerto Rico Corporations should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the HTA Plan.**

### 4.     Information Reporting and Backup Withholding

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the New HTA Bonds, and (iii) payments of proceeds of the sale or other disposition of the New HTA Bonds.

In general, a Puerto Rico Individual will not be subject to backup withholding with respect to any payments on the New HTA Bonds if it provides a validly completed IRS Form W-9 (or suitable substitute) unless such Puerto Rico Individual (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

A Puerto Rico Corporation, generally, will not be subject to backup withholding with respect to payments in respect of the exchange or payments of principal and interest and OID, if any, on the New HTA Bonds, provided that the Puerto Rico Corporation has provided a validly completed IRS Form W-8BEN-E (or other applicable form) establishing that it is not a U.S. person as defined in the IRC (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person).  Information reporting and, depending on the circumstances, backup withholding will apply to payments of proceeds of the sale or other disposition of the New HTA Bonds made within the United States or conducted through certain United States-related financial intermediaries, unless the Puerto Rico Corporation certifies to the payor under penalties of perjury that it is not a U.S. person (and the payor does not have actual knowledge or reason to know that such Puerto Rico Corporation is a U.S. person), or otherwise establishes an exemption.

Backup withholding is not an additional tax.  A Puerto Rico Individual or Puerto Rico Corporation, as applicable, generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain Puerto Rico Individuals and Puerto Rico Corporations are not subject to information reporting and backup withholding in specific circumstances, provided they properly identify themselves as exempt.  Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

**D.      Non-U.S. Holders**

**1.      Definition of Non-U.S. Holder**

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders.  As used herein, the term "Non-U.S. Holder" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) a Puerto Rico Individual or a Puerto Rico Corporation.

The following discussion includes only certain U.S. federal income tax consequences of the HTA Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the HTA Plan in their individual circumstances.

**2.      Treatment of Exchange**

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the HTA Plan, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a

339

permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described below, for New HTA Bonds, under "—Sale, Retirement or Other Disposition of New HTA Bonds" or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the New HTA Bonds as a capital asset and is present in the United States for one-hundred and eighty-three (183) days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

### 3.     Taxation of New HTA Bonds

#### (a)     *Treatment of Interest*

Payments of interest on a New HTA Bond, including OID, to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If contrary to the expectations, New HTA Bonds are issued as Taxable New HTA Bonds, and a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New HTA Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

#### (b)     *Sale, Retirement or Other Disposition of New HTA Bonds*

Gain realized upon a sale, retirement or other disposition of a New HTA Bond by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New HTA Bond by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the HTA Plan to the Non-U.S. Holders are uncertain. Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the HTA Plan.

4.      **FATCA**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party).  A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject to withholding tax with respect to any "withholdable payments."  For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodic income, profits and income and certain "foreign passthru payments."  Withholding under FATCA generally should not apply to payments of interest (including OID) under a New HTA Bond because such payments generally should be foreign source income.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.  Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

[*Remainder of Page Left Intentionally Blank*]

## X.      Certain Material Puerto Rico Income Tax Considerations

### A.  General

A general description of certain material Puerto Rico income tax consequences of the HTA Plan to holders of certain Claims is provided below.  This description is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Code"), regulations promulgated under the P.R. Code, administrative pronouncements and judicial decisions, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect (collectively, "Applicable P.R. Tax Law").  Changes in Applicable P.R. Tax Law or in their interpretation could cause some of or all the Puerto Rico income tax consequences of the HTA Plan to differ materially from the consequences described below.

The Puerto Rico income tax consequences of the HTA Plan are complex.  As of the date of this Disclosure Statement, no ruling has been formally requested from the Puerto Rico Treasury Department (the "P.R. Treasury"); no opinion has been requested from Debtor's counsel concerning any tax consequence of the HTA Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of Puerto Rico income taxation that may be relevant to Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, corporations of individuals, partnerships or other pass-through entities for Puerto Rico income tax purposes, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, the description assumes that a Holder holds HTA Bonds, and New HTA Bonds only as a "capital asset" within the meaning of Section 1034.01(a)(1) of the P.R. Code.  This description does not address Puerto Rico taxes other than Commonwealth income taxes, nor does it apply to any person that acquires New HTA Bonds in the secondary market.  Finally, this discussion does not address the treatment of holders of Federal Claims (Class 20), nor does it address the Puerto Rico income tax consequences to Holders of Claims who are deemed to have rejected the HTA Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the Puerto Rico tax consequences of the HTA Plan.

