UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>　　as representative of<br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br>　　　　　　　　　　Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS)<br>(Jointly Administered)<br><br>**RE: ECF Nos. 19520, 20541** |

## REPLY IN SUPPORT OF NTT DATA EAS, INC.'S VERIFIED MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

To the Honorable United States District Court Judge Laura Taylor Swain:

NTT DATA Eas, Inc. ("NTT DATA"), by and through the undersigned counsel, files this reply (the "Reply") to *The Commonwealth of Puerto Rico's Objection to Motion of NTT DATA Eas, Inc. for Allowance of Administrative Expense Claim* at ECF No. 20541 (the "Objection") filed by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), on behalf of the Commonwealth of Puerto Rico (the "Commonwealth"), and in further support of its *Verified Motion of NTT DATA Eas, Inc. for Allowance of Administrative Expense* (the "Motion"). In support of this Reply, NTT DATA respectfully states, represents, and alleges as follows:

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

**PRELIMINARY STATEMENT**

1. The Motion seeks an order allowing an administrative claim in favor of NTT DATA for certified invoices 9201000185, 9201000191, 9201000198, 9201000212, and 9201000216 in the total amount of $176,713.20 for the services rendered by NTT DATA to the Environmental Quality Board ("EQB") and/or the Department of Natural and Environment Resources ("DNER") from August 2019 until December 2019 under a certain *Professional Services Contract* executed on September 25, 2018, as amended. As per this Court's decisions in connection with the allowance of administrative expenses, the appropriate inquiry is whether the services provided – here the services provided by NTT DATA to the EQB and/or the DNER – benefited the Debtor (the Commonwealth). *In re Financial Oversight and Management Board for Puerto Rico*, 621 B.R. 289, 301 (D.P.R. 2020), *aff'd,* 7 F.4th 31 (1st Cir. 2021). As NTT DATA demonstrated in its Motion, its post-petition services under the *Professional Services Contract* and the subject of the certified invoices 9201000185, 9201000191, 9201000198, 9201000212, and 9201000216 were specifically contracted and, thus, performed for the benefit of the EQB, the DNER and/or the Commonwealth.

2. In its Objection, the Commonwealth does not dispute that NTT DATA provided the services to the EQB and/or the DNER nor that these services were requested and provided post-petition. Most notably, the Commonwealth does not aver that the Commonwealth did not receive a benefit from these services.

3. Instead, the Commonwealth argues that the Motion should be denied because *some* of the invoiced quantities exceeded the allowed quantities under the *Professional Services Contract*, as amended. As will be shown below, however, the Commonwealth's contention is mistaken for two separate reasons.

2

4. *First*, the third (and final) amendment to the *Professional Services Contract* provided for a five-month extension of the agreement and specifically stated that the DNER would adjust the necessary funding level "to support a continuance of support for the staffing level and hourly rates accorded in the original contract [...] to support the amended period of performance." *See* Amendment [to] the Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014C, **ECF No. 20541-1**, p. 2, Art. XXII (ECF p. 32 of 32). Thus, the maximum contract amount included in the second amendment to the *Professional Services Contract* does not apply to the invoices that are the subject of the Motion.

5. *Second*, this Court has recognized in these Title III proceedings that under Bankruptcy Code § 503(b)(1)(A) the relevant inquiry is the benefit received by the Debtor from the provided services, taking into consideration that the Commonwealth's ability to operate its government post-petition for the benefits to its residents is one of the main aims of PROMESA. *In re Financial Oversight and Management Board for Puerto Rico*, 621 B.R. at 303, *citing, In re Fin. Oversight and Mgmt. Bd. for P.R.*, 432 F.Supp. 3d 25, 30 (D.P.R. 2019). The Commonwealth does not appear to claim that the Debtor did not receive a benefit from these important services specifically undertaken at the direction of the Commonwealth and resulted in a benefit to the estate.

6. In consequence, since the Commonwealth does not dispute that it obtained a benefit from the services provided by NTT DATA and the limits referred to by the Commonwealth are inapplicable, the Motion should be granted.

