# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

**LIMITED OBJECTION OF THE HTA INSURED BONDHOLDER GROUP TO THE THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("**PBA**") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Franklin Advisers, Inc. and Nuveen Asset Management (collectively, the "**HTA Insured Bondholder Group**"), by and through their undersigned counsel, hereby submit this limited objection (the "**Limited Objection**") to confirmation of the *Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* (the "**Plan**") [Dkt. No. 1240].[1] In support of the Limited Objection, the HTA Insured Bondholder Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The HTA Insured Bondholder Group collectively holds more than $145 million of Assured Insured Bonds issued by the Debtor, approximately $159 million of which (the "**Premium Bonds**") include approximately $13.6 million of unamortized premium since their issuance at a premium in March 2007.[2] The HTA Insured Bondholder Group is supportive of the Plan and of the Debtor's overall restructuring. However, the Plan cannot be confirmed as drafted because it (i) impermissibly modifies contractual obligations of Assured, a non-debtor, to the beneficial holders of the Assured Insured Bonds (or to the fiscal agent for the bonds, on such beneficial holders' behalf), and (ii) impermissibly releases certain of Assured's contractual obligations without satisfying the exacting standard for granting third-party releases in the First Circuit.

## BACKGROUND

2. In each public offering of the Assured Insured Bonds, buyers of the bonds were provided with a form of insurance policy by which Assured insured the timely repayment of the bonds in the event HTA did not provide the fiscal agent with sufficient funds to pay the bonds

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2] The HTA Insured Bondholder Group intends to file a Rule 2019 Statement imminently.

when Due for Payment (as defined in the Assured Insurance Policies).[3] Certain of the Assured Insured Bonds (the Premium Bonds) were issued with an original issue premium.[4] Thus, while bondholders paid HTA up to 115% of the face amount of each Premium Bond upon their issuance in 2007, such premium has only been paid down to some lower amount – perhaps 105% for a bond that is two-thirds of the way to its scheduled maturity – through the application of a portion of each semiannual interest payment made by HTA (or paid by Assured once HTA stopped paying debt service on its bonds) as amortization of principal.

3. The Assured Insured Bonds benefit from insurance policies issued by Assured Guaranty Corporation and Financial Security Assurance Inc. (the "**Assured Insurance Policies**"). The Assured Insurance Policies provide that if the Debtor does not satisfy its obligations on account of the Assured Insured Bonds, "Assured Guaranty will make such Insured Payments [of principal and interest] to the Trustee on the later to occur of (i) the date applicable principal or interest becomes Due for Payment, or (ii) the Business Day next following the day on which Assured Guaranty shall have Received a completed notice of claim . . ."[5]

4. "Due for Payment" is defined in the Assured Insurance Policies as "the stated maturity date [of the bond], or the date on which such Bond shall have been duly called for mandatory sinking fund redemption, and does not refer to any earlier date on which payment is

---

[3] Official Statement for certain HTA Bonds (the "**Official Statement**"), Feb. 15, 2007, at Appendix XII, *available at:* https://emma.msrb.org/MS257006-MS232314-MD452964.pdf.

[4] Official Statement at 54-55.

[5] Official Statement at Appendix XII. The Financial Security Assurance Inc. insurance policy, attached to the Official Statement as Appendix X, contains nearly identical language: "On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security."

due by reason of a call for redemption (other than by mandatory sinking fund redemption), acceleration or other advance of maturity (unless Assured Guaranty in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date) and means, when referring to interest on a Bond, the stated date for payment of such interest."[6] The HTA bond resolution dated as of February 26, 1998 (the "**1998 Resolution**") and HTA bond resolution dated as of June 13, 1968 (the "**1968 Resolution**," and together with the 1998 Resolution, the "**Bond Resolutions**") contain no events of default, and do not provide for the maturities of the Assured Insured Bonds to be accelerated, whether upon a bankruptcy filing or otherwise.[7] Accordingly, contrary to what might occur with bonds governed by indentures with acceleration provisions, the maturity of the Assured Insured Bonds was not accelerated as a result of the Debtor's Title III filing.

