# Debtor's Ex. 2

# (Part 2 of 2)

# EXHIBIT A

HTA PLAN

HTA_CONF 00012648

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>     Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>     Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

**THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board*

*as Representative for the Debtor in Its Title III Case*

Dated: June 17, 2022

HTA_CONF 00012649

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS

1.1 AAFAF ...............................................................................................................................1
1.2 ACR Order .........................................................................................................................1
1.3 Act 106 ...............................................................................................................................1
1.4 Administrative Claim Bar Date .........................................................................................1
1.5 Administrative Expense Claim ..........................................................................................1
1.6 ADR Order .........................................................................................................................2
1.7 ADR Procedures ................................................................................................................2
1.8 Affiliate ..............................................................................................................................2
1.9 AFICA ...............................................................................................................................2
1.10 Allowed ..............................................................................................................................2
1.11 Allowed Claim ...................................................................................................................2
1.12 Ambac ................................................................................................................................2
1.13 Ambac Acceleration Price .................................................................................................2
1.14 Ambac Action ....................................................................................................................3
1.15 Ambac Bondholder Elections ............................................................................................3
1.16 Ambac Bondholder Election Forms ..................................................................................3
1.17 Ambac Bondholder Notice Form .......................................................................................3
1.18 Ambac Certificates ............................................................................................................3
1.19 Ambac Commutation Consideration ..................................................................................3
1.20 Ambac Commutation Treatment ........................................................................................3
1.21 Ambac CW/HTA Bond Claims .........................................................................................3
1.22 Ambac Election ..................................................................................................................3
1.23 Ambac Election Notice ......................................................................................................3
1.24 Ambac Insured Bond Claims .............................................................................................3
1.25 Ambac Insured Bondholder ...............................................................................................3
1.26 Ambac Insured Bonds ........................................................................................................4
1.27 Ambac Insurance Policies ..................................................................................................4
1.28 Ambac Non-Commutation Treatment ...............................................................................4
1.29 Ambac Plan Consideration ................................................................................................4
1.30 Ambac Treatment ...............................................................................................................4
1.31 Ambac Trust .......................................................................................................................4
1.32 Ambac Trust Assets ...........................................................................................................4
1.33 Appointments Related Litigation .......................................................................................4
1.34 Assets .................................................................................................................................4
1.35 Assured ...............................................................................................................................5
1.36 Assured Acceleration Price ................................................................................................5
1.37 Assured Bondholder Elections ...........................................................................................5
1.38 Assured Bondholder Elections Form .................................................................................5
1.39 Assured CW/HTA Bond Claims ........................................................................................5

i

| | | |
|---|---|---|
| 1.40 | Assured Election | 5 |
| 1.41 | Assured Election Notice | 5 |
| 1.42 | Assured Insurance Policies | 5 |
| 1.43 | Assured Insured Bond Claim | 5 |
| 1.44 | Assured Insured Bondholder | 5 |
| 1.45 | Assured Insured Bonds | 5 |
| 1.46 | Assured New HTA Bonds | 6 |
| 1.47 | Assured Plan Consideration | 6 |
| 1.48 | Assured Treatment | 6 |
| 1.49 | Assured Trust | 6 |
| 1.50 | Avoidance Actions | 6 |
| 1.51 | Avoidance Actions Trust | 6 |
| 1.52 | Avoidance Actions Trust Agreement | 7 |
| 1.53 | Avoidance Actions Trust Board | 7 |
| 1.54 | Avoidance Actions Trustee | 7 |
| 1.55 | Ballot Date | 7 |
| 1.56 | Ballot/Election Form | 7 |
| 1.57 | Bankruptcy Code | 7 |
| 1.58 | Bankruptcy Rules | 7 |
| 1.59 | Bar Date | 7 |
| 1.60 | Bar Date Orders | 7 |
| 1.61 | Business Day | 7 |
| 1.62 | Capital Improvements | 8 |
| 1.63 | Cash | 8 |
| 1.64 | Causes of Action | 8 |
| 1.65 | CCDA | 8 |
| 1.66 | Charging Lien | 8 |
| 1.67 | Claim | 8 |
| 1.68 | Class | 8 |
| 1.69 | Clawback Actions | 8 |
| 1.70 | Clawback CVI Indenture | 9 |
| 1.71 | Clawback CVIs | 9 |
| 1.72 | COFINA | 9 |
| 1.73 | Commonwealth | 9 |
| 1.74 | Commonwealth Confirmation Order | 9 |
| 1.75 | Commonwealth Constitution | 9 |
| 1.76 | Commonwealth Effective Date | 9 |
| 1.77 | Commonwealth Loan | 9 |
| 1.78 | Commonwealth Legislature | 9 |
| 1.79 | Commonwealth Plan | 9 |
| 1.80 | Consummation Costs | 10 |
| 1.81 | Convenience Cap | 10 |
| 1.82 | Convenience Claim | 10 |
| 1.83 | Conversion Date | 10 |
| 1.84 | Creditor | 10 |
| 1.85 | Creditors' Committee | 10 |

HTA_CONF 00012651

| 1.86 | CUSIP | 10 |
|---|---|---|
| 1.87 | Custodial Trust Documents | 10 |
| 1.88 | CVIs | 11 |
| 1.89 | CVI Indenture | 11 |
| 1.90 | CVI Legislation | 11 |
| 1.91 | CW/Convention Center Claim | 11 |
| 1.92 | CW/HTA Claim | 11 |
| 1.93 | CW/HTA Clawback Recovery | 11 |
| 1.94 | CW/MBA Claim | 11 |
| 1.95 | CW/PRIFA Rum Tax Claim | 11 |
| 1.96 | Debt | 12 |
| 1.97 | Debtor | 12 |
| 1.98 | Debt Management Policy | 12 |
| 1.99 | Debt Policy Period | 12 |
| 1.100 | Debt Related Objections | 12 |
| 1.101 | Debt Service Fund | 13 |
| 1.102 | Deemed Issuance Date | 13 |
| 1.103 | Definitive Documents | 13 |
| 1.104 | Disallowed | 13 |
| 1.105 | Disbursing Agent | 13 |
| 1.106 | Disclosure Statement | 13 |
| 1.107 | Disclosure Statement Hearing | 13 |
| 1.108 | Disclosure Statement Order | 14 |
| 1.109 | Disputed Claim | 14 |
| 1.110 | Disputed Funds Stipulation | 14 |
| 1.111 | Distribution Record Date | 14 |
| 1.112 | DRA | 14 |
| 1.113 | DRA Parties | 14 |
| 1.114 | DRA Restriction Fee | 14 |
| 1.115 | DRA Stipulation | 14 |
| 1.116 | Dual-Insured Bond | 15 |
| 1.117 | Eminent Domain/Inverse Condemnation Claim | 15 |
| 1.118 | Eminent Domain Proceeding | 15 |
| 1.119 | Entity | 15 |
| 1.120 | ERS | 15 |
| 1.121 | Executory Contract | 15 |
| 1.122 | Federal Claims | 15 |
| 1.123 | FGIC | 15 |
| 1.124 | FGIC Action | 15 |
| 1.125 | FGIC Certificates | 15 |
| 1.126 | FGIC CW/HTA Bond Claims | 15 |
| 1.127 | FGIC Escrow Account Agreements | 16 |
| 1.128 | FGIC Insured Bond Claims | 16 |
| 1.129 | FGIC Insured Bonds | 16 |
| 1.130 | FGIC Insurance Policies | 16 |
| 1.131 | FGIC Plan Consideration | 16 |

HTA_CONF 00012652

1.132   FGIC Rehabilitation Plan .................................................................................. 16
1.133   FGIC Treatment ................................................................................................. 16
1.134   FGIC Trust ......................................................................................................... 16
1.135   Final Order ......................................................................................................... 16
1.136   Findings of fact and Conclusions of Law ......................................................... 17
1.137   Fiscal Plan .......................................................................................................... 17
1.138   FY ....................................................................................................................... 17
1.139   GDB .................................................................................................................... 17
1.140   GDB/HTA Loans ................................................................................................ 17
1.141   GDB Loan Priority Determination ..................................................................... 17
1.142   GO CVIs ............................................................................................................. 17
1.143   Government Entity .............................................................................................. 18
1.144   Government Parties ............................................................................................. 18
1.145   Government Released Claims .............................................................................. 18
1.146   Government Releasees ......................................................................................... 18
1.147   GUC Recovery Cap ............................................................................................ 18
1.148   GUC Reserve ...................................................................................................... 19
1.149   Highway Assets .................................................................................................. 19
1.150   HTA ..................................................................................................................... 19
1.151   HTA 68 Bond Claim ........................................................................................... 19
1.152   HTA 68 Bond Claim (Ambac) ........................................................................... 19
1.153   HTA 68 Bond Claim (Assured) .......................................................................... 19
1.154   HTA 68 Bond Claim (National) ......................................................................... 19
1.155   HTA 68 Bond Recovery ..................................................................................... 19
1.156   HTA 68 Bonds .................................................................................................... 19
1.157   HTA 98 Bonds .................................................................................................... 20
1.158   HTA 98 Senior Bond Claim ............................................................................... 20
1.159   HTA 98 Senior Bond Claim (Ambac) ................................................................ 20
1.160   HTA 98 Senior Bond Claim (Assured) .............................................................. 20
1.161   HTA 98 Senior Bond Claim (FGIC) .................................................................. 20
1.162   HTA 98 Senior Bond Claim (National) .............................................................. 20
1.163   HTA 98 Senior Bond Recovery .......................................................................... 20
1.164   HTA 98 Senior Bonds ......................................................................................... 21
1.165   HTA 98 Sub Bond Claim .................................................................................... 21
1.166   HTA 98 Sub Bond Claim (Assured) ................................................................... 21
1.167   HTA 98 Sub Bond Claim (FGIC) ....................................................................... 21
1.168   HTA 98 Sub Bond Claim (National) .................................................................. 21
1.169   HTA 98 Sub Bond Recovery .............................................................................. 22
1.170   HTA 98 Sub Bonds ............................................................................................. 22
1.171   HTA Bond Claims ............................................................................................... 22
1.172   HTA Bonds ......................................................................................................... 22
1.173   HTA/CCDA Annex Agreement .......................................................................... 22
1.174   HTA/CCDA Joinder Agreement ......................................................................... 22
1.175   HTA/CCDA Joinder Deadline ............................................................................ 22
1.176   HTA/CCDA Joinder Creditors ........................................................................... 22
1.177   HTA/CCDA Plan Support Agreement ................................................................ 22

iv

1.178   HTA/CCDA PSA Creditors.................................................................22
1.179   HTA/CCDA PSA Restriction Fee Creditors ....................................22
1.180   HTA/CCDA PSA Restriction Fee Period .........................................23
1.181   HTA/CCDA PSA Threshold Attainment...........................................23
1.182   HTA Clawback CVI ...........................................................................23
1.183   HTA Clawback Recovery...................................................................23
1.184   HTA Committee Agreement ..............................................................23
1.185   HTA Confirmation Date ....................................................................23
1.186   HTA Confirmation Hearing...............................................................24
1.187   HTA Confirmation Order ..................................................................24
1.188   HTA Distribution Conditions............................................................24
1.189   HTA Effective Date ...........................................................................24
1.190   HTA Enabling Act .............................................................................24
1.191   HTA Fiscal Agent ..............................................................................24
1.192   HTA Fiscal Plan.................................................................................24
1.193   HTA/GDB Claim ...............................................................................24
1.194   HTA General Unsecured Claim .........................................................24
1.195   HTA GUC Recovery..........................................................................25
1.196   HTA Moscoso Bond Claim ...............................................................25
1.197   HTA Moscoso Bonds .........................................................................25
1.198   HTA Petition Date .............................................................................25
1.199   HTA Plan ...........................................................................................26
1.200   HTA PSA Restriction Fees ................................................................26
1.201   HTA Restriction Fee Percentage .......................................................26
1.202   HTA Title III Case ............................................................................26
1.203   Initial HTA/CCDA PSA Creditors ...................................................26
1.204   Insured HTA Bond Claim .................................................................26
1.205   Invalidity Actions..............................................................................26
1.206   IRC .....................................................................................................26
1.207   IRS .....................................................................................................26
1.208   Late-Filed Claim ...............................................................................26
1.209   Lien ....................................................................................................26
1.210   Lien Challenge Actions.....................................................................27
1.211   Lift Stay Motions ..............................................................................27
1.212   List of Creditors ................................................................................27
1.213   Local Bankruptcy Rules....................................................................27
1.214   MBA ..................................................................................................27
1.215   MFA ...................................................................................................27
1.216   Monolines ..........................................................................................27
1.217   National .............................................................................................27
1.218   National Action .................................................................................27
1.219   National Acceleration Price ..............................................................27
1.220   National Bondholder Election Form ..................................................28
1.221   National Certificates .........................................................................28
1.222   National Commutation Consideration ...............................................28
1.223   National Commutation Treatment .....................................................28

HTA_CONF 00012654

1.224  National CW/HTA Bond Claims ................................................................28
1.225  National Election Notice ..........................................................................28
1.226  National Escrow Account .........................................................................28
1.227  National Escrow Consideration ...............................................................28
1.228  National HTA Consideration ...................................................................28
1.229  National Insurance Policies .....................................................................29
1.230  National Insured Bond Claims .................................................................29
1.231  National Insured Bonds ...........................................................................29
1.232  National Non-Commutation Treatment ....................................................29
1.233  National Plan Consideration ....................................................................29
1.234  National Treatment ..................................................................................29
1.235  National Trust ..........................................................................................29
1.236  National Trust Consideration ...................................................................29
1.237  New HTA Bonds .......................................................................................29
1.238  New HTA Bonds Indenture ......................................................................29
1.239  New HTA Bonds Trustee ..........................................................................29
1.240  New HTA CABs ........................................................................................30
1.241  New HTA CIBs .........................................................................................30
1.242  New HTA Convertible CABs .....................................................................30
1.243  Outstanding .............................................................................................30
1.244  Oversight Board .......................................................................................30
1.245  Partial Disposition ...................................................................................30
1.246  PayGo ......................................................................................................30
1.247  PBA ..........................................................................................................30
1.248  Person ......................................................................................................30
1.249  PFC ..........................................................................................................30
1.250  Plan Supplement ......................................................................................30
1.251  Pledged Revenues ...................................................................................31
1.252  PRASA .....................................................................................................31
1.253  PREPA .....................................................................................................31
1.254  PRIDCO ...................................................................................................31
1.255  PRIFA .......................................................................................................31
1.256  PRITA ......................................................................................................31
1.257  Professional .............................................................................................31
1.258  Professional Claim ...................................................................................31
1.259  PROMESA ...............................................................................................31
1.260  Pro Rata Share ........................................................................................31
1.261  Related Persons .......................................................................................31
1.262  Released Claims .......................................................................................32
1.263  Released Parties ......................................................................................33
1.264  Releasing Parties .....................................................................................33
1.265  Reorganized Commonwealth ...................................................................33
1.266  Reorganized HTA .....................................................................................33
1.267  Reorganized HTA By-Laws ......................................................................33
1.268  SCC Action ..............................................................................................33
1.269  SEC ..........................................................................................................33

HTA_CONF 00012655

1.270   Section 103 Bond Counsel ................................................................. 33
1.271   Section 510(b) Subordinated Claim .................................................... 33
1.272   Secured Obligations ........................................................................... 33
1.273   Securities Act .................................................................................... 33
1.274   SIB Account ...................................................................................... 33
1.275   Solicitation Agent .............................................................................. 33
1.276   Subordinated Indebtedness ................................................................. 33
1.277   Syncora .............................................................................................. 34
1.278   Syncora Acceleration Price ................................................................ 34
1.279   Title III .............................................................................................. 34
1.280   Title III Case ...................................................................................... 34
1.281   Title III Court ..................................................................................... 34
1.282   Toll Facilities ..................................................................................... 34
1.283   Toll Rate Covenant ............................................................................ 34
1.284   Toll Receipts ...................................................................................... 34
1.285   Toll Receipt Fund .............................................................................. 34
1.286   Tolls ................................................................................................... 34
1.287   Transit Assets ..................................................................................... 34
1.288   Trust Documentation .......................................................................... 34
1.289   Trust Estate ........................................................................................ 35
1.290   Unclaimed Distribution ...................................................................... 35
1.291   Underwriter Actions ........................................................................... 35
1.292   Unexpired Lease ................................................................................ 35
1.293   Uniformity Litigation ......................................................................... 35
1.294   UPR .................................................................................................... 35
1.295   Voting Record Date ............................................................................ 35
1.296   Other Definitions ............................................................................... 36
1.297   Rules of Interpretation ....................................................................... 36

## ARTICLE II

### COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES/RETIREE CLAIMS

2.1     Litigation Resolution ......................................................................... 37
2.2     Allowance of Bond Claims ................................................................ 37
2.3     Releases, Injunctions and Exculpation .............................................. 37
2.4     HTA Operational Restructuring .......................................................... 37
2.5     Retiree Claims .................................................................................... 38

## ARTICLE III

### PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

3.1     Administrative Expense Claims ......................................................... 38
3.2     Professional Compensation and Reimbursement Claims .................... 39
3.3     HTA Consummation Costs ................................................................. 39
3.4     HTA Restriction Fee ........................................................................... 39

HTA_CONF 00012656

3.5   DRA Restriction Fee ........................................................................................41
3.6   Non-Severability ............................................................................................41

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1   Claims are classified as follows ....................................................................41

## ARTICLE V

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (CLASS 1)

5.1   Treatment of HTA 68 Bond Claims .................................................................42

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (AMBAC) (CLASS 2)

6.1   Treatment of HTA 68 Bond Claims (Ambac) ..................................................42

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (ASSURED) (CLASS 3)

7.1   Treatment of HTA 68 Bond Claims (Assured) .................................................42

## ARTICLE VIII

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (NATIONAL) (CLASS 4)

8.1   Treatment of HTA 68 Bond Claims (National) ................................................43

## ARTICLE IX

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (CLASS 5)

9.1   Treatment of HTA 98 Senior Bond Claims ......................................................43

## ARTICLE X

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (AMBAC) (CLASS 6)

10.1  Treatment of HTA 98 Senior Bond Claims (Ambac) ......................................43

HTA_CONF 00012657

# ARTICLE XI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (ASSURED) (CLASS 7)

11.1   Treatment of HTA 98 Senior Bond Claims (Assured) ......................................................43

# ARTICLE XII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (FGIC) (CLASS 8)

12.1   Treatment of HTA 98 Senior Bond Claims (FGIC) ...........................................................44

# ARTICLE XIII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (NATIONAL) (CLASS 9)

13.1   Treatment of HTA 98 Senior Bond Claims (National)......................................................44

# ARTICLE XIV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (CLASS 10)

14.1   Treatment of HTA 98 Sub Bond Claims .........................................................................44

# ARTICLE XV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (ASSURED) (CLASS 11)

15.1   Treatment of HTA 98 Sub Bond Claims (Assured).........................................................44

# ARTICLE XVI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (FGIC) (CLASS 12)

16.1   Treatment of HTA 98 Sub Bond Claims (FGIC).............................................................45

# ARTICLE XVII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (NATIONAL) (CLASS 13)

17.1   Treatment of HTA 98 Sub Bond Claims (National)........................................................45

HTA_CONF 00012658

# ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF HTA
## MOSCOSO BOND CLAIMS (CLASS 14)

18.1    Treatment of HTA Moscoso Bond Claims ........................................................................45

# ARTICLE XIX

## PROVISIONS FOR TREATMENT EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 15)

19.1    Treatment of Eminent Domain/Inverse Condemnation Claims........................................45

# ARTICLE XX

## PROVISIONS FOR TREATMENT OF HTA
## GENERAL UNSECURED  CLAIMS (CLASS 16)

20.1    Treatment of HTA General Unsecured Claims ................................................................46
20.2    Limitation on Recovery ...................................................................................................47
20.3    GUC Reserve ...................................................................................................................47

# ARTICLE XXI

## PROVISIONS FOR TREATMENT OF
## HTA/GDB CLAIMS (CLASS 17)

21.1    Treatment of HTA/GDB Claims.......................................................................................47

# ARTICLE XXII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 18)

22.1    Treatment of Section 510(b) Subordinated Claims ..........................................................47

# ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 19)

23.1    Treatment of Convenience Claims.....................................................................................48

# ARTICLE XXIV

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 20)

24.1    Treatment of Federal Claims ............................................................................................48

HTA_CONF 00012659

# ARTICLE XXV

## PROVISIONS REGARDING SECURED OBLIGATIONS
### AND ADDITIONAL INDEBTEDNESS

25.1    Issuance and Distribution of the New HTA Bonds ..................................................48
25.2    Tax-Exempt Treatment of the New HTA Bonds ...................................................52
25.3    Adoption and Maintenance of a Debt Management Policy .............................52

# ARTICLE XXVI

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL
### INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

26.1    Treatment of Assured Insured Bond Claims ..........................................................54
26.2    Treatment of National Insured Bond Claims .......................................................56
26.3    Treatment of FGIC Insured Bond Claims ............................................................59
26.4    Treatment of Ambac Insured Bond Claims .........................................................61
26.5    Fiscal Agent Obligations ...........................................................................................64

# ARTICLE XXVII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

27.1    Rejection or Assumption of Remaining Executory Contracts and Unexpired
       Leases .............................................................................................................................64
27.2    Approval of Rejection or Assumption of Executory Contracts and Unexpired
       Leases .............................................................................................................................65
27.3    Inclusiveness ...............................................................................................................65
27.4    Cure of Defaults .........................................................................................................65
27.5    Insurance Policies ......................................................................................................66
27.6    Rejection Damage Claims .........................................................................................66
27.7    Indemnification and Reimbursement Obligations ...............................................66
27.8    Nonoccurrence of HTA Effective Date .................................................................66
27.9    Reservation of Rights .................................................................................................66
27.10   Collective Bargaining Agreements .........................................................................67

# ARTICLE XXVIII

## PROVISIONS GOVERNING DISTRIBUTIONS

28.1    Time and Manner of Distribution .............................................................................67
28.2    Timeliness of Payments .............................................................................................68
28.3    Distributions by the Disbursing Agent ...................................................................68
28.4    Manner of Payment under the HTA Plan ...............................................................68
28.5    Delivery of Distributions ...........................................................................................68
28.6    Cancellation of Notes, Instruments, Certificates, and Other Documents ..........69
28.7    Undeliverable/Reserved Distributions ...................................................................70
28.8    Withholding and Reporting Requirements ............................................................70

HTA_CONF 00012660

28.9    Time Bar to Cash Payments.....................................................................71
28.10   Distributions After HTA Effective Date....................................................71
28.11   Setoffs .....................................................................................................71
28.12   Allocation of Plan Distributions Between Principal and Interest ...............71
28.13   Payment of Trustee Fees and Expenses ....................................................72
28.14   Beneficial Owner .....................................................................................72
28.15   Value of Distributions..............................................................................73
28.16   Disputed Funds Stipulation.......................................................................73

## ARTICLE XXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTOR

29.1    Prosecution of Claims ...............................................................................74

## ARTICLE XXX

## ACCEPTANCE OR REJECTION OF THE HTA PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

30.1    Impaired Classes to Vote ..........................................................................74
30.2    Acceptance by Class of Creditors .............................................................74
30.3    Cramdown.................................................................................................74

## ARTICLE XXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

31.1    Exculpation ..............................................................................................74
31.2    Powers of the Disbursing Agent ...............................................................75
31.3    Fees and Expenses Incurred From and After the HTA Effective Date...........75

## ARTICLE XXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS AND CLAIMS SUBJECT TO ACR PROCEDURES

32.1    Objections to Claims; Prosecution of Disputed Claims...............................75
32.2    Estimation of Claims.................................................................................76
32.3    Payments and Distributions on Disputed Claims........................................76
32.4    Authority to Amend Lists of Creditors ......................................................77
32.5    Non-Accrual of Interest ............................................................................77
32.6    Disallowance of Claims ............................................................................77
32.7    Claims Subject to ACR Procedures ...........................................................78

xii

HTA_CONF 00012661

# ARTICLE XXXIII

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE HTA PLAN
## AND NOT IMPAIRED BY THE HTA PLAN

33.1   Impaired Classes ................................................................78
33.2   Unimpaired HTA Classes ........................................................78

# ARTICLE XXXIV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE HTA PLAN

34.1   Conditions Precedent to Confirmation of the HTA Plan ..........................79
34.2   Waiver of Conditions Precedent to Confirmation ...............................80

# ARTICLE XXXV

## CONDITIONS PRECEDENT TO THE HTA EFFECTIVE DATE

35.1   Conditions Precedent to the HTA Effective Date ...............................80
35.2   Waiver of Conditions Precedent .............................................83
35.3   Effect of Non-Occurrence of Conditions to HTA Effective Date .................84

# ARTICLE XXXVI

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE HTA PLAN

36.1   Modification of HTA Plan ...................................................84
36.2   Revocation or Withdrawal ...................................................84
36.3   Amendment of Plan Documents ................................................84
36.4   No Admission of Liability ..................................................85

# ARTICLE XXXVII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED HTA

37.1   Corporate Action ...........................................................85
37.2   Amendment of By-Laws .......................................................86
37.3   Directors of Reorganized HTA ...............................................86
37.4   Officers of Reorganized HTA ................................................86

# ARTICLE XXXVIII

## PROVISIONS REGARDING OVERSIGHT BOARD AND
## COMPLIANCE WITH PROMESA

38.1   Effect of Confirmation .....................................................86
38.2   Ongoing Role of the Oversight Board ........................................86
38.3   Preemption of Laws .........................................................86

HTA_CONF 00012662

# ARTICLE XXXIX

## PROVISIONS REGARDING CREDITORS' COMMITTEE

39.1   Dissolution of Creditors' Committee ..................................................................................87

# ARTICLE XL

## RETENTION OF JURISDICTION

40.1   Retention of Jurisdiction ..................................................................................................88

# ARTICLE XLI

## MISCELLANEOUS PROVISIONS

41.1   Title to Assets ..................................................................................................................90
41.2   Discharge and Release of Claims and Causes of Action ..................................................90
41.3   Injunction on Claims ........................................................................................................93
41.4   Integral to HTA Plan ........................................................................................................93
41.5   Releases by the Debtor and Reorganized HTA ................................................................93
41.6   Injunction Related to Releases .........................................................................................94
41.7   Exculpation ......................................................................................................................94
41.8   Appointments Related Litigation/Uniformity Litigation .................................................96
41.9   Bar Order ..........................................................................................................................96
41.10  No Waiver .........................................................................................................................97
41.11  Supplemental Injunction ..................................................................................................97
41.12  Post-Effective Date Fees and Expenses ...........................................................................98
41.13  Securities Act Exemption .................................................................................................98
41.14  Severability ......................................................................................................................98
41.15  Governing Law .................................................................................................................98
41.16  Closing Case .....................................................................................................................99
41.17  Section Headings ..............................................................................................................99
41.18  Inconsistencies .................................................................................................................99
41.19  Document Retention .........................................................................................................99
41.20  Immediate Binding Effect .................................................................................................99
41.21  Additional Documents ....................................................................................................100
41.22  Reservation of Rights .....................................................................................................100
41.23  Successors and Assigns ..................................................................................................100
41.24  Notices ............................................................................................................................100
41.25  Term of Injunctions or Stays ..........................................................................................102
41.26  Entire Agreement ...........................................................................................................102
41.27  Plan Supplement .............................................................................................................102

HTA_CONF 00012663

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Puerto Rico Highways and Transportation Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following plan of adjustment.

# ARTICLE I

# DEFINITIONS

As used in the HTA Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1 **AAFAF:** Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.2 **ACR Order:** That certain Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief, dated March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.3 **Act 106:** Act No. 106 of August 23, 2017, which created the pay-as-you-go pension system known as "PayGo" and established a defined contribution retirement system to replace the retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act No. 3 of April 4, 2013, as amended, and Act No. 160 of December 24, 2013, as amended.

1.4 **Administrative Claim Bar Date:** Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the HTA Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the HTA Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtor and Reorganized HTA shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by the Debtor during the period from and after the HTA Petition Date, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of the entry of the HTA Confirmation Order.

1.5 **Administrative Expense Claim:** A Claim against the Debtor or its Assets constituting a cost or expense of administration of the Title III Case asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the HTA Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the HTA Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and HTA PSA Restriction Fees.

1

1.6    **ADR Order:**  That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.7    **ADR Procedures:**  The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.8    **Affiliate:**  With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.9    **AFICA:**  Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority.

1.10    **Allowed:**  With respect to any Claim against HTA, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtor in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the HTA Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the HTA Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the HTA Petition Date and any Claim that the Debtor may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law.  Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the HTA Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the HTA Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the HTA Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.11    **Allowed Claim:**  A Claim, to the extent it is or has become Allowed.

1.12    **Ambac:**  Ambac Assurance Corporation or its successor or designee.

1.13    **Ambac Acceleration Price:**  With respect to any Ambac Insured Bond, an amount equal to the outstanding principal amount of such Ambac Insured Bond plus the accrued and unpaid interest thereon as of the date of payment; provided, however, that such amount shall be adjusted to account for any payment of principal and/or accrued interest made to the holder of such Ambac Insured Bond on account of the Ambac Insurance Policies prior to the payment of

2

HTA_CONF 00012665

an applicable Allowed Ambac Insured Bond Claim in accordance with the terms and provisions of Section 26.4 hereof.

1.14 **Ambac Action:** The litigation styled <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV01505.

1.15 **Ambac Bondholder Elections:** Collectively, the elections provided to Ambac Insured Bond holders in accordance with the terms and provisions of Section 26.4 hereof and set forth in the Ambac Bondholder Election Form.

1.16 **Ambac Bondholder Election Forms:** The "Election Notice to Holders of Ambac Insured HTA 98 Senior Bond Claims" attached as Schedule 5(a) to the Disclosure Statement Order.

1.17 **Ambac Bondholder Notice Form:** The "Notice to Holders of Ambac Insured HTA 68 Bond Claims" attached as Schedule 4(e) to the Disclosure Statement Order.

1.18 **Ambac Certificates:** The certificate(s) or unit(s) to be issued by the Ambac Trust to beneficial holders of HTA Bonds electing treatment pursuant to the terms and provisions of Section 26.4 hereof and which HTA Bonds are deposited into the Ambac Trust.

1.19 **Ambac Commutation Consideration:** A combination of some or all of the following selected at Ambac's sole discretion at or prior to the commencement of the Disclosure Statement Hearing: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage, to be determined at Ambac's sole discretion, of the Consummation Costs and/or the HTA PSA Restriction Fee allocable to Ambac in accordance with the terms and provisions of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.20 **Ambac Commutation Treatment:** The treatment set forth in Section 25.4(b)(i) hereof.

1.21 **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.22 **Ambac Election:** Ambac's rights, as set forth in Section 26.4 hereof, to select the form of Ambac Treatment.

1.23 **Ambac Election Notice:** The "Ambac Election Notice" attached as Schedules 4(e) and 5(a) to the Disclosure Statement Order.

1.24 **Ambac Insured Bond Claims:** Collectively, the Claims against HTA arising from the Ambac Insured Bonds, including, any HTA 68 Bond Claims (Ambac) and HTA 98 Senior Bond Claims (Ambac).

1.25 **Ambac Insured Bondholder:** The beneficial holder of an Ambac Insured Bond.

3

HTA_CONF 00012666

1.26   **Ambac Insured Bonds:**  Collectively, the HTA Bonds that have been insured by Ambac or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.27   **Ambac Insurance Policies:**  The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.28   **Ambac Non-Commutation Treatment:**  The treatment set forth in Section 26.4(b)(ii) hereof.

1.29   **Ambac Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims and the CW/HTA Recovery allocable to holders of the Allowed Ambac CW/HTA Claims.

1.30   **Ambac Treatment:**  The treatment of Ambac Insured Bond Claims set forth in Section 26.4 hereof comprised of the Ambac Commutation Treatment and the Ambac Non-Commutation Treatment.

1.31   **Ambac Trust:**  With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the HTA Effective Date, by HTA, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.32   **Ambac Trust Assets:**  Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) the Ambac Plan Consideration, and (c) the Ambac Insurance Policies.

1.33   **Appointments Related Litigation:**  Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States, Case No. 21-1283 (appealed from Adv. Proc. No. 18-00041-LTS), currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montañez, et al. v. The Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.34   **Assets:**  Collectively, (i) all "property" of the Debtor, including, without limitation, such property as it may be reflected on the Debtor's books and records and the HTA Confirmation Order as of the HTA Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtor or other authorized representative for the benefit of the Debtor and its Creditors, unless modified or released pursuant to the HTA Plan or a Final Order, including, without limitation, any Avoidance Action.

4

HTA_CONF 00012667

1.35 **Assured:** Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.36 **Assured Acceleration Price:** A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof, in each case, as of the date of payment.

1.37 **Assured Bondholder Elections:** Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 26.1(b) hereof in the event Assured does not exercise the Assured Election.

1.38 **Assured Bondholder Elections Form:** The "Election Notice for Certain Assured Insured Bondholders with Claims in Classes 3 and 7" attached as Schedule 5(b) to the Disclosure Statement Order.

1.39 **Assured CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.40 **Assured Election:** Assured's rights, as set forth in Section 26.1 hereof, to receive the Assured New HTA Bonds allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid by Assured, in full, on the HTA Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.41 **Assured Election Notice:** The "Assured Election Notice", a copy of which is attached as Schedule 5(c) to the Disclosure Statement Order.

1.42 **Assured Insurance Policies:** The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.43 **Assured Insured Bond Claim:** A Claim against HTA arising from an Assured Insured Bond, including any HTA 68 Bond Claims (Assured), HTA 98 Senior Bond Claims (Assured), and HTA 98 Sub Bond Claims (Assured).

1.44 **Assured Insured Bondholder:** The beneficial holder of an Assured Insured Bond.

1.45 **Assured Insured Bonds:** Collectively, the HTA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

5

1.46　**Assured New HTA Bonds:** The New HTA Bonds allocable to holders of Assured Insured Bond Claims.

1.47　**Assured Plan Consideration:** The consideration allocable or distributable to holders of Allowed Assured Insured Bond Claims, consisting of (a) in the case of Assured Insured Bonds that are HTA 68 Bonds or HTA 98 Senior Bonds, but not Dual-Insured Bonds, (i) New HTA Bonds and/or (ii) in the event of an election by the Commonwealth and/or HTA to substitute Cash for the issuance of New HTA Bonds on the HTA Effective Date, Cash resulting from such election by the Commonwealth and/or HTA to substitute Cash for the New HTA Bonds on the HTA Effective Date, (b) in the case of Dual-Insured Bonds, FGIC Certificates, and (c) in the case of Assured Insured Bonds that are HTA 98 Sub Bonds, subject to the terms and provisions of the Commonwealth Plan and the Commonwealth Confirmation Order, any HTA 98 Sub Bond Recovery allocable to the related HTA 98 Sub Bond Claims (Assured); provided, however, that, for the avoidance of doubt, no Cash, securities, or other consideration that Assured is entitled to receive pursuant to Article LXIII of the Commonwealth Plan or decretal paragraph 52 of the Commonwealth Confirmation Order shall constitute Assured Plan Consideration.

1.48　**Assured Treatment:** The treatment of Assured Insured Bond Claims set forth in Section 26.1 hereof.

1.49　**Assured Trust**: A custodial trust, escrow arrangement or similar structure established pursuant to Section 26.1(b)(ii) of the HTA Plan.

1.50　**Avoidance Actions:** The avoidance, recovery, subordination actions identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the HTA Effective Date, against any Entity that have been brought by or on behalf of the Debtor against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or on behalf of the Debtor seeking affirmative recoveries, and which actions are set forth on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the HTA Effective Date, and (c) all similar Causes of Action that are currently subject to tolling agreements with HTA; provided, however, that under no circumstances shall "Avoidance Actions" include, (x) any Claim or Cause of Action against any Entity relating to HTA Bond Claims, (y) any Claim or Cause of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, which terminated upon entry of the Commonwealth Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, which terminated upon entry of the Commonwealth Confirmation Order.

1.51　**Avoidance Actions Trust:** The trust created on the Commonwealth Effective Date into which have been transferred Claims and Causes of Action of the Commonwealth, ERS,

HTA_CONF 00012669

and PBA, and into which on the HTA Effective Date shall be transferred the authority to litigate or compromise and settle the Avoidance Actions.

     1.52    **Avoidance Actions Trust Agreement:** That certain Avoidance Actions Trust Agreement, dated as of March 15, 2022, by and among the Commonwealth ERS, PBA, the Oversight Board and Drivetrain, LLC.

     1.53    **Avoidance Actions Trust Board:** The three (3) member board appointed as of the Commonwealth Effective Date to govern the Avoidance Actions Trust.

     1.54    **Avoidance Actions Trustee:** Drivertrain LLC, the trustee appointed by the Avoidance Actions Trust Board in accordance with the terms and provisions of the Avoidance Actions Trust Agreement.

     1.55    **Ballot Date:** The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the HTA Plan.

     1.56    **Ballot/Election Form:** The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the HTA Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the HTA Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the HTA Plan.

     1.57    **Bankruptcy Code:** The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Case.

     1.58    **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as amended and as applicable to the Title III Case.

     1.59    **Bar Date:** The date established by the Title III Court by which proofs of Claim against the Debtor must have been filed pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the HTA Plan.

     1.60    **Bar Date Orders:** The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtor or its Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], and (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 3160].

     1.61    **Business Day:** A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

HTA_CONF 00012670

1.62     **Capital Improvements:**  Any project or projects (a) funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities of HTA, including, without limitation, buildings, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit, or (b) financed or proposed to be financed, in whole or in part, through the issuance of private activity bonds or other similar instruments.

1.63     **Cash:**  Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.64     **Causes of Action:**  All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the HTA Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the HTA Effective Date.

1.65     **CCDA:**  Puerto Rico Convention Center District Authority.

1.66     **Charging Lien:**  A lien or right to priority of payment to which the HTA Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the HTA Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the HTA Effective Date.

1.67     **Claim:**  Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.68     **Class:**  A category of Claims set forth in Article IV of the HTA Plan.

1.69     **Clawback Actions:**  Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and

8

Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro.
No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and
Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro.
No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and
Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro.
No. 20-00007-LTS, currently pending in the Title III Court.

1.70    **Clawback CVI Indenture:**  The indenture executed and delivered on the
Commonwealth Effective Date pursuant to which the Commonwealth issued the Clawback
CVIs, and including all of the terms and provisions in connection therewith, as it may be
amended, supplemented or modified from time to time in accordance with its terms and
conditions.

1.71    **Clawback CVIs:**  Collectively, the general obligation securities, the payment for
which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article
VI of the Commonwealth Constitution and applicable Puerto Rico law issued on the
Commonwealth Effective Date by the Commonwealth in accordance with the terms and
conditions of Annex "2" to Exhibit "J" to the Commonwealth Plan, including, without limitation,
as implemented in accordance with the Commonwealth Confirmation Order, the Clawback CVI
Indenture and the CVI Legislation.

1.72    **COFINA:**  Puerto Rico Sales Tax Financing Corporation.

1.73    **Commonwealth:**  The Commonwealth of Puerto Rico.

1.74    **Commonwealth Confirmation Order:**  The Order and Judgment Confirming
Modified Eight Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto
Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto
Rico, and the Puerto Rico Public Buildings Authority, dated January 18, 2022 (Case No. 17-
03283-LTS, ECF No. 19813).

1.75    **Commonwealth Constitution:**  The Constitution of the Commonwealth of
Puerto Rico.

1.76    **Commonwealth Effective Date:**  March 15, 2022, the date on which the
Commonwealth Plan was substantially consummated in accordance with its terms and the
provisions of the Commonwealth Plan and the Commonwealth Confirmation Order.

1.77    **Commonwealth Loan:**  The loan extended by the Commonwealth to HTA in the
original principal amount up to Three Hundred Sixty-Two Million Dollars ($362,000,000.00) in
connection with, among other things, HTA's obligations pursuant to the HTA/CCDA Plan
Support Agreement, the Commonwealth Confirmation Order, and the DRA Stipulation.

1.78    **Commonwealth Legislature:**  The Legislative Assembly of Puerto Rico.

1.79    **Commonwealth Plan:**  That certain Modified Eighth Amended Title III Plan of
Adjustment of the Commonwealth of Puerto Rico, et al., dated January 14, 2022 [Case No. 17-
3283-LTS, ECF. No 19784].

HTA_CONF 00012672

1.80 **Consummation Costs:** Collectively, the amount set forth in Section 3.3 hereof to be paid, in Cash, on the HTA Effective Date, or as soon thereafter as practicable, but in no event later than ten (10) Business Days following the HTA Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement, Article III hereof, and the HTA Confirmation Order.

1.81 **Convenience Cap:** Two Million Five Hundred Thousand Dollars ($2,500,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims, unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing.

1.82 **Convenience Claim:** An Allowed HTA General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed HTA General Unsecured Claim to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 20.1(b) hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed HTA General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) in the aggregate, may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing in its sole and absolute discretion; and, provided, further, that, in the event the Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the HTA Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.83 **Conversion Date:** The final compounding date for the accretion period associated with the New HTA Convertible CABs at which time the New HTA Convertible CABs shall begin to accrue and pay interest on a semi-annual basis.

1.84 **Creditor:** Any Entity holding a Claim against the Debtor or any of the Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtor, including, without limitation, a Claim against the Debtor of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.85 **Creditors' Committee:** The statutory committee of unsecured claimholders appointed in the HTA Title III Case.

1.86 **CUSIP:** The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.87 **Custodial Trust Documents:** Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the HTA Effective Date and relating to the HTA Bonds insured by a Monoline, if applicable, and the distributions to

10

be made in accordance with the HTA Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board and the respective Monolines.

1.88 **CVIs:** Collectively, GO CVIs and the Clawback CVIs.

1.89 **CVI Indenture:** Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.90 **CVI Legislation:** Act No. 53 of October 26, 2021, known as the "Law to End the Bankruptcy of Puerto Rico".

1.91 **CW/Convention Center Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.92 **CW/HTA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

1.93 **CW/HTA Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" to the Commonwealth Plan.

1.94 **CW/MBA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

1.95 **CW/PRIFA Rum Tax Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b)

11

the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

1.96 **Debt:** Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money; provided, however, that "Debt" shall not include the Secured Obligations.

1.97 **Debtor:** HTA.

1.98 **Debt Management Policy:** The policy developed by HTA, and approved by the Oversight Board, relating to the issuance of indebtedness by Reorganized HTA, as more fully described in Section 24.3 hereof.

1.99 **Debt Policy Period:** The period commencing on the first (1st) calendar day immediately following the HTA Effective Date and ending on the first (1st) calendar day on which no New HTA Bonds or refinancing thereof remain outstanding.

1.100 **Debt Related Objections:** Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No. 10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without

12

HTA_CONF 00012675

limitation, litigations or actions commenced to recover principal and/or interest with respect to the GO Bonds, the PBA Bonds and/or the PRIFA BANs, and (ii) any other objections or joinders to these or other such objections or joinders to these or such other objections or notices of participation that support the relief requested in such objections filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond Claims, and the PBA Bond Claims.

1.101 **Debt Service Fund:** The fund to be created in accordance with the terms and provisions of the New HTA Bonds Indenture and Section 25.1 hereof in connection with the deposit of amounts necessary to satisfy the payments of principal and interest on account of the New HTA Bonds.

1.102 **Deemed Issuance Date:** The earlier to occur of (a) July 1, 2022 and (b) the HTA Effective Date.

1.103 **Definitive Documents:** Collectively, the definitive documents and agreements contemplated by the HTA Plan, including, without limitation, (a) the HTA Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the HTA Confirmation Order, and pleadings in support of entry thereof, (c) the New HTA Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New HTA Bonds, and (e) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF and the Monolines, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors' Committee.

1.104 **Disallowed:** With respect to any Claim against the Debtor, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or undisputed and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the holder thereof.

1.105 **Disbursing Agent:** Such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the HTA Effective Date to make or to facilitate distributions in accordance with the provisions of the HTA Plan.

1.106 **Disclosure Statement:** The disclosure statement relating to the HTA Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.107 **Disclosure Statement Hearing:** The hearing held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

13

1.108 **Disclosure Statement Order:** The order of the Title III Court (a) approving the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the HTA Plan, and (ii) elections, if applicable, of distributions hereunder, which order shall be in form and substance reasonably satisfactory to the Initial HTA/CCDA PSA Creditors and each of the Government Parties.

1.109 **Disputed Claim:** A Claim against the Debtor or its Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the HTA Plan, the Bankruptcy Code, the Bankruptcy Rules, or the HTA Confirmation Order, or is otherwise disputed by the Debtor in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.110 **Disputed Funds Stipulation:** That certain Amended and Restated Stipulation and Agreed Order Regarding the Disputed Funds in the HTA Bond Service Accounts, Redemption Accounts and Reserve Accounts, dated March 11, 2022, between (a) the Commonwealth and HTA, by and through the Oversight Board, and (b) The Bank of New York Mellon, in its capacity as fiscal agent, and approved pursuant to an order of the Title III Court, dated March 16, 2022 (Case No. 17-03283 LTS, ECF No. 20366).

1.111 **Distribution Record Date:** The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the HTA Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the HTA Plan through The Depository Trust Company.

1.112 **DRA:** The GDB Debt Recovery Authority.

1.113 **DRA Parties:** Collectively, AmeriNational Community Services LLC, in its capacity as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC, in its capacity as collateral monitor for Wilmington Trust N.A. in connection with the bonds issued by DRA pursuant to the Government Development Bank for Puerto Rico Debt Restructuring Act, Act No. 109-2017 (as amended), and the Qualifying Modification for GDB approved in accordance with the terms and provisions of Title VI of PROMESA.

1.114 **DRA Restriction Fee:** The fee to be paid, in Cash, on the HTA Effective Date, in accordance with the terms and provisions of the DRA Stipulation, Section 3.5 hereof, and the HTA Confirmation Order, in the amount of Fifteen Million Dollars ($15,000,000.00).

1.115 **DRA Stipulation:** That certain Stipulation in Connection With DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Commonwealth and HTA, Cantor-Katz Collateral Monitor LLC, and AmeriNational Community Services, LLC, and affirmed pursuant to an order, dated November 8, 2021 of the Title III Court [Case No. 17-3283-LTS, ECF No. 19124].

14

1.116  **Dual-Insured Bond:**  An Assured Insured Bond that is or was insured by Assured pursuant to a secondary market insurance policy and that also qualifies as an FGIC Insured Bond insured by FGIC pursuant to a primary market insurance policy.

1.117  **Eminent Domain/Inverse Condemnation Claim:**  A Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use by the Debtor without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

1.118  **Eminent Domain Proceeding:**  A condemnation action or proceeding commenced by HTA or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A. §2905 to obtain title to real property located on Puerto Rico.

1.119  **Entity:**  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.120  **ERS:**  Employee Retirement System of the Government of the Commonwealth of Puerto Rico.

1.121  **Executory Contract:**  A contract to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.122  **Federal Claims:**  Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security, and the United States Department of Labor.

1.123  **FGIC:**  Financial Guaranty Insurance Company or its successor or designee.

1.124  **FGIC Action:**  The litigation styled Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al., currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.125  **FGIC Certificates:**  With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

1.126  **FGIC CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

15

1.127 **FGIC Escrow Account Agreements:** Those certain (i) Escrow Account Agreement FGIC CW/HTA Bond Claims Arising from HTA 98 Senior Bonds, dated as of March 15, 2022, by and among the Commonwealth, FGIC, as escrow agent thereunder, and FGIC, as the bond insurer of the FGIC Insured HTA 98 Senior Bonds (as defined in such escrow account agreement), and (ii) Escrow Account Agreement FGIC CW/HTA Bond Claims arising from HTA 98 Sub Bonds, dated as of March 15, 2022, by and among the Commonwealth, FGIC, as escrow agent thereunder, and FGIC, as the bond insurer of the FGIC Insured HTA 98 Sub Bonds (as defined in such escrow account agreement), pursuant to which escrow accounts were established for the benefit of the beneficial holders of FGIC CW/HTA Bond Claims to hold such holders' respective allocable shares of the CW/HTA Clawback Recovery (including any payments received thereon and the net proceeds from any sales thereof) in escrow pending the HTA Effective Date, and from which such CW/HTA Clawback Recovery shall, on a proportionate basis, be distributed to FGIC or deposited into the applicable FGIC Trust as provided in such escrow account agreements.

1.128 **FGIC Insured Bond Claims:** Collectively, the Claims against HTA arising from the FGIC Insured Bonds, including, any HTA 98 Senior Bond Claims (FGIC) and HTA 98 Sub Bond Claims (FGIC).

1.129 **FGIC Insured Bonds:** Collectively, the HTA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.130 **FGIC Insurance Policies:** The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.131 **FGIC Plan Consideration:** The consideration allocable or distributable to holders of Allowed FGIC Insured Bond Claims.

1.132 **FGIC Rehabilitation Plan:** The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.133 **FGIC Treatment:** The treatment of FGIC Insured Bond Claims set forth in Section 26.3 hereof.

1.134 **FGIC Trust:** With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the HTA Effective Date, by HTA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.135 **Final Order:** An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed,

16

vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.136 **Findings of fact and Conclusions of Law:** The findings of fact and conclusions of law of the Title III Court entered in the Title III Case in connection with confirmation of the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA.

1.137 **Fiscal Plan:** A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.138 **FY:** A fiscal year of HTA, commencing on July 1st and concluding on June 30th of the following calendar year.

1.139 **GDB:** The Government Development Bank for Puerto Rico.

1.140 **GDB/HTA Loans:** Collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the Qualifying Modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.141 **GDB Loan Priority Determination:** The determination, rendered in the Commonwealth Title III Case and the HTA Title III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the DRA, including, without limitation, its predecessors and successors in interest, does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans, as set forth in that certain Opinion and Order Granting Defendants' Motion to Dismiss the Complaint, dated October 29, 2021, of the Title III Court entered in AmeriNational Community Services, LLC, et al. v Ambac Assurance Corporation, et al., Adv. Pro. No. 21-00068-LTS [ECF No 83].

1.142 **GO CVIs:** Collectively, the general obligation securities issued on the Commonwealth Effective Date by the Commonwealth in accordance with the terms and provisions of Annex "1" to Exhibit "J" to the Commonwealth Plan, the Commonwealth Confirmation Order, the GO CVI Indenture and the CVI Legislation.

17

1.143  **Government Entity:**  Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.144  **Government Parties:**  Collectively, (a) the Oversight Board, as the representative of the Debtor in accordance with Section 315(b) of PROMESA, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtor, and (d) AAFAF; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.145  **Government Released Claims:**  Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtor, Claims (including, without limitation, Claims arising from or relating to the HTA Bonds), the Debt Related Objections, the Lien Challenge Actions, and arising prior to the HTA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtor (or its successor, including Reorganized HTA), the Commonwealth, ERS, PBA or COFINA arising from or relating to the Debtor's, the Commonwealth's, ERS's, PBA's and COFINA's obligations, as applicable, pursuant to the HTA Plan or the securities to be issued pursuant to the HTA Plan or that were issued pursuant to the COFINA Plan or the Commonwealth Plan, or (ii) a Government Releasee unrelated to the Debtor or the Claims discharged pursuant to the terms and provisions of the HTA Plan, (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA.

1.146  **Government Releasees:**  Collectively, the Government Parties and the Debtor, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.147  **GUC Recovery Cap:**  Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust on account of the Avoidance Actions shall not count towards attaining the forty percent (40%) cap.

18

HTA_CONF 00012681

1.148   **GUC Reserve:**  The reserve to be created on or prior to the HTA Effective Date, and held by Kroll Restructuring Administration LLC (formerly, Prime Clerk LLC), solely for the benefit of holders of Allowed HTA General Unsecured Claims, pursuant to a separate agreement that will contain substantially similar protections for holders of HTA General Unsecured Claims as the agreement with respect to the GUC Reserve under the Commonwealth Plan has for holders of CW General Unsecured Claims (as defined in the Commonwealth Plan).

1.149   **Highway Assets:**  Collectively, the Toll Road Assets and the toll-free roads on Puerto Rico, managed, operated or maintained by HTA.

1.150   **HTA:**  Puerto Rico Highways and Transportation Authority.

1.151   **HTA 68 Bond Claim:**  A Claim against HTA on account of HTA 68 Bonds, other than an HTA 68 Bond Claim (Ambac), an HTA 68 Bond Claim (Assured) or an HTA 68 Bond Claim (National).

1.152   **HTA 68 Bond Claim (Ambac):**  A Claim against HTA on account of an HTA 68 Bond that is an Ambac Insured Bond.

1.153   **HTA 68 Bond Claim (Assured):**  A Claim against HTA on account of an HTA 68 Bond that is an Assured Insured Bond.

1.154   **HTA 68 Bond Claim (National):**  A Claim against HTA on account of an HTA 68 Bond that is a National Insured Bond.

1.155   **HTA 68 Bond Recovery:**  The aggregate recovery by holders of Allowed HTA 68 Bond Claims, Allowed HTA 68 Bond Claims (Ambac), Allowed HTA 68 Bond Claims (Assured), and Allowed HTA 68 Bond Claims (National), on account of any such Claims, consisting of (a) Three Hundred Eleven Million Five Hundred Twelve Thousand Eight Hundred Twenty-Two Dollars and Seventeen Cents ($311,512,822.17) in original principal amount of New HTA CIBs, (b) One Hundred Twenty-Three Million Five Hundred Forty-Three Thousand Eight Hundred Forty Dollars and Five Cents ($123,543,840.05) in original principal amount of New HTA CABs, and (c) Two Hundred Eleven Million Three Hundred Thirty-Two Thousand Six Hundred Eighty-Five Dollars and Fifty-Six Cents ($211,332,685.56) in original principal amount of New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, which election shall be disclosed no later than seven (7) days prior to the HTA  Effective Date, in their joint and absolute discretion, the Commonwealth or HTA, as the case may be, may substitute Cash for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (a)-(c) above, on a dollar-for-dollar basis.

1.156   **HTA 68 Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One

19

HTA_CONF 00012682

Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (h) the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

1.157    **HTA 98 Bonds:**  Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

1.158    **HTA 98 Senior Bond Claim:**  A Claim against HTA on account of HTA 98 Senior Bonds, other than an HTA 98 Senior Bond Claim (Ambac), an HTA 98 Senior Bond Claim (Assured), an HTA 98 Senior Bond Claim (FGIC) or an HTA 98 Senior Bond Claim (National).

1.159    **HTA 98 Senior Bond Claim (Ambac):**  A Claim against HTA on account of HTA 98 Senior Bond that is an Ambac Insured Bond.

1.160    **HTA 98 Senior Bond Claim (Assured):**  A Claim against HTA on account of HTA 98 Senior Bond that is an Assured Insured Bond.

1.161    **HTA 98 Senior Bond Claim (FGIC):**  A Claim against HTA on account of an HTA 98 Senior Bond that is a FGIC Insured Bond.

1.162    **HTA 98 Senior Bond Claim (National):**  A Claim against HTA on account of an HTA 98 Senior Bond that is a National Insured Bond.

1.163    **HTA 98 Senior Bond Recovery:**  The aggregate recovery by holders of Allowed HTA 98 Senior Bond Claims, Allowed HTA 98 Senior Bond Claims (Ambac), Allowed HTA 98 Senior Bond Claims (Assured), Allowed HTA 98 Senior Bond Claims (FGIC), and Allowed HTA 98 Senior Bond Claims (National) on account of any such Claims, consisting of (a) Two Hundred Eighty-Eight Million Four Hundred Eighty-Seven Thousand One Hundred Seventy-Seven Dollars and Eighty-Three Cents ($288,487,177.83) in original principal amount of New HTA CIBs, (b) One Hundred Fourteen Million Four Hundred Twelve Thousand Twenty-Eight Dollars and Eight Cents ($114,412,028.08) in original principal amount of New HTA CABs, and (c) One Hundred Ninety-Five Million Seven Hundred Eleven Thousand Nine Hundred Twelve Dollars and One Cent ($195,711,912.01) in original principal amount of the New HTA Convertible CABs; provided, however, at the election of the Commonwealth and HTA, which election shall be disclosed no later than seven (7) days prior to the HTA Effective Date, in their

20

joint and absolute discretion, the Commonwealth or HTA, as the case may be, may substitute Cash for the New HTA Bonds which would otherwise be issued on the HTA Effective Date in accordance with clauses (a)-(c) above, on a dollar-for-dollar basis.

1.164 **HTA 98 Senior Bonds:** Collectively, the following bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars ($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars ($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G, issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty Thousand Dollars ($82,340,000.00), (g) the 2004 Transportation Revenue Refunding Bonds, Series J, issued by HTA in the original principal amount of Four Hundred Five Million Nine Hundred Eighty-Five Thousand Dollars ($405,985,000.00), (h) the 2005 Transportation Revenue Refunding Bonds, Series K, issued by HTA in the original principal amount of Eight Hundred Million Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series L, issued by HTA in the original principal amount of Five Hundred Ninety-Eight Million Two Hundred Eighty-Five Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue Refunding Bonds, Series M, issued by HTA in the original principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original principal amount of One Billion Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95), and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Forty-Four Million Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.165 **HTA 98 Sub Bond Claim:** A Claim against HTA on account of HTA 98 Sub Bonds, other than an HTA 98 Sub Bond Claim (Assured), an HTA 98 Sub Bond Claim (FGIC), or an HTA 98 Sub Bond Claim (National).

1.166 **HTA 98 Sub Bond Claim (Assured):** A Claim against HTA on account of an HTA 98 Sub Bond that is an Assured Insured Bond.

1.167 **HTA 98 Sub Bond Claim (FGIC):** A Claim against HTA on account of  an HTA 98 Sub Bond that is a FGIC Insured Bond.

1.168 **HTA 98 Sub Bond Claim (National):** A Claim against HTA on account of an HTA 98 Sub Bond that is a National Insured Bond.

HTA_CONF 00012684

1.169 **HTA 98 Sub Bond Recovery:** The aggregate recovery by holders of Allowed HTA 98 Sub Bond Claims, Allowed HTA 98 Sub Bond Claims (Assured), Allowed HTA 98 Sub Bond Claims (FGIC), and Allowed HTA 98 Sub Bond Claims (National).

1.170 **HTA 98 Sub Bonds:** Collectively, the following subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million Fifty Thousand Dollars ($75,050,000.00), and (b) the Subordinated Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.171 **HTA Bond Claims:** Collectively, a Claim against HTA on account of HTA 68 Bonds, HTA 98 Senior Bonds, and HTA 98 Sub Bonds.

1.172 **HTA Bonds:** Collectively, the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.173 **HTA/CCDA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds became HTA/CCDA PSA Creditors.

1.174 **HTA/CCDA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds became HTA/CCDA PSA Creditors.

1.175 **HTA/CCDA Joinder Deadline:** With respect to (a) HTA 68 Bond Claims and HTA 68 Bond Claims (Ambac), May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), and HTA 98 Senior Bond Claims (FGIC), July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the HTA Plan.

1.176 **HTA/CCDA Joinder Creditors:** Collectively, those entities holding HTA Bonds or CCDA Bonds that executed and delivered either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement prior to the HTA/CCDA Joinder Deadline.

1.177 **HTA/CCDA Plan Support Agreement:** That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.178 **HTA/CCDA PSA Creditors:** Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.179 **HTA/CCDA PSA Restriction Fee Creditors:** Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors that executed the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement, or the HTA/CCDA

22

Annex Agreement prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that, notwithstanding anything contained herein to the contrary, all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA PSA Threshold Attainment is reached shall be considered HTA/CCDA PSA Restriction Fee Creditors; and, provided, further, that, under all circumstances, HTA PSA Restriction Fees shall not be available to holders of HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), or HTA 98 Sub Bond Claims (National) in their capacity as such, and such holders in such capacity shall not be considered HTA/CCDA PSA Restriction Fee Creditors with respect to such HTA 98 Sub Bonds.

1.180  **HTA/CCDA PSA Restriction Fee Period:**  The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.181  **HTA/CCDA PSA Threshold Attainment:**  The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent (85%) of the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National), inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National), inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.182  **HTA Clawback CVI:**  The CVI issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Commonwealth Plan.

1.183  **HTA Clawback Recovery:**  The aggregate recovery by holders of Allowed CW/HTA Claims, consisting of HTA Clawback CVIs distributed to holders of such Claims pursuant to the Commonwealth Plan and subject to the Annual Payment Waterfall, as defined in Exhibit "J" of the Commonwealth Plan. .

1.184  **HTA Committee Agreement:**  That certain letter agreement, dated May 9, 2022, between the Creditors' Committee and the Oversight Board.

1.185  **HTA Confirmation Date:**  The date on which the Clerk of the Title III Court enters the HTA Confirmation Order on the docket.

HTA_CONF 00012686

1.186 __HTA Confirmation Hearing:__ The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the HTA Plan, as such hearing may be adjourned or continued from time to time.

1.187 __HTA Confirmation Order:__ The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.188 __HTA Distribution Conditions:__ Collectively, (a) the Commonwealth Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.189 __HTA Effective Date:__ The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the HTA Plan specified in Section 35.1 of the HTA Plan shall have been satisfied or waived, as provided in Section 35.2 of the HTA Plan, and (ii) all the conditions precedent to the substantial consummation of the HTA Plan and occurrence of the HTA Effective Date specified in Section 36.1 of the HTA Plan shall have been satisfied or waived as provided in Section 36.2 of the HTA Plan.

1.190 __HTA Enabling Act:__ Act No. 74 of June 23, 1965, known as the "Puerto Rico Highway and Transportation Authority Act".

1.191 __HTA Fiscal Agent:__ The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.192 __HTA Fiscal Plan:__ A Fiscal Plan for the Debtor or Reorganized HTA.

1.193 __HTA/GDB Claim:__ A Claim against HTA with respect to loans extended by GDB to HTA, other than an HTA 68 Bond Claim, HTA 68 Bond Claim (Ambac), HTA 68 Bond Claim (Assured), HTA 68 Bond Claim (National), HTA 98 Senior Bond Claim, HTA 98 Senior Bond Claim (Ambac), HTA 98 Senior Bond Claim (Assured), HTA 98 Senior Bond Claim (FGIC), HTA 98 Senior Bond Claim (National), or HTA 98 Sub Bond Claim (National).

1.194 __HTA General Unsecured Claim:__ A Claim against HTA; provided, however, that, under all circumstances, "HTA General Unsecured Claim" shall not include (a) a Claim arising from or related to the HTA 68 Bonds, the HTA 98 Senior Bonds, the HTA 98 Sub Bonds,

24

the HTA Moscoso Bonds or the GDB/HTA Loans, (b) an Eminent Domain/Inverse
Condemnation Claim, (c) a Section 510(b) Subordinated Claim, (d) a Late-Filed Claim, (e) a
Convenience Claim, (f) any Claim that is eligible to be transferred into or administered through
the ACR process, (g) the Claim asserted in Proof of Claim No. 161091 filed by Concilio
Nacional de Policias Inc. and any other Claims related to the litigation styled <u>Frente Unido de
Policias Organizados, et al. v. Puerto Rico Police Department</u>, Case No. KAC-2007-4170, (h)
any Claims for retiree benefits (including, without limitation, those portions of Proofs of Claim
Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless
of whether such Claims are asserted by retirees or active employees and regardless of whether of
such Claims are asserted through litigation or administrative proceedings, but excluding Claims
for any increased pension payments that would have been payable prior to adjudication of such
Claims (<u>i.e.</u>, pension "back pay") and only up to the amount related to unpaid pensions, (i) all
Claims against the Debtor by any Governmental Unit (as defined in section 101 of the
Bankruptcy Code), including the United States government, any State government, foreign
government, any municipality (whether of the Commonwealth or otherwise), the
Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted
directly by such Governmental Unit or indirectly or derivatively by any other Entity, including,
without limitation, any Claims by the GDB asserted by or through the DRA, (j) any Claims
related to the Concession Agreement, dated as of December 20, 1991, between HTA and
Autopistas de PR, LLC, as amended and supplemented, relating to the operation and
maintenance of the Teodoro Moscoso Budge, including, without limitation, Proof of Claim No.
52295, (k) any Claims related to the Toll Road Concession Agreement, dated as of June 27,
2011, between the HTA and Autopistas Metropolitanas de Puerto Rico, LLC, as amended and
supplemented, including without limitation, Proof of Claim No. 35566, (l) any unsecured
deficiency claims with respect to asserted priority and/or secured Claims, or (m) such other
Claim determined by the Title III Court not to be an HTA General Unsecured Claim.

   1.195   **HTA GUC Recovery:**  The amount equal to (a) Forty-Eight Million Dollars
($48,000,000.00), to be funded in accordance with the terms and provisions of Section 20.3
hereof, <u>plus</u> (b) the net recoveries, if any, by the Avoidance Actions Trust attributable to the
Avoidance Actions, <u>minus</u> (c) such amount of Cash as is necessary to satisfy the payment of
Allowed Convenience Claims in accordance with the terms and provisions of Article XXIII
hereof.

   1.196   **HTA Moscoso Bond Claim:**  A Claim against HTA on account of the HTA
Moscoso Bonds.

   1.197   **HTA Moscoso Bonds:**  Collectively, the Special Facility Revenue Refunding
Bond, 2003 Series A, issued by HTA in the original principal amount of One Hundred Fifty-
Three Million Two Hundred Twenty-Two Thousand Two Hundred Seventy dollars and Forty-
Five Cents ($153,222,270,45) in accordance with the terms and provisions of that certain Trust
Agreement, dated as of October 1, 2003, between HTA and Banco Popular de Puerto Rico, as
Trustee in which, as of the HTA Petition Date, where in the aggregate outstanding principal
amount of $141,875411.00.

   1.198   **HTA Petition Date:**  May 21, 2017.

HTA_CONF 00012688

1.199 **HTA Plan:** This Third Amended Title III Plan of Adjustment of Puerto Rico Highways and Transportation Authority, including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.200 **HTA PSA Restriction Fees:** Collectively, the fees to be paid, in Cash, on the HTA Effective Date, in accordance with the terms and provisions of the HTA/CCDA Plan Support Agreement, Section 3.4 hereof, and the HTA Confirmation Order, which fees, in the aggregate, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amount as may be payable on account of Consummation Costs.

1.201 **HTA Restriction Fee Percentage:** The percentage equal to (a) One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amounts as may be payable on account of Consummation Costs, divided by (b) the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) held or, in the case of a Monoline, either held or insured and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents, and applicable law, by HTA/CCDA PSA Restriction Fee Creditors.

1.202 **HTA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Case No. 17-3567-LTS (D.P.R.).

1.203 **Initial HTA/CCDA PSA Creditors:** Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board, as of May 5, 2021.

1.204 **Insured HTA Bond Claim:** Collectively, the HTA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.205 **Invalidity Actions:** Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "B" hereto.

1.206 **IRC:** The United States Internal Revenue Code of 1986, as amended from time to time.

1.207 **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.208 **Late-Filed Claim:** A proof of claim filed in the HTA Title III Case from and after the commencement of the Disclosure Statement Hearing.

1.209 **Lien:** Any charge against or interest in property to secure payment of a debt or performance on an obligation.

26

1.210   **Lien Challenge Actions:**  Collectively, the adversary proceedings listed on Exhibit "C" hereto.

1.211   **Lift Stay Motions:**  Collectively, the litigation styled (a) <u>Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico</u>, filed in the HTA Title III Case [Dkt. No. 673], (b) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth's Title III case [Dkt. No. 10104], (c) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth's Title III case [Dkt. No. 10602], (d) <u>AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico</u>, filed in the Title III Case [Dkt. No. 591], (e) <u>Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) <u>Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.</u>, Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit, (g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (h) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

1.212   **List of Creditors:**  The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the *Notice of Filing of Creditor List for the Puerto Rico Highways and Transportation Authority* filed in the Title III Case [Case No. 17-3283-LTS, ECF No. 10708], pursuant to sections 924 and 925 of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be amended, restated, supplemented or otherwise modified by the Debtor.

1.213   **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.214   **MBA:**  Puerto Rico Metropolitan Bus Authority.

1.215   **MFA:**  Puerto Rico Municipal Finance Agency.

1.216   **Monolines:**  Collectively, Ambac, Assured, FGIC, and National, as insurers of HTA Bonds, or other Claims or securities issued by the Debtor, as applicable.

1.217   **National:**  National Public Finance Guarantee Corporation.

1.218   **National Action:**  The litigation styled <u>National Public Finance Guarantee Corp., et al. v. UBS Financial Services, Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.219   **National Acceleration Price:**  With respect to any National Insured Bond, a price equal to the outstanding principal amount of a National Insured Bond plus the accrued and

HTA_CONF 00012690

unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

1.220 **National Bondholder Election Form:** Collectively or individually, as the case may be, the "Form of Election Notice for Holders of Claims in Class 4" and the "Form of Election Notice for Holders of Claims in Class 9", copies of which are attached as Schedules 5(d) and 5(e), respectively, to the Disclosure Statement Order.

1.221 **National Certificates:** With respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

1.222 **National Commutation Consideration:** A combination of some or all of the following, to be selected by National at National's sole discretion at or prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the Consummation Costs and/or the HTA PSA Restriction Fee distributable to National in accordance with the terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

1.223 **National Commutation Treatment:** The treatment set forth in Section 26.2(a) hereof.

1.224 **National CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by National, including, without limitation, pursuant to a secondary market insurance policy.

1.225 **National Election Notice:** The "Notice of Non-Voting Status for Holders of HTA 98 Sub Bond Claims (National)", a copy of which is attached as Schedule 4(f) to the Disclosure Statement Order.

1.226 **National Escrow Account:** A single escrow account that may be formed, on or prior to the HTA Effective Date, by HTA, for the benefit of the beneficial holders of National Insured Bonds whose National Escrow Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.227 **National Escrow Consideration:** Some or all of the New HTA Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing.

1.228 **National HTA Consideration:** The consideration distributable pursuant to the Commonwealth Plan, the Commonwealth Confirmation Order, the HTA Plan and the HTA Confirmation Order on account of Allowed National Insured Bond Claims and Allowed National CW/HTA Bond Claims, consisting of (a) the Cash and New HTA Bonds distributable on account of Allowed National Insured Bond Claims, and (b) the HTA Clawback CVI distributable on account of Allowed National CW/HTA Bond Claims.

28

1.229    **National Insurance Policies:**  The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.230    **National Insured Bond Claims:**  Collectively, the Claims against HTA arising from the National Insured Bonds, including any HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims (National), and HTA 98 Sub Bond Claims (National).

1.231    **National Insured Bonds:**  Collectively, the HTA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.232    **National Non-Commutation Treatment:**  The treatment set forth in Section 26.2(b) hereof.

1.233    **National Plan Consideration:**  The consideration distributable on account of Allowed National Insured Bond Claims.

1.234    **National Treatment:**  With respect to each Class of National Insured Bond Claims, the treatment set forth in Section 26.2 hereof.

1.235    **National Trust:**  The trust(s) which may be formed, on or prior to the HTA Effective Date, by HTA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.236    **National Trust Consideration:**  Some or all of the New HTA Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing.

1.237    **New HTA Bonds:**  Collectively, the bonds to be issued on the HTA Effective Date by Reorganized HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture, the repayment of which shall be supported by a pledge of the Pledged Revenues.

1.238    **New HTA Bonds Indenture:**  The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which Reorganized HTA shall issue the Secured Obligations, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to the Monolines.

1.239    **New HTA Bonds Trustee:**  The trustee appointed in accordance with the terms and provisions of the New HTA Bonds Indenture.

HTA_CONF 00012692

1.240   **New HTA CABs:**  Collectively, the series of capital appreciation bonds, accreting interest at the rate of five percent (5.0%) per annum, to be issued pursuant to the HTA Plan as components of New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.241   **New HTA CIBs:**  Collectively, the series of current interest bonds, accruing interest at the rate of five percent (5%) per annum, to be issued pursuant to the HTA Plan as components of the New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.242   **New HTA Convertible CABs:**  Collectively, the series of convertible capital appreciation bonds, accreting interest at the rate of five percent (5.0%) per annum, to be issued pursuant to the HTA Plan as components of the New HTA Bonds and to be distributed pursuant to the terms and provisions of the HTA Plan.

1.243   **Outstanding:**  Debt that (i) has not been paid in full in accordance with its terms, or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.244   **Oversight Board:**  The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtor's representative in the Title III Case pursuant to Section 315(b) of PROMESA.

1.245   **Partial Disposition:**  A lease, long-term concession or other public-private partnership arrangement with respect to any real restate or personal property comprising a portion of the Toll Facilities.

1.246   **PayGo:**  The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.247   **PBA:**  Puerto Rico Public Buildings Authority.

1.248   **Person:**  An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.249   **PFC:**  Puerto Rico Public Finance Corporation.

1.250   **Plan Supplement:**  A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, the New HTA Bonds Indenture, forms of the New HTA Bonds, and Reorganized HTA By-Laws, which shall be in form and substance reasonably satisfactory to AAFAF, and the Monolines, and, solely with respect to the provisions affecting Classes 16 and 19, the Creditors' Committee.  The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes.  The Plan Supplement shall be deemed incorporated into and part of the HTA Plan as if set forth herein in full.

HTA_CONF 00012693

1.251  **Pledged Revenues:**  Collectively, (a) the Toll Receipts, (b) the rights of Reorganized HTA to receive the Toll Receipts, (c) except for purposes of the Toll Rate Covenant set forth in the New HTA Bonds Indenture, the proceeds derived from or related to any sale or disposition of, or any concession arrangement relating to, all or any part of the Toll Facilities, and (d) investment income received on any amounts held in the Toll Receipts Fund, the Debt Service Fund, the Operating Reserve Fund, the Renewal and Replacement Funds, the Subordinated Indebtedness Fund and the General Reserve Fund, each as defined in the New HTA Bonds Indenture; provided, however, that, under all circumstances, "Pledged Revenues" shall not include the proceeds of any gifts, grants, or other payments to Reorganized HTA from the United States of America, any state, territory, municipality or any public or private instrumentality, individual or entity that are not in the nature of a Toll.

1.252  **PRASA:**  Puerto Rico Aqueduct and Sewer Authority.

1.253  **PREPA:**  Puerto Rico Electric Power Authority.

1.254  **PRIDCO:**  Puerto Rico Industrial Development Company.

1.255  **PRIFA:**  Puerto Rico Infrastructure Financing Authority.

1.256  **PRITA:**  Puerto Rico Integrated Transit Authority.

1.257  **Professional:**  An Entity (a) to be compensated for services rendered prior to or on the HTA Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Case by the Government Parties (in the Government Parties' sole discretion); (ii) employed in the Title III Case by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.258  **Professional Claim:**  A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the HTA Confirmation Date under Sections 316 and 317 of PROMESA.

1.259  **PROMESA:**  The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.260  **Pro Rata Share:**  With respect to Allowed Claims against the Debtor (a) the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class, taking into account, and reducing for, unmatured interest thereon as of the HTA Petition Date with respect to individual bonds within such Class, and (b) among more than one Class, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.261  **Related Persons:**  With respect to any Entity (including for the avoidance of doubt, the Commonwealth, the Government Parties, and the Creditors' Committee), its predecessors, successors and assigns (whether by operation of law or otherwise) and their

31

respective current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and professionals (including, without limitation, any and all Professionals retained by the Debtor, AAFAF, and the Creditors' Committee), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), each in its respective capacity as such; provided, however, that "Related Persons" is not intended, nor shall it be construed, to include the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

     1.262 **Released Claims:** Collectively, (a) with respect to those Entities party to the HTA/CCDA Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the HTA/CCDA Plan Support Agreement, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtor or its Assets in the Title III Case, (c) Claims and Causes of Action that have been or could have been asserted by the Debtor (with respect to releases given by the Debtor) and by Creditors or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, (e) with respect to those Entities party to the DRA Stipulation, Claims and Causes of Action released hereunder and in accordance with the DRA Stipulation, and (f) Claims that otherwise arise from or relate to the Title III Case, the HTA Plan, the HTA/CCDA Plan Support Agreement, the HTA Committee Agreement, and the compromises set forth herein, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtor or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the HTA Confirmation Order or the HTA Plan, including, without limitation, performance of obligations arising from or related to New HTA Bonds, New GO Bonds, the HTA Clawback CVIs or under any policy of insurance or related documents issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims against the Commonwealth, AFICA, CCDA, COFINA, ERS, MBA, MFA, PBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

HTA_CONF 00012695

1.263 **Released Parties:** Collectively, solely to the extent provided in the HTA Plan, (a) the Government Parties, (b) the HTA/CCDA PSA Creditors, (c) the Creditors' Committee, (d) the DRA and the DRA Parties, and (e) with respect to the foregoing clauses (a) through (d), each of their respective Related Persons.

1.264 **Releasing Parties:** Collectively, solely to the extent provided in the HTA Plan, (a) all holders of Claims against the Debtor or its Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

1.265 **Reorganized Commonwealth:** The Commonwealth, from and after the Commonwealth Effective Date.

1.266 **Reorganized HTA:** The Debtor, from and after the HTA Effective Date.

1.267 **Reorganized HTA By-Laws:** The by-laws of Reorganized HTA, to the extent applicable, from and after the HTA Effective Date.

1.268 **SCC Action:** The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.269 **SEC:** The United States Securities and Exchange Commission.

1.270 **Section 103 Bond Counsel:** With respect to HTA or Reorganized HTA, as the case may be, counsel providing services with respect to Section 103 of the IRC.

1.271 **Section 510(b) Subordinated Claim:** Any Claim, to the extent determined pursuant to a Final Order, against the Debtor or its Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of the Debtor or an Affiliate of the Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.272 **Secured Obligations:** Collectively, the New HTA Bonds and the Subordinated Indebtedness.

1.273 **Securities Act:** The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.274 **SIB Account:** The State Infrastructure Bank account established and posted as security for the repayment of HTA 98 Sub Bond Claims (National).

1.275 **Solicitation Agent:** Kroll Restructuring Administration LLC (formerly, Prime Clerk LLC), the claims, balloting, and solicitation agent retained by the Debtor in the Title III Case by Title III Court order.

1.276 **Subordinated Indebtedness:** Collectively, the subordinated indebtedness to be issued to the Commonwealth pursuant to the New HTA Bonds Indenture or a supplement thereto and as a refinancing of HTA's obligations pursuant to the Commonwealth Loan, bearing interest

33

at the rate of two and one-half percent (2.5%) per annum, a maturity date of July 1, 2052, and such other salient payment provisions as set forth on Exhibit "E" annexed hereto.

1.277 **Syncora:** Syncora Guarantee Inc., together with its predecessors, successors, or designees.

1.278 **Syncora Acceleration Price:** With respect to an HTA 98 Senior Bond bearing CUSIP number 745190AY4, and the principal and interest payments of which have been insured by Syncora, a price equal to the outstanding principal amount of such HTA 98 Senior Bond plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

1.279 **Title III:** Title III of PROMESA.

1.280 **Title III Case:** The HTA Title III Case.

1.281 **Title III Court:** The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.282 **Toll Facilities:** Collectively, PR-20, PR-52, PR-53 and PR-66 toll highways.

1.283 **Toll Rate Covenant:** The toll rate covenant referred to in Section 24.1(i) hereof, as set forth herein and as may be revised in accordance with the terms and provisions of the New HTA Bonds Indenture.

1.284 **Toll Receipts:** Collectively, (a) all Cash receipts and automated or electric payments or credits from Tolls (including by way of the "Auto-Expresso" system), and (b) the proceeds of any business interruption insurance relating to the Toll Facilities and of any other insurance which insures against the loss of Toll Receipts.

1.285 **Toll Receipt Fund:** The fund designated, created and established pursuant to Section 5.01 of the New HTA Bonds Indenture to hold the Toll Receipts pending application and distribution in accordance with the terms and conditions of the New HTA Bonds Indenture.

1.286 **Tolls:** Collectively, tolls, fares, incomes, receipts, special fees or permit fees, or other charges imposed by or on behalf of Reorganized HTA on the owners, lessors, lessees or operators of motor vehicles for the operation of or the right to operate those vehicles on the Toll Facilities, and fines and penalties and interest thereon collected as a result of a failure to pay any such amount.

1.287 **Transit Assets:** Tren Urbano.

1.288 **Trust Documentation:** Collectively, the documentation required, if necessary, to establish and maintain the trust into which with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

HTA_CONF 00012697

1.289 **Trust Estate:** Collectively, and without limiting the provisions set forth in the New HTA Bonds Indenture, (a) all right, title, and interest of Reorganized HTA in and to the Pledged Revenues, and the right to receive the same, including, without limitation, any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, (i) subject only to the application of Pledged Revenues in accordance with the terms and provisions of the New HTA Bonds Indenture, and (ii) the senior lien and senior security interest granted by the New HTA Bonds Indenture for the benefit of holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and the subordinate security interest granted by the New HTA Bonds Indenture for the benefit of holders of Subordinated Indebtedness, and (b) except for the Authority Expense Fund and the Arbitrage Rebate Fund, all of Reorganized HTA's right, title and interest in the funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement and the moneys, securities, and other assets on deposit with the New HTA Bonds Trustee in such funds and accounts created pursuant to the New HTA Bonds Indenture and any supplemental trust agreement permitted by the HTA Enabling Act; provided, however, that the priority in which such moneys and securities are applied to the repayment of the Secured Obligations shall be as expressly specified in the New HTA Bonds Indenture.

1.290 **Unclaimed Distribution:** Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtor of an intent to accept a particular distribution, (c) responded to the Debtor's requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.291 **Underwriter Actions:** Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action, or any action brought in the future in any state, federal or Commonwealth court, agency or tribunal against any of the defendants named in such litigations concerning or relating to indebtedness or bonds issued by HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth.

1.292 **Unexpired Lease:** A lease of nonresidential real property to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.293 **Uniformity Litigation:** Collectively, (a) the litigation styled Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al., Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.294 **UPR:** Universidad de Puerto Rico.

1.295 **Voting Record Date**: The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the HTA Plan and set forth in the Disclosure Statement Order; provided, however, that the "Voting Record Date" shall not apply to the

35

publicly traded securities, the claims with respect to which will be voted through the Depository Trust Company's Automated Tender Offer Platform, known as "ATOP", where the holder of the securities at the time of tender (as opposed to a date certain) is deemed to be the holder entitled to vote.

1.296   **Other Definitions:**  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the HTA Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code.  Unless otherwise specified, (a) all section, schedule, or exhibit references in the HTA Plan are to the respective section in, article of, or schedule or exhibit to, the HTA Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America.  The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the HTA Plan as a whole and not to any particular section, subsection, or clause contained in the HTA Plan.  In computing any period prescribed or allowed by the HTA Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.297   **Rules of Interpretation:**  For purposes of the HTA Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents, (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the HTA Effective Date pursuant to the HTA Plan plus the amount, if any, of Cash so distributed, (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the HTA Plan, (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Case are references to the docket numbers under the Title III Court's CM/ECF system, (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation", and (i) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner consistent with the overall purpose and intent of the HTA Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

HTA_CONF 00012699

# ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES/RETIREE CLAIMS

2.1 **Litigation Resolution:** To the extent not resolved pursuant to the Commonwealth Plan or the Commonwealth Confirmation Order, the HTA Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of HTA 68 Bond Claims, HTA 98 Bond Claims, and CW/HTA Claims, including the disputes (a) set forth in the Debt Related Objections, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to HTA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, and (f) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/HTA Claims.

2.2 **Allowance of Bond Claims:** For purposes of confirmation and consummation of the HTA Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the HTA Effective Date, among other Claims, (a) the HTA 68 Bond Claims, the HTA 68 Bond Claims (Ambac), the HTA 68 Bond Claims (Assured), and the HTA 68 Bond Claims (National), shall be deemed allowed in the aggregate amount of $831,189,105.55, (b) the HTA 98 Senior Bond Claims, the HTA 98 Senior Bond Claims (Ambac), the HTA 98 Senior Bond Claims (Assured), the HTA 98 Senior Bond Claims (National), and the HTA 98 Senior Bond Claims (FGIC), including, without limitation, Claims arising from HTA 98 Senior Bonds held by the DRA, shall be deemed allowed in the aggregate amount of $3,129,667,976.84, (c) the HTA 98 Sub Bond Claims, the HTA 98 Sub Bond Claims (Assured), the HTA 98 Sub Bond Claims (FGIC), and the HTA 98 Sub Bond Claims (National) shall be deemed allowed in the aggregate amount of $277,107,234.18, and (d) the HTA/GDB Claims shall be deemed allowed in the aggregate amount of $2,149,579,432.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and exculpation provided in Article XLI herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this HTA Plan.

2.4 **HTA Operational Restructuring:** On or as soon as practicable following the HTA Effective Date, including, without limitation, upon approval of the United States Department of Transportation Federal Transit Administration, Reorganized HTA shall be operationally restructured through the separation of the Highway Assets from the Transit Assets, with such Transit Assets and all Transit Revenues being transferred to PRITA.

(a) **Transit Assets**. The Transit Assets shall be supported by the Transit Revenues and by such other expressly identified, dedicated revenue stream, or revenue streams of PRITA or the Commonwealth, as the case may be, sufficient to cover the Transit Assets' operational and maintenance expense deficits and capital improvement expenditure needs and

37

approved as adequate for such purposes by the United States Department of Transportation
Federal Transit Administration and the Oversight Board.

       (b)    **Highway Assets**.  From and after the HTA Effective Date, Reorganized
HTA shall retain the Highway Assets and, as soon as practicable thereafter, such Highway
Assets shall be operationally and financially separated between Toll Road Assets and non-toll
road assets, with a "Ring-Fenced" structure and allocation of cost and expenses implemented,
including, without limitation, (i) the internal separation of legal, financial and operational
functions and the establishment of separate Toll Road Assets and non-toll road assets
management offices, and (ii) the consolidation of all non-toll-road management responsibilities
of the Puerto Rico Department of Transportation and Public Works with and into Reorganized
HTA.

       (c)    **Inventory of Highway Assets**.  From and after the HTA Effective Date,
Reorganized HTA shall use its reasonable best efforts to inventory all available Highway Assets
and provide such inventory to the Oversight Board.

    2.5    **Retiree Claims:**  In accordance with the terms and provisions of Act 106 and the
Commonwealth Plan, any and all obligations of the Debtor to former employees have been
assumed and will be paid by the Commonwealth through Pay-Go, with the Debtor making "pay-
as-you-go" contributions to the Commonwealth consistent with the provisions of Act 106 and the
Commonwealth Plan, and are not otherwise treated pursuant to the HTA Plan.

## ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

    In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the
Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and
Professional Claims have not been classified and thus are excluded from the Classes of Claims
set forth in Article IV of the HTA Plan.

    3.1    **Administrative Expense Claims:**  On the later to occur of (a) the HTA Effective
Date and (b) the date on which an Administrative Expense Claim shall become an Allowed
Claim, Reorganized HTA shall (i) pay to each holder of an Allowed Administrative Expense
Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and
discharge such Allowed Administrative Expense Claim in accordance with such other terms no
more favorable to the claimant than as may be agreed upon by and between the holder thereof
and Reorganized HTA; provided, however, that Allowed Administrative Expense Claims
representing indebtedness incurred in the ordinary course prior to the HTA Effective Date by the
Debtor shall be paid in full and performed by Reorganized HTA in accordance with the terms
and subject to the conditions of any agreement governing, investment evidencing, or other
document relating to such transactions, including, without limitation, all obligations of HTA and
Reorganized HTA with respect to payment of the Commonwealth Loan; and, provided, further,
that, with respect to the Commonwealth Loan, the repayment thereof shall be satisfied in
accordance with the terms and provisions of the New HTA Bonds Indenture; and, provided,
further, that, if any such ordinary course expense is not billed, or a written request for payment is

HTA_CONF 00012701

not made, within one hundred fifty (150) days after the HTA Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the HTA Plan.

    3.2    **Professional Compensation and Reimbursement Claims:** All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court, including, without limitation, experts who provided services to the Debtor during the Title III Case, shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the HTA Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional, including, without limitation, experts who provided services to the Debtor during the Title III Case, must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the HTA Effective Date. Reorganized HTA shall pay compensation for professional services extended and reimbursement of expenses incurred after the HTA Effective Date in the ordinary course and without the need for Title III Court approval.

    3.3    **HTA Consummation Costs:** Notwithstanding anything contained in the HTA Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA Plan, each Initial HTA/CCDA PSA Creditor shall be entitled to receive on the HTA Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the HTA Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one percent (1.00%), truncated to two decimal points, of the aggregate amount of such Initial HTA/CCDA PSA Creditor's HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured) and HTA 98 Senior Bond Claims (National) (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial HTA/CCDA PSA Creditor as of 5:00 p.m. (EST) on May 5, 2021, in an aggregate amount not greater than One Hundred Twenty-Five Million Dollars ($125,000,000.00).

    3.4    **HTA Restriction Fee:** In exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms thereof, subject to the entry of the HTA Confirmation Order, each HTA/CCDA PSA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds (including the applicable Monolines, to the extent such Monolines are authorized to vote the applicable Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the HTA PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the HTA Plan in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National),

39

HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Restriction Fee Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of the Monolines held or insured, by such HTA/CCDA PSA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that each HTA/CCDA PSA Restriction Fee Creditor who acquires any HTA 68 Bonds and/or HTA 98 Senior Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured HTA Bond (other than a Monoline-insured HTA Bond insured by Assured or National, as the case may be), to the extent such HTA/CCDA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured HTA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such HTA PSA Restriction Fee equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National) (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held and/or insured by such HTA/CCDA PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the HTA Bond Claims and the entry of the HTA Confirmation Order; and, provided, further, that, if an HTA/CCDA PSA Restriction Fee Creditor sells any HTA 68 Bonds or HTA 98 Senior Bonds for which it would have been entitled to receive the HTA PSA Restriction Fee, the purchasing party shall not be entitled to receive the HTA PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate HTA PSA Restriction Fee plus the Consummation Costs attributable to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Assured), or HTA 98 Senior Bond Claims (National), as the case may be, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) thereof (subject to the extension provided for in Sections 7.1(b) or (c) thereof), or the Oversight Board terminates the HTA/CCDA Plan Support Agreement for any reason other than (i) a breach of the HTA/CCDA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the HTA Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Commonwealth Plan or the HTA Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Commonwealth Plan or the HTA Plan on terms consistent with the HTA/CCDA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "J"), or (iii) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the HTA/CCDA Plan Support Agreement, the aggregate HTA PSA

40

Restriction Fee and Consummation Costs, in the amount of Twenty Million Dollars ($20,000,000.00) shall be paid, ratably, in cash, as an administrative expense claim under the HTA Plan to the Initial HTA/CCDA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the HTA/CCDA Plan Support Agreement, including, without limitation, termination of the HTA/CCDA Plan Support Agreement in accordance with other provisions of Section 7.1 thereof, no Consummation Costs or HTA PSA Restriction Fee shall be due and payable to the party to HTA/CCDA Plan Support Agreement terminating such agreement or against the party such agreement is terminated.

3.5     **DRA Restriction Fee**:  In exchange for executing the DRA Stipulation, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its HTA 98 Senior Bonds and the HTA/GDB Claims in accordance with the terms thereof, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms hereof, but in no event later than ten (10) Business Days following the HTA Effective Date, DRA shall be entitled to receive the DRA Restriction Fee.

3.6     **Non-Severability**:  The allowance and payment of the Consummation Costs and HTA PSA Restriction Fees as set forth in this Article III compensate the HTA/CCDA Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

# ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1     **Claims are classified as follows:**

| | | |
|---|---|---|
| (a) | **Class 1:** | HTA 68 Bond Claims |
| (b) | **Class 2:** | HTA 68 Bond Claims (Ambac) |
| (c) | **Class 3:** | HTA 68 Bond Claims (Assured) |
| (d) | **Class 4:** | HTA 68 Bond Claims (National) |
| (e) | **Class 5:** | HTA 98 Senior Bond Claims |
| (f) | **Class 6:** | HTA 98 Senior Bond Claims (Ambac) |
| (g) | **Class 7:** | HTA 98 Senior Bond Claims (Assured) |
| (h) | **Class 8:** | HTA 98 Senior Bond Claims (FGIC) |
| (i) | **Class 9:** | HTA 98 Senior Bond Claims (National) |
| (j) | **Class 10:** | HTA 98 Sub Bond Claims |

41

| | | |
|---|---|---|
| (k) | **Class 11:** | HTA 98 Sub Bond Claims (Assured) |
| (l) | **Class 12:** | HTA 98 Sub Bond Claims (FGIC) |
| (m) | **Class 13:** | HTA 98 Sub Bond Claims (National) |
| (n) | **Class 14:** | HTA Moscoso Bond Claims |
| (o) | **Class 15:** | Eminent Domain/Inverse Condemnation Claims |
| (p) | **Class 16:** | HTA General Unsecured Claims |
| (q) | **Class 17:** | HTA/GDB Claims |
| (r) | **Class 18:** | Section 510(b) Subordinated Claims |
| (s) | **Class 19:** | Convenience Claims |
| (t) | **Class 20:** | Federal Claims |

## ARTICLE V

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (CLASS 1)

5.1     **Treatment of HTA 68 Bond Claims:** On the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim, such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (AMBAC) (CLASS 2)

6.1     **Treatment of HTA 68 Bond Claims (Ambac):** Subject to the terms and provisions of Section 26.4 hereof, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (Ambac), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (ASSURED) (CLASS 3)

7.1     **Treatment of HTA 68 Bond Claims (Assured):** Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA

HTA_CONF 00012705

68 Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (Assured), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE VIII

## PROVISIONS FOR TREATMENT OF HTA
## 68 BOND CLAIMS (NATIONAL) (CLASS 4)

8.1 **Treatment of HTA 68 Bond Claims (National):** Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 68 Bond Claim (National), such holder's Pro Rata Share of the HTA 68 Bond Recovery.

## ARTICLE IX

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (CLASS 5)

9.1 **Treatment of HTA 98 Senior Bond Claims:** On the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claims shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim, such holder's Pro Rata Share of the HTA 98 Bond Recovery.

## ARTICLE X

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (AMBAC) (CLASS 6)

10.1 **Treatment of HTA 98 Senior Bond Claims (Ambac):** Subject to the terms and provisions of Section 26.4 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (Ambac), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

## ARTICLE XI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (ASSURED) (CLASS 7)

11.1 **Treatment of HTA 98 Senior Bond Claims (Assured):** Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (Assured), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

HTA_CONF 00012706

# ARTICLE XII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (FGIC) (CLASS 8)

12.1 **Treatment of HTA 98 Senior Bond Claims (FGIC):** Subject to the terms and provision of Section 26.3 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (FGIC) shall be entitled to receive, in full consideration satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (FGIC), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

# ARTICLE XIII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SENIOR BOND CLAIMS (NATIONAL) (CLASS 9)

13.1 **Treatment of HTA 98 Senior Bond Claims (National):** Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Senior Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Senior Bond Recovery.

# ARTICLE XIV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (CLASS 10)

14.1 **Treatment of HTA 98 Sub Bond Claims:** On the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed HTA 98 Sub Bond Claim, such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

# ARTICLE XV

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (ASSURED) (CLASS 11)

15.1 **Treatment of HTA 98 Sub Bond Claims (Assured):** Subject to the terms and provisions of Section 26.1 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (Assured), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

44

## ARTICLE XVI

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (FGIC) (CLASS 12)

16.1    **Treatment of HTA 98 Sub Bond Claims (FGIC):**  Subject to the terms and provisions of Section 26.3 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (FGIC), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

## ARTICLE XVII

## PROVISIONS FOR TREATMENT OF HTA
## 98 SUB BOND CLAIMS (NATIONAL) (CLASS 13)

17.1    **Treatment of HTA 98 Sub Bond Claims (National):**  Subject to the terms and provisions of Section 26.2 hereof, on the HTA Effective Date, each holder of an Allowed HTA 98 Sub Bond Claim (National) shall (a) be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA 98 Sub Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery, and (b) release any interest in or Lien upon the SIB Account.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF HTA
## MOSCOSO BOND CLAIMS (CLASS 14)

18.1    **Treatment of HTA Moscoso Bond Claims:**  On the HTA Effective Date, Allowed HTA Moscoso Bond Claims shall be deemed unimpaired, including, without limitation, the curing of all monetary defaults, if any, with respect thereto and, on the HTA Effective Date, each holder of an Allowed HTA Moscoso Bond Claim, in full consideration, satisfaction, release, and exchange of such Allowed HTA Moscoso Bond Claim, shall be entitled to receive payments of principal and interest in accordance with the terms and conditions of the HTA Moscoso Bonds.

## ARTICLE XIX

## PROVISIONS FOR TREATMENT EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 15)

19.1    **Treatment of Eminent Domain/Inverse Condemnation Claims:**  From and after the HTA Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of

45

monies on deposit with the Court of First Instance with respect to the condemned property, and (b) subject to the entry of the HTA Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the HTA Plan providing such claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such unpaid balance; provided, however, that, in the event that the Oversight Board's appeal of the Commonwealth Confirmation Order and the Findings of Fact and Conclusions of Law entered with respect thereto relating to the non-dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth is successful and such Commonwealth Confirmation Order is reversed to such extent, the holder of such unpaid balance of an Allowed Eminent Domain/Inverse Condemnation Claims shall be entitled to receive, in full consideration, satisfaction, release and exchange therefor, payments from HTA equal to, and on the same timeframe as, the payments to be made to holders of Allowed HTA General Unsecured Claims pursuant to the terms and provisions of Sections 20.1, 20.2 and 20.3 hereof.

## ARTICLE XX

## PROVISIONS FOR TREATMENT OF HTA
## GENERAL UNSECURED CLAIMS (CLASS 16)

20.1    **Treatment of HTA General Unsecured Claims:**

(a)    Treatment of HTA General Unsecured Claims.  Subject to the election set forth in Section 20.1(b) hereof, on the HTA Effective Date, each holder of an Allowed HTA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed HTA General Unsecured Claim, such holder's Pro Rata Share of the HTA GUC Recovery up to the GUC Recovery Cap.

(b)    Election to be Treated as a Convenience Claim.  Notwithstanding the provisions of Section 20.1(a) of the HTA Plan, any holder of (i) an Allowed HTA General Unsecured Claim, other than a HTA General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed HTA General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed HTA General Unsecured Claim to Twenty Thousand Dollars ($20,000.00) and (ii) multiple Allowed HTA General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) in the aggregate, and who elects to reduce the aggregate amount of such Allowed HTA General Unsecured Claims to Forty Thousand Dollars ($40.000.00) shall, at such holder's option, be entitled to receive, based on such Allowed HTA General Unsecured Claim as so reduced, distributions pursuant to Section 23.1 hereof.  Such election must be made on the Ballot and be received by the Oversight Board on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon HTA unless the Ballot Date is expressly waived, in

46

writing, by the Oversight Board; provided, however, that, under no circumstances may such waiver by the Oversight Board occur on or after the HTA Effective Date.

20.2 **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed HTA General Unsecured Claims from the HTA GUC Recovery equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust with respect to the Avoidance Actions, any funds remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes.

20.3 **GUC Reserve:** The GUC Reserve shall be funded as follows: (a) Twenty-Four Million Dollars ($24,000,000.00) on the HTA Effective Date; and (b) Twenty-Four Million Dollars ($24,000,000.00) on the first (1st) anniversary of the HTA Effective Date; provided, however, that amounts necessary to satisfy Allowed Convenience Claims shall be deemed to satisfy a portion of the amount to be deposited into the GUC Reserve and be funded directly to the Disbursing Agent and not into the GUC Reserve; and, provided, further, that, in accordance with the provisions of Section 20.2 hereof, in the event recoveries on account of Allowed HTA General Unclaimed Claims from the HTA GUC Recovery equal the GUC Recovery Cap, (y) any funds (other than any recoveries by the Avoidance Actions Trust with respect to the Avoidance Actions) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to HTA for general purposes, or (z) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, HTA shall be relieved of such future funding obligation.

## ARTICLE XXI

### PROVISIONS FOR TREATMENT OF
### HTA/GDB CLAIMS (CLASS 17)

21.1 **Treatment of HTA/GDB Claims:** Pursuant to the terms and provisions of the DRA Stipulation, Allowed HTA/GDB Claims shall not receive a distribution pursuant to the HTA Plan and each holder of an Allowed HTA/GDB Claim shall be deemed to have accepted the HTA Plan.

## ARTICLE XXII

### PROVISIONS FOR TREATMENT OF
### SECTION 510(b) SUBORDINATED CLAIMS (CLASS 18)

22.1 **Treatment of Section 510(b) Subordinated Claims:** Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the HTA Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the HTA Plan with respect to such Section 510(b) Subordinated Claims.

47

# ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 19)

23.1 **Treatment of Convenience Claims:** On the later of the HTA Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

# ARTICLE XXIV

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 20)

24.1 **Treatment of Federal Claims**: On the later to occur of (a) the HTA Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, Reorganized HTA shall (i) in its sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims, or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the HTA Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as Reorganized HTA and the holder of any such Allowed Federal Claim shall agree.

# ARTICLE XXV

## PROVISIONS REGARDING SECURED OBLIGATIONS
## AND ADDITIONAL INDEBTEDNESS

25.1 **Issuance and Distribution of the New HTA Bonds:** On the HTA Effective Date, Reorganized HTA shall issue the Secured Obligations, in minimum denominations of One Dollar ($1.00) and increments of One Dollar ($1.00) thereafter, consisting of New HTA CIBs, New HTA CABs, New HTA Convertible CABs, and Subordinated Indebtedness, as more particularly described herein and in the New HTA Bonds Indenture. The maturities, interest rates and amortization schedules for the Secured Obligations are annexed hereto as Exhibits "D" and "E". All debt service on the Secured Obligations which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate for CABs), compounding semiannually, until the applicable Secured Obligations are paid or satisfied in full in accordance with their terms. Interest on the Secured Obligations shall be calculated on a 30/360 basis. To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New HTA Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New HTA

48

Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings. Notwithstanding anything contained in the HTA Plan to the contrary, to the extent that taxable New HTA Bonds are issued, such New HTA Bonds shall be distributed pro rata to recipients of New HTA Bonds.

    (a)    **New HTA CIBs:** Subject to any adjustments provided for herein, the New HTA CIBs shall have the original principal amount, coupon, maturity date and taxable status as follows: Six Hundred Million Dollars ($600,000,000.00), five percent (5.0%), July 1, 2062, and tax exempt. New HTA CIBs shall not carry any default rate of interest; provided, however, that interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

    (b)    **New HTA CABs:** Subject to any adjustments provided for herein, the New HTA CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: Two Hundred Thirty-Seven Million Nine Hundred Fifty-Five Thousand Eight Hundred Sixty-Eight Dollars and Thirteen Cents ($237,955,868.13), five percent (5.0%), July 1, 2032, and tax-exempt. New HTA CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

    (c)    **New HTA Convertible CABs:** Subject to any adjustments provided for herein, the New HTA Convertible CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: Four Hundred Seven Million Forty-Four Thousand Five Hundred Ninety-Seven Dollars and Fifty-Seven Cents ($407,044,597.57), five percent (5.0%), July 1, 2053, a Conversion Date of July 1, 2032, and tax-exempt. New HTA Convertible CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

    (d)    **Subordinated Indebtedness:** Subject to any adjustments provided herein, the Subordinated Indebtedness shall have the original principal amount, coupon and maturity date as follows: the outstanding principal amount of the Commonwealth Loan as of the HTA Effective Date, plus all accrued and unpaid interest on the Commonwealth Loan as of the HTA Effective Date, two and one-half percent (2.5%), and July 1, 2052.

    (e)    **Deemed Issuance Date:** Notwithstanding the timing of the HTA Effective Date, interest on the New HTA Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2022, and (ii) the HTA Effective Date, which date shall be designated as the "dated date" of the New HTA Bonds.

49

HTA_CONF 00012712

(f) **Call Provisions/Optional Redemption:** The New HTA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

**New HTA CIBs:**

2062 CIBS:  Callable at par on and after 7/1/32

**New HTA CABs:**

2032 CABS:  Non-Callable

**New HTA Convertible CABs:**

2053 CCABS:  Callable at par on and after 1/1/33

(g) **Extraordinary Call Provisions:**  Notwithstanding the terms and provisions of Section 25.1(d) hereof, from and after the HTA Effective Date and until the New HTA Bonds have been satisfied in full in accordance with their terms, (i) upon a full disposition of the Toll Facilities, the New HTA Bonds Trustee shall redeem the New HTA Bonds, at par, plus accrued or accreted interest thereon, and (ii) upon a Partial Disposition, the New HTA Bonds Trustee shall redeem, at par, plus accrued or accredited interest thereon, the allocable portion of New HTA Bonds related to the Toll Facilities subject to such Partial Disposition; provided, however, that, in the event that such redemption is for only a portion of the New HTA Bonds, such redemption shall be done in a manner to preserve the prevailing tax-exempt status of the New HTA Bonds.  Reorganized HTA will not enter into a Partial Disposition unless there is delivered to the New HTA Bonds Trustee a certificate of Reorganized HTA, and approved by the traffic consultant, a certificate setting forth (i) the amount of Net Receipts, as defined in the New HTA Bonds Indenture, that would have been collected in the most recently completed FY had such Partial Disposition occurred prior to the first day of such FY, (ii) maximum annual debt service on the Secured Obligations that will remain outstanding after such agreement becomes effective in accordance with its terms, and (iii) the percentages derived by derived by dividing the amount in clause (i) above by the amounts shown in clause (ii) above, which percentage shall not be less than one hundred twenty percent (120%).

(h) **Pledge of Trust Estate:**  From and after the HTA Effective Date, until the Secured Obligations have been paid or satisfied in full in accordance with their terms, the New HTA Bonds Trustee, on behalf of the holders of Secured Obligations, shall have a valid and perfected first-priority lien on and first-priority security interest in the Trust Estate, subject only to (i) the terms and provisions of the New HTA Bonds Indenture establishing the Authority Expense Fund and the Arbitrage Rebate Fund, and (ii) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted in Trust Estate for the benefit of holders of Subordinated Indebtedness.

(i) **Monthly Deposits of Toll Receipts:**  On the first (1st) Business Day of each calendar month, the New HTA Bonds Trustee shall withdraw the Toll Receipts from the

50

Toll Receipts Fund and transfer and apply such amounts in accordance with the terms and provisions of the New HTA Bonds Indenture. Without in any way limiting the foregoing, on the HTA Effective Date, Reorganized HTA shall deposit into the Toll Receipt Fund such additional amounts as may be necessary to account for the New HTA Bonds being issued as of the Deemed Issuance Date.

(j) **Additional Covenants for New HTA Bonds:** On the HTA Effective Date, the New HTA Bonds Indenture will contain customary terms, conditions and covenants for similarly structured and supported bonds, and such conditions and covenants shall be deemed incorporated herein as though set forth in full.

(k) **Rights of Acceleration:** The New HTA Bonds shall not have rights of acceleration.

(l) **Non-Impairment Covenant:** Pursuant to the New HTA Bonds Indenture, and/or the HTA Confirmation Order, Reorganized HTA shall covenant, pledge to, and agree, for the benefit of all initial and subsequent holders of New HTA Bonds, (i) to enforce the covenant of the Commonwealth set forth in § 2019 of the HTA Enabling Act that the Commonwealth will not limit or restrict the rights or power vested in HTA or Reorganized HTA, as the case may be, under the HTA Enabling Act until all New HTA Bonds, together with all interest thereon, are fully met and discharged and (ii) to take no action that would (A) impair the first-priority lien on and first-priority security interest in the Trust Estate, (B) impair the senior lien and senior security interest on the Trust Estate granted to the holders of New HTA Bonds, which shall in all respects be senior and superior to the subordinate lien and subordinate security interest on the Trust Estate granted to the holders of outstanding Subordinated Indebtedness, (C) impair or prevent the monthly deposits of Toll Receipts as set forth in subsection (i) of this Section 25.1, (D) limit or alter the rights vested in Reorganized HTA in accordance with the HTA Plan and the HTA Confirmation Order to fulfill the terms of any agreements with the holders of the New HTA Bonds or, (E) impair the rights and remedies of the New HTA Bonds Trustee or holders of the New HTA Bonds under the New HTA Bonds Indenture, including, without limitation, the defaults and remedies thereunder.

(m) **Automatic Perfection of Lien on Trust Estate:** The first-priority lien on the Trust Estate established pursuant to the New HTA Bonds Indenture shall be deemed automatically perfected as of the HTA Effective Date.

(n) **Direct Right of Action:** Pursuant to the New HTA Bonds Indenture, and subject to such additional rights as provided therein, the New HTA Bonds Trustee shall have a direct right of action to enforce the terms of the New HTA Bonds Indenture, including, without limitation, with respect to funding deposits made in accordance therewith and seeking specific performance and other available remedies for any breach of covenants in the New HTA Bonds Indenture.

(o) **HTA Fiscal Plans:** HTA Fiscal Plans certified on or after the HTA Effective Date shall provide for the measures necessary to service the obligations contemplated pursuant to this HTA Plan, the New HTA Bonds, and the New HTA Bonds Indenture.

51

(p) **Stamp or Legend:** The New HTA Bonds shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such New HTA Bonds are valid, legally binding and enforceable pursuant to the HTA Confirmation Order.

(q) **Retention of Jurisdiction:** The Title III Court shall retain jurisdiction to enforce the HTA Plan, the New HTA Bonds, and the New HTA Bonds Indenture, including, without limitation, the Toll Rate Covenant, or, in the event the Title III Court declines such retention of jurisdiction or the HTA Title III Case has been closed in accordance with the terms and provisions of PROMESA, the United States District Court for the District of Puerto Rico is hereby designated to enforce this HTA Plan, the New HTA Bonds and the New HTA Bonds Indenture, including, without limitation, the Toll Rate Covenant.

(r) **Governing Law:** The New HTA Bonds Indenture and the New HTA Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the New HTA Bonds Indenture and the New HTA Bonds, the authorization regarding the issuance of the New HTA Bonds is provided by the laws of the Commonwealth.

25.2 **Tax-Exempt Treatment of the New HTA Bonds:** In the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Determination") that all of the New HTA Bonds to be issued on the HTA Effective Date are tax-exempt, the holders of any Claims receiving New HTA Bonds pursuant to the HTA Plan shall receive the benefit of such Determination in the form of tax-exempt New HTA Bonds issued pursuant to the HTA Plan with coupons for all maturities equal to the coupons on the tax-exempt New HTA Bonds set forth on Exhibit "D" hereto; provided, however, that, in the event that the Determination is obtained subsequent to the HTA Effective Date, then the holders of the taxable New HTA Bonds affected by such Determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; and, provided, further, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and, provided, further, that, in the event that neither of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) June 15, 2022, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New HTA Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

25.3 **Adoption and Maintenance of a Debt Management Policy:** During the Debt

HTA_CONF 00012715

Policy Period, Reorganized HTA shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of HTA are not repeated. While Reorganized HTA may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a) **Long-Term Borrowing for Capital Improvements Only:** To ensure Reorganized HTA achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Debt issued by HTA after the HTA Effective Date may only be incurred to finance Capital Improvements, as determined by HTA and approved by AAFAF, and, to the extent not terminated, the Oversight Board, or to refinance Debt in accordance with the terms and provisions of Section 25.3(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in HTA's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b) **30-Year Maturity Limitation on All Borrowings:** No Debt issued by HTA after the HTA Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to Debt issued to refinance New HTA Bonds.

(c) **Required Principal Amortization:** No Debt issued from and after the HTA Effective Date may be issued unless its principal commences to amortize within two (2) years from the placed-in-service date of the project being financed, and continues amortizing in each and every year until such Debt is no longer outstanding.

(d) **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year:** Refinancings of Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by Reorganized HTA in its Debt Management Policy; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

(e) **Fiscal Plan Debt Service:** Any post-HTA Effective Date HTA Fiscal Plan shall include provisions for the payment, in each FY of principal and interest (and/or accreted value, as applicable) with respect to the Secured Obligations, including, without limitation, sinking fund payments due in such FY.

Notwithstanding the foregoing, nothing contained herein shall prohibit Reorganized HTA from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any

53

HTA_CONF 00012716

other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE XXVI

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

26.1 **Treatment of Assured Insured Bond Claims:**  In the event that Classes 3, 7, and 11 vote to accept the HTA Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force or effect, or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other provision of the HTA Plan, holders of Assured Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Assured, in its sole and absolute discretion, prior to the commencement of the Disclosure Statement Hearing and as set forth in the Assured Election Notice or the Assured Bondholder Elections Form, as applicable:

(a) **Assured Election:**  With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, subject to the rights of the HTA Fiscal Agent, Assured shall receive the Assured Plan Consideration allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid by Assured, in full, on the HTA Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b) **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2; and, provided, further, that, for the avoidance of doubt, Assured Insured Bonds owned by Assured (by subrogation or otherwise) shall not be subject to the Assured Bondholder Elections set forth in this Section 26.1(b), and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds:

54

(i)     **Assured Bondholder Election 1:** Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Assured Acceleration Price on the HTA Effective Date, in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Assured Plan Consideration allocable to such holder under the HTA Plan; or

(ii)     **Assured Bondholder Election 2:** Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) the applicable Assured Plan Consideration in accordance with terms acceptable to Assured. The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 26.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment. Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the HTA Effective Date upon thirty (30) days' prior written notice to the relevant holders. Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation. From and after payment of the Assured Acceleration Price, including without limitation, on (i) the HTA Effective Date or (ii) such other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable. Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above, including, without limitation, on the HTA Effective Date, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(c)     **Acceleration of Assured Insured Bonds:** Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the HTA Effective Date, and such Assured Insured Bonds shall be due and payable from and after the HTA Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

55

      (d)    **Assignment of Redemption Rights:**  Notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, HTA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were HTA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

      (e)    **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the HTA Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA

      (f)    **Dual-Insured Bonds:**  In the event any distributions of Cash are made to owners of Dual-Insured Bonds (rather than to Assured as the holder of the related HTA 98 Senior Bond Claims) pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions shall be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies and Assured's obligations under the applicable Assured Insurance Policies.  In the event any distributions of Cash are made on account of Dual-Insured Bonds to Assured as the holder of the related HTA 98 Senior Bond Claims pursuant to decretal paragraph 52 of the Commonwealth Confirmation Order, such Cash distributions shall be deemed to have reduced the principal amounts of such Dual-Insured Bonds as of the date of such Cash distributions and to have resulted in a corresponding reduction in FGIC's obligations under the applicable FGIC Insurance Policies, but shall be deemed not to have reduced (i) Assured's obligations under the applicable Assured Insurance Policies or (ii) the principal amount of any custody receipt evidencing a beneficial interest in such Dual-Insured Bonds and related Assured Insurance Policies.

    26.2   **Treatment of National Insured Bond Claims:**  In the event that Classes 4, 9 and 13 vote to accept the HTA Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, holders of Allowed National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing and be set forth on the National Bondholder Election Form or the National Election Notice, as applicable; provided, however, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Section 26.2 and, subject to the rights of the HTA Fiscal Agent, National shall receive the National Plan Consideration on account of such bonds; and, provided, further, that, subject to providing holders of Allowed National Insured Bond Claims with the treatment or elections set forth in this Section 26.2 and satisfying all such treatment or elections, National shall have all right, title and interest in the National HTA Consideration and shall manage the National HTA Consideration in its sole and absolute discretion subject to and in accordance with all applicable laws and regulations; and, provided, further, that any calculations and/or payments to be made to a holder based on, or

HTA_CONF 00012719

in relation to, such holder's Allowed National Insured Bond Claim pursuant to the options set forth in this Section 26.2 will take into account any payments of principal and/or accrued interest already made to such holder by National pursuant to the terms of the relevant National Insurance Policies, and such holder shall not be compensated for any amounts already paid to such holder pursuant to the terms of the relevant National Insurance Policies:

(a)     **National Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National):**  Each holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall have the option to elect on the National Bondholder Election Form to receive, on the HTA Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital appreciation bonds, the accreted value on and after, the Deemed Issuance Date, and to the extent any accrued or accreted interest is paid to such holder by National after such date, such amount shall be credited against the Cash such holder, their successors, transferees or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim.  The National Insured Bonds of a holder that timely and validly elects to receive the National Commutation Treatment or makes an improper election as described in Section 26.2(g) hereof, shall be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

(b)     **National Non-Commutation Treatment of HTA 68 Bond Claims (National) and HTA 98 Senior Bond Claims (National):**  In the event that a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment in accordance with the provisions of Sections 26.2(b) and (g) hereof, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such holder shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing, and as detailed in the applicable National Bondholder Election Form:

(i)     **Custodial Trusts:**  Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing holder, and the related National Insurance Policies into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

57

(ii)     **Escrow:**  Such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii)     **Payment of Accelerated Amounts:**  National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the HTA Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

(iv)     **Alternative Treatment:**  The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, with respect to different CUSIPs and different holders of National Insured Bonds.

(c)     **Acceleration of National Insured Bonds:**  Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the HTA Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the HTA Effective Date, and such National Insured Bonds shall be due and payable from and after the HTA Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  National shall have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the holder of the National Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable National Insurance Policy or other documents related to the National Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

(d)     **Treatment of HTA 98 Sub Bond Claims (National):**  On the HTA Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth (10th) Business Day following the HTA Effective Date, each holder of an Allowed HTA 98 Sub

HTA_CONF 00012721

Bond Claim (National) shall receive Cash in an amount equal to the National Acceleration Price, in full and final satisfaction, release, and discharge of National's obligations under the applicable National Insurance Policy, and National shall receive the National Plan Consideration that would be otherwise distributable to such holder, its successors, transferees, or assigns on account of its HTA 98 Sub Bond Claim (National).

(e) **Assignment of Redemption Rights:** Notwithstanding any other provision of the HTA Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the HTA Effective Date, HTA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were HTA for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(f) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the HTA Plan by holders of National Insured Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment as set forth in Section 26.2(a) hereof and the National Non-Commutation Treatment as set forth in Section 26.2(b) hereof shall be made by the beneficial holders of the applicable National Insured Bonds on the applicable National Bondholder Election Form; provided, however, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Section 26.2(b) hereof.

(g) **Improper Election:** If a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) (1) fails to timely and validly elect the National Non-Commutation Treatment pursuant to Section 26.2(b) hereof, or (2) submits an election for less than all of its National Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in Section 26.2(a) hereof with respect to such National Insured Bond Claims, to commute the applicable National Insurance Policies, to release and discharge National's obligations under such National Insurance Policies, and to receive distributions in accordance with Section 26.2(a) hereof. In addition, the National Insured Bonds of a holder of an Allowed HTA 68 Bond Claim (National) or Allowed HTA 98 Senior Bond Claim (National) that does not validly elect to receive the National Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed cancelled on the HTA Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

26.3 **Treatment of FGIC Insured Bond Claims**: In the event that Classes 8 and 12 vote to accept the HTA Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, holders of FGIC Insured Bond Claims shall receive the following treatments:

59

(a)      **FGIC Insured Bond Claims Treatment**:  Each holder of an Allowed
FGIC Insured Bond Claim (except as provided in Section 26.3(b) hereof) shall (A) deposit, or be
deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan
Consideration, its proportionate share of the CW/HTA Clawback Recovery, and the FGIC
Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable
FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan
Consideration and FGIC Certificates in consideration therefor.  All rights and remedies under
and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable
related legislative bond resolutions (other than with respect to the payment obligations of the
Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as
they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force
and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured
Bonds under the applicable FGIC Insurance Policy.  For the avoidance of doubt, each
distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically
and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the
FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in
FGIC's obligations under the applicable FGIC Insurance Policies.

(b)      **FGIC Insured Bond Claims Owned By FGIC:**  With respect to all
Allowed FGIC Insured Bond Claims owned by FGIC, on the HTA Effective Date, and subject to
the rights of the HTA Fiscal Agent, FGIC shall be entitled to receive, in full consideration,
satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, its Pro Rata
Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c)      **Dual-Insured Bonds:**  FGIC Certificates allocable to holders of Dual-
Insured Bonds shall be distributed in accordance with the terms and provisions of Section 26.1
hereof.

(d)      **Acceleration of FGIC Insured Bonds:**  Notwithstanding any other
provision of the HTA Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC
Insured Bonds shall be accelerated as of the HTA Effective Date, and the FGIC Insured Bonds
shall be due and payable from and after the HTA Effective Date at an "acceleration price" of one
hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the
case of capital appreciation bonds, the compounded amount thereof) to the date of payment;
<u>provided</u>, <u>however</u>, that for the avoidance of doubt, notwithstanding such acceleration, there
shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance
Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an
accelerated basis and FGIC has the express right to accelerate any such payment under the
applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC
Insured Bonds.

(e)      **Assignment of Redemption Rights:**  Notwithstanding any other
provision of the HTA Plan, to the extent permitted pursuant to applicable definitive insurance
documents and the applicable FGIC Insurance Policy, on the HTA Effective Date, HTA shall be
deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds
and any related rights such that such rights may be exercised directly and exclusively by FGIC as
if it were HTA for such purpose.

HTA_CONF 00012723

(f) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the HTA Plan by holders of FGIC Insured Bond Claims shall be made by the Oversight Board to FGIC in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents.

26.4 **Treatment of Ambac Insured Bond Claims**: In the event that Classes 2 and 6 vote to accept the HTA Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the HTA Effective Date, then, notwithstanding any other provision of the HTA Plan, on the HTA Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatment, as provided in the Ambac Election Notice and to the extent offered by Ambac, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing; provided, however, that, notwithstanding the following, Ambac may make different elections with respect to different CUSIPs and different Ambac Insured Bonds:

(a) **Treatment of HTA 68 Bond Claims (Ambac)**: On the HTA Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth (10th) day following the HTA Effective Date, each holder of an Allowed HTA 68 Bond Claim (Ambac) shall receive Cash in the amount equal to the Ambac Acceleration Price, in full and final satisfaction, release, and discharge of Ambac's obligations under the applicable Ambac Insurance Policy, and, subject to the rights of the HTA Fiscal Agent, Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to such holder, its successors, transferees or assigns on account of its HTA 68 Bond Claims (Ambac). For the avoidance of doubt, the Ambac Acceleration Price will include accrued and unpaid interest as of the date of payment.

(b) **Treatment of HTA 98 Senior Bond Claims (Ambac):** On the HTA Effective Date, or as soon as reasonably practicable thereafter, but in no event later than the tenth (10th) day following the HTA Effective Date, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) shall receive one of the following treatments:

(i) **Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment:** To the extent offered by Ambac, in its sole and absolute discretion, each holder of an Allowed HTA 98 Senior Bond Claim (Ambac) shall have the option to elect on the Ambac Bondholder Election Forms, to receive, on the HTA Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) such beneficial holder shall have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s), and (ii) subject to the rights of the HTA Fiscal Agent, Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder. The Ambac Insured HTA 98 Senior Bonds of a holder that validly elects to receive the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment, or makes an improper election as described in Section 26.4(f) hereof, shall be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and

61

HTA_CONF 00012724

Ambac's obligations under the applicable Ambac Insurance Policy shall be fully and finally
satisfied, released, and discharged.

        (ii)      **Allowed HTA 98 Senior Bond Claim (Ambac) Non-
Commutation Treatment:** In the event that a holder of an Allowed HTA 98 Senior Bond
Claim (Ambac) timely and validly elects on the Ambac Bondholder Election Form, to receive
the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment, such holder of
an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments
offered by Ambac, in its sole and absolute discretion, and as detailed in the applicable Ambac
Bondholder Election Form:

        (1)      **Custodial Trusts:**

        (i)      Such holder of an Allowed HTA 98 Senior Insured Bond Claim
(Ambac) shall deposit, or be deemed to have deposited, into the applicable Ambac Trust(s), (A)
such holder's Ambac Insured Bonds with respect to which the election has been made and the
related Ambac Insurance Policies, (B) such holder's Pro Rata Share of the Ambac Plan
Consideration, consisting of (1) Cash, (2) the CW/HTA Clawback Recovery, consisting of the
HTA Clawback CVIs and all payments on or collections in respect of such HTA Clawback
CVIs, and (3) the New HTA Bonds, and (C) shall be deemed to have received Ambac
Certificates in consideration therefor; such holders shall have no recourse to Ambac or the
applicable Ambac Insurance Policies other than as provided for under the terms of the Ambac
Trust(s). In the event the interim distribution amounts provided for in decretal paragraph 52 of
the Commonwealth Confirmation Order have been distributed directly to holders of Ambac
Insured Bonds prior to the HTA Effective Date, thereby reducing the principal amount of such
Ambac Insured HTA 98 Senior Bonds, such interim cash distributions need not be deposited into
the Ambac Trust(s).

        (ii)      The terms of the Ambac Trust(s) shall be set forth in a trust
agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall
include the following terms, without limitation: (A) Ambac shall not insure any payments on the
Ambac Certificates, shall not be required to pay any default or other interest amounts with
respect to the Ambac Insured Bonds, and is only required to pay its obligations under the
applicable Ambac Insurance Policy as provided therein and in the agreement HTA 98 Senior
governing the Ambac Trust(s); (B) Ambac shall be deemed the sole holder of the Ambac Insured
HTA 98 Senior Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration,
events of default, and election and direction of rights and remedies, including, without limitation,
in connection with insolvency proceedings during the period that there are no outstanding
payment defaults by Ambac under the applicable Ambac Insurance Policies; and (C) the
agreement governing the Ambac Trust(s) will provide, among other things, that (1) all rights of a
holder of Ambac HTA 98 Senior Insured Bonds held by the Ambac Trust(s) (whether as to
amendments and consents, direction of remedies or otherwise) shall be exercisable solely by
Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the
Ambac Insured HTA 98 Senior Bonds (other than as otherwise described in the Ambac Trust(s)),
(2) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the
underlying Ambac Insured HTA 98 Senior Bonds to individual holders of Ambac Certificates
upon the release of such holder's claims on the related Ambac Insurance Policy and against the

HTA_CONF 00012725

Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment, and (3) Ambac may, at its option, elect to direct the sale of any Ambac Trust Assets.

        (1)    **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to the holders of Allowed HTA 98 Senior Insured Bond Claims (Ambac) and Ambac's obligations to such holders shall be fully and completely discharged upon the payment, on the HTA Effective Date, or as soon as practicable thereafter, but in no event later than the tenth (10th) day following the HTA Effective Date, in Cash, of the Ambac Acceleration Price with respect thereto.

        (2)    **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Allowed HTA 98 Senior Bond Claim (Ambac) Non Commutation Treatment of the Ambac Insured HTA 98 Senior Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, at or prior to the commencement of the Disclosure Statement Hearing.

        (c)    **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the HTA Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to its obligations under the applicable Ambac Insurance Policies up to and including the HTA Effective Date, the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the HTA Effective Date. Ambac shall have the right to pay the Ambac Acceleration Price with respect to such bonds at any time, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

        (d)    **Assignment of Redemption Rights:** Notwithstanding any other provision of the HTA Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the HTA Effective Date, HTA shall be deemed to have assigned to Ambac any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were HTA for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

        (e)    **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (1) the solicitation of acceptances and rejections of the HTA Plan by holders of Ambac Insured Bond Claims shall be made by the Oversight Board to Ambac in

HTA_CONF 00012726

accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (2) where applicable and as described in Section 26.4(b) hereof, the election to choose between the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment as set forth in Section 26.4(b)(i) hereof and the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii) hereof shall be made by the beneficial holders of Ambac Insured HTA 98 Senior Bonds; provided, however, that the form of the Ambac Non-Commutation Treatment shall be selected by Ambac in accordance with the terms and provisions of Section 26.4(b)(ii) hereof.

(f)     **Improper Election:**  If a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) (1) fails to timely and validly elect either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i) hereof or the Allowed HTA 98 Senior Bond Claim (Ambac) Non-Commutation Treatment as set forth in Section 26.4(b)(ii) hereof, or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive with respect to its HTA 98 Senior Bond Claims (Ambac), the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment set forth in Section 26.4(b)(i) hereof, to commute the applicable Ambac Insurance Policies, and to fully and finally satisfy, release and discharge Ambac's obligations under such Ambac Insurance Policies, and shall receive, with respect to its HTA 68 Bond Claims (Ambac), the Allowed 68 Bond Claim (Ambac) Treatment, if any, as set forth in Section 26.4(a) hereof.  In addition, a holder of an Allowed HTA 98 Senior Bond Claim (Ambac) that does not validly elect to receive either the Allowed HTA 98 Senior Bond Claim (Ambac) Commutation Treatment or the Allowed HTA 98 Senior Bond (Ambac) Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed to have had, on or after the HTA Effective Date, its Ambac Insured HTA 98 Senior Bonds cancelled, and Ambac's obligation under the applicable Ambac Insurance Policy shall be fully and finally satisfied released and discharged.

26.5     **Fiscal Agent Obligations**:  Notwithstanding anything contained in the HTA Plan to the contrary, including, without limitation, the terms and provisions of this Article XXVI, the HTA Fiscal Agent shall have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date.

## ARTICLE XXVII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

27.1     **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**:  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 27.5 and 27.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the HTA Effective Date, shall be deemed rejected by the Debtor as of the HTA Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the HTA Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the

64

Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, or (g) by or between any Commonwealth agencies, departments, municipalities, public corporations or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtor reserves the right, on or prior to the HTA Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the HTA Effective Date. The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 27.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 27.1, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that the Debtor have any liability thereunder.

27.2 **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**: Entry of the HTA Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 27.1 of the HTA Plan.

27.3 **Inclusiveness**: Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

27.4 **Cure of Defaults**: Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 27.1 of the HTA Plan, the Debtor shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the HTA Confirmation Hearing, file with the Title III Court and serve by first class mail on each non- Debtor party to such Executory Contracts and Unexpired Leases to be assumed pursuant to Section 27.1 of the HTA Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor. If

65

there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court. Notwithstanding the terms and provisions of Section 27.1 of the HTA Plan, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the HTA Effective Date.

27.5 **Insurance Policies**: Subject to the terms and provisions of Section 27.7 hereof, each of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the HTA Plan; provided, however, that, except to the extent provided herein, the HTA Confirmation Order and the Definitive Documents, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

27.6 **Rejection Damage Claims**: If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, including, without limitation, Reorganized HTA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized HTA, as the case may be, on or before thirty (30) days after the later to occur of (i) the HTA Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

27.7 **Indemnification and Reimbursement Obligations**: For purposes of the HTA Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the HTA Petition Date, shall be deemed assumed as of the HTA Effective Date, and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the HTA Petition Date, as the case may be, shall be Administrative Expense Claims; provided, however, that, under no circumstances shall the Debtor or Reorganized HTA, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

27.8 **Nonoccurrence of HTA Effective Date**: In the event that the HTA Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

27.9 **Reservation of Rights**: Nothing contained in the HTA Plan or the Plan Supplement shall constitute an admission by the Debtor, Reorganized HTA or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtor have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized HTA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

66

HTA_CONF 00012729

27.10  **Collective Bargaining Agreements**:  Except as provided in Article XXVII hereof, none of the Debtor's collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the HTA Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Section 2.5 hereof regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE XXVIII

## PROVISIONS GOVERNING DISTRIBUTIONS

28.1  **Time and Manner of Distribution**:  Except as otherwise provided herein, distributions under the HTA Plan shall be made to each holder of an Allowed Claim as follows:

(a)  **Distributions to Holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), and HTA 68 Bond Claims (National):** Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 68 Bond Claim, an Allowed HTA 68 Bond Claim (Ambac), an Allowed HTA 68 Bond Claim (Assured), or an Allowed HTA 68 Bond Claim (National), and in each case consistent with the terms hereof, such holder's Pro Rata Share, if any, of the HTA 68 Bond Recovery, the HTA Restriction Fee, and HTA Consummation Costs, if applicable.

(b)  **Distributions to Holders of HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and HTA 98 Senior Bond Claims (National):**  Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 98 Bond Claim, an Allowed HTA 98 Senior Bond Claim (Ambac), an Allowed HTA 98 Senior Bond Claim (Assured), an Allowed HTA 98 Senior Bond Claim (FGIC), or an Allowed HTA 98 Senior Bond Claim (National), such holder's Pro Rata Share, if any, of (i) HTA 98 Senior Bond Recovery, (ii) the HTA PSA Restriction Fee, and (iii) HTA Consummation Costs, in each case, to the extent applicable.

(c)  **Distributions to Holders of HTA 98 Sub Bond Claims, HTA 98 Sub Bond Claims (Assured), HTA 98 Sub Bond Claims (FGIC), and HTA 98 Sub Bond Claims (National):**  Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA 98 Sub Bond Claim, an Allowed HTA 98 Sub Bond Claim (Assured), an Allowed HTA 98 Sub Bond Claim (FGIC), or an Allowed HTA 98 Sub Bond Claim (National), such holder's Pro Rata Share of the HTA 98 Sub Bond Recovery.

(d)  **Distributions with Respect to HTA General Unsecured Claims:** Except as otherwise provided herein, on the HTA Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed HTA General Unsecured Claim such holder's Pro Rata Share, if any, of the HTA GUC Recovery.

(e)  **Distributions with Respect to Eminent Domain/Inverse Condemnation Claims:**  Except as otherwise provided herein, within ten (10) Business Days

67

following the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Eminent Domain/Inverse Condemnation Claim, Cash in the amount of such Allowed Claim.

        (f)    **Distribution of Cash to Holders of Allowed Administrative Expense Claims:** Except as otherwise provided herein, on or as soon as practicable after the later of (i) the HTA Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

        (g)    **Distribution of Cash to Holders of Allowed Convenience Claims:** Except as otherwise provided herein, on or as soon as practicable after the later of (i) the HTA Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Claim, Cash in the amount of such Allowed Convenience Claim.

        28.2    **Timeliness of Payments**: Any payment or distribution to be made pursuant to the HTA Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the HTA Plan. Whenever any distribution to be made under this HTA Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 28.1 hereof to have been made on the HTA Effective Date.

        28.3    **Distributions by the Disbursing Agent**: Except as otherwise provided herein or in the HTA Confirmation Order, all distributions under the HTA Plan shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

        28.4    **Manner of Payment under the HTA Plan**: Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

        28.5    **Delivery of Distributions**: Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the HTA Confirmation Order or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent on account of Allowed HTA Bond Claims shall be made to, or at the direction of, the HTA Fiscal Agent in accordance with the respective governing documents for such

68

obligations; and, provided, further, that the Disbursing Agent may make distributions of HTA PSA Restriction Fees, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The HTA Fiscal Agent (or the HTA Fiscal Agent's designee) shall, in turn, deliver the distribution to the applicable holders in the manner provided for in the applicable governing documents. Regardless of whether such distributions are made by the HTA Fiscal Agent or the Disbursing Agent at the direction of the HTA Fiscal Agent, any Charging Lien of the HTA Fiscal Agent shall attach to such distributions in the same manner as if such distributions were made by or through the HTA Fiscal Agent. The HTA Fiscal Agent may rely upon the distribution instructions received from the Debtor or its agents with respect to delivery of distributions in accordance with the terms and provisions of this Article XXVII, including any contra-CUSIP positions and escrow positions set up by the debtor or its agents with the Depository Trust Company. The Debtor, its agents and servicers, the HTA Fiscal Agent, and the Disbursing Agent shall have no obligation to recognize any transfer of HTA Bond Claims after the Distribution Record Date; provided, however, that the New HTA Bonds and the HTA Clawback CVIs will be transferable and recognized in accordance with the terms and conditions of the New HTA Bonds Indenture and the CVI Indenture, respectively.

     28.6 **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the HTA Plan, (b) for purposes of evidencing a right to distribution under the HTA Plan, or (c) as specifically provided otherwise in the HTA Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 27.1 hereof), on the HTA Effective Date, the HTA Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtor and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtor, under the HTA Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the HTA Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the HTA Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed HTA Bond Claims and Allowed Insured HTA Bond Claims to receive distributions in accordance with the terms and provisions of the HTA Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the HTA Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 26.1 and 26.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that HTA use its reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured HTA Bonds, and (2) take such other reasonable steps as may be necessary to preserve

and effectuate such Claims; and, provided, further, that, notwithstanding the foregoing or anything else contained in the HTA Plan to the contrary, the HTA Fiscal Agent shall have no duties or responsibilities with respect to any HTA Bonds that are deposited into any of the Ambac Trust, the Assured Trust, the FGIC Trust, or the National Trust from and after the HTA Effective Date. Notwithstanding the foregoing, and except as otherwise expressly provided in the HTA Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized HTA, as the case may be.

28.7 **Undeliverable/Reserved Distributions**:

(a) **Holding of Undeliverable Distributions by the Disbursing Agent**: If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Subject to the terms and provision of Section 32.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind. Nothing contained in the HTA Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b) **Failure to Claim Undeliverable Distributions**: If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the HTA Effective Date, with respect to all Allowed Claims as of the HTA Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the HTA Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the HTA Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the HTA Plan, against Reorganized HTA, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized HTA for use to discharge operating expenses of Reorganized HTA, and (2) the HTA Bonds in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized HTA for cancellation or deposit into the treasury of Reorganized HTA, as determined by Reorganized HTA in its sole and absolute discretion.

28.8 **Withholding and Reporting Requirements**: Any party issuing any instrument or making any distribution under the HTA Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the HTA Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the HTA Plan shall have the sole and exclusive responsibility for the

HTA_CONF 00012733

satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the HTA Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the HTA Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

28.9 **Time Bar to Cash Payments**: Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the HTA Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

28.10 **Distributions After HTA Effective Date**: Distributions made after the HTA Effective Date to holders of Claims that are not Allowed Claims as of the HTA Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XXVIII of the HTA Plan.

28.11 **Setoffs**: Except as otherwise provided in the HTA Plan or in the HTA Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the HTA Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtor or Reorganized HTA may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized HTA of any such claims, rights, and Causes of Action that the Debtor or Reorganized HTA may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this Section 28.11 shall affect the releases and injunctions provided in Article XLI of the HTA Plan.

28.12 **Allocation of Plan Distributions Between Principal and Interest**: Unless otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under

71

the HTA Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated <u>first</u>, to interest accrued and unpaid as of the date immediately preceding the HTA Petition Date, <u>second</u>, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; <u>provided</u>, <u>however</u>, that the Debtor or Reorganized HTA's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

28.13 **Payment of Trustee Fees and Expenses**: The distributions to be made pursuant to the HTA Plan and the Commonwealth Confirmation Order to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on account of such Claims are intended to be inclusive of any and all of the HTA Fiscal Agent's reasonable fees and expenses due and owing by HTA pursuant to the applicable bond resolutions with respect to amounts discharged pursuant to the HTA Plan (the "HTA Fiscal Agent's Fees and Expenses"). To the extent not deducted in connection with payments made in accordance with the Commonwealth Confirmation Order upon satisfaction of the Distribution Conditions, the HTA Fiscal Agent's Fees and Expenses shall be deducted on a pro rata basis from distributions to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on account of such Claims, such that the cost of such HTA Fiscal Agent's Fees and Expenses is shared equally by all holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims based on the amount of their Claims; <u>provided</u>, <u>however</u>, that, notwithstanding anything in the HTA Plan, the HTA Confirmation Order, or the applicable bond resolutions to the contrary, the HTA Fiscal Agent's Fees and Expenses shall not exceed $2,360,681.02. In the event amounts reserved or deducted by the HTA Fiscal Agent from the distributions to be made to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims exceed the HTA Fiscal Agent's Fees and Expenses, such excess amounts shall be distributed by, or at the direction of, the HTA Fiscal Agent on a pro rata basis to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims on the HTA Effective Date (the "Excess Distribution"). For purposes of this Section 28.13, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims and the HTA 98 Senior Bond Claims arising from the HTA Bonds which are insured by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA, applicable law, and governing insurance and other documents applicable to such HTA Bonds; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to FGIC, and (b) with respect to any HTA 98 Senior Bonds insured by FGIC, but not owned by FGIC, the HTA Fiscal Agent shall make the Excess Distribution attributable thereto, if any, to the owners of such HTA 98 Senior Bonds. Except as otherwise provided in this Section 28.13, the HTA Plan does not, nor shall it be construed to, limit the rights of the HTA Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

28.14 **Beneficial Owner**: For all purposes of the HTA Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article XXVIII, the "holder" of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; <u>provided</u>, <u>however</u>, that, for purposes of Article XXVIII hereof and section 1126 of the Bankruptcy Code, (a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with Section

HTA_CONF 00012735

301(c)(3) of PROMESA, applicable law and governing insurance and other documents
applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims,
(b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured
CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured
CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable
law and governing insurance and other documents applicable to the Assured Insured Bond
Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims, and
the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any Ambac
Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA Bond
Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of
PROMESA, applicable law and governing insurance and other documents applicable to the
Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA
Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the
"holder" of any FGIC Insured Bond Claims and any FGIC CW/HTA Bond Claims, in
accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and
other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/HTA Bond Claims,
(e) Syncora shall constitute the "holder" of any HTA Bond Claims and CW/HTA Bond Claims
arising from or related to HTA 98 Senior Bonds bearing CUSIP number 745190AY4, and the
principal and interest payments of which have been insured by Syncora in accordance with
Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents
applicable to such Claims; provided, however, that, solely to the extent permitted by governing
insurance and other documents, on the HTA Effective Date, Syncora shall pay the beneficial
owners of such HTA 98 Senior Bonds the Syncora Acceleration Price; and, provided, further,
that Syncora shall indemnify and hold the Oversight Board, the Commonwealth, HTA, and
Reorganized HTA harmless from any and all claims, liabilities, damages, and causes of action
arising from or related to the acceleration of such HTA 98 Senior Bonds and the payment of the
Syncora Acceleration Price, and (f) the "holder" of any other Insured HTA Bond Claims shall be
determined in accordance with Section 301(c)(3) of PROMESA and any law or governing
documents applicable to such Insured HTA Bond Claims.

28.15   **Value of Distributions**:  For purposes of calculating the value of distributions
made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and
(b) the New HTA Bonds shall be valued at the original principal amount thereof.

28.16   **Disputed Funds Stipulation**:  In the event that the Distribution Conditions are
not satisfied prior to the HTA Effective Date, on the HTA Effective Date, the Distribution
Conditions shall be deemed satisfied and payments and distributions to be made in connection
therewith pursuant to the terms and provisions of the Commonwealth Confirmation Order and
the HTA/CCDA Plan Support Agreement shall be made on the HTA Effective Date to holders of
HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA
68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims
(Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC), and
HTA 98 Senior Bond Claims (National), including, without limitation, the distribution of monies
in accordance with the Disputed Funds Stipulation, subject to the rights of The Bank of New
York Mellon, as fiscal agent, to assert and apply, on a pro rata basis, any and all of its rights with
respect thereto.

HTA_CONF 00012736

## ARTICLE XXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTOR

29.1 **Prosecution of Claims**: Except as settled and released herein, from and after the HTA Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be included in the HTA GUC Recovery and be distributed to holders of Allowed HTA General Unsecured Claims.

## ARTICLE XXX

## ACCEPTANCE OR REJECTION OF THE HTA PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

30.1 **Impaired Classes to Vote**: Each holder of a Claim, as of the Voting Record Date or at the time of tender into ATOP, as the case may be, in an impaired Class not otherwise deemed to have rejected or accepted the HTA Plan in accordance with Article XXXIII of the HTA Plan shall be entitled to vote separately to accept or reject the HTA Plan.

30.2 **Acceptance by Class of Creditors**: An impaired Class of holders of Claims shall have accepted the HTA Plan if the HTA Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the HTA Plan.

30.3 **Cramdown**: In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the HTA Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to (i) request that the Bankruptcy Court confirm the HTA Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the HTA/CCDA PSA Creditors, in accordance with the provisions of the HTA/CCDA Plan Support Agreement, amend the HTA Plan.

## ARTICLE XXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

31.1 **Exculpation**: From and after the HTA Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the HTA Plan or any order of the Title III Court entered pursuant to or in furtherance of the HTA Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the HTA Plan or for implementing the provisions of the HTA Plan,

74

HTA_CONF 00012737

except for claims or causes of action arising from the gross negligence or willful misconduct of the Disbursing Agent.

31.2    **Powers of the Disbursing Agent**:  Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the HTA Plan, (b) make distributions contemplated by the HTA Plan, (c) comply with the HTA Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the HTA Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the HTA Plan.

31.3    **Fees and Expenses Incurred From and After the HTA Effective Date**:  Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the HTA Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court; provided, however, that the Disbursing Agent shall not be entitled to reimbursement or indemnification by Reorganized HTA related to claims or causes of action arising from the gross negligence or willful misconduct of the Disbursing Agent.

# ARTICLE XXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS AND CLAIMS SUBJECT TO ACR PROCEDURES

32.1    **Objections to Claims; Prosecution of Disputed Claims**:

(a)    Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized HTA, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court.  Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtor, Reorganized HTA shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the HTA Effective Date or such later date as may be approved by the Title III Court.  Following the making of distributions to holders of Allowed HTA Bond Claims in accordance with the provisions hereof, any HTA Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Kroll Restructuring Administration LLC (formerly Prime Clerk LLC), its court-appointed representative, to remove such HTA Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event

75

HTA_CONF 00012738

that an order reversing or vacating the HTA Confirmation Order with respect to HTA Bond Claims becomes a Final Order, such HTA Bond Claims shall be reinstated on the claims registry.

(b)     The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process with respect to HTA General Unsecured Claims, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to HTA General Unsecured Claims and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from HTA General Unsecured Claims as provided in the HTA Plan, and (C) in the event that such appointees disagree with any settlement of an HTA General Unsecured Claim, for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of HTA and its creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. Such appointees and their advisors shall not be entitled to compensation in excess to that provided pursuant to the Commonwealth Plan and the Commonwealth Confirmation Order.

(c)     From and after the HTA Effective Date, all Late-Filed Claims shall be deemed denied, with prejudice, and the Oversight Board shall instruct Kroll Restructuring Administration LLC (formerly Prime Clerk LLC), its court-appointed representative, to remove such Late-Filed Claims from the claims registry maintained for the benefit of the Title III Court and the Oversight Board shall cause a notice with respect thereto to be served upon the holder of such Late-Filed Claim.

32.2    **Estimation of Claims**:  Except with respect to Allowed Claims, on and after the HTA Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized HTA, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized HTA, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

32.3    **Payments and Distributions on Disputed Claims**:

HTA_CONF 00012739

(a) **Disputed Claims Holdback:** From and after the HTA Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized HTA shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized HTA; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. To the extent that Reorganized HTA retains any New HTA Bonds on behalf of Disputed Claims holders, until such New HTA Bonds are distributed, Reorganized HTA shall exercise voting or consent rights with respect to such obligations.

(b) **Allowance of Disputed Claims:** At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the HTA Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.

32.4 **Authority to Amend Lists of Creditors**: Except with respect to HTA Bond Claims, and subject to the limitations in Section 32.1(b) hereof, the Debtor shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court. If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

32.5 **Non-Accrual of Interest**: Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the HTA Petition Date, on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any disputed claim with respect to the period from the HTA Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

32.6 **Disallowance of Claims**: All Claims of any Entity from which property is sought by the Debtor under sections 550, or 553 of the Bankruptcy Code or that the Debtor alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor, on the

HTA_CONF 00012740

other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

32.7    **Claims Subject to ACR Procedures**:  To the extent not already transferred as of the HTA Effective Date in accordance with the terms and conditions of the ACR Order, the Debtor or Reorganized HTA, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtor and Reorganized HTA, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the HTA Plan, shall not be included in HTA General Unsecured Claims to be satisfied from the HTA GUC Recovery or Convenience Claims. Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the HTA Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 16 or Class 19 under the HTA Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 32.7.

**ARTICLE XXXIII**

**IDENTIFICATION OF CLAIMS IMPAIRED BY THE HTA PLAN
AND NOT IMPAIRED BY THE HTA PLAN**

33.1    **Impaired Classes**:  The Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, and 20 are impaired and receiving distributions pursuant to the HTA Plan, and are therefore entitled to vote to accept or reject the HTA Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Class 19 is deemed to have accepted the HTA Plan.  The Claims in Class 18 are impaired and not receiving a distribution pursuant to the HTA Plan and, therefore, Class 18 is deemed to have rejected the HTA Plan.

33.2    **Unimpaired HTA Classes**:  Claims in Class 14 and 19 are unimpaired pursuant to the HTA Plan, are deemed to have accepted the HTA Plan and are not entitled to vote to accept or reject the HTA Plan.

78

# ARTICLE XXXIV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE HTA PLAN

34.1 **Conditions Precedent to Confirmation of the HTA Plan**: Confirmation of the HTA Plan is subject to satisfaction of the following conditions precedent:

(a) **Fiscal Plan Certification:** The Oversight Board shall have certified an HTA Fiscal Plan consistent with the HTA Plan and shall have certified the submission of the HTA Plan, and any modifications to the HTA Plan through the HTA Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b) **Required Orders:** The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the HTA Confirmation Order) providing for the following:

(i) Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii) Authorizing the solicitation of votes and elections with respect to the HTA Plan;

(iii) Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv) Confirming and giving effect to the terms and provisions of the HTA Plan, including the releases set forth in Article XLI of the HTA Plan;

(v) Determining that the compromises and settlements set forth in the HTA Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

(vi) Determining that all applicable tests, standards and burdens in connection with the HTA Plan have been duly satisfied and met by the Oversight Board, the Debtor and the HTA Plan;

(vii) Approving the documents in the Plan Supplement, other than the Reorganized HTA By-Laws, and determining that such documents are valid and binding on parties with respect thereto; and

(viii) Authorizing Reorganized HTA to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the HTA Plan, and the documents in the Plan Supplement.

(c) **Form of Orders:** The HTA Confirmation Order and the HTA Plan are each in form and substance reasonably acceptable to the Oversight Board, AAFAF, the Debtor,

HTA_CONF 00012742

the HTA/CCDA PSA Creditors and, solely with respect to provisions affecting Classes 16 and 19, the Creditors' Committee.

(d) **HTA Confirmation Order:** The HTA Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the HTA Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XLI of the HTA Plan and (iii) the applicable provisions set forth in Section 34.1(b) hereof.

34.2 **Waiver of Conditions Precedent to Confirmation**: Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 34.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtor, and the Initial HTA/CCDA PSA Creditors, and solely with respect to the provisions affecting Classes 16 and 19, the Creditors' Committee, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

# ARTICLE XXXV

## CONDITIONS PRECEDENT TO THE HTA EFFECTIVE DATE

35.1 **Conditions Precedent to the HTA Effective Date**: The occurrence of the HTA Effective Date and the substantial consummation of the HTA Plan are subject to satisfaction of the following conditions precedent:

(a) **Fiscal Plan Certification:** The Oversight Board shall have determined that the HTA Plan is consistent with the Debtor's Fiscal Plan and shall have certified the submission of the HTA Plan, and any modifications to the HTA Plan through the HTA Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA. The HTA Fiscal Plan certified as of the HTA Effective Date shall include provisions for the payment of principal and interest with respect to the New HTA Bonds and the Subordinated Indebtedness, including, without limitation, sinking fund payments.

(b) **Entry of the HTA Confirmation Order:** The Clerk of the Title III Court shall have entered the HTA Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial HTA/CCDA PSA Creditors, and the Creditors' Committee and the HTA Confirmation Order shall provide for the following:

(i) Authorize the Debtor and Reorganized HTA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the HTA Plan;

80

(ii)  Decree that the provisions of the HTA Confirmation Order and the HTA Plan are nonseverable and mutually dependent;

(iii)  Authorize the Debtor and Reorganized HTA, as the case may be, to (1) make all distributions and issuances as required under the HTA Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)  Authorize the implementation of the HTA Plan in accordance with its terms;

(v)  Determine the New HTA Bonds Indenture, the New HTA Bonds, the Subordinated Indebtedness, and the covenants by Reorganized HTA, including, without limitation, the Toll Rate Covenant, for the benefit of the holders of the New HTA Bonds and the Subordinated Indebtedness, as provided in the New HTA Bonds Indenture, or the HTA Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of Reorganized HTA under Puerto Rico, New York and federal law;

(vi)  Determine that the New HTA Bonds Indenture, upon issuance of the Secured Obligations, including, without limitation, the Subordinated Indebtedness issued as a refinancing of the Commonwealth Loan, grants a first priority lien on and first priority security interest on all of Reorganized HTA's legal and equitable right, title and interest in the Trust Estate to the Secured Obligations, subject only to (1) the terms and provisions of the New HTA Bonds Indenture establishing the Authority Expense Fund and the Arbitrage Rebate Fund, and (2) the senior lien and senior security interest granted in the Trust Estate for the benefit of holders of New HTA Bonds, which first-priority lien and first-priority security interest shall in all respects be senior and superior to the subordinate lien and subordinate security interest granted in the Trust Estate for the benefit of holders of Subordinated Indebtedness, in each case, as permitted by the HTA Enabling Act, and shall be deemed automatically perfected as of the HTA Effective Date and shall in any event be valid, binding, perfected, and enforceable against all Entities having claims of any kind in tort, contract or otherwise against Reorganized HTA or its assets, irrespective of whether such Entities have notice of such lien or security interest, without any further act or agreement by any Entity, and will be "closed" and shall remain in full force and effect until the Secured Obligations have been paid or satisfied in full in accordance with their terms;

(vii)  Determine the HTA Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtor, (2) Reorganized HTA, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against HTA, the Commonwealth, or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtor or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the HTA Plan and, if impaired, whether or not such Entity accepted the HTA Plan, (5) any other Entity, and (6) each of the

81

foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(viii)  Provide that the HTA Fiscal Plan, certified as of the HTA Effective Date, and any post-HTA Effective Date HTA Fiscal Plan include provisions for the payment in each FY of principal and interest payable on the New HTA Bonds and the Subordinated Indebtedness, including, without limitation, any sinking fund payments which may become due in such FY;

(ix)  Provide that the automatic stay in any future insolvency proceeding commenced on behalf of HTA (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to Net Receipts held in the funds and accounts established in accordance with the New HTA Bonds Indenture (other than the Net Receipts on deposit in the Arbitrage Rebate Fund established pursuant to the New HTA Bonds Indenture;

(x)  Determine that, consistent with the HTA Fiscal Plan and corresponding budget, the discharge of debt to occur as of the HTA Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA as determined in accordance with modified accrual accounting standards;

(xi)  Determine that the HTA Plan is consistent with the Debtor's Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xii)  Provide that no party, Person or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the HTA Plan;

(xiii)  Provide that the Government Parties, including, without limitation, HTA and Reorganized HTA, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the HTA Plan; and

(xiv)  Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement and the Commonwealth Confirmation Order, the Commonwealth shall make payments on the HTA Effective Date to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

(c)  **No Injunction:**  The HTA Confirmation Order shall not be stayed in any respect.

(d)  **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the HTA Plan, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and not inconsistent with any other provision of the HTA Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the HTA Plan.

82

HTA_CONF 00012745

(e)     **Execution of Documents; Other Actions:**  All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the HTA Plan are effected or executed and delivered, as applicable, and are in full force and effect.

(f)     **Opinions:**  Usual and customary legal opinions for issuances of the type similar to the New HTA Bonds by outside counsel to the Debtor covering matters not expressly addressed in the HTA Confirmation Order, in form and substance reasonably acceptable to the Initial HTA/CCDA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the HTA Plan.

(g)     **Lift Stay Motions and Clawback Actions:**  The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

(h)     **Commonwealth Effective Date:**  The Commonwealth Effective Date shall have occurred.

(i)     **HTA Clawback CVI:**  In accordance with the decretal paragraph 34(f) of the Commonwealth Confirmation Order, the HTA Clawback CVI shall have been distributed to the applicable Creditors.

(j)     **HTA Interim Distribution:**  In accordance with decretal paragraph 52 of the Commonwealth Confirmation Order, including, without limitation, the satisfaction of conditions set forth therein, HTA shall have made interim distributions to holders of HTA 68 Bond Claims, HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), HTA 98 Senior Bond Claims (FGIC) and HTA 98 Senior Bond Claims (National) in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash; provided, however, that, for purposes of this Section 34.1(j), the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims (Ambac), HTA 68 Bond Claims (Assured), HTA 68 Bond Claims (National), HTA 98 Senior Bond Claims, HTA 98 Senior Bond Claims (Ambac), HTA 98 Senior Bond Claims (Assured), and HTA 98 Senior Bond Claims (National) arising from the HTA Bonds insured or owned by any such Monoline, if any, in accordance with Section 301(c)(3) of PROMESA; and, provided, further, that, notwithstanding the foregoing, (i) with respect to any HTA 98 Senior Bond Claims (FGIC) arising from HTA 98 Senior Bonds (or related payment rights) owned by FGIC, HTA shall have made such distribution to FGIC, and (ii) with respect to any HTA 98 Senior Bond Claims (FGIC) arising from HTA 98 Senior Bonds insured, but not owned, by FGIC, HTA shall have made such interim distribution to the beneficial owners of such HTA 98 Senior Bonds.

35.2     **Waiver of Conditions Precedent**:  Subject to the provisions of the HTA/CCDA Plan Support Agreement, the Oversight Board may waive any of the conditions to the HTA Effective Date set forth in Section 35.1 hereof at any time without any notice to any other parties in interest, other than the HTA/CCDA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title

HTA_CONF 00012746

III Court, and without any formal action other than proceeding to confirm and consummate the HTA Plan; provided, however, that, subject to the terms and provisions of the HTA Committee Agreement, each of the conditions precedent in Section 35.1 hereof with respect to the provisions affecting Classes 16 and 19, may be waived, in whole or in part, by the Oversight Board subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

35.3    **Effect of Non-Occurrence of Conditions to HTA Effective Date**:  If prior to the HTA Effective Date, the HTA Confirmation Order is vacated pursuant to a Final Order, then, except as provided in a Final Order vacating the HTA Confirmation Order, the HTA Plan will be null and void in all respects, and nothing contained in the HTA Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtor, the Oversight Board, the Creditors' Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor, the Oversight Board, the Creditor's Committee, or any other Entity.

## ARTICLE XXXVI

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE HTA PLAN

36.1    **Modification of HTA Plan**:  Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, the Oversight Board may alter, amend or modify the HTA Plan or the Exhibits at any time prior to or after the HTA Confirmation Date but prior to the HTA Effective Date.  A holder of a Claim that has accepted the HTA Plan shall be deemed to have accepted the HTA Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

36.2    **Revocation or Withdrawal**:

(a)    Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, the HTA Plan may be revoked or withdrawn prior to the HTA Confirmation Date by the Oversight Board.

(b)    If the HTA Plan is revoked or withdrawn prior to the HTA Confirmation Date, or if the HTA Plan does not become effective for any reason whatsoever, then the HTA Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any other Entity in any further proceeding involving the Debtor.

36.3    **Amendment of Plan Documents**:  From and after the HTA Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the HTA Plan, and any document attached to any of the

84

foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the HTA Plan and their respective attachments, as the case may be.

36.4    **No Admission of Liability:**

(a)    The submission of this HTA Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this HTA Plan.

(b)    None of this HTA Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this HTA Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized HTA, the Debtor, or any other Entity with respect to the validity of any Claim.  None of this HTA Plan or any settlement entered, act performed or document executed in connection with this HTA Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this HTA Plan or enforce any such agreement, and except that, once confirmed, any Entity may file this HTA Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE XXXVII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED HTA

37.1    **Corporate Action**:  On the HTA Effective Date, all matters provided for under the HTA Plan that would otherwise require approval of the directors of the Debtor or Reorganized HTA, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New HTA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized HTA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized HTA pursuant to the HTA Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the HTA Plan involving the corporate structure of Reorganized HTA or corporate action by Reorganized HTA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule.  Without limiting the foregoing, from and after the HTA Confirmation Date, the Debtor and Reorganized HTA shall take any and

HTA_CONF 00012748

all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New HTA Bonds Indenture, and the new corporate governance documents, as applicable.

37.2 **Amendment of By-Laws:** The by-laws of Reorganized HTA shall be amended as of the HTA Effective Date to provide substantially as set forth in Reorganized HTA By-Laws.

37.3 **Directors of Reorganized HTA:** On the HTA Effective Date, and pursuant to the terms and provisions of Section 36.2 hereof, the Reorganized HTA By-Laws shall provide that the board of directors of Reorganized HTA shall be appointed consistent with the terms and provisions of the HTA Enabling Act. The initial directors shall be disclosed prior to the HTA Confirmation Hearing. In the event that, during the period from the HTA Confirmation Hearing up to and including the HTA Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the board of directors of Reorganized HTA, the Governor of the Commonwealth, upon consultation with the Oversight Board, shall choose a substitute consistent with the independence and qualification standards set forth above and the Debtor shall file a notice thereof with the Title III Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the HTA Confirmation Hearing. The Reorganized HTA amended corporate governance documents shall provide that all board members shall owe a fiduciary duty to Reorganized HTA as consistent with Puerto Rico law and its Constitution.

37.4 **Officers of Reorganized HTA:** To the extent applicable, the board of directors of Reorganized HTA shall elect officers of Reorganized HTA as of or after the HTA Effective Date.

### ARTICLE XXXVIII

### PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

38.1 **Effect of Confirmation:** Nothing in this HTA Plan or the HTA Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of Reorganized HTA under PROMESA. From and after the HTA Effective Date, Reorganized HTA shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

38.2 **Ongoing Role of the Oversight Board:** Nothing in the HTA Plan or the HTA Confirmation Order shall discharge any or all obligations of the Debtor under PROMESA and, from and after the HTA Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtor's duties and obligations shall continue and be unaffected by the HTA Plan and the consummation thereof.

38.3 **Preemption of Laws:** As of the HTA Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth

HTA_CONF 00012749

laws that affect the Debtor or Reorganized HTA and are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, such preempted laws, rules and regulations include, without limitation, (a) pursuant to Section 4 of PROMESA, all laws, rules, and regulations (or such portions thereof) of the Commonwealth of Puerto Rico to the extent they give rise to obligations of the Debtor discharged by the HTA Plan and the HTA Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, and (b) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Debtor or Reorganized HTA to the Commonwealth or any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the HTA Plan's discharge of the Debtor's obligations and all such laws shall not be enforceable to the extent they are inconsistent with the HTA Plan's discharge of the Debtor's obligations or any of the transactions contemplated by the HTA Plan. Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by PROMESA that affect the Debtor include, without limitation, those listed on Exhibit "F" hereto for the reasons and to the extent set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, and (z) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "F" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the HTA Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified Fiscal Plan or HTA budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

## ARTICLE XXXIX

## PROVISIONS REGARDING CREDITORS' COMMITTEE

39.1    **Dissolution of Creditors' Committee**:  On the HTA Effective Date, the Creditors' Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Case; provided, however, that (x) in the event that an appeal of the HTA Confirmation Order is taken, the Creditors' Committee shall not be dissolved until the HTA Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with PREPA's Title III case, and (z) the Creditors' Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals. To the extent that, as of the date immediately prior to the HTA Effective Date, the Creditors' Committee was a party to a contested matter or adversary proceeding in connection with the Title III Case, including, without limitation, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the HTA Effective Date and to the extent not already a party thereto, Reorganized HTA shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon

HTA_CONF 00012750

such assumption, the Creditors' Committee shall be relieved of any role, responsibility or obligation with respect thereto.

## ARTICLE XL

## RETENTION OF JURISDICTION

40.1 **Retention of Jurisdiction**: The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Case and the HTA Plan, or that relates to the following:

(a) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b) to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c) to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the HTA Plan and adjudicate any and all disputes arising from or relating to distributions under the HTA Plan;

(d) to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor or Reorganized HTA that may be pending on the HTA Effective Date or brought thereafter;

(e) to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the HTA Plan or orders entered by the Title III Court;

(f) to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (i) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction, and (ii) the HTA Plan, the HTA Confirmation Order, the Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other

88

agreements or documents created in connection with the HTA Plan, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(g)     to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the HTA Plan, the HTA Confirmation Order, the Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the HTA Plan or any Entity's rights arising from or obligations incurred in connection with the HTA Plan or such documents, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(h)     to approve any modification of the HTA Plan or approve any modification of the HTA Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the HTA Plan, the HTA Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the HTA Plan or the HTA Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the HTA Plan;

(i)     to adjudicate, decide or resolve any matters relating to the Debtor's compliance with the HTA Plan and the HTA Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)     to determine any other matters that may arise in connection with or relate to the HTA Plan, the Disclosure Statement, the HTA Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the HTA Plan, the Disclosure Statement or the HTA Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)     to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the HTA Plan or the HTA Confirmation Order, including, without limitation, the provisions of Sections 41.2 and 41.3 hereof;

(l)     to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the HTA Plan or HTA Confirmation Order, including, without limitation, issuance of the New HTA Bonds and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m)     to enter and implement such orders as are necessary or appropriate if the HTA Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

HTA_CONF 00012752

(o)     to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board in accordance with the provisions of Section 32.1(b) of the HTA Plan;

(p)     to enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

(q)     to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XLI

## MISCELLANEOUS PROVISIONS

41.1     **Title to Assets**:  Except as provided in the HTA Confirmation Order, on the HTA Effective Date, title to all Assets and properties of the Debtor encompassed by the HTA Plan shall vest in Reorganized HTA, free and clear of all Liens, including, without limitation, any Lien upon or security interest in the SIB Account, but expressly excluding Liens granted pursuant to the HTA Plan and the HTA Confirmation Order.

41.2     **Discharge and Release of Claims and Causes of Action:**

(a)     Except as expressly provided in the HTA Plan or the HTA Confirmation Order, all distributions and rights afforded under the HTA Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtor and Reorganized HTA that arose, in whole or in part, prior to the HTA Effective Date, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 41.7 hereof, nothing contained in the HTA Plan or the HTA Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third party release of the HTA/CCDA PSA Creditors and their respective Related Persons by Creditors of the Debtor.  Upon the HTA Effective Date, the Debtor and Reorganized HTA shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the HTA Effective Date, and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the HTA Plan.  For the avoidance of doubt, nothing contained herein or in the HTA Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be

HTA_CONF 00012753

addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)　Except as expressly provided in the HTA Plan or the HTA Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtor and Reorganized HTA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Case, the Debtor or Reorganized HTA or any of their respective Assets and property, including any interest accrued on such Claims from and after the HTA Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the HTA Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the HTA Plan or the HTA Confirmation Order, the HTA Confirmation Order shall constitute a judicial determination, as of the HTA Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtor and Reorganized HTA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized HTA and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  As of the HTA Effective Date, and in consideration for the value provided under the HTA Plan, each holder of a Claim in any Class under this HTA Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtor and Reorganized HTA, and their respective Assets and property and all such Claims.

(c)　Notwithstanding any other provisions of this Section 41.2, in accordance with the provisions of the HTA/CCDA Plan Support Agreement, each of the HTA/CCDA PSA Creditors and their respective Related Persons, solely in their capacity as HTA/CCDA PSA Creditors of the Debtor, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 41.2.

(d)　SEC Limitation.  Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)　United States Limitation.  Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtor or Reorganized HTA, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or

91

injunction to which the Debtor or Reorganized HTA are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtor or Reorganized HTA to the United States arising from and after the HTA Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtor or Reorganized HTA, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtor or Reorganized HTA, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtor's or Reorganized HTA's obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the HTA Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtor and Reorganized HTA, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any entity, including, but not limited to, the Debtor and Reorganized HTA, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtor and Reorganized HTA, and (iv) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f) <u>Underwriter Actions</u>. Notwithstanding anything contained herein or in the HTA Confirmation Order to the contrary, including, without limitation, Sections 41.2, 41.3 and 41.11 of the HTA Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the HTA Plan, the HTA Confirmation Order or any HTA Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "<u>Defensive Rights</u>"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth in connection with an Underwriter Action; and, <u>provided</u>, <u>further</u>, that no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named third-party defendants, shall be permitted to assert: (i) against the Debtor or Reorganized HTA any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the HTA Plan, and/or the HTA Confirmation Order; and/or (ii) against the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without

limitation, for indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provision of the HTA Plan and the HTA Confirmation Order; and, provided, further, that nothing herein or in the HTA Confirmation Order is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action. The parties in the Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting, against the Debtor, Reorganized HTA, PREPA, the Commonwealth, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

41.3    **Injunction on Claims**: Except as otherwise expressly provided in the HTA Plan, the HTA Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 hereof or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 hereof are permanently enjoined, from and after the HTA Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the HTA Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the HTA Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the HTA Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the HTA Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

41.4    **Integral to HTA Plan**: Each of the discharge, injunction, exculpation and release provisions provided in this Article XLI is an integral part of the HTA Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XLI.

41.5    **Releases by the Debtor and Reorganized HTA**: Except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, on the HTA Effective Date, and for

HTA_CONF 00012756

good and valuable consideration, each of the Debtor and Reorganized HTA, the Disbursing
Agent and each of the Debtor's and Reorganized HTA's Related Persons shall be deemed to
have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release,
acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the
Debtor, Reorganized HTA, and the Disbursing Agent, or any of them, or anyone claiming
through them, on their behalf or for their benefit, have or may have or claim to have, now or in
the future, against any Released Party that are Released Claims.

41.6    **Injunction Related to Releases**:  As of the HTA Effective Date, all Entities that
hold, have held, or may hold a Released Claim that is released pursuant to Section 41.2 of the
HTA Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited,
barred and enjoined from taking any of the following actions, whether directly or indirectly,
derivatively or otherwise, on account of or based on the subject matter of such discharged
Released Claims:  (i) commencing, conducting or continuing in any manner, directly or
indirectly, any suit, action or other proceeding (including, without limitation, any judicial,
arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including,
without limitation any prejudgment attachment), collecting, or in any way seeking to recover any
judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any
matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions
from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any
amount against any liability or obligation owed to any Entity released under Section 41.2 hereof;
and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or
administrative proceeding in any forum, that does not comply with or is inconsistent with the
provisions of the HTA Plan or the HTA Confirmation Order.  For the avoidance of doubt, the
following stipulations will terminate upon the entry of the HTA Confirmation Order: (i) the
Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico
Highways and Transpiration Authority Regarding the Tolling of Statute of Limitations and
Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and (ii) the Fourth
Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and
the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the
Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations
[Case No. 17-3283-LTS, ECF No. 17394], as amended.

41.7    **Exculpation:**

        (a)    **Government Parties**:  The Oversight Board, AAFAF, the Debtor, and
each of their respective Related Persons, solely acting in its capacity as such at any time up to
and including the HTA Effective Date, shall not have or incur any liability to any Entity for any
act taken or omitted to be taken in connection with the Title III Case, the formulation,
preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any
compromises or settlements contained therein, the Disclosure Statement, or any contract,
instrument, release or other agreement or document provided for or contemplated in connection
with the consummation of the transactions set forth in the HTA Plan; provided, however, that the
foregoing provisions of this Section 41.7 shall not affect the liability of any Entity that otherwise
would result from any such act or omission to the extent that such act or omission is determined
in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in the
foregoing provisions of this Section 41.7 shall prejudice the right of any of the Government

94

Parties, and the Government Parties' officers and directors serving at any time up to and including the HTA Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the HTA Plan.

(b) **HTA/CCDA PSA Creditors:** Each of the HTA/CCDA PSA Creditors solely in its capacity as a party to HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the HTA Petition Date up to and including the HTA Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan; provided, however, that the foregoing provisions of this Section 41.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c) **Monoline Insurers:** Ambac, Assured, FGIC, National, and their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the HTA Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the HTA Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, or National Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, or National Insurance Policies provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the HTA Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, or National Insurance Policy, to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds or National Insured Bonds, as applicable, in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, or National Treatment, as applicable (or any claims that Ambac, Assured, FGIC, or National, may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, or National's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies or National Insurance Policies, as applicable).

(d) **Creditors' Committee:** Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the HTA Petition Date up to and including the HTA Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained herein, the HTA Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection

95

with the consummation of the transactions set forth in the HTA Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by HTA pursuant to a Final Order; and provided, further, that, the foregoing provisions of this Section 41.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)     **The DRA Parties:**  Each of the DRA and the DRA Parties, from the HTA Petition Date up to and including the HTA Effective Date, and each of the DRA Parties' respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the HTA Plan or any compromises or settlements contained therein, the Disclosure Statement, the DRA Stipulation, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the HTA Plan; provided, however, that, the foregoing provisions of this Section 41.7(e) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

41.8     **Appointments Related Litigation/Uniformity Litigation**:  Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the HTA Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the HTA Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the HTA Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the HTA Plan and the HTA Confirmation Order, including, without limitation, the releases, exculpations and injunctions provided pursuant to Article XLI of the HTA Plan; provided, however, that, to the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement or the ERS Stipulation, within five (5) Business Days of the HTA Effective Date, such plaintiff shall take any and all action to dismiss, with prejudice, or, in the event other plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

41.9     **Bar Order**:  To the limited extent provided in the HTA Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or

HTA_CONF 00012759

litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the HTA Plan, the negotiation and consummation of the HTA/CCDA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Case, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Case, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

41.10 **No Waiver**: Notwithstanding anything to the contrary contained in Sections 41.5 and 41.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized HTA, the HTA/CCDA PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

41.11 **Supplemental Injunction**: Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the HTA Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Case or any Claim against the Debtor, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the HTA Effective Date (including prior to the HTA Petition Date), including, but not limited to:

(a) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b) Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c) Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

97

HTA_CONF 00012760

(d)     Except as otherwise expressly provided in the HTA Plan or the HTA Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the HTA Plan or the HTA Confirmation Order, provided, however, that the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the HTA Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

41.12   **Post-Effective Date Fees and Expenses**:  From and after the HTA Effective Date, Reorganized HTA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized HTA related to implementation and consummation of the HTA Plan without further approval from the Title III Court.  Without limiting the foregoing, from and after the HTA Effective Date, Reorganized HTA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to Reorganized HTA, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the HTA Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the HTA Plan.

41.13   **Securities Act Exemption**:  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New HTA Bonds pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

41.14   **Severability**:  Subject to the terms and provisions of the HTA/CCDA Plan Support Agreement and the HTA Committee Agreement, if, prior to the HTA Confirmation Date, (a) any term or provision of the HTA Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the HTA Plan, the HTA Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

41.15   **Governing Law:**  Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this HTA Plan shall be

HTA_CONF 00012761

governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

41.16    **Closing Case**:  The Oversight Board shall, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Case, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XL of the HTA Plan.

41.17    **Section Headings**:  The section headings contained in this HTA Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the HTA Plan.

41.18    **Inconsistencies**:  To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the HTA Plan, the terms and provisions contained herein shall govern, (b) the terms and provisions of the HTA Plan and the terms and provisions of the HTA Confirmation Order, the terms and provisions of the HTA Confirmation Order shall govern and be deemed a modification of the HTA Plan, and (c) the terms and provisions of the HTA Plan and the New HTA Bonds Indenture, the terms and provisions of the New HTA Bonds Indenture shall govern; provided, however, that under no circumstances shall the HTA Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

41.19    **Document Retention**:  From and after the HTA Effective Date, the Debtor may maintain documents in accordance with standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtor.

41.20    **Immediate Binding Effect**:  Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the HTA Effective Date, the terms of the HTA Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the HTA Plan and whether or not such holder has accepted the HTA Plan.  The releases, exculpations, and settlements effected under the HTA Plan shall be operative, and subject to enforcement by the Title III Court, from and after the HTA Effective Date, including pursuant to the injunctive provisions of the HTA Plan.  Once approved, the compromises and settlements embodied in the HTA Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the HTA Plan must (a) challenge such compromise and settlement prior to confirmation of the HTA Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

99

41.21 **Additional Documents**:  On or before the HTA Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the HTA Plan.  The Debtor and all holders of Claims receiving distributions pursuant to the HTA Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the HTA Plan.

41.22 **Reservation of Rights**:  Except as expressly set forth herein, the HTA Plan shall have no force or effect unless the Title III Court shall enter the HTA Confirmation Order.  None of the filing of the HTA Plan, any statement or provision contained in the HTA Plan, or the taking of any action by the Debtor with respect to the HTA Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims prior to the HTA Effective Date.  Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

41.23 **Successors and Assigns**:  Except as expressly provided otherwise in the HTA Plan, the rights, benefits, and obligations of any Entity named or referred to in the HTA Plan or the HTA Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

41.24 **Notices**:  All notices, requests to, demands or other document(s) required by the HTA Plan or the HTA Confirmation Order to be served on or delivered to the Oversight Board, the Debtor or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:   Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave, Suite 1107
San Juan, PR 00918-1813
Attn:  Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
Brian S. Rosen, Esq.
Tel:  (212) 969-3000

100

Fax: (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

If to the Debtor, to:

Puerto Rico Highways and Transportation Authority
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Office of the Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

– and –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

101

If to AAFAF, to:          Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

– with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
       Peter Friedman, Esq.
       Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

     **41.25**  **Term of Injunctions or Stays**:  Unless otherwise provided herein or in the HTA Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the HTA Confirmation Date (excluding any injunctions or stays contained in the HTA Plan or the HTA Confirmation Order) shall remain in full force and effect until the HTA Effective Date. All injunctions or stays contained in the HTA Plan or the HTA Confirmation Order shall remain in full force and effect in accordance with their terms.

     **41.26**  **Entire Agreement**:  Except as otherwise indicated, the HTA Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the HTA Plan.

     **41.27**  **Plan Supplement**:  All documents included in the Plan Supplement are incorporated into and are a part of the HTA Plan as if set forth in full in the HTA Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://cases.primeclerk.com/ puertorico/ or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the HTA Plan that does not constitute the Plan Supplement, such part of the HTA Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New HTA Bonds Indenture to the extent that any provisions of the HTA Plan are inconsistent with the New HTA Bonds Indenture the New HTA Bonds Indenture shall control.

Dated: San Juan, Puerto Rico
      June 17, 2022

HTA_CONF 00012765

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY, by and
through the Financial Oversight and Management
Board for Puerto Rico as its representative


By: /s/ David A. Skeel Jr.
       Name: David A. Skeel Jr.
       Title: Chairman

HTA_CONF 00012766

# EXHIBIT A

SCHEDULE OF AVOIDANCE ACTIONS

A-1

HTA_CONF 00012767

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| GILA LLC | Adversary | 19-00354 |

HTA_CONF 00012768

**EXHIBIT B**

SCHEDULE OF INVALIDITY ACTIONS

HTA_CONF 00012769

**Invalidity Actions**

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

HTA_CONF 00012770

# EXHIBIT C

SCHEDULE OF LIEN CHALLENGE ACTIONS

HTA_CONF 00012771

## Lien Challenge Actions

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., Adv. Proc. No. 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, Adv. Proc. No. 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, Adv. Proc. No. 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, Adv. Proc. No. 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, Adv. Proc. No. 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., Adv. Proc. No. 19-00297

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00362

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ambac Assurance Corporation, Adv. Proc. No. 19-00363

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III  Debtors (Other Than COFINA) v. Davidson Kempner Capital Management LP, Adv. Proc. No. 19-00364

The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board of Puerto Rico and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Banco Popular de Puerto Rico, Adv. Proc. No. 19-00365

C-2

# EXHIBIT D

SCHEDULE OF CASH FLOW OF NEW HTA BONDS

D-1

HTA_CONF 00012773

EXHIBIT: D

Exhibit: Schedule of Cash Flow of New HTA Bonds:

| Fiscal Year (7/1) | Maturity | New HTA CIBs | | |
|---|---|---|---|---|
| | | Principal | Interest 5.000% | Debt Service |
| Total | | 600,000,000.00 | 1,085,949,250.00 | 1,685,949,250.00 |
| 2023 | 7/1/23 | - | 30,000,000.00 | 30,000,000.00 |
| 2024 | 7/1/24 | - | 30,000,000.00 | 30,000,000.00 |
| 2025 | 7/1/25 | - | 30,000,000.00 | 30,000,000.00 |
| 2026 | 7/1/26 | - | 30,000,000.00 | 30,000,000.00 |
| 2027 | 7/1/27 | - | 30,000,000.00 | 30,000,000.00 |
| 2028 | 7/1/28 | - | 30,000,000.00 | 30,000,000.00 |
| 2029 | 7/1/29 | - | 30,000,000.00 | 30,000,000.00 |
| 2030 | 7/1/30 | - | 30,000,000.00 | 30,000,000.00 |
| 2031 | 7/1/31 | - | 30,000,000.00 | 30,000,000.00 |
| 2032 | 7/1/32 | - | 30,000,000.00 | 30,000,000.00 |
| 2033 | 7/1/33 | - | 30,000,000.00 | 30,000,000.00 |
| 2034 | 7/1/34 | - | 30,000,000.00 | 30,000,000.00 |
| 2035 | 7/1/35 | - | 30,000,000.00 | 30,000,000.00 |
| 2036 | 7/1/36 | - | 30,000,000.00 | 30,000,000.00 |
| 2037 | 7/1/37 | - | 30,000,000.00 | 30,000,000.00 |
| 2038 | 7/1/38 | - | 30,000,000.00 | 30,000,000.00 |
| 2039 | 7/1/39 | - | 30,000,000.00 | 30,000,000.00 |
| 2040 | 7/1/40 | - | 30,000,000.00 | 30,000,000.00 |
| 2041 | 7/1/41 | - | 30,000,000.00 | 30,000,000.00 |
| 2042 | 7/1/42 | - | 30,000,000.00 | 30,000,000.00 |
| 2043 | 7/1/43 | - | 30,000,000.00 | 30,000,000.00 |
| 2044 | 7/1/44 | - | 30,000,000.00 | 30,000,000.00 |
| 2045 | 7/1/45 | - | 30,000,000.00 | 30,000,000.00 |
| 2046 | 7/1/46 | - | 30,000,000.00 | 30,000,000.00 |
| 2047 | 7/1/47 | - | 30,000,000.00 | 30,000,000.00 |
| 2048 | 7/1/48 | - | 30,000,000.00 | 30,000,000.00 |
| 2049 | 7/1/49 | - | 30,000,000.00 | 30,000,000.00 |
| 2050 | 7/1/50 | - | 30,000,000.00 | 30,000,000.00 |
| 2051 | 7/1/51 | - | 30,000,000.00 | 30,000,000.00 |
| 2052 | 7/1/52 | - | 30,000,000.00 | 30,000,000.00 |
| 2053 | 7/1/53 | 14,190,000.00 | 30,000,000.00 | 44,190,000.00 |
| 2054 | 7/1/54 | 53,125,000.00 | 29,290,500.00 | 82,415,500.00 |
| 2055 | 7/1/55 | 55,785,000.00 | 26,634,250.00 | 82,419,250.00 |
| 2056 | 7/1/56 | 58,575,000.00 | 23,845,000.00 | 82,420,000.00 |
| 2057 | 7/1/57 | 61,500,000.00 | 20,916,250.00 | 82,416,250.00 |
| 2058 | 7/1/58 | 64,575,000.00 | 17,841,250.00 | 82,416,250.00 |
| 2059 | 7/1/59 | 67,805,000.00 | 14,612,500.00 | 82,417,500.00 |
| 2060 | 7/1/60 | 71,195,000.00 | 11,222,250.00 | 82,417,250.00 |
| 2061 | 7/1/61 | 74,755,000.00 | 7,662,500.00 | 82,417,500.00 |
| 2062 | 7/1/62 | 78,495,000.00 | 3,924,750.00 | 82,419,750.00 |

D-2

*Deemed Issuance Date is 7/1/2022

| Fiscal Year (7/1) | Maturity | New HTA CABs | | |
|---|---|---|---|---|
| | | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
| Total | | 237,955,868.13 | 334,856,647.24 | 389,919,000.00 |
| 2023 | 7/1/23 | - | - | - |
| 2024 | 7/1/24 | - | - | - |
| 2025 | 7/1/25 | 25,289,588.80 | 29,327,916.80 | 41,440,000.00 |
| 2026 | 7/1/26 | 22,310,860.93 | 27,183,444.45 | 36,559,000.00 |
| 2027 | 7/1/27 | 25,083,317.54 | 32,108,471.38 | 41,102,000.00 |
| 2028 | 7/1/28 | 28,817,559.67 | 38,756,163.54 | 47,221,000.00 |
| 2029 | 7/1/29 | 35,543,345.34 | 50,221,494.18 | 58,242,000.00 |
| 2030 | 7/1/30 | 35,310,832.47 | 52,419,172.95 | 57,861,000.00 |
| 2031 | 7/1/31 | 33,610,009.98 | 52,419,983.94 | 55,074,000.00 |
| 2032(1) | 7/1/32 | 31,990,353.40 | 52,420,000.00 | 52,420,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity
*Deemed Issuance Date is 7/1/2022

D-3

| | | | New HTA CCABs | | |
|---|---|---|---|---|---|
| Fiscal Year (7/1) | Maturity | Initial Principal | (a) Maturity Value | (b) CCAB Interest (2) | (c = a + b) CCAB Debt Service |
| Total | | 407,044,597.57 | 666,991,000.00 | 419,638,900.00 | 1,086,629,900.00 |
| 2023 | 7/1/23 | - | - | - | - |
| 2024 | 7/1/24 | - | - | - | - |
| 2025 | 7/1/25 | - | - | - | - |
| 2026 | 7/1/26 | - | - | - | - |
| 2027 | 7/1/27 | - | - | - | - |
| 2028 | 7/1/28 | - | - | - | - |
| 2029 | 7/1/29 | - | - | - | - |
| 2030 | 7/1/30 | - | - | - | - |
| 2031 | 7/1/31 | - | - | - | - |
| 2032 | 7/1/32 | - | - | - | - |
| 2033 | 7/1/33 | 11,637,848.90 | 19,070,000.00 | 33,349,550.00 | 52,419,550.00 |
| 2034 | 7/1/34 | 12,220,046.48 | 20,024,000.00 | 32,396,050.00 | 52,420,050.00 |
| 2035 | 7/1/35 | 12,830,926.75 | 21,025,000.00 | 31,394,850.00 | 52,419,850.00 |
| 2036 | 7/1/36 | 13,472,320.52 | 22,076,000.00 | 30,343,600.00 | 52,419,600.00 |
| 2037 | 7/1/37 | 14,146,058.60 | 23,180,000.00 | 29,239,800.00 | 52,419,800.00 |
| 2038 | 7/1/38 | 14,853,361.53 | 24,339,000.00 | 28,080,800.00 | 52,419,800.00 |
| 2039 | 7/1/39 | 15,596,060.12 | 25,556,000.00 | 26,863,850.00 | 52,419,850.00 |
| 2040 | 7/1/40 | 16,375,985.18 | 26,834,000.00 | 25,586,050.00 | 52,420,050.00 |
| 2041 | 7/1/41 | 17,194,967.52 | 28,176,000.00 | 24,244,350.00 | 52,420,350.00 |
| 2042 | 7/1/42 | 18,054,837.95 | 29,585,000.00 | 22,835,550.00 | 52,420,550.00 |
| 2043 | 7/1/43 | 18,957,427.28 | 31,064,000.00 | 21,356,300.00 | 52,420,300.00 |
| 2044 | 7/1/44 | 19,905,176.59 | 32,617,000.00 | 19,803,100.00 | 52,420,100.00 |
| 2045 | 7/1/45 | 20,900,526.96 | 34,248,000.00 | 18,172,250.00 | 52,420,250.00 |
| 2046 | 7/1/46 | 21,945,309.20 | 35,960,000.00 | 16,459,850.00 | 52,419,850.00 |
| 2047 | 7/1/47 | 23,042,574.66 | 37,758,000.00 | 14,661,850.00 | 52,419,850.00 |
| 2048 | 7/1/48 | 24,194,764.42 | 39,646,000.00 | 12,773,950.00 | 52,419,950.00 |
| 2049 | 7/1/49 | 25,404,319.56 | 41,628,000.00 | 10,791,650.00 | 52,419,650.00 |
| 2050 | 7/1/50 | 26,674,901.70 | 43,710,000.00 | 8,710,250.00 | 52,420,250.00 |
| 2051 | 7/1/51 | 28,008,341.65 | 45,895,000.00 | 6,524,750.00 | 52,419,750.00 |
| 2052 | 7/1/52 | 29,408,911.30 | 48,190,000.00 | 4,230,000.00 | 52,420,000.00 |
| 2053(1) | 7/1/53 | 22,219,930.70 | 36,410,000.00 | 1,820,500.00 | 38,230,500.00 |

(1) Stated maturity; not a sinking fund redemption
(2) New HTA CCAB conversion date is 7/1/2032
*Deemed Issuance Date is 7/1/2022

D-4

Aggregate Debt Service Cash Flows

| Fiscal Year (7/1) | Maturity | CIB Debt Service | CAB Accreted Value at each Redemption Date | CCAB Debt Service | Total Debt Service |
|---|---|---|---|---|---|
| Total | | 1,685,949,250.00 | 334,856,647.24 | 1,086,629,900.00 | 3,107,435,797.24 |
| 2023 | 7/1/23 | 30,000,000.00 | - | - | 30,000,000.00 |
| 2024 | 7/1/24 | 30,000,000.00 | | - | 30,000,000.00 |
| 2025 | 7/1/25 | 30,000,000.00 | 29,327,916.80 | - | 59,327,916.80 |
| 2026 | 7/1/26 | 30,000,000.00 | 27,183,444.45 | - | 57,183,444.45 |
| 2027 | 7/1/27 | 30,000,000.00 | 32,108,471.38 | - | 62,108,471.38 |
| 2028 | 7/1/28 | 30,000,000.00 | 38,756,163.54 | - | 68,756,163.54 |
| 2029 | 7/1/29 | 30,000,000.00 | 50,221,494.18 | | 80,221,494.18 |
| 2030 | 7/1/30 | 30,000,000.00 | 52,419,172.95 | | 82,419,172.95 |
| 2031 | 7/1/31 | 30,000,000.00 | 52,419,983.94 | | 82,419,983.94 |
| 2032 | 7/1/32 | 30,000,000.00 | 52,420,000.00 | - | 82,420,000.00 |
| 2033 | 7/1/33 | 30,000,000.00 | - | 52,419,550.00 | 82,419,550.00 |
| 2034 | 7/1/34 | 30,000,000.00 | - | 52,420,050.00 | 82,420,050.00 |
| 2035 | 7/1/35 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2036 | 7/1/36 | 30,000,000.00 | - | 52,419,600.00 | 82,419,600.00 |
| 2037 | 7/1/37 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2038 | 7/1/38 | 30,000,000.00 | - | 52,419,800.00 | 82,419,800.00 |
| 2039 | 7/1/39 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2040 | 7/1/40 | 30,000,000.00 | - | 52,420,050.00 | 82,420,050.00 |
| 2041 | 7/1/41 | 30,000,000.00 | - | 52,420,350.00 | 82,420,350.00 |
| 2042 | 7/1/42 | 30,000,000.00 | - | 52,420,550.00 | 82,420,550.00 |
| 2043 | 7/1/43 | 30,000,000.00 | - | 52,420,300.00 | 82,420,300.00 |
| 2044 | 7/1/44 | 30,000,000.00 | - | 52,420,100.00 | 82,420,100.00 |
| 2045 | 7/1/45 | 30,000,000.00 | - | 52,420,250.00 | 82,420,250.00 |
| 2046 | 7/1/46 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2047 | 7/1/47 | 30,000,000.00 | - | 52,419,850.00 | 82,419,850.00 |
| 2048 | 7/1/48 | 30,000,000.00 | - | 52,419,950.00 | 82,419,950.00 |
| 2049 | 7/1/49 | 30,000,000.00 | - | 52,419,650.00 | 82,419,650.00 |
| 2050 | 7/1/50 | 30,000,000.00 | - | 52,420,250.00 | 82,420,250.00 |
| 2051 | 7/1/51 | 30,000,000.00 | - | 52,419,750.00 | 82,419,750.00 |
| 2052 | 7/1/52 | 30,000,000.00 | - | 52,420,000.00 | 82,420,000.00 |
| 2053 | 7/1/53 | 44,190,000.00 | - | 38,230,500.00 | 82,420,500.00 |
| 2054 | 7/1/54 | 82,415,500.00 | - | - | 82,415,500.00 |
| 2055 | 7/1/55 | 82,419,250.00 | - | - | 82,419,250.00 |
| 2056 | 7/1/56 | 82,420,000.00 | - | - | 82,420,000.00 |
| 2057 | 7/1/57 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2058 | 7/1/58 | 82,416,250.00 | - | - | 82,416,250.00 |
| 2059 | 7/1/59 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2060 | 7/1/60 | 82,417,250.00 | - | - | 82,417,250.00 |
| 2061 | 7/1/61 | 82,417,500.00 | - | - | 82,417,500.00 |
| 2062 | 7/1/62 | 82,419,750.00 | - | - | 82,419,750.00 |

D-5

## **EXHIBIT E**

SUBORDINATED INDEBTEDNESS PAYMENT TERMS

HTA_CONF 00012778

|  | Principal | Interest | Agg. Loan Payments |
|---|---|---|---|
| Total | 362,000,000.00 | 173,538,404.20 | 535,538,404.20 |
| 7/1/23 | 10,763,135.00 | 11,714,722.22 | 22,477,857.22 |
| 7/1/24 | 9,447,509.00 | 8,780,921.63 | 18,228,430.63 |
| 7/1/25 | 4,810,622.00 | 8,544,733.90 | 13,355,355.90 |
| 7/1/26 | 5,197,995.00 | 8,424,468.35 | 13,622,463.35 |
| 7/1/27 | 5,600,394.00 | 8,294,518.48 | 13,894,912.48 |
| 7/1/28 | 6,018,302.00 | 8,154,508.63 | 14,172,810.63 |
| 7/1/29 | 6,452,216.00 | 8,004,051.08 | 14,456,267.08 |
| 7/1/30 | 6,902,647.00 | 7,842,745.68 | 14,745,392.68 |
| 7/1/31 | 7,370,121.00 | 7,670,179.50 | 15,040,300.50 |
| 7/1/32 | 7,855,180.00 | 7,485,926.48 | 15,341,106.48 |
| 7/1/33 | 8,358,382.00 | 7,289,546.98 | 15,647,928.98 |
| 7/1/34 | 8,880,300.00 | 7,080,587.43 | 15,960,887.43 |
| 7/1/35 | 9,421,525.00 | 6,858,579.93 | 16,280,104.93 |
| 7/1/36 | 9,982,665.00 | 6,623,041.80 | 16,605,706.80 |
| 7/1/37 | 10,564,346.00 | 6,373,475.18 | 16,937,821.18 |
| 7/1/38 | 11,167,211.00 | 6,109,366.53 | 17,276,577.53 |
| 7/1/39 | 11,791,923.00 | 5,830,186.25 | 17,622,109.25 |
| 7/1/40 | 12,439,163.00 | 5,535,388.18 | 17,974,551.18 |
| 7/1/41 | 13,109,633.00 | 5,224,409.10 | 18,334,042.10 |
| 7/1/42 | 13,804,055.00 | 4,896,668.28 | 18,700,723.28 |
| 7/1/43 | 14,523,171.00 | 4,551,566.90 | 19,074,737.90 |
| 7/1/44 | 15,267,745.00 | 4,188,487.63 | 19,456,232.63 |
| 7/1/45 | 16,038,563.00 | 3,806,794.00 | 19,845,357.00 |
| 7/1/46 | 16,836,434.00 | 3,405,829.93 | 20,242,263.93 |
| 7/1/47 | 17,662,190.00 | 2,984,919.08 | 20,647,109.08 |
| 7/1/48 | 18,516,687.00 | 2,543,364.33 | 21,060,051.33 |
| 7/1/49 | 19,400,805.00 | 2,080,447.15 | 21,481,252.15 |
| 7/1/50 | 20,315,451.00 | 1,595,427.03 | 21,910,878.03 |
| 7/1/51 | 21,261,555.00 | 1,087,540.75 | 22,349,095.75 |
| 7/1/52 | 22,240,075.00 | 556,001.88 | 22,796,076.88 |

E-2

# EXHIBIT F

SCHEDULE OF PREEMPTED STATUTES

F-1

HTA_CONF 00012780

### List of Statutes Preempted by PROMESA[1]

**I.     Puerto Rico Highway and Transportation Authority Act**

1.     Act 74, approved on June 23, 1965:

    a.  9 L.P.R.A. §§ 2004(f), (h), (j), (l), (m), (n), (q)

    b.  9 L.P.R.A. § 2004a(3)

    c.  [9 L.P.R.A. § 2006]

    d.  9 L.P.R.A. § 2008

    e.  [9 L.P.R.A. § 2010]

    f.  9 L.P.R.A. §§ 2012(a), (b), (d), (e), (g) (h)

    g.  9 L.P.R.A. §§ 2013(a), (b)

    h.   9 L.P.R.A. § 2019

    i.  9 L.P.R.A. § 2020

2.     Act 1, approved on January 15, 2015:

    a.  9 L.P.R.A. § 2024

    b.  9 L.P.R.A. §§ 2026(b), (c), (d)(first paragraph), (d)(1), (d)(2), (d)(6), (d)(7), (d)(12), (d)(15)

    c.  9 L.P.R.A. § 2027

    d.  9 L.P.R.A. § 2030

    e.  9 L.P.R.A. § 2032

    f.  9 L.P.R.A. § 2035

---

[1]   The statutes listed herein are preempted for the reasons and solely to the extent set forth in Exhibit "A" to the Proposed Findings of Fact and Conclusions of Law.

The Debtor reserves the right to amend this list prior to the entry of the HTA Confirmation Order.

F-2

HTA_CONF 00012781

II. **Uniform Rate Revision and Modification Act**

    1.    Act 21, approved on May 31, 1985:

        a.    27 L.P.R.A. § 261a

        b.    27 L.P.R.A. § 261b

        c.    27 L.P.R.A. § 261c

        d.    27 L.P.R.A. § 261d

HTA_CONF 00012782

# EXHIBIT B

HTA/CCDA PSA

HTA_CONF 00012783

EXECUTION COPY

## HTA/CCDA RELATED PLAN SUPPORT AGREEMENT

HTA/CCDA RELATED PLAN SUPPORT AGREEMENT, dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), and Puerto Rico Highways and Transportation Authority ("**HTA**"), (b) certain holders of HTA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holder as set forth on Exhibit "A" hereto, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) certain holders of CCDA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holder as set forth on Exhibit "B" hereto (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA Holders**"), (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined below ("**Assured**"), and (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively with the HTA Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**"). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or in the Plan (as defined below), as applicable.

## RECITALS

A.       Pursuant to the authority granted pursuant to Act No. 74-1965, certified as 9 L.P.R.A. §§2001-2035, as amended, HTA was created for the purpose of, among other things, the construction, operation, and maintenance of the Commonwealth's transportation system.

B.       In accordance with (a) Resolution No. 68-18, adopted June 13, 1968 and as amended and supplemented thereafter, HTA issued a series of bonds (collectively, the "**HTA 68 Bonds**"), as set forth on Exhibit "C" hereto, and (b) Resolution 98-06, adopted February 26, 1998 and as amended and supplemented thereafter, HTA issued (i) a series of bonds as set forth on Exhibit "D" hereto (collectively, the "**HTA 98 Senior Bonds**"), and (ii) a series of subordinate bonds as set forth on Exhibit "E" hereto (collectively, the "**HTA 98 Sub Bonds**" and, together with the HTA 68 Bonds and the HTA 98 Senior Bonds, the "**HTA Bonds**").

C.       Pursuant the authority of Act 351 of September 2, 2000, the Puerto Rico Convention Center District Authority ("**CCDA**") was created for the purpose of, among other things, planning, developing and operating a convention center in San Juan, Puerto Rico.

D.       In accordance with the terms of that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JP Morgan Chase Bank, N.A., as trustee, as amended and supplemented from time to time, CCDA issued the series of bonds (collectively, the "**CCDA Bonds**"), as set forth on Exhibit "F" hereto, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00).

1

HTA_CONF 00012784

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex 2 (Part 2 of 3) Page 139 of 484

EXECUTION COPY

E.      In connection with the issuance of certain of the HTA Bonds and CCDA Bonds, Assured and National issued certain insurance policies and the HTA and CCDA entered into insurance agreements with respect thereto.

F.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

G.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to, among others, the Commonwealth and its instrumentalities, all as provided for in PROMESA.

H.      Pursuant to Act 2-2017, Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") was appointed as the agent of, and advisor to, the Government of the Commonwealth of Puerto Rico (the "**Government**"), and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth.

I.      On May 3, 2017 (the "**Commonwealth Petition Date**"), the Oversight Board filed a Title III petition on behalf of the Commonwealth (the "**Commonwealth PROMESA Proceeding**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

J.      On May 21, 2017 (the "**HTA Petition Date**"), the Oversight Board filed a Title III petition on behalf of HTA (the "**HTA PROMESA Proceeding**") in the Title III Court.

K.      The Oversight Board is the representative of the Commonwealth and HTA in the Commonwealth PROMESA Proceeding and the HTA PROMESA Proceeding, respectively, pursuant to Section 315(b) of PROMESA.

L.      On February 22, 2021, the Parties, among others, executed a Plan Support Agreement (the "**CW PSA**"), regarding the restructuring of GO Bonds and PBA Bonds, each as defined below, which agreement remains subject to certain conditions, including, without limitation, confirmation and consummation of a plan of adjustment in the Commonwealth PROMESA Proceeding.

M.      On March 8, 2021, the Commonwealth, the Employee Retirement System of the Government of the Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority filed that certain Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "**Second Amended Plan**") [Dkt. No. 15976], in the Title III Court, and a corresponding disclosure statement (the "**2021 Disclosure Statement**").

N.      Pursuant to Sections 7.1(g) and (h) of the CW PSA, Assured and National each had the right to terminate the CW PSA as to themselves on or before March 31, 2021 at 5:00pm (ET). By agreement, the Oversight Board extended such deadline up to and including April 20, 2021 at 5:00pm (ET).

2

HTA_CONF 00012785

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:23 Desc:
Debtors Ex 2 (Part 2 of 2) Page 140 of 484

EXECUTION COPY

O.     With the assistance of the Title III Court-appointed mediation team, the Parties have engaged in good faith, arm's-length negotiations, including, without limitation, regarding the terms of a proposed restructuring of the CCDA Bonds and the HTA Bonds and claims against the Commonwealth, HTA, and CCDA arising from or related to the CCDA Bonds and the HTA Bonds to be implemented in a manner as set forth in a (a) Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., as it may be amended, modified or supplemented (the "**Plan**"), which Plan shall be consistent with the terms and provisions of this Agreement, including, without limitation, Exhibit "J" hereto, the form of which shall be filed with the Title III Court as soon as practicable following the date hereof and, upon filing thereof, shall amend and supersede the Second Amended Plan, and (b) plan of adjustment filed in the HTA PROMESA Proceeding, which plan of adjustment the Oversight Board and HTA shall endeavor to file no later than January 31, 2022 and seek confirmation thereof; provided, however, that failure to file and/or confirm such plan of adjustment by the dates set forth above shall not give rise to a right of termination of this Agreement or a remedy with respect thereto.

P.     The Oversight Board consents to the execution and delivery of this Agreement by the Commonwealth and HTA and to the Commonwealth's and HTA's performance and exercise of their respective rights under this Agreement, including, without limitation, the right to terminate this Agreement and right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1     Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2     Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

**"5.5% SUT"** shall mean the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

**"Agreement"** shall mean this HTA/CCDA Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, upon filing, the Plan and the HTA Plan, as each may be amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof.

**"Appointments Related Litigation"** shall mean, collectively, the litigation styled (a) Rene Pinto Lugo, et al. v. The Government of the United States of America, et al., Adv. Pro. No. 18-041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b)

3

HTA_CONF 00012786

Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the United States of America, et al., Case No. 19-2243, currently pending in the United States Court of Appeals for the First Circuit, (c) Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

*"Assured HTA Bonds"* shall mean, collectively, the Assured Insured Bonds that are HTA Bonds.

*"Assured Insured Bonds"* shall mean, collectively, the HTA Bonds and the CCDA Bonds that are insured by Assured.

*"Bankruptcy Code"* shall mean Title 11 of the United States Code, as amended, §§101, et seq.

*"Bankruptcy Rules"* shall mean the Federal Rules of Bankruptcy Procedure.

*"Business Day"* shall mean a day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"CCDA Bond Claims"* shall mean, collectively, the claims against CCDA arising from or relating to the CCDA Bonds, which shall be calculated, for the purposes of the Plan, as the outstanding principal amount of the CCDA Bonds plus accrued, but unpaid, interest up to, but not including, the Commonwealth Petition Date.

*"CCDA Consummation Costs"* shall mean, collectively, an amount to be paid in consideration for fees and expenses incurred by an Initial PSA Creditor in connection with the negotiation and execution of this Agreement and the prosecution of approval of the Disclosure Statement and confirmation of the Plan, calculated in an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim on the CW Effective Date, in an amount not greater than Fifteen Million Dollars ($15,000,000.00).

*"CCDA Filing Date"* shall mean the date upon which (a) the Oversight Board files (i) a Title III petition on behalf of CCDA in the Title III Court or (ii) an application in the Title III Court to approve a qualifying modification under Title VI of PROMESA on behalf of CCDA, or (b) CCDA commences an out-of-court exchange or offering for the CCDA Bonds.

*"CCDA PROMESA Proceeding"* shall mean (a) the Title III case commenced by the Oversight Board on behalf of CCDA in the Title III Court or, in the event that Assured proposes to the Oversight Board a modification of the CCDA Bonds under Title VI of PROMESA, the application to approve a qualifying modification filed by the Oversight Board on behalf of CCDA or (b) CCDA commences an out-of-court exchange or offering for the CCDA Bonds.

HTA_CONF 00012787

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex 2 (Part 2 of 2) Page 142 of 484

EXECUTION COPY

"*CCDA Restriction Fee Percentage*" shall mean, the percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) <u>minus</u> such amount as may be payable on account of CCDA Consummation Costs <u>divided</u> by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by PSA Restriction Fee Creditors.

"*Clawback Actions*" shall mean, collectively, the litigation styled (a) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

"*Clawback Structuring Fees*" shall mean, collectively, the amounts set forth in Section 6.1(d) hereof to be paid, in cash, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, to Assured and National in accordance with the terms and provisions of this Agreement and the HTA Plan, including, without limitation, Article VI hereof.

"*COFINA*" shall mean the Puerto Rico Sales Tax Financing Corporation.

"*Comprehensive Cap*" shall have the meaning ascribed thereto in the Debt Responsibility Act.

"*Confirmation Order*" shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

"*Consummation Costs*" shall mean, collectively, the amounts set forth in Section 6.1(a) hereof to be paid, in cash, on the CW Effective Date or the HTA Effective Date, including CCDA Consummation Costs or HTA Consummation Costs, respectively, as the case may be, or as soon as practicable thereafter in accordance with the terms of the Plan and the HTA Plan, as the case may be, but in no event later than ten (10) Business Days following such date, to the Initial PSA Creditors in accordance with the terms and provisions of this Agreement, the Plan and the HTA Plan, as applicable, including, without limitation, Article VI hereof.

"*Covered Borrowers*" shall mean, collectively, the Commonwealth, HTA and, as of the CCDA Filing Date, CCDA.

"*CUSIP*" shall mean the Committee on Uniform Securities Identification Procedures nine-digit numeric or nine-digit character alphanumeric code which, for purposes of this Agreement, identifies the series of HTA Bonds and CCDA Bonds for the purposes of facilitating clearing and settlement of trades.

123408529v3

HTA_CONF 00012788

"*Custodial Trust Documents*" shall mean, collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the HTA Effective Date and relating to the Assured Insured Bonds, National Insured Bonds and the distributions to be made in accordance with the HTA Plan, the Plan or, to the extent necessary, a qualifying modification for the CCDA Bonds in accordance with Title VI of PROMESA.

"*CVIs*" shall mean, collectively, the securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution, to be issued on the CW Effective Date by the Commonwealth in accordance with the terms and conditions of this Agreement, the Plan, the Confirmation Order, the CVI Indenture, and the CVI Legislation.

"*CVI Indenture*" shall mean the indenture to be executed and delivered on or prior to the CW Effective Date pursuant to which the Commonwealth shall issue the CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

"*CVI Legislation*" shall mean the legislation to be enacted on or prior to the CW Effective Date authorizing certain transactions contemplated by, and consistent with, this Agreement and the Plan, including, without limitation, legislation authorizing the issuance of the CVIs, which may be part of the New GO Bonds Legislation.

"*CVI Payment Reserve*" shall mean, to the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the terms and provisions of the Plan, the CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI to be held in reserve by the CVI paying agent or the trustee, as the case may be, pursuant to the terms of the Trust Documentation and the CVI Indenture in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

"*CW Effective Date*" shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

"*Debt Related Objections*" shall mean, collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Dkt. No. 4784], (b)

6

HTA_CONF 00012789

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex 2 (Part 2 of 2) Page 144 of 484

EXECUTION COPY

Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Dkt. No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Dkt. No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Dkt. No. 9731], (e) Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of the Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Dkt. No. 9735], solely as it relates to the PRIFA BANs, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Dkt. No. 10638], and (g) any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, and/or the PRIFA BANs.

*"Debt Responsibility Act"* shall mean Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms and provisions of the Plan and the CW PSA.

*"Deemed Issuance Date"* shall mean the earlier to occur of (a) July 1, 2022 and (b) the HTA Effective Date.

*"Definitive Documents"* shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the Plan (including any amendments, modifications and supplements thereto), the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to each party to the CW PSA.

*"Disclosure Statement"* shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the PROMESA Proceedings in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

123408529v3

HTA_CONF 00012790

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex 2 (Part 2 of 2) Page 145 of 484

EXECUTION COPY

*"Disclosure Statement Order"* shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

*"Distribution Conditions"* shall mean, collectively, (a) the CW Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed this Agreement or a Joinder Agreement or an Annex Agreement with respect hereto, (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed this Agreement or a Joinder Agreement or an Annex Agreement with respect hereto; provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) shall be deemed satisfied.

*"EMMA"* shall mean the website of the Municipal Securities Rulemaking Boards Electronic Municipal Market Access.

*"Face Amount"* shall mean, solely for purposes of Article II hereof and the signature pages affixed hereto, (a) with respect to current interest HTA Bonds, insured or uninsured, the outstanding principal amount of such HTA Bonds as of the date of this Agreement, (b) with respect to CCDA Bonds, the outstanding principal amount of such CCDA Bonds as of the date of this Agreement, and (c) with respect to capital appreciation HTA Bonds, insured and uninsured, the accreted value of such HTA Bonds during the period up to, but not including, the HTA Petition Date.

*"Final Order"* shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed or reversed in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not

123408529v3

HTA_CONF 00012791

prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

"*Fiscal Plan*" shall mean a "Fiscal Plan" as defined by Section 5(10) of PROMESA.

"*Fiscal Year*" shall mean a fiscal year of the Commonwealth commencing on July 1st and concluding on June 30th of the following calendar year.

"*GDB HTA Loans*" shall mean, collectively, the loans, if any, made to HTA by the Government Development Bank and now held by the Government Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

"*GDB Loan Priority Determination*" shall mean the determination, in either the Commonwealth PROMESA Proceeding or the HTA PROMESA Proceeding, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of the Government Development Bank with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

"*General Fund*" shall mean the Government's primary operating fund.

"*Government Parties*" shall mean, collectively, the Oversight Board, AAFAF, the Commonwealth, ERS, PBA, HTA and CCDA.

"*Government Released Claims*" shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with HTA, the HTA Bonds, the HTA Bond Claims, CCDA, the CCDA Bonds, the CCDA Bond Claims, and arising prior to the CW Effective Date or the HTA Effective Date, as the case may be; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) the Commonwealth, CCDA or HTA arising from or relating to the Plan or the HTA Plan, the securities to be issued pursuant to the Plan or the HTA Plan, or (ii) a Government Party unrelated to the HTA Bonds, the HTA Bond Claims, the CCDA Bonds, or the CCDA Bond Claims, or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct; and, provided, further, that, for the avoidance of doubt, "Government Released Claims" includes all Government Released Claims pursuant to the CW PSA.

"*Government Releasees*" shall mean the Government Parties, together with their respective current or former board members, directors, principals, special committees, agents, officers, employees, advisors and professionals, in each case, in their capacities as such, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the PROMESA Proceedings, in their respective capacities as such.

9

HTA_CONF 00012792

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex-ibit (Part 2 of 2) Page 147 of 484

EXECUTION COPY

*"HTA Bond Claims"* shall mean, collectively, the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, and the HTA 98 Sub Bond Claims.

*"HTA 68 Bond Claims"* shall mean, collectively, the claims against HTA arising from or relating to the HTA 68 Bonds, which shall be calculated, for purposes of distribution pursuant to the Plan and the HTA Plan, as the outstanding principal amount of the HTA 68 Bonds, plus accrued, but unpaid, interest as set forth in the Settlement Summary.

*"HTA 98 Bonds"* shall mean, collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

*"HTA 98 Senior Bond Claims"* shall mean, collectively, the claims against HTA arising from or relating to the HTA 98 Senior Bonds, which shall be calculated for purposes of distribution pursuant to the Plan and the HTA Plan as the outstanding principal amount of the HTA 98 Senior Bonds, plus accrued, but unpaid, interest up to, but not including, the HTA Petition Date.

*"HTA 98 Sub Bond Claims"* shall mean, collectively, the claims against HTA arising from or relating to the HTA 98 Sub Bonds, which shall be calculated for purposes of distribution pursuant to the Plan and the HTA Plan as the outstanding principal amount of the HTA 98 Sub Bonds, plus accrued, but unpaid, interest up to, but not including, the HTA Petition Date.

*"HTA Clawback CVI"* shall mean the CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, this Agreement and the Settlement Summary annexed hereto as Exhibit "J".

*"HTA Confirmation Order"* shall mean, the order of the Title III Count confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA proceedings in accordance with Section 301 of PROMESA, which order shall be reasonably satisfactory to each Party.

*"HTA Consummation Costs"* shall mean, collectively, an amount to be paid in consideration for fees and expense incurred by an Initial PSA Creditor in connection with the negotiation and execution of this Agreement and the prosecution and approval of the HTA Disclosure Statement and confirmation of the HTA Plan, calculated in an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial PSA Creditor's HTA 68 Bond Claims and HTA 98 Senior Bond Claims, payable as an administrative expense claim on the HTA Effective Date, in an amount not greater than One Hundred Twenty-Five Million Dollars ($125,000,000.00).

*"HTA Definitive Documents"* shall mean, collectively, the documents, including, without limitation, any related agreements (including the New HTA Bond Indenture), instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the HTA Plan (including any amendments, modifications and supplements thereto), the HTA Disclosure Statement, the HTA Disclosure Statement Order, the HTA Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent

HTA_CONF 00012793

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex.2 (Part 2 of 2) Page 148 of 484

EXECUTION COPY

with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

"*HTA Disclosure Statement*" shall mean, the disclosure statement to be filed with respect to the HTA Plan with the Title III Court by the Oversight Board in the HTA PROMESA Proceeding in accordance with Section 1125 of the Bankruptcy Code made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably acceptable to the Oversight Board, Assured and National.

"*HTA Disclosure Statement Order*" shall mean the order of the Title III Court (a) approving the form of HTA Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the HTA Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

"*HTA Effective Date*" shall mean, the date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

"*HTA Plan*" shall mean a plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA PROMESA proceeding, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed hereto as Exhibit "J".

"*HTA Plan Supplement*" shall mean the volume of documents, agreements, and instruments, including, without limitation, the HTA Definitive Documents, which shall be filed with the Title III Court in connection with the HTA Plan and consummation of the transactions contemplated herein, and each of which shall be in form and substance reasonably satisfactory to the Oversight Board, Assured and National.

"*HTA Restriction Fee Percentage*" shall mean the percentage equal to (a) One Hundred Twenty-Five Million Dollars ($125,000,000.00) minus such amounts as may be payable on account of HTA Consummation Costs divided by (b) the aggregate amount of HTA 68 Bond Claims and the HTA 98 Senior Bond Claims held or, in the case of Assured and National, either held or insured and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by PSA Restriction Fee Creditors.

"*Insured Bond Claims*" shall mean, collectively, the Insured CCDA Bond Claims and the Insured HTA Bond Claims.

"*Insured CCDA Bond Claims*" shall mean, collectively, those CCDA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including pursuant to secondary market policies.

HTA_CONF 00012794

"***Insured HTA Bond Claims***" shall mean, collectively, those HTA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including pursuant to secondary market policies.

"***Invalidity Actions***" shall mean, collectively, those litigations set forth on Exhibit "G" hereto.

"***IRC***" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Joinder Creditors***" shall mean, collectively, those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "H" and "I", respectively, prior to the Joinder Deadline.

"***Joinder Deadline***" shall mean, with respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

"***Lift Stay Motions***" shall mean, collectively the litigation styled (a) Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 673], (b) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 591], (e) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) Ambac Assurance Corporation, et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1931, currently pending in the United States Court of Appeals for the First Circuit, (g) Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al., Adv. Pro. No. 17-00151-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, (h) Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al., Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with sections 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

"***Measured SUT***" shall mean the 5.5% SUT, less CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) as set forth in the Settlement Summary annexed hereto as Exhibit "J".

"***Monolines***" shall mean Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation, as insurers of CCDA Bonds and HTA Bonds, as applicable.

12

HTA_CONF 00012795

EXECUTION COPY

"*National Insured Bonds*" shall mean, collectively, the HTA Bonds that are insured by National.

"*New HTA Bonds*" shall mean, collectively, the bonds, as more fully described in the Settlement Summary annexed hereto as Exhibit "J", to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

"*New HTA Bonds Indenture*" shall mean the indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

"*Outperformance Condition*" shall mean the amount that the Measured SUT exceeds the Outperformance Metric, as defined in the Settlement Summary annexed hereto as Exhibit "J", in any Fiscal Year.

"*Plan Supplement*" shall mean the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties.

"*PRIFA*" shall mean The Puerto Rico Infrastructure Financing Authority.

"*PROMESA Proceedings*" shall mean, collectively, the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding

"*PSA Creditors*" shall mean, collectively, (a) the Initial PSA Creditors and (b) those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "H" and "I", respectively, in accordance with the terms and provisions of this Agreement.

"*PSA Restriction Fees*" shall mean, collectively, the fees payable in accordance with Sections 6.1(b) and (c) hereof, the Plan, the HTA Plan, the Confirmation Order and the HTA Confirmation Order, which fees, in the aggregate, shall not exceed One Hundred Forty Million Dollars ($140,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs and HTA Consummation Costs.

"*PSA Restriction Fee Creditors*" shall mean, collectively, the Initial PSA Restriction Fee Creditors and the Joinder Creditors that execute this Agreement, the Joinder Agreement, or the Annex Agreement prior to the expiration of the PSA Restriction Fee Period; provided, however, that notwithstanding anything contained herein to the contrary, all entities executing a Joinder Agreement or an Annex Agreement on the date the PSA Threshold Attainment is reached shall be considered PSA Restriction Fee Creditors; and, provided, further, that, under all circumstances, PSA Restriction Fees shall not be available to holders of HTA 98 Sub Bond

13

HTA_CONF 00012796

Claims in their capacity as such and such holders in such capacity shall not be considered PSA Restriction Fee Creditors with respect to such HTA 98 Sub Bonds.

*"PSA Restriction Fee Period"* shall mean the period from the date hereof up to and including the earlier to occur of (a) the PSA Threshold Attainment and (b) the Joinder Deadline.

*"PSA Threshold Attainment"* shall mean the date on which PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent (85%) of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are Insured Bond Claims, to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the HTA Bonds or the CCDA Bonds or enter with customers into long and short positions in debt securities such as the HTA Bonds or the CCDA Bonds, in its capacity as a dealer or market marker in such HTA Bonds or CCDA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to HTA Bonds or CCDA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Sales Tax" or "SUT"* shall mean the sales and use taxes, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

*"Section 926 Motion"* shall mean, the litigation arising from (a) the Urgent Motion for Bridge Order, and Motion for Appointment of Trustee Under 11 U.S.C. §926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation, dated July 17, 2020, filed in the HTA Title III Case [Dkt. No. 871] and the Commonwealth PROMESA Proceeding [Dkt. No. 13708], (b) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1847, currently pending in the United States Court of Appeals for the First Circuit, (c) any other motion or adversary proceeding pending as of the date hereof seeking appointment of a trustee for HTA in accordance with 11 U.S.C. §926, and (d) all claims and causes of action asserted in the Proposed Complaint, as defined in the Section 926 Motion and annexed thereto as Exhibit "C".

HTA_CONF 00012797

"*Settlement Summary*" shall mean the summary of the key economic terms to be included in the Plan and the HTA Plan as set forth in Exhibit "J" annexed hereto.

"*Substitute Measured Tax*" shall mean, all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

"*Trust Documentation*" shall mean, collectively, the documentation required, if necessary, to establish and maintain the trust into which the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of CW/HTA Claims (including the Monolines) pursuant to the terms of this Agreement.

"*Uniformity Litigation*" shall mean, collectively, (a) the litigation styled <u>Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.</u>, Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

Section 1.3    <u>Other Terms.</u>  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited,

Section 1.4    <u>Interpretations.</u>  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5    <u>Exhibits.</u>  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

HTA_CONF 00012798

## ARTICLE II

## GENERAL PROVISIONS

Section 2.1  <u>CW PSA</u>.  Notwithstanding anything contained in this Agreement to the contrary, the terms and conditions of the CW PSA remain in full force and effect, including, without limitation, the legal protections with respect to the CVIs, the CVI Legislation and the CVI Indenture set forth in Section 4.9(b) of the CW PSA, and are not intended, nor shall they be construed to be, amended or modified by any of the terms set forth herein. Without limiting the foregoing, the agreements, terms and conditions set forth herein, including, without limitation, the exhibits annexed hereto, are intended to supplement the terms and conditions of the CW PSA for the benefit of holders of CCDA Bond Claims and HTA Bond Claims.

Section 2.2  <u>Financial Information</u>.  The Oversight Board acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for the HTA Bonds, and the CCDA Bonds, provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged, and confidential, and (b) unless otherwise ordered by the Title III Court, shall not disclose to any third party and shall otherwise use its reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

Section 2.3  <u>CUSIP Information</u>.  Unless the then-current information has previously been provided to the Oversight Board, within two (2) Business Days after the date hereof, each Initial PSA Creditor shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the HTA Bonds and the CCDA Bonds, if any, such Party owns, insures or has due investment management responsibility and authority for funds or accounts which own such HTA Bonds and the CCDA Bonds, as the case may be. In addition, within five (5) Business Days of each calendar month or upon the request of the Oversight Board, which request shall be made no more frequently than monthly from and after the date hereof, each PSA Creditor shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the HTA Bonds and the CCDA Bonds, if any, such Party then owns, insures or has due investment management responsibility and authority for funds or accounts which own such HTA Bonds and the CCDA Bonds, as the case may be.

Section 2.4  <u>Additional Parties</u>.  Within two (2) Business Days from the date hereof, the Oversight Board shall request that AAFAF provide, through the prompt issuance on EMMA, a notice regarding the execution and delivery of this Agreement and the opportunity for all entities holding and/or insuring HTA Bonds and CCDA Bonds, having a Face Amount, in each case, in excess of One Million Dollars ($1,000,000.00), to execute and deliver to counsel to the Oversight Board, the form of Joinder Agreement annexed hereto as Exhibit "H", and to become a party hereto in accordance with the terms and conditions set forth herein and in the Joinder Agreement.

HTA_CONF 00012799

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Uniformity Litigation, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2    Representations and Warranties of the Commonwealth.   The Commonwealth, through its Title III representative, the Oversight Board, hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby: (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3    Representations and Warranties of HTA.  HTA, through its Title III representative, the Oversight Board, hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation

17

HTA_CONF 00012800

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 155 of 484

EXECUTION COPY

or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.4    Representations and Warranties of CCDA.  CCDA hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.5    Representations and Warranties of the HTA Holders.  Each of the HTA Holders, severally and not jointly, hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the HTA Bonds of no less than the Face Amounts set forth on the signature pages affixed to this Agreement as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than potentially with respect to the Insured HTA Bond Claims, and that, as of the date hereof, subject to any liens or encumbrances permitted by Section 4.5(a), it has not sold, transferred, pledged, hypothecated or assigned such HTA Bonds or any voting, consent or direction rights related to such HTA Bonds to any person or entity, that would prevent or adversely affect in any way such HTA Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Parties acknowledges that each Insured HTA Bonds Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

18

HTA_CONF 00012801

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Exhibit (Part 2 of 2) Page 156 of 484

EXECUTION COPY

Section 3.6 __Representations and Warranties of the CCDA Holders.__ Each of the CCDA Holders, severally and not jointly, hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the CCDA Bonds of no less than the Face Amounts set forth on the signature pages affixed to this Agreement as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than potentially with respect to the Insured CCDA Bond Claims, and that, as of the date hereof, subject to any liens or encumbrances permitted by Section 4.6(a), it has not sold, transferred, pledged, hypothecated or assigned such CCDA Bonds or any voting, consent or direction rights related to such CCDA Bonds to any person or entity, that would prevent or adversely affect in any way such CCDA Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; __provided__, __however,__ that each of the Parties acknowledges that each Insured CCDA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

Section 3.7 __Representations and Warranties of Assured.__ Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.8 __Representations and Warranties of National.__ National hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated

19

HTA_CONF 00012802

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex-2 (Part 2 of 2) Page 157 of 484

EXECUTION COPY

hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9  Representations of the Parties to this Agreement.  Each Party, severally and not jointly, represents and acknowledges that: (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as stated in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein. Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more HTA Holders or CCDA Holders, on the one hand, and a Monoline, on the other hand, or prevent any such parties from voluntarily entering into any commutation or similar separate agreement or instrument from and after the date hereof.

## ARTICLE IV

## COVENANTS

Section 4.1  Covenants of the Oversight Board.  The Oversight Board shall take, and cause the Commonwealth, HTA and following, the commencement of the CCDA PROMESA Proceeding, CCDA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan, and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; provided, however, that, in the event that Assured (including, as the case may be, jointly with other holders or insurers of CCDA Bond Claims) proposes to the Oversight Board a modification of the CCDA Bonds in accordance with Title VI of PROMESA, the Oversight Board shall consider such proposal, to the extent consistent with the terms set forth in the Settlement Summary annexed hereto as Exhibit "J", and make such determination as it deems appropriate. Such actions shall include, but not be limited

20

HTA_CONF 00012803

to, (a) commencing the CCDA PROMESA Proceeding, (b) filing the Plan and Disclosure Statement, in form and substance consistent with this Agreement and reasonably acceptable to the Parties, with the Title III Court, and requesting that the Title III Court establish hearing dates for the expeditious consideration of the Disclosure Statement and the Plan, (c) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (d) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditors (or their respective trustees, fiscal agents, or paying agents) relating to the HTA Bonds or the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (e) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan or the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "Clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds or HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, (f) at least four (4) days prior to such filing, delivering to counsel for each of Assured, and National copies of the Disclosure Statement, the HTA Disclosure Statement, the Plan, the HTA Plan, the Plan Supplement, the HTA Plan Supplement, the Confirmation Order, the HTA Confirmation Order, the other Definitive Documents and the HTA Definitive Documents and all other documents related to any of the foregoing, (g) in the event that a party (i) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, (h) using its reasonable best efforts to provide, and cause HTA to provide, to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA, and (i) using its reasonable best efforts and negotiate in good faith with Assured and National the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date. In addition to the foregoing, the Oversight Board, as representative of HTA in the HTA PROMESA Proceeding, (w) upon satisfaction of the Distribution Conditions, in accordance with the terms and provisions of Section 6.1(d) hereof, shall take such action as may be necessary to cause the Commonwealth to make payments to Assured and National, in cash, in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00), and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00) respectively, in consideration of the structuring of payments to be made to holders of CW/HTA Claims, CW Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims in accordance with the Plan, (x) shall take and cause HTA to take all actions necessary to file, or cause the filing of, the HTA

21

HTA_CONF 00012804

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Exhibit (Part 2 of 2) Page 159 of 484

EXECUTION COPY

Plan consistent with the terms set forth on Exhibit "J" annexed hereto, and shall use its reasonable best efforts to achieve confirmation thereof by the Title III Court, (y) upon satisfaction of the Distribution Conditions, shall take such action as may be necessary to cause HTA to make payments, in cash, of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) to holders of HTA 68 Bond Claims and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00) to holders of HTA 98 Senior Bond Claims, and (z) upon satisfaction of the Distribution Conditions, shall take, and cause the Commonwealth to take, such actions as are necessary to distribute the HTA Clawback CVI to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms of the Plan, the CVI Indenture, and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto and Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J".

Section 4.2    Covenants of the Commonwealth.    The Commonwealth shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement, and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order and the consummation, implementation and administration of the Plan and the HTA Plan, including, without limitation, the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan, and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the Commonwealth PROMESA Proceeding and the HTA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the HTA Bonds and the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any

action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan or the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, (e) in the event that a party (i) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (f) using its reasonable best efforts to provide, and cause HTA to provide, to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA. In addition to the foregoing, upon satisfaction of the Distribution Conditions, (y) in accordance with the terms and provisions of Section 6.1(d) hereof, the Commonwealth shall take such action as is necessary to make payments on the CW Effective Date, in cash, to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively, in consideration of the structuring of payments to be made to holders of CW/HTA Claims, CW Convention Center Claims, CW/PRIFA Rum Tax Claims and CW/MBA Claims in accordance with the Plan, and (z) the Commonwealth shall take such actions as are necessary to distribute the HTA Clawback CVI to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms of the Plan, the CVI Indenture, and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J".

Section 4.3    Covenants of HTA.  HTA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the HTA Plan, the Disclosure Statement, and the HTA Disclosure Statement, the approval of the Disclosure Statement and the HTA Disclosure Statement, and the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Plan and the HTA Plan (and their consummation, implementation and administration) and the other

23

HTA_CONF 00012806

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 161 of 484

EXECUTION COPY

Definitive Documents and the HTA Definitive Documents are consistent with the terms herein and in the Plan and the HTA Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and the HTA Disclosure Statement and confirmation of the Plan and the HTA Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the HTA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against Assured, National, any HTA Holder, or any CCDA Holder, relating to the HTA Bonds and the CCDA Bonds, (or their respective trustees, fiscal agents or paying agents), as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan and the HTA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and the HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial, and (e) using its reasonable best efforts to provide to Assured and National (and their respective advisors, as applicable) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the HTA Plan and the restructuring of HTA. In addition to the foregoing, HTA shall (y) file the HTA Plan consistent with the terms set forth on Exhibit "J" annexed hereto and the HTA Disclosure Statement and use its reasonable best efforts to achieve confirmation thereof by the Title III Court as expeditiously and practicable as possible and (z) upon satisfaction of the Distribution Conditions, take such action as is necessary to make payments, in cash, of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) to holders of HTA 68 Bond Claims and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00) to holders of HTA 98 Senior Bond Claims.

Section 4.4    Covenants of CCDA.  CCDA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; provided, however, that, in the event that Assured (including, as the case may be, jointly with other holders or insurers of CCDA Bond Claims) proposes to the Oversight Board a modification of the CCDA Bonds in accordance with Title VI of PROMESA, including as an alternative to inclusion of CCDA in the Plan as a debtor under Title III of PROMESA, if approved and authorized by the

HTA_CONF 00012807

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 162 of 484

**EXECUTION COPY**

Oversight Board, CCDA shall use its reasonable best efforts and take such actions as necessary to obtain approval of such qualifying modification consistent with the terms set forth on Exhibit "J" annexed hereto. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the CCDA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the HTA Bonds or the CCDA Bonds, as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection and (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of CCDA Bonds and the HTA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial.

Section 4.5 <u>Covenants of the HTA Holders.</u> Subject to the terms and conditions hereof, each of the HTA Holders, severally and not jointly, hereby covenants and agrees as follows:

(a) None of the HTA Holders shall sell, transfer, pledge, hypothecate or assign (except as may be required in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law with respect to a Monoline-insured bond) (a "**Transfer**") any of the HTA Bond Claims, or any voting, consent, or direction rights or participations or other interests therein (collectively, the "**HTA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) the HTA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.1 hereof; provided, however, that, notwithstanding the foregoing, each of the HTA Holders may transfer any HTA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of Transfer, such transferee that executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF, the Joinder Agreement attached hereto as Exhibit "G" (a "**Qualified Transferee**"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein, including, without limitation, with respect to any additional HTA Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder (other than the right to receive the Consummation Costs) and (z) on or after the effective date of the Transfer, such HTA Holder shall be deemed to have relinquished its rights (other than the right to receive the Consummation Costs), and be released from its obligations (other than as set forth in Section 4.5(c) hereof) on or after the effective date of the Transfer under this Agreement

25

HTA_CONF 00012808

solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void *ab initio* and the applicable HTA Bond Claims and the HTA Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the HTA Holders from acquiring additional HTA Bond Claims or CCDA Bond Claims; provided, however, that any such HTA Bond Claims and CCDA Bond Claims acquired from and after the date hereof shall automatically and immediately upon acquisition by an HTA Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the HTA Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth (including secured, unsecured, administrative or substantial contribution claims), on account of any HTA Bonds or HTA Bond Claims or provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such HTA Holders' aggregate holdings of HTA Bond Claims, (ii) except as permitted by Section 4.5(d) below solely with respect to the Monolines, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of its HTA Bonds or HTA Bond Claims (and each such HTA Holder agrees to such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims, or (iii) aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b); provided, however, that, to the extent consistent with its obligations hereunder, a HTA Holder may amend a proof of claim solely to change the claimant's name, address or similar information.

(c)     Each of the HTA Holders, solely in its capacity as holder of HTA Bonds or HTA Bond Claims, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan or the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement or the HTA Disclosure Statement, and the entry of the Confirmation Order or the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that such Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order, the HTA Confirmation Order, the Plan and the HTA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, the Plan and the HTA Plan, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 21 (Part 2 of 2) Page 164 of 484

EXECUTION COPY

the Oversight Board, AAFAF, the Commonwealth, HTA and CCDA and was made in accordance with the provisions of Section 8.1 hereof, and (B) not vote for or support any HTA or Commonwealth plan of adjustment not proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and HTA, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, and (iii) in the event that a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order, and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order.

(d)     Subject to the terms set forth herein, none of the HTA Holders shall be limited or prohibited from (i) taking any action that any such HTA Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents, (ii) taking any action to defend itself against the claims and causes of action asserted in the Debt Related Objections, the Invalidity Actions or the Lien Challenge Actions, to the extent such litigation is not otherwise stayed, or against the claims and causes of action asserted in any other litigation that is not stayed, (iii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iv) taking any action such holder shall deem necessary or appropriate as against a Monoline to preserve, protect or defend any of its rights under any policy of insurance issued by a Monoline with respect to any Monoline-insured bond. Without in any way limiting the foregoing, to the extent the Plan, the HTA Plan the Definitive Documents, and the HTA Definitive Documents are consistent with this Agreement and the exhibits hereto, none of the HTA Holders shall take any action to oppose confirmation of the Plan or the HTA Plan, as the case may be, with respect to the Covered Borrowers, including, without limitation, voting to reject the Plan or the HTA Plan with respect to any other claims held against the Commonwealth or HTA (with respect to a Monoline-insured bond, other than an Assured Insured Bond or a National Insured Bond, to the extent such HTA Holder is authorized to vote such claim in accordance with Section 301(c)(3) of PROMESA, any definitive insurance documents and applicable law); provided, however, that nothing in this Agreement shall limit or prohibit a HTA Holder from taking any action, or asserting any claims or causes of action, in connection with any matter relating to the Monolines and with respect to any Monoline-insured bond (including, without limitation, voting of claims, subrogation or acceleration, commutation or any other act necessary to maintain the benefits of the applicable Monoline insurance policy).

Section 4.6     Covenants of CCDA Holders. Subject to the terms and conditions hereof, each of the CCDA Holders, severally and not jointly, hereby covenants and agrees as follows:

(a)     None of the CCDA Holders shall Transfer any of the CCDA Bond Claims, or any voting, consent or direction rights or participations or other interests therein (collectively, the "**CCDA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) the CW Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.1 hereof; provided, however, that, notwithstanding the foregoing, each of the CCDA Holders may transfer any CCDA Interests to (1) another PSA Creditor or (2)

HTA_CONF 00012810

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:23 Desc:
Debtors Ex. Exhibit Part 2 of 2 Page 165 of 484

EXECUTION COPY

a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein, including, without limitation, with respect to any additional CCDA Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder (other than the right to receive the Consummation Costs) and (z) on or after the effective date of the Transfer, such CCDA Holder shall be deemed to have relinquished its rights (other than the right to receive the Consummation Costs), and be released from its obligations (other than as set forth in Sections 4.6(c) hereof) on or after the effective date of the Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void *ab initio* and the applicable CCDA Bond Claims and the CCDA Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the CCDA Holders from acquiring additional HTA Bond Claims or CCDA Bond Claims; provided, however, that any such CCDA Bond Claims or HTA Bond Claims, acquired from and after the date hereof shall automatically and immediately upon acquisition by a CCDA Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the CCDA Holders shall, except as expressly provided for herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth (including secured, unsecured, administrative or substantial contribution claims), on account of any CCDA Bonds or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such CCDA Holders' aggregate holdings of CCDA Bond Claims, (ii) except in accordance with any claims bar date order entered in the CCDA PROMESA Proceeding, or as permitted by Section 4.6(d) below solely with respect to the Monolines, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of its CCDA Bonds or CCDA Bond Claims (and each such CCDA Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims, or (iii) aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b); provided, however, that, to the extent consistent with its obligations hereunder, a CCDA Holder may amend a proof of claim solely to change the claimant's name, address or similar information.

(c)     Each of the CCDA Holders, solely in its capacity as holder of CCDA Bonds and CCDA Bond Claims, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to,

123408529v3

HTA_CONF 00012811

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc: Debtors Ex 2 (Part 2 of 2) Page 166 of 484

EXECUTION COPY

breach or be inconsistent with the terms herein or in the Plan, or impede or preclude, the filing of the Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF, the Commonwealth, HTA and CCDA and was made in accordance with the provisions of Section 8.1 hereof, and (B) not vote for or support any CCDA or Commonwealth plan of adjustment not proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and CCDA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that each of the Parties acknowledges that each Insured CCDA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, and (iii) in the event that a party (A) files a notice of appeal from the entry of the Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order.

(d)     Subject to the terms set forth herein, none of the CCDA Holders shall be limited or prohibited from (i) taking any action that any such CCDA Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents, (ii) taking any action to defend itself against claims or causes of action asserted in the Debt Related Objections, the Invalidity Actions or the Lien Challenge Actions, to the extent such litigation is not otherwise stayed, or against the claims and causes of action asserted in any other litigation that is not stayed, (iii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iv) taking any action such holder shall deem necessary or appropriate as against a Monoline to preserve, protect or defend any of its rights under any policy of insurance issued by a Monoline with respect to any Monoline-insured bond. Without in any way limiting the foregoing, to the extent the Plan and the Definitive Documents are consistent with this Agreement and the exhibits hereto, none of the CCDA Holders shall take any action to oppose confirmation of the Plan with respect to the Covered Borrowers, including, without limitation, voting to reject the Plan with respect to any other claims held against the Commonwealth or CCDA (with respect to a Monoline-insured bond, other than an Assured Insured Bond or a National Insured Bond, to the extent such CCDA Holder is authorized to vote such claim in accordance with Section 301(c)(3) of PROMESA, any definitive insurance documents and applicable law); provided, however, that nothing in this Agreement shall limit or prohibit a CCDA Holder from taking any action, or asserting any claims or causes of action, in connection with any matter relating to the Monolines and with respect to any Monoline-insured bond (including, without limitation, voting of claims, subrogation or acceleration, commutation or any other act necessary to maintain the benefits of the applicable Monoline insurance policy).

29

HTA_CONF 00012812

Section 4.7    <u>Covenants of Assured</u>.  Assured hereby covenants and agrees as follows:

(a)    Assured shall not, except as expressly provided herein or in accordance with any order of the Title III Court regarding the filing of proofs of claim in a CCDA PROMESA Proceeding, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA or CCDA (including secured, unsecured, administrative or substantial contribution claims) on account of any Assured Insured Bonds, or any HTA Bond Claims or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings of HTA Bond Claims or CCDA Bond Claims, (ii) upon entry of a stay of litigation, solely with respect to Assured, in the Commonwealth PROMESA Proceeding, the HTA Proceeding, and the CCDA Proceeding in which Assured is a plaintiff, defendant or respondent, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any Assured Insured Bonds or any of its HTA Bond Claims or CCDA Bond Claims in the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding (and Assured agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(a). Without limiting the foregoing, within four (4) Business Days from the date hereof, (A) Assured and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to Assured and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions, the Section 926 Motion as to Assured, and that certain litigation styled <u>Assured Guaranty Corp., et al. v. The Commonwealth of Puerto Rico, et al.</u>, Adv. Pro. No. 18-00059-LTS, currently pending in the Title III Court (the "**Adversary**"), and (B) Assured shall take, or cause to be taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by Assured in connection with the Clawback Actions and the Lift Stay Motions, including, without limitation, all such subpoenae, deposition notices, requests for production of documents, and any joinders by Assured to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)    Assured shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan and the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement and the HTA Disclosure Statement, the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order the HTA Confirmation Order, the Plan and the HTA Plan (and their consummation, implementation and administration) and the Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by the Oversight Board, and otherwise

30

consistent with the terms herein, and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that Assured acknowledges that each Insured HTA Bond Claim and Insured CCDA Bond Claim insured by Assured shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (iv) use its reasonable best efforts and negotiate in good faith with the Oversight Board and National the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date.

(c)     Subject to the terms set forth herein, including ,without limitation, the stay of litigation as required in accordance with Section 4.7(a) hereof, Assured shall not be limited or prohibited from (i) taking such action that Assured shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the HTA Plan, the other Definitive Documents, or the other HTA Definitive Documents, or (ii) asserting any claims or causes of action against any Party that breaches this Agreement; provided, however, that the foregoing shall not preclude Assured from participating in any action or proceeding regarding the GDB Loan Priority Determination.

Section 4.8     Covenants of National.  National hereby covenants and agrees as follows:

(a)     National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA or CCDA (including secured, unsecured, administrative or substantial contribution claims) on account of any National Insured Bonds, or any HTA Bond Claims or CCDA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of HTA Bond Claims or CCDA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any National Insured Bonds or any of its HTA Bond Claims or CCDA Bond Claims in the Commonwealth PROMESA Proceeding, the HTA PROMESA Proceeding and the CCDA PROMESA Proceeding (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.8(a). Without limiting the foregoing, within four (4) Business Days from the date hereof, (A) National and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to National and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions and the Section 926 Motion as to National, and (B) National shall take, or cause to be

123408529v3

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Exhibit 2 (Part 2 of 2) Page 169 of 484

EXECUTION COPY

taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by National in connection with the Clawback Actions and the Lift Stay Motions, including, without limitation, the withdrawal of all subpoenae, deposition notices, requests for production of documents, and any joinders by National to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)     National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan and the HTA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement and the HTA Disclosure Statement, the entry of the Confirmation Order and the HTA Confirmation Order, and the consummation, implementation and administration of the Plan and the HTA Plan, including the execution and delivery of the Definitive Documents and the HTA Definitive Documents, provided that the Disclosure Statement, the HTA Disclosure Statement, the Confirmation Order, the HTA Confirmation Order, the Plan and the HTA Plan (and its consummation, implementation and administration) and the Definitive Documents and the HTA Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the HTA Plan unless such modification is proposed or supported by the Oversight Board, and otherwise consistent with the terms herein and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that National acknowledges that each Insured HTA Bond Claim insured by National shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order or the HTA Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the HTA Confirmation Order, and (iv) use its reasonable best efforts and negotiate in good faith with the Oversight Board and Assured the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the CW Effective Date.

(c)     Subject to the terms set forth herein, including, without limitation, the stay of litigation as required in accordance with Section 4.8(a) hereof, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the HTA Plan, the other Definitive Documents or the HTA Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement; provided, however, that the foregoing shall not preclude National from participating in any action or proceeding regarding the GDB Loan Priority Determination.

Section 4.9     Covenants of the Parties. Subject to the terms and conditions hereof, each of the Parties, severally and not jointly, hereby covenants and agrees as follows:

32

(a)    Coordination.   The Parties shall coordinate and use their reasonable best efforts to obtain the consent and joinder of AAFAF prior to consummation of the transactions contemplated herein.  Any representations, warranties, covenants, or other obligations of AAFAF contemplated herein shall not be effective until an authorized signature for such entity has been affixed hereto.

(b)    Legal and Other Protections.   The Plan, the Confirmation Order, the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the HTA Definitive Documents, the CVI Legislation, the Debt Responsibility Act, and the CVI Indenture, to the extent applicable, in a manner to be agreed to by the Oversight Board, Assured and National, shall include the following legal protections:

(i)    For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law;

(ii)    Pursuant to the New HTA Bonds Indenture, the New HTA Bonds trustee shall have a direct right of action to enforce the New HTA Bonds Indenture, including (A) with respect to the New HTA Bonds and the New HTA Bonds Indenture, a net revenue pledge with respect to the collection of tolls, (B) seeking specific performance as a remedy for any breach of covenants in the New HTA Bonds Indenture, and (C) as of the commencement thereof, the automatic stay in any future insolvency proceeding commenced on behalf of HTA (whether under Title III of PROMESA or otherwise) would be deemed waived with respect to toll revenues, net of toll-only operating expenses and toll road enumerated capital expenditures; provided, however, that, upon an event of default under the New HTA Bonds Indenture, and, in the absence of action by the New HTA Bonds trustee, holders of not less than twenty-five percent (25%) in principal amount of the New HTA Bonds then outstanding shall be entitled to institute any suit, action, mandamus or other proceeding in equity or at law, or for the protection or enforcement of any right or remedy under the New HTA Bonds Indenture;

(iii)    Pursuant to the CVI Indenture, the CVI trustee shall have a direct right of action to enforce the CVI Indenture, including seeking specific performance as a remedy for any breach of covenants in the CVI Indenture; provided, however, that, upon an event of default pursuant to the CVI Indenture, as described therein, and, the absence of action by the CVI trustee, holders of not less than twenty-five percent (25%) in principal amount of the CVIs then outstanding shall be entitled to institute any suit, action, mandamus or other proceeding in equity or at law, or for the protection or enforcement of any right or remedy pursuant to the CVI Indenture;

(iv)    The HTA Fiscal Plan certified as of the HTA Effective Date, and any post-HTA Effective Date HTA Fiscal Plan will include provisions for the payment in each Fiscal Year of principal and interest of New HTA Bonds, including, without limitation, sinking fund payments due in such Fiscal Year;

(v)    The Fiscal Plan for the Commonwealth certified as of the Effective Date, and any Post-Effective Date Fiscal Plan will include provisions for the payment in each Fiscal Year to the extent that the Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

33

HTA_CONF 00012816

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 171 of 484

EXECUTION COPY

(vi)     The New HTA Bonds shall be secured by a first-priority lien on tolls collected by or on behalf of HTA and certain other HTA available revenues/ resources, and the right to receive the foregoing, subject to necessary operating and capital expenses of the toll roads specified in the New HTA Bonds Indenture (the "**Net Revenues**");

(vii)     The HTA Plan, the HTA Confirmation Order and the New HTA Bonds Indenture shall provide for a covenant setting forth an additional bonds test of 1.20x from Net Revenues;

(viii)     The HTA Plan and the HTA Confirmation Order shall provide for a rate covenant requiring a 1.10x coverage ratio of Net Revenues, whereby, for purposes of calculating the coverage ratio, Net Revenues may include unencumbered cash as provided in the New HTA Bonds Indenture;

(ix)     HTA Fiscal Plans certified on or after the HTA Effective Date, the HTA Plan and the HTA Confirmation Order shall provide for the measures necessary to service the obligations contemplated pursuant to this Agreement, the New HTA Bonds and the New HTA Bonds Indenture;

(x)     The HTA Confirmation Order shall provide for the retention of jurisdiction by the Title III Court, or, in the event the Title III Court declines such retention of jurisdiction or the PROMESA Proceedings have been closed in accordance with the terms and provisions of PROMESA, designation of the United States District Court for the District of Puerto Rico, to enforce the terms of the certified Fiscal Plans and the obligations contemplated pursuant to this Agreement, the New HTA Bonds and the New HTA Bonds Indenture;

(xi)     The New HTA Bonds, including, without limitation, any New HTA Bonds issued in accordance with the terms and provisions of Section 4.9(c) hereof, and, to the extent feasible, the CVIs shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such bonds and securities are valid, legally binding and enforceable pursuant to the Confirmation Order or the HTA Confirmation Order, as the case may be;

(xii)     The compromises and settlements embodied in this Agreement and set forth in the Plan, the Confirmation Order, the HTA Plan and the HTA Confirmation Order shall not be binding on any Party (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding with respect to the priority of the CVIs under PROMESA, the Puerto Rico Constitution or other applicable law;

(xiii)     The Commonwealth shall covenant for the benefit of all initial and subsequent holders of New HTA Bonds that the Commonwealth will not limit or restrict the rights or powers vested in HTA until all obligations with respect to the New HTA Bonds, together with all interest accrued thereon, have been paid or satisfied in full in accordance with their terms;

(xiv)     The Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Commonwealth will not: (a) take any

34

HTA_CONF 00012817

action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Commonwealth of (x) the amounts of the Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in the Settlement Summary annexed hereto as Exhibit "J";

(xv)     The HTA Confirmation Order shall include a determination that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the HTA Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for HTA as determined in accordance with modified accrual accounting standards;

(xvi)     The New HTA Bonds Indenture, the New HTA Bonds, and the CVIs shall be governed by New York law;

(xvii)     The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) HTA, (3) each person or entity asserting claims or other rights against the Commonwealth, HTA, COFINA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan and, if impaired, whether or not such person or entity accepted the Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(xviii)     The HTA Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) HTA, (3) each person or entity asserting claims or other rights against the Commonwealth, HTA, COFINA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the HTA Plan and, if impaired, whether or not such person or entity accepted the HTA Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

HTA_CONF 00012818

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 173 of 484

EXECUTION COPY

(xix)    The Plan shall include a provision that the HTA Clawback CVI to be issued and any distributions thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the Distribution Conditions are satisfied, and, in the event that this Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust, as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto;

(xx)    The Confirmation Order shall provide that, in consideration for the agreements set forth herein, and upon satisfaction of the Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xxi)    The Confirmation Order shall provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) hereof, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xxii)    The Plan and the CVI Indenture shall include provisions that provide that, upon satisfaction of the Distribution Conditions, the HTA Clawback CVI shall be distributed to the holders of Allowed CW/HTA Claims (including the Monolines) and payments on account thereof shall be in accordance with the terms of the Plan, the CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; provided, however, that, until receipt of the GDB Loan Priority Determination, (i) cash payments allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (ii) the HTA Clawback CVI otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section of the Settlement Summary annexed hereto as Exhibit "J"; and

(xxiii)    The Plan and the CVI Indenture shall provide that any modifications to the HTA Clawback CVI Priority Distribution Waterfall shall only require consent of the Oversight Board and the Initial PSA Creditors, provided that such modifications are not materially adverse to the holders of Allowed HTA Bonds Claims.

123408529v3

HTA_CONF 00012819

(c)      Tax-Exempt Treatment of the New HTA Bonds.  The Oversight Board and the HTA shall use their reasonable best efforts to cause the payment of principal and interest with respect to the New HTA Bonds to be treated as tax-exempt for applicable local tax and/or territorial laws and federal income tax purposes.

Section 4.10   Qualified Marketmaker. Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any HTA Interests or CCDA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided, however, that, in the event that a Qualified Marketmaker acquires such HTA Interests, CCDA Interests, on or before April 27, 2021, such Qualified Marketmaker may retain such HTA Interests, or CCDA Interests, as the case may be, for a period of one hundred twenty (120) days following such Qualified Marketmaker's acquisition of such HTA Interests or CCDA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any HTA Interests or CCDA Interests that the Qualified Marketmaker acquires from a holder of the HTA Interests or CCDA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.  A Qualified Marketmaker may, with the consent of the Government Parties, which consent shall not be unreasonably withheld, join this Agreement solely on behalf of a specific trading desk.

Section 4.11   Appointments Related Litigation/Uniformity Litigation.  Except as expressly provided below, or unless otherwise required to comply with an order of a court of competent jurisdiction that has not been vacated, reversed, or otherwise stayed, no Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall take further action in connection with such litigation but, under all circumstances, such Party hereby covenants and agrees (a) to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation or the Uniformity Litigation, with such determination and Final Order being entered either prior to consideration of approval of, or confirmation of, the Plan or the HTA Plan, as the case may be, by the Title III Court or subsequent to entry of the Confirmation Order or the HTA Confirmation Order, as applicable, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein and in the Plan or the HTA Plan as the case may be, and (ii) in the event that such determination and Final Order occurs prior to approval of, or confirmation of, the Plan or the HTA Plan, as the case may be, such Party shall urge and request, in writing, that the Oversight Board, as it may be modified, reconstructed or reappointed, (1) enforce the terms and conditions of this Agreement and the Plan and the HTA Plan, and (2) promptly seek confirmation of the Plan and the HTA Plan by the Title III Court. Notwithstanding the foregoing, during the period (i) prior to the CW Effective Date, a Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall be under no obligation hereunder to inform a court considering such litigation of the execution and pendency of this Agreement, and (ii) from and after the CW Effective Date, any Party to the Appointments Related Litigation or the Uniformity Litigation shall seek the dismissal, with prejudice, of such litigation.

123408529v3

HTA_CONF 00012820

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex x2i(Part 2 of 2) 39 Page 175 of 484

EXECUTION COPY

Section 4.12   Right to Vote. Each Party acknowledges that, for purposes of this Agreement, and any Plan or HTA Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect and is not otherwise terminated by Assured and National as to themselves, (a) Assured and National shall have the right to vote to accept or reject the Plan or the HTA Plan, as the case may be, to the extent provided by the terms and provisions of Section 301(c)(3) of PROMESA and such other applicable law and governing documents on account of any existing HTA Bonds and CCDA Bonds that it insures, and (b) it shall not object to Assured's or National's right to vote to accept or reject the Plan or the HTA Plan, as the case may be, in accordance with subsection (a) above. For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Assured's, National's and their respective insured bondholders' rights to vote to accept or reject any Plan or the HTA Plan, as the case may be.

## ARTICLE V

## PLAN AND PLAN SUPPORT

Section 5.1   Plan Support Commitment.  From and after the date hereof, provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the HTA Disclosure Statement, the Plan, the HTA Plan or any of the proposed Definitive Documents and the HTA Definitive Documents have been filed, amended or modified in a manner inconsistent with the provisions of this Agreement:

(a)       Commonwealth Plan: Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion and the Adversary, through a date no earlier than the CW Effective Date, solely with respect to Assured and National; provided, however, that a PSA Creditor shall only be required to support the Plan with respect to those HTA Bond Claims and CCDA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that they either hold or insure and are entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents; and, provided, further, that, nothing herein shall limit or prohibit any PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Assured and National from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured HTA Bond Claims or Insured CCDA Bond Claims that are insured by Assured or National, as the case may be (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable Monoline insurance policy), and (D) a stay of any joinders by Assured or National to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely

123408529v3

HTA_CONF 00012821

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex.21 (Part 2 of 2) Page 176 of 484

EXECUTION COPY

vote, or cause to be voted, to accept the Plan in its capacity as an HTA Holder, a CCDA Holder or insurer of Insured HTA Bond Claims or Insured CCDA Bond Claims, as applicable, with rights of acceptance in accordance with the Disclosure Statement Order, each as the case may be; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the Plan with respect to those HTA Bond Claims and CCDA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that Assured or National either holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the Plan unless such modification is (Y) not adverse to the HTA Holders, CCDA Holders, Assured and National, and (Z) not inconsistent with the terms provided herein and the Plan, and (v) not vote for or support any HTA or Commonwealth plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim and Insured CCDA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

(b)     HTA Plan: Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the HTA Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, and (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion and the Adversary, through a date no earlier than the HTA Effective Date, solely with respect to Assured and National; provided, however, that a PSA Creditor shall only be required to support the HTA Plan with respect to those HTA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that they either hold or insure and are entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents; and, provided, further, that, nothing herein shall limit or prohibit any PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Assured and National from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured HTA Bond Claims that are insured by Assured or National, as the case may be (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable Monoline insurance policy), and (D) a stay of any joinders by Assured or National to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the HTA Disclosure Statement and/or oral solicitation materials in respect of the HTA Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the HTA Plan in its capacity as a HTA Holder, or insurer of Insured HTA Bond Claims with rights of acceptance in accordance with the HTA Disclosure Statement Order, each as the case may be; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the HTA Plan with respect to those HTA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Assured or National, that Assured or National either holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such

123408529v3

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. Exhibit 2 Part 2 of 4 Page 177 of 484

**EXECUTION COPY**

other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the HTA Plan unless such modification is (Y) not adverse to the HTA Holders, Assured and National, and (Z) not inconsistent with the terms provided herein and the Plan, and (v) not vote for or support any HTA plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured HTA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

Section 5.2     Solicitation Required in Connection with Plans. Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan or the HTA Plan, as the case may be. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan and the HTA Plan, as applicable, will not be solicited until the Title III Court has approved the disclosure statement and related solicitation materials, and such disclosure statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

Section 5.3     Custodial Trusts/Acceleration/Commutation of Insurance. Subject to (a) the terms and provisions set forth in Article VII hereof, including, without limitation, the termination of this Agreement by Assured and/or National, and (b) all insurance policies and related agreements relating to Assured Insured Bonds and National Insured Bonds being in full force and effect, with no outstanding payment defaults by Assured or National with respect to such Assured Insured Bonds and National Insured Bonds, respectively, up to and including the CW Effective Date or the HTA Effective Date, as the case may be, (i) the Plan shall contain a provision providing that (A) the payment of the principal of the GO Bonds, PBA Bonds, and CCDA Bonds insured by Assured is accelerated as of the CW Effective Date, (B) the GO Bonds, PBA Bonds, and CCDA Bonds insured by Assured are payable from and after the CW Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, (C) the payment of the principal of the GO Bonds and PBA Bonds insured by National is accelerated as of the CW Effective Date, and (D) the GO Bonds and PBA Bonds insured by National are payable from and after the CW Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, (ii) the HTA Plan shall contain a provision providing that (A) the payment of the principal of the HTA Bonds insured by Assured is accelerated as of the HTA Effective Date, (B) the HTA Bonds insured by Assured are payable from and after the

HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment, (C) the payment of the principal of the HTA Bonds insured by National is accelerated as of the HTA Effective Date, and (D) the HTA Bonds insured by National are payable from and after the HTA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, and (iii) the Plan and the HTA Plan shall include provisions relating to, as applicable (A) the implementation of custodial trusts in connection with distributions to be made to the holders of Assured Insured Bonds and National Insured Bonds, and (B) a proposal to the applicable holders of Assured Insured Bonds and National Insured Bonds regarding the resolution of such holders' claims in respect of applicable policies of insurance, which provisions shall be in the form and substance satisfactory to the Oversight Board and, to the extent applicable, Assured and National. Such proposals may take the form of one or more commutation transactions; provided, however, that no holder of Assured Insured Bonds or National Insured Bonds shall be required to accept any such proposal to commute the respective policies of issuance.

## ARTICLE VI

## CONSUMMATION COSTS & RESTRICTION FEES

Section 6.1 <u>Consummation Costs and PSA Restriction Fees.</u> Subject to the terms and conditions herein and in the Plan and the HTA Plan, the Consummation Costs and the PSA Restriction Fees, each of which shall be fully earned as of the date hereof or the date of execution of a Joinder Agreement for Initial PSA Creditors or Joinder Creditors, as the case may be, shall be paid on the CW Effective Date or the HTA Effective Date, as the case may be, in accordance with the terms and conditions set forth in the Plan, the Confirmation Order, the HTA Plan, and the HTA Confirmation Order.

(a) <u>Consummation Costs</u>. In consideration for the fees and expenses incurred by Initial PSA Creditors in connection with (i) with respect to the CCDA Bond Claims, the negotiation and execution of this Agreement and the prosecution of approval of the Disclosure Statement and confirmation of the Plan and (ii) with respect to HTA Bond Claims, the negotiation and execution of this Agreement and the prosecution and confirmation of the HTA Plan and approval of the HTA Disclosure Statement with respect thereto, each Initial PSA Creditor shall be entitled to receive on the CW Effective Date or the HTA Effective Date, as the case may be, in the form of an allowed administrative expense claim, based upon its respective positions (insured or otherwise and, with respect to each of Assured and National, including positions that it holds or has insured) as of 5:00 p.m. (EDT) on the date hereof, a pro rata share of the HTA Consummation Costs and the CCDA Consummation Costs, as applicable.

(b) <u>HTA Restriction Fee</u>. In exchange for executing this Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of this Agreement, subject to the entry of the HTA Confirmation Order, each PSA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds (including Assured and National, to the extent Assured or National, as applicable, is authorized to vote such

123408529v3

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex21 (Part 2 of 2) Page 179 of 484

EXECUTION COPY

Insured HTA Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the HTA Plan in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims and HTA 98 Senior Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period; provided, however, that each PSA Restriction Fee Creditor who acquires any HTA 68 Bonds and/or HTA 98 Senior Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured HTA Bond (other than a Monoline-insured HTA Bond insured by Assured or National, as the case may be), to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured HTA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such PSA Restriction Fee equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bond Claims and HTA 98 Senior Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the HTA Bond Claims and the entry of the confirmation order; and, provided, further, that, if a PSA Restriction Fee Creditor sells any HTA 68 Bonds or HTA 98 Senior Bonds for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate PSA Restriction Fee plus the Consummation Costs attributable to an HTA Holder's HTA 68 Bond Claims or HTA 98 Senior Bond Claims, as the case may be, shall not exceed One Hundred Twenty-Five Million Dollars ($125,000,000.00); and, provided, further, that, in the event this Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) hereof (subject to the extension provided for in Sections 7.1(b) or (c) hereof), or the Oversight Board terminates this Agreement for any reason other than (i) a breach of this Agreement by a non-Government Party, (ii) the denial of confirmation of the HTA Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan or the HTA Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Plan or the HTA Plan on terms consistent with this Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed hereto as Exhibit "J"), (iii) the CVI Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) hereof, the aggregate PSA Restriction Fee and Consummation Costs, in the amount of Twenty Million Dollars ($20,000,000.00) shall be paid, ratably, in cash, as an administrative expense claim under a plan of adjustment for HTA to the Initial PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances,

HTA_CONF 00012825

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) Page 180 of 484

EXECUTION COPY

upon termination of this Agreement, including, without limitation, termination of this Agreement in accordance with other provisions of Section 7.1 hereof, no Consummation Costs or PSA Restriction Fee shall be due and payable to the Party to this Agreement terminating this Agreement or against the Party to this Agreement as to which this Agreement is terminated.

(c)   CCDA Restriction Fee. In exchange for executing this Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of this Agreement, subject to the entry of the Confirmation Order, each PSA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be) to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period; provided, however, that each PSA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Assured or National, as the case may be), to the extent such PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Assured and National, to the extent Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such PSA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a PSA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate PSA Restriction Fee plus the Consummation Costs attributable to a CCDA Holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event this Agreement is terminated pursuant to the terms of Section 7.1 hereof, no Consummation Costs or PSA Restriction Fee shall be due and payable to a CCDA Holder or Assured with respect to CCDA Bond Claims.

HTA_CONF 00012826

(d)     Clawback Structuring Fees.  In exchange for executing this Agreement, agreeing
to all of its terms and conditions,  and structuring the payments to be made in accordance with the
Settlement Summary annexed hereto as Exhibit "J", subject to the entry of the HTA
Confirmation Order, on the HTA Effective Date, Assured and National shall be entitled to
receive, and the Commonwealth shall pay, in cash, to Assured and National the amounts of
Thirty-Nine Million  Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million
Three Hundred Thousand Dollars ($19,300,000.00), respectively.  In the event that this
Agreement is terminated by either Assured or National in accordance with the provisions of
Article VII hereof, such Party shall not be entitled to the payment of a Clawback Structuring Fee.

## ARTICLE VII

## TERMINATION

Section 7.1     Termination of Agreement.

(a)     This Agreement may be terminated by any PSA Creditor, solely as to itself, at its
sole option and discretion and upon written notice to the other Parties, in the event that (i) the
Oversight Board fails to comply with any of its respective covenants in Article IV hereof or any
of its undertakings in this Agreement (except for the failure of the Oversight Board to agree with
Assured and National with respect to the HTA Plan, the HTA Confirmation Order, the New
HTA Bonds Indenture, the Trust Documentation and the Custodial Trust Documents prior to the
CW Effective Date provided that the Oversight Board used its reasonable best efforts and
negotiated in good faith in a timely manner in connection therewith), if such failure to comply
has or would have an adverse economic or legal impact on such PSA Creditor, including an
adverse economic impact in the treatment afforded to such PSA Creditor under the Plan or the
HTA Plan (including any applicable settlement under the Plan or the HTA Plan or changes to the
legal protections set forth in Section 4.9(b) hereof), or change in the cash flows for the New
HTA Bonds referenced in exhibits to the HTA Plan, the terms and structure of the CVIs set forth
in the Plan, or to the definition or calculation of Consummation Costs or PSA Restriction Fees
that would have an adverse economic or legal impact on such PSA Creditor, (ii) the Oversight
Board files any motion or pleading with the Title III Court, in each case, that is inconsistent with
this Agreement, including the Plan and the HTA Plan in any adverse economic or legal respect
(including treatment under the Plan or the HTA Plan, or any applicable settlement under the Plan
or the HTA Plan, or change in the cash flows for the New HTA Bonds referenced in the exhibits
to the HTA Plan, the terms and structure of the CVIs set forth in the Plan, or to the definition or
calculation of Consummation Costs or PSA Restriction Fees) before the earlier to occur of (y)
five (5) Business Days after the Oversight Board receives written notice from another Party (in
accordance with the notice provisions set forth in Section 8.11 hereof) that such motion or
pleading is inconsistent with this Agreement in such adverse economic or legal respect and (z)
entry of an order of the Title III Court approving such motion or pleading, (iii) the entry of a
Final Order in the PROMESA Proceedings has a material adverse effect on the confirmability of
the Plan or the HTA Plan, (iv) the CVI Legislation and the Debt Responsibility Act are not
enacted prior to the commencement of the hearing to consider confirmation of the Plan, (v) the
CW PSA has been terminated as to all parties thereto, (vi) HTA fails to make the payments

123408529v3

provided for in Section 4.9(b)(xx) hereof, or (viii) the Commonwealth fails to make the payment provided for in Section 4.9(b)(xxi) hereof.

(b)     This Agreement may be terminated at any time prior to the HTA Effective Date as to all Parties hereto by the Oversight Board, or by joint action of Assured and National in the event that (i) any other Party has failed to comply with any of its respective covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, and such non-compliance has a material adverse effect on confirmability of either the Plan or the HTA Plan, as the case may be (as determined jointly by the Government Parties, Assured and National), (ii) a court order shall be entered, and such order shall not be reversed or otherwise consensually resolved in a manner satisfactory to the Government Parties, and such order in the light of the totality of circumstances, has a material adverse effect on the confirmability of the Plan or renders consummation of the Plan impracticable; provided, however, that, in the event that the treatment to be provided with respect to CCDA Bond Claims renders the Plan unconfirmable, the Oversight Board may delete CCDA and the treatment of CCDA Bond Claims from the Plan, so long as the Oversight Board and Assured have agreed upon an alternative methodology to provide the same economic treatment contemplated for the CCDA Bond Claims in this Agreement and the Settlement Summary annexed hereto as Exhibit "J", and such action shall not give rise to a right of termination of this Agreement as to any Party, (iii) the CW PSA has been terminated as to all parties thereto, (iv) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, (v) the economic situation of the Commonwealth suffers a material adverse change which, in light of the totality of the circumstances, renders the confirmation of the Plan not feasible or consummation of the Plan impracticable, (vi) the Debt Responsibility Act, as enacted, does not contain the Comprehensive Cap, as set forth in the Plan, (vii) the CVI Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan; provided, however, that the Oversight Board's right to terminate this Agreement pursuant to the subsection (vii) may not be exercised earlier than December 31, 2021, or (viii) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment, or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay.

(c)     Without limiting the rights of Assured and National under any other provision in this Agreement, each of Assured and National may, in its sole discretion, terminate this Agreement as to itself if (i) the Oversight Board (A) modifies any of the provisions in the Plan or the HTA Plan and any such modification adversely economically or legally impacts the treatment afforded any HTA Holder, CCDA Holder, Assured or National, as applicable, in the Plan or the HTA Plan, (B) files a plan of adjustment in the Commonwealth PROMESA Proceeding that is economically inconsistent with the treatment set forth in the Plan (including, without limitation, any modifications to the legal protections set forth in Section 4.9(b) hereof; provided, however, that, in the event that the treatment to be provided with respect to CCDA Bond Claims renders the Plan unconfirmable, the Oversight Board may delete CCDA and the treatment of CCDA Bond Claims from the Plan, so long as the Oversight Board and Assured have agreed upon an alternative methodology to provide the same economic treatment contemplated for the CCDA Bond Claims in this Agreement and the Settlement Summary annexed hereto as Exhibit "J", and such action shall not give rise to a right of termination of this

HTA_CONF 00012828

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex Bit (Part 2 of 2) 4 Page 183 of 484

EXECUTION COPY

Agreement by Assured or National, or (C) files the HTA Plan and such plan of adjustment and the securities design features of the New HTA Bonds are inconsistent with the treatment set forth in Exhibit "J" hereto), in each case, without the consent of Assured and National; and, provided, further, that, for the avoidance of doubt, Assured and National shall not have the right to terminate this Agreement on the basis that the HTA Plan is not filed or confirmed by the Title III Court by a date certain.

(d)     The automatic stay under Sections 362 and 922 of the Bankruptcy Code, made applicable to the PROMESA Proceedings pursuant to Section 301 of PROMESA, shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

(e)     This Agreement shall automatically terminate as to all Parties upon the occurrence of the HTA Effective Date except with respect to any actions of the Parties that are expressly set forth herein to occur after the HTA Effective Date.

provided, however, that, for all purposes of this Section 7.1, the treatment to be afforded to all classes of claims other than those described in Exhibit "J" hereto shall not constitute an adverse economic or legal impact on any PSA Creditor; and, provided, further, that, in the event that either Assured or National terminates this Agreement solely as to itself, neither Assured nor National may object to confirmation of the Plan and the HTA Plan or otherwise oppose any motion or application on the basis of the payment of Consummation Costs or the PSA Restriction Fees provided by Article VI hereof, the Plan and the HTA Plan.

Section 7.2     Effect of Termination.     Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party or any of its affiliates (or of any of their respective directors, officers, employees, consultants, contractors, advisory clients, agents, legal and financial advisors or other representatives of such Party or its affiliates), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs or the PSA Restriction Fee, except as provided in accordance with the provisions of the Plan and the HTA Plan), except for the obligations and/or provisions set forth in Sections 2.1, 6.1(b), 7.1, 7.3, 8.3, 8.4, 8.8, 8.13 and 8.15 hereof and this clause (b) of Section 7.2, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel, and the Parties agree to waive, and not raise as a defense, the applicable statute of limitations for any claim, litigation, proceeding, action or matter against another Party barred by this Agreement as though such statute of limitations had been tolled during such time that this Agreement was binding on the Party then asserting such claim, litigation, proceeding, action, or matter; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or

46

HTA_CONF 00012829

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Debtors Ex Part 2 of 2) Page 184 of 484

EXECUTION COPY

termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab initio,* and shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, the HTA Plan, this Agreement or otherwise; and, provided, further, that, termination of this Agreement shall have no effect on any rights provided pursuant to the CW PSA or any related right or entitlement in accordance with the Plan. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

Section 7.3    Post-Effective Date Obligations.    In addition to the surviving obligations and provisions listed in Section 7.2(b) hereof, the obligations and/or provisions set forth in Sections 4.1(e), 4.1(f), 4.2(d), and 4.2(e) shall survive the automatic termination of this Agreement pursuant to Section 7.1(e) hereof.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1    Amendments.    This Agreement, may not be modified, amended, or supplemented except by a written agreement executed by the Government Parties that are Parties hereto, Assured and National; provided, however, that any modification, amendment, or supplement that has an adverse economic or legal impact on a PSA Creditor, including by changing the treatment afforded to such PSA Creditor under the Plan (including any applicable settlement under the Plan) or changing the cash flows or proposed legal protections for the New GO Bonds or CVIs or definition or calculation of Consummation Costs, or PSA Restriction Fee in a way that would have an adverse economic impact on such PSA Creditor, must be agreed to in writing by each of the Initial PSA Creditors. Notwithstanding the foregoing and the terms and provisions of Sections 4.5(a) and 4.6(a) hereof, and without the consent or approval of Assured and National, from and after the date hereof until the Joinder Deadline, the Oversight Board may solicit additional parties to become signatories hereto subject to all of the terms herein, including, without limitation, the terms and conditions set forth in the exhibits, annexes and schedules hereto; provided, however, that, notwithstanding the provisions of this Section 8.1, unless a modification, amendment or supplement has an adverse economic or legal impact on a PSA Creditor, the Oversight Board may amend or otherwise modify the terms herein without the consent of such additional parties provided that the prior written consent of Assured and National is obtained; and, provided, further, that each additional party must execute and deliver to counsel to the Oversight Board the form of Annex Agreement attached hereto as Exhibit "I"; and, provided, further, that, under no circumstances may the provisions of Section 6.1(a) be modified, amended, or supplemented without the express written consent of the Initial PSA Creditors as of the date of this Agreement.

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 2 (Part 2 of 2) 4 Page 185 of 484

EXECUTION COPY

Section 8.2    <u>Most Favored Nations.</u>  Notwithstanding anything contained herein to the contrary, in the event that the Oversight Board enters into any agreements which provide (or the Plan or the HTA Plan does provide) for the settlement or Plan or HTA Plan treatment that is more economically favorable (a) to any CCDA Bond Claim or CW/Convention Center Claim (for the avoidance of doubt, including, Insured CCDA Bond Claims or insured CW/Convention Center Claims) than the treatment set forth in the Settlement Summary for any other CCDA Bond Claims or CW/Convention Center Claims, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such CCDA Bond Claim or CW/Convention Center Claim, (b) to any HTA Bond Claim or CW/HTA Claim (for the avoidance of doubt, including, Insured HTA Bond Claims or insured CW/HTA Claims), than the treatment set forth in the Settlement Summary for any other HTA Bond Claim or CW/HTA Claim, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such HTA Bond Claim or CW/HTA Claim, (c) to any claim arising from or relating to the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee, as amended (the "**PRIFA Bond Claims**"), or CW/PRIFA Rum Tax Claim (for the avoidance of doubt, including insured PRIFA Bond Claims or insured CW/PRIFA Rum Tax Claims), than the treatment set forth in the Settlement Summary for any other PRIFA Bond Claim or CW/PRIFA Rum Tax Claim, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such PRIFA Bond Claim or CW/PRIFA Rum Tax Claim, or (d) to any Monoline, or holder of an Insured Bond Claim or insured PRIFA Bond Claim than the treatment provided hereunder and set forth in the Settlement Summary or under the Plan or the HTA Plan to Assured, National, or any holder of Insured Bond Claims or PRIFA Bond Claims insured by Assured or National, then the treatment provided to Assured, National and holders of Insured HTA Bond Claims, Insured CCDA Bond Claims or PRIFA Bond Claims insured by Assured or National, as the case may be, shall be modified to be equal to such enhanced treatment; <u>provided</u>, <u>however</u>, that treatment of customary "Convenience Claims", as defined in the Plan, shall be exempt from this provision; and, <u>provided</u>, <u>further</u>, that the payment of any premium paid to a Monoline in connection with providing insurance with respect to the refunding of any New HTA Bonds shall be exempt from this provision; and <u>provided</u>, <u>further</u>, that (y) more economically favorable treatment of CCDA Bond Claims, CW/Convention Center Claims, HTA Bond Claims, CW/HTA Claims, PRIFA Bond Claims, and/or CW/PRIFA Rum Tax Claims required by a Final Order resulting from a determination by litigation (but excluding an order approving a settlement, pursuant to Bankruptcy Rule 9019 or otherwise) of the Title III Court or such other court of competent jurisdiction, and (z) any claim arising from or relating to the PRIFA BANs, as defined in the CW PSA, shall be exempt from this provision.

Section 8.3    <u>No Admission of Liability.</u>

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance

123408529v3

Case:17-03283-LTS Doc#:21618-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex 2 (Part 2 of 2) Page 186 of 484

EXECUTION COPY

of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Debt Related Objections, the Invalidity Actions, the Lift Stay Motions, the Section 926 Motion, the Clawback Actions, the Lien Challenge Actions, or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against the Commonwealth, HTA or CCDA with respect to the validity of any of the CCDA Bond Claims, or HTA Bond Claims. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 8.4    Good Faith Negotiations.    The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; and each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement. The Parties further acknowledge and agree that, in connection with the PROMESA Proceedings and the negotiation and consummation of this Agreement, including, without limitation, the Plan and the HTA Plan, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 8.5    Third Party Beneficiary.    Other than funds and/or accounts which are holders of the HTA Bonds or CCDA Bonds, and whose advisors or managers are Parties hereto, and Assured and National, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any person (including, without limitation, any Monoline other than Assured and National) other than the Parties hereto, and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or

123408529v3

HTA_CONF 00012832

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex.2 (Part 2 of 2) Page 187 of 484

EXECUTION COPY

enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 8.7    Headings.    The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8    Binding Agreement; Successors and Assigns.    This Agreement is intended to, and shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Plan or the HTA Plan are not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible. Notwithstanding the foregoing, unless otherwise agreed to by the Parties, provisions herein providing payment of the Consummation Costs and PSA Restriction Fees are integral parts of this Agreement and cannot be severed.

Section 8.9    Entire Agreement.    This Agreement, including, without limitation, the Plan and the HTA Plan, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Plan and the HTA Plan, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

50

HTA_CONF 00012833

Section 8.10   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11   Notices.   All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

> (a)   If to the Oversight Board, the Commonwealth, CCDA or HTA, to:
>
> PROSKAUER ROSE LLP
> Eleven Times Square
> New York, NY 10036
> Attn: Martin J. Bienenstock, Esq.
> Email: mbienenstock@proskauer.com
> Brian S. Rosen, Esq.
> Email: brosen@proskauer.com
> Facsimile: 212-969-2900
>
> (b)   If to AAFAF, to:
>
> O'MELVENY & MEYERS LLP
> Seven Times Square
> New York, NY 10036
> Attn: John Rapisardi, Esq.
> Email: jrapisardi@omm.com
> Maria J. DiConza, Esq.
> Email: mdiconza@omm.com
> Facsimile: 212-326-2061
>
> (c)   If to Assured, to:
>
> CADWALADER, WICKERSHAM & TAFT
> 200 Liberty Street
> New York, NY 10281
> Attn: Mark Ellenberg, Esq.

HTA_CONF 00012834

Case:17-03283-LTS Doc#:21648-3 Filed:07/27/22 Entered:07/27/22 18:57:13 Desc:
Debtors Ex. 21 (Part 2 of 2) Page 189 of 484

EXECUTION COPY

Email: mark.ellenberg@cwt.com
Casey Servais, Esq.
Email: casey.servais@cwt.com

(d)        If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Andrew Wilkinson, Esq.
Email: Andrew.wilkinson@weil.com
Attn: Kelly Di Blasi, Esq.
Email: Kelly.diblasi@weil.com
Kirsten Erichsen, Esq.
Email: Kirsten.erichsen@weil.com

Section 8.12   Non-Waiver of Remedies.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 8.13   Several, Not, Joint Obligations.   The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

Section 8.14   Remedies Cumulative.  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 8.15   Specific Performance.  Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other similar relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement; provided, however, that, in the event the Agreement is terminated in accordance with the terms and provisions of Section 7.1 hereof, the sole remedy

52

HTA_CONF 00012835

(other than to enforce provisions of this Agreement that survive termination hereof) shall be the payment of the fees set forth in Section 6.1(b) hereof, as applicable.

   Section 8.16 <u>Further Assurances.</u> Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

HTA_CONF 00012836

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

**THE COMMONWEALTH OF PUERTO RICO**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

**THE PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Highways and Transportation Authority

By:   /s/ Natalie A. Jaresko

Name:  Natalie A. Jaresko

Title:  Executive Director

54

HTA_CONF 00012837

**ASSURED GUARANTY CORP. and ASSURED GUARANTY MUNICIPAL CORP.**

By:   /s/ Russell B. Brewer II
Name:  Russell B. Brewer II
Title:  Chief Surveillance  Office


Insurer of Principal  Amount of HTA Bonds: ███████████

Insurer of Principal  Amount of CCDA Bonds: ███████████

55

HTA_CONF 00012838

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By:  _/s/ Adam Bergonzi_____

Name:  _Adam Bergonzi_____

Title:  _Chief Risk Officer_____

Insurer of Face Amount of HTA Bonds:  █████████

Insurer of Face Amount of CCDA Bonds:  █████████

56

HTA_CONF 00012839

**DAVIDSON KEMPNER CAPITAL MANAGEMENT LP, on behalf of certain of its affiliated investment funds or affiliated entities**

By: _/s/ Suzanne K. Gibbons_

Name: _Suzanne K. Gibbons_

Title: _Managing Member_

Holder of Face Amount of HTA Bonds: ████████

Holder of Face Amount of CCDA Bonds: ████████

57

HTA_CONF 00012840

**WHITEHAVEN CREDIT OPPORTUNITIES MASTER FUND, LTD.**

By:   /s/ Scott Richman
Name:   Scott Richman
Title:   Managing Partner and CIO

Holder of Face Amount of HTA Bonds: ███████

Holder of Face Amount of CCDA Bonds: ███████

58

HTA_CONF 00012841

# EXHIBIT A

## LIST OF HTA HOLDERS

Davidson Kempner Capital Management LP, on behalf of certain of its affiliated investment funds or affiliated entities

Whitehaven Credit Opportunities Fund, Ltd.

123408529v3

HTA_CONF 00012842

## **EXHIBIT B**

LIST OF CCDA HOLDERS

None

123408529v3

HTA_CONF 00012843

# **EXHIBIT C**

SCHEDULE OF HTA 68 BONDS

123408529v3

HTA_CONF 00012844

## SCHEDULE OF HTA 68 BONDS

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745181M79 | SERIES Z | 7/1/18 | 3/1/96 |
| 745181NF0 | SERIES Y | 7/1/21 | 4/9/96 |
| 745181N60 | SERIES AA | 7/1/17 | 4/29/03 |
| 745181N78 | SERIES AA | 7/1/18 | 4/29/03 |
| 745181N86 | SERIES AA | 7/1/19 | 4/29/03 |
| 745181N94 | SERIES AA | 7/1/20 | 4/29/03 |
| 745181XN2 | SERIES AA | 7/1/21 | 4/29/03 |
| 745181XQ5 | SERIES AA | 7/1/23 | 4/29/03 |
| 745181XR3 | SERIES AA | 7/1/28 | 4/29/03 |
| 745181XS1 | SERIES AA | 7/1/35 | 4/29/03 |
| 745181ZJ9 | SERIES BB | 7/1/17 | 10/4/05 |
| 745181ZK6 | SERIES BB | 7/1/18 | 10/4/05 |
| 745181P35 | SERIES BB | 7/1/22 | 10/4/05 |
| 745181B22 | SERIES CC | 7/1/21 | 3/6/07 |
| 745181B48 | SERIES CC | 7/1/23 | 3/6/07 |
| 745181B55 | SERIES CC | 7/1/24 | 3/6/07 |
| 745181B63 | SERIES CC | 7/1/25 | 3/6/07 |
| 745181B71 | SERIES CC | 7/1/26 | 3/6/07 |
| 745181B89 | SERIES CC | 7/1/27 | 3/6/07 |
| 745181B97 | SERIES CC | 7/1/28 | 3/6/07 |
| 745181C21 | SERIES CC | 7/1/29 | 3/6/07 |
| 745181C39 | SERIES CC | 7/1/30 | 3/6/07 |
| 745181C47 | SERIES CC | 7/1/31 | 3/6/07 |
| 745181C54 | SERIES CC | 7/1/32 | 3/6/07 |
| 745181C62 | SERIES CC | 7/1/33 | 3/6/07 |
| 745181C70 | SERIES CC | 7/1/34 | 3/6/07 |
| 745181C88 | SERIES CC | 7/1/36 | 3/6/07 |
| 745181K97 | SERIES AA REMARKETING | 7/1/35 | 4/29/03 |
| 745181N52 | SERIES AA REMARKETING | 7/1/26 | 4/29/03 |

123408529v3

HTA_CONF 00012845

**EXHIBIT D**

SCHEDULE OF HTA 98 BONDS

123408529v3

HTA_CONF 00012846

# SCHEDULE OF HTA 98 BONDS

| CUSIP | Series | Maturity | Issuance |
|---|---|---|---|
| 745190AU2 | SERIES A | 7/1/17 | 3/19/98 |
| 745190AV0 | SERIES A | 7/1/18 | 3/19/98 |
| 7451903T3 | SERIES A | 7/1/28 | 2/15/98 |
| 745190Y77 | SERIES A | 7/1/28 | 5/27/08 |
| 745190AY4 | SERIES A | 7/1/38 | 2/15/98 |
| 745190Z92 | SERIES A | 7/1/38 | 2/15/98 |
| 745190HC5 | SERIES E | 7/1/17 | 2/7/02 |
| 745190HD3 | SERIES E | 7/1/18 | 2/7/02 |
| 745190HE1 | SERIES E | 7/1/19 | 2/7/02 |
| 745190HF8 | SERIES E | 7/1/20 | 2/7/02 |
| 745190HG6 | SERIES E | 7/1/21 | 2/7/02 |
| 745190HH4 | SERIES E | 7/1/22 | 2/7/02 |
| 745190HJ0 | SERIES E | 7/1/23 | 2/7/02 |
| 745190HK7 | SERIES E | 7/1/24 | 2/7/02 |
| 745190J41 | SERIES D | 7/1/27 | 2/7/02 |
| 7451902B3 | SERIES D | 7/1/32 | 2/7/02 |
| 7451902Q0 | SERIES G | 7/1/19 | 4/29/03 |
| 7451902R8 | SERIES G | 7/1/20 | 4/29/03 |
| 745190KC1 | SERIES G | 7/1/22 | 4/29/03 |
| 745190KD9 | SERIES G | 7/1/23 | 4/29/03 |
| 745190K56 | SERIES G | 7/1/28 | 4/29/03 |
| 7451902S6 | SERIES G | 7/1/33 | 4/29/03 |
| 7451902T4 | SERIES G | 7/1/42 | 4/29/03 |
| 7451902W7 | SERIES H | 7/1/18 | 4/29/03 |
| 745190KX5 | SERIES H | 7/1/19 | 4/29/03 |
| 745190KY3 | SERIES H | 7/1/20 | 4/29/03 |
| 745190KZ0 | SERIES H | 7/1/21 | 4/29/03 |
| 745190LA4 | SERIES H | 7/1/22 | 4/29/03 |
| 745190LB2 | SERIES H | 7/1/23 | 4/29/03 |
| 745190L22 | SERIES H | 7/1/28 | 4/29/03 |
| 7451902X5 | SERIES H | 7/1/35 | 4/29/03 |
| 745190PF9 | SERIES I | 7/1/17 | 4/20/04 |
| 745190PG7 | SERIES I | 7/1/18 | 4/20/04 |
| 745190PH5 | SERIES I | 7/1/19 | 4/20/04 |
| 745190PJ1 | SERIES I | 7/1/20 | 4/20/04 |
| 745190PK8 | SERIES I | 7/1/21 | 4/20/04 |
| 7451902Z0 | SERIES I | 7/1/22 | 4/20/04 |
| 745190PM4 | SERIES I | 7/1/23 | 4/20/04 |
| 745190PN2 | SERIES I | 7/1/24 | 4/20/04 |
| 745190PP7 | SERIES I | 7/1/25 | 4/20/04 |
| 745190PQ5 | SERIES I | 7/1/26 | 4/20/04 |
| 7451903K2 | SERIES J | 7/1/17 | 4/20/04 |
| 7451903L0 | SERIES J | 7/1/18 | 4/20/04 |
| 745190QH4 | SERIES J | 7/1/19 | 4/20/04 |
| 7451903M8 | SERIES J | 7/1/20 | 4/20/04 |
| 7451903N6 | SERIES J | 7/1/21 | 4/20/04 |
| 745190QM3 | SERIES J | 7/1/22 | 4/20/04 |

64

HTA_CONF 00012847

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745190QP6 | SERIES J | 7/1/23 | 4/20/04 |
| 745190QR2 | SERIES J | 7/1/24 | 4/20/04 |
| 7451903P1 | SERIES J | 7/1/29 | 4/20/04 |
| 745190TC2 | SERIES K | 7/1/17 | 10/4/05 |
| 745190TD0 | SERIES K | 7/1/18 | 10/4/05 |
| 745190TE8 | SERIES K | 7/1/19 | 10/4/05 |
| 745190TF5 | SERIES K | 7/1/20 | 10/4/05 |
| 745190TG3 | SERIES K | 7/1/20 | 10/4/05 |
| 745190TH1 | SERIES K | 7/1/21 | 10/4/05 |
| 745190TJ7 | SERIES K | 7/1/22 | 10/4/05 |
| 745190TK4 | SERIES K | 7/1/23 | 10/4/05 |
| 745190TL2 | SERIES K | 7/1/24 | 10/4/05 |
| 745190TM0 | SERIES K | 7/1/25 | 10/4/05 |
| 745190TN8 | SERIES K | 7/1/25 | 10/4/05 |
| 745190TP3 | SERIES K | 7/1/26 | 10/4/05 |
| 745190TQ1 | SERIES K | 7/1/27 | 10/4/05 |
| 745190TR9 | SERIES K | 7/1/30 | 10/4/05 |
| 745190TS7 | SERIES K | 7/1/35 | 10/4/05 |
| 745190UC0 | SERIES L | 7/1/17 | 10/4/05 |
| 745190UD8 | SERIES L | 7/1/18 | 10/4/05 |
| 745190UE6 | SERIES L | 7/1/19 | 10/4/05 |
| 745190UF3 | SERIES L | 7/1/20 | 10/4/05 |
| 745190UG1 | SERIES L | 7/1/21 | 10/4/05 |
| 745190UH9 | SERIES L | 7/1/22 | 10/4/05 |
| 745190UJ5 | SERIES L | 7/1/23 | 10/4/05 |
| 745190UK2 | SERIES L | 7/1/24 | 10/4/05 |
| 745190UL0 | SERIES L | 7/1/25 | 10/4/05 |
| 745190UM8 | SERIES L | 7/1/30 | 10/4/05 |
| 745190UP1 | SERIES L | 7/1/35 | 10/4/05 |
| 745190UN6 | SERIES L | 7/1/35 | 10/4/05 |
| 745190UQ9 | SERIES L | 7/1/38 | 10/4/05 |
| 745190UR7 | SERIES L | 7/1/41 | 10/4/05 |
| 745190YB8 | SERIES M | 7/1/17 | 3/6/07 |
| 745190YC6 | SERIES M | 7/1/18 | 3/6/07 |
| 745190YD4 | SERIES M | 7/1/18 | 3/6/07 |
| 745190YE2 | SERIES M | 7/1/19 | 3/6/07 |
| 745190YF9 | SERIES M | 7/1/20 | 3/6/07 |
| 745190YG7 | SERIES M | 7/1/20 | 3/6/07 |
| 745190YH5 | SERIES M | 7/1/21 | 3/6/07 |
| 745190YJ1 | SERIES M | 7/1/22 | 3/6/07 |
| 745190YK8 | SERIES M | 7/1/22 | 3/6/07 |
| 745190YL6 | SERIES M | 7/1/23 | 3/6/07 |
| 745190YM4 | SERIES M | 7/1/23 | 3/6/07 |
| 745190YN2 | SERIES M | 7/1/24 | 3/6/07 |
| 745190YP7 | SERIES M | 7/1/24 | 3/6/07 |
| 745190YQ5 | SERIES M | 7/1/25 | 3/6/07 |
| 745190YR3 | SERIES M | 7/1/25 | 3/6/07 |
| 745190YS1 | SERIES M | 7/1/26 | 3/6/07 |
| 745190YT9 | SERIES M | 7/1/26 | 3/6/07 |

123408529v3

HTA_CONF 00012848

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745190YU6 | SERIES M | 7/1/27 | 3/6/07 |
| 745190YV4 | SERIES M | 7/1/27 | 3/6/07 |
| 745190YW2 | SERIES M | 7/1/32 | 3/6/07 |
| 745190YY8 | SERIES M | 7/1/37 | 3/6/07 |
| 745190YX0 | SERIES M | 7/1/37 | 3/6/07 |
| 7451903D8 | SERIES M | 7/1/46 | 3/6/07 |
| 745190ZA9 | SERIES N | 7/1/19 | 3/6/07 |
| 745190ZB7 | SERIES N | 7/1/20 | 3/6/07 |
| 745190ZC5 | SERIES N | 7/1/21 | 3/6/07 |
| 745190ZD3 | SERIES N | 7/1/22 | 3/6/07 |
| 745190ZE1 | SERIES N | 7/1/23 | 3/6/07 |
| 745190ZF8 | SERIES N | 7/1/24 | 3/6/07 |
| 745190ZG6 | SERIES N | 7/1/25 | 3/6/07 |
| 745190ZH4 | SERIES N | 7/1/26 | 3/6/07 |
| 745190ZJ0 | SERIES N | 7/1/27 | 3/6/07 |
| 745190ZK7 | SERIES N | 7/1/28 | 3/6/07 |
| 745190ZL5 | SERIES N | 7/1/29 | 3/6/07 |
| 745190ZM3 | SERIES N | 7/1/30 | 3/6/07 |
| 745190ZN1 | SERIES N | 7/1/31 | 3/6/07 |
| 745190ZP6 | SERIES N | 7/1/32 | 3/6/07 |
| 745190ZQ4 | SERIES N | 7/1/33 | 3/6/07 |
| 745190ZR2 | SERIES N | 7/1/34 | 3/6/07 |
| 745190ZS0 | SERIES N | 7/1/36 | 3/6/07 |
| 745190ZT8 | SERIES N | 7/1/39 | 3/6/07 |
| 745190ZU5 | SERIES N | 7/1/41 | 3/6/07 |
| 745190ZV3 | SERIES N | 7/1/45 | 3/6/07 |
| 7451903V8 | SERIES H REMARKING | 7/1/32 | 4/29/03 |

123408529v3

HTA_CONF 00012849

# **EXHIBIT E**

SCHEDULE OF HTA 98 SUB BONDS

67

HTA_CONF 00012850

## SCHEDULE OF HTA 98 SUB BONDS

| CUSIP | Series | Maturity | Issuance |
|---|---|---|---|
| 745190CN6 | SERIES 1998 | 7/1/18 | 7/15/98 |
| 745190CP1 | SERIES 1998 | 7/1/22 | 7/15/98 |
| 745190CQ9 | SERIES 1998 | 7/1/28 | 7/15/98 |
| 745190MF2 | SERIES 2003 SUBORDINATE | 7/1/17 | 4/29/03 |
| 745190MG0 | SERIES 2003 SUBORDINATE | 7/1/17 | 4/29/03 |
| 745190MH8 | SERIES 2003 SUBORDINATE | 7/1/18 | 4/29/03 |
| 745190MJ4 | SERIES 2003 SUBORDINATE | 7/1/18 | 4/29/03 |
| 745190MK1 | SERIES 2003 SUBORDINATE | 7/1/19 | 4/29/03 |
| 745190ML9 | SERIES 2003 SUBORDINATE | 7/1/19 | 4/29/03 |
| 745190MM7 | SERIES 2003 SUBORDINATE | 7/1/20 | 4/29/03 |
| 745190MN5 | SERIES 2003 SUBORDINATE | 7/1/21 | 4/29/03 |
| 745190MP0 | SERIES 2003 SUBORDINATE | 7/1/22 | 4/29/03 |
| 745190MQ8 | SERIES 2003 SUBORDINATE | 7/1/22 | 4/29/03 |
| 745190MR6 | SERIES 2003 SUBORDINATE | 7/1/23 | 4/29/03 |
| 745190MS4 | SERIES 2003 SUBORDINATE | 7/1/28 | 4/29/03 |

123408529v3

HTA_CONF 00012851

# EXHIBIT F

SCHEDULE OF CCDA BONDS

123408529v3

HTA_CONF 00012852

## SCHEDULE OF CCDA BONDS

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745266AP1 | SERIES 2006 | 7/1/17 | 3/24/06 |
| 745266AQ9 | SERIES 2006 | 7/1/18 | 3/24/06 |
| 745266AR7 | SERIES 2006 | 7/1/19 | 3/24/06 |
| 745266AS5 | SERIES 2006 | 7/1/20 | 3/24/06 |
| 745266AT3 | SERIES 2006 | 7/1/21 | 3/24/06 |
| 745266AU0 | SERIES 2006 | 7/1/21 | 3/24/06 |
| 745266AV8 | SERIES 2006 | 7/1/22 | 3/24/06 |
| 745266AW6 | SERIES 2006 | 7/1/23 | 3/24/06 |
| 745266AX4 | SERIES 2006 | 7/1/24 | 3/24/06 |
| 745266AY2 | SERIES 2006 | 7/1/25 | 3/24/06 |
| 745266AZ9 | SERIES 2006 | 7/1/26 | 3/24/06 |
| 745266BA3 | SERIES 2006 | 7/1/26 | 3/24/06 |
| 745266BB1 | SERIES 2006 | 7/1/27 | 3/24/06 |
| 745266BC9 | SERIES 2006 | 7/1/31 | 3/24/06 |
| 745266BD7 | SERIES 2006 | 7/1/36 | 3/24/06 |

123408529v3

HTA_CONF 00012853

**EXHIBIT G**

LIST OF INVALIDITY ACTIONS

123408529v3

HTA_CONF 00012854

# INVALIDITY ACTIONS

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

123408529v3

HTA_CONF 00012855

**EXHIBIT H**

FORM OF JOINDER AGREEMENT

123408529v3

HTA_CONF 00012856

## FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE HTA/CCDA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), the Puerto Rico Highways and Transportation Authority ("**HTA**"), and (b) holders of HTA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) holders of CCDA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holders as set forth on Exhibit "B" to the PSA (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA Holders**"), and (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds ("**Assured**"), (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively with the HTA Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**") and (f) the other PSA Creditors from time to time party thereto, is executed and delivered by _____ (the "**Joining PSA Creditors**") as of _____ 2021. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

1.  Agreement to be Bound. The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA. The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "HTA Holder" (if it holds HTA Bond Claims) and a "CCDA Holder" (if it holds CCDA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any HTA Bond Claims and CCDA Bond Claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any HTA Bond Claims, and CCDA Bond Claims held in a Qualified Marketmaker capacity).

2.  Representations and Warranties and Covenants. With respect to the aggregate principal amount of any HTA Bond Claims and CCDA Bond Claims (without duplication) held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of any HTA Bond Claims, and CCDA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 3.5 of the PSA and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 3.6 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 4.5 of the PSA, and a " CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 4.6 of the PSA, to each of the other Parties to the PSA.

123408529v3

HTA_CONF 00012857

3.　　　　Governing Law. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

4.　　　　Notice of Joinder.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.5 of the PSA (if it holds HTA Bond Claims), Section 4.6 of the PSA (if it holds CCDA Bond Claims), and the notice provisions set forth in Section 8.11 of the PSA.

5.　　　　Acquisition of Non-PSA Bonds.  To the extent that the Joining PSA Creditor (a) as of the date hereof, holds HTA Bond Claims or CCDA Bond Claims not subject to the PSA and/or (b) from and after the date hereof, acquires HTA Bond Claims or CCDA Bond Claims in addition to those HTA Bond Claims or CCDA Bond Claims acquired pursuant to this Joinder Agreement, the Joining PSA Creditor shall, within five (5) calendar days of the date hereof or, to the extent of after-acquired HTA Bond Claims or CCDA Bond Claims, from the date of such subsequent acquisition, deliver to counsel for the Oversight Board, financial information required in accordance with the provisions of Section 2.2 of the PSA with respect to such HTA Bond Claims and CCDA Bond Claims.

IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.

[NAME OF QUALIFIED TRANSFEREE]


By: _____
　　　　　Name:
　　　　　Title:

Holder of Face Amount of HTA Bonds:

Holder of Face Amount of CCDA Bonds:

75

HTA_CONF 00012858

**EXHIBIT I**

FORM OF ANNEX AGREEMENT

123408529v3

HTA_CONF 00012859

## FORM OF ANNEX AGREEMENT

ANNEX AGREEMENT TO THE HTA/CCDA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of May 5, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), Puerto Rico Public Highways and Transportation Authority ("**HTA**"), and Convention Center District Authority of Puerto Rico ("**CCDA**"), (b) holders of HTA Bond Claims each as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of HTA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**HTA Holders**"), (c) holders of CCDA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of CCDA Bond Claims on behalf of such holders as set forth on Exhibit "B" to the PSA (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**CCDA3 Holders**"), (d) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds ("**Assured**"), and (e) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA Bonds ("**National**" and, collectively, with the GO Holders, the CCDA Holders, and Assured, the "**Initial PSA Creditors**"), and (f) the other PSA Creditors from time to time party thereto, is executed and delivered by _____(the "**Annex PSA Creditor**") as of _____ 2021. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

      1.    <u>Agreement to be Bound</u>. The Annex PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA. The Annex PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "HTA Holder" (if it holds HTA Bond Claims) and a "CCDA Holder" (if it holds CCDA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any HTA Bond Claims and CCDA Bond Claims held by the Annex PSA Creditor as of the date of this Annex Agreement (other than any HTA Bond Claims and CCDA Bond Claims held in a Qualified Marketmaker capacity).

      2.    <u>Representations and Warranties and Covenants</u>. With respect to the aggregate principal amount of any HTA Bond Claims and CCDA Bond Claims (without duplication) held by the Annex PSA Creditor, the Annex PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 3.5 of the PSA and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 3.6 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "HTA Holder" (if it holds HTA Bond Claims) set forth in Section 4.5 of the PSA, and a "CCDA Holder" (if it holds CCDA Bond Claims) set forth in Section 4.6 of the PSA, to each of the other Parties to the PSA.

123408529v3

HTA_CONF 00012860

3.    Governing Law. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Annex Agreement.

4.    Notice of Annex. The Annex PSA Creditor agrees to provide a copy of this Annex Agreement to counsel to the Oversight Board and in accordance with the notice provisions set forth in Section 8.11 of the PSA; provided, however, that, except with respect to counsel to the Oversight Board, the Annex PSA Creditor may delete the face amount of HTA Bonds and CCDA Bonds set forth below.

5.    Rejection of Annex Agreement. Notwithstanding the execution and delivery of this Annex Agreement to counsel to the Oversight Board, the Oversight Board may, in its sole and absolute discretion, determine not to accept such Annex Agreement and, in such event, (a) the Oversight Board shall provide written notice of such determination to the Annex PSA Creditor within fifteen (15) Business Days of receipt of the Annex Agreement and (b) the Annex PSA Creditor shall have no rights or entitlements pursuant to the PSA including, without limitation, rights to receive a PSA Restriction Fee.

IN WITNESS WHEREOF, the Annex PSA Creditor has caused this Annex Agreement to be executed as of the date set forth above.

[NAME OF ANNEX PSA CREDITOR]

By: _____
        Name: _____
        Title: _____
        Address: _____
                    _____
                    _____

Holder of Face Amount of HTA Bonds:

Holder of Face Amount of CCDA Bonds:

123408529v3

HTA_CONF 00012861

# **EXHIBIT J**

SETTLEMENT SUMMARY

123408529v3

HTA_CONF 00012862

**SUMMARY OF KEY ECONOMIC TERMS:**

| TERM | DESCRIPTION |
|---|---|
| 1) **HTA Consideration** | |
| a) **Cash** | |
| i) **Amount** | ▪ $184,800,000 distributed to holders of HTA 68 Bond Claims and $79,200,000 distributed to holders of HTA 98 Senior Bond Claims (in aggregate, "HTA Cash") once the Distribution Conditions (as defined in the HTA PSA) have been met |
| b) **Debt** | |
| i) **New HTA Bonds** | ▪ HTA Current Interest Bonds ("HTA CIBs")<br>▪ HTA Capital Appreciation Bonds ("HTA CABs")<br>▪ HTA Convertible Capital Appreciation Bonds ("HTA Convertible CABs") |
| ii) **Par Amount** | ▪ $1,245,000,000, allocated as specified within Annex 2 of this document |
| iii) **Tenor** | ▪ Up to 40 years |
| iv) **Interest Rate** | ▪ Average interest rate of 5.0% |
| v) **Deemed Issuance Date** | ▪ New HTA Bonds to begin accruing interest on the earlier of (i) July 1, 2022 and (ii) the HTA Effective Date |
| vi) **Call Option** | ▪ HTA CIBs and HTA CABs<br>   ○ Callable in 10 years at par<br>▪ HTA Convertible CABs:<br>   ○ Conversion date of 10 years or less<br>   ○ Callable at par commencing on the earlier of (i) 7 years after conversion date and (ii) 10.5 years after issuance |
| vii) **Cash for Bond Exchange** | ▪ Commonwealth / HTA retain the ability to substitute cash instead of New HTA Bonds at the HTA Effective Date |
| viii) **Public-Private Partnership** | ▪ Alternative to revenue bond structuring via public-private partnership or option to redeem all or a portion of the revenue bonds at par from proceeds of a public-private partnership with respect to the toll roads. Any such redemption |

123408529v3

HTA_CONF 00012863

| TERM | DESCRIPTION |
|---|---|
| | shall be done in a manner so as to preserve the tax exemption of the New HTA Bonds |
| **2) CCDA** | |
| **a) Cash** | ▪ $97,000,000 |
| **3) Clawback CVI** | ▪ Clawback CVI to be structured consistent with CVI in the CW PSA and further elaborated in the Plan of Adjustment<br>▪ Clawback CVI to Allowed CW/HTA Claims to be distributed once Distribution Conditions (as defined above) have occurred |
| **a) Outperformance Metric** | ▪ See Annex 1 |
| **b) Measured SUT** | ▪ As defined in PSA |
| **c) Attachment Point** | ▪ 100% of 5.5% SUT CW Fiscal Plan projections as included in Annex 1 (the "Baseline SUT") |
| **d) Structure of Clawback CVI** | ▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the Clawback CVI<br>▪ Security provisions as described in CW PSA Section 4.10 (b) |
| **e) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **f) Clawback CVI Notional / Lifetime Cap** | ▪ HTA: $3,697,668,995<br>▪ CCDA: $217,228,391 |
| **g) Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **h) Clawback CVI Maximum Annual Payment** | ▪ Clawback CVI Maximum Annual Payment applicable to aggregate payments to Clawback CVI (i.e., both Subject to Waterfall and Not Subject to Waterfall)<br>▪ <u>Years 1-22</u>: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the |

HTA_CONF 00012864

| TERM | DESCRIPTION |
|---|---|
| | applicable annual cap (i.e., $350 million) (the "Initial Period CVI Maximum Annual Payment")<br>▪ Years 23-30: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) (the "Post-GO/PBA CVI Maximum Annual Payment")<br>▪ To the extent that the GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the Post-GO/PBA CVI Maximum Annual Payment for the Clawback CVI would begin to apply in the following year<br>▪ To the extent any unused amounts from previous years remain at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI |
| i) **Call Structure for Clawback CVI** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| j) **SUT True-Up** | ▪ As described in CW PSA Exhibit I |
| k) **Baseline SUT Reduction** | ▪ As described in CW PSA Exhibit I |
| l) **CVI Subject to Waterfall** | |
| i) **Subject to Waterfall Outperformance Condition** | ▪ On an annual basis, the lesser of (the "Subject to Waterfall Outperformance Amount"):<br>  o (i) 50% of cumulative outperformance above the Outperformance Metric, starting on July 1, 2021, less payments previously made to GO CVI and Clawback CVI from Subject to Waterfall Outperformance Amount<br>  o (ii) 75% of annual outperformance |

123408529v3

HTA_CONF 00012865

| TERM | DESCRIPTION |
|---|---|
| ii) **Subject to Waterfall Annual Payments** | ▪ <u>Years 1-22</u>: From the Subject to Waterfall Outperformance Amount, annual payment waterfall as follows:<br>  ○ (a) First $100,000,000 to GO CVI<br>  ○ (b) Next $11,111,111 to Clawback CVI<br>  ○ (c) Pro rata sharing thereafter of 90% to GO CVI and 10% to Clawback CVI, subject to any applicable caps<br>▪ <u>Years 23-30</u>: 100% of the Subject to Waterfall Outperformance Amount to Clawback CVI, subject to any applicable caps |
| **m) CVI Not Subject to Waterfall** | |
| i) **Not Subject to Waterfall Outperformance Condition** | ▪ On an annual basis, the lesser of (the "Not Subject to Waterfall Outperformance Amount"):<br>  ○ (i) 40% of cumulative outperformance above the Outperformance Metric, starting on July 1, 2021, less payments previously made to Clawback CVI from Not Subject to Waterfall Outperformance Amount<br>  ○ (ii) 95% of annual outperformance (combined with amounts Subject to Waterfall) |
| ii) **Not Subject to Waterfall Annual Payments** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable caps |
| **n) Clawback CVI Recipients** | ▪ HTA allocation of the Clawback CVI will be no less than 68.6%, as specified within Annex 3 of this document |
| o) **HTA Clawback CVI Priority Distribution Waterfall** | ▪ <u>First</u>, Clawback CVI payments, if any, to the HTA 68 Bond Claims up to $179,462,539<br>▪ <u>Second</u>, Clawback CVI payments, if any, to HTA 98 Senior Bond Claims up to $1,833,405,578<br>▪ <u>Third</u>, Clawback CVI payments, if any, to HTA 98 Sub Bond Claims up to $207,294,178<br>▪ <u>Fourth</u>, after paying the permitted amounts above in full, remaining Clawback CVI payments, if any, to the HTA GDB DRA Loan up to $1,477,506,700<br>▪ Waterfall implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination |

123408529v3

HTA_CONF 00012866

# ANNEX 1: 5.5% SUT BASELINE[1]

*($ USD)*

| | | 5.5% SUT Baseline | | |
|---|---|---|---|---|
| **Fiscal Year** | **Amount** | | **Fiscal Year** | **Amount** |
| 2022 | $1,282,901,069.30 | | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | | 2050[1] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | | 2051[1] | 1,810,682,942.40 |

---

[1] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

123408529v3

HTA_CONF 00012867

**ANNEX 2: NEW HTA BONDS ALLOCATION SUMMARY**

| Claim | New HTA Bonds Allocation ($) |
|---|---|
| HTA 68 Bond Claims | $646,389,106 |
| HTA 98 Senior Bond Claims | $598,610,894 |

123408529v3

HTA_CONF 00012868

**ANNEX 3: CLAWBACK CVI MINIMUM ALLOCATION SUMMARY**

| Claim | Minimum Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims | 68.6% |

123408529v3

HTA_CONF 00012869

# EXHIBIT C

Stipulation in Connection with DRA Related Disputes

HTA_CONF 00012870

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | (Jointly Administered) |
| Debtors.[1] | |

## STIPULATION IN CONNECTION WITH DRA RELATED DISPUTES

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as sole representative of (i) the Commonwealth of Puerto Rico (the "Commonwealth"), (ii) the

Puerto Rico Public Buildings Authority ("PBA"), (iii) the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico ("ERS") and (iv) the Puerto Rico Highways

and Transportation Authority ("HTA") pursuant to section 315(b) of the *Puerto Rico Oversight,*

*Management, and Economic Stability Act* ("PROMESA"),[2] AmeriNational Community Services,

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations)

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

126714213v4

HTA_CONF 00012871

LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority ("DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company and as collateral monitor for Wilmington Trust, N.A. (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"),[3] by and through their respective counsel and authorized representatives, hereby stipulate and agree as follows:

**RECITALS**

**Creation of DRA**

      A.     On November 5, 2018, the Oversight Board certified a qualifying modification (the "GDB QM") for the Government Development Bank ("GDB") pursuant to Title VI of PROMESA. On November 7, 2018, the United States District Court for the District of Puerto Rico (the "Court") approved the GDB QM.

      B.     DRA is a statutory public trust and public governmental instrumentality of the Commonwealth, created by the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act 109-2017, to give effect to the terms of the GDB QM. 7 P.R. Laws Ann. § 3171.

      C.     Pursuant to a Master Transfer Agreement, dated as of November 29, 2018 (the "Transfer Agreement"), between DRA and GDB, GDB transferred substantially all of its assets to DRA, including, among other things, GDB's legal rights, title, and interest in:

      a.    twenty-three (23) promissory notes issued by HTA in favor of GDB (the "HTA Notes");

      b.    $200,000,000 in aggregate original principal amount of HTA Revenue Bonds (Series A), issued by HTA pursuant to Resolution No. 98-06 (the "HTA Senior 98 Bonds");

---

[3]  Each of the Commonwealth, PBA, ERS, HTA, the Servicer, and the Collateral Monitor is a "Party" and, collectively, they are the "Parties".

2

HTA_CONF 00012872

    c.  GDB's security interest in certain incremental revenues implemented through Act No. 30-2013 and Act No. 31-2013;

    d.  certain loans to PBA in the aggregate principal amount of $137,414,149.15;

    e.  certain loans to the Commonwealth;

    f.  certain loans (the "CCDA Loans") to the Puerto Rico Convention Center District Authority ("CCDA");

    g.  certain loans (the "CRIM Loans") to the Center for Municipal Revenue Collection ("CRIM");

    h.  certain loans (the "EDB Loans") to the Economic Development Bank ("EDB");

    i.  certain repurchase transactions (the "HFA Repos") with the Puerto Rico Housing Finance Authority (the "HFA");

    j.  certain loans (the "Ports Loans") to the Puerto Rico Ports Authority ("Ports"); and

    k.  to the extent not otherwise identified above, certain GDB Retained Loans as identified in Schedule 8 to the Transfer Agreement (the "GDB Retained Loans").

**Commencement of the Title III Cases and Title VI Proceeding**

D.      On May 3, 2017, the Oversight Board filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a) in the United States District Court for the District of Puerto Rico (the "Title III Court"), commencing a case under Title III thereof (the "Commonwealth Title III Case").

E.      On May 21, 2017 (the "HTA/ERS Petition Date"), the Oversight Board filed a voluntary petition for relief for each of HTA and ERS pursuant to PROMESA Section 304(a) in the Title III Court, commencing a case under Title III thereof (the "HTA Title III Case" and the "ERS Title III Case," respectively).

F.      On September 27, 2019 (the "PBA Petition Date"), the Oversight Board filed a voluntary petition for relief for PBA pursuant to PROMESA Section 304(a) in the Title III Court, commencing a case under Title III thereof (the "PBA Title III Case" and together with the

3

HTA_CONF 00012873

Commonwealth Title III Case, the ERS Title III Case, and the HTA Title III Case, the "<u>Title III
Cases</u>").

     G.    Pursuant to PROMESA Section 315(b), the Oversight Board is the sole
representative of the Commonwealth, HTA, ERS, and PBA in the Title III Cases.

     H.    On August 27, 2021, the Oversight Board, as Administrative Supervisor for CCDA
pursuant to PROMESA Section 601(a)(1), certified a qualifying modification (the "<u>CCDA QM</u>")
for CCDA, which proposed qualifying modification only restructures certain bond indebtedness
issued by CCDA (the "<u>CCDA Bonds</u>").  On October 8, 2021, the Oversight Board commenced an
action for CCDA pursuant to Title VI of PROMESA, Case No. 21-01493 (the "<u>CCDA Title VI
Case</u>"), for the purpose of seeking approval of the CCDA QM.  A hearing to consider approval of
the CCDA QM is scheduled to commence on November 8, 2021.  The Parties acknowledge that
the CCDA QM affects only the CCDA Bonds and does not affect in any way any claims that DRA
may hold against CCDA, including, without limitation, the CCDA Loans.

**<u>The Plan of Adjustment</u>**

     I.    On July 30, 2021, the Oversight Board filed the *Seventh Amended Title III Joint
Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17627] (the "<u>Seventh
Amended Plan</u>") and corresponding *Disclosure Statement for the Seventh Amended Title III Joint
Plan of Adjustment of the Commonwealth of Puerto Rico*, et al. [ECF No. 17628].

     J.    On August 2, 2021, the Court entered (i) the *Order (I) Approving Disclosure
Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and
Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V)
Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-
Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving*

HTA_CONF 00012874

*Vote Tabulation Procedures* [ECF No. 17639] (the "Solicitation Procedures Order"), establishing a schedule and procedures relating to solicitation of creditor votes upon the Seventh Amended Plan, and setting the hearing to consider confirmation of the Seventh Amended Plan to begin on November 8, 2021 (the "Confirmation Hearing").

K.    In connection with the solicitation of votes to accept or reject the Seventh Amended Plan, DRA voted to reject the Seventh Amended Plan in connection with its asserted claims in Classes 12, 14, 40, and 59 in the Seventh Amended Plan (Ballot Nos. 21060, 21098, 21255, 21283, 21790, and 21296) (collectively, the "DRA Votes").

L.    On October 19, 2021, the DRA Parties filed the *Objection of the DRA Parties to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. [Dkt. No. 17627]* (the "DRA Objection").

M.    On October 22, 2021, the DRA Parties filed the *Objection of the DRA Parties to the Proposed Order and Judgment Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "DRA Confirmation Order Objection," and together with the DRA Objection, the "Confirmation Objections"). The DRA Parties have filed additional pleadings in furtherance of DRA's and the DRA Parties' opposition to confirmation of the Seventh Amended Plan.

N.    On November 3, 2021, the Oversight Board filed the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 19053] (the "Plan").[4] As set forth in Section 2.2 of the Plan, for purposes of confirmation and consummation of the Plan and distributions to made thereunder, unless otherwise allowed pursuant to an order of the Title III Court, (1) the 2012 CW Bond Claims and the 2012 CW Bond Claims (Assured) shall be deemed

---

[4] Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Plan.

5

HTA_CONF 00012875

allowed in the aggregate amount of $2,934,427,459.40, and (2) the CW/HTA Claims shall be

deemed allowed in the aggregate amount of $6,377,335,459.34. DRA asserts that it holds 2012

CW Bond Claims in the amount of $63,215,037.71. DRA asserts that it holds a PBA/DRA Secured

Claim and a PBA/DRA Unsecured Claim in the amounts of $66,222,028.00 and $134,357,497.00,

respectively. DRA asserts that it is entitled to a portion of the recovery associated with the

CW/HTA Claims, as delineated in the Priority Distribution Waterfall from Clawback CVI

Allocation to Allowed CW/HTA Claims set forth in Exhibit "J" to the Plan.

**Disputes Relating to the DRA**

O.       The DRA Parties have commenced actions, filed pleadings, and/or participated in

connection with the following, among others (collectively, the "DRA-Related Disputes"):

(i)     **DRA Parties' Lift Stay Motion**. Litigation arising from (a) *The DRA Parties' Motion and Memorandum of Law in Support of Their Motion for Relief From the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [ECF No. 7643], (b) *The DRA Parties' Amended Motion and Memorandum of Law in Support of Their Request for Adequate Protection or Relief From the Automatic Stay* [ECF No. 16276], and (c) any other motion or dispute pending as of the date hereof relating to the above motions.

(ii)     **Administrative Expense Motion**. Litigation arising from (a) *The DRA Parties' Motion for Allowance of an Administrative Expense Claim* [ECF No. 17009], and (b) any other motion or dispute pending as of the date hereof relating to the above motion.

(iii)    **DRA Adversary Proceeding**. The litigation styled (a) *AmeriNational Community Services, LLC, et al. v. Ambac Assurance Corporation, et al.*, Adv. Proc. No. 21-00068, and (b) any other motion or adversary proceeding pending as of the date hereof relating to the above action.

(iv)     **PBA Adversary Proceeding**. The litigation styled (a) *Puerto Rico Public Buildings Authority v. AmeriNational Community Services, LLC, et al.*, Adv. Proc. No. 21-00100, (the "PBA Adversary") and (b) any other motion or adversary proceeding pending as of the date hereof relating to the above action.

6

HTA_CONF 00012876

(v) **Section 926 Motion**. Litigation arising from (a) the *Urgent Motion for Bridge Order, and Motion for Appointment of Trustee Under 11 U.S.C. §926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation*, dated July 17, 2020, filed in the HTA Title III Case [ECF No. 871] and the Commonwealth Title III Case [ECF No. 13708], (b) *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1847, and (c) any other motion or adversary proceeding pending as of the date hereof seeking appointment of a trustee for HTA in accordance with 11 U.S.C. §926.

(vi) **Lift Stay Motions**. The litigation styled (a) *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico*, filed in the HTA Title III Case [ECF No. 673], (b) *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [ECF No. 10104], (c) *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board*, filed in the Commonwealth Title III Case [ECF No. 10602], (d) *AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico*, filed in the HTA Title III Case [ECF No. 591], (e) *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) *Ambac Assurance Corporation, et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 20-1931, currently pending in the United States Court of Appeals for the First Circuit, (g) *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Pro. No. 17-00151-LTS, filed in the HTA Title III Case [ECF No. 1], as amended, (h) *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [ECF No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with sections 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

(vii) **Debt Related Objections**. Litigation arising from (a) *Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, dated January 14, 2019 [ECF No. 4784], (b) *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds*, dated May 21, 2019 [ECF No. 7057], (c) *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against*

7

HTA_CONF 00012877

*Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds*, dated July 18, 2019 [ECF No. 8141], (d) *Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth*, dated January 8, 2020 [ECF No. 9731], (e) *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors*, dated February 3, 2020 [ECF No. 10638], and (g) any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds.

(viii) **Clawback Actions**. The litigation styled (a) *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, and (b) *The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.*, Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

(ix) **Uniformity Litigation**. The litigation styled (a) *Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the HTA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

P.  On October 29, 2021, the Title III Court entered (a) the *Opinion and Order Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim* [ECF No. 18892] (the "Administrative Expense Opinion") in the Commonwealth Title III Case, and (b) the *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint* [Case No. 21-00068, ECF No. 83] (the "Order Dismissing DRA Adversary Complaint").

**NOW, THEREFORE,** in consideration of the foregoing, the Parties hereby agree as follows:

8

HTA_CONF 00012878

## AGREEMENT

1.  <u>DRA Votes</u>.  Promptly upon execution of this Stipulation, the DRA Parties shall notify the Debtors' balloting agent, Prime Clerk LLC, of its determination to change the DRA Votes, and any other votes cast in connection with the Seventh Amended Plan, from "Reject" to "Accept," including, without limitation, to the extent necessary, seeking relief of the Title III Court to modify the DRA Votes, and any other votes cast in connection with the Seventh Amended Plan, pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure, if required.

2.  <u>Withdrawal of Confirmation Objections</u>.  The DRA Parties agree that, promptly upon execution of this Stipulation, the DRA Parties shall withdraw the Confirmation Objections and take any and all other actions reasonably necessary to effectuate such withdrawal, including, but not limited to, withdrawal of (i) all witnesses, including any filed written declarations, offered by the DRA Parties at the Confirmation Hearing, (ii) all exhibits or other evidence proposed by the DRA Parties to be admitted into evidence at the Confirmation Hearing, (iii) any request to examine or otherwise elicit testimony from any witnesses at the Confirmation Hearing, and (iv) any motions filed by the DRA Parties regarding any issue relating to the Confirmation Hearing.

3.  <u>Plan Agreements</u>.  From and after the date hereof, and provided that this Stipulation has not been terminated, the Parties agree as follows:

   a.  To the extent further solicitation in connection with the Plan (or any plan of adjustment filed subsequent to the Plan) is required, the Servicer, for and on behalf of the DRA, shall vote to accept the Plan (or any plan of adjustment filed subsequent to the Plan that is in form and substance consistent with and not economically or materially worse than the terms of this Stipulation or the Plan);

   b.  DRA and the DRA Parties shall support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of any further plan of adjustment that is consistent with and not economically or materially worse than the terms of this Stipulation or the Plan, the administration of the Plan (or any plan of adjustment filed subsequent to the Plan that is in form and substance

9

consistent with and not economically or materially worse than the terms of this Stipulation or the Plan), entry of an order confirming the Plan (or any plan of adjustment filed subsequent to the Plan that is in form and substance consistent with and not economically or materially worse than the terms of this Stipulation or the Plan) and achievement of the Effective Date; provided, however, that such documents are consistent with the terms set forth herein;

c.  The Oversight Board shall promptly review the PBA/DRA Secured Claims and the PBA/DRA Unsecured Claims and, in the event that the Oversight Board disagrees with the amount of the asserted claims, (1) the Oversight Board shall notify the DRA Parties but in no event later than December 1, 2021, (2) the Parties shall meet and confer as to any disagreement regarding the amount thereof, and (3) to the extent that the Parties are unable to agree upon the amount thereof, the Oversight Board shall file an objection thereto, but in no event later than December 31, 2021 and request that the Title III Court promptly consider such objection;

d.  To the extent the PBA/DRA Secured Claims and the PBA/Unsecured Claims are allowed, DRA shall receive the treatment and recoveries provided for in Articles XVI and XVIII of the Plan, respectively (or the corresponding provisions in any plan of adjustment filed subsequent to the Plan);

e.  On the Effective Date, the 2012 CW Bond Claims held by DRA shall be deemed allowed in the aggregate amount of $63,215,037.71, represented by Loan ID No. 20001721500100347 in the amount of $24,305,448.72, and Loan ID No. 20001721500100356 in the amount of $38,909,588.99; and

f.  The Order Dismissing DRA Adversary Complaint, including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.  CCDA Title VI Case.  From and after the date hereof, and provided that this Stipulation has not been terminated, each of the DRA Parties agrees to not oppose, and otherwise not, encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude the approval of the CCDA QM in the CCDA Title VI Case, entry of an order approving the CCDA QM, and consummation of the CCDA QM.  To the extent any service of notice on the DRA Parties may be required in connection with the CCDA Title VI Case, DRA and the DRA Parties hereby waive service of such notice.

10

HTA_CONF 00012880

5.    Dismissal/Withdrawal of DRA-Related Disputes.  The DRA Parties agree to, and

shall, within five (5) Business Days after the date hereof, withdraw and/or dismiss, with prejudice

in each case, the DRA-Related Disputes and any other pending litigation or disputes between the

DRA Parties and the Debtors in the Title III Cases, and take any and all other actions reasonably

necessary to effectuate such withdrawal and/or dismissal, with prejudice in each case.  The DRA

Parties agree not to, and shall not, take any appeals in connection with the DRA-Related Disputes,

including, without limitation, from the Administrative Expense Opinion and the Order Dismissing

DRA Adversary Complaint.  Within five (5) Business Days of the Effective Date, the Oversight

Board shall cause the PBA Complaint to be dismissed with prejudice.

6.    Exculpation of the DRA Parties.   The Oversight Board shall include in the

Confirmation Order (and any plan of adjustment filed subsequent to the Plan) and the HTA Plan

(and any plan of adjustment filed subsequent to the HTA Plan) customary language providing for

the exculpation of the DRA Parties, DRA, and their respective professionals and advisors,

substantially similar to the exculpation provided to certain parties pursuant to Section 92.7 of the

Plan.

7.    HTA Plan Agreements.  From and after the date hereof, and provided that this

Stipulation has not been terminated, the Parties agree as follows:

    a.    DRA and the DRA Parties shall support approval of the disclosure statement (the
         "HTA Disclosure Statement") to be filed with respect to the HTA Plan with the
         Title III Court by the Oversight Board in the HTA Title III Case in accordance with
         section 1125 of the Bankruptcy Code, which disclosure statement shall be in form
         and substance consistent with this Stipulation and not economically or materially
         worse than the terms of this Stipulation and reasonably acceptable to the DRA
         Parties;

    b.    DRA and the DRA Parties shall support confirmation of the HTA Plan to be filed
         by the Oversight Board, as representative of HTA in the HTA Title III Case, in
         form and substance consistent with this Stipulation and not economically or
         materially worse than the terms of this Stipulation or the Plan and reasonably

11

HTA_CONF 00012881

acceptable to the DRA Parties, in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code;

c. Upon being solicited in accordance with the provisions of PROMESA, the Servicer, for and on behalf of DRA, shall vote to accept the HTA Plan (or any plan of adjustment filed subsequent to the HTA Plan that is consistent with and not economically or materially worse than the terms of this Stipulation);

d. DRA and the DRA Parties shall support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the HTA Plan (or any plan of adjustment filed subsequent to the HTA Plan that is consistent with and not economically or materially worse than the terms of this Stipulation), the administration of the HTA Plan (or any plan of adjustment filed subsequent to the HTA Plan that is consistent with and not economically or materially worse than the terms of this Stipulation), entry of an order confirming the HTA Plan (or any plan of adjustment filed subsequent to the HTA Plan that is consistent with and not economically or materially worse than the terms of this Stipulation) and achievement of the Effective Date (as defined in the HTA Plan); provided, however, that such documents are consistent with the terms herein; and

e. Upon the occurrence of the effective date of the HTA Plan, the HTA Senior 98 Bond Claims, the HTA Senior 98 Bond Claims (Ambac), the HTA Senior 98 Bond Claims (Assured), the HTA 98 Senior Bond Claims (National) and the HTA Senior 98 Bond Claims (FGIC), each as defined in the HTA Plan, shall be allowed in the aggregate amount of $3,129,667,976.84, and DRA's ownership of $200,000,000.00 of principal of the HTA 98 Senior Bonds shall be recognized and be deemed included in such amount.

8. <u>Commitment to Negotiate Further Restructurings</u>. The Oversight Board shall use its reasonable best efforts to, or to cause the applicable entity to:

a. <u>CRIM Loans</u>. Engage in good faith negotiations with CRIM, the DRA Parties, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("<u>AAFAF</u>") to finalize an agreement regarding the restructuring and/or reconciliation of the CRIM Loans on or before December 31, 2021.

b. <u>EDB Loans</u>. Engage in good faith negotiations with EDB, the DRA Parties, and AAFAF to finalize an agreement regarding the restructuring and/or reconciliation of the EDB Loans on or before December 31, 2021.

c. <u>HFA Repos</u>. Engage in good faith negotiations with HFA, the DRA Parties, and AAFAF to develop a proposal on or before January 31, 2022 regarding the restructuring and/or reconciliation of the HFA Repos. The Parties agree that the period in which HFA must answer or otherwise respond to the complaint filed in the litigation styled <u>Autoridad de Recuperacion de La Deuda Del Banco</u>

12

HTA_CONF 00012882

<u>Gubernamental de Fomento Para Puerto Rico, Representada por su Administrador de Activos AmeriNational Community Services, LLC v. Autoridad Para El Financiamiento de La Vivienda de Puerto Rico</u>, filed on November 3, 2021, currently pending in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Part, is extended up to and including February 15, 2022, to allow the Parties sufficient time to attempt to resolve the dispute in the complaint.

d. <u>Ports Loans</u>. Establish in good faith a schedule with Ports, the DRA Parties, and AAFAF for the restructuring and/or reconciliation of the Ports Loans, and engage in such discussions in good faith.

e. <u>GDB Retained Loans</u>. Establish in good faith a schedule with AAFAF, the DRA Parties, and applicable governmental entity to such loans for the restructuring and/or reconciliation of the applicable GDB Retained Loans, and engage in such discussions in good faith and use reasonable best efforts to resolve the restructuring and reconciliation of the applicable GDB Retained Loans within twelve (12) months of the Effective Date.

9. <u>Subsequent Transfers</u>. The DRA Parties agree to forbear from selling, transferring, pledging, hypothecating, or assigning their HTA Senior 98 Bonds or HTA Notes, or any voting, consent, or direction or participations or other interests therein (a "<u>Transfer</u>"). Notwithstanding anything herein to the contrary, the DRA Parties may effectuate a Transfer to (1) another Party to this Stipulation or (2), in the event that the transferee is not a Party at the time of the Transfer, such transferee that executes and delivers, within three (3) calendar days after execution thereof, to counsel for the Oversight Board, the joinder agreement attached hereto as **Exhibit A** (a "<u>Qualified Transferee</u>"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Stipulation and (ii) such Qualified Transferee shall then be deemed a Party for all purposes herein, including, without limitation, with respect to any additional HTA Senior 98 Bonds or HTA Notes held by such Qualified Transferee at the time it joins this Stipulation, and shall assume all of the rights and obligations hereunder (other than the right to receive the Restriction Fee) and (z) on or after the effective date of the Transfer, such Party transferor shall be deemed to have relinquished its rights (other than the right to receive the Restriction Fee); and, <u>provided</u>, <u>further</u>, that, to the extent that

13

HTA_CONF 00012883

a Transfer violates the provisions of this section, it shall be void *ab initio* and the applicable HTA Senior 98 Bonds or HTA Notes and the Party attempting such Transfer shall continue to remain subject to the terms of this Stipulation; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any Party from acquiring additional HTA Senior 98 Bonds or HTA Notes; provided, however, that any such HTA Senior 98 Bonds or HTA Notes acquired from and after the date hereof shall automatically and immediately upon acquisition by a Party be deemed subject to all of the terms and provisions of this Stipulation. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation. Notwithstanding the foregoing, a Party may Transfer HTA Senior 98 Bonds or HTA Notes (or interests therein) to a Qualified Marketmaker (defined below), acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a party to this Stipulation if such Qualified Marketmaker subsequently Transfers such HTA Senior 98 Bonds or HTA Notes (or interests therein) to a transferee that is a party to this Stipulation or a transferee who executes and delivers to counsel a Joinder in accordance with the Stipulation, at or before the time of the proposed Transfer. To the extent that a party hereto is acting in its capacity as a Qualified Marketmaker, it may Transfer any HTA Senior 98 Bonds or HTA Notes (or interest therein) that the Qualified Marketmaker acquires from a holder of the HTA Senior 98 Bonds or HTA Notes (or interest therein) that is not a Party to this Stipulation without the requirement that the transferee be or become a Party hereto. A Qualified Marketmaker may, with the consent of the Oversight Board, which consent shall not be unreasonably withheld, join this Stipulation solely on behalf of a specific trading desk. Notwithstanding the foregoing, nothing contained herein

14

HTA_CONF 00012884

supersedes any restriction on DRA and the DRA Parties' ability to sell, transfer, and convey the HTA Senior 98 Bonds or the HTA Notes (or any other Restructuring Property (as defined in the Transfer Agreement) as set forth in the operative agreements implementing the GDB Qualifying Modification).

10. <u>Qualified Marketmaker</u>. A "Qualified Marketmaker" shall mean an entity that: (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the HTA Senior 98 Bonds or HTA Notes or enter with customers into long and short positions in debt securities such as the HTA Senior 98 Bonds or HTA Notes, in its capacity as a dealer or market marker in such HTA Senior 98 Bonds or HTA Notes; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to HTA Senior 98 Bonds or HTA Notes, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

11. <u>HTA Distribution Conditions</u>. Upon satisfaction of the HTA Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to Allowed CW/HTA Claims set forth in Exhibit "J" to the Plan.

12. <u>Restriction Fee</u>. In consideration for the agreements set forth herein, including the agreement to "lock-up" its HTA Senior 98 Bonds and HTA Notes, DRA shall be entitled to receive on the effective date of the HTA Plan, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, in the form of an allowed administrative expense claim, Fifteen Million Dollars ($15,000,000.00), in cash, from HTA (the "<u>Restriction Fee</u>"); <u>provided</u>, <u>however</u>, that, if this Stipulation is terminated pursuant to decretal paragraph 16(b) hereof, DRA shall not be entitled to the Restriction Fee.

15

HTA_CONF 00012885

13. <u>Right to Amend Plan</u>. Provided this Stipulation has not been terminated and remains in full force and effect, in its sole and absolute discretion, the Oversight Board may file any further plan of adjustment (including, without limitation, related documents, such as the CW Fiscal Plan, and plan supplements) amending the Plan or any subsequent plan of adjustment for the Commonwealth or HTA; <u>provided</u>, <u>however</u>, that such plan shall contain provisions consistent with those described in this Stipulation and that nothing in such plan is inconsistent with such provisions; and, <u>provided</u>, <u>further</u>, that the Oversight Board shall not amend such plan in any manner that would diminish the DRA's entitlements and rights pursuant to this Stipulation or the Plan.

14. <u>No Offer to Issue or Sell Securities</u>. Each of the Parties, severally and not jointly, acknowledges and agrees that this Stipulation does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

15. <u>Duty to Defend</u>. The Oversight Board shall defend any challenge to this Stipulation.

16. <u>Termination</u>. This Stipulation shall terminate, and thereafter shall be null and void and deemed of no further force and effect upon the occurrence of one of the following events: (a)

16

HTA_CONF 00012886

by the DRA Parties, upon the Oversight Board's breach of any of the material terms or provisions of this Stipulation, including the filing of a plan of adjustment for HTA in a manner inconsistent with the terms herein; (b) by the Oversight Board, upon any of the DRA Parties' material breach of the terms or provisions of this Stipulation; or (c) by either the Oversight Board or the DRA Parties, if the Title III Court denies confirmation of the Plan or the HTA Plan (or any plan of adjustment filed subsequent to the HTA Plan) and the Oversight Board fails to file an amended Plan or amended HTA Plan (in each case, consistent with and not economically or materially worse than the terms of this Stipulation), within thirty (30) calendar days after such denial.

17.    <u>Specific Performance</u>.  The Parties understand and agree that monetary damages would be an insufficient remedy for any breach of this Stipulation by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of monetary damages as a remedy.  Specific performance and injunctive or other equitable relief and the right to terminate this Stipulation in accordance with the terms of this Stipulation shall be the sole and exclusive remedies for any breach of this Stipulation by any Party.

18.    <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Stipulation.

<u>Miscellaneous Provisions</u>

19.    The Court's holdings concerning the applicability of the Asset Restrictions to the DRA Parties in the *Order Concerning the Government Parties' Objection to the DRA Parties' Standing to Seek Relief from the Automatic Stay or in the Alternative, Ordering Payment of*

17

HTA_CONF 00012887

*Adequate Protection Concerning the DRA's Asset Restrictions* [ECF No. 17725] and the Administrative Expense Opinion shall be binding on the Parties.

20.     The Parties, by and through their respective counsel, represent and warrant that they are duly authorized to enter into and be bound by this Stipulation.

21.     The agreements, representations, covenants, and obligations of the Parties under this Stipulation are several only and not joint in any respect and none shall be responsible for the performance or breach of this Stipulation by another.

22.     The execution of this Stipulation is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Stipulation.   None of this Stipulation (including the recitals and exhibits hereto), the settlement, or any act performed or document executed pursuant to or in furtherance of this Stipulation or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of this Stipulation.

23.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Stipulation.

24.     This Stipulation shall be governed by New York law.

25.     This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which will be deemed an original, but all of which together will constitute one instrument.

HTA_CONF 00012888

26.     For the avoidance of doubt, this Stipulation shall not impact any claims of the DRA

Parties other than those pertaining to the Debtors and HTA.

Dated: November 5, 2021

[*Signature Pages Follow*]

126714213v4

HTA_CONF 00012889

**THE COMMONWEALTH OF PUERTO RICO**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico

By: _/s/ Brian S. Rosen_
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

_Attorneys for the Financial Oversight and Management Board as representative for the Commonwealth of Puerto Rico_

**THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico

By: _/s/ Brian S. Rosen_
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

_Attorneys for the Financial Oversight and Management Board as representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico_

20

126714213v4

HTA_CONF 00012890

**THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY**

By: Financial Oversight and Management
Board for Puerto Rico, as representative of
the Puerto Rico Public Buildings Authority


By:  /s/ Brian S. Rosen
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Puerto Rico Public Buildings Authority*


**THE PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: Financial Oversight and Management
Board for Puerto Rico, as representative of
the Puerto Rico Highways and
Transportation Authority


By:  /s/ Brian S. Rosen
Brian S. Rosen
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Puerto Rico Highways and Transportation
Authority*

21

HTA_CONF 00012891

**THE GDB DEBT RECOVERY AUTHORITY**

By: AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority

By: _/s/ Arturo J. García-Solá_
Arturo J. García-Solá
**MCCONNELL VALDÉS LLC**
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: 787-250-5632
Facsimile: 787-759-9225

_Attorneys for AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority_

22

HTA_CONF 00012892

**THE GDB DEBT RECOVERY
AUTHORITY**

By: Cantor-Katz Collateral Monitor LLC, as
Collateral Monitor for GDB Debt Recovery
Authority


By: /s/ *Douglas S. Mintz*
Douglas S. Mintz
**SCHULTE ROTH & ZABEL LLP**
901 Fifteenth Street, NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 729-7470
Facsimile: (202) 730-4520

-and-

Douglas Koff (admitted pro hac vice)
Abbey Walsh (admitted pro hac vice)
Peter J. Amend (admitted pro hac vice)
919 Third Avenue
New York, N.Y. 10022
Tel: 212-756-2000
Fax: 212-593-5955

*Attorneys for Cantor-Katz Collateral
Monitor LLC, as Collateral Monitor for
GDB Debt Recovery Authority*

23

HTA_CONF 00012893

# **EXHIBIT D**

2022 HTA Fiscal Plan

HTA_CONF 00012894

# Fiscal Plan for the Puerto Rico Highways & Transportation Authority (HTA)

## FY2022-FY2051

**Fiscal Plan Certified by the Financial Oversight and Management Board for Puerto Rico on February 22, 2022**

0

HTA_CONF 00012895

DISCLAIMER

The Financial Oversight and Management Board for Puerto Rico (the "FOMB," or "Oversight Board") has formulated this 2022 Fiscal Plan based on, among other things, information obtained from the Commonwealth of Puerto Rico (the "Commonwealth," or the "Government").

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

This 2022 Fiscal Plan is directed to the Governor and Legislature of Puerto Rico based on underlying data obtained from the Government. No representations or warranties, express or implied, are made by the Oversight Board with respect to such information.

This 2022 Fiscal Plan is not a Title III plan of adjustment. It does not specify classes of claims and treatments. It neither discharges debts nor extinguishes liens.

This 2022 Fiscal Plan is based on what the Oversight Board believes is the best information currently available to it. To the extent the Oversight Board becomes aware of additional information after it certifies this 2022 Fiscal Plan that the Oversight Board determines warrants a revision of this 2022 Fiscal Plan, the Oversight Board will so revise it.

For the avoidance of doubt, except as otherwise expressly provided, the Oversight Board does not consider and has not considered anything in the 2022 Fiscal Plan as a "recommendation" pursuant to Section 205(a). Nevertheless, to the extent that anything in the 2022 Fiscal Plan is ever deemed by the Governor or Legislature or determined by a court having subject matter jurisdiction to be a "recommendation" pursuant to Section 205(a), the Oversight Board hereby adopts it in the 2022 Fiscal Plan pursuant to PROMESA Section 201(b).

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and the Oversight Board, but also by other third-party entities such as the government of the United States. Examples of these factors include, but are not limited to:

–   Any future actions taken or not taken by the United States government related to Medicaid or the Affordable Care Act;

–   The amount and timing of receipt of any distributions from the Federal Emergency Management Agency and private insurance companies to repair damage caused by Hurricanes María and Irma, earthquakes and the COVID-19 pandemic;

–   The amount and timing of receipt of any amounts allocated to Puerto Rico and provided under the Community Disaster Loans Program;

–   The amount and timing of any additional amounts appropriated by the United States government to address the impacts of the COVID-19 pandemic;

–   The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein;

–   The timeline for completion of the work being done by the Puerto Rico Electric Power Authority ("PREPA") to repair PREPA's electric system and infrastructure and the impact of any future developments or issues related to PREPA's electric system and infrastructure on Puerto Rico's economic growth;

–   The impact of the COVID-19 pandemic on the financial, social, economic and demographic condition of Puerto Rico;

–   The impact of the measures described herein on outmigration; and

–   The impact of the resolution of any pending litigation in the Title III cases

Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document may be considered as an express or implied warranty of facts or future events; provided, however, that the Government is required to implement the measures in this 2021 Fiscal Plan and the Oversight Board reserves all its rights to compel compliance. Nothing in this document should  be considered a solicitation, recommendation or advice to any person to participate, pursue or support a course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient is deemed to have acknowledged the terms of these limitations. This document may contain capitalized terms that are not defined herein or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined and you should refer any questions to the Oversight Board at comments@oversightboard.pr.gov if clarification is required.

1

HTA_CONF 00012896

**List of Acronyms and Key Terms**

| | |
|---|---|
| 2022 HTA Fiscal Plan | Refers to this Fiscal Plan, certified in February 2022 |
| 2020 Certified Fiscal Plan | HTA Fiscal Plan certified by the Financial Oversight and Management Board in June 2020 |
| 2021 Certified Fiscal Plan | HTA Fiscal Plan certified by the Financial Oversight and Management Board in May 2021 |
| AAFAF | Puerto Rico Fiscal Agency and Financial Advisory Authority (Spanish acronym) |
| ACI | American Concrete Institute |
| AFC | Automatic Fare Collection system |
| Agency, Authority | Refers to the Puerto Rico Highway and Transportation Authority |
| AMA | Puerto Rico Metropolitan Bus Authority |
| AQI | Air Quality Index |
| ARP | American Rescue Plan |
| ATM | Maritime Transport Authority |
| B2A | Budget to Actuals monthly report provided to FOMB from HTA |
| BIL | Bipartisan Infrastructure Law |
| BRT | Bus Rapid Transit |
| CAGR | Compound Annual Growth Rate |
| CapEx | Capital expenditures |
| CARES | Coronavirus Aid, Relief and Economic Security Act funding |
| CDFO | Chief Discretionary Funds Officer, a designated member of the discretionary grant management team |
| CBDG | Community Development Block Grant |
| CDBG-DR | Community Development Block Grant Disaster Recovery Program |
| CDBG-MIT | Community Development Block Grant Mitigation Program |
| CFR | Code of Federal Regulations |
| CIG | Capital Investment Grants |
| CIP | Capital Improvement Plan |
| CO | Change Orders |
| CW Certified Fiscal Plan | Commonwealth of Puerto Rico Fiscal Plan certified in April 2021 |
| CPI | Consumer Price Index, or inflation |
| CW | Commonwealth of Puerto Rico |
| DB | Design-Build Contracting |
| DDFO | Deputy Discretionary Funds Officer, a designated member of the discretionary grant management team |
| DDIR | Detailed Damage Inspection Reports |
| DOH | Department of Health |
| DOJ | Department of Justice |
| DPS | Department of Public Safety |
| DTL | Dynamic toll lane for transit system |
| DTOP | Departamento de Transportación y Obras Públicas |
| ER | Emergency Repair |
| EFL | Eastern Federal Lands – Division of US Federal Highway Administration |
| EFLHD | Eastern Federal Lands Highway Division |
| EFT | Electronic Funds Transfers |
| ETC | Electronic Toll Collection |
| ETFC | Electronic Toll Fine Collection |
| EWO | Extra Work Orders |
| FAHP | Federal-Aid Highway Program |
| FAST | Fixing America's Surface Transportation Act funding |
| Federal Government | The United States Federal Government |
| FEMA | Federal Emergency Management Agency |
| FHWA | Federal Highway Administration |
| FOMB | Financial Oversight and Management Board for Puerto Rico |
| FRR | Farebox recovery ratio |
| FTA | Federal Transit Administration |
| GNP | Gross National Product |
| Government | Government of Puerto Rico |
| Governor | Governor Pedro Rafael Pierluisi Urrutia |
| HTA | Refers to Puerto Rico Highway and Transportation Authority |
| Hacienda | Puerto Rico Department of Treasury |
| Hurricanes | Hurricane Irma and Hurricane Maria |
| Island | Puerto Rico |
| ITS | Integrated Transportation System |
| KPIs | Key Performance Indicators |
| June 2020 Certified Fiscal Plan | HTA Fiscal Plan certified by the Financial Oversight and Management Board in May 2020 |
| LRTP | Long Range Transportation Plan |
| Metropistas | Autopistas Metropolitanas de Puerto Rico, LLC |
| MOAs | Memoranda of Agreement |
| MOU | Memorandum of Understanding |
| NEPA | National Environmental Policy Act |
| NHS | National Highway System |
| NTP | Notice to Proceed |

2

| | |
|---|---|
| OOH | Out of Home advertising |
| OpEx | Operating Expenditures |
| ORT | Open Road Tolling |
| P&L | Profit and Loss |
| P3A | Puerto Rico Public-Private Partnerships Authority |
| PCI | Payment Card Industry-compliant |
| PEMOC | Programa Estatal de Modernización de Carreteras |
| PIC | Payment Card Industry |
| PMIS | Project Management Information Systems |
| POA | Plan of Adjustment |
| POS | Point-of-sale machines, used to process card payments at transit stations |
| PPP/P3 | Public-Private Partnership |
| PR | Puerto Rico |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PREPA | Puerto Rico Electric and Power Authority |
| PRHP | Puerto Rico Highway Program |
| PRHTA (or HTA) | Puerto Rico Highway and Transportation Authority |
| PRITA | Puerto Rico Integrated Transit Authority |
| PROMESA | Puerto Rico Oversight, Management and Economic Stability Act |
| PS&E | Plans, Specifications and Estimate package |
| RAISE | Rebuilding American Infrastructure with Sustainability and Equity (RAISE) grant, formerly known as BUILD and TIGER |
| RFI | Request for Information |
| RFP | Request for Proposal |
| ROW | Right of Way |
| RSS | Roadside equipment |
| SOGR | State of Good Repair |
| SOP | Standard Operating Procedure |
| TAMP | Transportation Asset Management Plan |
| TOD | Transit-Oriented Development |
| TPB | Transportation Policy Board |
| TSR | Transportation Sector Reform |
| TU | Tren Urbano transit system |
| TVM | Ticket Vending Machines |
| USDOT | The United States Department of Transportation |
| USHUD | The U.S. Department of Housing and Development |
| VTP | Voluntary Transition Program |
| VRM | Vehicle Revenue Miles |
| USVI | The United States Virgin Islands |
| YTD | Year to Date |

3

HTA_CONF 00012898

**Part I – Executive Summary** ........................................................................................ **6**

**Part II - Transportation Reform** .................................................................................. **11**

Chapter 1: Transportation Sector Reform (TSR)..................................................... 11

    *A: Reorganize Puerto Rico's transportation assets into transportation mode-specific entities.* ......................................................................................................................... 12

    *B: Create an overarching transportation policy board to guide multi-modal transportation strategy across the Island.* ...................................................................................... 16

    *C: Develop and use objective frameworks for project selection.* .................................. 17

    *D: Improve performance management through integration in public systems, performance-based contracts, and better supervision.* ................................................ 19

    *E: Enhance effectiveness of governance by reforming entity boards of directors, where relevant, to include fewer political appointees and more subject-matter experts.* ......... 20

    *F: Maximize the Commonwealth's funding envelope through a more aggressive federal grants strategy and by improving bankability to attract private capital.*.......................... 20

**Part III – Description of HTA** .................................................................................... **24**

Chapter 2: HTA Mission, History & Vision ............................................................. 24

    *2.1 HTA's Mission and Vision*................................................................................... 24

    *2.2 History and Responsibilities of HTA* .................................................................. 25

    *2.3 HTA's Transportation Network* ........................................................................... 25

    *2.4 Governance and Organizational Structure* ......................................................... 27

    *2.5 Key Performance Indicators (KPIs)* .................................................................... 28

    *2.6 The Future of HTA & Puerto Rico's Transportation Sector* .................................. 30

Chapter 3: Relationship with Commonwealth, FOMB, FHWA, FTA and EFL........... 30

    *3.1 Relationship of HTA with the Commonwealth* ..................................................... 30

    *3.2 Relationship of HTA with the FOMB* ................................................................... 31

    *3.3 Overview of Relationship with Federal Highways Administration* .......................... 32

    *3.4 Memorandum of Understanding with FHWA and KPIs*.......................................... 33

    *3.5 Overview of Relationship with the Federal Transit Administration*.......................... 35

Chapter 4: Impact of Hurricane Maria, Earthquakes & Covid-19 ........................... 36

    *4.1 Overview of impact of natural catastrophes* ........................................................ 36

    *4.2 Impact of Hurricane Maria on HTA Activities* ...................................................... 36

    *4.3 Impact of COVID-19 on HTA activities* ................................................................ 37

**Part IV – Infrastructure Agenda** ............................................................................. **40**

Chapter 5: Achieving a state of good repair ......................................................... 41

    *5.1 Bringing HTA's roads to SOGR*........................................................................... 41

    *5.2 Current State of HTA's transit network*................................................................. 42

Chapter 6: Current Capital Delivery Process and Outcomes.................................. 43

Chapter 7: Discretionary Funds for Strategic Projects .......................................... 47

**Part V – Current baseline financial projections** ..................................................... **50**

HTA_CONF 00012899

Chapter 8: Revenue Baseline...........................................................................55

    *8.1 Operating revenue baseline* .................................................................55

    *8.2 Capital contribution baseline* .............................................................57

Chapter 9: Expense Baseline...........................................................................58

    *9.1 Operating expense baseline*................................................................58

    *9.2 Capital expense baseline* ...................................................................61

**Part VI – Projections with Fiscal Measures** .............................................**64**

Chapter 10: Organizational Enhancement Fiscal Measures ...........................70

    *10.1 Recruiting a new Board of Directors* ................................................70

    *10.2 Adopting and measuring KPIs* ..........................................................71

    *10.3 Organizational Capacity Analysis & Development* .............................74

Chapter 11: Fiscal Measures: Revenue Increases .........................................76

    *11.1 Increasing toll fares and optimizing fare collection* ..........................76

    *11.2 Implementing bi-directional tolling*....................................................81

    *11.3 Increasing toll fines, introducing a tiered fine system and optimizing fine collection* ....................................................................................................83

    *11.4 Improving ancillary revenues*............................................................85

    *11.5 Expanding transit fare revenues* ......................................................88

    *11.6 Introducing new congestion management mechanisms* .....................92

    *11.7 Collecting more discretionary funds* .................................................92

Chapter 12: Fiscal Measures: Operating Expense Optimization ....................95

    *12.1 Reducing healthcare costs* ...............................................................95

    *12.2 Reassessing TU contracts* ...............................................................96

    *12.3 Implementing congestion management mechanisms – Bus Rapid Transit (BRT) and signal optimization* ...........................................................................98

Chapter 13: Capital Expense Optimization ....................................................99

Chapter 14: Public-private partnership opportunities ...................................103

**Part VII – Liquidity Situation**....................................................................**105**

Chapter 15: Cash position of HTA Before CW Transfer ...............................105

Chapter 16: Commonwealth Fiscal Support ................................................106

**Part VIII – Debt Sustainability**..................................................................**108**

Chapter 17: Post-Measures Debt Sustainability...........................................108

**Appendix A – P&L Apportionment Assumptions**.......................................**109**

**Appendix B – Implementation Plan & Reporting Requirements** .................**111**

**Appendix C – Eastern Federal Lands Memorandum of understanding** .......**115**

**Appendix D – Potential drivers of future revenues**....................................**118**

HTA_CONF 00012900

# PART I – EXECUTIVE SUMMARY

**Every resident of Puerto Rico deserves safe, well-maintained roads and an efficient and reliable transportation system**

A well-functioning transportation system at its core provides mobility: allowing residents to travel where they want, when they want, safely and affordably. A well-performing transportation system is critical to the safe and affordable movement of goods and people. The Puerto Rico Highways and Transportation Authority (HTA) is a key stakeholder in Puerto Rico's transportation sector, responsible for a majority of the roads and key parts of the transit system. As such, HTA has critical influence in determining the current and future state of the transportation sector of Puerto Rico.

Unfortunately, Puerto Rico's current transportation system lags national standards for quality, safety, and reliability. Only 13%[1] of Puerto Rico's highways are in good condition, compared to a median of 84% in the U.S., while fatality rates are ~43% higher than the U.S. median.[2] In addition, because of a lack of a reliable mass transportation system, residents are forced to rely on private vehicles for transportation, resulting in increased congestion, higher costs, and limited mobility and accessibility for lower-income residents. The San Juan metropolitan area is one of the most congested cities in the US.[3] Drivers lose 58 hours each year to traffic congestion at a cost of $1,150 per driver and $400 million to the city.[4] Meanwhile, Tren Urbano ("TU"), the Island's only passenger train system, has one of the lowest levels of ridership among transit systems in North America, with approximately 5 million annual riders prior to the start of COVID-19, below Miami's Metrorail (19m), Cleveland's RTA (6m), Baltimore's SubwayLink (8m) and Philadelphia's PATCO Speedline (11m). TU, as a transit system, has the worst financial performance in North America, currently recovering only 4 cents of every dollar of operational cost, while its peers currently recover approximately 12 cents (and 25 cents prior to COVID) on average.[5]

**The transportation sector needs to undergo significant reform to transform its performance to support the Island's economic development and recovery. The 2022 HTA Fiscal Plan provides a roadmap for transformation of the transportation system, which should enable HTA to achieve fiscal responsibility and access to the capital markets.**

As the entity responsible for Puerto Rico's major highways and heavy rail, HTA plays a key role in shaping the future of the transportation network, as well as achieving financial responsibility and access to the capital markets. Among HTA's objectives, four tie directly to

---

[1] From PRHTA Budget-to-Actuals reporting for FY21 end of fiscal year.

[2] 1.96 fatalities per 100 Vehicle Miles Traveled versus 1.37 US median in 2020. National Highway Traffic Safety Administration. 2020 fatality data: https://www.nhtsa.gov/press-releases/2020-fatality-data-show-increased-traffic-fatalities-during-pandemic; 2020 road condition data: https://www.fhwa.dot.gov/policyinformation/statistics/2020/hm64.cfm

[3] San Juan has the seventh-longest average commute at 31.2 minutes.

[4] Costs include lost productivity, increased freight movements costs, higher operating costs and decreased reliability See: https://static.tti.tamu.edu/tti.tamu.edu/documents/mobility-report-2019.pdf; https://inrix.com/scorecard-city/?city=San%20Juan%2C%20PR&index=163

[5] Ridership Data: Public Transportation Ridership Report, American Public Transportation Association, Found online at: https://www.apta.com/wp-content/uploads/2018-Q4-Ridership-APTA.pdf / Farebox Recovery: National Transit Database, Found online at: https://www.transit.dot.gov/ntd/ntd-data

6

HTA_CONF 00012901

broader transportation sector reform: (1) promote the safe and easy movement of vehicles and individuals; (2) reach and maintain a minimum threshold "State of Good Repair" (SOGR) to ensure the people of Puerto Rico have access to quality roads and modes of transportation; (3) contribute to the development of Puerto Rico; (4) build a strong, resilient road network by strengthening assets that are prone to natural disasters.

Achieving these objectives requires HTA to become fiscally sustainable and operationally efficient. There are three root causes of the challenges facing the sector:[6]

1) Individual modes of transportation having overlapping and fragmented ownership;

2) Deficient performance management within individual modes of transportation and little multi-modal coordination; and

3) Systemic failure to maximize potential public and private funding.

To address these issues, six reforms are proposed in the 2022 HTA Fiscal Plan:

1) Restructure transportation assets into mode specific entities (e.g., toll roads, non-toll roads, mass transit);

2) Create an overarching Transportation Policy Board to guide multi-modal transportation strategy across the Island;

3) Develop and use objective frameworks for project selection;

4) Improve performance management through integrating public systems, performance-based contracts and better supervision of contractors;

5) Enhance effectiveness of governance by reforming governing boards, where relevant, to include fewer political appointees and more subject-matter experts; and

6) Maximize funding from non-Commonwealth sources, through a more comprehensive federal grants strategy, and improved bankability to attract private capital.

As the entity primarily responsible for toll roads, non-toll roads, and transit assets, HTA must work with other transportation entities on the island (e.g., DTOP[7], PRITA[8]) to ensure the successful execution of a sector-wide reform. The 2022 HTA Fiscal Plan advances plans towards these reforms, providing the greatest detail yet on implementation and potential impact across these recommendations.

The 2022 HTA Fiscal Plan places specific emphasis on the restructuring and separation of Puerto Rico's transportation assets. The current state, where several different agencies have overlapping control and responsibilities of toll-roads, non-toll roads, and transit agencies, leads to inefficiencies, lack of coordination and poor outcomes for citizens. To solve this, the transportation sector reform calls for the segmentation of transport assets across three distinct asset classes: non-toll roads, toll roads, and an integrated transit system. The proposed implementation approach would achieve the segmentation through the following:

---

[6] On January 27, 2021, in a letter pursuant to Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") section 205(a), the Financial Oversight and Management Board (FOMB) outlined the root causes of challenges facing the sector and recommendations to reform the transportation sector.

[7] Puerto Rico's Department of Transportation and Public Works (DTOP by its Spanish acronym)

[8] Puerto Rico Integrated Transit Authority (PRITA)

7

- **Integrating all transit assets under PRITA:** HTA should transfer all its transit assets to PRITA to empower PRITA to fulfill its original mission as a unitary transit authority.

- **Maintaining toll roads and non-toll roads under HTA with ring-fenced structure between these asset classes:[9]** HTA should assume construction and maintenance responsibility of toll- and non-toll roads with clear internal separation (legal, financial and operational), by moving toll assets to a toll-road management office.

- **Preparing and advancing a future toll-road concession for further structural independence as the Puerto Rico Public-Private Partnerships Authority ("P3A") continues to evaluate the viability of a toll-road concession:** The separation of toll-road assets into a newly created office should streamline potential public-private partnership ("P3") processes, reinforcing HTA's commitment to a fiscally sustainable toll-road operation.

The proposed restructuring should support HTA's exit from Title III. The separation of assets across toll, non-toll and transit ends the cross-subsidization across assets and provides greater clarity of the sustainability and financial requirements of each. The asset-specific revenue, expenditures, surpluses, and deficits specify the funding requirements and fund availability across toll, non-toll and transit assets. For non-toll roads and transit assets, the forecasted deficits indicate the level of support required from the Commonwealth through funding transfers. Forecasted surpluses at the toll-road management office can provide the basis for debt service, investment and other internal and external obligations.

**Achieving the full vision and impact of the transportation sector reform hinges on the successful execution of priority fiscal measures and delivering on the full scope of historic levels of capital investments.**

To achieve lasting change, these reforms should be adopted in conjunction with the fiscal measures laid out to improve revenue generation and restore capital delivery outcomes for HTA's responsibilities. In recent years, including through Fiscal Year ("FY") 2022 to date, HTA failed to make progress on key initiatives designed to improve its ability to deliver on its core objectives, particularly in enhancing revenues and improving operational efficiency and accountability. While there continues to be progress in the rate of disbursements in the capital program–notable given the challenges of the COVID-19 pandemic–realizing the transformation will require a renewed commitment from HTA to reform its operating model, sustain revenue streams and accelerate capital project delivery.

These sector reforms and fiscal measures remain critical to HTA's sustainable future. HTA is currently approximately $6.6 billion in debt. Since HTA entered Title III in May 2017, HTA has had insufficient cash flows to service its outstanding debt and has not made payments since July 2017. Based on the Fiscal Plan projections on cash flow, the existing HTA debt service will require significant restructuring and HTA's full commitment to delivering results across the following areas:

- **Increasing revenues to support fiscal responsibility**: The 2022 HTA Fiscal Plan requires HTA to ensure the funding availability for the transportation system by enhancing operating revenues in toll fares and toll fines and in the transit system via enhancements

---

[9] Details on the steps to accomplish the effective segregation of the toll roads, through the separation of accounting, labor force, contracting and governance, and the preparations required at HTA to take up additional maintenance responsibilities for non-toll roads from DTOP, are outlined in Chapter 1.

8

HTA_CONF 00012903

to performance. Toll fares require modest annual increases and bi-directional tolling implementation to keep up with growing costs and investment requirements. An enhanced toll fine structure should reward early payment. A series of transit enhancements should increase ridership, and thus farebox revenues, for TU.[10]

- **Maximizing the availability and deployment of federal funds:** HTA has repeatedly failed to deploy the full availability of its annual federal formula funding and historically has received far below its fair share of discretionary funds. The cost of inaction and poor management of federal funding opportunities has never been greater, given the approval of Community Block Development Grants (CDBG-DR) for Puerto Rico, and the enactment of the Bipartisan Infrastructure Law (BIL). HTA must develop a plan to disburse the estimated $1.5 billion transportation share of the $10 billion of CDBG-DR approved for Puerto Rico for special recovery projects.[11] HTA should further increase its pursuit of discretionary opportunities given ~$100 billion of new competitive transportation grant programs in the BIL. If HTA receives its fair share of discretionary federal grants (e.g., 1% of total, proportionate to share of US population), investment into the system would increase by ~$90m per year, or as much as $2.7 billion cumulatively over 30 years.

- **Executing an ambitious capital program to restore the system's condition and performance:** The 2022 HTA Fiscal Plan empowers the Authority to execute a $11.6 billion capital investment program[12] in FY22-51 across highways and transit, prioritizing restoration of the highway system to SOGR. The plan further supports the pursuit of discretionary projects to enhance capacity in strategic corridors, manage congestion and promote economic development. The proposed capital program increases annual disbursements from $212M, on average, in FY13-FY18, to approximately $386 million in capital investments from FY22-FY51. These investments will be enabled by the BIL, which is projected to increase the federal funding allocated to HTA for highway and bridge construction by $1.1 billion during FY22-51, plus an opportunity to compete for the ~$100 billion in new discretionary transportation grants, of which ~$90 million per year could be potentially allocated to Puerto Rico. funding would provide HTA with a generational opportunity to transform the Puerto Rican transportation system. Executing these investments will require a step-change in performance and a successful grant application strategy. Changes in HTA's governance and operating practices, including managerial improvements in project delivery outlined in its Memorandum of Understanding ("MOU") with the Federal Highway Administration ("FHWA"), will be critical to enabling it to improve the system safely and sustainably.

- **Adjusting the Authority's debts through Title III:**  HTA entered its Title III case with approximately $6.6 billion in debt. Although HTA should start generating annual operational surpluses when the fiscal measures in this plan are implemented, these surpluses would not be sufficient to repay the entire outstanding debt amount. HTA's existing debt burden is therefore unsustainable and will need to be substantially reduced through a Title III plan of adjustment.

---

[10] Tren Urban only receives 4 cents for every dollar it costs to operate, or a 4% farebox revenue ratio (FRR) for FY22 as of December 2021. FY21 FRR is close to 2% due to shutdown periods in 2020.

[11] For the latest actuals on CDBG-DR, published in November 2021, please see: https://cdbg-dr.pr.gov/en/download/action-plan-amendment-7-substantial-effective-on-november-5-2021/

[12] Including $0.8 billion in transit and toll optimization. Excluding these, the Fiscal Plan calls for $10.8 billion in highway-related capital expenditures. This does not include discretionary funding opportunities including CDBG-DR and BIL programs, as referenced above.

9

HTA_CONF 00012904

The projected impact of these fiscal measures is approximately $6.0 billion over FY22-51, turning a forecasted $1.2 billion deficit to a cumulative surplus of $4.8 billion. These measures will enable necessary investments, fiscal sustainability, and affordable restructuring of debt. Without measures for improvement, the level of the Authority's dependence on cash transfers from the Commonwealth is unsustainable.

HTA's recent track record underscores the required focus on implementation. HTA has made limited progress implementing the measures included in the 2021 Certified Fiscal Plan. This lack of progress results in a lack of incremental funding that could be further invested in enhancing the system's performance condition and outcomes. Non-implementation of measures for toll fare and toll fine increases and optimizing toll collection left an estimated $25 million in incremental revenue uncaptured in FY21 alone, robbing funding from a system in desperate need of investment, given the 's condition and performance shortfalls. Furthermore, for FY22 year-to-date, Capex construction disbursements are below budget for the federal construction program (~12% variance), the non-federal construction program (~11% variance) and the emergency repair program (~40% variance).[13]

Taken together, the transportation sector reform and fiscal measures, combined with potentially unprecedented levels of federal funding thanks to BIL, present a generational opportunity to create a new trajectory for the transportation sector in Puerto Rico. This sector could unlock economic development while promoting a safer, more sustainable, and more equitable future, for all Puerto Ricans.

---

[13] HTA December 2021 Budget-to-Actuals reporting data (reported in January 2022).

HTA_CONF 00012905

# PART II - TRANSPORTATION REFORM

## CHAPTER 1: TRANSPORTATION SECTOR REFORM (TSR)

The transportation sector is essential for both economic and social development in Puerto Rico, given its critical role in facilitating the movement of goods and people on the Island. A well-performing transportation system can increase access to jobs and business opportunity, unlocking the productive potential of residents and firms. In turn, a transportation system can increase economic output and invite further private investment.

Meanwhile, a poorly performing system can mire its residents in wasted time, inequitable access to jobs and opportunities, fractured communities and productivity losses. Puerto Rico is currently suffering from several of these factors.

As outlined in the Executive Summary, Puerto Rico's transportation sector currently underperforms across a range of outcomes, including congestion, safety and road quality. In 2020, HTA reported to FHWA that 12% of Puerto Rico's lane miles are in "poor" condition; federal law mandates that no more than 5% of lane miles may be in a "poor" state for pavement conditions on the Interstate System.[14][15] As a result, for the second consecutive year, FHWA imposed a penalty and constraints on some portion of its federal allocated funds.[16]

The state of public transit infrastructure and management in Puerto Rico deserves special focus given its many challenges. Congestion is increasing in many metropolitan areas, creating additional delays for commuting and transportation of goods. High congestion is due in part to the minimal use of mass transit; the San Juan metro area has 37,000 more households commuting by private vehicle than would be expected if mass-transit usage matched the U.S. average.[17] As a result of the extra vehicle journeys, San Juan experiences two additional weeks of low air-quality days per year, compared to the U.S. average.[18] Worse yet, NOx and PM2.5 emissions from vehicles are statistically associated with higher mortality rates in the local population.[19] The current transit system suffers from limited efficiency, route coordination, operational cohesiveness and accessibility. These issues result in higher congestion and reduced mobility, particularly for low-income residents who experience long commutes or are forced to bear the costs of owning a private vehicle.

---

[14] As defined by 23 USC 103(c)

[15] 23 USC 119(f)(1) and 23 CFR 490.315

[16] In a letter dated September 30, 2020, FHWA informed HTA the determination regarding pavement conditions in the Interstate System. After analyzing the 2019 Interstate System pavement condition data reported by HTA on the Highway Monitoring System, FHWA determined that (1) HTA did not meet the minimum level requirements for pavement condition on the Interstate System as required in 23 USC § 119(f)(1) and 23 CFR § 490.315 and (2) penalty under the provisions of the Interstate System Condition (23 USC § 119 (f)(1) must be invoked pursuant to 23 CFR § 490.317. As a result, HTA will have constraints on some portion of its allocated funds as per 23 CFR § 490.31(e).

[17] 22% of San Juan metro area residents commute via carpool, walking, bicycling, or public transit, compared to 27% for the U.S.

[18] Low air quality defined as AQI > 100; PR has 19 days per year to U.S. median of 4, as per the Department of Natural and Environmental Resources website

[19] EPA estimates excess deaths per ton of emissions at 0.002 for NOx and 0.1 for PM 2.5.

HTA_CONF 00012906

To address these issues, a comprehensive reform of the transportation sector on the island is required. HTA, being the manager of critical assets across different transport modes, should be a key driver of that reform. The cornerstone of the reform should be the rationalization of asset ownership, with the creation of mode-specific transport entities. To achieve that, HTA would need to transfer all transit assets to PRITA, establish an internal separation ("ringfence") between its toll and non-toll operations and pursue a P3 for further structural independence of toll assets.

This reorganization should enable HTA to optimize decisions on toll pricing policy, enhancing its financial position, and enabling investments that support economic growth priorities. Furthermore, it should enable HTA to deploy funds more effectively, thus reducing the proportion of pavement in poor condition and making the roads of Puerto Rico safer.

The rationalization of asset ownership should be accompanied by a series of other structural measures and should be rolled out as a holistic reform package. The 2022 HTA Fiscal Plan establishes how the Authority should support the implementation of this reform package, in line with the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") section 205(a) letter sent to the government of Puerto Rico by the Financial Oversight and Management Board for Puerto Rico ("FOMB") on January 29th, 2021:

### A: Reorganize Puerto Rico's transportation assets into transportation mode-specific entities.

The current state, where several different agencies have overlapping control and responsibilities of toll-roads, non-toll roads and transit assets, leads to inefficiencies, lack of coordination and poor outcomes for citizens. To solve this, the TSR calls for the segmentation of transport assets across three distinct classes: non-toll roads, toll roads and an integrated transit system. The following implementation approach achieves the segmentation through the following:

- **Integrating all transit assets under PRITA:** HTA should transfer all its transit assets to PRITA to empower PRITA to fulfill its original mission as a unified transit authority (i.e., encompassing all buses, ferries, TU). In parallel, the Government should also ensure PRITA achieves Federal Transit Administration ("FTA") grantee status to finance these new responsibilities.

- **Maintaining toll roads and non-toll roads under HTA with ring-fenced structure between these asset classes:** HTA's responsibility across both toll- and non-toll roads should expand to include construction and maintenance mandate, with internal separation (legal, financial, and operational) achieved through a toll-road-only management office. This approach (HTA maintaining all road assets, but internally separating toll assets via a toll roads management office) would allow HTA to leverage its existing capabilities and federal grantee status, while realizing the fiscal benefits of an asset separation.

- **Preparing and advancing a future toll-road concession for further structural independence as P3A continues to evaluate the viability of a toll-road P3:** The separation of toll-road assets into a newly created Toll Roads Management Office should streamline potential P3 processes (described below in section F) because it would demonstrate to potential investors and operators that HTA is committed to a fiscally sustainable toll-road operation. After the P3 is concluded, HTA should primarily

12

manage non-toll roads and serve as a contract-manager for toll-road assets that are ultimately transferred to a private operator

### Rationale for proposed structure

The 2021 HTA Fiscal Plan presented an alternative asset separation, in which the future state would consist of three separated entities: toll assets under HTA, non-toll roads under DTOP and transit under PRITA. Based on a series of collaborative discussions with HTA, PRITA, and the Fiscal Agency, and Financial Advisory Authority ("AAFAF"), the 2022 HTA Fiscal Plan instead requires the establishment of an internal separation between toll and non-toll operations of HTA. This approach will still realize the benefits of asset separation while minimizing the operational and financial risks entailed by the transfer of non-toll roads to DTOP. This approach was adopted given:

- HTA has optimized payment procedures for contractors and has set up an organizational structure that enables contract administration at scale

- HTA has demonstrated it can deliver large-scale capital investments

- HTA has developed more robust asset management procedures over the last 30 years

- HTA is the sole FHWA grantee in Puerto Rico and as such complies with all 23 CFR requirements across the following areas:

  o Payment procedures- Chapter 1, subchapter 8

  o Planning/Environmental- Section 135, Chapter I, Subchapter E

  o Design-Highway Standard/Design Criteria-Section 109, Chapter I, Subchapter G

  o Construction and Contracting Procedures- Chapter I, Subchapter G

  o Transportation Infrastructure Management- Chapter I, Sub-chapter F

  o Maintenance- Properly Maintenance all Roads- Section 116

  o Highway Safety- Section 402, Chapter I, Subchapter II

  o Right of Way and Environment- Chapter I, Subchapter H

### Implementation of Toll and Non-Toll segregation

Asset classes should be segregated with the creation of a Toll Roads Management Office within HTA and the transfer of the transit assets to PRITA (see Exhibit 1).

13

**Exhibit 1: Proposed alignment of asset types to entities**



To accomplish the effective segregation of the toll roads, HTA should create a new Toll Roads Management Office. The Toll Roads Management Office will be separated from other HTA departments in the following ways:

- **Segregation of Profit and Loss ("P&L") and Accounting**: The Office should have its own chart of accounts and financial statements. Furthermore, it will maintain separate bank accounts and it will use its own revenues to cover only expenses that are directly associated with toll roads. Use of toll revenues to subsidize operations of the remaining highway network will be explicitly prohibited.

- **Separation of labor force:** The Office should have a labor force that will be exclusively dedicated to toll road operations and capital improvements. It will also have its own back-office functions (e.g., HR, IT, Finance). Overall, the size of that labor force must be proportionate to the share of costs incurred by the Office within HTA.

- **Contract segregation**: The Office should have the independent authority to negotiate and sign contracts. Furthermore, it will be responsible for monitoring the implementation of these contracts and resolving any outstanding disputes with contractors.

- **Separation of governance:** The Office should have its own Executive Board and will be able to define its own capital allocation priorities if they remain in line with applicable federal regulations.

At the same time, HTA should prepare to take up additional maintenance responsibilities for non-toll roads from DTOP. Preparation should involve the following steps:

- **Employee mobility:** HTA should work with DTOP to identify which DTOP employees will be transferred to HTA to support the execution of maintenance works on non-toll roads

- **Financial resourcing:** HTA should leverage DTOP's help to estimate what additional resources would be required to carry out non-toll road maintenance. Then, any funding implications can be determined (e.g., size of the general Commonwealth transfer)

14

HTA_CONF 00012909

**Exhibit 2: Implementation plan for asset transfers, subject to adjustment**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Track impact of reforms** | Adopt transportation sector reform KPIs per the Commonwealth's selected scorecard[20] | AAFAF | August 31, 2022 |
| **Allocate transportation assets into mode-specific entities** | Develop a program foundation to align on priorities, success metrics, measures, and future state organizational structure to demonstrate progress | PRITA, HTA, DTOP, AAFAF | October 1, 2021 (Delayed) |
| | Organize assets, roles, and responsibilities within existing entities into asset-class groupings | PRITA, HTA, DTOP, AAFAF | October 1, 2021 (Delayed) |
| | Identify legal and other obstacles to asset reorganization and present to FOMB | PRITA, HTA, DTOP, AAFAF | October 1, 2021 (Delayed) |
| | Segregate costs/revenues associated to tolled, non-tolled roads and transit assets (e.g., labor, opex) and assign by asset class | PRITA, HTA, DTOP, AAFAF | October 1, 2021 (Delayed) |
| | Amend/Update entity organizational structures to accommodate restructured roles and responsibilities | PRITA, HTA, DTOP, AAFAF | November 15, 2021 (Delayed) |
| | Draft proposed legislation (if needed) for toll-specific ringfence within HTA | HTA, AAFAF | June 30, 2022 |
| | Update/amend internal management and financial systems to comply with legal separation of toll-assets | HTA, AAFAF | June 30, 2022 |
| | Transfer personnel and resources (as applicable) to the relevant entities | PRITA, HTA, DTOP, AAFAF | June 30, 2022 |

---

[20] Included based on the inclusion of a scorecard as suggested by the Commonwealth in their April 29, 2021 response to the original 205(a) letter. Timeline for HTA's adoption will be subject to Commonwealth implementation of this measure.

15

HTA_CONF 00012910

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| | Finalize transfer of roles and responsibilities for non-tolled roads from HTA to DTOP or relevant authority. | PRITA, HTA, DTOP, AAFAF | June 30, 2023 |
| **Re-allocate transit assets to PRITA** | Perform initial assessment of legal and Federal Transit Administration (FTA) and Transportation Asset Management Plan (TAMP) considerations | PRITA, HTA, AAFAF | Completed |
| | Specify, procure, and implement required system to operate transit assets (e.g., IT infrastructure) | PRITA | April 29, 2022 |
| | Achieve minimum financial, legal, and technical capacity to effectively manage FTA funds | PRITA, AAFAF | Completed |

### B: Create an overarching transportation policy board to guide multi-modal transportation strategy across the Island.

In accordance with the future vision for coordinated transportation assets across Puerto Rico, a transportation policy board should be established to set coordinated priorities for each agency. The Transportation Policy Board ("TPB") should control a common transportation fund and suggest projects for funding across all transportation modes based on their potential to advance the island-wide transportation strategy. These projects should be proposed by a variety of transportation stakeholders, including metropolitan planning organizations, local governments, and local transit agencies. The TPB should facilitate coordination between the agencies to ensure ease of multi-modal transportation for its users.

The TPB should be empowered to, at a minimum:

1. Set long-term, cross-modal, strategic plans and investment priorities applicable to all transportation investments on the Island;

2. Regularly review and report on execution compared against strategic plans, providing transparency and guidance on any corrective steps required;

3. Coordinate the federal grants strategy for all transportation entities to harmonize the process and maximize opportunity and availability of federal funds;

4. Develop and oversee the use of objective frameworks for project selection and project prioritization processes; and

5. Provide oversight and compliance checks to both the pre-construction and capital delivery activities.

16

The proposed TPB would provide oversight and guidance for the transportation entities within the Government but would not seek to burden them with new regulations, leaving implementation of long-term strategic plans to each relevant entity.

Although the responsibility of creating an Island-wide transportation Board would largely fall on the Commonwealth, HTA should leverage its experience and provide input regarding the Board's structure. Once established, HTA should formalize its interaction model with the Board through a MOU and leverage the Board's perspective to guide project planning, to ensure optimal multi-modal outcomes in Puerto Rico.

**Exhibit 3: Implementation Plan for Transportation Policy Board and multimodal coordination for transportation network**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Establish Transportation Policy Board or analogous entity** | Establish an independent advisory board responsible for setting long term holistic strategic plans and oversight of investment prioritization processes to advance transportation from an Island-wide perspective | AAFAF | November 1, 2021 (Delayed) |
| | Establish processes and guidelines for reviewing and reporting on the execution of strategic plans and providing transparency and guidance on corrective action | TPB | December 1, 2021 (Delayed) |
| | Establish processes and guidelines for coordinating the federal grants strategy for all transportation entities to harmonize the process and maximize availability of federal funds | TPB | December 1, 2021 (Delayed) |
| | Assess and develop mechanisms to lower traffic congestion and increase accessibility to transit | TPB | December 1, 2021 (Delayed) |
| | Establish an MOU agreement outlining the approach for and terms under which all transportation entities will work with one another | TPB, HTA, ATM, PRITA | December 1, 2021 (Delayed) |

***C: Develop and use objective frameworks for project selection.***

In Puerto Rico, poor performance management results in a backlog of maintenance projects, high costs relative to service levels and a disconnected system that cannot effectively execute

17

a multi-modal strategy. HTA has historically struggled to deploy its available capital funding to maintain SOGR. Unmet targets are not due to lack of available funding. They are rather a result of HTA's struggle to successfully execute its backlog of projects.

In Chapter 13, the Fiscal Plan lays out a clear methodology for HTA to better manage its capital expenditure and ensure that it can deliver its ambitious capital program. Under its Optimizing Construction Cost fiscal measure, HTA is required to reduce costs and ensure project delivery. As part of this Reform, HTA must consistently apply these frameworks for all investment decisions and tracking its use of the selection criteria (e.g., how chosen projects have scored relative to other selected and un-selected projects) with one another.

**Exhibit 4: Implementation plan for project performance management[21]**

| Measure | Action item | Responsible party | Deadline |
|---------|-------------|-------------------|----------|
| Optimize capital expenses | Propose set of projects that would benefit most from creation of standard project definition workflows (e.g., commonalities, frequencies) | HTA | Ongoing |
| | Propose set of projects that would benefit most from creation of standard design packages (e.g., number of stakeholders, frequencies) | HTA | Ongoing |
| | Identify and propose opportunities to leverage alternative procurement methods | HTA | Ongoing |
| | Identify capability gaps within in-house construction team | HTA | Ongoing |
| | Pilot improvements to address opportunities areas identified in capital delivery diagnostic | HTA | Ongoing |
| | Use standard project definition workflows for initial set of projects | HTA | Ongoing |
| | Use standard design packages for initial set of projects | HTA | Ongoing |
| | Create and propose alternative procurement RFP(s) for eligible projects | HTA | Ongoing |
| | Create plan to address capabilities gaps (e.g., outsourcing, training) within the construction team | HTA | March 31, 2022 |

---

[21] Full implementation plan also included in Chapter 12.1

HTA_CONF 00012913

| | Complete FHWA-approved process improvements (e.g., pay-item sampling) to expedite invoice processing in project close-out | HTA | June 30, 2022 |
| | Complete implementation of electronic records management system to facilitate efficient project close-outs | HTA | June 30, 2022 |

### D: Improve performance management through integration in public systems, performance-based contracts, and better supervision.

At present, públicos and transportation network companies operate broadly across Puerto Rico to satisfy excess demand for transportation beyond that provided by the public sector. There is limited coordination, however, between these private operators and the public networks. Similarly, private contractors execute much of the Island's transportation construction without providing visibility into individual project performance. If managed well, the private sector should be a key partner in both operating transit systems and delivering capital projects efficiently and cost- effectively.

HTA must implement existing fiscal measures, namely the transit enhancements listed in Section 11.5, to better integrate transit assets on the island. The Board should take steps to ensure that both schedules and transit card options are uniform between modes of transit to improve system accessibility for all users. Similarly, the CIP optimization fiscal measure in Chapter 13 lays out a path for HTA to deliver its entire capital program on time and under budget.

**Exhibit 5: Implementation plan for project performance management[22]**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Leverage private-sector services for improved efficiency | Design a series of initiatives that can be implemented in collaboration with private transport networks (e.g., públicos) | HTA, PRITA, private networks | December 31, 2021 (Delayed) |
| | Develop a strategy for communicating with private network operators | PRITA | December 31, 2022 |
| Transit Service Integration and Coordination | Adopt a single farecard for all public transit networks | HTA, ATM, PRITA | June 30, 2022 (Delayed) |
| | Harmonize fares and schedules across TU, buses, and ferries | HTA, ATM, PRITA | December 31, 2022 (Delayed) |
| | Pool data resources to conduct common research on future initiatives | HTA, ATM, PRITA | December 31, 2022 (Delayed) |

---

[22] Full implementation plan also included in Chapter 13

19

*E: Enhance effectiveness of governance by reforming entity boards of directors, where relevant, to include fewer political appointees and more subject-matter experts.*

An effective, independent board of directors for each mode-specific transportation organization would ensure that the entity's funds are optimally used to improve system performance, asset condition and user experience of each transportation mode. Prompt implementation of these changes will increase subject-matter expertise in the governance of HTA and further insulate the board from political pressures.

In section 9.1, HTA commits to recruiting a new Board of Directors as part of the fiscal measure. The current Board of Directors is majority government stakeholders; however, to become a successful, independent governing authority, HTA should change the Board structure to include a majority of independent expert perspectives. Accomplishing this fiscal measure will allow HTA to ensure that technical experience governs project selection and execution, aligned with the broader aims of the island-wide transportation sector reform.

Exhibit 6: Required Implementation Actions for Recruiting a new Board of Directors for HTA

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Create new Board of Directors for HTA** | Engage law firm to assist in legislative process | HTA | September 30, 2021 (Delayed) |
| | Share draft of Law enabling the appointment of the Board with FOMB | Commonwealth | December 31, 2021 (Delayed) |
| | Approve Law enabling the appointment of the Board | Commonwealth | February 28, 2022 |
| | Hire executive recruitment firm to identify potential independent Board members | HTA | May 31, 2022 |
| | Approve appointment of independent Board members | Commonwealth | September 30, 2022 |

*F: Maximize the Commonwealth's funding envelope through a more aggressive federal grants strategy and by improving bankability to attract private capital.*

Puerto Rico would benefit from a holistic strategy to maximize funding flowing into its transportation network. By establishing a federal funding strategy, attracting more private investment, and increasing ancillary revenue, HTA, alongside other agencies, can improve the transportation sector's financial health and invest more in service delivery and capital projects for public transportation users. To obtain Puerto Rico's proportional share of federal funds, transportation entities should have a proactive strategy to identify, apply for and pursue additional discretionary federal funding. Similarly, P3s and ancillary revenue are effective strategies to attract private investment into the transportation network.

20

The importance of these efforts has been magnified with the passage of the BIL, which increases the available pool of discretionary grant funding for which HTA can compete. If HTA were to get its "fair share" (i.e., 1%, comparable to Puerto Rico's share of the U.S. population), discretionary grant programs would add an additional $90 million per year for capital investments.

The "ringfence" approach (described in Recommendation A above) will support greater pursuit of P3 funding. The internal separation of toll assets will attract potential private operators and ease the transition of ownership and/or operations.

Section 11.7 establishes a strategy for HTA to maximize its access to funding under its "discretionary funds" fiscal measure and Section 11.3 identifies opportunities for HTA to enhance its receipt of ancillary revenues. Furthermore, Chapter 14 proposes approaches for more P3 opportunities to improve private funding. Each of these measures are critical as part of this reform in attracting non-Commonwealth revenue. These measures can be complemented by HTA working with AAFAF and P3A to ensure that there is a Commonwealth-wide P3 strategy that maximizes private funding as well. As part of this, HTA must review its portfolio of projects, determine which of those may be eligible for P3 and improve the bankability of projects as necessary to maximize the availability of non-Commonwealth funding.

Exhibit 7: Required implementation actions for maximizing HTA's funding

| Measure | Action item | Responsible party | Deadline |
|---------|-------------|-------------------|----------|
| Improve ancillary revenue | Hire ancillary revenue management team | HTA | December 31, 2021 (Delayed) |
| | Begin a campaign to acquire ancillary revenue increases (e.g., advertising) | HTA | February 28, 2022 |
| | Begin coordination with third parties for ancillary revenue increases that require contracting (e.g., rentals) | HTA | March 31, 2022 |
| | Begin ancillary revenue increases that require long-term planning and complex legal agreements (e.g., joint real estate development initiatives) | HTA | June 30, 2022 |
| | Develop a comprehensive ancillary revenue strategy, which will include a full asset inventory and an analysis of administrative constraints and submit to FOMB for review | HTA | June 30, 2022 |

21

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Collect discretionary grants** | Hire discretionary grant management team | HTA | December 31, 2021 (Delayed) |
| | Begin preparing discretionary grant applications and collecting all necessary supporting documents | HTA | March 31, 2022 |
| **Pursue P3 opportunities** | Evaluate and prioritize potential areas for additional P3s led by 3rd party. | HTA/P3A | August 31, 2021 (Delayed) |
| | Finalize due diligence process and desirability and convenience study. | HTA/P3A | September 30, 2021 (Delayed) |
| | Propose governance structure for oversight of P3 transaction process | HTA/P3A | April 30, 2022 |
| | Evaluate different potential deal structures using variety of scenarios within fiscal plan constraints. Finalize and share with FOMB detailed opportunity by opportunity execution plan for prioritized P3 opportunities. | HTA/P3A | April 30, 2022 |
| | Launch RFP(s) for prioritized P3 | P3A | Based on execution plan and aligned with legal constraints |
| | Begin first new P3 agreement | HTA/P3A | Based on execution plan and aligned with legal constraints |

*Tracking Progress Towards Outcomes*

By directly implementing, or assisting the Commonwealth in implementing, these recommendations, HTA will have more capacity to improve the transportation sector and deliver better outcomes for the citizens of Puerto Rico. To ensure that HTA and the Commonwealth are making concrete progress, HTA must collect and track relevant metrics on the outcomes of the system. An example of an outcome-based scorecard is provided below.

HTA_CONF 00012917

**Exhibit 8: An example outcome-based scorecard**

| Objectives | Impact metrics | Current PR performance | US median performance |
|---|---|---|---|
| Performance & Condition | Road condition: % of interstate pavement in poor condition | 12 | 2 |
| | Transit revenue generation: Non-fare directly-generated funding as % of total | 12.3 | 23.7 |
| | Train system condition: # of failures per 1M revenue mile | 373 | 55 |
| Experience & Efficiency | Driving experience: Hours lost to congestion per person per year | 58 | 54 |
| Sustainability & Resilience | Sustainable commuting options: % sustainable mode share | 22% | 27% |
| | Road safety: Road fatalities, # per 100M VMT | 2.0 | 1.1 |
| | Air quality: Days with AQI > 100 | 19 | 4 |

The recommendations are building blocks towards a vision for Puerto Rico's transportation sector that enhances safety, condition, performance, and sustainability. Implementation of the outlined recommendations and execution steps therein will result in a well-performing public transportation system, which can ultimately catalyze economic growth for the people of Puerto Rico. Improving the transportation system will be a gradual process that builds momentum over time as outcomes are incrementally realized through implementation of these recommendations. Nonetheless, by ensuring that operating assets are used efficiently, and projects are delivered on time and on budget, Puerto Rico can recycle savings back into the system. These improvements will ultimately have an impact on every user of the transportation network, supporting shorter, more predictable commutes; improved road safety; and cleaner air. With key investments and dedicated management, HTA and the other transportation authorities can build a safer, more sustainable, and more livable environment for its residents.

23

HTA_CONF 00012918

# PART III – DESCRIPTION OF HTA

## CHAPTER 2: HTA MISSION, HISTORY & VISION

### 2.1 HTA's Mission and Vision

HTA is a public corporation and government instrumentality of the Commonwealth of Puerto Rico, under the oversight of Puerto Rico's Department of Transportation and Public Works (DTOP, by its Spanish acronym). HTA is responsible for the operation of toll roads and the construction of roads, highways, and related transportation facilities in Puerto Rico. Furthermore, HTA is responsible for San Juan's metro system, TU, as well as its network of feeder buses.

HTA aims to facilitate movement of vehicles and individuals; ensure access to highways in good condition; alleviate the dangers and inconveniences of traffic congestion; improve the safety of the Commonwealth's highways; and address Puerto Rico's demand for improved transportation infrastructure. HTA strives to develop an integrated transportation system that promotes Puerto Rico's economic development in harmony with the environment.

HTA's mission is to support the economic development of Puerto Rico through an integrated transportation network, prioritizing safety, environmental responsibility and excellent service delivery focusing on:

1. **Safety:** Promote the safe and easy movement of vehicles and individuals.

2. **State of Good Repair:** Reach and maintain SOGR to ensure the people of Puerto Rico have access to quality roads and modes of transportation.

3. **Economic Development:** Contribute to the development of Puerto Rico.

4. **Resilience:** Build a strong, resilient road network by strengthening assets that are prone to natural disasters.

HTA must accomplish its mission through the following actions:

1. Plan and execute construction projects on Puerto Rico's highways;

2. Identify and implement strategies for addressing demand for improved transit and transportation facilities;

3. Contribute to the development and implementation of Puerto Rico's transportation plan and sector reforms;

4. Determine, impose, adjust and collect tolls;

5. Promote the development of the transit system and surrounding areas.[23]

---

[23] Article 2 and 4, Act No. 74 of June 23, 1965, as amended, known as the "Puerto Rico Highways and Transportation Authority Enabling Act"

24

### 2.2 History and Responsibilities of HTA

HTA was created by Act 74 of June 1965 to build Puerto Rico's highway network (the local equivalent of both US routes and Interstate), part of the system developed in the continental United States during the 1950s and 1960s. It has since evolved to adopt responsibilities beyond serving as the agency responsible for the construction of the state system and management of the toll roads. In 1990, through Act 4, HTA was designated to implement P3 contracts for the construction, operations and maintenance of highway, bridges, avenues, and other traffic installations. In this capacity, HTA completed the Teodoro Moscoso Bridge in 1994, the first P3 under U.S. jurisdiction. In 1991, under Act 1, the old Highway Authority became HTA, an integrated transportation authority that is now the principal promoter and developer of transportation on the Island. Though HTA originally was created to manage the toll network, HTA has grown to manage the highway network, TU transit system and feeder bus system. Today, HTA both constructs new roads and maintains its existing network of toll and non-toll roads and supports other public entities (e.g., municipalities) with the management of federal construction grants and the delivery of capital projects. In the future, these responsibilities will shift as the transportation reforms, described in Chapter 1, are implemented.

### 2.3 HTA's Transportation Network

Puerto Rico's road system consists of 11,653 non-municipal lane-miles of roads, of which 10,556 lane-miles are owned by DTOP and 1,097 lane-miles are owned by HTA (see Exhibit 9).[24] HTA-owned roads include 9.1% of state lane miles and transport 23.0% of the state roads' demand. Administrative responsibilities for construction and maintenance of roads are not allocated based on ownership. HTA is responsible for the operations and maintenance of 6.5% of highway lane-mileage, while being responsible for construction on 97.0% of highway lane-mileage, managing construction on behalf of DTOP for many roads.[25]

#### Exhibit 9: Toll and Non-Toll Road Mileage in Puerto Rico

| Toll roads vs. Non toll roads in Miles | | | | | | |
|---|---|---|---|---|---|---|
| | Sum of length | Sum of % length | Sum of Lane Miles | Sum of % Lane Miles | Sum of VMT | Sum of % VMT |
| Non toll road | 4,654.3 | 95.2% | 10,595.6 | 90.9% | 36,088,503.4 | 77.0% |
| Toll road | 236.4 | 4.8% | 1,057.7 | 9.1% | 10,772,645.6 | 23.0% |
| Total | 4,890.7 | 100.0% | 11,653.3 | 100.0% | 46,861,149.0 | 100.0% |

---

[24] Based on 2020 HPMS. The HPMS is a national level highway information system that includes data on the extent, condition, performance, use and operating characteristics of the nation's highways. The HPMS contains administrative and extent of system information on all public roads, while information on other characteristics is represented in HPMS as a mix of universe and sample data for arterial and collector functional systems. Limited information on travel and paved miles is included in summary form for the lowest functional systems. HTA collects data on 4,000 road segments on a continuous basis to comply with Federal regulations.

[25] Construction and major reconstruction of the state system and operations and maintenance of the toll roads was assigned to HTA by Act 74 of June 1965.

25

HTA_CONF 00012920

### Exhibit 10: Construction Responsibility by Agency

| Construction responsibility in Miles | | | | | | |
|---|---|---|---|---|---|---|
| | Sum of length | Sum of % length | Sum of Lane Miles | Sum of % Lane Miles | Sum of VMT | Sum of % VMT |
| Abertis | 1.3 | 0.0% | 9.5 | 0.1% | 89,330.8 | 0.2% |
| Metropistas | 73.2 | 1.5% | 344.4 | 3.0% | 4,700,537.3 | 10.0% |
| HTA | 4,816.2 | 98.5% | 11,299.5 | 97.0% | 42,071,280.9 | 89.8% |
| Total | 4,890.7 | 100.0% | 11,653.3 | 100.0% | 46,861,149.0 | 100.0% |

### Exhibit 11: Operations and Maintenance Responsibility by Agency

| Operations and maintenance responsibility in Miles | | | | | | |
|---|---|---|---|---|---|---|
| | Sum of length | Sum of % length | Sum of Lane Miles | Sum of % Lane Miles | Sum of VMT | Sum of % VMT |
| Abertis | 1.3 | 0.0% | 9.5 | 0.1% | 89,330.8 | 0.2% |
| DTOP | 4,649.4 | 95.1% | 10,546.8 | 90.5% | 35,128,085.3 | 75.0% |
| Metropistas | 73.2 | 1.5% | 344.4 | 3.0% | 4,700,537.3 | 10.0% |
| HTA | 166.8 | 3.4% | 752.7 | 6.5% | 6,943,195.5 | 14.8% |
| Total | 4,890.7 | 100.0% | 11,653.3 | 100.0% | 46,861,149.0 | 100.0% |

HTA manages tolling facilities on four major roads on the island (PR-20, PR-52, PR-53, and PR-66). As of February 2022, two additional toll roads (PR-5 and PR-22) and the Teodoro Moscoso bridge are managed and operated by Metropistas, a concessionaire. Part of the proposed transportation sector transformation includes supporting the P3A in studying potential P3s of the remaining toll roads.

### Exhibit 12: Map of Puerto Rico's highway system



In addition to road management, HTA also operates transit assets including TU, San Juan's heavy rail system, and its associated feeder buses. Completed in 2004, TU is the Caribbean's first urban rapid transit system. It consists of a single line of 10.7 miles with sixteen stations from Bayamón to Sagrado Corazón in downtown San Juan.[26] Most of the system is elevated with a 1.1-mile tunnel section in the Rio Piedras district.

---

[26] US General Accounting Office, Review of the Tren Urbano Finance Plan, p. 1 (Tren Urbano was initially estimated to cost ~$1.25B) / FHWA, Project Profile: Tren Urbano, Found online at: https://www.fhwa.dot.gov/ipd/project_profiles/pr_tren_urbano.aspx (Tren Urbano ended up costing ~$2.25B).

26

HTA_CONF 00012921

HTA is one of three agencies that manage the operation of public transportation assets in the San Juan metropolitan area. PRITA operates the main bus network of San Juan and Maritime Transport Authority (ATM) operates the ferry between Old San Juan and Cataño.

The management of multiple transportation assets and lack of asset-class specific ownership and responsibility contribute to a lack of integration and coordinated planning by mode across the Island. HTA's mandate beyond the toll road management creates potential overlap with other transportation agencies, which contributes to lagging performance outcomes across the entire system. This overlap should be addressed through the broader transportation sector reform outlined in Chapter 1.

### 2.4 Governance and Organizational Structure

### Current Organizational Structure

HTA is a government instrumentality overseen by DTOP and the HTA Executive Director reports to the Secretary of DTOP and HTA's Board of Directors. The Authority is led from the Office of the Executive Director and currently follows the organizational structure shown in Exhibit 13.

HTA has a Board of Directors, which guides HTA's overall strategy and aids in priority-setting. HTA's Board is composed of the DTOP Secretary, the President of the Puerto Rico Planning Board, the Executive Director of AAFAF and the Treasury Secretary. Three remaining positions, intended to be filled by industry professionals, are currently vacant. Board members currently serve terms of unlimited duration. Chapter 10 provides further details on how this Board should be optimized to enhance HTA's governance and build deeper industry expertise in the oversight of the Authority.

In January 2018, HTA had 1,283 employees. Since then, 373 employees enrolled in one of the three phases of the voluntary transition program ("VTP"), while HTA witnessed a net attrition of 74 employees. Currently, HTA has 836 employees distributed across 16 administrative areas (which are distinct from the fields in the organizational hierarchy).[27] Below is the breakdown of the Authority's employees by area:

---

[27] Employee data comes from HTA's payroll file as of December 2021. Classification of administrative areas does not fully match divisions in HTA org chart due to ongoing organizational changes that HTA has to undertake as part of its MOU with FHWA.

HTA_CONF 00012922

**Exhibit 13: Current Organizational Structure of HTA**



**Exhibit 14: Current HTA personnel by division (as of December 2021)**

| Division | Number of employees | Division | Number of employees |
|---|---|---|---|
| Area of Tren Urbano | 11 | Area of Infrastructure Support | 12 |
| Area of Highway Administration | 73 | Area of Infrastructure Technology | 8 |
| Area of Planning & Special Studies | 42 | Area of Human Resources | 24 |
| Area of Traffic Engineering | 24 | Area of Administration | 38 |
| Area of Property Acquisitions | 20 | Area of Administration & Finances | 33 |
| Area of Design | 23 | Area of Executive Director | 14 |
| Area of Construction | 374 | Divisions outside HTA | 93 |
| Area of Engineer Services | 47 | | |

SOURCE: HTA December 2021 Fiscal Plan submission

### 2.5 Key Performance Indicators (KPIs)

Improving the safety, condition and performance of the transportation system are central to HTA's mission as a transportation authority. Delivery on the capital program, in particular

28

reaching and maintaining SOGR[28] for the road network, is a strategic priority. By most metrics, HTA lags its mainland peers and must make substantial improvements in performance across the board, rather than modest incremental improvements in selected areas. For example, fatalities remain two times that level of mainland peers, the share of the network in good condition is one fourth of the share of peers, and San Juan remains among the most congested metros in North America. Radical improvements are paramount in these performance metrics, including HTA's ability to deliver on strategic priorities in the capital program. The historic level of capital investment proposed in the 2022 HTA Fiscal Plan will support HTA in its continued improvement on these metrics.

**Exhibit 15: Puerto Rico's performance against KPIs [29]**

| | Progress required according to this Fiscal Plan | | |
|---|---|---|---|
| Metric | Current PR performance (2020) | Minimum FHWA requirements[3] | Target performance (US Median in 2020) |
| Road fatalities (per 100M of annual VMT) | 1.89 | 1.85 | 1.37 |
| % of Pavement in Good Condition (Interstate)[1] | 13 | 2 | 84 |
| % of Pavement in Poor Condition (Interstate)[2] | 14 | 5 | 2 |
| % of Pavement in Good Condition (Non-Interstate)[1] | 4 | 2 | 57 |
| % of Pavement in Poor Condition (Non-Interstate)[2] | 8 | 20 | 10 |
| % of Bridge Deck Area in Poor Condition | 9 | 10 | 5 |

1 Good Condition: International Roughness Index (IRI) of less than 95 / 2 Poor Condition: IRI of more than 170 / 3 As featured in the FY19 Certified FP

Lagging performance not only impacts everyday citizens of Puerto Rico by adversely affecting the transportation network's ability to efficiently move goods and people, it also creates risks such as lack of federal funding compliance. HTA is expected to continue progress towards achieving target performance across these metrics. Failure to meet FHWA requirements results in financial penalties imposed by FHWA, which can then impact capital program investments. HTA has been in violation of FHWA requirements for interstate pavement condition over the last two years, but its continued investments will further its ability to bring the network to SOGR.

---

[28] The exact definition of the term is left to the discretion of State DOTs. However, FHWA has defined SOGR in the context of exercises. This definition is the following: 97% of Interstate pavement in Good or Fair Condition, 85% of Non-Interstate National Highway System (NHS) pavement in Good or Fair Condition and 75% of Non-Interstate Non-NHS pavement in Good or Fair Condition. Good Condition is, in turn, defined as having an International Roughness Index (IRI) score of less than 95 and Fair Condition is defined as having an IRI score of less than 120. FHWA exercise found online at: https://www.fhwa.dot.gov/asset/guidance/hif19006.pdf

[29] Reporting period for Current PR Performance as of June 30, 2020, from PRHTA B2A (December 2021)

29

HTA_CONF 00012924

To improve delivery of these metrics, the 2020 HTA Fiscal Plan required the Authority to identify more granular KPIs for each specific construction project, that was submitted to FOMB to approval by August 30, 2021. In compliance with the implementation actions for adopting and revising KPIs, HTA recommended a set of project level KPIs under multiple categories to provide more granularity in terms of the Capital Improvement Plan (CIP) performance. Upon review of the set of recommended project level KPIs, such were ultimately approved by the FOMB on October 18, 2021. Please refer to Chapter 6 for a detailed overview of the approved project level KPIs.

HTA must submit an annual report every May to the FOMB, describing its past progress and laying out its targets for the upcoming year across the metrics laid out above. Additional reporting requirements are further described in Appendix B of the 2022 HTA Fiscal Plan.

### 2.6 The Future of HTA & Puerto Rico's Transportation Sector

The transportation sector's continued underperformance across a range of outcomes underscores the importance of transformation of HTA and the rest of the transportation sector. Transformation of this scale is both possible and precedented.[30] HTA will improve and transform transportation outcomes for residents of Puerto Rico by meeting or exceeding fiscal measures and supporting the Commonwealth-wide transportation sector reforms.

The reforms outlined in Chapter 1 will allow HTA to focus its efforts on exclusively managing and operating its toll roads. Furthermore, through these reforms, HTA will have the opportunity to improve its processes through improved project management, increased discretionary

## CHAPTER 3: RELATIONSHIP WITH COMMONWEALTH, FOMB, FHWA, FTA AND EFL

### 3.1 Relationship of HTA with the Commonwealth

Due to its role delivering transportation infrastructure projects, HTA has historically received significant fiscal support from the Commonwealth. Before 2015, HTA received appropriations of revenues from the cigarette tax, gasoline tax, diesel tax, petroleum tax, vehicle license fees collected by the Commonwealth. In 2015, the sitting Governor issued Executive Order 2015-046, pursuant to which the Commonwealth began retaining these revenues. As a result, the Commonwealth started making two appropriations: a) a capital expenditure appropriation and b) a general transfer. To ensure HTA had enough resources to fund necessary maintenance and capital expenditures to keep Puerto Rico's transportation system operational, the Commonwealth started making two new, main appropriations: a) a capital expenditure

---

[30] Across the US and Latin America, there are multiple examples of successful transportation reforms that have yielded substantial improvement of transportation outcomes. Bogotá, for example, successfully integrated an industry of private bus operators into a new large-scale Bus Rapid Transit ("BRT") network, TransMilenio, in the early 2000s. TransMilenio led to a 32% reduction in travel times, 92% decrease in road deaths and 40% reduction in some air pollutants.

In 2002, Florida transformed its transportation department by combining all toll roads under a single entity and seeking private sector funding and support for many of its operational functions. Since 2013, the Florida Department of Transportation has seen a 5.8% compounded annual growth rate in toll revenues, with 2019 toll revenues of $932 million, up from $663 million in 2013.

In 1995, Virginia created its public-private partnership ("PPP") office, which has catalyzed at least $10.2 billion of transportation investment since its inception—the highest in the US.

30

HTA_CONF 00012925

appropriation, designed to help HTA advance its infrastructure priorities; and b) a general transfer, intended to be used by HTA solely to fund the operational expenses and capital needs of HTA's non-toll assets, in line with Section 5.2.6 of the Commonwealth Certified Fiscal Plan. As a result, over FY22-FY51, the 2022 HTA Fiscal Plan includes an average annual general unrestricted appropriation of $109 million and average capital appropriation of $67 million per year. The HTA operating transfer is intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes. The existence of these appropriations is subject to revision, in line with the broader priorities of the Commonwealth. The Commonwealth is unable to fund larger or additional appropriations to HTA (or re-establish appropriations of the retained tax revenues discussed above) given its own fiscal challenges, as set forth in the Commonwealth's 2022 Certified Fiscal Plan.

### 3.2 Relationship of HTA with the FOMB

In 2016, the US Congress enacted the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") to address a fiscal emergency in Puerto Rico. In enacting PROMESA, Congress found, among other things:

- A combination of severe economic decline and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies and excessive borrowing has created a fiscal emergency in Puerto Rico.

- As a result of its fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services.

- The current fiscal emergency has also affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents and businesses.

- A comprehensive approach to fiscal, management and structural problems and adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and a federal statutory authority of the Government of Puerto Rico.

Accordingly, PROMESA provided for the creation of the FOMB, which provides oversight to the Authority so that it will achieve fiscal responsibility and access to the capital markets. In May 2017, the FOMB filed a petition for relief under Title III of PROMESA in accordance with the requirements of section 302 of PROMESA for the purpose of adjusting its debts. The FOMB has determined that a successful restructuring of HTA's debts under a plan of adjustment and the viability of HTA going forward in accordance with the mandates of PROMESA will require HTA to undertake a series of initiatives (e.g., revenue enhancements, cost savings) that promote its fiscal responsibility, enhance quality of life, and promote economic growth through a reliable and accessible transportation system with professional and transparent governance. These initiatives are outlined as fiscal measures in HTA's Fiscal Plan, which is updated at the end of every Fiscal Year. These updates, including the updates reflected in this Fiscal Plan, reflect new macroeconomic, policy and technological developments and are certified by the FOMB after appropriate revisions are incorporated. The FOMB is responsible for monitoring progress of this Fiscal Plan by reviewing a series of reports that are submitted by HTA. The FOMB is also responsible for helping improve HTA's contract management practices through its contract review policy established in accordance with section 204(b)(2) of PROMESA. The FOMB reviews contracts with third parties, ensuring they promote market competition and are consistent with the Certified Fiscal Plan and Certified Budget.

31

HTA_CONF 00012926

### 3.3 Overview of Relationship with Federal Highways Administration

To fulfill its responsibilities as a transportation authority, HTA works closely with the FHWA. HTA receives an annual allocation of approximately ~$139 million after penalties from FHWA to execute capital projects. This allocation is included in federal legislation (FAST Act) and is projected to further increase by ~$19m per year over FY22-26 with the enactment of the BIL. Further to the above, new funding is occasionally made available to HTA, including Emergency Relief (ER) funds. The Federal-Aid Highway Programs (FAHP) is currently the primary source of funding for construction of Puerto Rico highways, roads, bridges, and streets. The FAHP is funded from the transportation user-related revenues deposited in the Federal Highway Trust Fund, primarily federal excise taxes on motor fuels along with excise taxes on tires, trucks and trailers and truck-use taxes.

The Federal-Aid Highway Program (FAHP) is a reimbursement program administered by HTA and assisted by FHWA. FHWA's relation with HTA is described in a "Stewardship and Oversight Agreement."[31] FHWA supports HTA to carry out highway construction when HTA's resources are limited due to unforeseen circumstances. For example, in the aftermath of Hurricane Maria, the Eastern Federal Lands Highway Division ("EFLHD") of FHWA executed two memoranda of agreement (MOAs) with HTA and FHWA Puerto Rico/US Virgin Islands ("USVI") Division to support HTA with the delivery of the ER program and accelerate the recovery of the Island. An overview of the MOAs is included in Appendix B. The first MOA, titled "Construction Engineering and Inspection Services for Highway and Bridge Projects," is for EFLHD to assist HTA in monitoring construction contractor performance and ensuring proper construction standards are adhered on HTA delivered construction ER program emergency contracts. EFLHD employees and consultants made recommendations to HTA regarding the suitability of completed work and contractor compliance with contracts. The second MOA, titled "Engineering and Construction Services for Bridge, Traffic Signage and Safety Improvements and Landslide Projects",[32] is for EFLHD to provide preliminary engineering, procurement, and construction engineering services of ER program permanent work for improvements related to damages caused by Hurricane Maria. The projects have been delayed due to the difficulties HTA and their consultants have experienced in completing and delivering the final designs, environmental permitting, utility coordination and ROW acquisition to EFLHD. These issues combined with the magnitude of the size of the program have prevented the projects from moving forward at a steady pace.

In terms of funding, of the $504.4 million in Hurricane relief funding allocated by FHWA, $241.8 million has been transferred to EFLHD. Of the remaining $262.6 million in hurricane relief funding made available to the Authority, ~60% ($155.6 million) has been disbursed.

---

[31] https://www.fhwa.dot.gov/Federalaid/stewardship/?CFID=164387233&CFTOKEN=7a4229de2767206b-9AFB817D-9DEB-10B1-9DDF1DD10B7433D1

[32] https://www.fhwa.dot.gov/prdiv/moa.cfm

HTA_CONF 00012927

**Exhibit 16: FHWA-allocated ER funding (as of June 30, 2021)**

FHWA Funds as of December 16, 2021

| Emergency addressed | Status, $M | | | |
|---|---|---|---|---|
| | Allocated Funds by FHWA | Transferred to EFL | Obligated to date | Spent to date |
| Hurricanes Irma and Maria | 504.4 | 241.8 | 262.6 | 155.6 |
| 2018 Tidal Waves | 1.8 | - | - | - |
| 2019 Heavy Rain Event | 6.4 | - | 5.4 | 3.2 |
| 2019 Karen Tropical Storm | 2.9 | - | 0.6 | 0.2 |
| January 2020 Earthquakes | 14.1 | - | 14.1 | 8.8 |
| Total | 529.6 | 241.8 | 282.5 | 167.8 |

FHWA and the US Department of Transportation (USDOT) also administer stimulus and discretionary grant programs, for which HTA is eligible.

The recently-enacted BIL provides an historic amount of capital funding for Puerto Rico—both through increases to formula funding and competitive, discretionary grant programs. Thus, HTA's focus on securing its fair share of competitive funding will take on increased importance. BIL also created a one-time (for the period of FY22-26) formula funded program for critical bridge repairs and investment, under which HTA is eligible for a minimum of $225 million ($45 million per year over five years). Finally, BIL expanded the size of the discretionary grant programs which are available to supplement HTA's formula funding. If HTA were to get its "fair share" of such funding (i.e., 1%, comparable to Puerto Rico's share of the U.S. population), discretionary grant programs would add an additional $90 million per year for capital investments.[33]

### 3.4 Memorandum of Understanding with FHWA and KPIs

*Memorandum of Understanding with FHWA*

To maintain its eligibility for designated Federal highway construction funding, the Governor of Puerto Rico signed an MOU with FHWA on February 29, 2016. The purpose of the MOU is to facilitate improvements to HTA's federal-aid billing procedure and enable HTA's ability to be suitably equipped and organized to meet federal requirements and to expedite project delivery. The MOU was required to maintain eligibility for designated federal highway construction funding in the face of persistent performance challenges, including a growing backlog of inactive obligations and unexpended balances.[34] This MOU specifies that HTA must undertake a series of improvements in the following areas:

---

[33] Figure reflects five-year (FY22-26) high-level estimate for the following programs: Megaprojects; RAISE; Safe Streets; Culverts; SMART; Bridge Program (competitive); INFRA; Reconnecting Communities; Low/no Emission Bus; Capital Investment Grants.

[34] As of September 2021, FHWA reported that HTA has 30.4% of inactive obligations while the national average is 1.5% and that HTA has ~$703M in unexpended balances, of which $129M are ER funds.

HTA_CONF 00012928

- **Federal Billing Procedures:** The MOU requires HTA to pay contractors with Electronic Funds Transfers (EFT) no more than 40 days after HTA receives their invoices. HTA must also track the status of payments in an electronic method that is acceptable and accessible to FHWA. In May 2016, HTA established a procedure to pay contractors with EFTs. Currently, HTA is paying Contractors within 40 days. For the long-term functionality of the billing procedures, HTA is planning to process invoices and certifications for payments through Project Management Information System (PMIS) and Integrated Contract Management Module (ICMM). During December 2021, FHWA approved the Record of Authorization for HTA to proceed with the PMIS and ICMM integration.HTA is currently in the implementation of the system's integration modifications and it's running a pilot program in PMIS to upload legacy invoices and certifications.

- **Toll Credits:** The MOU requires FHWA to identify the amount of toll credits available for HTA use and ensure its toll credit balance is in compliance with current FHWA guidance. The MOU also requires HTA to modify its processes for approving, tracking and reconciling toll credit usage. In December 2021 the SOP 09-11-06 "Procedures for the Use of Toll Credits" was approved. HTA is planning to incorporate the Toll Credits balance and usage through PMIS and has started a pilot program to include projects into the system.

- **Organizational Capacity:** The MOU requires HTA to develop a Request for Proposal ("RFP") to procure a management consultant. The consultant would help the Authority become a more efficient organization by improving its systems, procedures, structure, and bylaws. The MOU requires: (1) the selected consultant to prepare a recommendation report; and (2) HTA to submit the report to FHWA along with an implementation schedule for the accepted consultant's recommendation. In March 2019, HTA submitted the implementation schedule to FHWA. In August 2020, HTA received a draft of the Classification and Compensation Plan developed by the consultant but in October 2021 the plan was still in a draft version and was not finished yet. As soon as the plan is completed and approved the implementation date will be reviewed. HTA has already delineated a plan to prioritize the review and updates to the SOPs related to the delivery process.

- **Project Delivery:** The MOU requires HTA to identify the reasons behind delays in obligated projects and submit a schedule of milestones that would accelerate federal aid allocations. The MOU also requires HTA to improve email communications, electronic project monitoring and financial billing. As of May 2020, HTA had fulfilled the requirements to accelerate project obligations. At the end of federal FY21 (September 2021), HTA obligated $229.2M, representing 103.8% of the FY21 allocations which included $35M in CRSAA, $13M of the Omnibus Bill and 50% from FY20 carryforward. The obligated amount represents 144.3% of the regular annual allocations. The Authority has installed a new email communication system and improved its information systems, including an upgrade to a series of modules related to Human Resources, Inventory, and Contract Management. HTA has not finished the renovation of its project management information system, which is expected to be completed in early FY23. This

HTA_CONF 00012929

is particularly critical as HTA expends unexpended balances and seeks to deliver full disbursement expectations in the future.[35]

HTA must continue to take all steps necessary to build upon the progress to date. All of the requirements of the MOU must be completed according to the timelines established by FHWA without further delay. Given that the implementation of the MOU is critical for the continuation of HTA's status as a federal grantee and for the uninterrupted development of infrastructure in Puerto Rico, it will be monitored on a monthly basis by the FOMB. Furthermore, HTA must fulfill the FHWA reporting requirements (Exhibit 13) to maintain and achieve SOGR. The status of these metrics and HTA's performance is outlined further in Chapter 4.

#### Exhibit 17: FHWA reporting requirements

| FHWA reporting requirements | | | |
|---|---|---|---|
| Measure area | Performance measures | FHWA reporting cadence | FOMB reporting cadence |
| PM1: Safety | • Number of fatalities / serious injuries<br>• Fatalities / serious injuries per million vehicle miles traveled<br>• Number of non-motorized fatalities and non-motorized serious injuries | • Annual<br>• HSIP reporting with:<br>— Targets and how they support SHSP[1]<br>— Outcomes | • Annual |
| PM2: Pavement Condition | • Percentage of pavements of the Interstate System in Good/Poor condition<br>• Percentage of pavements of the non-Interstate NHS in Good/Poor condition | • Annual, 4 year perf. period<br>— Baseline<br>— Mid-period<br>— Full performance | • Biennial |
| PM2: Bridge Condition | • Percentage of pavements of the NHS System in Good/Poor condition | • State and MPO reports<br>• USDOT report to congress | |
| PM3: System Performance | • Interstate/Non-Interstate Travel Time Reliability Measure: Percent of person-miles traveled on the Interstate that are reliable | • Biennial, 4 year perf. period<br>— Baseline<br>— Mid-period<br>— Full performance | • Biennial |
| PM3: Freight Movement | • Freight Reliability Measure: Truck Travel Time Reliability (TTTR) Index | • State and MPO reports on performance | |
| PM3: Traffic Congestion | • Peak Hour Excessive Delay (PHED) Measure: Annual Hours of Peak Hour Excessive Delay (PHED) Per Capita<br>• Non-Single Occupancy Vehicle Travel (SOV) Measure: Percent of Non-Single Occupancy Vehicle (SOV) Travel | • USDOT report to congress | |

### 3.5 Overview of Relationship with the Federal Transit Administration

Since its inception, HTA has assumed the ownership and operation of TU, San Juan's metro line. To support the operations of TU, HTA receives an annual operational allocation of $20 million from FTA. This amount is occasionally supplemented by one-off grants that help HTA perform capacity or efficiency improvements (e.g., installation of a new communications system) and transit-related ER projects (e.g., vehicle repair). The BIL increased FTA formula funding allocations to transit agencies across the country. Although the precise allocation to HTA is not yet clear, HTA is estimated to receive an incremental ~$1.6 million per year, based on its current capital needs and disbursement capacity.

As HTA advances efforts to transfer ownership and operation of TU to PRITA, per the reforms indicated in Chapter 12 of the Commonwealth Certified Fiscal Plan, the Authority will also need to ensure FTA grantee status is transferred as well as the relevant staff, capabilities and

---

[35] HTA has made progress in improving its rate of disbursements for regular capital expenditures, from 29% in FY19 to 88% in FY21. Potential for improvement remains, however, in Emergency Relief expenditures: in 2016, HTA's unexpended balances were at $460M with Emergency Relief funding. As of September 2021, HTA's unexpended balances are at $703M.

HTA_CONF 00012930

expertise. Additional funding from the CARES Act and funding from the American Rescue Plan ("ARP") may provide additional transit funding through the FTA. These funds would be used to cover preventive maintenance costs for the TU, additional funding for the automated fare collection ("AFC") improvements, operational costs and capital improvement projects.

## CHAPTER 4: IMPACT OF HURRICANE MARIA, EARTHQUAKES & COVID-19

### 4.1 Overview of impact of natural catastrophes

Since FY18, Puerto Rico has been hit by a series of unforeseen emergencies: the most destructive hurricanes that has passed through the Island in the past century; several earthquakes with a magnitude of more than 5; and a pandemic that has necessitated a practical shutdown of economic activity and dramatically reduced road utilization. These catastrophes have collectively affected the operating revenues and capital delivery of HTA.

**Exhibit 18: Historical and Projected Disbursements of Federal Emergency Funding**

Federal and Local Emergency Relief Funds, FY19-26

| ER Funding Source, $M | FY19 | FY20 | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|---|---|---|
| Federal ER Funds (FHWA) | 71 | 42 | 20 | 34 | 59 | 65 | 30 | 22 |
| Federal ER Funds (FEMA) | - | - | - | 2 | 12 | 2 | - | - |
| Federal ER Funds (CARES) | - | - | - | 17 | - | - | - | - |
| Total Emergency Relief Funds | 71 | 42 | 20 | 53 | 71 | 67 | 30 | 22 |

To address the impact of these catastrophes, HTA has disbursed approximately $133 million in emergency funding as of June 2021 and expects to disburse an additional $241 million in emergency funding from FY22 to FY26.

### 4.2 Impact of Hurricane Maria on HTA Activities

Puerto Rico's highways suffered significant damage following Hurricane Maria, prompting the issuance of 1,175 Detailed Damage Inspection Reports (DDIRs).[36] Roads and bridges were damaged and several stations of TU were rendered inoperable, causing TU to stop running for a period of three months. In addition to the damage of HTA's transportation systems infrastructure, HTA's operating revenues also declined as a direct result of the hurricanes combined destruction.

---

[36] DDIR forms are required to be submitted to the FHWA to determine if the event qualifies as an emergency relief (ER) disaster, establish the estimates for the eligible ER disaster damages and outline the scope of work through adequate location and description of damage information.

HTA_CONF 00012931

HTA's operating revenues consist primarily of toll and train fares. Due to the hurricanes effects on HTA's tolling system, Puerto Rico was forced to suspend fine collection, which was already a pre-existing problem for Puerto Rico due to pre-existing collection system deficiencies. Toll fare receipts have returned to pre-disaster levels; however, toll fine receipts are still lagging. The lag in toll fine receipts is due to fines not being restored until July 2021, period in which HTA resumed fine collections. Through December 2021, HTA has collected $20.5 million in toll fines, which is significantly more than year to budget for that period ($8.1 million). Similarly, transit ridership on the TU fell by almost 30% after the hurricanes[37] and has yet to recover to its pre-hurricane ridership levels as of June 2021, which are still 78% below pre-hurricane levels, mainly attributable to the COVID-19 pandemic.

HTA has disbursed ~60% of the emergency repairs associated with Hurricanes Irma and María. Over FY22-26, the delivery of the ER program must be accelerated. The improvements that have not yet been completed by HTA include a modular bridge installation, landslide repairs, bridge scouring repairs, safety device installation and other highway reconstruction projects. Proposals have been submitted for the first permanent repair projects associated with signage, safety and lighting improvements.

On January 7, 2020, an earthquake with a magnitude of 6.4 caused significant damage throughout Puerto Rico's south and southwestern region, prompting the closure of segments of roads, including short segments of two major roads: PR-52 (km 106 in Ponce), PR-2 (km 218 at Peñuelas and km 153.9 in Mayagüez). As a result, the Federal Government classified several municipalities as major disaster areas.[38]

All roads were promptly opened using FHWA ER funds, including an initial $5 million allocation of quick release from ER funds. Initially, HTA had estimated the damages to these roads to be approximately $26.1 million, including both emergency and permanent repairs.[39] For these repairs, the FHWA allocated $14.1 million, ~60% of which ($8.8 million) have already been disbursed by HTA. In addition, approximately $3.6 million is estimated to require state funds, mostly for permanent repairs, matching and engineering services. HTA also plans to begin the design of permanent repairs for major structure rehabilitation and replacement, as well as sites where rockfall and landslides were experienced.

### 4.3 Impact of COVID-19 on HTA activities

The onset of COVID-19 in March 2020 quickly and dramatically impacted HTA's operations and financial performance. The below exhibits show the impact of lockdowns on monthly toll road transactions, TU ridership and capital project delivery. As the below exhibits indicate, HTA's four toll roads experienced a forty-five percent (45%) decline in the number of monthly toll transactions, dropping from 10.3 million per month[40] on average in toll transactions prior to

---

[37] HTA Tren Urbano Ridership Data, comparing 12 months before Hurricane Maria with 12 months after Tren Urbano operation was restored.

[38] The municipalities of Ponce, Guánica, Guayanilla, Yauco, Utuado, Peñuelas, Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San German, San Sebastian and Villalba were declared as major disaster areas as a result of the January 7, 2020 earthquakes.

[38] Damage estimates included herein are based on events and preliminary designs to date and thus may increase in future.

[40] Average monthly transactions for the six-month period from September 2019 through February 2020 (prior to COVID-19).

HTA_CONF 00012932

COVID-19, to an average of 5.6 million per month[41] during the height of the pandemic. Nonetheless, fiscal year 2021 and 2022 monthly toll transactions have been noted to approximate pre-COVID levels, reaching a monthly average of 9.8 million toll transactions for 2021[42], and 10.7 million toll transactions for fiscal year 2022 through December 2021.

**Exhibit 19: Monthly Toll Transactions for HTA-operated Toll Roads, FY20, FY21 & FY22 YTD**



Monthly toll transactions on PR-20, PR-52, PR-53 and PR-66, Millions

Transit assets experienced an even more dramatic decrease, given TU and feeder bus service were entirely shut down from mid-March until July 2020 and again in August and September 2020. Contrary to toll transactions, transit demand showed slower improvements, as the average monthly TU revenues remained approximately 64% below their pre-COVID levels for fiscal year 2021[43], although fiscal year 2022 has shown more consistent improvements.

COVID-19 has also caused significant delays in construction project schedules, leaving HTA unable to achieve its target KPI for project duration. As of March 31, 2020, post-María repair projects presented a 22.8% increase in project duration, originally was within the KPI target.[44] While HTA continues to monitor the effects of the COVID-19 pandemic on its capex program, the projected duration on the post-hurricane repair projects have been noted to increase to 64.3%[45], which does not meet the "on-time" delivery target for the project duration metric. The

---

[41] Average monthly transactions for the three-month period from March 2020 through May 2020 (COVID-19 shutdowns).

[42] Average monthly transactions for the twelve-month period from July 2020 through June 2021 (post-lockdown period).

[43] When comparing the six- month period from September 2019 through February 2020 (prior to COVID-19) against the six-month period from January 2021 through June 2021 - most recent six months for fiscal year 2021, which pertain to the post-lockdown period.

[44] KPIs as established within HTA's MOU with FHWA set the target for change in duration (program level) to be acceptable at <25%.

[45] As reported in HTA's B2A reporting for the month ended June 30, 2021.

HTA_CONF 00012933

significant increase is largely attributable to fifty-six days of lockdown-required extensions and projected additional delays.

**Exhibit 20: Monthly Transit Revenues for TU, FY20, FY21 & FY22 YTD**



HTA has enacted and implemented standard operating procedures (SOPs) to operate effectively under the present conditions, allowing HTA to partially mitigate the impact of the pandemic and the lockdown. HTA has established procedures to make payments to critical contractors, consultants and suppliers both during the lockdown and upon resumption of construction and other field operations, upholding the terms of the MOU with FHWA. Despite the lockdown, contractors have continued to retain and pay their workforce. Expediting payment for work completed is a priority to mitigate extended negative economic impact during the lockdown and keep contractors' financial condition more stable. HTA also implemented remote procedures for documentation required when partial field operations resume, including requests for information (RFIs), Change Orders (COs) and Extra Work Orders (EWOs) and accepting electronic documents instead of physical copies. HTA has also created SOPs to maintain compliance with protocols and alignment of resources to manage the federal reimbursement process remotely.

Furthermore, HTA may have to address significant contractor claims due to the impact of COVID-19. The Agency is working closely with FHWA to determine the impact of these claims, which include extended overhead and extra cost for changed conditions. Due to the uncertainty about the validity of the claims, this risk is not reflected in the Certified Fiscal Plan.

39

# PART IV – INFRASTRUCTURE AGENDA

Given the current condition of the network and years of under-investment, HTA's capital program should prioritize investments to achieve and maintain a SOGR of roads and transit assets.[46] With a projected decline in population (reduction of ~913,000 people by 2051) and a declining gross national product (GNP) (~10% decline by 2051), a focus on SOGR, instead of enhancements to road networks, promotes an effective use of funding and optimizes existing transportation assets. In an era of decreasing economic activity, population and travel demand, the Authority needs to prioritize maintaining its existing roads, highways and bridges over building out additional capacity. Therefore, the primary goal of HTA's capital program should be to keep Puerto Rico's roads, highways, bridges and transit in SOGR. Projects that advance SOGR for assets will be prioritized under the Infrastructure Agenda and any projects with aims outside of SOGR improvement will be subject to stringent evaluation criteria.[47]

HTA's historical inability to achieve SOGR cannot be attributed to a lack of sufficient federal funding. HTA has repeatedly failed to deploy the full availability of its annual federal formula funding and historically has received far below its fair share of discretionary funds. HTA's historical underperformance in CapEx delivery can be mostly attributed to the lack of a robust project selection framework and of effective performance management mechanisms across capital project delivery lifecycle

The 2022 HTA Fiscal Plan calls the Authority to address these issues and implement comprehensive productivity improvements. These improvements would enable HTA to take advantage of available federal funding, which is expected to reach unprecedented levels given the enactment of the BIL. In doing so, HTA should clear its backlog of federally funded projects from prior years and maximize the use of its annual FHWA allowance. HTA should pursue Community Block Development Grants (CDBG-DR) to carry out special recovery projects that improve the condition of assets which have been significantly damaged by natural catastrophes during FY17-19. Lastly, HTA should actively explore other discretionary fund opportunities, such as INFRA (supporting projects with beneficial impact on economic development) and RAISE (boosting investments in safety and environmental sustainability). If HTA receives its fair share of discretionary federal grants, investment into the system would increase by ~$90m per year.

HTA has made notable recent progress in improving its rate of capital disbursements– particularly in FY20, when HTA was achieving ~90% and above of the plan before the onset of COVID-19. HTA's performance to date in FY22 sustains this progress, with ~89% of planned construction disbursements completed.

The 2022 HTA Fiscal Plan sets the level of capital investments for HTA based on several inputs. A historical analysis of HTA's recent capital spending disburses suggests an "upper limit" to its capacity: in the past four fiscal years, total disbursements have not exceeded $360 million in a given year, and "core highway" capital expenditures (total minus transit and emergency spending) have not surpassed $320 million. A third-party report recently commissioned by HTA further considers difference investment scenarios, with different implications on asset condition targets by year.

---

[46] See Chapter 5.

[47] See Chapter 6.

HTA_CONF 00012935

Taking these factors into consideration, a construction budget of $11.6 billion dollars is set aside for FY22-FY51. This level of investment enables HTA to achieve the performance benchmarks contemplated in the third-party report, forecasted to achieve SOGR of both toll and non-toll assets by 2039. The proposed capital improvement plan includes a "surge" level of investments through FY28, consistent with the 2021 Certified Fiscal Plan, to accelerate the investment in the system and address the backlog associated with years of prior underinvestment.

The 2022 HTA Fiscal Plan also assumes state funding for discretionary project soft costs in FY22, but no further state investments in projects that go beyond SOGR. Any such projects would need to be financed through federal discretionary grants. HTA should set up a dedicated team that will research available opportunities, identify projects well aligned with specific discretionary programs and develop projects and applications for these discretionary grants, as outlined in Chapter 11. Absent successfully securing these grants, the focus of the capital program should remain on achieving SOGR.

## CHAPTER 5: ACHIEVING A STATE OF GOOD REPAIR

### *5.1 Bringing HTA's roads to SOGR*

Currently, Puerto Rico is ranked 51 out of 52 for quality of roads in the United States, imposing economic costs on its residents, decreasing safety and increasing the overall cost of road maintenance.[48] Well-maintained roads reduce vehicle operating costs, bolster quality of life for residents who commute daily and make Puerto Rico more competitive both for tourism and major industries responsible for the movement of significant exports and imports. This makes improving the condition of Puerto Rico's roads a key part of the broader structural reforms the Commonwealth is undertaking to grow Puerto Rico's economy, attract investors, increase jobs, promote business and broadly encourage economic development. Furthermore, a more resilient infrastructure network will allow Puerto Rico to be better prepared for future natural disasters.

As of 2021, 14% of interstate pavement is in poor condition, above the 5% maximum limit specified by FHWA. Furthermore, only 13% of interstate pavement and 4% of non-interstate pavement in Puerto Rico are in good condition, which is significantly below the target performance of 84% and 57% respectively, indicating that much progress must be made for the remaining pavement to meet the needs of Puerto Rico's residents. To address the overall condition of road pavement, HTA should adopt project-level KPIs to achieve capital delivery progress towards meeting FHWA requirements and eventually, target performance.

According to the recent third-party estimate commissioned by HTA,[49] the agency's assets can reach minimum SOGR targets for roads and bridges by 2036 via spending $4.7 billion (hard costs). The 2022 HTA Fiscal Plan takes into account this third-party expert analysis, as well as peer state long-run capital expenditures (on a per lane mile basis) and HTA's fiscal

---

[48] Cost of maintaining the system frequently measured as "Lifetime Cost of Ownership," or the total cost of repairs for maintenance of a specific section of a highway or road. It is expected that letting roads deteriorate increases maintenance repairs in the long run, leading to higher total costs than if they would have been kept at SOGR.

[49] Analysis of investment needs for PRHTA Tolled and Non-tolled Highways, CMA Engineers, December 2021

HTA_CONF 00012936

necessities in the long term (I.e., capital investments cannot be made without a corresponding source of revenue).

Since FY19, HTA has made progress towards goal of SOGR, having disbursed an estimated $747 million.[50] Between FY22-39, the 2022 HTA Fiscal Plan calls for an annual average disbursement of $253 million (hard costs) to fully "catch up" with pavement SOGR targets. Thereafter, the Fiscal Plan calls for an average annual investment of $301 million in hard costs (see Exhibit 21).



As described in Chapter 14, new P3s on HTA toll roads have the potential to accelerate progress toward SOGR. The Metropistas P3 for PR-22 and PR-5 provides a reference example. Since 2011, Metropistas has contributed $1.6 billion to HTA for the right to operate and collect tolls on PR-22 and PR-5. These funds have been used to reduce existing debt, improve road quality and accelerate safety improvements.[51]

### 5.2 Current State of HTA's transit network

TU continues to stagnate in its ability to be an effective and efficient transit system capable of serving riders' needs in the San Juan metropolitan area. While TU was initially projected to attain a monthly ridership of approximately 3.4 million passengers per month by 2010,[52] it currently has a ridership of only approximately 0.12 million passengers per month. TU's transit farebox recovery ratio (the share of expenses covered by fare revenues) is down to 4% from 17% in 2017.[53] Peer systems, meanwhile, currently have a farebox recovery ratio of 12%, while prior to COVID they were closer to ~25%. Peers are expected to return to the 20-23% range

---

[50] From year-end Budget-to-Actuals reports. $177M in FY19, $248M in FY20 and $322M in FY21.

[51] https://www.fhwa.dot.gov/ipd/project_profiles/pr_pr22_and_pr5_lease.aspx

[52] Review of the Tren Urbano Finance Plan, US General Accounting Office, Dated 03/31/2000, p.2.

[53] Reflects farebox revenue ratio (FRR) of FY22 (as of December 2021); FY21 FRR is closer to 2% due to shutdown periods in 2020.

HTA_CONF 00012937

in the next two to three years. As such, the percent of non-fare directly generated public transit revenue (as a percent of total transit revenue) in Puerto Rico is about half of the US median.

TU has suffered from mismanagement that predates its initial construction. Construction took 75% longer than expected, delaying TU's opening by four years and consequently increasing project costs from $1.5 billion to $2.3 billion. A 2018 assessment after Hurricanes Irma and María found that more than 50% of the turnstiles (barriers) are not operational; 20% of the ticket vending machines ("TVMs") have defects; the software is outdated; and the system is not Payment Card Industry ("PCI") compliant, which prevents users from purchasing tickets with debit and credit cards. Consequently, the current condition of the TU results in public accessibility reduction, reduced attractiveness of facilities and a lower quality of service. TU has failed to fix these problems despite the availability of federal funding since 2012 and as such, TU continues to witness decreasing revenues and ridership. HTA needs to make the necessary capital expenditures to repair the point-of-sale (POS) machines as an initial step to improve the transit system. These steps are further discussed in Chapter 11, which includes fiscal measures expected to drive revenue increases and improve TU operation.

## CHAPTER 6: CURRENT CAPITAL DELIVERY PROCESS AND OUTCOMES

Historically, Puerto Rico's transportation system has suffered from underinvestment and lack of a clear process for delivering capital programs. From FY1996 to FY2004, HTA averaged $661 million[54] in total capital disbursements per year, excluding TU investments and including capacity enhancement projects such as new road construction (see Exhibit 22). By FY07, however, as the recession hit Puerto Rico, capital spending decreased to below $400 million annually, falling to $257 million in FY08. During the years prior to Hurricane María, spending continued to decline, reaching a low point of $168 million in FY18.

In FY19, HTA disbursed only 29% of its budgeted capital expenditures.[55] HTA's inability to spend was driven by difficulty in finding construction labor (due to the increased need for projects on the island after Hurricane María), operational inefficiencies and procurement delays.

For FY20, HTA set goals to increase planned spend and ensure that all planned spend was indeed disbursed. Between Q1 and Q2 of FY20, HTA disbursements were tracking to 90% and above of targets due to operational improvements, including timely payment of contractors and effective project prioritization. However, after multiple earthquakes and the onset of the COVID-19 pandemic, HTA was unable to meet its targets for the remainder of FY20, averaging 52% of budgeted capital expenditures.[56] As of FY21, HTA has performed markedly better, disbursing 88% of budgeted capital expenditures (hard costs) for the fiscal year (see Exhibit 19 below).

---

[54] In 2018 $USD.

[55] HTA July 2019 B2A reporting

[56] HTA June 2020 B2A reporting

43

### Exhibit 22: Construction Historical Disbursements[57]



**Total annual capex spend[1]**, $M Adjusted to 2018 USD

Spike in capex spend from FY96-04 driven by Tren Urbano and other capacity enhancement projects such as new road construction (e.g. large portions of PR-53 and PR-22)

1 Total CIP expenses. Includes Transit CIP
SOURCE: PRHTA Data

### Exhibit 23: HTA capital project delivery budget-to-actuals, as of December 31, 2021



**FY21-FY22 (YTD) actuals vs. budget,** monthly hard cost disbursements, $M

---

[57] Includes Total capex spend which is non-Federal and Federal construction hard and soft costs as well as Transit CIP and capital ROW payments.

44

HTA_CONF 00012939

To ensure HTA focuses both on building the right projects and achieving target spending levels in a given year, HTA follows a structured capital improvement plan update process. The output of this process is a list of prioritized projects to be delivered over the next five years with anticipated disbursements for each year.

Currently, this CIP is developed in an ad-hoc manner, with project selection driven primarily by regulations and requirements of each funding source. Safety is a frequently emphasized factor in project selection across all funding sources. For regular FHWA funds for the Highway Improvement Program, projects are selected by giving priority to high-volume expressways, ensuring funds are spread geographically across the Island.

HTA must adopt a more systematic, data-driven approach to project selection, utilizing a prioritization framework similar to that introduced in the 2020 Certified Fiscal Plan. The framework focuses on the outcomes of the system and further utilizes specific metrics, allowing HTA CapEx planning teams to determine asset condition and prioritize delivery of projects that provide the most value. Chapter 13 provides further detail and lays out several additional measures that HTA must adopt to further increase the efficiency of its project delivery.

**Exhibit 24: HTA CIP Prioritization Framework**

| Decision Criteria | Long Range Transportation Plan (LRTP) Goal | Weight | Corresponding Objectives |
|---|---|---|---|
| Achieve a state of good repair | System Performance | 30 | ▪ Improve/maintain condition of capital assets |
| Improve performance of most critical corridors | System Performance; Economic Vitality; Mobility and Accessibility | 25 | ▪ Improve intersection performance, system bottlenecks and transit<br>▪ Increase operational capacity in a cost-effective manner<br>▪ Improve performance of freight and high travel corridors<br>▪ Prioritize the completion of projects which connect to ports and economic centers, and complete the island's strategic highway network |
| Resiliency, safety and emergency response | System Performance; Environmental Sustainability | 20 | ▪ Improve safety, resiliency and emergency response<br>▪ Improve resiliency and emergency response<br>▪ Reduce reliance on motorized travel, promote energy efficiency, and incorporate "reduce, reuse, recycle", practices in delivering infrastructure |
| Promote alternative modes of travel | Environmental sustainability; Mobility and Accessibility | 15 | ▪ Invest in redevelopment of urban centers to reduce need for motorized travel<br>▪ Improve coverage, capacity and service of alternative modes of travel<br>▪ Improve modal connectivity (first mile/last mile)<br>▪ Improve coverage, capacity and service of alternative modes of travel |
| Ensure cost effective-ness | Mobility and Accessibility | 10 | ▪ Cost effectiveness assuming mobility benefits<br>▪ Provide mobility for transportation-disadvantaged populations |

45

HTA_CONF 00012940

*Current progress against capital program KPIs*

To achieve the goals of its capital program, HTA sets and monitors performance targets at various stages and outcomes for the capital program and capital processes. Many of the metrics meet performance standards, while some fall short. For preconstruction, HTA is on target for delays in notice to proceed notification letters (NTP) by a margin of 13 days, but its percentage of planned NTP awards is below the <80% target at 43%. HTA has consistently failed to provide the ratios of soft costs to hard costs. For construction, HTA is slightly below target, with only 88.6% of planned federal funds obligated to date. However, it is on target for changes in cost, with actual costs exceeding plans by 12.6%.  The KPI that measures percentage change in duration of projects was a challenge during the COVID-19 pandemic, which caused significant project delays.  As of Q4, there is a 70% change in duration of projects, resulting mostly from the lockdown-mandated 56-day extensions. Finally, the disbursement variance for projects is still above the 20% target at 25%.

**Exhibit 25: HTA Capex KPI performance, FY21**

| Strategic priorities | Metrics[1] | FY20 Actual | FY21 Actual | Target |
|---|---|---|---|---|
| Preconstruction Program | Delays in NTP (Days from plan – Program Level) Quarterly – Cumulative | 6 Days | 15.8 Days | <30 Days |
| | % of Planned NTP Awards (Program Level) Quarterly | 100% | 43% | >80% |
| | % of Federal Funds Obligated (Program Level) Annual | N/A | 88.6%[1] | >90% |
| | % Soft vs Hard Costs (Program Level) Annual – Previous Year | N/A | N/A | 15% |
| Construction Delivery | % Change in Cost (Program Level) Quarterly - Cumulative | 1% | 12.6% | <15% |
| | % Change in Duration (Program Level) Quarterly - Cumulative | 5% | 70.0% | <25% |
| | Disbursement Variance (Program Level) Quarterly - Cumulative | 2% | 25% | <20% |
| Capital Improvement Program | Disbursement Variance (Program Level) Quarterly - Cumulative | N/A | N/A | 20% |

1 Applies to regular funds only. Per most recent estimates, 65.9% of emergency relief funds have been obligated.

The previously presented KPIs are reported at a program level. However, to provide more granularity in the reporting of KPIs for the CIP, HTA has developed project level KPIs for FY21 based on the type of contract and type of construction project.  The KPIs were recommended based on the level of risk in managing cost and time overruns in typical highway construction projects, the level of design carried out, the procurement approach and the construction contract terms and conditions. Exhibit 26 below provides the reasoning behind the target performance level.

46

HTA_CONF 00012941

**Exhibit 26: KPIs by contract and project type**

| Category | Project Level KPI | Description | Cost Overrun | Time Overrun |
|---|---|---|---|---|
| Contract Type | Singular Regular (without bonus) | Regular construction contracts where payment is executed based on unit prices for predefined pay items. | 20% | 50% |
| | Singular with Early Completion Bonus | Bonus included for either completing the project or for a specific milestone. | 20% | 25% |
| | Hybrid Contracts | These are lump sum contracts that include an allowance for several items with high risk of change during construction (e.g., length of driven piles, or excavation of rocks). | 15% | 20% |
| | Hybrid Contracts with Early Completion Bonus | Include no excuse (FDOT Type) completion bonus | 15% | 15% |
| Project Type | Critical Findings | These are relatively small projects focused on repairing a condition that caused a low load rating on the bridge. | 50% | 100% |
| | Accelerated / Abbreviated PS&Es | Highway reconstruction projects focused on pavement, safety devices and bridge preservation with the objective of maintaining SOGR of our highway system. | 20% | 50% |
| | Emergency Projects with Fixed Costs | Emergency Repair projects where construction costs are determined based on fixed unit prices approved by FHWA. Emergency repair projects do not have a detailed design nor previous studies. The SOW is adjusted in the field. | N/A | N/A |
| | Design Build Projects | With design-build delivery, the design-builder assumes responsibility for the majority of the design work and all construction activities, together with the risks associated with providing these services for a fixed fee. The agency procures the DB project with a schematic or preliminary design. | 15% | 25% |
| | Task Order Projects | Multiple projects are authorized by means of task orders, generally executed for emergency repairs. Change-orders to contracts require increasing the budget to execute additional task orders. | N/A | N/A |

These proposed project level KPIs were developed in collaboration with FOMB and have been reported on a quarterly basis since the first quarter of FY22. Target performance was established based on the capital expenditure levels projected in the May 2021 Certified Fiscal Plan and are subject to revision in FY23 accordingly.

Despite significant delays and unforeseen challenges due to COVID-19, HTA's progress in recent years reveals a path forward to achieving key performance target metrics. In FY23 and onwards, HTA must adopt and utilize the project prioritization framework (see Exhibit 24), further detailed in Chapter 13, to ensure that capital delivery improvement continues to approach and achieve target KPI metrics.

## CHAPTER 7: DISCRETIONARY FUNDS FOR STRATEGIC PROJECTS

As outlined in Chapters 5 and 6, HTA's capital priority is to achieve and sustain SOGR on its transportation assets. As such, regular state and federal appropriations are used for SOGR projects, while any non-SOGR projects (e.g., strategic enhancements to the highway network) must use an alternate source of funding.

Given the potential availability of federal discretionary funds for mitigation and disaster relief, as well as the recently passed BIL, HTA may be able to pursue strategic projects that will

47

HTA_CONF 00012942

provide resiliency to the strategic highway network and economic development at a regional level. To fund these strategic projects, HTA should explore alternative non-state funding sources including discretionary grants, new revenue opportunities, or public-private partnerships. HTA should prioritize discretionary federal grants such as:

- Community Development Block Grant – Disaster Recovery/Mitigation (CDBG-DR/MIT),

- Rebuilding American Infrastructure with Sustainability and Equity (RAISE),

- Infrastructure for Rebuilding America (INFRA) grants for highway projects and

- Capital Investment Grants (CIG) for transit projects.[58]

- Low or No Emission Vehicle Program (created in the recent Infrastructure Investment & Jobs Act)

- Congestion Relief program (created in the recent Infrastructure Investment & Jobs Act)

The 2021 Certified Fiscal Plan included annual investments for HTA to build a grant management team to ensure that Puerto Rico is competitive in federal discretionary funding decisions, funding sustained in the 2022 HTA Fiscal Plan.

Discretionary funding, if secured, may allow HTA to evaluate additional projects as prioritized by the framework. Examples of strategic, non-SOGR projects include:

- **Completing PR-10, connecting Utuado and Adjuntas**: Construction of the four remaining segments of PR-10 between Utuado and Adjuntas, with an approximate investment of $217M.  Currently, the users must take the PR-123, a tertiary road highly vulnerable to disaster events.  The project will provide a fast, safe and modern connection in the central region of Puerto Rico.  It will improve the movements of goods and services while connecting the industrial and agricultural areas with Rafael Hernández airport in Aguadilla and the existing and proposed ports located at the south region between the municipalities of Penuelas and Ponce.



---

[58] More information on BUILD grants can be found here: https://www.transportation.gov/BUILDgrants; more information on INFRA grants can be found here: https://www.transportation.gov/buildamerica/financing/infra-grants/infrastructure-rebuilding-america; more information on CIG grants can be found here: https://www.transit.dot.gov/CIG

HTA_CONF 00012943

- **Extension of PR-5 from Bayamón to Toa Alta:** Construction of the pending segment of PR-5 Expressway between its intersection with PR-199 in the Municipality of Bayamón and the intersection with PR-167 in the Municipality of Toa Alta, at an estimated investment of $155 million. The new segment will serve as an alternate to PR-167, a two-lane road in each direction that traverses the municipality of Bayamón and is subject to traffic congestion and safety problems. The project would provide a fast, modern and safe road connection between the municipalities of the central region (i.e., Naranjito, Orovovis, Ciales, Comerío and Barranquitas) with the San Juan Metropolitan Area.



- **Extension of PR-22 from Hatillo to Aguadilla:** Construction of the extension of the toll highway PR-22 from its intersection with PR-2 in the Municipality of Hatillo to its intersection with PR-11 in the Municipality of Aguadillas, requiring an investment of $102 million. Currently, PR-22 from San Juan to Hatillo and PR-2 from Hatillo to Aguadilla constitute the main route connecting the northwest region of the island with the San Juan Metropolitan Area. The PR-22 extension is expected to reduce travel time and improve highway capacity. The proposed project could also serve as an alternative route to PR-2 during emergencies and as a tsunami evacuation route for communities located close to the north coast.



If HTA is not able to secure additional sources of funding, the financial feasibility of investing in strategic non-SOGR projects across non-toll roads is very low. Funded for these is provided by Commonwealth transfers, which is only available for non-toll assets and should meet the evaluation criteria using the metrics set forth in Chapter 13.

49

## PART V – CURRENT BASELINE FINANCIAL PROJECTIONS

In the absence of any fiscal measures, HTA's toll assets are expected to have a cumulative surplus of $0.3 billion over the Fiscal Plan period, however, non-toll assets are expected to run a cumulative deficit of $1.4 billion, given that Commonwealth transfer allocations ($3.3 billion of operating funds and $2.0 billion of capital funds) are not sufficient to fund the capital needs of these assets.

The level of the cumulative deficit, even when operating and capital transfers from the Commonwealth are factored in, emphasizes the need for revenue enhancements and cost savings to ensure the fiscal sustainability of non-toll assets. Without implementation of fiscal measures, the level of the Authority's dependence on toll revenues and funding from the Commonwealth is unsustainable. To improve its capacity to balance costs and investments, HTA needs to implement the fiscal measures described in more detail in Chapters 10 through 13.

HTA_CONF 00012945

## Exhibit 27: Combined HTA Baseline Financial Performance

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | 141 | 141 | 138 | 136 | 136 | 691 | 4,035 |
| Toll fines | 23 | 22 | 22 | 22 | 22 | 110 | 616 |
| Other income | 10 | 10 | 10 | 9 | 7 | 45 | 204 |
| Transit fares | 3 | 5 | 7 | 7 | 7 | 29 | 200 |
| Operating FTA funds | 20 | 20 | 20 | 20 | 20 | 100 | 600 |
| Total operating revenues | 196 | 197 | 197 | 195 | 191 | 975 | 5,655 |
| TU Operation & Maintenance | (71) | (71) | (70) | (83) | (74) | (368) | (2,660) |
| Toll Highways Administration & Maintenance | (43) | (45) | (45) | (46) | (46) | (226) | (1,527) |
| Salaries & Related Benefits | (23) | (20) | (19) | (18) | (18) | (98) | (572) |
| Pensions | (36) | (36) | (36) | (36) | (35) | (178) | (790) |
| Other Operating Expenses | (33) | (32) | (29) | (20) | (20) | (135) | (812) |
| ROW payments | (8) | (8) | (10) | (10) | (10) | (46) | (58) |
| Integrated Transportation System | (11) | (9) | (9) | (9) | (9) | (47) | (336) |
| Litigation Reserve | (4) | (4) | (4) | (2) | (2) | (15) | (63) |
| Total operating expenses | (228) | (226) | (222) | (224) | (214) | (1,113) | (6,818) |
| Total operating balance | (33) | (28) | (25) | (29) | (23) | (138) | (1,163) |
| Regular FHWA funds | 149 | 269 | 249 | 264 | 229 | 1,160 | 6,327 |
| Regular CW CapEx appropriation | 53 | 54 | 54 | 55 | 56 | 272 | 2,002 |
| Non-regular CW CapEx funds[1] | 90 | - | - | - | - | 90 | 90 |
| Emergency Funds | 53 | 71 | 67 | 30 | 22 | 244 | 244 |
| Capital FTA funds | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Total capital contributions | 398 | 433 | 391 | 366 | 350 | 1,939 | 9,380 |
| Capital ROW payments | (3) | (4) | (4) | (4) | (4) | (20) | (145) |
| Local construction costs | (10) | (10) | (10) | (10) | (10) | (50) | (361) |
| Highway construction hard costs | (163) | (281) | (282) | (313) | (306) | (1,345) | (8,296) |
| Highway construction soft costs | (55) | (72) | (61) | (62) | (62) | (312) | (1,902) |
| Emergency repair costs | (36) | (81) | (76) | (35) | (26) | (254) | (254) |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Construction salaries & benefits | (29) | (25) | (25) | (25) | (26) | (130) | (928) |
| Other construction programs | (2) | (2) | (2) | (2) | (2) | (8) | (59) |
| Total capital expenses | (352) | (514) | (482) | (468) | (479) | (2,295) | (12,675) |
| Total capital balance | 46 | (81) | (91) | (102) | (128) | (355) | (3,295) |
| Total aggregate balance | 14 | (109) | (116) | (130) | (151) | (493) | (4,458) |
| CW Transfer | - | 179 | 138 | 136 | 148 | 600 | 3,284 |
| Final aggregate balance | 14 | 69 | 22 | 5 | (3) | 107 | (1,173) |

HTA_CONF 00012946

**Exhibit 28: Toll Roads Management Office Baseline Financial Performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | 142 | 142 | 139 | 138 | 137 | 698 | 4,076 |
| Toll fines | 9 | 9 | 9 | 9 | 9 | 45 | 250 |
| Other income | 4 | 4 | 4 | 4 | 3 | 19 | 86 |
| Transit fares | - | - | - | - | - | - | - |
| Operating FTA funds | - | - | - | - | - | - | - |
| Total operating revenues | 155 | 155 | 152 | 150 | 148 | 761 | 4,412 |
| TU Operation & Maintenance | - | - | - | - | - | - | - |
| Toll Highways Administration & Maintenance | (43) | (45) | (45) | (45) | (45) | (222) | (1,499) |
| Salaries & Related Benefits | (7) | (6) | (6) | (6) | (6) | (30) | (177) |
| Pensions | (7) | (7) | (7) | (7) | (7) | (34) | (152) |
| Other Operating Expenses | (18) | (18) | (16) | (11) | (11) | (74) | (447) |
| ROW payments | (1) | (1) | (2) | (2) | (2) | (8) | (11) |
| Integrated Transportation System | - | - | - | - | - | - | - |
| Litigation Reserve | (1) | (1) | (1) | (0) | (0) | (3) | (11) |
| Total operating expenses | (77) | (78) | (76) | (70) | (71) | (371) | (2,297) |
| Total operating balance | 78 | 77 | 76 | 80 | 78 | 390 | 2,114 |
| Regular FHWA funds | 4 | 47 | - | - | - | 51 | 51 |
| Regular CW CapEx appropriation | 5 | 6 | - | - | - | 11 | 11 |
| Non-regular CW CapEx funds[1] | 9 | - | - | - | - | 9 | 9 |
| Emergency Funds | 6 | 11 | 0 | - | - | 17 | 17 |
| Capital FTA funds | - | - | - | - | - | - | - |
| Total capital contributions | 24 | 64 | 0 | - | - | 88 | 88 |
| Capital ROW payments | (0) | (1) | (0) | (1) | (1) | (2) | (24) |
| Local construction costs | - | - | - | - | - | - | - |
| Highway construction hard costs | (8) | (58) | (33) | (41) | (48) | (190) | (1,427) |
| Highway construction soft costs | (2) | (3) | (1) | (7) | (7) | (20) | (303) |
| Emergency repair costs | (4) | (13) | (2) | (1) | (1) | (21) | (21) |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | - | - | - | - | - | - | - |
| Construction salaries & benefits | (3) | (3) | (3) | (3) | (3) | (16) | (111) |
| Other construction programs | (0) | (0) | (0) | (0) | (0) | (1) | (11) |
| Total capital expenses | (19) | (78) | (40) | (53) | (60) | (250) | (1,897) |
| Total capital balance | 5 | (14) | (40) | (53) | (60) | (162) | (1,809) |
| Total aggregate balance | 83 | 64 | 36 | 27 | 18 | 228 | 305 |
| CW Transfer | (72) | - | - | - | - | (72) | (72) |
| Final aggregate balance | 11 | 64 | 36 | 27 | 18 | 156 | 233 |

HTA_CONF 00012947

**Exhibit 29: Non-toll Roads Assets Baseline Financial Performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | (1) | (1) | (1) | (1) | (1) | (7) | (40) |
| Toll fines | 14 | 13 | 13 | 13 | 13 | 65 | 366 |
| Other income | 5 | 5 | 5 | 5 | 3 | 22 | 98 |
| Transit fares | - | - | - | - | - | - | - |
| Operating FTA funds | - | - | - | - | - | - | - |
| Total operating revenues | 17 | 16 | 16 | 16 | 15 | 80 | 424 |
| TU Operation & Maintenance | - | - | - | - | - | - | - |
| Toll Highways Administration & Maintenance | (1) | (1) | (1) | (1) | (1) | (4) | (28) |
| Salaries & Related Benefits | (10) | (9) | (8) | (8) | (8) | (42) | (246) |
| Pensions | (25) | (25) | (25) | (25) | (25) | (126) | (559) |
| Other Operating Expenses | (10) | (10) | (9) | (6) | (6) | (42) | (251) |
| ROW payments | (6) | (7) | (8) | (8) | (8) | (38) | (48) |
| Integrated Transportation System | - | - | - | - | - | - | - |
| Litigation Reserve | (3) | (3) | (3) | (1) | (1) | (12) | (52) |
| Total operating expenses | (56) | (55) | (55) | (50) | (49) | (264) | (1,184) |
| Total operating balance | (39) | (39) | (38) | (34) | (34) | (184) | (760) |
| Regular FHWA funds | 145 | 222 | 249 | 264 | 229 | 1,109 | 6,276 |
| Regular CW CapEx appropriation | 48 | 48 | 54 | 55 | 56 | 261 | 1,991 |
| Non-regular CW CapEx funds[1] | 81 | - | - | - | - | 81 | 81 |
| Emergency Funds | 47 | 61 | 67 | 30 | 22 | 227 | 227 |
| Capital FTA funds | - | - | - | - | - | - | - |
| Total capital contributions | 321 | 330 | 370 | 349 | 307 | 1,678 | 8,575 |
| Capital ROW payments | (3) | (3) | (4) | (3) | (3) | (17) | (120) |
| Local construction costs | (10) | (10) | (10) | (10) | (10) | (50) | (361) |
| Highway construction hard costs | (154) | (223) | (249) | (271) | (258) | (1,155) | (6,869) |
| Highway construction soft costs | (53) | (69) | (60) | (55) | (55) | (292) | (1,599) |
| Emergency repair costs | (32) | (68) | (74) | (34) | (25) | (234) | (234) |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | - | - | - | - | - | - | - |
| Construction salaries & benefits | (26) | (22) | (22) | (22) | (23) | (115) | (817) |
| Other construction programs | (1) | (1) | (1) | (1) | (1) | (7) | (49) |
| Total capital expenses | (279) | (397) | (421) | (397) | (375) | (1,869) | (10,049) |
| Total capital balance | 42 | (67) | (50) | (48) | (68) | (192) | (1,474) |
| Total aggregate balance | 2 | (105) | (89) | (82) | (103) | (376) | (2,234) |
| CW Transfer | - | 111 | 75 | 60 | 81 | 327 | 828 |
| Final aggregate balance | 2 | 6 | (14) | (22) | (21) | (49) | (1,406) |

53

HTA_CONF 00012948

**Exhibit 30: Transit Assets Baseline Financial Performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | - | - | - | - | - | - | - |
| Toll fines | - | - | - | - | - | - | - |
| Other income | 1 | 1 | 1 | 1 | 1 | 5 | 20 |
| Transit fares | 3 | 5 | 7 | 7 | 7 | 29 | 200 |
| Operating FTA funds | 20 | 20 | 20 | 20 | 20 | 100 | 600 |
| Total operating revenues | 24 | 26 | 28 | 28 | 28 | 134 | 820 |
| TU Operation & Maintenance | (71) | (71) | (70) | (83) | (74) | (368) | (2,660) |
| Toll Highways Administration & Maintenance | - | - | - | - | - | - | - |
| Salaries & Related Benefits | (6) | (5) | (5) | (5) | (5) | (25) | (149) |
| Pensions | (4) | (4) | (4) | (4) | (4) | (18) | (78) |
| Other Operating Expenses | (5) | (5) | (4) | (3) | (3) | (19) | (114) |
| ROW payments | - | - | - | - | - | - | - |
| Integrated Transportation System | (11) | (9) | (9) | (9) | (9) | (47) | (336) |
| Litigation Reserve | - | - | - | - | - | - | - |
| Total operating expenses | (95) | (93) | (91) | (103) | (94) | (477) | (3,337) |
| Total operating balance | (72) | (67) | (63) | (75) | (66) | (343) | (2,517) |
| Regular FHWA funds | - | - | - | - | - | - | - |
| Regular CW CapEx appropriation | - | - | - | - | - | - | - |
| Non-regular CW CapEx funds[1] | - | - | - | - | - | - | - |
| Emergency Funds | - | - | - | - | - | - | - |
| Capital FTA funds | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Total capital contributions | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Capital ROW payments | - | - | - | - | - | - | - |
| Local construction costs | - | - | - | - | - | - | - |
| Highway construction hard costs | - | - | - | - | - | - | - |
| Highway construction soft costs | - | - | - | - | - | - | - |
| Emergency repair costs | - | - | - | - | - | - | - |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Construction salaries & benefits | - | - | - | - | - | - | - |
| Other construction programs | - | - | - | - | - | - | - |
| Total capital expenses | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Total capital balance | (0) | (0) | (0) | (0) | (0) | (2) | (12) |
| Total aggregate balance | (72) | (68) | (64) | (76) | (66) | (345) | (2,529) |
| CW Transfer | 72 | 68 | 64 | 76 | 66 | 345 | 2,529 |
| Final aggregate balance | - | - | - | - | - | - | - |

HTA_CONF 00012949

## CHAPTER 8: REVENUE BASELINE

### *8.1 Operating revenue baseline*

HTA has five core sources of operating revenues: (1) toll fares; (2) toll fines; (3) FTA funds; (4) transit fares; and (5) other income. The projected revenues in the Baseline Scenario[59] from each source over the period of the 2022 HTA Fiscal Plan is seen in Exhibit 31.

#### Exhibit 31: Operating revenues by source, FY22-51

| Revenue Source, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY 22-26 | FY 22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | 141 | 141 | 138 | 136 | 136 | 691 | 4,035 |
| Toll fines | 23 | 22 | 22 | 22 | 22 | 110 | 616 |
| Transit fares | 3 | 5 | 7 | 7 | 7 | 29 | 200 |
| Operating FTA funds | 20 | 20 | 20 | 20 | 20 | 100 | 600 |
| Other income | 10 | 10 | 10 | 9 | 7 | 45 | 204 |
| Total baseline operating revenues | 196 | 197 | 197 | 195 | 191 | 975 | 5,655 |

**1. Toll revenue baseline:** Toll revenues contribute 72% of HTA's total operating revenue baseline, including both HTA and concessionaire-operated roads. Toll fares for the following four HTA-operated toll roads have remained flat for 16 years with no adjustment since 2005: PR-20, PR-52, PR-53 and PR-66. Future toll revenues were estimated using actual toll revenues and toll transactions from FY19 (pre-pandemic) and then adjusted each year based on the Commonwealth's real GNP projections. Additionally, the 2022 HTA Fiscal Plan Plan's projections adjusted upward PR-53's baseline to reflect the fact that both Humacao toll plazas (North and South) were closed during FY19 (used as a base year, unaffected by COVID), but reopened in August 2019.

Baseline toll revenues incorporate the effect of changes in the distribution of revenues in roads that are managed and operated by concessionaires (e.g., Metropistas and Teodoro Moscoso Bridge). Toll estimates for roads operated by concessionaires include scheduled annual increases of 1.5% plus annual inflation for the following toll roads: PR-5, PR-17 (bridge portion), PR-22 and PR-199 (bridge portion).[60] Additionally, the toll revenue forecast considers net collection risk factors, which adjust gross revenue to HTA by uncollected amounts of Metropistas, Guaynabo and Teodoro Moscoso and increase net revenue by off-period v-tolls[61]

---

[59] Baseline scenario assumes that HTA will implement no fiscal measures over the period of this Fiscal Plan.

[60] HTA has a contract with Guaynabo City to collect the toll revenues of the municipal toll road through the Autoexpreso operator for a fee.

[61] Refers to video tolls that are additional fees incurred by drivers that pass-through ORT gantries without an account or with a faulty transponder.

HTA_CONF 00012950

collected. The toll revenue baseline does not include measures to increase toll rates for HTA-operated roads; the impact of toll rate increases is shown separately in Chapter 11.1. Toll revenues from PR-20, PR-52, PR-53 and PR-66 are exclusively allocated to HTA's toll assets, while revenues and obligations from PR-5, PR-17, PR-22 and Dynamic Toll Lanes ("DTL") are exclusively allocated to the non-toll road assets.

**2. Toll fine baseline:** Fines imposed on drivers who pass through toll plazas without paying represent 12% of the Authority's operating revenue baseline in FY22, approximately $23 million for FY22.[62] Toll fine revenue is based on toll operation-related violations, where the fiscal plan assumes a 1% violation rate, based on historical actuals, and a $15 flat fine as revised by Act 220 of 2018. Toll fine forgiveness legislation passed in September 2018 had delayed Electronic Toll Fine collections for the past two fiscal years. HTA resumed toll fine collection in July 2021 and has collected significant amounts of revenue in the first half of the fiscal year ($20.5 million through the end of December 2021).

Electronic Toll Fine Collection ("ETFC") is assumed to have an 18-month collection cycle with 60% compliance in the baseline. Actual toll violation transactional data from FY21 and Puerto Rico real GNP assumptions are used to project future toll violation transactions and toll fine revenue. Projections are slightly lower compared to the 2021 Certified Fiscal Plan, given that HTA did not resume fine collection in FY21 and the baseline now accounts for actual growth from COVID-19. The baseline projects that HTA will generate $110 million over the next five years and $616 million over the entire period of this Fiscal Plan.[63] 41% of toll fine revenues are assigned to the toll assets based on transactions and violations associated with PR-20, PR-52, PR-53 and PR-66, while 59% are allocated to the non-toll road assets given associated assumption for PR-5, PR-17, PR-22 and DTL.

**3. Operating funds from FTA:** Through FY27, HTA will continue to receive approximately $20 million annually in operating funds from FTA for regular preventive maintenance activities for TU. Following FY27, the Fiscal Plan assumes the amount will remain stable. Operating FTA funds are assigned exclusively to the transit assets.

**4. Transit fares:** Revenues include TU and Metrobus operating income. Operating revenues are projected to grow in line with the Puerto Rico real GNP projections included within the Commonwealth 2021 Certified Fiscal Plan. When combined with inflation-based increases across most transit operation costs (e.g., labor, electricity, insurance), declining revenues yield $29 million in transit fares for FY22 to FY26 and approximately $200 million through FY51. Transit Revenues are assigned exclusively to the transit assets.

**5. Other revenue baseline:** HTA collects ~4% of its total operating revenue baseline from rent and lease receipts, import levy tax fees, toll tags sales, earned interest and other non-toll and transit-based revenue.[64] For instance, the Authority earns per year on average: (a) approximately $1.5 million from services related to its highway operations, such as electronic toll device sales and truck weighing; (b) approximately $2.7 million from property sales (only until FY25); (c) approximately $0.8 million from interest accrued on its bank accounts; (d) approximately $0.2 million from property rentals; and (e) approximately $0.6 million from activities related to TU operations (e.g., TU station space rentals, vending machines). For the

---

[62] Ibid.

[63] Assumes 1% of toll transactions would become fines and that 60% of all fines would be collected, in line with HTA's historical performance.

[64] Based on projected FY22 data.

HTA_CONF 00012951

revenue baseline, rent-related revenues are expected to move in line with inflation through FY51, while other types of income are projected to remain flat. Other revenues are assigned 42% to the toll assets, 48% to the non-toll assets and 10% to the transit assets.

### 8.2 Capital contribution baseline

HTA mainly derives capital contributions from two sources: (1) regular FHWA funds and (2) regular Commonwealth CapEx appropriation.[65] HTA also expects to receive ad hoc funding until at least FY26 from three additional sources: (3) Non-regular Commonwealth Capital Expenditure funds (e.g., rollover funds from prior years / special appropriations such as the one previously granted for Abriendo Caminos); (4) Federal Emergency Funds; and (5) Non-regular Capital FTA funds. The projected revenues from each source over the period of this Fiscal Plan are illustrated in Exhibit 32 below.

**Exhibit 32: Capital Contributions by Source, FY22-51**

| Revenue Source, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY 22-26 | FY 22-51 |
|---|---|---|---|---|---|---|---|
| Regular FHWA funds | 149 | 269 | 249 | 264 | 229 | 1,160 | 6,327 |
| Regular CW CapEx appropriation | 53 | 54 | 54 | 55 | 56 | 272 | 2,002 |
| Non-regular CW CapEx funds | 90 | - | - | - | - | 90 | 90 |
| Emergency funds | 53 | 71 | 67 | 30 | 22 | 244 | 244 |
| Non-regular Capital FTA funds | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Total baseline capital contributions | 398 | 433 | 391 | 366 | 350 | 1,939 | 9,380 |

**1. Regular FHWA Funds:** HTA's regular allocation of FHWA funds for highway construction projects is approximately $139 million per year over FY22-26 (after accounting for the penalty faced by Puerto Rico for its drinking age), as provided in the FAST act. This amount will be further increased thanks to BIL, which was signed into law on November 15, 2021. [66] Moreover, from FY22 to FY26, FHWA funds will exceed the regular allocation, reaching an annual average of $232 million, because the Authority plans to continue delivering on a backlog of projects that have been rolled over from previous years. The Fiscal Plan assumes that the regular allocation will resume in FY27 and grow in line with inflation thereafter. FHWA Funds are exclusively allocated to the non-toll road assets after FY23.

---

[65] Note: The CW CapEx appropriation is distinct from the CW Operating Transfer, which is discussed further in Chapter 15.

[66] HTA's actual allocation is approximately $158 million, but $19 million is deducted annually in penalties because the drinking age is below 21. https://www.fhwa.dot.gov/fastact/factsheets/territorialprhighwaysfs.cfm

HTA_CONF 00012952

**2. Federal Emergency Funds:** Revenues related to Federal emergency programs are set at an amount equal to the expenses they are projected to fund.[67] HTA has been allocated approximately $210 million from FHWA, $16M million from FEMA and $17M from FTA via the CARES Act for construction projects to repair the damages caused in the island's highway network by Hurricane Maria in 2017 and by earthquakes in 2020. 7% of federal emergency funds are allocated to the toll road entity, while 93% are allocated to the non-toll road assets.

**3. Regular Commonwealth CapEx Appropriation:** Commonwealth CapEx Appropriations are transferred to HTA each year to enable sufficient funding for HTA's CIP. In FY22, the appropriation is approximately $54 million and projected to grow with inflation through FY51, for an average of $67 million per year for FY22-51. Main Commonwealth CapEx Appropriation are exclusively allocated to the non-toll road assets after FY23.

**4. Other / non-regular Commonwealth CapEx Funds:** HTA expects to deploy "rollover" funds of $90 million across FY22 and FY23. These rollover funds reflect obligations from previous budgets for projects with signed contracts for which funds have been obligated but not yet disbursed. Relative to the 2021 HTA Fiscal Plan, the 2022 HTA Fiscal Plan has removed an allocation of $87 million for the Abriendo Caminos Phase IV, because that program is managed by DTOP (from Phase IV onward). Other Commonwealth State Funds are assigned 10% to the toll assets, 90% to the non-toll assets and 0% to the transit assets.

**5. Non-regular Capital FTA Funds:** From FY22-FY26, HTA is projected to receive approximately $174 million of capital funds to execute a series of capital improvements to TU. Capital improvements include repairing damages caused by Hurricane María, replacing telecommunication systems and installing a new fare collection system. CapEx FTA funds are assigned exclusively to the transit entity.

## CHAPTER 9: EXPENSE BASELINE

### 9.1 Operating expense baseline

HTA's operating expenses are distributed into the following categories: (1) TU Operation and Maintenance; (2) Toll Highways Administration and Maintenance; (3) Salaries and Related Benefits; (4) Pensions; (5) Other Operating Expenses; (6) Opex Right of Way (ROW) payments; (7) Integrated Transportation System (ITS) and (8) Litigation Reserve. The projected annual expenses for each category are shown in Exhibit 33.

---

[67] Per the Bipartisan Budget Act of 2018, 115th Cong., 2d Sess. (2018), p. 88; line 8.

HTA_CONF 00012953

**Exhibit 33: Operating expenses by category, FY22-51**

| Expense category, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY 22-26 | FY 22-51 |
|---|---|---|---|---|---|---|---|
| Tren Urbano Operation & Maintenance | (71) | (71) | (70) | (83) | (74) | (368) | (2,660) |
| Toll Highways Administration & Maintenance | (43) | (45) | (45) | (46) | (46) | (226) | (1,527) |
| Salaries & Related Benefits | (23) | (20) | (19) | (18) | (18) | (98) | (572) |
| Pensions | (36) | (36) | (36) | (36) | (35) | (178) | (790) |
| Other Operating Expenses | (33) | (32) | (29) | (20) | (20) | (135) | (812) |
| ROW payments | (8) | (8) | (10) | (10) | (10) | (46) | (58) |
| Integrated Transportation System | (11) | (9) | (9) | (9) | (9) | (47) | (336) |
| Litigation Reserve | (4) | (4) | (4) | (2) | (2) | (15) | (63) |
| Total baseline operating expenses | (228) | (226) | (222) | (224) | (214) | (1,113) | (6,818) |

**1. TU Operation and Maintenance:** TU Operation and Maintenance, $71 million in FY22, is projected to account for 27% of total operating expenses in FY22. TU's operating contract represents 68% of this category for FY22, amounting to approximately $49 million. These estimates are consistent with FY21 projections. This operating contract primarily covers operation of trains, maintenance of track and facilities, fare collection and electronic system management. The other largest line items within this expense category are utilities (approximately $8.5 million) and insurance contracts (approximately $9.1 million), above peer benchmarks for similar expenses.[68] After FY22, projections are based on per-year estimates consisting of contracted TU base compensation and Puerto Rico's expected inflation. There is a small, irregular increase in FY25, mainly due to a one-off vehicle overhaul program. After FY32, when the current contract with TU's private operator expires, main contract costs are assumed to increase in line with inflation. TU costs are assigned exclusively to the transit assets.

**2. Toll Highways Administration and Maintenance:** Electronic Toll Collection (ETC) costs, which consist of commissions paid to the toll operator, make up the plurality (44% in FY22) of total toll highways administration and maintenance costs, which are $43 million total for FY22. ETC costs are estimated to be 14.6% of baseline toll fares (based on FY21 actuals). Starting in FY23, all other costs within this expense category[69] are expected to grow in line with Puerto Rico's expected inflation rate, while ETC costs are projected as a constant percentage of

---

[68] While peers spend, on average, 2.7% of operating expenses on insurance, HTA spends 12.3%; similarly, peers spend 5.5% of operating expenses on utilities, while HTA spends 11.6%. Based on National Transportation Database 2019 operating expense information, compared to same peers as mentioned above.

[69] Includes reparation and maintenance of highway, electricity, insurance, security services, reparation and maintenance of vehicles, maintenance and conservation of equipment, reparation and maintenance of buildings, equipment rentals, rent of buildings, miscellaneous equipment, cellphone and telephone service, travel expenses, computer hardware and software, merchant fees and an "all other" category.

HTA_CONF 00012954

baseline toll fares collections (i.e., to reflect a per-transaction cost) each year. 98% of Toll Highways Administration and Maintenance costs are allocated to the toll road assets, while 2% are allocated to the non-toll road assets.

**3. Salaries and Related Benefits:** From FY22-26, operating salaries and related benefits are expected to be an average of approximately $19 million per year. Salaries and related benefits are assumed to remain flat until FY25, after which they are forecast to grow at Puerto Rico's expected inflation rate. Other benefits such as overtime, pension, Social Security and Medicare are calculated as a proportion of the base salary. Early retirement costs reach zero by FY37 given that those who retired early will stop receiving payments at this point.[70] For FY22, health insurance and early retirement costs are the highest cost categories within this operating expenditure line item, behind regular salary amounts. 31% of non-construction salaries are allocated to the toll road assets, 46% to the non-toll road assets and 26% to the transit assets.

**4. Pensions (PayGo costs):** Pension costs are calculated based on assumptions about the duration of expected retirement payments to current and past HTA employees. Pension costs are projected to slightly decrease over time, with an average annual cost of $26 million from FY22-51. 19% of pension costs are allocated to the toll road assets, 71% to the non-toll road assets and 10% to the transit assets.

**5. Other Operating Expenses:** Within this category, service costs make up 60% and are expected to be higher in the next two years due to the costs associated with toll optimization and Title III-related expenses. The remainder of the expenses in this category include utilities, IT costs and administrative costs.[71] Costs within this expense category are expected to begin leveling off from FY25 onwards as service costs taper off and stabilize. These expenses are generally expected to grow with inflation, reaching $36 million by FY51. 55% of other operating expenses are allocated to the toll road assets, 31% to the non-toll road assets and 14% to the transit assets.

**6. Operational Right of Way (ROW) Payments:** Operational ROW Payments correspond to claims that have already been submitted to HTA and corresponding ongoing payments. Opex ROW payments are expected to amount to approximately $12 million in FY22. This amount may fluctuate on an annual basis, so current projections are based on HTA's case-by-case estimates. From FY23 onwards, the average ROW payments will depend on the outcomes and treatment of claims in HTA's Title III case, between $10.3 million and $8.3 million over the next three years, decreasing to approximately $2.8 million in FY29.[72] Operational ROW payments are not currently planned beyond FY29. 18% of operating ROW costs are allocated to the toll road assets, while 82% are allocated to the non-toll road assets.

**7. Integrated Transportation System (ITS):** The ITS is a feeder bus system flowing into TU, operated by a third-party provider. The ITS total projected cost for FY22 is approximately $10 million and these costs are expected to average $9 million per year from FY22-26. These expenses include bus service expenses, a monthly fixed management fee, farebox expenses

---

[70] Costs related to early retirement do not increase with inflation.

[71] Includes rent for buildings, electricity, security services, insurance, telephone and cellphone service, reparation and maintenance of vehicles, water, rental of equipment, maintenance and conservation of equipment, subscriptions, computer software, reparation and maintenance of buildings, postal services, cultural activities, travel costs, training, printing and materials and any other category.

[72] These ROW payments are included in operating expenditures because they correspond to previous claims that must be paid out whereas ROW payments that are included in capital expenditures correspond to potential future claims related to construction.

HTA_CONF 00012955

and other special service fees. In FY22, as in FY21, HTA activated a contractual service increase of 13% for a new support line, which leads to higher "other" costs. Bus service expenses are calculated using assumptions based on mile and hourly costs for MetroBus, Metro Urbano and TU Conexión, reflecting the structure of the contract with the third-party provider. This is driven by forecasted volume of miles traveled by buses within ITS and the operational hours of the system's buses. Costs are projected to increase with Puerto Rico's inflation over the forecast period, while the total hours and miles traveled per year of these buses remains flat. All ITS costs are allocated to the transit assets.

**8. Litigation Reserve:** Litigation reserve projections are based on historical litigation expenses, with FY22 expected reserve to be $4 million, a decrease from $8.5 million in FY21 given the reallocation of the remaining litigation reserve budget. This amount is expected to remain constant from FY22-24 given anticipated COVID-19 related lawsuits and claims from contractors. HTA is working closely with FHWA to determine the impact of these claims, including extended overhead and extra costs for changed conditions. In FY25 onwards, the litigation reserve amount will decrease to $1.5 million and is expected to grow slightly with inflation for the duration of the Fiscal Plan period. This view is influenced by the minimal historic actual disbursements in this category over the past three years. 18% of litigation reserve deposits are allocated to the toll assets, while 82% are allocated to the non-toll assets.

### 9.2 Capital expense baseline

The operating expenses of HTA are distributed into the following seven categories: (1) Highway Construction Hard Costs; (2) Highway Construction Soft Costs; (3) Emergency Repair Costs; (4) Transit CIP; (5) Local Construction Costs; (6) Right of Way (ROW) payments; and (7) Other Capital Expenses. The projected annual expenses for each category, shown in five-year increments over the Fiscal Plan period, are shown below.

**Exhibit 34: Capital expenses by category, FY22-51**

| Expense category | FY22 | FY23 | FY24 | FY25 | FY26 | FY 22-26 | FY 22-51 |
|---|---|---|---|---|---|---|---|
| Highway Construction Hard Costs | (163) | (281) | (282) | (313) | (306) | (1,345) | (8,296) |
| Highway Construction Soft Costs | (55) | (72) | (61) | (62) | (62) | (312) | (1,902) |
| Emergency Repair Costs | (36) | (81) | (76) | (35) | (26) | (254) | (254) |
| Transit CIP | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Toll Optimization CIP | - | - | - | - | - | - | - |
| Local Construction Costs | (10) | (10) | (10) | (10) | (10) | (50) | (361) |
| ROW payments | (3) | (4) | (4) | (4) | (4) | (20) | (145) |
| Other Program Expenses | (2) | (2) | (2) | (2) | (2) | (8) | (59) |
| Construction salaries and related benefits | (29) | (25) | (25) | (25) | (26) | (130) | (928) |
| Total baseline capital expenses | (352) | (514) | (482) | (468) | (479) | (2,295) | (12,675) |

**1. Highway Construction Hard Costs:** Hard costs in the fiscal model reflect a maximization of capital expenditures to arrive as close as possible to the Scenario 1 of the third-party report

61

commissioned by HTA[73], subject to HTA's fiscal constraints (i.e., achieving investments as close to the SOGR targets in the third-party report, using all identified capital inflows). These costs will also grow in line with Puerto Rico's projected inflation (see Exhibit 21 for further detail). [74] From FY22 to FY26, FHWA funds account for 78% of hard costs (versus 22% for state funds). Roughly 18% of all hard costs is allocated to the toll road assets, while 82% is allocated to the non-toll road assets, based on SOGR investment requirements for the respective asset classes.

**2. Highway Construction Soft Costs:** Soft costs for capital expenses refer to pre-construction project-linked costs (e.g., design, environmental studies) as well as FHWA non-project linked planning and compliance costs (e.g., state planning and research). Total soft costs for FY22-26 are expected to be $312 million. Planning and compliance costs are taken from HTA's CIP from FY22-26 and then grown at inflation thereafter. Project-linked soft costs are taken from HTA's CIP in FY22-23 and for FY24 onwards are calculated as 15.6% of project-based hard costs. This ratio is in line with both HTA's historical soft cost needs as well as best practices from other US jurisdictions.[75] 18% of all soft costs is allocated to the toll road assets, while 82% is allocated to the non-toll road assets.

**3. Emergency Repair:** Emergency repair funds, projected from FY22 to FY26, are provided by federal emergency funding. Federal emergency cost spending makes up the majority of emergency repair spending, totaling ~$227 million from FY22-FY26. Local emergency costs (funded by non-federal capital revenues) are expected to amount to ~$28 million in the same period. Emergency repair funding is short-term and expected to conclude in FY26. 7% of federally funded Emergency Repair costs are allocated to the toll road assets, while all other Emergency Repair costs (federal & local) are allocated to the non-toll road assets.

**4. Transit CIP:** Transit CIP refers to investments that aim to improve TU. These investments include completing short term enhancements, including emergency relief projects, installing new telecommunications systems, repairing rolling surfaces, upgrading automated fare collection and repairing Point-of-Sale systems. Transit CIP expenses are projected to be $54 million in FY22. From FY22-FY26, these expenses are based off a list of Transit CIP projects, of which funding has been approved by FTA. After FY26, Transit CIP costs grow at $17.5 million with inflation. Transit CIP costs are all allocated to the transit assets.

**5. Capital ROW Payments:**[76] Capital ROW payments are expected to be approximately $4 million per year FY22-26. From FY27 onwards, Capital ROW payments grow with inflation. 18% of all capital ROW payments are allocated to the toll assets, while 82% are allocated to the non-toll assets.

---

73 Analysis of Investment Needs for PRHTA Tolled and Non-Tolled Highways (2021)

[74] PRHTA 2018-2028 Capital Improvement Program Validation Report, p. 63. Estimates are in 2018 $USD. Estimates for FY26 to FY28 subtract project level investments in preceding 8 years to determine the remaining investment required to achieve SOGR based on the PRHTA 2018-2028 Capital Improvement Program Validation Report.

[75] 2017 Reason Institute Road Benchmark Data, Found online at: https://reason.org/policy-study/24th-annual-highway-report/24th-annual-highway-report-executive-summary/.

[76] ROW payments within capital expenditures category refers to potential future claims related to construction, whereas those included in the operational expenditures category are past claims that must be paid out. Division reflects HTA accounting practices.

HTA_CONF 00012957

**6. Other Program Expenses:** This category consists of additional expenses related to construction support.[77] Equipment rental is the largest item within this category, primarily for car leases to support transportation within construction sites. These expenses are generally expected to grow with inflation reaching $2.5 million by FY51. 18% of all other program expenses are allocated to the toll assets, while 82% are allocated to the non-toll assets.

**7. Local construction costs:** Local construction expenditures average $12 million for the Fiscal Plan period (grown with inflation from a base of $10 million per year in FY22-26). Local Construction costs are exclusively allocated to the non-toll assets.

---

[77] Including Professional Services, Rent of Buildings, Electricity, Surveillance and Monitoring, Other Costs, Insurance, Telephone Services, Repair and Maintenance of Vehicles, Water, Equipment Rental, Maintenance and Conservation of Equipment, Subscriptions and Bills, Printed Materials, Computer-related Expenses, Repair and Maintenance of Buildings, Training, Trips, Postal Services and Cultural Activities.

63

HTA_CONF 00012958

# PART VI – PROJECTIONS WITH FISCAL MEASURES

The Fiscal Measures described in the following chapters are critical to HTA's long-term financial sustainability. If promptly and fully implemented, they have the potential to generate $6.0 billion in impact from FY22-51, taking HTA's ~$1.2 billion baseline deficit to a $4.8 billion post-measures surplus, as shown by Exhibit 35 below. Chapters 10 through 13 provide additional details on the fiscal measures outlined in Exhibit 37.

**Exhibit 35: Impact of Fiscal Measures on HTA projected surplus (deficit), FY22-51**



HTA's baseline financial projections and expected deficits from FY22 onwards demonstrate the need for the Authority to optimize expenses, generate revenues and support the transportation network of Puerto Rico through the implementation of fiscal measures. Although previous Certified Fiscal Plans outlined requirements to implement most of these measures, limited progress has been achieved to date (see Exhibit 36).

Revenue enhancements are expected to drive most of the fiscal benefit, generating approximately $5.3 billion through FY51. Cost savings would contribute approximately $0.7 billion. Enhancing toll fares and fines through price increases and performance improvement accounts for $4.7 billion of the $6.0 billion (approximately 78% of the total fiscal benefit). The impact of each measure over time is provided in Exhibit 37.

64

HTA_CONF 00012959

**Exhibit 36: Implementation status of Fiscal Measures during FY21**



| | | Fiscal measure | Description | Fiscal impact[1], $M FY21 Target | FY21 Actuals |
|---|---|---|---|---|---|
| Enhance org | 1 | Recruit a new Board of Directors | Recruit a new Board of Directors, with distinguished professionals from the private sector, thus promoting the independence of the Authority from political interference | - | |
| | 2 | Adopt organizational KPIs | Adopt a set of metrics that will be used to ensure that capital delivery happens on time and in line with best practices from other US states. | - | |
| Increase revenue | 3 | Fare increases | Increase toll fares in line with inflation and optimize fare collection through a new electronic tolling system | 7.6 | |
| | 4 | Fine increases | Increase toll fines in line with inflation, introduce a tiered fine payment system and optimize fine collection through a new electronic tolling system | 7.4 | |
| | 5 | Collect discretionary funds | Collect more discretionary funds to execute projects that would further expand the capacity of the island's transport infrastructure | -0.1 | |
| | 6 | Expand transit revenue | Expand transit revenues through the integration of TU with other transport networks and other initiatives (e.g., Transit Oriented Development) | - | |
| | 7 | Optimize toll collection | Optimize toll fare collection and fine collection through the introduction of new roadside equipment and a new vendor | 10.0 | |
| | 8 | Implement bi-directional tolling | Reduce revenue leakage through the implementation of bi-directional tolling | N/A | N/A |
| | 9 | Improve ancillary revenue | Improve ancillary revenues through activities other than asset sales (e.g., advertising, rentals) | 0.2 | |
| Optimize CapEx | 10 | Optimize capital expenses | Optimize capital expenses in a way that pushes HTA to be as efficient as other state transportation agencies | 15.4 | |
| Optimize OpEx | 11 | Reduce healthcare cost | Reduce costs of healthcare insurance while also maintaining a high level of benefits for covered employees | 1.1 | |
| | 12 | TU cost reduction | Reassess the operating contract of TU after it expires in FY32 to bring TU costs closer to costs of North American peers and outsource parking lot operations in stations | N/A | N/A |
| | 13 | Manage congestion | Introduce new congestion management mechanisms (e.g., Dynamic Toll Lanes, Bus Rapid Transit, Traffic Signal Management) | 2.6 | |
| Other | 14 | Explore concessions & implement reforms | Explore concession opportunities and implement TSR reforms to enable the Authority to develop the infrastructure of the island and improve management of the sector | - | |
| | | | Total | 44.3 | |



| | | Fiscal measure | Description | FY22-51 Fiscal impact, $M |
|---|---|---|---|---|
| Enhance org | 1 | New Board composition | Recruit a new Board of Directors, with distinguished professionals from the private sector, thus promoting the independence of the Authority from political interference | -18 |
| | 2 | Org. KPIs | Adopt a set of metrics that will be used to ensure that capital delivery happens on time and in line with best practices from other US states. | 0 |
| Increase revenue | 3 | Fare increases | Increase toll fares in line with inflation and compensate for historical non-implementation | 3,157 |
| | 4 | Fine increases | Increase toll fines in line with inflation, introduce a tiered fine payment system | 521 |
| | 5 | Discretionary grants | Collect more discretionary funds in order to execute projects that would further expand the capacity of the island's transport infrastructure | -11 |
| | 6 | Transit enhancements | Expand transit revenues through the integration of TU with other transport networks and other initiatives (e.g., Transit Oriented Development) | 283 |
| | 7 | Toll optimization | Optimize toll fare collection and fine collection through the introduction of new roadside equipment and a new vendor | 905 |
| | 8 | Bi-directional tolling | Reduce revenue leakage through the implementation of bi-directional tolling | 119 |
| | 9 | Ancillary revenues | Improve ancillary revenues through activities other than asset sales (e.g., advertising, rentals) | 163 |
| Optimize CapEx | 10 | CIP optimizations | Optimize capital expenses in a way that pushes HTA to be as efficient as other state transportation agencies | 209 |
| Optimize OpEx | 11 | Health benefits revision | Reduce costs of healthcare insurance while also maintaining a high level of benefits for covered employees | 132 |
| | 12 | TU cost reduction | Reassess the operating contract of TU after it expires in FY32 to bring TU costs closer to costs of North American peers and outsource parking lot operations in stations | 360 |
| | 13 | Congestion management | Expand Dynamic Toll Lanes, Bus Rapid Transit, and improve Signal Optimization | 167 |
| Other | 14 | Transportation reform | Explore concession opportunities and implement TSR reforms to enable the Authority to develop the infrastructure of the island and improve management of the sector | -10 |
| | | | Total | 5,976 |

HTA's cumulative $4.8 billion surplus would be entirely driven by the revenues of its toll assets. Non-toll assets would maintain balanced budgets across the Fiscal Plan period but would not generate any surplus.

65

HTA_CONF 00012960

**Exhibit 38: Post-measure Combined HTA Financial Performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | 154 | 176 | 189 | 193 | 198 | 909 | 8,196 |
| Toll fines | 36 | 43 | 43 | 44 | 44 | 210 | 1,480 |
| Other income | 10 | 10 | 11 | 11 | 9 | 51 | 367 |
| Transit fares | 5 | 7 | 10 | 12 | 14 | 48 | 482 |
| Operating FTA funds | 20 | 20 | 20 | 20 | 20 | 100 | 600 |
| Total operating revenues | 225 | 257 | 272 | 280 | 285 | 1,319 | 11,125 |
| TU Operation & Maintenance | (71) | (70) | (67) | (80) | (71) | (360) | (2,354) |
| Toll Highways Administration & Maintenance | (46) | (47) | (45) | (44) | (45) | (227) | (1,496) |
| Salaries & Related Benefits | (23) | (19) | (18) | (17) | (17) | (94) | (527) |
| Pensions | (36) | (36) | (36) | (36) | (35) | (178) | (790) |
| Other Operating Expenses | (43) | (34) | (30) | (21) | (21) | (149) | (862) |
| ROW payments | (8) | (8) | (10) | (10) | (10) | (46) | (58) |
| Integrated Transportation System | (12) | (10) | (10) | (10) | (10) | (52) | (373) |
| Litigation Reserve | (4) | (4) | (4) | (2) | (2) | (15) | (63) |
| Total operating expenses | (242) | (228) | (219) | (220) | (210) | (1,121) | (6,522) |
| Total operating balance | (17) | 29 | 53 | 59 | 75 | 198 | 4,603 |
| Regular FHWA funds | 149 | 269 | 249 | 264 | 229 | 1,160 | 6,327 |
| Regular CW CapEx appropriation | 53 | 54 | 54 | 55 | 56 | 272 | 2,002 |
| Non-regular CW CapEx funds[1] | 90 | - | - | - | - | 90 | 90 |
| Emergency Funds | 53 | 71 | 67 | 30 | 22 | 244 | 244 |
| Capital FTA funds | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Total capital contributions | 398 | 433 | 391 | 366 | 350 | 1,939 | 9,380 |
| Capital ROW payments | (3) | (4) | (4) | (4) | (4) | (20) | (145) |
| Local construction costs | (10) | (10) | (10) | (10) | (10) | (48) | (343) |
| Highway construction hard costs | (163) | (279) | (280) | (309) | (301) | (1,332) | (8,165) |
| Highway construction soft costs | (55) | (70) | (59) | (60) | (60) | (304) | (1,844) |
| Emergency repair costs | (36) | (81) | (76) | (35) | (26) | (254) | (254) |
| Toll optimization costs | (20) | (35) | (31) | - | - | (85) | (85) |
| Transit construction costs | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Construction salaries & benefits | (29) | (24) | (23) | (23) | (23) | (123) | (841) |
| Other construction programs | (2) | (2) | (2) | (2) | (2) | (8) | (59) |
| Total capital expenses | (371) | (543) | (506) | (460) | (469) | (2,349) | (12,465) |
| Total capital balance | 27 | (110) | (115) | (93) | (119) | (410) | (3,086) |
| Total aggregate balance | 10 | (81) | (62) | (34) | (44) | (212) | 1,517 |
| CW Transfer | - | 179 | 138 | 136 | 148 | 600 | 3,284 |
| Final aggregate balance | 10 | 98 | 76 | 102 | 104 | 389 | 4,802 |

HTA_CONF 00012961

**Exhibit 39: Post-measure Toll Roads Management Office Financial Performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | 159 | 182 | 194 | 199 | 204 | 938 | 8,253 |
| Toll fines | 15 | 17 | 17 | 18 | 18 | 85 | 601 |
| Other income | 4 | 4 | 5 | 5 | 4 | 22 | 154 |
| Transit fares | - | - | - | - | - | - | - |
| Operating FTA funds | - | - | - | - | - | - | - |
| Total operating revenues | 178 | 204 | 216 | 221 | 226 | 1,045 | 9,007 |
| TU Operation & Maintenance | - | - | - | - | - | - | - |
| Toll Highways Administration & Maintenance | (45) | (46) | (44) | (44) | (44) | (223) | (1,469) |
| Salaries & Related Benefits | (7) | (6) | (6) | (5) | (5) | (29) | (163) |
| Pensions | (7) | (7) | (7) | (7) | (7) | (34) | (153) |
| Other Operating Expenses | (24) | (19) | (16) | (12) | (12) | (82) | (474) |
| ROW payments | (1) | (1) | (2) | (2) | (2) | (8) | (11) |
| Integrated Transportation System | - | - | - | - | - | - | - |
| Litigation Reserve | (1) | (1) | (1) | (0) | (0) | (3) | (11) |
| Total operating expenses | (85) | (80) | (75) | (69) | (70) | (379) | (2,281) |
| Total operating balance | 93 | 124 | 141 | 152 | 156 | 665 | 6,726 |
| Regular FHWA funds | 4 | 47 | - | - | - | 51 | 51 |
| Regular CW CapEx appropriation | 5 | 6 | - | - | - | 11 | 11 |
| Non-regular CW CapEx funds[1] | 9 | - | - | - | - | 9 | 9 |
| Emergency Funds | 6 | 11 | 0 | - | - | 17 | 17 |
| Capital FTA funds | - | - | - | - | - | - | - |
| Total capital contributions | 24 | 64 | 0 | - | - | 88 | 88 |
| Capital ROW payments | (0) | (1) | (0) | (1) | (1) | (2) | (24) |
| Local construction costs | - | - | - | - | - | - | - |
| Highway construction hard costs | (8) | (58) | (33) | (41) | (47) | (188) | (1,404) |
| Highway construction soft costs | (2) | (2) | (1) | (7) | (7) | (20) | (294) |
| Emergency repair costs | (4) | (13) | (2) | (1) | (1) | (21) | (21) |
| Toll optimization costs | (20) | (35) | (31) | - | - | (85) | (85) |
| Transit construction costs | - | - | - | - | - | - | - |
| Construction salaries & benefits | (3) | (3) | (3) | (3) | (3) | (15) | (101) |
| Other construction programs | (0) | (0) | (0) | (0) | (0) | (1) | (11) |
| Total capital expenses | (39) | (112) | (71) | (52) | (58) | (332) | (1,940) |
| Total capital balance | (15) | (48) | (71) | (52) | (58) | (244) | (1,852) |
| Total aggregate balance | 78 | 76 | 70 | 100 | 98 | 422 | 4,875 |
| CW Transfer | (73) | - | - | - | - | (73) | (73) |
| Final aggregate balance | 5 | 76 | 70 | 100 | 98 | 349 | 4,802 |

HTA_CONF 00012962

**Exhibit 40: Post-measures Non-Toll Roads Assets Financial performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | (5) | (5) | (6) | (6) | (6) | (29) | (57) |
| Toll fines | 22 | 26 | 25 | 26 | 26 | 125 | 880 |
| Other income | 5 | 5 | 5 | 5 | 4 | 25 | 176 |
| Transit fares | - | - | - | - | - | - | - |
| Operating FTA funds | - | - | - | - | - | - | - |
| Total operating revenues | 21 | 25 | 25 | 25 | 24 | 121 | 999 |
| TU Operation & Maintenance | - | - | - | - | - | - | - |
| Toll Highways Administration & Maintenance | (1) | (1) | (1) | (1) | (1) | (4) | (27) |
| Salaries & Related Benefits | (10) | (8) | (8) | (7) | (7) | (40) | (226) |
| Pensions | (25) | (25) | (25) | (25) | (25) | (126) | (558) |
| Other Operating Expenses | (13) | (10) | (9) | (6) | (7) | (46) | (267) |
| ROW payments | (6) | (7) | (8) | (8) | (8) | (38) | (48) |
| Integrated Transportation System | - | - | - | - | - | - | - |
| Litigation Reserve | (3) | (3) | (3) | (1) | (1) | (12) | (52) |
| Total operating expenses | (59) | (55) | (54) | (49) | (49) | (267) | (1,178) |
| Total operating balance | (38) | (30) | (30) | (24) | (24) | (146) | (179) |
| Regular FHWA funds | 145 | 222 | 249 | 264 | 229 | 1,109 | 6,276 |
| Regular CW CapEx appropriation | 48 | 48 | 54 | 55 | 56 | 261 | 1,991 |
| Non-regular CW CapEx funds[1] | 81 | - | - | - | - | 81 | 81 |
| Emergency Funds | 47 | 61 | 67 | 30 | 22 | 227 | 227 |
| Capital FTA funds | - | - | - | - | - | - | - |
| Total capital contributions | 321 | 330 | 370 | 349 | 307 | 1,678 | 8,575 |
| Capital ROW payments | (3) | (3) | (4) | (3) | (3) | (17) | (120) |
| Local construction costs | (10) | (10) | (10) | (10) | (10) | (48) | (343) |
| Highway construction hard costs | (154) | (221) | (246) | (268) | (254) | (1,144) | (6,760) |
| Highway construction soft costs | (53) | (67) | (58) | (53) | (53) | (285) | (1,550) |
| Emergency repair costs | (32) | (68) | (74) | (34) | (25) | (234) | (234) |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | - | - | - | - | - | - | - |
| Construction salaries & benefits | (26) | (21) | (20) | (20) | (21) | (108) | (740) |
| Other construction programs | (1) | (1) | (1) | (1) | (1) | (7) | (49) |
| Total capital expenses | (279) | (392) | (414) | (390) | (367) | (1,842) | (9,797) |
| Total capital balance | 42 | (62) | (43) | (41) | 60 | (164) | (1,222) |
| Total aggregate balance | 4 | (92) | (73) | (65) | (84) | (310) | (1,401) |
| CW Transfer | - | 113 | 79 | 67 | 90 | 349 | 1,401 |
| Final aggregate balance | 4 | 22 | 6 | 2 | 6 | 40 | - |

68

HTA_CONF 00012963

**Exhibit 41: Post-measures Transit Assets financial performance**

| Item, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 | FY22-51 |
|---|---|---|---|---|---|---|---|
| Toll fares | - | - | - | - | - | - | - |
| Toll fines | - | - | - | - | - | - | - |
| Other income | 1 | 1 | 1 | 1 | 1 | 5 | 37 |
| Transit fares | 5 | 7 | 10 | 12 | 14 | 48 | 482 |
| Operating FTA funds | 20 | 20 | 20 | 20 | 20 | 100 | 600 |
| Total operating revenues | 26 | 28 | 31 | 33 | 35 | 153 | 1,119 |
| TU Operation & Maintenance | (71) | (70) | (67) | (80) | (71) | (360) | (2,354) |
| Toll Highways Administration & Maintenance | - | - | - | - | - | - | - |
| Salaries & Related Benefits | (6) | (5) | (5) | (4) | (4) | (24) | (137) |
| Pensions | (4) | (4) | (4) | (4) | (4) | (18) | (79) |
| Other Operating Expenses | (6) | (5) | (4) | (3) | (3) | (21) | (121) |
| ROW payments | - | - | - | - | - | - | - |
| Integrated Transportation System | (12) | (10) | (10) | (10) | (10) | (52) | (373) |
| Litigation Reserve | - | - | - | - | - | - | - |
| Total operating expenses | (98) | (93) | (90) | (102) | (92) | (475) | (3,063) |
| Total operating balance | (72) | (65) | (59) | (69) | (57) | (322) | (1,944) |
| Regular FHWA funds | - | - | - | - | - | - | - |
| Regular CW CapEx appropriation | - | - | - | - | - | - | - |
| Non-regular CW CapEx funds[1] | - | - | - | - | - | - | - |
| Emergency Funds | - | - | - | - | - | - | - |
| Capital FTA funds | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Total capital contributions | 53 | 39 | 21 | 17 | 43 | 174 | 717 |
| Capital ROW payments | - | - | - | - | - | - | - |
| Local construction costs | - | - | - | - | - | - | - |
| Highway construction hard costs | - | - | - | - | - | - | - |
| Highway construction soft costs | - | - | - | - | - | - | - |
| Emergency repair costs | - | - | - | - | - | - | - |
| Toll optimization costs | - | - | - | - | - | - | - |
| Transit construction costs | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Construction salaries & benefits | - | - | - | - | - | - | - |
| Other construction programs | - | - | - | - | - | - | - |
| Total capital expenses | (54) | (40) | (21) | (18) | (44) | (176) | (729) |
| Total capital balance | (0) | (0) | (0) | (0) | (0) | (2) | (12) |
| Total aggregate balance | (73) | (65) | (59) | (69) | (57) | (324) | (1,956) |
| CW Transfer | 73 | 65 | 59 | 69 | 57 | 324 | 1,956 |
| Final aggregate balance | - | - | - | - | - | - | - |

HTA_CONF 00012964

## CHAPTER 10: ORGANIZATIONAL ENHANCEMENT FISCAL MEASURES

To become an efficient capital delivery organization, HTA needs to implement the following four fiscal measures:

1. Recruit a New Board of Directors

2. Adopt Capital Delivery KPIs

3. Conduct Personnel Mapping by Asset

4. Improve Organizational Capacity

### 10.1 Recruiting a new Board of Directors

HTA must establish a Board of Directors to provide regular guidance to HTA executives, improve fiscal and corporate governance of HTA and establish the short-, medium- and long-term operational priorities of the entity in a professional and apolitical manner to ensure its services and necessary capital expenditures are adequately funded. The Board should be composed of seven members: three public servants and four independent, distinguished professionals from the private sector. The public servant positions should be filled by the Secretary of Transportation, the Secretary of Treasury and the Executive Director of AAFAF. The independent private professional positions should be filled by a licensed engineer, a finance professional and two professionals with proven public and private sector experience in infrastructure, planning, economic development and/or public administration.

Board members should (i) be appointed by the Governor, with the advice and consent of the Senate and (ii) be selected from a candidate list developed by a third-party private search firm. Members should possess relevant and successful experience in long-term transportation planning and capital investments. Additionally, membership should be staggered with defined, six-year terms to avoid disruption related to political cycles. Finally, strict guardrails should be put in place to ensure any conflicts of interest are avoided.

Recruiting the independent Board members is projected to cost approximately $0.1 million in professional search fees during FY22. Retaining the independent Board members from FY23 onwards would require that HTA provide them with compensation similar to benchmark private sector boards or public corporation board members. The Board's total compensation, including all reimbursements for applicable office expenses, would equal approximately $0.5M per year and increase in line with inflation after FY23. As stipulated in the HTA Enabling Act, members of the Board who are officials of the Government should not receive additional compensation for their services and other members will be entitled to reasonable per diems, as noted above.

Creating and implementing this new board will require enabling legislation, which should be drafted and submitted to the Legislature along with a report that details the reform's benefits. At present, HTA is reviewing proposals to engage a law firm to assist in this matter. The target date for legislative approval is June 30, 2022.

HTA_CONF 00012965

**Exhibit 42: Required Implementation Actions for Recruiting a new HTA Board of Directors**

| Measure | Action item | Responsible party | Deadline |
|---------|-------------|-------------------|----------|
| **Create new Board of Directors for HTA** | Engage law firm to assist in the legislative process | HTA | Completed |
| | Share with FOMB the draft of Law enabling the appointment of the Board | Commonwealth | March 31, 2022 |
| | Approve Law enabling the appointment of the Board | Commonwealth | June 30, 2022 |
| | Hire executive recruitment firm to identify potential independent Board members | HTA | July 31, 2022 |
| | Approve appointment of independent Board members | Commonwealth | January 1, 2023 |

## 10.2 Adopting and measuring KPIs

HTA's performance is measured by its ability to deliver against a set of KPIs based on the best practices of other U.S. transportation authorities and aligned with federal requirements. By tracking HTA' performance on different aspects of capital delivery (e.g., cost and time), HTA executives can identify and eliminate the inefficiencies that currently undermine transportation infrastructure development on the Island. As of FY21, HTA has adopted and begun tracking the KPIs and targets in Exhibit 43 and Exhibit 44. HTA must track progress against KPIs on a monthly basis and include an update in the monthly budget-to-actuals reports shared with FOMB.

In addition to the Capital Delivery and Safety KPIs, HTA must also collect a series of outcome-based metrics to track the impact of the TSR. These metrics must be collected on a periodic basis beginning in FY22 and compiled into a scorecard that will identify leading and lagging indicators of reform.

71

HTA_CONF 00012966

**Exhibit 43: Adopted KPIs - Capital Delivery**

| Strategic priorities | Metrics[1] | FY20 Actual | FY21 Actual | Target |
|---|---|---|---|---|
| Preconstruction Program | Delays in NTP (Days from plan – Program Level) Quarterly – Cumulative | 6 Days | 15.8 Days | <30 Days |
| | % of Planned NTP Awards (Program Level) Quarterly | 100% | 43% | >80% |
| | % of Federal Funds Obligated (Program Level) Annual | N/A | 88.6%[1] | >90% |
| | % Soft vs Hard Costs (Program Level) Annual – Previous Year | N/A | N/A | 15% |
| Construction Delivery | % Change in Cost (Program Level) Quarterly - Cumulative | 1% | 10.9% | <15% |
| | % Change in Duration (Program Level) Quarterly - Cumulative | 5% | 67.0% | <25% |
| | Disbursement Variance (Program Level) Quarterly - Cumulative | 2% | -25% | <20% |
| Capital Improvement Program | Disbursement Variance (Program Level) Quarterly - Cumulative | N/A | N/A | 20% |

1 Applies to regular funds only. Per most recent estimates, 65.9% of emergency relief funds have been obligated.

**Exhibit 44: Adopted KPIs - Safety, Asset Quality, & Congestion**

| Strategic priorities | Metrics | FY20 Actual | FY21 Actual | Target |
|---|---|---|---|---|
| Safety | # of road fatalities per 100M VMT | 1.91 | 1.89 | <1.86 |
| | # of road serious injuries per 100M VMT | 24.0 | 28.6 | 31.7 |
| Asset quality | % of Interstate Pavement in Good condition[2] | 10.8% | 13.0% | >2% |
| | % of Interstate Pavement in Poor condition[2] | 13.2% | 14.3% | <5% |
| | % of Non- Interstate NHS Pavement in Good condition[2] | 2.2% | 4.2% | >2% |
| | % of Non-Interstate NHA Pavement in Poor condition[2] | 9.0% | 8.0% | <20% |
| | % of NHS bridges in Good condition[2] | 20.5% | 18.0% | >10% |
| | % of NHS bridges in Poor condition[2] | 11.2% | 9.0% | <10% |
| Congestion | $ of congestion cost per customer | $1,150 | N/A | $1,045[1] |
| | Travel time index | 1.31 | N/A | 1.23[1] |
| | Mins for incident response | N/A | 0.5 | <15 mins |

2 As defined by FHWA using International Roughness Index (IRI)

HTA_CONF 00012967

**Exhibit 45: Proposed KPIs - Transportation Sector Reform Scorecard**

| Objectives | Impact metrics | Current PR performance | US median performance |
|---|---|---|---|
| Performance & Condition | Road condition: % of interstate pavement in poor condition | 12 | 2 |
| | Transit revenue generation: Non-fare directly-generated funding as % of total | 12.3 | 23.7 |
| | Train system condition: # of failures per 1M revenue mile | 373 | 55 |
| Experience & Efficiency | Driving experience: Hours lost to congestion per person per year | 58 | 54 |
| Sustainability & Resilience | Sustainable commuting options: % sustainable mode share | 22% | 27% |
| | Road safety: Road fatalities, # per 100M VMT | 2.0 | 1.1 |
| | Air quality: Days with AQI > 100 | 19 | 4 |

On a project level, HTA executives should also work with division leaders and project administrators to identify more granular KPIs for each specific construction project. These metrics should be communicated to all project stakeholders (e.g., employees and contractors). Following this, division leaders and project administrators should design enforcement mechanisms, such as timelines of project milestones with project owners and penalties for KPI underperformance.

**Exhibit 46: Required Implementation Actions for adopting and revising KPIs**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Track impact of reforms | Adopt transportation sector reform KPIs per the Commonwealth's selected scorecard | AAFAF | August 31, 2022 |
| Adopt project specific KPIs | Submit proposed project specific KPIs to FOMB for approval | HTA | Completed |
| | Approve project specific KPIs (with any necessary revisions) and determine a reporting cadence | FOMB | Completed |
| Update KPIs | Confirm relevance of existing KPIs and propose any updates that might be necessary | HTA | June 30, 2022 |

HTA_CONF 00012968

### 10.3 Organizational Capacity Analysis & Development

**Conduct productivity analysis**

In anticipation of future asset transfers per the transportation sector reform, described in Chapter 1, it is critical that HTA develop a report illustrating how its current personnel are mapped to assets currently housed within HTA. HTA should develop a map that shows to what extent each role in the organization supports toll roads, non-toll roads and transit assets. For roles split across asset types, HTA should estimate the fraction of that role attributable to each asset type and indicate whether the roles would be transferred to another entity as part of the transportation sector reform.

Furthermore, alongside asset-mapping, HTA must assess the productivity of its personnel. HTA must compile and submit a report to the FOMB that lays out the personnel required to deliver core services for each asset, including implementation of its capital plan. To estimate the impact of asset transfers, a clear understanding of the personnel within each function will allow HTA to assess its current operation and capital delivery for each of these assets, especially once asset transfers may change organization of personnel for each asset. Therefore, in addition to the personnel map, it is critical that HTA create a future-state organizational structure for the Plan duration after certain roles and responsibilities have been transferred to other entities. This organizational structure should highlight the gaps for which post-reform entities would need to hire personnel to fill the role. Overall, this analysis should be tied to a future-state mapping for what the future organization might look like for a toll road management office and a non-toll road management office, per the TSR. To complete these studies, HTA should hire a third-party firm to conduct an analysis of the personnel supporting assets within the Agency.

**Exhibit 47: Required implementation actions for classifying HTA's personnel by function**

| Initiative | Action item | Responsible party | Deadline |
|---|---|---|---|
| Conduct personnel mapping by asset | Create an RFP for procurement of a third-party firm to conduct personnel mapping and productivity reporting study | HTA | August 20, 2021 (Delayed) |
| | Study begins with selected third-party firm | HTA | November 30, 2021 (Delayed) |
| | Study concludes and HTA is able to assess the impact of asset transfers based on the mapping of personnel | HTA | June 30, 2022 |
| | HTA provides the assessment to FOMB. | HTA | July 30, 2022 |

**Improve organizational capacity**

As part of the MOU with FHWA, HTA must improve its systems, procedures and bylaws to become a more efficient organization and expedite project delivery process. In FY21, HTA launched an RFP with a third-party consultant to study and analyze potential areas for improvement. The resulting report had a series of recommendations that covered the following:

74

- Billing Process
- Organizational Structure
- Project Development Process
- Standard Documentation
- Laws and Regulations
- Standard Operating Procedures
- Training program

HTA has been in the process of implementing these recommendations. The Authority has issued RFPs to procure improved systems such as email communication, electronic project monitoring system and improvements to the financial billing system to reduce HTA's obligated but unspent balances. HTA has already completed its upgrade of email communications to Microsoft Office 365. Furthermore, HTA is nearing completion of upgrading its financial systems to Oracle e-Business suite and implementing the Oracle Primavera Unifier for project management information systems (PMIS).

HTA must continue implementing these recommendations and provide updates to the FOMB until it is deemed to be fully compliant with the requirements of its FHWA MOU.

At the same time, HTA needs to prepare for the implementation of TSR, as outlined in Chapter 1. HTA should set up an operationally ringfenced Toll Road Management Office, which will include all employees that support construction and administrative functions for toll roads. In parallel, it should work with DTOP to understand how many employees will be transferred over to support non-toll maintenance and identify the divisions that will absorb them. HTA's resulting organizational structure is shown in Exhibit 48.

**Exhibit 48: Anticipated Organizational Structure of HTA per Recommendations**

HTA_CONF 00012970

Exhibit 49: Required Implementation Actions for Improving Organizational Capacity

| Initiative | Action item | Responsible party | Deadline |
|---|---|---|---|
| Improve organizational capacity | Completion of financial systems transition | HTA | June 30, 2022 |
| | Completion of project management information system update | HTA | June 30, 2022 |

## CHAPTER 11: FISCAL MEASURES: REVENUE INCREASES

Six revenue fiscal measures should be implemented by HTA to generate a forecasted $5.3 billion over a 30-year period, forecasted to deliver approximately 88% of the total fiscal measure impact:

1. Increasing toll fares and optimizing fare collection: $3.7 billion (~61%)

2. Implementing bi-directional tolling: $0.1 billion (~2%)

3. Increasing toll fines, introducing tiered fine system and optimizing fine collection: $0.9 billion (~15%)

4. Expanding transit revenues: $0.3 billion (~5%)

5. Improving ancillary revenues: $0.2 billion (~3%)

6. Adopting congestion management initiatives: $0.2 billion (~3%)

7. Collecting discretionary funds: zero net fiscal impact given addition investment from the corresponding expenditures that will match funding inflows (0%)[78]

### 11.1 Increasing toll fares and optimizing fare collection

Toll fare price increases and enhanced collection are critical measures to increasing revenues to ensure fiscal sustainability. During the period of FY22-51, HTA is forecasted to generate $8.2 billion in cumulative toll fare revenues through implementation of these measures and other revenue enhancements. Two initiatives could raise approximately $178 million in additional revenue cumulatively by FY26 and approximately $3.7 billion cumulative by FY51:

- Increasing toll fares on HTA-operated toll roads; and
- Improving and expanding the Open Road Tolling ("ORT") system to improve efficiency in collecting toll fares[79]

HTA may propose and implement alternate means or approaches for generating toll fare revenue, provided such alternate means or approaches achieve the same level of aggregate revenue per year as those reflected in the Fiscal Plan. Otherwise, HTA must implement the measures outlined herein to ensure full compliance with the Fiscal Plan's fiscal objectives.

---

[78] The net fiscal impact of these funds will be zero, because funds will be spent on discretionary projects beyond the maintenance of transportation assets in a SOGR. Separated out in fiscal measure impact.

[79] ORT, also called all-electronic tolling, cashless tolling, or free-flow tolling, is the collection of tolls on toll roads without the use of toll booths. An electronic toll collection system is usually used instead.

HTA_CONF 00012971

*Increasing toll fares*

Toll fare increases, tied to inflation, are implemented in U.S. states and on the Puerto Rico toll roads that are managed and operated by concessionaires. Regular fare increases are necessary to ensure adequate investment in the toll road system for the continued maintenance of SOGR.

HTA has not increased toll fares for HTA-owned toll roads since 2005. As a result, HTA has had difficulty investing in and improving its road infrastructure in years past, evidenced by the difference in the condition of HTA and concessionaire roads. As Exhibit 50 shows, the fare rates for two of HTA's four toll roads are below the U.S. median. Moreover, even when adjusted for income, all but PR-66 are below the upper quartile. PR-52, the largest toll revenue generator for HTA, falls well below the U.S. median even when adjusted for income. This suggests an opportunity for toll fare increases that would not only generate additional revenue but also bring HTA-owned toll roads in line with U.S. peer roads.

**Exhibit 50: Comparison of tolling in Puerto Rico and other US states**



Toll fares now face a 16-year gap where they failed to keep pace with expenses. Each year HTA fails to implement these increases, fare pricing on the Island falls increasingly out of step with inflation and, by extension, the cost of maintaining HTA-owned roads and transportation assets. The gap between toll revenues and operating expenses remained largely flat through COVID-19 (see Exhibit 51) yet is forecast to slowly grow without fare increases. This gap could be covered by toll fare increases that catch up with inflation adjustments that have not been implemented since 2005 and maintains inflation-based increases thereafter.

Since 2015, HTA has offset its deficits with transfers from the Commonwealth and reallocation of capital expenditure funds to operational expenditure accounts. This approach prevents HTA from achieving its capital delivery targets and depletes funds that could be used for other purposes and are necessary to improve the transportation system.

Lack of investment leads to an inability to properly maintain roads, thus inhibiting economic growth in Puerto Rico. The increasing gap between toll revenues and operating expenses only

77

further highlights the importance of implementing initial fare increases to make up for the lack of revenue in recent years.

**Exhibit 51: Comparison of toll revenues and operating expenses, FY18-21**



Toll revenues[1], $M

HTA operating expenses, $M

1 PR-20, PR-52, PR-53, PR-66, and related V-tolls (both period and off-period)
SOURCE: FY21 Certified Fiscal Plan, June FY18 B2A

The 2022 HTA Fiscal Plan outlines a fare increase schedule that would allow for HTA to make up lack of fare increases since 2005. The Plan schedule will enable fares, over time, to catch up with inflation since 2005 and compensate for the lack of increases in FY20 and FY21. For FY22 to FY24, the schedule imposes annual fare increases of 8.3%. From FY25 onwards, annual increases adjust to CPI plus 1.5%, in line with the existing concessionaire agreements in Puerto Rico. The impact of fare increases on HTA's revenue is shown in Exhibit 52.

In the event that other revenue-generating measures are identified that generate an impact incremental to the estimates contained in this plan, any impact over-and-above the levels estimated in the 2022 HTA Fiscal Plan could be used to offset a portion of these toll fare increases.

Increased fares will also allow HTA to make up for foregone revenues and to strengthen its toll road network. A prompt increase to account for historical inflation and non-implementation of fare increases should improve HTA's ability to cover its operating expenses and invest in the safety and quality of the road network. Observed price elasticity of toll roads in Puerto Rico (e.g., concessionaire roads) suggest that, in the short term, demand should remain inelastic. The 2022 HTA Fiscal Plan assumes inelastic demand (0.05), consistent with both academic

78

HTA_CONF 00012973

research and case studies of Puerto Rico's demand for toll roads.[80],[81] Furthermore, concessionaire roads in Puerto Rico, which have a similar schedule of increases as is proposed by the toll fare increase measure,[82] reinforce the benefit of higher revenues enabling investment for better road quality. As of May 2021, less than 1% of PR-22's pavement is in "poor" condition, compared to 12% of Puerto Rico's interstate system. Based on these assumptions, Exhibit 52 and Exhibit 53 demonstrate revenues and traffic volumes forecasted over time.

#### Exhibit 52: Additional revenue from toll fare increases, FY22-51



Additional revenue brought in by toll fare increases, $M

#### Exhibit 53: Impact of toll fare increases on toll prices, FY22-51

Average toll price[1] (USD)

| Road | Plaza | Current | FY2025 | FY2030 | FY2035 | FY2040 | FY2045 | FY2051 |
|------|-------|---------|--------|--------|--------|--------|--------|--------|
| PR-20 | Guaynabo | 0.75 | 0.98 | 1.14 | 1.32 | 1.55 | 1.84 | 2.24 |
| PR-52 | Ponce | 0.75 | 0.98 | 1.14 | 1.32 | 1.55 | 1.84 | 2.24 |
| PR-53 | Hucar | 1.00 | 1.31 | 1.52 | 1.77 | 2.07 | 2.45 | 2.99 |
| PR-66 | Rio Grande | 1.00 | 1.03 | 1.20 | 1.39 | 1.63 | 1.92 | 2.35 |

1 For PR-20, PR-52, and PR-53, fares shown are based on current rates for Class 1 vehicles projected to grow by CPI+1.5%, with three years of additional increases of approximately 7% for "catch up" from non-increases in FY20 and FY21. For PR-60, fares increase at a rate of CPI+1.5% beginning in FY25.

---

[80] Pricing for toll roads is a function of the elasticity of the demand for travel. Demand in the absence of alternative routes of similar quality and availability, especially during peak times, remains relatively stable in the short term and slightly lower in the long term as a result of changing traffic and commuting patterns over time. As such, Puerto Rico's toll road fares are projected assuming greater inelasticity per the assumptions laid out by FHWA in its study, "Economics: Pricing, Demand and Economic Efficiency." https://ops.fhwa.dot.gov/publications/fhwahop08041/fhwahop08041.pdf

[81] For example, a ~43% toll fare increases across toll plazas in 2005 yielded a 50.4% growth in revenues for HTA between 2005 and 2007, highlighting limited relative impact on demand.

[82] Metropistas operates roads with a CPI plus additional 1.5% schedule of annual increases.

79

The 2022 HTA Fiscal Plan includes below a timeline that HTA should follow to roll out the proposed toll fare increases, in line with the 2021 Certified Fiscal Plan. The implementation of this timeline, however, has already been delayed. The 2022 HTA Fiscal Plan requires HTA to address any outstanding delays or promptly identify alternative measures that would enable the achievement of its target revenue profile.

**Exhibit 54: Toll fare increase implementation**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Implement toll fare increases** | Hold sessions informing public of upcoming fare adjustments | HTA | November 1, 2021 (Delayed) |
| | Increase toll fares in line with the Fiscal Plan | HTA | January 1, 2022 (delayed) |
| | Implement recurring toll fare increases at end of each Fiscal Year | HTA | January 1, 2022-2051 |

### *Optimizing fare collection*

The 2022 HTA Fiscal Plan also requires the Authority to optimize fare collection by installing new tolling systems and simultaneously expanding ORT. Optimizing tolls and expanding ORT will require an investment of approximately $55 million in capital expenses from FY22 to FY24. This figure will be fully offset by the additional toll revenues that the optimized fare collection will generate over the next 30 years (approximately $596 million), as seen below.

**Exhibit 55: Impact of toll optimization on fare revenue, FY22-51**



Toll optimization impact on fares[1], $M

1 Assumptions: ORT Conversion impact: 5% revenue increase for all affected parts of the network Toll operator improvement: 3% revenue increase

In 2018, HTA appointed a temporary operator for a transition period of 18 months and initiated a process to select a permanent operator for all toll roads. The procurement process of the operator is subject to the outcome of the ongoing legal proceeding related to the original RFP. However, HTA has worked with the existing provider and is moving forward with optimization measures while the litigation is resolved. The permanent operator plans to install new systems that increase the reliability and speed of transaction processing and account balance

HTA_CONF 00012975

maintenance, better track toll violations and ensure data collection complies with all relevant security protocols.

HTA has made initial progress on toll optimization measures. The ORT plazas at Juana Diaz and PR-66 have already been upgraded and reflect increased quality and accuracy of toll collections. Furthermore, HTA has launched a mobile customer interface and app to improve service delivery options. During Q3 of 2021, merchant fees at replenishment lanes will be replaced, creating additional savings. While progress has been made, HTA should diligently follow the timeline outlined in Exhibit 56 to ensure that toll optimization measures are completed and to enhance toll fare revenue beginning in FY22.

Through implementation of toll optimization measures, HTA expects several outcomes. For users, HTA hopes to deliver increased reliability and speed in transaction processing and account concerns, as well as new customer-friendly channels to increase registered accounts. These channels are also expected to reduce violations. Furthermore, HTA plans to enact a PCI compliant system, as well as transparency between the lane and back offices, optimizing transaction capture and recording.

**Exhibit 56: Required Implementation Actions for optimizing toll fare revenue**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Optimize toll fare revenue** | Introduce optimized electronic fare collection system | HTA | In process |
| | Begin expansion of ORT | HTA | December 31, 2022 |
| | Issue RFP for new toll operator | HTA | January 31, 2023 |
| | Select new toll operator and begin contract negotiations | HTA | June 30, 2023 |
| | Finalize new operator contract and submit for FOMB review | HTA | August 31, 2023 |
| | Begin operations under new toll operator | HTA | October 1, 2023 |

### 11.2 Implementing bi-directional tolling

Uni-directional tolling was initially implemented by HTA in the late 1990s to streamline manual tolling. However, the adoption of ORT through the installation of bi-directional gantries will allow HTA to improve compliance and equity with fare collection, including reducing leakage (e.g., users of toll roads who circumvent toll plazas). The benefits from bi-directional tolling will outweigh the initial capital and ongoing operating costs.

A third-party report commissioned by HTA identified six potential high value locations for bi-directional tolling (1) Guaynabo, (2) Ceiba, (3) Humacao Norte, (4) Humacao Sur, (5) Caguas Norte, and (6) Hucar.

81

**Exhibit 57: Map of proposed bi-directional tolling locations**



To quantify the impact of changing the current one-way tolling scheme to a two-way tolling scheme on the proposed plazas, HTA collected data on the plazas and then used network models to assess sensitivities around different tolling scenarios to finally estimate the expected revenue impacts for each toll plaza. Assuming that the two-way tolls would be half of the current toll rates plus $0.05 and that in converting a toll plaza from one-way tolling to two-way tolling, tolled traffic is expected to more than double:

- While traffic levels are generally higher in the non-tolled direction indicating that some travelers are traveling a different route to avoid the toll, the toll rate in the currently tolled direction will decrease with the conversion and thus that direction should experience a higher traffic level.

- Once the toll rate is equal in both directions, the currently non-tolled direction should obtain a similar level of traffic as the tolled direction with the lower two-way toll.

- The magnitude of the increase will be influenced by the size of the traffic difference between the current tolled and non-tolled directions and the attractiveness of the non-tolled route

With these assumptions, HTA estimated that toll fare revenues would increase by ~10-30% across the affected plazas. While this estimated revenue improvement target represents a significant improvement compared to the assumptions provided in the 2021 Certified Fiscal Plan, the 2022 HTA Fiscal Plan maintains a more conservative expected revenue improvement of 5%, with proposed rollout of bi-directional tolling across 7 plazas. This would translate into $149 million of additional revenue over the period of the Fiscal Plan, notwithstanding $30 million in capital investment costs to install gantries over FY22 to FY24.

As actual data from the implementation of bi-directional tolling comes in, this projection may need to be refined and revised upward, if the 10-30% increase estimated by third-part analyses are realized.

HTA_CONF 00012977

**Exhibit 58: Required implementation actions for bi-directional tolling**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Implement bi-directional tolling | Procurement of a third-party consultant to conduct traffic studies for proposed locations | HTA | Complete |
| | Completion of study with cost-benefit analyses and recommendations for plazas | HTA | Completed |
| | Roadside equipment (RSS) request for proposal published | HTA | Completed |
| | Note to proceed per RSS request for proposal | HTA | Completed |
| | Phase 1: Collection begins for ~6 plazas | HTA | July 1, 2022 |
| | Phase 2: Collection begins for up to ~7 plazas | HTA | July 1, 2023 |

### 11.3 Increasing toll fines, introducing a tiered fine system and optimizing fine collection

Toll fines are an additional critical component of the overall revenue profile that HTA must achieve during the period of FY22-51. The 2022 HTA Fiscal Plan outlines three steps that HTA should undertake to achieve that revenue target, namely:

- Optimizing fine collection (e.g., through collection rate improvements)

- Increasing toll fines in line with inflation

- Introducing a tiered fine system that would double fines remaining unpaid for more than 6 months

Together, these measures could generate approximately $100 million cumulatively from FY22-26 and $864 million cumulative from FY22-51, plus an additional $20 million of cost savings. HTA may propose and implement alternate means or approaches for generating toll fine revenue, provided such alternate means or approaches achieve the same level of aggregate revenue per year as those reflected in the Fiscal Plan. Otherwise, HTA must implement the measures outlined herein to ensure full compliance with the Fiscal Plan's fiscal objectives.

### Optimizing fine collection

With the introduction of a new toll operation system, the fine collection rate is expected to increase from 60% (pre-Maria historical average) to 80%, while fine collection lifecycle is expected to decrease from 18 to 12 months. These improvements are projected to generate $59 million in additional revenue over the next five years (FY22-26) and $343 million through FY51. Toll fine optimization improvements are also projected to generate $20 million of cost

83

savings through FY51, given that the new system will reduce HTA's dependence on physical fine enforcement mechanisms.[83]

### Increasing toll fines and introducing a tiered fine system

To achieve the fiscal targets contained in the 2022 HTA Fiscal Plan and ensure that its operations are adequately funded, HTA should increase its fine rates in line with inflation and implement a tiered fine system to reward early payment. Increasing fine prices in line with inflation (to the closest multiple of $1) will align with both the scheduled increases in toll fares and the Federal Civil Penalties Adjustment Act of 2015. Fine increases will consequently encourage drivers to avoid penalties and minimize nonpayment of fines. Furthermore, implementation of a tiered fine payment system is consistent with best practices of other U.S. states.[84] The system will incrementally increase fines for all violations that go unpaid for over six months.[85] The tiered system should reward timely payments and penalize late payment. These two measures should generate $41 million in additional fine revenue over the first five years (FY22-26) and $521 million by FY51 (Exhibit 59).

Legislative action is required before HTA can implement toll fine increases and establish a tiered toll-fine structure. To help HTA implement these strategies by Q4 of FY22, HTA and the Commonwealth should collaborate to develop the necessary legislation and support its approval by February 28, 2022.

The implementation of this measure may be delayed, as HTA evaluates changes to fine pricing. The 2022 HTA Fiscal Plan requires HTA to mitigate any potential delays or promptly identify alternative measures that would enable the achievement of its target revenue profile.

**Exhibit 59: Impact of toll fine measures, FY22-51**



Financial impact of toll fine measures FY22-FY51[1], $M

Legend: Toll optimization, Fine increases, Tiered fines

1 Option A (current fine price level) assumes that all measures that exist in the previous fiscal plan (e.g. collection rate optimization) are fully implemented
2 Lost revenues for each month of delay to July 2022 fine collection, assuming a system with fully implemented fiscal measures (tiered system, toll optimization)

---

[83] E.g., letters notifying violators that fines are pending after several months of nonpayment

[84] In Virginia, for example, unpaid fines double after 2 months and increase eightfold after 4 months.

[85] For the purposes of this Plan, HTA has assumed that fine prices would double after a violation remains unpaid for six months. The simplicity of the tiered system structure would ensure straightforward implementation.

HTA_CONF 00012979

**Exhibit 60: Required implementation actions for increasing toll fine revenue**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Increase toll fine revenue | Resume fine collections with optimized electronic fine collection system | HTA | Complete |
| | Develop draft legislation for tiered fine system/ fine inflation increases and submit for FOMB review | Commonwealth | August 30, 2021 (Delayed) |
| | Approve Law enabling fine price modifications | Commonwealth | November 30, 2021 (Delayed) |
| | Introduce tiered fine system | HTA | February 28, 2022 |
| | Implement recurring toll fine increases at end of each Fiscal Year | HTA | March 31, 2022 |

### 11.4 Improving ancillary revenues

HTA has been implementing strategies over the last year to generate ancillary revenues. Implementation thus far has focused on disposing of real estate assets. However, this strategy cannot continue over the long run because it would deplete most of HTA's real estate portfolio.

Despite the temporary ancillary revenue decline in FY21 due to COVID-19, HTA expects to generate $1.1 million a year in incremental ancillary revenues from FY22 to FY26, primarily as a result of the sale of a majority of HTA's non-core assets. A third-party contractor will determine whether properties being considered for sale could sustain long-term, repeating revenues prior to being sold in the short term. The contractor will also identify the activities that will allow for short-term revenues to be pursued. Future asset sales will be considered as HTA continues to identify and liquidate available properties; however, property and asset sales are not a sustainable source of revenue that can be relied on in the long term.

HTA has also identified suggestions for sustainable, repeatable sources of ancillary revenue that will eventually become a majority of HTA's ancillary revenues. For example, HTA is in process of developing a plan to hire a third party to manage TU parking operations. While revenue opportunities would be limited, HTA would offset approximately $1.5 million in operating expenses related to maintenance.

Emulating peer transit systems that have explored diversified ancillary revenue opportunities (e.g., advertising, space rentals, real estate development) would further allow HTA to increase its ancillary revenues sustainably.

HTA_CONF 00012980

**Exhibit 61: Benchmarks of ancillary revenue performance**



To achieve the fiscal targets contained in this Fiscal Plan and ensure its operations are adequately funded, HTA must increase TU's ancillary revenues by:

- **Real estate leasing and development (as opposed to direct sale):** HTA must maximize retail business spaces at the TU stations by renting available spaces. HTA should plan to explore the development of HTA-owned properties near TU stations. To maximize the attractiveness, safety and traffic in these areas and encourage TU ridership, HTA should collaborate with the private sector. Doing so will increase fare revenues and generate a passive income stream from rentals.

- **Advertising:** HTA must maximize advertising revenue by installing advertisements in different locations within TU stations (e.g., platform walls and pillars) its fleet and materials (e.g., tickets and rail cars). It should outsource advertising management to a private agency that is an expert in attracting advertisers.

HTA must also increase the ancillary revenues of its highway operations through other means, including:

- **Real estate development or rentals:** HTA should partner with private companies to build and operate highway-side facilities (e.g., service stations, hotels and gas stations), to boost its income from real estate. The concessions must be structured so that the concessionaires pay either a lump sum payment at the beginning or a recurring annual payment on the basis of the rents they collect from these facilities. HTA should also enhance its existing service stations with improved services that will enhance the experience at and revenues from the stations.

- **Advertising:** HTA should install advertisements on billboards, road signs and toll plazas in a manner that complies with the federal and local legal limitations on Out of Home (OOH) advertising.HTA is currently evaluating a proposal for the construction of fiber optic communication infrastructure along the PR-5 and PR-22 toll roads, which

HTA_CONF 00012981

would improve the overall resiliency of Puerto Rico's communication network, while also providing additional non-toll revenue to HTA. This project is in the initial stages of evaluation, but early estimates suggest potential yearly revenues for HTA between $700K and $3.1M and margins of 20%. In addition, on March 2021, HTA submitted a proposal to the Puerto Rico Public Private Partnerships Authority ("P3 Authority") for a P3 project to modernize HTA's digital infrastructure, which would provide greater access to high-speed internet to the public, while providing additional revenues to HTA. The P3 Authority will conduct a Desirability and Convenience Study to determine the viability of the project. Once this study is completed, HTA will be able to provide a more detailed project scope, revenue estimates and implementation timeline.

HTA should also evaluate other high-impact opportunities that may currently face legislative or administrative constraints and explore ways to maximize its revenues within those constraints. Through P3's for new revenue share mechanisms such as for broadband and telecommunications, HTA could potentially charge utility companies for access to Right of Way (ROW) land plots near highways and TU tracks. Exhibit 62 highlights the combined benefits of these activities.

If HTA were to collect ancillary revenue similar to successful peer benchmarks per a moderate scenario,[86] it would increase its ancillary revenues by $6 million through FY26 and by $163 million through FY51.[87] In order to meet these targets, HTA must invest approximately $0.4M per year (adjusted for inflation) from FY22 onwards in an ancillary revenue management team.

**Exhibit 62: Impact of ancillary revenue measures, FY22-51**



Ancillary revenue measures impact[1], FY22-51, $M

1 Assumptions: TU ancillary revenue measures are designed to help HTA's TU operations attain $4.14 per 100 passengers by FY2025 / Highway ancillary revenue measures are designed to help HTA's highway operations become 4.4% of toll revenues by FY2025 / Both targets assume that TU ridership and toll revenues would increase due to the implementation of the fiscal measures included in this Plan (e.g., transit enhancements, fare increases) / Numbers for highway measures incorporate impact of planned investment (~$0.4M / year)

[86] Assumptions include target revenues to be 5.1% of toll revenues, based on FY21 data and a target non-farebox revenue per 100 passengers to be $5.64.

[87] Targets are based on HTA maintaining the following ratios stable at their FY21 levels: Tren Urbano anc. revenues / Tren Urbano passengers & Highway anc. revenues / Toll fare and fine revenues. Keeping these ratios stable while increasing Tren Urbano ridership and toll revenues (thanks to other fiscal measures) would push HTA to substantially increase its ancillary revenues as well.

87

**Exhibit 63: Required implementation actions for improving ancillary revenue**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Improve ancillary revenue | Hire ancillary revenue management team | HTA | Completed |
| | Begin a campaign to increase ancillary revenue through short-term gains (e.g., advertising) | HTA | February 28, 2022 |
| | Begin coordination with third parties for ancillary revenue increases that require contracting (e.g., rentals) | HTA | March 31, 2022 |
| | Begin ancillary revenue increases that require long-term planning and complex legal agreements (e.g., joint real estate development initiatives) | HTA | June 30, 2022 |
| | Develop a comprehensive ancillary revenue strategy, which will include a full asset inventory and an analysis of administrative constraints and submit to FOMB for review | HTA | June 30, 2022 |

### 11.5 Expanding transit fare revenues

Historically, TU has underperformed peer small metro transit authorities in medium-sized U.S. cities in terms of farebox recovery ratio ("FRR"). FRR, the ratio of operating revenues to operating expenses, is a measure of the financial sustainability of a system, with higher number indicating a higher level of financial sustainability. In FY17, before Hurricane Maria, TU's Farebox Recovery Ratio (FRR) was approximately 15% before falling to ~11% in FY19. This compared to an average of ~25% of peer systems over the same time period, indicating TU's relative lack of financial sustainability. A key driver of the fall in FRR has been a fall in ridership; TU's ridership has fallen to ~1.5 million passengers, well below peer systems such as Baltimore's SubwayLink, which has an annual ridership of ~8 million passengers.

The low FRR and ridership metrics are driven by TU's difficulty in attracting riders, which stems from several factors: technical infrastructure problems (e.g., malfunctioning Point of Sale machines), little integration between the TU and San Juan's other public transit systems (e.g., PRITA buses and the ATM ferry) and riders' tendency to use private vehicles or transportation networks (e.g., públicos). Furthermore, COVID-19 negatively impacted TU as it did many transit systems, causing ridership to drop by ~75%. Because of these factors, TU's FRR fell to approximately 2% in FY21.

HTA_CONF 00012983

### Exhibit 64: Comparison of TU FRR with Peer Transit Systems



1 Revenues earned from fares/Total operating expenses; 2 Data was available through March 2019, was annualized to calculate annual farebox revenue; 3 Heavy rail line connecting New Jersey suburbs with Philadelphia; 4 Buffalo's light rail line; 5 Peers were chosen from both Light Rail (LR) and Heavy Rail (HR) reporting entities that met 3 of 4 criteria: Less than 18 stations  (TU=16),  Less than 40 track miles (TU=25.5),  Less than $15M in 2017 operating revenue (TU=$9.8M),  Less than 11M Unlinked Passenger Trips (TU=9.8M)
SOURCE: National Transit Database (NTD) FY 2017, PRHTA TU Ridership Data (March 2019)

By improving service, HTA's ridership should increase. Based on COVID-adjusted performance of peer systems, TU's FRR could increase approximately 18% with improved service. HTA's transit revenues would increase by approximately $19 million by FY26 and about $283 million cumulatively by FY51.[88] It would also reduce the environmental impacts of private-vehicle ownerships and enhance affordable commuting options for low-income households. To attain this FRR, HTA must enhance revenue in two categories: (i) improvements it can directly implement; and (ii) improvements where HTA needs to collaborate with other public or private entities (e.g., integration with the Metropolitan Bus Authority (AMA by its Spanish acronym) buses and Públicos). HTA must implement the following improvements:

- **Point of Sale (POS) system repair**: The fare collection system is an integral part of the public transportation system. The fare collection software and back-office systems have remained the same since TU began operations in 2005, which now results in operational challenges for HTA. Following the hurricanes of 2017, 25% of ticket vending machines and 49% of passenger barriers were in operating condition; this reflects the current status of the system. The Automatic Fare Collection system (AFC) continues to operate in a state of severe post-hurricane degradation and limits the revenue stream and proper accountability. As a result of outdated POS systems, TU riders cannot use debit or credit cards to purchase tickets, further decreasing revenue opportunity and ridership. HTA is hiring a contractor to repair the POS machines and HTA projects the system will be fully operational by Q1 FY25. Once POS machines are reintroduced, TU fare revenues are expected to increase by 5% (increasing revenues by $8 million from FY22 to FY51).

- **Enhancement of TU's rider rules**: To ensure the fiscal targets contained in this Fiscal Plan are met, HTA must ensure that TU ridership rules encourage the use of public

---

[88] Gap of remaining 5% could be closed by implementing cost reductions.

HTA_CONF 00012984

transit and address the needs of commuters who rely on TU as their main mode of transportation (e.g., enabling the carriage of bicycles / scooters).

To enable the achievement of the fiscal targets contained in this Fiscal Plan, implementation of measures to promote economic growth and investment in the public transportation system, HTA needs to also work closely with other transit agencies, government authorities and private transport companies to carry out other initiatives (see Exhibit 66 for timeline):

- **Integrating public transit systems and agencies:** HTA needs to collaborate closely with other public transit agencies (e.g., ATM, AMA, PRITA) to integrate TU's operations with their bus and ferry networks, set forth below. Leveraging existing capacity will allow HTA to increase ridership and improve service quality. As part of this, HTA should:

  - Adopt a single farecard for all transit systems

  - Harmonize fares and schedules across TU, buses and ferries

  - Design a coordinated network of routes, creating high-frequency trunks with timed transfers to a useful branch network

  - Pool data to develop better scheduling and routing

  - Redesign the physical landscape around transit stations to make them more accessible for pedestrians and increase their visibility

- **Improving curb management practices:** HTA should work with the Commonwealth and local municipal authorities to promote innovative curb management practices (e.g., dynamic pricing for on-street parking and replacing on-street parking with drop-off zones). These programs will encourage commuters to use public transit, decrease congestion and increase TU's revenues.

- **Promoting Transit-Oriented Development (TOD) around TU stations:** HTA should identify regulatory requirements that prevent or impact the development of real estate near transit stations (e.g., zoning restrictions, setback requirements, parking minimums). HTA must then work with the Commonwealth and local municipal authorities to change regulations to facilitate TOD, increase community accessibility to public transport and generate traffic near transit stations.

In line with the transportation sector reform, the implementation of these measures must begin with HTA, but happen in collaboration and as part of reform activities with PRITA.

Improved transit performance in the Commonwealth and TU in particular, can yield improved economic consequences. By improving the quality of transit operations, HTA decreases road congestion, reduces carbon emissions and improves mobility for lower-income residents of Puerto Rico.

The implementation of these transit improvements will have multiple positive effects for Puerto Rico's broader community and for HTA. The improvements are expected to decrease the average commute time of San Juan residents, make workers more productive, improve mobility and reduce the need to own a car. In doing so, the measures will increase TU's ridership from approximately 7 million (pre-Maria) to 15.6 million passengers per year.

HTA_CONF 00012985

### Exhibit 65: Impact of transit revenue expansion measures, FY22-51



Transit measures impact[1], FY22-51, $M

1 Assumptions: Transit enhancements are designed to raise the FRR of TU to ~18% (closer to peer standards) by FY2026

### Exhibit 66: Required implementation actions for expanding transit revenues

| Measure | Action item | Responsible party | Deadline[89] |
|---|---|---|---|
| Integrate transit assets under a unified PRITA | Complete transfer of assets per transportation sector reform | HTA, ATM, PRITA, DTOP and AAFAF | June 30, 2023 |
| Integrate transit networks | Adopt single farecard across systems | HTA, ATM and PRITA | June 30, 2021 (Delayed) |
| | Harmonize fares, routes and schedules across systems | HTA, ATM and PRITA | December 31, 2022 (Delayed) |
| | Begin partnerships with private transport networks | HTA, PRITA, Private networks | December 31, 2022 (Delayed) |
| Promote TOD | Identify barriers that prevent denser development near transit | HTA, ATM and PRITA | January 31, 2022 (Delayed) |
| Implement TU improvements | Complete repair of Point of Sale (POS) machines to enable credit card usage | HTA | June 30, 20221 (Delayed) |
| | Enhance TU ridership rules | HTA | September 30, 2022 |

---

[89] Given HTA's latest fiscal measure implementation reporting (December 2021 B2A), the Authority has experienced set back and anticipates delays in the implementation of fiscal measures identified as "delayed" in Exhibit 62.

HTA_CONF 00012986

### 11.6 Introducing new congestion management mechanisms

HTA is in the process of implementing dynamic toll lanes (DTLs) to reduce congestion. Baseline metrics have been developed and will be reported against to measure the efficacy of these initiatives and status of the overall initiative. HTA continues to implement the following measures:

- **Create new Dynamic Toll Lanes:** DTLs are created to charge different rates for toll road users depending on the time of use. The proposed DTLs will increase tolls for drivers during peak hours, motivating them to ride-share or use public transport. These lanes are projected to generate net impact of approximately $284 million cumulatively by FY51.

Exhibit 67 shows the combined impact of DTL revenue and Exhibit 68 shows their implementation timeline.

**Exhibit 67: Impact of Dynamic Toll Lanes measure, FY22-51**



Congestion management – DTL net impact, FY22-51, $M

**Exhibit 68: Required implementation actions for Dynamic Toll Lanes**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Introduce new congestion management mechanisms - DTL | Complete planned DTLs | HTA | Complete |
| | Complete DTL expansion of PR-52 to PR-30 | HTA | June 30, 2026 |

### 11.7 Collecting more discretionary funds

HTA's current fiscal constraints leave few resources available for the execution of capital improvements that go beyond the maintenance of SOGR. However, the Authority should attempt to invest in other enhancements, such as safety improvements, strategic network completion projects and congestion alleviation interventions.

92

In order to pursue these investments, HTA would need to successfully secure federal discretionary funds. BIL represents a generational opportunity to win federal funding that can transform the transportation networks of Puerto Rico. A successful grant strategy can enable the Commonwealth to get its "fair share" of nearly $100B in net new, competitive, federal discretionary transportation funds over the next 5 years. This funding would allow HTA to purchase clean buses to both improve service and air quality; build out new bicycle and pedestrian infrastructure to promote mobility; bring additional bridges to a SOGR, and reknit communities together that may have been torn apart by aging highways. The result would be a permanent trajectory towards increased mobility, cleaner air, and greater economic development.

Community Development Block Grants ("CDBG")[90] should also be a key source of discretionary funding for HTA in the short term, while HTA builds capacity and begins to address other grant opportunities. In the longer term, however, HTA should set a strategy to apply for larger federal grants, such as INFRA (supporting projects with beneficial impact on economic development) and RAISE (boosting investments in safety and environmental sustainability)

To get these grants, HTA should pursue an aggressive approach across three pillars.

- Setting up a new grant management team, with direct involvement of senior Authority executives. The following steps will be undertaken to establish such a team:

  o The current Deputy Executive Director will be appointed as Chief Discretionary Funds Officer (CDFO).

  o The role of the Director of the Federal Affairs Liaison Office will be expanded to include service as the Deputy Discretionary Funds Officer (DDFO), focused on FHWA grants. The DDFO has been identified and will soon be appointed.

  o The acting head of the Federal Coordination Office will also serve as Deputy Discretionary Funds Officer, with an emphasis on obtaining FTA discretionary grants.

  o Both Deputies will spearhead the efforts to prepare HTA for maximizing participation in earmarked projects, which may be adopted by the new Congress.

- Enhancing collaboration with federal agencies. The Discretionary Funds team should closely coordinate with the local FHWA and FTA Offices, as well as with Congress. In the meanwhile, HTA's Executive Director will coordinate with the Secretary of the DTOP to collaborate with both the Puerto Rico Office of Federal Affairs and the Office of the Resident Commissioner. Lastly, HTA will contract a firm experienced in pursuing discretionary grants of USDOT and USHUD (two federal agencies through which HTA is eligible for grant awards)

---

[90] Community Development Block Grants are grants to states, cities and counties to develop viable urban communities by providing decent housing and a suitable living environment and by expanding economic opportunities, principally for low- and moderate-income persons. The program is authorized under Title 1 of the Housing and Community Development Act of 1974, Public Law 93-383, as amended 42 U.S.C. 5301 et seq.

https://www.hudexchange.info/programs/cdbg/

HTA_CONF 00012988

- Creating a grant strategy for the island, so different agencies are not competing against each for similar pots of funds, and successfully accomplishing key activities in planning (e.g., develop priorities, create unique value proposition, project selection) pre-award (e.g., NOFO monitoring, education), application (e.g., cost-benefit analysis, technical analysis, compiling stakeholder support) and post-award (e.g., performance monitoring, outcome reporting).

**Exhibit 69: Major sources of federal discretionary funds**

| Grant | Priorities | Eligible projects |
|---|---|---|
| INFRA | ▪ Supporting economic development and job creation to facilitate recovery from COVID-19 | ▪ Projects on the National Freight Highway Network (NHFN)<br>▪ Projects that add capacity to the National Highway System (NHS) |
| RAISE | ▪ Enhancing safety, environmental sustainability and securing a state of good repair for surface infrastructure | ▪ Road and bridge construction<br>▪ Public transportation projects<br>▪ Intermodal projects |
| CIG | ▪ Promoting mobility improvements, congestion relief and economic development | ▪ Public transport infrastructure improvement and expansion (rolling stock acquisition, platform expansion, ROW acquisition) |

> In addition to these grants, HTA must also pursue part of the $18.5B CDBG funds that are currently available for Puerto Rico in order to make highways / TU more resilient to natural catastrophes

If HTA were to get its "fair share," discretionary grant programs would add an additional $90 million per year for capital investments. Achieving this benefit requires a proactive and deliberate strategy to review grant programs that align with investment priorities and needs, understand the requirements to determine what projects will score well, and develop project concepts and applications that have a higher likelihood of success. Due to the uncertainty inherent in discretionary fund applications and given any successful grant applicants would not have fiscal impact, rather enable greater investment, the Fiscal Plan does not include any specific target for grant amounts that could be allocated to HTA. Successful implementation of this measure, however, has the potential to generate a step-change in the investment in the system, thereby accelerating improvements in performance and condition.

**Exhibit 70: Required implementation actions for collecting more discretionary funds**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Collect discretionary grants | Hire discretionary grant management team | HTA | December 31, 2021 (Delayed) |
| | Begin preparing discretionary grant applications and collecting all necessary supporting documents | HTA | March 31, 2022 |

94

## CHAPTER 12: FISCAL MEASURES: OPERATING EXPENSE OPTIMIZATION

The following two fiscal measures will enable HTA to reduce its costs by approximately $492 million over a 30-year period, thus delivering ~8% of the total fiscal measure impact:

1. Reducing healthcare costs in accordance with the Commonwealth 2021 Certified Fiscal Plan: $132 million (~2%)

2. Reassessing TU contracts: $360 million (~6%)[91]

HTA must also pursue one fiscal measure that has a cumulative cost of $167 million:

3. Improving congestion management through implementation of Bus Rapid Transit (BRT) and signal optimization

### *12.1 Reducing healthcare costs*

To eliminate structural deficits and enable the achievement of the fiscal targets contained in the Fiscal Plan, HTA must adjust the current health care plan for its employees so that it is consistent with the Commonwealth's uniform healthcare benefit policy. This measure assumes an average employer contribution of $125 per employee per month for those who do not have preexisting conditions and $450 per employee per month for all others. As a public corporation, HTA has the option to participate in the private insurance market in a manner similar to any private corporation in Puerto Rico. These figures will be adjusted for inflation over time. This measure will generate an average annual savings of $4.4 million, or $132 million in total savings for the 30-year Fiscal Plan period from Q3 FY22 until FY51.

**Exhibit 71: Annual Uniform Health Savings, FY22-51**



Total Annual Healthcare Savings, $M

Assumptions: Maintain benefits of $125 / employee without pre-existing conditions and $450 / all other employees; adjusted for inflation over time

---

[91] This figure is a target and will be subject to the outcome of a competitive bidding process.

HTA_CONF 00012990

**Exhibit 72: Required implementation actions for healthcare costs**

| Measure | Action item | Responsible party | Deadline |
|---------|-------------|-------------------|----------|
| **Reduce healthcare costs** | Develop RFP to find and identify new healthcare provider consistent with certified budget | HTA | July 31, 2022 |
| | Select new healthcare provider | HTA | September 30, 2022 |
| | Finalize new healthcare insurance contract and submit to FOMB for review | HTA | November 30, 2022 |
| | Begin new healthcare insurance contract | HTA | January 1, 2023 |

### 12.2 Reassessing TU contracts

HTA's operating budget includes major, long-term operating contracts that support transit, design and construction and other functions. At present, TU contracts exceed cost benchmarks from peer systems and past procurements. These contracts are frequently above benchmark because the contracts: (i) do not reflect HTA's current operating environment; (ii) include outdated fuel cost estimates; (iii) price in the risk of nonpayment from HTA; and (iv) are longstanding agreements that have been extended without modifying for the prior considerations.

At present, TU has a contract with ACI to operate and maintain TU. The duration of the contract is 15 years, from 2017 to 2032, with the possibility of extending for two more 5-year periods. The contract includes a base compensation of $57.5 million annually, which covers labor; utility aside from electricity; low-cost repairs; security; maintenance of tracks, vehicles, facilities and equipment; customer relations and fare collection, among other obligations. Furthermore, HTA pays additional compensation of $1.5 million a year to cover heavy maintenance, re-engineering of parts and additional purchases of spare parts. The contract does not cover capital improvement overhaul programs, which are funded by HTA grants, electricity payments, or insurance costs.

In accordance with HTA's status under Title III of PROMESA, HTA has the opportunity to request improved terms from individual contracting partners or re-bid outdated contracts through solicitation. If HTA's main operating contract[92] matched peer system spend per track mile,[93] HTA would achieve annual savings of up to 58%, or $32 million a year.[94] Outside of the base contract additional areas of greater expense to HTA are insurance and utilities. Although costs must be a primary concern, new contracts should also increase performance standards and counterparty accountability for providing better services. Such agreements can improve

---

[92] Excludes insurance and utilities costs.

[93] Vehicle-revenue-miles (VRMs)

[94] Based on National Transportation Database 2019 operating expense information. Peer systems are other heavy rail, often single line systems in other U.S. states, including the PATCO Speedline, Metro SubwayLink, Staten Island Railway, RTA Rapid Transit (Red Line) and Miami-Dade MetroRail.

96

HTA's standing and enhance TU's farebox recovery ratio to fall closer in line with peer transportation systems.

As HTA's financial operations improve under new leadership and in accordance with FHWA MOU requirements and the 2022 HTA Fiscal Plan, HTA must strengthen the case for reduced cost of risk and will negotiate with vendors to improve TU contract terms, resulting in a potential saving of ~$3m per year until the expiration of the current contract in FY32. After the expiration of the current contract, further cost optimization should be pursued through a competitive bidding process, leading to ~$15m of potential savings per year until FY51. Lastly, HTA should outsource the parking lot operations in order to unlock an additional ~$2m of savings per year across FY22-51.

TU may be transferred to a transit authority per the transportation sector reform. Given TU is currently under HTA's purview, fiscal measures and fiscal impact from the TU contract reassessment remains a measure in the 2022 HTA Fiscal Plan and HTA should remain responsible until the reorganization is complete.

**Exhibit 73: Potential TU Contract reassessment savings, FY22-51**



Potential TU Contract Reassessment Savings, $M

■ Parking Lot Outsourcing ■ Main TU Contract Negotiation

**Exhibit 74: Required implementation actions for reassessing TU contract**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Reassess TU contracts** | Begin reassessment of TU operating contract, which is set to end in 2032 | HTA/PRITA/ P3A | Completed |
| | Launch a competitive procurement process for TU operating contract | HTA/PRITA/P3A | February 28, 2022 |
| | Select new TU operator | HTA/PRITA/P3A | August 31, 2022 |
| | Draft new operating contract and submit to FOMB for review | HTA/PRITA/P3A | November 30, 2022 |

HTA_CONF 00012992

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| | Begin operation of TU under new contract terms | HTA/PRITA | February 28, 2023 |

### 12.3 Implementing congestion management mechanisms – Bus Rapid Transit (BRT) and signal optimization

HTA is planning to implement BRT lanes and signal optimization to reduce congestion. Baseline metrics have been developed and will be reported against to measure the efficacy of these initiatives and status of the overall initiative. HTA needs to continue to implement the following measures:

- **Optimize traffic signals:** HTA needs to continue to synchronize traffic signals in critical intersections. This will facilitate the flow of traffic in major urban traffic arteries and reduce the burden on commuters during high traffic-volume hours. It will require an upfront investment of approximately $4.7 million in FY22 and about $1.5 million in annual maintenance investments until FY51.

- **Expanding BRT and integrating it with TU:** Increasing the scope and frequency of its BRT operations will help HTA reach neighborhoods that do not currently have existing TU feeder bus lines. To accomplish this, HTA must continue working closely with DTOP and local municipal authorities to create more dedicated spaces for BRT operations (e.g., special road lanes and off-board collection areas).

- **Opening new BRT line**: BRT lines are used to ensure that buses can operate more efficiently and on a coordinated schedule by operating on separated lanes. The new BRT line from Caguas to San Juan is operational as of May 2021. While the addition of another BRT line is not expected to generate a positive fiscal impact, its development and implementation are necessary to provide residents of Caguas and surrounding areas access to reliable transportation services to the San Juan metropolitan area.

Exhibit 75 shows the combined impact of signal optimization and BRT and Exhibit 76 shows the implementation timeline.

#### Exhibit 75: Impact of congestion management measures, FY22-51



Congestion management measures – BRT and signal optimization impact, $M

98

HTA_CONF 00012993

Exhibit 76: Required implementation actions for introducing new congestion management mechanisms

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Introduce new congestion management mechanisms | Identify potential new BRT lines | HTA | Completed |
| | Begin traffic signal optimization | HTA | June 30, 2022 |
| | Create more dedicated BRT spaces (e.g., special road lanes and drop-off zones) | HTA, Commonwealth and Municipalities | June 30, 2024 |

## CHAPTER 13: CAPITAL EXPENSE OPTIMIZATION

Over the last 20 years, HTA has invested about $10 billion in infrastructure, including the construction of the TU system. According to third-party estimates, HTA would need to invest $4.7 billion (hard costs) by FY36 to achieve SOGR for highway pavement. HTA needs to execute on this investment to improve, rehabilitate and preserve existing roadways. The capital investment to upgrade and maintain Puerto Rico's roads in SOGR will in turn support Puerto Rico's residents and promote economic growth across the Island.

The Authority is adopting a capital program, optimized to reduce HTA's expenses by approximately $0.3 billion over a 30-year period, delivering 5% of the total fiscal measure impact. Implementation of the capital program will also help HTA ensure its projects are delivered on-time and on-budget, by making good use of scarce resources for capital projects

### *Optimizing Construction Costs*

HTA must continue to prioritize its projects and deliver more efficiently in a manner that maximizes the value of its investments in the transportation system. Based on peer benchmarks and internal examples of success, these efforts should reduce current capital project spending requirements by 5% or more, without impacting the quality and outcomes of projects, to ensure the fiscal targets contained in this Fiscal Plan are achieved. As such, there are three ways to optimize CIP: (1) prioritize projections for selection; (2) optimize delivery; and (3) identify soft cost efficiencies.

### *Project prioritization*

HTA's planned projects for the Fiscal Plan period should focus on highway safety projects, improvement of existing infrastructure and improvement of buses and the TU system. At present, HTA uses a set of guidelines developed by the FHWA to prioritize projects for pavement reconstruction, highway safety and bridge rehabilitation per requirements for SOGR, and an additional prioritization framework for the Abriendo Caminos and the PEMOC[95] program.

To prioritize projects in the long term, HTA has developed a project prioritization framework to include projects not part of the national highway system ("NHS") and not funded by FHWA

---

[95] State Highway Modernization Program (PEMOC by its Spanish acronym)

99

funding (Exhibit 77).[96] The framework weighs decision criteria to prioritize safety, system performance and ways to extend the life of transportation assets. It then connects these criteria to the Long-Range Transportation Plan's ("LRTP") goals. Despite developing this framework in 2019, HTA has not applied it to make robust project prioritization decisions. Application of these prioritization frameworks–not simply their development–is central to the impact of the measure. HTA should adopt the framework to continue capturing benefits and implementing necessary capital expenditures to promote economic growth.

**Exhibit 77: HTA Prioritization Framework**

| Decision Criteria | LRTP Goal | Weight | Corresponding Objectives |
|---|---|---|---|
| Achieve a state of good repair | System Performance | 30 | ▪ Improve/maintain condition of capital assets |
| Improve performance of most critical corridors | System Performance; Economic Vitality; Mobility and Accessibility | 25 | ▪ Improve intersection performance, system bottlenecks and transit<br>▪ Increase operational capacity in a cost-effective manner<br>▪ Improve performance of freight and high travel corridors<br>▪ Prioritize the completion of projects which connect to ports and economic centers, and complete the island's strategic highway network |
| Resiliency, safety and emergency response | System Performance; Environmental Sustainability | 20 | ▪ Improve safety, resiliency and emergency response<br>▪ Improve resiliency and emergency response<br>▪ Reduce reliance on motorized travel, promote energy efficiency, and incorporate "reduce, reuse, recycle", practices in delivering infrastructure |
| Promote alternative modes of travel | Environmental sustainability; Mobility and Accessibility | 15 | ▪ Invest in redevelopment of urban centers to reduce need for motorized travel<br>▪ Improve coverage, capacity and service of alternative modes of travel<br>▪ Improve modal connectivity (first mile/last mile)<br>▪ Improve coverage, capacity and service of alternative modes of travel |
| Ensure cost-effectiveness | Mobility and Accessibility | 10 | ▪ Cost effectiveness assuming mobility benefits<br>▪ Provide mobility for transportation-disadvantaged populations |

**Project delivery optimization**

HTA has adopted and will expand the elements of its project delivery optimization process. The optimization process includes the following enhancements across the project lifecycle:

- **Project definition:** Adequate project definition and selection of optimal alternatives, including standard processes by project type. HTA uses standard project definition workflow for a number of project types, including Abriendo Caminos, PEMOC and emergency projects.

---

[96] 2020 Certified Fiscal Plan for HTA.

100

- **Pre-construction:** Comprised of (i) standard design and engineering, including standard contract packages by project type and (ii) enhanced preconstruction management, including procurement and contract approaches by project type and an adequate balance between internal and external capabilities.

- **Construction:** Enhanced construction management with an adequate balance between internal and external capabilities.

- **Closeout process:** Streamlining of the project close-out process.

*Impact measurement*

The processes above demonstrate significant progress by HTA in pursuing a more rigorous project prioritization process. By codifying these processes, HTA can compare itself to best-in-class transportation agencies and determine where it can increase efficiencies and gain cost savings. Per HTA's estimates, the revised project prioritization approach is expected to reflect an average savings of 5% of baseline expenses.

Through full implementation of this framework, HTA is projected to achieve $205 million in savings from FY22 to FY51.

**Exhibit 78: Capital delivery optimization opportunity**

Impact of capital efficiency measures on Baseline capex estimates, %



1 Best in class project prioritization in infrastructure projects can save 7–15% while improved delivery efficiencies can reach 15-25% in savings. Based on these benchmarks, further opportunity may exist in addition to the estimate of 4% across the portfolio. The delivery optimization opportunity is discounted using the Commonwealth's inflation adjustment to account for potential increases in construction costs.

101

HTA_CONF 00012996

**Exhibit 79: Required implementation actions for Capital Expense Optimization**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| Optimize Capital expenses | Refine analysis to identify incremental CapEx delivery optimization and soft cost efficiency opportunities and conduct working sessions with FOMB to confirm. | HTA | Ongoing |
| | Propose set of projects that would benefit most from creation of standard project definition workflows (e.g., commonalities, frequencies) | HTA | Ongoing |
| | Propose set of projects that would benefit most from creation of standard design packages (e.g., number of stakeholders, frequencies) | HTA | Ongoing |
| | Identify and propose opportunities to leverage alternative procurement methods | HTA | Ongoing |
| | Identify capability gaps within in-house construction team | HTA | Ongoing |
| | Implement pilot improvements to address opportunities areas identified in capital delivery diagnostic | HTA | Ongoing |
| | Use standard project definition workflows for initial set of projects | HTA | Ongoing |
| | Use standard design packages for initial set of projects | HTA | Ongoing |
| | Create and propose alternative procurement RFP(s) for eligible projects | HTA | Ongoing |
| | Create plan to address capabilities gaps (e.g., outsourcing, training) within the construction team | HTA | March 31, 2022 |
| | Complete FHWA-approved process improvements (e.g., pay-item sampling) to expedite invoice processing in project close-out | HTA | June 30, 2022 |
| | Complete implementation of electronic records management system to facilitate efficient project close-outs | HTA | June 30, 2022 |

102

# CHAPTER 14: PUBLIC-PRIVATE PARTNERSHIP OPPORTUNITIES

P3s are integrated service or project delivery approaches through which a public agency enters into a contractual agreement with a private sector entity to deliver a service. Under a P3 approach, the private sector entity assumes responsibility for the design, construction, financing, operations or the maintenance of facilities for the specified period while asset ownership remains with the public partner and possession reverts at the end of the concession period.[97] Puerto Rico's transportation sector underperforms in road safety, traffic congestion levels, public transit services and system integration resulting in suboptimal financial performance and overall sustainability. Given the complexity of managing an island's transportation infrastructure cost-effectively, P3s can be pursued to leverage private sector capital delivery capabilities and facilitate performance-based management.

HTA has a history of successfully utilizing concessions to improve road quality and financial sustainability. In 2017, HTA worked with Metropistas to create a 50-year toll road concession of PR-22 and PR-5, raising a total of $1.2 billion.[98,99] These proceeds have enabled HTA to repay $902 million of its existing debt and reinvest the remainder into future improvement projects for the region. In addition to raising funds, Metropistas has demonstrated success with quality improvements based on improved metrics for road conditions. As of 2019, 99% of PR-22's pavement is in "good" or "fair" condition, compared to 83% for Puerto Rico's interstate system. Potential P3 transactions involving HTA's toll road assets will support continued fiscal sustainability and provide for investment in safe and high-quality transportation network. The Metropistas-operated toll roads of PR-5 and PR-22 highlight how P3 can be a tool to successfully advance these goals.

The 2022 Commonwealth Fiscal Plan calls for strategic initiatives to attract private capital. Aging infrastructure, rising capital costs, shrinking budgets, limited labor availability and constrained funding all constrain HTA's capacity to deliver a system in SOGR. By leveraging P3 concessions, HTA can accelerate the implementation of needed transportation improvements and access new sources of funding. Through concessions, the public sector can limit risks inherent to the development of infrastructure (cost overruns, schedule overruns, etc.) by sharing responsibility with the private sector.[100]

Aligned with the objectives of the transportation sector reforms laid out in Chapter 1, concession opportunities on key roads (e.g., PR-20, PR-52, PR-53 and PR-66) will be evaluated as a potential method for HTA to secure additional capital inflows, improve operations and improve infrastructure to promote economic growth. Going forward, HTA needs to evaluate several options for executing concessions, including, but not limited to:

- Outsourcing of toll operations and hiring of a contract manager (with HTA keeping all revenues, less operating fees)

---

[97] DLA Piper, Public-Private Partnerships in Puerto Rico: Key Points (2017)

[98] Ibid.

[99] The $1.2 billion sum includes the up-front payment to HTA ($1.08 billion) and the concession agreement extension ($115 million), which increased the revenue share.

[100] USDOT FHWA Office of Innovative Program Delivery, Report on Highway Public-Private Concessions in the United States (Dec.2016)

103

HTA_CONF 00012998

- Traditional concession agreements with a significant upfront payment

- Concession agreement with no upfront payment and including revenue share

As HTA proceeds into the P3 process and evaluates these options, the following principles, reflecting best practices in P3 transportation transactions, should guide the approach:

- Establish a formal governance structure for oversight of the P3 process

- Define clear performance objectives for the assets, including safety and quality KPIs

- Outline capital investment requirements for the private operator, to ensure adequate levels of asset upgrading and maintenance

- Set clear parameters for toll fare increases that incorporate stakeholder input and concerns related to affordability

- Ensure a competitive procurement process, seeking to engage globally recognized operators, maintaining competition throughout all phases of the process, and making use of clear qualification and de-qualification criteria

HTA must study which of its assets are eligible for concessions and commission relevant asset condition and traffic and revenue reports to determine specific areas of opportunity; HTA is allocated $5 million over the next two fiscal years to implement these measures. HTA needs to prioritize opportunities based on its ability to improve both outcomes for road quality and the fiscal responsibility of HTA. At the same time, the P3A must ensure that all concessions / operations & management agreements signed by HTA serve the best interests of the people of Puerto Rico. The table below lays out the specific milestones that HTA needs to achieve to complete a high-quality P3 process for its toll road assets.

**Exhibit 80: Required implementation actions for pursuing P3 opportunities**

| Measure | Action item | Responsible party | Deadline |
|---|---|---|---|
| **Pursue P3 opportunities** | Evaluate and prioritize potential areas for additional concessions led by 3rd party. | HTA/P3A | Ongoing |
| | Finalize due diligence process and desirability and convenience study . | HTA/P3A | Ongoing |
| | Evaluate different potential deal structures using variety of scenarios within fiscal plan constraints. Finalize and share with FOMB detailed opportunity by opportunity execution plan for prioritized concession opportunities. | HTA/P3A | April 30, 2022 |
| | Launch RFP(s) for prioritized concessions | P3A | Based on execution plan and aligned with legal constraints |
| | Begin first new concession agreement | HTA/P3A | Based on execution plan and aligned with legal constraints |

104

# PART VII – LIQUIDITY SITUATION

### CHAPTER 15: CASH POSITION OF HTA BEFORE CW TRANSFER

Due in part to the effects of the COVID-19 pandemic, HTA did not execute the full scope of its planned FY21 capital program. The surplus thereby generated in FY21 should be deployed in the coming years on planned projects that were obligated in FY21, for which funding has not yet been disbursed. These projects will have disbursements as the CIP returns to historical spending levels.

If HTA fully and promptly implements all the measures in the 2022 HTA Fiscal Plan, it is expected that HTA could achieve operational surpluses as early as FY23. From FY22 to FY51, the 2022 HTA Fiscal Plan projects an average operational surplus of approximately ~$150 million and a capital deficit of about ~$110 million per year. The projected surplus is limited to the toll-entity, however, with non-toll assets and transit assets requiring the annual CW transfer to remain solvent based on the forecasted expenditures.

If the measures outlined in the 2022 HTA Fiscal Plan are not implemented, the Authority will likely have an annual operational deficit across all three asset classes of approximately ~$40 million and an average capital deficit of approximately ~$110 million per year from FY22 to FY51. This situation would be financially unsustainable and could jeopardize Puerto Rico's future infrastructure development. It would also lead to deteriorating road conditions and worsening congestion.

Under both scenarios (full implementation or lack thereof), the projected net deficit puts at risk HTA's capability of delivering transit and transportation investments needed to improve Puerto Rico's overall economy without the transfers from the CW described herein.

#### Exhibit 81: Pre-CW Operating Transfer Financial Performance of HTA FY22-FY51



Financial performance of HTA , FY22-51, $B

HTA_CONF 00013000

## CHAPTER 16: COMMONWEALTH FISCAL SUPPORT

### Commonwealth transfer for non-toll assets

In line with the 2021 Fiscal Plans for both HTA and the Commonwealth, the 2022 Fiscal Plans contain an annual transfer that support HTA's non-toll roads and transit assets cover their operational expenses and address their capital needs. This funding level has been maintained at the same dollar values as in the 2021 HTA Fiscal Plan, consistent with the Commonwealth's own fiscal plan projections. Due to the Commonwealth's own fiscal challenges as set forth in its certified Fiscal Plan, the Commonwealth is unable to transfer any funds to HTA for any other purpose. As detailed in the Commonwealth 2022 Fiscal Plan:

> "[The Commonwealth 2022 Certified Fiscal Plan] increases the HTA operating transfer to cover the full cost of non-toll assets, marking the first step towards the implementation of the Transportation System Reform. The appropriation does not include funding for the HTA emergency reserve, nor does it draw down existing balances. It also assumes toll roads have access to federal funds until reorganization is complete (assumed FY23), but not thereafter... The Commonwealth operating transfer may be reduced in a proportionate amount must the Federal Highway Administration (FHWA) federal funding for non-toll assets appropriated to HTA increase.
>
> The HTA operating transfer is intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes, including funding costs and projects above and beyond those contemplated in HTA's Certified Fiscal Plan."

Historically, the Commonwealth funded an emergency reserve equal to three to six months of operational and capital delivery required funding. The emergency reserve will no longer be funded due to the fiscal constraints faced by the Commonwealth. Currently, HTA has a restricted reserve for emergencies and unforeseen events to respond in circumstances beyond HTA's control. In the case of an extraordinary event like a natural disaster where the Authority incurs in expenditures above their current restricted reserve for emergencies and unforeseen events, HTA can also access the Commonwealth Emergency Reserve Fund to secure their response to declared events in Puerto Rico.

The Commonwealth provides funding to HTA in line with its vision of the future transportation sector reform. The funding, therefore, is tied to the estimated level of investment to maintain the non-tolled roads and transit assets, as the toll roads can fund own operating and capital expenses. The level of funding is based on the estimated apportionment of costs and revenues between asset classes and is subject to further refinement, particularly as capital project plans are finalized. From FY22-26 the Commonwealth transfer averages $150 million per year, on top of the $55 million per year in regular CapEx appropriation. Across the full FY22-51 period, the 2022 HTA Fiscal Plan assumes an operating transfer of $3.3 billion. These transfer amounts match the levels in the 2022 Commonwealth Fiscal Plan.

HTA_CONF 00013001

**Exhibit 82: Annual Commonwealth Operating Transfer to HTA, FY22-51**

Annual CW operating transfer, FY22-51 $M



***Commonwealth loan to support Plan of Adjustment payments***

In addition to the general Commonwealth transfer, the Commonwealth will also provide a one-time loan to HTA for FY2022 in the amount of $314 million to ensure HTA's liquidity upon confirmation of the Commonwealth Plan of Adjustment ("POA"). While the exact repayment terms have not yet been determined, the 2022 HTA Fiscal Plan assumes a 30-year subordinated loan repayment for illustrative purposes that will be updated once the loan details are finalized.

The repayment of this loan is expected solely from the surplus generated by the toll assets over time. Interest is expected to be paid semi-annually, commencing January 1, 2023, while principal is expected to amortize annually commencing in FY2023. Given the Commonwealth loan is subordinated to the interests of other creditors in such surplus, the ultimate repayment structure may need to be adjusted depending on the ultimate confirmation of HTA's POA. The Commonwealth loan repayment schedule is therefore considered illustrative pending finalization of the HTA POA.

HTA_CONF 00013002

# PART VIII – DEBT SUSTAINABILITY

## CHAPTER 17: POST-MEASURES DEBT SUSTAINABILITY

HTA is currently carrying approximately $6.6 billion in debt. Since HTA entered Title III in May 2017, HTA has had insufficient cash flows to service its outstanding debt and as a result has not made payments since July 2017. HTA's revenues are insufficient to fund its operating expenses, projected capital improvement needs and an emergency reserve, leading to a cumulative pre-measures deficit of $1.2 billion. Given that the Commonwealth's own fiscal challenges during this period will preclude any further appropriations to HTA, HTA's existing debt is not sustainable and requires significant adjustment under Title III.

With the implementation of the measures described in 2022 HTA Fiscal Plan, the toll road management office is projected to have a cumulative surplus of $4.8 billion. Following a near-term period of operating deficits as fiscal measures are implemented, HTA is expected to have operational surpluses that will fund a greater share of capital needs from its own resources. Further assistance from the Commonwealth, however, will be required for capital and reserve requirements for the entire 30-year period.

The amount of net revenues available for other needs besides implementation of the crucially important SOGR capital improvement program, such as the payment of debt service, are also highly dependent on the Authority achieving additional positive cash flow to enable HTA eventually to operate at a surplus without the projected Commonwealth variable transfer requirement. The Fiscal Plan utilizes the following matrix to illustrate the implied debt capacity over a 40-year period assuming level debt service at differing coupon levels and varying hypothetical levels of net revenues available for debt service throughout the 30-year period. For example, if the net revenues available for debt service are $50 million for 40 years and the coupon level is 5%, the implied debt capacity would be $858 million. For purposes of this matrix analysis, the Fiscal Plan analyzes the debt capacity to the assumed net revenues at 1.0 times coverage to debt service[101].

### Exhibit 83: Implied debt capacity

| | Illustrative Cash Flow Available | | Sensitivity Analysis: Implied Debt Capacity at 1.0x Coverage | | | |
|---|---|---|---|---|---|---|
| | | | $25 | $50 | $75 | $100 |
| | | 4.0% | $495 | $990 | $1,484 | $1,979 |
| | Sensitivity Analysis: PV rate % | 5.0% | $429 | $858 | $1,287 | $1,716 |
| | | 6.0% | $376 | $752 | $1,128 | $1,505 |

- The following matrix illustrates, for varying coupon levels and primary surplus, or net revenue, figures, the amount of restructured HTA debt that could be supported by that surplus level.
- The matrix assumes a 40-year, level debt service payment structure and only one-time coverage of net revenues to debt service.

Values in USD millions

---

[101] Any HTA debt will have coverage from net revenues - 1.0x implied debt capacity is for illustration purposes.

HTA_CONF 00013003

# APPENDIX A – P&L APPORTIONMENT ASSUMPTIONS

The exhibits below provide the methodological approach to the apportionment allocations and detailed line-item allocations that were developed by FOMB in collaboration with HTA.

**Exhibit 84: Line-item asset apportionment methodology**

| Line item | Approach | Resulting apportionment | | |
|---|---|---|---|---|
| | | Toll roads | Non-toll roads | Transit |
| **Four road toll revenue** | • Assign revenue from PR-20, PR-52, PR-53 and PR-66 to toll entity | 100% | 0% | 0% |
| **Concession revenue and obligations** | • Assign revenues and costs associated with PR-5, PR-17, PR-22 and DTL under non-toll P&L | 0% | 100% | 0% |
| **Toll fines** | • Assign fines from PR-20, PR-52, PR-53 and PR-66 to toll entity and keep all other fines under non-toll P&L | 40% | 60% | 0% |
| **Salaries & pensions** | • Apply reasonable allocation assumptions to the functional split of labor costs in HTA's FY21 Budget (e.g., allocating construction salaries according to Capex share and non-construction salaries in line with breakdown of operating expenses excl. labor, with pensions reflecting weighted average construction and non-construction) | 12% *Construction salaries & benefits* 31% *Non-construction salaries & benefits* 19% *Pensions* | 88% 43% 71% | 0% 26% 10% |
| **SOGR highway Capex costs** | • Allocate costs according to HTA's CIP plan before TSR implementation date; assign 82%% of all costs to non-toll entity thereafter (in line with third-party report) | 18% | 82% | 0% |
| **Regular FHWA and CW Capex funds** | • Allocate funds according to HTA's CIP plan before TSR implementation date; assign all funds to non-toll entity thereafter | 0% | 100% | 0% |

**Exhibit 85: Line-item asset apportionment allocations**

| Line item | | Resulting apportionment | | | Basis for apportionment |
|---|---|---|---|---|---|
| | | Toll roads | Non-toll roads | Transit | |
| **Operating revenues** | Four toll road revenue | 100% | 0% | 0% | Fare revenue from HTA operated toll roads (e.g. PR-20, PR-52, PR-53, PR-66) to toll road entity |
| | Concession revenue and obligations | 0% | 100% | 0% | Metropistas, concessionaire, Teodoro Moscoso, DTL to non-toll |
| | Transit revenues | 0% | 0% | 100% | All transit revenues to transit entity |
| | Toll fines revenue total | 40% | 60% | 0% | Fine revenue from HTA operated toll roads (e.g. PR-20, PR-52, PR-53, PR-66) to toll road entity; fine revenue from all other toll roads to non-toll entity |
| | Other income | 42% | 48% | 10% | Apportioned at the subline-item level on the basis of historical accounting analysis |
| | Operating FTA funds | 0% | 0% | 100% | FTA monies to fund transit entity |
| **Clawback revenues** | Gasoline Tax | 100% | 0% | 0% | Revenues allocated based on management discussion, confirmed on the basis of historical accounting analysis; all dollars ultimately flow to CW with no financial impact on HTA FP |
| | Diesel Tax | 100% | 0% | 0% | |
| | Petroleum Products Tax | 100% | 0% | 0% | |
| | Cigarettes taxes | 0% | 100% | 0% | |
| | Motor Vehicle License Fees | 100% | 0% | 0% | |
| | Act 30 - Licenses | 100% | 0% | 0% | |

109

HTA_CONF 00013004

## Exhibit 86: Line-item asset apportionment allocations (continued)

| Line item | | Resulting apportionment | | | Basis for apportionment |
|---|---|---|---|---|---|
| | | Toll roads | Non-toll roads | Transit | |
| Operating expenses | Construction salaries and related benefits | 12% | 88% | 0% | Based on HTA analysis, applies reasonable allocation assumptions to the functional split of labor costs in HTA's FY21 Budget (e.g., allocating construction salaries according to Capex share and non-construction salaries in line with breakdown of operating expenses excl. labor) |
| | Non-construction salaries and related benefits | 31% | 43% | 26% | |
| | Pension costs | 19% | 71% | 10% | Based on HTA analysis, reflecting weighted average of construction and non-construction salaries |
| | Right of Way Payments | 18% | 82% | 0% | |
| | Litigation Reserve | 18% | 82% | 0% | Aligned with share of forecasted highway CapEx across toll and non-toll roads |
| | Other construction program expenses | 18% | 82% | 0% | |
| | Toll highways administration and maintenance | 98% | 2% | 0% | One sub-item (repair and maintenance of motorway) partly allocated to toll entity (28%) – other items fully assigned to toll-entity according to historical accounting analysis |
| | Train operating and maintenance costs | 0% | 0% | 100% | 100% dedicated to transit entity |
| | ITS | 0% | 0% | 100% | |
| | Other operating expenses | 55% | 31% | 14% | Transit entity allocation according to historical accounting analysis, remainder allocated among toll/non-toll entities in line with share of lane miles among NHS roads |

| Line item | | Resulting apportionment | | | Basis for apportionment |
|---|---|---|---|---|---|
| | | Toll roads | Non-toll roads | Transit | |
| Capital contribut-ions | FHWA Funds | Various | Various | 0% | |
| | Main CW CapEx Appropriation | Various | Various | 0% | Allocated on the basis of specific projects until implementation of TSR, then all funds to non-toll to ensure financial independence of toll entity and financial solvency of non-toll entity |
| | Other CW State Funds | 10% | 90% | 0% | |
| | Federal Emergency Revenues | Various | Various | 0% | |
| | CapEx FTA funds | 0% | 0% | 100% | Based on management discussion, HTA analysis |
| Capital expenses | Right of Way | Various | Various | 0% | |
| | Federal Hard Costs | Various | Various | 0% | Allocated according to specific projects until implementation of TSR, then 18% of expenses allocated to non-toll entity based on forecasted share of highway CapEx according to third-party report |
| | Non-Federal Hard Costs | Various | Various | 0% | |
| | Non-Federal Soft Costs | Various | Various | 0% | |
| | Federal Soft Costs | 0% | 100% | 0% | Fully allocated to non-toll entity based on HTA analysis, assumes all highway transportation planning will be conducted by non-toll entity |
| | Local Construction | 0% | 100% | 0% | |
| | Federal Emergency Repair Program | Various | Various | 0% | Allocated according to specific projects |
| | Local Emergency Repair Program | 20% | 80% | 0% | |
| | Toll Optimization CIP | 100% | 0% | 0% | 100% to toll entity |
| | Transit CIP | 0% | 0% | 100% | 100% to transit entity |

HTA_CONF 00013005

# APPENDIX B − IMPLEMENTATION PLAN & REPORTING REQUIREMENTS

## Post-Certification Reporting Requirements for HTA

To rigorously track the Fiscal Plan's implementation, and in support of HTA's improved fiscal governance, HTA will submit periodic budget to actuals (B2A) reports to the FOMB as required by section 203(a) of PROMESA. To facilitate the Oversight Board accurately estimates projected revenues and expenditures going forward, HTA will need to submit monthly B2A reports to the FOMB. These will be due no later than the 15th day after the end of each month. The reports must reflect: i) Budget to Actuals performance; ii) liquidity; iii) bank balances; iv) CapEx obligations; v) progress in executing the Fiscal Measures of this Plan; vi) progress in executing capital delivery; vii) changes in headcount; viii) metrics of organizational productivity; ix) progress in executing HTA's MOUs with FHWA and EFL; and x) toll road traffic volume. The FOMB, with some exceptions, has been pleased with HTA's adherence to these reporting requirements to-date and has found the data provided by HTA a valuable tool to monitor performance and implementation of the Fiscal Plan.

**Budget to Actuals (B2A) Performance:** HTA must use a template from FOMB to report its Year to Date (YTD) performance across all items in its Certified Budget. The Authority must also use another FOMB template to disclose additional details on certain budget items like CIP costs, operating expenses and professional fees.

**Liquidity:** HTA must provide a liquidity report that includes actual cash flows by week for YTD and forecasted until the end of the Fiscal Year. All cash flows (receipts and disbursements) must be shown under the same classification that is followed in the Authority's Certified Budget. This will make it easier to track HTA's B2A performance on a cash basis; these must also be clearly separated into an OpEx and CapEx component.

**Bank Balances:** HTA must disclose all changes in its bank account balances and classify all bank accounts as capital or operational. In addition, it must show how these changes correspond to the cash flows laid out in its Liquidity report and use a template from the FOMB to display the projected impact of any funds that are in transit at the time of the report.

**CapEx Obligations:** HTA must disclose the amount of CapEx funds that are obligated for capital expenses at the end of each month and how these funds break down by project.

**Fiscal Measures:** HTA must provide an update on the progress of the Fiscal Measures that are included in this Plan, including the revenues/cost savings achieved by implementing the measures YTD. The Authority must provide a detailed justification for any measure's underperformance, describe the main reasons it is behind and lay out a path for getting its implementation back on track.

**Capital Delivery (Pre-Construction):** HTA must report, at a minimum, the following information for every project in the Pre-Construction phase: i) the unique identifier for the project (AC Code); ii) the description of the project (e.g., pavement rehabilitation, or bridge reconstruction); iii) the project's classification under one of the categories recognized in this Fiscal Plan (e.g., PEMOC, FHWA and/or Abriendo Caminos); iv) the miles and roads affected by the project; v) the programmed bid opening date; vi) the actual bid opening date; vii) the programmed bid award date; viii) the actual bid award date; ix) the programmed NTP letter date; x) the actual NTP letter date; xi) the contractor in charge of the project; xii) the engineer estimate for the project cost; and xiii) the actual bid cost. HTA must also provide any other

111

information about the pre-construction process that the FOMB might request during the course of the Fiscal Year.

**Capital Delivery (Construction):** HTA must report, at a minimum, the following information for every project that is in the Construction phase: i) the unique identifier for the project (AC Code), ii) the description of the project (e.g., pavement rehabilitation, or bridge reconstruction); iii) the project's classification under one of the categories recognized in this Fiscal Plan (e.g., PEMOC, FHWA and / or Abriendo Caminos); iv) the miles and roads affected by the project, v) the region of the project (e.g., North, East, South, West), vi) the longitude and latitude of the project, vii) the original cost of the project, viii) the revised cost of the project, ix) the amount of dollars already disbursed, x) the original date of project completion, xi) the revised date of project completion, xii) the contractor in charge of the project, xiii) the HTA employee in charge of the project. HTA must also provide any other information about the construction process that the FOMB might request during the Fiscal Year. This includes rolling out a CapEx dashboard that will enable stakeholders of the system to understand where improvements are ongoing as well as the performance of various projects.

**Headcount:** HTA must disclose the number of employees that enter and leave the Authority during each month. It must inform the FOMB about their division (e.g., Construction, Finance) and professional role (e.g., Engineer, Secretary).

**Organizational Productivity:** HTA must disclose the number of employees by division per millions of CapEx dollars disbursed during each month. It must also report the following information for the personnel in its construction-related divisions. It will need to develop a template to report: i) the number of employees (broken down by professional role) working on each project during each project phase and ii) the number of projects each employee oversees (including hours dedicated to each project, if applicable).

**FHWA – HTA MOU:** HTA must provide an update on the progress of the initiatives outlined in its MOU with FHWA. At a minimum, this update must include the initiative's launch date, estimated completion date and the work performed on it during each month. The Authority must also provide a detailed justification for any delays in MOU implementation, describing the main drivers of the delay and providing a plan of actions path that will get MOU implementation back on track. It must also disclose any other information about its MOU with FHWA that the FOMB might request during the course of the Fiscal Year.

**EFL – HTA MOU:** HTA must provide an update on the progress of its collaboration with EFL. More specifically, HTA must report the following information for every EFL project: i) the unique identifier of the project (AC Code), ii) the region of the project, iii) the miles and the roads affected by the project, iv) the original cost of the project, v) the revised cost of the project, vi) the amount of dollars already disbursed, vii) the original date of project completion, viii) the revised date of project completion. The Authority must also provide a detailed justification for any delays on these collaborative projects with EFL. It needs to describe the main reasons for the delays and a plan of action to get back on track.

**Toll Road Traffic Volume:** HTA must report the monthly volume of vehicle traffic in all the toll roads of Puerto Rico, regardless of whether these roads are partly or wholly owned by concessionaires.

**Project-level capital performance:** HTA must report its progress against capital delivery on a project-by-project basis once the necessary IT and finance reporting infrastructure is in place to do so.

112

**Exhibit 87: Post-certification reporting requirements (financials & traffic volume)**

| Post-certification reporting requirements (Financials & traffic volume) | | | |
|---|---|---|---|
| **Report type** | **Detail** | **FOMB reporting cadence** | **Public reporting** |
| Budget to Actuals | • Report Year to Date (YTD) performance across all items in the Certified Budget<br>• Disclose additional details on certain budget items like CIP costs, operating expenses, and professional fees | • Monthly | • Monthly |
| Liquidity & bank balances | • Provide a liquidity report that includes actual cash flows by week for YTD and forecasted until the end of the Fiscal Year, using the same classification of revenues and expenses as the Certified Budget<br>• Disclose all changes in bank account balances and classify all bank accounts as capital or operational<br>• Show how changes in bank balances correspond to cash flows and display the projected impact of any funds that are in transit at the time of the report | • Monthly | • Monthly |
| Fiscal measures | • Provide an update on the progress of the Fiscal Measures that are included in this Plan, including the revenues / cost savings achieved by implementing the measures YTD<br>• Provide a detailed justification for any measure's underperformance, describe the main reasons it is behind, and lay out a path for getting its implementation back on track | • Monthly | • Monthly |
| Toll road traffic | • Report the monthly volume of vehicle traffic in all the toll roads of Puerto Rico | • Monthly | • Monthly |

**Exhibit 88: Post-certification reporting requirements (labor data and MOU obligations)**

| Post-certification reporting requirements (Labor data and MOU obligations) | | | |
|---|---|---|---|
| **Report type** | **Detail** | **FOMB reporting cadence** | **Public reporting** |
| Headcount | • Provide information on all headcount changes (openings, additions, exits, closings)<br>• Classify all headcount changes by division and by professional roles | • Monthly | • Monthly |
| Organizational productivity | • Disclose number of employees by division per Million of CapEx dollars disbursed<br>• Provide the number of employees (broken down by professional role) working on each project during each project phase<br>• Provide the number of projects overseen by each employee (including hours dedicated to each project) | • Monthly | • Monthly |
| FHWA – HTA MOU | • Provide an update on the progress of initiatives outlined in the FHWA – HTA MOU, including: a) Launch date of each initiative, b) Estimated completion date of each initiative and c) Work performed on each initiative during each month<br>• Explain drivers of underperformance and lay out a path for getting implementation back on track | • Monthly | • Monthly |
| EFL – HTA MOU | • Provide an update on collaboration with EFL, including: a) Unique identifier of each EFL project (AC Code), b) Region of the project, c) Miles and roads affected by the project, d) Original cost of the project, e) Revised cost of the project, f) Amount of dollars already disbursed, g) Original date of project completion, h) Revised date of project completion | • Monthly | • Monthly |

113

HTA_CONF 00013008

**Exhibit 89: Post-certification reporting requirements (capital delivery)**

| Post-certification reporting requirements (Capital delivery) | | | |
| --- | --- | --- | --- |
| **Report type** | **Detail** | **FOMB reporting cadence** | **Public reporting** |
| Capital delivery (pre-construction) | ▪ Provide the following information for every project in the pre-construction phase: a) Unique identifier of the project (AC Code), b) Description of the project (e.g., pavement rehabilitation, bridge reconstruction etc.), c) Classification of the project under one of the categories recognized in this Fiscal Plan (e.g., PEMOC, FHWA, Abriendo Caminos), d) Miles and roads affected by the project, e) Programmed bid opening data, f) Actual bid opening date, g) Programmed bid award date, h) Actual bid award date, i) Programmed NTP letter date, j) Actual NTP letter date, k) Contractor in charge of the project, l) Engineer estimate for project cost, m) Actual bid cost<br>▪ Provide any other information that might be requested by the FOMB | ▪ Monthly | ▪ N/A |
| Capital delivery (ER construction) | ▪ Provide a list of active construction and pre-construction projects and disbursements | ▪ Monthly | ▪ N/A |
| CapEx obligations | ▪ Disclose the amount of funds that are obligated for capital expenses, broken down by project | ▪ Monthly | ▪ N/A |

**Exhibit 90: Post-certification reporting requirements (capital delivery)**

| Post-certification reporting requirements (Capital delivery) | | | |
| --- | --- | --- | --- |
| **Report type** | **Detail** | **FOMB reporting cadence** | **Public reporting** |
| Capital delivery (construction) | ▪ Provide the following information for every project in the construction phase: a) Unique identifier of the project (AC Code), b) Description of the project (e.g., pavement rehabilitation, bridge reconstruction etc.), c) Classification of the project under one of the categories recognized in this Fiscal Plan (e.g., PEMOC, FHWA, Abriendo Caminos), d) Miles and roads affected by the project, e) Region of the project (e.g., North, East, South, West), f) Longitude and latitude of the project, g) Original cost of the project, h) Revised cost of the project, i) Amount of dollars already disbursed, j) Original date of project completion, k) Revised date of project completion, l) Contractor in charge of the project, m) HTA employee in charge of the project<br>▪ Provide any other information that might be requested by the FOMB | ▪ Monthly | ▪ N/A |
| Capital delivery (Public dashboard) | ▪ Provide a list of active projects across all program types (i.e., Federal, State, ER, EFL)<br>▪ Describe progress completed during the month with key project information (e.g., NTP date, expected cost and completion date, delays and cost overruns, region and type of the project) | ▪ Monthly | ▪ Monthly |

HTA_CONF 00013009

# APPENDIX C – EASTERN FEDERAL LANDS MEMORANDUM OF UNDERSTANDING

**OBLIGATIONS, RESPONSIBILITIES AND FUNDING**

**A. The PRHTA agrees to:**

1. Designate a point of contact with decision-making authority so that all communication regarding the Work will be coordinated and managed through such person;

2. Provide the required funding for the Work through assigned ER funds, PRHP funds, or other funding sources as appropriate and as determined by PRHTA;

3. Allow EFLHD to pay for all costs related to meeting federal requirements as well as for the management, design and construction of the Work. Costs should include, but are not limited to, preparation of the environmental documentation, permits and other clearances, design, construction, construction engineering and other related engineering, program and project administration activities;

4. Provide design assistance to EFLHD and its designees, participate in progress meetings, design field reviews and approvals and final construction inspections, as required;

5. Review and comment on the scope, prioritization, schedule, budget and subsequent updates of the proposed projects within the timelines requested by EFLHD;

6. Maximize use of existing permit exemptions and programmatic agreements by providing guidance and general assistance to EFLHD and its designees in the preparation of permits and when necessary, submitting permit applications to obtain clearances from all permitting agencies in the Commonwealth of Puerto Rico and Municipalities;

7. Assist EFLHD and its designees in preparing permit applications to obtain all required federal permits and clearances;

8. Acquire necessary right-of-way (ROW);

9. Coordinate and execute utility agreements to provide timely relocations;

10. If the actual costs of the Work are anticipated to exceed the estimates in the approved DDIRs, the PRHTA and EFLHD agree to utilize one or more of the following options:

    a. EFLHD and PRHTA may revise the budget to reflect the new estimate(s) and PRHTA will transfer additional funds needed to complete the construction of the Work. EFLHD will request additional funds in time to have them in place before funds are exhausted. PRHTA will determine the type of supplemental funds to be transferred based on the availability of funding at the time of request to ensure compliance with the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)).

    b. Reduce the scope of work such that available funding is sufficient to cover the estimated costs.

    c. EFLHD may cease work on the unfunded aspects of the Work: or

    d. Any combination of (a), (b) or (c).

11. In addition, for projects designed by PRHTA and its designees:

    a. Provide all Plans, Specifications and Estimate (PS&E) packages for general EFLHD review and comments. Address comments provided by EFLHD and provide a written explanation of how each comment was addressed within the timelines requested by EFLHD;

    b. Provide ready for procurement/construction PS&E packages in Federal Fiscal Year 2019 (FY19) addressing all EFLHD comments. For projects to be advertised for construction in FY19, provide the final PS&E a minimum of 3 months before the quarter

115

in which the project is to be advertised. The PS&E package includes, but is not limited to:

  i.   Project priority list that organizes PS&E packages in order of priority for PRHTA;

  ii.  Plans, specifications, construction cost estimates, design technical reports, quantity calculations, NEPA documentation, permits, agreements and clearances from federal and local governments;

  iii. PS&E package certification indicating that all projects issues related to design, NEPA, permitting, ROW and utilities have been addressed and the projects are ready for construction;

c. Assist answering bidder questions within 3 working days, when assistance is requested. Assist in other aspects of the procurement process as needed; and

d. Provide technical assistance as needed to respond to issues during construction within the timelines requested by EFLHD.

12. Participate in monthly status meetings as required.

13. Throughout the course of EFLHD's delivery of projects, EFLHD, PHRTA and FHWA-PR/USVI will work together to identify opportunities for peer exchanges, technical support training and education to PHRTA's staff.

## B. The FHWA-PR/USVI agrees to:

1. Provide federal-aid funding for the Work including ER and other Puerto Rico Highway Program funds as appropriate and approve the transfer of funds from the PRHTA ER funds to the EFLHD prior to the start of any work by EFLHD as presented in the Financial Plan;

2. Delegate to EFLHD the approval of all federal actions including but not limited to:

  a. National Environmental Policy Act (NEPA) documentation and permits;

  b. ROW plans and administrative review of ROW acquisition and utility relocation activities by PRHTA, when applicable;

  c. The statements of work and award of any consultant contracts for the Work;

  d. Final PS&Es for advertisement, all contract administration efforts, construction inspections and approval of the completed project; and

  e. Authorization for contract awards, contract administration, contract modifications, inspection, project acceptance and contract completion.

3. Provide guidance on ER funding eligibility when requested;

4. Keep track of projects authorized based on the approved ER program;

5. Review and update the DDIRs if a change in scope occurs or there is an increase of twenty (20) percent from the original estimates;

6. Participate in EFL's FIRE and reviews as required or requested by EFL;

7. Participate in monthly status meetings;

8. Throughout the course of EFLHD's delivery of projects, EFLHD, PHRTA and FHWA-PR/USVI will work together to identify opportunities for peer exchanges, technical support training and education to PHRTA's staff.

## C. EFLHD agrees to:

1. Be the lead federal agency for applicable federal actions, project development and overall coordination of the Work;

2. Be responsible to meet timetable and delivery budgets while ensuring full compliance with applicable federal laws and regulations;

3. Accept funds as defined in Article III of this agreement;

4. Coordinate and develop the scope, schedule and budget for the delivery of the sites,

116

HTA_CONF 00013011

evaluate project development approach and proceed with procurement as deemed best
by EFLHD;

5. Procure and administer any consultant assistance contracts deemed necessary;

6. Review PS&E packages and provide technical support for quality control (QC)
of work;

7. For projects to be designed by EFLHD:

    a. Conduct survey and mapping necessary for design activities;

    b. Conduct subsurface investigations;

    c. Lead the preparation of environmental documents required by the NEPA, as
amended and 23 CFR 771, including the Environmental Impact Statement / Record of
Decision, Categorical Exclusion, Environmental Assessment / Finding of No Significant
Impact and 4(f) Evaluation and coordinate the necessary approvals for Section 106 of
the National Historic Preservation Act, the Endangered Species Act and the Clean
Water Act;

    d. Prepare environmental permit applications as required;

    e. Prepare necessary ROW documentation for PRHTA to acquire any necessary ROW

    f. Develop and administer utility agreements, if necessary;

    g. Prepare preliminary and final PS&E packages for the Work using PRHTA design
standards and specifications.

    h. Evaluate the resiliency of the proposed replacement and consider incorporating cost
effective features that will make the facilities more resilient and reduce the risk of
damage from future events. Document all resiliency measures implemented as
required in the ER Manual.

For projects designed by PRHTA:

    a. Provide Geotechnical and Structural Engineering reviews for the regular landslide
projects;

    b. Provide general reviews of PS&E packages, as deemed necessary;

    c. Develop Administrative Contract Specifications to add EFLHD's procurement and
contract administration requirements on the projects; and

    d. Packaging/bundling the projects for bidding;

9. Provide brief written status reports on a monthly basis to PHRTA, FHWA PR/USVI,
and the USDOT Transportation Recovery Representative on the Work;

10. Advertise and award the construction contract(s);

11. Administer the construction contract(s), including necessary construction engineering
and inspection (CEI);

12. Process payments to consultants, contractors and utility companies, as applicable;

13. Conduct final inspection of the Work;

14. Promptly initiate close-out and return unexpended funds once final costs for the Work
are known, including the transfer of the facilities after acceptance by the owner;

16. Coordinate with PRHTA's National Bridge Inventory program manager to ensure all
load rating work will meet Puerto Rico's legal load requirements as well as
Emergency Vehicle loadings as established in the FAST Act.

17. Use SP-934 specification for all structural concrete work

18. Throughout the course of EFLHD's delivery of projects, EFLHD, PHRTA and
FHWA-PR/USVI will work together to identify opportunities for peer exchanges, technical
support training and education to PHRTA's staff.

HTA_CONF 00013012

# APPENDIX D — POTENTIAL DRIVERS OF FUTURE REVENUES

Traffic volumes in HTA's road network and therefore its toll fare revenue, are forecast to grow long term primarily based on inflation and GNP projections. However, there are several macroeconomic trends in the transportation sector which may cause actual traffic volume growth through FY51 to be lower in the long term than current projections. As a result, HTA needs to continue to monitor and may consider additional factors to update future forecasts. Considerations including (1) a shift to public transit; (2) vehicle ownership patterns; (3) commuting behaviors; and (4) autonomous vehicle uptake may impact traffic volumes and consequently HTA's revenue baseline, in the long term.

1. **Shift to public transit**: Adoption of the transportation sector reforms is the first step in a shift to make public transit a viable and accessible option in the long term for commuters in Puerto Rico. Once the impact of the reforms is reflected, it is anticipated that Puerto Rico will witness an increase of public transit users, thus yielding increased revenues for both TU and the feeder bus route. For instance, if San Juan were to perform at the average US city level, 37,000 more households would commute more sustainably.[102] However, this change could be coupled with a shift away from private vehicles, which might have a potential negative impact on toll revenues.

2. **Vehicle ownership patterns:** In the past few years, ridesharing has become an affordable and increasingly accessible option for transportation. Increased uptake of ridesharing platforms may reduce private vehicle ownership and as a result, overall traffic levels would decline over time. Changed ownership patterns might have a negative impact on toll revenues in the long term.

3. **Commuting behaviors:** The impact of COVID-19 initially decreased traffic volumes in Puerto Rico, especially during the end of FY20 at the height of the pandemic. While Puerto Rico is now witnessing a gradual return to normal traffic levels, a move to hybrid work-from-home may result in lower traffic levels long term. Decreased commuter traffic may result in marginally lower traffic volumes for toll roads, negatively impacting toll revenues, as well as lower transit system use, negatively impacting transit revenues through FY51.

4. **Autonomous vehicle adoption:** Autonomous vehicle technologies are developing rapidly. One key assumption with autonomous vehicle adoption and owner behavior is the reduced value of saved time, thus disincentivizing use of toll roads at current rates. This may have a potential negative impact on congestion-relieving toll roads in the long term as autonomous vehicles witness increased uptake.[103]

Collectively, the aforementioned factors would likely decrease toll fare revenues over the long term, though the decline may be somewhat offset by increased transit fare revenue following greater use of the public transportation system. While current projections account for factors of economic and population growth, future estimates of traffic patterns may consider these factors to arrive at a more accurate baseline projection.

---

[102] Includes carpooling, walking, bicycling and public transit. The current U.S. average is 27% of households commuting sustainably, up from San Juan's current 22% of households.

[103] https://www.fitchratings.com/research/us-public-finance/the-effect-of-automated-vehicles-on-toll-roads-automated-vehicles-are-likely-positive-congestion-reliever-toll-roads-are-most-vulnerable-03-02-2020

HTA_CONF 00013013

# EXHIBIT E

2022 HTA Fiscal Budget

HTA_CONF 00013014



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
# FOR PUERTO RICO

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

Natalie A. Jaresko
Executive Director

David A. Skeel, Jr.
Chair

**BY ELECTRONIC MAIL**

March 4, 2022

Honorable Pedro R. Pierluisi Urrutia
Governor
Commonwealth of Puerto Rico

Dear Governor Pierluisi Urrutia:

Pursuant to the Resolution, a copy of which is attached hereto as Exhibit A (the "Resolution"), adopted by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), and Section 202(e)(4) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), the Oversight Board hereby issues to the Governor this compliance certification that the revised fiscal year 2022 budget for the Puerto Rico Highways and Transportation Authority ("HTA") identified in Exhibit 1 hereto, as developed by the Oversight Board pursuant to section 202(c)(2), is a compliant budget as set forth in the Resolution.

The Oversight Board looks forward to working with the Commonwealth and HTA to accomplish the requirements and goals of PROMESA for the benefit of the people of Puerto Rico.

Sincerely,

*David Skeel*

David A. Skeel

Andrew G. Biggs
Arthur J. Gonzalez
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

HTA_CONF 00013015

Honorable Pierluisi Urrutia
March 4, 2022
Page 2 of 2


CC:    Ms. Natalia A. Jaresko
        Hon. Omar Marrero Díaz
        Mr. Edwin González Montalvo
        HTA Governing Board

HTA_CONF 00013016

**EXHIBIT I**

**EXHIBIT I**: PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY'S
FISCAL YEAR 2022 REVISED CERTIFIED BUDGET

**EXHIBIT I**

## EXHIBIT I – REVENUES BUDGET

## PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY

**Section I. –** Budget Overview

|  | FY22 Budget ($000's) |
|---|---|
| Toll Fare & Fine Revenues | 185,236 |
| Transit Revenues | 4,973 |
| Operating FTA Funds | 20,000 |
| Other Operating Income | 10,270 |
| **Total Operating Revenues** | **220,479** |
| Commonwealth CapEx Funds | 143,020 |
| Federal CapEx Funds | 263,049 |
| **Total Capital Revenues** | **406,069** |
| **Total Consolidated Revenues** | **626,548** |
| Payroll & Pension Costs | 57,867 |
| Toll Highways Administration & Maintenance Costs | 45,235 |
| Tren Urbano & Feeder Bus Costs | 82,587 |
| Other Operating Costs | 51,247 |
| **Total Operating Expenses** | **236,936** |
| Federal Highway Construction Program Costs | 157,043 |
| Non-Federal Highway Construction Costs | 72,677 |
| Emergency Repair Construction Program Costs | 36,497 |
| Transit Construction Program Costs | 53,506 |
| Other Capital Costs[1] | 49,693 |
| **Total Capital Expenses** | **369,415** |
| Reserve Deposits | 6,000 |
| **Total Reserve Deposits** | **6,000** |
| **Total Consolidated Expenses** | **612,351** |
| **Balance** | **14,197** |

---

[1] 'Construction salaries and related benefits' and "other construction program expenses" have been reclassified as a capital expense and are included within this line item.

HTA_CONF 00013018

# EXHIBIT I

## TOLL FARE & FINE REVENUES

|  | FY22 Budget ($000's) |
|---|---|
| Toll fare revenue from current toll rates | 138,554 |
| Toll fare revenue from increase in toll rates | 4,584 |
| Toll fare revenue from dynamic toll lanes (DTL) | 5,500 |
| Toll fare revenue from bi-directional tolling | 166 |
| **Total Toll Fare Revenues** | **148,804** |
| Toll fine revenue from existing fine rates | 33,870 |
| Toll fine revenue from tiered fine rates | 2,562 |
| **Total Toll Fine Revenues** | **36,432** |
| **Total Toll Fare & Fine Revenues** | **185,236** |

## TRANSIT REVENUES

|  | FY22 Budget ($000's) |
|---|---|
| Tren Urbano fare revenue | 4,297 |
| Feeder Bus fare revenue | 676 |
| **Total Transit Revenue** | **4,973** |

## OPERATING FTA FUNDS

|  | FY22 Budget ($000's) |
|---|---|
| Operating FTA funds | 20,000 |
| **Total Operating FTA Funds** | **20,000** |

## OTHER OPERATING INCOME

|  | FY22 Budget ($000's) |
|---|---|
| Other operating income | 10,270 |
| **Total Other Operating Income** | **10,270** |

## COMMONWEALTH ("CW") CAPEX FUNDS

|  | FY22 Budget ($000's) |
|---|---|
| CW CapEx appropriation | 53,020 |
| Rollover state CapEx funds | 90,000 |
| **Total CW Capex Funds** | **143,020** |

HTA_CONF 00013019

## EXHIBIT I

### FEDERAL CAPEX FUNDS

|  | FY22 Budget ($000's) |
|---|---:|
| FHWA Regular Funds | 157,044 |
| FHWA "IIJA" Highway Funds | - |
| FHWA "IIJA" Bridge Funds | - |
| **Total Non-ER FHWA Funds** | **157,044** |
| FHWA Emergency Funds | 33,673 |
| FEMA Emergency Funds | 1,619 |
| CARES Emergency Funds | 17,607 |
| **Total Federal Emergency Funds** | **52,899** |
| FTA Regular Funds | 51,506 |
| FTA "IIJA" Funds | 1,600 |
| **Total Transit Federal Funds** | **53,106** |
| **Total Federal CapEx Funds** | **263,049** |

### PAYROLL & PENSION COSTS

|  | FY22 Budget ($000's) |
|---|---:|
| Main salaries - non-construction | 10,670 |
| Healthcare costs - non-construction | 3,086 |
| Christmas bonus - non-construction | 181 |
| Early retirement costs - non-construction | 6,737 |
| Other labor costs - non-construction | 1,434 |
| **Total non-construction salaries & related benefits** | **22,108** |
| Pensions contributions | 35,759 |
| Administrative costs | - |
| **Total pensions costs** | **35,759** |
| **Total Payroll & Pension Costs** | **57,867** |

### TOLL HIGHWAYS ADMINISTRATION AND MAINTENANCE COSTS

|  | FY22 Budget ($000's) |
|---|---:|
| Variable electronic toll collection fees | 20,646 |
| Highway electricity costs | 4,000 |
| Other toll highway administration & maintenance costs | 20,589 |
| **Total Toll Highways Administration and Maintenance Costs** | **45,235** |

HTA_CONF 00013020

## EXHIBIT I

**TREN URBANO & FEEDER BUS COSTS**

|  | FY22 Budget ($000's) |
|---|---|
| Base fee for Tren Urbano operating contract | 48,603 |
| Other costs under Tren Urbano operating contract | 3,620 |
| Tren Urbano insurance costs | 8,500 |
| Tren Urbano electricity costs | 9,129 |
| Other regular Tren Urbano costs | 68 |
| COVID-19 special costs | 1,100 |
| **Total Tren Urbano Costs** | **71,020** |
| Base fee for Feeder Bus operating contract | 8,847 |
| Other costs under Feeder Bus operating contract | 1,357 |
| Bus rapid transit costs | 1,074 |
| COVID-19 special costs | 698 |
| **Total Feeder Bus Costs** | **11,976** |
| **Total Tren Urbano & Feeder Bus Costs** | **82,996** |

**OTHER OPERATING COSTS**

|  | FY22 Budget ($000's) |
|---|---|
| Operational ROW payments | 7,905 |
| Non-Title III Professional Service Fees | 7,276 |
| Title III Professional Service Fees | 12,508 |
| Discretionary fund management team | 150 |
| Ancillary revenue management team | 200 |
| Electricity costs | 918 |
| Water supply costs | 500 |
| Other operating costs | 21,791 |
| **Total Other Operating Costs** | **51,247** |

**FEDERAL HIGHWAY CONSTRUCTION PROGRAM COSTS**

|  | FY22 Budget ($000's) |
|---|---|
| Hard costs for regular federal highway construction | 132,291 |
| **Total federal highway construction hard costs** | **132,291** |
| Federal soft costs for planning & compliance | 24,752 |
| **Total federal highway construction soft costs** | **24,752** |
| **Total Federal Highway Construction Program Costs** | **157,043** |

HTA_CONF 00013021

## EXHIBIT I

### NON-FEDERAL HIGHWAY CONSTRUCTION PROGRAM COSTS

|  | FY22 Budget ($000's) |
|---|---|
| Hard costs for Abriendo Caminos projects - Phase III | 26,511 |
| Hard costs for other non-federal highway construction projects | 4,224 |
| Local construction costs | 9,500 |
| **Total non-federal highway construction hard costs** | **40,235** |
| Soft costs for Abriendo Caminos projects - Phase III | 3,030 |
| Non-federal funded project-linked soft costs | 21,799 |
| CDBG-DR/MIT state soft costs | 5,513 |
| Capital ROW payments | 2,100 |
| **Total non-federal highway construction soft costs** | **32,442** |
| **Total Non-Federal Highway Construction Program** | **72,677** |

### EMERGENCY REPAIR CONSTRUCTION PROGRAM COSTS

|  | FY22 Budget ($000's) |
|---|---|
| FHWA funded emergency repair costs | 33,673 |
| FEMA funded emergency repair costs | 1,619 |
| Local emergency repair costs | 1,204 |
| **Total Emergency Repair Construction Program Costs** | **36,497** |

### TRANSIT CONSTRUCTION PROGRAM COSTS

|  | FY22 Budget ($000's) |
|---|---|
| Transit construction costs | 53,506 |
| **Total Transit Construction Program Costs** | **53,506** |

HTA_CONF 00013022

**EXHIBIT I**

## OTHER CAPITAL COSTS

|  | FY22 Budget ($000's) |
|---|---|
| Main salaries - construction | 17,869 |
| Healthcare costs - construction | 5,125 |
| Christmas bonus - construction | 349 |
| Early retirement costs - construction | - |
| Other labor costs - construction | 4,270 |
| **Total construction salaries & related benefits** | **27,613** |
| Toll optimization costs | 18,047 |
| **Total toll optimization costs** | **19,827** |
| Other construction program costs | 4,033 |
| **Total other construction program costs** | **4,033** |
| **Total other capital costs** | **48,973** |

## RESERVE DEPOSITS

|  | FY22 Budget ($000's) |
|---|---|
| Reserve deposits for non-Title III litigation costs | 6,000 |
| **Total Reserve Deposits** | **6,000** |

HTA_CONF 00013023

**EXHIBIT I**


**EXHIBIT I – REVENUES BUDGET (*cont.*)**

**ENFORCEMENT OF THE PUERTO HIGHWAY AND TRANSPORTATION REVISED FY22 BUDGET**

**Section II -** All appropriations and expenditures authorized in any prior fiscal year are terminated and no disbursement of public funds may be covered by such expenditure authorizations, except: (1) expenditures to carry out capital improvements that have been accounted for and kept on the books; (2) capital expenditures and equipment expenditures with procurement cycles that extend beyond the end of the fiscal year that have been accounted for and kept on the books; (3) the portion of any other expenditures authorized in the Puerto Rico Highway and Transportation Authority ("HTA") Certified Budget for the fiscal year 2021; and (4) the portion of the appropriations authorized for fiscal year 2021 that have been encumbered on or before June 30 of such fiscal year. This restriction on expenditures authorized in any prior fiscal year shall not apply to: (i) programs financed in whole or part with federal funds; (ii) orders by the United States district court with jurisdiction over all matters under Title III of PROMESA; and (iii) matters pertaining to any consent decree or injunction, or an administrative order or settlement entered into with a Federal Agency, with respect to Federal programs.

**Section III -** The funds allocated to the "Reserve deposits for unforeseen non-Title III litigation costs" budget lines in Section 1 are to be kept in an interest-bearing account (separate from other accounts currently in use by HTA to conduct day-to-day operations). The Executive Director shall make monthly deposits (equal to 1/12th of the total amount) to fund the account as established in Section 1 up to the amounts provided therein. Any expenditure or use of the funds from the reserve account must be made in response to circumstances beyond HTA's control which cause HTA to miss revenue targets and/or exceed expenditure targets. Such expenditures will require prior express and written authorization from the Oversight Board.

**Section IV -** The funds deposited to the "Reserve deposits for emergencies and unforeseen events" account (Section I of the FY2022 HTA Budget) are to be kept in an interest-bearing account (separate from other accounts currently in use by HTA to conduct day-to-day operations). Any expenditure or use of the funds from the reserve account must be made in response to circumstances beyond HTA's control which cause HTA to miss revenue targets and/or exceed expenditure targets. Such expenditures will require prior express and written authorization from the Oversight Board.

**Section V -** Notwithstanding any other statement, no unused budget allotments from any previous fiscal year shall be used by HTA to fund current fiscal year expenditures, except as otherwise expressly authorized in writing by the Oversight Board after June 30, 2021.

**Section VI -** The appropriations approved in this budget may only be reprogrammed with the prior express written approval of the Oversight Board. For the avoidance of doubt, this prohibition includes any reprogramming of any amount, line item or expenditure provided in this budget, regardless of whether it is an intra-agency reprogramming. Reprogramming, also known as reapportionments, may be made into spend concepts and/or objects not explicitly listed in the

HTA_CONF 00013024

## EXHIBIT I

FY2022 certified budget resolution as long as such requests are submitted to and approved in writing by the Oversight Board.

      **Section VII -** Pursuant to Section 203 of PROMESA, HTA must submit to the Oversight Board, no later than 15 days after the last day of each month of FY2022, a budget to actual report, along with an explanation of relevant variances as provided in the certified Fiscal Plan. The Oversight Board may determine to provide HTA a template to be used for such reporting, in which case any quarterly budget to actual reports submitted by HTA must be submitted consistent with such reporting template.

      **Section VIII -** The Oversight Board reserves the right to, in its sole discretion, issue a notice to the Governor, pursuant to PROMESA Section 202(a), setting forth a schedule for revising HTA's budget.

      **Section IX -** In conjunction with the reports required in these sections, a certification to the Oversight Board must be included stating (1) that no authorized budget amount of any previous fiscal year (except for those covered by the exceptions mentioned herein) has been used to cover any expenditure unless authorized by the express written approval of the Oversight Board.

      **Section X –** The HTA Budget for FY2022 as revised shall take effect on March 4, 2022.

HTA_CONF 00013025

# **EXHIBIT F**

Schedule of Bonds

HTA_CONF 00013026

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Balance as of HTA Petition Date |
|---|---|---|---|---|---|
| Highway Revenue Bonds – Series Y | 4/09/96 | $890,235,000 | 6.25 | 7/01/21 | $67,300,000 |
| Highway Revenue Refunding Bonds – Series Z | 3/01/96 | $185,040,000 | 6.00 – 6.25 | 7/01/18 | $19,775,000 |
| Highway Revenue Refunding Bonds – Series AA | 4/29/03 | $717,365,000 | 4.50 – 5.50 | 7/01/35 | $74,695,000 |
| Highway Revenue Refunding Bonds – Series AA (Remarketing) | 4/29/03 | $253,670,000 | 4.95 – 5.30 | 7/01/35 | $176,050,000 |
| Highway Revenue Refunding Bonds – Series BB | 10/04/05 | $101,625,000 | 5.25 | 7/01/22 | $63,070,000 |
| Highway Revenue Refunding Bonds – Series CC | 3/06/07 | $431,955,609 | 4.46 – 5.50 | 7/01/36 | $414,188,123 |
| Transportation Revenue Bonds – Series A | 3/19/98 | $1,129,643,740 | 4.75 – 12.00 | 7/01/38 | $244,523,613 |
| Transportation Revenue Bonds – Series D | 7/07/02 | $700,855,000 | 5.00 | 7/01/32 | $141,315,000 |
| Transportation Revenue Refunding Bonds – Series E | 7/07/02 | $284,405,000 | 5.50 – 5.75 | 7/01/24 | $155,620,000 |
| Transportation Revenue Bonds – Series G | 4/29/03 | $563,650,000 | 5.00 – 5.25 | 7/01/42 | $163,090,000 |
| Transportation Revenue Refunding Bonds – Series H | 4/29/03 | $72,035,000 | 4.00 – 5.00 | 7/01/35 | $9,875,000 |
| Transportation Revenue Refunding Bonds – Series H (Remarketing) | 4/29/03 | $44,275,000 | 5.45 | 7/01/32 | $12,720,000 |
| Transportation Revenue Refunding Bonds – Series I | 4/20/04 | $82,340,000 | 3.90 – 5.00 | 7/01/26 | $76,935,000 |
| Transportation Revenue Bonds – Series J | 4/20/04 | $405,895,000 | 4.63 – 5.00 | 7/01/29 | $79,725,000 |
| Transportation Revenue Bonds – Series K | 10/04/05 | $800,000,000 | 4.30 – 5.00 | 7/01/35 | $235,800,000 |
| Transportation Revenue Bonds – Series L | 10/04/05 | $598,285,000 | 3.88 – 5.25 | 7/01/41 | $542,195,000 |
| Transportation Revenue Bonds – Series M | 3/06/07 | $250,000,000 | 4.00 – 5.00 | 7/01/46 | $227,860,000 |
| Transportation Revenue Refunding Bonds – Series N | 3/06/07 | $1,502,904,943 | 0.72 – 5.50 | 7/01/45 | $1,021,729,944 |
| Subordinated Transportation Revenue Bonds – Series 1998 | 7/15/98 | $75,050,000 | 5.00 – 5.25 | 7/01/28 | $51,985,000 |
| Subordinated Transportation Revenue Bonds – Series 2003 | 4/29/03 | $320,545,000 | 2.30 – 5.75 | 7/01/28 | $215,960,000 |

HTA_CONF 00013027

| | Issue Date | Amount Issued | Range of Interest Rates | Final Maturity Date | Balance as of HTA Petition Date |
|---|---|---|---|---|---|
| Special Facility Revenue Refunding Bonds, 2003 Series A (Teodoro Moscoso Bridge) | 10/30/03 | $153,222,270.45 | 0.375 – 6.15 | 7/01/27 | $141,858,218.15[1] |

---

[1] This amount represents the par plus the accreted value of the capital appreciation bonds. The Special Facility Revenue Refunding Bonds, 2003 Series A (Teodoro Moscoso Bridge) have continued to pay regularly scheduled debt service since the HTA Petition Date.

**EXHIBIT G**

List of HTA's Bank Accounts, Balances, and Preliminary  Restriction Categorizations  as of December 31,  2021

HTA_CONF 00013029

**HTA:**

| Account Number | Account Number | 12/31/2021 Balance ($) | Categorization |
|---|---|---|---|
| **Unrestricted** | | | |
| 66/BSA-69-3768 | First Bank | $85,179,137.03 | Unrestricted |
| 66/BNY-16-5538 | Bank of New York Mellon | $34,202,538.01 | Unrestricted |
| 66/BSA-01-2473 | First Bank | $24,551,576.87 | Unrestricted |
| 66/BNY-20-5566 | Bank of New York Mellon | $16,785,475.27 | Unrestricted |
| 66/BNY-30-1811 | Bank of New York Mellon | $13,873,798.39 | Unrestricted |
| 66/BCP-14-5116 | Banco Popular | $13,002,018.11 | Unrestricted |
| 66/BNY-05-5484 | Bank of New York Mellon | $12,827,089.44 | Unrestricted |
| 66/BCP-12-1520 | Banco Popular | $9,510,355.29 | Unrestricted |
| 66/BNY-14-5532 | Bank of New York Mellon | $7,242,300.63 | Unrestricted |
| 66/BDE-01-bers[1] | Banco de Desarrollo Economico (BDE) | $5,948,490.44 | Unrestricted |
| 66/ORI-03-9874 | Oriental Bank | $3,416,628.92 | Unrestricted |
| 66/BNY-01-5475 | Bank of New York Mellon | $2,498,911.71 | Unrestricted |
| 66/BNY-09-5522 | Bank of New York Mellon | $1,066,161.06 | Unrestricted |
| 66/BNY-47-5471 | Bank of New York Mellon | $1,030,095.18 | Unrestricted |
| 66/BNY-11-5526 | Bank of New York Mellon | $790,330.21 | Unrestricted |
| 66/BCP-15-5353 | Banco Popular | $514,482.23 | Unrestricted |
| 66/BCP-13-5078 | Banco Popular | $343,931.91 | Unrestricted |
| 66/BNY-58-6813 | Bank of New York Mellon | $1,183.08 | Unrestricted |
| 66/BNY-19-5565 | Bank of New York Mellon | $674.92 | Unrestricted |
| 66/BNY-12-5529 | Bank of New York Mellon | $638.01 | Unrestricted |
| 66/BNY-23-5652 | Bank of New York Mellon | $590.03 | Unrestricted |
| 66/BNY-49-5474 | Bank of New York Mellon | $444.75 | Unrestricted |
| 66/BNY-46-5469 | Bank of New York Mellon | $193.86 | Unrestricted |

[1] The bank accounts at Banco de Desarrollo Economico (BDE) are not assigned a numerical identifier. Instead, there is only one bank account per agency that holds an account with BDE and the related transactions and statements are identified by the account holder name and mailing address.

HTA_CONF 00013030

| Account Number | Account Number | 12/31/2021 Balance ($) | Categorization |
|---|---|---|---|
| 66/BNY-06-5488 | Bank of New York Mellon | $27.29 | Unrestricted |
| 66/BNY-13-5530 | Bank of New York Mellon | $13.46 | Unrestricted |
| 66/BNY-38-4911 | Bank of New York Mellon | $3.08 | Unrestricted |
| 66/BNY-59-6814 | Bank of New York Mellon | $0.88 | Unrestricted |
| 66/BNY-48-5473 | Bank of New York Mellon | $0.25 | Unrestricted |
| 66/BNY-02-5478 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-03-5479 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-04-5482 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-07-5515 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-08-5520 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-10-5524 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-15-5537 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-17-5541 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-18-5564 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-25-1793 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-27-1804 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-28-1805 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-29-1806 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-31-4035 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-40-4914 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-42-4924 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-50-4910 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-51-4915 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-52-4916 | Bank of New York Mellon | $0.00 | Unrestricted |
| 66/BNY-53-4917 | Bank of New York Mellon | $0.00 | Unrestricted |
| **Total Unrestricted** | | **$232,787,090.31** | |
| **Federal Funds/Law** | | | |

Page 3 of 5

HTA_CONF 00013031

| Account Number | Account Number | | 12/31/2021 Balance ($) | Categorization |
|---|---|---|---|---|
| 66/BCP-17-0510 | Banco Popular | | $7,403,704.50 | **Restricted: Federal Funds** – funds provided by the U.S. Department of Transportation for construction projects governed by federal law or regulation |
| **Total Federal Funds/Law** | | | **$7,403,704.50** | |
| | | | | |
| **Third Party Funds** | | | | |
| 66/BCP-21-6411 | Banco Popular | $23,712,235.70 | $23,712,235.70 | **Restricted: Third Party Funds** – prepaid tolls prior to earned toll revenue distribution |
| **Total Third Party Funds** | | | **$23,712,235.70** | |
| | | | | |
| **Inconclusive** | | | | |
| 66/BCP-18-5210 | Banco Popular | | $6,438,057.61 | Inconclusive |
| **Total Inconclusive** | | | **$6,438,057.61** | |
| | | | | |
| **Unreviewed – Below $2M** | | | | |
| x6671 | Banco Popular | | $867,138.20 | Unreviewed[2] |
| x2489 | Oriental Bank | | $157,501.98 | Unreviewed |
| x6672 | Oriental Bank | | $67,965.72 | Unreviewed |
| x0303 | Banco Popular | | $5,000.00 | Unreviewed |
| x6438 | Banco Popular | | $5,000.00 | Unreviewed |
| x1795 | Bank of New York Mellon | | $2,098.99 | Unreviewed |
| x5656 | Bank of New York Mellon | | $1,220.27 | Unreviewed |
| x7726 | First Bank | | $541.48 | Unreviewed |

[2] Generally, accounts with balance lower than $2.0 million were not reviewed for restriction assessment. In some instances, if review of accounts with balance of $2.0 million or greater indicated that an account with a lower balance may be subject to a similar legal restriction on use of funds, then such accounts were also reviewed for restriction assessment notwithstanding a low balance. As of December 31, 2021, the accounts reviewed for restriction status represented approximately $270.3 million of the total $271.4 million, or 99.6% of funds held at the HTA accounts. The accounts that have not been reviewed based on the amount threshold are presented in gray boxes.

HTA_CONF 00013032

| Account Number | Account Number | 12/31/2021 Balance ($) | Categorization |
|---|---|---|---|
| x0693 | Bank of New York Mellon | $127.02 | Unreviewed |
| x5574 | Bank of New York Mellon | $78.82 | Unreviewed |
| x4042 | Bank of New York Mellon | $66.11 | Unreviewed |
| x4912 | Bank of New York Mellon | $15.19 | Unreviewed |
| x7474 | Bank of New York Mellon | $0.30 | Unreviewed |
| x5567 | Bank of New York Mellon | $0.02 | Unreviewed |
| x0026 | Bank of New York Mellon | $0.02 | Unreviewed |
| x0220 | Banco Popular | $0.01 | Unreviewed |
| x0025 | Bank of New York Mellon | $0.01 | Unreviewed |
| x0028 | Bank of New York Mellon | $0.00 | Unreviewed |
| x0186 | Bank of New York Mellon | $0.00 | Unreviewed |
| x0268 | Bank of New York Mellon | $0.00 | Unreviewed |
| x4919 | Bank of New York Mellon | $0.00 | Unreviewed |
| x4921 | Bank of New York Mellon | $0.00 | Unreviewed |
| x9574 | Oriental Bank | $0.00 | Unreviewed |
| **Total Unreviewed – Below $2M** | | **$1,106,754.14** | |
| **TOTAL FUNDS** | | **$271,447,842.26** | |

HTA_CONF 00013033

# EXHIBIT H

Latest Audited Financial Statements for Puerto Rico Highways and Transportation Authority



## GOVERNMENT OF PUERTO RICO
### PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

# Municipal Secondary Market Disclosure Information Cover Sheet
# Municipal Securities Rulemaking Board (MSRB)
# Electronic Municipal Market Access System (EMMA)

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Name of bond issue exactly as it appears on the cover of the Official Statement:

_____

_____

Nine-digit CUSIP* numbers if available, to which the information relates:

_____

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:  Puerto Rico Highways and Transportation Authority ("PRHTA")

Other Obligated Person's Name (if any): _____

Six-digit CUSIP* number(s):  745181, 745190, 745185 (Teodoro Moscoso Bridge)

**TYPE OF INFORMATION PROVIDED:**

A.  ☐ Annual Financial Information and Operating Data pursuant to Rule 15c2-12

Fiscal Period Covered: _____

B.  ☒ Audited Financial Statements or CAFR pursuant to Rule 15c2-12

Fiscal Period Covered:  2020-21

C.  ☐ Notice of Failure to Provide Annual Financial Information as Required: _____

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.

*/s/ Julian M. Bayne Hernández*
Julian M. Bayne Hernández
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for PRHTA

Dated: April 1, 2022

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 | PO Box 42001, San Juan, PR 00940-2001

 787.722.2525   contact@aafaf.pr.gov  aafaf.pr.gov

HTA_CONF 00013035

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Financial Statements with Independent Auditor's Report
and
Required Supplementary Information

Fiscal Year Ended June 30, 2021

HTA_CONF 00013036

# TABLE OF CONTENTS

| | Page |
|---|---|
| **INDEPENDENT AUDITOR'S REPORT** ................................................................................................... | 1 |
| Management's Discussion and Analysis (Unaudited) ........................................................................... | 4 |
| Audited Financial Statements: | |
| Statement of Net Deficit............................................................................................................. | 14 |
| Statement of Revenues, Expenses, and Changes in Net Deficit............................................... | 16 |
| Statement of Cash Flows............................................................................................................ | 17 |
| Notes to Financial Statements ........................................................................................................... | 19 |
| Required Supplementary Information: | |
| Schedule of Changes in the Authority's Total Postemployment Benefits other than Pensions (OPEB Plan) Liability and Related Ratios (Unaudited)........................................................................... | 69 |
| Schedule of Changes in the Commonwealth's Total Postemployment Benefits other than Pensions (ERS MIPC OPEB Plan) Liability and Related Ratios (Unaudited) ....................................... | 70 |

HTA_CONF 00013037



**Crowe PR PSC**
100 Carr 165, Suite 410
Guaynabo, PR 00968-8051
+1 (787) 625-1800
www.crowe.pr

## INDEPENDENT AUDITOR'S REPORT

To the Board of Directors of the
Puerto Rico Highways and Transportation Authority
(a Component Unit of the Commonwealth of Puerto Rico)

### Report on the Financial Statements

We have audited the accompanying financial statements of the Puerto Rico Highways and Transportation Authority (the "Authority") (a Component Unit of the Commonwealth of Puerto Rico), as of and for the fiscal year ended June 30, 2021, and the related notes to the financial statements, which collectively comprise the Authority's, basic financial statements as listed in the table of contents.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

HTA_CONF 00013038

*Basis for Qualified Opinion*

As discussed in Note 15 to the basic financial statements, the Commonwealth of Puerto Rico has not released the GASB 73 Pension Expense Report of the Commonwealth's Defined Benefit Pension Plan for the year ended June 30, 2021. Accordingly, all pension related amounts included in the financial statements are outdated, and this may have a significant effect on the financial position and results of operations of the Authority. Furthermore, pension information that is required to be disclosed by U.S. generally accepted accounting principles has been omitted.

As discussed in Note 16 to the basic financial statements, the Commonwealth of Puerto Rico has not released the GASB 75 Other Post-Employment Benefits (OPEB) Report of the Medical Insurance Plan Contribution Benefit (ERS MIPC) for the year ended June 30, 2021. Accordingly, the Authority's proportional share of the total ERS MIPC OPEB liability, deferred outflows/inflows of resources and related expense, as recorded in the financial statements are outdated, and this may have a significant effect on the financial position and results of operations of the Authority.

*Qualified Opinion*

In our opinion, except for the effects of the matters described above in the Basis for Qualified Opinion paragraph, the financial statements referred above present fairly, in all material respects, the financial position of the Authority as of June 30, 2021, and the changes in financial position and, its cash flows for the year then ended in accordance with U.S. generally accepted accounting principles.

*Ability to Continue as a Going Concern*

The accompanying financial statements have been prepared assuming that the Authority will continue as a going concern. As discussed in Notes 3 and 4 to the basic financial statements, on May 21, 2017, the Financial Oversight and Management Board for Puerto Rico (the Oversight Board), at the request of the Governor, commenced a case for the Authority by filing a petition for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101, *et seq.* (PROMESA) in the United States District Court of Puerto Rico. Thereafter, on May 5, 2021, the Authority executed the HTA /CCDA Plan Support Agreement (PSA) to settle all outstanding bonds and debt obligations to the Government Development Bank (GDB), in exchange for the issuance of new bonds by the Authority, contingent value instruments by the Commonwealth, and certain upfront cash consideration. This agreement was made part of the Commonwealth Plan of Adjustment dated January 18, 2022. However, the Authority is still negotiating its own Debt Plan of Adjustment for final approval by the Title III Court.

Therefore, until the Authority's Debt Plan of Adjustment is ratified by the Title III Court, there is still substantial doubt about the Authority's ability to continue as a going concern. Management's plans in regard to these matters are described in Note 4 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Restatement of Prior Period Financial Statements*

As discussed in Note 22 to the financial statements, as of July 1, 2020, the net deficit of the Authority has been restated to recognize the Authority's proportionate share of the pension liability of the Puerto Rico Government Employees Retirement System (ERS) under Government Accounting Standards Board (GASB) Statement No. 73, *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement 68, and Amendments to Certain Provisions of GASB Statements 67 and 68,* which information was not available when the June 30, 2020 financial statements were issued. In addition, as of July 1, 2020, the net deficit of the Authority has been restated to recognize the Authority's proportionate share of the ERS MIPC OPEB Liability under Government GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions* as a result of a misunderstanding of facts available as of such date. Our opinion is not modified in respect to this matter.

**Required Supplementary Information**

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis, the schedule of changes in the Authority's total postemployment benefits other than pensions (OPEB Plan) liability and related ratios, and the schedule of changes in the Commonwealth's total postemployment benefits other than pensions (ERS MIPC OPEB Plan) liability and related ratios be presented to supplement the basic financial

HTA_CONF 00013039

**Required Supplementary Information (Continued)**

statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

Management has omitted the GASB No. 73 required supplementary information that accounting principles generally accepted in the United States of America require to be presented to supplement the basic financial statements. Such missing information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of the financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. Our opinion on the basic financial statements is not affected by this missing information.

March 30, 2022

Stamp number E482989 was
affixed to the original of this
Report.

*Crowe PR PS*

-3-

HTA_CONF 00013040

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited)

For the Fiscal Years Ended June 30, 2021 and 2020

The following discussion and analysis of the financial performance and activity of the Puerto Rico Highways and Transportation Authority (the Authority) provides an introduction and understanding of the basic financial statements of the Authority for the fiscal years ended June 30, 2021and 2020. This discussion was prepared by management and should be read in conjunction with the financial statements and the notes thereto, which follows this section.

**Financial Statements**

The basic financial statements provide information about the Authority's activities. The financial statements are prepared in accordance with U.S. generally accepted accounting principles (GAAP) as promulgated by GASB, except as follows:

As discussed in Note 15 to the basic financial statements, the Commonwealth of Puerto Rico has not released the GASB 73 Pension Expense Report of the Pension Plan for the year-end June 30, 2021. Accordingly, all pension related amounts included in the financial statements are outdated, and this may have a significant effect on the financial position and results of operations of the Authority. Furthermore, pension information that is required to be disclosed by GAAP has been omitted. Therefore, all historic financial information presented in the Management Discussion Analysis must be read considering the possible effects of this departure.

As discussed in Note 16 to the basic financial statements, the Commonwealth of Puerto Rico has not released the GASB 75 Other Post Employment Benefits Report of the Medical Insurance Plan Contribution Benefit for the year-end June 30, 2021. Accordingly, $15.9 million related to the health plan benefit provided by the Employees Retirement System Medical Insurance Plan Contribution Benefit included in the financial statements is outdated, and this may have a significant effect on the financial position and results of operations of the Authority.

As explained in Note 22, the Authority restated the beginning of the year balance of the net deficit, to account for the total pension obligation as of June 30, 2020, and the related expense for the year then ended under GASB 73 which information had not been released by the Commonwealth of Puerto Rico when the Authority's 2020 financial statements were released. The Authority restated the beginning of the year balance of the net deficit, to account for its proportionate share of the total OPEB liability related to the health plan benefit provided by the Employees Retirement System Medical Insurance Plan Contribution Benefit under the GASB Statement No. 75 *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions* which had not been previous recognized.

We also alert the readers that since 2017, the Authority is operating under Title III – In Court Restructuring Process, of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). This matter raises substantial doubts about the Authority's ability to continue as a going concern. As explained in notes 4 and 24, the Authority was part of the Commonwealth Plan of Adjustment that significantly reduced the bonds payable and Government Development Bank (GDB) obligations to approximately $1,245 million; a reduction of approximately $6,600 million. Assuming the Authority's Plan of Adjustment is approved during 2022, these matters should allow a reasonable opportunity to continue as a going concern. The Authority has prepared its financial statements assuming the Authority will continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Financial Highlights**

The Authority's net deficit as of June 30, 2021, totaled $694.7 million as compared to net deficit of $394.3 million as of June 30, 2020, as restated. Net deficit increased by $300.4 million after capital grants during the fiscal year ended June 30, 2021, as compared to an increase of $646.7 million during the fiscal year ended June 30, 2020, as restated. This change is mainly attributable to an increase of operating revenues of $23.6 million, an increase of $17.5 million in operating expenses, a decrease of interest on bonds and GDB Debt Recovery Authority (GDB DRA) (formerly known as GDB) obligations of $36.1 million, an increase of $206.1 million of operating transfers from the Commonwealth, and an increase in capital transfers and grants of $112.1 million during fiscal year ended June 30, 2021.

-4-

HTA_CONF 00013041

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

The Authority's net capital assets, including assets under the Service Concession Agreements (as defined below), totaled $8,856.5 million on June 30, 2021, as compared to $9,096.3 million on June 30, 2020. Net capital assets decreased by 2.7% on June 30, 2021, when compared with the balance on June 30, 2020.

The total aggregate amount of the Authority's non-current liabilities was $8,741.7 million on June 30, 2021, as compared to $8,557 million on June 30, 2020 (as restated), which consisted principally of bonds payable, GDB Debt Recovery Authority obligation, accrued interest, accrued legal claims, voluntary termination incentive plans, and the Authority's net pension liability. A significant portion of the liabilities have been stayed under PROMESA Title III and are in the process of being restructured through the Title III proceedings. On May 5, 2021, the Authority executed the Highways and Transportation Authority / Convention Center District Authority Plan Support Agreement (HTA/CCDA PSA) to exchange the outstanding bonds, together with the GDB Debt Recovery Authority Obligation (disclosed in Note 14), for a combination of bonds to be issued by the Authority, contingent value bonds to be issued by the Commonwealth, and certain cash consideration to be paid at the time of the exchange. The Agreement, if finally confirmed by the Title III Court, as expected, will reduce the Authority's bond payable obligations to $1,245 million, which will be payable in forty years, at 5%. This represents an estimated discharge of debt of approximately $6,600 million.

**Overview of the Basic Financial Statements**

The basic financial statements consist of the: (1) statement of net deficit, (2) statement of revenues, expenses, and changes in net deficit, (3) statement of cash flows, and (4) notes to the financial statements. The basic financial statements are prepared on the accrual basis of accounting, meaning that all expenses are recorded when incurred and all revenues are recognized when earned, in accordance with GAAP.

**Statement of Net Deficit**

The statement of net deficit reports all financial and capital resources of the Authority. The statement is presented in the format where assets plus deferred outflows of resources equal liabilities plus deferred inflows of resources plus net deficit. Assets and liabilities are presented in order of liquidity and are classified as current (convertible into cash or due and payable within one year) and non-current. The focus of the statement of net deficit is to show a picture of the liquidity and financial health of the Authority as of the end of the year.

The Authority's net deficit is reported in the following categories:

**Net Investment in Capital Assets** - This component of net deficit consists of all capital assets, net of accumulated depreciation, reduced by the outstanding balances of any bonds, notes, or other borrowings that are attributable to the acquisition, construction, or improvement of those assets.

**Restricted for Debt Service** - This component of net deficit is used to account for restricted assets for the principal and interest payments of the bonds payable. However, since the Authority filed for relief under PROMESA Title III, all debt service of the bonds, other than those related to the Teodoro Moscoso Bridge concession have been stayed. Accordingly, assets are not being segregated for debt service. Furthermore, funds kept by the Bank of New York Mellon (the "Trustee") are no longer available for such purposes.

**Restricted for Construction** - This component of net deficit consists of restricted assets for the specific purpose of paying for construction projects. This restriction is imposed by the grantors and contributors, as well as the bondholders through debt covenants.

**Unrestricted Deficit** - This component consists of net deficit that does not meet the definition of net investment in capital assets or restricted for debt service or for construction.

HTA_CONF 00013042

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

**Statement of Revenues, Expenses, and Changes in Net Deficit**

The statement of revenues, expenses, and changes in net deficit includes: (i) operating revenues, which consist of toll fares, other operating income, concession agreements, and other operating expenses, such as costs of operating toll roads, the transportation system, administrative expenses, and depreciation on capital assets; and (ii) "non-operating" revenue and expenses, such operating transfers from the Commonwealth, interest and investment income, interest expense and others. The statement also includes capital contributions and payments received from the Commonwealth and federal government grants. The focus of the statement of revenues, expenses, and changes in net deficit is the change in net deficit (economic resources measurement focus). This is similar to net income or loss and portrays the results of operations of the Authority for the entire operating period.

**Statement of Cash Flows**

The statement of cash flows discloses net cash provided by or used by operating activities, noncapital financing activities, capital, and related financing activities and from investing activities. This statement also portrays the financial health of the Authority in that current cash flows are sufficient to pay current liabilities.

**Notes to the Financial Statements**

The notes to financial statements are an integral part of the basic financial statements and describe the significant accounting policies, related-party transactions, deposits and investments, capital assets, bonds payable, long-term liabilities, retirement plans, commitments, and contingencies, going concern and PROMESA. The reader is encouraged to read the notes in conjunction with the management discussion and analysis and the financial statements.

-6-

HTA_CONF 00013043

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

**Financial Analysis of the Authority**

*Condensed Statement of Net Deficit*

The following table reflects the condensed net deficit of the Authority as of June 30, 2021 and 2020:

|  | 2021 [1] | 2020 (Restated) |
|---|---|---|
| **Assets** | | |
| Current assets | $    89,537,218 | $    35,335,074 |
| Restricted assets | 316,905,109 | 249,296,172 |
| Capital assets, net | 8,660,384,135 | 8,898,393,339 |
| Highways and bridge under concession agreements, net | 196,198,857 | 197,896,107 |
| Total assets | 9,263,025,319 | 9,380,920,692 |
| Deferred outflows of resources | 64,376,495 | 132,970,094 |
| Total assets and deferred outflows of resources | $ 9,327,401,814 | $ 9,513,890,786 |
| **Liabilities** | | |
| Current liabilities | $    206,324,794 | $    251,305,802 |
| Non-current liabilities | 8,741,740,083 | 8,556,983,498 |
| Total liabilities | 8,948,064,877 | 8,808,289,300 |
| Deferred inflows of resources | 1,074,080,424 | 1,099,973,422 |
| Total liabilities and deferred inflows of resources | 10,022,145,301 | 9,908,262,722 |
| **Net deficit** | | |
| Net investment in capital assets | 1,521,179,877 | 1,759,491,091 |
| Restricted for debt service | - | - |
| Restricted for constructions | 119,621,153 | 132,436,565 |
| Unrestricted | (2,335,544,517) | (2,286,299,592) |
| Total net deficit | (694,743,487) | (394,371,936) |
| Total liabilities, deferred inflow of resources and net deficit | $ 9,327,401,814 | $ 9,513,890,786 |

---

[1] The 2021 Statement of Net Deficit lacks any adjustment related to the effects of unrecorded pension transactions for the year ended June 30, 2021, and Commonwealth OPEB transactions for the year ended June 30, 2021.

HTA_CONF 00013044

# PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

Current assets increased by approximately 153.4% to $89.5 million during the fiscal year ended June 30, 2021. The net increase in current assets of $54.2 million was principally due to an increase in cash and cash equivalents, by approximately $7.4 million and an increase in accounts receivable from the Commonwealth by approximately $46.2 million. Cash and cash equivalents increased by approximately $7.4 million mainly due to more toll revenues received during the fiscal year ended June 30, 2021. This increase is mainly due to the normalization of private and government operations after the impact of lockdown caused by the COVID-19 pandemic virus.

Restricted assets increased by approximately 27.1% to $316.9 million during the fiscal year ended June 30, 2021. Cash and cash equivalents and Investments with Trustee increased by approximately $47.8 million during the fiscal year ended June 30, 2021. This increase is mainly due to the use of capital expenditures (CAPEX) funds and "Abriendo Caminos" program by approximately $42.9 million, offset, by an increase of $85.2 million mainly due to a reserve deposit account created to pay utility obligations, other emergencies, and unforeseen events as required by the Federal Oversight and Management Board (FOMB) and Fiscal Plan. In addition, investments had interest income of approximately $3.2 million and accounts receivables from U.S. Federal government related to Federal Highway Administration (FHWA) funds increased by 40.1% to approximately $68.9 million. There were no pledged revenues deposited with the Trustee during fiscal years 2021 and 2020. All other restricted assets remained in line with prior fiscal year.

During the fiscal year ended June 30, 2021, capital assets decreased by 2.67% to approximately $8,660.4 million as compared to fiscal year 2020. The decrease was mainly due to the net result of an aggregate increase in construction in process, roads, bridges and equipment, and vehicles of approximately $236.7 million, net of depreciation expense of approximately $476.4 million for the fiscal year ended June 30, 2021.

During the fiscal year ended June 30, 2021, highways and bridges under the Service Concession Agreements (as defined below) decreased by 0.87% to approximately $196.2 million as compared to fiscal year 2020. This decrease was due to depreciation expense of approximately $1.6 million related to the Teodoro Moscoso Bridge. Note that other assets under service concession agreements are not depreciated, since the service concession agreements require the concessionaire to return the assets to the Authority in their original or an enhanced condition.

Deferred outflows of resources decreased to approximately $64.4 million during the current fiscal year. This represents a decrease of 51.6%, which is mainly due to the write offs of deferred outflows related to deferred losses on advance refundings during 2021.

During the fiscal year ended June 30, 2021, current liabilities decreased by 17.9% to approximately $206.3 million as compared to fiscal year 2020. Major changes in current liabilities are the following:

Accounts payable and accrued liabilities, including vacations, increased by 2.1% to approximately $144.0 million during the fiscal year ended June 30, 2021, as compared to prior fiscal year.

Deferred revenue decreased by $34.6 million due to state grants received and incurred for repairs and maintenance of roads and bridges during the current fiscal year.

Current portion of bonds payable decreased by 41.1% to approximately $13.2 million during the fiscal year ended June 30, 2021, as compared to prior fiscal year. The current portion of bonds payable is related to bonds payable of the Teodoro Moscoso Bridge. Decrease is mainly due to the decrease in principal bond payable amounts due for fiscal year 2022 when compared to amounts that were due during fiscal year 2021.

During the fiscal year ended June 30, 2021, non-current liabilities increased by 2.2% to approximately $8,741.7 million as compared to fiscal year 2020. The increase in non-current liabilities of approximately $184.8 million during the current fiscal year was the net effect of: an increase in accrued interest payable on bonds payable and GDB Debt Recovery Authority obligation by 15.7% to approximately $1,790.9 million during the fiscal year ended June

-8-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

30, 2021 as compared to prior fiscal year; and a decrease in bonds payable of approximately $11.5 million; a decrease of $25.2 million in accounts payable and a decrease of $3.8 million on obligations under vacations and voluntary termination incentive plan liability.

Legal claims not related to expropriation and related costs, decreased by 6.09% to approximately $19.8 million during the fiscal year ended June 30, 2021, as compared to the prior year period. Legal claims related to expropriation of properties decreased by 25.76% to approximately $46.5 million. The value of the legal claims was recorded based on advice from internal and external legal counsel.

Deferred inflows of resources during the fiscal year ended June 30, 2021, decreased by 2.4% to $1,074.1 million as compared to fiscal year 2020. The decrease of $25.8 million was mainly due to the effect of the amortization to the deferred inflows of resources on concession agreements.

During the fiscal year ended June 30, 2021, the Authority's net deficit increased by 76.1% to $694.7 million as compared to fiscal year 2020. The decrease was due to a loss of approximately $300.4 million after capital grants during the current fiscal year 2021. The largest portion of the Authority's net deficit was its investments in capital assets net of related debt outstanding used to acquire such capital assets.

-9-

HTA_CONF 00013046

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

**Condensed Statements of Revenues, Expenses, and Changes in Net Deficit**

The following table reflects a condensed summary of the revenues, expenses, and changes in net deficit for fiscal years ended June 30, 2021 and 2020:

| | 2021 [2] | 2020 (Restated and Reclassified) |
|---|---|---|
| Operating revenues: | | |
| Toll fares | $ 151,557,243 | $ 124,272,241 |
| Other operating income | 7,582,389 | 12,525,486 |
| Concession agreements | 41,164,686 | 39,945,626 |
| Total operating revenues | 200,304,318 | 176,743,353 |
| | | |
| Total operating expenses | 349,411,742 | 331,955,446 |
| Depreciation and amortization | 476,415,023 | 471,936,881 |
| Operating loss | (625,522,447) | (627,148,974) |
| Non-operating revenues (expenses): | | |
| Operating transfers from the Commonwealth of Puerto Rico | 206,136,000 | - |
| Operating grants from U.S. Federal Government | 16,565,090 | 24,310,201 |
| Investment income | 3,891,951 | 5,213,185 |
| Interest on bonds and GDB Debt Recovery Authority Obligations | (302,106,535) | (338,226,720) |
| Other non-operating expenses | (558,124) | 49,838 |
| Total non-operating revenues / (expenses) | (76,071,618) | (308,653,496) |
| Loss Before Capital Contributions | (701,594,065) | (935,802,470) |
| Capital grants (U.S. Federal and Commonwealth) | 401,222,514 | 289,140,974 |
| Change in net deficit | (300,371,551) | (646,661,496) |
| Net position (deficit) at beginning of year, including ($7,996,728), restatement in 2020 | (394,371,936) | 252,289,560 |
| | | |
| Net deficit at end of year | $ (694,743,487) | $ (394,371,936) |

---

[2] See footnote 1 on page 7

HTA_CONF 00013047

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

Operating revenues, which consisted of toll fares, concession agreements and other operating revenues increased by 13.3% to $200.3 million during the fiscal year ended June 30, 2021, as compared to fiscal year 2020. This increase is the net effect of the following:

a. The increase in toll fares of $27.2 million which is mainly attributable to the reopening of governmental and business operations after the impact of the lockdown mandates as a result of the COVID-19 pandemic virus.

b. The decrease in other operating income of approximately $4.9 million during the current fiscal year is related with less train fares due to less traffic attributable to impact of COVID-19 restrictions in schools and universities and increase in remote work in private and government entities.

c. The increase in concession revenue agreements of approximately $1.2 million during the current fiscal year is related to the increase of the Bridge Service Concession revenue for the amount of principal and interest on bonds made by Autopistas de Puerto Rico (Autopistas).

Operating expenses increased by 5.2% to approximately $349.4 million during the fiscal year ended June 30, 2021, as compared to fiscal year 2020. The increase in operating expenses of approximately $17.5 million during the current fiscal year was the aggregate effect of: 1) the net effect of an increase in salaries and related benefits of approximately $3.4 million; 2) a decrease in the proportionate share of GASB 73 Pension Expense Report of the Pension Plan for the year-end June 30, 2020 for approximately $7.9 million recorded as a prior period adjustment in fiscal year 2021; 3) an increase in toll highways administration of approximately $4.7 million due to the an increase in repairs and maintenance in highways and increase in monthly charges of the highways third party operator; 4) an increase in the train operating and maintenance expense of approximately $1.0 million; 5) an increase on the integrated transportation system of approximately $1.4 million; 6) an increase in repairs and maintenance of roads and bridges of approximately $3.2 million, and 7) a decrease in legal and professional services of approximately $9.1 million related with to the implementation of the Fiscal Plan and Title III legal services.

Operating transfers from the Commonwealth increased by approximately $206.1 million when compared to fiscal year ended June 30, 2020 as a result of an increase in amounts allocated by the Commonwealth.

On November 30, 2015, the Governor issued Executive Order 2015-046, which directed the Treasury Department to retain, among other things, certain gasoline, oil, diesel, and petroleum taxes that the Commonwealth had previously conditionally allocated to the Authority. These revenues were retained by the Commonwealth for the payment of essential government services. Such conditional allocation of gasoline, oil, diesel, and petroleum taxes to the Authority will no longer be made as the Commonwealth Plan of Adjustment (defined below) provides that the statutes that authorized such allocations have been preempted and the conditional allocation discharged.

Investment income decreased by approximately $1.3 million during the fiscal year ended June 30, 2021, as a result of a decrease in the interest rate in cash balances. In addition, interest expense on bonds and GDB Debt Recovery Authority obligations decreased by approximately $36.1 million during fiscal year ended June 30, 2021, principally due to the decrease in interest payable related with GDB Debt Recovery Authority obligation outstanding balance.

Other non-operating revenues remained in line with prior fiscal year.

The Authority also received capital and operating grants from the U.S. federal government. Capital grants may only be used for construction, major improvements, preservation of highways and bridges while operating grants are used to finance repair and maintenance for roads and bridges and other operating expenses of other mass transportation systems. Such capital and operating grants amounted to approximately $234.2 and $222.6 million during the fiscal year ended June 30, 2021 and 2020, respectively.

HTA_CONF 00013048

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

### CAPITAL ASSETS AND DEBT ADMINISTRATION

**Capital Assets**

As of June 30, 2021, the Authority had approximately $8,660.4 million in capital assets, net of accumulated depreciation, which represents a decrease of $238.0 million, when compared with the prior year. Capital assets consist of roads, bridges, mass transportation system, transportation equipment, buildings, lands, construction in progress, and highways and bridges under concession agreements.

Since the end of fiscal year 2005, the Authority operates the mass rail transportation system for the San Juan metropolitan area known as "Urban Train". The Authority originally incurred approximately $2.42 billion in costs in connection with the Urban Train, of which $685.7 million was paid with federal funds. The Urban Train in San Juan consists of approximately 17 km of track running from San Juan to Bayamón. Maintenance services are partially funded with operating grants from the Federal Transit Administration (FTA). Total operating grants received from FTA used for maintenance services and other programs amounted to approximately $16.5 million during the fiscal year ended June 30, 2021. Effective on July 1, 2017, the Authority entered into a new contract with ACI-Herzog for the purpose of operating and maintaining the Urban Train. This contract expires on June 30, 2032, with an option to extend the term for an additional two periods of not less than 5 years, as long as the entire term does not exceed 25 years. The total annual operation and maintenance cost, for the fiscal year ended June 30, 2021, was approximately $47.3 million.

On September 22, 2011, the Authority entered into a toll road service concession agreement (the Toll Road Service Concession Agreement) with Metropistas, in which the Authority granted Metropistas the right to finance, operate and maintain the PR-22 and PR-5 highways for a period of 40 years. During the 40-year term, Metropistas will have the right to charge and collect the tolls imposed on these highways as more fully described in Note 11 to the basic financial statements. On April 19, 2016, the Authority entered into an amendment of the Toll Road Service Concession Agreement to extend the original term for ten additional years and to create five bi-directional tolling points on the PR-5 and PR-22 highways.

On December 20, 1992, the Authority and Autopistas entered into a service concession agreement (as amended in 1992, 2004 and 2009, the Bridge Service Concession Agreement, and together with the Toll Road Service Concession Agreement, the Service Concession Agreements) for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a toll bridge that crosses the San Jose Lagoon between the municipalities of San Juan and Carolina. Autopistas designed and constructed the Teodoro Moscoso Bridge, which began operating on February 23, 1994, as more fully described in Note 11 to the basic financial statements. On September 9, 2009, the agreement was amended to extend its term to 50 years (2044).

**Debt Administration**

As of June 30, 2021, the total aggregate principal amount of the Authority's bonds outstanding (net of unamortized premiums and discounts) amounted to approximately $4,372.6 million, plus accrued interest of $890.7 million. In addition, as of the same date, the aggregate principal amount of expired lines of credit owed to the GDB DRA was $1,733.7 million, plus accrued interest of $900.3 million. Payment on these obligations has been stayed in the PROMESA Title III proceedings. These obligations are to be resolved on the terms set forth in that certain *Stipulation in Connection with DRA Related Disputes* [ECF No 19100], which provides that such obligations are discharged in exchange for certain subordinated Contingent Value Instruments (CVI's) issued under the Commonwealth Plan of Adjustment and payment of certain fees and expenses.

HTA_CONF 00013049

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management Discussion and Analysis (Unaudited) (Continued)

For the Fiscal Years Ended June 30, 2021 and 2020

As discussed below, upon filing for relief in 2017 under PROMESA Title III, all debt payments were stayed, except for certain debt which is currently being settled by a third party (Teodoro Moscoso Bonds). For fiscal year ended June 30, 2021, the Authority defaulted on the debt service principal and interests amounting to $351.8 million.

*CURRENTLY KNOWN FACTS*

**COVID-19 Pandemic Event**

Since China first alerted the World Health Organization ("WHO") of flu-like cases in Wuhan on December 31, 2019, the global community is experiencing an unprecedented health crisis caused by a novel coronavirus known as COVID-19, which can cause several severe symptoms including fever, cough, shortness of breath, and even death in extreme cases. On March 15, 2020, then Governor Wanda Vázquez Garced signed Executive Order No. OE-2020-023, which directed the closure of all non-essential businesses in Puerto Rico. Thereafter, to the date of these financial statements were issued, new Executive Orders have been issued, including those by the actual Governor Pedro Pierluisi. At the Authority, substantial closure of operations was in place for under two months. Thereafter, construction and maintenance work began, as contractors rescheduled the work in progress, and administrative employees began working under a hybrid schedule until May 24, 2021, when all employees were required to return to their workspace on a full-time basis, with proof of vaccination with certain exceptions. As of the date these financial statements were issued, there was a marked decrease in persons getting infected or requiring hospitalization. However, the long-term effect of the pandemic is still difficult to predict.

**Authority's Fiscal Plan and Agreements in Principle**

On February 22, 2022, the Oversight Board certified a modified version of the FY 2022 fiscal plan for the Authority that was initially approved on May 27, 2021. The modified FY 2022 fiscal plan incorporates elements of the Commonwealth Plan of Adjustment, which was confirmed on January 18, 2022 and became effective on March 15, 2022.

On April 12, 2021, the Commonwealth and other component units, including the Authority, filed an Agreement in Principle (AP) with the Municipal Securities Rulemaking Board. The Authority's portions of the AP disclosed tentative agreements reached with the Authority's bond holders, that if materialized, will result in a significant decrease in the obligations of the Authority. On May 5, 2021, the Oversight Board (as debtor representative of the Commonwealth and Authority in their respective Title III cases) and certain of the Authority's creditors and insurers entered into the HTA/CCDA PSA, which set forth the key terms for the resolution of creditor claims against the Authority under the Commonwealth Plan of Adjustment and the HTA Plan of Adjustment.

*CONTACTING THE AUTHORITY'S FINANCIAL MANAGEMENT*

This financial report is designed to provide our bondholders, and other interest parties with a general overview of the Authority's finances and to demonstrate the Authority's accountability for the money it receives. If you have any questions or need additional financial information, contact the Puerto Rico Highways and Transportation Authority, Finance Area, P.O. Box 42007, San Juan, Puerto Rico 00940-2007.

HTA_CONF 00013050

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Net Deficit

June 30, 2021

| | | |
|---|---|---:|
| Assets | | |
| Current assets: | | |
| Cash | $ | 18,400,049 |
| Accounts receivable, net | | 7,090,078 |
| Due from Commonwealth of Puerto Rico, net | | 59,067,000 |
| Prepaid expenses and other assets | | 4,980,091 |
| Total current assets | | 89,537,218 |
| | | |
| Restricted assets: | | |
| Cash and cash equivalents | | 158,169,219 |
| Investments with trustee | | 89,801,845 |
| Account receivable U.S. federal government | | 68,934,045 |
| Total restricted assets | | 316,905,109 |
| | | |
| Other Non-current assets: | | |
| Capital assets, net | | 8,660,384,135 |
| Highways and bridge under concession agreements, net | | 196,198,857 |
| Total other non-current assets | | 8,856,582,992 |
| Total assets | | 9,263,025,319 |
| | | |
| Deferred outflows of resources: | | |
| Pension related | | 64,249,240 |
| Other postemployment benefits other than pensions | | 127,255 |
| Total deferred outflows, net | | 64,376,495 |
| | | |
| Total assets and deferred outflows of resources | $ | 9,327,401,814 |

Continued.

-14-

HTA_CONF 00013051

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Net Deficit (Continued)

June 30, 2021

| | | |
|---|---|---:|
| **Liabilities** | | |
| **Current liabilities:** | | |
| Accounts payable | $ | 57,707,664 |
| Accrued and other liabilities | | 9,763,594 |
| Accounts payable subcontractors | | 76,586,137 |
| Deferred revenue | | 48,955,971 |
| Current portion of accrued legal claims | | 76,428 |
| Current portion of bonds payable, Teodoro Moscoso | | 13,235,000 |
| Total current liabilities | | 206,324,794 |
| **Non-current liabilities:** | | |
| Bonds payable | | 4,372,581,416 |
| Bonds payable, Teodoro Moscoso, net | | 76,305,479 |
| Accrued interest on bonds payable | | 890,679,364 |
| GDB Debt Recovery Authority obligation | | 1,733,697,499 |
| Accrued interest on GDB Debt Recovery Authority obligation | | 900,306,912 |
| Accrued vacations, net | | 2,918,261 |
| Voluntary termination incentive plan liability, net | | 25,864,412 |
| Total pension liability | | 615,651,428 |
| Other postemployment benefits other than pensions | | 18,387,663 |
| Accounts payable | | 8,764,467 |
| Accrued and other liabilities | | 4,021,368 |
| Accounts payable subcontractors | | 26,327,475 |
| Accrued legal claims | | 66,234,339 |
| Total non-current liabilities | | 8,741,740,083 |
| Total liabilities | | 8,948,064,877 |
| **Deferred inflow of resources:** | | |
| Service concession agreement | | 1,036,670,106 |
| Other postemployment benefits other than pensions | | 621,700 |
| Pension related | | 36,788,618 |
| Total deferred inflows of resources | | 1,074,080,424 |
| **Net deficit:** | | |
| Net investment in capital assets | | 1,521,179,877 |
| Restricted for debt service | | - |
| Restricted for construction | | 119,621,153 |
| Deficit | | (2,335,544,517) |
| Total net deficit | | (694,743,487) |
| Total liabilities, deferred inflow of resources and net deficit | $ | 9,327,401,814 |

The Notes to Financial Statements are an integral part of the Financial Statements.

HTA_CONF 00013052

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Revenues, Expenses, and Changes in Net Deficit

June 30, 2021

| | |
|---|---:|
| Operating revenues: | |
| Toll fares | $ 151,557,243 |
| Other operating income | 7,582,389 |
| Concession agreements | 41,164,686 |
| Total operating revenues | 200,304,318 |
| | |
| Operating expenses: | |
| Salaries and related benefits | 14,023,571 |
| Pensions paid (PayGo) | 35,037,526 |
| Other postemployment benefits | 56,387 |
| Toll highways administration and maintenance | 51,939,540 |
| Train operating and maintenance costs | 47,308,557 |
| Integrated transportation system | 9,513,372 |
| Repairs and maintenance of roads and bridges | 146,662,403 |
| Utilities | 8,681,257 |
| Insurance | 11,978,095 |
| Other | 24,211,034 |
| Total operating expenses | 349,411,742 |
| Operating loss before depreciation and amortization | (149,107,424) |
| Depreciation and amortization | 476,415,023 |
| Operating loss | (625,522,447) |
| | |
| Non-operating revenues (expenses): | |
| Operating transfers from the Commonwealth of Puerto Rico | 206,136,000 |
| Operating grants from U.S. Federal Government | 16,565,090 |
| Interest on bonds and GDB Debt Recovery Obligation | (302,106,535) |
| Investment income | 3,846,495 |
| Net change in fair value of investments | 45,456 |
| Other | (558,124) |
| Total non-operating revenues (expenses), net | (76,071,618) |
| Loss Before Capital Contributions | (701,594,065) |
| Capital Grants: | |
| U.S. federal government | 217,697,633 |
| Commonwealth | 183,524,881 |
| Total capital grants | 401,222,514 |
| | |
| Change in net deficit | (300,371,551) |
| Net deficit at beginning of the year | (386,375,208) |
| Prior period adjustment | (7,996,728) |
| Net deficit at end of year | $ (694,743,487) |

The Notes to Financial Statements are an integral part of the Financial Statements.

-16-

HTA_CONF 00013053

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Cash Flows

June 30, 2021

| | | |
|---|---|--:|
| OPERATING ACTIVITIES: | | |
| Receipt from tolls and train fares | $ | 165,910,309 |
| Receipt from other sources | | (38,423,563) |
| Payments to employees, PayGo and related benefits | | (53,802,467) |
| Payments to suppliers for goods and services | | (335,764,043) |
| Net cash used in operating activities | | (262,079,764) |
| | | |
| NONCAPITAL FINANCING ACTIVITIES: | | |
| Operating grants received | | 26,963,754 |
| Operating transfers from the Commonwealth of Puerto Rico | | 130,805,000 |
| Net cash provided by noncapital financing activities | | 157,768,754 |
| | | |
| CAPITAL AND RELATED FINANCING ACTIVITIES: | | |
| Capital grants received | | 446,416,084 |
| Acquisition and construction of capital assets | | (275,358,378) |
| Payment of bonds Teodoro Moscoso Bridge | | (12,760,000) |
| Interest paid Teodoro Moscoso Bridge | | (2,628,990) |
| Net cash flows provided by capital and related financing activities | | 155,668,716 |
| | | |
| INVESTING ACTIVITIES: | | |
| Purchase of investments | | (3,228,151) |
| Investments and interest income received | | 3,846,495 |
| Net cash provided by investing activities | | 618,344 |
| | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | | 51,976,050 |
| | | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | | 124,593,218 |
| | | |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ | 176,569,268 |

Continued.

- 17 -

HTA_CONF 00013054

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Cash Flows (Continued)

June 30, 2021

| | |
|---|---:|
| RECONCILIATION TO CASH AND CASH EQUIVALENTS PRESENTED IN THE STATEMENT OF NET POSITION: | |
| Cash | $ 18,400,049 |
| Cash and cash equivalents - restricted | 158,169,219 |
| Total | $ 176,569,268 |
| | |
| RECONCILIATION OF OPERATING LOSS TO NET CASH FLOW USED IN OPERATING ACTIVITIES: | |
| Operating loss | $ (625,522,447) |
| Adjustments to reconcile operating loss to net cash flows used in operating activities: | |
| Depreciation and amortization | 476,415,023 |
| Revenue from concession agreement | (41,164,686) |
| Other non-operating revenues | (558,123) |
| Net change in operating assets and liabilities: | |
| Accounts receivable | (46,483,753) |
| Prepaid expenses and other assets | (338,907) |
| Other post employment benefits | 104,374 |
| Deferred outflows of resources related to pensions | (10,535) |
| Accounts payable | 741,941 |
| Accrued liabilities | (18,916,713) |
| Accrued legal claims | (1,282,416) |
| Accrued vacation | (237,503) |
| Accrued voluntary incentive plan liability | (4,708,717) |
| Deferred inflows of resources related to pensions | (117,302) |
| Net cash flows used in operating activities | $ (262,079,764) |
| | |
| SUPPLEMENTAL CASH FLOWS INFORMATION: | |
| Non-cash transaction: | |
| Interest on bonds and GDB Debt Recovery Obligations including write-off related to deferred outflows of losses from advance refundings | $ 299,541,545 |

The Notes to Financial Statements are an integral part of the Financial Statements.

- 18 -

HTA_CONF 00013055

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements

Year Ended June 30, 2021

## 1. ORGANIZATION

The Authority is a public corporation and component unit of the Commonwealth of Puerto Rico (the Commonwealth) created by Act No. 74 of June 23, 1965, as amended ("Act No. 74-1965"), to design, construct and administer toll roads, highways, and other facilities for the mobility of individuals, vehicles, and vessels, and for the planning, promotion, and feasibility of mass transportation systems. As a component unit, the Authority is included in the basic financial statements of the Commonwealth.

The Authority is exempt from the payment of taxes on its revenues and properties. The Authority is governed by a seven-member board of directors empowered to approve, amend, and revoke any regulations necessary to perform its duties and to control the Authority's capital and operational budget. With the enactment of PROMESA on June 30, 2016, certain corporate actions may also require approval by the Financial Oversight and Management Board for Puerto Rico (the Oversight Board). In addition, the enactment of Act No. 2-2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, expanded the powers and authority of the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) so that AAFAF has the responsibility to negotiate, restructure, and reach agreements with creditors on all or part of the public debt or any other debt issued by any Commonwealth entity, including the Authority.

In addition, as discussed in Notes 3 and 4 to the basic financial statements, on May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Authority by filing a petition for relief under PROMESA Title III in the United States District Court for the District of Puerto Rico. The PROMESA Title III cases are presiding before U.S. District Judge Laura Taylor Swain. The Authority currently operates as a debtor in such Title III case.

The basic financial statements presented herein relate solely to the Authority's financial position and results of operations and are not intended to present the financial position of the Commonwealth or the results of its operations or cash flows.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Measurement Focus and Basis of Accounting

The accounting policies of the Authority conform to generally accepted accounting principles in the United States of America (GAAP), as promulgated in Governmental Accounting Standards Board (GASB) pronouncements.

The Authority's operations are accounted for as a proprietary fund (enterprise fund) using the flow of economic resources measurement focus and the accrual basis of accounting. With this measurement focus, all assets and deferred outflows of resources and all liabilities and deferred inflows of resources associated with the Authority's operations are included on the statement of net deficit. Revenue is recognized in the period in which it was earned, and expenses are recognized in the period in which they were incurred.

The Authority accounts for its operations and financing in a manner similar to private business enterprises. The intent is that costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges. Such accounts and these basic financial statements have been prepared on the basis that the Authority will continue as a going concern and as a legally separate governmental entity and component unit of the Commonwealth. See Note 4 to the basic financial statements.

HTA_CONF 00013056

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

**Cash and Cash Equivalents**

The Authority considers as cash and cash equivalents all highly liquid investments with original maturities within three months or less from the date of purchase. However, in the case of restricted assets, cash equivalents will be presented as investments.

**Receivables**

Accounts receivable consist of amounts due from the Commonwealth, which includes unremitted Commonwealth Operating transfers, amounts due from Federal programs, government agencies, public corporations, municipalities of the Commonwealth and other. Amounts that are significantly overdue are included in the allowance for doubtful accounts. Receivables are stated net of estimated allowances for uncollectible accounts, which are determined based upon past collection experience and current economic conditions, among other factors.

**Investments**

The Authority reports investments on the statement of net deficit at fair value and investment income, including changes in the fair value of investments, which are reported as non-operating revenue/(expense) in the statement of revenues, expenses, and changes in net deficit. Fair values have been determined using quoted or adjusted market values as of June 30, 2021.

**Allowance for Doubtful Accounts**

The allowance for doubtful accounts is an amount that management believes will be adequate to absorb possible losses on existing accounts receivable that may become uncollectible based on evaluations of collectability of accounts receivable and prior credit loss experience. Because of uncertainties inherent in the estimation process, management's estimate of credit losses inherent in the existing accounts receivable and related allowance may change in the future.

**Capital Assets**

**Cost Basis** - Capital assets are recorded at historical cost or acquisition value for donated assets. The cost of property and equipment includes costs for infrastructure assets (rights of way, bridge substructures, highways, and bridges), toll facilities, equipment, and other related costs (including software), buildings, and furniture. Highways and bridge substructures include road subbase, grading, land clearing, embankments, and other related costs. Costs for infrastructure assets include construction costs, design and engineering fees and administrative and general expenses associated with the project.

**Capitalization Policy** - Infrastructure capital assets (road, bridges, highways, transportation equipment, etc.) are defined by the Authority as assets with an initial, individual cost of more than $500,000 and an estimated useful life of more than one year. Other capital assets, such as equipment, vehicles, etc. are defined by the Authority as assets with an initial individual cost of more than $1,000 and an estimated life of more than two years.

Costs to acquire additional capital assets, which replace existing assets, extend their useful lives, and/or enhance the capital asset's capacity are capitalized.

HTA_CONF 00013057

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

The costs of normal maintenance and repairs that do not add to the value of the assets or materially extend assets lives are expensed as incurred.

**Depreciation of Capital Assets** - Depreciation is provided using the straight-line method over an estimated useful life of 40 years for new roads, highways and road widenings, 50-59 years for new bridges and transportation systems (including transportation equipment and facilities), 20 years for bridge improvements, 15 years for road resurfacing of freeways and 10 years for equipment, vehicles, and road resurfacing of non-freeways.

**Impairment of Capital Assets** - The Authority evaluates prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage, among others.

The Authority evaluated its capital assets and determined that there was no significant impairment as of June 30, 2021.

**Service Concession Agreements**

The Authority has entered into service concession agreements under which it has transferred the administration and operation of certain infrastructure assets to private organizations in exchange for concession fees. Amounts collected in advance are reported as deferred inflows of resources and are amortized into concession revenue in a systematic and rational manner over the term of the agreements. The assets are still owned by the Authority and, therefore, are reported in the Authority's basic financial statements. Improvements performed by Metropistas to the transferred assets are capitalized by the Authority. Refer to Note 11 for additional information regarding the service concession agreements in effect as of June 30, 2021.

**Claims and Judgments**

The estimated amount of liability for claims and judgments is recorded on the accompanying statement of net deficit based on the Authority's evaluation of the probability of an unfavorable outcome in the litigation of such claims and judgments. The Authority consults with legal counsel upon determining whether an unfavorable outcome is expected. Because of uncertainties inherent in the estimation process, management's estimate of the liability for claims and judgments may change in the future. Refer to Note 19 for additional information regarding the status of the Authority's key litigation as of the date of these basic financial statements.

**Compensated Absences**

Compensated absences include paid time off made available to employees in connection with vacation, and sick leave. The liability for compensated absences is reported in the statement of net deficit. A liability for compensated absences is reported in the financial statements only when payment is due. The liability for compensated absences recorded in the accompanying statement of net deficit is limited to leave that is attributable to services already rendered and is not contingent on a specific event.

On April 29, 2017, the Governor signed into law Act No. 26 of 2017 "Law for the Compliance with the Fiscal Plan," which, among other things, changed the vacation and sick leave accrual formula for all government

HTA_CONF 00013058

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

employees. Through the Act, it was established that as of May 1, 2017, all public employees will have the right to accumulate vacation leave at the rate of one and one-fourth days for each month of service. In addition, the payment of sick leave was eliminated when the employee resigns or at the time of separation. New employees accumulate vacation leave retroactively after the first 3 months of employment.

In addition, it was reported that as of the effective date of this Act, no public employee, whether a union member or not, who works for the Commonwealth in any of its agencies, instrumentalities or public corporations will have the right to receive pay for the liquidation of days in excess of the maximum allowable leave.

**Pensions**

Since July 1, 2017, the pension obligation of the Employees Retirement System (ERS) was transferred to an unfunded pension trust, where pension obligations are funded on a pay-as-you-go basis. On that date, active employees stopped contributing to ERS and new employees will not become members either. The funding change resulted in the change in accounting principle from GASB 68 – *Accounting and Financial Reporting for Pensions* to GASB GASB 73 – *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement 68, and Amendments to Certain Provisions of GASB Statements 67 and 68*. Under the Commonwealth Plan of Adjustment and Commonwealth Confirmation Order (each as defined and discussed below), a Pension Reserve Trust was created to fund future ERS pension liabilities with an initial funding contribution from the Commonwealth of $5 million on the Commonwealth Effective Date to fund the initial administrative costs and expenses of the Pension Reserve Board. Additional annual Commonwealth contributions will also be made to the Pension Reserve Trust in amounts to be determined each fiscal year in accordance with the terms of the Commonwealth Plan of Adjustment. The Commonwealth Plan of Adjustment and Commonwealth Confirmation Order also prevent the Commonwealth from implementing existing legislation or enacting new legislation within 10 years of the Commonwealth Effective Date that would create or increase any defined benefit pension payment or obligation to current or future retirees without the Title III Court's prior approval.

For purposes of measuring the total pension liability, deferred outflows of resources and deferred inflows of resources related to pensions, and pension expense, information about the total pension liability of the ERS, and changes in total pension liability have been determined on the same basis as they are reported by ERS. For this purpose, benefit payments (including refunds of employee contributions) are recognized when due and payable in accordance with the benefit terms. Refer to Note 15.

**Postemployment Benefits Other Than Pensions**

The Authority accounts postemployment benefits other than pensions in accordance with GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions*. Other postemployment benefits other than pensions (OPEB) expense is recognized and disclosed using the accrual basis of accounting. The Authority recognizes the total OPEB liability since the Authority's OPEB program is funded on a pay-as-you-go basis. Changes in the total OPEB liability during the period are recorded as OPEB expense, or as deferred inflows of resources or deferred outflows of resources depending on the nature of the change; recognition occurs in the period the OPEB expense, deferred inflows, or deferred outflows, as applicable, are incurred. Those changes in total OPEB liability that are recorded as deferred inflows or deferred outflows of resources that arise from changes in actuarial assumptions or other inputs and differences between expected or actual experience are amortized over the average of the remaining service life of all participants including retirees and recorded as a component of OPEB expense, beginning with the period in which they arose.

-22-

HTA_CONF 00013059

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Voluntary Termination Benefits

The Authority accounts for voluntary termination benefits in accordance with GASB Statement No. 47, *Accounting for Termination Benefits*. Pursuant to the provisions of GASB Statement No. 47, in financial statements prepared on the accrual basis of accounting, employers should recognize a liability and expense for voluntary termination benefits (for example, early retirement incentives) when the offer is accepted, and the amount can be estimated.

#### Deferred Outflows/Inflows of Resources

In addition to assets, the statement of net deficit reports a separate section for deferred outflows of resources. This separate financial statement element represents a consumption of net deficit that applies to a future period and will not be recognized as an outflow of resources (expenses) until then. The Authority has two items that qualify for reporting in this category: (i) the difference between expected and actual experience, due to changes in assumptions and employer's contribution to the pension plan subsequent to the measurement date of the net pension liability, and (ii) the difference between actual and expected experience related to the OPEB obligation.

In addition to liabilities, the statement of net deficit reports a separate section for deferred inflows of resources. This separate financial statement element represents an acquisition of net deficit that applies to a future period and will not be recognized as an inflow of resources (revenue) until that time. The Authority has two items that qualify for reporting in this category: (i) the deferred amounts of service concession agreements, and (ii) the difference between expected and actual experience, changes in assumptions and employer's contribution to the pension plan subsequent to the measurement date of the total pension liability.

A deferred outflow/inflow of resources related to pension results from differences between expected and actual experience, or changes in assumptions or other inputs. These amounts are deferred and included in pension expense in a systematic and rational manner over a period equal to the average of the expected remaining service lives of all employees that are provided with benefits through the pension plan (active employees and inactive employees). Deferred inflows of resources related to the service concession agreement amounted to $1,036.7 million. These amounts are being amortized over the 50-year term of the agreement. Deferred inflows of resources also include pension related amounts of $36.8 million and $621.7 thousand related to OPEB amounts. Deferred outflows of resources include pension related amounts of $64.2 million and $127.3 thousand related to OPEB amounts.

#### Bond Premiums (Discounts) and Bond Issuance Costs

Bond issuance costs are reported as expense during the year they are incurred.

Bonds discounts and premiums are amortized over the term of the related debt using the effective interest-rate method. Bonds payable are reported net of applicable discounts and premiums.

Amortization related to bond premiums (discounts) was approximately $12.9 million for the fiscal year ended June 30, 2021 and is included as a component of interest expense in the accompanying statements of revenues, expenses, and changes in net deficit.

HTA_CONF 00013060

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Debt Refunding

During prior years, the Authority defeased certain bonds related to the issuance of the concession agreements as further discussed in Note 11.

As of June 30, 2021, the outstanding balances of the bonds defeased by the Authority are as follows:

| | | |
|---|---|---:|
| Series BB | $ | 22,180,000 |
| Series AA | | 1,580,000 |
| Series CC (CABS) | | 1,300,000 |
| Total | $ | 25,060,000 |

Management believes that the new bond issuances, as a result of this defeasance, will be discharged according to the HTA/CCDA PSA. However, this is subject to the final approval by the Title III Court.

### Interest Expense

After the Title III filing under PROMESA, the Authority continues to account for interest on all interest-bearing obligations. The final amount of interest, if any, to be paid in the future is dependent on the resolution of the Authority's Title III Case. However, on May 5, 2021, the Authority entered into the HTA/CCDA PSA (still subject to approval by the Title III Court as of the date of the issuance of the financial statements). Based on the executed PSA, management believes it is more probable than not that total interest payable will be discharged, and accordingly, the Authority discontinued to accrue interest on said date. Furthermore, the deferred outflows related to the loss from advance refunding was charged to operations (within interest expense) during the current year, since management believes that it is more probable than not that the Title III court will approve the HTA/CCDA PSA and consequently, discharge all outstanding bonds payable, including the bonds issued as part of the advance refunding defeasance transaction.

### Net Deficit

Net deficit is classified in the following four components in the accompanying statement of net deficit:

**Net Investment in Capital Assets** - This component of net deficit consists of capital assets, net of accumulated depreciation, reduced by the outstanding balances of any bonds, notes, or other borrowings that are attributable to the acquisition, construction, or improvement of those assets. Deferred outflows of resources and deferred inflows of resources that are attributable to the acquisition, construction or improvement of those assets or related debt also should be included in this component of net deficit. If there are significant unspent related debt proceeds or deferred inflows of resources at fiscal year end, the portion of the debt or deferred inflows of resources attributable to the unspent amount are not included in the calculation of net investment in capital assets. Instead, that portion of the debt or deferred inflows of resources is included in the same net deficit component (restricted or unrestricted) as the unspent amount.

**Restricted for Debt Service** – This component of net deficit consists of restricted assets for payment of principal and interest related to bonds payable. This restriction is imposed by the bondholders through debt covenants.

HTA_CONF 00013061

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

**Restricted for Construction** - This component of net deficit consists of restricted assets for the specific purpose of financing construction projects. This restriction is imposed by the grantors and contributors, as well as the bondholders through debt covenants.

**Unrestricted deficit** - Unrestricted net deficit consists of net amount of the assets, deferred outflows of resources, liabilities, and deferred inflows of resources that are not included in the determination of net investments in capital assets or the restricted component of net deficit. As of June 30, 2021, the Authority has an accumulated deficit of approximately $2,335.5 million. Refer to Note 4 for further information regarding the Authority's ability to continue as a going concern.

### Revenue Recognition

The Authority distinguishes operating revenues and expenses from non-operating items. Revenues associated with tolls and train fares are recorded as operating revenues when earned, based on activity reports provided by the toll and train operators, respectively.

Expenses related to the administration and maintenance of toll highways and transportation system, repair and maintenance of roads and bridges, and administrative expenses are recorded as operating expenses. All other revenues and expenses are considered non-operating.

Non-operating revenues consist principally of operating transfers allocated to the Authority by the Commonwealth and U.S. federal government to finance the Authority's operations on capital projects.

Deferred revenues are related to "Programa Estatal de Modernización de Carreteras" (PEMOC) and "Abriendo Caminos" for repairs and maintenance of roads and bridges that are recognized following the applicable legal and contractual requirements. Essentially, revenues are recognized based upon the expenditures recorded. This occurs when expenditures are incurred for the specific purpose of the project. The remaining proceeds from such grants are presented as restricted cash in the Statement of Net Deficit.

### Capital and Operating Grants

Capital and operating grants are funds allocated by the federal and local governments, including the Federal Highways Administration (FHWA), the Federal Transit Administration (FTA), and the Commonwealth to the Authority for the construction of specific capital projects or infrastructure repairs and maintenance. These are reported as capital and operating grants as required by GASB Statement No. 33, *Accounting and Financial Reporting for Non-Exchange Transactions*.

### Use of Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect (i) the reported amounts of assets and liabilities; (ii) disclosure of contingent assets and liabilities at the date of the financial statements and (iii) the reported amounts of revenue and expenses during the period. Actual results could differ from those estimates.

### Risk Financing

The Authority carries commercial insurance to cover casualty, theft, claims and other losses. The current insurance policies have not been cancelled or terminated. The Authority has not settled any claims in excess of its insurance coverage for the fiscal year ended June 30, 2021.

HTA_CONF 00013062

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### New Accounting Pronouncements

The GASB has issued the following Statements:

- ASB Statement No. 87, *Leases* (GASB Statement No. 87), which is effective for periods beginning after June 15, 2021, as per GASB Statement No. 95 establishes a single approach to accounting for and reporting leases by state and local governments. GASB Statement No. 87 is based on the principle that leases are financings of the right to use an underlying asset. GASB Statement No. 87 provides guidance for lease contracts for nonfinancial assets including vehicles, heavy equipment and buildings—but excludes nonexchange transactions, including donated assets and leases of intangible assets (such as patents and software licenses). GASB Statement No. 87 provides exceptions from the single approach for short-term leases, financial purchases, leases of assets that are investments and certain regulated leases. GASB Statement No. 87 also addresses accounting for lease terminations and modifications, sale-leaseback transactions, non-lease components embedded in lease contracts (such as service agreements) and leases with related parties.

  Under this statement, a lessee government is required to recognize a lease liability and an intangible asset representing the lessee's right to use the leased asset. The liability should be the present value of the payments covered by the contract, and its value should be reduced as payments are made over the lease's term. The asset should equal the initial measurement of the liability. A lessee also will report the following in its financial statements:

  (1) amortization expense for using the lease asset (similar to depreciation) over the shorter of the term of the lease or the useful life of the underlying asset;
  (2) interest expense on the lease liability; and
  (3) note disclosures about the lease, including a general description of the leasing arrangement, the amount of lease assets recognized, and a schedule of future lease payments to be made.

  Under this statement, a lessor government is required to recognize a lease receivable and a deferred inflow of resources. A lessor will continue to report the leased asset in its financial statements. A lessor also will report the following in its financial statements:

  (1) lease revenue, systematically recognized over the term of the lease, corresponding with the reduction of the deferred inflow;
  (2) interest revenue on the receivable; and
  (3) note disclosures about the lease, including a general description of the leasing arrangement and the total amount of inflows of resources recognized from leases.

- GASB Statement No. 91, *Conduit Debt Obligations* (GASB Statement No. 91), which is effective for periods beginning after December 15, 2021, as per GASB Statement No. 95 provides a single method for government issuers to report conduit debt obligations and related commitments. GASB Statement No. 91 addresses the variation in practice by: clarifying what is a conduit debt obligation; eliminating the option for government issuers to recognize conduit debt obligations, thereby providing a single method of reporting; broadening the definition of conduit debt obligations to include those for which government issuers make related additional commitments, such as guarantees or moral obligation pledges, or voluntarily agree to make debt service payments or request an appropriation for such

-26-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

payments, if necessary; clarifying how government issuers should account for and report commitments they extend or voluntarily provide, and arrangements associated with conduit debt obligations, which often are characterized in practice as leases, but are not leases for financial reporting purposes; and enhancing note disclosures. Although government issuers will no longer report conduit debt obligations as liabilities, they may need to recognize a liability related to commitments they make or voluntarily provide associated with that conduit debt. GASB Statement No. 91 requires a government issuer to recognize a liability if qualitative factors indicate that it is more likely than not that it will support one or more debt service payments for a conduit debt obligation.

- GASB Statement No. 92, *Omnibus 2020* (GASB Statement No. 92), enhances comparability in accounting and financial reporting and improves the consistency of authoritative literature by addressing practice issues that have been identified during implementation and application of certain GASB Statements. This Statement addresses a variety of topics and includes specific provisions about the following: the effective date of GASB Statement No. 87, *Leases*, and Implementation Guide No. 2019-3, *Leases*, for interim financial reports; reporting of intra-entity transfers of assets between a primary government employer and a component unit defined benefit pension plan or defined benefit other postemployment benefit (OPEB) plan; the applicability of GASB Statements No. 73, *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement 68, and Amendments to Certain Provisions of GASB Statements 67 and 68*, as amended, and GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, as amended, to reporting assets accumulated for postemployment benefits; the applicability of certain requirements of GASB Statement No. 84, *Fiduciary Activities*, to postemployment benefit arrangements; measurement of liabilities (and assets, if any) related to asset retirement obligations (AROs) in a government acquisition; reporting by public entity risk pools for amounts that are recoverable from reinsurers or excess insurers; reference to nonrecurring fair value measurements of assets or liabilities in authoritative literature; and terminology used to refer to derivative instruments.

The requirements of GASB Statement No. 92 are effective as follows: the requirements related to the effective date of GASB Statement No. 87 and Implementation Guide 2019-3, regarding reinsurance recoveries, and terminology used to refer to derivative instruments are effective upon issuance; the requirements related to intra-entity transfers of assets and those related to the applicability of GASB Statements No. 73 and No. 74 are effective for fiscal years beginning after June 15, 2021; the requirements related to application of GASB Statement No. 84 to postemployment benefit arrangements and those related to nonrecurring fair value measurements of assets or liabilities are effective for reporting periods beginning after June 15, 2021; the requirements related to the measurement of liabilities (and assets, if any) associated with AROs in a government acquisition are effective for government acquisitions occurring in reporting periods beginning after June 15, 2021.

- GASB Statement No. 96, *Subscription-Based Information Technology Arrangements*. This Statement provides guidance on the accounting and financial reporting for subscription-based information technology arrangements (SBITAs) for government end users (governments). This Statement (1) defines a SBITA; (2) establishes that a SBITA results in a right-to-use subscription asset—an intangible asset—and a corresponding subscription liability; (3) provides the capitalization criteria for outlays other than subscription payments, including implementation costs of a SBITA; and (4) requires note disclosures regarding a SBITA. To the extent relevant, the standards for SBITAs are based on the

HTA_CONF 00013064

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

standards established in Statement No. 87, *Leases*, as amended. The requirements of this Statement are effective for fiscal years beginning after June 15, 2022, and all reporting periods thereafter. Earlier application is encouraged, but not required.

- GASB Statement No. 97, *Certain Component Unit Criteria, and Accounting and Financial Reporting for Internal Revenue Code Section 457 Deferred Compensation Plans*—an amendment of GASB Statements No. 14 and No. 84, and a supersession of GASB Statement No. 32. The primary objectives of this Statement are to (1) increase consistency and comparability related to the reporting of fiduciary component units in circumstances in which a potential component unit does not have a governing board and the primary government performs the duties that a governing board typically would perform; (2) mitigate costs associated with the reporting of certain defined contribution pension plans, defined contribution other postemployment benefit (OPEB) plans, and employee benefit plans other than pension plans or OPEB plans (other employee benefit plans) as fiduciary component units in fiduciary fund financial statements; and (3) enhance the relevance, consistency, and comparability of the accounting and financial reporting for Internal Revenue Code (IRC) Section 457 deferred compensation plans (Section 457 plans) that meet the definition of a pension plan and for benefits provided through those plans.

The requirements of this Statement that (1) exempt primary governments that perform the duties that a governing board typically performs from treating the absence of a governing board the same as the appointment of a voting majority of a governing board in determining whether they are financially accountable for defined contribution pension plans, defined contribution OPEB plans, or other employee benefit plans and (2) limit the applicability of the financial burden criterion in paragraph 7 of Statement 84 to defined benefit pension plans and defined benefit OPEB plans that are administered through trusts that meet the criteria in paragraph 3 of Statement 67 or paragraph 3 of Statement 74, respectively, are effective immediately.

The requirements of this Statement that are related to the accounting and financial reporting for Section 457 plans are effective for fiscal years beginning after June 15, 2021. For purposes of determining whether a primary government is financially accountable for a potential component unit, the requirements of this Statement that provide that for all other arrangements, the absence of a governing board be treated the same as the appointment of a voting majority of a governing board if the primary government performed the duties that a governing board typically would perform, are effective for reporting periods beginning after June 15, 2021. Earlier application of those requirements is encouraged and permitted by requirement as specified within this Statement.

GASB Statement No. 98, *The Annual Comprehensive Financial Report* - This Statement establishes the term annual comprehensive financial report and its acronym ACFR. That new term and acronym replace instances of comprehensive annual financial report and its acronym in generally accepted accounting principles for state and local governments.

This Statement was developed in response to concerns raised by stakeholders that the common pronunciation of the acronym for comprehensive annual financial report sounds like a profoundly objectionable racial slur. This Statement's introduction of the new term is founded on a commitment to

-28-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

promoting inclusiveness. The requirements of this Statement are effective for fiscal years ending after December 15, 2021.

**3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING**

The Commonwealth and many of its component units, including the Authority, suffered an economic and fiscal crisis, which caused, among other things, the initiation of financial measures directed to reinstate fiscal and financial stability, including a number of Commonwealth and federal laws that have been passed in recent years. On June 30, 2016, the U.S. Congress enacted PROMESA to address these problems. Thereafter, the Commonwealth and other governmental entities including the Authority, the Puerto Rico Sales Tax Financing Corporation (COFINA), the Employee Retirement System (ERS), the Puerto Rico Electric Power Authority (PREPA), and the Public Building Authority (PBA) initiated proceedings under PROMESA Title III, and the Government Development Bank for Puerto Rico (GDB), Puerto Rico Infrastructure Financing Authority (PRIFA), and the Puerto Rico Convention Center District Authority (PRCCDA) initiated proceedings under Title VI of PROMESA, each at the request of the Governor, to restructure or adjust their existing debt. The most relevant Commonwealth and federal legislation enacted to address the fiscal crisis and to initiate the economic recovery is as follows:

**Fiscal Measures Before PROMESA**

(i)  *Retention by the Government of Tax Revenues Conditionally Allocated to Certain Public Corporations and Priority of Payment Provisions*

On December 1, 2015, the Governor signed Executive Order No. 46 which ordered the Secretary of Department of Treasury (DOT) to retain certain available resources of the Commonwealth based on revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to such executive order, the Secretary of the DOT retained revenues conditionally allocated to the Authority, the Puerto Rico Infrastructure Financing Authority (PRIFA), the Puerto Rico Convention Center District Authority (PRCCDA), and Puerto Rico Metropolitan Bus Authority (PRMBA) for the payment of debt service on their bonds during fiscal year 2016. Since fiscal year 2016, such revenues are being retained by the Commonwealth pursuant to certain laws, including but not limited to (a) the Moratorium Act and Act No. 5 (discussed below), and (b) the automatic stay under PROMESA Title III. Litigation regarding the conditional allocation of gasoline, oil, diesel, and petroleum taxes to the Authority was settled pursuant to the terms of the Commonwealth Plan of Adjustment. Such allocations will no longer be made as the statutes that authorized such allocations have been preempted by the Commonwealth Plan of Adjustment and the allocations discharged.

(ii) *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Financial Emergency and Fiscal Responsibility of Puerto Rico Act and Related Executive Orders*

On April 6, 2016, the Commonwealth enacted Act No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (as amended, the Moratorium Act). Pursuant to the Moratorium Act, the Governor issued a series of executive orders declaring an emergency period, a moratorium and various other measures with respect to certain obligations of the Commonwealth and several of its instrumentalities. Pursuant to these executive orders, certain Commonwealth entities have either: (i) not made debt service payments, (ii) made debt service payments with funds on deposit with the trustees of their bonds, and/or (iii) not received or transferred certain revenues. Such executive orders also placed significant restrictions on the disbursement of funds deposited at GDB and suspended the disbursement of loans by GDB.

HTA_CONF 00013066

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

The implementation of the Moratorium Act and its related executive orders is the subject of ongoing litigation, as discussed in Note 19. Upon the enactment of PROMESA on June 30, 2016, the Title IV Stay (discussed below) applied to stay this litigation until its expiration on May 1, 2017. Since the commencement of the Commonwealth's Title III case on May 3, 2017, the automatic stay under PROMESA Title III has applied to continue the stay of this litigation and prevent debt service payments to bondholders. This litigation has been resolved pursuant to the Commonwealth Plan of Adjustment, which became effective on March 15, 2022.

**Overview of PROMESA**

In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits under Title IV of PROMESA; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under PROMESA Title III, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of Title 11 of the United States Code (U.S. Bankruptcy Code). Each of these elements are divided among PROMESA's seven titles, as briefly discussed below.

**Title I - Establishment of Oversight Board and Administrative Matters**

Upon PROMESA's enactment, the Oversight Board was established for the Commonwealth. See PROMESA § 101(b).

Upon PROMESA's enactment, the Oversight Board was established for Puerto Rico. As stated in PROMESA, "the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." On August 31, 2016, the President of the United States announced the appointment of the Oversight Board members. Each Oversight Board member is required to have "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government." The Oversight Board was "created as an entity within the territorial government for which it was established" and is expressly not an entity of the federal government, but it was also established to act independently from the Commonwealth government, such that neither the Governor nor the Legislature may "(1) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or (2) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board."

**Title II - Fiscal Plan and Budget Certification Process and Compliance**

Title II sets forth the requirements for proposing and certifying fiscal plans and budgets for the Commonwealth and its instrumentalities. "Each fiscal plan serves as the cornerstone for structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards fiscal responsibility and access to capital markets."

Only after the Oversight Board has certified a fiscal plan may the Governor submit a fiscal year Commonwealth budget and fiscal year budgets for certain Commonwealth instrumentalities (as approved by the Oversight Board) to the Legislature.

HTA_CONF 00013067

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

In furtherance of the foregoing duties, PROMESA contains a provision that grants the Oversight Board powers to monitor compliance with certified fiscal plans and budgets and undertake certain actions, including spending reductions and the submission of recommended actions to the Governor that promote budgetary compliance. Please refer to the language of PROMESA for a complete description of the Oversight Board's powers related to fiscal plan and budgetary compliance.

**Title III - In-Court Restructuring Process**

PROMESA Title III establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under Chapter 9 of the U.S. Bankruptcy Code.

The Oversight Board has sole authority to file a voluntary petition seeking protection under PROMESA Title III, subject to the prerequisites therein.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. Immediately upon filing the Title III petition, Bankruptcy Code section 362 (which is incorporated into Title III cases under PROMESA) applies to automatically stay substantially all litigation against the debtor (the Title III Stay). A Title III case culminates in the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file and modify a plan of adjustment prior to confirmation.

**Title IV Temporary Stay of Litigation, Government Reporting, and Other Miscellaneous Provisions**

Title IV of PROMESA contains several miscellaneous provisions, including a temporary stay of litigation related to "Liability Claims," relief from certain wage and hour laws, the establishment of a Congressional Task Force on Economic Growth in Puerto Rico (the Task Force), the requirement that the Comptroller General of the United States submit two reports to Congress regarding the public debt levels of the U.S. territories, and expansion of the federal government's small business HUBZone program in Puerto Rico.

Pursuant to PROMESA section 405, the enactment of PROMESA immediately and automatically imposed a temporary stay (the Title IV Stay) from June 30, 2016 (the date of PROMESA's enactment) through February 15, 2017, of all "Liability Claim" litigation commenced against the Commonwealth and its instrumentalities after December 18, 2015. A "Liability Claim" is defined as any right to payment or equitable remedy for breach of performance related to "a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights entitlements, or obligations arise from contract, statute, or any other source of law related [thereto]" for which the Commonwealth or one of its instrumentalities was the issuer, obligor, or guarantor and such liabilities were incurred prior to June 30, 2016. The Title IV Stay was subject to a one time 75-day extension by the Oversight Board or a one time 60-day extension by the United States District Court. On January 28, 2017, the Oversight Board extended the Title IV Stay by 75 days to May 1, 2017, at which time the Title IV Stay expired.

Title IV of PROMESA also required several federal government reports. First, PROMESA established the Task Force within the legislative branch of the U.S. federal government. The Task Force submitted its report to Congress on December 20, 2016.

Second, PROMESA required the U.S. Comptroller General, through the Government Accountability Office (GAO), to submit a report to the House and Senate by December 30, 2017, regarding: (i) the conditions that

-31-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

led to Puerto Rico's current level of debt; (ii) how government actions improved or impaired its financial condition; and (iii) recommendations on new fiscal actions or policies that the Commonwealth could adopt. The GAO published this report on May 9, 2018.

Third, PROMESA required the U.S. Comptroller General, through the GAO, to submit to Congress by June 30, 2017, a report on public debt of the U.S. territories. In addition to its initial report, the GAO must submit to Congress updated reports on the public debt at least once every two-years. The GAO published its initial report on October 2, 2017. On June 30, 2021, the GAO published its latest biannual report on the public debt of the U.S. territories.

### Title V – Infrastructure Revitalization

Title V of PROMESA establishes the position of Revitalization Coordinator under the Oversight Board and provides a framework for infrastructure revitalization through an expedited permitting process for "critical projects" as identified by the Revitalization Coordinator.

### Title VI – Consensual, Out-of-Court Debt Modification Process

Title VI of PROMESA establishes an out of court process for modifying Puerto Rico's debts. Under PROMESA section 601(d), the Oversight Board is authorized to establish "pools" of bonds issued by each Puerto Rico government related issuer based upon relative priorities. After establishing the pools, the government issuer or any bondholder or bondholder group may propose a modification to one or more series of the government issuer's bonds. If a voluntary agreement exists, the Oversight Board must issue a certification and execute a number of additional processes in order to qualify the modification.

Finally, the United States District Court for the District of Puerto Rico must enter an order approving the Qualifying Modification and vesting in the issuer all property free and clear of claims in respect of any bonds.

### Title VII – Sense of Congress

Title VII of PROMESA sets forth the sense of Congress that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between territories of the United States and the rest of the United States."

### Puerto Rico Legislation and Other Fiscal Measures

Act No. 2-2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, was enacted to expand AAFAF's powers and authority (as initially established under the Moratorium Act) so that AAFAF has the sole responsibility to negotiate, restructure, and reach agreements with creditors on all or part of the public debt or any other debt issued by any Commonwealth entity. AAFAF is also responsible for the collaboration, communication, and cooperation efforts between the Commonwealth and the Oversight Board under PROMESA. In addition, Act No. 2-2017 established AAFAF as the Commonwealth entity responsible for carrying out the roles inherited from the GDB along with additional duties and powers, which include, among other things: (i) oversight of the Commonwealth budget; (ii) an administrative presence on every board or committee where the GDB president was a member at that time; (iii) authority to conduct audits and investigations; and (iv) authority to freeze budgetary items, appoint trustees, redistribute human resources, and change procedures.

-32-

HTA_CONF 00013069

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

Act No. 3 2017, the Fiscal Crisis Management Act, was enacted to extend most of the fiscal measures that had been adopted under Act No. 66 2014 through July 1, 2021, including a 10-year extension of the excise tax on acquisitions by foreign corporations under Act No. 154 2010.

Act No. 5 2017, the Puerto Rico Fiscal Responsibility and Financial Emergency Act, authorized the Commonwealth to segregate funds that would eventually be used to fund the payment of public debt. Act No. 5 2017 states that the Governor may pay debt service as long as the Commonwealth is able to continue to fund essential services, such as the health, safety, and well-being of the people of Puerto Rico, including providing for their education and assistance to residents. Act No. 5 2017 continued to declare the Commonwealth to be in a state of emergency and increased the Governor's powers to manage the Commonwealth's finances. The emergency period under Act No. 5 2017 was set to expire on May 1, 2017, to coincide with the expiration of the Title IV Stay (as discussed above), unless extended by an additional three months by executive order. On April 30, 2017, the Governor issued executive order OE 2017 031, which extended the Act No. 5 2017 emergency period to August 1, 2017. On July 19, 2017, the Legislature enacted Act No. 46 2017, which further extended the Act No. 5 2017 emergency period through December 31, 2017. Act No. 46 2017 allowed the Governor to sign executive orders to extend the emergency period for successive periods of six months as long as the Oversight Board remains active in Puerto Rico under PROMESA. On June 27, 2019, the Governor issued executive order EO 2019 030 extending the emergency period until December 31, 2019. On December 31, 2019, the Governor issued executive order EO 2019 066 extending the emergency period until June 30, 2021.

Act No. 106-2017, the Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants, reformed the Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate "Account for the Payment of Accrued Pensions" to implement a PayGo method by which the Commonwealth will pay pension benefits to government retirees on a pay-as-you-go basis. Act No. 106-2017 created the legal framework so that the Commonwealth can make payments to pensioners through the PayGo system.

Act No. 109-2017, the Government Development Bank for Puerto Rico Debt Restructuring Act (the GDB Restructuring Act), effectuated the GDB Fiscal Plan and provided a path for the implementation of the GDB RSA by addressing the claims of the Commonwealth and its instrumentalities against GDB. Act No. 109-2017 created two special purpose entities—the GDB Debt Recovery Authority and the Public Entity Trust—into which the GDB would divide and irrevocably transfer its assets. As discussed below, these entities were utilized to complete the transactions in the GDB's Qualifying Modification, as approved by the District Court under Title VI of PROMESA.

Act No. 241-2018, the Puerto Rico Sales Tax Financing Corporation Act, amended and restated Act No. 91-2006 to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds by, among other things, authorizing the issuance of new COFINA bonds necessary to complete the transactions contemplated under the COFINA Plan of Adjustment.

Act No. 29-2019, the Act for the Reduction of Administrative Burdens of the Municipalities, addressed the severe fiscal crisis and liquidity shortage of the Puerto Rico municipalities by relieving them of their obligations to make PayGo payments to the Commonwealth and other payments to the Puerto Rico Health Insurance Administration (PRHIA) under Act 106-2017. The Oversight Board challenged the implementation and enforcement of Act 29-2019. On April 15, 2020, the Title III Court entered an order finding that Act 29-2019 is unenforceable and permanently enjoining the Commonwealth from implementing it and enforcing

HTA_CONF 00013070

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

it, effective May 6, 2020. The Oversight Board and other governmental entities have implemented other measures to address the issues raised in Act 29-2019.

**PROMESA Title III Cases**

*Commonwealth Title III Case*

On May 3, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Commonwealth by filing a petition for relief under PROMESA Title III in Title III Court.

On November 3, 2021, the Oversight Board filed its *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19053] (the Eighth Amended Plan), which further revised the Seventh Amended Plan to eliminate its Monthly Benefit Modification provisions, among other things. The hearing to consider confirmation of the Eighth Amended Plan commenced on November 8, 2021 and concluded on November 23, 2021. The final modified version of the Eighth Amended Plan was filed on January 14, 2022 [ECF No. 19813-1] (the Commonwealth Plan of Adjustment).

On January 18, 2022, the Title III Court entered its findings of fact and conclusions of law in connection with the Commonwealth Plan of Adjustment [ECF No. 19812] (the Findings of Fact) and an order confirming the Commonwealth Plan of Adjustment [ECF No. 19813] (the Commonwealth Confirmation Order). On March 15, 2022, the conditions precedent to the Effective Date of the Commonwealth Plan of Adjustment were satisfied and/or waived by the Oversight Board, and the plan became effective. Accordingly, the Commonwealth Plan of Adjustment has been confirmed and is currently effective as of the date hereof.

For further information, refer to Note 24 and the final versions of the Commonwealth Plan of Adjustment, Findings of Fact, and Commonwealth Confirmation Order, which are available at https://cases.primeclerk.com/puertorico/Home-DocketInfo.

*The Authority's Title III Case*

On May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for the Authority by filing a petition for relief under PROMESA Title III in the United States District Court for the District of Puerto Rico. The deadline by which all creditors were required to file their proofs of claim against the Authority was June 29, 2018. Approximately 2,290 claims were filed against the Authority in the total aggregate asserted amount of approximately $83.1 billion. Of this amount, approximately 1,255 claims in the total aggregate asserted amount of approximately $6.8 billion have been withdrawn or expunged by an omnibus objection order entered by the Title III Court. As a result, approximately 870 claims in the total aggregate asserted amount of approximately $76.2 billion remain outstanding (excluding claims pending objection, marked for future objection, or transferred or waiting to be transferred into Administrative Claims Reconciliation). The validity of these remaining claims has not yet been determined and such claims remain subject to the claims reconciliation process.

On May 5, 2021, the Oversight Board entered into the HTA/CCDA PSA with the Settling Monoline Insurers to settle certain claims against the Commonwealth regarding the bonds issued by the Authority and the Convention Center District Authority (CCDA), as well as claims against those issuers. The terms of the HTA/CCDA PSA have been incorporated into the Commonwealth Plan of Adjustment. The HTA/CCDA PSA also provides that the Authority must file its own plan of adjustment (the HTA Plan of Adjustment)—consistent with the economic provisions under the HTA/CCDA PSA—that would enable the Authority to exit its Title III

-34-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 3. THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA) AND OTHER LEGISLATION RELATED TO DEBT RESTRUCTURING (Continued)

proceeding. The Oversight Board is currently preparing the HTA Plan of Adjustment, which is expected to be filed promptly, to allow for the HTA Plan of Adjustment to be confirmed and become effective by the end of calendar year 2022. Refer to Note 24.

After the commencement of the Authority's Title III case, numerous motions and adversary proceedings were filed both by and against the Authority regarding creditor rights to the Authority's assets. The outcome of these proceedings and their impact on any plan of adjustment for the Authority cannot be determined at this time. For a detailed description of these legal contingencies, refer to Note 19.

### 4. GOING CONCERN

The discussion in the following paragraphs regarding the Authority's financial and liquidity risks provides the necessary background and support for management's evaluation as to whether there is substantial doubt about the Authority's ability to continue as a going concern for 12 months beyond the date of these basic financial statements or for an extended period if there is currently known information that may raise substantial doubt shortly thereafter.

The actions discussed below should allow an opportunity for the Authority to continue as a going concern. However, until the Authority's Debt Agreement Plan is confirmed by the Court, reasonable uncertainty remains about the Authority's ability to continue as a going concern, in accordance with GASB Statement No. 56, *Codification of Accounting and Financial Reporting Guidance Contained in the Statements of Auditing Standards*.

The accompanying basic financial statements have been prepared assuming that the Authority will continue as a going concern and, therefore, only assumes the liquidation of assets and liabilities in the normal course of the Authority's operations and does not include adjustments that might be required if the Authority is unable to continue as a going concern.

**Overview of Financial Deficit**

In 2015, the Authority was experiencing significant recurring losses from operations, because among other matters, the Commonwealth retained a significant amount of allocated revenues, under a clawback process that began in that year. Thereafter, the Authority defaulted in the payment of billions of dollars in outstanding bonds, expired lines of credit, and other obligations. As a result, on May 21, 2017 (the Petition Date), the Oversight Board, at the request of the Governor, filed a petition for relief for the Authority under PROMESA Title III.

 **Management's Remediation Plan**

On February 22, 2022, the Oversight Board certified a revised fiscal plan for the Authority through fiscal year 2051 that focuses on: (i) infrastructure agenda; (ii) memorandum of understating with its federal grantor agencies geared at revamping the Authority's project and program delivery capabilities; (iii) fiscal initiatives and organizational transformation; and (iv) debt sustainability, which reflects updated economic projections as a result of the effects of the COVID-19 pandemic and the terms approved under the Commonwealth Plan of Adjustment. For further updates regarding the fiscal plan refer to Note 24.

HTA_CONF 00013072

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**4. GOING CONCERN (Continued)**

Furthermore, the Authority is actively working to present its Plan of Adjustment of its obligations, before June 30, 2022, to obtain a final Court approval and certification before the end of the natural year 2022. As part of this process, on May 5, 2021, the Authority executed, the HTA/CCDA PSA. Under this Agreement, substantially all bonds payable and obligations to the GDB Debt Restructuring Authority, including accrued interest, will be exchanged for 1) $1,245 million in new notes payable to be issued by the Authority, bearing interest at 5%, and payable in 40 years; 2) contingent value bonds with a lifetime cap of $3,697,668,995, and payable from the Sales and Use Tax, in excess of certain baseline amounts, if any; and cash payments of $389 million, including certain transaction consummation costs of $125 million. Furthermore, as disclosed in Note 7, the Authority will use certain investments that would be used to offset the upfront cash payments. In relation to the repayment of these new bonds to be issued by the Authority, the Authority is evaluating alternatives to enter into public-private partnerships (PPP) for toll roads not currently under a PPP. The proceeds of any future privatization agreements reached, will be used to defray the outstanding balance of the new bonds to be issued. However, the negotiation of the liabilities, and the privatization of the remaining toll roads, is still subject to the Title III Court approval.

The Commonwealth's Plan of Adjustment was approved by the Title III Court on January 18, 2022. Therefore, the Plan became effective as of March 15, 2022, and the Commonwealth was discharged from the Title III bankruptcy proceedings, subject to the resolution of certain pending claims. This will allow the Commonwealth an opportunity to meet its obligations as they become due, for the foreseeable future. As a result, the Commonwealth shall be able to provide financial support to the Authority, which in the Authority's Certified Fiscal Plan to 2051, are projected to average $100,000,000 annually, but this could increase if the Authority is not successful in privatizing the remaining toll roads, as discussed above.

**5. CASH**

Cash on June 30, 2021, consisted of:

| | |
|---|---|
| Cash in banks | $ 18,400,049 |

Cash and cash equivalents include certificates of deposit with local commercial banks. Certificates of deposit with the Economic Development Bank (EDB) in the total aggregate amount of $5.9 million as of June 30, 2021, were fully allowed in prior years, as further described in Note 9 to the basic financial statements.

HTA_CONF 00013073

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 6. ACCOUNTS RECEIVABLE, NET

Accounts receivable as of June 30, 2021, consisted of:

### *Operating Receivables*

| | | |
|---|---|---:|
| Government, agencies and other | $ | 57,274,345 |
| Rent receivables | | 5,571,481 |
| Repairs to highways recoverable from users | | 1,571,646 |
| Toll escrow agent | | 4,924,968 |
| Other | | 5,878,940 |
| Total | | 75,221,380 |
| Less allowance for doubtful accounts | | (68,131,302) |
| Accounts receivable, net | $ | 7,090,078 |

### *Amounts Due from Governmental Entities of Puerto Rico*

Receivables from governmental entities consist of charges made to various government agencies, public corporations, and municipalities of the Commonwealth. Most of these amounts are significantly overdue and are included in the allowance for doubtful accounts as of June 30, 2021, except for current balances due by the Commonwealth amounting to $59.1 million, which $39.1 million were collected as of the date of issuance of the financial statements.

## 7. RESTRICTED CASH, CASH EQUIVALENTS, AND INVESTMENTS WITH TRUSTEE

Restricted cash, cash equivalents, and investments with trustee as of June 30, 2021, consisted of:

| | | |
|---|---|---:|
| Cash in Banks | $ | 158,169,219 |
| | | |
| Investments with trustee: | | |
| Mutual funds and money market funds | $ | 58,912,668 |
| Guaranteed investment contracts, FSA Capital Management Services | | 7,903,918 |
| US government securities | | 9,820,274 |
| Corporate bonds | | 13,164,985 |
| Total | $ | 89,801,845 |

The restricted cash in banks includes $85.2 million earmarked by the FOMB for certain operating expenses, $60.1 million earmarked by the Commonwealth of Puerto Rico for capital expenditures, and $12.9 million in other restricted cash.

As part of the HTA/CCDA PSA, as more fully disclosed in notes 4 and 24, these investments will be used to offset part of an expected down payment to PSA Creditors, including an additional payment for consummation costs related to the negotiation and execution of the HTA/CCDA PSA.

HTA_CONF 00013074

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 8. FAIR VALUE MEASUREMENTS

The Authority follows GASB Statement No. 72, *Fair Value Measurement and Application*. The Authority categorizes its fair value measurements within the fair value hierarchy established by GAAP. GASB Statement No. 72 sets forth the framework for measuring fair value. That framework provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted market prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to unobservable inputs (level 3 measurements). The three levels of the fair value hierarchy are described below:

**Level 1** - Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Authority has ability to access.

**Level 2** - Inputs to the valuation methodology include adjusted quoted market prices for similar assets or liabilities in active markets; adjusted quoted prices for identical or similar assets in active markets; inputs other than quoted prices that are observable for the asset or liability; or inputs that are derived principally from or corroborated by observable market data by correlation or other means. If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for the full term of the asset or liability.

For investments classified within Level 2 of the fair value hierarchy, the Authority's custodians generally use a multidimensional relational model. Inputs to their pricing models are based on observable market inputs in active markets. The inputs to the pricing models are typically benchmark yields, reported trades, broker-dealer quotes, issuer spreads and benchmark securities, among others.

**Level 3** - Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

The asset's level within the hierarchy is based on the lowest level of input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs. The determination of what constitutes observable requires judgment by the Authority's management. The Authority's management considers observable data to be market data that is readily available, regularly distributed or updated, reliable, and verifiable, not proprietary, and provided by multiple independent sources that are actively involved in the relevant market. The categorization of an investment within the hierarchy is based upon the relative observability of the inputs to its fair value measurement and does not necessarily correspond to management's perceived risk for that investment. The Authority has the following recurring fair value measurements as of June 30, 2021:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Debt Securities: | | | | |
| U.S. Government Obligations | $ - | $ 9,820,274 | $ - | $ 9,820,274 |
| Corporate Bonds | - | 13,164,985 | - | 13,164,985 |
| Mutual funds | 37,486,083 | - | - | 37,486,083 |
| Total | $37,486,083 | $ 22,985,259 | $ - | 60,471,342 |
| Investments valued at net asset value or amortized cost: | | | | |
| Money market funds | | | | 21,426,585 |
| Guaranteed investment contract | | | | 7,903,918 |
| Total investments | | | | $ 89,801,845 |

The Authority does not hold any investments that are measured using Level 3 inputs.

-38-

HTA_CONF 00013075

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 9. DEPOSITS AND INVESTMENTS

The Authority is restricted by law to deposit funds only in financial institutions approved by the DOT, and such deposits are required to be kept in separate accounts in the name of the Authority.

**Custodial Credit Risk - Deposits**

For deposits, custodial credit risk is the risk that in the event of bank failure, the Authority's deposits may not be recoverable. Under Commonwealth law, public funds deposited in commercial banks must be fully collateralized for the amount deposited in excess of federal depository insurance.

All monies deposited with the Trustee or any other depository institution hereunder in excess of the amount guaranteed by the Federal Deposit Insurance Corporation or other federal agency are continuously secured by lodging with a bank or trust company approved by the Authority and by the Trustee as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, Government Obligations or other marketable securities. As of June 30, 2021, the Authority's deposits maintained in commercial banks are as follows:

|  | Unrestricted | | Restricted | |
|---|---|---|---|---|
|  | **Book Balance** | **Bank Balance** | **Book Balance** | **Bank Balance** |
| Commercial banks | $ 18,400,049 | $ 20,335,817 | $ 158,169,219 | $ 158,130,716 |

**Custodial Credit Risk Loss on Economic Development Bank (EDB)**

The Authority has certificates of deposit with EDB in the total aggregate amount of approximately $5.9 million as of June 30, 2021. Management believes that EDB faces significant risks and uncertainties, and it currently lacks sufficient liquidity to meet obligations when they come due. As a result, all certificates of deposit held with EDB were fully allowed for as of June 30, 2021.

**Custodial Credit Risk - Investments**

For an investment, custodial credit risk is the risk that in the event of the failure of the counterpart, the Authority will not be able to recover the value of its investment or collateral securities that are in the possession of an outside party. The Authority invests in prime investments with a minimum quality rating of Aa1 (Moody's) or AA+ (S&P). In addition, investments in bond sinking funds are limited to direct obligations of the United States federal government, or obligations unconditionally guaranteed by the United States federal government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

**Interest-Rate Risk**

Interest-rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. Generally, the longer the maturity of an investment, the greater the sensitivity of its fair value is to changes to market interest rate.

Maturities of investments with the trustee as of June 30, 2021, were as follows:

HTA_CONF 00013076

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 9. DEPOSITS AND INVESTMENTS (Continued)

| | Less than One Year | One to Five Years | Five to Ten Years | Total |
|---|---|---|---|---|
| Mutual Funds | $ 37,486,083 | $ - | $ - | $ 37,486,083 |
| Corporate Bonds | 13,164,985 | - | - | 13,164,985 |
| Money market funds | 21,426,585 | - | - | 21,426,585 |
| U.S. Government Obligations | 2,980,274 | 6,840,000 | - | 9,820,274 |
| Guaranteed investment contract | - | - | 7,903,918 | 7,903,918 |
| Total | $ 75,057,927 | $ 6,840,000 | $ 7,903,918 | $ 89,801,845 |

## 10. CAPITAL ASSETS, NET

The following schedule summarizes the capital assets, on a net-basis, held by the Authority as of June 30, 2021:

| | Balance at June 30, 2020 | Increases | Decreases | Balance at June 30, 2021 |
|---|---|---|---|---|
| **Assets not being depreciated** | | | | |
| Land | $ 1,933,484,316 | $ 18,936,842 | $ (2,805,023) | $ 1,949,616,135 |
| Construction in progress | 584,078,989 | 239,943,244 | (306,446,744) | 517,575,489 |
| Total Assets not being depreciated | 2,517,563,305 | 258,880,086 | (309,251,767) | 2,467,191,624 |
| | | | | |
| **Assets being depreciated** | | | | |
| Transportation system | 2,419,375,826 | - | - | 2,419,375,826 |
| Roads | 13,221,331,014 | 259,047,589 | (583,266) | 13,479,795,337 |
| Bridges | 3,591,941,533 | 28,491,438 | - | 3,620,432,971 |
| Equipment vehicles and other | 123,076,002 | 124,489 | - | 123,200,491 |
| Total | 19,355,724,375 | 287,663,516 | (583,266) | 19,642,804,625 |
| Less accumulated depreciation | (12,974,894,341) | (474,717,773) | - | (13,449,612,114) |
| Total Assets being depreciated | 6,380,830,034 | (187,054,257) | (583,266) | 6,193,192,511 |
| Total capital assets, net | $ 8,898,393,339 | $ 71,825,829 | $ (309,835,033) | $ 8,660,384,135 |

HTA_CONF 00013077

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 11. HIGHWAYS AND BRIDGE UNDER SERVICE CONCESSION AGREEMENTS

Highways and bridge under Service Concession Agreements as of June 30, 2021, is summarized as follows:

| | Balance at June 30, 2020 | Increases | Decreases | Balance at June 30, 2021 |
|---|---|---|---|---|
| Toll roads (PR 5 and PR 22) | $ 310,362,533 | $ - | $ - | $ 310,362,533 |
| Toll roads concession improvements | 51,173,315 | - | - | 51,173,315 |
| Teodoro Moscoso bridge | 109,500,000 | - | - | 109,500,000 |
| Total | 471,035,848 | - | - | 471,035,848 |
| Less accumulated depreciation | (273,139,741) | (1,697,250) | - | (274,836,991) |
| Total | $ 197,896,107 | $ (1,697,250) | $ - | $ 196,198,857 |

**Toll Road Service Concession Agreement (PR-5 and PR-22)**

On September 22, 2011, the Authority entered into the Toll Road Service Concession Agreement with Metropistas, in which the Authority granted the right to operate PR-5 and PR-22 highways (the Toll Roads) for a period of 40 years. During the 40-year term, Metropistas will have the right to charge and collect the tolls imposed on the Toll Roads.

The Authority received an upfront concession fee payment of $1,136 million, of which approximately $873.1 million was used to redeem or defease bonds issued and outstanding associated with the Toll Roads.

The Authority recorded a deferred inflow of resources from the Toll Road Service Concession Agreement of $1,136 million that is being amortized and recognized as revenue over the 40-year term of the agreement. The Toll Roads (capital assets) will continue to be reported in the statement of net deficit as a separate item as highways and bridge under service concession agreements. As of June 30, 2021, the total aggregate amount of the Toll Roads capital assets was approximately $141.9 million, net of accumulated depreciation. Toll Roads depreciation was suspended on September 22, 2011, until the expiration of the Toll Road Service Concession Agreement because the agreement requires Metropistas to return the Toll Roads to the Authority in their original or an enhanced condition.

On April 19, 2016, the Authority entered into an amendment of the Toll Road Service Concession Agreement to extend the original term for 10 additional years and to create five bidirectional tolling points on the Toll Roads. The Authority received an upfront concession fee payment of $100 million, which was used to pay $18.2 million of the Authority's current debt and $79.8 million was transferred to the Commonwealth in fiscal year 2016. Also, in June 2017, the Authority received an additional $15 million payment concurrently with the commencement of the bidirectional system described above.

During the fiscal year ended June 30, 2021, the Authority did not capitalize improvements made by Metropistas to the Toll Roads.

HTA_CONF 00013078

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 11. HIGHWAYS AND BRIDGE UNDER SERVICE CONCESSION AGREEMENTS (Continued)

### Bridge Service Concession Agreement

On December 20, 1992, the Authority and Autopistas entered into the Bridge Service Concession Agreement for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a toll bridge, which crosses the San Jose Lagoon between the municipalities of San Juan and Carolina. Autopistas designed and constructed the Bridge and commenced operating the Teodoro Moscoso Bridge on February 23, 1994 (valuation date). The initial term of this agreement was 35 years, expiring on April 3, 2027. On September 9, 2009, the agreement was amended to extend its term to 50 years (2044).

Upon the implementation of GASB No. 60, *Accounting and Financial Reporting for Service Concession Arrangements,* on June 30, 2013, the Authority recognized the Teodoro Moscoso Bridge at fair value, equivalent to what the Authority might have paid to have the Teodoro Moscoso Bridge constructed (replacement cost) at valuation date. The replacement cost was determined to be $109.5 million depreciated over an estimated useful life of 59 years. The asset balance related to the Teodoro Moscoso Bridge was adjusted to recognize the first 17 years of operations and the remaining amortization will be amortized over 42 years. The Teodoro Moscoso Bridge is being depreciated because, in the opinion of management, the Bridge Service Concession Agreement does not require Autopistas to return the Teodoro Moscoso Bridge in its original condition. As of June 30, 2021, the net book value of the Teodoro Moscoso Bridge was $54.3 million.

The Bridge Service Concession Agreement, as amended, requires Autopistas to pay 5% of the annual toll revenues to the Authority until February 22, 2027, then 61.5% of such revenues from February 23, 2027, through the end of the agreement. During the fiscal year ended June 30, 2021, Autopistas paid the Authority approximately $1.9 million related to the toll revenues.

On October 22, 2003, the Authority issued term and capital appreciation bonds in the total aggregate amount of approximately $153.2 million (the 2003 Bonds). The proceeds of these bonds were used to refund, in advance, the bonds previously issued in 1992 to finance the construction of the Teodoro Moscoso Bridge. The activity of the bonds during the fiscal year ended June 30, 2021, as recorded in the accompanying financial statements is as follows:

| | Balance at June 30, 2020 | Increases / Accretions | Payments / Amortization | Balance at June 30, 2021 |
|---|---|---|---|---|
| Term bonds | $ 57,700,000 | $ - | $ (12,760,000) | $ 44,940,000 |
| Capital appreciation bonds | 42,035,489 | 2,564,990 | - | 44,600,479 |
| **Total** | $ 99,735,489 | $ 2,564,990 | $ (12,760,000) | $ 89,540,479 |

Under the terms of the Bridge Service Concession Agreement, Autopistas is responsible for the debt service payment on the bonds unless the agreement is terminated as specified in the Bridge Service Concession Agreement. Because the bonds are being paid by Autopistas, the Authority records concession revenue for the amount of principal and interest paid by Autopistas annually until settlement. Therefore, the Authority recorded concession revenue in the total aggregate amount of $15.3 million during the fiscal year ended June 30, 2021, which represents the principal and interest payments on bonds made by Autopistas.

Under certain circumstances, including if minimum toll revenues are not achieved, the Bridge Service Concession Agreement may be terminated, and the Authority is then obligated to assume all of Autopistas' obligations to pay the principal of, and interest on, the bonds outstanding, which pursuant to the Loan

HTA_CONF 00013079

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**11. HIGHWAYS AND BRIDGE UNDER SERVICE CONCESSION AGREEMENTS (Continued)**

Agreement will be paid from the net revenues of the use and operation of the Teodoro Moscoso Bridge. Although Autopistas currently has the ability to terminate the Bridge Service Concession Agreement and have the Authority assume its obligations, the Authority has not received such notice and does not currently expect the Bridge Service Concession Agreement to terminate.

The deferred inflows of resources in the total aggregate amount of approximately $1,036.7 million, as of June 30, 2021, were related to the Toll Roads Concession Agreement. The deferred inflows related to the Toll Roads Concession Agreement significantly reduce the net deficit for net investment in capital assets by $1,036.7 million as of June 30, 2021.

**12. BONDS PAYABLE**

As explained in notes 4 and 24 to the basic financial statements, as of the date these financial statements were issued, the Authority is still under relief protection and the debt service for its bond series continues to be stayed. However, on May 5, 2021, the Authority executed the HTA/CCDA PSA to exchange the outstanding bonds, together with the GDB Debt Recovery Authority Obligation (disclosed in Note 14), for a combination of bonds to be issued by the Authority, contingent value bonds to be issued by the Commonwealth, and certain cash consideration to be paid at the time of the exchange. The Agreement, if finally confirmed by the Title III Court, as expected, will reduce the Authority's bond payable obligations to $1,245 million, which will be payable in forty years, at 5%.

At present, the bonds are expected to begin amortization during fiscal year 2022-2023. Therefore, a current portion presentation is not required. As of the date these financial statements were issued, no amortization tables had been prepared. If the Authority is able to privatize the toll roads not previously privatized, the proceeds of the privatization will be used to defray these liabilities. In the event the Authority is not able to privatize the toll roads, based on the Authority's approved Certified Fiscal Plan's projections, the Authority may lack sufficient resources to settle these bonds as they become due, without additional financial support of the Commonwealth. Therefore, the historic information of the bonds, as presented in this note is substantially stale, and should only be read for informative purposes only.

The Bond Resolutions historically authorized the Authority to issue revenue bonds to raise funds for the construction and related costs of transportation facilities. As of June 30, 2021, bonds outstanding under the Bond Resolutions, were as follows:

HTA_CONF 00013080

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**12. BONDS PAYABLE (Continued)**

### RESOLUTION 1968-18

| | |
|---|---:|
| Serial bonds, maturing through 2034, with interest ranging from 3.30% to 6.50% | $ 396,389,997 |
| Term bonds, maturing through 2039, with interest ranging from 4.00% to 6.00% | 393,095,000 |
| Capital appreciation bonds, maturing through 2026, with interest ranging from 4.36% to 4.58% | 32,079,630 |
| Total Resolution 68-18 | 821,564,627 |

### RESOLUTION 1998-06

| | |
|---|---:|
| Serial bonds, maturing through 2037, with interest ranging from 2.25% to 5.75% | 1,186,895,000 |
| Term bonds, maturing through 2046, with interest ranging from 2.25% to 5.75% | 1,842,045,000 |
| Variable rate bonds held by the GDB Debt Recovery Authority | 200,000,000 |
| Capital appreciation bonds, maturing through 2026, with interest ranging from 4.47% to 5.08% | 81,264,404 |
| LIBOR based interest rate bonds maturing through 2045 | 700,000 |
| Consumer Price Index based interest rate bonds maturing through 2028 | 57,965,000 |
| Total Resolution 1998-06 | 3,368,869,404 |
| | |
| Total bonds outstanding | 4,190,434,031 |
| Add: Net unamortized premium | 182,147,385 |
| Net bonds payable | $ 4,372,581,416 |

For variable interest-rate bonds included above, the debt service requirements were computed assuming current interest rates remain the same for their remaining term. As rates vary, variable-rate bond interest payments will vary.

The conditional allocation of gasoline, oil, diesel, and petroleum taxes to the Authority for repayment of the Bonds will no longer be made as the statutes that authorized such allocations have been preempted by the Commonwealth Plan of Adjustment and such conditional allocation discharged.

The variable rate bonds bear interest at an annual rate of interest (not to exceed the maximum legal rate) as determined by the remarking agent on and as of the rate determination date. This rate will be, in the judgment of the remarking agent under existing current market conditions, the rate that would result in the sale of the outstanding variable interest bonds at a price equal to the purchase price as defined in the bond offering. The effective rate of these bonds was 12%, as of June 30, 2021.

The Series N LIBOR Bonds bear interest from their date of delivery at a per annum rate for each period equal to (a) 67% of the Three-Month LIBOR Rate for such period plus (b) a per annum spread equal to 0.53%. In

-44-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**12. BONDS PAYABLE (Continued)**

each case the LIBOR based interest rate cannot exceed the maximum rate permitted under Puerto Rico law (currently 12%). The effective rate on these bonds was 1.64% as of June 30, 2021.

Interest on the Consumer Price Index (CPI) Bonds were to be paid on the first business day of each month commencing on July 2, 2007. The CPI Rate, which will be reset monthly, is an interest rate based on changes in the CPI and cannot exceed the maximum rate permitted under the Puerto Rico law (currently 12%). The effective rate on these bonds was 3.17% as of June 30, 2021.

The Authority's bonds payable are subject to arbitrage regulations issued by the Internal Revenue Service of the United States of America, which require the payment of a rebate to the United States federal government of excess investments earnings on tax-exempt debt proceeds if the yield on those earnings exceeds the effective yield on the related tax-exempt debt issued. Excess earnings must be rebated every five years or upon maturity of the debt, whichever is earlier. Arbitrage calculations resulted in no liability as of June 30, 2021.

Long-term debt activity for the fiscal year ended June 30, 2021, was as follows:

| | Balance at June 30, 2020 | Increases / Accretions | Payments / Amortization | Balance at June 30, 2021 | Due within One Year |
|---|---|---|---|---|---|
| Serial bonds | | | | | |
| Resolution 1968-18 | $ 396,389,997 | $ - | $ - | $ 396,389,997 | $ - |
| Resolution 1998-06 | 1,186,895,000 | - | - | 1,186,895,000 | - |
| Total | 1,583,284,997 | - | - | 1,583,284,997 | - |
| Term bonds | | | | | |
| Resolution 1968-18 | 393,095,000 | - | - | 393,095,000 | - |
| Resolution 1998-06 | 1,842,045,000 | - | - | 1,842,045,000 | - |
| Total | 2,235,140,000 | - | - | 2,235,140,000 | - |
| Variable rate bonds | | | | | |
| Resolution 1998-06 | 200,000,000 | - | - | 200,000,000 | - |
| CPI based interest-rate bonds | | | | | |
| Resolution 1998-06 | 57,965,000 | - | - | 57,965,000 | - |
| LIBOR based interest-rate bonds | | | | | |
| Resolution 1998-06 | 700,000 | - | - | 700,000 | - |
| Capital appreciation bonds | | | | | |
| Resolution 1968-18 | 30,662,498 | 1,417,132 | - | 32,079,630 | - |
| Resolution 1998-06 | 81,264,404 | - | - | 81,264,404 | - |
| Total | 111,926,902 | 1,417,132 | - | 113,344,034 | - |
| Total before bond premium | 4,189,016,899 | 1,417,132 | - | 4,190,434,031 | - |
| Add net bond premium amortization | 195,092,776 | - | (12,945,391) | 182,147,385 | - |
| Total bonds outstanding subject to compromise | $ 4,384,109,675 | $ 1,417,132 | $ (12,945,391) | $ 4,372,581,416 | $ - |

HTA_CONF 00013082

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 12. BONDS PAYABLE (Continued)

The outstanding bonds as of June 30, 2021, require future payments of principal and interest as follows:

| Fiscal Years started July 1, | Principal | Interest | Total |
|---|---|---|---|
| 2022 (including amounts in arrears) | $ 671,244,401 | $ 1,007,800,449 | $ 1,679,044,850 |
| 2023 | 153,750,000 | 193,636,083 | 347,386,083 |
| 2024 | 150,079,058 | 185,774,044 | 335,853,102 |
| 2025 | 157,021,525 | 178,396,853 | 335,418,378 |
| 2026 | 164,290,890 | 170,637,788 | 334,928,678 |
| 2027-2031 | 878,093,157 | 731,402,818 | 1,609,495,975 |
| 2032-2036 | 1,036,960,000 | 498,357,239 | 1,535,317,239 |
| 2037-2041 | 843,560,000 | 225,418,987 | 1,068,978,987 |
| 2042-2046 | 121,560,000 | 50,443,998 | 172,003,998 |
| 2047 | 13,875,000 | 693,750 | 14,568,750 |
| Total | $ 4,190,434,031 | $ 3,242,562,009 | $ 7,432,996,040 |

### Bonds defaults

Upon the filing for relief under PROMESA Title III, as explained in Note 3, through June 30, 2021, the Authority stayed all debt service, other than the Teodoro Moscoso bonds. However, payments under bonds covered by monoline insurance may have been paid by such insurers.

| Fiscal Year Ended June 30, | Total defaults still outstanding | Subrogated monoline insurance company payments | Total defaults not subrogated by insurance |
|---|---|---|---|
| **2017** | | | |
| Principal | $ 3,110,000 | $ 3,110,000 | $ - |
| Interest | 2,509,625 | 245,125 | 2,264,500 |
| **2018** | | | |
| Principal | 122,885,000 | 107,805,000 | 15,080,000 |
| Interest | 247,524,261 | 112,581,380 | 134,942,881 |
| **2019** | | | |
| Principal | 128,035,000 | 112,235,000 | 15,800,000 |
| Interest | 242,089,354 | 119,320,846 | 122,768,508 |
| **2020** | | | |
| Principal | 127,101,793 | 72,745,000 | 54,356,793 |
| Interest | 241,459,632 | 113,186,409 | 128,273,223 |
| **2021** | | | |
| Principal | 130,568,151 | 58,260,000 | 72,308,151 |
| Interest | 220,195,929 | 90,567,163 | 129,628,766 |
| **Total** | $ 1,465,478,745 | $ 790,055,923 | $ 675,422,822 |

-46-

HTA_CONF 00013083

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 12. BONDS PAYABLE (Continued)

The debt service requirements not paid as referred to in the previous paragraph are insured by different insurance companies; Ambac Assurance Corporation ("AMBAC"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Insurance ("ASSURED"), MBIA Inc. ("MBIA"), AAC Insurance Group ("AAC") and CDC IXIS Financial Guaranty North America, Inc. ("CIFG N/A"). Ambac, Assured, MBIA and AAC have been covering their share of the debt service requirements on the bonds series covered by their corresponding insurance policies. FGIC has been subject to a Rehabilitation Plan and has been paying their corresponding portions based on an established percentage of debt service that has ranged from 25% in fiscal year 2017 to 38.5% through October 13, 2019. Beginning on October 13, 2019, the debt service percentage coverage is 43.5%. However, the amount paid by FGIC is not fully disclosed to the Authority's trustee. Even though these insurance companies have been paying principal and interest on such bonds, such payments do not constitute a reduction in the Authority's debt. Upon insurance companies' payments, they become the owner of the surrendered Bond Obligations and are fully subrogated to all the Bondholder Rights to payments.

## 13. BONDS PAYABLE -TEODORO MOSCOSO

On October 22, 2003, the Authority issued term and capital appreciation bonds in the total aggregate amount of approximately $153.2 million (the 2003 Bonds). The proceeds of these bonds were used to refund, in advance, the bonds previously issued in 1992 to finance the construction of the Teodoro Moscoso Bridge.

Bonds outstanding under the Bond Resolutions as of June 30, 2021, are as follows:

| | |
|---|---:|
| Term bonds, maturing through 2027 with interest ranging from 5.55% to 5.85% | $ 44,940,000 |
| Capital appreciation bonds, maturing through 2026 with interest ranging from 5.90% to 6.15% | 44,600,479 |
| Total Teodoro Moscoso bonds | 89,540,479 |
| Less: Current portion | 13,235,000 |
| Long-term portion | $ 76,305,479 |

-47-

HTA_CONF 00013084

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 13. BONDS PAYABLE -TEODORO MOSCOSO (Continued)

### Debt Maturities

The following schedule has been presented in accordance with original terms of the bonds payable. The outstanding bonds as of June 30, 2021, require future payments of principal and interest as follows:

| Fiscal years ended June 30, | Principal | Interest | Total |
|---|---|---|---|
| 2022 | $ 13,235,000 | $ 2,458,170 | $ 15,693,170 |
| 2023 | 12,954,501 | 2,170,644 | 15,125,145 |
| 2024 | 13,264,770 | 1,776,938 | 15,041,708 |
| 2025 | 14,989,438 | 1,294,606 | 16,284,044 |
| 2026 | 16,779,138 | 690,008 | 17,469,146 |
| 2027-2028 | 18,317,632 | 410,962 | 18,728,594 |
| Total | $ 89,540,479 | $ 8,801,328 | $ 98,341,807 |

Autopistas is currently paying the scheduled interest and principal payments for these bonds in accordance with the service concession agreement. Refer to Note 11.

## 14. DEBT TO THE GDB DEBT RECOVERY AUTHORITY

The Authority had various unsecured lines of credit with the GDB, which were transferred to the GDB Debt Recovery Authority, on November 29, 2018, pursuant to the GDB Qualifying Modifications of certain non-revolving Lines of credit bearing interest at variable rates plus a margin of 150 basis points or a 6.00% floor ($1,232.9 computed at Daily/360 and $500.8 million computed at 30/360). The total aggregate amount outstanding was approximately $1,733.7 million as of June 30, 2021, plus accrued and unpaid interest of $900.3 million.

On May 5, 2021, the Authority executed the HTA/CCDA PSA, that in substance, will include the settlement of this obligation, as part of the exchange of bonds payable with bond holders.

## 15. RETIREMENT PLAN

Before July 1, 2017, the Authority was a participating employer in the retirement plans administered by the Employees' Retirement System of the Commonwealth of Puerto Rico (ERS).

However, on September 30, 2016, ERS was designated by the Oversight Board as a Covered Territorial Instrumentality under PROMESA. On May 21, 2017, the Oversight Board filed a petition for relief under PROMESA Title III for ERS in the United States District Court for the District of Puerto Rico, commencing a Title III case for ERS. On June 15, 2017, the United States Trustee appointed an Official Committee of Retired Employees in the Commonwealth's Title III cases. On January 18, 2022, the Title III Court confirmed the Commonwealth Plan of Adjustment, which includes the restructuring of ERS's outstanding debts and other financial obligations. The Commonwealth Plan of Adjustment became effective on March 15, 2022.

Under the Commonwealth Plan of Adjustment and Commonwealth Confirmation Order, a Pension Reserve Trust was created to fund future ERS pension liabilities with an initial funding contribution from the Commonwealth of $5 million on the Commonwealth Effective Date to fund the initial administrative costs and expenses of the Pension Reserve Board. Additional annual Commonwealth contributions will also be made to the Pension Reserve Trust in amounts to be determined each fiscal year in accordance with the terms of the Commonwealth Plan of Adjustment. The Commonwealth Plan of Adjustment and Commonwealth

-48-

HTA_CONF 00013085

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 15. RETIREMENT PLAN (Continued)

Confirmation Order also prevent the Commonwealth from implementing existing legislation or enacting new legislation within 10 years of the Commonwealth Effective Date that would create or increase any defined benefit pension payment or obligation to current or future retirees without the Title III Court's prior approval.

### PayGo Pension Reform

On June 27, 2017, the DOT issued Circular Letter No. 1300-46-17 to convey to the central government agencies, public corporations, and municipalities the new implementation procedures to adopt, effective July 1, 2017, a new "pay-as-you-go" (PayGo) system, in which ERS and the Commonwealth's other retirement systems stopped receiving contributions from employers or plan participants and are no longer managing contributions on behalf of participants. Since fiscal year 2018, employers' contributions, contributions ordered by special laws, and the additional uniform contribution were all eliminated.

On August 23, 2017, the Governor signed into law the Act No. 106 of 2017, known as the *Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants* (Act 106-2017), which provides the legal framework for the Commonwealth to implement the PayGo system effective as of July 1, 2017. Under the PayGo system, the Commonwealth's General Fund makes direct pension payments to the pensioners and then gets reimbursed for those payments by the applicable participating employers, including the Authority. The Commonwealth allocation percentages are based on the ratio of each participating entity's actual benefit payments relative to the total aggregate benefit payments made by all participating entities for the year ending on the measurement date. Approximately $2 billion was allocated for these purposes in each of the Commonwealth's budgets for fiscal year 2019. The Commonwealth Plan of Adjustment preserves all accrued pension benefits for current retirees and employees at ERS, Teachers Retirement System (TRS), and Judicial Retirement System (JRS).

Act 106-2017, among other things, amended Act No. 447 with respect to the ERS's governance, funding, and benefits for active members of the actual program and new hired members. Under Act 106-2017, the ERS's Board of Trustees was eliminated, and a new retirement board was created (the Retirement Board), which is currently responsible for governing all Commonwealth Retirement Systems.

Act 106-2017 terminated the previously existing pension programs for ERS participants as of June 30, 2017 and created a new defined contribution plan (the New Defined Contribution Plan) for existing active members and new employees hired on or after July 1, 2017. This plan is similar to a 401(k) and is managed by a private entity. Future benefits will not be paid by the ERS. Under the New Defined Contribution Plan, members of the prior programs and new government employees hired on and after July 1, 2017, will be enrolled in the New Defined Contributions Program. As of June 22, 2020, the accumulated balance on the accounts of the prior pension programs will be transferred to the individual member accounts in the New Defined Contribution Plan.

Act 106-2017 also ordered a suspension of the ERS' loan programs and ordered a merger of the administrative structures of the Commonwealth's retirement systems. At the Retirement Board's discretion, the administration of benefits under the new Defined Contribution Plan may be managed by a third-party service provider. In addition, Act 106-2017 repealed the Voluntary Early Retirement Law, Act No. 211 of 2015, while creating incentives, opportunities, and retraining program for public workers.

### Plan Description Prior to July 1, 2017

This summary of ERS' pension plan provisions is intended to describe the essential features of the plan before the enactment of Act 106-2017. It should be noted that all eligibility requirements and benefit amounts shall be

-49-

HTA_CONF 00013086

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 15. RETIREMENT PLAN (Continued)

determined in strict accordance with the applicable law and regulations, and these benefits were not changed or amended with the enactment of Act 106-2017.

For employees who became ERS members prior to July 1, 2013, ERS operated under the following three benefit structures:

- Act No. 447 of May 15, 1951 (Act No. 447), effective on January 1, 1952 for members hired up to March 31, 1990;

- Act No. 1 of February 16, 1990 (Act No. 1), for members hired on or after April 1, 1990, and ending on or before December 31, 1999;

- Act No. 305 of September 24, 1999, (Act No. 305), which amended Act No. 447 and Act No. 1, for members hired from January 1, 2000, up to June 3, 2013.

Employees under Act No. 447 and Act No. 1 were participants in a cost-sharing multiple employers defined benefit plan (the Defined Benefit Program). Act No. 305 members were participants under a pension program known as the System 2000 Program, a hybrid defined contribution plan. Under the System 2000 Program, benefits at retirement age were not guaranteed by the Commonwealth and were subjected to the total accumulated balance in the participant's account.

Thereafter, under Act No. 3 of 2013, effective July 1, 2013, the Commonwealth created a hybrid plan where the employee no longer accrued employee benefits, and upon retirement would receive an annuity from the accumulated defined benefits until that date, plus the employee contributions made thereafter, adjusted by investment yields and market fluctuations. Other charges were also made to the Plan. Upon the enactment of Act. No. 3, the Commonwealth discontinued contributing a proportionate share on behalf of the employee, instead employer contributions were redirected to pay accrued pensions. Act No. 3 of 2013 (Act No. 3) amended the provisions of the different benefits structures under the ERS. Act No. 3 moved all participants (employees) under the Defined Benefit Program and System 2000 Program to a new defined contribution hybrid plan (the Contributory Hybrid Program). All regular employees hired for the first time on or after July 1, 2013, and former employees who participated in the Defined Benefit Program and the System 2000 Program, and were rehired on or after July 1, 2013, become members of the Contributory Hybrid Program as a condition to their employment. Act No. 3 benefits were terminated with the enactment of Act. No. 106-2017.

**Pension Liabilities, Pension Expense, and Deferred Outflows of Resources and Deferred Inflows of Resources Related to Pensions**

The GASB 73 Pension Expense Report of the Commonwealth for the year ended June 30, 2021, was not available when the Authority released these financial statements. Accordingly, the total pension liability, deferred outflows / inflows of resources and GASB 73 pension expense, as recorded in these financial statements are different from actual amounts. These differences may be material to the basic financial statements. Furthermore, total pension information that is required to be disclosed by U.S. generally accepted accounting principles is not disclosed.

The total amount paid by the Authority under the PayGo system during the fiscal year ended June 30, 2021 amounted to $35.0 million, which represents 100% of the contributions required under the law.

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**15. RETIREMENT PLAN (Continued)**

**Pension Plan Fiduciary Information**

Additional information on the Puerto Rico Government Employees Retirement System for the fiscal year ended June 30, 2019, can be obtained from the Employees' Retirement System of the Commonwealth of Puerto Rico, P.O. Box 42003, San Juan PR 00940-2003.

**16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB)**

The Authority participates in two OPEB plans. One plan is sponsored by the Commonwealth and the other is sponsored by the Authority:

| Total OPEB liability | | |
|---|---|---|
| OPEB Liability – Authority (Reporting Date June 30, 2021) | $ | 2,450,802 |
| OPEB Liability – Commonwealth (Reporting Date June 30, 2020) | | 15,936,861 |
| Total OPEB liability | $ | 18,387,663 |

**OPEB Sponsored by the Commonwealth**

The Authority participates in the OPEB plan of the Commonwealth for retired participants of the Employees Retirement System Medical Insurance Plan Contribution Benefit (ERS MIPC). The Plan is administered on a pay-as-you-go basis.

ERS MIPC is an unfunded cost sharing, multiple employers defined benefit OPEB plan (other than pension) sponsored by the Commonwealth. This ERS MIPC was created under Act No. 95-1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share. ERS MIPC covers substantially all full-time employees of the Commonwealth, certain municipalities and component units of the Commonwealth. For ERS MIPC, Commonwealth and Authority employees became plan members upon their date of employment. Plan members were eligible for benefits upon reaching the applicable pension benefits retirement age.

The ERS MIPC covers a payment of up to $100 per month to the eligible medical insurance plan selected by each member provided that the member retired prior to July 1, 2013, (Act No. 483, as amended by Act No. 3). The ERS MIPC is financed by the Commonwealth through legislative appropriations. However, the Commonwealth claims reimbursements from each employer on a monthly basis for the corresponding amount of the OPEB payments made by the Commonwealth in relation to the retirees associated with each employer. The legislative appropriations are considered estimates of the payments to be made by the ERS MIPC. There is no contribution requirement from the plan members during active employment. The retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution.

HTA_CONF 00013088

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

**Actuarial methods and assumptions**

The total ERS MIPC OPEB liability as of June 30, 2019, was determined by an actuarial valuation as of June 30, 2017, which was rolled forward to June 30, 2018. The actuarial valuation used the following actuarial assumptions applied to all periods in the measurement period:

| | |
|---|---|
| **Inflation** | Not applicable |
| **Municipal bond index** | 3.50%%, as per Bond Buyer General Obligation 20-Bond Municipal Bond Index |
| **Compensation increases** | 3.00% per year. No compensation increases are assumed until July 1, 2021 as a result of Act No. 3-2017 and the current general economy. |
| **Mortality** | Pre-retirement Mortality: |

For general employees not covered under Act No. 127, RP-2014 Employee Mortality Rates for males and females adjusted to reflect Mortality Improvement Scale MP-2018 from the 2006 base year and projected forward using MP-2018 on generational basis. For members covered under Act No. 127, RP-2014 Employee Mortality Rates with blue collar adjustments for males and females adjusted to reflect Mortality Improvement Scale MP-2018 from the 2006 base year and projected forward using MP-2018 on generational basis. As generational tables, they reflect mortality improvements both before and after the measurement date.

100% of deaths while in active service are assumed to be occupational for members covered under Act No. 127.

Post-retirement Healthy Mortality:

Rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2007 to 2012 and updated expectations regarding future mortality improvement. The 2010 base rates are equal to 92% of the rates from the UP-1994 Mortality Table for Males and 95% of the rates from the UP-1994 Mortality Table for Females, both projected from 1994 to 2010 using Scale AA. The base rates are projected using Mortality Improvement Scale MP-2018 on a generational basis. As a generational table, it reflects mortality improvements both before and after the measurement date.

Post-retirement Disabled Mortality:

Rates which vary by gender are assumed for disabled retirees based on a study of plan's experience from 2007 to 2012 and updated expectations regarding future mortality improvement. The 2010 base rates are equal to 105% of the rates from the UP-1994 Mortality Table for Males and 115% of the rates from the UP-1994 Mortality Table for Females. The base rates are projected using Mortality Improvement Scale MP-2018 on a generational basis. As a generational table, it reflects mortality improvements both before and after the measurement date.

HTA_CONF 00013089

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

Most other demographic assumptions used in the June 30, 2019 valuation were based on the results of an actuarial experience 2009 study using data as of June 30, 2003, June 30, 2005, and June 30, 2007.

The discount rate for June 30, 2019, and 2018 was 3.50% and 3.87%, respectively. This represents the municipal bond return rate as chosen by the Commonwealth. The source is the Bond Buyer GO 20-Bond Municipal Bond Index, which includes tax-exempt general obligation municipal bonds with an average rating of AA/Aa or higher.

Actuarial valuations of an ongoing plan involve estimates of the net value of reported amounts and assumptions about the probability of occurrence of events far into the future, including, for example, assumptions about future employment and mortality. Calculations are based on the types of benefits provided under the terms of the substantive plan at the time of each valuation and the pattern of sharing costs between the employer and plan member at the time of each valuation. The projections of benefits for financial reporting purposes does not explicitly incorporate the potential effects of legal or contractual funding limitations on the pattern of cost sharing between the employer and plan members in the future.

Actuarial assumptions are revised periodically to more closely reflect actual, as well as anticipated, future experience. Due to the change in the census collection date to the beginning of the fiscal year, rather than the end of the fiscal year, demographic gain/loss during the year is limited to the difference between actual and expected benefit payments, which arise from differences in termination and retirement activity and mortality versus expectations.

**The Authority's Proportion of Total OPEB Liability of the ERS MIPC**

The Authority's proportionate share of the total OPEB liability of the ERS MIPC and the proportion percentage of the aggregate total OPEB liability of the ERS allocated to the Authority as of June 30, 2019 (measurement date), was approximately $15.94 million and 1.91%, respectively. As the ERS MIPC is a multiple employer plan and the benefits are not funded by an OPEB trust, GASB Statement No. 75 applies to the OPEB provided to each participating employer's own employees. The Commonwealth of Puerto Rico and its component units are considered to be one employer. Other employers also participate in the ERS MIPC. Because certain employers that are component units of the Commonwealth, such as the Authority, prepare individual financial statements, a proportionate share or OPEB expense is determined for these employers. GASB Statement No. 75 requires that such proportionate share should be consistent with the manner in which amounts that are paid as benefits come due are determined. The proportionate share as of each measurement date is based on the ratio of each agency and component unit's actual benefit payments to the total actual benefit payments paid during the year ending on the measurement date.

HTA_CONF 00013090

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

### Sensitivity of total ERS MIPC OPEB liability to changes in the discount rate

The following table presents the Authority's proportionate share of the ERS MIPC OPEB liability at June 30, 2020 (measurement date June 30, 2019), for ERS calculated using the discount rate of 3.50%, as well as what the Company's proportionate share of the OPEB liability would be if it were calculated using a discount rate of one percentage point lower (2.50%) or one percentage point higher (4.50%) than the current rate:

|  | 1% Decrease (2.50%) | Current Assumption (3.50%) | 1% Increase (4.50%) |
|---|---|---|---|
| Total OPEB liability | $ 17,465,992 | $ 15,936,861 | $ 14,636,302 |

### Deferred outflows of resources and deferred inflows of resources

OPEB adjustments recognized by the Authority for the year ended June 30, 2020 (reporting date), related to the ERS MIPC amounted to approximately $83,000. Because all participants are inactive, there are no deferred outflows or inflows of resources as any changes in actuarial assumptions, economic or demographic gains and losses, and changes in proportionate share are recognized immediately during the measurement year. However, a deferred outflow has been recognized only for the amount of the benefit payments made by the Authority subsequent to the measurement date. Additional information on the ERS MIPC OPEB Plan of the Commonwealth of Puerto Rico for Retired Participants of ERS is provided on its standalone Schedules of Employer Allocations and Schedules of OPEB Amounts by Employer for the years ended June 30, 2018, and 2017, a copy of which can be obtained from the Employees' Retirement System of the Commonwealth of Puerto Rico, P.O. Box 42004, San Juan PR 00940-2004.

### Reporting Year for OPEB Liability of the ERS MIPC

The GASB 75 Expense Report of the Commonwealth for the year ended June 30, 2021, was not available when the Authority released these financial statements. Accordingly, the total ERS MIPC OPEB Liability, deferred outflows / inflows of resources and GASB 75 expense, as recorded in these financial statements are different from actual amounts. These differences may be material to the basic financial statements.

### The Authority's Health Benefit Plan

### Program Description and Membership

The Authority agreed to provide medical, pharmacy, dental and vision medical insurance coverage to eligible retirees, their spouses and dependents, for a period of one year after retirement for union employees and for the remainder of the calendar year of retirement for management employees, as a single employer defined benefit Other Post-Employment Benefits Plan (the OPEB Plan).

The OPEB Plan can be amended by action of the Authority subject to applicable collective bargaining and employment agreements. The OPEB Plan does not issue a stand-alone financial report because there are no assets legally segregated for the sole purpose of paying benefits under the OPEB Plan.

HTA_CONF 00013091

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)**

The obligations of the OPEB Plan member's employer are established by action of the Authority pursuant to applicable collective bargaining and employment agreements. The required contribution rates of the employer and the members vary depending on the applicable agreement.

All employees with more than twenty years of rendered service within the Authority are eligible for the OPEB upon retirement age.

For more details regarding the retirement age, refer to Note 15. The obligation ends in case of death before retirement and in case of total or permanent disability before retirement. The obligation also ends in case of death after retirement.

**Funding Policy**

The Authority currently contributes enough money to the OPEB Plan to satisfy current obligations on a pay-as-you-go basis. The costs of administering the OPEB Plan are paid by the Authority.

No assets are accumulated in a trust that meets the criteria in paragraph 4 of GASB Statement No. 75 for the payment of these benefits.

**Membership**

On June 30, 2021, the date of the most recent actuarial valuation, membership in the OPEB Plan was as follows:

| Description | Number |
|---|---|
| Inactive Employees or Beneficiaries Currently Receiving Benefits | 1 |
| Inactive Members Entitled To But Not Yet Receiving Benefits | - |
| Active Employees | 838 |
| Total Membership | 839 |

-55-

HTA_CONF 00013092

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

### Actuarial Assumptions

The total OPEB liability was determined by an actuarial valuation as of June 30, 2021, using the following key actuarial assumptions and other inputs:

| | |
|---|---|
| Inflation | 2.40% |
| Salary Increases | N/A |
| Municipal Bond Index Rate at Measurement Date | 2.66% |
| Long-Term Expected Rate of Return | 2.66% |
| Health care cost trend rate | 5.6% decreasing to 4.7% |

### Mortality Table

Mortality rates were based on the PUB-2010 General Retirees Amount-Weighted Mortality Table, projected generationally using scale MP-2020 for service retirements. The PUB-2010 General Disabled Retirees Amount-Weighted Mortality Table, projected generationally using scale MP-2020 was used for the period after disability retirement.

### Changes of Actuarial Assumptions

Since the Prior Measurement Date, the discount rate has decreased from 2.79% to 2.66%. Mortality rates have been updated to the PUB-2010 General Retiree Amount-Weighted Mortality Table, projected generationally using scale MP-2020 for service retirements. The PUB-2010 General Disabled Retiree Amount-Weighted Mortality Table, projected generationally using scale MP-2020 was used for the period after disability retirement.

### Changes of Benefit Terms

There was no change in the benefit terms that affected the measurement of the total OPEB liability since the prior measurement date. No benefit payments are attributable to the purchase of allocated insurance contracts.

### Sensitivity of the Total OPEB Plan Liability to Changes in the Discount Rate and Health Care Trend

The following presents the total OPEB liability calculated using the discount rate of 2.66%, as well as what it would be if it were calculated using a discount rate of 1 percent-point lower or 1 percent-point higher than the current rate:

| | 1% Decrease (1.66%) | Current Assumption (2.66%) | 1% Increase (3.66%) |
|---|---|---|---|
| Total OPEB liability | $ 2,710,302 | $ 2,450,802 | $ 2,214,240 |

HTA_CONF 00013093

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

Similarly, the exhibit below presents the total OPEB liability calculated using the health care cost trend rates as well as what it would be if it were calculated using a health care cost rate of 1 percent-point lower or 1 percent-point higher than the current rate:

|  | 1% Decrease (4.6% decreasing to 3.7%) | Current Assumption (5.6% decreasing to 4.7%) | 1% Increase (6.6% decreasing to 5.7%) |
|---|---|---|---|
| Total OPEB liability | $ 2,255,139 | $ 2,450,802 | $2,681,353 |

**Annual OPEB Plan Cost and OPEB Plan Liability**

The total OPEB Plan liability as of June 30, 2021 (reporting date), is based upon an actuarial valuation performed as of the Valuation Date, June 30, 2020. An expected total OPEB Plan liability is determined as of June 30, 2020, using standard roll forward techniques. The roll forward calculation begins with the total OPEB Plan liability as of the prior Measurement Date, June 30, 2019, adds the annual Normal Cost (also called the Service Cost), adds interest at the Discount Rate for the year, and then subtracts the expected benefit payments for the year. The difference between this expected total OPEB Plan liability and the actual total OPEB Plan liability as of the Measurement Date before reflecting any assumption changes is reflected as an experience gain or loss for the year. The difference between the actual total OPEB Plan liability as of the Measurement Date before and after reflecting any assumption changes is reflected as an assumption change gain or loss for the year.

The following table illustrates the OPEB Plan cost components for the year ended June 30, 2021:

| | |
|---|---|
| **Total OPEB Liability as of June 30, 2020 (Valuation Date)** | $ 2,346,428 |
| **Changes for the year:** | |
| Service Cost at the end of the year | 85,610 |
| Interest on OPEB Liability and Cash Flows | 64,351 |
| Change in benefit terms | - |
| Difference between expected and actual experience | 2,213 |
| Changes of assumptions or other inputs | 32,050 |
| Benefit payments | (79,850) |
| **Net changes** | 104,374 |
| **Total OPEB Liability as of June 30, 2021 (Reporting Date)** | $ 2,450,802 |

For the year ended June 30, 2021, the Authority recognized OPEB Plan expense of approximately $56,387.

-57-

HTA_CONF 00013094

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)**

Since certain expense items are recognized over closed periods each year, the deferred portions of these items must be tracked annually. If the amounts will increase OPEB Plan Expense they are labeled Deferred Outflows of Resources. If they serve to reduce OPEB expense, they are labeled Deferred Inflows of Resources. The recognition of these amounts is accomplished on a level dollar basis, with no interest included in the deferred amounts. Experience gains/losses and the impact of changes in actuarial assumptions or other inputs, if any, are recognized over the average expected remaining service life of the active and inactive Plan members at the beginning of the measurement period.

The following table provides a summary of the Deferred Outflows of Resources and Deferred Inflows of Resources as of June 30, 2021:

**OPEB Deferred Outflows of Resources and Deferred Inflows of Resources**

| Description | Deferred Outflows of Resources | Deferred Inflows of Resources |
|---|---|---|
| Differences between expected and actual experience | $ 1,918 | $ 621,700 |
| Changes of assumptions or other inputs | 125,337 | - |
| Total | $ 127,255 | $ 621,700 |

The implementation of GASB No. 75 requires to determine deferred outflows of resources and deferred inflows of resources in order to be amortized and recognized in the annual OPEB Plan expense.

The following table illustrates the OPEB Plan cost components for the year ended June 30, 2021:

| | |
|---|---|
| OPEB Expense: | |
| Service Cost at end of year | $ 85,610 |
| Interest on the Total OPEB Liability | 64,351 |
| Expensed portion of current-period difference between expected and actual experience in the Total OPEB Liability | 295 |
| Assumption change | 4,273 |
| Recognition of beginning Deferred Outflows of Resources as OPEB Expense | 19,160 |
| Recognition of beginning Deferred Inflows of Resources as OPEB Expense | (117,302) |
| OPEB expense | $ 56,387 |

HTA_CONF 00013095

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 16. OTHER POSTEMPLOYMENT BENEFITS OTHER THAN PENSIONS (OPEB) (Continued)

Amounts reported as Deferred Outflows of Resources and Deferred Inflows of Resources related to OPEB Plan benefits will be recognized in OPEB Plan Expense as follows:

| Fiscal Year Ended June 30: | Deferred Outflows of Resources | Deferred Inflows of Resources | OPEB Expenses increase/(decrease) |
|---|---|---|---|
| 2022 | $ 23,728 | $ 117,302 | $ (93,574) |
| 2023 | 23,728 | 117,302 | (93,574) |
| 2024 | 23,728 | 117,302 | (93,574) |
| 2025 | 23,728 | 117,302 | (93,574) |
| 2026 | 22,135 | 117,302 | (95,167) |
| Thereafter | 10,208 | 35,190 | (24,982) |
| Total | $ 127,255 | $ 621,700 | $ (494,445) |

### Actuarial Methods and Assumptions

The actuarial cost method used to measure the total OPEB Plan liability on June 30, 2021, was the individual entry age normal cost method.

## 17. VOLUNTARY TERMINATION BENEFITS

On July 2, 2010, the Commonwealth enacted Act No. 70, established a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. The program was available to eligible employees that have completed between 15 to 29 years of creditable services and provided monthly benefits ranging from 37.5% to 50% of each employees' monthly salary until the employee complies with the requirements of age and 30 years of credited service in the Retirement System. The ERS Pay-Go Plan (previously ERS) is responsible for benefit payments. The employees had until December 31, 2012, to elect to participate in this program. As of June 30, 2021, the Authority's total outstanding liability under this program was approximately $22.6 million, discounted at 1.85%.

On December 28, 2015, the Commonwealth enacted Act. No. 211 of 2015 (Act No. 211), known as the Voluntary Early Retirement Law. Act No. 211 allowed eligible active employees to participate in a voluntarily retirement program if they were hired before April 1990 and have accrued a minimum of twenty years of service. The voluntary program, which was initially adopted during the fiscal year ended June 30, 2017, provided eligible participants with 60% of their average compensation, determined as of December 31, 2015, until the employee attains age sixty-one. As of June 30, 2021, the outstanding balance under Act No. 211 amounted to $9.3 million. The liability under this program was discounted at 1.5%.

The aggregate adjustment for changes in discount rate under Act No. 70 and Act No. 211 during the fiscal year ended June 30, 2021, resulted in a loss of $2.3 million.

HTA_CONF 00013096

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 18. RELATED PARTY TRANSACTIONS

During the fiscal year ended June 30, 2021, operating expenses included approximately $8.1 million of charges from the Puerto Rico Electric Power Authority (PREPA), a component unit of the Commonwealth. Furthermore, the Authority has outstanding debt payable to PREPA from electricity charges amounting to approximately $7.9 million. In addition, during the year ended June 30, 2021, the Authority received charges from the PBA, a component unit of the Commonwealth, building rent amounting to approximately $1 million. During the year ended June 30, 2021, the Authority made the rent payments each month as required.

As of June 30, 2021, the Authority had an amount due from Commonwealth of approximately $59.1 million, of which $39.1 million were collected as of the date of issuance of the financial statements. The amount due from the Commonwealth relates to CAPEX appropriation transfers made to the Authority.

As further discussed in Note 14, the balance of the now terminated GDB lines of credit, was assumed by the GDB DRA. As of June 30, 2021, the Authority has an outstanding balance to GDB DRA of approximately $1,733.7 million plus $900.3 million in accrued interest.

Bonds payable includes $200 million variable rate bonds, purchased by the GDB (as formerly known) from a third party on May 19, 2014, and subsequently assumed by the GDB DRA.

During the year ended June 30, 2021, the Authority used from the Commonwealth capital grant approximately $183.5 million for repair maintenance and resurfacing of certain roads and bridges.

As of June 30, 2021, the Authority had amounts due to other governmental entities for operating leases, utilities, and other agreements of approximately $26.4 million, which are included in accounts payable and accrued liabilities in the accompanying statement of net deficit.

### 19. COMMITMENTS AND CONTINGENT LIABILITIES

#### Construction Commitments

As of June 30, 2021, the Authority had commitments of approximately $248.6 million related to construction contracts.

#### Lease Commitments

The Authority has various operating leases for office space with the PBA. These leases expired in fiscal years 2003 and 2004, and the Authority continues to use the premises on a month-to-month basis. During the fiscal year ended June 30, 2021, the total aggregate amount of rental expense recorded by the Authority on these contracts was approximately $1 million.

#### Legal Contingencies

1. Pending Key Litigation Filed Prior to Commencement of Title III Cases Related to the Authority

The Authority is defendant or co-defendant in various lawsuits for alleged damages in cases principally related to construction projects. The contractors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction of the projects.

HTA_CONF 00013097

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**19. COMMITMENTS AND CONTINGENT LIABILITIES (CONTINUED)**

2. *Ambac Assurance Corporation v. Puerto Rico Highways and Transportation Authority*, Case No. 16-cv-1893 (D.P.R.)

Ambac filed two claims against the Authority claiming (i) breaches in fiduciary duties, and (ii) breaches in contractual obligations. On May 16, 2016, plaintiff filed an amended complaint. On July 1, 2016, the Authority filed a motion to stay the proceeding, which the United States District Court for the District of Puerto Rico (the District Court) granted on August 23, 2016. On May 23, 2017, the Puerto Rico Department of Justice filed a notice of stay under PROMESA Title III. On May 24, 2017, the District Court entered an order confirming the stay.  As of the date of issuance of the financial statements, there has been no further docket activity.

3. *Scotiabank de Puerto Rico, et al. v. Garcia-Padilla, et al.*, Case No. 16-cv-2736 (D.P.R.)

Plaintiffs filed suit against various government parties, including the Authority, claiming that the Moratorium Act and executive orders issued pursuant to the Moratorium Act violate PROMESA, the United States Constitution, and the Puerto Rico Constitution. On September 10, 2017, plaintiffs filed their amended complaint. On November 11, 2016, defendants filed a motion to stay the proceedings. On December 16, 2016, defendants filed a motion to dismiss. On January 31, 2017, plaintiffs filed an opposition to defendants' motion. That motion is pending. On May 16, 2017, the Puerto Rico Department of Justice filed a notice of stay under PROMESA Title III. On May 17, 2017, the District Court entered an order confirming the stay. As of the date of issuance of the financial statements, there has been no further docket activity.

4. *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority*, Case No. 17-cv-01612 (D.P.R. May 9, 2017)

On May 9, 2017, Peaje Investments LLC filed a complaint for declaratory judgment and injunctive relief challenging the Authority's use of total toll revenues. On May 22, 2017, the Oversight Board filed a notice of stay under PROMESA Title III, which the Court granted on May 23, 2017. As of the date of issuance of the financial statements, there has been no further docket activity.

**Key Civil Actions Filed Against, or Relating to, the Authority After the Commencement of the Title III Case**

    1.  The following civil actions were resolved pursuant to the Commonwealth Plan of Adjustment:

        a.  Peaje Investments LLC v. Puerto rico Highways & Transportation Authority, et. Al., Case Nos. 17-151-LTS

        b.  The Authority Bondholder Lift Stay Motion, Case No. 17-3283-LTS (D.P.R. Jan 16, 2020).

        c.  The Fin. Oversight & Mgmnt. Bd. For Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Ambac Assurance Corp., et al., Adv. Pro. No. 20-00005-LTS (D.P.R. Jan. 16, 2020)

        d.  The Fin. Oversight & Mgmt. Bd. for Puerto Rico, as Representative of Puerto Rico Highways and Transportation Authority, et al. v. Ambac Assurance Corp., et al., Adv. Pro. No. 20-00007-LTS (D.P.R. Jan. 16, 2020)

        e.  Monoline Insurers' Motion for Appointment as Co-Trustees to Pursue Avoidance Actions, Case No. 17-3283-LTS (D.P.R. July 17, 2020)

        f.  Motion Pursuant to Bankruptcy Code Sections 105(a) and 362 for Order Directing Ambac Assurance Corporation to Withdraw Complaint, Case No. 17-3283-LTS (D.P.R. Mar. 31, 2020)

HTA_CONF 00013098

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

**19. COMMITMENTS AND CONTINGENT LIABILITIES (CONTINUED)**

2. Title III Claims

The deadline by which all creditors were required to file their proofs of claim against the Authority under its Title III case was June 29, 2018. Approximately 2,290 claims were filed against the Authority in the total aggregate asserted amount of approximately $83.1 billion. Of this amount, approximately 1,255 claims in the total aggregate asserted amount of approximately $6.8 billion have been withdrawn or expunged by an omnibus objection order entered by the Title III Court. As a result, approximately 870 claims in the total aggregate asserted amount of approximately $76.2 billion remain outstanding (excluding claims pending objection, marked for future objection, or transferred or waiting to be transferred into Administrative Claims Reconciliation). The validity of these remaining claims has not yet been determined and such claims remain subject to the claims reconciliation process.

**Contingent Liabilities Summary**

As of June 30, 2021, the Authority, based on legal advice, has recorded a liability of approximately $66.3 million for probable losses on those claims not fully covered by insurance. Outstanding legal liability is composed of $19.7 million of legal cases related to construction projects and other operating matters and $46.5 million related to expropriation and related costs. However, due to the estimation process, the amount accrued may change in the near term. Most of these losses may be treated as unsecured claims in the Authority's Title III case. Other claims against the Authority are principally related to the non-payment of the Authority's bonds and other long-term obligations that are fully recorded in the financial statements of the Authority, including accrued interest. These liabilities are expected to be negotiated under the Authority's reorganization under PROMESA Title III; accordingly, no further accrual is necessary.

The Authority is also a defendant in several other lawsuits filed by different contractors for alleged breach of contracts. These Authority's contractors allege, among other things, for administrative construction claims, as a consequence of the executive orders of the Governor of Puerto Rico that decreed a government shutdown from of March to May 2020. The contractors have sent notices for claims for contractual damages, particularly extended overhead. Based on the advice of counsel, the Authority believes that those claims are completely without merit and will vigorously defend its position. Accordingly, no accrual for losses, if any, have been recorded in the basic financial statements.

**Federal Assistance Programs**

The Authority participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of Title 2 U.S. Code of Federal Regulations Part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, or to compliance audits by grantor agencies.

On March 31, 2014, FHWA approved $756.4 million in toll credits that may be applied toward the non-federal matching share of transit projects. These toll credits will remain available until used. Since inception, only $166 million in toll credits have been claimed, and there was an outstanding balance of $590.3 million for future federally aided projects as of June 30, 2021. The toll credits balance is updated by the Authority's Budget Unit based on FHWA's approval. During the year ended June 30, 2021, the Authority used $20.6 million in toll credits.

HTA_CONF 00013099

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 20. OPERATION AND MAINTENANCE OF URBAN TRAIN AND OTHER TRANSPORTATION SYSTEMS

Effective on July 1, 2017, the Authority entered into a new contract with ACI-Herzog for the purpose of operating and maintaining the Urban Train. This contract expires on June 30, 2032, with an option to extend the term for an additional two periods of not less than 5 years, as long as the entire term does not exceed 25 years. The total annual operation and maintenance cost, for the fiscal year ended June 30, 2021, was approximately $51.5 million, including the base fee under the contract. The Authority is committed to the payment of the base fees through the remaining life of the contract.

The Authority contracted First Transit of Puerto Rico, Inc. (First Transit) to operate the service known as Metrobus I, which consists of two express routes (Metrobus Route I) and Metrobus-Expreso, that provide service between the University of Puerto Rico and Old San Juan. The service is provided seven days a week using 24 buses owned by First Transit. The existing service agreement with First Transit expired on June 30, 2015 and was extended to June 30, 2022. The total aggregate expense amount under this contract was $7.5 million for the fiscal year ended June 30, 2021.

## 21. OTHER OPERATING INCOME

For the year ended June 30, 2021, other operating income includes:

| | | |
|---|---:|---:|
| Teodoro Moscoso revenues | $ | 1,886,596 |
| Rental income | | 1,503,917 |
| Electronic toll revenues and label sales | | 1,419,760 |
| Urban train revenues | | 1,117,165 |
| Impact fee | | 851,868 |
| Metrobus fare fees | | 200,351 |
| Other | | 602,732 |
| Total | $ | 7,582,389 |

## 22. RESTATEMENT OF PRIOR YEAR NET DEFICIT

### Pension Expense

On January 22, 2022, ERS's GASB Statement No. 73 Pension Expense report for the reporting period June 30, 2020 was issued, which date was subsequent to the Authority's issuance of the 2020 financial statements. As a result, the Authority recorded an adjustment of $7.9 million to the beginning net deficit as of July 1, 2020, to recognize pension transactions for the year ended June 30, 2020.

-63-

HTA_CONF 00013100

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 22. RESTATEMENT OF PRIOR YEAR NET DEFICIT (Continued)

### Other Post-Employment Benefits (OPEB)

The Authority adjusted its OPEB liabilities to recognize the Authority's proportional share of the health plan benefit provided by the ERS MIPC under GASB Statement No. 75 which had not been previously recognized.

The Authority's beginning net deficit was changed as follows:

| | |
|---|---:|
| Net deficit, at beginning of fiscal year as previously reported | $ (386,375,208) |
| Prior period adjustments: | |
| Total pension liability under GASB Statement No. 73 | 7,940,133 |
| Total other post emloyment benefits GASB Statement No. 75 | (15,936,861) |
| Total prior period adjustments | (7,996,728) |
| Net deficit, at beginning of fiscal year, as restated | $ (394,371,936) |

## 23. COVID-19 PANDEMIC

Since China first alerted the World Health Organization ("WHO") of flu-like cases in Wuhan on December 31, 2019, the global community is experiencing an unprecedented health crisis caused by a novel coronavirus known as COVID-19, which can cause several severe symptoms including fever, cough, shortness of breath, and even death in extreme cases. On March 15, 2020, then Governor Wanda Vázquez Garced signed Executive Order No. OE-2020-023, which directed the closure of all non-essential businesses in Puerto Rico. Thereafter, to the date of these financial statements were issued, new Executive Orders have been issued. With respect to the Authority, substantial closure of operations remained in place for under two months. Thereafter, construction and maintenance work began, as contractors rescheduled the work in progress, and administrative employees began working under a hybrid schedule until May 24, 2021, when all employees were required to return to their workspace on a full-time basis, with proof of vaccination with certain exceptions. At the island-wide level, limited restrictions remain in public places, while vaccinations had already reached over 70% of the eligible population. As of the date these financial statements were issued, there was a marked decrease in persons getting infected or requiring hospitalization. However, the long-term effect of the pandemic is still difficult to predict.

## 24. SUBSEQUENT EVENTS

The Authority evaluated its subsequent events until March 30, 2022, the date on which the financial statements were ready for issuance. The Authority's management understands that no other material events occurred subsequent to June 30, 2021, that require to be disclosed in the financial statements, except as mentioned below. The Authority has determined that these events are non-adjusting subsequent events. Accordingly, the financial deficit and results of operations as of and for the year ended June 30, 2021, have not been adjusted to reflect their impact.

HTA_CONF 00013101

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

### 24. SUBSEQUENT EVENTS (Continued)

#### Bond Payment Defaults

Without the taxes and other revenues conditionally allocated by the Commonwealth as explained in Note 4, the Authority has been unable to make the scheduled payments on its outstanding bonds as explained below:

| Fiscal Year Ended June 30, | Total defaults still outstanding | | Subrogated monoline insurance company payments | | Total defaults not subrogated by insurance | |
|---|---|---|---|---|---|---|
| **2022** | | | | | | |
| Principal | $ | 145,493,895 | $ | 50,820,000 | $ | 94,673,895 |
| Interest | | 181,882,019 | | 86,707,190 | | 95,174,829 |
| **Total** | $ | 327,375,914 | $ | 137,527,190 | $ | 189,848,724 |

#### Status of Federal Disaster Relief Funds

The Commonwealth continues to coordinate relief and funding efforts to address the natural disasters that have affected Puerto Rico in recent years, including the continued recovery following Hurricanes Irma and Maria and the earthquakes that impacted (and continue to impact) the southern and southwestern part of Puerto Rico. As of March 24, 2022, approximately $78.5 billion has been appropriated by the United States Congress to Puerto Rico for disaster relief and recovery efforts. Of this amount, approximately $65.7 billion has been committed by federal agencies for distribution and $22.9 billion has been disbursed. Of the amounts obligated and disbursed, Federal Emergency Management Agency (FEMA) has approved approximately $37.6 billion and disbursed approximately $14.9 billion of the total amounts detailed above. The use of these funds is detailed by the Commonwealth on the COR3 website and can be accessed: https:\\recovery.pr\en.

#### Federal Funds held in GDB

The Authority became aware upon the fact that some of the Authority's funds that became impaired due to the insolvency of the GDB were actually federal funds. The GDB's restructuring under Title VI was specifically structured to not impair federal funds. In addition, the Confirmation Order, as issued by the court, confirms that no such funds were impaired, so the offset should not have legally been deemed not to apply to these federal funds and as a result, they should be restored. The Authority, with the support of FHWA, is actively seeking restitution of these deposits from the Commonwealth. The amounts of federal funding to be restituted amount to approximately $16 million. The recognition of this contingent gain will be recognized upon realization.

#### Confirmation of the Commonwealth Plan of Adjustment

On July 30, 2021, the Oversight Board—as representative to the Commonwealth, ERS, and PBA in their respective Title III cases—filed its Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. [ECF No. 17629] (the Seventh Amended Plan) and a corrected disclosure statement related thereto [ECF No. 17628] (the Seventh Amended Disclosure Statement).

On November 3, 2021, the Oversight Board filed its Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. [ECF No. 19053] (the Eighth Amended Plan), which further revised the Seventh Amended Plan to eliminate monthly pension cut provisions, among other things.

HTA_CONF 00013102

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 24. SUBSEQUENT EVENTS (Continued)

The hearing to consider confirmation of the Eighth Amended Plan commenced on November 8, 2021 and concluded on November 23, 2021. The final modified version of the Eighth Amended Plan was filed on January 14, 2022 [ECF No. 19813-1] (the Commonwealth Plan of Adjustment).

On January 18, 2022, the Title III Court entered its findings of fact and conclusions of law in connection with the Commonwealth Plan of Adjustment [ECF No. 19812] (the Findings of Fact) and an order confirming the Commonwealth Plan of Adjustment [ECF No. 19813] (the Commonwealth Confirmation Order). On March 15, 2022 (the Effective Date), the conditions precedent to the Effective Date of the Commonwealth Plan of Adjustment were satisfied and/or waived by the Oversight Board, and the plan became effective. Accordingly, the Commonwealth Plan of Adjustment has been confirmed and is currently effective as of the date hereof.

As of the Effective Date, the Commonwealth Plan of Adjustment reduced the Commonwealth's total debt from approximately $34.3 billion of prepetition debt to only approximately $7.4 billion, representing a total debt reduction of 78%. This debt reduction will also reduce the Commonwealth's maximum annual debt service (inclusive of COFINA) from approximately $4.2 billion to $1.15 billion, representing a total debt service reduction of 73%. Also as of the Effective Date, all of the legacy Commonwealth general obligation bonds, ERS bonds, and PBA bonds were discharged, and all of the Commonwealth, ERS, and PBA obligations and guarantees related thereto were discharged. In addition, all Commonwealth laws that required the transfer of funds from the Commonwealth to other entities are deemed preempted, and the Commonwealth has no obligation to transfer additional amounts pursuant to those laws. Importantly, executing the Commonwealth Plan of Adjustment provides an opportunity for Puerto Rico to access the credit markets and develop balanced annual budgets.

A critical component of the Commonwealth Plan of Adjustment is the post-Effective Date issuance of new general obligation bonds (the New GO Bonds) and contingent value instruments (CVIs) that provides recoveries to GO and PBA bondholders, as well as holders of clawback claims against the Commonwealth, including the Authority bondholders and the GDB DRA.

Municipal governments typically issue amortizing debt—i.e., debt with principal maturities due on a regularly scheduled basis over a duration that varies generally between 20 and 40 years. The Commonwealth's New GO Bonds will mature over 25 years and will include both Capital Appreciation Bonds (CABs) and Current Interest Bonds (CIBs). All of the CABs and CIBs will have term bonds with mandatory sinking fund payments. This is intended to optimize cash available to pay debt service since the municipal market has a yield curve, and bonds are not priced to the average life as is the case in other markets, because specific investors may purchase bonds in differing parts of the maturity curve, including individual investors, corporations and mutual funds.

The New GO Bonds were issued with an aggregate original principal amount of approximately $7.4 billion, consisting of approximately (i) $6.6 billion of New GO CIBs, (ii) $442.5 million of New GO CABs with a 5.375% interest rate, and (iii) $288.2 million of New GO CABs with a 5.0% interest rate. They have 11 different maturity dates and will be secured by (a) a statutory first lien, (b) a pledge of the amounts on deposit in the Debt Service Fund, and (c) a pledge of the Commonwealth's full faith, credit and taxing power in accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable Puerto Rico law. The New GO Bonds are dated as of, and will accrue or accrete interest from March 15, 2022, which is the Commonwealth Plan of Adjustment's Effective Date.

The Commonwealth Plan of Adjustment also provides for the issuance of CVIs, an instrument that gives a holder the right to receive payments in the event that certain triggers are met. The Commonwealth Plan of Adjustment establishes revenue-based performance benchmarks and permits the holders of CVIs to receive payments on account of the CVIs only if the benchmarks are exceeded. The CVIs issued under the Eighth

HTA_CONF 00013103

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 24. SUBSEQUENT EVENTS (Continued)

Amended Plan are based on over-performance collections of the Commonwealth's 5.5% sales and use tax (SUT), with some CVIs also being subject to over-performance collections of rum tax. The CVIs represent a conditional promise by the Commonwealth to pay CVI holders only if the SUT or rum tax baselines are exceeded in a given fiscal year. The outperformance metric will be measured as of the end of each fiscal year (i.e., June 30) beginning in fiscal year 2022 and is based on a SUT and rum tax collections baselines for fiscal years 2022 to 2043 as established in the Board-certified fiscal plan for the Commonwealth, dated May 27, 2020. As with the New GO Bonds, the Commonwealth pledged its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the CVIs. The CVIs will be deemed issued on July 1, 2021.

The CVIs are also divided into two categories: (i) GO CVIs and (ii) Clawback CVIs. The GO CVIs will be allocated to various GO bondholder claims and the Clawback CVIs will be allocated to claims related to the Authority, CCDA, PRIFA, and MBA bonds. The GO CVIs have a 22-year term. The Clawback CVIs have a 30-year term. The GO CVIs are subject to a lifetime cap of $3.5 billion, with maximum annual payments of $200 million plus any unused amounts from previous years subject to cumulative annual payments not exceeding $400 million. Similarly, the Clawback CVIs are subject to a $5.2 billion aggregate lifetime cap, allocated across the different types of bond claims, with maximum annual payments of (i) $175 million plus any unused amounts from previous years, not to exceed cumulative annual payments of $350 million, for fiscal years 1-22 of the 30-year term; and (ii) $375 million plus any unused amounts from previous years, not to exceed cumulative annual payments of $750 million, for fiscal years 23-30 of the 30-year term. The CVIs also apply an annual payment waterfall in which the first $100 million will be paid to GO CVIs and the next $11,111,111 will be paid to Clawback CVIs.

The Commonwealth Plan of Adjustment classifies claims into 69 classes, with each receiving the following aggregate recoveries:

- Various categories of Commonwealth Bond Claims (Classes 15-50): 73% recovery consisting of cash, New GO Bonds, and GO CVIs.

- Various categories of PBA Bond Claims (Classes 1-12, 14): 79% recovery in cash in addition to the New GO Bonds and GO CVIs that PBA bondholders receive on account of their CW Guarantee Claims.

- Various categories of clawback creditor claims (Classes 59-63): 23% recovery consisting of the Clawback CVIs.

- ERS Bond Claims (Class 65): 16% recovery consisting of cash and interests in the ERS Private Equity Portfolio.

- Various categories of General Unsecured Claims (Classes 13, 58, and 66): 21% recovery in cash.

- Other miscellaneous claims (Classes 52-57, 64, 67-69): 26% recovery in cash.

The Commonwealth Plan of Adjustment preserves all accrued pension benefits for active and retired public employees under Class 51. However, JRS and TRS participants will be subject to benefits freeze and the elimination of any cost of living adjustments previously authorized under the JRS and TRS pension plans.

HTA_CONF 00013104

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (Continued)

Year Ended June 30, 2021

## 24. SUBSEQUENT EVENTS (Continued)

For further information, refer to the final versions of the Commonwealth Plan of Adjustment, Findings of Fact, and Confirmation Order, which are available at https://cases.primeclerk.com/puertorico/Home-DocketInfo.

**The HTA/CCDA Plan Support Agreement and Proposed HTA Plan of Adjustment**

On May 5, 2021, the Oversight Board, as representative of the Commonwealth and the Authority in their Title III Cases, entered into the HTA/CCDA PSA with certain holders of in excess of $2 billion of claims against the Authority, including more than 85% of HTA 1968 Bonds and nearly 50% of HTA 1998 Senior Bonds, which include traditional municipal investors and monoline bond insurers Assured Guaranty Corp. and National Public Finance Guarantee Corporation, on the framework for the Commonwealth Plan of Adjustment and an HTA Plan of Adjustment to resolve, among other things, asserted "clawback claims" against the Commonwealth and the issuance of certain contingent value instruments based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax relative to projections in the Commonwealth's certified fiscal plan, as explained further in the HTA/CCDA PSA. As of the date these financial statements were issued, changes continued to be made to the PSA. The latest change is dated July 30, 2021.

The HTA/CCDA PSA and the Commonwealth Plan of Adjustment provide that, among other things, that within 10 business days after the satisfaction of certain "HTA Distribution Conditions," including agreement on the terms of the HTA Plan of Adjustment, the Authority must make cash payments in the total aggregate amount of $264 million to holders of HTA bonds, as follows: (i) $184.8 million to holders of HTA 68 Bonds; and (ii) $79.2 million to holders of HTA 98 Senior Bonds. In addition, the HTA/CCDA PSA requires the Authority to pay certain creditor parties an HTA Restriction Fee in exchange for their execution of the HTA/CCDA PSA in an amount not to exceed $125 million, less any Consummation Costs (as defined in the HTA/CCDA PSA). The HTA Plan of Adjustment has not yet been filed and remains subject to confirmation by the Court.

On February 22, 2022, the Oversight Board certified its fiscal plan for the Authority, which provides that the Commonwealth will provide the Authority with a one-time loan to the Authority for fiscal year 2022 in the amount of $314 million to implement the Authority's cash payment obligations under the Commonwealth Plan of Adjustment and additional payments under the HTA/CCDA PSA that will be implemented as part of the HTA Plan of Adjustment. The Authority will also use funds held by the trustee for those purposes, as required. The Oversight Board also certified a modified General Budget of Expenses of the Government of Puerto Rico for Fiscal Year 2022 on February 21, 2022 that, among other things, authorized the Secretary of Treasury to make one or more loans to the Authority to satisfy the Authority's payment obligations under the Commonwealth Plan of Adjustment and Commonwealth Confirmation Order. As of the date hereof, the Oversight Board, Commonwealth, and the Authority are currently negotiating the terms of a $314 million loan from the Commonwealth to the Authority for the cash payment obligations of the Authority under the Commonwealth Plan of Adjustment and the HTA Plan of Adjustment. In addition, the Board is currently negotiating and finalizing the terms of an HTA Plan of Adjustment that has not yet been filed with the Title III Court but is expected to be filed soon so that it can be confirmed before the end of calendar year 2022.

HTA_CONF 00013105

**REQUIRED SUPPLEMENTARY INFORMATION**

HTA_CONF 00013106

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Changes in the Authority's Total Postemployment
Benefits other than Pensions (OPEB Plan) Liability and Related Ratios (Unaudited)

June 30, 2021

| Total OPEB liability (Reporting Date) | 2021 | 2020 | 2019 |
|---|---|---|---|
| Service Cost at end of year | $ 85,610 | $ 117,660 | $ 114,893 |
| Interest | 64,351 | 90,625 | 91,351 |
| Difference between expected and actual experience | 2,213 | (856,304) | - |
| Changes of assumptions | 32,050 | 81,655 | 62,199 |
| Benefit payments | (79,850) | (256,598) | (35,231) |
| Net change in total OPEB liability | 104,374 | (822,962) | 233,212 |
| Total OPEB liability - beginning | 2,346,428 | 3,169,390 | 2,936,178 |
| Total OPEB liability - ending | $ 2,450,802 | $ 2,346,428 | $ 3,169,390 |
| Covered-employee payroll | $ 27,658,668 | $ 29,432,004 | $ 39,777,324 |
| Total OPEB Liability as a percentage of covered employee payroll | 8.86% | 7.97% | 7.97% |

**Note to schedule:**

The Authority's total OPEB liability as of June 30, 2021, was measured on June 30, 2019 (measurement date), by an actuarial valuation as of that date for the reporting period June 30, 2021.

This Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

-69-

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Changes in the Commonwealth's Total Postemployment
Benefits other than Pensions (ERS MIPC OPEB Plan) Liability and Related Ratios (Unaudited)
($ in Thousands)

June 30, 2021

| Total OPEB liability (Reporting Date) | 2020 | 2019 | 2018 |
|---|---|---|---|
| | | ($ in Thousands) | |
| Service Cost at end of year | $ - | $ - | $ - |
| Interest | 36,210 | 36,770 | 37,891 |
| Effect of economic/demographic gains or (losses) | 6,082 | (18,937) | (13,832) |
| Effect of assumption changes or inputs | 26,337 | (28,381) | (240,535) |
| Benefit payments | (80,341) | (81,511) | (90,417) |
| **Net change in total OPEB liability** | (11,712) | (92,059) | (306,893) |
| **Total OPEB liability - beginning** | 975,433 | 1,067,492 | 1,374,385 |
| **Total OPEB liability - ending** | $ 963,721 | $ 975,433 | $ 1,067,492 |
| **Covered-employee payroll** | N/A | N/A | N/A |
| **Total OPEB Liability as a percentage of covered employee payroll** | N/A | N/A | N/A |

**Note to schedule:**

The Commonwealth's total OPEB liability as of June 30, 2020, was measured on June 30, 2018 (measurement date), by an actuarial valuation as of that date for the reporting period June 30, 2020.

Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

HTA_CONF 00013108

**Exhibit I**

ILLUSTRATIVE CHARTS OF BOND RECOVERY DISTRIBUTIONS

*The following charts are provided for illustrative purposes only and are not intended to guarantee any level of recovery or distribution. Distributions on account of an Allowed Claim are subject in all respects to the terms and provisions of the HTA Plan.*

HTA_CONF 00013109

**Illustrative Example of $100,000 Claim Amount of "HTA 68 Bond Claims" Bond Recovery Category**

### CONSIDERATION SUMMARY

**Assumed Holdings**

| | |
|---|---|
| Bond Recovery Category | HTA 68 Bond Claims |
| Classes Included in Bond Recovery Category | 1 to 4 |
| Illustrative Holder Amount of Claim(1) | $100,000 |
| Total Claims in Bond Recovery Category | $831,189,106 |

**Recovery in Cash and Bond Consideration**

| | Consideration for Bond Recovery Category | Illustrative Holder(1) |
|---|---|---|
| Cash | $184,800,000.00 | $22,233.20 |
| Current Interest Bonds | 311,512,822.17 | 37,477.00 |
| Capital Appreciation Bonds (CABs) (Initial Principal) | 123,543,840.05 | 14,863.13 |
| Convertible Capital Appreciation Bonds (CCABs) (Initial Principal) | 211,332,685.56 | 25,425.07 |
| **Total Cash and Bond Consideration** | **$831,189,347.78** | **$99,998.39** |
| CVI (Lifetime Cap) | 179,462,539.00 | 21,591.00 |

**Bonds Received**

| | Current Interest Bonds | | | CABs & CCABs | | | | |
|---|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Principal | Tax Status | Yield | Cash Rate | Initial Principal | Accreted Interest | Accreted Value at Redemption |
| 7/1/2032 | | | | 5.000% | | 14,863.13 | 6,052.59 | 20,916 |
| 7/1/2053 | | | | 5.000% | 5.000% | 25,425.07 | 16,236.91 | 41,661.98 |
| 7/1/2062 | 5.000% | 37,477.00 | Tax-Exempt | | | | | |

**Cash Flows(2)**

| | Current Interest Bonds | | CABs | | CCABs | | | Total |
|---|---|---|---|---|---|---|---|---|
| | Tax-Exempt | | Initial | Accreted | Initial | Accreted | Cash | |
| Maturity | Principal | Cash Interest | Principal | Interest | Principal | Interest | Interest | Cash Flow |
| Cash | | | | | | | | $22,233.20 |
| 7/1/2023 | – | 1,873.85 | – | – | – | – | – | 1,873.85 |
| 7/1/2024 | – | 1,873.85 | – | – | – | – | – | 1,873.85 |
| 7/1/2025 | – | 1,873.85 | 1,579.63 | 252.24 | – | – | – | 3,705.72 |
| 7/1/2026 | – | 1,873.85 | 1,393.57 | 304.35 | – | – | – | 3,571.77 |
| 7/1/2027 | – | 1,873.85 | 1,566.75 | 438.80 | – | – | – | 3,879.40 |
| 7/1/2028 | – | 1,873.85 | 1,799.99 | 620.79 | – | – | – | 4,294.63 |
| 7/1/2029 | – | 1,873.85 | 2,220.10 | 916.82 | – | – | – | 5,010.77 |
| 7/1/2030 | – | 1,873.85 | 2,205.57 | 1,068.62 | – | – | – | 5,148.04 |
| 7/1/2031 | – | 1,873.85 | 2,099.34 | 1,174.90 | – | – | – | 5,148.09 |
| 7/1/2032 | – | 1,873.85 | 1,998.18 | 1,276.07 | – | – | – | 5,148.10 |
| 7/1/2033 | – | 1,873.85 | – | – | 726.93 | 464.23 | 2,083.10 | 5,148.11 |
| 7/1/2034 | – | 1,873.85 | – | – | 763.30 | 487.45 | 2,023.54 | 5,148.14 |
| 7/1/2035 | – | 1,873.85 | – | – | 801.45 | 511.83 | 1,961.00 | 5,148.13 |
| 7/1/2036 | – | 1,873.85 | – | – | 841.52 | 537.40 | 1,895.34 | 5,148.11 |
| 7/1/2037 | – | 1,873.85 | – | – | 883.60 | 564.28 | 1,826.39 | 5,148.12 |
| 7/1/2038 | – | 1,873.85 | – | – | 927.78 | 592.50 | 1,754.00 | 5,148.13 |
| 7/1/2039 | – | 1,873.85 | – | – | 974.17 | 622.12 | 1,677.99 | 5,148.13 |
| 7/1/2040 | – | 1,873.85 | – | – | 1,022.89 | 653.23 | 1,598.17 | 5,148.14 |
| 7/1/2041 | – | 1,873.85 | – | – | 1,074.04 | 685.91 | 1,514.37 | 5,148.17 |
| 7/1/2042 | – | 1,873.85 | – | – | 1,127.75 | 720.21 | 1,426.37 | 5,148.18 |
| 7/1/2043 | – | 1,873.85 | – | – | 1,184.13 | 756.21 | 1,333.97 | 5,148.16 |
| 7/1/2044 | – | 1,873.85 | – | – | 1,243.33 | 794.01 | 1,236.95 | 5,148.14 |
| 7/1/2045 | – | 1,873.85 | – | – | 1,305.50 | 833.72 | 1,135.09 | 5,148.16 |
| 7/1/2046 | – | 1,873.85 | – | – | 1,370.76 | 875.40 | 1,028.12 | 5,148.13 |
| 7/1/2047 | – | 1,873.85 | – | – | 1,439.30 | 919.16 | 915.82 | 5,148.13 |
| 7/1/2048 | – | 1,873.85 | – | – | 1,511.27 | 965.12 | 797.89 | 5,148.13 |
| 7/1/2049 | – | 1,873.85 | – | – | 1,586.82 | 1,013.37 | 674.07 | 5,148.11 |
| 7/1/2050 | – | 1,873.85 | – | – | 1,666.18 | 1,064.06 | 544.06 | 5,148.15 |
| 7/1/2051 | – | 1,873.85 | – | – | 1,749.47 | 1,117.25 | 407.55 | 5,148.12 |
| 7/1/2052 | – | 1,873.85 | – | – | 1,836.97 | 1,173.10 | 264.22 | 5,148.14 |
| 7/1/2053 | 886.33 | 1,873.85 | – | – | 1,387.91 | 886.35 | 113.71 | 5,148.15 |
| 7/1/2054 | 3,318.28 | 1,829.53 | – | – | – | – | – | 5,147.81 |
| 7/1/2055 | 3,484.42 | 1,663.62 | – | – | – | – | – | 5,148.04 |
| 7/1/2056 | 3,658.69 | 1,489.40 | – | – | – | – | – | 5,148.09 |
| 7/1/2057 | 3,841.39 | 1,306.47 | – | – | – | – | – | 5,147.86 |
| 7/1/2058 | 4,033.46 | 1,114.40 | – | – | – | – | – | 5,147.86 |
| 7/1/2059 | 4,235.21 | 912.73 | – | – | – | – | – | 5,147.94 |
| 7/1/2060 | 4,446.96 | 700.97 | – | – | – | – | – | 5,147.93 |
| 7/1/2061 | 4,669.32 | 478.62 | – | – | – | – | – | 5,147.94 |
| 7/1/2062 | 4,902.94 | 245.15 | – | – | – | – | – | 5,148.09 |
| **Total** | **$37,477.00** | **$67,830.24** | **$14,863.13** | **$6,052.59** | **$25,425.07** | **$16,236.91** | **$26,211.73** | **$216,329.86** |

Note: Distributions are for illustrative purposes only and do not take into account dollar-denominations on sinking fund payments.
   (1)    Reflects recovery to an illustrative holder of $100,000 of claim in bond recovery category.
   (2)    Cash flows do not include potential payments on account of Clawback CVI.

**Illustrative Example of $100,000 Claim Amount of "HTA 98 Senior Bond Claims" Bond Recovery Category**

*CONSIDERATION SUMMARY*

**Assumed Holdings**

| | |
|---|---|
| Bond Recovery Category | HTA 98 Senior Bond Claims |
| Classes Included in Bond Recovery Category | 5 to 9 |
| Illustrative Holder Amount of Claim[1] | $100,000 |
| Total Claims in Bond Recovery Category | $3,129,667,977 |

**Recovery in Cash and Bond Consideration**

| | Consideration for Bond Recovery Category | Illustrative Holder[1] |
|---|---|---|
| Cash | $79,200,000.00 | $2,530.61 |
| Current Interest Bonds | 288,487,177.83 | 9,217.00 |
| Capital Appreciation Bonds (CABs) (Initial Principal) | 114,412,028.08 | 3,655.52 |
| Convertible Capital Appreciation Bonds (CCABs) (Initial Principal) | 195,711,912.01 | 6,253.44 |
| **Total Cash and Bond Consideration** | **$677,811,117.92** | **$21,656.56** |
| CVI (Lifetime Cap) | 1,833,405,578.00 | 58,581.00 |

**Bonds Received**

| | Current Interest Bonds | | | CABs & CCABs | | | | |
|---|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Principal | Tax Status | Yield | Cash Rate | Initial Principal | Accreted Interest | Accreted Value at Redemption |
| 7/1/2032 | | | | 5.000% | | 3,655.52 | 1,488.61 | 5,144 |
| 7/1/2053 | | | | 5.000% | 5.000% | 6,253.44 | 3,993.56 | 10,247.00 |
| 7/1/2062 | 5.000% | 9,217.00 | Tax-Exempt | | | | | |

**Cash Flows[2]**

| | Current Interest Bonds | | CABs | | CCABs | | | Total |
|---|---|---|---|---|---|---|---|---|
| | Tax-Exempt | | Initial | Accreted | Initial | Accreted | Cash | |
| Maturity | Principal | Cash Interest | Principal | Interest | Principal | Interest | Interest | Cash Flow |
| Cash | | | | | | | | $2,530.61 |
| 7/1/2023 | – | 460.85 | – | – | – | – | – | 460.85 |
| 7/1/2024 | – | 460.85 | – | – | – | – | – | 460.85 |
| 7/1/2025 | – | 460.85 | 388.50 | 62.04 | – | – | – | 911.39 |
| 7/1/2026 | – | 460.85 | 342.74 | 74.86 | – | – | – | 878.45 |
| 7/1/2027 | – | 460.85 | 385.33 | 107.93 | – | – | – | 954.11 |
| 7/1/2028 | – | 460.85 | 442.70 | 152.68 | – | – | – | 1,056.23 |
| 7/1/2029 | – | 460.85 | 546.02 | 225.49 | – | – | – | 1,232.36 |
| 7/1/2030 | – | 460.85 | 542.45 | 262.82 | – | – | – | 1,266.12 |
| 7/1/2031 | – | 460.85 | 516.32 | 288.96 | – | – | – | 1,266.13 |
| 7/1/2032 | – | 460.85 | 491.46 | 313.83 | – | – | – | 1,266.14 |
| 7/1/2033 | – | 460.85 | – | – | 178.79 | 114.18 | 512.35 | 1,266.17 |
| 7/1/2034 | – | 460.85 | – | – | 187.74 | 119.89 | 497.70 | 1,266.18 |
| 7/1/2035 | – | 460.85 | – | – | 197.12 | 125.89 | 482.32 | 1,266.18 |
| 7/1/2036 | – | 460.85 | – | – | 206.98 | 132.17 | 466.17 | 1,266.17 |
| 7/1/2037 | – | 460.85 | – | – | 217.33 | 138.78 | 449.21 | 1,266.17 |
| 7/1/2038 | – | 460.85 | – | – | 228.19 | 145.73 | 431.41 | 1,266.18 |
| 7/1/2039 | – | 460.85 | – | – | 239.60 | 153.02 | 412.71 | 1,266.18 |
| 7/1/2040 | – | 460.85 | – | – | 251.58 | 160.67 | 393.08 | 1,266.18 |
| 7/1/2041 | – | 460.85 | – | – | 264.17 | 168.70 | 372.47 | 1,266.19 |
| 7/1/2042 | – | 460.85 | – | – | 277.38 | 177.14 | 350.82 | 1,266.19 |
| 7/1/2043 | – | 460.85 | – | – | 291.24 | 186.00 | 328.10 | 1,266.19 |
| 7/1/2044 | – | 460.85 | – | – | 305.80 | 195.30 | 304.24 | 1,266.19 |
| 7/1/2045 | – | 460.85 | – | – | 321.10 | 205.05 | 279.18 | 1,266.18 |
| 7/1/2046 | – | 460.85 | – | – | 337.15 | 215.30 | 252.87 | 1,266.17 |
| 7/1/2047 | – | 460.85 | – | – | 354.01 | 226.08 | 225.25 | 1,266.18 |
| 7/1/2048 | – | 460.85 | – | – | 371.70 | 237.38 | 196.25 | 1,266.18 |
| 7/1/2049 | – | 460.85 | – | – | 390.29 | 249.24 | 165.79 | 1,266.17 |
| 7/1/2050 | – | 460.85 | – | – | 409.81 | 261.71 | 133.82 | 1,266.19 |
| 7/1/2051 | – | 460.85 | – | – | 430.29 | 274.80 | 100.24 | 1,266.18 |
| 7/1/2052 | – | 460.85 | – | – | 451.81 | 288.53 | 64.99 | 1,266.18 |
| 7/1/2053 | 217.98 | 460.85 | – | – | 341.37 | 218.00 | 27.97 | 1,266.17 |
| 7/1/2054 | 816.00 | 449.95 | – | – | – | – | – | 1,266.04 |
| 7/1/2055 | 856.95 | 409.15 | – | – | – | – | – | 1,266.10 |
| 7/1/2056 | 899.81 | 366.30 | – | – | – | – | – | 1,266.11 |
| 7/1/2057 | 944.74 | 321.31 | – | – | – | – | – | 1,266.05 |
| 7/1/2058 | 991.98 | 274.07 | – | – | – | – | – | 1,266.05 |
| 7/1/2059 | 1,041.60 | 224.47 | – | – | – | – | – | 1,266.07 |
| 7/1/2060 | 1,093.67 | 172.39 | – | – | – | – | – | 1,266.06 |
| 7/1/2061 | 1,148.36 | 117.71 | – | – | – | – | – | 1,266.07 |
| 7/1/2062 | 1,205.82 | 60.29 | – | – | – | – | – | 1,266.11 |
| **Total** | **$9,217.00** | **$16,681.99** | **$3,655.52** | **$1,488.61** | **$6,253.44** | **$3,993.56** | **$6,446.93** | **$50,267.65** |

Note: Distributions are for illustrative purposes only and do not take into account dollar-denominations on sinking fund payments.
(1) Reflects recovery to an illustrative holder of $100,000 of claim in bond recovery category.
(2) Cash flows do not include potential payments on account of Clawback CVI.

**Illustrative Example of $100,000 Claim Amount of "HTA 98 Sub Bond Claims" Bond Recovery Category**

### CONSIDERATION SUMMARY

**Assumed Holdings**

| | |
|---|---|
| Bond Recovery Category | HTA 98 Sub Bond Claims |
| Classes Included in Bond Recovery Category | 10 to 13 |
| Illustrative Holder Amount of Claim[1] | $100,000 |
| Total Claims in Bond Recovery Category | $277,107,234 |

**Recovery in Cash and Bond Consideration**

| | Consideration for Bond Recovery Category | Illustrative Holder[1] |
|---|---|---|
| Cash | $– | $– |
| Current Interest Bonds | – | – |
| Capital Appreciation Bonds (CABs) (Initial Principal) | – | – |
| Convertible Capital Appreciation Bonds (CCABs) (Initial Principal) | – | – |
| **Total Cash and Bond Consideration** | **$–** | **$–** |
| CVI (Lifetime Cap) | 207,294,178.00 | 74,806.00 |

**Bonds Received**

| | Current Interest Bonds | | | | CABs & CCABs | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Principal | Tax Status | | Yield | Cash Rate | Initial Principal | Accreted Interest | Accreted Value at Redemption |
| 7/1/2032 | | | | | 5.000% | | – | – | – |
| 7/1/2053 | | | | | 5.000% | 5.000% | – | – | – |
| 7/1/2062 | 5.000% | – | Tax-Exempt | | | | | | |

**Cash Flows[2]**

| | Current Interest Bonds | | CABs | | CCABs | | | Total |
|---|---|---|---|---|---|---|---|---|
| | Tax-Exempt | | Initial | Accreted | Initial | Accreted | Cash | Total |
| Maturity | Principal | Cash Interest | Principal | Interest | Principal | Interest | Interest | Cash Flow |
| Cash | | | | | | | | $– |
| 7/1/2023 | – | – | – | – | – | – | – | – |
| 7/1/2024 | – | – | – | – | – | – | – | – |
| 7/1/2025 | – | – | – | – | – | – | – | – |
| 7/1/2026 | – | – | – | – | – | – | – | – |
| 7/1/2027 | – | – | – | – | – | – | – | – |
| 7/1/2028 | – | – | – | – | – | – | – | – |
| 7/1/2029 | – | – | – | – | – | – | – | – |
| 7/1/2030 | – | – | – | – | – | – | – | – |
| 7/1/2031 | – | – | – | – | – | – | – | – |
| 7/1/2032 | – | – | – | – | – | – | – | – |
| 7/1/2033 | – | – | – | – | – | – | – | – |
| 7/1/2034 | – | – | – | – | – | – | – | – |
| 7/1/2035 | – | – | – | – | – | – | – | – |
| 7/1/2036 | – | – | – | – | – | – | – | – |
| 7/1/2037 | – | – | – | – | – | – | – | – |
| 7/1/2038 | – | – | – | – | – | – | – | – |
| 7/1/2039 | – | – | – | – | – | – | – | – |
| 7/1/2040 | – | – | – | – | – | – | – | – |
| 7/1/2041 | – | – | – | – | – | – | – | – |
| 7/1/2042 | – | – | – | – | – | – | – | – |
| 7/1/2043 | – | – | – | – | – | – | – | – |
| 7/1/2044 | – | – | – | – | – | – | – | – |
| 7/1/2045 | – | – | – | – | – | – | – | – |
| 7/1/2046 | – | – | – | – | – | – | – | – |
| 7/1/2047 | – | – | – | – | – | – | – | – |
| 7/1/2048 | – | – | – | – | – | – | – | – |
| 7/1/2049 | – | – | – | – | – | – | – | – |
| 7/1/2050 | – | – | – | – | – | – | – | – |
| 7/1/2051 | – | – | – | – | – | – | – | – |
| 7/1/2052 | – | – | – | – | – | – | – | – |
| 7/1/2053 | – | – | – | – | – | – | – | – |
| 7/1/2054 | – | – | – | – | – | – | – | – |
| 7/1/2055 | – | – | – | – | – | – | – | – |
| 7/1/2056 | – | – | – | – | – | – | – | – |
| 7/1/2057 | – | – | – | – | – | – | – | – |
| 7/1/2058 | – | – | – | – | – | – | – | – |
| 7/1/2059 | – | – | – | – | – | – | – | – |
| 7/1/2060 | – | – | – | – | – | – | – | – |
| 7/1/2061 | – | – | – | – | – | – | – | – |
| 7/1/2062 | – | – | – | – | – | – | – | – |
| **Total** | **$–** | **$–** | **$–** | **$–** | **$–** | **$–** | **$–** | **$–** |

Note: Distributions are for illustrative purposes only and do not take into account dollar-denominations on sinking fund payments.
(1)  Reflects recovery to an illustrative holder of $100,000 of claim in bond recovery category.
(2)  Cash flows do not include potential payments on account of Clawback CVI.

# **EXHIBIT J**

Best Interests Test Report

HTA_CONF 00013113

***Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the
Puerto Rico Highways and Transportation Authority ("HTA")***

This analysis assesses the recoveries available to creditors of HTA on the basis of available
remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of
Puerto Rico. Pursuant to section 314(b)(6) of PROMESA,[1] a proposed Plan of Adjustment
should be "feasible and in the best interest of creditors, which requires the court to consider
whether available remedies under non-bankruptcy law and the constitution of the territory
would result in greater recoveries for the creditors than provided by the plan." This analysis
provides an estimated range of recoveries available to creditors if the stay of debt enforcement
is terminated, no Plan of Adjustment for HTA is confirmed, and the Title III case for HTA is
dismissed.

The analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey
& Company"). Proskauer Rose LLP and O'Neill & Borges LLC,[2] legal advisors to the
Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey
& Company with a set of legal assumptions used in the preparation of this analysis. The legal
assumptions are included in Appendix 1 of this document. FOMB's financial advisors provided
McKinsey & Company with financial information used in the preparation of this analysis. Such
financial information included schedules detailing estimates of outstanding bond debt,
estimates of cash balances, and other financial data. McKinsey & Company also relied on data
published by or directly provided by HTA and the Government of Puerto Rico and their
respective advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all the legal and
financial information and assumptions provided by Proskauer Rose LLP, O'Neill & Borges
LLC, other FOMB advisors, and the Government of Puerto Rico, HTA, and their respective
advisors. McKinsey & Company has not independently verified any of the information or
assumptions received from Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB
advisors, the Government of Puerto Rico, HTA, and their respective advisors, nor does it take
any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in the analysis are inherently subject to
business, economic, and political uncertainties, and, therefore, are subject to change. McKinsey
& Company makes no representation or warranty that the actual recoveries available to or
potentially realized by creditors on the basis of available remedies under any laws, including
the Puerto Rico Constitution, would or would not approximate the estimates and assumptions
represented in the analysis, and actual results may vary materially from those shown herein.
McKinsey & Company does, however, represent that the recovery range identified herein is its
best estimate of such recoveries based on the information provided to it.

---

[1] *PROMESA* means the Puerto Rico Oversight, Management and Economic Stability Act.

[2] Proskauer Rose LLP and O'Neill & Borges LLC are sometimes referred to as "FOMB's legal advisors" in this analysis.

1

## OVERALL METHODOLOGY

Following guidance provided by FOMB's legal advisors, the analysis assumes the PROMESA Title III case for HTA is dismissed and PROMESA Titles I and II continue to apply. Therefore, the analysis assumes the automatic stay of debt enforcement terminates, and the FOMB remains in place and will continue to certify HTA Fiscal Plans, and enforce implementation of budgets, subject to any debt enforcement in excess of the budget the Puerto Rico courts would order. The analysis further assumes creditors would pursue legal action against HTA to recover the amounts they claim they are owed.

This analysis is based on the revenue and expenditure projections as contained in the 2022 HTA Certified Fiscal Plan. The analysis relies on three components to calculate potential recoveries available to HTA creditors: (1) the Resource Envelope (defined below) available to satisfy HTA creditor obligations; (2) outstanding creditor obligations; and (3) priorities for the distribution of the Resource Envelope to service HTA's obligations.

The "Effective Date" of the analysis is June 30, 2022. The percentage recovery is calculated as the present value of the total amount expected to be paid to creditors over the entire period of the analysis as a proportion of the total outstanding principal and unpaid interest as of the HTA Title III petition date of May 21, 2017 (the "Petition Date"). Based on guidance from the FOMB's financial advisors, the analysis assumes an annual discount rate of 5% as reasonable for the calculation of the present value of future principal and interest payments.

This document consists of two sections. The first section provides an overview of HTA's resources available for debt service and outstanding creditor obligations. The second section outlines the distribution of available resources across all HTA's financial obligations and estimates the range of recoveries available to HTA creditors under different scenarios.

## I. RESOURCE ENVELOPE AND OUTSTANDING CREDITOR OBLIGATIONS

### 1) Resource Envelope

The total amount of resources available to pay creditor claims constitutes HTA's resource envelope (the "Resource Envelope"). The Resource Envelope is the sum of (A) starting cash available for debt service and (B) surplus generated by HTA over FY23–51 (see details below).

**A. Starting cash available for debt service:** Based on guidance from FOMB's legal and financial advisors, the starting cash available for debt service as of the Effective Date of the analysis is defined as: Cash in HTA's Bondholder Reserve Accounts (defined below) plus any excess of HTA's Unrestricted Cash (defined below) over HTA's recommended minimum cash balance.

The balances for these types of cash are projected as follows:

- **Cash in HTA's Bondholder Reserve Accounts**: The "Bondholder Reserve Accounts" are the funds held at the Bank of New York Mellon as a collateral for HTA bondholders under resolutions No. 68-18 ("1968 Resolution") and No. 98-06 ("1998 Resolution"). Based on data provided by FOMB's legal and financial advisors, the Bondholder Reserve Accounts are assumed to have no value as of the Effective Date of this analysis, as any such funds in those accounts are paid to HTA Bondholders pursuant to that certain *Second Amended and Restated Stipulation and Agreed Order Regarding the*

2

*Disputed Funds in the HTA Bond Service Accounts, Redemption Accounts and Reserve Accounts* [Case No. 17-bk-3567-LTS, ECF No. 1187] (the "Stipulation").

- **Unrestricted Cash:** HTA holds funds that do not have legal restrictions on their use (the "Unrestricted Cash"). Specifically, Unrestricted Cash does not include: (a) funds held on behalf of third parties in custodial or trust accounts;[3] (b) funds whose use is restricted by a secured interest or court orders; and (c) earmarked funds received from the federal government for specific purposes and/or restricted by federal law or regulation. Based on data provided by FOMB's financial advisors and liquidity projections provided by HTA, Unrestricted Cash is projected to be $113 million as of the Effective Date of the analysis.

- **Minimum cash balance:** This analysis contemplates HTA will maintain a minimum cash balance to meet its working capital needs. We understand an analysis of the advisable amount of minimum cash HTA should retain is in progress by FOMB's advisors but has not yet been completed. Based on guidance from FOMB's advisors, this analysis assumes, on a preliminary basis, that the amount of the recommended minimum cash balance will be in excess of the amount of available Unrestricted Cash as of the Effective Date of this analysis.

As of the Effective Date of the analysis, Unrestricted Cash is expected to be less than the recommended minimum cash balance. Therefore, no Unrestricted Cash is expected to be available for debt service as of the Effective Date of the analysis.

**B. Surplus generated by HTA**:

HTA's annual surplus is a function of revenues less expenses. HTA revenues include:

- Toll fare and fine revenues from roads specified in the 1968 Resolution and 1998 Resolution ("four pledged toll roads")[4]
- Operating revenues from other sources (*e.g.*, revenue shares from other toll roads,[5] fares from Tren Urbano and its feeder buses for as long as Tren Urbano is operated by HTA, ancillary revenues from activities such as property rentals, truck weighing and toll tag sales)
- Appropriations and grants from the Commonwealth, the Federal Highways Administration, the Federal Emergency Management Agency, and the Federal Transit Administration

HTA expenses include:

- Payroll, including salaries, retirement costs and related benefits
- Transit costs, which includes costs generated by transit assets, such as Tren Urbano (passenger train system) and feeder bus system
- Operating Right of Way ("ROW") costs and litigation reserve deposits
- Toll highway administration costs and other operating expenses[6]
- Hard[7] and soft[8] highway construction costs to maintain the existing road system

---

[3] Includes but is not limited to prepaid toll revenue collected but not yet earned by HTA

[4] Four pledged toll roads are: PR-20, PR-52, PR-53 and PR-66

[5] Other toll roads include: PR-5, PR-22 (incl. Dynamic Toll Lanes), PR-17, PR-199

[6] Other operating expenses include professional fees, rents, administrative costs, and others

[7] Costs associated with physical construction

[8] Costs associated with activities that do not involve physical construction

HTA_CONF 00013116

- Transit capital expenditures to maintain the existing transit system
- Other capital expenditures, such as emergency repair costs, toll optimization costs, local construction costs, capital ROW costs, and other construction program expenses[9]

For all the items above, this analysis uses projections from the 2022 HTA Certified Fiscal Plan, although certain projections are modified to reflect the dismissal of HTA's Title III case and the lack of a Plan of Adjustment ("PoA") for HTA. Based on guidance from FOMB's legal advisors, the FOMB is assumed to continue to exist because the requirements for its dissolution as defined by PROMESA would not be met if the Title III case is dismissed, and HTA would continue to incur professional fees through FY32 related to ongoing litigation and stakeholder engagement. As outlined in Appendix 1, relative to the amounts identified in the 2022 HTA Certified Fiscal Plan, legal professional fees are assumed to be 20% higher in FY23 and continue at that level, growing in line with inflation through FY32. Non-legal professional fees related to ongoing litigation and stakeholder engagement are assumed to decrease by 50% relative to the amount identified in the 2022 HTA Certified Fiscal Plan in FY23 and continue at that level, growing in line with inflation through FY32.

To establish an estimated likely surplus range, this analysis also takes into account a number of risks resulting from financial instability and political uncertainty (*e.g.*, challenges in the enactment of new legislation in the aftermath of HTA Title III case dismissal, elimination of fare increases, etc.) that may impact implementation of fiscal measures in the Fiscal Plan, if a PoA is not confirmed.

The higher end of the likely surplus range assumes the following adjustments with respect to fiscal measures in the 2022 HTA Certified Fiscal Plan:

- Non-implementation of measures that would require legislative authorization, such as changes in the HTA Board of Directors and fine price modifications (inflation-based increases, tiered fines), due to challenges in the enactment of new legislation in the aftermath of Title III case dismissal
- Elimination of fare increases that would catch up with historical inflation in FY22–24

The lower end of the likely surplus range additionally assumes the following adjustments with respect to fiscal measures (in addition to the adjustments described above):

- Non-implementation of ancillary revenue improvements and transit enhancements, which would require coordinated actions across various stakeholders
- Lack of Tren Urbano contract reassessments and healthcare cost reductions, which would generate surplus for debt service if they occurred
- Elimination of any fare increases above any increases needed to cover deficits before debt service in the later years of the HTA Certified Fiscal Plan

After accounting for these adjustments, the resulting range for cumulative HTA surplus over FY23–51 is estimated to be $667 million to $3,610 million, of which $650 to $3,570 million is from HTA's four pledged toll roads and $17 to $40 million is from other sources.

---

[9] Other construction program expenses include security costs, equipment rentals, travel costs

HTA_CONF 00013117

**2) Outstanding obligations**

This analysis considers the following classes of claims and associated balances based on information provided by FOMB's legal and financial advisors:

- **HTA Bonds:**[10] As of the Petition Date, the total amount of principal and interest owed was $4,159 million and $79 million, respectively. Based on guidance from FOMB's legal and financial advisors, owed principal is expected to decrease to $3,897 million as of the Effective Date of the analysis as a result of contemplated payments to HTA bondholders pursuant to the Stipulation. Interest is projected to be $1,253 million as of the Effective Date of the analysis, which includes accrued and unpaid interest from the Petition Date through the Effective Date in the amount of $1,174 million.
- **Government Development Bank (GDB) loans:** As of the Petition Date, the total amount of principal and interest owed to GDB was $1,734 million and $416 million, respectively. Based on guidance from FOMB's legal and financial advisors, owed principal is projected to stay the same and owed interest is projected to be $948 million as of the Effective Date of the analysis, which includes accrued and unpaid interest from the Petition Date through the Effective Date in the amount of $532 million.
- **Unsecured Claims:** As described in Appendix 1, there are three categories of unsecured claims as of the Effective Date of the analysis. Total unsecured claims of $513 million comprised of $256 million in HTA general unsecured claims, $84 million in eminent domain/inverse condemnation claims, and $173 million with respect to a loan from the Commonwealth to HTA.

The analysis excludes bonds issued to finance the construction of the Teodoro Moscoso Bridge. Those bonds are paid directly by the concessionaire and are neither currently in default nor anticipated to be in default in the future.


## II. DISTRIBUTION OF AVAILABLE RESOURCES ACROSS OUTSTANDING OBLIGATIONS

The distribution of resources available to pay creditor obligations follows a distribution waterfall (described below), and leads to a range of recoveries where the higher end is driven by the higher end surplus assumptions and the lower end is driven by the lower end surplus assumptions, as described above. This section provides (1) an estimated likely range of recoveries, as well as (2) estimated creditor recoveries under alternative scenarios based on the litigation risks described in Appendix 1.

**1) Estimated likely range of recoveries**

The estimated likely range of recoveries is calculated based on the cumulative HTA surplus range and legal assumptions outlined in Appendix 1 (including the Main Assumptions where applicable). Specifically, it is assumed HTA Bondholders do not have a validly perfected security interest in revenues earned by HTA's four pledged toll roads. In the absence of a validly perfected security interest in such toll fare and fine revenues, operating and capital expenses would be paid before HTA Bondholder debt is serviced.

Funds available for debt service:

---

[10] Including 1968 bonds, 1998 bonds, subordinated 1998 bonds, and subordinated 2003 bonds

HTA_CONF 00013118

- **Cumulative HTA surplus from the four pledged toll roads over FY23–51:** $650 million to $3,570 million – *after payment of all operating and capital expenses*
- **Cumulative HTA surplus from other sources[11] over FY23–51:** $17 million to $40 million – *after payment of all operating and capital expenses*

Funds available for debt service would be distributed in the order of priority outlined in Appendix 1 (*see Exhibit 1 below for more details*). For the claims considered in this analysis, obligations with the same level of priority would receive a pro rata allocation of resources in a given year up to the amount owed in that year. However, total recovery as a percent of outstanding debt may differ between debt with the same level of priority but different maturity schedules.

**Exhibit 1: Distribution waterfall[12]**



1 Including 1968 bonds, 1998 bonds, Subordinated 1998 bonds, and Subordinated 2003 bonds
2 Including Non-toll roads and Transit

Aggregate recoveries (*i.e.*, total recoveries for all creditors assuming HTA's Title III case is dismissed and all claims were enforced under non-bankruptcy law) would be $648 million to $1,789 million.[13] This would represent an implied aggregate recovery rate of 10% to 27%.[14] Recoveries would differ between different debt classes. Exhibit 2 shows the estimated likely range of recoveries for each class of claims.

---

11 Including non-toll (*e.g.*, electronic toll device sales and truck weighing, property sales and rentals, etc.) and transit (*e.g.*, Tren Urbano, Metrobus)

12 Following legal guidance outlined in Appendix 1

13 The amount refers to the present value (as of the Effective Date) of future debt payments using an annual 5% discount rate

14 Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

6

HTA_CONF 00013119

## Exhibit 2: Estimated likely range of recoveries

**Estimated likely range of recoveries available to creditors by debt class**

Present value of total payments in USD million, % recovery

|  | Lower end of range | Higher end of range |
|---|---|---|
| **HTA Bonds** | 612 | 1,688 |
|  | 14% | 40% |
| **GDB claims** | 15 | 32 |
|  | 1% | 1% |
| **Unsecured claims** | 21 | 70 |
|  | 6% | 20% |
| **Total** | 648 | 1,789 |
|  | 10% | 27% |

## 2) Alternative Scenarios based on litigation risks identified in Appendix 1

**A. Alternative Scenario 1:** On the basis of the litigation risks presented in Appendix 1, Alternative Scenario 1 assumes HTA Bondholders have a validly perfected security interest in all toll fares and fines from HTA's four pledged toll roads. Under the 1968 Resolution and 1998 Resolution, HTA Bondholders have a gross pledge over the toll revenues of these roads, meaning HTA is contractually required to service its bond debt obligations before using these revenues to pay any operating or capital expenses of HTA. However, Alternative Scenario 1 also assumes a court would enable HTA to use toll revenues to cover HTA operating and capital expenses before debt service to the extent necessary to prevent an interruption in vital public services.

Therefore, in this scenario, funds available to satisfy creditor obligations would be distributed in the following order outlined in Exhibit 3 (*see Appendix 1 for more details*).

### Exhibit 3: Distribution waterfall considered in Alternative Scenario 1



1 Including 1968 bonds, 1998 bonds, Subordinated 1998 bonds, and Subordinated 2003 bonds
2 Including Non-toll roads and Transit

7

HTA_CONF 00013120

Under Alternative Scenario 1, the estimated aggregate range of recoveries is between 10% and 27%.[15] Exhibit 5 shows the estimated likely range of recoveries for each class of claims.

**B. Alternative Scenarios 2 and 3:** Alternative Scenarios 2 and 3 also assume HTA Bondholders have a validly perfected security interest in toll revenues from HTA's four pledged toll roads as specified in the 1968 Resolution and 1998 Resolution. However, these scenarios assume a court would enforce the contractual gross pledge of HTA Bondholders over toll revenues from these roads and would not permit HTA to use these revenues to cover its expenses before servicing its debt. Although there are conceivably a number of potential outcomes, this analysis offers two possible scenarios.

Under Alternative Scenarios 2 and 3, the funds available for debt service would be:

- **Cumulative HTA surplus from the four pledged toll roads over FY23–51:** $5,051 million to $5,258 million – *before payment of operating and capital expenses*
- **Cumulative HTA surplus from other sources over FY23–51:** $0 to $40 million *after payment of all operating and capital expenses*

Therefore, funds available to satisfy creditor obligations under Alternative Scenarios 2 and 3 would be distributed in the following order outlined in Exhibit 4 (*see Appendix 1 for more details*).



Under Alternative Scenarios 2 and 3, HTA would not have enough funds after debt service to cover its operating and capital expenses. The analysis also assumes HTA would be unlikely to further increase any revenues or decrease any costs within these scenarios. For example, the analysis recognizes HTA may have limited incentives to roll out any type of fare increases if the majority or all of the toll fares were to be exclusively dedicated to debt service rather than HTA's own costs. Thus, the analysis assumes no implementation of fare increases under Alternative Scenarios 2 and 3.

---

[15] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

HTA_CONF 00013121

The 1968 Resolution and 1998 Resolution indicate that HTA has entered into an agreement with the Secretary of Public Works pursuant to which the Secretary of Public Works agreed to use general funds of the Commonwealth "which are made available to him" to pay for the maintenance, reparation, and operation of all traffic facilities financed by HTA. Therefore, the 1968 Resolution and 1998 Resolution do not imply an independent legal obligation for the Commonwealth to finance HTA's operating and capital costs.

Hence, the analysis assumes two alternative scenarios for the treatment of HTA's costs:

- **Alternative Scenario 2**: The Commonwealth agrees to fund all deficits not associated with the four pledged toll roads to support Puerto Rico's transport system. The Commonwealth also agrees to fund toll road capital expenditures, excluding the four pledged toll roads, to prevent the deterioration of conditions on major roads of the island. HTA Bondholders allow funds to be spent on operating costs of the four pledged toll roads, to ensure the continued operation of toll plazas and sustain recoveries over time (thus voluntarily reducing their short-term recoveries), but do not cover any capital expenses.
- **Alternative Scenario 3**: The Commonwealth agrees to fund all deficits not associated with the four pledged toll roads but does not agree to fund toll road capital expenditures. HTA Bondholders allow funds to be spent on both operating and capital expenses of the four pledged toll roads, to ensure the continued operation of toll plazas and sustain recoveries over time, thus voluntarily reducing their short-term recoveries.

Overall, the creditor recoveries under Alternative Scenario 2 would range from $1,712 million to $1,796 million,[16] which would represent an implied aggregate recovery rate of 25% to 27%.[17] Creditor recoveries under Alternative Scenario 3 would range from $988 million to $1,883 million, which would represent an implied aggregate recovery rate of 15% to 28%.

Recoveries would differ between different debt classes. Exhibit 5 shows the estimated likely range of recoveries for each class of claims for all the Alternative Scenarios 1–3.

---

[16] The amount refers to the present value (as of the Effective Date) of future debt payments using an annual 5% discount rate

[17] Recovery percentage is estimated as the present value (as of the Effective Date) of total debt paid over the full period of analysis as a proportion of the total principal outstanding and unpaid interest as of the Petition Date.

9

**Range of recoveries available to creditors by debt class,**
Present value of total payments in USD million, % recovery

|  | Alternative Scenario 1 | | Alternative Scenario 2 | | Alternative Scenario 3 | |
|---|---|---|---|---|---|---|
|  | Low end of range | High end of range | Low end of range | High end of range | Low end of range | High end of range |
| HTA Bonds | 631 | 1,754 | 1,712 | 1,796 | 971 | 1,847 |
|  | 15% | 41% | 40% | 42% | 23% | 44% |
| GDB claims | 15 | 32 | 0 | 0 | 15 | 32 |
|  | 1% | 1% | 0% | 0% | 1% | 1% |
| Unsecured claims | 2 | 4 | 0 | 0 | 2 | 4 |
|  | 1% | 1% | 0% | 0% | 1% | 1% |
| Total | 648 | 1,789 | 1,712 | 1,796 | 988 | 1,883 |
|  | 10% | 27% | 25% | 27% | 15% | 28% |

10

HTA_CONF 00013123

**Appendix 1**

HTA_CONF 00013124

## HTA Title III Plan

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| **1.** | To which assets and revenues will the HTA 1968 Bonds and HTA 1998 Bonds be entitled to recover from? | **ASSUMPTION 1 [MAIN ASSUMPTION]**: The Allocable Revenue statutes pursuant to which the Commonwealth transferred collections of certain fees and taxes are preempted by PROMESA; accordingly, the HTA 1968 Bonds and HTA 1998 Bonds shall not be entitled to recover therefrom. ECF No. 19813 (the "Confirmation Order"), Exhibit K (preempting Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]; 13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]; and 13 L.P.R.A. § 31751(a)(3). [cigarette tax]); *see also* Confirmation Order, Exhibit K, n.9 ("Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted."); Confirmation Order, Article LXXXIX, ¶ 89.3 ("Preemption of Laws" – generally approving preemption of provisions of Commonwealth laws inconsistent with PROMESA).<br><br>Outside of Title III, holders of the HTA 1968 Bonds and 1998 Bonds will be entitled to recover from the funds on deposit in the Bond Revenue Fund, Bond Reserve Fund, Debt Service Fund, Bond Sinking Fund, and Bond Redemption Fund Sinking Fund (the "Bond Sinking Funds") held by the fiscal agent, in which they have a security interest.<br><br>Additionally, while the Bondholders are contractually entitled to have certain toll and fine revenues specified in the Resolution deposited in the Bond Sinking Funds, they will share *pari passu* with other unsecured creditors to those revenues, including the GDB/HTA Loans, whose claims are included in the ratable calculations, but whose ratable recoveries will be allocated to the Bondholders until such bonds are paid in full (see assumption in row 2). The HTA 1968 Bonds and HTA 1998 Bonds ratable recoveries will be from only those revenues to which they are contractually entitled.<br><br>**BASIS**: The Bondholders have validly perfected security interests in the accounts specified by the HTA Bond resolutions, which accounts are for the benefit of the HTA 1968 Bonds and HTA 1998 Bonds, as so designated. Additionally, the Bondholders still have a contractual right to compel HTA to deposit the toll and fine revenues specified in |

1

| | Question | Assumption |
|---|---|---|
| | | the Resolution in the Bond Sinking Funds independent of whether their security interest attaches thereto. However, such contractual right is an unsecured obligation of HTA *pari passu* to the rights of all other creditors of HTA with respect to HTA's payment obligations. Further, the bonds will recover only from those revenues to which they have a contractual entitlement. <br><br>**ASSUMPTION 2 [LITIGATION RISK]**: The HTA 1968 Bonds have priority with respect to toll and fine revenues pledged under the 1968 Resolution, and the HTA 1998 Bonds have priority with respect to toll and fine revenues pledged under the 1998 Resolution. <br><br>**BASIS**: A court may find that the Bondholders have a security interest in the toll and fine revenues collected by HTA in addition the funds deposited in bank accounts held by Bank of New York Mellon. |
| 2. | What is the priority of payments with respect to each of the various revenue sources for holders of HTA debt? | **ASSUMPTION:** Under the bond documents, bondholders can only recover from revenues pledged to them, which includes revenues from toll roads managed by HTA and fines pledged under the 1968 Resolution and 1998 Resolution. Other sources of revenues, to the extent unrestricted (such as certain federal funds, Commonwealth appropriations, and revenues from concession toll roads such as the Metropistas Toll Roads and the Teodoro Moscoso Bridge) are available to all creditors other than the HTA Bondholders, whose claims are nonrecourse. <br><br>**HTA 1968 Bonds** <br>The HTA 1968 Bonds have priority with respect to the toll and fine revenues pledged under the 1968 Resolution. <br><br>Debt service on the 1968 HTA Bonds and the funding of the Reserve Account pursuant to the 1968 Resolution must be satisfied (*i.e.*, an amount equal to the lesser of (x) the maximum annual principal and interest payment on the 1968 HTA Bonds and (y) 10% of the original principal amount of each series of bonds outstanding) before any payments are made on the 1998 Bonds. The HTA 1968 Bonds may not be accelerated. |

2

HTA_CONF 00013126

| Question | Assumption |
|---|---|
| | **HTA 1998 Bonds**<br>The HTA 1998 Bonds will receive (i) excess revenues pledged under the 1968 Resolution provided the HTA 1968 Bonds have been paid all amounts due to date, and (ii) revenues from toll roads managed by HTA pledged to the holders of HTA 1998 Bonds (and not pledged to holders of HTA 1968 Bonds). The HTA 1998 Bonds may not be accelerated.<br><br>**GDB/HTA Loans (held by the DRA Parties)**<br>In accordance with the Title III Court's determination that the GDB/HTA Loans are subordinated to the HTA Bondholders, such loans will receive the excess revenues pledged under the 1968 Resolution and 1998 Resolution, only after the HTA 1998 Bonds and HTA 1998 Bonds are paid in full. The GDB/HTA Loans' ratable share of toll roads and fines are instead allocated to the HTA Bondholders, until such bondholders are paid in full.<br><br>The GDB/HTA Loans may also recover from the general revenues or other resources of HTA, which are not available to HTA Bondholders.<br><br>**Teodoro Moscoso Bridge Bonds**<br>Revenues generated by the Teodoro Moscoso Bridge are pledged to pay the Teodoro Moscoso bonds. In any given year, the revenues from this bridge are first used to pay all expenses incurred by the bridge, including payments to Autopistas for monthly expenses. Then, Teodoro Moscoso bondholders are paid with any remaining surplus. Finally, any remaining resources are transferred to HTA and are available for HTA's general use.<br><br>**BASIS**: The underlying debt documents set forth the respective rights of the various HTA debtholders, which rights are summarized above. |
| **3.** Should interest on debt that remained unpaid during the stay accrue additional interest? | **ASSUMPTION**: Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>    i.  **Interest on HTA debt during stay:** Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during the |

3

| Question | Assumption |
|---|---|
| | automatic stay, unless the underlying contract provides for default interest, in which case the latter should be used.  The HTA bond and loan documents do not provide for default interest or interest on interest.<br><br>ii. **Interest on unsecured claims during stay:**  Assume no interest accrues on debt having no interest rate.<br><br>iii. **Interest on unpaid debt:**  Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2022 (provided by Citi).<br><br>iv. **Interest on interest:**  No.  Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties, although there is no statutory provision for interest on interest.  However, the HTA Bonds do not provide for interest on overdue interest. |
| 4. | If all other resources available to HTA are insufficient to maintain HTA's solvency, may HTA use toll and fine revenues to pay operating expenditures and capital expenditures before debt service? | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  Yes.  HTA will be permitted to use toll and fine revenues to cover necessary operating expenses and capital expenses of HTA, both toll and non-toll related, prior to payment of debt service.<br><br>**BASIS:**  In accordance with the Puerto Rico Supreme Court's opinion in *Librotex, Inc., et al.* v. *Aqueduct and Sewer Authority of Puerto Rico*, et al., (Case No. CE-94-395, July 14, 1995), a court may approve the use of tolls and fine revenues to pay operating expenses and capital expenses.  *Librotex* holds that a judgment creditor cannot get an attachment of revenues if to do so would "result in the interruption" of a vital public service  Accordingly, if, without maintaining the entire transportation system, HTA's operations could be materially harmed, including the success of toll roads, non-toll roads, and the Tren Urbano, a court is likely to find the public interest overrides any contractual obligations to the contrary.<br><br>**ASSUMPTION 2 [LITIGATION RISK]:**  No.  Commonwealth courts may find that, if the Bondholders have a perfected security interest in toll and fine revenues, such |

HTA_CONF 00013128

| | Question | Assumption |
|---|---|---|
| | | revenues may not be used to pay operating expenses and capital expenses before debt service is paid in full. If necessary, the Commonwealth could pay all necessary operating expenses of HTA which HTA is not otherwise able to pay itself. <br><br>**BASIS**: The Resolutions for the 1968 HTA Bonds and the 1998 HTA Bonds provide the Bondholders have a gross pledge of the toll revenues, which provides debt service is paid prior to operating expenses and capital expenses. |
| 5. | Are eminent domain claims for just compensation senior to, or *pari passu* with, general unsecured claims? | **ASSUMPTION**: Eminent domain claims are *pari passu* with general unsecured claims. <br><br>**BASIS**: Eminent domain claims, even if not dischargeable in Title III, have rights no payment priority over unsecured claims. |
| 6. | Will HTA have restricted cash accounts not available for debt service? What minimum cash balance must HTA retain for operating expenses and capital expenses? | **ASSUMPTION**: Yes. HTA will retain minimum cash balances for operating expenses and capital expenses. <br><br>**BASIS**: To maintain the safe operation and maintenance of HTA, HTA will be required to maintain minimum liquidity for both operating expenses and capital expenses. |

HTA_CONF 00013129

**DEBT STACK**[1]

2. **Operating Cost**
   - Projected $18,988 million in annual expenses over FY23–51, per the 2022 HTA Fiscal Plan.

3. **Adjustments from Fiscal Plan**
   - HTA's legal fees are expected to increase by 20% in FY23 and grow in line with inflation from FY24 through FY32, assuming extensive litigation needs without Title III protections or a plan of adjustment. Non-legal professional fees fall by 50% once the Title III case is dismissed, and grow by inflation through FY32. All professional fees for the creditors committee are assumed to be zero after the effective date of this analysis (June 30, 2022).

4. **HTA Debt as of Effective Date of the HTA BIT Analysis**
   - HTA Bond Claims: $3,897 million in principal and $1,253 million in interest
   - GDB HTA Loans (held by the DRA Parties): $1,734 million in principal and $948 million in interest

5. **Other unsecured claims**
   - $255,972,641 (excluding eminent domain claims)
   - $83,687,663 in eminent domain claims
   - $173 million CW/HTA loan (no acceleration; payable according to the amortization schedule)

---

[1] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors. The legal advisors take no position as to the accuracy of the financial information provided herein.

HTA_CONF 00013130