# Debtor's Ex. 9

# (Part 2 of 2)

# PART V: Transforming government to better serve the residents

In addition to structural reforms, the Government must also implement fiscal measures to create a sustainable fiscal future for Puerto Rico. Fiscal measures should reduce costs while maintaining or improving the quality of important services. The wide range of government efficiency initiatives target an increase in revenues through new and more efficient collections activities, while decreasing government expenditures by ensuring reasonable usage of resources.

Although the Government has successfully maintained balanced budgets established by the Fiscal Plans, it has been slow to make meaningful progress in transforming its processes and organizational structures. These measures are necessary to sustainably reduce the Island's cost of operations. This delayed progress has created precarious risk to government service delivery, especially given recent events.

The earthquakes and the COVID-19 crisis have caused local residents to be especially reliant on the Government to effectively and efficiently provide public services. At the same time, the Government has received significant funding from both the Federal Government and the Oversight Board to respond to COVID-19, ensure service provision, and spur economic recovery. For one, the Oversight Board and Government provided a $787 million Emergency Support Package in early 2020 to agencies, individuals, and businesses. Further, COVID-19 related federal relief has totaled over $43 billion for the Island, with ~$4 billion alone going to PRDE and $5.5 billion for the Government's fiscal uses (via the CARES, CRRSA, and ARP Acts). Finally, the Oversight Board paused most fiscal measures for FY2021 to enable the Government to focus on implementation.

Unfortunately, the Government has struggled to drive operational changes and reforms, in part due to COVID-19 and a transition in Commonwealth leadership, but also because agencies have not focused on pursuing such reforms. With billions of dollars in federal support and the nation and Island starting to navigate out of the pandemic, the time is now for the Government to make its final push to drive efficiency and effectiveness.

With a new administration in place, the Government has a new opportunity to re-commit to identifying and driving initiatives that will result in better processes, more efficient spending, and greater quality of service for the Island. The 2022 Fiscal Plan assumes fiscal measures are mostly implemented by FY2023 and continues to include milestone budgeting, which provides incentives for achievement of longstanding key fiscal goals and efficiencies. Through these incentives, as well as rapid implementation of effective managerial processes, the Government can make meaningful progress in FY2022.

## Fiscal measures

**Agency efficiencies** *(Chapter 14)*. The new model for government operations involves "rightsizing" the Government through agency consolidation, process re-engineering, standardization of benefits, and reduction and/or elimination of government services. This process includes implementing comprehensive reform initiatives in the Departments of Education, Health, Public Safety, Corrections, OCFO, and Economic Development, as well as consolidations and reductions within the "long tail" of other agencies. FY2022 represents the final "savings ramp" for most of these measures, which are supposed to have been implemented since FY2019. Agency efficiency measures must result in $1.5 billion in run-rate savings[304] by FY2026 (versus the FY2018 baseline).

---

[304] Includes right-sizing, compensation, and utility measures

HTA_CONF 00014706

**Medicaid Investments and Reform** *(Chapter 16)*. Healthcare measures seek to reduce the rate of healthcare cost inflation through a comprehensive healthcare model.

**Tax Compliance and Fees Enhancement** *(Chapter 17)*. Tax compliance initiatives involve implementing new taxes as well as employing technology and other innovative practices to capture revenue from under-leveraged sources. These initiatives must increase run-rate revenues by $469 million by FY2026.

**Reduction in Appropriations to UPR** *(Chapter 18)*. The central Government will level for the next five years appropriations granted to UPR in compliance with Act 53-2020.

**Municipal Services Reform** *(Chapter 19)*. The 2022 Fiscal Plan establishes a reduction of $220 million to the Municipalities' appropriation as their reliance on Commonwealth transfers improvement in property tax collections to achieve a 100% reduction by FY2025.

**Pension Reform** *(Chapter 20)*. The 2022 Fiscal Plan reflects a future freeze of TRS and JRS pension accruals. Once that happens, future retirement benefits for teachers and judges must be funded by expanded Social Security and Defined Contribution access to safeguard the financial stability of these employees' retirement funds. Since the savings due to the TRS and JRS Defined Benefit pension freezes are long term in nature, the short-term impact of the pension measures will be a cost increase due to expanding access to Social Security. The overall pension measures are projected to result in annual savings beginning in FY2031.[305]

Together, these measures are crucial to the structural balance of the Commonwealth's budget and are projected to have an impact of ~$10 billion during FY2022-FY2026 and over $85 billion by FY2051 (See *Exhibit 134*).[306]

EXHIBIT 134: CUMULATIVE IMPACT OF FISCAL MEASURES SAVINGS AND REVENUES[307]



Impact of fiscal measures[1], $M

■ Agency efficiencies[2]    ▨ Tax Compliance and fees enhancement    ■ Pension reform
▨ Medicaid Reform    ▨ UPR and municipal appropriation reductions    ■ EITC

1 Comprised only of fiscal measures attributable to the Commonwealth
2 Includes investments and incremental budgetary adjustments

---

305 Excludes savings attributable to the upfront payment to System 2000 participants
306 Excludes non-Medicaid healthcare investments, union agreement, and other COVID-19 related investments
307 Excludes Union agreement, Non-Medicaid health investments and other COVID-19 investments

HTA_CONF 00014707

# Chapter 16. Medicaid investments and reform

## 16.1   Current State of Puerto Rico's Medicaid program

As of November 2022, an estimated 37% of Puerto Rico's population received their health coverage through the Commonwealth's state-run Medicaid program ("Plan Vital", formerly known as "Mi Salud"). The drop in the percent of residents covered under Puerto Rico's Medicaid function is mostly a result of updated population estimates for the Island overall (as discussed in *Section 4.6*). It does not reflect a drop in enrollment, which has actually increased as a result of the COVID-19 pandemic and related economic impacts. The percent of local residents receiving benefits via Plan Vital increases to 48% when considering the addition of dual-eligible enrollees who are also in one of the Island's Medicare Advantage programs (Platinos). This share of the population enrolled in Medicaid/CHIP-funded health insurance exceeds that of any U.S. state.[308]

In addition to its large covered population, Puerto Rico has lagged mainland U.S. states in both health outcomes and access. The Urban Institute's 2017 assessment of Puerto Rico's health care infrastructure and system performance cited the Island's aging population and high rates of poverty as partial contributors to the high rates of some chronic conditions such as hypertension and diabetes compared to mainland U.S. states.[309] Puerto Rico also has higher premature birth and infant mortality rates, and higher rates of adults reporting fair or poor health.[310,311] Puerto Rico contains 72 "medically underserved areas," as defined by the U.S. Department of Health and Human Services. These medically underserved areas have shortages of primary medical care, dental or mental health providers.[312]

Two separate agencies are responsible for the administration and provision of Plan Vital. The Department of Health is the state agency responsible for the administration of Medicaid, via the Puerto Rico Medicaid Program (PRMP). PRMP oversees enrollment and eligibility processes, and it also operates the Medicaid Management Information System (MMIS). Meanwhile, the Puerto Rico Health Insurance Administration (ASES, by its Spanish acronym) is responsible for negotiating, managing, and implementing the provisioning of Medicaid benefits, primarily through contracts with private managed care organizations (MCOs), pharmacy benefit managers (PBMs) and other health services organizations.

Plan Vital consists of four primary eligibility groups: federally-qualified Medicaid recipients; expanded federally-qualified Medicaid recipients; Children's Health Insurance Program (CHIP); and the Commonwealth's self-funded health insurance program, which covers (a) low-income adults who do not qualify for federal programs but qualify under the eligibility criteria established by the local government as well as (b) certain Commonwealth employees and retirees.[313] The first three programs are eligible for federal matching at varying rates, known as the Federal Medical Assistance Percentage (FMAP). The Vital program also covers dual-eligible enrollees, those who meet the eligibility standards for both federal Medicaid and Medicare. For dual-eligibles who are enrolled in Medicare Advantage plans, the Commonwealth provides an additional "wrap-around" payment.

Because federal-matching funds for Medicaid in U.S. territories is subject to an annual allotment cap, the federal portion of the Vital program revenues functions more like a block grant than a

---

308 Kaiser Family Foundation, "Medicaid State Fact Sheets: Percent of People Covered by Medicaid/CHIP, 2019"

309 Perreira, Krista et al. "Puerto Rico Health Care Infrastructure Assessment." Urban Institute, January 2017

310 Puerto Rico infant mortality rate is 6.16 per 1000 vs. U.S. mainland 5.2 per 1000. "Puerto Rico," World Factbook (Washington, DC: CIA)

311 Health Disparities Research Framework Adaptation to Reflect Puerto Rico's Socio-Cultural Context, Internal Journal of Environmental Research and Public Health; Published November 18, 2020

312 As reported on HHS HRSA website (data accessed March 30, 2021)

313 As it relates to (b) of the wholly Commonwealth-funded enrollees, Plan Vital coverage for currently retired police offices and active police officers upon their expected retirement is expected to be added beginning in FY2022 (see Section 14.5.1 for additional detail).

HTA_CONF 00014708

traditional Medicaid reimbursement system. See *Section 5.1.2* for further discussion on federal Medicaid funding for the Commonwealth.

Given the CMS interpretation of Section 1108 of the Social Security Act, the 2022 Fiscal Plan projects that Puerto Rico will have $3.1 billion federal funds available during FY2022, including traditional Medicaid (non-CHIP), EAP, and CHIP funds. Even though PR has received an increase to the inflow of federal funds, due to the significant portion of the population reliant on Medicaid for health care, it is important that the Commonwealth always be prepared to fund these services in the event that federal legislators reduce the Commonwealth's appropriations of federal Medicaid funds in future years. It is therefore crucial for ASES to put in place required reforms to reduce the long-term growth rate of health care expenditures.

## 16.2   Medicaid investments

Puerto Rico's health care system has experienced significant strain stemming from hurricanes, earthquakes, and the COVID-19 pandemic. These events are expected to have amplified provider shortages and create increases in demand for health services, particularly behavioral health care. In a survey conducted by the Office of Inspector General at the U.S. Department of Health and Human Services (HHS-OIG) across 45 states, the District of Columbia, and Puerto Rico, hospitals reported that the COVID-19 pandemic has significantly strained the health care delivery system.[314] Given these turbulent circumstances and the uncertain outlook with respect to the COVID-19 pandemic in the long term, the FY2020 Fiscal Plan included incremental investments in the health system. Such investments were made possible through additional federal funding made available through legislation such as the 2020 Further Consolidated Appropriations Act and will be further supported by the most recent FFY2022 allotment of $2.9 billion announced by CMS. These investments included providing Hepatitis C drug coverage and increasing reimbursement rates to specialty and primary care providers and hospitals.

Moreover, during FY2021, the Oversight Board entered into an agreement with the Government of Puerto Rico to temporarily expand coverage of the Medicaid Program to more than 200,000 local residents during the COVID-19 pandemic. The Government of Puerto Rico achieved this by submitting a State Plan Amendment (SPA) to the CMS with a sunset date of September 30, 2021, the same date that the increased Medicaid funding provided by the Federal Government was set to expire. Enrollment of these new beneficiaries started as early as December 2020. Given the recent announcement from CMS granting Puerto Rico $2.9 billion for FFY2022 and increasing by medical CPI-U thereafter, the Puerto Rico Medicaid Program has the necessary funds to cover the cost of this extended population beyond September 30, 2021, though a new SPA will need to be sent to CMS for review.

Please see below for a list of investments agreed to in the 2021 Certified Fiscal Plan that are likely to carry forward.

---

[314] Hospitals Reported That the COVID-19 Pandemic Has Significantly Strained Health Care Delivery, OEI-09-21-00140 (hhs.gov)

HTA_CONF 00014709

- **Increase provider reimbursement rates:** Reimbursement rates for Government Health Plan (GHP) providers lag those of Medicaid programs in other states and territories. For example, from July 2016 to July 2017 primary care services were reimbursed at 19% of the Puerto Rico Medicare fee-for-service rate, while these services are reimbursed at 66% of the Medicare rate nationally. Also, maternity services were reimbursed at 50% of the Puerto Rico Medicare fee-for-service rate while these services are reimbursed at 81% of Medicare rate nationally. Low reimbursement rates place pressure on providers and may lead to shortages, lack of access to certain specialty services, and lengthy wait times. ASES will increase provider reimbursement rates as follows**:**

  - **Establish a 70% of Medicare reimbursement floor for outpatient physician services**: Pursuant to a provision in the 2020 Further Consolidated Appropriations Act, ASES will establish a reimbursement floor for physician services set at 70% of the Medicare fee-for-service rate. The costs associated with the investment will be included in the Managed Care Organization PMPM capitation rate. In turn, the MCOs will be contractually obligated to reimburse all contracted providers at the rate of at least 70% of the Puerto Rico Medicare fee schedule.

  - **Increase sub-capitation payment for primary care physician (PCP) services**: Almost all primary care services are paid through sub-capitation arrangements, wherein MCOs pay Primary Medical Groups (PMGs) a fixed, monthly rate per member treated. To improve access to primary and preventive services, ASES included a 10% increase in the PMPM sub-capitation rate paid to PMGs.

  - **Increase reimbursement rates for hospitals**: According to the latest available CMS Hospital Cost Reports, over 50% of Puerto Rico hospitals reported net losses. Given the high portion of the population covered by Medicaid, Puerto Rico hospitals are disproportionately affected by reimbursement rates of the Medicaid program, which are lower than those of most other payers. These conditions jeopardize the ability for hospitals to operate and reinvest in their infrastructure. To support the ability of hospitals to meet the needs of Puerto Rico, ASES will increase reimbursement rates. Specifically, ASES will mandate that MCOs increase reimbursements for inpatient services through an episode-based payment schedule.

- **Provide Hepatitis C drug coverage:** Puerto Rico's Medicaid plan did not previously provide coverage for drugs that cure the Hepatitis C virus. There are approximately 14,000 local residents that are eligible for treatment and could be cured by making these drugs available to them. Granting coverage for these drugs will significantly increase the quality of lives for affected individuals. Furthermore, in the long term, it is estimated that savings can be achieved due to the avoidance of costs related to the treatment of Hepatitis C virus such as decompensated cirrhosis and liver transplants. This coverage has been available to affected Medicaid recipients as early as March 2020.

- **Increase the Puerto Rico Poverty Level (PRPL):** The PRPL is the key determinant of Medicaid eligibility – an enrollee's eligible income must be below this level to participate in the Federal Medicaid Program. In the past, the PRPL was set at about 46% of the Federal Poverty Level (FPL), however, during FY2021 the PRPL was increased to ~85% of the FPL, thus resulting in several thousand new enrollees as well as a portion of the Commonwealth-funded population now qualifying for Federal Medicaid. Expanded health insurance generally leads to healthier outcomes for the covered population. Due to the additional Section 1108 funding, the Government has indicated its intention to increase the PRPL to 100% of the FPL beginning this fiscal year.

286

HTA_CONF 00014710

## 16.3   Medicaid reform measures

The goal of the Puerto Rican public health insurance system is to fund high-quality healthcare services to all residents in need and, in doing so, cultivate a healthier population, especially as it relates to lowering the Island's disproportionally high rates of chronic conditions. To ensure the system can continue to support the vulnerable populations who rely on its services, Puerto Rico will need to improve the efficiency and effectiveness of its health insurance plan by "bending the health care cost curve" on premium inflation, which is reflective of escalating expenditures of health care delivery on the Island.

This section outlines several categories of actions the Government is required to execute to both curb the growth rate in per capita health care expenditure as well as shift the overall public health system toward higher-value care. In each of the below measures, the plan seeks to avoid reduction in service quality for beneficiaries and therefore assumes that any savings derived from the implementation of Medicaid reform measures will be reinvested into Puerto Rico's Medicaid Program. Such reforms include improving program integrity and quality relative to cost. Program integrity initiatives help to ensure that eligibility decisions are made correctly; prospective and enrolled providers meet federal and state participation requirements; services provided to enrollees are medically necessary and appropriate; and provider payments are made in the correct amount and for appropriate services.[315] Moreover, under value-based care, providers are reimbursed based on their ability to improve quality of care in a cost-effective manner or lower costs while maintaining standards of care, rather than the volume of care they provide.[316]

Enactment of these measures will require concentrated advancement of ASES and the Medicaid Program's capabilities, including IT systems. The 2022 Fiscal Plan includes additional reporting requirements (see *Section 21.4*) to ensure the Commonwealth remains on track towards implementation.

### 16.3.1   *Medicaid reforms to improve program integrity*

Program integrity activities are meant to ensure that federal and state taxpayer dollars are spent appropriately on delivering quality, necessary care and preventing fraud, waste, and abuse from taking place.[317] Program integrity initiatives will help to ensure that the Government is performing accurate enrollment verifications and minimizing fraud, waste, and abuse.

In 2016, the U.S. Government Accountability Office (GAO) reported that Managed Care Organizations (MCOs) in U.S. territories have not consistently reported improper payments to providers billing to the system, and that many MCOs face conflicts of interest in finding and eliminating fraud.[318] In a report released in February 2021, GAO found that seven of the eight selected Puerto Rico procurements[319] did not include important steps to promote competition and mitigate the risk for fraud, waste, and abuse, underscoring the need for federal oversight.[320]

Typical fraud, waste, and abuse reduction programs in other state Medicaid programs and health insurers have been able to achieve 1-3% cost savings. These savings have been reached through pre-payment review (e.g., reviewing claims before payment to identify outliers/issues); auditing and enforcement units to investigate suspicious behavior; advanced analytics capabilities to identify inefficient or fraudulent activities in post-payment review, such as identification of "impossible" utilization (e.g., billing for over 24 hours of service in one day) or frequently

---

315 "Program integrity : MACPAC", Accessed March 30, 2021
316 CMS Issues New Roadmap for States to Accelerate Adoption of Value-Based Care to Improve Quality of Care for Medicaid Beneficiaries | CMS
317 "Program integrity : MACPAC", Accessed March 30, 2021
318 "Medicaid and CHIP Increased Funding in U.S. Territories Merits Improved Program Integrity Efforts." GAO.gov, April 2016
319 According to the report, these eight procurements represent a non-generalizable sample of Puerto Rico Medicaid procurements that were in effect as of April 1, 2020. They represent approximately 97% of the total costs of Puerto Rico's Medicaid procurements in effect at that time
320 "Medicaid: CMS Needs to Implement Risk-Based Oversight of Puerto Rico's Procurement Process." GAO.gov, February 5, 2021. Accessed March 20, 2021

HTA_CONF 00014711

repeated, high value procedures; and long-term policy or organizational transformation. Pursuant to federal requirements, ASES has established a contracting reform plan to improve procurement and contracting prices as well as combat fraudulent, wasteful, and abusive contracts. ASES should begin implementing fraud, waste, and abuse reduction programs in FY2022, with a goal of achieving 3% cost savings from these programs by FY2025.

In addition, it is imperative for Medicaid programs to deploy robust enrollment verification in order to ensure that coverage is offered only to eligible individuals. In December 2020, the Office of Inspector General at the U.S. Department of Health and Human Services performed a Risk Assessment of Puerto Rico's Medicaid Program and identified the beneficiary eligibility process as a high-risk area. Specifically, the HHS-OIG noted weaknesses related to Puerto Rico's post-eligibility determination process for validating beneficiary eligibility. Outdated, missing, or inaccurate beneficiary eligibility information may limit the effectiveness of the eligibility validation process and increase the risk that ineligible applicants will be enrolled in the Puerto Rico Medicaid program.[321] Full compliance with Medicaid Eligibility Quality Control (MEQC) requirements and establishment of an asset verification system that utilizes third-party data sources can strengthen enrollment verification.[322] The PRMP should begin establishment of a robust enrollment verification program in FY2022, with a target of identifying a large proportion of ineligible beneficiaries (estimated to be roughly 5% of total enrollees) by FY2025. As of January 2022, the PRMP is in the early stages of identifying a potential third-party service provider to assist in verifying enrollee assets.

Puerto Rico has taken meaningful steps towards improving program integrity. These include the integration of ASES data with the MMIS. During FY2021, CMS approved the certification of Phase 2 of Puerto Rico's MMIS, clearing the way for the PRMP to begin planning Phase 3 implementation. MMIS Phase 3 includes the Design, Development, and Implementation (DDI) phase, expected to kick off by January 2022, improving the Payment Error Rate Measurement (PERM) and MEQC. Other steps taken towards promoting program integrity in prior years include the establishment of a Medicaid Fraud Control Unit (MFCU) and Program Integrity Unit (PIU), and the improvement in enrollment verification through employer certification and Public Assistance Reporting Information System (PARIS) checks.

While Puerto Rico has taken steps towards improving its Medicaid Program integrity, opportunities for further improvement remain. Limited recoupments from MCO investigations suggest that more can be done to mitigate fraud, waste, and abuse. Furthermore, practices in other states support the development of additional program integrity tools in parallel to building MMIS capabilities, such as leveraging analytics vendors on a contingent bases to identify savings related to improper payments. Finally, in a report to Congress, ASES stated they face challenges with reporting data since data is limited to the provider level and, therefore, the eligibility systems and data sets cannot track fraudulent activity performed by beneficiaries. Issues with enrollment verification can be improved by instituting an Asset Verification System and partnering with key out-migration states to conduct enrollment checks. Pursuant to the 2020 Further Consolidated Appropriations Act, Puerto Rico must continue to make progress to meet CMS's PERM and MEQC requirements. As evidence of this progress, in June 2021 CMS approved Puerto Rico's reports submitted on PERM and MEQC compliance. This is a positive first step, but significant acceleration of progress is required.

### 16.3.2   *Medicaid reforms to improve quality relative to cost*

Pursuing value-based improvement initiatives with demonstrated success are required to help the Commonwealth "bend the curve" on health care inflation without jeopardizing outcomes. There are several potential sources of value in Puerto Rico's health care system. These sources of value are opportunities to reduce wasteful health care spending and increase efficiency while improving

---

[321] Risk Assessment of Puerto Rico Medicaid Program, A-02-20-01011 (hhs.gov). December 11, 2020

[322] GAO "Medicaid Eligibility: Accuracy of Determinations and Efforts to Recoup Federal Funds Due to Errors," January 2020

HTA_CONF 00014712

quality of care and health outcomes. By implementing value-based reforms beginning in FY2022, ASES should aim to achieve 3% in annual cost savings from these reforms by FY2025.

Examples of best practice for value-based payment models include implementing a Diagnosis Related Group (DRG) based payment model where providers are reimbursed a fixed amount to fully treat a patient with a given medical condition. These models help control medical costs by incentivizing providers to deliver cost-effective care without sacrificing quality, while also improving the effectiveness of Medicaid service delivery by standardizing the measurement of patient acuity across providers and reducing the administrative burden associated with reimbursement. Another potential source of value lies in reducing emergency room (ER) visits. Prior to Hurricane María and the reforms, local residents utilized the ER three times as often as peers on the U.S. mainland, with estimates as high as 90% of ER visits occurring for non-emergency care that could be treated in lower cost settings.[323] Successfully shifting unnecessary ER visits to lower-cost settings, such as primary care offices or urgent care, could save tens of millions of dollars annually.

New approaches that emphasize care coordination and align incentives between patients, providers, and payors can produce improvements in health outcomes while lowering costs. Direct pay-for-performance quality bonuses provide special incentives to care for members with high-cost needs like behavioral health. Care coordination models like patient centered medical homes have been quite effective at improving outcomes for members with chronic conditions, empowering primary care providers to work closely with patients and manage treatment plans across multiple care providers.[324] Given the preponderance of chronic conditions and potential rising behavioral and mental health needs in the wake of recent natural disasters and the pandemic, better access and coordination of multiple comorbidities across populations will become increasingly important.[325]

Additional opportunity exists through reduction of both inpatient length of stay and hospital readmissions. Puerto Rico's inpatient length of stay was 1.5 times the U.S. average in 2014,[326] and 35 out of 41 Puerto Rico hospitals show readmission rates above the U.S. average of 15.3%.[327] Hospital readmissions occur when patients are discharged from hospitals but must return for additional treatment for the same condition. This can occur when patients are not adequately prepared to return home due to lack of education, lack of access to follow-up care, challenges with prescription drugs, among other factors. MCOs can incentivize both reduced hospital readmissions and shorter length of stay through improved discharge planning, as well as by increasing weekend staffing to manage discharges. Similar value-based programs piloted in mainland states have typically saved 2-10% of costs. In Puerto Rico, value-based reforms may result in lower-than-average savings due to the breadth of other simultaneous savings measures being implemented for Vital, as well as the challenges associated with recent natural disasters and the COVID-19 pandemic. Nevertheless, these structural changes to reimbursement and care delivery present the most viable path to long-term sustainability for the program.

Pursuant to the opportunities described above, ASES has developed a plan for implementing a modern DRG-based prospective payment system for inpatient services provided by short-term acute care hospitals. ASES has begun using a case mix adjustment that adjusts the payment to each hospital from the inpatient hospital funding pool based on the severity of conditions that each hospital treats, relative to each other. According to ASES, the DRG-based prospective payment system will create financial incentives for hospitals to improve coding and documenting practices, reduce lengths of stay, reduce utilization of unnecessary ancillary services, and reduce

---

323 JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries
324 Patient-Centered Primary Care Collaborative, "Benefits of Implementing the Primary Care Medical Home: A Review of Cost & Quality Results, 2012" (Sept 2012)
325 Thomas Huelskoetter, Center for American Progress, "Hurricane Katrina's Health Care Legacy" (August 15, 2015)
326 As of 2014. JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries
327 The disparity in hospital quality metrics between Puerto Rico and the U.S. - V2A (v2aconsulting.com), December 2, 2019

HTA_CONF 00014713

rates of avoidable complications and hospital-acquired conditions. ASES originally planned to launch this payment model in July 2021. However, due to the delicate position hospitals were in during the pandemic, the go-live date has been postponed to October 2022. Even though the Government has stated that the implementation of DRG will not achieve immediate savings, this effort is necessary for the Government to fund the long-term health needs of Puerto Rico. As of January 21, 2022, ASES has not provided any updates which would allow validation of progress to date.

**EXHIBIT 135: REQUIRED IMPLEMENTATION ACTIONS FOR MEDICAID REFORM**

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| **To be completed in FY2021** | • Incorporate language requiring participation in DRG-based payment model in MCO contract | • May 2020 | • Completed |
| | • Define key performance indicators and savings target measures for Medicaid program integrity initiatives (e.g., fraud, waste, and abuse reduction, enrollment verification) | • June 2020 | • Completed |
| | • Complete assessment for the need for additional third party vendors to develop an Asset Verification System and analytics for fraud, waste, and abuse reduction and enrollment verification | • June 2020 | • In progress – March 2022 |
| | • Identify and design additional value-based incentives (e.g., direct pay-for-performance quality bonuses) for inclusion in future MCO agreements, including timeline and plan for implementation | • December 2020 | • Delayed – February 2022 |
| | • Develop plan to incorporate Medicaid program integrity key performance indicators and savings targets into future MCO contracts, including design for associated incentives and penalties | • December 2020 | • Delayed – February 2022 |
| | • Complete Phase II of PRMMIS development and migrate financial and enrollment processes to the platform | • June 2021 | • Completed |
| | • Draft plans to meet PERM and MEQC requirements and receive CMS approval | • June 2021 | • Completed |
| **To be completed in FY2022** | • Change the current CMS-64 Claiming Methodology to properly account for Rebates | • September 2021 | • Completed |
| | • Start Phase III of PRMMIS development | • September 2021 | • Delayed – February 2022 |
| | • Launch DRG-based payment model | • July 2021 | • Delayed – October 2022 |

# Chapter 17. Tax compliance and fees enhancement

## 17.1   Current state and future vision for tax environment

Puerto Rico's current tax system suffers from structural complexity, instability, internal inconsistency, inefficient administration, and inadequate enforcement. There have been at least 11 major revisions to Puerto Rico's tax code since 1994, including at least six adjustments since 2013.[328] This has allowed for persistent problems with non-compliance, worsened by a lack of an integrated approach to addressing non-compliance. Much of the Government's revenue is highly concentrated in collections from a handful of multi-national corporations. The Government has also issued an assortment of credits, deductions and incentives that add to the system's complexity and further erode the tax base. Furthermore, audit and enforcement activity in recent years has been limited, which creates risks of increased levels of non-compliance.