### B.  P.R. Holders

#### 1.      Definition of P.R. Holder

Unless otherwise noted, the discussion below applies only to P.R. Holders.  As used herein, the term "P.R. Holder" means a beneficial owner of HTA Bonds on the Effective Date of the HTA Plan that is, for Puerto Rico income tax purposes:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for purposes of Section 933 of the U.S. Internal Revenue Code of 1986, as amended (as determined under Section 937(a) of such Code) and a resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a corporation for Puerto Rico income tax purposes, excluding a corporation or any other type of entity subject to pass through tax treatment or any other special tax regime under the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its source; or

- a trust (other than a business trust), all of the beneficiaries of which are individual residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds HTA Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding HTA Bonds are urged to consult their tax advisors.

A P.R. Holder who holds Allowed Claims of more than one Class may have different Puerto Rico income tax consequences for each Class of Allowed Claims. P.R. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such P.R. Holder holds, and P.R. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the Puerto Rico income tax consequences of each Class of Allowed Claims such P.R. Holder holds.

    **2.**    **Tax Treatment of Allowed Claims**

    **(a)**    **Holders of HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), and HTA 98 Bond Claims (National) (Class 9)**

The Debtor expects that pursuant to the Plan, each P.R. Holder of any of the following: (i) HTA 68 Bond Claims, (ii) HTA 68 Bond Claims (Ambac), (iii) HTA 68 Bond Claims (Assured), (iv) HTA 68 Bond Claims (National), (v) HTA 98 Senior Bond Claims, (vi) HTA 98 Senior Bond Claims (Ambac), (vii) HTA 98 Senior Bond Claims (Assured), (viii) HTA 98 Senior Bond Claims (FGIC), and (ix) HTA 98 Bond Claims (National), will be treated as exchanging such P.R. Holder's HTA Bonds that are the subject of these Classes of Allowed Claims for New HTA Bonds (consisting of New HTA CIBs, New HTA CABs and New HTA Convertible CABs) and Cash.

(i)  ***Tax Treatment of Exchange***

The Debtor expects that, and intend to take the position that, the exchange of a portion of the HTA Bonds for the New HTA Bonds and Cash pursuant to the HTA Plan will be considered a taxable exchange under the P.R. Code.  Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the HTA Bonds on the date of the exchange.  The amount realized on the exchange of HTA Bonds will equal the fair market value of each New HTA Bond and any Cash received (except for any portion attributable to accrued and unpaid interest).  Please refer to the discussion below related to Cash payments for Consummation Costs and the HTA PSA Restriction Fee.

Gain or loss on the exchange of HTA Bonds for New HTA Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the HTA Bonds is longer than one year.  Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable).  The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the HTA Bonds for New HTA Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income.  Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

To the extent that any consideration (i.e. New HTA Bonds or portion thereof, plus any Cash payment) received by a P.R. Holder in exchange for HTA Bonds is attributable to accrued and unpaid interest on the HTA Bonds, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes.  In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

The HTA Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the HTA Petition Date, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to other amounts not described in the preceding clauses.  Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes.  Consistent with such allocation under the HTA Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest.  There is no specific Applicable P.R. Tax Law that considers how payments must be applied in our situation.  While the Debtor intends to report distributions to a P.R. Holder in accordance with the HTA Plan, and the Debtor believes that such reporting is consistent with applicable law and congressional intent, there can

be no assurance that the P.R. Treasury will respect those allocations with respect to payments on the HTA Bonds.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan.

(ii)     *Taxation of New HTA Bonds*

<u>Interest on the New HTA Bonds</u>.  Interest paid or accrued to P.R. Holders on the New HTA Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax.  The excess of the principal amount of the New HTA Bonds due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

Ownership of the New HTA Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the New HTA Bonds being disallowed as deductions for Puerto Rico income tax purposes.