## ARGUMENT

### I. Facts Relevant to the Motion and the Issues Raised in the Opposition

7. On September 25, 2018, the EQB and NTT DATA executed a *Professional Services Contract* for Fiscal Year 2018-2019 for consulting services. Specifically, NTT DATA

3

was contracted to provide Peoplesoft HCM enhancements and production support to EQB's Peoplesoft applications. NTT DATA had been providing these services to EQB for over a decade. *See* Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014, **ECF No. 20541-1**, p. 11 (ECF p. 11 of 32); Declaration of Rick D. Johnson, **Exhibit 1**, ¶ 3.

8. The *Professional Services Contract* contemplated a maximum billing amount of 4400 billable hours and $445,142.00. *See* Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014, **ECF No. 20541-1**, p. 4, Art. IV (ECF p. 4 of 32). The agreement was amended on three different occasions and all three amendments impacted the maximum billing.

9. In the first amendment, the parties agreed to eliminate the billable hours cap, but retained the maximum monetary value of the contract of $445,142.00. *See* Professional Services Contract Amendment / Fiscal Year 2018-2019, Contract No. 2019-000014A, **ECF No. 20541-1**, p. 2, Art. IV (ECF p. 26 of 32).

10. In the second amendment, the parties agreed on a one-month extension of the *Professional Services Contract*, until July 31, 2019, at an additional cost of $66,000.00 to the contract, for a new maximum billing of $511,142. *See* Amendment [to] the Professional Services Contract Amendment / Fiscal Year 2018-2019, Contract No. 2019-000014B, **ECF No. 20541-1**, Pp. 2-3, Art. IV & XXII (ECF Pp. 29-30 of 32).

11. Amended Article XXII of the second amendment specifically states that "[t]hese services will be provided under the same terms and conditions in relation of the working hours and compensation accorded in the contract." *See* Amendment [to] the Professional Services Contract Amendment / Fiscal Year 2018-2019, Contract No. 2019-000014B, **ECF No. 20541-1**, p. 3, Art. XXII (ECF p. 30 of 32).

12. In the third amendment, the parties extended the *Professional Services Contract* for **five additional months until December 31, 2019**. Amended Article XXII of the third amendment specifically provides that: "[t]hese services will be provided under the same terms and conditions and continue to apply in correlation to the original contract 2019-000014. **The funding level necessary to support a continuance** of support for the staffing level and hourly rates accorded in the original contract **will be adjusted by the DNER to support the amended period of performance**." *See* Amendment [to] the Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014C, **ECF No. 20541-1**, p. 2, Art. XXII (ECF p. 32 of 32) (emphasis ours).

13. An honest reading of Amended Article XXII of the third amendment *vis a vis* Amended Article XXII of the second amendment reveals that in the third amendment the parties abandoned the invoicing maximum altogether. To this end, notice that Amended Article XXII of the second amendment did not make any reference to the necessity to keep "the funding level necessary to support a continuance […] to support the amended period of performance." There was no need for such language because the second amendment **already included an additional cost of $66,000.00 to cover the one-month extension**. The third amendment, however, specifically required the DNER to support the continued funding, under the original contract's rates, in order to secure the completion of the extended period.

14. Additional confirmation of the above stems from the fact that Amended Article XXII of the third amendment to the *Professional Services Contract* refers to the terms and conditions of the *original contract* – not the second amendment. However, as the Commonwealth recognizes in its Opposition, by then the parties had abandoned both the original billable hours cap and the original maximum invoice amount. The parties simply could not revive these two abandoned caps because they had already been surpassed during the existence of the contract. *See*

5

Declaration of Rick D. Johnson, **Exhibit 1**, ¶¶ 4 & 5; Certification of Payments Issued by the DNER, **ECF No. 20541-2**.