5. The Plan provides Assured with the option to make the Assured Election, and pay certain Assured Insured Bonds in full, in cash, on the HTA Effective Date. Plan at 54. With respect to the remaining Assured Insured Bonds, Assured Insured Bondholders may choose between Assured Bondholder Election 1 – to receive from Assured the applicable Assured Acceleration Price on the HTA Effective Date – or Assured Bondholder Election 2 – to opt into a custodial trust established by Assured that will include as its assets the applicable Assured Insurance Policy, the legacy Assured Insured Bonds (canceled as to any HTA obligation to pay bondholders), and any applicable Plan distributions. Plan at 54-55.

6. Therefore, holders of the Assured Insured Bonds can elect to be paid in cash now (Election 1), or to maintain the status quo and continue to hold their Assured Insured Bonds and

---

[6] Official Statement at Appendix XII.

[7] Official Statement at 30 ("Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.").

3

maintain their existing rights with respect to the Assured Insurance Policies (Election 2). However, despite the appearance of two distinct election options, in both cases the maturity of the Assured Insured Bonds will be "accelerated from and after the HTA Effective Date." Plan at 55; *see also* proposed Order and Judgment Confirming Third Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority (the "**Confirmation Order**") [Dkt. No. 1278] at ¶ 26(a).

7. With respect to Election 2, the Plan also provides Assured with the unfettered ability to prepay the Assured Insured Bonds at any time with 30 days' written notice.[8] The amount payable by Assured is described in the Plan as "the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon . . . to the date of payment." Plan at 55; *see also* Confirmation Order at ¶ 26.; Assured Custodial Trust Documents, Standard Terms to Trust Agreement ("**Assured Trust Agreement**"), Plan Supplement, Exh. E at Section 3.03(a) (implementing acceleration option).[9]

8. The Plan further provides that "[p]ayment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond . . . shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond" (the "**Assured Release**").[10] Plan at 55; *see also* Assured Trust Agreement, Section 3.03(b) (repeating

---

[8] "[I]n the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' prior written notice to the relevant holders." Plan at 55.

[9] *See also* Sections 3.04 and 3.05 of the Assured Trust Agreement, which impermissibly allow for partial reductions in the outstanding principal amount of the Assured Insured Bonds prior to their stated maturity date. These partial prepayments may be funded, by among other things, proceeds from discretionary sales made at the direction of Assured of the restructured bonds issued in exchange for Assured Legacy Bonds.

[10] *See also* Plan at 95 and proposed Confirmation Order at ¶ 42(c) which imply that Assured will not have any liability under the Assured Insurance Policy so long as the Assured Treatment is provided. As explained in this Limited Objection, the Assured Treatment is contrary to the terms of the Assured Insurance Policies as it impermissibly

4

language of Assured Release). The Plan would provide Assured with the Assured Release irrespective of whether Assured pays the Assured Acceleration Price on the HTA Effective Date (as is the case for those series of bonds designated by Assured pursuant to the "Assured Election" or for those bondholders that choose Election 1) or at some later date on 30 days' notice to holders of custodial trust certificates that choose Election 2. Either Election made by Assured or an Assured Insured Bondholder ultimately permits Assured to pay the Assured Acceleration Price, which extra-contractual acceleration of Assured's obligations to its policyholders serves as the pretext for asking this Court to grant the Assured Release.

## **LIMITED OBJECTION**

9. The Plan cannot be confirmed with respect to the Assured Insured Bonds for three reasons. *First*, the Plan contains the Assured Release, an impermissible third-party release that purports to release Assured of further liability under the Assured Insurance Policies without satisfying the exacting standard required in the First Circuit. *Second*, the Plan purports to accelerate the maturity of Assured Insured Bonds as of the HTA Effective Date, where the underlying bond documents allow for no such acceleration (or any other acceleration). HTA's Title III filing should not effect any acceleration that is not provided in the contractual documents, and any reliance on bankruptcy cases discussing "acceleration," which often represents shorthand for a creditor's right to liquidate amounts asserted on proofs of claim to "accelerate" such claims as of the petition date or for other limited purposes, is inapplicable to acceleration of Assured's obligations to its insured bondholders.[11] *Third*, the Plan further purports to unilaterally modify Assured's obligations under the Assured Insurance Policies, which are agreements between

---

modifies Assured's obligation to pay scheduled interest payments through the scheduled maturity of the Insured Bonds.

[11] *See infra* n.15.