---

[328] Reforms include: Act 40-2013, the "Tax Burden Redistribution and Adjustment Act;" Act 120-2014, the "Small and Medium Business Job Generation and Retention Act;" Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011;" Administrative Orders 2017-01 and 2017-05; and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

HTA_CONF 00014714

In response to these challenges, the Government has taken actions to improve tax compliance. It has taken steps to improve information reporting to better detect under-reporting of income and over-usage of deductions and credits, notably through recent changes to information reporting requirements included in Act 257-2018. These changes create greater interdependencies among taxpayers and the information they are obligated to report, which is expected to enable greater oversight and verification of the information being reported to the Government. Enhanced usage of data can help Hacienda better isolate risk and focus its compliance and enforcement resources. Hacienda has also expanded its SUT internet sales collections through regulations enabled with the passage of Act 40-2020. Hacienda is driving improvements in its culture and organization to boost enforcement capabilities, and digitizing the process of filing taxes, to lighten the burden of compliance on taxpayers.

With the publication of the first Tax Expenditure Report in September 2019 (see *Section 17.3.1*), policymakers now have the data necessary to review, assess, and adjust the use of individual tax expenditures to ensure that these foregone revenues are leading to positive economic development on the Island.

## 17.2   Administrative tax initiatives to increase revenue collections

Through implementation of administrative tax reform and realization of measures included in prior fiscal plans, the Government has captured incremental revenues through, among others, the implementation of SURI, which are now included in the baseline FY2021 General Fund revenue forecast.

EXHIBIT 136: REVENUE MEASURES SUMMARY OF IMPACT





### 17.2.1   *Improve compliance rate*

**The Government has made significant progress in its compliance efforts.** The 2020 Fiscal Plan included a ramp-up of 3 years, meeting 100% of targets by FY2023, to achieve a target 5% net uplift in annual revenues due to enhanced compliance across the major tax lines (personal income tax, corporate income tax, and SUT) – inclusive of implementation costs. Given the collections seen for the previous year and because all the necessary activities to achieve this have

HTA_CONF 00014715

been implemented (e.g., the implementation of SURI, the collection of SUT on internet sales, among others), the April 2021 Fiscal Plan accelerated the full value of the measures from FY2023 to FY2021, which is maintained in the 2022 Fiscal Plan.

Nevertheless, Hacienda should continue to undertake the initiatives set forth immediately below. These initiatives can boost voluntary compliance and will allow Hacienda to continue collecting the total taxes as expected in the 2022 Fiscal Plan. The goal should be to reduce the cost of compliance and simultaneously raise the cost of non-compliance, through a combination of an increased likelihood of identifying non-compliant taxpayers and evaders, and more effective and enforceable penalties.[329] Therefore, the 2022 Fiscal Plan requires the Government to:

- **Continue to use new systems and processes to identify and remediate non-compliance.** Hacienda has taken steps to make it harder to abuse deductions and credits to avoid tax liability, for example by only allowing taxpayers to claim certain deductions and exemptions if their return is prepared by a certified public accountant following agreed upon procedures.

- **Reduce the complexity of the tax system and process of filing taxes** to make it easier for individuals and businesses to pay their taxes correctly. As detailed further in *Section 9.4*, improving the process of for filing and paying taxes is critical for improving ease of doing business, and helps boost voluntary compliance.

- **Improve use of data and analytics to address non-compliance.** Small and medium taxpayers account for a significant share of the unpaid and underpaid taxes, but only a tiny fraction of these taxpayers receive full-scale audits due to the significant time and cost investment needed. While a traditional IRS audit costs an average of $2,278 per case, automated notices or letters can be executed for $52 to $274 per case.[330] Hacienda is receiving increasing filings of information returns that can be used to better identify risk and focus compliance resources. Hacienda should implement data-driven, tiered compliance approaches which, over time will enable Puerto Rico to reach a significantly larger share of nonpayers.

- **Improve collection of taxes on online purchases.** This has been implemented as part of Act 40-2020, which allowed the Government to reach agreements with remote sellers and marketplace facilitators. The results from this implementation have been also included as part of the forecasted SUT compliance gains in the 2022 Fiscal Plan and are expected to continue to be administered going forward. The Government should continue to expand agreements with remote sellers on a regular basis.

### 17.2.2    *Right-rate other taxes and fees*

On the other hand, the 2021 Fiscal Plan incorporated the value of collections from Medical Marijuana Tax and Airbnb (Room tax) tax which were updated to reflect the value of actuals for FY2020 and FY2021 as of January 2021.The 2022 Fiscal Plan also incorporates these collections.

**Medical Marijuana Tax.** Legislation has been enacted and enforced to tax medical marijuana. Based on information provided by the Government, total collections for FY2019 and FY2020 were approximately ~$13 million and ~$18 million per year respectively. The revenue collected from this initiative continues to be part of the revenue incorporated in the 2022 Fiscal Plan.[331]

**Online Rental Platforms Tax.** Legislation has been enacted to apply a 7% hotel room tax to all rental platforms, resulting in a projected annual revenue increase of ~$8 million. Going forward, the Government should analyze collections under this provision using the estimated

---

[329] Xenia Velez presentation to the Oversight Board (Nov. 30, 2017), 3

[330] IRS Enforcement Results, TIGTA Filing Season Audit, IRS Taxpayer Advocate, GAO

[331] Projected receipts include $1.5 million of dedicated revenues for the medical marijuana council established in 2017-Act 42 and controlled substances monitoring in 2017-Act 70

HTA_CONF 00014716

number and value of online rentals and, where there are differences between expected and collected revenues, should identify corrective actions to work with the rental platform providers to ensure all taxes owed are collected.

### 17.2.3   Improve tax yield from Other General Fund revenue sources

The 2022 Fiscal Plan includes revenue collections as a measure to reflect improved collections of Partnerships and Other Excise taxes. These additional measures were introduced in the 2021 Fiscal Plan and are maintained in the 2022 Fiscal Plan.

**Partnerships.** As discussed in *Chapter 5*, Partnership income taxes have significantly increased since FY2020 due to the enactment and enforcement of Act 60-2019. While most of this increase is attributed to a shift in the tax baseline (as taxes previously paid at the individual/corporate level are now paid at the partnership level), the 2022 Fiscal Plan incorporates ~$25-30 million of recurring income from Partnerships as a tax administration measure, resulting from improved tax compliance achieved by Hacienda.

**Other Excise Taxes.** As discussed in *Chapter 5*, there has been an increased yield in Other Excise Taxes collections, which began at the launch of Hacienda's new integrated tax platform in FY2019. The 2022 Fiscal Plan attributes ~$75-80 million of the increase in recurring income from other excise taxes tax administration measure, achieved as a result of improved tax compliance. This measure is inclusive of Hacienda's efforts to increase collections of tobacco taxes (included as a measure in prior fiscal plans). Analysis provided by Hacienda suggests that part of the increase in collections coming from Other Excise Taxes is from tobacco taxes. Hacienda is working to refine the allocations of these other excise taxes to more specific categories.

Hacienda must take all necessary steps to ascertain proper classification of all excise tax revenues collected through SURI on a timely basis, but not later than December 2021.

## 17.3   Implementation and enforcement of revenue measures

The following implementation plan details the continuation of the Commonwealth's efforts to improve tax administration.

### 17.3.1   Creation of a tax expenditure report and regular reporting

In order to provide a critical element of fiscal responsibility and transparency, the Government must regularly produce a tax expenditure report, which includes a comprehensive list of revenue losses attributable to provisions of the Puerto Rican tax code that deviate from the tax structures benchmark law. It is essential to know how much revenue is foregone because of tax incentives and to periodically review such expenditures to ensure they continue to meet their strategic objective. Having a clear and accurate understanding of what the Government spends through tax expenditures is critical to ensuring the expenditures are continuing to contribute to economic growth and opportunity.[332]

In response to the 2019 Fiscal Plan requirements, the Government published its inaugural Tax Expenditure Report in September 2019 for tax expenditures associated with tax year 2017. For the first time in Puerto Rico's history, taxpayers and the Government have better visibility into the full scope of tax expenditures being offered, together with a description and approximate cost of each expenditure. In May 2021, the Government published its second tax expenditure report reflecting tax expenditures for the tax year 2018, this report represents considerable effort, a high level of comprehensiveness (albeit with important omissions), and some significant improvements over the 2017 report. As shown in *Exhibit 137*, the 2017 Tax Expenditures Report provided many key insights into Puerto Rico's use of tax expenditures as an economic

---

[332] Tax Policy Center, Urban Institute & Brookings Institution, "State Income Tax Expenditures"

HTA_CONF 00014717

development tool, including the fact Puerto Rico issues more than 300 tax incentives with total foregone revenue in excess of $21 billion. This analysis also revealed, as illustrated in *Exhibit 138* and *Exhibit 139*, that Puerto Rico offers a far more generous tax incentive program than virtually every other jurisdiction in the U.S. as a share of the economy or total tax collections.

### EXHIBIT 137: SUMMARY OF TAX EXPENDITURES IN PUERTO RICO

Total Tax Expenditures by Count

| | Credits | Deductions | Exclusions | Exemptions | Preferential Rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | 28 | 10 | 8 | 47 | 14 | 1 | 108 |
| Business | 98 | 18 | 14 | 75 | 40 | 15 | 260 |
| • *Regular Corporations* | 25 | 4 | 3 | 38 | 5 | 7 | 82 |
| • *Incentive Acts* | 37 | 5 | - | - | 20 | 1 | 63 |
| • *Non-corporate Business* | 36 | 9 | 11 | 37 | 15 | 7 | 115 |
| SUT | - | - | 4 | 23 | - | - | 27 |
| Excise | 1 | - | 16 | 12 | - | - | 29 |
| Total | 127 | 28 | 42 | 157 | 54 | 16 | 424 |

Total Tax Expenditures by Dollar Amount, $ millions

| | Credits | Deductions | Exclusions | Exemptions | Preferential Rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | 157 | 347 | 211 | 1,094 | 622 | 0 | 2,431 |
| Business | 160 | 23 | 79 | 182 | 14,184 | 129 | 14,757 |
| • *Regular Corporations* | 65 | 9 | 7 | 90 | 32 | 98 | 300 |
| • *Incentive Acts* | 66 | 6 | 0 | 0 | 14,036 | 2 | 14,110 |
| • *Non-corporate Business* | 29 | 8 | 72 | 92 | 116 | 29 | 346 |
| SUT | - | - | 486 | 3,303 | - | - | 3,788 |
| Excise | 14 | 0 | 420 | 12 | 0 | 0 | 446 |
| Total | 332 | 370 | 1,195 | 4,590 | 14,807 | 129 | 21,422 |

Note: Data for the tax expenditure report is estimated by Hacienda using tax return data where available and national accounts otherwise. Puerto Rico did not have an earned income tax credit (EITC) in 2018

SOURCE: 2018 Tax Expenditure Report

HTA_CONF 00014718

EXHIBIT 138: TOTAL ESTIMATED TAX EXPENDITURE AS SHARE OF GROSS STATE PRODUCT



Note: Gross States Product (GSP) data is gathered from the Bureau of Economic Analysis (BEA). We also calculate, for Puerto Rico, total tax expenditures as a share of Gross National Product (GNP) to be 34%. GNP includes net income from foreigners, GDP does not. Alabama, Connecticut and Ohio do not include tax expenditures that arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness. Tax expenditure estimates for the US are for 2020 and reflect TCJA changes in tax policy. US tax total is not reduced for the cost of the refundable portion of tax credits, including the EITC.

SOURCE: 2018 Tax Expenditure Report and Bureau of Economic Analysis (BEA)

EXHIBIT 139: TOTAL TAX EXPENDITURE AS A SHARE OF TOTAL TAXES



Note: Total tax expenditure includes tax expenditures associated with total individual income tax, corporate income tax, SUT, and excise tax as well as other taxes included in state tax expenditure reports (excluding property tax). Similarly, total taxes include all taxes other than property tax. Alabama, Connecticut and Ohio, do not include tax expenditures that arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness.

HTA_CONF 00014719

For tax expenditures reporting to maintain its relevance and maximize its impact on the policy making process, regular reviews of each tax incentive must be completed to assess whether each incentive is meeting its policy objective (including an assessment of benefits along with costs).

All tax expenditures should undergo periodic technical reviews with a presumption each credit will be prohibited unless sufficient justification exists to maintain the incentive. The default position for all tax expenditures should be that the burden of proof of effectiveness lies with the tax expenditure. Absent a compelling justification, the tax expenditure should be eliminated. Simply because an incentive was offered in the past does not mean it meets the policy objectives in Puerto Rico's future.

Going forward, the estimates in the Tax Expenditures Report must also be systematically incorporated into the annual fiscal plan and budget review process. This means the estimates need to be considered in conjunction with direct spending proposals at the executive review and legislative levels and as a component of the budget envelope for agencies responsible for related direct spending programs. As an example, to force a legislative discussion, other states automatically sunset certain tax expenditures, which expire unless the incentives are proactively renewed, or states will explicitly cap the level of incentives offered.

For that milestone to be achieved, the Tax Expenditure Report must be produced annually on a timely and efficient basis. In fact, the publication of the first Tax Expenditures Report, in September 2019, stated the second annual report (reflecting tax year 2018) would be published in March 2020; however, this was not published until May 2021.[333] In a January 4, 2022 letter to the Secretary of the Treasury, the Oversight Board granted an extension for the submission of the 2019 Tax Expenditure report. We look forward to receiving the Report by the end of the extension period, January 31, 2022. Additionally, going forward the Government must publish the annual report by December 31 of each calendar year. As detailed in the Oversight Board's letter to the Secretary of the Treasury on December 2, 2021, the 2018 Tax Expenditure Report appears to be based on tax data from 2016 (or before) to calculate tax expenditures arising from tax incentives on business income taxes. Much has happened in Puerto Rico over the previous five years calling into question the overall accuracy of the 2018 estimates for current decisions. The most pressing issue for the Department of the Treasury should be updating the data upon which future tax expenditure reports shall be based to make such tax expenditure reports useful for completing analysis that can be used to inform coming years' budget decisions.

Additional revisions must also be incorporated into future tax expenditure reporting. This includes a multi-year expenditure forecast, a policy rationale for each incentive, a year-end assessment of tax incentives granted to each intended target, and a trend analysis of tax revenue collections. More specifically, future Tax Expenditure Reports must include the cost of each tax expenditure for the current year and at least the prior two years. The Tax Expenditure Reports must also forecast the expected revenue collections and losses for at least the next five years from the date the report is produced. As future Tax Expenditure Reports become more normalized, the forecast can also start accounting for behavioral effects of each incentive and the macroeconomic or other dynamic effects in the cost estimates.

Future Tax Expenditure Reports must also broaden the universe of tax expenditures included in the reports. The inaugural report included deviations from major revenue sources, including individual income taxes, personal income taxes, sale and gross receipts taxes and excise taxes. The Inclusion of tax expenditures for non-corporate businesses partnerships and special partnerships in the 2018 Tax Expenditure report is a positive step. This scope expansion should be extended to pass-through entities (corporations of individuals) and sole proprietorships when data becomes available. In addition, the exclusion of Act 154 taxes from the report may need to be reconsidered and or its legitimacy confirmed. The 2018 Report (like the 2017 Report) also does not include tax expenditures under Act 154. Past rationale has been that the Act 154 excise was introduced as a

---

333 On March 30, 2021 the Oversight Board issued a letter to the Secretary of Treasury providing detailed comments on the Commonwealth's tax expenditures, the Oversight Board also issued a letter on December 2, 2021 in response to the 2018 Tax Expenditure report.

HTA_CONF 00014720

substitute for the "normal" corporate income tax and tax expenditures are accounted for as erosions to the corporate income tax base. Since Act 154 is not considered to be a deviation from the corporate income tax, the expenditure associated with it is not included in the Report. The aggregate level of this excise tax erosion, however, should also be reported. Including an inventory of all tax credits, cash grants, deductions, exemptions, preferential tax rate, tax liability deferral and any other tax incentives where amounts allocated can materially impact the Commonwealth's financials will make the report more comprehensive.

Rationalizing the amount of tax expenditures offered by the Government is smart and prudent fiscal management. This can only be done in a comprehensive way through the production of the annual tax expenditure report on a timely basis.[334]

### 17.3.2   *Tax incentives code reform*

The current tax incentives code structure has high fiscal costs – in excess of $400 million – but does not provide enough visibility to allow for clear tracking of these tax concessions and the returns they generate for Puerto Rico's economic growth. Past studies, based on limited available economic data, have indicated that while some tax incentives led to positive returns on investment, many others do not yield similar results.

That is what led the Commonwealth to enact Act 60-2019 (the "Puerto Rico Tax Incentives Code" or "Incentives Code"), which amended previous tax incentives acts and adopted a new legal and administrative framework to normalize the way in which new incentives are created, approved, processed, and monitored. Not all laws compiled in Act 60-2019 were repealed and replaced, creating confusion as to whether the Treasury Department should follow guidelines imposed by these still-active statues or those imposed by the Incentives Code. To fully effectuate the goal of the Incentives Code, and to limit confusion, the Government should take action and repeal the remaining statutes, still in effect that were merged into the Incentives Code. To evaluate the fiscal benefit from each incentive, the Incentives Code uses a Return on Investment ("ROI") approach combined with an assessment of fiscal multipliers to prioritize high value-added incentives relative to those that do not generate sufficient economic return. The Incentives Code, however, does not include explicit caps on, reductions to, or the elimination of any specific incentives. Rather, the purpose of the Incentives Code is to measure the ROI of tax and economic incentives by grouping them under a transparent and uniform code.

Through the Incentives Code, the term, tax rate, and characteristics of incentives offered are harmonized across industries and credits. The Incentives Code also creates a centralized Incentives Office for Businesses in Puerto Rico at DDEC and establishes an Incentives Concession Portal to centralize, standardize, and streamline the processes related to the application and approval of decrees, cash grants, tax credits, subsidies, and other incentives.

Act 60-2019 also required the public disclosure of beneficiaries of certain tax expenditures. In accordance with that requirement, DDEC disclosed (on January 30, 2020) that 8,364 companies and individuals received certain tax incentives. The online database offers the name of the grantee, the type of benefit, and the decree's issue date. DDEC released the relevant information for recipients that receive benefits from the following Acts: Act 14-2017 (Physician Retention); Act 20-2012 (Exportation of Services); Act 22-2012 (Investor Relocation); Act 273-2012 (International Financial Center Regulatory Act); and Act 27-2011 (Film Production). DDEC subsequently released additional data on February 11, 2020, disclosing recipients of the following tax expenditures: Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act); and Act 83-2010 (Puerto Rico Green Energy Incentives Act). During FY2021, DDEC had a milestone budgeting incentive to publish quarterly reports on the agency's website detailing all economic incentive donations and subsidies to private corporations from FY2017 to the present date. DDEC has accordingly published the quarterly reports on their website.

---

[334] Ibid.

HTA_CONF 00014721

Many provisions of Act 60-2019, before they can be implemented, require the drafting and approval of regulations, including prior Oversight Board review and approval.[335] The promulgation of such regulations was included as part of the process during FY2021, and such regulations must continue to be drafted and approved during FY2022.

The lack of transparency and high cost of these tax concessions warrants further revisions to the Incentives Code such that tax incentives are structured in a way that is more likely to be beneficial to the Commonwealth. A multipronged approach is needed. This approach must include limiting the DDEC Secretary's discretion in awarding incentives, specifying in more detail the meaningful information to be submitted in the annual public reporting required by the statute, establishing a more robust audit process with meaningful penalties for firms that are found to be out of compliance or failing to provide the anticipated benefits, and establishing an ROI based standard of program evaluation that will meaningfully discriminate among projects so that incentives are concentrated on those projects most likely to provide net economic benefits to the commonwealth.

This can most easily be accomplished through the drafting and approval of Act 60-2019's regulations, including prior Oversight Board review and approval. Specifically, these regulations must, at minimum, include the following provisions:

- **Evaluation standards for tax incentive and grant award should be balanced.** Act 60-2019 established a positive ROI as the primary standard for determining incentive awards. The standard as currently operationalized, however, lacks balance. Benefits are defined more comprehensively and extensively than are costs, resulting in an ROI standard that does not assure net benefit actually accrues to the Commonwealth. The ROI standard operationalized by the implementing regulations should consider opportunity costs to the Commonwealth and any consideration of direct, indirect, and induced benefits, and should also require consideration of direct, indirect and induced cost for the ROI standard to meaningfully reflect net outcomes for the Commonwealth.

- **Limited time duration and sunset and review.** Any decree or incentive granted under Act 60-2019 should be for a specifically identified and limited amount of time. Typically, this should be no more than 5 years based on facts and circumstances, and extraordinary processes of review and approval should be required of any decree granted for a period in excess of 5 years. All decrees should specify and expiration date. No decrees should be extended without reapplication. Annual reports to the Legislature should include an evaluation of the efficacy of incentive programs and each program should undergo extensive review every 3 years which includes a recommendation on its continuation or termination and the detailed basis for that recommendation.

- **Budgeting incentives.** Cash grants require annual appropriation. All incentives, however, should be limited. Annual limits should be placed on the aggregate scale of incentives that can be offered each year. The estimated revenue loss calculated in the ROI should form the basis of determining annual revenue costs and the aggregate of these costs should be limited annually. Additional awards should be deferred to the following year once annual limits are reached. The accuracy of estimated revenue losses should be confirmed in subsequent program reports.

- **Revenue neutrality.** Firm limits should be established to limit the set of potentially eligible projects to ensure, with confidence, these projects satisfy development objectives and remain revenue neutral and consistent with the certified 2022 Fiscal Plan. Within the ROI methodology, the fiscal analysis of projects should assure at minimum they are revenue neutral.

- **Consultation with affected agencies and municipalities.** All affected agencies and jurisdictions should be consulted regarding the offering of tax incentives and the

---

[335] Pursuant to PROMESA section 204(b)(4) and the Oversight Board's policy with respect thereto, proposed rules, regulations, administrative orders and executive orders covered by said policy, including all regulations under Act 60-2019, must be submitted to the Oversight Board before being issued to ensure compliance with the certified 2021 Commonwealth Fiscal Plan

HTA_CONF 00014722

Commonwealth Government should not be permitted to commit the tax resources of a municipality toward a tax incentive without that municipality's active concurrence. Procedures should be established to minimize the risk that municipalities' tax resources are committed toward a tax incentive without a mutual agreement in place ensuring that the incentive is in both governments' best interests.

- **Public reporting of incentive recipient performance and audit.** Regular reporting of incentive effectiveness is required through publication of an Annual Incentive Effectiveness Report. The Act 60-2019 regulations should also provide meaningful guidance on how required project performance measures will be obtained or calculated. The annual report should include detail sufficient to maintain transparency and accountability. Similar to the DDEC transparency portal, it should publicly disclose recipients, type, and level of performance on incentives and expected public benefits. To assure that recipients comply with the terms of incentive decrees, audits should be periodically performed in the form of detailed desk reviews of compliance reports and on-site audits of books and facilities. Audit selection and review should be based on the decision of an audit committee, rather than at the discretion of a single official. An important feature to consider including are random audits incorporating a full onsite review of performance targets related to, for example, facilities, employment documentation, charitable contributions, investment, local purchases, and exports.

### 17.3.3    Principle of revenue neutrality

Puerto Rico needs to drive toward more formality and increased compliance within the tax base, but it cannot lose revenues in the process. Therefore, any tax reform or tax law initiative that the Government undertakes or pursues during a year within the 2022 Fiscal Plan period must be revenue neutral, that is, all tax reductions must be accompanied by specific, offsetting revenue measures of the same amount that are identified in the enabling legislation. Each tax measure must also include confidence building elements, such as behavioral adjustments and reasonable capture rates. To ensure revenue neutrality, the implementation of any tax law initiative must occur sequentially, with the Government ensuring that initiatives are paid for before rates are reduced. Enforcement mechanisms that yield additional revenues must be part of any tax initiative package that results in a tax revenue decrease to prevent a scenario where tax reductions are not accompanied by sufficient offsetting revenue measures identified in the enabling legislation.

### 17.3.4    Required implementation actions

To achieve the 2022 Fiscal Plan revenue measures, certain action items must be implemented according to the schedule described in *Exhibit 140*:

HTA_CONF 00014723

**EXHIBIT 140: REVENUE MEASURES REQUIRED IMPLEMENTATION ACTIONS**

| Required implementation action | Deadline | Completion Status |
|---|---|---|
| • Implement process to estimate the impact of compliance efforts on revenue collections to inform future program priorities | • September 2022 | • Not complete |
| • Publish an annual Tax Expenditures Report that identifies and quantifies all tax expenditures (including tax exclusions, exemptions, adjustments, deductions, subtractions, credits, abatements, deferrals, rebates, and special rules). | • January 2022 | • Annual update not complete |
| • Implement process to ascertain proper classification of all excise tax revenues collected through SURI | • June 2022 | • Not complete |
| • Conduct an analysis on the estimated number and value of online rentals to compare with the total collections from Online Rental Platforms Tax. | • June 2022 | • Not complete |

# Chapter 18. Appropriations to UPR

## 18.1   Current state and vision

The UPR, founded in 1903, is Puerto Rico's largest and main university system. Its mission is to serve the people of Puerto Rico, contribute to the development and enjoyment of the fundamental values of Puerto Rican culture, and uphold the ideals of a democratic society. To advance its mission, UPR strives to provide high-quality education and create new knowledge in the Arts, Sciences, and Technology. UPR has a history of academic excellence, with 694 degree-granting academic and professional certification programs, including six first-level professional degree programs and 34 PhD programs. The university system is also an important center of research; for example, the Río Piedras campus is classified as a high research activity university by the Carnegie Foundation (one of only 335 U.S. universities to receive such a designation) and there are 79 separate research centers across the university system. UPR plays a critical role in providing avenues for social and economic advancement, with 68% of students receiving Pell grants.[336]

The central Government provides a range of appropriations, including to the University of Puerto Rico (UPR). In FY2018, UPR was 67% subsidized (~$678 million in annual appropriations) by state and local funds, compared to an average 25% state and local subsidization for U.S. public universities.[337] In FY2018, UPR's undergraduate tuition was less than one-third of the U.S. average for public universities, even after adjusting for per-capita income, and more than 40% below the average tuition of private universities on the Island.[338] Yet, during the past decade, UPR has seen a 24% enrollment decline (17% since FY2018) with an additional drop of 5.2% expected through FY2023 across both graduate and undergraduate populations. Moreover, UPR consists of 11 independent campuses with minimal shared services or administrative consolidation. UPR has reduced its exposures to subsidies from the Commonwealth, and has made some progress in various measures, such as increasing undergraduate tuition, increasing the contribution to pension plans, and slightly increasing graduate tuition. Some other areas require additional progress, including diversification of revenues, implementation of tuition and scholarship

---

336 UPR 2012-2017 Strategic Plan
337 UPR, IPEDs 2016, College Board
338 Represents the average across the Ana G. Mendez University system, Inter-American University, Sacred Heart University, and Polytechnic University for SY18-19

HTA_CONF 00014724

systems, renewal and maintenance of infrastructure, addressing operational inefficiencies, and consolidation of the back-office.