<u>Sale, Exchange or Retirement of the New HTA Bonds</u>.  Gain or loss on the sale or exchange of New HTA Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the New HTA Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable).  The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the sale or exchange of the New HTA Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income.  Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

**(b)     Holders of HTA 98 Sub Bond Claims (Class 10), HTA 98 Sub Bond Claims (Assured) (Class 11), HTA 98 Sub Bond Claims (FGIC) (Class 12), and HTA 98 Sub Bond Claims (National) (Class 13)**

The Debtor expects that pursuant to the Plan, each P.R. Holder of any of the following: (i) HTA 98 Sub Bond Claims, (ii) HTA 98 Sub Bond Claims (Assured), (iii) HTA 98 Sub Bond Claims (FGIC), and (iv) HTA 98 Sub Bond Claims (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims, such holder's pro rata share of the HTA 98 Sub Bond Recovery. To the extent such amounts are available, such holders will be be treated as exchanging such P.R. Holder's HTA Bonds that are the subject of these Classes of Allowed Claims for Cash for Puerto Rico income tax purposes.

It is expected that, to the extent that any of the above-mentioned P.R. Holders receives its pro rata share of Cash under the HTA Plan, the Puerto Rico income tax consequences to such P.R. Holder should be as described above under "—*Holders of HTA 68 Bond Claims (Class 1),*

*HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims (Assured) (Class 3), HTA 68
Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond
Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior
Bond Claims (FGIC) (Class 8), and HTA 98 Bond Claims (National) (Class 9) —Tax Treatment
of Exchange*".

Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the
amount realized (except for any portion of Cash attributable to accrued and unpaid interest) and
the P.R. Holder's adjusted tax basis in the HTA Bonds on the date of the exchange.

**(c)      Holders of HTA Moscoso Bond Claims (Class 14), Eminent
Domain/Inverse Condemnation Claims (Class 15), HTA General
Unsecured Claims (Class 16), and Convenience Claims (Class 19)**

The Debtor expects that pursuant to the Plan, each P.R. Holder of any of the following: (i)
HTA Moscoso Bond Claims, (ii) Eminent Domain/Inverse Condemnation Claims, (iii) HTA
General Unsecured Claims and (iv) Convenience Claims shall be entitled to receive a distribution
in full consideration, satisfaction, release, and exchange of such holder's Claims that are the
subject of these Classes of Allowed Claims.  The consequences of the receipt of such distribution
will vary depending on the P.R. Holders individual circumstances and the nature of assets being
distributed.  P.R. Holders are urged to consult their tax advisors regarding the tax consequences
of the receipt of such distribution based on their individual circumstances.

**(d)      HTA/GDB Claims (Class 17) and Section 510(b) Subordinated Claims
(Class 18)**

It is expected that pursuant to the HTA Plan, each P.R. Holder of any of the following: (i)
HTA/GDB Claims and (ii) Section 510(b) Subordinated Claims shall not receive a distribution
pursuant to the HTA Plan.  Each P.R. Holder of HTA/GDB Claims shall be deemed to have
accepted the HTA Plan.  Each P.R. Holder of Section 510(b) Subordinated Claims shall be
deemed to have rejected the HTA Plan with respect to such Section 510(b) Subordinated Claims.
P.R. Holders are urged to consult their tax advisors regarding the tax consequences of accepting
or rejecting the HTA Plan.

**3.      Tax Treatment of Consummation Costs, HTA PSA Restriction Fee, and DRA
Restriction Fee**

Certain Holders of Claims may receive Cash payments of Consummation Costs, the HTA
PSA Restriction Fee and/or the DRA Restriction Fee.  The Puerto Rico income tax treatment of
Cash payments of Consummation Costs, the HTA PSA Restriction Fee and the DRA Restriction
Fee is unclear.  The Debtor intends to treat the receipt of the Consummation Costs, HTA PSA
Restriction Fee and DRA Restriction Fee similar to the treatment adopted for U.S. federal
income tax purposes, thus, their payment may be treated as a separate fee taxable as ordinary
income.  However,  the payment of the Consummation Costs, HTA PSA Restriction Fee and
DRA Restriction Fee may be treated as part of the amount realized by a P.R. Holder on the
exchange and be subject to Puerto Rico income taxes as described above under "—*Holders of
HTA 68 Bond Claims (Class 1), HTA 68 Bond Claims (Ambac) (Class 2), HTA 68 Bond Claims*

346

*(Assured) (Class 3), HTA 68 Bond Claims (National) (Class 4), HTA 98 Senior Bond Claims (Class 5), HTA 98 Senior Bond Claims (Ambac) (Class 6), HTA 98 Senior Bond Claims (Assured) (Class 7), HTA 98 Senior Bond Claims (FGIC) (Class 8), and HTA 98 Bond Claims (National) (Class 9)—Tax Treatment of Exchange*."