15. Thus, if the parties had intended to continue to be bound by the terms of the second amendment in relation to the billing maximum, they would have specifically referred to these caps. However, they chose not to, because at the time of the third amendment (July 31, 2019), NTT DATA had *almost* reached the invoicing maximum. In fact, by then NTT DATA had already billed $509,280.75 of the total $511,142 provided under the second amendment. *See* Declaration of Rick D. Johnson, **Exhibit 1**, ¶ 4; Certification of Payments Issued by the DNER, **ECF No. 20541-2**. It is a strained and unfair reading of the third amendment to believe that the parties agreed to a five-month extension without a corresponding agreement to pay, especially in light of the fact that the third amendment specifically provides that "**[t]he funding level necessary to support a continuance** of support for the staffing level and hourly rates accorded in the original contract **will be adjusted by the DNER to support the amended period of performance**." This language indicates precisely the opposite of what the Commonwealth claims in its Opposition and shows that the parties specifically agreed that NTT DATA would be paid for the services performed during the extended five-month period.

16. As a result, under the third amendment to the *Professional Services Contract*, NTT DATA continued providing services which benefitted the EQB and/or DNER, and NTT DATA submitted certified invoices 9201000185, 9201000191, 9201000198, 9201000212, and 9201000216 in the total amount of $176,713.20. During the entire period, Debtor continued to accept the benefit of NTT DATA's work, and neither the EQB nor the DNER informed NTT DATA that they would not recognize these invoices because NTT DATA had surpassed the billing maximum. *See* Declaration of **Rick D. Johnson**, Exhibit 1, ¶¶ 6 & 7.

**II.       The Correct Interpretation of the Third Amendment to the *Professional Services Contract* Contradicts the Inclusion of the Maximum Invoicing Clause of the Second Amendment.**

17.   Article 1233 of the Puerto Rico Civil Code applicable to the *Professional Services Contract* states that "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471. This article mandates that courts should enforce the literal sense of a written agreement, unless the words are somehow contrary to the intent of the parties. *Marina Ind. Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 69; 14 Offic. Trans. 86, 94-95 (1983).

18.   Under article 1234 of the Puerto Rico Civil Code, "[i]n order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." 31 L.P.R.A. § 3472.

19.   This Court must analyze the third amendment to the *Professional Services Contract* pursuant to these two articles of the Puerto Rico Civil Code to determine if, as the Commonwealth argues, the parties somehow incorporated into the third amendment the maximum billing provision of the second amendment.

20.   As previously stated, the plain language of the third amendment supports the conclusion that the parties did not include the maximum billing limits of the second amendment. *First*, the third amendment does *not* mention the second amendment, but the original contract, which contained a billing cap already abandoned by the parties. *Second*, Amended Article XXII of the third amendment specifically requires the DNER to secure that "**[t]he funding level necessary to support a continuance** of support for the staffing level and hourly rates accorded in the original contract **will be adjusted by the DNER to support the amended period of**

7

**performance**." *See* Amendment [to] the Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014C, **ECF No. 20541-1**, p. 2, Art. XXII (ECF p. 32 of 32) (emphasis ours). Therefore, the third amendment to the <u>Professional Services Contract</u> leaves no doubt that the parties did not include in it the maximum billing provisions but, rather, operated with the full expectation and agreement that NTT DATA would be paid for its work during the period of the extension "as necessary to support continuation of support for the staffing level and hourly rates according in the original contract." In fact, the third amendment specifically provides as such, stating that the funding level would be adjusted to pay for such during the amended period of performance. Any other reading that seeks to import some maximum billing cap previously abandoned by the prior amendment runs contrary to the express language that the funding level would be adjusted to pay for such continued support for the staffing level and hourly rates during the extended period and would make no sense in light of the fact that at the time of the third amendment NTT DATA had already billed $509,280.75 of the total $511,142 provided under the second amendment.