Assured and bondholders (or their fiscal agent) – non-debtors – and cannot be so modified by this Court.

I. *The Assured Release is Not Permissible under Applicable First Circuit Precedent*

10. The Assured Release is an impermissible third-party release which purports to release the claims of holders of Assured Insured Bonds against Assured pursuant to the Assured Insurance Policies. The Debtor has not satisfied the high standard for granting such a non-consensual third-party release.[12]

11. Courts in the First Circuit have permitted third-party releases only in limited instances, noting that while courts have jurisdiction to permit such releases, "such jurisdiction should be exercised with restraint and in extraordinary circumstances." *See In re Grove Instruments, Inc.*, 573 B.R. 307, 313-14 (Bankr. D. Mass. 2017); *In re Charles St. African Methodist Episcopal* Church of Bos., 499 B.R. 66, 100–03 (Bankr. D. Mass. 2013) (finding jurisdiction and authority to enter an order releasing third-party claims); *In re Quincy Med. Ctr., Inc.*, No. 11-16394, 2011 WL 5592907, at *2–4 (Bankr. D. Mass. Nov. 16, 2011) (finding that court had jurisdiction to approve third-party releases but requiring consent as a prerequisite for doing so); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 297–303 (Bankr. D. Mass. 2002) (recognizing court authority for approving third-party releases but declining to do so after applying *Master Mortgage* factors); *In re Boston Harbor Marina Co.*, 157 B.R. 726, 730-32 (Bankr. D. Mass. 1993) (holding that court had jurisdiction to approve third-party releases but declining to do so because the recipients directly contributed nothing to the plan). The First Circuit itself has not

---

[12] The HTA Insured Bondholder Group does not object to inclusion of third-party releases in the Plan as a general matter, and does not object to the release that Assured will receive as a Released Party from Releasing Parties under the Plan so long as the remainder of the Plan makes clear that such release does not modify or absolve Assured from its obligations under the Assured Insurance Policies. The HTA Insured Bondholder Group solely objects to the inclusion of the additional Assured Release as improper given the facts and circumstances of this case.

6

directly ruled on the appropriateness of third-party releases. *See In re Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 983–84 (1st Cir. 1995) (taking no position on acceptability of third-party releases but barring certain claims against third parties pursuant to injunction provisions in a confirmed plan of reorganization).

12. This Court has previously granted *consensual* third-party releases as part of COFINA's plan of reorganization, applying the *Master Mortgage* factors and relying on (i) substantial creditor approval of (and thereby consent to) the proposed releases, and (ii) the significant contributions of the two non-debtors who would be the subject of the releases to the plan. *In re Financial Oversight and Management Board for Puerto* Rico, 361 F.Supp.3d 203, 254-55 (D.P.R. 2019).

13. Applying the *Master Mortgage* factors here, it is clear that the standard has not been satisfied. The *Master Mortgage* factors are: (1) whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is one against the debtor and will deplete the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction [or release] is essential to the reorganization; (4) the affected classes have voted in favor of the plan; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction [or release]. *In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 369-70 (Bankr. D. Ma. 2005) (setting forth factors identified in *Master Mortgage* for granting third-party releases).

14. It is clear that the first *Master Mortgage* factor has not been satisfied, as there is no identity of interest between the Debtor and Assured. The Assured Insurance Policies do not provide Assured with any rights of indemnification or contribution against the Debtor that would justify providing Assured with a third-party release. While Assured may have rights of

subrogation to the rights of the Assured Insured Bondholders upon Assured's payments to such bondholders under the Assured Insurance Policies, when such subrogation rights are triggered it would put Assured in the shoes of the very bondholders who would be compelled to give the Assured Release. Accordingly, any rights of subrogation do not create an identity of interest between Assured and the Debtor, but rather would allow Assured to assume greater rights *as against the Debtor*.