## 18.2   Key initiatives to reduce appropriations

Previous Fiscal Plans planned a reduction in the Commonwealth appropriation to UPR to ~$442 million by FY2023 (growing with inflation starting FY2024); however, reflecting the approval of Act 53-2020, the 2022 Fiscal Plan increases the UPR appropriation to a constant at $500 million annually starting in FY2023 (*Exhibit 141*).

EXHIBIT 141: REDUCTION IN UPR APPROPRIATIONS MEASURES SUMMARY OF IMPACT STUDENTS



Summary of UPR appropriation (net of measures)[1], $M

1 This exhibit does not represent the total budgeted appropriation; It reflects the baseline appropriation post-measures; It excludes ARPA

A reduction in the appropriation for UPR was determined in 2017 through a collaborative process with the Government to identify reasonable, sustainable measures to bring UPR closer to U.S. mainland public university tuition and administrative cost benchmarks, while maintaining (and in many cases improving) the performance of the system, which serves as a primary economic growth engine of the Island. It reflects both the declining enrollment of the university as well as the sizeable opportunity to diversify revenue sources, transform operations through greater utilization of shared services and other administrative streamlining across its 11 campuses.

In light of the COVID-19 pandemic, last year, the Oversight Board provided a one-year pause (for FY2021) in the further reduction of UPR's annual appropriation to enable UPR to focus all its efforts on implementing the efficiencies previously required and not yet completed. For FY2022, the 2022 Fiscal Plan expects the appropriation to be reduced to $466 million. Thereafter, given the approval of Act 53-2020, the UPR appropriation will remain constant at $500 million for each fiscal year between FY2023 and FY2027.

After having analyzed the guidance released by the U.S. Department of Education on how to calculate the Maintenance of Effort (MOE) requirements associated with the COVID-19 stimulus packages (i.e., CARES, CRRSA and ARP Acts), as well as their implications on the UPR and PRDE funding provided for FY2022, the Commonwealth formally requested a full waiver of the MOE requirements on September 1, 2021.

HTA_CONF 00014725

## 18.3   Establish an independent needs-based scholarship fund for UPR

The UPR 2021 Fiscal Plan includes a measure to increase tuition, thereby bringing UPR more in line with other public U.S. universities in terms of own-source revenues and ensuring that those who can afford university pay for attending. At the same time, the Commonwealth has created a needs-based UPR scholarship fund, whose intent is to ensure the tuition-related measures do not impact the ability of students with demonstrated financial need to afford a UPR education.

The 2022 Fiscal Plan allocates funds to establish an independently-managed needs-based scholarship fund to benefit the students of the university system. The Commonwealth will contribute $35 to $51 million per year for scholarships to be managed by an external third party. The fund is expected to award the first scholarships in the first half of FY2023. The Oversight Board urges the Government of Puerto Rico to continue this implementation so students who cannot otherwise afford tuition in Puerto Rico are able to through this program. The need-based scholarship will guarantee that those who need the resources get them.

The 2022 Fiscal Plan includes an increase in the salaries of all Medical Residents who are part of the UPR residency programs. It includes an allocation of ~$2.5 million annually as of FY23 to cover a 20% salary increase for the students whose salaries have not been revised since 2003. The increase is intended to enhance the retention of students on the Island to provide the much-needed health related services. In addition, $500 thousand will be allocated to fund the required accreditation fees of the medical and dental programs of the Medical Science Campus.

# Chapter 19. Municipal services reform

## 19.1   Current state

All of Puerto Rico's 78 municipalities are recipients of the Commonwealth municipal appropriation. To incentivize a new operating model between the central and municipal governments as well as municipal operational changes, the Fiscal Economic and Growth Plan published by the Commonwealth in September 2015 called for the elimination of all General Fund based municipal financial transfers, including direct budgetary subsidies, the property tax exoneration fund (included in Act 83-1991) and the municipal equalization fund (included in Act 80-1991). The subsequent Fiscal Plans reduced this appropriation. In FY2018, the total municipal appropriation was $220 million (a reduction of $110 million relative to the prior year). In FY2019, it was reduced to $176 million, and in FY2020, as stipulated in the 2019 Fiscal Plan, it was further reduced to $132 million. This amount remained the same for FY2021 as a planned reduction was paused to provide support to municipalities during the COVID-19 pandemic, but the appropriation will be phased-out and eliminated by FY2025. The transfer in FY2022 will decrease to $88 million. Given this decrease and the eventual phase out of transfers to municipalities, the imperative to execute strategic efforts to increase revenues, maximize investment of federal recovery funds and decrease operational costs to maintain fiscal sustainability is critical.

Municipalities are often on the front lines of providing individual and community services and were demonstrably engaged in COVID-19 response and recovery. This recovery is in addition to ongoing efforts to recover from the natural disasters of hurricanes and earthquakes. Through stimulus measures, including the ARP Act and CARES Act, as well as significant disaster relief funds, municipalities will receive substantial, time limited, financial aid to support economic redevelopment. Their siloed operations and limited local capacity to manage relief funding creates obstacles to leveraging funding effectively to promote necessary economic development and fiscal recovery.

HTA_CONF 00014726

Prior to, and in recovery from the pandemic, there has been little meaningful progress on redefining the relationship between the territorial Government and municipalities, almost no decentralization of responsibilities, and no fiscal decentralization. Moreover, municipalities have made little (if any) progress towards implementing the fiscal discipline required to reduce reliance on Commonwealth appropriations and better reflect a declining population in many areas. This lack of fiscal management was further stressed by the COVID-19 pandemic, threatening the ability of municipalities to provide necessary services, such as health, sanitation, public safety, and emergency services to their residents, and forcing them to prioritize expenditures. Based on the lack of progress to date and entrenchment of the municipal governance including municipal legislatures, comprehensive changes including consolidation of services are required as individual municipalities cannot accomplish significant impacts to the municipal cost structure.

### 19.1.1   *Municipal reliance on Commonwealth funding*

The level of municipal dependency on intergovernmental income is highlighted in *Exhibit 142* below. Transfers of intergovernmental income includes both an equalization fund and lottery transfers. The lottery transfers will be maintained as the equalization fund portion phases out by FY2025. In FY2021, the General Fund of 27 of the 78 municipalities were 30% or more dependent upon funding from the Central Government. As the equalization fund portion of these transfers phases out, municipal revenues need to be increasingly bolstered by improved property tax collections at CRIM, or municipal budgets will become increasingly stressed.

EXHIBIT 142: MUNICIPAL DEPENDENCY ON INTERGOVERNMENTAL TRANSFERS AS A PERCENTAGE OF FY2021 REVENUE



Number of municipalities with intergovernmental transfers as percentage of FY2021 revenue, #

SOURCE: OGP FY21 Municipal Budgets and 2021 Certified CRIM Fiscal Plan

HTA_CONF 00014727

### EXHIBIT 143: GENERAL FUND REVENUES, ACTUAL VS. BUDGET

General Fund revenues, actual vs. budget,[1] $M



1 To avoid any misleading comparisons, only "fully-reporting" municipalities are analyzed throughout this section

To partially offset the impacts from the phase out of the Commonwealth transfer to the Equalization Fund, the Government worked to supplement funding to municipalities in addition to the disaster recovery and COVID-19 pandemic funding received from the federal government and the essential services provided by the Commonwealth, House Bill 1003 was enacted in October 2021 which declared that it is the public policy of the Commonwealth to guarantee to its population the efficient collection and disposal of garbage, solid wastes, debris, as well as the implementation of recycling programs. To provide municipalities funding, the legislation established the "Extraordinary Fund to Address the Collection and Disposal of Residuals, Wastes, and to Implement Recycling Programs in the Municipalities," ("Extraordinary Fund"), which will be within the "Municipalities Equalization Fund" provided in Article 7.015 of Act 107-2020, as amended, but in an account separate from other income of said fund. The fund was created as a mechanism for the Commonwealth to share with the 78 municipalities the savings achieved under the Plan of Adjustment. The Extraordinary Fund will be funded with an annual allocation from the General Fund, which will be equivalent in each fiscal year to 42% of the amount collected during the prior fiscal year on account of the 1.03% property tax. This appropriation may only be included in the budget for a fiscal year if the amount of Medicaid funds actually received during the prior fiscal year exceeds the projected amount of Medicaid funds for such prior fiscal year as set forth in the 2021 Fiscal Plan.

Additionally, during Q2 FY2022 municipalities received additional savings through a reduction to the FY2022 ASES health care base contribution from an extension of Medicaid benefits with an increased FMAP. In September 2021, the U.S. Congress passed a continuing resolution extending the higher FMAP defined in the Further Consolidated Appropriations Act (76% for most populations) through December 3, 2021. In addition, the incremental 6.2% increase in FMAP was extended through March 2022 due to an extension in the corresponding Public Health Emergency period. The available supplemental federal funds returned to standard levels in October 2021 and the higher FMAP defined in the Further Consolidated Appropriations Act will return to standard base levels (55% for most populations) in December 2021 (Q2 FY2022) in the

HTA_CONF 00014728

absence of new federal legislation, though the 6.2% increase will remain through March 2022 (meaning most populations will have an FMAP of 61.2% from December 3, 2021, through March 2022).

In November 2021, Governor Pierluisi announced the formation of the Municipal Strengthening Program, made available to the mayors of the 78 municipalities in agreement with the Financial Advisory Authority and Fiscal Agency (AAFAF) to fund public services, which includes but is not limited to infrastructure maintenance and operational expenses, as well as health, safety and education services. The program will receive $152 million allocation from the ARP Act State Fiscal Recovery Fund to be distributed $50 million over the next three years. The funds will be subsequently disbursed in August 2022 and August 2023. As of January 2022, $39 million had been disbursed of the $152 million program.

One of the largest contributors to municipal revenue results is poor tax compliance. Improving property tax collections has the potential to increase much needed annual revenues for municipalities. CRIM operates property tax collection on behalf of municipalities, must establish a program to improve collections on existing properties, reclassify properties that are currently erroneously categorized (residential vs. commercial), and pursue strategies to enhance collections. Current year collections have averaged approximately 68% in recent years, which is well below comparable U.S. jurisdictions. Low compliance rates and thousands of properties in Puerto Rico that do not appear on the property tax rolls affect the revenue productivity and fairness of the property tax system. CRIM has the responsibility for virtually every aspect of property tax administration, including developing a cadastral survey, identifying taxable parcels, developing and maintaining an appraisal manual, developing tax records, calculating the valuation for all real property, notifying taxpayers of their respective obligations, and collecting the real and personal property tax. Although CRIM currently delegates services to select municipalities via collaboration agreements for functions such as appraisals, collections, verifications, and investigations, municipal governments still have limited roles in the administration of the property tax. Thus, enhancing the effectiveness of CRIM is critical for municipal revenues and services.

*Nullification of Act 29-2019 and Repayment Waterfall*

As of December 2021, the remaining balance for the amounts owed from municipalities after the nullification of Act 29-2019 has been reduced to under $2.5 million with FY2020 PayGo fully repaid to $0 and FY2020 ASES debt still owed from 3 municipalities, Aguadilla, Guaynabo, and Yauco. Pursuant to the agreed upon repayment waterfall, described further herein, the Oversight Board, AAFAF, and CRIM have worked together with municipalities to ensure repayment of the approximately $198 million of accumulated pension and healthcare obligations.

On April 15, 2020, the Title III court issued a decision granting summary judgment to the Oversight Board on several of its claims against the Governor and the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym). The court issued a mandatory permanent injunction precluding the enforcement of Act 29-2019 and declared Act 29-2019 a nullity because it violated various provisions of PROMESA. The Title III court's order became effective on May 7, 2020. The effect of this nullification required municipalities to cover their own employees' PayGo and healthcare costs going forward and to reimburse the Commonwealth for its costs resulting from the impact of Act 29-2019 during its effective period. For FY2020, the PayGo and healthcare obligations were approximately $166 million and $32 million, respectively. The Oversight Board, the Government, and CRIM agreed that the combined amount due, $198 million, would be partially offset by the FY2020 Commonwealth transfer of $132 million (that was transferred to CRIM in accordance with the 2019 Fiscal Plan and Certified Budget). Under Act 29-2019, CRIM retained these funds and did not remit them to the municipalities as part of the Equalization Fund. Therefore, CRIM transferred the $132 million to the Health Insurance Administration (ASES, by its Spanish acronym) and the Retirement System for Employees of the Government of Puerto Rico (ERS) to partially repay the FY2020 PayGo and ASES debt. The $132 million was allocated proportionally to the municipalities based on their projected FY2020 PayGo and ASES debt.

305

After accounting for this transfer, the nullification of Act 29-2019 resulted in the municipalities together owing $66 million to the Commonwealth for their employees' FY2020 PayGo and healthcare contributions. This amount equated to approximately 3% of the total municipality General Fund budgets in FY2020 (~$2 billion), although the impact varied on a municipality-by-municipality basis. The remaining $66 million had to be repaid according to the repayment waterfall in *Exhibit 144*. This repayment waterfall focuses on incremental revenues that municipalities had not considered in their FY2020 or FY2021 budgets. Therefore, the financial impact on municipalities was minimized.

Since the beginning of FY2021, CRIM, AAFAF, and the municipalities have been working closely with the Oversight Board to implement the repayment waterfall and pay the outstanding FY2020 PayGo and healthcare debt. Funds have been prioritized to pay PayGo debt first before paying healthcare debt. The first three (3) steps of the repayment waterfall have been completed and the balance of the FY2020 PayGo has been fully repaid. The remaining $2.5 million of FY2020 ASES debt, which is less than 2% of the original debt outstanding, will be repaid through CRIM's collection efforts of prior year tax debts under the tax relief program that commenced in November 2021 before invoking required withholding of basic tax remittances pursuant to step 5 of the repayment waterfall by the end of FY2022.

Step 4 of the waterfall mandated CRIM to sell its past due tax portfolio in order to generate funds to repay the Act 29-2019 obligations and provide much needed revenues to municipalities. It should be noted that, CRIM and AAFAF have been working since July 2020 to retain expert services to support valuation of the property tax debt and associated tax liens, which is projected to be worth approximately $400 million, based on a third party's previous proposal to purchase the portfolio. After an RFP process generated three competing (3) proposals, CRIM and AAFAF requested additional information by way of an addendum issued in November 2020. Despite the passage of time, CRIM and AAFAF have yet to finalize the selection of the third-party experts to support the data clean-up and portfolio valuation and have claimed neither CRIM nor AAFAF have the funds available to carry out the contract. After the certification of the FY2021 CRIM Fiscal Plan, CRIM proposed as an alternative to step 4 and step 5 of the repayment waterfall, requiring sale of the accounts receivable portfolio and set off of municipal remittances. The proposal offered the use of unbudgeted alternate sources of funding including FY2021 Excess CAE, proceeds from the FY2021 year-end liquidation, and the internal collection of aged, past due tax obligations in order to monetize the past due tax debts. The Oversight Board disagreed with elimination of step 4, the sale of the portfolio, in principle, but consented to the request to defer pursuing the sale until September 2022 to allow for CRIM to undertake an internal collection program before proceeding with the sale of the portfolio.

The amnesty program grants discounts to the principal, interest, surcharges, and penalties as follows:

- Past due debt from FY2017 – FY2020
    - If paid between Nov. 5, 2021 – Jan. 31, 2022: taxpayer would owe only 100% principal; all interest, surcharges and penalties waived
    - If paid between Feb. 1, 2022 – Apr. 30, 2022: taxpayer would owe 100% of principal and interest; surcharges and penalties waived

- Past due debt prior to FY2017
    - If paid between Nov. 5, 2021 – Jan. 31, 2022: 55% discount of principal. Interest, surcharges, and penalties waived
    - If paid between Feb 1. 2022 – Apr. 30, 2022: 40% discount of principal. Interest, surcharges, and penalties waived

HTA_CONF 00014730

- If paid between May 1, 2022 – Jun. 30, 2022: 25% discount of principal. Interest, surcharges, and penalties waived

- If paid after June 30, 2022 – no discount is granted

The program commenced on November 5th and is scheduled to end on June 30, 2022.

Within 30 days after the completion of the program, CRIM must submit reports of the collections and effectiveness of the program to the CRIM Governing Board, the Mayors and to the Oversight Board every 30 days after the completion of each of the collection periods. In addition, CRIM must submit a final report to the CRIM Governing Board and the Oversight Board no later than 15 days of the following month after the culmination of the program. The report shall include the total tax collected to the program and the number of taxpayers subscribed to the program.

**EXHIBIT 144: ACT 29 REPAYMENT WATERFALL**

| Repayment waterfall | Description |
|---|---|
| Step 1 – Offset against lottery and muni funds | • **Completed:** Approximately $20M reduction form the application of lottery proceeds, direct municipal payments, and offset of municipal proceeds |
| Step 2 – Offset against Excess CAE | • Each year, municipalities receive the amount of accumulated CAE in excess of the next year's projected annual debt service for CAE loans<br>• **Completed:** Approximately $27M was applied by individual municipalities requesting the balance of their Excess CAE in FY2020 and FY2021 be used to reduce the balances |
| Step 3 – Offset against final liquidation | • Municipalities receive estimated tax remittances each month based on projected tax collections. CRIM reconciles the actual collections received with any surplus funds liquidated and remit to the municipality<br>• **Completed:** Approximately $17M offset from mid-year and year-end liquidation surpluses after CRIM completed property tax reconciliations |
| Step 4 (Alternate) – Repaid through property tax relief program | • **Currently underway:** CRIM will use the first monies distributed from the collection of past due, property tax debts from the tax relief program to repay the final $2.5M of FY2020 ASES owed by Aguadilla, Guaynabo, and Yauco.<br>   – After the end of the amnesty program, CRIM will resume the process to sell the A/R portfolio on behalf of the municipalities in order to monetize the remaining balance of any unpaid, past due tax debts |
| Step 5 – Offset against municipal advances | • If obligations are not fully repaid after collection of tax proceeds under Step 4, CRIM shall offset the municipality's monthly advances until the remaining obligation is repaid in full<br>• If the balance is not repaid in full by the end of FY2022, the budgeted monthly Commonwealth transfer will be placed on hold until such time that the repayment requirement is met |

## 19.2   Disaster relief and the COVID-19 pandemic

### 19.2.1   *Accelerating post-disaster relief at municipalities*

Puerto Rico has experienced historic and unprecedented disasters since 2017. The impact of Hurricanes Irma and María, as well as a magnitude 6.4 earthquake on January 7, 2020 (and the subsequent aftershocks), resulted in significant damage to the infrastructure and economy, and prompted material out-migration. The Federal Government has supported post-hurricane reconstruction in the municipalities primarily through FEMA's Public Assistance (PA) Program, Community Disaster Loans (CDLs), and 406 Hazard Mitigation Grant Program (HMGP). FEMA processes PA Program grant funding according to the type of work the applicant undertakes. Eligible work must be required as a result of the declared incident, be located in the designated area, and be the legal responsibility of the applicant. Eligible work is classified into different categories: Emergency work and Permanent work. Permanent work projects are considered either large or small. Projects above a certain amount are considered "large." The threshold corresponds to the annually adjusted small project maximum, which is adjusted annually for inflation. For FY2018, when hurricanes Irma and María made landfall, that threshold was $123,100. For small projects, final funding is based on the estimate at the time of project approval and certification of project completion is required when the project is done. Unlike large projects where the applicant completes the project and is later reimbursed for the project costs, small projects are paid out

HTA_CONF 00014731

upon obligation. Given the liquidity issues facing many of the municipalities, the Government made the obligation of small projects a priority in the Island's recovery.

In addition to the aid provided through the FEMA PA Program, CDLs are provided to municipalities that have suffered a substantial loss of revenues as a result of a disaster and that can demonstrate a need for federal financial assistance to perform critical functions such as payroll, supplies, and maintenance materials related to disaster operations. 78 of the 78 municipalities have received over $306 million from the Federal Government to make up for lost revenues due to the hurricanes in the form of CDLs. 15 municipalities affected by the 2020 earthquakes also received approximately $55 million in assistance in the form of CDL loans (see *Exhibit 145*).

EXHIBIT 145: POST-HURRICANE RECONSTRUCTION FEDERAL FUNDS FOR MUNICIPALITIES

| Source of funding | Allocated funds, $M | Disbursements, $M |
|---|---|---|
| FEMA Public Assistance | 1,600 | 177 |
| CDLs for hurricane relief | 306 | 285 |
| CDLs for earthquake relief | 55 | 32 |
| Total | 1,961 | 494 |

SOURCE: PRDE Personnel roster December 2020, COR3 Transparency Portal, accessed 01/24/2022

Municipalities and Puerto Rican residents have also received disaster funding through Individual Assistance programs, Small Business Administration (SBA) Loans, Department of Housing Community Development Block Grant Disaster Recovery (CDBG-DR) programs, and Department of Transportation funding. On September 30, 2021, Congress passed HR5305 extending Government Funding and Delivering Emergency Act' which forgave the $306 million in CDL's that were granted to Puerto Rico's Municipalities.

On December 7, 2019, the Oversight Board approved the Government's request to establish a "State Recovery Fund" that would fund advances to eligible Small Projects under the FEMA PA Program, which many municipalities required due to a lack of liquidity.[339] The State Recovery Fund was financed solely from a reprogramming of the $100 million FY2020 Certified Budget appropriation under the custody of the Office of Management and Budget (OGPe, by its Spanish acronym) designated as "Cost share of public assistance" and is to be used only for Small Projects (as defined above). The Oversight Board also included several requirements from the Government as a precondition of approval of this State Recovery Fund. Since the establishment of this State Recovery Fund, COR3 has informed the Oversight Board that $92.5 million would be returned to OGP, given other mechanisms have been put in place to expedite Small Projects and the funds are no longer required by the municipalities.[340] The fund was made available to municipalities from early 2020 to late spring of 2020. During the term of availability few municipalities completed the process to access these funds as the rate of obligation of small projects increased dramatically and Municipalities began to receive the funds to carry out the projects. Thus, the fund was no longer necessary, and funds could be re-programmed and used to address other needs.

The 2020 Fiscal Plan included the use of $51.4 million requested for the first required steps of demolition and debris removal as a result of the earthquakes in the southwestern region of the Island. These funds were appropriated to the Puerto Rico Department of Housing to administer for municipalities to carry out the FEMA Private Property Debris Removal and Demolition program (PPDR). Debris removal from private property is generally the responsibility of individual private property owners leveraging private funding, such as insurance, to cover the

---

339 Oversight Board letters dated December 7 and December 14, 2019
340 COR3 letter to the Oversight Board dated April 14, 2020

HTA_CONF 00014732

cost. However, if private property owners are not available because they have evacuated, the state or local government may need to enter the private property to remove debris considered to be an immediate threat to the lives, health, and safety of its residents.[341] The municipalities of Guayanilla, Guánica, Ponce, Yauco, and Peñuelas received approval from FEMA and COR3 to administer their own PPDR programs. In order for municipalities to have access to these funds, they had to enter into a Memorandum of Understanding (MOU) with Vivienda. To date, all five municipalities have completed the MOU stage and a total of $12.4 million has been advanced to begin demolition work. As part of the agreement with Vivienda, municipalities must work with COR3 to request the reimbursement for eligible expenses under this program. The reimbursement will then be used in the second stage of the redevelopment of the southwest region. The Municipalities of Yauco and Guánica began demolishing structures in FY2022.

After the demolition and debris removal, the next step or second stage should be the development of an integrated and comprehensive plan for the long-term economic reconstruction of the southwest region, focusing on rebuilding with resiliency and taking into account the changes in the economy in a post-COVID world, the patterns of migration from the area, and the potentially permanent risks to populations from the earthquakes and erosion after the hurricanes, among other factors. This plan should be developed in coordination with Vivienda and other relevant state and federal agencies.

### COR3 Revolving Fund

On November 18, 2020, the Government of Puerto Rico established a $750 million Revolving Fund ("RF") to be managed by COR3 through Joint Resolution 85 – 2020 to provide liquidity and short-term financing in the form of loan advances to central government agencies, public corporations, instrumentalities, and municipalities of the Commonwealth of Puerto Rico, with the goal of supporting and expediting reconstruction of the Island for damages incurred as a result of Hurricanes Irma and Maria and the January 2020 Earthquakes. The Revolving Fund is available to agencies and municipalities that are expecting to carry out Public Assistance Permanent Work and Hazard Mitigation Grant Programs and expect to be reimbursed by FEMA for such projects. Permanent Work projects include works for roads and bridges, water control facilities, public buildings, and utilities, as well as parks, recreational and other facilities. Advances can cover up to 90% of the total project cost for Public Assistance projects, and up to 75% of the total project cost for Hazard Mitigation Grant projects. In November 2021, the Oversight Board approved the first advance under this mechanism to the Municipality of Caguas.

FEMA PA and HMPG projects formulation and closeout are monitored by COR3. As Puerto Rico fiscal agent, financial advisor, and reporting agent, AAFAF is responsible for administering the Revolving Fund. Municipalities are responsible for project execution, program compliance, and submission of FEMA for reimbursement.

### City Revitalization, CDBG-DR

On March 16, 2021, Governor Pierluisi announced the reallocation of CDBG-DR City Revitalization funds overseen by Vivienda. This reallocation will increase the funds to the municipalities from an initial $600 million obligation to $1 billion, with an addition of $400 million. These funds were initially obligated on February 20, 2020 and the funds must be used by September 18, 2024. Additionally, the Governor allocated $10 million to municipalities for administrative expenses. *Exhibit 146* below details the total disaster relief funds allocated to each municipality. The Board also approved $14.9 million of support from the General fund Emergency Reserve to 18 municipalities directly impacted by the earthquakes.