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan, including Cash received as Consummation Costs and HTA PSA Restriction Fee.

## C.  Non-P.R. Holders

### 1.      Definition of Non-P.R. Holders

Unless otherwise noted, the discussion below applies only to Non-P.R. Holders.  As used herein, the term "Non-P.R. Holder" means a beneficial owner of HTA Bonds, or New HTA Bonds that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds HTA Bonds, or New HTA Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan to Non-P.R. Holders.  This discussion does not include any non-Puerto Rico tax considerations.  Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the Plan under their individual circumstances.

### 2.      Tax Treatment of Exchange

A Non-P.R. Holder that is not engaged in trade or business in Puerto Rico would not be subject to Puerto Rico income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the HTA Plan, including any amount allocated to accrued and unpaid interest.  On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for income tax purposes will be subject to Puerto Rico income tax as a P.R. Holder on any such gain if it is effectively connected with their Puerto Rico trade or business.

### 3.      Taxation of New HTA Bonds

#### (a)      Treatment of Interest

Interest paid or accrued on a New HTA Bond to a Non-P.R. Holder will not be subject to Puerto Rico income tax, including the alternate basic tax.  The excess of the principal amount of the New HTA Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the New HTA Bonds may be disallowed.

**(b)      Sale, Retirement or Other Disposition of New HTA Bonds**

Gain realized on the sale, retirement or other disposition of a New HTA Bond by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico will not be subject to Puerto Rico income tax, by way of withholding or otherwise.  On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business in the same manner as a P.R. Holder.  In addition, a corporation may be subject to a branch profits tax with respect to such effectively connected income.

[*Remainder of Page Left Intentionally Blank*]

## XI.   Applicability of Certain Federal and State Securities Laws

### A.   New HTA Bonds

#### 1.   Registration of Securities

In general, securities issued by Reorganized HTA such as the New HTA Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to governmental entities such as Reorganized HTA under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III ~~Cases~~Case pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor. Since obligations of the HTA are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized HTA although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code.  The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom.  Creditors of the Debtors who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to Reorganized HTA under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities.  Therefore, each trust indenture, ordinance, resolution and other written actions of HTA or Reorganized HTA relating to the New HTA Bonds will be exempt from qualification under section 304(a)(4) of the TIA.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors.  Such exemptions generally are expected to be available for subsequent transfers of the New HTA Bonds.

#### 2.   Market Disclosure

#### (a)   Initial Offer and Sale

Although exempt from registration, securities issued by Reorganized HTA are subject to the anti-fraud provisions of federal securities laws.  Sections 10(b) and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the SEC under the Exchange Act generally prohibit fraud in the purchase and sale of securities.  Therefore, each publicly offered sale of a public entity's obligations typically is accompanied by an offering

349

document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principles of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the Debtors and to hypothetical investors in obligations of the Debtors through a disclosure statement such as this Disclosure Statement.

### (b)     Continuing Disclosure

Publicly offered securities of Reorganized HTA generally are subject to the requirements of Rule 15c2-12 under the Exchange Act (the "Rule"), unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as Reorganized HTA.

The delivery of the New HTA Bonds pursuant to the Plan is not covered by the Rule because the New HTA Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

*[Remainder of Page Left Intentionally Blank]*

## XII.    Financial Information and Projections

### A.    Historical Financial Reporting

#### (a)    HTA Financial Statements

In accordance with Rule 15c2-12 of the SEC and in connection with its bond issuances, HTA has covenanted to file within three hundred and five (305) days after the end of each fiscal year, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report (the "HTA Report"), which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness generally found in the Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by HTA are for FY2021. These financial statements were filed by HTA with the MSRB through EMMA on April 1, 2022. The latest HTA Report was published on April 29, 2021 and sets forth unaudited financial information as of June 30, 2020.