21. Even if this Court were to understand that the plain language of the third amendment to the <u>Professional Services Contract</u> is not clear, the acts of the parties contemporaneous and subsequent to the contract reveal that they never intended for this amendment to include the maximum billing provisions of the second amendment and thus would have required NTT DATA to provide months of services without any compensation. *First*, at the time of the signature of the third amendment – July 31, 2019 – NTT DATA had already submitted invoices in the amount of $509,280.75 of the total $511,142 provided under the second amendment (very close to the maximum invoicing amount contemplated in the second amendment). *See* Declaration of Rick D. Johnson**, Exhibit 1**, ¶ 4; Certification of Payments Issued by the DNER,

8

**ECF No. 20541-2**. NTT DATA would have not subjected five months of additional work to a limited renumeration of less than $2,000.00, and neither the EQB nor the DNER required it. *See* Declaration of Rick D. Johnson, **Exhibit 1**, ¶ 8; Certification of Payments Issued by the DNER, **ECF No. 20541-2**. *Second*, subsequent to the third amendment, NTT DATA submitted five invoices to the EQB/DNER, in connection with each of the additional five months of work that were contracted. Neither the EQB nor the DNER objected any of these invoices on the basis they surpassed the contracted amounts or on any basis whatsoever. *See* Declaration of Rick D. Johnson, **Exhibit 1**, ¶¶ 6-7. Rather, the EQB and the DNER continued to accept services from NTT DATA, never raising an issue at the time regarding the amounts invoiced by NTT DATA despite the fact that the invoices make clear that NTT DATA operated with the expectation of payment.

22. Therefore, the Commonwealth's contention that certified invoices 9201000185, 9201000191, 9201000198, 9201000212, and 9201000216 should not be afforded administrative expense treatment because NTT DATA surpassed the billing maximum is mistaken. The Commonwealth's position is derived from an incorrect interpretation of the third amendment to the *Professional Services Contract* that is not supported by articles 1233 and 1234 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 3471 & 3472.

### III. The Services Provided by NTT DATA Should be Afforded Administrative Expense Priority

23. Congress enacted PROMESA in response to a "fiscal emergency in Puerto Rico," resulting in the Commonwealth being "unable to provide its citizens with effective services." 48 U.S.C. § 2194(m)(1)-(2). Congress incorporated Section 507(a)(2) of the Bankruptcy Code to PROMESA because, "without an assurance of priority, third parties, like [NTT DATA], entering contracts with Puerto Rico's instrumentalities, like [the DoH], have no guarantee their claims to

9

payment will be paid." *In re Financial Oversight and Management Board for Puerto Rico*, 7 F.4th at 38-39.

24. The Bankruptcy Code provides that "the actual, necessary costs and expenses of preserving the estate" are characterized as administrative expenses and are entitled to priority. 11 U.S.C. §§ 503 and 507. Administrative priority is given as an inducement to engage in business transactions with a debtor's estate. *Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416, reh'g denied, 983 F.2d 1060 (5th Cir. 1993). Administrative expense treatment is available under Section 503 of the Bankruptcy Code when (i) the right to payment arises post-petition and (ii) the consideration supporting the right to payment benefited the estate (or, in this case, the Debtor). *In re Financial Oversight and Management Board for Puerto Rico*, 621 B.R. at 301; *see also, In re Hemingway Transport, Inc.,* 954 F.2d 1, 5 (1st Cir. 1992). This is the appropriate standard for determining whether a claim is entitled to administrative priority, and in this case, there can be no doubt that the amounts requested by NTT DATA in the Motion satisfy this test.

25. In its Opposition, the Commonwealth did not argue that it did not receive a benefit from the services performed by NTT DATA nor that they were not performed post-petition. Instead, the Commonwealth attempts to avoid the clear application of the appropriate analysis provided by Section 503 of the Bankruptcy Code and argues that the invoices submitted by NTT DATA in connection to these services (certified invoices 9201000185, 9201000191, 9201000198, 9201000212, and 9201000216 in the total amount of $176,713.20) surpassed the maximum billing provisions of the second amendment to the *Professional Services Contract*. As previously shown above, this argument is meritless in light of the language of the third amendment, and the third amendment, in fact, does not support denial of the Motion. Moreover, and in any event, the Commonwealth's contention set forth in its response would import additional requirements into