15. The second *Master Mortgage* factor is likewise not satisfied. While Assured is *receiving* significant consideration pursuant to the Plan in the form of a $39 million structuring fee, Plan at 82, Assured is not making any direct contributions under the Plan that merit such a release. Assured may contend that it has voted in favor of the Plan, as it must do pursuant to the HTA/CCDA Plan Support Agreement to preserve its $39 million windfall. But submitting votes does not equate to any value, much less the significant and direct value a third-party must provide to receive a non-consensual third-party release within the First Circuit. *See In re Financial Oversight and Management Board for Puerto* Rico, 361 F.Supp.3d at 254-55 (D.P.R. 2019) (finding funding expenses necessary to facilitate negotiation of the plan and waiving an ability to assert a charging lien to facilitate plan distributions to be substantial contributions meriting a third-party release); *see also In re Master Mortg. Inv. Fund, Inc.* 168 B.R. 930, 937-38 (Bankr. W.D. Miss. 1994) (finding contribution consisting of releasing claims and collateral which allowed for a distribution to be made to other creditors to be a sufficiently substantial and direct contribution).

16. Similarly, the third *Master Mortgage* factor is not satisfied, as the Assured Release is not essential to the Plan nor to the Debtor's reorganization. The Plan effects a restructuring of HTA's liabilities, and neither the Plan nor PROMESA are designed to promote a restructuring of the time, method, or form of payment Assured may provide under its insurance policies. By

8

allowing Assured Insured Bondholders to opt for Election 2 and participate in the Assured Trust, the Plan conceals its effect on Assured's obligations under the Assured Insurance Policies. The discrete but important modification to the Assured Insurance Policies, which would allow Assured to pay the Assured Acceleration Price and receive the Assured Release at any time, is designed to benefit Assured at the expense of the Assured Insured Bondholders and serves no broader purpose in HTA's restructuring.

17. The fourth *Master Mortgage* factor is arguably inapplicable or not satisfied here, as Assured will vote on behalf of the holders of the Assured Insured Bonds, and will presumably vote in favor of the Plan as required by the HTA/CCDA Plan Support Agreement. *See* Disclosure Statement for the Third Amended Title III Plan of Adjustment for the Puerto Rico Highways and Transportation Authority (the "**Disclosure Statement**") [Dkt. No. 1241] at 210-15 ("Assured is entitled to vote to accept or reject the HTA Plan on account of Allowed HTA [68/98] [Sub/Senior] Bond Claims (Assured)."); HTA/CCDA Plan Support Agreement, Disclosure Statement Exh. B, at 39-40 (setting forth obligations of Assured and other parties to the HTA/CCDA Plan Support Agreement to vote to accept the Plan). The parties who will be harmed by the release of their claims against Assured will not be permitted to vote to accept or reject the Plan. A third-party release cannot be considered consensual where the third-party votes on behalf of direct creditors in favor of releasing itself and creditors have no ability to opt-out of the release.

18. Finally, the fifth *Master Mortgage* factor cannot be satisfied, as the Plan does not provide for payment of all of the Assured Insured Bondholders' claims. With respect to the Premium Bonds and other bonds within Class 7, the Disclosure Statement indicates that Assured Insured Bondholders will receive a Projected Fixed Recovery from HTA of approximately 22% on account of their Assured Insured Bonds. Disclosure Statement at 213. Furthermore, the Plan

is intentionally structured to deprive the bondholders of the full extent of their claims by allowing Assured to prepay the Assured Insured Bonds before their maturity and without any compensation for the unamortized premium associated with the Premium Bonds which they are contractually entitled to recover from Assured through its insurance of scheduled interest payments through the stated maturity date of the Assured Insured Bonds.[13]

II. *The Assured Insured Bonds Have Not Been, and Cannot Be, Accelerated*

19. The Plan purports (without any explanation) to accelerate the maturity of the Assured Insured Bonds as of the HTA Effective Date, in contravention to the plain language of the applicable bond documents. The maturity of the Assured Insured Bonds has not been and cannot be accelerated. The terms of issuance for the Assured Insured Bonds are clear that the bonds are not subject to acceleration or redemption prior to maturity. The Official Statement for the Assured Insured Bonds states that the Assured Insured Bonds "are not subject to redemption at the option of the Authority" and that "[n]either the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds."[14] Thus, although Section 26.1(d) of the Plan provides (again without explanation) that "on the HTA Effective Date, HTA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds," such

---

[13] While the Plan (at 95) and proposed Confirmation Order (at ¶ 42(c)) purport to provide that nothing in the Plan shall "release or exculpate, any payment obligation under the applicable . . . Assured Insurance Policy", such carve-out from only applies "to the extent of any failure of such holder to receive the . . . Assured Treatment." As demonstrated herein, the Assured Treatment is inconsistent with Assured's payment obligations under the Assured Insurance Policies. Accordingly, this carve-out is illusory and even these more general exculpation provisions are objectionable so long as the Assured Treatment is not revised to be consistent with Assured's contractual obligations.