---

341 Public Assistance Debris Removal Guide FEMA 325/July2007

HTA_CONF 00014733

## EXHIBIT 146: DISASTER RELIEF FUNDING ALLOCATIONS TO MUNICIPALITIES

Disaster recovery funding allocations to municipalities, $K

| Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Municipality | 2,044 | 8,543 | 4,735 | Fajardo | 2,478 | 11,862 | 14,340 | Fajardo | 2,478 | 11,862 | 14,340 |
| Adjuntas | 8,966 | 10,827 | 8,130 | Florida | 2,245 | 8,180 | 10,424 | Florida | 2,245 | 8,180 | 10,424 |
| Aguada | 2,608 | 11,997 | 28,182 | Guánica | 2,484 | 9,638 | 12,122 | Guánica | 2,484 | 9,638 | 12,122 |
| Aguadilla | 4,660 | 9,313 | 5,908 | Guayama | 6,371 | 15,048 | 21,418 | Guayama | 6,371 | 15,048 | 21,418 |
| Aguas Buenas | 6,608 | 9,754 | 5,482 | Guayanilla | 6,185 | 9,687 | 15,873 | Guayanilla | 6,185 | 9,687 | 15,873 |
| Aibonito | 8,281 | 10,158 | 6,471 | Guaynabo | 7,107 | 13,193 | 20,300 | Guaynabo | 7,107 | 13,193 | 20,300 |
| Añasco | 3,667 | 15,881 | 41,800 | Gurabo | 6,838 | 10,158 | 16,996 | Gurabo | 6,838 | 10,158 | 16,996 |
| Arecibo | 5,175 | 9,982 | 4,715 | Hatillo | 2,792 | 10,185 | 12,977 | Hatillo | 2,792 | 10,185 | 12,977 |
| Arroyo | 3,812 | 9,593 | 5,737 | Hormigueros | 1,644 | 8,510 | 10,155 | Hormigueros | 1,644 | 8,510 | 10,155 |
| Barceloneta | 4,318 | 9,661 | 6,717 | Humacao | 5,613 | 13,995 | 19,609 | Humacao | 5,613 | 13,995 | 19,609 |
| Barranquitas | 17,263 | 20,140 | 68,655 | Isabela | 5,474 | 10,886 | 16,361 | Isabela | 5,474 | 10,886 | 16,361 |
| Bayamón | 8,260 | 15,406 | 27,166 | Jayuya | 10,338 | 8,010 | 18,348 | Jayuya | 10,338 | 8,010 | 18,348 |
| Cabo Rojo | 10,230 | 22,997 | 54,357 | Juana Díaz | 6,129 | 12,289 | 18,419 | Juana Díaz | 6,129 | 12,289 | 18,419 |
| Caguas | 3,386 | 9,441 | 7,155 | Juncos | 6,335 | 10,015 | 16,350 | Juncos | 6,335 | 10,015 | 16,350 |
| Camuy | 7,610 | 12,864 | 23,547 | Lajas | 2,708 | 11,264 | 13,972 | Lajas | 2,708 | 11,264 | 13,972 |
| Canóvanas | 21,606 | 21,321 | 55,470 | Lares | 2,721 | 9,108 | 11,829 | Lares | 2,721 | 9,108 | 11,829 |
| Carolina | 6,296 | 9,630 | 5,642 | Las Marías | 3,534 | 8,964 | 12,498 | Las Marías | 3,534 | 8,964 | 12,498 |
| Cataño | 2,824 | 18,296 | 21,319 | Las Piedras | 4,827 | 10,074 | 14,901 | Las Piedras | 4,827 | 10,074 | 14,901 |
| Cayey | 2,808 | 11,650 | 4,048 | Loíza | 8,053 | 14,550 | 22,603 | Loíza | 8,053 | 14,550 | 22,603 |
| Ceiba | 2,453 | 9,677 | 4,520 | Luquillo | 3,431 | 8,593 | 12,024 | Luquillo | 3,431 | 8,593 | 12,024 |
| Ciales | 9,111 | 10,194 | 19,612 | Manatí | 5,012 | 11,256 | 16,268 | Manatí | 5,012 | 11,256 | 16,268 |
| Cidra | 7,916 | 10,559 | 8,388 | Maricao | 7,613 | 8,559 | 16,172 | Maricao | 7,613 | 8,559 | 16,172 |
| Coamo | 3,417 | 9,518 | 4,937 | Maunabo | 11,061 | 8,769 | 19,830 | Maunabo | 11,061 | 8,769 | 19,830 |
| Comerío | 7,511 | 10,467 | 7,436 | Mayagüez | 11,148 | 14,977 | 26,126 | Mayagüez | 11,148 | 14,977 | 26,126 |
| Corozal | 376 | 9,257 | 3,165 | Moca | 3,225 | 10,010 | 13,235 | Moca | 3,225 | 10,010 | 13,235 |
| Culebra | 7,073 | 10,793 | 8,042 | Morovis | 5,059 | 10,342 | 15,402 | Morovis | 5,059 | 10,342 | 15,402 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

### 19.2.2   COVID-19 pandemic and municipal support

Municipalities have received continuous Government and federal aid to address increased expenses associated with COVID-19 response and recovery actions. The most significant of this recovery funding are the allocations associated with the ARP Act.

On March 28, 2020, the Oversight Board approved the Commonwealth's plan to provide $100 million as part of the COVID-19 Emergency Measures Support Package. Municipalities received $50 million per month for two months with the funds distributed to each municipality using a 3-tier approach based on municipal population levels of $1 million, $1.35 million, and $1.75 million.

Further, the 2020 Fiscal Plan provided a one-year pause in the further reduction of Commonwealth appropriations to municipalities; accordingly, the FY2021 appropriation remained at $132 million. This additional financial support for municipalities was intended to be used to effectively implement strategies to improve municipalities' financial sustainability by instituting critical changes in operating structure, sharing costs through consolidated services, and improving revenue collection.

In addition, the Governor signed an executive order that adopts the "Strategic Plan for Disbursement" of the $2.2 billion allocated to Puerto Rico by the Coronavirus Relief Fund (CRF) created by the Federal Government through the CARES Act, which assigned $100 million to be transferred to the municipalities for eligible expenses related to COVID-19. Another $100 million in funding was available under the CARES Act to reimburse allowable COVID-related expenses incurred by the municipalities. In July 2020, the Governor expanded the available funds by another $100 million for a total of $200 million overseen by AAFAF. Municipalities are responsible for documenting and tracking all expenses for reimbursement.

HTA_CONF 00014734

In February 2021, the Governor announced the disbursement of an additional $100 million from the CARES Act to assist the municipalities with the mitigation of the effects of the pandemic. Each municipality will receive $1 million and the remaining $22 million will be distributed among the municipalities with the greatest economic difficulties.

### EXHIBIT 147: COVID-19 FUNDING ALLOCATIONS TO MUNICIPALITIES

Disaster recovery funding allocations to municipalities, $K

| Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjuntas | 1,000 | 2,066 | 1,669 | 4,735 | Fajardo | 1,350 | 2,808 | 13,242 | 17,400 | Naguabo | 1,350 | 2,581 | 2,477 | 6,408 |
| Aguada | 1,350 | 3,252 | 3,528 | 8,130 | Florida | 1,000 | 2,000 | 1,088 | 4,088 | Naranjito | 1,350 | 2,678 | 2,629 | 6,658 |
| Aguadilla | 1,750 | 4,085 | 22,347 | 28,182 | Guánica | 1,000 | 2,000 | 1,479 | 4,479 | Orocovis | 1,000 | 2,241 | 1,944 | 5,185 |
| Aguas Buenas | 1,000 | 2,523 | 2,386 | 5,908 | Guayama | 1,350 | 3,422 | 17,584 | 22,356 | Patillas | 1,000 | 2,000 | 1,559 | 4,559 |
| Aibonito | 1,000 | 2,357 | 2,125 | 5,482 | Guayanilla | 1,000 | 2,081 | 1,694 | 4,776 | Peñuelas | 1,000 | 2,181 | 1,851 | 5,032 |
| Añasco | 1,350 | 2,605 | 2,515 | 6,471 | Guaynabo | 1,750 | 6,138 | 22,395 | 30,283 | Ponce | 1,750 | 9,093 | 61,904 | 72,747 |
| Arecibo | 1,750 | 6,030 | 34,020 | 41,800 | Gurabo | 1,350 | 3,890 | 4,528 | 9,767 | Quebradillas | 1,000 | 2,406 | 2,203 | 5,610 |
| Arroyo | 1,000 | 2,058 | 1,657 | 4,715 | Hatillo | 1,350 | 3,407 | 3,770 | 8,527 | Rincón | 1,000 | 2,000 | 1,313 | 4,313 |
| Barceloneta | 1,000 | 2,456 | 2,281 | 5,737 | Hormigueros | 1,000 | 2,000 | 1,492 | 4,492 | Río Grande | 1,350 | 3,947 | 17,595 | 22,892 |
| Barranquitas | 1,350 | 2,701 | 2,665 | 6,717 | Humacao | 1,750 | 4,108 | 21,695 | 27,554 | Sabana Grande | 1,000 | 2,332 | 2,087 | 5,420 |
| Bayamón | 1,750 | 11,388 | 55,517 | 68,655 | Isabela | 1,350 | 3,481 | 18,387 | 23,217 | Salinas | 1,350 | 2,665 | 2,608 | 6,623 |
| Cabo Rojo | 1,350 | 3,916 | 21,900 | 27,166 | Jayuya | 1,000 | 2,000 | 1,335 | 4,335 | San Germán | 1,350 | 2,855 | 16,988 | 21,193 |
| Caguas | 1,750 | 8,647 | 43,960 | 54,357 | Juana Díaz | 1,350 | 3,742 | 18,321 | 23,413 | San Juan | 1,750 | 20,542 | 183,849 | 206,141 |
| Camuy | 1,350 | 2,872 | 2,933 | 7,155 | Juncos | 1,350 | 3,341 | 3,668 | 8,360 | San Lorenzo | 1,350 | 3,209 | 3,460 | 8,019 |
| Canóvanas | 1,350 | 3,742 | 18,455 | 23,547 | Lajas | 1,000 | 2,351 | 2,116 | 5,467 | San Sebastián | 1,350 | 3,180 | 16,563 | 21,093 |
| Carolina | 1,750 | 10,020 | 43,700 | 55,470 | Lares | 1,000 | 2,490 | 2,334 | 5,824 | Santa Isabel | 1,000 | 2,302 | 2,039 | 5,341 |
| Cataño | 1,000 | 2,419 | 2,223 | 5,642 | Las Marías | 1,000 | 2,000 | 762 | 3,762 | Toa Alta | 1,750 | 5,224 | 20,700 | 27,870 |
| Cayey | 1,350 | 3,603 | 16,366 | 21,319 | Las Piedras | 1,350 | 3,271 | 3,558 | 8,179 | Toa Baja | 1,750 | 5,558 | 26,454 | 33,762 |
| Ceiba | 1,000 | 2,000 | 1,048 | 4,048 | Loíza | 1,000 | 2,507 | 2,361 | 5,867 | Trujillo Alto | 1,750 | 4,907 | 20,800 | 27,457 |
| Ciales | 1,000 | 2,000 | 1,520 | 4,520 | Luquillo | 1,000 | 2,084 | 1,698 | 4,782 | Utuado | 1,350 | 2,681 | 2,634 | 6,665 |
| Cidra | 1,350 | 3,351 | 14,911 | 19,612 | Manatí | 1,350 | 3,288 | 18,150 | 22,788 | Vega Alta | 1,350 | 3,213 | 3,467 | 8,030 |
| Coamo | 1,350 | 3,353 | 3,686 | 8,388 | Maricao | 1,000 | 2,000 | 522 | 3,522 | Vega Baja | 1,750 | 4,070 | 19,331 | 25,151 |
| Comerío | 1,000 | 2,144 | 1,793 | 4,937 | Maunabo | 1,000 | 2,000 | 992 | 3,992 | Vieques | 1,000 | 2,000 | 806 | 3,806 |
| Corozal | 1,350 | 2,982 | 3,105 | 7,436 | Mayagüez | 1,750 | 5,390 | 35,463 | 42,602 | Villalba | 1,000 | 2,312 | 2,055 | 5,366 |
| Culebra | 1,000 | 2,000 | 165 | 3,165 | Moca | 1,350 | 3,141 | 3,354 | 7,846 | Yabucoa | 1,350 | 2,981 | 3,104 | 7,435 |
| Dorado | 1,350 | 3,218 | 3,475 | 8,042 | Morovis | 1,350 | 2,862 | 2,916 | 7,128 | Yauco | 1,350 | 3,060 | 14,554 | 18,964 |
| | | | | | | | | | | Total | 100,050 | 278,000 | 949,826 | 1,327,876 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

On March 11, 2021, President Biden signed the American Rescue Plan (ARP) Act into law, which contains $1.9 trillion in overall U.S. national spending to support relief and economic recovery efforts. The ARP Act provides a total of $350 billion in assistance to states, counties, municipalities, territories, and tribal governments to cover expenses, make up for lost revenue, and ease the overall economic impact from the COVID-19 pandemic. Specific to municipalities is the $130.2 billion to local governments from the Coronavirus Local Fiscal Recovery Fund:

- $65.1 billion to counties, allocated based on each county's share of the U.S. national population.

- $45.6 billion to metropolitan cities (cities with 50,000 or more people), allocated by an average of one of two sets of economic ratios, to be determined by the U.S. Secretary of the Treasury.

- $19.5 billion to municipalities with fewer than 50,000 people (to be distributed by the applicable state), allocated based on each municipality's share of the overall population of municipalities.

Puerto Rico's municipalities are estimated to receive approximately $1.55 billion under ARP. Local government (defined as non-entitlement unit by ARP) funds totaling $124 million will be distributed in two equal tranches, the first was distributed to the Commonwealth in June 2021 and the Commonwealth then distributed to the 51 applicable municipalities. The second tranche is expected to be paid in June 2022. The remaining $1.4 billion due to municipalities in their capacity as counties and/or metropolitan cities (as defined in ARP) are payable directly by US

HTA_CONF 00014735

Treasury via two equal tranches to the municipalities upon receipt of a request and certification from each municipality. In addition to these directed funds, there are multiple other funding programs directed by individual federal agencies which may be available to municipalities focused on improving economic development and resident services. Funds allocated from each of the State Fiscal Recovery Fund and Local Fiscal Recovery Fund may be used to:

- Respond to the COVID-19 emergency and address its economic effects, including through aid to households, small businesses, nonprofits, and impacted industries such as tourism and hospitality.

- Provide premium pay to essential employees of state or local governments or make grants to the employers of essential employees. Premium pay may not exceed $13 per hour or $25,000 per worker.

- Provide government services to the extent of any revenue reduction resulting from COVID-19.

- Make investments in water, sewer, and broadband infrastructure.

- All funds must be obligated on or before December 31, 2024.

- All funds must be expended by December 31, 2026.

- State and local governments cannot use the funds to make pension payments.

- State and local governments may transfer funds to private nonprofit groups, public benefit corporations involved in passenger or cargo transportation, and special-purpose units of state or local governments.

- State and local governments must provide periodic reports to the Secretary of the Treasury giving a detailed accounting of the uses of funds and, in the cases of states, all modifications to the states' tax revenue sources.

## 19.3   Vision and reform needed to transform municipal services

The significant opportunity associated with ARP and other recovery funds provide municipalities an opportunity to make meaningful investments towards their fiscal sustainability. Municipalities must engage in evidence-based investments in driving efficiencies in operations to lower expenses while increasing revenues through economic development, improved tax collections and business growth. Yet, for many of the 78 municipalities, reducing their individual cost structures will be insufficient in the face of rising operational costs and without the ongoing benefit of governmental transfers. Current levels of fiscal stability, level of population decline, and economic opportunities vary across the 78 municipalities. Furthermore, many municipalities which have greater dependency upon Commonwealth transfers as a source of revenue are at increased risk of fiscal distress as transfers continue to decline.

Thus, the Government will need to develop a solution to streamline and consolidate municipal services throughout Puerto Rico. Otherwise, the Government faces the prospect of expanding municipal operating deficits, further deteriorating infrastructure, and worsening service delivery.

To enhance stakeholder discussion on this issue, in June 2020 the Oversight Board published a policy paper examining a new government structure between the Commonwealth and municipal governments.[342] The report included design parameters around decentralization and municipal service consolidation. While the Oversight Board did not advocate for eliminating municipal governments, it did call for a comprehensive statutory overhaul to lay a solid foundation for reform. In March 2021, an Executive Order was signed by Governor Pierluisi, the Mayor's Association, and the Mayor's Federation to create the 'Committee for the Decentralization of Municipal Affairs.' The Committee, composed of one representative from each political party and

---

[342] Cruz, Arnaldo. "Essay: Rethinking Government, A New Commonwealth-Muni Partnership." Puerto Rico Financial Oversight and Management Board. Accessed April 21, 2021

HTA_CONF 00014736

led by the Secretary for Municipal Affairs would be responsible for identifying potential services and competencies that could be gradually transferred from the Central Government to the municipalities, along with the respective required funding. The Committee was expected to submit a report by May 18, 2021 listing their ideas; however, to date no such report has been submitted. Top-down changes to the delivery of government services is critical to achieving impact on cost structures given the entrenched local governance structure with 78 municipal governments and their legislatures. The Committee's recommended implementation plan must prioritize changing the cost structure of service delivery as well as shifting responsibilities.

A new decentralized model could improve the delivery of services by centralized Commonwealth agencies which are historically untimely and lack responsiveness. Such a model has the potential to dramatically increase capacity to respond to a crisis and improve service delivery at a local level. Unfortunately, most municipalities do not (individually) have the administrative or financial capacity to operate programs currently provided by the Commonwealth. Many also lack the economies of scale necessary to be efficient with programs such as the Administration for Child Support Enforcement (ASUME, by its Spanish acronym), Administration for Families and Children (ADFAN, by its Spanish acronym), or Vivienda. However, a consolidated municipal service structure could enable the delegation of certain Commonwealth responsibilities to local governments. Such a model could yield municipal and Commonwealth savings, and a portion of those savings could be reinvested back into the municipalities where savings are realized.

In addition, a more integrated government structure could help implement locally based economic development strategies, which are more viable at a regional level than on an individual municipality basis. On the revenue side, service consolidation could further enhance the coordination of property tax collection by standardizing and automating processes and integrating data and information systems. The Oversight Board is committed to helping the Government and all the municipal governments throughout a reform process, with ideas, insight, and design support, if, and only if, the proposed solution reduces the costs of services provided by municipalities through service consolidation.

### 19.3.1   *Oversight Board's municipal pilot*

The Oversight Board initiated the Pilot program in May 2019 when it designated all 78 Puerto Rican municipalities as covered entities under PROMESA. The 10 municipalities in the Pilot were Aibonito, Barranquitas, Camuy, Cidra, Comerío, Isabela, Quebradillas, San Sebastián, Orocovis and Villalba, reflecting diverse political representation, size, and financial strength. The Pilot provided important insights into the scope of financial problems municipalities face and the deep-rooted systemic challenges that must be overcome to enable fiscal sustainability.

Although the Pilot ended on June 30, 2021, the Oversight Board continues its work with municipal governments with the launch of three municipal incentive funds available to all 78 municipalities. The Oversight Board will work with any and all that are eager to benefit from this program and will continue to provide support to help improve municipalities' fiscal stability by working with mayors on identifying and adopting leading local government practices on efficient spending, economic development, and maximization of federal funds.

HTA_CONF 00014737

EXHIBIT 148: MAP OF MUNICIPALITIES PARTICIPATING IN THE OVERSIGHT BOARD'S PILOT PROGRAM



### 19.3.2   *Incentivizing consolidation of services*

*Municipal Consolidation Fund*

To further incentivize service consolidation, the 2020 Fiscal Plan established funds to assist the municipalities to achieve fiscal sustainability. By consolidating services, municipalities will be able to significantly reduce costs and generate additional revenues through economic development and other potential initiatives. Municipalities that voluntarily consolidate services will be eligible to receive a one-time financial incentive upon certification of such action by the Oversight Board. To fund this initiative, the 2020 Fiscal Plan set aside $22 million in each fiscal year through FY2025 for distribution among municipalities that complete service consolidations. The amount distributed to each participating municipality will be determined in coordination between AAFAF and the Oversight Board and is dependent on the savings or revenue generation achieved. The fund was expected to commence under AAFAF in the fourth quarter of 2021. FY2021 funding not disbursed was authorized to rollover to FY2022. The annual funding commitment will be reviewed each year through FY2025 based on municipal participation in the fund. As of January 2022, the program has not been launched, thus no money has been disbursed from this fund.

*School and Road Maintenance Funds*

As provided for in the 2020 Commonwealth Fiscal Plan, the Oversight Board committed to support all 78 municipalities through the creation of school and road maintenance funds. These funds will help municipalities through:

- Defraying maintenance costs often covered by municipalities instead of responsible Commonwealth agencies
- Detailing requirements between Commonwealth agencies and municipalities for roads and school maintenance
- Establishing processes to fund such requirements

For school maintenance, the 2020 Fiscal Plan made available $2.5 million for FY2021 which was extended to FY2022. Within this incentive fund, municipalities are reimbursed for maintenance costs associated with their Public Building Authority (AEP for its Spanish acronym) managed schools. 377 schools managed by AEP in 76 municipalities are eligible to participate. This represents $6,631 available funding per school. Municipalities are required to establish a memorandum of understanding (MOU) with AEP on specific maintenance costs which can be covered. As of January 2022, no MOUs have been signed between municipalities and AEP.

HTA_CONF 00014738

For road maintenance, the 2020 Fiscal Plan made available $10 million for FY2021 which was extended to FY2022. Within this incentive fund, municipalities can be reimbursed for maintenance costs associated with their secondary and tertiary roads through coordination with the Department of Transportation and Public Works (DTOP for its Spanish acronym). 78 municipalities with 6,553 kilometers of roads are eligible to participate. This represents $1,526 available funds per kilometer. Municipalities are required to establish a MOU with DTOP on specific maintenance costs which can be covered and may include primary roads. As of January 2022, 74 Municipalities have signed MOUs with DTOP in order to access these funds which represents $9,334,063.27. Only 4 out of the 74 municipalities have requested reimbursements to OGP (Añasco, Morovis, San Lorenzo and Villalba) representing $391,449.57 in disbursements.

### 19.3.3   *Property tax reform*

CRIM plays an important role in supporting Puerto Rico's municipalities in their economic and social development by ensuring an efficient process for collecting and distributing real and personal property taxes, which are important revenue sources for municipalities. For FY2021, property taxes represent approximately 30% of the aggregate general fund budget for municipalities.

It is essential that CRIM seize all opportunities to maximize property tax collections by improving compliance to help municipalities reduce the reliance on the Commonwealth transfer and achieve long-term fiscal sustainability. Historically, the taxable value of real and personal property has been significantly reduced by tax exemptions and exonerations, which have a negative impact on the municipalities that rely on property taxes to fund essential services. Puerto Rico offers considerably more tax breaks both in terms of number and notional value compared to other U.S. jurisdictions. For example, in FY2020, more than 50% of the real and personal property tax base was eliminated through these exemptions and exonerations. In addition, CRIM's tax roll does not include all the properties in Puerto Rico, nor does it accurately reflect the taxable value of some properties as significant home improvements have not been properly appraised. Similarly, due to outdated systems and inefficiencies, there are high levels of delinquencies with collection rates for real property tax billings that are well below comparable jurisdictions, standing at approximately 68%. This has resulted in a large accounts receivable balance. Therefore, it is essential that CRIM continue to seize all opportunities to maximize property tax collections by improving compliance to help municipalities achieve long-term fiscal sustainability.

CRIM continues an operational transformation centered around replacing outdated and inefficient applications and hardware, implementing best practices for business continuity, re-engineering processes to improve services to municipalities and taxpayers, and establishing a more data-driven culture. In September 2021, CRIM rolled-out their new ERP system CRIM 360. CRIM 360 is an enhanced enterprise ERP which integrates the different applications and portals used by CRIM to streamline the user experience and improve payment processing. These initiatives should continue to serve as the foundation for CRIM to implement strategies to successfully enhance tax revenue collections.

In addition, CRIM is undertaking various measures to improve collaboration with other government agencies and update the tax rolls to accurately reflect property taxable value and ownership. These measures will allow CRIM to better capture unrealized property tax revenues by increasing tax compliance and improving overall collection rates. Based on implementation planning discussions with CRIM management, CRIM estimates these initiatives could produce:

- $69 million of additional annual revenue from raising real property tax compliance from 68% to 76%

- $166 million of additional annual revenue from registering properties and home improvements not on the tax roll

HTA_CONF 00014739

- $89 million of additional annual revenue from fixing incorrect mailing addresses in the billing system

- $400 million of one-time revenue from selling the accounts receivable portfolio

- Additional revenue-enhancing measures are identified in CRIM's 2021 Fiscal Plan

**EXHIBIT 149: REDUCTION IN MUNICIPAL APPROPRIATIONS UNDER STATUS QUO SCENARIO**



# Chapter 20. Pension reform

## 20.1  Current state of and required changes to pension reform

The Government operates three public employee retirement systems in Puerto Rico: The Employees' Retirement System (ERS), the Teachers' Retirement System (TRS), and the Judiciary Retirement System (JRS). The systems have different tiers of benefit formulas, some of which are traditional defined benefit pensions based upon years of service and final salary, while others are hybrid cash balance plans. Under the hybrid cash balance plans, employees have notional accounts credited with contributions and interest, and upon retirement, benefits are payable as an annuity. Different benefit tiers apply to employees based upon the year in which they were hired. Per the latest data available, each of the systems included the following liabilities: [343]

- **ERS:** 233,000 total participants covered (113,000 active employees, 120,000 retirees and other beneficiaries); with $1.5 billion in annual benefits and $31 billion in total actuarial liability[344]

- **TRS:** 77,000 total participants covered (32,000 active employees, 45,000 retirees and other beneficiaries); with $0.8 billion in annual benefits and $17 billion in total actuarial liability

- **JRS:** 840 total participants covered (381 active employees, 459 retirees and other beneficiaries); with $25 million in annual benefits and $0.7 billion in total actuarial liability

---

343 All liability estimates are as of July 1, 2017. Benefit estimates and headcounts are based on census data as of July 1, 2017
344 Coverage counts do not include participants who are terminated and owed a deferred vested benefit as this participant data is unavailable. The liability for these participants is estimated via a load in the actuarial liability

HTA_CONF 00014740

**All employees have historically made contributions toward their benefits, albeit at different rates**. Most regular government employees (including police officers as of January 1, 2020) also participate in Social Security, which includes both employer and employee contributions; most teachers and judges do not participate.

EXHIBIT 150: PUBLIC EMPLOYEE RETIREMENT SYSTEMS OVERVIEW (PRIOR TO PLAN OF ADJUSTMENT)

| Group | Defined Benefit Component | Hybrid Cash Balance Component | Defined Contribution Component | Social Security Coverage |
|---|---|---|---|---|
| ERS - Hired Jan 1, 2000 or later | None | Based on employee contributions and a share of investment earnings prior to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| ERS - Hired before 2000 | Based on years of service and salary, frozen as of June 30, 2013 | Based on employee contributions and a share of investment earnings from June 30, 2013 to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| TRS - Hired Aug 1, 2014 or later | None | None | Based on employee contributions | No |
| TRS – Hired before Aug 1, 2014 | Based on salary and years of service | None | None | No |
| JRS - Hired Jul 1, 2014 or later | Reduced formula based on salary and years of service | Based on employee contributions and a share of investment earnings | None | No |
| JRS — Hired before Jul 1, 2014 | Based on salary and years of service | None | None | No |

1  Police officers were enrolled in Social Security effective as of January 1, 2020.

**Over many decades, successive Governments have failed to adequately fund these retirement plans, and today the ERS, TRS, and JRS are insolvent**. In fact, Commonwealth PayGo expenditures to provide pension benefits are expected to continue constituting over 20% of General Fund expenditures without further action, as detailed below (*Exhibit 151*).

317

HTA_CONF 00014741

EXHIBIT 151: PAYGO EXPENDITURES COMPARED TO OVERALL GENERAL FUND EXPENDITURES, PRE-MEASURES



PayGo expenditures compared to overall General Fund expenditures, $M

In accordance with Section 211 of PROMESA, the Oversight Board published a detailed report in September 2019 on the Commonwealth's retirement systems.[345] This report provides a comprehensive analysis, through the date of the report, of the retirement systems' legal structure, operations, and benefit provisions, as well as additional detail related to the history of management of these funds and actions by the Commonwealth that led to the insolvency of these plans. The report outlines that several factors contributed to the historical underfunding, including inadequate employer contribution levels; the enactment of special laws granting new benefits without adequate funding for said benefits; early retirement programs; debt issuance the ERS system could not support; and mortgage, personal and cultural loans made to participants. Moreover, it clearly illustrates the systems' critical underfunding (see *Exhibit 152*) and urgent need for reform.

---

345 EY, PROMESA Section 211 Report on the Puerto Rico Retirement Systems, September 2019

HTA_CONF 00014742

EXHIBIT 152: FUNDING LEVELS OF ERS, TRS, AND JRS AS OF JUNE 30, 2016



Summary of GASB 67 pension funded status / liabilities, $B

1 Includes only GASB 67 pension costs from Milliman actuarial reports. GASB 45 medical insurance costs are not included in the accrued liabilities

As previously stated, these retirement plans have depleted the assets that were set aside to pay benefits. Further, the employer contributions were not transferred as anticipated.[346] Satisfying pension commitments to current retirees and future retirees and their families is not only important to these individuals but also important to Puerto Rico's economy as retirees spend virtually all their income on the Island. **Action must be taken to identify a level of benefits that Puerto Rico can afford and devise a plan for the Government to fund these revised benefits**.