The financial statements for FY2021 were audited by Crowe Puerto Rico, PSC. The auditors' report expresses qualified opinions[212][213] because, among other reasons, the Commonwealth has not released the Governmental Accounting Standards Board ("GASB") Pension Expense Report of the Commonwealth's Defined Benefit Pension Plan for the year ended June 30, 2021. Therefore, all pension related amounts included in the financial statements are outdated and may have a significant effect on the financial position and results of operations of HTA. However, as of July 1, 2020, HTA has restated its net deficit, to account for its proportionate share of ERS's pension liability under GASB Statement No. 73 – "Accounting and Financial Reporting for Pensions and Related Assets that are not within the Scope of GASB Statement No. 68, and Amendments to Certain Provisions of GASB Statement No. 67 and 68." The pension information that is required to be disclosed according to U.S. generally accepted accounting principles ("GAAP") has been omitted. However, the auditors noted their opinion on the basic financial statements is not affected by this missing information.

**Late Filing of Financial Reports.** Although HTA has filed all the reports and financial statements required to be filed for prior years, some of these filings have been made after HTA's filing deadline, which is normally May 1.

Below is a brief summary of the filing delays with respect to the audited financial statements for FY2016 and onward.

*Fiscal Year 2020.* On April 29, 2021, HTA gave notice that its audited financial statements would not be filed by the May 1, 2021 deadline. The audited financial statements for FY2020 were filed on December 10, 2021.

---

[212][213]  A qualified opinion is a statement issued after an audit is completed suggesting that the information being provided is limited in scope.

***Fiscal Year 2019.***  On April 29, 2020, HTA gave notice that its audited financial statements would not be filed by the April 30, 2020 deadline.  The audited financial statements for FY2019 were filed on May 19, 2021.

***Fiscal Year 2018.***  The audited financial statements for FY2018 were timely filed on April 30, 2019.

***Fiscal Year 2017.***  On April 30, 2018, HTA gave notice that its audited financial statements would not be filed by the May 1, 2018 deadline.  The audited financial statements for FY2017 were filed on April 9, 2019.

***Fiscal Year 2016.***  On May 1, 2017, HTA gave notice that its audited financial statements for FY2016 would not be filed by the May 1, 2017 deadline.  The audited financial statements for FY2016 were filed on May 7, 2018.

### B.    HTA Fiscal Plan and Projections

Attached to this Disclosure Statement as Exhibit D is a copy of the HTA Fiscal Plan, certified by the Oversight Board on February 22, 2022.  The HTA Fiscal Plan provides details regarding HTA's projected operations under the HTA Plan, subject to the assumptions and qualifications set forth in the certified HTA Fiscal Plan.

It is important to note the projections described in the HTA Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of HTA, which are affected by various legal, financial, social, economic, environmental, governmental and political factors.  These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, the Oversight Board, and other third-party entities such as the government of the United States.

The financial projections included in the HTA Fiscal Plan assume the successful implementation of the HTA Plan.  The financial projections included in the HTA Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the HTA Fiscal Plan, and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in the sections titled "Overview of HTA," "HTA Title III Plan of Adjustment," "Certain Risk Factors to Be Considered," "Certain Material United States Federal Income Tax Considerations," "Certain Material Puerto Rico Income Tax Considerations," and "Applicability of Certain Federal and State Securities Laws."

The HTA Fiscal Plan does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization.  Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of HTA, and the information contained herein.

The HTA Fiscal Plan is not a Title III plan of adjustment.  It does not specify classes of claims and treatments.  It neither discharges debts nor extinguishes liens.  In deciding whether to vote to accept or reject the HTA Plan, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

*[Remainder of Page Left Intentionally Blank]*

## XIII.   **Additional Information**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  All Exhibits to the HTA Plan will be filed with the Title III Court and available for review, free of charge, on the Document Website at https://cases.ra.kroll.com/puertorico/ prior to the Voting Deadline.  Copies of all Exhibits to the HTA Plan also may be obtained, free of charge, by contacting the Solicitation Agent, Kroll Restructuring Administration LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@ra.kroll.com and reference "HTA Plan of Adjustment Exhibits" in the subject line.  Please note that Kroll Restructuring Administration LLC is not authorized to provide, and will not provide, legal advice.

## XIV.   **Conclusion**

The Oversight Board and the Debtor believes that the HTA Plan is in the best interests of all creditors and urge the Holders of Impaired Claims entitled to vote on the HTA Plan to vote to accept the HTA Plan and to evidence the acceptance by timely returning their Ballots marked to accept the HTA Plan by the Voting Deadline.