10

Section 503 of the Bankruptcy Code and would have the Court disregard the real inquiry, which is whether or not NTT DATA's services underlying the certified invoices at issue in the Motion benefitted the estate. NTT DATA agreed to the third amendment to the *Professional Services Contract* and continued to provide important services to the estate post-petition, which were requested and accepted by the Commonwealth for months. These services benefitted the estate, which the Commonwealth does not appear to seriously dispute. Under the applicable, well-recognized standards of 11 U.S.C. §503(b), NTT DATA is entitled to payment for such services, and the Motion should be granted.

### IV. The Services Performed by NTT DATA Merit Administrative Expense Treatment Under the Fundamental Fairness Exception

26. Finally, the Commonwealth argues that the fundamental fairness exception established by the Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471 (1968), does not apply to the Motion because NTT DATA failed to comply with the *Professional Services Contract*, as amended.

27. Nevertheless, NTT DATA did not breach the *Professional Services Contract*, as amended. Rather, it was the EQB and/or the DNER who breached the agreement by failing to make the payments under the *Professional Services Contract*.

28. Thus, assuming *arguendo* that this Court considers that the requirements of Section 503 are not met, which is denied, this Court can still grant NTT DATA's request under the doctrine of "fundamental fairness" adopted by the Supreme Court in *Reading*. In fact, the *Reading* doctrine was recently recognized by this Court (citing the Bankruptcy Appellate Panel for the First Circuit in the case of *In re Healthco International Inc.*, 272 B.R. 510 (BAP 1st Cir. 2002), *aff'd.*, 310 F3d 9 (1st Cir. 2002)).

11

29. Considering the equities, and even if the Court considers that there was not a direct benefit to the estate (which NTT DATA denies), NTT DATA is entitled to receive compensation for the expenses it incurred at the request of the Debtor. NTT DATA's claim set forth in the Motion arises from a post-petition contract, and the EQB's and DNER's failure to comply with the same violates applicable law to NTT DATA's detriment. The Debtor requested the contract extension and agreed that "**[t]he funding level necessary to support a continuance** of support for the staffing level and hourly rates accorded in the original contract **will be adjusted by the DNER to support the amended period of performance**." *See* Amendment [to] the Professional Services Contract / Fiscal Year 2018-2019, Contract No. 2019-000014C, **ECF No. 20541-1**, p. 2, Art. XXII (ECF p. 32 of 32) (emphasis ours). The Commonwealth was invoiced for these services and continued to receive the benefit of these services even after being invoiced. To allow the Commonwealth to now avoid paying NTT DATA would violate "fundamental fairness" and result in an injustice to NTT DATA. As a result, for this additional reason, the Motion should be granted.

WHEREFORE NTT DATA respectfully requests the Court (i) overrule the Objection, (ii) enter an order granting the Motion, and (iii) enter any other relief as is just and proper.

**Respectfully submitted.**

In Guaynabo, Puerto Rico, on June 20, 2022.

          **ARROYO & RIOS LAW OFFICES, P.S.C.**
          PMB 688
          1353 Ave. Luis Vigoreaux
          Guaynabo, P.R. 00966
          Tel.: (787) 522-8080
          Fax: (787) 523-5696
          E-mail: mrios@arroyorioslaw.com

          *s/ Moraima S. Ríos Robles*
          Moraima S. Ríos Robles
          USDC-PR No. 224912

                *s/ Jessica A. Figueroa-Arce*
                Jessica A. Figueroa-Arce
                USDC-PR No. 225206

**CERTIFICATE OF SERVICE**

      I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice electronically to all counsel of record, and will provide hard copies to the Court and United States Trustee as soon as practical after the filing of the foregoing, consistent with the Court's Sixteenth Amended Case Management Order. *See* Docket No. 20190-1.

      Dated: June 20, 2021.

                *s/ Moraima S. Ríos Robles*
                Moraima S. Ríos Robles
                USDC-PR No. 224912