[14] Official Statement at 13, 30.

assignment, even if valid, is an assignment of nothing as HTA has no right to redeem and call the Assured Insured bonds.[15]

20. Likewise, the maturity of the Assured Insured Bonds has not been and cannot be accelerated with respect to Assured's corresponding obligations under the Assured Insurance Policies. The Assured Insurance Policies are clear that Assured only makes payments to the holders of Assured Insured Bonds when the bonds are "Due for Payment." As noted above, Due for Payment is defined as, with respect to principal payments, on "the stated maturity thereof" and not on "any earlier date on which payment is due by reason of call for redemption, . . . acceleration or other advancement of maturity (unless Assured Guaranty in its sole discretion elects to make any principal payment, in whole or in part, on such earlier date)," and with respect to interest, "the stated date for payment of such interest."[16]

---

[15] The HTA Insured Bondholder Group expects that the Debtor and/or Assured will argue that the Assured Insured Bonds automatically accelerated as a result of the Debtor's Title III filing. However, existing case law discussing the automatic acceleration of debts upon a bankruptcy filing largely addresses debt instruments where a bankruptcy filing was an event of default, as was not the case here, or cases discussing whether a prepayment premium is due as a result of acceleration upon a bankruptcy filing. *See, e.g., Petroleum & Franchise Funding, LLC v. Dhaliwal*, 688 F.Supp.2d 844, 848-49 (E.D. Wis. 2010) (finding that funded debt automatically accelerated by virtue of bankruptcy filing for purposes of determining whether prepayment fee was due, underlying bond documents allowed creditors to accelerate bonds upon occurrence of an event of default); *In re Ridgewood Apartments of DeKalb County, Ltd.*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) (finding automatic acceleration of debt upon bankruptcy filing for purposes of determining whether prepayment penalty was due). Furthermore, these cases fail to acknowledge the distinction between an "automatic acceleration effectuated by the Bankruptcy Code and an automatic acceleration effectuated by a contractual provision. The automatic acceleration of a debt under the Bankruptcy Code allows a lender to file a proof of claim for the unmatured principal amount of debt under § 502(b) without violating the automatic stay, but such acceleration is relatively limited and does not change the maturity date of the debt." *In re Premier Entertainment Biloxi LLC*, 445 B.R. 582, 630-31 (Bankr. S.D. Miss. 2010). Where a bankruptcy filing is *not an event of default*, and the underlying bond documents provided that the maturity of the bonds cannot be accelerated, any automatic acceleration under the Bankruptcy Code solely serves to crystallize a claim amount for the purposes of filing a proof of claim. The Debtor and/or Assured may rely on acceleration language provided in other Title III plans of adjustment or on cases such as *Oppenheimer*, where the court noted that municipal bonds automatically accelerated by virtue of the debtor's bankruptcy filing for the purposes of enforcing an insurance policy, but it is not clear that this issue was squarely in front of the *Oppenheimer* court or litigated in any other Title III cases. *Oppenheimer AMT-Free Municipals v. ACA Financial Guar. Corp.*, 110 A.D.3d 280, 283-84 (Sup. Ct. N.Y. 2013). Thus, any such argument should not be persuasive here.

[16] Official Statement at Appendix XII.

11

21.     The Assured Insured Bonds are not subject to acceleration or redemption, and no other "advancement of maturity" has taken place. To the extent that there is any ambiguity in the terms of the Assured Insurance Policies on this point (and there is not), "any ambiguity must be construed in favor of the insured and against the insurer" under New York law, which governs the Assured Insurance Policies. *Oppenheimer AMT-Free Municipals,* 110 A.D.3d at 284-85 (Sup. Ct. N.Y. 2013). The Assured Insured Bonds did not accelerate by virtue of the Debtor's Title III filing, and as set forth in the following section, regardless of whether the maturity of the Assured Insured Bonds was accelerated for certain limited purposes such as the filing of a proof of claim, the Plan cannot be used to strip Assured's obligations under its own insurance policies.[17]