The Commonwealth has already taken critical steps toward a more stable pension system. Benefits for System 2000 ERS employees hired after January 1, 2000 were transitioned to a hybrid cash balance design with a benefit level based solely on the level of employee contributions. Subsequently, various pieces of legislation passed from 2013 through 2017 ceased accruals under the unsustainable ERS and TRS defined benefit (DB) plans (though TRS reform was subsequently partially overturned). As part of this reform, benefits for all ERS employees and for TRS employees hired after August 1, 2014 were transitioned to a hybrid cash balance plan design. With Act 106-2017, the Commonwealth transitioned to a new PayGo pension system, was required to liquidate assets of the three systems to help fund benefits owed and has moved the assets of recently hired TRS members (and future contributions of ERS and TRS members) into segregated accounts. Hybrid accounts of System 2000 members were not similarly moved into segregated accounts. Now, almost four years after the provisions of Act 106-2017 went into effect, Puerto Rico's retirement systems must be further reformed to reduce costs and maintain adequate funding for current and future retirees. The freeze and removal of annual System 2000 costs will have an average annual impact of a reduction in costs of approximately $26 million through FY2026. When factoring in estimated Social Security cost projections, the measures included

---

[346] Legislative attempts to increase employer contributions to the pension trust were passed, including the Additional Uniform Contribution payments for ERS (Act 32-2013) and the Annual Additional Contribution for TRS and JRS (Act 160-2013 and Act 162-2013), however, large portions went unpaid and/or were not fully implemented prior to elimination by Act 106-2017

HTA_CONF 00014743

herein will begin generating net savings in FY2029 (as compared to estimated PayGo costs which include annual System 2000 pension costs).

**Only with pension reform can the Government help restore both fiscal balance and the promise for current and future retirees to safeguard their assets and their future pensions.**

## 20.2   Proposed pension reform initiatives

Based on the measures herein, restructuring the pension systems will lead to long-term savings, but due to the expansion of Social Security access, this will produce up-front costs of $207 million to FY2026, as shown below (*Exhibit 153*).

EXHIBIT 153: PENSION REFORM SUMMARY OF IMPACT



Summary of pensions reform impact, $M

Freeze on TRS / JRS ■ Social Security contributions ▨ System 2000 removal[2]

1 Post-measures
2 System 2000 removal savings are in exchange for a one-time payment of ~$1.5 billion per Section 19.2.4

### 20.2.1   *Freeze Defined Benefit accumulation for JRS/TRS and enroll employees in a Defined Contribution plan with segregated accounts*

TRS members hired prior to August 1, 2014, and all JRS members are currently accruing benefits under the defined benefit components of their retirement plans. ERS members and TRS members hired after August 1, 2014, transitioned to hybrid cash balance plans. TRS members hired after August 1, 2014, have subsequently had their hybrid accounts segregated from the DB plan by Act 106-2017. These segregated balances, along with ERS and TRS contributions made after June 30, 2017, have been transitioned to DC accounts effective June 2020. To avoid creating future pension liabilities and to adequately fund the pensions future retirees, the JRS and remaining TRS benefit accruals must be frozen. The fiscal plan assumes that benefits will be frozen on March 1, 2022. Members will retain the benefits they have accrued to date. Future benefits must be based on contributions and earnings in new DC accounts. This will result in consistent and equitable treatment across ERS, TRS, and JRS, where all employees will contribute to segregated DC

320

accounts. Going forward, employees should have certainty that their contributions and investment returns will be managed for the future through their own segregated accounts.

The DB freeze savings over time produce significant savings (growing to over $300 million per year by FY2044) which will play a significant role in restoring long-term adequate funding. The freeze will be implemented through the Plan of Adjustment and is slated to take effect in conjunction with the Plan of Adjustment Effective Date.

The 2022 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects:

- Participants eligible to retire at the freeze date retain eligibility to retire at any time based on the benefit that has accrued through the freeze date. Otherwise:
  - Individuals that have yet to vest in a benefit amount will be allowed the opportunity to earn additional service towards vesting after the freeze; the benefit upon vesting will be calculated based on service as of the freeze date, with prorations of the full 10-year benefit based on years of service less than 10 years for judges with shorter tenures
  - Certain judges within six months of service as of the freeze of reaching 30-year enhanced service benefits will be granted six months to grow into a modified enhanced 30-year benefit
  - Normal retirement eligibility will be delayed up to three years for those not yet eligible for retirement as of the freeze date
- Future Cost of Living Adjustments (COLAs) will be eliminated for all current and future retirees
- Minimum benefits and bonuses will be eliminated for future retirements
- The ability to purchase additional years of service will be eliminated
- Future terminations due to disability will be entitled to the same benefits as regular terminations

### 20.2.2    8.5% pension benefit reduction

While the prior fiscal plan included a benefit modification to reduce pensions up to 8.5%, consistent with the current PoA, the 2022 Fiscal Plan reflects the elimination of the pension benefit reduction provision.

### 20.2.3    2022 Fiscal Plan covering more government workers in Social Security

As part of a comprehensive approach to the retirement of teachers and judges, the confirmed Plan of Adjustment contains provisions that expands participation in Social Security to teachers and judges. Currently, teachers and judges do not participate in Social Security. They do not pay into the program, nor does the Government make a Social Security contribution on their behalf. Unlike ERS members, teachers and judges are entirely reliant on their government pensions for income in retirement. This places them at risk given that government retirement plans are poorly funded. Effective January 1, 2020, police officers, who were similarly situated previously, began actively participating in Social Security.

These groups are exempt from Social Security because of the "Section 218" agreement between the Commonwealth and the Social Security Administration, which stipulates that certain government employees have wages that are includable for Social Security and subject to Federal Insurance Contributions Act (FICA) taxes while others may be exempt from Social Security if they participate in a "qualified replacement plan." Section 218 of the Social Security law provides guidance as to what constitutes a "qualified retirement plan," such as a defined benefit plan with

HTA_CONF 00014745

a minimum benefit level or a defined contribution plan in which total employee and employer contributions equal to at least 7.5% of employee wages. Teachers and judges are both in job classifications that, under the Section 218 agreement, are exempted if such a "qualified replacement plan" exists. Under the current TRS and JRS retirement plans, this requirement is met and, therefore, such employees are exempted from Social Security.

Covering these workers under Social Security will provide them with diversified sources of income in retirement, and Social Security's progressive benefit formula will provide a stronger safety net for lower-paid employees. Workers will typically earn greater retirement benefits under Social Security, based on a 6.2% employee contribution and a 6.2% employer (government) match, than they would in a DC plan funded only with a 6.2% employee contribution. For example, a typical full-career government employee retiring with a salary of $35,000 will be entitled to a Social Security benefit of approximately $16,000, in addition to the benefit the employee builds in their defined contribution retirement account.

Social Security retirement benefits are only provided for those who have ten years of covered earnings. Therefore, it would not be worthwhile for older workers, who may not meet the ten-year threshold and do not have other employment in which they were covered by Social Security, to be covered under Social Security. For this reason, only teachers and judges *under the age of 45* shall automatically be covered under Social Security. Social Security coverage for teachers and judges over age 45 as of the PoA effective date will be provided only to those that choose to opt into coverage, if they make the determination that they will benefit from such coverage. Expanding Social Security coverage to teachers and judges will be accomplished without either an employee referendum or new federal legislation by freezing the TRS and JRS plans and reducing the DC account contributions for i) current teachers and judges under the age of 45 ii) current teachers and judges over 45 who opt into Social Security coverage and iii) all teachers and judges hired in the future to an amount lower than the 7.5% required by Section 218 to be considered as participating in a qualified retirement plan. This step will trigger mandatory enrollment in Social Security. Concurrently, lowering the employee DC for those that are enrolled in Social Security will address the loss of take-home pay they would suffer by having to contribute the 6.2% Social Security payroll tax. The approach of lowering the DC contribution to 2.3% is consistent with the approach used to implement Social Security participation for police officers in FY2020.

### 20.2.4   *System 2000 settlement*

Following the agreement with AFSCME documented in the AFSCME Plan Support Agreement, the Plan of Adjustment includes specific treatment for certain ERS plan participants known as System 2000 members. These are generally ERS members hired on or after January 1, 2000.

Employees who joined ERS on or after January 1, 2000, were enrolled in a hybrid cash balance plan. The hybrid account balances were credited with the employee contributions made to the plan and interest that was connected to the overall ERS trust return. As a result of Act 106-2017, these accounts were frozen as of June 30, 2017, and no longer were credited with either employee contributions or interest.

For participants who have not yet retired, providing access to a market interest return can help the participant in achieving greater retirement benefits than the System 2000 contributions. In lieu of receiving a future benefit from ERS, System 2000 participants will receive the value of their contributions and any interest accrued under the terms of the plan through the Commonwealth petition date as a deposit into their Act 106-2017 accounts (approximately $1.376 billion).

For ERS participants hired prior to January 1, 2000, defined benefits accrued and payable under Act 1 and Act 447 were frozen as of June 30, 2013 by Act 3-2013. As a result, from July 1, 2013 through June 30, 2017, these employees also accrued benefits under a hybrid plan from employee contributions and interest associated with ERS trust returns similar to System 2000. These benefits are annuitized and paid out along with the defined benefits calculated under Act 1 / Act

HTA_CONF 00014746

447. Additionally, such individuals employed as of the Effective Date will receive a one-time contribution of $2,600 to their Act 106-2017 accounts.

### 20.2.5   Other Plan of Adjustment provisions

The Plan of Adjustment provides that a pension reserve trust will be established and funded to ensure that future PayGo benefits can be supported regardless of the future economic or political situation in the Commonwealth. The trust will be independently managed by a committee whose members shall meet the independence, professionalism, experience, and qualification standards set forth in the Pension Reserve Deed of Trust.[347] Funding for the pension reserve trust is to be provided according to a formula based on the Commonwealth's annual surpluses.[348] The pension reserve trust is projected to be fully funded by FY2039, at which point withdrawals can be made to fund PayGo pension payments under certain conditions.

The Oversight Board recognizes that there will be costs associated with implementing the various pension related provisions of the Plan of Adjustment. Therefore, the Oversight Board intends to allocate funds that can be accessed for the execution of these provisions based on services that need to be rendered.

The PoA provides that for the first ten years after the PoA effective date, the Government shall not (a) implement or enact legislation to create or increase any defined benefit pension payment or obligation to current or future retirees, regardless of funding source, or (b) undo (in whole or part) the PoA's eliminations of defined benefit plan accruals and cost of living adjustments; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the PoA.

## 20.3   Implementation and enforcement of pensions measures

Work has begun to ensure the freeze of JRS / TRS, including the associated expansion of Social Security, Defined Contribution account access, as well as to ensure proper communications with all Puerto Rican pension recipients. The PoA requires and the 2022 Fiscal Plan reflects full implementation of pension reform measures upon the effective date of the Plan of Adjustment.

### 20.3.1   Defined Contribution plan implementation

After almost three years since Act 106-2017 introduced the Defined Contribution accounts for most of the Commonwealth employees, and multiple letters and statements issued by the Oversight Board regarding the importance of implementing these accounts, individual accounts for participants were funded and employees received access to view and manage their account balances in June 2020. In addition to government employees being able to view their account balances, they now can select their investments, designate their beneficiaries, transfer balances to other investment funds and increase their contributions. Prior to this, employee contributions to their Defined Contribution accounts were held in a temporary trust with nominal interest accruals. By fully funding the individual accounts, the participants are being provided access to their market returns as promised by the Government. Current and future public sector workers can now have confidence that the funds being invested toward their retirement are being treated with the appropriate level of care and afforded the opportunity to grow over time. It is precisely because the Government has no financial obligation for these retirement benefits, that the

---

[347] Article LXXXIII, Governance and Provisions regarding Pension Reserve, Section 83.2 of the January 14, 2022 Amended Plan of Adjustment

[348] Please refer to Article LXXXIII – Governance and Provisions Regarding Pension Reserve in the January 14, 2022 Amended Plan of Adjustment for additional detail

HTA_CONF 00014747

Government must continue honoring its fiduciary obligation for implementing the Act 106 plan and transferring employee contribution in a timely manner (i.e., by 15th day of the following month).

During this implementation delay, the Oversight Board repeatedly identified instances where the Government has failed to ensure employee withholdings are transferred immediately to the temporary trust where account balances are being held. On April 30, 2019, and subsequently on February 21, 2020, the Oversight Board notified the Commonwealth that it had identified agencies that had withheld employee contributions intended for participants DC accounts but had failed to transfer these dollars to the Retirement System. As a result of this follow-up and ongoing monitoring by the Oversight Board, the Oversight Board made pertinent referrals to the Department of Justice, and individual contributions has decreased 97%. The Oversight Board continues to urge the Government of Puerto Rico to instruct agencies, municipalities, public corporations, and those entities that manage government payroll to deduct and immediately address the transfer of these individual contributions. A failure to honor this fiduciary obligation increases the risk of insufficiency in retirement income, the potential futility of the benefit offering, and the diminishing viability of employment in the public sector.

Additionally, during 2020 the Oversight Board made a recommendation to the Government pursuant Section 205 of PROMESA for legislative intervention to amend Act 106 in order to define the default investment option as a target data life-cycle fund, rather than a principal preservation fund once the transition to the Defined Contribution plan became complete. The Oversight Board believes that the default investment option offered by the Defined Contribution Plan should encourage participants to adequately invest their accounts to generate retirement stability. The current default option of the principal preservation fund is inadequate for this task, and as such the Oversight Board feels it is important to change the default investment option to the target date life-cycle fund. This vehicle produces significantly higher long term returns by providing access to higher returning investments during the period of participants' lives when they are better able to handle the risk. While the Government has declined to take the Board's suggestion on this matter, the Oversight Board remains committed to promoting this change since the default option of a principal preservation fund, as currently provided under Act 106, is inadequate for retirement readiness.

In addition, the Oversight Board believes that the use of a principal protection fund as the default investment option is not compliant with fiduciary responsibilities under the Employee Retirement Income Security Act of 1974 (ERISA). The use of target date funds as an investment option, however, is largely supported by similar plans in both the private sector and is consistent with the investment vehicles used by many other governments.

As part of meeting its fiduciary responsibility, in selecting which target date funds to offer, the Commonwealth should select funds that have a demonstrated track record of appropriate management and achieving returns that are justified by their fees. This will provide Commonwealth employees with the tools they need to be adequately prepared for retirement.

After the Oversight Board's recommendation, the Government declined to implement. The Oversight Board urges the Government to reevaluate or continue to provide constant education to DC participants so that each individual can manage their investment options and make decisions that best benefit individually.

### 20.3.2   *Monitoring of pension related legislative activity*

The Oversight Board has been actively monitoring a series of Acts and proposed legislation that has sought to expand the retirement system for the Commonwealth. The Oversight Board has, on numerous occasions, expressed concern over the compliance of these pieces of legislation with the provisions of PROMESA.

HTA_CONF 00014748

In August 2020, the Commonwealth enacted Act 80-2020 granting an incentivized retirement program for certain ERS participants, Act 81-2020 granting enhanced benefits to members of the Puerto Rico Police Ranking System, Fire Fighters Corps Bureau, Puerto Rico Custody Officers Corps, and medical emergency technicians of the Medical Emergency Corps Bureau and the Municipal Medical Emergency System, and Act 82-2020 granting credit to retirement benefits arising from unused sick leave balances for participants under the Teachers Retirement System. After on-going discussions between the Oversight Board and the Government, an agreement was reached and an order was entered in the Title III court to nullify Acts 80-2020, Act 81-2020, Act 82-2020, and Joint Resolution 33 (a resolution passed on December 16, 2021, which ordered the Executive Directors of OMB and the Retirement Systems Administration to begin at least partial implementation of Act 80-2020). In addition, it was ordered that the Oversight Board and the Governor would endeavor to reach agreements on incentivized retirement program for certain ERS participants while creating the necessary offsetting savings for the Government, providing enhanced retirement benefits to police officers, and providing possible alternatives for enhanced compensation packages for teachers. The Oversight Board and the Governor have been actively working to pursue agreements in each of these areas in a fiscally responsible way.

*PayGo Compliance*

In addition to establishing the Defined Contribution Plan, the passage of Act 106-2017 established the Pay-as-you-Go ("PayGo") system. The PayGo system, under which pension benefits are paid out of the annual Commonwealth budget rather than via amounts previously set aside into pension trust funds, was implemented to ensure the continued payment of benefits to retirees given that the ERS, TRS, and JRS trust funds were effectively insolvent. Currently, PayGo obligations represent approximately 20% of General Fund expenditures.

Section 2.1(b) of Act 106-2017 establishes a PayGo Fee that is "equal to the amount paid to Retirees and Beneficiaries of each covered entity." The responsibility for entities to pay this Fee and the authority of the Office of Management and Budget to collect the fee is further outlined in the legislation. Section 2.1(f) authorizes the Office of Management and Budget to "withhold from the appropriations made to the agencies of the Government of Puerto Rico, the necessary amounts for the payment of the Pay-Go Fee, if it determines that such withholding is necessary to ensure that covered entities fulfill their obligation." Section 3.5(2) further subjects any entity who fails to remit the Fee to a series of corrective actions, including the following:

- A demand by the Retirement Board for the immediate transfer of the Pay-Go fee or delinquent contribution

- The Secretary of Treasury may make adjustments to the "accounts, obligations, and advances that the Department of Treasury must remit to the delinquent employer"

- The Municipal Revenue Collection Center, "CRIM", may remit the Pay-Go fee or delinquent contribution from the "unencumbered balance of the property tax and other revenues that the Municipalities are entitled to receive."

- The Office of Management and Budget may withhold any form of appropriations to agencies necessary to meet the Pay-Go Fee obligation

The Oversight Board continuously monitors the status of entity compliance with paying the Pay-Go Fee. *Exhibit 154* demonstrates the significant level of PayGo debt owed by Public Corporations and Municipalities as of November 15, 2022.

HTA_CONF 00014749

EXHIBIT 154: CURRENT PAYGO DEBT FOR MUNICIPALITIES AND PUBLIC CORPORATIONS

| Entity type | FY2018 debt, $M | FY2019 debt, $M | FY2020 debt, $M | FY2021 debt, $M | Total, $M |
|---|---|---|---|---|---|
| Municipality | 17 | 70 | 0 | 65 | 152 |
| Public Corporations | 35 | 18 | 11 | 40 | 104 |
| Total | 52 | 88 | 11 | 105 | 256 |

There has been an effort to have delinquent agencies and municipalities to enter into payment plans to resolve historic PayGo debt. As of February 15, 2021, municipalities and public corporations have executed repayment plans, with two other active negotiations ongoing for the municipalities of San Juan and Guaynabo. Signed payment plans account for ~$48 million of the $274 million in outstanding debt. The Oversight Board will continue to closely monitor the municipalities budget and compliance with current year PayGo debt and the execution of Payment Plans.

It is important to mention that after the Act 29-2019 per Title III Court ruling on April 15, 2020, the Oversight Board engaged with the Retirement Board, CRIM and Municipalities concerning the implementation of a repayment waterfall that Municipalities received from Excess CAE (refer to CRIM 2021 Fiscal Plan, Section 7.4 for further information). The Oversight Board reached out as well after becoming aware that FY2020 Payment Plans were being executed regardless of the repayment waterfall and notified Retirement Board the inconsistency with the implementation agreed. However, the Oversight Board made clear for prior periods municipalities with FY2018, FY2019, and/or FY2020 debts must enter into payment plans for such periods in accordance with certified Commonwealth and CRIM Fiscal Plans and Article 2.1 of Law 106-2017, as amended.

EXHIBIT 155: MUNICIPALITIES REQUIRING PAYGO PAYMENT PLAN EXECUTION

| Municipality | PayGo debt not in Payment Plan | Amount of debt, $ |
|---|---|---|
| Guayanilla | FY2021 debt | 449,226 |
| Las Marías | FY2021 debt | 256,942 |
| Patillas | FY2021 debt | 520,320 |

HTA_CONF 00014750

**EXHIBIT 156: PUBLIC CORPORATIONS REQUIRING PAYGO PAYMENT PLAN EXECUTION**

| Public corporation | PayGo debt not in Payment Plan | Amount of debt, $ |
|---|---|---|
| Puerto Rico Aqueduct and Sewer Authority (PRASA) | FY2018 Debt | 6,360,564 |
| | FY2019 Debt | 2,258,017 |
| | FY2020 Debt | 2,841,957 |
| | FY2021 Debt | 7,690,866 |
| Department of Economic Development (DDEC) | FY2019 Debt | 4,838,469 |
| | FY2020 Debt | 4,724,260 |
| | FY2021 Debt | 3,027,985 |
| Land Authority | FY2018 Debt | 2,199,247 |
| | FY2019 Debt | 2,949,810 |
| | FY2020 Debt | 3,353,433 |
| | FY2021 Debt | 3,027,985 |
| Land Administration | FY2018 Debt | 1,982,371 |
| Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico (COSSEC) | FY2018 Debt | 392,503 |
| | FY2019 Debt | 432,161 |
| | FY2020 Debt | 405,189 |
| | FY2021 Debt | 389,284 |
| Ports Authority | FY2018 Debt | 22,685,821 |
| | FY2021 Debt | 24,414,240 |

The Oversight Board has further discussed with AAFAF possible remedies to further reduce the outstanding debt. AAFAF has the authority under Section 8(e) of Act 2 – 2017 to appoint a representative to oversee compliance with the execution of the 2022 Fiscal Plan, including compliance with the requirement that future and past due PayGo Fees be remitted in a timely fashion. Further, Section 8(b)(iv) of Act 2 – 2017 permits that when reports indicate an entity's cash flows are not consistent with the Certified Budget, AAFAF may "direct and perform banking transactions on behalf of the appropriate entities of the Government of Puerto Rico to make debt service payments, among others." The Oversight Board and AAFAF have discussed actions including, but not limited to, withholding general fund revenues and/or debiting existing cash accounts to satisfy PayGo Fee debt.

Proper long-term health of the PayGo system requires constant compliance with and monitoring of the PayGo Fees as set forth in Act 106-2017. Failure to ensure these payments continue to be made would threaten the ability of the General Fund to sustain pension payments in the long-term and ultimately harm the welfare of Commonwealth retirees.

*Pension Working Groups*

The Oversight Board reached out to the Government on February 27, 2020, to convene an interagency working group (the "Social Security Working Group") to ensure the effective and timely implementation of Social Security for teachers and judges. The expansion of access to Social Security for public workers has been a goal since the 2017 Fiscal Plan, and the Social Security Working Group has been created to prevent additional delays in ensuring that public employees are eligible for this benefit, particularly in light of past delays and challenges experienced as part of the implementation process. On July 19, 2019, the Governor enacted legislation (Act 71-2019) to allow for the participation of police officers in Social Security. Multiple

327

HTA_CONF 00014751

Fiscal Plans, including the 2019 Fiscal Plan, called for police officers to have access to Social Security no later than July 1, 2019. To provide adequate funding, the certified Commonwealth budgets also provided the appropriations needed for the Police Bureau to fund their Social Security contributions. Nevertheless, the implementation of Social Security for police was delayed by six months to January 1, 2020.

The Social Security Working Group has been addressing the lessons learned from the implementation of Social Security for police officers, payroll implementation, and optional participation election with the participation of members selected by the Government from AAFAF, the Department of Education, the Retirement Board, the Department of the Treasury, and the Office of Court Administration.

The Social Security Working Groups have been regularly meeting, developing timelines, and assigning the tasks necessary to meet this goal, including simultaneous establishment of DC accounts and development of educational materials for all impacted teachers and judges. In connection with this, and at the Oversight Board's recommendation, the Social Security Working Group is also participating in implementation discussions related to the Defined Contribution plan so that all retirement related withholdings are coordinated. This is important in particular for police whose minimum Defined Contribution requirements have been reduced to 2.3%, with an additional 6.2% being withheld for Social Security FICA purposes. Based on the terms of their Section 218 agreement, police that want to maintain their eligibility for Social Security coverage cannot be allowed to contribute to their Defined Contribution accounts more than the 7.5% bar for a qualified replacement plan under Social Security law. Similar protocols will also need to be in place for teachers and judges that eventually are enrolled in Social Security.[349]

The 2022 Fiscal Plan expects the Social Security Working Groups to accomplish the milestones outlined in *Exhibit 157* below.

### 20.3.3   *Required implementation actions*

To achieve the 2022 Fiscal Plan pension reform measures, certain action items must be implemented as described in *Exhibit 157*. Multiple steps are needed to implement each of these action items and full implementation of the pension measures must be in effect by the effective date of the plan of adjustment.

---

[349] Internal Revenue Service, "Federal State Reference Guide", 2020

328

HTA_CONF 00014752

**EXHIBIT 157: REQUIRED IMPLEMENTATION ACTIONS FOR PENSION REFORM**

| | Action item | Sample intermediate steps |
|---|---|---|
| **To be completed by Effective Date of Plan** | ▪ **Enroll teachers and judges under age 45, participants electing participation over 45, as well as new hires, in Social Security** | ▪ Establish controls to prevent DC contributions from exceeding 7.5% if enrolled in Social Security<br>▪ Communicate changes to members including options for those over 45<br>▪ Set up mechanism to incorporate elections for judges and pre-2014 teachers<br>▪ Design reporting and reconciliation steps required for Social Security Administration compliance<br>▪ Update PRDE and Office of Court Administration payroll systems to reflect revised withholdings<br>▪ Confirm law modified to reflect TRS/JRS freeze prior to enrollment in Social Security |
| | ▪ **Implement JRS / TRS freeze and transition to segregated DC accounts** | ▪ Update processes to allow for DC deposits on 15th of following month<br>▪ Communicate changes to members<br>▪ Establish and provide access DC accounts for judges and pre-2014 teachers<br>▪ Update pension calculation systems to reflect frozen benefit provisions in ad hoc calculations<br>▪ Update pension calculation databases to include frozen benefit calculations (long-term calculation solution, to complete following the Effective Date) |
| | ▪ **Implement System 2000 segregation and $2,600 deposit for active Act 1, 447 participants to segregated DC accounts** | ▪ Identify the total defined contribution deposit amount and set up procedure for cash transfer to DC accounts<br>▪ Identify treatment of participants that do not currently have a DC account<br>▪ Develop procedure to handle participants with missing data<br>▪ Confirm tax treatment for participants receiving distributions |
| | ▪ **Establishment of the Pension Reserve Trust** | ▪ Develop governance structure and identify individuals for governance roles<br>▪ Establish Board governance protocols including: Independent board, investment polices, mechanism for transferring surplus, and selection of advisors such as asset manager / investment consultant |

The implementation of these milestones is the combined responsibility of AAFAF, Treasury Department, Department of Education, Retirement Board, and the Office of Court Administration. These agencies are actively participating in the Social Security Working Groups and are meeting frequently to ensure timely implementation. The Oversight Board continues to urge the Social Security Working Groups outlined above to take responsibility for identifying all intermediate milestones, as well as establishing the necessary detailed timelines and responsibilities so that these steps will be complete when the Plan of Adjustment is approved.

# Chapter 21. Ensuring successful implementation and fiscal controls

As was discussed in *Section 13.2.1*, the Office of the Chief Financial Officer (OCFO) has broad responsibility for improving fiscal management as outlined in the 2022 Fiscal Plan. Below are specific details regarding the necessary implementation steps and reporting required by the 2022 Fiscal Plan.