III.     *The Plan Cannot Modify the Assured Insurance Policies*

22.     Through the Assured Release, the definition of Assured Acceleration Price, and the provision allowing Assured to prepay the Assured Insured Bonds with 30 days' notice, the Plan also purports to modify Assured's obligations under the Assured Insurance Policies, which are agreements between Assured and the fiscal agent on behalf of the Assured Insured Bondholders. The Bankruptcy Code does not permit modifying such a contract between non-debtors. *See In re*

---

[17] Many corporate debt instruments and some municipal debt instruments contain a so-called *ipso facto* clause that provides the principal amount of a bond is accelerated automatically upon the filing of a bankruptcy or other insolvency case by or against the issuer. The bond documents governing the HTA Bonds contain no *ipso facto* clause. Nonetheless, in corporate or municipal restructurings there is sometimes a need to liquidate or otherwise estimate the present value of claims as of the petition date (or some other date) for certain purposes, such as determining the amount of adequate protection (comparing collateral value to claim amount as of petition date), filing a proof of claim (value of a claim as of the petition date), or rejection of a lease (present value of future lease payments as rejection damages). Although a common task in various bankruptcy contexts, these present valuation exercises do not cause an acceleration of the debtor's obligations under the debt unless the underlying contracts provide for such *ipso facto* acceleration. *See In re Premier Biloxi LLC*, 445 B.R. at 630-32 ("The automatic acceleration of a debt under the Bankruptcy Code allows a lender to file a proof of claim for the unmatured principal amount of the debt under § 502 without violating the automatic stay, but such acceleration is relatively limited and does not change the maturity date of the debt.").

*PWS Holding Corp.,* 228 F.3d 224, 245–46 (3d Cir. 2000) ("discharge in bankruptcy does not extinguish claims by third parties against guarantors … for the debt discharged in bankruptcy").

23. Courts have held that the obligations of monoline insurers under similar insurance policies are not discharged or abrogated through confirmation of a Chapter 11 plan. *Oppenheimer AMT-Free Municipals,* 110 A.D.3d at 284-85 ("Neither the restructuring plan, nor the issuer's discharge of debt in the bankruptcy proceeding, changed the obligations under the parties' contracts of insurance."). Absent an express third-party release absolving Assured of liability under the Assured Insurance Policies (which should not be permitted, as set forth above), a plan of reorganization cannot modify Assured's obligations under the underlying insurance policies it issued. *Id.*, at 285.

## **CONCLUSION**

24. The HTA Insured Bondholder Group respectfully requests that the Court not confirm the Plan unless (i) the Assured Release is removed from the Plan, Confirmation Order and Assured Trust Agreement, or the Assured Insured Bondholders are permitted to opt out of the Assured Release prior to the HTA Effective Date, (ii) the Plan, Confirmation Order and Assured Trust Agreement are each revised to remove any finding or provision stating that the Assured Insured Bonds have been or can be accelerated or otherwise prepaid (in whole or in part) prior to their respective stated maturities, and (iii) the Plan, Confirmation Order, and all parties' rights are reserved with respect to the proper interpretation of Assured's obligations and as to the appropriate venue in which such matters should be litigated.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

13

Dated: San Juan, Puerto Rico
      July 27, 2022                                        Resepectfully Submitted,

**TORO COLÓN MULLET P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

/s/ Manuel Fernández-Bared
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204204
E-mail: mfb@tcm.law

/s/ Linette Figueroa-Torres
LINETTE FIGUEROA-TORRES
USDC-PR No. 227104
E-mail: lft@tcm.law

/s/ Nayda Perez-Roman
NAYDA PEREZ-ROMAN
USDC–PR No. 300208
E-mail: nperez@tcm.law

*Counsel for the HTA Insured Bondholder Group*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
2000 K Street NW, 4th Floor
Washington, D.C. 20006
Tel.: (202) 775-4500
Fax: (202) 775-4510

/s/ Matthew M. Madden
MATTHEW M. MADDEN*
Email: mmadden@kramerlevin.com

*Pro Hac Vice Application Forthcoming*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000

DOUGLAS BUCKLEY**
Email: dbuckley@kramerlevin.com

**Admitted Pro Hac Vice*

*Counsel for the HTA Insured Bondholder Group*

14