## 21.1   Implementation architecture

Developing a centrally run Project Management Office (PMO) is an important step toward ensuring the implementation and tracking of the core operational transformation and agency efficiency measures that will achieve savings targets under the 2022 Fiscal Plan. The Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) should serve as the central

HTA_CONF 00014753

PMO with defined reporting to the Governor of all economic and transformation measures. The PMO should be run by AAFAF's senior leadership, regularly coordinate across the Office of Management and Budget (OMB) and the Office of the Administration and Transformation of Human Resources (OATRH, by its Spanish acronym), work directly and frequently with Agency PMOs, and report directly to the Governor's office.

Individual Agency PMOs should be established with direct reporting to the PMO. Each agency head shall be responsible for developing and implementing a PMO structure that best fits their respective agency groupings. They are expected to coordinate across all agencies in their grouping, lead reforms for the grouping, and be responsible for achieving their agency grouping savings targets. Through this PMO structure, the Government will be positioned to effectively manage and implement the 2022 Fiscal Plan. As such:

- Designated agency heads should lead the Agency PMOs and report directly to AAFAF.

- Agency PMOs should undertake the required work to implement initiatives.

- The daily activities of PMOs should be managed and undertaken by staff knowledgeable in the relevant subject matter areas and assigned members should meet regularly with PMO leadership to report on progress and facilitate necessary decision-making.

- Agency PMOs shall be responsible for assembling a taskforce to: complete validation and definition of full scope of projects and priorities, finalize reporting tools and tracking responsibilities, and perform ongoing weekly tracking and reporting.

The PMOs should ensure continued implementation progress through robust tracking and reporting tools that foster growth in transparency and ownership, including:

- **Project charters** that establish the goals and structures of measures, identify risks and obstacles, and establish metrics and KPIs.

- **Implementation plans** with detailed layouts of each activity required for accomplishing sub-measures, risks / mitigants for each activity, clear leaders and owners for each activity, and metrics and KPIs. These should include a "live" calendar of updates and status of each measure.

- **Implementation dashboard / tracker** that provides a single snapshot of the entire transformation plan; and allows management to know the status of each initiative in a distinct status: Complete; In Progress; Delays; Major Issues. This tracker will allow the Oversight Board to monitor progress and ensure enforcement of measures and reforms.

- **Sub-measure dashboards** that provide "zoomed in" views of a specific sub-measure, display progress with details / commentary on project status, include agreed upon milestones / dates to track progress, and provide mitigation plans.

- **Implementation monthly reports** that provide a more detailed perspective on progress, including several key reporting elements: a) headcount by regular and transitory with more details in specific agency cases, b) budget to actuals by cost category and concept, c) milestones progress, d) KPIs/leading indicators, e) achieved savings to date. These reports provide important codification of progress as well as context for monthly meetings where agencies, OCFO, and Oversight Board representatives can hold meaningful discussions on progress, items at risk and ongoing mitigating activities.

## 21.2   Oversight Board and OCFO implementation collaboration

The Oversight Board has played, and will continue to play, an active role in overseeing all aspects of Fiscal Plan implementation. The OCFO must provide the Oversight Board and its staff the information needed to effectively track the status of key initiatives included in the 2022 Fiscal

HTA_CONF 00014754

Plan, which is necessary to measure overall progress against the fiscal and budget objectives outlined therein.

For example, the OCFO will provide Oversight Board staff with key management information on a timely basis, including:

- Implementation plans submitted by individual PMOs
- Progress reviews (including milestones and metrics) against key structural and fiscal measures
- Reviews of key implementation risks, including assessments of the likelihood of realization, potential impact, and potential mitigations
- Monthly progress reports submitted by individual PMOs

## 21.3   Reporting on Fiscal Plan reforms

**The fiscal and structural reforms described in the 2022 Fiscal Plan represent a significant and transformative effort across the Government.** As such, there are strict reporting requirements needed to ensure savings and growth targets are being achieved on time, and to identify any major risks to reform to course correct at an early stage.

**To date, however, the Government has struggled with implementing reforms and reporting on this implementation in a timely manner.** Progress has, as a result, been inconsistent and incomplete, and many agencies appear unprepared to meet savings targets. While some progress on measures has been made, many reforms are delayed or not occurring. In cases where certain reforms will not occur, the Government must achieve these savings through other means.

**The Government shall produce monthly performance reports**, which shall be submitted to the Oversight Board on the 15th of each month, demonstrating the progress made on all key reform areas. Agency efficiency savings that have been realized should be broken down by grouping and agency across payroll and non-payroll savings (as well as on an object level where needed). This will display the performance of the realized agency efficiency savings for each agency against the projections as set forth herein. Implementation reports should explicitly explain how budget-to-actuals reports tie to agency actions and reforms, and what is driving major discrepancies. Reporting shall also include detail on use of funds for professional services, as well as within the Other (or "englobadas") cost concept, such that these expenses can be appropriately managed. Currently, less than 30% of agency groupings have consistently provided implementation reporting. The Government must improve reporting such that it and the Oversight Board can hold agencies accountable for achieving savings through the implementation of fiscal measures.

If, after any fiscal quarter, the projected agency efficiency savings for any grouping is not realized, the shortfall from that fiscal quarter will be added to the agency efficiency savings target for the corresponding grouping for the following quarter. As needed, the Oversight Board will also hold public hearings to review implementation progress. Should there be underperformance in agency efficiency savings for any grouping, the Oversight Board may rely on its powers and rights pursuant to PROMESA to take measures to enforce reductions in the amount of unrealized savings.

## 21.4   Ensuring fiscal controls and transparency

Consistent with *Chapter 13*, the OCFO must improve fiscal governance, accountability, and internal controls over the Government's finances and budget. To ensure that there is transparency into the Government's progress toward meeting its savings targets, the Government must meet the following milestones (*Exhibit 158*).

HTA_CONF 00014756

## EXHIBIT 158: FISCAL CONTROLS & REPORTING KEY IMPLEMENTATION MILESTONES

| | Reporting Requirement | Closing of the 1st Reporting Period | Cadence for FOMB Reporting ^ | Cadence for Public Reporting# | Reporting Requirement Source |
|---|---|---|---|---|---|
| **I. Cash Reporting** | A. Treasury Single Account (TSA) Liquidity (Actuals vs. Liquidity Plan) | 10/26/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | B. Consolidated TSA including Agency Detail (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. Independently Forecasted Component Units (IFCUs) (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Liquidity - Office of the Comptroller, Senate, House of Representatives, Judiciary Branch, Civil Rights Commission, OMBUDSMAN (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | E. Summary of Bank Account for the Government of Puerto Rico and its Instrumentalities | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | F. General Fund (GF) Revenues Actual Reconciliation: Treasury Single Account (TSA) Liquidity 1 (A) Report by AAFAF vs. GF Net Revenues Report by Puerto Rico Department of the Treasury (PRDT) | 11/30/2021 | Monthly | Monthly | Fiscal Plan |
| **II. Additional Actuals Reporting** | A. Budget to Actual Report - Including Revenues (including gross revenues, tax credits collected, and net revenues)' | | | | |
| | 1. General Fund | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 2. Non-General Fund Funds (including Special Revenue Funds) ²,³ | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Federal Funds | 10/31/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | 4. IFCUs | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 5. Comptroller, Senate, House of Representatives, Judiciary, Civil Rights Commission, OMBUDSMAN | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | B. Central Government Payroll and Headcount | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. IFCU Payroll and Headcount ⁴ | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Central Government 3rd Party Accounts Payable | 10/26/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | E. Central Government Invoice Processing KPIs | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | F. Tax Credits | | . | | Fiscal Plan |
| | 1. Liability | 12/31/2018 | Quarterly | Quarterly (beginning 1/31/19) | Fiscal Plan |
| | 2. New credits granted | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Credits used (direct impact on collections) | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 4. Tax Expenditure Report | 12/31/2018 | Yearly | Yearly | Fiscal Plan |
| | G. OATRH Attendance for the Preceding 4-Week Period | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | H. Emergency Reserve Fund Quarterly Reporting | 5/15/2020 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | I. Budget to Actual CAPEX Report | 11/15/2020 | Monthly | Quarterly | Fiscal Plan |
| | J. Prior Year Fund Extensions and Releases | 8/15/2021 | Monthly | Monthly | Fiscal Plan |
| | K. Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial government during the preceding quarter | 10/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| | L. Revised Year End Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial govt. during the preceding quarter (60 days after year end) | 8/31/2019 | Annual | Annual | Fiscal Plan |
| **III. Measures and Reforms Reporting (Progress Reports)⁵,⁶** | A. Structural Reforms (4) | | | | |
| | 1. Labor Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Ease of Doing Business Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Energy Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Infrastructure Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | B. Fiscal Measures (4) | | | | |
| | 1. Office of the Chief Financial Officer | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Revenue Measures | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Pension Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Healthcare Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | C. Agency Efficiencies | | | | |
| | 1. Agriculture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Corrections | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Culture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Economic Development | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 5. Environmental | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 6. Executive Offices | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 7. Finance Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 8. Office of the CFO | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 9. Healthcare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 10. Justice | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 11. Labor | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 12. Land | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 13. Ombudsman | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 14. Public Safety | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 15. Public Works | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 16. Social Welfare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 17. State | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 18. Universities | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 19. Utilities Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 20. Education | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 21. Independent Agencies | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |

HTA_CONF 00014757

| | | | | | |
|---|---|---|---|---|---|
| IV. Macro-economic Indicators | Macroeconomic Indicators | 12/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| V. Recovery Funding Reporting | A. Uses/Disbursement Related to Hurricane Assistance (PWs) | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | B. Department of Housing | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | C. Highways and Transportation Authority | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | D. TSA Vendor Disbursements | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| VI. PayGo Reporting | PayGo Receivables and Contributions Reporting | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| VII. Certifi-cations and Others | A. Quarterly revenue forecast update | 10/31/2018 | 45 days after end of every quarter | n/a | Budget |
| | B. Certify that no appropriation of any previous fiscal year (except for appropriations covered by the exceptions authorized in the budget) has been used to cover any expense during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | C. Certify that no amount of the (i) Social Security Reserve or (ii) Emergency Reserve has been used to cover any expenses during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | D. Payroll transfers per Law 8-2017 | 12/31/2018 | Monthly | n/a | Fiscal Plan |
| | E. Signed legislation Compliance Certificates | n/a | 7 days after a bill is signed by the Governor | n/a | PROMESA |
| | F. Sabana file submission | n/a | n/a | n/a | Budget |
| | G. Quarterly budget submission | n/a | n/a | n/a | Budget |
| VIII. ASES Reporting | In order to increase transparency, going forward ASES must submit the following documentation to the FOMB: <br> A. Detailed enrollment and PMPM projections for each Medicaid sub-population (Medicaid expansion, CHIP, Maternity, Dual-eligibles, etc.) <br> B. FMAP breakdown for each sub-population (Medicaid expansion, CHIP, Maternity, Duals, etc.) <br> C. Projected federal funds vs. local funds required for the program <br> D. Detailed breakdown of available federal funding and SRF funding (full amount allocated for the FY vs. funds still available) <br> E. Amount of Section 1108 funding allocated to DOH for administrative expenses and 330 Centers/FQHC payments <br> F. Detailed breakdown of non-premium expenditures including administrative and operating expenditures (e.g., PBM payments, hospital reimbursements, air ambulance, etc.) <br> G. Progress reports on measures implementation <br> H. Any previously completed data quality audits and assessments <br><br> In addition, the FOMB may require the Puerto Rico Medicaid Program and ASES to submit detailed claims-based data, which, at a minimum, include membership and eligibility information (e.g., demographics, plan eligibility, attributions), provider information (e.g., provider demographics, network, and program participation), pharmacy information (e.g., dispensing information and amounts), and medical information (e.g., MB-04 and CMS1500 fields, including header and detail level amounts and type, granular diagnosis, and procedure codes). In addition, the Puerto Rico Medicaid Program and ASES should provide any additional materials and supporting datasets necessary to support data reconciliation, which may include data crosswalks and additional information on programs and products <br><br> This information is essential to know the overall program size of the Medicaid Program. If ASES fails to comply with the reporting requirements stipulated here, the administrative funds assigned to ASES may be clawed back (in addition to other actions as determined by the Board) | n/a | Quarterly | n/a | Fiscal Plan |

1 Revenues must include gross revenues received, less tax refunds; SRF revenues must be included.
2 The following fund types are included in non-GF reporting: (1) FEE (Fondos Especiales Estatales or Special State Funds) – This fund type should only include revenue designated by specific laws; (2) OI (Otros Ingresos or Other Income) - This fund type should only include non-recurring revenue with specific expenses tied to it. No recurring income should be included or recognized under this fund type OI; and (3) IP (Ingresos Propios or Own Income) - This fund type should only include revenue generated by the agencies or public corporation through their services.
3 The monthly deliverable must include: (1) All revenues and expenses for the current FY; (2) The cash balance for each fund type as of the beginning of the Fiscal Year; (3) The new cash earned during the current fiscal year; and (4) the net cash balance.
4 The report must include (1) the fund type; (2) overtime amounts; and (3) the breakdown of benefits.
5 Implementation plans must be provided for each agency under each agency grouping; the full list of the agencies is included in the Appendix of the Fiscal Plan.
6 Reporting must include: (a) Monthly monitoring by each government agency of key performance indicators for each of the fiscal reform measures. (b) Monthly self-reported realized savings achieved year to date by agency and agency groupings. (c) Implementation dashboard / tracker that provides status of each initiative in a distinct status. (d) Sub-measures dashboard.

A Unless otherwise specified, monthly reporting to the Oversight Board must be received 15 days after the end of a reporting period.
B Unless otherwise specified, public reporting must be published 30 days after the end of a reporting period.
C Report shall be structured in a way that allows for the confidentiality of the agreements to be maintained, but the overall (summarized) numbers and trends to be available to the public.

In addition to meeting the above milestones, the Government must proceed according to the following budgetary requirements:

■ The Department of the Treasury ("Treasury") will remit to: the Legislative Branch and its components, the Judicial Branch, the University of Puerto Rico ("UPR"), and the non-profit entities that receive funds from the General Fund, monthly and in advance, the budgetary allotments corresponding to one-twelfth (1/12) of the budget allocation provided herein for such entities. The one-twelfth monthly allocation to each entity (except with respect to the Judicial Branch) shall be subject to the 2.5% withholding set forth in the section below during the first three quarters of FY2023.

■ The Director of the Office of Management and Budget ("OMB") may authorize the encumbrance and disbursement of up to 97.5% of each appropriation intended for encumbrance and disbursement during the first three quarters of FY2023. The Director of the OMB shall withhold the remaining two and a half percent (2.5%) of each appropriation until after the end of the third quarter of FY2023. Such withheld percentage of each appropriation shall only be encumbered and disbursed during the fourth quarter of FY2023 if (1) the first

HTA_CONF 00014758

eight months of actual General Fund revenues reported to the Oversight Board reach the revenue forecast in the 2022 Fiscal Plan for that period and (2) the encumbrance and disbursement is approved by the Oversight Board. If actual General Fund revenues for the first eight months of FY2023 fail to reach the revenue forecast for that period, the amount of the withheld percentage of each appropriation that may be encumbered and disbursed shall be reduced proportionally according to the negative budget variance between projected and actual General Fund revenues. Notwithstanding the foregoing, PayGo appropriations, Consent Decree amounts, Highway and Transportation Authority ("HTA") appropriations, economic incentive funds and distributions, cigarette and rum distributions, allocations of Sales and Use Tax ("SUT") to the Municipal Administration Fund ("FAM," by its Spanish acronym)," and agencies in the Department of Public Safety and in the Health groupings, as defined in the 2022 Fiscal Plan, shall not be subject to the 2.5% withholding requirement.

- Notwithstanding any provision here to the contrary, each of the appropriations listed in the FY2023 General Fund Budget under the following sources of revenue is entirely dependent on the level of revenues collected therefrom: (1) Allocation of SUT to FAM (excluding Debt Portion); (2) Outflow of the Special Fund for Economic Development ("FEDE," by its Spanish acronym) portion of Corporate Income Taxes and Non-Resident Withholding; and (3) cigarette and rum distributions. As such, the disbursements of those appropriations will be gradual and subject to the actual collections thereunder. No expenditure, disbursement, pledge, or any other encumbrance of any such funds may be made until such time as the revenues are actually collected and accounted for in the books.

- No later than 45 days after the closing of each quarter of FY2023, the Secretary of the Treasury shall revise the projected net revenues of the General Fund for FY2023 (the "Quarterly Revision") and shall notify the revision to the Director of the OMB, the Governor, and the Oversight Board. The Quarterly Revision shall project future revenues based on actual General Fund revenues and include revisions to the assumptions used to generate the General Fund's net revenue projections.

- All appropriations authorized in any prior fiscal year, including appropriations without a specific fiscal year, are eliminated and no disbursement of public funds may be covered by such appropriations, except the following which the 2022 Fiscal Plan redeploys as current appropriations, subject to Oversight Board adjustment at any time: (1) appropriations authorized in the fiscal year to carry out permanent improvements that have been encumbered, accounted for, and kept on the books but not exceeding two fiscal years on the books; (2) appropriations in the certified budget for equipment with procurement cycles that extend beyond the end of the fiscal year, which are encumbered on or before June 30, 2023; (3) the portion of the appropriations authorized for the fiscal year that have been encumbered on or before June 30 of such fiscal year, which shall be kept in the books for 60 days after the termination of that fiscal year and after those 60 days no amount shall be drawn against such portion for any reason; (4) the appropriation in the amount $130 million for the emergency reserve included in the FY2022 certified budget and required by *Section 5.2.8* of the 2022 Fiscal Plan (the "Emergency Reserve"); (5) the unobligated portion of the Public Assistance Federal Fund Matching appropriation included in the FY2022 certified budget; (6) unused appropriations for use in audit services held at the Department of the Treasury; (7) FY2022 unused General Funds intended for Medicaid related expenditures; (8) unused Title III funds; (9) reported unused funds from Department of Health's Mental Disability program; (10) reported unused funds from Department of Correction and Rehabilitation's ("DCR") Juvenile program, as certified jointly by Hacienda and DCR; (11) unused appropriations for State unemployment insurance, disability insurance, and chauffeur's insurance, which are held under the custody of the Department of Labor and Human Resources; (12) unused appropriations for milestones and incentives held under the custody of OMB as approved by the Oversight Board; (13) unused appropriations for municipal voluntary cost sharing milestone; (14) unused appropriations for the school and road maintenance funds under the custody of OMB; (15) FY2022 unused General Funds intended for Catastrophic Illness Fund

335

related expenditures; (16) unused appropriations for the Broadband infrastructure expansion and 21st Century Technical and Business Education Fund; and (17) unused appropriations for the rural area health professionals scholarship and loan forgiveness endowment; a working group between the Department of Treasury, Office of the CFO, AAFAF, and the Oversight Board must be established to develop metrics, compliance requirements, and financial monitoring around the eligibility and disbursement of the scholarship and loan forgiveness endowment funds. In addition, this restriction on the use of appropriations of prior fiscal years shall not apply to: (i) programs financed in whole or in part with federal funds; (ii) orders by the United States district court with jurisdiction over all matters under Title III of PROMESA; or (iii) matters pertaining to any consent decree or injunction, or an administrative order or settlement entered into with a federal agency, with respect to federal programs.

- On or before July 31, 2022, the Secretary of the Treasury, Executive Director of the Fiscal Agency and Financial Advisory Authority ("AAFAF", by its Spanish acronym), and the Director of the OMB shall provide to the Oversight Board a certification indicating the amounts of unused FY2022 appropriations for all items enumerated in the previous section. If the Government fails to submit said certification, the amount of unused funds in items 1, 2, 10, and 15 will not carry over to the following fiscal year.

- The FY2023 certified budget resolution will eliminate the UPR Scholarship Fund under the Custody of Hacienda and transfers the UPR Scholarship Fund unused appropriations from prior years to a new UPR Endowment Fund. A new working group between the UPR, Department of Treasury, Office of the CFO, AAFAF, and the Oversight Board must be established to develop metrics, compliance requirements, and financial monitoring. Also, this committee will safeguard that the funds are allocated to students with financial needs only, monitor the asset allocation of the funds, and investments alternatives. Compliance shall be developed and overseen by AAFAF, pursuant to its ministerial duties levied in Act No. 2- 2017.

- In a similar manner as in the previous fiscal year, the FY2023 total budget allocated for the Department of Health's Mental Disability program will be detailed in the upcoming fiscal year's certified budget resolution.

- Each power of OMB, AAFAF, or the Department of the Treasury, including the authorities granted under Act 230-1974, as amended, known as the "Puerto Rico Government Accounting Act" ("Act 230"), to authorize the reprogramming or extension of appropriations of prior fiscal years is hereby suspended.

- The appropriations approved in this budget may only be reprogrammed with the prior approval of the Oversight Board. For the avoidance of doubt, this prohibition includes any reprogramming of any amount, line item or expenditure provided in this budget, regardless of whether it is an intra-agency reprogramming. Reprogramming, also known as reapportionments, may be made into spend concepts and/or objects not explicitly listed in the certified budget resolution as long as such requests are submitted to and approved by the Oversight Board. Reprogrammed funds authorized for the hire of personnel in specialized roles are restricted for that specific use only and may not be made available nor be used for any other budgetary needs.

- The Governor must submit to the Oversight Board all reporting requirements set forth on *Exhibit 158* of the 2022 Fiscal Plan according to the reporting cadence described therein. In addition, if the Oversight Board approves a reprogramming pursuant to the sections above, the immediately subsequent report by the Governor must illustrate the specific implementation of such reprogramming, including the amount, the source of the reprogrammed amount identified by government entity and expenditure concept, the Government entity that received such amount, and the expenditure concept to which it was applied.

HTA_CONF 00014760

- In addition, the Governor shall submit to the Oversight Board a comprehensive reporting package in a similar format to that required in accordance with Section 203 of PROMESA for the following specified programs within different agencies: (1) Department of Education's ("PRDE") Special Education Program; (2) PRDE's Remedio Provisional Program (3) Department of Health's ("DOH") Adult Hospital Program; (4) DOH's Pediatric Hospital Program; (5) DOH's Hospital Universitario Dr. Ramón Ruiz Arnau ("HURRA") Bayamón Hospital Program; (6) DOH's 330 Centers Payments; (7) DOH's Intellectual Disability Program; (8) Mental Health and Anti-Addiction Services Administration's ("ASSMCA", by its Spanish acronym) Río Piedras Hospital Program; and (9) DCR's Juvenile Program. Program reporting must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to/from other programs or agencies.

- In addition, in order to ensure maximum and proper use of federal funds, such as, but not limited to, (1) DRF, (2) CARES, (3) FFCRA, (4) CRRSAA, (5) and ARP, the Governor shall submit a work plan before any disbursement of funds. Improved reporting will help prevent and combat actual, and claims of, misuse, fraud, waste, and abuse. Therefore, the Governor shall also submit weekly reports that detail any disbursements and use of federal funds received. Weekly reporting shall include a list of all awards broken down by agency, program, category, recipient, and sub-recipient detailing (1) date award was granted; (2) date award expires/renews; (3) total award amount (split into payroll/non-personnel); (4) total award encumbrances and disbursements from prior fiscal years (split into payroll/non-personnel); (5) total award encumbrances and disbursements for the current fiscal year (split into payroll/non-personnel); and (6) total remaining award amount (split into payroll/non-personnel). The Governor shall also provide, as requested, performance metrics with regards, but not limited to, time required to submit claims, time required to submit compliance reporting, and time required to collect reimbursement claims.

- In addition, the Governor shall submit to the Oversight Board a monthly reporting package detailing capital expenditure spending by agency and by project including details for expenditures which have RFPs issued, which contracts have been awarded, and which are in process.

- Furthermore, the Governor shall submit to the Oversight Board a monthly reporting package detailing all of PRDE's salary and other payroll expenses within four categories: (1) Central Administrative Personnel; (2) Regional Administrative Personnel; (3) Regional School Support Personnel; and (4) School Personnel as established in the FY2023 certified budget resolution. In order to assess compliance and guarantee accountability, PRDE must submit such monthly reporting detailing salary and payroll expenses by the categories established herein along with a salaries and payroll reconciliation of funds disbursed and actual expenses recorded.

- The reports required pursuant to this section are in addition to the reports that the Governor must submit to the Oversight Board in accordance with Section 203 of PROMESA.

- In conjunction with the reports that the Governor must submit to the Oversight Board no later than 15 days after the last day of each quarter of FY2023, pursuant to Section 203 of PROMESA, the Secretary of the Treasury, Executive Director of AAFAF, and the Director of the OMB shall each certify to the Oversight Board: (1) that no appropriation of any previous fiscal year (except for the appropriations covered by the exceptions in the sections above) have been used to cover any expense; and (2) the Director of the OMB shall certify to the Oversight Board that no amount of (i) the Emergency Reserve and (ii) the unallocated capital expenditures under the custody of OMB has been obligated unless authorized in accordance with the section below.

- The Emergency Reserve, the unallocated capital expenditures, healthcare investments reserve, technology reserve, milestones reserve, utility reserve and the economic incentive

HTA_CONF 00014761

fund under the custody accounts of OMB and the Department of the Treasury, as detailed in the certified budget for FY2020, FY2021, FY2022 and FY2023 may not be used to cover any allocation or expense whatsoever without the prior, written approval of the Oversight Board. If Federal Emergency Management Agency ("FEMA") funding is not available for capital expenditures, a transfer from unallocated capital expenditures may be requested. The economic incentive funds held under the custody of the Department of the Treasury will be released on a quarterly basis after a formal reapportionment is submitted by the DDEC, reviewed and approved by OMB, and submitted to the Oversight Board for review, and the Oversight Board provides its authorization to release such funding. Exceptions to the economic incentive fund release may apply upon meeting all of the specified criteria, if any, listed in the FY023 certified budget resolution.

■ The utility reserve funds held under the custody of OMB may only be released after the Government provides a detailed report to the Oversight Board of employees transferred to individual agencies from the Puerto Rico Electric Power Authority ("PREPA") along with an attendance report for each transferred individual. In addition, agencies that may receive these funds are required to provide a full roster with all active employees to the Oversight Board. Such roster must identify any employee transferred from PREPA to the respective agency.

■ The Emergency Reserve is intended to expedite response activities and, upon request, provide the Commonwealth Agencies and affected local governments with capital in the event of an emergency of such severity and magnitude that effective response exceeds the capacity of current budget resources and federal disaster assistance is not available or not yet available to respond to the emergency. Moreover, the Emergency Reserve is only intended for extraordinary events like natural disasters or as otherwise agreed with the Oversight Board and that are generally outside of human control and unpreventable. The Emergency Fund is not intended to mitigate emergencies related to operational inefficiencies.

– Accessing Emergency Reserve funds shall require: (1) a State of Emergency declaration, by the Governor of the Commonwealth, in accordance with Article 6.10 of Act 20-2017, as amended, known as the Puerto Rico Public Safety Department Act and in accordance with the above description of what constitutes an extraordinary event; (2) OMB request to the Oversight Board for access to the emergency reserve fund for a finite period, indicating the agency or local government that will receive the advance, the amount of the advance, usage of funds requested, and the PR Emergency Disaster Management ("PREMA") request number from WEBEOC platform as well as the projected re-payment date of the funds; (3) amounts approved by the Oversight Board and disbursed to the Government shall be replenished not later than the following fiscal year; and (4) agencies and municipalities, recipients of state emergency reserve funds, shall update OMB on a quarterly basis about the Public Assistance process with FEMA.

– OMB shall request Emergency Reserve funds exclusively for the use of Government agencies and affected local governments. The agencies and affected local governments must be in an emergency declared area and the Emergency Reserve funds must be used for response activities related to the declared event. Non-profits, public corporations outside of the commonwealth, and individuals are not eligible applicants for advances through the Emergency Reserve fund.

– OMB shall submit quarterly reports to the Oversight Board detailing the status of Emergency Reserve funds, amounts provided to agencies and affected local governments, amount of funds expended, amount of funds remaining, and updated projected re-payment dates. Agencies and local governments that received funds from the Emergency Reserve are required to file with FEMA a Request for Public Assistance ("RPA") and Project Worksheet to ensure maximum federal fund reimbursements are replenished into the Emergency Reserve. As a rule, OMB shall offset late repayment by agencies and local governments with other Commonwealth funding to repay the Emergency Reserve on time.

HTA_CONF 00014762

- Cost share matching funds are restricted for use on approved projects/requirements under FEMA's Individual Assistance, Public Assistance, and Hazard Mitigation programs. Any unused cost share matching funds in a given fiscal year may be rolled over to the following fiscal year and are subject to the same restrictions. The use of these funds must be coordinated with CDBG-DR and CDBG-MIT in meeting cost share requirements.

- Additional General Funds may be made available to agencies upon reaching certain, specified milestones and after written approval and authorization from the Oversight Board. Once respective milestones are achieved, agencies must provide a formal notice and submit supporting data corroborating such achievement to the Oversight Board for its review. The subsections listed in the upcoming fiscal year's certified resolution will detail the allowable milestones and incentives for each relevant agency.

- Funds to cover parametric insurance will also be made available upon reaching the following milestones and after the approval and authorization from the Oversight Board.

  - Develop a comprehensive insurance plan to develop a program that considers the available markets, costs, meeting Obtain and Maintain ("O&M") requirements and levels of coverage.

    □ Conduct a risk analysis including hazards/perils covered

    □ Analyze expected O&M requirements on a building-by-building basis

    □ Identify the types and extent of insurance needed to protect against risk and meet O&M requirements

    □ Identify insurance gaps between O&M requirements and insurance that is reasonably available

    □ Identify the authority for developing, implementing, and enforcing the plan

    □ Design the financial arrangement structure for funding the plan and pay for losses, which includes a system for fixed contributions, a formalized plan to pay losses as they occur, and how funds will be distributed

  - Prioritize insurance and strategically consider options to supplement the existing insurance coverage

    □ Identify how the Commonwealth will meet Flood Insurance requirements

    □ Consider broader / expanded limits on existing policies

    □ Consider a separate excess insurance policy that provides coverage above the current limits

    □ Consider a Parametric policy and CAT Bond or a hybrid combination of the two to provide supplemental or excess coverage

  - Engage the Insurance Commissioner

    □ Establish the criteria for the Insurance Commissioner's certification of the insurance coverage that is reasonably available

- As a rule, necessary for the responsible disbursement of budgetary allocations for operating and other expenses, OMB shall withhold from any of the allocations to the agencies of the Executive Branch the amounts necessary to pay for the PayGo contribution, unemployment insurance, or taxes withheld from their employees, when OMB determines that such a withholding is necessary to ensure compliance with these obligations by the agencies concerned. Any such amounts withheld by OMB shall solely be reprogrammed to pay the

corresponding outstanding obligations related to PayGo contributions, unemployment insurance, or taxes withheld from employees.

- OMB and the Department of the Treasury are authorized to establish the necessary mechanisms to ensure that when implementing the concept of mobility, pursuant to the provisions of Act 8-2017, as amended, known as the "Puerto Rico Human Resources Management and Transformation in the Government Act," the corresponding transfer of funds allocated to payroll and related costs of said employee are to be carried out simultaneously.

- The Secretary of the Treasury, the Director of the OMB, and the Finance Director and Executive Director of each agency or public corporation covered by the 2022 Fiscal Plan will be responsible for not spending or encumbering during FY2023 any amount that exceeds the appropriations authorized for FY2023. This prohibition applies to every appropriation set forth in a budget certified by the Oversight Board, including appropriations for payroll and related costs. The Executive Director of AAFAF and the Director of the OMB shall also certify to the Oversight Board by September 30, 2022 that no amount was spent or encumbered that exceeded the appropriations in the certified budget for FY2022.

- For the avoidance of doubt, any reference within the budget to AAFAF, the Department of the Treasury, or OMB, or any of their respective officers, applies to any successor thereof.

- On or before July 31, 2022, the Governor shall provide to the Oversight Board budget projections of General Fund revenues and expenditures for each quarter of FY2023, which must be consistent with the corresponding budget certified by the Oversight Board (the "Quarterly Budget"). The Quarterly Budget shall be provided to the Oversight Board in Excel format and include detailed allocations by agency, public corporation, fund type and concept of spend. Together with the report that the Governor must provide under Section 203 of PROMESA not later than 15 days after the last day of each quarter, the Governor shall provide a quarterly variance analysis that is consistent with modified accrual accounting.

- If during the fiscal year the Government fails to comply with the liquidity and budgetary savings measures required by the 2022 Fiscal Plan, the Oversight Board may take all necessary corrective action, including the measures provided in PROMESA Sections 203 and 204.

- Pursuant to Section 204 (b)(2) of PROMESA, the Oversight Board has maintained since November 6, 2017 a Contract Review Policy to require prior Oversight Board approval of contracts with a value of $10 million or more to assure that they "promote market competition" and "are not inconsistent with the approved fiscal plan." The Policy applies to any contract or series of related contracts, inclusive of any amendments, modifications, or extensions, with an aggregate expected value of $10 million or more, that is proposed to be entered into by the Commonwealth (which includes the Executive, Legislative, and Judicial branches of government) or any covered instrumentality. In addition, the Oversight Board may select to review contracts below the $10 million threshold for these purposes, on a random basis or at its own discretion. Specifically, in the case of the Puerto Rico Electric Power Authority ("PREPA"), the contract review threshold has been reduced to $250,000 exclusively for contracts which are payable from PREPA's "Professional & Technical Outsourced Services" and "PREPA Restructuring and Title III" budget lines. Consequently, all proposed contracts (or series of related contracts) that meet such threshold and are classified as Consulting Services Contracts by the Office of the Comptroller of Puerto Rico (and any applicable sub-categories) must be submitted to the Oversight Board for review and approval prior to execution. For all other PREPA contracts, the Oversight Board maintains the current $10 million threshold. Similarly, in the case of the University of Puerto Rico, the Oversight Board lowered the UPR's contract review threshold to $2 million for all contracts. Finally, in order to further ensure certain contracts promote market competition, the Oversight Board may require, at its own discretion, the Commonwealth or any covered instrumentality, to give it access to ongoing procurement processes for the execution of new contracts.

HTA_CONF 00014764

Moreover, pursuant to Section 204(b)(4) of PROMESA, the Oversight Board has maintained since August 6, 2018 a Policy for the Review of Rules, Regulations, and Orders to be issued by the Executive Branch of the Commonwealth of Puerto Rico. This Policy is aimed at ensuring that certain rules, regulations, administrative orders, and executive orders proposed to be issued by the Governor (or the head of any department or agency) "are not inconsistent with the approved fiscal plan." The Policy requires prior Oversight Board approval of any rule, regulation, administrative order, or executive order that is proposed to be issued in connection with or that concerns financial aspects, or which has the potential to impact fiscal governance, accountability, or internal controls of the Commonwealth or any covered instrumentality under the most recent Certified Fiscal Plan. The above implementation and fiscal controls requirements are important tools to ensure the Government can make meaningful progress towards achieving the goals of the 2022 Fiscal Plan.

### 21.4.1 *Skills and knowhow transfer from consultants to public sector personnel*

The lack of adequate human capital planning in the Government has led to the excessive delegation of critical responsibilities to government contractors and consultants. Contractors and consultants are often performing day-to-day planning and management functions within agencies, instead of being limited to temporary, short-term projects which do not require full time employment or other similar items. Additionally, agencies' pervasive reliance upon contractors for increasingly critical tasks can result in a lack of transparency of true government expenses. Professional services costs can exceed the cost of comparable full-time employees as contractors and consultants often have additional contractual remuneration and benefits (i.e., travel expenses) creating needless tension and budgetary shortfalls at the Commonwealth agencies.

Consequently, the Commonwealth should work on reducing its professional services spending to enable the professionalization of the civil service and reduce the reliance on outside consultants. Starting in FY2022, professional consulting contracts should include provisions requiring adequate transfer of skills and technical knowledge, from consultants to pertinent public sector personnel, to the extent that the contract reflects recurring work that could be done by appropriately trained government staff.

Specifically, contracts must detail the functions carried out by consultants, as per their applicable Scopes of Work, and establish clear plans to ensure that agencies create internal teams of appropriately trained and experienced employees to carry out such functions upon the expiration of consulting contracts. Additionally, agencies will need to establish clear expectations with consultants that internal knowledge transfer and technical training is a key priority. Therefore, shared responsibility and progress should be measured and monitored for the purposes of contract compliance and performance.

Accordingly, agencies should strive to ensure that both the creation of internal teams and the transfer of knowledge to such teams are completed within the applicable timeframes of proposed contracts.

HTA_CONF 00014765

# PART VI. Conclusion

**The 2022 Fiscal Plan is the result of five years of intensive work sessions, dialogue, stakeholder engagement, and experience working to establish the conditions for economic recovery and growth for the benefit of residents of Puerto Rico.** Across these activities, the Oversight Board and the Government have collaborated to create a deep and rich fact base to underpin their work and have remained focused on creating an integrated approach to restoring fiscal sustainability and economic opportunity for future generations of residents.

**The starting point for this 2022 Fiscal Plan involved numerous structural inhibitors to growth, over $120 billion in outstanding debt and unfunded pension obligations, and the devastating impact from a historically destructive set of natural disasters. Yet with the confirmation of the Commonwealth PoA and in the aftermath of hurricanes, earthquakes, and the COVID-19 pandemic—with over $129 billion in federal support mechanisms being made available to enable the Island to rebuild— Puerto Rico has a unique opportunity to take control of its future destiny through implementation of a complete Financial Management Agenda, CSR, accelerated structural reforms, targeted investments in operational capacity to improve government service delivery, and execution of a fiscally responsible post-bankruptcy roadmap.**

**First priority must be the implementation of transformational structural reforms that will change the nature of Puerto Rico's economic development trajectory and provide the residents of the Island with a better and more prosperous future.** COVID-19 federal relief and disaster relief-related spending will provide economic buoyancy in the coming years. However, to achieve meaningful economic growth in the long term, Puerto Rico must use this time to achieve timely and robust implementation of structural reforms, to enhance workforce development and labor productivity and to create a better environment for businesses and investors to create jobs. Without sustained dedication to implementing the 2022 Fiscal Plan structural reforms, and the ambition to pursue additional structural reforms in the future, the challenges that have held back the economy will not be addressed, and the Government will have lost its window to restore long-term opportunity to the people of Puerto Rico. The 2022 Fiscal Plan lays out a series of practical and proven growth-oriented structural reforms and investments, which, when coupled with the federal reconstruction funds, can ensure that the Island can rebuild better in the wake of the pandemic and other natural disasters.

**Second, reorganizing the way government services are delivered, as well as improving their delivery and efficacy on the Island, is critical.** The 2022 Fiscal Plan includes, in order to achieve sustainable and quality delivery of public services, investments aimed at improving the operational capacity of the government, cultivating a high-performing public workforce, enhancing frontline services, and strengthening the technology sector. Amongst the different investments, the 2022 Fiscal Plan includes resources to begin a comprehensive CSR aimed at empowering civil servants by strengthening their skills and performance management and hence provide better quality public services and ensuring improved remuneration. However, the Government must continue to take even greater actions to implement the Financial Management Agenda and ensure a healthy fiscal future for the Island, as Puerto Rico embarks on a new era of fiscal responsibility.

**The Puerto Rico Government has a unique and historic opportunity to seize the current moment—emerging from Title III bankruptcy proceedings and receiving substantial federal funding support—to transform the Island's trajectory. The Oversight Board stands ready to work in partnership with the Government to achieve this vital outcome.**

342

HTA_CONF 00014766

# Appendix

## Chapter 22. Model presentation

The 2022 Fiscal Plan addresses the finances of central government agencies, component units, and other agencies. Agencies for which an independent 2022 Fiscal Plan is being developed have not been consolidated into the 2022 Fiscal Plan and are only represented to the extent they impact the Commonwealth (*Exhibit 159, Exhibit 160, Exhibit 161*).

EXHIBIT 159: MAJOR ENTITES INCLUDED IN AND EXCLUDED FROM THE 2022 FISCAL PLAN



1 GDB , HTA, and UPR have separate and apart fiscal plans from the Central Government, HTA and UPR receive General Fund appropriations.
2. Major CUs include the following IFCUs: ASEM, ASES, PRITA, Ports, PBA, ADEA, AAFAF, HFA, SIFC, PRCCDA
Note: Housing Finance Authority, resources from the Cap Funds (money transferred by HUD for financing projects and repayment of bonds) are not contemplated in the 2022 Fiscal Plan

HTA_CONF 00014767

## EXHIBIT 160: LIST OF ENTITIES COVERED BY THE 2022 FISCAL PLAN

Entities included in Fiscal Plan

| Agency Code | Agency | Agency Code | Agency |
|---|---|---|---|
| 8 | Office of the Comptroller | 43 | Puerto Rico National Guard |
| 10 | General Court of Justice | 45 | Department of Public Safety |
| 11 | Traffic Safety Commission | 49 | Department of Transportation and Public Works |
| 14 | Environmental Quality Board | 50 | Department of Natural and Environmental Resources |
| 15 | Office of the Governor | 55 | Department of Agriculture |
| 16 | Office of Management and Budget | 60 | Citizen's Advocate Office (Ombudsman) |
| 18 | Planning Board | 62 | Cooperative Development Commission |
| 21 | Emergency Management and Disaster Admin Agency | 65 | Public Services Commission |
| 22 | Office of the Commissioner of Insurance | 67 | Department of Labor and Human Resources |
| 23 | Department of State | 68 | Labor Relations Board |
| 24 | Department of the Treasury | 69 | Department of Consumer Affairs |
| 25 | Hacienda | 70 | State Insurance Fund Corporation (SIFC) |
| 28 | Commonwealth Election Commission | 71 | Department of Health |
| 29 | Federal Affairs Administration | 75 | Office of the Financial Institutions Commissioner |
| 30 | Office of Admin and Transformation of HR | 78 | Department of Housing |
| 31 | General Services Administration | 79 | Automobile Accident Compensation Admin (ACAA) |
| 34 | Investigation, Prosecution and Appeals Commission | 81 | Department of Education |
| 35 | Industrial Tax Exemption Office | 82 | Institute of Puerto Rican Culture |
| 37 | Civil Rights Commission | 87 | Department of Sports and Recreation |
| 38 | Department of Justice | 89 | Horse Racing Industry and Sport Administration |
| 40 | Puerto Rico Police | 90 | Medical Services Administration (ASEM) |
| 42 | Puerto Rico Firefighter Corps | 95 | Mental Health and Addiction Services Administration |
| | | 96 | Women's Advocate Office |
| 100 | Legislative Assembly | 165 | Land Authority of Puerto Rico |
| 105 | Industrial Commission | 167 | Company for the Integral Development of Cantera's Peninsula |
| 106 | Public Housing Administration | 168 | Ports Authority |
| 109 | School of Plastic Arts | 177 | Land Administration |
| 119 | Dept of Economic Development and Commerce | 180 | Tourism Company |
| 120 | Veterans Advocate Office | 184 | Solid Waste Authority |
| 121 | 9-1-1 Services Governing Board | 186 | Culebra Conservation and Development Authority |
| 122 | Department of the Family | 187 | Health Insurance Administration (ASES) |
| 123 | Families and Children Administration | 188 | PR and the Caribbean Cardiovascular Center Corp |
| 124 | Child Support Administration | 189 | Institute of Forensic Sciences |
| 126 | Vocational Rehabilitation Administration | 191 | Musical Arts and Stagecraft Corporation |
| 127 | Admin for Socioeconomic Develop of the Family | 192 | Fine Arts Center Corporation |
| 133 | Natural Resources Administration | 193 | Office of Government Ethics |
| 137 | Department of Correction and Rehabilitation | 195 | Economic Development Bank |
| 138 | Institutional Trust of the National Guard of Puerto Rico | 196 | Public Broadcasting Corporation |
| 139 | Parole Board | 198 | Farm Insurance Corporation |
| 141 | Telecommunication's Regulatory Board | 200 | Special Independent Prosecutor Panel |
| 152 | Elderly and Retired People Advocate Office | 208 | Contributions to Municipalities (CRIM)' |
| 153 | Advocacy for Persons with Disabilities of the CW of PR | 211 | AFICA |
| 155 | State Historic Preservation Office | 215 | Conservatory of Music |
| 161 | Infrastructure Financing Authority | 220 | Correctional Health |
| 162 | Public Buildings Authority (PBA) | | |
| 221 | Emergency Medical Services Corps | 288 | UPR Comprehensive Cancer Center |
| 231 | Health Advocate Office | 289 | Energy Commission |
| 235 | Housing Financing Authority (HFA) | 290 | Energy Affairs Office |
| 238 | Port of the Americas Authority | 293 | Center for Research, Education and Medical Services for Diabetes |
| 241 | Administration for Integral Development of Childhood | 294 | Bosque Modelo de Puerto Rico |
| 258 | Puerto Rico Trade and Export Company | 295 | Fiscal Agency and Financial Advisory Authority (AAFAF) |
| 264 | Martin Peña Canal ENLACE Project Corporation | 303 | Convention Center District Authority (PRCCDA) |
| 265 | Roosevelt Roads Naval Station Redevelopment | 329 | Socio-Economic Development Office |
| 268 | Institute of Statistics | 928 | Government Employee Retirement System (ERS) |
| 272 | Office of the Inspector General | 928 | Judicial Retirement System (JRS) |
| 273 | Permit Management Office | 929 | Teacher Retirement System (TRS) |
| 276 | Public-Private Partnership Authority | | Additional (Electronic) Lottery |
| 277 | Agricultural Enterprises Development Admin (ADEA) | | Maritime Shipping Authority |
| 278 | Puerto Rico Education Council | | Special Communities Perpetual Trust |
| 279 | Public Service Appeals Commission | | Traditional Lottery |
| 281 | Office of the Electoral Comptroller | | Unemployment Insurance Fund |
| 285 | Puerto Rico Integrated Transport Authority (PRITA) | | Corp for the Industries of Blind, Mentally Retarded, and Other Disabled People of Puerto Rico |
| 286 | Ponce Port Authority | | Puerto Rico Municipal Finance Corporation |

344

**EXHIBIT 161: LIST OF ENTITIES EXCLUDED FROM THE 2022 FISCAL PLAN**

| Entities issuing standalone Fiscal Plan | Entities excluded from Fiscal Plan |
|---|---|
| Development Bank for PR | Agency Fund (Special Deposit Fund) |
| Aqueduct and Sewer Authority | Commonwealth of Puerto Rico Regional Center Corporation |
| Municipal Revenues Collection Center (CRIM) | Public Finance Corporation (PFC) |
| PR Electric Power Authority | Puerto Rico Government Investment Trust Fund |
| PR Highways and Transportation Authority[1] | Puerto Rico Municipal Finance Agency |
| Puerto Rico Industrial Development Company | Puerto Rico Water Pollution Control Revolving Fund |
| University of Puerto Rico[2] | Puerto Rico Industrial Development Company |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | Safe Drinking Water Treatment Revolving Loan Fund |
| | The Children's Trust Fund |
| | Tourism Development Fund |

1 Commonwealth Fiscal Plan includes HTA general fund appropriations
2 Commonwealth Fiscal Plan includes UPR general fund appropriations

# Chapter 23. Macroeconomic projections

## 23.1   Economic and demographic trends

EXHIBIT 162: MACROECONOMIC TRENDS



Macroeconomic trajectory: GNP levels, $B Fiscal Years ending June 30th

HTA_CONF 00014769

## EXHIBIT 163: POPULATION TREND

Historical and projected population, millions of people



## EXHIBIT 164: PER CAPITA GNP TREND

Historical and projected GNP per capita, $ USD



HTA_CONF 00014770

# Chapter 24. Financial projections

## 24.1   Detailed financial projections

### EXHIBIT 165: FINANCIAL PROJECTIONS POST-MEASURES AND STRUCTURAL REFORMS

Financial projections post-measures and structural reforms, units as labeled

| Line item | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| **Population,** thousands | 3,279 | 3,241 | 3,208 | 3,177 | 3,152 |
| Population growth rate, % | -1.3% | -1.1% | -1.0% | -1.0% | -0.8% |
| Real growth rate[1], % | 5.2% | 0.6% | -1.6% | -1.0% | -0.5% |
| **Nominal GNP,** $M | 78,766 | 81,354 | 81,413 | 81,811 | 82,680 |
| Nominal GNP per capita, $ | 24,024 | 25,099 | 25,380 | 25,754 | 26,230 |
| Nominal GNP per capita growth, % | 10.7% | 4.5% | 1.1% | 1.5% | 1.8% |
| **Inflation,** % | 3.8% | 2.7% | 1.7% | 1.6% | 1.5% |
| **Disaster relief and infrastructure funding,** $M | 4,273 | 5,702 | 5,066 | 6,204 | 6,209 |
| **Revenues[2],** $M | 24,729 | 24,951 | 25,081 | 25,370 | 25,663 |
| Commonwealth revenues, $M | 17,099 | 17,156 | 17,126 | 17,258 | 17,384 |
| Federal transfers, $M | 7,630 | 7,796 | 7,954 | 8,112 | 8,279 |
| **Expenditures[2],** $M | (21,901) | (22,456) | (22,810) | (23,124) | (23,450) |
| Commonwealth-funded expenditures, $M | (14,276) | (14,665) | (14,860) | (15,016) | (15,176) |
| Federally funded expenditures, $M | (7,625) | (7,791) | (7,950) | (8,108) | (8,274) |
| **Surplus/(Deficit) Post Measures** $M | 2,827 | 2,495 | 2,270 | 2,246 | 2,213 |
| Surplus potentially not available[3], $M | 187 | 207 | 198 | 193 | 192 |
| **Unrestricted surplus, post-measures, pre-PoA terms, Pre-Debt Service[4]** $M | 2,640 | 2,288 | 2,072 | 2,053 | 2,021 |

1 Adjusted for income effects
2 Revenues and expenditures excluding gross up adjustments, revenues include GF and SRF but do not include Earned Income Tax Credit gross up
3 These surplus amounts are generated by Commonwealth corporations and the Commonwealth's ability to access such surplus amounts could be at risk without further legislative action
4 FY22 surplus is higher than FY23 onward due to a combination of Federal Medicaid funding, Act 152 revenues slowing from FY23 onward, and incremental investments starting in FY23

HTA_CONF 00014771

## EXHIBIT 166: REVENUE BREAKDOWN, POST-MEASURES

Revenue detail post-measures and structural reforms

| Fiscal Year Ending June 30, $M | FY2022 | FY2023 | FY2024 | FY2025 | FY2026 |
|---|---|---|---|---|---|
| **General Fund Revenues:** | | | | | |
| Individual Income Taxes[1] | 2,281 | 2,374 | 2,360 | 2,385 | 2,406 |
| Corporate Income Taxes | 2,196 | 2,226 | 2,194 | 2,238 | 2,260 |
| SUT | 2,452 | 2,540 | 2,518 | 2,519 | 2,530 |
| Act 154 | 1,631 | 1,447 | 1,199 | 1,199 | 1,199 |
| Non-Resident Withholdings | 440 | 369 | 369 | 370 | 372 |
| Alcoholic Beverages | 278 | 283 | 285 | 286 | 288 |
| Cigarettes | 106 | 108 | 109 | 111 | 112 |
| Motor Vehicles | 625 | 494 | 433 | 435 | 440 |
| Excises on Off-Shore Shipment Rum | 230 | 211 | 212 | 214 | 215 |
| Partnerships | 431 | 415 | 388 | 363 | 339 |
| Other excise taxes | 240 | 248 | 248 | 250 | 252 |
| Other General Fund Revenue | 416 | 430 | 431 | 433 | 437 |
| **Sub-total before other Tax Revenues** | 11,327 | 11,145 | 10,748 | 10,802 | 10,852 |
| Total GF portion of misc. tax streams | 573 | 600 | 599 | 602 | 605 |
| Total Conditionally Allocable Revenues (including CRIM) | 809 | 826 | 824 | 823 | 821 |
| Total Other Non-Tax Revenues | 0 | 2 | 19 | 19 | 19 |
| **Total General Fund Revenues** | 12,709 | 12,573 | 12,190 | 12,246 | 12,297 |
| **Special Revenue Fund:** | | | | | |
| SRF revenues - CW Agencies | 1,267 | 1,323 | 1,312 | 1,317 | 1,322 |
| SRF revenues - IFCUs | 1,685 | 1,781 | 2,118 | 2,163 | 2,207 |
| Enterprise Fund Revenues | 1,239 | 1,272 | 1,294 | 1,314 | 1,335 |
| **Total SRF Revenues** | 4,190 | 4,376 | 4,724 | 4,794 | 4,864 |
| **Federal Fund Revenues:** | | | | | |
| Central Government | 1,156 | 1,186 | 1,206 | 1,224 | 1,243 |
| IFCUs | 165 | 170 | 173 | 175 | 178 |
| Social Programs | 3,301 | 3,378 | 3,425 | 3,469 | 3,518 |
| Federal Fund Revenues (excl. Medicaid receipts) | 4,622 | 4,734 | 4,803 | 4,868 | 4,939 |
| Federal Transfers - Medicaid | 3,008 | 3,061 | 3,152 | 3,244 | 3,340 |
| **Total Federal Fund Revenues** | 7,630 | 7,796 | 7,954 | 8,112 | 8,279 |
| **Revenue Post measures, pre gross up** | 24,529 | 24,744 | 24,868 | 25,153 | 25,440 |
| Adjustments for revenue gross up | 727 | 728 | 728 | 728 | 728 |
| **Revenue Post measures, post gross up** | 25,256 | 25,473 | 25,597 | 25,880 | 26,169 |

1  Includes impact of EITC

HTA_CONF 00014772

## EXHIBIT 167: SUMMARY OF BASELINE EXPENDITURES AND MEASURES

Expense detail post-measures and structural reforms

| Fiscal Year Ending June 30, $M | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| **Expenses** | | | | | |
| **General Fund Expenditures:** | | | | | |
| Direct Payroll | (3,645) | (3,704) | (3,579) | (3,629) | (3,664) |
| Non-Personnel Operating Expense (excl. Capex) | (2,004) | (1,967) | (2,012) | (2,055) | (2,082) |
| Municipal, HTA and UPR appropriations | (990) | (1,170) | (1,142) | (1,152) | (1,176) |
| Pension Expenses | (2,307) | (2,285) | (2,283) | (2,277) | (2,272) |
| Disaster Recovery Cost Match | (11) | (11) | (11) | (50) | (72) |
| Restructuring / Title III Costs | (288) | (168) | (130) | (49) | (1) |
| Other GF Expenses | (471) | (155) | (155) | (155) | (133) |
| Total GF Expenses (excl. inter gov transfers) | (9,714) | (9,459) | (9,312) | (9,368) | (9,399) |
| Medicaid - commonwealth funded | (697) | (1,074) | (1,028) | (1,074) | (1,130) |
| Social Programs - commonwealth funded | (15) | (15) | (15) | (15) | (15) |
| Total GF Expenses (excl. inter gov transfers and incl. Medicaid and social programs) | (10,426) | (10,548) | (10,355) | (10,457) | (10,544) |
| **Special Revenue Fund Expenditures:** | | | | | |
| CW Agencies Direct Payroll | (704) | (747) | (755) | (763) | (770) |
| CW agencies Non-Personnel Operating Expenses (excl. Capex) | (1,684) | (1,710) | (1,710) | (1,725) | (1,744) |
| Medicaid - Special Revenue Fund | (392) | (449) | (783) | (819) | (848) |
| **Federal Fund Expenditures:** | | | | | |
| CW Agencies Direct Payroll | (783) | (800) | (809) | (818) | (828) |
| CW agencies Non-Personnel Operating Expenses (excl. Capex) | (965) | (990) | (1,006) | (1,021) | (1,038) |
| Medicaid - federally funded | (3,008) | (3,061) | (3,152) | (3,244) | (3,340) |
| Social Programs - federally funded | (2,870) | (2,940) | (2,983) | (3,024) | (3,068) |
| Total CW Funded Op. Exp.[1] | (20,831) | (21,245) | (21,553) | (21,872) | (22,180) |
| Expense Measures[2] | 858 | 745 | 725 | 760 | 770 |
| Adjustments for expenditure gross up | (727) | (728) | (728) | (728) | (728) |
| Total CW Funded Op. Exp. Post Measures excl. Loss of Medicaid Funding | (20,700) | (21,229) | (21,556) | (21,840) | (22,139) |
| Net Operating Surplus/(Deficit)[3] | 4,756 | 4,451 | 4,253 | 4,257 | 4,253 |
| **Capex and Other Expenses:** | | | | | |
| Maintenance Capex | (277) | (295) | (299) | (304) | (309) |
| Enterprise funds | (1,238) | (1,271) | (1,293) | (1,314) | (1,334) |
| Others[4] | (414) | (390) | (390) | (393) | (397) |
| Other Non-Recurring | | | | | |
| Total Capex and Other Expenses | (1,929) | (1,956) | (1,983) | (2,011) | (2,040) |
| Surplus post-measures[5] | 2,827 | 2,495 | 2,270 | 2,246 | 2,213 |
| Surplus potentially not available[6] | 187 | 207 | 198 | 193 | 192 |
| Unrestricted surplus, post-measures, pre-debt service and Pension Trust contributions | 2,640 | 2,288 | 2,072 | 2,053 | 2,021 |

1   Excludes Enterprise Funds, Capex, Other non-recurring, Cigarettes, Disbursements to public corporations, Payment of State Revolving Funds / Other Federal Funds Deposits at GDB
2   Includes EITC impact. Note that previous Exhibit captures EITC as a PIT revenue measure to show effective impact. Surplus calculations are adjusted to avoid double-counting
3   These figures reflect corrected amounts.  A previous version of the 2022 Fiscal Plan document contained incorrect figures
4   Cigarettes, Disbursements to public corporations, Payment of State Revolving Funds / Other Federal Funds Deposits at GDB
5   Includes capex and other expenses
6   These surplus amounts are generated by Commonwealth corporations and the Commonwealth's ability to access such surplus amounts could be at risk without further legislative action

HTA_CONF 00014773

## 24.2   Debt policy revenues

EXHIBIT 168: DEBT POLICY REVENUES

| Year | Adj. Revenue Post Measures (excl. federal transfers), $M | COFINA debt service, $M[1] | Debt policy revenues, $M | Year | Adj. Revenue Post Measures (excl. federal transfers), $M | COFINA debt service, $M[1] | Debt policy revenues, $M |
|------|------|------|------|------|------|------|------|
| FY22 | 17,099 | 466 | 17,565 | FY37 | 18,641 | 846 | 19,487 |
| FY23 | 17,156 | 485 | 17,640 | FY38 | 18,818 | 880 | 19,698 |
| FY24 | 17,126 | 504 | 17,631 | FY39 | 19,022 | 917 | 19,939 |
| FY25 | 17,258 | 525 | 17,782 | FY40 | 19,244 | 955 | 20,199 |
| FY26 | 17,384 | 546 | 17,930 | FY41 | 19,555 | 991 | 20,546 |
| FY27 | 17,699 | 568 | 18,267 | FY42 | 19,753 | 991 | 20,743 |
| FY28 | 17,875 | 591 | 18,466 | FY43 | 20,044 | 991 | 21,035 |
| FY29 | 17,965 | 615 | 18,580 | FY44 | 20,323 | 991 | 21,314 |
| FY30 | 18,052 | 640 | 18,692 | FY45 | 20,634 | 991 | 21,625 |
| FY31 | 18,179 | 666 | 18,844 | FY46 | 20,954 | 991 | 21,945 |
| FY32 | 18,243 | 693 | 18,936 | FY47 | 21,306 | 991 | 22,297 |
| FY33 | 18,357 | 721 | 19,077 | FY48 | 21,653 | 991 | 22,643 |
| FY34 | 18,458 | 750 | 19,208 | FY49 | 22,011 | 991 | 23,002 |
| FY35 | 18,562 | 780 | 19,342 | FY50 | 22,385 | 991 | 23,376 |
| FY36 | 18,526 | 812 | 19,338 | FY51 | 22,772 | 991 | 23,762 |

1  COFINA debt service figures based on May 2021 COFINA Certified Fiscal Plan.

# Chapter 25. Fiscal measures

## 25.1   Agency efficiencies

*Exhibit 169* details the payroll and non-payroll savings for each of the agency groupings. Agency groupings are as shown below in *Exhibit 170*.

HTA_CONF 00014774

## EXHIBIT 169: MEASURES SUMMARY IMPACT FOR ALL AGENCY GROUPINGS

Run-rate savings from agency efficiency measures[1], $K

|  | FY2022 | FY2023 | FY2024 | FY2025 | FY2026 |
|---|---|---|---|---|---|
| Agriculture | 30,310 | 31,092 | 31,632 | 32,124 | 32,620 |
| Automobile Accident Compensation Administration | 19,274 | 20,025 | 20,372 | 20,689 | 21,009 |
| Closures | 22,263 | 22,582 | 22,973 | 23,330 | 23,690 |
| Corrections | 105,364 | 109,677 | 111,580 | 113,315 | 115,066 |
| Courts and Legislature | 104,732 | 97,225 | 98,912 | 100,450 | 102,003 |
| Culture | 5,128 | 6,071 | 6,176 | 6,272 | 6,369 |
| Custody Acct. | 247,027 | 63,849 | 67,650 | 68,717 | 69,794 |
| Economic Development | 58,701 | 60,200 | 61,236 | 62,183 | 63,142 |
| Education | 501,882 | 557,910 | 567,592 | 576,415 | 585,325 |
| Environmental | 23,111 | 24,140 | 24,606 | 25,030 | 28,159 |
| Executive Office | 25,085 | 26,925 | 32,953 | 33,405 | 33,894 |
| Families & Children | 48,026 | 47,967 | 48,766 | 49,502 | 50,257 |
| Finance Commission | 4,205 | 4,363 | 4,439 | 4,508 | 4,578 |
| FOMB | 15,418 | 15,473 | 15,534 | 15,599 | 15,677 |
| Health | 101,280 | 110,407 | 112,325 | 114,073 | 115,838 |
| Housing | 34,557 | 36,911 | 37,551 | 38,135 | 38,724 |
| Independent Agencies | 32,765 | 34,821 | 35,424 | 35,974 | 36,529 |
| Institute of Statistics | 300 | 560 | 570 | 579 | 588 |
| Justice | 18,325 | 19,298 | 19,633 | 19,939 | 20,247 |
| Labor | 18,258 | 19,370 | 19,706 | 20,012 | 20,322 |
| Land | 4,026 | 4,167 | 4,239 | 4,305 | 4,371 |
| OCFO - Treasury | 93,370 | 96,745 | 98,407 | 99,921 | 101,450 |
| Ombudsman | 368 | 412 | 420 | 426 | 433 |
| Public Safety | 173,689 | 192,703 | 190,686 | 188,396 | 186,133 |
| Public Works | 40,893 | 55,765 | 56,733 | 57,615 | 58,505 |
| Retirement Services | 1,571 | 1,598 | 1,626 | 1,651 | 1,677 |
| State | 3,063 | 3,161 | 3,216 | 3,266 | 3,317 |
| State Insurance Fund Corporation | 78,562 | 81,377 | 82,789 | 84,076 | 85,376 |
| Transparency & Control Entities | 1,179 | 1,205 | 1,226 | 1,245 | 1,265 |
| Universities | 1,957 | 2,125 | 2,162 | 2,195 | 2,229 |
| Utilities Commission | 3,123 | 3,294 | 3,351 | 3,403 | 3,456 |
| Total run-rate savings from agency efficiency measures | 1,817,814 | 1,751,420 | 1,784,487 | 1,806,750 | 1,832,043 |

1  Excluding investments and other funding increases

HTA_CONF 00014775

## 25.2 Agency groupings and consolidation process

### EXHIBIT 170: AGENCY GROUPINGS

| Group | | |
|---|---|---|
| Agriculture | (1) Agricultural Enterprises Development Administration | (3) Farm Insurance Corporation |
| | (2) Department of Agriculture | |
| Courts and Legislature | (1) General Court of Justice (GCJ) | (2) Legislative Assembly (LA) |
| Culture | (1) Fine Arts Center Corporation | (3) Musical Arts and Stagecraft Corporation |
| | (2) Institute of Puerto Rican Culture | |
| Economic Development | (1) Authority for the Redevelopment of Roosevelt Roads Naval Station | (6) Permit Management Office |
| | (2) Department of Economic Development and Commerce | (7) Planning Board |
| | (3) Energy Affairs Office | (8) Puerto Rico Trade and Export Company |
| | (4) Industrial Development Company | (9) Regional Center Corporation of Commonwealth of PR |
| | (5) Industrial Tax Exemption Office | (10) Tourism Company |
| Environmental | (1) Department of Natural and Environmental Resources | (3) Natural Resources Administration |
| | (2) Environmental Quality Board | (4) Solid Waste Authority |
| Executive Office | (1) Federal Affairs Administration | (5) Office of Socioeconomic Development |
| | (2) Infrastructure Financing Authority | (6) Public Buildings Authority |
| | (3) Office of the Commissioner of Municipal Affairs | (7) Public-Private Partnership Authority |
| | (4) Office of the Governor | (8) State Historical Preservation Office |
| Finance Comm. | (1) Office of the Commissioner of Insurance | (2) Office of the Financial Institutions Commissioner |
| Health | (1) Center for Research, Education and Medical Services for Diabetes | (5) Medical Services Administration |
| | (2) Department of Health | (6) Mental Health and Addiction Services Administration |
| | (3) Health Insurance Administration | (7) Puerto Rico and Caribbean Cardiovascular Center Corporation |
| | (4) University of Puerto Rico Comprehensive Cancer Center[1] | |
| Justice | (1) Department of Justice | (2) Parole Board |
| Labor | (1) Department of Labor and Human Resources | (4) Public Service Appeals Commission |
| | (2) Investigation, Prosecution and Appeals Commission | (5) Vocational Rehabilitation Administration[1] |
| | (3) Labor Relations Board | |
| Land | (1) Land Administration | (2) Land Authority |
| | (3) Agricultural Development Innovation Fund | |
| Ombudsman | (1) Advocacy for Persons with Disabilities of the Commonwealth of Puerto Rico | (4) Veterans Advocate Office |
| | (2) Elderly and Retired People Advocate Office | (5) Women's Advocate Office |
| | (3) Health Advocate Office | |
| Public Works | (1) Department of Transportation and Public Works | (3) Ports Authority[1] |
| | (2) Integrated Transport Authority | (4) Traffic Safety Commission |
| Families | (1) Administration for Integral Development of Childhood | (4) Department of the Family |
| | (2) Administration for Socioeconomic Development of the Family | (5) Families and Children Administration |
| | (3) Child Support Administration | |
| Housing[2] | (1) Department of Housing | (3) Public Housing Administration |
| | (2) Housing Financing Authority | |
| State | (1) Department of State | (2) Puerto Rico Education Council |
| Transparency & Control Entities | (1) Office of Government Ethics | (2) Office of the Comptroller |
| Department of Public Safety | (1) Puerto Rico Police Department (PRPD) | (5) 9-1-1 Services Governing Board |
| | (2) Firefighters Corps | (6) Special Investigation Unit |
| | (3) Emergency Medical Services Corps | (7) Department of Public Safety |
| | (4) Emergency Management and Disaster Administration Agency | |
| Treasury / OCFO | (1) Department of the Treasury | (4) General Services Administration |
| | (2) Puerto Rico Office of Human Resources Management and Transformation | (5) Fiscal Agency and Financial Advisory Authority[1] |
| | (3) Office of Management and Budget | |
| Universities | (1) Conservatory of Music[1] | (2) School of Plastic Arts[1] |
| Utilities Commission | (1) Puerto Rico Energy Board | (4) Independent Bureau of Consumer Protection |
| | (2) Public Services Commission | (5) Telecommunications Regulatory Board |
| | (3) Public Service Regulatory Board | |
| Corrections | (1) Department of Correction and Rehabilitation | (2) Correctional Health |
| Closures | (1) Model Forest of Puerto Rico | (2) Culebra Conservation and Development Authority |
| Independent Agencies | (1) Civilian's Advocate Office (Ombudsman) | (15) Office of the Inspector General |
| | (2) Civil Rights Commission | (16) Port of Ponce Authority |
| | (3) State Elections Commission | (17) Port of the Americas |
| | (4) Company for the Integral Development of Cantera's Peninsula | (18) Public Broadcasting Corporation |
| | (5) Convention Center District Authority | (19) Puerto Rico Innovation and Technology Services |
| | (6) Cooperative Development Commission | (20) Puerto Rico National Guard |
| | (7) Department of Consumer Affairs | (21) Special Independent Prosecutor Panel |
| | (8) Department of Sports and Recreation | (22) Teacher's Retirement System |
| | (9) Gaming Commission | (23) Institute of Statistics |
| | (10) Industrial Commission | (24) Economic Development Bank |
| | (11) Martin Peña Canal ENLACE Project Corporation | (25) Retirement Board of the Government of Puerto Rico |
| | (12) Institutional Trust of the National Guard of Puerto Rico | (26) Department of Education |
| | (13) Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | (27) Agricultural Innovation Development Fund |
| | | (28) Institute of Forensic Sciences |
| | (14) Office of the Electoral Comptroller | |
| Other | (1) Automobile Accident Compensation Authority | (3) State Insurance Fund Corporation |
| | (2) Financial Oversight and Management Board | |

1 Current draft of agency consolidation plan may leave this agency as a standalone entity | 2 Federal funding requirements may limit consolidation of Housing agencies

HTA_CONF 00014776

EXHIBIT 171: AGENCY CONSOLIDATION PROGRESS DETAILS

| Grouping | Agencies | Consolidation status | Legal provision (if applicable) | Remarks and key FY2021 priorities (indicated by agency) |
|---|---|---|---|---|
| State | Department of State, Puerto Rico Education Council | ● Completed | Law 212-2018 | • Consolidation of shared services completed within 90 days; savings higher than USD 400 thousand realized in rental contract cancellation<br>• One single Finance reporting and HR system<br>• Staffing remains constrained |
| Utilities Commission | PR Energy Board (PREB), Public Service Commission (PSC), Independent Bureau of Consumer Protection, Telecommunications Regulatory Board | ● Completed | Law 211-2018 | • Consolidation of shared services completed under Public Services Commission (JRSP)<br>• All administrative (e.g., HR, Legal, Finance) supervision consolidated under one director; IT yet to consolidate under central office location and implement platform integration |
| Environ-mental | Department of Natural and Environmental Resources, Environmental Quality Board, Natural Resources Administration, Solid Waste Authority | ● Completed | Law 171-2018 | • Office locations consolidated in the same building<br>• Shared services and back-office systems consolidated across agencies |
| Agriculture | Agricultural Enterprises Development Administration (ADEA), Department of Agriculture (DA), Farm Insurance Corporation (CSA) | ● Completed | MOU signed (expiration December 31, 2020) | • Consolidation of administrative areas (HR, Legal, Finance, IT) for ADEA and DA is complete with shared back-office (with back-office personnel efficiencies)<br>• CSA continues to maintain operational independence (legal limitations on being an insurance company) but is in the process to merge IT systems with ADEA |
| Department of Public Safety | Puerto Rico Police Bureau (PRPB), Firefighters Corps, Emergency Medical Services Corps, Emergency Management and Disaster Administration Agency, 9-1-1 services Governing Board, Institute of Forensic Sciences, Special Investigations Unit | ● Completed | Law 20-2017 | • Processes unified for all functions across bureaus; all back-office functions consolidated in shared services structure.<br>• Direct reporting and central office established across functional departments; currently staffing vacancies in DPS and other Bureaus.<br>• FY22 priority to recruit civilian staff for administrative roles in and reduce overtime expenses in PRPB and implement KRONOS across all bureaus.<br>• Forensic left grouping as of 12/23/2020 |

HTA_CONF 00014777

| Category | Agencies | Status | Legal Provision | Notes |
|---|---|---|---|---|
| Economic Development | Authority of the Redevelopment of the Roosevelt Roads Naval Station (RR), Department of Economic Development and Commerce, Energy Affairs Office, Industrial Development Company (PRIDCO), Industrial Tax Exemption Office, Permit Management Office, Planning Board, PR Trade and Export Company, Regional Center Corporation of Commonwealth of PR (CRELA), PR Tourism Company (PRTC) | Delayed | Law 141-2018 establishes all agencies to be reorganized into DDEC except ascribed agencies (RR, PRIDCO and Planning Board) | • Consolidation of accounting books (except PRTC, PRIDCO, CRELA and RR) • Cross-training of employees across agencies • PRIDCO building being remodeled to transfer all front-office personnel |
| Finance Commission | Office of the Commissioner of Insurance (OIC), Office of the Financial Institutions | No progress | Legislation repealed; MOU certified | • Third-party analysis of shared services consolidation is yet incomplete • OCI to identify Commissioner to re-initiate consolidation effort. |
| Health | Center for Research Education and Medical Services for Diabetes, Comprehensive Cancer Center, Department of Health, Health Insurance Administration, Medical Services Administration, Mental Health and Addiction Services Administration, Puerto Rico and Caribbean Cardiovascular Center Corporation | No progress | Legislation for ASES/DOH Consolidation was not recommended in the Legislature | • Plans for consolidation of all health agencies have not been drafted nor presented to the Oversight Board • No back-office consolidations achieved between agencies in the grouping |
| Labor | Department of Labor and Human Resources, Investigation, Prosecution and Appeals Commission, Labor Relations Board, Public Service Appeals Commission, Vocational Rehabilitation Administration | No progress | MOU not signed | • No progress reported on consolidation of shared services |
| Family | Administration for Integral Development of Childhood, Administration for Socioeconomic Development of the Family, Child Support Administration, Department of Family, Families and Children Administration | Delayed | Legislation proposed but not presented | • MOU pending for physical space consolidation • Backoffice consolidation has been achieved partially between some sub-groups of agencies but inconsistently across different functions (e.g., HR, Procurement) |
| Treasury/ OCFO | Department of the Treasury, Puerto Rico Office of Human Resources Management and Transformation (OATRH), Office of Management and Budget (OMB), General Services Administration (GSA), Fiscal Agency and Financial Advisory Authority (AAFAF) | No progress | EO 2021-018, legislation not presented | • The Government has issued an Executive Order creating the CFO position in collaboration with other financial agencies • There has not been concrete traction to enact legislation |
| Executive Office | Federal Affairs Administration, Infrastructure Financing Authority, Office of the Commissioner of Municipal Affairs, Office of the Governor, Office of Socioeconomic Development, Public Buildings Authority, Public-Private Partnership Authority, State Historical Preservation Office | No progress | No legal provision | • Government has indicated no willingness to merge agencies |
| Culture | Fine Arts Center Corporation, Institute of Puerto Rican Culture, Musical Arts and Stagecraft Corporation | No progress | MOU signed (expiration June 30, 2023) | • Only consulting services shared as of now • No progress (or future plans) reported on unification of functions or offices |
| Public Works | Department of Transportation and Public Works (DTPW), Integrated Transport Authority (ITA), Ports Authority, Traffic Safety Commission (TSC) | No progress | Legislation repealed | • No progress or future implementation plans reported |
| Housing | Department of Housing, Housing Financing Authority, Public Housing Administration | No progress | No law or MOU signed | • All agencies currently operating independently; no progress or future implementation plans reported |
| Universities | Conservatory of Music, School of Plastic Arts | No progress | Legislation proposed but not presented | • Government letter to Oversight Board claimed lack of inter-agency cooperation |
| Justice | Department of Justice, Parole Board | No progress | No detail provided on legal provision or MOU | • No progress or future implementation plans reported; Parole board still under DCR |
| Land | Land Administration, Land Authority | No progress | No law or MOU signed | • Both agencies currently operating independently; no progress or future implementation plans reported |
| Ombudsman | Advocacy for Persons with Disability, Elderly and Retired People Advocate Office, Health Advocate Office, Veterans Advocate Office, Women Advocate Office | No progress | Legislation repealed; MOU not signed | • No progress or future implementation plans reported |

354

HTA_CONF 00014778

## 25.3   Agency T&A implementation timeline

### EXHIBIT 172: AGENCY T&A IMPLEMENTATION TIMELINE

| Grouping | Agency Number | Agency Name | Completion Date |
|---|---|---|---|
| Families & Children | 122 | Secretariat of the Department of the Family | May 2021 |
| Families & Children | 123 | Family and Children Administration | May 2021 |
| Families & Children | 124 | Child Support Administration | May 2021 |
| Families & Children | 127 | Administration for Socioeconomic Development of the Family | May 2021 |
| Families & Children | 241 | Administration for Integral Development of Childhood | May 2021 |
| Health | 90 | Medical Services Administration of Puerto Rico | May 2021 |
| Justice | 38 | Puerto Rico Department of Justice | May 2021 |
| Labor | 67 | Puerto Rico Department of Labor and Human Resources | May 2021 |
| Department of Public Safety | 40 | Puerto Rico Police Bureau | November 2022 |
| Environmental | 50 | Department of Natural and Environmental Resources | November 2022 |
| Executive Office | 162 | Public Building Authority | November 2022 |
| Health | 95 | Mental Health and Drug Addiction Services Administration | November 2022 |
| Public Works | 49 | Department of Transportation and Public Works | November 2022 |
| Public Works | 285 | Puerto Rico Integrated Transit Authority | November 2022 |
| Agriculture | 277 | Agricultural Enterprises Development Administration | May 2023 |
| Department of Public Safety | 45 | Department of Public Safety | May 2023 |
| Economic Development | 18 | Puerto Rico Planning Board | May 2023 |
| Economic Development | 119 | Department of Economic Development & Commerce | May 2023 |
| Health | 188 | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | May 2023 |
| Health | 288 | University of Puerto Rico Comprehensive Cancer Center | May 2023 |
| Housing | 78 | Department of Housing | May 2023 |
| Housing | 106 | Public Housing Administration | May 2023 |
| Independent Agencies | 28 | State Elections Commission | May 2023 |
| Independent Agencies | 87 | Department of Recreation and Sports | May 2023 |
| Independent Agencies | 312 | Retirement Board of the Government of Puerto Rico | May 2023 |
| Labor | 126 | Vocational Rehabilitation Administration | May 2023 |
| Other | 79 | Automobile Accidents Compensation Administration | May 2023 |
| Public Works | 168 | Puerto Rico Ports Authority | May 2023 |
| Universities | 215 | Puerto Rico Conservatory of Music Corporation | May 2023 |
| Agriculture | 55 | Puerto Rico Department of Agriculture | November 2023 |
| Culture | 82 | Institute of Puerto Rican Culture | November 2023 |
| Economic Development | 180 | Puerto Rico Tourism Company | November 2023 |
| Executive Office | 15 | Office of the Governor | November 2023 |
| Independent Agencies | 43 | Puerto Rico National Guard | November 2023 |
| Independent Agencies | 69 | Puerto Rico Department of Consumer Affairs | November 2023 |
| Independent Agencies | 105 | Industrial Commission | November 2023 |
| Independent Agencies | 272 | Office of the Inspector General | November 2023 |
| Independent Agencies | 311 | Puerto Rico Gaming Commission | November 2023 |
| Ombudsman | 152 | Elderly and Retired People Advocate Office | November 2023 |
| State | 23 | Puerto Rico Department of State | November 2023 |
| Transparency & Control Entities | 193 | Office of Government Ethics | November 2023 |
| Treasury/Office of the Chief Financial Officer | 16 | Office of Management and Budget | November 2023 |
| Utilities Commission | 298 | Public Service Regulatory Board | November 2023 |
| Agriculture | 198 | Agricultural Insurance Corporation | May 2024 |
| Culture | 191 | Musical Arts Corporation | May 2024 |
| Culture | 192 | Fine Arts Center Corporation | May 2024 |
| Economic Development | 265 | Redevelopment Authority of Roosevelt Roads | May 2024 |
| Executive Office | 29 | Puerto Rico Federal Affairs Administration | May 2024 |
| Executive Office | 155 | State Historic Preservation Office of Puerto Rico | May 2024 |
| Executive Office | 161 | Puerto Rico Infrastructure Financing Authority | May 2024 |
| Executive Office | 278 | Puerto Rico Public Private Partnership Authority | May 2024 |
| Executive Office | 329 | Office of Socioeconomic Development | May 2024 |
| Finance Commission | 22 | Office of The Commissioner of Insurance | May 2024 |
| Finance Commission | 75 | Office of the Financial Institutions Commissioner | May 2024 |
| Health | 187 | Puerto Rico Health Insurance Administration | May 2024 |
| Health | 293 | Center for Diabetes | May 2024 |
| Housing | 235 | Housing Finance Authority | May 2024 |
| Independent Agencies | 62 | Cooperative Development Commission of Puerto Rico | May 2024 |
| Independent Agencies | 167 | Integral Development of the "Península de Cantera" | May 2024 |
| Independent Agencies | 196 | Puerto Rico Public Broadcasting Corporation | May 2024 |
| Independent Agencies | 200 | Special Independent Prosecutor's Panel | May 2024 |
| Independent Agencies | 238 | Ponce Authority (Authority Of The Port Of The Americas) | May 2024 |
| Independent Agencies | 264 | Corporation for the "Caño Martin Peña" Enlace Project | May 2024 |
| Independent Agencies | 268 | Puerto Rico Institute of Statistics | May 2024 |
| Independent Agencies | 271 | Puerto Rico Innovation and Technology Service | May 2024 |
| Independent Agencies | 281 | Office of the Election Comptroller | May 2024 |
| Independent Agencies | 286 | Authority of the Port of Ponce | May 2024 |
| Independent Agencies | 303 | Convention Center of District Authority | May 2024 |
| Justice | 139 | Parole Board | May 2024 |
| Labor | 34 | Commission of Investigation, Processing and Appeals | May 2024 |
| Labor | 68 | Puerto Rico Labor Relations Board | May 2024 |
| Labor | 236 | Comprehensive Fund for Agricultural Development | May 2024 |
| Labor | 279 | Public Service Appeals Commission | May 2024 |
| Land | 165 | Land Authority | May 2024 |
| Land | 177 | Land Authority of Puerto Rico | May 2024 |
| Ombudsman | 96 | Office of the Women's Advocate | May 2024 |
| Ombudsman | 120 | Veteran's Advocate Office of Puerto Rico | May 2024 |
| Ombudsman | 153 | Office for People with Disabilities | May 2024 |
| Ombudsman | 231 | Office for the Patient's Advocate | May 2024 |
| Public Works | 11 | Puerto Rico Traffic Safety Commission | May 2024 |
| Treasury/Office of the Chief Financial Officer | 30 | Human Resources Management & Transformation | May 2024 |
| Treasury/Office of the Chief Financial Officer | 31 | General Services Administration | May 2024 |
| Treasury/Office of the Chief Financial Officer | 295 | Fiscal Agency & Financial Advisory Authority | May 2024 |
| Universities | 109 | Puerto Rico School of Plastic Arts | May 2024 |

HTA_CONF 00014779